# Exhibit 10

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND EMPLOYEE RETENTION ASSETS LLC | § § § § | |
| *Plaintiff,* | § § | Civil Action No. 3:24–cv–498 |
| v. | § § § | |
| JAMES DONDERO, MARK OKADA, MARK KATZ, MICHAEL HURST, SHON BROWN, SCOTT ELLINGTON, ISAAC LEVENTON, ERIC GIRARD, JOHN HONIS, TED DAMERIS, RAYMOND JOSEPH DOUGHERTY, AMIT WALIA, PATRICK BOYCE, LANE BRITAIN, FRANK WATERHOUSE, BRIAN COLLINS, HUNTON ANDREWS KURTH LLP, ABRAMS & BAYLISS LLP, DLA PIPER LLP, NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; JOHN HONIS, AS TRUSTEE OF HUNTER MOUNTAIN INVESTMENT TRUST; LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2 | § § § § § § § § § § § § § § § § § § § § § § § § § § § | |
| *Defendants.* | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Plaintiff Highland Employee Retention Assets LLC ("PLAINTIFF" or

the "Highland Employee Vessel") complaining of James Dondero ("Dondero"), Mark Okada

("Okada"), Marc Katz ("Katz"),  Michael Hurst ("Hurst"), Shon Brown ("Brown"), Scott Ellington ("Ellington"), Isaac Leventon ("Leventon"), Eric Girard ("Girard"),  John Honis ("Honis"), Ted Dameris ("Dameris"), Raymond Joseph Dougherty ("Dougherty"), Amit Walia ("Walia"), Patrick Boyce ("Boyce"), Lane Britain ("Britain"), Frank Waterhouse ("Waterhouse"), Brian Collins ("Collins"), Hunton Andrews Kurth LLP ("Hunton Andrews Kurth"),  Abrams & Bayliss LLP, ("Abrams & Bayliss") DLA Piper, LLP ("DLA Piper") Nancy Dondero, As Trustee Of Dugaboy Investment Trust "Dugaboy Trust"); Grant James Scott III, As Trustee Of Get Good Trust ("Get Good Trust");  John Honis, As Trustee Of Hunter Mountain Investment Trust ("Hunter Mountain Trust"); Lawrence Tonomura As Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Exempt Trust #1"); Lawrence Tonomura as Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Exempt Trust #2") and referred to collectively as Defendants and for cause of action would respectfully show the Court as follows:

## I.
## PARTIES

1.      Plaintiff Highland Employee Retention Assets, LLC ("Highland Employee Vessel") is a Delaware limited liability company with its principal place of business in Dallas, Texas.

2.      Defendant Dondero is an individual who resides in Dallas County Texas and may be served with process either at his place of residence at 3807 Miramar Ave, Dallas, TX 75205 and/or where he regularly conducts business at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

3.      Defendant Okada is an individual who resides in Dallas County Texas and may be served with process either at his place of residence at 9008 Briarwood Lane, Dallas, Texas, 75209 and/or where he regularly conducts business at 2101 Cedar Springs Rd Suite 1250, Dallas, Texas 75201.

4.     Defendant Katz is an individual who resides in Dallas County Texas and may be served with process either at his place of residence at 10244 Epping Lane, Dallas, Texas, 75229 and/or where he regularly conducts business at 1900 N Pearl St Suite 2200, Dallas, TX 75201.

5.     Defendant Hurst is an individual who resides in Dallas County Texas and may be served with process where he regularly conducts business at 2100 Ross Ave., Suite 2700, Dallas, Texas 75201.

6.     Defendant Brown is an individual who resides in Dallas County Texas and may be served with process either at where he resides in 5840 Colhurst St, 752305, Dallas Texas, and/or where he regularly conducts business at 2200 Ross Avenue, Suite 2200, Dallas, TX 75201

7.     Defendant Ellington is an individual who resides in Dallas County Texas and may be served with process either at where he resides at 3825 Potomac Ave, Dallas, Texas 75205 and/or where he regularly conducts business at 2101 Cedar Springs Road, Suite 1200, Dallas, Texas 75201.

8.     Defendant Leventon is an individual who resides in Dallas County Texas and may be served with process either at where he resides at 409 Pleasant Valley Ln, Richardson, Texas, 75080 and/or where he regularly conducts business at 2101 Cedar Springs Road Ste 1200 Dallas Texas 75201.

9.     Defendant Girard is an individual who resides in Tarrant County Texas and may be served with process either at where he resides at 312 Polo Trail, Colleyville, Texas76034 and/or where he regularly conducts business at 12222 Merit Dr, Dallas, Texas 75251.

10.     Defendant Honis is an in individual who resides in Florida and may be served with process either where he resides at 2250 Seaside St, Vero Beach, Florida 32963 and/or regularly conducts business at 42 Regatta View Dr, Saratoga Springs, New York 12866-8307, and/or at Trust 87 Railroad Place – Suite 403 Saratoga Springs, New York, 12866.

11.      Defendant Dameris is an individual who resides in Dallas County Texas and may be served with process where he resides at 2215 Cedar Springs Road #1702, Dallas, Texas, 75201.

12.      Defendant Dougherty is an individual who resides in Dallas County Texas and may be served with process where he resides at 316 W. Parkway, Ada, Oklahoma, 74820.

13.      Defendant Walia is an individual who resides in Dallas County Texas and may be served with process where he resides at 6716 Woodland Drive, Dallas, Texas, 75225.

14.      Defendant Boyce is an individual who resides in Montgomery County Texas and may be served with process where he resides at 9651 Crestwater Circle, Montgomery, Texas, 77354.

15.      Defendant Britain is an individual who resides in Dallas County Texas and may be served with process where he resides at 5721 Farquhar Lane, Dallas, Texas, 75209.

16.      Defendant Waterhouse is an individual who resides in Collin County Texas and may be served with process either where he resides at 2604 Dublin Park Drive, Parker, Texas 75094 and/or where he regularly conducts business at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

17.      Defendant Collins is an individual who regularly conducts business at 8343 Douglas Ave #400, Dallas, TX 75225

18.      Defendant Hunton Andrews Kurth LLP may be served with process by serving Jarrett Hale and/or Alexander G. McGeoch at 1445 Ross Avenue, Suite 3700, Dallas, Texas 75202.

19.      Defendant Abrams & Bayliss LLP is a partnership established under the laws of Delaware and regularly conducts business at 20 Montchanin Road, Suite 200, Wilmington, Delaware 19807.

20.     Defendant DLA Piper LLP is a partnership established under the laws of Maryland and may be served with process by serving CSC-Lawyers Incorporating Service Company 7 St. Paul Street Ste 820 Baltimore MD 21202.

21.     Defendant Honis is named in his capacity as Trustee of Hunter Mountain Investment Trust ("Hunter Mountain") is a statutory trust established under the laws of the state of Delaware and can be served at c/o E. P. Keiffer at Rochelle McCullough LLP, 325 N. Saint Paul St., Ste. 4500, Dallas, Texas 75201.

22.     Defendant Nancy Dondero as Trustee of Dugaboy Investment Trust ("Dugaboy Trust") is a statutory trust established under the laws of the state of Delaware and can be served at c/o E. P. Keiffer at Rochelle McCullough LLP, 325 N. Saint Paul St., Ste. 4500, Number Street, Dallas, Texas 75201 or where it regularly conducts its business at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

23.     Defendant Lawrence Tonomura as Trustee of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Trust #1") that was created under the laws of the state of Texas. Okada controls Okada Trust #1 and can be served with process at 2101 Cedar Springs Rd., Suite 1250, Dallas, Texas 75201.

24.     Defendant Lawrence Tonomura as Trustee of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Trust #2") that was created under the laws of the state of Texas. and can be served by process at 2101 Cedar Springs Rd., Suite 1250, Dallas, Texas 75201.

25.     Defendant Grant James Scott III as Trustee of the Get Good Trust that was created under the laws of the state of Texas. and can be served with process where it regularly conducts its business at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

## II.
## JURISDICTION

26.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because it

involves a federal question.

**III**.
**VENUE**

27.    Venue for this action is predicated upon 28 U.S.C. §1391(a)(2) and 28 U.S.C. §1391(b)(1) and (2).

**IV.**
**FACTUAL BACKGROUND**

**A. The Tortured History of Dondero, Okada, Ellington, and The Defendant Minions**

28.    This is yet another example of an all-too familiar pattern where Dondero, Okada and Ellington would strip the assets of entities they controlled to ensure that an aggrieved party could not collect on their hard-fought judgments or their rights of ownership. When challenged, they would execute their well-honed tactics to lie, deny, conceal, and postpone while attempting to exhaust their adversaries of funds as they ran out the clock. In this case, Highland Employee Vessel brings this action to recover tens of millions of dollars in damages that it suffered at the hands of Dondero, Okada, Ellington, and their enablers, acting in concert with other entities that they owned and/or controlled (collectively, the "Dondero/Okada/Ellington Entities"), and with the aid of its own officers, directors and attorneys who disregarded their duties to Highland Employee Vessel in favor of their own self-interests.

29.    Dondero and Okada co-founded Highland Capital Management, LP ("Highland Capital") in 1993 and with their trusts were its primary owners until it emerged from bankruptcy in August 2021. Highland Capital is an investment advisor registered with the SEC under the Investment Company Act 1940 that managed billions of dollars of assets through its structure of approximately 2,000 separate business entities including those of Highland Employee Vessel. Dondero was President, and Chief Executive Officer of Highland Capital until his removal in 2020. Okada was Chief Investment Officer and Executive Vice President until Highland Capital

filed for bankruptcy in late 2019. Ellington served in various roles as a partner and Highland Capital's Chief Legal Officer and General Counsel from 2010 until he was fired for cause in January 2021 for acting in a manner adverse to Highland Capital's interest. Leventon served as Assistant General Counsel at Highland from 2009 until he was fired for cause in January 2021 for acting in a manner adverse to Highland Capital's interest. Thomas Surgent ("Surgent") served as Chief Compliance Officer and Deputy General Counsel of Highland Capital from 2011 through the Highland Capital bankruptcy. Girard served as internal counsel at Highland Capital from 2011 until he was terminated in 2017. Hurst was a partner at his former firm Gruber Hurst Johansen Hail Shank LLP and served as outside counsel to Highland Employee Vessel.  Brown was a partner at her former firm Gruber Hurst Johansen Hail Shank LLP and served as outside counsel to Highland Employee Vessel. Katz was a partner at his former firm Hunton Andrews Kurth and is now at DLA Piper where he served as outside counsel to Highland Employee Vessel and Highland Capital.  Jeff Abrams ("Abrams"), Matt Miller ("Miller") and Stephen Hough ("Hough") were attorneys at Abrams & Bayliss and served as outside counsel to Highland Employee Vessel. Dameris was a board member of Highland Employee Vessel and served as a Managing Director at Highland Capital. Boyce was a board member of Highland Employee Vessel and was a Partner at Highland Capital. Lane Britain was a board member of Highland Employee Vessel and was a Partner at Highland Capital. Honis was a board member of Highland Employee Vessel, Partner of Highland Capital, and trustee to Hunter Mountain. Walia was a board member of Highland Employee Vessel and was a Partner at Highland Capital. Dougherty was a board member of Highland Employee Vessel and was a Partner at Highland Capital. Collins was the Head of Human Resources at Highland Capital and was the primary agent for Highland Employee Vessel's investor communications, document custody, governance solicitation, and Highland Capital's offer solicitation. Waterhouse was the Chief Financial Officer at Highland

Capital. Klos was the head accountant for Highland Employee Vessel. Dugaboy, Get Good, the Okada Trusts and Hunter Mountain are trusts established by Dondero and Okada for themselves and their family members that have owned or controlled Highland Capital through the relevant period.

30.     Dondero and Okada, with Ellington, Leventon, Girard, Thomas Surgent ("Surgent"), Hurst and Katz at their side, for years-controlled Highland Capital and its byzantine web of funds and other entities under its management with unilateral and unfettered discretion. Dondero, Okada, Ellington and the individual Defendants ensured the companies they controlled routinely failed to observe corporate formalities with respect to their personnel, governance, internal systems, and considerable assets.

31.     In a dubious tax scheme, ownership of Highland Capital transferred to Hunter Mountain on or around December 17, 2015, from its then-existing limited partners (i.e., Dondero, Okada, Ellington, and entities that they controlled). Through a complex series of transactions that occurred on December 21, 2015, and December 24, 2015, Dondero and Okada caused Hunter Mountain to become the owner-in name of 99.5% of the economic interests of Highland Capital. Meanwhile, Dondero and Okada caused Hunter Mountain to issue a series of notes and cash, such that Dondero, Okada, and certain entities that they controlled (including Dugaboy, Okada Trust #1, and Okada Trust #2) continued to receive the economic benefit of limited partnership distributions made by Highland Capital to Hunter Mountain even after they had purportedly sold their limited partnership interests to Hunter Mountain.

32.     Highland Employee Vessel has never had employees and at all times depended on its board of directors, counsel, manager, and its investment advisor to conduct its affairs. Highland employees including Dondero, Okada, Ellington, Leventon, Girard, Collins, Jason Goldsmith, Hellen Kim, Waterhouse, and David Klos performed investment management, legal

and accounting services to Highland Employee Vessel under shared services and "blanket" agreements.

33.     In September 2008, Highland Capital took a dramatic turn for the worse because of mismanagement and self-dealing by Dondero and Okada during the financial crisis. Highland Capital defaulted on its credit facility prompting its lenders to demand a forensic accounting review of missing cash and assets. During the audit, it was discovered that Dondero and Okada had siphoned tens of millions of dollars out of the Highland Capital accounts while leaving creditors and employees with insufficient resources to collect what was owed to them. A multitude of lawsuits were filed over a ten-year period against Dondero, Okada, Ellington, Leventon, and their affiliates as they became embroiled in litigation for fraud, breach of fiduciary duty, breach of good faith and fair dealing, willful misconduct, fraudulent transfers, money laundering, and wire fraud among others that resulted in over one billion of damage awards.

34.     The lenders initially demanded that the cash be returned immediately to which Dondero threatened, "Highland will fail before I fail"! Following months of difficult negotiations, the lenders agreed to an extension of the credit facility in exchange for strict repayment terms and a security interest in over $125 million of Highland Capital's remaining assets. In addition, the lenders agreed to allow for the creation of a vessel to set aside assets for the purpose of retaining and incentivizing employees (the "Highland Employee Vessel"). Importantly, the assets were transferred to the Highland Employee Vessel in exchange for deferred compensation assets that were terminated as a result of the security interests taken by the lenders. Dondero, Okada and their affiliates were intentionally forbidden from participating as preferred unit holders in the Highland Employee Vessel.

35.     Okada resented the cost of the Highland Employee Vessel and often demonstrated his contempt for employees in general. Indeed, when he wasn't lambasting employees: hispanics

as "spics" and "wetbacks"; Jews as "Jesus Killers", and Caucasians as "dumb white people that all look the same", he would flaunt his belief that he could "Do whatever I want because I'm in a protected class" while bragging about the Japanese surprise attack on Pearl Harbor, exposing himself in the nude at company events, groping women in the office through simulated intercourse, and physically assaulting employees as his alter ego "Thor".

36.    Patrick Daugherty ("Daugherty") was a partner, officer, director, Head of Private Equity, and Co-Head of Research for Highland Capital and certain of its affiliates from 1998 until 2011. Daugherty became a holder of Series A Preferred Units of Highland Employee Vessel on October 26, 2009. He was awarded 1,571.86 preferred units and was the largest holder of the lender approved Highland Employee Vessel. The number of his units and percentage ownership of Highland Employee Vessel increased to 1,909.69 and approximately 19.09% as other employees resigned from Highland Capital prior to their interests vesting in 2011. Daugherty and his affiliates now own and control 100% of Highland Employee Vessel pursuant to the terms of a bankruptcy court approved settlement on March 1, 2022.

37.    Daugherty resigned from Highland Capital on September 28, 2011, because he refused to participate in conduct at Highland Capital that would later result in over a billion dollars in damage awards to investors and creditors for breach of fiduciary duty, willful misconduct, and fraud among other causes. Indeed, Dondero, Okada, Ellington, Leventon, Katz, and Hurst would later pursue legal actions on behalf of Highland Capital against Daugherty to whitewash willful misconduct and breach of fiduciary duties against UBS, Josh Terry (a former employee), the Credit Strategies fund investors and the Crusader Fund investors (including Dallas Police and Fire, Baylor University, Army Airforce Exchange, Ontario Teachers, and many others).  At the time of his resignation, Daugherty was a director of Highland Employee Vessel. After his resignation, Defendants began a campaign to inflict economic pain on him by stripping

Highland Employee Vessel of its assets.

38. On February 16, 2012, Highland Employee Vessel's board members, Boyce, Britain, Dameris, Dougherty (no relation to Daugherty), Honis, and Walia removed Daugherty as a director. Immediately thereafter, the newly composed board executed a Second Amended and Restated Agreement (the "2012 Amendment") prepared by Highland Capital's Chief Compliance Officer and Deputy General Counsel, Thomas Surgent (Surgent"). The 2012 Amendment purported to impose a punitive procedure to deplete the value of a holder who litigated any action "related to" Highland Employee Vessel, Highland Capital, and its officers and directors, escrow the holder's interest, and, in a type of reverse-indemnification, impose the litigation costs of Highland Employee Vessel and any deemed "diminution in value" cost to the litigant whether they lost or won the litigation (the "Lose – Lose Clause").

### B. The Texas Litigation

39. On April 11, 2012, Highland Capital at the direction of Dondero, Okada, Ellington and Leventon commenced a lawsuit against Daugherty in Texas captioned Highland Capital Management, L.P. v. Daugherty, 12-04005, District Court of Dallas County, Texas, 68th Judicial District (Dallas) (the "Texas Action") and Dondero subsequently threatened, "You will never get a dime" and "I'm going to take you [Daugherty] to zero". Daugherty responded with counterclaims against Highland Capital, Highland Employee Vessel, and others, alleging breach of contract and breach of the covenant of good faith and fair dealing against Highland Employee Vessel and Highland Capital. Katz and Hutton Andrews Kurth purported to represent Highland Capital and Hurst, Brown and Gruber Hurst purported to represent Highland Employee Vessel.

40. It was not until new management of Highland Employee Vessel demanded review of its invoices and records in May 2022 that it was revealed Abrams & Bayless had been retained solely on behalf of Highland Employee Vessel on June 11, 2012, after discussions with Boyce,

Britain, Dameris, Honis, Dougherty, Hough, Abrams, Brown, Ellington, Kim, Collins, Surgent regarding the Highland employee Vessel litigation with Daugherty. It was also revealed that in an email dated November 28, 2012, Dameris was advised by Kevin Abrams ("Abrams") and Stephen Hough ("Hough"), "We caution that the board, which manages Highland Employee Vessel, owes fiduciary duties to both the LLC itself and to its members."

41.     On September 24, 2012, Daugherty made his first request to inspect Highland Employee Vessel's assets to verify its assets. Abrams acted to block the inspection by scheming with Surgent, Hurst, and Katz to demand that Daugherty pay for the costs of producing the materials and sign an onerous confidentiality agreement.

42.     A subsequent invoice discovered in October 2022 revealed that on December 22, 2012, Dondero communicated his buyout offer to Highland Employee Vessel's board.

43.     On December 26, 2012, Dameris, as Managing Director of Highland Capital, sent an email titled "Buyout" to Dondero detailing a scheme in which Dondero could gain control of Highland Employee Vessel at a substantial discount to value pending review by Delaware counsel and noted, "If you decide to offer everyone except 1 [Daugherty] a buyout…". The scheme was created at the same time that a large cash payoff was due to be paid to the Highland Employee Vessel from the Safety-kleen Systems, Inc sale proceeds.

44.     It was not until new management of Highland Employee Vessel demanded review of its invoices and records in May 2022 that it was revealed Hough (copying Abrams) had conspired with Demaris and its former board members on December 30, 2012 to provide a detailed scheme of "Buyout Steps" including how to transfer control to Dondero and Okada while attempting to forgive the board members of their fiduciary duties to Highland Employee Vessel and simultaneously seeking to create expanded indemnification rights for themselves.

45.     It was also revealed in late 2022 that Surgent sent an email on January 15, 2013,

distributing all of Highland Employee Vessel's operative documents to implement the scheme to Paul Lackey ("Lackey"), Mike Aigen ("Aigen") [lawyers at Lackey Hershmen], Katz, Hough, Ellington, Boyce, Britain and Dameris for comment. Lackey, Aigen and Katz were not counsel to Highland Employee Vessel during his time but, nevertheless Highland Employee's confidential information was disclosed to them for unrelated matters concerning Highland Capital litigation with Daugherty and his law firm, Looper Reed, and McGraw. It would later be discovered that their invoices were allocated by Dondero, Ellington, Leventon, Surgent, Klos and Waterhouseto Highland Employee Vessel.

46.    Highland Capital and Dondero then directed Collins and Surgent to offer all of Highland Employee Vessel preferred unit holders, except Daugherty, to purchase their preferred units for 100% of the value of their cash interests and 60% of the value of their non- cash interests on January 18 and 31, 2013. However, Highland Capital and its legal team often engaged in the practice of creating documents after the fact and back-dating or forward-dating them to appear as if they existed on the date listed. It was not until October of 2022 that it was revealed the actual offer for preferred unit holders that were employed by Highland Capital at the time occurred much sooner and were effectively offers to keep their employment if they signed. Indeed, all of the preferred unit holders that were employed by Highland Capital at the time purported to accept the offer on the same date the offer was made, January 18, 2013. When the offer was finally presented to former employees on January 31, 2013, Collins and Surgent warned those who questioned the fairness of the price that a majority had already agreed to the offer and that anyone who did not accept the offer would "have their rights stripped".

47.    It was also not until late 2022 that documents were finally produced to reveal that Highland Employee Vessel's board and counsel did nothing to protect the company from this lowball offer despite knowing it was a violation of their fiduciary duties, among others. It did not

seek a higher price from Highland Capital, Dondero, Okada or from Highland Capital's other partners at the time including Boyce, Britain, Ellington, Honis and Walia who stood to benefit from the transaction despite simultaneously serving on Highland Employee Vessel's board. They did not discuss a poison pill or a standstill or any other corporate defense mechanism available to protect from a creeping tender pursuant to their obligation under Delaware law. The board never even met to discuss the offer. Rather, they secretly attempted to ratify their own self-dealing actions, whitewash their dereliction of duty, and enlisted counsel from Abrams and Bayliss and Surgent to provide themselves broad releases of their fiduciary obligations and indemnifications while paving the way for Dondero, Okada, Ellington, and Highland Capital to strip Highland Employee Vessel of its assets. Tellingly, in one of the many amendments and actions by written consent that were never produced in the litigation with Daugherty, the board members purported to execute a Reserve for actual and potential expenses but did not bother to reserve anything for the claims being made by Daugherty.

48.    It was not until concealed documents with metadata were finally produced by Abrams & Bayliss and new management at Highland Capital in October 2022 that a review indicated numerous documents had been executed in violation of Section 5.1, 5.2(b)(ii) and 5.2(b)(iv) of the Second Amended and Restated Limited Liability Company Agreement. Specifically, document data revealed they had been falsely and intentionally misdated by Highland Employee Vessel counsel Surgent to appear as if the board members had authority when in fact they did not. Hough reported to Abrams in a "Buyout Update Highland Employee Vessel" email on January 18, 2013, "Thomas Surgent called and told me that the Highland Employee Vessel buyout documents were executed this morning, with close to 60% accepting. As we discussed, Highland [Capital] is going to wait two weeks to extend the offer to HERA's [Highland Employee Vessel's] non-employee members…. "Thomas [Surgent] will date the

outgoing board's resignations January 19 so that there is no doubt that their resignations occurred only after the transactions were effected." Indeed, Surgent noted in an email to Hough that they had not reached the 75% threshold until February 11, 2013, long after the board members had surrendered their ownership rights in the Highland Employee Vessel and their board positions had terminated. Notwithstanding, the board members disregarded the fact that Delaware entities such as Highland Employee Vessel are not permitted to waive liability for fraud, or breach of good faith and fair dealing.

49.    The purported new manager of Highland Employee Vessel, Highland ERA Management was formed on February 1, 2013, and wrongfully assumed management and control of Highland Employee Vessel. Although Defendants contended that Highland ERA Management was the manager of Highland Employee Vessel, metadata later revealed in October 2022 indicated there was no valid corporate action taken by the board and Series A Preferred unit holders to execute such an arrangement. Indeed, Daugherty and his affiliates were the only rightful owners of the Series A Preferred Units of Highland Employee Vessel at that time.

50.    Despite the absence of valid authority, Dondero, serving as the president of Highland ERA Management and with the assistance of his minions of Highland Capital legal counsel who simultaneously represented both Highland Capital and the Highland Employee Vessel through a "shared services agreement" and an "umbrella agreement", purported to execute a series of transactions to strip Highland Employee Vessel of its assets.

51.    On February 1, 2013, the day that Highland ERA Management was formed, Dondero purportedly executed the Third Amended and Restated Agreement on behalf of Highland Employee Vessel prepared by Surgent, Ellington, Katz, Hurst, Hough and Abrams, which (1) eliminated the purpose for which Highland Employee Vessel was created, (2) eliminated the requirement of Highland Employee Vessel to make cash distributions to preferred unit

holders to cover pass-through tax obligations attributable to Highland Employee Vessel, (3) eliminated members' rights to indemnification, (4) limited indemnification obligations to the discretion of the Manager (Highland ERA Management, LLC) or the Initial Member (Highland Capital Management , LP), and (5) provided for broad indemnification to the Manager [Highland ERA Management, LLC] and Dondero.

52.    Dondero purported to execute an Expense Allocation Agreement prepared by Surgent, Ellington, Leventon, Katz, Hurst, Hough, Abrams, Waterhouse and Klos also dated February 1, 2013, on behalf of both Highland Capital and Highland Employee Vessel under which the parties reallocated 93.4% of Highland Capital's purported legal expenses billed by their firms and others related to the Texas Action to Highland Employee Vessel for no consideration. According to the document, Highland Capital had incurred $1,142,284 in legal expenses in the Texas Action as of December 31, 2012, compared to just $154,029 incurred by Highland Employee Vessel over the same period.

53.    On February 6, 2013, Daugherty sent a letter seeking to review the books and records of Highland Employee Vessel to verify its assets and their value. Abrams rejected the request in a letter dated February 13, 2013 by declaring, "You seek, inter alia, "documents establishing the December 31, 2012 estimated value of the Interests as calculated by HERA [Highland Employee Vessel]"; "HERA's [Highland Employee Vessel's] balance sheets, income statements, lists of assets, general ledger, and the account records for any depository accounts of HERA [Highland Employee Vessel], as of December 31, 2012 and for the periods ending December 31, 2012, 2011, 2010 and 2009"; "HERA's [Highland Employee Vessel's] 2009, 2010 and 2011 federal, state, and local tax returns"; "information… regarding and identifying the current holders of the Series A Preferred Units, and to the extent the Common Unit Holder has already acquired any such units… from whom, in what amounts and for what consideration";

"documents… regarding member lists"; and "documents… regarding HERA's [Highland Employee Vessel] Board… and any amendments to HERA's [Highland Employee Vessel's] company agreement." Your Demand takes a shotgun approach to requesting books and records that is antithetical to the "rifled precision" required by Delaware law. E.g., Brehm v. Eisner, 746 A.2d 244, 266 (Del. 2000).

54.     On February 7, 2013, Surgent sent an email attaching Daugherty's request to inspect Highland Employee Vessel's assets to Hough, Hurst, Katz, Lackey, Ellington, and Zarin. Again, Katz and Lackey did not represent Highland Employee Vessel at the time but were adverse to Daugherty and his counsel at Looper Reed, and McGraw on behalf of Highland Capital. It was later discovered in September 2023 that Leventon, Ellington, Dondero, Klos, Waterhouse, and Katz, had fraudulently allocated over $14,000,000 in invoices from Hurst, Hunton Andrews Kurth, DLA Piper, Lackey Hershman, and other firms to Highland Employee Vessel.

55.     On April 30, 2013, Dondero purported to execute a backdated action by Written Consent that declared Highland Capital as the "sole economic interest holder in the [Highland Employee Vessel] following the consummation of the transactions pursuant to the Offers to Purchase dated on or about January 18, 2013, and January 31, 2013". The same document also declared that, "Daugherty's economic interest in the [Highland Employee Vessel] is now zero as a result of the application of Article XI of the [Highland Employee Vessel's Operating Agreement]. And it further resolved to transfer all of Highland Employee Vessel's assets to Highland Capital because Highland Capital and Highland Employee Vessel "have each determined that it is in their respective best interest" to transfer substantially all the assets of Plaintiff as "in-kind distribution[s]" to Highland Capital (then valued at approximately $9,700,000 on top of approximately $6 million in cash that Highland Capital also took) despite

providing no consideration to Highland Employee Vessel.

56.    Through this series of bogus transactions that were later revealed in October of
2022 to have been backdated from August 22, 2013, by Leventon and Jason Goldsmith to appear
legitimate, Highland Capital claimed to have taken all the assets of Highland Employee Vessel,
leaving it insolvent. Highland Employee Vessel only became insolvent in 2013 because its funds
and assets were purportedly used: (1) to pay for substantially all of Highland Capital's attorneys'
fees incurred in the Texas Action pursuant to the Expense Allocation Agreement dated February
1, 2013; (2) to pay for all of Highland Employee Vessel's attorneys' fees incurred in in trying to
wrongfully prevent Daugherty from receiving his share of the assets; and (3) transfer and register
substantially all of its assets to Highland Capital for nothing. It was also revealed that in an email
dated October 7, 2013, Katz, Hurst, Miller, Childers knew the Highland Employee Vessel board
had ignored their duties to properly review the Highland Capital Purchase Offer and had even
discussed the LAMPERS v Fertitta case by highlighting:

> Turning first to the board's failure to employ a poison pill to prevent
> Fertitta from obtaining control without paying a control premium, it is reasonable
> in the context of a motion to dismiss to infer fiduciary misconduct more serious
> than a breach of the duty of care. The failure to act in the face of an obvious threat
> to the corporation and the minority stockholders instead supports a reasonable
> inference that the board breached its duty of loyalty in choosing not to cross
> Fertitta.

57.    It was later revealed after legal invoices were finally produced under new
management in October 2022, that as Defendants prepared for the first trial in Texas, they
[Highland Capital, Hurst, Katz, Ellington, Brown, Leventon, Girard, Boyce, Britain and Hunton
Andrews Kurth] participated in a mock trial on December 4, 2013, that resulted in their mock

jury finding in favor of Daugherty. From December 6 to 12, 2013, Defendants Dondero, Hurst, Brown, Katz, Abrams, Miller, Boyce, Britain, Ellington, Girard, Leventon, and others schemed to "come up with trial strategy regarding witness testimony as to HERA [Highland Employee Vessel] sale and where are funds;" and conferenced with "Delaware counsel concerning escrowing of Daugherty's HERA [Highland Employee Vessel] interests and related issues there to."

58.    In May 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege, it was revealed that on December 12, 2013, Ellington, Leventon, and Surgent coordinated with Delaware law firm Abrams & Bayliss LLP ("Abrams & Bayliss") to serve as escrow agent of the Escrow. Highland Capital's assistant general counsel, Leventon, sent a draft of the Escrow Agreement to Abrams & Bayliss on December 13, 2013, and the agreement was executed that day by Ellington. Matthew Miller ("Miller"), Esquire, the Abrams & Bayliss attorney who primarily worked on the escrow matter and had just completed his first year as an attorney and simply used the terms proposed by Leventon.

59.    The deposited assets in the escrow were represented to be: (1) $1,210,502.03 in cash; (2) a limited partner interest in Restoration Capital Partners Fund, LP and (3) 1088.42 shares of NexPoint Credit Strategies. This was the story Defendants "came up with" so they could sell to the jury that they had not simply stolen Highland Employee Vessel's assets. The notion that Defendants did nothing nefarious with Highland Employee Vessel's and Daugherty's assets and merely set them aside would become a theme of Defendants in the Texas Action.

60.    The key provision of the Escrow Agreement that undergirded Defendants' story in the Texas Action provided that if Daugherty prevailed in the Texas Action, escrowed assets in the amount of the judgment "shall" be transferred to Highland Employee Vessel. Also pursuant to the crime-fraud discovery in May 2019, it was revealed that 19 days after executing the Escrow

Agreement, Leventon and Girard changed the Escrow Agreement without Daugherty's knowledge because it wanted to "slip sheet the Schedule 1 assets" to change "the NexPoint shares from shares to the cash equivalent of shares because it is difficult to find a prime broker to open account for such a small pool of assets." Abrams & Bayliss simply swapped the pages. Abrams & Bayliss later explained, "if Daugherty digs deeply enough, he may discover that Schedule 1 was revised on December 16, 2013, with no re-execution of the Escrow Agreement by Highland and A&B. Highland's counsel merely re-sent the Escrow Agreement with an updated Schedule 1, and A&B sent an email confirmation of the change." According to Abrams & Bayliss, "[i]t is unlikely that Daugherty would learn of the revision." With the appearance of an escrow in place, Defendants were poised to present themselves in the Texas Action not as thieves, but rather protectors of Highland Employee Vessel's and Daugherty's interests. This was the state of affairs just a month before trial in the Texas Action.

61.     In furtherance of the sham, Hurst, Dondero, and Surgent made it a point to let the court and jury know during the trial that Highland Employee Vessel retained control of "all" of its assets. In January Dondero testified in response to questions by Hurst:

> Q. Okay. So – so if, if Mr. Daugherty somehow prevails in his lawsuit against Patrick Boyce and Lane Britain and [Highland Employee Vessel], what happens to Mr. Daugherty's interest that's being escrowed right now with a third-party escrow agent?
> A. They go to him.
> Q. I'm sorry?
> A. They go to him via to HERA [Highland Employee Vessel] and then to him.
>
> Dondero further testified when Hurst asked him:
>
> Q. The escrow, did you just escrow this last month?
> A. No. We've had it segregated at Highland since April when we first put it in and then formalized the escrow. It takes a while to set up an escrow and transfer illiquid assets that have all sorts of transfer limitations.

62.     Highland Capital's Chief Compliance Officer and Deputy General Counsel,

Surgent swore under oath in regard to a question regarding the April 30, 2013, implementation of the asset sweep from Highland Employee Vessel, "Yes, but then it placed those funds in escrow". But when questioned further why the escrow appeared to be created 36 days prior to his testimony and more than eight months after the assets were swept from Highland Employee Vessel, Surgent answered to the court and jury, "The escrow was formalized in this agreement, but I believe it existed sooner." In fact, it did not, and Surgent knew it.

63.     In closing arguments, Highland Employee Vessel's counsel, Hurst lied to the court jury once again, "[I]f Pat Daugherty happens to prevail in his lawsuit against HERA [Highland Employee Vessel], you heard Jim Dondero testify, he gets his interest, which is currently escrowed in the third-party escrow account, all of it.'

64.     It was not until legal invoices were produced by the new management of Highland Capital in October 2022 that this was all exposed as a lie.

65.     After three-weeks of trial, the jury found that Highland Employee Vessel, at the direction of Defendants from Highland Capital, breached the implied covenant of good faith and fair dealing by adopting Section 12.1 of the 2012 Agreement (the "Lose-Lose" clause) and that Highland Capital and Dondero had defamed Daugherty with malice. The jury awarded Daugherty damages against Plaintiff in the amount of $2.6 million plus interest. The court also determined that Daugherty had retained ownership of his preferred units in Highland Employee Vessel. The problem was Dondero, Ellington, Surgent and their merry band of minions lied to the jury and never funded the Escrow while incurring millions in legal fees to drain Highland Capital Vessel's assets to perpetuate the lie.

66.     It was not until May 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege that it was revealed Highland Capital contacted Abrams & Bayliss on February 14, 2014 "to discuss a memorandum we need drafted to address the Escrow

Agreement in context of the recent Daugherty Verdict." The memo reaffirmed that Abrams &
Bayliss had "received no cash or documents from Highland Capital or HERA (Highland
Employee Vessel) regarding the escrow of Daugherty's interests in Restoration Capital Partners,
LP. The memorandum then discussed the consequences if the escrow of Highland Employee
Vessel's assets was deemed a "sham". In a section of the memorandum titled "Daugherty May
Assert that the Escrow Agreement Is a Sham and that the Deposit Assets Stayed within the
Control of Highland," Abrams & Bayliss advised: "Daugherty could argue that, even if the
Deposit Assets are deemed to be in escrow, the Escrow Agreement left Highland [Highland
Capital] with actual control of the Deposit Assets because (1) A&B [Abrams & Bayliss] is
Highland's [Highland Capital] counsel, and (2) A&B [Abrams & Bayliss] may resign at any time
with the Deposit Assets returning to Highland [Highland Capital]. Daugherty might argue that,
despite the language of the Escrow Agreement, A&B [Abrams & Bayliss] will do whatever
Highland [Highland Capital] instructs it to do with the Deposit Assets, even if that means
disbursing the Deposit Assets in contrary to the Escrow Agreement's terms. Paragraph 5 of the
Escrow Agreement entitles A&B [Abrams & Bayliss] to resign at any time provided that it gives
ten days advance notice. After A&B [Abrams & Bayliss] resigns, it must deliver the Deposit
Assets either to the successor escrow agent or to Highland [Highland Capital]. Daugherty might
argue that, even if A&B [Abrams & Bayliss] would not disburse the Deposit Assets in
contradiction of the Escrow Agreement, A&B [Abrams & Bayliss] might be willing to resign as
Escrow Agent in order to return the Deposit Assets to Highland." Said another way, Highland
Employee Vessel's own lawyers were acting on behalf of Highland Capital at the expense of their
client while they stripped it of its assets and charged it for the privilege.

67.    True to form, Highland Capital requested, and on March 25, 2014, Abrams &
Bayliss provided, an expanded memo addressing "tangentially related topics." In the expanded

memo, Abrams & Bayliss explained: "Although unlikely, it is conceivable that the court in the Texas Litigation could take issue with the assertion of Highland Employee Vessel's counsel that the full amount of the Deposit Assets was held by A&B, when arguably at least, only $1.2 million of the Deposit Assets were truly beyond Highland's control."

68. The Defendants also attempted to conceal the true value of the assets that were supposed to be escrowed on behalf of Highland Employee Vessel. When Girard was asked to provide an update on value by Miller. Girard briefed Abrams that, "Girard would prefer not to update the estimated value of the Restoration Capital Funding interest. Highland received a windfall when the jury valued Daugherty's Highland Employee Vessel interest at only $2.6 million because Highland believes his former interest in HERA [Highland Employee Vessel] is worth more. Schedule 1 currently reflects a value of $3.03 million. If Highland updated Schedule 1 to reflect their current estimates, the Escrow Assets would be worth $3.3 million."

69. Daugherty suspected that Defendants had lied about the existence of the Highland Employee vessel escrow and on August 24, 2014, served post-judgment discovery requests on Highland Employee Vessel and Highland Capital, seeking information concerning the location of Highland Employee Vessel's assets and liabilities and its post-litigation conveyances to Highland Capital.

70. Twenty days later, Highland Employee Vessel, at the direction of Dondero, Ellington, Leventon and Hurst, filed a Notice of Cash Deposit in Lieu of Supersedeas Bond and Affidavit Establishing Net Worth. Highland Employee Vessel submitted the affidavit of Klos, which stated that Highland Employee Vessel had a negative net worth of ($2,447,709) after fraudulently applying approximately $7,500,000 of Highland Capital's legal expenses at the time to Highland Employee Vessel as of August 31, 2014. Highland Capital also purported to have loaned Highland Employee Vessel the cash necessary to repay its own legal expenses owed to

Highland Capital because Highland Employee Vessel did not have sufficient funds after transferring all of its assets to Highland Capital back on April 30, 2013. However, a footnote to the balance sheet exhibit to the affidavit noted, "Per Escrow Agreement dated December 13, 2013, between HCMLP [Highland Capital] and Abrams & Bayliss, LLP, if a final, non-appealable judgment against HERA [Highland Employee Vessel] is reached, Abrams & Bayliss, LLP as Escrow Agent, will transfer the HERA [Highland Employee Vessel] Deposit Assets to HERA [Highland Employee Vessel]." The affidavit included a copy of the Escrow Agreement with a schedule again falsely listing escrow assets of: (1) $1,210,502.03 in cash; (2) a limited partner interest in Restoration Capital Partners Fund, LP and (3) cash equivalent of 1088.42 shares of NexPoint Credit Strategies.

71.    Also not revealed until May 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege, Miller emailed Abrams, "do we look bad for claiming to hold non-monetary assets in escrow when on a day-to-day basis we have no idea what the status of these assets are?" Miller was "not looking forward to being deposed."

72.    In order to conceal the fact that no such transfer ever actually occurred, Dondero, Hurst and the Highland Capital minions then directed Highland Employee Vessel to object to Daugherty's discovery requests on the basis that it was harassing and argued that its cash deposit limited post-judgment discovery to Highland Employee Vessel's net worth. Hurst, doubled down at a subsequent hearing on September 22, 2014, before the court and stated, "everything that's in the sworn financial statement has been provided to the other side and it's been provided to the Court, also came up during trial; that is the exact same assets."

73.    Again on July 10, 2015, Hurst thwarted discovery of Highland Employees' missing assets by filing Highland Employee Retention Assets LLC's Written Objections To Daugherty's Notice of Deposition Upon Written Questions and responding to every question

and request for production with the boiler plate response, "Given the procedural posture of the case, with a final judgment and appellant bond on file, the only discovery that may be sought by Daugherty is that directly relevant to the calculation of HERA's [Highland Employee Vessel's] net worth. The scope of this request goes well beyond that, seeking information that that [sic] has potential proprietary confidential interests and unduly burdening a third-party."

74.     On December 1, 2016, Hurst and Ellington boasted in the press about a settlement with Nautic Partners regarding a breach of fiduciary duty matter over an indirect investment owned by Highland Employee Vessel and other funds in Cornerstone Healthcare Group. It would not be discovered until December 2021 that Dondero, as Chairman of the Cornerstone board and Ellington as General Counsel to Highland Capital serving as the investment advisor to the funds that owned interests in Cornerstone, had schemed with Hurst, Katz and Hunton Andrews Kurth to revise their fee structure on the eve of settlement increasing them from an hourly fee that had already incurred $6 million in charges to a contingency fee that would pay the lawyers approximately $25 million in fees. Dondero and Ellington then received an $11 million facilitating fee that was wired to their affiliates secretly operating as the SAS Platform in the Cayman Islands.

75.     Also on December 1, 2016, Daugherty's judgment against Plaintiff, which had been affirmed on appeal, became final and non-appealable pursuant to the appellate Court's mandate. The appellate court also denied the request to declare that Daugherty's ownership in the preferred units of Highland Employee Vessel were extinguished as a result of his damage award paving the way for him to seek damages on behalf of Highland Employee Vessel. Dondero, Katz, Ellington, Leventon, Miller, and Abrams reviewed the mandate that day and started the process of shutting down the Escrow and assuring the remaining cash assets were swept from Highland Employee Vessel to Highland Capital. A summary of the reconciled emails sent or

received from different time zones follows:

76.     From discovery obtained in May 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege, a series of emails revealed that on December 1, 2016, at 7:51 p.m.: Hunton Andrews Kurth, outside counsel for Highland Capital and now concurrently outside counsel for Highland Employee Vessel, emailed Abrams, counsel for Highland Capital, counsel for Highland Employee Vessel, and trustee for Highland Employee Vessel's escrow: "Kevin, we need to have a call as early tomorrow as possible regarding the escrow arrangements. Can you let me know when you can be available? Also, can you please send us a copy of the escrow agreement?. Abrams responded to the email copying Miller and Hunton Andrews Kurth lawyers Katz, James Bookhout, and Isabel Crosby.

77.     December 2, 2016, at 10:03 a.m.: Miller informed Abrams, "The call with Highland's ⸢Highland Capital's⸥ attorneys in the HERA ⸢Highland Employee Vessel⸥ litigation was short. Simply put, Highland ⸢Highland Capital⸥ wants to get the funds back to HERA ⸢Highland Employee Vessel⸥ and/or Highland ⸢Highland Capital⸥ as quickly as possible in any way we feel comfortable with." Miller proposed several alternatives, including resignation: "Second, we could resign as escrow agent under Paragraph 5 …. This paragraph permits us to return assets directly to the Depositor, which is Highland ⸢Highland Capital⸥. Highland's ⸢Highland Capital's⸥ attorneys think that a ten-day notice period will not interfere with their garnishment action plans."

Miller outlined for Abrams a step-by-step resignation plan:

1.     Resignation letter from us that states that all deposit assets will be released to Highland ⸢Highland Capital⸥ after the 10-day notice period.
2.     Letter from Highland ⸢Highland Capital⸥ waiving notice period and seeking our confirmation and signature (because paragraph 10 requires all amendments or waivers to be signed by both parties).
3.     Wiring of cash back to Highland ⸢Highland Capital⸥.

Highland ⸢Highland Capital⸥ encouraged Abrams & Bayliss to resign, "As an update to the

below, Highland [Highland Capital] would prefer that we resign but before we do to agree in writing that the 10-day notice period is waived". "Hunton Andrews Kurth and [Abrams & Bayliss] were on the same page about the resignation strategy."

78.     December 2, 2016, at 2:52 p.m.: Miller emailed Hunton Andrews Kurth: "As we discussed, attached is the resignation letter we contemplate as the first step of unwinding the escrow."

79.     December 2, 2016, at 4:37 p.m.: Miller emailed Hunton Andrews Kurth: "As an FYI, my banker tells me that 5:30 EST is the cut-off time for a domestic wire; the international transfer cut-off already is passed. I am not optimistic that I will receive the necessary authorizations during the next hour. However, would you mind passing along the Highland [Highland Capital] letter on an FYI basis so that I have the wiring instructions handy?"

80.     December 2, 2016, at 5:08 p.m.: Hunton Andrews Kurth emailed Miller: "Matt, please find attached Highland's [Highland Capital's] signed letter accepting the Escrow Agent's resignation." Miller subsequently informed Abrams, "The second step in the HERA [Highland Employee Vessel] strategy is for you to sign the attached letter from Highland [Highland Capital]."

81.     December 2, 2016, at 10:07 p.m.: Miller emailed Ellington: "Scott, please find the attached correspondence regarding the escrow agreement between Highland Capital Management, L.P. and Abrams & Bayliss LLP."

82.     December 2, 2016, at 10:18 p.m.: Katz emailed Miller: "Matt, attached is correspondence from Scott Ellington accepting the resignation and providing wiring instructions. If you need additional information, please let me know."

83.     December 2, 2016, at 10:19 p.m.: Miller emailed Katz: "Thanks, Mark. [sic] We will get a counter-signed copy back to you and arrange for wiring the funds."

84.    December 3, 2016, at 10:06 a.m.: Miller emailed Ellington and Katz: "Scott and Marc, attached please find a counter-signed copy of Scott Ellington's letter."

85.    December 3, 2016, at 2:45 p.m.: Internal Abrams & Bayliss email: "Wells Fargo was unable to initiate the transaction today [a Saturday]. The wire amount required multiple levels of upper management approval so I will go back on Monday morning."

86.    December 5, 2016, at 12:26 p.m.: Miller emailed the team: "Team, As reflected below, the funds A&B [Abrams & Bayliss] was holding in escrow on behalf of HERA [Highland Employee Vessel] have been transferred as instructed in Scott Ellington's December 2, 2016, letter."

87.    "Boom!" (emphasis added). That was the reaction of Girard when he learned the Escrow funds "have been received" by Highland [Highland Capital] on December 5, 2016.

## C. Crime-fraud Evidence in Delaware

88.    On February 16, 2017, Abrams of Abrams & Bayliss unveiled Defendants' "Highland Employee Asset strategy" to Daugherty:

> I write on behalf of Abrams & Bayliss LLP ("Abrams & Bayliss") in response to your letter of February 14, 2017 (incorrectly dated February 14, 2016) regarding my firm's service as escrow agent under an escrow agreement with Highland Capital Management, L.P. ("Highland"), dated December 13, 2013 (the "Escrow Agreement"). Capitalized terms used but not defined herein have the meanings given in the Escrow Agreement.
> By letter dated December 2, 2016, Abrams & Bayliss notified Highland that it was resigning as Escrow Agent pursuant to Paragraph 5 of the Escrow Agreement. By letter dated December 2, 2016, Highland informed Abrams & Bayliss that it was (i) accepting Abrams & Bayliss' resignation as Escrow Agent, (ii) waiving the ten-day notice period under Paragraph 5 of the Escrow Agreement, and (iii) directing Abrams & Bayliss to return the Deposit Assets to Highland in accordance with the instructions provided in the letter.
> On December 3, 2016, Abrams & Bayliss informed Highland in writing that it agreed to the waiver of the notice period, such that Abrams & Bayliss' resignation was effective immediately. On December 5, 2016, Abrams & Bayliss returned the Deposit Assets to Highland in accordance with the December 2, 2016, instructions. Accordingly, Abrams & Bayliss no longer serves as Escrow Agent or holds Deposit Assets.

89.    On July 6, 2017, Daugherty, having his disputed ownership in Highland Employee Vessel's assets recently confirmed by Texas Appellate Court, filed a complaint in Delaware Chancery Court seeking the return of all of Highland Employee Vessel's assets in addition to making claims for fraudulent transfer, breach of fiduciary duties on behalf of Highland Employee Vessel, aiding and abetting breach of fiduciary duties on behalf of Highland Employee Vessel, breach of implied covenant of good faith and fair dealing on behalf of Highland Employee Vessel, among other claims. Certain defendants moved to dismiss the complaint.

90.    On January 16, 2018, the Delaware Court of Chancery denied the motion to dismiss against Highland Capital and Plaintiff but granted dismissal against Dondero and Highland ERA management which was controlled by Dondero at the time on the grounds that evidence against them was "conclusory" at that time the court was not privy to the evidence that was later produced pursuant to the crime-fraud ruling in May 2019 and the document production by new management at Highland Capital in October 2022 and October 2023. Later, on June 29, 2018, the Delaware Court denied dismissal against Highland Capital but granted dismissal based on laches for the claims arising out of what was known about the 2013 amendments and contemporaneous actions of the Defendants at that time. It was not until October 2022 and October 2023 that Highland Capital, under new management, produced refuting documentation and invoices.

91.    On May 17, 2019, the Delaware Chancery Judge granted a motion to compel stating, "Daugherty has been dogged in his pursuit of these documents, and Highland [Capital] was just as resolute in refusing to produce them." She also stated, "Daugherty has made a prima facie showing that a reasonable basis exists to believe that a fraud has been perpetrated, and that Highland [Highland Capital] sought A&B [Abrams & Bayliss] to serve as escrow agent and to provide legal analysis in furtherance of that fraud; specifically, to protect the escrowed assets

from Daugherty while the Texas case was pending, and then to transfer them back to Highland [Highland Capital] after the Texas verdict was finalized. I conclude any privilege Highland [Highland Capital] claims over A&B's [Abram's & Bayliss] legal advice regarding the escrow arrangement and A&B's [Abram's & Bayliss] resignation has been stripped under the crime-fraud exception." She also concluded that, Highland Capital, Dondero, Ellington, Leventon, and the other defendants (who were also controlled by Dondero) were "improperly withholding documents," that "there is a reasonable basis to believe" that they perpetrated a fraud—and solicited "the services of attorneys to aid in furtherance of that fraud"—as part of an effort to evade Daugherty's judgment during the pendency of his case. The Vice Chancellor concluded that "defendants, with [counsel's] advice and assistance, were never going to let the assets held in the escrow agreement make their way to Daugherty." Additionally, a Special Master was appointed to oversee discovery compliance. It was later discovered after Highland Capital filed for bankruptcy that Leventon concealed the existence of company owned phones used by Dondero and Ellington as well as a secret server used by many of the defendants or their affiliates to transfer assets. In addition, despite a motion to compel to the contrary, the existence of numerous January 2013 Highland Employee Vessel amendments and actions by written consent were concealed by Dondero, Ellington, Leventon, and Surgent until they were finally produced in October 2022 after full ownership of Highland Employee Vessel was transferred to Daugherty.

92.     On the second day of a three-day trial, Dondero—for the first time—revealed that his misconduct as manager of Highland Employee Vessel was done at the direction and based on the advice of his outside and in-house counsel, i.e., the other defendants in this action. He testified, for example:

> Q. Did Highland [Capital] have outside counsel advising with respect to the purchase of the units?
> A. Yes. I believe the whole situation was the most lawyered thing we've ever done. I mean, there was counsel for each of the board members, there was counsel for Highland [Highland

Capital], there was counsel for HERA [Highland Employee Vessel], there was Delaware counsel. Everything was orchestrated, dictated by counsel.

Q. Did Highland [Highland Capital] have – did that counsel that Highland [Highland Capital] used also advise counsel on the documents, the transaction documents, relating to those purchases?

A. Yes. All the functional documents and major moves at various turning points were all at the request – or decided by counsel.

Q. Did you have any communication – are you familiar with Abrams & Bayliss, with what Abrams & Bayliss is?

A. I know they're a Delaware law firm. But beyond that, no.

Q. Did you ever have any communications with Abrams & Bayliss about them resigning as escrow agent?

A. No. Highland [Highland Capital] and myself, I know, were purposely kept separate from this whole thing. And it was driven by – it was driven by counsel.

Q. My question is a little bit more specific because it relates to the escrow assets and Mr. Daugherty. If you had been told by counsel that Mr. Daugherty was entitled to the escrow assets, you would have given him the escrow assets; right?

A. Yes. We would have done whatever counsel told us. We tried very hard to compartmentalize this mess. We have a business to run. And this is – a half dozen lawsuits, haranguing everybody in public, it was all intended to disrupt our business as much as possible. So we tried to delegate it and compartmentalize it to the lawyers as much as possible.

Q. Let's talk about which lawyers you're referring to. So I'll start with the in-house lawyers again. Which in-house lawyers of Highland [Highland Capital] are you relying on with respect to the transfer of the escrow assets?

A. It would have been the same three internal lawyers working with external counsel.

Q. Mr. Ellington, Mr. Leventon, and Mr. Surgent; is that right?

A. I believe so. I believe they were the ones at that time and place.

Q. Which outside counsel are you relying on?

A. I don't know if Andrews and Kurth had merged with Piper. I don't know who else was involved besides the Abrams guys. But it would have been, more likely than not, those two counsels with whatever other counsel was representing some of the people who were sued individually.

## D. Highland Capital Bankruptcy

93.    The following day, On October 16, 2019, Highland Capital at the direction of Dondero and Ellington filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware. On December 4, 2019, the Delaware Court entered an order transferring venue of the case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. As a result, the Delaware action was stayed.

94.    On January 9, 2020, the Highland Capital Creditors Committee demanded and

Court approved a change of control of Highland Capital, which involved the removal of Dondero as the sole director and the appointment of James P. Seery ("Seery"), John S. Dubel ("Dubel"), and retire Judge Russell F. Nelms ("Nelms") as independent directors (the "Independent Directors" and collectively, the "Independent Board") of Strand Advisors, Inc., Highland Capital's general partner (the "General Partner"). The Independent Directors were granted exclusive control over Highland Capital and its operations during the pending bankruptcy proceedings.

95. On July 16, 2020, the Court approved Highland Capital's motion to appoint Independent Director Seery, as Highland's CEO and CRO.

96. On October 9, 2020, Dondero was further instructed to resign or face removal as an employee of Highland Capital and as portfolio manager for all Highland Capital managed funds due to his detrimental conduct to the firm and its creditors.

97. Highland Capital's bankruptcy was unique because all of the largest creditors' claims stemmed from litigation claims and judgments against the firm, not debt holders. Indeed, Dondero, Ellington and Leventon expected to use the bankruptcy process to once again thwart recoveries while keeping themselves in control. Dondero later complained to Seery, "I'm not getting the Chapter 11 experience." as if he were somehow supposed to benefit from the failure of the company he managed. To the contrary, bankruptcy revealed a litany of terrible acts through a pattern of recurring conduct ultimately resulting in well over one billion dollars in litigation and arbitration claims and over $50,000,000 million dollars in legal fees.

98. In January 2021, it was discovered that Dondero had been secretly coordinating with Highland Capital's then counsel Ellington and Leventon to direct the affairs of Highland Capital despite his dismissal. When the Court entered an order restraining Dondero from communicating with Highland Capital employees, Dondero flouted the order, by communicating with Ellington and Leventon and instructing other employees to resist document production

requests, even though those documents were kept on Highland Capital's computer system.

99.      Ellington and Leventon we terminated for cause on January 5, 2021, for acting in manner adverse to Highland Capital's interests.

100.     Dondero, Ellington and Leventon evinced no respect for Highland Capital as an entity separate and apart from themselves. The bankruptcy also revealed discovery misconduct during the Delaware action with Daugherty including a secret server that Dondero, Ellington, Leventon and others routinely used, which was concealed during discovery in the Delaware action with Daugherty. Additionally, the bankruptcy court twice found Dondero in contempt for violating a TRO. During testimony at the first show cause hearing, it was revealed that Dondero and Ellington destroyed their cell phones that were provided by Highland Capital. Yet, in the Delaware action with Daugherty, Leventon testified at his custodian of records deposition that Highland Capital did not "have access to people's phones" and that Highland Capital did not own any cell phones for the custodians.

101.     On February 8, 2021, the Court agreed to confirm Highland Capital's bankruptcy plan, and the Court entered its plan Confirmation Order on February 22, 2021.

102.     On August 11, 2021, Highland Capital's bankruptcy plan, as amended to date, became effective, and as a result Highland Capital's ownership was restructured. Highland Capital became a wholly owned subsidiary of the Highland Claimant Trust, a newly formed liquidating trust owned by the creditors of Highland Capital. Specifically:

- The Highland Claimant Trust became the sole limited partner of Highland Capital.
- HCMLP GP LLC replaced Strand Advisors, Inc. as General Partner of
- Highland Capital. HCMLP GP LLC is also a wholly owned subsidiary of the Highland Claimant Trust.
- Seery serves as the Claimant Trustee of the Highland Claimant Trust and remains the CEO of Highland Capital today. Dondero and Okada are no longer involved in the management of Highland Capital or the Claimant Trust.

103.     In the Bankruptcy, Daugherty filed claims estimated in excess of $40,000.00. In

November 2021, Daugherty reached a settlement with Highland Capital for some of his claims and retained the right to pursue Defendants for various other claims.

104.    On March 1, 2022, during the settlement hearing, Highland Capital finally acknowledged, "Dondero, through Highland Capital, engaged in an asset-stripping campaign designed to render Highland Employee Vessel judgment-proof, further exposing Highland Capital to liability and unnecessary legal costs." Highland's new CEO, James Seery, testified:

> It actually looks like, frankly, the escrow was never really an escrow, and it was a —
> it was a fraud from the beginning. And that one's a pretty disturbing one.

105.    On April 1, 2022, full ownership of Highland Employee Vessel and Highland ERA Management were transferred to Daugherty and his affiliates.

106.    On May 11, 2022, Highland Employee Vessel instructed Abrams & Bayliss, Hunton Andrews Kurth, DLA Piper, Marc Katz, and Michal Hurst to forward all of its casefiles, records and invoices allocated to Highland Employee Vessel.

107.    True to form, Hunton Andrews Kurth responded by letter on May 25, 2022, "Our records and research indicate that the Firm represented ERA and/or HERA [Highland Employee Vessel] in connection with only two matters. The first matter was opened on June 1, 2012, for which our records indicate we represented Highland Capital Management, LP ("Highland") and HERA [Highland Employee Vessel], and for which only 1.6 hours of attorney time was recorded. We have located no files for this matter other than an electronic record of the recorded time." They made this statement despite Katz representing before the court Highland Employee Vessel incurred millions of dollars in legal expenses, including those from his firm, making it insolvent.

108.    Hunton Andrews Kurth continued, "Additionally, given that Daugherty now wholly owns and controls HERA [Highland Employee Vessel] and ERA, we believe we are constrained in what we may transfer. Your HERA [Highland Employee Vessel] and ERA file

transfer request equates to Daugherty gaining access to his litigation adversaries' attorney's files. In this unique circumstance of a litigant seeking his adversary's attorney's file by acquiring control of one (or more) of his litigation adversary's attorney's former jointly represented clients, the case law we have reviewed favors protecting the co-client's justified expectation that its attorney's files will not be disclosed to its litigation adversary." Said another way, after invoicing millions of dollars in legal fees that were allocated to Highland Employee Vessel, Hunton Andrews Kurth continues to conceal their conduct by claiming some privilege based on jointly representing Highland Capital and Dondero. Tellingly, Hunton Andrews Kurth could produce no retention agreement that named Dondero as a client nor did Dondero pay a single $1 for any such legal expenses. However, Highland Employee Vessel was allocated over 93% of the fees invoiced to Highland Capital.

109.    DLA Piper delayed until July 22, 2022, to make the following similar response, "Second, as you know, DLA's representations of HERA and ERA in the Daugherty Case were joint representations in which DLA also represented HCMLP and Mr. Dondero. Mr. Daugherty is still adverse to Mr. Dondero in the Daugherty case and in Daugherty v. Dondero, No. 2019-0956 (Del. Ch.). That means that your request for the client file would result in DLA providing to one litigation party the privileged and work product-protected communications of its litigation adversary. Such a production "would be anathema to the principles underlying the policy of fostering unfettered attorney-client communication." Again, DLA piper made this response despite having millions of dollars of its fees allocated to Highland Employee Vessel and producing no retention agreement that listed Dondero as a client or that he ever paid anything for the alleged representation.

110.    Hurst never responded to Highland Employee Vessel's file and document request.

111.    It was not until October 2022 and October 2023, after Highland Employee Vessel

received documents from Highland Capital and Abrams & Bayliss pursuant to two books and records requests, that extensive billing fraud was revealed at the expense of Highland Employee Vessel at the hands of its lawyers Katz, Hurst, Hunton Andrews Kurth, DLA Piper, Abrams & Bayliss and others. Indeed, financial records and information from Highland Capital reveal that over $14,000,000 of expenses for other matters were allocated to the Highland Employee Vessel and their lawyers were aware of it.

112.    Shockingly, Highland Capital and its partners including Dondero, Okada, their trusts, Ellington, Boyce, Britain, Dougherty, and Surgent had taken the tax benefits of these expenses as though they were their own despite knowing that the obligations to pay were allocated to Highland Employee Vessel. Surgent explained to Abrams & Bayliss that they did not want Daugherty to get the tax benefit of the expense/loss pass-throughs so they made the legal expense allocations effective after they received their 2013 buy-out proceeds.

113.    Not surprisingly, when the details of the fraud were discovered, new management of Highland Capital realized a charge to the Highland Employee Vessel capital accounts in excess $10 million as an offset to write off over $10 million of falsely allocated debt resulting in a loss of capital account basis that could have been used by Highland Employee Vessel and its unit holders for tax purposes.

### E.  A Recurring Theme

114.    This avoidance of having to pay judgments for their terrible acts is a customary practice for the Defendants. Highland Employee Vessel was stripped of its assets as retaliation against Daugherty for assisting in recovery efforts of the following related matters:

#### 1.  Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry

115.    In 2010, Dondero and Okada formed Acis Capital Management, L.P. ("Acis") and

Acis Capital Management GP, LLC ("Acis GP") as a "lifeboat" to divert collateralized loan business fees from Highland Capital after its lenders placed security liens on its assets. Dondero was President both of Acis and Acis GP. Okada was Chief Investment Officer for all funds including those of Acis. Collectively, they controlled the investment and operating decisions of the Acis platform. Acis was initially indirectly owned by Dondero and Okada (through Highland Capital Management Services, Inc). Joshua Terry ("Terry"), a Highland Capital employee, later joined the platform in 2011 to manage Acis after its previous managers left Highland Capital. Like Highland Employee Vessel, Acis had no employees. Highland Capital was the investment manager for Acis, and Acis performed almost all of its services through Highland Capital employees. In 2013, Dondero modified Terry's ownership in Acis. As a result, Dondero and Okada, with the help of the Highland Capital legal team, once again engaged in a scheme to siphon value from Acis and transfer it back to Highland Capital.

116.    By 2016, Dondero and Terry came to an impasse. Dondero sought to improperly finance a latex company investment in South America by causing a separate portfolio company, Trussway Industries Inc ("Trussway"), to incur unnecessary debt and divert the loan proceeds to finance the purchase. Terry criticized the misconduct as a breach of their fiduciary duties to their investors. Dondero responded by firing him and making a pretextual claim of termination for "cause". Dondero also amended the partnership agreement to terminate Terry's interests in Acis and directed Acis to sue Terry in Texas state court. Terry counterclaimed and demanded arbitration.

117.    On October 20, 2017, following a ten-day arbitration, the arbitration panel issued Terry an award of $7,949,749.15, plus interest, against Acis. The arbitration panel found, among other things, that (i) Terry's termination was "without cause," and Acis had "knowingly and willfully" invoked Highland Capital's false pretext of "for cause" in order to deny Terry his

contractual entitlement to the value of his Acis partnership interest, (ii) Acis had breached its limited partnership agreement, and breached the fiduciary duties it owed to Terry as Acis's limited partner, (iii) beginning in 2013, Dondero had caused Acis to pay Highland Capital more than its contractual entitlement for shared expenses in order to reduce the amount of Terry's limited partnership distributions, and (iv) one month after Terry was terminated from Acis, Dondero significantly increased the amounts that Acis was paying Highland Capital under their shared services and sub-advisory agreements, retroactive to January 1, 2016.

118.    Beginning on October 24, 2017—four days after Terry's arbitration judgment was issued—Dondero, acting through Highland Capital, and with the aid of Ellington, Leventon, and Surgent entered into numerous transactions designed to take control of Acis's assets and business, and strip Acis of assets so that it would be unable to pay Terry's arbitration award.

119.    Dondero's elaborate schemes to render Acis judgment-proof led Terry to file involuntary petitions for protection under chapter 11 of the United States Bankruptcy Code against Acis and Acis GP on January 30, 2018. In response to the bankruptcy filings, Dondero caused Highland Capital, which served as the sub-advisor to the Acis CLOs, to grossly mismanage the Acis funds following the appointment of a chapter 11 trustee in the Acis bankruptcy case. This abrogation of duties caused the chapter 11 trustee to replace Highland Capital with Brigade Capital Management, LP ("Brigade") and Cortland Capital Markets Services LLC ("Cortland").

120.    Dondero also caused Highland Capital to commence litigation against the Acis chapter 11 trustee, prompting a countersuit pursuant to which the chapter 11 trustee sought to recover fraudulent transfers Dondero had directed (through Highland Capital) and to stop Highland Capital from engaging in a course of conduct that was harmful to Acis and the Acis CLOs. This led to the entry of a temporary restraining order against Highland Capital, which

Dondero caused Highland Capital to violate.

121.     Daugherty communicated with Terry on several occasions regarding the extreme means utilized by Highland Capital against Daugherty including sending constables to his home to execute collection efforts under false pretenses, stripping the Highland Employee Vessel of its assets, and seeking to have Daugherty incarcerated. For the legal services provided by Hurst, Katz, Hunton Andrews Kurth, DLA Piper and Lackey Hershman for attacking Daugherty on behalf of Highland Capital, Highland Employee Vessel was allocated the bill.

### 2.  Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest

122.     Dondero and Ellington fraudulently induce third party investors HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). At the same time that Dondero was surreptitiously transferring valuable rights associated with the Acis funds away from Acis in order to evade Terry's arbitration award, he and Ellington were using Highland Capital to induce the HarbourVest Entities to purchase 49.9% of HCLOF—the owner of the equity tranche of the Acis CLOs—from CLO Holdco for approximately $75 million in cash, with a commitment to invest an additional $75 million in HCLOF. In soliciting this investment, Dondero and Ellington failed to disclose material facts to HarbourVest regarding the Terry disputes and Acis frauds, thus exposing Highland Capital to substantial and unnecessary liability.

123.     In inducing HarbourVest's investment, Dondero and Ellington, purportedly acting through Highland Capital, made numerous misrepresentations and omissions, including: (1) failing to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award against it, including by causing Acis to consummate a series of fraudulent transfers; (2) misrepresenting the reasons that Dondero changed the name of the holding

company for the Acis CLOs from Acis Loan Funding, Ltd. ("ALF") to HCLOF immediately prior to the HCLOF Investment; and (3) expressing confidence in HCLOF's ability to reset or redeem the CLOs under its control, when in actuality Dondero's actions to evade Terry's arbitration award against Acis resulted in Acis's bankruptcy, and rendered the resets impossible.

124.    Moreover, unbeknownst to HarbourVest, Dondero intended for CLO Holdco to use the $75 million that it received from HarbourVest to make investments in other Dondero controlled and owned entities, including entities managed by NexPoint and HCMFA. Thus, the HarbourVest investment benefited Dondero personally, but left Highland Capital exposed to hundreds of millions of dollars in potential damages to HarbourVest.

125.    At various times in the Highland Capital bankruptcy, Daugherty coordinated with HarbourVest on an ad hoc steering committee basis to identify and seek the return of the assets looted from Highland Capital estate, HarbourVest and Highland Employee Vessel.

### 3.    Willful Misconduct in the Transfer of Highland Capital Credit Strategies Fund's Assets to Dondero, Okada and Ellington Controlled Entities

126.    Another instance involved the Highland Capital Credit Strategies Fund judgment. In that case Highland Capital was found to have engaged in distinct types of misconduct, where Dondero also personally threatened the redeemer committee's personnel with retribution. The most important aspect of the misconduct is that Highland Capital effectively moved the assets to other Highland Capital-controlled entities for far less than their actual value. In fact, Highland Capital paid even less for the interest ($24 million) than it had marked the value on its own books ($28 million) and far less than valuations done by third parties, even those hired by Highland Capital (up to $37 million). Highland Capital did so in secret and the redeemer committee only found out when a line item referring to the $24 million as "Cornerstone sale proceeds" showed up in a regular cash report to the redeemer committee. An arbitration panel found that Highland Capital not only breached its obligations under the Plan of liquidation but engaged in willful

misconduct in its sale of the Fund's Cornerstone equity. The panel found Highland Capital's explanations to excuse its conduct as "to put it mildly, far-fetched."

127.    Daugherty communicated several times with members of the Highland Capital Credit Strategies Fund regarding his views of the value and location of their assets pursuant to his ongoing fiduciary duties under the 1940 Advisors Act. In addition, his countersuit against Highland Capital detailed numerous acts of fraud and breaches of fiduciary duty that caused damage to Highland Capital Credit Strategies Fund. Dondero, Ellington, Leventon, Hurst, Katz, Hunton Andrews Kurth, DLA Piper and Lackey Hershman embarked on a crusade to smear Daugherty and his law firm while filing numerous baseless show cause motions against him. In addition, the services of the Ashcroft Law Firm ("Ashcroft") were retained to conduct an independent "investigation" into the allegations made by Daugherty. Daugherty was never interviewed and not surprisingly, Ashcroft produced a report that absolved Highland Capital. The arbitration panel disagreed and found in favor of Highland Capital Credit Strategies Fund for over $30,000,000 in damages resulting from willful misconduct and breach of fiduciary duty. Once again, for these dubious legal services provided by Hurst, Katz, Hutton Andrews Kurth, DLA Piper, and Lackey Hershman on behalf of Highland Capital, Highland Employee Vessel was allocated the bill.

**4.    Willful Misconduct in the Transfer of Highland Crusader Fund's Assets to Dondero, Okada and Ellington Controlled Entities**

128.    Dondero, Ellington, and Leventon also engaged in misconduct relating to Highland Capital managed funds Highland Offshore Partners L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Crusader Funds"). Highland Capital had placed the Crusader Funds into wind-down in October 2008. Investors in the funds subsequently commenced lawsuits alleging breach of fiduciary duty claims against Highland Capital, based on allegations that Dondero had refused to make

mandated distributions and honor redemption requests, and traded the funds' positions in a manner designed to render them illiquid in order to deter future redemptions, which led to multiple disputes among redeeming investors. Certain of these lawsuits were ultimately resolved in July 2011, when the parties entered into a Joint Plan of Distribution of the Crusader Fund and a Scheme of Arrangement for its creditors (together, the "Joint Plan and Scheme"). As part of the Joint Plan and Scheme, a committee referred to as the "Redeemer Committee" was elected from the Crusader Funds' investors to oversee Highland Capital's wind-down of the Crusader Funds and distribution of proceeds to investors.

129.    On July 5, 2016, the Redeemer Committee (i) terminated Highland Capital as investment manager; (ii) filed a complaint in Delaware Chancery Court against Highland Capital seeking a limited status quo order, a declaration that the Redeemer Committee had "cause" to terminate Highland Capital as manager, and a declaration that Highland Capital had forfeited any right to indemnification as a result of its failure to distribute proceeds to investors of various funds; and (iii) commenced an arbitration proceeding (the "Redeemer Arbitration") against Highland Capital alleging that it had engaged in various forms of misconduct in its role as investment advisor. After two years of arbitration proceedings, the Redeemer Arbitration culminated in a nine-day evidentiary hearing in September 2018 that included testimony from eleven fact witnesses and four expert witnesses. On March 6, 2019, the arbitration panel issued an award in favor of the Redeemer Committee, which resulted in gross damages of $136.8 million and total damages (including interest) of $190.8 million. Ultimately, the panel awarded ten forms of damages: (1) the Deferred Fee Claim ($43,105,395); (2) the Distribution Fee Claim ($22,922,608); (3) the Taking of Plan Claims ($3,277,991); (4) the CLO Trades Claim ($685,195); (5) the Credit Suisse Claim ($3,660,130); (6) the UBS Claim ($2,600,968); (7) the Barclays Claim ($30,811,366); (8) the Legal Fees, Costs, and Expenses Claim ($11,351,850); (9) the Portfolio

Company Award ($71,894,891); and (10) the Administrative Fees Award ($514, 164).

130.    The claims that were asserted against Highland Capital by the Redeemer Committee stemmed from the various breaches of fiduciary duty to the Crusader Funds that Dondero, Ellington, and Leventon caused Highland Capital to commit. For example, the "Barclays Claim"—which gave rise to over $30 million in liability for Highland Capital—arose out of Dondero, Ellington, and Leventon causing Highland Capital to transfer Barclays' limited partnership interests in the Crusader Funds to Highland Capital's wholly-owned affiliate, Eames, after the Redeemer Committee had already refused to approve that transfer. In so doing, Dondero, Ellington, and Leventon caused Highland Capital to violate the Joint Plan and Scheme and its fiduciary duties. Because of Dondero, Ellington, and Leventon's wrongful conduct, Highland Capital was ordered to pay: (1) over $30 million on account of disgorged partnership interests; (2) additional sums for disgorgement of distribution fees (that were included within the $22.9 million Distribution Fee Award); and (3) interest, fees, and expenses incurred in connection with the arbitration.

131.    In addition, from December 2013 through January 2016, Dondero, Ellington, and Leventon caused Highland Capital to purchase 28 Plan Claims from Crusader investors in violation of the Redeemer Committee's right of first refusal ("ROFR"). During this time, Leventon told multiple investors interested in possible transfers of their interests that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. Leventon also made affirmative misrepresentations to the Redeemer Committee to disguise the fact that Highland Capital had purchased the Plan Claims. Pursuant to the arbitration award, Highland Capital was required to transfer the 28 Plan Claims to the Redeemer Committee, and to disgorge to the Committee whatever financial benefits Highland Capital obtained from the 28 transactions, plus interest at the rate of 9%, from the date of each purchase.

132.     Dondero's, Ellington's, and Leventon's conduct also resulted in Highland Capital becoming liable to the Redeemer Committee for over $71 million in connection with claims arising from the Cornerstone Healthcare Group Capital ("Cornerstone") that was owned, directly and indirectly, by Highland Capital. Some of Cornerstone's stock was owned by the Crusader Funds. Dondero, Ellington, and Leventon caused Highland Capital to covertly purchase shares in Cornerstone from another fund that Dondero controlled at below-market prices and failed to liquidate the Crusader Funds' shares in Cornerstone as their fiduciary duties required. Pursuant to the arbitration award, Highland Capital was required to purchase the Crusader Funds' shares in Conrerstone at a fixed price of $48,070,407, and to pay pre-judgment interest that brought the total claim to $71,894,891.

133.     Additionally, the Joint Plan and Scheme required Highland Capital to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete. Dondero, Ellington, and Leventon caused Highland Capital to violate that provision of the Joint Plan and Scheme by causing Highland Capital to surreptitiously transfer approximately $32 million in Deferred Fees from the Crusader Funds' accounts on January 21 and April 6, 2016. The arbitration panel ruled that as a consequence of Dondero's, Ellington's, and Leventon's blatant breach of the payment requirements of the Joint Plan and Scheme, Highland Capital forfeited its right to these fees entirely.

134.     The Redeemer Committee set a hearing in Delaware Chancery Court for October 8, 2019, to obtain entry of a judgment with respect to the award. The hearing was subsequently continued to October 16, 2019, before the same court presiding over the Daugherty causes involving Dondero, Highland Capital, Ellington, Leventon, Girard, Hurst, and Katz. That morning, Highland Capital filed for bankruptcy.

135.     Daugherty communicated several times with members of the Highland Crusader

Fund regarding his views of the value and location of their assets pursuant to his ongoing fiduciary duties under the 1940 Advisors Act. In addition, his countersuit against Highland Capital detailed numerous acts of fraud and breaches of fiduciary duty that caused damage to Highland Crusader Fund. Dondero, Ellington, Leventon, Hurst, Katz, Hunton Andrews Kurth, and Lackey Hershman embarked on a crusade to smear Daugherty and his legal counsel while filing numerous baseless show cause motions against him. In addition, the services of the Ashcroft Law Firm ("Ashcroft") were retained to conduct an independent "investigation" into the allegations made by Daugherty. Daugherty was never interviewed and, not surprisingly, Ashcroft produced a report that absolved Highland Capital and its officers. The arbitration panel disagreed and found in favor of Crusader Funds for over $190,000,000 in damages resulting from willful misconduct and breach of fiduciary duty among other things. Once again, for these dubious legal services provided by Hurst, Katz, Hutton Andrews Kurth, DLA Piper, and Lackey Hershman in attempting to silence Daugherty on behalf of Highland Capital, Highland Employee Vessel was allocated the bill.

### 5. Dondero And His Accomplices, Including Ellington, and Leventon, Cause Highland Capital To Engage In Misconduct That Increases Its Liability To UBS

136.    In March 2017, the New York state court presiding over UBS's claims against Highland Capital and other fund counterparties ruled its claims could proceed to trial. Shortly thereafter, Dondero, Ellington, and Leventon, along with Highland Capital employees Jean Paul Sevilla, Katie (Irving) Lucas, and Matthew DiOrio, took steps to transfer the fund counterparty's remaining assets to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands entity indirectly owned and controlled by Dondero and Ellington, in order to ensure that such assets would be out of UBS's reach in the event that a judgment was entered in its favor.

137.    In or around August 2017, Dondero, Ellington, Leventon, Sevilla, Lucas, and

DiOrio orchestrated the surreptitious transfer of all of the fund counterparty's assets—with a face amount of $300 million and a market value of at least $100 million —to Sentinel.

138.    The pretextual justification for these transfers was to satisfy a $25 million premium on an "after the event" insurance policy issued by Sentinel that purportedly insured the fund counterparty's first $100 million of liability to UBS. The real goal of the transfer, however, was to drain the fund counterparty's assets and render them judgment-proof, while keeping the assets within Dondero's and Ellington's control. There is no legitimate explanation as to why the funds transferred assets worth at least four times the premium payment to Sentinel. And given that Dondero and Ellington indirectly own and control Sentinel, they personally and improperly benefitted from this overpayment.

139.    Moreover, Ellington and Leventon (along with Sevilla, Lucas, and DiOrio) actively concealed the transfer of assets and the existence of the insurance policy from the Independent Board, apparently in order to prevent the Fund Counterparties from making a claim under the policy. Indeed, Leventon, who was directly involved in the transfers to Sentinel, was tasked with educating the Independent Board about UBS's claim and the assets potentially available to satisfy it. In response, Leventon delivered an extensive—but intentionally misleading—presentation to the Independent Board that said nothing about the August 2017 asset transfer and the Sentinel insurance policy and lied to Highland Capital regarding the Fund Counterparties' assets. Additionally, around the same time that Ellington and Leventon were hiding this secret insurance policy from the Independent Board, (i) Ellington charged the policy for personal expenses in excess of $500,000 that bore no relation to the UBS litigation and provided no benefit whatsoever to the Fund Counterparties or Highland Capital; and (ii) Ellington and Leventon, among others, entered into agreements whereby Sentinel agreed to pay attorneys' fees and expenses they incurred in connection with Highland Capital's bankruptcy.

140.     As a direct result of Ellington's and Leventon's fraudulent concealment of the transfers to Sentinel, Highland Capital inadvertently made factually inaccurate statements to the Bankruptcy Court and incurred millions of dollars in additional fees litigating (rather than settling) with UBS. In March 2021, after the policy was uncovered through Highland Capital's diligence (notwithstanding Ellington's and Leventon's cover-up), the CDO Fund made a claim on the policy. To date, Sentinel has refused to make any payments.

141.     Daugherty communicated several times with members of the UBS team regarding his views of the value and location of their assets pursuant to his ongoing fiduciary duties under the 1940 Advisors Act. In addition, his countersuit against Highland Capital detailed numerous acts of fraud and breaches of fiduciary duty that caused damage to UBS. Dondero, Ellington, Leventon, Hurst, Katz, Hunton Andrews Kurth embarked on a crusade to smear Daugherty and his counsel while filing numerous baseless show cause motions against him. In addition, the services of the Ashcroft Law Firm ("Ashcroft") were retained to conduct an independent "investigation" into the allegations made by Daugherty. Daugherty was never interviewed and not surprisingly, Ashcroft produced a report that absolved Highland Capital.

142.     On February 10, 2020, the New York state court disagreed with the Ashcroft report and issued a judgment against the Highland Counterparties in connection with the phase one litigation, in the principal amount of $519,374,149, plus $523,016,882.79 in prejudgment interest, for an overall judgment of $1,042,391,031.79. Trial on UBS's claims against Highland Capital was still pending when HCMLP filed for bankruptcy on October 16, 2019 (as discussed infra).

143.     Once again, for these dubious legal services provided by Hurst, Katz, Hutton Andrews Kurth, DLA Piper, and Lackey Hershman in attempting to silence Daugherty on behalf of Highland Capital, Highland Employee Vessel was allocated the bill.

# V.
## CAUSES OF ACTION

### Count One: Violations of Federal Civil RICO—Conduct of a RICO Enterprise, 18 U.S.C. § 1962(c)

144.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

145.    At all relevant times, Defendants Dondero, Okada, Dameris, Ellington, Katz, Hurst, Brown Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain are each "person[s]" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

146.    The Defendants each violated 18 U.S.C. § 1962(c) by the acts described in the paragraphs above.

147.    The Defendants actions described in the previous paragraphs constitute an Enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

148.    At all relevant times, the Defendants were engaged in, and/or its activities constituting wire fraud within the meaning of 18 U.S.C. § 1962(c) and 1343. At all relevant times, the Defendants participated in the operation, management, and directed the affairs of the Enterprise.

149.    The Defendants, each of whom are persons associated with the concerted efforts against Plaintiff did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the conduct, management, or operation of the affairs of the Enterprise.

150.    The Defendants through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c), through multiple instances of Mail Fraud and Wire Fraud, in violation of 18 U.S.C. §§ 1341 and 1343, and Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Use of the Mails and Wires to Defraud, in violation of 18 U.S.C. §§ 1341 and 1343. 94. The Defendants devised or intended to devise a scheme to defraud Plaintiffs

of money, property, and other benefits and assets

151.    For the purposes of executing their scheme, the Defendants delivered or caused delivery of various documents and things by the U.S. mails or by private or commercial interstate carriers or received such therefrom. For the purposes of executing their scheme, the Defendants transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce various writings, signs, and signals.

152.    In furtherance of their scheme, the Defendants used the wires and/or U.S. mails or private or commercial carriers to delivery documents and things to Plaintiff or the Enterprise for the purposes of defrauding Plaintiff, including, but not limited to the following: a. Emails b. Wirings and/or mailings between and among the Defendants concerning: the scheme to defraud Plaintiff of money and property as well as other benefits and assets. c. Funds transferred between Defendants with the intent that those funds be used to promote the carrying on of Defendants' scheme to defraud Plaintiff of money and property as well as other benefits and assets.

153.    The Defendants used wire and mail communications in furtherance of their scheme to defraud Plaintiff, in violation of 18 U.S.C. §§ 1341 and 1343, as described fully above.

154.    The Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to advance their scheme to deceive or defraud Plaintiff. The Defendants knowingly and intentionally prepared documents, including but not limited to, resolutions, court papers, letters, notices, and other documents, and then knowingly and with the intent to deceive Plaintiff, caused those documents to be sent to Plaintiff or entities that would further the Defendants' scheme to defraud.

155.    The Defendants have, on multiple occasions, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducted or attempt to conduct a financial transaction which in fact involves the proceeds of specified

unlawful activity with the intent to promote the carrying on of specified unlawful activity, including, but not limited to, violations of 18 U.S.C. §§ 1341 and 1343 and the Defendants have, therefore, violated 18 U.S.C § 1956(a)(1)(A)(i), money laundering.

156.    Each of the Defendants has engaged in multiple predicate acts, as described in the preceding paragraphs. The conduct of each of the Defendants described in the preceding paragraphs constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

157.    The Defendants violations of federal law as set forth herein, each of which directly and proximately injured Plaintiff, constitutes a continuous course of conduct, which was intended to defraud Plaintiff of money and property through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of racketeering activity as defined by 18 U.S.C. §§ 1961(1) and (5).

158.    Plaintiff was injured in their money and property by reason of the Defendants' violation of 18 U.S.C. § 1962(c).

159.    The Defendants' injuries to Plaintiff were a direct, proximate, and reasonably foreseeable result of their violation of 18 U.S.C. § 1962. Plaintiff is the ultimate victims of the Defendants unlawful Enterprises and scheme. Plaintiff has been and will continue to be injured in their money and property in an amount to be determined at trial.

160.    Pursuant to 18 U.S.C. § 1962(c), Plaintiff is entitled to recover treble damages plus costs and attorneys' fees from the Defendants as well as any other relief authorized by statute.

**Count Two: PROMISSORY ESTOPPEL**

161.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

162. Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce, and Britain made promises to Plaintiff regarding the establishment, funding, and management of the Escrow.

163. Plaintiff reasonably and substantially relied on that promise to its detriment.

164. Plaintiff's reliance on the promise was foreseeable to Defendants.

165. Injustice to Plaintiff can only be avoided by enforcing Defendants promise.

166. The Defendants actions or omission proximately caused Plaintiff injury.

167. Plaintiff incurred actual damages.

## Count Three: MONEY HAD AND RECEIVED

168. Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

169. Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce, Britain, Honis as Trustee of Hunter Mountain Trust, Nancy Dondero as Trustee of Dugaboy Trust, Lawrence Tonomura as Trustee of the Okada Trust #1 and Okada Trust #2 and Grant James Scott III as Trustee of the Get Good Trust hold money.

170. That money belongs to Plaintiff in equity and good conscious.

## Count Four: CONVERSION

171. Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

172. Plaintiff had the right to possession of assets which were personal.

173. Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce, Britain, Honis as Trustee of Hunter Mountain Trust, Nancy Dondero as Trustee of Dugaboy Trust, Lawrence Tonomura

as Trustee of the Okada Trust #1 and Okada Trust #2 and Grant James Scott III as Trustee of the Get Good Trust have wrongfully exercised dominion and control over Plaintiff's property.

174.     Plaintiff has suffered injury as a result of Defendants actions.

## Count Five: FRAUD

175.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

176.     Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain made representations to Plaintiff.

177.     The representations were material.

178.     The representations were false.

179.     At the time Defendants made the representations the Defendants knew they were false and made the representations recklessly, as a positive assertion and without knowledge of its truth.

180.     The Defendants made the representations with the intent that the Plaintiff act on them which in fact the Plaintiff did rely on them.

181.     The representations caused the Plaintiff injury.

## Count Six: FRAUD BY NONDISCLOSURE

182.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

183.     Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain and concealed from and/or failed to disclose certain facts to Plaintiff.

184.     Defendants had a duty to disclose these facts to the Plaintiff.

185.    The facts were material.

186.    At the time Defendants made those representations the Defendants knew that Plaintiff was ignorant of the facts and that Plaintiff would not have an equal opportunity to discover the facts.

187.    The Defendants were deliberately silent when they had a duty to speak.

188.    By failing to disclose those facts the Defendants intended to induce Plaintiff to take some action or refrain from same.

189.    Plaintiff relied on the Defendants nondisclosure.

190.    Plaintiff was injured as a result of acting without the knowledge of the undisclosed facts.

## Count Seven: LEGAL MALPRACTICE

191.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

192.    Defendants Ellington, Katz, Hurst, Leventon, Girard, Demaris, Brown, Hunton Andrews Kurth LLP, Abrams & Bayliss, LLP, DLA Piper, LLP, and owed Plaintiff a duty.

193.    The Defendants negligent acts and/or commissions breached that duty.

194.    The breach proximately caused Plaintiff's injury.

195.    Plaintiff suffered damages as a result.

## Count Eight: TEXAS THEFT LIABILITY ACT

196.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

197.    Plaintiff had possessory right to assets.

198.    Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain appropriated

those assets by taking it without Plaintiff's effective consent by the theft of personal property under

Texas Penal Code §31.03.

199.    The Defendants unlawful taking was made with the intent to deprive the Plaintiff of

the property.

200.    The Plaintiff sustained damage as a result of the theft.

## Count Nine: BREACH OF FIDUCIARY DUTY

201.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if

fully set forth herein.

202.    Plaintiff had a fiduciary relationship with Defendants Dondero, Okada, Ellington,

Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty,

Walia, Boyce and Britain .

203.    The Defendants breached that duty to the Plaintiff.

204.    The Defendants breach proximately caused injury to the Plaintiff and/or resulted in

a benefit to the Defendants.

## Count Ten: ASSISTING AND PARTICIPATING

205.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if

fully set forth herein.

206.    Defendants Dondero, Okada and Ellington's acts and/or omissions accomplished a

tortious result as to Plaintiff.

207.    Dondero, Okada, Ellington, Katz, Hurst, Brown, Leventon, Girard, Collins,

Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain provided substantial

assistance to Defendants Dondero, Okada and Ellington in accomplishing the tortious result.

208.    Defendants Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard,

Honis, Dameris, Dougherty, Walia, Boyce and Britain own conduct, separate from Defendants

Donero, Okada and Ellington's were a breach of the duty to Plaintiff and their participation was a substantial factor in causing the tort against Plaintiff.

209.    These acts caused injury to the Plaintiff.

## Count Eleven: CONSPIRACY

210.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

211.    Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain were members of a combination of two or more people who object was to accomplish the unlawful acts and omissions against Plaintiff.

212.    The Defendants had a meeting of the minds on the object of that course of action.

213.    One of more of the Defendants committed an unlawful overt act to further course of actions.

214.    The Plaintiff suffered injury as a proximate result of the wrongful act.

## Count Twelve: TEXAS UNIFORM FRAUDULENT TRANSFER ACT (TUFTA)

215.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

216.    Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain fraudulently transferred the assets with the actual intent to hinder delay and/or defraud the Plaintiff.

217.    Defendants retained possession and control of the assets after the transfer.

218.    Defendants transfer of the assets was concealed.

219.    Defendants had been sued before the transfer was made.

220.    The transfer was of substantially all of the Defendants assets.

221.    Defendants became insolvent shortly after the transfer was made.

**Count Thirteen: IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**

222.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

223.    Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain owed Plaintiff an implied duty of good faith and fair dealing regarding the company operating agreement.

224.    The agreement required that Defendants act in a reasonable manner which Defendants failed to do by taking advantage of Plaintiff in a manner Plaintiff did not contemplate when entering the agreement.

225.    Defendants impaired and/or inhibited Plaintiffs right to receive the benefits of the agreement.

226.    Plaintiff suffered injury as a result of Defendants acts and/or omissions.

**Count Fourteen: UNJUST ENRICHMENT (In the alternative)**

227.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

228.    Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce, Britain, Honis as Trustee of Hunter Mountain Trust, Nancy Dondero as Trustee of Dugaboy Trust, Lawrence Tonomura as Trustee of the Okada Trust #1 and Okada Trust #2 and Grant James Scott III as Trustee of the Get Good Trust were unjustly enriched by receiving the assets of the Plaintiff.

229.    Defendant's acquisition of the assets caused a detriment to the Plaintiff.

230.    There was no contract between the parties.

231.    Plaintiff expected to receive the assets from the Defendants.

232.    Defendants accepted, used, and enjoyed the benefit of the assets.

**Count Fifteen: PIERCING THE COPRORATE VEIL**

233.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

234.    The corporate forms of Plaintiff Highland Employee Retention Assets LLC, (during the time Dondero and Okada controlled it) and Highland ERA Management LLC (during the time Dondero and Okada controlled it) should be disregarded because the form was used to perpetuate a fraud, the corporation was organized and operated as a mere tool or business conduit of another and the form was used to protect against the discovery of a crime or to justify a wrong.

235.    As it relates to the operating agreements of the entities Defendants Dondero and Okada caused the corporations to be sued for the purpose of perpetrating an actual fraud and perpetrated an actual fraud on the Plaintiff primarily for Defendant Dondero and Okada's direct personal benefit.

## VI.
## CONDITIONS PRECEDENT

236.    All conditions precedent for the claims above have been performed or have occurred.

## VII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Highland Capital Employee Retention Assets LLC prays that Defendants be cited to appear and answer herein, and for the further relief set forth below:

(1)    Actual damages;

(2)    Exemplary damages;

(3)    Pre and post judgment interest;

(5)    For costs of suit; and

(6)    For such other and further relief to which Plaintiff Highland Capital Employee Retention Assets LLC may be justly entitled.

Dated: February 29, 2024.

Respectfully submitted,

LAW OFFICE OF MATTHEW BOBO, PLLC.


/s/ Matthew W. Bobo
**Matthew W. Bobo**
State Bar No. 24006860

4916 Camp Bowie Blvd.
Fort Worth, Texas 76107
Telephone: (817) 529-0774
Facsimile: (817) 698-9401
mbobo@mwblawyer.com

**ATTORNEYS FOR PLAINTIFF**