# Exhibit 39

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND EMPLOYEE RETENTION ASSETS LLC | § § § | |
| *Plaintiff,* | § § § | Civil Action No. |
| v. | § § | |
| JAMES DONDERO, MARK OKADA, MARK KATZ, MICHAEL HURST, SHONN BROWN, SCOTT ELLINGTON, ISAAC LEVENTON, ERIC GIRARD, JOHN HONIS, TED DAMERIS, RAYMOND JOSEPH DOUGHERTY, AMIT WALIA, PATRICK BOYCE, LANE BRITAIN, FRANK WATERHOUSE, BRIAN COLLINS, HUNTON ANDREWS KURTH LLP, ABRAMS & BAYLISS LLP, DLA PIPER LLP, NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; JOHN HONIS, AS TRUSTEE OF HUNTER MOUNTAIN INVESTMENT TRUST; LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2, | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |
| *Defendants.* | § § | |

## PLAINTIFF'S FIRST AMENDED ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Plaintiff Highland Employee Retention Assets LLC ("Plaintiff" or

"Highland Employee Vessel") complaining of James Dondero ("Dondero"), Mark Okada

("Okada"), Marc Katz/HAK/DLAP ("Katz/HAK/DLAP"),   Michael Hurst ("Hurst"), Shonn

Brown ("Brown"), Scott Ellington ("Ellington"), Isaac Leventon ("Leventon"), Eric Girard ("Girard"), John Honis ("Honis"), Ted Dameris ("Dameris"), Raymond Joseph Dougherty ("Dougherty"), Patrick Boyce ("Boyce"), Lane Britain ("Britain"), Frank Waterhouse ("Waterhouse"), Brian Collins ("Collins"), Hunton Andrews Kurth LLP ("Hunton Andrews Kurth"), Abrams & Bayliss LLP, ("Abrams & Bayliss") DLA Piper, LLP ("DLA Piper") Nancy Dondero, As Trustee Of Dugaboy Investment Trust "Dugaboy Trust"); Grant James Scott III, As Trustee Of Get Good Trust ("Get Good Trust"); John Honis, As Trustee Of Hunter Mountain Investment Trust ("Hunter Mountain Trust"); Lawrence Tonomura As Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Exempt Trust #1"); Lawrence Tonomura as Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Exempt Trust #2") referred to collectively as Defendants, and for cause of action would respectfully show the Court as follows:

## I.
## <u>PARTIES</u>

1.    Plaintiff Highland Employee Retention Assets, LLC ("Plaintiff" or "Highland Employee Vessel") is a Delaware limited liability company with its principal place of business in Dallas, Texas.

2.    Defendant Dondero is an individual who resides in Dallas County Texas and has made an appearance through counsel.

3.    Defendant Okada is an individual who resides in Dallas County Texas and has made an appearance through counsel.

4.    Defendant Katz is an individual who resides in Dallas County Texas and has made an appearance through counsel. [we need to break DLAP out separately].

5.    Defendant Hurst is an individual who resides in Dallas County Texas and has made an appearance through counsel.

6.    Defendant Brown is an individual who resides in Dallas County Texas and has

made an appearance through counsel.

7.     Defendant Ellington is an individual who resides in Dallas County Texas and has made an appearance through counsel.

8.     Defendant Leventon is an individual who resides in Dallas County Texas and has made an appearance through counsel.

9.     Defendant Girard is an individual who resides in Tarrant County Texas and has made an appearance through counsel.

10.    Defendant Honis is an individual who resides in Florida and has made an appearance through counsel.

11.    Defendant Dameris is an individual who resides in Dallas County Texas and has made an appearance through counsel.

12.    Defendant Dougherty is an individual who resides in Ada, Oklahoma and has made an appearance through counsel.

13.    Defendant Boyce is an who resides in Montgomery County Texas and may be served with process where he resides at 9651 Crestwater Circle, Montgomery, Texas, 77354.

14.    Defendant Britain is an individual who resides in Dallas County Texas and has made an appearance through counsel.

15.    Defendant Waterhouse is an individual who resides in Collin County Texas and has made an appearance through counsel.

16.    Defendant Collins is an individual who resides in Dallas County Texas and has made an appearance through counsel.

17.    Defendant Hunton Andrews Kurth LLP has made an appearance through counsel.

18.    Defendant Abrams & Bayliss LLP is a partnership established under the laws of Delaware and has made an appearance through counsel.

19.    Defendant DLA Piper LLP is a partnership established under the laws of

Maryland and has made an appearance through counsel.

20.     Defendant Honis is named in his capacity as Trustee of Hunter Mountain Investment Trust ("Hunter Mountain") is a statutory trust established under the laws of the state of Delaware and has made an appearance through counsel.

21.     Defendant Nancy Dondero as Trustee of Dugaboy Investment Trust ("Dugaboy Trust") is a statutory trust established under the laws of the state of Delaware and has made an appearance through counsel.

22.     Defendant Lawrence Tonomura as Trustee of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Trust #1") that was created under the laws of the state of Texas. Okada controls Okada Trust #1 and has made an appearance through counsel.

23.     Defendant Lawrence Tonomura as Trustee of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Trust #2") that was created under the laws of the state of Texas and has made an appearance through counsel.

24.     Defendant Grant James Scott III as Trustee of the Get Good Trust that was created under the laws of the state of Texas and has made an appearance through counsel.

## II.
## JURISDICTION

25.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because it involves a federal question.

## III.
## VENUE

26.     Venue for this action is predicated upon 28 U.S.C. §1391(a)(2) and 28 U.S.C. §1391(b)(1) and (2).

## IV.
## FACTUAL BACKGROUND

### A.  The Tortured History of Dondero, Okada, Ellington, and The Defendant Minions

27.     Dondero and Okada co-founded Highland Capital Management, LP ("Highland

Capital") in 1993 and, with the Defendant Trusts, were its primary owners until it emerged from bankruptcy in August 2021. Highland Capital is an investment advisor registered with the SEC under the Investment Company Act of 1940 that managed billions of dollars of assets through its structure of approximately 2,000 separate business entities. Plaintiff was one of those entities.

28.    Dondero was President and Chief Executive Officer of Highland Capital was a "Key Man" manager of Plaintiffs most valuable investment, Restoration Capital Partners, LP. until his removal in 2020.

29.    Okada was Chief Investment Officer and Executive Vice President until Highland Capital filed for bankruptcy in October 2019. He also was defined as a "Key Man" manager of Plaintiffs most valuable investment, Restoration Capital Partners, LP. He managed the investor relations department of Highland Capital where he orchestrated his stated strategy to manipulate "perception over reality."

30.    Ellington served in various roles as a partner and Highland Capital's Chief Legal Officer and General Counsel from 2010 until he was fired for cause in January 2021 for acting in a manner adverse to Highland Capital's interest.

31.    Leventon served as Assistant General Counsel at Highland from 2009 until he was fired for cause in January 2021 for acting in a manner adverse to Highland Capital's interest.

32.    Thomas Surgent ("Surgent") served as Chief Compliance Officer and Deputy General Counsel of Highland Capital from 2011 through the Highland Capital bankruptcy and has served as Highland Capital's General Counsel since it emerged from bankruptcy in August 2021.

33.    Girard served as internal counsel at Highland Capital from 2011 until he was terminated in 2017.

34.    Hurst was a partner at his former firm, Gruber Hurst Johansen Hail Shank LLP, and is currently a partner at Lynn Pinker Gruber & Schwegmann where he served as outside

counsel to Plaintiff until he was fired by Highland Capital's new management team in 2020 for insubordination and unprofessional misconduct.

35.     Brown was a partner at her former firms, Gruber Hurst Johansen Hail Shank LLP, and Lynn Pinker Gruber & Schwegmann where she served as outside counsel to Plaintiff.

36.     Katz was a partner at his former firm, Hunton Andrews Kurth, and is now at DLA Piper[1], where he served as outside counsel to Plaintiff and Highland Capital.

37.     Jeff Abrams ("Abrams"), Matt Miller ("Miller") and Stephen Hough ("Hough") were attorneys at Abrams & Bayliss and served as outside counsel to Plaintiff.

38.     Dameris was a board member of Plaintiff and served as a Managing Director at Highland Capital.

39.     Boyce was a board member of Plaintiff and was a Partner at Highland Capital. He also served as Head of Private Equity for Plaintiff's limited partnership interests including Plaintiffs most valuable investment, Restoration Capital Partners, LP. from late 2011 until his termination from Highland Capital in 2014.

40.     Britain was a board member of Plaintiff and was a Partner at Highland Capital.

41.     Honis was a board member of Plaintiff, Partner of Highland Capital, and trustee to Hunter Mountain. He also was a "Key Man" manager of Plaintiffs most valuable investment, Restoration Capital Partners, LP.

42.     Walia was a board member of Plaintiff and was a Partner at Highland Capital.

43.      Dougherty was a board member of Plaintiff and was a Partner at Highland Capital.

44.     Trey Parker ("Parker") was Co-Chief Investment Officer with Okada at Highland Capital and Head of Private Equity after Boyce for Plaintiff's limited partnership investments

---

[1] Throughout this petition Plaintiff will refer to Katz, Hunton Andrews Kurth and DLA Piper collectively as ("Katz/HAK/DLAP, except where DLAP is identified separately")

including Plaintiff's most valuable investment, Restoration Capital Partners, LP. He was also named Partner at Highland Capital in 2015.

45.    Waterhouse was the Chief Financial Officer at Highland Capital until he was terminated in 2021.

46.    Collins was the Head of Human Resources at Highland Capital until he was terminated in 2021 and was the primary agent to implement and execute actions on behalf of the board for Plaintiff as well as lead its investor communications, document custody, governance solicitation and Highland Capital's buyout offer solicitation.

47.    David Klos ("Klos") was a senior accountant at Highland Capital that was responsible for the management of Plaintiff's accounting records. He has been the Chief Financial Officer at Highland Capital since its emergence from bankruptcy in August 2021.

48.    Rick Swadley ("Swadley") was a senior tax director at Highland Capital that was responsible for the management of Plaintiff's tax records until he was terminated in 2021.

49.    Dugaboy, Get Good, the Okada Trusts and Hunter Mountain are trusts established by Dondero and Okada for the benefit of themselves and their family members.

50.    Dondero and Okada, with Boyce, Parker, Ellington, Leventon, Girard, Surgent, Hurst, Katz/HAK/DLAP, Waterhouse, Klos and Swadley at their side, controlled Highland Capital and its byzantine web of funds and other entities under its management with unilateral and unfettered discretion for years. They ensured that Highland Capital and its affiliates routinely failed to observe corporate formalities with respect to their personnel, corporate governance, internal systems, legal affairs, and considerable assets.

51.    In September 2008, Highland Capital took a dramatic turn for the worse because of Dondero and Okada's mismanagement and self-dealing during the financial crisis. Highland Capital defaulted on its credit facility, prompting its lenders to demand a forensic accounting review of missing cash and assets. The audit revealed that Dondero and Okada had siphoned tens

of millions of dollars out of Highland Capital's accounts, while leaving creditors and employees with insufficient resources to collect what was owed to them. A multitude of lawsuits were filed over a ten-year period against Dondero and his trusts, Okada and his trust, Ellington, Leventon, and their affiliates as they became embroiled in litigation on allegations of fraud, breach of fiduciary duty, breach of good faith and fair dealing, willful misconduct, fraudulent transfers, money laundering, and wire fraud that resulted in verdicts of over one billion dollars in damages against them or their affiliates.

52.    The lenders initially demanded that the cash be returned immediately to which Dondero threatened, "Highland will fail before I fail!" Following months of difficult negotiations, the lenders agreed to an extension of the credit facility in exchange for strict repayment terms and a security interest in over $125 million of Highland Capital's remaining assets. In addition, the lenders agreed to allow for the creation of a vessel to set aside assets for the purpose of retaining and incentivizing employees – this entity is Plaintiff. Importantly, the assets were transferred to Plaintiff in exchange for deferred compensation assets that were terminated as a result of the security interests taken by the lenders. Dondero, Okada and their affiliates were intentionally forbidden from participating as preferred unit holders in Plaintiff.

53.    Plaintiff has never had employees and at all times depended on its board of directors, legal counsel, managers, service providers, and its investment advisors to conduct its affairs. Highland employees, including Dondero, Okada, Parker, Ellington, Leventon, Girard, Surgent, Collins, Hellen Kim, Waterhouse, Swadley, and Klos performed investment management, legal, accounting, and tax services to Plaintiff under Shared Services and Blanket Agreements. Dondero and Okada resented the cost of Plaintiff.

54.    Okada often demonstrated his contempt for Highland Capital employees, routinely lambasting them and referring to Hispanics as "spics" and "wetbacks," Jews as "Jesus Killers," and Caucasians as "dumb white people that all look the same." He would flaunt his belief

that he could "do whatever I want because I'm in a protected class," while bragging about the Japanese surprise attack on Pearl Harbor. Okada also exposed himself in the nude at company events, groped women in the office through simulated intercourse, and physically assaulted employees as his self-proclaimed alter ego, "Thor."

### B. Daugherty Resigns from Highland Capital and is Removed as Director of Plaintiff

55.     Patrick Daugherty ("Daugherty") was a partner, officer, director, Head of Private Equity, and Co-Head of Research for Highland Capital and certain of its affiliates from 1998 until 2011. Daugherty resigned from Highland Capital on September 28, 2011, because he refused to participate in the conduct at Highland Capital that would later result in over a billion dollars in damage awards to investors and creditors for breach of fiduciary duty, willful misconduct, and fraud, among other causes of action. Indeed, Dondero, Okada, Ellington, Leventon, Katz/HAK/DLAP, Hurst and Brown would later pursue legal actions on behalf of Highland Capital against Daugherty to whitewash willful misconduct and breach of fiduciary duties against UBS, Josh Terry (a former employee), the Credit Strategies fund investors and the Crusader Fund investors (including Dallas Police and Fire, Baylor University, Army Airforce Exchange, Ontario Teachers, and many others).

56.     Prior to his resignation, Daugherty became a holder of Series A Preferred Units of Plaintiff on October 26, 2009. He was awarded 1,571.86 preferred units and was the largest holder of the lender-approved Plaintiff. Plaintiff was created based on a "last man standing" structure where remaining employees would receive reallocated shares of the units forfeited by departed employees. The number of Daugherty's units and percentage ownership of Plaintiff increased to 1,909.69 and approximately 19.09% as other employees resigned from Highland Capital prior to their interests vesting in 2011. At the time of his resignation, Daugherty was a director of Plaintiff. After his resignation, Defendants began a campaign to inflict economic pain on Daugherty by stripping Plaintiff of its assets.

57. On February 16, 2012, Plaintiff's board members, Boyce, Britain, Dameris, Dougherty (no relation to Daugherty), Honis, and Walia removed Daugherty as a director of Plaintiff. Immediately thereafter, the newly composed board executed a Second Amended and Restated Agreement (the "2012 Amendment") prepared by Highland Capital's Chief Compliance Officer and Deputy General Counsel, Surgent. The 2012 Amendment purported to impose a punitive procedure to deplete the value of a holder who litigated any action "related to" Plaintiff, Highland Capital, and its officers and directors, escrow the holder's interest, and, in a type of reverse-indemnification, impose the litigation costs of Plaintiff and any deemed "diminution in value" cost to the litigant, whether it lost or won the litigation – a proverbial lose-lose clause.

58. After his removal as a director of Plaintiff, Daugherty had no access to or ability to know what the Defendants were doing regarding the Plaintiff.

59. In a dubious tax scheme, ownership of Highland Capital transferred to Hunter Mountain on or around December 17, 2015, from its then-existing limited partners (i.e., Dondero, Okada, Ellington, Parker, and entities they controlled). Through a complex series of transactions that occurred on December 21, 2015, and December 24, 2015, Dondero and Okada caused Hunter Mountain to become the owner-in name of 99.5% of the economic interests of Highland Capital. Meanwhile, Dondero and Okada caused Hunter Mountain to issue a series of notes and cash, such that Dondero, Okada, and certain entities they controlled (including Dugaboy, Okada Trust #1, and Okada Trust #2) continued to receive the economic benefit of limited partnership distributions made by Highland Capital to Hunter Mountain even after they had purportedly sold their limited partnership interests to Hunter Mountain.

### C. Daugherty Obtains Control of Plaintiff and For the First Time Discovers Harm to Plaintiff Caused by Defendants' Deliberately Concealed Bad Acts and Omissions

60. Daugherty and his affiliates now own and control 100% of Plaintiff pursuant to the terms of a bankruptcy court approved settlement on March 1, 2022. It is critically important to note that it was not until Daugherty and his affiliates obtained control of Plaintiff in March of

2022 that Defendants' wrongdoing complained of in this lawsuit, was fully discovered and that those wrongful acts and omissions had been deliberately concealed.

61.    After obtaining control of Plaintiff, Daugherty (on behalf of Plaintiff) began to request documents, legal invoices, emails, and metadata related to Plaintiff, but was met with obstruction at every turn. Despite this, through diligent efforts undertaken since March of 2022 Daugherty, for the first time, has been able to gather detailed information regarding Defendants' acts and omissions as they relate to harm caused to Plaintiff.

62.    The subsequent facts relay more background information interposed with what Plaintiff now knows happened with the information obtained since March of 2022.

## D. In 2022, it is Discovered that Plaintiff's Board Members Stripped Plaintiff of all of its Assets Through a Series of Shady Backdoor Corporate Governance Maneuvers

63.    Back on September 24, 2012, Daugherty, after he was removed as a director of Plaintiff, made his first request to inspect and verify Plaintiff's assets. Abrams & Bayliss acted to block the inspection by scheming with Surgent, Hurst, and Katz/HAK to demand that Daugherty pay for the costs of producing the materials and sign an onerous confidentiality agreement.

64.    It was not until Plaintiff's new management demanded review of its invoices and records in May 2022 that it was revealed that Abrams & Bayless had been retained solely on behalf of Plaintiff on June 11, 2012, after discussions with Boyce, Britain, Dameris, Honis, Dougherty, Hough, Abrams, Brown, Ellington, Kim, Collins, and Surgent regarding the Plaintiff's litigation with Daugherty. It was also revealed that in an email dated November 28, 2012, Dameris was advised by Jeff Abrams and Stephen Hough ("Hough"), "We caution that the board, which manages Plaintiff, owes fiduciary duties to both the LLC itself and to its members."

65.    Invoices and emails discovered in October 2022, revealed that December 22, 2012, Dondero communicated his buyout offer to members of Plaintiff's board after Dameris considered and Dondero rejected certain settlement scenarios regarding Daugherty's claims against Plaintiff

despite Abrams & Bayliss' warning to Dameris that Plaintiff's board had fiduciary duties to Plaintiff and the other unit holders. This provided previously unknown context to an email that was produced in the Texas litigation from Dameris, as Managing Director of Highland Capital, to Dondero on December 26, 2012 that presented as legitimate a "Buyout" scheme in which Dondero could gain control of Plaintiff at a substantial discount to value, pending review by Delaware counsel, noting "[i]f you decide to offer everyone except 1 [Daugherty] a buyout . . ..". It refuted certain testimony given by Dondero in the Texas trial that Dondero had no influence over Plaintiff prior to January 2013. It also revealed why Dameris collaborated with Abrams & Bayliss on December 30, 2013, to enhance indemnification rights of Plaintiff's directors. Importantly, this scheme was created at the same time that a large cash payoff was due to be paid to Plaintiff from the Safety-Kleen Systems, Inc. sale proceeds.

66.     It was not until Plaintiff's new management demanded review of its invoices and records in May 2022 that it was for the first time revealed that Hough (copying Abrams & Bayliss) had conspired with Plaintiff and its former board members on December 30, 2012 to provide a detailed scheme of "Buyout Steps," including how to  transfer control of Plaintiff to Dondero and Okada, while attempting to forgive the board members of their fiduciary duties to Plaintiff and simultaneously seeking to create expanded indemnification rights for themselves.

67.     It was also revealed for the first time in late 2022 that Surgent sent an email on January 9th and 15th, 2013, distributing all of Plaintiff's operative documents to implement the scheme to Katz/HAK, Paul Lackey ("Lackey"), Michael Aigen ("Aigen), Hough, Ellington, Boyce, Britain, Dameris for comment. Katz/HAK, Lackey, and Aigen were not counsel to Plaintiff during this time but, nevertheless, Plaintiff's confidential information was disclosed to them.

68.     Highland Capital and Dondero directed Collins and Surgent to offer all of Plaintiff preferred unit holders, except Daugherty, to purchase their preferred units for 100% of the value of their cash interests and 60% of the value of their non- cash interests on January 18, 2013.

However, Highland Capital and its legal team often engaged in the practice of creating documents after the fact and back-dating or forward-dating them to appear as if they existed on the date listed. It was not until October 2022 that it was revealed for the first time that the actual offer for preferred unit holders that were employed by Highland Capital at the time occurred much sooner and were effectively offers to keep their employment if they signed. Indeed, all of the preferred unit holders that were employed by Highland Capital at the time purported to accept the offer on the same date the offer was made, January 18, 2013. When the offer was finally presented to former employees on January 31, 2013, Collins and Surgent warned those who questioned the fairness of the price that a majority had already agreed to the offer and that anyone who did not accept the offer would "have their rights stripped."

69.     It was also not until late 2022 that documents were finally produced that revealed that Plaintiff's board of directors and legal counsel did nothing to protect Plaintiff from this lowball offer, despite knowing it was a violation of their fiduciary duties. It did not seek a higher price from Highland Capital, Dondero, Okada or from Highland Capital's other partners at the time, including Boyce, Britain, Ellington, and Honis, who stood to benefit from the transaction, despite simultaneously serving on Plaintiff's board. They did not discuss a poison pill, a standstill, or any other corporate defense mechanism available to protect from a creeping takeover pursuant to their obligations under Delaware law. The board never even met to discuss the offer. Rather, they secretly attempted to ratify their own self-dealing actions, whitewash their dereliction of duty, and enlisted counsel from Abrams & Bayliss and Surgent to provide themselves broad releases of their fiduciary obligations and indemnifications while paving the way for Dondero, Okada, Ellington, and Highland Capital to strip Plaintiff of its assets. Tellingly, in one of the many amendments and actions by written consent that were never produced in the litigation with Daugherty, the board members purported to execute a Reserve for actual and potential expenses but did not bother to reserve anything for the claims being made by Daugherty.

70.     It was not until concealed documents with metadata were finally produced by Abrams & Bayliss and new management at Highland Capital in October 2022 that a review indicated numerous documents had been executed in violation of Section 5.1, 5.2(b)(ii) and 5.2(b)(iv) of the Second Amended and Restated Limited Liability Company Agreement. Specifically, document data revealed they had been falsely and intentionally misdated by Plaintiff's counsel, Surgent, to appear as if the board members had authority when, in fact, they did not. Hough reported to Abrams in a "Buyout Update Plaintiff" email on January 18, 2013, "Thomas Surgent called and told me that the Plaintiff buyout documents were executed this morning, with close to 60% accepting. As we discussed, Highland [Capital] is going to wait two weeks to extend the offer to HERA's [Plaintiff's] non-employee members…. "Thomas [Surgent] will date the outgoing board's resignations January 19 so that there is no doubt that their resignations occurred only after the transactions were effected." Indeed, Surgent noted in an email to Hough that they had not reached the 75% threshold until February 11, 2013, long after the board members had surrendered their ownership rights in the Plaintiff and their board positions had terminated. Regardless of their failed attempt, the board members disregarded the fact that Delaware entities such as Plaintiff are not permitted to waive liability for fraud, or breach of good faith and fair dealing.

71.     It was not discovered until May 2024 that Walia was never included as a signatory to the January 17, 2013, governance amendments and corporate actions and that Honis did not submit his signatures on the proposed actions until after 4:30pm on January 18, 2013. By that time, Boyce, Britain, Dougherty, and Dameris had previously forfeited their positions as board members by waiving and releasing any and all rights they had to the Preferred Units pursuant to the terms of the Transfer Agreement. The then-existing governance of the Second Amended and Restated Limited Liability Company Agreement specifically required that 75% approval of board members be required for amendments to the agreement. Since there were only two board

members at the time Honis submitted his signatures for the proposed actions, approval was impossible without the signature of Walia. The attempted amendments failed, but Honis and Walia subsequently negotiated for and received their own transactions that required them to waive and release all claims to their Preferred Units pursuant to their Transfer Agreements. Accordingly, Daugherty became the only remaining owner of the Preferred Units in Plaintiff and only he and his affiliates could effect a change in governance pursuant to the terms of the last legitimate governance amendment on February 16, 2012.

72.    The new manager of Plaintiff, Highland ERA Management, LLC was formed on February 1, 2013, and, at the direction of Dondero, wrongfully assumed management and control of Plaintiff. Although Defendants contended that Highland ERA Management was the manager of Plaintiff, metadata later revealed in October 2022 indicated there was no valid corporate action taken by the board and Series A Preferred Unit holders to execute such an arrangement. Indeed, Daugherty was the only rightful and sole owner of the Series A Preferred Units of Plaintiff at that time.

73.    Despite the absence of valid authority, Dondero, serving as the president of Highland ERA Management, with the assistance of his minions at Highland Capital and their legal counsel who simultaneously represented both Highland Capital and the Plaintiff through a Shared Services Agreement and a Blanket Agreement, purported to execute a series of transactions to strip Plaintiff of its assets.

74.    On February 1, 2013, the day that Highland ERA Management was formed, Dondero purportedly executed the Third Amended and Restated Agreement on behalf of Plaintiff prepared by Surgent, Ellington, Katz/HAK, Hurst, Hough and Abrams, which (1) eliminated the purpose for which Plaintiff was created, (2) eliminated the requirement of Plaintiff to make cash distributions to preferred unit holders to cover pass-through tax obligations attributable to Plaintiff, (3) eliminated members' rights to indemnification, (4) limited indemnification

obligations to the discretion of the Manager (Highland ERA Management, LLC) or the Initial Member (Highland Capital Management, LP), and (5) provided for broad indemnification to the Manager (Highland ERA Management, LLC) and Dondero.

75.    Dondero purported to execute an Expense Allocation Agreement prepared by Surgent, Ellington, Leventon, Katz/HAK, Hurst, Hough, Abrams, Waterhouse and Klos also dated February 1, 2013, on behalf of both Highland Capital and Plaintiff under which the parties reallocated 93.4% of Highland Capital's purported legal expenses billed by their firms and others related to the Texas Litigation[2] to Plaintiff for no consideration. According to the document, Highland Capital had incurred $1,142,284 in legal expenses in the Texas Litigation as of December 31, 2012, compared to just $154,029 incurred by Plaintiff over the same period.

76.    On February 6, 2013, Daugherty sent a letter seeking to review Plaintiff's books and records to verify its assets and their value. Abrams & Bayliss rejected the request in a letter dated February 13, 2013 by declaring, "You seek, inter alia, 'documents establishing the December 31, 2012 estimated value of the Interests as calculated by HERA [Plaintiff];' 'HERA's [Plaintiff's] balance sheets, income statements, lists of assets, general ledger, and the account records for any depository accounts of HERA [Plaintiff], as of December 31, 2012 and for the periods ending December 31, 2012, 2011, 2010 and 2009;' 'HERA's [Plaintiff's] 2009, 2010 and 2011 federal, state, and local tax returns'; 'information… regarding and identifying the current holders of the Series A Preferred Units, and to the extent the Common Unit Holder has already acquired any such units… from whom, in what amounts and for what consideration;' 'documents… regarding member lists;' and 'documents… regarding HERA's [Plaintiff's] Board… and any amendments to HERA's [Plaintiff's] company agreement.' Your Demand takes a shotgun approach to requesting books and records that is antithetical to the 'rifled precision'

---

[2] On April 11, 2012, Highland Capital, at the direction of Dondero, Okada, Ellington, Leventon, Girard and Surgent, commenced a lawsuit against Daugherty in Texas captioned *Highland Capital Management, L.P. v. Daugherty*, Cause No. 12- 04005 in the 68th Judicial District Court of Dallas County, Texas (the "Texas Litigation") which will be described in detail in Section F below.,

required by Delaware law. e.g., Brehm v. Eisner, 746 A.2d 244, 266 (Del. 2000)."

77.     It was further discovered in 2022 that on February 7, 2013, Surgent sent an email attaching Daugherty's request to inspect Plaintiff's assets to Hough, Hurst, Katz/HAK, Lackey and Ellington. Again, Katz/HAK and Lackey did not represent Plaintiff at the time but were adverse to Daugherty and his counsel at Looper Reed, and McGraw on behalf of Highland Capital. It was later discovered in September 2023 that Leventon, Ellington, Surgent, Dondero, Klos, Swadley, Waterhouse, and Katz/HAK had fraudulently allocated over $14,000,000 in invoices from Hunton Andrews Kurth, Lackey Hershman and other firms to Plaintiff.

78.     It was discovered for the first time in October 2022 that an action by written consent purportedly executed by Dondero on April 30, 2013 was in fact backdated to declare Highland Capital as the "sole economic interest holder in the [Plaintiff] following the consummation of the transactions pursuant to the Offers to Purchase dated on or about January 18, 2013, and January 31, 2013." The same document also declared that, "Daugherty's economic interest in the [Plaintiff] is now zero as a result of the application of Article XI of [Plaintiff's Operating Agreement]." And it further resolved to transfer all of Plaintiff's assets to Highland Capital because Highland Capital and Plaintiff "have each determined that it is in their respective best interest" to transfer substantially all the assets of Plaintiff as "in-kind distribution[s]" to Highland Capital (then valued at approximately $9,700,000 on top of approximately $6 million in cash that Highland Capital also took), despite providing no consideration to Plaintiff.

79.     Through this series of bogus transactions that were only revealed for the first time in October 2022 to have been backdated and later circulated by Leventon and Goldsmith to appear legitimate, Highland Capital claimed to have taken all of Plaintiff's assets, leaving it insolvent. Plaintiff only became insolvent in 2013 because its funds and assets were purportedly used: (1) to pay for substantially all of Highland Capital's attorneys' fees incurred in the Texas Litigation pursuant to the Expense Allocation Agreement dated February 1, 2013; (2) to pay for

all of Plaintiff's attorneys' fees incurred in in trying to wrongfully prevent Daugherty from receiving his share of the Plaintiff's assets; and (3) to transfer and register substantially all of its assets to Highland Capital for nothing. It was also revealed that in an email dated October 7, 2013, Katz/HAK, Hurst, and Miller knew Plaintiff's board had ignored their duties to carefully review the Highland Capital Purchase Offer and had even discussed the *Lampers v. Fertitta* case by highlighting:

> Turning first to the board's failure to employ a poison pill to prevent Fertitta from obtaining control without paying a control premium, it is reasonable in the context of a motion to dismiss to infer fiduciary misconduct more serious than a breach of the duty of care. The failure to act in the face of an obvious threat to the corporation and the minority stockholders instead supports a reasonable inference that the board breached its duty of loyalty in choosing not to cross Fertitta.

### E. The Texas Litigaiton

80.      On April 11, 2012, Highland Capital, at the direction of Dondero, Okada, Ellington, Leventon, Girard and Surgent, commenced a lawsuit against Daugherty in Texas captioned *Highland Capital Management, L.P. v. Daugherty*, Cause No. 12- 04005 in the 68th Judicial District Court of Dallas County, Texas (the "Texas Litigation"), and Dondero subsequently threatened, "You will never get a dime" and "I'm going to take you [Daugherty] to zero." Daugherty responded with counterclaims against Highland Capital, Plaintiff, and others, alleging breach of contract and breach of the covenant of good faith and fair dealing against Plaintiff and Highland Capital. Katz/HAK and Hutton Andrews Kurth purported to represent Highland Capital while Hurst, Brown and Gruber Hurst purported to represent Plaintiff.

81.      It was later revealed after legal invoices were finally produced under new management in October 2022, that as Defendants prepared for the first trial in Texas, they [Highland Capital, Hurst, Katz/HAK, Ellington, Brown, Leventon, Surgent, Girard, Boyce, Britain and Hunton Andrews Kurth] participated in a mock trial on December 4, 2013, that resulted in their mock jury finding in favor of Daugherty. From December 6 to 12, 2013, Defendants Dondero, Hurst, Brown, Katz/HAK, Abrams, Miller, Boyce, Britain, Ellington,

Girard, Leventon, and others schemed to "come up with trial strategy regarding witness testimony as to HERA [Plaintiff] sale and where are funds;" and conferenced with "Delaware counsel concerning escrowing of Daugherty's HERA [Plaintiff] interests and related issues there to."

82.     In June 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege, it was for the first time revealed that on December 12, 2013, Ellington, Leventon, and Surgent coordinated with Abrams & Bayliss to serve as escrow agent of the Escrow. Highland Capital's assistant general counsel, Leventon, sent a draft of the Escrow Agreement to Abrams & Bayliss on December 13, 2013, and the agreement was executed that day by Ellington. Matthew Miller ("Miller"), an Abrams & Bayliss attorney who primarily worked on the escrow matter and had just completed his first year as an attorney and simply used the terms proposed by Leventon.

83.     The assets deposited in the escrow were represented to be: (1) $1,210,502.03 in cash; (2) a limited partner interest in Restoration Capital Partners Fund, LP and (3) 1088.42 shares of NexPoint Credit Strategies. This was the story Defendants "came up with" so they could sell to the jury that they had not simply stolen Plaintiff's assets. The notion that Defendants did nothing nefarious with Plaintiff's and Daugherty's assets and merely set them aside would become a theme of Defendants in the Texas Litigation.

84.     The key provision of the Escrow Agreement that undergirded Defendants' story in the Texas Litigation provided that if Daugherty prevailed in the Texas Litigation, escrowed assets in the amount of the judgment "shall" be transferred to Plaintiff. Also pursuant to the crime-fraud discovery in May 2019, it was revealed that 19 days after executing the Escrow Agreement, Leventon and Girard changed the Escrow Agreement without Daugherty's knowledge because it wanted to "slip sheet the Schedule 1 assets" to change "the NexPoint shares from shares to the cash equivalent of shares because it is difficult to find a prime broker to open

account for such a small pool of assets." Abrams & Bayliss simply swapped the pages. Abrams & Bayliss later explained, "if Daugherty digs deeply enough, he may discover that Schedule 1 was revised on December 16, 2013, with no re-execution of the Escrow Agreement by Highland and Abrams & Bayliss. Highland's counsel merely re-sent the Escrow Agreement with an updated Schedule 1, and Abrams & Bayliss sent an email confirmation of the change." According to Abrams & Bayliss, "[i]t is unlikely that Daugherty would learn of the revision." With the appearance of an escrow in place, Defendants were poised to present themselves in the Texas Litigation not as thieves, but rather as protectors of Plaintiff's and Daugherty's interests. That is the story they spun at trial. This was a state of affairs just a month before trial in the Texas Litigation.

85.     On the first day of trial, January 16, 2014, Okada took the stand as Chief Investment officer and Head of Public Relations to assure the jury the following regarding their duties to clients and funds: "We have an advisory business where we're managing other people's money, teachers, firefighters, individuals, through their pension funds, or through their retirement accounts, or, you know, various pools of savings." "But our primary business at Highland Capital is to take their money, take the money that's entrusted to us and make good decisions with it."

86.     He further sanctimoniously lectured about his and Dondero's culture of trust, "Our culture is one of trust, of hard work, and transparency, and something that we like to call alignment of interest, and I will explain the last one. But when you're managing other people's money you have to make sure that they trust you. That they know what you're doing. That you're telling them what you're doing, how well you're doing well, whether you're doing well or not doing so well. You've got to be honest and straightforward. And you can't do this for 20 years without doing that. If you're not trustworthy and honest and your culture isn't one of those, you're just not going to be in this business. You don't survive in the money management business

without having a culture of trust……And then lastly, I would say that this idea of alignment of interest is where -- think of it this way, if something's good for you, it's good for me. If it's good for our clients, it should be good for us. If it's bad for our clients, it should be bad for us, that's alignment of interest. It means that whatever you're doing, whether you're paying an employee, or whether you're promoting an employee, or whether you're making an investment, you've got to think about the client. You're thinking about their interest and putting their interest first. And our culture is one of doing that." This testimony was a far cry from what insiders knew about Okada, Dondero and the culture at Highland Capital. Indeed, Okada was often observed to cover his ears and exclaim "I'm not hearing this! I'm not hearing this! I'm not hearing this!" when confronted with legal, fiduciary, and ethical misdeeds at Highland Capital. It was quite a contrast with reality when Highland Capital filed for bankruptcy on October 16, 2019, because its clients, including teachers, firefighters, veterans, pensioners, former employees, and other creditors, won over $1.4 billion in damage awards against it for willful misconduct, fraud, breach of fiduciary duties and other causes of action.

87.    In furtherance of the sham, Hurst, Dondero, and Surgent made it a point to let the court and jury know that Plaintiff retained control of "all" of its assets. Dondero also testified in January, responding to questions by Hurst as follows:

> Q. Okay. So – so if, if Mr. Daugherty somehow prevails in his lawsuit against Patrick Boyce and Lane Britain and [Plaintiff], what happens to Mr. Daugherty's interest that's being escrowed right now with a third-party escrow agent?
> A. They go to him.
> Q. I'm sorry?
> A. They go to him via to HERA [Plaintiff] and then to him.

Dondero further testified when Hurst asked him:

> Q. The escrow, did you just escrow this last month?
> A. No. We've had it segregated at Highland since April when we first put it in and then formalized the escrow. It takes a while to set up an escrow and transfer illiquid assets that have all sorts of transfer limitations.

88.    Highland Capital's Chief Compliance Officer and Deputy General Counsel,

Surgent, swore under oath in regard to a question regarding the April 30, 2013, implementation of the asset sweep from Plaintiff, "Yes, but then it placed those funds in escrow." But when questioned further why the escrow appeared to be created 36 days prior to his testimony and more than eight months after the assets were swept from Plaintiff, Surgent answered to the court and jury, "The escrow was formalized in this agreement, but I believe it existed sooner." In fact, it did not, and Surgent knew that.

89.     In closing arguments, Plaintiff's counsel, Hurst, lied to the court and jury once again, "[I]f Pat Daugherty happens to prevail in his lawsuit against HERA [Plaintiff], you heard Jim Dondero testify, he gets his interest, which is currently escrowed in the third-party escrow account, all of it."

90.     It was not until some evidence from Abrams & Bayliss was produced pursuant to the crime-fraud ruling in Delaware on June 7, 2019, and substantial detailed legal invoices and emails were produced to the new management of Highland Capital in October 2022 that this web of lies was fully exposed.

91.     After three-weeks of trial, the jury found that Plaintiff, at the direction of Defendants from Highland Capital, breached the implied covenant of good faith and fair dealing by adopting Section 12.1 of the 2012 Agreement (the Lose-Lose clause) and that Highland Capital and Dondero had defamed Daugherty with malice. The jury awarded Daugherty damages against Plaintiff in the amount of $2.6 million, plus interest which remains unpaid and has currently accreted to approximately $5 million. The court also determined that Daugherty had retained ownership of his preferred units in Plaintiff. The problem was Dondero, Ellington, Surgent and their merry band of minions lied to the jury and never funded Escrow while incurring millions in legal fees to drain Plaintiff's assets to perpetuate the lie.

92.     It was not until May 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege, that it was revealed that Highland Capital contacted

Abrams & Bayliss on February 14, 2014 "to discuss a memorandum we need drafted to address the Escrow Agreement in context of the recent Daugherty Verdict." The memo reaffirmed that Abrams & Bayliss had "received no cash or documents from Highland Capital or HERA [Plaintiff] regarding the escrow of Daugherty's interests in Restoration Capital Partners, LP. The memorandum then discussed the consequences if the escrow of Plaintiff's assets was deemed a "sham." In a section of the memorandum titled "Daugherty May Assert that the Escrow Agreement Is a Sham and that the Deposit Assets Stayed within the Control of Highland," Abrams & Bayliss advised: "Daugherty could argue that, even if the Deposit Assets are deemed to be in escrow, the Escrow Agreement left Highland [Highland Capital] with actual control of the Deposit Assets because (1) A&B [Abrams & Bayliss] is Highland's [Highland Capital] counsel, and (2) A&B [Abrams & Bayliss] may resign at any time with the Deposit Assets returning to Highland [Highland Capital]. Daugherty might argue that, despite the language of the Escrow Agreement, A&B [Abrams & Bayliss] will do whatever Highland [Highland Capital] instructs it to do with the Deposit Assets, even if that means disbursing the Deposit Assets contrary to the Escrow Agreement's terms. Paragraph 5 of the Escrow Agreement entitles A&B [Abrams & Bayliss] to resign at any time provided that it gives ten days advance notice. After A&B [Abrams & Bayliss] resigns, it must deliver the Deposit Assets either to the successor escrow agent or to Highland [Highland Capital]. Daugherty might argue that, even if A&B [Abrams & Bayliss] would not disburse the Deposit Assets in contradiction of the Escrow Agreement, A&B [Abrams & Bayliss] might be willing to resign as Escrow Agent in order to return the Deposit Assets to Highland." Said another way, Plaintiff's own lawyers were acting on behalf of Highland Capital at the expense of their client while they stripped it of its assets and charged it for the privilege.

93.    True to form, Highland Capital requested, and on March 25, 2014, Abrams & Bayliss provided, an expanded memo addressing "tangentially related topics." In the expanded

memo, Abrams & Bayliss explained: "Although unlikely, it is conceivable that the court in the Texas Litigation could take issue with the assertion of Plaintiff's counsel that the full amount of the Deposit Assets was held by A&B, when arguably at least, only $1.2 million of the Deposit Assets were truly beyond Highland's control."

94.     Defendants also attempted to conceal the true value of the assets that were supposed to be escrowed on behalf of Plaintiff. When Girard was asked to provide an update on value by Miller, Girard briefed Abrams that, "Girard would prefer not to update the estimated value of the Restoration Capital Funding interest. Highland received a windfall when the jury valued Daugherty's Plaintiff interest at only $2.6 million because Highland believes his former interest in HERA [Plaintiff] is worth more. Schedule 1 currently reflects a value of $3.03 million. If Highland updated Schedule 1 to reflect their current estimates, the Escrow Assets would be worth $3.3 million."

95.     Daugherty suspected that Defendants had lied about the existence of the escrow and on August 24, 2014, served post-judgment discovery requests on Plaintiff and Highland Capital, seeking information concerning the location of Plaintiff's assets and liabilities and its post-litigation conveyances to Highland Capital.

96.     Twenty days later, Plaintiff, at the direction of Dondero and Hurst, filed a Notice of Cash Deposit in Lieu of Supersedeas Bond and Affidavit Establishing Net Worth. Plaintiff submitted the affidavit of Klos, which stated that Plaintiff had a negative net worth of ($2,447,709) after fraudulently applying approximately $7,500,000 of Highland Capital's legal expenses at the time to Plaintiff as of August 31, 2014. Highland Capital also purported to have loaned Plaintiff the cash necessary to repay its own legal expenses owed to Highland Capital because Plaintiff did not have sufficient funds after transferring all of its assets to Highland Capital back on April 30, 2013. However, a footnote to the balance sheet exhibit to the affidavit noted, "Per Escrow Agreement dated December 13, 2013, between HCMLP [Highland Capital]

and Abrams & Bayliss, LLP, if a final, non-appealable judgment against HERA [Plaintiff] is reached, Abrams & Bayliss, LLP as Escrow Agent, will transfer the HERA [Plaintiff] Deposit Assets to HERA [Plaintiff]." The affidavit included a copy of the Escrow Agreement with a schedule again falsely listing escrow assets of: (1) $1,210,502.03 in cash; (2) a limited partner interest in Restoration Capital Partners Fund, LP and (3) cash equivalent of 1088.42 shares of NexPoint Credit Strategies.

97.    Also not revealed until May 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege, Miller emailed Abrams, "do we look bad for claiming to hold non-monetary assets in escrow when on a day-to-day basis we have no idea what the status of these assets are?" Miller was "not looking forward to being deposed."

98.    In order to conceal the fact that no such transfer ever actually occurred, Dondero, Hurst and the Highland Capital minions then directed Plaintiff to object to Daugherty's discovery requests on the basis that it was harassing and argued that its cash deposit limited post-judgment discovery to Plaintiff's net worth. Hurst, doubled down at a subsequent hearing on September 22, 2014, before the court and stated, "everything that's in the sworn financial statement has been provided to the other side and it's been provided to the Court, also came up during trial; that is the exact same assets."

99.    Again on July 10, 2015, Hurst thwarted discovery of Plaintiff's missing assets by filing Highland Employee Retention Assets LLC's Written Objections To Daugherty's Notice of Deposition Upon Written Questions and responding to every question and request for production with the boiler plate response, "Given the procedural posture of the case, with a final judgment and appellant bond on file, the only discovery that may be sought by Daugherty is that directly relevant to the calculation of HERA's [Plaintiff's] net worth. The scope of this request goes well beyond that, seeking information that that [sic] has potential proprietary confidential interests and unduly burdening a third-party."

100.     On December 1, 2016, Hurst and Ellington boasted in the press about a settlement with Nautic Partners regarding breach of fiduciary duty over an indirect investment owned by Plaintiff and other funds in Cornerstone Healthcare Inc. It was not discovered until December 2021 that Dondero, as Chairman of the Cornerstone board, and Ellington, as General Counsel to Highland Capital serving as the investment advisor to the funds that owned interests in Cornerstone, had schemed with Hurst, Katz/HAK/DLAP and Hunton Andrews Kurth to revise their fee structure on the eve of settlement increasing them from an hourly fee that had already reached $6 million to a contingency fee that would pay the lawyers approximately $25 million in fees. Dondero and Ellington then received an $11 million facilitating fee that was wired to their affiliates secretly operating as the SAS platform in the Cayman Islands.

101.     Also on December 1, 2016, Daugherty's judgment against Plaintiff, which had been affirmed on appeal, became final and non-appealable pursuant to the appellate Court's mandate. The appellate court also denied the request to declare that Daugherty's ownership in the preferred units of Plaintiff were extinguished as a result of his damage award. Dondero, Katz/HAK, Ellington, Leventon, Miller, and Abrams reviewed the mandate that day and started the process of shutting down the Escrow and assuring the remaining cash assets were swept from Plaintiff to Highland Capital. A summary of the reconciled emails sent or received from different time zones follows:

102.     From discovery obtained in May 2019, after a Delaware court granted the crime-fraud exception to attorney-client privilege, a series of emails revealed that on December 1, 2016, at 7:51 p.m.: Hunton Andrews Kurth, outside counsel for Highland Capital and now concurrently outside counsel for Plaintiff, emailed Abrams, counsel for Highland Capital, counsel for Plaintiff, and trustee for Plaintiff's escrow: "Kevin , we need to have a call as early tomorrow as possible regarding the escrow arrangements. Can you let me know when you can be available? Also, can you please send us a copy of the escrow agreement?. Abrams responded to the email copying

Miller and Hunton Andrews Kurth lawyers Katz/HAK, James Bookhout, and Isabel Crosby.

103.    December 2, 2016, at 10:03 a.m.: Miller informed Abrams, "The call with Highland's [Highland Capital's] attorneys in the HERA [Plaintiff] litigation was short. Simply put, Highland [Highland Capital] wants to get the funds back to HERA [Plaintiff] and/or Highland [Highland Capital] as quickly as possible in any way we feel comfortable with." Miller proposed several alternatives, including resignation: "Second, we could resign as escrow agent under Paragraph 5 …. This paragraph permits us to return assets directly to the Depositor, which is Highland [Highland Capital]. Highland's [Highland Capital's] attorneys think that a ten-day notice period will not interfere with their garnishment action plans."

Miller outlined for Abrams a step-by-step resignation plan:

1.    Resignation letter from us that states that all deposit assets will be released to Highland [Highland Capital] after the 10-day notice period.
2.    Letter from Highland [Highland Capital] waiving notice period and seeking our confirmation and signature (because paragraph 10 requires all amendments or waivers to be signed by both parties).
3.    Wiring of cash back to Highland [Highland Capital].

Highland [Highland Capital] encouraged Abrams & Bayliss to resign, "As an update to the below, Highland [Highland Capital] would prefer that we resign but before we do to agree in writing that the 10-day notice period is waived." "Hunton Andrews Kurth and [Abrams & Bayliss] were on the same page about the resignation strategy."

104.    December 2, 2016, at 2:52 p.m.: Miller emailed Hunton Andrews Kurth: "As we discussed, attached is the resignation letter we contemplate as the first step of unwinding the escrow."

105.    December 2, 2016, at 4:37 p.m.: Miller emailed Hunton Andrews Kurth: "As an FYI, my banker tells me that 5:30 EST is the cut-off time for a domestic wire; the international transfer cut-off already is passed. I am not optimistic that I will receive the necessary authorizations during the next hour. However, would you mind passing along the Highland [Highland Capital] letter on an FYI basis so that I have the wiring instructions handy?"

106.     December 2, 2016, at 5:08 p.m.: Hunton Andrews Kurth emailed Miller: "Matt, please find attached Highland's [Highland Capital's] signed letter accepting the Escrow Agent's resignation." Miller subsequently informed Abrams, "The second step in the HERA [Plaintiff] strategy is for you to sign the attached letter from Highland [Highland Capital]."

107.     December 2, 2016, at 10:07 p.m.: Miller emailed Ellington: "Scott, please find the attached correspondence regarding the escrow agreement between Highland Capital Management, L.P. and Abrams & Bayliss LLP."

108.     December 2, 2016, at 10:18 p.m.: Katz/HAK emailed Miller: "Matt, attached is correspondence from Scott Ellington accepting the resignation and providing wiring instructions. If you need additional information, please let me know."

109.     December 2, 2016, at 10:19 p.m.: Miller emailed Katz/HAK: "Thanks, Mark. [sic] We will get a counter-signed copy back to you and arrange for wiring the funds."

110.     December 3, 2016, at 10:06 a.m.: Miller emailed Ellington and Katz/HAK: "Scott and Marc, attached please find a counter-signed copy of Scott Ellington's letter."

111.     December 3, 2016, at 2:45 p.m.: Internal Abrams & Bayliss email: "Wells Fargo was unable to initiate the transaction today [a Saturday]. The wire amount required multiple levels of upper management approval so I will go back on Monday morning."

112.     December 5, 2016, at 12:26 p.m.: Miller emailed the team: "Team, As reflected below, the funds A&B [Abrams & Bayliss] was holding in escrow on behalf of HERA [Plaintiff] have been transferred as instructed in Scott Ellington's December 2, 2016, letter."

113.     "Boom!" (emphasis added). That was the reaction of Girard when he learned the Escrow funds "have been received" by Highland [Highland Capital] on December 5, 2016.

### F.     Crime-Fraud Evidence in Delaware

114.     On February 16, 2017, Abrams of Abrams & Bayliss unveiled Defendants' "Highland Employee Asset strategy" to Daugherty:

I write on behalf of Abrams & Bayliss LLP ("Abrams & Bayliss") in response to your letter of February 14, 2017 (incorrectly dated February 14, 2016) regarding my firm's service as escrow agent under an escrow agreement with Highland Capital Management, L.P. ("Highland"), dated December 13, 2013 (the "Escrow Agreement"). Capitalized terms used but not defined herein have the meanings given in the Escrow Agreement.

By letter dated December 2, 2016, Abrams & Bayliss notified Highland that it was resigning as Escrow Agent pursuant to Paragraph 5 of the Escrow Agreement. By letter dated December 2, 2016, Highland informed Abrams & Bayliss that it was (i) accepting Abrams & Bayliss' resignation as Escrow Agent, (ii) waiving the ten-day notice period under Paragraph 5 of the Escrow Agreement, and (iii) directing Abrams & Bayliss to return the Deposit Assets to Highland in accordance with the instructions provided in the letter.

On December 3, 2016, Abrams & Bayliss informed Highland in writing that it agreed to the waiver of the notice period, such that Abrams & Bayliss' resignation was effective immediately. On December 5, 2016, Abrams & Bayliss returned the Deposit Assets to Highland in accordance with the December 2, 2016, instructions. Accordingly, Abrams & Bayliss no longer serves as Escrow Agent or holds Deposit Assets.

115.   On July 6, 2017, Daugherty, having his disputed ownership in Plaintiff's assets recently confirmed by Texas Appellate Court, filed a complaint in Delaware Chancery Court seeking the return of all of Plaintiff's assets, in addition to making claims for fraudulent transfer, breach of fiduciary duties on behalf of Plaintiff, aiding and abetting breach of fiduciary duties on behalf of Plaintiff, and breach of implied covenant of good faith and fair dealing on behalf of Plaintiff, among other claims. Certain defendants moved to dismiss the complaint.

116.   On January 16, 2018, the Delaware Court of Chancery denied the motion to dismiss against Highland Capital and Plaintiff but granted dismissal against Dondero and Highland ERA management, which was controlled by Dondero at the time, on the grounds that evidence against them was "conclusory." At that time, the court was not privy to the evidence that was later produced pursuant to the crime-fraud ruling in May 2019 and the document production by new management at Highland Capital in October 2022 and October 2023. Later, on June 29, 2018, the Delaware Court denied dismissal against Highland Capital but granted dismissal based on laches for the claims arising out of what was known about the 2013 amendments and contemporaneous actions of the Defendants at that time, which was very little.

It was not until October 2022 and October 2023 that Highland Capital, under new management, produced refuting documentation and invoices.

117.    On May 17, 2019, the Delaware Chancery Judge granted a motion to compel stating, "Daugherty has been dogged in his pursuit of these documents, and Highland [Capital] was just as resolute in refusing to produce them." She also stated, "Daugherty has made a prima facie showing that a reasonable basis exists to believe that a fraud has been perpetrated, and that Highland [Highland Capital] sought A&B [Abrams & Bayliss] to serve as escrow agent and to provide legal analysis in furtherance of that fraud; specifically, to protect the escrowed assets from Daugherty while the Texas case was pending, and then to transfer them back to Highland [Highland Capital] after the Texas verdict was finalized. I conclude any privilege Highland [Highland Capital] claims over A&B's [Abram's & Bayliss] legal advice regarding the escrow arrangement and A&B's [Abram's & Bayliss] resignation has been stripped under the crime-fraud exception." She also concluded that Highland Capital, Dondero, Ellington, Leventon, and the other defendants (who were also controlled by Dondero) were "improperly withholding documents," that "there is a reasonable basis to believe" that they perpetrated a fraud—and solicited "the services of attorneys to aid in furtherance of that fraud"—as part of an effort to evade Daugherty's judgment during the pendency of his case. The Vice Chancellor concluded that "defendants, with [counsel's] advice and assistance, were never going to let the assets held in the escrow agreement make their way to Daugherty." Additionally, a Contractual Master was appointed to oversee discovery compliance. It was later discovered in2021, after Highland Capital filed for bankruptcy, that Leventon concealed the existence of company owned phones used by Dondero and Ellington, as well as a secret server used by many of the defendants or their affiliates to transfer assets. In addition, despite a motion to compel to the contrary, the existence of numerous January 2013 Plaintiff amendments and actions by written consent were concealed by Dondero, Ellington, Leventon, and Surgent until they were finally produced in October 2022

after full ownership of Plaintiff was transferred to Daugherty.

118.    On the second day of a three-day trial, Dondero—for the first time—revealed that his misconduct as manager of Plaintiff was done at the direction and based on the advice of his outside and in-house counsel, i.e., the other defendants in this action. He testified, for example:

> Q. Did Highland [Capital] have outside counsel advising with respect to the purchase of the units?
> A. Yes. I believe the whole situation was the most lawyered thing we've ever done. I mean, there was counsel for each of the board members, there was counsel for Highland [Highland Capital], there was counsel for HERA [Plaintiff], there was Delaware counsel. Everything was orchestrated, dictated by counsel.
> Q. Did Highland [Highland Capital] have – did that counsel that Highland [Highland Capital] used also advise counsel on the documents, the transaction documents, relating to those purchases?
> A. Yes. All the functional documents and major moves at various turning points were all at the request – or decided by counsel.
> Q. Did you have any communication – are you familiar with Abrams & Bayliss, with what Abrams & Bayliss is?
> A. I know they're a Delaware law firm. But beyond that, no.
> Q. Did you ever have any communications with Abrams & Bayliss about them resigning as escrow agent?
> A. No. Highland [Highland Capital] and myself, I know, were purposely kept separate from this whole thing. And it was driven by – it was driven by counsel.
> Q. My question is a little bit more specific because it relates to the escrow assets and Mr. Daugherty. If you had been told by counsel that Mr. Daugherty was entitled to the escrow assets, you would have given him the escrow assets; right?
> A. Yes. We would have done whatever counsel told us. We tried very hard to compartmentalize this mess. We have a business to run. And this is – a half dozen lawsuits, haranguing everybody in public, it was all intended to disrupt our business as much as possible. So we tried to delegate it and compartmentalize it to the lawyers as much as possible.
> Q. Let's talk about which lawyers you're referring to. So I'll start with the in-house lawyers again. Which in-house lawyers of Highland [Highland Capital] are you relying on with respect to the transfer of the escrow assets?
> A. It would have been the same three internal lawyers working with external counsel.
> Q. Mr. Ellington, Mr. Leventon, and Mr. Surgent; is that right?
> A. I believe so. I believe they were the ones at that time and place.
> Q. Which outside counsel are you relying on?
> A. I don't know if Andrews and Kurth had merged with Piper. I don't know who else was involved besides the Abrams guys. But it would have been, more likely than not, those two counsels with whatever other counsel was representing some of the people who were sued individually.

## G. Highland Capital Bankruptcy

119.    The following day, on October 16, 2019, Highland Capital at the direction of

Dondero and Ellington, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware. On December 4, 2019, the Delaware Court entered an order transferring venue of the case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. As a result, the Delaware action was stayed.

120.    On January 9, 2020, the Highland Capital Creditors Committee demanded and the Court approved a change of control of Highland Capital, which involved the removal of Dondero as the sole director and the appointment of James P. Seery ("Seery"), John S. Dubel ("Dubel"), and retired Judge Russell F. Nelms ("Nelms") as independent directors (the "Independent Directors" and collectively, the "Independent Board") of Strand Advisors, Inc., Highland Capital's general partner (the "General Partner"). The Independent Directors were granted exclusive control over Highland Capital and its operations during the pending bankruptcy proceedings.

121.    On July 16, 2020, the Court approved Highland Capital's motion to appoint Independent Director Seery, as Highland's CEO and CRO.

122.    On October 9, 2020, Dondero was further instructed to resign or face removal as an employee of Highland Capital and as portfolio manager for all Highland Capital managed funds due to his detrimental conduct to the firm and its creditors.

123.    Highland Capital's bankruptcy was unique because all of the largest creditors' claims stemmed from litigation claims and judgments against the firm, not debt holders. Indeed, Dondero, Ellington and Leventon expected to use the bankruptcy process to once again thwart recoveries while keeping themselves in control. Dondero later complained to Seery, "I'm not getting the Chapter 11 experience," as if he were somehow supposed to benefit from the failure of the company he managed. To the contrary, bankruptcy revealed a litany of terrible acts through a pattern of recurring conduct resulting in well over $1.4 billion dollars in litigation and arbitration claims and over $50,000,000 in legal fees.

124.    In January 2021, it was discovered that Dondero had been secretly coordinating

with Highland Capital's then-counsel Ellington and Leventon to direct the affairs of Highland Capital, despite his dismissal. When the Court entered an order restraining Dondero from communicating with Highland Capital employees, Dondero flouted the order by communicating with Ellington and Leventon and instructing other employees to resist document production requests, even though those documents were kept on Highland Capital's computer system.

125.    Ellington and Leventon we terminated for cause on January 5, 2021, for acting in manner adverse to Highland Capital's interests.

126.    Dondero, Ellington and Leventon evinced no respect for Highland Capital as an entity separate and apart from themselves. The bankruptcy also revealed discovery misconduct during the Delaware action with Daugherty, including a secret server that Dondero, Ellington, Leventon and others routinely used, which was concealed during discovery in the Delaware action with Daugherty. Additionally, the bankruptcy court twice found Dondero in contempt for violating a temporary restraining order. During testimony at the first show cause hearing, it was revealed that Dondero and Ellington destroyed their cell phones that were provided by Highland Capital. Yet, in the Delaware action with Daugherty, Leventon testified at his custodian of records deposition that Highland Capital did not "have access to people's phones" and that Highland Capital did not own any cell phones for the custodians.

127.    On February 8, 2021, the Court agreed to confirm Highland Capital's bankruptcy plan, and the Court entered its plan Confirmation Order on February 22, 2021.

128.    On August 11, 2021, Highland Capital's bankruptcy plan, as amended to date, became effective, and as a result, Highland Capital's ownership was restructured. Highland Capital became a wholly owned subsidiary of the Highland Claimant Trust, a newly formed liquidating trust owned by the creditors of Highland Capital. Specifically:

- The Highland Claimant Trust became the sole limited partner of Highland Capital.

- HCMLP GP LLC replaced Strand Advisors, Inc. as General Partner of Highland Capital. HCMLP GP LLC is also a wholly owned subsidiary of the Highland

Claimant Trust.

- Seery serves as the Claimant Trustee of the Highland Claimant Trust and remains the CEO of Highland Capital today. Dondero and Okada are no longer involved in the management of Highland Capital or the Claimant Trust.

129.    In the Bankruptcy, Daugherty filed claims estimated in excess of $40,000.000.00. In November 2021, Daugherty reached a settlement with Highland Capital for some of his claims and specifically retained the right to pursue Defendants in future litigation, i.e., this current lawsuit for these claims.

130.    On March 1, 2022, during the settlement hearing, Highland Capital finally acknowledged, "Dondero, through Highland Capital, engaged in an asset-stripping campaign designed to render Plaintiff judgment-proof, further exposing Highland Capital to liability and unnecessary legal costs." Highland's new CEO, James Seery, testified:

It actually looks like, frankly, the escrow was never really an escrow, and it was a — it was a fraud from the beginning. And that one's a pretty disturbing one.

131.    On April 1,2022, full ownership of Plaintiff and Highland ERA Management was transferred to Daugherty and his affiliates.

132.    On May 11, 2022, Plaintiff instructed Abrams & Bayliss, Hunton Andrews Kurth, DLA Piper, Marc Katz/HAK/DLA, and Michal Hurst to forward all of its casefiles, records and invoices allocated to Plaintiff.

133.    True to form, Hunton Andrews Kurth responded by letter on May 25, 2022, "Our records and research indicate that the Firm represented ERA and/or HERA [Plaintiff] in connection with only two matters. The first matter was opened on June 1, 2012, for which our records indicate we represented Highland Capital Management, LP ("Highland") and HERA [Plaintiff], and for which only 1.6 hours of attorney time was recorded. We have located no files for this matter other than an electronic record of the recorded time." They made this statement despite Katz/HAK/DLAP representing before the Delaware court that Plaintiff incurred millions of dollars in legal expenses, including those from his firm, making it insolvent.

134.    Hunton Andrews Kurth continued, "Additionally, given that Daugherty now wholly owns and controls HERA [Plaintiff] and ERA, we believe we are constrained in what we may transfer. Your HERA [Plaintiff] and ERA file transfer request equates to Daugherty gaining access to his litigation adversaries' attorney's files. In this unique circumstance of a litigant seeking his adversary's attorney's file by acquiring control of one (or more) of his litigation adversary's attorney's former jointly represented clients, the case law we have reviewed favors protecting the co-client's justified expectation that its attorney's files will not be disclosed to its litigation adversary." Said another way, after invoicing millions of dollars in legal fees that were allocated to Plaintiff, Hunton Andrews Kurth continues to conceal their conduct by claiming some privilege based on jointly representing Highland Capital, Dondero and Plaintiff. Tellingly, Hunton Andrews Kurth could produce no retention agreement that named Dondero as a client nor did Dondero pay a single dollar for any such legal expenses. However, Plaintiff was allocated over 93% of the fees invoiced to Highland Capital.

135.    DLA Piper delayed until July 22, 2022, to make the following similar response, "Second, as you know, DLA's representations of HERA [Plaintiff] and ERA in the Daugherty Case were joint representations in which DLA also represented HCMLP [Highland Capital] and Mr. Dondero. Mr. Daugherty is still adverse to Mr. Dondero in the Daugherty case and in Daugherty v. Dondero, No. 2019-0956 (Del. Ch.). That means that your request for the client file would result in DLA providing to one litigation party the privileged and work product-protected communications of its litigation adversary. Such a production "would be anathema to the principles underlying the policy of fostering unfettered attorney-client communication." Again, DLA Piper made this response despite having millions of dollars of its fees allocated to Plaintiff, representing Plaintiff in Delaware court, and producing no retention agreement that listed Dondero as a client or that he ever paid anything for the alleged representation.

136.    Hurst never responded to Plaintiff's file and document request.

137.    It was not until October 2022 and October 2023, after Plaintiff received documents from Highland Capital and Abrams & Bayliss pursuant to two books and records requests, that extensive billing fraud was revealed at the expense of Plaintiff at the hands of its lawyers Katz/HAK/DLAP, Hurst, Hunton Andrews Kurth, Abrams & Bayliss and others. Indeed, financial records and information from Highland Capital reveal that over $14,000,000 of expenses for other matters were allocated to Plaintiff, and its lawyers were aware of it.

138.    Shockingly, Highland Capital and its partners, including Dondero, Okada, the Defendant trusts, Ellington, Boyce, Britain, Dougherty, Honis, Parker, had taken the tax benefits of these expenses with the assistance of Surgent, Leventon, Girard, Waterhouse, Swadley and Klos as though they were their own, despite knowing that the obligations to pay were allocated to Plaintiff. Surgent explained to Abrams & Bayliss that they did not want Daugherty to get the tax benefit of the expense/loss pass-throughs so they made the legal expense allocations effective after they received their 2013 buy-out proceeds.

139.    Not surprisingly, when the details of the fraud were discovered, new management of Highland Capital realized a charge to the Plaintiff capital accounts in excess $10 million as an offset to write off over $10 million of falsely allocated debt resulting in a loss of capital account basis that could have been used by Plaintiff and its unit holders for tax purposes.

## H.  A Recurring Theme

140.    This above-described acts are simply yet another example of an all-too familiar pattern where Dondero, Okada and Ellington strip the assets of entities they controlled to ensure that an aggrieved party could not collect on its hard-fought judgments or its rights of ownership. When challenged, they execute their well-honed tactics to lie, deny, conceal, and postpone, while attempting to exhaust their adversaries of funds as they ran out the clock. In this case, Plaintiff brings this action to recover tens of millions of dollars in damages that it suffered at the hands of Dondero, Okada, Ellington, and their enablers, acting in concert with other entities that they

owned and/or controlled and with the aid of Plaintiff's own officers, directors and attorneys at the time who disregarded their duties to Plaintiff in favor of their own self-interests.

141.    Plaintiff was stripped of its assets as retaliation against Daugherty for his assistance in recovery efforts of the following related matters:

### 1. Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry

142.    In 2010, Dondero and Okada formed Acis Capital Management, L.P. ("Acis") and Acis Capital Management GP, LLC ("Acis GP") as a "lifeboat" to divert collateralized loan business fees from Highland Capital after its lenders placed security liens on its assets. Dondero was President both of Acis and Acis GP. Okada was Chief Investment Officer for all funds including those of Acis. Collectively, they controlled the investment and operating decisions of the Acis platform. Acis was initially indirectly owned by Dondero and Okada (through Highland Capital Management Services, Inc). Joshua Terry ("Terry"), a Highland Capital employee, later joined the platform in 2011 to manage Acis after its previous managers left Highland Capital. Like Plaintiff, Acis had no employees. Highland Capital was the investment manager for Acis, and Acis performed all of its services through Highland Capital employees. In 2013, Dondero modified Terry's ownership in Acis. As a result, Dondero and Okada, with the help of the Highland Capital legal team, once again engaged in a scheme to siphon value from Acis and transfer it back to Highland Capital.

143.    By 2016, Dondero and Terry came to an impasse. Dondero sought to improperly finance a latex company investment in South America by causing a separate portfolio company, Trussway Industries Inc. ("Trussway"), to incur unnecessary debt and divert the loan proceeds to finance the purchase. Terry criticized the misconduct as a breach of their fiduciary duties to their investors. Dondero responded by firing him and making a pretextual claim of termination for "cause." Dondero also amended the partnership agreement to terminate Terry's interests in Acis and directed Acis to sue Terry in Texas state court. Terry counterclaimed and demanded

arbitration.

144.    On October 20, 2017, following a ten-day arbitration, the arbitration panel issued Terry an award of $7,949,749.15, plus interest, against Acis. The arbitration panel found, among other things, that (i) Terry's termination was "without cause," and Acis had "knowingly and willfully" invoked Highland Capital's false pretext of "for cause" in order to deny Terry his contractual entitlement to the value of his Acis partnership interest, (ii) Acis had breached its limited partnership agreement, and breached the fiduciary duties it owed to Terry as Acis's limited partner, (iii) beginning in 2013, Dondero had caused Acis to pay Highland Capital more than its contractual entitlement for shared expenses in order to reduce the amount of Terry's limited partnership distributions, and (iv) one month after Terry was terminated from Acis, Dondero significantly increased the amounts that Acis was paying Highland Capital under their shared services and sub-advisory agreements, retroactive to January 1, 2016.

145.    Beginning on October 24, 2017—four days after Terry's arbitration judgment was issued—Dondero, acting through Highland Capital, and with the aid of Ellington, Leventon, and Surgent, entered into numerous transactions designed to take control of Acis's assets and business and strip Acis of assets so that it would be unable to pay Terry's arbitration award.

146.    Dondero's elaborate schemes to render Acis judgment-proof led Terry to file involuntary petitions for protection under chapter 11 of the United States Bankruptcy Code against Acis and Acis GP on January 30, 2018. In response to the bankruptcy filings, Dondero caused Highland Capital, which served as the sub-advisor to the Acis CLOs, to grossly mismanage the Acis funds following the appointment of a chapter 11 trustee in the Acis bankruptcy case. This abrogation of duties caused the chapter 11 trustee to replace Highland Capital with Brigade Capital Management, LP ("Brigade") and Cortland Capital Markets Services LLC ("Cortland").

147.    Dondero also caused Highland Capital to commence litigation against the Acis

chapter 11 trustee, prompting a countersuit pursuant to which the chapter 11 trustee sought to recover fraudulent transfers Dondero had directed (through Highland Capital) and to stop Highland Capital from engaging in a course of conduct that was harmful to Acis and the Acis CLOs. This led to the entry of a temporary restraining order against Highland Capital, which Dondero caused Highland Capital to violate.

148.    Daugherty communicated with Terry on several occasions regarding the extreme means utilized by Highland Capital against Daugherty, including sending constables to his home to execute collection efforts under false pretenses, stripping Plaintiff of its assets, and seeking to have Daugherty incarcerated. For the legal services provided by Hurst, Katz/HAK/DLAP for attacking Daugherty on behalf of Highland Capital, Plaintiff was allocated the bill.

### 2.    Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest

149.    Dondero and Ellington fraudulently induced an investment from third party investors HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). At the same time that Dondero was surreptitiously transferring valuable rights associated with the Acis funds away from Acis in order to evade Terry's arbitration award, he and Ellington were using Highland Capital to induce the HarbourVest Entities to purchase 49.9% of HCLOF—the owner of the equity tranche of the Acis CLOs—from CLO Holdco for approximately $75 million in cash, with a commitment to invest an additional $75 million in HCLOF. In soliciting this investment, Dondero and Ellington failed to disclose material facts to HarbourVest regarding the Terry disputes and Acis frauds, thus exposing Highland Capital to substantial and unnecessary liability.

150.    In inducing HarbourVest's investment, Dondero and Ellington, purportedly acting through Highland Capital, made numerous misrepresentations and omissions, including: (1) failing to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million

arbitration award against it, including by causing Acis to consummate a series of fraudulent transfers; (2) misrepresenting the reasons that Dondero changed the name of the holding company for the Acis CLOs from Acis Loan Funding, Ltd. ("ALF") to HCLOF immediately prior to the HCLOF Investment; and (3) expressing confidence in HCLOF's ability to reset or redeem the CLOs under its control, when in actuality Dondero's actions to evade Terry's arbitration award against Acis resulted in Acis's bankruptcy, and rendered the resets impossible.

151.    Moreover, unbeknownst to HarbourVest, Dondero intended for CLO Holdco to use the $75 million that it received from HarbourVest to make investments in other Dondero controlled and owned entities, including entities managed by NexPoint and HCMFA. Thus, the HarbourVest investment benefited Dondero personally, but left Highland Capital exposed to hundreds of millions of dollars in potential damages to HarbourVest.

152.    At various times in the Highland Capital bankruptcy, Daugherty coordinated with HarbourVest on an ad hoc steering committee basis to identify and seek the return of the assets looted from Highland Capital's estate, HarbourVest and Plaintiff.

### 3. Willful Misconduct in the Transfer of Highland Capital Credit Strategies Fund's Assets to Dondero, Okada and Ellington Controlled Entities

153.    Another instance involved the Highland Capital Credit Strategies Fund judgment. In that case, Highland Capital was found to have engaged in distinct types of misconduct, where Dondero also personally threatened the redeemer committee's personnel with retribution. The most important aspect of the misconduct is that Highland Capital and Dondero effectively moved the assets to other Highland Capital-controlled entities for far less than their actual value. In fact, Highland Capital paid even less for the interest ($24 million) than it had marked the value on its own books ($28 million) and far less than valuations done by third parties, even those hired by Highland Capital (up to $37 million). Highland Capital did so in secret and the redeemer committee only found out when a line item referring to the $24 million as "Cornerstone sale proceeds" showed up in a regular cash report to the redeemer committee. An arbitration panel

found that Highland Capital not only breached its obligations under the Plan of liquidation but engaged in willful misconduct in its sale of the Fund's Cornerstone equity. The panel found Highland Capital's explanations to excuse its conduct "to put it mildly, far-fetched."

154.    Daugherty communicated several times with members of the Highland Capital Credit Strategies Fund regarding his views of the value and location of their assets pursuant to his ongoing fiduciary duties under the 1940 Advisors Act. In addition, his countersuit against Highland Capital revealed numerous acts of fraud and breaches of fiduciary duty that caused damage to Highland Capital Credit Strategies Fund. Dondero, Ellington, Leventon, Hurst, and Katz/HAK/DLAP embarked on a crusade to smear Daugherty and his law firm while filing numerous baseless show cause motions against him. In addition, the services of the Ashcroft Law Firm ("Ashcroft") were retained to conduct an independent "investigation" into the allegations made by Daugherty. Daugherty was never interviewed and not surprisingly, Ashcroft produced a report that absolved Highland Capital. The arbitration panel disagreed and found in favor of Highland Capital Credit Strategies Fund for over $30,000,000.00 in damages resulting from willful misconduct and breach of fiduciary duty. Once again, for these dubious legal services provided by Hurst, Katz/HAK/DLAP and other firms on behalf of Highland Capital, Plaintiff was allocated the bill.

### 4.    Willful Misconduct in the Transfer of Highland Crusader Fund's Assets to Dondero, Okada and Ellington Controlled Entities

155.    Dondero, Ellington, and Leventon also engaged in misconduct relating to Highland Capital managed funds Highland Offshore Partners L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Crusader Funds"). Highland Capital had placed the Crusader Funds into wind-down in October 2008. Investors in the funds subsequently commenced lawsuits alleging breach of fiduciary duty claims against Highland Capital, based on allegations that Dondero had refused to make mandated distributions and honor redemption requests, and traded the funds' positions in a

manner designed to render them illiquid in order to deter future redemptions, which led to multiple disputes among redeeming investors. Certain of these lawsuits were resolved in July 2011, when the parties entered into a Joint Plan of Distribution of the Crusader Fund and a Scheme of Arrangement for its creditors (together, the "Joint Plan and Scheme"). As part of the Joint Plan and Scheme, a committee referred to as the "Redeemer Committee" was elected from the Crusader Funds' investors to oversee Highland Capital's wind-down of the Crusader Funds and distribution of proceeds to investors.

156.    On July 5, 2016, the Redeemer Committee (i) terminated Highland Capital as investment manager; (ii) filed a complaint in Delaware Chancery Court against Highland Capital seeking a limited status quo order, a declaration that the Redeemer Committee had "cause" to terminate Highland Capital as manager, and a declaration that Highland Capital had forfeited any right to indemnification as a result of its failure to distribute proceeds to investors of various funds; and (iii) commenced an arbitration proceeding (the "Redeemer Arbitration") against Highland Capital alleging that it had engaged in various forms of misconduct in its role as investment advisor. After two years of arbitration proceedings, the Redeemer Arbitration culminated in a nine-day evidentiary hearing in September 2018 that included testimony from eleven fact witnesses and four expert witnesses. On March 6, 2019, the arbitration panel issued an award in favor of the Redeemer Committee, which resulted in gross damages of $136.8 million and total damages (including interest) of $190.8 million. Ultimately, the panel awarded ten forms of damages: (1) the Deferred Fee Claim ($43,105,395); (2) the Distribution Fee Claim ($22,922,608); (3) the Taking of Plan Claims ($3,277,991); (4) the CLO Trades Claim ($685,195); (5) the Credit Suisse Claim ($3,660,130); (6) the UBS Claim ($2,600,968); (7) the Barclays Claim ($30,811,366); (8) the Legal Fees, Costs, and Expenses Claim ($11,351,850); (9) the Portfolio Company Award ($71,894,891); and (10) the Administrative Fees Award ($514,164).

157.    The claims that were asserted against Highland Capital by the Redeemer

Committee stemmed from the various breaches of fiduciary duty to the Crusader Funds that Dondero, Ellington, and Leventon caused Highland Capital to commit. For example, the "Barclays Claim"—which gave rise to over $30 million in liability for Highland Capital—arose out of Dondero, Ellington, and Leventon causing Highland Capital to transfer Barclays' limited partnership interests in the Crusader Funds to Highland Capital's wholly-owned affiliate, Eames, after the Redeemer Committee had already refused to approve that transfer. In so doing, Dondero, Ellington, and Leventon caused Highland Capital to violate the Joint Plan and Scheme and its fiduciary duties. Because of Dondero, Ellington, and Leventon's wrongful conduct, Highland Capital was ordered to pay: (1) over $30 million on account of disgorged partnership interests; (2) additional sums for disgorgement of distribution fees (that were included within the $22.9 million Distribution Fee Award); and (3) interest, fees, and expenses incurred in connection with the arbitration.

158.    In addition, from December 2013 through January 2016, Dondero, Ellington, and Leventon caused Highland Capital to purchase 28 Plan Claims from Crusader investors in violation of the Redeemer Committee's right of first refusal ("ROFR"). During this time, Leventon told multiple investors interested in transfers of their interests that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. Leventon also made affirmative misrepresentations to the Redeemer Committee to disguise the fact that Highland Capital had purchased the Plan Claims. Pursuant to the arbitration award, Highland Capital was required to transfer the 28 Plan Claims to the Redeemer Committee, and to disgorge to the Committee whatever financial benefits Highland Capital obtained from the 28 transactions, plus interest at the rate of 9% from the date of each purchase.

159.    Dondero's, Ellington's, and Leventon's conduct also resulted in Highland Capital becoming liable to the Redeemer Committee for over $71 million in connection with claims arising from the Cornerstone Healthcare Group Capital ("Cornerstone") that was owned, directly

and indirectly, by Highland Capital. Some of Cornerstone's stock was owned by the Crusader Funds. Dondero, Ellington, and Leventon caused Highland Capital to covertly purchase shares in Cornerstone from another fund that Dondero controlled at below-market prices and failed to liquidate the Crusader Funds' shares in Cornerstone as their fiduciary duties required. Pursuant to the arbitration award, Highland Capital was required to purchase the Crusader Funds' shares in Cornerstone at a fixed price of $48,070,407, and to pay pre-judgment interest that brought the total claim to $71,894,891.

160.     Additionally, the Joint Plan and Scheme required Highland Capital to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete. Dondero, Ellington, and Leventon caused Highland Capital to violate that provision of the Joint Plan and Scheme by causing Highland Capital to surreptitiously transfer approximately $32 million in Deferred Fees from the Crusader Funds' accounts on January 21 and April 6, 2016. The arbitration panel ruled that as a consequence of Dondero's, Ellington's, and Leventon's blatant breach of the payment requirements of the Joint Plan and Scheme, Highland Capital forfeited its right to these fees entirely.

161.     The Redeemer Committee set a hearing in Delaware Chancery Court for October 8, 2019, to obtain entry of a judgment with respect to the award. The hearing was subsequently continued to October 16, 2019, before the same court presiding over the Daugherty causes involving Dondero, Highland Capital, Ellington, Leventon, Girard, Hurst, and Katz/HAK/DLAP. That morning, Highland Capital filed for bankruptcy.

162.     Daugherty communicated several times with members of the Highland Crusader Fund regarding his views of the value and location of their assets pursuant to his ongoing fiduciary duties under the 1940 Advisors Act. In addition, his countersuit against Highland Capital revealed numerous acts of fraud and breaches of fiduciary duty that caused damage to Highland Crusader Fund. Dondero, Ellington, Leventon, Hurst, and Katz/HAK/DLAP

embarked on a crusade to smear Daugherty and his legal counsel while filing numerous baseless show cause motions against him. In addition, Ashcroft was retained to conduct an independent "investigation" into the allegations made by Daugherty. Daugherty was never interviewed and, not surprisingly, Ashcroft produced a report that absolved Highland Capital and its officers. The arbitration panel disagreed and found in favor of Crusader Funds for over $190,000,000 in damages resulting from willful misconduct and breach of fiduciary duty among other things. Once again, for these dubious legal services provided by Hurst, and Katz/HAK/DLAP in attempting to silence Daugherty on behalf of Highland Capital, Plaintiff was allocated the bill.

### 5. Dondero And His Accomplices, Including Ellington, and Leventon, Cause Highland Capital To Engage In Misconduct That Increases Its Liability To UBS

163.    In March 2017, the New York state court presiding over UBS's claims against Highland Capital and other fund counterparties ruled its claims could proceed to trial after numerous filings and dismissals since 2009. Shortly thereafter, Dondero, Ellington, and Leventon, along with Highland Capital employees Jean Paul Sevilla ("Sevilla"), Katie (Irving) Lucas ("Irving"), and Matthew DiOrio ("DiOrio") took steps to transfer the fund counterparty's remaining assets to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands entity indirectly owned and controlled by Dondero and Ellington, in order to ensure that such assets would be out of UBS's reach in the event that a judgment was entered in its favor.

164.    In or around August 2017, Dondero, Ellington, Leventon, Sevilla, Lucas, and DiOrio orchestrated the surreptitious transfer of all of the fund counterparty's assets—with a face amount of $300 million and a market value of at least $100 million —to Sentinel.

165.    The pretextual justification for these transfers was to satisfy a $25 million premium on an "after the event" insurance policy issued by Sentinel that insured the fund counterparty's first $100 million of liability to UBS. The real goal of the transfer, however, was to drain the fund counterparty's assets and render them judgment-proof, while keeping the assets

within Dondero's and Ellington's control. There is no legitimate explanation as to why the funds transferred assets worth at least four times the premium payment to Sentinel. And given that Dondero and Ellington indirectly own and control Sentinel, they personally and improperly benefitted from this overpayment.

166.    Moreover, Ellington and Leventon (along with Sevilla, Lucas, and DiOrio) actively concealed the transfer of assets and the existence of the insurance policy from the new Highland Capital management independent board ("Independent Board"), apparently in order to prevent the Fund Counterparties from making a claim under the policy. Indeed, Leventon, who was directly involved in the transfers to Sentinel, was tasked with educating the Independent Board about UBS's claim and the assets potentially available to satisfy it. In response, Leventon delivered an extensive—but intentionally misleading—presentation to the Independent Board that said nothing about the August 2017 asset transfer and the Sentinel insurance policy and lied to Highland Capital regarding the Fund Counterparties' assets. Additionally, around the same time that Ellington and Leventon were hiding this secret insurance policy from the Independent Board, (i) Ellington charged the policy for personal expenses in excess of $500,000 that bore no relation to the UBS litigation and provided no benefit whatsoever to the Fund Counterparties or Highland Capital; and (ii) Ellington and Leventon, among others, entered into agreements whereby Sentinel agreed to pay attorneys' fees and expenses they incurred in connection with Highland Capital's bankruptcy.

167.    As a direct result of Ellington's and Leventon's fraudulent concealment of the transfers to Sentinel, Highland Capital inadvertently made factually inaccurate statements to the Bankruptcy Court and incurred millions of dollars in additional fees litigating (rather than settling) with UBS. In March 2021, after the policy was uncovered through Highland Capital's diligence (notwithstanding Ellington's and Leventon's cover-up), the CDO Fund made a claim on the policy. To date, Sentinel has refused to make any payments.

168.    Daugherty communicated several times with members of the UBS team regarding his views of the value and location of their assets pursuant to his ongoing fiduciary duties under the 1940 Advisors Act. In addition, his countersuit against Highland Capital revealed numerous acts of fraud and breaches of fiduciary duty that caused damage to UBS. Dondero, Ellington, Leventon, Hurst, and Katz/HAK/DLAP embarked on a crusade to smear Daugherty and his counsel while filing numerous baseless show cause motions against him. In addition, Ashcroft was retained to conduct an independent "investigation" into the allegations made by Daugherty. Daugherty was never interviewed and not surprisingly, Ashcroft absolved Highland Capital in its report.

169.    On February 10, 2020, the New York state court disagreed with the Ashcroft report and issued a judgment against the Highland Counterparties in connection with the phase one litigation in the principal amount of $519,374,149, plus $523,016,882.79 in prejudgment interest, for an overall judgment of $1,042,391,031.79. Trial on UBS's claims against Highland Capital was still pending when HCMLP filed for bankruptcy on October 16, 2019 (as discussed infra).

170.    Once again, for these dubious legal services provided by Hurst, Katz/HAK/DLAP, on behalf of Highland Capital, Plaintiff was allocated the bill.

## V.
## CAUSES OF ACTION

## COUNT ONE: BREACH OF FIDUCIARY DUTY #1 – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – THE BOARD MEMBER GROUP DEFENDANTS

171.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

172.    Boyce, Britain, Dameris, Dougherty, Ellington[3]  and Honis (collectively, the

---

[3] There is a dispute as to whether Ellington was ever properly a board member due to the timing of the "election"

"Board Member Group") had a fiduciary relationship with Plaintiff as they served on the board of directors of Plaintiff.

173. The above described buy out and asset stripping scheme of 2013 was nothing more than a ruse to strip Plaintiff of its assets and its distributions for the benefit of Dondero, Okada, Boyce, Collins, Honis, Ellington, Leventon, Girard, and Waterhouse (collectively, "Highland Capital Officers and Employees Group").

174. Plaintiff discovered in 2022 that Dameris began the scheme with Dondero in December 2012 to strip Plaintiff of its assets for no value by collaborating with Abrams & Bayliss to "…. offer everyone but the 1 a buyout…." Plaintiff but did not learn that Abrams & Bayliss was "Delaware Counsel" until 2022 invoices when some of the invoices were finally provided⁷

175. Further, Plaintiff discovered in 2022 that in January 2013, Abrams and Bayliss, Boyce, Britain, Ellington, Dameris, Honis, Hurst, Katz and HAK, discussed, coordinated, prepared and reviewed documents prepared for Plaintiff to execute the scheme to strip Plaintiff of its assets for no value and transfer those assets to Highland Capital for the benefit of Highland Capital and the Highland Capital Officers and Employees Group and the Defendant Trusts.

176. They revealed their culpability by racing to create broad releases and indemnifications rights for themselves on January 17, 2013, as they attempted to facilitate the buyout.

177. Plaintiff discovered in 2022 that after the buyout, Leventon and Goldsmith identified over $14 million in assets and distribution transfers to Highland Capital and then Leventon lied under oath in multiple courts that such transfers of "non-certificated" limited partnership interests were simply not possible.

178. Further, Plaintiff discovered in 2022 that just prior to the Texas Litigation,

---

and thus whether his vote counts and if it did so when it counted; however, that notwithstanding he took actions as a board member and is thus included in this group.

Dondero, Ellington, Leventon, Hurst, Brown, Abrams & Bayliss, Katz/HAK colluded in December 2013 to manufacture false and misleading evidence that an escrow account was created to hold over $3 million to be paid to Plaintiff upon final resolution of the Texas Litigation.

179.    Plaintiff discovered in 2022 that Dameris concealed the value of Plaintiff's assets by saying to Highland Capital colleagues about one particular asset, "I hope he [Daugherty] does not find out about the parking garage deal value". During the Texas trial in 2014, Hurst, Brown and Dondero presented multiple lies about the timing and amount of the escrow to gain advantage for themselves by misleading the judge and jury. Dondero also lied when he testified at the Texas trial that the escrow assets "First go to HERA [Plaintiff]…." Dondero also lied when he testified that the delay caused in funding the escrow for Plaintiff was due to the illiquidity of the escrowed assets when no such assets were ever transferred to the escrow, and in fact the same assets were immediately transferred to Highland Capital purportedly in April 2013.

180.    Plaintiff further discovered in 2022 that Abrams & Bayliss knew that Hurst and Brown stated false facts to the jury in the Texas Litigation regarding the assets in the escrow account and that they were falsely representing the contents therein. They also knew that "Highland is happy for Daugherty to be distracted by another front of warfare in Delaware while he is also fighting the appeal in Texas…… Playing obstructionist in Delaware and then filing the Texas bond after-the-fact if Daugherty seems to be succeeding might be fun for Highland, but I think it harms our credibility."

181.    Plaintiff, discovered in 2022 that Miller of Abrams & Bayliss had the audacity to ask, "Do we look bad for claiming to hold non-monetary assets in escrow when on a day-to-day basis we have no idea what the status of these assets are? I personally am not looking forward to being deposed, even if I do know the questions ahead of time but will do it if I have to." Miller also acknowledged, "…although Highland doesn't seem to care what the Texas trial judge thinks

of it, does Highland lose credibility with the Texas court if the Texas court pierces the escrow account and finds HERA's previous representations that the funds being held in escrow were false?"

182.    Moreover Plaintiff discovered in 2022 that later in 2014, Girard colluded with Abrams & Bayliss further to conceal the true value of the escrow assets on behalf of Plaintiff that were previously presented to the Texas Litigaiton jury so that Highland Capital could collect a "windfall."

183.    During the Delaware litigation in 2019 Dondero testified at trial that he was relying on the advice of counsel, who are co-Defendants in this action, with respect to the buyout of all Plaintiff unit holders except Daugherty, the purported assignment of all assets from Plaintiff in 2013, and the taking of assets from Plaintiff in December 2016, all of which formed part of the fraud that was consummated in December 2016.

184.    The Board Member Group breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own by failing to evaluate the buyout offer for fairness.

185.    The Board Member Group breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own by failing to disclose all material facts about the buyout offer including that the board members were controlled by Highland Capital and that Boyce, Britain, and Honis were partners of Highland Capital.

186.    The Board Member Group breached its fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own by

knowing that the buyout offer had been tendered and doing nothing to assure full disclosure of the buyout offer.

187.    The Board Member Group breached their fiduciary duties to Plaintiff. specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own by doing nothing to challenge, and in fact facilitating, the Dondero-led buyout by Highland Capital and allowing a "creeping takeover" unobstructed by a standstill agreement or poison pill.

188.    The Board Member Group breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation, duty to place the corporations interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by failing to require abstention from conflicted board members who were simultaneously partners and employees of Highland Capital and stood to gain by acquiring the assets of Plaintiff at a substantial discount.

189.    The Board Member Group breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by attempting to acquire broad releases and indemnifications rights for themselves to protect against liability caused by their breaching of fiduciary duties by allowing the buyout or creeping takeover to occur.

190.    The Board Member Group breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by

ignoring Plaintiff's existing governance at the time of the buyout, which prohibited a buyout or purchase by Highland Capital. The Board Member Group instead negotiated for their own individual buyout, abdicated their duties as board members, accepted the buyout, surrendered their rights in Preferred Units of Plaintiff pursuant to the terms of the Transfer Agreement, and automatically surrendered their positions as board members of Plaintiff leaving Plaintiff with no one except Abrams & Bayliss, Hurst, Brown, Katz, Andrews Kurth, Highland Capital Officers and Employees Group to conduct its affairs.

191.    The Board Member Group breached their fiduciary duties to Plaintiff specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by participating in a scheme to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

192.    The Board Member Group breached its fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

193.    The Board Member Group breached its fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by causing Plaintiff to incur unnecessary legal expenses so that Dondero could use Plaintiff's

relationship with Daugherty to exact his vengeance on Daugherty.

194.    The Board Member Group breached its fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by allocating legal expenses incurred by Highland Capital to Plaintiff.

195.    The Board Member Group's breaches proximately caused injury to Plaintiff in forcing it to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT TWO: BREACH OF FIDUCIARY DUTY #2 – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – DONDERO ERA MANAGEMENT DEFENDANTS

196.    Dondero and his alter ego, Highland ERA Management, LLC ("ERA" and together, "Dondero ERA Management")[4] had a fiduciary relationship with Plaintiff in February 2013. ERA was a limited liability company created by Dondero, as President, in collaboration with Surgent, Dameris, Ellington, Leventon, Surgent, Abrams & Bayliss, Hurst, Katz/HAK, Boyce, Britain and Honis purportedly to serve as the sole general partner and manager of Plaintiff after the Board Member Group vacated their director positions.

197.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and managers relations with the corporation when they purported to implement an action by written consent in February 2013 that allocated 93% of Highland Capital's expenses related to the Highland Capital v.

---

[4] ERA Management is not a party to this lawsuit as it is also an entity that Daugherty obtained control of from the Delaware settlement.

Daugherty litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

198.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager relations with the corporation by failing to require abstention from conflicted Dondero ERA Management who were simultaneously President and managing partner at Highland Capital and President, Manager and general partner at Plaintiff in February 2013, when they implemented an action by consent that allocated 93% of Highland Capital's expenses related to the Highland Capital v. Daugherty litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

199.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and managers relations with the corporation by attempting to acquire broad releases and indemnification rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the asset transfer to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account.

200.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by failing to require abstention from conflicted Dondero ERA Management who

were attempting to acquire broad releases and indemnifications rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the asset transfer to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account.

201.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by participating in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

202.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by failing to require abstention from conflicted Dondero ERA Management who were participating in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

203.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

204.     Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by allocating legal expenses incurred by Highland Capital to Plaintiff.

205.     Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

206.     Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by approving or signing accounting statements and tax returns from 2013 to 2022 that transferred substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, and falsely recognized loan obligations back to Highland Capital.

207.     Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by falsely representing to be the President and manager of Plaintiff while secretly

concealing the documentation and governance documents that proved they had no legitimate authority for the purpose of legitimizing and effectuating the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

208.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation when they collaborated with Brown, Hurst, Katz/HAK, Abrams & Bayliss, Dondero, Ellington, and Leventon to conceive and falsify misleading evidence that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013.

209.    Dondero ERA Management's breaches proximately caused injury to Plaintiff in forcing Plaintiff to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT THREE: BREACH OF FIDUCIARY DUTY #3 – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – HIGHLAND CAPITAL OFFICERS AND EMPLOYEES DEFENDANTS

210.    Plaintiff had fiduciary duty relationships with Dondero, Okada, Boyce, Collins, Honis, Ellington, Leventon, Girard, and Waterhouse (collectively, "Highland Capital Officers and Employees Group"). This fiduciary relationship arose out of the long relationship between the Highland Capital Officers and Employees Group and the Plaintiff whereby Plaintiff relied on the Highland Capital Officers and Employees Group to act in its best interest. Similarly, the fiduciary relationship arises as a result of the dominance on the part of the Highland Capital Officers and Employees Group compared to the weakness and dependence on the part of the Plaintiff.

211.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure, by failing to protect it from having its assets stripped and instead facilitating the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

212.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

213.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by allocating legal expenses incurred by Highland Capital to Plaintiff.

214.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

215.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by ostensibly providing legal services to Plaintiff that were in actuality for the benefit of Highland Capital to develop and execute a scheme to strip Plaintiff of its assets

and transfer them Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

216.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by secretly concealing the documentation and governance documents that proved they had no legitimate authority for the purpose of legitimizing and effectuating the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

217.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by serving in the capacity as advisors to Plaintiff in addition to that of its largest investment, Restoration Capital Partners, LP, along with investments in  Highland Capital Real Estate Fund, L.P., Sugar Land Project, LLC, HCREA Nolen Drive, L.P. HE MEZZ KR, LLC., HCREA Trimarchi of North Dallas, L.P., CHS Electronics, Inc., HE Capital KR, LLC. And HYSKY Communications, Inc. and allowing Plaintiff's assets to be transferred to Highland Capital in April 2013 for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

218.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by allocating legal expenses incurred by Highland Capital to Plaintiff.

219.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain

from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and
the duty of full disclosure by serving in the capacity as administrator, implementor and executor
to effectuate Dondero's scheme to transfer ownership of Plaintiff in January 2013 and ultimately
its assets to Highland Capital in April 2013 for the benefit of Dondero and his trusts, Okada and
his trusts, Boyce, Britain and Honis.

220.    Highland Capital Officers and Employees Group breached their fiduciary duties
to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain
from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and
the duty of full disclosure by collaborating with Swadley, Klos and Surgent to prepare, allocate,
approve and/or sign inaccurate accounting statements and tax returns from 2013 to 2022 that
transferred substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland
Capital expenses to Plaintiff, and falsely recognized loan obligations back to Highland Capital .

221.    Highland Capital Officers and Employees Group breached their fiduciary duties
to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain
from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and
the duty of full disclosure by wrongfully participating in and coordinating the 2013 assignment
of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his
trusts, Okada and his trusts, Boyce, Britain and Honis.

222.    Highland Capital Officers and Employees Group breached their fiduciary duties
to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain
from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and
the duty of full disclosure when they collaborated with outside counsel to conceive and falsify
misleading evidence with Brown, Hurst, Katz/HAK, and Abrams & Bayliss that was presented
to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013
were held in an escrow account as of December 2013.

223.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure when they collaborated with Brown, Hurst, and Surgent to conceive and falsify misleading evidence that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of April 2013.

224.    Highland Capital Officers and Employees Group breaches proximately caused injury to Plaintiff in forcing Plaintiff to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT FOUR: BREACH OF FIDUCIARY DUTY #4 – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – OUTSIDE LEGAL PROVIDERS GROUP #1 DEFENDANTS

225.    Abrams & Bayliss, Hurst and Katz/HAK (collectively, "Outside Legal Providers Group #1") had a fiduciary relationship with Plaintiff in that they acted as attorneys for and provided legal services to Plaintiff.

226.    Abrams & Bayliss stated in its engagement letter, "You are engaging us solely to provide civil litigation and related services in connection with the civil action pending in the District Court of Dallas County, Texas, styled Highland Capital Management, L.P. v. Daugherty, No. 12-04005. We refer to our advice with respect to this matter as the 'Representation.' Our engagement is limited to the Representation. We are not acting as your counsel generally or on other matters. We are engaged to represent you as your exclusive Delaware counsel in connection with the Representation. With respect to entities or persons generally affiliated or associated with you, including entities owned by or otherwise related to you, you agree that the Firm is not being asked to provide, and will not be providing, legal advice to, or establishing an attorney-client relationship with, any such affiliated entity or person in his, her, or its individual

capacity and will not be expected to do so unless the Firm has been asked and has specifically agreed to do so in writing. Additionally, although in the course of our Representation we may receive or provide information or advice from or to your affiliates, associates, agents, or employees, our engagement is to represent you and not any of your affiliates, associates, agents, or employees."

227.    Abrams & Bayliss further stated, "We understand that you have retained Gruber Hurst Johansen Hail Shank LLP ('Gruber Hurst') with respect to matters related to the Representation. We expect to consult with Gruber Hurst, and you have confirmed that we may rely on instructions given and information provided by Gruber Hurst as to all matters involving the Representation and that, absent written notice from you, we may take direction from Gruber Hurst as if provided directly by you." Hurst and Brown were the lead attorneys at Gruber Hurst that provided legal services to and invoiced Plaintiff.

228.    The civil litigation in Texas pertaining to Plaintiff was limited to the breach of its implied duty of good faith and fair dealing with regard to the damages to Daugherty's interest in Plaintiff caused by the implementation of Article XII Dispute Resolution of the Second Amended and Restated Limited Liability Company Agreement of Highland Employee Retention Assets, LLC on February 16, 2012 where the jury determined such bad faith actions to have caused a diminution in Daugherty's interests[5]

229.    Importantly, the Texas Litigation against Plaintiff did not include actions against or on behalf of Highland Capital or Sierra Verde, nor did it include corporate actions based on asset transfers.

230.    Katz/HAK purported to represent Plaintiff in Delaware Court through 2017 up until the Highland Capital bankruptcy filing in 2019.

---

[5] . The Texas Litigation was limited to claims against Plaintiff board members Boyce and Britain for involvement in Second Amended and Restated Limited Liability Company Agreement of Highland Employee Assets, LLC.

231. Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they developed, advised and assisted the implementation of the Dondero scheme to deprive Daugherty of his interests in Plaintiff's assets in 2013 by stripping Plaintiff of all its assets and transferring them to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

232. Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they developed, advised and assisted the implementation of the Dondero scheme to deprive Daugherty of his interests in Plaintiff's assets in 2013 that transferred substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

233. Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when it prepared, revised and distributed certain documents designed to strip Plaintiff of all its assets and assist the board members in shielding their liability. Those documents include but are not limited to:

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 18, 2013 – Regarding approving a

resolution to transfer of Series A Preferred units to Highland Capital in violation of Article IX, and accepting Highland Capitals offer to purchase in violation of Section 5.2(b)(ii).

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding approving amendment to Article VIII – Expanded indemnification for board members;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removing of Joseph Dougherty as board member and replacing him with Scott Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removal of Walia as board member and approving Amendment;

- AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, to add Ellington to board, remove Walia from board and reduce board size to five members by Boyce, Britain, Dameris, Honis and Ellington;

- SECOND AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, purporting to amend ARTICLE VIII in its entirety and provide the self-dealing board members with broad indemnification for the bad conduct they just participated in.

- THIRD AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 18, 2013, purporting to amend section 5.1 and 5.2. to allow assignment to Highland capital.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment for ARTICLE VIII modification to grant broad releases to the board that just ignored their fiduciary duties.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment Section 5.1 and 5.2 modification to alter board member service requirements and approve recommendation of assignment of preferred units to Highland Capital.

- TRANSFER AGREEMENT – for the buyout and release of claims against Plaintiff.

- OFFER TO PURCHASE – dated January 15, 2013, with recommendation for dispute reserve and fairness opinion that did not happen.

- TRANSFER AGREEMENT – for the buyout and release of claims against Plaintiff.

- OFFER TO PURCHASE – dated January 15, 2013with recommendation for dispute reserve and fairness opinion that did not happen.

- THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- EXPENSE ALLOCATION AGREEMENT – Dated February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- WRITTEN CONSENT OF MANAGER - Effective as of February 1, 2013 – regarding allocation of Highland Capital's legal expenses to Plaintiff.

234.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly

honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they failed to inform all of Plaintiff's board members of their fiduciary duties to Plaintiff regarding the buyout and subsequent transfer of assets in 2013 to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

235.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by failing to protect Plaintiff from having its assets stripped in 2013 and instead facilitating the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

236.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

237.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they knew their legal expenses incurred on behalf of Highland Capital were allocated to Plaintiff.

238.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff,

specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by presenting evidence of invoices they attributed to legal costs regarding the Texas Litigation and then later presenting evidence while defending Plaintiff in the Daugherty v. Highland Employee Retention Asset, LLC trial in Delaware to justify the transfer of Plaintiff's assets to Highland pursuant to an expense allocation agreement that allocated those same invoices to Plaintiff despite knowing that Daugherty had already paid the invoices submitted in the Texas Litigation – double dipping their legal expenses and concealing that Daugherty had already reimbursed Highland Capital for the invoices presented at the Texas Litigation.

239.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by wrongfully participating in and coordinating the 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

240.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they collaborated to conceive and falsify misleading evidence that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of

December 2013.

241.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they caused Plaintiff to incur unnecessary legal expenses by invoicing and/or allocating to Plaintiff legal expenses that were actually for the benefit of Highland Capital, including but not limited to unrelated third-party employee harassment and separation agreement matters, defense matters concerning Sierra Verde, Dondero and Okada, issues concerning their interests in the Acis Capital Bankruptcy, litigation against the Wall Street Journal for unflattering articles, press spin communications, a multitude of discrete legal actions on behalf of Highland Capital against Daugherty, and to pursue Dondero's various vendettas against former employees Terry and Daugherty, including but not limited to Highland Capital's numerous failed attempts to have Daugherty held in contempt and incarcerated for fabricated violations of a since vacated injunction while almost $30,000 in donations were funneled to the presiding judge from Katz, Hurst, Ellington, Leventon, Sevilla, DiOrio and Crystal Jameson Woods (counsel at Hutton Andrews Kurth and DLA Piper on behalf of Plaintiff).

242.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when it knowingly double allocated invoices to both Plaintiff and Highland Capital while representing to the Delaware Court that they were allocated to Plaintiff.

243.     Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by causing Plaintiff to incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

244.     Outside Legal Providers Group #1's breaches proximately caused injury to the Plaintiff and/or resulted in a benefit to the Defendants.

## COUNT FIVE: BREACH OF FIDUCIARY DUTY #5 –TRANSFER OF ESCROW ASSETS 2016- DONDERO ERA MANAGEMENT DEFENDANTS

245.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

246.     Dondero and his alter ego, Highland ERA Management, LLC ("ERA" and together, "Dondero ERA Management") had a fiduciary relationship with Plaintiff in December 2016. ERA was a limited liability company created by Dondero, as President, in collaboration with Ellington, Leventon, Surgent, Abrams & Bayliss, Hurst, Katz/HAK, and Hutton Andrews Kurth purportedly to serve as the sole general partner and manager of Plaintiff after the Board Member Group vacated their director positions.

247.     Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by participating in a new December 2016 scheme that was designed to strip Plaintiff of its remaining assets in an escrow account including a valuable interest in Highland Restoration Partners fund, cash, and shares in NexPoint Credit strategies fund . These interests

were assigned to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington and Honis.

248.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by failing to require abstention from conflicted Dondero ERA Management, who were participating in a scheme that was designed to strip Plaintiff of its remaining assets in escrow pursuant to the December 2016 assignment of substantially all of Plaintiff's remaining assets to Highland Capital Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington, and Honis.

249.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

250.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by allocating legal expenses incurred by Highland Capital to Plaintiff.

251.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's

own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

252. Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by approving or signing false accounting statements and tax returns from 2013 to 2022 that transferred substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, falsely recognized loan obligations back to Highland Capital.

253. Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by failing to evaluate the fairness of a transfer on behalf of all preferred unit holders of Plaintiff.

254. Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by ignoring Plaintiff's existing governance at the time of the transfers that prohibited substantial assets transfers without amendment.

255. Dondero ERA Management's breaches proximately caused injury to Plaintiff in forcing Plaintiff to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff

in their scheme to deprive Daugherty of his interests in Plaintiff.

**COUNT SIX: BREACH OF FIDUCIARY DUTY #6 –TRANSFER OF ESCROW ASSETS 2016- HIGLAND CAPITAL OFFICERS AND EMPLOYEES GROUP**

256.     Plaintiff had fiduciary duty relationships with Highland Capital Officers and Employees Group. This fiduciary relationship arose out of the long relationship between the Highland Capital Officers and Employees Group and the Plaintiff whereby Plaintiff relied on the Highland Capital Officers and Employees Group to act in its best interest. Similarly, the fiduciary relationship arises as a result of the dominance on the part of the Highland Capital Officers and Employees Group and the weakness and dependence on the part of the Plaintiff.

257.     Dondero, Ellington, and Leventon testified that services were provided to Plaintiff under a Blanket Agreement. Highland Capital Officers and Employees Group provided management, administration, legal, accounting, tax, administration, and implementation services creating fiduciary relationship with Plaintiff.

258.     Okada, as Chief Investment Officer, testified about the importance of transparency, trust, alignment of interest and putting the client first. None of those virtues were practiced with regard to the transfer of assets from the escrow account in December 2016.

259.     Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff,  specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by failing to protect it from having its remaining assets stripped from the escrow and instead facilitating the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

260.     Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by participating in the 2016 remaining asset stripping scheme that left

Plaintiff insolvent and unable to pay its expenses and debts.

261.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by allocating legal expenses incurred by Highland Capital to Plaintiff.

262.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

263.    Ellington, Leventon and Girard breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure, duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by ostensibly providing legal services to Plaintiff that were in actuality for the benefit of Highland Capital to develop and execute a scheme to strip Plaintiff of its remaining escrow assets and transfer them to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

264.    Dondero, Okada and Honis breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure by serving in the capacity as advisors to Plaintiff in addition to that of its largest investment,

Restoration Capital Partners, and allowing Plaintiff's remaining escrow assets to be transferred to Highland Capital in December 2016 for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

265.    Collins breached his fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure by serving in the capacity as administrator, implementor and executor to effectuate the stripping of the remaining assets from the escrow in December 2016 and the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

266.    Waterhouse and Leventon breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure by preparing, allocating, approving and/or signing accounting statements and tax returns from 2013 to 2022 that transferred substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, wrongly failed to indicate payments made by Daugherty and falsely recognized loan obligations back to Highland Capital.

267.    Ellington, Leventon and Girard breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure by wrongfully participating in and coordinating the 2016 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

268.    Ellington, Leventon and Girard breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-

dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure when they collaborated with outside counsel Katz/HAK, and Abrams & Bayliss in December 2016 to transfer Plaintiff's remaining assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

269.   Highland Capital Officers and Employees Group's breaches proximately caused injury to Plaintiff in forcing Plaintiff to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT SEVEN: BREACH OF FIDUCIARY DUTY #7 –TRANSFER OF ESCROW ASSETS 2016- OUTSIDE LEGAL PROVIDERS GROUP #2 DEFENDANTS

270.   Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

271.   Abrams & Bayliss, Hurst, Katz/HAK and Brown (collectively, "Outside Legal Providers Group #2") had a fiduciary relationship with Plaintiff in that they acted as attorneys for and provided legal.

272.   Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they developed, advised and assisted the implementation of the Dondero scheme that transferred Plaintiff's remaining assets from escrow in 2016 to Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington, and Honis.

273.   Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation,

and the duty to timely inform Plaintiff of conflict of interest when they failed to inform Plaintiff's managers of their duties to Plaintiff regarding the escrow assets and subsequent transfer of assets to Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis despite performing legal analysis of the previous board members' breach of fiduciary duty to Plaintiff and its unit holders on December 2016.

274.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they collaborated with Ellington, Leventon and Girard in December 2016 to transfer Plaintiff's remaining assets to Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

275.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by knowing their invoices were being double allocated to both Plaintiff and Highland Capital while representing to the Delaware Court that they were allocated to Plaintiff.

276.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they caused Plaintiff to incur

unnecessary legal expenses by invoicing and/or allocating to Plaintiff legal expenses that were
for the benefit of Highland Capital for matters concerning Josh Terry, the Acis Capital
Bankruptcy, Highland Capital claims against Daugherty including but not limited to numerous
failed attempts to have Daugherty held in contempt and incarcerated for fabricated violations of
the an injunction for the benefit of Highland Capital to prevent Daugherty from disclosing
Highland Capital's confidential information (the injunction was subsequently vacated pursuant
to Daugherty's bankruptcy court approved settlement with Highland Capital).

277.    Hurst and Brown breached their fiduciary duties to Plaintiff, specifically the duty
to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor,
openness and honesty without any concealment or deception, duty to be strictly honest about fee
arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to
timely inform Plaintiff of conflict of interest when they represented and invoiced Plaintiff in the
Texas litigation with Daugherty for services provided on behalf of Highland Capital. In 2014,
Daugherty won a judgment in the Texas litigation against Plaintiff that was defended by Hurst
and Brown for breach of good faith and fair dealing with regards to the implementation of the
Second Amended and Restated Limited Liability Operating Agreement of Highland Employee
Retention Assets, LLC that resulted in an award of approximately $5 million in damages and
interest against Plaintiff. However, Hurst and Brown invoiced Plaintiff for services rendered on
behalf of Highland Capital before and after the Texas Litigation.

278.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff,
specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute
perfect candor, openness and honesty without any concealment or deception, duty to be strictly
honest about fee arrangements, duty to inform the Plaintiff of matters of material representation,
and the duty to timely inform Plaintiff of conflict of interest by participating in the 2016
remaining asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and

debts.

279.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by knowing Daugherty had paid over $3.1 million in payment to Highland Capital for its legal invoices that were subsequently presented to the Delaware court as unpaid legal obligations on behalf of Plaintiff. Additionally, invoices were being double allocated to both Plaintiff and Highland Capital while they represented to the Delaware Court that they were allocated to Plaintiff.

280.    Outside Legal Providers Group #2's breaches proximately caused injury to Plaintiff and/or resulted in a benefit to the Defendants.

## COUNT EIGHT: BREACH OF CONTRACT #1 -- BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 -- BOARD MEMBER GROUP DEFENDANTS

281.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

282.    The Board Member Group had a valid, enforceable contract with Plaintiff. Plaintiff is the proper party to bring suit for breach of the contract. Plaintiff performed, tendered performance of, or was excused from performing its contractual obligations.

283.    Pursuant to Section 5.1 and 5.2 of the Second Amended and Restated Limited Liability Company Agreement of Highland Employee Retention Assets, LLC (the "HERA Company Agreement"), The Board Member Group agreed to operate Plaintiff and its business Section 2.1 Purpose to hold and receive assets.

284.    The Board Member Group breached its contractual obligations under Section 2.1 to receive and hold assets and instead participated and/or acquiesced to a scheme that stripped Plaintiff of its assets for no value and sent those assets to Highland Capital for the benefit of

Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

285.    The Board Member Group breached its contractual obligations under Section 3.4 to maintain Capital Accounts pursuant to the terms of 3.4.(a)(i)-(iv) as they participated and/or acquiesced to a scheme to misallocate expenses, net income, and net losses to individual member Capital Accounts.

286.    The Board Member Group breached its contractual obligations under Section 3.5 to maintain allocate Net Income and Net Loss pro rata in accordance with each vested Series A Preferred Unit holders Capital Account balance as they participated and/or acquiesced to a scheme to misallocate expenses, net income, and net losses to individual member Capital Accounts.

287.    The Board Member Group breached its contractual obligations under Section 4.1 by participating or acquiescing to a scheme that allowed distributions to be made of all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

288.    The Board Member Group breached its contractual obligations under Section 5.2 (b)(iv) to Plaintiff by not obtaining prior affirmative vote or written consent of at least 75% of the members of the Board to make the purported amendments, alterations, changes and/or repeals to the purported in the January 17, 2013 and January 18, 2013 governance actions by amendment and/or written consent pursuant to the HERA Company Agreement. Such actions include but are not limited to the following:

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding expenses;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 –

Regarding transfer of Joseph Dougherty Preferred Units to Highland Capital;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removing of Joseph Dougherty as board member and replacing him with Scott Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removal of Walia as board member and approving Amendment;

- AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, to add Ellington to board, remove Walia from board and reduce board size to five members by Boyce, Britain, Dameris, Honis and Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding approving amendment to Article VIII – Expanded indemnification for board signed by Boyce, Britain, Dameris, Honis and Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 18, 2013 – Regarding approving a resolution to transfer of Series A Preferred units to Highland Capital in violation of Article IX, and accepting Highland Capitals offer to purchase in violation of Section 5.2(b)(ii).

- THIRD AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 18, 2013, purporting

to amend section 5.1 and 5.2.

- SECOND AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, purporting to amend ARTICLE VIII in its entirety and provide the self-dealing board members with broad indemnification for the bad conduct they just participated.

- TRANSFER AGREEMENT – for the buyout and release of claims against Plaintiff.

- OFFER TO PURCHASE – dated January 15, 2013with recommendation for dispute reserve and fairness opinion that did not happen.

- THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- EXPENSE ALLOCATION AGREEMENT – Dated February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- WRITTEN CONSENT OF MANAGER - Effective as of February 1, 2013 – regarding allocation of Highland Capital's legal expenses to Plaintiff.

289.   The Board Member Group breached its contractual obligations under Section 5.6 to Plaintiff by causing it to prepare false tax returns that improperly reflected the preferred unit holders share of income, loss, credit, and deductions.

290.   The Board Member Group breached its contractual obligations under ARTICLE IX by allowing the preferred units to be assigned to Highland Capital for the benefit of Dondero and his trusts, Okada and his trust, Boyce, Britain, and Honis.

291.   The Board Member Group breached its contractual obligations to Plaintiff under

Section 11.1 by ignoring its obligation of Separateness and Operations by:

- 11.1(a)(i) and (ii) not solely holding assets for distribution to former employees of Highland Capital, and not distributing the proceeds of Retention Assets pursuant to the terms of the Series A Preferred Units of the Plaintiff

- 11.1(b) allowing the Plaintiff's assets to be listed on the books of another entity, Highland Capital's for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

- 11.1(d) allowing its funds to be commingled with affiliates, Highland Capital's for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

- 11.1(e) allowing the Plaintiff to be obligated for Highland Capital's legal expenses and holding Plaintiff out as responsible to pay Highland Capital's legal expenses for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

- 11.1(f) failing to allocate expenses to Plaintiff in a fair and reasonable manner.

- 11.1(g) failing to hold regular board meetings.

- 11.1(h) limiting the Plaintiff to paying its own liabilities and expenses to the benefit of Highland Capital and Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

292.    The Board Member Group's breaches caused Plaintiff injury.

## COUNT NINE: IMPLIED DUTIES OF GOOD FAITH AND FAIR DEALING #1 — BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – BOARD MEMBER GROUP DEFENDANTS

293.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

294.    The Board Member Group owed Plaintiff an implied duty of good faith and fair

dealing due to their contractual relationship.

295.    The Board Member Group and Plaintiff did not consider at the time of contracting that the Board Member Group would allow Plaintiff's assets to be stripped and transferred to Highland Capital in April 2013 for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis for no value. The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group breached their implied duty of good faith and fair dealing to Plaintiff by failing to protect it from having its assets stripped and instead facilitating the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis for no value.

296.    The Board Member Group and Plaintiff did not consider at the time of contracting that The Board Member Group would allow Plaintiff's assets to be stripped leaving Plaintiff insolvent and unable to pay its expenses and debts. The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, the Board Member Group breached their implied duty of good faith and fair dealing by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

297.    The Board Member Group and Plaintiff did not consider at the time of contracting that The Board Member Group would allocate Highland Capital's legal expenses to Plaintiff (including those already repaid by Daugherty). The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group breached their implied duty of good faith and fair dealing by allocating legal expenses incurred by Highland Capital to Plaintiff.

298.    The Board Member Group and Plaintiff did not consider at the time of contracting that The Board Member Group would double allocate legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty. The Board Member Group and Plaintiff

would have prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group breached their implied duty of good faith and fair dealing by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

299.    The Board Member Group and Plaintiff did not consider at the time of contracting that The Board Member Group would participate in preparing, revising, and distributing certain documents designed to strip Plaintiff of all its assets and assist the board members in shielding their liability by doing so. The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group breached their implied duty of good faith and fair dealing to Plaintiff when they participated in preparing, revising, and distributing certain documents designed to strip Plaintiff of all its assets and assist the board members in shielding their liability. Those documents include but are not limited to:

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 18, 2013 – Regarding approving a resolution to transfer of Series A Preferred units to Highland Capital in violation of Article IX, and accepting Highland Capitals offer to purchase in violation of Section 5.2(b)(ii).

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding approving amendment to Article VIII – Expanded indemnification for board;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removing of Joseph Dougherty as board member and replacing him with Scott Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removal of Walia as board member and approving Amendment;

- AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, to add Ellington to board, remove Walia from board and reduce board size to five members by Boyce, Britain, Dameris, Honis and Ellington;

- SECOND AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, purporting to amend ARTICLE VIII in its entirety and provide the self-dealing board members with broad indemnification for the bad conduct they just participated in.

- THIRD AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 18, 2013, purporting to amend section 5.1 and 5.2. to allow assignment to Highland capital.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment for ARTICLE VIII modification to grant broad releases to the board that just ignored their fiduciary duties at the advice of A&B and Hurst and Brown.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment Section 5.1 and 5.2 modification to alter board member service requirements and approve recommendation of assignment of preferred units to Highland Capital.

- TRANSFER AGREEMENT – for the buyout and release of claims against Plaintiff.

- OFFER TO PURCHASE – dated January 15, 2013with recommendation for dispute reserve and fairness opinion that did not happen.

- THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- EXPENSE ALLOCATION AGREEMENT – Dated February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- WRITTEN CONSENT OF MANAGER - Effective as of February 1, 2013 – regarding allocation of Highland Capital's legal expenses to Plaintiff.

300.    The Board Member Group and Plaintiff did not consider at the time of contracting that The Board Member Group would participate in preparing, allocating, approving, or signing false accounting statements and tax returns that purported to transfer all of Plaintiff's assets to Highland Capital, falsely allocate Highland Capital expenses to Plaintiff, and falsely allocate loan obligations back to Highland Capital. The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group breached their implied duty of good faith and fair dealing to Plaintiff by participating in preparing, allocating, approving, or signing false accounting statements and tax returns that purported to transfer all of Plaintiff's assets to Highland Capital, falsely allocate Highland Capital expenses to Plaintiff, and falsely allocate loan obligations back to Highland Capital.

301.    Ellington and Plaintiff did not consider at the time of contracting that Ellington would falsely represent himself to be a board member for a three-day period to legitimize and effectuate the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis. Ellington and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Ellington breached his implied duty of good faith and fair dealing to Plaintiff by falsely representing to be a board member for a three-day period to legitimize and effectuate the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada

and his trusts, Boyce, Britain and Honis.[This should probably get moved to the next section since he was not a board member].

302.    The Board Member Group and Plaintiff did not consider at the time of contracting that The Board Member Group would allow Dondero to use Plaintiff's relationship with Daugherty to further his vendetta against Daugherty causing Plaintiff to incur unnecessary legal expenses and loss. The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group breached their implied duty of good faith and fair dealing by causing Plaintiff to incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

303.    The Board Member Group's breaches caused Plaintiff injury.

## COUNT TEN: IMPLIED DUTIES OF GOOD FAITH AND FAIR DEALING #2-- BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS

304.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

305.    Dondero, Ellington, and Leventon testified that management, administration, legal, accounting, tax, and implementation services were provided to Plaintiff under a Blanket Agreement.

306.    Highland Capital Officers and Employees Group owed Plaintiff an implied duty of good faith and fair dealing due to their contractual relationship.

307.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would not protect Plaintiff from having its assets stripped and instead would facilitate the transfer of those assets to Highland Capital in April 2013 for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The

Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing to Plaintiff by allowing it to have its assets stripped and instead facilitated the transfer of those assets to Highland Capital in April 2013 for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

308.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would participate in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, the Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

309.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that The Highland Capital Officers and Employees Group would allocate Highland Capital's legal expenses to Plaintiff (including those already repaid by Daugherty). The Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing by allocating legal expenses incurred by Highland Capital to Plaintiff.

310.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that The Highland Capital Officers and Employees Group would double allocate legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty. The Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing by

double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

311.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that The Highland Capital Officers and Employees Group would participate in preparing, revising, and distributing certain documents designed to strip Plaintiff of all its assets and assist the board members in shielding their liability by doing so. The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing to Plaintiff when they participated in preparing, revising, and distributing certain documents designed to strip Plaintiff of all its assets and assist the board members in shielding their liability. Those documents include but are not limited to:

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 18, 2013 – Regarding approving a resolution to transfer of Series A Preferred units to Highland Capital in violation of Article IX, and accepting Highland Capitals offer to purchase in violation of Section 5.2(b)(ii).

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding approving amendment to Article VIII – Expanded indemnification for board;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removing of Joseph Dougherty as board member and replacing him with Scott Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removal of Walia as board member and approving Amendment;

- AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, to add Ellington to board, remove Walia from board and reduce board size to five members by Boyce, Britain, Dameris, Honis and Ellington;

- SECOND AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, purporting to amend ARTICLE VIII in its entirety and provide the self-dealing board members with broad indemnification for the bad conduct they just participated in.

- THIRD AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 18, 2013, purporting to amend section 5.1 and 5.2. to allow assignment to Highland capital.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment for ARTICLE VIII modification to grant broad releases to the board that just ignored their fiduciary duties at the advice of A&B and Hurst and Brown.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment Section 5.1 and 5.2 modification to alter board member service requirements and approve recommendation of assignment of preferred units to Highland Capital.

- TRANSFER AGREEMENT – for the buyout and release of claims against Plaintiff.

- OFFER TO PURCHASE – dated January 15, 2013with recommendation for dispute reserve and fairness opinion that did not happen.

312.    The Highland Capital Officers and Employees Group and Plaintiff did not

consider at the time of contracting that The Highland Capital Officers and Employees Group would participate in preparing, allocating, approving, or signing false accounting statements and tax returns that purported to transfer all of Plaintiff's assets to Highland Capital, falsely allocate Highland Capital expenses to Plaintiff, and falsely allocate loan obligations back to Highland Capital. The Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing to Plaintiff by participating in preparing, allocating, approving, or signing false accounting statements and tax returns that purported to transfer all of Plaintiff's assets to Highland Capital, falsely allocate Highland Capital expenses to Plaintiff, and falsely allocate loan obligations back to Highland Capital.

313.     Ellington did not consider at the time of contracting that Ellington would falsely represent himself to be a board member for a three-day period to legitimize and effectuate the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis. Ellington and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Ellington breached his implied duty of good faith and fair dealing to Plaintiff by falsely representing to be a board member for a three-day period to legitimize and effectuate the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

314.     The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that The Highland Capital Officers and Employees Group would allow Dondero to use Plaintiff's relationship with Daugherty to further his vendetta against Daugherty causing Plaintiff to incur unnecessary legal expenses and loss. The Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the

parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing by causing Plaintiff to incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

315.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that The Highland Capital Officers and Employees Group would collaborate with outside counsel to conceive and falsify misleading evidence with Brown, Hurst, Katz/HAK and Abrams & Bayliss that was presented in the Texas Litigation to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013. The Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing by when they collaborated with outside counsel to conceive and falsify misleading evidence with Surgent, Brown, Hurst, Katz/HAK and Abrams & Bayliss that was presented in the Texas Litigation to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013.

316.    Highland Capital Officers and Employees Group's breaches caused Plaintiff injury.

## COUNT ELEVEN: IMPLIED DUTIES OF GOOD FAITH AND FAIR DEALING #3 -- BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – DONDERO ERA MANAGEMENT GROUP DEFENDANTS

317.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

318.    Dondero, Ellington, and Leventon testified that management, administration, legal, accounting, tax, and implementation services were provided to Plaintiff under a Blanket Agreement. [I'm not sure this is proper here].

319.    Dondero and his alter ego, Highland ERA Management, LLC ("ERA" and together, "Dondero ERA Management") owed Plaintiff implied duties of good faith and fair dealing in February 2013. ERA was a limited liability company created by Dondero, as President, in collaboration with Surgent, Dameris, Ellington, Leventon, Surgent, Abrams & Bayliss, Hurst, Katz/HAK, Boyce, Britain and Honis purportedly to serve as the sole general partner and manager of Plaintiff after the Board Member Group vacated their director positions.

320.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would attempt to implement an action by written consent in February 2013 that allocated 93% of Highland Capital's expenses related to the Texas and Delaware litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing to implement an action by written consent in February 2013 that allocated 93% of Highland Capital's expenses related to the Texas and Delaware litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

321.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would not require abstention from conflicted Dondero ERA Management who were simultaneously President and managing partner at Highland and President, Manager and general partner at Plaintiff in February 2013, when they implemented an action by consent that allocated 93% of Highland Capital's expenses related to the Texas and Delaware litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their implied duty of good faith and fair dealing to plaintiff when they

implemented an action by consent that allocated 93% of Highland Capital's expenses related to the Texas and Delaware litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

322.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would attempt to acquire broad releases and indemnification rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the 2013 asset transfer to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account in December 2013. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by attempting to acquire broad releases and indemnification rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the asset transfer to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account.

323.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would not abstain from attempting to acquire broad releases and indemnification rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the 2013 asset transfer to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account in December 2013. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by not abstaining before attempting to acquire broad releases and indemnification rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the asset transfer

to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account.

324.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would participate in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it  Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by participating in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

325.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would not abstain from participating in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by not abstaining from participating in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

326.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would participate in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts. Dondero ERA

Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by participating in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts.

327.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would double allocate legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

328.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would approve and/or sign accounting statements and tax returns from 2013 to 2022 that purported to transfer substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, and falsely recognized loan obligations back to Highland Capital. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by approving and/or signing accounting statements and tax returns from 2013 to 2022 that purported to transfer substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, and falsely recognized loan obligations back to Highland Capital.

329.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would falsely represent to be the President and manager of Plaintiff while secretly concealing the documentation and governance documents that proved they had no legitimate authority for the purpose of legitimizing and effectuating the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his

trusts, Boyce, Britain and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by falsely representing to be the President and manager of Plaintiff while secretly concealing the documentation and governance documents that proved they had no legitimate authority for the purpose of legitimizing and effectuating the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

330. Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would conceive and falsify misleading evidence that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff when they collaborated with Brown, Hurst, Katz/HAK, Abrams & Bayliss, Dondero, Ellington, Leventon and Surgent to conceive and falsify misleading evidence that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013.

331. Dondero ERA Management's breaches proximately caused injury to Plaintiff in forcing Plaintiff to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT TWELVE: BREACH OF IMPLIED GOOD FAITH AND FAIR DEALING #4 – TRANSFER OF ESCROW ASSETS 2016- DONDERO ERA MANAGEMENT DEFENDANTS

332. Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

333. Dondero ERA Management owed Plaintiff an implied duty of good faith and fair

dealing in 2016. ERA was a limited liability company created by Dondero, as President, in collaboration with Surgent, Dameris, Ellington, Leventon, Surgent, Abrams & Bayliss, Hurst, Katz/HAK, Boyce, and Britain purportedly to serve as the sole general partner and manager of Plaintiff after the Board Member Group vacated their director positions.

334. Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would participate in a new December 2016 scheme that was designed to strip Plaintiff of its remaining assets in an escrow account including a valuable purported interest in Highland Restoration Partners fund and substantial cash and transfer those interest to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by participating in a new December 2016 scheme that was designed to strip Plaintiff of its remaining assets in an escrow account including a valuable purported interest in Highland Restoration Partners fund and substantial cash. These interests were assigned to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington and Honis.

335. Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would fail to require themselves to abstain from conflicted positions regarding a scheme that was designed to strip Plaintiff of its remaining assets in escrow pursuant to the December 2016 assignment of substantially all of Plaintiff's remaining assets to Highland Capital Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington, and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by failing to require abstention from conflicted Dondero ERA Management who were participating in a scheme that

was designed to strip Plaintiff of its remaining assets in escrow pursuant to the December 2016 assignment of substantially all of Plaintiff's remaining assets to Highland Capital Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington, and Honis.

336.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would by participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

337.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would fail to require themselves to abstain from conflicted positions by participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly,, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by failing to require abstention from conflicted Dondero ERA Management who were participating in a scheme that was designed to strip Plaintiff of its remaining assets in escrow pursuant to the December 2016 assignment of substantially all of Plaintiff's remaining assets to Highland Capital Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington, and Honis.

338.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would participate in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts. Dondero ERA

Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by participating in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts.

339.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would cause injury to Plaintiff in forcing Plaintiff to lose all of its assets in escrow and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by causing injury to Plaintiff in forcing Plaintiff to lose all of its assets in escrow and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

340.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would fail to evaluate the fairness of the escrow transfer on behalf of all preferred unit holders of Plaintiff. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by failing to evaluate the fairness of the escrow transfer on behalf of all preferred unit holders of Plaintiff.

341.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would ignore Plaintiff's existing governance at the time of the escrow transfers that prohibited substantial assets transfers without amendment. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by ignoring Plaintiff's existing governance at the time of the escrow

transfers that prohibited substantial assets transfers without amendment.

342.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would cause injury to Plaintiff in forcing Plaintiff to lose all of its escrow assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by causing injury to Plaintiff in forcing Plaintiff to lose all of its escrow assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT THIRTEEN: BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING #5 –TRANSFER OF ESCROW ASSETS 2016- HIGLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS

343.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

344.    Dondero, Ellington, and Leventon testified that management, administration, legal, accounting, tax, and implementation services were provided to Plaintiff under a Blanket Agreement.

345.    Highland Capital Officers and Employees Group owed Plaintiff an implied duty of good faith and fair dealing in 2016.

346.    Highland Capital Officers and Employees Group and Plaintiff did not consider that Highland Capital Officers and Employees Group would participate in a new December 2016 scheme that was designed to strip Plaintiff of its remaining assets in an escrow account including a valuable purported interest in Highland Restoration Partners fund and substantial cash and transfer those interest to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington and Honis. Highland Capital Officers and

Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by participating in a new December 2016 scheme that was designed to strip Plaintiff of its remaining assets in an escrow account including a valuable purported interest in Highland Restoration Partners fund and substantial cash. These interests were assigned to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington and Honis.

347.    Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would be participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

348.    Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would participate in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by participating in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts.

349.    Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would cause injury

to Plaintiff in forcing Plaintiff to lose all of its assets in escrow and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by causing injury to Plaintiff in forcing Plaintiff to lose all of its assets in escrow and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

350.    Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would fail to evaluate the fairness of the escrow transfer on behalf of all preferred unit holders of Plaintiff. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by failing to evaluate the fairness of the escrow transfer on behalf of all preferred unit holders of Plaintiff.

351.    Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would ignore Plaintiff's existing governance at the time of the escrow transfers that prohibited substantial assets transfers without amendment. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by ignoring Plaintiff's existing governance at the time of the escrow transfers that prohibited substantial assets transfers without amendment.

352.    Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would cause injury to Plaintiff by forcing Plaintiff to lose all of its escrow assets and incur unnecessary legal expenses

by allocating over $14 million in legal expenses, including cocktails and meals, incurred on behalf of Highland Capital and its affiliates to Plaintiff [including but not limited to Hutton Andrews Kurth, DLA Piper, Gruber Hurst, Abrams & Bayliss, Lynn Pinker Hurst Schwegman, Ashcroft Law Firm, Cole Schotz, Morgan Lewis, Stanton Law Firm, Bell Nunnally, Cooke Young & Keidan, Fish & Richardson, Gardner Haas, Greenberg Traurig, The Griffith Law Firm, Hutcherson Law,  Littler Mendelson, Nutter, McLennen & Fish, Contractual Counsel, Robert Half, The Stanton Law Firm, Berkeley Research Group, Bloom Strategic Consulting, CBIZ valuation Group, Digital Works, Duff and Phelps, Elite Document Technology, Esquire Deposition Solutions, Folks & Associates, Point Multimedia, Phil Rochefort Audio Services, Gary Durham Consulting, JAMS Inc, Matthew Okolita, and Michael Colvin.] by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by causing injury to Plaintiff by forcing Plaintiff to lose all of its escrow assets and incur unnecessary legal expenses by allocating over $14 million in legal expenses,

353.    Ellington, Leventon and Plaintiff did not consider at the time of contracting that Ellington and Leventon would breach their duty of good faith and fair dealing to Plaintiff when they collaborated with outside counsel Katz/HAK, and Abrams & Bayliss in December 2016 to transfer Plaintiff's remaining escrow assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Ellington and Leventon breached their duty of good faith and fair dealing to Plaintiff when they collaborated with outside counsel Katz/HAK, and Abrams & Bayliss in December 2016 to transfer Plaintiff's remaining escrow assets to Highland Capital for

the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

354. Highland Capital Officers and Employees Group's breaches caused Plaintiff injury.

## COUNT FOURTEEN: BREACH OF CONTRACT #2 –TRANSFER OF ESCROW ASSETS 2016- HIGLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS

355. Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

356. Plaintiff had a valid, enforceable contractual relationship with Highland Capital Officers and Employees Group. Plaintiff is a property party to bring suit for breach of contract. Plaintiff performed, tendered performance of, or was excused from performing its contractual obligations.

357. Dondero, Ellington, and Leventon testified that management, administration, legal, accounting, tax, administration, and implementation services were provided to Plaintiff under a Blanket Agreement.

358. Highland Capital Officers and Employees Group breached the contract by failing to protect Plaintiff from having its remaining assets stripped from the escrow in December 2016 and instead facilitated the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

359. Highland Capital Officers and Employees Group breached the contract by participating in the 2016 remaining asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

360. Highland Capital Officers and Employees Group breached the contract by allocating over $14 million in legal expenses, including cocktails and meals, incurred on behalf of Highland Capital and its affiliates to Plaintiff, including but not limited to Hutton Andrews Kurth, DLA Piper, Gruber Hurst, Abrams & Bayliss, Lynn Pinker Hurst Schwegman, Ashcroft

Law Firm, Cole Schotz, Morgan Lewis, Stanton Law Firm, Bell Nunnally, Cooke Young &
Keidan, Fish & Richardson, Gardner Haas, Greenberg Traurig, The Griffith Law Firm,
Hutcherson Law,  Littler Mendelson, Nutter, McLennen & Fish, Contractual Counsel, Robert
Half, The Stanton Law Firm, Berkeley Research Group, Bloom Strategic Consulting, CBIZ
valuation Group, Digital Works, Duff and Phelps, Elite Document Technology, Esquire
Deposition Solutions, Folks & Associates, Point Multimedia, Phil Rochefort Audio Services,
Gary Durham Consulting, JAMS Inc, Matthew Okolita, and Michael Colvin.

361.    Highland Capital Officers and Employees Group breached the contract by double
allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by
Daugherty.

362.    Highland Capital Officers and Employees Group breached the contract by serving
in the capacity as advisor to Plaintiff in addition to that of its largest investment, Restoration
Capital Partners, and allowing Plaintiff's remaining escrow assets to be transferred to Highland
Capital in December 2016 for the benefit of Dondero and his trusts, Okada and his trusts, Hunter
Mountain, Ellington and Honis.

363.    Highland Capital Officers and Employees Group breached the contract by
allocating legal expenses incurred by Highland Capital to Plaintiff.

364.    Highland Capital Officers and Employees Group breached the contract by
preparing, allocating, approving, or signing accounting statements and tax returns from 2013 to
2022 that transferred substantially all of Plaintiff's assets to Highland Capital, falsely allocated
Highland Capital expenses to Plaintiff, wrongly failed to indicate payments made by Daugherty
and falsely indicated loan obligations back to Highland Capital.

365.    Highland Capital Officers and Employees Group breached the contract by
wrongfully participating in and coordinating the 2016 assignment of all of Plaintiffs assets to
Highland Capital for the benefit of Highland Capital for the benefit of Dondero and his trusts,

Okada and his trusts, Hunter Mountain, Ellington and Honis.

366.    Highland Capital Officers and Employees Group breached the contract when they collaborated with outside counsel Katz/HAK, and Abrams & Bayliss in December 2016 to transfer Plaintiff's remaining assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

367.    Highland Capital Officers and Employees Group breached the contract when they caused Plaintiff to incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

368.    Highland Capital Officers and Employees Group's breaches caused Plaintiff injury.

## COUNT FIFTEEN - BREACH OF CONTRACT #3 –CHARGING OF EXCESSIVE ATTORNEYS FEES- OUTSIDE LEGAL PROVIDERS GROUP #2 DEFENDANTS

369.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

370.    Outside Legal Providers Group #2 breached their contract with Plaintiff by charging excessive attorney's fees. *Pollard v. Hanschen*, 315 S.W.3d 636, 641 (Tex. App.—Dallas 2010, no pet.).

371.    Plaintiff had valid and enforceable contracts with the Outside Legal Providers Group #2. Plaintiff is a proper party to bring suit for breach of contract. Plaintiff performed, tendered performance of, or was excused from performing its contractual obligations.

372.    Outside Legal Providers Group #2 breached their contractual duties to Plaintiff when they caused Plaintiff to incur unnecessary legal expenses by invoicing and/or allocating to Plaintiff legal expenses that were actually for the benefit of Highland Capital, including but not limited to unrelated third-party employee harassment and separation agreement matters, defense matters concerning Sierra Verde, Dondero and Okada issues concerning their interests in the Acis Capital Bankruptcy, litigation against the Wall Street Journal for unflattering articles, press

spin communications, a multitude of discrete legal actions on behalf of Highland Capital against Daugherty including having Daugherty followed to London and recording his panel discussion at a conference, and to pursue Dondero's various vendettas against former employees Terry and Daugherty, including but not limited to Highland Capital's numerous failed attempts to have Daugherty held in contempt and incarcerated for fabricated violations of a since vacated injunction while approximately $29,000 in donations were funneled to the presiding judge.

373.    Outside Legal Providers Group #2 breached their contractual duties to Plaintiff by causing redacted invoices for reimbursement to be produced in the Texas Litigation between Highland Capital and Daugherty in 2014 for services performed on behalf of Highland Capital. And then, after Daugherty paid over $3.1 million in December 2016 pursuant to wiring instructions by Katz/HAK, they represented that the same invoices were unpaid obligations for work performed on behalf of Plaintiff in the Delaware litigation commencing in 2017. Additionally, invoices were being double allocated to both Plaintiff and Highland Capital while they represented to the Delaware Court that they were allocated to Plaintiff.

374.    Outside Legal Providers Group #2 breached their contractual duties with Plaintiff by representing to the Delaware court that certain legal expenses incurred on behalf of Plaintiff by Highland Capital were unpaid obligations of Plaintiff when in fact those same invoices were already paid by Daugherty pursuant to wiring instructions provided by Katz/HAK after Katz/HAK was already secretly aware that Highland had already swept over $1.2 million from Plaintiff's escrow account and after Katz/HAK had filed turnover and garnishment motions against Daugherty claiming that Highland Capital had not been paid. Said another way, Katz/HAK charged Plaintiff for expenses they knew had already been paid twice by sweeping Plaintiff's cash escrow assets and then by wire from Daugherty because they had been falsely presented the same invoices as Highland Capital expenses in the Texas trial.

375.    Outside Legal Providers Group #2 breached their contractual duties to Plaintiff

when it was discovered in 2022 that on February 7, 2013, Surgent sent an email attaching Daugherty's request to inspect Plaintiff's assets to Hough, Hurst, Katz/HAK, and Ellington. Again, Katz/HAK did not represent Plaintiff at the time but was adverse to Daugherty and his counsel at Looper Reed, and McGraw on behalf of Highland Capital.

376.   Outside Legal Providers Group #2 breached their contractual duties to Plaintiff when a detailed review of invoices discovered for the first time in 2022 revealed that Outside Legal Providers Group #2, with the assistance of Dondero, Leventon, Ellington, Dondero, Klos, Waterhouse, and Swadley, had fraudulently represented to various courts that over $14,000,000 in invoices for the benefit of Highland Capital was improperly allocated to Plaintiff from 2012 to 2019.

377.   Outside Legal Providers Group #2's breaches proximately caused injury to Plaintiff.

**COUNT SIXTEEN - CONSPIRACY TO COMMIT FRAUD #1 – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – BOARD MEMBER GROUP, DONDERO ERA MANAGEMENT, HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP, OUTSIDE LEGAL PROVIDERS GROUPS #1 AND #2 DEFENDANTS**

378.   Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

379.   The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 were a member of a combination of two or more persons whose object was to accomplish an unlawful purpose, to defraud Plaintiff of its assets and distributions pursuant to the buyout scheme of 2012/2013.

380.   The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 had a meeting of the minds on the object and course of action to cooperate in the 2012/2013 scheme to defraud

Plaintiff and all acted in accordance with the conspiracy to defraud Plaintiff.

381.    The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 made and caused to be made false representations in the Texas Litigation, Delaware actions, and Northern District of Texas bankruptcy court that were at various times designed to induce the Texas judge and jury, the Delaware judge, the Northern District of Texas Bankruptcy Judge, Daugherty and Plaintiff to rely on those false representations. The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 knew the representations to be false at the time made because at all times the Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 intended to take the assets that they represented were validly approved in the purported corporate governance actions of Plaintiff on January 17, 2013, January 18, 2013, February 2013, and April 30, 2013 and assign Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, Honis and Ellington.

382.    The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 withheld critical information and documents that disproved the legitimacy of the scheme that stripped Plaintiff of its assets and associated distributions in April of 2013.

383.    The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 made and caused to be made false representations in the Texas Litigation that were designed to induce the Texas judge and jury on those false representations. The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group #1 and the Outside Legal Provider Groups #1 and #2 knew the representations to be false at the time made because at all

times the The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 intended to take the assets out of escrow that belonged to Plaintiff.

384.    The Plaintiff suffered injury as a proximate result of these wrongful acts.

**COUNT SEVENTEEN - CONSPIRACY TO COMMIT FRAUD #2 – TRANSFER OF ESCROW ASSETS 2016 – DONDERO ERA MANAGEMENT, HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP, OUTSIDE LEGAL PROVIDERS GROUP #2 AND BOYCE DEFENDANTS**

385.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

386.    Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Group #2 and Boyce were members of a combination of two or more person whose object was to accomplish an unlawful purpose, to defraud Plaintiff of the assets held on escrow in 2016.

387.    Dondero ERA Management, Highland Capital Officers, and Employees Group, the Outside Legal Provider Group #2 and Boyce had a meeting of the minds on the object and course of action to cooperate in the 2016 scheme to defraud Plaintiff and all acted in accordance with the conspiracy to defraud Plaintiff.

388.    Dondero ERA Management, Highland Capital Officers, and Employees Group, the Outside Legal Provider Group #2 and Boyce participated in the conspiracy to defraud Plaintiff of its assets and distributions therefrom pursuant to the escrow stripping scheme.

389.    Dondero ERA Management, Highland Capital Officers and Employees Group, the Outside Legal Provider Group #2 and Boyce made and caused to be made false representations in the Delaware courts and the Northern District of Texas bankruptcy courts that were designed to induce the respective judges to rely on those false representations. Dondero ERA Management, Highland Capital Officers and Employees Group, the Outside Legal Provider Group #2 and Boyce knew the representations to be false at the time made because at all times

the Dondero ERA Management, Highland Capital Officers and Employees Group, Outside Legal Provider Group #2 and Boyce intended to legitimize the taking of the assets out of escrow that belonged to Plaintiff.

390.    The Plaintiff suffered injury as a proximate result of these wrongful acts.

## COUNT EIGHTEEN – UNJUST ENRICHMENT #1 BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – ALL DEFENDANTS

391.    Plaintiff restates each of the foregoing allegations as if fully set forth in this paragraph.

392.    Defendants exercised total control over Plaintiff and, due to their acts and omission, were unjustly enriched.

393.    Defendants participated in the conspiracy to defraud Plaintiff of its assets by enabling a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiffs assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

394.    Defendants wrongly acquired assets for their mutual benefit while simultaneously being unjustly enriched at the expense of Plaintiff. Defendants took these actions knowingly and as part of their conspiracy to unjustly enrich themselves at the expense of Plaintiff.

395.    Defendants were unjustly enriched by the taking of the assets in April 2013 that they had misrepresented as properly approved and then actively concealed the improper execution and legitimacy pursuant to the terms of the Second Amended and Restated Limited Liability Company Operating Agreement of Plaintiff.

396.    Defendants accepted, used, and enjoyed the benefit of these assets leaving Plaintiff stripped of its assets and allocated legal expenses that were incurred on behalf of Highland Capital, legal expenses that were already paid by Daugherty, and legal expenses to defend against Daugherty's claims to Plaintiff.

## COUNT NINETEEN – UNJUST ENRICHMENT #2 (IN THE ALTERNATIVE)– TRANSFER OF ESCROW ASSETS 2016 – ALL DEFENDANTS

397.    Plaintiff restates each of the foregoing allegations as if fully set forth in this paragraph.

398.    Defendants exercised total control over Plaintiff and treated its funds as their own.

399.    Defendants participated in the conspiracy to defraud Plaintiff of its interests in the escrow in December 2016 to unjustly enrich themselves.

400.    Defendants were unjustly enriched by the taking of the assets in escrow that they had misrepresented had been set aside for Plaintiff to pay its obligations. Defendants themselves benefited from this unjust enrichment through the acquisition of the assets and the payment of their legal fees and salaries.

401.    Defendants accepted, used, and enjoyed the benefit of these assets leaving Plaintiff stripped of its assets and allocated legal expenses that were incurred on behalf of Highland Capital, legal expenses that were already paid by Daugherty, and legal expenses to defend against Daugherty's claims to Plaintiff.

## COUNT TWENTY – VIOLATIONS OF FEDERAL CIVIL RICO—CONDUCT OF A RICO ENTERPRISE, 18 U.S.C. § 1962(C) -- BOARD MEMBER GROUP AND HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS

402.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

403.    At all relevant times, the Board Member Group and Highland Capital Officers and Employees Group Defendants are each "person[s]" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

404.    The Board Member Group and Highland Capital Officers and Employees Group each violated 18 U.S.C. § 1962(c) by the acts described in the paragraphs above.

405.    The Board Member Group and Highland Capital Officers and Employees Group actions described in the previous paragraphs constitute an Enterprise within the meaning of 18

U.S.C. §§ 1961(4) and 1962(c).

406.    At all relevant times, The Board Member Group and Highland Capital Officers and Employees Group were engaged in, and/or its activities constituting wire fraud within the meaning of 18 U.S.C. § 1962(c) and 1343. At all relevant times, The Board Member Group and Highland Capital Officers and Employees Group participated in the operation, management, and directed the affairs of an enterprise intended to defraud Plaintiff of money, property, and other benefits and assets as set forth above (the "Enterprise").

407.    The Board Member Group and Highland Capital Officers and Employees Group, each of whom are persons associated with the concerted efforts against Plaintiff did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the conduct, management, or operation of the affairs of the Enterprise.

408.    The Board Member Group and Highland Capital Officers and Employees Group through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c), through multiple instances of Mail Fraud and Wire Fraud, in violation of 18 U.S.C. §§ 1341 and 1343, and Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i). The Board Member Group and Highland Capital Officers and Employees Group devised or intended to devise a scheme to defraud Plaintiff of money, property, and other benefits and assets.

409.    For the purposes of executing their scheme, The Board Member Group and Highland Capital Officers and Employees Group delivered or caused delivery of various documents and things by U.S. mail or by private or commercial interstate carriers or received such therefrom. For the purposes of executing their scheme, The Board Member Group and Highland Capital Officers and Employees Group transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce various writings, signs, and signals.

410.    In furtherance of their scheme, The Board Member Group and Highland Capital

Officers and Employees Group used the wires and/or U.S. mails or private or commercial carriers to deliver documents and things to Plaintiff or the Enterprise for the purposes of defrauding Plaintiff, including, but not limited to the following: (a) emails; (b) wirings and/or mailings between and among The Board Member Group and Highland Capital Officers and Employees Group concerning the scheme to defraud Plaintiff of money and property as well as other benefits and assets; and (c) funds transferred between The Board Member Group and Highland Capital Officers and Employees Group with the intent that those funds be used to promote the carrying on of The Board Member Group and Highland Capital Officers and Employees Group's scheme to defraud Plaintiff of money and property as well as other benefits and assets.

411.    The Board Member Group and Highland Capital Officers and Employees Group used wire and mail communications in furtherance of their scheme to defraud Plaintiff, in violation of 18 U.S.C. §§ 1341 and 1343, as described fully above.

412.    The Board Member Group and Highland Capital Officers and Employees Group participated in the scheme or artifice knowingly, willfully, and with the specific intent to advance their scheme to deceive or defraud Plaintiff. The Board Member Group and Highland Capital Officers and Employees Group knowingly and intentionally prepared documents, including but not limited to, resolutions, court papers, letters, notices, and other documents, and then knowingly and with the intent to deceive Plaintiff, caused those documents to be sent to Plaintiff or other entities that would further The Board Member Group and Highland Capital Officers and Employees Groups' scheme to defraud.

413.    The Board Member Group and Highland Capital Officers and Employees Group have, on multiple occasions, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducted or attempt to conduct a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity, including, but not limited to,

violations of 18 U.S.C. §§ 1341 and 1343 and The Board Member Group and Highland Capital Officers and Employees Group have, therefore, violated 18 U.S.C § 1956(a)(1)(A)(i), money laundering.

414.    The Board Member Group and Highland Capital Officers and Employees Group have engaged in multiple predicate acts, as described in the preceding paragraphs. The conduct of each of The Board Member Group and Highland Capital Officers and Employees Group described in the preceding paragraphs constitutes a pattern of racketeering activity connected to the acquisition, establishment, conduct or control of the Enterprise within the meaning of 18 U.S.C. § 1961(5).

415.    The Board Member Group and Highland Capital Officers and Employees Groups' violations of federal law as set forth herein, each of which directly and proximately injured Plaintiff, constitutes a continuous course of conduct, which was intended to defraud Plaintiff of money and property through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of racketeering activity as defined by 18 U.S.C. §§ 1961(1) and (5).

416.    Plaintiff was injured in its money and property by reason of The Board Member Group and Highland Capital Officers and Employees Groups' violation of 18 U.S.C. § 1962(c).

417.    The Board Member Group and Highland Capital Officers and Employees Groups' injuries to Plaintiff were a direct, proximate, and reasonably foreseeable result of their violation of 18 U.S.C. § 1962. Plaintiff is the ultimate victim of The Board Member Group and Highland Capital Officers and Employees Groups' unlawful Enterprises and scheme. Plaintiff has been and will continue to be injured in its money and property in an amount to be determined at trial.

418.    Pursuant to 18 U.S.C. § 1962(c), Plaintiff is entitled to recover treble damages plus costs and attorneys' fees from The Board Member Group and Highland Capital Officers and Employees Group as well as any other relief authorized by statute.

**COUNT TWENTY-ONE – PROMISSORY ESTOPPEL – TRANSFER OF ESCROW
ASSETS 2016 – DONDERO ERA MANAGEMENT, BOARD MEMBER GROUP,
HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP, OUTSIDE LEGAL
PROVIDERS GROUPS #1 AND #2 AND BOYCE DEFENDANTS**

419.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as
if fully set forth herein.

420.    The Dondero ERA Management, Highland Capital Officers and Employees
Group, the Outside Legal Provider Groups #1 and #2 and Boyce made promises to Plaintiff
regarding the establishment, funding, and management of Escrow.

421.    Plaintiff reasonably and substantially relied on those promises to its detriment.

422.    Plaintiff's reliance on the promise was foreseeable to The Dondero ERA
Management, Highland Capital Officers and Employees Group, the Outside Legal Provider
Groups #1 and #2 and Boyce.

423.    Injustice to Plaintiff can only be avoided by enforcing The Dondero ERA
Management, Highland Capital Officers and Employees Group, the Outside Legal Provider
Groups #1 and #2 and Boyce.

424.    The Dondero ERA Management, Highland Capital Officers and Employees
Group, the Outside Legal Provider Groups #1 and #2 and Boyce actions or omission proximately
caused Plaintiff injury.

425.    Plaintiff incurred actual damages.

**COUNT TWENTY-TWO – MONEY HAD AND RECIEVED – TRANSFER OF ESCROW
ASSETS 2016 AND BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS
2013 – ALL DEFENDANTS**

426.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as
if fully set forth herein.

427.    Defendants Dondero, Okada, Katz/HAK/DLAP, Hurst, Brown, Ellington,
Leventon, Girard, Honis, Collins, Dameris, Dougherty, Boyce, Britain, Waterhouse, Abrams &
Bayliss, Nancy Dondero, As Trustee Of Dugaboy Investment Trust ("Dugaboy Trust"); Grant

James Scott III, As Trustee Of Get Good Trust ("Get Good Trust"); John Honis, As Trustee Of Hunter Mountain Investment Trust ("Hunter Mountain Trust"); Lawrence Tonomura As Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Exempt Trust #1"); Lawrence Tonomura as Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Exempt Trust #2") hold money that came from assets or distributions from assets that belonged to Plaintiff..

428.   That money belongs to Plaintiff in equity and good conscience.

## COUNT TWENTY-THREE – CONVERSION – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 AND TRANSFER OF ESCROW ASSETS 2016– ALL DEFENDANTS

429.   Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

430.   Plaintiff owned, possessed, or had the right to possession of its property/assets, which were personal.

431.   Defendants Dondero, Okada, Katz/HAK/DLAP, Hurst, Brown, Ellington, Leventon, Girard, Honis, Collins, Dameris, Dougherty, Boyce, Britain, Waterhouse, Abrams & Bayliss, Nancy Dondero, As Trustee Of Dugaboy Investment Trust ("Dugaboy Trust"); Grant James Scott III, As Trustee Of Get Good Trust ("Get Good Trust"); John Honis, As Trustee Of Hunter Mountain Investment Trust ("Hunter Mountain Trust"); Lawrence Tonomura As Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Exempt Trust #1"); Lawrence Tonomura as Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Exempt Trust #2") have wrongfully exercised dominion and control over Plaintiff's property.

432.   Plaintiff has suffered injury as a result of Defendants' actions.

**COUNT TWENTY-FOUR – TEXAS THEFT LIABLITY ACT – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 AND TRANSFER OF ESCROW ASSETS 2016 – ALL DEFENDANTS**

433.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

434.    Plaintiff had possessory right to its property/assets.

435.    Defendants Dondero, Okada, Katz/HAK/DLAP, Hurst, Brown, Ellington, Leventon, Girard, Honis, Collins, Dameris, Dougherty, Boyce, Britain, Waterhouse, Abrams & Bayliss, Nancy Dondero, As Trustee Of Dugaboy Investment Trust ("Dugaboy Trust"); Grant James Scott III, As Trustee Of Get Good Trust ("Get Good Trust"); John Honis, As Trustee Of Hunter Mountain Investment Trust ("Hunter Mountain Trust"); Lawrence Tonomura As Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Exempt Trust #1"); Lawrence Tonomura as Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Exempt Trust #2") unlawfully appropriated those assets by taking them without Plaintiff's effective consent by the theft of personal property under Texas Penal Code §31.03.

436.    The Defendants' unlawful taking was made with the intent to deprive the Plaintiff of the property.

437.    The Plaintiff sustained damage as a result of the theft.

**COUNT TWENTY-FIVE – TEXAS UNIFORM FRAUDLENT TRANSFER ACT (TUFTA) – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 AND TRANSFER OF ESCROW ASSETS 2016 – BOARD MEMBER GROUP, HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP, DONDERO ERA MANAGEMENT GROUP, OUTSIDE LEGAL PROVIER GROUP #1 AND #2 DEFENDANTS**

438.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

439.    Plaintiff is a creditor with a claim as a result of his verdict in the Texas Litigaiton and the Delaware Litigation.

440.    The Board Member Group, The Dondero ERA Management, the Highland

Capital Officers, and Employees Group and the Outside Legal Provider Group #1 and #2 are debtors liable on those claims.

441.    As described in detail above, The Board Member Group, The Dondero ERA Management, the Highland Capital Officers, and Employees Group and the Outside Legal Provider Groups #1 and #2 fraudulently transferred Plaintiff's assets with the actual intent to hinder delay and/or defraud the Plaintiff.

442.    The Board Member Group, The Dondero ERA Management, the Highland Capital Officers, and Employees Group and the Outside Legal Provider Groups #1 and #2 retained possession and control of the assets after the transfer.

443.    The Board Member Group, The Dondero ERA Management, the Highland Capital Officers, and Employees Group and the Outside Legal Provider Group #1 and #2 transfer of the assets was concealed and made with the intent to hinder, delay, or defraud Plaintiff.

444.    The transfer was of all of Plaintiff's assets.

445.    The Plaintiff became insolvent shortly after the transfer was made.

## COUNT TWENTY-SIX – FRAUD – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013– THE BOARD MEMBER GROUP, THE DONDERO ERA MANAGEMENT, THE HIGHLAND CAPITAL OFFICERS, AND EMPLOYEES GROUP DEFENDANTS

446.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

447.    Plaintiff refers specifically to the above factual background section and the facts plead in the causes of action sections above as applied and incorporated to this cause of action for fraud.

448.    As set forth above, the Board Member Group, The Dondero ERA Management, the Highland Capital Officers, and Employees Group made multiple false and material representations to Plaintiff regarding the protection of its assets in 2012-2013.

449.    The Board Member Group, The Dondero ERA Management, the Highland

Capital Officers, and Employees Group made these representations, and they knew the representations were false.

450.     The Board Member Group, The Dondero ERA Management, the Highland Capital Officers and Employees Group these representations with the intent that the Plaintiff act on it.

451.     The Plaintiff did in fact rely on these representations thus causing injury to the Plaintiff.

**COUNT TWENTY-SEVEN – FRAUD – TRANSFER OF ESCROW ASSETS 2016– THE DONDERO ERA MANAGEMENT, THE HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS**

452.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

453.     Plaintiff refers specifically to the above factual background section and the facts plead in the causes of action sections above as applied and incorporated to this cause of action for fraud.

454.     As set forth above, The Dondero ERA Management, the Highland Capital Officers, and Employees Group, made multiple false and material representations to Plaintiff regarding the stripping of the escrow in 2016.

455.     The Dondero ERA Management, the Highland Capital Officers, and Employees Group, made these representations, and they knew the representations were false.

456.     The Dondero ERA Management, the Highland Capital Officers, and Employees Group, made these representations with the intent that the Plaintiff act on it.

457.     The Plaintiff did in fact rely on these representations thus causing injury to the Plaintiff.

**COUNT TWENTY-EIGHT – THIRD PARTY BENEFICAIRY BREACH OF CONTRACT – TRANSFER OF ESCROW ASSETS 2016– ABRAMS & BAYLISS DEFENDANT**

458.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as

if fully set forth herein.

459.    On December 12, 2013, Ellington, Leventon, and Surgent coordinated with Abrams & Bayliss to serve as escrow agent. Highland Capital's assistant general counsel, Leventon, sent a draft of the Escrow Agreement to Abrams & Bayliss on December 13, 2013, and the agreement was executed that day by Ellington. Matthew Miller ("Miller"), an Abrams & Bayliss attorney who primarily worked on the escrow matter and had just completed his first year as an attorney and simply used the terms proposed by Leventon.

460.    The assets deposited in the escrow account were represented to be: (1) $1,210,502.03 in cash; (2) a limited partner interest in Restoration Capital Partners Fund, LP and (3) 1088.42 shares of NexPoint Credit Strategies. This was the story Defendants "came up with" so they could sell to the jury in the Texas Litigaiton that they had not simply stolen Plaintiff's assets. The notion that Defendants did nothing nefarious with Plaintiff's assets and merely set them aside would become a theme of Defendants in the Texas Litigation.

461.    The key provision of the Escrow Agreement that undergirded Defendants' story in the Texas Litigation provided that if Daugherty prevailed in the Texas Litigation, escrowed assets in the amount of the judgment "shall" be transferred to Plaintiff. Also pursuant to the crime-fraud discovery in May 2019, it was revealed that 122 days after executing the Escrow Agreement, Leventon and Girard changed the Escrow Agreement without Daugherty's knowledge because it wanted to "slip sheet the Schedule 1 assets" to change "the NexPoint shares from shares to the cash equivalent of shares because it is difficult to find a prime broker to open account for such a small pool of assets." Abrams & Bayliss simply swapped the pages. Abrams & Bayliss later explained, "if Daugherty digs deeply enough, he may discover that Schedule 1 was revised on December 16, 2013, with no re-execution of the Escrow Agreement by Highland Capital and Abrams & Bayliss. Highland's counsel merely re-sent the Escrow Agreement with an updated Schedule 1, and Abrams & Bayliss sent an email confirmation of the change."

According to Abrams & Bayliss, "⌈i⌉t is unlikely that Daugherty would learn of the revision." With the appearance of an escrow in place, Defendants were poised to present themselves in the Texas Litigation not as thieves, but rather as protectors of Plaintiff's and Daugherty's interests. That is the story they spun at trial. This was a state of affairs just a month before trial in the Texas Litigation.

462.     It was not until previously concealed document and email production in 2022 and 2023 that Plaintiff learned the full story of how Abrams & Bayliss and Highland Capital had stripped the escrow account of all assets.

463.     The Escrow Agreement between Abrams & Bayliss and Highland Capital is a valid and enforceable contract whose intent was to secure a benefit, the deposited assets, for the benefit of the Plaintiff. Plaintiff is now entitled to enforce that contract as a third-party beneficiary because that benefit has been denied to Plaintiff, as Abrams & Bayliss and Highland Capital stripped the escrow account of the deposited assets.

## COUNT TWENTY-NINE – TORTIOUS INTERFREENCE WITH A CONTRACT – TRANSFER OF ESCROW ASSETS 2016– ABRAMS & BAYLISS AND HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS

464.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

465.     Plaintiff was controlled by a limited liability company operating agreement, which was a valid and enforceable contract. The Highland Capital Officers and Employees Group and Abrams & Bayliss intentionally interfered with that contract when The Highland Capital Officers and Employees Group moved Plaintiff's assets into an escrow account held by Abrams & Bayliss. This interference proximately caused Plaintiff's injury through the loss of its assets, incurring actual damages.

**COUNT THIRTY – TORTIOUS INTEREFRENCE WITH A CONTRACT – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013– DONDERO ERA MANAGEMENT, OFFICERS, AND EMPLOYEES GROUP DEFENDANTS**

466.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

467.    Plaintiff was controlled by a limited liability company operating agreement, which was a valid and enforceable contract. The Highland Capital Officers and Employees Group intentionally interfered with that contract when The Highland Capital Officers and Employees Group moved Plaintiff's assets to Highland Capital in 2013. This interference proximately caused damage to Plaintiff.

**COUNT THIRTY-ONE – TORTIOUS INTEREFRENCE WITH A CONTRACT – TRANSFER OF ESCROW ASSETS 2016– DONDERO ERA MANAGEMENT, HIGHLAND CAPITAL OFFICER AND EMPLOYEES GROUP DEFENDANTS**

468.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

469.    Plaintiff was controlled by a limited liability company operating agreement, which was a valid and enforceable contract. Dondero ERA Management and the Highland Capital Officer and Employees Group intentionally interfered with that contract when The Highland Capital Officers and Employees Group and the Dondero ERA Management Group moved Plaintiff's assets from an escrow account to Highland Capital in 2016. This interference proximately caused damages to Plaintiff.

**COUNT THIRTY-TWO – BREACH OF FIDUCAIRY DUTY– KATZ/DLAP DEFENDANT**

470.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

471.    Katz/DLAP breached their fiduciary duties to Plaintiff, specifically the duty to represent Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements,

duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by presenting redacted invoices for reimbursement in the Texas Litigation between Highland Capital and Daugherty in 2014 that represented legal services were performed on behalf of Highland Capital. And then, after Daugherty paid over $3.1 million in December 2016 pursuant to wiring instructions by Katz, they represented that the same invoices were unpaid obligations for work performed on behalf of Plaintiff in the Delaware litigation commencing in 2017.

472.    Katz/DLAP breached their fiduciary duties to Plaintiff, specifically the duty to represent Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by billing Plaintiff for legal services provided to Highland Capital in the Delaware Litigation.

473.    Katz/DLAP's breaches proximately caused injury to the Plaintiff and/or resulted in a benefit to the Defendants.

## VI.
## CONDITIONS PRECEDENT

474.    All conditions precedent for the claims above have been performed or have occurred.

## VII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Highland Capital Employee Retention Assets LLC prays that Defendants be cited to appear and answer herein, and for the further relief set forth below:

(1)    Actual damages;

(2)    Exemplary damages;

(3)    Pre- and post- judgment interest;

(4)    Attorneys' fees and costs of suit; and

(5)    Such other and further relief to which Plaintiff Highland Capital Employee
       Retention Assets LLC may be justly entitled.

Dated: July 15, 2024.

                    Respectfully submitted,

                    LAW OFFICE OF MATTHEW BOBO, PLLC.

                    */s/ Matthew W. Bobo*
                    **Matthew W. Bobo**
                    State Bar No. 24006860

                    4916 Camp Bowie Blvd.
                    Fort Worth, Texas 76107
                    Telephone: (817) 529-0774
                    Facsimile: (817) 698-9401
                    mbobo@mwblawyer.com

                    **ATTORNEYS FOR PLAINTIFF**