# Exhibit 42

ORIGINAL

MAY 2 3 2012

NO. 12-04005



| HIGHLAND CAPITAL | § | IN THE DISTRICT COURT OF |
| MANAGEMENT, L.P., | § | |
| | § | |
|     **Plaintiff and Counter-Defendant,** | § | |
| | § | |
| v. | § | |
| | § | |
| PATRICK DAUGHERTY, | § | |
| | § | |
|     **Defendant and Counter-Plaintiff,** | § | DALLAS COUNTY, TEXAS |
| | § | |
| v. | § | |
| | § | |
| SIERRA VERDE, LLC, HIGHLAND | § | |
| EMPLOYEE RETENTION ASSETS LLC, | § | |
| JAMES DONDERO, PATRICK BOYCE, | § | |
| AND WILLIAM L. BRITAIN, | § | |
| | § | |
|     **Third-Party Defendants.** | § | 68th JUDICIAL DISTRICT |

## DEFENDANT'S ORIGINAL ANSWER, COUNTERCLAIM
## AND THIRD-PARTY PETITION

COMES NOW, Patrick Daugherty ("Daugherty") and files this his Original Answer,
Counterclaim and Third-Party Petition and would respectfully show the Court as follows:

### I.

### GENERAL DENIAL

1.    Daugherty generally denies each and every allegation contained in Highland
Capital Management, L.P.'s ("HCM" or "Defendant") Original Petition and demands strict proof
thereof.

## II.

## COUNTERCLAIM AND THIRD-PARTY PETITION

### PARTIES

2.       Patrick Daugherty is an individual who resides in Dallas County, Texas.

3.       Counterclaim Defendant Highland Capital Management, L.P. has already entered an appearance in this cause. Therefore, no further service of process is required at this time.

4.       Third-Party Defendant Sierra Verde, LLC ("Sierra Verde") is a Delaware limited liability company that maintains its principal office in Dallas, Texas and may be served with process through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

5.       Third-Party Defendant Highland Employee Retention Assets LLC ("HERA") is a Delaware limited liability company that maintains its principal office in Dallas, Texas and may be served with process through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

6.       Third-Party Defendant James Dondero ("Dondero") is a Texas resident and may be served with process at 3807 Miramar, Dallas, Texas 75205, or 300 Crescent Court, Suite 700, Dallas, Texas 75201, or wherever he may be found.

7.       Third-Party Defendant Patrick Boyce ("Boyce") is a Texas resident and may be served with process at 6617 Muirfield Circle, Plano, Texas 75093, or 300 Crescent Court, Suite 700, Dallas, Texas 75201, or wherever he may be found.

8.    Third-Party Defendant William L. Britain ("Britain") is a Texas resident and may

be served with process at 5603 Caruth Blvd., Dallas, Texas 75209, or 300 Crescent Court, Suite

700, Dallas, Texas 75201, or wherever he may be found.

### III.

### VENUE AND JURISDICTION

9.    This Court has jurisdiction over this matter under the laws and Constitution of the

State of Texas.  The amount in controversy, exclusive of interest and costs, is within the

jurisdictional limits of this Court.

10.    Venue is proper in Dallas County, Texas pursuant to Tex. Civ. Prac. & Rem.

Code §§ 15.002(a)(1) and (a)(2), because all or a substantial part of the events or omissions

giving rise to the claims in this action occurred in Dallas County, Texas, and all of the

Defendants either reside or had their principal place of business in Dallas County, Texas at the

time the causes of action accrued.

### IV.

### DISCOVERY PLAN

11.    Discovery is to be conducted pursuant to a Level III Discovery Control Plan

Scheduling Order in accordance with Texas Rules of Civil Procedure 190.4.

### V.

### FACTUAL BACKGROUND

12.    In April 1998, Daugherty was hired by HCM as a Portfolio Analyst.  He reported

to Dondero and his duties initially consisted of underwriting and performing credit analysis for a

portfolio of corporate loans held by investment vehicles known as collateralized loan obligations

("CLOs"). Daugherty prepared annual self-reviews through 2008, where his yearly performance was evaluated and benchmarked against other employees within the firm. These evaluations reflected his strong performance, and he was promoted several times to more senior positions as his responsibilities and compensation grew. After 2008, Daugherty was no longer required to prepare self-reviews.

13.     Through his tenure at HCM, Daugherty was promoted from Portfolio Analyst to Senior Analyst to Portfolio Manager to Senior Portfolio Manager to Team Leader to Head of Distressed to Head of Distressed and Special Situations to Head of Distressed, Special Situations and Private Equity. Daugherty founded HCM's profitable stressed, distressed and private equity lines of business. He also served twice as General Counsel of HCM during his successful career there.

14.     During Daugherty's employment, he entered into various agreements with HCM, including an Amended Employment Agreement, effective December 31, 2004, which purports to contain a non-competition provision and various other restrictive covenants (the "Employment Agreement").

15.     During Daugherty's annual compensation review, he received a Compensation and Benefits Statement that detailed various forms of earnings and awards granted to Daugherty as a result of his performance at HCM over the previous year. These awards included cash and incentive-based compensation in the form of equity or equity-like options that served to track the performance of reference investments which Dondero and HCM deemed important. The equity and equity-like options were issued under various tax based structures and were generally

referred to as the STIP program, the Option-it program and the Vessel program (also known as the LTIP/Vessel program). The LTIP/Vessel programs included HERA and Sierra Verde.

16.     The STIP consisted of reference positions in the Highland Crusader Fund, L.P., Highland Real Estate Fund 2002-A, L.P., Highland CDO and Structured Products Fund and the Highland Credit Strategies Fund, L.P.

17.     The Option-it program consisted of reference positions in the Highland Crusader Fund, L.P., Highland Real Estate Fund 2002-A, L.P., Highland CDO and Structured Product Fund, Highland Equity Focus Fund, L.P. and the Highland Credit Strategies Fund-HCF.

18.     The LTIP/Vessel programs included at least two valuable, vested awards for Daugherty: 1) the HERA program (the Amended and Restated Limited Liability Company Agreement between HERA and HCM), which included most HCM employees; and 2) the Sierra Verde program, which included Daugherty's private equity team.

19.     The HERA program consisted of limited partnership grants in the Restoration Capital Partners, L.P. ("Restoration"), HE Sugarland Project, LLC., and the Highland CLO Value Fund, L.P.

20.     The Sierra Verde vessel, an entity formed in December 2010 to hold and distribute assets, was a program conceived to retain, reward and incentivize Daugherty and his private equity team, which received equity and options in Cornerstone Healthcare Group Holdings, Inc. ("Cornerstone") and Trussway Holdings, Inc.

21.     For high ranking employees ("Partners"), HCM also awarded LTIP interests that tracked the performance of the Highland Partnership. This program was separate from the LTIP/Vessel program. The LTIP program (the 2005 HCMLP Long-Term Incentive Plan) is an

incentive plan created for non-voting partners in HCM, a partnership controlled by Strand Advisors which is controlled by affiliates of Dondero. Daugherty also had an interest in the Defined Benefit Pension Plan.

22.     Contrary to HCM's assertions, which characterize Daugherty as some "unmanageable, erratic and insubordinate" or brain-damaged[1] employee, Daugherty was dedicated, hard-working, healthy and consistently ranked and paid as the top performer through the 2011 bonus year. In fact, Daugherty was held out by Dondero as the model manager which others should aspire to emulate. Dondero regularly praised Daugherty's "warrior" mentality and effective restructuring skills. However, beginning in 2006, Daugherty, in his role of Portfolio Manager, began to disagree with the firm's shift in strategy and risk. He was concerned that the Highland Crusader Fund, L.P. ("Crusader"), started in 2000 by Daugherty and Dondero, had drifted too far from its original mandate and had become an unfocused and levered mix of non-

---

[1] HCM falsely alleges that Daugherty "recently" admitted to having "two strokes," that left him with "dead spots in his brain." Such statement is a complete fabrication. In January of 2000, Daugherty suffered a Transient Ischemic Attack while working at HCM. The symptoms abated within less than 60 seconds without Daugherty ever losing consciousness. EMS was called to the scene and Daugherty was taken to the hospital for evaluation. Daugherty received a battery of tests that came back inconclusive. After not feeling well a few days later, Daugherty returned to the hospital and underwent a series of tests including numerous blood tests, electrocardiograms, MRIs, CatScans, Carotid Ultrasounds, and a Transesophageal Echocardiogram. It was determined that Daugherty had a Atrial Septal heart defect consisting of a "hole" in his heart about the size of a quarter. The remedy was routine open-heart surgery to patch/repair the hole between the two upper chambers of Daugherty's heart. Daugherty had successful surgery to make the repair in early April of 2000.

HCM was fully aware that Daugherty reported back to work within 10 days of having the surgery and actively participated in leading the Genesis/Multicare bankruptcy and restructuring negotiations. At no time did Daugherty suffer damage to his brain as a result of the 2000 TIA. Daugherty has had no recurrence of TIA. Daugherty has had no adverse neurological or cardiovascular occurrences or tests since 2000. HCM was fully aware that Daugherty received a full release from his cardiologist and neurologist within months of the surgery in 2000. HCM was fully aware of Daugherty's medical releases as he qualified for HCM's Life Insurance and Healthcare coverage programs within a year of the surgery.

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,**
**COUNTERCLAIM AND THIRD-PARTY PETITION – Page 6**
1056534.9

core strategies. He was particularly troubled by the fact that Dondero had begun to more actively and unilaterally change the focus and risk profile of Crusader, allocating the vast majority of the fund's assets to Dondero's other "seed" initiatives that were beyond the expertise of HCM and its employees' skill sets. Daugherty voiced these concerns to Dondero on numerous occasions beginning in 2006.

23.    From 2006 thru 2008, Daugherty objected to speculative bets being placed on heavily concentrated and leveraged public equities, residential mortgage backed securities ("RMBS"), commercial mortgage backed securities ("CMBS"), treasuries, foreign exchange, life settlement investments, undeveloped residential real estate, timber, and oil and gas investments—all utilizing the assets of Crusader. Daugherty was quite vocal in expressing his growing disapproval of the increased leverage being used in Crusader.

24.    In late October 2007, Daugherty pleaded with Dondero to reduce the leverage in Crusader's equity portfolio on the basis that it left no room for error. Despite having positive year-to-date returns, Dondero was not satisfied with the performance, and said that if Crusader could not achieve certain unrealistic return goals by the end of the year, then he would take the firm's capital out of Crusader and invest it elsewhere where he could achieve those returns. Daugherty thought this was wrong and continued to lobby to reduce the leverage in Crusader. Even so, Dondero rejected Daugherty's advice and assigned Dave Semic to reallocate vast portions of Crusader's capital, and increase its overall leverage by shorting treasuries and buying RMBS and CMBS securities on virtually limitless margins.

25.    During 2007, HCM also decided to pursue a new distressed for control private equity fund named Restoration. This fund was created based on Daugherty's successful

distressed for control track record within Crusader.  However, HCM's senior management decided that Daugherty would not be part of the Restoration management team.  When Daugherty objected, Mark Okada ("Okada"), HCM's co-founder, explained to him (with Dondero and Jack Yang ("Yang") on the phone) that while they appreciated his contributions to the track record, they had decided to reduce their exposure to Daugherty and feature another manager within HCM, John Honis ("Honis"), despite the fact that Honis had much less involvement with the referenced track record.  Daugherty was disappointed with their decision, but agreed to assist in the development of the target strategy and preparation of the marketing materials.

26.    Soon after the launch of Restoration, it was apparent that the marketing process was failing miserably.  Initially Yang and Okada blamed Honis for having poor marketing skills as cause for the failure.  Honis was even directed to enroll in a public speaking course.  Yang then briefly took control of the marketing effort for Restoration, but he, too, failed due to his lack of knowledge of the details behind the track record.

27.    Ultimately, it was determined that Daugherty needed to be included in the Restoration marketing effort, because he was best suited to handle the in-depth questions that arose from detailed investor due diligence.  Daugherty hesitantly accepted the new role as a key man in the revised Restoration platform and spent the second half of 2007 leading Restoration's capital-raising efforts.

28.    By the end of 2007, Honis had been functionally removed from Restoration and was replaced with Brett Pope ("Pope"), who was named co-manager with Daugherty.  Dondero announced that Daugherty would be in charge of sourcing and restructuring of distressed

investments, while Pope would be placed in charge of post-restructured operations and traditional private equity. Neither Pope nor Daugherty favored this arrangement, since the responsibilities were ambiguous and the available capital for each initiative came from the same source.

29.     In January 2008, Daugherty informed Dondero of his intent to leave the firm on his anniversary date in April 2008. He offered a 6-month transition period. Also in January, HCM experienced the worst performance of its existence with many funds deteriorating significantly. By March 2008, Pope resigned from HCM. The problems at HCM and the funds it managed had continued to escalate and Dondero asked Daugherty to stay and help him manage through the crisis. Daugherty agreed to stay and assist HCM, even though he would experience significant deterioration in his personal wealth by not having sold out of the various incentive compensation awards he could have liquidated had he resigned as planned. Daugherty worked with Britt Brown and Brian Lording from the accounting team at HCM and began to raise cash for various HCM funds by selling investments, as the firm and its funds entered a severe liquidity crisis. He was also appointed to sole head of the Private Equity Team and Senior Manager of the Restoration Fund.

30.     By July 2008, Daugherty was troubled to hear that available cash was flowing out of HCM to support struggling initiatives and affiliates of HCM that were experiencing liquidity crises of their own. He was equally concerned to hear that Dondero refused to de-lever (reducing debt by selling more assets) in anticipation of further deterioration because Dondero had declared to Daugherty, Okada and Kurt Plumer that he was going to "robo trade our way out of this."

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,
COUNTERCLAIM AND THIRD-PARTY PETITION** – Page 9
1056534.9

31.     Daugherty's concerns were validated when later in July/August, Dondero refused to satisfy a prime brokerage capital call with its bank counter party, triggering a breach in the financing line for several of its funds.   This led to a daily liquidity crisis, since margin arrangements could be modified by the bank at its sole discretion.   Instead of meeting the mandated margin call, Dondero chose not to liquidate the necessary assets and only authorized a partial payment.   However, the margin call required 100% satisfaction, and this partial payment resulted in a breach of the loan (total return swap arrangement).   On the Friday that the breach occurred, Dondero was happily passing out $100 bills and dinner vouchers to accountants and analysts in attendance, thinking he had done "enough" to comply with the requirement.   HCM found out the following Monday that the breach had caused an immediate acceleration in the credit line and that Crusader was now at the mercy of its creditors.

32.     In August 2008, Daugherty continued to raise cash in Crusader and other funds for margin calls, as well as for investor redemptions that were due to be paid in early October. Daugherty attempted to reject several purchases into Crusader (e.g., life settlement and real estate investments), but Dondero overruled him, instructing him that he was to make purchases if Crusader had cash to make the trade on that day, regardless of what the future impact on cash would be post looming redemptions.   In fact, Dondero instructed Daugherty to respond only with "ok" in response to Dondero's trades if Crusader had cash.

33.     Dondero's actions had led to a substantial write down/write-off in the value of Daugherty's and the other employees' previously awarded incentive compensation.   By September 10, 2008, Daugherty was out of patience with Dondero's reckless and self-serving actions.   He formally submitted his resignation in writing, although he gave 30 days' notice in

order to effect an orderly transition. By the last week in September, Daugherty had raised enough cash to meet margin calls as well as make a partial cash payment to prior redeemers in Crusader. By this time, it was apparent that Crusader and the Highland Credit Strategy Fund ("Strat") would have to liquidate by October with a "payment in-kind" distribution of securities and assets to investors, because there simply wasn't enough cash to pay redeemers in full.

34.     During the last week in September, Michael Colvin ("Colvin") and Okada came to Daugherty's office to seek his help in preventing Dondero from orchestrating a series of trades that would sell the most liquid investments in Crusader and Strat to the CLOs and then have Crusader take that cash and funnel it into Highland Financial Partners ("HFP"). HFP was another HCM fund which was experiencing a major liquidity crisis, even though Dondero had previously transferred over $100 million in cash to keep it afloat, in return for illiquid notes to be held by Crusader and Strat. Colvin and Okada explained their concerns and objections with the appropriateness of the transactions and Daugherty agreed.

35.     Daugherty phoned Dondero, told him of his conversation with Colvin and Okada, and informed him that the trades in question should not be completed. At first, Dondero calmly explained that his intention was to make Crusader, Strat and HFP as illiquid as possible to punish Barclays for raising the margin requirements on HCM's pledge of limited partnership interests to another loan. Dondero then instructed Daugherty to authorize the trades. Daugherty resisted and told Dondero that he would not allow the trades. Dondero grew angry and ordered Daugherty to make the trades, claiming that it was his decision, and telling Daugherty to stay out of the trade approval process. Daugherty then angrily shouted to Dondero that he was not going to approve the trades nor was he going to let Dondero make the trades. Dondero was furious. He told

Daugherty that he was not to "waste any more of his time" and was to immediately "go home until further notice." Daugherty was further instructed by Dondero to inform Boyce, the Chief Administrative Officer, Chief Operating Officer and Chief Financial Officer of HCM at the time, of his absence and was not to discuss the matter with anyone at HCM until further notice.

36.     Daugherty followed Dondero's instruction and stayed at home for the remainder of the last week of September 2008. While Daugherty was at home on the mandated leave, the trades were completed. Britain took control of Daugherty's team during this time and directed Daugherty's team at the time the trades were executed. Boyce, as CFO and head of the Pricing Committee, also presided over the execution and settlement of the trades. Daugherty received an email from a Haynes and Boone attorney attempting to formalize closing of the trades and asking Daugherty whether "Crusader approves of these trades." Since Daugherty was on orders from Dondero to keep his views to himself, he simply responded: "I don't think Crusader has a say." The Haynes and Boone representative pressed more directly and asked Daugherty, as Portfolio Manager of Crusader, if he "approves of the trades on behalf of the Crusader investors." To which Daugherty replied: "Jim Dondero is approving these trades on behalf of the Crusader investors."

37.     In September 2008, Lehman Brothers failed, causing it to file for bankruptcy. HCM was directly and indirectly impacted by the Lehman collapse because Dondero had invested HCM's and many of its fund's last remaining cash on a desperate bet for Lehman's survival. Additionally, with the fall of Lehman, HCM and the funds it managed lost almost all of their hedges because Lehman was its counter-party and had failed in its obligations when it filed for bankruptcy. As the crisis worsened, asset prices reached new lows, and financial firms were

liquidating performing loans at pennies on the dollar. HCM was forced to "put up the gates" to stem withdrawals at Crusader and Strat. Shockingly, Dondero determined that he would not make "payment in kind" distributions to the Crusader and Strat investors. In fact, he declared that he had traded the positions of the funds in such a manner as to render them completely illiquid in order to punish those investors who had redeemed or might attempt to redeem in the future. He used this approach to take advantage of investors who needed immediate liquidity by offering to buy their partnership interests at huge discounts to value. He and Okada purchased these interests into Highland Capital Services, L.P. ("Highland Services"), an entity wholly owned and operated by Dondero, Okada and their affiliates. He further schemed to manufacture a dispute between the "prior redeemers" and the "compulsory redeemers" of the two funds so that he could delay unwinding the fund until the "dispute" was eventually resolved.

38.    Many of the Crusader and Strat investors brought suits or threatened to bring suits against HCM for its self-serving actions. The investors were disgusted with HCM's blatant disregard for its fiduciary duties towards them, but were being held hostage with their own money, since Dondero refused to liquidate the portfolio until he received full releases from the investors. These suits were ultimately resolved through settlement negotiations that were finalized in July 2011. Dondero declared the outcome a success and ordered news releases posted to the HCM website so that the investment community and the SEC would see the news.

39.    By "putting up the gates," HCM effectively committed to a liquidation of Crusader and Strat, and lost its ability to charge most of its management and incentive fees to those funds. This would play a critical role later in 2012, as HCM attempted to purchase the



assets being liquidated from these funds at deep discounts into other HCM-managed funds or into portfolio companies owned by other HCM-managed funds that were paying full fees.

40.      Late in 2008, HCM was widely viewed as a firm certain to default.  Dondero assigned Yang with the task of negotiating a restructure of HCM's credit facility.  The banks were furious to discover that Dondero and Okada had been siphoning tens of millions of dollars out of HCM into their closely-held affiliated account at Highland Services under the guise of repaying their loan to HCM.

41.      The banks demanded that the cash be returned immediately or they would put HCM into an involuntary bankruptcy.  During a telephonic bank meeting, Dondero refused to return the cash and defiantly proclaimed: "Highland will fail before I fail."  To make matters worse, Yang was repeatedly caught lying to the bank group about the status of HCM and its funds (namely Crusader, Strat and HFP) and their redemption activity.  The situation deteriorated so badly that the banks would no longer speak with Yang.  In January 2009, Boyce asked Daugherty to intervene.

42.      Boyce and Daugherty agreed that the payments to Highland Services needed to stop immediately.  Daugherty then assumed an active role in negotiations with the bank group.  During the process of negotiating with the banks, Dondero and Okada refused to provide collateral pledges to the banks until they were allowed to withdraw tens of millions of additional non-cash assets from HCM.  Dondero brought the negotiations to the brink of a midnight bankruptcy filing in June 2009 until he got what he wanted.  Dondero ultimately took the incremental amount he demanded from the employee compensation reserve, which had been set aside by the banks in order to retain employees during the crisis.  Neither Dondero nor Okada

returned the tens of millions of cash they siphoned from HCM during this horrible crisis in late 2008, despite ordering lay-offs of more than 50% of HCM's employees.

43.    By the Compensation Review period for February 27, 2009, moral was at an all-time low at HCM. Employees were resigning and being fired en mass. HCM had very little cash and available assets for incentive compensation grants. In fact, Dondero, Okada and Boyce announced that managers were to consider the tax-loss refund checks for prior year's compensation awards that had been written off in 2008 as their "bonus" for 2009. Dondero and Boyce determined arbitrary values for the "2008 Tax Refund" and distributed them to employees in their Compensation and Benefits Statement for 2009. These "awards" were notorious for being inconsistent with what the employees actually received from the Internal Revenue Service.

44.    During late 2009, members of Daugherty's private equity team (Lawler, Carl Moore ("Moore"), Callan, and Smith) expressed to Daugherty their concerns regarding the stability of HCM. They were especially concerned about the tens of millions of dollars that Dondero and Okada had siphoned from HCM and what that said about their commitment to HCM. Accordingly, the members of the team presented a proposal that would incentivize them to stay with HCM, while aligning their interests with those of the investors. The plan included options and equity that tracked the performance of certain HCM-managed portfolio companies targeted for the plan. Options were chosen in addition to equity grants, since it was generally HCM's policy to grant option-like compensation programs to reward performance when the stock price of the underlying Company could have sufficient value that would lead to high cash taxes in the year of the grant. Importantly, these options would not create a taxable event for the recipient until they were exercised.

45.    The intent of the plan was to provide equity-based incentives to the private equity team that would be realized upon the successful sale of certain portfolio companies managed by the team. Daugherty, together with Moore and Lawler, presented the plan to Dondero for approval. Daugherty explained to Dondero that the plan would act as an incentive to retain the employees on the private equity platform, since much of the value of their existing HCM retention-based incentive compensation had been destroyed as a result of right-offs and the liquidations caused by HCM's numerous margin defaults in late 2008.

46.    After a series of discussions between Dondero, Moore, Thomas Surgent ("Surgent") (HCM's in-house attorney and Chief Compliance Officer) and Daugherty, including one where Dondero inserted himself into the program as the largest recipient under the retention plan, Dondero approved moving forward on the plan. He then instructed Daugherty to work with Surgent and Moore to implement the plan. In addition, Dondero gave strict instructions that the plan was not to be mentioned to Boyce, since he believed Boyce would also demand to be included, and he did not want to include Boyce in this particular incentive plan.

47.    Surgent then gave instructions to Daugherty and Moore on what processes were required in order to make the plan align with HCM's Compliance Policy. He instructed Daugherty and Moore that any rewards under the plan would be subject to the Turnover Grid (a chart listing what percentage of compensation must be repaid or turned over to certain funds and what percentage of compensation could be retained by HCM employees in compliance with the various fund indenture agreements) applied to HCM employees who received compensation as portfolio company board members.

48.     Surgent also instructed Daugherty that independent counsel would need to be retained on behalf of the portfolio companies involved and that the independent board members of the companies involved would have to approve of the plans. In January 2010, Moore retained Matt Lyons ("Lyons") of Andrews Kurth LLP to review the plan and negotiate on behalf of the portfolio companies and the board of directors (the board generally consisted of the Chief Executive Officer, Highland Private Equity personnel and independent board members). Numerous discussions took place between Lyons, Daugherty, Moore, senior executive management and the independent board members. Lyons advised all of the board members, including Daugherty, that all options awarded to executive management, independent board members and HCM employees should have the same strike prices.

49.     Over the next several months, Lyons negotiated the various other points and concerns with Moore and Daugherty, who interceded on behalf of Dondero. These negotiations caused numerous delays on finalizing the incentive compensation to the executive teams and the independent board members, but by July 2010, the plans were submitted to the independent board members for final approval.

50.     During the board meetings and prior to seeking approval of the independent board members, Lyons detailed the purpose, merits, market standards and fairness for each one of the option incentive grants. Lyons hosted question and answer sessions (with and without HCM representatives present) where all board members had the opportunity to discuss any matters regarding the option plans. Daugherty and the other board members relied heavily on Lyon's advice during these sessions. Finally, a vote for final approval was made with all HCM affiliated board members abstaining from the vote. By the end of July 2010, each portfolio company

received final approval to grant the options to the executive management teams, independent board members and the private equity team.

51.    In accordance with Dondero's instruction, the HCM employee grants were amalgamated and held in a separate holding entity called Sierra Verde. This was an entity named by Moore and created by Lyons to resemble the HERA vessel which was created to hold equity-based compensation for other HCM employees. Final ownership of Sierra Verde was allocated among the private equity team on December 16, 2010, with Dondero receiving the largest share at 24%. As far as Daugherty was concerned, Sierra Verde was finalized and was just another component of his and the private equity team's deferred compensation package from HCM.

52.    HCM began to stabilize in the second half of 2009, although it remained significantly leveraged and had become the target of many large lawsuits. In late 2009, Dondero informed the senior managers at HCM that he intended to position future fund initiatives outside of HCM to avoid having to contribute such interests to the bank group's collateral pool. He sketched a schematic for Daugherty where new "brands" would be created for HCM's future initiatives, with Dondero, Okada and their affiliates retaining 75% via Highland Services. The proposed brands eventually included:

> Tunstall – for stressed and distressed investing in hedge fund, private equity fund and 40act sub-advisory (retail funds) – led by Daugherty;
>
> ACIS – for structured product and CLOs – led by Mahmoud, later Terry;
>
> Falcon – for oil and gas investments in private equity funds – led by Britain;
>
> Canopy – for timber investments in private equity funds – led by Britain;

Highland Funds (now Pyxis) – for various comingled, sub-advisored and equity based 40act funds (retail) – led by Joe Dougherty (no relation to Patrick Daugherty);

Granite Bay – for long-short credit investing – led by Okada and Kaufman with Dondero taking a minority interest;

Brazillian Fund-unnamed at Daugherty's departure to pursue debt investing with Brazilian partners – led by Latimer, later Bramer; and

Swiss Fund – unnamed at Daugherty's departure to pursue healthcare venture capital investing based on Gregory and Daugherty's track record in healthcare – led by Gregory.

53. Dondero offered to partner with Daugherty on the Tunstall fund initiative, giving Daugherty 25% of Tunstall Capital Management, LP ("Tunstall Capital"). He also offered Daugherty 5-10% of all of the other management companies (or branded initiatives). The rest of the initiatives were doled out by Dondero to the managers he believed were most critical to their success.

54. In December 2009, Daugherty spoke to Dondero about the desire of several independent board members within the private equity portfolio platform to get better returns on the accumulated cash on their balance sheets. Daugherty suggested a non-leveraged, lower risk fund primarily with senior debt, bonds and highly liquid public equities that would carry no fees. Dondero agreed with the concept but wanted to incorporate a fee structure consistent with the hedge fund standard of 2% management fee and 20% incentive fee. Daugherty was opposed to charging a fee for managing these funds, since the cash balances were owned by companies that were owned by pre-existing funds managed by HCM and so were already being charged such fees or had their fees intentionally terminated (as was the case with Crusader and Strat).

55.    Further, because Dondero intended to structure the fund like a hedge fund with monthly marking, both the management fee and the incentive fee would be paid monthly without disclosure to the various fund investors.  This contrasted with the Sierra Verde equity/options, which would not be paid until a realization event occurred (e.g. when the companies were actually sold), at which time all distributions would be transparent to fund investors, and any turnover or netbacks against HCM's incentive fees would be made.  Dondero agreed to make the incentive fee subject to realization events (actual sales of the investments), but Daugherty was not satisfied because there was no pass-through distribution to fund investors, unlike Sierra Verde.  Daugherty thought the new fund idea had died until early January 2010, when Dondero inquired about the progress and instructed Daugherty and Surgent to "get it done."

56.    Daugherty enlisted the help of Moore and once again retained Lyons at Andrew Kurth to advise them on the best way to achieve Dondero's demand.  On January 26, 2010, Daugherty received an email from Surgent, copying Dondero, Boyce, Clint Gilchrist ("Gilchrist") and Honis, with attachments for documents related to Tunstall Distressed Opportunities Fund, which was later renamed Tunstall Special Opportunities Fund ("Tunstall").  In the email, Surgent instructed Daugherty that Dondero directed that the documents were to be distributed to the board of directors by the end of the day.  This was just one of many emails from Surgent to Daugherty pushing to get Tunstall launched.  Daugherty continued to resist signing the Tunstall Capital Management, LP ("Tunstall Capital") documents because he was not comfortable with numerous elements of the documents, including the fee structure to be paid to Tunstall Capital to manage Tunstall.

57.     Daugherty made his views opposing the structure of Tunstall Capital and the fees paid by Tunstall clear to Dondero during several meetings in Dondero's office. On September 1, 2010, Daugherty learned that all committee members for the portfolio companies had approved the formation of Tunstall and the fees structure.

58.     On January 22, 2011, Dondero sent Daugherty another email stating that 75% of Tunstall Capital fees had already been distributed (to Dondero and Okada and their affiliates via Highland Services), and that the remainder must be distributed by February 15, 2011 to Daugherty, and he needed to sign the documents. Daugherty again refused to sign. On March 13, 2011, Daugherty was informed that Tunstall Capital was a part of his compensation for 2010. He received several other emails from Dondero, declaring that he needed to sign the Tunstall Capital documents. Daugherty again refused to sign.

59.     Having his past incentive compensation awards virtually wiped out from late 2008 to early 2009, but avoiding a bankruptcy filing for HCM, Daugherty focused on managing his HCM private equity portfolio back to health, and again began to experience significant successes by the end of 2009 and into 2010. HCM stabilized, primarily as a result of hundreds of millions of dollars of gains due to Daugherty's investments and restructuring contributions. Dondero proposed that Daugherty launch a new follow-on fund to Restoration, which had been tremendously successful under his leadership. Daugherty began the marketing process for Tunstall RCP II in early 2011.

60.     Daugherty received his Compensation and Benefits letter for 2010 on the last day of February 2011. He was disappointed to see that he was awarded less compensation than the year before, reduced by 50% of the board fees he was allowed to keep pursuant to HCP's Board

Compensation Turnover Plan, with a payout over two years instead of one. He was also told that Dondero would not grant him the promised 5-10% ownership interests in any of the new branding initiatives agreed to earlier. Finally, he was again told to sign the Tunstall Capital documents so that he could receive his 25% share and fees earned at that entity. Daugherty expressed his disappointment to Dondero. Dondero explained that Daugherty had to trust him and that he based his decision on Highland 2.0 (a "back to future" attempt at resetting HCM's culture to the earlier days of HCM when Dondero made decisions and awarded or changed compensation purely at his discretion). Daugherty told Dondero that Highland 2.0 would not work for him because he wanted an agreement in writing that clearly defined how he and his team would be compensated. He told Dondero that he would negotiate in good faith thru the end of the summer of 2011, explaining that if they did not have a deal by that time, he would resign from HCM at the end of the summer.

61.    In the spring of 2011, Dondero asked Daugherty and David Smith ("Smith") what they thought the ultimate value and recovery would be for Cornerstone equity and bank debt, respectively, and whether Daugherty would be interested in buying some cheap for the Restoration Fund. Daugherty and Smith gave Dondero their views regarding the value of the Cornerstone debt and equity consistent with their presentations that had been prepared on a quarterly and semi-annual basis for investors. Daugherty and Smith presented Dondero with a series of analyses demonstrating what the value of the Company could be once the reimbursement environment had stabilized. Dondero then directed HCM trading personnel to offer to purchase Cornerstone's equity and debt at a significant discount from the valuation offered by Daugherty and Smith.

62.      After a couple of weeks had passed, Dondero informed Daugherty and Smith that the seller was actually the committee representative for the Strat Fund, and that they were willing to pursue a sale of their Cornerstone interests for liquidity reasons, so long as the buying party was not affiliated with HCM because they did not trust Dondero's or HCM's pricing motives. More time passed, leading Daugherty and Smith to assume that the trade had died.

63.      As summer began, Dondero began to show enhanced interest in how Cornerstone was valued.  Daugherty found this strange, since the value used for Cornerstone was basically meaningless because the funds that held the investment did not pay fees based on estimated values; they only paid incentive fees based on realized values (e.g. when the asset was actually sold).  Daugherty and Smith had appropriately and conservatively marked the position for many months and had discounted the negative factors that could impact the stock price over the foreseeable future.

64.      As Dondero continued to pursue a transaction with the Highland Credit Strat Committee, he directed that a third-party valuation of Cornerstone should be performed.  By early August, the new valuation of Cornerstone had been completed, and Smith presented it to Dondero.  However, Dondero was not pleased with the new valuation of Cornerstone because it was "not low enough."  Smith explained that Cornerstone was already conservatively marked and that he and the third-party valuation expert had already valued Cornerstone at a steep discount compared to its publicly-traded peers.  Boyce was put in charge of getting a "better" third-party valuation.

65.      While Daugherty was out of the office, Dondero and Boyce directed Smith to present additional and more onerous discounts to the third-party valuation expert.  Additionally,

Dondero, after being fully appraised of the value of real estate owned by Cornerstone as well as settlement negotiations in Cornerstone's pending litigation, instructed Smith to ignore and to omit any other value from the third-party firm's data package.  Dondero and Boyce instructed Smith to make additional value reduction assumptions, including more draconian future reimbursement assumptions and management team discounts that would further reduce the third-party valuation.  Finally, Dondero and Boyce received the lower valuation they had sought and presented it to the Highland Credit Strat Committee as proof for the legitimacy of their low bid price.

66.    About this same time, Dondero instructed Daugherty and Smith to begin the process of granting another series of options for the Sierra Verde vehicle in order to true-up the dilutive effect of the rights offering promulgated by the Restoration investment into Cornerstone in December 2010, which effectively diluted/reduced the ownership of preexisting holders by approximately 30%. The purpose of the original rights offering was to infuse additional capital into Cornerstone so that it could make strategic acquisitions and acquire hospital real estate assets.

67.    By the end of August 2011, Smith reported to Daugherty that Lyons was not comfortable with the mechanics of the second round of equity/option grants and that the request had "numerous problems."  Daugherty instructed Moore, who had been the point man on the original Sierra Verde transaction, to take over the discussions with Andrews Kurth, and to advise Daugherty about any problems he discovered.  By mid-September, Moore indicated that a second round of equity/option grants was not advisable at the past levels due to the company's material improvement since the last grants.  Daugherty agreed with Moore's assessment and

informed Dondero accordingly.    Dondero disagreed with the assessment and instructed Daugherty to "find a way to get it done." Daugherty said he would try to find a way to complete the transaction, but that it was unlikely.

68.    Also during the summer of 2011, Dondero broached the subject of having Daugherty serve as CEO of Cornerstone, while Dondero assumed the role of Chairman of the Board.  Dondero told Daugherty that they could each collect the equivalent of a CEO's salary via this arrangement.  Daugherty disagreed and explained to Dondero that there could only be the equivalent of one CEO's salary paid, regardless of the split between the CEO and Chairman responsibilities.  Dondero then proposed a co-CEO arrangement: Daugherty would manage "operations" and work at Cornerstone three days a week while Dondero would handle "marketing" and work at Cornerstone two days a week.  Dondero also informed Daugherty that Dondero would receive 60% of the CEO compensation while Daugherty would receive 40%. Dondero suggested that they would not have to follow the firm's Turnover guidelines as used for board fees.    Daugherty disagreed.    Dondero gave Daugherty a highlighted copy of the Restoration indenture and told him that HCM's legal/compliance group recommended that they would have to turnover certain compensation mandated by the indentures consistent with the process for board fees earned by HCM employees, but that Dondero thought it was a "grey area" and would let Daugherty decide.  Daugherty showed the highlighted document to Moore and told him he did not think there was any way to keep all of the compensation as Dondero suggested. Moore agreed, and Daugherty informed Dondero that he concurred with HCM's legal/compliance department's conclusions that Dondero's approach was not permitted. Dondero and Daugherty were elected as co-CEO's of Cornerstone during the last week of

August 2011. Daugherty resigned by the end of September and never collected any compensation for his services as co-CEO of Cornerstone.

69.     In early September 2011, Dondero informed Daugherty of his intent to issue a second rights offering for NexBank Capital, Inc. ("NexBank Capital"). NexBank Capital is a holding Company controlled by Dondero, Okada and their affiliates, and is the sole shareholder of NexBank Capital, SSB). Daugherty and other senior HCM and affiliate employees had been granted shares in NexBank Capital pursuant to their Compensation and Benefits award for 2004. After Todd Travers and Davis Deadman left HCM and its affiliates in 2010, Dondero ordered the first rights offering to raise capital for NexBank Capital. Dondero disputed with Travers and Deadman regarding the "fair value" and lack of arms length process for the rights offering. Dondero guided the valuation experts' price lower so that he could cheaply dilute existing holders who were unwilling to participate under Dondero's leadership. Existing holders that were HCM employees were expected to be "loyal" and participate or suffer reprisals in their 2011 bonuses. Travers and Deadman were removed from the board and subsequently diluted. Daugherty reluctantly participated and was named to the NexBank Capital board of directors in early 2011. When Dondero informed Daugherty of his intent to launch a second rights offering in September 2011, Daugherty protested. This time, Dondero launched an even lower value for the rights offering and did not even bother to retain a third-party valuation expert. Dondero assured Daugherty that he would benefit because his purpose was to increase the ownership of current HCM employees like Daugherty and decrease the ownership of those former employees perceived as "disloyal" to the firm. He specifically identified Travers and Deadman as being his targets for dilution. Daugherty and other senior ranking HCP employees declined to participate.

Daugherty later learned that Amit Wahlia, who did not participate, was subsequently demoted and reassigned to report to a more junior HCM employee, Trey Parker, in early 2012.

70.     Daugherty worked from Montana during the Summer of 2011, and spent most of his weeks on the road attempting to raise funds for Tunstall RCP II, a second distressed for control private equity fund.  From March 2011 to September 2011, Daugherty was also in the process of negotiating his future compensation package with Dondero that would keep him at HCM through the investment period of Tunstall RCP II, which was about 5 years.  Daugherty made it clear to Dondero in March 2011 that he intended to leave HCM if a new arrangement could not be worked out.  He also told Dondero that he would not remain at HCM through the first close on Tunstall RCP II without an agreement that committed him to the firm for the investment period of the Tunstall RCP II Fund.  Dondero assured Daugherty that he would provide him and his team with more autonomy and a market-based deal by the end of the summer.

71.     Dondero offered Daugherty a Compensation and Benefits Statement that was delivered to Daugherty by Brian Collins on September 26, 2011.  The statement included a series of inducements that included cash and bonuses, 25% of the management fees in Tunstall RCP II, the 40% share of the CEO compensation from Cornerstone, full retention of portfolio board fees as allowed by HCM compliance, 15% of a future REIT (assuming it was launched) and 25% of the before-mentioned Tunstall Capital management fees.

72.     Daugherty had concerns about some of the components of the compensation offer, namely the co-CEO role at Cornerstone and the Tunstall Capital fees.  However, before he could address these issues, Dondero retracted the REIT award and inexplicably rescinded the entire

offer on September 27, 2011. When Daugherty called Dondero to protest, he was told "Fuck you! Quit!" When he later tried to discuss the matter by email, Dondero sent him a response (with a copy to Boyce) telling him: "[You] will get no agreement in writing" and "[You] will trust or you will leave."

73.   By this point, Daugherty was already very frustrated by the proposition of having Dondero as a co-CEO of Cornerstone, since he regularly missed entire board meetings and corporate dinners for Cornerstone and other portfolio companies in which he served as board member. He was also tired of having his job made more complicated by constantly having to find solutions to Dondero's self-dealing and conflicts of interest. Further, he was generally disgusted by Donderos's attempts to manipulate mark-downs so that he could take advantage of his own investors. Daugherty was unwilling to tolerate Dondero's latest attempt to re-trade his commitment to Daugherty's compensation and bonus terms and was totally fed up with the entire HCM culture, which pitted senior managers against one another in order to incite negative comments and backstabbing to justify paying each less. Daugherty submitted his letter of resignation on September 28, 2011.

74.   The day following his resignation and pursuant to his 30-day notice, Daugherty reported to work and attended a meeting in Boyce's conference room to present his thoughts and recommendations on each investment within his portfolio and each member of his team. Boyce and Britain were in attendance. Daugherty again brought up the problems with issuing a second round of equity/option grants for Cornerstone to the Sierra Verde entity. He also told all in attendance that the lawyers at Andrews Kurth, as counsel to Cornerstone and the board, were

unlikely to approve of the supplemental issuance demanded by Dondero and that the idea should not be pursued. He continued to give his views on other portfolio positions and personnel.

75.     After the meeting, Boyce and Britain conspired to deprive Daugherty of his earned compensation by converting and modifying contracts and vessels which Daugherty had vested ownership in. They both disliked Daugherty and each stood to gain by acquiring power and prestige with his departure. Throughout 2011, Boyce inserted himself into the affairs of Daugherty's team and created problems and tensions in order to undermine Daugherty. Boyce and Britain also led the implementation of Highland 2.0, which was used to reduce Daugherty's influence at the firm and over his team.

76.     On September 30, 2012, Boyce and Britain began interrogating many of the members of Daugherty's private equity team regarding the initial Sierra Verde grants and the formation of that vessel. Boyce was livid to learn that he had not been included in the Sierra Verde transaction and that its value was now substantial. In fact, Boyce and Britain focused much of their attention in the days following Daugherty's departure on investigating and confronting private equity team members with the fact that their equity/option grants could now be worth more than what Boyce and Britain had received in total compensation for 2010.

77.     Their accusations were self-serving and wholly ignored the fact that the Sierra Verde grant process began in 2009, when all security levels were much lower because of the global financial crisis against a context where HCM itself had defaulted on its bank loans and had contemplated filing for bankruptcy. Their investigation ignored the fact that these grants were approved by the independent board members on behalf of each company following a process that was dictated by outside counsel at Andrews Kurth and by HCM counsel, Surgent, on

behalf of the HCM-managed funds. In fact, Britain boasted that he intended to never speak to Daugherty again upon hearing of his resignation. This obviously made it difficult for Britain to determine the reason for Sierra Verde's creation and the purpose and process behind it.

78.    Several of the private equity team members, including Moore, Lawler, Smith and Callan, reported to Daugherty that Boyce and Britain were determined to unwind the Sierra Verde vessel and presented it as a rogue transaction promulgated by Daugherty. Never once did Britain or Boyce seek Daugherty's explanation for the genesis, scope and intent of the plan. They later discovered that Dondero had mandated the plan in 2009 and that Surgent had given the Legal Department's approval for the plan -- with Lyon's blessing.

79.    On October 2, 2011, Dondero reached out to Daugherty to have drinks at Nicola's Restaurant telling Daugherty: "Life is too short for it to be anything but a pleasant exchange between two battle-hardened warriors." They met at Nicolas's on October 6, 2011. In that meeting, Dondero discussed, in great detail, how he recently discovered his wife's infidelity. He suggested that other wives of HCM employees had not been faithful to their husbands as well, while assuring Daugherty that his wife had remained faithful.

80.    Dondero then offered, as evidence of his wife's unfaithfulness to their marriage, about 20 pages of emails and text messages between his wife and her alleged lover. He explained to Daugherty that he had spent about three sleepless days reading almost 20,000 emails and texts raided from various tracking sources he had through his connections with certain branches of the intelligence community. Dondero explained that the emails and texts covered every communication his wife had over their five-year marriage. He also mentioned

that he had used sources that were illegal in order to obtain the information and had committed about 20,000 misdemeanors in the process.

81.     In the meeting, Dondero went on to explain that at the time of Daugherty's resignation, he was in the process of reviewing these communications and that initially, a cell phone number he identified as belonging to Daugherty kept recurring, causing him to think Daugherty may have been having an affair with his wife as well.  Dondero admitted that it was not until the following week when he was able to match up phone numbers with messages that he had been able to determine that his wife was communicating with Daugherty's wife, primarily regarding children's activities.

82.     Dondero then attempted to entice Daugherty to come back to HCM by re-offering him the options of Cornerstone that had previously been held in the Sierra Verde vessel, which had been illegally dissolved after Daugherty's departure.  He also offered Daugherty the full CEO position at Cornerstone, conditioned upon Daugherty's agreement that Dondero could alter his compensation as he felt appropriate and that his private equity team members could be reassigned as Dondero determined to be necessary.  Dondero also told Daugherty that he would continue to lead the marketing effort for the Tunstall RCP II Fund.  He dangled other incentives before Daugherty in order to attempt to entice him to return, including his right to maintain his board positions at MGM Studios and Safety-Kleen Systems, Inc.

83.     Daugherty was understandably unnerved by this entirely bizarre conversation.  He thanked Dondero for the offer, but respectfully declined.  As Daugherty prepared to leave, Dondero asked that Daugherty think it over and get back to him with a final answer later.  The following morning, Daugherty reported to work and was soon greeted by Boyce who remarked

that he had heard the meeting with Dondero "went well" and that Daugherty would be staying at HCM under the revised offer proposed by Dondero. Daugherty informed Boyce that while the meeting was civil, he had no intention of remaining at HCM under the new terms or under any other terms. Boyce left Daugherty's office with a surprised look on his face.

84. On October 12, 2011, Boyce informed Daugherty that Dondero had originally instructed him to find a way to get out of paying Daugherty under Sierra Verde the day after Daugherty resigned. Boyce, in an attempt to play "good cop," then assured Daugherty that he would try and get him the value of his Sierra Verde holdings. Boyce's efforts were hollow, since he did not like Daugherty. Boyce considered Daugherty a threat and envied Daugherty's senior position within the firm. Boyce desperately wanted to lead the private equity group managed by Daugherty. When Daugherty informed Boyce that he was unwilling to accept Dondero's revised offer, Boyce aggressively lobbied to have Daugherty removed from the office immediately.

85. When Daugherty returned to the office on October 17, 2011, Boyce had Brian Collins, Head of Human Resources, present Daugherty with three documents relating to HCM's separation offer: (1) Sierra Verde Consent – a document to be signed by the Board of Directors of Sierra Verde agreeing to have the vessel dissolved; (2) Cornerstone Separation Agreement - a document dictating that Daugherty was no longer co-CEO and Chairman of Cornerstone, and that he would be paid $600,000.00 over the following 18 months in exchange for his continuing duty to consult and cooperate relating to Cornerstone matters; and (3) HCM Separation Agreement – with new and more restrictive terms and release provisions from Daugherty's 2004 Employment Agreement. At this meeting, Daugherty stated that he wanted his compensation

awards and that he was exercising any rights to be paid such awards. Daugherty received a compensation spreadsheet explaining his remaining payouts.

86.     Daugherty was also informed by various HCM employees that Dondero had hastily called a brief meeting with Restoration investors the previous Friday and had informed them that Daugherty had resigned from the firm because he had "flaked out" and "wanted to go to Montana because he didn't know what he wanted to do with his life." Dondero also told Julie Silcock at Houlihan Lokey that Daugherty had "taken a one year leave of absence."

87.     Within days of being asked to vacate HCM's offices, Daugherty received immediate pressure from Surgent, Collins and Dondero to sign the new separation documents, which he refused to do. He also noted that the documents he was given instructed him to seek the advice of legal counsel, which he had not had a chance to do. On October 20, 2011, Daugherty asked Collins if the offer was an all or nothing deal and whether he had to execute all three documents in order for any one of them to be effective. Collins replied that he did.

88.     Daugherty also inquired of Surgent why Sierra Verde was being unwound and dissolved. Surgent told him it was an "improper transaction" and was not permitted under the relevant indenture documents. When Daugherty asked how it was that this was just being discovered now, especially since Surgent was involved in the Sierra Verde approval and formation process dating back to 2009, Surgent did not respond. Daugherty said he was willing to entertain substitute consideration if there was a legitimate mistake, but that he was confused as to how it was now determined that the indenture did not permit Daugherty and the private equity team to receive options on the performance of Cornerstone and Trussway – especially since a payment could only be realized upon a successful sale of the company, with full disclosure to the

funds' investors.   Further, if the Sierra Verde vessel was improper, Daugherty could not understand how it was permissible for him to receive monthly payments by Cornerstone equaling $600,000.00 under the proposed Cornerstone Separation Agreement, when there was no connection to Cornerstone's performance and the payments would not be visible to the fund's investors. Surgent again did not respond.

89.     Daugherty further inquired about how the rest of his private equity team was being compensated. Surgent refused to answer Daugherty's question, other than to say that his former private equity team had been taken care of. Finally, Daugherty asked Surgent how it was deemed that the performance-driven option program under Sierra Verde was considered impermissible but the Tunstall fees were considered permissible. Surgent did not respond.

90.     Daugherty later discovered that the Cornerstone independent board members had not been informed of the Sierra Verde unwind and were completely unaware that there was a compensation dispute with Daugherty. Dondero left voice messages with Daugherty telling him he needed to sign the documents and offering to update him on "what it's like to be married to a tramp wife."

91.     On October 27, 2011, Dondero sent Daugherty an email notifying him that HCM had changed the documents and that all of the new documents would have to be signed. Surgent, Collins and Dondero attempted to schedule another meeting to discuss the new documents on October 28, 2011. Daugherty declined to discuss the matter further with HCM and referred the matter to his attorneys.

92.     In January 2012, Daugherty was informed that Dondero, Boyce, Britain and Honis were schedule to host an investor committee update for the Crusader Fund. Daugherty

was listed in the presentation materials as having left HCM for "lifestyle" reasons. Dondero explained to those in attendance that Daugherty left HCM due to "lifestyle" reasons, that he was "burned out," that he was only willing to "work 30 hour weeks," and that he had effectively spent the summer of 2011 on vacation in Montana. Dondero, Boyce, Britain and Honis knew these remarks were wholly untrue, misleading and defamatory in nature. To the contrary, Daugherty was actively managing the various funds and investments and people that reported to him, and was aggressively marketing the new Tunstall RCP II Fund. Dondero was fully aware of, and indeed specifically approved of, Daugherty's request to work from a base in Montana during the summer of 2011 since so much of his time was spent on the road attending board meetings and marketing Tunstall RCP II in places like Dallas, Chicago, Boston and New York. In fact, Daugherty maintained an approximate 57 hour per week average approved by Dondero through the day of his resignation.

93.     The Crusader investors did not trust Dondero because of the misrepresentations, broken promises and activities that took place with the management of their fund since 2008. Many of them knew Daugherty to be blunt, honest and hard working, and found it suspicious that he would leave HCM for "lifestyle" reasons. They insisted on having access to Daugherty to conduct an exit interview. Dondero and HCM complied with this demand and included Daugherty's email and contact information in the same presentation materials that listed Daugherty as having left for "lifestyle" reasons.

94.     In late January 2012, Daugherty participated in exit interviews with certain fund committee members and detailed his views on the prospects and liquidity for the various fund investments and his reasons for leaving HCM. Daugherty presented his views in the same

manner and thoroughness that he had done while conducting quarterly and semi-annual updates consistent with his responsibilities at HCM.

95.     Apparently, Daugherty's views were materially inconsistent with information and advice provided by Dondero, Boyce and Britain regarding the companies in the Fund. Daugherty gave a very strong review of one of the fund's largest investments, noting that discussions were taking place at the board level to sell one of the Fund's companies to a private equity firm or take it public in an IPO (Initial Public Offering) in the third quarter of 2012, which would likely more than double the price of the stock.  Britain and Dondero had presented a completely different scenario to these investors, telling them there were no plans for a liquidity event.

96.     Britain and Dondero had recommended that these investors sell their shares into a HCM-endorsed tender that the portfolio company was pursuing at the direction of Dondero and Britain at half of the expected IPO/sale price.  The investors were told this was their only foreseeable option for liquidity, while Dondero and Britain were simultaneously campaigning to block the company from pursuing the IPO or outright sale.  Dondero and Britain knew this would transfer more value to themselves and to HCM, since other HCM-managed funds were paying full management fees and incentive fees to HCM and this would increase one fund's percentage ownership of the company at the expense of another fund's investors.  The net effect of their scheme allowed higher fee paying funds to increase their ownership and take part in the higher price liquidity event later, while funds that had suspended fees to HCM would sell out at depressed levels.  Additionally, Dondero and Britain were actively trying to acquire shares in the

company from an investment bank for their personal accounts, while instructing the fund's investors to tender (sell) their shares.

97.     Daugherty was asked by the committee to give his views on value and future prospects of another portfolio company. Daugherty told the group that the bank debt was easily worth 100% on the dollar, and that the equity would likely be worth two and maybe three times its current market price. Daugherty mentioned that EBITDA had significantly improved and there was a significant potential value from a proposed settlement.

98.     In contrast, Daugherty learned that Dondero and Boyce had presented a far lower and bleaker value picture. In addition, among other things, they omitted any reference to the EBITDA improvement. Instead, they focused their analysis on the trailing reported quarterly EBITDA numbers and contraction by trading multiples of industry peers. Daugherty later learned that Dondero and Boyce were attempting to buy the debt and equity in this company from other Highland fund investors at deep discounts.

99.     This pattern of abuse and self-dealing continues through the acts of Dondero, Okada, Britain, Boyce and Surgent. Recently, these same principals threatened investors to agree to being bought out at .75 cents on the dollar on their entire holdings in a fund, or run the risk of having their covenants stripped and being made silent partners if HCM was able to raise enough cash to buy over 50% of the partnership. Simply put, HCM is attempting to raise cash from new investors in order to steal the assets of its old investors by claiming that they are "distressed."

100.     In response to a request from Dondero on Christmas Eve 2011, Daugherty agreed to meet Dondero for drinks on February 2, 2012. Daugherty had been subpoenaed by Rebecca Dondero to testify in the Dondero's divorce that morning, but the hearing had been postponed.

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,**
**COUNTERCLAIM AND THIRD-PARTY PETITION – Page 37**
1056534.9

Dondero again chose Nicola's Restaurant to meet. During the meeting, which lasted about an hour and a half, Dondero explained to Daugherty how evil his wife was and why he was determined to pay her nothing in the divorce. Daugherty advised Dondero to pay his wife the $5 million stipulated in their prenuptial agreement because she would always be the mother of his children and would always have primary custody of them. Daugherty also advised Dondero that it wasn't good for the kids to see their father disparaging their mother in public as a "whore." Dondero said he was leery about the cost of litigation, but was following his lawyer's advice that "if his wife got all of the money up front, it would be too easy to just leave the kids with a nanny and go party in Aspen." Dondero further commented that he could also trade custody for more cash compensation at a later date.

101.    Dondero then briefly mentioned Daugherty's unresolved compensation issues and acknowledged that Daugherty was treated poorly during his exit from HCM. Daugherty expressed his opinions about the real value of Sierra Verde and its underlying investments. Dondero mentioned his appreciation for Daugherty's most recent investments/restructurings and the positive impact they had on the firm's performance (MGM, Safety-Kleen, Rotech and Graceway Pharmaceuticals just to name a few). Dondero further stated that he would try to get Daugherty's compensation issues resolved quickly.

102.    Daugherty awoke the next morning to a phone message requesting that he call Dondero back. The message had been left around 9:00 p.m. the previous night. Daugherty called Dondero around 7:30 a.m., and Dondero proceeded to interrogate Daugherty as to why Rebecca Dondero was seeking his testimony. Daugherty explained that he did not know, but that he was subpoenaed and was required to produce any emails between him and Dondero in 2011,

any financial information of HCM, any partnership documents, and to surrender his cell phone. Dondero then attempted to help Daugherty remember how he should testify regarding his wife, suggesting that it was Daugherty's idea that he pay his wife nothing and that Daugherty had referred to Dondero's wife as a whore. Daugherty denied Dondero's manipulated version of the facts and reminded Dondero that he had encouraged him to seek marriage counseling in September 2011. Dondero became annoyed and hung up on Daugherty.

103.   On February 9, 2012, Dondero phoned Daugherty and left him a message, again offering to pay him $600,000.00 from Cornerstone with a "consulting contract" in exchange for seizing his Sierra Verde shares. He also offered to purchase Daugherty's shares in Nexbank Holdings for $40 per share, compared to a recent rights offering price of $30 per share, as long as Daugherty would cease communications with former investors and executives of companies affiliated with HCM's funds.

104.   Daugherty reminded Dondero that he was very familiar with the appropriate value for Cornerstone, since he had presided over the investment in various capacities as Chairman, Executive Chairman and CEO since 2008. Daugherty refused to accept Dondero and Boyce's valuation. Dondero raged at Daugherty, claiming it was his mark that was used for valuation purposes, but Daugherty reminded Dondero that it was his and Boyce's valuation, since they were the ones who ordered Smith to have the company revalued by a third-party firm while Daugherty was working from Montana.

105.   Dondero then angrily proclaimed that he had spoken to someone at Concorde who told him they were not pursuing the Strat sale because Daugherty had given them HCM's confidential information and had told them not to do so. This was not true. Concorde

representative served on both the Crusader committee and the Strat committee, and were thus informed of Daugherty's views of Cornerstone during the exit interview granted by HCM. Concorde independently determined not to sell to Dondero or his affiliates, despite numerous attempts by Dondero to induce a sale through the summer of 2011.

106.    In the last week of February 2012, Dondero instructed certain HCM employees, as board members of the HERA program, to amend the governing documents. The amendments would allow the entity to terminate the payments and ownership interests if the board, in its sole discretion, determined that a former employee violated the terms of the confidentiality provisions in HCM's employment agreement. Dondero also instructed the board members to amend the governing documents to cause any former employee to forfeit his interest if he or she ever brought suit against HCM. This effectively made it impossible for anyone to enforce collection under the rewards program. These actions took place even though Daugherty was fully vested in the program and received a 2011 W2 from HCM claiming it as income for Daugherty and an expense for HCM.

107.    In the first week of March 2012, Dondero, Okada, Boyce and Britain called a mandatory meeting among HCM professionals to inform them that there would soon be litigation with Daugherty, and that anyone caught communicating with Daugherty for any reason would be fired on the spot. They were also told that anyone who helped HCM provide damaging testimony or dirt on Daugherty would be well-regarded by management, and any misdeeds or failings of the past would be forgiven.

108.    On March 19, 2012, Daugherty received a letter from counsel for HCM alleging broad, ambiguous and unsupported violations of various agreements, and claiming that

Daugherty had therefore forfeited "compensation and other payments and distributions" that he was entitled to under "any policy, plan, or agreement with Highland or any of its affiliates." Such conduct constitutes an anticipatory repudiation of the parties' agreements.

109.    On April 4, 2012, Daugherty testified, pursuant to a subpoena issued by Rebecca Dondero, in Dondero's divorce proceedings, currently pending in a Family District Court in Dallas County. At the hearing, Daugherty testified that he believed Highland was stable and solvent. He also testified that while he was having drinks with Dondero, Dondero told Daugherty that he was going to get his net worth down to as little as possible in order to avoid paying his wife the $5 million that she was entitled to pursuant to the couple's prenuptial agreement. During the hearing and after Daugherty had testified, Dondero stated, off the record, that he would "destroy" Daugherty. Two weeks later, Plaintiff filed its Original Petition.

## V.

## GENERAL CAUSES OF ACTION

110.    For each cause of action herein, Daugherty re-alleges and incorporates by reference each and every allegation and statement contained in the foregoing paragraphs as if fully set forth herein.

### A.    REQUEST FOR DECLARATORY JUDGMENT AS TO THE EMPLOYMENT AGREEMENT

111.    Pursuant to Section 37.001 of the Texas Civil Practice & Remedies Code, *et seq.*, Plaintiff requests that the Court determine the rights of the parties with regard to the Restrictive Covenants contained in Section 5.3 of the Employment Agreement. Plaintiff seeks a declaratory judgment that the non-solicitation and non-competition covenants are overly-broad and unenforceable and not reasonably tailored to protect the business interests and good will of HCM

and are accordingly, unenforceable under Section 15.50 of the Texas Business & Commerce Code.

**B.      BREACH OF THE EMPLOYMENT AGREEMENT AGAINST HCM**

112.    Pursuant to the Employment Agreement, Daugherty was entitled to participate in any bonus, option or similar incentive compensation plan, including the LTIP, the HERA Plan, Sierra Verde and HCM's Defined Benefit Pension Plan.  Daughtery's termination under the Employment Agreement was a "Voluntary Termination—Non-Competing Business," as dictated by Section 4.5 of the Employment Agreement, which requires HCM to honor any amounts or rights to which the employee would be entitled to under any other written agreements with HCM.

113.    Section 4.5 of the Employment Agreement further required HCM to pay Daugherty severance pay dependent upon his execution of a separation agreement and release "substantially in the form" as Exhibit "A" to the Employment Agreement.  In further breach of the Employment Agreement, HCM presented Daugherty with a General Release and Separation Agreement on October 27, 2011 which did not resemble, in any respect, Exhibit "A" to the Employment Agreement.

114.    By reason of the foregoing acts and conduct of HCM, and breach of numerous agreements, including the Employment Agreement, Daugherty has been damaged in an amount in excess of the minimum jurisdictional limits of this Court.

C.   **DEFAMATION AGAINST HCM AND DONDERO**

115.   In connection with Daugherty leaving his employment with HCM, HCM and

Dondero published false statements of fact regarding Daugherty stating, among other things, that

Daugherty was "burned out" and had left for "lifestyle" reasons. HCM and Dondero made such

statements knowing them to be false, and published them to third parties intentionally with actual

malice or reckless disregard for the truth and/or created an unreasonable risk that the defamatory

statements would be communicated to third parties.

116.   HCM and Dondero's actions constitute defamation *per se*, because the nature of

the defamatory statements related to Daugherty's professional character, reputation or standing.

HCM and Dondero's defamation of Daugherty proximately caused damage to Daugherty in

excess of the minimum jurisdictional limits of this Court.

## VI.

## SIERRA VERDE CAUSES OF ACTION

117.   For each cause of action herein, Daugherty re-alleges and incorporates by

reference each and every allegation and statement contained in the foregoing paragraphs as if

fully set forth herein.

A.   **BREACH OF CONTRACT AGAINST SIERRA VERDE AND DONDERO**

118.   On December 16, 2010, a Limited Liability Company Agreement ("Agreement")

was entered into by Sierra Verde and certain Members, including Daugherty, who were holders

of units. Pursuant to the Agreement, Dondero was named the Manager of Sierra Verde and

given "sole right, power and authority to manage, direct and control all of the business and

affairs" of Sierra Verde.

119.    After Daughterly left his employment at HCM, and in an illegal and unilateral breach of the Agreement intended to cause harm to Daugherty and to deprive him of his valuable ownership interests in Sierra Verde, Sierra Verde and Dondero took steps to purportedly unwind and dissolve Sierra Verde.

120.    Sierra Verde and Dondero further breached the Agreement by failing to give Daugherty, as a holder of units, his entitled vote, as required by Section 3.3 of the Agreement.

121.    Sierra Verde and Dondero failed to deliver to Daugherty, as a holder of units, the quarterly reports required by Section 3.5 of the Agreement, again in breach of the Agreement.

122.    Sierra Verde and Dondero engaged in other acts amounting to blatant, illegal breaches of the Sierra Verde Agreement, including but not limited to, the improper delegation of power and authority to Dondero as Manager and the failure to properly distribute cash and assets of Sierra Verde to Daughtery, as a holder of units, upon the dissolution of Sierra Verde.

123.    By reason of the foregoing acts and conduct of Sierra Verde and Dondero, Daugherty has been damaged in an amount in excess of the minimum jurisdictional limits of this Court.

**B.    OPPRESSION OF A MINORITY SHAREHOLDER AGAINST SIERRA VERDE AND DONDERO**

124.    At all relevant times, Daugherty was a minority holder of units in Sierra Verde. Sierra Verde and Dondero, as Manager, have engaged in conduct that constitutes oppression of Daugherty, a minority shareholder, including but not limited to the following: (i) unwinding and dissolving Sierra Verde; (ii) failing to provide Daugherty with required quarterly reports; (iii) committing multiple breaches of the Sierra Verde Agreement; (iv) failing to provide Daugherty

with his voting rights under the Agreement; and (v) failing to distribute any property or other assets to Daughtery in accordance with his ownership interests.

125.    The actions of Sierra Verde and Dondero served to substantially defeat the expectations of Daugherty, as a member of Sierra Verde with a minority ownership. Daugherty's expectations were both reasonable under the circumstances and central to his decision to continue in the employ of HCM.  Further, the actions of Sierra Verde and Dondero were burdensome, harsh, and wrongful conduct amounting to a lack of probity and fair dealing in the affairs of Sierra Verde to the prejudice of Daugherty.  Sierra Verde and Dondero visibly departed from the standards of fair dealing on which Daugherty was entitle to rely.

126.    By reason of the foregoing acts and conduct, Daugherty has suffered damages in an amount in excess of the minimum jurisdictional limits of this Court.

**C.    BREACH OF FIDUCIARY DUTY ON BEHALF OF SIERRA VERDE**

127.    At all relevant times, Daugherty was a holder of units in Sierra Verde, and may thus pursue a derivative action if Sierra Verde refuses to pursue action against Dondero.

128.    As a majority shareholder and an officer of Sierra Verde, Dondero owed fiduciary duties of due care and loyalty to Sierra Verde.

129.    Dondero engaged in unfair business transactions with respect to Sierra Verede, including: (i) unwinding and dissolving Sierra Verde; (ii) fraudulently inducing holders of units in Sierra Verde to agree to unwind Sierra Verde based upon false statements of fact; (iii) attempting to coerce Daugherty to agree to unwind Sierra Verde; (iv) failing to provide Daugherty with required quarterly reports; (v) committing multiple breaches of the Sierra Verde Agreement; (vi) failing to provide Daugherty with his voting rights under the Agreement; and

(vii) failing to distribute any property or other assets to Daughtery in accordance with his ownership interests.

130.    Specifically, Dondero breached his duties of (i) candor; (ii) loyalty and utmost good faith; (iii) refraining from self-dealing; (iv) integrity of the strictest kind; and (v) full disclosure.

131.    The transactions decreased the value of Sierra Verde's shares and caused damages to Sierra Verde and its unit holders.

**D.    IMPROPER WITHHOLDING OF CORPORATE BOOKS AND RECORDS**

132.    Defendant is a minority holder of units and has demanded to inspect Sierra Verde's books and records.  Defendant's purpose for inspecting the company books and records is reasonably related to his ownership of a minority holder of units.  Dondero refused to allow Daugherty access to the books and records; thus, they violated Tex. Bus. Corp. Act, Art. 2.44(B) and damaged Sierra Verde and its unit holders.  Daugherty hereby requests that the Court compel Dondero to open the books and records of Sierra Verde to Daugherty for inspection and to award Daugherty his reasonable attorneys' fees pursuant to Tex. Bus. Corp. Act, Art. 2.44(B).

**E.    CONVERSION AGAINST SIERRA VERDE AND DONDERO**

133.    Daugherty, as a holder of units in Sierra Verde, owned, possessed, or had the right to immediate possession of his property.

134.    Sierra Verde and Dondero, in engaging in the above described intentional conduct, wrongfully exercised dominion and control over Daugherty's personal property in a manner inconsistent with Daugherty's exclusive rights to the property. This conversion of Daugherty's property was willful, malicious and in conscious disregard of Daugherty's rights.

135.    Consequently, Daugherty suffered damages in an amount in excess of the minimum jurisdictional limits of this Court.  Further, Daugherty is entitled to an award of exemplary damages sufficient to punish Sierra Verde and Dondero and to serve as a deterrent to such conduct in the future.

**F.    UNJUST ENRICHMENT AGAINST SIERRA VERDE AND DONDERO**

136.    Sierra Verde and Dondero illegally received and retained benefits from Daugherty when they wrongfully dissolved and maintained the property and assets of Sierra Verde.  The benefits obtained by Sierra Verde and Dondero were not gratuitous, and Sierra Verde and Dondero will be unjustly enriched if allowed to retain the benefits.

137.    As a direct and proximate result of unjust enrichment, Daugherty has sustained damages in an amount in excess of the minimum jurisdictional limits of this Court.

**G.    BREACH OF FIDUCIARY DUTY AGAINST DONDERO**

138.    As Manager of Sierra Verde, Dondero controlled Sierra Verde.  In engaging in the wrongful conduct described above, Dondero breached fiduciaty duties owed to Daugherty as a minority holder of units in Sierra Verde.  A special relationship of trust and confidence exists between Daugherty and Dondero.  Specifically, Dondero breached his duties of (i) candor; (ii) loyalty and utmost good faith; (iii) refraining from self-dealing; (iv) integrity of the strictest kind; and (v) full disclosure.  Dondero's breaches of these duties has materially harmed Daugherty and unlawfully benefited Dondero and Sierra Verde.

139.    Daugherty is entitled to recover damages sustained by him as a result of Dondero's breach of fiduciary duty.  In addition to actual damages, Daugherty is also entitled to

recover exemplary damages because Dondero intentionally and maliciously violated the fiduciary duties he owed Daugherty.

## VII.

## HERA CAUSES OF ACTION

140. For each cause of action herein, Daugherty re-alleges and incorporates by reference each and every allegation and statement contained in the foregoing paragraphs as if fully set forth herein.

### A. BREACH OF CONTRACT AGAINST HCM AND HERA

141. On October 26, 2009, a Limited Liability Company Agreement ("Agreement") was entered into by HERA and HCM and other members of the board of HERA, including Daugherty. The purpose of the HERA Plan was to receive and hold assets contributed by HCM and to distribute proceeds of those assets from time to time to create a retention initiative. Daugherty was granted units of ownership in the HERA Plan. The unilateral decision of HCM and HERA to amend the Agreement to divest Daugherty of his valuable ownership interest constitutes a material breach of the Agreement.

142. As a result of this breach of contract, Daugherty has been damaged in an amount in excess of the minimum jurisdictional limits of this Court.

### B. SHAREHOLDER OPPRESSION AGAINST DONDERO, BOYCE AND BRITAIN

143. Dondero, as well as, Boyce and Britain, who were members of HERA's board of directors, which is effectively controlled by Dondero, engaged in oppressive conduct by unilaterally amending the Agreement to suspend distributions for any holder of units who commenced litigation, initiated a dispute or made a claim related to HERA or its management or

members. This conduct substantially defeated the expectations of Daugherty, as a member of the HERA Plan with a minority ownership. Daugherty's expectations were both reasonable under the circumstances and central to his decision to join HCM. Further, these defendants engaged in burdensome, harsh, and/or wrongful conduct and a lack of probity and fair dealing in the company's affairs to the prejudice of Daugherty. Defendants visibly departed from the standards of fair dealing on which Daugherty was entitled to rely.

144.   As a direct and proximate result, Daugherty has suffered damages in an amount in excess of the minimum jurisdictional limits of this Court.

**C.   DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY**

145.   At all relevant times, Daugherty was a member of HERA with a minority ownership.

146.   As members of HERA's Board of Directors, Dondero, Boyce, and Britain owed fiduciary duties of due care and loyalty to Sierra Verde.

147.   Dondero, Boyce, and Britain enganged in unfair business transactions with respect to HERA by unilaterally amending the Agreement to suspend distributions for any holder of units who commenced litigation, initiated a dispute or made a claim related to HERA or its management or members, making it impossible for anyone to enforce collections through the rewards program.

148.   By engaging in the aforementioned conduct, Dondero, Boyce, and Britain breached their duties of (i) candor; (ii) loyalty and utmost good faith; (iii) refraining from self-dealing; (iv) integrity of the strictest kind; and (v) full disclosure.

149. The transactions decreased the value of ownership in HERA and caused damages to HERA and its members.

**D.    CONVERSION AGAINST HERA, HCM, DONDERO, BOYCE AND BRITAIN**

150. Daugherty owned, possessed, or had the right to immediate possession of his property, including his interests in HERA.

151. These Defendants wrongfully exercised dominion and control over Daugherty's personal property in a manner inconsistent with Daugherty's exclusive rights to the property. Daugherty suffered injury in an amount in excess of the minimum jurisdictional limits of this Court. Defendants' conversion of Daugherty's property was willful, malicious and in conscious disregard of Daugherty's rights. Consequently, Daugherty is entitled to an award of exemplary damages sufficient to punish HERA, HCM, Dondero, Boyce and Britain and to serve as a deterrent to such conduct in the future.

## VIII.

## LTIP CAUSES OF ACTION

152. For each cause of action herein, Daugherty re-alleges and incorporates by reference each and every allegation and statement contained in the foregoing paragraphs as if fully set forth herein.

**A.    BREACH OF CONTRACT AGAINST HCM**

153. Effective January 1, 2005, HCM established a long-term incentive program for selected key employees, including Daugherty. The LTIP was established to create positive morale and teamwork, to attract and retain key talent and to encourage achievement of common goals. Daugherty was granted long-term incentive units in the LTIP. HCM's unilateral decision

to divest Daugherty of his valuable ownership interest in units held by him constitutes a material breach of the parties' agreement.

154.   As a result of this breach of contract, Daugherty has been damaged in an amount in excess of the minimum jurisdictional limits of this Court.

**B.   CONVERSION AGAINST HCM**

155.   Daugherty owned, possessed, or had the right to immediate possession of his property, including his interests in the LTIP.

156.   HCM wrongfully exercised dominion and control over Daugherty's personal property in a manner inconsistent with Daugherty's exclusive rights to the property. Daugherty suffered injury in an amount in excess of the minimum jurisdictional limits of this Court. HCM's conversion of Daugherty's property was willful, malicious and in conscious disregard of Daugherty's rights. Consequently, Daugherty is entitled to an award of exemplary damages sufficient to punish HCM and to serve as a deterrent to such conduct in the future.

## IX.

### ATTORNEYS' FEES AGAINST HCM, DONDERO, SIERRA VERDE AND HERA

157.   Daugherty seeks recovery of the costs and reasonable and necessary attorneys' fees incurred in connection with this action pursuant to Sections 37.009 and 38.001 of the Texas Civil Practice and Remedies Code.

## X.

### REQUEST FOR DISCLOSURE

158.   Pursuant to Rule 194 of the Texas Rules of Civil Procedure, HCM, HERA, Sierra Verde, Dondero, Boyce and Britain are hereby requested to disclose the information or material

described in Rule 194.2. This is a continuing duty and requires supplementation in accordance with the Texas Rules of Civil Procedure.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Daugherty respectfully requests that this Honorable Court grant the following relief:

Upon trial of this cause, that the Court make an award in favor of Daugherty and against HCM, HERA, Sierra Verde, Dondero, Boyce and Britain for the following:

a.      Actual damages and exemplary damages;

b.      A declaratory judgment that the covenants not to compete are unenforceable under Section 15.50 of the Texas Business & Commerce Code;

c.      Reasonable and necessary attorneys' fees and costs incurred; prejudgment and post judgment interest as allowed by law; and,

d.      Any and all further relief the Court deems just and equitable.

Respectfully submitted,

By: _____

James W. Ribman
State Bar No. 00797762
Ruth Ann Daniels
State Bar No. 15109200
Looper Reed & McGraw P.C.
1601 Elm Street, Suite 4600
Dallas, Texas 75201
(214) 954-4135
(214) 953-1332 (Fax)

**ATTORNEYS FOR PATRICK DAUGHERTY**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been transmitted by certified mail – return receipt requested to counsel for Defendant, Marc D. Katz and Aaron J. Epstein, Andrews Kurth LLP, 1717 Main St., Suite 3700, Dallas, Texas 75201, on this 22nd day of May, 2012.

James W. Ribman



# LOOPER REED

### LOOPER REED & McGRAW P.C.

FILED
'12 MAY 22 PM 4: 24

Dallas | Houston | Tyler

James W. Ribman
jribman@lrmlaw.com

May 22, 2012

**_Via Hand-Delivery_**
Mr. Gary Fitzsimmons
Dallas County District Clerk
George L. Allen, Sr. Court's Bldg.
600 Commerce Street
Dallas, Texas 75202

Re:     Cause No. 12-04005; *Highland Capital Management, L.P. v. Patrick Daugherty
v. Sierra Verde, LLC, Highland Employee Retention Assets LLC, James Dondero,
Patrick Boyce, and William L. Britain*

Dear Mr. Fitzsimmons:

Enclosed please find the original and seven copies of Defendant's Original Answer, Counterclaim and Third-Party Petition for filing with the Court along with our firm's check in the amount of $100.00 to serve as payment for the filing and issuance fees. Please prepare citations for the five Third-Party Defendants and contact my assistant, Stel Benavides when they are ready for pick-up so that we have them served by private process.

In addition, enclosed you will find the original and one copy of Patrick Daugherty's Verified Motion to Disqualify Marc D. Katz, Aaron J. Epstein and Andrews Kurth LLP, and Patrick Daugherty's Motion for Sanctions Against Plaintiff and Plaintiff's Counsel for filing with the Court.

Please return a file-stamped copy of all documents to our office, via our courier.

Thank you for your assistance in this matter. Should you have any questions, please do not hesitate to contact me.

Sincerely,

James W. Ribman /eib

James W. Ribman

JWR/eib
Enclosures

Mr. Gary Fitzsimmons
May 22, 2012
Page 2


cc:     Marc D. Katz
        Aaron J. Epstein
        (w/enclosures – via CM-RRR 7011 2000 0001 4619 4938)

        Ruth Ann Daniels (*of the firm*)

