1

2
                    IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION

3                                    )    **Case No. 19-34054-sgj-11**
         In Re:                      )    Chapter 11
                                     )
4        HIGHLAND CAPITAL            )    Dallas, Texas
         MANAGEMENT, L.P.,           )    June 25, 2025
5                                    )    9:30 a.m. Docket
              Reorganized Debtor.    )
6                                    )    - MOTION TO EXTEND DURATION OF
                                     )      TRUSTS (4213)
7                                    )    - MOTION TO APPROVE SETTLEMENT
                                     )      (4216)
8        _____    )

9                      TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                UNITED STATES BANKRUPTCY JUDGE.

11       APPEARANCES:

12       For the Highland Capital     John A. Morris
         Management Claimant Trust:   PACHULSKI STANG ZIEHL & JONES, LLP
13                                     780 Third Avenue, 34th Floor
                                       New York, NY  10017-2024
14                                     (212) 561-7760

15       For the Highland Capital     Hayley R. Winograd
         Management Claimant Trust:   Gregory V. Demo
16                                     PACHULSKI STANG ZIEHL & JONES, LLP
                                       1700 Broadway, 36th Floor
17                                     New York, NY  10019
                                       (212) 561-7732

18
         For the Highland Capital     Jeffrey N. Pomerantz
19       Management Claimant Trust:   PACHULSKI STANG ZIEHL & JONES, LLP
                                       10100 Santa Monica Blvd.,
20                                      13th Floor
                                       Los Angeles, CA  90067
21                                     (310) 277-6910

22       For Marc S. Kirschner,       Robert Scott Loigman
         Litigation Trustee:          QUINN EMANUEL URQUHART & SULLIVAN,
23                                      LLP
                                       295 5th Avenue
24                                     New York, NY  10016
                                       (212) 849-7000

25

```
 1  APPEARANCES, cont'd.:

 2  For the Hunter Mountain      Louis M. Phillips
    Entities:                    Amelia L. Hurt
 3                               KELLY HART & PITRE
                                 301 Main Street, Suite 1600
 4                               Baton Rouge, LA  70801
                                 (225) 381-9643
 5
    For the Dugaboy              Deborah Rose Deitsch-Perez
 6  Investment Trust:            STINSON, LLP
                                 2200 Ross Avenue, Suite 2900
 7                               Dallas, TX  75201
                                 (214) 560-2201
 8
    For the Dugaboy              Michael Justin Lang
 9  Investment Trust:            CRAWFORD WISHNEW & LANG, PLLC
                                 1700 Pacific Avenue, Suite 2390
10                               Dallas, TX  75201
                                 (214) 817-4500
11
    For Crown Global Life        David L. Curry, Jr.
12  Insurance, Ltd. and          OKIN ADAMS, LLP
    The Dallas Foundation:       1113 Vine Street, Suite 240
13                               Houston, TX  77002
                                 (713) 228-4100
14
    For Patrick Daugherty:       Andrew K. York
15                               Drake Rayshell
                                 Joshua Smeltzer
16                               GRAY REED & MCGRAW, LLP
                                 1601 Elm Street, Suite 4600
17                               Dallas, TX  75201
                                 (214) 954-4135
18
    For the U.S. Trustee:        Erin Marie Schmidt
19                               OFFICE OF THE UNITED STATES
                                     TRUSTEE
20                               1100 Commerce Street, Room 976
                                 Dallas, TX  75242-1496
21                               (214) 767-1075

22  Recorded by:                 Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
23                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
24                               (214) 753-2062

25
```

1    Transcribed by:              Kathy Rehling
2                                 311 Paradise Cove
                                  Shady Shores, TX  76208
3                                 (972) 786-3063

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
                transcript produced by transcription service.

1              <u>DALLAS, TEXAS - JUNE 25, 2025 - 9:38 A.M.</u>

2              THE CLERK:  All rise.  The United States Bankruptcy

3    Court for the Northern District of Texas, Dallas Division, is

4    now in session, the Honorable Stacey Jernigan presiding.

5              THE COURT:  Good morning.  Please be seated.

6              MR. LANG:  Good morning, Judge.

7              THE COURT:  All right.  We have Highland settings

8    this morning, Case No. 19-34054.  We have two motions:  a

9    motion to extend the duration of the Plan Trust, and then a

10   motion under Rule 9019 to approve a settlement between the

11   estate entities and Hunter Mountain entities.

12        All right.  So, lots to get to.  Let's quickly get

13   appearances from the participating parties in interest this

14   morning.

15             MR. MORRIS:  Good morning, Your Honor.  John Morris;

16   Pachulski Stang Ziehl & Jones.  I'm joined by my colleagues

17   Jeffery Pomerantz, Gregory Demo, and Hayley Winograd.  And we

18   represent the Highland Capital Management Claimant Trust and

19   Highland Capital Management, LP.

20             THE COURT:  Okay.  Good morning.  Other appearances?

21             MR. LOIGMAN:  Good morning, Your Honor.  Robert

22   Loigman from Quinn Emanuel.  We represent the Highland

23   Litigation Trustee, Marc Kirschner.

24             THE COURT:  Good morning.

25             MS. DEITSCH-PEREZ:  Good morning, Your Honor.  This

1  is Deborah Deitsch-Perez from Stinson representing the Dugaboy

2  Trust on the motion to extend the duration of the Trust.

3           THE COURT:  Good morning.

4           MS. DEITSCH-PEREZ:  Good morning.

5           MR. LANG:  Michael Lang for Dugaboy Investment Trust

6  on the 9019 motion.

7           THE COURT:  Good morning.

8           MR. LANG:  Good morning.

9           MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

10 Phillips and Amelia L. Hurt; Kelly Hart Hallman -- Kelly Hart

11 Pitre, Louisiana trade name, I don't know why -- appearing on

12 behalf of Hunter Mountain Investment Trust and the Hunter

13 Mountain entities in connection with the 9019 motion.

14          THE COURT:  Good morning.

15          MR. YORK:  Good morning, Your Honor.  Drew York along

16 with Joshua Smeltzer and Drake Rayshell from Gray Reed on

17 behalf of Patrick Daugherty with regard to the 9019 motion.

18          THE COURT:  Good morning.  Ms. Schmidt?

19          MS. SCHMIDT:  Erin Schmidt on behalf of the U.S.

20 Trustee.

21          THE COURT:  Good morning.

22          MR. CURRY:  Good morning, Your Honor.  David Curry

23 from Okin Adams on behalf of The Dallas Foundation and Crown

24 Global Life Insurance, Ltd.

25          THE COURT:  Good morning.

1          All right.  Well, let me ask.  I'll start with Mr. Morris,

2     given these are your motions.  Do you have any agreements

3     about how you're going to proceed?  I'm wondering, first off,

4     are we going to have joint presentations, joint evidence on

5     both motions, or are we going to take one at the time?

6          MR. MORRIS:  Good morning, Your Honor.  Thank you

7     very much for hearing us yesterday.  It's kind of a big day in

8     the case.  We have a milestone that we hope will greatly

9     advance the prosecution of this case, and, frankly, what

10    remains to be done to complete the wind-up of Highland.

11         There are two motions before the Court.  The first is the

12    motion to extend the Trusts.  That was filed at Docket No.

13    4213.  We're going to address that one first, Your Honor,

14    because we have a resolution and a stipulation.  There's only

15    one objecting party.  That was the Dugaboy Investment Trust.

16    And early this morning we reached an agreement whereby Dugaboy

17    is going to withdraw its objection, with prejudice, subject to

18    a stipulation that we will file with the Court but that

19    contains the following terms.

20         THE COURT:  Okay.

21         MR. MORRIS:  Number one, Dugaboy agrees to withdraw

22    its objection to the motion, with prejudice.

23         Number two, the Trusts expect to dissolve by August 11th,

24    2026, so that no further extension of the duration of the

25    Trusts will be necessary.

1          THE COURT:  Okay.

2          MR. MORRIS:  And number three, Dugaboy hereby

3    preserves and does not waive its right, if any, to object to

4    any further attempts to extend the date by which the Trusts

5    must be dissolved or to extend the duration of the Trusts.

6          THE COURT:  Wait.  I don't understand that third one.

7    Could you repeat it?

8          MR. MORRIS:  It's a reservation of rights.

9          THE COURT:  Okay.

10          MR. MORRIS:  And so Dugaboy preserves and does not

11    waive its right, if any, to object --

12          THE COURT:  Well, okay.  I'm sorry.  Maybe I zoned

13    out or heard something different.

14          MR. MORRIS:  Uh-huh.

15          THE COURT:  I thought number two of the agreement was

16    August 11th, 2026 would be it; there would be no further

17    extensions.

18          MR. MORRIS:  It's a statement of expectation.  It's

19    not a representation.  It's not a warranty.  We do not believe

20    today, based on the facts and circumstances that we know of,

21    that a further extension will be necessary, but we're not

22    waiving the right to seek it if circumstances change or

23    something unforeseen happens.  And all Dugaboy is saying is

24    that, okay, we reserve the right, if any, to object.

25          THE COURT:  Okay.

1          MR. MORRIS:  It's that simple.

2          THE COURT:  Okay.  It's sort of confusing, right?

3          MR. MORRIS:  Yeah.

4          THE COURT:  Okay.

5          MR. MORRIS:  Perhaps.  If you have any questions, let

6    me try and clarify.

7          THE COURT:  Well, I guess I'll just start with Ms.

8    Deitsch-Perez.  Would you come to the podium?  We've got I

9    don't know who on the camera, but we want to make sure

10   everyone hears.

11         MS. DEITSCH-PEREZ:  Okay.  I'll take a stab at --

12         THE COURT:  Do you confirm what you heard and do you

13   have any clarification of Points 2 and 3?

14         MS. DEITSCH-PEREZ:  Maybe I can make it clear.  I

15   confirm that is the stipulation that we agreed upon, and I

16   think all that was intended is the Trusts and the Debtor are

17   saying they expect to be done by August 11, 2026, so that they

18   will not need to make this motion again, but they could not

19   and would not promise that they will be done by then.  So

20   Dugaboy is withdrawing the objection to this particular

21   extension but is not waiving the right to object to a further

22   request for an extension.  And that's the sum of it.  Does

23   that make sense to Your Honor?

24         THE COURT:  It does.

25         MS. DEITSCH-PEREZ:  Okay.

1          THE COURT:  I'm hoping it'll be over by August 11th,

2     2026, and we'll see where we are at that time.

3          Well, one of my reasons for a slight bit of confusion is,

4     in reading the 9019 settlement that is before the Court, I saw

5     that there were some future installments payments, if you

6     will, to HMIT, I think up through 2029, maybe.

7          MR. MORRIS:  Sure.

8          THE COURT:  So I was --

9          MR. MORRIS:  So let me clarify.

10          THE COURT:  Okay.

11          MR. MORRIS:  The only thing that we said that we

12     expect to happen as of, you know, by August 11th, 2026 is that

13     the Trusts will be dissolved.  But that is not the end of

14     their life.  It is a process.  Once you file for dissolution,

15     then you have to complete the wind-down.  And completing the

16     wind-down will require the completion of all litigation.  It

17     will -- right?

18          All we're talking about is dissolving the Highland

19     Claimant Trust and the Highland Litigation Subtrust so that

20     what remains after that is the Indemnity Trust.  And the

21     Indemnity Trust will be fully funded and will be prepared to

22     go forward.  And if we ever get to a point when there's no

23     further litigation, the corpus of that will be distributed to

24     whatever stakeholders are entitled to it at that time.

25          But when we talk about being done by next year, it doesn't

1   mean the case will be over.  It simply means that the Claimant

2   Trust and the Highland Litigation Subtrust will be dissolved.

3   But they still have to complete the wind-up.

4          THE COURT:  Okay.  Gotcha.

5          MS. DEITSCH-PEREZ:  And Dugaboy is reserving its

6   rights to object to -- if something is happening that seems

7   improper or untoward or they're seeking additional relief,

8   obviously, we're not waiving the unknown now.

9          THE COURT:  Okay.  Gotcha.  All right.  Well, I

10  appreciate the resolution of these issues.  I assume no other

11  party in interest is going to weigh in since we only had a

12  Dugaboy objection.

13         MR. MORRIS:  That was the only objection we had.  I'm

14  prepared to, if Your Honor thinks it's necessary or

15  appropriate, or both, to make a very short proffer.  A

16  proffer.

17         THE COURT:  Okay.  I'll accept that proffer at this

18  time.

19         MR. MORRIS:  Okay.  So, Your Honor, we filed on the

20  docket at No. 4253 Exhibits 1 through 65, and we supplemented

21  our exhibit list at Docket No. 4271 with two additional

22  documents, which are Exhibits 66 and 67.  We don't believe

23  there's any objection to any of those documents, and we would

24  respectfully move for their admission into evidence.

25         THE COURT:  All right.  Could you repeat the numbers

1   once again?

2           MR. MORRIS:  Yes, Your Honor.  So, for the motion for

3   an order further extending the duration of the Trusts, we have

4   two docket entries that contain Highland's exhibits.  The

5   first is Docket No. 4253, and that has Exhibits 1 through 65.

6           THE COURT:  Okay.

7           MR. MORRIS:  And then we supplemented at 4271 with

8   Docket -- with Exhibit Numbers 66 and 67.

9           THE COURT:  All right.  I presume there's no

10  objection to these exhibits.

11      All right.  They are admitted.

12      (Claimant Trust's Exhibits 1 through 67 are admitted into

13  evidence.)

14          JAMES P. SEERY, JR., PROFFER OF TESTIMONY

15          MR. MORRIS:  Okay.  So, Your Honor, if called to

16  testify, James P. Seery, Jr., the Claimant Trustee of the

17  Highland Claimant Trust, would testify as follows.

18      At Exhibits 63 and 64, Highland filed excerpts of the

19  Litigation Trust and the Litigation Subtrust -- the Claimant

20  Trust and the Litigation Subtrust, and each of those excerpts

21  contain Section 9.1, respectively.  That's the section of the

22  Trusts that deal with the extensions that may be necessary

23  from to the original three-year term.  And Mr. Seery would

24  testify that he's familiar with those provisions and that he

25  understands the requirements of those provisions include,

Seery - Proffer                              12

1  among other things, the requirement that all objections to

2  claims and equity interests have been resolved and that all

3  assets that the Trustee believes might yield sufficient value

4  to the estate have been sold.

5      Mr. Seery would also testify that the Highland estate has

6  a number of assets in its possession today, certain of which

7  will be conveyed to Hunter Mountain if the 9019 motion is

8  approved.

9      Among those assets, Mr. Seery would testify that, in

10 accordance with the proposed settlement agreement, which is at

11 Exhibit 17, in Paragraph 5(b), the Court will see reference to

12 what's known as the Dugaboy Note.  The Dugaboy Note is an

13 asset of the estate that will go to Hunter Mountain if the

14 9019 motion is approved.  If it's not approved, then Mr. Seery

15 would testify that he's got to find another way to dispose of

16 it.  But it is an asset with a face amount today of about $17

17 million, so it has substantial value.

18     There is a note from Hunter Mountain.  That also will be

19 disposed of as set forth in Paragraph 4(a) of the proposed

20 settlement agreement.  That note is going to be used to reduce

21 the allowed amount of Hunter Mountain's Class 10 claim if the

22 settlement is approved.  But that note is also an asset of the

23 estate.  It's worth over $60 million.  I believe it actually

24 might be in the fifties.  But somewhere in the $50 to $60

25 million range.  And that's an asset that needs to be disposed

Seery - Proffer                          13

1    of.

2        The estate has a contingent right to receive certain funds

3    under its settlement with Mr. Okada, and it has the Kirschner

4    Litigation.  All of these assets will be disposed of.  They're

5    very illiquid assets, I'd call them, and it would be very

6    helpful to the estate in moving this case forward if the 9019

7    motion is approved.

8        There are other assets that the estate has that will not

9    be monetized by August 11th and which therefore require the

10   extension of the Trusts.  Mr. Seery would testify, if called

11   to the stand, that the pursuit of the sale of these assets

12   will yield proceeds that justified the continued pursuit of

13   their monetization.  They include interests in Highland CLO

14   Funding, Ltd.  Documents pertaining to that can be found at

15   Exhibits 21 and 25.

16       The Claimant Trust also owns shares in Highland Capital

17   Management Korea, Ltd.  Documents relating to that asset can

18   be found at Exhibits 18 through 20.  That's an asset that, if

19   Mr. Seery were to testify, he would say that he has been

20   actively engaged in trying to liquidate that asset, but it's

21   not going to be completed by August 11th.

22       There's also a note that is due from Highland Capital

23   Management Korea, Ltd.  That can be found at Exhibit 67.

24   That's another asset that Mr. Seery has concluded and would

25   testify to that he thinks is valuable for the estate but will

Seery - Proffer                            14

1    not be monetized by the end of this extension period.

2         And then there's the bad faith award that the estate

3    obtained against HCRE, which remains on appeal.  The appeal of

4    that order can be found at Exhibit 15.  And there's no further

5    cost, really, to waiting for the Court's decision, but that is

6    an asset of the estate that remains to be monetized.

7         So there's two buckets of assets, one of which, hopefully,

8    if the 9019 motion is approved, will go to HMIT and that will

9    be helpful.  But there's another bucket of assets that are not

10   implicated by the HMIT settlement that will not be monetized

11   before August 11th that Mr. Seery would testify we need a

12   little bit more time and that's why we're going to extend the

13   Trusts.

14        Mr. Seery would also testify, finally, that there are

15   claims and equity interests that remain unresolved.  They

16   include Mr. Daugherty's Class 8 claim.  As Your Honor is

17   probably aware at this point, Highland has objected to that

18   claim.  It seeks to disallow, subordinate, that particular

19   claim.  Otherwise, have it monetized for purposes of winding

20   up the estate.

21        Mr. Daugherty has moved to dismiss that complaint.  That's

22   his right.  But our scheduling order already takes us past

23   August 11th.

24        And then, finally, we've got Dugaboy's Class 11 interest,

25   which has not yet been allowed.  If the 9019 motion is

Seery - Proffer                    15

1  approved today, we do expect to move quickly to get to that

2  point so that we can finish that up.  But we don't foresee

3  that being completed before August 11th, either.

4      So, in sum, Mr. Seery would testify that, from his

5  perspective, the estate still has assets that are valuable to

6  the estate that will not be monetized by August 11th, and

7  there are still one claim and one equity interest that need to

8  be resolved in order to satisfy the test, you know, to get to

9  the dissolution.

10     So that would be the sum total of his testimony.  That's

11  the completion of the proffer.  And unless Your Honor has any

12  objections, we're prepared to move to the next motion.

13          THE COURT:  I have a couple of questions.

14          MR. MORRIS:  Sure.

15          THE COURT:  But first I'm going to go ahead and swear

16  in Mr. Seery --

17          MR. MORRIS:  Great.

18          THE COURT:  -- to affirm this, as well as swear him

19  in for what I'm sure will be future testimony today.

20          MR. MORRIS:  Sure.

21          MR. SEERY:  Would you like me to come --

22          THE COURT:  Well, you can just stand in place.  Just

23  make sure we hear you.

24      (The witness is sworn as to both his proffer and future

25  testimony.)

1            THE COURT:  Okay.  Thank you.

2       All right.  My question is probably for you.

3            THE WITNESS:  Uh-huh.

4            THE COURT:  Just confirm my understanding.  We have

5  one claim and one --

6            MR. MORRIS:  Equity interest.

7            THE COURT:  -- equity interest to resolve?  Mr.

8  Daugherty's Class 8 claim and the Dugaboy what would be Class

9  11 interest?

10            MR. MORRIS:  That is correct.

11            THE COURT:  Did I hear that correctly, Mr. Seery?

12            THE WITNESS:  That's correct, Your Honor.

13            THE COURT:  Okay.  Thank you.

14       And then my other question is, once again, a

15  clarification.  I pulled out of your attachments to your

16  motion to extend the Exhibit B, Unresolved Pending Litigation.

17            MR. MORRIS:  Uh-huh.

18            THE COURT:  And at the time this was filed, May 8th,

19  2025, it showed nine pending matters at all court levels.  And

20  I think two of them now are finished.  I'm sorry.  This is a

21  long question.  But maybe I'm wrong.  The first two matters,

22  the recusal matter that was at the Fifth Circuit, as well as

23  the gatekeeper appeal, which I know a motion to stay the

24  mandate was at the Supreme Court, both of those are finished

25  now?  Done?

1          MR. MORRIS:  Yes, Your Honor.

2          THE COURT:  Okay.  So the nine pending matters is now

3  down to seven.  And if the Court were to approve the 9019

4  today, I understand that, well, it looks like, at a minimum,

5  two more would go away?

6          MR. MORRIS:  Precisely.

7          THE COURT:  We have an appeal at the District Court,

8  what we call the Claims Trading Appeal, where Highland had

9  sued -- I'm sorry, Hunter Mountain had sued Highland and

10  others regarding the claims trading issue, I'll call it.  So

11  that would go away?

12          MR. MORRIS:  Yes, Your Honor.

13          THE COURT:  And then let me see what else.  I've

14  marked all over my chart.

15          MR. MORRIS:  And then I believe Hunter Mountain's

16  motion for leave to file a complaint in the Delaware Chancery

17  Court --

18          THE COURT:  Ah.

19          MR. MORRIS:  -- to remove Mr. Seery will also be

20  dismissed with prejudice --

21          THE COURT:  Okay.

22          MR. MORRIS:  -- if the 9019 motion is approved.

23          THE COURT:  Okay.  So, that, yes, Hunter Mountain v.

24  Seery, the Court issued a stay on that being able to go

25  forward in Delaware.

1          MR. MORRIS:  Precisely.

2          THE COURT:  So that would go away.

3      So, of the nine matters listed, we're down to five.  But

4  I'll hear, I guess, about this later with Mr. Seery, the big

5  what I would call Kirschner adversary against lots of

6  defendants which has been abated for a long, long time now.

7  Hunter Mountain would basically receive that lawsuit with

8  those claims?  The claims against it go away?  And I don't

9  know what we'll hear, I don't know what Hunter Mountain will

10 do with that big adversary, but maybe it doesn't know yet.  I

11 don't know.

12         MR. MORRIS:  Yeah.

13         THE COURT:  So, --

14         MR. MORRIS:  Not a question we've concerned ourselves

15 with, Your Honor.

16         THE COURT:  Okay.  So that, again, I'm kind of

17 recapping everything.

18     (Counsel confer.)

19         MR. MORRIS:  Go ahead, Your Honor.

20         THE COURT:  So, again, I'm looking at the chart.  If

21 anyone wants to know what I'm looking at, it's at Docket No.

22 4213-2, filed May 8th.  We're down to the HCRE --

23         MR. MORRIS:  Appeal.

24         THE COURT:  -- appeal.

25         MR. MORRIS:  Uh-huh.  Which is fully briefed and

1    we're just waiting for a decision.

2            THE COURT:  Okay.  So that bad faith decision may or

3    may not stick, but it's hanging there on appeal.

4            MR. MORRIS:  Uh-huh.

5            THE COURT:  We're down to a Dugaboy -- what we called

6    the Imaging Motion.  Or no?

7            MR. MORRIS:  Correct.  I guess that's been stayed,

8    but that's out there.

9            THE COURT:  We have the valuation motion of Dugaboy,

10   but I don't know, is it going to be moot after today?  I don't

11   know what I'm going to hear today as far as the evidence.

12           MR. MORRIS:  So, that has -- great question -- two

13   plaintiffs in that lawsuit, HMIT and Dugaboy.

14           THE COURT:  Oh, that's right.  So --

15           MR. MORRIS:  HMIT is going to dismiss it with

16   prejudice.  Dugaboy will still have an active complaint.

17           THE COURT:  Appeal.

18           MR. MORRIS:  My hope is that --

19           THE COURT:  It's an appeal of --

20           MR. MORRIS:  Yes.

21           THE COURT:  Okay.

22           MR. MORRIS:  My hope is that, because we produced so

23   much valuation information to HMIT, which we then had to make

24   available to Dugaboy because that's the way discovery works,

25   that they'll withdraw that complaint.

1              THE COURT:  Okay.

2              MR. MORRIS:  I'm going to make that plea right on the

3    record here, because they've now gotten everything they've

4    asked for.  But that's their decision to make, and it's out

5    there.  But HMIT is withdrawing itself as a party to that

6    lawsuit, but it does remain in Dugaboy's lap.

7              THE COURT:  Okay.  So those potentially three things?

8              MR. MORRIS:  Yeah.

9              THE COURT:  Plus the Daugherty matter?

10             MR. MORRIS:  Yeah.

11             THE COURT:  Okay.  Mr. Seery, did I miss something?

12             THE WITNESS:  One clarification, Your Honor.  My

13   apologies.  One clarification.  In the Class 11 subordinated

14   interests, there's a Dugaboy capital account of $740,000.

15   There's also the Strand capital account -- both of these are

16   controlled by Mr. Dondero -- of $994,000.  And then Mr. Okada

17   and his affiliates have a combined capital account of

18   $248,000.  So we'll -- I said just Dugaboy, but it's actually

19   Dugaboy, Strand, and then Okada and two family trusts of his.

20             THE COURT:  Okay.

21             MR. MORRIS:  And if the 9019 motion is granted, --

22             THE WITNESS:  It's in the footnote.  It's in the

23   footnote in the motion.

24             THE COURT:  Yes.  I actually had that in my notes.

25             MR. MORRIS:  Yeah.

1           THE COURT:  So I glossed over Class 11 just being

2    Dugaboy.  There are Strand and Okada.

3       All right.  So I appreciate that clarification.  We're

4    down hopefully to very little litigation.  But we have no

5    control over higher courts, when they have time to look at it.

6           MR. MORRIS:  Or future litigation, now that the

7    gatekeeper has been curtailed.

8           THE COURT:  Okay.  All right.

9       Anyone wish to say anything about this motion to extend?

10      All right.  Well, based on the pleadings, the argument,

11   the evidence, I do think it is necessary and appropriate and

12   reasonable to extend the duration of the Highland Trusts

13   through August 11th, 2026.  The relief is something that is

14   contemplated as a possibility under the trust documents.

15   Moreover, I think the Court has some authority under

16   Bankruptcy Rule 9006(b) and Bankruptcy Code Section 105 to

17   grant this relief.

18      The evidence shows there are unliquidated assets and some

19   unfinished litigation that must be resolved before the Trust

20   is in a position to wind down.  So, again, I think it's

21   necessary, prudent, and in the best interest.  The motion is

22   granted, and the Court duly acknowledges the comments with

23   regard to the stipulation of Dugaboy and the estate.  All

24   right.

25          MR. MORRIS:  Thank you very much.  So, may I move to

1   the 9019 motion?

2              THE COURT:  You may.

3              MR. MORRIS:  Okay.  With respect to the 9019 motion,

4   there were originally three Objecting Parties:  the Dugaboy

5   Investment Trust, Patrick Daugherty, and The Dallas Foundation

6   and an entity called Crown Global.

7        I'm pleased to report, and I think Your Honor may already

8   be aware, that a settlement has been reached to dispose of The

9   Dallas Foundation and the Crown Global objection.  There is a

10  written agreement to that effect that effectuates that.  And

11  I'd like to just turn the podium over to Mr. Phillips.  Louis

12  Phillips represents the HMIT Entities.  I know Mr. Curry is

13  here on behalf of the objecting parties, The Dallas

14  Foundation, but I think -- I think I'll let Mr. Phillips

15  address, you know, the specific terms of the resolution of

16  that objection.

17             THE COURT:  All right.  Thank you.  And I will say

18  that my staff reached out yesterday to -- I don't know if it

19  was Mr. Curry or someone in your office -- wanting to know

20  have you delivered exhibit notebooks.  And it was at that

21  point my staff heard, well, we've resolved.

22             MR. CURRY:  We had just finished.

23             THE COURT:  Okay.  All right.  So I'm happy to hear

24  what the resolution is.

25             MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

1    Phillips on behalf of the Hunter Mountain Investment Trust and

2    the named parties therein.

3        We had a written stipulation that has been signed by my

4    firm, by Mr. Curry's firm, by the Pachulski firm, and by the

5    Quinn Emanuel firm that is to be submitted to the -- is to be

6    filed on the record.  It also contains a reference to a

7    settlement agreement that will be attached.  But we will read

8    the stipulation into the record, if Your Honor would allow me

9    to.

10            THE COURT:  All right.  You may.

11            MR. PHILLIPS:  And Mr. Curry is here, and he can tell

12    me whether or not I have read correctly, but I think I have

13    it.

14            THE COURT:  Okay.  All right.

15            MR. PHILLIPS:  (reading)  Now, wherefore, it is

16    jointly -- hereby jointly stipulated and agreed as follows.

17    The Foundation Parties -- Mr. Curry's clients -- withdraw The

18    Foundation Objection, which is a defined term in the

19    stipulation, with prejudice, in accordance with the terms of

20    the term sheet annexed hereto as Attachment 1.  And Attachment

21    1 will be attached to the stipulation.

22        Paragraph 2.  The Foundation Parties, the HMIT Entities --

23    that's Hunter Mountain Entities and the Movants; that is, Mr.

24    Morris' client and Quinn Emanuel on behalf of the Litigation

25    Subtrust -- agree that the following language shall be

1    contained in the proposed order on the 9019 motion.  And

2    that's clearly the proposed order.  This is not dependent upon

3    the motion being granted.  Notwithstanding anything in the

4    settlement agreement or the 9019 order to the contrary, none

5    of The Dallas Foundation, EDF, Okada Family, or Crown (The

6    Foundation Parties) are or will be included in the definition

7    of HMIT Releasors or Highland Releasors.  For the avoidance of

8    doubt, however, any attempt by The Foundation Parties to

9    assert a claim against an HMIT released party by, through, or

10   under, including derivatively a Highland entity, or against a

11   Highland released party by, through, or under, including

12   derivatively an HMIT entity, is barred by this order and the

13   settlement agreement.

14       That is the sum and substance of the stipulation.  The

15   settlement agreement we don't think needs to be read to the

16   Court because it's a signed settlement agreement that will be

17   attached as Attachment 1 to the stipulation.  And I believe I

18   read it correctly.

19            THE COURT:  Mr. Curry, did he read it correctly?

20            MR. CURRY:  Mr. Phillips did read it correctly, Your

21   Honor.  And thank you.

22       And we want to thank Trustee's counsel and Mr. Phillips

23   for working with us to address some very real concerns.  And

24   through the stipulation, we still have some work to do, but we

25   have the time to do it, and maybe move it to where we can

1    actually get it resolved.

2            THE COURT:  Okay.  Well, there are some things I am

3    concerned -- well, I should say, all I really feel the need to

4    go into is you're releasing your objection, your clients are,

5    and all of the parties here, parties to the proposed

6    settlement and the estates, the Debtors, Hunter Mountain, are

7    agreeing that your clients are not releasors under the 9019

8    settlement if the Court approves it.

9            MR. CURRY:  Correct, Your Honor.  Unless and except

10   our clients were to attempt to assert a released claim against

11   a released party, and that's what the "provided, however" was

12   to clarify.

13           MR. PHILLIPS:  And this doesn't affect the estate at

14   all.  It basically affects the HMI -- the Hunter Mountain

15   entities.  But the language that we have read in the

16   stipulation has been agreed to and is contained within the

17   order that will be proposed.

18           THE COURT:  Okay.  You said it better than I said it.

19   The estate is releasing claims --

20           MR. PHILLIPS:  I can't believe that, Your Honor, but

21   thank you.

22           THE COURT:  Well, the estate is releasing claims that

23   it has --

24           MR. PHILLIPS:  Correct.

25           THE COURT:  -- or in Trusts have -- I shouldn't have

1  said the estate.  It's the Trust entities and what's left of

2  the Reorganized Debtors are releasing any claims they have

3  against Hunter Mountain in the proposed settlement --

4          MR. PHILIPS:  Yes.

5          THE COURT:  -- if it's approved.  But any direct

6  claims of your clients are not --

7          MR. CURRY:  Well, direct claims that our client has

8  or derivative claims, for example, against Hunter Mountain

9  that are derivative through Hunter Mountain.

10         THE COURT:  Okay.  All right.

11         MR. PHILLIPS:  Yeah.

12         MR. CURRY:  Yeah.  That was the -- what we were

13  trying to make sure.

14         THE COURT:  Yes.  All right.  Well, and when I said

15  this is all I care about, what I mean is I don't even know who

16  the heck Crown Insurance is.

17         MR. PHILLIPS:  Correct.

18         THE COURT:  There was a very interesting party in

19  interest objection asserted by the Debtor.  And I've learned a

20  lot about a lot of entities during all these years, but that

21  was a new one on me.  I understood that it's somewhere in the

22  framework of the --

23         MR. PHILLIPS:  Yes, Your Honor.

24         THE COURT:  -- Charitable DAF.

25         MR. PHILLIPS:  Let's say it's somewhere in the

1   universe, Your Honor.

2          THE COURT:  The universe?  Okay.

3          MR. PHILLIPS:  The universe.  Not necessarily the

4   Charitable DAF or Hunter Mountain.

5          THE COURT:  Okay.

6          MR. PHILLIPS:  But in the universe.

7          THE COURT:  Well, but the point is, we've announced

8   anything relevant to --

9          MR. PHILLIPS:  Correct.

10          THE COURT:  -- the Reorganized Debtor, --

11          MR. PHILLIPS:  Correct.

12          THE COURT:  -- Claimant Trust, Subtrust.

13          MR. PHILLIPS:  And the motion -- and the objections

14   of all these entities are withdrawn with prejudice.

15          THE COURT:  All right.

16          MR. CURRY:  And Your Honor, the one thing that I will

17   note, part of our agreement, and it's in the signed term sheet

18   that you'll see, is that we've agreed that if there's a

19   dispute over the settlement to withdraw our objection, this

20   Court will have at least concurrent jurisdiction to resolve

21   that dispute, because it is a settlement to resolve an

22   objection to a core proceeding.

23          THE COURT:  Okay.  Thank you.

24          MR. PHILLIPS:  And we have agreed and we do agree

25   that the Court has jurisdiction.  It has jurisdiction.

1            THE COURT:  Okay.  For what that is worth.

2            MR. PHILLIPS:  Well, that's what we can agree to.

3            THE COURT:  All right.  I appreciate that.

4        Anyone wish to say anything about what's been announced?

5        All right.  Well, I accept this resolution and withdrawal

6   of --

7            MR. PHILLIPS:  Okay.  We will be filing --

8            THE COURT:  -- the objection.

9            MR. PHILLIPS:  We will be filing, at the close of

10  this hearing, this stipulation, and we will be clicking

11  whatever ECF box request that the Court so ordered on the

12  stipulation.

13           THE COURT:  Okay.  We will be on the lookout for

14  that.

15       All right.  Well, Mr. Lang, you stood up on behalf of

16  Dugaboy.

17           MR. LANG:  I just want to make the Court aware of a

18  letter that was sent last night that involves this from the

19  Caymans, from Grant Thornton.

20           MR. PHILLIPS:  We object.

21           MR. LANG:  I just want to make the Court -- they were

22  asking for a 45-day that the Joint Liquidators --

23           MR. PHILLIPS:  We object to this, Your Honor.  That's

24  not a part of the record.  This is a person from outer space.

25  Not outer space, but the Cayman Islands.  And it's a letter

1    that we --

2             THE COURT:  Coming from someone --

3             MR. PHILLIPS:  It looks like a letter --

4             THE COURT:  -- who is called Yosemite Sam, I

5    understand, outside of court.

6             MR. PHILLIPS:  Yeah.  Yeah.  I didn't want to bring

7    that up, but Mr. Morris --

8             THE COURT:  Okay.  Well, it's stuck in my brain

9    forever now.

10            MR. PHILLIPS: -- says it's his favorite cartoon

11   character, so it must be okay.

12            THE COURT:  Okay.  Well, okay, I don't want to make

13   light.  I think this goes back to what I was saying about

14   there are certain things I care about and certain things I

15   don't care about.  And I read from the pleadings, I haven't

16   heard evidence but I've read from the pleadings that there is

17   a lot going on in the Cayman Islands with regard to what I

18   call the Charitable DAF structure or Hunter Mountain.

19            MR. LANG:  Yes.

20            THE COURT:  Parties in that universe.  And I don't

21   plan to exercise any control or jurisdiction over that, so I'm

22   hesitant to hear what it is you want to present.  I don't

23   know, maybe on cross-examination of Mark Patrick today it may

24   or may not be relevant.  But what is it --

25            MR. LANG:  All they ask for is a 45-day basically

1    abeyance or continuance of the decision on the 9019, to allow

2    them to investigate and weigh in on it.

3              MR. PHILLIPS:  Your Honor?

4              MR. LANG:  They're Joint Liquidators.  That's -- I'm

5    just making the Court aware of the request.

6              THE COURT:  Okay.  Well, they're not here to

7    articulate that.  So I respect your wanting to be transparent

8    and whatnot, but I'm not going to let it stop me from going

9    forward today.  Okay.

10              MR. LANG:  Thank you.

11              THE COURT:  Thank you.

12              MR. PHILLIPS:  Your Honor, if I may be excused,

13    that's our position with respect to the withdrawal.  We

14    appreciate Your Honor's attention.  Thank you.

15              THE COURT:  Okay.  Thank you.

16              MR. CURRY:  Thank you, Your Honor.

17              THE COURT:  Anyone else wish to weigh in?

18        All right.  Well, I do, as I was saying, accept the

19    withdrawal of The Dallas Foundation and related entities'

20    objection to the 9019 settlement.

21        So does that leave only the Daugherty objection to the

22    settlement?  Well, and the Dugaboy.

23              MR. MORRIS:  And the Dugaboy, yes.

24              THE COURT:  And Dugaboy, of course.

25              MR. MORRIS:  That's right.

1          THE COURT:  Okay.

2          MR. MORRIS:  So, --

3          THE COURT:  So how did you want to proceed?

4          MR. MORRIS:  So, the way I propose to proceed, Your

5    Honor, I have an opening statement to make --

6          THE COURT:  Okay.

7          MR. MORRIS:  -- with a PowerPoint presentation to

8    present.  I would propose that, as the Movant, I go first.

9    Then we can hear from Dugaboy, we can hear from Mr. Daugherty,

10   and then we can put Mr. Seery on the stand.

11       Assuming that there is no challenge to Mark Patrick's

12   authority to enter into the settlement agreement on behalf of

13   all of the HMIT entities, I would not plan on calling either

14   Mr. Dondero or Ms. Deitsch-Perez, who are under subpoena here,

15   because the challenge to authority was really coming from The

16   Dallas Foundation.  Their objection has now been withdrawn.

17   So as long as Mr. Daugherty -- well, really, as long as

18   Dugaboy doesn't challenge Mr. Patrick's authority to enter

19   into the settlement agreement on behalf of the HMIT entities,

20   I think we'll just put on the one witness and be done.

21         THE COURT:  All right.  Just so we know what lies

22   ahead, --

23         MR. MORRIS:  Uh-huh.

24         THE COURT:  -- I don't think that Dugaboy objected to

25   Mr. Patrick's authority.  I do recall it was just The

1  Foundation.

2          MR. LANG:  There was no objection on the -- there was

3  no objection.

4          THE COURT:  Okay.  And same with Mr. Daugherty?  No

5  objection about the authority of Mark Patrick to enter into

6  the settlement?

7          MR. YORK:  There was no objection.

8          THE COURT:  All right.

9          MR. MORRIS:  All right.  May I proceed?

10          THE COURT:  You may proceed.

11          MR. MORRIS:  Okay.  So, may I approach, Your Honor?

12  I've got a --

13          THE COURT:  You may.  Is this a PowerPoint?  And

14  everyone else has it, correct?

15      (Pause.)

16          THE COURT:  You may proceed.

17          MR. MORRIS:  Thank you, Your Honor.  John Morris;

18  Pachulski Stang Ziehl & Jones; for Highland Capital

19  Management, LP and the Highland Claimant Trust.

20      Before I begin, Your Honor, I'd like to move my exhibits

21  into evidence because I will be referring to them in my

22  opening.

23          THE COURT:  All right.  So I think I said on Monday

24  the first thing I was going to ask, and I've already blown

25  that, was did you all have good faith discussions regarding

1  admission of each other's exhibits?  And I did see Mr. Lang

2  filed a day or two ago his list of objections.  It looked like

3  you were like you were down to about nine or eleven exhibits

4  you were objecting to.

5      (Counsel confer.)

6          THE COURT:  Out of 123 designations, which I think

7  probably grew overnight to --

8          MR. MORRIS:  Oh, okay.  Well, --

9          MR. LANG:  I just have to make clear for the record.

10         MR. MORRIS:  You go ahead and do that.

11         MR. LANG:  Your Honor, I've been told that Dugaboy

12  does challenge the authority.  It is not in our objection.

13         MR. PHILLIPS:  It's not in his --

14         THE COURT:  Well, can I ask why it was not in your

15  objection?

16         MR. LANG:  I do not know.  I was not counsel of

17  record when the objection was filed.  I do not know what was

18  known or not known at that time.

19         THE COURT:  So, --

20         MR. LANG:  So I guess we just seek leave to --

21         THE COURT:  -- if you did not have him on -- was Mark

22  Patrick on your exhibit list?  I don't think he was, right?

23         MR. LANG:  He was not.

24         THE COURT:  Okay.  So how would you address that?

25  Again, we've had, I know, some back and forth over who was

1    going to represent Dugaboy on this matter.

2              MR. LANG:  Yes.

3              THE COURT:  I remember the substitutions and whatnot.

4    But --

5              MR. LANG:  We found out late last night that The

6    Foundation was resolving their issue, and that kind of left us

7    in a position.

8              THE COURT:  So what are you saying?  You all were

9    relying on --

10             MR. LANG:  Well, the issue had --

11             THE COURT:  -- The Foundation to carry the flag on

12   this one?

13             MR. LANG:  They had raised the issue.  They were

14   pursuing the issue.  We went through discovery and they were

15   pursuing it.  It was already in front of the Court.

16             THE COURT:  All right.  What would you like to say,

17   Mr. Morris?

18             MR. MORRIS:  Your Honor, this is more than

19   disappointing.  The fact of the matter is Mr. Dondero is

20   funding both the Cayman Islands litigation as well as The

21   Dallas Foundation's prosecution of the objection.  The fact

22   that The Dallas Foundation settled doesn't open the door to

23   Mr. Dondero to assert objections that he's never asserted

24   before.

25        I will tell you what will happen.  If Your Honor allows

1    this, I will have to call Mr. Dondero and Ms. Deitsch-Perez to

2    the stand to offer evidence under subpoena that they

3    personally acknowledge and understand, because Mr. Dondero's

4    signature is on documents that were signed in the year 2025,

5    that Mr. Patrick is authorized to represent HMIT.  I really

6    didn't want to do that.  But if they want to pursue it, I'll

7    have to do my job.

8          THE COURT:  All right.

9          MR. LANG:  And I want to clarify one thing.

10         THE COURT:  Uh-huh.

11         MR. LANG:  And it goes back to something we already

12   discussed, which is the authority issue is derived from the

13   Cayman Island Joint Liquidators' appointment on May 6th, 2020.

14   And so how that changes the authority, it's -- I think the

15   issue is does he have authority, like Mr. Morris --

16         THE COURT:  All right.  Well, before I comment, Mr.

17   Phillips, it's your client representative that we're talking

18   about here.  What do you say?

19         MR. PHILLIPS:  Very disappointing, but -- and further

20   revealing the limits of my imagination.  There is no objection

21   to authority.  There's no evidence of record of objection to

22   authority.  There's no evidence even in The Dallas

23   Foundation's papers about authority.  Dugaboy did not raise

24   objections to authority.  Daugherty did not raise objections

25   to authority.  And Mr. Morris was willing to release Ms.

1    Deitsch-Perez and Mr. Dondero from subpoena in connection with

2    an order that this Court entered that Hunter Mountain objected

3    to.  And outside the Court, the evidence will establish, the

4    evidence submitted by Mr. Morris will establish that Hunter

5    Mountain, through authority of Mr. Patrick, objected to Ms.

6    Deitsch-Perez signing on behalf of Hunter Mountain because she

7    did not seek approval and did not have authorization to sign a

8    stipulation before this Court.

9        Subsequently, after signing the stipulation and entry of

10    the order, we suggested that we would not deal with Ms.

11    Deitsch-Perez, we would only deal with unconflicted counsel,

12    and we dealt with unconflicted counsel to make an agreement

13    with HCLOM and another of Mr. Dondero's entities to avoid

14    filing a motion for reconsideration before this Court based on

15    the fact that, as we have suggested in the motion that we

16    didn't file, Hunter Mountain's approval was not real.

17        So Mr. Morris has these people under subpoena because we

18    signed an agreement that Mr. Dondero signed to avoid the

19    filing of a motion for reconsideration before this Court,

20    recognizing that Mr. Patrick had authority for Hunter Mountain

21    to sign the agreement.  And so that's the purpose of his

22    subpoena.

23        But our position is there's no suggestion in pleadings by

24    Dugaboy or Daugherty that challenge the authority of Mr.

25    Patrick to execute on behalf of any of the Hunter Mountain

1    entities.  And the one party who, without suggesting an

2    evidentiary basis, but that's fine, they say maybe they did

3    have an evidentiary -- we -- and they withdrew their

4    objection.

5              THE COURT:  Okay.  Let me --

6              MR. MORRIS:  Okay.  I'm sorry.  Just really --

7              THE COURT:  Thirty second.

8              MR. MORRIS:  Really quickly.

9              THE COURT:  Uh-huh.

10             MR. MORRIS:  The letter that Mr. Lang just referred

11   to from the Joint Official Liquidators, addressed to us,

12   asking for an extension of time, doesn't even challenge Mr.

13   Patrick's authority to act today on behalf of the HMIT

14   entities to enter into the settlement agreement.  The Joint

15   Official Liquidators wrote to us last night, and they don't

16   say what Mr. Lang is now saying.

17             MR. PHILLIPS:  And the only thing I would say is we

18   got a letter by email from somebody who says, I am who I am.

19   It came through email PDF.  We don't challenge the authority.

20   But we would respectfully request -- we're not there.  We've

21   made no appearance.  We don't challenge the authority.  But

22   please wait -- ask the Court to wait the 45 minutes -- 45 days

23   for us.  We got a letter.  PDF.  We don't know who sent it.

24             THE COURT:  Okay.

25             MR. PHILLIPS:  It wouldn't be admissible even if

1    someone tried to introduce it as evidence.

2         THE COURT:  Okay.  Let me just say a few things here.

3    This has felt like a very strange sideshow, I'm going to say.

4    When I read The Foundation's objection, I was, again,

5    scratching my head, who in the heck is Crown Insurance?  I

6    know who Dallas Foundation is because there have been charts

7    submitted to me in the past, and I know it's part of the I'm

8    going to say Mr. Phillips' client set over the months, the

9    Charitable Foundation structure.  But I'm like, how in the

10    heck do these people have standing?  Okay?  I have to always

11    consider standing.  That's every trial judge's first

12    obligation, does this party have standing?  Not a creditor.

13    Not an equity holder.  But somehow I guess they're going to

14    explain through evidence how they're a person aggrieved by the

15    proposed settlement.

16        So that's why I kind of -- hopefully, it doesn't sound

17    flippant -- thought this sounded like a sideshow, because this

18    is a stranger, really, to weigh in.

19        Okay.  So now I'm hearing that a party in interest, which

20    Dugaboy is -- I guess some might argue that, but I think

21    they're affected by the settlement, so that makes them a party

22    in interest -- you're making the same argument.  And it's

23    because of a rotation of counsel you didn't make it sooner.

24        Okay.  So I'm just trying to be transparent here, tell you

25    what the Court is thinking.  I guess what the Court is

1   thinking is Mark Patrick is the client representative, so I'm

2   told by the Movants on the 9019, and you, Mr. Phillips, he's

3   the party representative for Hunter Mountain.

4          MR. PHILLIPS:  Yes, Your Honor.

5          THE COURT:  I don't, I guess, know what harm there

6   is, except a longer hearing, in, okay, put him on the stand to

7   testify about the bona fides of the settlement.  It's more

8   evidence.  But if you all want to call Mr. Dondero, I'm going

9   to require that.

10         MR. MORRIS:  Your Honor?

11         THE COURT:  I mean, as a counterbalance, since it's

12  appearing from the pleadings to be --

13         MR. MORRIS:  Your Honor, respectfully, Mr. Patrick is

14  not on their witness list.  He's not on our witness list.

15         THE COURT:  Wasn't he on somebody's witness list?

16         MR. MORRIS:  He was on The Dallas Foundation's

17  witness list.

18         THE COURT:  Oh.

19         MR. MORRIS:  He's not on their witness list.  He's

20  not on our witness list.  He should not testify today because

21  they're raising an issue that they didn't raise ever before.

22  This is improper.  They should just be shut down here.

23         THE COURT:  I think probably you should be shut down.

24  But I kind of go back and forth, what's the harm in having the

25  representative, the person I'm told is the representative of

1    Highland?

2              MR. PHILLIPS:  Your Honor?

3              THE COURT:  I could limit it to one hour.  And the

4    flip side is that Dondero himself, as I guess the

5    representative of Dugaboy, would have to also take the stand,

6    limited to one hour.

7              MR. PHILLIPS:  I'd like to make one note, Your Honor,

8    about the documents that Mr. Morris has introduced.  That

9    document list -- and I don't have the numbers in front of me

10   -- but part of the presentation and the reason Mr. Patrick is

11   not on the Movants' motion -- witness and exhibit list, the

12   documents that have been introduced are all of -- include all

13   of the documents evidencing Mr. Patrick's authority as the

14   control person of the entire Hunter Mountain group.

15             THE COURT:  Which they've stipulated.

16             MR. PHILLIPS:  Which they've stipulated to.

17             THE COURT:  Uh-huh.

18             MR. MORRIS:  And to be clear, Your Honor, they can be

19   found at Exhibits 70 through 104.  We've got 34 documents in

20   evidence that establish that Mr. Patrick is authorized to act

21   on behalf of each of the HMIT entities.  All that's going to

22   happen is we're now going to spend time dealing with an issue

23   that you already described as a sideshow, and we're going to

24   do it for a party who didn't put Mr. Patrick on a witness

25   list, who hasn't objected on this basis, and we've got a

1   mountain of evidence that shows that he's completely

2   authorized to do this.  I just --

3           MR. PHILLIPS:  To which there's no objection.

4           MR. MORRIS:  And you can also look, Your Honor, at

5   Exhibit 69.  That's the agreement that Mr. Dondero signed with

6   Mr. Patrick after he got outed for authorizing Ms. Deitsch-

7   Perez to sign a document on behalf of HMIT without Mark

8   Patrick's knowledge or approval.  He signed that.  Six months

9   ago.  And we're going to have a trial here over whether Mark

10  Patrick is authorized to act on behalf of HMIT?

11          A VOICE:  That was long ago.

12          MR. MORRIS:  This is not -- this is not --

13          THE COURT:  We're not going to have a trial.  And I

14  fully acknowledge that I am possibly abusing discretion by

15  allowing this.  We have our rules, and our rules were not

16  complied with, and it does feel a little bit like ambush.

17  Okay?

18      But on the flip side of it, it doesn't seem entirely

19  unreasonable to have the representative, the purported

20  representative of Hunter Mountain, who is the counterparty, if

21  you will, to this very major settlement, take the stand.  And

22  I'll limit it.  And, again, I condition it on Mr. Dondero, the

23  ultimate beneficiary of the Dugaboy Trust, as it's been

24  represented to me in prior filings, --

25          MR. MORRIS:  Correct.

1          THE COURT:  -- he'll have to stay an equal amount of

2     time on the stand.  Okay?

3          MR. MORRIS:  Okay.

4          THE COURT:  Okay.  Hang on.  I've got my smarter

5     staff member handing me a note.  Okay.

6        (Pause.)

7          THE COURT:  Okay.  Well, so that's how we're going to

8     stand.

9        Now, I am going to address Mr. Daugherty here.  We're not

10    going to let Mr. Daugherty cross-examine Patrick.  Clearly,

11    his objection has been around, and he never said anything

12    about --

13         MR. YORK:  Certainly not as to authority.  However,

14    we should be able to examine him as it relates to the portion

15    of the objection that goes to whether the settlement is in the

16    best interest, given the claims that are being -- the

17    Kirschner claims that are being transferred by Highland to the

18    HMIT entities.

19         THE COURT:  All right.  Well, you all are going to

20    have to share your 30 minutes.

21         MR. YORK:  That's fine.

22         THE COURT:  Okay?  We're giving 30 minutes to Debtor

23    entities, Highland entities, and Hunter Mountain entities

24    collectively, and 30 minutes to Dugaboy and Daugherty

25    collectively.  Okay?  So, I'm going to have my law clerk

1    timing you like you're on the clock.

2              MR. MORRIS:  Okay.

3              THE COURT:  Okay?

4              MR. MORRIS:  May I proceed?

5              THE COURT:  You may proceed.

6              MR. MORRIS:  Thank you, Your Honor.  So, appearing at

7    Docket 4255 is the Movants' exhibit list, with Exhibits 1

8    through 123.  At Docket 4277 are Exhibits 124 and 125.  And at

9    Docket 4280, we've got Exhibit 126.

10       The Movants respectfully move into evidence all of those

11   documents, with the exception of Exhibits 124 and 125 on

12   Docket No. 4277.  Those are the transcripts of The Dallas

13   Foundation representatives, and since we have reached an

14   agreement and The Dallas Foundation has withdrawn their

15   objection, we are not going to offer those two transcripts

16   into evidence as part of the record in this matter.

17       But Exhibits 1 through 123, and Exhibit 126, we move into

18   evidence.

19              THE COURT:  All right.  And as I thought we were

20   going to start talking about a moment ago, Mr. Lang objected

21   to 11 of these 123 designations.  Do those still remain?  If

22   they do, we're just going to see if they want to be I think

23   offered --

24              MR. LANG:  No, I think we've --

25              THE COURT:  -- the old-fashioned way, but I think

1    that might be more efficient.  I have, in your objection,

2    which is at Docket 4273, you objected to Numbers 10, 12, 13,

3    57 and 59, and then 64 through 69.  Eleven items.

4         MR. LANG:  Mr. Morris clarified that 12 and 13 are

5    one document.  But I still, I think that, again, for purposes

6    of the authority issue, Exhibit 13 we don't think is relevant.

7         MR. MORRIS:  Exhibit 13, Your Honor.  We'll just take

8    them one at a time.

9         THE COURT:  Yes, go ahead and address it.

10         MR. MORRIS:  Is relevant because it's simply a

11    document that was provided to Highland by Hunter Mountain as

12    part of the negotiations.  And we've been asked to produce all

13    of the documents related to the negotiations.  This is one of

14    the documents that we received.

15         THE COURT:  Okay.  And do I understand 12 and 13 are

16    actually the same thing, or --

17         MR. MORRIS:  Yeah.  Well, 12 is the email, 13 is the

18    attachment.

19         THE COURT:  Okay.  I overrule the relevance

20    objection.  Those will be admitted.

21      (Claimant Trust's Exhibits 12 and 13 are admitted into

22    evidence.)

23         MR. LANG:  57.

24         MR. MORRIS:  57 is also a part of the settlement

25    documents.  It's, I think, an email exchange between Mr. Seery

1      and UBS, which was one of the Class 9 claimants, and we had to

2      obtain their consent and that's part of the process of getting

3      to the settlement agreement.

4              MR. LANG:  I think the objection is it doesn't

5      include the attachment.

6              MR. MORRIS:  It's got all -- it's got numerous

7      attachments on it.

8              MR. LANG:  To 57?

9              MR. MORRIS:  Yeah.

10              MR. LANG:  Mine did not.

11              MR. MORRIS:  Your Honor, we'll withdraw the exhibit.

12              THE COURT:  Okay.

13              MR. MORRIS:  Okay.

14              THE COURT:  59.  Well, you didn't address #10.

15              MR. LANG:  Oh, sorry.

16              THE COURT:  That was the first one.

17              MR. LANG:  Yeah.

18              MR. MORRIS:  We'll withdraw #10.

19              THE COURT:  All right.

20              MR. MORRIS:  Okay.

21              THE COURT:  So, 59?

22              MR. MORRIS:  59?  Your Honor, I'm not surprised they

23      object, because it's at the core of the Court's ability to

24      authorize this settlement.

25              MR. LANG:  We withdrew that.

1          MR. MORRIS:  Oh, you withdrew that?

2          MR. LANG:  Withdrew.

3          MR. MORRIS:  Oh, okay.  They withdrew that.

4          THE COURT:  Okay.  So, 59 will be admitted.

5      (Claimant Trust's Exhibit 59 is admitted into evidence.)

6          MR. MORRIS:  And then I think the last is 64 to 69.

7          THE COURT:  Uh-huh.

8          MR. MORRIS:  We were actually prepared to withdraw

9   those exhibits because we didn't think there was a challenge

10  to authority.  Now that there's a challenge to authority,

11  we're going to offer all of those in because they're highly

12  relevant to the acknowledge of Mr. Patrick's authority.

13         THE COURT:  All right.  And your objection was solely

14  to relevance?

15         MR. LANG:  The objection was relevance because they

16  predate the May 6th issue in the Caymans, which is what caused

17  the entire structure to -- the authority from the top down to

18  be questioned.

19         THE COURT:  All right.  Well, you can cross-examine

20  if you want on those items.

21         MR. LANG:  Okay.

22         THE COURT:  But I find they're relevant so they will

23  be admitted, 64 through 69.

24     (Claimant Trust's Exhibits 64 through 69 are admitted into

25  evidence.)

1      *[Court Edit:  Claimant Trust's Exhibits 1 through 9, 11*

2    *through 56, 58 through 123, and 126 are admitted into*

3    *evidence.]*

4            THE COURT:  All right.  And as far as the exhibits of

5    Dugaboy, I think it was just the plan and settlement agreement

6    were all that had been designated.  Correct?

7            MR. LANG:  Yes.

8            MR. MORRIS:  No objection.

9            THE COURT:  So, no objection.  Those will be

10   admitted.

11      (Dugaboy Investment Trust's exhibits are admitted into

12   evidence.)

13           THE COURT:  And Daugherty's exhibits?

14           MR. YORK:  Yes, Your Honor.  So, Mr. Morris and I

15   conferred yesterday about both sides' exhibits.  And my

16   understanding is we've reached an agreement that both sides'

17   exhibits are not objected to.  And so therefore we'd move to

18   admit Daugherty's as well.

19           THE COURT:  All right.

20           MR. YORK:  1 through 42, I believe, it is.

21           THE COURT:  All right.  So you confirm?

22           MR. MORRIS:  Yes, Your Honor.

23           THE COURT:  All right.  The Court will admit all of

24   Daugherty's 1 through 42, and they appear at Docket Entry

25   4266.

1      (Patrick Daugherty's Exhibits 1 through 42 are admitted

2    into evidence.)

3           THE COURT:  All right.  Opening statements.

4         OPENING STATEMENT ON BEHALF OF THE CLAIMANT TRUST

5           MR. MORRIS:  All right.  Good morning, Your Honor.

6    John Morris; Pachulski Stang Ziehl & Jones; for Highland

7    Capital Management, LP and the Highland Claimant Trust.

8      If we can go to the first slide, Your Honor.  This is a

9    9019 motion.  It's not a terribly high bar.  What the Movant

10   has to show here is that the settlement agreement was the

11   product of arm's-length, good-faith negotiations, and

12   effectively that it's in the best interests of its

13   stakeholders.

14          THE COURT:  Did you want this put on the screen, or

15   does everyone have a hard copy?

16          MR. MORRIS:  Counsel have a hard copy.

17          THE COURT:  Oh, okay.

18          MR. MORRIS:  Yeah.  The evidence is going to show,

19   and there really is no dispute, that the settlement agreement

20   is the product of arm's-length, good-faith negotiations.  Mr.

21   Seery is going to testify that the negotiations began in late

22   March and they concluded on May 19th.  Exhibits 2 through 57,

23   with the exception of the one or two I just withdrew, reflect

24   the parties' negotiations.  Mr. Seery is going to testify that

25   the negotiations were conducted by Zoom, by phone call, there

1   was one in-person meeting, there was many, many email

2   exchanges that are reflected in the exhibits.

3       Mr. Seery is going to testify about the substance of the

4   negotiations at a high level.  Originally, we had sought to

5   have one agreement with Hunter Mountain and the DAF entities.

6   Mr. Patrick was not comfortable with that.  He wanted to run

7   them separately.  And there was a DAF agreement that was

8   ultimately entered into but that nobody believed required

9   court approval.

10      So, once that got completed and one of the Fifth Circuit

11  appeals got dismissed as a result, we moved to the Hunter

12  Mountain discussions.  Those discussions were robust.  There

13  were issues about the timing of the effectiveness of certain

14  of the benefits under the proposed agreement.  Highland wanted

15  the releases, for example, to be effective upon signing.  Mr.

16  Patrick was unwilling to agree to anything without this

17  Court's approval.

18      So there were changes that were made over time in terms of

19  the timing of the transfer of the consideration.  There were

20  discussions and negotiations and bids and asks about the

21  amounts that would be paid, when they would be paid, the

22  circumstances under -- that they would be paid.  There was an

23  enormous amount of information that was exchanged pursuant to

24  a confidentiality agreement that now became public because

25  it's relevant to the Debtors' burden or the Claimant Trust's

1    burden to carry the day here.

2         That information included claims information, the trust

3    agreement itself, budgets, asset/liability valuation

4    information, forecasted expenses, because HMIT rightly

5    wondered, you know, what's going to happen to the money?  Is

6    it going to be gone before it got its agreed-upon share?  So,

7    you know, there will be, I think, indisputable evidence at the

8    end of the day that the settlement is the product of arm's-

9    length, good-faith negotiations.

10        If we move to the next slide, the evidence will also show

11   that the proposed settlement is indisputably in the best

12   interest of the Highland entities and their stakeholders.

13   Upon court approval, all of the pending litigation that Your

14   Honor identified earlier will be dismissed with prejudice,

15   thereby greatly reducing litigation risk and attendant costs.

16        The stakeholders will also benefit from the allowance of

17   the HMIT claim at a fixed amount of $337 million.  And we will

18   explain -- Mr. Seery will explain to the Court how that number

19   was arrived at.

20        The estates and their stakeholders will also benefit

21   because, under the proposed settlement, as I indicated

22   earlier, Highland will be able to monetize or otherwise

23   dispose of a number of illiquid assets, including the Dugaboy

24   Note and the estate claims in the Kirschner Litigation.  And

25   perhaps most importantly to the estate, we are getting very,

1  very broad what we refer to as litigation protections from all

2  of the Hunter Mountain entities.  It includes not only a

3  release but a covenant not to sue as well as, you know, we

4  could go through it, but -- but we believe that even if Mr.

5  Dondero or somebody else obtains control of Hunter Mountain,

6  unless somebody sets aside this agreement, those protections

7  are going to inure to the benefit of the Trusts, the Indemnity

8  Trust and all of its stakeholders until the end of time, and

9  nobody is ever going to be able to set this agreement aside

10  because it was negotiated in good faith, it was the product of

11  arm's-length negotiations, and it's fair and reasonable to

12  both sides.

13      So those litigation protections are paramount and they

14  provide another indicator of the benefits that the Claimant

15  Trust is going to receive.

16      The next slide, Your Honor, is a demonstrative exhibit,

17  although, as always, we have citations to the very specific

18  documents that are now in the record.  Mr. Seery will describe

19  for you at a high level how the allowed claim of HMIT was

20  calculated, and it's really just based on the limited

21  partners' capital accounts as of the petition date.  And I'll

22  just leave it at that for the moment.  There's no magic to it.

23  It's objectively reasonable.  It's mathematics.  There's

24  really no subjectivity that I'm aware of that goes into this.

25  It's just, hey, let's look at the tax returns, let's look at

1    the financial statements, and let's look at the partnership

2    agreement, and let's see how the capital account was

3    structured as of the petition date.  And that's how you get

4    to, really, $396 million less the amount of the Dugaboy Note.

5    I mean, the HMIT note.

6        The next slide.  With the settlement, the transfer of the

7    Kirschner Litigation is in the best interests of the Movants.

8    I think Mr. Daugherty somehow suggests that really the best

9    thing to do would be to prosecute that litigation.  We

10   respectfully disagree.  In the Debtors' business -- in the

11   Claimant Trust's business judgment, that would be exactly the

12   wrong thing to do when you are settling with HMIT.

13       And why is that?  When we commenced the Kirschner

14   Litigation a number of years ago, the Kirschner Litigation

15   represented a potential source of funding for indemnification

16   expenses, and at that time, for the payment in full to

17   creditors.

18       By 2023, 2024, with the success of the Highland team's

19   monetization of assets, the need to pursue and monetize the

20   Kirschner claims became less clear, so we put it on ice.  And

21   we voluntarily stayed the litigation to conserve resources.

22       The settlement with HMIT changes everything.  The claims

23   are as valid today as they were yesterday, as they were before

24   we signed the agreement, as they were when we commenced the

25   action.  But they have very different value to Highland when

1   you're settling with HMIT.  And that's why we're prepared to

2   transfer the claims today.

3       Why?  Because at this point, unlike when we commenced the

4   action, Class 8 has been paid in full except for Mr.

5   Daugherty's fully-reserved claim, right, in an amount that he

6   agreed to for years and that he ratified and reaffirmed three

7   different times in three different stipulations.  That's the

8   only thing that remains in Class 8.

9           THE COURT:  And remind me of the dollar amounts on

10  reserve.

11          MR. MORRIS:  It's approximately $2.5 million.  I can

12  --

13          THE COURT:  Okay.

14          MR. MORRIS:  It's -- the dollar amount is

15  specifically set forth --

16      (Pause.)

17          MR. MORRIS:  It would be, I believe, in Exhibit 60,

18  --

19          THE COURT:  Okay.

20          MR. MORRIS:  -- is the original tolling agreement.

21  And in Paragraph 1 it has the very specific dollar amount.

22  And then in Exhibits 62, 63 -- 61, 62, and 63, those are

23  amendments to the tolling agreement that fully incorporated

24  the original tolling agreement, including the reserve amount.

25  So that amount has been there for years.  Nobody has ever said

1    anything about it.  Nobody has ever tried to adjust it.

2    Nobody has ever identified a change in circumstances that

3    would suggest a change was appropriate.  But here we are.

4        So, why is it different and why does the Kirschner

5    Litigation not have so much value to us when we're settling

6    with Class 11?  Because Class 8 has been paid in full.  Class

7    9 has been paid 80 percent.  If the HMIT settlement is

8    approved, it will receive another 10 percent.  So that all

9    that remains is 10 percent of the Class 9s.

10       And most importantly, Your Honor, with the settlement with

11   HMIT and the Claimant Trust's receipt of the litigation

12   protections, the need for indemnification expenses is going to

13   be greatly reduced.  We can give the money where it belongs

14   because all we'll have left is Mr. Dondero and Dugaboy.  It

15   really will literally be the only thing.  And we need a lot to

16   deal with that, but not as much as we needed when we had to

17   deal with them and HMIT.

18       And at the end of the day, once you're settling with HMIT,

19   prosecution of the claims would only benefit HMIT, so why

20   should we undertake the expense of doing that?

21       Is that clear to Your Honor?

22            THE COURT:  It is.

23            MR. MORRIS:  It is?  So, it's -- this has nothing to

24   do -- and you're going to hear questions of Mr. Seery, did you

25   value the Kirschner claims?  Are you giving them away for

1   free?  No, we didn't value them, because once you're settling

2   with HMIT it doesn't really matter.  Once you have the

3   litigation protections, once you know that HMIT is never going

4   to be an adversary of yours, the monetization of the Kirschner

5   claims would insure to their benefit because they will have an

6   allowed claim of $330 million.  So even if we sued and even if

7   we got a hundred million dollars, that's going to go to them.

8   Why would we pick up the tab today?  A very different scenario

9   than when we prosecuted the case, when the case was commenced.

10      So, really, really, in the estate's best interest to get

11  value for those claims.  The value is reflected in the

12  totality of the agreement.  The Court really should look at

13  the body of the consideration that's being received, including

14  the litigation protections.

15      If we can go to the next slide, Your Honor.  As long as

16  we're on the topic of Mr. Patrick's authority, Mr. Seery is

17  going to testify to the work that he did to satisfy himself

18  that Mr. Patrick was duly authorized to act on behalf of each

19  of the HMIT entities in this case.

20      The next slide here shows an excerpt from the Hunter

21  Mountain Trust Agreement.  It's Paragraph 7.  And it says,

22  among other things, the Administrator -- who is Mark Patrick

23  -- shall be duly authorized, from time to time, in his sole

24  discretion, to manage the business and affairs of the Trust.

25      It continues by saying that the Administrator, Mr.

1    Patrick, shall also have the power to settle, compromise,

2    submit to arbitration, or to submit to any court having

3    jurisdiction in any matter, any matters that are in dispute.

4        So, you know, this is just one document.  It's the Hunter

5    Mountain document.  We focus on the Hunter Mountain document

6    because that's the only one of the HMIT entities that has a

7    stake in the Claimant Trust.  But, again, Your Honor, if you

8    just -- Mr. Seery will, at a high level, confirm that Exhibits

9    70 through 104 are documents that definitively establish that

10   Mr. Patrick has the authority to enter into each of these

11   agreements on behalf of the HMIT entities.

12       Not only that, but he will describe, if asked by you or

13   anybody cross-examining him, why nobody has the ability to

14   interfere with the effectuation of his authority.  He doesn't

15   have to get anybody's consent.  He doesn't have to -- right?

16   This is all just crystal clear.  And whatever entity far up

17   the chain may exist, Your Honor should just think of as a

18   shareholder.  And if Coca-Cola came in here and they wanted to

19   do a 9019 motion, a shareholder can't come in and stop Coca-

20   Cola from doing that.  If they don't like what Coca-Cola is

21   doing, go file a derivative suit.  Go sue Coca-Cola in another

22   court at another time.  Not that I'm inviting litigation

23   against Mr. Patrick, but by analogy, this is what we're

24   talking about.

25       There is no restriction on Mr. Patrick's authority.  The

1    settlement is fair and reasonable.  He has authority under the

2    governing documents to do what he has done here, and that is

3    act in the best interests of the HMIT entities.  And so this

4    is just one page.  Mr. Seery will explain, you know, just the

5    work that he's done to satisfy himself.

6        The next slide, Your Honor, there's objections about how

7    somehow the settlement agreement violates the plan or the

8    absolute priority rule, all of that.  It's not accurate.  I'll

9    just leave it at that in terms of how I characterize it.

10        The next slide is excerpts of -- I think it's the plan of

11    reorganization, Your Honor.  And I think we admitted the plan

12    last night.  That's Exhibit 126.  And they're -- these

13    excerpts are really important because what they show is that

14    Classes 9 and 10 have the indisputable right to accept less

15    favorable treatment.  And that's what they've done.  Okay?

16    And I think it's Article III, Section H, Subparts 9 and 10.

17    Holders of Class 9 and 10 interests have the right to accept

18    less favorable treatment.

19        And if we can go to the next slide, I'll just briefly

20    describe the less favorable treatment that these stakeholders

21    have in fact accepted.  As permitted by the plan, holders of

22    Class 9 claims consented to the payment in full of Mr.

23    Daugherty's Class 9 claim and the Class 10 distributions, in

24    accordance with the settlement agreement, before their Class 9

25    claim is paid in full.

1      And that's Exhibit 59.  It may be among the most important

2  documents that have been admitted this morning.  Exhibit 59 is

3  the consent of the Class 9 holders other than Mr. Daugherty to

4  accept lesser treatment.

5      So there's no violation of the plan at all.  HMIT is also

6  accepting less favorable treatment than it might otherwise be

7  entitled to if it ever successfully prosecuted its claim.  It

8  has less favorable treatment because it's agreeing that it's

9  not a Claimant Trust beneficiary, that its rights are limited

10  to the rights that are given to it under the settlement

11  agreement and nowhere else.  It's accepting less favorable

12  treatment because it's agreeing that the Highland entities owe

13  no duty of any kind to any HMIT entity except as provided for

14  in the settlement agreement.  It's accepting restrictions on

15  its ability to transfer its Class 10 interests -- more less-

16  favorable treatment -- as a condition to the first and second

17  distributions.  They have agreed that they are subject to Mr.

18  Seery's determination that the Highland entities are not at

19  that time under any Threat.  "Threat" is a defined term, and

20  it has to do with litigation.

21      And so if Mr. Seery, in his sole discretion, believes that

22  he needs to conserve resources because he remains years in the

23  future under threat of litigation, he's not going to make the

24  payments to HMIT, and HMIT is okay with that because they

25  understand.

1          And, of course, in the end, they're accepting less

2     favorable treatment because they're granting to the Claimant

3     Trust the litigation protections.

4          All stakeholders have been paid in full except for the 10

5     percent of Class 9 and Mr. Daugherty's Class 8 claim.  That

6     claim is the subject of an objection, and as I just walked

7     Your Honor through, it has been fully reserved in an agreed-

8     upon amount for years.

9          There was some questioning during Mr. Seery's -- one of

10     Mr. Seery's I think three depositions in the last week --

11     about why he didn't offer Mr. Daugherty the same treatment

12     that he offered to the other Class 9 holders because Mr.

13     Daugherty had about an $800,000 Class 9 claim.  Your Honor

14     will see in Exhibit 58 that that claim was paid in full, and

15     Mr. Seery will explain that he found negotiating with Mr.

16     Patrick to be difficult, number one.  And number two, it was

17     an amount of money that the estate could afford.  And so the

18     other Class 9 claims are substantially bigger, so rather than

19     going through the process of attempting to negotiate with Mr.

20     Daugherty, he just paid it in full.  The Claimant Trust had

21     every right to do that.  And Mr. Daugherty should not be heard

22     to complain that he actually got everything that he could have

23     ever been entitled to.

24               THE COURT:  And --

25               MR. MORRIS:  Uh-huh?

1              THE COURT:  I don't mean to get you off-track.

2              MR. MORRIS:  That's all right.

3              THE COURT:  But Class 9 claimants, I'm trying to

4    remember who else was in that class.  Was it a UBS --

5              MR. MORRIS:  UBS.

6              THE COURT:  -- claim?

7              MR. MORRIS:  Exactly right.

8              THE COURT:  Okay.

9              MR. MORRIS:  And then affiliates of Stonehill and

10   Farallon.

11             THE COURT:  Okay.

12             MR. MORRIS:  Because they had purchased --

13             THE COURT:  They had Class 9 --

14             MR. MORRIS:  They had purchased originally I think it

15   was Josh Terry, and the Redeemer Committee may have had a

16   piece.  No, no.  No, no, no.  HarbourVest.  HarbourVest had a

17   piece.  Right?  So, HarbourVest sold their claim, including

18   the Class 9 claim.  Josh Terry sold his claim, including his

19   Class 9 claim.  Then there's UBS, who still holds a piece of

20   their claim, and Mr. Daugherty.  So, UBS, if you look at

21   Exhibit 59, you'll see the signatures of UBS and the

22   affiliates of Stonehill and Farallon, who all agreed to accept

23   lesser treatment.

24             THE COURT:  Okay.

25             MR. MORRIS:  So, at the end of the day, Your Honor,

1  the last slide is a slide that I didn't intend to present,

2  frankly, because I didn't ever believe that there was going to

3  be a challenge to authority by anybody other than The Dallas

4  Foundation.  But as long as we have it attached, we might as

5  well see it.

6      As you can see, Your Honor, in the lower right-hand

7  corner, you can see Hunter Mountain is owned by Beacon

8  Mountain, which is owned by CLO Holdco.  Like, there is no --

9  and Mr. Patrick controls it.  And it's really on the other

10 side of the ledger, in the DAF house, so to speak, that any of

11 The Dallas Foundation got interested.

12     Dugaboy is not even on here, by the way.  Like, Dugaboy is

13 nobody.  The people in here who are now going to challenge the

14 authority of Mr. Patrick, no, not on here.  And they're going

15 to do it, they're going to do it without ever having given us

16 notice.

17     I know Your Honor made your ruling and we'll deal with it,

18 but I don't know if Your Honor was aware of this:  They're not

19 on here.

20     Your Honor, at the end of the day, this is a really,

21 really easy call to make from our perspective.  We have been

22 waiting for this moment for years.  Finally, a responsible

23 person understands that the way to preserve value is to put

24 the sword down.

25     Mr. Patrick, I don't know what happened between him and

1   Mr. Dondero.  I don't care.  I have no knowledge of that.  But

2   clearly he is exercising independence.  And that's why we're

3   here, because we finally have somebody who says, you know

4   what, give me everything I can possibly get and I will stop

5   fighting.  I wish other people would say that, because then

6   this case would be over.  Then the case would really be over.

7       But getting to a settlement with the Class 10 interest

8   holder who is going to have an allowed claim of $337 million,

9   such that any value in the future is going to go to HMIT, I

10  hope that that -- you know, this is an easy call to make, Your

11  Honor.

12      I have nothing further at this time, but I look forward to

13  putting Mr. Seery on the stand and making sure that Your Honor

14  has, you know, an adequate, sufficient, overwhelming basis,

15  frankly, to approve this motion.

16          THE COURT:  Okay.  I don't mean to stifle you, but --

17          MR. MORRIS:  Yeah.

18          THE COURT:  -- anything more for an opening

19  statement?  Mr. Phillips, I'm doing friendlies and then

20  friendlies.

21    OPENING STATEMENT ON BEHALF OF THE HUNTER MOUNTAIN ENTITIES

22          MR. PHILLIPS:  Your Honor, just briefly.  Louis M.

23  Phillips on behalf of the Hunter Mountain entities.

24      We fully embrace and concur with everything that Mr.

25  Morris has told the Court.  From our perspective, and the

1    reason that -- and you'll see, the documents include all of

2    the back and forth -- we required the Court approval before

3    the effectiveness of any releases, litigation protections, et

4    cetera, for exactly the reason that we needed the Class 9 to

5    agree.  And we obtained -- the Highland entities obtained the

6    approval of the Class 9 creditors to our treatment, and I

7    think that the bona fides of this settlement and the value of

8    the settlement and our -- what we are giving in the settlement

9    is, I think, established beyond even the slightest bit of

10   question by the fact that the Class 9 creditors and the

11   Oversight Board of the Claimant Trust all agreed that it was

12   important enough to the estate to get this settlement with

13   Hunter Mountain Investment Trust that they agreed to allow

14   Hunter Mountain Investment Trust to receive the money set

15   forth in the settlement upon the approval.  And we have agreed

16   that, notwithstanding appeal rights of some people who really

17   don't have the right to be here, but that's going to be

18   determined by Your Honor, we're not worried about that.  We

19   are giving our releases.  And the releases are effective upon

20   approval by this Court.  We are not requiring any type of

21   final unappealable order that doesn't -- that waits for years

22   before the releases are effective.

23        Very importantly, it seems to me, from Your Honor's

24   perspective, and I'm reluctant to suggest that I know about

25   that, but our releases are given upon the approval by this

1    Court of the settlement.  They're not -- if the settlement is

2    reversed on appeal, our releases stay.

3         So the Class 9s that are above the Class 10 have voted,

4    and they have approved, and Mr. Seery is going to testify

5    about that.  And we think that in and of itself is a

6    monumental accomplishment.  And we appreciate everything Mr.

7    Morris has said.  We agree with everything Mr. Morris has

8    said.  We agree with everything Mr. Morris has said about the

9    absence of true objection.  We agree with everything Mr.

10    Morris has said about the fallacy of suggesting that Mr. Seery

11    had to value the Hunter Mountain -- the Kirschner Litigation

12    proceeds, of which would come to us.

13         The idea that we need to worry about how much Mr. Dondero

14    entities can pay in connection with the Kirschner Litigation

15    so that we could value the Kirschner Litigation based on what

16    Mr. Dondero can pay, so that to suffice with an objection by

17    Dugaboy maybe that there was no value given.  I mean, that's

18    all backwards.  Value was given as described by Mr. Morris and

19    will be established by the evidence submitted by Mr. Seery's

20    testimony and the documents that are already in evidence.

21         And that is it from our standpoint, Your Honor.  Thank

22    you.

23              THE COURT:  Thank you.  All right.  I'll hear from

24    the Objectors.  Daugherty's counsel, are you going to go

25    first?

1          OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

2                MR. YORK:  Thank you, Your Honor.  If I may approach.

3                THE COURT:  You may.

4                MR. YORK:  Good morning, Your Honor.  Drew York on

5    behalf of Mr. Daugherty.

6          We're here today regarding the 9019 and Mr. Daugherty's

7    objection.  The 9019 motion should be denied.  If you turn to

8    the third slide in there, we say that Highland -- Highland,

9    I'm referring to Highland collectively for the Movants --

10   attempts to put the cart before the horse.  So really what's

11   going on here, Your Honor, is we're just asking the Court to

12   follow the rules of the road that it set forth in the plan,

13   the confirmation order, and, frankly, even Highland to follow

14   the terms of the settlement agreement it entered into with Mr.

15   Daugherty.

16         None of that is happening here as a result of this

17   proposed settlement that's being presented to you today for

18   consideration.

19         The first problem with the motion and the proposed

20   settlement is that it violates the absolute priority rule, it

21   violates the express terms of the Court's plan, the

22   confirmation order, as well as the Claimant Trust Agreement,

23   because it attempts to fund the contingent Class 10 claims

24   without first resolving, let alone satisfying, Mr. Daugherty's

25   remaining Class 8 claim.

1    And then, secondly, the settlement agreement does not

2  satisfy the *Jackson Brewing* factors because it prioritizes the

3  HMIT insiders over the estate creditors, including Mr.

4  Daugherty, and it forfeits potential recovery that would go to

5  the benefit of those to creditors to appease litigation

6  pressure.

7    So, first, I'm going to talk about why the settlement

8  violates the plan, the confirmation order, and the Trust

9  Agreement.

10    As everyone is aware, the HMIT entities are asserting a

11  Class 10 claim.

12    If you turn to the next page, as Mr. Morris has

13  acknowledged and admitted here today, Mr. Daugherty has a

14  remaining Class 8 claim.  And, importantly, Your Honor,

15  because Mr. Morris and Highland continue to argue that that

16  claim is fully reserved, I would point out that in the

17  settlement agreement between Mr. Daugherty and Highland the

18  parties characterized that claim as a contingent unliquidated

19  claim.  A contingent unliquidated claim.  And in fact, they

20  went so far, Highland did, in its adversary complaint on the

21  next slide, Your Honor, to again refer to it as an

22  unliquidated and contingent claim that is dependent on the

23  final outcome of the 2008 audit, including the magnitude of

24  any adjustments.

25    And so Highland cannot come into this courtroom and on the

1    one hand argue that that claim is fully reserved, and at the

2    same time admit that it is a contingent unliquidated claim

3    that is subject to a myriad of adjustments depending upon the

4    outcome of that audit.

5        And in reality, when you look at the tolling agreement,

6    there is nothing that the parties said that that was a fully

7    reserved claim at all.  That's simply not what they agreed to.

8    They just simply put a number in there, which was put into the

9    reserve account at the time.  But it did not constitute a

10   fully reserved claim at all.

11       Nor has Highland pointed to anything -- in the plan, the

12   confirmation order, or the Claimant Trust Agreement -- that

13   allows Highland to come in and violate those documents by

14   simply saying that we fully reserved for Mr. Daugherty's

15   claim.

16           THE COURT:  Okay.  Well, we're going to hear the

17   evidence, but as I understood it, it was an agreed reserved

18   amount.  And I asked earlier, was it $2.5 million or -- I feel

19   like it was an agreed amount plus even some interest,

20   acknowledging there might be time.  I don't remember every

21   detail from this case, but I'm just telling you that's what my

22   memory is.  Am I correct?

23           MR. YORK:  The --

24           THE COURT:  Mr. Daugherty agreed, here's what we'll

25   agree is enough to set aside for our ultimately potentially

1    allowed claim, *x* amount plus interest?  Can you confirm?

2            MR. YORK:  What the tolling agreement provides is

3    that Mr. Daugherty agreed to provide the tolling of the

4    objection deadline.  Okay.  And Highland then agreed to put

5    $2.56 million into the reserve.

6        And what the footnote says in the tolling agreement,

7    Exhibit 60, is that the estimated amount of that claim as of

8    -- and let's be clear about this -- as of October 23rd of

9    2020, was $2.56 million and change.  And that's it.  And I'm

10   happy to have my colleague, Mr. Smeltzer, who is a tax

11   attorney and deals with these issues all the time, can come up

12   and explain why, at the end of the day, this is still a

13   contingent unliquidated claim and it's subject to a myriad of

14   factors that make it that that amount that Highland has set

15   aside is not necessarily going to be a fully-reserved amount.

16       That is why the parties have -- had called it both in the

17   settlement agreement and the tolling agreement, and Highland

18   has continued to call it -- characterize it in its adversary

19   complaint as a contingent unliquidated claim.  So --

20           THE COURT:  Okay.  It's hard to wrap my brain around

21   it.  It's a claim that I understood really couldn't be

22   liquidated with certainty until this potential audit of 2008

23   is final, and there was some discussion of how close to it

24   being final was it.  But I guess -- well, I don't know where

25   I'm going here except to say this could be a contingent

1    unliquidated claim for a -- you know, it's already, what, 17

2    years?

3           MR. YORK:  Based -- from when the tax return was

4    filed?  I think that's correct, Your Honor.

5           THE COURT:  Okay.  Well, this is what the adversary

6    is about, right?  I guess they're finally saying it should be

7    estimated, liquidated, pursuant to the Bankruptcy Code and

8    we'll be done.

9           MR. YORK:  Correct.  In violation of the terms of the

10   settlement agreement between Mr. Daugherty and Highland.  Yes,

11   that's --

12          THE COURT:  Wait.  Wait.  What?

13          MR. YORK:  So, the settlement agreement between

14   Daugherty and Mr. Highland provides --

15          THE COURT:  Mr. Highland?

16          MR. YORK:  I'm sorry.  I apologize.  Between Mr.

17   Daugherty and Highland --

18          THE COURT:  Uh-huh.

19          MR. YORK:  -- provides that the -- as long as the IRS

20   audit has not had a final -- there's not a final

21   determination, --

22          THE COURT:  Uh-huh.

23          MR. YORK:  -- then any litigation concerning the

24   validity or the amount of Mr. Daugherty's claim is stayed and

25   cannot be brought before the Court.  And that's exactly what

1    their adversary complaint did, which is -- because they admit

2    in their adversary complaint --

3         THE COURT:  Well, okay.  I won't pursue this anymore.

4    But what's an estate to do?  They're getting criticized for

5    the Trust going on too long.  Not by your client, but -- and

6    meanwhile you want, I mean, 2032, are we still going to be

7    waiting on the IRS?

8         MR. YORK:  I don't know because we don't have any

9    insight into what the IRS audit is.

10        THE COURT:  Well, it's been 17 years.

11        MR. YORK:  I understand, Your Honor.

12        THE COURT:  So, --

13        MR. YORK:  But the bottom line is this.  The plan --

14   that Highland entered into the terms of that settlement

15   agreement.

16        THE COURT:  I'm going to say it right now.  I'm not

17   keeping this estate open until 2032.  I just, I was --

18        MR. YORK:  I presume that --

19        THE COURT:  -- kind of flippantly throwing that out

20   there.

21        MR. YORK:  And --

22        THE COURT:  But this happens in bankruptcy cases a

23   lot, where you've got a contingent unliquidated claim, and

24   there are provisions in the Bankruptcy Code to say what can be

25   done in that scenario.  The Court can estimate or liquidate.

1              MR. YORK:  Understood.  Your point to me was --

2    before was that's why Highland brought the adversary

3    complaint, and I was simply pointing out that, pursuant to the

4    express terms of the agreement that Highland reached with Mr.

5    Daugherty, Highland was -- is not allowed to bring the

6    adversary complaint to challenge the validity or amount of Mr.

7    Daugherty's claim so long as the IRS audit has not been -- had

8    a final determination.  That's exactly what's going on here

9    with the adversary complaint that they have filed.

10             THE COURT:  Okay.

11             MR. YORK:  Okay.  So I think Your Honor is familiar

12   with the terms of the plan, the Fifth Amended Plan and the

13   subordination.  But specifically we have two issues.  One

14   begins with the Claimant Trust Agreement in Section 5.1(c),

15   which provides that the equity holders shall not have any

16   rights under the agreement unless and until the Claimant

17   Trustee files with the Bankruptcy Court a certification that

18   all of general unsecured creditor beneficiaries have been paid

19   indefeasibly, in full, including, to the extent applicable,

20   all accrued and unpaid postpetition interest, consistent with

21   the plan, and all disputed claims have been resolved.

22        That has not happened here and it cannot happen because,

23   for one, Mr. Daugherty's unresolved Class 8 claim, and also

24   the remaining Class 9 claims, as I think you'll hear from Mr.

25   Seery.  And so there are no rights that can be given to the

1    HMIT entities pursuant to -- as a Class 10 holder, an allowed

2    Class 10 holder, pursuant to the Claimant Trust Agreement.  So

3    the proposed settlement violates the Claimant Trust

4    Agreement's express terms.

5        It also violates the Court's confirmation order that was

6    entered at -- specifically on Page 45 of the order, in

7    Subparagraph (a):  The holders of the equity interests --

8    which would be the Class 10 and Class 11 equity interests --

9    that are junior to the claims in Class 8 and Class 9 will not

10   receive or retain under the plan, on account of such junior

11   claim interest, any property, unless and until the claims --

12   the claims, not the allowed claims, but the claims -- in Class

13   8 and Class 9 are paid in full, plus applicable interest.

14       That's exactly what the settlement that is proposed here

15   is designed to do.

16       And if you turn two pages in, you'll see that in addition

17   to the assignment of the Kirschner claims, what we're also

18   having under this proposed settlement are interim cash

19   distributions that would be made to the HMIT entities, interim

20   cash distributions that theoretically could be made before the

21   resolution of Mr. Daugherty's Class 8 claim, which would be in

22   violation of the plan, the Claimant Trust Agreement, and the

23   confirmation order.

24       And that is, as best as they put in their agreement,

25   that's approximately $23 million in cash that would be paid

1    out theoretically in those interim distributions.

2         One of the things that Mr. Morris said in his opening was

3    that they did not -- Mr. Seery did not negotiate with Mr.

4    Daugherty because he was difficult to deal with.  Well, that's

5    surprising, Your Honor, considering, on the other hand, Mr.

6    Morris says to the Court that there were repeated tolling

7    agreements or amendments to the tolling agreement that were

8    entered into by Mr. Daugherty willingly and voluntarily to

9    benefit Highland.

10        And what really happened when Mr. Morris says that there

11   were good-faith arm's-length negotiations, well, there may

12   have been good-faith, arm's-length negotiations between the

13   HMIT entities and Highland, but what happened here was that

14   Highland actually sought to ice out Mr. Daugherty from all of

15   this completely.

16        And how did that happen?  Well, the evidence is going to

17   show that Highland reached out to the other Class 9 creditors

18   over a month in advance of the motion being filed, sought

19   their consent to the proposed settlement, told them that Mr.

20   Daugherty was not going to be a part of it, told them that Mr.

21   Daugherty's Class 8 claim was going to have an adversary

22   complaint filed against it, told them that once that adversary

23   complaint was granted and the claim was disallowed, then those

24   funds would waterfall down to Class 9, so the Class 9

25   creditors would get that -- those funds that theoretically are

1    part of Mr. Daugherty's Class 8 claim.

2        So at no point in time prior to the filing of the

3    adversary proceeding, or even prior to the filing of the

4    motion for approval of this proposed settlement, did Highland

5    ever contact Mr. Daugherty to attempt to discuss any of this,

6    because they simply wanted to ice him out.

7            THE COURT:  Okay.  I'm going to hear evidence.  I

8    don't mean to cut you off, but --

9            MR. YORK:  Sure.

10            THE COURT:  -- I was told that Mr. Daugherty was paid

11    $800,000 --

12            MR. YORK:  With respect to his --

13            THE COURT:  -- on his Class 9 claim.

14            MR. YORK:  Correct.

15            THE COURT:  Is that not true?

16            MR. YORK:  So, the day --

17            THE COURT:  Is that true?

18            MR. YORK:  It is true.  The day after the motion for

19    entry of the proposed settlement was filed, Mr. Demo sent a

20    letter to my office that was a payoff --

21            THE COURT:  I just wanted to -- I don't need to know

22    every detail.

23            MR. YORK:  Yes.  Sure.

24            THE COURT:  Has he been paid?

25            MR. YORK:  His Class 9 claim was paid in full the day

1   after the proposed settlement was filed.

2          THE COURT:  Okay.  So what is the asserted amount of

3   his Class 8 claim?

4          MR. YORK:  We -- again, both sides do not know

5   because they do not have --

6          THE COURT:  What was the asserted amount in the proof

7   of claim that's been reserved for, the Class 8 proof of claim?

8   What was the asserted amount?

9          MR. YORK:  It was listed as contingent unliquidated.

10  And as I understood it, and Your Honor --

11         MR. MORRIS:  No.  I think it's approximately $1.7

12  million, Your Honor.

13         MR. DAUGHERTY:  That's not true.

14         THE COURT:  $1.7 million?

15         MR. DAUGHERTY:  No.

16         THE COURT:  I would look it up, but I don't know if

17  we --

18         MR. DAUGHERTY:  Your Honor, I'll tell you.  It was

19  like $1.45 million, and then the interest to October, which

20  was like another $1.3 million.  I'm estimating it.  But the

21  total is around $2.6 million, $2.7 million at October/November

22  2020.  Up to that point.

23         THE COURT:  Okay.  Well, that's kind of a weird

24  process here for an opening statement.  But I'm asking

25  because, you know, I always try to stray people into let's be

1    pragmatic whenever I can.  And a pragmatic approach here might

2    have been, if your client didn't think the reserve was big

3    enough, you all could have a discussion about, oh, instead of

4    $2.56 million, it now should, I don't know, $3 million,

5    whatever you say the number is.  And there could have been a

6    give and take, instead of all these people showing up in the

7    court and having an all-day hearing.

8         So I'm just trying to understand that.  And you're saying,

9    okay, violation of the absolute priority, when your client

10   took a full payment on his Class 9 claim without Class 8 being

11   quite paid in full.  I'm just trying to be pragmatic here.

12   What would it take to make Mr. Daugherty happy?  Again, that's

13   just the bankruptcy judge speaking on Chapter 11 world that's

14   trying to get to a pragmatic result.

15        MR. YORK:  We're happy to have that discussion with

16   the other side.  We were -- we --

17        THE COURT:  Well, what --

18        MR. YORK:  Yes.

19        THE COURT:  You can't tell me right now?  You're here

20   ready to go to battle over this settlement, and I'm trying to

21   figure out what might happen here that would make you all

22   withdraw your objection.  And that's what we do in Chapter 11.

23   If there's a way we can pragmatically resolve things, we do.

24        MR. YORK:  Sure.

25        THE COURT:  And it just, I'm picking on you because

1    we're talking about a $2.5 or so million claim in a situation

2    where people are wanting the estate wrapped up and it's

3    holding hundreds of millions of dollars, I guess.

4        MR. MORRIS:  Not that much, Your Honor.

5        THE COURT:  Not that much anymore.  Not that much

6    anymore.  A lot has been paid out.  But a lot more than $2.56

7    million, shall we say.

8        MR. YORK:  Understood, Your Honor.  And I'm happy to

9    have a conversation with Mr. Morris and see if we can reach a

10    number that's agreeable to accept as, you know, the reserve.

11        THE COURT:  How hard could that be?  I don't mean to

12    be --

13        MR. YORK:  Happy to do so.  Sure.

14        THE COURT:  How hard could that be, when we're

15    talking about he's been paid $800,000 on his Class 9 ahead of

16    his Class 8, which, to understand your argument, would be an

17    absolute priority rule problem.  But, you know, --

18        MR. YORK:  Correct.  We indicated that --

19        THE COURT:  -- no picking and choosing what is

20    problematic here.  And we're talking about $2.56 million is

21    set aside, and we're talking about the prospect of liquidating

22    it and paying whatever is appropriate way before the IRS is

23    finished.  Maybe.  I don't know.  So how hard could it be to

24    figure out --

25        MR. YORK:  I'm sure we can -- we can have a

1  conversation real quick and try to see if we can --

2         THE COURT:  Okay.  Well, it'll have to be during a

3  break, --

4         MR. YORK:  Sure.  Happy to.

5         THE COURT:  -- because we're plowing ahead.  Okay.

6  Anything else on your opening statement?

7         MR. YORK:  The only other thing I would point out

8  with respect to the best interests of the estate is that the

9  -- as part of the settlement, the Class 9 holders and the

10 Class 10 holders are actually getting more favorable treatment

11 than Mr. Daugherty's Class 8 claim because of the mutual

12 releases that they're getting pursuant to the terms of the

13 proposed settlement, including the fact that the Class 9

14 written consent holders who are all -- all have served on the

15 board here are getting those releases as well under the

16 proposed settlement.

17        THE COURT:  It's not a release by your client.

18        MR. YORK:  No, I understand that.  I understand that.

19 But they're getting mutual releases from each other on

20 litigation that Highland has -- the Claimant Trust, excuse me,

21 has -- Trustee has, you know, consistently said that they had

22 all of those parties, all of those defendants, dead to rights

23 on.

24     So, that's all I have.

25        THE COURT:  Okay.  I really, I'm trying to focus on

1  people's standing.  Your client has standing.  He has a proof

2  of claim that's unresolved.  But I'm just trying to understand

3  the economic impact, I guess, on your client.  And all I'm

4  hearing is, I don't know, that maybe he thinks more than $2.56

5  million ought to be reserved.  I mean, I'm --

6      MR. YORK:  Given the passage of time, and also given

7  the fact that it's still undetermined as to what's going to

8  happen with that audit and what the penalties might be,

9  considering that the amount that was --

10     THE COURT:  But, again, this is bankruptcy-land.  We

11  can't wait around 20 years, 30 years.  The Bankruptcy Code

12  contemplates we can at some point estimate --

13     MR. YORK:  Sure.

14     THE COURT:  -- a contingent unliquidated claim.

15     MR. YORK:  I understand.

16     THE COURT:  So I -- all right.  Thank you.

17     MR. YORK:  Thank you.

18     THE COURT:  And Mr. Lang?

19   OPENING STATEMENT ON BEHALF OF THE DUGABOY INVESTMENT TRUST

20     MR. LANG:  We're down to three issues, one of which

21  is the scope of the release, which I think we can work out

22  with Mr. Morris, just to make sure people are carved out,

23  being Dugaboy.

24    The second issue is the use of the dollar value from the

25  capital account as the basis for the Class 10 claim versus

1    using the -- well, they're using it on the petition date

2    versus using it -- the current capital account balance or the

3    percentage interest of 99.5 percent, because that prevents the

4    class, as structured, class level (inaudible).  And so we have

5    an issue with why they're using the capital account as the

6    basis for the allowed claim, when the plan is silent on how

7    that equity interest is to be valued.

8        Does that make sense?

9            THE COURT:  Okay.  You have a problem with the

10   valuation methodology used here, which was taking the capital

11   account balances from --

12           MR. LANG:  On the petition date.

13           THE COURT:  -- on the petition date?

14           MR. LANG:  Versus using the ownership percentage of

15   the equity on, as repeatedly stated, 99.5 percent of Highland

16   is owned by HMIT, .5 is owned by the Class 11.

17           THE COURT:  Okay.  Well, I'm not sure what -- I guess

18   you'll cross-examine Mr. Seery on different possible

19   methodologies.

20           MR. LANG:  Yes.

21           THE COURT:  Okay.

22           MR. LANG:  And so then the third one is the authority

23   issue on Mr. Patrick's authority to enter into the settlement

24   agreement and the transfer of the Dugaboy Note to Mr.

25   Patrick's entity, HMIT.

1          THE COURT:  All right.  And, again, I'll just clarify

2    my understanding.  Dugaboy -- this came up earlier -- itself

3    has a .1866 percent Class A limited partnership interest?

4          MR. LANG:  I think that's approximately right.  Not

5    exact.  Is that Mr. Morris' sheet?

6          THE COURT:  It was in several pleadings.

7          MR. LANG:  Okay.  Yeah.

8          THE COURT:  Okay.  So the question will be, should

9    that be valued at $740,000 or something different?

10         MR. LANG:  More -- there's $65 to $70 million in

11   assets in the estate.  There's $20 million in Class 9 debt, is

12   what Mr. Seery -- unpaid Class 9, is what Mr. Seery testified

13   to.

14         THE COURT:  Uh-huh.

15         MR. LANG:  So it's $45 to $50 million would be left

16   after payment of the Class 9.  And if they use the ownership

17   percentages, Class 11 gets some money.  If they use a $333

18   million capital account, Class 11 gets nothing.

19         THE COURT:  Okay.  I presume that's a material

20   difference, and I'm going to hear about that.

21         MR. LANG:  Yes.

22         THE COURT:  Okay.  And then I guess my other thoughts

23   on his interest -- I say his; it's Dugaboy.  We tend to equate

24   Dugaboy with Mr. Dondero since we've heard he and his family

25   are the hundred percent beneficiaries.  There I guess is a

1   note that is addressed in the settlement.

2              MR. LANG:  Yes.

3              THE COURT:  I called it the $24.2 million note in my

4   --

5              MR. LANG:  That was --

6              THE COURT:  -- preparation, but it's down to --

7              MR. LANG:  Seventeen-ish.

8              THE COURT:  -- $17 million or whatever.  So, right

9   now, Highland is a payee on that note, as well as Get Good

10  Trust, and Hunter Mountain under the proposed settlement gets

11  to substitute in as a co-payee.

12      So I guess I'm just trying to, in my brain, figure out all

13  the, just like I was doing with Mr. Daugherty, the economic

14  impact of this settlement on your client.  And have I just

15  addressed the two things in your view?

16             MR. LANG:  Yes.

17             THE COURT:  Okay.

18             MR. LANG:  I believe so.

19             THE COURT:  Okay.  Thank you.

20      All right.  Can we start with evidence?  At some point,

21  we'll break for lunch, but we'll figure out as we go.  I don't

22  want to be inconvenient to people if people have ordered lunch

23  or something.

24             MR. MORRIS:  We are going to be finished with Mr.

25  Seery on direct well before lunch.

1          THE COURT:  Okay.

2          MR. MORRIS:  Or by lunch, for sure.

3          THE COURT:  It's 11:30.

4          MR. MORRIS:  Yeah.

5          THE COURT:  So, all right.

6          MR. MORRIS:  I do -- I would be remiss if I didn't

7    point out that Mr. Lang just raised yet another issue, the

8    calculation of the allowed amount of HMIT's Class 10 claim.

9    Nowhere in his pleading.  Again, hearing about this for the

10   first time as I'm standing here.  He raised three issues, only

11   one of which is in their pleading, only one of which I ever

12   heard about from Dugaboy, and that is the scope of the

13   release.

14         THE COURT:  Okay.  I don't know if it makes a

15   material difference or not.  I am not a mathematician.  But --

16         MR. MORRIS:  So Highland -- the Movants call Mr.

17   Seery.

18         THE COURT:  All right.  Mr. Seery, if you could

19   approach the witness box.  I swore you in earlier for purposes

20   of all testimony today, so you are under oath.

21         MR. SEERY:  Thank you, Your Honor.

22      JAMES SEERY, CLAIMANT TRUST'S WITNESS, PREVIOUSLY SWORN

23                      DIRECT EXAMINATION

24   BY MR. MORRIS:

25   Q    Good morning, Mr. Seery.

1    A    Good morning.

2    Q    Do you have three binders in front of you?

3    A    I have four binders in front of me.

4    Q    Okay.  I just want to make sure you have ours.

5    A    I think -- yes, sir.

6    Q    The fourth has the last few exhibits that we filed on the

7    docket.

8         Should we wait for Mr. Edmond?

9             THE WITNESS:  That would be good.

10            THE COURT:  Yes.  I just noticed.  Okay.  The

11   recording is always going, so never fear.

12        (Pause.)

13            THE COURT:  All right.

14            THE WITNESS:  Apologies, Your Honor.

15            THE COURT:  Oh, I didn't see what happened.  Was

16   there a spill episode?

17        And please, if people need breaks, let me know.  I

18   sometimes go long without appropriate breaks, so let me know,

19   anybody, if we need to break for bathroom.

20            MR. MORRIS:  May I proceed, Your Honor.

21            THE COURT:  You may.

22            MR. MORRIS:  All right.

23   BY MR. MORRIS:

24   Q    Are you comfortable, Mr. Seery?

25   A    Yes.

Seery - Direct                          85

1   Q    I want to actually start a little unscripted with the

2   argument that was just made on behalf of Mr. Daugherty.  Did

3   you listen to that?

4   A    I did, Your Honor.  Yes, I did.  I'll speak to Your Honor.

5   Yes, I did, Your Honor.

6   Q    Did Mr. Daugherty have a Class 9 claim?

7   A    He did have a Class 9 claim.

8   Q    And what was the value of the Class 9 interest that he

9   held?

10  A    It was approximately $3.7 million.

11  Q    And who are the other Class 9 claim holders?

12  A    There are three -- I'm sorry, there are four other Class 9

13  holders.  There is Muck Holdings, LLC.  There is Jessup

14  Holdings, LLC.  There is UBS AG.  And there's UBS Securities,

15  LLC.

16  Q    Okay.  And if you can turn to Exhibit 58, which is in

17  Volume 1.

18          A VOICE:  Mr. Morris, what was the exhibit number?

19          MR. MORRIS:  It's 58.

20          A VOICE:  Thank you.

21          MR. MORRIS:  You're welcome.

22  BY MR. MORRIS:

23  Q    Do you have that in front of you, sir?

24  A    Yes.

25  Q    What is that?

1    A    That is a distribution notice to Mr. Daugherty from the

2    Highland Claimant Trust with the eighth distribution.  And I

3    believe this would be related to his Class 9 claim.  It may be

4    some 8 -- some Class 8 as well.  But March 25 is -- I'm sorry,

5    May 25, my eyes are not that great for close up, this is just

6    related to the payoff of his Class 9 claim.  So he'd had a

7    $3.7 million.  This was the last -- final payment, so he's

8    been paid in full on his Class 9 claim.

9    Q    So do I have this right, that before you sent this

10   $800,000-plus to him, he had already received $2.9 million on

11   account of his Class 9 claim?

12   A    That's approximately correct, yes.

13   Q    And how many different distributions were made to Mr.

14   Daugherty on account of his Class 9 claim before this last

15   one?

16   A    Two -- two or three.  I believe the way we had phrased and

17   put 8 is our total distributions including 8 and 9.  So he had

18   a larger Class 8 claim as well.  I think it was approximately

19   $8.25 million.  That's been paid in full.  His Class 9 claim

20   was getting paid in full by this one.

21   Q    Okay.  And did Mr. Daugherty receive these prior

22   distributions -- withdrawn.  Did the other holders of Class 9

23   claims also receive pro rata their Class 9 distributions at

24   the same time as Mr. Daugherty?

25   A    Yes.  The distributions were pro rata.

Seery - Direct                          87

1   Q    Okay.  Did Mr. Daugherty ever return any of the Class 9

2   checks that he received and say, oh my goodness, it violates

3   the plan and the absolute priority rule and everything else

4   because his Class 8 claim hasn't been paid in full?

5   A    No, he did not.

6   Q    Did he -- did he suggest that UBS or Muck or Jessup should

7   return their checks that they received on account of their

8   Class 9 claims because his Class 8 claim had remained

9   unresolved?

10  A    No, he did not.

11  Q    Okay.  Let's go to the reason that we're really here

12  today, the agreement itself.  Did you negotiate the settlement

13  on behalf of the Highland entities?

14  A    Yes, I did.

15  Q    Can you describe for the Court how that came about?

16  A    In December, we had a hearing on -- this is a little bit

17  convoluted, I apologize -- but in December we had a hearing on

18  the HCLOM claim in court, and we settled that claim as a $10

19  million Class 10 interest.

20       We moved into the new year and we heard some -- at some

21  point that HMIT disagreed with that settlement, even though

22  HMIT had signed that settlement as acceptable to it in form

23  and substance.  And the reason was because HMIT had been the

24  only Class 10 -- not allowed, but the only Class 10 interest

25  in -- under the plan, and defined that way, and we had agreed

Seery - Direct                                    88

1    pursuant to the plan to put HCLOM in there.

2        And although HMIT had signed in form and substance

3    acceptable by its attorney, we learned that Mark Patrick had

4    not been consulted and that attorney had simply -- because we

5    were in the room -- had gone in and gotten permission from Mr.

6    Dondero to approve that settlement in form and substance.  We

7    didn't know it at the time.

8        That went away pretty quickly, and we understood that

9    somehow it got resolved.

10        Shortly after that, sometime I believe in January or early

11    February, there was contact between HMIT counsel and our

12    counsel about a potential settlement.  And we had two issues,

13    really, with Mr. Patrick, who controlled two separate

14    entities.  There's the DAF entities he controlled and there's

15    the HMIT entities.  And we wanted to make sure -- and we had

16    disputes with both of them.  We had a Fifth Circuit appeal

17    coming up in DAF and HMIT.  And so we were contacted and said,

18    okay, we're willing to settle this if we can get to a place

19    that makes sense to us.  And so that was the commencement of

20    those negotiations.

21    Q    And can you describe -- how long did the negotiations

22    last?

23    A    Well, there was negotiation around the NDA, which took

24    some time, and I think we probably got that finalized at

25    around the middle to end of March.  And then we began

Seery - Direct                              89

1  negotiations in earnest during April.  And we took pretty much

2  the full month to get these negotiations done, maybe a month

3  and a half.

4  Q   Can you describe for the Court just how the negotiations

5  were conducted?

6  A   Well, initially, we ensured that the ground rules would be

7  set.  We didn't want to waste our time and expense if we

8  weren't going to reach agreement around particularly

9  litigation protections, because that's essential to us, and

10 having any settlement required that.

11     Secondly, we then -- from their side, they wanted

12 information.  So, pursuant to that NDA, which was rather

13 robust, we provided substantial information.

14     We then had a -- I believe one or two Zoom calls, and then

15 a face-to-face meeting, and then subsequently a number of Zoom

16 calls with our counsel -- usually, these were always with

17 counsel -- so, our counsel, their counsel, principals, my

18 team, Mr. Patrick and his team, to go through each of the

19 items that we exchanged.  And then we worked through a

20 framework to -- back and forth on that to a term sheet, to a

21 negotiated structured settlement along the lines of the one

22 you see.

23 Q   And did the parties exchange information as part of the

24 process?

25 A   Yeah.  As I explained, we, under our NDA, we gave a lot of

1    information.  We got information back from Mr. Patrick, Mr.

2    Phillips, their teams, about the structure of their entities,

3    how we could interact with them, who was responsible for each

4    entity.  And that caused us to, frankly, move from just HMIT

5    to a couple other entities to make sure we had full

6    protection.

7    Q    Did you provide information concerning assets, budgets,

8    expenses, and the like?

9    A    Yeah.  The detailed information we provided, it was pretty

10   extensive.  So we gave a high-level view of our budget,

11   assuming that we had a settlement with them.  We have an asset

12   list that we keep and where each asset was located.  So,

13   dollars amounts, what kind of form it was in, whether it was

14   cash, whether it was U.S. Treasuries, whether it was, you

15   know, equity interests.  Some couple other assets, as Mr.

16   Morris explained in the opening, had not yet been disposed of.

17   And the valuations we put on those assets.

18   Q    Can you turn, I guess, to any volume, and let's just look

19   at the exhibit list.  Are you generally familiar with the

20   documentation concerning the negotiations?

21   A    Yes.

22   Q    Can you confirm that Exhibits 2 through 57 are the emails

23   and information that were disclosed between the Highland side

24   and the HMIT side during the negotiations?

25   A    Yes.  And I -- I could look through 2 through 57 now, but

1   --

2   Q    Yeah.

3   A    -- I have looked through them before, and this is the

4   information back and forth.  We generally exchanged, other

5   than at the face-to-face meeting, we exchanged information on

6   Zoom calls as well, but when we get documents we gave them

7   counsel-to-counsel.

8   Q    Okay.  And did you instruct me to produce all of the

9   communications with the HMIT side in connection with the

10  discovery requests that were served in this case?

11  A    Yes.  We had discovery requests that we went through in

12  detail and reviewed them, and we produced in accordance with

13  those requests.

14  Q    Are you aware of any document that we didn't produce that

15  reflects the parties' negotiations of this agreement?

16  A    No, not at all.

17  Q    Can you describe for the Court the general deal points

18  that were negotiated?  Withdrawn.  Who was your counterparty

19  to these negotiations?

20  A    The principal on the HMIT side is Mr. Mark Patrick.  He

21  had his team.  And I was responsible on our side with my team.

22  Q    And can you just describe for the Court what the primary

23  negotiating points were between the two teams?

24  A    Yeah.  Number one for us was dismissal of outstanding

25  litigations.  So we needed, with prejudice, dismissal of those

1    litigations.  Otherwise, why are we bothering?

2        Number two, we wanted to make sure that we had litigation

3    protections.  These have been around since -- we came up with

4    them during our mediation.  They're really important to us.

5    They set up a structure where we can actually count on the

6    estate and the principals of the estate and the indemnified

7    parties of the estate not being attacked.  So that was

8    essential to us.

9        In exchange, we had to fix their claim and allow it in an

10   amount pursuant to the plan, which requires us to fix an

11   amount.  And that's the Class 10 interest that they have,

12   which is senior to the Class 11 interests under the plan and

13   the Claimant Trust Agreement.

14       And then the way the Trust is set up in the plan, it's a

15   waterfall.  They -- we advocated for getting everything for us

16   upfront and putting everything for them at the back.  They,

17   understandably, didn't like that as much and wanted

18   distributions upfront.  So we negotiated around those terms.

19   And I think those are the biggest terms.

20       We had some assets that we were -- we were -- difficult to

21   monetize that we also were happy to dispose of in this way,

22   with a credit, you know, towards their claim amount.

23   Q    Did you -- and I may have missed this; I apologize if I

24   did -- but did you also negotiate the amounts and the timing

25   of the distributions that would be made to the HMIT entities?

Seery - Direct                          93

1    A    Yeah.  That's what I alluded to, where we -- we had hoped

2    to get everything for us upfront, give them everything later.

3    I think it's the *Wimpy* 'For a hamburger you give me today,

4    I'll gladly pay you Tuesday' structure.  That didn't like that

5    as much, so we did work on timing.  And that did bring into

6    consideration the other Class 9 holders and timing with

7    respect to payments to the Class 9.

8    Q    Was the topic of the allowed amount of HMIT's Class 10

9    interest the subject of negotiation?

10   A    The topic of the allowed --

11   Q    Did you discuss how the amount of its allowed interest

12   would be calculated?

13   A    Oh, yeah, that was a, you know, a critical part of the --

14   or, you know, essential part of the structure.  What's the

15   allowed amount they're going to get?  The plan requires an

16   amount fixed for that class.  We had already had a $10 million

17   HCLOM amount allowed into that class.  So we needed to fix

18   that amount.

19   Q    So let's transition to that particular topic, the

20   calculation of HMIT's Class 10 interest.  Are you familiar

21   with the methodology that was used to arrive at the Class 10

22   amount?

23   A    Yes.

24   Q    Can you tell me the process, before we get to the

25   methodology itself?  Like, what work was done to figure that

Seery - Direct                                    94

1   out?

2   A    Well, the structure of limited partnership is that the

3   equity account is treated as what's called a capital account.

4   Each limited partner in a limited partnership has a capital

5   account that tracks their equity interest.  As a default rule,

6   it's the amount that a limited partner can expect to get on a

7   sale of the partnership or a liquidation of the partnership.

8   So we used the capital account that had been maintained

9   continuously by Highland to set their capital account amount.

10      I think the partnership agreement talks about 99-1/2

11  percent for HMIT.  It doesn't talk about dollars because

12  that's kept in the accounting for the partnership.  And that

13  amount was consistently kept by Highland up to the petition

14  date.  And even after the petition date in the monthly

15  operating reports.

16  Q    If you take a look back at the exhibit list, I would

17  direct your attention to Page 12 of 15.  Actually, it starts

18  at the Page 11.  At the bottom, it's got the heading, Capital

19  Account Amounts.  Are you familiar with Exhibits 113 through

20  118?  And if you need to look at the exhibits, take your time.

21  A    Oh, I'm sorry.  I thought you told me 15.

22  Q    No.  One -- I did.  I mentioned Page 15.  But we're just

23  looking at Exhibits 113 to 118.

24              THE COURT:  113 to what?

25              MR. MORRIS:  18.

1          THE COURT:  Okay.

2          THE WITNESS:  Um, --

3          MR. MORRIS:  If you look at the index, Your Honor, at

4   the bottom of Page 15 -- 11, you'll see a heading, Capital

5   Accounts --

6          THE COURT:  Right.

7          MR. MORRIS:  -- Amounts.  And then that captures

8   Exhibits 113 to 118.

9          THE WITNESS:  Yes.

10  BY MR. MORRIS:

11  Q   Are those the documents that you and your team relied upon

12  in order to calculate the amount of the allowed Class 10

13  interest for HMIT?

14  A   These are some of them.  I don't know if you have the tax

15  returns in here and the K-1s.  Oh, here they are.  115.

16  Q   Yeah.  That's 115?

17  A   Yeah.  You've got the K-1s for 2018, which fix an amount.

18  Those are signed by Mr. Dondero, and they give the amounts to

19  each partner.  And then you've got the adjustments, because

20  those are done in -- they're 2018 year-end.  They were done in

21  September of 2019, about a month before the filing.

22  Q   And is that Exhibit 116?

23  A   It's 115 and 116.  I believe that's -- 116 is 2019, I

24  believe, and that would have been signed postpetition by -- I

25  believe that was signed by Waterhouse.

Seery - Direct                                    96

1    Q    Okay.

2    A    So it sets out the K-1.  The numbers that we have are

3    slightly different because they're in the -- they're not

4    middle of the year, but they're for the petition date of

5    10/16/19.  And there are -- there's economic activity that

6    happens during the year, that you take the year-end from '18

7    and you have economic activity that would affect, pursuant to

8    the partnership, the capital account of each partner during

9    that year,  fixed it on the petition date, and then it's been

10   forward since.

11   Q    Did you apply any of your own subjective views or beliefs

12   in the calculation of the amount of the Class 10 interest held

13   by HMIT?

14   A    No.  This was math.

15   Q    And did you hear Dugaboy's counsel suggest in the opening

16   that there was a different methodology that perhaps you could

17   have used, a pro rata methodology, instead of the methodology

18   you used?

19   A    I heard what he said, but it doesn't make any sense.  You

20   can't fix an amount that way.

21   Q    And do you understand that Dugaboy, under the partnership

22   agreement, is subordinated to HMIT?

23   A    Dugaboy is subordinated under the partnership agreement

24   for certain distributions.  But importantly for our purposes,

25   they're subordinated under the plan.  So the Class 11

1   interests are explicitly subordinated to the Class 10

2   interests, in both the plan and the Claimant Trust Agreement.

3   Q    Did the Debtor consider putting Dugaboy and HMIT in the

4   same class?  Back when the plan was being formulated?

5   A    I -- I don't recall.

6   Q    Do you recall why they're in separate classes?

7   A    They -- they're in separate classes because HMIT had a

8   senior -- a right to senior distributions under the

9   partnership agreement.  We set it up that way.  Nobody

10  objected to it.  That was part of the confirmed plan and the

11  confirmed order.

12  Q    Thank you very much.  Let's talk for just a moment about

13  Mr. Patrick's authority.  Before entering into the settlement

14  agreement, did you do anything to satisfy yourself that Mr.

15  Patrick had the authority to enter into the settlement

16  agreement on behalf of each of the HMIT entities?

17  A    Yes.

18  Q    What did you do to satisfy yourself?

19  A    Well, as a default rule, I always look at the agreements

20  that I'm going to enter into and the organizational docs.  And

21  we did do that.  We looked at each of the organizational docs

22  to --

23  Q    Let me stop you there for a second.  Are those the

24  documents that are in the exhibit list from 70 through 104?

25  A    I'd have to check the actual numbers, but --

1    Q    If you just look at the exhibit list.

2    A    Oh.

3    Q    It's at the front.  You'll see on Page 8 of 15 of the

4    exhibit list there's a heading, --

5    A    Yes.

6    Q    -- E, Patrick Authority, and then I'm asking you if you

7    are aware of what Exhibits 70 through 104 are?

8    A    Yes.  So, these, these are -- there's a number of

9    organizational documents that we looked and made sure that Mr.

10    Patrick had authority.

11        We also knew from our own files that Mr. Patrick, you

12    know, previously had different interests assigned to him, and

13    we know from Mr. Patrick and documents he's given us that John

14    Honis, who was a former controller of some of -- controlled

15    some of these entities and a friend of Dondero's who

16    previously worked at Highland, is on some retail boards, in

17    2022 transferred those interests to an entity controlled by

18    Mr. Patrick.

19        Moreover, Mr. Patrick was here in court as the HMIT

20    Administrator, trying to sue the Highland estate.  He

21    testified on behalf of HMIT as the Administrator.  And the

22    documents are very clear that the Administrator has full

23    control of these entities.

24    Q    We've heard some argument about a Cayman Islands

25    proceeding.  Are you generally aware of what's happening in

Seery - Direct                                    99

1    the Cayman Islands?

2    A    I hesitate to say generally aware.  I'm aware that there's

3    a proceeding in the Cayman Islands about involving a blocker

4    corp.  And there's disclosure in this Court about what that

5    entity is.  It's a blocker corp. in the Caymans that prevents

6    the ultimate charitable entities -- and I put that in quotes

7    -- to -- from receiving UBTI, which is Unrelated Business

8    Income.  And in that case, they would have to pay tax on it,

9    and the idea is that they don't want to pay taxes and they

10   don't pay taxes.  So that corp. apparently is in some sort of

11   proceeding.  That's on the DAF side.  That is not on the HMIT

12   side.

13   Q    Okay.  So, based on the work that you did and the

14   documents that you reviewed, did you form a view as to whether

15   or not Mr. Patrick is authorized to enter into the settlement

16   agreement on behalf of each of the HMIT entities?

17   A    Yes.

18   Q    And what view did you reach?

19   A    He has complete authority over each of these entities.

20   They run up to entities that he controls or he owns.  And he's

21   had that, and it's the structure that was set up a long time

22   ago, and any changes to that structure are just consistent

23   with the documents that let him do these things.  And the

24   proceeding in Cayman, whatever that is, has no impact on Mr.

25   Patrick's authority over these entities or any of the entities

1   in this chain.

2   Q    Did you see anything in the diligence that you conducted

3   that required Mr. Patrick to seek anybody's authority,

4   consent, or approval before entering into the settlement

5   agreement on behalf of the HMIT entities?

6   A    No.  And we could go through each document.  He has

7   complete authority on each of these entities.  And even the

8   objections that were filed that were withdrawn from The Dallas

9   Foundation, they have no -- it's absolutely clear that they

10  have no rights to deal with at all the management of each of

11  these entities.  They don't have an ownership interest in it.

12  Crown issued an annuity policy that's a variable policy.  They

13  have no rights.

14  Q    All right.  Let's turn to the agreement itself.  Can you

15  tell the Court why you believe that the settlement agreement

16  is in the Claimant Trust's best interests?

17  A    Number one, this case has been going on for a full five

18  years.  We have spent tens of millions of dollars dealing with

19  vexatious and frivolous litigation and attacks.  The

20  opportunity to settle with a Class 10 holder and allow their

21  claim under the terms of the settlement is extremely valuable

22  because it moves us much, much closer to a potential

23  resolution of this case, which we would all love to resolve.

24      Number two, it's fair value for the estate.  We are making

25  sure, while we're paying some money out in front, we have

Seery - Direct                                101

1    triggers on the backend payments to ensure that the Indemnity

2    Trust has enough assets to protect parties if there are

3    unforeseen litigations.  And I can almost bet there'll be at

4    least one or two of those.  So it's really, really valuable in

5    that respect.

6        Three, it cuts down tremendously on what future expenses

7    could be.  Because we have gotten these litigation

8    protections, we've basically walled off a potential avenue to

9    be attacked.  And I think the structure of this deal is

10   valuable, not only to the fiduciaries and folks who have been

11   responsible for managing this process and who are indemnified

12   by the Claimant Trust or HCMLP, it also enables us to, down

13   the road, pay off the Class 9s and ultimately make

14   distributions to the Class 10s.

15   Q    Is one of the other benefits to this agreement is that it

16   enables the Claimant Trust to dispose of certain illiquid

17   assets?

18   A    Well, that's a -- that is a benefit, because we do have to

19   resolve these claims and dispose of these assets, and we're

20   not in a position to hang around until 2030 or more to do

21   that.

22       So we've got the Kirschner claims, which would go to HMIT.

23   Again, the way that the waterfall is set up, to the extent

24   that they have value, they are very expensive to pursue.

25   We've spent a ton of money setting them up.  We've produced

Seery - Direct                                    102

1    seven million documents, pages, and received zero in return.

2    We stayed them because we didn't think we needed them for the

3    Class 8 and 9 and it was prudent to do so, and the question

4    was would we need them for indemnification.  So disposing of

5    those claims now at this time as part of this settlement,

6    where that value would go to Class 10 anyway, is very

7    valuable.

8    Q    Had you made any efforts prior to entering into this

9    agreement to monetize or otherwise sell the Dugaboy Note?

10   A    Yes.

11   Q    Can you describe for the Court what your efforts were in

12   that regard?

13   A    So, we set out to try to monetize the Dugaboy Note.  I

14   contacted -- we put together what we call a teaser, laying out

15   what we knew about Dugaboy, at least up until the time that

16   Dugaboy was no longer part of our computer system.  Laid out

17   what we thought the assets were.  There's not a lot of public

18   information.  Laid out the amortizing of the note.  It's a 3.2

19   percent-ish, 3.26 percent note, I believe, goes to 2047, '46

20   on the amortization, 2047.   And then presented that to I

21   think it's five different investors in distressed funds.  Had

22   no interest whatsoever.  One investor laughed at me, which I

23   understood that he was aware of the parties and the principals

24   and the collection efforts that would be difficult on that

25   note.

Seery - Direct                                103

1        The note is performing, because if it hadn't performed I

2   would have accelerated on the first second and we would have

3   collected the whole thing.  But we've seen that show in the

4   other Notes Litigation.  And so we didn't -- we didn't get any

5   reception.

6        We also reached out to Mr. Dondero, in writing, through

7   D.C. Sauder, and made them an offer and tried to get them to

8   respond, and they indicated they had no interest in the note.

9   Q    Turning back to the exhibit list, if you can turn your

10  attention to Page 11 of 15 of the exhibit list, is Section F,

11  Exhibits 105 through 112, the documents that reflect the note

12  and your efforts to dispose of the note?

13  A    Yes.

14  Q    And let's take a look at Exhibit 112 quickly, since that

15  involves Mr. Dondero.  Can you just tell the Court what this

16  exhibit is?

17  A    Yes.  This is an exchange between D.C. Sauder, Matt

18  McGraner, both of whom work for Dondero, and Dave Klos, our

19  CFO.  I'd authorized Dave to make an offer to them to see if

20  we could get cash for the Dugaboy Note.  And as you see right

21  below the reply from Mr. Klos, which is -- this is friendly,

22  but Mr. Sauder's indication that they have no interest.

23  Q    Okay.  So Highland offered to sell the Dugaboy Note to Mr.

24  Dondero or entities controlled by him, and that offer was

25  rejected without a counteroffer.  Do I have that right?

Seery - Direct                                    104

1    A    That's correct.

2    Q    Okay.  Let's finish up here.  Are you familiar with the

3    objections of Dugaboy and Mr. Daugherty that the settlement

4    somehow violates the plan because it's making distributions to

5    Class 10 before junior classes are paid in full?

6    A    Yes.  I'm familiar with those.

7    Q    Do you believe the settlement violates the plan?

8    A    Not at all.

9    Q    And why is that?

10   A    The plan specifically contemplates that -- I don't think

11   it's -- we showed the 9 and 10s, but I think it's any claimant

12   could take less than is being offered by the plan.  What we

13   did very specifically is go to the Class 9 claimants and

14   discuss with them this opportunity to settle with HMIT and

15   what it would take, which included some, as I described

16   earlier, payments upfront.

17        After being fully informed -- they asked a lot of

18   questions, they pushed back quite a bit, as you can expect

19   that they would -- and we reached agreement with those Class 9

20   claimants in writing to approve the structure of the deal and

21   the settlement and the concurrent payments, as well as the

22   final small payment to Mr. Daugherty on behalf of his Class 9

23   claim.

24   Q    Could I trouble you to turn to Exhibit 59, please, Mr.

25   Seery?

1    A    I've got it.

2    Q    Are you familiar with that document?

3    A    I am, yes.

4    Q    Can you explain to the Court what that document is?

5    A    This document is the written consent that we entered into

6    with the Class 9 claimants, approving the settlement agreement

7    as well as the payment to Mr. Daugherty.

8    Q    Okay.

9    A    And -- and -- so these -- the payment to Mr. Daugherty

10   would have been non-pro rata, so they agreed to that.  And the

11   concurrent payments under the settlement agreement to Class 10

12   were agreed to by the Class 9 claim holders.

13   Q    So looking at Page 2 at the top, do I have this right,

14   that Mr. Daugherty's original Class 9 subordinated claim was

15   in the amount of $3.75 million, and that with the payment

16   described in this document his claim was paid in full?

17   A    That's correct, yes.

18   Q    And did he complain that he was getting paid in full but

19   the other Class 9 holders were not?

20   A    No.  That had never been his complaint.

21   Q    Did he complain that he was getting paid in full on his

22   Class 9 claim but his Class 8 claim remained unresolved?

23   A    No.  I think that, as indicated before in my testimony and

24   indicated here, this was the last payment, the 781.  Before

25   that, he'd received almost $3 million on account of his Class

Seery - Direct                                    106

1    9 claim.  And pro rata with the other Class 9 claimants.

2    Q    I think you mentioned that your understanding is that,

3    under the plan, creditors can elect to receive less favorable

4    treatment than the plan otherwise provides.  Is that right?

5    A    That's correct.  And I think that's a pretty standard

6    provision in virtually every plan that I see.

7    Q    Can we just grab that for a second?  It's the last

8    exhibit, 126, which is probably in the skinny binder, if you

9    have one.

10   A    Yes.  Do you want me to go to the section?

11   Q    Yeah.  Just one minute.  I want to make sure the judge is

12   with us.  Give her a second.

13            MR. MORRIS:  Are you with us, Your Honor?

14            THE COURT:  Yes.

15            MR. MORRIS:  Okay.

16   BY MR. MORRIS:

17   Q    So if you can turn to Page 23 of Exhibit 126.  Does

18   Section 9, under Treatment, Romanette (ii), is that the

19   provision that you were just describing that gives Class 9

20   holders the ability to receive such other less-favorable

21   treatment as to which such holder and the Claimant Trust may

22   agree upon in writing?

23   A    That's correct.

24   Q    And the same is true with respect to the Class 10 claims,

25   at the top of Page 24?

1  A    That's also correct, yes.

2  Q    All right.  And so was the consent that was executed by

3  the Class 9 holders that's Exhibit 59 done in satisfaction of

4  these plan provisions?

5  A    I'd say it's consistent with these.  They could elect to

6  receive it or not, but this was, you know, did it under this

7  provision and they were entitled to elect to take lesser

8  treatment, if that's what they agree to.

9  Q    Okay.  Can you describe for the Court why you believe that

10  the Class 9 claim holders are receiving less-favorable

11  treatment under -- as a result of this settlement agreement

12  than they would otherwise be entitled to under the plan?

13  A    Well, they would be entitled to receive payments in front

14  of any payments that would be made to Class 10.  In addition,

15  they would have been entitled to receive a pro rata

16  distribution of the $800,000 that was paid to Mr. Daugherty,

17  and they agreed to waive those provisions.

18  Q    Okay.  Is it your understanding that HMIT is also

19  accepting less favorable treatment than it might otherwise

20  receive if it pursued and succeeded in the prosecution of its

21  claim?

22  A    I suppose, ultimately, if everything was resolved, that

23  they could have gotten a Class 10 interest that wasn't

24  structured along the lines of the settlement agreement.  So

25  the settlement agreement takes some of that structure and what

Seery - Direct                                      108

1  arguably would be value away from them, and this is the amount

2  that they've agreed to have as their allowed claim, as

3  structured by the settlement agreement.

4  Q    And is it your understanding that under the settlement

5  agreement HMIT has disavowed any rights under the Claimant

6  Trust Agreement?

7  A    Under the Claimant Trust Agreement, yes.  They have rights

8  under the settlement agreement to receive distributions, and

9  those will ultimately come from the Indemnity Trust as we wind

10 down the Claimant Trust.

11 Q    And did HMIT also agree that it would not be a Claimant

12 Trust beneficiary under the Claimant Trust?

13 A    Yes.  And that's very important to us because we have seen

14 lots of litigation, lots of emails, trying to use these types

15 of structures just to create claims, even when there's

16 literally no basis for it.  I should -- well, I'll control

17 myself.

18 Q    Yeah.  We can stop there.

19        MR. MORRIS:  Your Honor, I have no further questions

20 at this time.

21        THE COURT:  All right.  We're going to figure out,

22 are we taking a bathroom break or a short lunch break.  I'll

23 poll the audience and then I'll decide.  Do people want to

24 take maybe a 30 to 45-minute lunch break, or just a bathroom

25 break and keep going?

Seery - Direct                              109

1              THE WITNESS:  Thirty minutes.

2              THE COURT:  I'll say -- are you going to have any

3    further examination?

4              MR. PHILLIPS:  I'm going to maybe ask one question,

5    just to bring it up.  It's already been -- but one question.

6              THE COURT:  Okay.  And then what about Dugaboy and

7    Daugherty?  Guesstimate how much examination you'll have.

8              MR. YORK:  Fifteen minutes, maybe.

9              MR. LANG:  Twenty minutes or so.

10             THE COURT:  Why don't we take a five-minute bathroom

11   break, --

12             MR. PHILLIPS:  Sure.

13             THE COURT:  -- and then we'll at least finish this

14   witness.

15             MR. PHILLIPS:  Perfect.

16             THE COURT:  All right?

17             MR. PHILLIPS:  Thank you, Your Honor.

18             THE WITNESS:  Thank you.

19             THE CLERK:  All rise.

20        (A recess ensued from 12:07 p.m. until 12:15 p.m.)

21             THE CLERK:  All rise.

22             THE COURT:  Please be seated.

23        (Pause.)

24             THE COURT:  All right.  Can I get some help rounding

25   people up?

Seery - Cross                              110

1      (Pause.)

2              THE COURT:  All right.  We're missing -- okay.  We're

3      going back on the record in Highland Capital.  We still have

4      Mr. Seery on the witness stand.  Mr. Phillips, you had

5      examination.  You said one question.

6              MR. PHILLIPS:  I did, Your Honor.  And I meant it.

7              THE COURT:  Okay.

8                          CROSS-EXAMINATION

9      BY MR. PHILLIPS:

10     Q    Could you look at Exhibit 118, please?

11     A    You said 118?

12     Q    Yes, sir.

13     A    Certainly.

14     Q    Did the calculation of the Class 10 claim amount of

15     $336,940,230.58, is that the result of applying the full value

16     to the Highland or Highland Claimant Trust of the HMIT note

17     receivable?

18     A    Apologies, because I can't read this because it's too

19     small, but I can answer the question.

20              THE COURT:  Would you like this?

21              THE WITNESS:  I think I can answer the question

22     without it.

23              THE COURT:  Okay.

24              THE WITNESS:  The -- what we used was the petition

25     date capital account.

1  BY MR. PHILLIPS:

2  Q    Correct.

3  A    And just like every other claim in bankruptcy, fixed at

4  the petition date.  And what we subtracted from that petition

5  date was the petition date amount principal and interest of

6  that HMIT note which was owed to Highland Capital.

7  Q    Thank you.

8           THE COURT:  All right.  That was one question.

9       All right.  Counsel?

10          MR. YORK:  Thank you, Your Honor.  Get it organized

11  here.

12                      CROSS-EXAMINATION

13  BY MR. YORK:

14  Q    Good afternoon, Mr. Seery.

15  A    Good afternoon.

16  Q    Would you take a look at Exhibit 1 in Daugherty's witness

17  and exhibit binder?  It's the settlement agreement between

18  Highland and Mr. Daugherty, I believe.

19  A    Yes, I have it.

20  Q    All right.  And can you confirm that is the settlement

21  agreement that Highland and Mr. Daugherty entered into in

22  connection with the claims Mr. Daugherty asserted in the

23  bankruptcy?

24  A    It appears to be, yes.

25  Q    Would you turn to Section 9, then, which is on Page #11,

Seery - Cross                                    112

1   starts on Page #11?

2   A    Yes.

3   Q    And that relates to a reserved claim that Mr. Daugherty

4   had as part of his proof of claim against Highland in the

5   bankruptcy, correct?

6   A    That's correct.

7   Q    And would you agree with me that the second line of

8   Section 9 there of the settlement agreement describes that

9   claim as a contingent unliquidated claim against the Debtor?

10  A    I would not agree with you on that, no.

11  Q    Why not?

12  A    Because it says, Daugherty contends --

13  Q    Ah.  Daugherty contends.

14  A    -- he has a contingent unliquidated claim against the

15  Debtor.

16  Q    Okay.  Well, why don't you then turn with me to Daugherty

17  Exhibit #2, which is the -- which is the -- Highland's

18  adversary complaint that was filed against Mr. Daugherty on I

19  believe May 2nd of 2025.  Correct?

20  A    I don't recall the specific date and it's blurred at the

21  top.  So if you say so, I'll accept that.

22  Q    All right.  And if you look at Paragraph 1, the third

23  line, there's a sentence there that says, All of Mr.

24  Daugherty's claims were settled except his unliquidated

25  contingent claim that the Debtor has a continuing and

1    indefinite obligation to make him whole if a tax refund he

2    apparently received for tax year 2008 on account of his

3    partnership interest is ever successfully challenged by the

4    IRS.

5         Did I read that correctly?

6    A    You did read that correctly, yes.

7    Q    All right.  This reserved claim under the settlement

8    agreement is a Class 8 unsecured claim, correct?

9    A    It is the claim that he asserted and that we initially

10   classed under Class 8 in a fixed amount for a tax refund which

11   is on his statement that he got that he claims he's entitled

12   to more, which would be unsecured as of the petition date.  I

13   believe the amount on his payment statement from 2009 is

14   $1.475 million.

15   Q    All right.

16           THE COURT:  Could you pull the microphone closer to

17   you?

18           THE WITNESS:  I'm sorry, Your Honor.

19           THE COURT:  Okay.  Good.

20           MR. YORK:  All right.

21   BY MR. YORK:

22   Q    And, again, my question is pretty simple.  And it's a

23   Class 8 unsecured claim, right?

24   A    It's not a Class 8.  It was in Class 8.  It's been

25   objected to.

Seery - Cross                          114

1    Q    Right.

2    A    So it is not in a class now at all.  We seek to disallow

3    it in its entirety, or, at worst, subordinate it to all

4    creditor claims.

5    Q    Understood.  But it has been asserted as a Class 8 general

6    unsecured claim, right?

7    A    He asserted it as that, yes.

8    Q    Okay.  And is it fair to say that in the adversary

9    complaint, if you go to Page -- I'm sorry, Paragraph 4 --

10   Highland alleges that:  However, even if Mr. Daugherty's claim

11   is not disallowed in its entire -- I think that should be

12   entirety.  Right?

13   A    It should be, yes.

14   Q    It remains contingent on the outcome of the 2008 audit.

15   Correct?  Did I read that correctly?

16   A    You did read that correctly, yes.

17   Q    And the next sentence says, It is unclear when, how, or if

18   the 2008 audit will finally be resolved.  Correct?

19   A    Correct.

20   Q    And in fact, if you go to, then, Page #7 of the complaint

21   and you look at Footnote 6, at the very end of that footnote

22   it indicates that Highland has an understanding that the

23   resolution may not be expected until approximately 2029.  Is

24   that correct?

25   A    The litig... I can't read it because it's small, but the

Seery - Cross                                          115

1    litigation may not be resolved.  The IRS has already issued a

2    final determination on the audit.

3    Q    How do you know that?

4    A    I was advised that by another partner.

5    Q    Who?

6    A    Kurt Plumer.

7    Q    Have you seen the FPAA that was issued by the IRS?

8    A    No, I have not.

9    Q    Have you asked for it?

10   A    Yes.

11   Q    You did, personally?

12   A    My lawyers did.

13   Q    Your lawyers did?

14   A    Yes.

15   Q    Okay.  But you -- but you did not, right?  Just to be

16   clear.

17   A    No, I did not.  My lawyers, acting at my direction, did.

18   Q    Asked the tax matters partner for Highland for that

19   information?

20   A    Asked Mr. Daugherty.

21   Q    Asked Mr. --

22   A    I think asked you, I'm sorry.

23   Q    Oh, asked me for that information?

24   A    Yes.

25   Q    Well, so tell me, why is Mr. Daugherty -- first off, do

Seery - Cross                                    116

1    you know if Mr. Daugherty has received the FPAA?

2    A    I don't know.

3    Q    Okay.  Do you know if anybody else has received an FPAA?

4    A    I was told there was a final determination.  I don't know

5    if they've actually received an FPAA.  But I do know that Mr.

6    Daugherty has produced a document where the IRS has requested

7    additional information for him.  Since they hadn't done that

8    for 17 years, I suspect that they've reached a final

9    determination of the audit.

10   Q    All right.  So you don't know whether an FPAA has actually

11   been issued?

12   A    I --

13   Q    True?

14   A    I don't know.  And for the Court's benefit, that's a Final

15   Partnership something Determination.

16   Q    Okay.  What -- where --

17              THE COURT:  F-A --

18              THE WITNESS:  F-P-P -- I think it's --

19              MR. YORK:  F-P-A-A.

20              THE WITNESS:  -- F-P-A-A.

21              THE COURT:  Okay.  The court reporter will no doubt

22   ask, so good.

23   BY MR. YORK:

24   Q    Tell me, where in the universe is it that -- is it Mr.

25   Daugherty's obligation to provide Highland with the FPAA?

Seery - Cross                                    117

1    A    I don't -- I don't think there's any such obligation that

2    I've seen.

3    Q    And in fact, the IRS audit is handled by the tax matters

4    partner for Highland Capital, correct?

5    A    The IRS audit for Highland Capital's -- from Highland

6    Capital's position is handled by that.  The IRS handles their

7    side.

8    Q    Right.  From Highland's side.  Okay.  And that tax matters

9    partner is doing that on behalf of Highland Capital, right?

10   A    I think at this point it's doing it on behalf of the old

11   Highland Capital, not Reorg Highland Capital.  We don't have

12   any liability with respect to it, nor do we have any

13   visibility as to what's going on in the tax audit.

14   Q    So even though, under the partnership agreement, that's

15   the tax matters partner that's referred to, Highland Capital

16   cannot compel that tax matters partner to provide that

17   information to them, if an FPAA actually exists?

18   A    I don't think so.  That partnership agreement is the pre-

19   effective date partnership agreement.

20   Q    All right.

21   A    The new Highland Reorg Debtor doesn't have these partners

22   and is not a tax matter partner for those -- those audits.

23   Q    So let's go back, then, to Paragraph 4 of the adversary

24   complaint that was filed.  And I want to look at the next

25   sentence that Highland wrote there.  It says:  Moreover, if

1    the claim is not disallowed, it will need to be estimated,

2    after taking into account the likely outcome of the 2008

3    audit, including adjustments that result therefrom.

4        Did I read that correctly?

5    A    You read that correctly.

6    Q    Have -- has anyone at Highland conducted any analysis as

7    of today to determine what Mr. Daugherty's potential liability

8    would be from that IRS audit if that audit was completed today

9    and all interest and penalties were assessed as of today?

10   A    Yes.

11   Q    How much?

12   A    It would be $1.475 million, the amount of his prepetition

13   claim in his proof of claim.  Since it's unsecured, whatever

14   happens with the IRS is not a concern of Highland.  His claim

15   is that he didn't get that amount as a refund.  Either he got

16   that amount or he got some -- some lower amount.  It would be

17   a petition -- prepetition-date amount.  And under Texas law,

18   he would be entitled to prejudgment interest from 2009 to the

19   petition date at a rate of five percent.

20   Q    Which would be how much?

21   A    It would be approximately $2.2 million in aggregate.

22   Q    Okay.  And there would be -- you're saying there would be

23   no penalties or any other -- any other interests or

24   assessments that would -- Mr. Daugherty would be liable for

25   that Highland would also then be liable for under that claim?

Seery - Cross                              119

1  A    No.  There would not.  It would not impact his claim

2  against Highland.  His claim against Highland is simply:  I

3  did not get this refund.

4      He got the refund.  He's now claiming it might be

5  adjusted.  If the IRS otherwise has penalties, interest

6  against him for his tax attributes somewhere between 2009 and

7  2019, that wouldn't be subject to his proof of claim and it

8  wouldn't be the responsibility of Highland.

9  Q    Even if Highland had promised at the time that that refund

10 was made that it would -- it would make him whole with respect

11 to any IRS audit whatsoever?

12 A    It simply --

13         MR. MORRIS:  Objection to the form of the question.

14         THE WITNESS:  It simply didn't do that.

15         MR. MORRIS:  Yeah.

16         THE COURT:  Okay.  Overruled.

17         THE WITNESS:  We can -- you could litigate the claim,

18 but that's just not what it says.

19 BY MR. YORK:

20 Q    So you talked earlier about the Class 9 consent that was

21 obtained, and no one from Highland reached out to Mr.

22 Daugherty to try to seek his consent.  Right?

23 A    That's correct.

24 Q    Why not?

25 A    Because I didn't want to.

Seery - Cross                                    120

1    Q    Why?

2    A    Because Mr. Daugherty is an extremely difficult person to

3    deal with.  The last time I dealt with Mr. Daugherty on the

4    phone with respect to anything, I had extreme difficulty and

5    got sucked into a stalking lawsuit that I had to testify to

6    that is a complete mess that I want nothing to do with.  So

7    originally my counsel said, have no communication with him.

8    But with respect to this, we were objecting to his claim.  We

9    knew he would try to hold this up.  You have tried to do that

10   and demanded $20 million.  So that's why we didn't reach out

11   to you.  We just paid the 9 and we have a fully-reserved

12   amount on the 8.

13   Q    You thought that the stalking case that you were pulled

14   into was completely fabricated, didn't you?

15   A    I thought that at the time.  I'm not as sure anymore.

16   Q    Oh, really?

17   A    Yeah.

18   Q    Okay.  And you actually also told Mr. Daugherty that Mr.

19   Ellington, who brought that case, was a complete liar and POS,

20   right?

21   A    I don't know if I used POS, but I do not think Mr.

22   Ellington is an honest person.

23        MR. MORRIS:  Your Honor, at some point I'm going to

24   on relevance grounds.  I think we've got a settlement

25   agreement before the Court that we're trying to get approved

1   today, not to take discovery on any other matters.

2           THE COURT:  Okay.  I'm going to overrule to the

3   extent there was an objection, but I think it's appropriate to

4   worry that we're straying down a road that is not relevant.

5   So, --

6           MR. YORK:  Understood.

7           THE COURT:  -- reign it in.

8           MR. YORK:  All right.

9   BY MR. YORK:

10  Q    You'd agree that the -- under the terms of the proposed

11  settlement, there will be some interim distributions will be

12  made to the HMIT entities in cash totaling approximately $23

13  million.  Correct?

14  A    Not necessarily, no.

15  Q    Why not?

16  A    Because there's an initial distribution.  I believe it's

17  $10 million.

18  Q    Yes.

19  A    And then subsequent distributions are predicated on

20  whether there are threats, either outstanding litigation or

21  threats as defined in the agreement.

22  Q    And so long as those threats don't occur, then those

23  interim -- those additional interim distributions will be

24  made, right?

25  A    Yes.  The Indemnity Trust would make those distributions

Seery - Cross                        122

1    at those times, and then I have to make -- it's a double

2    trigger, because it has to be no threats and I have to

3    determine that the Indemnity Trust had sufficient assets to

4    meet its obligations for both actual and contingent

5    indemnification obligations.

6    Q    But at a minimum, the HMIT entities will receive at least

7    $10 million?

8    A    Yes.

9    Q    On an interim basis?

10   A    Yes.

11   Q    All right.  And you'd agree with me that, under the terms

12   of the plan, the plan provides that the classes get paid in

13   order of priority, correct?

14   A    That's correct.

15   Q    All right.  And if you turn to Daugherty Exhibit 4, which

16   is the confirmation order, at Page 45.  And Subsection A there

17   in the middle of that has a sentence that says:  Accordingly,

18   as the holders of the equity -- excuse me.  Strike that.  Let

19   me start over.  Are you there yet, Mr. --

20   A    Now I am.

21   Q    All right.  Accordingly, as the holders of equity

22   interests that are junior to the claims in Class 8 and Class 9

23   will not receive or retain under the plan on account of such

24   junior claim interest in any property unless and until the

25   claims in Class 8 and Class 9 are paid in full, plus

Seery - Cross                                123

1    applicable interest, --

2         Did I read all that correctly?

3    A    Yes.

4    Q    Okay.  And the term "Claim" there is a capitalized term,

5    right?

6    A    Yes.

7    Q    It's not -- it doesn't say allowed claims.  It just says

8    claims.  Right?

9    A    That's correct.

10   Q    All right.  All right.  Now, if you'd turn with me to the

11   Claimant Trust Agreement, which is Daugherty Exhibit 5, and go

12   to Section 5(c).  Excuse me.  5.1(c).  I apologize.

13   A    Yes.

14   Q    And this is -- this is -- relates to the contingent trust

15   interests associated with the Class 10 and Class 11 limited

16   partnership interests in Highland, correct?

17   A    Generally, yes.

18   Q    All right.  And you'd agree with me that, in the -- about

19   four lines down, it says:  The Claimant Trustee shall allocate

20   to each holder of allowed Class 10-B and C limited partnership

21   interests and each holder of allowed Class 11 Class A limited

22   partnership interests a contingent trust interest equal to the

23   ratio that the amount of each holder's allowed Class 10 or

24   Class 11 interest bears to the total amount of the Class 11 or

25   -- Class 10 or Class 11 interest, excuse me, as applicable

Seery - Cross                                    124

1    under the plan.

2         Did I read all of that correctly?

3    A    I believe you did, yes.

4    Q    All right.  And under the terms of the proposed

5    settlement, the HMIT entities are getting an allowed Class 10

6    interest, correct?

7    A    That's correct, yes.

8    Q    All right.  And then the next sentence goes on to say:

9    The contingent trust interest shall not vest and the equity

10   holder shall not have any rights under this agreement unless

11   and until the Claimant Trustee files with the Bankruptcy Court

12   a certification that all GUC beneficiaries have been paid

13   indefeasibly in full, including, to the extent applicable, all

14   accrued and unpaid postpetition interest consistent with the

15   plan and all disputed claims have been resolved.  The GUC

16   Payment Certification.

17        Did I read that correctly?

18   A    You did, except you used the article "The" before

19   "contingent trust interest" at the start of the sentence.

20   Q    Fair enough.  And the GUC beneficiaries there would be the

21   general unsecured creditor beneficiaries, correct?

22   A    That's correct.

23   Q    And this certification has not been issued yet by the

24   Claimant Trustee in this bankruptcy, correct?

25   A    That's correct.

Seery - Cross                                    125

1    Q    In part because of Mr. Daugherty's remaining unresolved

2    Class 8 claim, correct?

3    A    In part, yes.

4    Q    And also in part because of the remaining Class 9 claimant

5    holders who still have money owed to them on their Class 9

6    claims?

7    A    In part, yes.

8    Q    Okay.  Does the term of the proposed settlement agreement

9    provide those Class 9 consent holders with releases from the

10   HMIT entities?

11   A    No.

12   Q    It does not?

13   A    No.

14   Q    At all?

15   A    No.

16   Q    Even if they were in their capacity serving as board

17   members for Highland Capital?

18   A    Certain of the Class 9 holders are also on the Oversight

19   Board.  In their capacity as Oversight Board members, yes,

20   they get -- they get broad releases.  UBS, for example, is

21   not.  There are no releases in there for the two UBS entities.

22   Q    Would you now -- you can set that binder aside.  And if

23   you'd turn with me to Exhibit 60 in the -- Highland's exhibit

24   list.

25   A    Six zero?

Seery - Cross                                      126

1    Q    Yes, sir.

2    A    Yes.

3    Q    This is a copy of the tolling agreement extending

4    objection deadline between -- that's on -- dated July 27th of

5    2022 between Mr. Daugherty and Highland Capital Management, LP

6    and Highland Claimant Trust.  Correct?

7    A    Yes.  That's what it appears to be, yes.

8    Q    All right.  If you would, go with me to Page 2 at the

9    bottom.  There is a Footnote #3.  Do you see that?

10   A    Yes.

11   Q    And that footnote relates to, up above, a defined term

12   called a "Reserved Claim," the Reserved Claim being what was

13   discussed earlier in Mr. Daugherty's settlement agreement with

14   Highland, right?

15   A    That's correct, yes.

16   Q    And it states in here that that Reserved Claim means "the

17   contingent and unliquidated claim as referenced in Proof of

18   Claim #205."

19        Did I read that portion of the footnote correctly?

20   A    Yes.

21   Q    All right.  And it goes further to say that the amount

22   listed there of 2.65 million three hundred -- two point six --

23   let me start ever.  $2,650,353 is the amount estimated as of

24   October 23, 2020.  Correct?

25   A    That's correct.

Seery - Cross                                    127

1    Q    All right.  It doesn't say it's -- anywhere in there that

2    it's a fully -- it fully reserves that unliquidated contingent

3    claim.  Correct?

4    A    In what you just read, no.

5    Q    All right.  And if you go to Page 1 -- or, I'm sorry, to

6    Page 3, Paragraph 1, the covenant to reserve where Highland

7    agrees to reserve $2,650,353 on account of the reserved claim,

8    does it say anywhere in there that that is -- fully reserves

9    that contingent unliquidated claim anywhere?

10   A    It says exactly what it says.  And you read it.

11   Q    That's not my question.  Does it say --

12   A    I don't -- well, it says, Further agree to reserve $2.650

13   [million] on account of the reserved claim in disputed claim

14   reserve.

15   Q    All right.  Does it say anywhere in there that that is the

16   fully-reserved amount of that claim?

17   A    Not in that sentence, no.

18   Q    Thank you.  All right.

19          MR. YORK:  Your Honor, give me one second.  Let me

20   confer.

21          THE COURT:  Okay.

22       (Pause.)

23   BY MR. YORK:

24   Q    Mr. Seery, UBS is one of the consent holders, Class 9

25   consent holders related to the HMIT settlement.  Correct?

Seery - Cross                          128

1    A    There are two UBS entities, UBS AG 66 and UBS Securities,

2    LLC.

3    Q    All right.  Did either of those entities sit on the

4    Unsecured Creditors' Committee in this bankruptcy?

5    A    A UBS entity did.  I'm not sure which of those did, or

6    whether it was both with one counsel.  I don't -- there's a

7    UBS entity on that Creditors' Committee.

8    Q    Is the -- are the members of the Unsecured Creditors'

9    Committee within the definition of the Highland released

10   parties under the proposed HMIT settlement?  Do you know?

11   A    I don't know.  The members of the Creditors' Committee, I

12   believe, have exculpation anyway, so I don't -- I don't -- I

13   don't know if it captures the old members of the Creditors'

14   Committee.  I don't -- for example -- I don't think so.  I

15   don't -- I don't know.

16             MR. YORK:  Pass the witness.

17             THE COURT:  All right.  Mr. Lang?

18             THE WITNESS:  Do you have a separate binder?

19             MR. LANG:  No.

20             THE WITNESS:  Okay.  Will you be using Mr.

21   Daugherty's binder?

22             MR. LANG:  No.

23                         CROSS-EXAMINATION

24   BY MR. LANG:

25   Q    All right, Mr. Seery.  Just to be clear, the Class B and C

Seery - Cross                              129

1  -- or the Class A interests and the -- of Highland under the

2  plan, they have 99.5 percent of the -- Highland Capital

3  Management.  Correct?

4  A    Could --

5  Q    Sorry.  The Class B and C --

6  A    Limited partnership interest.

7  Q    -- shareholder -- limited partnership interests were 99

8  point -- or, were .5 percent of Highland Capital Management?

9  A    I -- I'm not trying to be difficult.

10  Q    No, it's fine.  It's a terrible -- terrible --

11  A    I don't -- I just don't -- I don't understand your

12  question.  I apologize.

13  Q    Okay.  So, at the time of the petition, --

14  A    Yes.

15  Q    -- Hunter Mountain Investment Trust owned 99.5 percent of

16  Highland Capital Management?

17  A    It owned 99-1/2 percent of the limited partnership

18  interest in Highland Capital Management.

19  Q    And the remainder -- and HMIT has the Class 10 claims.

20  Correct?

21  A    You said something, the remainder?  The --

22  Q    Oh, sorry.  The remaining interests are owned by the Class

23  11 claims under the plan.

24  A    The remaining partnership interests are among those

25  entities I testified earlier to, which are Dugaboy, Strand, --

Seery - Cross                                   130

1    Q    And Okada?

2    A    -- Mark Okada individually, and two Mark Okada and Pamela

3    Okada trusts.

4    Q    Okay.  And the total assets in the estate right currently

5    you testified are between $65 to $70 million?

6    A    I -- off the top of my head, I don't recall, but it --

7    rough range, it could be in that general vicinity.  That does

8    not include the payments that have to be made to the 9s and

9    expenses.  So I believe there's documents in here that we

10   could go through, if you like.

11   Q    And I believe you testified that the remaining unpaid 9s

12   are owed approximately $20 million?

13   A    Approximately $20 million, yes.

14   Q    Okay.  And the plan does not say that the equity claims

15   for Class 10 and 11 are to be determined by the capital

16   account values of the limited partnership interests in the

17   Debtor LP?

18   A    That's correct.  It says to set an amount.  It doesn't

19   tell you how to do the amount.

20   Q    Okay.  And under the settlement agreement, Class 10

21   interests will be allowed in the amount of $336,940,230.58?

22   A    Approximately $336 million, yes.

23   Q    $336 million.  Fair.  And this is the capital account

24   balance as of -- HMIT's capital account balance as of the

25   petition date, less, I believe, the HMIT note?

Seery - Cross                                      131

1   A    That's correct.  So that amount is the net amount.

2   Q    The net?  And do you know how the capital account balances

3   were calculated --

4   A    Yes.

5   Q    -- on the petition date?

6   A    Yes.

7   Q    And how were they calculated?

8   A    So, you take the 2018 year-end capital account amount, and

9   then there's activity in the company that gets passed through

10  through the partnership.  The partnership agreement -- in this

11  instance, the prepetition Debtor partnership agreement passed

12  through profits and losses on a pro rata basis.  There was

13  activity in the first half of the year that affected that

14  capital account.  You can see that reflected in the year-end

15  auditeds as well as the K-1 statement that -- for 2018 that

16  was given to HMIT.  That would be their 2018 year-end.  That

17  then, from an accounting perspective, was used and brought

18  down to the petition date.  And between the petition date and

19  year-end 2019, there was additional capital activity, the

20  biggest one of which was the reserve -- full reserve for the

21  $50-plus million for the HMIT note.  And so then you'll see

22  the 2009 auditeds that are signed off by Mr. Waterhouse.  And

23  in those interim months, then you also see the gross amount of

24  the partner capital each month in the monthly operating

25  reports.

Seery - Cross                         132

1   Q   And correct me if I'm wrong, but I believe you testified

2   that the capital account balances continued to go down after

3   2019.  So you have the petition date, you have the next year,

4   and did they continue to --

5   A   I don't think I testified to that.  What I testified to is

6   that there was economic activity in 2019 that affected the

7   year-end '18 to the petition date.  And then from the petition

8   date there was year-end activity -- there was activity from

9   the petition date to year-end '19 that would affect the

10  capital account as reflected in the 2018 auditeds -- they

11  weren't auditeds -- 2018 tax returns signed off by Waterhouse.

12  The biggest part of that activity was the application or the

13  reserve for the Hunter Mountain Note.

14  Q   And was there any activity after the 2019 tax return?

15  A   There was postpetition activity in the partnership,

16  certainly.

17  Q   And did it reduce the capital accounts during those years?

18  A   I assume it would have reduced all of the capital accounts

19  pro rata.

20  Q   Okay.  And why'd you use the petition date as the date to

21  determine the value of the capital accounts?

22  A   Because this is bankruptcy and that's the date on which

23  you fix all your claims and interests.

24  Q   If you used -- have you ever used equity ownership

25  percentages to determine the payment to the equity versus

Seery - Cross                                    133

1    their capital account balances?

2    A    In this case, or elsewhere?

3    Q    Elsewhere.

4    A    I think that's standard.  I can't cite you a specific

5    thing, but typically when a partnership liquidates or a

6    partnership is sold, amounts get distributed pursuant to the

7    capital accounts and -- and -- in up to amounts in the capital

8    accounts.

9    Q    You would agree, if you use the percentage of ownership,

10   being 99.5 percent for Class 10 and the .5 percent for Class

11   11, would potentially leave money for the Class 11 creditors

12   to recover?

13   A    I don't think so.  No, I don't agree with that.

14   Q    Why do you say that?

15   A    Because Class 11 is subordinated to Class 10.

16   Q    Okay.  So explain how, if $60 million exists and you pay

17   $20 million to the Class 9, --

18   A    Roughly.  Yeah.

19   Q    Rough.  Just rough math.

20   A    Okay.

21   Q    That leaves $40 million.

22   A    Okay.

23   Q    Correct?  And if the ownership interests or the allowed

24   claim for HMIT was 99.5 percent, wouldn't that leave .5

25   percent of $40 million for the remaining creditors?

Seery - Cross                                134

1   A    That doesn't make any sense, because 99-1/2 percent of a

2   senior thing means you get everything.  So that Class 10 has

3   to be paid in full before the 11.

4        In addition, there's already an agreed-upon amount on

5   HCLOM for $10 million.  So how do I give HCLOM $10 million and

6   99-1/2 percent to somebody else?  There has to be numbers.

7   Q    But to be clear, the plan does not say that the equity

8   claims are determined on capital accounts.  Correct?

9   A    That's correct.

10  Q    All right.

11            MR. LANG:  No further questions.

12            THE COURT:  All right.  Any redirect?

13            MR. MORRIS:  Just one moment, Your Honor.

14        (Pause.)

15            MR. MORRIS:  We have no questions, Your Honor.

16            THE COURT:  All right.  Any redirect from --

17            MR. PHILLIPS:  No, Your Honor.  Thank you.

18            THE COURT:  -- the one question?

19        Okay.  Thank you, Mr. Seery.  You are excused from the

20  witness box.

21            THE WITNESS:  Thank you, Your Honor.

22        (The witness steps down.)

23            THE COURT:  Okay.  I'm going to again take proposals.

24  I can live with a 30-minute lunch break.  I and my staff can.

25  But it's easier for us than all of you.  So do you all want to

1  negotiate for more?

2           MR. MORRIS:  I just wanted to let the Court know

3  that, with that, the Movants rest.  We're not -- we're not

4  going to call anybody else.

5           THE COURT:  Okay.

6           MR. MORRIS:  We reserve the right to cross-examine.

7  We reserve the right to call rebuttal witnesses, including Ms.

8  Deitsch-Perez and Mr. Dondero, depending on what testimony is

9  elicited.  So we reserve the right to call rebuttal witnesses.

10  But we're not calling anybody further on our direct case, and

11  we rest.

12           THE COURT:  Okay.  So let me --

13           MR. MORRIS:  I'll let them --

14           THE COURT:  -- follow up on that point.

15           MR. MORRIS:  Uh-huh.

16           THE COURT:  There had been a discussion of Mr.

17  Patrick.

18           MR. MORRIS:  Uh-huh.

19           THE COURT:  Limited to one total hour.  Thirty

20  minutes collectively, Debtor and HMIT.  Thirty minutes

21  collectively, Dugaboy and Daugherty.

22           MR. MORRIS:  You know what, Your Honor.

23           THE COURT:  You're -- you're not asking --

24           MR. MORRIS:  No, maybe I -- I forgot that you had

25  told us we could do it, too.  So let's take the lunch break,

1  let us figure it out, we'll let you know when we come back.

2        THE COURT:  Well, I'm clarifying because I'm deciding

3  --

4        MR. MORRIS:  Yeah.

5        THE COURT:  -- who gets to go first.

6        MR. MORRIS:  Understood.

7        THE COURT:  Each witness.

8        MR. MORRIS:  Understood.

9        THE COURT:  And I presume --

10        MR. MORRIS:  Understood.

11        THE COURT:  -- the Debtor/HMIT would go first.

12        MR. MORRIS:  Yeah.

13        THE COURT:  And then with regard to Dondero, --

14        MR. MORRIS:  Yeah.

15        THE COURT:  -- you all would go first.

16        MR. MORRIS:  So I withdraw what I said.  Let us

17  confer during the lunch break and we'll figure out who's going

18  first, whether we do rest or whether we put Mr. Patrick on for

19  a short direct.

20        THE COURT:  Okay.  Which leads me to our lunch break.

21  Do people want to negotiate for more than 30 minutes?  I don't

22  want to make someone collapse if --

23        MR. MORRIS:  Thirty minutes, or 1:30?

24        MR. PHILLIPS:  1:30.

25        MR. MORRIS:  1:30, Your Honor.  It's nice and round.

1          MR. PHILLIPS:  One clarification, Your Honor.

2   Because I don't -- I don't -- if one side doesn't take the

3   half hour, does that go over to the other side, or --

4          THE COURT:  No.

5          MR. PHILLIPS:  No?

6          THE COURT:  I don't think -- I'm just giving --

7          MR. PHILLIPS:  Great.  Thank you.

8          THE COURT:  And my law clerk said maybe I was

9   confusing about that earlier today.

10         MR. MORRIS:  Yeah.

11         THE COURT:  One hour total, but 30 minutes each.  And

12  if one collective team doesn't use the whole 30 minutes, we're

13  not --

14         MR. MORRIS:  Yeah.

15         THE COURT:  -- giving it to the other side.  Okay?

16         MR. PHILLIPS:  That was my question.

17         MR. MORRIS:  Understood, Your Honor.

18         THE COURT:  And while I'll let you all discuss

19  whatever you want, what I envisioned is you all would go first

20  with Mr. Patrick, --

21         MR. MORRIS:  Uh-huh.

22         THE COURT:  -- and then Dugaboy and Daugherty would

23  go first on Mr. Dondero.  But if you all collectively think it

24  makes sense to do something different, I'll hear.

25         MR. MORRIS:  No.  That makes sense, Your Honor.

1           MR. PHILLIPS:  Thank you, Your Honor.

2           THE COURT:  All right.  So we'll come back at 1:30 --

3           MR. YORK:  Yes.

4           THE COURT:  -- and resume.

5           MR. YORK:  Thank you so much.

6           THE COURT:  Okay.  Thank you.

7           THE CLERK:  All rise.

8      (A luncheon recess ensued from 12:51 p.m. until 1:33 p.m.)

9           THE CLERK:  All rise.

10          THE COURT:  Please be seated.  All right.  We're back

11   on the record in the Highland Capital matter, the Rule 9019

12   motion for approval of a settlement.  When we broke, we were

13   waiting to talk about Mr. Patrick and Mr. Dondero as

14   witnesses.  Are they going -- is Patrick going to be your

15   witness?

16          MR. MORRIS:  No, Your Honor.  We're going to reserve

17   our 30 minutes for rebuttal.

18          THE COURT:  Okay.  Thank you.

19      All right.  I'll hear from the Objectors now.

20      (Pause.)

21          MR. YORK:  Sorry, Your Honor.  I didn't realize they

22   were going to observe.  So, --

23          THE COURT:  Well, yes.  If you understood what I was

24   saying before the break, I presumed they might want to go

25   first with Mr. Patrick, but it was -- you're the one who

1    wanted him, so if they want to go second, they can go second.

2              MR. YORK:  Well, --

3              THE COURT:  Well, I say "you're."  I'm sorry.

4              MR. LANG:  No, it's okay.

5              THE COURT:  Mr. Lang wanted to go --

6              MR. YORK:  Yeah.  So are we definitely doing Mark

7    Patrick now?

8              MR. PHILLIPS:  No.

9              MR. YORK:  Oh, okay.

10             MR. PHILLIPS:  We just rested.

11             THE COURT:  Okay.

12             MR. MORRIS:  They can call whoever they want.

13             THE COURT:  They have rested.  If you don't want to

14   go forward with any witnesses, you don't have to.

15             MR. YORK:  Oh, we --

16             THE COURT:  But you had wanted to go forward -- you

17   wanted to question Patrick and I said, if he's going to be a

18   witness, then Dondero should also be a witness.  Okay?  And at

19   most an hour collectively for each witness.  If you don't want

20   to call either one of them, you don't have to call either one

21   of them.

22             MR. LANG:  We're going to.  I think that they were

23   just going to call Daugherty first.  I didn't know if you had

24   an order that you wanted to do this in.

25             THE COURT:  Well, no.  I don't care.  I guess I don't

1    care.  Was Daugherty listed?  I mean, --

2              MR. YORK:  Yes.

3              THE COURT:  I'm sorry.  Did you say Daugherty or

4    Dondero?

5              MR. LANG:  Daugherty.

6              THE COURT:  Okay.  I'm sorry.  So you want to call

7    Daugherty?

8              MR. YORK:  Yes.

9              THE COURT:  And you listed him as a witness?

10             MR. YORK:  Yes.

11             THE COURT:  So you may call Daugherty.

12             MR. YORK:  All right.

13             MR. MORRIS:  Yes.  I --

14             MR. YORK:  We'll call Patrick Daugherty, then.

15             THE COURT:  Okay.

16             MR. MORRIS:  I don't believe Dugaboy did, but --

17             MR. YORK:  Right.

18             MR. MORRIS:  -- if they -- if they want to call him,

19    by all means.

20             THE COURT:  Okay.

21             MR. MORRIS:  Yep.

22             THE COURT:  All right.  Mr. Daugherty, if you could

23    approach the witness box, I will swear you in.  Please raise

24    your right hand.

25        PATRICK DAUGHERTY, PATRICK DAUGHERTY'S WITNESS, SWORN

Daugherty - Direct                                    141

1              THE COURT:  All right.  Please be seated.

2              THE WITNESS:  Oh, wow.  A lot of water up here.

3              THE COURT:  Plenty of water for everyone.

4                         DIRECT EXAMINATION

5    BY MR. YORK:

6    Q    Good afternoon, Mr. Daugherty.  Could you state your name

7    for the record, please?

8    A    Patrick H. Daugherty.

9    Q    Mr. Daugherty, are you a creditor in the Highland Capital

10   bankruptcy?

11   A    Yes, I am.

12   Q    All right.  And would you turn to, in the Daugherty

13   exhibit binder, turn to Exhibit 1, please?

14   A    Yes.

15   Q    And this is a settlement agreement between you and

16   Highland Capital Management relating to claims -- your proof

17   of claim that you made in this bankruptcy, correct?

18   A    Yes.

19   Q    And we looked earlier.  You were in the courtroom for Mr.

20   Seery's testimony, correct?

21   A    I was.

22   Q    All right.  And we talked in Section 9 about the defined

23   Reserved Claim in there.  Do you remember that?

24   A    I did.

25   Q    All right.  Can you describe what --

Daugherty - Direct                    142

1    A    I consider it the Compensation Claim, but yes.

2    Q    Can you describe what the Reserved Claim is?

3    A    Yeah.  Basically, it, background, it dates back to the

4    financial crisis of 2008, 2009.  Highland was on the brink of

5    filing for bankruptcy.  We had a creditor bank led by Bank of

6    America and Scotia, and we were in default.  And so the banks

7    came in, declared default, and basically put a limit or

8    terminated our ability to pay cash bonuses.  And that -- right

9    after Lehman Brothers failed, so call it September 2008 and

10   going into 2009.

11       And the problem with that is we were losing people right

12   and left.  We had about 22 senior-level guys.  We were down --

13   and I say guys.  I think there were some women, too.  But we

14   were down to about 12 people.  And they were trying to stem

15   the tide of people running out of the doors in order to save

16   the value of Highland.  We started the year at about $40

17   billion under management, and by that time, we were -- I think

18   we were as low as $19 or $20 billion under management.

19       Hedge funds were rolling up.  CLOs did fine.  Private

20   equity did fine.  Retail funds were having problems.  And

21   separate accounts were okay.  But we were definitely a firm in

22   crisis and trying to hold on to people.

23       So the nature of this compensation claim, you know, every

24   year, everybody except Dondero and Okada would get what's

25   called a compensations and award letter.  Because Dondero and

Daugherty - Direct                                    143

1   Okada were really the only partners.  I think you can kind of

2   see that, given your experience.  They were called the

3   founding partners.  They were the only ones that got true

4   distributions from the firm annually.  Guys like us, you know,

5   the other 12 or so, we got cash bonuses and incentive comp and

6   deferred comp.  And, you know, obviously, cash compensation

7   was a big part of our compensation, and they were prohibited

8   from the banks from paying it.

9       So Dondero, with the help of Rick Swadley and some of the

10  other tax people, I don't know if we used out outside firms or

11  not, they came up with this scheme, if you will, where

12  Highland was going to go and use whatever they came up with

13  with the partnerships and whatnot and then generate a tax

14  refund to the senior-level guys.  As or in lieu of the cash

15  bonuses that couldn't be paid, they were going to go make

16  these elections and then we were going to get this money.

17      And if you look at our awards agreement, it says you're

18  going to get *x* amount of money.  And it's in the line that

19  historically is the cash bonus.

20      Also, when we got like our email or whatever that year

21  from Patrick Boyce, our CFO, he was like, Congratulations,

22  your bonus this year was *x*.  And it was whatever that amount

23  was on your compensation and award letter.

24      Well, several of us had the same accountant, John Garvey,

25  at Bland Garvey.  Me, Joe Daugherty, and Davis Deadman.  And

Daugherty - Direct                    144

1    we took this concept to our accountant and he's like, man,

2    that's really precedent.  And so you guys are going to have to

3    basically protect yourselves from -- sorry, go ahead.  Make

4    your objection.  I'm sure I'm --

5              MR. MORRIS:  I just, I just don't remember what the

6    question was at this point and he's testifying to --

7              THE WITNESS:  Why I got this thing.

8              THE COURT:  It was --

9              THE WITNESS:  My apologies.

10             MR. MORRIS:  -- to conversations and hearsay.

11             THE COURT:  What is the --

12             MR. YORK:  Let me ask a question and I'm going to try

13   to --

14             THE COURT:  -- proof of claim about, was the essence

15   of the question.

16             MR. YORK:  Yeah.  Right.

17             THE COURT:  So I sustain.  We're getting a little

18   narrative, shall we say.

19             THE WITNESS:  My apologies.

20             MR. YORK:  So, --

21             THE WITNESS:  I'll tighten it up.

22   BY MR. YORK:

23   Q    All right.  So, Mr. Daugherty, what you were getting under

24   this scheme, as you describe it, was a cash bonus that was

25   masked as a refund, correct?

Daugherty - Direct                    145

1   A    Look, Highland paid for it however they're going to pay

2   for it.  They're the one who created whatever that they did.

3   But for us, it was a cash bonus.

4   Q    Okay.

5   A    But given that I was -- what I was just alluding to, there

6   were concerns about the tax impacts if the IRS didn't agree

7   with Highland.  And so what we did is we negotiated for and

8   got from Dondero -- really, I mean, Jim ultimately made the

9   decisions at Highland.  He said, look, if you don't -- if this

10  doesn't work, if it doesn't go through, we'll make you whole.

11  And so we got that provision in the compensation and award

12  letter that says if the actual refund deviates materially from

13  the refund, then you'll get substitute compensation.  And that

14  was enough for us, --

15  Q    And --

16  A    -- and that's what led to this claim.

17  Q    And was it your understanding that, in terms of making you

18  whole, that was not just whatever you had to pay back for the

19  refund, but also interest and penalties?

20  A    Yeah.

21          MR. MORRIS:  Objection.  Leading.

22          THE COURT:  Sustained.

23          THE WITNESS:  That's fair enough.

24  BY MR. YORK:

25  Q    What was your understanding as to what that 'make you

Daugherty - Direct                                146

1    whole' constituted?

2    A    It was basically to put me and the others back in the

3    position of getting to that number that was listed in the

4    document.  So if there were any interest, penalties, pullbacks

5    from the IRS, then we would be made whole at that -- we'd get

6    back the net of that number.  However, if the IRS was fine

7    with it, we wouldn't get anything.

8    Q    So there's a chance, depending on how the IRS audit turns

9    out, if the IRS says what Highland did was fine, then you

10   don't owe the IRS anything, right?

11   A    Yeah.  That's been a critical thing, that I may not owe

12   the IRS anything, and certainly I wouldn't expect Highland to

13   give me anything.

14   Q    And at that point, what's been reserved as your reserved

15   claim would effectively at that point, from the IRS

16   perspective, the IRS audit perspective, would be a zero dollar

17   amount, right?

18   A    Yeah.  I mean, more so.  I mean, Jim Seery offered to buy

19   me out with an amount of the reserved claim.  And I said,

20   listen, I'm not looking for a windfall here.  What I'm looking

21   for is to be made whole, --

22   Q    Right.

23   A    -- it's my insurance policy on what I earned back in 2008,

24   because the alternative is I will have ended up working for

25   free in 2008, plus have to pay penalties and interest going

1   forward that could wipe out my net worth.

2   Q    All right.

3   A    So I wanted the insurance policy aspect of it.

4   Q    So you heard Mr. Seery's testimony earlier where he said

5   the total amount you would owe was somewhere in the range of

6   $1.4 to $1.5 million if there was --

7   A    He's wrong about that, if that's what he said.

8   Q    Why?

9   A    At the time -- I think the number he was referencing was

10  in our claim number that I filed back in, I want to say,

11  October 2020.  And the $1.45 million, what was in the

12  compensation -- was the number in the compensation and awards

13  letter.

14       The other number that I spoke about from the gallery out

15  there was one point -- I don't know, whatever the interest --

16  whatever I guessed the interest might be.  And then I didn't

17  have anything for penalties.  So, at that particular time,

18  took those numbers and said, okay, if the IRS says no way on

19  all this, this is what I'd have to pay, not including

20  penalties.

21  Q    All right.  So you've seen today and you listened to the

22  testimony about the footnote in Highland's adversary complaint

23  against you in which they say that the resolution may not be

24  until 2029 of this IRS audit?

25  A    That's correct.  I've heard that.

Daugherty - Direct                              148

1   Q    All right.

2   A    I've seen it and heard it.

3   Q    All right.  As you've sat here today, have you done any

4   calculation back of the napkin to try to estimate what your

5   potential exposure would be to the IRS in terms of interest

6   and penalties as a result of that audit dispute if it wasn't

7   resolved until 2029?

8   A    Yeah.  I listened to the judge.  I went and ran '33

9   because that was a number that was just thrown out.  At '33,

10  if it's 2033, it's $7.4 million, and if it's 2029 it's $5.7

11  million.

12  Q    What sort of financial impact would that have on you?

13  A    The latter would pretty much wipe me out.  I'm sorry.  The

14  former would -- the $5.7 million would wipe me out.  The

15  latter would cause me to file for bankruptcy.

16  Q    Okay.  Mr. Seery also discussed his -- that he had heard

17  through the grapevine that the IRS audit had been resolved.

18  Has anyone from Highland ever told you that the IRS audit is

19  resolved?

20  A    No one's told me that from anywhere, anyhow, anyway.

21  Q    Have you had a conver... have you had -- so nobody at all,

22  right?

23  A    No one at all.

24  Q    Have you -- did you have a conversation recently with Kurt

25  Plumer over it?

Daugherty - Direct                                149

1    A    I did.  I had lunch with him at Hillstone.

2    Q    Did he mention it at all?

3    A    No.

4    Q    All right.  Could you turn with me to, in your exhibit

5    binder, Exhibit 8, please?

6    A    Yeah.

7    Q    All right.  Can you just identify for us what this

8    document is?

9    A    This is a letter I got from the IRS dated November 20th,

10   2024, basically telling me that the case is open and I may owe

11   money.

12   Q    And specifically, if we look at the first paragraph, it

13   says, "Why You're Receiving This Letter," in bold, right?

14   A    It does.

15   Q    And then below that it says:  We might have to adjust your

16   tax return based on our examination of the Highland Capital

17   Management listed above.

18        Did I read that part correctly?

19   A    Yes.

20   Q    And so is it your understanding that your -- that this is

21   related to the IRS audit of Highland?

22   A    That is my understanding.

23   Q    And that your tax return, your personal tax return may be

24   adjusted as a result of that?

25   A    Mine and my wife's.

Daugherty - Direct                              150

1    Q    Which would mean you're subject to interests and penalties

2    as well?

3    A    As is she.

4    Q    Okay.  And is this the only letter you've ever received

5    from the IRS?

6    A    No.

7    Q    Related to the Highland Capital Management audit?

8    A    No.

9    Q    All right.  Do you receive these periodically?

10   A    Yes.  The initial one came I want to say about five months

11   after we filed the returns in two thousand -- it was for the

12   calendar year 2008, so it was April 15th, 2009, I want to say.

13   Maybe it was -- I think the first one came around October,

14   late October 2009.

15   Q    And --

16   A    Like this.  I can't -- I don't remember it verbatim.

17   Q    Is this the last communication you have received from the

18   IRS relating to Highland's IRS audit?

19   A    This was it.  Yeah.

20   Q    Okay.  Has anyone from the IRS ever told you that an FPAA

21   has been issued --

22   A    No.

23   Q    -- with respect to the Highland's audit?

24   A    No.  I don't even know what that -- I didn't even know

25   what that was.

1    Q    And you've never received an FPAA from the IRS, right?

2    A    I have not.

3    Q    And you've never -- nobody else has ever sent you an FPAA

4    related to the Highland audit, right?

5    A    No.

6              MR. MORRIS:  I'm being kind, but this is just --

7              THE COURT:  It's leading.

8              MR. MORRIS:  -- testifying from the podium.

9              THE COURT:  Sustained.

10             THE WITNESS:  Yeah.

11   BY MR. YORK:

12   Q    All right.  Mr. Daugherty, would you turn -- we'll switch

13   topics real quick to the tolling agreement.  Would you turn in

14   Volume 1 of the Highland exhibits to Exhibit 60, please?

15   A    Volume 1, and then which one, I'm sorry?

16   Q    Exhibit 60.

17   A    Yeah.  Yes, I'm there.

18   Q    Why did you enter into -- well, back up.  Strike that.

19   Start over.  This is the tolling agreement extending a claim

20   objection deadline between you and Highland Capital and the

21   Highland Claimant Trust as of July 27th, 2022, correct?

22   A    That is correct.

23   Q    And is it your signature on Page 6 or 7 of the document on

24   the left-hand side?

25   A    It appears to be, yes.

Daugherty - Direct                              152

1   Q    All right.  Why did you enter in this tolling agreement?

2   Why did you enter into --

3   A    I'm sorry, what was your question?

4   Q    Why did you enter into this tolling agreement?

5   A    Jim Seery had reached out to me in 2022 and said that they

6   had a problem with -- the Court had an objection deadline that

7   was running and that was somewhat inconsistent with the

8   settlement agreement that we had just gotten approved in early

9   March of 2022 that said they couldn't object, they being

10  Highland, object to the legitimacy or amount of my

11  compensation claim.

12      So he said, look, you know, we're in a little bit of a

13  predicament here.  We can go to the Court or we can try and

14  work this out.  And I'm like, hey, I'm fine to work it out.  I

15  don't want the estate to be burdened or any way.  So we went

16  back and forth on the document, and ultimately I felt that it

17  was the right thing to do.  The spirit of our settlement was,

18  you know, I -- they couldn't -- they couldn't challenge this

19  part of my claim, but the *quid pro quo* was I'm not going to be

20  able to beat them out on a technicality by running in here,

21  saying, ah, the objection deadline, you know, expired.

22      So his solution seemed to be a reasonable one.  And we

23  worked with their counsel, I think Demo and to some degree

24  Morris, to work that out for them.

25  Q    How did the estimate come about in Footnote 3?

Daugherty - Direct                                153

1   A    I don't know.  Nobody ever asked me about it.  There was

2   no -- Mr. Morris is right, there was no negotiation about it.

3   Because, frankly, I didn't see that as my problem.  They had

4   something to fulfill pursuant to the plan.  And there was no

5   back and forth on that reserve amount with Seery whatsoever.

6   He just said, This is what we're doing and, you know, we're

7   going to put this -- and my perception is I didn't have any

8   right to challenge it other than what was in my settlement

9   agreement.  And I looked at that as a one-time right to go and

10  seek an estimate, and I didn't want to do it that early in the

11  process.

12  Q    Would you take a look with me at the last recital that's

13  on Page 3 of the document?  All right.  It says, --

14  A    Oh.  You're going to make me read.  All right.

15  Q    It says:  Whereas, solely to avoid the expense,

16  inconvenience, and uncertainty associated with litigation, and

17  without any party admitting liability, fault, or wrongdoing,

18  or releasing or waiving any rights or defenses with respect to

19  the reserved claim, the parties desire to enter into this

20  agreement to extend the claim objection deadline solely with

21  respect to the reserved claim to January 11th, 2023 at 5:00

22  p.m. Central Time, defined as the Objection Deadline.

23       Did I read that part correctly?

24  A    You did.

25  Q    What was your understanding of this recital provision

Daugherty - Direct                                    154

1  being put in here?

2  A    Well, I think I just kind of summarized it.  There was a

3  problem that the parties didn't, you know, fully recognize

4  could occur that would give me a windfall, and so this was to

5  kind of solve that on an interim basis until we got to a final

6  resolution on this tax refund thing.

7        I mean, the honest truth, God -- Judge.  Not God, Judge.

8  But the honest-to-God's truth is Seery and I had a very good

9  relationship, and we were going back and forth, and his view

10 was that this thing could get resolved in 2022.

11 Q    Did you have an understanding as to whether or not you

12 were reserving all rights with respect to your reserved claim

13 under the terms of the tolling agreement?

14 A    Absolutely I did.  Both in emails and in the document.

15 Q    All right.

16        MR. YORK:  Pass the witness.

17        THE COURT:  All right.  Any cross?  I'm assuming

18 Dugaboy did not have questions.  And, Mr. Daugherty, I should

19 have --

20        MR. LANG:  No, we do not.

21        THE COURT:  Okay.  Thank you.  Cross?

22                    CROSS-EXAMINATION

23 BY MR. MORRIS:

24 Q    Good afternoon, Mr. Daugherty.  Take your time.

25 A    How are you, Mr. Morris?

Daugherty - Cross                                    155

1    Q    Good.  I just have a few questions.  You have been paid in

2    full on your Class 9 claim, correct?

3    A    Evidently, yes.

4    Q    And that Class 9 claim was for $3.7 million, correct?

5    A    I believe it was $3.75 million.

6    Q    Thank you for the clarification.  Do you recall how many

7    payments you received that resulted in your receipt of $3.75

8    million?

9    A    I don't.

10   Q    When you received those payments, did you tell Mr. Seery

11   -- did you send it back to Mr. Seery out of any concern that

12   your Class 8 claim has not been resolved?

13   A    No.

14   Q    When you received those payments, did you object to Mr.

15   Seery or to anybody else that it was improper for the other

16   Class 9 holders to receive the payments when your Class 8

17   claim had not been resolved?

18   A    I had no idea what they were receiving.

19   Q    Did you have any reason to believe that you were receiving

20   a benefit that the other Class 9 claim holders were not

21   receiving?

22   A    Again, I had no idea what they were receiving, so I can't

23   compare the two.

24   Q    Okay.  But it is true that you accepted without protest

25   your Class 9 payments, even though your Class 8 claim had not

Daugherty - Cross                              156

1   been resolved, correct?

2   A    I think that's accurate.

3   Q    Okay.  I think you mentioned in your proof of claim it had

4   $1.4 million; is that right?

5   A    Again, I'm cuffing it.  If you could grab it, I'll -- I

6   want to say it was -- the proof of claim had two components,

7   as I mentioned.  There was a, as I mentioned, there was the

8   compensation award amount from my compensation letter of like

9   $1.475 million.

10  Q    Uh-huh.

11  A    Don't quote me on that, but close enough.

12  Q    Approximate.

13  A    And then an interest component that would take me up to

14  that particular time if the IRS reversed it.

15  Q    Okay.

16  A    But no penalties were included.

17  Q    And that approximately $1.45 million, that's money that

18  you received back in 2009?

19  A    I didn't get that full amount in 2009.  That was -- I

20  don't want to broaden this up too much, but many times what

21  was promised was not what was delivered.  So I got a lesser

22  amount from the IRS.

23  Q    How much less did you receive?

24  A    I want to say, on a net basis, it was just under $1.2

25  million.

Daugherty - Cross                          157

1    Q    Okay.  And so it's true that you've had the benefit of the

2    $1.2 million for 15 years now?

3    A    When you say the benefit, what do you mean?

4    Q    It went into your pocket 15 years ago.

5    A    Yeah, but it's a contingent liability I have back to the

6    IRS, so I can't say that it's, you know, not without

7    reservations.

8    Q    But you've had possession of that million and a half

9    dollars now for 15 years, correct?

10   A    Right.  And with it comes an obligation --

11   Q    Okay.

12   A    -- contingent back to the IRS.

13   Q    Your claim is a prepetition claim; is that right?

14   A    What do you mean by my claim?  Are you talking about the

15   compensation one?

16   Q    Yes.

17   A    Yeah.  I mean, that -- that contractual obligation

18   originated in, well, yeah, February 2009.

19   Q    It's not an administrative claim, right?

20   A    I don't believe so, no.

21   Q    It's just -- it's just a claim that existed prior to the

22   petition date.  Fair?

23   A    That is fair.

24   Q    Okay.  With respect to the reserve, you did agree to that

25   amount of the reserve, fair?

Daugherty - Cross                                    158

1   A    I did not.  I mean, I -- I signed the document, but I did

2   not agree to that amount.

3   Q    Well, --

4   A    I did not negotiate for it or anything like that.

5   Q    Well, but if you turn to Exhibit 60 that you just looked

6   at, --

7   A    sure.

8   Q    -- and you go towards the end of the document, that is

9   your signature on the first Page 7, right?

10  A    Yeah.  I've already admitted that.

11  Q    And Paragraph 1 of the agreement that you signed

12  specifically set the reserve at the amount set forth in

13  Paragraph 1, correct?

14  A    That much is true.

15  Q    Okay.  And you --

16  A    You just said, did I agree to it, and I'm like, it was in

17  the document.

18  Q    It's in the agreement that you signed, correct?

19  A    For sure.

20  Q    Okay.  And you've never asked for that amount to be

21  adjusted, correct?

22  A    I've spoken many times to Mr. Seery and told him that it

23  will need to be adjusted upward as years go by.  We've had

24  quite a dialogue along those lines.

25  Q    Okay.  But he's never agreed to do that, correct?

1   A    He said when the time comes, we'll figure out -- listen,

2   we had a very collaborative relationship up until like the

3   last year.  And so it was like, hey, I'm not going to press

4   you.  You don't -- he's fighting off Dondero right and left.

5   You know, and I'm like, I don't want to get in the middle of

6   all this.  You go do what you've got to do.  We'll both sit

7   tight.  In fact, there was dialogue to that very effect.

8   Q    Uh-huh.

9   A    And so this was just all part of sitting tight, thinking

10  that the right thing would be done when we got final analysis

11  to this.

12  Q    Okay.  So would you just agree with me that, since signing

13  this agreement, you haven't come to court to seek an

14  adjustment --

15  A    No.

16  Q    -- of the reserve?

17  A    I did not want to be a burden.

18  Q    Okay.  And since signing this agreement back in 2022, you

19  and Mr. Seery have not come to an agreement on any adjustment

20  to the reserve, correct?

21  A    We have not.

22  Q    Okay.  Do you believe that you have claims against

23  Highland's employees?

24          MR. YORK:  I'm going to object on relevance grounds.

25  Also, outside the scope.

Daugherty - Cross                          160

1              THE COURT:  What is the relevance?

2              MR. MORRIS:  We're going to get to the $20 million

3    demand in a moment.  I'm laying the foundation.  But we have

4    anybody on anybody --

5              THE COURT:  But what's the $20 million demand?

6              MR. MORRIS:  I'll get to it in a moment.

7              THE WITNESS:  There's --

8              THE COURT:  I can't figure out if --

9              MR. MORRIS:  I can make a proffer if you'd like.

10             THE COURT:  -- that's relevant.

11             MR. MORRIS:  I can make a proffer, Your Honor.  I'll

12   tell you.  I'll tell you right now.

13        On June 5th, Mr. York called me and said that Mr.

14   Daugherty asserts that he has claims against the Highland

15   employees, and if Highland didn't pay him $20 million he was

16   going to sue them, and he was going to file this objection

17   together with a petition in the Supreme Court opposing

18   Highland's request to stay the issuance of a mandate in the

19   Fifth Circuit.

20             MR. YORK:  First off, if Mr. Morris is going to

21   become a witness, we've got a problem here.  Secondly, any

22   sort of communications between us would be 408.  And third,

23   it's not relevant to the issue we're here on today.

24             THE COURT:  Okay.

25             MR. MORRIS:  My response to that, Your Honor?

 1              THE COURT:  All right.  I'm going to allow a little

 2   latitude, --

 3              MR. MORRIS:  Yeah.

 4              THE COURT:  -- but I'm still unclear --

 5              MR. MORRIS:  It's about -- it's about three

 6   questions.

 7              THE COURT:  Okay.

 8              MR. MORRIS:  It's about three questions.

 9              THE COURT:  You may proceed.

10   BY MR. MORRIS:

11   Q    Do you believe you have claims against Highland's

12   employees?

13   A    Me personally, no.

14   Q    Okay.  Do you -- did you authorize your lawyer to call me

15   and to demand $20 million in exchange for a release and your

16   standing down from filing any objection to this motion?

17   A    I'm not aware that that ever happened.  Nobody demanded

18   anything of you.

19   Q    Really?

20   A    Yeah.

21   Q    Do you know that your lawyer used the number $20 million

22   to me?

23   A    Oh, I've read the emails back and forth between you.

24   Q    So why don't you explain to Judge Jernigan what your

25   understanding is as to what your lawyer meant when used $20

1   million to me.

2   A    I can't say for sure what he meant, but I can tell you

3   from my perspective what I understood.

4   Q    What did you understand?

5   A    I have another entity that I picked up in the settlement

6   with Highland called the Highland Employee Retention Asset

7   Fund.  And again, pursuant to the settlement agreement, I mean

8   -- I guess supposedly, I guess, when I think about it, I do

9   have claims individually, because it's with me, that

10  agreement.

11      But it said that Highland had to turn over all the books

12  and records of the HERA fund.  And Mr. Morris was on many of

13  those emails.  And they had turned over some of the books and

14  records, but they didn't turn over any of the books and

15  records that implicated Thomas Surgent and David Klos in

16  defrauding HERA in allocating Highland's expenses when they

17  were litigating me, against me, back to HERA.

18      So I do have a settlement agreement with Highland and

19  these employees, but Highland Employee Retention Assets needs

20  their books and records.  And we've made it very clear to you

21  on numerous emails where you, you know, kind of muscled up on

22  us and said this is all you're going to get and tough if you

23  don't like it or whatever.

24      And so the deeper we get into this, we did get discovery

25  from others, we found that Highland's been withholding

Daugherty - Cross                                  163

1    material information.

2        So as it relates to -- I mean, you're doing that little

3    squeaky thing, and I think he's a fantastic lawyer, but the

4    reality is you guys have created some damages to HERA that you

5    may be accountable for.  Your clients, not you.

6    Q    Okay.  In the four years since we signed the settlement

7    agreement, you've never asserted a breach of contract claim,

8    have you?

9    A    Well, because we thought you were complying with it.  So

10   if you want to go into the details there, in 2022, we were --

11   asked for more information.  2023, we asked for more

12   information.  2024, we asked for more information.  And so

13   those are continuing breaches.

14       Again, I -- I don't want to go to war with Highland.

15   You're too damn good of an attorney, you're scaring me a

16   little bit.  But --

17   Q    I don't want to.

18   A    You know, listen.  You know I think well of you.

19   Q    I appreciate that.

20   A    But, you know, I mean, I just wanted the information.  I'm

21   not looking to go to war with you guys.  I got enough battles

22   that I've got to fight.  And so, you know, I guess a number

23   was thrown out or whatever.  I don't know the full context of

24   it.  But it wasn't -- it wasn't for this IRS compensation

25   issue.

Daugherty - Cross                                164

1  Q    But what was the -- my last question.  What was the $20

2  million demand for?

3  A    Again, it's just a number.  Y'all were having settlement

4  negotiations.  So, I mean, you work off of it.

5  Q    All right.

6           MR. MORRIS:  I have no further questions, Your Honor.

7           THE WITNESS:  Yeah.

8           THE COURT:  All right.  Any redirect?

9           MR. PHILLIPS:  I have no questions, Your Honor.

10          THE COURT:  All right.  Okay.

11          MR. YORK:  Apologies.  I wanted to make sure.

12          THE COURT:  Yes.

13          MR. YORK:  No redirect, Your Honor.

14                      EXAMINATION BY THE COURT

15          THE COURT:  Okay.  If you've watched Highland

16 hearings, you know the judge sometimes has questions.  I am

17 still trying to understand the 1.4, the 1.2, the 1.475.  I

18 understand broadly that, in essence, a cash bonus was

19 negotiated back in early 2009, I think you said.

20          THE WITNESS:  Yes.

21          THE COURT:  After 2008.  And so that's, in essence,

22 what was contractually negotiated.  But I understand there was

23 a hook, if you will, we're calling it a contingency, whatever

24 word you want to use, where if one day there was an IRS audit

25 and I guess Highland had extra liability for 2008, that this

Daugherty - Examination by the Court                165

1    -- I don't know if I understood it or not.

2           THE WITNESS:  Do you want me to try and guess what

3    you're asking, or --

4           THE COURT:  Try to guess what I'm asking.  Again, I'm

5    --

6           THE WITNESS:  The liability -- so, Highland chose to

7    use this tax scheme as a currency to pay us a cash bonus.

8    From our perspective, we weren't stupid.  We're like, well,

9    okay, that's great, but if the IRS says --

10          THE COURT:  Okay, I just want to know what -- you say

11   you were contractually entitled to $1.4 million.

12          THE WITNESS:  That's what I was supposed to get for

13   that bonus year.

14          THE COURT:  Okay.  But there was a tax contingency,

15   if you will, where -- that's where I want you to jump in.

16          THE WITNESS:  So, Highland had a tax problem.  They

17   came up with this mechanism to use whatever they were doing

18   with the IRS to create the cash to pay us a bonus.  We looked

19   at it and said, well, this looks fishy -- by the way, every

20   year before that and after that, I've just gotten a cash

21   bonus.  But for this one year, when the banks are saying, no,

22   no, no, we get this.  And so we looked at this and said, look,

23   this sounds fishy, but if you can't pull it off, we need to be

24   made whole.  I can't be in a situation where here I am in 2025

25   and I may have to pay $5, $6 million to the IRS for the

Daugherty - Examination by the Court          166

1   pleasure of working at Highland.

2            THE COURT:  Okay.  See, that's where my disconnect

3   is.

4            THE WITNESS:  Uh-huh.

5            THE COURT:  Because I thought this all turned on a

6   Highland tax return.

7            THE WITNESS:  Oh, no, no.  So, Highland did the

8   planning and the creation of the scheme, and I guess

9   ultimately it was Highland's tax return, but it flowed through

10  to us as pass-throughs.  K-1s, what have you.

11           THE COURT:  Right.

12           THE WITNESS:  So I guess it's both.

13           THE COURT:  Okay.  You were a partner.

14           THE WITNESS:  Well, that's debatable, too.  That's

15  debatable, too, because I had a --

16           THE COURT:  Okay.  I thought you weren't, but --

17           THE WITNESS:  Well, I wasn't --

18           THE COURT:  But you got -- okay.  Let me just skip

19  to, --

20           THE WITNESS:  Yeah.

21           THE COURT:  -- I guess, the important part.  You did,

22  you got paid?  You said $1.2 million?

23           THE WITNESS:  Yeah.  I got a refund back from the IRS

24  for around that amount.  Slightly under $1.2 million.

25           THE COURT:  So the contingency you are worried about

Daugherty - Examination by the Court          167

1   that you think gives you a contingent claim against Highland

2   is, what, the IRS comes back and says --

3         THE WITNESS:  And they say, Give us that money back

4   plus interest plus penalties or we're taking your house.  And

5   it's a very real threat, because this has gone on, as you've

6   noted, forever.  And I went from having a one-point-whatever

7   bonus to possibly having to pay six, seven, eight, I don't

8   know how long this lasts, million dollars back to the IRS for

9   an election that was made by them.  As a substitute for paying

10  me a cash bonus the regular way, they did it this way.  And

11  that's why we put and negotiated for that term in the

12  compensation agreement that said, if for whatever reason the

13  actual refund is different, we get made whole.

14        THE COURT:  Okay.  I may be overthinking this, I do

15  do that sometimes, but I'm still, I'm trying to understand why

16  your claim would escalate up to, you know, you said maybe $5.7

17  million if, in 2029, this all plays out with the IRS.

18        THE WITNESS:  That --

19        THE COURT:  Because you've gotten the benefit of that

20  money and --

21        THE WITNESS:  Well, no, because if the IRS says --

22        THE COURT:  -- return on that.

23        THE WITNESS:  Sorry.  I didn't mean to interrupt.

24        THE COURT:  You know what I'm saying?  So I'm trying

25  to figure out why it would grow in the way that you're

Daugherty - Examination by the Court                168

1   suggesting.

2              THE WITNESS:  Can I respond?

3              THE COURT:  Yes.

4              THE WITNESS:  So I've gotten money that the IRS says

5   is not mine.  Right?  And the IRS says --

6              THE COURT:  And you've had the use of it.

7              THE WITNESS:  Oh, yes.

8              THE COURT:  You've presumably invested it and --

9              THE WITNESS:  Well, no, I mean, you can't --

10             THE COURT:  Well, you've had the ability to.  Uh-huh.

11             THE WITNESS:  But you don't want to take risk with

12  something that's not yours, so you're kind of limited, right?

13  But I have, I have that amount of money.  Here's the problem,

14  Your Honor, with that.  If the IRS says, Give us back our

15  money, here's the interest, here's the principal.  Oh, by the

16  way, if it's $7, $8 million, I can't -- I don't have that.

17  I've got to file for bankruptcy in order to give the IRS back

18  money that I'm having to pay them for the pleasure that I had

19  of working for Highland in 2008 when I helped save the company

20  and create a lot of the assets that paid all these people in

21  the room.  MGM Studios, Trussway.

22             THE COURT:  Okay.

23             THE WITNESS:  Okay.

24             THE COURT:  Yeah.  We are going beyond this.

25             THE WITNESS:  Fair enough.

1          THE COURT:  I was just, I'm zeroing in on this

2    because I'm trying to figure out, I mean, it matters to me if

3    that reserve is likely fair enough, the reserve I'm told you

4    agreed to is fair enough.  And I'm having trouble figuring

5    out, I mean, if you've had the use of this money for 17 years

6    or whatever that is, why you would get this extra interest

7    add-on that you're -- $5.7 million or whatever it would be.

8    You know, $3 million more.

9          THE WITNESS:  Can I answer that question?

10          THE COURT:  Uh-huh.

11          THE WITNESS:  Because the IRS didn't look at it as my

12   money.  They looked at it as their money.  And so if you look

13   at the plain language of the compensation award letter, if the

14   actual amount deviates from the amount that was granted, then

15   Highland was going to give me substitute compensation to make

16   me whole.  Making me whole includes the penalties and the

17   interest that I would owe the IRS.  Because if you look at it

18   any other way, I had to pay money to work at Highland.

19          THE COURT:  Do I have that letter in my evidence?

20          THE WITNESS:  You should.  Drew?

21          THE COURT:  Do I?  Maybe I'll just cut this off and

22   look at the letter.

23          MR. YORK:  It's at Daugherty 2, and it's at the back

24   of --

25          THE WITNESS:  There's multiple letters, but this is

Daugherty - Examination by the Court          170

1   one of them.

2          THE COURT:  The letter that you say this claim stems

3   from.

4          THE WITNESS:  Sure.

5          THE COURT:  I'll just cut it off and look at that.

6          THE WITNESS:  Yeah, you can tell her where it is.

7          MR. YORK:  So I think it's at the back of the

8   statement on PD-2.  It's at the last page, Your Honor.

9          THE COURT:  Which one?

10          MR. YORK:  P -- Daugherty 2.

11          THE COURT:  Oh, 2?  I've got emails.

12          THE WITNESS: P-2?  I don't think so.

13          THE COURT:  Okay.  We can move on.

14          MR. YORK:  That's fine.  We'll work this out.

15          THE COURT:  Before we're done here today, I want to

16   look at the letter to better understand how the claim could

17   grow substantially to --

18          MR. YORK:  Yeah.

19          THE COURT:  -- $5.7 million by 2029.  Okay.  Thank

20   you.

21          THE WITNESS:  Thank you, Your Honor.

22          THE COURT:  You're excused.

23          THE WITNESS:  Oh, I found -- I just found it and then

24   I closed it.

25          THE COURT:  Okay.  Well, you can --

Patrick - Direct                       171

1          THE WITNESS:  My bad.

2          THE COURT:  -- call my attention to it when you find

3     it.

4          THE WITNESS:  All right.

5        (The witness steps down.)

6          THE COURT:  All right.  Your next witness?

7          MR. YORK:  I believe we're calling Mark Patrick.

8          THE COURT:  All right, Mr. Patrick.  All right.

9     Please raise your right hand.

10      MARK PATRICK, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

11         THE COURT:  All right.  Please be seated.

12       And, Courtney, you're going to start the clock going.  I

13    show 2:12.  I don't know if my clock's right.

14       You may proceed.

15         MR. LANG:  And, Your Honor, may I hand the witness --

16    this is from Mr. Morris' opening.  May I use this as Exhibit

17    3?

18         THE COURT:  Oh, okay.  You're talking about the back

19    page of his PowerPoint?

20         MR. LANG:  Yes.  Org chart.

21         THE COURT:  Yes.  I've got it in front of me.  And

22    for the record, I'm going to put this PowerPoint, even though

23    it's not an exhibit *per se*, as a demonstrative aid in the file

24    for this matter.  And so it's the last item of the Highland

25    PowerPoint.  All right.

Patrick - Direct                                172

1           MR. LANG:  Yes.

2                       DIRECT EXAMINATION

3    BY MR. LANG:

4    Q    Mr. Patrick, does this Hunter Mountain Investment Trust

5    org chart that I just handed you accurately reflect the

6    structure of the Hunter Mountain Investment Trust ownership

7    today?

8    A    Just give me a few moments to review.

9    Q    Sure.

10           MR. LEWIS:  Your Honor, I had mentioned early on that

11   we object to this whole line of questioning because it's

12   outside the scope of the objection of Dugaboy.  And I don't

13   want to interrupt, but I want to make sure that my objection

14   is continuing, because this has nothing to do with the

15   objection presented by Dugaboy.

16           THE COURT:  All right.

17           MR. PHILLIPS:  So we object to the question.

18           THE COURT:  Okay.  So the record will reflect

19   basically a running objection from Hunter Mountain?

20           MR. PHILLIPS:  We would appreciate that, Your Honor.

21           THE COURT:  Okay.  In light of the failure of Dugaboy

22   to disclose Mark Patrick as a witness, as well as the failure

23   to challenge in a written objection his authority.  Okay.  So

24   I recognized that this was quite a persuasive objection, but

25   given the magnitude, I would say, of what is going on here,

Patrick - Direct                            173

1   potentially a settlement that could come very close to ending

2   this long-running plan implementation process, I'm erring, if

3   it's an error, I'm erring on the side of allowing this.  All

4   right.  But you have a running objection that the record will

5   reflect if one day there is an appeal.

6           MR. MORRIS:  And, Your Honor, the Highland Claimant

7   Trust and the Highland Litigation Subtrust and Highland

8   Capital Management, LP join Mr. Phillips' objection.

9           THE COURT:  Okay.  Understood.

10          MR. PHILLIPS:  Thank you very much, Your Honor.

11          THE COURT:  All right.

12  BY MR. LANG:

13  Q    Mr. Patrick, have you had time to study this Hunter

14  Mountain Investment Trust org chart?

15  A    Yes, I have.

16  Q    And does this accurately show the ownership structure for

17  Hunter Mountain Investment Trust today?

18  A    I'm not sure, without reviewing the underlying corporate

19  documents on some of these entities that you have listed here.

20  Q    Did you help prepare this chart?

21  A    No.

22  Q    No?  Okay.  So Hunter Mountain Investment Trust is owned

23  by Beacon Mountain, LLC, correct?

24  A    Yes.

25  Q    And Beacon Mountain, LLC is owned by CLO Holdco, LLC,

Patrick - Direct                         174

1    correct?

2    A    Correct.

3    Q    And CLO Holdco, LLC is owned by CLO Holdco, Limited?

4    A    That's correct.

5    Q    And CLO Holdco, Limited is owned by Charitable DAF Fund,

6    LP?

7    A    Correct.

8    Q    And Charitable DAF Fund 1, LP is owned by CDMC FAD, LLC?

9    A    The ultimate beneficial owner is DFW Charitable

10   Foundation.  To my -- to the best of my recollection, I would

11   say that appears accurate.  I'm just not a hundred percent.

12   Q    Okay.  And --

13   A    But I am a hundred percent that DFW Charitable Foundation

14   is the ultimate beneficial owner.  And I'm a hundred percent

15   that Dugaboy Investment Trust has no interest in it.  And I'm

16   also a hundred percent that The Dallas Foundation or any --

17            MR. LANG:  Judge, I haven't asked --

18            THE WITNESS:  -- or any other nonprofit has any --

19            MR. LANG:  -- any of these questions.

20            THE COURT:  Okay.  There's an objection,

21   nonresponsive.  I sustain.

22   BY MR. LANG:

23   Q    Mr. Patrick, before December of 2024, Charitable DAF Fund,

24   LP was owned by Charitable DAF Holdco, correct?

25   A    (Pause.)  I'm just waiting for a relevancy.  I don't

1  understand how that's relevant to my authority --

2          THE COURT:  Okay.  You're not allowed to make a

3  relevancy objection.  Okay.

4          MR. PHILLIPS:  Your Honor, I think the problem is

5  that, if I could, we have made an objection.  And our

6  objection, our running objection is founded on relevancy and

7  founded on improper process.  So I would like to just tell the

8  Court, and so my client representative can hear it, that the

9  fact that I'm not standing up every time there's a problematic

10 question, --

11         THE COURT:  Okay.

12         MR. PHILLIPS:  -- because every question is

13 problematic, my objection is being maintained to every

14 question that's being asked.

15         THE COURT:  Okay.  You understand that, right?

16         THE WITNESS:  I --

17         THE COURT:  There's a running relevancy objection.

18 You're the witness.  You can't make the objection.  But it's

19 on the record for whatever use it might have down the road.

20         MR. PHILLIPS:  I have objected to every question

21 that's coming in connection with this line of questioning on

22 the basis of relevance.

23         THE COURT:  I got it.  I think we all have it.

24         MR. PHILLIPS:  I'm just --

25         MR. LANG:  Understood.

1          THE COURT:  Yes.  And you're thinking he's eating

2    into your 30 minutes?

3          MR. LANG:  Yes.

4          THE COURT:  Okay.  We've got it.

5          THE CLERK:  I stopped the time.

6          MR. LANG:  So -- thank you.

7          THE COURT:  Did you stop the time for a minute?

8          THE CLERK:  Yes, I did.

9          MR. LANG:  Thank you.

10          THE COURT:  Okay.

11    BY MR. LANG:

12    Q    So, to my question, before December of 2024, Charitable

13    DAF Fund, LP was owned by Charitable DAF Holdco, correct?

14    Charitable DAF Holdco, Limited?

15    A    And where is that on the chart?

16    Q    I'm asking, before December of 2024, Charitable DAF Fund,

17    LP was owned by Charitable DAF Holdco, Limited.

18    A    Can you show me a corporate document so I know the precise

19    corporation you're referring to?

20    Q    You're the -- you are the manager of -- or the control

21    person of CDHGP Limited, correct?

22    A    Again, I'd have to refresh my recollection, but I am the

23    control person over CDMC.

24    Q    Okay.  And CDMC --

25    A    As well as Charitable DAF Fund.  I'll represent that to

1  you.

2  Q   Okay.  Was there a transaction in December of 2024 where

3  Charitable DAF Holdco, Limited sold its interest or

4  transferred its interest in Charitable DAF Fund, LP to CDMC

5  FAD, LLC?

6  A   I know you're trying to help other litigation and --

7            MR. PHILLIPS:  Mark.

8            THE COURT:  Okay.  Nonresponsive.

9            THE WITNESS:  Your Honor, he's using your time to

10  fish for other litigation to support that --

11            THE COURT:  Okay.  Okay.  We have a running objection

12  to relevance.  I'm going to say that one more time.  Okay.

13  Just answer the question as best you can.

14            THE WITNESS:  I'd have to review the corporate

15  documents to refresh my recollection for that time period.

16  BY MR. LANG:

17  Q   Up until December of 2024, Charitable DAF Fund, LP was

18  owned 100 percent by Charitable DAF Holdco, Limited, wasn't

19  it?

20  A   I don't know what entity you're referring to without a

21  refreshment of corporate documents of that entity.  There

22  could be a lot of entities called that.

23  Q   You're aware that there is a proceeding in the Caymans

24  investigating the December 2024 transaction that sold -- where

25  Charitable DAF Holdco, Limited sold its interest in -- and or

Patrick - Direct                        178

1  transferred its interest in Charitable DAF Fund, LP to CDMC

2  FAD, LLC?

3  A    There are several parts to that question.  So the answer

4  is no.

5  Q    Are you aware of a proceeding pending in the Caymans

6  involving Charitable DAF Holdco, Limited?

7  A    Again, I don't know what entity you're referring to.  Show

8  me a -- show me a corporate document.

9          MR. LANG:  Your Honor, this was on the Foundation's

10  exhibit list.  We cross-designated any document designated as

11  an exhibit by any other party in this case.  And I'd like to

12  hand this to the witness.

13          MR. MORRIS:  Which exhibit is it?

14          THE COURT:  Which is -- yes.

15          MR. LANG:  It was on the -- it was on the DAF -- or,

16  the Foundation's exhibit list.

17          MR. MORRIS:  They haven't been admitted into evidence

18  and they've withdrawn their objection.  We object, Your Honor.

19          THE COURT:  Yes, they've not been admitted.

20          MR. LANG:  Okay.  Well, can I --

21          MR. PHILLIPS:  We object to that, Your Honor.  We

22  object to any witness --

23          MR. LANG:  We cross-designated every --

24          THE COURT:  I already discussed at the beginning what

25  we were admitting and that was not disclosed.

Patrick - Direct                                    179

1            MR. LANG:  Okay.

2            THE COURT:  As I recall, I said you've only

3    designated the plan and settlement agreement, and the answer

4    was yes.

5            MR. LANG:  Okay.

6    BY MR. LANG:

7    Q    And we're aware that the Joint Official -- are you aware

8    that there is a Joint Official Liquidator appointed over a

9    Charitable DAF entity in the Cayman Islands?

10           MR. PHILLIPS:  Objection to form.

11           THE WITNESS:  Again, without more specific --

12           THE COURT:  Overruled.  Yes.

13           THE WITNESS:  -- specificity, there could be a

14   thousand different actions that you're referring to, in my

15   mind.

16   BY MR. LANG:

17   Q    Are you aware that the Joint Official Liquidators in the

18   Caymans are investigating transactions involving Charitable

19   DAF Fund, LP and Charitable DAF Holdco, Limited?

20   A    Again, again, I don't specifically know what you're

21   referring to.

22           MR. PHILLIPS:  Your Honor, may I -- excuse me.  I

23   don't know that my running objection includes an objection to

24   form for each of the questions.  This objection is to form of

25   the questions about, quote, --

1              THE COURT:  What's wrong with the form?

2              MR. PHILLIPS:  -- investigation.

3              THE COURT:  What is wrong with the form of that

4    question?  I'm not clear.

5              MR. PHILLIPS:  My objection to form is that the

6    question is an open-ended question with an undefined term,

7    investigation.

8              THE COURT:  Overruled.  I don't think that's a vague

9    term.  So you may answer.

10             THE WITNESS:  If you show me some document, some

11   complaint or something, I'll be very happy to verify whatever

12   questions related to that.  But just giving me verbal words of

13   entities and names and actions, I don't know precisely what

14   you are talking about.

15   BY MR. LANG:

16   Q    Mr. Patrick, who set up the entities in the Hunter

17   Mountain Investment Trust org chart that is sitting in front

18   of you?

19   A    I'm sorry.  Repeat the question?

20   Q    Who set up the various entities that are in the org chart

21   that is on your -- on the stand?

22             MR. PHILLIPS:  Objection to form.  Set up.  What does

23   that mean?

24             THE WITNESS:  It -- yeah, it's very --

25             THE COURT:  I think we know what it means.  Creating,

1    perhaps.

2    BY MR. LANG:

3    Q    Created?

4    A    Who?  Are you asking if I created it?

5    Q    Did you participate in creating them?

6    A    Did I participate?  In which ones?

7    Q    CDMC FAD, LLC.

8    A    What do you mean by participate?

9    Q    Were you involved in creating -- did you initiate the

10   creation of CDMC FAD, LLC?

11   A    Lawyers were.

12   Q    Did you engage in any capacity on behalf of any entity?

13   Were you involved in engaging the lawyers to set up CDMC FAD,

14   LLC?

15   A    Yes, I engaged lawyers to set up entities.

16            MR. LANG:  Objection.  Nonresponsive.

17            THE COURT:  Sustained.

18            MR. LANG:  Did you --

19            THE COURT:  He asked about this one particular

20   entity, I think.

21   BY MR. LANG:

22   Q    Did you --

23   A    Which entity, again, did you ask?

24   Q    CDMC FAD, LLC.

25   A    Yes, I believe I hired a lawyer.

Patrick - Direct                              182

1   Q    And when did CDMC FAD, LLC become a hundred percent owner

2   of Charitable DAF Fund, LP?

3   A    Around the end of March of 2025.  I believe.

4   Q    And were you involved in the transaction between -- in

5   which CDMC FAD, LLC obtained a hundred percent interest in

6   Charitable DAF Fund, LP?

7   A    What do you mean by involved?  How?

8            THE COURT:  Okay.  I can see what's happening here or

9   I have an impression of what's happening here.  I feel like

10  you're slowing down this process where I've given 30 minutes

11  to this lawyer.  Okay?  And I feel like you're feigning

12  confusion.  I don't mean to be insulting, but that's how it

13  comes across.  Okay?  So I need you to speed up your answers

14  and not be confused about things you shouldn't be confused

15  about.  Okay?

16           THE WITNESS:  Okay.

17           THE COURT:  I feel like it's late 1980s *Dondi*.  Does

18  anyone know what I mean by that?  Okay.  We've been there,

19  done that, in the federal courts, and we don't like the

20  looking at -- you're not looking up at the ceiling.  That's

21  what they did in *Dondi*.  Confusion.  Delay.  Okay?

22       So I don't mean to chastise you.  I'm just telling you

23  that you're going to make us be here a lot longer, and nobody

24  wants that, because I will give him extra time for this.

25  Okay?

Patrick - Direct                                      183

1              THE WITNESS:  Understood.

2              THE COURT:  Thank you.

3   BY MR. LANG:

4   Q    Okay.  So you were involved in the transaction in which

5   CDMC FAD, LLC acquired 100 percent ownership interest in

6   Charitable DAF Fund, LP in or around March of 2025, correct?

7   A    Correct.

8   Q    Who did CDMC FAD, LLC obtain its interests in Charitable

9   DAF Fund, LP from in March of 2025?

10  A    From an -- from an entity called Charitable DAF Holdco,

11  Ltd.

12  Q    Charitable DAF Holdco, Ltd., the entity that I asked about

13  earlier, correct?

14  A    Of the same name.

15  Q    Yes.  And Charitable DAF Holdco, Ltd. has had Joint

16  Liquidated -- Liquidators, Joint Official Liquidators

17  appointed over it in the Cayman Islands, correct?

18  A    Yes.

19  Q    And those Joint Official Liquidators were appointed over

20  Charitable DAF Holdco, Limited in or around May 6th, 2025?

21  A    In May is what I recall.

22             MR. LANG:  Your Honor, we'll pass the witness.

23             THE COURT:  All right.  Do we have any questions?

24             MR. YORK:  No questions, Your Honor.

25             THE COURT:  Okay.  Any cross?

Patrick - Cross                                    184

1              MR. MORRIS:  Just briefly, Your Honor.

2                           CROSS-EXAMINATION

3    BY MR. MORRIS:

4    Q    Mr. Patrick, do you know who initiated the proceedings to

5    get the appointment of the Joint Official Liquidators in the

6    Cayman Islands?

7    A    The director and myself, we initially filed for a

8    voluntary joint liquidation in May.

9    Q    And did there come a time when the Cayman court appointed

10   the Joint Official Liquidators?

11   A    Yes.

12   Q    Do you know who asked the court to appoint the Joint

13   Official Liquidators?

14   A    We did, as well as other -- it was an agreement with the

15   participation holders of that entity.

16   Q    And who are the participation holders of that entity?

17   A    It was the DFW Charitable Foundation as a 51 percent

18   holder as well as the Highland Dallas Foundation, Highland

19   Santa Barbara Foundation, and the Highland Kansas City

20   Foundation.

21   Q    And those three foundations that you just mentioned, do

22   you know who controls them?

23   A    Jim Dondero.

24   Q    Is it your understanding that Mr. Dondero was funding the

25   litigation in the Cayman Islands?

Patrick - Cross                                    185

1    A    Yes.

2    Q    The Joint Official Liquidators, are you aware of any

3    statement that they've ever made that you are not authorized

4    to act on behalf of any of the HMIT entities?

5    A    Yeah, they've never made a statement that I'm not

6    authorized to act under any of those entities.

7    Q    Okay.  Did you receive a letter last night that was

8    purportedly authored by the Joint Official Liquidators?

9    A    Yes.

10   Q    Did you review that letter?

11   A    Yes.

12   Q    Did that letter refer to today's hearing?

13   A    Yes.

14   Q    Are you aware of the Joint Official Liquidators making any

15   appearance in this proceeding?

16   A    No, I'm not aware they made any appearance in this

17   proceeding.

18   Q    Based on your recollection of the contents of that letter,

19   did the Joint Official Liquidators challenge your authority to

20   enter into the settlement agreement on behalf of the HMIT

21   entities?

22   A    No, they did not, because there's no ownership interest.

23   Q    Okay.  And what do you mean by that?

24   A    The entity in liquidation owns nothing.  And the DFW

25   Charitable Foundation is the ultimate beneficial owner.

Patrick - Cross                                                186

1    Q    Are you aware that The Dallas Foundation filed an

2    objection to the settlement agreement on behalf of Empower

3    Dallas Foundation, the Okada Family Foundation, and Crown

4    Global?

5    A    Yes.

6    Q    Are you aware that that objection was withdrawn?

7    A    Yes.

8    Q    Was the withdrawal of that objection the product of

9    negotiations that your counsel had with lawyers for The Dallas

10   Foundation and Crown Global?

11   A    Yes, it was.

12   Q    Did The Dallas Foundation or Crown Global require you to

13   surrender your control position of the HMIT entities as a

14   condition to the withdrawal of their objection?

15   A    To give up my control?  No.

16   Q    They didn't ask you to do that, did they?

17   A    No.  No.

18   Q    You are the control person for each of the HMIT entities

19   that are party to the settlement agreement, correct?

20   A    That is correct.

21   Q    Are you aware of any requirement in any of the governance

22   documents --

23         MR. CURRY:  Your Honor, I'm not questioning, but I'm

24   going to object to the line of questioning here about what was

25   asked and what was not received into negotiations, because,

Patrick - Cross                              187

1    frankly, you're getting an imperfect picture there.  And I

2    don't think it should be misrepresented.  The communications

3    didn't happen with Mr. Patrick.

4           THE COURT:  Okay.  I don't know if that objection was

5    a confidential settlement communications.

6           MR. CURRY:  It's a combination of foundation and that

7    he's going into confidential settlement discussions.

8           MR. MORRIS:  Your Honor, it's a very simple question.

9    I'll ask it again.

10          THE COURT:  Okay.  We'll let --

11   BY MR. MORRIS:

12   Q    To the best of best of your knowledge, Mr. Patrick, did

13   The Dallas Foundation or any of the entities on whose behalf

14   it filed its objection require you to surrender your position

15   as the control person of the HMIT entities in exchange for the

16   withdrawal of their objection?

17   A    No, they did not.

18   Q    Thank you.  Are you aware -- are you familiar with the

19   governance documents for the HMIT entities?

20   A    Yes, I am.

21   Q    Are you aware of any restriction on your ability to act on

22   behalf of those HMIT entities with respect to -- withdrawn.

23   Are you required to obtain the consent of anyone in order to

24   enter into the settlement agreement on behalf of the HMIT

25   entities?

Patrick - Cross                                    188

1  A    No, I am not.  I'm the sole authority and control person

2  for that entity.

3  Q    And do you believe that you're entering into the

4  settlement agreement on behalf of the HMIT entities in good

5  faith?

6  A    Yes, I do.

7  Q    Have you received legal counsel before entering into the

8  agreement?

9  A    Yes, I have.

10 Q    Do you believe that you've negotiated the best terms that

11 you could get on behalf of the HMIT entities?

12 A    Yes, I do.

13 Q    Do you believe that you received the information that you

14 believed you required in order to make an informed decision

15 before you entered into the settlement agreement on behalf of

16 the HMIT entities?

17 A    Yes, I did.

18         MR. MORRIS:  I have no further questions, Your Honor.

19         THE COURT:  All right.  Mr. Phillips, anything from

20 you?

21         MR. PHILLIPS:  No questions.

22         THE COURT:  Okay.  Any redirect?

23         MR. LANG:  Briefly.

24         THE COURT:  Uh-huh.

25         MR. LANG:  Your Honor, because they mentioned the

Patrick - Redirect                              189

1    letter of last night from Grant Thornton, the Liquidators, I'm

2    going to offer that into evidence as the letter that we talked

3    about this morning.  But Mr. Morris directly asked him if he

4    reviewed it and asked him questions about it.

5              THE COURT:  Response?

6              MR. MORRIS:  No objection, Your Honor.  Go right

7    ahead.

8              THE COURT:  I'll admit it.

9              MR. LANG:  This is --

10             THE COURT:  Do I have it in my notebook?

11             MR. LANG:  -- Dugaboy --

12             THE COURT:  Okay.

13                       REDIRECT EXAMINATION

14   BY MR. LANG:

15   Q    Mr. Patrick, I've handed you --

16             THE COURT:  We're going to call this Dugaboy 3?

17             MR. LANG:  Dugaboy 3.

18             THE COURT:  Okay.

19        (Dugaboy Investment Trust's Exhibit 3 is admitted into

20   evidence.)

21   BY MR. LANG:

22   Q    Mr. Patrick, I've handed you a letter.  It's from Grant

23   Thornton dated June 24th, 2025.  Do you see that?

24   A    Yes.

25   Q    And is this a true and correct copy of the letter that you

1    received or that you reviewed from the Joint Liquidators that

2    you referred to in your answers to Mr. Morris' questions?

3    A    Well, it's a PDF.  I mean, I'm assuming it's from the

4    Official Liquidators.

5    Q    But this is the letter you were referring to in your

6    testimony a few minutes ago?

7    A    Yes.

8    Q    And do you see on the second paragraph it says that, on

9    May 6th, 2025, the Grand Court of Cayman Islands Financial

10   Services Division appointed Margot MacInnis and Sandipan

11   Bhowmik, each of Grant Thornton Special Services (Cayman)

12   Limited, as the Joint Official Liquidators of the company.  Do

13   you see that?

14   A    Yes.

15   Q    And do you see on the second page, it says:  Since our

16   appointment, we have been diligently investigating these

17   transactions, including a corporate transaction that occurred

18   in or around December 2024 where the company transferred a

19   hundred percent of its interest in the Fund to CDMC FAD, LLC,

20   which resulted in the company being the sole member of CDM and

21   subsequent redemptions of the company's interests in CDM.

22        Do you see that?

23   A    Yes.

24   Q    Is that your understanding of what is happening in the

25   Caymans right now, is investigating these transactions?

1    A    Correct.

2               MR. LANG:  Pass the witness.

3               MR. MORRIS:  May I just have that letter, please?

4               THE COURT:  Any recross?

5               MR. MORRIS:  Yeah, just real brief.

6                         RECROSS-EXAMINATION

7    BY MR. MORRIS:

8    Q    None of the transactions that you were just asked about

9    has anything to do with any of the HMIT entities, correct?

10   A    That's absolutely correct.

11   Q    Okay.  And now that we have the letter in the record, if

12   you could look at the third paragraph.  Do you see --

13   A    Yeah.

14   Q    Do you see it refers to the Highland Dallas Foundation,

15   Highland Santa Barbara Foundation, and Highland Kansas City

16   Foundation?

17   A    Yes.

18   Q    Are those the three entities that you referred to earlier

19   that are, to the best of your understanding, controlled by Mr.

20   Dondero?

21   A    Yes.

22   Q    Okay.  And this is the letter that you said you reviewed

23   and concluded that the Joint Official Liquidators weren't

24   challenging your authority to enter into the agreement on

25   behalf of the HMIT entities; do I have that right?

Patrick - Examination by the Court                192

1    A    Yes.  Yes, you do.

2              MR. MORRIS:  I have no further questions, Your Honor.

3              THE COURT:  Okay.  I have a question or two.

4                        EXAMINATION BY THE COURT

5              THE COURT:  And again, I apologize if I sounded harsh

6    earlier.  I recognize different people present different ways

7    when they testify.  It just appeared to me that maybe we were

8    slowing things down unnecessarily.  All right?

9              THE WITNESS:  I apologize, too.  I'm just a little

10   emotionally upset they're using this proceeding for a benefit

11   someplace else.

12             THE COURT:  Okay.  My question, very general

13   question:  Do you think this settlement is fair and equitable

14   as far as HMIT is concerned?

15             THE WITNESS:  Absolutely.

16             THE COURT:  And could you tell me why?

17             THE WITNESS:  Yeah.  There was no obvious pathway for

18   HMIT to, in my mind, to receive the residual interest of the

19   bankruptcy estate without a settlement with the Debtor.

20   Otherwise, it just seemed to me that it would go on forever.

21   And then I balanced that against the existing litigation and

22   the probability of the outcome weighted against the costs, and

23   determined that it made sense from HMIT's perspective to enter

24   into the settlement agreement.

25             THE COURT:  Okay.  And you understand that, as part

Patrick - Examination by the Court          193

1   of this, you're giving up some litigation claims that have

2   been waged now for a couple of years or more?

3          THE WITNESS:  That is correct, but I'm also receiving

4   the Kirschner Litigation, which I did negotiate to receive.

5          THE COURT:  Okay.  And there was a note that the

6   estate -- I've heard it called at some point the $57 million

7   note that HMIT owed Highland, a December 2015 note -- that

8   basically gets credited against the capital account.  You

9   understand that?

10         THE WITNESS:  Yes, I do.

11         THE COURT:  Okay.  And then you understand that if I

12  approve this deal, I'm not sure why there's going to be

13  $500,000 to HMIT and then also another $10 million to HMIT,

14  but subsequent payments could get held up if there are

15  litigation threats to the Highland Claimant Trust.  You

16  understand that, correct?

17         THE WITNESS:  Yes, I do.

18         THE COURT:  Okay.  I just, I have to ask.  I'm

19  confused about what's going on here.  I thought that -- well,

20  let me just ask this:  Would you consider yourself crossways

21  with Mr. Dondero now?

22         THE WITNESS:  No, but I'll answer the question.  Upon

23  advice of counsel, I quit Skyview Group.  And upon advice of

24  counsel, I terminated the back office services that Skyview

25  Group was providing to the DAF.

Patrick - Examination by the Court          194

1          THE COURT:  Okay.  Well, you said you're getting

2    maybe a little emotional because of other litigation.  I'm

3    just trying -- I don't understand what all that other --

4          THE WITNESS:  Unrelated -- well, unrelated to that.

5    They're clearly trying to use this forum to benefit their

6    Cayman actions.  They hired U.S. counsel called Reed Smith,

7    and they've been begging for an organization chart to issue a

8    variety of frivolous lawsuits against the operating DAF

9    entities.  So I do apologize, but that's a little upsetting to

10   me because I know we're going to -- that I've just fed them a

11   list of targets in another unrelated matter.

12         THE COURT:  Okay.  Reed Smith.  Here we go again with

13   -- they've made an appearance for Mr. Seery in this

14   litigation.

15         MR. MORRIS:  Exactly.  And we have raised that issue.

16         THE COURT:  Okay.

17         MR. MORRIS:  And I'm surprised to hear that they

18   think they still have the ability to do this.  But we will

19   pursue that later.

20         THE COURT:  Okay.  All right.  I had nothing further.

21   Thank you, Mr. Patrick.

22       (The witness steps down.)

23         THE COURT:  All right.  So where are we now?  I said

24   that, again, just trying to balance the playing field, if

25   Dugaboy was given the ability to question Mr. Patrick, then I

1   would allow I guess you want to call it rebuttal in the form

2   of the Debtor, Reorganized Debtor/Claimant to call Mr.

3   Dondero.  Do you choose to call him?

4              MR. MORRIS:  I'm not.

5              THE COURT:  Oh, and I guess I'll allow you, --

6              MR. MORRIS:  Yeah.

7              THE COURT:  -- if you want to put on your client

8   representative, Mr. Lang.

9              MR. LANG:  We call Jim Dondero.

10             THE COURT:  All right.  Yes, we are timing.

11       Please raise your right hand, sir, Mr. Dondero.

12  JAMES "JIM" DONDERO, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

13             THE COURT:  All right.  Thank you.  The time is

14  running.

15             THE WITNESS:  Thank you for the time.

16                        DIRECT EXAMINATION

17  BY MR. LANG:

18  Q   Mr. Dondero, do you claim that Mr. Patrick lost authority

19  to enter into the 9019 settlement -- or, the settlement

20  agreement that's the subject of the 9019 motion today?

21  A   Yes.

22  Q   And when do you claim Mr. Patrick lost authority to enter

23  into that settlement agreement?

24  A   I think it's best if I give a timeline.  He left Sky --

25  can I give a --

Dondero - Direct                              196

1          MR. PHILLIPS:  Objection, Your Honor.  Nonresponsive.

2          THE COURT:  Overruled.  He can give a timeline.

3          THE WITNESS:  He left Skyview in October, November,

4   walked out the door, never talked to anybody again, never

5   talked to the charities again except through counsel.  Never

6   collected severance, anything else.  Just walked out the door.

7       As part of Skyview's review of what he'd been working on

8   and what was the nature and what might have been happening,

9   they discovered numerous abnormalities.  They discovered--

10          THE COURT:  Do we have an objection?

11          MR. MORRIS:  We do.  We're not going to use this

12  opportunity to smear Mr. Patrick.  If the notion is that the

13  breach of the ability to act with authority occurred in May,

14  he should start his timeline in May.

15          THE COURT:  Well, I assumed he was just giving

16  background to explain.

17          THE WITNESS:  Yes.

18          THE COURT:  So I'll overrule.

19          THE WITNESS:  Thank you.  I'm going to just give you

20  a little bit of background.  Everything that I'm stating is in

21  the public record.  I won't do anything to besmirch Mark

22  Patrick.  It's all in the public record.  It's all in the

23  Cayman pleadings.  But there was affidavits regarding

24  embezzlements by vendors where he would request overbilling

25  and the money sent to his house.

Dondero - Direct                    197

1            MR. PHILLIPS:  Your Honor, we're talking about

2    documents outside the scope, not identified, not listed.

3    Objection.

4            THE WITNESS:  It's all --

5            MR. PHILLIPS:  This is not a timeline.

6            THE COURT:  This --

7            THE WITNESS:  It's --

8            THE COURT:  Sustained.  We don't have anything in the

9    record.  This is --

10           THE WITNESS:  Okay.  It's all in the public arena.

11   And so is the insider trading.

12           MR. PHILLIPS:  Objection, Your Honor.

13           THE WITNESS:  So, --

14           THE COURT:  Okay.  I sustain.

15           THE WITNESS:  Okay.  All right.

16      And then, yeah, and then there was monies missing.  There

17   were large amounts of monies missing from the estate.  There

18   was unexplained $16 million of expenses in '23.

19           MR. PHILLIPS:  Objection, Your Honor.  They're --

20           THE COURT:  Okay.  Explain the relevance, Mr. Lang.

21           MR. LANG:  I thought he was just giving a background.

22           THE COURT:  It's getting rather --

23           THE WITNESS:  Okay, Your Honor.  Well, --

24           THE COURT:  -- colorful, shall we say.  All right?

25           THE WITNESS:  Okay.  Without giving specifics

Dondero - Direct                                    198

1    regarding the embezzlement or --

2                MR. PHILLIPS:  Your Honor?

3                MR. MORRIS:  We move to strike, Your Honor.

4                MR. PHILLIPS:  We move to strike all of this.

5                MR. MORRIS:  We move to strike all of this.

6                THE COURT:  Okay.  I grant.  We don't have any

7    evidence of embezzlement.

8                THE WITNESS:  Okay.  All right.  Without detailing

9    any of the bad acts that we -- that it looked like happened

10   from the investigation, we took all the bad acts and all the

11   investigations and we gave them to the three underlying

12   charities.  Let's remember the DAF is a legacy charity I set

13   up 15 years ago, or actually, Mark Patrick did the

14   documentation back when he was a loyal employee.  And it was

15   three -- around $300 million and about $600 million of

16   liability, I mean, legal claims and other things that were

17   meant to be a family legacy, where the donations would help

18   the community.  We've given out more than $50 million over the

19   years.  And the recognition would help our various companies

20   or our families.  That's what it was.  Okay?

21       Went to the three underlying charities who were the

22   beneficiaries of the DAF as it existed:  Santa Barbara, Dallas

23   Foundation, Kansas City.  These are large charities that have

24   been around for a hundred years.  I don't control them by any

25   form or fashion.  As a matter of fact, the Hunts are $4

Dondero - Direct                                199

1   billion out of the $6 billion in Kansas City.  I think I'm a

2   hundred million or whatever.  The DAF was a hundred million.

3   I think the Hunts would be disturbed to hear that I control

4   it.

5       Anyway, so all those charities were beneficiaries.  And so

6   we went to them with all the investigative results.  And at

7   first, they tried to verify, they tried to have an audience

8   with Mark Patrick.  They wanted details.  They wanted what --

9   financials.  They wanted to know what was happening.  And

10  nothing was forthcoming from Mark Patrick.  He didn't think he

11  owed them any fiduciary responsibilities.

12          MR. PHILLIPS:  Objection.  Hearsay.

13          THE WITNESS:  No, that's --

14          THE COURT:  What is the out-of-court statement?  I'm

15  not sure.

16          MR. MORRIS:  Mark Patrick thinks that he doesn't owe

17  any fiduciary duties.

18          MR. PHILLIPS:  They did an investigation.  They tried

19  to do $x$.  They tried to do $y$.

20          THE COURT:  Oh, okay.  Technically not hearsay, but I

21  think we're getting --

22          THE WITNESS:  Okay.

23          THE COURT:  -- a little far beyond the subject

24  matter.  So if we could reign it in, please.

25          THE WITNESS:  Okay.  In February, they were noted,

 1  they were notified, or, in particular, Dallas Foundation was

 2  notified that their Empower subsidiary, which owned a hundred

 3  percent of the HMIT interests that we were talking about, was

 4  transferred to an undisclosed company for a million dollars.

 5  Without any transparency, without any understanding of who the

 6  new owner was, they filed for receivership in Cayman.  To the

 7  best of the charity's knowledge and based on all the

 8  documentation --

 9              MR. PHILLIPS:  Your Honor, objection.

10              THE COURT:  Okay.  Let me try to understand the

11  relevance.  Do you think I opened this up by asking if there

12  was a falling out essentially between you and Patrick?  Is

13  that why you're going into this?  Or --

14              THE WITNESS:  No, no, no.  No.  The falling-out is

15  much bigger than this.  But I'm just saying the day

16  receivership was filed was the day Mark Patrick lost

17  authority.  And I think anybody would look at it that way.  It

18  was for liquidation in the Cayman --

19              THE COURT:  Okay.  That's his view and we'll either

20  see the --

21              THE WITNESS:  Okay.

22              THE COURT:  -- documents that support that or not.

23              THE WITNESS:  All right.  So, your -- yes.  Because

24  the question was when do I think he lost authority.  I -- you

25  could make the argument he lost it a lot sooner, because for

Dondero - Direct                           201

1    months beforehand the charities had written him letters saying

2    they wanted their assets distributed in kind, they lost faith

3    in --

4              THE COURT:  Okay.

5              THE WITNESS:  Yeah.

6              MR. PHILLIPS:  Again, Your Honor, objection.

7              THE COURT:  This is hearsay.  Okay.  I sustain.

8              THE WITNESS:  Okay.  Well, they did.

9         So, eventually, and it takes a lot to get four little old

10   ladies at different charities to get together and agree to

11   file a charity in liquidation, but they did in the Caymans.

12   Okay?  And then lo and behold, the response from Mark Patrick

13   was, ha-ha, there are no assets there anymore, I moved them

14   all to my living room --

15             MR. PHILLIPS:  Move to strike, Your Honor.

16             THE WITNESS:  -- at DFW.

17             MR. PHILLIPS:  There's no evidence in the record of

18   this.  There was no evidence of any statement.  Move to

19   strike.

20             THE COURT:  There's not, right?

21             THE WITNESS:  Well, no, there is, because what Mark

22   Patrick --

23             THE COURT:  Sustained.  I don't have it.

24             MR. PHILLIPS:  Your Honor, there is no evidence of

25   any of this.

Dondero - Direct                                    202

```
 1              THE WITNESS:  Well, Mark Patrick's testimony, he said
 2     -- he said that our receivership was right after his
 3     receivership.  He had liquidated and taken all the assets out
 4     from Dallas, Santa Barbara, and whatever, and moved it all to
 5     his charity.  So when we tried -- when the poor charities in
 6     Texas in the U.S. tried to file for liquidation, his response
 7     was ha-ha.  And there were no assets there, you know, because
 8     he had already filed --
 9              MR. PHILLIPS:  Objection.
10              THE WITNESS:  He -- he --
11              THE COURT:  Okay, I've sustained the objection to the
12     ha-ha.  Okay.
13              THE WITNESS:  Okay.  But he had, he had filed --
14              MR. PHILLIPS:  Your Honor, please, move to strike.
15              THE COURT:  Okay.  Let's strike everything after that
16     last question.  Ask your next question.
17              MR. LANG:  I don't remember what the first question
18     was.
19     BY MR. LANG:
20     Q    What happened -- or, what's your understanding of the
21     proceedings in the Caymans?
22              MR. PHILLIPS:  Your Honor, objection.  Form.
23     Understanding of the proceedings in the Caymans?
24              MR. LANG:  His understanding is, I mean, his
25     understanding.  What's his endgame?
```

Dondero - Direct                                   203

1              THE COURT:  All right.  I sustain.

2              MR. LANG:  Okay.

3              THE WITNESS:  The Cayman Islands --

4              MR. PHILLIPS:  Your Honor?

5              MR. LANG:  Hold --

6              THE COURT:  I sustained, so --

7              THE WITNESS:  Oh, sustained.  Sorry.  Okay.

8  BY MR. LANG:

9  Q    What is your endgame with respect to your objection over

10  the authority of Mr. Patrick to enter into the settlement

11  agreement that is subject of the 9019?

12  A    The three charities in the U.S. are affected materially.

13  Dallas Foundation can't make payroll as of October.  Dallas

14  Foundation --

15              MR. PHILLIPS:  Your Honor, I'll object to this

16  testimony.  The Dallas Foundation has withdrawn its objection

17  on behalf of -- Dallas Foundation appearing on behalf of

18  Empower, the Okada Family Foundation, and Crown Global.  The

19  Dallas Foundation is no longer a party here and did not even

20  object in its -- an individual capacity.  Object.

21              THE COURT:  I sustain the objection.  They had an

22  objection.  They withdrew it.

23       Moreover, as I announced early on today, I was really

24  questioning their standing to weigh in.

25       So in light of all of that, I'm not going to allow

1   testimony regarding the impact there has been on Dallas

2   Foundation as a result of something Mark Patrick may have

3   done.  Okay?

4            THE WITNESS:  Okay.  I can answer it differently.

5            THE COURT:  Well, wait for your question.  Okay.

6   BY MR. LANG:

7   Q    Well, what -- what is the --

8   A    What is my goal?

9   Q    Well, yes, what is your goal?

10           THE COURT:  Okay.  Yes.  Why are you objecting?  Why

11  is Dugaboy objecting?  How about that?

12           MR. LANG:  Safely.

13           THE WITNESS:  Safely.  Without stating where the

14  assets are or might be, they are not with the three charities

15  they were with a year ago.  They have zero.  And I would like

16  to get those assets back.

17      (Pause.)

18           THE COURT:  Okay.  Go ahead.  I have a couple of

19  questions, but maybe you'll hit on them.

20           MR. LANG:  Oh.

21  BY MR. LANG:

22  Q    Mr. Dondero, are you asking the Court to -- are you

23  objecting to the settlement agreement that is the subject of

24  the 9019, asking the Court to allow the Joint Liquidators in

25  the Caymans to weigh in on the settlement agreement?

Dondero - Direct                              205

1    A    Yes.  Or described a little differently, there's no

2    irreparable harm --

3              MR. PHILLIPS:  Objection.  Nonresponsive.

4    BY MR. LANG:

5    Q    Well, let me ask you this:  Are you asking --

6              THE COURT:  Let him answer.

7              MR. LANG:  Yes.

8              THE COURT:  Go ahead and answer.

9    BY MR. LANG:

10   Q    Go ahead.

11   A    There's no irreparable harm for a bit of delay to get to

12   the bottom of where the assets are and what bad deeds have

13   occurred.

14   Q    Is that the reason why you're objecting, is to delay this

15   for 45 days or so?

16   A    Well, I believe the HMIT million-dollar transaction in

17   February was a steal.  I believe it was a stolen asset that he

18   -- Mark Patrick's trying to monetize.  And I don't believe

19   it's monetized at nearly its fair value.  And so I believe

20   that it needs to be reviewed.

21   Q    Are you asking the Court to -- are you objecting simply to

22   allow the Liquidators in the Caymans time to review this

23   transaction and the settlement agreement?

24   A    Yes.  There needs to be more time.

25   Q    Okay.

Dondero - Cross                                    206

1          MR. LANG:  I'll pass the witness.

2          THE COURT:  All right.  Cross?

3                         CROSS-EXAMINATION

4    BY MR. MORRIS:

5    Q    Good afternoon, Mr. Dondero.

6    A    How's it going?

7    Q    Okay.  You referred to the three underlying charities as

8    being The Dallas Foundation, The Highland Santa Barbara

9    Foundation, and The Highland Kansas City Foundation.  Do I

10   have that right?

11   A    The three are The Dallas Foundation, Santa Barbara, Kansas

12   City.  There's a holding company or there's an entity below

13   it, below each one that I'm on the board of, but it's separate

14   and distinct from the overall charity.

15   Q    Okay.  But the ones that are separate and distinct that

16   have the Highland name, --

17   A    Yes.

18   Q    -- those are the ones that you control, correct?

19   A    No.  I'm on the board.  There's three or four people on

20   the board.

21   Q    Okay.  But --

22   A    But we don't control.  Otherwise, you know, we would have

23   not recommended the settlement.

24   Q    Does the Hunt family make their contributions to The

25   Dallas Foundation, The Santa Barbara Foundation, and The

Dondero - Cross                                    207

1    Kansas City Foundation, or do they make them to The Highland

2    Dallas Foundation, The Highland Santa Barbara Foundation, and

3    The Highland Kansas City Foundation?

4    A    Most families do it through DAF, so they probably have

5    their own -- they're just involved with Kansas City, as far as

6    I know.  I don't know if they're involved in any of these

7    others.  But they probably have a Hunt Kansas City.

8    Q    But the ones with the Highland name are the ones who

9    initiated the proceeding in the Cayman Islands to get the

10   Joint Official Liquidators appointed over this entity down

11   there, right?

12   A    Yes, I believe so.

13   Q    And you personally funded that litigation, correct?

14   A    The charities can't make payroll.

15   Q    And the charities, did you tell the charities what's

16   happening here?

17   A    Yes.  They're aware.

18   Q    When did you tell the charities what's happening here?

19   A    They've known it for weeks.

20   Q    And they haven't filed any objection in this court,

21   correct?

22   A    They thought it was best for Dallas to file it.

23   Q    And Dallas settled; isn't that right?

24   A    To the surprise of all the other charities.

25   Q    Okay.  So today, there's actually no charity who is

Dondero - Cross                                    208

1  objecting to the settlement agreement, correct?

2  A    Because it was -- she got bludgeoned in depositions over

3  the weekend and it happened last night and nobody was aware of

4  it.

5  Q    I didn't bludgeon anybody.

6  A    Well, --

7  Q    I don't bludgeon people.

8  A    She switched course after a Sunday full-day deposition or

9  half-day deposition.

10 Q    Okay.  So the charities that you speak of aren't

11 objecting, correct?

12 A    Well, if we had more time.  We only had six hours' notice

13 that Dallas fell away.  I think they probably would object.

14 Q    And you say -- you began to have concerns about Mark

15 Patrick going all the way back to 2023, right?

16 A    2023?  A little bit, yeah.

17 Q    And then you had real concerns in 2024, right?

18 A    Yeah.  I mean, he's an odd duck, but he was really odd

19 towards the end.

20 Q    Did you file a declara... is one of those public documents

21 you mentioned in the Cayman Islands, that's your affidavit,

22 right?

23 A    I believe so.

24 Q    Do you want to grab Binder 3 of 3?

25 A    Sure.

Dondero - Cross                                    209

1    Q    And turn to Exhibit 119?

2    A    Yes.

3    Q    Okay.  And this is the declara... this is the affidavit

4    that you filed in the Cayman Islands?

5    A    Yes.

6    Q    And if you turn to Page 4, in Paragraph 25 you begin to

7    recite events concerning Mark Patrick that concerned you,

8    correct?

9    A    Yes.  I'm glad you're bringing this into evidence.

10   Q    Yes.  And in the two years since you started having

11   concerns, has anybody sued Mark Patrick for breach of

12   fiduciary duty?

13   A    No.

14   Q    Have you recommended to any of these charities:  Mark

15   Patrick is doing wrong, let's go sue him?

16   A    We were unaware on 90 percent of it until he left.

17   Q    You were aware of everything that's in your declaration.

18   It says in 2023, you have notice of these emails.  Right?  And

19   you did an investigation in 2024, correct?

20   A    Yes.  But it took a while to get the affidavits from third

21   parties.

22   Q    You had the whole investigation done in 2024 and nobody

23   sued Mark Patrick, right?

24   A    We didn't sue him.  Correct.

25   Q    You're just mad that you lost control.  Isn't that right?

Dondero - Cross                                210

1   A    No.

2   Q    Turn to Paragraph 33, please.  You accuse Mr. Patrick of

3   misusing material nonpublic inside information.  Is that

4   right?

5   A    Yes.

6   Q    What material nonpublic inside information did he abuse?

7   A    I wasn't involved in the specifics.  My understanding is

8   that he had an awareness of a tender or some financial

9   transaction and then was providing inside information to

10  attorneys and then had them do something.  But I don't -- I

11  don't know the specifics.

12  Q    Sir, under oath, in this affidavit that you submitted to

13  the Cayman Islands, you accuse Mark Patrick of obtaining and

14  abusing material nonpublic inside information.  Can you just

15  tell Judge Jernigan what you had in mind?

16  A    Whatever it says I have in mind.  I'm just saying I didn't

17  remember the specifics.  I can read it, though, if you'd like

18  me to read it.

19  Q    Well, was it something about a put option?

20  A    Yes.

21  Q    Did he tell The Dallas Foundation that it had a put

22  option?  Does that refresh your recollection?

23  A    I don't remember the details.

24  Q    Do you remember who the counterparty was to the put

25  option?

Dondero - Cross                                211

1  A    Counterparty.  One of the mutual funds.

2  Q    Does it refresh your recollection that it was the Dugaboy?

3  A    No.

4  Q    Do you remember, sir?

5  A    I don't remember.

6  Q    I'm going to try.  I'm going to try and refresh your

7  recollection.  Do you remember that Mark Patrick suggested to

8  The Dallas Foundation that it could recover millions of

9  dollars if it simply exercised the put option with Dugaboy?

10 A    My recollection is it was a mutual fund, and it wasn't

11 millions of dollars, but it would disrupt the transaction that

12 was already in place.  That's my recollection.

13 Q    Okay.

14 A    And I don't see Dugaboy anywhere in here, by the way.

15 Q    I know.  I was wondering if you could just -- I asked you,

16 but it doesn't sound like you know specifically what the

17 material nonpublic --

18 A    Well, --

19 Q    -- inside information is that you accused Mr. Patrick of

20 abusing at that time.

21 A    I know it's been reported.  We can get you the details.

22 Q    Okay.  You, in fact, acted on behalf of HMIT, didn't you?

23 A    Who is HMIT?

24 Q    Apologies.  You personally -- there's no question in your

25 mind that Mark Patrick is the Administrator at HMIT, correct?

Dondero - Cross                          212

1   A    I'm sorry, I'm drawing a blank on HMIT.  What is HMIT?

2   Q    I apologize.  Hunter Mountain Investment Trust.

3   A    Oh.  Okay.

4   Q    I'm calling it HMIT.

5   A    Okay.  All right.  Sorry.

6   Q    I probably not saying it clearly.  I apologize.  H-M-I-T.

7   HMIT, that's what I call it.  Is there something better that

8   you prefer?

9   A    No, that's fine.  Yeah.

10  Q    Okay.  So HMIT.  Mark Patrick is the Administrator at

11  HMIT, right?

12  A    I believe his status, his dirty hands, I believe he's

13  trying to monetize a stolen asset.

14          MR. PHILLIPS:  Objection, Your Honor.  Nonresponsive.

15          THE COURT:  Sustained.

16          THE WITNESS:  No, I -- I saw it.  I don't agree --

17          MR. PHILLIPS:  Objection, Your Honor.

18          THE COURT:  Sustained.

19          MR. PHILLIPS:  Move to strike.

20          THE COURT:  Granted.

21          THE WITNESS:  I do not agree.

22  BY MR. MORRIS:

23  Q    Okay.  Has he -- he was at one time the Administrator.

24  You would agree with that, right?

25  A    Yes.

1    Q    And did he stop becoming the Administrator in your mind

2    when the Joint Official Liquidators were appointed?

3    A    Yes.  I believe.

4    Q    Okay.  So, in your mind, that's when it happened?

5         Can you describe for the Court the relationship between

6    the entity in the Cayman Islands and HMIT?

7    A    The entity in the Cayman Island, as far as we knew, was

8    the org structure that all the assets were either in or

9    controlled by in the organizational structure before all the

10   HGEQ things that you went over earlier with Mark Patrick.

11   Q    Okay.  I'm not asking -- it's my fault.  Do you believe

12   the entity in the Cayman Islands controls HMIT?

13   A    HMIT was one of the assets that were owned by the

14   charities until it was moved for a million dollar to who know

15   who.

16   Q    And do you know how many layers there are between the

17   Cayman Islands entity and HMIT?

18   A    I do not.

19   Q    Is it fair to -- in your view, do you believe that the

20   Cayman Islands entity had a direct -- withdrawn.  Do you

21   believe that the Cayman Islands entity had an indirect

22   ownership interest in HMIT?

23   A    We believed it was direct.

24   Q    Direct.  So it was the owner?

25   A    Well, it was -- it was the direct before it got moved in

1   February.

2   Q    Hasn't Beacon always been the owner of -- the beneficial

3   owner of HMIT?

4   A    Then it was Beacon that was moved.  There was -- charities

5   were notified in February that, for $1 million, the HMIT was

6   sold to an undisclosed, unknown person.

7   Q    Do you believe that the entity in the Cayman Islands ever

8   had the ability to control Hunter Mountain Investment Trust?

9   A    Yeah.  It was an asset in the portfolio.

10  Q    And do you believe that that gives it the right to control

11  HMIT?

12  A    Yes.  I think the Liquidators will prove that.  I think

13  they can go back in time on bad acts and bad behavior and they

14  can regroup assets to their rightful owners.

15  Q    So your concern here is not with corporate authority, it's

16  with the bad acts.  Is that fair?

17  A    Well, no.  I think you lose your corporate authority when

18  you're fiducially irresponsible or commit corporate crimes.

19  Q    Okay.  But you've never -- you've never brought a lawsuit

20  accusing him of that.  Fair?

21  A    I think you'll see a litany of stuff come out of the

22  Cayman Islands.

23          MR. PHILLIPS:  Objection.  Nonresponsive.

24          MR. MORRIS:  I'm sure we might someday.

25          THE COURT:  Sustained.

1              THE WITNESS:  Yeah.  But, no.  But I have not, no.

2    BY MR. MORRIS:

3    Q    Yeah.  But you personally, have you ever been the

4    Administrator of Hunter Mountain Investment Trust?

5    A    Not that I'm aware of.

6    Q    Have you ever had any role whatsoever with respect to the

7    Hunter Mountain Investment Trust?

8    A    Not that I -- not that I recall.

9    Q    Okay.  Do you recall last December we were here on some

10   litigation concerning HCLOM's scheduled claim?

11   A    You have to give me more of a clue.

12   Q    Remember HCLOM had that $10 million scheduled claim and

13   Highland had filed a bad faith motion and we were all here in

14   court and we wound up settling that matter and HCLOM got a

15   Class 10 interest for $10 million?

16   A    Yes, I vaguely remember that.

17   Q    Okay.  And you were here and you were representing HCLOM,

18   right?

19   A    Okay.  I don't remember specifics, but, yes, go ahead.

20   Q    Okay.  And do you recall that Highland required Hunter

21   Mountain Investment Trust's consent as part of the

22   transaction?

23   A    Vaguely.

24   Q    And you personally authorized that consent back in

25   December, didn't you?

Dondero - Cross                                    216

1   A    No.

2   Q    Who did?

3   A    Whoever would have spoke for HMIT at the time.

4   Q    Okay.  Let's take a look at Exhibit 68, please.

5   A    So, Binder 2?

6   Q    Yes, please.

7   A    Sorry, this says Pat Daugherty.  This is 1 of 3.  This

8   one.  Okay.  Did you say 68?

9   Q    Yes.

10  A    It's not in here, either.  68.

11  Q    So you see that's an order of the Court?

12  A    Yes.

13  Q    And this resolves HCLOM's claim?  Take your time.

14  A    I'll leave it in case someone else needs it.  Okay.

15  Q    And do you see on the last page of the document there's an

16  electronic signature by Deborah Deitsch-Perez at the Stinson

17  firm as counsel for Hunter Mountain Investment Trust and

18  Dugaboy Investment Trust?  Do you see that?

19  A    I'm sorry.  I went to the very last page with Mark and I.

20  Is there another page?  Oh, okay.  Yes.  Okay.

21  Q    So you see Stinson has signed both on behalf of you

22  personally and HCLOM, and at the bottom, Stinson and Ms.

23  Deitsch-Perez has also signed on behalf of Hunter Mountain

24  Investment Trust and the Dugaboy Investment Trust?  Do you see

25  that?

1    A    Yes.  But then it's separate on 69, right?

2    Q    Yeah.  We're just looking at 68.

3    A    Okay.

4    Q    Do you know who authorized Ms. Deitsch-Perez to sign her

5    name and tell the Court that the Dugaboy Investment Trust had

6    approved this form of order both as to form and substance?

7    Who acted on behalf of Dugaboy?

8    A    I have no idea.  I hope she keeps it straight when she's

9    signing stuff.

10   Q    Well, on whose behalf are you here today?

11   A    Dugaboy's.

12   Q    And are you a representative of Dugaboy?

13   A    Representative?  I'm primary beneficiary until I pass.

14   Q    And who's the trustee of Dugaboy?

15   A    I believe it's my sister at the moment.

16   Q    Does she know you're here today testifying on behalf of

17   Dugaboy?

18   A    She knows I'm in court.  I didn't -- I wasn't specific.

19   Q    Did you talk to her about the Dugaboy -- does she -- does

20   she even know about the Dugaboy objection?

21   A    I don't know.

22   Q    Okay.  So how about Hunter Mountain Investment Trust?  Do

23   you know who authorized Ms. Deitsch-Perez to sign this

24   document on behalf of Hunter Mountain Investment Trust?

25   A    When was this?  In December or January?

Dondero - Cross                                          218

1    Q    Yeah.

2    A    I'm assuming -- I'm assuming Mark Patrick.

3    Q    Late December.

4    A    I'm assuming Mark Patrick.  But I don't know.

5    Q    Did you hear about a week later that Mr. Phillips called

6    your lawyer and accused her of signing this document without

7    authority from Hunter Mountain Investment Trust's authorized

8    representative, Mr. Patrick?

9    A    In hindsight, he's been in on it for a while, so --

10   Q    What do you mean, he's been in on it for a while?

11   A    I think he knows the plan Mark Patrick's been putting in

12   place for quite a while.

13   Q    But this document was signed without his knowledge or

14   consent; isn't that right?

15   A    I don't know.

16   Q    And you had to sign a new agreement with Mark Patrick as

17   the authorized representative of HMIT.  Didn't you do that,

18   sir?

19   A    I don't know.

20   Q    Okay.  Let's take a look at guess I guess probably Exhibit

21   69.  So this is an intercreditor and participation agreement.

22   Do you see that?

23   A    Yes.

24   Q    And it's dated January 10th, 2025, correct?

25   A    Yes.

Dondero - Cross                                                    219

1    Q    And even though you -- even though Skyview had completed

2    this investigation in which it was alleged that Mr. Patrick

3    misused material nonpublic inside information and he had

4    terminated his relationship with Skyview, you still entered

5    into this agreement with him as the authorized representative

6    of HMIT, correct?

7    A    Those were different work streams, you know, so they were

8    -- but yes.

9              MR. PHILLIPS:  Objection.  Nonresponsive.

10             THE COURT:  Sustained.

11   BY MR. MORRIS:

12   Q    That is -- that is your signature on the last page,

13   correct?

14   A    Yeah.  I mean, --

15   Q    It's a simple question.  That's your signature, right?

16   A    Yes.

17   Q    And you understood that you were signing an agreement with

18   Mark Patrick, correct?

19   A    Yes.

20   Q    And you signed this agreement in order to avoid Mr.

21   Phillips filing a motion in this court for reconsideration of

22   an order that she signed not knowing that Hunter Mountain had

23   given its consent without authority.  Isn't that right?

24   A    No, I had no -- none of that --

25   Q    So what's your memory?  Why do you think you entered into

Dondero - Cross                                          220

1  this agreement?

2  A    Because the lawyers put it in front of me as a finished

3  product from what had been going on recently.

4  Q    And you had no understanding of what it was?

5  A    Not with the innuendo and agenda that you were describing.

6  No.  I mean, I just -- I knew what it generally involved.

7  That's it.

8  Q    But you would agree with me that you entered into an

9  agreement knowing that Mark Patrick was signing on behalf of

10  Hunter Mountain, correct?

11  A    Yes.

12  Q    I mean, it's right below your name, right?

13  A    Yes.

14  Q    You couldn't have missed it.

15  A    Yes.  That part, I'll agree with.

16  Q    Okay.  And you signed the agreement with Mark acting as

17  the authorized agent and representative of Hunter Mountain,

18  notwithstanding all of the bad acts that you supposedly were

19  aware of at the time.  Correct?

20  A    Object to aware of at the time.  They were all coming

21  together in parallel work paths.

22              THE COURT:  Okay.

23              MR. PHILLIPS:  Object.  Nonresponsive.

24              THE COURT:  Sustained.  Like I told Mr. Patrick, the

25  witness does not get to object.

1              THE WITNESS:  Okay.

2    BY MR. MORRIS:

3    Q    And just to close the loop, Mr. Dondero, you fully funded

4    The Dallas Foundation's objection, correct?

5    A    And I made additional donations so that they could pursue

6    bad actors and get their money back.

7    Q    You funded the litigation so that The Dallas Foundation

8    could pursue their objection, correct?

9    A    I made additional donations so that they could get some

10   assets back so that they could be a charity again and make

11   donations.

12   Q    Do you get a tax deduction for that donation?

13   A    Yes.

14   Q    Okay.  That's nice.

15        Let's just finish up with the Joint Official Liquidators.

16   Have you spoken to them?

17   A    I do not believe so.

18   Q    Has anybody acting on your behalf spoken with the Joint

19   Official Liquidators?

20   A    I don't know.  I think the Joint Official Liquidators are

21   an accounting firm.  I think they're Grant Thornton.  I think

22   people have spoken to the attorneys down there, but I don't

23   know -- I haven't spoken to Grant Thornton and I don't know if

24   anybody else has.

25   Q    Okay.  Did you see the letter that your counsel marked as

Dondero - Cross                                222

1    the exhibit, the one that was sent last night?

2    A    I've not heard it -- I've not read it, but I've heard you

3    guys read it today.

4    Q    Yeah.  Are you aware of the Joint Official Liquidators

5    saying at any time that they didn't believe Mark Patrick had

6    the authority to enter into the settlement agreement on behalf

7    of the HMIT entities?

8    A    I have not.

9    Q    Okay.

10           MR. MORRIS:  No further questions, Your Honor.

11           THE COURT:  All right.  Mr. Phillips?

12           MR. PHILLIPS:  Yeah.

13           THE COURT:  Wait.  What are we at timewise?

14           THE CLERK:  So their 30 minutes is over.  If you

15   intended to give them 30 minutes for Patrick and --

16           THE COURT:  Yes.  Yes.  They collectively got 30

17   minutes.

18           THE CLERK:  For both of those --

19           THE COURT:  Yes.

20           THE CLERK:  -- witnesses.  Okay.  Yes, they're out.

21           THE COURT:  How much did Mr. Morris use?

22           THE CLERK:  Well, I don't know.  I just was --

23           THE COURT:  No, no, no, no.  30 minutes for each side

24   for each Patrick and Dondero.

25           MR. MORRIS:  About eight minutes.

Dondero - Cross                              223

1                    THE CLERK:  Yes.  Mr. Morris -- I think Mr. Phillips

2      may have asked one question, but Mr. Morris mostly -- 30

3      minutes.

4                    THE COURT:  No.  On this witness, Phillips hadn't

5      gone.

6                    THE CLERK:  No, not this witness.

7                    THE COURT:  Okay.  That's all I care about, this

8      witness.

9                    THE CLERK:  I don't know this witness.

10                   THE COURT:  Okay.  Do you have a question, Mr.

11     Phillips?

12                   THE CLERK:  I was doing 30 minutes for the total.

13                   THE COURT:  No, no, no, no, no.

14                   MR. PHILLIPS:  Your Honor, I can resolve this.  I can

15     resolve this.  We have no questions.

16                   THE COURT:  Okay.  Thank you.  Where are we?  Mr.

17     Lang, any redirect?

18                   MR. LANG:  I'm not sure.

19                   THE COURT:  Okay.

20                   THE WITNESS:  The last one.

21                   MR. PHILLIPS:  Your Honor, the witness is telling the

22     lawyer what question to ask.

23                   THE COURT:  Okay.

24                   MR. LANG:  I believe I've already asked, which is the

25     endgame.

Dondero - Redirect                    224

1              THE COURT:  Okay.  Just let's move on.  Anything

2      else?  What was the question?

3                        REDIRECT EXAMINATION

4      BY MR. LANG:

5      Q   Mr. Dondero, what are you looking to accomplish through

6      this objection?

7              MR. PHILLIPS:  Asked and answered.

8              THE COURT:  Sustained.  Sustained.  He did.  He was

9      asked and answered.

10     BY MR. LANG:

11     Q   The endgame in general.

12             MR. PHILLIPS:  Asked and answered.

13             THE COURT:  Answered and answered.  Move on.

14             THE WITNESS:  No, no.  No, I haven't.  No, I --

15             MR. PHILLIPS:  Asked and answered.  Move to strike.

16             THE COURT:  You asked him this on your direct

17     earlier.

18             MR. LANG:  I did.

19             THE WITNESS:  But, in general, regarding the --

20             MR. PHILLIPS:  Your Honor?

21             THE WITNESS:  Not just this.

22             THE COURT:  Sustained.  Ask another question.

23             MR. LANG:  I don't have any more questions.

24             THE COURT:  Okay.  I have a question.

25                        EXAMINATION BY THE COURT

1          THE COURT:  Here is something that I want to

2    understand.  What I have before me is whether a settlement

3    with Hunter Mountain, a settlement between the Highland

4    entities, the Claimant Trust, the Subtrusts, and the Hunter

5    Mountain entities, seven of them, is fair and equitable, is in

6    the best interest of the estate.  If you were the director,

7    the manager, the representative of Hunter Mountain estate,

8    what would your answer be?

9          THE WITNESS:  It's not in the ZIP Code.

10         THE COURT:  It's not in the ZIP Code?

11         THE WITNESS:  Of fair.  Yes.

12         THE COURT:  Okay.  Why do you think it's not in the

13   ZIP Code of fair?

14         THE WITNESS:  Okay.  We filed in Delaware on a $100

15   million judgment.  Pachulski was our counsel.  They told us --

16         THE COURT:  I know all this.

17         THE WITNESS:  It just --

18         THE COURT:  I'm talking about the settlement in front

19   of me right now.

20         THE WITNESS:  -- we'd be in and out in three months,

21   right?  We got liquidated instead.  We got liquidated for over

22   $850 million, which not enough people talk about.  Okay?  It

23   would've been $950 million if Seery had done a good job, but

24   it was $850 million we got liquidated for.  Okay?  The POCs

25   were pumped up.  People who supposedly had no claim, all of a

Dondero - Examination by the Court                    226

1    sudden, $300 million.

2        There's $700 million missing or misallocated from the

3    estate.  Okay?  There was -- all the original creditors, all

4    the original creditors sold 99 percent of their interest for

5    $160 million.  The Farallon and Stonehill went to the beach.

6    There was enough money on the balance sheet.  Seery could have

7    given them the $160 million and tossed us the keys.  Instead,

8    he had relations, deep relations, undisclosed business

9    relationships with Farallon and Stonehill, --

10            THE COURT:  Okay.  I do want you to know --

11            THE WITNESS:  No, but --

12            THE COURT:  -- I've read all this many times.

13            THE WITNESS:  Okay.  But so -- so these --

14            THE COURT:  I promise I read every piece of paper

15   submitted.

16            THE WITNESS:  Okay.  So, so he sold the POCs to them,

17   and it's been -- they've tripled their money in two and a half

18   years.  The professional fees have been $300-odd million.

19   There's interrelationships between all the professionals --

20   Farallon, Stonehill, Grosvenor, the Hellman & Friedman guys,

21   the Millennium guys who took whatever.  All this stuff has to

22   come out.

23       We're on the edge of a giant RICO case eventually.  We're

24   -- that's -- we're on the edge of a giant RICO case.  And they

25   should not be giving up their rights for $10, $20 million.

1    It's crazy for them to give up their rights at Dallas

2    Foundation for 10 or 20 million bucks.

3        There's $700 million missing.  All the original creditors

4    sold for $160 million.  The estate was sold for over $850

5    million.  Where'd all the money go?  Where'd all the money go

6    and why?  You know.

7        We get updates quarterly, once in a while, well, this much

8    went out to this law firm, this much went out to this,

9    whatever, but no one looks at the gross amount and where'd all

10   the money go?  And why?  Why did it have to -- why did it have

11   to go down like that?  Why do we have to fire --

12             THE COURT:  Okay.  I know you have an objection.

13             THE WITNESS:  -- all the employees?

14             THE COURT:  This is narrative.

15             MR. MORRIS:  Yeah.  And --

16             THE COURT:  I understand all --

17             MR. MORRIS:  -- I'm not going to cross-examine him,

18   but this is -- this is not accurate.

19             THE COURT:  I understand all of these arguments.  You

20   know, I --

21             THE WITNESS:  But I'm just --

22             THE COURT:  Your lawyers at least know, if you don't

23   know, that we wrote a 100-plus-page opinion on the motion of

24   Hunter Mountain to sue for all of this.  Okay?  So I promise

25   I've heard this and looked at it.  But right now, Hunter

Dondero - Examination by the Court                     228

1    Mountain, through Mark Patrick, you question his authority,

2    but they are ready to lay down their swords and not pursue

3    that motion for leave to sue based on the claims trading, and

4    --

5              THE WITNESS:  Have you seen all the insider trading,

6    Farallon, Stonehill?  Have you seen the trading and claims on

7    insider information?  Have you seen all that stuff?

8              THE COURT:  I've seen the allegations but I --

9              THE WITNESS:  Well, why would you release all those

10   people right now before the RICO?

11             THE COURT:  So I -- Dugaboy -- you've been asked what

12   is your goal?  Dugaboy a .18 limited partnership interest --

13             THE WITNESS:  Correct.

14             THE COURT:  -- that is subordinated to Hunter

15   Mountain.  I'm just trying to understand the scenario where it

16   makes sense to keep fighting for years to come.

17             THE WITNESS:  Well, RICO transcends this, right?  I

18   mean, RICO brings everybody in.  Until we get --

19             THE COURT:  Okay.  You think it's -- and my question,

20   why is this not fair and equitable and in the best interest of

21   the estate, you think it's better to litigate several more

22   years and maybe have a chance, you know, --

23             THE WITNESS:  At $600 mill.  At $600 million.

24             THE COURT:  -- Hunter Mountain would have a chance to

25   --

1          THE WITNESS:  $600 million.  Yes.

2          THE COURT:  Okay.

3          THE WITNESS:  Versus $20 million now.  But you have

4    to remember, it's all part of -- you have to pay attention to

5    this Mark Patrick stuff.

6          MR. PHILLIPS:  Your Honor?

7          THE COURT:  Okay.  Yes.  I asked my question.  I'm

8    trying to understand why Dugaboy, why its position is this is

9    not fair and equitable and in the best interest and in the

10   range of reasonableness.  Those are the buzz words that a

11   judge has to focus on.

12         THE WITNESS:  It's not fair to the charities.  I

13   still think no one's ever seen --

14         THE COURT:  The charities aren't parties here.

15         THE WITNESS:  Not yet.  Give them a little time.

16   They just heard about the settlement yesterday.

17         THE COURT:  Well, isn't that what the Cayman Islands

18   is all about?  What I do doesn't necessarily affect what's

19   happening there.

20         THE WITNESS:  Well, no, but you're saying they're not

21   here today.  If you delayed this three weeks, they'd be here.

22   It's just a couple --

23         THE COURT:  They were here and they chose to

24   withdraw.

25         THE WITNESS:  One.  One.  Just one charity.  But the

Dondero - Examination by the Court          230

1    others, if you give them some time, they'll be here.

2              THE COURT:  Okay.  Okay.  I think you've answered my

3    question, your theory of how this should play out and how you

4    want it to play out.  Okay.  All right.

5              THE WITNESS:  Thank you.

6              THE COURT:  That's all.  Thank you.

7              THE WITNESS:  Thank you for the time.

8              THE COURT:  Uh-huh.

9         (The witness steps down.)

10             THE COURT:  All right.  I think that concludes our

11   evidence, correct?

12             MR. YORK:  Yes, Your Honor.  At least from

13   Daugherty and --

14             THE COURT:  Okay.  The Objectors rest.  Any rebuttal?

15             MR. PHILLIPS:  No, Your Honor.

16             THE COURT:  Okay.

17             MR. YORK:  Your Honor, would it be okay if we took a

18   five-minute comfort break?

19             THE COURT:  Yes.  We may as well turn it into a 10-

20   minute break because that's what's going to happen.  All

21   right.  We'll be back at 3:40.

22             THE CLERK:  All rise.

23         (A recess ensued from 3:30 p.m. until 3:44 p.m.)

24             THE CLERK:  All rise.

25             THE COURT:  Please be seated.  We're back on the

 1    record in Highland Capital.  I will hear closing arguments.

 2    And I dangled something out there before lunch and I've never

 3    heard any follow-up.  I guess no agreement with Daugherty

 4    could be reached on the reserve?

 5            MR. YORK:  Haven't had that conversation, Your Honor.

 6            THE COURT:  You didn't have that conversation?  Oh,

 7    well.  Why didn't you have that conversation?

 8            MR. YORK:  We were, during the lunch break, working

 9    busily to prepare the rebuttal to Mr. Seery's testimony, --

10            MR. MORRIS:  Yeah.

11            MR. YORK:  -- Your Honor.  And so --

12            THE COURT:  Okay.  You told me you'd talk about it.

13            MR. MORRIS:  May I proceed, Your Honor?

14            THE COURT:  I guess I don't matter.  Do I not matter

15    when I suggest something like that?

16        Okay.  Go ahead.

17          CLOSING ARGUMENT ON BEHALF OF THE CLAIMANT TRUST

18            MR. MORRIS:  Good afternoon, Your Honor.  John

19    Morris; Pachulski, Stang, Ziehl & Jones; for Highland Capital

20    Management, LP and the Highland Claimant Trust and on behalf

21    of the Highland Litigation Subtrust.

22        I know that we've got Bob Loigman in the courtroom, but I

23    know that -- at least I hope he joins me in this closing

24    argument.  I suspect he does.

25        I don't want to be too long here, Your Honor.  We don't

1  have a high burden.  This is a 9019 motion, for goodness'

2  sakes.  I've never been involved in such a contentious 9019

3  motion in my life.  We had three depositions on Friday.  We

4  had two on Sunday.  I think we had two on Monday.  For a 9019,

5  I've had one witness sit multiple times.

6      It's been an extraordinary experience.  But at the end of

7  the day, nobody's really challenging the settlement agreement.

8  You've got people challenging, you know, the Cayman Islands.

9  You've got people challenging, is it -- you know, can you jam

10  it in under the plan?  We're not jamming anything under the

11  plan.  We're following the plan provisions.

12      Nobody's challenging the bona fides of the motion.  Nobody

13  is challenging whether it's the product of good-faith, arm's-

14  length negotiations.

15      You heard Mr. Seery testify at length about the process.

16  You've got 55 different documents in the record proving that

17  this agreement is the product of arm's-length, good-faith

18  negotiations between parties represented by sophisticated

19  counsel that resulted from an exchange of information, an

20  exchange of proposals, back and forth, and here we are.

21      It's also in the best interests of the estate.  Really not

22  challenged by anybody.  Nobody is contending that Highland is

23  getting a raw deal here.  Nobody.  And the proof that Highland

24  is getting fair consideration and that this settlement is in

25  the best interest of the Claimant Trust and its stakeholders,

1   it's obvious we are terminating costly, wasteful, and I dare

2   say frivolous litigation.  We are disposing of several

3   illiquid assets.  We are getting litigation protections that

4   will inure to the benefit of the released parties, the

5   Highland release parties and it will, we believe, provide the

6   protection that we deserve.

7       It's not just releases.  It's covenants not to sue.  It's

8   all kinds of bells and whistles in there.  Substantial

9   benefits to the estate.  And so nobody's really objecting to

10  that.

11      Nobody's really objecting to the fairness of the

12  settlement to the HMIT parties except for Mr. Dondero, and

13  he's just mad that peace is breaking out.  He's just mad

14  because he's not going to be able to litigate anymore.  It's

15  not relevant to a 9019 motion.  But even if it was, it's

16  ridiculous.  It's just ridiculous.

17      The settlement is fair and reasonable and in the best

18  interest of the creditors.  It's the product of good-faith,

19  arm's-length negotiations.  And on that alone, it should be

20  approved.

21      We've had a lot of testimony today about Mark Patrick's

22  authority.  The only actual evidence that concerns Mark

23  Patrick's authority are the exhibits in the binder and Jim

24  Seery's testimony about the diligence that he did.  And the

25  exhibits in the binder all prove that Mark Patrick has the

1    authority to act and bind the HMIT entities to the settlement

2    agreement.  It's Paragraph 7 of the HMIT trust agreement

3    itself.

4        Did the objecting parties point you to one single document

5    to support their speculative argument, because it's not

6    anything more than that, that somehow Mark Patrick isn't

7    authorized to do this?  There is not a scintilla of evidence

8    that Mark Patrick is not authorized to do this.

9        And if Your Honor had any concerns about Mr. Patrick, I

10   think he answered them at the end.  That he understood exactly

11   what the terms of the agreement are.  That he had a reasonable

12   opportunity to consult with counsel and to negotiate.  That he

13   knows exactly what he's doing on behalf of these entities.

14   That he believes the best path forward from the HMIT entities

15   is to grab the value today instead of letting it waste.

16       We welcome Mr. Patrick to the table.  It makes a lot of

17   sense.  We've been trying to get to this point forever.

18       Mr. Daugherty.  You know, I have no gripes with Mr.

19   Daugherty.  I don't know quite what's motivating him these

20   days, but he admitted and the evidence is clear that when he

21   was a Class 9 claim holder, I forget if it's two or three or

22   four occasions, he accepted $3.7 million in multiple payments,

23   without any concern at all as to whether or not it violated

24   the plan, even though his Class 8 claim had remained

25   unresolved.

1          He didn't send the money back.  He didn't say, Mr. Seery,

2     you can't do this because it violates the plan.  He knowingly

3     and willingly accepted the benefits of being a Class 9 claim

4     holder.  And now he comes and objects on the basis that

5     somehow it's not fair to him as a Class 8 holder?  This is

6     what we call estoppel.  Right?

7          I wasn't in a position to really make the argument because

8     I didn't quite understand it until today.  Like, how does he

9     come in today and say you can't do this, Your Honor?  You

10    can't allow Class 9 and 10 to get a nickel until he's done,

11    when he himself has accepted millions of dollars before his

12    claim is resolved?  That doesn't sound right to me.  And I

13    don't think the Court should accept that argument.

14         Just quickly, because I don't want to give it any weight,

15    frankly, but this whole business of the Cayman Islands and the

16    JOLs, the only facts Your Honor has to take into account are

17    that they were appointed before this motion was filed.

18    They've never appeared here.  They've never objected.  And

19    there is no evidence in the record to suggest, let alone to

20    prove, that the JOLs contend that Mark Patrick does not have

21    the authority to enter into the settlement on behalf of the

22    HMIT entities.  There's no evidence of any kind.

23         What you need to know and need to remember, though, is

24    that whole proceeding in the Cayman Islands is being brought

25    on behalf of not The Kansas City Foundation or The Dallas

1    Foundation, but The Highland Kansas City Foundation, The

2    Highland Dallas.  It's Mr. Dondero, and he's funding it, and

3    it says it in Paragraph I think 47 or 48 of his declaration.

4    He's funding all of that.  And he funded The Dallas

5    Foundation's objection here.

6        And that's why he's upset, because they settled last night

7    without telling him because they didn't want any part of this,

8    Your Honor.  That's the truth.  That's why they're not here.

9    And they, right, they're the people who suggested that maybe

10    something untoward happened and maybe someday -- because this

11    is the way their objection is characterized.  Complete

12    speculation.

13        If you go back and look at the objection, it's someday,

14    somebody might do something and might someday set it aside.

15    That wasn't a proper basis at the time, but we know that Mark

16    Patrick remains in control of the HMIT entities today because

17    nobody has told the Court otherwise.  And we know that The

18    Dallas Foundation has withdrawn its objection.  As I asked Mr.

19    Patrick, have you been, you know, removed or clipped or

20    terminated or in any way restricted in your capacity as the

21    Administrator and control person of the HMIT entities as a

22    result of the settlement, and the answer was no.

23        There's nothing to see here, Your Honor, except the

24    opportunity for the Highland Claimant Trust and its affiliated

25    entities in moving this case forward in an enormously positive

1   and constructive direction.

2        We have the opportunity today to put to rest a lot of

3   pending litigation.  We have the opportunity today to put to

4   rest a lot of future potential litigation that undoubtedly

5   would have come to pass had these entities remained under the

6   indirect control of Mr. Dondero, because we know that that was

7   the case.

8        If you remember, Your Honor, we sat here two years ago,

9   June 8th, 2023, on the evidentiary hearing on Hunter

10  Mountain's motion for leave to bring the claims trading case.

11  And if Your Honor will remember, Mr. Patrick at that time was

12  forced to admit that the entirety of that case came in from

13  Mr. Dondero, that he had no knowledge of any facts that

14  related to anything.

15       I would ask Your Honor to go and compare The Dallas

16  Foundation's objection with Mr. Dondero's declaration that he

17  filed in the Cayman Islands.  I'm not going to say they're

18  verbatim, but they are largely, largely the same.  This is

19  just Jim Dondero being Jim Dondero, and that is not a basis to

20  overrule or deny the motion under Rule 9019.

21       It's a product of good faith negotiations, it is clearly

22  in the best interests of the estate, and we respectfully

23  request that as soon as possible Your Honor grant motion.

24            THE COURT:  Okay.

25            MR. MORRIS:  Thank you, Your Honor.

1        THE COURT:  Any closing from the Movant, Co-Movant?

2        MR. PHILLIPS:  Your Honor, thank you very much.

3   Louis M. Phillips on behalf of the --

4        THE COURT:  I don't know if you're the Co-Movant.

5   You're a party to the proposed settlement.

6        MR. PHILLIPS:  I'm not a Co-Movant.

7        THE COURT:  Okay.

8        MR. PHILLIPS:  I'm a party to the settlement.

9        THE COURT:  Uh-huh.

10       MR. PHILLIPS:  I didn't quite make it to that status

11   to be a Co-Movant.

12     CLOSING ARGUMENT ON BEHALF OF THE HUNTER MOUNTAIN ENTITIES

13       MR. PHILLIPS:  But anyway, we appreciate the Court's

14   time.  We appreciate the Court's attention.  This was, as the

15   evidence established, we provided and were provided an immense

16   amount of information.

17     Much of the information, certainly the information about

18   Mr. Patrick's control of the HMIT entities, was provided by

19   us.  It was reviewed by Mr. Seery.  And Mr. Seery made a very

20   strong case for the amount of diligence he did on our side of

21   the equation.  It's not nearly as relevant to Your Honor's

22   decision about whether to approve the settlement whether we

23   got a good deal or not, but the deal we got, we think, is very

24   fair.

25     The deal we got was negotiated with counsel, with

1  businesspeople who are very sophisticated.  We have agreed on

2  the methodology and of the calculation of our Class 10 claim.

3  The Debtor and the Debtor estate or the Claimant Trust or

4  whoever held the HMIT note got full value for the HMIT note.

5  Any additional value from the HMIT note would come back to

6  HMIT.  The Kirschner Litigation would be for the benefit of

7  HMIT.  The Dugaboy Note would be for the benefit of HMIT.

8      All of that is being put into a package and is being

9  resolved, affiliated, administered in a very effective and

10  efficient manner.  We are getting some money.  We appreciate.

11  We tried to get more.  We couldn't.  They tried to pay less.

12  We made a deal.

13      So, Your Honor, I echo and thank Mr. Morris for all of his

14  comments.  I appreciate counsel being involved here today.  We

15  think this is a fair and equitable settlement.  There is no

16  question under 9019 that this settlement should be approved.

17  And the suggestion that this Court should allow itself to just

18  be a vehicle for continued litigation, when we have analyzed

19  it, perhaps from a different perspective, and made the

20  decision that it is time to make our deal now, it is time to

21  take HMIT out of the litigation picture and into the fold of a

22  party in interest of a fixed claim with fixed treatment that's

23  different from the plan, authorized by the plan.  And we

24  appreciate it.

25      Thank you, Your Honor.

1              THE COURT:  Thank you.  All right.  Mr. Loigman, we

2      didn't mean to ignore you.

3        CLOSING ARGUMENT ON BEHALF OF MARC S. KIRSCHNER, LITIGATION

4                                TRUSTEE

5              MR. LOIGMAN:  Thank you, Your Honor.  Robert Loigman,

6      Quinn Emanuel.  You didn't ignore me.  Louis was just quicker

7      to jump up than I was.

8          And I step up solely because you asked whether the Co-

9      Movant had anything to add.  And we have nothing further to

10     add to what Mr. Morris said.  We agree with it wholly.  We

11     think this is a fair and complete settlement, and we would ask

12     that the Court approve the settlement under the 9019 motion.

13             THE COURT:  Thank you.

14             MR. LOIGMAN:  Thank You, Your Honor.

15             THE COURT:  All right.  The Objectors?

16             MR. MORRIS:  Your Honor?

17             THE COURT:  Oh.

18             MR. MORRIS:  Just to clarify, the motion was made

19     under 9019 and Section 363.  I just don't want that to get

20     lost.  That's all.

21             THE COURT:  Okay.  363, use of property.  Okay.

22         The Objectors?

23           CLOSING ARGUMENT ON BEHALF OF PATRICK DAUGHERTY

24             MR. YORK:  Thank you, Your Honor.  I'll be very

25     brief.

1          I certainly appreciate that the Court desires to have this

2    bankruptcy wrapped up, given how long it's gone on now, for

3    six -- approximately six years in this court.  The fact of the

4    matter is that the settlement agreement that Highland proposes

5    to enter into with Hunter Mountain Investment Trust entities

6    violates the express terms of the plan, the confirmation

7    order, and the Claimant Trust Agreement.

8          And they have not pointed to any language in there or to

9    argue otherwise.  Their only argument has been that they've

10   set a reserve aside.  And there's no provision in any of those

11   documents that provides that that's an excuse for them to

12   violate the express terms of the confirmation order, the plan,

13   or the Claimant Trust Agreement, including specifically the

14   language that Class 10 claims are not to receive or retain

15   anything under the plan on account of their interest unless

16   and until the Class 8 and Class 9 claims are paid in full plus

17   applicable interest.  And --

18              THE COURT:  I really want to understand that

19   argument.  Mr. Seery correctly testified that, pretty much in

20   every Chapter 11 plan we see, there's a disputed claim

21   reserve.  Well, I guess unless we have really unsophisticated

22   creditors who don't insist on that.  But we had sophisticated

23   creditors.  So why doesn't that mechanism, which I would call

24   tried and true, we see it in most cases, why doesn't that

25   resolve this issue you're raising?

1          MR. YORK:  Well, --

2          THE COURT:  And I focused in more than maybe I needed

3    to about the nature of Mr. Daugherty's remaining claim, his

4    Class 8 claim.  What was the scope?  What's the maximum amount

5    it could be?  When might it be resolved?  Because I think we

6    have a tried-and-true mechanism that addresses his concerns.

7    Tell me why it doesn't.

8          MR. YORK:  Well, --

9          THE COURT:  Really, I want to understand what you

10   think I'm missing.

11         MR. YORK:  Well, so I think twofold, Your Honor.  The

12   first is that the dispute reserve that exists normally would

13   be for whatever the amount of the disputed claim is.  And here

14   we're dealing with, as both sides have acknowledged, a claim

15   that they at best could estimate, but they don't know for

16   certain, given all of the machinations that could come out of

17   the IRS audit.

18      And secondly, specifically with respect to the

19   confirmation order, if it had said that the net 10 and 11

20   claims could be paid as long as the allowed 8 and 9 claims

21   were paid, then the dispute reserve would provide that

22   protection.  But that's not what the language in the

23   confirmation order says.  It says claims, not allowed claims.

24   And therefore it's referring to all claims, including disputed

25   claims.  And --

1          THE COURT:  But we have a disputed claim reserve.

2   Okay.  We have a disputed claim reserve.

3          MR. YORK:  There is, yes, there is a reserve.

4          THE COURT:  So is it your argument that I can't

5   approve a settlement like this until Mr. Daugherty's claim has

6   been resolved with certainty, which might be in 2033 or

7   whatever?  I can't keep a bankruptcy estate open, allowing

8   administrative expenses to continue to accrue, because of one

9   contingent unliquidated claim that may never even develop.

10         MR. YORK:  Your Honor, I appreciate the Court's

11  frustration with that, but that's the way that the documents

12  are written in terms of the confirmation order.  And so it's

13  an --

14         THE COURT:  So the disputed claim reserve is

15  meaningless?

16         MR. YORK:  No, it is not -- a disputed claim reserve

17  exists, but it does not, under the terms of the confirmation

18  order, in terms of allowing the payment of Class 10 and Class

19  11 claims, those can't be done until the Class 8 claims are

20  resolved.

21         THE COURT:  You would have -- just a moment -- you

22  would have me keep this estate open for as long as it takes,

23  2033, whatever, without allowing Class 10 and Class 11

24  theoretically to get anything?

25         MR. YORK:  At least under --

1          THE COURT:  Let's just let the -- with all respect to

2     Mr. Seery, he's charging a handsome amount.  It was agreed to

3     or approved by the Court.  Let's just let him continue

4     accruing until 2033 because of Mr. Daugherty's prospect of the

5     IRS saying you owe $1.4 million plus interest and penalties,

6     when he's gotten the use of that all?  Help me.  This doesn't

7     make sense to me.

8          MR. YORK:  Sure.  One way this could be solved is

9     that the payments to -- the cash payments, for example, that

10    are to be made to the HMIT entities, under the proposed

11    settlement could be held in abeyance until the resolution of

12    the Class 8 claim.  The Court could modify the proposed

13    settlement based on that.  That's one way to deal with the

14    issue, for example.

15         THE COURT:  Do what?  Hold it in abeyance?

16         MR. YORK:  Yes.  For -- the payments to be made to

17    the Hunter Mountain Investment Trust under the proposed

18    settlement could be -- could be done in accordance with the

19    terms of the confirmation order.  We'll just hold those

20    payments until such time.

21         THE COURT:  We who?  Put it in the Court Registry?

22         MR. YORK:  Or --

23         THE COURT:  Where it will earn 0.18 percent?

24         MR. YORK:  No.  No.  It can remain within the

25    Claimant Trust until the time at which the Class 8 claim is

1    finally and fully resolved.

2            THE COURT:  Okay.  Meanwhile, I've approved the

3    extension of the Trusts for one year, with Dugaboy saying, we

4    don't think this should happen again and again and again.  We

5    reserve our rights.  That's not a good solution.

6            MR. YORK:  Your Honor, I understand the Court's

7    frustration, but this is the terms of the plan and the

8    confirmation order that were entered.  Highland needs to

9    follow it.

10            THE COURT:  Okay.  What about the estoppel argument

11    that I heard Mr. Morris make?

12            MR. YORK:  Well, sure.  So, the first time they raise

13    it is here today.  And the one thing that -- the difference is

14    that allowing this settlement to go forward is an effective

15    liquidation of the estate versus where things are now, in

16    which any payments that were made is not an effective

17    liquidation.  It doesn't expose anyone that would have

18    priority to Class 10 with respect to anything that happens in

19    the future from, you know, not having sufficient funds to deal

20    with it.  That's all.

21            THE COURT:  Okay.

22            MR. YORK:  Thank you, Your Honor.

23            THE COURT:  Thank you.  All right.  Mr. Lang?

24        CLOSING ARGUMENT ON BEHALF OF DUGABOY INVESTMENT TRUST

25            MR. LANG:  I'll be brief.  Your Honor, there are

1    three issues that we've raised.  One is the capital account

2    balance being used for the claim for the Class 10 holders.

3    The plan does not specify that the capital account balance is

4    to be used.  Allowing the $336 million claim to Class 10

5    ensures that Class 11 will not ever receive a dime.  That's

6    guaranteed.

7         Alternatively, upon the satisfaction of the Class 9, the

8    $20 million approximately owed to Class 9, the holders of HMIT

9    should receive 99.5 percent of the total residual.  We think

10   that would be a more fair outcome to the Class 11 claimants.

11             THE COURT:  Wait, say again?

12             MR. LANG:  That, so, of total assets, $70 million

13   approximately, $20 million is owed to Class 9.

14             THE COURT:  Uh-huh.

15             MR. LANG:  Of the remainder from that, HMIT should

16   receive 99.5 percent of those assets, whatever they are, the

17   value, rather than a $336 million claim.  That was the

18   objection.

19             THE COURT:  But I didn't get any evidence of a

20   separate way of competing -- of doing that.  I heard credible

21   testimony from Mr. Seery about why he used the math he used

22   and I didn't hear any countervailing evidence of, wait, this

23   is a more fair, realistic way of computing it.  And what I did

24   hear is the .5 percent limited partnership interest of Dugaboy

25   is subordinated in its payment rights under the limited

1   partnership agreement of Highland.

2          MR. LANG:  It's subordinated under the plan, but yes,

3   the plan does not say to use --

4          THE COURT:  Under the partnership agreement is the

5   reason the plan did it, is what I've been presented.

6          MR. LANG:  I believe Mr. Seery -- and I could be

7   wrong -- I think I heard him say that he has used the other

8   method, but I could have misheard him in the testimony.

9          THE COURT:  Well, that's not what I heard.  I heard

10  him emphasizing the fact that the Class 8 interests, including

11  that of Dugaboy, are subordinated with regard to payment

12  rights under the Highland partnership agreement.  And so

13  that's why he didn't think it made sense to just apply

14  percentages.

15         MR. LANG:  That's what he testified to.

16         THE COURT:  So I'm just -- anyway, I'm just trying to

17  figure out what the countervailing evidence is here to suggest

18  his methodology is wrong.

19         MR. LANG:  I believe the partner -- or, the plan says

20  that the Class 10, when the GUC certification is a Class 10,

21  and the Class 11 received pro rata, it doesn't specify the

22  account balance is to be used as the number to determine what

23  they receive.

24         THE COURT:  Okay.  You want to point out what you are

25  focused on?

1          MR. LANG:  I believe it's under Treatment.

2          THE COURT:  Okay.

3          MR. LANG:  Section --

4          THE COURT:  I don't want to hunt.  I want you to tell

5   me what the language is that you think is supportive of that.

6          MR. LANG:  And the second -- I guess the secondary

7   issue that we probably should just get to is the release.  We

8   think it's broad, and just Dugaboy and Dondero are carved out.

9   And Mr. Morris did send me a proposal last -- yesterday

10  evening that I haven't gotten to.  But that is an objection

11  that we have, is just to make sure that the -- that nobody can

12  argue that the release covers any claim Dugaboy might have, if

13  any.

14         THE COURT:  Okay.  I think many hours ago I remember

15  this being mentioned.  I guess it was a little bit more broad

16  than just -- I think it was Highland employees.  I don't know.

17     What is the agreement, Mr. Morris, if you're awake there,

18  on --

19         MR. MORRIS:  I am awake, Your Honor.  Apologies.

20         THE COURT:  Okay.  I didn't mean to be flippant.

21         MR. MORRIS:  Yeah.

22         THE COURT:  I get punchy and --

23         MR. MORRIS:  That's okay.  With respect to the

24  release?

25         THE COURT:  Right.

1          MR. MORRIS:  We don't have an agreement.  We have an

2     agreement -- well, I sent a proposal last night, but it didn't

3     get responded to.  If they want to accept that proposal,

4     that's terrific.

5          THE COURT:  Okay.  I don't know what the agreement

6     says.  Are you saying you want to accept what they proposed

7     last night?

8          MR. LANG:  No, I have edits to it.  I just couldn't

9     --  I was tied up on another filing last night.  I have not

10    been able to get to it today.

11         THE COURT:  Okay.  I'm going to make a ruling today.

12    Okay?  If it means y'all sit here in the courtroom a while,

13    fine.  But just like all of you, I have a mountain of other

14    stuff waiting for me, so I really want to rule today.  So, --

15         MR. LANG:  Understood.

16         THE COURT:  Yeah.

17         MR. LANG:  Maybe we can work on it as soon as I'm

18    done and I can get back to 'em --

19         THE COURT:  Okay.

20         MR. LANG:  -- and get back to you.

21      Your Honor, the -- it's on Page 23 of the plan.  It talks

22    about the Class 10 and Class 11, where the partnership

23    interests, that their treatment, they shall receive as pro

24    rata share of the contingent Claimant Trust interests.  And

25    all we're asking is that be used or applied as a 99.5/.5

1   distribution.

2        (Pause.)

3            THE COURT:  I'm sorry.  Go ahead.

4            MR. LANG:  Oh, sorry.  I thought you were looking for

5   it.

6        And the last issue is authority.  The only point of the

7   authority argument, Your Honor, is that the Joint

8   Administrators were appointed down in the Caymans to

9   investigate the transaction that moved basically the entire

10  ownership, because it's owned a hundred percent down to HMIT,

11  out.  They're investigating the transactions.  They have not

12  stipulated to authority.  They're looking at everything.

13  They've requested a 45-day delay on this motion.  And that's

14  all that -- not even asking to deny the 9019.  They were just

15  asking time to basically bless this transaction so that nobody

16  could come back and make an issue of it.  But I understand

17  your desire to rule today.

18           THE COURT:  Okay.  Any rebuttal?

19           MR. MORRIS:  Yeah, briefly, Your Honor.

20      REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE CLAIMANT TRUST

21           MR. MORRIS:  I just want to point the Court to two

22  provisions of the operative documents that I think --

23           THE COURT:  Okay.

24           MR. MORRIS:  -- will resolve even further the issues

25  that we've presented today.

1      The Claimant Trust Agreement -- and I apologize, I don't

2   know if the whole document is in evidence, but I will

3   respectfully suggest to the Court that the Claimant Trust

4   Agreement provides in Article 5, Section 5.1(c), --

5            THE COURT:  Okay.  Let me catch up.

6            MR. MORRIS:  Yes.

7      (Counsel confer.)

8            THE COURT:  It's not Debtor's Exhibit 5.

9            MR. MORRIS:  Yeah.

10           THE COURT:  Daugherty's Exhibit 5?

11           MR. MORRIS:  It's Daugherty Exhibit 5?

12           MR. YORK:  Yes.

13           THE COURT:  Okay.

14           MR. YORK:  So we have a full copy at Daugherty --

15           THE COURT:  I've got it.  Daugherty's Exhibit 5.

16           MR. MORRIS:  Okay.  So if you could just go to Page

17  27, Your Honor.  And this is in response to Mr. Lang's

18  argument about the calculation of the allowed claim.  You'll

19  see it deals with contingent trust interests.  And the very

20  last sentence says the equity trust --

21           THE COURT:  Wait.  What page again?

22           MR. MORRIS:  27.

23           THE COURT:  Okay.

24           MR. MORRIS:  Do you see Section C in the middle is

25  Contingent Trust Interests?

1          THE COURT:  No.

2          THE CLERK:  It's 26 of the Claimant Trust Agreement,

3     27 of the --

4          THE COURT:  Ah, it's 26.  Yes.  On the bottom, it's

5     26; on the top, it's 27 of 38.

6          MR. MORRIS:  Okay.

7          THE COURT:  Okay.

8          MR. MORRIS:  And at the end of Section C, it says

9     explicitly:  The equity trust interests distributed to allowed

10    holders of Class A limited partnership interests -- that's

11    Dugaboy --

12         THE COURT:  Uh-huh.

13         MR. MORRIS:  -- shall be subordinated to the equity

14    interests distributed to the allowed holders of Class B and C.

15    That's Hunter Mountain.  Okay?

16       So the trust agreement provides for exactly what we're

17    doing here.  Dugaboy is in fact subordinated to HMIT.  It

18    doesn't get paid until HMIT gets paid in full.  And Mr. Seery

19    I think compellingly testified as to the reasonable

20    calculation that he did based on very objective numbers to

21    determine each respective limited partner's capital account.

22       With respect to Mr. Daugherty, the plan, which is on the

23    docket at 1943, has a definition of Disputed Claim Reserve.

24    And it states, among other things, that the amount of the

25    disputed claim upon which the disputed claim --

1          THE COURT:  Give me the page number.

2          MR. MORRIS:  I apologize, Your Honor.

3          THE COURT:  I've got it right in front of me.

4          MR. MORRIS:  It's Page 7 of the plan.

5          THE COURT:  Okay.  All right.  I'm there.  The

6   Defined Term.

7          MR. MORRIS:  So the Defined Term "Disputed Claim,

8   Claims Reserve Amount" in the middle says:  The amount of the

9   disputed claim upon which the disputed claims reserve is

10  calculated shall be -- they've got an A and then a B -- the

11  amount agreed to by the holder of the disputed claim and the

12  Claimant Trustee or Reorganized Debtor, as applicable.  And

13  then it says D:  Or is otherwise ordered by the Bankruptcy

14  Court, including an estimated -- an order estimating the

15  disputed claim.

16     And that last provision is vital, Your Honor, because that

17  is the hook upon which you can always hang your hat when you

18  decide that we are not going to wait until 2023 [sic] when the

19  IRS audit may be resolved, because you have the ability, as

20  ordered by the Bankruptcy Court, including estimating the

21  amount of the disputed claim.  Which is one of the causes of

22  action that we've asserted in the complaint.  It's either to

23  subordinate -- actually, it's to disallow, to subordinate, or

24  to estimate.  Because this case does have to end, Your Honor.

25  We actually think he should be bound by the definition in B.

1    It is an agreed-upon amount.

2        I've heard the testimony from Mr. Daugherty that there was

3    no negotiation, but he didn't deny that he signed a document

4    that is called an agreement that sets forth the disputed claim

5    amount.  And that is an agreement, and I think that satisfies

6    that definition.  And even if it didn't, at some point this

7    case has to end.

8        Thank you, Your Honor.

9            THE COURT:  Okay.  Thank you.

10        All right.  Well, it's been a long day and even a longer

11    case.  I think a lot of people were on the receiving end of a

12    little bit of my grumpiness at times today, and I apologize

13    for that.

14        I always feel compelled to say to the lawyers and parties

15    when I rule from the bench that I can assure you it's not

16    knee-jerk.  I can assure you my law clerk and I have read

17    every piece of paper submitted.  And we come in here I think

18    well-prepared and we just want to listen to the evidence to

19    see if it supports -- who it supports.  So I am going to rule

20    from the bench.

21        I first want to make clear that with regard to the motion

22    before the Court, the motion which was filed May 19th at

23    Docket Entry 4216, pursuant to Bankruptcy Rule 9019 and

24    Bankruptcy Code Section 363, the Court is being asked to

25    approve a very broad settlement that is between what are

1    defined as the HMIT entities, seven entities in all; Hunter

2    Mountain Investment Trust; as well as Beacon Mountain, LLC;

3    Rand Advisors, LLC; Rand PE Fund 1, LP; Rand PE Fund

4    Management, LLC; Atlas IDF, LP; and Atlas IDF GP, PLLC.  So

5    this proposed compromise and settlement is between all of

6    those Hunter Mountain entities as well as the Reorganized

7    Debtor, the Highland Claimant Trust, the Highland Litigation

8    Subtrust, and the Highland Indemnity Trust.

9        I first will note that notice has been fulsome, reasonable

10    under the circumstances, to provide due process to anyone

11    affected by the proposed compromise.

12        The Court would note that the legal standard is a very

13    well-known and established legal standard here.  Among other

14    things, the Court is to look at whether the settlement is

15    fair, reasonable, and in the best interest of the estate;

16    whether it would appear reasonable business judgment has been

17    exercised; is the compromise and settlement within the range

18    of reasonableness?

19        And this involves looking at, among other things, the

20    probability of success in the litigation -- that would be all

21    the various litigation involving HMIT, if it were to go

22    forward; the complexity and likely duration of further

23    litigation and attendant expense, inconvenience, and delay;

24    and all other factors bearing on the wisdom of the compromise.

25    We know that's *Cajun Electric*, *Jackson Brewing*, *Foster*

1     *Mortgage*, among other cases.  I probably left out *AWECO*.

2          Anyway, applying all of those legal standards here, I do

3     think the evidence was very thorough in showing that the

4     compromise is a product of good faith and arm's-length

5     negotiations.  Indeed, it was almost shocking to this Court

6     when I saw the motion, having the history I have with all of

7     the contested issues, adversary proceedings that have

8     transpired over the past few years between Hunter Mountain and

9     the Debtor.

10         I do think the evidence is that it's fair and equitable

11    and in the best interest of the estate and within the range of

12    reasonableness, given due regard for all of the expense,

13    delay, and likelihood of success.

14         I'll just briefly recount that, as noted early today,

15    there was an Exhibit B attached to the 9019 motion that listed

16    nine unresolved pending pieces of litigation that the Highland

17    entities are embroiled in.  Two of those are now gone.  This

18    was filed May 8th, and as of January 25th, they're gone.  So

19    seven pieces of litigation, of which two will go entirely away

20    if I approve this settlement.  The Kirschner adversary claims

21    against Hunter Mountain will go away.

22         We have very little, very little, relatively speaking,

23    left in this bankruptcy case to resolve if I approve this

24    settlement.  That alone is very, very significant.  Again, we

25    have large shall I say issues with Hunter Mountain.  Highland

1    says Hunter Mountain owes the Highland entities something like

2    $57.69 million on a note that Hunter Mountain is payor on

3    dated December 21st, 2015.

4        The flip side of that is that Hunter Mountain was sued by

5    Kirschner in the Kirschner action on various claims, including

6    this $57 million note.  We have had Hunter Mountain file

7    multiple motions for leave to sue Highland, the Claimant

8    Trust, Mr. Seery.  And those have been denied, but are in

9    appeal status or remand status or some further litigation

10   status.

11       And again, we have numerous issues.  Hunter Mountain

12   having sought valuation.  The Court denied that.  It's on

13   appeal.

14       So, so much goes away, so much further litigation goes

15   away and we make a monumental step in ending this long-running

16   case if I approve this settlement.

17       Now, on the flip side of this, I know that Dugaboy,

18   through the voice of Mr. Dondero today, expressed that Hunter

19   Mountain is, I forget the words he used, but not -- this isn't

20   close to being fair and equitable as far as he was concerned

21   for Hunter Mountain.  That Hunter Mountain, in addition to

22   being through with litigation in this bankruptcy-land, would

23   be paid $500,000 within five days.  They would also be paid

24   separately $10 million as an initial distribution, with the

25   hope of two more $6.5 million distributions in '27 and '28.

1   And it would get a note, which I think has $24 million -- I

2   think it was less than that, $17 or $18 million left on it,

3   perhaps, on which Dugaboy is a maker.  The debtor is one of

4   the two payees.  The Debtor gives up its rights in that note.

5         It looks like Hunter Mountain is getting a lot.  And

6   again, the way this estate has been liquidated, there is money

7   that can flow to it as a Class 10 equity here, as the evidence

8   has shown.

9         So I am approving the settlement.  I am specifically

10  overruling the remaining objections of both Dugaboy and Mr.

11  Daugherty.

12        As far as Mr. Daugherty's argument that the settlement

13  violates the absolute priority rule or violates the terms of

14  the plan or the confirmation order or the trust agreement by,

15  putting words in his mouth, skipping over the full payment of

16  whatever his Class 8 claim is going to be and allowing a

17  subordinate class, Class 10, to get paid, I have flipped and

18  studied the wording of the plan and the confirmation order and

19  the defined term for Disputed Reserve.  And I referred to a

20  disputed reserve as a tried-and-true provision in Chapter 11

21  plans.  I think it does what needs to happen for precisely

22  this kind of situation, that as long as an appropriate amount

23  is being held in reserve, and the Court can decide what is an

24  appropriate amount, we don't have to hold up a bankruptcy

25  estate for years and years.

1          So the disputed claim reserve is what allows me to find

2     this is fair and equitable and this isn't some sort of

3     violation of the absolute priority rule.  I think this is

4     precisely the reason the disputed claim reserve mechanism is

5     in place, so that we can get on with the business of getting

6     more people paid sooner.

7          And based on the evidence I've heard, it is an appropriate

8     amount, I think.  We're doing a lot of crystal-balling, what

9     may or may not ever happen when, but I think, based on all the

10    persuasive evidence I've heard, the Daugherty objection should

11    be overruled.

12         As far as Dugaboy, I, as noted, am overruling that

13    objection.  I didn't have any persuasive evidence, solid

14    evidence to show me that Mark Patrick doesn't have appropriate

15    corporate governance authority to enter into this settlement

16    agreement.

17         I realize there's a lot swirling around in the Cayman

18    Islands, and that's going to play out however it plays out.

19    But as of today, I don't have any evidence that he doesn't

20    have authority currently to enter into the settlement.  And it

21    speaks volumes that The Foundation backed down.  It would seem

22    that they have been convinced that the lack-of-authority

23    argument was not one they wanted to press today.  So that is

24    overruled.

25         I feel like we have all seen this movie many times before.

1   I wanted to understand, perhaps I went deeper than I needed

2   to, I know Mr. Phillips thinks I went deeper than I needed in

3   hearing some of the testimony from Mr. Patrick and Mr.

4   Dondero, but I'm just trying to understand what's happening

5   here.  Why people who were so lockstep and friendly for years

6   of this case suddenly, when we're right on the brink of maybe

7   the case being put to bed -- I'm optimistic; it's not quite

8   that close -- all of a sudden they're at loggerheads.

9        And so how many times have I seen this over the years,

10  whether it's a breakdown in business and personal

11  relationships, Mr. Daugherty, Mr. Terry, Grant Scott, now Mark

12  Patrick?  I'm probably leaving out someone.  I don't know.  I

13  feel like I'm watching the same movie.  Okay, now these two

14  have parted ways.  Now these two have parted ways.

15       And then, as I recall, when Grant Scott withdrew his

16  objection to the HarbourVest settlement all these years ago,

17  2020, 2021, which he had been lodging for Charitable DAF, I

18  think it was, --

19            MR. MORRIS:  Yes, Your Honor.

20            THE COURT:  -- then what happens?  Well, I think Mark

21  Patrick came in to work or replace Grant Scott, and then a

22  bunch of people ended up getting sued in a different court

23  regarding the settlement I approved, the HarbourVest

24  settlement I approved.

25       So why am I saying this?  I just, I'm trying to understand

1    things I'll never understand.  I wanted to maybe hear

2    something that would make me better understand what's happened

3    now between Hunter Mountain, Mark Patrick, and Dondero and

4    Dugaboy, because it sure seems like they were on the same team

5    for many years.  But it was very likely irrelevant, as Mr.

6    Phillips kept getting up and down and saying.  I just was

7    seeing if it would lead to something relevant that would bear

8    on the wisdom of this compromise, since that's one of my other

9    legal standards.  I'm supposed to consider all factors that

10    might bear on the wisdom of the compromise.  And so I guess

11    that's where I was going in allowing all of that to come in.

12        All right.  Well, while everyone is not thrilled with this

13    compromise and settlement, I heartily congratulate the human

14    beings that made it happen, and they know who they are.  Maybe

15    I do, maybe I don't.  But I think it's rather amazing.  And I

16    hope that we are not coming to court for hearings in 2032.  I

17    don't know who among us will be alive.  I'm not going to be

18    alive by then.  Certain people might cheer if that's the case.

19    But I congratulate the human beings who made this happen.  And

20    you know who you are.  Maybe I do, maybe I don't, but I

21    congratulate you.

22        All right.  So I reserve the right to supplement or amend

23    this oral bench ruling in a more fulsome written order.  I am

24    asking Mr. Morris and his team to be the scriveners on that

25    order.  And obviously, you're going to run it by the other

1  lawyers here who participated today.

2      Is there anything else before we wrap it up?

3          MR. MORRIS:  Just one other thing, Your Honor.  And I

4  greatly appreciate your comments.

5      When we draft the order, are we authorized to say that

6  this settlement is approved not only pursuant to 9019 but to

7  363?  Because there are asset sales that are part of this.  We

8  moved under that provision, and I didn't hear Your Honor

9  reference that, --

10          THE COURT:  Okay.

11          MR. MORRIS:  -- but we would like to include that in

12  the order.

13          THE COURT:  You may.  And that is precisely why I

14  said I reserve the right to supplement or amend, because many

15  times I get out of here and look at this transcript and, ooh,

16  I forgot to say whatever.

17          MR. MORRIS:  Yeah.

18          THE COURT:  So I meant to say that and I didn't, so

19  you may add that.

20          MR. MORRIS:  And I assume all Your Honor wants is a

21  fairly simple form of order that incorporates --

22          THE COURT:  I do not want a 40-page order.

23          MR. MORRIS:  Right.

24          THE COURT:  Okay?

25          MR. MORRIS:  Just an order that incorporates your

1    comments on the record, and to the extent that Your Honor

2    wants to amend that, you'll do so at your leisure?

3              THE COURT:  Yes.

4              MR. MORRIS:  Perfect.

5              THE COURT:  All right.

6              MR. MORRIS:  Thank you.

7              THE COURT:  Thank you all.  We're adjourned.

8              MR. PHILLIPS:  Thank you, Your Honor.

9              THE CLERK:  All rise.

10         (Proceedings concluded at 4:38 p.m.)

11                          --oOo--

12

13

14

15

16

17

18

19

20                        CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23     **/s/ Kathy Rehling**                    **06/27/2024**

24   _____    _____
     Kathy Rehling, CETD-444                      Date
25   Certified Electronic Court Transcriber

264

INDEX

PROCEEDINGS                                              4

OPENING STATEMENTS

By Mr. Morris                                          48
By Mr. Phillips                                        62
By Mr. York                                            64
By Mr. Lang                                            79

WITNESSES

Claimant Trust's Witnesses

James P. Seery
- Proffer of Testimony by Mr. Morris                   11
- Direct Examination by Mr. Morris                     83
- Cross-Examination by Mr. Phillips                   110
- Cross-Examination by Mr. York                       111
- Cross-Examination by Mr. Lang                       128

Patrick Daugherty's Witnesses

Patrick Daugherty
- Direct Examination by Mr. York                      141
- Cross-Examination by Mr. Morris                     154
- Examination by the Court                            164

Dugaboy Investment Trust's Witnesses

Mark Patrick
- Direct Examination by Mr. Lang                      171
- Cross-Examination by Mr. Morris                     184
- Redirect Examination by Mr. Lang                    189
- Recross-Examination by Mr. Morris                   191
- Examination by the Court                            192

James "Jim" Dondero
- Direct Examination by Mr. Lang                      195
- Cross-Examination by Mr. Morris                     206
- Redirect Examination by Mr. Lang
- Examination by the Court                            224
- Recross-Examination by Mr. Morris

```
 1                        INDEX
                         Page 2
 2
 3    EXHIBITS

 4    Claimant Trust's Exhibits (Motion to Extend Duration)

 5    1 through 67                          Received    11

 6    Claimant Trust's Exhibits (Motion to Approve Settlement)

 7    1 through 123, 126                     Offered    43
      10                                  Withdrawn    45
 8    12                                   Received    44
      13                                   Received    44
 9    57                                  Withdrawn    45
      59                                   Received    46
10    64-69                                Received    46

11    Dugaboy Investment Trust's Exhibits

12
      Plan and Settlement Agreement        Received    47
13    Exhibit 3                            Received   189

14    Patrick Daugherty's Exhibits

15    1-42                                 Received    47

16    CLOSING ARGUMENTS

17    By Mr. Morris                                   231
      By Mr. Phillips                                 238
18    By Mr. Loigman                                  240
      By Mr. York                                     240
19    By Mr. Lang                                     245
      By Mr. Morris                                   250
20
21    RULINGS

22    Motion for an Order Further Extending Duration of Trusts    21
      (4213)
23

24

25
```

1                                 INDEX
                                 Page 3
2

3   RULINGS, cont'd.

4   Motion for Entry of an Order Pursuant to Bankruptcy      28/254
    Rule 9019 and 11 U.S.C. § 363 Approving Settlement
5   with HMIT Entities and Authorizing Actions Consistent
    Therewith (4216)
6
    END OF PROCEEDINGS                                          263
7
    INDEX                                                   264-266
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25