Jason S. Brookner (Texas Bar No. 24033684)
Andrew K. York (Texas Bar No. 24051554)
Joshua D. Smeltzer (Texas Bar No. 24113859)
Drake M. Rayshell (Texas Bar No. 24118507)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, TX 75201
Telephone: (214) 954-4135
Facsimile:  (214) 953-1332
Email:      jbrookner@grayreed.com
            dyork@grayreed.com
            jsmeltzer@grayreed.com
            drayshell@grayreed.com

*Counsel to Patrick Daugherty*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 (SGJ) |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

**PATRICK DAUGHERTY'S OBJECTION TO MOTION FOR**
**AN ORDER AUTHORIZING (A) THE DESTRUCTION OF CERTAIN**
**DOCUMENTS AND OBSOLETE EQUIPMENT AND (B) FOR RELATED RELIEF**

Patrick Daugherty ("Daugherty) files this Objection to the *Motion for an Order Authorizing (A) The Destruction of Certain Documents and Obsolete Equipment and (B) For Related Relief* [Docket No. 4416] (the "Motion") filed by Highland Capital Management, L.P.'s ("Debtor" or "Highland") and the Highland Claimant Trust (the "Claimant Trust") (collectively, Highland and the Claimant Trust "Movants").  In support of this Objection, Daugherty respectfully states as follows:

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

## I.    SUMMARY

1.    The Motion's conclusory, unsubstantiated characterizations of the Documents[2] and Retained Documents to be imminently destroyed should cause concern.  The Documents, Retained Documents, and Obsolete Equipment may include information relevant to ongoing disputes pending before this Court,[3] and in other forums.  This is hardly the sort of information that is "not required to be retained under applicable law."  Motion at ¶ 1.  Yet Movants will not provide clear, direct answers to questions seeking to confirm what is, and what is not, included in the Documents and Retained Documents that Movants want to destroy.

2.    Significantly, Movants do not represent that they have actually reviewed the contents of the 3,987 boxes central to their Motion.[4]  Instead they only state that they have reviewed "a current inventory *describing the boxes and their contents*."  Motion at ¶ 1 (emphasis added).  At best, Movants' reliance on a third-party's description of the contents is questionable. But given that Highland is maintaining an Adversary Proceeding against Daugherty regarding facts and circumstances surrounding Highland's 2008 tax returns it is extremely concerning that Highland cannot, or refuses to, represent that it has thoroughly examined the Documents or Retained Documents to identify potentially relevant information to those claims.  It is further concerning that Highland promised to provide Daugherty with all HERA and ERA[5] records

---

[2] Capitalized terms not otherwise defined herein are defined in the Motion.

[3] Not the least of which, Highland's Adversary Proceeding No. 25-03055 against Daugherty founded on information dating back to 2008 (the "Adversary Proceeding").

[4] The Motion seeks authority to destroy three categories of items: (1) Documents, (2) Retained Documents, and (3) Obsolete Equipment.  Motion at ¶ 2.  Because Movants represent that the data stored on the Obsolete Equipment has been fully backed up to cloud storage, Daugherty's Objection only concerns the destruction of the Documents and Retained Documents.

[5] As utilized herein, the terms "HERA" and "ERA" have the meaning ascribed to them in November 2021 Settlement Agreement between Daugherty and Highland (the "Settlement Agreement").  A true and correct copy of the Settlement Agreement is attached hereto as Exhibit A.  [Doc. No. 3089-1].

4934-6755-8517

pursuant to its Settlement Agreement with Daugherty, dated November 2021, but has failed to do so.  *See* Ex. A.

3.      These conclusory, non-committal statements are insufficient to justify an order underwriting Highland's request to destroy its own records.  The Court should demand more from Highland.  For all of these reasons, as more fully set forth below, the Court should deny the Motion.

## II.      BACKGROUND FACTS

4.      On October 16, 2019 (the "<u>Petition Date</u>"), Highland filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239(CSS).   The case was ultimately transferred to this Court on December 4, 2019. [Doc. No. 186].

5.      The inception of this bankruptcy proceeding was fraught with complications and obstructions manufactured by Highland's legacy management, which ultimately resulted in the appointment of independent fiduciaries to run the debtor.  [*See e.g.,* Doc. 2934 at ¶ 9].

6.      Under independent leadership, on January 22, 2021, Highland filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1808] (the "<u>Plan</u>").  A month later, the Court entered the *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) and (II) Granting Related Relief* [Docket No. 1943] (the "<u>Confirmation Order</u>").  The Plan then became effective on August 11, 2021.  [*See* Docket No. 2700].

7.      On March 8, 2022, following Court approval, Daugherty and Highland entered a Settlement Agreement to resolve, in part, his Claim No. 205.   Docket No. 3088, 3089 (the "<u>Settlement Agreement</u>").   The consideration from Highland to Daugherty included, in part, a promise "[t]o facilitate [the] recovery of [] potential claims" belonging to HERA and ERA by

4934-6755-8517

Highland "transfer[ring] its interests in HERA and ERA to Daugherty." Ex. A at § 8. Highland's "interests in HERA and ERA" included all property, data, information, documents, books, and records belonging to HERA and ERA in Highland's possession as evidenced by Highland's express promise that the transfer would include, among other things, "the HERA and ERA books and records (spreadsheet) maintained on [Highland's] system." *Id.*

8.     Pursuant to the terms of the Settlement Agreement, Daugherty requested Highland produce all of HERA and ERA's books and records. Ex. B, Decl. of P. Daugherty at ¶ 2. To date, Highland has failed to deliver on its promise under the Settlement Agreement. *Id.* Daugherty, on behalf of HERA, however, obtained material and relevant information from a third-party, Abrams & Bayliss, that included communications between Highland's former principals and agents regarding actions taken on behalf of HERA and ERA. *Id.* at ¶ 3; *see also e.g.,* Ex. B-1. Highland's failure to produce those records is the basis of Daugherty's claim for breach of the Settlement Agreement in the Adversary Proceeding. [*See* Adv. Proc. No. 25-03055, Doc. No. 39].

9.     On February 29, 2024, HERA brought suit against James Dondero, Mark Okada, Scott Ellington, and others. *See* Ex. B-2 (HERA's First Amended Complaint). That litigation is based in part on the records produced by Abrams & Bayliss that were exchanged with former principals and agents of Highland, HERA and ERA. These are records that Highland, HERA and ERA should have readily available. *See* Ex. B-1 (a sampling of emails produced by Abrams & Bayliss including email handles from legacy principals and agents of Highland discussing HERA and ERA matters).

10.    On May 2, 2025, Highland brought the Adversary Proceeding against Daugherty seeking to have the Court disallow Daugherty's Claim No. 205 in its entirety.[6] Exhibit C.

---

[6] Daugherty maintains that Highland's Adversary Proceeding is in direct violation of the parties' Settlement Agreement.

4934-6755-8517

Daugherty filed a motion to dismiss the Adversary Proceeding, arguing the action violated the stay provision in Daugherty's Settlement Agreement with Highland (the "Stay Provision"). [Adv. Proc. 25-03055, Doc. No. 5]; *see also* Ex. A at § 9.  In response, recognizing the Stay Provision as problematic to its ability to bring the Adversary Proceeding, Highland objected and, by a cross-motion, moved the Court to strike the Stay Provision from the Settlement Agreement. [Adv. Proc. 25-03055, Doc. No. 11].  On September 5, 2025, The Court granted Highland's requested relief and struck the Stay Provision. [Adv. Proc. 25-03055, Doc. No. 23].  Daugherty immediately appealed the Court's order and that appeal remains pending. [Adv. Proc. 25-03055, Doc. No. 25]. Daugherty also filed a counterclaim against Highland for breach of the HERA and ERA books and records provision of the Settlement Agreement. [*See* Adv. Proc. No. 25-03055, Doc. No. 39].

11.    On September 30, 2025, Movants filed their Motion for an Order Authorizing (A) The Destruction of Certain Documents and Obsolete Equipment and (B) for Related Relief. *See generally* Motion.  The Motion failed to describe with any particularity the contents of the materials in upwards of 4,000 boxes that Movants sought to destroy.  The Motion also failed to explain how Movants determined the materials were no longer needed.  This left Daugherty wondering whether any of those materials were pertinent to the Adversary Proceeding or the HERA lawsuit against Dondero et al.

12.    Accordingly, on October 6, 2025, Daugherty's counsel sent Highland a letter requesting further detail regarding the contents of those boxes and seeking further representations regarding the scope of Highland's review.  Exhibit D, Decl. of A. York at ¶ 2; Ex. D-1.  Daugherty, among other things, requested Highland to detail: (1) what efforts it undertook to ensure the boxes of Documents and Retained Documents are all available electronically; (2) assuming the information is available electronically, whether the hard copies contained any information not

4934-6755-8517

available in electronic form, such as handwritten notes; (3) whether the documents contained

information related to Daugherty's compensation package while at Highland; (4) whether those

boxes contained any information belonging to HERA or ERA pursuant to the parties' settlement

agreement. *See* Ex. D-1.

13.     In response, on October 8, 2025, Highland's counsel produced a .pdf version of the

Iron Mountain inventory list (the "<u>First Inventory List</u>").[7] Exs. D-2, D-3.  The First Inventory List,

however, lacked date information due to a formatting issue, so on the following day Daugherty's

counsel requested Highland produce the data in its native spreadsheet format.  Ex. D-4.   In

response, Highland produced an updated .pdf version of the Iron Mountain inventory list (the

"<u>Second Inventory List</u>").[8]  Exs. D-5, D-6.  Highland has not produced a native version of the

spreadsheet, and aside from the First and Second Inventory Lists, Highland ignored the questions

Daugherty posed in his October 6 letter.  Ex. D-1, D-2, D-5.

14.     On October 26, 2025, after a thorough analysis of the Second Inventory List,

Daugherty's counsel again contacted Highland's counsel to identify deficiencies.  Ex. D-7; *see*

*also* Ex. D-6 at p. 16 (showing significant gaps in data regarding the boxes' contents through

blanks in the columns "from date," "to date," "major description," "minor description," and "long

description").  Daugherty's counsel also requested Highland respond to the questions contained in

his October 6 letter.  *Id.*  Highland responded with a "too bad" and gratuitously refused to respond

to Daugherty's October 6 inquiries purportedly based on separate discovery issued on October 24,

---

[7] Highland's counsel also offered to provide Daugherty copies of the Documents in any box "assuming they are plausibly related to some on-going litigation." Ex. D-2. Nevertheless, given the incomplete and unreliable inventory list from Iron Mountain, the offer is picayune.

[8] Daugherty's objection herein relies upon the data and information (or, properly, the lack thereof) within the Second Inventory List.

4934-6755-8517

2025, in the Adversary Proceeding.  Ex. D-8.  Whether Highland will actually produce documents

in response to that discovery remains to be seen, however.

### III.    ARGUMENT AND AUTHORITIES

**A.    Highland has not fulfilled its obligations under the Settlement Agreement.**

15.    Highland's Settlement Agreement with Daugherty obligated it to convey all of its

interests in HERA and ERA to Daugherty, and that "[s]uch transfer will include the HERA and

ERA books and records."  Ex. A at § 8.  The Parties expressly provided that the intent of this

provision was "[t]o facilitate recovery of [HERA and ERA's] potential claims" that HERA and

ERA may have against persons and entities that were not released prior to the date of the Settlement

Agreement.  *Id.*

16.    Despite the Settlement Agreement's terms, Highland failed to transfer the entirety

of those records.  *See* Ex. A at § 8; Ex. B at ¶ 2.  In fact, HERA brought suit against many of those

persons and entities based on information it acquired through document requests to other third-

parties.  Ex. B at ¶¶ 3, 4; Exs. B-1, B-2.  This information should be in Highland's possession,

custody or control.  *See* Exs. B-2.

17.    Shortly after Highland filed the Motion, Daugherty's counsel wrote Highland's

counsel requesting confirmation that the Documents and Retained Documents Highland seeks to

destroy "do not include any of HERA's books and records."  Ex. D-1 at ¶ 3.  Highland has refused

to respond to that question.  Instead, Highland provided a summary chart that contains, in large

part, indecipherable descriptions of the boxes that Highland seeks to destroy.  Ex. D-6.  Worse yet,

Highland refused to respond to questions about what efforts Highland took to confirm that all of

the information in boxes is available electronically.  Ex. D-8.  The Court should not rely on

Highland's conclusory statements that the Documents and Retained Documents do not contain any

relevant information.  Instead, the Court should require Highland to provide detailed responses to

4934-6755-8517

Daugherty's questions and allow Daugherty a reasonable opportunity to bring any concerns to the Court's attention, before the Court allows the Documents and Retained Documents to be destroyed.

**B.    Highland has a duty to preserve relevant evidence.**

18.    In addition to its contractual obligation, litigants like Highland have a duty to preserve potentially relevant evidence when they have notice or should have notice of its relevance to anticipated or ongoing litigation.  *See e.g. Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015); *Jim S. Adler v. McNeil Consultants, LLC*, No. 3:19-CV-2025-K-BN, 2023 WL 2699511, at *8 (N.D. Tex. Feb. 15, 2023) (same).  "When the duty to preserve arises, even information subject to routine deletion may fall within the duty's reach, requiring the deletion process be interrupted." *Adler*, 2023 WL 2699511 at *8 (citation omitted).

19.    Here, Movants seek to ignore that duty and destroy potentially relevant evidence under the guise of efficiency—i.e., to further "the anticipated dissolution and wind-up of the Claimant Trust"—before they even fully investigate the contents of what they seek to destroy. [*See* Seery Decl., Doc. No. 4417 at ¶ 5].  Movants make the conclusory assertion that the none of the information in the Documents "is relevant to any pending or reasonably foreseeable litigation". Motion at ¶ 19.  The Court should not accept Movants' *ipse dixit*.

20.    Movants fail to credibly represent to the Court that there is not any relevant evidence in the Documents or Retained Documents to the pending Adversary Proceeding.  Nor could they based on the scope of the review that Jim Seery describes Highland undertook: "[c]ertain of Highland's employees and I have reviewed an inventory listing from Iron Mountain describing the Documents and determined that (a) the continued storage of the Documents is no longer necessary because the Documents do not concern any current business activities *or any*

*pending or foreseeable litigation and have no other business purpose*." [Doc. 4417 at ¶ 5 (emphasis added)]. In other words, Movants are relying upon a third-party's representation as to the contents of nearly 4,000 boxes of information—not their personal institutional knowledge of the materials or knowledge gained from a personal examination of those records.

21. Iron Mountain's inventory list is incomplete and unreliable on its face. *See generally* D-6. First, the list only contains piecemeal descriptions for little over half of the boxes, approximately 2,400 boxes, not all 3,987 that Movants, ultimately, seek to destroy. *Id.* Of those descriptions, only a spattering of information is available. *Id.* For example, 112 of the boxes contain no description of their substantive contents whatsoever (i.e., no "Major Description" or "Minor Description"). *Id.* What's more, the vast majority of the list (over 1,700 of the entries) does not include any date information identifying the complete date range of the contents in a certain box. *Id.*

22. Second, even if the inventory itself did not suffer from such infirmities, Movants wholly failed to describe the method by which Iron Mountain created the inventory list. Consequently, it is unclear whether Iron Mountain even created the descriptions based on the boxes' actual contents.

23. Movants, therefore, cannot credibly represent that they comprehend the contents of those boxes based on an incomplete and unreliable inventory list provided by a third-party. Absent even basic comprehension of all the boxes' contents, Movants also cannot determine whether any of that information is relevant to ongoing litigation or required to be produced to Daugherty pursuant to their Settlement Agreement. Much less reasonably request this Court to authorize them to destroy those records despite their duty to preserve relevant evidence.

**C.**    **Highland seeks to destroy evidence that may be relevant to its Adversary Proceeding against Daugherty.**

24.    Further eroding the credibility of their request, Movants are maintaining an Adversary Proceeding against Daugherty based on facts and circumstances surrounding Highland's 2008 tax return.  *See* Exhibit C [Adv. Proc. 25-03055, Doc. No 1].  The crux of Highland's claim involves an Audit that the IRS is conducting of Highland's 2008 return.  For that return, Highland orchestrated a complex tax refund scheme to compensate its employees at year end in lieu of their typical bonus payments, which were an expected component of their compensation package.  *Id.*  The scheme raised flags for the IRS, and it remains subject to a pending IRS audit and review to this day.  Relevant documents to the Adversary Proceeding, therefore, span back to at least 2008.  *Id.*

25.    Movants represent that the Documents contain information dated pre-2012 and the Retained Documents dating 2013 and beyond.  Motion at ¶ 1.  The known date range, taken alone, could include Documents related to the IRS Audit.  This is sufficient to require Highland to further review the Documents to ensure that no relevant evidence is contained therein before requesting they be destroyed.  Yet Highland makes no specific representation to the Court that the Documents and Retained Documents they wish to destroy have no connection to the facts giving rise to the claims brought in the Adversary Proceeding.  Instead, Highland relies upon an inventory that mostly lacks identifying date information for the contents of the boxes, and in many instances contains no description of what is inside the boxes at all.  *See* Ex. D-6.

26.    As detailed above, the Iron Mountain inventory list lacks sufficient information to determine the contents of the 3,987 boxes—again, it only lists piecemeal information for little over 2,000 of the boxes, 1,700 of which does not even include the date range of the boxes' contents.  *Id.*  At the risk of stating the obvious, Highland brought the Adversary Proceeding against

Daugherty, and this Bankruptcy proceeding has been fraught with litigation since its inception. Highland's reliance on the Iron Mountain list is misplaced.

27.      The Court should not permit Movants to destroy material evidence to the Adversary Proceeding without specific representations that Movants have confirmed that (1) they have preserved all documents and information relevant to the Adversary Proceeding; and (2) the Documents and Retained Documents do not include any such relevant materials.

28.      At a minimum, if the Court is persuaded by Movants purported cost savings through the deletion of the Documents and Retained Documents, there is another viable solution.  Those materials can simply be turned over to Daugherty and/or HERA for storage and future deletion once the pending litigation has been resolved.  Daugherty is willing to observe confidentiality agreements or obligations necessary to facilitate the transfer and storage of those materials, with the understanding that any material and relevant evidence identified within those Documents and Retained Documents may be utilized in pending litigation subject to any necessary protections.

## IV.    CONCLUSION

29.      For the foregoing reasons, the Court should deny Movant's Motion.

4934-6755-8517

Respectfully submitted this 28th day of October, 2025.

**GRAY REED**

By: _/s/ Andrew K. York_
      Jason S. Brookner
      Texas Bar No. 24033684
      Andrew K. York
      Texas Bar No. 24051554
      Joshua D. Smeltzer
      Texas Bar No. 24113859
      Drake M. Rayshell
      Texas Bar No. 24118507
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:   (469) 320-6050
Facsimile:   (469) 320-6886
Email:      jbrookner@grayreed.com
          dyork@grayreed.com
          jsmeltzer@grayreed.com
          draysehll@grayreed.com

*Counsel to Patrick Daugherty*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing instrument was served on all Parties or counsel of record herein on this 28th day of October 2025, via the CM/ECF system and/or email.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz
CA Bar No. 143717
jpomerantz@pszjlaw.com
John A. Morris
NY Bar No. 2405397
jmorris@pszjlaw.com
Gregory V. Demo
NY Bar No. 5371992
gdemo@pszjlaw.com
Hayley R. Winograd
NY Bar No. 5612569
hwinograd@pszjlaw.com
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

**HAYWARD PLLC**
Melissa S. Hayward
TX Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
TX Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

By: */s/ Andrew K. York*
Andrew K. York

4934-6755-8517

# EXHIBIT A

# EXHIBIT 1

Final Execution Copy

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Settlement") is made and entered into by and between (i) Highland Capital Management, L.P., as reorganized debtor ("HCMLP" or the "Debtor"), and (ii) Patrick Hagaman Daugherty ("Daugherty" and together with HCMLP, the "Parties," and individually as a "Party"). This Settlement provides for the treatment of certain claims asserted by Daugherty against the Debtor, and for the Parties to take certain other specified actions in settlement thereof.

## RECITALS

WHEREAS, on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, the Debtor's chapter 11 case (the "Bankruptcy") is pending in the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court");

WHEREAS, on February 2 and 3, 2021, the Court conducted a confirmation hearing with respect to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) [Docket No. 1808] (the "Plan");

WHEREAS, on February 8, 2021, the Court rendered an opinion from the bench in which it confirmed the Plan [Docket No. 1924];

WHEREAS, on February 22, 2021, the Court issued an order confirming the Plan [Docket No. 1943];

WHEREAS, on August 11, 2021, the Effective Date (as defined in the Plan) occurred [Docket No. 2700];

WHEREAS, Daugherty is a former employee and limited partner of the Debtor and has

served in other positions with affiliates and former affiliates of the Debtor;

WHEREAS, at the time of his resignation, Daugherty owned 19.1% of the preferred units of

Highland Employee Retention Assets LLC ("HERA"), an employee deferred compensation vehicle

managed by the Debtor and Highland ERA Management, LLC ("ERA") and contends that he owned

or had the right to own all of the preferred units of HERA;

WHEREAS, prior to his resignation from HCMLP, Daugherty was awarded units of

HERA, which vehicle owned interests in Restoration Capital Partners, LP ("RCP"), an HCMLP

managed private equity fund, and other investments;

WHEREAS, in April 2012, the Debtor commenced an action against Daugherty in Texas

state court (the "Texas Action"), and Daugherty subsequently asserted counterclaims for breach of

contract and defamation, and third-party claims against HERA and others;

WHEREAS, after a three-week trial, the jury returned a verdict partially in favor of the

Debtor, but Daugherty prevailed on his claims against the Debtor and James Dondero ("Dondero")

for defamation with malice and a third-party claim against HERA and was awarded damages of

$2.6 million against HERA, plus prejudgment and post-judgment interest at 5% (the "HERA

Judgment");[1]

WHEREAS, in July 2017, after being unable to collect on the HERA Judgment, Daugherty

commenced an action against the Debtor, Dondero, HERA, and ERA Management in the Delaware

Chancery Court (the "Delaware Court"), in a case captioned *Daugherty v. Highland Capital*

*Management, L.P., et al.*, C.A. No. 2017-0488-MTZ, for fraudulent transfer, promissory estoppel,

unjust enrichment, indemnification, and fees on fees (the "Highland Delaware Case");

---

[1] The Debtor prevailed on its claims against Mr. Daugherty for breach of contract and breach of fiduciary duty for non-monetary damages and obtained an award of $2.8 million in attorney's fees. The HERA Judgment was affirmed on appeal on December 1, 2016.

WHEREAS, the Delaware Court in the Highland Delaware Case (i) found that the Dondero-related defendants improperly withheld dozens of documents in discovery on privilege grounds, and (ii) ruled that there was "a reasonable basis to believe that a fraud has been perpetrated" such that the Delaware Court applied the "crime-fraud exception" to the attorney-client privilege assertion, and such rulings have not been overturned;

WHEREAS, Daugherty asserts that such withholding of documents and the failure to search defendants' and their employees personal electronic devices for stored documents and texts as well as other emails and domain names such as sasmgt.com and gmail.com which were in their possession and control and to provide required discovery injured him by undermining his attempts to build an evidentiary record to support his claims against the Debtor and the other defendants in the Highland Delaware Case;

WHEREAS, on October 14, 2019, the Highland Delaware Case proceeded to trial and two days later, on October 16, 2019, before the completion of the trial and before the Delaware Court ruled on Daugherty's and the Debtor's cross-motions for summary judgment regarding indemnification and fees on fees, the Debtor filed for bankruptcy;

WHEREAS, on December 1, 2019, Daugherty filed a separate lawsuit in the Delaware Court, captioned *Daugherty v. Dondero, et al.*, C.A. No. 2019-0956-MTZ, against Dondero, HERA, ERA, Hunton Andrews Kurth LLP ("Andrews Kurth"), Marc Katz ("Katz"), Michael Hurst ("Hurst"), the Debtor's Chief Compliance Officer, the Debtor's then in-house counsel (Isaac Leventon ("Leventon")), and the Debtor's then general counsel (Scott Ellington ("Ellington")), for conspiracy to commit fraud, among other claims (the "HERA Delaware Case" and together with the Highland Delaware Case, the "Delaware Cases");

WHEREAS, on April 1, 2020, Daugherty filed a general, unsecured, non-priority claim

3

against the Debtor in the amount of at "least $37,483,876.59," and such claim was denoted by the

Debtor's claims agent as Proof of Claim No. 67 ("Proof of Claim No. 67");

WHEREAS, on April 6, 2020, Daugherty filed a general, unsecured, non-priority claim

against the Debtor in the amount of at "least $37,482,876.62" that superseded Proof of Claim No.

67 and that was denoted by the Debtor's claims agent as Proof of Claim No. 77 ("Proof of Claim

No. 77");

WHEREAS, on August 31, 2020, the Debtor commenced an adversary proceeding against

Daugherty by filing a complaint (the "Complaint") in which the Debtor: (1) objected to Proof of

Claim No. 77 on various grounds (the "Claim Objection"), and (2) asserted a cause of action for

the subordination of part of Daugherty's claim pursuant to section 510(b) of the Bankruptcy Code.

Adv. Proc. No. 20-03107 (the "Adv. Proc.") [Adv. Docket No. 1] (the "Adversary Proceeding");

WHEREAS, on September 29, 2020, Daugherty filed his answer to the Complaint [Adv.

Docket No. 8] (the "Answer");

WHEREAS, on September 24, 2020, Daugherty filed his *Motion to Confirm Status of

Automatic Stay, or Alternatively to Modify Automatic Stay* [Docket No. 1099] (the "Stay Motion")

pursuant to which he sought to sever the Debtor from the Highland Delaware Case and then

consolidate the remaining claims in the Highland Delaware Case into the HERA Delaware Case

and proceed with one case against the non-Debtor parties;[2]

WHEREAS, on October 23, 2020, Daugherty filed a motion seeking leave to amend his

Proof of Claim No. 77 [Docket No. 1280] (the "POC Amendment Motion"). The amended proof

---

[2] On October 8, 2020, the Debtor commenced a second adversary proceeding against Daugherty (the "Second
Adversary Proceeding"), seeking to enjoin him from prosecuting the Delaware Cases. Adv. Proc. 20-03128 ("2d Adv.
Proc.") [2d Adv. Proc. Docket No. 1].   On January 29, 2021, the parties filed a Settlement that resolved the Second
Adversary Proceeding, and the Second Adversary Proceeding was subsequently dismissed with prejudice. [2d Adv.
Proc. Docket No. 12].

of claim attached to the POC Amendment Motion increased Daugherty's general, unsecured, non-priority claim against the Debtor to the amount of at "least $40,410,819.42" and sought to supersede Proof of Claim No. 67 and Proof of Claim No. 77;

WHEREAS, on October 23, 2020, Daugherty filed his *Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018 Motion*, seeking for his Claim to be temporarily allowed for voting purposes in this amount of $40,410,819.42 [Docket No. 1281] (the "3018 Motion");

WHEREAS, on November 3, 2020, the Court granted the Stay Motion [Docket No. 1327];

WHEREAS, the Debtor opposed the 3018 Motion, and after conducting an evidentiary hearing for the limited purpose of determining the 3018 Motion, the Court entered an order temporarily allowing Daugherty's Claim only for voting purposes in the amount of $9,134,019 [Docket No. 1474];

WHEREAS, on December 10, 2020, the Court entered an order [Docket No. 1533] granting the POC Amendment Motion, and Daugherty was permitted to file an amendment to his proof of claim. On December 23, 2020, Daugherty filed an amended proof of claim, designated by the Debtor's claim agent as Proof of Claim No. 205 ("Proof of Claim No. 205" or the "Daugherty Claim"). Proof of Claim No. 205 superseded Proof of Claim No. 77 and increased the amount of the Daugherty's Claim to $40,710,819.42;

WHEREAS, on November 30, 2020, Daugherty filed his Motion to Lift the Automatic Stay (the "Lift Stay Motion") [Docket No. 1491] seeking to lift the automatic stay to allow him to finish his trial in the Delaware Court and liquidate his claims. The Debtor opposed the Lift Stay Motion, and after a hearing was held on December 17, 2020, the Court denied the relief requested in the Lift Stay Motion [Docket No. 1612];

5

WHEREAS, except with respect to the Reserved Claim (as defined below), the Parties have agreed to settle and resolve all claims and disputes between them and their respective current affiliates, managed entities, and employees, including the Daugherty Claim, on the terms set forth in this Settlement:

## AGREEMENT

**NOW, THEREFORE**, after good-faith, arms-length negotiations, and in consideration of the foregoing, it is hereby stipulated and agreed that:

1.    <u>Allowed Claims</u>:  In full satisfaction of the entirety of the Daugherty Claim against the Debtor and HCMLP Released Parties (defined below), excluding the Reserved Claim, Daugherty shall receive (a) an allowed general unsecured Class 8 claim in the amount of $8,250,000; (b) an allowed subordinated general unsecured Class 9 claim in the amount of $3,750,000; and (c) a one-time lump sum cash payment in the amount of $750,000 to be paid within 5 business days of Bankruptcy Court approval of this Settlement Agreement.

2.    <u>Recovery</u>:  The Debtor makes no representation or warranty as to the recovery on Class 8 or Class 9 claims under the Plan.

3.    <u>Observation Access</u>:  As soon as practicable following entry of an order of the Bankruptcy Court approving this Settlement, HCMLP shall use reasonable efforts to petition the Claimant Trust Oversight Board[3] to permit Daugherty to have access as an observer to meetings of the Claimant Trust Oversight Board, subject to policies, procedures, and agreements applicable to other observers of the Claimant Trust Oversight Board, including policies, procedures, and agreements related to confidentiality and common interest.  Whether Daugherty will be granted observer access and any continuing observer access is and will remain at the sole discretion of the

---

[3] The Claimant Trust Oversight Board refers to the Oversight Board as defined in the August 11, 2021 Highland Claimant Trust Agreement establishing the Claimant Trust, as defined therein.

Claimant Trust Oversight Board.

4.    RCP Track Record:  HCMLP shall use reasonable efforts to provide Daugherty

with data constituting the investment performance track record of RCP during Daugherty's tenure

at HCMLP.  Daugherty shall not be entitled to any compensation with respect to the performance

of RCP.  HCMLP makes no representations or warranties regarding such data and takes no

responsibility with respect to the use of such data for any purposes.

5.    Daugherty Releases:  Except as specifically provided in this paragraph 5, and to

the maximum extent permitted by applicable law, the Debtor, on behalf of itself and each of the

HCMLP Entities and HCMLP Parties (as those terms are defined in paragraph 6 below), hereby

forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and

exonerates, and covenants never to sue Daugherty, his successors, affiliates, and assigns, (and in

each such category to include their respective advisors, trustees, directors, officers, managers,

members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries,

parents, affiliates, and designees) (collectively, the "Daugherty Additional Release Parties" and

together with Daugherty, the "Daugherty Released Parties"), in each case acting in such capacity,

for and from any and all claims, debts, liabilities, demands, obligations, promises, acts,

agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and

related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature,

whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or

unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without

limitation those which were or could have been asserted in the Bankruptcy, including the

Adversary Proceeding, the Texas Action, or the Delaware Cases, all existing as of the date hereof

(collectively, the "HCMLP Released Claims"); provided, however, that such release shall not

7

apply with respect to any and all defenses that HCMLP or the HCMLP Entities may have to the

Reserved Claim or the Reserve Motion (as those terms are defined herein) or Daugherty's

obligations under this Settlement. For the avoidance of doubt, the HCMLP Released Claims

include all claims or causes of action and facts, known or unknown, that exist as of the date hereof

but do not include or apply to claims or causes of action based on facts occurring after the date

hereof.

      6.    <u>HCMLP Releases</u>: Except as specifically provided in this paragraph 6, and to the

maximum extent permitted by law, Daugherty, on behalf of himself and each of the Daugherty

Released Parties, hereby forever, finally, fully, unconditionally, and completely releases, relieves,

acquits, remises, and exonerates, and covenants never to sue, (a)(i) HCMLP; (ii) Strand Advisors

Inc.; (iii) the Claimant Trust; (iv) the Claimant Trust Oversight Board; (v) the Highland Litigation

Sub-Trust; (vi) the Highland Indemnity Trust; (vii) any entity of which greater than fifty percent

of the voting ownership is held directly or indirectly by HCMLP as of the date hereof and any

entity otherwise directly or indirectly controlled by HCMLP as of the date hereof,; and (viii) any

entity managed by either HCMLP or a direct or indirect subsidiary of HCMLP, including Highland

Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland

Restoration Capital Master, L.P. (and all of their respective general partners, feeder funds,

managers, and affiliates) (the foregoing (a)(i) through (a)(viii) the "<u>HCMLP Entities</u>"), and (b)

with respect to each such HCMLP Entity, such HCMLP Entity's respective current (meaning

employed in their respective roles as of the date hereof) advisors, trustees, directors, officers,

managers, members, partners, employees, beneficiaries, shareholders (but not the shareholders of

Strand Advisors Inc.), agents, participants, subsidiaries, parents, affiliates, successors, designees,

and assigns, except as expressly set forth below (the "<u>HCMLP Parties</u>," and together with the

HCMLP Entities, the "HCMLP Released Parties"),[4] in each case acting in such capacity, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including without limitation those which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding, the Texas Action, the Daugherty Claim, or the Highland Delaware Case (collectively, the "Daugherty Released Claims"); provided, however, that such release shall not apply with respect to the Reserved Claim or the Reserve Motion (as those terms are defined in paragraph 9 below) or HCMLP's obligations under this Settlement. This release expressly applies to all current employees of HCMLP as the Reorganized Debtor (as defined in the Plan), in their capacities as such. For the avoidance of doubt, the Daugherty Released Claims includes all claims or causes of action and facts, known or unknown, that exist as of the date hereof but do not include or apply to claims or causes of action based on facts occurring after the date hereof.

7. Reservation of Daugherty Rights: Notwithstanding anything contained herein to the contrary, the term HCMLP Released Parties shall not include (a) NexPoint Advisors, L.P. (or any of its subsidiaries and employees, advisors, or agents), (b) the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and any of their respective employees, advisors, or agents), (c) NexBank, SSB (or any of its subsidiaries, employees, advisors, or agents), (d) James Dondero or any trust in which Dondero or any of his family members are a trustee or beneficiary (or any trustee acting for such trust), including but not limited to Hunter

---

[4] The Daugherty Additional Released Parties and the HCMLP Released Parties are collectively referred to as the "Additional Released Parties."

Mountain Investment Trust, The Get Good Trust, Dugaboy Investment Trust, SLHC Investment Trust, (e) HERA (subject to paragraph 8 below), (f) ERA (subject to paragraph 8 below), (g) Grant Scott, (h) Mark Okada and any trust in which Mark Okada or any of his family members are a beneficiary (or any trustee acting for such trust in their respective capacities), (i) Ellington, (j) Leventon, (k) Katz, (l) Hurst, (m) Andrews Kurth, or (m) any other former employee (as of the date hereof) of the HCMLP Released Parties.

8.    HERA and ERA:  The Parties acknowledge and agree that as of the date hereof, HERA and ERA have no material assets other than potential claims that may exist against persons or entities not released at or prior to the date hereof, and no claims against the HCMLP Released Parties. The allowed claims provided in paragraph 1 hereof are expressly agreed to in order to satisfy any liability the Debtor may have in connection with the HERA Judgment.  To facilitate recovery of such potential claims – which expressly excludes any and all claims by or in the name of HERA and ERA against any of the HCMLP Released Parties -- HCMLP will transfer its interests in HERA and ERA to Daugherty. Such transfer will include the HERA and ERA books and records (spreadsheet) maintained on HCMLP's system.   Such transfer will be without representation or warranty of any type; including, for the avoidance of doubt, without any representation or warranty as to the merits of the potential claims or the efficacy of the transfer of the potential claims.  Such transfer will be without any liability or material cost to HCMLP or its affiliates or the other HCMLP Released Parties, including any liability in respect of any assets that HERA or ERA ever actually or allegedly owned, possessed, or controlled and that were actually or allegedly transferred, conveyed, sold, written off or otherwise disposed of (in any such case, a "Disposition").  In connection with the transfer, HERA and ERA have expressly released the HCMLP Released Parties from any and all claims, including any claims actions or remedies related

10

to any Disposition, either of them may have against any HCMLP Released Party now or in the future (the "HERA and ERA Release"). Daugherty on behalf of himself and each of the Daugherty Released Parties acknowledges, accepts, and agrees not to challenge the HERA and ERA Release or support any challenge thereto. A copy of the HERA and ERA Release is annexed hereto as **Exhibit A**. Daugherty acknowledges and agrees that even though HERA and ERA are not HCMLP Released Parties under this Agreement, Daugherty and all Daugherty Released Parties shall (a) not seek to hold any HCMLP Released Party liable for any action or inaction taken by or on behalf of HERA or ERA, including through any derivative, veil-piercing or similar cause of action or remedy; and (b) not seek to recover damages or obtain any form of relief against any HCMLP Released Party on account of any action or inaction taken by or on behalf of HERA or ERA, including through any veil piercing or similar cause of action or remedy. If, for any reason, HERA or ERA, or any person or entity acting on their behalf, recovers anything from any HCMLP Released Party, Daugherty shall promptly turnover to HCMLP or its successors and assigns any amounts actually recovered by Daugherty or any Daugherty Released Party, from HERA or ERA arising from, related to, or derived from any claim that HERA or ERA or any person or entity acting on their behalf has or may have against any HCMLP Released Party. HCMLP will provide reasonable assistance to Daugherty to assist with the preparation of any required HERA K-1s for 2021, but any requirement to provide such K-1s will be the obligation, if any, of HERA.

9. <u>IRS Compensation Claim</u>: In section 4(ii) of the Addendum to Proof of Claim No. 205, Daugherty contends that he has a contingent, unliquidated claim against the Debtor arising out of a 2008/2009 compensation letter (the "Reserved Claim"), which claim is also related to an audit/dispute between the Debtor and the Internal Revenue Service (the "IRS") (the dispute between the Debtor and IRS being referred to herein as the "IRS Audit Dispute"). The Debtor

disputes the validity and amount of the Reserved Claim. Daugherty shall retain the Reserved Claim solely against the Debtor and not against any other HCMLP Released Party, and the Debtor reserves the right to assert any and all defenses thereto. Any litigation by and between the Debtor and Daugherty concerning the validity and amount of the Reserved Claim shall be stayed until the IRS makes a final determination with respect to the IRS Audit Dispute; provided, however, that Daugherty may file a motion with the Bankruptcy Court to have the Reserved Claim estimated for purposes of establishing a reserve as a "Disputed Claim" under the Debtor's Plan (the "Reserve Motion"), and the Debtor (and any successor) reserves the right to assert any and all defenses thereto. Notwithstanding the foregoing, Daugherty may address any personal claim or personal liability to the IRS as a result of the IRS Audit Dispute, including settlement of any such claims; provided, however, Daugherty agrees to forego settling or addressing any claims with the IRS without the written consent of the Debtor until March 31, 2022.

10.   Current HCMLP Employees: The HCMLP Parties set forth on **Appendix A** hereto are currently employed by the Debtor are HCMLP Released Parties. By executing a copy of this Settlement and delivering it to Daugherty, each of the persons on Appendix A agrees not to sue, attempt to sue, or threaten or work with or assist any entity or person to sue, attempt to sue, or threaten any Daugherty Released Party on or in connection with any claim or cause of action arising prior to the date of this Settlement.

11.   Dismissal and Motions in Other Actions. Within ten business days after approval of this Settlement by the Bankruptcy Court, the Parties shall take all steps necessary (a) to dismiss with prejudice (i) the Highland Delaware Case, as against the Debtor and any HCMLP Released Party, and (ii) the HERA Delaware Case, as against every HCMLP Released Party, (b) to file an agreed motion and proposed order to partially vacate the final judgment entered against Daugherty

in the Texas Action, (c) withdraw HCMLP's objection to the Daugherty motion to recuse in the
Texas Action, and (d) to dismiss the Adversary Proceeding with prejudice. The parties shall file
the foregoing motions and withdrawals substantially in the form of the documents annexed hereto
as **Exhibit B**.

12. <u>Additional Third Party Claims Discovery</u>: The Debtor (a) shall accept service of
any subpoenas via email served by Daugherty in connection with the Delaware Cases on behalf of
itself, the HCMLP Entities, the HCMLP Parties (but only in their capacity as employees of
HCMLP); and (b) acknowledge and consent to the jurisdiction of the Delaware Chancery Court
for purposes of enforcing any such subpoenas, subject in all respects to the rights that the HCMLP
Entities and HCMLP Parties to defend the requested production, if any.

13. <u>Settlement of Third Party Claims</u>: Daugherty shall not settle any claims or causes
of action against any current or former director, officer, employee, agent or representative of
HCMLP or Strand Advisors Inc. (collectively, the "<u>Potentially Indemnified Parties</u>") to the extent
such claims have been brought or could have been brought against any Potentially Indemnified
Parties, if any such settlement designates, defines or describes the settled claims as arising out of
or relating to simple negligence or as having otherwise been within the scope of employment of
the Potentially Indemnified Party.

14. <u>Claims Register</u>: As soon as practicable after the Settlement Effective Date,
HCMLP shall instruct the claims agent in the Debtor's chapter 11 case to adjust the claims register
in accordance with this Settlement.

15. <u>Daugherty Representations</u>: Daugherty represents and warrants to each of the
HCMLP Released Parties that (a) he has full authority to release the Daugherty Released Claims
and has not sold, transferred, or assigned any Daugherty Released Claim to any other person or

entity and that (b) no person or entity other than Daugherty has been, is, or will be authorized to bring, pursue, or enforce any Daugherty Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) Daugherty.

16. <u>HCMLP Representations</u>: Each of HCMLP and each HCMLP Released Party who has signed this Settlement represents and warrants to Daugherty that (a) he, she or it has not sold, transferred, pledged, assigned or hypothecated any HCMLP Released Claim to any other person or entity and (b) he, she, or it has full authority to release any HCMLP Released Claims that such HCMLP Released Party personally has against Daugherty.

17. <u>Additional HCMLP Representations</u>: HCMLP represents and warrants that it is releasing the HCMLP Released Claims on behalf of the HCMLP Entities to the maximum extent permitted by any contractual or other legal rights HCMLP possesses. To the extent any of the HCMLP Entities dispute HCMLP's right to release the HCMLP Released Claims on behalf of any of the HCMLP Entities, HCMLP shall use commercially reasonable efforts to support Daugherty's position, if any, that such claims were released herein. For the avoidance of doubt, HCMLP will have no obligations to assist Daugherty under this paragraph if HCMLP has been advised by external counsel that such assistance could subject HCMLP to liability to any third party or if such assistance would require HCMLP to expend material amounts of time or money. HCMLP shall not argue in any forum that the non-signatory status of any of the HCMLP Entities to this Settlement shall in any way affect the enforceability of this Settlement vis-à-vis any of the HCMLP Entities. The Parties agree that all of the HCMLP Entities are intended third-party beneficiaries of this Release.

18. <u>HCMLP Covenant</u>: HCMLP and the HCMLP Entities covenant and agree that they will not pursue or seek to enforce any injunctions entered in the Texas Action against

Daugherty.

19.  <u>Entire Agreement; Modification</u>: This Settlement contains the entire agreement between the Parties as to its subject matter and supersedes and replaces any and all prior agreements and undertakings between the Parties.  This Settlement may not be modified other than by a signed writing executed by the Parties.

20.  <u>Bankruptcy Court Approval</u>: Notwithstanding anything to the contrary contained herein, the effectiveness of HCMLP and the Claimant Trust's execution of this Settlement shall be subject to entry of an order of the Bankruptcy Court approving this Settlement.  HCMLP shall take all steps necessary to file with the Bankruptcy Court a motion for an order approving this Settlement pursuant to Federal Rule of Bankruptcy Procedure 9019 and section 363 of the Bankruptcy Code (the "<u>Motion</u>").  The parties agree to cooperate in the preparation and prosecution of the Motion which shall be filed no later than 5 business day after execution of this Settlement, unless such time is extended by mutual agreement.

21.  <u>Counterparts</u>:  This Settlement may be executed in counterparts (including facsimile and electronic transmission counterparts), each of which will be deemed an original but all of which together constitute one and the same instrument and shall be effective against a Party or Additional Released Party upon approval of the Settlement by the Bankruptcy Court.

22.  <u>Governing Law; Jurisdiction</u>: This Settlement will be exclusively governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of law principles, and all claims relating to or arising out of this Settlement, or the breach thereof, whether sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of Delaware, excluding Delaware's conflicts of law principles. The Bankruptcy Court will retain exclusive jurisdiction over all disputes relating to this Settlement.

23.    <u>Headings</u>:  Paragraph headings included herein are for convenience and shall have

no impact whatsoever on the meaning or interpretation of any part of this Settlement.

[Remainder of page intentionally left blank]

In witness whereof, the parties hereto, intending to be legally bound, have executed this

Settlement as of the day and year set forth below:

Dated: *11-21-21*    HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: James P. Seery, Jr.
Title: Chief Executive Officer

HIGHLAND CLAIMANT TRUST

By: _____
Name: James P. Seery, Jr.
Title: Claimant Trustee

PATRICK HAGAMAN DAUGHERTY

Dated: *11/22/21*

By: _____
Name: Patrick Hagaman Daugherty

# EXHIBIT A

# HERA RELEASE AGREEMENT

This HERA Release Agreement ("HERA Release Agreement") is entered into as of November 21, 2021 by and among Highland Capital Management, L.P., as reorganized debtor ("HCMLP" or the "Debtor"), Patrick Hagaman Daugherty ("Daugherty"), Highland Employee Retention Assets, LLC ("HERA") and Highland ERA Management, LLC ("ERA" and together with HCMLP, and HERA, the "Parties," and individually as a "Party").

WHEREAS, reference is hereby made to the Settlement Agreement (the "Settlement") of even date herewith and attached hereto made and entered into by and between the Debtor, the Highland Claimant Trust, and Daugherty.

WHEREAS, the Settlement settles all of Daugherty's claims against the HCMLP Released Parties, including all claims against the HCMLP Released Parties relating to transfers of assets from HERA.

WHEREAS, the Settlement includes, among other things, the transfer by HCMLP to Daugherty of HCMLP's interests in HERA and ERA.

WHEREAS, under the Settlement such transfer is being made without any liability to any of the HCMLP Released Parties of any type and is conditional on the full release of, and covenant not to sue, each of the HCMLP Released Parties, by and from HERA, ERA, Daugherty and the Daugherty Released Parties.

WHEREAS, neither HERA nor ERA filed proofs of claim in the Bankrupty and have no claims against HCMLP.

WHEREAS, out of an abundance of caution to confirm that HERA, ERA, Daugherty, and the Daugherty Released Parties have no claims against the HCMLP Released Parties, this HERA Release Agreement is being entered into contemporaneously with the Settlement and constitutes an

essential part thereof.

WHEREAS, capitalized terms used herein but not otherwise defined herein have the respective meanings set forth in the Settlement.

NOW, THEREFORE, in consideration of the entry into of the Settlement, the transfer of the equity interests in HERA and ERA to Daugherty in accordance with the Settlement, and for other good and valuable consideration, including the provisions set forth herein, the parties hereto further agree as follows:

1.    Upon entry of an order of the Bankruptcy Court approving this Settlement and to the maximum extent permitted by law, Daugherty, on behalf of himself and each of the Daugherty Additional Release Parties, together with each of HERA and ERA (Daugherty, the Daugherty Additional Release Parties, HERA and ERA shall be collectively referred to herein as the "HERA Releasing Parties"), each hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, any of the HCMLP Released Parties for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including without limitation those which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding, the Texas Action, the Daugherty Claim, Highland Delaware Case, or the HERA Delaware Case (collectively, "Claims"), in each case that in any way arise from or otherwise in any way relate to HERA or ERA, including, without limitation, any actual or potential claims, whether known or unknown, in any way related to or

arising out of the formation, management, operation or assets of HERA, ERA or any of their respective predecessors or successors, including the transfer of any assets to or from HERA or ERA, it being understood that all remaining assets of HERA have been transferred to HCMLP prior to the date hereof, and in addition to the releases set forth above, each of the HERA Releasing Parties irrevocably waives and releases and covenants not to sue with respect to any Claims against any of the HCMLP Released Parties in any way related to any such transfers or assets, whether *in personam* with respect to the HCMLP Released Parties or *in rem* with respect to any of their assets (collectively, the "HERA Released Claims") or any other Disposition.

2.     This Release constitutes a part of, and is supplemental to, the provisions of the Settlement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

In witness whereof, the parties hereto, intending to be legally bound, have executed this
HERA Release Agreement as of the date set forth above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name:  James P. Seery, Jr.
Title:   Chief Executive Officer

PATRICK HAGAMAN DAUGHERTY

By: _____
Name:  Patrick Hagaman Daugherty

HIGHLAND EMPLOYEE RETENTION ASSETS, LLC

By: Highland ERA Management, LLC, its manager

By: Highland Capital Management. LP

By: _____
Name:  James P. Seery, Jr.
Title:   Chief Executive Officer

HIGHLAND ERA MANAGEMENT, LLC

By: _____
Name:  James P. Seery, Jr.
Title:   Authorized Signatory

# EXHIBIT B



**CAUSE NO. 12-04005**

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| v. | § § | |
| PATRICK DAUGHERTY, | § § | |
| Defendant and Counter-Plaintiff, | § § | DALLAS COUNTY, TEXAS |
| v. | § § | |
| SIERRA VERDE, LLC, HIGHLAND EMPLOYEE RETENTION ASSETS LLC, JAMES DONDERO, PATRICK BOYCE, AND WILLIAM L. BRITAIN, | § § § § § | |
| Third-Party Defendants. | § § § | 68th JUDICIAL DISTRICT |

## AGREED MOTION TO PARTIALLY VACATE THE FINAL JUDGMENT DATED JULY 14, 2014

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Highland Capital Management, LP ("Highland") and Defendant Patrick Daugherty ("Daugherty" and together with Highland, the "Parties") file this *Agreed Motion to Partially Vacate the Final Judgment dated July 14, 2014* (the "Motion"), and respectfully show the following:

1.     On July 14, 2014, this Court entered a *Final Judgment* (the "Judgment") that, among other things, granted Highland's motion for injunctive relief against Daugherty.

2.     The Judgment was amended on March 23, and June 23, 2017.

3.     On October 16, 2019, filed a petition under chapter 11 in the United States Bankruptcy Court for the District of Delaware ("Highland's Bankruptcy Case"). On October 24,

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 1 OF 5**
4851-6473-6986.4

2019, as a result of the commencement of Highland's Bankruptcy Case, the Supreme Court of Texas issued an order abating a related case that Daugherty had brought in that court, Case No. 19-0758. Highland's Bankruptcy Case was subsequently transferred to the United States Bankruptcy Court for the Northern District of Texas.

4.      Daugherty asserted certain claims against Highland in Highland's Bankruptcy Case. The Parties have fully and finally resolved their disputes pursuant to a settlement agreement (the "Settlement Agreement") reached in the Highland Bankruptcy Case pursuant to which, among other things, (a) all of Daugherty's known and unknown claims against each of the Highland Released Parties (as those terms are defined in the Settlement Agreement) are resolved, and (b) this Motion seeking the *vacatur* of certain provisions of the Judgment specifically set forth below is being filed.

5.      Highland and Daugherty hereby agree and stipulate that the Court has plenary power to issue an order granting this Motion because the Court retained authority to enforce the permanent injunction rendered in the Judgment, and that changed circumstances have now arisen such that the Court should dissolve the permanent injunction. Highland and Daugherty further agree and stipulate that this Motion shall be treated as an agreement of the Parties pursuant to Texas Rule of Civil Procedure 11, and is fully enforceable. *See Coale v. Scott*, 331 S.W.3d 829, 831-32 (Tex. App.—Amarillo 2011, no pet.) ("Irrespective of whether a trial court lost its plenary jurisdiction over its judgment, the trial court's authority to approve a Rule 11 agreement does not depend on whether it has such jurisdiction.").

6.      Highland and Daugherty agree that the following portions of the Judgment shall be vacated pursuant to their settlement in the Highland Bankruptcy:

a. The second full paragraph on Page 2 of the Judgment, which begins "The Court, after considering the jury's findings regarding Daugherty's breaches of contract and breaches of fiduciary duty . . .";

b. The permanent injunction rendered against Daugherty in the third full paragraph on Page 2 of the Judgment, which begins "It is therefore further ORDERED that Daugherty be and hereby is commanded to cease and desist from . . .";

c. The fourth and fifth full paragraphs on Page 2 of the Judgment awarding Highland a monetary judgment against Daugherty for reasonable and necessary attorney's fees, as well as post-judgment interest on that award[1]; and

d. The jury's answers to Questions 1, 2, 5, 6, 9 and 12 in the Verdict, which was attached as Exhibit 1 to the Judgment.

7. Highland and Daugherty further agree that, as a result of the vacation of the permanent injunction in the Judgment, Highland hereby withdraws any pending motions to show cause or motions for contempt against Daugherty that allege Daugherty violated or is violating the permanent injunction. Highland also agrees not to seek to enforce the permanent injunction in any manner in the future.

---

[1] Daugherty previously satisfied the monetary judgment awarded to Highland, and Highland filed a release of the monetary judgment. Although Highland and Daugherty have agreed to vacate the monetary judgment awarded to Highland, Daugherty waives and relinquishes any right or claim to recover any amount previously paid in satisfaction of the Judgment and Highland shall not be required to reimburse Daugherty for his prior satisfaction of the monetary judgment. To the extent Daugherty is entitled to indemnification for any liabilities, losses, and damages allegedly incurred by him for actions taken in connection with Highland's business, including the liabilities Daugherty allegedly incurred in connection with this action and the Judgment, such indemnification claims have been fully and finally satisfied and resolved under the Settlement Agreement.

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 3 OF 5**
4851-6473-6986.4

8.    Concurrent with the filing of this Motion, Daugherty will file a motion to dismiss his as-yet unfiled petition for review pending before the Supreme Court of Texas under Case No. 19-0758.

9.    Highland and Daugherty further agree that any portions of the Judgment that are not specifically vacated pursuant to this Motion shall remain in full force and effect.

WHEREFORE, Highland and Daugherty pray that the Court grant this Motion in its entirety, and for all further relief, at law or in equity, the Court deems necessary.

Respectfully submitted,

GRAY REED & McGRAW LLP

By:   _/s/ Sonya D. Reddy_
    ANDREW K. YORK
    State Bar No. 24051554
    E-mail: dyork@grayreed.com
    SONYA D. REDDY
    State Bar No. 24079188
    E-mail: sreddy@grayreed.com

1601 Elm Street, Suite 4600
Dallas, Texas 75201
(214) 954-4135
(214) 953-1332 (Fax)

**ATTORNEYS FOR PATRICK DAUGHERTY**

**CERTIFICATE OF SERVICE**

    I hereby certify that a true and correct copy of the foregoing document has been transmitted by electronic transmission to all counsel of record on February ___, 2021, as follows:

| | |
|---|---|
| Marc D. Katz | Michael K. Hurst |
| Crystal J. Woods | A. Shonn Brown |
| DLA PIPER LLP (US) | Jonathan Childers |
| 1717 Main St., Suite 3700 | LYNN PINKER COX HURST, LLP |
| Dallas, Texas 75201 | 2100 Ross Ave., Suite 2700 |
| 214-743-4545 (Fax) | Dallas, Texas 75201 |
| marc.katz@dlapiper.com | (214) 981-3839 (Fax) |
| crystal.woods@dlapiper.com | mhurst@lynnllp.com |
| | sbrown@ lynnllp.com |
| Attorneys for Highland Capital | jchilders@ lynnllp.com |
| Management, L.P. | |
| | Attorneys for Third-Party Defendants HERA, |
| | Patrick Boyce, and William Britain |

    _/s/ Sonya D. Reddy_
    SONYA D. REDDY

**APPENDIX A** (signatures to follow)

1. James P. Seery, Jr.
2. Cameron Baynard
3. Nathan Burns
4. Timothy Cournoyer
5. Naomi Chisum
6. Stetson Clark
7. Sean Fox
8. Matthew Gray
9. Kristin Hendrix
10. David Klos
11. Vishal Patel
12. Thomas Surgent
13. Michael Throckmorton

# EXHIBIT B

Jason S. Brookner (Texas Bar No. 24033684)
Andrew K. York (Texas Bar No. 24051554)
Joshua D. Smeltzer (Texas Bar No. 24113859)
Drake M. Rayshell (Texas Bar No. 24118507)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, TX 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email:     jbrookner@grayreed.com
           dyork@grayreed.com
           jsmeltzer@grayreed.com
           drayshell@grayreed.com

*Counsel to Patrick Daugherty*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 (SGJ) |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

## DECLARATION OF PATRICK DAUGHERTY IN
## SUPPORT OF PATRICK DAUGHERTY'S OBJECTION TO MOTION
## FOR AN ORDER AUTHORIZING (A) THE DESTRUCTION OF CERTAIN
## DOCUMENTS AN OBSOLETE EQUIPMENT AND (B) FOR RELATED RELIEF

I, Patrick Daugherty, pursuant to 28 U.S.C § 1746, under penalty of perjury, declare as

follows:

1.      I am an interested party in the Main Bankruptcy Proceeding, Case No. 19-34054,

and the named defendant in the Adversary Proceeding Case No. 25-03055-sgj11. I am also the

Chief Asset Recovery Officer of Highland Employee Retention Assets, LLC ("HERA") and

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for
Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

Highland ERA Management, LLC ("ERA"), entities I received from Highland (defined below) through a settlement agreement approved by this Court in March 2022.  [*See* Doc. Nos. 3088, 3089 (the "Settlement Agreement")].  I am able to swear, and hereby do swear, that the facts stated in this declaration are true and correct and are within my personal knowledge.  I make this declaration in support of Patrick Daugherty's *Objection to the Motion for an Order Authorizing (A) The Destruction of Certain Documents and Obsolete Equipment and (B) For Related Relief* [Docket No. 4416] (the "Motion") filed by Highland Capital Management, L.P.'s ("Debtor" or "Highland"), the Highland Claimant Trust (the "Claimant Trust"), and (collectively, Highland and the Claimant Trust "Movants").

2.      Pursuant to the terms of our Settlement Agreement, I requested Highland to turn over all HERA and ERA books and records, and that comprise Highland's "interests in HERA and ERA" as promised under the Settlement Agreement.  In response to those many requests, I have only received limited items and incomplete information within categories of tax information, statements and spreadsheets, financial information, invoices, and documents from Highland.  I have never received any email communications from Highland that concern HERA and ERA's affairs.

3.      In my capacity as an agent for HERA, I requested and received documents from other third-parties that I suspected may have relevant information to HERA's claims of malfeasance against James Dondero, Mark Okada, Scott Ellington, and others.  In response to those requests, Abrams & Bayliss produced a number of relevant email communications and attachments that indicated HERA had actionable claims against its prior principals and agents.  True and correct copies of certain emails from that production are attached hereto as Exhibit B-1.

2

4.      Based on those emails, inter alia, HERA brought claims against its prior principals and agents as detailed in Plaintiff's First Amended Complaint in Cause No. 3:24-cv-00498-K, pending in the Northern District of Texas, filed July 15, 2024.  A true and correct copy of that complaint is attached hereto as Exhibit B-2.  Critically, that litigation concerns bad acts committed by HERA's former principals and agents dating back to the late 2000s.

5.      I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed in Dallas County, Texas on the 28th Day of October 2025.

*PH Daugherty*
_____
Patrick Daugherty

4915-5332-3893

# EXHIBIT B-1

| | |
|---|---|
| **From:** | Thomas Surgent <TSurgent@hcmlp.com> |
| **Sent:** | Wednesday, January 23, 2013 8:22 PM |
| **To:** | Hough, Steven C.; 'Michael K. Hurst (mhurst@ghjhlaw.com)'; 'Katz, Marc (MarcKatz@andrewskurth.com)' |
| **Cc:** | Abrams, Kevin; Scott Ellington; Greg Zarin |
| **Subject:** | HERA Drafts |
| **Attachments:** | HERA 3rd Amended Restated LLC Agreement.doc; HERA Resolution re Allocation of Legal Expenses.doc; HERA Expense Allocation Agreement.docx |

| | |
|---|---|
| **Importance:** | High |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Attached for your review and comment are:

1.   The amended and restated LLC agreement proposed for HERA now that the initial offer to purchase has closed
2.   A draft proposed expense allocation agreement for the appropriate allocation of expenses related to the Daugherty litigation
3.   A resolution of the HERA manager allocating the Daugherty litigation expenses as an offset under Section 11.1.

The allocation agreement in particular needs someone on the litigation side to fill in the appropriate facts/details.

Please let me know if you have any questions or comments.  Happy to discuss tomorrow as needed.

**THOMAS SURGENT** | CHIEF COMPLIANCE OFFICER &
DEPUTY GENERAL COUNSEL

**HIGHLAND CAPITAL**
M A N A G E M E N T, L P

300 Crescent Court   |   Suite 700 |   Dallas, Texas 75201
Office: 972.419-6205         |         Fax: 972.628.4147
tsurgent@hcmlp.com         |         www.hcmlp.com

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

DRAFT
1/23/13

# THIRD AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY AGREEMENT
# OF
# HIGHLAND EMPLOYEE RETENTION ASSETS LLC

THIS THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "*Agreement*") is entered into as of this ____ day of January, 2013 by Highland Employee Retention Assets LLC, a Delaware limited liability company (the "*Company*"), and the parties set forth on the signature pages hereof.

WHEREAS, the original Limited Liability Company Agreement of the Company was entered into on October 26, 2009 (the "*Original Agreement*");

WHEREAS, the Original Agreement was amended and restated effective May 13, 2011 and again on February 16, 2012 and further amended on January 17, 2013 and on January 18, 2013 (as amended, the "*Restated Agreement*");

WHEREAS, the Member(s) holding at least of majority-in-interest of the Series A Preferred Units have recommended certain amendments to the Restated Agreement;

WHEREAS, in order to incorporate such amendments and restate the Restated Agreement, the parties hereto hereby approve the further amendment and restatement of the Restated Agreement on the terms set forth herein;

NOW THEREFORE, the Restated Agreement of the Company, as amended, is hereby further amended and restated in its entirety as follows:

## ARTICLE I

## NAME AND PLACE OF BUSINESS

The name of the Company is Highland Employee Retention Assets LLC.  Its registered office in the State of Delaware is 1209 Orange Street, Wilmington, Delaware 19801, in the County of New Castle.  The name of its registered agent at such address is The Corporation Trust Company.  Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201 or such other place or places as the Manager may hereafter determine.

## ARTICLE II

## BUSINESS, PURPOSE, AND TERM OF COMPANY

Section 2.1    Purposes.  The purpose of the Company shall be to do all such things for which limited liability companies may be formed under the Act.

Section 2.2    Term of Company.    The term of the Company shall continue on a perpetual basis unless dissolved pursuant to ARTICLE VI of this Agreement.

Section 2.3     Powers of the Company.  In addition to the purpose set forth in Section 2.1 above, the Company shall have the power:

(a)     to conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any state, territory, district or possession of the United States, or in any foreign country that may be necessary, convenient or incidental to the accomplishment of  the purpose of the Company;

(b)     to acquire, by purchase, mortgage, lease, contribution of property or otherwise, and to own, hold, operate, maintain, finance, improve, lease, sell, convey, mortgage, transfer or dispose of any real or personal property that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

(c)     to enter into, perform and carry out contracts of any kind, including, without limitation, contracts with any affiliate of the Company or the Manager or any person or other entity that directly or indirectly controls, is controlled by, or is under common control with any Member of the Company, or any agent of the Company necessary to, in connection with, convenient to, or incidental to, the accomplishment of the purpose of the Company;

(d)     to lend or borrow money and to invest its funds, in each case as necessary to, convenient to, or incidental to, the accomplishment of the purpose of the Company;

(e)     to sue and be sued;

(f)     to appoint employees and fix their compensation; and

(g)     to indemnify any current or former officer, director, employee, agent, Member or Manager of the Company.

ARTICLE III

MEMBERSHIP UNITS; CAPITAL CONTRIBUTIONS

Section 3.1     Membership Units.  The capital interests in the Company shall consist of (a) Common Units and (b) Series A Preferred Units, each having the respective rights set forth on Exhibit A, attached.

Section 3.2     Capital Contribution by Members.  Capital Contributions shall be made, in cash or in kind, from time to time as the Manager shall determine.

Section 3.3     Capital Accounts.   (a) The Company shall establish and maintain a separate Capital Account for each Member in accordance with Section 704 of the Code and the Treasury Regulations promulgated thereunder, including Treasury Regulations §1.704-a(b) (each such Capital Account, a "***Capital Account***").  The Capital Account maintained for each member shall be equal to:

(i)     the capital contributions made by such member to the Company, if any; *increased by*

2

(ii)    the aggregate amount of Net Income and other items of income and gain allocated to such Member pursuant to this ARTICLE III; *decreased by*

(iii)    the aggregate amount of distributions made by the Company to such Member; *decreased by*

(iv)    the aggregate amount of Net Loss and other items of deduction, expenditure and loss allocated to such member pursuant to this ARTICLE III.

(b)    The maintenance of Capital Accounts pursuant to this ARTICLE III is intended to comply with the requirements of Section 704 of the Code and the Treasury Regulations promulgated thereunder, and the provisions of this Agreement regarding the maintenance of Capital Accounts shall be interpreted and applied consistently therewith.  If, in the opinion of the Manager, the manner in which the Capital Accounts are to be maintained pursuant to this ARTICLE III should be modified in order to comply with the requirements of Section 704 of the Code and the Treasury Regulations promulgated thereunder, then, notwithstanding anything to the contrary contained in this ARTICLE III, the Manager may change the manner in which the Capital Accounts are maintained, and the Manager shall have the right, upon delivery of written notice to each other Member and without obtaining the consent of any member, to amend this Agreement to reflect any such change in the manner in which the Capital Accounts are maintained.

Section 3.4    <u>Allocation of Net Income and Net Loss</u>.  (a) Except as otherwise provided in Section 11.1 hereof, Net Income and Loss shall be allocated pro rata in accordance with each Series A Preferred Unit holders Capital Account balance.

(b)    The Members agree to be bound by the provisions of this ARTICLE III in reporting their shares of Company Net Income and Loss for tax purposes.

(c)    The cost of performance of any special service attributable to any member shall be allocated and charged to and borne by such Member.  Any Member allocated and charged a particular cost or expense shall be entitled to such deductions or credits as a re-attributable to such cost or expense in computing such Member's taxable income or tax liability to the exclusion of any other Member.

ARTICLE IV

<u>DISTRIBUTIONS</u>

No other distributions of any cash or assets of the Company shall be made, except as (a) as determined by the Manager in its sole discretion or (b) as required in connection with the dissolution of the Company.

ARTICLE V

MANAGEMENT OF THE COMPANY

Section 5.1     General.  The Company shall be managed by [HERA Management, LLC] (the "***Manager***").

The Manager shall have the sole right, power and authority to manage, direct and control all of the business and affairs of the Company, to transact business on behalf of the Company, to sign for the Company or on behalf of the Company or otherwise to bind the Company.  The Manager shall serve until the Manager's resignation or removal by the affirmative vote of the Members holding at least a majority-in-interest of the Series A Preferred Units.  In the event of the resignation or removal of the Manager, a successor Manager shall be appointed by Members holding at least a majority-in-interest of the Series A Preferred Units.

Section 5.2     Powers of the Manager.  The Manager shall have the exclusive and complete authority, acting without the consent or approval of, or notice to, the Member and in the Manager's sole and absolute discretion, at the Company's expense, to operate the Company and its business and to make all determinations or elections or to consent to any matter otherwise described in or desirable, convenient or incidental to this Agreement, including, without limitation, the power of the Company set forth in section 2.3 hereof.

Section 5.3     Reliance by Third Parties.  Any person or entity dealing with the Company may rely on a certificate signed by the Manager as to:

(a)     the identity of the Manager;

(b)     the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Manager or are in any matter germane to the affairs of the Company;

(c)     the persons who or entities which are authorized to execute and deliver any instrument or document of or on behalf of the Company; or

(d)     any act or failure to act by the Company or as to any other matter whatsoever involving the Company.

Section 5.4     Tax Reporting.  The Manager shall endeavor to cause to be prepared after the end of each taxable year of the Company and filed, on or before their respective due dates (as the same may be extended), all federal and state income tax returns of the Company for such taxable year and shall take all action as may be necessary to permit the Company's regular accountants to prepare and timely file such returns.  Form, 1065 (Schedule K-1) shall be sent to the Member and each holder of Series A Preferred Units after the end of each taxable year reflecting such member's or holders pro rata share of income, loss, credit and deductions for such taxable year.

Section 5.5     Tax Election.  Any elections required or permitted to be made by the Company under the Code shall be made by the Manager in such manner as the Manager shall

4

determine.   In the event of an audit of the Company by the Internal Revenue Service, the Manager shall act as the "tax matters partner" pursuant to Section 6231(a)(7) of the Code, and such tax matters partner shall comply with all of his obligations as such under the Code and the regulations promulgated thereunder.   During any time as the Company has one Member, it intends to be treated as a "branch" of such Member for U.S. federal income tax purposes, and during such time as the Company has more than one member, it intends to be treated as a partnership for federal income tax purposes, and the Manager shall make any such elections necessary for such purposes and neither the Member nor any holder of Series A Preferred Units shall do anything inconsistent with such characterization.

ARTICLE VI

DISSOLUTION

The Company shall be dissolved, and shall terminate and wind up its affairs, upon the first to occur of the following:

      (a)     the determination by the Manager to dissolve the Company; or

      (b)     the entry of a decree of judicial dissolution pursuant to Section 18.802 of the Act.

ARTICLE VII

GOVERNING LAW AND JURISDICTION

This Agreement, including its existence, validity, construction and operating effect, and the rights of each of the parties hereto, shall be governed by and construed in accordance with the laws of the State of Delaware (without regard to principles of conflicts of laws).

ARTICLE VIII

INDEMNIFICATION

Section 8.1    Indemnification and Liability.    (a) To the maximum extent permitted by applicable law, no member of the Board of the Company (as constituted on January 18, 2013), no current or future officer of the Company nor the Initial Member (each an "*Indemnitee*") shall be liable to the Company or any other third party (i) for mistakes of judgment, (ii) for any act or omission suffered or taken by it, (iii) for breach of fiduciary duty owed to the Company and/or its members or (iv) for losses due to any such mistake, action or inaction, or breach of fiduciary duty.

      (b)     To the fullest extent permitted by applicable law as the same exists or may hereafter be amended, the Company shall indemnify and hold harmless, and advance expenses including attorneys' fees, to an Indemnitee against all liabilities and claims against each such person arising from such person's performance of his duties in conformance with the terms of this Agreement.   Notwithstanding the preceding sentence, the Company shall be required to indemnify, or advance expenses to, an Indemnitee in connection with a proceeding (or part

5

thereof) commenced by such Indemnitee only if the commencement of such proceeding (or part thereof) by the Indemnitee was authorized by the Manager and/or the Initial Member.

(c)     An Indemnitee may consult with legal counsel or accountants selected by the Manager and/or the Initial Member and, to the maximum extent permitted by applicable law, any action or omission suffered or taken in good faith in reliance and in accordance with the written opinion or advice of any such counsel or accountants (provided such counsel or accountants have been selected with reasonable care) shall be fully protected and justified with respect to the action or omission so suffered or taken.

(d)     The rights conferred upon Indemnitees in this Article VIII shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a member of the Board, an officer of the Company or the Initial Member and shall inure to the benefit of the Indemnitee's heirs, executors, administrators and successors.  Any amendment, alteration or repeal of this Article VIII that adversely affects any right of an Indemnitee or its successors shall be prospective only and shall not limit or eliminate any such right with respect to any liability or claim involving any occurrence or any alleged occurrence of any action or omission that took place prior to such amendment or repeal.

ARTICLE IX

ASSIGNMENT OF INTERESTS

No interest in the Company, whether Common Units, Preferred Units or otherwise, may be assigned without the prior written consent of the Manager, which may be withheld in its sole discretion.

ARTICLE X

WINDING UP AND DISTRIBUTION OF ASSETS

Section 10.1    Winding Up.  If the Company is dissolved, the Manager shall wind up the affairs of the Company.

Section 10.2    Distribution of Assets.  Upon the winding up of the Company, subject to the provisions of the Act, the Manager shall pay or make reasonable provision to pay all claims and obligations of the Company, including all costs and expenses of the liquidation and all contingent, conditional or unmatured claims and obligations that are known to the Manager but for which the identity of the claimant is unknown.  If there are sufficient assets, such claims and obligations shall be paid in full and any such provision shall be made in full.  If there are insufficient assets, such claims and obligations shall be paid or provided for according to their priority and, among claims and obligations of equal priority, ratably to the extent of assets available therefor.  Any remaining cash and other assets shall be distributed to the Members in proportion to their respective Capital Account balances.

ARTICLE XI

DISPUTE RESOLUTION; CONFIDENTIALITY

Section 11.1    Dispute Resolution.  In the event any Member or holder of units of the Company, including, without limitation, Series A Preferred Units (any such member or holder, a "***Disputing Party***"), is party to or commences litigation, or otherwise is party to or initiates any dispute or makes any claim, or takes any action that results in, has resulted in or could be expected to result in any third party making a claim, in each case involving or related to the Company, the Manager, the Initial member, or any of their respective members, officers, directors, agents, representatives, partners, employees, advised funds or accounts, equity holders (collectively, "***Relevant Parties***") or the management or operation of any such entities or any of the assets held thereby (each, a "***Dispute***"), or that in any way does or could adversely impact any of the assets held by the Company, then in sole discretion of the Manager, all pending and future distributions to the Disputing Party shall be immediately suspended until the Manager determines the total of the full losses, costs and expenses (including costs and expenses of legal counsel) of the Relevant Parties, plus any diminution in value of any Relevant Party's assets (including, without limitation, good will) incurred in connection with each Dispute or a Member's disclosure of matters and information regarding any Relevant Party or its assets (except as required by law or directed and authorized in writing by the applicable Relevant Party) in each case as determined by the Manager in its sole discretion (such aggregate losses, costs and expenses, the "***Damages***").  Once the Manager determines the Damages, it may in its sole discretion offset 100% of such Damages against any and all amounts that would otherwise be payable or distributable by the Company to the Disputing Party.  Any amount deducted from a Disputing Party's distribution pursuant to the preceding sentence shall be reallocated pro rata to the holder(s) of the Common Units.

Section 11.2    Confidentiality.  All matters and information regarding the Company and the assets held thereby are strictly confidential (all such information, "***Confidential Information***").  No holder of units of the Company, including, without limitation, the Series A Preferred Units, shall be permitted to disclose or to use for any purpose any Confidential Information, except as (i) required by law or (ii) as directed and authorized in writing by the Company.  In the event any unit holder violates the provisions of this Section 11.2 as determined by the Manager, then the dispute resolution provisions of Section 11.1 hereof shall be deemed to apply as if the violating holder was a "Disputing Party" thereunder pending the Company's resolution of such violation, including, without limitation, the netting provisions under Section 11.1 with respect to the costs, expenses and diminution resulting from such violation.

ARTICLE XII

DEFINITIONS

As used herein, the following terms shall have the indicated definitions.

"***Act***" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq., as may be amended from time to time.

7

"*Agreement*" means this Limited Liability Company Agreement, as may be amended from time to time.

"*Capital Contribution*" means the contribution by the Member to capital of the Company.

"*Certificate of Formation*" means the Certificate of Formation of the Company as filed with the Delaware Secretary of State on June 23, 2009, as the same may be amended from time to time.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Company*" means Highland Employee Retention Assets LLC, a Delaware limited liability company.

"*Initial Member*" means Highland Capital Management, L.P., a Delaware limited partnership, the holder of the Common Units of the Company.

"*Members*" means the Initial Member and each holder of vested Series A Preferred Units.

"*Net Income*" or "*Net Loss*" means, for any fiscal year of the Company, the taxable income or loss of the Company for such year, as well as any other taxable income or loss (as computed for federal income tax purposes), with the following adjustments:  (i) expenditures of the Company that are neither deductible for federal income tax purposes nor allowable as additions to the basis of Company property (or that are so treated pursuant to Section 1.704-1(b)(2)(iv) of the Treasury Regulations) shall be subtracted from such taxable income or loss; and (ii) there shall not be taken into account any items specially allocated pursuant to Section 3.5.

"*Treasury Regulations*" means the Treasury Regulations promulgated under the Code.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement the day and year first above written.

MANAGER:

[_____]

INITIAL MEMBER:

HIGHLAND CAPITAL MANAGEMENT, L.P.
By: Strand Advisors, Inc., its General Partner

By:_____

Name:_____

Title:_____

COMPANY:

HIGHLAND EMPLOYEE RETENTION ASSETS LLC
By:   [HERA MANAGEMENT, LLC], its Manager

By:_____

Name:_____

Title:_____

<u>**Exhibit A**</u>

**Rights of Common Units and Series A Preferred Units**

**I.      COMMON UNITS**

1.      <u>General</u>.

1.1      <u>Authorized/Issued Units</u>.  The number of authorized Common Units shall consist of 100 Common Units, all of which shall be issued to Highland Capital Management, L.P.

2.      <u>Voting Rights</u>.  Each holder of shares of Common Units shall not be entitled to vote.

3.      <u>No Other Rights</u>.  No other rights shall be vested in the holders of the Common Units except as expressly provided in the Agreement.

**II.     SERIES A PREFERRED UNITS**

1.      <u>General</u>.

1.1      <u>Authorized/Issued Units</u>.  The Company shall issue (or reissue, in the case of forfeited units) Series A Preferred Units to such persons and in such amounts designated by the Manager.  No holder of any Class A Preferred Units of the Company shall have any preemptive right to purchase units sold or issued by the Company except to the extent that such a right may from time to time be set forth in a written agreement between the Company and a unitholder.

1.2      <u>Transfer</u>.  No Restricted Series A Preferred Units nor any interest therein, may be sold, assigned, transferred, pledged, hypothecated or otherwise disposed of, except by will or the Laws of descent and distribution, without the express written consent of the Manager, which may be withheld in its sole discretion. Any attempt to dispose of any Restricted Series A Preferred Units in contravention of the above restriction shall be null and void and without effect.

2.      <u>Voting Rights</u>.  No holder of shares of Series A Preferred Units shall be entitled to vote.

3.      <u>No Right to Continued Employment</u>.  Nothing in this Agreement shall confer upon any holder of Series A Preferred Units any right to continue in the employ of the Member nor of any affiliate thereof, or shall interfere with or restrict in any way the right of the Member or any such affiliate, which is hereby expressly reserved, to remove, terminate or discharge the holder at any time for any reason whatsoever, with or without cause and with or without advance notice.

Draft: 1/23/2013

# EXPENSE ALLOCATION AGREEMENT

This EXPENSE ALLOCATION AGREEMENT is made this ___ day of January, 2013, by and between Highland Capital Management, L.P. ("***HCMLP***"), and Highland Employee Retention Assets LLC ("***HERA***").

## RECITALS

A.   WHEREAS, HCMLP and HERA are parties to [LIST Daugherty litigation] (the "***Daugherty Litigation***") in connection with which Patrick Daugherty has made a number a claims against HCMLP and HERA, among others (the "***Daugherty Claims***");

B.   WHEREAS, the Parties acknowledge that the Daugherty Claims are largely claims with respect to compensation Daugherty alleges he is owed;

C.   WHEREAS, [90%] of all Daugherty's Claims for compensation relate to HERA, while only [10%] relate to HCMLP, in each case prior to appropriate offsets and deductions for damages incurred by such parties as a result of the Daugherty Claims;

D.   WHEREAS, a substantial majority of all motions to date related to [HERA] [DESCRIBE IN MORE DETAIL];

E.   WHEREAS, Messrs. Boyce and Britain are parties to the Daugherty Litigation solely in their capacities as Directors of HERA and not as employees, officers, or representatives of HCMLP;

F.   WHEREAS, notwithstanding the recitals above, to date HCMLP has borne a disproportionate share of the costs and expenses related to the Daugherty Litigation, and therefore the parties hereto believe that all past, current and future costs and expenses related to the Daugherty Litigation should be allocated in a manner that more appropriately reflects the relevant party with respect to such costs and expenses; and

G.   WHEREAS, HCMLP and HERA believe that the below expense allocation agreement is fair, equitable and reasonable.

NOW, THEREFORE, in consideration of the foregoing recitals, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## AGREEMENT

1.   HCMLP represents that it has incurred at least $[_____] of direct legal expenses to date in respect of the Daugherty Litigation and is likely to continue to incur substantial damages, costs and expenses related to the Daugherty Litigation going forward.

2.      HERA represents that it has incurred at least $[_____] of direct legal expenses to date in respect of the Daugherty Litigation and is likely to continue to incur substantial damages, costs and expenses related to the Daugherty Litigation going forward.

3.      In light of the recitals set forth above, the parties agree to reallocate all past and present costs and expenses related to the Daugherty Litigation such that the aggregate such costs and expenses be borne [10%] by HCMLP and [90%] by HERA.  In light of the foregoing reallocation, HERA shall immediately pay to HCMLP the amount of $_____ to property effect such pro rata allocation.

4.      The parties agree to allocate all future costs and expenses in a manner consistent with the foregoing allocation.

5.      The parties acknowledge and agree that the reallocation and allocations provided for above herein are fair, equitable and reasonable.

6.      This Agreement shall be governed by the laws of the State of Texas, without regard to the conflict of laws principles thereof.

7.      This Agreement may be executed in one or more counterparts.

*[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

HIGHLAND CAPITAL MANAGEMENT, L.P.
By: Stand Advisors, Inc., its general partner

By:_____
    Name:_____
    Title:_____


HIGHLAND EMPLOYEE RETENTION ASSETS LLC

By:_____
    Name:_____
    Title:_____

**WRITTEN CONSENT**
**OF MANAGER**
**OF**

**HIGHLAND EMPLOYEE RETENTION ASSETS LLC**

Effective as of January __, 2013

THE UNDERSIGNED being the sole Manager (the "***Manager***") of Highland Employee Retention Assets LLC, a Delaware limited liability company (the "***Company***"), acting pursuant to the Delaware Limited Liability Company Act and the Third Amended and Restated Limited Liability Company Agreement of the Company dated January __, 2013, as amended (the "***Company Agreement***"), does hereby adopt the following resolutions by written consent:

WHEREAS, to date the Company has incurred at least $[300,000] of direct legal expenses in connection with claims made by Patrick Daugherty ("***Daugherty***") against the Company (the "***Initial Daugherty Expenses***");

WHEREAS, pursuant to that certain Expense Allocation Agreement of even date herewith, the Company is responsible for bearing at least an additional $[_____] of costs and expenses in connection with claims made by Daugherty that involve the Company and members of its former Board of Directors (the "***Allocated Expenses***");

WHEREAS, the Company is likely to bear significant additional costs and expenses in connection with Daugherty's outstanding claims against or that relate to the Company (the "***Future Expenses***");

NOW, THEREFORE, BE IT

RESOLVED, in accordance with Section 11.1 of the Company Agreement, as amended, the Manager hereby allocates the full amount of the Initial Daugherty Expenses and the Allocated Expenses, together with any and all Future Expenses, as a 100% offset against any and all amounts that would otherwise be payable or distributable under the Agreement in respect of the Series A Preferred Units held by Daugherty, or otherwise.

FURTHER RESOLVED, that the Manager be, and hereby is, authorized, empowered and directed for, in the Company's name and behalf, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions; and that all acts and deeds of the Manager and agents on behalf of the Company prior to the date hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the Company's acts and deeds.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, the undersigned Manager of the Company has executed this Consent to be effective as of the date first set forth above.

**<u>MANAGER</u>:**

HERA MANAGEMENT, LLC

By:_____
Name:_____
Title:_____

**From:** Tyler, Annette
**Sent:** Monday, February 4, 2013 9:31 PM
**To:** 'Thomas Surgent'
**Cc:** Ted Dameris
**Subject:** HERA
**Attachments:** 2-4-13 HERA letter and invoices.pdf

Please see attached.

Annette B. Tyler
Assistant to Kevin G. Abrams
Abrams & Bayliss LLP
(302) 778-1012

## ABRAMS & BAYLISS LLP

20 MONTCHANIN ROAD, SUITE 200
WILMINGTON, DE 19807
MAIN: 302-778-1000
FAX: 302-778-1001

KEVIN G. ABRAMS

DIRECT DIAL NUMBER
302-778-1002
ABRAMS@ABRAMSBAYLISS.COM

February 4, 2013

Highland Employee Retention Assets, LLC
c/o Thomas J. Surgent, Esq.
Highland Capital Management, L.P.
300 Crescent Court - Suite 700
Dallas, Texas  75201

Re:      HERA—Daugherty Litigation

Dear Tom:

This letter constitutes a reminder regarding our unpaid invoices for services rendered to Highland Employee Retention Assets, LLC in connection with the Daugherty Litigation and related matters.

I have enclosed copies of Invoice No. 11050 dated January 9, 2013 in the amount of $8,167.98 and Invoice No. 11092 dated January 11, 2013 in the amount of $100,000.00.  Per your request, the foregoing invoices were submitted to a "legal-invoices" email address at Highland on January 9 and January 11; however, payment has not been received.  If you find our enclosed bills to be in order, we would appreciate anything you can do to ensure that we receive prompt payment.

As always, we appreciate the opportunity to represent Highland Capital Management and we hope that you will not hesitate to give us a call in the event we can provide any additional assistance.

Sincerely yours,

*/s/ Kevin G. Abrams*

Kevin G. Abrams

KGA/abt
Enclosures
cc:      Ted Dameris (by email with enclosures)

ABRAMS & BAYLISS LLP

20 MONTCHANIN ROAD
SUITE 200
WILMINGTON, DE 19807
302-778-1000

TAX ID NO. 56-2528254

HIGHLAND EMPLOYEE RETENTION ASSETS
c/o Highland Capital Mgmt, L.P.
300 Crescent Court - Suite 700
Dallas, TX  75201

| | |
|---|---|
| Invoice Date: | January 11, 2013 |
| Invoice No. | 11092 |
| Account No. | 729.00 |
| Page: | 1 |

Attn:   Thomas Surgent, Esq.

Re:  Daugherty Litigation

Activities

| | | | Hours |
|---|---|---|---|
| | | | |
| 01/11/2013 | KGA | RETAINER REQUEST | 100,000.00 |
| | | For Current Services Rendered | 100,000.00 |
| | | Total Current Work | 100,000.00 |
| | | **TOTAL AMOUNT DUE:** | $100,000.00 |

WIRING INSTRUCTIONS:

ABRAMS & BAYLISS LLP OPERATING ACCOUNT
Account No. 2910 3917

M&T Bank
ABA No. 031100092

20 Montchanin Road
Suite 200
Wilmington, DE 19807
302-778-1000

Tax ID No. 56-2528254

HIGHLAND EMPLOYEE RETENTION ASSETS
c/o Highland Capital Mgmt, L.P.
300 Crescent Court - Suite 700
Dallas, TX   75201

| | |
|---|---|
| Invoice Date: | January 9, 2013 |
| Invoice No. | 11050 |
| Account No. | 729.00 |
| Page: | 1 |

Attn:   Thomas Surgent, Esq.

Re:   Daugherty Litigation

<u>Activities</u>

| Date | Atty | Description | Hours | Amount |
|---|---|---|---|---|
| 12/06/2012 | KGA | Messages with board members | 0.10 | 79.50 |
| | SCH | Emails re disqualification and settlement | 0.20 | 89.00 |
| 12/07/2012 | SCH | Emails re settlement | 0.10 | 44.50 |
| | KGA | Messages with clients re settlement negotiations | 0.10 | 79.50 |
| 12/09/2012 | SCH | Emails re board meetings and settlement | 0.20 | 89.00 |
| 12/10/2012 | SCH | Emails re settlement proposals; review order re motions to disqualify | 0.20 | 89.00 |
| | KGA | Messages with directors re settlement issues | 0.10 | 79.50 |
| 12/12/2012 | SCH | Email re settlement proposals | 0.10 | 44.50 |
| | KGA | Review settlement term sheet | 0.10 | 79.50 |
| 12/22/2012 | SCH | Emails re HERA LLC agreement | 0.20 | 89.00 |
| | KGA | Review client questions re board voting procedures and Dondero buyout offer; review HERA operating agreement; prepare talking points re responses to client questions | 1.00 | 795.00 |
| 12/23/2012 | SCH | Review LLC agreement; conference call with HERA directors re LLC agreement; draft memo re LLC agreement and Dondero proposal | 1.70 | 756.50 |
| | KGA | Review and analyze client questions re board procedures and Dondero buyout offer; review HERA operating agreement; prepare advice to directors re board procedures and Dondero offer; teleconference with directors | 1.50 | 1,192.50 |
| 12/24/2012 | KGA | Review LLC operating agreement and analyze client questions re Dondero buyout offer; revise advice memo to clients re board reconstitution and Dondero buyout | 0.70 | 556.50 |
| | SCH | Analyze indemnification issues and LLC agreement; draft memo re LLC agreement amendments | 2.10 | 934.50 |
| 12/25/2012 | SCH | Emails re HERA LLC agreement and Dondero buyout | 0.10 | 44.50 |

HIGHLAND EMPLOYEE RETENTION ASSETS

| | | |
|---|---|---|
| Invoice Date: | | January 9, 2013 |
| Invoice No. | | 11050 |
| Account No. | | 729.00 |
| Page: | | 2 |

Re:  Daugherty Litigation

| | | | Hours | |
|---|---|---|---|---|
| 12/26/2012 | KGA | Analyze client questions re Dondero taking board control; review LLC agreement; revise advice messages to client; follow up messages with Dameris re Dondero buyout proposal | 0.60 | 477.00 |
| | SCH | Analyze potential amendments to HERA LLC agreement; emails re HERA LLC agreement; legal research re indemnification and amendments to LLC agreements; draft message to Dameris re electing and replacing directors, amendment to LLC agreements and indemnification; draft messages to Dameris re HERA LLC agreement amendments | 2.70 | 1,201.50 |
| 12/29/2012 | SCH | Legal research re indemnification; draft message to Dameris re HERA LLC agreement and Dondero buyout proposal | 2.10 | 934.50 |
| 12/30/2012 | KGA | Revise advice memo to Dameris re director indemnification issues | 0.20 | 159.00 |
| | SCH | Draft memo re HERA LLC agreement amendments; emails re HERA LLC agreement amendments | 0.60 | 267.00 |
| | | For Current Services Rendered | 14.70 | 8,081.50 |

## Expenses

| | |
|---|---|
| Photocopying | 7.50 |
| Total Expenses | 7.50 |

## Advances

| | |
|---|---|
| Online Legal Research | 78.98 |
| Total Advances | 78.98 |
| Total Current Work | 8,167.98 |

**TOTAL AMOUNT DUE:**                                   $8,167.98

WIRING INSTRUCTIONS:

ABRAMS & BAYLISS LLP OPERATING ACCOUNT
Account No. 2910 3917

M&T Bank
ABA No. 031100092

# EXHIBIT B-2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND EMPLOYEE RETENTION ASSETS LLC | § § § § | |
| *Plaintiff,* | § § | Civil Action No. |
| v. | § § § | |
| JAMES DONDERO, MARK OKADA, MARK KATZ, MICHAEL HURST, SHONN BROWN, SCOTT ELLINGTON, ISAAC LEVENTON, ERIC GIRARD, JOHN HONIS, TED DAMERIS, RAYMOND JOSEPH DOUGHERTY, AMIT WALIA, PATRICK BOYCE, LANE BRITAIN, FRANK WATERHOUSE, BRIAN COLLINS, HUNTON ANDREWS KURTH LLP, ABRAMS & BAYLISS LLP, DLA PIPER LLP, NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; JOHN HONIS, AS TRUSTEE OF HUNTER MOUNTAIN INVESTMENT TRUST; LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2, | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |
| *Defendants.* | § | |

## PLAINTIFF'S FIRST AMENDED ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Plaintiff Highland Employee Retention Assets LLC ("Plaintiff" or "Highland Employee Vessel") complaining of James Dondero ("Dondero"), Mark Okada ("Okada"), Marc Katz/HAK/DLAP ("Katz/HAK/DLAP"),  Michael Hurst ("Hurst"), Shonn

Brown ("Brown"), Scott Ellington ("Ellington"), Isaac Leventon ("Leventon"), Eric Girard ("Girard"),  John Honis ("Honis"), Ted Dameris ("Dameris"), Raymond Joseph Dougherty ("Dougherty"), Patrick Boyce ("Boyce"), Lane Britain ("Britain"), Frank Waterhouse ("Waterhouse"), Brian Collins ("Collins"), Hunton Andrews Kurth LLP ("Hunton Andrews Kurth"),  Abrams & Bayliss LLP, ("Abrams & Bayliss") DLA Piper, LLP ("DLA Piper") Nancy Dondero, As Trustee Of Dugaboy Investment Trust "Dugaboy Trust"); Grant James Scott III, As Trustee Of Get Good Trust ("Get Good Trust");  John Honis, As Trustee Of Hunter Mountain Investment Trust ("Hunter Mountain Trust"); Lawrence Tonomura As Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Exempt Trust #1"); Lawrence Tonomura as Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Exempt Trust #2") referred to collectively as Defendants, and for cause of action would respectfully show the Court as follows:

## I.
## PARTIES

1.    Plaintiff Highland Employee Retention Assets, LLC ("Plaintiff" or "Highland Employee Vessel") is a Delaware limited liability company with its principal place of business in Dallas, Texas.

2.    Defendant Dondero is an individual who resides in Dallas County Texas and has made an appearance through counsel.

3.    Defendant Okada is an individual who resides in Dallas County Texas and has made an appearance through counsel.

4.    Defendant Katz is an individual who resides in Dallas County Texas and has made an appearance through counsel. [we need to break DLAP out separately].

5.    Defendant Hurst is an individual who resides in Dallas County Texas and has made an appearance through counsel.

6.    Defendant Brown is an individual who resides in Dallas County Texas and has

made an appearance through counsel.

7.      Defendant Ellington is an individual who resides in Dallas County Texas and has made an appearance through counsel.

8.      Defendant Leventon is an individual who resides in Dallas County Texas and has made an appearance through counsel.

9.      Defendant Girard is an individual who resides in Tarrant County Texas and has made an appearance through counsel.

10.     Defendant Honis is an individual who resides in Florida and has made an appearance through counsel.

11.     Defendant Dameris is an individual who resides in Dallas County Texas and has made an appearance through counsel.

12.     Defendant Dougherty is an individual who resides in Ada, Oklahoma and has made an appearance through counsel.

13.     Defendant Boyce is an who resides in Montgomery County Texas and may be served with process where he resides at 9651 Crestwater Circle, Montgomery, Texas, 77354.

14.     Defendant Britain is an individual who resides in Dallas County Texas and has made an appearance through counsel.

15.     Defendant Waterhouse is an individual who resides in Collin County Texas and has made an appearance through counsel.

16.     Defendant Collins is an individual who resides in Dallas County Texas and has made an appearance through counsel.

17.     Defendant Hunton Andrews Kurth LLP has made an appearance through counsel.

18.     Defendant Abrams & Bayliss LLP is a partnership established under the laws of Delaware and has made an appearance through counsel.

19.     Defendant DLA Piper LLP is a partnership established under the laws of

Case 19-34054-sgj11    Doc 4449    Filed 10/28/25    Entered 10/28/25 16:52:09    Desc
Case 3:24-cv-00498-K    Main Document    Filed 07/25/24    Page 4 of 126    PageID 439
Page 575 of 280    Page 4 of 290

Maryland and has made an appearance through counsel.

20.     Defendant Honis is named in his capacity as Trustee of Hunter Mountain Investment Trust ("Hunter Mountain") is a statutory trust established under the laws of the state of Delaware and has made an appearance through counsel.

21.     Defendant Nancy Dondero as Trustee of Dugaboy Investment Trust ("Dugaboy Trust") is a statutory trust established under the laws of the state of Delaware and has made an appearance through counsel.

22.     Defendant Lawrence Tonomura as Trustee of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Trust #1") that was created under the laws of the state of Texas. Okada controls Okada Trust #1 and has made an appearance through counsel.

23.     Defendant Lawrence Tonomura as Trustee of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Trust #2") that was created under the laws of the state of Texas and has made an appearance through counsel.

24.     Defendant Grant James Scott III as Trustee of the Get Good Trust that was created under the laws of the state of Texas and has made an appearance through counsel.

## II.
## JURISDICTION

25.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because it involves a federal question.

## III.
## VENUE

26.     Venue for this action is predicated upon 28 U.S.C. §1391(a)(2) and 28 U.S.C. §1391(b)(1) and (2).

## IV.
## FACTUAL BACKGROUND

### A.  The Tortured History of Dondero, Okada, Ellington, and The Defendant Minions

27.     Dondero and Okada co-founded Highland Capital Management, LP ("Highland

Capital") in 1993 and, with the Defendant Trusts, were its primary owners until it emerged from bankruptcy in August 2021. Highland Capital is an investment advisor registered with the SEC under the Investment Company Act of 1940 that managed billions of dollars of assets through its structure of approximately 2,000 separate business entities. Plaintiff was one of those entities.

28.     Dondero was President and Chief Executive Officer of Highland Capital was a "Key Man" manager of Plaintiffs most valuable investment, Restoration Capital Partners, LP. until his removal in 2020.

29.     Okada was Chief Investment Officer and Executive Vice President until Highland Capital filed for bankruptcy in October 2019. He also was defined as a "Key Man" manager of Plaintiffs most valuable investment, Restoration Capital Partners, LP. He managed the investor relations department of Highland Capital where he orchestrated his stated strategy to manipulate "perception over reality."

30.     Ellington served in various roles as a partner and Highland Capital's Chief Legal Officer and General Counsel from 2010 until he was fired for cause in January 2021 for acting in a manner adverse to Highland Capital's interest.

31.     Leventon served as Assistant General Counsel at Highland from 2009 until he was fired for cause in January 2021 for acting in a manner adverse to Highland Capital's interest.

32.     Thomas Surgent ("Surgent") served as Chief Compliance Officer and Deputy General Counsel of Highland Capital from 2011 through the Highland Capital bankruptcy and has served as Highland Capital's General Counsel since it emerged from bankruptcy in August 2021.

33.     Girard served as internal counsel at Highland Capital from 2011 until he was terminated in 2017.

34.     Hurst was a partner at his former firm, Gruber Hurst Johansen Hail Shank LLP, and is currently a partner at Lynn Pinker Gruber & Schwegmann where he served as outside

counsel to Plaintiff until he was fired by Highland Capital's new management team in 2020 for insubordination and unprofessional misconduct.

35.    Brown was a partner at her former firms, Gruber Hurst Johansen Hail Shank LLP, and Lynn Pinker Gruber & Schwegmann where she served as outside counsel to Plaintiff.

36.    Katz was a partner at his former firm, Hunton Andrews Kurth, and is now at DLA Piper[1], where he served as outside counsel to Plaintiff and Highland Capital.

37.    Jeff Abrams ("Abrams"), Matt Miller ("Miller") and Stephen Hough ("Hough") were attorneys at Abrams & Bayliss and served as outside counsel to Plaintiff.

38.    Dameris was a board member of Plaintiff and served as a Managing Director at Highland Capital.

39.    Boyce was a board member of Plaintiff and was a Partner at Highland Capital. He also served as Head of Private Equity for Plaintiff's limited partnership interests including Plaintiffs most valuable investment, Restoration Capital Partners, LP. from late 2011 until his termination from Highland Capital in 2014.

40.    Britain was a board member of Plaintiff and was a Partner at Highland Capital.

41.    Honis was a board member of Plaintiff, Partner of Highland Capital, and trustee to Hunter Mountain. He also was a "Key Man" manager of Plaintiffs most valuable investment, Restoration Capital Partners, LP.

42.    Walia was a board member of Plaintiff and was a Partner at Highland Capital.

43.     Dougherty was a board member of Plaintiff and was a Partner at Highland Capital.

44.    Trey Parker ("Parker") was Co-Chief Investment Officer with Okada at Highland Capital and Head of Private Equity after Boyce for Plaintiff's limited partnership investments

---

[1] Throughout this petition Plaintiff will refer to Katz, Hunton Andrews Kurth and DLA Piper collectively as ("Katz/HAK/DLAP, except where DLAP is identified separately")

including Plaintiff's most valuable investment, Restoration Capital Partners, LP. He was also named Partner at Highland Capital in 2015.

45.     Waterhouse was the Chief Financial Officer at Highland Capital until he was terminated in 2021.

46.     Collins was the Head of Human Resources at Highland Capital until he was terminated in 2021 and was the primary agent to implement and execute actions on behalf of the board for Plaintiff as well as lead its investor communications, document custody, governance solicitation and Highland Capital's buyout offer solicitation.

47.     David Klos ("Klos") was a senior accountant at Highland Capital that was responsible for the management of Plaintiff's accounting records. He has been the Chief Financial Officer at Highland Capital since its emergence from bankruptcy in August 2021.

48.     Rick Swadley ("Swadley") was a senior tax director at Highland Capital that was responsible for the management of Plaintiff's tax records until he was terminated in 2021.

49.     Dugaboy, Get Good, the Okada Trusts and Hunter Mountain are trusts established by Dondero and Okada for the benefit of themselves and their family members.

50.     Dondero and Okada, with Boyce, Parker, Ellington, Leventon, Girard, Surgent, Hurst, Katz/HAK/DLAP, Waterhouse, Klos and Swadley at their side, controlled Highland Capital and its byzantine web of funds and other entities under its management with unilateral and unfettered discretion for years. They ensured that Highland Capital and its affiliates routinely failed to observe corporate formalities with respect to their personnel, corporate governance, internal systems, legal affairs, and considerable assets.

51.     In September 2008, Highland Capital took a dramatic turn for the worse because of Dondero and Okada's mismanagement and self-dealing during the financial crisis. Highland Capital defaulted on its credit facility, prompting its lenders to demand a forensic accounting review of missing cash and assets. The audit revealed that Dondero and Okada had siphoned tens

of millions of dollars out of Highland Capital's accounts, while leaving creditors and employees with insufficient resources to collect what was owed to them. A multitude of lawsuits were filed over a ten-year period against Dondero and his trusts, Okada and his trust, Ellington, Leventon, and their affiliates as they became embroiled in litigation on allegations of fraud, breach of fiduciary duty, breach of good faith and fair dealing, willful misconduct, fraudulent transfers, money laundering, and wire fraud that resulted in verdicts of over one billion dollars in damages against them or their affiliates.

52.    The lenders initially demanded that the cash be returned immediately to which Dondero threatened, "Highland will fail before I fail!" Following months of difficult negotiations, the lenders agreed to an extension of the credit facility in exchange for strict repayment terms and a security interest in over $125 million of Highland Capital's remaining assets. In addition, the lenders agreed to allow for the creation of a vessel to set aside assets for the purpose of retaining and incentivizing employees – this entity is Plaintiff. Importantly, the assets were transferred to Plaintiff in exchange for deferred compensation assets that were terminated as a result of the security interests taken by the lenders. Dondero, Okada and their affiliates were intentionally forbidden from participating as preferred unit holders in Plaintiff.

53.    Plaintiff has never had employees and at all times depended on its board of directors, legal counsel, managers, service providers, and its investment advisors to conduct its affairs. Highland employees, including Dondero, Okada, Parker, Ellington, Leventon, Girard, Surgent, Collins, Hellen Kim, Waterhouse, Swadley, and Klos performed investment management, legal, accounting, and tax services to Plaintiff under Shared Services and Blanket Agreements. Dondero and Okada resented the cost of Plaintiff.

54.    Okada often demonstrated his contempt for Highland Capital employees, routinely lambasting them and referring to Hispanics as "spics" and "wetbacks," Jews as "Jesus Killers," and Caucasians as "dumb white people that all look the same." He would flaunt his belief

that he could "do whatever I want because I'm in a protected class," while bragging about the Japanese surprise attack on Pearl Harbor. Okada also exposed himself in the nude at company events, groped women in the office through simulated intercourse, and physically assaulted employees as his self-proclaimed alter ego, "Thor."

## B. Daugherty Resigns from Highland Capital and is Removed as Director of Plaintiff

55.    Patrick Daugherty ("Daugherty") was a partner, officer, director, Head of Private Equity, and Co-Head of Research for Highland Capital and certain of its affiliates from 1998 until 2011. Daugherty resigned from Highland Capital on September 28, 2011, because he refused to participate in the conduct at Highland Capital that would later result in over a billion dollars in damage awards to investors and creditors for breach of fiduciary duty, willful misconduct, and fraud, among other causes of action. Indeed, Dondero, Okada, Ellington, Leventon, Katz/HAK/DLAP, Hurst and Brown would later pursue legal actions on behalf of Highland Capital against Daugherty to whitewash willful misconduct and breach of fiduciary duties against UBS, Josh Terry (a former employee), the Credit Strategies fund investors and the Crusader Fund investors (including Dallas Police and Fire, Baylor University, Army Airforce Exchange, Ontario Teachers, and many others).

56.    Prior to his resignation, Daugherty became a holder of Series A Preferred Units of Plaintiff on October 26, 2009. He was awarded 1,571.86 preferred units and was the largest holder of the lender-approved Plaintiff. Plaintiff was created based on a "last man standing" structure where remaining employees would receive reallocated shares of the units forfeited by departed employees. The number of Daugherty's units and percentage ownership of Plaintiff increased to 1,909.69 and approximately 19.09% as other employees resigned from Highland Capital prior to their interests vesting in 2011. At the time of his resignation, Daugherty was a director of Plaintiff. After his resignation, Defendants began a campaign to inflict economic pain on Daugherty by stripping Plaintiff of its assets.

57.     On February 16, 2012, Plaintiff's board members, Boyce, Britain, Dameris, Dougherty (no relation to Daugherty), Honis, and Walia removed Daugherty as a director of Plaintiff. Immediately thereafter, the newly composed board executed a Second Amended and Restated Agreement (the "2012 Amendment") prepared by Highland Capital's Chief Compliance Officer and Deputy General Counsel, Surgent. The 2012 Amendment purported to impose a punitive procedure to deplete the value of a holder who litigated any action "related to" Plaintiff, Highland Capital, and its officers and directors, escrow the holder's interest, and, in a type of reverse-indemnification, impose the litigation costs of Plaintiff and any deemed "diminution in value" cost to the litigant, whether it lost or won the litigation – a proverbial lose-lose clause.

58.     After his removal as a director of Plaintiff, Daugherty had no access to or ability to know what the Defendants were doing regarding the Plaintiff.

59.     In a dubious tax scheme, ownership of Highland Capital transferred to Hunter Mountain on or around December 17, 2015, from its then-existing limited partners (i.e., Dondero, Okada, Ellington, Parker, and entities they controlled). Through a complex series of transactions that occurred on December 21, 2015, and December 24, 2015, Dondero and Okada caused Hunter Mountain to become the owner-in name of 99.5% of the economic interests of Highland Capital. Meanwhile, Dondero and Okada caused Hunter Mountain to issue a series of notes and cash, such that Dondero, Okada, and certain entities they controlled (including Dugaboy, Okada Trust #1, and Okada Trust #2) continued to receive the economic benefit of limited partnership distributions made by Highland Capital to Hunter Mountain even after they had purportedly sold their limited partnership interests to Hunter Mountain.

## C. Daugherty Obtains Control of Plaintiff and For the First Time Discovers Harm to Plaintiff Caused by Defendants' Deliberately Concealed Bad Acts and Omissions

60.     Daugherty and his affiliates now own and control 100% of Plaintiff pursuant to the terms of a bankruptcy court approved settlement on March 1, 2022. It is critically important to note that it was not until Daugherty and his affiliates obtained control of Plaintiff in March of

2022 that Defendants' wrongdoing complained of in this lawsuit, was fully discovered and that those wrongful acts and omissions had been deliberately concealed.

61.    After obtaining control of Plaintiff, Daugherty (on behalf of Plaintiff) began to request documents, legal invoices, emails, and metadata related to Plaintiff, but was met with obstruction at every turn. Despite this, through diligent efforts undertaken since March of 2022 Daugherty, for the first time, has been able to gather detailed information regarding Defendants' acts and omissions as they relate to harm caused to Plaintiff.

62.    The subsequent facts relay more background information interposed with what Plaintiff now knows happened with the information obtained since March of 2022.

### D. In 2022, it is Discovered that Plaintiff's Board Members Stripped Plaintiff of all of its Assets Through a Series of Shady Backdoor Corporate Governance Maneuvers

63.    Back on September 24, 2012, Daugherty, after he was removed as a director of Plaintiff, made his first request to inspect and verify Plaintiff's assets. Abrams & Bayliss acted to block the inspection by scheming with Surgent, Hurst, and Katz/HAK to demand that Daugherty pay for the costs of producing the materials and sign an onerous confidentiality agreement.

64.    It was not until Plaintiff's new management demanded review of its invoices and records in May 2022 that it was revealed that Abrams & Bayless had been retained solely on behalf of Plaintiff on June 11, 2012, after discussions with Boyce, Britain, Dameris, Honis, Dougherty, Hough, Abrams, Brown, Ellington, Kim, Collins, and Surgent regarding the Plaintiff's litigation with Daugherty. It was also revealed that in an email dated November 28, 2012, Dameris was advised by Jeff Abrams and Stephen Hough ("Hough"), "We caution that the board, which manages Plaintiff, owes fiduciary duties to both the LLC itself and to its members."

65.    Invoices and emails discovered in October 2022, revealed that December 22, 2012, Dondero communicated his buyout offer to members of Plaintiff's board after Dameris considered and Dondero rejected certain settlement scenarios regarding Daugherty's claims against Plaintiff

despite Abrams & Bayliss' warning to Dameris that Plaintiff's board had fiduciary duties to Plaintiff and the other unit holders. This provided previously unknown context to an email that was produced in the Texas litigation from Dameris, as Managing Director of Highland Capital, to Dondero on December 26, 2012 that presented as legitimate a "Buyout" scheme in which Dondero could gain control of Plaintiff at a substantial discount to value, pending review by Delaware counsel, noting "[i]f you decide to offer everyone except 1 [Daugherty] a buyout . . ..". It refuted certain testimony given by Dondero in the Texas trial that Dondero had no influence over Plaintiff prior to January 2013. It also revealed why Dameris collaborated with Abrams & Bayliss on December 30, 2013, to enhance indemnification rights of Plaintiff's directors. Importantly, this scheme was created at the same time that a large cash payoff was due to be paid to Plaintiff from the Safety-Kleen Systems, Inc. sale proceeds.

66.    It was not until Plaintiff's new management demanded review of its invoices and records in May 2022 that it was for the first time revealed that Hough (copying Abrams & Bayliss) had conspired with Plaintiff and its former board members on December 30, 2012 to provide a detailed scheme of "Buyout Steps," including how to  transfer control of Plaintiff to Dondero and Okada, while attempting to forgive the board members of their fiduciary duties to Plaintiff and simultaneously seeking to create expanded indemnification rights for themselves.

67.    It was also revealed for the first time in late 2022 that Surgent sent an email on January 9th and 15th, 2013, distributing all of Plaintiff's operative documents to implement the scheme to Katz/HAK, Paul Lackey ("Lackey"), Michael Aigen ("Aigen), Hough, Ellington, Boyce, Britain, Dameris for comment. Katz/HAK, Lackey, and Aigen were not counsel to Plaintiff during this time but, nevertheless, Plaintiff's confidential information was disclosed to them.

68.    Highland Capital and Dondero directed Collins and Surgent to offer all of Plaintiff preferred unit holders, except Daugherty, to purchase their preferred units for 100% of the value of their cash interests and 60% of the value of their non- cash interests on January 18, 2013.

However, Highland Capital and its legal team often engaged in the practice of creating documents after the fact and back-dating or forward-dating them to appear as if they existed on the date listed. It was not until October 2022 that it was revealed for the first time that the actual offer for preferred unit holders that were employed by Highland Capital at the time occurred much sooner and were effectively offers to keep their employment if they signed. Indeed, all of the preferred unit holders that were employed by Highland Capital at the time purported to accept the offer on the same date the offer was made, January 18, 2013. When the offer was finally presented to former employees on January 31, 2013, Collins and Surgent warned those who questioned the fairness of the price that a majority had already agreed to the offer and that anyone who did not accept the offer would "have their rights stripped."

69.     It was also not until late 2022 that documents were finally produced that revealed that Plaintiff's board of directors and legal counsel did nothing to protect Plaintiff from this lowball offer, despite knowing it was a violation of their fiduciary duties. It did not seek a higher price from Highland Capital, Dondero, Okada or from Highland Capital's other partners at the time, including Boyce, Britain, Ellington, and Honis, who stood to benefit from the transaction, despite simultaneously serving on Plaintiff's board. They did not discuss a poison pill, a standstill, or any other corporate defense mechanism available to protect from a creeping takeover pursuant to their obligations under Delaware law. The board never even met to discuss the offer. Rather, they secretly attempted to ratify their own self-dealing actions, whitewash their dereliction of duty, and enlisted counsel from Abrams & Bayliss and Surgent to provide themselves broad releases of their fiduciary obligations and indemnifications while paving the way for Dondero, Okada, Ellington, and Highland Capital to strip Plaintiff of its assets. Tellingly, in one of the many amendments and actions by written consent that were never produced in the litigation with Daugherty, the board members purported to execute a Reserve for actual and potential expenses but did not bother to reserve anything for the claims being made by Daugherty.

70.     It was not until concealed documents with metadata were finally produced by Abrams & Bayliss and new management at Highland Capital in October 2022 that a review indicated numerous documents had been executed in violation of Section 5.1, 5.2(b)(ii) and 5.2(b)(iv) of the Second Amended and Restated Limited Liability Company Agreement. Specifically, document data revealed they had been falsely and intentionally misdated by Plaintiff's counsel, Surgent, to appear as if the board members had authority when, in fact, they did not. Hough reported to Abrams in a "Buyout Update Plaintiff" email on January 18, 2013, "Thomas Surgent called and told me that the Plaintiff buyout documents were executed this morning, with close to 60% accepting. As we discussed, Highland [Capital] is going to wait two weeks to extend the offer to HERA's [Plaintiff's] non-employee members…. "Thomas [Surgent] will date the outgoing board's resignations January 19 so that there is no doubt that their resignations occurred only after the transactions were effected." Indeed, Surgent noted in an email to Hough that they had not reached the 75% threshold until February 11, 2013, long after the board members had surrendered their ownership rights in the Plaintiff and their board positions had terminated. Regardless of their failed attempt, the board members disregarded the fact that Delaware entities such as Plaintiff are not permitted to waive liability for fraud, or breach of good faith and fair dealing.

71.     It was not discovered until May 2024 that Walia was never included as a signatory to the January 17, 2013, governance amendments and corporate actions and that Honis did not submit his signatures on the proposed actions until after 4:30pm on January 18, 2013. By that time, Boyce, Britain, Dougherty, and Dameris had previously forfeited their positions as board members by waiving and releasing any and all rights they had to the Preferred Units pursuant to the terms of the Transfer Agreement. The then-existing governance of the Second Amended and Restated Limited Liability Company Agreement specifically required that 75% approval of board members be required for amendments to the agreement. Since there were only two board

members at the time Honis submitted his signatures for the proposed actions, approval was impossible without the signature of Walia. The attempted amendments failed, but Honis and Walia subsequently negotiated for and received their own transactions that required them to waive and release all claims to their Preferred Units pursuant to their Transfer Agreements. Accordingly, Daugherty became the only remaining owner of the Preferred Units in Plaintiff and only he and his affiliates could effect a change in governance pursuant to the terms of the last legitimate governance amendment on February 16, 2012.

72.    The new manager of Plaintiff, Highland ERA Management, LLC was formed on February 1, 2013, and, at the direction of Dondero, wrongfully assumed management and control of Plaintiff. Although Defendants contended that Highland ERA Management was the manager of Plaintiff, metadata later revealed in October 2022 indicated there was no valid corporate action taken by the board and Series A Preferred Unit holders to execute such an arrangement. Indeed, Daugherty was the only rightful and sole owner of the Series A Preferred Units of Plaintiff at that time.

73.    Despite the absence of valid authority, Dondero, serving as the president of Highland ERA Management, with the assistance of his minions at Highland Capital and their legal counsel who simultaneously represented both Highland Capital and the Plaintiff through a Shared Services Agreement and a Blanket Agreement, purported to execute a series of transactions to strip Plaintiff of its assets.

74.    On February 1, 2013, the day that Highland ERA Management was formed, Dondero purportedly executed the Third Amended and Restated Agreement on behalf of Plaintiff prepared by Surgent, Ellington, Katz/HAK, Hurst, Hough and Abrams, which (1) eliminated the purpose for which Plaintiff was created, (2) eliminated the requirement of Plaintiff to make cash distributions to preferred unit holders to cover pass-through tax obligations attributable to Plaintiff, (3) eliminated members' rights to indemnification, (4) limited indemnification

obligations to the discretion of the Manager (Highland ERA Management, LLC) or the Initial Member (Highland Capital Management, LP), and (5) provided for broad indemnification to the Manager (Highland ERA Management, LLC) and Dondero.

75.    Dondero purported to execute an Expense Allocation Agreement prepared by Surgent, Ellington, Leventon, Katz/HAK, Hurst, Hough, Abrams, Waterhouse and Klos also dated February 1, 2013, on behalf of both Highland Capital and Plaintiff under which the parties reallocated 93.4% of Highland Capital's purported legal expenses billed by their firms and others related to the Texas Litigation[2] to Plaintiff for no consideration. According to the document, Highland Capital had incurred $1,142,284 in legal expenses in the Texas Litigation as of December 31, 2012, compared to just $154,029 incurred by Plaintiff over the same period.

76.    On February 6, 2013, Daugherty sent a letter seeking to review Plaintiff's books and records to verify its assets and their value. Abrams & Bayliss rejected the request in a letter dated February 13, 2013 by declaring, "You seek, inter alia, 'documents establishing the December 31, 2012 estimated value of the Interests as calculated by HERA [Plaintiff];' 'HERA's [Plaintiff's] balance sheets, income statements, lists of assets, general ledger, and the account records for any depository accounts of HERA [Plaintiff], as of December 31, 2012 and for the periods ending December 31, 2012, 2011, 2010 and 2009;' 'HERA's [Plaintiff's] 2009, 2010 and 2011 federal, state, and local tax returns'; 'information… regarding and identifying the current holders of the Series A Preferred Units, and to the extent the Common Unit Holder has already acquired any such units… from whom, in what amounts and for what consideration;' 'documents… regarding member lists;' and 'documents… regarding HERA's [Plaintiff's] Board… and any amendments to HERA's [Plaintiff's] company agreement.' Your Demand takes a shotgun approach to requesting books and records that is antithetical to the 'rifled precision'

---

[2] On April 11, 2012, Highland Capital, at the direction of Dondero, Okada, Ellington, Leventon, Girard and Surgent, commenced a lawsuit against Daugherty in Texas captioned *Highland Capital Management, L.P. v. Daugherty*, Cause No. 12- 04005 in the 68th Judicial District Court of Dallas County, Texas (the "Texas Litigation") which will be described in detail in Section F below.,

required by Delaware law. e.g., Brehm v. Eisner, 746 A.2d 244, 266 (Del. 2000)."

77.     It was further discovered in 2022 that on February 7, 2013, Surgent sent an email attaching Daugherty's request to inspect Plaintiff's assets to Hough, Hurst, Katz/HAK, Lackey and Ellington. Again, Katz/HAK and Lackey did not represent Plaintiff at the time but were adverse to Daugherty and his counsel at Looper Reed, and McGraw on behalf of Highland Capital. It was later discovered in September 2023 that Leventon, Ellington, Surgent, Dondero, Klos, Swadley, Waterhouse, and Katz/HAK had fraudulently allocated over $14,000,000 in invoices from Hunton Andrews Kurth, Lackey Hershman and other firms to Plaintiff.

78.     It was discovered for the first time in October 2022 that an action by written consent purportedly executed by Dondero on April 30, 2013 was in fact backdated to declare Highland Capital as the "sole economic interest holder in the [Plaintiff] following the consummation of the transactions pursuant to the Offers to Purchase dated on or about January 18, 2013, and January 31, 2013." The same document also declared that, "Daugherty's economic interest in the [Plaintiff] is now zero as a result of the application of Article XI of [Plaintiff's Operating Agreement]." And it further resolved to transfer all of Plaintiff's assets to Highland Capital because Highland Capital and Plaintiff "have each determined that it is in their respective best interest" to transfer substantially all the assets of Plaintiff as "in-kind distribution[s]" to Highland Capital (then valued at approximately $9,700,000 on top of approximately $6 million in cash that Highland Capital also took), despite providing no consideration to Plaintiff.

79.     Through this series of bogus transactions that were only revealed for the first time in October 2022 to have been backdated and later circulated by Leventon and Goldsmith to appear legitimate, Highland Capital claimed to have taken all of Plaintiff's assets, leaving it insolvent. Plaintiff only became insolvent in 2013 because its funds and assets were purportedly used: (1) to pay for substantially all of Highland Capital's attorneys' fees incurred in the Texas Litigation pursuant to the Expense Allocation Agreement dated February 1, 2013; (2) to pay for

all of Plaintiff's attorneys' fees incurred in in trying to wrongfully prevent Daugherty from receiving his share of the Plaintiff's assets; and (3) to transfer and register substantially all of its assets to Highland Capital for nothing. It was also revealed that in an email dated October 7, 2013, Katz/HAK, Hurst, and Miller knew Plaintiff's board had ignored their duties to carefully review the Highland Capital Purchase Offer and had even discussed the *Lampers v. Fertitta* case by highlighting:

> Turning first to the board's failure to employ a poison pill to prevent Fertitta from obtaining control without paying a control premium, it is reasonable in the context of a motion to dismiss to infer fiduciary misconduct more serious than a breach of the duty of care. The failure to act in the face of an obvious threat to the corporation and the minority stockholders instead supports a reasonable inference that the board breached its duty of loyalty in choosing not to cross Fertitta.

### E. The Texas Litigaiton

80.    On April 11, 2012, Highland Capital, at the direction of Dondero, Okada, Ellington, Leventon, Girard and Surgent, commenced a lawsuit against Daugherty in Texas captioned *Highland Capital Management, L.P. v. Daugherty*, Cause No. 12-04005 in the 68th Judicial District Court of Dallas County, Texas (the "Texas Litigation"), and Dondero subsequently threatened, "You will never get a dime" and "I'm going to take you [Daugherty] to zero." Daugherty responded with counterclaims against Highland Capital, Plaintiff, and others, alleging breach of contract and breach of the covenant of good faith and fair dealing against Plaintiff and Highland Capital. Katz/HAK and Hutton Andrews Kurth purported to represent Highland Capital while Hurst, Brown and Gruber Hurst purported to represent Plaintiff.

81.    It was later revealed after legal invoices were finally produced under new management in October 2022, that as Defendants prepared for the first trial in Texas, they [Highland Capital, Hurst, Katz/HAK, Ellington, Brown, Leventon, Surgent, Girard, Boyce, Britain and Hunton Andrews Kurth] participated in a mock trial on December 4, 2013, that resulted in their mock jury finding in favor of Daugherty. From December 6 to 12, 2013, Defendants Dondero, Hurst, Brown, Katz/HAK, Abrams, Miller, Boyce, Britain, Ellington,

Girard, Leventon, and others schemed to "come up with trial strategy regarding witness testimony as to HERA [Plaintiff] sale and where are funds;" and conferenced with "Delaware counsel concerning escrowing of Daugherty's HERA [Plaintiff] interests and related issues there to."

82.     In June 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege, it was for the first time revealed that on December 12, 2013, Ellington, Leventon, and Surgent coordinated with Abrams & Bayliss to serve as escrow agent of the Escrow. Highland Capital's assistant general counsel, Leventon, sent a draft of the Escrow Agreement to Abrams & Bayliss on December 13, 2013, and the agreement was executed that day by Ellington. Matthew Miller ("Miller"), an Abrams & Bayliss attorney who primarily worked on the escrow matter and had just completed his first year as an attorney and simply used the terms proposed by Leventon.

83.     The assets deposited in the escrow were represented to be: (1) $1,210,502.03 in cash; (2) a limited partner interest in Restoration Capital Partners Fund, LP and (3) 1088.42 shares of NexPoint Credit Strategies. This was the story Defendants "came up with" so they could sell to the jury that they had not simply stolen Plaintiff's assets. The notion that Defendants did nothing nefarious with Plaintiff's and Daugherty's assets and merely set them aside would become a theme of Defendants in the Texas Litigation.

84.     The key provision of the Escrow Agreement that undergirded Defendants' story in the Texas Litigation provided that if Daugherty prevailed in the Texas Litigation, escrowed assets in the amount of the judgment "shall" be transferred to Plaintiff. Also pursuant to the crime-fraud discovery in May 2019, it was revealed that 19 days after executing the Escrow Agreement, Leventon and Girard changed the Escrow Agreement without Daugherty's knowledge because it wanted to "slip sheet the Schedule 1 assets" to change "the NexPoint shares from shares to the cash equivalent of shares because it is difficult to find a prime broker to open

account for such a small pool of assets." Abrams & Bayliss simply swapped the pages. Abrams & Bayliss later explained, "if Daugherty digs deeply enough, he may discover that Schedule 1 was revised on December 16, 2013, with no re-execution of the Escrow Agreement by Highland and Abrams & Bayliss. Highland's counsel merely re-sent the Escrow Agreement with an updated Schedule 1, and Abrams & Bayliss sent an email confirmation of the change." According to Abrams & Bayliss, "[i]t is unlikely that Daugherty would learn of the revision." With the appearance of an escrow in place, Defendants were poised to present themselves in the Texas Litigation not as thieves, but rather as protectors of Plaintiff's and Daugherty's interests. That is the story they spun at trial. This was a state of affairs just a month before trial in the Texas Litigation.

85.    On the first day of trial, January 16, 2014, Okada took the stand as Chief Investment officer and Head of Public Relations to assure the jury the following regarding their duties to clients and funds: "We have an advisory business where we're managing other people's money, teachers, firefighters, individuals, through their pension funds, or through their retirement accounts, or, you know, various pools of savings." "But our primary business at Highland Capital is to take their money, take the money that's entrusted to us and make good decisions with it."

86.    He further sanctimoniously lectured about his and Dondero's culture of trust, "Our culture is one of trust, of hard work, and transparency, and something that we like to call alignment of interest, and I will explain the last one. But when you're managing other people's money you have to make sure that they trust you. That they know what you're doing. That you're telling them what you're doing, how well you're doing well, whether you're doing well or not doing so well. You've got to be honest and straightforward. And you can't do this for 20 years without doing that. If you're not trustworthy and honest and your culture isn't one of those, you're just not going to be in this business. You don't survive in the money management business

without having a culture of trust……And then lastly, I would say that this idea of alignment of interest is where -- think of it this way, if something's good for you, it's good for me. If it's good for our clients, it should be good for us. If it's bad for our clients, it should be bad for us, that's alignment of interest. It means that whatever you're doing, whether you're paying an employee, or whether you're promoting an employee, or whether you're making an investment, you've got to think about the client. You're thinking about their interest and putting their interest first. And our culture is one of doing that." This testimony was a far cry from what insiders knew about Okada, Dondero and the culture at Highland Capital. Indeed, Okada was often observed to cover his ears and exclaim "I'm not hearing this! I'm not hearing this! I'm not hearing this!" when confronted with legal, fiduciary, and ethical misdeeds at Highland Capital. It was quite a contrast with reality when Highland Capital filed for bankruptcy on October 16, 2019, because its clients, including teachers, firefighters, veterans, pensioners, former employees, and other creditors, won over $1.4 billion in damage awards against it for willful misconduct, fraud, breach of fiduciary duties and other causes of action.

87.     In furtherance of the sham, Hurst, Dondero, and Surgent made it a point to let the court and jury know that Plaintiff retained control of "all" of its assets. Dondero also testified in January, responding to questions by Hurst as follows:

> Q. Okay. So – so if, if Mr. Daugherty somehow prevails in his lawsuit against Patrick Boyce and Lane Britain and [Plaintiff], what happens to Mr. Daugherty's interest that's being escrowed right now with a third-party escrow agent?
> A. They go to him.
> Q. I'm sorry?
> A. They go to him via to HERA [Plaintiff] and then to him.

Dondero further testified when Hurst asked him:

> Q. The escrow, did you just escrow this last month?
> A. No. We've had it segregated at Highland since April when we first put it in and then formalized the escrow. It takes a while to set up an escrow and transfer illiquid assets that have all sorts of transfer limitations.

88.     Highland Capital's Chief Compliance Officer and Deputy General Counsel,

Surgent, swore under oath in regard to a question regarding the April 30, 2013, implementation of the asset sweep from Plaintiff, "Yes, but then it placed those funds in escrow." But when questioned further why the escrow appeared to be created 36 days prior to his testimony and more than eight months after the assets were swept from Plaintiff, Surgent answered to the court and jury, "The escrow was formalized in this agreement, but I believe it existed sooner." In fact, it did not, and Surgent knew that.

89.    In closing arguments, Plaintiff's counsel, Hurst, lied to the court and jury once again, "[I]f Pat Daugherty happens to prevail in his lawsuit against HERA [Plaintiff], you heard Jim Dondero testify, he gets his interest, which is currently escrowed in the third-party escrow account, all of it."

90.    It was not until some evidence from Abrams & Bayliss was produced pursuant to the crime-fraud ruling in Delaware on June 7, 2019, and substantial detailed legal invoices and emails were produced to the new management of Highland Capital in October 2022 that this web of lies was fully exposed.

91.    After three-weeks of trial, the jury found that Plaintiff, at the direction of Defendants from Highland Capital, breached the implied covenant of good faith and fair dealing by adopting Section 12.1 of the 2012 Agreement (the Lose-Lose clause) and that Highland Capital and Dondero had defamed Daugherty with malice. The jury awarded Daugherty damages against Plaintiff in the amount of $2.6 million, plus interest which remains unpaid and has currently accreted to approximately $5 million. The court also determined that Daugherty had retained ownership of his preferred units in Plaintiff. The problem was Dondero, Ellington, Surgent and their merry band of minions lied to the jury and never funded Escrow while incurring millions in legal fees to drain Plaintiff's assets to perpetuate the lie.

92.    It was not until May 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege, that it was revealed that Highland Capital contacted

Abrams & Bayliss on February 14, 2014 "to discuss a memorandum we need drafted to address the Escrow Agreement in context of the recent Daugherty Verdict." The memo reaffirmed that Abrams & Bayliss had "received no cash or documents from Highland Capital or HERA [Plaintiff] regarding the escrow of Daugherty's interests in Restoration Capital Partners, LP. The memorandum then discussed the consequences if the escrow of Plaintiff's assets was deemed a "sham." In a section of the memorandum titled "Daugherty May Assert that the Escrow Agreement Is a Sham and that the Deposit Assets Stayed within the Control of Highland," Abrams & Bayliss advised: "Daugherty could argue that, even if the Deposit Assets are deemed to be in escrow, the Escrow Agreement left Highland [Highland Capital] with actual control of the Deposit Assets because (1) A&B [Abrams & Bayliss] is Highland's [Highland Capital] counsel, and (2) A&B [Abrams & Bayliss] may resign at any time with the Deposit Assets returning to Highland [Highland Capital]. Daugherty might argue that, despite the language of the Escrow Agreement, A&B [Abrams & Bayliss] will do whatever Highland [Highland Capital] instructs it to do with the Deposit Assets, even if that means disbursing the Deposit Assets contrary to the Escrow Agreement's terms. Paragraph 5 of the Escrow Agreement entitles A&B [Abrams & Bayliss] to resign at any time provided that it gives ten days advance notice. After A&B [Abrams & Bayliss] resigns, it must deliver the Deposit Assets either to the successor escrow agent or to Highland [Highland Capital]. Daugherty might argue that, even if A&B [Abrams & Bayliss] would not disburse the Deposit Assets in contradiction of the Escrow Agreement, A&B [Abrams & Bayliss] might be willing to resign as Escrow Agent in order to return the Deposit Assets to Highland." Said another way, Plaintiff's own lawyers were acting on behalf of Highland Capital at the expense of their client while they stripped it of its assets and charged it for the privilege.

93.    True to form, Highland Capital requested, and on March 25, 2014, Abrams & Bayliss provided, an expanded memo addressing "tangentially related topics." In the expanded

memo, Abrams & Bayliss explained: "Although unlikely, it is conceivable that the court in the Texas Litigation could take issue with the assertion of Plaintiff's counsel that the full amount of the Deposit Assets was held by A&B, when arguably at least, only $1.2 million of the Deposit Assets were truly beyond Highland's control."

94.    Defendants also attempted to conceal the true value of the assets that were supposed to be escrowed on behalf of Plaintiff. When Girard was asked to provide an update on value by Miller, Girard briefed Abrams that, "Girard would prefer not to update the estimated value of the Restoration Capital Funding interest. Highland received a windfall when the jury valued Daugherty's Plaintiff interest at only $2.6 million because Highland believes his former interest in HERA [Plaintiff] is worth more. Schedule 1 currently reflects a value of $3.03 million. If Highland updated Schedule 1 to reflect their current estimates, the Escrow Assets would be worth $3.3 million."

95.    Daugherty suspected that Defendants had lied about the existence of the escrow and on August 24, 2014, served post-judgment discovery requests on Plaintiff and Highland Capital, seeking information concerning the location of Plaintiff's assets and liabilities and its post-litigation conveyances to Highland Capital.

96.    Twenty days later, Plaintiff, at the direction of Dondero and Hurst, filed a Notice of Cash Deposit in Lieu of Supersedeas Bond and Affidavit Establishing Net Worth. Plaintiff submitted the affidavit of Klos, which stated that Plaintiff had a negative net worth of ($2,447,709) after fraudulently applying approximately $7,500,000 of Highland Capital's legal expenses at the time to Plaintiff as of August 31, 2014. Highland Capital also purported to have loaned Plaintiff the cash necessary to repay its own legal expenses owed to Highland Capital because Plaintiff did not have sufficient funds after transferring all of its assets to Highland Capital back on April 30, 2013. However, a footnote to the balance sheet exhibit to the affidavit noted, "Per Escrow Agreement dated December 13, 2013, between HCMLP [Highland Capital]

and Abrams & Bayliss, LLP, if a final, non-appealable judgment against HERA [Plaintiff] is reached, Abrams & Bayliss, LLP as Escrow Agent, will transfer the HERA [Plaintiff] Deposit Assets to HERA [Plaintiff]." The affidavit included a copy of the Escrow Agreement with a schedule again falsely listing escrow assets of: (1) $1,210,502.03 in cash; (2) a limited partner interest in Restoration Capital Partners Fund, LP and (3) cash equivalent of 1088.42 shares of NexPoint Credit Strategies.

97.    Also not revealed until May 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege, Miller emailed Abrams, "do we look bad for claiming to hold non-monetary assets in escrow when on a day-to-day basis we have no idea what the status of these assets are?" Miller was "not looking forward to being deposed."

98.    In order to conceal the fact that no such transfer ever actually occurred, Dondero, Hurst and the Highland Capital minions then directed Plaintiff to object to Daugherty's discovery requests on the basis that it was harassing and argued that its cash deposit limited post-judgment discovery to Plaintiff's net worth. Hurst, doubled down at a subsequent hearing on September 22, 2014, before the court and stated, "everything that's in the sworn financial statement has been provided to the other side and it's been provided to the Court, also came up during trial; that is the exact same assets."

99.    Again on July 10, 2015, Hurst thwarted discovery of Plaintiff's missing assets by filing Highland Employee Retention Assets LLC's Written Objections To Daugherty's Notice of Deposition Upon Written Questions and responding to every question and request for production with the boiler plate response, "Given the procedural posture of the case, with a final judgment and appellant bond on file, the only discovery that may be sought by Daugherty is that directly relevant to the calculation of HERA's [Plaintiff's] net worth. The scope of this request goes well beyond that, seeking information that that [sic] has potential proprietary confidential interests and unduly burdening a third-party."

100.    On December 1, 2016, Hurst and Ellington boasted in the press about a settlement with Nautic Partners regarding breach of fiduciary duty over an indirect investment owned by Plaintiff and other funds in Cornerstone Healthcare Inc. It was not discovered until December 2021 that Dondero, as Chairman of the Cornerstone board, and Ellington, as General Counsel to Highland Capital serving as the investment advisor to the funds that owned interests in Cornerstone, had schemed with Hurst, Katz/HAK/DLAP and Hunton Andrews Kurth to revise their fee structure on the eve of settlement increasing them from an hourly fee that had already reached $6 million to a contingency fee that would pay the lawyers approximately $25 million in fees. Dondero and Ellington then received an $11 million facilitating fee that was wired to their affiliates secretly operating as the SAS platform in the Cayman Islands.

101.    Also on December 1, 2016, Daugherty's judgment against Plaintiff, which had been affirmed on appeal, became final and non-appealable pursuant to the appellate Court's mandate. The appellate court also denied the request to declare that Daugherty's ownership in the preferred units of Plaintiff were extinguished as a result of his damage award. Dondero, Katz/HAK, Ellington, Leventon, Miller, and Abrams reviewed the mandate that day and started the process of shutting down the Escrow and assuring the remaining cash assets were swept from Plaintiff to Highland Capital. A summary of the reconciled emails sent or received from different time zones follows:

102.    From discovery obtained in May 2019, after a Delaware court granted the crime-fraud exception to attorney-client privilege, a series of emails revealed that on December 1, 2016, at 7:51 p.m.: Hunton Andrews Kurth, outside counsel for Highland Capital and now concurrently outside counsel for Plaintiff, emailed Abrams, counsel for Highland Capital, counsel for Plaintiff, and trustee for Plaintiff's escrow: "Kevin , we need to have a call as early tomorrow as possible regarding the escrow arrangements. Can you let me know when you can be available? Also, can you please send us a copy of the escrow agreement?. Abrams responded to the email copying

Miller and Hunton Andrews Kurth lawyers Katz/HAK, James Bookhout, and Isabel Crosby.

103.   December 2, 2016, at 10:03 a.m.: Miller informed Abrams, "The call with Highland's [Highland Capital's] attorneys in the HERA [Plaintiff] litigation was short. Simply put, Highland [Highland Capital] wants to get the funds back to HERA [Plaintiff] and/or Highland [Highland Capital] as quickly as possible in any way we feel comfortable with." Miller proposed several alternatives, including resignation: "Second, we could resign as escrow agent under Paragraph 5 …. This paragraph permits us to return assets directly to the Depositor, which is Highland [Highland Capital]. Highland's [Highland Capital's] attorneys think that a ten-day notice period will not interfere with their garnishment action plans."

Miller outlined for Abrams a step-by-step resignation plan:

1.   Resignation letter from us that states that all deposit assets will be released to Highland [Highland Capital] after the 10-day notice period.
2.   Letter from Highland [Highland Capital] waiving notice period and seeking our confirmation and signature (because paragraph 10 requires all amendments or waivers to be signed by both parties).
3.   Wiring of cash back to Highland [Highland Capital].

Highland [Highland Capital] encouraged Abrams & Bayliss to resign, "As an update to the below, Highland [Highland Capital] would prefer that we resign but before we do to agree in writing that the 10-day notice period is waived." "Hunton Andrews Kurth and [Abrams & Bayliss] were on the same page about the resignation strategy."

104.   December 2, 2016, at 2:52 p.m.: Miller emailed Hunton Andrews Kurth: "As we discussed, attached is the resignation letter we contemplate as the first step of unwinding the escrow."

105.   December 2, 2016, at 4:37 p.m.: Miller emailed Hunton Andrews Kurth: "As an FYI, my banker tells me that 5:30 EST is the cut-off time for a domestic wire; the international transfer cut-off already is passed. I am not optimistic that I will receive the necessary authorizations during the next hour. However, would you mind passing along the Highland [Highland Capital] letter on an FYI basis so that I have the wiring instructions handy?"

106.     December 2, 2016, at 5:08 p.m.: Hunton Andrews Kurth emailed Miller: "Matt, please find attached Highland's [Highland Capital's] signed letter accepting the Escrow Agent's resignation." Miller subsequently informed Abrams, "The second step in the HERA [Plaintiff] strategy is for you to sign the attached letter from Highland [Highland Capital]."

107.     December 2, 2016, at 10:07 p.m.: Miller emailed Ellington: "Scott, please find the attached correspondence regarding the escrow agreement between Highland Capital Management, L.P. and Abrams & Bayliss LLP."

108.     December 2, 2016, at 10:18 p.m.: Katz/HAK emailed Miller: "Matt, attached is correspondence from Scott Ellington accepting the resignation and providing wiring instructions. If you need additional information, please let me know."

109.     December 2, 2016, at 10:19 p.m.: Miller emailed Katz/HAK: "Thanks, Mark. [sic] We will get a counter-signed copy back to you and arrange for wiring the funds."

110.     December 3, 2016, at 10:06 a.m.: Miller emailed Ellington and Katz/HAK: "Scott and Marc, attached please find a counter-signed copy of Scott Ellington's letter."

111.     December 3, 2016, at 2:45 p.m.: Internal Abrams & Bayliss email: "Wells Fargo was unable to initiate the transaction today [a Saturday]. The wire amount required multiple levels of upper management approval so I will go back on Monday morning."

112.     December 5, 2016, at 12:26 p.m.: Miller emailed the team: "Team, As reflected below, the funds A&B [Abrams & Bayliss] was holding in escrow on behalf of HERA [Plaintiff] have been transferred as instructed in Scott Ellington's December 2, 2016, letter."

113.     "Boom!" (emphasis added). That was the reaction of Girard when he learned the Escrow funds "have been received" by Highland [Highland Capital] on December 5, 2016.

### F.  Crime-Fraud Evidence in Delaware

114.     On February 16, 2017, Abrams of Abrams & Bayliss unveiled Defendants' "Highland Employee Asset strategy" to Daugherty:

I write on behalf of Abrams & Bayliss LLP ("Abrams & Bayliss") in response to your letter of February 14, 2017 (incorrectly dated February 14, 2016) regarding my firm's service as escrow agent under an escrow agreement with Highland Capital Management, L.P. ("Highland"), dated December 13, 2013 (the "Escrow Agreement"). Capitalized terms used but not defined herein have the meanings given in the Escrow Agreement.

By letter dated December 2, 2016, Abrams & Bayliss notified Highland that it was resigning as Escrow Agent pursuant to Paragraph 5 of the Escrow Agreement. By letter dated December 2, 2016, Highland informed Abrams & Bayliss that it was (i) accepting Abrams & Bayliss' resignation as Escrow Agent, (ii) waiving the ten-day notice period under Paragraph 5 of the Escrow Agreement, and (iii) directing Abrams & Bayliss to return the Deposit Assets to Highland in accordance with the instructions provided in the letter.

On December 3, 2016, Abrams & Bayliss informed Highland in writing that it agreed to the waiver of the notice period, such that Abrams & Bayliss' resignation was effective immediately. On December 5, 2016, Abrams & Bayliss returned the Deposit Assets to Highland in accordance with the December 2, 2016, instructions. Accordingly, Abrams & Bayliss no longer serves as Escrow Agent or holds Deposit Assets.

115.    On July 6, 2017, Daugherty, having his disputed ownership in Plaintiff's assets recently confirmed by Texas Appellate Court, filed a complaint in Delaware Chancery Court seeking the return of all of Plaintiff's assets, in addition to making claims for fraudulent transfer, breach of fiduciary duties on behalf of Plaintiff, aiding and abetting breach of fiduciary duties on behalf of Plaintiff, and breach of implied covenant of good faith and fair dealing on behalf of Plaintiff, among other claims. Certain defendants moved to dismiss the complaint.

116.    On January 16, 2018, the Delaware Court of Chancery denied the motion to dismiss against Highland Capital and Plaintiff but granted dismissal against Dondero and Highland ERA management, which was controlled by Dondero at the time, on the grounds that evidence against them was "conclusory." At that time, the court was not privy to the evidence that was later produced pursuant to the crime-fraud ruling in May 2019 and the document production by new management at Highland Capital in October 2022 and October 2023. Later, on June 29, 2018, the Delaware Court denied dismissal against Highland Capital but granted dismissal based on laches for the claims arising out of what was known about the 2013 amendments and contemporaneous actions of the Defendants at that time, which was very little.

It was not until October 2022 and October 2023 that Highland Capital, under new management, produced refuting documentation and invoices.

117.     On May 17, 2019, the Delaware Chancery Judge granted a motion to compel stating, "Daugherty has been dogged in his pursuit of these documents, and Highland [Capital] was just as resolute in refusing to produce them." She also stated, "Daugherty has made a prima facie showing that a reasonable basis exists to believe that a fraud has been perpetrated, and that Highland [Highland Capital] sought A&B [Abrams & Bayliss] to serve as escrow agent and to provide legal analysis in furtherance of that fraud; specifically, to protect the escrowed assets from Daugherty while the Texas case was pending, and then to transfer them back to Highland [Highland Capital] after the Texas verdict was finalized. I conclude any privilege Highland [Highland Capital] claims over A&B's [Abram's & Bayliss] legal advice regarding the escrow arrangement and A&B's [Abram's & Bayliss] resignation has been stripped under the crime-fraud exception." She also concluded that Highland Capital, Dondero, Ellington, Leventon, and the other defendants (who were also controlled by Dondero) were "improperly withholding documents," that "there is a reasonable basis to believe" that they perpetrated a fraud—and solicited "the services of attorneys to aid in furtherance of that fraud"—as part of an effort to evade Daugherty's judgment during the pendency of his case. The Vice Chancellor concluded that "defendants, with [counsel's] advice and assistance, were never going to let the assets held in the escrow agreement make their way to Daugherty." Additionally, a Contractual Master was appointed to oversee discovery compliance. It was later discovered in 2021, after Highland Capital filed for bankruptcy, that Leventon concealed the existence of company owned phones used by Dondero and Ellington, as well as a secret server used by many of the defendants or their affiliates to transfer assets. In addition, despite a motion to compel to the contrary, the existence of numerous January 2013 Plaintiff amendments and actions by written consent were concealed by Dondero, Ellington, Leventon, and Surgent until they were finally produced in October 2022

after full ownership of Plaintiff was transferred to Daugherty.

118.    On the second day of a three-day trial, Dondero—for the first time—revealed that

his misconduct as manager of Plaintiff was done at the direction and based on the advice of his

outside and in-house counsel, i.e., the other defendants in this action. He testified, for example:

> Q. Did Highland [Capital] have outside counsel advising with respect to the purchase of the units?
> A. Yes. I believe the whole situation was the most lawyered thing we've ever done. I mean, there was counsel for each of the board members, there was counsel for Highland [Highland Capital], there was counsel for HERA [Plaintiff], there was Delaware counsel. Everything was orchestrated, dictated by counsel.
> Q. Did Highland [Highland Capital] have – did that counsel that Highland [Highland Capital] used also advise counsel on the documents, the transaction documents, relating to those purchases?
> A. Yes. All the functional documents and major moves at various turning points were all at the request – or decided by counsel.
> Q. Did you have any communication – are you familiar with Abrams & Bayliss, with what Abrams & Bayliss is?
> A. I know they're a Delaware law firm. But beyond that, no.
> Q. Did you ever have any communications with Abrams & Bayliss about them resigning as escrow agent?
> A. No. Highland [Highland Capital] and myself, I know, were purposely kept separate from this whole thing. And it was driven by – it was driven by counsel.
> Q. My question is a little bit more specific because it relates to the escrow assets and Mr. Daugherty. If you had been told by counsel that Mr. Daugherty was entitled to the escrow assets, you would have given him the escrow assets; right?
> A. Yes. We would have done whatever counsel told us. We tried very hard to compartmentalize this mess. We have a business to run. And this is – a half dozen lawsuits, haranguing everybody in public, it was all intended to disrupt our business as much as possible. So we tried to delegate it and compartmentalize it to the lawyers as much as possible.
> Q. Let's talk about which lawyers you're referring to. So I'll start with the in-house lawyers again. Which in-house lawyers of Highland [Highland Capital] are you relying on with respect to the transfer of the escrow assets?
> A. It would have been the same three internal lawyers working with external counsel.
> Q. Mr. Ellington, Mr. Leventon, and Mr. Surgent; is that right?
> A. I believe so. I believe they were the ones at that time and place.
> Q. Which outside counsel are you relying on?
> A. I don't know if Andrews and Kurth had merged with Piper. I don't know who else was involved besides the Abrams guys. But it would have been, more likely than not, those two counsels with whatever other counsel was representing some of the people who were sued individually.

## G. Highland Capital Bankruptcy

119.    The following day, on October 16, 2019, Highland Capital at the direction of

Dondero and Ellington, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware. On December 4, 2019, the Delaware Court entered an order transferring venue of the case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. As a result, the Delaware action was stayed.

120.    On January 9, 2020, the Highland Capital Creditors Committee demanded and the Court approved a change of control of Highland Capital, which involved the removal of Dondero as the sole director and the appointment of James P. Seery ("Seery"), John S. Dubel ("Dubel"), and retired Judge Russell F. Nelms ("Nelms") as independent directors (the "Independent Directors" and collectively, the "Independent Board") of Strand Advisors, Inc., Highland Capital's general partner (the "General Partner"). The Independent Directors were granted exclusive control over Highland Capital and its operations during the pending bankruptcy proceedings.

121.    On July 16, 2020, the Court approved Highland Capital's motion to appoint Independent Director Seery, as Highland's CEO and CRO.

122.    On October 9, 2020, Dondero was further instructed to resign or face removal as an employee of Highland Capital and as portfolio manager for all Highland Capital managed funds due to his detrimental conduct to the firm and its creditors.

123.    Highland Capital's bankruptcy was unique because all of the largest creditors' claims stemmed from litigation claims and judgments against the firm, not debt holders. Indeed, Dondero, Ellington and Leventon expected to use the bankruptcy process to once again thwart recoveries while keeping themselves in control. Dondero later complained to Seery, "I'm not getting the Chapter 11 experience," as if he were somehow supposed to benefit from the failure of the company he managed. To the contrary, bankruptcy revealed a litany of terrible acts through a pattern of recurring conduct resulting in well over $1.4 billion dollars in litigation and arbitration claims and over $50,000,000 in legal fees.

124.    In January 2021, it was discovered that Dondero had been secretly coordinating

with Highland Capital's then-counsel Ellington and Leventon to direct the affairs of Highland Capital, despite his dismissal. When the Court entered an order restraining Dondero from communicating with Highland Capital employees, Dondero flouted the order by communicating with Ellington and Leventon and instructing other employees to resist document production requests, even though those documents were kept on Highland Capital's computer system.

125.    Ellington and Leventon we terminated for cause on January 5, 2021, for acting in manner adverse to Highland Capital's interests.

126.    Dondero, Ellington and Leventon evinced no respect for Highland Capital as an entity separate and apart from themselves. The bankruptcy also revealed discovery misconduct during the Delaware action with Daugherty, including a secret server that Dondero, Ellington, Leventon and others routinely used, which was concealed during discovery in the Delaware action with Daugherty. Additionally, the bankruptcy court twice found Dondero in contempt for violating a temporary restraining order. During testimony at the first show cause hearing, it was revealed that Dondero and Ellington destroyed their cell phones that were provided by Highland Capital. Yet, in the Delaware action with Daugherty, Leventon testified at his custodian of records deposition that Highland Capital did not "have access to people's phones" and that Highland Capital did not own any cell phones for the custodians.

127.    On February 8, 2021, the Court agreed to confirm Highland Capital's bankruptcy plan, and the Court entered its plan Confirmation Order on February 22, 2021.

128.    On August 11, 2021, Highland Capital's bankruptcy plan, as amended to date, became effective, and as a result, Highland Capital's ownership was restructured. Highland Capital became a wholly owned subsidiary of the Highland Claimant Trust, a newly formed liquidating trust owned by the creditors of Highland Capital. Specifically:

- The Highland Claimant Trust became the sole limited partner of Highland Capital.

- HCMLP GP LLC replaced Strand Advisors, Inc. as General Partner of Highland Capital. HCMLP GP LLC is also a wholly owned subsidiary of the Highland

Claimant Trust.

- Seery serves as the Claimant Trustee of the Highland Claimant Trust and remains the CEO of Highland Capital today. Dondero and Okada are no longer involved in the management of Highland Capital or the Claimant Trust.

129.    In the Bankruptcy, Daugherty filed claims estimated in excess of $40,000.000.00. In November 2021, Daugherty reached a settlement with Highland Capital for some of his claims and specifically retained the right to pursue Defendants in future litigation, i.e., this current lawsuit for these claims.

130.    On March 1, 2022, during the settlement hearing, Highland Capital finally acknowledged, "Dondero, through Highland Capital, engaged in an asset-stripping campaign designed to render Plaintiff judgment-proof, further exposing Highland Capital to liability and unnecessary legal costs." Highland's new CEO, James Seery, testified:

> It actually looks like, frankly, the escrow was never really an escrow, and it was a –- it was a fraud from the beginning. And that one's a pretty disturbing one.

131.    On April 1,2022, full ownership of Plaintiff and Highland ERA Management was transferred to Daugherty and his affiliates.

132.    On May 11, 2022, Plaintiff instructed Abrams & Bayliss, Hunton Andrews Kurth, DLA Piper, Marc Katz/HAK/DLA, and Michal Hurst to forward all of its casefiles, records and invoices allocated to Plaintiff.

133.    True to form, Hunton Andrews Kurth responded by letter on May 25, 2022, "Our records and research indicate that the Firm represented ERA and/or HERA [Plaintiff] in connection with only two matters. The first matter was opened on June 1, 2012, for which our records indicate we represented Highland Capital Management, LP ("Highland") and HERA [Plaintiff], and for which only 1.6 hours of attorney time was recorded. We have located no files for this matter other than an electronic record of the recorded time." They made this statement despite Katz/HAK/DLAP representing before the Delaware court that Plaintiff incurred millions of dollars in legal expenses, including those from his firm, making it insolvent.

134.    Hunton Andrews Kurth continued, "Additionally, given that Daugherty now wholly owns and controls HERA [Plaintiff] and ERA, we believe we are constrained in what we may transfer. Your HERA [Plaintiff] and ERA file transfer request equates to Daugherty gaining access to his litigation adversaries' attorney's files. In this unique circumstance of a litigant seeking his adversary's attorney's file by acquiring control of one (or more) of his litigation adversary's attorney's former jointly represented clients, the case law we have reviewed favors protecting the co-client's justified expectation that its attorney's files will not be disclosed to its litigation adversary." Said another way, after invoicing millions of dollars in legal fees that were allocated to Plaintiff, Hunton Andrews Kurth continues to conceal their conduct by claiming some privilege based on jointly representing Highland Capital, Dondero and Plaintiff. Tellingly, Hunton Andrews Kurth could produce no retention agreement that named Dondero as a client nor did Dondero pay a single dollar for any such legal expenses. However, Plaintiff was allocated over 93% of the fees invoiced to Highland Capital.

135.    DLA Piper delayed until July 22, 2022, to make the following similar response, "Second, as you know, DLA's representations of HERA [Plaintiff] and ERA in the Daugherty Case were joint representations in which DLA also represented HCMLP [Highland Capital] and Mr. Dondero. Mr. Daugherty is still adverse to Mr. Dondero in the Daugherty case and in Daugherty v. Dondero, No. 2019-0956 (Del. Ch.). That means that your request for the client file would result in DLA providing to one litigation party the privileged and work product-protected communications of its litigation adversary. Such a production "would be anathema to the principles underlying the policy of fostering unfettered attorney-client communication." Again, DLA Piper made this response despite having millions of dollars of its fees allocated to Plaintiff, representing Plaintiff in Delaware court, and producing no retention agreement that listed Dondero as a client or that he ever paid anything for the alleged representation.

136.    Hurst never responded to Plaintiff's file and document request.

137.   It was not until October 2022 and October 2023, after Plaintiff received documents from Highland Capital and Abrams & Bayliss pursuant to two books and records requests, that extensive billing fraud was revealed at the expense of Plaintiff at the hands of its lawyers Katz/HAK/DLAP, Hurst, Hunton Andrews Kurth, Abrams & Bayliss and others. Indeed, financial records and information from Highland Capital reveal that over $14,000,000 of expenses for other matters were allocated to Plaintiff, and its lawyers were aware of it.

138.   Shockingly, Highland Capital and its partners, including Dondero, Okada, the Defendant trusts, Ellington, Boyce, Britain, Dougherty, Honis, Parker, had taken the tax benefits of these expenses with the assistance of Surgent, Leventon, Girard, Waterhouse, Swadley and Klos as though they were their own, despite knowing that the obligations to pay were allocated to Plaintiff. Surgent explained to Abrams & Bayliss that they did not want Daugherty to get the tax benefit of the expense/loss pass-throughs so they made the legal expense allocations effective after they received their 2013 buy-out proceeds.

139.   Not surprisingly, when the details of the fraud were discovered, new management of Highland Capital realized a charge to the Plaintiff capital accounts in excess $10 million as an offset to write off over $10 million of falsely allocated debt resulting in a loss of capital account basis that could have been used by Plaintiff and its unit holders for tax purposes.

## H.  A Recurring Theme

140.   This above-described acts are simply yet another example of an all-too familiar pattern where Dondero, Okada and Ellington strip the assets of entities they controlled to ensure that an aggrieved party could not collect on its hard-fought judgments or its rights of ownership. When challenged, they execute their well-honed tactics to lie, deny, conceal, and postpone, while attempting to exhaust their adversaries of funds as they ran out the clock. In this case, Plaintiff brings this action to recover tens of millions of dollars in damages that it suffered at the hands of Dondero, Okada, Ellington, and their enablers, acting in concert with other entities that they

owned and/or controlled and with the aid of Plaintiff's own officers, directors and attorneys at the time who disregarded their duties to Plaintiff in favor of their own self-interests.

141.    Plaintiff was stripped of its assets as retaliation against Daugherty for his assistance in recovery efforts of the following related matters:

### 1.  Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry

142.    In 2010, Dondero and Okada formed Acis Capital Management, L.P. ("Acis") and Acis Capital Management GP, LLC ("Acis GP") as a "lifeboat" to divert collateralized loan business fees from Highland Capital after its lenders placed security liens on its assets. Dondero was President both of Acis and Acis GP. Okada was Chief Investment Officer for all funds including those of Acis. Collectively, they controlled the investment and operating decisions of the Acis platform. Acis was initially indirectly owned by Dondero and Okada (through Highland Capital Management Services, Inc). Joshua Terry ("Terry"), a Highland Capital employee, later joined the platform in 2011 to manage Acis after its previous managers left Highland Capital. Like Plaintiff, Acis had no employees. Highland Capital was the investment manager for Acis, and Acis performed all of its services through Highland Capital employees. In 2013, Dondero modified Terry's ownership in Acis. As a result, Dondero and Okada, with the help of the Highland Capital legal team, once again engaged in a scheme to siphon value from Acis and transfer it back to Highland Capital.

143.    By 2016, Dondero and Terry came to an impasse. Dondero sought to improperly finance a latex company investment in South America by causing a separate portfolio company, Trussway Industries Inc. ("Trussway"), to incur unnecessary debt and divert the loan proceeds to finance the purchase. Terry criticized the misconduct as a breach of their fiduciary duties to their investors. Dondero responded by firing him and making a pretextual claim of termination for "cause." Dondero also amended the partnership agreement to terminate Terry's interests in Acis and directed Acis to sue Terry in Texas state court. Terry counterclaimed and demanded

arbitration.

144.    On October 20, 2017, following a ten-day arbitration, the arbitration panel issued

Terry an award of $7,949,749.15, plus interest, against Acis. The arbitration panel found, among

other things, that (i) Terry's termination was "without cause," and Acis had "knowingly and

willfully" invoked Highland Capital's false pretext of "for cause" in order to deny Terry his

contractual entitlement to the value of his Acis partnership interest, (ii) Acis had breached its

limited partnership agreement, and breached the fiduciary duties it owed to Terry as Acis's

limited partner, (iii) beginning in 2013, Dondero had caused Acis to pay Highland Capital more

than its contractual entitlement for shared expenses in order to reduce the amount of Terry's

limited partnership distributions, and (iv) one month after Terry was terminated from Acis,

Dondero significantly increased the amounts that Acis was paying Highland Capital under their

shared services and sub-advisory agreements, retroactive to January 1, 2016.

145.    Beginning on October 24, 2017—four days after Terry's arbitration judgment was

issued—Dondero, acting through Highland Capital, and with the aid of Ellington, Leventon, and

Surgent, entered into numerous transactions designed to take control of Acis's assets and

business and strip Acis of assets so that it would be unable to pay Terry's arbitration award.

146.    Dondero's elaborate schemes to render Acis judgment-proof led Terry to file

involuntary petitions for protection under chapter 11 of the United States Bankruptcy Code

against Acis and Acis GP on January 30, 2018. In response to the bankruptcy filings, Dondero

caused Highland Capital, which served as the sub-advisor to the Acis CLOs, to grossly

mismanage the Acis funds following the appointment of a chapter 11 trustee in the Acis

bankruptcy case. This abrogation of duties caused the chapter 11 trustee to replace Highland

Capital with Brigade Capital Management, LP ("Brigade") and Cortland Capital Markets

Services LLC ("Cortland").

147.    Dondero also caused Highland Capital to commence litigation against the Acis

chapter 11 trustee, prompting a countersuit pursuant to which the chapter 11 trustee sought to recover fraudulent transfers Dondero had directed (through Highland Capital) and to stop Highland Capital from engaging in a course of conduct that was harmful to Acis and the Acis CLOs. This led to the entry of a temporary restraining order against Highland Capital, which Dondero caused Highland Capital to violate.

148.    Daugherty communicated with Terry on several occasions regarding the extreme means utilized by Highland Capital against Daugherty, including sending constables to his home to execute collection efforts under false pretenses, stripping Plaintiff of its assets, and seeking to have Daugherty incarcerated. For the legal services provided by Hurst, Katz/HAK/DLAP for attacking Daugherty on behalf of Highland Capital, Plaintiff was allocated the bill.

### 2. Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest

149.    Dondero and Ellington fraudulently induced an investment from third party investors HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). At the same time that Dondero was surreptitiously transferring valuable rights associated with the Acis funds away from Acis in order to evade Terry's arbitration award, he and Ellington were using Highland Capital to induce the HarbourVest Entities to purchase 49.9% of HCLOF—the owner of the equity tranche of the Acis CLOs—from CLO Holdco for approximately $75 million in cash, with a commitment to invest an additional $75 million in HCLOF. In soliciting this investment, Dondero and Ellington failed to disclose material facts to HarbourVest regarding the Terry disputes and Acis frauds, thus exposing Highland Capital to substantial and unnecessary liability.

150.    In inducing HarbourVest's investment, Dondero and Ellington, purportedly acting through Highland Capital, made numerous misrepresentations and omissions, including: (1) failing to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million

arbitration award against it, including by causing Acis to consummate a series of fraudulent transfers; (2) misrepresenting the reasons that Dondero changed the name of the holding company for the Acis CLOs from Acis Loan Funding, Ltd. ("ALF") to HCLOF immediately prior to the HCLOF Investment; and (3) expressing confidence in HCLOF's ability to reset or redeem the CLOs under its control, when in actuality Dondero's actions to evade Terry's arbitration award against Acis resulted in Acis's bankruptcy, and rendered the resets impossible.

151.    Moreover, unbeknownst to HarbourVest, Dondero intended for CLO Holdco to use the $75 million that it received from HarbourVest to make investments in other Dondero controlled and owned entities, including entities managed by NexPoint and HCMFA. Thus, the HarbourVest investment benefited Dondero personally, but left Highland Capital exposed to hundreds of millions of dollars in potential damages to HarbourVest.

152.    At various times in the Highland Capital bankruptcy, Daugherty coordinated with HarbourVest on an ad hoc steering committee basis to identify and seek the return of the assets looted from Highland Capital's estate, HarbourVest and Plaintiff.

### 3.  Willful Misconduct in the Transfer of Highland Capital Credit Strategies Fund's Assets to Dondero, Okada and Ellington Controlled Entities

153.    Another instance involved the Highland Capital Credit Strategies Fund judgment. In that case, Highland Capital was found to have engaged in distinct types of misconduct, where Dondero also personally threatened the redeemer committee's personnel with retribution. The most important aspect of the misconduct is that Highland Capital and Dondero effectively moved the assets to other Highland Capital–controlled entities for far less than their actual value. In fact, Highland Capital paid even less for the interest ($24 million) than it had marked the value on its own books ($28 million) and far less than valuations done by third parties, even those hired by Highland Capital (up to $37 million). Highland Capital did so in secret and the redeemer committee only found out when a line item referring to the $24 million as "Cornerstone sale proceeds" showed up in a regular cash report to the redeemer committee. An arbitration panel

found that Highland Capital not only breached its obligations under the Plan of liquidation but engaged in willful misconduct in its sale of the Fund's Cornerstone equity. The panel found Highland Capital's explanations to excuse its conduct "to put it mildly, far-fetched."

154.    Daugherty communicated several times with members of the Highland Capital Credit Strategies Fund regarding his views of the value and location of their assets pursuant to his ongoing fiduciary duties under the 1940 Advisors Act. In addition, his countersuit against Highland Capital revealed numerous acts of fraud and breaches of fiduciary duty that caused damage to Highland Capital Credit Strategies Fund. Dondero, Ellington, Leventon, Hurst, and Katz/HAK/DLAP embarked on a crusade to smear Daugherty and his law firm while filing numerous baseless show cause motions against him. In addition, the services of the Ashcroft Law Firm ("Ashcroft") were retained to conduct an independent "investigation" into the allegations made by Daugherty. Daugherty was never interviewed and not surprisingly, Ashcroft produced a report that absolved Highland Capital. The arbitration panel disagreed and found in favor of Highland Capital Credit Strategies Fund for over $30,000,000.00 in damages resulting from willful misconduct and breach of fiduciary duty. Once again, for these dubious legal services provided by Hurst, Katz/HAK/DLAP and other firms on behalf of Highland Capital, Plaintiff was allocated the bill.

### 4. Willful Misconduct in the Transfer of Highland Crusader Fund's Assets to Dondero, Okada and Ellington Controlled Entities

155.    Dondero, Ellington, and Leventon also engaged in misconduct relating to Highland Capital managed funds Highland Offshore Partners L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Crusader Funds"). Highland Capital had placed the Crusader Funds into wind-down in October 2008. Investors in the funds subsequently commenced lawsuits alleging breach of fiduciary duty claims against Highland Capital, based on allegations that Dondero had refused to make mandated distributions and honor redemption requests, and traded the funds' positions in a

manner designed to render them illiquid in order to deter future redemptions, which led to multiple disputes among redeeming investors. Certain of these lawsuits were resolved in July 2011, when the parties entered into a Joint Plan of Distribution of the Crusader Fund and a Scheme of Arrangement for its creditors (together, the "Joint Plan and Scheme"). As part of the Joint Plan and Scheme, a committee referred to as the "Redeemer Committee" was elected from the Crusader Funds' investors to oversee Highland Capital's wind-down of the Crusader Funds and distribution of proceeds to investors.

156.   On July 5, 2016, the Redeemer Committee (i) terminated Highland Capital as investment manager; (ii) filed a complaint in Delaware Chancery Court against Highland Capital seeking a limited status quo order, a declaration that the Redeemer Committee had "cause" to terminate Highland Capital as manager, and a declaration that Highland Capital had forfeited any right to indemnification as a result of its failure to distribute proceeds to investors of various funds; and (iii) commenced an arbitration proceeding (the "Redeemer Arbitration") against Highland Capital alleging that it had engaged in various forms of misconduct in its role as investment advisor. After two years of arbitration proceedings, the Redeemer Arbitration culminated in a nine-day evidentiary hearing in September 2018 that included testimony from eleven fact witnesses and four expert witnesses. On March 6, 2019, the arbitration panel issued an award in favor of the Redeemer Committee, which resulted in gross damages of $136.8 million and total damages (including interest) of $190.8 million. Ultimately, the panel awarded ten forms of damages: (1) the Deferred Fee Claim ($43,105,395); (2) the Distribution Fee Claim ($22,922,608); (3) the Taking of Plan Claims ($3,277,991); (4) the CLO Trades Claim ($685,195); (5) the Credit Suisse Claim ($3,660,130); (6) the UBS Claim ($2,600,968); (7) the Barclays Claim ($30,811,366); (8) the Legal Fees, Costs, and Expenses Claim ($11,351,850); (9) the Portfolio Company Award ($71,894,891); and (10) the Administrative Fees Award ($514,164).

157.   The claims that were asserted against Highland Capital by the Redeemer

Committee stemmed from the various breaches of fiduciary duty to the Crusader Funds that Dondero, Ellington, and Leventon caused Highland Capital to commit. For example, the "Barclays Claim"—which gave rise to over $30 million in liability for Highland Capital—arose out of Dondero, Ellington, and Leventon causing Highland Capital to transfer Barclays' limited partnership interests in the Crusader Funds to Highland Capital's wholly-owned affiliate, Eames, after the Redeemer Committee had already refused to approve that transfer. In so doing, Dondero, Ellington, and Leventon caused Highland Capital to violate the Joint Plan and Scheme and its fiduciary duties. Because of Dondero, Ellington, and Leventon's wrongful conduct, Highland Capital was ordered to pay: (1) over $30 million on account of disgorged partnership interests; (2) additional sums for disgorgement of distribution fees (that were included within the $22.9 million Distribution Fee Award); and (3) interest, fees, and expenses incurred in connection with the arbitration.

158.    In addition, from December 2013 through January 2016, Dondero, Ellington, and Leventon caused Highland Capital to purchase 28 Plan Claims from Crusader investors in violation of the Redeemer Committee's right of first refusal ("ROFR"). During this time, Leventon told multiple investors interested in transfers of their interests that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. Leventon also made affirmative misrepresentations to the Redeemer Committee to disguise the fact that Highland Capital had purchased the Plan Claims. Pursuant to the arbitration award, Highland Capital was required to transfer the 28 Plan Claims to the Redeemer Committee, and to disgorge to the Committee whatever financial benefits Highland Capital obtained from the 28 transactions, plus interest at the rate of 9% from the date of each purchase.

159.    Dondero's, Ellington's, and Leventon's conduct also resulted in Highland Capital becoming liable to the Redeemer Committee for over $71 million in connection with claims arising from the Cornerstone Healthcare Group Capital ("Cornerstone") that was owned, directly

and indirectly, by Highland Capital. Some of Cornerstone's stock was owned by the Crusader Funds. Dondero, Ellington, and Leventon caused Highland Capital to covertly purchase shares in Cornerstone from another fund that Dondero controlled at below-market prices and failed to liquidate the Crusader Funds' shares in Cornerstone as their fiduciary duties required. Pursuant to the arbitration award, Highland Capital was required to purchase the Crusader Funds' shares in Cornerstone at a fixed price of $48,070,407, and to pay pre-judgment interest that brought the total claim to $71,894,891.

160.    Additionally, the Joint Plan and Scheme required Highland Capital to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete. Dondero, Ellington, and Leventon caused Highland Capital to violate that provision of the Joint Plan and Scheme by causing Highland Capital to surreptitiously transfer approximately $32 million in Deferred Fees from the Crusader Funds' accounts on January 21 and April 6, 2016. The arbitration panel ruled that as a consequence of Dondero's, Ellington's, and Leventon's blatant breach of the payment requirements of the Joint Plan and Scheme, Highland Capital forfeited its right to these fees entirely.

161.    The Redeemer Committee set a hearing in Delaware Chancery Court for October 8, 2019, to obtain entry of a judgment with respect to the award. The hearing was subsequently continued to October 16, 2019, before the same court presiding over the Daugherty causes involving Dondero, Highland Capital, Ellington, Leventon, Girard, Hurst, and Katz/HAK/DLAP. That morning, Highland Capital filed for bankruptcy.

162.    Daugherty communicated several times with members of the Highland Crusader Fund regarding his views of the value and location of their assets pursuant to his ongoing fiduciary duties under the 1940 Advisors Act. In addition, his countersuit against Highland Capital revealed numerous acts of fraud and breaches of fiduciary duty that caused damage to Highland Crusader Fund. Dondero, Ellington, Leventon, Hurst, and Katz/HAK/DLAP

embarked on a crusade to smear Daugherty and his legal counsel while filing numerous baseless show cause motions against him. In addition, Ashcroft was retained to conduct an independent "investigation" into the allegations made by Daugherty. Daugherty was never interviewed and, not surprisingly, Ashcroft produced a report that absolved Highland Capital and its officers. The arbitration panel disagreed and found in favor of Crusader Funds for over $190,000,000 in damages resulting from willful misconduct and breach of fiduciary duty among other things. Once again, for these dubious legal services provided by Hurst, and Katz/HAK/DLAP in attempting to silence Daugherty on behalf of Highland Capital, Plaintiff was allocated the bill.

### 5. Dondero And His Accomplices, Including Ellington, and Leventon, Cause Highland Capital To Engage In Misconduct That Increases Its Liability To UBS

163.    In March 2017, the New York state court presiding over UBS's claims against Highland Capital and other fund counterparties ruled its claims could proceed to trial after numerous filings and dismissals since 2009. Shortly thereafter, Dondero, Ellington, and Leventon, along with Highland Capital employees Jean Paul Sevilla ("Sevilla"), Katie (Irving) Lucas ("Irving"), and Matthew DiOrio ("DiOrio") took steps to transfer the fund counterparty's remaining assets to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands entity indirectly owned and controlled by Dondero and Ellington, in order to ensure that such assets would be out of UBS's reach in the event that a judgment was entered in its favor.

164.    In or around August 2017, Dondero, Ellington, Leventon, Sevilla, Lucas, and DiOrio orchestrated the surreptitious transfer of all of the fund counterparty's assets—with a face amount of $300 million and a market value of at least $100 million —to Sentinel.

165.    The pretextual justification for these transfers was to satisfy a $25 million premium on an "after the event" insurance policy issued by Sentinel that insured the fund counterparty's first $100 million of liability to UBS. The real goal of the transfer, however, was to drain the fund counterparty's assets and render them judgment-proof, while keeping the assets

within Dondero's and Ellington's control. There is no legitimate explanation as to why the funds transferred assets worth at least four times the premium payment to Sentinel. And given that Dondero and Ellington indirectly own and control Sentinel, they personally and improperly benefitted from this overpayment.

166.    Moreover, Ellington and Leventon (along with Sevilla, Lucas, and DiOrio) actively concealed the transfer of assets and the existence of the insurance policy from the new Highland Capital management independent board ("Independent Board"), apparently in order to prevent the Fund Counterparties from making a claim under the policy. Indeed, Leventon, who was directly involved in the transfers to Sentinel, was tasked with educating the Independent Board about UBS's claim and the assets potentially available to satisfy it. In response, Leventon delivered an extensive—but intentionally misleading—presentation to the Independent Board that said nothing about the August 2017 asset transfer and the Sentinel insurance policy and lied to Highland Capital regarding the Fund Counterparties' assets. Additionally, around the same time that Ellington and Leventon were hiding this secret insurance policy from the Independent Board, (i) Ellington charged the policy for personal expenses in excess of $500,000 that bore no relation to the UBS litigation and provided no benefit whatsoever to the Fund Counterparties or Highland Capital; and (ii) Ellington and Leventon, among others, entered into agreements whereby Sentinel agreed to pay attorneys' fees and expenses they incurred in connection with Highland Capital's bankruptcy.

167.    As a direct result of Ellington's and Leventon's fraudulent concealment of the transfers to Sentinel, Highland Capital inadvertently made factually inaccurate statements to the Bankruptcy Court and incurred millions of dollars in additional fees litigating (rather than settling) with UBS. In March 2021, after the policy was uncovered through Highland Capital's diligence (notwithstanding Ellington's and Leventon's cover-up), the CDO Fund made a claim on the policy. To date, Sentinel has refused to make any payments.

168.    Daugherty communicated several times with members of the UBS team regarding his views of the value and location of their assets pursuant to his ongoing fiduciary duties under the 1940 Advisors Act. In addition, his countersuit against Highland Capital revealed numerous acts of fraud and breaches of fiduciary duty that caused damage to UBS. Dondero, Ellington, Leventon, Hurst, and Katz/HAK/DLAP embarked on a crusade to smear Daugherty and his counsel while filing numerous baseless show cause motions against him. In addition, Ashcroft was retained to conduct an independent "investigation" into the allegations made by Daugherty. Daugherty was never interviewed and not surprisingly, Ashcroft absolved Highland Capital in its report.

169.    On February 10, 2020, the New York state court disagreed with the Ashcroft report and issued a judgment against the Highland Counterparties in connection with the phase one litigation in the principal amount of $519,374,149, plus $523,016,882.79 in prejudgment interest, for an overall judgment of $1,042,391,031.79. Trial on UBS's claims against Highland Capital was still pending when HCMLP filed for bankruptcy on October 16, 2019 (as discussed infra).

170.    Once again, for these dubious legal services provided by Hurst, Katz/HAK/DLAP, on behalf of Highland Capital, Plaintiff was allocated the bill.

**V.**
**CAUSES OF ACTION**

**COUNT ONE: BREACH OF FIDUCIARY DUTY #1 – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – THE BOARD MEMBER GROUP DEFENDANTS**

171.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

172.    Boyce, Britain, Dameris, Dougherty, Ellington[3] and Honis (collectively, the

---

[3] There is a dispute as to whether Ellington was ever properly a board member due to the timing of the "election"

"Board Member Group") had a fiduciary relationship with Plaintiff as they served on the board of directors of Plaintiff.

173.    The above described buy out and asset stripping scheme of 2013 was nothing more than a ruse to strip Plaintiff of its assets and its distributions for the benefit of Dondero, Okada, Boyce, Collins, Honis, Ellington, Leventon, Girard, and Waterhouse (collectively, "Highland Capital Officers and Employees Group").

174.    Plaintiff discovered in 2022 that Dameris began the scheme with Dondero in December 2012 to strip Plaintiff of its assets for no value by collaborating with Abrams & Bayliss to "…. offer everyone but the 1 a buyout…." Plaintiff but did not learn that Abrams & Bayliss was "Delaware Counsel" until 2022 invoices when some of the invoices were finally provided⌉

175.    Further, Plaintiff discovered in 2022 that in January 2013, Abrams and Bayliss, Boyce, Britain, Ellington, Dameris, Honis, Hurst, Katz and HAK, discussed, coordinated, prepared and reviewed documents prepared for Plaintiff to execute the scheme to strip Plaintiff of its assets for no value and transfer those assets to Highland Capital for the benefit of Highland Capital and the Highland Capital Officers and Employees Group and the Defendant Trusts.

176.    They revealed their culpability by racing to create broad releases and indemnifications rights for themselves on January 17, 2013, as they attempted to facilitate the buyout.

177.    Plaintiff discovered in 2022 that after the buyout, Leventon and Goldsmith identified over $14 million in assets and distribution transfers to Highland Capital and then Leventon lied under oath in multiple courts that such transfers of "non-certificated" limited partnership interests were simply not possible.

178.    Further, Plaintiff discovered in 2022 that just prior to the Texas Litigation,

---

and thus whether his vote counts and if it did so when it counted; however, that notwithstanding he took actions as a board member and is thus included in this group.

Dondero, Ellington, Leventon, Hurst, Brown, Abrams & Bayliss, Katz/HAK colluded in
December 2013 to manufacture false and misleading evidence that an escrow account was created
to hold over $3 million to be paid to Plaintiff upon final resolution of the Texas Litigation.

179.    Plaintiff discovered in 2022 that Dameris concealed the value of Plaintiff's assets
by saying to Highland Capital colleagues about one particular asset, "I hope he [Daugherty]
does not find out about the parking garage deal value". During the Texas trial in 2014, Hurst,
Brown and Dondero presented multiple lies about the timing and amount of the escrow to gain
advantage for themselves by misleading the judge and jury. Dondero also lied when he testified
at the Texas trial that the escrow assets "First go to HERA [Plaintiff]…." Dondero also lied
when he testified that the delay caused in funding the escrow for Plaintiff was due to the
illiquidity of the escrowed assets when no such assets were ever transferred to the escrow, and
in fact the same assets were immediately transferred to Highland Capital purportedly in April
2013.

180.    Plaintiff further discovered in 2022 that Abrams & Bayliss knew that Hurst and
Brown stated false facts to the jury in the Texas Litigation regarding the assets in the escrow
account and that they were falsely representing the contents therein. They also knew that
"Highland is happy for Daugherty to be distracted by another front of warfare in Delaware while
he is also fighting the appeal in Texas…… Playing obstructionist in Delaware and then filing
the Texas bond after-the-fact if Daugherty seems to be succeeding might be fun for Highland,
but I think it harms our credibility."

181.    Plaintiff, discovered in 2022 that Miller of Abrams & Bayliss had the audacity to
ask, "Do we look bad for claiming to hold non-monetary assets in escrow when on a day-to-day
basis we have no idea what the status of these assets are? I personally am not looking forward to
being deposed, even if I do know the questions ahead of time but will do it if I have to." Miller
also acknowledged, "…although Highland doesn't seem to care what the Texas trial judge thinks

of it, does Highland lose credibility with the Texas court if the Texas court pierces the escrow account and finds HERA's previous representations that the funds being held in escrow were false?"

182.    Moreover Plaintiff discovered in 2022 that later in 2014, Girard colluded with Abrams & Bayliss further to conceal the true value of the escrow assets on behalf of Plaintiff that were previously presented to the Texas Litigaiton jury so that Highland Capital could collect a "windfall."

183.    During the Delaware litigation in 2019 Dondero testified at trial that he was relying on the advice of counsel, who are co-Defendants in this action, with respect to the buyout of all Plaintiff unit holders except Daugherty, the purported assignment of all assets from Plaintiff in 2013, and the taking of assets from Plaintiff in December 2016, all of which formed part of the fraud that was consummated in December 2016.

184.    The Board Member Group breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own by failing to evaluate the buyout offer for fairness.

185.    The Board Member Group breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own by failing to disclose all material facts about the buyout offer including that the board members were controlled by Highland Capital and that Boyce, Britain, and Honis were partners of Highland Capital.

186.    The Board Member Group breached its fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own by

knowing that the buyout offer had been tendered and doing nothing to assure full disclosure of the buyout offer.

187.    The Board Member Group breached their fiduciary duties to Plaintiff. specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own by doing nothing to challenge, and in fact facilitating, the Dondero-led buyout by Highland Capital and allowing a "creeping takeover" unobstructed by a standstill agreement or poison pill.

188.    The Board Member Group breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation, duty to place the corporations interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by failing to require abstention from conflicted board members who were simultaneously partners and employees of Highland Capital and stood to gain by acquiring the assets of Plaintiff at a substantial discount.

189.    The Board Member Group breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by attempting to acquire broad releases and indemnifications rights for themselves to protect against liability caused by their breaching of fiduciary duties by allowing the buyout or creeping takeover to occur.

190.    The Board Member Group breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by

ignoring Plaintiff's existing governance at the time of the buyout, which prohibited a buyout or purchase by Highland Capital. The Board Member Group instead negotiated for their own individual buyout, abdicated their duties as board members, accepted the buyout, surrendered their rights in Preferred Units of Plaintiff pursuant to the terms of the Transfer Agreement, and automatically surrendered their positions as board members of Plaintiff leaving Plaintiff with no one except Abrams & Bayliss, Hurst, Brown, Katz, Andrews Kurth, Highland Capital Officers and Employees Group to conduct its affairs.

191.    The Board Member Group breached their fiduciary duties to Plaintiff specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by participating in a scheme to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

192.    The Board Member Group breached its fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

193.    The Board Member Group breached its fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by causing Plaintiff to incur unnecessary legal expenses so that Dondero could use Plaintiff's

relationship with Daugherty to exact his vengeance on Daugherty.

194.    The Board Member Group breached its fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by allocating legal expenses incurred by Highland Capital to Plaintiff.

195.    The Board Member Group's breaches proximately caused injury to Plaintiff in forcing it to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT TWO: BREACH OF FIDUCIARY DUTY #2 – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – DONDERO ERA MANAGEMENT DEFENDANTS

196.    Dondero and his alter ego, Highland ERA Management, LLC ("ERA" and together, "Dondero ERA Management")[4] had a fiduciary relationship with Plaintiff in February 2013. ERA was a limited liability company created by Dondero, as President, in collaboration with Surgent, Dameris, Ellington, Leventon, Surgent, Abrams & Bayliss, Hurst, Katz/HAK, Boyce, Britain and Honis purportedly to serve as the sole general partner and manager of Plaintiff after the Board Member Group vacated their director positions.

197.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and managers relations with the corporation when they purported to implement an action by written consent in February 2013 that allocated 93% of Highland Capital's expenses related to the Highland Capital v.

---

[4] ERA Management is not a party to this lawsuit as it is also an entity that Daugherty obtained control of from the Delaware settlement.

Daugherty litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

198.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager relations with the corporation by failing to require abstention from conflicted Dondero ERA Management who were simultaneously President and managing partner at Highland Capital and President, Manager and general partner at Plaintiff in February 2013, when they implemented an action by consent that allocated 93% of Highland Capital's expenses related to the Highland Capital v. Daugherty litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

199.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and managers relations with the corporation by attempting to acquire broad releases and indemnification rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the asset transfer to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account.

200.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by failing to require abstention from conflicted Dondero ERA Management who

were attempting to acquire broad releases and indemnifications rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the asset transfer to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account.

201.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by participating in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

202.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by failing to require abstention from conflicted Dondero ERA Management who were participating in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

203.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

204.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by allocating legal expenses incurred by Highland Capital to Plaintiff.

205.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

206.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by approving or signing accounting statements and tax returns from 2013 to 2022 that transferred substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, and falsely recognized loan obligations back to Highland Capital.

207.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by falsely representing to be the President and manager of Plaintiff while secretly

concealing the documentation and governance documents that proved they had no legitimate authority for the purpose of legitimizing and effectuating the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

208.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation when they collaborated with Brown, Hurst, Katz/HAK, Abrams & Bayliss, Dondero, Ellington, and Leventon to conceive and falsify misleading evidence that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013.

209.    Dondero ERA Management's breaches proximately caused injury to Plaintiff in forcing Plaintiff to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT THREE: BREACH OF FIDUCIARY DUTY #3 – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – HIGHLAND CAPITAL OFFICERS AND EMPLOYEES DEFENDANTS

210.    Plaintiff had fiduciary duty relationships with Dondero, Okada, Boyce, Collins, Honis, Ellington, Leventon, Girard, and Waterhouse (collectively, "Highland Capital Officers and Employees Group"). This fiduciary relationship arose out of the long relationship between the Highland Capital Officers and Employees Group and the Plaintiff whereby Plaintiff relied on the Highland Capital Officers and Employees Group to act in its best interest. Similarly, the fiduciary relationship arises as a result of the dominance on the part of the Highland Capital Officers and Employees Group compared to the weakness and dependence on the part of the Plaintiff.

211.     Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure, by failing to protect it from having its assets stripped and instead facilitating the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

212.     Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

213.     Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by allocating legal expenses incurred by Highland Capital to Plaintiff.

214.     Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

215.     Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by ostensibly providing legal services to Plaintiff that were in actuality for the benefit of Highland Capital to develop and execute a scheme to strip Plaintiff of its assets

and transfer them Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

216.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by secretly concealing the documentation and governance documents that proved they had no legitimate authority for the purpose of legitimizing and effectuating the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

217.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by serving in the capacity as advisors to Plaintiff in addition to that of its largest investment, Restoration Capital Partners, LP, along with investments in  Highland Capital Real Estate Fund, L.P., Sugar Land Project, LLC, HCREA Nolen Drive, L.P. HE MEZZ KR, LLC., HCREA Trimarchi of North Dallas, L.P., CHS Electronics, Inc., HE Capital KR, LLC. And HYSKY Communications, Inc. and allowing Plaintiff's assets to be transferred to Highland Capital in April 2013 for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

218.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by allocating legal expenses incurred by Highland Capital to Plaintiff.

219.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain

from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by serving in the capacity as administrator, implementor and executor to effectuate Dondero's scheme to transfer ownership of Plaintiff in January 2013 and ultimately its assets to Highland Capital in April 2013 for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

220.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by collaborating with Swadley, Klos and Surgent to prepare, allocate, approve and/or sign inaccurate accounting statements and tax returns from 2013 to 2022 that transferred substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, and falsely recognized loan obligations back to Highland Capital .

221.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by wrongfully participating in and coordinating the 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

222.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure when they collaborated with outside counsel to conceive and falsify misleading evidence with Brown, Hurst, Katz/HAK, and Abrams & Bayliss that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013.

223.     Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure when they collaborated with Brown, Hurst, and Surgent to conceive and falsify misleading evidence that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of April 2013.

224.     Highland Capital Officers and Employees Group breaches proximately caused injury to Plaintiff in forcing Plaintiff to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT FOUR: BREACH OF FIDUCIARY DUTY #4 – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – OUTSIDE LEGAL PROVIDERS GROUP #1 DEFENDANTS

225.     Abrams & Bayliss, Hurst and Katz/HAK (collectively, "Outside Legal Providers Group #1") had a fiduciary relationship with Plaintiff in that they acted as attorneys for and provided legal services to Plaintiff.

226.     Abrams & Bayliss stated in its engagement letter, "You are engaging us solely to provide civil litigation and related services in connection with the civil action pending in the District Court of Dallas County, Texas, styled Highland Capital Management, L.P. v. Daugherty, No. 12-04005. We refer to our advice with respect to this matter as the 'Representation.' Our engagement is limited to the Representation. We are not acting as your counsel generally or on other matters. We are engaged to represent you as your exclusive Delaware counsel in connection with the Representation. With respect to entities or persons generally affiliated or associated with you, including entities owned by or otherwise related to you, you agree that the Firm is not being asked to provide, and will not be providing, legal advice to, or establishing an attorney-client relationship with, any such affiliated entity or person in his, her, or its individual

capacity and will not be expected to do so unless the Firm has been asked and has specifically agreed to do so in writing. Additionally, although in the course of our Representation we may receive or provide information or advice from or to your affiliates, associates, agents, or employees, our engagement is to represent you and not any of your affiliates, associates, agents, or employees."

227.    Abrams & Bayliss further stated, "We understand that you have retained Gruber Hurst Johansen Hail Shank LLP ('Gruber Hurst') with respect to matters related to the Representation. We expect to consult with Gruber Hurst, and you have confirmed that we may rely on instructions given and information provided by Gruber Hurst as to all matters involving the Representation and that, absent written notice from you, we may take direction from Gruber Hurst as if provided directly by you." Hurst and Brown were the lead attorneys at Gruber Hurst that provided legal services to and invoiced Plaintiff.

228.    The civil litigation in Texas pertaining to Plaintiff was limited to the breach of its implied duty of good faith and fair dealing with regard to the damages to Daugherty's interest in Plaintiff caused by the implementation of Article XII Dispute Resolution of the Second Amended and Restated Limited Liability Company Agreement of Highland Employee Retention Assets, LLC on February 16, 2012 where the jury determined such bad faith actions to have caused a diminution in Daugherty's interests[5]

229.    Importantly, the Texas Litigation against Plaintiff did not include actions against or on behalf of Highland Capital or Sierra Verde, nor did it include corporate actions based on asset transfers.

230.    Katz/HAK purported to represent Plaintiff in Delaware Court through 2017 up until the Highland Capital bankruptcy filing in 2019.

---

[5] . The Texas Litigation was limited to claims against Plaintiff board members Boyce and Britain for involvement in Second Amended and Restated Limited Liability Company Agreement of Highland Employee Assets, LLC.

231.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they developed, advised and assisted the implementation of the Dondero scheme to deprive Daugherty of his interests in Plaintiff's assets in 2013 by stripping Plaintiff of all its assets and transferring them to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

232.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they developed, advised and assisted the implementation of the Dondero scheme to deprive Daugherty of his interests in Plaintiff's assets in 2013 that transferred substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

233.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when it prepared, revised and distributed certain documents designed to strip Plaintiff of all its assets and assist the board members in shielding their liability. Those documents include but are not limited to:

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 18, 2013 – Regarding approving a

resolution to transfer of Series A Preferred units to Highland Capital in violation of Article IX, and accepting Highland Capitals offer to purchase in violation of Section 5.2(b)(ii).

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding approving amendment to Article VIII – Expanded indemnification for board members;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removing of Joseph Dougherty as board member and replacing him with Scott Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removal of Walia as board member and approving Amendment;

- AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, to add Ellington to board, remove Walia from board and reduce board size to five members by Boyce, Britain, Dameris, Honis and Ellington;

- SECOND AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, purporting to amend ARTICLE VIII in its entirety and provide the self-dealing board members with broad indemnification for the bad conduct they just participated in.

- THIRD AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 18, 2013, purporting to amend section 5.1 and 5.2. to allow assignment to Highland capital.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment for ARTICLE VIII modification to grant broad releases to the board that just ignored their fiduciary duties.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment Section 5.1 and 5.2 modification to alter board member service requirements and approve recommendation of assignment of preferred units to Highland Capital.

- TRANSFER AGREEMENT – for the buyout and release of claims against Plaintiff.

- OFFER TO PURCHASE – dated January 15, 2013, with recommendation for dispute reserve and fairness opinion that did not happen.

- TRANSFER AGREEMENT – for the buyout and release of claims against Plaintiff.

- OFFER TO PURCHASE – dated January 15, 2013with recommendation for dispute reserve and fairness opinion that did not happen.

- THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- EXPENSE ALLOCATION AGREEMENT – Dated February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- WRITTEN CONSENT OF MANAGER - Effective as of February 1, 2013 – regarding allocation of Highland Capital's legal expenses to Plaintiff.

234.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly

honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they failed to inform all of Plaintiff's board members of their fiduciary duties to Plaintiff regarding the buyout and subsequent transfer of assets in 2013 to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

235.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by failing to protect Plaintiff from having its assets stripped in 2013 and instead facilitating the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

236.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

237.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they knew their legal expenses incurred on behalf of Highland Capital were allocated to Plaintiff.

238.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff,

specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by presenting evidence of invoices they attributed to legal costs regarding the Texas Litigation and then later presenting evidence while defending Plaintiff in the Daugherty v. Highland Employee Retention Asset, LLC trial in Delaware to justify the transfer of Plaintiff's assets to Highland pursuant to an expense allocation agreement that allocated those same invoices to Plaintiff despite knowing that Daugherty had already paid the invoices submitted in the Texas Litigation – double dipping their legal expenses and concealing that Daugherty had already reimbursed Highland Capital for the invoices presented at the Texas Litigation.

239.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by wrongfully participating in and coordinating the 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

240.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they collaborated to conceive and falsify misleading evidence that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of

December 2013.

241.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they caused Plaintiff to incur unnecessary legal expenses by invoicing and/or allocating to Plaintiff legal expenses that were actually for the benefit of Highland Capital, including but not limited to unrelated third-party employee harassment and separation agreement matters, defense matters concerning Sierra Verde, Dondero and Okada, issues concerning their interests in the Acis Capital Bankruptcy, litigation against the Wall Street Journal for unflattering articles, press spin communications, a multitude of discrete legal actions on behalf of Highland Capital against Daugherty, and to pursue Dondero's various vendettas against former employees Terry and Daugherty, including but not limited to Highland Capital's numerous failed attempts to have Daugherty held in contempt and incarcerated for fabricated violations of a since vacated injunction while almost $30,000 in donations were funneled to the presiding judge from Katz, Hurst, Ellington, Leventon, Sevilla, DiOrio and Crystal Jameson Woods (counsel at Hutton Andrews Kurth and DLA Piper on behalf of Plaintiff).

242.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when it knowingly double allocated invoices to both Plaintiff and Highland Capital while representing to the Delaware Court that they were allocated to Plaintiff.

243.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by causing Plaintiff to incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

244.    Outside Legal Providers Group #1's breaches proximately caused injury to the Plaintiff and/or resulted in a benefit to the Defendants.

## COUNT FIVE: BREACH OF FIDUCIARY DUTY #5 –TRANSFER OF ESCROW ASSETS 2016- DONDERO ERA MANAGEMENT DEFENDANTS

245.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

246.    Dondero and his alter ego, Highland ERA Management, LLC ("ERA" and together, "Dondero ERA Management") had a fiduciary relationship with Plaintiff in December 2016. ERA was a limited liability company created by Dondero, as President, in collaboration with Ellington, Leventon, Surgent, Abrams & Bayliss, Hurst, Katz/HAK, and Hutton Andrews Kurth purportedly to serve as the sole general partner and manager of Plaintiff after the Board Member Group vacated their director positions.

247.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by participating in a new December 2016 scheme that was designed to strip Plaintiff of its remaining assets in an escrow account including a valuable interest in Highland Restoration Partners fund, cash, and shares in NexPoint Credit strategies fund . These interests

were assigned to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington and Honis.

248.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by failing to require abstention from conflicted Dondero ERA Management, who were participating in a scheme that was designed to strip Plaintiff of its remaining assets in escrow pursuant to the December 2016 assignment of substantially all of Plaintiff's remaining assets to Highland Capital Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington, and Honis.

249.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

250.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by allocating legal expenses incurred by Highland Capital to Plaintiff.

251.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's

own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

252.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by approving or signing false accounting statements and tax returns from 2013 to 2022 that transferred substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, falsely recognized loan obligations back to Highland Capital.

253.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by failing to evaluate the fairness of a transfer on behalf of all preferred unit holders of Plaintiff.

254.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by ignoring Plaintiff's existing governance at the time of the transfers that prohibited substantial assets transfers without amendment.

255.    Dondero ERA Management's breaches proximately caused injury to Plaintiff in forcing Plaintiff to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff

in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT SIX: BREACH OF FIDUCIARY DUTY #6 –TRANSFER OF ESCROW ASSETS 2016- HIGLAND CAPITAL OFFICERS AND EMPLOYEES GROUP

256.    Plaintiff had fiduciary duty relationships with Highland Capital Officers and Employees Group. This fiduciary relationship arose out of the long relationship between the Highland Capital Officers and Employees Group and the Plaintiff whereby Plaintiff relied on the Highland Capital Officers and Employees Group to act in its best interest. Similarly, the fiduciary relationship arises as a result of the dominance on the part of the Highland Capital Officers and Employees Group and the weakness and dependence on the part of the Plaintiff.

257.    Dondero, Ellington, and Leventon testified that services were provided to Plaintiff under a Blanket Agreement. Highland Capital Officers and Employees Group provided management, administration, legal, accounting, tax, administration, and implementation services creating fiduciary relationship with Plaintiff.

258.    Okada, as Chief Investment Officer, testified about the importance of transparency, trust, alignment of interest and putting the client first. None of those virtues were practiced with regard to the transfer of assets from the escrow account in December 2016.

259.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff,  specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by failing to protect it from having its remaining assets stripped from the escrow and instead facilitating the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

260.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by participating in the 2016 remaining asset stripping scheme that left

Plaintiff insolvent and unable to pay its expenses and debts.

261.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by allocating legal expenses incurred by Highland Capital to Plaintiff.

262.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

263.    Ellington, Leventon and Girard breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure, duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by ostensibly providing legal services to Plaintiff that were in actuality for the benefit of Highland Capital to develop and execute a scheme to strip Plaintiff of its remaining escrow assets and transfer them to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

264.    Dondero, Okada and Honis breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure by serving in the capacity as advisors to Plaintiff in addition to that of its largest investment,

Restoration Capital Partners, and allowing Plaintiff's remaining escrow assets to be transferred to Highland Capital in December 2016 for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

265.    Collins breached his fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure by serving in the capacity as administrator, implementor and executor to effectuate the stripping of the remaining assets from the escrow in December 2016 and the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

266.    Waterhouse and Leventon breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure by preparing, allocating, approving and/or signing accounting statements and tax returns from 2013 to 2022 that transferred substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, wrongly failed to indicate payments made by Daugherty and falsely recognized loan obligations back to Highland Capital.

267.    Ellington, Leventon and Girard breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure by wrongfully participating in and coordinating the 2016 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

268.    Ellington, Leventon and Girard breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-

dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure when they collaborated with outside counsel Katz/HAK, and Abrams & Bayliss in December 2016 to transfer Plaintiff's remaining assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

269.    Highland Capital Officers and Employees Group's breaches proximately caused injury to Plaintiff in forcing Plaintiff to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT SEVEN: BREACH OF FIDUCIARY DUTY #7 –TRANSFER OF ESCROW ASSETS 2016- OUTSIDE LEGAL PROVIDERS GROUP #2 DEFENDANTS

270.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

271.    Abrams & Bayliss, Hurst, Katz/HAK and Brown (collectively, "Outside Legal Providers Group #2") had a fiduciary relationship with Plaintiff in that they acted as attorneys for and provided legal.

272.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they developed, advised and assisted the implementation of the Dondero scheme that transferred Plaintiff's remaining assets from escrow in 2016 to Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington, and Honis.

273.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation,

and the duty to timely inform Plaintiff of conflict of interest when they failed to inform Plaintiff's managers of their duties to Plaintiff regarding the escrow assets and subsequent transfer of assets to Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis despite performing legal analysis of the previous board members' breach of fiduciary duty to Plaintiff and its unit holders on December 2016.

274.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they collaborated with Ellington, Leventon and Girard in December 2016 to transfer Plaintiff's remaining assets to Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

275.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by knowing their invoices were being double allocated to both Plaintiff and Highland Capital while representing to the Delaware Court that they were allocated to Plaintiff.

276.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they caused Plaintiff to incur

unnecessary legal expenses by invoicing and/or allocating to Plaintiff legal expenses that were for the benefit of Highland Capital for matters concerning Josh Terry, the Acis Capital Bankruptcy, Highland Capital claims against Daugherty including but not limited to numerous failed attempts to have Daugherty held in contempt and incarcerated for fabricated violations of the an injunction for the benefit of Highland Capital to prevent Daugherty from disclosing Highland Capital's confidential information (the injunction was subsequently vacated pursuant to Daugherty's bankruptcy court approved settlement with Highland Capital).

277.    Hurst and Brown breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they represented and invoiced Plaintiff in the Texas litigation with Daugherty for services provided on behalf of Highland Capital. In 2014, Daugherty won a judgment in the Texas litigation against Plaintiff that was defended by Hurst and Brown for breach of good faith and fair dealing with regards to the implementation of the Second Amended and Restated Limited Liability Operating Agreement of Highland Employee Retention Assets, LLC that resulted in an award of approximately $5 million in damages and interest against Plaintiff. However, Hurst and Brown invoiced Plaintiff for services rendered on behalf of Highland Capital before and after the Texas Litigation.

278.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by participating in the 2016 remaining asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and

debts.

279.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by knowing Daugherty had paid over $3.1 million in payment to Highland Capital for its legal invoices that were subsequently presented to the Delaware court as unpaid legal obligations on behalf of Plaintiff. Additionally, invoices were being double allocated to both Plaintiff and Highland Capital while they represented to the Delaware Court that they were allocated to Plaintiff.

280.    Outside Legal Providers Group #2's breaches proximately caused injury to Plaintiff and/or resulted in a benefit to the Defendants.

## COUNT EIGHT: BREACH OF CONTRACT #1 -- BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 -- BOARD MEMBER GROUP DEFENDANTS

281.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

282.    The Board Member Group had a valid, enforceable contract with Plaintiff. Plaintiff is the proper party to bring suit for breach of the contract. Plaintiff performed, tendered performance of, or was excused from performing its contractual obligations.

283.    Pursuant to Section 5.1 and 5.2 of the Second Amended and Restated Limited Liability Company Agreement of Highland Employee Retention Assets, LLC (the "HERA Company Agreement"), The Board Member Group agreed to operate Plaintiff and its business Section 2.1 Purpose to hold and receive assets.

284.    The Board Member Group breached its contractual obligations under Section 2.1 to receive and hold assets and instead participated and/or acquiesced to a scheme that stripped Plaintiff of its assets for no value and sent those assets to Highland Capital for the benefit of

Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

285.     The Board Member Group breached its contractual obligations under Section 3.4 to maintain Capital Accounts pursuant to the terms of 3.4.(a)(i)–(iv) as they participated and/or acquiesced to a scheme to misallocate expenses, net income, and net losses to individual member Capital Accounts.

286.     The Board Member Group breached its contractual obligations under Section 3.5 to maintain allocate Net Income and Net Loss pro rata in accordance with each vested Series A Preferred Unit holders Capital Account balance as they participated and/or acquiesced to a scheme to misallocate expenses, net income, and net losses to individual member Capital Accounts.

287.     The Board Member Group breached its contractual obligations under Section 4.1 by participating or acquiescing to a scheme that allowed distributions to be made of all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

288.     The Board Member Group breached its contractual obligations under Section 5.2 (b)(iv) to Plaintiff by not obtaining prior affirmative vote or written consent of at least 75% of the members of the Board to make the purported amendments, alterations, changes and/or repeals to the purported in the January 17, 2013 and January 18, 2013 governance actions by amendment and/or written consent pursuant to the HERA Company Agreement. Such actions include but are not limited to the following:

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding expenses;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 –

Regarding transfer of Joseph Dougherty Preferred Units to Highland Capital;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removing of Joseph Dougherty as board member and replacing him with Scott Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removal of Walia as board member and approving Amendment;

- AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, to add Ellington to board, remove Walia from board and reduce board size to five members by Boyce, Britain, Dameris, Honis and Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding approving amendment to Article VIII – Expanded indemnification for board signed by Boyce, Britain, Dameris, Honis and Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 18, 2013 – Regarding approving a resolution to transfer of Series A Preferred units to Highland Capital in violation of Article IX, and accepting Highland Capitals offer to purchase in violation of Section 5.2(b)(ii).

- THIRD AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 18, 2013, purporting

to amend section 5.1 and 5.2.

- SECOND AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, purporting to amend ARTICLE VIII in its entirety and provide the self-dealing board members with broad indemnification for the bad conduct they just participated.

- TRANSFER AGREEMENT – for the buyout and release of claims against Plaintiff.

- OFFER TO PURCHASE – dated January 15, 2013 with recommendation for dispute reserve and fairness opinion that did not happen.

- THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- EXPENSE ALLOCATION AGREEMENT – Dated February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- WRITTEN CONSENT OF MANAGER - Effective as of February 1, 2013 – regarding allocation of Highland Capital's legal expenses to Plaintiff.

289.    The Board Member Group breached its contractual obligations under Section 5.6 to Plaintiff by causing it to prepare false tax returns that improperly reflected the preferred unit holders share of income, loss, credit, and deductions.

290.    The Board Member Group breached its contractual obligations under ARTICLE IX by allowing the preferred units to be assigned to Highland Capital for the benefit of Dondero and his trusts, Okada and his trust, Boyce, Britain, and Honis.

291.    The Board Member Group breached its contractual obligations to Plaintiff under

Section 11.1 by ignoring its obligation of Separateness and Operations by:

- 11.1(a)(i) and (ii) not solely holding assets for distribution to former employees of Highland Capital, and not distributing the proceeds of Retention Assets pursuant to the terms of the Series A Preferred Units of the Plaintiff

- 11.1(b) allowing the Plaintiffs assets to be listed on the books of another entity, Highland Capital's for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

- 11.1(d) allowing its funds to be commingled with affiliates, Highland Capital's for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

- 11.1(e) allowing the Plaintiff to be obligated for Highland Capital's legal expenses and holding Plaintiff out as responsible to pay Highland Capital's legal expenses for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

- 11.1(f) failing to allocate expenses to Plaintiff in a fair and reasonable manner.

- 11.1(g) failing to hold regular board meetings.

- 11.1(h) limiting the Plaintiff to paying its own liabilities and expenses to the benefit of Highland Capital and Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

292.    The Board Member Group's breaches caused Plaintiff injury.

## COUNT NINE: IMPLIED DUTIES OF GOOD FAITH AND FAIR DEALING #1 -- BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – BOARD MEMBER GROUP DEFENDANTS

293.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

294.    The Board Member Group owed Plaintiff an implied duty of good faith and fair

dealing due to their contractual relationship.

295.     The Board Member Group and Plaintiff did not consider at the time of contracting
that the Board Member Group would allow Plaintiff's assets to be stripped and transferred to
Highland Capital in April 2013 for the benefit of Dondero and his trusts, Okada and his trusts,
Boyce, Britain and Honis for no value. The Board Member Group and Plaintiff would have
prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group
breached their implied duty of good faith and fair dealing to Plaintiff by failing to protect it from
having its assets stripped and instead facilitating the transfer of those assets to Highland Capital
for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis for no
value.

296.     The Board Member Group and Plaintiff did not consider at the time of contracting
that The Board Member Group would allow Plaintiff's assets to be stripped leaving Plaintiff
insolvent and unable to pay its expenses and debts. The Board Member Group and Plaintiff
would have prohibited such conduct if the parties had considered it. Accordingly, the Board
Member Group breached their implied duty of good faith and fair dealing by participating in the
2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

297.     The Board Member Group and Plaintiff did not consider at the time of contracting
that The Board Member Group would allocate Highland Capital's legal expenses to Plaintiff
(including those already repaid by Daugherty). The Board Member Group and Plaintiff would
have prohibited such conduct if the parties had considered it. Accordingly, The Board Member
Group breached their implied duty of good faith and fair dealing by allocating legal expenses
incurred by Highland Capital to Plaintiff.

298.     The Board Member Group and Plaintiff did not consider at the time of contracting
that The Board Member Group would double allocate legal expenses to Plaintiff that were
incurred by Highland Capital and repaid by Daugherty. The Board Member Group and Plaintiff

would have prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group breached their implied duty of good faith and fair dealing by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

299.    The Board Member Group and Plaintiff did not consider at the time of contracting that The Board Member Group would participate in preparing, revising, and distributing certain documents designed to strip Plaintiff of all its assets and assist the board members in shielding their liability by doing so. The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group breached their implied duty of good faith and fair dealing to Plaintiff when they participated in preparing, revising, and distributing certain documents designed to strip Plaintiff of all its assets and assist the board members in shielding their liability. Those documents include but are not limited to:

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 18, 2013 – Regarding approving a resolution to transfer of Series A Preferred units to Highland Capital in violation of Article IX, and accepting Highland Capitals offer to purchase in violation of Section 5.2(b)(ii).

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding approving amendment to Article VIII – Expanded indemnification for board;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removing of Joseph Dougherty as board member and replacing him with Scott Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removal of Walia as board member and approving Amendment;

- AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, to add Ellington to board, remove Walia from board and reduce board size to five members by Boyce, Britain, Dameris, Honis and Ellington;

- SECOND AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, purporting to amend ARTICLE VIII in its entirety and provide the self-dealing board members with broad indemnification for the bad conduct they just participated in.

- THIRD AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 18, 2013, purporting to amend section 5.1 and 5.2. to allow assignment to Highland capital.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment for ARTICLE VIII modification to grant broad releases to the board that just ignored their fiduciary duties at the advice of A&B and Hurst and Brown.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment Section 5.1 and 5.2 modification to alter board member service requirements and approve recommendation of assignment of preferred units to Highland Capital.

- TRANSFER AGREEMENT – for the buyout and release of claims against Plaintiff.

- OFFER TO PURCHASE – dated January 15, 2013with recommendation for dispute reserve and fairness opinion that did not happen.

- THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY
  AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated
  February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- EXPENSE ALLOCATION AGREEMENT – Dated February 1, 2013, regarding
  allocation of Highland Capital's legal expenses to Plaintiff.

- WRITTEN CONSENT OF MANAGER - Effective as of February 1, 2013 – regarding
  allocation of Highland Capital's legal expenses to Plaintiff.

300.    The Board Member Group and Plaintiff did not consider at the time of contracting
that The Board Member Group would participate in preparing, allocating, approving, or signing
false accounting statements and tax returns that purported to transfer all of Plaintiff's assets to
Highland Capital, falsely allocate Highland Capital expenses to Plaintiff, and falsely allocate loan
obligations back to Highland Capital. The Board Member Group and Plaintiff would have
prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group
breached their implied duty of good faith and fair dealing to Plaintiff by participating in
preparing, allocating, approving, or signing false accounting statements and tax returns that
purported to transfer all of Plaintiff's assets to Highland Capital, falsely allocate Highland Capital
expenses to Plaintiff, and falsely allocate loan obligations back to Highland Capital.

301.    Ellington and Plaintiff did not consider at the time of contracting that Ellington
would falsely represent himself to be a board member for a three-day period to legitimize and
effectuate the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of
Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis. Ellington and Plaintiff
would have prohibited such conduct if the parties had considered it. Accordingly, Ellington
breached his implied duty of good faith and fair dealing to Plaintiff by falsely representing to be
a board member for a three-day period to legitimize and effectuate the Dondero scheme to
transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada

and his trusts, Boyce, Britain and Honis.[This should probably get moved to the next section since he was not a board member].

302.    The Board Member Group and Plaintiff did not consider at the time of contracting that The Board Member Group would allow Dondero to use Plaintiff's relationship with Daugherty to further his vendetta against Daugherty causing Plaintiff to incur unnecessary legal expenses and loss. The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group breached their implied duty of good faith and fair dealing by causing Plaintiff to incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

303.    The Board Member Group's breaches caused Plaintiff injury.

## COUNT TEN: IMPLIED DUTIES OF GOOD FAITH AND FAIR DEALING #2-- BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS

304.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

305.    Dondero, Ellington, and Leventon testified that management, administration, legal, accounting, tax, and implementation services were provided to Plaintiff under a Blanket Agreement.

306.    Highland Capital Officers and Employees Group owed Plaintiff an implied duty of good faith and fair dealing due to their contractual relationship.

307.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would not protect Plaintiff from having its assets stripped and instead would facilitate the transfer of those assets to Highland Capital in April 2013 for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The

Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing to Plaintiff by allowing it to have its assets stripped and instead facilitated the transfer of those assets to Highland Capital in April 2013 for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

308.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would participate in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, the Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

309.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that The Highland Capital Officers and Employees Group would allocate Highland Capital's legal expenses to Plaintiff (including those already repaid by Daugherty). The Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing by allocating legal expenses incurred by Highland Capital to Plaintiff.

310.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that The Highland Capital Officers and Employees Group would double allocate legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty. The Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing by

double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

311.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that The Highland Capital Officers and Employees Group would participate in preparing, revising, and distributing certain documents designed to strip Plaintiff of all its assets and assist the board members in shielding their liability by doing so. The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing to Plaintiff when they participated in preparing, revising, and distributing certain documents designed to strip Plaintiff of all its assets and assist the board members in shielding their liability. Those documents include but are not limited to:

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 18, 2013 – Regarding approving a resolution to transfer of Series A Preferred units to Highland Capital in violation of Article IX, and accepting Highland Capitals offer to purchase in violation of Section 5.2(b)(ii).

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding approving amendment to Article VIII – Expanded indemnification for board;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removing of Joseph Dougherty as board member and replacing him with Scott Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removal of Walia as board member and approving Amendment;

- AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, to add Ellington to board, remove Walia from board and reduce board size to five members by Boyce, Britain, Dameris, Honis and Ellington;

- SECOND AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, purporting to amend ARTICLE VIII in its entirety and provide the self-dealing board members with broad indemnification for the bad conduct they just participated in.

- THIRD AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 18, 2013, purporting to amend section 5.1 and 5.2. to allow assignment to Highland capital.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment for ARTICLE VIII modification to grant broad releases to the board that just ignored their fiduciary duties at the advice of A&B and Hurst and Brown.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment Section 5.1 and 5.2 modification to alter board member service requirements and approve recommendation of assignment of preferred units to Highland Capital.

- TRANSFER AGREEMENT – for the buyout and release of claims against Plaintiff.

- OFFER TO PURCHASE – dated January 15, 2013with recommendation for dispute reserve and fairness opinion that did not happen.

312.    The Highland Capital Officers and Employees Group and Plaintiff did not

consider at the time of contracting that The Highland Capital Officers and Employees Group would participate in preparing, allocating, approving, or signing false accounting statements and tax returns that purported to transfer all of Plaintiff's assets to Highland Capital, falsely allocate Highland Capital expenses to Plaintiff, and falsely allocate loan obligations back to Highland Capital. The Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing to Plaintiff by participating in preparing, allocating, approving, or signing false accounting statements and tax returns that purported to transfer all of Plaintiff's assets to Highland Capital, falsely allocate Highland Capital expenses to Plaintiff, and falsely allocate loan obligations back to Highland Capital.

313.   Ellington did not consider at the time of contracting that Ellington would falsely represent himself to be a board member for a three-day period to legitimize and effectuate the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis. Ellington and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Ellington breached his implied duty of good faith and fair dealing to Plaintiff by falsely representing to be a board member for a three-day period to legitimize and effectuate the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

314.   The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that The Highland Capital Officers and Employees Group would allow Dondero to use Plaintiff's relationship with Daugherty to further his vendetta against Daugherty causing Plaintiff to incur unnecessary legal expenses and loss. The Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the

parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing by causing Plaintiff to incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

315.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that The Highland Capital Officers and Employees Group would collaborate with outside counsel to conceive and falsify misleading evidence with Brown, Hurst, Katz/HAK and Abrams & Bayliss that was presented in the Texas Litigation to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013. The Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing by when they collaborated with outside counsel to conceive and falsify misleading evidence with Surgent, Brown, Hurst, Katz/HAK and Abrams & Bayliss that was presented in the Texas Litigation to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013.

316.    Highland Capital Officers and Employees Group's breaches caused Plaintiff injury.

**COUNT ELEVEN: IMPLIED DUTIES OF GOOD FAITH AND FAIR DEALING #3 -- BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – DONDERO ERA MANAGEMENT GROUP DEFENDANTS**

317.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

318.    Dondero, Ellington, and Leventon testified that management, administration, legal, accounting, tax, and implementation services were provided to Plaintiff under a Blanket Agreement. [I'm not sure this is proper here].

319.     Dondero and his alter ego, Highland ERA Management, LLC ("ERA" and together, "Dondero ERA Management") owed Plaintiff implied duties of good faith and fair dealing in February 2013. ERA was a limited liability company created by Dondero, as President, in collaboration with Surgent, Dameris, Ellington, Leventon, Surgent, Abrams & Bayliss, Hurst, Katz/HAK, Boyce, Britain and Honis purportedly to serve as the sole general partner and manager of Plaintiff after the Board Member Group vacated their director positions.

320.     Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would attempt to implement an action by written consent in February 2013 that allocated 93% of Highland Capital's expenses related to the Texas and Delaware litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing to implement an action by written consent in February 2013 that allocated 93% of Highland Capital's expenses related to the Texas and Delaware litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

321.     Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would not require abstention from conflicted Dondero ERA Management who were simultaneously President and managing partner at Highland and President, Manager and general partner at Plaintiff in February 2013, when they implemented an action by consent that allocated 93% of Highland Capital's expenses related to the Texas and Delaware litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their implied duty of good faith and fair dealing to plaintiff when they

implemented an action by consent that allocated 93% of Highland Capital's expenses related to the Texas and Delaware litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

322.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would attempt to acquire broad releases and indemnification rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the 2013 asset transfer to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account in December 2013. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by attempting to acquire broad releases and indemnification rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the asset transfer to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account.

323.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would not abstain from attempting to acquire broad releases and indemnification rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the 2013 asset transfer to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account in December 2013. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by not abstaining before attempting to acquire broad releases and indemnification rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the asset transfer

to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account.

324. Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would participate in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it  Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by participating in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

325. Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would not abstain from participating in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by not abstaining from participating in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

326. Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would participate in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts. Dondero ERA

Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by participating in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts.

327.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would double allocate legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

328.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would approve and/or sign accounting statements and tax returns from 2013 to 2022 that purported to transfer substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, and falsely recognized loan obligations back to Highland Capital. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by approving and/or signing accounting statements and tax returns from 2013 to 2022 that purported to transfer substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, and falsely recognized loan obligations back to Highland Capital.

329.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would falsely represent to be the President and manager of Plaintiff while secretly concealing the documentation and governance documents that proved they had no legitimate authority for the purpose of legitimizing and effectuating the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his

trusts, Boyce, Britain and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by falsely representing to be the President and manager of Plaintiff while secretly concealing the documentation and governance documents that proved they had no legitimate authority for the purpose of legitimizing and effectuating the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

330.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would conceive and falsify misleading evidence that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff when they collaborated with Brown, Hurst, Katz/HAK, Abrams & Bayliss, Dondero, Ellington, Leventon and Surgent to conceive and falsify misleading evidence that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013.

331.    Dondero ERA Management's breaches proximately caused injury to Plaintiff in forcing Plaintiff to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT TWELVE: BREACH OF IMPLIED GOOD FAITH AND FAIR DEALING #4 – TRANSFER OF ESCROW ASSETS 2016- DONDERO ERA MANAGEMENT DEFENDANTS

332.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

333.    Dondero ERA Management owed Plaintiff an implied duty of good faith and fair

dealing in 2016. ERA was a limited liability company created by Dondero, as President, in collaboration with Surgent, Dameris, Ellington, Leventon, Surgent, Abrams & Bayliss, Hurst, Katz/HAK, Boyce, and Britain purportedly to serve as the sole general partner and manager of Plaintiff after the Board Member Group vacated their director positions.

334.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would participate in a new December 2016 scheme that was designed to strip Plaintiff of its remaining assets in an escrow account including a valuable purported interest in Highland Restoration Partners fund and substantial cash and transfer those interest to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by participating in a new December 2016 scheme that was designed to strip Plaintiff of its remaining assets in an escrow account including a valuable purported interest in Highland Restoration Partners fund and substantial cash. These interests were assigned to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington and Honis.

335.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would fail to require themselves to abstain from conflicted positions regarding a scheme that was designed to strip Plaintiff of its remaining assets in escrow pursuant to the December 2016 assignment of substantially all of Plaintiff's remaining assets to Highland Capital Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington, and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by failing to require abstention from conflicted Dondero ERA Management who were participating in a scheme that

was designed to strip Plaintiff of its remaining assets in escrow pursuant to the December 2016 assignment of substantially all of Plaintiff's remaining assets to Highland Capital Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington, and Honis.

336.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would by participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

337.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would fail to require themselves to abstain from conflicted positions by participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly,, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by failing to require abstention from conflicted Dondero ERA Management who were participating in a scheme that was designed to strip Plaintiff of its remaining assets in escrow pursuant to the December 2016 assignment of substantially all of Plaintiff's remaining assets to Highland Capital Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington, and Honis.

338.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would participate in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts. Dondero ERA

Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by participating in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts.

339.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would cause injury to Plaintiff in forcing Plaintiff to lose all of its assets in escrow and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by causing injury to Plaintiff in forcing Plaintiff to lose all of its assets in escrow and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

340.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would fail to evaluate the fairness of the escrow transfer on behalf of all preferred unit holders of Plaintiff. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by failing to evaluate the fairness of the escrow transfer on behalf of all preferred unit holders of Plaintiff.

341.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would ignore Plaintiff's existing governance at the time of the escrow transfers that prohibited substantial assets transfers without amendment. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by ignoring Plaintiff's existing governance at the time of the escrow

transfers that prohibited substantial assets transfers without amendment.

342.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would cause injury to Plaintiff in forcing Plaintiff to lose all of its escrow assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by causing injury to Plaintiff in forcing Plaintiff to lose all of its escrow assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT THIRTEEN: BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING #5 –TRANSFER OF ESCROW ASSETS 2016- HIGLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS

343.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

344.    Dondero, Ellington, and Leventon testified that management, administration, legal, accounting, tax, and implementation services were provided to Plaintiff under a Blanket Agreement.

345.    Highland Capital Officers and Employees Group owed Plaintiff an implied duty of good faith and fair dealing in 2016.

346.    Highland Capital Officers and Employees Group and Plaintiff did not consider that Highland Capital Officers and Employees Group would participate in a new December 2016 scheme that was designed to strip Plaintiff of its remaining assets in an escrow account including a valuable purported interest in Highland Restoration Partners fund and substantial cash and transfer those interest to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington and Honis. Highland Capital Officers and

Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by participating in a new December 2016 scheme that was designed to strip Plaintiff of its remaining assets in an escrow account including a valuable purported interest in Highland Restoration Partners fund and substantial cash. These interests were assigned to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington and Honis.

347.   Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would be participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

348.   Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would participate in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by participating in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts.

349.   Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would cause injury

to Plaintiff in forcing Plaintiff to lose all of its assets in escrow and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by causing injury to Plaintiff in forcing Plaintiff to lose all of its assets in escrow and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

350.    Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would fail to evaluate the fairness of the escrow transfer on behalf of all preferred unit holders of Plaintiff. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by failing to evaluate the fairness of the escrow transfer on behalf of all preferred unit holders of Plaintiff.

351.    Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would ignore Plaintiff's existing governance at the time of the escrow transfers that prohibited substantial assets transfers without amendment. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by ignoring Plaintiff's existing governance at the time of the escrow transfers that prohibited substantial assets transfers without amendment.

352.    Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would cause injury to Plaintiff by forcing Plaintiff to lose all of its escrow assets and incur unnecessary legal expenses

by allocating over $14 million in legal expenses, including cocktails and meals, incurred on behalf of Highland Capital and its affiliates to Plaintiff [including but not limited to Hutton Andrews Kurth, DLA Piper, Gruber Hurst, Abrams & Bayliss, Lynn Pinker Hurst Schwegman, Ashcroft Law Firm, Cole Schotz, Morgan Lewis, Stanton Law Firm, Bell Nunnally, Cooke Young & Keidan, Fish & Richardson, Gardner Haas, Greenberg Traurig, The Griffith Law Firm, Hutcherson Law,  Littler Mendelson, Nutter, McLennen & Fish, Contractual Counsel, Robert Half, The Stanton Law Firm, Berkeley Research Group, Bloom Strategic Consulting, CBIZ valuation Group, Digital Works, Duff and Phelps, Elite Document Technology, Esquire Deposition Solutions, Folks & Associates, Point Multimedia, Phil Rochefort Audio Services, Gary Durham Consulting, JAMS Inc, Matthew Okolita, and Michael Colvin.] by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by causing injury to Plaintiff by forcing Plaintiff to lose all of its escrow assets and incur unnecessary legal expenses by allocating over $14 million in legal expenses,

353.    Ellington, Leventon and Plaintiff did not consider at the time of contracting that Ellington and Leventon would breach their duty of good faith and fair dealing to Plaintiff when they collaborated with outside counsel Katz/HAK, and Abrams & Bayliss in December 2016 to transfer Plaintiff's remaining escrow assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Ellington and Leventon breached their duty of good faith and fair dealing to Plaintiff when they collaborated with outside counsel Katz/HAK, and Abrams & Bayliss in December 2016 to transfer Plaintiff's remaining escrow assets to Highland Capital for

the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

354.     Highland Capital Officers and Employees Group's breaches caused Plaintiff injury.

**COUNT FOURTEEN: BREACH OF CONTRACT #2 –TRANSFER OF ESCROW ASSETS 2016- HIGLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS**

355.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

356.     Plaintiff had a valid, enforceable contractual relationship with Highland Capital Officers and Employees Group. Plaintiff is a property party to bring suit for breach of contract. Plaintiff performed, tendered performance of, or was excused from performing its contractual obligations.

357.     Dondero, Ellington, and Leventon testified that management, administration, legal, accounting, tax, administration, and implementation services were provided to Plaintiff under a Blanket Agreement.

358.     Highland Capital Officers and Employees Group breached the contract by failing to protect Plaintiff from having its remaining assets stripped from the escrow in December 2016 and instead facilitated the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

359.     Highland Capital Officers and Employees Group breached the contract by participating in the 2016 remaining asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

360.     Highland Capital Officers and Employees Group breached the contract by allocating over $14 million in legal expenses, including cocktails and meals, incurred on behalf of Highland Capital and its affiliates to Plaintiff, including but not limited to Hutton Andrews Kurth, DLA Piper, Gruber Hurst, Abrams & Bayliss, Lynn Pinker Hurst Schwegman, Ashcroft

Law Firm, Cole Schotz, Morgan Lewis, Stanton Law Firm, Bell Nunnally, Cooke Young &
Keidan, Fish & Richardson, Gardner Haas, Greenberg Traurig, The Griffith Law Firm,
Hutcherson Law,  Littler Mendelson, Nutter, McLennen & Fish, Contractual Counsel, Robert
Half, The Stanton Law Firm, Berkeley Research Group, Bloom Strategic Consulting, CBIZ
valuation Group, Digital Works, Duff and Phelps, Elite Document Technology, Esquire
Deposition Solutions, Folks & Associates, Point Multimedia, Phil Rochefort Audio Services,
Gary Durham Consulting, JAMS Inc, Matthew Okolita, and Michael Colvin.

361.    Highland Capital Officers and Employees Group breached the contract by double
allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by
Daugherty.

362.    Highland Capital Officers and Employees Group breached the contract by serving
in the capacity as advisor to Plaintiff in addition to that of its largest investment, Restoration
Capital Partners, and allowing Plaintiff's remaining escrow assets to be transferred to Highland
Capital in December 2016 for the benefit of Dondero and his trusts, Okada and his trusts, Hunter
Mountain, Ellington and Honis.

363.    Highland Capital Officers and Employees Group breached the contract by
allocating legal expenses incurred by Highland Capital to Plaintiff.

364.    Highland Capital Officers and Employees Group breached the contract by
preparing, allocating, approving, or signing accounting statements and tax returns from 2013 to
2022 that transferred substantially all of Plaintiff's assets to Highland Capital, falsely allocated
Highland Capital expenses to Plaintiff, wrongly failed to indicate payments made by Daugherty
and falsely indicated loan obligations back to Highland Capital.

365.    Highland Capital Officers and Employees Group breached the contract by
wrongfully participating in and coordinating the 2016 assignment of all of Plaintiffs assets to
Highland Capital for the benefit of Highland Capital for the benefit of Dondero and his trusts,

Okada and his trusts, Hunter Mountain, Ellington and Honis.

366.     Highland Capital Officers and Employees Group breached the contract when they collaborated with outside counsel Katz/HAK, and Abrams & Bayliss in December 2016 to transfer Plaintiff's remaining assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

367.     Highland Capital Officers and Employees Group breached the contract when they caused Plaintiff to incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

368.     Highland Capital Officers and Employees Group's breaches caused Plaintiff injury.

## COUNT FIFTEEN - BREACH OF CONTRACT #3 –CHARGING OF EXCESSIVE ATTORNEYS FEES- OUTSIDE LEGAL PROVIDERS GROUP #2 DEFENDANTS

369.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

370.     Outside Legal Providers Group #2 breached their contract with Plaintiff by charging excessive attorney's fees. *Pollard v. Hanschen*, 315 S.W.3d 636, 641 (Tex. App.—Dallas 2010, no pet.).

371.     Plaintiff had valid and enforceable contracts with the Outside Legal Providers Group #2. Plaintiff is a proper party to bring suit for breach of contract. Plaintiff performed, tendered performance of, or was excused from performing its contractual obligations.

372.     Outside Legal Providers Group #2 breached their contractual duties to Plaintiff when they caused Plaintiff to incur unnecessary legal expenses by invoicing and/or allocating to Plaintiff legal expenses that were actually for the benefit of Highland Capital, including but not limited to unrelated third-party employee harassment and separation agreement matters, defense matters concerning Sierra Verde, Dondero and Okada issues concerning their interests in the Acis Capital Bankruptcy, litigation against the Wall Street Journal for unflattering articles, press

spin communications, a multitude of discrete legal actions on behalf of Highland Capital against Daugherty including having Daugherty followed to London and recording his panel discussion at a conference, and to pursue Dondero's various vendettas against former employees Terry and Daugherty, including but not limited to Highland Capital's numerous failed attempts to have Daugherty held in contempt and incarcerated for fabricated violations of a since vacated injunction while approximately $29,000 in donations were funneled to the presiding judge.

373. Outside Legal Providers Group #2 breached their contractual duties to Plaintiff by causing redacted invoices for reimbursement to be produced in the Texas Litigation between Highland Capital and Daugherty in 2014 for services performed on behalf of Highland Capital. And then, after Daugherty paid over $3.1 million in December 2016 pursuant to wiring instructions by Katz/HAK, they represented that the same invoices were unpaid obligations for work performed on behalf of Plaintiff in the Delaware litigation commencing in 2017. Additionally, invoices were being double allocated to both Plaintiff and Highland Capital while they represented to the Delaware Court that they were allocated to Plaintiff.

374. Outside Legal Providers Group #2 breached their contractual duties with Plaintiff by representing to the Delaware court that certain legal expenses incurred on behalf of Plaintiff by Highland Capital were unpaid obligations of Plaintiff when in fact those same invoices were already paid by Daugherty pursuant to wiring instructions provided by Katz/HAK after Katz/HAK was already secretly aware that Highland had already swept over $1.2 million from Plaintiff's escrow account and after Katz/HAK had filed turnover and garnishment motions against Daugherty claiming that Highland Capital had not been paid. Said another way, Katz/HAK charged Plaintiff for expenses they knew had already been paid twice by sweeping Plaintiff's cash escrow assets and then by wire from Daugherty because they had been falsely presented the same invoices as Highland Capital expenses in the Texas trial.

375. Outside Legal Providers Group #2 breached their contractual duties to Plaintiff

when it was discovered in 2022 that on February 7, 2013, Surgent sent an email attaching Daugherty's request to inspect Plaintiff's assets to Hough, Hurst, Katz/HAK, and Ellington. Again, Katz/HAK did not represent Plaintiff at the time but was adverse to Daugherty and his counsel at Looper Reed, and McGraw on behalf of Highland Capital.

376.    Outside Legal Providers Group #2 breached their contractual duties to Plaintiff when a detailed review of invoices discovered for the first time in 2022 revealed that Outside Legal Providers Group #2, with the assistance of Dondero, Leventon, Ellington, Dondero, Klos, Waterhouse, and Swadley, had fraudulently represented to various courts that over $14,000,000 in invoices for the benefit of Highland Capital was improperly allocated to Plaintiff from 2012 to 2019.

377.    Outside Legal Providers Group #2's breaches proximately caused injury to Plaintiff.

## COUNT SIXTEEN - CONSPIRACY TO COMMIT FRAUD #1 – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – BOARD MEMBER GROUP, DONDERO ERA MANAGEMENT, HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP, OUTSIDE LEGAL PROVIDERS GROUPS #1 AND #2 DEFENDANTS

378.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

379.    The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 were a member of a combination of two or more persons whose object was to accomplish an unlawful purpose, to defraud Plaintiff of its assets and distributions pursuant to the buyout scheme of 2012/2013.

380.    The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 had a meeting of the minds on the object and course of action to cooperate in the 2012/2013 scheme to defraud

Plaintiff and all acted in accordance with the conspiracy to defraud Plaintiff.

381. The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 made and caused to be made false representations in the Texas Litigation, Delaware actions, and Northern District of Texas bankruptcy court that were at various times designed to induce the Texas judge and jury, the Delaware judge, the Northern District of Texas Bankruptcy Judge, Daugherty and Plaintiff to rely on those false representations. The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 knew the representations to be false at the time made because at all times the Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 intended to take the assets that they represented were validly approved in the purported corporate governance actions of Plaintiff on January 17, 2013, January 18, 2013, February 2013, and April 30, 2013 and assign Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, Honis and Ellington.

382. The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 withheld critical information and documents that disproved the legitimacy of the scheme that stripped Plaintiff of its assets and associated distributions in April of 2013.

383. The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 made and caused to be made false representations in the Texas Litigation that were designed to induce the Texas judge and jury on those false representations. The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group #1 and the Outside Legal Provider Groups #1 and #2 knew the representations to be false at the time made because at all

times the The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 intended to take the assets out of escrow that belonged to Plaintiff.

384.    The Plaintiff suffered injury as a proximate result of these wrongful acts.

**COUNT SEVENTEEN - CONSPIRACY TO COMMIT FRAUD #2 – TRANSFER OF ESCROW ASSETS 2016 – DONDERO ERA MANAGEMENT, HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP, OUTSIDE LEGAL PROVIDERS GROUP #2 AND BOYCE DEFENDANTS**

385.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

386.    Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Group #2 and Boyce were members of a combination of two or more person whose object was to accomplish an unlawful purpose, to defraud Plaintiff of the assets held on escrow in 2016.

387.    Dondero ERA Management, Highland Capital Officers, and Employees Group, the Outside Legal Provider Group #2 and Boyce had a meeting of the minds on the object and course of action to cooperate in the 2016 scheme to defraud Plaintiff and all acted in accordance with the conspiracy to defraud Plaintiff.

388.    Dondero ERA Management, Highland Capital Officers, and Employees Group, the Outside Legal Provider Group #2 and Boyce participated in the conspiracy to defraud Plaintiff of its assets and distributions therefrom pursuant to the escrow stripping scheme.

389.    Dondero ERA Management, Highland Capital Officers and Employees Group, the Outside Legal Provider Group #2 and Boyce made and caused to be made false representations in the Delaware courts and the Northern District of Texas bankruptcy courts that were designed to induce the respective judges to rely on those false representations. Dondero ERA Management, Highland Capital Officers and Employees Group, the Outside Legal Provider Group #2 and Boyce knew the representations to be false at the time made because at all times

the Dondero ERA Management, Highland Capital Officers and Employees Group, Outside Legal Provider Group #2 and Boyce intended to legitimize the taking of the assets out of escrow that belonged to Plaintiff.

390.    The Plaintiff suffered injury as a proximate result of these wrongful acts.

## COUNT EIGHTEEN – UNJUST ENRICHMENT #1 BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – ALL DEFENDANTS

391.    Plaintiff restates each of the foregoing allegations as if fully set forth in this paragraph.

392.    Defendants exercised total control over Plaintiff and, due to their acts and omission, were unjustly enriched.

393.    Defendants participated in the conspiracy to defraud Plaintiff of its assets by enabling a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiffs assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

394.    Defendants wrongly acquired assets for their mutual benefit while simultaneously being unjustly enriched at the expense of Plaintiff. Defendants took these actions knowingly and as part of their conspiracy to unjustly enrich themselves at the expense of Plaintiff.

395.    Defendants were unjustly enriched by the taking of the assets in April 2013 that they had misrepresented as properly approved and then actively concealed the improper execution and legitimacy pursuant to the terms of the Second Amended and Restated Limited Liability Company Operating Agreement of Plaintiff.

396.    Defendants accepted, used, and enjoyed the benefit of these assets leaving Plaintiff stripped of its assets and allocated legal expenses that were incurred on behalf of Highland Capital, legal expenses that were already paid by Daugherty, and legal expenses to defend against Daugherty's claims to Plaintiff.

## COUNT NINETEEN – UNJUST ENRICHMENT #2 (IN THE ALTERNATIVE)– TRANSFER OF ESCROW ASSETS 2016 – ALL DEFENDANTS

397.    Plaintiff restates each of the foregoing allegations as if fully set forth in this paragraph.

398.    Defendants exercised total control over Plaintiff and treated its funds as their own.

399.    Defendants participated in the conspiracy to defraud Plaintiff of its interests in the escrow in December 2016 to unjustly enrich themselves.

400.    Defendants were unjustly enriched by the taking of the assets in escrow that they had misrepresented had been set aside for Plaintiff to pay its obligations. Defendants themselves benefited from this unjust enrichment through the acquisition of the assets and the payment of their legal fees and salaries.

401.    Defendants accepted, used, and enjoyed the benefit of these assets leaving Plaintiff stripped of its assets and allocated legal expenses that were incurred on behalf of Highland Capital, legal expenses that were already paid by Daugherty, and legal expenses to defend against Daugherty's claims to Plaintiff.

## COUNT TWENTY – VIOLATIONS OF FEDERAL CIVIL RICO—CONDUCT OF A RICO ENTERPRISE, 18 U.S.C. § 1962(C) -- BOARD MEMBER GROUP AND HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS

402.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

403.    At all relevant times, the Board Member Group and Highland Capital Officers and Employees Group Defendants are each "person[s]" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

404.    The Board Member Group and Highland Capital Officers and Employees Group each violated 18 U.S.C. § 1962(c) by the acts described in the paragraphs above.

405.    The Board Member Group and Highland Capital Officers and Employees Group actions described in the previous paragraphs constitute an Enterprise within the meaning of 18

U.S.C. §§ 1961(4) and 1962(c).

406.    At all relevant times, The Board Member Group and Highland Capital Officers and Employees Group were engaged in, and/or its activities constituting wire fraud within the meaning of 18 U.S.C. § 1962(c) and 1343. At all relevant times, The Board Member Group and Highland Capital Officers and Employees Group participated in the operation, management, and directed the affairs of an enterprise intended to defraud Plaintiff of money, property, and other benefits and assets as set forth above (the "Enterprise").

407.    The Board Member Group and Highland Capital Officers and Employees Group, each of whom are persons associated with the concerted efforts against Plaintiff did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the conduct, management, or operation of the affairs of the Enterprise.

408.    The Board Member Group and Highland Capital Officers and Employees Group through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c), through multiple instances of Mail Fraud and Wire Fraud, in violation of 18 U.S.C. §§ 1341 and 1343, and Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i). The Board Member Group and Highland Capital Officers and Employees Group devised or intended to devise a scheme to defraud Plaintiff of money, property, and other benefits and assets.

409.    For the purposes of executing their scheme, The Board Member Group and Highland Capital Officers and Employees Group delivered or caused delivery of various documents and things by U.S. mail or by private or commercial interstate carriers or received such therefrom. For the purposes of executing their scheme, The Board Member Group and Highland Capital Officers and Employees Group transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce various writings, signs, and signals.

410.    In furtherance of their scheme, The Board Member Group and Highland Capital

Officers and Employees Group used the wires and/or U.S. mails or private or commercial carriers to deliver documents and things to Plaintiff or the Enterprise for the purposes of defrauding Plaintiff, including, but not limited to the following: (a) emails; (b) wirings and/or mailings between and among The Board Member Group and Highland Capital Officers and Employees Group concerning the scheme to defraud Plaintiff of money and property as well as other benefits and assets; and (c) funds transferred between The Board Member Group and Highland Capital Officers and Employees Group with the intent that those funds be used to promote the carrying on of The Board Member Group and Highland Capital Officers and Employees Group's scheme to defraud Plaintiff of money and property as well as other benefits and assets.

411.    The Board Member Group and Highland Capital Officers and Employees Group used wire and mail communications in furtherance of their scheme to defraud Plaintiff, in violation of 18 U.S.C. §§ 1341 and 1343, as described fully above.

412.    The Board Member Group and Highland Capital Officers and Employees Group participated in the scheme or artifice knowingly, willfully, and with the specific intent to advance their scheme to deceive or defraud Plaintiff. The Board Member Group and Highland Capital Officers and Employees Group knowingly and intentionally prepared documents, including but not limited to, resolutions, court papers, letters, notices, and other documents, and then knowingly and with the intent to deceive Plaintiff, caused those documents to be sent to Plaintiff or other entities that would further The Board Member Group and Highland Capital Officers and Employees Groups' scheme to defraud.

413.    The Board Member Group and Highland Capital Officers and Employees Group have, on multiple occasions, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducted or attempt to conduct a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity, including, but not limited to,

violations of 18 U.S.C. §§ 1341 and 1343 and The Board Member Group and Highland Capital Officers and Employees Group have, therefore, violated 18 U.S.C § 1956(a)(1)(A)(i), money laundering.

414.    The Board Member Group and Highland Capital Officers and Employees Group have engaged in multiple predicate acts, as described in the preceding paragraphs. The conduct of each of The Board Member Group and Highland Capital Officers and Employees Group described in the preceding paragraphs constitutes a pattern of racketeering activity connected to the acquisition, establishment, conduct or control of the Enterprise within the meaning of 18 U.S.C. § 1961(5).

415.    The Board Member Group and Highland Capital Officers and Employees Groups' violations of federal law as set forth herein, each of which directly and proximately injured Plaintiff, constitutes a continuous course of conduct, which was intended to defraud Plaintiff of money and property through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of racketeering activity as defined by 18 U.S.C. §§ 1961(1) and (5).

416.    Plaintiff was injured in its money and property by reason of The Board Member Group and Highland Capital Officers and Employees Groups' violation of 18 U.S.C. § 1962(c).

417.    The Board Member Group and Highland Capital Officers and Employees Groups' injuries to Plaintiff were a direct, proximate, and reasonably foreseeable result of their violation of 18 U.S.C. § 1962. Plaintiff is the ultimate victim of The Board Member Group and Highland Capital Officers and Employees Groups' unlawful Enterprises and scheme. Plaintiff has been and will continue to be injured in its money and property in an amount to be determined at trial.

418.    Pursuant to 18 U.S.C. § 1962(c), Plaintiff is entitled to recover treble damages plus costs and attorneys' fees from The Board Member Group and Highland Capital Officers and Employees Group as well as any other relief authorized by statute.

**COUNT TWENTY-ONE – PROMISSORY ESTOPPEL – TRANSFER OF ESCROW
ASSETS 2016 – DONDERO ERA MANAGEMENT, BOARD MEMBER GROUP,
HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP, OUTSIDE LEGAL
PROVIDERS GROUPS #1 AND #2 AND BOYCE DEFENDANTS**

419.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as
if fully set forth herein.

420.    The Dondero ERA Management, Highland Capital Officers and Employees
Group, the Outside Legal Provider Groups #1 and #2 and Boyce made promises to Plaintiff
regarding the establishment, funding, and management of Escrow.

421.    Plaintiff reasonably and substantially relied on those promises to its detriment.

422.    Plaintiff's reliance on the promise was foreseeable to The Dondero ERA
Management, Highland Capital Officers and Employees Group, the Outside Legal Provider
Groups #1 and #2 and Boyce.

423.    Injustice to Plaintiff can only be avoided by enforcing The Dondero ERA
Management, Highland Capital Officers and Employees Group, the Outside Legal Provider
Groups #1 and #2 and Boyce.

424.    The Dondero ERA Management, Highland Capital Officers and Employees
Group, the Outside Legal Provider Groups #1 and #2 and Boyce actions or omission proximately
caused Plaintiff injury.

425.    Plaintiff incurred actual damages.

**COUNT TWENTY-TWO – MONEY HAD AND RECIEVED – TRANSFER OF ESCROW
ASSETS 2016 AND BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS
2013 – ALL DEFENDANTS**

426.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as
if fully set forth herein.

427.    Defendants Dondero, Okada, Katz/HAK/DLAP, Hurst, Brown, Ellington,
Leventon, Girard, Honis, Collins, Dameris, Dougherty, Boyce, Britain, Waterhouse, Abrams &
Bayliss, Nancy Dondero, As Trustee Of Dugaboy Investment Trust ("Dugaboy Trust"); Grant

James Scott III, As Trustee Of Get Good Trust ("Get Good Trust"); John Honis, As Trustee Of Hunter Mountain Investment Trust ("Hunter Mountain Trust"); Lawrence Tonomura As Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Exempt Trust #1"); Lawrence Tonomura as Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Exempt Trust #2") hold money that came from assets or distributions from assets that belonged to Plaintiff..

428.    That money belongs to Plaintiff in equity and good conscience.

## COUNT TWENTY-THREE – CONVERSION – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 AND TRANSFER OF ESCROW ASSETS 2016– ALL DEFENDANTS

429.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

430.    Plaintiff owned, possessed, or had the right to possession of its property/assets, which were personal.

431.    Defendants Dondero, Okada, Katz/HAK/DLAP, Hurst, Brown, Ellington, Leventon, Girard, Honis, Collins, Dameris, Dougherty, Boyce, Britain, Waterhouse, Abrams & Bayliss, Nancy Dondero, As Trustee Of Dugaboy Investment Trust ("Dugaboy Trust"); Grant James Scott III, As Trustee Of Get Good Trust ("Get Good Trust"); John Honis, As Trustee Of Hunter Mountain Investment Trust ("Hunter Mountain Trust"); Lawrence Tonomura As Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Exempt Trust #1"); Lawrence Tonomura as Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Exempt Trust #2") have wrongfully exercised dominion and control over Plaintiff's property.

432.    Plaintiff has suffered injury as a result of Defendants' actions.

**COUNT TWENTY-FOUR – TEXAS THEFT LIABLITY ACT – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 AND TRANSFER OF ESCROW ASSETS 2016 – ALL DEFENDANTS**

433.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

434.     Plaintiff had possessory right to its property/assets.

435.     Defendants Dondero, Okada, Katz/HAK/DLAP, Hurst, Brown, Ellington, Leventon, Girard, Honis, Collins, Dameris, Dougherty, Boyce, Britain, Waterhouse, Abrams & Bayliss, Nancy Dondero, As Trustee Of Dugaboy Investment Trust ("Dugaboy Trust"); Grant James Scott III, As Trustee Of Get Good Trust ("Get Good Trust"); John Honis, As Trustee Of Hunter Mountain Investment Trust ("Hunter Mountain Trust"); Lawrence Tonomura As Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Exempt Trust #1"); Lawrence Tonomura as Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Exempt Trust #2") unlawfully appropriated those assets by taking them without Plaintiff's effective consent by the theft of personal property under Texas Penal Code §31.03.

436.     The Defendants' unlawful taking was made with the intent to deprive the Plaintiff of the property.

437.     The Plaintiff sustained damage as a result of the theft.

**COUNT TWENTY-FIVE – TEXAS UNIFORM FRAUDLENT TRANSFER ACT (TUFTA) – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 AND TRANSFER OF ESCROW ASSETS 2016 – BOARD MEMBER GROUP, HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP, DONDERO ERA MANAGEMENT GROUP, OUTSIDE LEGAL PROVIER GROUP #1 AND #2 DEFENDANTS**

438.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

439.     Plaintiff is a creditor with a claim as a result of his verdict in the Texas Litigaiton and the Delaware Litigation.

440.     The Board Member Group, The Dondero ERA Management, the Highland

Capital Officers, and Employees Group and the Outside Legal Provider Group #1 and #2 are debtors liable on those claims.

441.    As described in detail above, The Board Member Group, The Dondero ERA Management, the Highland Capital Officers, and Employees Group and the Outside Legal Provider Groups #1 and #2 fraudulently transferred Plaintiff's assets with the actual intent to hinder delay and/or defraud the Plaintiff.

442.    The Board Member Group, The Dondero ERA Management, the Highland Capital Officers, and Employees Group and the Outside Legal Provider Groups #1 and #2 retained possession and control of the assets after the transfer.

443.    The Board Member Group, The Dondero ERA Management, the Highland Capital Officers, and Employees Group and the Outside Legal Provider Group #1 and #2 transfer of the assets was concealed and made with the intent to hinder, delay, or defraud Plaintiff.

444.    The transfer was of all of Plaintiff's assets.

445.    The Plaintiff became insolvent shortly after the transfer was made.

## COUNT TWENTY-SIX – FRAUD – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013– THE BOARD MEMBER GROUP, THE DONDERO ERA MANAGEMENT, THE HIGHLAND CAPITAL OFFICERS, AND EMPLOYEES GROUP DEFENDANTS

446.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

447.    Plaintiff refers specifically to the above factual background section and the facts plead in the causes of action sections above as applied and incorporated to this cause of action for fraud.

448.    As set forth above, the Board Member Group, The Dondero ERA Management, the Highland Capital Officers, and Employees Group made multiple false and material representations to Plaintiff regarding the protection of its assets in 2012-2013.

449.    The Board Member Group, The Dondero ERA Management, the Highland

Capital Officers, and Employees Group made these representations, and they knew the representations were false.

450.     The Board Member Group, The Dondero ERA Management, the Highland Capital Officers and Employees Group these representations with the intent that the Plaintiff act on it.

451.     The Plaintiff did in fact rely on these representations thus causing injury to the Plaintiff.

## COUNT TWENTY-SEVEN – FRAUD – TRANSFER OF ESCROW ASSETS 2016– THE DONDERO ERA MANAGEMENT, THE HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS

452.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

453.     Plaintiff refers specifically to the above factual background section and the facts plead in the causes of action sections above as applied and incorporated to this cause of action for fraud.

454.     As set forth above, The Dondero ERA Management, the Highland Capital Officers, and Employees Group, made multiple false and material representations to Plaintiff regarding the stripping of the escrow in 2016.

455.     The Dondero ERA Management, the Highland Capital Officers, and Employees Group, made these representations, and they knew the representations were false.

456.     The Dondero ERA Management, the Highland Capital Officers, and Employees Group, made these representations with the intent that the Plaintiff act on it.

457.     The Plaintiff did in fact rely on these representations thus causing injury to the Plaintiff.

## COUNT TWENTY-EIGHT – THIRD PARTY BENEFICAIRY BREACH OF CONTRACT – TRANSFER OF ESCROW ASSETS 2016– ABRAMS & BAYLISS DEFENDANT

458.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as

if fully set forth herein.

459.    On December 12, 2013, Ellington, Leventon, and Surgent coordinated with Abrams & Bayliss to serve as escrow agent. Highland Capital's assistant general counsel, Leventon, sent a draft of the Escrow Agreement to Abrams & Bayliss on December 13, 2013, and the agreement was executed that day by Ellington. Matthew Miller ("Miller"), an Abrams & Bayliss attorney who primarily worked on the escrow matter and had just completed his first year as an attorney and simply used the terms proposed by Leventon.

460.    The assets deposited in the escrow account were represented to be: (1) $1,210,502.03 in cash; (2) a limited partner interest in Restoration Capital Partners Fund, LP and (3) 1088.42 shares of NexPoint Credit Strategies. This was the story Defendants "came up with" so they could sell to the jury in the Texas Litigaiton that they had not simply stolen Plaintiff's assets. The notion that Defendants did nothing nefarious with Plaintiff's assets and merely set them aside would become a theme of Defendants in the Texas Litigation.

461.    The key provision of the Escrow Agreement that undergirded Defendants' story in the Texas Litigation provided that if Daugherty prevailed in the Texas Litigation, escrowed assets in the amount of the judgment "shall" be transferred to Plaintiff. Also pursuant to the crime-fraud discovery in May 2019, it was revealed that 122 days after executing the Escrow Agreement, Leventon and Girard changed the Escrow Agreement without Daugherty's knowledge because it wanted to "slip sheet the Schedule 1 assets" to change "the NexPoint shares from shares to the cash equivalent of shares because it is difficult to find a prime broker to open account for such a small pool of assets." Abrams & Bayliss simply swapped the pages. Abrams & Bayliss later explained, "if Daugherty digs deeply enough, he may discover that Schedule 1 was revised on December 16, 2013, with no re-execution of the Escrow Agreement by Highland Capital and Abrams & Bayliss. Highland's counsel merely re-sent the Escrow Agreement with an updated Schedule 1, and Abrams & Bayliss sent an email confirmation of the change."

According to Abrams & Bayliss, "⌈i⌉t is unlikely that Daugherty would learn of the revision." With the appearance of an escrow in place, Defendants were poised to present themselves in the Texas Litigation not as thieves, but rather as protectors of Plaintiff's and Daugherty's interests. That is the story they spun at trial. This was a state of affairs just a month before trial in the Texas Litigation.

462.    It was not until previously concealed document and email production in 2022 and 2023 that Plaintiff learned the full story of how Abrams & Bayliss and Highland Capital had stripped the escrow account of all assets.

463.    The Escrow Agreement between Abrams & Bayliss and Highland Capital is a valid and enforceable contract whose intent was to secure a benefit, the deposited assets, for the benefit of the Plaintiff. Plaintiff is now entitled to enforce that contract as a third-party beneficiary because that benefit has been denied to Plaintiff, as Abrams & Bayliss and Highland Capital stripped the escrow account of the deposited assets.

## COUNT TWENTY-NINE – TORTIOUS INTEREFRENCE WITH A CONTRACT – TRANSFER OF ESCROW ASSETS 2016– ABRAMS & BAYLISS AND HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS

464.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

465.    Plaintiff was controlled by a limited liability company operating agreement, which was a valid and enforceable contract. The Highland Capital Officers and Employees Group and Abrams & Bayliss intentionally interfered with that contract when The Highland Capital Officers and Employees Group moved Plaintiff's assets into an escrow account held by Abrams & Bayliss. This interference proximately caused Plaintiff's injury through the loss of its assets, incurring actual damages.

**COUNT THIRTY – TORTIOUS INTEREFRENCE WITH A CONTRACT – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013– DONDERO ERA MANAGEMENT, OFFICERS, AND EMPLOYEES GROUP DEFENDANTS**

466. Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

467. Plaintiff was controlled by a limited liability company operating agreement, which was a valid and enforceable contract. The Highland Capital Officers and Employees Group intentionally interfered with that contract when The Highland Capital Officers and Employees Group moved Plaintiff's assets to Highland Capital in 2013. This interference proximately caused damage to Plaintiff.

**COUNT THIRTY-ONE – TORTIOUS INTEREFRENCE WITH A CONTRACT – TRANSFER OF ESCROW ASSETS 2016– DONDERO ERA MANAGEMENT, HIGHLAND CAPITAL OFFICER AND EMPLOYEES GROUP DEFENDANTS**

468. Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

469. Plaintiff was controlled by a limited liability company operating agreement, which was a valid and enforceable contract. Dondero ERA Management and the Highland Capital Officer and Employees Group intentionally interfered with that contract when The Highland Capital Officers and Employees Group and the Dondero ERA Management Group moved Plaintiff's assets from an escrow account to Highland Capital in 2016. This interference proximately caused damages to Plaintiff.

**COUNT THIRTY-TWO – BREACH OF FIDUCAIRY DUTY– KATZ/DLAP DEFENDANT**

470. Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

471. Katz/DLAP breached their fiduciary duties to Plaintiff, specifically the duty to represent Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements,

duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by presenting redacted invoices for reimbursement in the Texas Litigation between Highland Capital and Daugherty in 2014 that represented legal services were performed on behalf of Highland Capital. And then, after Daugherty paid over $3.1 million in December 2016 pursuant to wiring instructions by Katz, they represented that the same invoices were unpaid obligations for work performed on behalf of Plaintiff in the Delaware litigation commencing in 2017.

472.     Katz/DLAP breached their fiduciary duties to Plaintiff, specifically the duty to represent Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by billing Plaintiff for legal services provided to Highland Capital in the Delaware Litigation.

473.     Katz/DLAP's breaches proximately caused injury to the Plaintiff and/or resulted in a benefit to the Defendants.

## VI.
## <u>CONDITIONS PRECEDENT</u>

474.     All conditions precedent for the claims above have been performed or have occurred.

## VII.
## <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiff Highland Capital Employee Retention Assets LLC prays that Defendants be cited to appear and answer herein, and for the further relief set forth below:

(1)     Actual damages;

(2)     Exemplary damages;

(3)     Pre- and post- judgment interest;

(4)     Attorneys' fees and costs of suit; and

(5)     Such other and further relief to which Plaintiff Highland Capital Employee Retention Assets LLC may be justly entitled.

Dated: July 15, 2024.

Respectfully submitted,

LAW OFFICE OF MATTHEW BOBO, PLLC.

*/s/ Matthew W. Bobo*
**Matthew W. Bobo**
State Bar No. 24006860

4916 Camp Bowie Blvd.
Fort Worth, Texas 76107
Telephone: (817) 529-0774
Facsimile: (817) 698-9401
mbobo@mwblawyer.com

**ATTORNEYS FOR PLAINTIFF**

# EXHIBIT C

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| v. | § | _____ |
| | § | |
| PATRICK HAGAMAN DAUGHERTY, | § | |
| | § | |
| Defendant. | § | |

## COMPLAINT FOR (1) DISALLOWANCE OF CLAIM NO. 205 IN ITS ENTIRETY, (2) ESTIMATION OF CLAIM NO. 205 FOR ALLOWANCE PURPOSES, OR (3) SUBORDINATION OF ANY ALLOWED PORTION OF CLAIM NO. 205 OF PATRICK HAGAMAN DAUGHERTY

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.



¹1934054250505000000000001

Highland Capital Management, L.P., the reorganized debtor ("Highland" or the "Debtor" as applicable) in the above-captioned chapter 11 case ("Bankruptcy Case") and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), files the *Complaint for (1) Disallowance of Claim No. 205 in Its Entirety, (2) Estimation of Claim No. 205 for Allowance Purposes, or (3) Subordination of Any Allowed Portion of Claim No. 205 of Patrick Hagaman Daugherty* (the "Complaint"), alleging upon knowledge of its own actions and upon information and belief as to all other matters as follows:

## PRELIMINARY STATEMENT[2]

1. Patrick Daugherty is a former employee of, and former limited partner in, the Debtor. Mr. Daugherty filed a claim (denoted as Claim No. 205) in which he asserted a myriad of claims against the Debtor. All of Mr. Daugherty's claims were settled except his unliquidated, contingent claim that the Debtor has a continuing and indefinite obligation to make him whole if a tax refund he apparently received for tax year 2008 on account of his Partnership Interests is ever successfully challenged by the IRS.

2. As discussed below, in 2009, Mr. Daugherty was allocated his applicable losses from Highland for tax year 2008 on account of his Partnership Interests. The allocation of losses in 2009 fully satisfied the 2008 Refund line item in the 2009 Statement; Mr. Daugherty received exactly what he was entitled to receive from Highland. Accordingly, Mr. Daugherty's Claim against the Debtor for additional compensation for 2008 has no basis and the Claim should be disallowed.

3. To avoid this result, Mr. Daugherty alleges the Debtor is required to make him whole if any portion of the tax refund he received for 2008 on account of his Partnership Interest

---

[2] All capitalized terms used but not defined in this Preliminary Statement have the meanings given to them below.

is clawed back by the IRS—Highland's 2008 tax return is currently subject to an IRS audit. But the 2009 Statement contains no future, ongoing obligations. Under the 2009 Statement, if Mr. Daugherty received the material equivalent of the "2008 Refund" (which he apparently did), Highland's obligations have been satisfied in full. The 2009 Statement contains no ongoing obligation for Highland to defend Mr. Daugherty or indemnify him. And it would violate basic tenets of contract law to read vague and indefinite precatory language in the 2009 Statement as creating a specific continuing and binding payment obligation that can be enforced forever. This is particularly true where the agreement that governed Mr. Daugherty's employment by the Debtor expressly provided that after his separation from the Debtor, the Debtor would have no further liability or obligation to Mr. Daugherty in connection with his employment.

4.      However, even if Mr. Daugherty's Claim is not disallowed in its entirely, it remains contingent on the outcome of the 2008 Audit. It is unclear when, how, or if the 2008 Audit will be finally resolved. Moreover, if the Claim is not disallowed, it will need to be estimated—after taking into account the likely outcome of the 2008 Audit, including adjustments that result therefrom—pursuant to 11 U.S.C. § 502(c). The Claim (in whatever amount) based on his partnership tax allocations must also be subordinated to the interests in Class 10 pursuant to 11 U.S.C. § 510(b).

## JURISDICTION AND VENUE

5.      This Adversary Proceeding arises in and relates to Highland's Bankruptcy Case.

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

7.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Bankruptcy Rule 7008, Highland consents to the entry of a final order by the Court if

it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the U.S. Constitution.

8.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

9.     Highland is a limited partnership formed under the laws of Delaware with a business address at 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

10.    Upon information and belief, Defendant Patrick Daugherty is an individual residing at 3621 Cornell Avenue, Suite 830, Dallas, Texas 75205.

## STATEMENT OF FACTS

### I.     The Bankruptcy Case and Mr. Daugherty's Claims

11.    On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the Bankruptcy Case.

12.    On April 1, 2020, Mr. Daugherty filed Proof of Claim No. 67 ("Claim 67"). On April 6, 2020, Mr. Daugherty filed Proof of Claim No. 77 ("Claim 77"), which superseded and replaced Claim 67 in its entirety. On December 23, 2020, Mr. Daugherty filed Proof of Claim No. 205 (the "Claim" or "Claim 205"), which superseded and replaced Claim 77 in its entirety.

13.    On February 22, 2021, this Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Bankr. Docket No. 1943],[3] which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Bankr. Docket No. 1808] (as amended, the "Plan"). The Plan became effective August 11, 2021 [Bankr. Docket No. 2700].

---

[3] Bankr. Docket No. __" refers to the docket maintained in Case No. 19-34054-sgj11.

14.     On December 8, 2021, the Debtor filed *Reorganized Debtor's Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith* [Bankr. Docket No. 3088] (the "<u>Settlement Motion</u>").

15.     This Court approved the Settlement Motion on March 8, 2022 [Bankr. Docket No. 3298] (the "<u>Settlement Order</u>"), disallowing Claim 67 and Claim 77 with prejudice and resolving all of Claim 205 other than Mr. Daugherty's claim for the 2008 Refund.

## II.      <u>Mr. Daugherty Was Employed by the Debtor and Became a Limited Partner</u>

16.     Mr. Daugherty was hired by the Debtor in 1998. Later, he became eligible to participate in the Debtor's long-term incentive plan (the "<u>LTIP</u>"). Pursuant to the LTIP, at various times, Mr. Daugherty received limited partnership interests in the Debtor (the "<u>Partnership Interests</u>") and became one of the Debtor's limited partners. At all relevant times with respect to Claim 205 as it relates to the 2008 Tax Refund, Mr. Daugherty's employment was governed by an *Amended and Restated Employment Agreement*, dated as of December 31, 2004 (the "<u>Employment Agreement</u>"). For the 2008 tax year, Mr. Daugherty was allocated 0.740262% of the taxable losses of the Debtor on account of his Partnership Interests.

17.     Because the Debtor was a limited partnership, it was a pass-through entity for tax purposes and paid no federal income tax. The Debtor's limited partners, including Mr. Daugherty, were therefore required to pay individual federal income taxes (among other taxes) based on, among other things, their allocable share of the Debtor's income, if any, or could use their allocable share of any losses to offset other current income or, in certain circumstances, carry back losses, and receive a tax refund from the Internal Revenue Service (the "<u>IRS</u>"). Thus, because of his Partnership Interests, Mr. Daugherty was entitled to receive a pass through of his allocable share of any taxable gains or losses generated by the Debtor. Taxable gains increase tax liability; taxable losses decrease tax liability.

### III.    The 2009 Statement and IRS Audit

18.    On February 27, 2009, the Debtor provided Mr. Daugherty with a *Comprehensive Compensation and Benefits Statement* recapping all earnings, awards, and benefits Mr. Daugherty received in connection with his employment by and Partnership Interests in the Debtor during calendar year 2008 (the "2009 Statement"). A true and accurate copy of the 2009 Statement is attached hereto as **Exhibit A**. Such statements were provided to all employees each year at the conclusion of the annual performance review and bonus cycle.

19.    The 2009 Statement included what Highland estimated to be the tax refund Mr. Daugherty could expect for tax year 2008 in the amount of $1,475,816 (the "2008 Refund"). That amount purported to be an estimate of the pre-tax equivalent refund that Mr. Daugherty should have expected to receive from the IRS on account of the losses attributable to his Partnership Interests for the 2008 tax year.

20.    The 2008 Refund was "an estimated amount" based on the notion that losses in 2008 would equal or exceed total partnership gains that had been allocated to Mr. Daugherty in tax years 2005, 2006, and 2007 and assuming a 27% effective tax rate for each year for all of the employee limited partners. The amount was then "grossed up" by 35% so that Mr. Daugherty could compare it to the value of the other benefits for being a Debtor partner and employee[4]. Finally, the estimated partner tax refund amount was calculated without reference to Mr. Daugherty's other personal tax attributes for the 2008 tax year or prior years, and partners were advised that each person's own actual refund may vary based on their own effective tax rate.

21.    While the 2009 Statement vaguely noted that "[i]f actual refund deviates materially from estimate, other compensation will be fairly adjusted," partners like Mr.

---

[4] The calculation of the 2008 Refund was therefore 2005-2007 allocated income of $3,552,890 x 27% or $959,280. Then the $959,280 was divided by 35% for a "pre-tax" calculated amount of $1,475,816.

Daugherty were told that the tax refund amounts were "not guaranteed," and that if refund amounts were different, Highland would merely "consider what action to take on a case-by case basis, considering several factors."

22.     As reflected on his K-1 for tax year 2008 (the "2008 K-1"), Mr. Daugherty was allocated ordinary business losses by Highland in excess of $4 million, along with other losses that well-exceeded the allocated income from 2005-2007.[5] As shown in the 2008 K-1, Mr. Daugherty received what he was promised in the 2009 Statement, if not more.

23.     After the obligations to Mr. Daugherty under the 2009 Statement had been satisfied, the IRS began an audit of Highland's 2008 tax return (the "2008 Audit").[6] On information and belief, the 2008 Audit is not yet fully resolved.

24.     On October 31, 2011, Mr. Daugherty terminated his employment with Highland. Pursuant to the express conditions of his Employment Agreement, Mr. Daugherty acknowledged and agreed that the Debtor would "have no further liability or obligation to [Mr. Daugherty] under [the Employment Agreement] or in connection with his/her employment of termination."

## IV.     The Alleged Basis for the Claim

25.     In the Claim, Mr. Daugherty demands the Debtor pay him $2,650,353, which consists of the full amount of the 2008 Refund ($1,475,816) plus interest of $1,174,537.[7] Mr.

---

[5] In the simplest terms, to determine whether an individual owes additional taxes or is entitled to a refund, income or losses are multiplied by the applicable tax rate. As an example, in a vacuum, $4 million of taxable losses allocated to an individual in the 27% bracket would result in $1.1 million of benefit in terms of reduction to their taxes owed ($4 million x 27% = $1.1 million). Likewise, $1 million of adjusted gross income resulting from W-2 wage income for an individual would result in $270,000 of tax liability for an individual whose effective tax rate is 27%, all else equal.

[6] Strand Advisors, Inc. ("Strand"), is the Debtor's "tax matters partner" for purposes of defending the 2008 Audit. Control of Strand reverted to James Dondero—the Debtor's ousted founder—in 2021, and the Debtor has no role in the 2008 Audit or visibility into its current status or how it is being conducted. On information and belief, the 2008 Audit has not been resolved and is heading to court with a resolution not expected until approximately 2029.

[7] Mr. Daugherty has provided no statutory or other justification for his claim for interest nor has he provided a proposed interest rate.

Daugherty's theory seems to be that if, upon the conclusion of the 2008 Audit, he is required to reverse the tax loss he received as a limited partner, the Debtor must reimburse him for the entirety of the 2008 Refund with interest. In other words, Mr. Daugherty reads a continuing obligation into the 2009 Statement to indemnify him for personal income taxes he may owe, if any, as a result of the 2008 Audit.

26.    However, and as set forth above, there is no such obligation in the 2009 Statement. Mr. Daugherty has no claim.

27.    But even if Mr. Daugherty did have a claim (he does not), it would be unliquidated and contingent and subordinated as it arises solely from his Partnership Interests.

## FIRST CLAIM FOR RELIEF

### (Disallowance under Bankruptcy Code 11 U.S.C. § 502(a))

28.    Highland repeats and re-alleges as if set forth herein the foregoing factual allegations.

29.    Under 11 U.S.C. § 502(a) a "claim ..., proof of which is filed under section 501 [of the Bankruptcy Code], is deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a).

30.    The ultimate burden of proof for a claim always lies with the claimant. *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15 (2000)).

31.    Mr. Daugherty received and has benefited for the past 16 years from the 2008 Refund, *i.e.*, the 2008 losses allocated to Mr. Daugherty as a Highland partner. The benefit he received from the IRS (either as a tax refund or liability reduced through offsetting of income) did not materially deviate from, and may have exceeded, the basis for the estimated 2008 Refund set forth in the 2009 Statement.

32.     Accordingly, the Debtor satisfied its obligations (to the extent it even had any) under the 2009 Statement in full, and no additional, future obligations exist under the 2009 Statement. Because the Debtor has satisfied its obligations, Claim 205 should be disallowed in its entirety.

33.     Moreover, even if the tax benefits he received related to tax year 2008 materially deviated from the 2009 Statement, Mr. Daugherty would not be able to recover from the Debtor based on the vague statement in the 2009 Statement that lacks the definiteness required to form a contractual obligation.

## SECOND CLAIM FOR RELIEF

### (Estimation under Bankruptcy Code 11 U.S.C. § 502(c))

34.     Highland repeats and re-alleges as if set forth herein the foregoing factual allegations.

35.     As set forth above, Mr. Daugherty has no Claim; however, to the extent the Court believes he has one, it is unliquidated and contingent on the final outcome of the 2008 Audit, including the magnitude of any adjustments. If the 2008 Audit is successfully defended, Mr. Daugherty will have no claim.

36.     Under 11 U.S.C. § 502(c) "[t]here shall be estimated for purposes of allowance … (1) any contingent or unliquidated claim, the fixing or liquidation of which … would unduly delay the administration of the case …."

37.     The Plan was confirmed in February of 2021 and has been effective since August of 2021. Mr. Daugherty's Claim is the last unresolved claim[8] against the estate.

38.     It is currently unknown when, if, or how the 2008 Audit will be resolved.

---

[8] The Equity Interests in subordinated Class 10 and further subordinated Class 11 have not been allowed under the terms of the Plan.

39.     Accordingly, the Debtor requests that this Court estimate the Claim—after taking into account the likelihood and degree to which the 2008 Audit will be successful or unsuccessful—under 11 U.S.C. § 502(c) for purposes of allowance and distribution.

**THIRD CLAIM FOR RELIEF**

**(Subordination under Bankruptcy Code 11 U.S.C. § 510(b))**

40.     Highland repeats and re-alleges as if set forth herein the foregoing factual allegations.

41.     Under the Bankruptcy Code,

> a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security ….

11 U.S.C. § 510(b). Section 510(b) requires the subordination of claims arising from the purchase of the equity itself and all claims arising thereafter as incidents of ownership. *In re SeaQuest Diving, LP*, 579 F.3d 411, 421 (5th Cir. 2009).

42.     Section 510(b) applies to the ownership of limited partnership interests. *Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 154 (5th Cir. 2015).

43.     Mr. Daugherty owned the Partnership Interests, and his Claim is contingent on the IRS clawing back the 2008 Refund he received on account of those Partnership Interests through the 2008 Audit.

44.     But for the Partnership Interests, Mr. Daugherty would not have been entitled to the 2008 Refund nor would Mr. Daugherty have any potential liability to the IRS from the 2008 Audit. A nexus or causal relationship exists between Claim 205 and the "purchase" of the Partnership Interests.

45.     Accordingly, judgment should issue declaring that the Claim—to the extent it is not disallowed in full—is subordinated pursuant to 11 U.S.C. § 510(b) and shall, subject to such other defenses or objections as may exist with respect to the Claim, have the same rank and priority as Class 11 under the Plan.

### **PRAYER**

WHEREFORE, Highland prays for judgment as follows:

1.     For the disallowance of the Claim in its entirety;

2.     For estimation for the Claim for purposes of allowance and distribution;

3.     For subordination of the Claim;

4.     For damages and costs of suit, including attorneys' fees, incurred in connection herewith; and

5.     For such other and further relief as the Court deems just and proper.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

Dated: May 2, 2025.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
       jmorris@pszjlaw.com
       gdemo@pszjlaw.com
       hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT A

**PAT DAUGHERTY**

Date of Hire: 4/3/1998
Comprehensive Compensation and Benefits Statement
February 27, 2009

---

### EARNINGS AND AWARDS

2008 Base Salary, as of 12/31/08             $ ███0
**2009 Base Salary, effective March 1, 2009 :   $ ███0**

2008 Tax Refund                                $ 1,475,816

Refund is an estimated amount. If actual refund deviates materially from estimate, other compensation will be fairly adjusted. Refund is expected to be received in approximately 4 months.

Loan Forgiven in 2009 as part of bonus:

2008 Other Awards
- 401K Match
- Defined Benefit

2008 Deferred Compensation
- Retention Award

Highland's Hedge Funds and Private Equity funds, for a variety of reasons, largely preclude redemptions and Highland Capital Management, L.P. may or may not be in a position to provide a cash equivalent upon triggering of any employee specific monetization. Therefore for this deferred compensation award and any previous awards of Option IT and STIP, Employee agrees to accept payment in kind settlement of any monetization if necessary. _____ (*Please Initial*)

*2008 Total Earnings and Awards*                 $ ██████

---

### HIGHLAND PAID BENEFITS

Medical
Dental
Basic and Dependent Life Insurance/AD&D
Short Term Disability and Long Term Disability
Executive LTD
Daily Catered Lunches
Blackberry
Parking

*2008 Estimated Total Value of Highland Paid Benefits*

---

### TOTAL COMPENSATION PACKAGE        $ ██████

---

*Waiver and Release Payments in 2008*           $ ███0

**ACCEPTED AND AGREED:**

_____            _____

**Patrick Daugherty**                         **Date**

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br><br>Highland Capital Management, L.P. | DEFENDANTS<br><br>Patrick Hagaman Daugherty |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067, Tel.: (310) 277-6910; and Hayward PLLC, 10501 N. Central Expressway, Suite 106, Dallas, TX 75231, Tel.: (972) 755-7100 | ATTORNEYS (If Known) |

| PARTY (Check One Box Only)<br>☑ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor    ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Disallowance or estimation of claim under 11 U.S.C. 502 or subordination under 11 U.S.C. 510(b)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
☐ 11-Recovery of money/property – §542 turnover of property
☐ 12-Recovery of money/property – §547 preference
☐ 13-Recovery of money/property – §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(h) Subordination of Claim or Interest**
☑ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ |

Other Relief Sought

Disallowance or estimation of claim under 11 U.S.C. 502

**B1040 (FORM 1040) (12/24)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>May 2, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# EXHIBIT D

Jason S. Brookner (Texas Bar No. 24033684)
Andrew K. York (Texas Bar No. 24051554)
Joshua D. Smeltzer (Texas Bar No. 24113859)
Drake M. Rayshell (Texas Bar No. 24118507)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, TX 75201
Telephone: (214) 954-4135
Facsimile:  (214) 953-1332
Email:     jbrookner@grayreed.com
           dyork@grayreed.com
           jsmeltzer@grayreed.com
           drayshell@grayreed.com

*Counsel to Patrick Daugherty*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 (SGJ) |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

## DECLARATION OF ANDREW K. YORK IN
## SUPPORT OF PATRICK DAUGHERTY'S OBJECTION TO MOTION
## FOR AN ORDER AUTHORIZING (A) THE DESTRUCTION OF CERTAIN
## DOCUMENTS AN OBSOLETE EQUIPMENT AND (B) FOR RELATED RELIEF

I, Andrew K. York, pursuant to 28 U.S.C. § 1746, under penalty of perjury, declare as follows:

1.     I am an attorney of record for Patrick Daugherty ("Daugherty") in both the main bankruptcy proceeding, Case No. 19-34054-sgj11, and Adversary Proceeding Case No. 25-03055-sgj11. I am able to swear, and hereby do swear, that the facts stated in this declaration are true and

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

correct and are within my personal knowledge.  I make this declaration in support of Patrick Daugherty's *Objection to the Motion for an Order Authorizing (A) The Destruction of Certain Documents and Obsolete Equipment and (B) For Related Relief* [Docket No. 4416] (the "Motion") filed by Highland Capital Management, L.P.'s ("Debtor" or "Highland"), the Highland Claimant Trust (the "Claimant Trust"), and (collectively, Highland and the Claimant Trust "Movants").

2.      On October 6, 2025, in response to the Motion, I drafted and sent a letter to Highland's counsel, John Morris, requesting additional details about the information that Movants seek to destroy through their Motion.  A true and correct copy of that letter is attached here to as Exhibit D-1.

3.      On October 8, 2025, Mr. Morris responded to my letter by providing the Iron Mountain Inventory List in .pdf format (the "First Inventory List").  A true and correct copy of that email is attached hereto as Exhibit D-2.  A true and correct copy of the First Inventory List is attached hereto as Exhibit D-3.

4.      On October 9, 2025, my associate, Drake Rayshell emailed Mr. Morris indicating that the list was missing data due to the formatting of the columns within the document.  A true and correct copy of that email is attached hereto as Exhibit D-4.

5.      Mr. Morris responded on October 9, 2025 and provided a different .pdf copy of the Iron Mountain Inventory List (the "Second Inventory List").  A true and correct copy of that email is attached hereto as Exhibit D-5.  A true and correct copy of the Second Inventory List is attached hereto as Exhibit D-6.

6.      On October 26, 2025, with no additional details forthcoming and after my team's review the Second Inventory List, I emailed Mr. Morris identifying the deficiencies in the Iron

4916-2069-4901

Mountain information and requesting a response to the inquiries in my October 6 letter.  A true and correct copy of that email is attached hereto as Exhibit D-7.

7.       Mr. Morris responded on October 27, 2025, that it was "too bad Mr. Daugherty did not find anything on the inventory list that might be useful" and refused to engage in further meaningful discussion regarding the contents of my October 6 letter.  A true and correct copy of that email is attached hereto at Exhibit D-8.

8.       I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed in Dallas County, Texas on the 28th Day of October 2025.


*/s/ Andrew K. York*
Andrew K. York

4916-2069-4901

# EXHIBIT D-1



ANDREW K. YORK
DIRECT DIAL: (469) 320-6114
EMAIL: dyork@grayreed.com

1601 ELM STREET, SUITE 4600
DALLAS, TEXAS 75201
www.grayreed.com

October 6, 2025

**VIA EMAIL: jmorris@pszjlaw.com**

John Morris
PACHULSKI STANG ZIEHL & JONES LLP
1700 Broadway, 36th Floor
New York, New York 10019

Re:    Case No. 19-34054-sgj11, *In re: Highland Capital Management, L.P.* and
Case 25-03055-sgj, *Highland Capital Management, L.P. v. Patrick
Hagaman Daugherty*

Dear John:

I am writing concerning *Highland Capital Management, L.P. and The Highland Claimant
Trust's Motion for an Order Authorizing (A) The Destruction of Certain Documents and Obsolete
Equipment and (B) for Related Relief* (Doc. No. 4416 in Case No. 19-34054-sgj11). As you know,
Highland brought an adversary complaint against Patrick Daugherty (Case No. 25-03055).
Additionally, Highland and Daugherty entered into a settlement agreement that included an
obligation for Highland to turn over all books and records of Highland Employee Retention Assets,
LLC ("HERA") to Daugherty. We have a number of concerns regarding statements in the Motion,
and request answers and clarifications to the following items so that Daugherty can adequately
evaluate how he will respond to the Motion:

1.    The Motion indicates that Highland believes the information contained in the 2,414
boxes of Documents and 1,573 boxes of Retained Documents is duplicative of what
is contained on a cloud-based storage solution. What efforts has Highland made to
ensure that the materials contained in these boxes of Documents and Retained
Documents are all available electronically? Further, what efforts has Highland
made to ensure that the boxes of Documents and Retained Documents do not
contain any hard copies that contain information (such as handwritten notes) not
available on the electronic versions of the same documents?

John Morris
October 6, 2025
Page 2

2.      The Motion states that the Documents and Retained Documents "are not needed for any pending or foreseeable litigation." Do the Documents and Retained Documents contain any information concerning Daugherty's compensation while at Highland? Do the Documents and Retained Documents contain any information concerning Daugherty and/or his team's performance and investments while at Highland? Do the Documents and Retained Documents contain any information concerning Daugherty's and/or his team's investments after he left Highland? Has Highland confirmed the Documents and Retained Documents do not include the "Separation Agreement" Daugherty supposedly was bound by upon his resignation from Highland in 2011? Do the Documents and Retained Documents contain any information concerning the matters that Daugherty worked on between 2007 and 2011 including the out of court restructuring of Highland led by Daugherty when Highland defaulted on its credit facility during the great Financial Crisis?

3.      Although Highland turned over some of HERA's books and records, it has not turned over all of them. Daugherty has repeatedly requested all of the books and records, only to be rebuffed. Please confirm that the Documents and Retained Documents do not include any of HERA's books and records. Please also confirm that the Documents and Retained Documents do not include any documents or communications among Highland employees concerning HERA. Finally, it is clear from past hearings that Highland is aware of HERA's lawsuit against James Dondero, Mark Okada, Scott Ellington and others currently pending in the Northern District of Texas. Please confirm that the Documents and Retained Documents do not include any documents, communications or records that might be related to HERA's allegations in that lawsuit including but not limited to (1) all casefiles, documents and correspondence with outside counsel regarding matters listed in invoices that were allocated to HERA; (2) all casefiles, work product, and communications from Ellington, Surgent, and Leventon concerning HERA pursuant to their purported representation of HERA; (3) all casefiles, invoices and communications from outside counsel who purported to represent HERA as counsel or whose invoices were allocated to HERA; (4) all documents and communications, that relate to direct investments of HERA from 2009 to the present; (5) all documents and communications that relate to HERA's investment in Restoration Capital Partners, LP (aka RCP); (6) all documents and communications that relate to Restoration Capital Partners, LP's underlying investments including but not limited to Cornerstone Healthcare, Trussway Holdings and affiliates, Metro Goldwyn Mayer (aka MGM), Building Materials Holding, Safety-Kleen Systems, DBSD North America, American HomePatient, Lifecare Holdings; (7) all documents and communications regarding any offered follow-on or add-on investment related to any initial underlying investments of Restoration Capital Partners, LP; (8) all documents and communications regarding any financing, re-financing or incurrence of debt to any initial underlying

John Morris
October 6, 2025
Page 3

investments of Restoration Capital Partners, LP; and (9) any documents or communications concerning tax and/or accounting matters related to HERA.

4.      Is Highland willing to share with Daugherty the "inventory describing the boxes and their contents" referenced in the Motion?

Please respond in writing no later than close of business October 8, 2025, to these items so Daugherty has sufficient time to evaluate and continue any conferral with Highland to try to narrow any issues relating to the Motion. Additionally, we note that you have not set the Motion for hearing nor included a negative notice provision within your Motion. Absent doing so, and subject to the response we get to this letter, Daugherty will be filing an objection and/or a response before the hearing in accordance with the Court's local rules.

Very truly yours,

Andrew K. York

AKY/sll

4905-9661-6815.4

# EXHIBIT D-2

| **From:** | John A. Morris |
|---|---|
| **To:** | Deitsch-Perez, Deborah R.; Drew K. York |
| **Cc:** | Jeff Pomerantz; Aigen, Michael P.; Drake Rayshell |
| **Subject:** | [EXTERNAL] Highland: Inventory of Boxes to be Destroyed |
| **Date:** | Wednesday, October 8, 2025 2:11:59 PM |
| **Attachments:** | image001.jpg |
| | Iron Mountain Inventory for destruction.pdf |

Deborah and Drew:

You have each inquired about the Documents subject to the Destruction Motion.

While your clients have no right to obtain any of the Documents, Highland would like to avoid any objection to the Motion.

Toward that end, attached is the inventory of the boxes subject to the Motion (I understand the list is searchable).  To resolve any objection, please let us know if your clients want copies of the Documents in any box; assuming they are plausibly related to some on-going litigation, we can arrange to have them copied at your client's expense and provide them pursuant to an agreed-upon confidentiality agreement.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

# EXHIBIT D-3

| CUSTOMER ID | CUSTOMER NAME | DISTRICT ID | DISTRICT NAME | DIVISION ID | DIVISION NAME | DEPARTMENT ID | DEPARTMENT NAME | RECORD CODE | RECORD CODE DES | REF BOX # | CUST BOX # | STATUS | BOX TYPE | CUBIC FT | MEDIA TYPE | CREATE DATE | EVENT DATE | RECEIPT DATE | FROM DATE | TO DATE | DESTRUCTION DATE | DESTRUCTION IND | MANUAL DESTRUCT | BOX LOCATION | MAJOR DESCRIPTION | MINOR DESCRIPTION | ALPHA FROM | ALPHA TO | REFERENCE 1 | REFERENCE 2 | LONG DESCRIPTION | LAST PICK-UP ORDER | RFID TAG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000715 | 38410XXM NMM | | 1.2 | 1.2 | | 2/22/2000 | | 2/24/2000 | 2/1/1992 ####### | | U | NO | D.LDW1300034350 | AUDIT LETTERS & | PROMO LIST | | | | | 38410036 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000716 | 38010000 NMM | | 1.2 | 1.2 | | | | 3/24/2000 | | | U | NO | D.LDW1200004985 | GHYPE | | | | | | 38010036 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000726 | 38010001 NMM | | 1.2 | 1.2 | | 2/22/2000 | | 2/24/2000 | 2/1/1988 ####### | | U | NO | D.LDW1200004983 | PROSPECT STREET HIGH | | INCOME PORTFOLIO | | | | 38010001 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000727 | 38010002 NMM | | 1.2 | 1.2 | | 2/22/2000 | | 2/24/2000 | 2/1/1989 ####### | | U | NO | D.LDW1200004982 | PROSPECT STREET HIGH | | INCOME PORTFOLIO | | | | 38010002 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000728 | 38010003 NMM | | 1.2 | 1.2 | | 2/22/2000 | | 2/24/2000 | 2/1/1990 ####### | | U | NO | D.LDW1200004994 | PROSPECT STREET HIGH | | INCOME PORTFOLIO | | | | 38010003 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000736 | 38010004 NMM | | 1.2 | 1.2 | | 2/22/2000 | | 2/24/2000 | 1/31/1985 ####### | | U | NO | D.LDW1200004993 | BANK OF NEW YORK MONTH | | END REPORTS | | | | 38010004 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000740 | 38010005 NMM | | 1.2 | 1.2 | | 2/24/2000 | | 2/1/1989 ####### | | U | NO | D.LDW1200004204 | PROSPECT-TRADE TICKETS | | | | | | 38010005 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000741 | 38010006 NMM | | 1.2 | 1.2 | | 2/22/2000 | | 2/24/2000 | 1/4/1993 ####### | | U | NO | D.LDW1300034349 | PROSPECT STREET HIGH | | INCOME PORTFOLIO | | | | 38410007 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000742 | 38010007 NMM | | 1.2 | 1.2 | | 2/22/2000 | | 2/24/2000 | 3/22/1985 ####### | | U | NO | D.LDW1300034348 | PROSPECT STREET HIGH | | INCOME PORTFOLIO | | | | 38010008 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000744 | 38010008 NMM | | 1.2 | 1.2 | | 2/22/2000 | | 2/24/2000 | 9/1/1989 ####### | | U | NO | D.LDW1300034299 | PROSPECT STREET HIGH | | INCOME PORTFOLIO | | | | 38010009 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000745 | 38010009 NMM | | 1.2 | 1.2 | | 2/22/2000 | | 2/24/2000 | 12/1/1989 ####### | | U | NO | D.LDW1300034298 | PROSPECT STREET HIGH | | INCOME PORTFOLIO | | | | 38010010 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000746 | 38010010 NMM | | 1.2 | 1.2 | | 2/22/2000 | | 2/24/2000 | 1/1/1989 ####### | | U | NO | D.LDW1300034267 | PROSPECT STREET HIGH | | INCOME PORTFOLIO | | | | 38010011 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000748 | 38010011 NMM | | 1.2 | 1.2 | | 2/22/2000 | | 2/24/2000 | 8/30/1990 ####### | | U | NO | D.LDW1300034466 | PROSPECT STREET HIGH | | INCOME PORTFOLIO | | | | 38010012 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000749 | 38010012 NMM | | 1.2 | 1.2 | | 2/22/2000 | | 2/24/2000 | 3/28/1990 ####### | | U | NO | D.LDW1300034468 | PROSPECT STREET HIGH | | INCOME PORTFOLIO | | | | 38010013 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000750 | 38010013 NMM | | 1.2 | 1.2 | | 2/22/2000 | | 2/24/2000 | 5/12/1989 ####### | | U | NO | D.LDW1300034469 | PROSPECT STREET HIGH | | INCOME PORTFOLIO | | | | 38010014 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000751 | 38010014 NMM | | 1.2 | 1.2 | | 2/22/2000 | | 2/24/2000 | 2/23/1989 ####### | | U | NO | D.LDW1300034505 | PROSPECT STREET HIGH | | INCOME PORTFOLIO | | | | 38010015 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000751 | 38010015 NMM | | 1.2 | 1.2 | | 2/22/2000 | | 2/24/2000 | 12/20/1989 ####### | | U | NO | D.LDW1300034306 | PROSPECT STREET HIGH | | INCOME PORTFOLIO | | | | 38010016 | | | 0 |
| 37311 | HIGHLAND CAPITAL O | DALLAS, TX | | MASTER DIVISION | | | MASTER DEPARTMENT | | | DFW01000752 | 38010017 NMM | | 1.2 | 1.2 | | 2/22/2000 | | 2/24/2000 | 3/27/1989 ####### | | U | NO | D.LDW1300034308 | PROSPECT STREET HIGH | | INCOME PORTFOLIO | | | | 38010017 | | | 0 |

# EXHIBIT D-4

| | |
|---|---|
| **From:** | Drake Rayshell |
| **To:** | "John A. Morris"; Deitsch-Perez, Deborah R.; Drew K. York |
| **Cc:** | Jeff Pomerantz; Aigen, Michael P. |
| **Subject:** | RE: Highland: Inventory of Boxes to be Destroyed |
| **Date:** | Thursday, October 9, 2025 7:05:32 AM |
| **Attachments:** | Iron Mountain Inventory for destruction.pdf |

John,

At first blush, it looks like your .pdf export caused a loss of data because a large portion of the spreadsheet displays "######" instead of the actual date.  It is unclear if any other information was also lost in the export.  Will you please provide the native spreadsheet instead so we can evaluate the complete information?

Thanks,
Drake

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, October 8, 2025 2:09 PM
**To:** Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; Drew K. York <dyork@grayreed.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Aigen, Michael P. <michael.aigen@stinson.com>; Drake Rayshell <drayshell@grayreed.com>
**Subject:** [EXTERNAL] Highland: Inventory of Boxes to be Destroyed

Deborah and Drew:

You have each inquired about the Documents subject to the Destruction Motion.

While your clients have no right to obtain any of the Documents, Highland would like to avoid any objection to the Motion.

Toward that end, attached is the inventory of the boxes subject to the Motion (I understand the list is searchable).  To resolve any objection, please let us know if your clients want copies of the Documents in any box; assuming they are plausibly related to some on-going litigation, we can arrange to have them copied at your client's expense and provide them pursuant to an agreed-upon confidentiality agreement.

Regards,

John

**John A. Morris**

Pachulski Stang Ziehl & Jones LLP

Direct Dial: 212.561.7760

Tel: 212.561.7700 | Fax: 212.561.7777

jmorris@pszjlaw.com

vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

# EXHIBIT D-5

| | |
|---|---|
| **From:** | John A. Morris |
| **To:** | Drake Rayshell; Deitsch-Perez, Deborah R.; Drew K. York |
| **Cc:** | Jeff Pomerantz; Aigen, Michael P. |
| **Subject:** | [EXTERNAL] RE: Highland: Inventory of Boxes to be Destroyed |
| **Date:** | Thursday, October 9, 2025 2:54:08 PM |
| **Attachments:** | image001.jpg |
| | image002.png |
| | Iron Mountain.pdf |

Drake:

Try and attached and let me know if there are any issues.

Regards,

John

**John A. Morris**

Pachulski Stang Ziehl & Jones LLP

Direct Dial: 212.561.7760

Tel: 212.561.7700 | Fax: 212.561.7777

jmorris@pszjlaw.com

vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Drake Rayshell <drayshell@grayreed.com>
**Sent:** Thursday, October 9, 2025 8:06 AM
**To:** John A. Morris <jmorris@pszjlaw.com>; Deitsch-Perez, Deborah R.
<deborah.deitschperez@stinson.com>; Drew K. York <dyork@grayreed.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Aigen, Michael P. <michael.aigen@stinson.com>
**Subject:** RE: Highland: Inventory of Boxes to be Destroyed

John,

At first blush, it looks like your .pdf export caused a loss of data because a large portion of the spreadsheet displays "######" instead of the actual date.  It is unclear if any other information was also lost in the export.  Will you please provide the native spreadsheet instead so we can evaluate the complete information?

Thanks,

Drake


**Drake Rayshell**
**Associate**
Tel 469.320.6220  | Fax 469.320.6805 | drayshell@grayreed.com
1601 Elm St., Suite 4600 | Dallas, TX 75201
grayreed.com | Connect with me on LinkedIn



CONFIDENTIALITY NOTICE: This electronic transmission and any attachments constitute confidential information which is
intended only for the named recipient(s) and may be legally privileged. If you have received this communication in error, please
contact the sender immediately. Any disclosure, copying, distribution or the taking of any action concerning the contents of
this communication by anyone other than the named recipient(s) is strictly prohibited.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, October 8, 2025 2:09 PM
**To:** Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; Drew K. York
<dyork@grayreed.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Aigen, Michael P. <michael.aigen@stinson.com>;
Drake Rayshell <drayshell@grayreed.com>
**Subject:** [EXTERNAL] Highland: Inventory of Boxes to be Destroyed

Deborah and Drew:

You have each inquired about the Documents subject to the Destruction Motion.

While your clients have no right to obtain any of the Documents, Highland would like to avoid
any objection to the Motion.

Toward that end, attached is the inventory of the boxes subject to the Motion (I understand the
list is searchable).  To resolve any objection, please let us know if your clients want copies of
the Documents in any box; assuming they are plausibly related to some on-going litigation, we
can arrange to have them copied at your client's expense and provide them pursuant to an
agreed-upon confidentiality agreement.

Regards,

John

**John A. Morris**

Pachulski Stang Ziehl & Jones LLP

Direct Dial: 212.561.7760

Tel: 212.561.7700 | Fax: 212.561.7777

jmorris@pszjlaw.com

vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

# EXHIBIT D-6

CUSTOMER ID CUSTOMER NAME DISTRICT ID DISTRICT NAME DIVISION ID DIVISION NAME DEPARTMENT ID DEPARTMENT NAME RECORD CODE RECORD CODE DESCRIPTION CUST BOX # BOX TYPE CUBIC FT MEDIA TYPE CREATE DATE EVENT DATE RECEIPT DATE FROM DATE TO DATE DESTRUCTION DATE DESTRUCTION AND MANUAL DESTRUC BOX LOCATION MAJOR DESCRIPTION MINOR DESCRIPTION ALPHA FROM ALPHA TO REFERENCE 1 REFERENCE 2 LONG DESCRIPTION LAST PICK UP ORDER RFID TAG

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

| CUSTOMER | CUSTOMER NAME | DISTRICT ID | DISTRICT NAME | DIVISION ID | DIVISION NAME | DEPARTMENT ID | DEPARTMENT NAME | RECORD CODE | RECORD CODE DES | BATCH # | CUSTDESK # | STATUS | BOX TYPE | CUBIC FT | MEDIA TYPE | CREATE DATE | EVENT DATE | EVENT DATE | RECEIPT DATE | FROM DATE | TO DATE | DESTRUCTION DATE | DESTRUCTION HOLD | MANUAL DESTRUC | BOX LOCATION | MAJOR DESCRIPTION | MINOR DESCRIPTION | ALPHA FROM | ALPHA TO | REFERENCE 1 | REFERENCE 2 | LONG DESCRIPTION | LAST PICK UP ORDER | RFID TAG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*The body of this page consists of a very large, dense spreadsheet export (customer records for HOLLAND CAPITAL O, DALLAS TX, MASTER DIVISION / MASTER DEPARTMENT). The individual cell values are not legibly resolvable at this image resolution.*

| CUSTOMER ID | CUSTOMER NAME | DISTRICT ID | DISTRICT NAME | DIVISION ID | DIVISION NAME | DEPARTMENT ID | DEPARTMENT NAME | RECORD CODE | RECORD CODE DESCRIPTION | BOX REF# | CUSTBOX# | STATUS | BOX TYPE | CUBIC FT | MEDIA TYPE | CREATE DATE | EVENT DATE | RECEIPT DATE | FROM DATE | TO DATE | DESTRUCTION DATE | DESTRUCTION IND | MANUAL DESTRUC | BOX LOCATION | MAJOR DESCRIPTION | MINOR DESCRIPTION | ALPHA FROM | ALPHA TO | REFERENCE 1 | REFERENCE 1 LONG DESCRIPTION | LAST PICK-UP ORDER | RFID TAG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| CUSTOMER ID | CUSTOMER NAME | DISTRICT ID | DISTRICT NAME | DIVISION ID | DIVISION NAME | DEPARTMENT ID | DEPARTMENT NAME | RECORD CODE | RECORD CODE DES | REF BOX # | CUST BOX # | STATUS | BOX TYPE | CUST TYPE | MEDIA TYPE | CREATE DATE | EVENT DATE | RECEIPT DATE | FROM DATE | TO DATE | DESTRUCTION DATE | DESTRUCTION INDI | MANUAL DESTRUC | BOX LOCATION | MAJOR DESCRIPTION | MINOR DESCRIPTION | ALPHA FROM | ALPHA TO | REFERENCE 1 | REFERENCE 2 | LONG DESCRIPTION | LAST PICK-UP ORDER | RFID TAG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 37311 | HIGHLAND CAPITAL D | DALLAS TX | MASTER DIVISION | | | | MASTER DEPARTMENT | | | DFW01000731 | 384100266 NRM | 1.2 | 1.2 | | | | 2/22/2000 | | 3/24/2000 3/1/1992 12/31/1992 | | 0 | NO | | S.1200.1000044300 | AUDIT LETTERS & | PRICING LIST | | | 386100296 | | | 0 | |
| 37311 | HIGHLAND CAPITAL D | DALLAS TX | MASTER DIVISION | | | | MASTER DEPARTMENT | | | DFW01000732 | 384100267 NRM | 1.2 | 1.2 | | | | 2/22/2000 | | 3/24/2000 | | 0 | NO | | S.1200.1000044200 | CHYPE | | | | 386100298 | | | 0 | |
| 37311 | HIGHLAND CAPITAL D | DALLAS TX | MASTER DIVISION | | | | MASTER DEPARTMENT | | | DFW01000733 | 384100265 NRM | 1.2 | 1.2 | | | | 2/22/2000 | | 2/24/2000 2/1/1990 12/28/1992 | | 0 | NO | | S.1200.2900084800 | PROSPECT STREET HIGH | INCOME PORTFOLIO | | | 386100011 | | | 0 | |
| 37311 | HIGHLAND CAPITAL D | DALLAS TX | MASTER DIVISION | | | | MASTER DEPARTMENT | | | DFW01000734 | 384100301 NRM | 1.2 | 1.2 | | | | 2/22/2000 | | 2/24/2000 2/1/1995 3/31/1995 | | 0 | NO | | S.1200.2900084800 | PROSPECT STREET HIGH | INCOME PORTFOLIO | | | 386100601 | | | 0 | |
| 37311 | HIGHLAND CAPITAL D | DALLAS TX | MASTER DIVISION | | | | MASTER DEPARTMENT | | | DFW01000735 | 384100303 NRM | 1.2 | 1.2 | | | | 2/22/2000 | | 2/24/2000 4/1/1991 1/31/1992 | | 0 | NO | | S.1200.2900084800 | PROSPECT STREET HIGH | INCOME PORTFOLIO | | | 386100602 | | | 0 | |
| 37311 | HIGHLAND CAPITAL D | DALLAS TX | MASTER DIVISION | | | | MASTER DEPARTMENT | | | DFW01000736 | 384100302 NRM | 1.2 | 1.2 | | | | 2/22/2000 | | 2/24/2000 3/1/1990 8/31/1994 | | 0 | NO | | S.1200.2900044100 | BANK OF NEW YORK MONTH | END REPORTS | | | 386100603 | | | 0 | |
| 37311 | HIGHLAND CAPITAL D | DALLAS TX | MASTER DIVISION | | | | MASTER DEPARTMENT | | | DFW01000740 | 384100305 NRM | 1.2 | 1.2 | | | | 2/22/2000 | | 2/24/2000 1/1/1989 12/31/1991 | | 0 | NO | | S.1200.2900044200 | PROSPECT TRADE TICKETS | | | | 386100304 | | | 0 | |
| 37311 | HIGHLAND CAPITAL D | DALLAS TX | MASTER DIVISION | | | | MASTER DEPARTMENT | | | DFW01000741 | 384100306 NRM | 1.2 | 1.2 | | | | 2/22/2000 | | 2/24/2000 1/4/1993 9/20/1993 | | 0 | NO | | S.1200.1000264600 | PROSPECT STREET HIGH | INCOME PORTFOLIO | | | 386100307 | | | 0 | |
| 37311 | HIGHLAND CAPITAL D | DALLAS TX | MASTER DIVISION | | | | MASTER DEPARTMENT | | | DFW01000742 | 384100307 NRM | 1.2 | 1.2 | | | | 2/22/2000 | | 2/24/2000 3/22/1989 3/22/1989 | | 0 | NO | | S.1200.1000264200 | PROSPECT STREET HIGH | INCOME PORTFOLIO | | | 386100308 | | | 0 | |
| 37311 | HIGHLAND CAPITAL D | DALLAS TX | MASTER DIVISION | | | | MASTER DEPARTMENT | | | DFW01000743 | 384100309 NRM | 1.2 | 1.2 | | | | 2/22/2000 | | 2/24/2000 9/1/1989 11/30/1989 | | 0 | NO | | S.1200.0900184200 | PROSPECT STREET HIGH | INCOME PORTFOLIO | | | 386100008 | | | 0 | |
| 37311 | HIGHLAND CAPITAL D | DALLAS TX | MASTER DIVISION | | | | MASTER DEPARTMENT | | | DFW01000744 | 384100304 NRM | 1.2 | 1.2 | | | | 2/22/2000 | | 2/24/2000 9/1/1989 3/22/1989 | | 0 | NO | | S.1200.0900184200 | PROSPECT STREET HIGH | INCOME PORTFOLIO | | | 386100010 | | | 0 | |
| 37311 | HIGHLAND CAPITAL D | DALLAS TX | MASTER DIVISION | | | | MASTER DEPARTMENT | | | DFW01000745 | 384100311 NRM | 1.2 | 1.2 | | | | 2/22/2000 | | 2/24/2000 1/1/1988 12/5/1988 | | 0 | NO | | S.1200.0900184200 | PROSPECT STREET HIGH | INCOME PORTFOLIO | | | 386100011 | | | 0 | |
| 37311 | HIGHLAND CAPITAL D | DALLAS TX | MASTER DIVISION | | | | MASTER DEPARTMENT | | | DFW01000746 | 384100312 NRM | 1.2 | 1.2 | | | | 2/22/2000 | | 2/24/2000 3/30/1990 8/29/1995 | | 0 | NO | | S.1200.1000264600 | PROSPECT STREET HIGH | INCOME PORTFOLIO | | | 386100012 | | | 0 | |
| 37311 | HIGHLAND CAPITAL D | DALLAS TX | MASTER DIVISION | | | | MASTER DEPARTMENT | | | DFW01000750 | 384100314 NRM | 1.2 | 1.2 | | | | 2/22/2000 | | 2/24/2000 3/22/1989 8/29/1995 | | 0 | NO | | S.1200.1000264600 | PROSPECT STREET HIGH | INCOME PORTFOLIO | | | 386100014 | | | 0 | |
| 37311 | HIGHLAND CAPITAL D | DALLAS TX | MASTER DIVISION | | | | MASTER DEPARTMENT | | | DFW01000751 | 384100315 NRM | 1.2 | 1.2 | | | | 2/22/2000 | | 2/24/2000 12/29/1986 3/18/1988 | | 0 | NO | | S.1200.1000265600 | PROSPECT STREET HIGH | INCOME PORTFOLIO | | | 386100016 | | | 0 | |
| 37311 | HIGHLAND CAPITAL D | DALLAS TX | MASTER DIVISION | | | | MASTER DEPARTMENT | | | DFW01000752 | 384100317 NRM | 1.2 | 1.2 | | | | 2/22/2000 | | 2/24/2000 3/27/1989 3/11/1988 | | 0 | NO | | S.1200.1000265300 | PROSPECT STREET HIGH | INCOME PORTFOLIO | | | 386100017 | | | 0 | |

# EXHIBIT D-7

| | |
|---|---|
| **From:** | Drew K. York |
| **To:** | John A. Morris |
| **Cc:** | Jeff Pomerantz; Drake Rayshell |
| **Subject:** | RE: Highland: Inventory of Boxes to be Destroyed |
| **Date:** | Sunday, October 26, 2025 2:30:34 PM |
| **Attachments:** | 2025.10.06 LTR to J. Morris fr AKY.pdf |
| | grayreed40thanniversary_776cb36b-8781-4a34-a4ad-ddc5f9a4202d.png |

John,

We have reviewed the inventory you provided.  Unfortunately, the inventory is insufficient for Daugherty to be able to fully determine whether the boxes contain (1) HERA/ERA books and records Daugherty is entitled to under the Settlement Agreement; or (2) discoverable information relating to existing litigation, including the HCMLP adversary proceeding against Daugherty and the HERA lawsuit against Dondero et al.  By our counts there are more than 100 boxes that have no description at all.  There are also numerous boxes on the inventory that have vague descriptions that their contents are indiscernible.  I request a response to the questions raised in my October 6 letter, which I've attached again for your convenience. Thank you.

Regards,
Drew

**Drew K. York**
**Partner**
Tel 469.320.6114  | Fax 469.320.6883 | dyork@grayreed.com
1601 Elm St., Suite 4600 | Dallas, TX 75201
grayreed.com | Connect with me on LinkedIn



**CONFIDENTIALITY NOTICE:** This electronic transmission and any attachments constitute confidential information which is intended only for the named recipient(s) and may be legally privileged. If you have received this communication in error, please contact the sender immediately. Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication by anyone other than the named recipient(s) is strictly prohibited.

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, October 08, 2025 2:09 PM
**To:** Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; Drew K. York <dyork@grayreed.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Aigen, Michael P. <michael.aigen@stinson.com>; Drake Rayshell <drayshell@grayreed.com>
**Subject:** [EXTERNAL] Highland: Inventory of Boxes to be Destroyed

Deborah and Drew:

You have each inquired about the Documents subject to the Destruction Motion.

While your clients have no right to obtain any of the Documents, Highland would like to avoid any objection to the Motion.

Toward that end, attached is the inventory of the boxes subject to the Motion (I understand the list is searchable).  To resolve any objection, please let us know if your clients want copies of the Documents in any box; assuming they are plausibly related to some on-going litigation, we can arrange to have them copied at your client's expense and provide them pursuant to an agreed-upon confidentiality agreement.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

# EXHIBIT D-8

| | |
|---|---|
| **From:** | John A. Morris |
| **To:** | Drew K. York |
| **Cc:** | Jeff Pomerantz; Drake Rayshell |
| **Subject:** | [EXTERNAL] FW: Highland: Inventory of Boxes to be Destroyed |
| **Date:** | Monday, October 27, 2025 12:55:21 PM |
| **Attachments:** | grayreed40thanniversary_776cb36b-8781-4a34-a4ad-ddc5f9a4202d.png |
| | 2025.10.06 LTR to J. Morris fr AKY.pdf |

Drew,

Thank you for the email below. It's too bad Mr. Daugherty did not find anything on the inventory list that might be useful.

Pursuant to paragraph 8 of the Parties' Settlement Agreement, HERA/ERA cannot be "entitled" to anything in the boxes because nothing in them is "maintained on HCMLP's system" as required.

As to the latter issue, now that Mr. Daugherty has served his discovery demands, Highland will fulfill its obligations under applicable rules (taking into account the factors set forth in Rule 26(b)(1)), and sees no reason to engage in an informal discussion over how it's doing that.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Drew K. York <dyork@grayreed.com>
**Sent:** Sunday, October 26, 2025 3:30 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Drake Rayshell <drayshell@grayreed.com>
**Subject:** RE: Highland: Inventory of Boxes to be Destroyed

John,

We have reviewed the inventory you provided.  Unfortunately, the inventory is insufficient for Daugherty to be able to fully determine whether the boxes contain (1) HERA/ERA books and records Daugherty is entitled to under the Settlement Agreement; or (2) discoverable information relating to existing litigation, including the HCMLP adversary proceeding against Daugherty and the HERA lawsuit against Dondero et al.  By our counts there are more than 100 boxes that have no description at all.  There are also numerous boxes on the inventory that have vague descriptions that their contents are indiscernible.  I request a response to the questions raised in my October 6 letter, which I've attached again for your convenience. Thank you.


Regards,
Drew


**<span style="color:red">Drew K. York</span>**
**Partner**
Tel 469.320.6114 | Fax 469.320.6883 | dyork@grayreed.com
1601 Elm St., Suite 4600 | Dallas, TX 75201
grayreed.com | Connect with me on LinkedIn



CONFIDENTIALITY NOTICE: This electronic transmission and any attachments constitute confidential information which is intended only for the named recipient(s) and may be legally privileged. If you have received this communication in error, please contact the sender immediately. Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication by anyone other than the named recipient(s) is strictly prohibited.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, October 08, 2025 2:09 PM
**To:** Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>; Drew K. York <dyork@grayreed.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Aigen, Michael P. <michael.aigen@stinson.com>; Drake Rayshell <drayshell@grayreed.com>
**Subject:** [EXTERNAL] Highland: Inventory of Boxes to be Destroyed


Deborah and Drew:

You have each inquired about the Documents subject to the Destruction Motion.

While your clients have no right to obtain any of the Documents, Highland would like to avoid any objection to the Motion.

Toward that end, attached is the inventory of the boxes subject to the Motion (I understand the list is searchable).  To resolve any objection, please let us know if your clients want copies of the Documents in any box; assuming they are plausibly related to some on-going litigation, we can arrange to have them copied at your client's expense and provide them pursuant to an agreed-upon confidentiality agreement.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco