Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE DUGABOY INVESTMENT TRUST'S
MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

## TABLE OF CONTENTS

                                                                                      **Page**

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND .................................................................................................. 5

      A.   Patrick Serves as a Tax Attorney and Advisor to Dondero and His Companies
           for More than 16 Years ............................................................................... 5

      B.   Patrick Designs a Pooled Investment Vehicle to Fund and Protect Dondero's
           Charitable Endeavors .................................................................................. 6

      C.   Patrick Creates Hunter Mountain as a Tax-Advantaged, Charitable Vehicle to
           Hold the Majority of Highland's Equity and to Further Ensure Highland's
           Charitable Legacy ....................................................................................... 7

      D.   Highland Seeks Bankruptcy Protection, the Court Confirms Highland's Plan,
           and Litigation Ensues ............................................................................... 10

      E.   Hunter Mountain Initially Aligned With Dondero to Oppose the Bankruptcy
           Professionals' Misuse of Highland's Assets .............................................. 12

      F.   Patrick Secretly Steals the DAF's Assets from the Charities Through Secret
           Corporate Restructurings and Brazen Self-Dealing ................................... 13

      G.   The Charitable Owners Send a "No Confidence" Letter, and Patrick Carries
           Out His Secret "Work Plan" ...................................................................... 15

      H.   Patrick Moves to Liquidate the Original DAF, and the Charitable Owners Ask
           the Cayman Islands Court to Throw Patrick Out ....................................... 18

      I.   Patrick Repeats His Theft Playbook to Convert Hunter Mountain's Assets from
           The Dallas Foundation ............................................................................. 19

      J.   While Stakeholders Scramble to Unravel Patrick's Fraudulent Scheme,
           Highland and Hunter Mountain Announce their 9019 Settlement ............ 22

      K.   New Evidence on Patrick's Actions Demands Additional Scrutiny ............ 27

      L.   The Predecessor Judge in this Matter Recuses ......................................... 29

III.  THE COURT SHOULD RECONSIDER AND VACATE THE 9019 SETTLEMENT
      ORDER............................................................................................................ 31

      A.   This Court Has Ample Authority to Reconsider and Reverse Settlement Orders
           That Were Error, Are Undermined by Newly Discovered Evidence, Are
           Affected by Fraud or Misconduct, or Are Themselves Inequitable ........... 31

      B.   The Court Should Reconsider and Vacate the 9019 Settlement Order Due to
           Patrick's Fraud and Misconduct ............................................................... 33

           1.   This Court Should Reconsider and Vacate the 9019 Settlement Order
                Because Newly Discovered Evidence Shows It Was Affected by Fraud
                and Misconduct ............................................................................... 33

           2.   This Court Should Vacate the 9019 Settlement Order Because It Is the
                Product of Patrick's Misconduct and Fraud ...................................... 40

3.      This Court Should Vacate the 9019 Settlement Order Because Letting It
Stand Is Contrary to this Court's Equitable Purpose and Powers ................ 42

C.     The Court Should Reconsider and/or Vacate the Rule 9019 Settlement Order
Because It Was Issued by a Judge Who Lacked Authority Because She Should
Have Been Disqualified.......................................................................................... 43

IV.    CONCLUSION .................................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abshire v. Seacoast Prods., Inc.*,
    668 F.2d 832 (5th Cir. 1982) ...................................................................31, 40, 44, 49

*In re Acis Cap. Mgmt., L.P.*,
    No. 18-03078-sgj, Bankr. N.D. Tex. Dkt. 85-2 at 190 ..........................................46

*Allen v. United States*,
    No. 3:96-cv-256-K, 2015 WL 3824448 (N.D. Tex. June 18, 2015) .................................33, 40

*Matter of AWECO, Inc.*,
    725 F.2d 293 (5th Cir. 1984) ...............................................................................42

*Brengettecy v. Horton*,
    423 F.3d 674 (7th Cir. 2005) ...............................................................................31

*Cap. Exp., LLC v. Zinus, Inc.*,
    996 F.3d 1332 (Fed. Cir. 2021) ...........................................................................42

*Carter v. Fenner*,
    136 F.3d 1000 (5th Cir. 1998) .............................................................................42

*Castner v. First Nat'l Bank of Anchorage*,
    278 F.2d 376 (9th Cir. 1960) ...............................................................................32

*In re Charitable DAF Holdco Ltd. (In Official Liquidation)*,
    No. 25-11376-BLS (Bankr. D. Del. July 21, 2025), Dkt. 1 ...................................19

*In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*,
    No. 05-26-90042 (Dec. 29, 2025), https://tinyurl.com/yynh3u67 ...................................29, 45

*In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*,
    No. 05-26-90044 (Dec. 29, 2025), https://tinyurl.com/3vym9yu4 ...........................................45

*In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*,
    No. 05-26-90045 (Dec. 29, 2025), https://tinyurl.com/2vka5dn6 ...........................................45

*Demodulation, Inc. v. United States*,
    114 Fed. Cl. 655 (2014) ........................................................................................50

*Diaz v. Methodist Hosp.*,
   46 F.3d 492 (5th Cir. 1995) ........................................................................ 41

*Dondero et al. v. Stacey G. Jernigan*,
   No. 3:21-CV-0879-K, Dkt. 39 (N.D. Tex. Feb. 9, 2022) ....................................... 48

*Dondero v. Jernigan*,
   No. 24-10287, 2025 WL 1122466 (5th Cir. Apr. 16, 2025) ................................. 30, 47, 48, 49

*Dondero v. Jernigan*,
   No. 25-355 (Sup. Ct.) ..................................................................... 31, 48

*Dugaboy Inv. Tr. v. Highland Cap. Mgmt., L.P.*,
   No. 23-03038-sgj, Dkt. 1 (Bankr. N.D. Tex. May 10, 2023) ................................. 13

*Exxon Corp. v. United States*,
   931 F.2d 874 (Fed. Cir. 1991) .................................................................. 32

*In re Ford Motor Co.*,
   591 F.3d 406 (5th Cir. 2009) ................................................................... 32

*Frew v. Janek*,
   780 F.3d 320 (5th Cir. 2015) ................................................................... 33

*Greyhound Corp., Inc. v. Int'l Bus. Machs. Corp.*,
   559 F.2d 488 (9th Cir. 1977) ................................................................... 31

*Harrison v. Byrd*,
   765 F.2d 501 (5th Cir. 1985) ................................................................... 34

*Hayman Cash Reg. Co. v. Sarokin*,
   669 F.2d 162 (3d Cir. 1982) ................................................................... 31

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
   322 U.S. 238 (1944) ........................................................................... 33

*Hernandez v. Results Staffing, Inc.*,
   907 F.3d 354 (5th Cir. 2018) .................................................................. 41

*In re Highland Cap. Mgmt., L.P.*,
   No. 19-cv-34054-sgj (Bankr. N.D. Tex.) ..................................................... 1, 46

*In re J.P. Jeanneret Assocs., Inc.*,
   769 F. Supp. 2d 340 (S.D.N.Y. 2011) ........................................................ 38

*Jackson v. Thaler*,
   348 F. App'x 29 (5th Cir. 2009) .............................................................. 40

*Johnson Waste Materials v. Marshall*,
　611 F.2d 593 (5th Cir. 1980) ................................................................................. 33

*Kirschner v. Dondero*,
　Adv. Proc. No. 21-03076-sgj, Dkt. 1 (Bankr. N.D. Tex. Oct. 15, 2021) ............................ 4, 12

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
　523 U.S. 26 (1998) ............................................................................................. 49

*Liljeberg v. Health Servs. Acquisition Corp.*,
　486 U.S. 847 (1988) ............................................................................................ 44

*Loumar, Inc. v. Smith*,
　698 F.2d 759 (5th Cir. 1983) ....................................................................... 31, 32, 33

*Nelson v. City of Albuquerque*,
　921 F.3d 925 (10th Cir. 2019) .............................................................................. 32

*In re Osborne*,
　379 F.3d 277 (5th Cir. 2004) ................................................................................ 42

*In re Paradigm Cap. Mgmt., Inc.*, Securities and Exchange Commission Investment
　Advisers Act Release No. 3857, 2014 WL 2704311 (June 16, 2014) .................................. 38

*Philip Morris USA Inc. v. Lee*,
　494 F. Supp. 2d 544 (W.D. Tex. 2007) .................................................................... 34

*Rozier v. Ford Motor Co.*,
　573 F.2d 1332 (5th Cir. 1978) ......................................................................... 40, 41

*Stilwell v. Travelers Ins. Co.*,
　327 F.2d 931 (5th Cir. 1964) ................................................................................ 34

*Tramonte v. Chrysler Corp.*,
　136 F.3d 1025 (5th Cir. 1998) .............................................................................. 44

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
　444 U.S. 11 (1979) ............................................................................................. 38

*In re United States*,
　733 F.2d 10 (2d Cir. 1984) ................................................................................... 31

*United States v. Balistrieri*,
　779 F.2d 1191 (7th Cir. 1985) .............................................................................. 49

*United States v. O'Keefe*,
　128 F.3d 885 (5th Cir. 1997) ................................................................................ 32

*United States v. Philpot*,
    773 F. App'x 583 (11th Cir. 2019) ................................................................32

*Zarnow v. City of Wichita Falls, Tex.*,
    614 F.3d 161 (5th Cir. 2010) ........................................................................32

*Zeyen v. Bonneville Joint Dist., #93*,
    114 F.4th 1129 (9th Cir. 2024) .....................................................................32

**Statutes**

11 U.S.C. § 363 ...................................................................................................*passim*

15 U.S.C. § 80b-15(b) ...............................................................................................38

28 U.S.C. § 455 ......................................................................................32, 47, 49

28 U.S.C. § 455(a) ............................................................................43, 44, 47, 49

Bankruptcy Code Chapter 15 ....................................................................................19

Investment Advisors Act § 206 ..........................................................................37, 38

Investment Advisors Act § 215 ................................................................................37

**Other Authorities**

Federal Rule of Bankruptcy Procedure 9019 ....................................................*passim*

Crown Global Insurance Group, LLC Website,
    https://www.crownglobalinsurance.com ..........................................................8

Dallas Foundation Website, https://www.thedallasfoundation/about-us/ .....................8

Fed. R. Bankr. P. 2015.3.....................................................................................11, 12

Fed. R. Bankr. P. 9024.................................................................................1, 33, 34

Fed. R. Civ. P. 60...............................................................................................33, 49

Fed. R. Civ. P. 60(b).....................................................................................1, 33, 44

Fed. R. Civ. P. 60(b)(1)–(6).....................................................................................33

Fed. R. Civ. P. 60(b)(2) ....................................................................................33, 34

Fed. R. Civ. P. 60(b)(3) ..............................................................................40, 41, 42

Fed. R. Civ. P. 60(d)................................................................................................40

Internal Revenue Service, Donor-advised funds (Nov. 26, 2024),
    https://www.irs.gov/charities-non-profits/charitable-organizations/donor-
    advised-funds ............................................................................................................... 6

Stacey G. Jernigan, *He Watches All My Paths*, SJ Novels (self-published) (Jan. 16,
    2019) ................................................................................................................. 46, 47

Stacey G. Jernigan, *Hedging Death*, White Bird Publications (Mar. 22, 2022) ..................... 46, 47

Fifth Circuit Judicial Conduct and Discipline Rule 4(a)(7) ......................................................... 45

Securities and Exchange Commission, Interpretation of Section 206(3) of the
    Investment Advisers Act of 1940, Inv. Adv. Act Rel. No. 1732 (July 17, 1998),
    63 Fed. Reg. 39,056 (July 23, 1998) ...................................................................... 38

The Dugaboy Investment Trust ("Dugaboy") files this motion (1) for reconsideration of the Court's Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, No. 19-34054-sgj11, Dkt. 4297[1] (Bankr. N.D. Tex. June 30, 2025) (Exhibit 1, "Rule 9019 Settlement Order"); (2) seeking relief under Fed. R. Bankr. P. 9024 and Fed. R. Civ. P. 60(b); and (3) asking the Court to use its inherent power to vacate the Rule 9019 Settlement Order. The Court should do so because the Rule 9019 Settlement Order was the product of fraud and misconduct, is being used to advance and protect from further inquiry that fraud and misconduct, and was entered by a judge who should already have been disqualified.

## I.    INTRODUCTION

The Movant represents James Dondero, one of the principal former equity owners of Highland Capital Management, L.P. ("Highland"). Highland is a Dallas-based, Delaware-domiciled hedge fund manager, commenced its bankruptcy in late 2019 in the District of Delaware, after encountering a significant judgment. Highland needed temporary bankruptcy protection to sell a handful of assets in an orderly manner to satisfy that judgment. The bankruptcy was to be a reorganization, and a short and discrete one at that.

When the case was transferred to the Northern District of Texas, all that changed. Several participants in the bankruptcy—including a law firm that Highland's owners retained to ensure a brief and straightforward process—saw an opportunity to extend the bankruptcy into a multi-year saga. It was a perfect storm. The bankruptcy judge had encountered Dondero in a prior case and formed a very negative view of him and his line of business. So much so that the judge was writing

---

[1] Unless otherwise specified, all references to "Dkt." herein are references to the docket in the main bankruptcy case, *In re Highland Cap. Mgmt., L.P.*, No. 19-cv-34054-sgj (Bankr. N.D. Tex.).

1

books deriding a hedge fund and manager that resembled Highland and Dondero.

In the very first hearing, the bankruptcy judge suggested on her own initiative that Dondero should be removed from Highland's management during the pendency of the restructuring. Exhibit 2, Transcript of Status and Scheduling Conference Hearing Held 12/6/19 at 23:2–15, Dkt. 207. From that point forward, the bankruptcy professionals took every opportunity to make Highland look as though it were irredeemably insolvent and had to be saved from financial crisis by a long, drawn-out, liquidation that would take years and generate massive fees for those professionals.

This windfall was only possible because Highland was not then, and is not now, insolvent. It had more than enough assets to pay its actual creditors what they were legitimately owed. Through a variety of means—from not reporting on the value of Highland's assets (as ordinarily required in bankruptcy) to inflating Highland's supposed liabilities—the bankruptcy professionals dragged out the bankruptcy and turned it into a multi-year liquidation. Along the way, the chief restructuring officer appointed to run Highland gave long-time colleagues at selected hedge funds the opportunity to scoop up creditor claims, with assurances that there would ultimately be plenty of money to pay them.

Despite all these efforts to portray Highland as a company in financial shambles, Highland has paid most creditor claims and was poised to have something left over for equity holders. That is where the June 2025 Rule 9019 settlement that is the subject of this Motion became relevant.

Dondero and his partners—long ago—had restructured Highland to achieve certain long-term tax efficiencies and so that the company could serve a long-term charitable purpose. To that end, in 2015, Dondero and the other Highland equity holders sold their equity stake in Highland to Hunter Mountain Investment Trust ("Hunter Mountain"). And they selected The Dallas

Foundation as the primary charitable beneficiary of the restructuring.  The Dallas Foundation is a century-old charity dedicated to improving the lives of people in the hometown of Dondero and Highland.  It was ultimately structured to run like a donor-advised fund, controlled by an administrator—charged with acting in the best interest of the charitable beneficiaries—and advised by the donors as to the fund's investments and charitable purposes.

In 2021 and 2022, Mark Patrick became that administrator.   Patrick hijacked the fund to benefit himself instead of charitable causes.   He pulled this off by defrauding the charitable beneficiaries of the fund and the donors to it.  As explained below, he secretly reorganized the corporate structure of the donor-advised fund to make its beneficiary a sham charity run out of his house, rather than the genuine charities Dondero meant to benefit.  And Patrick started mowing through the charitable assets to pay himself massive "bonuses," including more than $11 million in 2024 alone.  To put this theft into scale, his predecessor was compensated only tens of thousands of dollars per year.

The charities that were the fund's intended beneficiaries started asking questions.  By early 2025, Patrick's misconduct was being investigated by the judicial system of the Cayman Islands, where the key donor-advised fund entities had been incorporated. Patrick went into overdrive to cover up his misconduct, in the face of these inquiries.  He saw an opportunity in the form of Hunter Mountain, the entity that held much of the interests of Highland's former equity holders.  For years, Hunter Mountain had pressed those equity rights in an effort to stem and to remedy the above-described unjustifiable financial bleeding from the bankruptcy professionals and process.  Given the investigations into his misconduct, that was no longer important for Patrick. He was willing to sacrifice any charitable asset to deter or slow inquiries into his theft.  And Patrick knew he had a short window of time to remain in nominal charge of the donor-advised fund, as

the investigations advanced.

Patrick secretly started negotiations with Highland's bankruptcy professionals. They offered Patrick a modest cash payment for the donor-advised fund and (more importantly for Patrick) for an assignment of the so-called *Kirschner* litigation. *Kirschner* consisted of meritless claims by the Highland corporate debtor against the former equity owners and leaders of Highland, including Dondero and his colleagues, for allegedly mismanaging Highland.[2] Highland's chief restructuring officer knew that Patrick would sign away all the rights of former Highland equity owners, for virtually nothing, to gain a weapon against the donors who were urging investigations into his misconduct. And that is exactly what happened.

So the Highland Entities[3] and the HMIT Entities[4] entered into a Rule 9019 settlement that crushed the interests of the equity owners, to serve the short-term, fraudulent ends of Mark Patrick. There were already indicia of Patrick's misconduct when the predecessor judge in this matter approved the 9019 Settlement in June 2025, in the form of the ongoing investigations of the Cayman Islands court and the plea of the Texas Attorney General for this Court to pause these proceedings pending his own inquiry. The predecessor judge erred in glossing over those concerns. But subsequent to the approval of the 9019 Settlement, newly discovered evidence has laid bare the breathtaking scope and severity of Patrick's perfidy.

The formerly presiding bankruptcy judge's approval of the 9019 Settlement should be set aside. First, this Court should exercise its authority to reevaluate the rulings of its predecessor

---

[2] *See Kirschner v. Dondero, et al.*, Adv. Proc. No. 21-cv-03076-sgj (N.D. Tex.).

[3] The "Highland Entities" are Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust. *See* Exhibit 24, Settlement Agreement & General Release, Dkt. 4217-1, at 1.

[4] The "HMIT Entities" are Hunter Mountain Investment Trust, Beacon Mountain LLC, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, and Atlas IDF, LP. *Id.*

judge and to reconsider the Rule 9019 Settlement Order.  The predecessor judge should not have approved—and this Court cannot let stand—a settlement effectively advancing Patrick's inequitable and, indeed, criminal conduct.  Newly discovered evidence proves that the settlement agreement was the product of misconduct and obtained by fraud, that the settlement is being used to perpetrate a continuing fraudulent scheme, and that the settlement could interfere with the victims' ability to recover nine figures' worth of stolen assets.

Second, the predecessor bankruptcy judge who approved the 9019 Settlement should have recused herself long before that approval due to her novel writing and concomitant stripping away of the public confidence in judicial impartiality, as subsequent developments discussed below have made more apparent.  Amid the judicial and governmental investigations into Patrick, the most reasonable course of action would have been for the Court to pause consideration of the settlement.  But the Court—at the urging of its appointed bankruptcy professionals—accelerated it.  This created a situation where the predecessor judge's impartiality could reasonably be called into question.  In particular, one might reasonably wonder whether the predecessor judge's reason for rushing the settlement—whatever its merits—was to dampen inquiries into her handling of the bankruptcy and whether she should have been presiding over it at all.  This Court should determine that the predecessor judge should have recused herself before issuing the Rule 9019 Settlement Order, vacate that order, and examine the 9019 resolution on a clean slate.

## II.   BACKGROUND

### A.   Patrick Serves as a Tax Attorney and Advisor to Dondero and His Companies for More than 16 Years

James Dondero and Mark Okada founded Highland in 1993.  Before its bankruptcy, Highland was an SEC-registered multi-billion-dollar investment advisor that employed dozens of individuals to manage its complex financial vehicles and investments.

Mark Patrick—a Texas-licensed attorney and tax professional—initially came to work for

Highland as tax counsel in January 2008.  *See* Caymans Exhibit A, First Affidavit of Mark Eric

Patrick, *In the Matter of Charitable DAF Holdco, Ltd.* ("First Patrick Aff."), No. FSD 116 of 2025

(JAJ) (Grand Ct. Cayman Islands – Financial Services Division), ¶ 64.[5]  In his capacity as tax

counsel, Patrick advised Dondero, Highland, and Dondero's affiliates (including Dugaboy) on the

tax consequences of various transactions and corporate structures.  Patrick continued in this role

until February 2021, when he left Highland to join Skyview Group, a company founded by former

Highland employees to provide Dondero and his companies the same legal and tax services that

Patrick had provided while at Highland.  Once at Skyview, Patrick performed essentially the same

role as tax counsel.  *Id.*, ¶¶ 64, 67.

### B. Patrick Designs a Pooled Investment Vehicle to Fund and Protect Dondero's Charitable Endeavors

As Highland grew and enjoyed financial success, Dondero sought to create a charitable

legacy.  In 2006, he gave an initial gift to a newly formed charitable trust that, in October 2011,

was converted into an investment vehicle for long-term charitable endeavors.  That investment

vehicle was a form of donor-advised fund.[6]  Patrick, as Highland's longtime tax counsel, was the

architect of the vehicle and oversaw internal and external professionals in its creation.  *See* Exhibit

3, Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for

---

[5] The lettered exhibits in this Motion have been segregated in accordance with a Protective Order governing confidential materials in the parallel Cayman Islands proceedings. Dugaboy will file a motion for protective order in this Court seeking leave to submit the complete, unredacted exhibits under seal.

[6] A donor-advised fund is a philanthropic giving vehicle set up as a fund or account within a public charity (the "sponsoring organization").  The donor contributes assets (cash, stock, etc.) to the sponsoring 501(c)(3) charity and receives an immediate tax deduction, but legally the charity owns and controls the donation. The donor (or designated advisor) retains advisory privileges—meaning it can recommend how the charity should invest the assets and which charitable causes to grant funds to over time.  *See* Internal Revenue Service, Donor-advised funds (Nov. 26, 2024), available at https://www.irs.gov/charities-non-profits/charitable-organizations/donor-advised-funds.

Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement

with the HMIT Entities and Authorizing Actions Consistent Therewith ("Charities' Obj."), Dkt

4231, ¶ 12.  At the top of the structure sat Charitable DAF HoldCo, Ltd. (the "DAF").[7]  Control

of the DAF rested with an independent fiduciary, which for many years was Grant Scott ("Scott"),

while the beneficial ownership was held by three (and eventually four) charitable foundations

through "participation shares."  *See* Caymans Exhibit B, Writ of Summons and Statement of

Claim, *In the Matter of Charitable DAF HoldCo, Ltd.*, Cause No. FSD 201 of 2025 (Grant Ct.

Cayman Islands – Financial Services Division July 15, 2025) ("Statement of Claim"), ¶¶ 54–57.

The DAF was the sole limited partner of Charitable DAF Fund, LP (the "DAF Fund"), a

Cayman Islands limited partnership formed to invest and manage assets for the benefit of the

charitable foundations.  For most of its existence, the DAF Fund was managed by its general

partner, Charitable DAF GP, LLC ("DAF GP"), whose managing member was also Scott.  *See*

DAF Org Chart, Ex. 4; *see also* Ex. 3, Charities' Obj., Dkt. 4231, ¶ 11.  Under Scott's management,

the DAF Fund grew to almost $300 million in assets and distributed more than $40 million to a

wide range of causes, including support for military veterans, underserved youth, and victims of

domestic violence.

### C. Patrick Creates Hunter Mountain as a Tax-Advantaged, Charitable Vehicle to Hold the Majority of Highland's Equity and to Further Ensure Highland's Charitable Legacy

In 2015, Patrick devised a plan that he believed would minimize taxes paid by Highland

and its owners, while expanding Dondero's charitable legacy.  The plan involved a complex series

of transactions, summarized as follows:

- Highland's co-founders, Dondero and Okada, donated $29.5 million to an independent charitable organization.  Ultimately, they chose The Dallas

---

[7] Attached as Exhibit 4 is the DAF's original organizational chart ("DAF Org Chart").

Foundation, a charity formed in 1929 and dedicated to improving the lives of people in Dallas.[8]  *See* Caymans Exhibit C, Transcript of Deposition of Torrey Littleton ("Littleton Dep.") at 19:16–25.

- The Dallas Foundation invested the $29.5 million donation through an independent insurance company, Crown Global Insurance Group, LLC ("Crown Global").[9]  In exchange for that investment, Crown Global issued The Dallas Foundation's sponsoring charities—Empower Dallas and the Okada Foundation—annuity policies that would guarantee the charities a regular stream of income.[10] *Id.* at 17:3–24, 21:8–13; *see also* Ex. 3, Charities' Obj., Dkt. 4231, ¶ 18.  The charities' use of an insurance mechanism is a common method of financial planning to ensure more regular income over the life of a charitable gift.

- Crown Global then invested in various income-producing vehicles.  Among those was an entity called Atlas IDF, LP ("Atlas Fund").  Caymans Ex. C, Littleton Dep. at 17:25–18:7.  The Atlas Fund, in turn, invested into Rand PE Fund I, LP ("Rand PE Fund").  *See id.*  For many years, Rand PE Fund was managed by John Honis ("Honis"), a financial professional working for an SEC-registered investment advisor, Rand Advisors, LLC ("Rand Advisors").  *See* Exhibit 5, Rand Advisors, LLC Form ADV Part 2A (March 2021) at 5–7.

---

[8] *See* The Dallas Foundation Website, available at https://www.thedallasfoundation/about-us/.

[9] *See* Crown Global Insurance Group, LLC Website, available at https://www.crownglobalinsurance.com.

[10] The "annuity" given to the charities effectively operated as equity with an optional redemption.  The charities could redeem the accrued equity by surrendering the policy.

- Rand PE Fund was the sole member of a company called Beacon Mountain, LLC ("Beacon Mountain"), which in turn became the sole owner of Hunter Mountain. *See* Caymans Ex. C, Littleton Dep. at 17:25–18:7.[11]



To ensure that The Dallas Foundation and its sponsoring charities became the ultimate beneficiaries of Highland's financial success, the principal equity owners of Highland (Dondero and Okada, and their associated entities, including Dugaboy) sold their limited partnership interests in Highland to Hunter Mountain in exchange for cash payments and notes payable. Hunter Mountain thus became the holder of 99.5% of the outstanding limited partnership shares of Highland.  *See* Exhibit 6, Amended Complaint and Objection to Claims, *Kirschner v. Dondero*,

---

[11] Attached as Exhibit 40 is the original organizational chart for Hunter Mountain.

Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.), Dkt. 158, ¶ 27.  The idea was that The Dallas Foundation would become Highland's ultimate beneficiary and use its assets for good works.  In the interim, The Dallas Foundation and its sponsoring charities would receive the income that the structure was designed to produce.  *See* Charities' Obj., Dkt. 4231, ¶ 18; Caymans Ex. C, Littleton Dep. at 21:8–13.

### D.    Highland Seeks Bankruptcy Protection, the Court Confirms Highland's Plan, and Litigation Ensues

In October 2019, Highland sought bankruptcy protection in the District of Delaware.  That move was a limited effort to sell in an orderly manner some less liquid assets to satisfy an unanticipated judgment that Highland encountered.  Exhibit 43, Voluntary Petition, Dkt. 3.  At the time, the company's equity ownership was as follows:  (i) Hunter Mountain (99.5%); (ii) Dugaboy (a family trust associated with Dondero) (0.1866%); (iii) Okada, personally and through family trusts (0.0627%); and (iv) Strand Advisors, Inc. ("Strand"), Highland's general partner (0.25%).  Exhibit 41, Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief ("Confirmation Order"), Dkt. 1943, ¶ 5.  The lawyers who encouraged Dondero to have Highland seek Chapter 11 protection confidently projected Highland would enter and exit the bankruptcy process in a few months.

The bankruptcy did not go as planned.

The case was transferred to the Northern District of Texas, on grounds that its chief bankruptcy judge there was familiar with Dondero's businesses.  At her first hearing, the predecessor judge in this case began acting on her negative views of Dondero, suggesting that he be removed from Highland's management while the restructuring occurred.  That ultimately led to a chief restructuring officer being given sole control over Highland.  The Unsecured Creditors Committee became stacked with Highland's historic litigation adversaries.  *See* Ex. 41,

Confirmation Order, Dkt. 1943, ¶ 8.

Highland's bankruptcy counsel—originally hired by Dondero—began to see the financial opportunity of a long-drawn out bankruptcy and quickly took sides against Dondero. They and the chief restructuring officer began misleadingly portraying Highland as insolvent, in need of what effectively would become a marathon liquidation, instead of the short-duration restructuring necessary to satisfy an emergency judgment and then resume normal operations. To do so, they consistently refused to provide any information on Highland's present financial condition (in stark contravention of the rules governing any bankruptcy, such as Rule 2015.3). Instead, they kept citing stale data from the deepest darkest financial hour of the country at the beginning of the Covid-19 pandemic in March 2020. And they began inflating the claims of creditors.

On February 22, 2021, over the objections of all equity holders, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization (as Modified) (the "Plan"). Ex. 41, Confirmation Order, Dkt. 1943. The Plan stretched the word "Reorganization" beyond the limits of the English language; it was effectively a liquidation. It classified all claims into eleven classes. Hunter Mountain, as a holder of pre-bankruptcy Class B and C limited partnership interests, received an unliquidated Class 10 claim subordinate to all pre-bankruptcy creditors. *Id.* at Caymans Ex. A at Art. I.B, ¶¶ 33–36, III.B, III.H.11. The other equity holders, which held pre-bankruptcy Class A limited partnership interests in Highland, received an unliquidated Class 11 claim, subordinate to Hunter Mountain. *Id.* at Caymans Ex. A at Art. I.B.33, III.B, III.H.11. As holders of the lowest classes of claims under the Plan, all the former equity holders were given "Contingent Claimant Trust Interests" in the Plan-created Highland Claimant Trust—the entity created to hold, monetize, and distribute the assets of Highland's estate. *Id.* at Art. III.H.10–11, Art. IV.B. Contingent Claimant Trust Interests were to vest only upon certification by the

Claimant Trustee—James P. Seery, Jr. ("Seery")—that all unsecured creditors had been paid in full with interest.  *Id.* at Art. I.B, ¶ 44.  Notably, the Claimant Trust had no fixed value; it was to receive the residual value of the Highland estate.  *Id.* at Art.1.B.26–27, Art. III.H.10–11.

The Plan became effective on August 11, 2021.  Exhibit 7, Notice of Occurrence of Effective Date of Confirmed Plan of Reorganization, Dkt. 2700. Because the bankruptcy professionals were inaccurately portraying Highland as insolvent, they urged the need for some complicated mechanism to recover the fictitious gap between assets and liabilities from Highland's former owners and managers.  At their urging, the bankruptcy judge approved the creation of a Litigation Sub-Trust and the appointment of a Litigation Trustee to sue Highland's pre-bankruptcy management to fill the supposed gap between Highland's assets and liabilities.  The Litigation Trustee was Marc A. Kirschner ("Kirschner"), and in October 2021, he filed a 36-count complaint (the "Kirschner Litigation") against dozens of defendants, including Dondero, Okada, Dugaboy, Strand, Hunter Mountain, and Rand PE Fund.  Exhibit 8, *Kirschner v. Dondero*, Adv. Proc. No. 21-03076-sgj, Dkt. 1 (Bankr. N.D. Tex. Oct. 15, 2021).

### E.   Hunter Mountain Initially Aligned With Dondero to Oppose the Bankruptcy Professionals' Misuse of Highland's Assets

All along, the equity owners disputed the bankruptcy professionals' claims that Highland was insolvent and advocated that Highland should be restructured to pay creditors what they were legitimately owed and then to return Highland to its equity owners.  They pressed the chief restructuring officer to file required reports on Highland's financial condition, but the predecessor judge refused to enforce compliance with the bankruptcy rules' transparency requirements.  *See* Exhibit 45, Motion to Compel Compliance with Bankruptcy Rule 2015.3, Dkt. 2256; Exhibit 46, Order Denying Motion to Compel Compliance with Bankruptcy Rule 2015.3, Dkt. 2812.

The DAF Fund was one of the parties aligned with former equity holders in arguing that

Highland's estate was worth far more than what bankruptcy management was publicly representing.  Exhibit 12, Complaint to (I) Compel Disclosures About the Assets of the Highland Claimant Trust and (II) Determine (A) Relative Value of Those Assets, and (B) Nature of Plaintiffs' Interests in the Claimant Trust, *The Dugaboy Investment Trust v. Highland Cap. Mgmt., L.P.*, No. 23-03038-sgj, Dkt. 1 (Bankr. N.D. Tex. May 10, 2023) ("Valuation Litigation").  In March 2021, Scott—the DAF's longtime trustee—decided to move on.  Patrick, who had participated in the DAF's creation, volunteered to assume that role.  Accordingly, in April 2021, Scott transferred the DAF's management shares and ownership of the DAF Fund's general partner to Patrick. Ex. 3, Charities' Obj., Dkt. 4231 at ¶ 12.

In August 2022, Patrick became Hunter Mountain's administrator when a subsidiary of the DAF Fund became the manager of Hunter Mountain.  Patrick directed Hunter Mountain to vindicate the rights of equity holders through a series of motions and lawsuits which are summarized in Appendix A to this Motion. For their part, Highland's professionals continued to delay resolution of the estate while paying themselves handsome salaries and fees.  Although the chief restructuring officer and his retained bankruptcy professionals have not been required to account for their compensation for some time, the post-effective date administrative expenses look to be well over $225 million.[12]

### F.     Patrick Secretly Steals the DAF's Assets from the Charities Through Secret Corporate Restructurings and Brazen Self-Dealing

As early as mid-2023, Patrick set out to take advantage of his positions of power.  In June 2023, Patrick stated that the DAF would make a $10,000 distribution to Highland Dallas

---

[12] This amount was calculated using the post-effective date quarterly operating reports reflecting distributions and total expenditures. *See* Dkts. 3200–3202, 3325–3326, 3409–3410, 3582–3583, 3652–3653, 3756–3757, 3888–3889, 3955–3956, 4020–4021, 4049–4050, 4130–4131, 4171–4172, 4201–4202, 4207–4208, 4319–4320, 4438–4439, 4503–4504.

Foundation and asked that the foundation, in turn, make a $10,000 charitable donation to an entity named Creative Hearts TX. Ex. 3, Charities' Obj., Dkt. 4231, ¶ 14. Patrick did not disclose that he, his wife, and his daughter had recently formed Creative Hearts and were its directors. *Id.* A few months later, Patrick attempted a kick-back scheme with a vendor, Fortaris Capital Advisors ("Fortaris"). Patrick approached Fortaris principal Kevin Cronin and proposed that the DAF make a monthly payment of $25,000 to $50,000 to an entity controlled by Cronin that Cronin would then split with Patrick. Believing that such an arrangement constituted fraud, Cronin declined the proposal and informed Dondero. Patrick has admitted his effort to effectuate this illegal scheme. *See* Caymans Ex. A, First Patrick Aff., ¶ 173.

After learning of the attempted embezzlement, Dondero demanded greater transparency into the DAF's operations. New evidence shows that within two months of Dondero's request, Patrick reached out to a loyalist law firm, The Shields Law Group, seeking guidance on how to steal the DAF from the charities. Caymans Ex. B, Statement of Claim, ¶¶ 77–80. At the heart of this scheme was secretly creating a new general partner for the DAF. Patrick's instruction was that this new corporate entity be "***hard to find or track, or trace. Or find owners, etc. Generic name. Strong litigation protection***." *Id.* ¶ 82 (emphasis added). These lawyers created a shocking "Work Plan" that outlined how to insert a couple of surreptitious companies into the corporate structure so that Patrick could separate the DAF from the charities it was created to benefit.

Patrick began to execute this scheme, setting up new companies in the dark of night. *See id.*, ¶¶ 36–37, 82–84. Patrick needed to divorce the DAF from the charities because he was stealing the DAF's assets. The scale of his self-dealing, new evidence shows, was breathtaking. Patrick increased his "director fees" *more than fifty-fold*, from approximately $40,000 in 2022 to nearly $600,000 in 2023 and then to $2.25 million in the first half of 2024. Patrick also awarded himself

"bonuses," resulting in total compensation of $11.259 million in September and October 2024 alone.  *Id.*, ¶¶ 86–87.  All of this for something—running the DAF—that would not have been a full-time job for anyone not busy stealing its assets. Patrick shut down any disclosures to the charities and gave them no notice or explanation for this staggering "compensation."  *Id.*; *see also* Ex. 3, Charities' Obj., Dkt. 4231, ¶ 22.

### G. The Charitable Owners Send a "No Confidence" Letter, and Patrick Carries Out His Secret "Work Plan"

In November 2024, the charities told Patrick they had "no confidence" in his management and requested protections against misuse of their assets.  Caymans Ex. B, Statement of Claim, ¶ 90.  Between December 2024 and April 2025,[13] while feigning a desire to engage with the charities on an amicable path forward, Patrick secretly implemented his planned restructuring of the DAF. Here is the DAF structure before Patrick's restructuring:

---

[13] In February 2024, Patrick replaced the DAF Fund's Delaware general partner, Charitable DAF GP, LLC, with a new Cayman entity as the general partner, CDH GP, Ltd. ("New GP").  He did not inform the Charities of this change.



Patrick restructured it as follows:

- Patrick incorporated a new charitable foundation in Delaware, DFW Charitable Foundation.  Caymans Ex. B, Statement of Claim, at ¶¶ 25, 93.  The new foundation, which is based out of Patrick's home, conducts almost no known charitable activity, and Patrick is its sole director, president, and member.  *Id.* ¶ 26.

- Patrick created a new donor-advised fund ("DAF 2.0") in Delaware and made himself its sole manager.  *Id.* ¶¶ 39, 42, 97.

- Patrick and Murphy, without providing notice to anyone, much less the charities, assigned the DAF's limited partnership interests to DAF 2.0 in exchange for 100% of the member interests in DAF 2.0.  *Id.* ¶¶ 98–99.[14]

- Patrick caused the new DAF 2.0 to enter into a new limited liability company agreement with himself as sole manager.  The agreement was a homemade recipe for facilitating Patrick's theft.  It provided that Patrick would have no fiduciary duties to the new donor-advised fund or to protect the assets of his charities, and that Patrick would have the sole power and discretion to value and to redeem any member's interest in the DAF.  *Id.* ¶¶ 99–101.

- Finally, Patrick asked a loyalist financial advisor to figure out a way to devalue the charitable owners' membership interests by more than 99% from just a few months earlier.  With that bogus valuation in hand, he secretly added his new foundation

---

[14] Attached as Exhibit 19 is an organizational chart reflecting the DAF restructuring.

as the owner of DAF 2.0 and redeemed the charitable owners' collective interests for $1.6 million. *Id.* ¶¶ 121–122, 136–145, 146.7, 148.

The problem is that the DAF did not hold $1.6 million in assets, but instead **nearly 200 times as much.** The charitable owners received approximately $1.6 million for assets worth approximately $270 million. And Patrick's personal charitable foundation became the sole beneficial owner of his new DAF and its $270 million in assets. The result was two remaining structures: DAF 1.0, owned by Patrick and the Charities, with zero assets; and DAF 2.0, owned entirely by Patrick, with $270 million in assets.





**$270 million in assets**

### H.    Patrick Moves to Liquidate the Original DAF, and the Charitable Owners Ask the Cayman Islands Court to Throw Patrick Out

Now that Patrick had drained the original DAF of any assets, he placed it into voluntary liquidation in the Cayman Islands court on April 2, 2025.  Caymans Ex. B, Statement of Claim, ¶ 151.  He did so without informing the charities or anyone else.

For their part, the charities were unaware of what Patrick had been up to, except that Patrick was not answering any of their questions.  The charities separately filed a petition in the Cayman Islands court seeking to take the DAF away from Patrick.  *See* Caymans Exhibit E, Winding Up Petition, *In the Matter of Charitable DAF Holdco, Ltd.*, No. FSD 99 of 2025 (JAJ) (Grand Court, Cayman Islands, Financial Services Division Apr. 23, 2025).

Only after that filing did the charities learn of Patrick's parallel and secret attempt to liquidate the DAF.  The liquidators selected by Patrick immediately resigned.  *See* Charities' Obj.,

Dkt. 4231, ¶ 31 n.4.  And on May 6, 2025, the Cayman Islands court stepped in, determining that there was enough evidence of misconduct that Patrick could no longer manage the DAF and that the court needed to remove Patrick from its management.  It did so by appointing what the Cayman Islands court calls "joint official liquidators"—the equivalent of a court-appointed receiver in the U.S. legal system—to oversee the DAF's operations.  *See* Caymans Ex. B, Statement of Claim, ¶ 154; Ex. 3, Charities' Obj., Dkt. 4231, ¶ 31.

As the court-appointed liquidators sought discovery into Patrick's activities, Patrick spent millions from the charitable assets opposing those investigative efforts.   On July 21, 2025, the joint official liquidators filed a Writ of Summons and Statement of Claim in the Cayman Islands proceeding, naming as defendants Patrick, Paul Murphy, and Patrick's new corporate entities that (as it turns out) had stolen the DAF's assets.  On the same date, to ensure that they could discover the additional details of Patrick's fraud, the joint official liquidators filed a separate Chapter 15 petition in the United States Bankruptcy Court for the District of Delaware seeking recognition of the Cayman Islands proceeding.  *See* Caymans Exhibit D, Chapter 15 Petition for (I) Recognition of a Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code, *In re Charitable DAF Holdco Ltd. (In Official Liquidation)*, No. 25-11376-BLS (Bankr. D. Del. July 21, 2025), Dkt. 1.

## I.  Patrick Repeats His Theft Playbook to Convert Hunter Mountain's Assets from The Dallas Foundation

Patrick next moved against Hunter Mountain.  At the time, Patrick was a fiduciary of Hunter Mountain and the entities in its ownership chain (including Rand PE Fund and Atlas Fund) because of his role in Rand Advisors, the SEC-registered investment adviser tasked with managing those entities.

But rather than acting as a trusted fiduciary, Patrick had other plans.  On February 20, 2025,

one of the 4 percent minority investors in Rand PE Fund received an unexplained notice of a distribution. *See* Exhibit 20, Email from Shawn Raver to Chris Rice dated Feb. 20, 2025. The sole asset of Rand PE Fund was Beacon Mountain—the sole (100%) beneficial owner of Hunter Mountain. After inquiring, the minority investor was told that Rand PE Fund had sold its investment in Beacon Mountain (and thereby Beacon Mountain's interest in Hunter Mountain) to an undisclosed third party for $1 million. *See* Exhibit 21, Email from Chris Rice to Skyview Group dated Mar. 12, 2025. Despite further investigation, it was impossible to determine who the undisclosed third-party purchaser was or how the sale of the Hunter Mountain interest had been accomplished.

It has since come to light that Patrick engineered the sale to the structure owned by DFW Charitable, a company he controlled. And no doubt his playbook mirrors the one he used in the DAF restructuring: Obtain a sham valuation from a loyalist financial advisor, use that valuation to justify the sale of an otherwise valuable asset to a captive company owned by Patrick, and then extract all the value for himself. Through this playbook, Patrick ensured that the entire beneficial interest in Hunter Mountain was diverted from its original charitable purpose and went into a structure over which he has absolute control and that he can manipulate for his personal enrichment. As was later discovered, the interest in Beacon Mountain/Hunter Mountain was sold in February 2025 to CLO Holdco, LLC—an entity whose sole economic beneficiary is, by virtue of Patrick's fraudulent DAF restructuring, Patrick's own sham "charity." *See* Exhibit 23, Transcript of Hearing dated June 25, 2025 ("9019 Hrg. Tr.") at 173:22–174:14.

To represent the transaction, here is the ownership of Hunter Mountain before Patrick's self-dealing:



Patrick then caused Rand Fund to receive $1 million in exchange for the Hunter Mountain Asset:



**J.     While Stakeholders Scramble to Unravel Patrick's Fraudulent Scheme, Highland and Hunter Mountain Announce their 9019 Settlement**

Knowing he would shortly be taking ownership of Hunter Mountain, Patrick approached Highland to settle Hunter Mountain's stake in the Highland bankruptcy estate in the hopes of monetizing his fraud and deterring further inquiry into his misconduct.   The Dallas Foundation and the other charities for which Mr. Dondero established these funds and entities were in it for the long term.  Patrick's horizon—with investigations bearing down upon him—could not have been shorter term.  He needed to make off with as much cash as he could before investigations progressed further and courts kicked him out from control of these entities.   And he needed weaponry to deter the donors and others from pressing the investigation forward.

22

So in the Spring of 2025, Patrick sharply pivoted with respect to Hunter Mountain's duty to protect the asset of the former equity stake in Highland. He started to negotiate with Highland's chief restructuring officer. And on May 19, 2025, while the charities were still attempting to understand and unravel Patrick's machinations, Highland and its constituents filed their Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith ("9019 Motion"), Dkt. 4216, Exhibit 22. The settlement would:

- Resolve all pending disputes between Hunter Mountain and the Highland Entities;

- Transfer all remaining claims in the Kirschner Litigation to Hunter Mountain;

- Make an immediate, lump-sum payment of $500,000 to Hunter Mountain;

- Make an immediate initial distribution on Hunter Mountain's Class 10 claim of $10 million, with subsequent distributions of $6,500,000 planned in 2027 and 2028;

- Grant Hunter Mountain an allowed Class 10 claim in the amount of $336,940,230.58; and

- Entitle Hunter Mountain to receive a "final distribution" of "all excess remaining Indemnity Trust Assets" at the close of all proceedings involving the estate.

Exhibit 24, Settlement Agreement & General Release, Dkt. 4217-1, ¶¶ 1–8. There was nothing special about the last two items. Hunter Mountain was a Class 10 claimant. And it was entitled to a substantial amount of the excess after the creditors were paid.

What Hunter Mountain "got" for attempting to give the bankruptcy professional running Highland a free pass was a half-million dollar wire payment and a $10 million distribution for its Class 10 status that frankly it should have received long ago. And Patrick got the right to control the Kirschner litigation against Dondero and his colleagues for purportedly ruining Highland. *That he needed desperately*, because Dondero was asking hard questions about what Patrick had stolen from Dondero's charitable legacy. Patrick—rightly—was on defense against the emerging

23

evidence of his theft and misconduct.  He needed something with which to fight back.

Several parties, including Dugaboy, objected to the 9019 Settlement.  *See generally* Exhibit 25, Preliminary Objection of The Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities, Dkt. 4230.  The Dallas Foundation and Crown Global also objected to the 9019 Settlement, but the objection itself (and the stale documents offered as exhibits in support of their objection) highlights the dearth of information they had at the time about Patrick's misconduct. As those two entities explained:

> [T]he Settlement is ***potentially tainted*** by the actions of Mark Patrick, ***the apparent sole manager and director*** of the HMIT Entities.  Specifically, ***upon information and belief,*** Mr. Patrick illicitly restructured the ownership of the HMIT Entities in a manner ***that seems to facilitate the diversion of millions of dollars*** in assets from the charitable entities that are the beneficial owners of the HMIT Entities. . . . [G]iven the actions of Mr. Patrick and the pending proceedings related thereto, rather than provide the peace sought by Movants, approval of and consummation of the Settlement will ***most likely*** result in further litigation both before this Court and in jurisdictions outside of the United States.

Ex. Charities' Obj., Dkt. 4231, ¶ 2 (emphasis added).

The objection from Crown Global and The Dallas Foundation prompted a show of overwhelming force in defense of Patrick from the bankruptcy professionals.  Highland insisted on deposing their representatives—Julie Diaz, the President and CEO of The Dallas Foundation, and Torrey Littleton, its CFO—on an emergency basis over the following weekend, giving them very little time to prepare to give testimony in a very contentious bankruptcy proceeding.[15] Following their depositions, Highland pressured Diaz and Littleton to withdraw their objection in exchange for the disclosure of information regarding Patrick's actions vis-à-vis the DAF.  Faced

---

[15] *See* Caymans Ex. F, Transcript of Deposition of Julie Diaz at 9:21–23; Caymans Ex. C, Littleton Dep. at 11:4–14.

with a fight they felt ill-equipped to handle, Diaz and Littleton relented.

The Court held a hearing on Highland's Rule 9019 Motion on June 25, 2025. *See* Ex. 26, Notice of Hearing Held, Dkt. 4295. At the beginning of that hearing, Highland announced its agreement with The Dallas Foundation and Crown Global and explained that those two entities would be withdrawing their objections to the Rule 9019 Settlement. *See* Ex. 23, 9019 Hrg. Tr., at 22:3–16. The terms of that agreement provided, among other things, that (1) Hunter Mountain would hold $7.5 million of any initial settlement payments received for a period of 30 calendar days in an identified account; and (2) Hunter Mountain's representative Shawn Raver would meet with The Dallas Foundation by no later than July 7, 2025, to explain the DAF's current structure, provide its most recent balance sheets, and account for any transfers of assets made by the DAF during periods covered by the balance sheets. *See* Ex. 27, Stipulation Withdrawing Objection of the Dallas Foundation and Crown Global Life Insurance, Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith ("Withdrawal Stip."), Dkt. 4291 at Attachment 1.

After The Dallas Foundation and Crown Global withdrew their objections, Dugaboy's counsel orally objected to the 9019 Settlement on similar grounds to those raised in the withdrawn objections—including Patrick's fraud and his lack of authority based on that fraud to enter into the settlement. Ex. 23, 9019 Hrg. Tr. at 33:11–12. The Court overruled Dugaboy's objection and approved the Rule 9019 Settlement. *See* Ex. 1, Rule 9019 Settlement Order, Dkt. 4297, ¶ 10. To do so, the Court had to address whether the "Settlement Agreement was negotiated and entered into by . . . the HMIT Entities without collusion or fraud [and] in good faith . . . ." *Id.* ¶ 4. The Court found that the HMIT Entities were "acquiring the Transferred Claims and Dugaboy Note in

good faith" and had "proceeded with all aspects of the Settlement Agreement in good faith." *Id.*
¶ 6.

On July 9, 2025, Texas Attorney General Ken Paxton asked the Court to grant a brief stay
of the bankruptcy proceeding to allow the AG's office time to investigate and enforce potential
breaches of fiduciary duties by those entrusted with managing charitable trusts and other nonprofit
organizations involved in the proceedings. *See* Exhibit 28, Letter from Ken Paxton re: Request
for a Stay; Dkt. 4308.

The meeting Patrick promised the Dallas Foundation did not materialize as planned.
Patrick failed to show up to explain himself. And Raver was unable to convey the information
that The Dallas Foundation had demanded as a prerequisite to their capitulation.

After filing its notice of appeal of the Rule 9019 Settlement Order, on July 17, 2025,
Dugaboy likewise sought a stay of the Order pending appeal. *See* Ex. 29, Notice of Appeal, Dkt.
4311; Ex. 30, The Dugaboy Investment Trust's Motion to Stay 9019 Order ("Dugaboy Motion to
Stay"), Dkt. 4326. Dugaboy explained that filings by the joint official liquidators in the Cayman
Islands proceeding demonstrated that Patrick had "restructured the ownership of the HMIT Entities
in a manner that seems to facilitate the diversion of millions of dollars in assets from the charitable
entities that are the beneficial owners of the HMIT Entities." Ex. 30, Dugaboy Motion to Stay,
Dkt. 4326, ¶ 2. Dugaboy argued that Patrick's actions called the validity of the 9019 Settlement
into question and that the settlement itself helped further Patrick's fraudulent scheme. *Id.*, ¶¶ 33–
34.

Three days later, on July 21, 2025—and without the benefit of any further briefing or oral
argument on the stay requests—the predecessor judge summarily denied the requests. In doing
so, the Court concluded that: "***Whatever the misdeeds may or may not be of Mark Patrick, they***

***are not sufficiently intertwined with the Highland bankruptcy estate (or the Settlement***

***Agreement) to justify a stay.***" Ex. 31, Memorandum Order and Opinion Regarding Stay Requests

("Stay Order"), Dkt. 4333, at 4 (emphasis in original). The Court refused a stay despite knowing

of judicial proceedings in the Cayman Islands that already had removed Patrick from control of

the DAF structure and that were likely to eventually reach the entities over which he claimed

authority to enter into the 9019 Settlement. The Court also held that neither the bankruptcy case

nor the contested matter involving the 9019 Settlement was a "proceeding involving a charitable

trust." *Id.* Finally, the Court concluded that "the parties have other avenues to address any

malfeasance of Mark Patrick," including the liquidation proceedings in the Cayman Islands. *Id*.

### K. New Evidence on Patrick's Actions Demands Additional Scrutiny

As explained above, in the lead up to the June 25, 2025, hearing on the 9019 Settlement,

the charitable owners, The Dallas Foundation, Crown Global, Dugaboy, and various other

interested parties were scrambling to determine what Patrick had done vis-à-vis various charitable

assets, how far his potential fraud extended, and whether there was any path forward to ensure that

he could not abscond with money and assets earmarked for long-term charitable purposes.

It was not until the hearing itself that Dugaboy and others learned that Hunter Mountain

had been sold to CLO HoldCo and that the ultimate beneficial owner of the Hunter Mountain

interest was Patrick's captive charity rather than The Dallas Foundation and its supporting

charitable organizations. *See* Ex. 23, 9019 Hrg Tr. at 173:22–174:16. But that shocking news was

only the beginning.

On July 15, 2025, the first real evidence about the scale of Patrick's fraudulent scheme

began to emerge. On that date, the joint official liquidators appointed in the Cayman Islands filed

a Writ of Summons and Statement of Claim against Mark Patrick, Paul Murphy, CDMCFAD, LLC

(referred to as "DAF 2.0"), DFW Charitable Foundation (Patrick's personal charitable foundation),

CDH GP, Ltd. (Patrick's newly-created general partner for DAF 2.0), and CLO HoldCo, Ltd. Caymans Ex. B, Statement of Claim, ¶ 1.  The evidence in that Statement of Claim is highlighted throughout the discussion above.  That Statement of Claim revealed, for the first time, that Patrick had secretly effectuated the DAF restructuring and thereby fraudulently absconded with $270 million in charitable assets belonging to the charitable owners.  *See generally id.* Further evidence of this wrongdoing was unearthed by the Joint Liquidators in December 2025 filings, just a few weeks ago.  *See, e.g.*, Caymans Ex. A, First Patrick Aff. (released December 2025); *but see* Caymans Ex. B, Statement of Claim; Caymans Ex. C, Littleton Depo. Trans.; Caymans Ex. D, Ch. 15 Petition; Caymans Ex. E, Winding Up Petition; Caymans Ex. F, Diaz Depo. Trans.; Caymans Ex. G, MacInnis Dec. (released July 2025).

And while representatives of Highland repeatedly suggested at the hearing on the Rule 9019 Settlement that the DAF and Hunter Mountain structures were entirely separate, what is now crystal clear is that is untrue.  Patrick made sure that Hunter Mountain was folded into the DAF structure through the sale of Beacon Mountain's interest in Hunter Mountain to CLO HoldCo. That transaction—surreptitiously orchestrated by Patrick (and about which Dugaboy still has few salient details)—made certain that Patrick could control all of Hunter Mountain's assets that should belong to charitable organizations.

Much of this information has only recently come to light, however, as the proceedings in the Cayman Islands investigating Patrick's and his associates' malfeasance have been subject to a protective order under the confidentiality rules of the Cayman Islands judicial system.  After a hearing in December 2025, the formerly confidential documents arising after July 2025 in the Caymans proceedings appended hereto became publicly available.

The documents released in December 2025 revealed details of the charitable assets Patrick and his conspirators have been stuffing in their own pockets.   Patrick took more than $10.5 million and $3.32 million in director's fees alone in 2024 and 2025, respectively, for work that did not amount to a full-time job.  *See* Third Affidavit of Margot MacInnis ("MacInnis Aff. 3") at ¶ 52. Patrick's co-conspirator Murphy even revised his own compensation plan to pay himself $500,000 in fees triggered when injunctions are sought against the DAF, the very proceedings now pending in the Caymans.  *Id.* at ¶ 79.2.  This revision was backdated to the beginning of 2025 in monthly installments, and thus Murphy is receiving additional compensation from the very fund the liquidators in the Cayman Islands are working to save.  *Id.*  Moreover, both Patrick and Murphy sought indemnification from the DAF for their own legal fees incurred obstructing the joint liquidators' investigation into *the fraud they committed*.  Ex. MM-3, at 199–202, 829.

The December 2025 documents revealed Patrick's desperate efforts to prevent the courts from learning about his shifting of funds.   In response to judicial orders that he open the books of the DAF and all related entities, Patrick provided only a consolidated balance sheet for the overall Fund so that his corporate shell game could not be traced.  *Id.* at ¶¶ 102–03.  And the December 2025 documents showed his intent to defraud, revealing how he confided in advisors about getting assets away from the charities and into his own, exclusive control.  *See* Ex. MM-3, 61–82.

### L.    The Predecessor Judge in this Matter Recuses

As explained further below, the predecessor judge who approved the challenged settlement in July 2025 has been recused from this case.  That outcome was announced by the Fifth Circuit Judicial Council in resolutions of judicial conduct complaints dated December 29, 2025.[16]  That is

---

[16] *See, e.g.*, *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90042 (Dec. 29, 2025), at 7, available at https://tinyurl.com/yynh3u67.

an outcome the predecessor judge resisted, denying multiple motions seeking it.

The grounds for the recusal was the predecessor judge's authoring of novels that negatively depicted a hedge fund and its manager. Dondero contended the novel's hedge fund and manager was hard to distinguish from his own. This novel writing was occurring when the case was started and well before the July 2025 Rule 9019 Settlement Order at issue here.

The Fifth Circuit's Chief Judge resolved the judicial conduct complaint through arranging for extensive "corrective action," including the predecessor judge's recusal from this case and professional education. Of the more than 500 Fifth Circuit Judicial Council resolutions of judicial conduct complaints in the last decade, there had been only four prior instances of resolving them through "corrective action" rather than dismissal. (One other had been referred to a special committee for sanction, some others were cut off by resignation of the subject judge).

The Fifth Circuit Chief Judge's resolution noted that it did not pass judgment on whether the predecessor judge's prior refusals to recuse were error, or on the validity of her prior orders. Ex. 32, Order 05-26-90042 at 6 n.3. Nor could it have, because those issues must be addressed inside the pending case, with arguments from the parties to it.[17]

Most notably, Dondero and others challenged the predecessor judge's refusal to recuse through a writ of mandamus. The Fifth Circuit held that there was "a strong argument that [the predecessor judge] had a duty to recuse" due to the novels and their similarity to Dondero, but that the argument did not rise to the level of a "clear and indisputable" abuse of discretion required for mandamus relief. *Dondero v. Jernigan*, No. 24-10287, 2025 WL 1122466, at *7 (5th Cir. Apr. 16, 2025). The Fifth Circuit distinguished that high standard from the more searching review that would be available on direct review from an eventual final judgment. *Id*. at *4.

---

[17] *See* R. Judicial-Conduct and Judicial-Disability Procs., r. 3 Fifth Cir. cmt. 3.2.

Dondero is seeking review of the mandamus-stage decision in the Supreme Court. *See Dondero v. Jernigan*, No. 25-355. The Supreme Court initially denied certiorari on January 12, 2026. In doing so, neither Dondero nor the Supreme Court was aware of the Fifth Circuit Judicial Council resolution imposing the corrective action of recusal. Dondero timely petitioned for rehearing in the Supreme Court alerting it to these intervening developments on February 6, 2026. That petition remains pending.

## III.   THE COURT SHOULD RECONSIDER AND VACATE THE 9019 SETTLEMENT ORDER

The Rule 9019 Settlement Order was obtained by and unintentionally advances fraud and misconduct, as newly discovered evidence conclusively demonstrates. Only *after* the hearing on Highland's 9019 Motion did shocking but clear and convincing evidence of Patrick's fraud and misconduct come to light. It was also entered by a judge who lacked the authority to act, because circumstances were already in place disqualifying her from presiding. The Court should reconsider and vacate the Rule 9019 Settlement Order.

### A.   This Court Has Ample Authority to Reconsider and Reverse Settlement Orders That Were Error, Are Undermined by Newly Discovered Evidence, Are Affected by Fraud or Misconduct, or Are Themselves Inequitable

The Court has the power to reconsider, vacate, or otherwise grant relief from the Rule 9019 Settlement Order. When a successor judge takes over a case from a predecessor, "[t]he successor judge has the same discretion as the first judge to reconsider [] order[s] issued previously in the case. *Abshire v. Seacoast Prods., Inc.*, 668 F.2d 832, 837–38 (5th Cir. 1982). This is a well-established power that a majority of circuits have confirmed. *See In re United States*, 733 F.2d 10, 13 (2d Cir. 1984); *Hayman Cash Reg. Co. v. Sarokin*, 669 F.2d 162, 169 (3d Cir. 1982); *Loumar, Inc. v. Smith*, 698 F.2d 759, 762–63 (5th Cir. 1983); *Brengettecy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005); *Greyhound Corp., Inc. v. Int'l Bus. Machs. Corp.*, 559 F.2d 488, 508 (9th Cir. 1977);

31

*Nelson v. City of Albuquerque*, 921 F.3d 925, 930 n.2 (10th Cir. 2019); *United States v. Philpot*, 773 F. App'x 583, 588 (11th Cir. 2019); *Exxon Corp. v. United States*, 931 F.2d 874, 878 (Fed. Cir. 1991). Some circuits require a showing that the operation of the previous ruling be "clearly erroneous and its enforcement would work a manifest injustice" or that "intervening controlling authority" makes reconsideration appropriate, see, e.g., *Zeyen v. Bonneville Joint Dist., #93*, 114 F.4th 1129, 1138 (9th Cir. 2024), and other circuits have described a successor judge's authority as "plenary" to reconsider prior orders, *see Philpot*, 773 Fed. Appx. at 588. The Fifth Circuit strikes a middle path, empowering a successor judge with discretion to reconsider an order of the predecessor judge, but cautioning not to overrule an earlier order "merely because the later judge might have decided matters differently" in order to maintain general principles of comity. *In re Ford Motor Co.*, 591 F.3d 406, 411 (5th Cir. 2009).

Concern for leaving prior rulings undisturbed gives way "to the interests of justice and economy." *Id.* at 837. The successor judge need only have "reason [he] deems sufficient" to overturn a prior judge's orders, even in the absence of new evidence or a change of law. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 171 (5th Cir. 2010). The successor judge has "necessarily bountiful discretion" to review prior work in a case before it. *Loumar, Inc.*, 698 F.2d at 763. To "conscientiously carry out his judicial function," a judge has discretion to correct "what he believes to be a prior erroneous ruling[.]" *Castner v. First Nat'l Bank of Anchorage*, 278 F.2d 376, 380 (9th Cir. 1960). This is particularly so when a predecessor judge has recused herself: the successor judge must be able to reconsider the order or else risk jeopardizing the important values of impartial adjudication underlying 28 U.S.C. § 455. *United States v. O'Keefe*, 128 F.3d 885, 891 n.6 (5th Cir. 1997).

In addition, the Court may revisit its orders for any of several enumerated reasons within a

32

"reasonable" time after the order's issuance, even when the order has come in the form of a final judgment ending a case. Fed. R. Civ. P. 60(b).[18] Specifically, Rule 60(b) empowers the Court to give relief from a "final judgment, order, or proceeding" for the following reasons: (1) mistake, (2) newly discovered evidence, (3) fraud, misrepresentation, or misconduct by an opposing party, (4) the judgment is void; (5) applying it prospectively is no longer equitable, or (6) "any other reason that justifies relief." Rule 60(b)(1)–(6). Rule 60(b) "is to be construed liberally to do substantial justice. . . [it] is broadly phrased and many of the itemized grounds are overlapping, freeing Courts to do justice in hard cases where the circumstances generally measure up to one or more of the itemized grounds." *Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015) (quoting *Johnson Waste Materials v. Marshall*, 611 F.2d 593, 600 (5th Cir. 1980)). As explained below, relief is warranted in this case under several of Rule 60(b)'s subsections. Finally, even beyond the powers bestowed by Rule 60(b), the Court has the inherent power "to vacate a judgment obtained by fraud." *Allen v. United States*, No. 3:96-cv-256-K, 2015 WL 3824448, at *2 (N.D. Tex. June 18, 2015) (citing *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944)).

### B. The Court Should Reconsider and Vacate the 9019 Settlement Order Due to Patrick's Fraud and Misconduct

#### 1. This Court Should Reconsider and Vacate the 9019 Settlement Order Because Newly Discovered Evidence Shows It Was Affected by Fraud and Misconduct

The Court should reconsider its Rule 9019 Settlement Order because the scope of Patrick's misconduct was unknown before the hearing on Highland's 9019 Motion. The Court should exercise its "necessarily bountiful discretion" to reconsider the Rule 9019 Settlement Order. *See Loumar*, 698 F.2d at 763. In addition, Federal Rule of Civil Procedure 60(b)(2) authorizes reversal

---

[18] Federal Rule of Civil Procedure 60 applies in bankruptcy proceedings. Fed. R. Bankr. P. 9024.

or vacatur of an order, even a final judgment, based on "newly discovered evidence." Fed. R. Civ. P. 60(b)(2); *see also* Fed. R. Bankr. P. 9024.  Reconsideration is appropriate where the evidence "could not through due diligence have been discovered" before the prior order and "would have clearly produced a different result if presented to the court before" the prior order. *Harrison v. Byrd*, 765 F.2d 501, 503 (5th Cir. 1985); *see also Stilwell v. Travelers Ins. Co.*, 327 F.2d 931, 933 (5th Cir. 1964) (reversing trial court's denial of Rule 60(b)(2) motion where newly discovered evidence changed facts of the case).  The newly discovered evidence may be direct or circumstantial. *Philip Morris USA Inc. v. Lee*, 494 F. Supp. 2d 544, 550 (W.D. Tex. 2007).  And the evidence may include affidavits of the moving party. *Harrison*, 765 F.2d at 502–03.

Here, newly discovered evidence amply demonstrates that Patrick was not presenting his settlement proposal to the Court "without collusion or fraud [and] in good faith," as the predecessor judge had determined.  Ex. 1, Rule 9019 Settlement Order, Dkt. 4297, ¶ 4.  The newly discovered evidence, instead, demonstrates that Patrick remained in his position only because of fraudulent efforts to cover up his misconduct and that, indeed, he was seeking the settlement to deter investigation into it.

There was smoke of this misconduct at the June 25, 2025, hearing approving the settlement, including signs of wrongdoing and requests for caution from Cayman Islands court-appointed investigators and the Texas Attorney General.  The flames of the misconduct were revealed, however, by successive later filings in July and December of 2025 by the joint official liquidators appointed in the Cayman Islands.

First, those filings showed that Patrick had secretly restructured the DAF and Hunter Mountain to steal their assets from the charities they were meant to benefit.  Then, we learned that Patrick had established his own sham charity, run out of his house with his family as directors, to

take over more than $270 million in assets actually belonging to established charities.   It became apparent that Patrick effected this restructuring in the dark of night, with instructions to lawyers to make the new maze of companies he was setting up untraceable.

At the heart of all this is Patrick's newly created sham charity, the so-called DFW Foundation.  Leading up to the hearing, Patrick wanted to keep everyone away from this curious new entity.  At his deposition on June 23, 2025, Patrick avoided answering whether his sham charity was the ultimate owner of Hunter Mountain, ultimately testifying it was another company instead.  *See* Exhibit 49, Transcript of Deposition of Mark Patrick, 8:1–6 (June 23, 2025) ("Q: Does DFW Charities own CDMCFAD, LLC? A: Yeah, again, you know Mr. Lang, you know, there are several entities in this structure, and I – I just don't want to go beyond what I have a hundred percent knowledge of."); *see id.* at 11:10–12:7 (testifying that the ultimate owner of Hunter Mountain was a company called Beacon Mountain).  The Liquidators' later filings laid bare the truth:  That Patrick's sham charity had been reorganized into its role as the ultimate beneficial owner of Hunter Mounter, the settling entity. Documents from the Cayman litigation later revealed that Patrick is the registered director, sole member, and president of DFW Foundation.  *See* Caymans Ex. G, First Affidavit of Margot MacInnis dated July 15, 2025 at ¶¶ 11.5, 31.4, and 31.5.

And that sham charity was part of a massive fraud scheme to steal DAF's more than $270 million in charitable assets.  *See id*. at Ex. 33, pages 448–53 (internal Patrick email Nov. 26, 2024 at 4:11 pm).  Internal communications, not available before the 9019 Hearing, revealed that in November 2024, Patrick sought advice on creating DFW Foundation to dilute the existing Charities and take the ownership of the DAF.  *See* Caymans Ex. B, Statement of Claim at ¶¶ 91–93.  He intentionally misled the Charities and obfuscated his self-dealing transactions in

communications with the Charities in November 2024–March 2025. *See* Caymans Ex. G (MacInnis Declaration dated July 21, 2025) at Ex. 60–64, 70–71, 75–76, and 86. This enabled Patrick to enter into a series of self-dealing transactions whose result was that the new buyer of Hunter Mountain was entirely controlled by him. *See id.* at Ex. 44–47, 49, 52–55, and 65. Had this series of transactions been revealed before the 9019 hearing, the Court would have known that the owners of Hunter Mountain who signed the 9019 Settlement only recently came to that ownership through breach of fiduciary duty and fraud, and that the 9019 Settlement essentially provided the Court's approval of Patrick's monetization of a stolen asset.

Second, newly discovered evidence showed that Patrick paid himself more than $12 million in September and October 2024 alone for the part-time job of running this charitable exercise. *See* Caymans Ex. B, July Statement of Claim at ¶¶ 86–88. The proceeds of any distribution approved by the 9019 Motion would have gone into the same pool of charitable assets from which Patrick had just paid himself $12 million. This Court never would have poured settlement proceeds into Patrick's vessel if it had known there was a hole in the bottom of it leading directly to Patrick's pocket.

Third, the newly discovered evidence shows that Patrick structured the settlement to protect himself from further investigation into his misconduct. Dondero and others were asking questions about his handling of the DAF, so Patrick gave away asset value for the charities in exchange for acquiring the Kirschner claims. Ex. 24, Settlement and General Release, ¶¶ 3–4, 8(a). These are meritless claims that historical managers of Highland mismanaged it. And obtaining them would give Patrick an offensive weapon against Dondero and his partners who had donated to the DAF and wished to see their gift flourish for the charities' benefit. In this way, Patrick used the settlement for his own personal benefit, to obtain at the expense of the charitable beneficiaries

some kind of deterrence against Dondero and his former owner partners from asking hard questions about Patrick's misconduct going forward.  Patrick set out immediately to deploy it, asking the predecessor judge to take the Kirschner claims out of hibernation and to freeze all Dondero's other assets, lest they be used to investigate Patrick. Caymans Exhibit H, Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver, No. 25-BC01B-0027 (July 1, 2025).  And it led to a bizarre world in which the beneficiaries of Dondero's gift—through the self-interested intervention of Patrick—would be suing Dondero for alleged historical misconduct.

The prominence of the Kirschner aspect of the settlement should have given the Court a moment of pause.  But with the newly discovered evidence showing the scale of Patrick's misconduct, Patrick's motive in seeking the Kirschner claims—and dealing away value for the charitable beneficiaries to obtain those claims—becomes apparent.  Patrick's clear objective in entering into the rushed settlement was to obtain a weapon against Dondero so that he could deter further inquiry into his misconduct.  That weapon was the Kirschner litigation, and Patrick sacrificed the long-term assets of pressing the case of former equity holders against Highland for the short-term cudgel of gaining a litigation tool against Dondero.  Equity demands that this Bankruptcy Court not allow a 9019 settlement to help a wrongdoer deter investigation into misconduct and cover up his wrongdoing.  When it becomes apparent that happened, a settlement should be reconsidered and/or vacated.  And this one should be.

Fourth, the newly discovered evidence shows that Patrick's self-dealing to transfer the economic benefit of Hunter Mountain from the Dallas Foundation to himself violated Sections 206 and 215 of the Investment Advisors Act and that the 9019 settlement advances that clear violation of federal law.  As the control person of Rand Advisors, Patrick caused Hunter Mountain to be

traded to the DAF structure under his new DFW Foundation entity.[19]  This rendered the trade a

principal transaction prohibited under Advisors Act § 206.  *See* Securities and Exchange

Commission, Interpretation of Section 206(3) of the Investment Advisers Act of 1940, Inv. Adv.

Act Rel. No. 1732 (July 17, 1998), 63 Fed. Reg. 39,056 (July 23, 1998) (internal citations omitted).

Additionally, it would have rendered the entire transaction void and subject to rescission.  15

U.S.C. §80b-15(b); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 367 (S.D.N.Y. 2011)

(*citing Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 24, 100 S.Ct. 242, 62 L.Ed.2d

146 (1979)).

It also violates a provision of the governing documents of Atlas Fund, the 96% owner of

Rand Fund, which prohibits Rand Fund from selling Hunter Mountain to an affiliate of Patrick

without investor consent.  *See* Ex. 50, Amended and Restated Limited Partnership Agreement of

Atlas Fund as of November 30, 2015 at §3.01(b).  As revealed in Rand Fund's audit issued *the day

after* the 9019 Hearing, as of December 2024, Rand Fund's sole asset was Beacon Mountain, the

beneficiary of Hunter Mountain.  *See* Ex. 48, Rand Fund 2024 Audit at 4.  As a result, while Patrick

did not transfer Atlas Fund's direct ownership of Rand Fund, Patrick did transfer all of Rand

Fund's value without disclosure to, or consent from, a client.   Ex. 23, Hrg. Tr. June 25, 2025 at

214:2–6.

Under applicable law, Patrick was not permitted to use his position as investment advisor

of Atlas Fund to approve of Rand Fund selling an asset to Patrick's own account.  *See In re

Paradigm Cap. Mgmt., Inc.*, Securities and Exchange Commission Investment Advisers Act

---

[19] Rand Advisors was the investment advisor of Rand PE Fund, which was the owner of Beacon Mountain, the sole beneficiary of Hunter Mountain.  Exhibit 5, Rand Advisors, LLC Form ADV Part 2A (March 2021).  Beacon Mountain, with its beneficial ownership of Hunter Mountain, was the asset transferred by Patrick to his own ultimate benefit.

Release No. 3857, 2014 WL 2704311, at *2 ¶ 15 (June 16, 2014). Patrick should have sought the

consent of Crown Global as the sole limited partner of Atlas Fund, which in turn was the 96%

owner of Rand Fund, the selling party.  Ex. 40, Hunter Mountain Org. Chart.  Crown Global, the

annuity policy issuer, would have taken instructions from the Dallas Foundation, the annuity policy

beneficiary.  *See* Ex. 47, Deferred Variable Annuity Policy No. 30218 dated as of December 10,

2015, issued to Empower Dallas as Policyholder and Beneficiary. Rescission of the transfer

renders the 9019 Settlement fatally flawed because the Debtor signed the agreement with the

wrong owner of Hunter Mountain.  Had Patrick timely disclosed both that DFW Foundation was

the ultimate beneficial owner of Hunter Mountain after it was traded, and his own relationship to

DFW Foundation, the parties objecting to the 9019 Settlement, both Dugaboy and the Dallas

Foundation, would have been able to take additional discovery, submit additional exhibits, and

brief additional arguments opposing the 9019 Settlement.  Patrick prevented them from doing so.

That this information had to come out after the hearing was not for lack of diligent inquiry.

When asked at the 9019 hearing to explain the recent changes in Hunter Mountain's ownership

structure, Patrick first lodged his own relevance objections from the witness stand, then argued he

should not have to answer because it would affect related litigation, and finally resorted to being

entirely confused as to the names of entities even when spelled out in their entirety.  Ex. 23, Hrg.

Tr. June 25, 2025 at 174:23–175:3 and 177:2–22. He even feigned unfamiliarity with the DAF

itself even though he personally put it into liquidation less than three months earlier.  *Id*.  at 178:5–

8, 179:7–21.

None of this information was available to Dugaboy before the 9019 hearing, despite its

diligence.  As explained above, because Patrick carefully hid his machinations from all affected

parties, including his clients Dondero and Dugaboy and the charities for which he served as a

39

fiduciary, it was impossible for any relevant stakeholders to know or fully grasp the extent of

Patrick's deception.  Nor could Dugaboy have known that Patrick had self-dealt Hunter Mountain

into the DAF structure through the sale of Beacon Mountain's interest in Hunter Mountain to CLO

Holdco.  Despite inquiries, Patrick and his inner circle refused to reveal the details of the sale.

This evidence—which was unknown and unavailable at the hearing on Highland's 9019

Motion—was material and should have produced a different result had it been presented to the

Court before the Rule 9019 Settlement Order was issued.

### 2.   This Court Should Vacate the 9019 Settlement Order Because It Is the Product of Patrick's Misconduct and Fraud

For many of the same reasons, the Court also should reconsider the Rule 9019 Settlement

Order because Patrick's elaborate, carefully concealed fraud prevented Dugaboy (or any other

affected stakeholder) from fully and fairly objecting to the 9019 Settlement.  Upholding a previous

order begotten in part by fraud weighs against "the interests of justice and economy," and thus this

Court should not rigidly adhere to prior order it is empowered to rectify.  *Abshire v. Seacoast

Prods., Inc.*, 668 F.2d at 837.  Further, where a party engages in "fraud . . . , misrepresentation, or

misconduct," the opposing party is entitled to reconsideration of a prior court order.  Fed. R. Civ.

P. 60(b)(3); Fed. R. Civ. P. 60(d) (recognizing court's power to "set aside a judgment for fraud on

the court").  As the Fifth Circuit has recognized, Rule 60(b)(3) "allows the courts to 'set aside a

judgment for fraud on the court' without a strict time bar."  *Jackson v. Thaler*, 348 F. App'x 29,

34 (5th Cir. 2009) (per curiam) (quoting *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir.

1978)).  And "[c]ourts are given wide discretion in determining whether relief should be granted

under Rule 60(b)(3) based on fraud."  *Allen v. United States*, 2015 WL 3824448, at *2 (N.D. Tex.

June 18, 2015) (citation omitted).  That is because Rule 60(b)(3) "is aimed at judgments which

were unfairly obtained, not at those which are factually incorrect."  *Rozier*, 573 F.2d at 1339.

Reconsideration is particularly appropriate where, as here, the offending party's "misconduct prevented the moving party from fully and fairly presenting his case." *Hernandez v. Results Staffing, Inc.*, 907 F.3d 354, 364 (5th Cir. 2018). The offending party's misconduct need not rise to the level of actionable fraud. *See* Fed. R. Civ. P. 60(b)(3). Rather, misconduct warranting reconsideration may consist of misleading statements or a failure to disclose relevant information. *Hernandez*, 907 F.3d at 365. The test is whether the misconduct "inhibited the unearthing of evidence" or "substantially interfered" with the moving party's "preparation." *Id.* (internal quotation marks omitted). The analysis thus rests on whether an order was "unfairly obtained" as a result of the offending party's misconduct. *Id.* at 364 n.20 (quoting *Diaz v. Methodist Hosp.*, 46 F.3d 492, 496 (5th Cir. 1995)).

As described above,[20] Patrick's actions involve just the sort of fraud, misrepresentations, or misconduct that requires reconsideration of the Rule 9019 Settlement Order. Patrick concealed his restructurings of the DAF and Hunter Mountain so that he could divert assets intended to flow to charitable beneficiaries to entities that he owned and controlled. Indeed, Patrick specifically told his lawyers when crafting his fraudulent scheme that he wanted to hide his actions by creating a new entity that was "hard to find or track, or trace. Or find owners, etc. Generic name. Strong litigation protection." Caymans Ex. B, Statement of Claim, ¶ 82. He also surreptitiously increased his own compensation to the tune of millions of dollars to the detriment of the same charitable beneficiaries he was planning to defraud. He then sought out and negotiated a settlement on behalf of Hunter Mountain knowing that all the settlement value would benefit entities he controlled instead of funding the charitable legacy that the Hunter Mountain structure was created to benefit. The courts routinely employ their powers to correct much less significant wrongdoing. *See Rozier*,

---

[20] *See supra* Sections II.F–II.K.

41

573 F.2d at 1342–46 (reversing district court's denial of Rule 60(b)(3) motion for new trial where non-moving party failed to produce materials during discovery); *Cap. Exp., LLC v. Zinus, Inc.*, 996 F.3d 1332, 1342 (Fed. Cir. 2021) (affirming vacatur under Rule 60(b)(3) where expert witness misrepresented his knowledge of material prior art in patent case); *Carter v. Fenner*, 136 F.3d 1000, 1005–07 (5th Cir. 1998) (voiding judgment approving wrongful death settlement due to lack of authority to consent).

Patrick's restructuring of the DAF and Hunter Mountain to divert valuable charitable assets to his own control and use amounts to self-dealing, fraud, and—at the bare minimum—misconduct.

### 3.    This Court Should Vacate the 9019 Settlement Order Because Letting It Stand Is Contrary to this Court's Equitable Purpose and Powers

The Court should reconsider its Rule 9019 Settlement Order because equity strongly favors a hearing to explore the scope of Patrick's fraud and how it impacts Hunter Mountain. *See In re Osborne*, 379 F.3d 277, 284 (5th Cir. 2004).

The facts of this case overwhelmingly militate in favor of reconsideration. In fashioning its Rule 9019 Settlement Order, the Bankruptcy Court explicitly concluded that the 9019 Settlement was "negotiated and entered into by . . . the HMIT Entities without collusion or fraud [and] in good faith." Ex. 1, Rule 9019 Settlement Order, Dkt. 4297, ¶ 4. That finding was a prerequisite to approving a settlement under Rule 9019. *See Matter of AWECO, Inc.*, 725 F.2d 293, 299 (5th Cir. 1984).

For the above reasons, this settlement was the product of fraud and misconduct, not free of it. And there was no good faith here. As important, the settlement itself was structured by Patrick to help him keep his misconduct from public view. It was designed to throw charitable assets—the interests in pressing the rights of former Highland equity holders in and regarding the

administration of the bankruptcy estate—over the side of the boat so that Patrick could obtain a weapon against Dondero. It was a desperate attempt to deter those whose generosity created these charitable structures from asking the hard questions about Patrick—criminally—running off with them.

Parties with unclean hands cannot come to courts of equity and ask for relief. That is because the orders of courts of equity should not be sullied with misconduct. A natural corollary is that when the perfidious have obtained relief from courts of equity, and worse when such relief advances their misconduct to the slightest degree, it should be reversed.

Under the circumstances, equity and justice favor Dugaboy (*i.e.*, the deceived party) over Patrick (*i.e.*, the deceiving party). And equity and justice require reconsideration of the Rule 9019 Settlement Order in light of Patrick's many uncovered misdeeds.

### C. The Court Should Reconsider and/or Vacate the Rule 9019 Settlement Order Because It Was Issued by a Judge Who Lacked Authority Because She Should Have Been Disqualified

Finally, the Court should reconsider the 9019 Settlement Order because the predecessor judge lacked the authority to enter it, as already existing circumstances disqualified her from acting in this case. Congress mandated that the judge "shall disqualify" herself "in any proceeding in which [her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). By the time of the 9019 Settlement Order, the circumstances compromising the appearance of her impartiality were already present: the writing of novels about a hedge fund and its manager similar to Dondero. That has resulted in the Fifth Circuit Judicial Council taking corrective action to recuse the predecessor judge from the case going forward. This Court should address the consequences of these circumstances going backward.

The bankruptcy remains pending, and the currently presiding judge retains discretion to reverse any ruling made in the bankruptcy, for any reason, before the bankruptcy is closed through

43

a final judgment.  *Abshire v. Seacoast Prods., Inc.*, 668 F.2d at 837–38.  In addition, Federal Rule

of Civil Procedure Rule 60(b) authorizes vacatur of orders issued when a judge should have

recused herself.  *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863–64 (1988).

This is because "to perform its high function in the best way[,] 'justice must satisfy the appearance

of justice.'"  *Id.* at 864 (citation omitted); *see also Tramonte v. Chrysler Corp.*, 136 F.3d 1025,

1028 (5th Cir. 1998) (stating that a judge that should have recused lacks authority to enter

subsequent orders).

In determining whether a judgment should be vacated for a violation of 28 U.S.C.

§ 455(a)—which mandates recusal whenever a judge's impartiality "might reasonably be

questioned")—courts must consider "the risk of injustice to the parties in the particular case, the

risk that the denial of relief will produce injustice in other cases, and the risk of undermining the

public's confidence in the judicial process."  *Liljeberg*, 486 U.S. at 864.  In discussing the third

prong, the Supreme Court explained that because the purpose of the recusal statute is "to promote

confidence in the judiciary by avoiding even the appearance of impropriety whenever

possible . . . it is critically important in a case of this kind to identify the facts that *might reasonably

cause an objective observer* to question [a judge's] impartiality."  *Id.* at 865 (emphasis added).

The *Liljeberg* Court therefore affirmed the circuit court's granting of a Rule 60(b) motion to vacate

a judgment where the judge *was not even aware* of his fiduciary interest in the litigation.  *Id.* at

867–68.  As described below, the facts present here weigh even heavier in favor of vacatur.

Here, the Fifth Circuit Judicial Council, acting through the Fifth Circuit Chief Judge,

effected a recusal of the predecessor judge as "corrective action" for books she authored and

published critical of the hedge-fund industry and negatively depicting characters with striking

similarity to Dondero while presiding over the Highland bankruptcy.  The corrective action was

taken in disposition of three ethics complaints by the Judicial Council of the Fifth Circuit regarding

the judge's impartiality.[21]  In the dispositions, Chief Judge Elrod determined that recusal was one

of several significant measures constituting "appropriate corrective action that acknowledges and

remedies the problems" raised by the complainants.  Ex. 32, Order 05-26-90042 at 7; Ex. 33, Order

05-26-90044 at 3–4; Ex. 34, Order 05-26-90045 at 3.  The corrective action of recusal was meant

to redress "conduct occurring outside the performance of official duties if the conduct is reasonably

likely to have prejudicial effect on the administration of the business of the courts, including a

substantial and widespread lowering of public confidence in the courts among reasonable people."

Ex. 32, Order 05-26-90042 at 5 (quoting Judicial Conduct and Discipline Rule 4(a)(7)).

The Fifth Circuit Chief Judge noted that the judicial misconduct resolution should not "be

interpreted as an opinion or reflection on the merits of the judge's prior decision not to

recuse . . . or on the validity of any decision" she had issued.  Ex. 32, Order 05-26-90042 at 6 n.3,

Ex. 33, Order 05-26-90044 at 3 n.1, & Ex. 34, Order 05-26-90045 at 3 n.1.  That is because there

are judicial proceedings to address consequences for rulings in a case.  The Judicial Conduct and

Discipline Rules are clear that proceedings thereunder are not to be used to reverse rulings in

pending cases, because all the parties to those cases should be heard on such rulings.  R. Judicial-

Conduct and Judicial-Disability Procs., r. 3 Fifth Cir. cmt. 3.2.  This motion is one such mechanism

for that.

As the corrective action acknowledges, the predecessor judge wrote and published *He*

---

[21] *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90042
(Dec. 29, 2025), at 7, available at https://tinyurl.com/yynh3u67; *In re Complaint of Judicial Misconduct
Under the Judicial Improvements Act of 2002*, No. 05-26-90044 (Dec. 29, 2025), at 3, available at
https://tinyurl.com/3vym9yu4; *In re Complaint of Judicial Misconduct Under the Judicial Improvements
Act of 2002*, No. 05-26-90045 (Dec. 29, 2025), at 3, available at https://tinyurl.com/2vka5dn6.

*Watches All My Paths*[22] and *Hedging Death*,[23] while presiding over this bankruptcy and the previous involuntary bankruptcy commenced against Acis Capital Management, L.P. and Acis Capital Management GP, L.L.C.—entities owned by or closely associated with Dondero.

The novels follow a Texas bankruptcy judge—portrayed to be heroic and modeled after Judge Jernigan herself—who faces hedge funds and a nefarious hedge-fund manager, Cade Graham, in her court. Graham bears striking similarities to Dondero. For instance, Graham shares much of the same biographical information as Dondero, such as stature, age, and general professional experience. Ex. 35, *Hedging Death* excerpt, at 112a.[24] Graham's hedge fund is named Ranger Capital, just as Dondero's had been before rebranding as Highland Capital Management. *Id.*, 133a (*Hedging Death* excerpt); Exhibit 36, Memorandum of Law in Support of Highland Capital Management Fund Advisors, L.P.'s Motion to Recuse at 16–17, *Highland Cap. Mgmt. L.P. v. Kirschner*, Adv. Proc. No. 21-03076, Dkt. 310 (Bankr. N.D. Tex. Feb. 27, 2023) ("Motion to Recuse"). References to the historical name of Dondero's hedge fund were made in both the Acis and Highland bankruptcies, which Judge Jernigan presided over while writing the books in question.[25] Ranger Capital also had a unique mix of investments that mirrored Highland—with "hedge funds . . . private equity funds, CDOs, CLOs, REITs, life settlement, all

---

[22] Stacey G. Jernigan, *He Watches All My Paths*, SJ Novels (self-published) (Jan. 16, 2019), available on Amazon at http://bit.ly/4nhfTRd. Movants are submitting a hard copy of this book, which is designated as Exhibit 54 and will be delivered to the Court later this week.

[23] Stacey G. Jernigan, *Hedging Death*, White Bird Publications (Mar. 22, 2022), available on Amazon at http://bit.ly/3KfFCL6. Movants are submitting a hard copy of this book, which is designated as Exhibit 53 and will be delivered to the Court later this week.

[24] Attached to this Motion as Exhibits 35 (*Hedging Death*) and 51 (*He Watches All My Paths*) are pertinent excerpts of both novels, as included in Movants' Petition Appendix to their Petition for Certiorari at the Supreme Court filed on September 22, 2025. The pagination in these book excerpts matches that used in the Petition Appendix.

[25] *In re Acis Cap. Mgmt., L.P.*, Case No. 18-03078-sgj, Dkt. 85-2 at 190; *In re Highland Cap. Mgmt., L.P.*, Case No. 19-34054-sgj, Dkts. 74-2 at 5; 247 at 59-60; 400 at 6; 675 at 23; 883 at 57; 1719 at 7; 1761 at 33; 1810-1 at 8; 1811 at 6; 1875-5 at 6; 1895-1 at 46; 1895-6 at 60–61; 1943 at 159.

manner of complicated financial products."  Ex. 35, *Hedging Death* excerpt, at 112a; Ex. 36, Mot. to Recuse at 16–17 (Dkt. 310). ("As Judge Jernigan is well aware, [Highland] and its affiliates managed hedge funds, private equity funds, CDOs, CLOs, REITs, life settlement portfolios and private investment accounts for institutions around the world—exactly the same unusual mix of investments at issue in Judge Jernigan's second 'fictional' novel.").  This combination is not just rare; it is one of a kind.

The novels also make derogatory comments about hedge funds and their managers, describing them as "suck[ing] up money . . . like an i-Robot vacuum" with "outrageous amount[s] of hubris."  Ex. 51, *He Watches All My Paths* excerpt, at 104a.  The books further deride certain international tax structures as "byzantine," a word Judge Jernigan has frequently used to describe Dondero's companies.  Ex. 35, *Hedging Death* excerpt at 144a; *Dondero v. Jernigan*, No. 24-10287, 2025 WL 1122466, at *7 (5th Cir. Apr. 16, 2025), *cert. denied*, No. 25-355, 2026 WL 79972 (U.S. Jan. 12, 2026).  Moreover, *Hedging Death* describes the life-settlement industry as "creepy," and as mentioned, Highland and Dondero invested in the life-settlement industry.  Ex. 35, *Hedging Death* excerpt at 117a.

Dondero and others sought recusal on the basis of these novels long before the 9019 Settlement Order.  Exhibit 37, Movant's Supplemental Memorandum of Law in Support of Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455, No. 19-34054, Dkt. 3673 (Bankr. N.D. Tex. Mar. 3, 2023).  On March 6, 2023, the predecessor judge denied that motion, with the same explanations provided to the Fifth Circuit Chief Judge in response to the judicial misconduct complaints.  *Compare* Exhibit 38, Memorandum Opinion and Order Denying "Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455," No. 19-34054, Dkt. 3676 at 32–36 (Bankr. N.D. Tex. Mar. 6, 2023), *with* Ex. 32, Order 05-26-90042 at 5, Ex. 33, Order 05-

26-90044 at 3, & Ex. 34, Order 05-26-90045 at 2–3.

Dondero and the other parties seeking recusal then appealed.  The District Court held a direct appeal of the recusal denial to be jurisdictionally improper, and that the issue could be reviewed only through a petition for writ of mandamus. Order*, Dondero et al. v. Stacey G. Jernigan*, No. 3:21-CV-0879-K, at 1, 12–13, Dkt. 39 (N.D. Tex. Feb. 9, 2022).  Dondero and the other parties then filed a mandamus petition with the District Court.  *See* Exhibit 39, Order re: Writ of Mandamus at 3, No. 3:23-cv-00726-S, Dkt. 25 (N.D. Tex. Mar. 8, 2024).  The issue as raised on mandamus reached the United States Court of Appeals for the Fifth Circuit.  After a petition for rehearing, the Fifth Circuit amended its opinion with renewed focus on the novels, and the Court observed that "[d]ue to the similarities between the characters in Chief Judge Jernigan's novel and the litigants currently before her in court, a strong argument could be made that she had a duty to recuse." *Dondero*, 2025 WL 1122466, at *7.  However, the Fifth Circuit withheld relief on mandamus, reasoning that the Court could act at the interlocutory, mandamus stage only upon a "clear and indisputable abuse of discretion." *Id.*  The Fifth Circuit repeatedly explained how high a bar the "clear and indisputable" standard on mandamus is, and distinguished it from the lower standard of review to be applied on appeal from a final order affected by the recusal issue. *See id.* at *4 (describing the standard as a "high burden," and explaining that "in general, if a matter is within the district court's discretion, the litigant's right to a particular result cannot be 'clear and indisputable,'" and that such relief is granted on disqualification "only in exceptional circumstances") (citations and quotation marks omitted).

Dondero sought Supreme Court review of the Fifth Circuit's mandamus-stage decision. *Dondero v. Jernigan*, No. 25-355 (Sup. Ct.)  Unaware of the Fifth Circuit Judicial Council's parallel corrective action recusing the predecessor judge from this matter going forward, the

Supreme Court denied certiorari on January 12, 2026.  Dondero timely filed a petition for rehearing based on the intervening Fifth Circuit corrective action, which is pending.  *See* Petition for Rehearing, *Dondero v. Jernigan* (attached as Exhibit 52).

This Court is not restrained by the standard of review issues that appeared to be the only thing keeping the recusal decision from already having been reversed on mandamus.[26]  The law is clear: A successor judge in an ongoing proceeding may reverse any prior order for any reason and without deference to the rulings of the previous judge.  *Abshire v. Seacoast Prods., Inc.*, 668 F.2d at 837–38.  That is because the prior rulings become those of the replacement judge when addressed on appeal from a final order in the case.  This Court can and should do the following: Determine that, as the Fifth Circuit put it, the "strong argument that [the predecessor judge] had a duty to recuse" disqualified her from ruling on and deprived her of authority to enter the 9019 Order, thus voiding it.  Because this Court is not sitting as a reviewing court, no standard of review or extremely elevated showing required on mandamus restrains it from taking such action.  This Court, instead, is cleaning up one aspect of the docket so that the reviewing courts are not presented with a problem when this issue arrives on direct review.  As the Supreme Court has made clear, successor judges should use Rule 60 even after final judgment (and presumably other authorities before) to void orders by a judge who was disqualified from acting in a matter under 28 U.S.C. §

---

[26] Dugaboy, Dondero, and others continue to contest that the standard of appellate review of orders denying recusal is abuse of discretion.  Congress made recusal under certain circumstances—including where a judge's impartiality may be reasonably questioned—mandatory, not optional or discretionary.  28 U.S.C. § 455(a) (mandating that a judge "*shall* disqualify himself in any proceeding in which his impartiality might reasonably be questioned") (emphasis added); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (explaining that "the mandatory 'shall[]'" in a statute "normally creates an obligation impervious to judicial discretion").  Moreover, no one is a particularly good judge of her own misconduct, making *de novo* review particularly appropriate when the grounds of recusal overlap with violations of the rules of judicial conduct.  *See* Ex. 32, Order 05-26-90042 at 4–5, Ex.33, Order 05-26-90044 at 3, & Ex. 34, Order 05-26-90045 at 2.  For these and other reasons, the Seventh Circuit reviews a judge's decision not to recuse *de novo*.  *United States v. Balistrieri*, 779 F.2d 1191, 1202–03 (7th Cir. 1985).

455.

Given the predecessor judge's disqualification and lack of authority, this Court should reconsider the 9019 Settlement Order on a "clean slate." *See Demodulation, Inc. v. United States*, 114 Fed. Cl. 655, 657 (2014) ("[I]f the orders of the now-recused judge were allowed to stand, Plaintiff could one day wonder whether the outcome of the case was influenced by a judge who later recused herself from the case"). The Court should vacate that order, subject to Highland somehow reasserting its motion to approve the settlement if the circumstances now extant with the evidence of Patrick's misconduct could possibly support such a move.

## IV.   CONCLUSION

Highland's bankruptcy has been long and complicated, but the issues raised by Dugaboy's Motion are not. Something very bad happened here, and the Bankruptcy Court's Rule 9019 Settlement Order facilitated that conduct. This Court should ensure that all bankruptcy constituents act fairly and free of fraud. Recent events make clear that the 9019 Settlement at issue was tainted by both, and the Court should exercise its considerable discretion to reconsider and vacate the Rule 9019 Settlement Order.

Dated:  February 9, 2026

Respectfully submitted,

*/s/ John Michael Gaddis*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on February 9, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ John Michael Gaddis*

John Michael Gaddis