# Exhibit 2

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 19-34054-sgj11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) STATUS/SCHEDULING |
| | ) CONFERENCE |
| Debtor. | ) |
| | ) December 6, 2019 |
| | ) Dallas, Texas |

Appearances:

For the Debtor:            Jeffrey N. Pomerantz
                          Ira D. Kharasch
                          Pachulski Stang Ziehl & Jones LLP
                          10100 Santa Monica Boulevard, 13th Floor
                          Los Angeles, California  90067

                          Chuck Gibbs
                          Katten Muchin Rosenman LLP
                          1301 McKinney Street, Suite 3000
                          Houston, Texas  77010

For the Official          Matthew A. Clemente
Committee of              Penny P. Reid
Unsecured Creditors:      Paige Holden Montgomery
                          Charles M. Persons
                          Sidley Austin LLP
                          One South Dearborn
                          Chicago, Illinois  60603

For ACIS Capital          Brian Shaw
Management:               Winstead PC
                          2728 North Harwood Street, Suite 500
                          Dallas, Texas  75201

For the U.S.              Lisa Lambert, Assistant U.S. Trustee
Department of             Office of the U.S. Trustee, Region 6
Justice:                  William T. Neary, U.S. Trustee
                          1100 Commerce Street, Room 976
                          Dallas, Texas  75242-1496

Appearances continued on next page.

2

Appearances continued:

| | |
|---|---|
| For the Redeemer Committee of the Highland Crusader Fund: | Mark A. Platt<br>Frost Brown Todd LLC<br>100 Crescent Court, Suite 350<br>Dallas, Texas  75201 |
| For Alvarez & Marsal CRF Management, LLC: | Michael A. Rosenthal<br>Gibson Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, New York  10066 |

(via telephone:)

| | |
|---|---|
| For the Debtor: | John A. Morris<br>Pachulski Stang Ziehl & Jones LLP<br>780 Third Avenue, 34th Floor<br>New York, New York  10017 |
| For the Redeemer Committee of the Highland Crusader Fund: | Marc B. Hankin<br>Jenner & Block LLP<br>919 Third Avenue<br>New York, New York  10022-3098 |
| | Terri Mascherin<br>Jenner & Block LLP<br>353 North Clark Street<br>Chicago, Illinois  60654-3456 |
| For Jefferies LLC: | Patrick C. Maxcy<br>Dentons US LLP<br>233 South Wacker Drive, Suite 5900<br>Chicago, Illinois  60606-6361 |
| Digital Court Reporter: | United States Bankruptcy Court<br>Northern District of Texas<br>Michael F. Edmond Sr., Judicial<br> Support Specialist<br>Earle Cabell Building, U.S. Courthouse<br>1100 Commerce Street, Room 1254<br>Dallas, Texas  75242<br>(214) 753-2062, direct; 753-2072, fax |
| Certified Electronic Transcriber: | Palmer Reporting Services<br>1948 Diamond Oak Way<br>Manteca, California  95336-9124 |

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

| | *Status/Scheduling Conference* | 3 |

1    Friday, December 6, 2019                    9:35 o'clock a.m.

2                    P R O C E E D I N G S

3         COURT SECURITY OFFICER:  All rise.  The United States

4    Bankruptcy Court for the Northern District of Texas, Dallas

5    Division, is now in session, the Honorable Stacey Jernigan

6    presiding.

7         THE COURT:  All right.  Please be seated.

8         All right.  We have a larger crowd in the courtroom

9    than I thought we might, also lots of people on the phone.

10   Let's start by getting appearances from the lawyers in the

11   courtroom who wish to appear.

12        MR. GIBBS:  Good morning, Your Honor.

13        THE COURT:  Good morning.

14        MR. GIBBS:  Chuck Gibbs from Katten Muchin.  We had

15   filed a notice of appearance as proposed co-counsel for the

16   debtor on Wednesday and had filed the notice of scheduling for

17   today's status conference.  We had agreed on Wednesday when we

18   were contacted to represent Highland Capital subject to

19   clearance of conflicts.  And late last night a conflict arose

20   that we can't resolve, so we will not be able to accept the

21   representation, but I got a limited waiver to appear today for

22   the primary purpose of introducing the lead counsel for the

23   debtor, the Pachulski Stang, in particular Jeff Pomerantz and

24   Ira Kharasch, and they will handle the hearing today.

25        THE COURT:  Okay.  Thank you.

*Status/Scheduling Conference*                                             4

1          MR. GIBBS:  Thank you.

2          MR. POMERANTZ:  Good morning, Your Honor.

3          MR. KHARASCH:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MR. CLEMENTE:  Excuse me.  Good morning, Your Honor.

6    Matthew Clemente from Sidley Austin, proposed counsel to the

7    Official committee of Unsecured Creditors.  With me in the

8    courtroom today are my colleagues, Ms. Penny Reid, —

9          THE COURT:  Good morning.

10         MR. CLEMENTE:  — Ms. Paige Montgomery, and Mr. Charles

11   Persons.  They have filed a pro hac vice for me.  I don't

12   believe it's been entered yet, but with Your Honor's indulgence,

13   please allow me to address the Court later today.

14         THE COURT:  You certainly may.

15         MR. CLEMENTE:  Thank you so much.  I appreciate it.

16         THE COURT:  And I think Ms. Reid and I went to law

17   school together, but we —

18         MS. REID:  It's been a few years.

19         THE COURT:  — haven't seen each other in 30 years.

20         All right.  Good to see you after all these years.

21         MR. SHAW:  Good morning, Your Honor.  Brian Shaw —

22         THE COURT:  Good morning.

23         MR. SHAW:  — on behalf of ACIS Capital Management.

24   Ms. Patel is delayed by a medical appointment, but she is on her

25   way as well.

*Status/Scheduling Conference*                                              5

1          THE COURT:  Okay.  Good morning.

2          MR. SHAW:  Thank you.  Good morning.

3          MR. PLATT:  Good morning, Your Honor.  Mark Platt from

4   Frost Brown Todd on behalf of the Redeemer Committee of the

5   Highland Crusader Fund.  I believe on the phone is Terri

6   Mascherin and Marc Hankin — and from the Jenner and Block firm.

7          THE COURT:  Okay.  Thank you.

8          MS. LAMBERT:  May it please the Court, my name is Lisa

9   Lambert.  I represent the United States Trustee William Neary.

10         THE COURT:  Good morning.

11         MR. ROSENTHAL:  Good morning, Your Honor.  Michael

12  Rosenthal from Gibson Dunn and Crutcher.  I represent Alvarez

13  and Marsal, as investment manager of the Highland Crusader

14  Funds.

15         THE COURT:  Okay.  Thank you.

16         All right.  Now we will look to the phone list.  Of

17  this you wish to appear, — well, I'll just call the people who

18  have asked for a live line.

19         Asif Attarwala for UBSC; are you there?

20     (No audible response.)

21         THE COURT:  All right.  How about Jeff Bjork, also

22  with that firm, for UBSC?

23     (No audible response.)

24         THE COURT:  All right.  Andrew Plubock (phonetic) for

25  UBSC; are you on the phone?

*Status/Scheduling Conference*                                        6

1        (No audible response.)

2        THE COURT:  Well, how about this:  Anyone on the phone

3   who wishes to appear go ahead.  I'm all ears.

4        MR. MAXCY:  Good morning, Your Honor.  This is Patrick

5   Maxcy from Dentons US LLP on behalf of Jefferies LLC.  My — my

6   pro hac vice motion, application was really filed this afternoon

7   and notice of appearance.  I ask your indulgence to allow me to

8   appear today.

9        THE COURT:  Okay.  Yes, you may appear today.

10       Anyone else?

11       MR. MAXCY:  Thank you, Your Honor.

12       MS. MASCHERIN:  Yes.  Your Honor, Terri Mascherin of

13  Jenner and Block.  Mr. Platt has already introduced my colleague

14  Mark Hankin and I.  We represent the Redeemer Committee of the

15  Highland Crusader Fund.

16       THE COURT:  All right.  Good morning to you.

17       Anyone else?

18       MR. MORRIS:  Your Honor, it's John Morris — excuse me

19  — from Pachulski Stang Ziehl and Jones, on behalf of the debtor.

20       THE COURT:  All right.  Good morning.

21       Anyone else?

22       (No audible response.)

23       THE COURT:  All right.  Well, we're here obviously for

24  what we've called a status/scheduling conference.  A couple of

25  housekeeping matters.

1      We do have pulled over to the Dallas docket now all of

2   the pleadings that were filed in the Delaware case.  So just for

3   your ease of operation, if you will.  I think we've got a

4   complete docket now in Dallas.

5      Obviously I'm going to defer to Highland at the outset

6   to see what it thinks we need to accomplish today.  I'll tell

7   you that I did pull up — my law clerk pulled up the agenda that

8   was on file in Delaware for the hearing earlier this week,

9   December 2nd.  I saw that there were 12 matters on it.  One was

10  venue the motion, so there are 11 matters.  Looks like two

11  didn't really need court hearing time.  Interim orders have

12  become final.

13     So I guess — one thing I'm going to ask you:  Do we

14  have nine matters — doing the math subtraction — that need

15  hearings and how soon?  Four or five of those look like

16  employment matters.  So I'll defer now to Highland's counsel to

17  see what you think we need to accomplish today, but I figure

18  this agenda is one of the things we need to talk about.

19     MR. POMERANTZ:  Good morning, Your Honor.  Again it's

20  Jeff Pomerantz and Ira Kharasch from Pachulski Stang Ziehl

21  Jones, representing the debtor.  Good to be in Your Honor's

22  courtroom.

23     What I thought I would do is I would like to introduce

24  some people on behalf of the debtor who are here with me.  And

25  then I thought it might be helpful for Your Honor for me to give

*Status/Scheduling Conference*                                                              8

1    Your Honor a little background on the case, what transpired in

2    Delaware, how we got here, and then some thoughts about where

3    we're going.

4                    THE COURT:  Okay, that would be good.

5                    MR. POMERANTZ:  Your Honor, in the courtroom sitting

6    in the first row is Mr. Brad Sharp.

7                    THE COURT:  Good morning.

8                    MR. POMERANTZ:  He is the managing director of DSI.

9    He is the debtor's proposed chief restructuring officer.

10                   THE COURT:  Okay.

11                   MR. POMERANTZ:  Also as I will discuss in a few

12   moments, the debtor is in discussions with the creditors

13   committee with respect to some management changes, significant

14   management changes, and in connection with that the appointment

15   of the new board.  The debtor has identified certain people to

16   serve on that board.  While those people have not yet been

17   agreed to and you will hear it's the subject of discussion, we

18   invited Judge Lee Clark (phonetic) to be here.  He is one of the

19   debtor's proposed —

20                   THE COURT:  Well, good morning.  I just now saw you.

21                   MR. CLARK:  Here I am.

22                   THE COURT:  Okay.  Nice to see you.

23                   MR. POMERANTZ:  So his presence should be nothing

24   other than he is one of the debtor's proposed people.  We are in

25   conversations, as you will hear, with the committee on the

*Status/Scheduling Conference* 9

1    management training.

2            THE COURT:  Very good.

3            MR. POMERANTZ:  So, Your Honor, Highland is a

4    multibillion dollar global asset management fund.  There are 75

5    employees in Dallas and its affiliates have approximately 50

6    employees at locations around the world.  It directly manages

7    two and a half billion dollars of assets and also provides

8    shared services for additionally seven and a half billion

9    dollars of assets.  And the assets consist primarily of public

10   securities, interests in private equity funds, interest in hedge

11   funds.  And there are assets located all around the world,

12   Singapore, Latin America, and Korea.

13           The debtor commenced the case on October 16th as a

14   result of an adverse arbitration ruling in a dispute between the

15   debtor and the Redeemer Committee, which was a committee

16   appointed in connection with the winddown of one of Highland's

17   Funds, the Crusader Fund.  The debtor lacked the liquidity to

18   satisfy the Redeemer arbitration award, and the debtor sought

19   Chapter 11 protection to provide a time to develop a

20   restructuring plan with respect to how it would address those

21   claims as well as other claims.

22           The debtor retained our firm on approximately

23   September 26th.  And based upon our understanding of the claims

24   that were asserted in the Redeemer matter, prior proceedings in

25   this Court, as well as the claims of other creditors, we

1   recommended that the debtor appoint a chief restructuring

2   officer with expanded powers.  The debtor retained Brad Sharp

3   and DSI October 7th.  And I'm not sure if the Court is familiar

4   with Mr. Sharp and DSI, but DSI is a nationally-recognized

5   restructuring and financial advisory firm headquartered in

6   Chicago.  And Mr. Sharpe served as the chief restructuring

7   officer in a variety of extremely challenging cases.  And he is

8   known too and respected by the committee.

9           Mr. Sharp has been serving as the chief restructuring

10  officer for the past two months.  And he and his lieutenant Fred

11  Caruso (phonetic) have been onsite at the debtor almost every

12  day since then as well as several other DSI personnel.  And, as

13  a result, they have developed a substantial amount of knowledge

14  regarding the debtor's operations, its business, its assets, and

15  its liabilities.  Importantly, Your Honor, since DSI's retention

16  there have been no allegations of any postpetition misconduct;

17  and DSI has been and will continue to be accessible to the

18  committee as well as answerable to the Court and transparent

19  with respect to the debtor's operations.

20          While under the Bankruptcy Code the debtor can operate

21  in the ordinary course without Bankruptcy Court approval, Mr.

22  Sharp and our firm thought that especially in a case like this

23  and given the debtor's operations, it was unclear how the

24  ordinary course standard should be applied to an

25  asset-management firm such as Highland.  This is especially true

*Status/Scheduling Conference*                                   11

1    giving the — given the interconnective relationship the debtor

2    has with a lot of its affiliates and inside.  Also we felt it

3    was collect — we collectively felt it was important to be

4    transparent with the creditors in the Court in light of the

5    allegations that have been made in various forums against the

6    debtor relating to certain of its prepetition conduct.  As a

7    result, Pachulski Stang and DSI work with the debtor to develop

8    a series of protocols that would outline what is and what is not

9    an ordinary course transaction.  And in developing those

10   protocols, the debtor tried to balance the concerns of a fair

11   and transparent process with creditor input with the necessary

12   time exigencies, given the company such as the debtor and the

13   need to quickly transact business.

14         The committee was formed on October 29th, and the

15   debtor and its professionals immediately engaged with the

16   committee and their professionals in a dialogue to discuss a

17   variety of things, including the nature and scope of the CRO's

18   duties, the ordinary course protocols, and other matters

19   relating to the debtor's business.  And such efforts have

20   included the debtor providing a substantial amount of discovery,

21   both informal and formal to the committee; and also having

22   several of the debtor personnel, including the CRO, sit for

23   depositions.

24         The committee filed its motion-to-transfer-venue

25   motion early on in the case.  And while for the better part of

*Status/Scheduling Conference*                                          12

1   the last three weeks, the parties have been focused on written

2   discovery and depositions, the debtor has also worked with the

3   committee to narrow the disputes that were pending before Judge

4   Sontchi on December 2nd.  While the parties made some progress

5   and several orders had been entered, including I think some of

6   the items Your Honor may see on the docket, they had not reached

7   agreement by December 2nd on a variety of issues.

8            In addition to the venue matter, the following four

9   motions were the motions that were to be contested at the

10  hearing on the 2nd.  First, the motion to obtain the chief

11  restructuring officer.  Second, the protective motion to approve

12  ordinary-course protocols.  Third, the cash-management motion.

13  And, fourth, the motion to approve the retention of Foley

14  Gardere and Lynn Pinker as special litigation counsel.

15           After Judge Sontchi granted the committee's motion to

16  transfer venue, he declined to rule on the remaining motions,

17  instead deferring to Your Honor.  For the reasons I will explain

18  in a couple of moments, Your Honor, we do not believe that the

19  Court right now at this hearing needs to schedule those motions

20  for hearing.  Rather, we will be seeking a continued hearing,

21  perhaps for later next week, to discuss the results of what I'm

22  about to describe to the Court.

23           Leading up to today, the debtor has engaged the

24  committee on an alternative corporate governing structure that

25  we hope will address the committee's concerns with the

*Status/Scheduling Conference*                                              13

1  management and operation of the debtor, and will allow the

2  parties to start working consensually and constructively towards

3  a reorganization plan.

4          The debtor has heard the committee loud and clear,

5  Your Honor, that the committee does not want Mr. Dondero to be

6  in this position to manage the debtor's operations.

7  Accordingly, the debtors have informed the committee that Mr.

8  Dondero is willing to resign from any and all positions of the

9  debtor, and use his authority over the debtor's general partner

10 to appoint an independent board that would be in charge with

11 managing the debtor.  Mr. Dondero would further agree that any

12 further changes to the board could only be made with the

13 committee's consent.  The CRO would remain.  It would be the

14 senior most employees answering directly to the board.

15         While Mr. Dondero will no longer be in a position of

16 control with the debtor, the committee and the debtor will be

17 discussing whether maximizing the estate's assets will need to

18 include Mr. Dondero being involved with the debtor in some

19 capacity, subject to appropriate controls.  That is because the

20 debtor may lose certain valuable revenue streams if Mr. Dondero

21 is not associated with the business, based upon the various

22 contracts the debtor was a party to.

23         In any event, Your Honor, that decision will be made

24 first in the first instance subject to this committee's consent

25 and, second, subject to the directly of the board.  The debtor

*Status/Scheduling Conference*                                           14

1    has actually provided documents to the committee that Mr.

2    Dondero has signed effectuating these management changes, and

3    those documents are being held in our, my firm's, possession and

4    trust, pending approval of the Court.

5           The debtor signed these documents not to be

6    presumptuous enough that the committee would accept them without

7    modification.  Rather, the debtor wanted to impress upon the

8    committee and this Court that the proposal is more than just a

9    concept, and then Mr. Dondero is serious about change.

10          Last night we received a termsheet from the committee

11   regarding the governance proposal.  And as recently as right

12   before this hearing, we have had further discussions with

13   committee counsel, and we expect that dialogue to continue over

14   the next few days.

15          I believe the debtor and the committee both recognize

16   this case is at a crossroads and it takes some time — and it

17   makes sense to take some time to see if the parties can reach an

18   agreement on a consensual path forward.  And I think I speak for

19   the debtor and the committee in saying that achieving a

20   consensual resolution on governance control is more preferable

21   than time-consuming and costly litigation of what would likely

22   be a trustee motion, a deal I think would also be better for the

23   business and allow the stakeholders to focus on the business and

24   not on litigation.  It is for this reason, Your Honor, that we

25   request that the Court continue this hearing until perhaps later

*Status/Scheduling Conference*                                      15

1    next week, consistent with the Court's calendar.  And by that

2    time, I think, Your Honor, it will be clear whether the debtor

3    and the committee have reached a deal for which we would seek

4    approval from Your Honor, which can be sought under appropriate

5    notice or whether the case will go in another direction, which

6    will likely involve one or more motions for a trustee and

7    litigation over those motions.

8           Based upon the ongoing dialogue, the committee has

9    told the debtor that while of course it reserves the right to

10   file a trustee motion at any time, it is not seeking that relief

11   today.

12          The debtor wants the Court and the committee to be

13   assured that pending any resolution or any litigation, the

14   debtor will continue to comply with the protocols that were

15   shared with the committee in advance of the December 2nd hearing

16   — there are further modifications that make it even more

17   stringent than what is on the docket — and that either Mr. Sharp

18   or Mr. Caruso, his lieutenant, will be onsite at the debtor's

19   headquarters pending whatever outcome is reached.

20          Your Honor, I'm happy to answer any further questions

21   you might have.

22          THE COURT:  All right.  Well, before I ask questions

23   I'll ask does the committee want to speak up —

24          MR. CLEMENTE:  Yes, Your Honor.

25          THE COURT:  — and give its own version, consistent or

*Status/Scheduling Conference*                                          16

1   not consistent, with this.

2           MR. CLEMENTE:  Good morning, Your Honor.  Matthew

3   Clemente from Sidley Austin on behalf of the committee.  It is a

4   pleasure to be in front of Your Honor this morning.

5           If I could just maybe make a few preliminary comments

6   to provide Your Honor with some background that Mr. Pomerantz

7   didn't cover, and then we can talk a little bit further about

8   what Mr. Pomerantz did talk about.

9           THE COURT:  By the way, —

10          MR. CLEMENTE:  Yes.

11          THE COURT:  — you're probably going to get to this,

12  but who are the members of the committee —

13          MR. CLEMENTE:  Yes.  That's exactly my first starting

14  point, Your Honor.

15          THE COURT:  Okay, very good.

16          MR. CLEMENTE:  I would say great minds, but I wouldn't

17  consider mine a great mind, so, Your Honor, it is a four-member

18  committee.

19          THE COURT:  Okay.

20          MR. CLEMENTE:  And the committee consists of the

21  following parties:  The Redeemer Committee of the Highland

22  Crusader Fund.  Your Honor, this is a formal committee appointed

23  — there was a Bermuda winddown proceeding for the Crusader Fund,

24  and that was a committee appointed in connection with that

25  winddown proceeding.

*Status/Scheduling Conference*                                              17

1          The second member of the committee, Your Honor, is

2    ACIS Capital Management, L.P. and ACIS Capital Management, GP,

3    LLP.  I believe Your Honor is familiar with ACIS.

4          THE COURT:  Yes.

5          MR. CLEMENTE:  The third member, Your Honor, is UBS

6    Securities, LLC and UBS AG London Branch.

7          The fourth member, Your Honor, is Meta-e Discovery,

8    and Meta-e Discovery is a trade vendor to the debtor.

9          The committee hired Sidley on October 29th, 2019, and

10   hired FTI as its financial advisor on November 6th, 2019.  Now

11   that we're before Your Honor, we will be filing our retention

12   application very shortly.

13         It is important to note, Your Honor, that three of the

14   four members of the committee, the Redeemer Committee, ACIS, and

15   UBS, all have extensive experience litigating with Highland,

16   several of the unaffiliated myriad Highland entities — excuse me

17   — nondebtor affiliated Highland entities and Mr. Dondero, the

18   sole person in control of Highland — Highland Capital Management

19   — excuse me — who is our debtor here.  The vast majority of

20   claims in terms of dollar amount, Your Honor, in this case arise

21   from litigation claims against the debtor.  And, in fact, as Mr.

22   Pomerantz stated, the precipitating factor behind the bankruptcy

23   filing was the arbitration award obtained by the Redeemer

24   Committee.

25         So, Your Honor, we do not believe that this is a case

Case 19-34054-sgj11  Doc 2045-2  Filed 02/09/26  Entered 02/09/26 14:03:50  Desc

*Status/Scheduling Conference*                                    18

1   where the balance sheet became over levered.  Instead, this is a

2   case driven by litigation claims arising out of conduct with

3   this debtor prior to the bankruptcy.

4           Although the schedules have not yet been filed, Your

5   Honor, I believe they're due to be filed shortly, within the

6   next week or two.  We do not believe there are other large

7   creditors, secured or unsecured, that exist, but there are two

8   secured creditors that we are aware of.  Jefferies is a name

9   Your Honor may have seen.  They're owed, I believe,

10  approximately $30 million, and they are significantly over

11  secured by virtue of a trading account.  It's a margin loan, I

12  believe.

13          Frontier Bank, Your Honor, is owed approximately $5

14  million, and we also believe they are significantly over

15  secured.

16          So from the committee's perspective, Your Honor, I

17  provide you with that background because we believe this is a

18  case about unsecured creditors, and the vast majority in terms

19  of dollar amount are represented on the creditor's committee.

20  And the overwhelming amount of those dollars arise from

21  litigation judgments against the creditors — excuse me — against

22  the debtor.

23          Your Honor, the first thing the committee did after

24  its appointment was determine that venue was more appropriate in

25  this Court, so we filed our motion, which was ultimately granted

1   by Judge Sontchi, and we are now very pleased to be in front of

2   Your Honor here in Dallas.

3           The second thing the committee did was immediately

4   focus on the governance and the need for transparency by this

5   debtor.  On the governance, Your Honor, the debtor and some of

6   its 2,000 affiliated nondebtor entities are all owned and

7   controlled in one fashion by Mr. Dondero.  The committee quickly

8   came to the conclusion that a world where Mr. Dondero remained

9   in control, from a governance perspective, particularly given

10  the very real history many of the parties have with Mr. Dondero,

11  was not one which could work.

12          The debtor did file a CRO motion and a protective

13  ordinary-course motion designed, Your Honor, we believe in our

14  view, the cement these otherwise unacceptable governance issues

15  in place.  And that is why we filed our objection, and we're

16  prepared to prosecute that objection very vigorously.

17          Regarding transparency, Your Honor, the situation is

18  unique in a couple respects.  One is there is no DIP loan or use

19  of cash collateral.  So where you normally have a DIP lender or

20  a cash collateral provider, there is reporting, transparency

21  that — discipline that's inherent in that process.  And we don't

22  have that because we don't have that type of postpetition

23  secured lender here.

24          Additionally, there are myriad transactions and

25  structures that are Byzantine and we believe intentionally

*Status/Scheduling Conference*                                          20

1   opaque and are rife with insider and related-party dealings,

2   requiring a tremendous need for open dialogue and access to

3   information to understand the web of interconnected

4   transactions, issues, and agreements.

5           So we believe that those two factors create a

6   heightened level of transparency that's required by this

7   committee.

8           Some efforts, Your Honor, were made to address these

9   concerns, in particular the transparency concern, but the

10  creditors committee does not believe the debtor's current

11  governance structure, where Mr. Dondero remains in control, can

12  work.  And, therefore, the committee has been, as Mr. Pomerantz

13  referred to, focused on preparing a motion for the appointment

14  of a Chapter 11 trustee as the solution to the governance and

15  transparency issues.  The status quo as it exists today simply

16  cannot and does not and will not be able to work for the

17  committee.

18          However, as Mr. Pomerantz pointed out, the debtors

19  have approached the committee with a structure to address the

20  governance issues.  And the committee is engaging with the

21  debtor on that structure.  However, if we are not able to come

22  to resolution is that, we will be pursuing a Chapter 11 trustee.

23          As Mr. Pomerantz pointed out, they have some documents

24  that they have prepared, they have identified some certain

25  names.  Again to be clear to, Your Honor, the committee has not

*Status/Scheduling Conference*                                21

1   consented to any of that at this point, but we are engaged in a

2   dialogue with the debtor concerning the governance issues, and

3   we're hopeful, cautiously hopeful, that we will be able to come

4   to a resolution on that.  But again if we do not, we believe the

5   only way to resolve the governance issues and to create the

6   transparency necessary is to bring forth a Chapter 11 trustee

7   motion.

8          Your Honor, regarding the ultimate outcome of the

9   cases, and if I may for a moment, it's too early to tell.  The

10  statement and schedules have not been filed yet.  It's not a —

11  not a criticism, it's just a fact they haven't been filed yet.

12         The committee needs much more transparency into the

13  assets of the debtors, the liabilities, and what can be done in

14  terms of an exit solution, and what the contours of an exit

15  solution might look like here.  And, again, given the tangled

16  web of insider and affiliated and related-party transactions

17  that have occurred, that is going to be a critical focus

18  understanding those past historical transactions in order to

19  determine ways that potentially supplement the estate by

20  bringing things back into the estate that we may conclude

21  appropriately belong in the estate.

22         Your Honor, to sum up, we do remain very concerned

23  about the governance issues and the existing structure and the

24  lack of transparency.  We are hopeful that by engaging with the

25  debtor on a new governance structure we can address those

*Status/Scheduling Conference* 22

1   concerns.  If not, we will proceed to seek a Chapter 11 trustee.

2   It's only once we have the governance issues resolved and have

3   full and complete transparency will we be able to then assess

4   the best way to resolve these cases.

5         In terms of timing, Your Honor, I do think it makes

6   sense to have a status conference again maybe some time late in

7   the week next week.  It could be something that perhaps we can

8   do by telephone or folks can show up in person because, you

9   know, as a committee we — obviously we need to work through

10   these issues and we have multiple members and it takes us, you

11   know, time to work through them.  So I wouldn't want to suggest

12   to Your Honor we'd be in a position to be back before Your Honor

13   early next week, but perhaps something later in the week next

14   week.

15         With that, unless Your Honor has any questions of me,

16   I will cede the podium.

17         THE COURT:  I don't think I have any more questions.

18         MR. CLEMENTE:  Thank you, Your Honor.

19         THE COURT:  Thank you.

20         Who else wishes to speak, anyone else?

21    (No audible response.)

22         THE COURT:  So when — when are the schedules due?  I

23   know there was an order, you know, obviously extending the

24   deadline, but I heard next week perhaps?

25         MR. POMERANTZ:  Your Honor, Jeff Pomerantz, Pachulski

*Status/Scheduling Conference*                                           23

1    Stang Ziehl and Jones.  They are due to be filed next Friday.

2            THE COURT:  Next Friday, okay.

3            All right.  Well, obviously I'm very glad to hear

4    there are constructive conversations going on with the committee

5    regarding these governance issues.  I'm not meaning to compare

6    apples to oranges here, but the ACIS case that this Court

7    presided over, fairly quickly got a Chapter 11 trustee because

8    of I think some of these same issues that are being mentioned

9    with regard to Mr. Dondero and a concern about independence and

10   — and people in charge appreciating fiduciary duties.  So

11   obviously if there's some in-between approach here, where we

12   have independent people involved and that potentially preserves

13   value of revenue streams which has been alluded to, that sounds

14   like a nice fix to address people's concerns, and get the

15   company fairly quickly focused on a reorganization plan.

16           Again, we had a very contentious, litigated Chapter 11

17   with ACIS, and it would seem to me that if we get these

18   corporate governance issues quickly resolved to everybody's

19   satisfaction, we might have a more constructive path in this

20   case than we sometimes did in the ACIS case.

21           So, anyway, that's very good music to my ears.  I

22   would hate to think we're going to have lots of adversary

23   proceedings and lots of litigation at the very start of this

24   case — well, it's not the start.  The case has been pending

25   almost two months, but — but it occurs to me that, well, if what

*Status/Scheduling Conference*                                               24

1   I'm hearing is true, we've got two secured creditors who are

2   very over secured and then we have several large creditors

3   already with judgments or arbitration awards.  The focus needs

4   to be on how to pay those people more than, you know, claim

5   objections, challenges with various parties-in-interest.

6          So I am happy to give you time next week for another

7   status conference.  It sounds like that is all you want it to be

8   at this point.  You don't want any of these hangover motions

9   from the December 2nd agenda set yet?

10         MR. POMERANTZ:  That is correct, Your Honor.

11         THE COURT:  Okay.

12         MR. POMERANTZ:  There is nothing on those hangover

13  motions that are emergent.

14         There was a matter also scheduled for December 17th

15  before Judge Sontchi dealing with bonuses, which is not on the

16  agenda.  That is something that we'll be talking with the

17  committee about and at least with respect to part of it, having

18  it go forward as quickly as possible but not something we're

19  going to ask for Your Honor now.  We feel that next week when we

20  come back and we have a little better sense of where the case is

21  going, we could then propose an appropriate schedule for Your

22  Honor taking up those motions.

23         THE COURT:  Okay.  Well, I am going to see if I can

24  work you in Thursday if that is good for everyone.  My son's

25  graduating from grad school on Friday, so I'm trying to take the

*Status/Scheduling Conference*                                    25

1    day off, but —

2            MR. POMERANTZ:  I'm glad Your Honor has her priorities

3    straight.

4        (Pause in the proceedings at 10:04 a.m.)

5            THE COURT:  All right.  So we can give you 9:30 next

6    Thursday, December 12th.

7            And, as far as your future planning, we could give you

8    time the week of December 16th if motions end up needing time

9    that week, just you know let us know when.  But the week of the

10   23rd, I am out the entire week, so plan to be back in the office

11   the 31st, December, and thereafter.  So that's going to be the

12   one bad week for hearings, the week of the 23rd.  You're

13   probably glad to hear that, a lot of folks, so.

14           MR. CLEMENTE:  Thank you for that, Your Honor.

15           THE COURT:  Um-hum.

16           MR. POMERANTZ:  After the hearing before Judge Sontchi

17   on the Monday after Thanksgiving, it's very nice to hear that

18   you're going to be out that week.

19           THE COURT:  Okay.  Well, you know, I was having court

20   that day too, so.

21           MR. POMERANTZ:  Your Honor, one other comment.  Ms.

22   O'Neill mentioned to me that there's an appellate brief due on

23   December 15th in one of the ACIS matters, for which we are

24   seeking Foley Gardere and Lynn Pinker's retention.  I think

25   we're going to just proceed with preparing those but recognize

1  that Your Honor has not yet approved their employment.  And I

2  suspect that we will try hopefully, you know, by the end of next

3  Friday to maybe get a consensual order, if that's possible.  And

4  if not, perhaps have that hearing set for the week of the 16th.

5       THE COURT:  All right.  We'll stay tuned for that

6  possibly.

7       All right.  Anything else?

8       MR. POMERANTZ:  Thank you, Your Honor.

9       THE COURT:  All right.  Good to see you and we'll see

10  you next Thursday.

11       MR. CLEMENTE:  Thank you.

12       THE COURT:  All right.

13       MR. POMERANTZ:  Thank you.

14       COURT SECURITY OFFICER:  All rise.

15    (The hearing was adjourned at 10:06 o'clock a.m.)

16                    —o0o—

17

18

19

20

21

22

23

24

25

State of California          )
                             )      SS.
County of San Joaquin        )


        I, Susan Palmer, certify that the foregoing is a true
and correct transcript, to the best of my ability, of the above
pages, of the digital recording provided to me by the United
States Bankruptcy Court, Northern District of Texas, Office of
the Clerk, of the proceedings taken on the date and time
previously stated in the above matter.

        I further certify that I am not a party to nor in any
way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber
by the American Association of Electronic Reporters and
Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer
Reporting Services is approved by the Administrative Office of
the United States Courts to officially prepare transcripts for
the U.S. District and Bankruptcy Courts.


                            Susan Palmer
                            Palmer Reporting Services

                            Dated December 6, 2019