# Exhibit 10

Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Chapter 11** |
| **MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

## HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED ADVERARY PROCEEDING

Hunter Mountain Investment Trust ("HMIT"), Movant, files this Emergency

Motion for Leave to File Verified Adversary Proceeding ("Motion"), both in its individual

capacity and as a derivative action on behalf of the Reorganized Debtor, Highland Capital

Management, L.P. ("HCM" or "Reorganized Debtor") and the Highland Claimant Trust

against Muck Holdings, LLC ("Muck"), Jessup Holdings, LLC ("Jessup"), Farallon

[1]

Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC

("Stonehill"), James P. Seery, Jr. ("Seery") and John Doe Defendant Nos. 1-10 (Muck,

Jessup, Stonehill, Farallon, Seery and the John Doe Defendant Nos. 11-10 are collectively

"Respondents" or "Proposed Defendants").

## I.      Good Cause for Expedited Relief

1.      HMIT seeks leave to file an Adversary Proceeding pursuant to the Court's

"gatekeeping" orders, as well as the injunction and exculpation provisions in the Fifth

Amended Plan of Reorganization of Highland Capital Management, L.P. (Doc. 1943), as

modified (the "Plan").[1] A copy of HMIT's proposed Verified Adversary Proceeding

("Adversary Proceeding") is attached as Exhibit 1 to this Motion. This Motion is

separately supported by objective evidence derived from historical filings in the

bankruptcy proceedings,[2] as well as the declarations of James Dondero, dated May 2022

(Ex. 2), James Dondero, dated February 2023 (Ex. 3), and Sawnie A. McEntire with

attached evidence (Ex. 4). [3]

---

[1] The exculpation provisions were recently modified by a decision of the Fifth Circuit. Such provisions apply to James P. Seery, Jr. only and are limited to his capacity as an Independent Director. *Matter of Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 438 (5th Cir. 2022).

[2] Unless otherwise referenced, all references to evidence involving documents filed in the Debtor's bankruptcy proceedings (Case No. 19-34054-sgj11 (Bankr. N.D. Tex.)) are cited by "Doc." reference. HMIT asks the Court to take judicial notice of the documents identified by such entries.

[3] The supporting declarations will be cited as Dondero 2022 Dec. (Ex. 2), Dondero 2023 Dec. (Ex. 3), and McEntire Dec. (Ex. 4).

2.      The expedited nature of this Motion is permitted under Fed. R. Bank P. 9006

(c)(1), which authorizes a shortened time for a response and hearing for good cause. For

the reasons set forth herein, HMIT has shown good cause and requests that the Court

schedule a hearing on this Motion on three (3) days' notice, and that any responses be

filed no later than twenty-four hours before the scheduled hearing.[4]

3.      HMIT brings this Motion on behalf of itself and derivatively on behalf of

the Reorganized Debtor and the Highland Claimant Trust ("Claimant Trust"), as defined

in the Claimant Trust Agreement (Doc. 3521-5) ("CTA").[5] Upon the Plan's Effective Date,

Highland Capital Management, LP, as the original Debtor ("Original Debtor"),

transferred its assets, including its causes of action, to the Claimant Trust, including the

causes of action set forth in the attached Adversary Proceeding. The attached Adversary

Proceeding alleges claims which are substantially more than "colorable" based upon

plausible allegations that the Proposed Defendants, acting in concert, perpetrated a

fraud,[6] including a fraud upon innocent stakeholders, as well as breaches of fiduciary

---

[4] Expedited action on this Motion is also warranted to hasten Movants' opportunity to file suit, pursue prompt relevant discovery, and reduce the threat of loss of potentially key evidence. Upon information and belief, Seery has been deleting text messages on his personal iPhone via a rolling, automatic deletion setting.

[5] Solely in the alternative, and in the unlikely event HMIT's proposed causes of actions against Seery, Stonehill, Farallon, Muck, and/or Jessup are considered to be "Estate Claims" as those terms are used and defined within the CTA and Exhibit A to the Notice of Final Term Sheet [Docket No. 354] in HCM's bankruptcy (and without admitting the same), HMIT alternatively seeks standing to bring this action as a derivative action on behalf of the Litigation Sub-Trust as appropriate.

[6] Neither this Motion nor the proposed Adversary Complaint seeks to challenge the Court's Orders or the Plan. In addition, neither this Motion nor the proposed Adversary Complaint seeks to redistribute the assets of the Claimant Trust in a manner that would adversely impact innocent creditors. Rather, the

duties and knowing participation in (or aiding and abetting) breaches of fiduciary duty. The Adversary Proceeding also alleges that the Proposed Defendants did so collectively by falsely representing the value of the Debtor's Estate, failing to timely disclose accurate values of the Debtor's Estate, and trading on material non-public information regarding such values. HMIT also alleges that the Proposed Defendants colluded to manipulate the Debtor's Estate—providing Seery the opportunity to plant close business allies into positions of control to approve Seery's compensation demands following the Effective Date.

4.     Emergency relief is needed because of a fast-approaching date (April 16, 2023) that one or more of the Proposed Defendants *may* argue, depending upon choice of law, constitutes the expiration of the statute of limitations concerning some of the common law claims available to the Claimant Trust, as well as to HMIT.[7] Although HMIT offered to enter tolling agreements from each of the Proposed Defendants, they either rejected HMIT's requests or have not confirmed their willingness to do so, thereby necessitating the expedited nature of this Motion.[8] Because this Motion is subject to the

---

proposed Adversary Proceeding seeks to benefit all innocent stakeholders while working within the terms and provisions of the Plan, as well as the Claimant Trust Agreement.

[7] The first insider trade at issue involved the sale and transfer of Claim 23 in the amount of $23 million held by ACMLD Claim, LLC to Muck on April 16, 2021 (Doc. 2215).

[8] HMIT has been diligent in its efforts to investigate the claims described in this Motion, including the filing of a Tex. R. Civ. P. Rule 202 proceeding in January 2023, which was not adjudicated until recently in March 2023. Those proceeding were conducted in the 191st Judicial District Court in Dallas County, Texas, under Cause DC-23-01004. *See* McEntire Dec. Ex. 4 and the attached Ex. 4-A. Farallon and Stonehill defended those proceedings by aggressively arguing, in significant part, that the discovery issues were better undertaken in this Court.[8] The Rule 202 Petition was recently dismissed (**necessarily without prejudice**)

Court's "gatekeeping" orders and the injunction provisions of the Plan, emergency leave is required.

5.       This Motion will come as no surprise to the Proposed Defendants. Farallon and Stonehill were involved in recent pre-suit discovery proceedings under Rule 202 of the Texas Rules of Civil Procedure relating to the same insider trading allegations described in this Motion. Muck and Jessup, special purpose entities created and ostensibly controlled by Farallon and Stonehill, respectively, also were provided notice of these Rule 202 Proceedings in February 2023.[9] Like this Motion, the Rule 202 Proceedings focused on Muck, Jessup, Farallon, and Stonehill and their wrongful purchase of large, allowed claims in the Original Debtor's bankruptcy based upon material non-public information. Seery is also aware of these insider trading allegations because of a prior written demand.

6.       In light of the Proposed Defendants' apparent refusal to enter tolling agreements, or their failure to fully affirm their willingness to do so, HMIT is forced to seek emergency relief from this Court to proceed timely with the proposed Adversary Proceeding before the expiration of any *arguable* limitations period.[10]

---

on March 8, 2023, ostensibly based on such arguments. However, it is telling that Stonehill and Farallon admitted during the Rule 202 Proceedings to their "affiliation" with Muck and Jessup and that they bought the Claims through these entities.

[9] *See* Dec. of Sawnie McEntire, Ex. 4.

[10] HMIT respectfully requests that this Motion be addressed and decided on an expedited basis that provides HMIT sufficient time to bring the proposed action timely. In the event the Court denies the requested relief, HMIT respectfully requests prompt notice of the Court's ruling to allow HMIT sufficient

## II.  Summary of Claims

7.  HMIT requests leave to commence the proposed Adversary Proceeding, attached as Exhibit 1, seeking redress for breaches of duty owed to HMIT, breaches of duties owed to the Original Debtor's Estate, aiding and abetting breaches of those fiduciary duties, conspiracy, unjust enrichment, and fraud. HMIT also alleges several viable remedies, including (i) imposition of a constructive trust; (ii) equitable disallowance of any unpaid balance on the claims at issue;[11] (iii) disgorgement of ill-gotten profits (received by Farallon, Stonehill, Muck and Jessup) to be restituted to the Claimant Trust; (iv) disgorgement of ill-gotten compensation (received by Seery) to be restituted to the Claimant Trust; (v) declaratory judgment relief; (vi) actual damages; and (vii) punitive damages.

## III.  Standing

8.  **HMIT.** Prior to the Plan's Effective Date, HMIT was the largest equity holder in the Original Debtor and held a 99.5% limited partnership interest. HMIT currently holds a Class 10 Claim as a contingent Claimant Trust Interest under the CTA

---

time to seek, if necessary, appropriate relief in the United States District Court. In order to have a fair opportunity to seek such relief on a timely basis and protect HMIT's rights and the rights of the Reorganized Debtor, HMIT will need to seek such relief on or before Wednesday, April 5, 2023, if this Motion has not been resolved.

[11] In the alternative only, subordination of Muck's and Jessup's General Unsecured Claim Trust Interests and Subordinated Claim Trust Interests to all other interests in the Claimant Trust, including HMIT's Contingent Trust Interest, is necessary and appropriate to remedy Muck's and Jessup's wrongful conduct, and is also consistent with the purposes of the Bankruptcy Code.

(Doc. 3521-5). Upon information and belief, all conditions precedent to HMIT's

certification as a vested Claimant Trust Beneficiary would be readily satisfied but for the

Defendants' wrongful actions and conduct described in this Motion and the attached

Adversary Proceeding.

9.     **Reorganized Debtor.** Although HMIT has standing as a former Class B/C

Equity Holder, Class 10 claimant, and now contingent Claimant Trust Interest under the

CTA,[12] this Motion separately seeks authorization to prosecute the Adversary Proceeding

derivatively on behalf of the Reorganized Debtor and Claimant Trust. All conditions

precedent to bringing a derivative action are satisfied.

10.     Fed. R. Civ. P. 23.1 provides the procedural steps for "derivative actions,"

and applies to this proceeding pursuant to Fed. R. Bank. P. 7023.1. Applying Rule 7023.1,

the Proposed Defendants' wrongful conduct occurred, and the improper trades

consummated, in the spring and early summer of 2021, before the Effective Date in

August 2021. During this period, HMIT was the 99.5% Class B/C limited partner in the

original Debtor. As such, HMIT has individual standing to bring this action because Seery

owed fiduciary duties directly to HMIT at that time, and the other Proposed Defendants

aided and abetted breaches of those duties at that time.

---

[12] The last transaction at issue involved Claim 190, the Notice for which was filed on August 9, 2021. (Doc. 2698).

11.     The derivative nature of this proceeding is also appropriate because any demand on Seery would be futile.[13] Seery is the Claimant Trustee under the terms of the CTA. Furthermore, any demand on the Oversight Board to prosecute these claims would be equally futile because Muck and Jessup, both of whom are Proposed Defendants, dominate the Oversight Board.[14]

12.     The "classic example" of a proper derivative action is when a debtor-in-possession is "unable or unwilling to fulfill its obligations" to prosecute an otherwise colorable claim where a conflict of interest exists. *Cooper*, 405 B.R. at 815 (quoting *Louisiana World*, 858 F.2d at 252). Here, because HMIT's proposed Adversary Proceeding includes claims against Seery, Muck, and Jessup, the conflicts of interest are undeniable. Seery is the Trustee of the Claimant Trust Assets under the CTA, and he also serves as the "Estate Representative."[15] Muck and Jessup, as successors to Acis, the Redeemer Committee and UBS, effectively control the Oversight Board, with the responsibility to "monitor and oversee the administration of the Claimant Trust and the Claimant Trustee's performance . . . ."[16]

---

[13] Any demand on the Litigation Sub-Trust would be equally futile for the same reasons addressed herein, since the Litigation Trustee serves at the direction of the Oversight Board.

[14] *See* Footnote 8, *infra.* In December 2021, several stakeholders made a demand on the Debtor through James Seery, in his capacity as Trustee to the Claimant Trust, to pursue claims related to these insider trades.

[15] *See* Claimant Trust Agreement (Doc. 3521-5), Sec. 3.11.

[16] *Id.* at Sec. 4.2(a) and (b).

13.     Creditors' committees frequently bring suit on behalf of bankruptcy estates.

Yet, it is clear that any ***appropriately designated party*** also may bring derivative claims.

*In re Reserve Prod., Inc.*, 232 B.R. 899, 902 (Bankr. E.D. Tex. 1999) (citations omitted); *see In re Enron Corp.*, 319 B.R. 128, 131 (Bankr. S.D. Tex. 2004). As this Court has held in *In Re Cooper*:

> In Chapter 11 [cases], there is both a textual basis . . . and, frequently, a non-textual, equitable rationale for granting a creditor or creditors committee derivative standing to pursue estate actions (*i.e.*, the equitable rationale coming into play when the debtor-in-possession has a conflict of interest in pursuing an action, such as in the situation of an insider-defendant).

*In re Cooper*, 405 B.R. 801, 803 (Bankr. N.D. Tex. 2009) (also noting that "[c]onflicts of interest are, of course, frequently encountered in Chapter 11, where the metaphor of the 'fox guarding the hen house' is often apropos"); *see also In re McConnell*, 122 B.R. 41, 43-44 (Bankr. S.D. Tex. 1989) ("[I]ndividual creditors can also act in lieu of the trustee or debtor-in-possession . . . ."). Here, the Proposed Defendants are the "*foxes guarding the hen house*," and their conflicts of interest abound.[17] Proceeding in a derivative capacity is necessary, if not critical.

---

[17] *See Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 987 (3d Cir. 1998) (settlement noteholders purchased Debtors' securities with "the benefit of non-public information acquired as a fiduciary" for the "dual purpose of making a profit and influenc[ing] the reorganization in [their] own self-interest."), *see also, Wolf v. Weinstein*, 372 U.S. 633, 642, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963) ("Access to inside information or strategic position in a corporate reorganization renders the temptation to profit by trading in the Debtor's stock particularly pernicious.").

14. The proposed Adversary Proceeding also sets forth claims that readily satisfy the Court's threshold standards requiring "colorable" claims, as well as the requirements for a derivative action. This Motion, which is supported by objective evidence contained in historical filings in the bankruptcy proceedings, also incorporates sworn declarations. At the very least, this additional evidence satisfies the Court's threshold requirements of willful misconduct and fraud set forth in the "gatekeeping" orders, as well as the injunction and exculpation provisions in the Plan.[18] This evidence also supports well-pleaded allegations exempted from the scope of the releases included in the Plan.

15. HMIT is an appropriate party to bring this action on behalf of the Reorganized Debtor and the Claimant Trust. If successful, the Adversary Proceeding will likely recover well over $100 million for the Claimant Trust, thereby enabling the Reorganized Debtor and Claimant Trust to pay off any remaining innocent creditors and make significant distributions to HMIT as a vested Claimant Trust Beneficiary.

16. As of December 31, 2022, the Claimant Trust had distributed 64.2% of the total $397,485,568 par value of all Class 8 and Class 9 unsecured creditor claims. The

---

[18] HMIT recognizes that it is an "Enjoined Party" under the Plan. The Plan requires a showing, *inter alia*, of bad faith, willful misconduct, or fraud against a "Protected Party." Seery is a "Protected Party" and an "Exculpated Party" in his capacity as an Independent Director. Muck and Jessup *may* be "Protected Parties" as members of the Oversight Committee, but they were not "protected" when they purchased the Claims before the Effective Date. While it is HMIT's position that Farallon and Stonehill do not qualify as "Protected Parties," they are included in this Motion in the interest of judicial economy.

Claims acquired by Muck and Jessup have an allowed par value of $365,000,000. Based on these numbers, the innocent unsecured creditors hold approximately $32 million in allowed claims.[19]

17.     As of December 31, 2022, the Claimant Trust has distributed $255,201,228.[20] On a *pro rata* basis, that means that innocent creditors have received approximately $22,373,000 in distributions against the stated value of their allowed claims. That leaves a remaining unpaid balance of approximately $9,627,000.

18.     Muck and Jessup already have received approximately $232.8 million on their Claims. Assuming and original investment of approximately $160 million, this represents over $72 million in ill-gotten profits that, if disgorged, would be far more than what is required to fully pay all other innocent creditors - immediately placing HMIT in the status of a vested Claimant Trust Beneficiary. The benefits to the Reorganized Debtor, the Claimant Trust and innocent stakeholders are undeniable.[21]

19.     Seery and the Oversight Board should be estopped from challenging HMIT's status to bring this derivative action on behalf of the Claimant Trust. Seery, Muck and Jessup have committed fraud, acted in bad faith and have unclean hands, and they should not be allowed to undermine the proposed Adversary Proceeding - which seeks

---

[19] Doc. 3653.

[20] *Id.*

[21] Further, under the present circumstances and time constraints, this Motion should be granted to avoid the prospect of the loss of some of HMIT's and the Claimant Trust's claims and denial of due process.

to rectify significant wrongdoing. To hold otherwise would allow Seery, Muck, Jessup, Stonehill, and Farallon the opportunity to not just "guard the hen house," but to also open the door and take what they want.[22] HMIT seeks a declaratory judgment of its rights, accordingly.

## IV.   The Proposed Defendants

20.     Seery acted in several capacities during relevant times. He served as the Debtor's Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO"). He also served as member of the Debtor's Independent Board.[23] He currently serves as Claimant Trustee under the CTA and remains the CEO of the Reorganized Debtor.

21.     There is no doubt Seery owed the Original Debtor's Estate, as well as equity, fiduciary duties, including the duty of loyalty and the duty to avoid conflicts of interest. *See In re Xtreme Power Inc.*, 563 B.R. 614, 632-33 (Bankr. W.D. Tex. 2016) (detailing fiduciary duties owed by corporate officers and directors under Delaware law); *Louisiana World*, 858 F.2d at 245-46 (detailing duties owed by debtors-in-possession).[24]

---

[22] "The doctrine of 'unclean hands' provides that "a litigant who engages in reprehensible conduct in relation to the matter in controversy ... forfeits his right to have the court hear his claim, regardless of its merit. [T]he purpose of the clean hands maxim is to protect the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims, regardless of their merit. As such it is not a matter of defense to be applied on behalf of a litigant; rather it is a rule of public policy." *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 80–81 (Del. Ch. 2008) (citations omitted) (internal quotations omitted for clarity).

[23] Seery is the beneficiary of the Court's "gatekeeping" orders and is an "exculpated" party in his capacity as an Independent Director. He is also a "Protected Party."

[24] The Internal Affairs Doctrine dictates choice of law. Here, the Debtor, Highland Capital Management, was organized under the law of Delaware. As much, Seery's fiduciary duties and claims involving breaches of those duties will be governed by Delaware law.

[12]

22.     Farallon and Stonehill are capital management companies which manage hedge funds; they are also Seery's close business allies with a long history of business ventures and close affiliation. Although they were strangers to the Original Debtor's bankruptcy on the petition date, and were not original creditors, they became entangled in this bankruptcy at Seery's invitation and encouragement—and then knowingly participated in the wrongful insider trades at issue. By doing so, Seery was able to plant friendly allies onto the Oversight Board to rubber stamp compensation demands. The proposed Adversary Proceeding alleges that Farallon and Stonehill bargained to receive handsome pay days in exchange.

23.     Muck and Jessup are special purpose entities, admittedly created by Farallon and Stonehill on the eve of the alleged insider trades, and they were used as vehicles to assume ownership of the purchased claims.[25] The record is clear that Muck and Jessup *did not exist* before confirmation of the Plan in February 2021.[26] Now, however, Muck and Jessup serve on the Oversight Board with immense powers under the CTA.[27] When they purchased the claims at issue, Muck and Jessup were *not* acting in their official capacities on the Oversight Committee and, therefore, they were not "Protected Persons" under the Plan.

---

[25] *See* Ex. 4-B, Rule 202 Transcript at 55:22-25.

[26] *See* McEntire Dec., Ex. 4, Ex. 4-D, Ex. 4-E. Muck was created on March 9, 2021 before the Effective Date. Jessup was created on April 8, 2021, before the Effective Date.

[27] *See* Doc. 3521-5, Sec. 4(a) and 4(b).

24.     By trading on the alleged material non-public information, Farallon, Stonehill, Muck, and Jessup became non-statutory "insiders" with duties owed directly to HMIT at a time when HMIT was the largest equity holder.[28] *See S.E.C. v. Cuban*, 620 F.3d 551, 554 (5th Cir. 2010) ("The corporate insider is under a duty to 'disclose or abstain'—he must tell the shareholders of his knowledge and intention to trade or abstain from trading altogether."). In this context, there is no credible doubt that Farallon's and Stonehill's dealings with Seery were ***not*** arms-length. Again, Farallon and Stonehill were Seery's past business partners and close allies.[29] By virtue of the insider trades at issue, Farallon and Stonehill acquired control (acting through Muck and Jessup) over the Original Debtor and Reorganized Debtor through Seery's compensation agreement and awards, as well as supervisory powers over the Claimant Trust. This makes Farallon and Stonehill paradigm non-statutory insiders.

25.     HMIT also seeks recovery against John Doe Defendant Nos. 1 through 10.[30] It is clear Farallon and Stonehill refuse to disclose the precise details of their legal

---

[28] Because of their "insider" status, this Court should closely scrutinize the transactions at issue.

[29] Farallon and Stonehill are two capital management firms (similar to HCM) with whom Seery has had substantial business relationships. Also, Seery previously served as legal counsel to Farallon. Seery also has a long-standing relationship with Stonehill. GCM Grosvenor, a global asset management firm, held four seats on the Redeemer Committee (an original member of the Unsecured Creditors Committee in HCM's bankruptcy). Upon information and belief, GCM Grosvenor is a significant investor in Stonehill and Farallon. GCM Grosvenor, through Redeemer, also played a large part in appointing Seery as a director of Strand Advisors and approved his appointment as HCM's CEO and CRO.

[30] Farallon and Stonehill consummated their trades concealing their actual involvement through Muck and Jessup as shell companies. Farallon's and Stonehill's identities were not discovered until much later after the fact.

relationships with Muck and Jessup. They resisted such discovery in the prior Rule 202

Proceedings in state district court.[31] They also refused to disclose such details in response

to a prior inquiry to their counsel.[32] Furthermore, the corporate filings of both Muck and

Farallon conspicuously omit the identity of their respective members or managing

members.[33] Accordingly, HMIT intends to prosecute claims against John Doe Defendant

Nos. 1 -- 10 seeking equitable tolling pending further discovery whether Farallon and

Stonehill inserted intermediate corporate layers between themselves and the special

purpose entities (Muck and Jessup) they created. *See In re ATP Oil & Gas Corp.*, No. 12-

36187, 2017 WL 2123867, *4 (Bankr. S.D. Tex. May 16, 2017) (lsgur .J.); *see also In re IFS Fin.*

*Corp.* No. 02-39553, 2010 WL 4614293, *3 (Bankr. S.D. Tex. No. 2, 2010) ("The identity of

the party concealing the fraud is immaterial, the critical factor is whether any of the

parties involved concealed property of the estate." "In either case, the trustee must

demonstrate that despite exercising diligence, he could not have discovered the identity

of the [unnamed] defendants prior to the expiration of the limitations period.") *ATP Oil*,

2017 WL 2123867 at *4. That burden is easily satisfied here.

---

[31] *See* McEntire Dec., Ex. 4.

[32] *See* McEntire Dec., Ex. 4, *see also*, Ex. 4-F.

[33] *See* Ex. 4-D, Ex. 4-E.

# V.    Background

26.    As part of this Court's Governance Order, an independent board of directors—which included Seery as one of the selections of the Unsecured Creditor's Committee—was appointed to the Board of Directors (the "Board") of Strand Advisors, Inc., ("Strand Advisors"), the Original Debtor's general partner. Following approval of the Governance Order, the Board then appointed Seery as the Original Debtor's CEO and CRO. [34] Following the Effective Date of the Plan, Seery now serves as Trustee of the Claimant Trust (the Reorganized Debtor's sole post-reorganization limited partner), and continues to serve as the Reorganized Debtor's CEO. [35]

27.    Imbued with his powers as CEO and CRO, Seery negotiated and obtained bankruptcy court approval of several settlements prior to the Effective Date, resulting in the following approximate allowed claims (hereinafter "Claims"):[36]

| Creditor | Class 8 | Class 9 |
|---|---|---|
| Redeemer | $137 mm | $0 mm |
| Acis | $23 mm | $0 mm |
| HarbourVest | $45 mm | $35 mm |
| UBS | $65 mm | $60 mm |
| **(Totals)** | $270 mm | $95 mm |

---

[34] Doc. 854, Order Approving Retention of Seery as CEO/CRO.

[35] *See* Doc. 1943, Order Approving Plan, p. 34.

[36] Orders Approving Settlements [Doc. 1273, Doc. 1302, Doc. 1788, Doc. 2389].

Each of the settling parties curiously sold their Claims to Farallon or Stonehill (or their affiliated special purpose entities) shortly after they obtained court approval of their settlements. One of these "trades" occurred within just a few weeks before the Effective Date. Farallon and Stonehill coordinated and controlled the purchase of these Claims through Muck and Jessup, and they admitted in open court that Muck and Jessup were created to allow their purchase of the Claims.[37]

28. HMIT alleges that Seery filed (or caused to be filed) deflated, misleading projections regarding the value of the Debtor's Estate,[38] while inducing unsecured creditors to discount and sell their Claims to Farallon and Stonehill. But as reflected in the attached declarations, it is now known that Seery provided material, non-public information to Farallon. The circumstantial evidence is also clear that both Farallon and Stonehill had access to and used this non-public information in connection with their purchase decisions.

29. Farallon and Stonehill are registered investment advisors who have their own fiduciary duties to their investors, and they are acutely aware of what these duties entail. Yet, upon information and belief, they collectively invested over $160 million dollars to purchase the Claims in the absence of any publicly available information that

---

[37] *See* Ex. 4-B, Rule 202 Transcript at 55:22-25.

[38] The pessimistic projections were issued as part of the Plan Analysis on February 2, 2021. [Doc. 1875-1]. The Debtor projected 0% return on Class 9 claims and only 71.32% return on Class 8 Claims.

could rationally justify such investments. These "trades" become even more suspect

because, at the time of confirmation, the Plan provided pessimistic projections advising

stakeholders that the Claim holders would never receive full satisfaction:

- From October 2019, when the original Chapter 11 Petition was filed, to January 2021, just before the Plan was confirmed, the valuation of HCM's assets dropped over $200 million from $566 million to $328.3 million.[39]

- HCM's Disclosure Statement projected payment of 71.32% of Class 8 claims, and 0% of claims in Classes 9-11;[40]

    - This meant that Farallon and Stonehill invested more than $103 million in Claims *when the publicly available information indicated they would receive $0 in return on their investment as Class 9 creditors and substantially less than par on their Class 8 Claims*.

- In HCM's Q3 2021 Post-Confirmation Report, HCM reported that the amount of Class 8 claims expected to be paid dropped even further from 71% *to 54%*;[41]

30.     In the third financial quarter of 2021, just over $6 million of the projected

$205 million available to satisfy general unsecured creditors was disbursed.[42] No

additional distributions were made to the unsecured claimholders until, suddenly, in Q3

2022 almost $250 million was paid toward Class 8 general unsecured claims—**$45 million**

**more than was *ever* projected**.[43]

---

[39] Doc. 1473, Disclosure Statement, p. 18.

[40] Doc. 1875-1, Plan Supplement, p. 4.

[41] Doc 2949.

[42] Doc 3200.

[43] Doc 3582.

31.     According to Highland Capital's Motion for Exit Financing,[44] and a recent motion filed by Dugaboy Investment Trust,[45] there remain **substantial** assets to be monetized for the benefit of the Reorganized Debtor's creditors. Thus, upon information and belief, Stonehill and Farallon, stand to realize significant profits on their wrongful investments. In turn, Stonehill and Farallon will garner (and already have garnered) substantial fees – both base fees and performance fees – as the result of their acquiring and/or managing the Claims. Upon information and belief, HMIT also alleges that Seery has received excessive compensation and bonuses approved by Farallon (Muck) and Stonehill (Jessup) as members of the Oversight Board.

32.     As evidenced in the supporting declarations (Exs. 2 and 3):

- Farallon admitted it conducted no due diligence and relied upon Seery in making its multi-million-dollar investment decisions at issue.[46]

- Farallon admitted it was unwilling to sell its stake in these Claims at any price because Seery assured Farallon that the Claims were tremendously valuable.[47]

- Farallon bragged about the value of its investment referencing non-public information regarding Amazon, Inc.'s ("Amazon") interest in acquiring Metro-Goldwyn-Mayer Studios Inc. ("MGM").[48]

---

[44] Doc 2229.

[45] Doc 3382.

[46] *See* Ex. 2, 2022 Dondero Declaration.

[47] *See* Ex. 2, 2022 Dondero Declaration, Ex. 3, 2023 Dondero Declaration.

[48] *See* Ex. 3, 2023 Dondero Declaration.

> ▪ Farallon was unwilling to sell its stake in the newly acquired Claims even though publicly available information suggested that Farallon would lose millions of dollars on its investment.[49]

Farallon can offer **no credible explanation** to explain its significant investment, and its refusal to sell at any price, **except** Farallon's access to material non-public information. In essence, Seery became the guarantor of Farallon's significant investment. Farallon admitted as much in its statements to James Dondero.

33. The same holds true for Stonehill. Given the negative, publicly available information, Stonehill's multi-million-dollar investments make no rational sense unless Stonehill had access to material non-public information.

34. Fed. R. Bank. P. 2015.3 requires debtors to "file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." However, no public reports required by Rule 2015.3 were filed. Seery testified they simply "fell through the cracks." [50]

35. Six days prior to the filing of the motion seeking approval of the HarbourVest Settlement, Seery acquired material non-public information regarding Amazon's interest in acquiring MGM.[51] Upon receipt of this material non-public

---

[49] *See* Ex. 3, 2023 Dondero Declaration, *see also* Doc. 1875-1.

[50] Doc. 1905, February 3, 2021, Hearing Transcript, 49:5-21.

[51] *See* Adversary No. 20-3190-sgj11, Doc. 150-1.

information, MGM should have been placed on the Original Debtor's "restricted list," but Seery continued to move forward with deals that involved MGM stock and notes.[52] Because the Original Debtor additionally held direct interests in MGM,[53] the value of MGM was of paramount importance to the value of the estate.

36.     Armed with this and other insider information, Farallon—through Muck—proceeded to invest in the Claims and, acting through Muck, acceded to a powerful position on the Oversight Board to oversee future distributions to Muck and itself. It is no coincidence Seery invited his business allies into these bankruptcy proceedings with promises of great profits. Seery's allies now oversee his compensation.[54]

37.     The Court also should be aware that the Texas States Securities Board ("TSSB") opened an investigation into the subject matter of the insider trades at issue, and this investigation has not been closed. The continuing nature of this investigation

---

[52] As part of the HarbourVest Settlement, Seery negotiated the purchase of HarbourVest's interest in HCLOF for approximately $22.5 million as part of the transaction. Approximately 19.1% of HCLOF's assets were comprised of debt and equity in MGM. The HCLOF interest was not to be transferred to the Debtor for distribution as part of the bankruptcy estate, but rather to "to an entity to be designated by the Debtor"—*i.e.*, one that was not subject to typical bankruptcy reporting requirements. Doc. 1625, p. 9, n. 5. Doc. 1625.

[53] *See* Doc. 2229, Motion for Exit Financing.

[54] Amazon closed on its acquisition of MGM in March 2022, but the evidence strongly suggests that agreements for the trades already had been reached - while announcement of the trades occurred strategically after the MGM news became public. Now, as a result of their wrongful conduct, Stonehill and Farallon profited significantly on their investments, and they stand to gain substantially more profits.

underscores HMIT's position that the claims described in the attached Adversary Proceeding are plausible and certainly far more than merely "colorable."

## VI.   Argument

### A.   *HMIT has asserted Colorable Claims against Seery, Stonehill, Farallon, Muck, and Jessup.*

38.     Unlike the terms "Enjoined Party," "Protected Party," or "Exculpated Party," the Plan does not define what constitutes a "colorable" claim. Nor does the Bankruptcy Code define the term. However, relevant authorities suggest that a Rule 12(b)(6) standard is an appropriate analogue.

39.     The Fifth Circuit has held that a "colorable" claim standard is met if a [movant], such as HMIT, has asserted claims for relief that, on appropriate proof, would allow a recovery. A court need not and should not conduct an evidentiary hearing but must ensure that the claims do not lack any merit whatsoever. *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 248 (5th Cir. 1988). Stated differently, the Court need not be satisfied there is an evidentiary basis for the asserted claims but instead should allow the claims if they *appear* to have *some* merit.

40.     Other federal appellate courts have reached similar conclusions. For example, the Eighth Circuit holds that "creditors' claims are colorable if they would survive a motion to dismiss." *In re Racing Services, Inc.*, 540 F.3d 892, 900 (8th Cir. 2008); *accord In Re Foster,* 516 B.R. 537, 542 (B.A.P. 8th Cir. 2014), aff'd 602 Fed. Appx. 356 (8th Cir. 2015) (*per curiam*). The Sixth Circuit has adopted a similar test requiring that the court

look *only* to the face of the complaint to determine if claims are colorable. *In re The Gibson Group, Inc.*, 66 F.3d 1436, 1446 (6th Cir. 1995) (emphasis added).

41.     Although there is a dearth of federal court authorities in Texas, other federal courts have adopted the same standard—*i.e.*, a claim is colorable if it is "plausible" and could survive a motion to dismiss. *See In re America's Hobby Center, Inc.*, 223 B.R. 273, 282 (S.D.N.Y 1998). In addition, in the non-bankruptcy context, the District Court for the Northern District of Texas explained that "[t]he requirement of a 'colorable claim' means only that the plaintiff must have an '*arguable* claim' and not that the plaintiff must be able to succeed on that claim." *Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 207 F. Supp. 2d 570, 577 (N.D. Tex. 2002) (Emphasis added).

42.     Thus, in this instance, this Court's gatekeeping inquiry is properly limited to whether HMIT has stated a plausible claim on the face of the proposed pleadings involving "bad faith," "willful misconduct," or "fraud." Because the face of the Adversary Complaint alleges plausible facts, HMIT's Motion is properly granted. Clearly, the attached Adversary Proceeding would survive a Rule 12(b)(6) challenge. Furthermore, the supporting declarations and documentary evidence provide additional support, and the circumstantial evidence proves that Farallon and Stonehill, strangers to the bankruptcy on the petition date, would not have leaped into these proceedings without undisclosed assurances of profit.

### B. Fraud

43.     As set forth in the proposed Adversary Proceeding, HMIT alleges a colorable claim for fraud—both fraud by knowing misrepresentation and fraud by omission of material fact. Here, these allegations of fraud are appropriately governed by Texas law under appropriate choice of law principals.[55]

44.     Seery had a duty to not provide material inside information to his business allies. But, he did so. At the latest, Seery became aware of the potential sale of MGM in December 2020 when he received an email from Jim Dondero.[56] Thus, Seery knew at that time that this potential sale would likely yield significant value to the Original Debtor's Estate. Yet, the financial disclosures associated with the Plan's confirmation, which were provided only a month later, presented an entirely different outlook for both Class 8 and Class 9 unsecured creditors.[57] Seery knew at that time that these pessimistic disclosures were misleading, if not inaccurate.

45.     There is no credible doubt Seery intended that innocent stakeholders would rely upon the pessimistic projections set forth in the Plan Analysis. Indeed, the singular purpose of the Plan Analysis was to advise stakeholders. As such, HMIT alleges that Seery knowingly made misrepresentations with the intention that innocent stakeholders

---

[55] However, Delaware law is substantially similar on the elements of fraud. *See Malinals v. Kramer*, No. CIV.A. CPU 6-11002145, 2012 WL 174958, at 2 (Del. Com. PI. Jan. 5, 2012)

[56] *See,* Dondero 2022 Dec., Ex. 2-1.

[57] *See* Doc. 1875-1, Plan Analysis, February 1, 2021.

would rely, and that he failed to disclose material information concerning his entanglements with Farallon and Stonehill, as well as the related negotiations that were chock full of conflicts of interest.

46.     On the flip side of this conspiracy coin, Farallon and Stonehill were engaged in negotiations to acquire the Claims at discounted prices; and, they successfully did so. HMIT alleges that their success was based on knowledge that the financial disclosures associated with the Plan Analysis were significantly understated. Otherwise, it would make no financial sense for Farallon and Stonehill to do the deals at issue. Indeed, Farallon admitted that it would not sell the Claims at any price, expressing great confidence in the substantial profits it expected even in the absence of any supporting, publicly available information.[58]

47.     All of the Proposed Defendants had a duty of affirmative disclosure under these circumstances. Seery always had this duty. Muck, Jessup, Farallon, and Stonehill assumed this duty when they became non-statutory "insiders." Thus, all of the Proposed Defendants are liable for conspiring to perpetrate a fraud by omission of material facts.

48.     HMIT also claims that Seery and the other Proposed Defendants failed to disclose material information concerning Seery's involvement in brokering the Claims in exchange for *quid pro quo* assurances of enhanced compensation. Seery's compensation

---

[58] Ex. 3, 2023 Dondero Declaration.

should be disgorged or, alternatively, such compensation constitutes a damage recoverable by the Reorganized Debtor and Claimant Trust as assignees (or transferees) of the Original Debtor's causes of action. This compensation was the product of the alleged self-dealing, breaches of fiduciary duty, and fraud.

### C. Breaches and Aiding and Abetting Breaches of Fiduciary Duties

49.     It is beyond dispute Seery owed fiduciary duties to the Estate. *See Xtreme Power*, 563 B.R. at 632-33 (detailing fiduciary duties owed by corporate officers and directors under Delaware law);[59] *Louisiana World*, 858 F.2d at 245-46 (5th Cir. 1988) (detailing duties owed by debtors-in-possession). Although Seery did not buy the Claims at issue, he stood to profit from these sales because his close business allies would do his bidding after they had acceded to positions of power and control on the Oversight Board. Muck and Jessup were essentially stepping into the shoes of three of the largest unsecured creditors who were already slated to serve on the Oversight Board. Thus, by acquiring their Claims, all of the Proposed Defendants knew that Muck and Jessup would occupy these powerful oversight positions after the Effective Date.

50.     Thus, the alleged conspiracy was successfully implemented before the Effective Date. Farallon and Stonehill now occupy control positions through the shell

---

[59] The *Xtreme* case also notes that "several Delaware courts have recognized that 'directors who are corporate employees lack independence because of their substantial interest in retaining their employment." 563 B.R. at 633-34. Because Muck and Jessup are now in control of Seery's compensation, it follows that Seery is beholden to them, and Seery's disclosure of inside information to Stonehill and Farallon confirms his conflict of interest.

entities (Muck and Jessup) overseeing large compensation packages for Seery. Of course, this control (and the opportunity to control) presented a patent conflict of interest which Seery should have avoided, but instead knowingly created, fostered, and encouraged. HMIT alleges that Seery breached his duty to avoid this conflict or otherwise disclose this conflict and Farallon and Stonehill aided and abetted this breach.

51.     The Original Debtor, as an investment adviser registered with the SEC, is also required to make public disclosures on its Form ADV, the uniform registration form for investment advisers required by the SEC. These Form ADV disclosures, which were in effect at the time of the insider trades at issue, explicitly forbade "any access person from trading either personally or on behalf of others . . . on material non-public information or communicating material non-public information to others in violation of the law or duty owed to another party."[60] It now appears these representations were false when made. Seery's alleged conduct also violated, at minimum, the duties Seery owed in his various capacities with the Original Debtor under the Form ADV disclosures.

52.     Although initially strangers to the original bankruptcy, by accepting and using inside information, Farallon and Stonehill became "temporary insiders" and thus owed separate duties to the Estate. *See S.E.C. v. Cuban*, 620 F.3d 551 (5th Cir. 2010) ("[E]ven

---

[60] *See, e.g.,*

https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=77
7026.

an individual who does not qualify as a traditional insider may become a 'temporary insider' if by entering 'into a special confidential relationship in the conduct of the business of the enterprise [they] are given access to information solely for corporate purposes." *In re Washington Mut., Inc.*, 461 B.R. 200 (Bankr. D. Del. 2011), *vacated in part*, 08-12229 MFW, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) (finding that equity committee stated colorable claim for equitable disallowance against creditors who "became temporary insiders of the Debtors when the Debtors gave them confidential information and allowed them to participate in negotiations with JPMC for the shared goal of reaching a settlement that would form the basis of a consensual plan of reorganization"; vacated in part as a condition of settlement only);[61] *See also, In re Smith*, 415 B.R. 222, 232-33 (Bankr. N.D. Tex. 2009) ("[a]n insider is an entity or person with 'a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor.' 'Thus, the term "insider" is viewed to encompass two classes: (1) per se insiders as listed in the Code and (2) extra-statutory insiders that do not deal at arm's length.'" (citations omitted)). Farallon, Stonehill, Muck, and Jessup clearly fall into this latter category.

---

[61] Although the *Washington Mutual* case was subsequently vacated, the Court's intellectual reasoning remains valid because the vacatur was mandated by a mediated settlement, not because the court's logic was flawed or changed, and the court expressly noted that the parties' settlement was conditioned on vacatur. *See In re Washington Mut., Inc.*, No. 08-12229 MFW, 2012 WL 1563880, *8 (Bankr. D. Del. Feb. 24, 2012) ("grant[ing] partial vacatur . . . *in furtherance of the settlement embodied in the Plan*," and noting that "absent the requested vacatur, the collapse of the Plan could result in the termination of the Global Settlement Agreement." (emphasis added)).

53.    Because Farallon and Stonehill (acting through Muck and Jessup) now hold the majority of the seats on the Oversight Board, they, along with Seery, exercise control of the reorganization proceedings. At no time were Farallon, Stonehill, or Seery's plans disclosed to the other creditors or equity. In fact, the only inference that can be reasonably drawn is that Farallon and Stonehill brazenly sought to conceal their involvement by establishing shell entities—Muck and Jessup—to nominally hold the Claims and create an opaque barrier to any effort to identify the "*Oz behind the curtain*." Such conduct aligns precisely with the inequitable conduct detailed in *Citicorp* and *Adelphia* (discussed below).

54.    In sum, the proposed Adversary Proceeding sets forth plausible allegations that Stonehill and Farallon were aware of Seery's fiduciary duties. Indeed, as registered investment advisors, both Farallon and Stonehill were acutely aware of Seery's fiduciary obligations, including, without limitation, the duty to act in the best interests of the Original Debtor's Estate and the duty not to engage in insider trading that would benefit Seery, as an insider, and themselves, as non-statutory insiders. By accepting and then acting on material non-public information, Farallon and Stonehill (as well as Muck and Jessup) aided and abetted breaches of these fiduciary duties. By placing themselves in positions to control Seery's compensation, Farallon and Stonehill (acting through Muck and Jessup) induced, encouraged, aided and abetted Seery's self-dealing.

### D. Equitable Disallowance is an Appropriate Remedy

55.     HMIT also seeks equitable disallowance. Although the Fifth Circuit in

*Matter of Mobile Steel Co.* generally limited the court's equitable powers to subordination

rather than disallowance,[62] the Fifth Circuit **did *not* foreclose** the viability of equitable

disallowance as a potential remedy. *See* 563 F.2d 692, 699 n. 10 (5th Cir. 1977). Binding U.S.

Supreme Court precedent in *Pepper v. Litton* also permits bankruptcy courts to fashion

disallowance remedies. 308 U.S. 295, 304-11 (1939). Bankruptcy Code § 510, which

supplies the authority for equitable subordination, was "intended to codify case law, such

as *Pepper v. Litton . . . and is not intended to limit the court's power in any way…. Nor does [it]*

*preclude a bankruptcy court from completely disallowing a claim in appropriate circumstances.*"

*In re Adelphia Commun. Corp.*, 365 B.R. 24, 71-72 (Bankr. S.D.N.Y. 2007), *aff'd in part sub*

*nom. Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *adhered to on*

*reconsideration*, 05 CIV. 9050 (LMM), 2008 WL 1959542 (S.D.N.Y. May 5, 2008) (emphasis

and omissions in original).[63]

56.     The Fifth Circuit's decision in *Mobile Steel* also was premised on the notion

that disallowance would not add to the quiver of defenses to fight unfairness because

---

[62] Equitable subordination is an inadequate remedy in this instance.

[63] In *Washington Mutual,* the Court's intellectual reasoning when imposing disallowance is instructive. *See In re Washington Mut., Inc.*, No. 08-12229 MFW, 2012 WL 1563880, *8 (Bankr. D. Del. Feb. 24, 2012) ("grant[ing] partial vacatur . . . *in furtherance of the settlement embodied in the Plan,*" and noting that "absent the requested vacatur, the collapse of the Plan could result in the termination of the Global Settlement Agreement." (emphasis added)).

creditors "are fully protected by subordination" and "[i]f the misconduct directed against the bankrupt is so extreme that disallowance might appear to be warranted, then *surely* the claim is either invalid or the bankrupt possesses a clear defense against it." *Mobile Steel*, 563 F.2d at 699 n. 10 (emphasis added). Importantly, however, the factual scenarios considered in *Mobile Steel* do not exist here.

57.     Here, Muck and Jessup purchased both Class 8 and Class 9 Claims, and they now effectively occupy more than 90% of the entire field of unsecured creditors in these two claimant tiers. Thus, subordination cannot effectively address the current facts where the Original Debtor's CEO and CRO conspired directly with close business allies who acquired the largest unsecured claims to the detriment of other innocent creditors and *former equity*. The reasoning in published cases from other circuits supports this conclusion. *See Adelphia*, 365 B.R. at 71-73; *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 n. 7 (3d Cir. 1998).

58.     The purpose of equitable subordination is to assure that the wrongdoer does not profit from bad conduct. In the typical case, subordination to other creditors will achieve this deterrence. But, it is clear that the Third Circuit's decision in *Citicorp* was structured to use subordination as just one tool in a larger tool box to make sure "at a minimum, the remedy here should deprive – [the fiduciary] of its profit on the purchase of the notes." *Id* at 991. In *Adelphia*, the Southern District of New York also used equitable

subordination as a remedy to address wrongs of non-insiders who aided and abetted breaches a fiduciary duty by the debtor's management. 365 B.R. at 32.

59.     But subordination cannot adequately address the wrongful conduct at issue. This is because subordination is typically limited to instances where one creditor is subordinated to other creditors, not equity. Here, for all practical purposes, there are only a few other unsecured creditors with relatively small stakes. Therefore, subordination as a weapon of deterrence is neutered.

60.     In sum, by engaging in the alleged wrongful acts, including aiding and abetting Seery's breaches of fiduciary duty, Farallon, Stonehill, Muck, and Jessup should not be rewarded. The Proposed Defendants engaged in alleged conduct which damaged the Original Debtor's estate, including improper agreements to compensate Seery under the terms of the CTA. Equitable disallowance is an appropriate remedy which, when combined with disgorgement of all ill-gotten profits, will deprive the Proposed Defendants of their ill-gotten gains.

### E.  *Disgorgement and Unjust Enrichment*

61.     The law is clear that disgorgement is an available remedy for breach of fiduciary duty both under Texas Law, see *Kinzbach Tool Co. v. Corbett-Wallace Corporation*, 160 S.W. 2d 509 (Tex. 1942), and under Delaware law, see *Metro Storage International, LLC v. Harron*, 275 A.3d 810 (Del. Ch. 2022). Disgorgement is also an appropriate remedy for unjust enrichment under Texas law, *Hunter v. Shell Oil Co.*, 198 F.2d 485 (5th Cir. 1952),

and under Delaware law, *In re Tyson Foods, Inc. Consolidated Shareholder Litigation*, 919 A.2d 563 (Del. Ch. 2007).[64]

62.     Likewise, the imposition of a constructive trust is proper for addressing unjust enrichment under both Delaware and Texas law, see *Teacher's Retirement System of Louisiana v. Aidinoff*, 900 A.2d 654 (Del. Ch. 2006) and *Hsin-Chi-Su v. Vantage Drilling Company*, 474 S.W. 3d 384 (Tex. App. – 14th Dist. 2015), pet. denied. The elements of unjust enrichment are: (1) the defendant must have gained a benefit (2) at the expense of plaintiff, (3) and retention of that benefit must be shown to be unjust. *See Restatement (Third) of Restitution and Unjust Enrichment* §321, cmt. e (2011).

63.     Here, the imposition of a constructive trust and disgorgement are clearly appropriate to provide redress for the alleged breaches of fiduciary duty and the knowing participation in (or aiding and abetting) those breaches. Furthermore, the imposition of a constructive trust and disgorgement are appropriate to disgorge the improper benefits that all of the Proposed Defendants received by virtue of collusion and insider trading.

64.     As set forth in the proposed Adversary Proceeding, Seery gained the opportunity to have his compensation demands rubber stamped. The other Defendants gained the opportunity to purchase valuable claims at a discount knowing that

---

[64] It is likely that the Internal Affairs Doctrine will dictate that Delaware choice of law governs the breach of fiduciary duty claims.

pessimistic financial projections were false and that the upside investment potential was

great. Retention of the benefits they received would be unjust and inequitable.

65.     Clearly, the Debtor's Estate was damaged by virtue of the claimed conduct.

Seery obtained profits and compensation to the detriment of that estate as well as the

estate of the Reorganized Debtor, other innocent creditors and HMIT, as former equity

and as a contingent Claimant Trust Beneficiary.

### F.  Declaratory Relief

66.     HMIT also seeks declaratory relief pursuant to Fed. R. Bank P. 7001(9).

Specifically, HMIT seeks a declaratory judgment that: (a) there is a ripe controversy

concerning HMIT's rights and entitlements under the Claimant Trust Agreement; (b) as

a general matter, HMIT has standing to bring an action against a trustee even if its interest

is considered "contingent;" (c) HMIT's status as a Claimant Trust Beneficiary is fully

vested upon disgorgement of the ill-gotten profits of Muck and Jessup, and by extension,

Farallon and Stonehill; (d) HMIT's status as a Claimant Trust Beneficiary is fully vested

upon the equitable disallowance of the Claims held by Muck and Jessup over and above

their initial investments; (e) Seery is properly estopped from asserting that HMIT is not

an appropriate party to bring this derivative action on behalf of the Reorganized Debtor

and/or the Claimant Trust because of fraudulent conduct, bad faith, willful misconduct,

and unclean hands; (f) Muck and Jessup are properly estopped from asserting that HMIT

is not an appropriate party to bring this derivative action on behalf of the Reorganized

Debtor and the Claimant Trust because of their fraudulent conduct, bad faith, willful

misconduct, and unclean hands; and (g) all of the Proposed Defendants are estopped

from asserting that HMIT does not have standing in its individual capacity due to their

fraudulent conduct, bad faith, willful misconduct, and unclean hands.

### G. HMIT has Direct Standing.

67.     The Texas Supreme Court recently held that "a partner or other stakeholder

in a business organization has constitutional standing to sue for an alleged loss in the

value of its interest in the organization." *Pike v. Texas EMC Mgt., LLC*, 610 S.W.3d 763, 778

(Tex. 2020). In so holding, the Court considered federal law and found that the traditional

"incantation that a shareholder may not sue for the corporation's injury" is really a

question of capacity, which goes to the merits of a claim, rather than an issue of standing

that would impact subject matter jurisdiction. *Id.* at 777 (noting that the 5th Circuit and

"[o]ther federal circuits agree that a plaintiff has standing to sue for the lost value of its

investment in a corporation"). Because Seery, Muck, Jessup, Stonehill, Farallon's alleged

actions devalued HMIT's interest in the Debtor's Estate, including, without limitation,

payment of excessive compensation to Seery, HMIT has standing to pursue its common

law claims directly. HMIT also has direct standing to seek declaratory relief as set forth

in the proposed Adversary Proceeding.

## VII.    Prayer

WHEREFORE, PREMISES CONSIDERED, Hunter Mountain Investment Trust respectfully requests this Court grant HMIT leave authorizing it to file the Adversary Complaint, attached as Exhibit 1, as an Adversary Proceeding in this United States Bankruptcy Court for the Northern District of Texas, in its own name and as a derivative action on behalf of the Debtor Highland Capital Management, L.P., against Muck Holdings, LLC, Jessup Holdings, LLC, Farallon Capital Management, LLC, Stonehill Capital Management, LLC, James P. Seery, Jr., and John Doe Defendants Nos. 1 – 10, and further grant HMIT all such other and further relief to which HMIT may be justly entitled.

Dated: March 28, 2023

<div style="margin-left:40%">

Respectfully Submitted,

**PARSONS MCENTIRE MCCLEARY PLLC**

By: _/s/ Sawnie A. McEntire_
    Sawnie A. McEntire
    Texas State Bar No. 13590100
    smcentire@pmmlaw.com
    1700 Pacific Avenue, Suite 4400
    Dallas, Texas 75201
    Telephone: (214) 237-4300
    Facsimile: (214) 237-4340

    Roger L. McCleary
    Texas State Bar No. 13393700
    rmccleary@pmmlaw.com
    One Riverway, Suite 1800
    Houston, Texas 77056

</div>

Telephone: (713) 960-7315

Facsimile: (713) 960-7347

**Attorneys for Hunter Mountain
Investment Trust**

## CERTIFICATE OF CONFERENCE

Beginning on March 24, 2023, and also on March 27, 2023, the undersigned counsel conferred either by telephone or via email with all counsel for all Respondents regarding the relief requested in the foregoing Motion, including John A. Morris on behalf of James P. Seery, and Brent McIlwain on behalf of Muck Holdings LLC, Jessup Holdings LLC, Stonehill Capital Management, and Farallon Capital Management. Mr. Seery is opposed to this Motion. Based upon all communications with Mr. McIlwain, it is reasonably believed his clients are also opposed and we advised him that this recitation would be placed in the certificate of conference.

 /s/ *Sawnie A. McEntire*            
Sawnie A. McEntire


## CERTIFICATE OF SERVICE

I certify that on the 28th day of March 2023, a true and correct copy of the foregoing Motion was served on all counsel of record or, as appropriate, on the Respondents directly.

/s/ *Sawnie A. McEntire* 
Sawnie A. McEntire