# Exhibit 49

## Page 1

```
         IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
                      DALLAS DIVISION
                             §
In re                        § Chapter 11
HIGHLAND CAPITAL MANAGEMENT, L.P, § Case No. 19-34054-sgj11
Reorganized Debtor.          §
                             §
        ------------------------------------------
                     ORAL DEPOSITION OF
                       MARK PATRICK
                      JUNE 23, 2025
                    (Reported remotely)
        ------------------------------------------
     ORAL DEPOSITION OF MARK PATRICK, produced as a witness
duly sworn by me at the instance of the Defendant, taken in
the above-styled and numbered cause on the 23RD day of June,
2025, from 12:05 p.m. to 1:14 p.m., via Zoom videoconference
before Ida Alcala, Certified Shorthand Reporter No. 12565,
in and for the State of Texas, reported by oral stenographic
means, pursuant to the Texas Rules of Civil Procedure, and
the provisions stated on the record or attached hereto.
```

## Page 2

```
                      APPEARANCES
Mr. Sawnie A. Mcentire    (Via Videoconference)
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Ave Ste 4400
Dallas, Texas 75201-7324
214-237-4300

Mr. Michael Lang          (Videoconference)
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave Ste 2390
Dallas, Texas 75201
214-817-4500

Mr. Louis M. Phillips     (Via Videoconference)
KELLY HART ATTORNEYS AT LAW (LOUISIANA)
Baton Rouge Office
301 N. Main Street Ste. 1600
Baton Rouge, LA 70801
225-381-9643

Mr. John R. Morris        (Via Videoconference)
ATTORNEY AT LAW
P.O. Box 470472
Fort Worth, Texas 76147-0472
817-262-7762

Ms. Deborah A. 'Deborah' Newman  (Via Videoconference)
NEWMAN LAW FIRM
245 W. 18th Street
Houston, Texas 77008-4005
713-942-2501

Mr. Matthew Okin          (Via Videoconference)
OKIN ADAMS LLP
1113 Vine St Ste 240
Houston, Texas 77002-1044
713-228-4100
         (CONTINUED ON NEXT PAGE)
```

## Page 3

```
                      (CONTINUED)
Mr. Andrew Kohl 'Drew' York    (Via Videoconference)
GRAY REED & MCGRAW
1601 Elm St. Ste 4600
Dallas, Texas 75201-7212
469-320-6114

Ms. Kathryn George        (Via Videoconference)
LATHAM AND WATKINS LLP
Chicago Office
330 North Wabash Avenue Ste 2800
Chicago, IL 60611
312-876-7700

ALSO PRESENT:
Ms. Amelia Hurt           (Videoconference)
Mr. Jeff Pomerantz        (Videoconference)
Mr. Gregory Demo          (Videoconference)
```

## Page 4

```
                       I N D E X
                                                    PAGE
WITNESS: MARK PATRICK
     Appearances................................   2
     Examination by Mr. Lang....................   5
     Examination by Mr. York....................   24
     Further Examination by Mr. Lang............   42
     Changes and Signature......................   44
     Reporter's Certification...................   46

           INFORMATION REQUESTED TO BE FURNISHED
                         (None)

                     EXHIBITS INDEX
COUNSEL FOR DUGABOY INVESTMENT TRUST
                                                    PAGE
EXHIBITS            DESCRIPTION            IDENTIFIED

   1     Charitable DAF/CLO HoldCo Structure Chart    8
   2     Rand Structure Chart                         8
   3     Proposed settlement agreement               16
```



Page 5

1  P R O C E E D I N G S
2         MARK PATRICK,
3  having been duly sworn, testified as follows:
4         EXAMINATION
5  BY MR. LANG:
6     Q. Please state your name for the record.
7     A. Mark Patrick.
8     Q. And, Mr. Patrick, how are you currently employed?
9     A. I -- what do you mean by --
10    Q. Who's your -- who do you work for?
11    A. I work for DAF entities.
12    Q. And when you say the DAF entities, can you be more
13 specific into which entities that are?
14    A. You know, there -- it's just a group of entities
15 that hold investment assets for charitable purposes.
16    Q. Specifically, do you have the names of these
17 entities?
18    A. Some -- some of them such as CLO HoldCO.
19    Q. Anybody else?
20    A. Liberty, I think.  Charitable DAF HoldCo Inc, US
21 entity, Charitable DAF Fund LP.  I'm probably missing
22 several others.  It's a sophisticated structure, but that's
23 generally the gist of when I refer to DAF entities.
24    Q. And what about Hunter Mountain?  Are you employed
25 by Hunter Mountain?

Page 6

1     A. Well, no -- I know -- I appreciate that.  I'm --
2  like, when I think of employment, I'm also the preferred
3  manager for Wind Advisers, which is an investment adviser
4  that advises investment funds -- and then -- so then I have
5  roles and that's why when you ask about employment, you
6  know, there's -- it's kind of a different question than
7  roles.
8     Q. That's fair.  Tell you what.  Why don't I put up a
9  work chart and we'll talk through it.  Will that work?
10    A. Yeah, I'll take a look anything.
11    Q. Okay.  Do you see this chart?
12    A. Yes, I do.
13    Q. Okay.  So this is the charitable DAFs, you know,
14 the whole structure comp chart.  Do you see that at the top?
15    A. Yes.
16    Q. Okay.  Is this how the DAF CLO HoldCo structure
17 currently looks today?
18    A. No, it does not.
19    Q. Okay.  What is different?
20    A. Well, there's a lot of differences.  I'd have to
21 kind of see the specific documentation to be exact.
22    Q. Well, can you generally describe the -- the changes
23 that have been made to this flowchart?
24        MR. MCENTIRE:  I'll object as to form and
25 relevance.

Page 7

1     A. Yeah.  I mean, I -- I think I have already, you
2  know, with respect to the listing of entities.  You'd have
3  to show me some documents with respect to these entities and
4  I can, you know, walk you through it.
5     Q. Would charitable DAF GP LLC still the GP for
6  charitable DAF CLO Co?
7     A. I don't -- I don't recall precisely and I, you
8  know, I want -- I want to be -- when I give you an answer, a
9  hundred percent accurate.
10    Q. Okay.  Does charitable DAF Fund LP still own a
11 hundred percent of CLO Hold Co?
12    A. Yes, that is my understanding.
13    Q. And this charitable DAF CLO CO limited still own a
14 hundred percent of charitable DAF Fund LP?
15        MR. MCENTIRE:  Objection, form.
16    A. No.
17    Q. (By Mr. Lang) Okay.  Charitable DAF FUND LP, is
18 that owned by CDM CFAD LLP?
19        MR. MCENTIRE:  Objection, form.
20    A. That's my general -- that's my general
21 understanding.
22    Q. (By Mr. Lang) Okay.  And who owns CDM CFAD LLC?
23    A. Yeah, again, without corporate documents that you
24 can present to me, I -- you know -- I -- I just don't want
25 to be inaccurate.

Page 8

1     Q. Does DFW Charities own CDM CFAD LLC?
2        MR. MCENTIRE:  Objection, form.  Relevant.
3     A. Yeah, again, you know, Mr. Lang, you know, there
4  are several entities in this structure, and I -- I just
5  don't want to go beyond what I have a hundred percent
6  knowledge of.
7     Q. I'm sharing this charitable DAF CLO CO structure
8  chart as Exhibit 1, to be fair.  And this is a RAND
9  structured chart, which I'm marking as Exhibit 2.  Do you
10 recognize this document?
11        MR. MCENTIRE:  Mark, at this time he's only
12 asking whether you recognize it.
13    A. Yeah, I haven't made it to the bottom, I apologize.
14        MR. MCENTIRE:  Okay.
15    A. What is the question now?
16    Q. (By Mr. Lang) Well, do you recognize this
17 organizational structure?  Let me change the question.
18    A. Do I recognize this structure.  Generally -- very
19 generally.
20    Q. Okay.  And starting at the top, charitable DAF
21 Holdings Corp, do you see that box?
22    A. Yes, I do.
23    Q. Is that owned by CLO HOLD CO?
24        MR. MCENTIRE:  Objection, form.
25    A. I don't know -- I don't know.  I can't recall



Page 9

1  precisely if there's other entities in -- in between that,
2  you know, whether that links up to CLO Hold Co.
3      Q.  (By Mr. Lang) Does CLO Hold Co indirectly own
4  charitable -- charitable DAF holdings Corp.?
5           MR. MCENTIRE:  Objection, form.
6      A.  Yeah, again, I can't answer with accuracy here
7  unless you showed me a corporate -- some actual corporate
8  filings or something like that.
9      Q.  (By Mr. Lang) Is this generally the structure for
10 the RAND -- structure -- is it generally a structure it
11 looks like today?
12          MR. MCENTIRE:  Objection, form.
13     A.  What part of the structure are you referring to,
14 Mr. Lang?
15     Q.  (By Mr. Lang) Well, the whole thing.  Charitable
16 DAF Holdings Corp?
17     A.  No.
18     Q.  Does it own Rand Advises LLC?
19     A.  Yeah, can you restate that question, again?
20     Q.  Does charitable DAF Holdings Corp, top box, the
21 sole member of Rand Advisers LLC?  The green box to the
22 left.
23     A.  Yes, that is -- that is my understanding.
24     Q.  Okay.  Does charitable DAF holdings Corp, the box
25 at the top, is it still the sole member of Rand PD fund

Page 10

1  management LLC?
2      A.  I would -- I would believe so.
3      Q.  Okay.  And is RAND PE fund management LLP still the
4  general partner for RAND PE Fund One LP?  See it just below
5  it?
6      A.  Yes, I would believe so.
7      Q.  And then charitable DAF Holdings Corp, the box at
8  the top, is it still the sole member for Atlas IDF GP PLLC?
9           MR. MCENTIRE:  Objection, form.
10     A.  Yes, I would believe so.
11     Q.  (By Mr. Lang) Okay.  And is Atlas IDF GP LLC still
12 the general corporate for Atlas IDF LP?
13          MR. MCENTIRE:  Objection, form?
14     A.  Yes, I would believe so.
15     Q.  (By Mr. Lang) Okay.  And is Atlas IDF LP still the
16 99 percent limited partner for RAND PE FUND I LP?
17          MR. MCENTIRE:  Objection, form.
18     A.  I'm trying to recall because I have RAND PE FUND in
19 a wind down situation.  So I -- I don't know if that is
20 accurate or not offhand.
21     Q.  (By Mr. Lang) And does RAND PE FUND ONE LP still
22 the sole member of Beacon LLC?
23          MR. MCENTIRE:  Objection, form.
24     A.  No.
25     Q.  (By Mr. Lang) Okay.  Who -- who owns Beacon

Page 11

1  Mountain LLC?
2      A.  An entity called CLO HOLD CO LLC.
3      Q.  And that's different than CLO HOLD CO limited?
4      A.  Yes.
5      Q.  Who owns CLO HOLD CO LLP?
6      A.  I believe it's CLO HOLD CO limited, from my
7  understanding.
8      Q.  And the CLO HOLD CO LLC owned Hunter Mountain?
9      A.  No.
10     Q.  Who owns Hunter Mountain?
11     A.  Beacon Mountain LLC.  And I would clarify one
12 thing.  I -- it's beneficial -- it's a beneficial ownership.
13 Hunter Mountain investment trust is a trust.
14     Q.  Okay.  I appreciate that.
15     A.  Can you do -- if you don't mind, do a summary?  I
16 just want to make sure that we're sort of accurate here?
17     Q.  Okay.  From what I understand --
18     A.  Yeah, from Beacon Mountain ownership.  I just want
19 to make sure you are understanding is --
20     Q.  Beacon Mountain LLC is owned by CLO HOLD CO LLC?
21     A.  Yes.
22     Q.  Beacon Mountain LLC owns Hunter or -- Hunter
23 Mountain Investment Trust is owned by Beacon Mountain LLP?
24     A.  Yes.
25          MR. MCENTIRE:  Objection.

Page 12

1      A.  (inaudible) beneficial.
2           MR. MCENTIRE:  Yeah, I would object to
3  mischaracterizing his testimony.
4           MR. LANG:  Nobody's mischaracterizing.
5      Q.  (By Mr. Lang) The beneficial owner of Hunter
6  Mountain Investment Trust.
7      A.  Yeah, this is all a current state.
8      Q.  Current state.
9           And what is your role with Hunter Mountain
10 Investment Trust?
11     A.  My understanding is I'm the -- an administrator
12 which is a -- the control person for that trust.
13     Q.  Are you the control person for Beacon Mountain LLP?
14     A.  Yes.
15     Q.  Are you the control person for CLO HOLD CO LLC?
16     A.  Yes.
17     Q.  Are you the control person for RAND Advisers LLC?
18     A.  Yes.
19     Q.  Are you the control person for RAND PE FUND
20 Management LLC?
21     A.  Yes.
22     Q.  Are you the control person for Atlas IDF GP LLC?
23     A.  Yes.
24     Q.  Are you the control person for the Charitable DAF
25 Holdings Corp?



Page 13

1　A. Yes.
2　Q. And you're the control person for Charitable DAF
3　Fund LP?
4　　　I'll -- I'll go back here.
5　　　MR. MCENTIRE: Objection, form.
6　Q. (By Mr. Lang) Are you the control person for
7　Charitable DAF Fund LP?
8　　　MR. MCENTIRE: Objection, form.
9　A. It's -- no, but you should ask me a follow-up
10　question.
11　Q. What's your role at Charitable DAF Fund LP?
12　A. Yeah, I'm the control person for the general
13　partner of that limited partnership.
14　Q. And who's the general partner of the limited
15　partnership?
16　A. Yeah, and then this is where my memory is -- is --
17　I'd have to kind of revisit the actual organizational
18　documents to give you a confident a hundred percent answer.
19　　　MR. MCENTIRE: Yeah, Mark, let's don't --
20　let's don't speculate unless he has a document, okay?
21　A. Yes.
22　Q. (By Mr. Lang) Are you the control person for
23　CDMCFAD LLC?
24　　　MR. MCENTIRE: Can you repeat the question, I
25　didn't hear it, Mr. Lang.

Page 14

1　Q. (By Mr. Lang) Mr. Patrick, are you the control
2　person for CDMCFAD LLC?
3　A. I believe I am.
4　Q. Does that stand for anything out of curiosity?
5　A. I don't remember.
6　Q. All right.
7　　　MR. PHILLIPS: Objection, formatting.
8　Q. (By Mr. Lang) Did you -- you negotiated the
9　settlement agreement that is the subject of (inaudible)
10　correct?
11　A. Correct.
12　Q. Did you initiate settlement discussion with about
13　events?
14　A. What do you mean by initiate.
15　Q. Well, did you approach them about settlement or did
16　they approach you?
17　A. I'm sorry, you were slightly muffled there.
18　Q. I said did they approach you about settling or did
19　you approach them about a potential settlement?
20　　　MR. PHILLIPS: Objection to the form of the
21　question?
22　A. I can't -- I can't recall offhand. Who approached
23　who or -- yeah.
24　Q. Under the settlement agreement, Hunter Mountain is
25　to receive among other things the Dugaboy note and the

Page 15

1　Kirschner claims. Do you know what I'm referring to when I
2　refer to the Dugaboy note and the Kirschner claims?
3　A. I -- I would appreciate it if you could pull up the
4　-- the Dugaboy note document that you are referring to.
5　There's an awful lot of Dugaboy notes out there, and -- and
6　as a starter and I'd also appreciate if you could pull up
7　for me the -- what you're referring to as the Kirschner
8　Litigation complaint.
9　Q. I'm referring to what's in the settlement
10　agreement. It refers to the Dugaboy note --
11　A. Well, then the document speaks for itself, sir. If
12　you want to show me the document, I'll definitely testify to
13　the accuracy of what I signed.
14　Q. I'm asking if you know what I'm referring to when I
15　refer to the Dugaboy note and the Kirschner claims as re
16　restricted at that point out from Patricia claims as
17　referenced in the settlement agreement.
18　A. Yeah, and I'm asking you to show me the settlement
19　agreement with the lines and then I -- and I'll verify that
20　for you if you don't mind.
21　　　There's a lot of Dugaboy notes out there you
22　have to appreciate that, Mr. Lang.
23　Q. Which one have you bargained to receive in the
24　settlement agreement?
25　A. And -- and there's a lot of Kirschner litigation as

Page 16

1　well.
2　Q. Well, the Kirschner litigation is that -- Styled
3　Kirschner versus Dondero Adversary Proceeding 2103076.
4　　　Are you familiar with that one?
5　A. I'm not familiar with that caption. If you could
6　just show me the document that you're -- the complaint that
7　you're referring to, then I will say that is -- that is the
8　litigation that -- that we negotiated for.
9　Q. Okay.
10　A. You can bring up the settlement agreement, I'll
11　happily verify that whatever is referenced in there is what
12　I negotiated for, but I'm not gonna broad brush generically
13　say that I negotiated for some Dugaboy note without a little
14　more precision, if you don't mind.
15　Q. Can you see my screen?
16　A. Here we go. Yes.
17　Q. Okay. When I refer to the Dugaboy note, that's the
18　note that I'm referring to. Does that help you?
19　　　MR. MCENTIRE: Well, for the record, Mr. Lang,
20　can we just identify that you have put up the actual
21　settlement agreement, is that correct?
22　　　MR. LANG: Yes. Sorry. Exhibit 3 will be the
23　settlement agreement. The proposed settlement agreement.
24　A. Yes, so you're having me refer to the Dugaboy note
25　dated May 31st, 2017, with a face amount of roughly

Case 19-34054-sgj11   Doc 4513-52   Filed 02/09/26   Entered 02/09/26 19:03:50   Desc
Exhibit 49   Page 6 of 13

MARK PATRICK  
IN RE: HIGHLAND CAPITAL MNGMT

June 23, 2025  
17–20

Page 17

1  24 million as the maker and with Highland Capital Management
2  collectively as the payee.  That's what -- that's what
3  you're referring me to.
4      Q.  That's what I'm referring you to.
5      A.  And what is your question?
6      Q.  I'm -- I was just asking if you understand what I'm
7  referring to when I say the Dugaboy note?
8      A.  Okay.  I understand now what you're referring to.
9      Q.  And then the Kirchner claims are -- means all
10 claims and causes of action that were asserted or could've
11 been asserted by litigation trustee or the litigation
12 subtrust in the capital amended.  Do you see that?
13     A.  Yes, I do.
14     Q.  Okay.  Let's go up and see the amenities claims.
15 The amended complaint means the Amended Complaint and
16 objection to claims Docket number 158 in Kirschner versus
17 Dondero adversary proceeding 21-03076, do you see that?
18     A.  Yes, I do.
19     Q.  Okay.  So if I refer to the Kirchner claims, you
20 know what I'm referring to now?
21     A.  Yes, I do.  Thank you.
22     Q.  Okay.  How does Hunter Mountain value the Kirchner
23 claims?
24         MR. MORRIS:  Objection to the form of the
25 question.

Page 18

1      A.  Hunter Mountain is a non-living entity.  It's a
2  trust.
3      Q.  (By Mr. Lang) Have you valued the Kirchner claims?
4      A.  I have not had an appraised evaluation.  I'm not
5  qualified to appraise value.
6      Q.  Do you have an estimated value of the Kirchner
7  claims?
8      A.  Estimate.  Estimate.  Who?  Are you asking if I've
9  estimated the value?
10     Q.  Yes.
11     A.  Of the Kirchner claim?
12     Q.  Yes.
13     A.  No.
14     Q.  Have you done anything to determine the value of
15 the Kirchner claims?
16     A.  No.
17     Q.  What does Hunter Mountain plan to do with the
18 Kirchner claims after the settlement agreement if it's
19 approved?
20         MR. MCENTIRE:  Objection to the form of the
21 question.
22         MR. PHILLIPS:  Objection, form.
23     A.  So you're asking me to speculate about my future
24 actions --
25     Q.  (By Mr. Lang) I'm not asking you --

Page 19

1      A.  -- with respect that claim?
2      Q.  What does Hunter Mountain plan to do with the
3  Kirschner claims if the settlement agreement is pursued
4  or --
5      A.  What do you mean by plan?
6      Q.  What is it's intention to do with the Kirschner
7  claims if the settlement agreement is approved?
8          MR. PHILLIPS:  Objection, form.
9      A.  And again, what do you mean by to do?
10     Q.  (By Mr. Lang) What -- are you going to dismiss the
11 claims?
12     A.  I don't -- I won't be the owner of the claim so I
13 couldn't dismiss it.
14     Q.  Is Hunter Mountain going to dismiss the claim?
15     A.  I wouldn't want to -- want to speculate.
16     Q.  Do you have any plans whatsoever sitting here today
17 on what you're going to do -- what Hunter Mountain is going
18 to do with the Kirchner claim if the settlement agreement is
19 approved?
20         MR. PHILLIPS:  Objection, form.
21         MR. MCENTIRE:  Joined objection.
22     A.  And again, help me understand better what you mean
23 by plan because, you know, I have a -- it's -- I have a lot
24 of plans for the weekend, but whether I do it or not, you
25 know, is fairly speculative.  You just got to help me kind

Page 20

1  of understand what you mean by that.
2      Q.  (By Mr. Lang) I mean, what is your intent?  What
3  do you plan to do with the Kirchner claims if the settlement
4  agreement is approved.  Why is it such a hard question to
5  answer?  It seems very basic?
6          MR. PHILLIPS:  Objection, form.
7      A.  To be fair, Mr. Lang, if the agreement -- the
8  settlement agreement is approved, then Hunter Mountain will
9  have ownership over that claim, and -- one thing -- I guess
10 one thing that is certain that I can tell you as far as a
11 plan is to evaluate and decide what we are going to do.
12     Q.  (By Mr. Lang) And that means pursuing the claims?
13         MR. MCENTIRE:  Objection, form.
14     A.  Wait.  I'm sorry.  Say that, again.
15     Q.  (By Mr. Lang) I said, and does that include
16 potentially pursuing the claims?
17     A.  By whom?
18     Q.  Hunter Mountain.
19     A.  Oh, pursuing the claim.  Well, yes, I would imagine
20 it -- it involves a range of options.
21     Q.  And what -- what is within that range of options
22 that you can think of sitting here right now?
23         MR. PHILLIPS:  Objection, form.
24     A.  I don't know because I'll reach out to my legal
25 advisors and they'll give me a range of options, but, you



Case 19-34054-sgj11   Doc 4513-52   Filed 02/09/26   Entered 02/09/26 19:03:50   Desc
Exhibit 49   Page 7 of 13

MARK PATRICK
IN RE: HIGHLAND CAPITAL MNGMT
June 23, 2025
21–24

Page 21

1  know, I would say either move forward or not or whatnot, but
2  I'll let the legal advisors tell me.
3      MR. MCENTIRE: Yeah, Mark, let me jump in
4  here. You can try to answer the question if you can to the
5  extent you're not relying upon legal advice, okay? And so
6  feel free to do that. If you have to rely upon legal
7  advice, then I instruct you not to answer.
8      A. At some point in the future, I'll rely upon legal
9  advice to determine what my range of options are.
10     Q. Has Hunter Mountain performed any analysis of the
11 Dugaboy note?
12     A. Has Hunter Mountain performed any analysis
13 regarding the Dugaboy note?
14     Q. Like the valve of the Dugaboy note.
15     A. Oh, has Hunter Mountain itself determined the --
16     Q. Yes.
17     A. -- the -- the value of it. We'll, again, it's an
18 entity and it doesn't, you know, think for itself so I would
19 say, no.
20     Q. Has anybody with Hunter Mountain analyzed the
21 value of the Dugaboy note?
22     A. Anybody with? Again, what you are -- I'm the
23 administrator but -- are you talking about people with a
24 role?
25     Q. Have you? Have you performed any analysis of the

Page 22

1  value of the Dugaboy note?
2      A. No, again, because I'm not a qualified appraiser.
3      Q. Have you requested anyone to provide an analysis of
4  the valve of the Dugaboy note?
5      A. Yes.
6      Q. Who have you requested the value of Dugaboy note?
7      A. A qualified appraisal company.
8      Q. Who is that qualified appraisal company?
9      A. It's a company called Weaver.
10     Q. Okay. Have they provided you with an opinion on
11 the value of the Dugaboy note?
12     A. No.
13     Q. When do expect them -- let me ask this, have they
14 told you when they may be able to provide the opinion of a
15 value of the Dugaboy note?
16         MR. PHILLIPS: Objection to form?
17     A. I can't -- I can't recall offhand when they'll
18 provide me an evaluation on that Dugaboy note?
19     Q. (By Mr. Lang) Okay.
20         MR. LANG: I'll pass the witness.
21         MR. MCENTIRE: I'm sorry, Mr. Lang, I couldn't
22 hear you. I apologize.
23         MR. LANG: I said -- I said I'll pass the
24 witness.
25         I think David or there are other attorneys

Page 23

1  that have questions.
2      MR. MCENTIRE: Okay.
3      Is there anyone else who wants to ask
4  Mr. Patrick any questions?
5      MR. PHILLIPS: Michael could you take down a
6  document?
7      MR. LANG: Yup, sorry. Thank you.
8      MR. PHILLIPS: I read it seven times now.
9      MR. LANG: I got it. I forgot it was up.
10     MR. MCENTIRE: Anybody else have any questions
11 for Mr. Patrick?
12     MR. YORK: Go ahead, Matthew.
13     MR. OKIN: Can everybody hear me okay?
14     MR. PHILLIPS: Yes.
15     MR. OKIN: I think, Louis, you and I have an
16 agreement that we were going to postpone our asking
17 questions til tomorrow, is that correct?
18     MR. PHILLIPS: Correct, at 2:00 o'clock,
19 right? 2:00 o'clock, right?
20     MR. OKIN: 2:00 o'clock tomorrow. So we'll
21 defer our questions. We are going to take Mr. Patrick's
22 deposition when we recommence at 2:00 o'clock tomorrow.
23     MR. MCENTIRE: Okay. Anyone else have any
24 questions of Mr. Patrick.
25     MR. YORK: So -- this is Drew York, I do.

Page 24

1      Mr. Phillips, are you okay with me going
2  forward now.
3      MR. PHILLIPS: I think we -- I forgot, I
4  didn't get a chance to tell you, Mr. York, that I think Mr.
5  Patrick --
6      Mr. Patrick you want to -- we don't want to
7  wait til 2:00, so --
8      THE WITNESS: Yeah, let's just keep going.
9      MR. PHILLIPS: We can keep going. We can move
10 straight on to you. I just didn't know if he wanted a five
11 minute break.
12     MR. YORK: Let's take five minutes. Let's do
13 that. Let's go off the record, take a five-minute break and
14 come back, how's that?
15     MR. PHILLIPS: Okay.
16         (Recess at 12:33 p.m.)
17         (Resume at 12:41 p.m.)
18     MR. YORK: Let's go on the record.
19         EXAMINATION
20 BY MR. YORK:
21     Q. Mr. Patrick, good afternoon, my name is Drew York
22 and I represent Patrick Daugherty in this matter. Are you
23 familiar with Mr. Daugherty?
24     A. Yes.
25     Q. And how do you know Mr. Daugherty?



Page 25
1  A. I knew him from Highland.
2  Q. Were you also employed at Highland at one point in
3  time?
4  A. Yes.
5  Q. What position?
6  A. I was in the tax department.
7  Q. Okay. Did you have a title?
8  A. I was a tax professional.
9  Q. How long were you employed at Highland?
10  A. Oh, from 2008 to 2021.
11  Q. And were you always employed in the position as a
12  taxpayer professional at Highland during that time?
13  A. Yes.
14  Q. You mentioned earlier in response to some questions
15  from Mr. Lang that you're currently the administrator or
16  control person for Hunter Mountain, is that correct?
17  A. Yes.
18  Q. Okay. When did you take on that role?
19  A. I believe in 2022.
20  Q. Did you have -- do you remember when in 2022?
21  A. I think the latter part of the summer.
22  Q. Did you have any role at Hunter Mountain trust
23  prior to that time in 2022 when you became the
24  administrator?
25  A. Can you ask that question one more time?

Page 26
1  Q. Sure. Did you have any role at the Hunter Mountain
2  trust prior to the time you became the administrator in
3  2022?
4        (Zoom call froze)
5        THE COURT REPORTER: Is everyone still there?
6  A. -- recall specifically, you know, so I, you know, I
7  had no formal role.
8  Q. Okay. When you say you would speak to Mr. Hanus
9  from time to time when he was the administrator, can you
10  describe for me what it was that you would be conferring
11  with him about?
12  A. Probably would have to be -- involved taxes.
13  Q. And why was he conferring with you on that based on
14  your -- I assume role at Highland at the time, right?
15        MR. MCENTIRE: Objection, form.
16  Q. (By Mr. York) Actually, that's fair. I'll back up
17  and let me ask this question. Did Mr. Hanus reach out to
18  you in his role as the administrator for the Hunter Mountain
19  trust while you were still in the tax department at
20  Highland?
21  A. I can't recall specifically, but I'm confident that
22  he and I spoke on occasion.
23  Q. And what do you recall the two of you speaking
24  about?
25  A. It had to involve tax -- some sort of tax related

Page 27
1  type questions.
2  Q. Did you have any other involvement with the Hunter
3  Mountain Trust at all? Not even in a formal role, but any
4  involvement with the Hunter Mountain Trust at all prior to
5  your becoming the administrator in 2022?
6  A. No.
7  Q. Were you ever counsel for the Hunter Mountain
8  Trust?
9  A. No.
10  Q. Were you ever counsel to the Hunter Mountain Trust
11  in any fashion?
12  A. No.
13  Q. Did you ever conduct any tax analysis with regard
14  to the Hunter Mountain Trust when you were at Highland?
15  A. I can't recall, specifically.
16  Q. Can you recall even if you did, when?
17  A. Well, it'd probably be around -- I mean, it would
18  be when that trust was, you know, created and after it was
19  created.
20  Q. When was the trust created?
21  A. I don't recall, specifically.
22  Q. Do you recall who came up with the idea to create
23  the trust?
24  A. The idea to create the trust. You know what, I
25  actually do.

Page 28
1  Q. Who was that?
2  A. It was Thomas Surgeon. That's what I seem to
3  recall. He -- he wanted that trust created.
4  Q. Why?
5  A. Well, I can't recall specifically, but he was in
6  the compliance department at Highland.
7  Q. Earlier today Mr. Lang showed you those
8  organizational structure charts that we looked at. I think
9  Exhibit 1 which was the charitable DAF structure chart. And
10  I -- as I understood from your testimony the chart that he
11  put up is no longer accurate. Do you know why it's changed?
12        MR. PHILLIPS: Objection, form.
13        MR. MCENTIRE: Following the objection. He's
14  already asked and answered this question too.
15  A. I'm trying to remember when that exhibit was put in
16  to place, but -- any variably kind of complex sophisticated
17  corporate structures, you know, they're generally -- just
18  don't -- a lot of different reasons for -- for structures to
19  kind of shift throughout the years.
20  Q. (By Mr. York) And you don't recall specifically
21  when those changes were made to the structure?
22  A. Well, I think there's -- I guess I'm trying to
23  expresses this -- it's rather fluid. A lot of these kind of
24  structures, you know, just for an example, sometimes you
25  make an investment of certain types and so then you want to



Page 29

1  have a special purpose vehicle formed for that investment,
2  and, you know, to hold it, and it can be for a variety of
3  reasons and purposes and whatnot. So that's what I'm kind
4  of saying that, that these structures are always sort of
5  fluid when you have a variety of investment holdings as one
6  reason, and as, you know, tax law changes can influence
7  development of structures, legal -- corporate legal changes.
8  That's why it's -- it's a very complex structure that has a
9  lot of different things, and so you really have to see it
10 and snapshot it in time, you know, but -- but it's always
11 evolving in light of different considerations.
12     Q. Let's switch gears. Did you have any involvement
13 in the creation and development of the charitable DAF?
14        MR. MCENTIRE: Objection, form.
15        MR. PHILLIPS: Objection, form.
16     A. If you don't mind, could you be a little more
17 specific to what you're referring to charitable DAF?
18     Q. (By Mr. York) Sure.
19         Mr. Lang, can you put up the chart for me
20 please, Exhibit 1.
21        MR. PHILLIPS: I'm having a hard time -- I
22 know there's not a question pending, but what does this have
23 to do with the Daugherty objection?
24        MR. MCENTIRE: I don't think it has anything
25 to do with the objection.

Page 30

1         So, Mr. Lang -- I mean, Mr. York, I don't
2  know how we go here.
3         MR. PHILLIPS: We're not going to allow any
4  kind of amendment to pleadings or by additional evidence and
5  that sort of thing. I'm just having a hard time with this
6  folderol about -- Daugherty has an objection, but this is
7  not part of it.
8         MR. YORK: Take down the exhibit for now, I'll
9  go a different route.
10        Mr. Patrick, have you read Mr. Daugherty
11 objection to the proposed settlement between Highland and
12 the HMIT entities?
13    A. Yes.
14    Q. Are you aware that Highland has separately filed an
15 adversary proceeding against Mr. Daugherty?
16    A. I have an awareness, yes.
17    Q. Okay. Have you ever read the settlement agreement
18 between Highland and Mr. Daugherty?
19    A. No.
20    Q. In the course of the negotiations of the proposed
21 settlement between Highland and the HMIT entities, was there
22 ever any discussions about Mr. Daugherty unresolved class a
23 claim?
24        MR. PHILLIPS: Objection to form.
25    A. Yes.

Page 31

1     Q. (By Mr. York) When did those take place?
2     A. I believe during the period of the -- the
3  discussions around the settlement.
4     Q. Before or after the settlement agreement -- I'm
5  sorry, strike that. Before or after the motion for entry
6  for approval of settlement was filed with the Bankruptcy
7  Court?
8     A. Oh, I can't recall with that sort of precision.
9     Q. Did it come up before the parties, that is Highland
10 and HMIT entities reached an agreement in principle to the
11 proposed settlement?
12    A. Yes, I --
13    Q. Who brought it up?
14    A. Not me, is what I can say because it's nothing that
15 was really in my radar screen.
16    Q. Was it brought up by anybody else on the HMIT
17 entities side?
18        MR. PHILLIPS: Objection, form.
19        MR. MCENTIRE: Let me jump in here. I would
20 object to the extent that he's asking you to talk about
21 discussions you've had with Mr. Lewis or other attorneys
22 representing Hunter Mountain. If you can answer that
23 without making reference to any such privileged discussions,
24 you can do so. Otherwise, I will instruct you not to
25 answer.

Page 32

1     A. Yeah, no -- I mean, we had substantial all legal
2  involvement and so I think a lot of those discussions -- I
3  mean, it wasn't necessarily me, but is lawyers to lawyers.
4     Q. (By Mr. York) Did you ever have any communications
5  yourself with anyone on the Highland side regarding
6  Mr. Daugherty unresolved Class A claim in the bankruptcy?
7     A. I just remember generally speaking -- and it coming
8  up in the settlement negotiations.
9     Q. I understand that. So is your answer then, no, you
10 did not have any direct conversations with anyone from
11 Highland regarding Mr. Daugherty Class A claim?
12    A. I wish I could be that precise. I just don't
13 recall. Maybe.
14    Q. Well, if you did, who would those conversations
15 have been with?
16    A. Yeah, I don't want to speculate.
17        MR. MORRIS: Objection form.
18    Q. (By Mr. York) Are you aware that Highland is
19 engaged in a dispute with the IRS regarding its tax filings
20 from 2008 to 2010?
21    A. Yes.
22    Q. Okay. And have you been aware of that since, you
23 know, since the time that you became the administrator at
24 Hunter Mountain Trust?
25    A. Yes.



Page 33

1  Q. And before that?
2  A. Yes.
3  Q. All right. What is your understanding of that
4  dispute?
5      MR. PHILLIPS: Objection, form.
6  A. That there's a proposed adjustment with respect to
7  the Highland tax return for 2007 and 2008.
8  Q. Have you had any discussions with anyone from
9  Highland regarding that dispute?
10 A. When?
11 Q. At any point in time.
12 A. Oh, yeah, when I was employed by Highland, yes.
13 Q. Okay. What about since?
14 A. When I was employed by Skyview.
15 Q. When you were employed by Skyview?
16 A. Yeah.
17 Q. Okay. Who owns Skyview?
18 A. My understanding is a Scott Ellington.
19 Q. Okay. And who did you have those conversations
20 with?
21 A. Oh, outside counsel.
22 Q. Other than counsel, have you had discussions with
23 anyone else about the IRS audit dispute?
24 A. Oh, I'm sure I have.
25 Q. Do you recall who?

Page 34

1  A. Not really, specifically.
2  Q. Do you recall the last time you did?
3  A. No.
4  Q. Do you recall what was said?
5  A. No.
6  Q. Are you familiar with what's known an FPAA,
7  F-P-A-A?
8  A. Yes, I am.
9  Q. What does that stand for?
10 A. Final partnership administrator adjustment.
11 Q. And is that a document or form, I guess, that is
12 issued by the IRS with respect to an audit?
13 A. Yes, it is.
14 Q. All right. Do you know whether an FPAA has been
15 issued with regard to Highlands tax filings for 2007-2008?
16 A. I may have known, but I may have forgotten.
17 That's -- so I don't want to say, I don't know because I
18 just can't -- I can't recall, but I may have known.
19 Q. I'm not sure -- so you just don't know as you sit
20 here?
21 A. Well, I'm saying I guess I can't remember, but it's
22 within a realm of possibility that I may have known at some
23 point.
24 Q. Have you seen it?
25 A. It's been many years, and that's why my memory

Page 35

1  isn't precise enough to give you kind of an affirmative.
2      MR. MCENTIRE: Mark, don't speculate if you
3  don't remember.
4  A. Yeah.
5  Q. (By Mr. York) Have you ever had any discussions
6  with anyone concerning the FPAA if one has actually been
7  issued for either Highland's 2007 at 2008 tax returns?
8      MR. PHILLIPS: Objection, form.
9  A. Can you state that again?
10 Q. (By Mr. York) Sure. Have you ever had any
11 discussions with anyone to the best of your recollection
12 about an FPAA if one has actually been issued concerning
13 Highland's either 2007 or 2008 tax returns?
14 A. Yeah, I don't recall. If I have or have not, I
15 just don't remember.
16 Q. You were asked earlier by Mr. Lang about who
17 reached out first on the settlement discussions. Am I
18 correct the settlement discussions between Highland and
19 Hunter Mountain began sometime in, I think, March of this
20 year? Is that right?
21 A. I -- I don't know with absolute precision, like, I
22 was thinking April.
23 Q. Did you personally have any direct negotiations
24 with anyone on the Highland side?
25     MR. MORRIS: Objection.

Page 36

1  A. Yes.
2  Q. (By Mr. York) Who was that?
3  A. Wait, so restate your question again.
4  Q. Yeah, my question was did you -- did you have any
5  direct negotiations with anyone on Highland side relating to
6  the proposed settlement?
7  A. Yes, I did.
8  Q. And my question then was, who --
9      MR. MCENTIRE: Objection.
10 A. The professionals at Highland.
11 Q. (By Mr. York) So you spoke just with the
12 professionals at Highland? Nobody else?
13 A. No, I spoke to a lot of, you know, like, my team.
14 Q. Sure. I'm asking on the Highland side, who did you
15 speak with?
16 A. Oh, the professionals there at Highland.
17 Q. Okay, which ones?
18 A. You know, Mr. Starey, and I guess when you say
19 spoke with, I mean, do you, like, general discussions within
20 a group typesetting. You know, Dave Clause and Tim
21 Corinoir. Those are the names that come to mind.
22 Q. And you can't recall who initiated the settlement
23 discussions -- the discussions about potentially settling
24 the dispute between Highland and the Hunter Mountain
25 entities, correct?



Case 19-34054-sgj11   Doc 4513-52   Filed 02/09/26   Entered 02/09/26 19:03:50   Desc
Exhibit 49   Page 11 of 13

MARK PATRICK
IN RE: HIGHLAND CAPITAL MNGMT
June 23, 2025
37–40

Page 37

1  A. Yeah, I can't, specifically.
2  Q. You consider yourself to have had a close
3  relationship with Jim Dondero in the past?
4      MR. MCENTIRE: Objection, form.
5      MR. PHILLIPS: Objection, form.
6  A. No.
7      MR. YORK: So you know that Highland at one
8  point did characterize you as having a close relationship
9  with Mr. Dondero over a more than decade period of time that
10 you worked at Highland.
11     MR. PHILLIPS: Objection, form.
12     MR. MCENTIRE: Joined in the objection.
13 A. I didn't have that awareness.
14 Q. (By Mr. York) Do you still communicate with
15 Mr. Dondero?
16     MR. PHILLIPS: Objection, form.
17 A. No.
18 Q. (By Mr. York) When was the last time you recall
19 communicating with him?
20     MR. MCENTIRE: Objection, form.
21 A. I can't recall precisely.
22 Q. (By Mr. York) Was it some time within this
23 calendar year?
24     MR. MCENTIRE: Same objection.
25 A. No.

Page 38

1  Q. (By Mr. York) Last year?
2  A. Yes.
3  Q. Do you recall when last year?
4  A. No.
5  Q. Can you tell me -- was it, you know, spring,
6  summer, fall 2024? Any idea?
7      MR. PHILLIPS: Objection, form.
8  A. Well, I'm pretty confident it was in the summer.
9  Q. Okay.
10 A. But it may have been later, but at least the
11 summer.
12 Q. All right. What do you recall the two of you
13 discussing in the last conversation?
14     MR. MCENTIRE: Objection, form.
15     MR. PHILLIPS: Objection, form.
16     MR. MCENTIRE: Can we have an agreement that
17 one attorney objects, it's good for all?
18     MR. YORK: Sure.
19     MR. PHILLIPS: It's fine with me. I can't
20 speak for Mr. Lang or Okin.
21     MR. LANG: That's fine.
22 A. I just don't specifically remember.
23 Q. (By Mr. York) Has Highland capital ever had an
24 ownership interest in Hunter Mountain Trust?
25 A. Highland Capital Management having an ownership in

Page 39

1  Hunter Mountain?
2  Q. Yeah.
3  A. To my understanding, no.
4  Q. Okay. Do you know how Hunter Mountain came to own
5  Class B and Class C limited partnership interest in Highland
6  Capital Management?
7  A. Yes.
8  Q. How?
9  A. Purchase and contribution.
10 Q. So are you saying that Hunter Mountain purchased
11 Class B Limited partnership interest in Highland Capital?
12     MR. PHILLIPS: I'm going to object to form.
13     And counsel, where are we headed here?
14     MR. YORK: Just trying to make sure we have a
15 full understanding when we go into this hearing. Hunter
16 Mountain interest is as set forth in the -- in the proposed
17 settlement relating to the capital account balance, that's
18 all.
19 A. What was the question?
20 Q. Yeah, so did -- I was trying to understand when you
21 said purchase and contribution, what do you mean by that?
22 What's -- what's that number?
23 A. Yeah, yeah, my understanding is that Hunter
24 Mountain had purchased the -- some interest in Highland
25 Capital Management LP. I don't recall precisely the class

Page 40

1  and then it had also acquired interest in Highland Capital
2  Management LP via a contribution contributing a note or an
3  asset into it. Is what I -- is my general understanding.
4  Q. And is that note, that you're referring to, is
5  what Coakley has been called the Hunter Mountain Investment
6  Trust note?
7      MR. PHILLIPS: Objection to form.
8  A. Yeah, I don't know what you're referring to. I'm
9  just -- my general -- my general knowledge is that -- that
10 there was a note contributed by Hunter Mountain into
11 Highland in exchange for an interest.
12 Q. (By Mr. York) When did that occur to your
13 knowledge?
14     MR. PHILLIPS: Objection, form.
15 A. I can't remember the years gone by.
16 Q. (By Mr. York) Was it while you were employed with
17 Highland?
18 A. Yes.
19 Q. The last couple of questions here, I think, is
20 Hunter Mountain paying the legal expenses for Mr. Phillips
21 and his firm? Relating to the proposed settlement and, I
22 guess, the defense of the proposed settlement at the
23 upcoming hearing?
24 A. I believe so.
25 Q. Okay. Is there --



Page 41

1  MR. PHILLIPS: I'll answer that, yes.
2  MR. YORK: Mr. Phillips, if you want to go
3  under oath we can put you under oath as a witness too,
4  but --
5  MR. PHILLIPS: Let me rephrase. I hope so.
6  A. Yeah.
7  Q. (By Mr. York) Is there anyone that's making any
8  payment or contribution to Hunter Mountain in relation to
9  those legal expenses? In other words, is any third party
10 paid Hunter Mountain or reimbursed Hunter Mountain for any
11 legal expenses associated with the proposed settlement?
12 A. No, but -- except for the current ownership, you
13 know, is probably funding it that way. So CLO HoldCo LLC
14 would be making a contribution into Hunter Mountain to pay
15 legal bills.
16 Q. All right.
17 A. And probably -- I'm kinda jumping -- probably go to
18 Beacon Mountain first and then it would go to Hunter
19 Mountain like that.
20 Q. On up the chain, so to speak?
21 A. Yeah. Well, I don't know how -- on up the chain --
22 yeah, until there's cash which would be CLO HoldCo.
23 Q. Okay. Are there any indemnifications agreements
24 that Hunter Mountain has entered into where it is being
25 indemnified by any parties relating to -- relating to the

Page 42

1  settlement at all?
2  MR. PHILLIPS: Objection, form.
3  A. Not to my -- not to my knowledge.
4  Q. Okay. All right.
5  MR. PHILLIPS: I would qualify that. If
6  you're asking about the settlement agreement, could you put
7  the settlement agreement up because there may be
8  indemnification provisions in the settlement agreement. If
9  you're asking for outside the settlement agreement, that's a
10 different story.
11 MR. YORK: You took care of that for me Lewis.
12 A. Yeah, yeah, and no, I appreciate that clarification
13 because I guess I should have asked you either or because I
14 was getting confused thinking that maybe it also includes
15 the settlement agreement. No, my answer is with respect to
16 anything outside of a settlement agreement. There are no
17 indignities to my general understanding.
18 Q. All right.
19 With that, I think, at this point, I'll pass
20 the witness back to Mr. Lang, if he's got any further
21 questions.
22 FURTHER EXAMINATION
23 BY MR. LANG:
24 Q. I have one question. You said that Rand PE Fund I,
25 LP was in liquidation, do you recall that?

Page 43

1  A. Yeah, yeah, well, I call it a windup.
2  Q. Windup, okay.
3  A. Yeah, yeah. It's a windup.
4  Q. And then I could be wrong, but I think I recall
5  that Mr. Raver testified that Atlas IDF LP was in
6  liquidation, does that sound right?
7  MR. MCENTIRE: Objection, form.
8  A. Yeah, windup.
9  Q. (By Mr. Lang) You said windup also?
10 A. Yeah, but, but loosely termed they're one and the
11 same.
12 MR. LANG: Okay. That's all I've got.
13 MR. MCENTIRE: Anybody else?
14 MR. OKIN: Well, we'll be back at 2:00
15 tomorrow.
16 MR. MCENTIRE: Yeah. Okay. I think that
17 adjourns the deposition Ms. Court Reporter.
18 (End of Proceedings.)

Page 44

1              CHANGES AND SIGNATURE
2  PAGE  LINE  CHANGE                         REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____



### Page 45

```
 1         I, MARK PATRICK, have read the foregoing
   deposition and hereby affix my signature that same is true
 2 and correct, except as noted above.
                                       _____
 3                                     MARK PATRICK
 4
 5 THE STATE OF TEXAS
   COUNTY OF _____
 6         Before me, _____, on this day
   personally appeared MARK PATRICK, known to me (or proved to
 7 me under oath or through _____)(description
   of identity card or other document) to be the person whose
 8 name is subscribed to the foregoing instrument and
   acknowledged to me that they executed the same for the
 9 purposes and consideration therein expressed.
           Given under my hand and seal of office this
10 _____ day of _____, 20___.
11
12                                _____
13                                Notary Public in and for
                                  the State of Texas
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 46

```
 1          IN THE UNITED STATES BANKRUPTCY COURT
 2           FOR THE NORTHERN DISTRICT OF TEXAS
 3                      DALLAS DIVISION
 4                              §
 5 In re                        § Chapter 11
 6 HIGHLAND CAPITAL MANAGEMENT, L.P, § Case No. 19-34054-sgj11
 7 Reorganized Debtor.          §
 8                              §
 9              REPORTER'S CERTIFICATION
10              DEPOSITION OF MARK PATRICK
11                   JUNE 23, 2025
12     I, IDA ALCALA, Certified Shorthand Reporter in and for
   the State of Texas, hereby certify to the following:
13
       That the witness, MARK PATRICK, was duly sworn by the
14 officer and that the transcript of the oral deposition is a
   true record of the testimony given by the witness;
15
       That the deposition transcript was submitted on
16 _____, 2025, to the witness or to the attorney
   for the witness for examination, signature and return to me
17        by _____, 2025;
18 That the amount of time used by each party at the deposition
               is as follows:
19
         Mr. Lang  :  (00:28)
20       Mr. York  :  (00:27)
21     That pursuant to information given to the deposition
   officer at the time said testimony was taken, the following
22 includes all parties of record:
23 Mr. Michael Lang, Attorney for Dugaboy Investment Trust.
   Mr. Sawnie Mcentire, Attorney for Mark Patrick.
24 Mr. Drew York, Attorney for Patrick Daugherty.
25         I further certify that I am neither counsel for,
   related to, nor employed by any of the parties in the action
```

### Page 47

```
 1 in which this proceeding was taken, and further that I am
   not financially or otherwise interested in the outcome of
 2 the action.
           Further certification requirements pursuant to
 3 Rule 203 of the Texas Rules of Civil Procedure will be
   certified to after they have occurred.
 4
 5         Certified to by me this 23rd day of June, 2025.
 6                                 _____
                                   Ida Alcala, CSR#12565
 7                                 CSR Expiration Date: 12/31/26
                                   Firm Registration No. CRF-3
 8                                 1235 North Loop West
                                   Suite 510
 9                                 Houston, Texas 77008
10
11        FURTHER CERTIFICATION UNDER RULE 203 TRCP
12     The original deposition was/was not returned to the
   deposition officer on _____, 2025.
13     If returned, the attached Changes and Signature page
   contains any changes and the reasons therefor;
14     If returned, the original deposition was delivered to
   Mr. Mcentire, Custodial Attorney;
15     That $_____ is the deposition officer's charges
   to the Defendant for preparing the original deposition
16 transcript and any copies of exhibits;
       That the deposition was delivered in accordance with
17 Rule 203.3 and that a copy of this certificate was served on
   all parties shown herein and filed with the Clerk.
18     Certified to by me this _____ day of _____,
   2025.
19                                 _____
                                   Ida Alcala, CSR#12565
20                                 Firm Registration No. CRF-3
                                   1235 North Loop West
21                                 Suite 510
                                   Houston, Texas 77008
22                                 CSR Expiration Date: 12/31/26
23
24
25
```

