# Exhibit 51

92a



Excerpts from He Watches All My Paths
By Stacey Jernigan
Copyright (c) 2019 by Stacey Jernigan

93a

Excerpt 1:
Author's Note
(emphasis added in **bold**)

94a

## AUTHOR'S NOTE

Because I am a sitting United States judge, and I am also married to a police officer, I feel compelled, at the outset, to clarify certain points regarding this novel.

First, the following is a work of fiction. **Some of the characters and events herein are based loosely on actual persons and events,** and some of the places (in my home state of Texas and in various other faraway spots) are certainly very real. Moreover, in my capacity as a judge, I have been the recipient of death threats that ultimately required United States Marshal Service protection, like the main character in this novel. But, the human characters in this novel are absolutely fictional. Judge Avery Lassiter, the main character in this novel, is not me and my own situation with threats did not transpire in the same manner as hers.

Second, one should not assume that any statement or opinion expressed or implied by any characters in this novel are necessarily mine or are somehow a reflection on how I might rule on any particular issue in any case in the future.

Third—and perhaps most importantly—the references herein to certain federal judges, public officials, and lawyers (and families) who have been assassinated in this country in the past are, sadly, true—as are certain facts presented regarding the United States Marshals Service. As mentioned earlier, these honorable souls are among those to whom this novel is dedicated.

The author, Stacey G. C. Jernigan, has served as a federal bankruptcy judge, since the year 2006, in Dallas, Texas. Before that, she practiced law many years at a large international law firm, Haynes and Boone, LLP, based in Texas. **She is married to a police officer and**

95a

**has a son and a daughter who are both young adults now.** She writes and travels extensively in her spare time.

96a

Excerpt 2:
Pages 26–27
(emphasis added in **bold**)

97a

Thanksgiving—while strange and unrelaxed—was relatively uneventful for the most part. But Judge Lassiter's extended family was, without a doubt, somewhat traumatized and had never realized that Avery's job had risks like this attached to it. Officer Max's job—sure. He definitely experienced his share of dangerous encounters (practically daily, serving on his covert undercover special task force). Officer Max's and his colleagues' catch phrase was "every day we play the deadly game." But now Avery's and the kids' lives seemed vulnerable to a possibly dangerous predator. This was unsettling and unexpected. Until recently, Avery had been a corporate attorney representing Fortune 500 companies and other wealthy institutional clients for her entire legal career, at a prestigious international law firm. **Now she presided over civil and bankruptcy matters in her court. She had no criminal law background or docket whatsoever. She handled financial disputes and ruled in money matters—not murder and mayhem. The most exciting legal matter that she ever encountered was a financial super-web that needed unraveling.** Avery's Southern Belle mother, in her pearls and navy, knit St. John suit, and perfectly hair-sprayed bob, kept wringing her hands that Thanksgiving Day and saying, "I thought you didn't handle criminal matters, Honey? Why would somebody want to kill you over money? It's just money! It's only money!" Avery always said that her mother could be incredibly naïve about such things. Strange, considering Avery's mother's appreciation for all things Biblical—and money being "the root of all evil" and such.

98a

Excerpt 3:
Pages 60–62
(emphasis added in **bold**)

99a

The man's thoughts were suddenly distracted when the clerk told the jury panel to listen and turn their attention to the overhead monitors where they would be shown a 15-minute video about the importance of jury service. After that, folks would be told where to go next. The man shifted in his chair uncomfortably and glared up at the nearest screen. Good God. The video featured some of the pillars of the Dallas community, telling him how special jury duty was and how important they all were. He'd go through the motions today. But what a joke.

About an hour later, the clerk finally started calling people for jury panels. The man had a low number, so he suspected his chances were pretty high of being put on a jury panel. He was right. He was in the second group called. He was told to report to a courtroom on the 5th floor. He followed the line of people moving like sheep toward the outrageously slow elevators. He avoided eye contact and speaking with the masses. He didn't want to be there with them.

Finally, about thirty minutes after being forced to sit shoulder-to-shoulder with strangers on the cold, hard pews in the courtroom of the Honorable Wayne T. Barnes, there was some activity. Approximately a half-dozen lawyers came into the front of the courtroom, exiting from the chamber doors of Judge Barnes, and started settling into places at the counsel table. There were dozens of banker boxes piled up around the walls of the courtroom, and lawyers began pulling files and notepads and laptop computers out of them. **It was obvious that one group of lawyers (four of them) represented a deep pocket corporation, and the other two lawyers were likely representing a humbler client. One group**

100a

**of lawyers (all men) wore slicked back perfect hair and expensive dark wool suits with tailor made shirts, silk red ties, cufflinks, and Italian loafers. They each had a polished, fraternal, athletic look. They had similarly well-dressed clients who were sipping Starbucks lattes, constantly checking cell phones, and looking incensed about being in a courtroom. They no doubt had billion-dollar companies that they needed to be running, or a golf game or three-martini lunch at the Dallas Country Club that they would be missing. Or maybe they were hedge fund managers—they had that air of hubris about them that was so characteristic of those Wall Street assholes.** The two other lawyers had bad haircuts and cheap, ill-fitting suits (one wearing Seersucker in January), with brown, smudged loafers, and looked as though they had been up all night. They had an elderly man and three blue collar looking adults in their 30's or 40's sitting next to them. A courtroom deputy suddenly jerked to attention and yelled "all rise; the 199th Judicial District Court of Dallas County, Texas is now in session. The Honorable Wayne T. Barnes presiding." A tall, lanky African American, bald man in a black robe said hello and kindly smiled, telling the jury panel members and lawyers to take a seat.

    The man found the next thirty minutes to be absolutely excruciating. During this phase of jury duty, the lawyers informed the jury panel a bit about the trial for which they were seeking jurors. The lawyer in the Seersucker suit starting things off, standing up and wandering toward the jury panel with a lumbering gait and an exposed large girth. He began speaking in a velvety Baritone voice with a very Southern drawl: "May it please

101a

the court. And ladies and gentlemen. Let me share with you fine citizens of Dallas County some of the salient facts of the case at bar."

"Why did fucking lawyers have to talk that way?" the man thought. "Salient facts. Why can't they just say 'hey, here's what happened."

The lawyer soon shared that the plaintiffs were the surviving widower (age 74) and three adult offspring of Mrs. Dottie Wilson. The plaintiffs alleged that they had suffered damages due to the death of Mrs. Wilson, on August 6, 2015, allegedly caused by Mrs. Wilson's exposure to asbestos dust and fibers when she handled and laundered the allegedly asbestos-laden clothing of her husband, Myron Wilson. Mr. Wilson had been employed for 30 years at a large natural gas field and processing facility in East Texas, known as the Chandler Lake Refinery. In the course of performing his work, Mr. Wilson allegedly was occupationally exposed to large quantities of asbestos-containing insulation products that were utilized and/or handled by, or in the close proximity of, Mr. Wilson. Mr. Wilson's initial job for Chandler was a switcher. When he was a switcher, he worked with steam coils on certain flow lines and each of them was covered with insulation containing asbestos. Also, certain heaters within the work area had insulation in them. Mr. Wilson later became a compressor operator and then a chief operator. When he was a compressor operator, he worked with turbochargers, engines, and compressors that had insulation on them. Mr. Wilson later became a member of a maintenance crew (fixing anything that broke throughout the plant). Mr. Wilson also believed that he was exposed to asbestos at the Chandler Lake Refinery through certain pipe insulation—specifically "hot oil pip-

102a

ing" used in the process of "drying" natural gas—that is, getting propane and pentanes out of the hydrocarbon gas. Mr. Wilson believed, in particular, that he may have been exposed to asbestos dust in the compressor building at the Chandler Lake Refinery where, once a year or so, he would have to pull out, repair, or rip off pipe insulation. Upon completion of Mr. Wilson's daily work, he would leave the worksite and return home with asbestos dust and fibers on his clothing and person. Mrs. Dottie Wilson was allegedly then exposed to the asbestos dust and fibers when she gathered, handled, and laundered Mr. Wilson's dust-laden clothing and ultimately sustained a very serious injury to her body. In 2015, Mrs. Wilson suddenly developed pain and trouble breathing. Shortly thereafter, Mrs. Wilson was diagnosed with the asbestos-related lung cancer known as mesothelioma. Mrs. Wilson's contraction of mesothelioma resulted in immediate disability, physical pain and suffering, and severe mental stress, and she soon passed away, on August 6, 2015.

 The plaintiffs soon filed their petition for survival and wrongful death damages in Dallas County, Texas, where the behemoth Chandler Corporation was headquartered. Chandler Corporation somehow had avoided mass tort litigation from the plaintiffs' bar until the Wilson lawsuit, and they were not going to go down without a fight. If they lost this suit, it would be the tip of the iceberg and they would soon be fighting hundreds or thousands of copycat lawsuits just like this one. They had to stop the floodgates.

103a

Excerpt 4:
Pages 78
(emphasis added in **bold**)

104a

She was dealing with a nasty dispute involving two feuding hedge fund managers. There were several SMU law students in her courtroom observing the court proceedings. The students had wanted to learn something about what hedge funds were and how they made their money. **Avery had been explaining to the students before court about how hedge funds work—describing how they are a less-regulated side of capital finance.** Avery had further lectured to the students that hedge funders raise money from wealthy "accredited" individuals and institutions, such as government pension funds or university endowments, and the hedge funders deploy (that is, invest) that money as they see fit. **These high-flying hedge fund managers essentially suck up money ("fresh powder" they call it) like an iRobot vacuum cleaner from every corner of the universe and invest it, generally earning compensation of 20% of the assets they invest and another 2% of the profits that the assets earn. They make money no matter what—whether their investments are successful or not—because of their 20% cut.** Avery explained, to the law students' surprise, that lawyers, physicians, and investment bankers were now yesteryear's rich, esteemed professions. The law students were probably starting to rethink their decision to attend law school (that had not been Avery's intention). **Avery had been quietly daydreaming about whether one of these hedge fund manager guys (they are mostly men—in a stereotypically competitive "bro culture") could somehow have been connected to her death threats—she was recalling the comment in the second threat letter about the "rich who rule the universe."** Hedge fund managers were certainly worthy of that description. The hedge

105a

fund managers in her courtroom right now were rich alright—they were centimillionaires. They probably thought of anyone making $1–$5 million per year as middle class. Some of these managers were intelligent with impressive academic credentials. **They all were bombastic talkers imbued with an outrageous amount of hubris.** They vacationed in places like Lake Como and Bora Bora and consulted meditation gurus in places like the Bay of Bengal. They sailed catamarans around the world and bought airplanes and race horses like it was candy. **Everything in their life was about winning. In the current lawsuit Avery had before her, the hedgies were accusing each other of being greedy sociopaths.** As Avery's mind drifted deeper toward wondering if perhaps someone in her court involving one of these hedgies had perhaps sent her the death threats, Annalise quietly slipped into the courtroom and handed her a note, telling her that she needed to take a recess. That was never a good sign. Avery had a call holding from one of Mad Max's police department colleagues, saying that Officer Max was at a local hospital emergency room, because he had been injured in a mishap while on duty, but it appeared that he was going to be alright. Avery would probably want to come to the hospital—but he thought Mad Max would be fine.

106a

Excerpt 5:
Pages 165 to 168
(emphasis added in **bold**)

107a

 Avery was packing up a bag in her bedroom at home on an especially nice warm Wednesday in November. She would be driving down to Austin with Ward Scott and the Deputy Marshals midmorning. She and Ward were going to be making a presentation at a bankruptcy law conference in Austin. She and Ward would be speaking to 300 or so lawyers and other professionals in the restructuring and insolvency community regarding oil and gas law issues. "A riveting subject, to be sure," Avery joked.

 The Deputy Marshals hated it when Avery engaged in public speaking, but she didn't really care. She did a lot of it—it is expected of judges. Avery went down to this particular law conference in Austin every November. She had an old law professor from her University of Texas Law School days that she always enjoyed seeing. She also always took the opportunity to visit with some of her former law clerks, interns, and externs who were still in the Austin area or who otherwise traveled to the conference for continuing legal education. And, best of all, she seized the opportunity to stay a couple of days at the Four Seasons Hotel and Spa on Lady Bird Lake and visit some of her old law school haunts on nearby Sixth Street in downtown Austin.

 As Avery packed, she stopped to listen to the latest daily cable news coverage about Karl Lee. There was still no proof of his death, and the legal and family drama engulfing the Lee empire had now reached an absolute crisis level. The quarreling among Lee's wife and his grown children was more rancorous than ever. They had all taken to Twitter on an almost hourly basis, publicly airing their disputes in a very distasteful and embarrassing way. The boards of directors at all of Lee's corporations were bickering as well. **Meanwhile, certain ex-**

108a

**tremely aggressive hedge funds were starting to buy up blocking positions in the shares of his companies, as well as debt all over the capital structure of the Lee empire—an obvious sign that they smelled opportunity. Hedge funds are drawn to distressed companies like sharks are drawn to blood.** The Regent Hotel & Casino was particularly hard hit. Bondholders of the casino were starting to form ad hoc committees consisting of the largest holders of the debt and would soon be conducting "beauty contests"—that is, interviewing legal counsel and financial advisors for a possible out-of-court restructuring and likely Chapter 11 bankruptcy case. It barely made any sense to Avery. Lee disappeared three months ago, and it was as though all of his companies fell off of a financial cliff. How could one man be so indispensable to his companies? Avery guessed it was really true, that companies needed to have succession plans for this type of thing and Lee's companies—as well run as they were—did not have any. Avery wondered how Judges Lupinaci and Murphy would feel if one of their most high profile and successful corporate restructuring cases ended up being a "Chapter 22" (lawyer-lexicon for a second Chapter 11 case; 11 times 2).

    Avery imagined that the lawyers at the conference in Austin would be gossiping nonstop about the possibility of another Regent bankruptcy case and other possible Lee companies that might need to be run through the cleansing bath of bankruptcy. Lawyers in the corporate restructuring field can be like vultures, waiting to swoop onto the carcass of a dying company. A variation of "barbarians at the gate," as some have called it. They are in the misery business for sure. Ward sometimes grumpily called them "the lowest common denominator" in the

109a

lawyer food chain. Avery always chastised him that this was not entirely fair. Actually, the lawyers in the corporate restructuring field tended to be creative problem solvers who were great at cleaning up financial messes. They were the "fixers." They were often brilliant—having chosen an area of law practice that was far more complex than something like tort law or criminal law. One had to be both a financial wizard and legal wizard to be successful in the field. Still, Avery hated how the lawyers in this field loved to gossip about tragedy. The only thing that this group of lawyers loved to do more than gossip about corporate calamity was talk about how busy they were and how many billable hours they racked up in the preceding month. Toxic chest pounding. It was Avery's personal belief that lawyers tended to lie spectacularly to one another about how many hours they billed. Just like the cliché of the fisherman who lies about the size of the fish he catches daily.