# Exhibit C

# EXHIBIT 125

```
 1              UNITED STATES BANKRUPTCY COURT

 2           FOR THE NORTHERN DISTRICT OF TEXAS

 3                     DALLAS DIVISION

 4     --------------------------

 5   In Re:                      Case No. 19-34054-sgj11

 6   HIGHLAND CAPITAL MANAGEMENT,

 7   L.P.,

 8        Debtor.                  Chapter 11

 9   -------------------------X.

10

11

12        REMOTE VIDEO-RECORDED DEPOSITION of

13                   TORREY LITTLETON

14               Sunday, June 22, 2025

15               3:30 p.m. Central time

16

17

18

19

20   Reported Stenographically by:

21   Gail L. Inghram,

22   BA, RDR, CRR, RSA, CA-CSR No. 8635

23

24

25
```

1

2

3

4

5

6

7

8             WHEREUPON, the remote video-recorded

9    deposition of TORREY LITTLETON was held via

10   video-conferencing on Sunday, June 22, 2025,

11   beginning at approximately 3:30 p.m. Central

12   Time, the proceedings being recorded

13   stenographically by Gail Inghram, Registered

14   Diplomate Reporter, Certified Realtime Reporter,

15   Certified Shorthand Reporter, and transcribed

16   under her direction, there being present:

17

18

19

20

21

22

23

24

25

Case 19-34054-sgj11    Doc 4327-2    Filed 08/24/26    Entered 08/24/26 16:00:35    Desc
Exhibit 125    Page 5 of 101

Deposition of Torrey Littleton                                                    In re Highland Capital Management, L.P.

```
 1    A P P E A R A N C E S:

 2    [All parties appeared via remote videoconferencing.]

 3

 4    On behalf of Highland Capital Management, and the Highland

 5    Claimant Trust:

 6        JOHN MORRIS, ESQ.

 7        jmorris@pszjlaw.com

 8        GREGORY V. DEMO, ESQ.

 9        gdemo@pszjlaw.com

10        JEFFREY POMERANTZ, ESQ.

11        jpomerantz@pszjlaw.com

12        HAYLEY WINOGRAD, ESQ.

13        hwinograd@pszjlaw.com

14            PACHULSKI STANG ZIEHL & JONES

15            780 Third Avenue, 34th Floor

16            New York, New York 10017-2024

17            310.277.6910

18

19    On behalf of Highland Litigation Trustee:

20        ROBERT S. LOIGMAN, ESQ.

21        robertloigman@quinnemanuel.com

22            QUINN EMANUEL URQUHART & SULLIVAN, LLP

23            51 Madison Avenue 22nd Floor

24            New York, New York 10010

25            212.849.7615
```

Case 19-34054-sgj11 Doc 4327-2 Filed 08/24/26 Entered 08/24/26 10:00:35 Desc
Exhibit 125 Page 6 of 101

Deposition of Torrey Littleton                                                In re Highland Capital Management, L.P.

```
1    A P P E A R A N C E S (Cont'd):

2

3    On behalf of Defendant Dallas Foundation and Crown Global

4    Life Insurance:

5       MATTTHEW OKIN, ESQ.

6       mokin@okinadams.com

7       DAVID CURRY, ESQ.

8       dcurry@okinadams.com

9          OKIN ADAMS BARTLETT CURRY LLP

10         1113 Vine Street, Suite 240

11         Houston, Texas 77002

12         713.228.4100

13

14   On behalf of Defendant Dugaboy Investment Trust:

15      MICHAEL LANG, ESQ.

16      mlang@cwl.law.com

17         CRAWFORD WISHNEW & LANG PLLC

18         1700 Pacific Avenue, Suite 2390

19         Dallas, Texas 75201

20         214.817.4500

21

22

23

24

25
```

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   On Behalf of Hunter Mountain Investment Trust:

 4        LOUIS M. PHILLIPS, ESQ.

 5        lphillips@kellyhart.com

 6        AMELIA L. HURT, ESQ.

 7        ahurt@kellyhart.com

 8            KELLY HART & HALLMAN LLP

 9            301 Main Street, Suite 1600

10            Baton Rouge, Louisiana 70801

11            225.381.9643

12

13   VIDEOGRAPHER:

14        PAUL D'AMBRA

15

16

17   ALSO PRESENT:

18        NATHAN HALL, Pachulski Stang Ziehl & Jones

19        JAMES SEERY

20        SHAWN RAVER

21        JULIE DIAZ

22

23

24

25
```

In re Highland Capital Management, L.P.

```
1                        - - -

2                    I N D E X

3                        - - -

4

5    EXAMINATION OF:                          PAGE

6    TORREY LITTLETON

7          Attorney Morris ..................8

8

9

10

11   PREVIOUSLY MARKED EXHIBITS REFERENCED:

12   NUMBER                    PAGE

13   Exhibit Highland 1 ..........58

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    DEPOSITION SUPPORT INDEX

 2      INSTRUCTION NOT TO ANSWER:

 3      PAGE    LINE

 4       67       21

 5

 6

 7      REQUEST FOR PRODUCTION OF DOCUMENTS

 8      PAGE    LINE

 9      (None)

10

11

12      STIPULATIONS

13      PAGE    LINE

14      (None)

15

16      QUESTIONS MARKED

17      PAGE    LINE

18      (None)

19

20

21                      REPORTER'S NOTE:

22      QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT NECESSARILY

23      REFLECT A DIRECT QUOTE.

24

25
```

```
 1                      -   -   -

 2              P R O C E E D I N G S

 3                      -   -   -

 4    WHEREUPON,

 5                  TORREY LITTLETON,

 6    being first duly sworn or affirmed to testify to the

 7    truth, the whole truth, and nothing but the truth,

 8    was examined and testified as follows:

 9

10                  EXAMINATION

11    BY ATTORNEY MORRIS:

12         Q.    Actually, I just want to start by

13    apologizing to the witness that I did not tell

14    him that Sunday depositions were casual.  Thanks

15    for dressing up.

16         A.    I appreciate it.  No worries.

17         Q.    And for some of us, Mr. Littleton,

18    every day is Sunday unless we're going to court.

19              It's nice to meet you, sir.

20         A.    Same here.

21         Q.    Can you hear me okay, sir?

22         A.    Yes, I can hear you.

23         Q.    Okay.  Good afternoon.  My name is

24    John Morris.  I'm an attorney at a law firm who

25    represents Highland Capital Management, LP, and
```

1    the Highland Claimant Trust.  And we're here

2    today for your deposition in connection with the

3    Dallas Foundation's objection to a certain

4    proposed settlement agreement between Highland

5    and some affiliates and some entities that are

6    controlled by Mark Patrick.

7            Do you understand that?

8        A.    Yes.

9        Q.    Have you ever been deposed before,

10   sir?

11       A.    No.  This is my first time.

12       Q.    Okay.  It's not -- just relax.  It's

13   a -- it's a formal process, but it's not a

14   complicated process.  I'm going to ask you a

15   series of questions, and it's very important that

16   you let me finish my question before you begin

17   your answer.  Okay?

18       A.    Yes, sir.

19       Q.    It's important that I allow you to

20   finish your answer before I begin my next

21   question; and if I fail to do that, will you let

22   me know?

23       A.    Yes, sir, I will.

24       Q.    Do you understand that your testimony

25   today is being transcribed by Gail, the court

```
 1    reporter?

 2         A.    Yes.

 3         Q.    So everything you and I say is going

 4    to be written down verbatim, or that's the goal

 5    anyway.

 6               Do you understand that?

 7         A.    Yes, I do.

 8         Q.    Okay.  If there's a question that I

 9    ask that you don't understand, will you let me

10    know and I'll try to rephrase it?

11         A.    Yes.

12         Q.    From time to time your lawyer might

13    object to some of my questions.  It will give --

14    it's formal, legal stuff, lawyer stuff.  It gives

15    me a chance to think about whether there's a

16    legal infirmity in my question, and it gives me

17    an opportunity to rephrase it if I want.

18               But unless he directs you not to

19    answer, I'm going to ask you to answer the

20    question anyway.  Okay?

21         A.    Okay.

22         Q.    Just so you're not surprised by the

23    process.

24               If you need a break for any reason at

25    any time, let me know, and I'll try to
```

1   accommodate you as long as a question is not

2   pending.  Okay?

3        A.    Yes.

4        Q.    Are you affiliated with the Dallas

5   Foundation, sir?

6        A.    Yes, I am.

7        Q.    In what capacity?

8        A.    I am the CFO here at the Dallas

9   Foundation.

10        Q.    How long have you been the CFO of the

11   Dallas Foundation?

12        A.    I've been the CFO here since

13   January 1st of 2022, but I've been with the

14   organization for 13 years.

15        Q.    And what are your duties and

16   responsibilities as the CFO?

17        A.    As the CFO, my main duty is to ensure

18   the proper oversight and fiduciary stewardship of

19   our charitable assets.  That means having

20   fiduciary oversight of our investments, our

21   financial reporting, any legal aspects that may

22   impact the foundation in any capacity.

23            I also serve as a board director as

24   relates to some of our supporting organizations,

25   part of our conversation here today with Empower

1    Foundation and the Okada Family Foundation.

2          Q.    Are you a lawyer?

3          A.    No, sir.

4          Q.    Are you familiar with a company called

5    Highland Capital Management, LP?

6          A.    Yes, sir.

7          Q.    Are you aware that that entity filed

8    for bankruptcy a number of years ago?

9          A.    Yes, sir.

10          Q.    Are you aware that that entity used to

11    be controlled by a gentleman named Jim Dondero?

12          A.    Yes, sir.

13          Q.    Okay.  Are you aware that the Dallas

14    Foundation recently filed an objection in the

15    bankruptcy court overseeing Highland's bankruptcy

16    and the objection pertaining to a proposed

17    settlement agreement between Highland and certain

18    affiliates and certain entities that are

19    controlled by Mr. Patrick?

20          A.    Yes, sir.

21          Q.    Did you review that objection before

22    it was filed?

23          A.    Yeah, I read through the objections.

24    But for the most part, I rely on our legal team

25    to give us a summary and kind of walk us through

1    some of the pertinent details.

2         Q.    Are you familiar with the entities

3    that Mr. Patrick signed that agreement on behalf

4    of?

5         A.    Yeah; I believe it's the Hunter

6    Mountain Investment Trust.

7         Q.    Right.  And you're aware that in

8    addition to the Hunter Mountain -- can we refer

9    to Hunter Mountain Investment Trust as "HMIT"

10   today?

11        A.    Yes.

12        Q.    And are you aware that certain

13   affiliates of HMIT are also party to the

14   settlement agreement that is the subject of this

15   proceeding?

16        A.    I am.

17        Q.    And can we refer to HMIT and those

18   affiliates that are party to the agreement as

19   "the HMIT entities"?

20        A.    Yes.

21        Q.    Okay.  It's going to make our day a

22   little bit quicker and a little bit easier.

23        A.    Sure.

24        Q.    Do you know who approved the filing of

25   the objection on behalf of the Dallas Foundation?

1      A.    Yeah, so it was approved by President

2   Julie Diaz.

3      Q.    Anybody else?

4      A.    Then our legal team helped us kind of

5   put together the objection.

6      Q.    Do you know, have you ever met

7   Jim Dondero?

8      A.    I have never met him personally, no.

9      Q.    Have you ever spoken with him?

10     A.    I think I was on one conference call

11   with him one time that I can recall.

12     Q.    Okay.  Do you know if he had any role

13   in the preparation of the Dallas Foundation's

14   objection?

15     A.    I didn't have any exposure with

16   Mr. Dondero.  So, no, I do not know.

17     Q.    Do you know where the idea of filing

18   the objection originated?  Like, whose idea was

19   it?

20     A.    Yes -- yes.

21     Q.    Whose idea was it to file the

22   objection?

23     A.    Well, it's a combination of the

24   Empower and Okada Foundation boards.  Just

25   looking at some of the investment activity that

1    transpired through the first quarter, we had some

2    concerns about the activity.  And a portion of

3    that activity was the sale of Hunter Mountain

4    interests through the Rand PE Fund I that

5    ultimately rolled up to the Atlas, LP Fund, which

6    impacted the economic value of the portfolio

7    that's held by Crown Global.

8         Q.    That's why the -- let's unpack that a

9    little bit.  I asked where did the -- who came up

10   with the idea of objecting?  Let's take that

11   first.

12        A.    Sure, sure.  Yeah, I think it was the

13   board of the foundations, so primarily Julie Diaz

14   and myself just kind of thinking through the

15   activity that we became aware of.

16        Q.    And Mr. Dondero is a member of the

17   board; right?

18        A.    That's correct.

19        Q.    And it's just the three of you;

20   correct?

21        A.    That's correct.

22              ATTORNEY OKIN:  Object to form.

23   BY ATTORNEY MORRIS:

24        Q.    The Dallas Foundation's objection

25   refers to certain litigation pending in the

1     Cayman Islands.

2              Are you aware of that?

3       A.    Yes.

4       Q.    Are you aware that Mr. Dondero is

5     funding that litigation on behalf of the

6     supporting organizations that commenced it?

7       A.    Yes, sir.

8       Q.    And you're aware that he's funding

9     this litigation on behalf of the Dallas

10    Foundation; correct?

11      A.    That's correct.

12      Q.    Do you know why Empower Dallas

13    Foundation and the Okada Family Foundation didn't

14    just file the objection in their own name rather

15    than having the Dallas Foundation do it for them?

16              ATTORNEY OKIN:  Object to form.

17      A.    I think we looked it as the Dallas

18    Foundation is the supporting organization of the

19    two entities.  And we felt that the Dallas

20    Foundation and our president, Julie Diaz, we just

21    decided to file it under the foundation based on

22    a recommendation from our legal counsel.

23    BY ATTORNEY MORRIS:

24      Q.    Are you aware that the objection is

25    also filed on behalf of Crown Global Life

 1    Insurance, Limited?

 2         A.    Yes, sir.

 3         Q.    Okay.  And what is Crown Global Life

 4    Insurance, Limited?

 5         A.    The Crown Global Life Insurance,

 6    Limited, is an issuer of insurance annuities.

 7         Q.    What -- what role does it play with

 8    respect to the Dallas Foundation?

 9         A.    Yeah, so it plays a role more so with

10    the Empower Dallas and Okada Family Foundation.

11    They each hold policies with Crown Global through

12    the insurance annuities.  So the legal contract

13    is between Empower Dallas and Okada Family

14    Foundation with Crown Global.

15         Q.    And -- and is the withdrawn.

16               Does the annuity pay dividends or make

17    other distributions?

18         A.    Yeah, it makes distributions to the

19    fund as fixed payments through the contract, yes,

20    sir.

21         Q.    And do those fixed payments go

22    directly from Crown Global to Empower Dallas and

23    the Okada Family Foundation respectively?

24         A.    That's correct.

25         Q.    And do you know what the annuities are

1   invested in?

2        A.    I don't know the actual underlying

3   investments.  I know the annuities have within

4   them the Atlas IDF, LP Fund, and that they --

5   what ultimately rolls up is the Rand Fund I, the

6   Beacon Mountain and the Hunter Mountain, HMIT,

7   ultimately rolls up.

8        Q.    And is -- are the annuities the sole

9   source of Empower Dallas and the Okada Family

10  Foundation's income, to the best of your

11  knowledge?

12       A.    That's correct, yes, sir.

13       Q.    And does a portion of that income then

14  flow up to the Dallas Foundation?

15       A.    Well, the income doesn't flow to the

16  Dallas Foundation.  What does happen is, as

17  Empower and the Okada Family Foundations make

18  recommendations, those recommendations flow to

19  the Dallas Foundation, to the corresponding

20  donor-advised fund; and then ultimately those

21  donor-advised funds make the grants out to the

22  community.

23            We typically don't get any of the

24  income through the Crown Global vehicle -- the

25  Dallas Foundation doesn't get any income through

 1    the Crown Global vehicle.

 2          Q.    Is there anybody in the room with you

 3    right now?

 4          A.    No, sir.

 5          Q.    Do you have any device on other than

 6    the computer that we're sharing right now?

 7          A.    No.  I have a fan on.  Is it causing

 8    feedback?

 9          Q.    No, but I have a fan on too.  Maybe

10    it's --

11          A.    Okay.  Sorry.  Yeah.  Sorry about

12    that.

13          Q.    Do you have any notes or anything that

14    you're reading from or that you're looking at?

15          A.    No, sir, no.

16          Q.    Okay.  So there are these annuities.

17    How did those annuities get funded?  Do you know?

18          A.    Yes.  So back in 2015, I believe, in

19    November of 2015, we funded the annuities with

20    about $29 million.  So contributions from -- I

21    think it was about $22 million from the --

22    Mr. Dondero, and then I believe another $7

23    million from Mr. Okada, which ultimately were

24    sent over to Crown Global to invest in the

25    annuities.

1      Q.     And under the annuities, they pay

2    fixed amounts to both supporting organizations?

3      A.     Yes, sir, that's correct.

4      Q.     And is there any market risk that the

5    supporting organizations have, or is this a -- is

6    it your understanding that it's a contractual

7    obligation of Crown Global to pay that fixed

8    amount for some duration?

9      A.     Yeah, I believe Crown Global takes the

10   risk.  They have to pay a fixed amount through

11   the obligation.  I believe they take an M&E

12   expense, which compensates for the risk.

13     Q.     What's that last piece?  I missed --

14     A.     The M&E expenses, it's part of

15   their -- we receive their statements quarterly.

16   They have an administrative fee that they take,

17   and then they have what they call an M&E expense,

18   which it was explained a while back that's a

19   percentage that they take to compensate for the

20   risk associated with insurance annuities.

21     Q.     And is the annuity tied to a -- is it

22   a fixed period of time, or is it tied to a

23   particular event?

24     A.     That, I cannot answer.

25     Q.     Okay.  But is it fair to say that the

1  supporting organizations paid money to Crown

2  Royal -- Crown Global -- it's getting late.

3  Sorry.

4          ATTORNEY OKIN:  Sounds good.

5          THE WITNESS:  No.  Sounds good, yeah.

6  BY ATTORNEY MORRIS:

7      Q.    Let me restate the question.

8            Is it your understanding that the

9  supporting organizations paid money to

10  Crown Global; and in exchange, they got annuities

11  which produced a fixed stream of income for a

12  period of time in the future?  Is that right?

13     A.    That's correct.

14     Q.    Okay.  And that the assets -- the

15  segregated accounts themselves are owned by

16  Crown Global; correct?

17     A.    I believe the Atlas IDF Fund, I

18  believe Crown Global has partnership interests in

19  that particular fund.  I don't think they have

20  any ownership of the other underlying segregated

21  accounts.  Not that I'm aware of.

22     Q.    Do the segregated accounts hold

23  anything other than the annuities?  Withdrawn.

24            Do the segregated accounts hold the

25  annuities?

Deposition of Torrey Littleton                                     In re Highland Capital Management, L.P.

1            A.     The segregated accounts, not to my

2     knowledge do they hold the annuities.  What I

3     believe hold the annuities is the Atlas IDF, LP

4     Fund holds the annuities.

5            Q.     But Crown Global is the one who takes

6     the risk with respect to the investments in the

7     annuities; correct?

8            A.     That's correct.

9            Q.     And do they take the risk as well with

10    respect to the value of Atlas, for example?

11           A.     Yes, they do take the risk with the

12    value of Atlas.

13           Q.     So whether Atlas is worth a dollar or

14    a billion dollars, Crown Global has the same

15    obligation to the supporting organizations to pay

16    the fixed stream of income that it agreed to when

17    it sold the annuity to them; correct?

18           A.     That's my understanding.

19           Q.     Okay.  So that regardless of the value

20    of the segregated accounts, the supporting

21    organizations are guaranteed to receive the exact

22    same amount of money over time as long as

23    Crown Global complies with its obligations in the

24    annuity contract; correct?

25           A.     Yes, sir.

1      Q.    Okay.  Do you know if the Dallas

2    Foundation ever appeared in the Highland

3    bankruptcy before it filed this objection?

4      A.    No, sir, I don't believe we did.

5      Q.    And as the CFO, is it fair to say that

6    you know that the Dallas Foundation never filed a

7    claim in the Highland bankruptcy?

8      A.    Yes, sir.

9      Q.    And do you also know that the Dallas

10   Foundation does not have an interest in the

11   Highland Claimant Trust that was formed as part

12   of the plan of reorganization?

13           ATTORNEY OKIN:  Object to form.

14   BY ATTORNEY MORRIS:

15     Q.    Withdrawn.  Let me lay a little bit of

16   foundation.

17           Are you familiar with an entity called

18   the Highland Claimant Trust?

19     A.    Yes.

20     Q.    Okay.  Does the Dallas Foundation

21   have, directly or indirectly, any interest in the

22   Highland Claimant Trust?

23           ATTORNEY OKIN:  Object to form.

24     A.    What I could say is that it depends on

25   the settlement with relationship with Hunter

 1   Mountain and indirectly with the roll-up that the

 2   beneficial interest to Empower and Okada

 3   Foundation and how that settlement impacts the

 4   economic interest there.  I think that's where

 5   the Dallas Foundation could indirectly have some

 6   interest.  While we're not the sole ownership of

 7   the Crown Global policy, we do have a

 8   relationship with Empower Dallas and the Okada

 9   supporting organizations.

10   BY ATTORNEY MORRIS:

11       Q.    Well, you don't have an interest in

12   what, did you say?  The annuities?

13       A.    We do have an interest in the annuity

14   contracts.

15       Q.    The Dallas Foundation didn't fund the

16   annuity contracts; correct?

17       A.    No, we did not fund them.  But --

18       Q.    And the Dallas Foundation doesn't own

19   the annuity contracts; correct?

20       A.    No, we don't own the annuity

21   contracts.  But what we do is we do have a

22   fiduciary responsibility for any relationship

23   that they financially to protect, preserve and to

24   grow these charitable assets.  And, ultimately,

25   the supporting organizations, they roll up into

1    our financial statements.

2         Q.    Is it your understanding that

3    Crown Global has a duty to distribute --

4    withdrawn.

5              Is it your understanding that

6    Crown Global has a duty to make distributions to

7    the Dallas Foundation?

8         A.    No, sir.  They make distributions to

9    Empower and Okada supporting organizations.

10        Q.    Do you have any reason to believe that

11   Crown Global owes any duty at all to the Dallas

12   Foundation with respect to the annuities?

13             ATTORNEY OKIN:  Object to form.

14        A.    There's no direct responsibility from

15   Crown Global to the Dallas Foundation.  But

16   because of our relationship with Okada and

17   Empower, there is an indirect relationship there,

18   that we have an interest.

19   BY ATTORNEY MORRIS:

20        Q.    And let's go beyond the annuities.

21             Do you know whether Crown Global has

22   any direct duty to the Dallas Foundation for any

23   reason?

24             ATTORNEY OKIN:  Object to form.

25        A.    I'm going to say not directly.

 1    BY ATTORNEY MORRIS:

 2         Q.    Okay.   Thank you.

 3               Does the Dallas Foundation carry on

 4    its balance sheet any interest in the Highland

 5    Claimant Trust?

 6         A.    No, sir.

 7         Q.    Do you know if the Dallas Foundation

 8    has any contractual relationship with Highland

 9    Capital Management or the Highland Claimant

10    Trust?

11         A.    No, sir, we don't.

12         Q.    Do you have any reason to believe

13    today that Highland Capital Management or the

14    Highland Claimant Trust owes any duties or

15    obligations to the Dallas Foundation?

16               ATTORNEY OKIN:   Object to form.

17         A.    I wouldn't say there was any duties or

18    obligations to the Dallas Foundation.   But I do

19    think we have, again, some interest in the

20    settlements and how the funds originally were

21    supposed to flow up to Empower and Okada.

22               Empower and Okada, they roll up to the

23    Dallas Foundation's financial statements.   So I

24    think there is some indirect interest in Highland

25    Capital Claimant Trust and the decisions that are

```
 1   being made as it relates to the settlement.

 2   BY ATTORNEY MORRIS:

 3        Q.     I'm going to respectfully move to

 4   strike and ask you to listen carefully to my

 5   question --

 6        A.     Yes, sir.

 7        Q.     -- and this will go very smoothly.

 8               Do you have any reason to believe that

 9   Highland Capital Management or the Highland

10   Claimant Trust owes any duties or obligations to

11   the Dallas Foundation?

12               ATTORNEY OKIN:  Objection; form.

13               THE WITNESS:  My apologies.

14               ATTORNEY OKIN:  Go ahead.

15        A.     No, sir.

16   BY ATTORNEY MORRIS:

17        Q.     Are you aware that if the settlement

18   between the Highland entities and the HMIT

19   entities is approved, that the HMIT entities will

20   receive cash and other assets as set forth in the

21   agreement?

22        A.     Yes.

23        Q.     Do you have any reason to believe that

24   the Dallas Foundation has a right to receive any

25   of the cash or other assets that would be
```

Deposition of Torrey Littleton                                           In re Highland Capital Management, L.P.

1    delivered to HMIT if the settlement is approved?

2                ATTORNEY OKIN:   Object to form.

3        A.    Like I say based on the facts is that

4    the interest in HMIT were sold for a million

5    dollars.  So I believe the current structure as

6    of now, the two supporting organizations would

7    not receive any settlements.  They would not have

8    any economic benefit of the settlement payout.

9                Based on the historical structure,

10   yes, I would have said yes.  We had interest in

11   that settlement that would ultimately impact the

12   fair market values for Empower and Okada.

13   BY ATTORNEY MORRIS:

14       Q.    Are you familiar with the fair market

15   value of Empower and Okada?

16       A.    So the fair market value is through

17   the insurance annuity.  So based on the --

18       Q.    I'm sorry.  Through the insurance

19   what?

20       A.    It's the insurance through

21   Crown Global, so they produce a fund statement on

22   a quarterly basis.  We use that to state the fair

23   market value.

24       Q.    And is the fair market value based on

25   anything other than the projected future income

1    stream that you described earlier?

2         A.    I believe there is impact related to

3    some of the sub accounts.  One thing we do know

4    is in February of 2025, we saw the fair market

5    value increased by 918,000 due to the sale of

6    Rand's interest in Hunter Mountain.  So we do

7    believe there are other assets that impact the

8    fair market value.

9         Q.    But that's the fair market value of

10   the annuities; is that right?

11        A.    The sale of the Rand -- the interest

12   in the Hunter Mountain, the Rand?

13        Q.    Yeah, yeah.  Is what you're describing

14   the fair market value of the annuities that flows

15   up to the supporting organizations?

16        A.    I believe we have a couple of

17   investments that are within the Crown Global

18   structure.  I think you have insurance annuities,

19   and then you have other assets that are also

20   within that structure through the Atlas platform.

21   The way I understand it, the Atlas platform

22   allows for other alternative investments to be

23   wrapped within the insurance annuities.

24        Q.    Did the supporting organizations have

25   an ownership interest in Crown Global?

1    A.    Yeah.  They hold the policy, right?

2  The supporting organizations hold the policy

3  through Crown Global, so absolutely.

4    Q.    And the policy that you're referring

5  to are the annuity policies?

6    A.    The annuity policies, that's correct.

7    Q.    And, again, just for clarity, it does

8  not matter to the supporting organization what

9  the value of the assets that are held by

10 Crown Global is; what matters is the agreed-upon

11 future flow of distributions; fair?

12    A.    That's fair, yes, sir.  Yes.

13    Q.    Are you familiar at all with the

14 structure of the Highland Claimant Trust?

15    A.    Not with the Highland Claimant Trust,

16 no.  I'm familiar with the structure of the --

17 the Rand structure here as relates to the Empower

18 Dallas, and then I'm familiar with the DAF Holdco

19 structure.

20    Q.    Are you familiar with the HMIT

21 structure?

22    A.    I'm familiar -- I know how the

23 structure flows up to the Atlas IDF Fund.

24    Q.    Have you reviewed any of the governing

25 documents for HMIT or any of the Rand funds or

```
 1   any of the Atlas funds?  Have you ever reviewed

 2   the governing documents?

 3        A.    At a high level, I took a glance at

 4   the governing documents to get an understanding

 5   of the flow.  I've seen organizational flow

 6   charts to kind of give me an idea of who owns

 7   what and how does it roll up ultimately to

 8   Crown Global.

 9        Q.    Do you have any knowledge as to what,

10   if any, role Crown Global played in the Highland

11   bankruptcy?

12        A.    No, sir.

13        Q.    So we've talked about the Rand and the

14   Atlas entities and Hunter Mountain, and we've

15   referred to those that signed on to the agreement

16   as "the HMIT entities"; right?

17        A.    Yes.

18        Q.    Do you know why each of the HMIT

19   entities was created?  Do you know what purpose

20   they served?

21        A.    You know, I know that they create some

22   vehicles that allow some different types of

23   investments.  I would imagine -- I don't know why

24   the structures were created the way they were.

25   We don't have that kind of insight.  That's just
```

```
 1    an assumption.

 2          Q.    Can you identify any assets that HMIT

 3    owns today?

 4          A.    No, sir.

 5          Q.    Were you ever able to identify any

 6    assets that HMIT owned?

 7          A.    No.

 8          Q.    In your duties as the CFO for the

 9    Dallas Foundation, did you ever make an inquiry

10    as to what assets HMIT owned?

11          A.    We made an inquiry to the Atlas

12    structure unsuccessfully over the years because

13    they were able to get to the underlying assets to

14    have a clear understanding of the holdings; so,

15    no, I couldn't tell you that I was successful in

16    understanding the underlying assets.

17          Q.    So you've been the CFO for three years

18    now --

19          A.    Yes, sir.

20          Q.    -- and a half?

21                But you were with the organization for

22    about six; right?

23          A.    For 13, 13 total.

24          Q.    Thank you.

25                So you've been with the organization
```

 1    long before Mark Patrick ever had any role with

 2    respect to the HMIT entities; right?

 3         A.    Yes, sir.

 4         Q.    Okay.  At any time that you've been

 5    with the Dallas Foundation, were you ever

 6    informed as to the assets that were held by HMIT?

 7         A.    No, sir.

 8         Q.    No; right?

 9         A.    That's correct -- no.

10         Q.    Do you know today what assets are held

11    by any of the HMIT entities?

12         A.    No, sir.

13         Q.    At any time during your tenure at the

14    Dallas Foundation, were you ever informed as to

15    what the assets were that any of the HMIT

16    entities owned?

17         A.    No, sir.

18         Q.    Okay.  And did you ever think that, as

19    part of your duties and responsibilities working

20    for the Dallas Foundation, that you needed to

21    know that information?

22         A.    Absolutely.  Yeah, we inquired on

23    multiple occasions to get our auditors

24    comfortable with the investment vehicle.

25         Q.    And you were never able to get that

1    information, is that right?

2         A.    That's right.

3         Q.    And that was true for the entire time

4    of your tenure at the Dallas Foundation?

5         A.    Yes, sir.

6         Q.    Okay.  In the course of your duties,

7    did you ever communicate with anybody who was

8    acting on behalf of HMIT?

9         A.    I had some communications with

10   Mark Patrick, but I don't think he was over HMIT

11   at the time.  I don't know.  So it's kind of hard

12   to understand the transfer of a trustee or

13   ownership or oversight those accounts had.

14           So at a high level, he was probably

15   the person I tried to communicate with if we had

16   any questions around the valuations.

17        Q.    But it wasn't necessarily because he

18   was wearing the HMIT hat; it was because he wore

19   a lot of hats.  Is that fair?

20        A.    That's fair, yes.

21        Q.    During the course of your tenure at

22   the Dallas Foundation, did you ever once say to

23   yourself, I need to speak to the guy who's the

24   head of HMIT?

25        A.    No, we've never said that.

1    Q.    Okay.  Did you ever say to yourself at

2    any time during your tenure at the Dallas

3    Foundation, I need to speak to the head of any of

4    the HMIT entities?

5    A.    No, sir.

6    Q.    Do you know if the Dallas Foundation

7    ever received anything of value from HMIT

8    directly?

9    A.    I can't say directly, no.  I just

10   assumed it had rolled up.  It was -- we had some

11   value through the structure, I would imagine.

12   Q.    Do you know if the Dallas Foundation

13   ever received anything of value directly from any

14   of the HMIT entities?

15   A.    No, sir.

16   Q.    Do you know if any of the --

17   withdrawn.

18         Do you have any reason to believe that

19   any of the HMIT entities owes a duty or

20   obligation to the Dallas Foundation today?

21         ATTORNEY OKIN:  Object to the form.

22   A.    I believe that there's going to be

23   impact to our economic interest in Crown Global.

24   I do believe there's a fiduciary obligation to

25   the Dallas Foundation to have communication if

 1    there are investment decisions that are being

 2    made that's going to impact that economic

 3    interest, positive or negatively.

 4    BY ATTORNEY MORRIS:

 5        Q.    Sorry.  I may not have heard it

 6    clearly.

 7            But do you believe that Highland

 8    Capital Management or the Highland Claimant Trust

 9    owes a fiduciary duty to the Dallas Foundation?

10        A.    Sorry.  No.  No.  No.  I thought you

11    said HMIT.  Sorry.

12        Q.    You know what?  I probably did.  Let's

13    do that.

14        A.    Yeah.

15        Q.    Did you believe -- do you believe that

16    any of the HMIT entities owes a fiduciary duty to

17    the Dallas Foundation?

18            ATTORNEY OKIN:  Object to form.

19        A.    Again, I'll just restate what I said.

20            If it's starting to impact the

21    economic interest for the value of the

22    Crown Global policies, I do think there's a

23    fiduciary obligation to have a conversation to

24    inform of any investment decisions that are being

25    made that could have significant impact to that

 1    value.

 2    BY ATTORNEY MORRIS:

 3        Q.    Okay.   Are you aware that HMIT filed a

 4    motion in the bankruptcy court a couple of years

 5    ago seeking permission to file a lawsuit against

 6    Highland Capital Management and others?

 7        A.    Yes, sir, I am aware of that.

 8        Q.    You are.

 9              Did HMIT seek the Dallas Foundation's

10    approval before filing that motion?

11        A.    No, sir, not that I'm aware of.

12        Q.    Do you believe that HMIT was required

13    to seek the Dallas Foundation's approval before

14    filing that lawsuit?

15        A.    Again, I think it -- I don't know if

16    "seek approval" is the right language I would

17    use.   But I do think informing the Dallas

18    Foundation, that this could impact the economic

19    interests of Empower and Okada Foundation.

20        Q.    And nobody ever told you that; is that

21    right?

22        A.    That's correct.

23        Q.    How did you learn about the lawsuit

24    that HMIT commenced against Highland and others a

25    couple of years ago?

 1        A.    Well, as we kind of got -- one, it was

 2    kind of some news that was -- that came about

 3    through some other research.  Currently, as of

 4    today, we have our legal team working, pulling

 5    together facts so they kind of reiterated some of

 6    the facts that could impact the overall case.  So

 7    I will just lean on our legal team to kind of

 8    bring us up to speed on this fact-finding.

 9        Q.    Do you know who authorized the filing

10    of that motion?

11        A.    From HMIT?

12            ATTORNEY OKIN:  Object to form.  Which

13    motion do you mean, John?

14            ATTORNEY MORRIS:  The same one we're

15    talking about, the motion for permission from the

16    bankruptcy court to sue Highland and other

17    parties.

18            ATTORNEY OKIN:  The one he told you he

19    didn't even know about what was filed.

20            ATTORNEY MORRIS:  Hey, Matt, he did

21    tell me.  He actually did tell me --

22            ATTORNEY OKIN:  He told you he heard

23    about it after, but go ahead.

24    BY ATTORNEY MORRIS:

25        Q.    So...

1        A.    Yes, sir, I believe it was

2    Mr. Mark Patrick that filed them.

3        Q.    That authorized the filing of that

4    lawsuit?

5        A.    Yes, sir.

6        Q.    Do you think he did anything wrong in

7    doing that?

8              ATTORNEY OKIN:  Object to form.

9        A.    What I can say is that it has

10   impact -- it can potentially have some impact on

11   the -- it's convoluted.  I can't say he did

12   anything wrong with filing that motion.  But if

13   it's going to impact the Empower and Okada

14   Foundation, which is why I'm here today, is to

15   represent those supporting orgs, you know, I

16   think we have interest in the decisions that he's

17   making, right?

18   BY ATTORNEY MORRIS:

19       Q.    Okay.  But we can agree that he never

20   sought nor obtained the Dallas Foundation's

21   approval to file that motion; correct?

22       A.    Yes, sir, we can agree.

23       Q.    And can we also agree that you only

24   heard about that lawsuit after it was commenced

25   or after the motion was filed?

 1        A.    Yes, sir.

 2        Q.    Okay.  Have you read the settlement

 3   agreement that is the subject of the Dallas

 4   Foundation's objection?

 5        A.    Yeah, I've got some high-level facts

 6   related to the settlement agreement.  We had a

 7   legal team kind of -- again, we leaned on them to

 8   kind of pull out some of the important facts that

 9   could impact the Empower and Okada Foundation.

10        Q.    Do you know generally what HMIT is

11   proposing to give and receive under the

12   settlement agreement?

13        A.    Yes, sir, generally, I do know.  I

14   believe they're trying to release liability on

15   some of the claims.  I think that's part of the

16   settlement agreement.  I'm also aware that there

17   are future payouts that will be made to Hunter

18   Mountain.

19        Q.    And are you aware of other assets that

20   Hunter Mountain might receive if the settlement

21   agreement is pursued?

22        A.    Yes.

23        Q.    And what other assets are you aware

24   of?

25        A.    I know there's a large sum of assets,

1    you know, in the -- 300 million, I think that's

2    the amount of it that I don't recall.  But I

3    couldn't go verbatim.

4        Q.    It's not your understanding that

5    there's $300 million worth of anything that's

6    related to that agreement --

7        A.    Oh, yeah, yeah, yeah.  But, yeah, it's

8    not -- it's not there -- I was thinking about

9    there was some data around -- I apologize if I'm

10    getting my facts confused.

11        Q.    That's okay.

12        A.    Yeah, actually, there's a -- as it

13    relates to the Empower and Okada, I believe there

14    was an impact of roughly 23-plus million dollars,

15    potentially.

16        Q.    But that has nothing to do with

17    Highland; correct?

18        A.    That's correct.

19        Q.    And it has nothing to do with this

20    settlement agreement; correct?

21        ATTORNEY OKIN:  Object to form.

22        A.    Well, I think if it has impact,

23    ultimately, again, to Empower and Okada, again,

24    we sold our interest in Highland Capital

25    Management -- or Hunter Mountain for a million

1    dollars.  So based on what we know is if there is

2    a payout of $23 million, Empower and Okada, we

3    won't benefit from it.

4    BY ATTORNEY MORRIS:

5        Q.    So is it fair to say that the Dallas

6    Foundation's concern is not with the terms of the

7    settlement agreement itself but with the

8    disposition of the assets that Hunter Mountain

9    will receive if the settlement agreement is

10   approved?

11            ATTORNEY OKIN:  Object to form.

12       A.    Well, the only thing I would say about

13   that is we have individuals making some

14   questionable decisions and, you know, with

15   charitable assets.  I believe Highland Dallas has

16   entered into a settlement agreement with this

17   individual.  I think that's -- that's what I

18   could say is somewhat problematic.

19   BY ATTORNEY MORRIS:

20       Q.    What's problematic?

21       A.    Oh, we have an individual that's

22   shifting around charitable assets out of the

23   responsibility of Empower and Okada; right?  And,

24   you know, Highland Capital has entered into an

25   agreement with this individual.  I think we all

 1  understand the facts that are at play.

 2         Q.    Do you have any reason to believe that

 3  the settlement agreement was not the product of

 4  an arm's-length, good-faith negotiation between

 5  adverse parties?

 6              ATTORNEY OKIN:   Object to form.

 7         A.    I can't say anything.  Yeah, I wasn't

 8  a part of those conversations, so I can't opine.

 9  BY ATTORNEY MORRIS:

10         Q.    And you don't have any facts that

11  would suggest that the settlement agreement is

12  anything other than the product of good-faith,

13  arm's-length negotiations; correct?

14              ATTORNEY OKIN:   Object to the form.

15         A.    I wasn't part of the conversation, so

16  I can't opine.  But what I can state is that I

17  believe there's significant impact to the Okada

18  and Empower Dallas Foundation.

19  BY ATTORNEY MORRIS:

20         Q.    And that's as -- not as a result of

21  the settlement agreement, but as a result of what

22  the Dallas Foundation contends was the

23  restructuring that Mr. Patrick engaged in earlier

24  this year; fair?

25              ATTORNEY OKIN:   Object to form.

 1        A.    For the most part, I'd say that's

 2   fair.

 3   BY ATTORNEY MORRIS:

 4        Q.    Okay.  Do you have any concerns that

 5   the settlement agreement is not the product of

 6   arm's-length, good-faith negotiations?

 7        A.    I'd have to restate that, again, we

 8   have an individual who's moving around charitable

 9   assets.  And, again, I think we understand the

10   facts of restructuring, and the agreement was

11   made to settle with this individual.  So from our

12   standpoint, again, it impacts the two supporting

13   organizations that we are here representing.

14            So I think there's two things at play.

15   The negotiations that you had with this

16   individual, I can't opine whether or not that it

17   wasn't done in good faith; but the impact of that

18   settlement agreement does impact Okada and

19   Empower Dallas.

20        Q.    And that's because as a result of

21   Mr. Patrick's restructuring, the Dallas

22   Foundation is concerned that it may not have --

23   it may not receive as much as it would have

24   indirectly had the restructuring not taken place;

25   fair?

1        A.      That's fair.

2                ATTORNEY OKIN:   Object to form.

3    BY ATTORNEY MORRIS:

4        Q.      Okay.  Do you have any reason to

5    believe that the proposed settlement is unfair to

6    Highland Capital Management, LP?

7        A.      Yeah, I don't have any reason to

8    opine, no.

9        Q.      Okay.  Do you have any reason to opine

10   as to whether or not the proposed settlement

11   agreement is unfair to the Highland Claimant

12   Trust?

13       A.      No, sir.

14       Q.      Do you have any reason to opine that

15   the proposed settlement agreement is unfair to

16   the Highland Litigation Subtrust?

17       A.      No, sir.

18       Q.      Do you have any reason to opine that

19   the settlement agreement is unfair to Hunter

20   Mountain Investment Trust?

21       A.      No, sir.  We can make good-faith

22   settlements, given that there are facts that

23   certain organizations or entities could be

24   impacted, given what we've already talked about,

25   what Mark Patrick has done with the

```
 1   restructuring.

 2        Q.    So two things can be true, at the same

 3   time --

 4        A.    Two things can be true.

 5        Q.    Two things can be true at the same

 6   time; right, sir?  The settlement agreement can

 7   be a fair and reasonable settlement that's the

 8   product of arm's-length and good-faith

 9   negotiations; while at the same time, the Dallas

10   Foundation can still have concerns over the

11   disposition of the assets that Hunter Mountain

12   receives as a result of this restructuring; fair?

13        A.    I think for the most part, that's

14   fair.  The only caveat I would add to that is if

15   I'm negotiating with an individual that we know

16   is causing harm to other organizations, I just

17   say maybe we don't care about that.  But from our

18   standpoint, we do.

19        Q.    Do you have any reason to believe that

20   the proposed settlement is unfair to any of the

21   HMIT entities?

22        A.    No, sir.

23        Q.    Are you aware that under the

24   settlement agreement, the HMIT entities are

25   releasing the Highland parties from any liability
```

Case 19-34054-sgj11  Doc 4327-2  Filed 08/24/26  Entered 08/24/26 16:00:35  Desc
Exhibit 25  Page 49 of 100

Deposition of Torrey Littleton                                        In re Highland Capital Management, L.P.

 1   other than that which arises out of the

 2   settlement agreement itself?

 3        A.    Yeah.  I believe that was a part of

 4   the settlement.  That's why we have the

 5   settlement.  Yeah.

 6        Q.    Do you have any concern about the

 7   scope of the releases that the HMIT entities are

 8   providing?

 9             ATTORNEY OKIN:  Object to form.

10   BY ATTORNEY MORRIS:

11        Q.    You can answer, sir.

12        A.    No, sir; only as it impacts, how does

13   it impact or potentially can impact lost income

14   for Okada and Empower.

15        Q.    Do you have any reason to believe that

16   the granting of the releases in the proposed

17   settlement agreement by the HMIT entities will

18   have any impact at all on the supporting

19   organizations?

20             ATTORNEY OKIN:  Object to form.

21        A.    Again, I think there's an economic

22   interest in what does the settlement -- the loss

23   of income streams to Empower and Okada, which we

24   believe is true.

25   ///

 1   BY ATTORNEY MORRIS:

 2        Q.    I'm just focused on the releases now.

 3        A.    Sure.

 4        Q.    Do you have any reason to believe that

 5   the releases that the HMIT parties are granting

 6   under the proposed settlement will have any

 7   economic impact on the supporting organizations?

 8             ATTORNEY OKIN:  Object to form.

 9        A.    No, sir.

10   BY ATTORNEY MORRIS:

11        Q.    Okay.  Are you aware of any facts that

12   could give rise to a claim by the Dallas

13   Foundation against Highland?

14             ATTORNEY OKIN:  Object to form.

15        A.    Can you elaborate on that a little bit

16   for me.

17   BY ATTORNEY MORRIS:

18        Q.    Sure.

19             So I'm just -- I'm wondering if you

20   know of any facts that might give rise to a claim

21   or a cause of action by the Dallas Foundation

22   against Highland Capital Management.

23             ATTORNEY OKIN:  Object to form.

24        A.    Not directly, no, sir.

25   ///

 1   BY ATTORNEY MORRIS:

 2        Q.    Okay.  Are you aware of any facts that

 3   might give rise to a claim or cause of action

 4   that the Dallas Foundation could assert against

 5   the Highland Claimant Trust?

 6             ATTORNEY OKIN:  Object to form.

 7        A.    No, sir, not directly, no.

 8   BY ATTORNEY MORRIS:

 9        Q.    Do you understand the basis for the

10   Dallas Foundation's objection to the proposed

11   settlement?

12        A.    Absolutely, yes, I do.

13        Q.    Can you describe for me in your own

14   words what your understanding is of the basis of

15   the objection.

16        A.    Yeah.  We are aware that we sold Rand

17   PE Fund, which rolls up to the Atlas IDF Fund,

18   sold its interest in the Hunter Mountain for a

19   million dollars; and we believe that we have

20   significant future economic payments that would

21   be paid out to Hunter Mountain that Empower and

22   Okada would no longer benefit from.

23        Q.    Is it fair to say that the Dallas

24   Foundation is concerned, not with the terms of

25   the settlement agreement itself, but with the

 1    possibility that it may not get its fair share of

 2    the consideration that the HMIT entities are to

 3    receive under the settlement agreement?

 4            ATTORNEY OKIN:   Object to form.

 5        A.    Yeah, for the most part, that's the

 6    key -- that's our concern.

 7    BY ATTORNEY MORRIS:

 8        Q.    Okay.  Do you understand that Mark

 9    Patrick has entered into the settlement agreement

10    with the Highland entities on behalf of each of

11    the HMIT entities?

12        A.    That's my understanding.

13        Q.    Do you have any reason to believe that

14    the governing documents for the HMIT entities did

15    not authorize Mr. Patrick to enter into the

16    settlement agreement on behalf of each of the

17    HMIT entities?

18            ATTORNEY OKIN:   Object to form.

19        A.    You know, what I would say to that is,

20    you know, regardless of the governing documents,

21    I do believe there's a fiduciary obligation that

22    Mr. Patrick had to the supporting organizations,

23    to inform us of any significant investment

24    decisions that could impact the economic interest

25    in the Crown Global vehicle.

```
 1              So I just believe that, you know, just

 2      like any trustee investment advisor/control

 3      person, those are just normal conversations that

 4      we expect to have; and we not did not have that

 5      in this situation.

 6      BY ATTORNEY MORRIS:

 7          Q.    Okay.  Anything else?

 8          A.    No, sir.

 9          Q.    Okay.  You don't believe that

10      Mr. Patrick was required to obtain the Dallas

11      Foundation's consent before entering into the

12      settlement agreement; fair?

13          A.    That's fair.

14          Q.    And you don't have any reason to

15      believe that the Dallas Foundation has any right

16      or ability to prevent Mr. Patrick from entering

17      into the settlement agreement on behalf of the

18      HMIT entities; fair?

19              ATTORNEY OKIN:  Object to form.

20          A.    You know, I think there's two things

21      can be true again.  I think there's documentation

22      which I haven't seen, but, again, there's a

23      fiduciary obligation to the interested parties, I

24      believe, just as any relationship with an

25      investment advisor or control person.
```

1   BY ATTORNEY MORRIS:

2        Q.    And in your view, does the fiduciary

3   duty that you believe Mr. Patrick had as the

4   representative of the HMIT entities, does that

5   extend anywhere beyond the duty to inform?

6             ATTORNEY OKIN:   Object to form.

7        A.    Well, I'm just trying to think

8   about -- you know, we advised $650 million of

9   assets under management.  We have advisors all

10  the time, before they make any decisions on the

11  sale of investments, we're informed about it.

12  They kind of let us know if it's going to have

13  impact to our portfolios.  And that's just an

14  expectation that we have of any investment

15  advisor or control person.

16  BY ATTORNEY MORRIS:

17       Q.    I appreciate that you have that

18  expectation.  Do you have an expectation that the

19  HMIT entities needed to obtain the Dallas

20  Foundation's consent before entering into the

21  settlement agreement?

22       A.    I'm not a legal person.  But I would

23  imagine if you have the documentation legally, I

24  don't know if you had to get our consent.  It's

25  more so just a fiduciary obligation.

1        Q.     And, legally, do you have any reason

2    to believe that the Dallas Foundation has a legal

3    right over transactions that Mark Patrick, in his

4    capacity as the representative of any of the HMIT

5    entities, wanted to enter into?

6              ATTORNEY OKIN:   Object to form.

7        A.     As an interested party, I think we

8    have an ability to have conversations to see if

9    this decision was made that negatively impacted

10   the supporting organizations.   I think we do have

11   a right there to really understand why this

12   decision was made.   Why are we selling the

13   interest for a million dollars?   Why now?   Why is

14   the timing that happened now?   Because if nothing

15   happened, what we know is we would have benefited

16   from the settlement payouts.

17   BY ATTORNEY MORRIS:

18        Q.     Does the Dallas Foundation have a

19   direct ownership interest in any of the HMIT

20   entities?

21        A.     Not a direct ownership, no, sir.

22        Q.     Does the Dallas Foundation have any

23   indirect ownership interest in any of the HMIT

24   entities?

25              ATTORNEY OKIN:   Object to form.

1      A.    Not directly.  The Dallas Foundation

2    does not.

3    BY ATTORNEY MORRIS:

4      Q.    So no direct interest -- withdrawn.

5            No direct ownership interest and no

6    indirect ownership interest; fair?

7            ATTORNEY OKIN:  Object to form.

8      A.    We do have an interest in -- because

9    the assets roll up to our balance sheet overall,

10   they would present an audited financial

11   statement.  So we do have to understand the

12   fluctuations in market value to explain not just

13   to our board but to our auditors what's happened.

14   So we do have indirect interest.

15   BY ATTORNEY MORRIS:

16     Q.    And none of the HMIT entities appear

17   as an asset on the Dallas Foundation's balance

18   sheet; correct?

19     A.    Not directly.  But if they roll up and

20   they feed into the Atlas IDF Fund, right, and

21   then the Atlas IDF Fund, which is a part of the

22   Crown Global annuities, feeds into our balance

23   sheet, there is an indirect interest in HMIT.

24           Fair to say?

25     Q.    Does any Atlas entity appear on the

1    Dallas Foundation balance sheet?

2          A.    Yeah, through the Crown Global

3    annuity.  So if you look at the Crown Global

4    statement, it lists an Atlas LP as the investment

5    vehicle.

6          Q.    Do you know if the Dallas Foundation

7    has any right to control any of the HMIT

8    entities?

9                ATTORNEY OKIN:  Object to form.

10          A.    No, we can't directly control the HMIT

11    entities.

12    BY ATTORNEY MORRIS:

13          Q.    Do you know if the Dallas Foundation

14    has any right to approve or disapprove of any

15    potential transaction that an HMIT entity was

16    contemplating entering into?

17          A.    Yeah, so with the Atlas IDF Fund, what

18    I can say is the Empower and Okada, they do have

19    the opportunity to consent.

20                We had some notes that were -- there

21    were some notes that Mark Patrick wanted to sell

22    in February.  We had to get the consent of

23    Crown Global in order to sell these notes; and we

24    had -- we opined with Crown Global to withdraw

25    consent, right?

1          So he did reach out to Crown Global

2    for consent in which the Empower and Okada had an

3    opportunity to provide our recommendation.

4          Q.     Let's focus on the settlement

5    agreement.

6               Do you have any reason to believe that

7    Mr. Patrick was required to obtain the consent of

8    the Dallas Foundation before he signed it on

9    behalf of the HMIT entities?

10               ATTORNEY OKIN:   Object to form.

11          A.     No.

12    BY ATTORNEY MORRIS:

13          Q.     Do you have any reason to believe that

14    Mr. Patrick was required to obtain the consent of

15    the supporting organizations before entering into

16    the settlement agreement on behalf of the HMIT

17    entities?

18               ATTORNEY OKIN:   Object to form.

19          A.     No, sir.

20    BY ATTORNEY MORRIS:

21          Q.     Do you have any reason to believe that

22    Mr. Patrick was required to obtain the consent of

23    Crown Global before entering into the proposed

24    settlement agreement on behalf of each of the

25    HMIT entities?

```
 1              ATTORNEY OKIN:  Object to form.

 2        A.     No, sir.

 3   BY ATTORNEY MORRIS:

 4        Q.     Do you have any reason to believe that

 5   Crown Global has any right to control any of the

 6   HMIT entities?

 7              ATTORNEY OKIN:  Object to form.

 8        A.     Not that I'm aware of, no.

 9   BY ATTORNEY MORRIS:

10        Q.     Do you have any reason to believe

11   that -- we're going to move on.

12              So we're going to put up on the screen

13   the Dallas Foundation's objection.

14        A.     Yes, sir.

15        Q.     It will just take a moment for my

16   colleague to do that.

17              While he's doing that, let me just

18   tell you that this can be a little bit of a

19   cumbersome process.  I'm doing this by Zoom.  If

20   there's any aspect of the document that you

21   recall that you think you need to review to

22   refresh your recollection or to put it in

23   context, will you just let me know that so that I

24   give you a full and fair opportunity to answer

25   the questions?
```

```
 1          A.    Yes, sir.

 2                ATTORNEY MORRIS:  Okay.  Can we go to

 3    paragraph 32, please.

 4                (Previously marked Highland Exhibit

 5                1 introduced by counsel.)

 6    BY ATTORNEY MORRIS:

 7          Q.    So I've put up on the screen,

 8    Mr. Littleton, the portion of the Dallas

 9    Foundation's objection that was filed in this

10    case.

11                And you're familiar with that

12    document; is that right?

13          A.    Yeah.  I couldn't repeat it back to

14    you verbatim, but I understand some of the

15    high-level facts in this objection.

16          Q.    You give me comfort when you say that.

17    You should not be able to repeat verbatim what

18    this document is.  So --

19                ATTORNEY OKIN:  And, Mr. Littleton,

20    although he didn't say it this time, he did say

21    it in the prior one:  If you need to see any more

22    of this in order to be able to answer his

23    questions, be sure to point that out.

24                THE WITNESS:  Absolutely.

25                ATTORNEY MORRIS:  I actually did say
```

```
 1    that.  That's okay.

 2              ATTORNEY OKIN:  Did you say that this

 3    time?  I know you said it last time.

 4              ATTORNEY MORRIS:  Sorry, I must be

 5    putting you to sleep.

 6              ATTORNEY OKIN:  That's a possibility.

 7    BY ATTORNEY MORRIS:

 8        Q.    Looking at the third line, I'm just

 9    going to read this quote:  "Unfortunately, it

10    does not appear, however, that joint official

11    liquidators are parties to or have authorized the

12    settlement."

13              Do you see that sentence?

14        A.    Yes, sir.

15        Q.    Do you know the entity over which the

16    joint official liquidators were appointed?

17        A.    Yes, sir.  It's the DAF Foundation

18    Holdco.

19        Q.    And that's in the Cayman Islands; is

20    that right?

21        A.    Yes, sir; that's correct.

22        Q.    Are you aware that all of the HMIT

23    entities are Delaware organizations?

24        A.    Yes, sir; that's correct.

25        Q.    Have you ever communicated with the
```

Deposition of Torrey Littleton                                                    In re Highland Capital Management, L.P.

 1    joint official liquidators?

 2          A.     No, not officially.  We do have a

 3    planned communication this week.

 4          Q.     Do you know if anybody acting on

 5    behalf of the Dallas Foundation has ever informed

 6    the joint official liquidators of Highland's

 7    motion to have the settlement agreement approved?

 8          A.     No, sir.

 9          Q.     Do you know if anybody acting on

10    behalf of the Dallas Foundation has provided a

11    copy of the objection that's on the screen to the

12    joint official liquidators?

13          A.     Not that I'm aware of, sir.

14          Q.     Do you have any reason to believe, as

15    you sit here today, that the joint official

16    liquidators have any knowledge of the settlement

17    agreement that is going to be before the Court on

18    Wednesday?

19                ATTORNEY OKIN:  Object to form.

20          A.     I can't directly say.

21    BY ATTORNEY MORRIS:

22          Q.     Okay.  You haven't had any

23    communications with anybody in the world at any

24    time that led you to believe that the joint

25    official liquidators were informed of the

Case 19-34054-sgj11   Doc 4327-2   Filed 08/24/26   Entered 08/24/26 16:00:35   Desc
Exhibit 125   Page 63 of 100

Deposition of Torrey Littleton                                                          In re Highland Capital Management, L.P.

 1   proposed settlement agreement or the Dallas

 2   Foundation's objection; fair?

 3        A.   That's fair, sir.

 4        Q.   Okay.  Do you have any reason to

 5   believe that Mr. Patrick was required to obtain

 6   the authorization of the joint official

 7   liquidators before entering into this settlement

 8   agreement on behalf of the HMIT entities?

 9             ATTORNEY OKIN:  Object to form.

10        A.   No, sir, I can't.  I can't speak to

11   that.

12   BY ATTORNEY MORRIS:

13        Q.   Can you speak to whether or not the

14   joint official liquidators have any right to veto

15   or prevent the HMIT entities from entering into

16   the settlement agreement?

17        A.   Again, I'm not a legal person, so I

18   can't really opine on the official capacity of

19   the joint liquidators and what they're capable of

20   doing and not doing.  So I'm going to have to

21   say, no, I can't answer that question.

22        Q.   Further down in the paragraph it

23   states that:

24             "Indeed, many of Mr. Patrick's

25        actions, including the insertion of

1        newly created entities into the fund's

2        structure for the apparent purpose of

3        diverting charitable assets will now be

4        subject to the scrutiny of an

5        independent, Court-appointed fiduciary

6        and may be subject to clawback or other

7        avoidance actions in the Cayman

8        liquidation or such other tribunal as

9        has jurisdiction."

10              Have I read that correctly, sir?

11        A.    Yes, sir, you have.

12        Q.    Okay.  You're not an expert in Cayman

13   Islands law; correct?

14        A.    No, sir.

15        Q.    I think you said earlier you're not a

16   lawyer.  Right?

17        A.    That's correct.

18        Q.    Do you have any understanding as to

19   what facts must be established in order to

20   succeed in a clawback or avoidance action?

21        A.    It would just be assumption of mine

22   that I would have, whether it's a breach of

23   contract, discovery of various actions

24   decision-making.  But, no, I can't give you a

25   legal opinion.

1    Q.    Do you have any view at all as to

2    likelihood that the supporting organizations or

3    the Dallas Foundation might succeed in clawing

4    back or succeeding in other avoidance actions to

5    set aside the settlement agreement if it's

6    approved by the Court?

7              ATTORNEY OKIN:  Object to form.

8              And I'll also just remind you,

9    Mr. Littleton, to the extent it's implicated,

10   don't go into attorney-client privileged

11   information that you may have received.

12   A.    Yeah, I can't -- I can't answer your

13   question, Mr. Morris, on that one.

14   BY ATTORNEY MORRIS:

15   Q.    Is it fair to say you'd have to

16   speculate as to whether or not -- let me just

17   finish the question.

18              Is it fair to say that you would have

19   to speculate as to whether or not the Dallas

20   Foundation or anybody else might succeed in

21   clawing back or avoiding the settlement agreement

22   if it's approved by the Court?

23              ATTORNEY OKIN:  Object to form.

24   A.    It would be my opinion.  It would be

25   speculation of how I feel, given the facts that

 1   I've seen and just some of the impact that we've

 2   seen on our supporting organizations; and I would

 3   just leave it there.

 4            ATTORNEY MORRIS:  Okay.  If we could

 5   scroll up to paragraph 33, please.

 6   BY ATTORNEY MORRIS:

 7        Q.    Okay.  The last sentence of

 8   paragraph 33 says:  "Thus, even if approved by

 9   this Court, consummation of the settlement is not

10   likely to buy the peace the debtor now seeks."

11            Do you see that?

12        A.    Yes, sir.

13        Q.    Do you have any reason to believe that

14   the Highland parties have done anything wrong in

15   entering into this proposed settlement agreement?

16            ATTORNEY OKIN:  Object to form.

17        A.    You know, what I would say is we have

18   an individual, in Mr. Patrick, that's moving

19   around charitable assets; and we -- Highland

20   Capital or the Highland entities have settled --

21   have made a settlement agreement with this

22   individual, knowing some of the facts of how the

23   charities are being negatively impacted.

24   That's -- that would be my comment there.

25   ///

 1   BY ATTORNEY MORRIS:

 2        Q.    I'm not asking about the impact on the

 3   charitable foundations, and I'm not asking about

 4   Mr. Patrick.  I'm just asking if you have any

 5   facts that lead you to believe that Highland has

 6   engaged in any wrongdoing with respect to

 7   negotiation and entry into the proposed

 8   settlement agreement.

 9             ATTORNEY OKIN:  Object to form.  He

10   answered your question.

11   BY ATTORNEY MORRIS:

12        Q.    You can answer, sir.

13        A.    No, sir.  I'll just leave it as I

14   stated.  That was my answer.

15        Q.    All right.  So I didn't hear any

16   facts, so you don't have any facts.  Is that

17   fair?

18             ATTORNEY OKIN:  Object to form;

19   argumentative.  Come on, John.

20             ATTORNEY MORRIS:  Matt, I'm being --

21             ATTORNEY OKIN:  You asked him if they

22   did anything wrong.  He told you they did

23   something wrong by --

24             (Indiscernible cross-talk.)

25             THE COURT REPORTER:  I'm sorry.  I

1  can't understand you both when you are talking at

2  the same time.

3  BY ATTORNEY MORRIS:

4      Q.    Mr. Littleton, are you aware of any

5  facts that cause you to believe that the Highland

6  parties have done anything wrong in entering into

7  this agreement?

8          ATTORNEY OKIN:   Object to form.

9      A.    Again, I would just state that we have

10  an individual who is moving around charitable

11  assets, and I think we all are aware of the facts

12  of what has taken place.  Now, whether we want to

13  consider that as anything wrong, in quotations,

14  that's up for opinion.

15          In terms of "facts" facts, I can't --

16  no, I'm going to say, no, I don't have facts that

17  I can with share you, Mr. Morris.

18  BY ATTORNEY MORRIS:

19      Q.    And you don't even have any facts that

20  suggest Highland had any role in moving the

21  assets around that you just described; fair?

22      A.    Yeah, I don't understand that Highland

23  has moved around the assets.  But I think when

24  you're making a deal knowing that the individual

25  that I'm settling with has done some things that

1      are questionable, you know, I think that

2      discussion can be up for debate, whether -- you

3      know, charities are being impacted; significant

4      dollars are not going to be going out to the

5      community; there's a lot of uncertainty with

6      these assets.

7              And we all know the facts.  The facts

8      are clearly outlined.

9          Q.    Do you know why the Dallas Foundation

10     contends that:  "Even if approved by the Court,

11     consummation of the settlement is not likely to

12     buy the peace that the debtor now seeks"?

13             What's the basis for that, if you have

14     any understanding at all?

15         A.    That one there, sir, I'm not going to

16     be able to answer that one for you.

17         Q.    Are you aware of any potential claims

18     that the Dallas Foundation is considering

19     bringing against Highland Capital Management or

20     the Highland Claimant Trust?

21             ATTORNEY OKIN:  I'm going to instruct

22     him not to answer that.  To the extent that he

23     would be aware of those, that would be --

24             ATTORNEY MORRIS:  Why don't we just do

25     "yes" or "no," Matt.  Okay?

Case 19-34054-sgj11   Doc 4377-2   Filed 08/24/26   Entered 08/24/26 10:00:25   Desc
Exhibit 25   Page 70 of 100

Deposition of Torrey Littleton                                                    In re Highland Capital Management, L.P.

1          ATTORNEY OKIN:  No.  I think -- I

2    think whether or not there are any claims and

3    whether we're considering any claims is

4    attorney-client privilege.  It's not a "yes" or

5    "no" or detail; it's a not answer.

6          ATTORNEY MORRIS:  I'll ask him on

7    Wednesday.

8          ATTORNEY OKIN:  Okay.

9    BY ATTORNEY MORRIS:

10     Q.    Let's go to -- yeah, paragraph 34 says

11   that "there is ample evidence that Mr. Patrick

12   has acted and is acting well outside the scope of

13   his authority and fiduciary obligations."

14          Do you see that?

15     A.    Yes, sir, I do.

16     Q.    Okay.  I want to focus solely on the

17   negotiation and execution of the settlement

18   agreement.

19          Focusing --

20     A.    Yes, sir.

21     Q.    Focusing solely on the settlement

22   agreement, do you believe that Mr. Patrick acted

23   outside of the scope of his authority to

24   negotiate and enter into the settlement agreement

25   on behalf of each of the HMIT entities?

1          ATTORNEY OKIN:  Object to form of the

2     question.

3          A.    Again, I think it's something that

4     I've stated a few times now.  Two things can be

5     true.  I think we've already agreed on that.

6     BY ATTORNEY MORRIS:

7          Q.    Which two things can be true here?

8          A.    The good-faith conversation with the

9     settlement; but at the same time, it could have a

10    consequential impact on the Okada and Empower

11    Dallas supporting organizations.

12         Q.    Okay.  Do you believe -- do you have

13    any reason to believe that Mr. Patrick acted

14    outside of his fiduciary obligations with respect

15    to his negotiation and execution of the

16    settlement agreement on behalf of the HMIT

17    entities?

18         ATTORNEY OKIN:  Object to form.  Are

19    you asking him personally or the organization

20    that filed this?

21         ATTORNEY MORRIS:  It's not a 30(b)(6)

22    witness.  I know the difference.

23         ATTORNEY OKIN:  Just so we're clear.

24         A.    Yeah, I do think there was a fiduciary

25    obligation to inform and have a conversation with

1    the interested parties.

2    BY ATTORNEY MORRIS:

3        Q.    Okay.  So, again, it's a duty to

4    inform but nothing more; is that fair?

5            ATTORNEY OKIN:  Object to form.

6        A.    Yeah, yeah, again, I think it's, you

7    know, something that we all expect to have,

8    again, with our investment advisors, control

9    persons, trustees.

10   BY ATTORNEY MORRIS:

11       Q.    Okay.  Can we go to paragraph 16,

12   please.

13           Do you see paragraph 16 refers to

14   material nonpublic information?

15       A.    Yes, sir.  I see it.

16       Q.    Do you know what material nonpublic

17   information is being referred to there?

18       A.    No, sir.

19       Q.    Did you ever ask anybody?

20       A.    No.  I didn't want to get involved in

21   that conversation, no, sir.  I did not ask

22   anybody.

23       Q.    Do you know where -- withdrawn.

24           Do you know the Dallas Foundation's

25   source of information that enabled it to state,

```
 1    upon information and belief, that the information

 2    provided was obtained by Mr. Patrick through his

 3    employment at Skyview and constituted MNPI?

 4              ATTORNEY OKIN:  Object to form.

 5         A.   No, sir, I was not -- no.

 6    BY ATTORNEY MORRIS:

 7         Q.   You don't know where that information

 8    came from?

 9         A.   No, sir.

10         Q.   The next sentence refers to a put

11    option.

12              Do you see that?

13         A.   Yes, sir.

14         Q.   Did the foundation have a put option?

15         A.   Yeah, the Highland Dallas Foundation

16    had a put option agreement with the Dugaboy

17    Investment Trust.  I think we had 1.5 million

18    shares of NexPoint Hospitality Trust.  I think it

19    was a contribution that was given in 2019 with

20    the 7-year put option.

21         Q.   And is that option now expired?

22         A.   I believe it converted into a

23    different investment vehicle now.

24         Q.   So the Dallas Foundation never

25    exercised that option; correct?
```

1          A.     Correct.

2          Q.     Why not?

3          A.     We didn't have a -- we didn't feel we

4     had any reason to exercise the put option.

5          Q.     Did you ever do any analysis to try to

6     determine what the economic impact would be on

7     the Dallas Foundation if they actually exercised

8     that put option?

9          A.     We had some conversations with our

10    internal investment advisor, and at the time his

11    recommendation was not to make any changes or

12    call the put option.

13         Q.     Who was that advisor?

14         A.     Madden & Associates at the time --

15    excuse me.  Madden Asset Management.

16         Q.     Do you have the shares to exercise the

17    put today?

18         A.     To be honest, Mr. Morris, there's a

19    little bit of discovery we have to understand now

20    that the shares have converted.  I believe they

21    converted to a different vehicle in April of this

22    year.

23         Q.     Are you aware that the Dallas

24    Foundation lost $9 million by not exercising the

25    put option before it converted?

```
 1              ATTORNEY OKIN:  Object to form.

 2         A.    I think we -- so we do have some

 3    information that we just need to understand

 4    thoroughly about what's happened now that the

 5    assets transferred into a different vehicle.

 6    BY ATTORNEY MORRIS:

 7         Q.    Well, you're the CFO; right?  And I

 8    think you said that your duty is to be

 9    responsible for the foundation's assets; right?

10         A.    That's fair; yes, sir.

11         Q.    Were you aware that the put was going

12    to convert before it actually converted?

13         A.    I was not aware of that.  I was not

14    informed of that.

15         Q.    Were you ever told what the value

16    would be to the Dallas Foundation if the Dallas

17    Foundation exercised the put?

18         A.    Yeah, I believe you're correct, it was

19    in the ballpark range of $9 million.

20         Q.    So is it fair to say that had the

21    Dallas Foundation exercised the put, then it

22    would have recovered $9 million?

23         A.    Yeah, I think that's fair, yeah.

24         Q.    What's the value of the shares that it

25    received upon conversion?  Do you know that?
```

1    A.    No, I don't know that.  We were just

2    notified recently that the shares had converted.

3    Q.    Is one of the reasons that you didn't

4    exercise the put option is because Dugaboy,

5    Mr. Dondero's family trust, was the counterparty?

6    ATTORNEY OKIN:  Object to the form.

7    A.    No, sir, that wouldn't be the reason.

8    BY ATTORNEY MORRIS:

9    Q.    Do you think Mark Patrick breached his

10   fiduciary duty by telling the Dallas Foundation

11   that it should consider exercising a put that was

12   worth $9 million?

13   ATTORNEY OKIN:  Object to form.

14   A.    You know, I think there was

15   information that was not privy to individuals, so

16   I don't know if we could rely on that information

17   to make a decision.

18   BY ATTORNEY MORRIS:

19   Q.    This was a put that was owned by the

20   Dallas Foundation; do I have that right?

21   A.    The Highland Dallas Foundation,

22   supporting organization.

23   Q.    And what's the relationship between

24   the Dallas Foundation and the Highland Dallas

25   Foundation?

```
 1        A.    Very similar to the relationship

 2   between Empower Dallas and Okada Dallas.  The

 3   Highland Dallas Foundation is the supporting org

 4   that we have indirect oversight of.

 5        Q.    And if the Highland Dallas Foundation

 6   had exercised the put, would that have inured to

 7   the benefit of the Dallas Foundation?

 8             ATTORNEY OKIN:  Object to form.

 9        A.    It ultimately would have.  What it

10   would have benefited was the supporting

11   organization to allow for more impactful

12   grant-making.  So you would have had $9 million

13   of liquidity that could be pushed out into the

14   community.

15             ATTORNEY MORRIS:  Okay.  How much time

16   do I have left, Matt?  I know you're watching.

17             ATTORNEY OKIN:  I lost track, I was so

18   enraptured by your questions.

19             18 minutes.

20             ATTORNEY MORRIS:  You wouldn't be the

21   first one.

22             Why don't we take a short break here.

23   I've got 18 minutes left.  If we could just take

24   a five-minute break.

25   ///
```

```
 1                (Recess taken from 4:42 p.m. to

 2                4:49 p.m.)

 3    BY ATTORNEY MORRIS:

 4         Q.    Mr. Littleton, I think you answered

 5    this.  If I did, I apologize.

 6                Can you confirm for me that you've

 7    never communicated with the joint official

 8    liquidators?

 9         A.    Yes, sir.  That is correct, other than

10    emails to set up a conversation.

11         Q.    Conversations that you did not

12    participate in; is that right?

13         A.    Yeah, just for -- yeah, just for some

14    questions they wanted to ask of the Dallas

15    Foundation's finance team.

16         Q.    But did you participate -- so you

17    spoke with the joint official liquidators'

18    finance team?

19         A.    No.  They wanted to set up a call.

20    That's the only time -- the only communication

21    I've had.

22         Q.    And you haven't had that call yet; is

23    that right?

24         A.    That's correct.

25         Q.    And that call is going to be scheduled
```

```
 1    for sometime in the future; fair?

 2         A.    Yes, sir.

 3               ATTORNEY MORRIS:  I have no further

 4    questions.

 5               ATTORNEY PHILLIPS:  No questions.

 6               ATTORNEY OKIN:  All right.

 7               ATTORNEY MORRIS:  Mr. Littleton, thank

 8    you very, very much for your time and patience.

 9               Matt, thank you for arranging this on

10    short notice.

11               Gail, do you need anything else from

12    anybody?

13               THE COURT REPORTER:  Okay.  I have

14    copies for Mr. Morris, Mr. Lang, Mr. Okin,

15    and Mr. Phillips.

16               Anybody else?

17               ATTORNEY OKIN:  Gail, we do want to

18    read and sign both transcripts.

19                    (Whereupon, at 4:50 p.m. Central

20                    Time the proceedings concluded.)

21

22

23

24

25
```

```
 1                    INSTRUCTIONS TO DEPONENT

 2            After reading this volume of your

 3    deposition, indicate any corrections or changes

 4    to your testimony and the reasons therefor on the

 5    Errata Sheet supplied to you and sign it.  DO NOT

 6    make marks or notations on the transcript volume

 7    itself.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1             E R R A T A

2

3        I wish to make the following changes,

4   for the following reasons:

5 Page  Line

6 \_\_\_\_ \_\_\_\_ CHANGE: _____

7 REASON: _____

8 \_\_\_\_ \_\_\_\_ CHANGE: _____

9 REASON: _____

10 \_\_\_\_ \_\_\_\_ CHANGE: _____

11 REASON: _____

12 \_\_\_\_ \_\_\_\_ CHANGE: _____

13 REASON: _____

14 \_\_\_\_ \_\_\_\_ CHANGE: _____

15 REASON: _____

16 \_\_\_\_ \_\_\_\_ CHANGE: _____

17 REASON: _____

18 \_\_\_\_ \_\_\_\_ CHANGE: _____

19 REASON: _____

20 \_\_\_\_ \_\_\_\_ CHANGE: _____

21 REASON: _____

22 \_\_\_\_ \_\_\_\_ CHANGE: _____

23 REASON: _____

24

25

```
 1

 2

 3            C E R T I F I C A T I O N

 4

 5

 6            I hereby certify that I have read the

 7    foregoing transcript of my deposition testimony,

 8    and that my answers to the questions propounded,

 9    with the attached corrections or changes, if any,

10    are true and correct.

11

12    ------------------------------------
      TORREY LITTLETON
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                CERTIFICATE OF SHORTHAND REPORTER

3

4

5              I, Gail Inghram, Registered Diplomate

6     Reporter, Certified Realtime Reporter, Realtime

7     Systems Administrator, CA-Certified Shorthand

8     Reporter No. 8635, and Notary Public, the officer

9     before whom the foregoing proceedings were taken,

10    do hereby certify that the foregoing transcript

11    is a true and correct record of the proceedings;

12    that said proceedings were taken by me

13    stenographically and thereafter reduced to

14    typewriting under my supervision; and that I am

15    neither counsel for, related to, nor employed by

16    any of the parties to this case and have no

17    interest, financial or otherwise, in its outcome.

18

19

20

_____

21    Gail Inghram,
      BA, RDR, CRR, RSA, CA-CSR No. 8635

22

23

24

25

## WORD INDEX

< $ >
$22  19:21
$23  42:2
$29  19:20
$300  41:5
$650  52:8
$7  19:22
$9  72:24  73:19, 22
  74:12  75:12

< 1 >
1  6:13  58:5
1.5  71:17
10010  3:24
10017-2024  3:16
11  1:8
1113  4:10
13  11:14  32:23
16  70:11, 13
1600  5:9
1700  4:18
18  75:19, 23
19-34054-sgj11  1:5
1st  11:13

< 2 >
2015  19:18, 19
2019  71:19
2022  11:13
2025  1:14  2:10  29:4
21  7:4
212.849.7615  3:25
214.817.4500  4:20
22  1:14  2:10
225.381.9643  5:11
22nd  3:23
2390  4:18
23-plus  41:14
240  4:10

< 3 >
3:30  1:15  2:11
30(b)(6  69:21
300  41:1
301  5:9
310.277.6910  3:17
32  58:3

33  64:5, 8
34  68:10
34th  3:15

< 4 >
4:42  76:1
4:49  76:2
4:50  77:19

< 5 >
51  3:23
58  6:13

< 6 >
67  7:4

< 7 >
70801  5:10
713.228.4100  4:12
75201  4:19
77002  4:11
780  3:15
7-year  71:20

< 8 >
8  6:7
8635  1:22  81:8, 21

< 9 >
918,000  29:5

< A >
ability  51:16  53:8
able  32:5, 13  33:25
  58:17, 22  67:16
absolutely  30:3
  33:22  49:12  58:24
accommodate  11:1
accounts  21:15, 21,
  22, 24  22:1, 20  29:3
  34:13
acted  68:12, 22  69:13
acting  34:8  60:4, 9
  68:12
action  48:21  49:3
  62:20
actions  61:25  62:7,
  23  63:4
activity  14:25  15:2,

3, 15
actual  18:2
ADAMS  4:9
add  46:14
addition  13:8
administrative  20:16
Administrator  81:7
adverse  43:5
advised  52:8
advisor  51:25  52:15
  72:10, 13
advisor/control  51:2
advisors  52:9  70:8
affiliated  11:4
affiliates  9:5  12:18
  13:13, 18
affirmed  8:6
afternoon  8:23
ago  12:8  37:5, 25
agree  39:19, 22, 23
agreed  22:16  69:5
agreed-upon  30:10
agreement  9:4  12:17
  13:3, 14, 18  27:21
  31:15  40:3, 6, 12, 16,
  21  41:6, 20  42:7, 9,
  16, 25  43:3, 11, 21
  44:5, 10, 18  45:11, 15,
  19  46:6, 24  47:2, 17
  49:25  50:3, 9, 16
  51:12, 17  52:21  56:5,
  16, 24  60:7, 17  61:1,
  8, 16  63:5, 21  64:15,
  21  65:8  66:7  68:18,
  22, 24  69:16  71:16
ahead  27:14  38:23
ahurt@kellyhart.com
  5:7
allow  9:19  31:22
  75:11
allows  29:22
alternative  29:22
AMELIA  5:6
amount  20:8, 10
  22:22  41:2
amounts  20:2
ample  68:11
analysis  72:5
annuities  17:6, 12, 25
  18:3, 8  19:16, 17, 19,

25  20:1, 20  21:10, 23,
  25  22:2, 3, 4, 7  24:12
  25:12, 20  29:10, 14,
  18, 23  54:22
annuity  17:16  20:21
  22:17, 24  24:13, 16,
  19, 20  28:17  30:5, 6
  55:3
ANSWER  7:2  9:17,
  20  10:19  20:24
  47:11  57:24  58:22
  61:21  63:12  65:12,
  14  67:16, 22  68:5
answered  65:10  76:4
answers  80:8
Anybody  14:3  19:2
  34:7  60:4, 9, 23
  63:20  70:19, 22
  77:12, 16
anyway  10:5, 20
apologies  27:13
apologize  41:9  76:5
apologizing  8:13
apparent  62:2
appear  54:16, 25
  59:10
appeared  3:2  23:2
appointed  59:16
appreciate  8:16
  52:17
approval  37:10, 13,
  16  39:21
approve  55:14
approved  13:24  14:1
  27:19  28:1  42:10
  60:7  63:6, 22  64:8
  67:10
approximately  2:11
April  72:21
argumentative  65:19
arises  47:1
arm's-length  43:4, 13
  44:6  46:8
arranging  77:9
aside  63:5
asked  15:9  65:21
asking  65:2, 3, 4
  69:19
aspect  57:20

aspects 11:*21*
assert 49:*4*
asset 54:*17* 72:*15*
assets 11:*19* 21:*14*
24:*24* 27:*20*, *25* 29:*7*,
*19* 30:*9* 32:*2*, *6*, *10*,
*13*, *16* 33:*6*, *10*, *15*
40:*19*, *23*, *25* 42:*8*, *15*,
*22* 44:*9* 46:*11* 52:*9*
54:*9* 62:*3* 64:*19*
66:*11*, *21*, *23* 67:*6*
73:*5*, *9*
associated 20:*20*
Associates 72:*14*
assumed 35:*10*
assumption 32:*1*
62:*21*
Atlas 15:*5* 18:*4*
21:*17* 22:*3*, *10*, *12*, *13*
29:*20*, *21* 30:*23* 31:*1*,
*14* 32:*11* 49:*17*
54:*20*, *21*, *25* 55:*4*, *17*
attached 80:*9*
Attorney 6:*7* 8:*11*,
*24* 15:*22*, *23* 16:*16*,
*23* 21:*4*, *6* 23:*13*, *14*,
*23* 24:*10* 25:*13*, *19*,
*24* 26:*1*, *16* 27:*2*, *12*,
*14*, *16* 28:*2*, *13* 35:*21*
36:*4*, *18* 37:*2* 38:*12*,
*14*, *18*, *20*, *22*, *24* 39:*8*,
*18* 41:*21* 42:*4*, *11*, *19*
43:*6*, *9*, *14*, *19*, *25*
44:*3* 45:*2*, *3* 47:*9*, *10*,
*20* 48:*1*, *8*, *10*, *14*, *17*,
*23* 49:*1*, *6*, *8* 50:*4*, *7*,
*18* 51:*6*, *19* 52:*1*, *6*,
*16* 53:*6*, *17*, *25* 54:*3*,
*7*, *15* 55:*9*, *12* 56:*10*,
*12*, *18*, *20* 57:*1*, *3*, *7*, *9*
58:*2*, *6*, *19*, *25* 59:*2*, *4*,
*6*, *7* 60:*19*, *21* 61:*9*,
*12* 63:*7*, *14*, *23* 64:*4*,
*6*, *16* 65:*1*, *9*, *11*, *18*,
*20*, *21* 66:*3*, *8*, *18*
67:*21*, *24* 68:*1*, *6*, *8*, *9*
69:*1*, *6*, *18*, *21*, *23*
70:*2*, *5*, *10* 71:*4*, *6*
73:*1*, *6* 74:*6*, *8*, *13*, *18*

75:*8*, *15*, *17*, *20* 76:*3*
77:*3*, *5*, *6*, *7*, *17*
attorney-client 63:*10*
68:*4*
audited 54:*10*
auditors 33:*23* 54:*13*
authority 68:*13*, *23*
authorization 61:*6*
authorize 50:*15*
authorized 38:*9*
39:*3* 59:*11*
Avenue 3:*15*, *23* 4:*18*
avoidance 62:*7*, *20*
63:*4*
avoiding 63:*21*
aware 12:*7*, *10*, *13*
13:*7*, *12* 15:*15* 16:*2*,
*4*, *8*, *24* 21:*21* 27:*17*
37:*3*, *7*, *11* 40:*16*, *19*,
*23* 46:*23* 48:*11* 49:*2*,
*16* 57:*8* 59:*22* 60:*13*
66:*4*, *11* 67:*17*, *23*
72:*23* 73:*11*, *13*

**< B >**
BA 1:*22* 81:*21*
back 19:*18* 20:*18*
58:*13* 63:*4*, *21*
balance 26:*4* 54:*9*,
*17*, *22* 55:*1*
ballpark 73:*19*
BANKRUPTCY 1:*1*
12:*8*, *15* 23:*3*, *7*
31:*11* 37:*4* 38:*16*
BARTLETT 4:*9*
based 16:*21* 28:*3*, *9*,
*17*, *24* 42:*1*
basis 28:*22* 49:*9*, *14*
67:*13*
Baton 5:*10*
Beacon 18:*6*
beginning 2:*11*
behalf 3:*4*, *19* 4:*3*,
*14* 5:*3* 13:*3*, *25* 16:*5*,
*9*, *25* 34:*8* 50:*10*, *16*
51:*17* 56:*9*, *16*, *24*
60:*5*, *10* 61:*8* 68:*25*
69:*16*
belief 71:*1*

believe 13:*5* 19:*18*,
*22* 20:*9*, *11* 21:*17*, *18*
22:*3* 23:*4* 25:*10*
26:*12* 27:*8*, *23* 28:*5*
29:*2*, *7*, *16* 35:*18*, *22*,
*24* 36:*7*, *15* 37:*12*
39:*1* 40:*14* 41:*13*
42:*15* 43:*2*, *17* 45:*5*
46:*19* 47:*3*, *15*, *24*
48:*4* 49:*19* 50:*13*, *21*
51:*1*, *9*, *15*, *24* 52:*3*
53:*2* 56:*6*, *13*, *21*
57:*4*, *10* 60:*14*, *24*
61:*5* 64:*13* 65:*5*
66:*5* 68:*22* 69:*12*, *13*
71:*22* 72:*20* 73:*18*
beneficial 24:*2*
benefit 28:*8* 42:*3*
49:*22* 75:*7*
benefited 53:*15*
75:*10*
best 18:*10*
beyond 25:*20* 52:*5*
billion 22:*14*
bit 13:*22* 15:*9*
23:*15* 48:*15* 57:*18*
72:*19*
board 11:*23* 15:*13*,
*17* 54:*13*
boards 14:*24*
breach 62:*22*
breached 74:*9*
break 10:*24* 75:*22*,
*24*
bring 38:*8*
bringing 67:*19*
buy 64:*10* 67:*12*

**< C >**
CA-Certified 81:*7*
CA-CSR 1:*22* 81:*21*
call 14:*10* 20:*17*
72:*12* 76:*19*, *22*, *25*
called 12:*4* 23:*17*
capable 61:*19*
capacity 11:*7*, *22*
53:*4* 61:*18*
CAPITAL 1:*6* 3:*4*
8:*25* 12:*5* 26:*9*, *13*,
*25* 27:*9* 36:*8* 37:*6*

41:*24* 42:*24* 45:*6*
48:*22* 64:*20* 67:*19*
care 46:*17*
carefully 27:*4*
carry 26:*3*
Case 1:*5* 38:*6* 58:*10*
81:*16*
cash 27:*20*, *25*
casual 8:*14*
cause 48:*21* 49:*3*
66:*5*
causing 19:*7* 46:*16*
caveat 46:*14*
Cayman 16:*1* 59:*19*
62:*7*, *12*
Central 1:*15* 2:*11*
77:*19*
certain 9:*3* 12:*17*, *18*
13:*12* 15:*25* 45:*23*
CERTIFICATE 81:*2*
Certified 2:*14*, *15*
81:*6*
certify 80:*6* 81:*10*
CFO 11:*8*, *10*, *12*, *16*,
*17* 23:*5* 32:*8*, *17*
73:*7*
chance 10:*15*
CHANGE 79:*6*, *8*, *10*,
*12*, *14*, *16*, *18*, *20*, *22*
changes 72:*11* 78:*3*
79:*3* 80:*9*
Chapter 1:*8*
charitable 11:*19*
24:*24* 42:*15*, *22* 44:*8*
62:*3* 64:*19* 65:*3*
66:*10*
charities 64:*23* 67:*3*
charts 31:*6*
claim 23:*7* 48:*12*, *20*
49:*3*
Claimant 3:*5* 9:*1*
23:*11*, *18*, *22* 26:*5*, *9*,
*14*, *25* 27:*10* 30:*14*,
*15* 36:*8* 45:*11* 49:*5*
67:*20*
claims 40:*15* 67:*17*
68:*2*, *3*
CLARITY 7:*22* 30:*7*
clawback 62:*6*, *20*

**clawing** 63:*3, 21*
**clear** 32:*14* 69:*23*
**clearly** 36:*6* 67:*8*
**colleague** 57:*16*
**combination** 14:*23*
**Come** 65:*19*
**comfort** 58:*16*
**comfortable** 33:*24*
**commenced** 16:*6*
*37:24* 39:*24*
**comment** 64:*24*
**communicate** 34:*7, 15*
**communicated** 59:*25*
76:*7*
**communication** 35:*25*
60:*3* 76:*20*
**communications** 34:*9*
60:*23*
**community** 18:*22*
67:*5* 75:*14*
**company** 12:*4*
**compensate** 20:*19*
**compensates** 20:*12*
**complicated** 9:*14*
**complies** 22:*23*
**computer** 19:*6*
**concern** 42:*6* 47:*6*
50:*6*
**concerned** 44:*22*
49:*24*
**concerns** 15:*2* 44:*4*
46:*10*
**concluded** 77:*20*
**conference** 14:*10*
**confirm** 76:*6*
**confused** 41:*10*
**connection** 9:*2*
**consent** 51:*11* 52:*20,
24* 55:*19, 22, 25* 56:*2,
7, 14, 22*
**consequential** 69:*10*
**consider** 66:*13* 74:*11*
**consideration** 50:*2*
**considering** 67:*18*
68:*3*
**constituted** 71:*3*
**consummation** 64:*9*
67:*11*
**Cont'd** 4:*1* 5:*1*

**contemplating** 55:*16*
**contends** 43:*22* 67:*10*
**context** 57:*23*
**contract** 17:*12, 19*
22:*24* 62:*23*
**contracts** 24:*14, 16,
19, 21*
**contractual** 20:*6*
26:*8*
**contribution** 71:*19*
**contributions** 19:*20*
**control** 51:*25* 52:*15*
55:*7, 10* 57:*5* 70:*8*
**controlled** 9:*6* 12:*11,
19*
**conversation** 11:*25*
36:*23* 43:*15* 69:*8, 25*
70:*21* 76:*10*
**conversations** 43:*8*
51:*3* 53:*8* 72:*9*
76:*11*
**conversion** 73:*25*
**convert** 73:*12*
**converted** 71:*22*
72:*20, 21, 25* 73:*12*
74:*2*
**convoluted** 39:*11*
**copies** 77:*14*
**copy** 60:*11*
**correct** 15:*18, 20, 21*
16:*10, 11* 17:*24*
18:*12* 20:*3* 21:*13, 16*
22:*7, 8, 17, 24* 24:*16,
19* 30:*6* 33:*9* 37:*22*
39:*21* 41:*17, 18, 20*
43:*13* 54:*18* 59:*21,
24* 62:*13, 17* 71:*25*
72:*1* 73:*18* 76:*9, 24*
80:*10* 81:*11*
**corrections** 78:*3* 80:*9*
**correctly** 62:*10*
**corresponding** 18:*19*
**counsel** 16:*22* 58:*5*
81:*15*
**counterparty** 74:*5*
**couple** 29:*16* 37:*4, 25*
**course** 34:*6, 21*
**COURT** 1:*1* 8:*18*
9:*25* 12:*15* 37:*4*
38:*16* 60:*17* 63:*6, 22*

64:*9* 65:*25* 67:*10*
77:*13*
**Court-appointed** 62:*5*
**CRAWFORD** 4:*17*
**create** 31:*21*
**created** 31:*19, 24*
62:*1*
**cross-talk** 65:*24*
**Crown** 4:*3* 15:*7*
16:*25* 17:*3, 5, 11, 14,
22* 18:*24* 19:*1, 24*
20:*7, 9* 21:*1, 2, 10, 16,
18* 22:*5, 14, 23* 24:*7*
25:*3, 6, 11, 15, 21*
28:*21* 29:*17, 25* 30:*3,
10* 31:*8, 10* 35:*23*
36:*22* 50:*25* 54:*22*
55:*2, 3, 23, 24* 56:*1,
23* 57:*5*
**CRR** 1:*22* 81:*21*
**cumbersome** 57:*19*
**current** 28:*5*
**Currently** 38:*3*
**CURRY** 4:*7, 9*

**< D >**
**DAF** 30:*18* 59:*17*
**DALLAS** 1:*3* 4:*3, 19*
9:*3* 11:*4, 8, 11* 12:*13*
13:*25* 14:*13* 15:*24*
16:*9, 12, 15, 17, 19*
17:*8, 10, 13, 22* 18:*9,
14, 16, 19, 25* 23:*1, 6,
9, 20* 24:*5, 8, 15, 18*
25:*7, 11, 15, 22* 26:*3,
7, 15, 18, 23* 27:*11, 24*
30:*18* 32:*9* 33:*5, 14,
20* 34:*4, 22* 35:*2, 6,
12, 20, 25* 36:*9, 17*
37:*9, 13, 17* 39:*20*
40:*3* 42:*5, 15* 43:*18,
22* 44:*19, 21* 46:*9*
48:*12, 21* 49:*4, 10, 23*
51:*10, 15* 52:*19* 53:*2,
18, 22* 54:*1, 17* 55:*1,
6, 13* 56:*8* 57:*13*
58:*8* 60:*5, 10* 61:*1*
63:*3, 19* 67:*9, 18*
69:*11* 70:*24* 71:*15,
24* 72:*7, 23* 73:*16, 21*

74:*10, 20, 21, 24* 75:*2,
3, 5, 7* 76:*14*
**D'AMBRA** 5:*14*
**data** 41:*9*
**DAVID** 4:*7*
**day** 8:*18* 13:*21*
**dcurry@okinadams.co
m** 4:*8*
**deal** 66:*24*
**debate** 67:*2*
**Debtor** 1:*8* 64:*10*
67:*12*
**decided** 16:*21*
**decision** 53:*9, 12*
74:*17*
**decision-making**
62:*24*
**decisions** 26:*25* 36:*1,
24* 39:*16* 42:*14*
50:*24* 52:*10*
**Defendant** 4:*3, 14*
**Delaware** 59:*23*
**delivered** 28:*1*
**DEMO** 3:*8*
**depends** 23:*24*
**DEPONENT** 78:*1*
**deposed** 9:*9*
**DEPOSITION** 1:*12*
2:*9* 7:*1* 9:*2* 78:*3*
80:*7*
**depositions** 8:*14*
**describe** 49:*13*
**described** 29:*1* 66:*21*
**describing** 29:*13*
**detail** 68:*5*
**details** 13:*1*
**determine** 72:*6*
**device** 19:*5*
**DIAZ** 5:*21* 14:*2*
15:*13* 16:*20*
**difference** 69:*22*
**different** 31:*22*
71:*23* 72:*21* 73:*5*
**Diplomate** 2:*14* 81:*5*
**DIRECT** 7:*23* 25:*14,
22* 53:*19, 21* 54:*4, 5*
**direction** 2:*16*
**directly** 17:*22* 23:*21*
25:*25* 35:*8, 9, 13*

Case 19-34054-sgj11   Doc 4327-2   Filed 08/24/26   Entered 08/24/26 16:00:35   Desc
Exhibit 125   Page 86 of 100

Deposition of Torrey Littleton
In re Highland Capital Management, L.P.

48:*24*  49:*7*  54:*1, 19*
55:*10*  60:*20*

**director**  11:*23*

**directs**  10:*18*

**disapprove**  55:*14*

**discovery**  62:*23*
72:*19*

**discussion**  67:*2*

**disposition**  42:*8*
46:*11*

**distribute**  25:*3*

**distributions**  17:*17,*
*18*  25:*6, 8*  30:*11*

**DISTRICT**  1:*2*

**diverting**  62:*3*

**dividends**  17:*16*

**DIVISION**  1:*3*

**document**  57:*20*
58:*12, 18*

**documentation**  51:*21*
52:*23*

**DOCUMENTS**  7:*7*
30:*25*  31:*2, 4*  50:*14,*
*20*

**doing**  39:*7*  57:*17, 19*
61:*20*

**dollar**  22:*13*

**dollars**  22:*14*  28:*5*
41:*14*  42:*1*  49:*19*
53:*13*  67:*4*

**Dondero**  12:*11*  14:*7,*
*16*  15:*16*  16:*4*  19:*22*

**Dondero's**  74:*5*

**donor-advised**  18:*20,*
*21*

**dressing**  8:*15*

**due**  29:*5*

**Dugaboy**  4:*14*  71:*16*
74:*4*

**duly**  8:*6*

**duration**  20:*8*

**duties**  11:*15*  26:*14,*
*17*  27:*10*  32:*8*  33:*19*
34:*6*

**duty**  11:*17*  25:*3, 6,*
*11, 22*  35:*19*  36:*9, 16*
52:*3, 5*  70:*3*  73:*8*
74:*10*


**< E >**

**earlier**  29:*1*  43:*23*
62:*15*

**easier**  13:*22*

**economic**  15:*6*  24:*4*
28:*8*  35:*23*  36:*2, 21*
37:*18*  47:*21*  48:*7*
49:*20*  50:*24*  72:*6*

**elaborate**  48:*15*

**emails**  76:*10*

**EMANUEL**  3:*22*

**employed**  81:*15*

**employment**  71:*3*

**Empower**  11:*25*
14:*24*  16:*12*  17:*10,*
*13, 22*  18:*9, 17*  24:*2,*
*8*  25:*9, 17*  26:*21, 22*
28:*12, 15*  30:*17*
37:*19*  39:*13*  40:*9*
41:*13, 23*  42:*2, 23*
43:*18*  44:*19*  47:*14,*
*23*  49:*21*  55:*18*  56:*2*
69:*10*  75:*2*

**enabled**  70:*25*

**engaged**  43:*23*  65:*6*

**enraptured**  75:*18*

**ensure**  11:*17*

**enter**  50:*15*  53:*5*
68:*24*

**entered**  42:*16, 24*
50:*9*

**entering**  51:*11, 16*
52:*20*  55:*16*  56:*15,*
*23*  61:*7, 15*  64:*15*
66:*6*

**entire**  34:*3*

**entities**  9:*5*  12:*18*
13:*2, 19*  16:*19*  27:*18,*
*19*  31:*14, 16, 19*  33:*2,*
*11, 16*  35:*4, 14, 19*
36:*16*  45:*23*  46:*21,*
*24*  47:*7, 17*  50:*2, 10,*
*11, 14, 17*  51:*18*  52:*4,*
*19*  53:*5, 20, 24*  54:*16*
55:*8, 11*  56:*9, 17, 25*
57:*6*  59:*23*  61:*8, 15*
62:*1*  64:*20*  68:*25*
69:*17*

**entity**  12:*7, 10*  23:*17*
54:*25*  55:*15*  59:*15*

**entry**  65:*7*

**Errata**  78:*5*

**ESQ**  3:*6, 8, 10, 12, 20*
4:*5, 7, 15*  5:*4, 6*

**established**  62:*19*

**event**  20:*23*

**evidence**  68:*11*

**exact**  22:*21*

**EXAMINATION**  6:*5*
8:*10*

**examined**  8:*8*

**example**  22:*10*

**exchange**  21:*10*

**excuse**  72:*15*

**execution**  68:*17*
69:*15*

**exercise**  72:*4, 16*
74:*4*

**exercised**  71:*25*  72:*7*
73:*17, 21*  75:*6*

**exercising**  72:*24*
74:*11*

**Exhibit**  6:*13*  58:*4*

**EXHIBITS**  6:*11*

**expect**  51:*4*  70:*7*

**expectation**  52:*14, 18*

**expense**  20:*12, 17*

**expenses**  20:*14*

**expert**  62:*12*

**expired**  71:*21*

**explain**  54:*12*

**explained**  20:*18*

**exposure**  14:*15*

**extend**  52:*5*

**extent**  63:*9*  67:*22*


**< F >**

**fact-finding**  38:*8*

**facts**  28:*3*  38:*5, 6*
40:*5, 8*  41:*10*  43:*1,*
*10*  44:*10*  45:*22*
48:*11, 20*  49:*2*  58:*15*
62:*19*  63:*25*  64:*22*
65:*5, 16*  66:*5, 11, 15,*
*16, 19*  67:*7*

**fail**  9:*21*

**fair**  20:*25*  23:*5*
28:*12, 14, 16, 22, 24*
29:*4, 8, 9, 14*  30:*11,*
*12*  34:*19, 20*  42:*5*

43:*24*  44:*2, 25*  45:*1*
46:*7, 12, 14*  49:*23*
50:*1*  51:*12, 13, 18*
54:*6, 24*  57:*24*  61:*2,*
*3*  63:*15, 18*  65:*17*
66:*21*  70:*4*  73:*10, 20,*
*23*  77:*1*

**faith**  44:*17*

**familiar**  12:*4*  13:*2*
23:*17*  28:*14*  30:*13,*
*16, 18, 20, 22*  58:*11*

**Family**  12:*1*  16:*13*
17:*10, 13, 23*  18:*9, 17*
74:*5*

**fan**  19:*7, 9*

**February**  29:*4*  55:*22*

**fee**  20:*16*

**feed**  54:*20*

**feedback**  19:*8*

**feeds**  54:*22*

**feel**  63:*25*  72:*3*

**felt**  16:*19*

**fiduciary**  11:*18, 20*
24:*22*  35:*24*  36:*9, 16,*
*23*  50:*21*  51:*23*  52:*2,*
*25*  62:*5*  68:*13*  69:*14,*
*24*  74:*10*

**file**  14:*21*  16:*14, 21*
37:*5*  39:*21*

**filed**  12:*7, 14, 22*
16:*25*  23:*3, 6*  37:*3*
38:*19*  39:*2, 25*  58:*9*
69:*20*

**filing**  13:*24*  14:*17*
37:*10, 14*  38:*9*  39:*3,*
*12*

**finance**  76:*15, 18*

**financial**  11:*21*  25:*1*
26:*23*  54:*10*  81:*17*

**financially**  24:*23*

**finish**  9:*16, 20*  63:*17*

**firm**  8:*24*

**first**  8:*6*  9:*11*  15:*1,*
*11*  75:*21*

**five-minute**  75:*24*

**fixed**  17:*19, 21*  20:*2,*
*7, 10, 22*  21:*11*  22:*16*

**Floor**  3:*15, 23*

**flow**  18:*14, 15, 18*

26:21  30:11  31:5
**flows** 29:14  30:23
**fluctuations** 54:12
**focus** 56:4  68:16
**focused** 48:2
**Focusing** 68:19, 21
**following** 79:3, 4
**follows** 8:8
**foregoing** 80:7  81:9, 10
**form** 15:22  16:16  23:13, 23  25:13, 24  26:16  27:12  28:2  35:21  36:18  38:12  39:8  41:21  42:11  43:6, 14, 25  45:2  47:9, 20  48:8, 14, 23  49:6  50:4, 18  51:19  52:6  53:6, 25  54:7  55:9  56:10, 18  57:1, 7  60:19  61:9  63:7, 23  64:16  65:9, 18  66:8  69:1, 18  70:5  71:4  73:1  74:6, 13  75:8
**formal** 9:13  10:14
**formed** 23:11
**forth** 27:20
**Foundation** 4:3  11:5, 9, 11, 22  12:1, 14  13:25  14:24  16:10, 13, 15, 18, 20, 21  17:8, 10, 14, 23  18:14, 16, 19, 25  23:2, 6, 10, 16, 20  24:3, 5, 15, 18  25:7, 12, 15, 22  26:3, 7, 15, 18  27:11, 24  32:9  33:5, 14, 20  34:4, 22  35:3, 6, 12, 20, 25  36:9, 17  37:18, 19  39:14  40:9  43:18, 22  44:22  46:10  48:13, 21  49:4, 24  51:15  53:2, 18, 22  54:1  55:1, 6, 13  56:8  59:17  60:5, 10  63:3, 20  67:9, 18  71:14, 15, 24  72:7, 24  73:16, 17, 21  74:10, 20, 21, 24, 25  75:3, 5, 7

**foundations** 15:13  18:17  65:3
**Foundation's** 9:3  14:13  15:24  18:10  26:23  37:9, 13  39:20  40:4  42:6  49:10  51:11  52:20  54:17  57:13  58:9  61:2  70:24  73:9  76:15
**full** 57:24
**Fund** 15:4, 5  17:19  18:4, 5, 20  21:17, 19  22:4  24:15, 17  28:21  30:23  49:17  54:20, 21  55:17
**funded** 19:17, 19
**funding** 16:5, 8
**funds** 18:21  26:20  30:25  31:1
**fund's** 62:1
**Further** 61:22  77:3
**future** 21:12  28:25  30:11  40:17  49:20  77:1

**< G >**
**Gail** 1:21  2:13  9:25  77:11, 17  81:5, 21
gdemo@pszjlaw.com 3:9
**generally** 40:10, 13
**gentleman** 12:11
**getting** 21:2  41:10
**give** 10:13  12:25  31:6  40:11  48:12, 20  49:3  57:24  58:16  62:24
**given** 45:22, 24  63:25  71:19
**gives** 10:14, 16
**glance** 31:3
**Global** 4:3  15:7  16:25  17:3, 5, 11, 14, 22  18:24  19:1, 24  20:7, 9  21:2, 10, 16, 18  22:5, 14, 23  24:7  25:3, 6, 11, 15, 21  28:21  29:17, 25  30:3, 10  31:8, 10  35:23  36:22  50:25  54:22

**55:2, 3, 23, 24**  56:1, 23  57:5
**go** 17:21  25:20  27:7, 14  38:23  41:3  58:2  63:10  68:10  70:11
**goal** 10:4
**going** 8:18  9:14  10:3, 19  13:21  25:25  27:3  35:22  36:2  39:13  52:12  57:11, 12  59:9  60:17  61:20  66:16  67:4, 15, 21  73:11  76:25
**Good** 8:23  21:4, 5  44:17
**good-faith** 43:4, 12  44:6  45:21  46:8  69:8
**governing** 30:24  31:2, 4  50:14, 20
**granting** 47:16  48:5
**grant-making** 75:12
**grants** 18:21
**GREGORY** 3:8
**grow** 24:24
**guaranteed** 22:21
**guy** 34:23

**< H >**
**half** 32:20
**HALL** 5:18
**HALLMAN** 5:8
**happen** 18:16
**happened** 53:14, 15  54:13  73:4
**hard** 34:11
**harm** 46:16
**HART** 5:8
**hat** 34:18
**hats** 34:19
**HAYLEY** 3:12
**head** 34:24  35:3
**hear** 8:21, 22  65:15
**heard** 36:5  38:22  39:24
**held** 2:9  15:7  30:9  33:6, 10
**helped** 14:4
**Hey** 38:20
**high** 31:3  34:14

**HIGHLAND** 1:6  3:4, 19  6:13  8:25  9:1, 4  12:5, 17  23:2, 7, 11, 18, 22  26:4, 8, 9, 13, 14, 24  27:9, 18  30:14, 15  31:10  36:7, 8  37:6, 24  38:16  41:17, 24  42:15, 24  45:6, 11, 16  46:25  48:13, 22  49:5  50:10  58:4  64:14, 19, 20  65:5  66:5, 20, 22  67:19, 20  71:15  74:21, 24  75:3, 5
**Highland's** 12:15  60:6
**high-level** 40:5  58:15
**historical** 28:9
**HMIT** 13:9, 13, 17, 19  18:6  27:18, 19  28:1, 4  30:20, 25  31:16, 18  32:2, 6, 10  33:2, 6, 11, 15  34:8, 10, 18, 24  35:4, 7, 14, 19  36:11, 16  37:3, 9, 12, 24  38:11  40:10  46:21, 24  47:7, 17  48:5  50:2, 11, 14, 17  51:18  52:4, 19  53:4, 19, 23  54:16, 23  55:7, 10, 15  56:9, 16, 25  57:6  59:22  61:8, 15  68:25  69:16
**hold** 17:11  21:22, 24  22:2, 3  30:1, 2
**Holdco** 30:18  59:18
**holdings** 32:14
**holds** 22:4
**honest** 72:18
**Hospitality** 71:18
**Houston** 4:11
**Hunter** 5:3  13:5, 8, 9  15:3  18:6  23:25  29:6, 12  31:14  40:17, 20  41:25  42:8  45:19  46:11  49:18, 21
**HURT** 5:6
hwinograd@pszjlaw.com 3:13

**< I >**
**idea** 14:*17, 18, 21*
  15:*10* 31:6
**identify** 32:*2, 5*
**IDF** 18:*4* 21:*17*
  22:*3* 30:23 49:*17*
  54:*20, 21* 55:*17*
**imagine** 31:*23* 35:*11*
  52:*23*
**impact** 11:*22* 28:*11*
  29:*2, 7* 35:*23* 36:*2,*
  *20, 25* 37:*18* 38:6
  39:*10, 13* 40:9 41:*14,*
  *22* 43:*17* 44:*17, 18*
  47:*13, 18* 48:7 50:*24*
  52:*13* 64:*1* 65:2
  69:*10* 72:6
**impacted** 15:6 45:*24*
  53:9 64:*23* 67:3
**impactful** 75:*11*
**impacts** 24:*3* 44:*12*
  47:*12*
**implicated** 63:*9*
**important** 9:*15, 19*
  40:*8*
**including** 61:*25*
**income** 18:*10, 13, 15,*
  *24, 25* 21:*11* 22:*16*
  28:*25* 47:*13, 23*
**increased** 29:5
**independent** 62:*5*
**INDEX** 7:*1*
**indicate** 78:*3*
**indirect** 25:*17* 26:*24*
  53:*23* 54:6, *14, 23*
  75:*4*
**indirectly** 23:*21*
  24:*1, 5* 44:*24*
**Indiscernible** 65:*24*
**individual** 42:*17, 21,*
  *25* 44:*8, 11, 16* 46:*15*
  64:*18, 22* 66:*10, 24*
**individuals** 42:*13*
  74:*15*
**infirmity** 10:*16*
**inform** 36:*24* 50:*23*
  52:5 69:*25* 70:*4*
**information** 33:*21*
  34:*1* 63:*11* 70:*14, 17,*

*25* 71:*1, 7* 73:3
  74:*15, 16*
**informed** 33:6, *14*
  52:*11* 60:5, *25* 73:*14*
**informing** 37:*17*
**Ingham** 1:*21* 2:*13*
  81:5, *21*
**inquired** 33:*22*
**inquiry** 32:*9, 11*
**insertion** 61:*25*
**insight** 31:*25*
**instruct** 67:*21*
**INSTRUCTION** 7:*2*
**INSTRUCTIONS**
  78:*1*
**Insurance** 4:*4* 17:*1,*
  *4, 5, 6, 12* 20:*20*
  28:*17, 18, 20* 29:*18,*
  *23*
**interest** 23:*10, 21*
  24:*2, 4, 6, 11, 13*
  25:*18* 26:*4, 19, 24*
  28:*4, 10* 29:6, *11, 25*
  35:*23* 36:*3, 21* 39:*16*
  41:*24* 47:*22* 49:*18*
  50:*24* 53:*13, 19, 23*
  54:*4, 5, 6, 8, 14, 23*
  81:*17*
**interested** 51:*23*
  53:7 70:*1*
**interests** 15:*4* 21:*18*
  37:*19*
**internal** 72:*10*
**introduced** 58:*5*
**inured** 75:*6*
**invest** 19:*24*
**invested** 18:*1*
**Investment** 4:*14* 5:*3*
  13:6, *9* 14:*25* 33:*24*
  36:*1, 24* 45:*20* 50:*23*
  51:*2, 25* 52:*14* 55:*4*
  70:*8* 71:*17, 23* 72:*10*
**investments** 11:*20*
  18:*3* 22:*6* 29:*17, 22*
  31:*23* 52:*11*
**involved** 70:*20*
**Islands** 16:*1* 59:*19*
  62:*13*
**issuer** 17:*6*

**its** 22:*23* 26:*4* 49:*18*
  50:*1* 81:*17*

**< J >**
**JAMES** 5:*19*
**January** 11:*13*
**JEFFREY** 3:*10*
**Jim** 12:*11* 14:7
**jmorris@pszjlaw.com**
  3:7
**JOHN** 3:6 8:*24*
  38:*13* 65:*19*
**joint** 59:*10, 16* 60:*1,*
  *6, 12, 15, 24* 61:6, *14,*
  *19* 76:*7, 17*
**JONES** 3:*14* 5:*18*
**jpomerantz@pszjlaw.c**
  **om** 3:*11*
**JULIE** 5:*21* 14:*2*
  15:*13* 16:*20*
**June** 1:*14* 2:*10*
**jurisdiction** 62:*9*

**< K >**
**KELLY** 5:*8*
**key** 50:6
**kind** 12:*25* 14:*4*
  15:*14* 31:6, *25* 34:*11*
  38:*1, 2, 5, 7* 40:*7, 8*
  52:*12*
**know** 9:*22* 10:*10, 25*
  13:*24* 14:6, *12, 16, 17*
  16:*12* 17:*25* 18:*2, 3*
  19:*17* 23:*1, 6, 9*
  25:*21* 26:7 29:*3*
  30:*22* 31:*18, 19, 21,*
  *23* 33:*10, 21* 34:*11*
  35:6, *12, 16* 36:*12*
  37:*15* 38:*9, 19* 39:*15*
  40:*10, 13, 25* 41:*1*
  42:*1, 14, 24* 46:*15*
  48:*20* 50:*19, 20* 51:*1,*
  *20* 52:*8, 12, 24* 53:*15*
  55:6, *13* 57:*23* 59:*3,*
  *15* 60:*4, 9* 64:*17*
  67:*1, 3, 7, 9* 69:*22*
  70:*7, 16, 23, 24* 71:*7*
  73:*25* 74:*1, 14, 16*
  75:*16*
**knowing** 64:*22* 66:*24*

**knowledge** 18:*11*
  22:*2* 31:*9* 60:*16*

**< L >**
**L.P** 1:*7*
**LANG** 4:*15, 17*
  77:*14*
**language** 37:*16*
**large** 40:*25*
**late** 21:*2*
**law** 8:*24* 62:*13*
**lawsuit** 37:5, *14, 23*
  39:*4, 24*
**lawyer** 10:*12, 14*
  12:*2* 62:*16*
**lay** 23:*15*
**lead** 65:*5*
**lean** 38:*7*
**leaned** 40:*7*
**learn** 37:*23*
**leave** 64:*3* 65:*13*
**led** 60:*24*
**left** 75:*16, 23*
**legal** 10:*14, 16* 11:*21*
  12:*24* 14:*4* 16:*22*
  17:*12* 38:*4, 7* 40:*7*
  52:*22* 53:*2* 61:*17*
  62:*25*
**legally** 52:*23* 53:*1*
**level** 31:*3* 34:*14*
**liability** 40:*14* 46:*25*
**Life** 4:*4* 16:*25* 17:*3,*
  *5*
**likelihood** 63:*2*
**Limited** 17:*1, 4, 6*
**LINE** 7:*3, 8, 13, 17*
  59:*8* 79:*5*
**liquidation** 62:*8*
**liquidators** 59:*11, 16*
  60:*1, 6, 12, 16, 25*
  61:*7, 14, 19* 76:*8, 17*
**liquidity** 75:*13*
**listen** 27:*4*
**lists** 55:*4*
**Litigation** 3:*19*
  15:*25* 16:*5, 9* 45:*16*
**little** 13:*22* 15:*9*
  23:*15* 48:*15* 57:*18*
  72:*19*

**LITTLETON** 1:*13*
2:*9* 6:*6* 8:*5, 17* 58:*8,
19* 63:*9* 66:*4* 76:*4*
77:*7* 80:*12*
**LLP** 3:*22* 4:*9* 5:*8*
**LOIGMAN** 3:*20*
**long** 11:*1, 10* 22:*22*
33:*1*
**longer** 49:*22*
**look** 55:*3*
**looked** 16:*17*
**looking** 14:*25* 19:*14*
59:*8*
**loss** 47:*22*
**lost** 47:*13* 72:*24*
75:*17*
**lot** 34:*19* 67:*5*
**LOUIS** 5:*4*
**Louisiana** 5:*10*
**LP** 8:*25* 12:*5* 15:*5*
18:*4* 22:*3* 45:*6* 55:*4*
**lphillips@kellyhart.co
m** 5:*5*

**< M >**
**M&E** 20:*11, 14, 17*
**Madden** 72:*14, 15*
**Madison** 3:*23*
**Main** 5:*9* 11:*17*
**making** 39:*17* 42:*13*
66:*24*
**MANAGEMENT** 1:*6*
3:*4* 8:*25* 12:*5* 26:*9,
13* 27:*9* 36:*8* 37:*6*
41:*25* 45:*6* 48:*22*
52:*9* 67:*19* 72:*15*
**Mark** 9:*6* 33:*1*
34:*10* 39:*2* 45:*25*
50:*8* 53:*3* 55:*21*
74:*9*
**MARKED** 6:*11* 7:*16*
58:*4*
**market** 20:*4* 28:*12,
14, 16, 23, 24* 29:*4, 8,
9, 14* 54:*12*
**MARKS** 7:*22* 78:*6*
**material** 70:*14, 16*
**Matt** 38:*20* 65:*20*
67:*25* 75:*16* 77:*9*

**matter** 30:*8*
**matters** 30:*10*
**MATTTHEW** 4:*5*
**mean** 38:*13*
**means** 11:*19*
**meet** 8:*19*
**member** 15:*16*
**met** 14:*6, 8*
**MICHAEL** 4:*15*
**million** 19:*20, 21, 23*
28:*4* 41:*1, 5, 14, 25*
42:*2* 49:*19* 52:*8*
53:*13* 71:*17* 72:*24*
73:*19, 22* 74:*12*
75:*12*
**mine** 62:*21*
**minutes** 75:*19, 23*
**missed** 20:*13*
**mlang@cwl.law.com**
4:*16*
**MNPI** 71:*3*
**mokin@okinadams.co
m** 4:*6*
**moment** 57:*15*
**money** 21:*1, 9* 22:*22*
**MORRIS** 3:*6* 6:*7*
8:*11, 24* 15:*23* 16:*23*
21:*6* 23:*14* 24:*10*
25:*19* 26:*1* 27:*2, 16*
28:*13* 36:*4* 37:*2*
38:*14, 20, 24* 39:*18*
42:*4, 19* 43:*9, 19*
44:*3* 45:*3* 47:*10*
48:*1, 10, 17* 49:*1, 8*
50:*7* 51:*6* 52:*1, 16*
53:*17* 54:*3, 15* 55:*12*
56:*12, 20* 57:*3, 9*
58:*2, 6, 25* 59:*4, 7*
60:*21* 61:*12* 63:*13,
14* 64:*4, 6* 65:*1, 11,
20* 66:*3, 17, 18* 67:*24*
68:*6, 9* 69:*6, 21* 70:*2,
10* 71:*6* 72:*18* 73:*6*
74:*8, 18* 75:*15, 20*
76:*3* 77:*3, 7, 14*
**motion** 37:*4, 10*
38:*10, 13, 15* 39:*12,
21, 25* 60:*7*
**Mountain** 5:*3* 13:*6,
8, 9* 15:*3* 18:*6* 24:*1*

29:*6, 12* 31:*14* 40:*18,
20* 41:*25* 42:*8* 45:*20*
46:*11* 49:*18, 21*
**move** 27:*3* 57:*11*
**moved** 66:*23*
**moving** 44:*8* 64:*18*
66:*10, 20*
**multiple** 33:*23*

**< N >**
**name** 8:*23* 16:*14*
**named** 12:*11*
**NATHAN** 5:*18*
**NECESSARILY** 7:*22*
34:*17*
**need** 10:*24* 34:*23*
35:*3* 57:*21* 58:*21*
73:*3* 77:*11*
**needed** 33:*20* 52:*19*
**negatively** 36:*3* 53:*9*
64:*23*
**negotiate** 68:*24*
**negotiating** 46:*15*
**negotiation** 43:*4*
65:*7* 68:*17* 69:*15*
**negotiations** 43:*13*
44:*6, 15* 46:*9*
**neither** 81:*15*
**never** 14:*8* 23:*6*
33:*25* 34:*25* 39:*19*
71:*24* 76:*7*
**New** 3:*16, 24*
**newly** 62:*1*
**news** 38:*2*
**NexPoint** 71:*18*
**nice** 8:*19*
**nonpublic** 70:*14, 16*
**normal** 51:*3*
**NORTHERN** 1:*2*
**Notary** 81:*8*
**notations** 78:*6*
**NOTE** 7:*21*
**notes** 19:*13* 55:*20,
21, 23*
**notice** 77:*10*
**notified** 74:*2*
**November** 19:*19*
**NUMBER** 6:*12* 12:*8*

**< O >**

**object** 10:*13* 15:*22*
16:*16* 23:*13, 23*
25:*13, 24* 26:*16* 28:*2*
35:*21* 36:*18* 38:*12*
39:*8* 41:*21* 42:*11*
43:*6, 14, 25* 45:*2*
47:*9, 20* 48:*8, 14, 23*
49:*6* 50:*4, 18* 51:*19*
52:*6* 53:*6, 25* 54:*7*
55:*9* 56:*10, 18* 57:*1,
7* 60:*19* 61:*9* 63:*7,
23* 64:*16* 65:*9, 18*
66:*8* 69:*1, 18* 70:*5*
71:*4* 73:*1* 74:*6, 13*
75:*8*
**objecting** 15:*10*
**objection** 9:*3* 12:*14,
16, 21* 13:*25* 14:*5, 14,
18, 22* 15:*24* 16:*14,
24* 23:*3* 27:*12* 40:*4*
49:*10, 15* 57:*13* 58:*9,
15* 60:*11* 61:*2*
**objections** 12:*23*
**obligation** 20:*7, 11*
22:*15* 35:*20, 24*
36:*23* 50:*21* 51:*23*
52:*25* 69:*25*
**obligations** 22:*23*
26:*15, 18* 27:*10*
68:*13* 69:*14*
**obtain** 51:*10* 52:*19*
56:*7, 14, 22* 61:*5*
**obtained** 39:*20* 71:*2*
**occasions** 33:*23*
**officer** 81:*8*
**official** 59:*10, 16*
60:*1, 6, 12, 15, 25*
61:*6, 14, 18* 76:*7, 17*
**officially** 60:*2*
**Oh** 41:*7* 42:*21*
**Okada** 12:*1* 14:*24*
16:*13* 17:*10, 13, 23*
18:*9, 17* 19:*23* 24:*2,
8* 25:*9, 16* 26:*21, 22*
28:*12, 15* 37:*19*
39:*13* 40:*9* 41:*13, 23*
42:*2, 23* 43:*17* 44:*18*
47:*14, 23* 49:*22*
55:*18* 56:*2* 69:*10*
75:*2*

**okay** 8:*21, 23* 9:*12,
17* 10:*8, 20, 21* 11:*2*
12:*13* 13:*21* 14:*12*
17:*3* 19:*11, 16* 20:*25*
21:*14* 22:*19* 23:*1, 20*
26:*2* 33:*4, 18* 34:*6*
35:*1* 37:*3* 39:*19*
40:*2* 41:*11* 44:*4*
45:*4, 9* 48:*11* 49:*2*
50:*8* 51:*7, 9* 58:*2*
59:*1* 60:*22* 61:*4*
62:*12* 64:*4, 7* 67:*25*
68:*8, 16* 69:*12* 70:*3,
11* 75:*15* 77:*13*
**OKIN** 4:*5, 9* 15:*22*
16:*16* 21:*4* 23:*13, 23*
25:*13, 24* 26:*16*
27:*12, 14* 28:*2* 35:*21*
36:*18* 38:*12, 18, 22*
39:*8* 41:*21* 42:*11*
43:*6, 14, 25* 45:*2*
47:*9, 20* 48:*8, 14, 23*
49:*6* 50:*4, 18* 51:*19*
52:*6* 53:*6, 25* 54:*7*
55:*9* 56:*10, 18* 57:*1,
7* 58:*19* 59:*2, 6*
60:*19* 61:*9* 63:*7, 23*
64:*16* 65:*9, 18, 21*
66:*8* 67:*21* 68:*1, 8*
69:*1, 18, 23* 70:*5*
71:*4* 73:*1* 74:*6, 13*
75:*8, 17* 77:*6, 14, 17*
**once** 34:*22*
**opine** 43:*8, 16* 44:*16*
45:*8, 9, 14, 18* 61:*18*
**opined** 55:*24*
**opinion** 62:*25* 63:*24*
66:*14*
**opportunity** 10:*17*
55:*19* 56:*3* 57:*24*
**option** 71:*11, 14, 16,
20, 21, 25* 72:*4, 8, 12,
25* 74:*4*
**order** 55:*23* 58:*22*
62:*19*
**org** 75:*3*
**organization** 11:*14*
16:*18* 30:*8* 32:*21, 25*
69:*19* 74:*22* 75:*11*
**organizational** 31:*5*

**organizations** 11:*24*
16:*6* 20:*2, 5* 21:*1, 9*
22:*15, 21* 24:*9, 25*
25:*9* 28:*6* 29:*15, 24*
30:*2* 44:*13* 45:*23*
46:*16* 47:*19* 48:*7*
50:*22* 53:*10* 56:*15*
59:*23* 63:*2* 64:*2*
69:*11*
**orgs** 39:*15*
**originally** 26:*20*
**originated** 14:*18*
**outcome** 81:*17*
**outlined** 67:*8*
**outside** 68:*12, 23*
69:*14*
**overall** 38:*6* 54:*9*
**overseeing** 12:*15*
**oversight** 11:*18, 20*
34:*13* 75:*4*
**owes** 25:*11* 26:*14*
27:*10* 35:*19* 36:*9, 16*
**owned** 21:*15* 32:*6,
10* 33:*16* 74:*19*
**ownership** 21:*20*
24:*6* 29:*25* 34:*13*
53:*19, 21, 23* 54:*5, 6*
**owns** 31:*6* 32:*3*

**< P >**

**p.m** 1:*15* 2:*11* 76:*1,
2* 77:*19*
**PACHULSKI** 3:*14*
5:*18*
**Pacific** 4:*18*
**PAGE** 6:*5, 12* 7:*3, 8,
13, 17* 79:*5*
**paid** 21:*1, 9* 49:*21*
**paragraph** 58:*3*
61:*22* 64:*5, 8* 68:*10*
70:*11, 13*
**part** 11:*25* 12:*24*
20:*14* 23:*11* 33:*19*
40:*15* 43:*8, 15* 44:*1*
46:*13* 47:*3* 50:*5*
54:*21*
**participate** 76:*12, 16*
**particular** 20:*23*
21:*19*

**parties** 3:*2* 38:*17*
43:*5* 46:*25* 48:*5*
51:*23* 59:*11* 64:*14*
66:*6* 70:*1* 81:*16*
**partnership** 21:*18*
**party** 13:*13, 18* 53:*7*
**patience** 77:*8*
**Patrick** 9:*6* 12:*19*
13:*3* 33:*1* 34:*10*
39:*2* 43:*23* 45:*25*
50:*9, 15, 22* 51:*10, 16*
52:*3* 53:*3* 55:*21*
56:*7, 14, 22* 61:*5*
64:*18* 65:*4* 68:*11, 22*
69:*13* 71:*2* 74:*9*
**Patrick's** 44:*21* 61:*24*
**PAUL** 5:*14*
**pay** 17:*16* 20:*1, 7, 10*
22:*15*
**payments** 17:*19, 21*
49:*20*
**payout** 28:*8* 42:*2*
**payouts** 40:*17* 53:*16*
**PE** 15:*4* 49:*17*
**peace** 64:*10* 67:*12*
**pending** 11:*2* 15:*25*
**percentage** 20:*19*
**period** 20:*22* 21:*12*
**permission** 37:*5*
38:*15*
**person** 34:*15* 51:*3,
25* 52:*15, 22* 61:*17*
**personally** 14:*8*
69:*19*
**persons** 70:*9*
**pertaining** 12:*16*
**pertinent** 13:*1*
**PHILLIPS** 5:*4* 77:*5,
15*
**piece** 20:*13*
**place** 44:*24* 66:*12*
**plan** 23:*12*
**planned** 60:*3*
**platform** 29:*20, 21*
**play** 17:*7* 43:*1*
44:*14*
**played** 31:*10*
**plays** 17:*9*
**please** 58:*3* 64:*5*

70:*12*
**PLLC** 4:*17*
**point** 58:*23*
**policies** 17:*11* 30:*5,
6* 36:*22*
**policy** 24:*7* 30:*1, 2, 4*
**POMERANTZ** 3:*10*
**portfolio** 15:*6*
**portfolios** 52:*13*
**portion** 15:*2* 18:*13*
58:*8*
**positive** 36:*3*
**possibility** 50:*1* 59:*6*
**potential** 55:*15* 67:*17*
**potentially** 39:*10*
41:*15* 47:*13*
**preparation** 14:*13*
**present** 2:*16* 5:*17*
54:*10*
**preserve** 24:*23*
**President** 14:*1* 16:*20*
**prevent** 51:*16* 61:*15*
**PREVIOUSLY** 6:*11*
58:*4*
**primarily** 15:*13*
**prior** 58:*21*
**privilege** 68:*4*
**privileged** 63:*10*
**privy** 74:*15*
**probably** 34:*14*
36:*12*
**problematic** 42:*18, 20*
**proceeding** 13:*15*
**proceedings** 2:*12*
77:*20* 81:*9, 11, 12*
**process** 9:*13, 14*
10:*23* 57:*19*
**produce** 28:*21*
**produced** 21:*11*
**product** 43:*3, 12*
44:*5* 46:*8*
**PRODUCTION** 7:*7*
**projected** 28:*25*
**proper** 11:*18*
**proposed** 9:*4* 12:*16*
45:*5, 10, 15* 46:*20*
47:*16* 48:*6* 49:*10*
56:*23* 61:*1* 64:*15*
65:*7*

proposing 40:*11*
propounded 80:*8*
protect 24:*23*
provide 56:*3*
provided 60:*10* 71:*2*
providing 47:*8*
Public 81:*8*
pull 40:*8*
pulling 38:*4*
purpose 31:*19* 62:*2*
pursued 40:*21*
pushed 75:*13*
put 14:*5* 57:*12, 22*
58:*7* 71:*10, 14, 16, 20*
72:*4, 8, 12, 17, 25*
73:*11, 17, 21* 74:*4, 11,*
*19* 75:*6*
putting 59:*5*

< Q >
quarter 15:*1*
quarterly 20:*15*
28:*22*
question 9:*16, 21*
10:*8, 16, 20* 11:*1*
21:*7* 27:*5* 61:*21*
63:*13, 17* 65:*10* 69:*2*
questionable 42:*14*
67:*1*
QUESTIONS 7:*16*
9:*15* 10:*13* 34:*16*
57:*25* 58:*23* 75:*18*
76:*14* 77:*4, 5* 80:*8*
quicker 13:*22*
QUINN 3:*22*
QUOTATION 7:*22*
quotations 66:*13*
QUOTE 7:*23* 59:*9*

< R >
Rand 15:*4* 18:*5*
29:*11, 12* 30:*17, 25*
31:*13* 49:*16*
Rand's 29:*6*
range 73:*19*
RAVER 5:*20*
RDR 1:*22* 81:*21*
reach 56:*1*

read 12:*23* 40:*2*
59:*9* 62:*10* 77:*18*
80:*6*
reading 19:*14* 78:*2*
really 53:*11* 61:*18*
Realtime 2:*14* 81:*6*
reason 10:*24* 25:*10,*
*23* 26:*12* 27:*8, 23*
35:*18* 43:*2* 45:*4, 7, 9,*
*14, 18* 46:*19* 47:*15*
48:*4* 50:*13* 51:*14*
53:*1* 56:*6, 13, 21*
57:*4, 10* 60:*14* 61:*4*
64:*13* 69:*13* 72:*4*
74:*7* 79:*7, 9, 11, 13,*
*15, 17, 19, 21, 23*
reasonable 46:*7*
reasons 74:*3* 78:*4*
79:*4*
recall 14:*11* 41:*2*
57:*21*
receive 20:*15* 22:*21*
27:*20, 24* 28:*7* 40:*11,*
*20* 42:*9* 44:*23* 50:*3*
received 35:*7, 13*
63:*11* 73:*25*
receives 46:*12*
Recess 76:*1*
recollection 57:*22*
recommendation
16:*22* 56:*3* 72:*11*
recommendations
18:*18*
record 81:*11*
recorded 2:*12*
recovered 73:*22*
reduced 81:*13*
refer 13:*8, 17*
REFERENCED 6:*11*
referred 31:*15* 70:*17*
referring 30:*4*
refers 15:*25* 70:*13*
71:*10*
REFLECT 7:*23*
refresh 57:*22*
regardless 22:*19*
50:*20*
Registered 2:*13* 81:*5*
reiterated 38:*5*

related 29:*2* 40:*6*
41:*6* 81:*15*
relates 11:*24* 27:*1*
30:*17* 41:*13*
relationship 23:*25*
24:*8, 22* 25:*16, 17*
26:*8* 51:*24* 74:*23*
75:*1*
relax 9:*12*
release 40:*14*
releases 47:*7, 16*
48:*2, 5*
releasing 46:*25*
rely 12:*24* 74:*16*
remind 63:*8*
REMOTE 1:*12* 2:*8*
3:*2*
reorganization 23:*12*
repeat 58:*13, 17*
rephrase 10:*10, 17*
Reported 1:*20*
Reporter 2:*14, 15*
10:*1* 65:*25* 77:*13*
81:*2, 6, 8*
REPORTER'S 7:*21*
reporting 11:*21*
represent 39:*15*
representative 52:*4*
53:*4*
representing 44:*13*
represents 8:*25*
REQUEST 7:*7*
required 37:*12*
51:*10* 56:*7, 14, 22*
61:*5*
research 38:*3*
respect 17:*8* 22:*6, 10*
25:*12* 33:*2* 65:*6*
69:*14*
respectfully 27:*3*
respectively 17:*23*
responsibilities 11:*16*
33:*19*
responsibility 24:*22*
25:*14* 42:*23*
responsible 73:*9*
restate 21:*7* 36:*19*
44:*7*
restructuring 43:*23*
44:*10, 21, 24* 46:*1, 12*

result 43:*20, 21*
44:*20* 46:*12*
review 12:*21* 57:*21*
reviewed 30:*24* 31:*1*
Right 13:*7* 15:*17*
19:*3, 6* 21:*12* 27:*24*
29:*10* 30:*1* 31:*16*
32:*22* 33:*2, 8* 34:*1, 2*
37:*16, 21* 39:*17*
42:*23* 46:*6* 51:*15*
53:*3, 11* 54:*20* 55:*7,*
*14, 25* 57:*5* 58:*12*
59:*20* 61:*14* 62:*16*
65:*15* 73:*7, 9* 74:*20*
76:*12, 23* 77:*6*
rise 48:*12, 20* 49:*3*
risk 20:*4, 10, 12, 20*
22:*6, 9, 11*
ROBERT 3:*20*
robertloigman@quinn
emanuel.com 3:*21*
role 14:*12* 17:*7, 9*
31:*10* 33:*1* 66:*20*
roll 24:*25* 26:*22*
31:*7* 54:*9, 19*
rolled 15:*5* 35:*10*
rolls 18:*5, 7* 49:*17*
roll-up 24:*1*
room 19:*2*
Rouge 5:*10*
roughly 41:*14*
Royal 21:*2*
RSA 1:*22* 81:*21*

< S >
sale 15:*3* 29:*5, 11*
52:*11*
saw 29:*4*
says 64:*8* 68:*10*
scheduled 76:*25*
scope 47:*7* 68:*12, 23*
screen 57:*12* 58:*7*
60:*11*
scroll 64:*5*
scrutiny 62:*4*
see 53:*8* 58:*21*
59:*13* 64:*11* 68:*14*
70:*13, 15* 71:*12*
seek 37:*9, 13, 16*

**seeking** 37:5

**seeks** 64:10 67:12

**seen** 31:5 51:22 64:1, 2

**SEERY** 5:19

**segregated** 21:15, 20, 22, 24 22:1, 20

**sell** 55:21, 23

**selling** 53:12

**sent** 19:24

**sentence** 59:13 64:7 71:10

**series** 9:15

**serve** 11:23

**served** 31:20

**set** 27:20 63:5 76:10, 19

**settle** 44:11

**settled** 64:20

**settlement** 9:4 12:17 13:14 23:25 24:3 27:1, 17 28:1, 8, 11 40:2, 6, 12, 16, 20 41:20 42:7, 9, 16 43:3, 11, 21 44:5, 18 45:5, 10, 15, 19 46:6, 7, 20, 24 47:2, 4, 5, 17, 22 48:6 49:11, 25 50:3, 9, 16 51:12, 17 52:21 53:16 56:4, 16, 24 59:12 60:7, 16 61:1, 7, 16 63:5, 21 64:9, 15, 21 65:8 67:11 68:17, 21, 24 69:9, 16

**settlements** 26:20 28:7 45:22

**settling** 66:25

**share** 50:1 66:17

**shares** 71:18 72:16, 20 73:24 74:2

**sharing** 19:6

**SHAWN** 5:20

**sheet** 26:4 54:9, 18, 23 55:1 78:5

**shifting** 42:22

**short** 75:22 77:10

**Shorthand** 2:15 81:2, 7

**sign** 77:18 78:5

**signed** 13:3 31:15 56:8

**significant** 36:25 43:17 49:20 50:23 67:3

**similar** 75:1

**sir** 8:19, 21 9:10, 18, 23 11:5 12:3, 6, 9, 12, 20 16:7 17:2, 20 18:12 19:4, 15 20:3 22:25 23:4, 8 25:8 26:6, 11 27:6, 15 30:12 31:12 32:4, 19 33:3, 7, 12, 17 34:5 35:5, 15 37:7, 11 39:1, 5, 22 40:1, 13 45:13, 17, 21 46:6, 22 47:11, 12 48:9, 24 49:7 51:8 53:21 56:19 57:2, 14 58:1 59:14, 17, 21, 24 60:8, 13 61:3, 10 62:10, 11, 14 64:12 65:12, 13 67:15 68:15, 20 70:15, 18, 21 71:5, 9, 13 73:10 74:7 76:9 77:2

**sit** 60:15

**situation** 51:5

**six** 32:22

**Skyview** 71:3

**sleep** 59:5

**smoothly** 27:7

**sold** 22:17 28:4 41:24 49:16, 18

**sole** 18:8 24:6

**solely** 68:16, 21

**somewhat** 42:18

**Sorry** 19:11 21:3 28:18 36:5, 10, 11 59:4 65:25

**sought** 39:20

**Sounds** 21:4, 5

**source** 18:9 70:25

**speak** 34:23 35:3 61:10, 13

**speculate** 63:16, 19

**speculation** 63:25

**speed** 38:8

**spoke** 76:17

**spoken** 14:9

**standpoint** 44:12 46:18

**STANG** 3:14 5:18

**start** 8:12

**starting** 36:20

**state** 28:22 43:16 66:9 70:25

**stated** 65:14 69:4

**statement** 28:21 54:11 55:4

**statements** 20:15 25:1 26:23

**STATES** 1:1 61:23

**Stenographically** 1:20 2:13 81:13

**stewardship** 11:18

**STIPULATIONS** 7:12

**stream** 21:11 22:16 29:1

**streams** 47:23

**Street** 4:10 5:9

**strike** 27:4

**structure** 28:5, 9 29:18, 20 30:14, 16, 17, 19, 21, 23 32:12 35:11 62:2

**structures** 31:24

**stuff** 10:14

**sub** 29:3

**subject** 13:14 40:3 62:4, 6

**Subtrust** 45:16

**succeed** 62:20 63:3, 20

**succeeding** 63:4

**successful** 32:15

**sue** 38:16

**suggest** 43:11 66:20

**Suite** 4:10, 18 5:9

**SULLIVAN** 3:22

**sum** 40:25

**summary** 12:25

**Sunday** 1:14 2:10 8:14, 18

**supervision** 81:14

**supplied** 78:5

**SUPPORT** 7:1

**supporting** 11:24 16:6, 18 20:2, 5 21:1, 9 22:15, 20 24:9, 25 25:9 28:6 29:15, 24 30:2, 8 39:15 44:12 47:18 48:7 50:22 53:10 56:15 63:2 64:2 69:11 74:22 75:3, 10

**supposed** 26:21

**Sure** 13:23 15:12 48:3, 18 58:23

**surprised** 10:22

**sworn** 8:6

**Systems** 81:7

**< T >**

**take** 15:10 20:11, 16, 19 22:9, 11 57:15 75:22, 23

**taken** 44:24 66:12 76:1 81:9, 12

**takes** 20:9 22:5

**talked** 31:13 45:24

**talking** 38:15 66:1

**team** 12:24 14:4 38:4, 7 40:7 76:15, 18

**tell** 8:13 32:15 38:21 57:18

**telling** 74:10

**tenure** 33:13 34:4, 21 35:2

**terms** 42:6 49:24 66:15

**testified** 8:8

**testify** 8:6

**testimony** 9:24 78:4 80:7

**TEXAS** 1:2 4:11, 19

**Thank** 26:2 32:24 77:7, 9

**Thanks** 8:14

**therefor** 78:4

**thing** 29:3 42:12

**things** 44:14 46:2, 4, 5 51:20 66:25 69:4, 7

**think** 10:15 14:10 15:12 16:17 19:21

21:*19*  24:*4*  26:*19, 24*
29:*18*  33:*18*  34:*10*
36:*22*  37:*15, 17*  39:*6,*
*16*  40:*15*  41:*1, 22*
42:*17, 25*  44:*9, 14*
46:*13*  47:*21*  51:*20,*
*21*  52:*7*  53:*7, 10*
57:*21*  62:*15*  66:*11,*
*23*  67:*1*  68:*1, 2*  69:*3,*
*5, 24*  70:*6*  71:*17, 18*
73:*2, 8, 23*  74:*9, 14*
76:*4*
**thinking**  15:*14*  41:*8*
**Third**  3:*15*  59:*8*
**thoroughly**  73:*4*
**thought**  36:*10*
**three**  15:*19*  32:*17*
**tied**  20:*21, 22*
**time**  1:*15*  2:*12*  9:*11*
10:*12, 25*  14:*11*
20:*22*  21:*12*  22:*22*
33:*4, 13*  34:*3, 11*
35:*2*  46:*3, 6, 9*  52:*10*
58:*20*  59:*3*  60:*24*
66:*2*  69:*9*  72:*10, 14*
75:*15*  76:*20*  77:*8, 20*
**times**  69:*4*
**timing**  53:*14*
**today**  9:*2, 25*  11:*25*
13:*10*  26:*13*  32:*3*
33:*10*  35:*20*  38:*4*
39:*14*  60:*15*  72:*17*
**told**  37:*20*  38:*18, 22*
65:*22*  73:*15*
**TORREY**  1:*13*  2:*9*
6:*6*  8:*5*  80:*12*
**total**  32:*23*
**track**  75:*17*
**transaction**  55:*15*
**transactions**  53:*3*
**transcribed**  2:*15*
9:*25*
**transcript**  78:*6*  80:*7*
81:*10*
**transcripts**  77:*18*
**transfer**  34:*12*
**transferred**  73:*5*
**transpired**  15:*1*
**tribunal**  62:*8*
**tried**  34:*15*

**true**  34:*3*  46:*2, 4, 5*
47:*24*  51:*21*  69:*5, 7*
80:*10*  81:*11*
**Trust**  3:*5*  4:*14*  5:*3*
9:*1*  13:*6, 9*  23:*11, 18,*
*22*  26:*5, 10, 14, 25*
27:*10*  30:*14, 15*  36:*8*
45:*12, 20*  49:*5*  67:*20*
71:*17, 18*  74:*5*
**Trustee**  3:*19*  34:*12*
51:*2*
**trustees**  70:*9*
**truth**  8:*7*
**try**  10:*10, 25*  72:*5*
**trying**  40:*14*  52:*7*
**two**  16:*19*  28:*6*
44:*12, 14*  46:*2, 4, 5*
51:*20*  69:*4, 7*
**types**  31:*22*
**typewriting**  81:*14*
**typically**  18:*23*

**< U >**
**ultimately**  15:*5*  18:*5,*
*7, 20*  19:*23*  24:*24*
28:*11*  31:*7*  41:*23*
75:*9*
**uncertainty**  67:*5*
**underlying**  18:*2*
21:*20*  32:*13, 16*
**understand**  9:*7, 24*
10:*6, 9*  29:*21*  34:*12*
43:*1*  44:*9*  49:*9*  50:*8*
53:*11*  54:*11*  58:*14*
66:*1, 22*  72:*19*  73:*3*
**understanding**  20:*6*
21:*8*  22:*18*  25:*2, 5*
31:*4*  32:*14, 16*  41:*4*
49:*14*  50:*12*  62:*18*
67:*14*
**unfair**  45:*5, 11, 15,*
*19*  46:*20*
**Unfortunately**  59:*9*
**UNITED**  1:*1*
**unpack**  15:*8*
**unsuccessfully**  32:*12*
**URQUHART**  3:*22*
**use**  28:*22*  37:*17*

**< V >**
**valuations**  34:*16*
**value**  15:*6*  22:*10, 12,*
*19*  28:*15, 16, 23, 24*
29:*5, 8, 9, 14*  30:*9*
35:*7, 11, 13*  36:*21*
37:*1*  54:*12*  73:*15, 24*
**values**  28:*12*
**various**  62:*23*
**vehicle**  18:*24*  19:*1*
33:*24*  50:*25*  55:*5*
71:*23*  72:*21*  73:*5*
**vehicles**  31:*22*
**verbatim**  10:*4*  41:*3*
58:*14, 17*
**veto**  61:*14*
**videoconferencing**  3:*2*
**video-conferencing**
2:*10*
**VIDEOGRAPHER**
5:*13*
**VIDEO-RECORDED**
1:*12*  2:*8*
**view**  52:*2*  63:*1*
**Vine**  4:*10*
**volume**  78:*2, 6*

**< W >**
**walk**  12:*25*
**want**  8:*12*  10:*17*
66:*12*  68:*16*  70:*20*
77:*17*
**wanted**  53:*5*  55:*21*
76:*14, 19*
**watching**  75:*16*
**way**  29:*21*  31:*24*
**wearing**  34:*18*
**Wednesday**  60:*18*
68:*7*
**week**  60:*3*
**Well**  14:*23*  18:*15*
22:*9*  24:*11*  38:*1*
41:*22*  42:*12*  52:*7*
68:*12*  73:*7*
**we're**  8:*18*  9:*1*  19:*6*
24:*6*  38:*14*  52:*11*
57:*11, 12*  68:*3*  69:*23*
**we've**  31:*13, 14*
34:*25*  45:*24*  64:*1*

69:*5*
**WINOGRAD**  3:*12*
**wish**  79:*3*
**WISHNEW**  4:*17*
**withdraw**  55:*24*
**withdrawn**  17:*15*
21:*23*  23:*15*  25:*4*
35:*17*  54:*4*  70:*23*
**witness**  8:*13*  21:*5*
27:*13*  58:*24*  69:*22*
**wondering**  48:*19*
**words**  49:*14*
**wore**  34:*18*
**working**  33:*19*  38:*4*
**world**  60:*23*
**worries**  8:*16*
**worth**  22:*13*  41:*5*
74:*12*
**wrapped**  29:*23*
**written**  10:*4*
**wrong**  39:*6, 12*
64:*14*  65:*22, 23*  66:*6,*
*13*
**wrongdoing**  65:*6*

**< Y >**
**Yeah**  12:*23*  13:*5*
14:*1*  15:*12*  17:*9, 18*
19:*11*  20:*9*  21:*5*
29:*13*  30:*1*  33:*22*
36:*14*  40:*5*  41:*7, 12*
43:*7*  45:*7*  47:*3, 5*
49:*16*  50:*5*  55:*2, 17*
58:*13*  63:*12*  66:*22*
68:*10*  69:*24*  70:*6*
71:*15*  73:*18, 23*
76:*13*
**year**  43:*24*  72:*22*
**years**  11:*14*  12:*8*
32:*12, 17*  37:*4, 25*
**York**  3:*16, 24*

**< Z >**
**ZIEHL**  3:*14*  5:*18*
**Zoom**  57:*19*

## WORD LIST

**< $ >**
**$22** *(1)*
**$23** *(1)*
**$29** *(1)*
**$300** *(1)*
**$650** *(1)*
**$7** *(1)*
**$9** *(5)*

**< 1 >**
**1** *(2)*
**1.5** *(1)*
**10010** *(1)*
**10017-2024** *(1)*
**11** *(1)*
**1113** *(1)*
**13** *(3)*
**16** *(2)*
**1600** *(1)*
**1700** *(1)*
**18** *(2)*
**19-34054-sgj11** *(1)*
**1st** *(1)*

**< 2 >**
**2015** *(2)*
**2019** *(1)*
**2022** *(1)*
**2025** *(3)*
**21** *(1)*
**212.849.7615** *(1)*
**214.817.4500** *(1)*
**22** *(2)*
**225.381.9643** *(1)*
**22nd** *(1)*
**2390** *(1)*
**23-plus** *(1)*
**240** *(1)*

**< 3 >**
**3:30** *(2)*
**30(b)(6** *(1)*
**300** *(1)*
**301** *(1)*
**310.277.6910** *(1)*
**32** *(1)*
**33** *(2)*

**34** *(1)*
**34th** *(1)*

**< 4 >**
**4:42** *(1)*
**4:49** *(1)*
**4:50** *(1)*

**< 5 >**
**51** *(1)*
**58** *(1)*

**< 6 >**
**67** *(1)*

**< 7 >**
**70801** *(1)*
**713.228.4100** *(1)*
**75201** *(1)*
**77002** *(1)*
**780** *(1)*
**7-year** *(1)*

**< 8 >**
**8** *(1)*
**8635** *(3)*

**< 9 >**
**918,000** *(1)*

**< A >**
**ability** *(2)*
**able** *(6)*
**absolutely** *(4)*
**accommodate** *(1)*
**accounts** *(8)*
**acted** *(3)*
**acting** *(4)*
**action** *(3)*
**actions** *(4)*
**activity** *(4)*
**actual** *(1)*
**ADAMS** *(1)*
**add** *(1)*
**addition** *(1)*
**administrative** *(1)*
**Administrator** *(1)*
**adverse** *(1)*
**advised** *(1)*

**advisor** *(4)*
**advisor/control** *(1)*
**advisors** *(2)*
**affiliated** *(1)*
**affiliates** *(4)*
**affirmed** *(1)*
**afternoon** *(1)*
**ago** *(3)*
**agree** *(3)*
**agreed** *(2)*
**agreed-upon** *(1)*
**agreement** *(57)*
**ahead** *(2)*
**ahurt@kellyhart.com** *(1)*
**allow** *(3)*
**allows** *(1)*
**alternative** *(1)*
**AMELIA** *(1)*
**amount** *(4)*
**amounts** *(1)*
**ample** *(1)*
**analysis** *(1)*
**annuities** *(26)*
**annuity** *(12)*
**ANSWER** *(16)*
**answered** *(2)*
**answers** *(1)*
**Anybody** *(11)*
**anyway** *(2)*
**apologies** *(1)*
**apologize** *(2)*
**apologizing** *(1)*
**apparent** *(1)*
**appear** *(3)*
**appeared** *(2)*
**appointed** *(1)*
**appreciate** *(2)*
**approval** *(4)*
**approve** *(1)*
**approved** *(10)*
**approximately** *(1)*
**April** *(1)*
**argumentative** *(1)*
**arises** *(1)*
**arm's-length** *(4)*
**arranging** *(1)*
**aside** *(1)*
**asked** *(2)*

**asking** *(4)*
**aspect** *(1)*
**aspects** *(1)*
**assert** *(1)*
**asset** *(2)*
**assets** *(34)*
**associated** *(1)*
**Associates** *(1)*
**assumed** *(1)*
**assumption** *(2)*
**Atlas** *(19)*
**attached** *(1)*
**Attorney** *(143)*
**attorney-client** *(2)*
**audited** *(1)*
**auditors** *(2)*
**authority** *(2)*
**authorization** *(1)*
**authorize** *(1)*
**authorized** *(3)*
**Avenue** *(3)*
**avoidance** *(3)*
**avoiding** *(1)*
**aware** *(32)*

**< B >**
**BA** *(2)*
**back** *(5)*
**balance** *(5)*
**ballpark** *(1)*
**BANKRUPTCY** *(9)*
**BARTLETT** *(1)*
**based** *(6)*
**basis** *(4)*
**Baton** *(1)*
**Beacon** *(1)*
**beginning** *(1)*
**behalf** *(22)*
**belief** *(1)*
**believe** *(62)*
**beneficial** *(1)*
**benefit** *(4)*
**benefited** *(2)*
**best** *(1)*
**beyond** *(2)*
**billion** *(1)*
**bit** *(7)*
**board** *(4)*
**boards** *(1)*

breach *(1)*
breached *(1)*
break *(3)*
bring *(1)*
bringing *(1)*
buy *(2)*

**< C >**
CA-Certified *(1)*
CA-CSR *(2)*
call *(6)*
called *(2)*
capable *(1)*
capacity *(4)*
CAPITAL *(16)*
care *(1)*
carefully *(1)*
carry *(1)*
Case *(4)*
cash *(2)*
casual *(1)*
cause *(3)*
causing *(2)*
caveat *(1)*
Cayman *(4)*
Central *(3)*
certain *(6)*
CERTIFICATE *(1)*
Certified *(3)*
certify *(2)*
CFO *(9)*
chance *(1)*
CHANGE *(9)*
changes *(4)*
Chapter *(1)*
charitable *(9)*
charities *(2)*
charts *(1)*
claim *(4)*
Claimant *(16)*
claims *(4)*
CLARITY *(2)*
clawback *(2)*
clawing *(2)*
clear *(2)*
clearly *(2)*
colleague *(1)*
combination *(1)*
Come *(1)*

comfort *(1)*
comfortable *(1)*
commenced *(3)*
comment *(1)*
communicate *(2)*
communicated *(2)*
communication *(3)*
communications *(2)*
community *(3)*
company *(1)*
compensate *(1)*
compensates *(1)*
complicated *(1)*
complies *(1)*
computer *(1)*
concern *(3)*
concerned *(2)*
concerns *(3)*
concluded *(1)*
conference *(1)*
confirm *(1)*
confused *(1)*
connection *(1)*
consent *(10)*
consequential *(1)*
consider *(2)*
consideration *(1)*
considering *(2)*
constituted *(1)*
consummation *(2)*
Cont'd *(2)*
contemplating *(1)*
contends *(2)*
context *(1)*
contract *(4)*
contracts *(4)*
contractual *(2)*
contribution *(1)*
contributions *(1)*
control *(6)*
controlled *(3)*
conversation *(7)*
conversations *(5)*
conversion *(1)*
convert *(1)*
converted *(6)*
convoluted *(1)*
copies *(1)*
copy *(1)*

correct *(36)*
corrections *(2)*
correctly *(1)*
corresponding *(1)*
counsel *(3)*
counterparty *(1)*
couple *(3)*
course *(2)*
COURT *(13)*
Court-appointed *(1)*
CRAWFORD *(1)*
create *(1)*
created *(3)*
cross-talk *(1)*
Crown *(45)*
CRR *(2)*
cumbersome *(1)*
current *(1)*
Currently *(1)*
CURRY *(2)*

**< D >**
DAF *(2)*
DALLAS *(116)*
D'AMBRA *(1)*
data *(1)*
DAVID *(1)*
day *(2)*
dcurry@okinadams.com *(1)*
deal *(1)*
debate *(1)*
Debtor *(3)*
decided *(1)*
decision *(3)*
decision-making *(1)*
decisions *(7)*
Defendant *(2)*
Delaware *(1)*
delivered *(1)*
DEMO *(1)*
depends *(1)*
DEPONENT *(1)*
deposed *(1)*
DEPOSITION *(6)*
depositions *(1)*
describe *(1)*
described *(2)*
describing *(1)*

detail *(1)*
details *(1)*
determine *(1)*
device *(1)*
DIAZ *(4)*
difference *(1)*
different *(4)*
Diplomate *(2)*
DIRECT *(7)*
direction *(1)*
directly *(12)*
director *(1)*
directs *(1)*
disapprove *(1)*
discovery *(1)*
discussion *(1)*
disposition *(2)*
distribute *(1)*
distributions *(5)*
DISTRICT *(1)*
diverting *(1)*
dividends *(1)*
DIVISION *(1)*
document *(3)*
documentation *(2)*
DOCUMENTS *(6)*
doing *(5)*
dollar *(1)*
dollars *(7)*
Dondero *(6)*
Dondero's *(1)*
donor-advised *(2)*
dressing *(1)*
due *(1)*
Dugaboy *(3)*
duly *(1)*
duration *(1)*
duties *(7)*
duty *(13)*

**< E >**
earlier *(3)*
easier *(1)*
economic *(12)*
elaborate *(1)*
emails *(1)*
EMANUEL *(1)*
employed *(1)*
employment *(1)*

Empower (33)
enabled (1)
engaged (2)
enraptured (1)
ensure (1)
enter (3)
entered (3)
entering (10)
entire (1)
entities (48)
entity (6)
entry (1)
Errata (1)
ESQ (10)
established (1)
event (1)
evidence (1)
exact (1)
EXAMINATION (2)
examined (1)
example (1)
exchange (1)
excuse (1)
execution (2)
exercise (3)
exercised (5)
exercising (2)
Exhibit (2)
EXHIBITS (1)
expect (2)
expectation (3)
expense (2)
expenses (1)
expert (1)
expired (1)
explain (1)
explained (1)
exposure (1)
extend (1)
extent (2)

< F >
fact-finding (1)
facts (28)
fail (1)
fair (42)
faith (1)
familiar (10)
Family (8)

fan (2)
February (2)
fee (1)
feed (1)
feedback (1)
feeds (1)
feel (2)
felt (1)
fiduciary (16)
file (5)
filed (12)
filing (7)
finance (2)
financial (5)
financially (1)
finish (3)
firm (1)
first (5)
five-minute (1)
fixed (8)
Floor (2)
flow (7)
flows (2)
fluctuations (1)
focus (2)
focused (1)
Focusing (2)
following (2)
follows (1)
foregoing (3)
form (53)
formal (2)
formed (1)
forth (1)
Foundation (101)
foundations (3)
Foundation's (20)
full (1)
Fund (18)
funded (2)
funding (2)
funds (4)
fund's (1)
Further (2)
future (6)

< G >
Gail (7)
gdemo@pszjlaw.com

generally (2)
gentleman (1)
getting (2)
give (10)
given (4)
gives (2)
glance (1)
Global (44)
go (10)
goal (1)
going (23)
Good (4)
good-faith (6)
governing (5)
granting (2)
grant-making (1)
grants (2)
GREGORY (1)
grow (1)
guaranteed (1)
guy (1)

< H >
half (1)
HALL (1)
HALLMAN (1)
happen (1)
happened (4)
hard (1)
harm (1)
HART (1)
hat (1)
hats (1)
HAYLEY (1)
head (2)
hear (3)
heard (3)
held (5)
helped (2)
Hey (1)
high (2)
HIGHLAND (59)
Highland's (2)
high-level (2)
historical (1)
HMIT (65)
hold (7)
Holdco (2)

holdings (1)
holds (1)
honest (1)
Hospitality (1)
Houston (1)
Hunter (18)
HURT (1)
hwinograd@pszjlaw.c
om (1)

< I >
idea (5)
identify (2)
IDF (8)
imagine (3)
impact (29)
impacted (5)
impactful (1)
impacts (3)
implicated (1)
important (3)
including (1)
income (10)
increased (1)
independent (1)
INDEX (1)
indicate (1)
indirect (7)
indirectly (4)
Indiscernible (1)
individual (11)
individuals (1)
infirmity (1)
inform (5)
information (12)
informed (6)
informing (1)
Inghram (4)
inquired (1)
inquiry (2)
insertion (1)
insight (1)
instruct (1)
INSTRUCTION (1)
INSTRUCTIONS (1)
Insurance (12)
interest (34)
interested (3)
interests (3)

internal *(1)*
introduced *(1)*
inured *(1)*
invest *(1)*
invested *(1)*
Investment *(18)*
investments *(7)*
involved *(1)*
Islands *(3)*
issuer *(1)*
its *(5)*

**< J >**
JAMES *(1)*
January *(1)*
JEFFREY *(1)*
Jim *(2)*
jmorris@pszjlaw.com *(1)*
JOHN *(4)*
joint *(12)*
JONES *(2)*
jpomerantz@pszjlaw.com *(1)*
JULIE *(4)*
June *(2)*
jurisdiction *(1)*

**< K >**
KELLY *(1)*
key *(1)*
kind *(13)*
know *(76)*
knowing *(2)*
knowledge *(4)*

**< L >**
L.P *(1)*
LANG *(3)*
language *(1)*
large *(1)*
late *(1)*
law *(2)*
lawsuit *(5)*
lawyer *(4)*
lay *(1)*
lead *(1)*
lean *(1)*
leaned *(1)*

learn *(1)*
leave *(2)*
led *(1)*
left *(2)*
legal *(14)*
legally *(2)*
level *(2)*
liability *(2)*
Life *(4)*
likelihood *(1)*
Limited *(3)*
LINE *(6)*
liquidation *(1)*
liquidators *(12)*
liquidity *(1)*
listen *(1)*
lists *(1)*
Litigation *(5)*
little *(7)*
LITTLETON *(12)*
LLP *(3)*
LOIGMAN *(1)*
long *(4)*
longer *(1)*
look *(1)*
looked *(1)*
looking *(3)*
loss *(1)*
lost *(3)*
lot *(2)*
LOUIS *(1)*
Louisiana *(1)*
LP *(7)*
lphillips@kellyhart.com *(1)*

**< M >**
M&E *(3)*
Madden *(2)*
Madison *(1)*
Main *(2)*
making *(3)*
MANAGEMENT *(15)*
Mark *(9)*
MARKED *(3)*
market *(11)*
MARKS *(2)*
material *(2)*

Matt *(5)*
matter *(1)*
matters *(1)*
MATTTHEW *(1)*
mean *(1)*
means *(1)*
meet *(1)*
member *(1)*
met *(2)*
MICHAEL *(1)*
million *(18)*
mine *(1)*
minutes *(2)*
missed *(1)*
mlang@cwl.law.com *(1)*
MNPI *(1)*
mokin@okinadams.com *(1)*
moment *(1)*
money *(3)*
MORRIS *(79)*
motion *(9)*
Mountain *(19)*
move *(2)*
moved *(1)*
moving *(4)*
multiple *(1)*

**< N >**
name *(2)*
named *(1)*
NATHAN *(1)*
NECESSARILY *(2)*
need *(7)*
needed *(2)*
negatively *(3)*
negotiate *(1)*
negotiating *(1)*
negotiation *(4)*
negotiations *(4)*
neither *(1)*
never *(7)*
New *(4)*
newly *(1)*
news *(1)*
NexPoint *(1)*
nice *(1)*
nonpublic *(2)*

normal *(1)*
NORTHERN *(1)*
Notary *(1)*
notations *(1)*
NOTE *(1)*
notes *(4)*
notice *(1)*
notified *(1)*
November *(1)*
NUMBER *(2)*

**< O >**
object *(53)*
objecting *(1)*
objection *(22)*
objections *(1)*
obligation *(10)*
obligations *(6)*
obtain *(6)*
obtained *(2)*
occasions *(1)*
officer *(1)*
official *(12)*
officially *(1)*
Oh *(2)*
Okada *(33)*
okay *(51)*
OKIN *(71)*
once *(1)*
opine *(8)*
opined *(1)*
opinion *(3)*
opportunity *(4)*
option *(11)*
order *(3)*
org *(1)*
organization *(8)*
organizational *(1)*
organizations *(27)*
orgs *(1)*
originally *(1)*
originated *(1)*
outcome *(1)*
outlined *(1)*
outside *(3)*
overall *(2)*
overseeing *(1)*
oversight *(4)*
owes *(6)*

owned  (5)
ownership  (9)
owns  (2)

< P >
p.m  (5)
PACHULSKI  (2)
Pacific  (1)
PAGE  (7)
paid  (3)
paragraph  (7)
part  (13)
participate  (2)
particular  (2)
parties  (11)
partnership  (1)
party  (3)
patience  (1)
Patrick  (27)
Patrick's  (2)
PAUL  (1)
pay  (5)
payments  (3)
payout  (2)
payouts  (2)
PE  (2)
peace  (2)
pending  (2)
percentage  (1)
period  (2)
permission  (2)
person  (6)
personally  (2)
persons  (1)
pertaining  (1)
pertinent  (1)
PHILLIPS  (3)
piece  (1)
place  (2)
plan  (1)
planned  (1)
platform  (2)
play  (3)
played  (1)
plays  (1)
please  (3)
PLLC  (1)
point  (1)
policies  (4)

policy  (4)
POMERANTZ  (1)
portfolio  (1)
portfolios  (1)
portion  (3)
positive  (1)
possibility  (2)
potential  (2)
potentially  (3)
preparation  (1)
present  (3)
preserve  (1)
President  (2)
prevent  (2)
PREVIOUSLY  (2)
primarily  (1)
prior  (1)
privilege  (1)
privileged  (1)
privy  (1)
probably  (2)
problematic  (1)
proceeding  (1)
proceedings  (5)
process  (4)
produce  (1)
produced  (1)
product  (4)
PRODUCTION  (1)
projected  (1)
proper  (1)
proposed  (13)
proposing  (1)
propounded  (1)
protect  (1)
provide  (1)
provided  (2)
providing  (1)
Public  (1)
pull  (1)
pulling  (1)
purpose  (2)
pursued  (1)
pushed  (1)
put  (20)
putting  (1)

< Q >
quarter  (1)

quarterly  (2)
question  (13)
questionable  (2)
QUESTIONS  (11)
quicker  (1)
QUINN  (1)
QUOTATION  (1)
quotations  (1)
QUOTE  (2)

< R >
Rand  (8)
Rand's  (1)
range  (1)
RAVER  (1)
RDR  (2)
reach  (1)
read  (6)
reading  (2)
really  (2)
Realtime  (3)
reason  (39)
reasonable  (1)
reasons  (3)
recall  (3)
receive  (10)
received  (4)
receives  (1)
Recess  (1)
recollection  (1)
recommendation  (3)
recommendations  (2)
record  (1)
recorded  (1)
recovered  (1)
reduced  (1)
refer  (2)
REFERENCED  (1)
referred  (2)
referring  (1)
refers  (3)
REFLECT  (1)
refresh  (1)
regardless  (1)
Registered  (2)
reiterated  (1)
related  (4)
relates  (4)
relationship  (9)

relax  (1)
release  (1)
releases  (4)
releasing  (1)
rely  (2)
remind  (1)
REMOTE  (3)
reorganization  (1)
repeat  (2)
rephrase  (2)
Reported  (1)
Reporter  (10)
REPORTER'S  (1)
reporting  (1)
represent  (1)
representative  (2)
representing  (1)
represents  (1)
REQUEST  (1)
required  (6)
research  (1)
respect  (7)
respectfully  (1)
respectively  (1)
responsibilities  (2)
responsibility  (3)
responsible  (1)
restate  (3)
restructuring  (6)
result  (4)
review  (2)
reviewed  (2)
Right  (38)
rise  (3)
risk  (7)
ROBERT  (1)
robertloigman@quinn
emanuel.com  (1)
role  (6)
roll  (5)
rolled  (1)
rolls  (3)
roll-up  (1)
room  (1)
Rouge  (1)
roughly  (1)
Royal  (1)
RSA  (2)

Deposition of Torrey Littleton

In re Highland Capital Management, L.P.

**< S >**
sale  (4)
saw  (1)
says  (2)
scheduled  (1)
scope  (3)
screen  (3)
scroll  (1)
scrutiny  (1)
see  (8)
seek  (3)
seeking  (1)
seeks  (2)
seen  (4)
SEERY  (1)
segregated  (6)
sell  (2)
selling  (1)
sent  (1)
sentence  (3)
series  (1)
serve  (1)
served  (1)
set  (4)
settle  (1)
settled  (1)
settlement  (68)
settlements  (3)
settling  (1)
share  (2)
shares  (5)
sharing  (1)
SHAWN  (1)
sheet  (6)
shifting  (1)
short  (2)
Shorthand  (3)
sign  (2)
signed  (3)
significant  (5)
similar  (1)
sir  (87)
sit  (1)
situation  (1)
six  (1)
Skyview  (1)
sleep  (1)
smoothly  (1)
sold  (5)

sole  (2)
solely  (2)
somewhat  (1)
Sorry  (9)
sought  (1)
Sounds  (2)
source  (2)
speak  (4)
speculate  (2)
speculation  (1)
speed  (1)
spoke  (1)
spoken  (1)
standpoint  (2)
STANG  (2)
start  (1)
starting  (1)
state  (4)
stated  (1)
statement  (3)
statements  (3)
STATES  (2)
Stenographically  (3)
stewardship  (1)
STIPULATIONS  (1)
stream  (3)
streams  (1)
Street  (2)
strike  (1)
structure  (13)
structures  (1)
stuff  (2)
sub  (1)
subject  (4)
Subtrust  (1)
succeed  (3)
succeeding  (1)
successful  (1)
sue  (1)
suggest  (2)
Suite  (3)
SULLIVAN  (1)
sum  (1)
summary  (1)
Sunday  (4)
supervision  (1)
supplied  (1)
SUPPORT  (1)
supporting  (30)

supposed  (1)
Sure  (6)
surprised  (1)
sworn  (1)
Systems  (1)

**< T >**
take  (9)
taken  (5)
takes  (2)
talked  (2)
talking  (2)
team  (7)
tell  (5)
telling  (1)
tenure  (4)
terms  (3)
testified  (1)
testify  (1)
testimony  (3)
TEXAS  (3)
Thank  (4)
Thanks  (1)
therefor  (1)
thing  (2)
things  (8)
think  (50)
thinking  (2)
Third  (2)
thoroughly  (1)
thought  (1)
three  (2)
tied  (2)
time  (31)
times  (1)
timing  (1)
today  (12)
told  (5)
TORREY  (5)
total  (1)
track  (1)
transaction  (1)
transactions  (1)
transcribed  (2)
transcript  (3)
transcripts  (1)
transfer  (1)
transferred  (1)
transpired  (1)

tribunal  (1)
tried  (1)
true  (10)
Trust  (24)
Trustee  (3)
trustees  (1)
truth  (3)
try  (3)
trying  (2)
two  (10)
types  (1)
typewriting  (1)
typically  (1)

**< U >**
ultimately  (10)
uncertainty  (1)
underlying  (4)
understand  (17)
understanding  (13)
unfair  (5)
Unfortunately  (1)
UNITED  (1)
unpack  (1)
unsuccessfully  (1)
URQUHART  (1)
use  (2)

**< V >**
valuations  (1)
value  (21)
values  (1)
various  (1)
vehicle  (8)
vehicles  (1)
verbatim  (4)
veto  (1)
videoconferencing  (1)
video-conferencing  (1)
VIDEOGRAPHER  (1)
VIDEO-RECORDED  (2)
view  (2)
Vine  (1)
volume  (2)

**< W >**

Deposition of Torrey Littleton

In re Highland Capital Management, L.P.

walk  *(1)*
want  *(6)*
wanted  *(4)*
watching  *(1)*
way  *(2)*
wearing  *(1)*
Wednesday  *(2)*
week  *(1)*
Well  *(10)*
we're  *(10)*
we've  *(6)*
WINOGRAD  *(1)*
wish  *(1)*
WISHNEW  *(1)*
withdraw  *(1)*
withdrawn  *(7)*
witness  *(5)*
wondering  *(1)*
words  *(1)*
wore  *(1)*
working  *(2)*
world  *(1)*
worries  *(1)*
worth  *(3)*
wrapped  *(1)*
written  *(1)*
wrong  *(7)*
wrongdoing  *(1)*

< Y >
Yeah  *(41)*
year  *(2)*
years  *(6)*
York  *(4)*

< Z >
ZIEHL  *(2)*
Zoom  *(1)*