# Exhibit F

# EXHIBIT 124

```
 1              UNITED STATES BANKRUPTCY COURT

 2         FOR THE NORTHERN DISTRICT OF TEXAS

 3                   DALLAS DIVISION

 4     --------------------------

 5   In Re:                    Case No. 19-34054-sgj11

 6   HIGHLAND CAPITAL MANAGEMENT,

 7   L.P.,

 8        Debtor.              Chapter 11

 9   --------------------------X.

10

11

12

13        REMOTE VIDEO-RECORDED DEPOSITION of

14                   JULIE DIAZ

15              Sunday, June 22, 2025

16              1:37 p.m. Central Time

17

18

19

20   Reported Stenographically by:

21   Gail L. Inghram,

22   BA, RDR, CRR, RSA, CA-CSR No. 8635

23

24

25
```

1

2

3

4

5

6

7

8            WHEREUPON, the remote video-recorded

9   deposition of JULIE DIAZ was held via

10   video-conferencing on Sunday, June 22, 2025,

11   beginning at approximately 1:37 p.m. Central

12   Time, the proceedings being recorded

13   stenographically by Gail Inghram, Registered

14   Diplomate Reporter, Certified Realtime Reporter,

15   Certified Shorthand Reporter, and transcribed

16   under her direction, there being present:

17

18

19

20

21

22

23

24

25

```
 1   A P P E A R A N C E S:

 2   [All parties appeared via remote videoconferencing.]

 3

 4   On behalf of Highland Capital Management, and the Highland

 5   Claimant Trust:

 6       JOHN MORRIS, ESQ.

 7       jmorris@pszjlaw.com

 8       GREGORY V. DEMO, ESQ.

 9       gdemo@pszjlaw.com

10       JEFFREY POMERANTZ, ESQ.

11       jpomerantz@pszjlaw.com

12       HAYLEY WINOGRAD, ESQ.

13       hwinograd@pszjlaw.com

14           PACHULSKI STANG ZIEHL & JONES

15           780 Third Avenue, 34th Floor

16           New York, New York 10017-2024

17           310.277.6910

18

19   On behalf of Highland Litigation Trustee:

20       ROBERT S. LOIGMAN, ESQ.

21       robertloigman@quinnemanuel.com

22           QUINN EMANUEL URQUHART & SULLIVAN, LLP

23           51 Madison Avenue 22nd Floor

24           New York, New York 10010

25           212.849.7615
```

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   On behalf of Defendant Dallas Foundation and Crown Global

 4   Life Insurance:

 5      MATTTHEW OKIN, ESQ.

 6      mokin@okinadams.com

 7      DAVID CURRY, ESQ.

 8      dcurry@okinadams.com

 9         OKIN ADAMS BARTLETT CURRY LLP

10         1113 Vine Street, Suite 240

11         Houston, Texas 77002

12         713.228.4100

13

14   On behalf of Defendant Dugaboy Investment Trust:

15      MICHAEL LANG, ESQ.

16      mlang@cwl.law.com

17         CRAWFORD WISHNEW & LANG PLLC

18         1700 Pacific Avenue, Suite 2390

19         Dallas, Texas 75201

20         214.817.4500

21

22

23

24

25
```

Case 19-34054-sgj11   Doc 4327-5   Filed 08/24/26   Entered 08/24/26 16:00:35   Desc
Exhibit 24   Page 7 of 103

Deposition of Julie Diaz                                                          In re Highland Capital Management, L.P.

```
 1    A P P E A R A N C E S (Cont'd):

 2

 3    On Behalf of Hunter Mountain Investment Trust:

 4        LOUIS M. PHILLIPS, ESQ.

 5        lphillips@kellyhart.com

 6        AMELIA L. HURT, ESQ.

 7        ahurt@kellyhart.com

 8           KELLY HART & HALLMAN LLP

 9           301 Main Street, Suite 1600

10           Baton Rouge, Louisiana 70801

11           225.381.9643

12

13    VIDEOGRAPHER:

14        PAUL D'AMBRA

15

16

17    ALSO PRESENT:

18        NATHAN HALL, Pachulski Stang Ziehl & Jones

19        JAMES SEERY

20        TORREY LITTLETON

21        SHAWN RAVER

22

23

24

25
```

```
 1                      - - -

 2                  I N D E X

 3                      - - -

 4   EXAMINATION OF:                          PAGE

 5   JULIE DIAZ

 6        By Attorney Morris ...............8

 7

 8

 9

10

11
                    E X H I B I T S
12   HIGHLAND:                               PAGE

13

14   Highland 1    Objection of the Dallas ..........63

15                 Foundation and Crown Global to

16                 Motion for Entry of An Order

17                 Approving Settlement

18                 (15 pages)

19

20

21

22

23

24

25
```

```
 1                  DEPOSITION SUPPORT INDEX

 2

 3   QUESTIONS INSTRUCTED NOT TO ANSWER:

 4   PAGE   LINE

 5   (None)

 6

 7   REQUEST FOR PRODUCTION OF DOCUMENTS

 8   PAGE   LINE

 9   (None)

10

11

12   STIPULATIONS

13   PAGE   LINE

14   (None)

15

16   QUESTIONS MARKED

17   PAGE   LINE

18   (None)

19

20

21                    REPORTER'S NOTE:

22   QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT NECESSARILY

23   REFLECT A DIRECT QUOTE.

24

25
```

```
 1                        -   -   -

 2                P R O C E E D I N G S

 3                        -   -   -

 4    WHEREUPON,

 5                     JULIE DIAZ,

 6    being first duly sworn or affirmed to testify to the

 7    truth, the whole truth, and nothing but the truth,

 8    was examined and testified as follows:

 9

10                     EXAMINATION

11     BY ATTORNEY MORRIS:

12         Q.    Good afternoon, Ms. Diaz.  Can you

13    hear me okay?

14         A.    I can.

15         Q.    My name is John Morris.  I'm an

16    attorney for Highland Capital Management, and

17    we're here to take your deposition today in

18    connection with the Dallas Foundation's objection

19    to a certain settlement.

20               Are you aware of that?

21         A.    Yes, I am.

22         Q.    Have you ever been deposed before?

23         A.    Yes, I have.

24         Q.    Okay.  So just some quick ground rules

25    so we're on the same page.
```

 1          I'm going to ask a series of

 2   questions, and it's very important that you allow

 3   me to finish my question before you begin the

 4   answer.

 5          Is that fair?

 6       A.    Yes.

 7       Q.    I will try to allow you to finish your

 8   answer before I begin a question; but if I fail

 9   to do so, will you let me know that?

10       A.    Yes, I will.

11       Q.    If I ask a question that you don't

12   understand, will you let me know that?

13       A.    I will.

14       Q.    If you need a break at any time, I'm

15   happy to accommodate you; but I just ask that you

16   not seek a break while a question is pending

17   unless you need to consult with your lawyer about

18   privilege questions.

19          Is that fair?

20       A.    Yes.

21       Q.    Are you affiliated with the Dallas

22   Foundation?

23       A.    Yes.  I am the president and CEO.

24       Q.    When did you become the president and

25   CEO of the Dallas Foundation?

1      A.      Formally, April 1st, 2024.  Prior to

2      that, I was interim CEO; and have been with the

3      foundation for six years.

4           Q.     Are you familiar with the company

5      called Highland Capital Management, LP?

6           A.     Yes, I am.

7           Q.     Are you aware that Highland Capital

8      Management, LP, filed for bankruptcy back in

9      2019?

10          A.     Yes, I am.

11          Q.     Are you aware that the Dallas

12     Foundation recently filed in the bankruptcy court

13     an objection to a proposed settlement between

14     certain Highland affiliates and certain

15     affiliates of Hunter Mountain Investment Trust?

16          A.     Yes, I am.

17          Q.     Are you aware of the parties to the

18     settlement agreement that the Dallas Foundation

19     has objected to?

20          A.     Can you clarify that question.

21          Q.     Can you identify the parties on the

22     Highland side that are -- that executed the

23     settlement agreement that the Dallas Foundation

24     objected to?

25          A.     No.

1        Q.    Can you identify the parties --

2   withdrawn.

3              Are you aware that there are

4   parties -- are you aware that Hunter Mountain

5   Investment Trust is a party to the settlement

6   agreement?

7        A.    Yes, I am.

8        Q.    Are you aware that a gentleman named

9   Mark Patrick signed the agreement on behalf of

10  the Hunter Mountain Investment Trust?

11       A.    I'm aware of his involvement.

12       Q.    But you're not aware as you sit here

13  right now that Mr. Patrick signed on behalf of

14  Hunter Mountain Investment Trust?

15       A.    No.

16       Q.    Can I refer to Hunter Mountain

17  Investment Trust as "HMIT" for purposes of the

18  deposition?

19       A.    Yes, you may.

20       Q.    Are you aware that there are other

21  entities that are affiliated with HMIT that are

22  also party to the settlement agreement?

23       A.    Yes, I am.

24       Q.    Can we generally refer to all of the

25  affiliates of HMIT and HMIT itself as "the HMIT

1    entities" for purposes of today's deposition?

2         A.    Yes.

3         Q.    Did you review the Dallas Foundation's

4    objection before it was filed?

5         A.    Yes, I did.

6         Q.    Were you responsible for authorizing

7    its filing?

8         A.    Yes.

9         Q.    Are you aware that the objection was

10   filed on behalf of an entity called Empower

11   Dallas Foundation?

12        A.    Yes.

13        Q.    Are you familiar with that entity?

14        A.    Yes, I am.

15        Q.    What is the Empower Dallas Foundation?

16        A.    Empower Dallas Foundation is a

17   supporting organization that is sponsored by the

18   Dallas Foundation.  It's a grant-making

19   organization that's been in existence for at

20   least 10 years.

21        Q.    Do you know who formed Empower Dallas

22   Foundation?

23        A.    Yes.  I'm aware that it came from Jim

24   Dondero.

25        Q.    What do you mean that it came from Jim

1    Dondero?

2        A.    Well, that the donation was made from

3    Mr. Dondero.

4        Q.    Did Mr. Dondero make a donation to

5    Empower Dallas Foundation?

6        A.    Yes.

7        Q.    And does Empower Dallas Foundation

8    fund the Dallas Foundation?

9        A.    Technically, it is a -- we are a -- it

10   is a supporting organization of the Dallas

11   Foundation, which is an IRS entity for which it

12   makes grant recommendations that then flow to a

13   donor-advised fund that then the Dallas

14   Foundation effectuates, basically, the grant.

15       Q.    Do you know if the Dallas -- did I

16   step on your words?

17       A.    No.

18       Q.    Do you know if the Dallas --

19   withdrawn.

20             Do you know if Empower Dallas

21   Foundation had any contractual obligation to make

22   donations to the Dallas Foundation?

23       A.    I believe that through its charitable

24   status, it is required to make contributions on a

25   regular basis.  And we also have governance that

1    oversees activity within all of our charitable

2    funds.

3         Q.    Is there an agreement of any kind

4    between the Dallas Foundation and Empower Dallas

5    Foundation?

6         A.    Yes.  We have a fund agreement.

7         Q.    And under that fund agreement, is the

8    Dallas Foundation entitled to receive

9    contributions from Empower Dallas?

10        A.    Yes.  I don't know the technical

11   language offhand.

12        Q.    Do you know if Mr. Dondero plays any

13   role in the management of Empower Dallas

14   Foundation?

15        A.    What do you mean by "management"?

16        Q.    Does he have any involvement in --

17        A.    Yes.  As any fundholder, he would have

18   involvement in making recommendations for grants

19   he would like to put into the community, as all

20   of our fundholders do.

21        Q.    Does he play any other role, to the

22   best of your knowledge, with respect to the

23   Empower Dallas Foundation?

24        A.    No.

25        Q.    Are you familiar with --

1        A.    Oh, sorry.  May I correct myself?

2              The Empower Dallas Foundation does

3   have its own governance, of which he is president

4   of the foundation.  I'm the vice president.  And

5   we have a treasurer.  As with all of our

6   supporting orgs, the Dallas Foundation has

7   majority oversight.

8        Q.    The Dallas Foundation has majority

9   oversight of Empower Dallas Foundation?

10       A.    Yes.

11       Q.    And how does it exercise that

12  oversight?

13       A.    In voting.

14       Q.    And who gets to vote?

15       A.    The officers:  the president, the vice

16  president, and the treasurer.

17       Q.    Of which entity?

18       A.    Of the supporting organization, the

19  Empower Dallas Foundation.

20       Q.    Can you identify who those people are.

21       A.    Jim Dondero is the president; I'm the

22  vice president; and our CFO, Torrey Littleton, is

23  the treasurer.

24       Q.    How about the Okada Family Foundation?

25  Are you familiar with that?

```
 1           A.    Oh, excuse me -- sorry.

 2                 I'm -- I need to correct myself.  That

 3    is for Empower Dallas, because we have two funds

 4    I'm confusing.  Empower Dallas Foundation, I am

 5    the president; Torrey is the treasurer; and we

 6    have a secretary.

 7                 For consent agendas, Jim Dondero plays

 8    an individual member role.

 9           Q.    Ma'am, what are you reading right now?

10           A.    I'm looking at the structure of our

11    supporting organizations.

12           Q.    Can you just hold that up for me so I

13    can see what you're looking at.

14           A.     It literally lists that for all of

15    them.

16           Q.    Do you have any other documents with

17    you today?

18           A.     Just my notes.

19           Q.    Can I ask you to put those away for

20    now.

21           A.    Oh, sure.

22           Q.    How about the Okada Family Foundation;

23    is that another supporting organization?

24           A.    Yes, it is.

25           Q.    And do you know if Mr. Dondero has any
```

 1    involvement with that entity?

 2         A.    It does not have any involvement with

 3    that entity.

 4         Q.    Okay.  Do you know if Mr. Dondero

 5    played any role in the Dallas Foundation's

 6    decision to object to the proposed settlement

 7    between the Highland entities and the HMIT

 8    entities?

 9         A.    Did not have any role.

10         Q.    Did you ever speak to him about the

11    objection?

12         A.    I have spoken to him in the last six

13    months.

14         Q.    Did you ever speak with him about the

15    objection?

16         A.    No.

17         Q.    Did you speak with him about any of

18    the facts that are set forth in the objection?

19         A.    No.

20         Q.    Was Mr. Dondero a source for some of

21    the facts that are set forth in the Dallas

22    Foundation's objection?

23         A.    No.

24         Q.    Did Mr. Dondero or anyone acting on

25    his behalf provide any information to the Dallas

Case 19-34054-sgj11    Doc 4327-5    Filed 08/24/26    Entered 08/24/26 10:00:25    Desc
Exhibit 4    Page 20 of 102

Deposition of Julie Diaz                                                    In re Highland Capital Management, L.P.

1   Foundation that the Dallas Foundation used in its

2   objection?

3        A.    Repeat the question.

4        Q.    Did Mr. Dondero or anybody you believe

5   was acting on his behalf provide any information

6   that the Dallas Foundation used in its objection?

7        A.    I'll abstain from answering that.

8        Q.    Excuse me?

9        A.    I'd rather not answer that question.

10       Q.    I appreciate that, but you have to.

11       A.    Well, there's a lot of context around

12   the formation of where we are today.  So I have

13   been engaged with our counterpart over the last

14   six years, so I have a lot of information from

15   working through our grant-making and the

16   management of the assets over the past six years.

17            So in that same vein, I've learned a

18   lot from many interested parties.

19       Q.    Okay.  So I ask you to listen

20   carefully to my question, because it's rather

21   precise.

22            Do you know if Mr. Dondero or anybody

23   you believed was acting on his behalf provided

24   the Dallas Foundation with any information that

25   is -- that was used to prepare the objection?

```
 1          A.    No.

 2          Q.    Are you familiar with the objection?

 3          A.    I am familiar.  I authorized it and

 4     read it.

 5          Q.    And it's your testimony that Jim

 6     Dondero wasn't the source of any information

 7     that's in that objection.  Is that fair?

 8          A.    That is fair.

 9          Q.    Do you know where the idea of filing

10     the objection originated?

11          A.    I don't.

12          Q.    Do you know whose idea, who came up

13     with the idea to object to this -- withdrawn.

14                Do you know whose idea it was to

15     object to the Highland/HMIT settlement?

16                ATTORNEY OKIN:  Okay.  Actually,

17     Ms. Diaz, before you answer, just want to caution

18     you that as long as it's not conveying advice of

19     counsel, you can answer the question.

20          A.    You'll have to repeat that.  I don't

21     understand that.

22     BY ATTORNEY MORRIS:

23          Q.    Do you know who came up with the idea

24     of objecting to the proposed Highland/HMIT

25     settlement?
```

1      A.    I believe it came out of discussions

2   in another settlement.

3      Q.    What settlement are you referring to?

4      A.    In the Cayman Islands.

5      Q.    What settlement is that?

6      A.    Well, it has to do with the three

7   large supporting orgs and an entity called

8   DAF Holdco.

9      Q.    Which three large supporting orgs are

10  you referring to?

11     A.    Kansas City Foundation; Santa Barbara

12  Foundation; Highland Dallas Foundation; and

13  really in a small way, North Texas Community

14  Foundation.  All --

15     Q.    And I apologize.  What did you just

16  refer to those entities as?  Supporting

17  organizations?

18     A.    Yes.

19     Q.    The Kansas -- and you called it the

20  Kansas City --

21     A.    Foundation.

22     Q.    -- Foundation, the Santa Barbara

23  Foundation and the Dallas Foundation?  And those

24  are three additional supporting organizations of

25  the Dallas Foundation?

1        A.    Sorry.  We have three -- four

2   community foundations; right?  Dallas Foundation,

3   Santa Barbara Foundation, Kansas City Foundation,

4   and North Texas Community Foundations.

5             The three -- Kansas City, Dallas and

6   Highland -- I'm sorry -- Dallas, Kansas City, and

7   Santa Barbara all have supporting organizations

8   that were the result of contributions from

9   Highland Capital in 2011.

10       Q.    Do you know if Mr. Dondero has any

11   relationship to the Dallas, Kansas City, or

12   Santa Barbara Foundations that you just

13   identified?

14       A.    My understanding is they have -- he

15   has the same structure of supporting org with

16   Kansas City, Santa Barbara, and Dallas.

17       Q.    Is he the president of each, to the

18   best of your knowledge?

19       A.    Yes.

20       Q.    And are those the entities that

21   commenced the Cayman Islands proceedings, to the

22   best of your understanding?

23       A.    Yes.

24       Q.    Is it your understanding that

25   Mr. Dondero directed those entities to do so?

Case 19-34054-sgj11   Doc 4327-5   Filed 08/24/26   Entered 08/24/26 10:00:35   Desc
Exhibit 124   Page 243 of 1002

Deposition of Julie Diaz                                          In re Highland Capital Management, L.P.

1       A.     No.

2       Q.     Who directed those entities to do so,

3   to the best of your knowledge?

4       A.     CEOs of the organizations.

5       Q.     And who are they?

6       A.     Debbie Wilkerson is the CEO of

7   Kansas City.  Jackie Carrera is the CEO of

8   Santa Barbara.  Rose Bradshaw is the CEO of North

9   Texas Community Foundation, although she did not

10  enter in, in the formal filing.  They have a very

11  de minimis role in the asset.

12      Q.     Are you aware that Mr. Dondero filed a

13  declaration or an affidavit in the Cayman Islands

14  in support of the Community Foundation's

15  litigation that they commenced?

16      A.     I did see that.

17      Q.     Did you read it?

18      A.     Yeah.

19      Q.     Did you see any familiarity between

20  that declaration and the Dallas Foundation's

21  objection?

22      A.     I think there were some similarities

23  because of the nature of the activities that have

24  been happening.

25      Q.     Did you learn, when you read

```
 1    Mr. Dondero's declaration in the Cayman Islands,

 2    that he's actually funding that litigation on

 3    behalf of the supporting organizations?

 4         A.    No, that's not when I learned that.

 5         Q.    That's not when you learned it or --

 6    withdrawn.

 7              Are you aware that he's funding that

 8    litigation?

 9         A.    Yes.

10         Q.    When did you learn that he was funding

11    that litigation?

12         A.    Before we got into litigation.

13         Q.    Is he funding this litigation on

14    behalf of the Dallas Foundation?

15         A.    Yes, he is.

16         Q.    And how much money did he provide for

17    the funding of this litigation?

18         A.    We have not agreed on an amount.  As

19    with any of our fundholders', legal expenses will

20    get paid through by the fund.  So that's a very

21    common business practice.  And it would go until

22    the legal issues ceased.

23         Q.    But he's made a commitment to fund --

24    to personally fund the expenses of the Dallas

25    Foundation in connection with this litigation; is
```

 1    that right?

 2          A.    Yes.

 3          Q.    Are you aware of any particular reason

 4    that that's not disclosed in the Dallas

 5    Foundation's objection?

 6          A.    I'm not aware.

 7          Q.    Why did the Dallas Foundation file the

 8    objection on behalf of Empower Dallas Foundation?

 9          A.    Well, we filed the objection on behalf

10    of both Empower and Okada Family Foundation, in

11    essence, because the person who has been

12    overseeing the activity ceased to communicate

13    with us as of last fall.  And there were enough

14    irregularities in our communication and

15    accounting leading up to then some pretty

16    dramatic changes in valuations that raised a red

17    flag for us.

18          Q.    Who is the person that you're

19    referring to?

20          A.    Mark Patrick.

21          Q.    And did the Empower Dallas Foundation

22    ask the Dallas Foundation to file this objection

23    on its behalf?

24          A.    As fiduciaries of all of our

25    charitable assets, we oversee the activity; and

1    when there is any irregular activity, we

2    investigate.

3         Q.    I appreciate that.  I'm just asking

4    you if the Empower Dallas Foundation asked the

5    Dallas Foundation to file the objection on its

6    behalf.

7         A.    Well, since I am representative of the

8    Empower Dallas Foundation, I don't have to ask

9    anybody except ourselves to do that.

10        Q.    And did you confer with Mr. Dondero

11   about that decision?

12        A.    I think we informed him.

13        Q.    Did he review a copy of the objection

14   before it was filed?

15        A.    Not to my knowledge, no.

16        Q.    Are you aware that the Dallas

17   Foundation also filed the objection on behalf of

18   certain segregated accounts held at Crown Global

19   Life Insurance Limited?

20        A.    Yes.

21        Q.    Can I refer to Crown Global Life

22   Insurance Limited as just "Crown Global"?

23        A.    Yes.

24        Q.    And can I refer to the segregated

25   accounts that are identified in the Dallas

Case 19-34054-sgj11   Doc 4327-5   Filed 08/24/26   Entered 08/24/26 10:00:25   Desc
Exhibit 14   Page 28 of 102

Deposition of Julie Diaz                                                     In re Highland Capital Management, L.P.

 1    Foundation's objection as "the segregated

 2    accounts"?

 3         A.    Yes.

 4         Q.    And are you familiar with those

 5    segregated accounts?

 6         A.    At a high level.

 7         Q.    What's your understanding at a high

 8    level of what those segregated accounts are?

 9         A.    That the Crown Global assets are

10    really insurance annuities that pay out to the

11    fund; and that's the source of income for

12    charitable purposes.

13         Q.    Where does the income from the annuity

14    flow to?

15         A.    Flows to the supporting organizations.

16         Q.    And then the supporting organizations

17    have the proceeds from the annuity available for

18    the foundations; is that fair?

19         A.    Yes.

20         Q.    And do you know who took out these

21    insurance policies or these annuities?  Which of

22    the -- withdrawn.

23              Can you identify the supporting

24    organization that funded the purchase of the

25    annuities?

Case 19-34054-sgj11   Doc 4327-5   Filed 08/24/26   Entered 08/24/26 10:00:35   Desc
Exhibit 14   Page 29 of 102

Deposition of Julie Diaz                                                    In re Highland Capital Management, L.P.

1        A.    Empower Dallas Foundation and Okada

2    Family Foundation.

3        Q.    And is the cash that is thrown off

4    from the annuities -- withdrawn.

5              To the best of your understanding, is

6    the cash that's thrown off from the annuities the

7    sole source of income for Empower Dallas

8    Foundation and the Okada Foundation?

9        A.    That's my understanding.

10       Q.    Is it your understanding that the

11   Dallas Foundation has not received anything of

12   value from Empower Dallas Foundation or the Okada

13   Family Foundation other than proceeds from the

14   annuities?

15       A.    That's my understanding.

16       Q.    Do you know why the Dallas Foundation

17   filed the objection on behalf of the segregated

18   accounts at Crown Global?

19       A.    Yes.

20       Q.    Why did the Dallas Foundation file its

21   objection on behalf of the segregated accounts?

22       A.    As I said earlier, because there had

23   been activity and essentially a write-down of

24   40 percent of value, we were concerned that there

25   were activities within Crown Global for the

 1    organizations that support that that we did not

 2    have any, you know, access to, vision or

 3    communication around.

 4          Q.     Does the Dallas Foundation have any

 5    relationship with Crown Global?

 6          A.     Yes.

 7          Q.     As it pertains to -- what relationship

 8    does the Dallas Foundation have with

 9    Crown Global?

10          A.     Well, I don't understand on a

11    transactional, but we get quarterly reports from

12    them.  They obviously send the proceeds to us.  I

13    mean, they are a fiduciary to us in the same way

14    we are to others.

15          Q.     Crown Global is?

16          A.     Yeah.

17          Q.     With respect to the disbursement of

18    proceeds from the annuity?

19          A.     Yes.

20          Q.     Okay.  So the proceeds from the

21    annuity don't go to Empower Dallas or the Okada

22    Family Foundation; they get remitted directly to

23    the Dallas Foundation.

24          Do I have that right?

25          A.     No.  They go -- they go to the

Case 19-34054-sgj11 Doc 4327-5 Filed 08/24/26 Entered 08/24/26 10:00:25 Desc
Exhibit 14 Page 31 of 103

Deposition of Julie Diaz                                                  In re Highland Capital Management, L.P.

 1    supporting organizations.  But in our governance

 2    that -- I refer to both as -- it flows into our

 3    finance office, and then they get allocated to

 4    the foundations.

 5          Q.    You mentioned that there was a

 6    40 percent write-down in value.  Is that with

 7    respect to the annuities?

 8          A.    I don't know all of the transactions

 9    that led up to that.  But what we understood,

10    there were a few -- sorry.

11                There are a few requests for us to

12    approve that we didn't understand and sent them

13    to our counsel, and then got the first-quarter

14    report for March 30th, and it was significantly

15    lower and we didn't know why.

16                So in asking for that, we found out

17    there was a decline.

18          Q.    And is that -- is it your

19    understanding that it's the decline in value --

20    withdrawn.

21                Is it your understanding that it's the

22    unexplained decline in value that caused the

23    Dallas Foundation to file the objection on behalf

24    of the segregated accounts?

25          A.    Yes.

Case 19-34054-sgj11   Doc 4277-5   Filed 08/24/26   Entered 08/24/26 16:00:25   Desc
Exhibit 24   Page 32 of 102

Deposition of Julie Diaz                                                    In re Highland Capital Management, L.P.

```
 1         Q.     Did anybody ask the Dallas Foundation

 2    to file the objection on behalf of the segregated

 3    accounts?

 4         A.     No.

 5         Q.     Can you identify the owner of the

 6    segregated accounts on behalf of -- on whose

 7    behalf the Dallas Foundation filed the objection?

 8                Withdrawn.  Too many words.

 9                Do you know who owns the segregated

10    accounts?

11         A.     No.  I won't guess.

12         Q.     Are you aware that the owner of the

13    segregated accounts is Crown Global?

14         A.     Oh, yes.

15         Q.     And so is that your understanding,

16    that Crown Global --

17         A.     Yes.

18         Q.     -- owns the segregated accounts?

19         A.     Yes.

20         Q.     Did anybody from the Dallas Foundation

21    seek Crown Global's consent and approval before

22    filing the objection on behalf of the segregated

23    accounts?

24         A.     Yes.

25         Q.     Yes?
```

 1         And who at Crown Global gave the

 2    authorization, if you know?

 3         A.    Mr. -- the CEO and their chief legal,

 4    Hernandez -- Paul --

 5              ATTORNEY OKIN:  Let me interrupt here

 6    too, John.  You're acting as though the objection

 7    was filed solely by the Dallas Foundation.  We

 8    represent two clients here.  We represent the

 9    Dallas Foundation and Crown Global.

10              And you're putting Ms. Diaz in a

11    position where I think she thinks she has to

12    justify having -- Crown Global's actions when

13    they -- we represent them as well.

14              ATTORNEY MORRIS:  Well, as I read the

15    pleading that you filed, it said the Dallas

16    Foundation -- I won't --

17              ATTORNEY OKIN:  I think that's a --

18              ATTORNEY MORRIS:  I'll ask the

19    questions, and we'll --

20              ATTORNEY OKIN:  Take a look at our

21    signature block.  It says clearly that we're

22    doing it on behalf of the Dallas Foundation and

23    Crown Global.

24    BY ATTORNEY MORRIS:

25         Q.    Ms. Diaz, do you know if the Dallas

 1   Foundation ever appeared in the Highland

 2   bankruptcy case before it filed this objection?

 3        A.    I do not believe so.

 4        Q.    To the best of your knowledge, the

 5   Dallas Foundation never filed a claim against

 6   Highland in the Highland bankruptcy case;

 7   correct?

 8        A.    No.

 9        Q.    To the best of your knowledge --

10   withdrawn.

11             Have you ever heard of the Highland

12   Claimant Trust?

13        A.    No.

14        Q.    So is it fair to say that you have no

15   reason to believe that the Dallas Foundation has

16   any interest in the Highland Claimant Trust?

17        A.    No.  That is not -- that's not fair to

18   claim.

19        Q.    So is it your testimony that you

20   believe the Dallas Foundation has a direct or

21   indirect interest in the Highland Claimant Trust?

22        A.    What you asked me was had we ever

23   participated and did we then have any result

24   from it.

25             I don't know the answer to that

1   question.

2       Q.    I apologize if my questioning wasn't

3   clear to you.  Let me try again.

4            To the best of your knowledge, the

5   Dallas Foundation has never appeared in the

6   Highland bankruptcy case until it filed the

7   objection that we're talking about today;

8   correct?

9       A.    I don't know the answer to that.

10      Q.    But to the -- you have no knowledge

11  that they ever did; is that fair?

12      A.    I have no knowledge.

13      Q.    Okay.  And you have no knowledge that

14  the Dallas Foundation ever filed a claim against

15  Highland in the Highland bankruptcy case;

16  correct?

17      A.    I have no knowledge of that.

18      Q.    And you have no knowledge that the

19  Dallas Foundation has any interest of any kind in

20  the Highland Claimant Trust; correct?

21      A.    I do not agree with that statement.

22      Q.    What knowledge do you have that the

23  Dallas Foundation has an interest in the Highland

24  Claimant Trust?

25      A.    Because of the relationship between

1  Hunter Mountain and how it feeds up to

2  Crown Global and, therefore, the supporting

3  organizations.

4      Q.    It might be my fault that I'm not

5  being clear, but I'm really just focused on

6  Highland right now.  Has nothing to do with

7  Crown Global --

8      A.    Okay.

9      Q.    -- or Hunter Mountain; it's just

10  Highland.

11      A.    Okay.

12      Q.    Are you aware that as a result of the

13  bankruptcy, an entity Called the Highland

14  Claimant Trust was formed?

15      A.    I was not, no.

16      Q.    Okay.  So if you weren't aware that an

17  entity called the Highland Claimant Trust was

18  formed, is it also fair to say you have no

19  knowledge that the Dallas Foundation has an

20  interest in the Highland Claimant Trust?

21      A.    Okay.

22      Q.    Okay.  And does the Dallas Foundation

23  have any contractual relationship with Highland

24  Capital Management, LP?

25      A.    No.

 1        Q.    Has the Dallas Foundation ever had a

 2   contractual relationship with Highland Capital

 3   Management, LP, to the best of your knowledge?

 4        A.    No.

 5        Q.    Does the Dallas Foundation have any

 6   contractual relationship with an entity called

 7   the Highland Claimant Trust, to the best of your

 8   knowledge?

 9        A.    No.

10        Q.    And to the best of your knowledge, has

11   the Dallas Foundation ever had a contractual

12   relationship with an entity called the Highland

13   Claimant Trust?

14        A.    No.

15        Q.    Do you have any reason to believe, as

16   you sit here today, that Highland Capital

17   Management, LP, owes any duties or obligations to

18   the Dallas Foundation?

19             ATTORNEY OKIN:   Object to form.

20   BY ATTORNEY MORRIS:

21        Q.    You can answer.

22        A.    Can you ask the question again.

23        Q.    Sure.

24             As you sit here today, do you have any

25   reason to believe that Highland Capital

1    Management, LP, owes any duties or obligations to

2    the Dallas Foundation?

3              ATTORNEY OKIN:  Object to form.

4         A.    No.

5    BY ATTORNEY MORRIS:

6         Q.    As you sit here today, do you have any

7    reason to believe that Highland Capital

8    Management, LP, ever had any duties or

9    obligations that it owed to the Dallas

10   Foundation?

11             ATTORNEY OKIN:  Object to form.

12        A.    No.

13   BY ATTORNEY MORRIS:

14        Q.    Are you aware that if the settlement

15   agreement between the Highland entities and the

16   HMIT entities is approved, the HMIT entities will

17   receive cash and other assets pursuant to the

18   terms of the settlement agreement?

19        A.    I'm assuming that there is assets

20   within the agreement.

21        Q.    Have you reviewed the settlement

22   agreement yourself, Ms. Diaz?

23        A.    No.

24        Q.    Are you generally familiar with the

25   terms of the settlement agreement?

Case 19-34054-sgj11  Doc 4327-5  Filed 08/24/26  Entered 08/24/26 16:00:25  Desc
Exhibit 24  Page 39 of 102

Deposition of Julie Diaz                                      In re Highland Capital Management, L.P.

 1        A.      At a high level.

 2        Q.      What's your understanding at a high

 3   level?

 4        A.      That once the settlement is complete,

 5   that Hunter Mountain will receive assets of some

 6   size that will flow up to Crown Global.

 7        Q.      Do you know if the requirement that

 8   the assets flow up to Crown Global is part of the

 9   settlement agreement that's before the Court and

10   that the Dallas Foundation is objecting to?

11        A.      That was our understanding.

12        Q.      From the agreement itself?

13        A.      I have not seen the settlement

14   agreement.

15        Q.      So you authorized an objection to a

16   settlement agreement that you haven't seen; is

17   that fair?

18        A.      That's fair.

19        Q.      Do you have any reason to believe that

20   the Dallas Foundation has a right to recover any

21   of the assets you just described that HMIT will

22   receive if the settlement is approved by the

23   Court?

24                ATTORNEY OKIN:  Object to form.

25        A.      Can you repeat the question.

Case 19-34054-sgj11   Doc 4327-5   Filed 08/24/26   Entered 08/24/26 10:00:25   Desc
Exhibit 24   Page 40 of 102

Deposition of Julie Diaz                                                    In re Highland Capital Management, L.P.

1    BY ATTORNEY MORRIS:

2         Q.    Do you have any reason to believe that

3    the Dallas Foundation has a right to recover any

4    portion of the assets that HMIT will receive if

5    the settlement agreement is approved by the

6    bankruptcy court?

7              ATTORNEY OKIN:  Object to form.

8         A.    My job is to protect the charitable

9    assets under our organization's fiduciary

10   compliance role; and so if there is any

11   opportunity for assets to either be diminished or

12   not move forward, it's my job to ensure that I've

13   done everything I can to recover them.

14   BY ATTORNEY MORRIS:

15        Q.    But do you have an understanding as to

16   whether or not -- withdrawn.

17             I think you just testified that it's

18   your understanding at a high level that HMIT will

19   receive certain assets if the settlement

20   agreement is approved.

21             Do I have that right?

22        A.    Yes.

23        Q.    Do you have an understanding that the

24   Dallas Foundation is entitled to receive all or

25   any portion of the assets that HMIT would receive

 1     under the settlement agreement?

 2               ATTORNEY OKIN:  Object to form.

 3          A.    I don't know that.

 4     BY ATTORNEY MORRIS:

 5          Q.    You don't know that?

 6          A.    (Shakes head.)

 7          Q.    Have you asked anybody whether the

 8     Dallas Foundation has a right to recover any

 9     portion of the assets that HMIT will receive

10     under the settlement agreement?

11               ATTORNEY OKIN:  Before you answer

12     that, Ms. Diaz, I'll just remind you:  Other than

13     disclosing any of your conversations with counsel

14     for you or for the foundation.

15     BY ATTORNEY MORRIS:

16          Q.    But you can answer the question.

17          A.    You'll have to ask the question again.

18          Q.    No problem.  I appreciate that.

19               Did you ever ask anybody whether the

20     Dallas Foundation had a right to receive any of

21     the assets that HMIT will receive under the

22     settlement agreement?

23          A.    Like somebody-who in your question?

24          Q.    Anybody.  Did you ever ask the

25     question of anybody?  Let's just start with "yes"

1    or "no."

2          A.    Yes.

3          Q.    And who did you ask?

4          A.    I'll strike that, because it would

5    be -- I couldn't tell you definitively I did

6    that.

7          Q.    Did Mr. Dondero tell you that the

8    Dallas Foundation had a right to the assets that

9    HMIT was going to receive under the settlement

10   agreement?

11         A.    No.

12         Q.    And you don't recall asking that

13   question of anybody; is that fair?

14         A.    The only person I talked to this --

15   about these assets to is Mark Patrick.

16         Q.    And did Mr. Patrick tell you that the

17   Dallas Foundation had a right to recover any of

18   the proceeds under the HMIT/Highland settlement

19   agreement?

20         A.    I don't know.

21         Q.    Have you ever received any documents

22   that lead you to believe that the Dallas

23   Foundation has an ownership interest in any of

24   the assets that HMIT will receive under the

25   settlement agreement?

| 1 | ATTORNEY OKIN:  Object to form. |
| 2 | A.    My understanding is that through the |
| 3 | Hunter Mountain settlement, that those assets |
| 4 | flow into the Atlas fund that I know Mark Patrick |
| 5 | was managing.  So indirectly. |
| 6 | BY ATTORNEY MORRIS: |
| 7 | Q.    Is there a document that you reviewed |
| 8 | that leads you to believe that the assets HMIT |
| 9 | receives will go to the Atlas fund? |
| 10 | A.    No. |
| 11 | Q.    Can you identify with any specificity |
| 12 | which Atlas entity you have in mind that's |
| 13 | expected to receive the proceeds from the |
| 14 | HMIT/Highland settlement? |
| 15 | A.    No. |
| 16 | Q.    Do you know if the Atlas entity that |
| 17 | you just identified, does that have any |
| 18 | obligation to disburse any of the assets it may |
| 19 | receive from HMIT? |
| 20 | A.    I don't know. |
| 21 | Q.    Okay.  Let's -- do you have any reason |
| 22 | to believe that the Dallas Foundation will be |
| 23 | impacted in any way if the settlement between |
| 24 | Highland and the HMIT entities is approved? |
| 25 | A.    As I said, because the Crown Global is |

1    to disburse money that it receives from Atlas,

2    then there would be an impact.  That's why we

3    filed the objection.

4         Q.    Is it fair to say that the Dallas

5    Foundation's concern is what happens to the

6    assets that HMIT receives after the settlement is

7    approved and it's not with the agreement itself?

8         A.    I can't answer that.

9         Q.    If Mark Patrick hadn't done anything

10   to change any of the structure that's described

11   in the Dallas Foundation's objection such that

12   the Dallas Foundation's expectations as set forth

13   in its objection were met, would the Dallas

14   Foundation have any reason to object to this

15   settlement?

16              ATTORNEY OKIN:  Objection; form.

17        A.    I don't know.

18   BY ATTORNEY MORRIS:

19        Q.    Isn't the problem here that you're

20   concerned about what happens to the money after

21   it's received by HMIT?

22        A.    I'm concerned that the case that's

23   pending in the Cayman Islands shows that

24   $300 million of charitable assets have vanished

25   and that the same type of behavior is happening

```
 1    in Crown Global and impacts those funds to the

 2    tune of $25 million.

 3         Q.    But that has nothing to do with

 4    Highland.

 5              Fair enough?

 6         A.    I don't know.

 7         Q.    Do you have any basis to say that

 8    Highland has any involvement in anything you just

 9    described?

10         A.    Well, I'm not a lawyer and,

11    technically, I don't know how to answer that.

12    But Highland has been involved from day one.

13         Q.    Involved in what?

14         A.    The original contribution to set up

15    the supporting orgs with those shares; like I

16    said, I -- all the different legal entities --

17    GPs, LPs, et cetera -- I leave you all to track.

18         Q.    If the Court approved the settlement

19    and Mark Patrick decided to give all of the

20    proceeds to the Dallas Foundation, would the

21    Dallas Foundation have any reason to object to

22    the settlement?

23              ATTORNEY OKIN:  Object to form.

24         A.    I think we'd want to know more.

25    ///
```

 1   BY ATTORNEY MORRIS:

 2        Q.    What would you want to know?

 3        A.    What are the assets that we would be

 4   receiving?  What would the structure be?

 5        Q.    Well, the assets are set forth in the

 6   settlement agreement; right?  So there's no

 7   mystery about the assets.

 8              Fair enough?

 9        A.    I don't know that.  I don't know --

10   are they -- is it cash?  Is it securities?  What

11   are the nature of the -- I would want to know a

12   lot more before accepting all things like that.

13        Q.    Do you know if Crown Global ever

14   appeared in the Highland bankruptcy?

15        A.    I don't know.

16        Q.    Do you know if the segregated accounts

17   ever filed a notice of appearance in the Highland

18   bankruptcy?

19        A.    I don't know.

20        Q.    Do you know if Crown Global ever filed

21   a claim against Highland in the Highland

22   bankruptcy?

23        A.    I don't know.

24        Q.    Do you know if the segregated accounts

25   ever filed a claim against Highland in the

1    Highland bankruptcy?

2         A.    I don't know.

3         Q.    Do you know if Crown Global has an

4    interest in the Highland Claimant Trust?

5         A.    No.  No, I don't know.

6         Q.    Do you know if the segregated accounts

7    have an interest in the Highland Claimant Trust?

8         A.    I don't know.

9         Q.    Do you know if Crown Global has any

10   contractual relationship with Highland?

11        A.    I don't know.

12        Q.    Do you know if Crown Global has any

13   contractual relationship with the Highland

14   Claimant Trust?

15        A.    No.

16        Q.    I'm going to take Mr. -- I think it's

17   Mr. Littleton's deposition next.

18        A.    Yep.

19        Q.    Do you know if he is affiliated with

20   Crown Global in any way?

21        A.    No.  He's an employee of the Dallas

22   Foundation.

23        Q.    Thank you.

24              Do you know if Crown Global has any

25   right to recover any of the assets that HMIT and

 1   the HMIT entities may receive under the

 2   settlement agreement?

 3           ATTORNEY OKIN:  Object to form.

 4       A.    I don't know.

 5   BY ATTORNEY MORRIS:

 6       Q.    Have you asked that question of

 7   anybody?

 8           ATTORNEY OKIN:  Other than your

 9   lawyers, you can answer that, Ms. Diaz.

10           ATTORNEY MORRIS:  Please --

11   BY ATTORNEY MORRIS:

12       Q.    Was the answer "no," Ms. Diaz?

13       A.    Ask the question again, please.

14       Q.    Have you ever asked anybody whether

15   Crown Global had the right to receive any of the

16   assets that Highland will convey to HMIT under

17   the settlement agreement?

18       A.    No.

19       Q.    We're using the phrase "HMIT entities"

20   to mean the entities on whose behalf Mark Patrick

21   signed the settlement agreement; right?  Are we

22   on the same page?

23       A.    That's what you're telling me.

24       Q.    Okay.  Are you familiar with any of

25   those entities?

```
 1              A.     Tell me what they are.

 2              Q.     Are you familiar with any of the Rand

 3    entities?

 4              A.     I'm familiar with Rand.

 5              Q.     And what's your familiarity with Rand?

 6              A.     Certainly it was another vehicle that

 7    flowed through to Atlas.  And when Mr. Patrick

 8    came to see me last October, told me that there

 9    might be some issues with Rand and that structure

10    might be changing.  That's vague.

11              Q.     Let's stick with the Hunter Mountain

12    Investment Trust.

13                     Are you aware of any assets that the

14    Hunter Mountain Investment Trust owns today?

15              A.     No.

16              Q.     Was it your understanding that

17    Mr. Patrick controlled Rand?

18              A.     Yes.

19              Q.     And is it your understanding that he

20    controls Rand today?

21              A.     Yes.

22              Q.     And going back to Hunter Mountain

23    Investment Trust, you're not aware of any assets

24    that that entity holds today; correct?

25              A.     No.
```

```
 1          Q.    Were you --

 2          A.    I'm assuming Rand is one of the

 3    assets, I guess.

 4          Q.    Were you ever -- did you ever know --

 5    were you ever aware of any asset that HMIT owned?

 6          A.    Well, Atlas.

 7          Q.    It's your understanding --

 8          A.    Yeah, I feel like I'm being quizzed on

 9    Hunter Mountain Trust.

10          ATTORNEY OKIN:    Let me interrupt here.

11    John, two things.

12          One, if you want to show her an org

13    chart so she can actually see these entities in a

14    way that actually would help her remember them.

15    Nobody can possibly keep them in their mind cold.

16          And, second, Ms. Diaz is not going to

17    be our witness on this Hunter Mountain structure

18    and the Rand structure.  You can keep asking her

19    questions about it and testing her memory on it,

20    but I don't think you're going to find that the

21    answers are going to be any different.

22          Mr. Littleton will talk to these

23    issues, yes.  I can't promise you he'll be able

24    to answer every one of your questions.  But to

25    the extent you want somebody with the Dallas
```

1    Foundation's knowledge of the workings of that

2    structure, he's the one to ask about that.

3              ATTORNEY MORRIS:  I'll continue to ask

4    the questions, but I appreciate that.

5    BY ATTORNEY MORRIS:

6        Q.    Do you know if the Dallas Foundation

7    ever received anything of value from any of the

8    HMIT entities?

9        A.    Crown Global.

10       Q.    Crown Global is not an HMIT entity.

11   So I'm asking you to just focus on the entities

12   that Mark Patrick controlled, the Rand entities,

13   the Atlas entities and Hunter Mountain.

14             Did any of those entities ever give

15   anything of value to the Dallas Foundation?

16       A.    Not directly that I'm aware of, no.

17       Q.    Did any of those entities ever have

18   any business dealings with the Dallas Foundation?

19       A.    Only in the relationship with

20   Crown Global.

21       Q.    Do you have any understanding as to

22   whether any of the HMIT entities owes any duties

23   or obligations to the Dallas Foundation today?

24             ATTORNEY OKIN:  Objection to form.

25       A.    I don't know.

Case 19-34054-sgj11   Doc 4277-5   Filed 08/24/26   Entered 08/24/26 16:00:25   Desc
Exhibit 4   Page 52 of 103

Deposition of Julie Diaz                                                         In re Highland Capital Management, L.P.

```
 1    BY ATTORNEY MORRIS:

 2         Q.    I understand there was some corporate

 3    reorganization earlier this year.  I think that's

 4    described in the Dallas Foundation's objection.

 5              Is that just generally fair?

 6         A.    As it relates to Mr. Patrick?

 7         Q.    Yes.

 8         A.    (Nods head.)

 9         Q.    Okay.  Do you have any reason to

10    believe that before Mr. Patrick effectuated those

11    changes, that any of the HMIT entities owed any

12    duty or obligation to the Dallas Foundation?

13              ATTORNEY OKIN:  Objection to form.

14         A.    I don't know.

15    BY ATTORNEY MORRIS:

16         Q.    Are you aware that HMIT filed a couple

17    of years ago a motion in the bankruptcy court for

18    permission to bring certain claims against

19    Highland Capital Management and a gentleman named

20    James Seery?

21         A.    No.

22         Q.    Nobody ever told you that; is that

23    fair?

24         A.    Fair.

25         Q.    Are you aware that Highland contends
```

1    that the settlement agreement that it has entered

2    into with the HMIT entities is the product of

3    good-faith, arm's-length negotiations?

4         A.    Am I aware?  No.

5         Q.    Do you have any knowledge of the

6    nature of any negotiations between the Highland

7    entities and the HMIT entities?

8         A.    I'm aware that it's been going on for

9    four years.

10        Q.    I'm just talking about the settlement

11   agreement now.

12        A.    Okay.

13        Q.    Do you have any knowledge of any facts

14   concerning the negotiation of that particular

15   settlement agreement?

16        A.    No.

17        Q.    Do you have any knowledge of any facts

18   that might suggest that the settlement agreement

19   was not the product of good-faith, arm's-length

20   negotiations?

21        A.    No.

22        Q.    Do you have any reason to believe that

23   the proposed settlement is unfair to Highland

24   Capital Management, LP?

25             ATTORNEY OKIN:  Object to form.

1    BY ATTORNEY MORRIS:

2         Q.    You can answer, ma'am.

3         A.    I don't know.

4         Q.    Do you know whether the proposed

5    settlement is unfair to the Highland Claimant

6    Trust?

7         A.    I don't know.

8              ATTORNEY OKIN:  Object to form.

9    BY ATTORNEY MORRIS:

10        Q.    You don't have a view on that; is that

11   fair?

12        A.    Yes.

13        Q.    And is it fair that in connection with

14   the preparation and the filing of the

15   objection -- withdrawn.

16              The Dallas Foundation, in its

17   objection, does not contend that the settlement

18   is unfair to Highland Capital Management; is that

19   correct?

20        A.    I don't know.

21        Q.    You reviewed and authorized the filing

22   of the objection; isn't that right, ma'am?

23        A.    Right.

24        Q.    And you're familiar with the document

25   that you authorized to be filed; fair?

1          A.     Yes.

2          Q.     And based on your recollection, do you

3    recall the Dallas Foundation making any assertion

4    or claim that the settlement agreement was unfair

5    to Highland Capital Management, LP, or any of its

6    affiliates?

7          A.     The claim was that it was unfair to

8    the supporting organizations.

9          Q.     And how is the settlement agreement

10   unfair to the supporting organizations?

11         A.     Because we would -- well, what we

12   claimed is that because of our lack of

13   transparency of the flow of those funds and the

14   changes in the fund recently, that the supporting

15   organizations were losing their assets and any

16   potential future assets.

17         Q.     Is there any other basis that you're

18   aware of by which the Dallas Foundation contends

19   that the settlement agreement is unfair to it?

20         A.     No.

21         Q.     Does the Dallas Foundation contend

22   that the settlement agreement is unfair to Hunter

23   Mountain Investment Trust?

24         A.     I don't know.

25         Q.     As the person who authorized the

 1    filing of the objection on behalf of the Dallas

 2    Foundation, do you have any reason to believe

 3    that the terms of the settlement are unfair to

 4    the Hunter Mountain Investment Trust?

 5         A.    I do not.

 6         Q.    Are you aware that under the

 7    settlement agreement, the HMIT entities and the

 8    Highland entities are releasing each other from

 9    all liabilities except for the liabilities

10    arising under the settlement agreement?

11         A.    I'm assuming that's what the

12    settlement is intended to do.

13         Q.    And the Dallas Foundation doesn't have

14    any concern about the scope of the mutual

15    releases; is that fair?

16              ATTORNEY OKIN:  Objection to form.

17         A.    I don't know.

18    BY ATTORNEY MORRIS:

19         Q.    As the person who authorized the

20    filing of the objection on behalf of the Dallas

21    Foundation, do you recall there being any

22    statement in the objection where the Dallas

23    Foundation expressed any concern at all about the

24    scope of the mutual releases that are in the

25    settlement agreement?

Case 19-34054-sgj11   Doc 4327-5   Filed 08/24/26   Entered 08/24/26 10:00:25   Desc
Exhibit 4   Page 56 of 102

Deposition of Julie Diaz                                                    In re Highland Capital Management, L.P.

1           ATTORNEY OKIN:  Object to form.  The

2    document speaks for itself.  I mean, if you want

3    to show it to her and ask her to find it, that's

4    fine.

5    BY ATTORNEY MORRIS:

6           Q.    You can answer, ma'am.

7           A.    I don't --

8           Q.    I'm sorry?

9           A.    I don't recall that.

10          Q.    Okay.  Thank you.

11                Are you aware of any facts that could

12    give rise to a claim by the Dallas Foundation

13    against any Highland entity?

14          ATTORNEY OKIN:  Object to form.

15          A.    Repeat the question.

16    BY ATTORNEY MORRIS:

17          Q.    Are you aware of any facts that would

18    support a claim by the Dallas Foundation against

19    Highland Capital Management, LP, or the Highland

20    Claimant Trust?

21          ATTORNEY OKIN:  Object to form.

22          A.    No.

23    BY ATTORNEY MORRIS:

24          Q.    Do you understand the basis for the

25    Dallas Foundation's objection?

Case 19-34054-sgj11   Doc 4227-5   Filed 08/24/26   Entered 08/24/26 16:00:25   Desc
Exhibit 24   Page 58 of 103

Deposition of Julie Diaz                                          In re Highland Capital Management, L.P.

 1          A.      Yes.

 2          Q.      Can you articulate that for me.

 3     What's your understanding of the basis of the

 4     Dallas Foundation's objection?

 5               ATTORNEY OKIN:   Object to form.

 6          A.      Our objection --

 7     BY ATTORNEY MORRIS:

 8          Q.      Pardon me?   What's that, ma'am?

 9               ATTORNEY OKIN:   I said I object to the

10     form of the question.

11               Go ahead.   You can answer.

12          A.      Our objection is based on -- and I've

13     said this before -- the fact that there's been

14     irregular significant erosion of the assets to

15     date by the party who seems to control a lot of

16     the liquidity flows and oversight of the assets.

17               And so with the backdrop of all of the

18     work we're doing in the Cayman Islands to recover

19     300-plus million dollars, this seemed not

20     insignificant to protect the $25 million for

21     these two supporting organizations.

22               So as this happens on Wednesday, what

23     we've learned is that every opportunity we can to

24     slow down decisions that are made give us time to

25     understand where -- what is happening with these

1    charitable assets and where they are.

2    BY ATTORNEY MORRIS:

3         Q.    Do you have any reason to believe that

4    Mark Patrick does not have the authority to enter

5    into the settlement agreement on behalf of each

6    of the HMIT entities?

7              ATTORNEY OKIN:  Object to the form of

8    the question.

9         A.    I don't know what authority he has to

10   enter into that.

11   BY ATTORNEY MORRIS:

12        Q.    Do you have any facts that you can

13   share with me that suggest that Mr. Patrick does

14   not have the legal authority to enter into the

15   settlement agreement on behalf of any of the HMIT

16   entities?

17             ATTORNEY OKIN:  Object to the form of

18   the question.

19        A.    I don't.

20   BY ATTORNEY MORRIS:

21        Q.    Is it your understanding that

22   Mr. Patrick was required to obtain the Dallas

23   Foundation or Crown Global's consent before

24   entering into this settlement agreement?

25        A.    I think what we would have appreciated

```
 1   and what had been our business as usual was

 2   information prior to and during anything that

 3   involved the assets under our aegis.

 4        Q.    Do you know if any of the HMIT

 5   entities had an obligation or duty to provide

 6   information to the Dallas Foundation or

 7   Crown Global before entering into the settlement

 8   agreement?

 9             ATTORNEY OKIN:  Object to the form of

10   the question.

11        A.    I don't --

12   BY ATTORNEY MORRIS:

13        Q.    I'm sorry.  Ms. Diaz, you don't know?

14        A.    I don't contractually know that.  But

15   whether it's authority that he was given or

16   assumed, he should have communicated with us.

17        Q.    Should he have communicated with you

18   before filing a lawsuit against the Highland --

19   withdrawn.

20             Do you believe that Mr. Patrick should

21   have communicated with the Dallas Foundation

22   before filing a lawsuit on behalf of Hunter

23   Mountain Investment Trust against Highland,

24   Mr. Seery, and others?

25        A.    I don't know.
```

 1          Q.    You don't have a view on that; is that

 2    fair?

 3          A.    Fair.

 4          Q.    I apologize if I asked this, but do

 5    you have any reason to believe that Mr. Patrick

 6    was required to obtain either the Dallas

 7    Foundation's or Crown Global's consent before

 8    entering into the settlement on behalf of the

 9    HMIT entities?

10                ATTORNEY OKIN:   Object to form of the

11    question.

12          A.    I don't know.

13    BY ATTORNEY MORRIS:

14          Q.    Do you have any reason to believe that

15    the Dallas Foundation or Crown Global has --

16    withdrawn.

17                Do you know if the Dallas Foundation

18    has a direct ownership interest in any of the

19    HMIT entities that are party to the settlement

20    agreement?

21          A.    I don't believe so.

22          Q.    Do you know if Crown Global has a

23    direct ownership interest in any of the HMIT

24    entities that are party to the settlement

25    agreement?

```
 1          A.    I don't know.

 2          Q.    Do you know if the Dallas Foundation

 3   has an indirect ownership interest in any of the

 4   HMIT entities that are party to the settlement

 5   agreement?

 6          A.    Indirect ownership?

 7                ATTORNEY OKIN:  Object to the form of

 8   the question.

 9          A.    I don't know.

10   BY ATTORNEY MORRIS:

11          Q.    Did you ever ask anybody?

12          A.    No.

13          Q.    No?

14          A.    No.

15          Q.    Do you know if Crown Global has an

16   indirect ownership interest in any of the HMIT

17   entities that are party to the settlement

18   agreement?

19                ATTORNEY OKIN:  Object to the form of

20   the question.

21          A.    I don't know.

22   BY ATTORNEY MORRIS:

23          Q.    Do you know if the Dallas Foundation

24   has any right to control any of the HMIT

25   entities?
```

```
 1          A.    No.

 2          Q.    No, you don't know; or, no, they don't

 3    have that right?

 4          A.    No, we don't have that right.

 5          Q.    Do you know if Crown Global has the

 6    right to control any of the HMIT entities?

 7          A.    I don't know.

 8          Q.    Do you know if the Dallas Foundation

 9    has the right to approve transactions that are

10    entered into by any of the HMIT entities?

11          A.    I don't know.

12          Q.    Do you know if Crown Global has the

13    right to approve any transaction that's entered

14    into by any of the HMIT entities?

15          A.    I don't know.

16          Q.    Do you know if Crown Global or the

17    segregated accounts has any right to control any

18    of the HMIT entities?

19          A.    I don't know.

20          Q.    Do you know if Crown Global or the

21    segregated accounts has any right to approve

22    transactions that any of the HMIT entities might

23    enter into?

24          A.    I don't know.

25          Q.    Do you know if any of the HMIT
```

```
 1   entities were required to obtain the segregated

 2   accounts' consent before entering into the

 3   settlement agreement?

 4              ATTORNEY OKIN:  Object to the form of

 5   the question.

 6        A.    I don't know.

 7              ATTORNEY MORRIS:  Okay.  We're going

 8   to put up on the screen -- Nathan, can you please

 9   put up on the screen the Dallas Foundation's

10   objection.

11   BY ATTORNEY MORRIS:

12        Q.    And while we wait, Ms. Diaz, I will

13   tell you that, you know, the good news with

14   COVID -- or at least one piece of the good

15   news -- is that we learned to do these remote

16   depositions so people don't have to travel and

17   it's much less expensive for clients.

18              The bad news is that I'm not in the

19   room with you and we have to put documents on the

20   screen, and sometimes that can be a little bit

21   cumbersome.

22              The Dallas Foundation's objection is

23   fairly lengthy.  This is not a test at all.  I am

24   going to point to certain parts of the objection.

25   But if you believe that you need to see any other
```

 1    portion of the document, will you let me know

 2    that so that I give you a chance to be fully

 3    informed?

 4            A.    Yes.

 5                  ATTORNEY MORRIS:  Okay.  I think it's

 6    towards the end, Nathan, paragraph 32.

 7                  This will be -- let's just call it

 8    Highland 1.

 9                  (Whereupon, Exhibit Highland 1

10                  was marked for identification and

11                  is attached hereto.)

12    BY ATTORNEY MORRIS:

13            Q.    So we've got up on the screen

14    paragraph 32 of the objection.  And the third

15    sentence states, "Unfortunately, it does not

16    appear, however, that joint official liquidators

17    are parties to or have authorized the

18    settlement."

19                  Do you see that?

20            A.    I see it.

21            Q.    Okay.  Are you aware that joint

22    official liquidators were appointed by a Cayman

23    court?

24            A.    Yes.

25            Q.    Do you know the entity over which the

```
 1    joint official liquidators were appointed?

 2         A.    I've met with them.

 3               Entity?

 4               ATTORNEY OKIN:  Ms. Diaz, maybe you

 5    need the question repeated.  You seem to be

 6    confused by the wrong part of it.

 7               THE WITNESS:  Okay.

 8               ATTORNEY MORRIS:  Thank you, Matt.

 9    That's fine.  That's fine.  I'll ask the question

10    again.

11    BY ATTORNEY MORRIS:

12         Q.    Can you identify the entity that's the

13    subject of the Cayman Islands liquidation

14    proceeding?

15         A.    Yes; the DAF Holdco.

16         Q.    Are you aware that all of the HMIT

17    entities are Delaware corporations?  Withdrawn.

18               Are you aware that all of the HMIT

19    entities were formed under the laws of the State

20    of Delaware?

21         A.    Sounds familiar.

22         Q.    And have you ever communicated with

23    the joint official liquidators?

24         A.    Yes.

25         Q.    When did you do that?
```

 1        A.     Two weeks ago.

 2        Q.     Did you make them aware of Highland's

 3   motion to have the settlement between the

 4   Highland entities and the HMIT entities approved?

 5        A.     I'd have to look at my calendar.

 6        Q.     Do you need your calendar to refresh

 7   your recollection as to whether or not you

 8   informed them of the Highland settlement motion?

 9        A.     I would want to make sure that the day

10   I met with them is clear in my mind as to this

11   versus when we've talked to them.

12        Q.     Fair enough.

13        A.     As you can imagine, there's been a lot

14   of detail around all of these cases.

15        Q.     Sure.  And I don't mean to be

16   disrespectful at all, ma'am.  I apologize if you

17   took it that way.

18             Do you recall ever making the joint

19   official liquidators aware of the Dallas

20   Foundation's objection to the settlement motion?

21        A.     As I said, I don't know if we've made

22   them aware of the objection, except as it relates

23   to ancillary activity that we're concerned about

24   regarding Mark Patrick.

25             So this was filed on June 9th, and I

```
 1   would want to make sure that I spoke with them

 2   before or after that; and I don't have that.

 3        Q.    Do you know if anybody provided a copy

 4   of the Dallas Foundation's objection to the joint

 5   official liquidators?

 6        A.    I don't know that.

 7        Q.    Did you ever consider doing that?

 8        A.    I will after today.

 9        Q.    Do you know if anybody asked the joint

10   official liquidators to make an appearance in

11   this case?

12        A.    I don't know that.

13        Q.    Did you ever ask the joint official

14   liquidators to appear in this case?

15        A.    We've already precluded that we don't

16   know whether I've actually talked to them about

17   this case, so that's moot; right?

18        Q.    Okay.  Do you believe that Mr. Patrick

19   was required to obtain the joint official

20   liquidators' authorization before entering into

21   the settlement agreement?

22        A.    I don't know that.

23              ATTORNEY OKIN:  Object to the form of

24   the question.

25   ///
```

 1    BY ATTORNEY MORRIS:

 2         Q.    I'm sorry, ma'am.  What did you say?

 3         A.    I don't know that.

 4         Q.    Did you have any reason to believe

 5    that Mr. Patrick was required to obtain the joint

 6    official liquidators' consent before entering

 7    into this settlement agreement?

 8         A.    I don't know.

 9         Q.    Do you have any reason to believe that

10    the joint official liquidators have any authority

11    to reject the proposed settlement?

12              ATTORNEY OKIN:  Object to the form.

13         A.    I don't know.

14    BY ATTORNEY MORRIS:

15         Q.    A little bit further down, towards the

16    bottom of this paragraph, there's a reference, it

17    says that the Court-appointed fiduciary, quote,

18    may -- withdrawn.

19              It says:

20              "Indeed, many of Mr. Patrick's

21         actions, including the insertion of

22         newly created entities into the fund's

23         structure for the apparent purpose of

24         diverting charitable assets, will now be

25         subject to the scrutiny of an

1          independent, Court-appointed fiduciary

2          and may be subject to clawback or other

3          avoidance actions in the Cayman

4          liquidation or such other tribunal as

5          has jurisdiction."

6                   Do you see that?

7          A.    No.  You need to scroll down on the --

8          Q.    It's just at the end of paragraph 32

9     here.  It's the last sentence of 32.

10         A.    And so what's your question?

11         Q.    I just want to make sure that you and

12    I are on the same page, because I'm going to ask

13    some questions about this sentence.

14         A.    Yeah.

15         Q.    You're not an expert in Cayman Islands

16    law; fair?

17         A.    Fair.

18         Q.    You're not a lawyer, are you?

19         A.    Nope.

20         Q.    You're not an expert on clawback or

21    other avoidance actions, as that phrase is used

22    in the Dallas Foundation's objection in

23    paragraph 32; fair?

24         A.    Fair.

25         Q.    Do you have any understanding as to

 1   what facts must be established to succeed in a

 2   clawback or other avoidance action?

 3        A.    Repeat the question.

 4        Q.    Do you have any understanding as to

 5   what facts somebody needs to prove in order to

 6   succeed on a clawback or other avoidance action?

 7        A.    Not in a corporate setting.

 8        Q.    Is there any other type of setting

 9   that would pertain to the Dallas Foundation's

10   claims against Mr. Patrick?

11        A.    No.

12        Q.    Okay.  Do you have a view as to the

13   likelihood that the Dallas Foundation might

14   succeed in clawing back or asserting another

15   avoidance action to set aside the settlement

16   agreement if it's approved by the bankruptcy

17   court?

18             ATTORNEY OKIN:  Object to form.

19        A.    I don't know.

20   BY ATTORNEY MORRIS:

21        Q.    And you don't have a view; is that

22   fair?

23        A.    No, I just really don't know --

24        Q.    If we could --

25        A.    -- whether we will.

1          Q.    Okay.  You would have to speculate; is

2     that fair?

3          A.    Yes.

4                ATTORNEY MORRIS:  Can we scroll down

5     to paragraph 33, please.

6                ATTORNEY OKIN:  John, how much longer

7     do you anticipate going?  We talked about these

8     being an hour and a half.

9                ATTORNEY MORRIS:  Correct.  And we

10    started at exactly 2:37 New York time.  I expect

11    to finish at 4:07 New York time.

12                ATTORNEY OKIN:  Are we doing

13    additional questions from anybody else?

14                ATTORNEY MORRIS:  Mr. Phillips, do you

15    have any questions?

16                You're on mute, sir.

17                We'll be done in the 90 minutes.

18                ATTORNEY PHILLIPS:  Not at this time.

19                ATTORNEY MORRIS:  Okay.  Thank you.

20    BY ATTORNEY MORRIS:

21          Q.    So in paragraph 33, it says at the

22    end, quote:  "Even if approved by this Court,

23    consummation of the settlement is not likely to

24    buy the peace the debtor now seeks."

25                Do you see that?

 1          A.     Yes.

 2          Q.     Are you aware of anything in the

 3   Dallas Foundation's objection that suggests the

 4   Highland parties have done anything wrong here?

 5          A.     Repeat that question.

 6          Q.     Is there anything in the Dallas

 7   Foundation objection that you read and authorized

 8   to be filed that suggests that any of the

 9   Highland parties have done anything wrong?

10          ATTORNEY PHILLIPS:  I'm going to

11   object to that question because you said that she

12   read and authorized it to be filed.

13          ATTORNEY MORRIS:  I apologize.  I

14   apologize.  Thank you.

15   BY ATTORNEY MORRIS:

16          Q.     Let me start again, Ms. Diaz.

17          Do you recall whether there's anything

18   in the Dallas Foundation objection that asserts

19   that any of the Highland parties have done

20   anything wrong in connection with the entry into

21   the settlement agreement?

22          A.     I don't recall.

23          Q.     Are you aware of any facts that cause

24   you to believe that any of the Highland entities

25   did anything wrong in negotiating and entering

Case 19-34054-sgj11   Doc 4327-5   Filed 08/24/26   Entered 08/24/26 16:00:35   Desc
Exhibit 4   Page 74 of 103

Deposition of Julie Diaz                                              In re Highland Capital Management, L.P.

```
 1    into the settlement agreement?

 2         A.    I don't know.

 3         Q.    If you're not aware of any facts

 4    suggesting that Highland has engaged in

 5    wrongdoing, do you know why the Dallas Foundation

 6    has informed the Court that consummation of the

 7    settlement is not likely to buy the peace the

 8    debtor now seeks?

 9              ATTORNEY OKIN:  Object to form.

10         A.    I'll abstain from answering that.

11    BY ATTORNEY MORRIS:

12         Q.    That's not a thing, respectfully.

13              ATTORNEY MORRIS:  If -- Matt, if you

14    want to just help your witness out.

15              ATTORNEY OKIN:  You want me to give

16    her the answer?

17    BY ATTORNEY MORRIS:

18         Q.    Well, there's no abstention, so you

19    have to answer the question, ma'am.

20              ATTORNEY OKIN:  As best you can answer

21    it, Ms. Diaz, answer it.  If you can't answer it,

22    tell him you can't answer it.

23         A.    And I'll just say, when you say

24    "Highland," you want to be more specific?

25    ///
```

```
 1   BY ATTORNEY MORRIS:

 2        Q.    Sure.  Highland Capital Management,

 3   LP, the Highland Claimant Trust or the Highland

 4   Litigation Subtrust.

 5        A.    And so repeat the question.

 6        Q.    Okay.  If you don't have any facts

 7   suggesting that they've done anything wrong, why

 8   did the Dallas Foundation inform the Court, at

 9   the end of paragraph 33, that consummation of the

10   settlement is not likely to buy the peace the

11   debtor now seeks?

12             ATTORNEY OKIN:  Object to form.

13   BY ATTORNEY MORRIS:

14        Q.    You can answer.

15             ATTORNEY OKIN:  If you can answer it.

16        A.    Again, I'll just repeat that the peace

17   that the debtor seeks will be tainted because of

18   the harm that will come to the Dallas Foundation.

19   BY ATTORNEY MORRIS:

20        Q.    Anything else?

21        A.    No.

22        Q.    Is the Dallas Foundation considering

23   bringing any claims against Highland, the

24   Highland Claimant Trust or any of its

25   fiduciaries?
```

 1      A.     (No audible response.)

 2      Q.     I'm sorry, ma'am.  Did you answer?

 3      A.     I did.  I said, "No."

 4      Q.     Thank you.

 5             In paragraph 34 --

 6             ATTORNEY MORRIS:  Yeah, right there.

Thank you Nathan --

 7

 8  BY ATTORNEY MORRIS:

 9      Q.     -- it says, quote:  "There is ample

10  evidence that Mr. Patrick has acted and is acting

11  well outside the scope of his authority and

12  fiduciary obligations."

13             Have I read that correctly?

14      A.     Yes.

15      Q.     Focusing solely on the settlement

16  agreement, do you have any reason to believe that

17  Mr. Patrick is acting outside of the scope of his

18  authority in entering into the settlement

19  agreement on behalf of each of the HMIT entities?

20             ATTORNEY OKIN:  Object to form.

21      A.     And I don't know.

22  BY ATTORNEY MORRIS:

23      Q.     Okay.  Focusing solely on the

24  settlement agreement, do you have any reason to

25  believe that Mr. Patrick is breaching his

1    fiduciary obligations by entering into the

2    settlement agreement on behalf of each of the

3    HMIT entities?

4          A.    I don't know.

5                ATTORNEY MORRIS:  Can we scroll up to

6    paragraph 16, please.

7                Do you see paragraph 16 concerns

8    material nonpublic inside information?

9          A.    Yes.

10         Q.    And was Mr. Dondero the source of the

11   information in this particular paragraph?

12         A.    No.

13         Q.    Who was?

14         A.    My attorneys.

15         Q.    That's how you learned about it; is

16   that fair?

17         A.    Yes.

18         Q.    Do you see there's a reference to a

19   put option in the last line of this paragraph?

20         A.    Yes.

21         Q.    Are you generally familiar with that

22   put option?

23         A.    Yes.

24         Q.    And do you know who the counterparty

25   is for that put option?

```
 1          A.     No, I don't.

 2          Q.     You don't know?

 3          A.     No.

 4          Q.     Did you ever ask?

 5          A.     I'm sure when we --

 6                 ATTORNEY OKIN:   Louis, you're not on

 7    mute, by the way.

 8    BY ATTORNEY MORRIS:

 9          Q.     Go ahead, Ms. Diaz.  I'm sorry.

10          A.     I'm sure when we received the

11    contribution, we asked.  And you can ask our CFO

12    that question.

13                 My understanding from the original

14    call in Labor Day weekend to our attorney was

15    that we should call the put.  That was a 10-year,

16    I believe, and this would have been at year 7;

17    and we didn't understand why he would be calling

18    to ask that.  And ...

19          Q.     Has the Dallas Foundation exercised

20    the put as of today?

21          A.     Absolutely not.

22          Q.     Why not?

23          A.     We stopped all activity because this,

24    again, was the beginning of, why is somebody

25    doing that, not giving us the information, not
```

1    talking to us directly; and that -- and at advice

2    of counsel, we -- we have been very careful with

3    any of our activities to date.

4         Q.    And do you know what material

5    nonpublic inside information Mr. Patrick

6    supposedly misused?

7         A.    I'll just tell you the quote he gave

8    us, which was Jim Dondero's spiraling out of

9    control and you need to do this because nothing

10   appears to be what it is.

11        Q.    He didn't tell you who -- withdrawn.

12             Is that your basis for alleging that

13   he had material nonpublic inside information --

14        A.    I'll -- well, I guess, I can't

15   abstain.  I don't know.

16        Q.    Do you have any other --

17        A.    If my --

18        Q.    I'm sorry.

19        A.    Well, if my attorney says, "Don't do

20   that," we don't do it.

21        Q.    I appreciate that.  I don't quarrel

22   with you.  I'm just trying to learn facts here.

23             Can you identify any information that

24   you believe Mr. Patrick had that constitutes

25   material nonpublic inside information, as that

 1   phrase is used in the Dallas Foundation's

 2   objections?

 3        A.    Right.

 4             ATTORNEY OKIN:  Hold on, John.  I

 5   assume you're not -- I assume we're talking about

 6   information that's no longer nonpublic?

 7             ATTORNEY MORRIS:  If -- if you all

 8   want to mark this -- I don't know what it is,

 9   Matt, so I can't say.  And it's not my

10   information either.  So I'm happy to mark it

11   confidential if you really prefer.

12             ATTORNEY OKIN:  I -- I don't even know

13   if she knows the answer to the question.

14        A.    I don't know the answer to that.  But

15   I will tell you that we quickly got a call from

16   Skyview saying that Mark Patrick was no longer

17   employed there and that that was confidential,

18   yeah, insider information.

19   BY ATTORNEY MORRIS:

20        Q.    Oh, so somebody at Skyview told you

21   that; is that fair?

22        A.    That's fair.

23        Q.    And who was that at Skyview?

24        A.    Well, it was an attorney for Skyview.

25        Q.    Was it D.C. Sauder?

1        A.    No.  A woman.

2        Q.    Okay.  So a female attorney at Skyview

3   told you that Mark Patrick had been terminated

4   and that he had material nonpublic inside

5   information.

6             Do I have that right?

7        A.    That they were investigating him and

8   understood that we had called the -- he had

9   called -- told us to call the put option.

10       Q.    Okay.  But as you sit here today,

11  you're not able to tell me what material

12  nonpublic inside information Mr. Patrick

13  supposedly had; fair?

14       A.    Fair.

15            ATTORNEY MORRIS:  Ma'am, thank you so

16  much.  I appreciate your time.

17            Matt, thank you for a professional

18  deposition.

19            We'll see you all, I guess, in a

20  little bit for the next deposition.

21            Thanks, folks.

22            THE COURT REPORTER:  Do you want a

23  copy of the transcript?

24            ATTORNEY OKIN:  Yes, rushed, please.

25  Whenever John gets it.

Case 19-34054-sgj11   Doc 4327-5   Filed 08/24/26   Entered 08/24/26 16:00:35   Desc
Exhibit 124   Page 82 of 103

Deposition of Julie Diaz                                                                In re Highland Capital Management, L.P.

```
 1                ATTORNEY PHILLIPS:  Yes, expedited,

 2     like everybody else.

 3                THE COURT REPORTER:  Mr. Lang, do you

 4     want a copy of the transcript?

 5                ATTORNEY LANG:  Yes, please.

 6                (Whereupon, at 3:08 p.m. Central

 7                Time, the proceedings concluded.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INSTRUCTIONS TO DEPONENT

 2                    After reading this volume of your

 3      deposition, indicate any corrections or changes

 4      to your testimony and the reasons therefor on the

 5      Errata Sheet supplied to you and sign it.  DO NOT

 6      make marks or notations on the transcript volume

 7      itself.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 19-34054-sgj11   Doc 4327-5   Filed 02/24/26   Entered 02/24/26 10:00:35   Desc
Exhibit 4   Page 84 of 103

Deposition of Julie Diaz                                          In re Highland Capital Management, L.P.

```
 1                    E R R A T A

 2

 3            I wish to make the following changes,

 4      for the following reasons:

 5    Page  Line

 6    _____  _____   CHANGE: _____

 7    REASON: _____

 8    _____  _____   CHANGE: _____

 9    REASON: _____

10    _____  _____   CHANGE: _____

11    REASON: _____

12    _____  _____   CHANGE: _____

13    REASON: _____

14    _____  _____   CHANGE: _____

15    REASON: _____

16    _____  _____   CHANGE: _____

17    REASON: _____

18    _____  _____   CHANGE: _____

19    REASON: _____

20    _____  _____   CHANGE: _____

21    REASON: _____

22    _____  _____   CHANGE: _____

23    REASON: _____

24

25
```

```
 1
 2
 3                    C E R T I F I C A T I O N
 4
 5
 6            I hereby certify that I have read the
 7     foregoing transcript of my deposition testimony,
 8     and that my answers to the questions propounded,
 9     with the attached corrections or changes, if any,
10      are true and correct.
11
12     ------------------------------------
       JULIE DIAZ
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 19-34054-sgj11    Doc 4327-5    Filed 02/24/26    Entered 02/24/26 16:00:35    Desc
Exhibit 24    Page 85 of 102

Deposition of Julie Diaz                                                   In re Highland Capital Management, L.P.

1

2                    CERTIFICATE OF SHORTHAND REPORTER

3

4

5               I, Gail Inghram, Registered Diplomate

6       Reporter, Certified Realtime Reporter, Realtime

7       Systems Administrator, CA-Certified Shorthand

8       Reporter No. 8635, and Notary Public, the officer

9       before whom the foregoing proceedings were taken,

10      do hereby certify that the foregoing transcript

11      is a true and correct record of the proceedings;

12      that said proceedings were taken by me

13      stenographically and thereafter reduced to

14      typewriting under my supervision; and that I am

15      neither counsel for, related to, nor employed by

16      any of the parties to this case and have no

17      interest, financial or otherwise, in its outcome.

18

19

20

_____

21      Gail Inghram,
        BA, RDR, CRR, RSA, CA-CSR No. 8635

22

23

24

25

**WORD INDEX**

**< $ >**
**$25**  43:*2*  56:*20*
**$300**  42:*24*

**< 1 >**
**1**  6:*14*  63:*8, 9*
**1:37**  1:*16*  2:*11*
**10**  12:*20*
**10010**  3:*24*
**10017-2024**  3:*16*
**10-year**  76:*15*
**11**  1:*8*
**1113**  4:*10*
**15**  6:*18*
**16**  75:6, *7*
**1600**  5:*9*
**1700**  4:*18*
**19-34054-sgj11**  1:*5*
**1st**  10:*1*

**< 2 >**
**2:37**  70:*10*
**2011**  21:*9*
**2019**  10:*9*
**2024**  10:*1*
**2025**  1:*15*  2:*10*
**212.849.7615**  3:*25*
**214.817.4500**  4:*20*
**22**  1:*15*  2:*10*
**225.381.9643**  5:*11*
**22nd**  3:*23*
**2390**  4:*18*
**240**  4:*10*

**< 3 >**
**3:08**  80:*6*
**300-plus**  56:*19*
**301**  5:*9*
**30th**  29:*14*
**310.277.6910**  3:*17*
**32**  63:6, *14*  68:8, 9, *23*
**33**  70:5, *21*  73:*9*
**34**  74:*5*
**34th**  3:*15*

**< 4 >**

**4:07**  70:*11*
**40**  27:*24*  29:*6*

**< 5 >**
**51**  3:*23*

**< 6 >**
**63**  6:*14*

**< 7 >**
**7**  76:*16*
**70801**  5:*10*
**713.228.4100**  4:*12*
**75201**  4:*19*
**77002**  4:*11*
**780**  3:*15*

**< 8 >**
**8**  6:*6*
**8635**  1:*22*  84:8, *21*

**< 9 >**
**90**  70:*17*
**9th**  65:*25*

**< A >**
**able**  48:*23*  79:*11*
**Absolutely**  76:*21*
**abstain**  18:7  72:*10*  77:*15*
**abstention**  72:*18*
**accepting**  44:*12*
**access**  28:*2*
**accommodate**  9:*15*
**accounting**  24:*15*
**accounts**  25:*18, 25*  26:2, 5, *8*  27:*18, 21*  29:*24*  30:3, 6, 10, 13, 18, 23*  44:16, 24*  45:*6*  61:*17, 21*  62:*2*
**acted**  74:*10*
**acting**  17:*24*  18:5, *23*  31:6  74:*10, 17*
**action**  69:2, 6, *15*
**actions**  31:*12*  67:*21*  68:*3, 21*
**activities**  22:*23*  27:*25*  77:*3*

**activity**  14:*1*  24:*12, 25*  25:*1*  27:*23*  65:*23*  76:*23*
**ADAMS**  4:*9*
**additional**  20:*24*  70:*13*
**Administrator**  84:*7*
**advice**  19:*18*  77:*1*
**aegis**  58:*3*
**affidavit**  22:*13*
**affiliated**  9:*21*  11:*21*  45:*19*
**affiliates**  10:*14, 15*  11:*25*  53:*6*
**affirmed**  8:*6*
**afternoon**  8:*12*
**agendas**  16:*7*
**ago**  50:*17*  65:*1*
**agree**  33:*21*
**agreed**  23:*18*
**agreement**  10:*18, 23*  11:6, 9, 22*  14:3, 6, 7*  36:*15, 18, 20, 22, 25*  37:9, 12, 14, 16*  38:5, 20*  39:1, 10, 22*  40:*10, 19, 25*  42:7  44:*6*  46:2, 17, 21*  51:1, 11, 15, 18*  53:4, 9, 19, 22*  54:7, 10, 25*  57:5, 15, 24*  58:8  59:*20, 25*  60:5, 18*  62:3  66:*21*  67:7  69:*16*  71:*21*  72:*1*  74:*16, 19, 24*  75:*2*
**ahead**  56:*11*  76:*9*
**ahurt@kellyhart.com**  5:*7*
**alleging**  77:*12*
**allocated**  29:*3*
**allow**  9:2, *7*
**AMELIA**  5:*6*
**amount**  23:*18*
**ample**  74:*9*
**ancillary**  65:*23*
**annuities**  26:*10, 21, 25*  27:4, 6, 14*  29:*7*
**annuity**  26:*13, 17*  28:*18, 21*
**ANSWER**  7:3  9:*4, 8*  18:9  19:*17, 19*  32:*25*

33:9  35:*21*  39:*11, 16*  42:8  43:*11*  46:9, 12*  48:*24*  52:*2*  55:*6*  56:*11*  72:*16, 19, 20, 21, 22*  73:*14, 15*  74:*2*  78:*13, 14*
**answering**  18:*7*  72:*10*
**answers**  48:*21*  83:*8*
**anticipate**  70:*7*
**anybody**  18:*4, 22*  25:*9*  30:*1, 20*  39:7, 19, 24, 25*  40:*13*  46:7, 14*  60:*11*  66:3, 9*  70:*13*
**apologize**  20:*15*  33:*2*  59:*4*  65:*16*  71:*13, 14*
**apparent**  67:*23*
**appear**  63:*16*  66:*14*
**appearance**  44:*17*  66:*10*
**appeared**  3:*2*  32:*1*  33:*5*  44:*14*
**appears**  77:*10*
**appointed**  63:*22*  64:*1*
**appreciate**  18:*10*  25:*3*  39:*18*  49:*4*  77:*21*  79:*16*
**appreciated**  57:*25*
**approval**  30:*21*
**approve**  29:*12*  61:9, 13, 21*
**approved**  36:*16*  37:*22*  38:5, 20*  41:*24*  42:7  43:*18*  65:*4*  69:*16*  70:*22*
**Approving**  6:*17*
**approximately**  2:*11*
**April**  10:*1*
**arising**  54:*10*
**arm's-length**  51:3, *19*
**articulate**  56:*2*
**aside**  69:*15*
**asked**  25:4  32:*22*  39:7  46:6, 14*  59:*4*  66:9  76:*11*
**asking**  25:3  29:*16*  40:*12*  48:*18*  49:*11*
**asserting**  69:*14*

**assertion** 53:*3*
**asserts** 71:*18*
**asset** 22:*11* 48:*5*
**assets** 18:*16* 24:*25*
26:*9* 36:*17, 19* 37:*5,*
*8, 21* 38:*4, 9, 11, 19,*
*25* 39:*9, 21* 40:*8, 15,*
*24* 41:*3, 8, 18* 42:*6,*
*24* 44:*3, 5, 7* 45:*25*
46:*16* 47:*13, 23* 48:*3*
53:*15, 16* 56:*14, 16*
57:*1* 58:*3* 67:*24*
**assume** 78:*5*
**assumed** 58:*16*
**assuming** 36:*19* 48:*2*
54:*11*
**Atlas** 41:*4, 9, 12, 16*
42:*1* 47:*7* 48:*6*
49:*13*
**attached** 63:*11* 83:*9*
**Attorney** 6:*6* 8:*11,*
*16* 19:*16, 22* 31:*5, 14,*
*17, 18, 20, 24* 35:*19,*
*20* 36:*3, 5, 11, 13*
37:*24* 38:*1, 7, 14*
39:*2, 4, 11, 15* 41:*1, 6*
42:*16, 18* 43:*23* 44:*1*
46:*3, 5, 8, 10, 11*
48:*10* 49:*3, 5, 24*
50:*1, 13, 15* 51:*25*
52:*1, 8, 9* 54:*16, 18*
55:*1, 5, 14, 16, 21, 23*
56:*5, 7, 9* 57:*2, 7, 11,*
*17, 20* 58:*9, 12* 59:*10,*
*13* 60:*7, 10, 19, 22*
62:*4, 7, 11* 63:*5, 12*
64:*4, 8, 11* 66:*23*
67:*1, 12, 14* 69:*18, 20*
70:*4, 6, 9, 12, 14, 18,*
*19, 20* 71:*10, 13, 15*
72:*9, 11, 13, 15, 17, 20*
73:*1, 12, 13, 15, 19*
74:*6, 8, 20, 22* 75:*5*
76:*6, 8, 14* 77:*19*
78:*4, 7, 12, 19, 24*
79:*2, 15, 24* 80:*1, 5*
**attorneys** 75:*14*
**audible** 74:*1*

**authority** 57:*4, 9, 14*
58:*15* 67:*10* 74:*11,*
*18*
**authorization** 31:*2*
66:*20*
**authorized** 19:*3*
37:*15* 52:*21, 25*
53:*25* 54:*19* 63:*17*
71:*7, 12*
**authorizing** 12:*6*
**available** 26:*17*
**Avenue** 3:*15, 23* 4:*18*
**avoidance** 68:*3, 21*
69:*2, 6, 15*
**aware** 8:*20* 10:*7, 11,*
*17* 11:*3, 4, 8, 11, 12,*
*20* 12:*9, 23* 22:*12*
23:*7* 24:*3, 6* 25:*16*
30:*12* 34:*12, 16*
36:*14* 47:*13, 23* 48:*5*
49:*16* 50:*16, 25* 51:*4,*
*8* 53:*18* 54:*6* 55:*11,*
*17* 63:*21* 64:*16, 18*
65:*2, 19, 22* 71:*2, 23*
72:*3*

**< B >**
**BA** 1:*22* 84:*21*
**back** 10:*8* 47:*22*
69:*14*
**backdrop** 56:*17*
**bad** 62:*18*
**BANKRUPTCY** 1:*1*
10:*8, 12* 32:*2, 6* 33:*6,*
*15* 34:*13* 38:*6* 44:*14,*
*18, 22* 45:*1* 50:*17*
69:*16*
**Barbara** 20:*11, 22*
21:*3, 7, 12, 16* 22:*8*
**BARTLETT** 4:*9*
**based** 53:*2* 56:*12*
**basically** 13:*14*
**basis** 13:*25* 43:*7*
53:*17* 55:*24* 56:*3*
77:*12*
**Baton** 5:*10*
**beginning** 2:*11* 76:*24*
**behalf** 3:*4, 19* 4:*3,*
*14* 5:*3* 11:*9, 13*
12:*10* 17:*25* 18:*5, 23*

23:*3, 14* 24:*8, 9, 23*
25:*6, 17* 27:*17, 21*
29:*23* 30:*2, 6, 7, 22*
31:*22* 46:*20* 54:*1, 20*
57:*5, 15* 58:*22* 59:*8*
74:*19* 75:*2*
**behavior** 42:*25*
**believe** 13:*23* 18:*4*
20:*1* 32:*3, 15, 20*
35:*15, 25* 36:*7* 37:*19*
38:*2* 40:*22* 41:*8, 22*
50:*10* 51:*22* 54:*2*
57:*3* 58:*20* 59:*5, 14,*
*21* 62:*25* 66:*18* 67:*4,*
*9* 71:*24* 74:*16, 25*
76:*16* 77:*24*
**believed** 18:*23*
**best** 14:*22* 21:*18, 22*
22:*3* 27:*5* 32:*4, 9*
33:*4* 35:*3, 7, 10*
72:*20*
**bit** 62:*20* 67:*15*
79:*20*
**block** 31:*21*
**bottom** 67:*16*
**Bradshaw** 22:*8*
**breaching** 74:*25*
**break** 9:*14, 16*
**bring** 50:*18*
**bringing** 73:*23*
**business** 23:*21* 49:*18*
58:*1*
**buy** 70:*24* 72:*7*
73:*10*

**< C >**
**CA-Certified** 84:*7*
**CA-CSR** 1:*22* 84:*21*
**calendar** 65:*5, 6*
**call** 63:*7* 76:*14, 15*
78:*15* 79:*9*
**called** 10:*5* 12:*10*
20:*7, 19* 34:*13, 17*
35:*6, 12* 79:*8, 9*
**calling** 76:*17*
**CAPITAL** 1:*6* 3:*4*
8:*16* 10:*5, 7* 21:*9*
34:*24* 35:*2, 16, 25*
36:*7* 50:*19* 51:*24*

52:*18* 53:*5* 55:*19*
73:*2*
**careful** 77:*2*
**carefully** 18:*20*
**Carrera** 22:*7*
**Case** 1:*5* 32:*2, 6*
33:*6, 15* 42:*22* 66:*11,*
*14, 17* 84:*16*
**cases** 65:*14*
**cash** 27:*3, 6* 36:*17*
44:*10*
**cause** 71:*23*
**caused** 29:*22*
**caution** 19:*17*
**Cayman** 20:*4* 21:*21*
22:*13* 23:*1* 42:*23*
56:*18* 63:*22* 64:*13*
68:*3, 15*
**ceased** 23:*22* 24:*12*
**Central** 1:*16* 2:*11*
80:*6*
**CEO** 9:*23, 25* 10:*2*
22:*6, 7, 8* 31:*3*
**CEOs** 22:*4*
**certain** 8:*19* 10:*14*
25:*18* 38:*19* 50:*18*
62:*24*
**Certainly** 47:*6*
**CERTIFICATE** 84:*2*
**Certified** 2:*14, 15*
84:*6*
**certify** 83:*6* 84:*10*
**cetera** 43:*17*
**CFO** 15:*22* 76:*11*
**chance** 63:*2*
**change** 42:*10* 82:*6, 8,*
*10, 12, 14, 16, 18, 20,*
*22*
**changes** 24:*16* 50:*11*
53:*14* 81:*3* 82:*3*
83:*9*
**changing** 47:*10*
**Chapter** 1:*8*
**charitable** 13:*23*
14:*1* 24:*25* 26:*12*
38:*8* 42:*24* 57:*1*
67:*24*
**chart** 48:*13*
**chief** 31:*3*

**City** 20:*11, 20* 21:*3, 5, 6, 11, 16* 22:*7*
**claim** 32:*5, 18* 33:*14* 44:*21, 25* 53:*4, 7* 55:*12, 18*
**Claimant** 3:*5* 32:*12, 16, 21* 33:*20, 24* 34:*14, 17, 20* 35:*7, 13* 45:*4, 7, 14* 52:*5* 55:*20* 73:*3, 24*
**claimed** 53:*12*
**claims** 50:*18* 69:*10* 73:*23*
**clarify** 10:*20*
**CLARITY** 7:*22*
**clawback** 68:*2, 20* 69:*2, 6*
**clawing** 69:*14*
**clear** 33:*3* 34:*5* 65:*10*
**clearly** 31:*21*
**clients** 31:*8* 62:*17*
**cold** 48:*15*
**come** 73:*18*
**commenced** 21:*21* 22:*15*
**commitment** 23:*23*
**common** 23:*21*
**communicate** 24:*12*
**communicated** 58:*16, 17, 21* 64:*22*
**communication** 24:*14* 28:*3*
**community** 14:*19* 20:*13* 21:*2, 4* 22:*9, 14*
**company** 10:*4*
**complete** 37:*4*
**compliance** 38:*10*
**concern** 42:*5* 54:*14, 23*
**concerned** 27:*24* 42:*20, 22* 65:*23*
**concerning** 51:*14*
**concerns** 75:*7*
**concluded** 80:*7*
**confer** 25:*10*
**confidential** 78:*11, 17*
**confused** 64:*6*
**confusing** 16:*4*

**connection** 8:*18* 23:*25* 52:*13* 71:*20*
**consent** 16:*7* 30:*21* 57:*23* 59:*7* 62:*2* 67:*6*
**consider** 66:*7*
**considering** 73:*22*
**constitutes** 77:*24*
**consult** 9:*17*
**consummation** 70:*23* 72:*6* 73:*9*
**Cont'd** 4:*1* 5:*1*
**contend** 52:*17* 53:*21*
**contends** 50:*25* 53:*18*
**context** 18:*11*
**continue** 49:*3*
**contractual** 13:*21* 34:*23* 35:*2, 6, 11* 45:*10, 13*
**contractually** 58:*14*
**contribution** 43:*14* 76:*11*
**contributions** 13:*24* 14:*9* 21:*8*
**control** 56:*15* 60:*24* 61:*6, 17* 77:*9*
**controlled** 47:*17* 49:*12*
**controls** 47:*20*
**conversations** 39:*13*
**convey** 46:*16*
**conveying** 19:*18*
**copy** 25:*13* 66:*3* 79:*23* 80:*4*
**corporate** 50:*2* 69:*7*
**corporations** 64:*17*
**correct** 15:*1* 16:*2* 32:*7* 33:*8, 16, 20* 47:*24* 52:*19* 70:*9* 83:*10* 84:*11*
**corrections** 81:*3* 83:*9*
**correctly** 74:*13*
**counsel** 19:*19* 29:*13* 39:*13* 77:*2* 84:*15*
**counterpart** 18:*13*
**counterparty** 75:*24*
**couple** 50:*16*
**COURT** 1:*1* 10:*12* 37:*9, 23* 38:*6* 43:*18* 50:*17* 63:*23* 69:*17*

70:*22* 72:*6* 73:*8* 79:*22* 80:*3*
**Court-appointed** 67:*17* 68:*1*
**COVID** 62:*14*
**CRAWFORD** 4:*17*
**created** 67:*22*
**Crown** 4:*3* 6:*15* 25:*18, 21, 22* 26:*9* 27:*18, 25* 28:*5, 9, 15* 30:*13, 16, 21* 31:*1, 9, 12, 23* 34:*2, 7* 37:*6, 8* 41:*25* 43:*1* 44:*13, 20* 45:*3, 9, 12, 20, 24* 46:*15* 49:*9, 10, 20* 57:*23* 58:*7* 59:*7, 15, 22* 60:*15* 61:*5, 12, 16, 20*
**CRR** 1:*22* 84:*21*
**cumbersome** 62:*21*
**CURRY** 4:*7, 9*

**< D >**
**D.C** 78:*25*
**DAF** 20:*8* 64:*15*
**DALLAS** 1:*3* 4:*3, 19* 6:*14* 8:*18* 9:*21, 25* 10:*11, 18, 23* 12:*3, 11, 15, 16, 18, 21* 13:*5, 7, 8, 10, 13, 15, 18, 20, 22* 14:*4, 8, 9, 13, 23* 15:*2, 6, 8, 9, 19* 16:*3, 4* 17:*5, 21, 25* 18:*1, 6, 24* 20:*12, 23, 25* 21:*2, 5, 6, 11, 16* 22:*20* 23:*14, 24* 24:*4, 7, 8, 21, 22* 25:*4, 5, 8, 16, 25* 27:*1, 7, 11, 12, 16, 20* 28:*4, 8, 21, 23* 29:*23* 30:*11, 7, 20* 31:*7, 9, 15, 22, 25* 32:*5, 15, 20* 33:*5, 14, 19, 23* 34:*19, 22* 35:*1, 5, 11, 18* 36:*2, 9* 37:*10, 20* 38:*3, 24* 39:*8, 20* 40:*8, 17, 22* 41:*22* 42:*4, 11, 12, 13* 43:*20, 21* 45:*21* 48:*25* 49:*6, 15, 18, 23* 50:*4, 12* 52:*16* 53:*3,

18, 21* 54:*1, 13, 20, 22* 55:*12, 18, 25* 56:*4* 57:*22* 58:*6, 21* 59:*6, 15, 17* 60:*2, 23* 61:*8* 62:*9, 22* 65:*19* 66:*4* 68:*22* 69:*9, 13* 71:*3, 6, 18* 72:*5* 73:*8, 18, 22* 76:*19* 78:*1*
**D'AMBRA** 5:*14*
**date** 56:*15* 77:*3*
**DAVID** 4:*7*
**day** 43:*12* 65:*9* 76:*14*
**dcurry@okinadams.com** 4:*8*
**de** 22:*11*
**dealings** 49:*18*
**Debbie** 22:*6*
**Debtor** 1:*8* 70:*24* 72:*8* 73:*11, 17*
**decided** 43:*19*
**decision** 17:*6* 25:*11*
**decisions** 56:*24*
**declaration** 22:*13, 20* 23:*1*
**decline** 29:*17, 19, 22*
**Defendant** 4:*3, 14*
**definitively** 40:*5*
**Delaware** 64:*17, 20*
**DEMO** 3:*8*
**DEPONENT** 81:*1*
**deposed** 8:*22*
**DEPOSITION** 1:*13* 2:*9* 7:*1* 8:*17* 11:*18* 12:*1* 45:*17* 79:*18, 20* 81:*3* 83:*7*
**depositions** 62:*16*
**described** 37:*21* 42:*10* 43:*9* 50:*4*
**detail** 65:*14*
**DIAZ** 1:*14* 2:*9* 6:*5* 8:*5, 12* 19:*17* 31:*10, 25* 36:*22* 39:*12* 46:*9, 12* 48:*16* 58:*13* 62:*12* 64:*4* 71:*16* 72:*21* 76:*9* 83:*12*
**different** 43:*16* 48:*21*
**diminished** 38:*11*
**Diplomate** 2:*14* 84:*5*

**DIRECT** 7:*23* 32:*20*
59:*18, 23*

**directed** 21:*25* 22:*2*

**direction** 2:*16*

**directly** 28:*22* 49:*16*
77:*1*

**disburse** 41:*18* 42:*1*

**disbursement** 28:*17*

**disclosed** 24:*4*

**disclosing** 39:*13*

**discussions** 20:*1*

**disrespectful** 65:*16*

**DISTRICT** 1:*2*

**diverting** 67:*24*

**DIVISION** 1:*3*

**document** 41:*7*
52:*24* 55:*2* 63:*1*

**DOCUMENTS** 7:*7*
16:*16* 40:*21* 62:*19*

**doing** 31:*22* 56:*18*
66:*7* 70:*12* 76:*25*

**dollars** 56:*19*

**donation** 13:*2, 4*

**donations** 13:*22*

**Dondero** 12:*24* 13:*1,
3, 4* 14:*12* 15:*21*
16:*7, 25* 17:*4, 20, 24*
18:*4, 22* 19:*6* 21:*10,
25* 22:*12* 25:*10* 40:*7*
75:*10*

**Dondero's** 23:*1* 77:*8*

**donor-advised** 13:*13*

**dramatic** 24:*16*

**Dugaboy** 4:*14*

**duly** 8:*6*

**duties** 35:*17* 36:*1, 8*
49:*22*

**duty** 50:*12* 58:*5*

**< E >**

**earlier** 27:*22* 50:*3*

**effectuated** 50:*10*

**effectuates** 13:*14*

**either** 38:*11* 59:*6*
78:*10*

**EMANUEL** 3:*22*

**employed** 78:*17*
84:*15*

**employee** 45:*21*

**Empower** 12:*10, 15,
16, 21* 13:*5, 7, 20*
14:*4, 9, 13, 23* 15:*2, 9,
19* 16:*3, 4* 24:*8, 10,
21* 25:*4, 8* 27:*1, 7, 12*
28:*21*

**engaged** 18:*13* 72:*4*

**ensure** 38:*12*

**enter** 22:*10* 57:*4, 10,
14* 61:*23*

**entered** 51:*1* 61:*10,
13*

**entering** 57:*24* 58:*7*
59:*8* 62:*2* 66:*20*
67:*6* 71:*25* 74:*18*
75:*1*

**entities** 11:*21* 12:*1*
17:*7, 8* 20:*16* 21:*20,
25* 22:*2* 36:*15, 16*
41:*24* 43:*16* 46:*1, 19,
20, 25* 47:*3* 48:*13*
49:*8, 11, 12, 13, 14, 17,
22* 50:*11* 51:*2, 7*
54:*7, 8* 57:*6, 16* 58:*5*
59:*9, 19, 24* 60:*4, 17,
25* 61:*6, 10, 14, 18, 22*
62:*1* 64:*17, 19* 65:*4*
67:*22* 71:*24* 74:*19*
75:*3*

**entitled** 14:*8* 38:*24*

**entity** 12:*10, 13*
13:*11* 15:*17* 17:*1, 3*
20:*7* 34:*13, 17* 35:*6,
12* 41:*12, 16* 47:*24*
49:*10* 55:*13* 63:*25*
64:*3, 12*

**Entry** 6:*16* 71:*20*

**erosion** 56:*14*

**Errata** 81:*5*

**ESQ** 3:*6, 8, 10, 12, 20*
4:*5, 7, 15* 5:*4, 6*

**essence** 24:*11*

**essentially** 27:*23*

**established** 69:*1*

**et** 43:*17*

**everybody** 80:*2*

**evidence** 74:*10*

**exactly** 70:*10*

**EXAMINATION** 6:*4*

8:*10*

**examined** 8:*8*

**excuse** 16:*1* 18:*8*

**executed** 10:*22*

**exercise** 15:*11*

**exercised** 76:*19*

**Exhibit** 63:*9*

**existence** 12:*19*

**expect** 70:*10*

**expectations** 42:*12*

**expected** 41:*13*

**expedited** 80:*1*

**expenses** 23:*19, 24*

**expensive** 13:*17*

**expert** 68:*15, 20*

**expressed** 54:*23*

**extent** 48:*25*

**< F >**

**fact** 56:*13*

**facts** 17:*18, 21* 51:*13,
17* 55:*11, 17* 57:*12*
69:*1, 5* 71:*23* 72:*3*
73:*6* 77:*22*

**fail** 9:*8*

**fair** 9:*5, 19* 19:*7, 8*
26:*18* 32:*14, 17*
33:*11* 34:*18* 37:*17,
18* 40:*13* 42:*4* 43:*5*
44:*8* 50:*5, 23, 24*
52:*11, 13, 25* 54:*15*
59:*2, 3* 65:*12* 68:*16,
17, 23, 24* 69:*22* 70:*2*
75:*16* 78:*21, 22*
79:*13, 14*

**fairly** 62:*23*

**fall** 24:*13*

**familiar** 10:*4* 12:*13*
14:*25* 15:*25* 19:*2, 3*
26:*4* 36:*24* 46:*24*
47:*2, 4* 52:*24* 64:*21*
75:*21*

**familiarity** 22:*19*
47:*5*

**Family** 15:*24* 16:*22*
24:*10* 27:*2, 13* 28:*22*

**fault** 34:*4*

**feeds** 34:*1*

**feel** 48:*8*

**female** 79:*2*

**fiduciaries** 24:*24*
73:*25*

**fiduciary** 28:*13* 38:*9*
67:*17* 68:*1* 74:*12*
75:*1*

**file** 24:*7, 22* 25:*5*
27:*20* 29:*23* 30:*2*

**filed** 10:*8, 12* 12:*4,
10* 22:*12* 24:*9* 25:*14,
17* 27:*17* 30:*7* 31:*7,
15* 32:*2, 5* 33:*6, 14*
42:*3* 44:*17, 20, 25*
50:*16* 52:*25* 65:*25*
71:*8, 12*

**filing** 12:*7* 19:*9*
22:*10* 30:*22* 52:*14,
21* 54:*1, 20* 58:*18, 22*

**finance** 29:*3*

**financial** 84:*17*

**find** 48:*20* 55:*3*

**fine** 55:*4* 64:*9*

**finish** 9:*3, 7* 70:*11*

**first** 8:*6*

**first-quarter** 29:*13*

**flag** 24:*17*

**Floor** 3:*15, 23*

**flow** 13:*12* 26:*14*
37:*6, 8* 41:*4* 53:*13*

**flowed** 47:*7*

**Flows** 26:*15* 29:*2*
56:*16*

**focus** 49:*11*

**focused** 34:*5*

**Focusing** 74:*15, 23*

**folks** 79:*21*

**following** 82:*3, 4*

**follows** 8:*8*

**foregoing** 83:*7* 84:*9,
10*

**form** 35:*19* 36:*3, 11*
37:*24* 38:*7* 39:*2*
41:*1* 42:*16* 43:*23*
46:*3* 49:*24* 50:*13*
51:*25* 52:*8* 54:*16*
55:*1, 14, 21* 56:*5, 10*
57:*7, 17* 58:*9* 59:*10*
60:*7, 19* 62:*4* 66:*23*
67:*12* 69:*18* 72:*9*
73:*12* 74:*20*

**formal** 22:*10*
**Formally** 10:*1*
**formation** 18:*12*
**formed** 12:*21* 34:*14*, *18* 64:*19*
**forth** 17:*18*, *21* 42:*12* 44:*5*
**forward** 38:*12*
**found** 29:*16*
**Foundation** 4:*3* 6:*15* 9:*22*, *25* 10:*3*, *12*, *18*, *23* 12:*11*, *15*, *16*, *18*, *22* 13:*5*, *7*, *8*, *11*, *14*, *21*, *22* 14:*4*, *5*, *8*, *14*, *23* 15:*2*, *4*, *6*, *8*, *9*, *19*, *24* 16:*4*, *22* 18:*1*, *6*, *24* 20:*11*, *12*, *14*, *21*, *22*, *23*, *25* 21:*2*, *3* 22:*9* 23:*14*, *25* 24:*7*, *8*, *10*, *21*, *22* 25:*4*, *5*, *8*, *17* 27:*1*, *2*, *8*, *11*, *12*, *13*, *16*, *20* 28:*4*, *8*, *22*, *23* 29:*23* 30:*1*, *7*, *20* 31:*7*, *9*, *16*, *22* 32:*1*, *5*, *15*, *20* 33:*5*, *14*, *19*, *23* 34:*19*, *22* 35:*1*, *5*, *11*, *18* 36:*2*, *10* 37:*10*, *20* 38:*3*, *24* 39:*8*, *14*, *20* 40:*8*, *17*, *23* 41:*22* 42:*14* 43:*20*, *21* 45:*22* 49:*6*, *15*, *18*, *23* 50:*12* 52:*16* 53:*3*, *18*, *21* 54:*2*, *13*, *21*, *23* 55:*12*, *18* 57:*23* 58:*6*, *21* 59:*15*, *17* 60:*2*, *23* 61:*8* 69:*13* 71:*7*, *18* 72:*5* 73:*8*, *18*, *22* 76:*19*
**foundations** 21:*2*, *4*, *12* 26:*18* 29:*4*
**Foundation's** 8:*18* 12:*3* 17:*5*, *22* 22:*14*, *20* 24:*5* 26:*1* 42:*5*, *11*, *12* 49:*1* 50:*4* 55:*25* 56:*4* 59:*7* 62:*9*, *22* 65:*20* 66:*4* 68:*22* 69:*9* 71:*3* 78:*1*
**four** 21:*1* 51:*9*
**fully** 63:*2*

**fund** 13:*8*, *13* 14:*6*, *7* 23:*20*, *23*, *24* 26:*11* 41:*4*, *9* 53:*14*
**funded** 26:*24*
**fundholder** 14:*17*
**fundholders** 14:*20* 23:*19*
**funding** 23:*2*, *7*, *10*, *13*, *17*
**funds** 14:*2* 16:*3* 43:*1* 53:*13*
**fund's** 67:*22*
**further** 67:*15*
**future** 53:*16*

**< G >**
**Gail** 1:*21* 2:*13* 84:*5*, *21*
**gdemo@pszjlaw.com** 3:*9*
**generally** 11:*24* 36:*24* 50:*5* 75:*21*
**gentleman** 11:*8* 50:*19*
**give** 43:*19* 49:*14* 55:*12* 56:*24* 63:*2* 72:*15*
**given** 58:*15*
**giving** 76:*25*
**Global** 4:*3* 6:*15* 25:*18*, *21*, *22* 26:*9* 27:*18*, *25* 28:*5*, *9*, *15* 30:*13*, *16* 31:*1*, *9*, *23* 34:*2*, *7* 37:*6*, *8* 41:*25* 43:*1* 44:*13*, *20* 45:*3*, *9*, *12*, *20*, *24* 46:*15* 49:*9*, *10*, *20* 58:*7* 59:*15*, *22* 60:*15* 61:*5*, *12*, *16*, *20*
**Global's** 30:*21* 31:*12* 57:*23* 59:*7*
**go** 23:*21* 28:*21*, *25* 41:*9* 56:*11* 76:*9*
**going** 9:*1* 40:*9* 45:*16* 47:*22* 48:*16*, *20*, *21* 51:*8* 62:*7*, *24* 68:*12* 70:*7* 71:*10*
**Good** 8:*12* 62:*13*, *14*
**good-faith** 51:*3*, *19*

**governance** 13:*25* 15:*3* 29:*1*
**GPs** 43:*17*
**grant** 13:*12*, *14*
**grant-making** 12:*18* 18:*15*
**grants** 14:*18*
**GREGORY** 3:*8*
**ground** 8:*24*
**guess** 30:*11* 48:*3* 77:*14* 79:*19*

**< H >**
**half** 70:*8*
**HALL** 5:*18*
**HALLMAN** 5:*8*
**happening** 22:*24* 42:*25* 56:*25*
**happens** 42:*5*, *20* 56:*22*
**happy** 9:*15* 78:*10*
**harm** 73:*18*
**HART** 5:*8*
**HAYLEY** 3:*12*
**head** 39:*6* 50:*8*
**hear** 8:*13*
**heard** 32:*11*
**held** 2:*9* 25:*18*
**he'll** 48:*23*
**help** 48:*14* 72:*14*
**hereto** 63:*11*
**Hernandez** 31:*4*
**high** 26:*6*, *7* 37:*1*, *2* 38:*18*
**HIGHLAND** 1:*6* 3:*4*, *19* 6:*12*, *14* 8:*16* 10:*5*, *7*, *14*, *22* 17:*7* 20:*12* 21:*6*, *9* 32:*1*, *6*, *11*, *16*, *21* 33:*6*, *15*, *20*, *23* 34:*6*, *10*, *13*, *17*, *20*, *23* 35:*2*, *7*, *12*, *16*, *25* 36:*7*, *15* 41:*24* 43:*4*, *8*, *12* 44:*14*, *17*, *21*, *25* 45:*1*, *4*, *7*, *10*, *13* 46:*16* 50:*19*, *25* 51:*6*, *23* 52:*5*, *18* 53:*5* 54:*8* 55:*13*, *19* 58:*18*, *23* 63:*8*, *9* 65:*4*, *8* 71:*4*, *9*, *19*, *24* 72:*4*, *24* 73:*2*, *3*, *23*, *24*

**Highland/HMIT** 19:*15*, *24*
**Highland's** 65:*2*
**HMIT** 11:*17*, *21*, *25* 17:*7* 36:*16* 37:*21* 38:*4*, *18*, *25* 39:*9*, *21* 40:*9*, *24* 41:*8*, *19*, *24* 42:*6*, *21* 45:*25* 46:*1*, *16*, *19* 48:*5* 49:*8*, *10*, *22* 50:*11*, *16* 51:*2*, *7* 54:*7* 57:*6*, *15* 58:*4* 59:*9*, *19*, *23* 60:*4*, *16*, *24* 61:*6*, *10*, *14*, *18*, *22*, *25* 64:*16*, *18* 65:*4* 74:*19* 75:*3*
**HMIT/Highland** 40:*18* 41:*14*
**hold** 16:*12* 78:*4*
**Holdco** 20:*8* 64:*15*
**holds** 47:*24*
**hour** 70:*8*
**Houston** 4:*11*
**Hunter** 5:*3* 10:*15* 11:*4*, *10*, *14*, *16* 34:*1*, *9* 37:*5* 41:*3* 47:*11*, *14*, *22* 48:*9*, *17* 49:*13* 53:*22* 54:*4* 58:*22*
**HURT** 5:*6*
**hwinograd@pszjlaw.com** 3:*13*

**< I >**
**idea** 19:*9*, *12*, *13*, *14*, *23*
**identification** 63:*10*
**identified** 21:*13* 25:*25* 41:*17*
**identify** 10:*21* 11:*1* 15:*20* 26:*23* 30:*5* 41:*11* 64:*12* 77:*23*
**imagine** 65:*13*
**impact** 42:*2*
**impacted** 41:*23*
**impacts** 43:*1*
**important** 9:*2*
**including** 67:*21*
**income** 26:*11*, *13* 27:*7*
**independent** 68:*1*

**INDEX** 7:*1*
**indicate** 81:*3*
**indirect** 32:*21* 60:*3,
6, 16*
**indirectly** 41:*5*
**individual** 16:*8*
**inform** 73:*8*
**information** 17:*25*
18:*5, 14, 24* 19:*6*
58:*2, 6* 75:*8, 11*
76:*25* 77:*5, 13, 23, 25*
78:*6, 10, 18* 79:*5, 12*
**informed** 25:*12* 63:*3*
65:*8* 72:*6*
**Inghram** 1:*21* 2:*13*
84:*5, 21*
**insertion** 67:*21*
**inside** 75:*8* 77:*5, 13,
25* 79:*4, 12*
**insider** 78:*18*
**insignificant** 56:*20*
**INSTRUCTED** 7:*3*
**INSTRUCTIONS**
81:*1*
**Insurance** 4:*4* 25:*19,
22* 26:*10, 21*
**intended** 54:*12*
**interest** 32:*16, 21*
33:*19, 23* 34:*20*
40:*23* 45:*4, 7* 59:*18,
23* 60:*3, 16* 84:*17*
**interested** 18:*18*
**interim** 10:*2*
**interrupt** 31:*5* 48:*10*
**investigate** 25:*2*
**investigating** 79:*7*
**Investment** 4:*14* 5:*3*
10:*15* 11:*5, 10, 14, 17*
47:*12, 14, 23* 53:*23*
54:*4* 58:*23*
**involved** 43:*12, 13*
58:*3*
**involvement** 11:*11*
14:*16, 18* 17:*1, 2*
43:*8*
**irregular** 25:*1* 56:*14*
**irregularities** 24:*14*
**IRS** 13:*11*

**Islands** 20:*4* 21:*21*
22:*13* 23:*1* 42:*23*
56:*18* 64:*13* 68:*15*
**issues** 23:*22* 47:*9*
48:*23*
**its** 12:*7* 13:*23* 15:*3*
18:*1, 6* 24:*23* 25:*5*
27:*20* 42:*13* 52:*16*
53:*5* 73:*24* 84:*17*

**< J >**
**Jackie** 22:*7*
**JAMES** 5:*19* 50:*20*
**JEFFREY** 3:*10*
**Jim** 12:*23, 25* 15:*21*
16:*7* 19:*5* 77:*8*
**jmorris@pszjlaw.com**
3:*7*
**job** 38:*8, 12*
**JOHN** 3:*6* 8:*15*
31:*6* 48:*11* 70:*6*
78:*4* 79:*25*
**joint** 63:*16, 21* 64:*1,
23* 65:*18* 66:*4, 9, 13,
19* 67:*5, 10*
**JONES** 3:*14* 5:*18*
**jpomerantz@pszjlaw.c
om** 3:*11*
**JULIE** 1:*14* 2:*9* 6:*5*
8:*5* 83:*12*
**June** 1:*15* 2:*10*
65:*25*
**jurisdiction** 68:*5*
**justify** 31:*12*

**< K >**
**Kansas** 20:*11, 19, 20*
21:*3, 5, 6, 11, 16* 22:*7*
**keep** 48:*15, 18*
**KELLY** 5:*8*
**kind** 14:*3* 33:*19*
**know** 9:*9, 12* 12:*21*
13:*15, 18, 20* 14:*10,
12* 16:*25* 17:*4* 18:*22*
19:*9, 12, 14, 23* 21:*10*
26:*20* 27:*16* 28:*2*
29:*8, 15* 30:*9* 31:*2,
25* 32:*25* 33:*9* 37:*7*
39:*3, 5* 40:*20* 41:*4,
16, 20* 42:*17* 43:*6, 11,*

24 44:*2, 9, 11, 13, 15,
16, 19, 20, 23, 24* 45:*2,
3, 5, 6, 8, 9, 11, 12, 19,
24* 46:*4* 48:*4* 49:*6,
25* 50:*14* 52:*3, 4, 7,
20* 53:*24* 54:*17* 57:*9*
58:*4, 13, 14, 25* 59:*12,
17, 22* 60:*1, 2, 9, 15,
21, 23* 61:*2, 5, 7, 8, 11,
12, 15, 16, 19, 20, 24,
25* 62:*6, 13* 63:*1, 25*
65:*21* 66:*3, 6, 9, 12,
16, 22* 67:*3, 8, 13*
69:*19, 23* 72:*2, 5*
74:*21* 75:*4, 24* 76:*2*
77:*4, 15* 78:*8, 12, 14*
**knowledge** 14:*22*
21:*18* 22:*3* 25:*15*
32:*4, 9* 33:*4, 10, 12,
13, 17, 18, 22* 34:*19*
35:*3, 8, 10* 49:*1* 51:*5,
13, 17*
**knows** 78:*13*

**< L >**
**L.P** 1:*7*
**Labor** 76:*14*
**lack** 53:*12*
**LANG** 4:*15, 17* 80:*3,
5*
**language** 14:*11*
**large** 20:*7, 9*
**law** 68:*16*
**laws** 64:*19*
**lawsuit** 58:*18, 22*
**lawyer** 9:*17* 43:*10*
68:*18*
**lawyers** 46:*9*
**lead** 40:*22*
**leading** 24:*15*
**leads** 41:*8*
**learn** 22:*25* 23:*10*
77:*22*
**learned** 18:*17* 23:*4,
5* 56:*23* 62:*15* 75:*15*
**leave** 43:*17*
**led** 29:*9*
**legal** 23:*19, 22* 31:*3*
43:*16* 57:*14*
**lengthy** 62:*23*

**level** 26:*6, 8* 37:*1, 3*
38:*18*
**liabilities** 54:*9*
**Life** 4:*4* 25:*19, 21*
**likelihood** 69:*13*
**Limited** 25:*19, 22*
**LINE** 7:*4, 8, 13, 17*
75:*19* 82:*5*
**liquidation** 64:*13*
68:*4*
**liquidators** 63:*16, 22*
64:*1, 23* 65:*19* 66:*5,
10, 14, 20* 67:*6, 10*
**liquidity** 56:*16*
**listen** 18:*19*
**lists** 16:*14*
**literally** 16:*14*
**Litigation** 3:*19*
22:*15* 23:*2, 8, 11, 12,
13, 17, 25* 73:*4*
**little** 62:*20* 67:*15*
79:*20*
**LITTLETON** 5:*20*
15:*22* 48:*22*
**Littleton's** 45:*17*
**LLP** 3:*22* 4:*9* 5:*8*
**LOIGMAN** 3:*20*
**long** 19:*18*
**longer** 70:*6* 78:*6, 16*
**look** 31:*20* 65:*5*
**looking** 16:*10, 13*
**losing** 53:*15*
**lot** 18:*11, 14, 18*
44:*12* 56:*15* 65:*13*
**LOUIS** 5:*4* 76:*6*
**Louisiana** 5:*10*
**lower** 29:*15*
**LP** 10:*5, 8* 34:*24*
35:*3, 17* 36:*1, 8*
51:*24* 53:*5* 55:*19*
73:*3*
**lphillips@kellyhart.co
m** 5:*5*
**LPs** 43:*17*

**< M >**
**Ma'am** 16:*9* 52:*2, 22*
55:*6* 56:*8* 65:*16*
67:*2* 72:*19* 74:*2*

Case 19-34054-sgj11 Doc 4227-5 Filed 08/24/26 Entered 08/24/26 10:00:35 Desc
Exhibit 4 Page 92 of 102

Deposition of Julie Diaz In re Highland Capital Management, L.P.

79:*15*
**Madison** 3:*23*
**Main** 5:*9*
**majority** 15:*7, 8*
**making** 14:*18* 53:*3*
65:*18*
**MANAGEMENT** 1:*6*
3:*4* 8:*16* 10:*5, 8*
14:*13, 15* 18:*16*
34:*24* 35:*3, 17* 36:*1,*
*8* 50:*19* 51:*24* 52:*18*
53:*5* 55:*19* 73:*2*
**managing** 41:*5*
**March** 29:*17*
**Mark** 11:*9* 24:*20*
40:*15* 41:*4* 42:*9*
43:*19* 46:*20* 49:*12*
57:*4* 65:*24* 78:*8, 10,*
*16* 79:*3*
**MARKED** 7:*16*
63:*10*
**MARKS** 7:*22* 81:*6*
**material** 75:*8* 77:*4,*
*13, 25* 79:*4, 11*
**Matt** 64:*8* 72:*13*
78:*9* 79:*17*
**MATTTHEW** 4:*5*
**mean** 12:*25* 14:*15*
28:*13* 46:*20* 55:*2*
65:*15*
**member** 16:*8*
**memory** 48:*19*
**mentioned** 29:*5*
**met** 42:*13* 64:*2*
65:*10*
**MICHAEL** 4:*15*
**million** 42:*24* 43:*2*
56:*19, 20*
**mind** 41:*12* 48:*15*
65:*10*
**minimis** 22:*11*
**minutes** 70:*17*
**misused** 77:*6*
**mlang@cwl.law.com**
4:*16*
**mokin@okinadams.co**
**m** 4:*6*
**money** 23:*16* 42:*1, 20*
**months** 17:*13*
**moot** 66:*17*

**MORRIS** 3:*6* 6:*6*
8:*11, 15* 19:*22* 31:*14,*
*18, 24* 35:*20* 36:*5, 13*
38:*1, 14* 39:*4, 15*
41:*6* 42:*18* 44:*1*
46:*5, 10, 11* 49:*3, 5*
50:*1, 15* 52:*1, 9*
54:*18* 55:*5, 16, 23*
56:*7* 57:*2, 11, 20*
58:*12* 59:*13* 60:*10,*
*22* 62:*7, 11* 63:*5, 12*
64:*8, 11* 67:*1, 14*
69:*20* 70:*4, 9, 14, 19,*
*20* 71:*13, 15* 72:*11,*
*13, 17* 73:*1, 13, 19*
74:*6, 8, 22* 75:*5* 76:*8*
78:*7, 19* 79:*15*
**Motion** 6:*16* 50:*17*
65:*3, 8, 20*
**Mountain** 5:*3* 10:*15*
11:*4, 10, 14, 16* 34:*1,*
*9* 37:*5* 41:*3* 47:*11,*
*14, 22* 48:*9, 17* 49:*13*
53:*23* 54:*4* 58:*23*
**move** 38:*12*
**mute** 70:*16* 76:*7*
**mutual** 54:*14, 24*
**mystery** 44:*7*

**< N >**
**name** 8:*15*
**named** 11:*8* 50:*19*
**NATHAN** 5:*18* 62:*8*
63:*6* 74:*7*
**nature** 22:*23* 44:*11*
51:*6*
**NECESSARILY** 7:*22*
**need** 9:*14, 17* 16:*2*
62:*25* 64:*5* 65:*6*
68:*7* 77:*9*
**needs** 69:*5*
**negotiating** 71:*25*
**negotiation** 51:*14*
**negotiations** 51:*3, 6,*
*20*
**neither** 84:*15*
**never** 32:*5* 33:*5*
**New** 3:*16, 24* 70:*10,*
*11*

**newly** 67:*22*
**news** 62:*13, 15, 18*
**Nods** 50:*8*
**nonpublic** 75:*8* 77:*5,*
*13, 25* 78:*6* 79:*4, 12*
**Nope** 68:*19*
**North** 20:*13* 21:*4*
22:*8*
**NORTHERN** 1:*2*
**Notary** 84:*8*
**notations** 81:*6*
**NOTE** 7:*21*
**notes** 16:*18*
**notice** 44:*17*

**< O >**
**object** 17:*6* 19:*13, 15*
35:*19* 36:*3, 11* 37:*24*
38:*7* 39:*2* 41:*1*
42:*14* 43:*21, 23* 46:*3*
51:*25* 52:*8* 55:*1, 14,*
*21* 56:*5, 9* 57:*7, 17*
58:*9* 59:*10* 60:*7, 19*
62:*4* 66:*23* 67:*12*
69:*18* 71:*11* 72:*9*
73:*12* 74:*20*
**objected** 10:*19, 24*
**objecting** 19:*24*
37:*10*
**Objection** 6:*14* 8:*18*
10:*13* 12:*4, 9* 17:*11,*
*15, 18, 22* 18:*2, 6, 25*
19:*2, 7, 10* 22:*21*
24:*5, 8, 9, 22* 25:*5, 13,*
*17* 26:*1* 27:*17, 21*
29:*23* 30:*2, 7, 22*
31:*6* 32:*2* 33:*7*
37:*15* 42:*3, 11, 13, 16*
49:*24* 50:*4, 13* 52:*15,*
*17, 22* 54:*1, 16, 20, 22*
55:*25* 56:*4, 6, 12*
62:*10, 22, 24* 63:*14*
65:*20, 22* 66:*4* 68:*22*
71:*3, 7, 18*
**objections** 78:*2*
**obligation** 13:*21*
41:*18* 50:*12* 58:*5*
**obligations** 35:*17*
36:*1, 9* 49:*23* 74:*12*
75:*1*

**obtain** 57:*22* 59:*6*
62:*1* 66:*19* 67:*5*
**obviously** 28:*12*
**October** 47:*8*
**offhand** 14:*11*
**office** 29:*3*
**officer** 84:*8*
**officers** 15:*15*
**official** 63:*16, 22*
64:*1, 23* 65:*19* 66:*5,*
*10, 13, 19* 67:*6, 10*
**Oh** 15:*1* 16:*1, 21*
30:*14* 78:*20*
**Okada** 15:*24* 16:*22*
24:*10* 27:*1, 8, 12*
28:*21*
**okay** 8:*13, 24* 17:*4*
18:*19* 19:*16* 28:*20*
33:*13* 34:*8, 11, 16, 21,*
*22* 41:*21* 46:*24* 50:*9*
51:*12* 55:*10* 62:*7*
63:*5, 21* 64:*7* 66:*18*
69:*12* 70:*1, 19* 73:*6*
74:*23* 79:*2, 10*
**OKIN** 4:*5, 9* 19:*16*
31:*5, 17, 20* 35:*19*
36:*3, 11* 37:*24* 38:*7*
39:*2, 11* 41:*1* 42:*16*
43:*23* 46:*3, 8* 48:*10*
49:*24* 50:*13* 51:*25*
52:*8* 54:*16* 55:*1, 14,*
*21* 56:*5, 9* 57:*7, 17*
58:*9* 59:*10* 60:*7, 19*
62:*4* 64:*4* 66:*23*
67:*12* 69:*18* 70:*6, 12*
72:*9, 15, 20* 73:*12, 15*
74:*20* 76:*6* 78:*4, 12*
79:*24*
**once** 37:*4*
**opportunity** 38:*11*
56:*23*
**option** 75:*19, 22, 25*
79:*9*
**Order** 6:*16* 69:*5*
**org** 21:*15* 48:*12*
**organization** 12:*17,*
*19* 13:*10* 15:*18*
16:*23* 26:*24*
**organizations** 16:*11*
20:*17, 24* 21:*7* 22:*4*

23:3 26:15, 16 28:1
29:1 34:3 53:8, 10,
15 56:21
**organization's** 38:9
**orgs** 15:6 20:7, 9
43:15
**original** 43:14 76:13
**originated** 19:10
**outcome** 84:17
**outside** 74:11, 17
**oversee** 24:25
**overseeing** 24:12
**oversees** 14:1
**oversight** 15:7, 9, 12
56:16
**owed** 36:9 50:11
**owes** 35:17 36:1
49:22
**owned** 48:5
**owner** 30:5, 12
**ownership** 40:23
59:18, 23 60:3, 6, 16
**owns** 30:9, 18 47:14

**< P >**
**p.m** 1:16 2:11 80:6
**PACHULSKI** 3:14
5:18
**Pacific** 4:18
**PAGE** 6:4, 12 7:4, 8,
13, 17 8:25 46:22
68:12 82:5
**pages** 6:18
**paid** 23:20
**paragraph** 63:6, 14
67:16 68:8, 23 70:5,
21 73:9 74:5 75:6, 7,
11, 19
**Pardon** 56:8
**part** 37:8 64:6
**participated** 32:23
**particular** 24:3
51:14 75:11
**parties** 3:2 10:17, 21
11:1, 4 18:18 63:17
71:4, 9, 19 84:16
**parts** 62:24
**party** 11:5, 22 56:15
59:19, 24 60:4, 17

**Patrick** 11:9, 13
24:20 40:15, 16 41:4
42:9 43:19 46:20
47:7, 17 49:12 50:6,
10 57:4, 13, 22 58:20
59:5 65:24 66:18
67:5 69:10 74:10, 17,
25 77:5, 24 78:16
79:3, 12
**Patrick's** 67:20
**PAUL** 5:14 31:4
**pay** 26:10
**peace** 70:24 72:7
73:10, 16
**pending** 9:16 42:23
**people** 15:20 62:16
**percent** 27:24 29:6
**permission** 50:18
**person** 24:11, 18
40:14 53:25 54:19
**personally** 23:24
**pertain** 69:9
**pertains** 28:7
**PHILLIPS** 5:4
70:14, 18 71:10 80:1
**phrase** 46:19 68:21
78:1
**piece** 62:14
**play** 14:21
**played** 17:5
**plays** 14:12 16:7
**pleading** 31:15
**Please** 46:10, 13
62:8 70:5 75:6
79:24 80:5
**PLLC** 4:17
**point** 62:24
**policies** 26:21
**POMERANTZ** 3:10
**portion** 38:4, 25
39:9 63:1
**position** 31:11
**possibly** 48:15
**potential** 53:16
**practice** 23:21
**precise** 18:21
**precluded** 66:15
**prefer** 78:11
**preparation** 52:14

**prepare** 18:25
**present** 2:16 5:17
**president** 9:23, 24
15:3, 4, 15, 16, 21, 22
16:5 21:17
**pretty** 24:15
**Prior** 10:1 58:2
**privilege** 9:18
**problem** 39:18 42:19
**proceeding** 64:14
**proceedings** 2:12
21:21 80:7 84:9, 11,
12
**proceeds** 26:17
27:13 28:12, 18, 20
40:18 41:13 43:20
**product** 51:2, 19
**PRODUCTION** 7:7
**professional** 79:17
**promise** 48:23
**proposed** 10:13 17:6
19:24 51:23 52:4
67:11
**propounded** 83:8
**protect** 38:8 56:20
**prove** 69:5
**provide** 17:25 18:5
23:16 58:5
**provided** 18:23 66:3
**Public** 84:8
**purchase** 26:24
**purpose** 67:23
**purposes** 11:17 12:1
26:12
**pursuant** 36:17
**put** 14:19 16:19
62:8, 9, 19 75:19, 22,
25 76:15, 20 79:9
**putting** 31:10

**< Q >**
**quarrel** 77:21
**quarterly** 28:11
**question** 9:3, 8, 11, 16
10:20 18:3, 9, 20
19:19 33:1 35:22
37:25 39:16, 17, 23,
25 40:13 46:6, 13
55:15 56:10 57:8, 18
58:10 59:11 60:8, 20

62:5 64:5, 9 66:24
68:10 69:3 71:5, 11
72:19 73:5 76:12
78:13
**questioning** 33:2
**QUESTIONS** 7:3, 16
9:2, 18 31:19 48:19,
24 49:4 68:13 70:13,
15 83:8
**quick** 8:24
**quickly** 78:15
**QUINN** 3:22
**quizzed** 48:8
**QUOTATION** 7:22
**QUOTE** 7:23 67:17
70:22 74:9 77:7

**< R >**
**raised** 24:16
**Rand** 47:2, 4, 5, 9, 17,
20 48:2, 18 49:12
**RAVER** 5:21
**RDR** 1:22 84:21
**read** 19:4 22:17, 25
31:14 71:7, 12 74:13
83:6
**reading** 16:9 81:2
**really** 20:13 26:10
34:5 69:23 78:11
**Realtime** 2:14 84:6
**reason** 24:3 32:15
35:15, 25 36:7 37:19
38:2 41:21 42:14
43:21 50:9 51:22
54:2 57:3 59:5, 14
67:4, 9 74:16, 24
82:7, 9, 11, 13, 15, 17,
19, 21, 23
**reasons** 81:4 82:4
**recall** 40:12 53:3
54:21 55:9 65:18
71:17, 22
**receive** 14:8 36:17
37:5, 22 38:4, 19, 24,
25 39:9, 20, 21 40:9,
24 41:13, 19 46:1, 15
**received** 27:11 40:21
42:21 49:7 76:10
**receives** 41:9 42:1, 6
**receiving** 44:4

**recollection** 53:*2*
65:*7*
**recommendations**
13:*12* 14:*18*
**record** 84:*11*
**recorded** 2:*12*
**recover** 37:*20* 38:*3*,
*13* 39:*8* 40:*17* 45:*25*
56:*18*
**red** 24:*16*
**reduced** 84:*13*
**refer** 11:*16*, *24* 20:*16*
25:*21*, *24* 29:*2*
**reference** 67:*16*
75:*18*
**referring** 20:*3*, *10*
24:*19*
**REFLECT** 7:*23*
**refresh** 65:*6*
**regarding** 65:*24*
**Registered** 2:*13* 84:*5*
**regular** 13:*25*
**reject** 67:*11*
**related** 84:*15*
**relates** 50:*6* 65:*22*
**relationship** 21:*11*
28:*5*, *7* 33:*25* 34:*23*
35:*2*, *6*, *12* 45:*10*, *13*
49:*19*
**releases** 54:*15*, *24*
**releasing** 54:*8*
**remember** 48:*14*
**remind** 39:*12*
**remitted** 28:*22*
**REMOTE** 1:*13* 2:*8*
3:*2* 62:*15*
**reorganization** 50:*3*
**Repeat** 18:*3* 19:*20*
37:*25* 55:*15* 69:*3*
71:*5* 73:*5*, *16*
**repeated** 64:*5*
**report** 29:*14*
**Reported** 1:*20*
**Reporter** 2:*14*, *15*
79:*22* 80:*3* 84:*2*, *6*, *8*
**REPORTER'S** 7:*21*
**reports** 28:*11*
**represent** 31:*8*, *13*
**representative** 25:*7*

**REQUEST** 7:*7*
**requests** 29:*11*
**required** 13:*24*
57:*22* 59:*6* 62:*1*
66:*19* 67:*5*
**requirement** 37:*7*
**respect** 14:*22* 28:*17*
29:*7*
**respectfully** 72:*12*
**response** 74:*1*
**responsible** 12:*6*
**result** 21:*8* 32:*23*
34:*12*
**review** 12:*3* 25:*13*
**reviewed** 36:*21* 41:*7*
52:*21*
**right** 11:*13* 16:*9*
21:*2* 24:*1* 28:*24*
34:*6* 37:*20* 38:*3*, *21*
39:*8*, *20* 40:*8*, *17*
44:*6* 45:*25* 46:*15*, *21*
52:*22*, *23* 60:*24* 61:*3*,
*4*, *6*, *9*, *13*, *17*, *21*
66:*17* 74:*6* 78:*3*
79:*6*
**rise** 55:*12*
**ROBERT** 3:*20*
**robertloigman@quinn**
**emanuel.com** 3:*21*
**role** 14:*13*, *21* 16:*8*
17:*5*, *9* 22:*11* 38:*10*
**room** 62:*19*
**Rose** 22:*8*
**Rouge** 5:*10*
**RSA** 1:*22* 84:*21*
**rules** 8:*24*
**rushed** 79:*24*

**< S >**
**Santa** 20:*11*, *22* 21:*3*,
*7*, *12*, *16* 22:*8*
**Sauder** 78:*25*
**saying** 78:*16*
**says** 31:*21* 67:*17*, *19*
70:*21* 74:*9* 77:*19*
**scope** 54:*14*, *24*
74:*11*, *17*
**screen** 62:*8*, *9*, *20*
63:*13*

**scroll** 68:*7* 70:*4*
75:*5*
**scrutiny** 67:*25*
**second** 48:*16*
**secretary** 16:*6*
**securities** 44:*10*
**see** 16:*13* 22:*16*, *19*
47:*8* 48:*13* 62:*25*
63:*19*, *20* 68:*6* 70:*25*
75:*7*, *18* 79:*19*
**seek** 9:*16* 30:*21*
**seeks** 70:*24* 72:*8*
73:*11*, *17*
**seen** 37:*13*, *16*
**SEERY** 5:*19* 50:*20*
58:*24*
**segregated** 25:*18*, *24*
26:*1*, *5*, *8* 27:*17*, *21*
29:*24* 30:*2*, *6*, *9*, *13*,
*18*, *22* 44:*16*, *24* 45:*6*
61:*17*, *21* 62:*1*
**send** 28:*12*
**sent** 29:*12*
**sentence** 63:*15* 68:*9*,
*13*
**series** 9:*1*
**set** 17:*18*, *21* 42:*12*
43:*14* 44:*5* 69:*15*
**setting** 69:*7*, *8*
**Settlement** 6:*17* 8:*19*
10:*13*, *18*, *23* 11:*5*, *22*
17:*6* 19:*15*, *25* 20:*2*,
*3*, *5* 36:*14*, *18*, *21*, *25*
37:*4*, *9*, *13*, *16*, *22*
38:*5*, *19* 39:*1*, *10*, *22*
40:*9*, *18*, *25* 41:*3*, *14*,
*23* 42:*6*, *15* 43:*18*, *22*
44:*6* 46:*2*, *17*, *21*
51:*1*, *10*, *15*, *18*, *23*
52:*5*, *17* 53:*4*, *9*, *19*,
*22* 54:*3*, *7*, *10*, *12*, *25*
57:*5*, *15*, *24* 58:*7*
59:*8*, *19*, *24* 60:*4*, *17*
62:*3* 63:*18* 65:*3*, *8*,
*20* 66:*21* 67:*7*, *11*
69:*15* 70:*23* 71:*21*
72:*1*, *7* 73:*10* 74:*15*,
*18*, *24* 75:*2*
**Shakes** 39:*6*

**share** 57:*13*
**shares** 43:*15*
**SHAWN** 5:*21*
**Sheet** 81:*5*
**Shorthand** 2:*15* 84:*2*,
*7*
**show** 48:*12* 55:*3*
**shows** 42:*23*
**side** 10:*22*
**sign** 81:*5*
**signature** 31:*21*
**signed** 11:*9*, *13* 46:*21*
**significant** 56:*14*
**significantly** 29:*14*
**similarities** 22:*22*
**sir** 70:*16*
**sit** 11:*12* 35:*16*, *24*
36:*6* 79:*10*
**six** 10:*3* 17:*12*
18:*14*, *16*
**size** 37:*6*
**Skyview** 78:*16*, *20*, *23*,
*24* 79:*2*
**slow** 56:*24*
**small** 20:*13*
**sole** 27:*7*
**solely** 31:*7* 74:*15*, *23*
**somebody** 48:*25*
69:*5* 76:*24* 78:*20*
**somebody-who** 39:*23*
**sorry** 15:*1* 16:*1*
21:*1*, *6* 29:*10* 55:*8*
58:*13* 67:*2* 74:*2*
76:*9* 77:*18*
**Sounds** 64:*21*
**source** 17:*20* 19:*6*
26:*11* 27:*7* 75:*10*
**speak** 17:*10*, *14*, *17*
**speaks** 55:*2*
**specific** 72:*24*
**specificity** 41:*11*
**speculate** 70:*1*
**spiraling** 77:*8*
**spoke** 66:*1*
**spoken** 17:*12*
**sponsored** 12:*17*
**STANG** 3:*14* 5:*18*
**start** 39:*25* 71:*16*
**started** 70:*10*
**State** 64:*19*

statement 33:*21*
54:*22*
**STATES** 1:*1* 63:*15*
status 13:*24*
Stenographically
1:*20* 2:*13* 84:*13*
step 13:*16*
stick 47:*11*
**STIPULATIONS**
7:*12*
stopped 76:*23*
**Street** 4:*10* 5:*9*
strike 40:*4*
structure 16:*10*
21:*15* 42:*10* 44:*4*
47:*9* 48:*17, 18* 49:*2*
67:*23*
subject 64:*13* 67:*25*
68:*2*
**Subtrust** 73:*4*
succeed 69:*1, 6, 14*
suggest 51:*18* 57:*13*
suggesting 72:*4* 73:*7*
suggests 71:*3, 8*
**Suite** 4:*10, 18* 5:*9*
**SULLIVAN** 3:*22*
**Sunday** 1:*15* 2:*10*
supervision 84:*14*
supplied 81:*5*
**SUPPORT** 7:*1*
22:*14* 28:*1* 55:*18*
supporting 12:*17*
13:*10* 15:*6, 18* 16:*11,
23* 20:*7, 9, 16, 24*
21:*7, 15* 23:*3* 26:*15,
16, 23* 29:*1* 34:*2*
43:*15* 53:*8, 10, 14*
56:*21*
supposedly 77:*6*
79:*13*
sure 16:*21* 35:*23*
65:*9, 15* 66:*1* 68:*11*
73:*2* 76:*5, 10*
sworn 8:*6*
**Systems** 84:*7*

< T >
tainted 73:*17*
take 8:*17* 31:*20*

45:*16*
taken 84:*9, 12*
talk 48:*22*
talked 40:*14* 65:*11*
66:*16* 70:*7*
talking 33:*7* 51:*10*
77:*1* 78:*5*
technical 14:*10*
**Technically** 13:*9*
43:*11*
tell 40:*5, 7, 16* 47:*1*
62:*13* 72:*22* 77:*7, 11*
78:*15* 79:*11*
telling 46:*23*
terminated 79:*3*
terms 36:*18, 25* 54:*3*
test 62:*23*
testified 8:*8* 38:*17*
testify 8:*6*
testimony 19:*5*
32:*19* 81:*4* 83:*7*
testing 48:*19*
**TEXAS** 1:*2* 4:*11, 19*
20:*13* 21:*4* 22:*9*
**Thank** 45:*23* 55:*10*
64:*8* 70:*19* 71:*14*
74:*4, 7* 79:*15, 17*
**Thanks** 79:*21*
therefor 81:*4*
thing 72:*12*
things 44:*12* 48:*11*
think 22:*22* 25:*12*
31:*11, 17* 38:*17*
43:*24* 45:*16* 48:*20*
50:*3* 57:*25* 63:*5*
thinks 31:*11*
**Third** 3:*15* 63:*14*
three 20:*6, 9, 24*
21:*1, 5*
thrown 27:*3, 6*
**Time** 1:*16* 2:*12*
9:*14* 56:*24* 70:*10, 11,
18* 79:*16* 80:*7*
today 8:*17* 16:*17*
18:*12* 33:*7* 35:*16, 24*
36:*6* 47:*14, 20, 24*
49:*23* 66:*8* 76:*20*
79:*10*
today's 12:*1*

told 47:*8* 50:*22*
78:*20* 79:*3, 9*
**TORREY** 5:*20*
15:*22* 16:*5*
track 43:*17*
transaction 61:*13*
transactional 28:*11*
transactions 29:*8*
61:*9, 22*
transcribed 2:*15*
transcript 79:*23*
80:*4* 81:*6* 83:*7*
84:*10*
transparency 53:*13*
travel 62:*16*
treasurer 15:*5, 16, 23*
16:*5*
tribunal 68:*4*
true 83:*10* 84:*11*
**Trust** 3:*5* 4:*14* 5:*3*
10:*15* 11:*5, 10, 14, 17*
32:*12, 16, 21* 33:*20,
24* 34:*14, 17, 20* 35:*7,
13* 45:*4, 7, 14* 47:*12,
14, 23* 48:*9* 52:*6*
53:*23* 54:*4* 55:*20*
58:*23* 73:*3, 24*
**Trustee** 3:*19*
truth 8:*7*
try 9:*7* 33:*3*
trying 77:*22*
tune 43:*2*
two 16:*3* 31:*8* 48:*11*
56:*21* 65:*1*
type 42:*25* 69:*8*
typewriting 84:*14*

< U >
understand 9:*12*
19:*21* 28:*10* 29:*12*
50:*2* 55:*24* 56:*25*
76:*17*
understanding 21:*14,
22, 24* 26:*7* 27:*5, 9,
10, 15* 29:*19, 21*
30:*15* 37:*2, 11* 38:*15,
18, 23* 41:*2* 47:*16, 19*
48:*7* 49:*21* 56:*3*
57:*21* 68:*25* 69:*4*

76:*13*
understood 29:*9* 79:*8*
unexplained 29:*22*
unfair 51:*23* 52:*5,
18* 53:*4, 7, 10, 19, 22*
54:*3*
**Unfortunately** 63:*15*
**UNITED** 1:*1*
**URQUHART** 3:*22*
usual 58:*1*

< V >
vague 47:*10*
valuations 24:*16*
value 27:*12, 24* 29:*6,
19, 22* 49:*7, 15*
vanished 42:*24*
vehicle 47:*6*
vein 18:*17*
versus 65:*11*
vice 15:*4, 15, 22*
videoconferencing 3:*2*
video-conferencing
2:*10*
**VIDEOGRAPHER**
5:*13*
**VIDEO-RECORDED**
1:*13* 2:*8*
view 52:*10* 59:*1*
69:*12, 21*
**Vine** 4:*10*
vision 28:*2*
volume 81:*2, 6*
vote 15:*14*
voting 15:*13*

< W >
wait 62:*12*
want 19:*17* 43:*24*
44:*2, 11* 48:*12, 25*
55:*2* 65:*9* 66:*1*
68:*11* 72:*14, 15, 24*
78:*8* 79:*22* 80:*4*
way 20:*13* 28:*13*
41:*23* 45:*20* 48:*14*
65:*17* 76:*7*
**Wednesday** 56:*22*
weekend 76:*14*
weeks 65:*1*

**Well** 13:*2* 18:*11*
20:*6* 24:*9* 25:*7*
28:*10* 31:*13, 14*
43:*10* 44:*5* 48:*6*
53:*11* 72:*18* 74:*11*
77:*14, 19* 78:*24*
**we're** 8:*17, 25* 31:*21*
33:*7* 46:*19* 56:*18*
62:*7* 65:*23* 78:*5*
**we've** 56:*13* 63:*13*
65:*11, 21* 66:*15*
**Wilkerson** 22:*6*
**WINOGRAD** 3:*12*
**wish** 82:*3*
**WISHNEW** 4:*17*
**withdrawn** 11:*2*
13:*19* 19:*13* 23:*6*
26:*22* 27:*4* 29:*20*
30:*8* 32:*10* 38:*16*
52:*15* 58:*19* 59:*16*
64:*17* 67:*18* 77:*11*
**witness** 48:*17* 64:*7*
72:*14*
**woman** 79:*1*
**words** 13:*16* 30:*8*
**work** 56:*18*
**working** 18:*15*
**workings** 49:*1*
**write-down** 27:*23*
29:*6*
**wrong** 64:*6* 71:*4, 9,*
*20, 25* 73:*7*
**wrongdoing** 72:*5*

**< Y >**
**Yeah** 22:*18* 28:*16*
48:*8* 68:*14* 74:*6*
78:*18*
**year** 50:*3* 76:*16*
**years** 10:*3* 12:*20*
18:*14, 16* 50:*17* 51:*9*
**Yep** 45:*18*
**York** 3:*16, 24* 70:*10,*
*11*

**< Z >**
**ZIEHL** 3:*14* 5:*18*

## WORD LIST

**< $ >**
**$25**  *(2)*
**$300**  *(1)*

**< 1 >**
**1**  *(3)*
**1:37**  *(2)*
**10**  *(1)*
**10010**  *(1)*
**10017-2024**  *(1)*
**10-year**  *(1)*
**11**  *(1)*
**1113**  *(1)*
**15**  *(1)*
**16**  *(2)*
**1600**  *(1)*
**1700**  *(1)*
**19-34054-sgj11**  *(1)*
**1st**  *(1)*

**< 2 >**
**2:37**  *(1)*
**2011**  *(1)*
**2019**  *(1)*
**2024**  *(1)*
**2025**  *(2)*
**212.849.7615**  *(1)*
**214.817.4500**  *(1)*
**22**  *(2)*
**225.381.9643**  *(1)*
**22nd**  *(1)*
**2390**  *(1)*
**240**  *(1)*

**< 3 >**
**3:08**  *(1)*
**300-plus**  *(1)*
**301**  *(1)*
**30th**  *(1)*
**310.277.6910**  *(1)*
**32**  *(5)*
**33**  *(3)*
**34**  *(1)*
**34th**  *(1)*

**< 4 >**
**4:07**  *(1)*

**40**  *(2)*

**< 5 >**
**51**  *(1)*

**< 6 >**
**63**  *(1)*

**< 7 >**
**7**  *(1)*
**70801**  *(1)*
**713.228.4100**  *(1)*
**75201**  *(1)*
**77002**  *(1)*
**780**  *(1)*

**< 8 >**
**8**  *(1)*
**8635**  *(3)*

**< 9 >**
**90**  *(1)*
**9th**  *(1)*

**< A >**
**able**  *(2)*
**Absolutely**  *(1)*
**abstain**  *(3)*
**abstention**  *(1)*
**accepting**  *(1)*
**access**  *(1)*
**accommodate**  *(1)*
**accounting**  *(1)*
**accounts**  *(20)*
**acted**  *(1)*
**acting**  *(6)*
**action**  *(3)*
**actions**  *(4)*
**activities**  *(3)*
**activity**  *(7)*
**ADAMS**  *(1)*
**additional**  *(2)*
**Administrator**  *(1)*
**advice**  *(2)*
**aegis**  *(1)*
**affidavit**  *(1)*
**affiliated**  *(3)*
**affiliates**  *(4)*
**affirmed**  *(1)*

**afternoon**  *(1)*
**agendas**  *(1)*
**ago**  *(2)*
**agree**  *(1)*
**agreed**  *(1)*
**agreement**  *(59)*
**ahead**  *(2)*
**ahurt@kellyhart.com**
  *(1)*
**alleging**  *(1)*
**allocated**  *(1)*
**allow**  *(2)*
**AMELIA**  *(1)*
**amount**  *(1)*
**ample**  *(1)*
**ancillary**  *(1)*
**annuities**  *(7)*
**annuity**  *(4)*
**ANSWER**  *(30)*
**answering**  *(2)*
**answers**  *(2)*
**anticipate**  *(1)*
**anybody**  *(16)*
**apologize**  *(6)*
**apparent**  *(1)*
**appear**  *(2)*
**appearance**  *(2)*
**appeared**  *(4)*
**appears**  *(1)*
**appointed**  *(2)*
**appreciate**  *(6)*
**appreciated**  *(1)*
**approval**  *(1)*
**approve**  *(4)*
**approved**  *(10)*
**Approving**  *(1)*
**approximately**  *(1)*
**April**  *(1)*
**arising**  *(1)*
**arm's-length**  *(2)*
**articulate**  *(1)*
**aside**  *(1)*
**asked**  *(8)*
**asking**  *(5)*
**asserting**  *(1)*
**assertion**  *(1)*
**asserts**  *(1)*
**asset**  *(2)*
**assets**  *(38)*

**assume**  *(2)*
**assumed**  *(1)*
**assuming**  *(3)*
**Atlas**  *(8)*
**attached**  *(2)*
**Attorney**  *(126)*
**attorneys**  *(1)*
**audible**  *(1)*
**authority**  *(7)*
**authorization**  *(2)*
**authorized**  *(9)*
**authorizing**  *(1)*
**available**  *(1)*
**Avenue**  *(3)*
**avoidance**  *(5)*
**aware**  *(42)*

**< B >**
**BA**  *(2)*
**back**  *(3)*
**backdrop**  *(1)*
**bad**  *(1)*
**BANKRUPTCY**  *(15)*
**Barbara**  *(7)*
**BARTLETT**  *(1)*
**based**  *(2)*
**basically**  *(1)*
**basis**  *(6)*
**Baton**  *(1)*
**beginning**  *(2)*
**behalf**  *(35)*
**behavior**  *(1)*
**believe**  *(31)*
**believed**  *(1)*
**best**  *(12)*
**bit**  *(3)*
**block**  *(1)*
**bottom**  *(1)*
**Bradshaw**  *(1)*
**breaching**  *(1)*
**break**  *(1)*
**bring**  *(1)*
**bringing**  *(1)*
**business**  *(3)*
**buy**  *(3)*

**< C >**
**CA-Certified**  *(1)*
**CA-CSR**  *(2)*

calendar  (2)
call  (5)
called  (10)
calling  (1)
CAPITAL  (17)
careful  (1)
carefully  (1)
Carrera  (1)
Case  (10)
cases  (1)
cash  (4)
cause  (1)
caused  (1)
caution  (1)
Cayman  (10)
ceased  (2)
Central  (3)
CEO  (7)
CEOs  (1)
certain  (7)
Certainly  (1)
CERTIFICATE  (1)
Certified  (3)
certify  (2)
cetera  (1)
CFO  (2)
chance  (1)
change  (10)
changes  (6)
changing  (1)
Chapter  (1)
charitable  (8)
chart  (1)
chief  (1)
City  (8)
claim  (9)
Claimant  (18)
claimed  (1)
claims  (3)
clarify  (1)
CLARITY  (1)
clawback  (4)
clawing  (1)
clear  (3)
clearly  (1)
clients  (2)
cold  (1)
come  (1)
commenced  (2)

commitment  (1)
common  (1)
communicate  (1)
communicated  (4)
communication  (2)
community  (6)
company  (1)
complete  (1)
compliance  (1)
concern  (3)
concerned  (4)
concerning  (1)
concerns  (1)
concluded  (1)
confer  (1)
confidential  (2)
confused  (1)
confusing  (1)
connection  (4)
consent  (6)
consider  (1)
considering  (1)
constitutes  (1)
consult  (1)
consummation  (3)
Cont'd  (2)
contend  (2)
contends  (2)
context  (1)
continue  (1)
contractual  (7)
contractually  (1)
contribution  (2)
contributions  (3)
control  (5)
controlled  (2)
controls  (1)
conversations  (1)
convey  (1)
conveying  (1)
copy  (4)
corporate  (2)
corporations  (1)
correct  (11)
corrections  (2)
correctly  (1)
counsel  (5)
counterpart  (1)
counterparty  (1)

couple  (1)
COURT  (14)
Court-appointed  (2)
COVID  (1)
CRAWFORD  (1)
created  (1)
Crown  (45)
CRR  (2)
cumbersome  (1)
CURRY  (2)

< D >
D.C  (1)
DAF  (7)
DALLAS  (160)
D'AMBRA  (1)
date  (2)
DAVID  (1)
day  (3)
dcurry@okinadams.co
m  (1)
de  (1)
dealings  (1)
Debbie  (1)
Debtor  (5)
decided  (1)
decision  (2)
decisions  (1)
declaration  (3)
decline  (3)
Defendant  (2)
definitively  (1)
Delaware  (2)
DEMO  (1)
DEPONENT  (1)
deposed  (1)
DEPOSITION  (11)
depositions  (1)
described  (4)
detail  (1)
DIAZ  (20)
different  (2)
diminished  (1)
Diplomate  (2)
DIRECT  (4)
directed  (2)
direction  (1)
directly  (3)
disburse  (2)

disbursement  (1)
disclosed  (1)
disclosing  (1)
discussions  (1)
disrespectful  (1)
DISTRICT  (1)
diverting  (1)
DIVISION  (1)
document  (4)
DOCUMENTS  (4)
doing  (5)
dollars  (1)
donation  (2)
donations  (1)
Dondero  (20)
Dondero's  (2)
donor-advised  (1)
dramatic  (1)
Dugaboy  (1)
duly  (1)
duties  (4)
duty  (2)

< E >
earlier  (2)
effectuated  (1)
effectuates  (1)
either  (3)
EMANUEL  (1)
employed  (2)
employee  (1)
Empower  (25)
engaged  (2)
ensure  (1)
enter  (5)
entered  (3)
entering  (9)
entities  (55)
entitled  (2)
entity  (19)
Entry  (1)
erosion  (1)
Errata  (1)
ESQ  (10)
essence  (1)
essentially  (1)
established  (1)
et  (1)
everybody  (1)

Deposition of Julie Diaz
In re Highland Capital Management, L.P.

evidence *(1)*
exactly *(1)*
**EXAMINATION** *(2)*
examined *(1)*
excuse *(2)*
executed *(1)*
exercise *(1)*
exercised *(1)*
**Exhibit** *(1)*
existence *(1)*
expect *(1)*
expectations *(1)*
expected *(1)*
expedited *(1)*
expenses *(2)*
expensive *(1)*
expert *(2)*
expressed *(1)*
extent *(1)*

**< F >**
fact *(1)*
facts *(13)*
fail *(1)*
fair *(36)*
fairly *(1)*
fall *(1)*
familiar *(14)*
familiarity *(2)*
Family *(6)*
fault *(1)*
feeds *(1)*
feel *(1)*
female *(1)*
fiduciaries *(2)*
fiduciary *(6)*
file *(6)*
filed *(25)*
filing *(10)*
finance *(1)*
financial *(1)*
find *(2)*
fine *(3)*
finish *(3)*
first *(1)*
first-quarter *(1)*
flag *(1)*
Floor *(2)*
flow *(6)*

flowed *(1)*
**Flows** *(3)*
focus *(1)*
focused *(1)*
Focusing *(2)*
folks *(1)*
following *(2)*
follows *(1)*
foregoing *(3)*
form *(33)*
formal *(1)*
Formally *(1)*
formation *(1)*
formed *(4)*
forth *(4)*
forward *(1)*
found *(1)*
**Foundation** *(145)*
foundations *(5)*
**Foundation's** *(24)*
four *(2)*
fully *(1)*
fund *(11)*
funded *(1)*
fundholder *(1)*
fundholders *(2)*
funding *(5)*
funds *(4)*
fund's *(1)*
further *(1)*
future *(1)*

**< G >**
**Gail** *(4)*
gdemo@pszjlaw.com *(1)*
generally *(4)*
gentleman *(2)*
give *(6)*
given *(1)*
giving *(1)*
**Global** *(41)*
**Global's** *(4)*
go *(7)*
going *(13)*
**Good** *(3)*
good-faith *(2)*
governance *(3)*
**GPs** *(1)*

grant *(2)*
grant-making *(2)*
grants *(1)*
**GREGORY** *(1)*
ground *(1)*
guess *(4)*

**< H >**
half *(1)*
**HALL** *(1)*
**HALLMAN** *(1)*
happening *(3)*
happens *(3)*
happy *(2)*
harm *(1)*
**HART** *(1)*
**HAYLEY** *(1)*
head *(2)*
hear *(1)*
heard *(1)*
held *(2)*
he'll *(1)*
help *(2)*
hereto *(1)*
**Hernandez** *(1)*
high *(5)*
**HIGHLAND** *(82)*
**Highland/HMIT** *(2)*
**Highland's** *(1)*
**HMIT** *(54)*
**HMIT/Highland** *(2)*
hold *(2)*
**Holdco** *(2)*
holds *(1)*
hour *(1)*
**Houston** *(1)*
**Hunter** *(19)*
**HURT** *(1)*
hwinograd@pszjlaw.com *(1)*

**< I >**
idea *(5)*
identification *(1)*
identified *(3)*
identify *(8)*
imagine *(1)*
impact *(1)*
impacted *(1)*

impacts *(1)*
important *(1)*
including *(1)*
income *(3)*
independent *(1)*
**INDEX** *(1)*
indicate *(1)*
indirect *(4)*
indirectly *(1)*
individual *(1)*
inform *(1)*
information *(19)*
informed *(4)*
**Inghram** *(4)*
insertion *(1)*
inside *(6)*
insider *(1)*
insignificant *(1)*
**INSTRUCTED** *(1)*
**INSTRUCTIONS** *(1)*
Insurance *(5)*
intended *(1)*
interest *(13)*
interested *(1)*
interim *(1)*
interrupt *(2)*
investigate *(1)*
investigating *(1)*
Investment *(13)*
involved *(3)*
involvement *(6)*
irregular *(2)*
irregularities *(1)*
**IRS** *(1)*
Islands *(8)*
issues *(3)*
its *(13)*

**< J >**
Jackie *(1)*
**JAMES** *(2)*
**JEFFREY** *(1)*
Jim *(6)*
jmorris@pszjlaw.com *(1)*
job *(2)*
**JOHN** *(7)*
joint *(11)*
**JONES** *(2)*

jpomerantz@pszjlaw.com (1)
JULIE (5)
June (3)
jurisdiction (1)
justify (1)

< K >
Kansas (9)
keep (2)
KELLY (1)
kind (2)
know (122)
knowledge (21)
knows (1)

< L >
L.P (1)
Labor (1)
lack (1)
LANG (4)
language (1)
large (2)
law (1)
laws (1)
lawsuit (2)
lawyer (3)
lawyers (1)
lead (1)
leading (1)
leads (1)
learn (3)
learned (6)
leave (1)
led (1)
legal (5)
lengthy (1)
level (5)
liabilities (2)
Life (3)
likelihood (1)
Limited (2)
LINE (6)
liquidation (2)
liquidators (11)
liquidity (1)
listen (1)
lists (1)
literally (1)

Litigation (10)
little (3)
LITTLETON (3)
Littleton's (1)
LLP (3)
LOIGMAN (1)
long (1)
longer (3)
look (2)
looking (2)
losing (1)
lot (6)
LOUIS (2)
Louisiana (1)
lower (1)
LP (11)
lphillips@kellyhart.com (1)
LPs (1)

< M >
Ma'am (10)
Madison (1)
Main (1)
majority (2)
making (3)
MANAGEMENT (19)
managing (1)
March (1)
Mark (14)
MARKED (2)
MARKS (2)
material (6)
Matt (4)
MATTHEW (1)
mean (6)
member (1)
memory (1)
mentioned (1)
met (3)
MICHAEL (1)
million (4)
mind (3)
minimis (1)
minutes (1)
misused (1)
mlang@cwl.law.com (1)

mokin@okinadams.com (1)
money (3)
months (1)
moot (1)
MORRIS (69)
Motion (5)
Mountain (19)
move (1)
mute (2)
mutual (2)
mystery (1)

< N >
name (1)
named (2)
NATHAN (4)
nature (3)
NECESSARILY (1)
need (8)
needs (1)
negotiating (1)
negotiation (1)
negotiations (3)
neither (1)
never (2)
New (6)
newly (1)
news (3)
Nods (1)
nonpublic (7)
Nope (1)
North (3)
NORTHERN (1)
Notary (1)
notations (1)
NOTE (1)
notes (1)
notice (1)

< O >
object (35)
objected (2)
objecting (2)
Objection (63)
objections (1)
obligation (4)
obligations (6)
obtain (5)

obviously (1)
October (1)
offhand (1)
office (1)
officer (1)
officers (1)
official (11)
Oh (5)
Okada (7)
okay (29)
OKIN (52)
once (1)
opportunity (2)
option (4)
Order (2)
org (2)
organization (6)
organizations (15)
organization's (1)
orgs (4)
original (2)
originated (1)
outcome (1)
outside (2)
oversee (1)
overseeing (1)
oversees (1)
oversight (4)
owed (2)
owes (3)
owned (1)
owner (2)
ownership (6)
owns (3)

< P >
p.m (3)
PACHULSKI (2)
Pacific (1)
PAGE (10)
pages (1)
paid (1)
paragraph (13)
Pardon (1)
part (2)
participated (1)
particular (3)
parties (11)
parts (1)

Case 19-34054-sgj11  Doc 4327-5  Filed 08/24/26  Entered 08/24/26 16:00:35  Desc
Exhibit 24  Page 102 of 103

Deposition of Julie Diaz                                                In re Highland Capital Management, L.P.

party (7)
Patrick (31)
Patrick's (1)
PAUL (2)
pay (1)
peace (4)
pending (2)
people (2)
percent (2)
permission (1)
person (5)
personally (1)
pertain (1)
pertains (1)
PHILLIPS (5)
phrase (3)
piece (1)
play (1)
played (1)
plays (2)
pleading (1)
Please (7)
PLLC (1)
point (1)
policies (1)
POMERANTZ (1)
portion (4)
position (1)
possibly (1)
potential (1)
practice (1)
precise (1)
precluded (1)
prefer (1)
preparation (1)
prepare (1)
present (2)
president (10)
pretty (1)
Prior (2)
privilege (1)
problem (2)
proceeding (1)
proceedings (6)
proceeds (8)
product (2)
PRODUCTION (1)
professional (1)
promise (1)

proposed (6)
propounded (1)
protect (2)
prove (1)
provide (4)
provided (2)
Public (1)
purchase (1)
purpose (1)
purposes (3)
pursuant (1)
put (11)
putting (1)

< Q >
quarrel (1)
quarterly (1)
question (39)
questioning (1)
QUESTIONS (12)
quick (1)
quickly (1)
QUINN (1)
quizzed (1)
QUOTATION (1)
QUOTE (5)

< R >
raised (1)
Rand (9)
RAVER (1)
RDR (2)
read (8)
reading (2)
really (5)
Realtime (3)
reason (29)
reasons (2)
recall (7)
receive (17)
received (5)
receives (3)
receiving (1)
recollection (2)
recommendations (2)
record (1)
recorded (1)
recover (7)
red (1)

reduced (1)
refer (6)
reference (2)
referring (3)
REFLECT (1)
refresh (1)
regarding (1)
Registered (2)
regular (1)
reject (1)
related (1)
relates (2)
relationship (11)
releases (2)
releasing (1)
remember (1)
remind (1)
remitted (1)
REMOTE (4)
reorganization (1)
Repeat (8)
repeated (1)
report (1)
Reported (1)
Reporter (9)
REPORTER'S (1)
reports (1)
represent (3)
representative (1)
REQUEST (1)
requests (1)
required (6)
requirement (1)
respect (3)
respectfully (1)
response (1)
responsible (1)
result (3)
review (2)
reviewed (3)
right (31)
rise (1)
ROBERT (1)
robertloigman@quinn
emanuel.com (1)
role (7)
room (1)
Rose (1)
Rouge (1)

RSA (2)
rules (1)
rushed (1)

< S >
Santa (7)
Sauder (1)
saying (1)
says (6)
scope (4)
screen (4)
scroll (3)
scrutiny (1)
second (1)
secretary (1)
securities (1)
see (13)
seek (2)
seeks (4)
seen (2)
SEERY (3)
segregated (20)
send (1)
sent (1)
sentence (3)
series (1)
set (6)
setting (2)
Settlement (84)
Shakes (1)
share (1)
shares (1)
SHAWN (1)
Sheet (1)
Shorthand (3)
show (2)
shows (1)
side (1)
sign (1)
signature (1)
signed (3)
significant (1)
significantly (1)
similarities (1)
sir (1)
sit (5)
six (4)
size (1)
Skyview (5)

slow  (1)
small  (1)
sole  (1)
solely  (3)
somebody  (4)
somebody-who  (1)
sorry  (11)
Sounds  (1)
source  (5)
speak  (3)
speaks  (1)
specific  (1)
specificity  (1)
speculate  (1)
spiraling  (1)
spoke  (1)
spoken  (1)
sponsored  (1)
STANG  (2)
start  (2)
started  (1)
State  (1)
statement  (2)
STATES  (2)
status  (1)
Stenographically  (3)
step  (1)
stick  (1)
STIPULATIONS  (1)
stopped  (1)
Street  (2)
strike  (1)
structure  (9)
subject  (3)
Subtrust  (1)
succeed  (3)
suggest  (2)
suggesting  (2)
suggests  (2)
Suite  (1)
SULLIVAN  (1)
Sunday  (2)
supervision  (1)
supplied  (1)
SUPPORT  (4)
supporting  (23)
supposedly  (2)
sure  (9)
sworn  (1)

Systems  (1)

< T >
tainted  (1)
take  (3)
taken  (2)
talk  (1)
talked  (4)
talking  (4)
technical  (1)
Technically  (2)
tell  (10)
telling  (1)
terminated  (1)
terms  (3)
test  (1)
testified  (2)
testify  (1)
testimony  (4)
testing  (1)
TEXAS  (6)
Thank  (9)
Thanks  (1)
therefor  (1)
thing  (1)
things  (2)
think  (11)
thinks  (1)
Third  (2)
three  (5)
thrown  (2)
Time  (9)
today  (14)
today's  (1)
told  (5)
TORREY  (3)
track  (1)
transaction  (1)
transactional  (1)
transactions  (3)
transcribed  (1)
transcript  (5)
transparency  (1)
travel  (1)
treasurer  (4)
tribunal  (1)
true  (2)
Trust  (32)
Trustee  (1)

truth  (3)
try  (2)
trying  (1)
tune  (1)
two  (5)
type  (2)
typewriting  (1)

< U >
understand  (8)
understanding  (26)
understood  (2)
unexplained  (1)
unfair  (9)
Unfortunately  (1)
UNITED  (1)
URQUHART  (1)
usual  (1)

< V >
vague  (1)
valuations  (1)
value  (7)
vanished  (1)
vehicle  (1)
vein  (1)
versus  (1)
vice  (3)
videoconferencing  (1)
video-conferencing  (1)
VIDEOGRAPHER  (1)
VIDEO-RECORDED  (2)
view  (4)
Vine  (1)
vision  (1)
volume  (2)
vote  (1)
voting  (1)

< W >
wait  (1)
want  (16)
way  (7)
Wednesday  (1)
weekend  (1)
weeks  (1)

Well  (17)
we're  (9)
we've  (5)
Wilkerson  (1)
WINOGRAD  (1)
wish  (1)
WISHNEW  (1)
withdrawn  (16)
witness  (3)
woman  (1)
words  (2)
work  (1)
working  (1)
workings  (1)
write-down  (2)
wrong  (6)
wrongdoing  (1)

< Y >
Yeah  (6)
year  (2)
years  (6)
Yep  (1)
York  (6)

< Z >
ZIEHL  (2)