# Exhibit G
## Part 2

# EXHIBIT 36

*Execution Version*

**DATED 11 March 2024**

**SECOND AMENDED AND RESTATED**
**EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP**

WARNING
THE TAKING OR SENDING BY ANY PERSON OF AN ORIGINAL OF THIS DOCUMENT INTO THE
CAYMAN ISLANDS MAY GIVE RISE TO THE IMPOSITION OF CAYMAN ISLANDS STAMP DUTY

*Execution Version*

## TABLE OF CONTENTS

**PAGE**

| | | |
|---|---|---|
| ARTICLE I | GENERAL PROVISIONS; COMPENSATION AND EXPENSES | 1 |
| 1.1 | Continuation. | 1 |
| 1.2 | Name. | 1 |
| 1.3 | Purpose and Powers. | 1 |
| 1.4 | Registered Office. | 1 |
| 1.5 | Partners. | 1 |
| 1.6 | Powers. | 1 |
| 1.7 | Term. | 2 |
| 1.8 | Admission of New Partners. | 2 |
| 1.9 | Taxable Year. | 2 |
| 1.10 | Liability of Partners | 2 |
| 1.11 | Limitation on Assignability of Partners' Interests. | 2 |
| 1.12 | Definitions. | 2 |
| 1.13 | Service Providers. | 3 |
| 1.14 | Partnership Expenses. | 3 |
| 1.15 | Partnership Records. | 3 |
| 1.16 | Limited Partner Information. | 3 |
| | | |
| ARTICLE II | POWERS. | 4 |
| 2.1 | Partnership Powers. | 4 |
| 2.2 | Rights, Powers, Limitations on Liability and Indemnification of General Partner. | 5 |
| | | |
| ARTICLE III | CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES | 7 |
| 3.1 | Capital Contributions. | 7 |
| 3.2 | Capital Account; Allocation of Profits and Losses. | 7 |
| | | |
| ARTICLE IV | LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWLS FROM CAPITAL ACCOUNT | 8 |
| 4.1 | Legal Interest. | 8 |
| 4.2 | Distributions. | 8 |
| 4.3 | Withdrawal. | 8 |
| | | |
| ARTICLE V | DURATION OF PARTNERSHIP | 9 |
| 5.1 | Commencement of Winding Up. | 9 |
| 5.2 | Winding Up. | 9 |
| 5.3 | Termination. | 9 |
| | | |
| ARTICLE VI | MISCELLANEOUS | 9 |
| 6.1 | Tax Matters Partner. | 9 |
| 6.2 | Right to Hire. | 9 |
| 6.3 | Applicable Law, etc. | 10 |
| 6.4 | Power of Attorney. | 10 |
| 6.5 | Tax Elections Under the Internal Revenue Code. | 10 |
| 6.6 | Amendments to Partnership Agreement. | 10 |
| 6.7 | Investment Representation. | 11 |
| 6.8 | Notices. | 11 |
| 6.9 | General Partner Determinations. | 11 |
| 6.10 | Dispute Resolution. | 11 |
| 6.11 | Successors and Assigns. | 13 |
| 6.12 | Severability. | 13 |
| 6.13 | No Third Party Rights. | 13 |
| 6.14 | No Right to Partition. | 14 |

*Execution Version*

# SECOND AMENDED AND RESTATED

## EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP

**THIS SECOND AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT** (the "Agreement") is made on 11 March 2024

BETWEEN

(1) CDH GP, Ltd., a Cayman Islands exempted company having its registered office at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands as general partner (the "**General Partner**");

(2) Charitable DAF HoldCo, Ltd, a Cayman Islands exempted company having its registered office at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands as limited partner (the "**Limited Partner**"); and

(3) Each individual, partnership, corporation, limited liability company, trust or other entity (each, a "**Person**") admitted as a limited partner or general partner (collectively, the "**Partners**") of the Partnership (as defined below) in accordance with this Agreement, including any Persons hereafter admitted as Partners in accordance with this Agreement and excluding any Persons who cease to be Partners in accordance with this Agreement.

**WHEREAS**, Charitable DAF Fund, LP (the "**Partnership**") was formed on October 25, 2011 and registered as an exempted limited partnership pursuant to and in accordance with the Exempted Limited Partnership Act (as amended) of the Cayman Islands (the "**Act**"), and an Initial Limited Partnership Agreement of the Partnership was entered into as of the same date (the "**Initial Agreement**");

**WHEREAS**, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein;

**WHEREAS**, the Limited Partner and Charitable DAF GP, LLC, as general partner of the Partnership, amended and restated the Initial Agreement in its entirety on November 7, 2011 ("**A&R LPA**");

**WHEREAS**, Charitable DAF GP, LLC assigned to the General Partner its general partnership interest and the General Partner assumed the obligations of Charitable DAF GP, LLC, as general partner of the Partnership pursuant to an assignment and assumption agreement dated 7 March 2024; and

**WHEREAS**, the Limited Partner and the General Partner, desire to amend and restate the A&R LPA in its entirety as set forth below.

**NOW THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby adopt this Agreement to be their Limited Partnership Agreement, as follows:

**IT IS AGREED:**

**ARTICLE I**

**GENERAL PROVISIONS; COMPENSATION AND EXPENSES**

1.1     Continuation. The parties hereto continue the Partnership as an exempted limited partnership formed on October 25, 2011 pursuant to the Act.

1.2     Name. The name of the Partnership is Charitable DAF Fund, LP or such other name as the General Partner may from time to time determine provided that the words "Limited Partnership" or the abbreviations "LP" or "L.P." shall be included in the name as required by the Act.

1.3     Purpose and Powers. The purpose of the Partnership shall be to invest and trade, directly or indirectly, in securities of all types and other investment vehicles and instruments, and to engage in any lawful activity for which exempted limited partnerships may be formed under the Act. At least initially, a majority of the Partnership's assets shall be invested in shares of CLO HoldCo, Ltd., a Cayman Islands exempted company ("**CLO HoldCo**"), but the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.

1.4     Registered Office. The registered office of the Partnership is c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands or such other place in the Cayman Islands as the General Partner may in its absolute discretion from time to time determine. The General Partner shall make the required filings with the Registrar of Exempted Limited Partnerships of any change to the Partnership's registered office in accordance with the Act.

1.5     Partners. The name and addresses of the Partners are as follows:

| Name | Address |
|------|---------|
| CDH GP, LTD. (General Partner) | c/o Campbells Corporate Services Limited<br>Floor 4, Willow House<br>Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands |
| Charitable DAF HoldCo, Ltd (Limited Partner) | c/o Campbells Corporate Services Limited<br>Floor 4, Willow House<br>Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands |

1.6     Powers.

(a)     Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and conduct of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of an exempted limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in

1

this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.

(b) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management or conduct of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

1.7    Term. The Partnership was established on October 25, 2011 and shall continue until wound up and subsequently dissolved in accordance with this Agreement or any amendment or modification thereof.

1.8    Admission of New Partners. The General Partner may at any time admit one or more new Partners on such terms as it may determine in its sole discretion; provided that any such new Limited Partner shall have as its equity owners solely Indirect Charitable Owners.

1.9    Taxable Year. The Taxable Year of the Partnership shall be a calendar fiscal year, or such other fiscal year as the General Partner shall determine in their sole discretion from time to time.

1.10    Liability of Partners

(a) The General Partner shall be liable for all of the debts, liabilities and obligations of the Partnership.

(b) Except to the extent otherwise required by law or this Agreement, a Limited Partner shall not be personally liable for any obligations of the Partnership to third parties nor for the return of any distributions from the Partnership to the Limited Partner. Limited Partners should not take part in the conduct of the business of the Partnership and should not deal with third parties, nor for the return of any distributions from the Partnership to the Limited Partner, or otherwise hold itself out, as, a general partner of the Partnership. A Limited Partner may be liable for the tax audit and related expenses referred to in Section 6.1

1.11    Limitation on Assignability of Partners' Interests.

(a) A Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner. Any attempted assignment or substitution not made in accordance with this section shall be void *ab initio.*

(b) The General Partner may not assign their interests in the Partnership to any entity that is not under common control with the General Partner without the consent of a majority-in-interest of the Limited Partners. Notwithstanding the foregoing, the General Partner may freely assign their economic interest in the Partnership in whole or in part. The General Partner shall file, or cause to be filed, any amended Section 10 Statement with the Cayman Islands Registrar of Exempted Limited Partnerships required to be filed pursuant to Section 10 of the Act to give effect to the provisions of this Section 1.11.

1.12    Definitions. For the purpose of this Agreement, unless the context otherwise requires:

2

(a) <u>General Partner</u>. The term "**General Partner**" shall refer to CDH GP, Ltd., and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

<u>Indirect Charitable Owners.</u> The term "Indirect Charitable Owner" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 50l(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

(b) <u>Limited Partner.</u> The term "**Limited Partner**" shall refer to Charitable DAF HoldCo Ltd (and each person subsequently admitted as a limited partner by the General Partner pursuant to the terms of this Agreement).

(c) <u>Partner.</u> The term "**Partner**" shall refer to the General Partner or the Limited Partner.

1.13 <u>Service Providers.</u> The General Partner may engage one or more Persons to act, or remove any one or more Persons from so acting, as service providers to the Company (including, without limitation, as manager, administrator, custodian, registrar and transfer agent, investment manager, investment adviser, sponsor and/or prime broker, auditors and legal counsel to the Partnership) in its sole discretion; provided, that any compensation paid to any such service provider that is affiliated with the General Partner shall be in an amount customary for services of a similar nature.

1.14 <u>Partnership Expenses.</u> The Partnership will bear its own operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees (if any), taxes, research costs, legal and accounting expenses and other operating expenses. In addition, the Partnership will bear its pro rata share of CLO HoldCo's operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees, taxes, research costs, legal and accounting expenses and other operating expenses. The Partnership will also bear (or reimburse the General Partner for) its organizational fees and expenses. To the extent the Partnership shares trading expenses with other accounts that may be managed by the General Partner or any affiliates, it will bear a proportionate share of the associated costs. In no event shall the General Partner receive any compensation from the Partnership.

1.15 <u>Partnership Records.</u> The General Partner shall cause to be maintained at the principal office of the Partnership, or at such other place as the Act may permit, a register of limited partnership interests which shall include such information as may be required by the Act (the "**Register**"). The Register shall not be part of this Agreement. The General Partner shall, from time to time, update the Register as required by the Act to accurately reflect the information therein and no action of any Limited Partner shall be required to amend or update the Register. [Upon the prior consent of the General Partner, the Limited Partners shall have the right to inspect the Register.] Any reference in this Agreement to the Register shall be deemed a reference to the Register as in effect from time to time. Subject to the terms of this Agreement, the General Partner may take any action authorised hereunder in respect of the Register, including making the Register available at the registered office to satisfy any order or notice pursuant to the Tax Information Authority Act (as amended) without any need to obtain the consent of any other Partner.

1.16 <u>Limited Partner Information.</u> Other than what has been expressly agreed to be provided to the Limited Partners herein, the Limited Partners are not entitled to any other additional information regarding the Partnership (including for the purposes of section 22 of the Act (which is disapplied with respect to the Partnership)) unless agreed by the General Partner in its sole discretion.

**ARTICLE II**

3

**POWERS**

2.1    <u>Partnership Powers.</u>

The Partnership shall have the following powers:

(a)    To purchase, sell, invest and trade, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non- U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, syndicated debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; statutory claims; royalty claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (all such items being called herein a "**Financial Instruments**"), and to sell Financial Instruments short and cover such sales;

(b)    To possess, transfer, mortgage, pledge, charge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Financial Interests held or owned by the Partnership with the ultimate objective of the preservation, protection, improvement and enhancement in value thereof and to hold such Financial Interests in the name of the Partnership, in the name of any securities broker or firm, in the name of any nominee of such firm, or in the name of any other nominee or any other street name, or any combination thereof;

(c)    To lend, either with or without security, any Financial Instruments, funds or other properties of the Partnership, including by entering into reverse repurchase agreements, and, from time to time, undertake leverage on behalf of the Partnership;

(d)    To borrow or raise moneys and, from time to time, without limit as to amount, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any of the foregoing instruments and of the interest thereon by mortgage upon or pledge, charge,

4

conveyance or assignment in trust of the whole or any part of the property of the Partnership, whether at the time owned or thereafter acquired, and to sell, pledge, charge or otherwise dispose of such bonds or other obligations of the Partnership for its purposes;

(e)    To have and maintain one or more offices within or without the Cayman Islands and in connection therewith to rent or acquire office space, engage personnel and do such other acts and things as may be necessary or advisable in connection with the maintenance of such office or offices;

(f)    To open, maintain and close bank accounts and brokerage accounts, including the power to draw checks or other orders for the payment of monies; and

(g)    To enter into, make and perform all contracts, agreements and other undertakings as may be necessary or advisable or incidental to the carrying out of the foregoing objects and purposes.

2.2    <u>Rights, Powers, Limitations on Liability and Indemnification of General Partner.</u>

(a)    Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the General Partner, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including members of any committee and parties acting as agents for the execution of transactions) (each, a **"Covered Person"** and collectively, **"Covered Persons")** shall be subject to the provisions of this Section.

(b)    To the fullest extent permitted by law, no Covered Person shall be liable to the Partnership or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Partnership, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Partnership, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Partnership whom such Covered Person believes is authorized to make such suggestions on behalf of the Partnership, (iii) any act or omission by the Partnership, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Partnership selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c)    Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Partnership or in furtherance of the business of the Partnership in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d)    To the fullest extent permitted by law, the Partnership shall indemnify and save harmless Covered Persons (the **"Indemnitees"),** from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection

5

with the business of the Partnership, any investment made under or in connection with this Agreement, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Partnership, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or gross negligence.

(e)     Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

(f)     The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

(g)     The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h)     **Notwithstanding anything in this Agreement to the contrary, the aggregate maximum amount that a Covered Person may be liable to the Partnership and/or any of the Partners pursuant to this Agreement shall, to the extent not prohibited by law, never exceed the amount of management and incentive fees received by such Covered Person from the Partnership under this Agreement prior to the date that the acts or omissions giving rise to a claim for indemnification or liability shall have occurred. In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits. No Covered Person shall incur any liability for interest on any monies at any time received by such Covered Person or any investment loss or other charge resulting therefrom with respect to amounts invested hereunder.**

(i)     <u>**WAIVER OF CONSUMER RIGHTS:**</u>  **The Partnership and each of the Limited Partners waive all of their respective rights, if any, under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Texas Business & Commerce Code ("DTPA"), a law that gives consumers special rights and protections. After consultation with an attorney of Partnership's own selection, Partnership voluntarily consents to this waiver. This waiver includes any right to recover attorneys' fees under the DTPA Further, Partnership waives all of its rights to any and all protections afforded by any other state or federal Consumer Protection Acts, including the recovery of attorneys' fees.**

(j)     No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Covered Person, the Partnership (and not the applicable Covered Person) shall be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence or reckless or intentional misconduct of any Covered Person.  Given the volume of transactions executed on behalf of the Partnership, Limited Partners acknowledge that trading errors (and similar errors) will occur and that the Partnership shall be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Covered Person.

(k)     This Section 2.2 shall survive a Limited Partner's withdrawal as a limited partner of the Partnership and any termination of this Agreement.

**ARTICLE III**

**CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES**

3.1     Capital Contributions.

(a)     Each Partner has made the capital contributions to the Partnership in the amount set forth in the records of the Partnership.  The Limited Partner has contributed to the Partnership all of the outstanding equity interests of CLO HoldCo.

3.2     Capital Account; Allocation of Profits and Losses.

(b)     There shall be established for each Partner on the books of the Partnership as of the first day of the fiscal period during which such Partner was admitted to the Partnership a capital account for such Partner in an amount equal to his capital contribution to the Partnership.

(c)     Since the General Partner's capital account and contributions shall be the minimum required by Act, all income, deductions, gains, losses and credits of the Partnership shall be allocated shall be for the benefit of the Limited Partner, except as may otherwise be required by law.  In the event any valuation of assets is necessary or appropriate, the General Partner shall determine such value in any reasonable manner determined by the General Partner in its sole discretion consistent with relevant accounting principles and applicable law.

(d)     For purposes of determining the share of any items allocated to any period during the relevant Taxable Year of the Partnership, such shares shall be determined by the General Partner using any method permitted by the Code and the regulations thereunder.  All allocations to be made by the General Partner may be overridden if necessary to comply with the Code, the regulations thereunder or other applicable law.

(e)     To the extent that the Partnership pays withholding taxes as to a Partner, such amounts shall be charged to the applicable Partner's capital account; provided, however, that any such amounts may be treated as an advance to the Partner with interest to be charged to that Partner's capital account at a rate determined by the General Partner.

(f)     Each Partner agrees not to treat, on any tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with treatment of such item by the Partnership.

7

## ARTICLE IV

## LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWLS FROM CAPITAL ACCOUNT

4.1     <u>Legal Interest.</u> Each Partner shall have and own during any Taxable Year an undivided interest in the Partnership equal to his opening capital account for such period.

4.2     <u>Distributions.</u>

    (a)     Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses.  In determining the amount of cash or securities available for distribution, the General Partner may retain reasonable reserves in such amounts as it determines may be necessary to cover expenses, contingencies and losses. Notwithstanding the foregoing, distributions made in connection with a sale of all or substantially all of the Partnership's assets or a liquidation of the Partnership shall be made in accordance with the capital account balances of the Partners within the time period set forth in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(3).

    (b)     The General Partner may withhold and pay over to the U.S. Internal Revenue Service (or any other relevant taxing authority) such amounts as the Partnership is required to withhold or pay over, pursuant to the Code or any other applicable law, on account of a Partner's distributive share of the Partnership's items of gross income, income or gain.

    (c)     For purposes of this Agreement, any taxes so withheld or paid over by the Partnership with respect to a Partner's distributive share of the Partnership's gross income, income or gain shall be deemed to be a distribution or payment to such Partner, reducing the amount otherwise distributable to such Partner pursuant to this Agreement and reducing the capital account of such Partner.  If the amount of such taxes is greater than any such distributable amounts, then such Partner and any successor to such Partner's interest shall pay the amount of such excess to the Partnership, as a contribution to the capital of the Partnership. Notwithstanding anything to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, will not be required to make a distribution to any Partner on account of its interest in the Partnership if such distribution would violate any provision of the Act or any other applicable law.

4.3     <u>Withdrawal.</u> Without the consent of the General Partner, no Partner may withdraw as a Partner or  make withdrawals from such Partner's capital account.  In the event the General Partner permits any such withdrawal, the withdrawal shall be on such terms and conditions as the General Partner shall determine in its sole discretion.  The General Partner may require the withdrawal of all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall  be directly or  indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.

## ARTICLE V

**DURATION OF PARTNERSHIP**

5.1 <u>Commencement of Winding Up.</u> The Partnership shall be required to be wound up and subsequently dissolved pursuant to the provisions of Section 36(1)(a) of the Act after the earliest of:

    (a)    the service of a notice by the General Partner on the other Partners requiring that the Partnership be wound up and dissolved; or

    (b)    the withdrawal by or resignation of the General Partner as general partner of the Partnership; or

    (c)    the withdrawal of all Limited Partners.

    Upon the occurrence of any such event, the Partnership's affairs shall be wound up by the General Partner or such other Person as the General Partner shall appoint to act as liquidator of the Partnership.

5.2 <u>Winding Up.</u> Upon the commencement of the winding up of the Partnership, the General Partner (or a duly appointed liquidator, as applicable) shall proceed with the liquidation and distribution of the assets of the Partnership in an orderly manner in accordance with this Agreement and the Act.

5.3 <u>Termination.</u> Upon completion of the winding up of affairs of the Partnership in accordance with the Act and this Agreement, the General Partner (or liquidator, as applicable) shall execute a notice of dissolution ("**Notice of Dissolution**") in respect of the Partnership and cause such Notice of Dissolution to be filed with the Registrar of Exempted Limited Partnerships of the Cayman Islands, and this Agreement shall terminate.

**ARTICLE VI**

**MISCELLANEOUS**

6.1 <u>Tax Matters Partner.</u> The General Partner shall at all times constitute, and have full powers and responsibilities, as the Tax Matters Partner of the Partnership. In the event the Partnership shall be the subject of an income tax audit by any Federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof, and the Tax Matters Partner shall be indemnified and held harmless by the Partnership and each Partner for any action so taken by him in good faith. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership to the extent of available Partnership funds, and any excess shall be paid by the Partners individually in proportion to their percentage interests in the Partnership.

6.2 <u>Right to Hire.</u>

    (a) Nothing herein shall preclude the General Partner from engaging on behalf of the Partnership the services of any person or firm, whether or not affiliated with the General Partner, including the General Partner, to render for compensation such services to the Partnership as may be necessary to implement the business purposes of the Partnership. For the avoidance of doubt, the General Partner and the Limited Partners confirm that any such compensation is received by the General Partner in its capacity as general partner of the Partnership and in

furtherance of the General Partner's authority to conduct the Partnership's business and affairs on behalf of the Partnership.

(b) Each of the Partners consents that the General Partner or any Limited Partner or any affiliate (as defined in the Securities Act of 1933, as amended, and the regulations thereunder) of any of them, including without limitation the investment manager of the CLO HoldCo, may engage in or possess an interest in directly or indirectly, any other present or future business venture of any nature or description for his own account, independently or with others, including but not limited to, any aspect of the securities business or any other business engaged in by the Partnership, and may become the general partner in other partnerships; and neither the Partnership nor any Partner shall have any rights in or to such independent venture or the income or profits derived therefrom.

(c) The General Partner and any affiliate or employee of such General Partner, may hereafter render investment advisory services to other investors with respect to, and/or may own, purchase or sell, securities or other interests in property the same as or similar to those which the General Partner may purchase, hold or sell on behalf of the Partnership.

6.3    Applicable Law, etc. This Agreement: (i) shall be binding on the executors, administrators, estates, heirs and legal successors of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the Cayman Islands; and iii) may be executed in more than one counterpart, all of which taken together shall constitute one and the same instrument.

6.4    Power of Attorney. Each of the undersigned does hereby constitute and appoint the General Partner, with full power of substitution, his true and lawful representative and attorney in-fact, in his name, place and stead to make, execute, sign and file this Agreement and any amendment to this Agreement authorized by the terms of this Agreement, and all such other instruments, documents and certificates (and any amendments thereto) which may from time to time be required by the laws of the Cayman Islands, the United States of America, or any state in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Partnership and to take any further action that the General Partner considers advisable in its sole discretion in connection with the exercise of its authority pursuant to this Agreement.

This power of attorney is intended to secure a proprietary interest of the General Partner and, in addition, the obligations of each relevant Limited Partner under this Agreement and shall be irrevocable.

6.5    Tax Elections Under the Internal Revenue Code. The General Partner shall have the authority to make all tax elections and determinations on behalf of the Partnership under the Internal Revenue Code, the regulations promulgated thereunder or other applicable law to effect any elections, determinations or capital allocations.

6.6    Amendments to Partnership Agreement. The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the consent of the General Partner together with the consent of a majority in interest of the Limited Partners, insofar as is consistent with the laws governing this Agreement. Notwithstanding the foregoing, the General Partner shall have the right to effect amendments to this Agreement without the consent of any Limited Partner, including without limitation, to reflect: a change in the location of the Partnership's principal place of business; a change in the registered office or registered agent; a change in the name of the Partnership; admission of Partners in accordance with this Agreement; a change that is necessary to qualify the Partnership as a limited partnership under the laws of any state or that is necessary or advisable in the opinion of the Tax Matters Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for Federal income tax purposes; a change of the provisions relating to the management fee or other compensation to the General Partner so that such provisions conform to any applicable requirements of the U.S. Securities and Exchange

10

Commission and other regulatory authorities; a change (i) that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state agency or contained in any Federal or state statute, compliance with any of which the General Partner deems to be in the best interests of the Partnership and the Limited Partners, (ii) that is required or contemplated by this Agreement, or (iii) that is necessary or desirable to implement new regulations published by the Internal Revenue Service with respect to partnership allocations of income, gain, loss, deduction and credit; a change to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provision with respect to the matters or questions arising under this Agreement which will not be inconsistent with the provisions hereof; or a change that does not adversely affect the Limited Partners in any material respect; provided, that in no event shall the General Partner effect any amendment to this Agreement that has the effect of giving the General Partner any economic benefits in the assets of the Partnership; provided further, that the General Partner shall give notice to the Limited Partners of any such amendment.

6.7     <u>Investment Representation.</u> Each Partner hereby acknowledges and represents that it acquired its interest in the Partnership for investment purposes only and not with a view to its resale or distribution.

6.8     <u>Notices.</u> All notices, requests or approvals that any party hereto is required or desires to give to any Partner or to the Partnership shall be in writing signed by or on behalf of the party giving the same and delivered personally or sent overnight express mail by a reputable private carrier or by prepaid registered or certified mail, return receipt requested, addressed (i) to the Limited Partner at the address set forth in this Agreement; (ii) to the Partnership at the principal place of business of the Partnership with a copy of such notice sent simultaneously to the General Partner at 6716 Glenhurst Dr., Dallas, TX 75254; or (iii) to the respective party at such other address or addresses as the party may specify from time to time in a writing given to the Partnership in the manner provided in this Section 6.8 of ARTICLE VI. Notice shall be deemed to have been duly given and received (i) on the date of delivery, if personally delivered, (ii) on the next business day subsequent to sending by overnight express mail as aforesaid, or iii) on the third day subsequent to mailing if mailed as aforesaid; provided that any withdrawal notices shall not be deemed to have been given until actually received by the Partnership.

6.9     <u>General Partner Determinations.</u> Any determinations or calculations made by the General Partner shall, if made in good faith and in the absence of manifest error, be binding upon the Partnership and its Limited Partners.

6.10    <u>Dispute Resolution.</u> The following procedures shall be used to resolve any controversy or claim **("Dispute")** arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a)     <u>Mediation.</u>

(1)     Any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

11

(2)    The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(3)    The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

(4)    Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

(b)    <u>Arbitration.</u> If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect **("Arbitration Rules").** In the event of a conflict, the provisions of this document will control.

(1)    The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act ("FAA"), and resolved by the arbitrators, provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(2)    The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

12

(3)    The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code§ 38.001(8), which rights the parties expressly waive.

(4)    No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty- five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(5)    All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(6)    The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

6.11    <u>Successors and Assigns.</u> Subject to the limitations set forth in <u>Section 1.11</u>, this Agreement shall inure to the benefit of and be binding upon the parties and to their respective heirs, executors, administrators, successors and permitted assigns. For the avoidance of doubt, any Limited Partner who becomes a former Limited Partner shall remain bound to all terms and conditions of this Agreement.

6.12    <u>Severability.</u> Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

6.13    <u>No Third Party Rights.</u> Any Covered Person not being a party to this Agreement, may enforce any rights granted to it pursuant to this Agreement in its own right as if it were a party to this Agreement. Except as expressly provided in the foregoing sentence, a person who is not a party to this Agreement shall not have any rights under the Contracts (Rights of Third Parties) Act (as amended)

13

of the Cayman Islands to enforce any term of this Agreement.  Notwithstanding any term of this Agreement, the consent of or notice to any person who is not a party to this Agreement shall not be required for any termination, rescission or agreement to any variation, waiver, assignment, novation, release or settlement under this Agreement at any time."

6.14   <u>No Right to Partition.</u> Each of the Partners, on behalf of themselves and their shareholders, partners, principals, members, successors and assigns, if any and as permitted hereunder, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.

**[Signature Page follows.]**

29858621.5.C8689.187150

IN WITNESS WHEREOF, the undersigned have executed and delivered this Amended and Restated Exempted Limited Partnership Agreement as a Deed on the day and year first above written.

EXECUTED AS A DEED by Charitable DAF Holdco, )
Ltd, as Limited Partner: )
  )
  )
  )

Duly Authorised Signatory

Name: Mark Patrick

Title: Director

in the presence of:

Signature of Witness

Name: Kasey J. Rose

Address: 16400 Dallas Pkwy, Ste 300
Dallas, TX 75248

EXECUTED AS A DEED by CDH GP, Ltd. as )
General Partner: )
  )
  )
  )

Duly Authorised Signatory

Name: Mark Patrick

Title: Director

in the presence of:

Signature of Witness

Name: Kasey J. Rose

Address: 16400 Dallas Pkwy, Ste 300
Dallas, TX 75248

15

# EXHIBIT 37

**WRITTEN CONSENT**
**OF THE MANAGING MEMBER**
**OF**
**CHARITABLE DAF GP, LLC**

**March 7, 2024**

The undersigned, being the managing member (the "Managing Member") of Charitable DAF GP, LLC, a Delaware limited liability company (the "Company"), does hereby consent to, adopt and approve, ratify and confirm by written consent the following resolutions and directs that this written consent be filed with the minutes of the proceedings of the Company:

**WHEREAS**, the Company is the sole general partner of Charitable DAF Fund, LP, an exempted Cayman Islands limited partnership (the "Partnership");

**WHEREAS**, the Managing Member has determined it to be in the best interests of the Company and its member for the Company to transfer its entire general partnership interest in the Partnership to CDH GP, Ltd. (the "Transfer"), pursuant to the terms of that certain Deed of Assignment and Assumption of General Partner Interest, among the Company, CDH GP, Ltd. and Charitable DAF Holdco, Ltd. (the "Deed").

**WHEREAS**, a section 10 statement relating to the replacement of the general partner of the Partnership from the Company to CDH GP, Ltd., shall be filed with the Registrar of Exempted Limited Partnerships in the Cayman Islands as required under the Exempted Limited Partnership Law (as amended) (the "Section 10 Statements");

**NOW, THEREFORE, BE IT RESOLVED**, that the Transfer is hereby approved in all respects in accordance with the terms set forth in the Deed; and be it

**RESOLVED FURTHER**, that the terms, conditions and provisions of the Deed are hereby approved in all respects and the Company is hereby authorized to execute, deliver and perform its obligations under the Deed; and be it

**RESOLVED FURTHER**, that the Managing Member, acting alone, is hereby authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver and to cause the Company to perform its obligations under the Deed, with such changes therein and additions thereto as the Managing Member may deem necessary, appropriate, advisable or desirable, and the execution and delivery of the Deed by the Managing Member with any changes thereto shall be conclusive evidence that the Managing Member deemed such changes to meet such standard; and be it

**RESOLVED FURTHER**, that the Managing Member, acting alone, is hereby authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver the Section 10 Statements and that the filing of the Section 10 Statements be approved by the Company; and be it

**RESOLVED FURTHER**, that the Managing Member, acting alone, be, and hereby is, authorized and empowered to execute and deliver in the name and on behalf of the Company and to cause the Company to perform its obligations under, such other and further agreements, instruments or documents (with such changes as the Managing Member deems necessary or advisable, such determination to be conclusively evidenced by the Managing Member's execution thereof) and to take all other actions that the Managing Member deems necessary or advisable to evidence and finalize the Transfer and to carry out the intent and accomplish the purposes of these resolutions; and be it

**RESOLVED FURTHER**, that all acts of the Managing Member taken prior to the adoption of the foregoing resolutions, which acts are consistent with the purposes of the foregoing resolutions are hereby severally ratified, confirmed, approved and adopted as acts of the Company.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

29924046.2.C8689.187150

      IN WITNESS WHEREOF, the undersigned has executed this written consent as of the date first set forth above.

**MANAGING MEMBER**:

_____
Name: Mark E. Patrick

# EXHIBIT 38

**STATEMENT IN TERMS OF SECTION 10**
**OF THE EXEMPTED LIMITED PARTNERSHIP ACT (AS AMENDED)**

**CHARITABLE DAF FUND, LP**
**(THE "PARTNERSHIP")**

Whereas the general partner of the Partnership was changed on _____7 March 2024_____, the following revisions to the details previously filed in the Section 9 Statement for the Partnership are made and filed:

1.    General Partner:    CDH GP, Ltd., a Cayman Islands exempted company at Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

For and on behalf of Charitable DAF GP, LLC
(General Partner of the Partnership)
BY: Mark E. Patrick, Managing Member

Dated:    3/7/2024

# EXHIBIT 39

Date of Incorporation: 27 February 2024

REGISTER OF MEMBERS
FOR:
**CDH GP, LTD.**

Share Class: Ordinary
Voting: Yes
Conditional: No
Nominal Value:

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| WNL Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands | 27 February 2024 | Allotment | 1.00 | 27 February 2024: Subscriber's share issued by operation of law on registration | No Cert | 100 | 1.00 | |
| | | Transfer | (1.00) | 27 February 2024: Transfer of 1.00 Ordinary share from WNL Limited to Mark Patrick pursuant to resolution dated 27 February 2024 | | | (1.00)<br><br>Nil | 27 February 2024 |
| Mark Patrick, 6716 Glenhurst Dr., Dallas, Texas, 75254, United States of America | 27 February 2024 | Transfer | 1.00 | 27 February 2024: Transfer of 1.0 Ordinary share from WNL Limited to Mark Patrick pursuant to resolution dated 27 February 2024 | No Cert | 100 | 1.00 | |

Notes:

29753843.2.C8689.187150

Date of Incorporation: 27 February 2024

REGISTER OF DIRECTORS
FOR:
**CDH GP, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| WNL Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands | Director | 27 February 2024 | 27 February 2024 |
| Mark Patrick<br>6716 Glenhurst Dr. Dallas, Texas, 75254, United States of America | Director | 27 February 2024 | |
| | | | |

29753843.2.C8689.187150

Date of Incorporation: 27 February 2024

REGISTER OF OFFICERS
FOR:
**CDH GP, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

29753843.2.C8689.187150

Date of Incorporation: 27 February 2024

REGISTER OF MORTGAGES AND CHARGES
FOR:
**CDH GP, LTD.**

| Entry No. | Date of Charge | Charge Instrument | Description of Property Charged | Amount of Charge Created | Names of Mortgagees or Person entitled to Charge | Date of Discharge |
|-----------|----------------|-------------------|--------------------------------|--------------------------|--------------------------------------------------|-------------------|
|           |                |                   |                                |                          |                                                  |                   |
|           |                |                   |                                |                          |                                                  |                   |
|           |                |                   |                                |                          |                                                  |                   |

Notes:

# EXHIBIT 40

**EXHIBIT 4**



Registration No.: 249232

Date of Incorporation: 13 December 2010

Client No.: KY057017

REGISTER OF MEMBERS
FOR:
CLO HOLDCO, LTD.

| | |
|---|---|
| Share Class: | Ordinary |
| Nominal Value: | USD 1.00 |
| Voting Rights: | Yes |
| Conditional: | No |

| Member<br>Name & Address | Date Entered<br>as a Member | Transaction<br>Type | Number of<br>Shares | Notes | Cert # | %<br>Paid | Total Share<br>Holding | Date Ceased<br>to be a<br>Member |
|---|---|---|---|---|---|---|---|---|
| WNL Limited<br>Walkers Corporate Services<br>Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005<br>Cayman Islands | 13 Dec 2010 | Allotment | 1.00 | 13 Dec 2010 : Subscriber's share issued by operation of law on registration | No<br>Cert | | | |
| | | Transfer | (1.00) | 17 Dec 2010 : Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 17 Dec 2010 | | | | |
| | | | | | | Nil | Nil | 17 Dec 2010 |
| Highland Capital<br>Management Partners,<br>Charitable Trust #2<br>13455 Noel Road<br>Suite 800<br>Dallas TX 75240<br>USA | 17 Dec 2010 | Transfer | 1.00 | 17 Dec 2010 : Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 17 Dec 2010 | No<br>Cert | | | |
| | | Transfer | (1.00) | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CHARITABLE DAF HOLDCO, LTD | | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 3]

PATRICK_000022



**EXHIBIT 4**

Registration No.: 249232

Date of Incorporation: 13 December 2010

Client No.: KY057017

REGISTER OF MEMBERS
FOR:
CLO HOLDCO, LTD.

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| | | | | pursuant to Contribution and Tranfser Agreement dated 7 Nov 2011 | | | | |
| | | | | | | Nil | Nil | 7 Nov 2011 |
| CHARITABLE DAF FUND, LP Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 7 Nov 2011 | Transfer | 1.00 | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from CHARITABLE DAF HOLDCO, LTD to CHARITABLE DAF FUND, LP pursuant to Contribution and Transfer Agreement dated 7 Nov 2011 | No Cert | | | |
| | | | | | | 100 | 1.00 | |
| CHARITABLE DAF HOLDCO, LTD Walkers Corporate Services Limited Walker House 87 Mary Street George Town Grand Cayman KY1-9005 Cayman Islands | 7 Nov 2011 | Transfer | 1.00 | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CHARITABLE DAF HOLDCO, LTD pursuant to Contribution and Tranfser Agreement dated 7 Nov 2011 | No Cert | | | |
| | | Transfer | (1.00) | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from CHARITABLE DAF HOLDCO, LTD to CHARITABLE DAF FUND, LP pursuant to Contribution and Transfer Agreement dated 7 Nov 2011 | | | | |
| | | | | | | Nil | Nil | 7 Nov 2011 |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[2 / 3]

PATRICK_000023



**EXHIBIT 4**

Registration No.: 249232

Date of Incorporation: 13 December 2010

Client No.: KY057017

REGISTER OF MEMBERS
FOR:
CLO HOLDCO, LTD.

Notes:

# EXHIBIT 41



# Search Report

| | |
|---|---|
| **Entity Name :** | CLO HoldCo, Ltd. |
| **Jurisdiction :** | Cayman Islands |
| **Registration Number :** | 249232 |
| **Registration Date :** | 13th December 2010 |
| **Entity Type :** | EXEMPT |
| **Registered Office :** | CAMPBELLS CORPORATE SERVICES LIMITED |
| | Floor 4 |
| | Willow House, Cricket Square |
| | Grand Cayman  KY1-9010 |
| | Cayman Islands |

| | |
|---|---|
| **Status :** | ACTIVE |
| **Status Date :** | 13th December 2010 |

- INFORMATION REGARDING THE CORPORATE RECORDS AND REGISTERS ARE NOT AVAILABLE FOR PUBLIC INSPECTION

- THIS REPORT DOES NOT CONFIRM THE ENTITY IS IN GOOD STANDING

Authorisation Code : 877697100783
www.verify.gov.ky
23 April 2025

# EXHIBIT 42

**THE COMPANIES LAW (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**

**OF**

# CLO HOLDCO, LTD.



Walker House, 87 Mary Street, George Town
Grand Cayman KY1-9001, Cayman Islands
T 345 949 0100  F 345 949 7886  www.walkersglobal.com
**REF: VC/CM/99957**



REGISTERED AND FILED
AS NO. 207252 THIS 13ᵗʰ DAY
OF December, 2010

Asst. Registrar of Companies
Cayman Islands

**THE COMPANIES LAW (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**MEMORANDUM OF ASSOCIATION**

OF

# CLO HOLDCO, LTD.

1. The name of the company is CLO HoldCo, Ltd. (the "**Company**").

2. The registered office of the Company will be situated at the offices of **Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands** or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is **US$50,000.00** divided into **50,000** shares of a nominal or par value of **US$1.00 each** provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.

1

The undersigned, whose name, address and description are set out below, wishes the Company to be incorporated as a company in the Cayman Islands in accordance with this Memorandum of Association, and agrees to take the number of shares in the capital of the Company as set out opposite the undersigned's name.

| NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER | NUMBER OF SHARES TAKEN BY SUBSCRIBER |
|---|---|

Walkers Nominees Limited, 87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

ONE SHARE

(Sgd) Virginia Czarnocki

Virginia Czarnocki
as Authorised Signatory of Walkers Nominees Limited

Dated:    13 December 2010

(Sgd) Carol MacDonald
Signature of Witness

Name:    Carol MacDonald

Address:    87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

Occupation:    Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG.

V. Daphene Whitelocke
Assistant Registrar

Date. 13ᵗʰ December, 2010



2

3760538_1

## TABLE OF CONTENTS

**CLAUSE**                                                                 **PAGE**

TABLE A ..................................................................................................... 1

INTERPRETATION ..................................................................................... 1

PRELIMINARY ........................................................................................... 3

SHARES .................................................................................................... 3

MODIFICATION OF RIGHTS ....................................................................... 4

CERTIFICATES .......................................................................................... 4

FRACTIONAL SHARES ............................................................................... 4

LIEN ......................................................................................................... 5

CALLS ON SHARES ................................................................................... 5

FORFEITURE OF SHARES ......................................................................... 6

TRANSFER OF SHARES ............................................................................. 7

TRANSMISSION OF SHARES ...................................................................... 7

ALTERATION OF SHARE CAPITAL .............................................................. 7

REDEMPTION AND PURCHASE OF SHARES ............................................... 8

GENERAL MEETINGS ................................................................................ 8

NOTICE OF GENERAL MEETINGS .............................................................. 9

PROCEEDINGS AT GENERAL MEETINGS .................................................... 9

VOTES OF SHAREHOLDERS ...................................................................... 10

CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS ................. 11

DIRECTORS .............................................................................................. 11

ALTERNATE DIRECTOR OR PROXY ........................................................... 12

POWERS AND DUTIES OF DIRECTORS ...................................................... 12

BORROWING POWERS OF DIRECTORS ..................................................... 13

THE SEAL ................................................................................................. 14

DISQUALIFICATION OF DIRECTORS .......................................................... 14

PROCEEDINGS OF DIRECTORS ................................................................................................ 14

DIVIDENDS ................................................................................................................................ 16

ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ......................................... 17

CAPITALISATION OF RESERVES ............................................................................................. 17

SHARE PREMIUM ACCOUNT ................................................................................................... 18

NOTICES .................................................................................................................................... 18

INDEMNITY ................................................................................................................................ 19

NON-RECOGNITION OF TRUSTS ............................................................................................ 20

WINDING UP .............................................................................................................................. 20

AMENDMENT OF ARTICLES OF ASSOCIATION ..................................................................... 21

CLOSING OF REGISTER OR FIXING RECORD DATE .............................................................. 21

REGISTRATION BY WAY OF CONTINUATION ......................................................................... 21

DISCLOSURE ............................................................................................................................. 21



COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

OF

# CLO HOLDCO, LTD.

## TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to CLO HoldCo, Ltd. (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

## INTERPRETATION

1.    In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time;

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company;

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof;

"**Law**" means the Companies Law (as amended) of the Cayman Islands;

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time;

"**Office**" means the registered office of the Company as required by the Law;

"**Ordinary Resolution**" means a resolution:

(a)    passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and

1

where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)  approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed;

**"paid up"** means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up;

**"Person"** means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires;

**"Register"** means the register of Members of the Company required to be kept pursuant to the Law;

**"Seal"** means the common seal of the Company (if adopted) including any facsimile thereof;

**"Secretary"** means any Person appointed by the Directors to perform any of the duties of the secretary of the Company;

**"Share"** means a share in the capital of the Company. All references to "Shares" herein shall be deemed to be Shares of any or all Classes as the context may require. For the avoidance of doubt in these Articles the expression "Share" shall include a fraction of a Share;

**"Shareholder"** or **"Member"** means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber;

**"Share Premium Account"** means the share premium account established in accordance with these Articles and the Law;

**"signed"** means bearing a signature or representation of a signature affixed by mechanical means; and

**"Special Resolution"** means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a)  passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)  approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

2.    In these Articles, save where the context requires otherwise:

(a)  words importing the singular number shall include the plural number and vice versa;

(b)     words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c)     the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)     reference to a dollar or dollars (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)     reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;

(f)     reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

(g)     reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

3.     Subject to the last two preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## PRELIMINARY

4.     The business of the Company may be commenced at any time after incorporation.

5.     The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

6.     The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

7.     The Directors shall keep, or cause to be kept, the Register at such place as the Directors may from time to time determine and, in the absence of any such determination, the Register shall be kept at the Office.

## SHARES

8.     Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a)     issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

(b)     grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

9.    The Directors may authorise the division of Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors.

10.   The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

11.   The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MODIFICATION OF RIGHTS

12.   Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Shares of the relevant Class, or with the sanction of a resolution passed at a separate meeting of the holders of the Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that all such Classes would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes.

13.   The rights conferred upon the holders of the Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Shares of any Class by the Company.

## CERTIFICATES

14.   No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

15.   The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or

4

par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

## LIEN

16.  The Company has a first and paramount lien on every Share (whether or not fully paid) for all amounts (whether presently payable or not) payable at a fixed time or called in respect of that Share. The Company also has a first and paramount lien on every Share registered in the name of a Person indebted or under liability to the Company (whether he is the sole registered holder of a Share or one of two or more joint holders) for all amounts owing by him or his estate to the Company (whether or not presently payable). The Directors may at any time declare a Share to be wholly or in part exempt from the provisions of this Article. The Company's lien on a Share extends to any amount payable in respect of it.

17.  The Company may sell, in such manner as the Directors in their absolute discretion think fit, any Share on which the Company has a lien, but no sale shall be made unless an amount in respect of which the lien exists is presently payable nor until the expiration of fourteen days after a notice in writing, demanding payment of such part of the amount in respect of which the lien exists as is presently payable, has been given to the registered holder for the time being of the Share, or the Persons entitled thereto by reason of his death or bankruptcy.

18.  For giving effect to any such sale the Directors may authorise some Person to transfer the Shares sold to the purchaser thereof. The purchaser shall be registered as the holder of the Shares comprised in any such transfer and he shall not be bound to see to the application of the purchase money, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the sale.

19.  The proceeds of the sale after deduction of expenses, fees and commission incurred by the Company shall be received by the Company and applied in payment of such part of the amount in respect of which the lien exists as is presently payable, and the residue shall (subject to a like lien for sums not presently payable as existed upon the Shares prior to the sale) be paid to the Person entitled to the Shares immediately prior to the sale.

## CALLS ON SHARES

20.  The Directors may from time to time make calls upon the Shareholders in respect of any moneys unpaid on their Shares, and each Shareholder shall (subject to receiving at least fourteen days' notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on such Shares.

21.  The joint holders of a Share shall be jointly and severally liable to pay calls in respect thereof.

22.  If a sum called in respect of a Share is not paid before or on the day appointed for payment thereof, the Person from whom the sum is due shall pay interest upon the sum at the rate of eight percent per annum from the day appointed for the payment thereof to the time of the actual payment, but the Directors shall be at liberty to waive payment of that interest wholly or in part.

23.  The provisions of these Articles as to the liability of joint holders and as to payment of interest shall apply in the case of non-payment of any sum which, by the terms of issue of a Share,

5

becomes payable at a fixed time, whether on account of the amount of the Share, or by way of premium, as if the same had become payable by virtue of a call duly made and notified.

24. The Directors may make arrangements on the issue of partly paid Shares for a difference between the Shareholders, or the particular Shares, in the amount of calls to be paid and in the times of payment.

25. The Directors may, if they think fit, receive from any Shareholder willing to advance the same all or any part of the moneys uncalled and unpaid upon any partly paid Shares held by him, and upon all or any of the moneys so advanced may (until the same would, but for such advance, become presently payable) pay interest at such rate (not exceeding without the sanction of an Ordinary Resolution, eight percent per annum) as may be agreed upon between the Shareholder paying the sum in advance and the Directors.

## FORFEITURE OF SHARES

26. If a Shareholder fails to pay any call or instalment of a call in respect of partly paid Shares on the day appointed for payment, the Directors may, at any time thereafter during such time as any part of such call or instalment remains unpaid, serve a notice on him requiring payment of so much of the call or instalment as is unpaid, together with any interest which may have accrued.

27. The notice shall name a further day (not earlier than the expiration of fourteen days from the date of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed the Shares in respect of which the call was made will be liable to be forfeited.

28. If the requirements of any such notice as aforesaid are not complied with, any Share in respect of which the notice has been given may at any time thereafter, before the payment required by notice has been made, be forfeited by a resolution of the Directors to that effect.

29. A forfeited Share may be sold or otherwise disposed of on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

30. A Person whose Shares have been forfeited shall cease to be a Shareholder in respect of the forfeited Shares, but shall, notwithstanding, remain liable to pay to the Company all moneys which at the date of forfeiture were payable by him to the Company in respect of the Shares forfeited, but his liability shall cease if and when the Company receives payment in full of the amount unpaid on the Shares forfeited.

31. A statutory declaration in writing that the declarant is a Director, and that a Share has been duly forfeited on a date stated in the declaration, shall be conclusive evidence of the facts in the declaration as against all Persons claiming to be entitled to the Share.

32. The Company may receive the consideration, if any, given for a Share on any sale or disposition thereof pursuant to the provisions of these Articles as to forfeiture and may execute a transfer of the Share in favour of the Person to whom the Share is sold or disposed of and that Person shall be registered as the holder of the Share, and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the disposition or sale.

33. The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which by the terms of issue of a Share becomes due and payable, whether on account of the

amount of the Share, or by way of premium, as if the same had been payable by virtue of a call duly made and notified.

## TRANSFER OF SHARES

34. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

35. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor.

36. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

37. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

## TRANSMISSION OF SHARES

38. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased survivor, shall be the only Person recognised by the Company as having any title to the Share.

39. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

40. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

41. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

42. The Company may by Ordinary Resolution:

(a)    consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b)    convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c)    subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d)    cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

43.    The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION AND PURCHASE OF SHARES

44.    Subject to the Law, the Company may:

(a)    issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may, before the issue of such Shares, determine;

(b)    purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder; and

(c)    make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law, including out of its capital, profits or the proceeds of a fresh issue of Shares.

45.    Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

46.    The redemption or purchase of any Share shall not be deemed to give rise to the redemption or purchase of any other Share.

47.    The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

## GENERAL MEETINGS

48.    The Directors may, whenever they think fit, convene a general meeting of the Company.

49.    General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later

than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

50.   If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

51.   At least seven days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

52.   The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

53.   All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, the appointment and removal of Directors and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

54.   No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

55.   If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

56.   If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

57. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

58. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

59. The chairman may with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting) adjourn a meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given as in the case of an original meeting. Save as aforesaid it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

60. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason, upon notice in writing to Shareholders. A postponement may be for a stated period of any length or indefinitely as the Directors may determine.

61. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

62. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

63. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

64. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

## VOTES OF SHAREHOLDERS

65. Subject to any rights and restrictions for the time being attached to any Share, on a show of hands every Shareholder present in person and every Person representing a Shareholder by proxy shall, at a general meeting of the Company, each have one vote and on a poll every Shareholder and every Person representing a Shareholder by proxy shall have one vote for each Share of which he or the Person represented by proxy is the holder.

66. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

67. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

68. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

69. On a poll votes may be given either personally or by proxy.

70. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised.  A proxy need not be a Shareholder.

71. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

72. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

73. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

74. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

75. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

## DIRECTORS

76. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

77. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

78. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

79.   The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

80.   The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

81.   There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

82.   The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

## ALTERNATE DIRECTOR OR PROXY

83.   Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be an officer of the Company. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

84.   Any Director may appoint any Person , whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

## POWERS AND DUTIES OF DIRECTORS

85.   Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

86.   The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their

number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

87. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

88. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

89. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

90. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article .

91. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

92. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

93. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

## BORROWING POWERS OF DIRECTORS

94. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

## THE SEAL

95.    The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

96.    The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal.  The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

97.    Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

98.    The office of Director shall be vacated, if the Director:

(a)    becomes bankrupt or makes any arrangement or composition with his creditors;

(b)    dies or is found to be or becomes of unsound mind;

(c)    resigns his office by notice in writing to the Company;

(d)    is removed from office by Ordinary Resolution;

(e)    is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or

(f)    is removed from office pursuant to any other provision of these Articles.

## PROCEEDINGS OF DIRECTORS

99.    The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit . Questions arising at any meeting shall be decided by a majority of votes.  In case of an equality of votes the chairman shall have a second or casting vote.  A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

100.    A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication

equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

101. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one. A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

102. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

103. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

104. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

105. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

    (a)    all appointments of officers made by the Directors;

    (b)    the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

    (c)    all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

106. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

107.  A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be.  When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

108.  The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

109.  The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

110.  Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings.  If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

111.  A committee appointed by the Directors may meet and adjourn as it thinks proper.  Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

112.  All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

## DIVIDENDS

113.  Subject to any rights and restrictions for the time being attached to any Shares, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

114.  Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

115.  The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

116. Any dividend may be paid in any manner as the Directors may determine.  If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.  Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

117. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

118. Subject to any rights and restrictions for the time being attached to any Shares, all dividends shall be declared and paid according to the amounts paid up on the Shares, but if and for so long as nothing is paid up on any of the Shares dividends may be declared and paid according to the par value of the Shares.

119. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

120. No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

121. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

122. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

123. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

124. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

125. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

## CAPITALISATION OF RESERVES

126. Subject to the Law, the Directors may, with the authority of an Ordinary Resolution:

(a)   resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

17

(b)    appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i)    paying up the amounts (if any) for the time being unpaid on Shares held by them respectively, or

(ii)    paying up in full unissued Shares or debentures of a nominal amount equal to that sum,

and allot the Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Shares to be allotted to Shareholders credited as fully paid;

(c)    make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d)    authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

(i)    the allotment to the Shareholders respectively, credited as fully paid, of Shares or debentures to which they may be entitled on the capitalisation, or

(ii)    the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Shares,

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e)    generally do all acts and things required to give effect to the resolution.

## SHARE PREMIUM ACCOUNT

127.    The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share .

128.    There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

## NOTICES

129.    Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the

18

purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

130. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

131. Any notice or other document, if served by:

    (a)    post, shall be deemed to have been served five days after the time when the letter containing the same is posted;

    (b)    facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

    (c)    recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

    (d)    electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

132. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

133. Notice of every general meeting of the Company shall be given to:

    (a)    all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

    (b)    every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

## INDEMNITY

134. Every Director (including for the purposes of this Article any alternate Director appointed pursuant to the provisions of these Articles), Secretary, assistant Secretary, or other officer for the time being and from time to time of the Company (but not including the Company's auditors) and the personal representatives of the same (each an "**Indemnified Person**") shall be indemnified and

secured harmless against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such Indemnified Person, other than by reason of such Indemnified Person's own dishonesty, wilful default or fraud, in or about the conduct of the Company's business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such Indemnified Person in defending (whether successfully or otherwise) any civil proceedings concerning the Company or its affairs in any court whether in the Cayman Islands or elsewhere.

135.   No Indemnified Person shall be liable:

(a)   for the acts, receipts, neglects, defaults or omissions of any other Director or officer or agent of the Company; or

(b)   for any loss on account of defect of title to any property of the Company; or

(c)   on account of the insufficiency of any security in or upon which any money of the Company shall be invested; or

(d)   for any loss incurred through any bank, broker or other similar Person; or

(e)   for any loss occasioned by any negligence, default, breach of duty, breach of trust, error of judgement or oversight on such Indemnified Person's part; or

(f)   for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers, authorities, or discretions of such Indemnified Person's office or in relation thereto;

unless the same shall happen through such Indemnified Person's own dishonesty, wilful default or fraud.

## NON-RECOGNITION OF TRUSTS

136.   Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

## WINDING UP

137.   If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

138.   If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Shareholders or different Classes.  The liquidator may, with the like sanction, vest the whole or any part of such assets in

trustees upon such trusts for the benefit of the Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

139. Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

140. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

141. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

142. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BY WAY OF CONTINUATION

143. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## DISCLOSURE

144. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial

authority, or to any stock exchange on which the Shares may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

**NAME, ADDRESS AND DESCRIPTION
OF SUBSCRIBER**

Walkers Nominees Limited, 87 Mary
Street, George Town, Grand Cayman
KY1-9001, Cayman Islands

(Sgd) Virginia Czarnocki

Virginia Czarnocki
as Authorised Signatory for and on behalf of Walkers
Nominees Limited

Dated:    13 December 2010

(Sgd) Carol MacDonald
Signature of Witness

Name:        Carol MacDonald

Address      87 Mary Street, George
Town, Grand Cayman KY1-
9001, Cayman Islands

Occupation:   Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG.
V. Daphene Whitelocke
Assistant Registrar

Date. 13th December, 2010



23

Subject: Articles

Sender: Brandon R. Schaller

Sender Email: bschaller@shieldslegal.com

To: Philip.Aubry@walkersglobal.com, Geoffrey.Sykes@walkersglobal.com

Body: [this message is from an external sender]


_____




Brandon R. Schaller

ATTORNEY


16400 Dallas Parkway, Suite 300

Dallas, TX 75248


Phone | 469.726.3055


Email | bschaller@shieldslegal.com <mailto:bschaller@shieldslegal.com>


Bio <https://url.jer.m.mimecastprotect.com/s/BNWWCnrkQDiM5BoDc9fPTJpv23?domain=shieldslegal.
LinkedIn <https://url.jer.m.mimecastprotect.com/s/E_DACoQlREhx4WzYTzhoTpdotE?domain=linkedin
| vCard <https://url.jer.m.mimecastprotect.com/s/1qXhCpQmwGhXD68oIYiDTG_oVC?domain=shieldsl

SHIELDSLEGAL.COM
<https://url.jer.m.mimecastprotect.com/s/hJVHCrRoZKfL9JvZfjtyT4iO2f?domain=shieldslegal.com/>


This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C.
The information contained in this e-mail may be protected from disclosure by one or more privileges,
including without limitation, the attorney-client communication privilege. If you are not the

intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message.  You should not copy it or disclose its contents to any other person.  Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses.  This e-mail message does not contain or constitute legal advice and/or federal tax advice.  The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# LIBERTY CLO HOLDCO, LTD.



Walker House, 87 Mary Street, George Town
Grand Cayman KY1-9001, Cayman Islands
T 345 949 0100  F 345 949 7886  www.walkersglobal.com
**REF: SS/LS/111503**

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM OF ASSOCIATION

OF

# LIBERTY CLO HOLDCO, LTD.

1.    The name of the company is Liberty CLO Holdco, Ltd. (the "**Company**").

2.    The registered office of the Company will be situated at the offices of Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands or at such other location as the Directors may from time to time determine.

3.    The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4.    The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5.    The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6.    The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7.    The capital of the Company is **US$50,000.00** divided into **5,000,000** shares of a nominal or par value of **US$0.01** each provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8.    The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



The undersigned, whose name, address and description are set out below, wishes the Company to be incorporated as a company in the Cayman Islands in accordance with this Memorandum of Association, and agrees to take the number of shares in the capital of the Company as set out opposite the undersigned's name.

| NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER | NUMBER OF SHARES TAKEN BY SUBSCRIBER |
|---|---|

Walkers Nominees Limited, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands

ONE SHARE

(Sgd) Silva Seferian

Silva Seferian
as Authorised Signatory of Walkers Nominees Limited

Dated: 6 June 2012

(Sgd) Laura Scott

Signature of Witness

Name:        Laura Scott

Address:     87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

Occupation:  Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG.

D. EVADNE EBANKS
Assistant Registrar

Date. 6th June, 2012

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS

# TABLE OF CONTENTS

| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 3 |
| SHARES | 4 |
| MODIFICATION OF RIGHTS | 4 |
| CERTIFICATES | 5 |
| FRACTIONAL SHARES | 5 |
| LIEN | 5 |
| CALLS ON SHARES | 5 |
| FORFEITURE OF SHARES | 6 |
| TRANSFER OF SHARES | 7 |
| TRANSMISSION OF SHARES | 7 |
| ALTERATION OF SHARE CAPITAL | 8 |
| REDEMPTION, PURCHASE AND SURRENDER OF SHARES | 8 |
| TREASURY SHARES | 9 |
| GENERAL MEETINGS | 9 |
| NOTICE OF GENERAL MEETINGS | 10 |
| PROCEEDINGS AT GENERAL MEETINGS | 10 |
| VOTES OF SHAREHOLDERS | 11 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 12 |
| DIRECTORS | 12 |
| ALTERNATE DIRECTOR | 13 |
| POWERS AND DUTIES OF DIRECTORS | 13 |
| BORROWING POWERS OF DIRECTORS | 14 |
| THE SEAL | 14 |

DISQUALIFICATION OF DIRECTORS...................................................................................15

PROCEEDINGS OF DIRECTORS.......................................................................................15

DIVIDENDS.........................................................................................................................17

ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION......................................18

CAPITALISATION OF RESERVES ......................................................................................18

SHARE PREMIUM ACCOUNT.............................................................................................19

NOTICES.............................................................................................................................19

INDEMNITY..........................................................................................................................20

NON-RECOGNITION OF TRUSTS .......................................................................................21

WINDING UP........................................................................................................................21

AMENDMENT OF ARTICLES OF ASSOCIATION.................................................................21

CLOSING OF REGISTER OR FIXING RECORD DATE.........................................................21

REGISTRATION BY WAY OF CONTINUATION....................................................................22

MERGERS AND CONSOLIDATION......................................................................................22

DISCLOSURE .....................................................................................................................22

**COMPANIES LAW (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**ARTICLES OF ASSOCIATION**

**OF**

# LIBERTY CLO HOLDCO, LTD.

### TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to Liberty CLO Holdco, Ltd. (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

### INTERPRETATION

1.    In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Law**" means the Companies Law (as amended) of the Cayman Islands.

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Law.

"**Ordinary Resolution**" means a resolution:

(a)     passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)     approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Law and these Articles, means the Register maintained by the Company pursuant to the Law and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law and includes any Branch Register(s) established by the Company in accordance with the Law.

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a share in the capital of the Company. All references to "Shares" herein shall be deemed to be Shares of any or all Classes as the context may require. For the avoidance of doubt in these Articles the expression "Share" shall include a fraction of a Share.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a)     passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)     approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders

and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

**"Treasury Shares"** means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

2.      In these Articles, save where the context requires otherwise:

(a)      words importing the singular number shall include the plural number and vice versa;

(b)      words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c)      the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)      reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)      reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;

(f)      reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

(g)      reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

3.      Subject to the preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## PRELIMINARY

4.      The business of the Company may be commenced at any time after incorporation.

5.      The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

6.      The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

7.      The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Law and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Law, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Law.

## SHARES

8.    Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a)    issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

(b)    grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

9.    The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

10.    The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

11.    The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MODIFICATION OF RIGHTS

12.    Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Shares of the relevant Class, or with the sanction of a resolution passed at a separate meeting of the holders of the Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that all such Classes would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes.

13.    The rights conferred upon the holders of the Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation,

allotment or issue of further Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Shares of any Class by the Company.

## CERTIFICATES

14.  No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

15.  The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

## LIEN

16.  The Company has a first and paramount lien on every Share (whether or not fully paid) for all amounts (whether presently payable or not) payable at a fixed time or called in respect of that Share.  The Company also has a first and paramount lien on every Share (whether or not fully paid) registered in the name of a Person indebted or under liability to the Company (whether he is the sole registered holder of a Share or one of two or more joint holders) for all amounts owing by him or his estate to the Company (whether or not presently payable).  The Directors may at any time declare a Share to be wholly or in part exempt from the provisions of this Article.  The Company's lien on a Share extends to any amount payable in respect of it.

17.  The Company may sell, in such manner as the Directors in their absolute discretion think fit, any Share on which the Company has a lien, but no sale shall be made unless an amount in respect of which the lien exists is presently payable nor until the expiration of fourteen days after a notice in writing, demanding payment of such part of the amount in respect of which the lien exists as is presently payable, has been given to the registered holder for the time being of the Share, or the Persons entitled thereto by reason of his death or bankruptcy.

18.  For giving effect to any such sale the Directors may authorise some Person to transfer the Shares sold to the purchaser thereof.  The purchaser shall be registered as the holder of the Shares comprised in any such transfer and he shall not be bound to see to the application of the purchase money, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the sale.

19.  The proceeds of the sale after deduction of expenses, fees and commission incurred by the Company shall be received by the Company and applied in payment of such part of the amount in respect of which the lien exists as is presently payable, and the residue shall (subject to a like lien for sums not presently payable as existed upon the Shares prior to the sale) be paid to the Person entitled to the Shares immediately prior to the sale.

## CALLS ON SHARES

20.  The Directors may from time to time make calls upon the Shareholders in respect of any moneys unpaid on their Shares, and each Shareholder shall (subject to receiving at least fourteen days' notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on such Shares.

21.   The joint holders of a Share shall be jointly and severally liable to pay calls in respect thereof.

22.   If a sum called in respect of a Share is not paid before or on the day appointed for payment thereof, the Person from whom the sum is due shall pay interest upon the sum at the rate of eight percent per annum from the day appointed for the payment thereof to the time of the actual payment, but the Directors shall be at liberty to waive payment of that interest wholly or in part.

23.   The provisions of these Articles as to the liability of joint holders and as to payment of interest shall apply in the case of non-payment of any sum which, by the terms of issue of a Share, becomes payable at a fixed time, whether on account of the amount of the Share, or by way of premium, as if the same had become payable by virtue of a call duly made and notified.

24.   The Directors may make arrangements on the issue of partly paid Shares for a difference between the Shareholders, or the particular Shares, in the amount of calls to be paid and in the times of payment.

25.   The Directors may, if they think fit, receive from any Shareholder willing to advance the same all or any part of the moneys uncalled and unpaid upon any partly paid Shares held by him, and upon all or any of the moneys so advanced may (until the same would, but for such advance, become presently payable) pay interest at such rate (not exceeding without the sanction of an Ordinary Resolution, eight percent per annum) as may be agreed upon between the Shareholder paying the sum in advance and the Directors.

## FORFEITURE OF SHARES

26.   If a Shareholder fails to pay any call or instalment of a call in respect of any Shares on the day appointed for payment, the Directors may, at any time thereafter during such time as any part of such call or instalment remains unpaid, serve a notice on him requiring payment of so much of the call or instalment as is unpaid, together with any interest which may have accrued.

27.   The notice shall name a further day (not earlier than the expiration of fourteen days from the date of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed the Shares in respect of which the call was made will be liable to be forfeited.

28.   If the requirements of any such notice as aforesaid are not complied with, any Share in respect of which the notice has been given may at any time thereafter, before the payment required by notice has been made, be forfeited by a resolution of the Directors to that effect.

29.   A forfeited Share may be sold or otherwise disposed of on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

30.   A Person whose Shares have been forfeited shall cease to be a Shareholder in respect of the forfeited Shares, but shall, notwithstanding, remain liable to pay to the Company all moneys which at the date of forfeiture were payable by him to the Company in respect of the Shares forfeited, but his liability shall cease if and when the Company receives payment in full of the amount unpaid on the Shares forfeited.

31.   A statutory declaration in writing that the declarant is a Director, and that a Share has been duly forfeited on a date stated in the declaration, shall be conclusive evidence of the facts in the declaration as against all Persons claiming to be entitled to the Share.

32.   The Company may receive the consideration, if any, given for a Share on any sale or disposition thereof pursuant to the provisions of these Articles as to forfeiture and may execute a transfer of

the Share in favour of the Person to whom the Share is sold or disposed of and that Person shall be registered as the holder of the Share, and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the disposition or sale.

33. The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which by the terms of issue of a Share becomes due and payable, whether on account of the amount of the Share, or by way of premium, as if the same had been payable by virtue of a call duly made and notified.

## TRANSFER OF SHARES

34. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

35. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor.

36. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

37. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

## TRANSMISSION OF SHARES

38. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

39. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

40. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

41.     The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

42.     The Company may by Ordinary Resolution:

(a)     consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b)     convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c)     subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d)     cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

43.     The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION, PURCHASE AND SURRENDER OF SHARES

44.     Subject to the Law, the Company may:

(a)     issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

(b)     purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c)     make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law; and

(d)     accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

45.     Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

46.     The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

47.     The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

## TREASURY SHARES

48. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Law. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

49. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

50. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

   (a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

   (b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Law, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.

51. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

## GENERAL MEETINGS

52. The Directors may, whenever they think fit, convene a general meeting of the Company.

53. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

54. General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

55. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

56.   At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

57.   The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

58.   All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors.  No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

59.   No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business.  Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

60.   If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved.  In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

61.   If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

62.   The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

63.   If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

64.   The chairman may adjourn a meeting from time to time and from place to place either:

      (a)   with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting); or

(b)      without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

    (i)      secure the orderly conduct or proceedings of the meeting; or

    (ii)     give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.  When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting.  Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

65.     At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

66.     If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

67.     In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

68.     A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith.  A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

**VOTES OF SHAREHOLDERS**

69.     Subject to any rights and restrictions for the time being attached to any Share, on a show of hands every Shareholder present in person and every Person representing a Shareholder by proxy shall, at a general meeting of the Company, each have one vote and on a poll every Shareholder and every Person representing a Shareholder by proxy shall have one vote for each Share of which he or the Person represented by proxy is the holder.

70.     In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

71.     A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

72. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

73. On a poll votes may be given either personally or by proxy.

74. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised.   A proxy need not be a Shareholder.

75. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

76. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

77. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

78. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

79. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

## DIRECTORS

80. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

81. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

82. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

83. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

84. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

85. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

86. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

## ALTERNATE DIRECTOR

87. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be deemed to be an officer of the Company solely as a result of his appointment as an alternate. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

88. Any Director may appoint any Person, whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

## POWERS AND DUTIES OF DIRECTORS

89. Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

90. The Directors may from time to time appoint any natural person or corporation, whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

91. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

92.     The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

93.     The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

94.     The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

95.     The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

96.     The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

97.     Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

## BORROWING POWERS OF DIRECTORS

98.     The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

## THE SEAL

99.     The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

100.  The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal.  The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

101.  Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

102.  The office of Director shall be vacated, if the Director:

(a)  becomes bankrupt or makes any arrangement or composition with his creditors;

(b)  dies or is found to be or becomes of unsound mind;

(c)  resigns his office by notice in writing to the Company;

(d)  is removed from office by Ordinary Resolution;

(e)  is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or

(f)  is removed from office pursuant to any other provision of these Articles.

## PROCEEDINGS OF DIRECTORS

103.  The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit.  Questions arising at any meeting shall be decided by a majority of votes.  In case of an equality of votes the chairman shall have a second or casting vote.  A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

104.  A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

105.  The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one.  A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

106.  A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the

Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

107. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

108. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

109. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a) all appointments of officers made by the Directors;

(b) the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c) all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

110. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

111. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

112. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

113. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

114. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

115. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

116. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

**DIVIDENDS**

117. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Law and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

118. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

119. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

120. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

121. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

122. Subject to any rights and restrictions for the time being attached to any Shares, all dividends shall be declared and paid according to the amounts paid up on the Shares, but if and for so long as nothing is paid up on any of the Shares dividends may be declared and paid according to the par value of the Shares.

123.    If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

124.    No dividend shall bear interest against the Company.

### ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

125.    The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

126.    The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

127.    The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

128.    The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

129.    The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

### CAPITALISATION OF RESERVES

130.    Subject to the Law and these Articles, the Directors may:

(a)     resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b)     appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i)     paying up the amounts (if any) for the time being unpaid on Shares held by them respectively, or

(ii)    paying up in full unissued Shares or debentures of a nominal amount equal to that sum,

and allot the Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Shares to be allotted to Shareholders credited as fully paid;

(c)     make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

    (i) the allotment to the Shareholders respectively, credited as fully paid, of Shares or debentures to which they may be entitled on the capitalisation, or

    (ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Shares,

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

## SHARE PREMIUM ACCOUNT

131. The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

132. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

## NOTICES

133. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

134. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

135. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d)     electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

136.    Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

137.    Notice of every general meeting of the Company shall be given to:

(a)     all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b)     every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

**INDEMNITY**

138.    Every Director (including for the purposes of this Article any alternate Director appointed pursuant to the provisions of these Articles), Secretary, assistant Secretary, or other officer for the time being and from time to time of the Company (but not including the Company's auditors) and the personal representatives of the same (each an "**Indemnified Person**") shall be indemnified and secured harmless against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such Indemnified Person, other than by reason of such Indemnified Person's own dishonesty, wilful default or fraud, in or about the conduct of the Company's business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such Indemnified Person in defending (whether successfully or otherwise) any civil proceedings concerning the Company or its affairs in any court whether in the Cayman Islands or elsewhere.

139.    No Indemnified Person shall be liable:

(a)     for the acts, receipts, neglects, defaults or omissions of any other Director or officer or agent of the Company; or

(b)     for any loss on account of defect of title to any property of the Company; or

(c)     on account of the insufficiency of any security in or upon which any money of the Company shall be invested; or

(d)     for any loss incurred through any bank, broker or other similar Person; or

(e)    for any loss occasioned by any negligence, default, breach of duty, breach of trust, error of judgement or oversight on such Indemnified Person's part; or

(f)    for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers, authorities, or discretions of such Indemnified Person's office or in relation thereto;

unless the same shall happen through such Indemnified Person's own dishonesty, wilful default or fraud.

## NON-RECOGNITION OF TRUSTS

140.    Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

## WINDING UP

141.    If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

142.    If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

143.    Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

144.    For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

145.    In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of,

attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

146.    If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BY WAY OF CONTINUATION

147.    The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATION

148.    The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Law.

## DISCLOSURE

149.    The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

**NAME, ADDRESS AND DESCRIPTION
OF SUBSCRIBER**

Walkers Nominees Limited, 87 Mary
Street, George Town, Grand Cayman
KY1-9005, Cayman Islands

(Sgd) Silva Seferian

Silva Seferian
as Authorised Signatory for and on behalf of Walkers
Nominees Limited

Dated:   6 June 2012

(Sgd) Laura Scott

Signature of Witness

Name:         Laura Scott

Address      87 Mary Street, George
             Town, Grand Cayman
             KY1-9001, Cayman Islands

Occupation:  Secretary



CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG.

D. EVADNE EBANKS
Assistant Registrar

Date. 6th June, 2012

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS

# EXHIBIT 43

I, Shawnalee Henry, a duly admitted Notary Public
in and for the Cayman Islands, HEREBY CONFIRM
that this is a true and correct copy of the original.

*SHenry*

Shawnalee Henry
Notary Public in the Cayman Islands
Floor 4, Willow House, Cricket Square
Grand Cayman, KY1-9010, Cayman Islands
My Commission expires: 31 January, 2024
T: + 1 345 949 2648
E: SHenry@Campbellslegal.com
Date: 24 January 2024

WK–249232

# Certificate Of Incorporation

*I,* **V. DAPHENE WHITELOCKE** *Assistant Registrar of Companies of the Cayman Islands
DO HEREBY CERTIFY, pursuant to the Companies Law CAP. 22, that all requirements of the said
Law in respect of registration were complied with by*

### CLO HoldCo, Ltd.

*an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect
from the 13th day of December Two Thousand Ten*

*Given under my hand and Seal at George Town in the
Island of Grand Cayman this 13th day of December
Two Thousand Ten*



**Assistant Registrar of Companies,
Cayman Islands.**

# EXHIBIT 44

**CHARITABLE DAF HOLDCO, LTD**
the ("**Company**")

---

**Unanimous Written Resolutions of all of the Directors of the Company passed on
18 December 2024
in accordance with the Articles of Association of the Company**

---

**1    Declaration of Interests**

**IT IS NOTED THAT** the directors of the Company (each, a "**Director**" and together, the "**Directors**")
have declared their respective interests (if any) in the matters contemplated by these resolutions,
and any such interest be and is hereby noted, ratified and acknowledged.

**2    Transfer of interest in the Partnership**

**2.1    IT IS NOTED THAT:**

(a)    In connection with a corporate restructure of the Company's group, the Company
proposes to transfer, convey, assign or otherwise contribute to CDMCFAD, LLC, a
Delaware limited liability company (the "**Transferee**"), 100% of the Company's interests
in CHARITABLE DAF FUND, LP, an exempted limited partnership established in the Cayman
Islands (the "**Partnership**") in consideration for the contribution by the sole member of
the Transferee of 100% of the issued and outstanding limited liability company interests
in the Transferee (the "**Transfer**").

(b)    In connection with the Transfer, the Company proposes to enter into a deed of
assignment and assumption (the "**Deed**"), substantially in the form that was circulated to
and carefully considered by the Directors, to be entered into by and among the Company,
the Transferee and CDH GP, LTD, solely in its capacity as general partner (the "**GP**") of the
Partnership, under the terms of which the Company will transfer, convey, assign or
otherwise contribute all of its Transferred Interest (as defined in the Deed) to the
Transferee on the terms and conditions set out therein.

(c)    Section 1.11(a) of the amended and restated limited partnership agreement of the
Partnership dated as of 7 November 2011 as amended on 26 July 2022 and as further
amended and restated as of 11 March 2024 (as further amended, restated and/or
supplemented from time to time) (the "**Partnership Agreement**") provides that a Limited
Partner may not assign his interest in whole or in part to any person, without the prior
written consent of the General Partner, except by operation of law, nor shall he be
entitled to substitute for himself as a Limited Partner any other person, without the prior
written consent of the General Partner, which in either case may be given or withheld in
the sole discretion of the General Partner (each term as defined in the Partnership
Agreement).

(d)    Under the terms of the Deed, it is expected that:

**454**

(i)      the Transferee will make in favour of the GP and the Company, each representation, as was made by the Company in connection with its admission as a Limited Partner;

(ii)     the Transferee will undertake to perform all of the obligations of a Limited Partner and be bound by and receive the benefit of all terms of the Partnership Agreement and replace the Company as a Limited Partner and will assume all the duties, liabilities and obligations, whether past (to the extent permitted by law), present or future, under the Partnership Agreement with respect to the Transferred Interest;

(iii)    the GP will: (x) consent to the assignment and assumption contemplated thereby; (y) acknowledge that all requirements and conditions for the Transfer and the admission of the Transferee as a Limited Partner of the Partnership have been satisfied or waived; and (z) certify that the Transferee will, in accordance with Section 1.15 of the Partnership Agreement, be listed in the books and records of the Partnership as a Limited Partner and as sole legal owner of the Transferred Interest;

(iv)    the GP will agree to admit the Transferee as a Limited Partner in respect of the Transferred Interest and remove, in accordance with Section 1.15 of the Partnership Agreement, the name of the Company from the register of Limited Partners maintained in respect of the Partnership; and

(v)     the Company and Transferee will undertake to jointly and severally indemnify the GP and the Partnership from any expense arising from the transactions contemplated by the Deed or any losses arising from the breach of the Deed or the Partnership Agreement.

(e)    All the requirements of the transfer provisions contained in the Partnership Agreement have been or will be either satisfied by the Company and Transferee or waived by the GP.

(f)    U.S. tax counsel has advised the Company and its Directors that reorganization of the Company and its subsidiaries pursuant to the Transfer generally would provide the following benefits and protections to the Company, the Partnership, and the Company's subsidiaries (collectively, the "DAF"):

(i)     The Transfer would help insulate the DAF from exposure to James Dondero and his entities (collectively, "Dondero"), who may be at risk of causing the Internal Revenue Service (the "IRS") to revoke the tax-exempt status of one or more of the participating shareholders/supporting organizations, which could imperil the assets of the DAF;

(A)    Each Internal Revenue Code (the "IRC") Section 501(c)(3) organization must be organized and operating primarily for charitable purposes;

(B)    Treasury Regulation Section 1.501(c)(3)-1(c)(1) provides that an organization will not be compliant with the operational test "if more than

2

an insubstantial part of its activities is not in furtherance of an exempt purpose"; and

(C) An IRC Section 501(c)(3) organization cannot be operated for the benefit of an individual or entity due to the private benefit/private inurement prohibition.

(ii) The Transfer would help reduce the influence of Dondero and, as such, would broaden the charitable scope of DAF for its benefit and the benefit of the public;

(iii) The IRS would look favorably upon any and all attempts for DAF to maintain its influence from "what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement"; and

(iv) Further, due to Dondero's attempts to control the DAF and its assets, DAF runs an increased risk of being embroiled in litigation directed against Dondero and his entities.

(g) Delaware counsel has advised the Company and its Directors that, as a result of the Transfer, the Transferred Interest shall be held by the Transferee, and that certain Limited Liabiltiy Company Agreement of the Transferee (the "**LLC Agreement**"), along with the Transfer generally, shall provide the following benefits and protections to the Company and the Partnership:

(i) Under Delaware law and the Delaware Limited Liability Compay Act (the "**LLC Act**"), there are very few required adminstrative or other requirements for a limited liablity company that cannot be modified or elimintated in a limited liablity company agreement and therefore, the Company and the Partnership will benefit from the contractual freedom and flexbility to provide for its desired terms under the LLC Agreement;

(ii) As a Delaware limited liability company, the Transferee will be governed by the LLC Act, which unlike the statutes in almost every other jurisidction, is updated annually to stay current based on the needs of companies forming in Delaware and the changing markets, as well as any needed changes due to the results of case law;

(iii) Under the LLC Act, the only required filing in Delaware is a certificate of formation that contains only the name of the company and its registered agent and registered office, therefore maintaining the privacy of the members and managers of the company by allowing them to put their business terms into a limited liablity company agreement that is a private document not avialable to the public;

(iv) Under the LLC Act, and the LLC Agreement, the neither the Company nor the Partnership shall be personally liable for the debts, obligations and liabilities of the Transferee, whether such debts, obligations or liabilities arise in contract, tort or otherwise;

3

**456**

(v)    As permitted under the LLC Act, the terms of the LLC Agreement eliminate the fiduciary duties of the manager of the Transferee;

(vi)    It will be very difficult to dissolve and terminate the Transferee, with any such voluntary decision requiring the consent of the manager of the Transferee;

(vii)    The cost to maintain a limited liability company in Delaware is relatively low, with only a $300 annual state franchise tax and minimal expenses to maintain a Delaware registered agent and registered office;

(viii)    Any enforcement action with respect to the LLC Agreement will likely occur in the Delaware Chancery Court, which is known as being one of the most respected and sophisticated business courts in the United States.

## 2.2   IT IS HEREBY RESOLVED THAT:

(a)    It is in the best interests of the Company to enter into the Transfer and execute and enter into the Deed and consummate the transactions contemplated thereunder.

(b)    A draft of the Deed having been provided to the Directors, the form thereof be approved on behalf of the Company, subject to such amendments and additions thereto as any director, officer or attorney of the Company in his absolute discretion and opinion deems appropriate, the signature of any director, officer or attorney of the Company on the Deed being due evidence for all purposes of his approval of any such amendment or addition and the final terms thereof on behalf of the Company.

(c)    The Company do give, make, sign, execute and deliver all such notes, deeds, agreements, letters, notices, certificates, acknowledgments, instructions, fee letters and other documents (whether of a like nature or not) (the "**Ancillary Documents**") as may in the sole opinion and absolute discretion of any director, officer or attorney of the Company be considered necessary or desirable for the purpose of compliance with any condition precedent or the coming into effect of or otherwise giving effect to, consummating or completing or procuring the performance and completion of all or any of the transactions contemplated by or referred to in the Deed and the Company do all other such acts and things as might in the sole opinion and absolute discretion of any director, officer or attorney of the Company be necessary or desirable for the purposes aforesaid.

(d)    The Ancillary Documents be in such form as any director, officer or attorney of the Company should in his absolute discretion and sole opinion approve, the signature of any director, officer or attorney of the Company on any of the Ancillary Documents being due evidence for all purposes of his approval of the terms thereof on behalf of the Company.

(e)    The Deed and the Ancillary Documents (where required to be executed by the Company) be executed by the signature thereon of any director, officer or attorney of the Company and the Company deliver and perform the Deed and Ancillary Documents.

(f)    Any director, officer or attorney of the Company be and they are hereby authorised to take such further actions as they may consider necessary or convenient to effect the foregoing resolutions.

4

**457**

(g)     All prior acts of any of the directors, officers or attorneys of the Company in connection with the foregoing resolutions be and they hereby are confirmed, ratified and approved.

*[Signature Page follows]*

5

**IN WITNESS WHEREOF** the undersigned, being all of the Directors of the Company for the time being, hereby adopt and pass the foregoing resolutions as unanimous written resolutions on the date set out above.

Name: **Mark E. Patrick**

Title:    Director


Name: **Paul Murphy**

Title:    Director

**459**

**IN WITNESS WHEREOF** the undersigned, being all of the Directors of the Company for the time being, hereby adopt and pass the foregoing resolutions as unanimous written resolutions on the date set out above.

_____

Name:  **Mark E. Patrick**

Title:   Director

_____

Name:  **Paul Murphy**

Title:   Director

**460**

# EXHIBIT 45

### Deed of Assignment and Assumption

This Deed of Assignment and Assumption (this "**Deed**") is made on the 18th day of December 2024

**BY AND AMONG:**

(1)     **CDH GP, LTD**, a company incorporated under the laws of the Cayman Islands, with registered number 407515, whose registered office is at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands (the "**General Partner**"), in its capacity as general partner of **CHARITABLE DAF FUND, LP**, an exempted limited partnership formed under the laws of the Cayman Islands, with registered number 53083, whose registered office is at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands (the "**Partnership**");

(2)     **CHARITABLE DAF HOLDCO, LTD**, a company incorporated under the laws of the Cayman Islands, with registered number 263805, whose registered office is at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands (the "**Transferor**"); and

(3)     **CDMCFAD, LLC**, a Delaware limited liability company (the "**Transferee**").

**WHEREAS:**

(A)     The General Partner is the general partner of the Partnership which is governed by an amended and restated limited partnership agreement of the Partnership dated as of 7 November 2011 as amended on 26 July 2022 and as further amended and restated as of 11 March 2024 (as further amended, restated and/or supplemented from time to time) (the "**Partnership Agreement**").

(B)     Unless otherwise defined, capitalised terms used in this Deed have the meanings given to them in the Partnership Agreement.

(C)     In connection with a corporate restructuring of the Transferor's corporate group, the Transferor now wishes to assign to the Transferee the entirety of its interest in the Partnership, together with the rights and obligations attaching thereto (together, the "**Transferred Interest**") for the Consideration (as defined below) to the Transferor, and the Transferee wishes to assume all of the rights and obligations with respect to the Transferred Interest and be admitted to the Partnership, subject to the terms and conditions of this Deed (the "**Assignment**").

(D)     The General Partner, whose consent is required for the purpose of the assignment of any interest in the Partnership, hereby provides its consent, subject to the terms and conditions of this Deed.

4900-9980-4933\1

**461**

**NOW IT IS HEREBY AGREED AS FOLLOWS:**

**1        Assignment of Transferred Interest**

1.1      Subject to the terms and conditions of this Deed, the Transferor hereby assigns the Transferred Interest to the Transferee with effect on and from the date of this Deed (the "**Transfer Date**") in consideration for the contribution by the sole member of the Transferee of 100% of the issued and outstanding limited liablity company interests in the Transferee (the "**Consideration**") to the Transferor, and without prejudice to its obligations under clause 7 hereof and subject to the remaining terms and conditions of this Deed, the Transferee shall exercise its reasonable best endeavours to facilitate the implementation of the transfer, assignment, conveyance and contribution of the Consideration to the Transferor, with effect as of the date of this Deed.

1.2      Except as expressly provided herein, no further action by any party hereto and no additional document or instrument of transfer shall be required to evidence such assignment, transfer and assumption.

**2        Undertaking to be Bound and Power of Attorney**

2.1      In accordance with the terms of the Partnership Agreement and upon the General Partner giving its consent to the Assignment, and making appropriate entries for the name and details of the Transferee, including as required by sections 1.11(a) and 1.15 of the Partnership Agreement, into the register of Limited Partners, the Transferee undertakes to the General Partner and the Partnership that it will be bound by and have full benefit of all the terms of the Partnership Agreement and this Deed in the place of and instead of the Transferor in respect of the Transferred Interest and will assume all the duties, liabilities and obligations, whether past (to the extent permitted by law), present or future, of the Transferor under the Partnership Agreement with respect to the Transferred Interest as if the Transferee had been a Limited Partner in the Partnership with respect to the Transferred Interest with effect from the date upon which the Transferor became a Limited Partner pursuant to the terms of the Partnership Agreement and for all other purposes under the Partnership Agreement and any other relevant agreements. Furthermore, the General Partner hereby confirms the satisfaction or due waiver by the General Partner of any and all applicable conditions and restrictions set forth in the Partnership Agreement (or any other relevant agreements) to the proposed Assignment.

2.2      Without limitation to clause 2.1 above, the Transferee hereby constitutes, appoints and grants to the General Partner the power of attorney set out in section 6.4 of the Partnership Agreement with effect on and from the Transfer Date.

2.3      The Transferee hereby makes in favour of the General Partner and the Transferee, each representation, as was made by the Transferor in connection with its admission as a Limited Partner.

**3    Distributions and other accrued sums in respect of the Transferred Interest**

3.1    The Transferor agrees that:

(a)    on and from the Transfer Date, it shall cease to have any further entitlement to allocations of income or distributions whatsoever or any other rights or benefits in respect of the Transferor's interest in the Partnership (including, for the avoidance of doubt, any dividends which may be payable in connection with the Transferred Shares relating to the period up to the Transfer Date but which may be paid after the Transfer Date) (collectively, the "**Distributions**");

(b)    all Distributions payable to the Transferor under the terms of the Partnership Agreement in respect of the Transferred Interest transferred and assigned hereunder and which accrue during, or are payable by reference to, any period prior to the Transfer Date shall be payable to the Transferee; and

(c)    any sums paid to the Partnership in connection with its admission as a Limited Partner or other costs or expenses paid in connection with the establishment or ongoing administration of the Partnership shall not be reimbursed.

**4    Accession**

In consideration of the mutual covenants contained herein, the General Partner, Transferor and Transferee hereby agree that, with effect from the Transfer Date, the Transferee shall have the rights and benefits under, and be bound by the provisions of, the Partnership Agreement in respect of the Transferred Interest and all parties, other than the Transferor, shall be bound by the terms of the Partnership Agreement in every way as if the Transferee was named therein in substitution of and for the Transferor.

**5    Approval of General Partner and Updates to Register of Limited Partners**

5.1    In reliance upon the undertakings, representations and warranties given by the Transferor and Transferee (as applicable) under this Deed, the General Partner:

(a)    consents, for the purposes of section 1.11 of the Partnership Agreement and for all other purposes, to the transactions contemplated by this Deed;

(b)    acknowledges that all requirements and conditions relating to such transactions have been satisfied or waived; and

(c)    certifies that the Transferee will be listed in the books and records of the Partnership as a Limited Partner and as sole legal owner of the Transferred Interest in substitution of and for the Transferor; and

shall, on the Transfer Date, promptly:

(d)    record the assignment of the Transferred Interest in accordance with applicable law;

(e)    admit the Transferee as a Limited Partner in respect of the Transferred Interest; and

(f)    remove the name of the Transferor from the register of Limited Partners.

**6    Indemnification**

6.1    The Transferor and the Transferee hereby agree to indemnify and hold the General Partner and the Partnership harmless from any damage, loss, claim or expense resulting from:

(a)    the transactions contemplated by this Deed; or

(b)    any breach of this Deed or the Partnership Agreement by the Transferor or the Transferree, whether such breach occurred prior to, on or after the Transfer Date.

6.2    The liability of the Transferor and the Transferee under clause 6.1 shall be joint and several.

**7    Further Assurances**

Each of the parties hereto shall, at any time and from time to time, at the request of the other, promptly and duly execute and deliver any and all such further documents and instruments as may be reasonably required for the Transferor and Transferee to obtain the full benefit of the transactions contemplated by this Deed or as may be required pursuant to the Partnership Agreement to complete the substitution of the Transferor by the Transferee as a Limited Partner of the Partnership.

**8    Miscellaneous**

8.1    All words and terms which are defined in the Partnership Agreement and which are used in this Deed shall (where so used, and save only: (a) where otherwise expressly provided; or (b) where the context otherwise requires) have the same meanings as are given to such words and terms in the Partnership Agreement.

8.2    In this Deed, the clause headings are for convenience only and shall not affect the construction of this Deed, words and terms (including defined terms) denoting the singular shall include the plural and vice versa and words importing any gender shall include all genders.

8.3    The Transferor and the Transferee shall jointly and severally be obligated to reimburse the General Partner and the Partnership for all reasonable expenses (including attorneys' fees and expenses) in connection with the transfer and assignment of the Transferred Interest from the Transferor to the Transferee in accordance with this Deed.

8.4    Neither the Transferor nor the Transferee shall assign all or any part of their rights or obligations under this Deed.

8.5    If any provision of this Deed shall be held to be illegal or unenforceable, the enforceability of the remainder of this Deed shall not be affected.

4

**464**

8.6     This Deed may be signed in any number of counterparts.  Any single counterpart or a set of counterparts signed, in either case, by all the parties hereto shall constitute a full and original Deed for all purposes.

8.7     This Deed and the rights of the parties hereto shall be governed by, and interpreted in accordance with, the laws of the Cayman Islands.  The parties hereto hereby submit to the non-exclusive jurisdiction of the Cayman Islands courts.

*[signature page to follow]*

**465**

**IN WITNESS WHEREOF** the parties have executed and delivered this document as a deed on the date first written above.

*GENERAL PARTNER*

**EXECUTED AND DELIVERED AS A DEED** by

Name: Mark E Patrick
Title: Director
for and on behalf of
**CDH GP, LTD.**
as general partner of
**CHARITABLE DAF FUND, LP,**
in the presence of:

Name: MaryNell Cash
Title: Witness

*TRANSFEREE*

**EXECUTED AND DELIVERED AS A DEED** by

Name: Mark E Patrick
Manager
for and on behalf of
**CDMCFAD, LLC**

in the presence of:

Name: MaryNell Cash
Title: Witness

*TRANSFEROR*

**EXECUTED AND DELIVERED AS A DEED** by

Name:
Title: Director
for and on behalf of
**CHARITABLE DAF HOLDCO, LTD**

6

**466**

# EXHIBIT 46

**CHARITABLE DAF HOLDCO, LTD**
**(THE "COMPANY")**

---

**WRITTEN RESOLUTIONS OF THE DIRECTORS**
**OF THE COMPANY DATED 2 APRIL 2025**

---

1. **DECLARATION AND PAYMENT OF DIVIDENDS**

1.1 **IT IS NOTED** that:

(a) CDMCFAD, LLC (the "**LLC**"), a Delaware limited liability company, redeemed the Company's entire limited liability company interests in the LLC on 27 March 2025 (the "**CDMCFAD Redemption**") for the aggregate amount of US$1,637,192;

(b) the current Amended and Restated Articles of Association of the Company (the "**Articles**") provide that all dividends shall be declared and paid in such amounts as may be declared by the Directors in their absolute discretion;

(c) following receipt of the proceeds of the CDMCFAD Redemption, the Company wishes to make a payment as at the date hereof of dividends on a pro-rata basis to the Participating Shareholders (but excluding DFW Charitable Foundation; collectively, the "**Shareholders**") in the amount of (i) $528,587.54 with respect to each of Highland Dallas Foundation, Inc., Highland Kansas City Foundation, Inc., and Highland Santa Barbara Foundation, Inc.; and (ii) $26,429.39 with respect to The Community Foundation of North Texas;

(d) the Directors have determined that the sum of **$1,612,192.01** is lawfully available for distribution as profits or share premium of the Company and is distributable in accordance with the Articles and the Companies Act (as amended) (the "**Companies Act**");

(e) the Directors have confirmed no awareness of any subsequent losses by the Company as at the date hereof which would affect the amount of profits or share premium available for distribution; and

(f) a distribution may be unlawful, even where the provisions of the Articles and the Companies Act have been complied with, where the Directors are unable to reasonably conclude that the Company would have sufficient funds to be able to continue to be able to meet its debts as they fall due.

1.2 **IT IS RESOLVED** that:

(a) In the opinion of the Directors, it is reasonable to conclude that following making the payment of the Dividends, the Company will have sufficient funds to be able to continue to be able to meet its debts as they fall due; and

(b) the Directors make a payment of dividends to the Shareholders as set forth in Section 1.1(c) above.

2. **GENERAL AUTHORISATION**

2.1 **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, any Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the

1

name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

## 3.   RATIFICATION OF PRIOR ACTIONS

3.1   **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.

Mark Patrick
**Director**

Paul Murphy
**Director**

State of Texas
County of Dallas

The foregoing instrument was acknowledged before me by means of physical prescence on this day, April 2, 2025 by Mark Patrick. He appeared before me, is personally known to me, has executed the document/instrument, for the purposes and considerations therein expressed.



NATALIE R OLVERA
Notary ID #130890197
My Commission Expires
March 29, 2027

Signature of Notary - State of TX

My commission expires: 3/29/27

2

name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

## 3.   RATIFICATION OF PRIOR ACTIONS

3.1   **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.

_____
Mark Patrick
**Director**

Paul Murphy
**Director**

**SIGNED IN THE PRESENCE OF**



Amy Altneu
Notary Public in and for The Cayman Islands
Dated this ⅔ day of ____April____ , 20 2⅔
(My commission expires on 31 January 20 ⅔)

2

35901511.2.C8689.187150

333

# EXHIBIT 47



# Delaware

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF FORMATION OF "CDMCFAD, LLC", FILED

IN THIS OFFICE ON THE TWELFTH DAY OF DECEMBER, A.D. 2024, AT

11:33 O`CLOCK A.M.



Jeffrey W. Bullock, Secretary of State

10035168  8100
SR# 20244471736

Authentication: 205115849
Date: 12-12-24

You may verify this certificate online at corp.delaware.gov/authver.shtml

# CERTIFICATE OF FORMATION

## OF

## CDMCFAD, LLC

This Certificate of Formation of CDMCFAD, LLC (the "Company"), is being duly executed and filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 *Del. C.* § 18-101 *et seq.*) (the "Act").

1. <u>Name</u>. The name of the limited liability company formed hereby is CDMCFAD, LLC.

2. <u>Registered Office</u>. The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

3. <u>Registered Agent</u>. The name and address of the registered agent for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation in accordance with the Act.

Name: Mark Patrick
Authorized Person

4930-4296-2948\1

State of Delaware
Secretary of State
Division of Corporations
Delivered  11:33 AM 12/12/2024
FILED  11:33 AM 12/12/2024
SR 20244471736  - File Number  10035168

# EXHIBIT 48

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**CDMCFAD, LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

**December 18, 2024**

# TABLE OF CONTENTS

**Page**

Section 1 Definitions ...................................................................................................... 1

    1.1     Specific Definitions ........................................................................ 1
    1.2     General Usage ................................................................................. 5

Section 2 Formation ..................................................................................................... 6

    2.1     Formation and Name ..................................................................... 6
    2.2     Term ............................................................................................... 6
    2.3     Purpose and Scope ........................................................................ 6
    2.4     Principal Office .............................................................................. 7
    2.5     Delaware Office and Agent ........................................................... 7
    2.6     Admission of Members ................................................................. 7
    2.7     Contact Information of the Members ............................................. 7
    2.8     Additional Documents ................................................................... 7
    2.9     Title to Property ............................................................................ 7

Section 3 Capitalization ............................................................................................... 7

    3.1     Capital Contributions .................................................................... 7
    3.2     Limitation on Capital Contributions ............................................ 8
    3.3     Withdrawal and Return of Capital ................................................ 8
    3.4     Loans to the Company ................................................................... 8
    3.5     Interest on Capital ......................................................................... 8
    3.6     Limitation of Liability; Return/Withholding of Certain Distributions ................... 8

Section 4 Profits and Losses ........................................................................................ 9

    4.1     Allocations of Company Profits and Losses ................................. 9
    4.2     Allocation Adjustments Required to Comply With Section 704(b) of the Code ................... 9
    4.3     General Allocation and Capital Account Maintenance Provisions ................... 11
    4.4     Nonallocation of Distributions to Increases in Minimum Gain ................... 12
    4.5     Allocation of Liabilities ................................................................. 12
    4.6     Modifications to Preserve Underlying Economic Objectives ................... 12
    4.7     Withholding Taxes ........................................................................ 12
    4.8     Intent of Allocations/Cash Savings Clause .................................. 13

Section 5 Distributions ............................................................................................... 14

    5.1     Distributions .................................................................................. 14
    5.2     Limitation on Distributions .......................................................... 15

Section 6 Administration; Management ..................................................................... 15

4937-0258-2788\4

|  6.1 | Management Powers and Authority of the Manager | 15 |
|  6.2 | Designation of Manager | 16 |
|  6.3 | Manager's Power to Bind the Company | 16 |
|  6.4 | Action by Members | 16 |
|  6.5 | No Duties to the Company | 16 |
|  6.6 | Manager and Member Expenses | 16 |
|  6.7 | Tax Matters; Partnership Representative | 17 |
|  6.8 | Records and Financial Statements | 18 |
|  6.9 | Valuation of Company Assets | 18 |
|  6.10 | Officers. | 19 |

**Section 7 Transfers and Resignations** ............................................................... 19

|  7.1 | Transfers of Interests | 19 |
|  7.2 | Resignation/Removal of a Member | 19 |
|  7.3 | Redemption | 19 |

**Section 8 Dissolution and Liquidation** .............................................................. 19

|  8.1 | Dissolving Events | 19 |
|  8.2 | Winding Up and Liquidation | 20 |
|  8.3 | Deficit Restoration/Liability | 21 |

**Section 9 Exculpation; Indemnification** ............................................................. 21

|  9.1 | Exculpation | 21 |
|  9.2 | Indemnification | 21 |

**Section 10 General Provisions** ........................................................................... 22

|  10.1 | Meetings | 22 |
|  10.2 | Action Without a Meeting | 22 |
|  10.3 | Entire Agreement | 22 |
|  10.4 | Amendments | 22 |
|  10.5 | Counterparts; Binding upon Members | 22 |
|  10.6 | No Third Party Beneficiaries | 22 |
|  10.7 | Notices, Consents, Elections, Etc | 23 |
|  10.8 | Severability | 23 |
|  10.9 | Governing Law | 23 |
|  10.10 | Status Under the Act | 23 |
|  10.11 | Partnership for Tax Purposes Only | 23 |
|  10.12 | Miscellaneous | 23 |

**SCHEDULE A – Member Information**

4937-0258-2788\4

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## CDMCFAD, LLC

## A DELAWARE LIMITED LIABILITY COMPANY

This Limited Liability Company Agreement of CDMCFAD, LLC, a Delaware limited liability company, is entered into as of December 18, 2024 and is hereby made effective as of the Effective Date (as defined below).

## SECTION 1

## DEFINITIONS

**1.1** *Specific Definitions*.  As used in this Agreement:

*Act* shall mean the Delaware Limited Liability Company Act, Title 6, Delaware Code, Section 18-101 *et seq*.

*Adjusted Capital Account Deficit* shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)     The Capital Account shall be increased by any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) or the penultimate sentences of each of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)     The Capital Account shall be decreased by the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

*Affiliate* shall mean, with respect to any Person, any other Person with regard to which the Person is controlling, controlled or commonly controlled.  For purposes of the preceding sentence, "control" shall mean the power to direct the principal business management and activities of a Person, whether through ownership of voting Securities, by agreement, or otherwise.

*Agreement* shall mean this Limited Liability Company Agreement of CDMCFAD, LLC, a Delaware limited liability company, including all schedules, appendices, and exhibits hereto, as amended in accordance with the terms hereof.

*Allocation Percentage* shall mean, for each Member, the percentage set forth on Schedule A, which shall be adjusted as necessary to reflect the Members' varying interests in the Company. For the avoidance of doubt, the aggregate Allocation Percentages of all Members shall at all times equal one hundred percent (100%).

*Capital Account* shall mean, for each Member, a separate account that is:

      (a)     Increased by: (i) the amount of such Member's Capital Contribution and (ii) allocations of Profits to such Member pursuant to Section 4;

      (b)     Decreased by: (i) the amount of cash distributed to such Member by the Company; (ii) the Fair Market Value of any other property distributed to such Member by the Company (determined as of the time of distribution and net of liabilities secured by such property that the Member assumes or to which the Member's ownership of the property is subject); and (iii) allocations of Losses to such Member pursuant to Section 4;

      (c)     Otherwise adjusted in accordance with the provisions of this Agreement; and

      (d)     Revalued in connection with any event described in paragraph (a) of the definition of "Gross Asset Value" to the extent the Manager determines that a revaluation is necessary to preserve the economic arrangement of the Members. In determining the amount of any liability for purposes of subparagraphs (a) and (b) above, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Treasury Regulations.

Capital Accounts shall be maintained in accordance with Treasury Regulations Section 1.704-1(b) and specifically in a manner consistent with the Member's interest in the Company and the provisions of this Agreement shall be interpreted and applied in a manner consistent with such regulations and intent.

*Capital Contribution* shall mean, for any Member, the sum of the net amount of cash and the Fair Market Value of any other property (determined as of the time of contribution and net of liabilities secured by such property that the Company assumes or to which the Company's ownership of the property is subject) contributed by such Member to the capital of the Company. For purposes of this Agreement, each Capital Contribution shall be deemed to have been made at the later of: (i) the Close of Business on the due date of such Capital Contribution as determined in accordance with this Agreement; or (ii) the Close of Business on the date on which such Capital Contribution is actually received by the Company.

*Certificate* shall mean the Certificate of Formation of the Company, as amended and/or restated from time to time.

*Close of Business* shall mean 5:00 p.m., local time, in New York, New York.

*Code* shall mean the United States Internal Revenue Code of 1986, as amended.

*Company* shall mean CDMCFAD, LLC, a Delaware limited liability company.

**Depreciation** shall mean, for each Fiscal Year or other period, an amount equal to the federal income tax depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period; provided, however, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year or other period bears to such beginning adjusted tax basis; and provided further, that if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

**Fair Market Value** shall have the meaning set forth in Section 6.9(b).

**Fiscal Period** shall mean the Fiscal Year or such shorter period as necessary to take into account the Members' varying interests in the Company.

**Fiscal Year** shall mean the period from January 1 through December 31 of each year (unless otherwise required by law).

**Gross Asset Value** shall mean, with respect to any asset, such asset's adjusted basis for federal income tax purposes (except that the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross Fair Market Value of the asset on the date of contribution), except as follows:

(a)      The Gross Asset Value of all Company assets shall be adjusted to equal their respective fair market values upon the occurrence of any of the events listed in Treasury Regulations Section 1.704-1(b)(2)(iv)(f)(5); provided, however, that adjustments pursuant to this clause (a) (other than in a liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g)) shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

(b)      The Gross Asset Value of any Company asset distributed to any Member shall be the Fair Market Value of such asset on the date of distribution.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (a) or paragraph (b) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

**Interest** shall mean, for each Member, the entirety of such Member's rights, duties and limited liability company interest in respect of the Company in such Member's capacity as such (as distinguished from any other capacity such as employee, debtor or creditor) and shall include such Member's right, if any, to vote on Company matters, bind the Company vis-à-vis third parties, or receive distributions as well as such Member's obligation under this Agreement, if any, to provide services, make Capital Contributions or take any other action.

-3-

*Manager* shall mean the Person designated as the Manager in Section 6.2.

*Member* shall mean those Persons admitted as members under this Agreement as shown on Schedule A as such schedule may be updated from time to time, each in such Person's capacity as a member of the Company. Except where the context requires otherwise, a reference in this Agreement to "the Members" shall mean all of the Members.

*Member Minimum Gain* has the same meaning as the term "partner nonrecourse debt minimum gain" in Treasury Regulations Section 1.704-2(i)(2).

*Member Nonrecourse Deduction* shall mean an item of loss, expense or deduction attributable to a nonrecourse liability of the Company for which a Member bears the economic risk of loss within the meaning of Treasury Regulations Section 1.704-2(i).

*Minimum Gain* of the Company or *Company Minimum Gain* shall, as provided in Treasury Regulations Section 1.704-2, mean the total amount of gain the Company would realize for federal income tax purposes if it disposed of all assets subject to nonrecourse liability for no consideration other than full satisfaction thereof.

*Person* shall mean an individual, partnership, corporation, limited liability company, unincorporated organization, trust, joint venture, governmental agency, or other entity, whether domestic or foreign.

*Principal Office* shall have the meaning set forth in Section 2.4.

*Profits* and *Losses* shall mean, for each Fiscal Year or other Fiscal Period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other Fiscal Period, as applicable, determined in accordance with Section 703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code), with the following adjustments:

      (a)    Any income of the Company exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to (or subtracted from, as the case may be) such taxable income or loss;

      (b)    Any expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from (or added to, as the case may be) such taxable income or loss;

      (c)    In the event that the Gross Asset Value of any Company asset is adjusted in accordance with paragraphs (a) or (b) of the definition of "Gross Asset Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

      (d)    Gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed

-4-

by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(e)     In lieu of the depreciation, amortization and other cost recovery deductions that would otherwise be taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other Fiscal Period, computed in accordance with the definition of "Depreciation" above; and

(f)     Notwithstanding any other provision of this definition, any items that are specially allocated pursuant to Sections 4.2 or 4.3 shall not be taken into account in computing Profits or Losses.

*Securities* shall mean debt, equity and synthetic securities of any type.

*Term* shall have the meaning set forth in Section 2.2.  Where not capitalized, "term" shall mean the entire period of the Company's existence, including any period of winding-up and liquidation following the dissolution of the Company pursuant to Section 8.1.

*Title XI 2015 RBA* shall have the meaning set forth in Section 6.7(d).

*Transfer* shall mean any sale, exchange, transfer, gift, encumbrance, assignment, pledge, mortgage, hypothecation or other disposition, whether voluntary or involuntary.

*Treasury Regulations* shall mean the regulations issued by the United States Treasury Department and relating to a matter arising under the Code.

*Updated Capital Account* shall mean, with respect to a Member, such Member's Capital Account determined as if, immediately prior to the time of determination, all of the Company's assets had been sold for Fair Market Value and any previously unallocated Profits and Losses had been allocated pursuant to Section 4.

**1.2     *General Usage***.  The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.  Except where the context clearly requires to the contrary:  (i) each reference in this Agreement to a designated "Section," "Schedule," "Exhibit," or "Appendix" is to the corresponding Section, Schedule, Exhibit, or Appendix of or to this Agreement; (ii) instances of gender or entity-specific usage (*e.g.*, "his," "her," "its," "person" or "individual") shall not be interpreted to preclude the application of any provision of this Agreement to any individual or entity; (iii) the word "or" shall not be applied in its exclusive sense; (iv) "including" shall mean "including, without limitation"; (v) references to laws, regulations and other governmental rules, as well as to contracts, agreements and other instruments, shall mean such rules and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the effective date of this Agreement) and shall include all successor rules and instruments thereto; (vi) references to any specific statute or similar codification of law shall mean such statute or other codification as construed, modified, extended or enabled by any applicable binding governmental rules or regulations; (vii) references to "law" shall mean any applicable law, whether embodied in statute, governmental rule or regulation, case law or other legally binding format; (viii) references to "$" or "dollars" shall mean the lawful

currency of the United States; (ix) references to "federal" shall be to laws, agencies or other attributes of the United States (and not to any State or locality thereof); (x) the meaning of the terms "domestic" and "foreign" shall be determined by reference to the United States; (xi) references to "days" shall mean calendar days and references to "business days" shall mean all days other than Saturdays, Sundays and days that are legal holidays in the State of New York; (xii) references to months or years shall be to the actual calendar months or years at issue (taking into account the actual number of days in any such month or year); (xiii) days, business days and times of day shall be determined by reference to local time in New York, New York; and (xiv) the English language version of this Agreement shall govern all questions of interpretation relating to this Agreement, notwithstanding that this Agreement may have been translated into, and executed in, other languages.

## SECTION 2

## FORMATION

**2.1** *Formation and Name*.

(a) The Members hereby enter into this Agreement and form the Company as a limited liability company in accordance with the Act. Mark Patrick is hereby designated as an "authorized person" of the Company within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware (such filing being hereby approved and ratified in all respects and the time at which the initial Certificate of Formation is filed with the Secretary of State of the State of Delaware, the "**Effective Date**"). Upon the filing of the Certificate of Formation of the Company with the Secretary of State of the State of Delaware, his powers as an "authorized person" of the Company ceased, and the Manager thereupon became the designated "authorized person" of the Company and shall continue as the designated "authorized person" of the Company within the meaning of the Act. The Manager, as an "authorized person" of the Company within the meaning of the Act, shall execute, deliver and file, or cause the execution, delivery and filing of, all certificates (and any amendments and/or restatements thereof) required or permitted by the Act to be filed with the Secretary of State of the State of Delaware. The Member shall execute, deliver and file, or cause the execution, delivery and filing of any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any other jurisdiction in which the Company may wish to conduct business.

(b) The name of the Company shall be "CDMCFAD, LLC."

**2.2** *Term*. The "Term" of the Company commenced as of the filing of the Certificate with the Secretary of State of the State of Delaware and shall continue until the Company is dissolved and then wound up pursuant to Section 8.1. Except as provided in Section 8.1, the Company shall not be dissolved.

**2.3** *Purpose and Scope*. Within the meaning and for purposes of the Act, the purpose and scope of the Company shall include any lawful action or activity permitted to a limited liability company under the Act, as determined by the Manager.

**2.4** *Principal Office*. The Company shall have a single "Principal Office" which shall at all times be located within the United States. The Principal Office shall be located at such location as may hereafter be determined by the Manager.

**2.5** *Delaware Office and Agent*. The Company shall maintain a Delaware registered office and agent for service of process as required by the Act. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Manager shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be, each in accordance with the Act.

**2.6** *Admission of Members*. Each Person as of the date hereof that has executed this Agreement and whose name is listed under Name and Contact Information on Schedule A, as such Schedule A may be updated from time to time by the Manager, is hereby admitted as a member of the Company. With the consent of the Manager, additional Members may be admitted to the Company from time to time upon each such Person's execution of a counterpart signature page to this Agreement or other joinder agreeing to be bound by the terms of this Agreement.

**2.7** *Contact Information of the Members*. Set forth below the name of each Member on Schedule A shall be appropriate contact information for such Member. Each Member shall promptly provide the Company with the information required to be set forth for such Member on Schedule A and shall thereafter promptly notify the Company of any change to such information.

**2.8** *Additional Documents*. The Manager shall cause to be executed, filed, recorded, published, or amended any documents, as the Manager in its reasonable discretion determines to be necessary or advisable: (x) in connection with the formation, operation, dissolution, winding-up, or termination of the Company pursuant to applicable law; or (y) to otherwise give effect to the terms of this Agreement. The terms and provisions of each document described in the preceding sentence shall be initially established and shall be amended as necessary to cause such terms and provisions to be consistent with the terms and provisions of this Agreement.

**2.9** *Title to Property*. Title to all Company property shall be held in the name of the Company; provided, however, that publicly traded Securities may be held in "street name" or through a similar arrangement with a reputable financial institution.

---

## SECTION 3

## CAPITALIZATION

---

**3.1** *Capital Contributions*.

(a) *Initial Capital Contributions*. Each Member has contributed (or is deemed to have contributed) such capital to the Company as set forth on the books and records of the Company. Except to the extent set forth on the books and records of the Company or agreed to by the Manager, all Capital Contributions shall be in cash and/or cash equivalents.

-7-

(b)     *Increased Capital Contributions*.   The Members may make additional Capital Contributions to the Company at such times and in such amounts as shall be determined by the Manager and the Member making such additional Capital Contribution.

(c)     *Adjustment of Member Allocation Percentages*.   Upon (i) the admission of a Member following the date hereof or (ii) the acceptance of Capital Contributions by the Company from a Member following contribution of such Member's initial Capital Contribution, the Manager shall adjust the Allocation Percentage of each Member, and shall accordingly update Schedule A hereto, so that the Allocation Percentages of the Members represent their Interest in the Company taking into account a revaluation of the Company's assets, if any, and in accordance with the economic arrangement of the Members.

**3.2**     *Limitation on Capital Contributions*.   Except as specifically provided in this Section 3, no Person shall be permitted or required to make a contribution to the capital of the Company.

**3.3**     *Withdrawal and Return of Capital*.   Except as provided in Section 5 and Section 8 or as otherwise agreed to by the Manager, no Member shall be entitled to the return of such Member's Capital Contribution, a distribution in respect of such Member's Capital Account balance, or any other distribution in respect of such Member's Interest.

**3.4**     *Loans to the Company*.   No Member shall be required to lend any money to the Company or to guaranty any Company indebtedness.

**3.5**     *Interest on Capital*.   No Member shall be entitled to interest on such Member's Capital Contribution, Capital Account balance, or share of unallocated Profits.

**3.6**     *Limitation of Liability; Return/Withholding of Certain Distributions*.

(a)     Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member or manager of the Company.

(b)     A Member that receives a distribution (i) in violation of this Agreement or (ii) that is required to be returned to the Company under applicable law shall return such distribution within thirty (30) days after demand therefor by the Manager.   The Company may elect to withhold from any distributions otherwise payable to a Member amounts due to the Company from such Member.

(c)     Nothing in this Section 3.6 shall be applied to release any Member from (i) its obligation to make Capital Contributions or other payments specifically required under this Agreement or (ii) its obligations pursuant to any relationship between the Company and such Member acting in a capacity other than as a Member (including, for example, as a borrower, employee or independent contractor).

4937-0258-2788\4

---

## SECTION 4

## PROFITS AND LOSSES

---

**4.1** **_Allocations of Company Profits and Losses_**.  Except as otherwise provided in this Agreement, Profits and Losses for each Fiscal Period shall be allocated as follows:

(a)    Profits shall be allocated among the Members in the following order of priority:

(i)    First, among the Members on a pro rata basis so as to reverse prior allocations of Losses for prior Fiscal Periods under Section 4.1(b)(ii) until cumulative Profit allocated under this Section 4.1(a)(i) equals the cumulative Losses allocated under Section 4.1(b)(ii); and

(ii)    Second, among the Members in proportion to their Allocation Percentages.

(b)    Losses shall be allocated among the Members in the following order of priority:

(i)    First, among the Members on a pro rata basis so as to reverse allocations of Profits for prior Fiscal Periods under Sections 4.1(a)(i) and 4.1(a)(ii), in reverse order, until Losses allocated under this Section 4.1(b)(i) equal the cumulative Profit previously allocated under Sections 4.1(a)(i) and 4.1(a)(ii); and

(ii)    Second, among the Members in proportion to their Allocation Percentages.

**4.2** **_Allocation Adjustments Required to Comply With Section 704(b) of the Code_**.

(a)    **_Limitation on Allocation of Losses_**.  If an item of Losses otherwise allocable to a Member under Section 4.1(b) would cause such Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year (or increase the amount of such Member Adjusted Capital Account Deficit), the item shall not be allocated to such Member, but shall instead be specially allocated as follows:

(i)    To the Members in proportion to their respective positive Capital Account balances, until the Capital Account balance of each Member has been reduced to (but not less than) zero; and

(ii)    Next, to the Members as a group in proportion to their respective Allocation Percentages as determined in the reasonable discretion of the Manager.

To the extent that there have been special allocations of Losses away from a Member under this Section 4.2(a) that have not subsequently been reversed pursuant to this sentence or Sections 4.2(f)

-9-

or 4.3(e), the next available items of Profits otherwise allocable to such Member pursuant to Section 4.1(a) shall be specially allocated to the Members to whom such items of Losses had been specially allocated under this Section 4.2(a) so as to first offset in reverse order such special allocations of Losses.

(b)     ***Qualified Income Offset***.  In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.2(b) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 4 have been tentatively made as if this Section 4.2(b) were not in this Agreement.

(c)     ***Gross Income Allocation***.  In the event any Member has an Adjusted Capital Account Deficit at the end of any Fiscal Year, that Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.2(c) shall be made only if and to the extent that the Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 4 have been made, as if Section 4.2(b) and this Section 4.2(c) were not in this Agreement.

(d)     ***Member Nonrecourse Deductions***.  In accordance with the provisions of Treasury Regulations Section 1.704-2(i), each item of Member Nonrecourse Deduction shall be allocated among the Members in proportion to the economic risk of loss that the Members bear with respect to the nonrecourse liability of the Company to which such item of Member Nonrecourse Deduction is attributable.

(e)     ***Minimum Gain Chargeback***.  This Section 4.2(e) hereby incorporates by reference the "minimum gain chargeback" provisions of Treasury Regulations Section 1.704-2.  In general, upon a reduction of Company Minimum Gain or Member Minimum Gain, the preceding sentence shall require that items of income and gain be allocated among the Members in a manner that reverses prior allocations of deductions attributable to liabilities giving rise to Company Minimum Gain or Member Nonrecourse Deductions as well as reductions in the Members' Capital Account balances resulting from distributions that, notwithstanding Section 4.4, are allocable to increases in the Company Minimum Gain.  Subject to the provisions of Section 704 of the Code and the Treasury Regulations thereunder, if the Manager determines in its reasonable discretion at any time that operation of such "minimum gain chargeback" provisions likely will not achieve such a reversal by the conclusion of the liquidation of the Company, the Manager shall adjust the allocation provisions of this Section 4 as necessary to accomplish that result.

(f)     ***Intent of Regulatory Allocations***.     The allocations set forth in Sections 4.2(a) through 4.2(e) are intended to comply with certain regulatory requirements under the Code.  The Members intend that, to the extent possible, all allocations made pursuant to such Sections will, over the term of the Company, be offset either with other allocations pursuant to Sections 4.2(a) through 4.2(e) or with special allocations of other items of Company income, gain,

-10-

loss or deduction pursuant to this Section 4.2(f). Accordingly, the Manager is hereby authorized and directed to make offsetting allocations of Company income, gain, loss or deduction under this Section 4.2(f) in whatever manner the Manager determines is appropriate so that, after such offsetting special allocations are made, the Capital Accounts of the Members are, to the extent possible, equal to the Capital Accounts each would have if the provisions of Sections 4.2(a) through 4.2(e) were not contained in this Agreement and all Company income, gain, loss, and deduction were instead allocated in accordance with the provisions of Section 4.1.

**4.3** *General Allocation and Capital Account Maintenance Provisions*.

(a) ***Book - Tax Accounting Disparities***. If Company property is reflected in the Capital Accounts of the Members at a value that differs from the adjusted tax basis of such property (whether because such property was contributed to the Company by a Member or because of a revaluation of the Members' Capital Accounts under Treasury Regulations Section 1.704-1(b)), allocations of depreciation, amortization, income, gain or loss with respect to such property shall be made among the Members in a manner which takes such difference into account in accordance with Code Section 704(c) and the Treasury Regulations issued thereunder using a method determined in the reasonable discretion of the Manager.

(b) ***Allocations in Event of Transfer***. If an Interest in the Company is Transferred in accordance with this Agreement, allocations of Profits and Losses as between the transferor and transferee shall be made using any method selected by the Manager and permitted under Section 706 of the Code.

(c) ***Adjustment to Capital Accounts for Distributions of Property***. If property distributed in kind is reflected in the Capital Accounts of the Members at a value that differs from the Fair Market Value of such property at the time of distribution, the difference shall be treated as Profit or Loss on the sale of the property and shall be allocated among the Members in accordance with the provisions of Section 4.

(d) ***Tax Credits and Similar Items***. Any tax credits or similar items not allocable pursuant to Sections 4.1, 4.2 and 4.3(a) through 4.3(c) shall be allocated to the Members in proportion to their respective Allocation Percentages. Notwithstanding the preceding sentence, if Company expenditures that give rise to tax credits also give rise to Member Nonrecourse Deductions, the tax credits attributable to such expenditures shall be allocated in accordance with Treasury Regulations Section 1.704-1(b)(4)(ii).

(e) ***Reallocation of Certain Losses***. To the extent that: (i) Losses which otherwise would have been allocated to a Member under this Section 4.3 were allocated to one or more other Members pursuant to Section 4.2(a) or any other provision of this Agreement that prohibits the allocation to a Member of Losses which would reduce such Member's Capital Account (or Updated Capital Account) balance below a specified amount; (ii) such allocation has not been reversed pursuant to the subsequent operation of Section 4.2(a) or this Section 4.3(e); and (iii) the Member thereafter returns a distributed amount as required under Section 3.6(b) or otherwise makes a contribution to the capital of the Company, the Capital Accounts of the Members shall be adjusted in connection with such return or contribution (to the extent of the value thereof) to effect a reallocation, in reverse order, of such Losses to the Member.

-11-

(f)    *Tax Allocations*.  It is intended that items of Company income, gain, loss, deduction or credit recognized for federal income tax purposes shall be allocated among the Members for federal income tax purposes in the same manner as its correlative item of "book" income, gain, loss or deduction is allocated pursuant to Sections 4.1 and 4.2 hereof, to the extent consistent with the requirements of the Code and the Treasury Regulations.

**4.4**    *Nonallocation of Distributions to Increases in Minimum Gain*.  To the extent permitted under Treasury Regulations Section 1.704-2(h), distributions to Members shall not be allocable to increases in the Company Minimum Gain.  In general, and except as provided in such Treasury Regulations, the preceding sentence is intended to ensure that reductions in a Member's Capital Account balance resulting from distributions of money or other property to that Member are not reversed by the minimum gain chargeback provisions of Section 4.2(e).

**4.5**    *Allocation of Liabilities*.  Solely for purposes of determining the Members' respective shares of the nonrecourse liabilities of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), each Member's interest in Company Profits shall be equal to the ratio that such Member's Allocation Percentage bears to the aggregate Allocation Percentages of the Members.

**4.6**    *Modifications to Preserve Underlying Economic Objectives*.  In the event that (i) there is a change in the federal income tax law, (ii) the Company borrows money or property, or (iii) the Company makes an election to adjust the basis of the Company's assets under Section 754 of the Code, the Manager, acting in his reasonable discretion after consultation with tax counsel to the Company, shall make the minimum modifications to the allocation provisions of this Agreement necessary to preserve the underlying economic objectives of the Members as reflected in this Agreement and, in the case of such a borrowing or election, to properly allocate the tax items relating to such borrowing or election in accordance with the Code and the Treasury Regulations.

**4.7**    *Withholding Taxes*.

(a)    The Company shall be permitted to withhold taxes from distributions to, and allocations among, the Members to the extent required by law (as determined by the Manager in the Manager's sole discretion).  Except as otherwise provided in this Section 4.7, any amount so withheld by the Company with regard to a Member shall be treated for purposes of this Agreement as an amount actually distributed to such Member pursuant to Section 5.1.  An amount shall be considered withheld by the Company if, and at the time, remitted to a governmental agency without regard to whether such remittance occurs at the same time as the distribution or allocation to which it relates; provided, however, that an amount actually withheld from a specific distribution or designated by the Manager as withheld from a specific allocation shall be treated as if distributed at the time such distribution or allocation occurs.  Nothing in this Section 4.7(a) shall have any bearing on amounts withheld from a Member in respect of compensation paid or payable to such Member in such Member's capacity as an employee of the Company or pursuant to a bona fide written employment agreement between such Member and the Company.

(b)    If, pursuant to Section 4.7(a), an amount withheld with regard to a Member is treated for purposes of this Agreement as an amount distributed to such Member pursuant to

-12-

Section 5.1, subsequent actual distributions to such Member pursuant to Section 5.1 shall be reduced as necessary to, as quickly as possible, cause the aggregate distributions to such Member over the term of the Company (including actual distributions and distributions deemed to have occurred pursuant to Section 4.7(a)) to equal the actual distributions that would have been made to such Member if Section 4.7(a) were not part of this Agreement.

(c)  To the extent that operation of Section 4.7(a) would create a negative balance in a Member's Updated Capital Account or increase the amount by which such Updated Capital Account balance is negative, the amount of the deemed distribution shall instead be treated as a loan by the Company to such Member, which loan shall be payable upon demand by the Company and shall bear interest at a floating rate equal to the prime rate as announced from time to time by the Wall Street Journal, compounded daily.

(d)  In the event that the Manager determines in its discretion that the Company lacks sufficient cash available to pay withholding taxes in respect of a Member, the Manager may, in its sole and absolute discretion, make a loan to the Company to enable the Company to pay such taxes.  Any such loan shall be full-recourse to the Company and shall bear interest at a floating rate equal to the prime rate as published from time to time by The Wall Street Journal, compounded daily.  Notwithstanding any provision of this Agreement to the contrary, any loan (including interest accrued thereon) made to the Company by a Member or the Manager pursuant to this Section 4.7(d) shall be repaid or returned as promptly as is reasonably possible.

(e)  Each Member hereby agrees to indemnify the Company and the other Members for (i) any liability they may incur for failure to properly withhold taxes in respect of such Member, and (ii) any tax liabilities imposed on the Company with respect to such Member; moreover, each Member hereby agrees that neither the Company nor any other Member shall be liable for any excess taxes withheld in respect of such Member's Interest and that, in the event of overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate governmental authority.  The obligations of a Member set forth in this Section 4.7 shall survive the resignation of any Member from the Company or any Transfer of a Member's Interest.

**4.8**  *Intent of Allocations/Cash Savings Clause*.  The parties intend that the foregoing allocation provisions of this Section 4 shall produce final Capital Account balances of the Members that will permit liquidating distributions that are made in accordance with final Capital Account balances under Section 8.2(d) hereof to be made in a manner identical to the order of priorities set forth in Section 5.1(b).  To the extent that the allocation provisions of this Section 4 would fail to produce such final Capital Account balances, (i) such provisions shall be amended by the Manager without the consent of any Member or other Person, if and to the extent necessary to produce such result and (ii) income and loss of the Company for prior open years (including items of gross income and deduction of the Company for such years) shall be reallocated by the Manager among the Members to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years, as approved by the Manager.  This Section 4.8 shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service ("**IRS**") or any other taxing authority.  The Manager shall have the power to amend this Agreement without the consent of the Members, as it reasonably considers advisable, to make the allocations and adjustments described in this Section 4.8.  To the extent that after making the allocations and

-13-

adjustments described in this Section 4.8, the distributions that any Member will receive under this Agreement are less than the amount of the distributions such Member would receive if all such distributions were made pursuant to the order of priority set forth in Section 5.1(b), the Company may make a guaranteed payment (within the meaning of Section 707(c) of the Code) to such Member (to be made at the time such Member would otherwise receive the distributions that have been reduced) to the extent such payment does not violate the requirements of Sections 704(b) and 514(c)(9)(E) of the Code or may take such other action as reasonably determined by the Manager to offset such reduction.

## SECTION 5

## DISTRIBUTIONS

**5.1** *Distributions*.

(a) ***General***.  Except as otherwise provided in this Agreement, distributions prior to the dissolution of the Company shall be made in accordance with this Section 5.1 and each Member actually receiving amounts pursuant to a specific distribution by the Company shall receive a pro rata share of each item of cash or property of which such distribution is constituted (based upon such Member's share under this Agreement of the total amount to be included in such distribution).

(b) ***Discretionary Distributions***.  The Manager may at any time in its sole discretion to the extent the Company has cash and any property available for distribution taking into account current and anticipated needs (including without limitation operating expenses, debt service, guaranteed payments and a reserve for future operating costs), distribute such excess cash and any property available for distributions to the Members in accordance with their respective Allocation Percentages.

(c) ***Tax Distributions.***

(i) Notwithstanding the foregoing, the Company shall distribute to each Member, not later than ninety (90) days after the close of each Fiscal Year, or as soon as reasonably practicable thereafter, an amount of cash equal to the product of the Tax Percentage for such Fiscal Year and such Member's allocated share of the Company's net taxable income and gain for such Fiscal Year as shown on the Company's federal income tax return. The Manager may, in its sole discretion and determination, make distributions pursuant to this Section 5.1(c) on a quarterly basis so as to permit the Members to make quarterly estimated tax payments.

(ii) For purposes of this Section 5.1(c), the "Tax Percentage" shall equal the highest combined federal, state and local marginal tax rate for an individual resident of the State of Texas with respect to net taxable income or net short term capital gains or with respect to net long term capital gains, as applicable.  The Manager may adjust the determination of the Tax Percentage to reflect a change in law or rates.

-14-

(iii)    For purposes of determining whether the Company has satisfied its distribution obligation under Section 5.1(c)(i), all cash distributions made during a Fiscal Year shall be treated as distributions made to satisfy Section 5.1(c)(i) in respect of such Fiscal Year (except to the extent that such distributions were made to satisfy the obligations of the Company under Section 5.1(c)(i) in respect of one or more prior Fiscal Years, in which case such distributions shall be treated as having been made pursuant to Section 5.1(c)(i) in respect of such prior Fiscal Year(s)).  Further, distributions made in respect of this Section 5.1(c) during any Fiscal Year shall be treated as satisfying the distribution requirement of Section 5.1(b) hereof with respect to such Fiscal Year (except to the extent that such distributions were made in respect of a prior Fiscal Year, in which case such distribution shall be treated as having been made in respect of such prior Fiscal Year(s)).

(iv)    At the election of the Manager, no distribution shall be required pursuant to Section 5.1(c)(i) in respect of any Fiscal Year if the total net taxable income and gain of the Company for such Fiscal Year is less than or equal to One Hundred Thousand Dollars ($100,000).

(v)    No distribution shall be required to be made pursuant to this Section 5.1(c) to a Member to the extent such Member has a cumulative net loss with respect to such Member's allocable share of the taxable income or gain, as the case may be, after taking into account allocations for the current and all prior taxable periods.

(vi)    The Company shall not make a distribution under this Section 5.1(c) to a Member to the extent such Member is allocated net taxable income and gain solely in connection with (A) redemption of such Member's Interest or (B) a liquidation of the Company.

(d)    *Source of Items Available for Distribution*.  In the event that, at the time of a distribution, items available for distribution include items from more than one source, the source of those items actually distributed shall be determined by the Manager in its sole discretion.

**5.2**    *Limitation on Distributions*.  No distribution shall be made to a Member pursuant to Section 5.1 if and to the extent that such distribution would:  (i) create a negative balance in the Updated Capital Account of such Member or increase the amount by which such Updated Capital Account balance is negative; (ii) cause the Company to be insolvent; or (iii) render the Member liable for a return of such distribution under applicable law.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to a Member on account of its interest in the Company if such distribution would violate the Act or other applicable law.

---

## SECTION 6

## ADMINISTRATION; MANAGEMENT

---

**6.1**    *Management Powers and Authority of the Manager*.  Except as otherwise specifically provided in this Agreement, the Company and its business shall be managed, controlled and operated exclusively by the Manager, which shall be the "manager" of the Company

within the meaning of Section 18-101 of the Act and shall have all of the powers and authority in respect of the Company permitted to managers under the Act.

**6.2** *Designation of Manager*. The initial Manager shall be Mark Patrick. In the event that Mark Patrick dies or is unable to serve as such, the will or other testamentary documentation for Mark Patrick shall designate a successor Manager. To the extent that the will or other related documentation for Mark Patrick fails to provide for a successor Manager or if any such designated individual shall be unable or is unwilling to fill such position, the managing shareholder of Charitable DAF HoldCo, Ltd., shall appoint a successor Manager. To the extent that Mark Patrick desires to resign as Manager, he shall appoint his successor.

**6.3** *Manager's Power to Bind the Company*.

(a) Notwithstanding any provision of this Agreement to the contrary, any contract agreement, deed, lease, note or other document or instrument executed on behalf of the Company by a Manager shall be deemed to have been duly executed by the Company; no Member's signature shall be required in connection with the foregoing and third parties shall be entitled to rely upon the Manager's power to bind the Company without otherwise ascertaining that the requirements of this Agreement have been satisfied.

(b) The Manager is hereby authorized to file with any governmental entity, on behalf of the Company and the Members, a certificate or similar instrument that evidences the Manager's power to bind the Company as set forth in the preceding paragraph (a).

(c) To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement the Manager is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the Manager shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in its "good faith" or under another express standard, the Manager shall act under such express standard and shall not be subject to any other or different standard.

**6.4** *Action by Members*. Except as set forth in Section 6.2, no Member shall have any right to vote with respect to any Company action.

**6.5** *No Duties to the Company*. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.

**6.6** *Manager and Member Expenses*.

(a) *General*. Except as otherwise provided in this Section 6.6, no Manager or Member shall be reimbursed for expenses incurred on behalf of, or otherwise in connection with,

the Company. Any reimbursement paid by a third party for expenses actually reimbursed by the Company shall be retained by (or paid over by the recipient thereof to) the Company.

(b)     **Manager**.   The Manager shall be reimbursed by the Company for reasonable out-of-pocket expenses incurred by the Manager on behalf of the Company.

(c)     **Member**.  A Member shall be reimbursed for expenses incurred on behalf of the Company only with the approval of the Manager, which approval may be withheld by the Manager in its sole and absolute discretion.

### 6.7     *Tax Matters; Partnership Representative*.

(a)     **Partnership Classification for Tax Purposes**.   Except to the extent otherwise required by applicable law (disregarding for this purpose any requirement that can be avoided through the filing of an election or similar administrative procedure), the Manager shall cause the Company to take the position that the Company is a "partnership" or disregarded entity, as applicable, for federal, state and local income tax purposes and shall cause to be filed with the appropriate tax authorities any elections or other documents necessary to give due legal effect to such position.  A Member shall not file (and each Member hereby represents that it has not filed) any income tax election or other document that is inconsistent with the Company's position regarding its classification as a "partnership" for applicable federal, state and local income tax purposes.

(b)     **Notice of Inconsistent Treatment of Company Item**.  No Member shall file a notice with the IRS under Section 6222(b) of the Code in connection with such Member's intention to treat an item on such Member's federal income tax return in a manner which is inconsistent with the treatment of such item on the Company's federal income tax return.

(c)     **Notice of Settlement Agreement**.  Any Member entering into a settlement agreement with the United States Department of the Treasury which concerns a Company item shall notify the Manager of such settlement agreement and its terms within sixty (60) days after the date thereof.

(d)     **Partnership Representative and Audits**.

(i)     The Manager shall be the "partnership representative" of the Company (the "**Partnership Representative**") pursuant to and to the extent permitted by Section 6223 of Title XI of the Bipartisan Budget Act of 2015 ("**Title XI 2015 BBA**").  In the event of any pending tax action, investigation, claim or controversy at the Company level that may result in a "partnership adjustment," within the meaning of Section 6241(2) of Title XI 2015 BBA (a "**Partnership Adjustment**"), to any item reported on a federal tax return of any Member(s), the Partnership Representative, shall keep such Member(s) fully and timely informed by written notice of any audit, administrative or judicial proceedings, meetings or conferences with the IRS or other similar material matters that come to its attention in its capacity as Partnership Representative.  The Partnership Representative will give the Members not less than fifteen (15) days' prior written notice as to any action to be taken or of any decision not to take action with respect to any such material matter.  The Partnership Representative shall act in any similar capacity under applicable state, local or foreign law, subject to similar restrictions and obligations.

-17-

The Company shall reimburse the Partnership Representative for its reasonable expenses in connection with the performance of his duties hereunder.

(ii)     For any Partnership Adjustment or proposed Partnership Adjustment to the federal income tax returns of the Company for which an "imputed underpayment," within the meaning of Section 6225(b) of Title XI 2015 BBA would arise, then either, (1) the Partnership Representative may require that the Member(s) affected by such Partnership Adjustment file amended returns that take into account such Partnership Adjustments and pay any additional tax due pursuant to Section 6225(c) of Title XI 2015 BBA or (2) if the Partnership Representative does not require the affected Member(s) to file such amended returns as provided in clause (1), and the affected Member(s) do not otherwise file such amended returns, the Partnership Representative may elect application of Section 6226 of Title XI 2015 BBA.  In any case, the affected Member(s) shall keep the Partnership Representative fully and timely informed by written notice of any administrative or judicial proceedings, meetings or conferences with the IRS or other similar matters with respect to the Partnership Adjustment, and the Partnership Representative shall have the right to review and comment on any submissions to the IRS, and attend and jointly participate in any meetings or conferences with the IRS.

(iii)     This Section 6.7(d) is intended to comply with certain provisions under Title XI 2015 BBA that may be subject to change or further interpretation by the U.S. Treasury or IRS.  In the event of such change or further interpretation, the Manager is hereby authorized to amend this Agreement consistent with the provisions of Sections 6.7(d)(i) and 6.7(d)(ii) above.

**6.8**    *Records and Financial Statements*.

(a)     The Company shall maintain true and proper books, records, reports, and accounts in which shall be entered all transactions of the Company.  The Company shall also maintain all schedules to this Agreement and shall update such schedules promptly upon receipt of new information relating thereto. Notwithstanding anything in Section 18-305 of the Act, except as provided in Section 6.8(b), no Member shall have any right to review or inspect any of the books or records of the Company or receive any other Company information.

(b)     Within ninety (90) days after the end of each Fiscal Year, or as soon as reasonably practicable thereafter, the Company shall supply to each Member such Member's IRS Schedule K-1 for such Fiscal Year.

**6.9**    *Valuation of Company Assets*.

(a)     *General*.  The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.

(b)     *Binding Effect*.  The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.

-18-

**6.10** *Officers*. The Manager may, from time to time as it deems advisable, select natural persons who are employees or agents of the Company and designate them as officers of the Company (the "**Officers**") and assign titles (including, without limitation, President, Vice President, Secretary, and Treasurer) to any such person. Unless the Manager decides otherwise, if the title given to an Officer is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Any delegation pursuant to this Section 6.10 may be revoked at any time by the Manager. An Officer may be removed with or without cause by the Manager.

## SECTION 7

## TRANSFERS AND RESIGNATIONS

**7.1** *Transfers of Interests*. To the fullest extent permitted by law, a Member shall not Transfer all or any portion of its Interest without the prior written consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion.

**7.2** *Resignation/Removal of a Member*. No Member shall resign from the Company or otherwise cease to be a Member without the consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion.

**7.3** *Redemption*. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal amount of the Fair Market Value of such Member's Interest being redeemed, as determined by the Manager in its sole discretion.

## SECTION 8

## DISSOLUTION AND LIQUIDATION

**8.1** *Dissolving Events*. The Company shall be Dissolved upon the occurrence of any of the following events:

(a) An election in writing by the Manager to dissolve the Company;

(b) Any time there are no members of the Company, unless the Company is continued in accordance with the Act; or

4937-0258-2788\4

(c)    The entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

To the maximum extent permitted by the Act, the Members hereby waive their rights to seek a judicial dissolution of the Company.

**8.2**    *Winding Up and Liquidation*.

(a)    Upon dissolution of the Company, the Manager shall promptly wind up the affairs of, and liquidate the Company. In furtherance thereof, the Manager, as the "liquidating trustee" of the Company within the meaning of the Act shall: (i) continue to have all of the administrative and management rights and powers of the Manager (including the power to bind the Company); and (ii) be reimbursed for Company expenses it incurs. Following dissolution, the Company shall sell or otherwise dispose of assets determined by the Manager to be unsuitable for distribution to the Members, but shall engage in no other business activities except as may be necessary to preserve the value of the Company's assets during the period of winding-up and liquidation. At the conclusion of the winding-up and liquidation of the Company, the Manager shall: (i) hold the books and records of the Company for not less than six years following the termination of the Company under the Act; and (ii) execute, file and record, as necessary, a certificate of cancellation or similar document to effect the termination of the Company under the Act and other applicable laws.

(b)    Distributions to the Members in liquidation may be made in cash or in kind, or partly in cash and partly in kind, as determined by the Manager. Distributions in kind shall be valued at Fair Market Value as determined in accordance with the provisions of Section 6.9 and shall be subject to such conditions and restrictions as may be necessary or advisable to preserve the value of the property so distributed or to comply with applicable law. Each Member actually receiving amounts pursuant to a specific distribution shall receive a pro rata share of each item of cash or property of which such distribution is constituted (based upon such Member's share of the total amount to be included in such distribution).

(c)    The Profits and Losses of the Company during the period of winding-up and liquidation shall be allocated among the Members in accordance with the provisions of Section 4. If any property is to be distributed in kind, the Capital Accounts of the Members shall be adjusted with regard to such property in accordance with the provisions of Section 4.3(c).

(d)    The assets of the Company (including proceeds from the sale or other disposition of any assets during the period of winding-up and liquidation) shall be applied as follows:

(i)    First, to repay any claims and obligations of the Company, whether to third parties or the Members, in the order of priority required by law and to the extent of any reserves which the Manager, or the liquidating trustee, as applicable, reasonably deems necessary for all contingent, conditional or unmatured claims or obligations of the Company (which reserves when they become unnecessary in accordance with the Act, shall be distributed in accordance with the provisions of clause (i), below); and

-20-

       (ii)     Next, to the Members in proportion to their respective positive Capital Account balances (after taking into account all adjustments to the Members' Capital Accounts required under Section 8.2(c)).

**8.3**    ***Deficit Restoration/Liability***.  Except as otherwise specifically provided in this Agreement, a Member shall have no obligation to restore a negative balance in such Member's Capital Account at the time of dissolution of the Company and no liability to the Company or to any other Member in respect of a negative balance in such Member's Capital Account during the term of the Company or at the conclusion of the Company's termination.

---

## SECTION 9

## EXCULPATION; INDEMNIFICATION

---

**9.1**    ***Exculpation***.  To the fullest extent permitted by applicable law, neither the Manager, Partnership Representative nor any Officer or Member nor any officer, director, employee, agent or Affiliate of the foregoing (collectively, the "**Covered Persons**"), shall be liable to the Company, or any other Person who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Person's gross negligence or willful misconduct.

**9.2**    ***Indemnification***.

       (a)     To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 9.2 by the Company shall be provided out of and to the extent of Company assets only, and no Member nor the Manager shall have personal liability on account thereof.

       (b)     To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon the receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section 9.2.

       (c)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to

-21-

the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

(d) The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Covered Person to the Company or its members otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

(e) The foregoing provisions of this Section 9.2 shall survive any termination of this Agreement.

## SECTION 10

## GENERAL PROVISIONS

**10.1** *Meetings*.  There shall be no requirement of annual or periodic meetings of the Company's members or managers within the meaning of the Act.

**10.2** *Action Without a Meeting*.  Any action of the Manager may be taken by written consent of the Manager.  Any consent or approval required by this Agreement to be "written" may also be made by the use of electronic transmission.

**10.3** *Entire Agreement*.  This Agreement and the other agreements referred to herein, including any employment, services, granting or other similar agreements, contain the entire understanding among the Members, and supersede any prior written or oral agreement between them, with respect to the Company.  There are no representations, agreements, arrangements, or understandings, oral or written, among the Members relating to the Company which are not fully expressed in this Agreement (or any employment, services, granting or other similar agreements).

**10.4** *Amendments*.  This Agreement may be amended, in whole or in part, only through a written amendment executed by the Manager.

**10.5** *Counterparts; Binding upon Members*.  This Agreement may be executed in any number of counterparts and, when so executed, all of such counterparts shall constitute a single instrument binding upon all parties notwithstanding the fact that all parties are not signatory to the original or to the same counterpart.

**10.6** *No Third Party Beneficiaries*.  The provisions of this Agreement are not intended to be for the benefit of or enforceable by any third party and shall not give rise to a right on the part of any third party to require a Member to make a Capital Contribution, return distributions, or make other payments to the Company as set forth in this Agreement.

-22-

**10.7**    ***Notices, Consents, Elections, Etc***.  All notices, consents, agreements, elections, amendments, demands and approvals provided for or permitted by this Agreement or otherwise relating to the Company shall be in writing and signed copies thereof shall be retained with the books of the Company.  For purposes of the following provisions of this Section 10.7, the term "notice" shall be deemed to include any notice, statement, report, consent or similar item required or permitted to be provided to one or more Persons under this Agreement or applicable law.

**10.8**    ***Severability***.  In the event that any provision of this Agreement is determined to be invalid or unenforceable, such provision shall be deemed severed from the remainder of this Agreement and replaced with a valid and enforceable provision as similar in intent as reasonably possible to the provision so severed, and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

**10.9**    ***Governing Law***.  The interpretation and enforceability of this Agreement and the rights and liabilities of the Members and the Manager as such shall be governed by the laws of the State of Delaware.  To the extent permitted by the Act and other applicable law, the provisions of this Agreement shall supersede any contrary provisions of the Act or other applicable law.

**10.10**    ***Status Under the Act***.    This Agreement is the "limited liability company agreement" of the Company within the meaning of Section 18-101 of the Act.

**10.11**    ***Partnership for Tax Purposes Only***.  As set forth in Section 2.1, the Members hereby form the Company as a limited liability company under the Act.  The Members expressly do not intend hereby to form a partnership except insofar as the Company may be treated as a partnership solely for tax purposes.

**10.12**    ***Miscellaneous***.  This Agreement shall not be construed for or against any party by reason of the authorship or alleged authorship of any provisions hereof or by reason of the status of the respective parties.  Each Member hereby specifically consents to the selection of all other Members admitted to the Company pursuant to the terms of this Agreement.

*[remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties have executed this Limited Liability Company Agreement of CDMCFAD, LLC, a Delaware limited liability company, as of the date first above written.

MEMBERS:

CHARITABLE DAF HOLDCO, LTD.

By: _____

Name: Mark Patrick
Title: Director

MANAGER:

_____

Name: Mark Patrick

**CDMCFAD, LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

**SCHEDULE A**

**MEMBER INFORMATION**

**Revised:  December 18, 2024**

| Name and Contact Information | Allocation Percentage |
|---|---|
| Charitable DAF Holdco, Ltd.<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 100% |

# EXHIBIT 49



# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF INCORPORATION OF "DFW CHARITABLE

FOUNDATION", FILED IN THIS OFFICE ON THE NINTH DAY OF DECEMBER,

A.D. 2024, AT 4:06 O`CLOCK P.M.



Jeffrey W. Bullock, Secretary of State

10030937  8100

SR# 20244432762

Authentication: 205075905

Date: 12-09-24

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:06 PM 12/09/2024
FILED 04:06 PM 12/09/2024
SR 20244432762 - File Number 10030937

CERTIFICATE OF INCORPORATION
OF
DFW CHARITABLE FOUNDATION
a nonprofit nonstock corporation

## I.

The name of the Corporation is DFW Charitable Foundation.

## II.

The name of the incorporator is Douglas Mancino. The address of the incorporator is 2029 Century Park East, Suite 3500, Los Angeles, CA 90067.

## III.

The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

## IV.

A.     The Corporation is a nonprofit nonstock corporation and is not organized for the private gain of any person. It is organized under the General Corporation Law of the State of Delaware ("DGCL") exclusively for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States internal revenue law (the "Code").

B.     In furtherance of its purposes, the Corporation shall have all the general powers and privileges of a corporation granted by the DGCL, as now in effect or as may hereafter be amended, including the power to solicit grants and contributions to further its charitable purposes.

## V.

The Corporation shall not have any capital stock and the Corporation is not authorized . The member of the corporation is Mark Patrick. The rights and privileges of the member shall be set forth in the Corporation's bylaws, provided that the member shall not have a "membership interest" in the Corporation within the meaning of section 114(d)(2) of the DGCL.

## VI.

A.     No part of the activities of the Corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation. The Corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of, or in opposition to, any candidate for public office.

315132803v.2

B.    Notwithstanding any other provision of this Certificate of Incorporation, the Corporation shall not directly or indirectly carry on any activity which would prevent it from obtaining exemption from Federal income taxation as a corporation described in section 501(c)(3) of the Code, or cause it to lose such exempt status, or carry on any activity not permitted to be carried on by a corporation, contributions to which are deductible under section 170(c)(2) of the Code.

## VII.

The property of the Corporation is irrevocably dedicated to charitable purposes, and no part of the net income or assets of the Corporation shall ever inure to the benefit of any director, officer, or member thereof or to the benefit of any private person. Upon the dissolution or winding up of the Corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of the Corporation shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for charitable purposes and which has established its tax-exempt status under section 501(c)(3) of the Code.

## VIII.

A director or officer of the Corporation shall not be liable to the Corporation for monetary damages for breach of fiduciary duty as a director or officer, except for liability: (a) for any breach of the director's or officer's duty of loyalty to the Corporation or its members, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, or (c) for any transaction from which the director or officer derived any improper personal benefit. If the DGCL is amended after adoption of this Article VIII to authorize Corporation action further eliminating or limiting the personal liability of directors or officers, then the liability of a director or officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any repeal or modification of the foregoing provisions of this Article VIII shall not adversely affect any right or protection of a director or officer of the Corporation existing at the time, or increase the liability of any director or officer of the Corporation with respect to any acts or omissions of such director or officer occurring prior to such repeal or modification.

## IX.

The Corporation shall, to the maximum extent permitted from time to time under the law of the State of Delaware, indemnify and upon request shall advance expenses to any person who is or was a party or is threatened to be made a party to any threatened, pending or completed action, suit, proceeding or claim, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was or has agreed to be a member or director or officer of the Corporation, or while the person is or was serving at the request of the Corporation as a director, officer, partner, trustee, employee or agent of any corporation, limited liability company, partnership, joint venture, trust or other entity, against expenses (including reasonable attorneys' fees and expenses), judgments, fines, penalties and amounts paid in settlement incurred in connection with the investigation, preparation to defend, or defense of such action, suit, proceeding or claim; provided however that: (a) the foregoing shall not require the Corporation to indemnify, or advance expenses to, any member or director or officer in connection with any

2

action, suit, proceeding or claim initiated by or on behalf of such member or director or officer, or any against the Corporation initiated by or on behalf of such member or director or officer; and (b) a member or director or officer seeking indemnification under this Article IX shall execute a written undertaking (reasonably acceptable to the Corporation) to repay the Corporation any expense or other amounts advanced and/or paid to such member or director or officer under this Article IX in the event that it is ultimately determined that such member or director or officer is not entitled to be indemnified by the Corporation. Such indemnification shall not be exclusive of other indemnification rights arising under any bylaw, agreement, vote of directors or member or otherwise and shall inure to the benefit of the heirs and legal representatives of such person. Any person seeking such indemnification under this Article IX shall be deemed to have met the standard of conduct required for such indemnification unless the contrary shall be established. Any repeal or modification of the foregoing provisions of this Article IX shall not adversely affect any right or protection of a member or director or officer of the Corporation with respect to any acts or omissions of such member or director or officer occurring prior to such repeal or modification.

**IN WITNESS WHEREOF**, this Certificate of Incorporation has been executed by its incorporator this 9th day of December, 2024.

/s/ Douglas Mancino
Douglas Mancino, Incorporator

# EXHIBIT 50

**VALUATION ANALYSIS OF
CERTAIN PARTICIPATION SHARES OF
CHARITABLE DAF HOLDCO, LTD**

**AS OF
MARCH 25, 2025**

Prepared for:

Mr. Bart F. Higgins
Attorney
Shields Legal Group



PM-1/300



March 26, 2025

Mr. Bart F. Higgins
Attorney
Shields Legal Group
16400 Dallas Parkway
Dallas, Texas 75248

**RE: *Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Higgins:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of following participation shares (the "Subject Interest" or the "Participation Shares") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of March 25, 2025 (the "Valuation Date").[1]

- 100 Participation Shares of DAF held by *Highland Dallas Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Kansas City Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Santa Barbara Foundation, Inc.*
- 5 Participation Shares of DAF held by *The Community Foundation of North Texas*

This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of shares), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.

---

[1] Our analysis assumes that the Company's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

950 E. State Highway 114 • Suite 120 • Southlake • Texas 76092 • Tel: 817.481.4901 • Fax: 817.481.4905
*www.valuescopeinc.com*

PM-1/301

Mr. Bart F. Higgins
March 26, 2025
Page 2

2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.
7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The valuation is conducted under the assumption that the DAF will continue as a going concern.[2] The liquidation premise of value was considered but deemed inapplicable, as the going-concern premise reflects the "highest and best use" of the Participation Shares.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's management shareholder ("Management"). To understand the environment in which DAF operates, we researched relevant information concerning the US private equity, hedge funds & investment vehicles industry. We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Balance sheet for CLO HoldCo, Ltd. as of September 30, 2024

- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd, amended and restated as of January 24, 2024

---

[2] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

Mr. Bart F. Higgins
March 26, 2025
Page 3

- Information regarding the Company's history and current operations

- Historical distributions paid to the holders of the Subject Interest

- The organizational structure chart for Charitable DAF HoldCo, Ltd

- Discussions with the Company's Management

- Pepperdine 2024 Private Capital Markets Report, dated June 10, 2024

- IBISWorld Industry Report 52599, *Private Equity, Hedge Funds & Investment Vehicles in the US*, October 2024

The procedures employed in valuing the Subject Interest included such steps that we considered necessary, including (but not limited to):

- An analysis of the general economic environment and industry as of the Valuation Date

- An interview with Management regarding expectations for future distributions

- An application of appropriate valuation techniques and procedures, including the income approach

- An analysis of other pertinent facts and data influencing our conclusion of value

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation.  Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data.  Our analysis was based in part on this information, as well as on other data we developed.

Mr. Bart F. Higgins
March 26, 2025
Page 4

**CONCLUSION OF VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**
**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | 20.0% | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | Shares | Fair Market Value |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis.  Our fee for these valuation services was in no way influenced by the results of our analysis.  The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report.  If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

*ValueScope*

ValueScope, LLC

**VALUE**SCOPE, LLC

PM-1/304

**TABLE OF CONTENTS**

ENGAGEMENT OVERVIEW ..........................................................................................1

    DESCRIPTION OF THE ASSIGNMENT .................................................................. 1

    SCOPE ..................................................................................................................... 1

    PROCEDURES ......................................................................................................... 1

DAF OVERVIEW.......................................................................................................2

    COMPANY OVERVIEW ........................................................................................... 2

    CAPITALIZATION TABLE ........................................................................................ 2

    COMPANY STRUCTURE CHART ............................................................................ 3

    FINANCIAL POSITION ............................................................................................ 3

    SUBJECT INTEREST OVERVIEW............................................................................. 6

ECONOMIC AND INDUSTRY OVERVIEW ..........................................................8

    OVERVIEW OF THE U.S. ECONOMY ..................................................................... 8

    OVERVIEW OF THE PRIVATE EQUITY... & INVESTMENT VEHICLES INDUSTRY................ 16

VALUATION METHODOLOGY ............................................................................17

    VALUATION APPROACHES................................................................................... 17

    VALUATION METHODS ....................................................................................... 18

    SUMMARY OF THE VALUATION APPROACHES AND METHODS ...................... 18

VALUATION ANALYSIS ........................................................................................20

    INCOME APPROACH ANALYSIS .......................................................................... 20

CONCLUSION OF VALUE - SUBJECT INTEREST ..............................................22

    DISCOUNT FOR LACK OF MARKETABILITY ....................................................... 22

    PRE-IPO STUDIES ................................................................................................ 34

    APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST ................ 35

    DISCOUNT ADJUSTMENT DISCUSSION.............................................................. 36

    SUBJECT INTEREST DISCOUNT CALCULATION.................................................. 37

    FAIR MARKET VALUE CONCLUSION................................................................... 38

ASSUMPTIONS AND LIMITING CONDITIONS ...............................................39

APPRAISAL CERTIFICATION ...............................................................................44

## TABLE OF SCHEDULES

**VALUATION SUMMARY** ..................................................................... **SUMMARY SCHEDULE**

**HISTORICAL FINANCIAL ANALYSIS** ........................................................................................ **A**

HISTORICAL DISTRIBUTIONS TABLE .................................................................... A.1
HISTORICAL DISTRIBUTIONS CHARTS ................................................................ A.2
CLO HOLDCO, LTD - SUMMARY BALANCE SHEET ........................................... A.3

**INCOME APPROACH** ...................................................................................................... **B**

DISCOUNTED CASH FLOW (DCF) ANALYSIS .................................................... B.1
SENSITIVITY ANALYSIS – HYPOTHETICAL RISK-FREE BOND ............................ B.2

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS** ....................................... **C**

RESTRICTED STOCK STUDIES............................................................................. C.1
RESTRICTED STOCK STUDIES SUMMARY STATISTICS...................................... C.2
DLOM QUALITATIVE SCORING .......................................................................... C.3
CALCULATION OF MARKETABILITY DISCOUNT................................................. C.4
DLOM FOOTNOTES AND COMMENTS............................................................... C.5

## ENGAGEMENT OVERVIEW

### DESCRIPTION OF THE ASSIGNMENT

We were retained to perform an independent valuation analysis to determine the fair market value of following participation shares (the "Subject Interest" or the "Participation Shares") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of March 25, 2025 (the "Valuation Date").[3]

- 100 Participation Shares of DAF held by *Highland Dallas Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Kansas City Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Santa Barbara Foundation, Inc.*
- 5 Participation Shares of DAF held by *The Community Foundation of North Texas*

This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of shares), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

### SCOPE

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections. The first section outlines the description, scope, and procedures of our analysis. The second section provides a brief description of the Company and the Subject Interest. The third section includes a discussion of the national economy and the industry in which the Company operates. The fourth section details a discussion of valuation theory and methodology. The fifth section presents our valuation analysis, and the sixth section presents our conclusion of the fair market value of the Subject Interest.

### PROCEDURES

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances. We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information, as well as on other data obtained through additional research. A full discussion of the methodologies employed appears in the following sections of this report.

---

[3]    Our analysis assumes that the Company's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

**DAF OVERVIEW**

**COMPANY OVERVIEW[4]**

Charitable DAF HoldCo, Ltd is a Cayman Islands "company limited by shares" formed in October 2011.  Upon the shareholders' acceptance of shares, the shareholders agreed to the provisions of the Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd (as amended from time to time in accordance with the provisions thereof, the "DAF Agreement") and the Companies Law of the Cayman Islands (as amended from time to time, the "Law").  As a holding company, DAF's predominant assets were historically interests in the equity tranches of Collateralized Loan Obligations ("CLOs"), the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities.  In recent periods, however, the DAF's underlying assets have been allocated across a broader and more diverse range of asset classes, including but not limited to cash and cash equivalents, public equity, private equity, private credit, real estate, and other alternative investments.

**CAPITALIZATION TABLE**

On February 7, 2025, the Company issued 318 participation shares to *DFW Charitable Foundation*, increasing the total number of participation shares to 623, composed of:

- 318 participation shares held by *DFW Charitable Foundation*
- 100 participation shares held by *Highland Dallas Foundation, Inc.*
- 100 participation shares held by *Highland Kansas City Foundation, Inc.*
- 100 participation shares held by *Highland Santa Barbara Foundation, Inc.*
- 5 participation shares held by *The Community Foundation of North Texas*

All the Company's management shares are held by Mark Patrick.

---

[4]    Based on the Company's memorandum and articles of association and information from Management.

## COMPANY STRUCTURE CHART



## FINANCIAL POSITION

The Company's only asset stems from its indirect interest in CLO HoldCo, Ltd ("CLO HoldCo"). The Company provided an unaudited balance sheet (the "Balance Sheet") for CLO HoldCo as of September 30, 2024. Based on a review of the Balance Sheet, CLO HoldCo reported total assets of $316.3 million, including $138.4 million of cash & cash equivalents, $175.3 million of other investments, and $2.5 million of other assets. CLO HoldCo reported total liabilities of $47.2 million.  CLO HoldCo has net assets of $269.1 million on its books as of September 30, 2024.  The Balance Sheet is presented below and in Schedule A.3.

**CLO HoldCo, Ltd - Summary Balance Sheet**

|  | Balance Sheet as of: | |
|---|---|---|
|  | 9/30/2024 | |
|  | Actual | % |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

The Company paid distributions to the Participation Shareholders of $819,050 in 2019, $619,050 in 2020, $834,450 in 2021, $968,950 in 2022, $950,881 in 2023, and $317,796 in the first three quarters of 2024.  Fourth quarter distributions were historically larger than in the first three quarters.[5]   Historical Distributions are presented in the following charts and in Schedules A.1 and A.2.

---

[5]   Distributions are typically paid a few months following the end of a quarter.  As a result, fourth quarter distributions may be paid in the first or second quarter of the following calendar year.

DAF OVERVIEW



Note: Q4 2024 distributions have not yet been paid.



**SUBJECT INTEREST OVERVIEW**

The Subject Interest consists of participation shares, which from time to time may receive discretionary cash distributions intended to support the charitable and expense goals of the holders.  The rights and limitations of the participation shares are defined by the DAF Agreement and are directly influenced by the discretion and actions of the Company's Management and directors.

The DAF Agreement grants the directors substantial discretion over distributions, share issuances, governance, and financial transparency, leaving participation shareholders with little influence over corporate decisions.  They are subject to potential dilutions, transfer restrictions, and limited access to information, with limited voting rights and no ability to amend governing documents.   Given these extensive limitations, the participation shares represent a highly restricted and passive financial interest with limited control or enforceable rights.

### *Limited Rights Over Distributions*

Participation shareholders do not have:

- The right to cause, vote on, or receive pro-rata distributions.
- The right to annual, timed, or guaranteed distributions.
- The right to receive notice of distributions made to other participation shareholders.
- The ability to amend the DAF Agreement to modify distribution rights.

### *Governance and Voting Limitations*

Participation shareholders do not have:

- The right to remove or appoint directors.
- The right to vote on the issuance of additional participation shares, receive notice of such issuance, or exercise pre-emption rights.
- The right to vote on or receive notice of share redemptions.

The appointed directors and Management have full control over the management, operations, and affairs of the Company (subject to requiring a two-thirds majority of the participation shareholders for any material adverse variation or abrogation of rights attached to the participation shares), including the issuance and purchase of shares on terms they determine.  Since participation shareholders do not have voting or approval rights over further issuances, additional participation shares may be issued at any time, potentially impacting the economic interests associated with existing shares (noting that

the purchase of participation shares, or issuance of further shares ranking pari passu or subsequent to the participation shares, is not regarded as causing a material adverse variation or abrogation of the rights of the participation shareholders).  Additionally, the transfer of participation shares requires director approval, and directors may reject transfer at their discretion.

### Restrictions on Meetings and Information Access

Participation shareholders do not have:

- The right to receive notice of, attend, speak at, or vote at general meetings.
- The right to inspect company records, accounts, or documents, except at the director's sole discretion (or in the very limited circumstances conferred by law).
- The ability to modify or amend the DAF Agreement in any capacity.

### Restricted Persons Clause

Certain individuals or entities may be classified as Restricted Persons, including:

- Any holder of participation shares in breach of applicable laws.
- Any holder that is not exempt from taxation under Section 501(c)(3).
- Any holder whose participation, in the opinion of the directors, could cause the Company to incur tax, legal, regulatory, administrative, or pecuniary liabilities that it would not otherwise face.

If the directors become aware that any participation shares are held by a Restricted Person, they may, by written notice, require the transfer of such shares in accordance with the DAF Agreement.

For further details, refer to Appendix A for key provisions of the DAF Agreement.

# ECONOMIC AND INDUSTRY OVERVIEW

## OVERVIEW OF THE U.S. ECONOMY

In the third quarter of 2024, the US economy expanded at a faster pace than in the second quarter.  Inflation, which peaked at 8.99% in June 2022, declined to 2.73% by November 2024, reflecting progress toward the Federal Reserve's target.  After a prolonged period of elevated interest rates to curb inflation, signs of a cooling labor market and stable prices led the Fed to cut rates by 25 basis points in December.  The rate hikes that began in 2023 initially resulted in an inverted yield curve, signaling investor concerns about an economic slowdown, but the curve has since normalized following the presidential election.  Meanwhile, US equity markets gained momentum, with major indices ending the year higher, supported by easing inflation and expectations of further monetary policy accommodation.

## Gross Domestic Product[6]

Real gross domestic product (GDP) increased at an annual rate of 3.1 percent in the third quarter of 2024, following an increase of 3.0 percent in the second quarter. The acceleration in real GDP in the third quarter primarily reflected accelerations in exports, consumer spending, and federal government spending.  These movements were partly offset by a downturn in private inventory investment and a larger decrease in residential fixed investment.



---

[6]    U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Third Quarter 2024. (Release Date: 12/19/2024).

ECONOMIC AND INDUSTRY OVERVIEW

### *Population*

Population growth is an important driver of long-term growth in an economy.  The total population increased from 335.9 million in November 2023 to 337.7 million in November 2024.[7]  The working-age population (15-64) increased from 208.9 million in November 2023 to 209.0 million in November 2024.[8]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic.  It partially recovered in just several months and has been trending upward/flat.   In November 2023, the civilian labor force participation rate was 62.8% and stands at 62.5% as of November 2024.[9]





---

7    U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

8    Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

9    U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

### Employment

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 227,000 in November 2024 and the unemployment rate changed little at 4.2 percent. Employment trended up in health care, leisure and hospitality, government, and social assistance. Retail trade lost jobs.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased from 7.0% in November 2023 to 7.7% in November 2024.[10]





Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will increase from 4.0 percent in 2024 to 4.3 percent in 2025 and then decrease to 4.1 percent in 2027.

---

[10]   U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

### Inflation

According to the BLS, The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.3 percent in November on a seasonally adjusted basis, after rising 0.2 percent in each of the following 4 months. Over the last 12 months, the all-items index increased 2.7 percent before seasonal adjustment.[11]

The index for shelter rose 0.3 percent in November and was the main factor in the all items increase. The food index increased 0.4 percent in November. The index for food away from home rose 0.5 percent over the month, while the index for food at home rose 0.3 percent. The energy index fell 0.2 percent over the month, after being unchanged in the preceding month.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has declined significantly since a year ago, November 2023, declining from 53.20% to 5.10% in November 2024[12].The forecasters predict current-quarter headline CPI inflation will average 2.2 percent at an annual rate, down from the prediction of 2.5 percent in the previous survey[13].



---

[11]  Federal Reserve Bank of St. Louis, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[12]  Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[13]  Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters,* November 15, 2024.

ECONOMIC AND INDUSTRY OVERVIEW

*Interest Rates*

The interest rate on the three-month Treasury bill declined from 5.20% as of December 29, 2023, to 4.23% as of December 31, 2024.[14]  The interest rate on the ten-year Treasury note increased from 3.88% as of December 29, 2023, to 4.58% as of December 31, 2024.[15]



The interest rate on Moody's Aaa-rated corporate bonds increased from 4.65% as of December 29, 2023, to 5.40% as of December 31, 2024.[16] The interest rate on the Moody's Baa-rated corporate bonds increased from 5.49% to 6.00% over the same time.[17]



---

14   Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

15   Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

16   Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last January 10, 2025.

17   Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

ECONOMIC AND INDUSTRY OVERVIEW

In the last twelve months, the yield curve transitioned from being inverted to normal, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill increasing between December 29, 2023, to December 31,2024 from -0.59% to a positive 0.70%.[18]



***Corporate Profits***

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) decreased slightly by 15 billion in the third quarter of 2024 from the second quarter of 2024.



---

[18]    U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed January 10, 2025.

ECONOMIC AND INDUSTRY OVERVIEW

*Stock Markets*[19]

The stock markets gained momentum from December 29, 2023, to December 31, 2024. The S&P 500 Index (SPY) closed at 475.31 on December 29, 2023, and closed higher at 586.08 on December 31, 2024.  The Dow Jones Industrial Average Index (DIA) closed at 376.87 on December 29, 2023, and closed higher at 425.50 on December 31, 2024.  The NASDAQ Composite Index (QQQ) closed at 409.52 on December 29, 2023, and closed higher at 511.23 on December 31, 2024.  In the graph below, the December 30, 2022, values were set to 100.



*Construction & Housing Starts*

Construction spending and housing starts are two other important indicators for the economy.  Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment.  Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy.  Housing starts decreased from 1.510 million units in November 2023 to 1.289 million units in November 2024.[20]  Construction spending, a seasonally adjusted annual figure, increased from $2.09 trillion in November 2023 to $2.15 trillion in November 2024.[21]

---

[19]  CapIQ Database, last accessed January 10, 2025.

[20]  U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[21]  U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

ECONOMIC AND INDUSTRY OVERVIEW



***Consumer Sentiment***

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has increased from 61.30 a year ago in November 2023 to 71.80 in November 2024. Although it has increased significantly from a year ago, the index is still well below the pre-COVID high of 101.0 in February 2020.[22] The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions.  The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S.  This is considered a leading indicator of future consumer expenditures and economic activity.



---

[22]    University of Michigan, *Surveys of Consumers*, November 2024

## OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY[23]

This industry is composed of private equity funds, hedge funds, closed-end funds, unit investment trusts and other financial vehicles. Entities in this industry manage securities or other assets on behalf of shareholders, unit holders or other beneficiaries to achieve high returns on targeted investments. This industry excludes insurance and employee-benefit funds, open-end investment funds and trusts, estates and agency accounts.

### *Executive Summary*

In recent years, industry assets have become increasingly integral to institutional investors' portfolios and the larger asset management market. Institutional investors are individuals or organizations that trade securities in such substantial volumes that they qualify for lower commissions and fewer protective regulations since it's assumed that they're knowledgeable enough to protect themselves. Increasing demand from institutional investors has contributed to the surge in the industry's assets under management (AUM) and revenue during the current period.

In recent years, the industry has continued to enmesh itself more deeply within the broader financial ecosystem despite the challenges posed at the onset of the period. The pandemic, mainly in the first quarter of 2020, contributed to revenue declines for many operators. Many portfolios, previously thought to be sound investments, were reevaluated and businesses pivoted their strategies due to the unprecedented nature of the crisis. However, as inflation was rampant in the latter part of the period, the FED increased interest rates to control high inflation, although as inflationary pressures eased in 2024, the FED cut interest rates, which will increase liquidity in financial markets. The Fed is anticipated to cut rates further in 2025, increasing liquidity and driving the shift of investments into equities from fixed-income securities. Overall, over the past five years, industry revenue grew at a CAGR of 4.2% to $310.1 billion, including an increase of 2.5% in 2025 alone. Industry profit has climbed significantly and will comprise 49.6% of revenue in the current year.

Industry revenue will grow at a CAGR of 2.7% to $353.7 billion over the five years to 2030. The Federal Reserve is anticipated to cut interest rates as inflationary pressures continue to ease. These declining interest rates will increase liquidity in the markets. Private equity firms and hedge funds will have less difficulty raising capital for investments. As characteristics of the financial system change in light of post-financial crisis banking regulations and regulators' recognition of the importance of hedge funds within the financial system, hedge funds will likely experience heightened oversight.

---

[23]  IBISWorld Industry Report 52599, March 2025, *Private Equity, Hedge Funds & Investment Vehicles in the U.S.*

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

## VALUATION APPROACHES

### *Income Approach*

The income approach quantifies the present value of anticipated future income generated by a business or an asset. Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes. One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow. The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate. The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

### *Market Approach*

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets. Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset. Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions. The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

### *Asset-Based (Cost) Approach*

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities. Replacement cost is often a primary indicator of the value of a business' assets. The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it. Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors. The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

**VALUATION METHODS**

The following are common valuation methods used under the three approaches:

    A. Income Approach
        1.  Discounted Cash Flow Method (multi-period model)
        2.  Direct Capitalization Method (single period model)
        3.  Excess Earnings Method

    B. Market Approach
        1.  Guideline Public Company Method
        2.  Merger and Acquisition Method

    C. Asset-Based Approach
        1.  Reproduction Cost Method
        2.  Replacement Cost Method
        3.  Net Asset Value Method

**SUMMARY OF THE VALUATION APPROACHES AND METHODS**

For the valuation of non-controlling interests in holding companies such as DAF, the asset-based approach is most commonly used.  When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities).  The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

However, in the case of the participation shares under consideration, the asset-based approach is not applicable.  These shares do not confer control and only have a claim in respect of the underlying assets in a winding up.  Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of these shares are contingent upon discretionary distributions by the director.  As such, their value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality.[24]

Given the nature of the participation shares, the income approach, specifically the discounted cash flow (DCF) method, is the most appropriate valuation methodology.[25]

---

[24]  Previous valuations conducted by ValueScope did not account for the rights of the participation shares under the applicable law, specifically that these shares confer an extremely limited enforceable claim to the entity's underlying NAV.

[25]  The market approach was considered but deemed inapplicable due to the absence of comparable transactions involving securities with characteristics similar to the participation shares.

VALUATION METHODOLOGY

This approach estimates the present value of expected future distributions, if any, based on reasonable assumptions regarding the manager's discretion in making such distributions.  If no future distributions are expected, the value of the Subject Interest would be nominal.  The DCF method captures the time value of money and the risk associated with the uncertainty of future distributions, providing a more accurate measure of the fair market value of the Participation Shares.

**VALUATION ANALYSIS**

**INCOME APPROACH ANALYSIS**

The income approach estimates the fair market value of an interest based on the present value of expected future economic benefits. In the case of the Participation Shares, these economic benefits are exclusively tied to discretionary distributions made by the director, rather than earnings or cash flows of the DAF's underlying assets. The approach involves forecasting expected future distributions and discounting them to present value using a rate of return that reflects the risk associated with the uncertainty and discretionary nature of these payments. The resulting present value represents the fair market value of the Subject Interest.

### Discounted Cash Flow Method

We developed a DCF model to determine the fair market value of the Subject Interest as of the Valuation Date. The DCF method projects the distributions that the Participation Shareholders are expected to receive. Each projected distribution is discounted to present value using a rate that reflects the risk associated with the uncertainty and discretionary nature of these payments.

### Projected Distributions

Distributions to the holders of the Subject Interest were projected based on discussions with Management and a review of historical distributions. Management indicated that the timing and size of future distributions will be discretionary, and that DAF does not intend to establish reserves for distributions.

Despite this discretion, Management currently intends to maintain distributions to the holders of the Subject Interest at levels consistent with those paid over the past 12 to 24 months. We projected distributions to occur quarterly, with the next four quarters reflecting the average distribution of the corresponding quarters from the prior two years, totaling approximately $950,000. Beyond this period, distributions were assumed to grow at an annual rate of 2.5%, consistent with expected inflation, in perpetuity.

### Cost of Equity

A cost of equity of 68.3% was applied to discount the expected discretionary distributions to the holders of the Subject Interest, reflecting their high-risk profile, extremely limited claim on underlying NAV, and absence of control over distributions. This rate was selected based on the third quartile of required returns for pre-seed venture capital investments from the Pepperdine 2024 private capital markets report, aligning with the speculative nature of potential cash flows, significant legal and governance risks, and the

VALUATION ANALYSIS

inability to force a sale or liquidity event. The Subject Interest exhibits characteristics similar to early-stage equity investments, where cash flows are highly uncertain, illiquidity risks are substantial, and investor returns are largely dependent on discretionary managerial decisions. Given these factors, a higher-end venture capital return benchmark was deemed appropriate.

### Conclusion – Income Approach Analysis

Based on the forecasts and methodologies presented in this analysis, the income approach indicated a minority and marketable value of the Subject Interest of $2,045,531 as of the Valuation Date.

This conclusion of value implies a discount for lack of control (DLOC) of 99.2%, calculated as the concluded marketable value of the Subject Interest divided by the NAV of CLO HoldCo.[26]

To assess the impact of the discount rate, a sensitivity analysis was performed under the hypothetical assumption that projected distributions followed the risk profile of a risk-free perpetual bond with identical expected cash flows. In this scenario, a 4.65% discount rate, equivalent to the 30-year US Treasury yield as of the Valuation Date, was applied. Under this assumption, the minority, marketable value of the Subject Interest would be $44.7 million, resulting in an implied DLOC of 83.4%. However, this analysis does not reflect the substantial risks associated with the Subject Interest.

---

[26] Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls. Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

## CONCLUSION OF VALUE - SUBJECT INTEREST

Based on the methodologies presented in this analysis, it is our opinion that the value of the Subject Interest on a minority and marketable basis, as of the Valuation Date, can reasonably be stated as $2,045,531.

## DISCOUNT FOR LACK OF MARKETABILITY

A discount for lack of marketability (DLOM) is necessary to determine the fair market value of the Subject Interest, as it cannot be readily sold or liquidated in an active market. The absence of a public exchange and transfer restrictions further constrain liquidity. A review of restricted stock studies was conducted to support the DLOM, examining the price differences between freely traded shares and comparable shares with resale restrictions. These studies provide empirical evidence of the impact of illiquidity on value, reinforcing the rationale for applying a marketability discount.

### *Restricted Stock Studies*

The restricted stock studies reviewed included data from 1966 through 2010. The studies analyzed the difference in prices between publicly traded stock and restricted stocks of the same entity. The restricted stocks were identical to the traded stock except for marketability. A summary of the mean and median discounts of the restricted stock studies is presented in the following figure.

CONCLUSION OF VALUE - SUBJECT INTEREST

**Summary of Restricted Stock Studies**



### SEC Institutional Investor Study[27]

The SEC Institutional Investor Study is a comprehensive restricted stock study with 398 transactions from January 1, 1966, through October 22, 1969. The study analyzed differences in discounts based on the following categories: trading market, type of institution purchasing the security, transaction size, sales of the issuer, and earnings of the issuer. The study found significant differences in discounts for type of exchange, sales, and earnings of the issuer. Stocks listed on the major exchanges had lower

---

[27] U.S. Securities and Exchange Commission, "Institutional Investor Report," 92nd Congress, 1st Session, House Documents No. 92-4, Part 5, 1971.

CONCLUSION OF VALUE - SUBJECT INTEREST

discounts than smaller exchanges and over-the-counter stocks.  The study found higher discounts for companies with smaller sales and lower earnings.

**Johnson & Racette Study[28]**

Richard Johnson and George Racette performed a study on restricted securities purchased by registered investment companies between 1967 and 1973.  The study included 86 observations sent from 75 investment companies that met the selection criteria.  Johnson and Racette's analysis indicated an average marketability discount of 34%, in line with the range with the most common observations of 30-40%.

**Gelman Study[29]**

Milton Gelman of National Economic Research Associates, Inc. conducted a study of 89 restricted stock transactions executed by four investment companies from 1968 to 1970.  The investment companies were formed in 1968 to specialize in restricted securities.  A significant portion of the funds of the investment companies were invested in restricted stock transactions consisting of shares of large and small companies listed on large and small exchanges, over the counter, purchased directly from the companies, or from selling stockholders.  Gelman's analysis found mean and median discounts of approximately 33%.  In addition, 59% of the transactions had discounts of 30% or more and 36% of the transactions had discounts of 40% or more.

**Trout Study[30]**

Robert R. Trout, a principal of Trout, Shulman & Associates, analyzed 60 transactions involving the purchase of restricted stock by mutual funds from 1968 to 1972.  Trout performed a regression analysis to determine the relationship between discounts and certain variables such as exchange listing, number of shares outstanding, and transaction size relative to total outstanding shares.  Trout's findings suggested an intercept or implied mean and median discount of 43.5%.

---

[28]   Richard D. Johnson and George A. Racette, "Discounts on Letter Stock Do Not Appear to Be a Good Base on Which to Estimate Discounts for Lack of Marketability on Closely Held Stocks," *Taxes—The Tax Magazine*, August 1981, 574-581.

[29]   Milton Gelman, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely-Held Company," "*The Journal of Taxation*, June 1972, 353-354.

[30]   Robert R. Trout, "Estimation of the Discount Associated With the Transfer of Restricted Securities," *Taxes—The Tax Magazine*, June 1977, 381-385.

CONCLUSION OF VALUE - SUBJECT INTEREST

**Moroney Study[31]**

Robert E. Moroney of Moroney, Beissner & Co. in Houston presented his restricted stock study to the Texas CPA Tax Institute in November 1972.  The study was subsequently published in 1973.  The analysis focused on 146 transactions in restricted securities by 10 registered investment companies.  The discounts ranged from a 30% premium to a 90% discount with a mean and median discount of 35.8% and 32.8%, respectively.

**Maher Study[32]**

Michael Maher, a former estate and gift tax agent with the Internal Revenue Service, published his study results in 1976.  The study observed discounts for 34 restricted stock transactions from 1966 to 1973.  The results of his study suggested a mean discount for his total and adjusted analyses of 35.4% and 34.7%, respectively.

**Standard Research Consultants Study[33]**

A 1983 study by two Standard Research consultants, William F. Pittock and Charles H. Stryker, CPA, observed discounts relating to 28 private placements of common stock from October 1978 to June 1982.  The discounts varied from 7% to 91% with a median of 45%.  The results of the study tend to suggest higher discounts for companies with smaller revenues.

**Wruck Study[34]**

Karen Wruck's Harvard University study on firm value analyzed 83 sales of unregistered securities from 1979 to 1984, 37 of which were observable and included in the study's sample.  On average, the offering price of the unregistered securities was set at 86.5% of the market price of the stock on the day before the announcement, indicating a discount of 13.5%.  The median discount indicated was similar at 12.2%.

---

[31]    Robert E. Moroney, "Most Courts Overvalue Closely Held Stocks," *Taxes—The Tax Magazine*, March 1973, 144-155.

[32]    J. Michael Maher, "Discounts for Lack of Marketability for Closely Held Business Interests," *Taxes—The Tax Magazine*, September 1976, 562-570.

[33]    William F. Pittock and Charles H. Stryker, "Revenue Ruling 77-287 Revisited," *SRC Quarterly Reports*, Spring 1983, 1-3, cited in Quantifying Marketability Discounts by Z. Christopher Mercer, 63.

[34]    Karen H. Wruck, "Equity Ownership Concentration and Firm Value, Evidence From Private Equity Financings," *Journal of Financial Economics*, Vol. 23. 1989, 3-1.

**FMV Opinions Study[35]**

The FMV Study included over 230 transactions from 1980 through April 1997, the date of the most recent amendment of Rule 144.  The mean and median discounts were 22.3% and 20.1%, respectively.  The authors of the study made the following generalization regarding their analysis:

- Companies with higher revenues resulted in lower discounts and vice versa
- Companies with unrestricted stock traded on exchanges exhibited lower discounts
- Discounts were higher for blocks exceeding 10% of ownership
- Discounts for companies with capitalization under $50 million ranged from 30% to 40%

**Barclay, Holderness, Sheehan Study[36]**

Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan's study observed private placements of large-percentage blocks of stock from 1980 to 1996.  Specifically, the study analyzed private placements to a variety of different types of investors, namely active investors, passive investors, and management.  Active investors were found to be willing to pay higher prices in their placements, indicating lower discounts, while management placements had the highest discounts, although they were found to not have a statistically significant difference from private placements.  In total, the average discount across all private placements was 18.7% while the median discount was 17.4%.

**Hertzel & Smith Study[37]**

A 1993 study by Michael Hertzel and Richard L. Smith analyzed private placements between 1980 between 1987.  The study's sample included private placements of 106 companies listed on the NYSE and AMEX exchanges as well as OTC firms.  While the mean and median indicated discounts were 20% and 13%, respectively, more than 35% of the private placements observed had discounts greater than 25%.

---

[35]  Hall, Lance S., and Timothy C. Polacek, "Strategies for Obtaining the Largest Valuation Discounts," *Estate Planning*, January/February 1994. pp. 38-44.

[36]  Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan, "Private Placements and Managerial Entrenchment," *The Journal of Corporate Finance*, 2007, Vol. 13, Issue 4, 461-484.

[37]  Michael Hertzel and Richard L. Smith, "Market Discounts and Shareholder Gains for Placing Equity Privately," *The Journal of Finance*, Vol. 48, No. 2. June 1993, 459-485.

**Management Planning Study[38]**

Management Planning, Inc. published the results of a study performed from 1980-1996 by Robert P. Oliver, ASA and Roy H. Meyers, ASA, CFA. They started with a base on 231 transactions and looked at discounts from the total sample, discounts from 53 transactions without registration rights, and discounts from 27 transactions with registration rights. A summary of the mean and median discounts from their study is presented in the following table.

**Results of Management Planning Study**

| Discount | Entire Sample of 231 Transactions | 53 Transactions without Registration Rights | 27 Transactions with Registration Rights |
|---|---|---|---|
| Low | N/A | 3.0% | N/A |
| Mean | 29.0% | 27.0% | 12.8% |
| Median | 28.0% | 25.0% | 9.1% |
| High | N/A | 58.0% | N/A |

The authors cite the difference between discounts with and without registration rights as evidence of the lack of marketability on an investment. Certain factors were also cited by the authors as the most influential in determining discounts. The factors include:

- Companies with higher revenues tend to have lower discounts
- Companies with higher earnings tend to have lower discounts
- Higher per share prices tend to have lower discounts
- Lower price volatility tends to result in lower discounts
- Block sizes representing a higher percentage of average trading volume tend to have higher discounts
- Large dollar blocks tend to have lower discounts

**Hertzel, Lemmon, Linck, Rees Study[39]**

A 2001 study by Michael Hertzel, Michael Lemmon, James Linck, and Lynn Rees analyzed private placements from 1980 to 1996. A total of 619 private placements were ultimately selected for the sample, which primarily consisted of small-cap, technology companies as 79% of the sample companies were traded on the NASDAQ exchange and the mean market value of equity for the companies was $188 million. Of the 619 private

---

[38] A Study by Management Planning Inc. published in Z. Christopher Mercer, "Analysis of Restricted Stocks of Public Companies 1980-1995," *Quantifying Marketability Discounts*, Peabody Publishing, 1997, Chapter 12, 345-370. Retrieved from John J. Stockdale Sr., *BVR's Guide to Discounts for Lack of Marketability*. 5th ed. Vol. 1. Portland, OR: Business Valuation Resources, LLC, 2013.

[39] Michael Hertzel, Michael Lemmon, James S. Linck, and Lynn L. Rees, "Long-Run Performance Following Private Placements of Equity," workpaper, Dec. 21, 2001.

placements in the sample, 404 had sufficient information and disclosures to determine relevant discounts.  The study indicated a mean discount of 16.5% and a median discount of 13.4%.

### Wruck & Wu Study[40]

A study by Karen Wruck and YiLin Wu in 2008 supplemented Ms. Wruck's 1989 study and analyzed private placements of companies between 1980 and 1999.  1,976 private placements were selected in the sample.  Of these, 1,854 had data for observed discounts.  The study found a mean discount of 11.33% and a median discount of 10.96%.

### Angrist, Curtis, Kerrigan (MPI) Study[41]

A study by Ezra Angrist, Harry Curtis, III, CFA, ASA, and Daniel Kerrigan, CFA in 2011 grouped a total of 402 transactions of unregistered stock into four groups based on the timing of the issuances in respect to the changes in holding period restrictions per Rule 144 as follows:

**Results of Angrist, Curtis, Kerrigan (MPI) Study**

| Period | Observations | Mean Discount | Median Discount |
|--------|-------------|---------------|-----------------|
| Pre-1990 | 79 | 30.5% | 32.3% |
| 1990 - Apr 1997 | 110 | 25.1% | 22.5% |
| May '97 - Feb '08 | 164 | 20.8% | 16.6% |
| Feb '08 - Dec '08 | 49 | 5.9% | 5.0% |
| Total | 402 | 22.1% | 19.6% |

Results of the study show that as restriction periods have declined, so have discounts.

### Willamette Management Associates Study[42]

Willamette performed an analysis of 33 private placements of restricted stock from January 1, 1981 through May 27, 1984.  There was a brief overlap in the latter part of the period included in the Standard Research Consultants Study.  The Willamette study resulted in a mean discount of 31.2%.

---

[40]   Karen H. Wruck and Yi Lin Wu, "Business Relationships, Corporate Governance, and Performance: Evidence From Private Placements of Common Stock," *Journal of Corporate Finance*, 15, 2009, 30-47.

[41]   Ezra Angrist, Harry Curtis III, and Daniel Kerrigan, "Regression Analysis and Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 30, No. 1 Spring 2011, 36-48.

[42]   Shannon Pratt, Robert F. Reilly, and Robert P. Schweihs, *Valuing a Business*, 2nd edition, 247.

**Silber Study[43]**

William L.  Silber, a professor of finance and economics at the Stern School of Business at New York University analyzed 69 private placements from 1981 through 1989.  Silber's study results ranged from a 12.7% premium to an 84% discount with a mean discount of 33.8%.  Silber also cited in his findings that discounts are larger when the block of restricted stock is large relative to the total shares outstanding and the dollar size is inversely related to the discount.

**Krishnamurthy, et al. Study[44]**

Srinivasan Krishnamurthy, Pual Spindt, Venkat Subramaniam, and Tracie Woidtke's 2001 study analyzed private placements from 1983 to 1992.  The study performed different discount calculations for the following classifications: 1) restricted shares, 2) shares with registration pending, 3) shares not known to be restricted, and 4) shares with pending registration or not known to be restricted (groups 2 and 3 combined).  The mean discounts for Groups 1-4 were 34.0%, 23.3%, 15.4%, and 16.0%, respectively.  The overall mean discount was 19.4%.

**Wu Study[45]**

YiLin Wu's study on private placements was published in the Journal of Financial Economics in 2004.  The study analyzed 301 private placements taking place from 1986 to 1997.  Mean and median discounts of 8.7% and 19.8%, respectively, were observed.

**Bajaj Study[46]**

The Bajaj study expands on previous restricted stock studies, namely by Wruck and by Hertzel and Smith.  This study analyzed 88 private placements occurring between 1990 and 1995.  The 88 observations revealed results ranging from a premium of approximately 14% to a discount of 68%, with mean and discounts of 22% and 21%, respectively.  The authors note four characteristics to consider regarding the target firm and private placement itself when analyzing discounts: the percentage of total shares offered, business risk, financial distress, and total proceeds.

---

[43]   William L. Silber, "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," *Financial Analysts Journal*, July-August 1991, 60-64.

[44]   Srinivasan Krishnamurthy, Paul Spindt, Venkat Subramaniam, and Tracie Woidtke, "Does Investor Identity Matter in Equity Issues? Evidence From Private Placements," *Journal of Financial Intermediation*, 14, 2005, 210–238.

[45]   Yi Lin Wu, "The Choice of Equity Selling Mechanisms," *Journal of Financial Economics*, 74, 2004, 93-119.

[46]   Mukesh Bajaj, David J. Denis, Stephen P. Ferris, and Atulya Sarin, "Firm Value and Marketability Discounts," *Journal of Corporation Law*, Vol. 27, Fall 2001, 89-115.

**Johnson Study (Business Valuation Review)[47]**

Bruce A. Johnson, ASA of Munroe, Park & Johnson conducted a restricted stock study from 1991 to 1995.  The study included 72 private placements with results varying from a 10% premium to a 60% discount with a mean discount of 20%.  Johnson also cited four important factors to consider when evaluating potential discounts: positive net income, sales volume, transaction value, and net income strength.

**Finnerty Study[48]**

John D. Finnerty, professor of finance at Fordham University, performed two studies to compare the impact of the changes in law regarding restriction periods for private placements that occurred in 1997 and 2008.  The first study focused on private placements from 1991 to 1997 and resulted in mean and median discounts of 26% and 20%, respectively.  The second study focused on private placements from 1997 to 2008 and resulted in mean and median discounts of 22% and 16%, respectively.

**Chaplinsky Purchase Discount and Warrant Study[49]**

Susan Chaplinsky's and David Haushalter's 2010 study analyzed private placements with a concentration on contract terms.  The study asserts that companies that are riskier and have poorer performance more commonly have private placement contracts with contingency terms rather than just offering a pure discount.  The indicated mean discount considering only the purchase discount was 19%, and the median was 15%.  The indicated mean discount considering purchase discounts as well as warrants was 17%, and the median was 14%.

**Brophy PIPE Study[50]**

David J. Brophy, Paige P. Ouimet, and Clemens Sialm of the University of Michigan performed a 2006 study that compared the effects of issuing private placements to hedge fund investors versus other investors.  The study indicated a mean discount of 14% when private placements were issued to hedge funds, but the mean discount when the issuance involved other investors was just 9%.

---

[47]   Bruce A. Johnson, "Quantitative Support for Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 18, No. 4, December 1999, 152-155.

[48]   John D. Finnerty, "An Average-Strike Put Option Model of the Marketability Discount," *The Journal of Derivatives*, April 19, 2012, 53-69.

[49]   Susan Chaplinsky and David Haushalter, "Financing Under Extreme Risk: Contract Terms and Returns to Private Investments in Public Equity," *Review of Financial Studies*, 2010, 23 (7), 2,789-2,820.

[50]   David Brophy, Paige Ouimet, and Clemens Sialm, "Hedge Funds as Investors of Last Resort?" workpaper, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=782791.

CONCLUSION OF VALUE - SUBJECT INTEREST

**Columbia Financial Advisors Study**[51]

This study focused on the effect of the Rule 144 holding period reduction to one year. The study considered two periods: January 1, 1996, to April 30, 1997, and May 1, 1997, to December 31, 1998.  The one-year holding period became effective April 29, 1997.  A summary of the study results is presented in the following table.

**Summary of Columbia Financial Advisors Study**

|  | January 1, 1996 to April 30, 1997 | May 1, 1997 to December 31, 1998 |
|---|---|---|
| Number of Transactions | 23 | 15 |
| Low | 0.8% | 0.0% |
| Mean | 21.0% | 13.0% |
| Median | N/A | 9.0% |
| High | 67.5% | 30.0% |

**Meidan Study**[52]

Danny Meidan's 2006 study observed PIPE transactions between 1996 and 2003.  The study categorized a total of 1,726 total private placement transactions into three groups: placements issued at discounts greater than 30%, placements issued between a 30% discount and 5% premium, and placements issued at a premium greater than 5%.  The majority of these transactions fell into the 30% discount to 5% premium category at 1,278 placements, or roughly 74% of the total sample.  The weighted average of the mean discounts was calculated as 9.8%.

**Verdasca Study**[53]

Andrew Verdasca of the Leonard N. Stern School of Business of New York University performed a 2007 study on a sample of 771 private placement transactions.  The study found a discount range from a 78% discount to a 93% premium, but both the mean and median results indicated discounts of approximately 10%.

---

[51]  Kathryn F. Aschwald, "Restricted Stock Discounts Decline as Result of 1-Year Holding Period," *Shannon Pratt's Business Valuation Update*, Vol. 6, No. 5, May 2000, 1-5.

[52]  Danny Meidan , "The Informativeness of Offer Characteristics Versus Investor Identity in PIPE Transactions," April 2, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=894689.

[53]  Andrew Verdasca , "Common Stock PIPE Discounts and Long-Term Performance," April 2, 2007, www.stern.nyu.edu/cons/groups/content/documents/webasset/uat_024319.pdf.

**Billett & Floros Study[54]**

Matthew T. Billett and Ioannis V. Floros' 2012 study focuses on two key features of financial relationships, contract terms and investor identity, in regard to private placements between 2001 and 2008.  These factors were found to both complement and substitute for the other depending on individual circumstances.  By analyzing 12,004 transactions in the PlacementTracker and PrivateRaise databases, the study concluded a median discount of 26.7%.

**Stout Risius Ross Study[55]**

Aaron M. Stumpf, CPA/ABV, Robert L. Martinez, and Christopher T. Stallman of the valuation firm Stout Risius Ross performed a study of restricted stock transactions from September 2005 through May 2010, focusing on discounts associated with shorter holding periods.  The chosen time period includes transactions both before and after Rule 144 implementation.  The study found that for all transactions considered, the average and median discounts were 10.9% and 9.3%, respectively.  Stout Risius Ross also found that the most significant and reliable factors influencing discounts were subject company volatility, block size, dividends, profitability, growth, and size.

**Harris-Trugman Study[56]**

William Harris, AM of Trugman Valuation Associates, Inc.'s study was performed to analyze the impact of the economic recession on implied restricted stock discounts and the statistical relationships between implied restricted stock discounts and various company-specific variables.  The study originally included 80 transactions of restricted stock sales that took place in 2007-2008.  Due to the volatility of the Rule 144 holding period implementation, an additional 56 transactions were included in 2011.  For the 47 transactions that took place prior to Rule 144 implementation, the average and median discounts were 17.9% and 14.8%, respectively.  The 89 transactions analyzed after the rule implantation had average and median discounts of 15.9% and 14.3%, respectively.  The overall group indicated mean and median discounts of 16.6% and 14.3%, respectively.  The Harris-Trugman study noted that the only company-specific variable that had a notable statistical relationship with the implied discounts was volatility.

---

[54]  Matthew Billett and Ioannis Floros, "Do Investor Identity and Contract Terms Interact? Evidence From the Wealth Effects of Private Placements," workpaper, April 2012, papers.ssrn.com/sol3/papers.cfm?abstract_id=1784498.

[55]  Aaron Stumpf, Robert Martinez, and Christopher Stallman, "The Stout Risius Ross Restricted Stock Study: A Recent Examination of Private Placement Transactions From September 2005 Through May 2010," *Business Valuation Review*, Vol. 30, No. 1, Spring 2011, 36-48.

[56]  William Harris, "Trugman Associates, Inc. (TVA) Restricted Stock Study—An Update," *Business Valuation Review*, Vol. 30, No. 4, Winter 2011, 132-139.

**Summary of Restricted Stock Studies**

The restricted stock studies previously mentioned were performed based on data from 1966 to 2010.  Reported mean discounts range from 8.7% to 35.6%.  The average of reported mean discounts was 20.8%, while the median was 19.4%.   Reported median discounts range from 9.0% to 45.0%.  The average of reported median discounts was 19.9%, while the median was 15.3%.

Some of the variation in the studies has to do with the specific periods analyzed.  Prior to April 1997, the SEC-required holding period for restricted stocks was two years.  That was decreased to one year on April 29, 1997.  Similarly, the holding period was reduced from one year to six months effective February 15, 2008.

The following table shows the summary statistics for studies based upon the period studied.

**Analysis of Restricted Stock Studies for Different Periods**

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | **Mean** | **Median** |
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |

The studies also cited several company and security specific factors in determining the estimated discount.

**PRE-IPO STUDIES**

In recent years, a number of pre-IPO studies were performed to support marketability discounts.  The methodology applied in these studies is based on the initial offering price (the price prior to public trading).  This price is reduced by the price per share at the time of the last private transaction (which must be less than five months prior to the initial offering to qualify for the study) and adjusted by an appropriate index to account for related market or sector movements over the five-month period.  The resulting amount is divided by the initial offering price to arrive at the appropriate discount.  The pre-IPO methodology of determining marketability discounts is a relevant method as private stockholders experience an inability to freely sell their stock in the open market, similar to restricted stockholders.  Furthermore, private stockholders differ from unrestricted public stockholders, much like restricted stockholders, because there is not a public forum in which investments can be easily liquidated (which is only one of the differences between private and public stockholders).

***Emory Studies***

John Emory, Sr., ASA began his pre-IPO studies with Baird & Co. and continued his studies with his own firm, Emory Business Valuation, LLC.  Emory has completed nine studies with the original published in June 1986.  The first eight studies eliminated development-stage companies, companies with historical operating losses and companies with IPO prices less than $5 per share.  The ninth study deviated from the previous studies as follows:

- Included only companies with "com" in their names

- Review period was increased from 18 months in the previous studies to 35 months

- All transactions were actual sales as opposed to the previous studies that included options

- Most of the companies did not have earnings

The study consisted of 53 transactions.  The mean and median discounts by study are presented in the following chart.

CONCLUSION OF VALUE - SUBJECT INTEREST



### Willamette Management Associates Pre-IPO Study

This study observed 556 companies and 1,007 transactions from 1975 through 1997. The adjusted mean discount[57] for each time period varied from 28.9% to 56.8%. The mean for the entire review period was 44.2%. The median discount range was from 31.8% to 73.1% with the overall median at 50.4%. The Willamette study found the standard mean discount was greater than 35% for all but three of the 14 periods in the study and that median discounts exceeded 40% in all but one year.

### Valuation Advisors Pre-IPO Study

Two studies were conducted by Valuation Advisors for the calendar years of 1999 and 2000. The mean discount of these studies was 48.9%. The key feature of this study was the inclusion of holding period based upon the length of time between the private transaction and the IPO. The study confirmed the author's initial hypothesis that higher discounts accompany longer holding periods.

### APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST

While there are potential application problems associated with various studies, especially the pre-IPO studies, a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest. The mean and median discounts from the restricted stock studies ranged from 9% to 45%. The findings of the restricted stock studies as well as additional private placement studies by Hertzel and Smith suggest discounts can vary greatly depending on size, profitability and other company or security specific factors.

---

[57]    Excluded highest and lowest deciles of indicated discounts

The latest restricted stock studies indicate mean and median marketability discounts in 14% range.  We view the latest restricted stock studies as shorter term and therefore have taken the full sample of restricted stock studies into account in our analysis.  Our analysis compares these interests to the comparable transactions and makes adjustments from the baseline discounts noted in the comparable transactions.  Since the latest one-year study does not measure restricted securities with similar hold periods relative to the vast majority of other discount studies and since it has a relatively small sample size, we relied upon all the restricted stock studies' findings as the basis for our comparison.

The pre-IPO studies may be less indicative of appropriate marketability discounts, as much of the differences in the transaction prices between pre-IPO and IPO may include event premiums, such as the securing of additional capital which promotes the viability of the company.  We did not use these studies for our analysis.

### Factors Affecting Marketability

Based on the SEC Study, we noticed that as company size and profitability decreases, the marketability discount associated with restricted stock in these companies increase.  We also note that various other factors affected discounts observed in the other studies. Most notably, the following affect marketability discounts:

- Increase in dividend payment decreases marketability discounts
- Increase in the size of interest and amount of control decreases discounts
- Increase in financial strength of the company decreases discounts
- Increase in restrictions increases marketability discounts

Given the characteristics of size, lack of distribution history, etc., we concluded a 20.8% marketability discount, with a standard deviation of 8.2%, as the baseline observed from all the restricted stock studies we reviewed.

### DISCOUNT ADJUSTMENT DISCUSSION

In the following sections, we adjust the marketability discount to reflect the attributes of the Subject Interest.

The analysis originates with the baseline discount concluded in the previous section. Then, our analysis reviews several factors that affect marketability for both the interests being valued and the comparable interest which provides the base of comparison.  Each interest is assigned a ranking from 1 to 5 (from Poor to Strong) based upon the respective feature.  Then, the feature ranking for the Subject Interest is subtracted from the feature ranking from the comparable interest.  This results in a range of outputs from -4 to +4

CONCLUSION OF VALUE - SUBJECT INTEREST

(from significantly worse to significantly better).  The output is then multiplied by the standard deviation of the restricted stock studies (lack of marketability) to give an indication as to the adjustment necessary to the baseline discount based upon this feature.  An importance factor (from low to high) is also attributed to each feature to provide a final scaling factor for the specific feature.

Once the individual feature scaling factors are computed, the baseline discounts are adjusted upward and downward by multiplying the baseline discount by the product of all relevant feature scaling factors.

## SUBJECT INTEREST DISCOUNT CALCULATION

### *Adjustment Analysis – Marketability*

The Subject Interest is characterized by a lack of rights and, is therefore, somewhat riskier and more volatile.  The Participation Shares have restrictions on the transfer of their shares and only have a claim in respect of the underlying assets in a winding up.

The 20.8% baseline lack of marketability discount of the comparable investments reflects the discount that would apply to the Subject Interest if it had illiquidity features similar to restricted stock.  Since the Subject Interest did not exhibit these exact characteristics, further adjustments were necessary to conclude fair market value.

Schedule C.3 summarizes the differences between the Subject Interest and the comparable investments used in our analysis.  Overall, these factors resulted in a modest decrease in the discount from the baseline.

Based on the analyses and procedures outlined herein, we concluded that a lack of marketability discount of 20.0% is appropriate for the Subject Interest.

**FAIR MARKET VALUE CONCLUSION**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**

**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | 20.0% | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | Shares | Fair Market Value |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

Our conclusion of value implies an expected payback period of 1.27 years for the Subject Interest.  Our conclusion of value is presented in the Summary Schedule as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report.  We relied on information received as indicative of the Company as of the Valuation Date.  We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation.  Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data.  Our analysis was based in part on this information as well as on other data we developed.  We have no obligation to update this report or our conclusion of value for information that comes to our attention after the date of this report.

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, LLC is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated.  They should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever.  Notwithstanding the foregoing, the valuation report and its contents may be disclosed to third parties, including potential investors, acquirers, and advisors, to establish the fair market value of the Company or in connection with transactions involving the Company, without requiring prior written consent from ValueScope, LLC.  Additionally, the Company may distribute this report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, LLC, and we shall have no responsibility for any such unauthorized change.

The valuation report has been prepared based on specific assumptions, methodologies, and data outlined herein.  This report may be used alongside other appraisals or studies for comparative or analytical purposes.  The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts.  The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, other than as expressly permitted herein, without the express written consent of ValueScope, LLC.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

**OPERATIONAL ASSUMPTIONS**

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

**COMPETENT MANAGEMENT ASSUMED**

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership.  This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

**NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION**

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement.  If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, LLC must be made in advance. ValueScope, LLC reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s).  We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

ASSUMPTIONS AND LIMITING CONDITIONS

**NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE**

No opinion is rendered as to legal fee or property title.  No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

**LIENS AND ENCUMBRANCES**

ValueScope will give no consideration to liens or encumbrances except as specifically stated.  We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks.  We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

**INFORMATION PROVIDED BY OTHERS**

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

**PROSPECTIVE FINANCIAL INFORMATION**

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted.  Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA).  We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation guidelines.

## REGULATORY AND ENVIRONMENTAL CONSIDERATIONS

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

## POTENTIAL FUTURE SALES

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

ASSUMPTIONS AND LIMITING CONDITIONS

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided.  An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time.  Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

**INDEMNIFICATION BY THE COMPANY**

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement.  Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement.  In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

**APPRAISAL CERTIFICATION**

I certify that, to the best of my knowledge and belief:

1. We have not inspected certain assets, properties, or business interests encompassed by this appraisal.

2. We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.

3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.

4. Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.

5. To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.

6. No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.

7. The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.

8. This report and analysis were prepared under the direction of Steven C. Hastings.

9. I am in compliance with all professional appraisal certifications and licensing.

10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.


By:    ValueScope, LLC


Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, LLC

**APPENDIX A
KEY DAF AGREEMENT PROVISIONS**

1. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restriction whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided. [Paragraph 7, Memorandum]

2. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

   a. issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

   b. and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

   and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued. [Article 7]

3. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, establishing and designated (or re-designated as the case may be) and the variations in the relative rights (including without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligation as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution. [Article 8]

4. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether

absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerages as may be lawful on any issue of Shares. [Article 9]

5.  The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason. [Article 10]

6.  Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote in general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles. [Article 12]

7.  Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes. [Article 13]

APPENDIX A:  KEY DAF AGREEMENT PROVISIONS

8.  The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares raking *pari passu* with or subsequent to them or the redemption of purchase of any Participating Shares of any Class by the Company. [Article 14]

9.  The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws. [Article 18]

10. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles. [Article 21]

11. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution. [Article 65]

12. Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed. [Article 72]

13. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article. [Article 77]

14. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor. [Article 100]

15. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors. [Article 101]

APPENDIX A:  KEY DAF AGREEMENT PROVISIONS

16. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rate basis as to the paid-up or par value of the Shares. [Article 105]

17. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions and regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors of by Ordinary Resolution. [Article 110]

## APPENDIX B
## QUALIFICATIONS OF THE APPRAISER

### *Steven C.  Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA*
### Principal
### shastings@valuescopeinc.com, 817-481-4901

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

### EMPLOYMENT HISTORY

*2006 – Present*                                                      *ValueScope, LLC*

*Principal*

Mr.  Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis.  As a CPA with significant valuation and financial reporting experience, Mr.  Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

2001 – 2006                                                           *Value Capital, LLC*

*Principal*

Mr.  Hastings served as a principal with Value Capital, LLC.  During his tenure at Value Capital Mr.  Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries.  He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions.  His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000*                           *Finance Commission of Texas*

*Director*

The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner.  As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets.  Mr.  Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations.  He was

instrumental in assisting the Savings and Loan Department in writing new Mortgage Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001*                                                    *MedCare Financial Solutions, Inc.*

*President*
Mr.  Hastings served as an officer of MedCare Financial Solutions, Inc.  and MedCapital Funding Corporation.  MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers.  MedCare Financial Solutions provided other financial and operational services to health care providers.  These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending.  Mr.  Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

*1986 – 1994*                                                    *H.D.  Vest Financial Services*

*Executive Vice President and CFO*
As executive vice president and CFO of H.D.  Vest Financial Services, Mr.  Hastings assisted in placing over $1.5 billion annually in investment.  Responsible for day-to-day financial operations and capital structuring, Mr.  Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers.  Mr.  Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr.  Hastings supervised stockbrokers' and investment advisors' day-to-day activities.  As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies.  Being licensed in life, disability, health, property and casualty insurance, Mr.  Hasting was instrumental in implementing this line of business at HD Vest.

*1979 – 1986*                                                    *Arthur Andersen & Co.*

*Senior Manager*
Mr.  Hastings served as a senior manager with significant responsibilities in the several industries.  He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona

Bachelor of Science - Indiana University, Bloomington, Indiana

**CERTIFICATIONS AND LICENSES**

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

**ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS**

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

**RECENT IRS CASES - OFFICE OF CHIEF COUNSEL**

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.
- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C. Docket No. 1045-13, Estate of Jinana M. Bowey, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C. Docket No. 8401-13, Estate of Edward S. Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.
- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C. Docket No. 223630-12, Michael Tricarichi, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C. Docket No. 6936-10, et al, John M. Alterman, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No. 8097-13, *Sumner Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.*
- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No. 20177-11, *Richard H. Cullifer, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.*
- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

APPENDIX B:  QUALIFICATIONS OF THE APPRAISER

**RECENT IRS CASES – LMSB AUDIT DIVISION**

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.
- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.
- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.
- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.
- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

**RECENT DEPARTMENT OF JUSTICE CASE**

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America.  Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No.  4:16-cv-03302, ALPC Services of Texas, Inc.  v.  United States of America and Internal Revenue Service.  Valuation issues report, 2017.
- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No.  12-844, *The Estate of David W.  Longaberger v. The United States.*  Valuation issues report, 2014.

**RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS**

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al.  Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.
- Expert Report June 2018
- Deposition Testimony May 2019

APPENDIX B:  QUALIFICATIONS OF THE APPRAISER

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al.  Fraudulent transfer, solvency and economic damages.
- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.
- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No.  CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al.  Economic damages related to lost wages.
- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No.  2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.
- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No.  14-671C.  Always at Market, Inc.  v.  United States of America (DOD/DOJ).  Army & Air Force Exchange Service economic damages.
- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No.  CV-05-1483, General Medicine, PC v.  Healthsouth Corporation v.  General Medicine, PC.  Economic damages related to contract dispute.
- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

 "Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International

**WHITE PAPERS**

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v.  Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

**SCHEDULES**

**VALUE**SCOPE, LLC

**Charitable DAF HoldCo, Ltd**
**Table of Contents**

**Valuation Date: March 25, 2025**

## Table of Contents

| Schedule Name | Schedule |
| --- | --- |
| **Valuation Summary and Conclusion** | Summary Schedule |
| | |
| **Historical Financial Analysis** | |
| Historical Distributions Table | Schedule A.1 |
| Historical Distributions Charts | Schedule A.2 |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.3 |
| | |
| **Income Approach** | |
| Discounted Cash Flow (DCF) Analysis | Schedule B.1 |
| Sensitivity Analysis - Hypothetical Risk-Free Bond | Schedule B.2 |
| | |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Restricted Stock Studies | Schedule C.1 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.2 |
| DLOM Qualitative Scoring | Schedule C.3 |
| Calculation of Marketability Discount | Schedule C.4 |
| DLOM Footnotes and Comments | Schedule C.5 |

**Charitable DAF HoldCo, Ltd**
**Valuation Summary and Conclusion**

**Summary Schedule**
**Valuation Date: March 25, 2025**

*Synthesis of Fair Market Value*

## Fair Market Value Summary

| | | Value | Reference |
|---|---|---|---|
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | 20.0% | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |

## Fair Market Value per Share

**$5,368**

## Subject Interest Valuation Breakout

| | Shares | Fair Market Value |
|---|---|---|
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

PM-1/364

**Charitable DAF HoldCo, Ltd**
**Historical Financial Analysis**

Schedule A.1
Valuation Date: March 25, 2025

*Historical Distributions Table*

| | | | Quarterly Distributions - Previous 5 Years | | |
|---|---|---|---|---|---|
| Organization | Highland Dallas Foundation, Inc. | Highland Kansas City Foundation, Inc. | Highland Santa Barbara Foundation, Inc. | The Community Foundation of North Texas | Total |
| Holding | 100 Participation Shares | 100 Participation Shares | 100 Participation Shares | 5 Participation Shares | 305 Participation Shares |
| 31-Mar-19 | 39,750 | - | 51,000 | - | $90,750 |
| 30-Jun-19 | 39,438 | - | 50,688 | - | 90,125 |
| 30-Sep-19 | 36,813 | - | 48,063 | - | 84,875 |
| 31-Dec-19 | 231,738 | 168,250 | 53,313 | 100,000 | 553,300 |
| 2019 Subtotal | $347,738 | $168,250 | $203,063 | $100,000 | $819,050 |
| 31-Mar-20 | 25,750 | - | 37,000 | - | 62,750 |
| 30-Jun-20 | 27,625 | - | 38,875 | - | 66,500 |
| 30-Sep-20 | 27,125 | - | 38,375 | - | 65,500 |
| 31-Dec-20 | 162,738 | 120,250 | 41,313 | 100,000 | 424,300 |
| 2020 Subtotal | $243,238 | $120,250 | $155,563 | $100,000 | $619,050 |
| 31-Mar-21 | 33,188 | - | 44,438 | - | 77,625 |
| 30-Jun-21 | 40,063 | - | 51,313 | - | 91,375 |
| 30-Sep-21 | 43,063 | - | 54,313 | - | 97,375 |
| 31-Dec-21 | 236,513 | 176,250 | 55,313 | 100,000 | 568,075 |
| 2021 Subtotal | $352,825 | $176,250 | $205,375 | $100,000 | $834,450 |
| 31-Mar-22 | 46,438 | - | 57,688 | - | 104,125 |
| 30-Jun-22 | 52,438 | - | 63,688 | - | 116,125 |
| 30-Sep-22 | 50,750 | - | 62,000 | - | 112,750 |
| 31-Dec-22 | 285,013 | 191,750 | 59,188 | 100,000 | 635,950 |
| 2022 Subtotal | $434,638 | $191,750 | $242,563 | $100,000 | $968,950 |
| 31-Mar-23 | 48,313 | - | 59,563 | - | 107,875 |
| 30-Jun-23 | 45,750 | - | 57,000 | - | 102,750 |
| 30-Sep-23 | 47,688 | - | 58,938 | - | 106,625 |
| 31-Dec-23 | 277,741 | 195,712 | 60,178 | 100,000 | 633,631 |
| 2023 Subtotal | $419,491 | $195,712 | $235,678 | $100,000 | $950,881 |
| 31-Mar-24 | 47,608 | - | 58,858 | - | 106,467 |
| 30-Jun-24 | 46,939 | - | 58,189 | - | 105,127 |
| 30-Sep-24 | 47,476 | - | 58,726 | - | 106,202 |
| 31-Dec-24 | TBD | TBD | TBD | TBD | TBD |
| 2024 Subtotal | $142,023 | $0 | $175,773 | $0 | $317,796 |
| Grand Total (2019 - 2024) | $1,939,952 | $852,212 | $1,218,013 | $500,000 | $4,510,177 |

Note: Payments are typically made a few months following the end of each period.



**Charitable DAF HoldCo, Ltd**
**Historical Financial Analysis**
*Historical Distributions Charts*

**Schedule A.2**
**Valuation Date: March 25, 2025**





Note: Q4 2024 distributions have not yet been paid.

PM-1/366

**Charitable DAF HoldCo, Ltd**
**Historical Financial Analysis**

Schedule A.3
Valuation Date: March 25, 2025

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: | |
| --- | --- | --- |
| | 9/30/2024 | |
| | Actual | % |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| | | |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| | | |
| **Total Assets** | 316,257,723 | 100.0% |
| | | |
| **Total Liabilities** | 47,204,916 | 14.9% |
| | | |
| **Total Equity** | 269,052,808 | 85.1% |
| | | |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

PM-1/367

**Charitable DAF HoldCo, Ltd**
**Income Approach**

Schedule B.1
Valuation Date: March 25, 2025

*Discounted Cash Flow (DCF) Analysis*

| | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | For the Projected Period Ending: | | | | | | | |
| Projected Distributions | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ WACC = 68.3% | 0.9663 | 0.8484 | 0.7449 | 0.6540 | 0.5742 | 0.5041 | 0.4426 | 0.3886 | 0.3412 | 0.2995 | 0.2630 | 0.2309 | |
| Present Value (PV) Net Cash Flow | $613,430 | $90,926 | $77,423 | $69,593 | $373,598 | $55,377 | $47,153 | $42,384 | $227,533 | $33,726 | $28,718 | $25,813 | |

PV net cash flow: $1,685,675
PV residual value: $359,856

| Value of Subject Interest, Minority, Marketable | $2,045,531 |
|---|---|
| Less: Discount for Lack of Marketability (see schedule C.4) | 20.0% |
| Value of Subject Interest, Minority, Non-Marketable | $1,637,192 |
| Number of Subject Interest Participation Shares | 305 |
| Value per Share, Minority, Non-Marketable | $5,368 |

**Residual Value - Gordon Growth Model**

| Residual annual net cash flow : | $1,025,537 |
|---|---|
| Residual discount rate (k) : | 68.3% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple (1 / (k-g)) : | 1.5x |
| Residual value : | $1,558,568 |
| x PV factor : | 0.2309 |
| PV residual value : | $359,856 |

**Key Valuation Statistics**

| CLO HoldCo Net Asset Value | $20,952,808 |
|---|---|
| Implied Discount for Lack of Control | 99.2% |
| Valuation as a % of NAV | 0.6% |
| Estimated Payback Period (Years) | 1.27 |

**Charitable DAF HoldCo, Ltd**
**Income Approach**

Schedule 8.2
Valuation Date: March 25, 2025

*Sensitivity Analysis - Hypothetical Risk-Free Bond*

| | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | For the Projected Period Ending: | | | | | | | | |
| Projected Distributions | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ Risk Free Rate = 4.7% | 0.9970 | 0.9858 | 0.9746 | 0.9636 | 0.9527 | 0.9420 | 0.9313 | 0.9208 | 0.9104 | 0.9001 | 0.8899 | 0.8799 | |
| **Present Value (PV) Net Cash Flow** | **$632,896** | **$105,644** | **$101,300** | **$102,540** | **$619,894** | **$103,473** | **$99,219** | **$100,433** | **$607,158** | **$101,348** | **$97,180** | **$98,370** | |

| | |
|---|---|
| PV net cash flow | $2,769,456 |
| PV residual value | $41,969,350 |
| **Value of Subject Interest, Minority, Marketable** | **$44,738,806** |
| Less: Discount for Lack of Marketability *(see schedule C.4)* | 20.0% |
| **Value of Subject Interest, Minority, Non-Marketable** | **$35,807,821** |
| Number of Subject Interest Participation Shares | 305 |
| **Value per Share, Minority, Non-Marketable** | **$117,403** |

**Residual Value - Gordon Growth Model**

| | |
|---|---|
| Residual annual net cash flow: | $1,025,537 |
| Residual discount rate (k): | 4.7% |
| Residual growth rate (g): | 2.5% |
| x Gordon multiple [ 1 / (k-g) ]: | 46.5x |
| Residual value: | $47,699,415 |
| x PV factor: | 0.8799 |
| PV residual value: | $41,969,350 |

**Key Valuation Statistics**

| | |
|---|---|
| CLO HoldCo Net Asset Value | $29,952,808 |
| Implied Discount for Lack of Control | 83.4% |
| Valuation as a % of NAV | 13.3% |
| Estimated Payback Period (Years) | 26.53 |

PM-1/370

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

*DLOM Determination - Restricted Stock Studies*

**Schedule C.1**
**Valuation Date: March 25, 2025**

**Restricted Stock Studies**

| # | Name of Study | Study Date | Period Covered — From | To | Sub-Sample | Observations | Reported Mean | Reported Median |
|---|---|---|---|---|---|---|---|---|
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramaniam, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | | | | | | |
| | *Purchase Discount Only* | | 1995 | 2000 | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | After 1997 & Before 2008 | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | 9.7% | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

**Schedule C.2**
**Valuation Date: March 25, 2025**

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | Mean | Median |
|---|---|---|
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

Schedule C.3
**Valuation Date: March 25, 2025**

*DLOM Qualitative Scoring*

| Feature | Restricted Stock | Rating | Discount for Lack of Marketability (DLOM) Analysis | Rating | Advantage |
|---|---|---|---|---|---|
| Asset liquidity | Securities examined in marketability studies often are of smaller industrial operating companies, often with poor cash flows. | Fair | A majority of investments are in illiquid securities with poor cash flows. However, CLO HoldCo has approximately $91 million in net cash, representing approximately 34% of net asset value. | Strong | Better |
| Cash flow expectations | Restricted securities typically have a lower likelihood of paying dividends since they are associated with emerging companies. | Fair | Distributions are entirely dependent on director discretion as to the timing and amount. Distributions are not required. Howevever, regular distributions have been made over the last five years. | Good | Slightly better |
| Contingent liabilities | Moderate probability of contingent liabilities depending on type of company and size. Smaller companies can fall prey to securities litigation. | Fair | Higher probability of contingent liabilities. The Company and CLO HoldCo has been engaged in numerous litigation matters. | Weak | Slightly worse |
| Debt capacity | Company leverage is usually on the higher side, as they are typically in the emerging stage. | Weak | CLO HoldCo has a small amount of debt representing 15% of net asset value. | Good | Better |
| Redemption/ withdrawal | No redemption rights. | Poor | No redemption rights. | Poor | Equal |
| Transfer restrictions | Transfer restrictions are limited to securities laws, with holding periods of two years. Holding period was shortened to one year in 1997, but studies generally relate to two year holds. Once the restriction time period is complete, no restrictions on transfer exist. Markets are liquid for non-restricted shares. | Fair | Transfers must be approved by the directors. | Poor | Worse |
| Value of entity | Companies range in size, however, restricted securities are more commonly utilized by smaller companies in the development stage. Approximately 50 percent of the companies issuing restricted stock included in the Silber study had sales less than $40 million. | Fair | Participating shareholders have no direct rights to the underlying net asset value other than in a winding up. CLO HoldCo is expected to generate revenue well in excess of required distributions. | Good | Slightly better |
| Value of interest | Purchasers of restricted securities tend to be institutional or private investors that are active in the public markets. The analysis associated with these types of securities precludes small holders from purchasing. Size of interests tend to be moderate. | Fair | Participation shareholders are small, private foundations. The foundations must be 501c3 non-profit organizations. At the director's discretion, participating shareholders may be diluted through the issuance of additional participation shares to non-existing participating shareholders. | Poor | Worse |

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

Schedule C.4
Valuation Date: March 25, 2025

*Calculation of Marketability Discount*

| Feature | Net Advantage A (Schedules B) | Gross Adjustment B = F(A) | Importance C | Weight D = F(C) | Adjustment E = B x D | Scaling Adjustment F = 1+E or 1/(1-E) | Final Adjustment |
|---|---|---|---|---|---|---|---|
| **Marketability Factors** | | | | | | | |
| Asset liquidity | Better | -16% | High | 100% | -16% | 86% | -2.9% |
| Cash flow expectations | Slightly better | -8% | High | 100% | -8% | 92% | -1.4% |
| Contingent liabilities | Slightly worse | 8% | High | 100% | 8% | 108% | 1.4% |
| Debt capacity | Better | -16% | Low | 25% | -4% | 96% | -0.7% |
| Redemption/ withdrawal | Equal | 0% | High | 100% | 0% | 100% | 0.0% |
| Transfer restrictions | Worse | 16% | High | 100% | 16% | 116% | 2.8% |
| Value of entity | Slightly better | -8% | Medium | 50% | -4% | 96% | -0.8% |
| Value of interest | Worse | 16% | Low | 25% | 4% | 104% | 0.8% |
| **Net Scaling Adjustment** | $G = \text{Product } (F_i), i = 1 \text{ to } n$ | | | | | 96% | -0.8% |

**Marketability Discount**

| | | |
|---|---|---|
| Unadjusted discount | I (See Report) | 20.8% |
| Scaling adjustment | G (See above) | 96% |
| **Concluded Marketability Discount** | J = G x I | **20.0%** |

**Charitable DAF HoldCo, Ltd**

**Schedule C.5**

**Discount for Lack of Marketability (DLOM) Analysis**

**Valuation Date: March 25, 2025**

*DLOM Footnotes and Comments*

**A)** Our comparison matrix ranks the features of the Subject Interest and the comparable interests on a scale from 1 to 5.

1 = Poor   2 = Weak   3 = Fair   4 = Good   5 = Excellent

We then subtract the Subject Interest feature score from the comparable feature score to determine the advantage.

| | | |
|---|---|---|
| 0 = Equal   1 = Slightly Better   2 = Better   3 = Much Better   4 = Significantly Better |
| -1 = Slightly Worse   -2 = Worse   -3 = Much Worse   -4 = Significantly Worse |

**B)** B is calculated as the weighted average standard deviation of the comparable investments in closed end funds multiplied by the Advantage Score.

**C)** The importance of the feature is assessed.

1 = Low   2 = Medium   3 = High

**D)** Weights are allocated as follows:

Low = 25%   Medium = 50%   High = 100%

**E)** To compute the adjustment, B is multiplied by D.

**F)** The scaling adjustment is computed as 1+E if E > 0 or 1/(1-E) if E < 0 for the particular feature.

**G)** The net scaling adjustment for marketability factors is the product of all marketability features' scaling adjustments.

**H)** The net scaling adjustment for control factors is the product of all control features' scaling adjustments.

**I)** This is the concluded baseline marketability discount determined for comparable investments.

**J)** This is the baseline marketability discount multiplied by the scaling factor.

**K)** This is the concluded baseline minority interest discount determined for comparable investments.

**L)** This is the baseline minority interest discount multiplied by the scaling factor.

**M)** This is the combined discount of both marketability and minority interest discounts.

# EXHIBIT 51

**VALUATION ANALYSIS OF
100 PARTICIPATION SHARES OF
CHARITABLE DAF HOLDCO, LTD**

**AS OF
SEPTEMBER 30, 2024**

Prepared for:

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd



VALUESCOPE
a marshall + stevens company

January 7, 2025

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd
2101 Cedar Springs Road, Suite 1200
Dallas, Texas 75201

**RE: Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd**

Dear Mr. Patrick:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") out of an assumed 305 participation shares of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of September 30, 2024 (the "Valuation Date"). ValueScope has not independently verified the total number of participation shares outstanding.[1] This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.
2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.

---

[1] The Subject Interest is assumed to effectively represent approximately 32.8% of all participation shares.

Mr. Mark Patrick
January 7, 2025
Page 2

7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.

8. The marketability, or lack thereof, of the securities.

The premise of value followed herein is going concern.[2]  The liquidation premise of value was considered and rejected as not applicable because the going-concern value results in a "highest and best use" value for the interest.

## SCOPE OF WORK

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's advisors. To understand the environment in which DAF operates, we researched relevant information concerning the collateralized debt industry.  We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances.  Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Financial statements for the Company as of September 30, 2024

- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd

- Information regarding the Company's history and current operations

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation.  Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data.  Our analysis was based in part on this information, as well as on other data we developed.

---

[2]     The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

Mr. Mark Patrick
January 7, 2025
Page 3

**CONCLUSION OF VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$75,961,370**
**SEVENTY-FIVE MILLION NINE HUNDRED SIXTY-ONE THOUSAND THREE HUNDRED SEVENTY DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

*ValueScope, Inc.*

ValueScope, Inc.

# TABLE OF CONTENTS

**ENGAGEMENT OVERVIEW** .................................................................................................**1**

    DESCRIPTION OF THE ASSIGNMENT ............................................................... 1

    SCOPE.............................................................................................................. 1

    PROCEDURES................................................................................................... 1

**DAF OVERVIEW**...............................................................................................................**2**

    COMPANY OVERVIEW ..................................................................................... 2

    SUBJECT INTEREST OVERVIEW......................................................................... 2

    HISTORICAL FINANCIAL ANALYSIS ................................................................... 2

**ECONOMIC AND INDUSTRY OVERVIEW**..........................................................................**4**

    OVERVIEW OF THE U.S. ECONOMY ................................................................. 4

    OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY
    ..................................................................................................................... 12

**VALUATION METHODOLOGY** .......................................................................................**15**

    VALUATION APPROACHES............................................................................. 15

    VALUATION METHODS ................................................................................. 16

    SUMMARY OF THE VALUATION APPROACHES AND METHODS ....................... 16

**VALUATION ANALYSIS** .................................................................................................**17**

    ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE ................................ 17

**CONCLUSION OF VALUE - SUBJECT INTEREST**................................................................**19**

    DISCOUNT FOR LACK OF CONTROL ............................................................... 19

    DISCOUNT FOR LACK OF MARKETABILITY ..................................................... 19

    CONCLUSION - SUBJECT INTEREST VALUE ..................................................... 21

**ASSUMPTIONS AND LIMITING CONDITIONS** ................................................................**23**

**APPRAISAL CERTIFICATION** .........................................................................................**28**

**TABLE OF SCHEDULES**

**HISTORICAL VALUATION SUMMARY** ............................................................... **SUMMARY 1**

**CURRENT VALUATION SUMMARY** .................................................................... **SUMMARY 2**

**DAF NET ASSET VALUE ANALYSIS** ...................................................................................... **A**

    CLO HOLDCO, LTD - SUMMARY BALANCE SHEET ........................................................... A.1

    CHARITABLE DAF HOLDCO, LTD - SUMMARY BALANCE SHEET .................................... A.2

**DISCOUNT FOR LACK OF CONTROL (DLOC) ANALYSIS** ...................................................... **B**

    CLOSED-END FUND DATA - INVESTMENT GRADE BOND FUNDS .................................. B.1

    CLOSED-END FUND DATA - US GENERAL EQUITY FUNDS ............................................. B.2

    DLOC CONCLUSION .......................................................................................................... B.3

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS** ........................................ **C**

    DLOM DETERMINATION - PUT OPTION APPROACH ...................................................... C.1

    PUT OPTION APPROACH - HISTORICAL VOLATILITY SUMMARY .................................... C.2

    DLOM DETERMINATION - RESTRICTED STOCK STUDIES .............................................. C.3

    DLOM DETERMINATION - RESTRICTED STOCK STUDIES SUMMARY STATISTICS ......... C.4

    DLOM CONCLUSION ......................................................................................................... C.5

## ENGAGEMENT OVERVIEW

**DESCRIPTION OF THE ASSIGNMENT**

We were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") out of an assumed 305 participation shares of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of September 30, 2024 (the "Valuation Date").  ValueScope has not independently verified the total number of participation shares outstanding.[3]  This valuation analysis was conducted for internal reporting purposes.  No other use for this analysis is intended or should be inferred.

**SCOPE**

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections.  The first section outlines the description, scope, and procedures of our analysis.  The second section provides a brief description of the Company and the Company's financial position.  The third section includes a discussion of the national economy and the industry in which the Company operates.  The fourth section details a discussion of valuation theory and methodology.  The fifth section presents our valuation analysis, and the sixth section presents our conclusion and reconciliation of the fair market value of the Subject Interest.

**PROCEDURES**

This valuation analysis was conducted in accordance with generally accepted valuation procedures.  These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances.  We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information.  Our analysis was based in part on this information, as well as on other data obtained through additional research.  A full discussion of the methodologies employed appears in the following sections of this report.

---

[3]   The Subject Interest is assumed to effectively represent approximately 32.8% of all participation shares.

## DAF OVERVIEW[4]

**COMPANY OVERVIEW**

Charitable DAF HoldCo, Ltd is a Cayman Islands "company limited by shares" formed in October 2011.  Upon the shareholders' acceptance of shares, the shareholders agreed to the provisions of the Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd (as amended from time to time in accordance with the provisions thereof, the "DAF Agreement") and the Companies Law of the Cayman Islands (as amended from time to time, the "Law").  As a holding company, DAF's predominant assets were historically interests in the equity tranches of Collateralized Loan Obligations ("CLOs"), the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities.

**SUBJECT INTEREST OVERVIEW**

Based on information provided by the Company's management ("Management"), the Subject Interest shares are participation shares that from time to time are expected to receive cash distributions to fulfill certain charitable and expense goals of the owners of the participation shares.  The Subject Interest shares are directly affected by the terms of the DAF Agreement and the actions of DAF's directors.  According to the DAF Agreement, the appointed directors control the business, affairs, and power of the Company (Sections 72 and 77), including the issuance and purchase of shares on such terms and in such manner as the director determines (Sections 7-10).  Director consent is also required for shareholders to transfer their interests in DAF (Section 18).  Finally, although shareholders may determine the timing and amounts of dividends (Section 100), no dividend can exceed an amount approved by the directors (Section 101).

**HISTORICAL FINANCIAL ANALYSIS**

We were provided with the Company's balance sheet as of September 30, 2024.  These financial statements reflect various professional valuations of DAF's ultimate underlying assets.

As reported as of the Valuation Date, DAF's sole asset consisted of 100% of the equity of CLO HoldCo, Ltd ("CLO HoldCo").  CLO HoldCo is a holding company which invests in CLOs and other various investments.  The net asset value for CLO HoldCo was reported as

---

[4]    Based on the Company's memorandum and articles of association and information from management.

$269.1 million.  DAF reported no liabilities as of the Valuation Date.  As a result, DAF's book equity as of the Valuation Date was determined to equal $269.1 million.

DAF's balance sheet as of the Valuation Date is presented in Schedule A.2.

## ECONOMIC AND INDUSTRY OVERVIEW

**OVERVIEW OF THE U.S. ECONOMY**

In the second quarter of 2024, the US economy experienced positive growth that surpassed the pace of the first quarter.  Inflation has moderated significantly from its peak of 8.99% in June 2022 to 2.59% by August 2024, reflecting progress toward the Federal Reserve's inflation target.  After an extended period of elevated interest rates to curb inflation, recent data pointed to a cooling labor market and continued price stability, prompting the Fed to cut rates by 50 basis points.  The steady rate hikes initiated in 2023 led to an inverted yield curve, suggesting investor expectations of an economic slowdown.  Nevertheless, US stock markets have gained momentum, with indices closing higher year-over-year, supported by declining inflation and anticipated further monetary easing.

**Gross Domestic Product[5]**

Real gross domestic product (GDP) increased at an annual rate of 3.0 percent in the second quarter of 2024, following an increase of 1.6 percent in the first quarter. The acceleration in real GDP in the second quarter primarily reflected accelerations in consumer spending, private inventory investment, and nonresidential fixed investment. These movements were partly offset by a deceleration in residential fixed investment. Imports increased.



---

[5]    U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Second Quarter 2024. (Release Date: 9/26/2024).

## Population

Population growth is an important driver of long-term growth in an economy.  The total population increased from 335.4 million in August 2023 to 337.2 million in August 2024.[6] The working-age population (15-64) increased from 208.7 million in August 2023 to 208.9 million in August 2024.[7]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic.  It partially recovered in just several months and has been trending upward/flat.  In August 2023, the civilian labor force participation rate was 62.8% and stands at 62.7% as of August 2024.[8]





---

6    U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

7    Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

8    U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

### *Employment*

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 142,000 in August 2024 and the unemployment rate increased slightly to 4.2 percent. Job gains occurred in construction and healthcare.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased from 7.1% in August 2023 to 7.9% in August 2024.[9]





Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will be 4.2% for both 2026 and 2027.

---

9    U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

### Inflation

According to the BLS, The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.2 percent in August on a seasonally adjusted basis, after the same increase in July. Over the last 12 months, the all-items index increased 2.5 percent before seasonal adjustment.[10]

The index for shelter rose 0.5 percent in August and was the main factor in the all items increase. The food index increased 0.1 percent in August, after rising 0.2 percent in July. The index for food away from home rose 0.3 percent over the month, while the index for food at home was unchanged. The energy index fell 0.8 percent over the month, after being unchanged in the preceding month.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has declined significantly since a year ago, August 2023, declining from 88.97% to 24.05% in August 2024[11].The forecasters predict current-quarter headline CPI inflation will average 2.3 percent at an annual rate, down from the prediction of 2.8 percent in the previous survey[12].



---

[10]   Federal Reserve Bank of St. Louis, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

[11]   Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

[12]   Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters,* August 9, 2024.

ECONOMIC AND INDUSTRY OVERVIEW

### *Interest Rates*

The interest rate on the three-month Treasury bill declined from 5.32% as of September 29, 2023, to 4.52% as of September 30, 2024.[13]  The interest rate on the ten-year Treasury note declined from 4.59% as of September 29, 2023, to 3.81% as of September 30, 2024.[14]



The interest rate on Moody's Aaa-rated corporate bonds declined from 5.36% as of September 29, 2023, to 4.72% as of September 30, 2024.[15] The interest rate on the Moody's Baa-rated corporate bonds declined from 6.37% to 5.44% over the same time.[16]



---

[13]  Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

[14]  Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

[15]  Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

[16]  Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

In the last twelve months, the yield curve remained inverted, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill increasing/flattening between September 29, 2023, to September 30,2024 from -0.54% to 0.21%.[17]



### Corporate Profits

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) increased $132.4 billion in the second quarter of 2024 from the first quarter of 2024.



---

[17]   U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed October 7, 2024.

### Stock Markets[18]

The stock markets gained momentum from September 29, 2023, to September 30, 2024. The S&P 500 Index (SPY) closed at 427.48 on September 29, 2023, and closed higher at 573.76 on September 30, 2024.  The NASDAQ Composite Index (QQQ) closed at 334.95 on September 29, 2023, and closed higher at 423.12 on September 30, 2024.  The Dow Jones Industrial Average Index (DIA) closed at 358.27 on September 29, 2023 and closed higher at 488.07 on September 30, 2024.  In the graph below, the September 30, 2022, values were set to 100.



### Construction & Housing Starts

Construction spending and housing starts are two other important indicators for the economy.  Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment.  Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy.  Housing starts increased from 1.305 million units in August 2023 to 1.356 million units in August 2024.[19]  Construction spending, a seasonally adjusted annual figure, increased from $2.05 trillion in August 2023 to $2.13 trillion in August 2024.[20]

---

18   CapIQ Database, last accessed October 7, 2024.
19   U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.
20   U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.



***Consumer Confidence***

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has decreased from 69.40 a year ago in August 2023 to 67.90 in August 2024. Although it has declined slightly from a year ago, the index is still well below the pre-COVID high of 101.0 in February 2020.[21] The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions.  The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S.  This is considered a leading indicator of future consumer expenditures and economic activity.



---

[21]    University of Michigan, *Surveys of Consumers*, September 2024

**OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY[22]**

This industry is composed of private equity funds, hedge funds, closed-end funds, unit investment trusts and other financial vehicles. Entities in this industry manage securities or other assets on behalf of shareholders, unit holders or other beneficiaries to achieve high returns on targeted investments. This industry excludes insurance and employee-benefit funds, open-end investment funds and trusts, estates and agency accounts.

*Executive Summary*

In recent years, industry assets have become increasingly integral to institutional investors' portfolios and the larger asset-management market. Institutional investors are individuals or organizations that trade securities in such substantial volumes that they qualify for lower commissions and fewer protective regulations since it's assumed that they're knowledgeable enough to protect themselves. Increasing demand from institutional investors has contributed to the surge in the industry's assets under management (AUM) and revenue during the current period.

In recent years, the industry has continued to enmesh itself more deeply within the broader financial ecosystem despite challenges posed by the COVID-19 pandemic in 2020 and 2021. The pandemic, mainly in the first quarter of 2020, contributed to revenue declines for many operators. Many portfolios, previously thought to be sound investments, were reevaluated, and businesses pivoted their strategies due to the unprecedented nature of the crisis. In the past five years, industry revenue grew at a CAGR of 4.0% to $312.2 billion, including 5.2% in 2024 alone, when profit will increase to 48.9%.

Industry revenue will grow at a CAGR of 4.2% to $383.6 billion over the five years to 2029, when profit will rise to 50.5%. The Federal Reserve is increasing interest rates to quell historically high inflation. These higher interest rates are reducing liquidity in the markets. Private equity firms and hedge funds will have more difficulty raising capital for investments. As characteristics of the financial system change in light of post-financial crisis banking regulations and regulators' recognition of the importance of hedge funds within the financial system, hedge funds will likely experience heightened oversight.

*Industry Performance*

The Federal Reserve has increased interest rates to combat rampant inflation, which has surged due to persistent supply chain issues and a global energy crisis. After lowering

---

[22]   IBISWorld Industry Report 52599, July 2024, *Private Equity, Hedge Funds & Investment Vehicles in the U.S.*

rates to historic lows in response to the COVID-19 pandemic, the Fed began raising them in 2022, with the current target rate ranging from 5.25% to 5.50%. These higher rates are reducing liquidity in financial markets, compelling private equity and hedge funds to seek new methods of raising capital, while those unable to adapt are exiting the industry. The previous decade's low-interest-rate environment had been advantageous for these investment vehicles, as it led investors to shift away from fixed-income and credit securities in favor of potentially higher returns. With more accessible funds during that period, fundraising activity surged, and those who capitalized on lower rates are currently benefiting from reduced interest payments and enhanced returns.

Simultaneously, there is a growing interest in Environmental, Social, and Governance (ESG) factors among investors who wish to align their investments with their values. This shift has led private equity firms and hedge fund managers to increasingly incorporate ESG considerations into their investment strategies. For instance, investments are now evaluated for their long-term environmental impact. Investors are also demanding that companies disclose information about their environmental and social performance. In response, private equity firms and hedge funds are diversifying their workforces and integrating ESG principles into their organizational frameworks.

Moreover, minority stakes are becoming more common in private equity firms. As internal competition intensifies, firms are diversifying their investments and establishing smaller, targeted funds, driven by a decrease in liquidity. The significant volatility in prominent markets like the S&P 500 during the COVID-19 pandemic encouraged companies to acquire minority stakes either in other companies or investments. There is a trend towards large private equity groups acquiring minority stakes in one another, as firms seek creative strategies to unlock potential investments. Changes in management types, with CEOs preferring to retain control while leveraging private equity expertise for growth, have also contributed to this trend.

Finally, technology and data analytics are increasingly being utilized by private equity firms and hedge funds to enhance their investment processes. These firms are employing machine learning algorithms to analyze vast amounts of data—such as financial statements, news articles, and social media posts—to uncover trends and insights not immediately visible to human analysts. Additionally, some are automating back-office functions like accounting and compliance using artificial intelligence (AI), which improves task processing and operational efficiency.

### *Industry Outlook*

The Federal Reserve's ongoing battle against inflation is likely to result in volatile interest rates in the near future. As inflation continues to affect the U.S. economy, the Fed has signaled that it may maintain or further increase interest rates if necessary. These higher rates will reduce market liquidity, making it more challenging for hedge funds and private

equity firms to raise capital. Firms that cannot adapt may be forced out of the industry. Typically, investors turn to lower-risk investments, such as bonds, when interest rates are high, which will pose significant obstacles for the industry due to decreased liquidity and shifting investor preferences. Consequently, hedge funds and private equity firms will need to be more strategic and innovative in finding profitable investments as liquidity tightens.

At the same time, there is a sustained interest in Environmental, Social, and Governance (ESG) factors. Investors are increasingly concerned about the impact of their investments on the environment and society, seeking to align their portfolios with their values. Private equity firms and hedge fund managers are expected to continue integrating ESG considerations into their investment strategies, with climate change effects increasingly influencing investment decisions across various sectors. As environmental conditions worsen, the importance of selecting investments that contribute positively to the environment will grow. Additionally, as the population becomes more diverse, there is an expectation for hedge funds and private equity firms to reflect this diversity in their operations.

The use of technology and data analytics by private equity firms and hedge funds is expected to expand further. These firms will increasingly rely on advanced technology to identify and evaluate potential investments, and to manage and monitor existing portfolios. With the growing dependence on technology, cybersecurity will become increasingly critical, prompting firms to invest more in securing their technological networks. As artificial intelligence (AI) evolves, it will enable hedge funds and private equity firms to analyze extensive data sets in real-time, facilitating more informed trading and investment decisions. Given that data is now considered a crucial asset, industry players will use improved tools to access and analyze data, aiming to discover new investment opportunities.

Moreover, fintech is emerging as an attractive investment area for private equity, hedge funds, and investment vehicles. The rapidly growing fintech and biotechnology sectors, though currently constrained, are poised for future expansion and will likely attract increased investment. The proximity of Silicon Valley and Wall Street offers industry players easy access to cutting-edge technological innovations and robust financial networks, enhancing their ability to invest in promising new ideas. As the distinction between Silicon Valley and Wall Street continues to blur, private equity firms and hedge funds that can sift through the hype to find valuable opportunities will be well-positioned in the evolving fintech landscape.

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

## VALUATION APPROACHES

### *Income Approach*

The income approach quantifies the present value of anticipated future income generated by a business or an asset. Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes. One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow. The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate. The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

### *Market Approach*

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets. Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset. Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions. The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

### *Asset-Based (Cost) Approach*

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities. Replacement cost is often a primary indicator of the value of a business' assets. The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it. Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors. The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

## VALUATION METHODS

The following are common valuation methods used under the three approaches:

A. Income Approach
1. Discounted Cash Flow Method (multi-period model)
2. Direct Capitalization Method (single period model)
3. Excess Earnings Method

B. Market Approach
1. Guideline Public Company Method
2. Merger and Acquisition Method

C. Asset-Based Approach
1. Reproduction Cost Method
2. Replacement Cost Method
3. Net Asset Value Method

## SUMMARY OF THE VALUATION APPROACHES AND METHODS

For the valuation of non-controlling interests in holding companies such as DAF, the asset-based approach is most commonly used. When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

# VALUATION ANALYSIS

## ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE

DAF's ultimate holdings are interests in various investment assets. DAF's sole asset reported as of the Valuation Date consisted of 100% of the equity of CLO HoldCo. CLO HoldCo is a holding company which invests in CLOs and other investments. We relied upon DAF management's determination of CLO HoldCo's NAV based on the values of its various underlying investments and assets. CLO HoldCo's balance sheet as of the Valuation Date is shown in the following charts and in Schedule A.1.

As shown below, CLO HoldCo's primary assets consist of cash & cash equivalents and other investment investments[23]. CLO HoldCo reported $316.3 million in total assets. CLO HoldCo also reported $47.2 million in total liabilities as of the Valuation Date. Therefore, CLO HoldCo's equity can be reasonably stated as $269.1 million.

### *CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: | |
| --- | --- | --- |
| | 9/30/2024 | |
| | Actual | % |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

---

[23]   Other investments consist of investments in approximately 39 entities.

### DAF NAV Conclusion

As of the Valuation Date, DAF's balance sheet consisted solely of a 100% ownership interest in CLO HoldCo's equity.  Therefore, DAF's NAV can be reasonably stated as $269.1 million (rounded).  This analysis is summarized in the following table and in Schedule A.2.

| | Balance Sheet as of: | |
| --- | --- | --- |
| | 9/30/2024 | |
| | Actual | % |
| **Assets** | | |
| CLO HoldCo, LTD | $269,052,808 | 100.0% |
| **Total Assets** | $269,052,808 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $269,052,808 | 100.0% |
| **Total Liabilities & Equity** | $269,052,808 | 100.0% |

## CONCLUSION OF VALUE - SUBJECT INTEREST

DAF's NAV was determined to equal $269.1 million as of the Valuation Date.  Dividing this NAV by the 305 total participation shares outstanding results in a NAV per share of $882,140.  However, sellers of fractional interests in holding companies rarely receive a price equal to the NAV of their investment.  This is because the interest holders do not have direct control over the entity's assets and have a limited market for their interests.  Therefore, in order to arrive at the fair market value of the Subject Interest shares that are the subject of this analysis, we applied relevant discounts (control and marketability).

## DISCOUNT FOR LACK OF CONTROL

Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls.  Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

Due to the Company's ultimate holdings in debt and equity investments, the Company exhibits some of the characteristics of a closed-end fund.  Closed-end funds, like open-ended mutual funds, are asset holding companies that typically hold a portfolio of publicly traded securities.  However, unlike unit holders in open-ended funds, closed-end fund unit holders who wish to liquidate their investment cannot look to the fund to repurchase their shares.  Rather, they must sell them on the open market.  The price they receive is not usually equal to the fundamental or net asset value of the investment.  Therefore, the fair market value of closed-end funds is generally described in terms of a discount or premium to net asset value.

To align with the Company's holdings, we selected closed-end fund data from investment grade bond funds and general equity funds.  The investment grade bond fund data shown in Schedule B.1 indicated mean and median discounts of 2.9% and 2.5%, respectively.  The general equity fund data shown in Schedule B.2 indicated mean and median discounts of 12.1% and 13.6%, respectively.  Based on these indications, we selected a discount for lack of control of 8.1% to be applicable to the Subject Interest, as shown in Schedule B.3.

## DISCOUNT FOR LACK OF MARKETABILITY

Discounts for lack of marketability (DLOMs) are applied to the shares of private companies based on the premise that an asset or interest in an entity without a readily available market would sell for less to a hypothetical buyer than an identical asset or interest that is readily marketable.  Several factors are widely recognized to affect

marketability, such as distributions or dividends, investment performance, holding period to complete a sale, and management performance, among others.  We utilized two methods of quantifying a relevant DLOM: the put option approach and an analysis of restricted stock studies.

### Put Option Approach

The price of a contract providing the right to sell a number of shares (a put option) represents the difference between the non-marketable and marketable price of an asset.  For example, if a holder of restricted or non-marketable stock purchases a put option on the underlying asset, the holder would be purchasing marketability.  The price of the put determines the size of the DLOM.

In order to determine the price of such a put, we utilized the Black-Scholes put option model.[24]  Based on our analysis, we determined that an appropriate volatility for investment grade bond funds and general equity bond funds such as DAF is approximately 12.3% (Schedule C.2) and between one half and one year (averaged to 0.75 years) would be required to sell the Subject Interest in an orderly transaction.  As a result of these inputs, the put option approach indicated a discount for lack of marketability of 2.8%.  This DLOM indication is presented in Schedule C.1.

### Restricted Stock Study Analysis

There are several studies that attempt to measure discounts for lack of marketability, and a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest.[25]  As mentioned, we would expect between six months and one year to be required to sell the Subject Interest in an orderly transaction.

Schedule C.4 presents a summary of restricted stock studies performed involving issuances of shares during the time period 1997 through 2008, which is when the SEC-mandated lock-up period for restricted stocks was one year.  Based on a range of low discounts of 9.0%-10.9%, we selected a 9.7% DLOM utilizing the findings of the restricted stock studies.

### DLOM Conclusion

The put option approach in Schedule C.1 indicated a DLOM of 2.8%.  The restricted stock study analysis in Schedule C.4 indicated a DLOM of 9.7%.  Based on these indications, we

---

[24]   Black, F. and M. Scholes, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy*, May 1973
[25]   See Schedule C.3

concluded a discount for lack of marketability of 6.3%.  This conclusion is presented in Schedule C.5.

**CONCLUSION - SUBJECT INTEREST VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$75,961,370**
**SEVENTY-FIVE MILLION NINE HUNDRED SIXTY-ONE THOUSAND THREE HUNDRED SEVENTY DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

Our conclusion of value is presented in Summary Schedule 2 as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report.  We relied on information received as indicative of the Company as of the Valuation Date.  We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation.  Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data.  Our analysis was based in part on this information as well as on other data we developed.  We have no obligation to update this

report or our conclusion of value for information that comes to our attention after the date of this report.

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, Inc. is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

**LIMITATION ON DISTRIBUTION AND USE**

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated; they should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever.  Neither the valuation report, nor its contents, nor any reference to the appraiser or ValueScope, Inc. may be referred to or quoted in any registration statement, prospectus, offering memorandum, sales brochure, other appraisal, loan or other agreement or document given to third parties without our prior written consent.  In addition, except as set forth in the report, our analysis and report are not intended for general circulation or publication, nor are they to be reproduced or distributed to third parties without our prior written consent.  Notwithstanding the foregoing, ValueScope, Inc. permits the Company to distribute this Report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, and we shall have no responsibility for any such unauthorized change.

The valuation may not be used in conjunction with any other appraisal or study.  The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts.  The appraisal was prepared solely for the purpose, function, and party so identified in the report.  The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, without the express written consent of ValueScope, Inc.

**NOT A FAIRNESS OPINION**

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

**OPERATIONAL ASSUMPTIONS**

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

**COMPETENT MANAGEMENT ASSUMED**

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership.  This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

**NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION**

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement.  If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, Inc. must be made in advance. ValueScope, Inc. reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s).  We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

## NO CONSIDERATION IS RENDERED AS TO THE LAW OF THE CAYMAN ISLANDS

No consideration is rendered as to the law of the Cayman Islands. Implications of Cayman Island jurisdiction are not considered.

## NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE

No opinion is rendered as to legal fee or property title. No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

## LIENS AND ENCUMBRANCES

ValueScope will give no consideration to liens or encumbrances except as specifically stated. We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks. We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

## INFORMATION PROVIDED BY OTHERS

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

## PROSPECTIVE FINANCIAL INFORMATION

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA). We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation

guidelines.

## REGULATORY AND ENVIRONMENTAL CONSIDERATIONS

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities.  Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount.  Such matters, if any, are noted in the report.  To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

## POTENTIAL FUTURE SALES

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided.  An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time.  Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

## INDEMNIFICATION BY THE COMPANY

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement.  Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement.  In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

**APPRAISAL CERTIFICATION**

I certify that, to the best of my knowledge and belief:

1. We have not inspected certain assets, properties, or business interests encompassed by this appraisal.

2. We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.

3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.

4. Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.

5. To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.

6. No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.

7. The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.

8. This report and analysis were prepared under the direction of Steven C. Hastings.

9. I am in compliance with all professional appraisal certifications and licensing.

10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.

By:    ValueScope, Inc.

Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, Inc.

## APPENDIX:  QUALIFICATIONS OF THE APPRAISER

### Steven C.  Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA
**Principal**
shastings@valuescopeinc.com, 817-481-4901

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

### EMPLOYMENT HISTORY

*2006 – Present*                                                                                    *ValueScope, Inc.*

*Principal*
Mr.  Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis.  As a CPA with significant valuation and financial reporting experience, Mr.  Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

*2001 – 2006*                                                                                    *Value Capital, LLC*

*Principal*
Mr.  Hastings served as a principal with Value Capital, LLC.  During his tenure at Value Capital Mr.  Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries.  He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions.  His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000*                                                    *Finance Commission of Texas*

*Director*
The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner.  As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets.  Mr.  Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations.  He was instrumental in assisting the Savings and Loan Department in writing new Mortgage

Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.


*1994 – 2001*                                                    *MedCare Financial Solutions, Inc.*

*President*

Mr.  Hastings served as an officer of MedCare Financial Solutions, Inc.  and MedCapital Funding Corporation.   MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers.   MedCare Financial Solutions provided other financial and operational services to health care providers.   These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending.   Mr.  Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.


1986 – 1994                                                    *H.D.  Vest Financial Services*

*Executive Vice President and CFO*

As executive vice president and CFO of H.D.  Vest Financial Services, Mr.  Hastings assisted in placing over $1.5 billion annually in investment.  Responsible for day-to-day financial operations and capital structuring, Mr.  Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers.  Mr.  Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr.  Hastings supervised stockbrokers' and investment advisors' day-to-day activities.  As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies.  Being licensed in life, disability, health, property and casualty insurance, Mr.  Hasting was instrumental in implementing this line of business at HD Vest.

1979 – 1986                                                    *Arthur Andersen & Co.*

*Senior Manager*

Mr.  Hastings served as a senior manager with significant responsibilities in the several industries.  He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona
Bachelor of Science - Indiana University, Bloomington, Indiana

## CERTIFICATIONS AND LICENSES

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

## ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

## RECENT IRS CASES - OFFICE OF CHIEF COUNSEL

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.
- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.
- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report September 2015

- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C.  Docket No.  1045-13, Estate of Jinana M.  Bowey, et al, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.
- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C.  Docket No.  8401-13, Estate of Edward S.  Redstone, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.
- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C.  Docket No.  223630-12, Michael Tricarichi, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C.  Docket No.  6936-10, et al, John M.  Alterman, et al, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No.  8097-13, *Sumner Redstone, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.*
- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No.  20177-11, *Richard H.  Cullifer, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.*
- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

## RECENT IRS CASES – LMSB AUDIT DIVISION

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.
- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.
- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.
- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.
- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

## RECENT DEPARTMENT OF JUSTICE CASE

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America.  Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No.  4:16-cv-03302, ALPC Services of Texas, Inc.  v.  United States of America and Internal Revenue Service.  Valuation issues report, 2017.
- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No.  12-844, *The Estate of David W.  Longaberger v. The United States*.  Valuation issues report, 2014.

## RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al.  Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.
- Expert Report June 2018
- Deposition Testimony May 2019

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al.  Fraudulent transfer, solvency and economic damages.

- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.
- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No.  CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al.  Economic damages related to lost wages.
- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No.  2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.
- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No.  14-671C.  Always at Market, Inc.  v.  United States of America (DOD/DOJ).  Army & Air Force Exchange Service economic damages.
- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No.  CV-05-1483, General Medicine, PC v.  Healthsouth Corporation v.  General Medicine, PC.  Economic damages related to contract dispute.
- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

 "Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International


**WHITE PAPERS**

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v. Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

**SCHEDULES**

**Charitable DAF HoldCo, Ltd**
**Table of Contents**

**Valuation Date: September 30, 2024**

| Table of Contents | |
|---|---|
| **Schedule Name** | **Schedule** |
| | |
| **Historical Valuation Summary** | Summary Schedule 1 |
| **Current Valuation Summary** | Summary Schedule 2 |
| | |
| **DAF Net Asset Value Analysis** | |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.1 |
| Charitable DAF HoldCo, Ltd - Summary Balance Sheet | Schedule A.2 |
| | |
| **Discount for Lack of Control (DLOC) Analysis** | |
| Closed-End Fund Data - Investment Grade Bond Funds | Schedule B.1 |
| Closed-End Fund Data - US General Equity Funds | Schedule B.2 |
| DLOC Conclusion | Schedule B.3 |
| | |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Put Option Approach | Schedule C.1 |
| Put Option Approach - Historical Guideline Company Volatility Summary | Schedule C.2 |
| DLOM Determination - Restricted Stock Studies | Schedule C.3 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.4 |
| DLOM Conclusion | Schedule C.5 |

| Charitable DAF HoldCo, Ltd | | | | | | | | Summary Schedule 1 |
| Historical Valuation Summary | | | | | | | | Valuation Date: September 30, 2024 |

| | For the Quarter Ended: | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 9/30/2022 | 12/31/2022 | 3/31/2023 | 6/30/2023 | 9/30/2023 | 12/31/2023 | 3/31/2024 | 6/30/2024 | 9/30/2024 |
| Company Net Asset Value (NAV) | $289,502,301 | $276,241,856 | $275,227,939 | $270,414,002 | $288,884,011 | $277,573,090 | $272,449,558 | $270,432,538 | $269,052,808 |
| Discount for Lack of Control | 8.0% | 8.7% | 7.8% | 11.6% | 13.9% | 8.0% | 8.7% | 9.7% | 8.1% |
| Discount for Lack of Marketability | 7.0% | 7.3% | 7.1% | 6.6% | 6.4% | 6.5% | 6.6% | 6.2% | 6.3% |
| Combined Discount | 14.4% | 15.4% | 14.3% | 17.4% | 19.4% | 14.0% | 14.7% | 15.3% | 13.9% |
| FMV of Subject Interest (Per 100 Shares) | $81,212,514 | $76,654,941 | $77,292,849 | $73,202,932 | $76,331,301 | $78,284,712 | $76,173,502 | $75,101,687 | $75,961,370 |

**Charitable DAF HoldCo, Ltd**  **Summary Schedule 2**
**Current Valuation Summary**  **Valuation Date: September 30, 2024**

| FMV Summary | | |
|---|---|---|
| Company Net Asset Value (NAV) | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | 305 | |
| **NAV Per Share** | **$882,140** | |
| **Applicable Discounts** | | |
| Discount for Lack of Control | 8.1% | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) |
| **FMV Per Share** | **$759,614** | |
| Subject Shares | 100 | |
| **FMV of Subject Interest** | **$75,961,370** | |

| Charitable DAF HoldCo, Ltd | Schedule A.1 |
|---|---|
| DAF Net Asset Value Analysis | Valuation Date: September 30, 2024 |

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: | |
|---|---|---|
| | **9/30/2024** | |
| | **Actual** | **%** |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| | | |
| **Other Assets** | | |
| Highland CLO Funding, Ltd. | 10,002,234 | 3.2% |
| Highland CLO Funding, Ltd. (Participation Rights) | 69,385 | 0.0% |
| MidWave Common | 1,640,571 | 0.5% |
| MidWave - Term Loan A | 85,552,571 | 27.1% |
| MidWave - Term Loan C | 40,174 | 0.0% |
| NexPoint Capital, Inc. (BDC) | 14,223,433 | 4.5% |
| NexPoint Real Estate Strategies Fund Z | 8,487,030 | 2.7% |
| NexPoint Real Estate Finance (NREF) | 6,174,381 | 2.0% |
| NexPoint Residential (NXRT) | 2,338,207 | 0.7% |
| NexPoint Diversified Real Estate (NXDT) | 2,331,025 | 0.7% |
| Small Bay II (Class I) | 3,770,609 | 1.2% |
| Small Bay II (Class II) | 4,047,276 | 1.3% |
| Small Bay II (Class III) | 2,357,682 | 0.7% |
| Polo Glen | 678,545 | 0.2% |
| NHT Holdco | 109,056 | 0.0% |
| ACHC | 158,525 | 0.1% |
| COLL | 115,804 | 0.0% |
| HRTX | 10,945 | 0.0% |
| ACRG/AU | 3,267 | 0.0% |
| ACRG/BU | 1,409 | 0.0% |
| TGTX | 333,308 | 0.1% |
| TMO | 282,686 | 0.1% |
| BIO | 111,081 | 0.0% |
| iHeart Communications | 365 | 0.0% |
| Multi Strat | 107,324 | 0.0% |
| Crusader Fund II, Ltd. | 38,131 | 0.0% |
| BVP Property | 94,000 | 0.0% |
| NCI Apache Trail | 1,104,000 | 0.3% |
| NCI Fort Worth Land | 874,200 | 0.3% |
| NCI Royse City Land | 11,448,367 | 3.6% |
| NCI Stewart Creek | 1,250,000 | 0.4% |
| NLA Assets | 1,766,000 | 0.6% |
| FFWM | 2,541,184 | 0.8% |
| SRG | 139,500 | 0.0% |
| SRTY | 2,380,529 | 0.8% |
| SQQQ | 1,818,805 | 0.6% |
| SPXU | 2,174,013 | 0.7% |
| Serengetti | 2,951,678 | 0.9% |
| Conservation Equity Fund | 3,253,139 | 1.0% |
| MMPQ | 527,460 | 0.2% |
| Total Wire Convertible Promissory Note | 20,560 | 0.0% |
| Sable Permian Resources | 2 | 0.0% |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| | | |
| **Total Assets** | 316,257,723 | 100.0% |
| | | |
| **Total Liabilities** | 47,204,916 | 14.9% |
| | | |
| **Total Equity** | 269,052,808 | 85.1% |
| | | |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

**Charitable DAF HoldCo, Ltd**                                    **Schedule A.2**
**DAF Net Asset Value Analysis**                    **Valuation Date: September 30, 2024**

*Charitable DAF HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: | |
| | 9/30/2024 | |
| | Actual | % |
|---|---|---|
| **Assets** | | |
| CLO HoldCo, LTD | $269,052,808 | 100.0% |
| **Total Assets** | $269,052,808 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $269,052,808 | 100.0% |
| **Total Liabilities & Equity** | $269,052,808 | 100.0% |

| Charitable DAF HoldCo, Ltd | Schedule B.1 |
|---|---|
| Discount for Lack of Control (DLOC) Analysis | Valuation Date: September 30, 2024 |

*Closed-End Fund Data - Investment Grade Bond Funds*

| | Closed-End Fund Data - Investment Grade Bond Funds | | | |
|---|---|---|---|---|
| **Fund Ticker** | **Fund Name** | **Net Asset Value** | **Market Price** | **Premium (Discount)** |
| BKT | BlackRock Income Trust, Inc. | $12.65 | $12.43 | (1.7%) |
| FMY | First Trust Mortgage Income Fund | $13.05 | $12.49 | (4.3%) |
| VBF | Invesco Bond Fund | $16.87 | $17.01 | 0.8% |
| VLT | Invesco High Income Trust II | $11.74 | $11.53 | (1.8%) |
| JLS | Nuveen Mortgage and Income Fund | $19.54 | $18.43 | (5.7%) |
| JMM | Nuveen Multi-Market Income Fund | $6.68 | $6.36 | (4.8%) |
| DMO | Western Asset Mortgage Opportunity Fund Inc. | $12.28 | $11.97 | (2.5%) |

| Summary Statistics | |
|---|---|
| Mean Premium (Discount) | (2.9%) |
| Median Premium (Discount) | (2.5%) |
| Standard Deviation | 2.2% |

*Sources: CEF Connect as of market close September 30, 2024*

| Charitable DAF HoldCo, Ltd | Schedule B.2 |
|---|---|
| Discount for Lack of Control (DLOC) Analysis | Valuation Date: September 30, 2024 |

*Closed-End Fund Data - US General Equity Funds*

| Closed-End Fund Data - US General Equity Funds | | | | |
|---|---|---|---|---|
| Fund Ticker | Fund Name | Net Asset Value | Market Price | Premium (Discount) |
| ADX | Adams Diversified Equity Fund, Inc. | $24.31 | $21.56 | (11.3%) |
| BIGZ | BlackRock Innovat and Growth Term Trust | $8.54 | $7.55 | (11.6%) |
| CET | Central Securities Corp. | $56.17 | $45.84 | (18.4%) |
| CRF | Cornerstone Total Return Fund | $6.85 | $8.09 | 18.1% |
| GRF | Eagle Capital Growth | $12.03 | $9.88 | (17.9%) |
| FXBY | FOXBY Corp | $27.70 | $16.00 | (42.2%) |
| GDV | Gabelli Dividend & Income | $28.46 | $24.45 | (14.1%) |
| GAM | General American Investors | $62.92 | $53.61 | (14.8%) |
| USA | Liberty All-Star Equity | $7.17 | $7.10 | (1.0%) |
| ASG | Liberty All-Star Growth | $6.03 | $5.61 | (7.0%) |
| JCE | Nuveen Core Equity Alpha | $15.21 | $15.37 | 1.1% |
| RMT | Royce Micro-Cap Trust | $10.84 | $9.61 | (11.3%) |
| STEW | SRH Total Return Fund | $20.51 | $15.80 | (23.0%) |
| SPE | Special Opportunities | $16.37 | $13.91 | (15.0%) |
| FUND | Sprott Focus Trust | $8.91 | $7.70 | (13.6%) |

| Summary Statistics | |
|---|---|
| Mean Premium (Discount) | (12.1%) |
| Median Premium (Discount) | (13.6%) |
| Standard Deviation | 13.0% |

*Sources: CEF Connect as of market close September 30, 2024*

**Charitable DAF HoldCo, Ltd**                                    **Schedule B.3**
**Discount for Lack of Control (DLOC) Analysis**       **Valuation Date: September 30, 2024**

*DLOC Conclusion*

| Discount for Lack of Control Conclusion | | |
|---|---|---|
| DLOC Determination - Closed End Bond Funds (Mean) | 2.9% | *Schedule B.1* |
| DLOC Determination - Closed End Bond Funds (Median) | 2.5% | *Schedule B.1* |
| | | |
| DLOC Determination - Closed End Equity Funds (Mean) | 12.1% | *Schedule B.2* |
| DLOC Determination - Closed End Equity Funds (Median) | 13.6% | *Schedule B.2* |
| | | |
| **Concluded Discount for Lack of Control** | **8.1%** | |

| Charitable DAF HoldCo, Ltd | Schedule C.1 |
|---|---|
| Discount for Lack of Marketability (DLOM) Analysis | Valuation Date: September 30, 2024 |

*DLOM Determination - Put Option Approach*

### Discount for Lack of Marketability - Put Option Approach

**Option-Pricing Inputs:**

| | | | |
|---|---|---|---|
| Stock Price | S | $1.00 | |
| Strike Price | X | $1.00 | *(Set to same as stock price)* |
| Expected Life | T | 0.75 | *(Years)* |
| Volatility | s | 12.3% | *Schedule C.2* |
| Risk-free rate | R | 4.18% | *US Treasury Implied Yield for Expected Life* |
| Dividend Yield | Q | 0.00% | * |

*Intermediate Calculations:*

| | | | |
|---|---|---|---|
| $d1$ | *0.34756838* | $-d1$ | *-0.34756838* |
| $d2$ | *0.24104726* | $-d2$ | *-0.24104726* |
| $N(d1)$ | *0.63591782* | $N(d1)$ | *0.36408218* |
| $N(d2)$ | *0.59524076* | $N(d2)$ | *0.40475924* |

| Black-Scholes | | Black-Scholes | |
|---|---|---|---|
| Call Option Price | $0.06 | Put Option Price | $0.03 |

| **Implied Discount for Lack of Marketability (DLOM)** | **2.8%** |
|---|---|

*\* Distributions not expected in the near future*

| Charitable DAF HoldCo, Ltd | | | | | | | | | Schedule C.2 |
|---|---|---|---|---|---|---|---|---|---|
| Discount for Lack of Marketability (DLOM) Analysis | | | | | | | | | Valuation Date: September 30, 2024 |

*Put Option Approach - Historical Guideline Company Volatility Summary*

| Historical | Bond Funds | | | | | Equity Funds | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Volatility Term | BKT | FMY | JMM | JLS | VBF | FXBY | GRF | EQS | SPE | RVT |
| 0.5 Years | 10.1% | 10.8% | 9.5% | 9.0% | 8.3% | 20.9% | 16.6% | 43.0% | 11.6% | 20.3% |
| 1 Year | 12.3% | 13.7% | 9.9% | 12.0% | 13.0% | 20.7% | 20.2% | 41.7% | 11.4% | 20.1% |
| 1.5 Years | 11.5% | 13.2% | 10.3% | 11.0% | 12.3% | 25.9% | 23.0% | 42.1% | 10.7% | 19.3% |
| 2 Years | 11.8% | 15.3% | 12.5% | 11.0% | 14.4% | 25.6% | 28.6% | 48.3% | 12.3% | 21.7% |
| 2.5 Years | 12.7% | 15.1% | 13.3% | 11.3% | 14.8% | 25.8% | 32.2% | 48.6% | 13.6% | 23.8% |
| 3 Years | 12.6% | 14.8% | 13.4% | 11.2% | 14.2% | 27.4% | 32.2% | 47.4% | 13.6% | 23.8% |
| 3.5 Years | 12.3% | 14.1% | 12.8% | 10.8% | 13.8% | 113.1% | 30.2% | 45.4% | 13.3% | 22.9% |
| 4 Years | 11.8% | 13.9% | 12.6% | 10.6% | 13.7% | 106.5% | 29.2% | 51.4% | 13.4% | 22.7% |
| 4.5 Years | 11.5% | 13.8% | 14.2% | 12.3% | 14.0% | 101.9% | 29.4% | 52.7% | 15.9% | 24.1% |
| 5.0 Years | 11.8% | 14.5% | 16.6% | 15.9% | 15.5% | 97.5% | 30.1% | 53.5% | 22.0% | 27.6% |

| Historical | Statistical Summary | | | | | |
|---|---|---|---|---|---|---|
| Volatility Term | Low | 25th % | Median | Mean | 75th % | High |
| **0.5 Years** | 8.3% | 9.6% | **11.2%** | 16.0% | 19.4% | 43.0% |
| **1 Year** | 9.9% | 12.0% | **13.3%** | 17.5% | 20.1% | 41.7% |
| 1.5 Years | 10.3% | 11.1% | 12.8% | 17.9% | 22.1% | 42.1% |
| 2 Years | 11.0% | 12.3% | 14.8% | 20.1% | 24.6% | 48.3% |
| 2.5 Years | 11.3% | 13.4% | 15.0% | 21.1% | 25.3% | 48.6% |
| 3 Years | 11.2% | 13.5% | 14.5% | 21.1% | 26.5% | 47.4% |
| 3.5 Years | 10.8% | 13.0% | 14.0% | 28.9% | 28.3% | 113.1% |
| 4 Years | 10.6% | 12.8% | 13.8% | 28.6% | 27.6% | 106.5% |
| 4.5 Years | 11.5% | 13.9% | 15.0% | 29.0% | 28.1% | 101.9% |
| 5.0 Years | 11.8% | 15.6% | 19.3% | 30.5% | 29.5% | 97.5% |

| Concluded Volatility | 12.3% |
|---|---|

*Source: Yahoo Finance*

| Charitable DAF HoldCo, Ltd | Schedule C.3 |
|---|---|
| Discount for Lack of Marketability (DLOM) Analysis | Valuation Date: September 30, 2024 |

*DLOM Determination - Restricted Stock Studies*

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Study | Period Covered | | | | Reported | Reported |
| | Name of Study | Date | From | To | Sub-Sample | Observations | Mean | Median |
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

| Charitable DAF HoldCo, Ltd | Schedule C.4 |
|---|---|
| Discount for Lack of Marketability (DLOM) Analysis | Valuation Date: September 30, 2024 |

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
|  | **Mean** | **Median** |
| **All Studies after 1997 and before 2008** | | |
| **Low** | **9.7%** | **9.0%** |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 2008** | | |
| **Low** | **10.9%** | **9.3%** |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
|  | | |
| **Indicated Discount for Lack of Marketability** | **9.7%** | |
|  | | |

| Charitable DAF HoldCo, Ltd | Schedule C.5 |
|---|---|
| **Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: September 30, 2024** |

*DLOM Conclusion*

| Discount for Lack of Marketability | | |
|---|---|---|
| DLOM Determination - Put Option Approach | 2.8% | *Schedule C.1* |
| DLOM Determination - Restricted Stock Studies | 9.7% | *Schedule C.4* |
| **Concluded Discount for Lack of Marketability** | **6.3%** | |

# EXHIBIT 52

March 27, 2025

**Re: Letter Agreement re: Assignment of Undertakings**

To whom it may concern:

This letter agreement (this "Agreement") is to confirm in writing an agreement made by Charitable DAF HoldCo, Ltd., a Cayman Islands limited company ("Holdco") and CDMCFAD, LLC, a Delaware limited liability company ("DAF"). Each party hereto may be referred to generically as a "Party" or collectively as the "Parties" in this Agreement.

WHEREAS, DAF completed a restructuring on March 27, 2025, that (i) issued new membership interests in DAF to DFW Charitable Foundation, a Delaware 501(c)(3) non-profit organization and (ii) redeemed the membership interests in DAF owned by Holdco (collectively, the "Issuance and Redemption Transaction");

WHEREAS, Mark Patrick and Paul Murphy, the Directors of Holdco intend to wind up the affairs of Holdco and engage liquidators to complete that process; and

WHEREAS, in connection with the Issuance and Redemption Transaction, Holdco and DAF have mutually agreed to assign all of the contracts and agreements listed on Schedule A hereto (collectively, the "Assigned Contracts") from Holdco to DAF.

NOW, THEREFORE, as material inducement to each Party entering this Agreement, and in consideration of the mutual representations and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.      Assignment of Undertakings.  Subject to the terms hereof, Holdco hereby assigns the Assigned Contracts to DAF with effect on and from the date first written above in consideration for the assumption of liabilities set forth herein (the "Assignment of Undertakings").

2.      Assumption of Liabilities.  In connection with the Assignment of Undertakings, DAF has agreed to assume all responsibilities and risks in any manner connected with the Assigned Contracts, whether now existing or hereafter arising.

3.      Further Assurances.  Until such time as Holdco completes its liquidation, Holdco agrees to cooperate (at DAF's sole expense) with DAF to take any further actions requested by DAF in connection with this Assignment of Undertakings, including executing assignment or similar agreements necessary to cause DAF to enter into the Assigned Contracts and obtain consent from counterparties. Notwithstanding anything to the contrary set forth herein, DAF shall not be responsible for funding any litigation of adverse actions relating to Holdco arising after the date hereof.

4.      Representations and Warranties.  By its execution and delivery hereof, each of the Parties represents and warrants to the other Party that, as of the date hereof and after giving effect to this Agreement:

(a) (i) such Party has all requisite power and authority to execute and deliver this Agreement, (ii) this Agreement has been duly executed and delivered by each Party to the other, and (iii) this Agreement constitutes the legal, valid, and binding obligations of such Party, enforceable in accordance with its respective terms;

(b) neither the execution, delivery, and performance of this Agreement, nor the consummation of any transactions contemplated herein or therein, will (i) contravene the terms of the trust agreement, limited liability company agreement, or other governing documents as applicable to such Party hereto; (ii) conflict with or result in any breach or contravention of, or the creation of (or the requirement to create) any lien under, or require any payment to be made under (a) any contractual obligation to which such Party is bound or affecting such Party or its respective properties or (b) any order, injunction, writ or decree of any governmental authority or any arbitral award to which such Party or such Party's property is subject; or (iii) violate any applicable law; and

(c) no approval, consent, exemption, authorization, or other action by, notice to, or filing with, any governmental authority or other person not previously obtained is necessary or required in connection with the execution, delivery, or performance by, or enforcement against, such Party to this Agreement.

5.    Assignment. Neither Party may assign this Agreement without the other Party's prior written consent.

6.    Governing Law; Venue. The Parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Texas and to the jurisdiction of the federal courts with jurisdiction covering Dallas, Texas, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of Texas or the federal courts with jurisdiction covering Dallas, Texas, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

7.    Further Assurances. Each Party agrees to execute, acknowledge, and deliver such further instruments and to do all such other acts as may be reasonably necessary or appropriate in order to carry out the purposes and intent of this Letter.

8.    Notices. All notices or requests required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given when hand delivered or sent by certified mail, return receipt requested, or by reputable overnight courier, in each case with receipt verified in writing, addressed in accordance with the respective Parties' signature on the signature pages hereto.

9.    Signature; Counterparts. This Agreement may be executed electronically, or in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

10.    Enforceability. If one or more provisions of this Agreement is found by a court of competent jurisdiction to be illegal, invalid, or unenforceable in whole or in part, the remaining terms and provisions of this Agreement shall remain in full force and effect disregarding such illegal, invalid, or unenforceable portion and such court shall be empowered to modify, if possible, such illegal, invalid, or unenforceable provision to the extent necessary to make it enforceable in accordance with the intent and purposes of the Parties expressed herein to the fullest extent permitted by applicable law.

11.    WAIVER OF JURY TRIAL. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF

THIS AGREEMENT OR THE SUBJECT MATTER HEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

12.    Merger; Amendment. This Agreement (i) is the only agreement between the Parties concerning the subject matter hereof and supersedes, terminates and cancels any prior statements, representations or agreements between the Parties concerning the subject matter hereof, (ii) is being executed by the Parties without reliance upon any representation, warranty, or other statement of any kind whatsoever, whether oral or written, which is not expressly set forth herein, and (iii) may not be changed orally, but only in a writing signed by duly authorized representatives of each of the Parties.

[*Remainder of Page Intentionally Blank*]

The undersigned have executed this Agreement as of the date first written above.

**Agreed and Accepted:**

**Charitable DAF HoldCo, Ltd.,**
a Cayman Islands limited company

By: _____
Name: Mark Patrick
Title: Director

By: _____
Name: Paul Murphy
Title: Director

Address for Notices:
Email: mpatrick@dafholdco.com
Email: pmurphy@dafholdco.com

**CDMCFAD, LLC,**
a Delaware limited liability company

By: _____
Name: Mark Patrick
Title: Manager

Address for Notices:
Email: mpatrick@dafholdco.com

## Schedule A

### Assigned Contracts and Agreements

1. Engagement Letter between Stone Hilton PLLC and Charitable DAF HoldCo, Ltd. dated February 27, 2025
2. Engagement Letter between Shields Legal Group, P.C. and Charitable DAF HoldCo, Ltd. (among others) dated September 27, 2023
3. Terms of Engagement by Walkers (Cayman) LLP to Charitable DAF HoldCo, Ltd.
4. Firestarter Proposal between Firestarter and Charitable DAF HoldCo, Ltd. dated January 15, 2025
5. Various ValueScope agreements, which we do not have
6. Engagement Letter between Seyfarth Shaw LLP and Charitable DAF HoldCo, Ltd. dated October 23, 2023
7. Engagement Letter between Deloitte Tax LLP and Charitable DAF HoldCo, Ltd. dated January 17, 2023
   a. Engagement Letter between Deloitte Tax LLP and Charitable DAF HoldCo, Ltd. dated February 7, 2022
8. Acknowledgment and Ratification Agreement among Grant James Scott, Charitable DAF HoldCo, Ltd., Charitable DAF GP, LLC, and Charitable DAF Fund, LP dated July 1, 2024
9. Engagement Letter among Charitable DAF HoldCo, Ltd. (and other DAF entities) and Carrington Coleman dated March 22, 2024
10. Engagement Letter among Charitable DAF HoldCo, Ltd., Charitable DAF GP, LLC, and Hueston Hennigan LLP dated January 26, 2024
11. In DAF's sole discretion, any other contract which they deem necessary to achieve a voluntary and solvent liquidation of Holdco

# EXHIBIT 53

## ADMISSION AND AMENDMENT NO. 1 AGREEMENT

This Admission and Amendment No. 1 Agreement (this "**Agreement**"), is entered into by the undersigned on March 27, 2025 (the "**Effective Date**").  Capitalized terms used herein and not otherwise defined shall have the meanings for such terms set forth in the LLC Agreement (as defined below).

## RECITALS

WHEREAS, CDMCFAD, LLC, a Delaware limited liability company (the "**Company**") is currently governed by that certain Limited Liability Company Agreement of the Company, dated as of December 18, 2024 (the "**LLC Agreement**");

WHEREAS, in accordance with the terms of the LLC Agreement, the parties hereto desire to: (i) admit the undersigned new Member (the "**New Member**") as an additional Member of the Company with the capital contribution of $1,637,192 (the "**Capital Contribution**") and Allocation Percentage set forth in Exhibit A hereto and (ii) amend Schedule A to the LLC Agreement as set forth in Exhibit A hereto to reflect the foregoing, as of the Effective Date; and

WHEREAS, the Manager hereby consents to and approves of the admission of the New Member and the amendments to Schedule A to the LLC Agreement as contemplated herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## AGREEMENTS

**I.**     **Admission.**   Each of the parties hereto hereby consents to the admission of the undersigned New Member as an additional Member of the Company.  In exchange for the payment to the Company of the Capital Contribution, the New Member is hereby issued a limited liability company interest in the Company with an Allocation Percentage as set forth on Exhibit A attached hereto as of the Effective Date.  Upon the execution of this Agreement, the undersigned New Member is hereby admitted as an additional Member of the Company as of the Effective Date and in such capacity, hereby agrees to and shall be bound by the terms of the LLC Agreement commencing as of the Effective Date.  For the avoidance of doubt, the execution and delivery of this Agreement by the undersigned New Member shall constitute the execution and delivery of a counterpart signature page to the LLC Agreement as required under Section 2.6 of the LLC Agreement.

**II.**    **Amendments.**

A.     Schedule A of the LLC Agreement is hereby amended and restated in its entirety and replaced with Exhibit A attached hereto.

521677\00001\4928-6266-5259\1

**536**

### III. __Miscellaneous__.

A. <u>Agreement in Effect</u>. Except as otherwise hereby amended, the LLC Agreement shall remain in full force and effect.

B. <u>Governing Law</u>. This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Delaware, all rights and remedies being governed by such laws.

C. <u>Counterparts</u>. This Agreement may be executed in counterparts (including by facsimile or other electronic transmission), each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

D. <u>Successors and Assigns</u>. This Agreement is binding upon and will inure to the benefit of the parties to this Agreement and their successors and assigns.

*[Signature Page Follows]*

2

**537**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and date first above written.

**MANAGER:**

Name: Mark Patrick

**NEW MEMBER:**

DFW CHARITABLE FOUNDATION

By:

Name: Mark Patrick

Title: President

*[Signature Page to Admission and
Amendment No. 1 Agreement – CDMCFAD, LLC]*

**EXHIBIT A**

**LIMITED LIABILITY COMPANY AGREEMENT**

**<u>SCHEDULE A</u>**

**MEMBER INFORMATION**

**Revised:  March 27, 2025**

| Name and Contact Information | Allocation Percentage |
|---|---|
| Charitable DAF Holdco, Ltd.<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 50% |
| DFW Charitable Foundation<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 50% |

**539**

# EXHIBIT 54

# REDEMPTION AND AMENDMENT NO. 2 AGREEMENT

This Redemption and Amendment No. 2 Agreement (this "**Agreement**"), is entered into by the undersigned on March 27, 2025 (the "**Effective Date**").  Capitalized terms used herein and not otherwise defined shall have the meanings for such terms set forth in the LLC Agreement (as defined below).

## RECITALS

WHEREAS, CDMCFAD, LLC, a Delaware limited liability company (the "**Company**") is currently governed by that certain Limited Liability Company Agreement of the Company, dated as of December 18, 2024 (as heretofore amended, the "**LLC Agreement**"); and

WHEREAS, in accordance with the terms of the LLC Agreement, Manager desires to: (i) redeem the entire limited liability company interest in the Company currently held by Charitable DAF HoldCo, Ltd. (the "**Redeemed Member**") effective as of the Effective Date for $1,637,192 (the "**Redemption Price**"), such amount being the Fair Market Value for the Redeemed Member's Interest as determined by the Manager, and (ii) amend Schedule A to the LLC Agreement as set forth in Exhibit A hereto to reflect the foregoing, as of the Effective Date.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## AGREEMENTS

**I.**      **Redemption.**    The Manager hereby approves and as of the Effective Date, the Redeemed Member's entire Interest in the Company is hereby redeemed by the Company for the payment of the Redemption Price.  As of the redemption contemplated by this Section I, the Redeemed Member shall cease to be a member of the Company and shall thereupon cease to have any rights or obligations as a member of the Company under the LLC Agreement, the Act or otherwise.

**II.**      **Amendments.**

A.      Schedule A of the LLC Agreement is hereby amended and restated in its entirety and replaced with Exhibit A attached hereto.

**III.**      **Miscellaneous.**

A.      Agreement in Effect.  Except as otherwise hereby amended, the LLC Agreement shall remain in full force and effect.

B.      Governing Law.  This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Delaware, all rights and remedies being governed by such laws.

C.    <u>Successors and Assigns</u>.  This Agreement is binding upon and will inure to the benefit of the parties to this Agreement and their successors and assigns.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Manager executed this Agreement as of the day and date first above written.

**MANAGER**:

Name: Mark Patrick

# EXHIBIT A

## LIMITED LIABILITY COMPANY AGREEMENT

## SCHEDULE A

### MEMBER INFORMATION

### Revised: March 27, 2025

| Name and Contact Information | Allocation Percentage |
|---|---|
| DFW Charitable Foundation<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 100% |

# EXHIBIT 55

**WRITTEN CONSENT**
**OF THE MANAGER**
**OF**
**CDMCFAD, LLC**

**March 27, 2025**

The undersigned, being the manager (the "Manager") of CDMCFAD, LLC, a Delaware limited liability company (the "Company"), does hereby consent to, adopt and approve, ratify and confirm by written consent the following resolutions and directs that this written consent be filed with the minutes of the proceedings of the Company:

**WHEREAS**, the current sole member of the Company is Charitable DAF Holdco, Ltd. (the "Current Member");

**WHEREAS**, the Company is currently governed by that certain Limited Liability Company Agreement of the Company, dated December 18, 2024 (the "LLC Agreement");

**WHEREAS**, the Company is part of a larger group of entities that include the Current Member (collectively the "DAF"), and the mission statement of the Current Member (which is representative of DAF as a whole) is as follows: "*Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*" (the "Mission Statement");

**WHEREAS**, the Highland Dallas Foundation, Inc., the Highland Kansas City Foundation, Inc., and the Highland Santa Barbara Foundation, Inc. (collectively, the "Highland Foundations") are Participating Shareholders in the Current Member and may be entitled to discretionary dividends if declared by the current Directors of the Current Member;

**WHEREAS**, the Manager has formed the view that the Current Member, by virtue of being a member of the Company and having as Participating Shareholders the Highland Foundations, poses a material risk to the Company, its assets, and the Mission Statement of DAF due to, among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii);

**WHEREAS**, and in connection therewith, the Manager desires to cause the Company to (i) admit DFW Charitable Foundation as an additional member of the Company and to amend the LLC Agreement to reflect the same, each pursuant to the terms of that certain Admission and Amendment No. 1 Agreement, a form of which is attached hereto as Exhibit A (the "Admission Agreement") and (ii) redeem the entire limited liability company interests in the Company held by the Current Member and to amend the LLC Agreement to reflect the same, each pursuant to the terms of that certain Redemption and Amendment No. 2 Agreement, a form of which is attached hereto as Exhibit B (the "Redemption Agreement" and together with the Admission Agreement, jointly, the "Restructure Agreements");

**WHEREAS**, in connection with the Restructure Agreements and the transactions contemplated thereby, the Manager (on behalf of the Company) obtained a valuation report of the membership interests

of the Company from ValueScope and (ii) FTI Consulting, copies of which are attached hereto as Exhibit E, which valuation reports have informed the Manager the fair market value of the membership interests;

**WHEREAS**, for the foregoing reasons, and others, the Manager has determined it to be in the best interests of the Company and its members for the Company to take all steps necessary to complete the transactions contemplated by the Restructure Agreements (such transactions collectively, the "Member Reorganization") so that the Company and DAF can again fulfill its Mission Statement and charitable purpose.

**NOW, THEREFORE, BE IT RESOLVED**, that the Member Reorganization is hereby approved in all respects in accordance with the terms set forth in the Restructure Agreements; and be it

**RESOLVED FURTHER**, that the terms, conditions and provisions of each of the Restructure Agreements are hereby approved in all respects; and be it

**RESOLVED FURTHER**, that the Manager, acting alone, be, and hereby is, authorized and empowered to execute and deliver in the name and on behalf of the Company and to cause the Company to perform its obligations under, such other and further agreements, instruments or documents (with such changes as the Manager deems necessary or advisable, such determination to be conclusively evidenced by the Manager's execution thereof) and to take all other actions that the Manager deems necessary or advisable to evidence and finalize the Member Reorganization and to carry out the intent and accomplish the purposes of these resolutions; and be it

**RESOLVED FURTHER**, that all acts of the Manager taken prior to the adoption of the foregoing resolutions, which acts are consistent with the purposes of the foregoing resolutions are hereby severally ratified, confirmed, approved and adopted as acts of the Company.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

2

IN WITNESS WHEREOF, the undersigned has executed this written consent as of the date first set forth above.

**MANAGER:**

Name: Mark E. Patrick

# EXHIBIT 56

### Total Annual Expenses ($)

| Expense | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 12/31/2022 | 12/31/2023 | 6/30/2024 |
|---|---|---|---|---|---|---|---|
| Legal Fee Expense | 66,797.39 | 116,173.18 | 398,091.82 | 4,346,447.57 | 4,337,827.65 | 8,044,320.10 | 6,184,744.91 |
| Investment Expense | - | - | - | - | - | 3,044,078.13 | 6,179,478.60 |
| Directors fees | - | - | - | 49,000.00 | 40,250.00 | 599,473.64 | 2,257,660.66 |
| Professional fees expense | 104,844.77 | 93,255.12 | 537,769.44 | 1,100,599.17 | 626,856.17 | 1,197,513.69 | 995,497.60 |
| Interest expense | 5,105,931.21 | 6,886,101.21 | 3,928,638.85 | 2,747,813.34 | 2,072,787.45 | 1,667,391.35 | 811,866.58 |
| Valuation services expense | - | - | 48,072.72 | 286,599.05 | 181,516.46 | 2,044,488.51 | 701,556.14 |
| Administration fees | 179,215.18 | 149,110.70 | 122,603.91 | 895,861.24 | 1,180,146.01 | 1,181,933.45 | 589,608.35 |
| Other expense | 344,897.87 | 1,062,261.79 | 679,023.69 | 388,462.74 | 449,838.72 | 805,068.65 | 571,048.05 |
| Dividend expense | - | 131,955.82 | 7,468.07 | 12,996.55 | 4,988,446.12 | 21,739.62 | 52,534.35 |
| Government fees | 46,343.20 | 52,782.23 | 30,765.73 | 251.20 | 4,647.69 | 7,076.35 | 1,468.44 |
| Management Fees | 5,472,982.35 | 4,468,290.73 | 3,576,464.98 | 230,460.41 | - | - | - |
| Trustee fees | 158,025.00 | 246,150.00 | 290,407.53 | 145,000.00 | - | - | - |
| Deferred Loan Fees Expense | (4,986.97) | 16,095.79 | 8,870.28 | - | 523.67 | - | - |
| Other Income | - | - | - | (2,400,000.00) | (12,768.67) | - | - |
| | 11,474,050.00 | 13,222,176.57 | 9,628,177.02 | 7,803,491.27 | 13,870,071.27 | 18,613,083.49 | 18,345,463.68 |

*Item flowing through other income as an expense was a true-up/correction of an item that had been booked incorrectly by the fund administrator

### Percentage of Total Expenses

| Expense | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 12/31/2022 | 12/31/2023 | 6/30/2024 |
|---|---|---|---|---|---|---|---|
| Legal Fee Expense | 0.58% | 0.88% | 4.13% | 55.70% | 31.27% | 43.22% | 33.71% |
| Investment Expense | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 16.35% | 33.68% |
| Directors fees | 0.00% | 0.00% | 0.00% | 0.63% | 0.29% | 3.22% | 12.31% |
| Professional fees expense | 0.91% | 0.71% | 5.59% | 14.10% | 4.52% | 6.43% | 5.43% |
| Interest expense | 44.50% | 52.08% | 40.80% | 35.21% | 14.94% | 8.96% | 4.43% |
| Valuation services expense | 0.00% | 0.00% | 0.50% | 3.67% | 1.31% | 10.98% | 3.82% |
| Administration fees | 1.56% | 1.13% | 1.27% | 11.48% | 8.51% | 6.35% | 3.21% |
| Other expense | 3.01% | 8.03% | 7.05% | 4.98% | 3.24% | 4.33% | 3.11% |
| Dividend expense | 0.00% | 1.00% | 0.08% | 0.17% | 35.97% | 0.12% | 0.29% |
| Government fees | 0.40% | 0.40% | 0.32% | 0.00% | 0.03% | 0.04% | 0.01% |
| Management Fees | 47.70% | 33.79% | 37.15% | 2.95% | 0.00% | 0.00% | 0.00% |
| Trustee fees | 1.38% | 1.86% | 3.02% | 1.86% | 0.00% | 0.00% | 0.00% |
| Deferred Loan Fees Expense | -0.04% | 0.12% | 0.09% | 0.00% | 0.00% | 0.00% | 0.00% |
| Other Income | 0.00% | 0.00% | 0.00% | -30.76% | -0.09% | 0.00% | 0.00% |
| | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

### Percentage change Y/Y

| Expense | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 12/31/2022 | 12/31/2023 | 6/30/2024 |
|---|---|---|---|---|---|---|---|
| Legal Fee Expense | - | 73.92% | 242.67% | 991.82% | -0.20% | 85.45% | -23.12% |
| Investment Expense | - | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 103.00% |
| Directors fees | - | 0.00% | 0.00% | -17.86% | 0.29% | 1389.38% | 276.61% |
| Professional fees expense | - | -11.05% | 476.66% | 104.66% | -43.04% | 91.03% | -16.87% |
| Interest expense | - | 34.86% | -42.95% | -30.06% | -24.57% | -19.56% | -51.31% |
| Valuation services expense | - | 0.00% | 0.00% | 496.18% | -36.67% | 1026.34% | -65.69% |
| Administration fees | - | -16.80% | -17.78% | 630.70% | 31.73% | 0.15% | -50.11% |
| Other expense | - | 207.99% | -36.08% | -42.79% | 15.80% | 78.97% | -29.07% |
| Dividend expense | - | 0.00% | -94.34% | 74.03% | 38282.85% | -99.56% | 141.65% |
| Government fees | - | 13.89% | -41.71% | -99.18% | 1750.20% | 52.26% | -79.25% |
| Management Fees | - | -18.36% | -19.96% | -93.56% | -100.00% | 0.00% | 0.00% |
| Trustee fees | - | 55.77% | 17.98% | -50.07% | -100.00% | 0.00% | 0.00% |
| Deferred Loan Fees Expense | - | -422.76% | -44.89% | -100.00% | 0.00% | -100.00% | 0.00% |
| Other Income | - | 0.00% | 0.00% | 0.00% | -99.47% | -100.00% | 0.00% |

# EXHIBIT 57

CHARITABLE DAF HOLDCO, LTD.
(THE "COMPANY")

WRITTEN RESOLUTIONS OF THE
DIRECTORS OF THE COMPANY

MADE ON 13th September 2024

The undersigned, being all of the Directors of the Company, hereby resolve, pursuant to the Articles of Association of the Company, the following directors' resolutions.

1.     REVIEW AND APPROVAL OF COMPENSATION FOR MARK PATRICK.

1.1    NOTED THAT:

(a)   Since 24 March 2021, Mr. Mark Patrick has been appointed as President, Chief Investment Officer and General Counsel of the Company, and appointed as President and Chief Investment Officer for seven subsidiaries/affiliated entities.

(b)   In or about March 2024, the Company, including Charitable DAF Fund LP, engaged Mercer LLP to conduct an independent compensation review of Mr. Mark Patrick's duties as President, Chief Investment Officer and General Counsel of the Company, and as President and Chief Investment Officer for seven subsidiaries/affiliated entities.

(c)   Mercer LLP prepared an independent report dated 26 August 2024 ("Mercer Report") which contains a summary of Mr. Patrick's roles and responsibilities and their methodology for calculating market comparables. At page 5 of that report, Mercer recommended that Mr Patrick's compensation be structured as follows:

a.   Base salary: USD $850,000 or USD $750,000 if general partner liability insurance can be acquired to mitigate Mr Patrick's personal risk exposure.

b.   Long-term incentive ("LTI") tied to DAF LP returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).

(d)   The Mercer report raised two issue for the Company to consider::

a.   Whether performance for the LTI compensation be calculated based on 2021 performance or start for the 2022 cycle; and

b.   Whether the LTI calculation should be calculated net of all Company expenses or new of fund expenses only.

(e)   On 12th September 2024, Mr. Paul Murphy, a co-director of the Company, spoke to Heidi O'Brien, a Partner at Mercer, to discuss the issues identified in 1, 1.1 (d) a. and b. Following this conversation and based on the fact that (i) Ms. O'Brien confirmed that it was not uncommon for similar companies to award employees for the complete fiscal year when starting part way through the year, and (ii) Mr. Patrick was appointed in March 2021, the Directors have concluded that Mr. Patrick's LTI compensation should be calculated on the basis of the 2021 cycle.

(f)   In addition, the Directors have concluded that the Company should assess the legal expenses

**338**

attributable to investments which impact the LTI compensation and, after that assessment, determine whether the LTI compensation should be increased.

(g) Based on the knowledge of the Directors of Mr. Patrick's roles and responsibilities, the Mercer LLP report and fact that Mr. Patrick is considered a key employee, the Directors have concluded that Mr. Patrick's compensation should be set in accordance with the recommendation in the Mercer report with the additional caveat that Mercer identified that CEOs and CIOs are often compensated on the basis of a base salary, annual incentive and LTI and an annual incentive is not included in the Mercer report. The Directors have concluded that it is in the Company's interest to determine whether an annual incentive should also be included as part of Mr. Patrick's compensation and, if so, how this is to be assessed.

(h) Mr. Patrick has declared his interests to the Company in relation to the matters the subject of this resolution, being that Mr Patrick is Director of the Company, and also employed by the Company as President, Chief Investment Officer, and General Counsel of the Company.

1.2 **IT IS RESOLVED** by unanimous written resolution that:

(a) Mr. Patrick's compensation be fixed, in accordance with recommendation of the Mercer LLP report, as follows:

    a. Base salary: USD $850,000, provided that, 100% of the base salary for calendar year 2024 may be paid on or about the date of these resolutions.

    b. Long-term incentive tied to DAF LP returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return), less any amounts previously advanced to Mr. Patrick.

(b) The Directors will assess:

    a. Whether any adjustment should be made to the LTI calculation based on whether the calculation should be made net of all expenses or net of fund expenses; and

    b. Whether Mr. Patrick should receive an annual bonus and the basis of that annual bonus.

Executed by the Directors comprising the entire Board of Directors of the Company:

BY   _____
Paul Murphy - Director
CHARITABLE DAF HOLDCO, LTD.

BY   _____
Mark Patrick - Director
CHARITABLE DAF HOLDCO, LTD.

**339**

# EXHIBIT 58

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE**
**DIRECTORS OF THE COMPANY**

**MADE ON 1 October 2024**

The undersigned, being all of the Directors of the Company, hereby resolve, pursuant to the Articles of Association of the Company, the following directors' resolutions. Any capitalized terms not defined herein are taken from the Directors' Resolution dated 12th September 2024.

1. **ESTABLISHMENT OF COMPENSATION COMMITTEE/GUIDELINES AND APPOINTMENT OF MEMBERS OF COMPENSATION COMMITTEE.**

1.1 **NOTED THAT:**

   (a) The Company does not presently have a compensation committee and the Directors believe it is in the best interest of the Company to establish a compensation committee which will be guided and governed by compensation committee guidelines established by the Directors.

   (b) Given the Directors knowledge and experience of the Company, the initial appointments to the compensation committee will be Mark Patrick and Paul Murphy.

1.2 **IT IS RESOLVED THAT:**

   (a) The Company establish a compensation committee (**"Compensation Committee"**) and adopt the guidelines in the form substantially contained in Appendix 1 to these resolutions (**"Compensation Committee Guidelines"**).

   (b) Mark Patrick and Paul Murphy be appointed to the Compensation Committee.

   (c) The Company empowers the Compensation Committee to make recommendations to the Directors on all matters outlined in the Compensation Committee Guidelines, provided that, all recommendations by the Compensation Committee are subject to review and approval by the Directors.

   (d) The Compensation Committee shall not make any recommendations in relation to Mark Patrick's compensation arising from the resolution passed by the Directors on 12th September 2024, in particular, the LTI payment and annual bonus resolution passed in these Directors' Resolutions paragraph number 2.

2. **FURTHER REVIEW AND APPROVAL OF COMPENSATION FOR MARK PATRICK AND EMPLOYMENT AGREEMENT.**

2.1 **NOTED THAT:**

   (a) On 12 September 2024, the Directors passed a directors' resolution addressing Mark Patrick's compensation as a Director, President/CEO, Chief Investment Officer and General Counsel of the Company. The Directors approved compensation in the following amounts:

   a. Base salary: USD $850,000.

**340**

      b.   LTI tied to Charitable DAF Fund LP ("DAF LP") returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).

(b)  In addition, the Directors resolved that they would assess:

      a.   Whether any adjustment should be made to the LTI calculation based on whether the calculation should be made net of all expenses or net of fund expenses; and

      b.   Whether Mr. Patrick should receive an annual bonus and the basis of that annual bonus.

LTI

(c)  Paul Murphy noted that the return of the Company is impacted by whether legal expenses should be included as an operational expense of the Company (in which case the LTI payment would be lower) or whether legal expenses have been incurred not as an operational expense but as an expense to preserve, protect and maximize returns to the Company (in which case it is appropriate to exclude these expenses when assessing the Company's return thereby raising the LTI payment, in whole or in part).

(d)  Paul Murphy, having a detailed and working knowledge of the Company's legal issues, and having commissioned Shawn Raver, legal advisor to the Company, to provide a breakdown of legal fees (i) which are attributable to the normal operation of the Company's investment portfolio, and (ii) which have been incurred to preserve, protect and maximize returns to the Company, who has assessed that 75% of those legal fees have been incurred to preserve, protect and maximize returns to the Company.

(e)  Accordingly, the LTI calculation should be adjusted to award 75% of the difference between the figures noted in page 9 of the Mercer Report which is $975,000.[1]

Annual Bonus

(f)  Paul Murphy conducted an independent assessment of whether Mark Patrick should receive an annual bonus and the basis of that annual bonus having regard to the Mercer Report, further discussions with Heidi O'Brien (Partner at Mercer), further review of industry comparables with CEO/CIO roles in complex structured finance senior positions, and assessment of other charitable organisations/structures (acknowledging that the Company and its subsidiaries are not subject to United States of America regulations).

(g)  Having (i) reviewed the Compensation Committee Guidelines and, (ii) a detailed working knowledge of the Company and Mark Patrick's roles and responsibilities, Paul Murphy assessed that Mark Patrick is eligible for an annual bonus in the amount of 2.5 times his base salary for the year 2023 and payable immediately for, inter alia, the following reasons:

      a.   CEOs and CIOs in comparable positions are typically awarded a base salary, annual bonus and form of long term incentive plan which is designed to compensate senior executives for their performance and value to a company on an annual and long term basis (see Mercer Report page 17, which is consistent with and supported by Paul Murphy's

---

[1] The calculation net of all expense is $4,459,000 and net of fund expenses is $5,759,000 leaving a difference of $1.3m of which $975,000 is 75%.

**341**

knowledge of US based asset managers).

    b.   The Company, in the absence of a senior executive willing to undertake the roles and responsibilities of a CEO, CIO and general counsel would, in the US, have to incur annual expenses of at least \$3-4m at the median range and \$5-6m at the upper range[2] to appropriately staff these positions.[3] By undertaking the roles of CEO, CIO and General Counsel, Mark Patrick would be undercompensated if the Company were only to award a base salary and LTI.

    c.   The Company has faced/is facing significant and complex legal issues in Texas, New York, the Cayman Islands and, until recently, Guernsey, which it has had to manage on a reactive and proactive basis and which Mark Patrick has been instrumental in the prosecution and defence of. These include sophisticated parties including US Bank, UBS and a Trustee in Bankruptcy.

    d.   Mark Patrick was instrumental in 2023/2024 defeating an action by UBS against the Company in New York which significantly reduced the Company's potential liabilities.

    e.   The risk profile to Mark Patrick as a director, CEO and CIO is high and his decision making will and is likely to be scrutinized which may lead to personal liability. He is undertaking these positions without the benefit of directors' and officers' insurance.

    f.   Mark Patrick has been instrumental in implementing and driving forward policies that will bring rigorous scrutiny and governance to the Company.

    g.   The Company's investments over the past three years have outperformed the S&P 500 significantly where the average returns for the S&P 500 over the same period returned 11.49% compared to 16.46% for the Company.

    h.   To date, Mark Patrick has not been awarded an annual bonus during his tenure at the Company nor has he received benefits which a CEO/CIO would typically enjoy.

(h)   These are not a comprehensive list of factors Paul Murphy took into account but form the basis of his independent conclusion that the Directors should (i) enter into an employment agreement in a form drafted by the Company's US and Cayman Islands counsel which reflects the on-going compensation package, and (ii) award an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary.

(i)   Mr. Patrick has declared his interests to the Company in relation to the matters the subject of this resolution, being that Mr Patrick is Director of the Company, and also employed by the Company as President, Chief Investment Officer, and General Counsel of the Company.

2.2    **IT IS RESOLVED** by unanimous written resolution that:

---

[2] Per Mercer Report at page 7 and adjusted to account for base compensation and annual bonus/long term incentive for general counsel.
[3] It is noted that the basis for these figures includes assessment of charities and foundations in the US which the Company is not. Whilst useful guidance, the Company must be mindful of the fact that the Company is a Cayman Islands company that holds complex structured financial products through Cayman Islands companies and is not bound by the same provisions that relate to US charities and foundations.

(a) Mark Patrick be awarded:

    a. An adjustment to the LTI incentive payment in the amount of $975,000.

    b. An annual bonus for the year 2023, payable immediately, of 2.5 times his base salary.

    c. No annual bonus for the years 2021 and 2022 given the entirety of the compensation package provided to Mark Patrick as of 12th September 2024 and the date of this resolution.

Executed by the Directors comprising the entire Board of Directors of the Company:

**BY** _____
Paul Murphy - Director

CHARITABLE DAF HOLDCO, LTD.


**BY** _____
Mark Patrick - Director

CHARITABLE DAF HOLDCO, LTD.

## APPENDIX 1
## COMPENSATION COMMITTEE GUIDELINES

### Compensation Policy for Executives and Directors

As adopted on October 1, 2024

1. **Overview and Objectives**

This document sets forth the Compensation Policy for Executives and Directors of Charitable DAF HoldCo, Ltd., its subsidiaries, and CDH GP, Ltd. (collectively, "**Company**").

Compensation is a key component of the Company's overall human capital strategy to attract, retain, reward, and motivate highly skilled individuals that will enhance the Company's value and otherwise assist the Company's to reach its long-term goals. Accordingly, the structure of this Policy is established to tie the compensation of each officer to the Company's goals and performance.

For purposes of this Policy, "Executive Officers" shall mean the Company's Chief Executive Officer, Chief Investment Officer, Chief Company Officer, and Chief Operating Officer, and such other executive officers as appointed by the Company from time to time.

For purposes of this Policy, "Directors" shall mean the Directors as defined in the organizational and governing documents of the Company.

This Policy is subject to applicable law and is not intended, and should not be interpreted as limiting or derogating from, provisions of applicable law to the extent not permitted.

This Policy shall apply to compensation agreements and arrangements which will be approved after the date on which this Policy is adopted and shall serve as Company's Compensation Policy for five (5) years, commencing as of its adoption, unless amended earlier.

The Compensation Committee and the Board of Directors of the Company (the "**Compensation Committee**" and the "**Board**", respectively) shall review and reassess the adequacy of this Policy from time to time.

The Compensation Committee and Board shall have regard to the fact that Charitable DAF HoldCo, Ltd. and its subsidiaries are incorporated and subject to Cayman Islands law ("**Cayman Islands Entities**"). Accordingly, whilst US law, regulation and industry standards ("**US Practices**") may be taken into account when considering the Objectives (as defined below), the US Practices are not binding on the Cayman Islands Entities, the Cayman Islands Entities having been purposely established as non-US entities, and the Compensation Committee will have regard to all factors which, in its discretion, achieve the Objectives (as defined below).

2. **Objectives**

Company's objectives and goals in setting this Policy are to attract, motivate and retain highly experienced leaders who will contribute to Company's success and enhance shareholder value, while demonstrating professionalism in a highly achievement-oriented culture that is based on merit and rewards excellent performance in the long term, and embedding Company's core values as part of a motivated behavior ("**Objectives**"). To that end, this Policy is designed, among others:

**344**

2.1. To closely align the interests of the Executive Officers and Directors with those of Company's shareholders in order to enhance shareholder value;

2.2. To align a significant portion of the Executive Officers' and Directors' compensation with Company's short and long-term goals and performance;

2.3. To provide the Executive Officers and Directors with a structured compensation package, including competitive salaries, performance-motivating cash and equity incentive programs and benefits;

2.4. To strengthen the retention and the motivation of Executive Officers and Directors in the long term; and

2.5. To provide appropriate awards in order to incentivize superior individual excellency and corporate performance.

3. **Compensation Instruments**

3.1 Compensation instruments under this Policy may include, but need not be limited to, the following:

    3.1.1 Base salary;

    3.1.2 Benefits;

    3.1.3 Annual cash bonuses;

    3.1.4 Change of control terms;

    3.1.5 Retirement and termination terms; and

    3.1.6 Long-term and short-term incentive payments

3.2 When fixing compensation instruments the Company may have regard to any matter which, in the Company's complete discretion, is commensurate with the Objectives. Without limitation, this may include:

    3.2.1 Assessing an Executive Officer and Director's performance with regard to their contribution to and management of any assets or investments the Company sources or owns from time to time;

    3.2.2 Assessing the performance of assets or investments of the Company in relation to overall returns to the Company;

    3.2.3 Mitigation of Company liabilities;

    3.2.4 Ensuring sound and prudent corporate governance including compliance with all legal, regulatory and industry standards;

    3.2.5 Efficient management of service providers;

3.2.6    Risk the Executive Officer and/or the Director is exposed to;

3.2.7    Responsibilities the Executive Officer and/or the Director undertakes; and

3.2.8    Achieving the Company's business and charitable objectives

4. **Benefits**

4.1    The following benefits may be granted to the Executive Officers and Directors in order, among other things, to comply with legal requirements:

4.1.1    Vacation days in accordance with market practice;

4.1.2    Sick days in accordance with market practice;

4.1.3    Convalescence pay according to applicable law;

4.1.4    Company may contribute on behalf of the Executive Officer or Director to an insurance policy (including, without limitation, split-dollar life insurance) or a pension fund, as allowed by applicable law and with reference to Company's policies and procedures and the practice in peer group companies (including contributions on bonus payments); and

4.1.5    Company may contribute on behalf of the Executive Officer or Director towards work disability insurance, as allowed by applicable law and with reference to Company's policies and procedures and to the practice in peer group companies.

4.2    In events of relocation or repatriation of an Executive Officer or Director to another geography, such Executive Officer or Director may receive other similar, comparable or customary benefits as applicable in the relevant jurisdiction in which he or she is employed or additional payments to reflect adjustments in cost of living. Such benefits may include reimbursement for out of pocket one-time payments and other ongoing expenses, such as housing allowance, car allowance, and home leave visit, etc.

4.3    Company may offer additional benefits to its Executive Officers and Directors, which will be comparable to customary market practices, such as, but not limited to: cellular and land line phone benefits, company car and travel benefits, reimbursement of business travel including a daily stipend when traveling and other business related expenses, insurances, other benefits (such as newspaper subscriptions, academic and professional studies), etc., provided, however, that such additional benefits shall be determined in accordance with Company's policies and procedures.

5. **Miscellaneous**

5.1    Nothing in this Policy shall be deemed to grant to any of Company's Executive Officers, employees, directors, or any third party any right or privilege in connection with their employment by or service to the Company, nor deemed to require Company to provide any compensation or benefits to any person. Such rights and privileges shall be governed by applicable personal

**346**

employment agreements or other separate compensation arrangements entered into between Company and the recipient of such compensation or benefits. The Board may determine that none or only part of the payments, benefits and perquisites detailed in this Policy shall be granted, and is authorized to cancel or suspend a compensation package or any part of it.

5.2    In the event that new regulations or law amendment in connection with Executive Officers' and Directors' compensation will be enacted following the adoption of this Policy, Company may follow such new regulations or law amendments, even if such new regulations are in contradiction to the compensation terms set forth herein.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This Policy is designed solely for the benefit of Company and none of the provisions thereof are intended to provide any rights or remedies to any person other than Company.

# EXHIBIT 59



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 (     )**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

| | |
|---|---|
| **(1)** | **MARK ERIC PATRICK** |
| **(2)** | **PAUL MURPHY** |
| **(3)** | **CDMCFAD, LLC** |
| **(4)** | **DFW CHARITABLE FOUNDATION** |
| **(5)** | **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** |
| **(6)** | **CLO HOLDCO, LTD.** |

Defendants

---

**WRIT OF SUMMONS**

---

TO:   (1)   **MARK ERIC PATRICK** of 6716 Glenhurst Drive, Dallas, Texas, 72554, United States of America

THIS WRIT was issued by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83527361)

(2)      **PAUL MURPHY** of Windsor Village #24, South Church Street, Grand Cayman, Cayman Islands

(3)      **CDMCFAD, LLC** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(4)      **DFW CHARITABLE FOUNDATION** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(5)      **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

(6)      **CLO HOLDCO, LTD.** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

THIS WRIT OF SUMMONS has been issued against you by the above-named Plaintiff in respect of the claim set out on the next page.

Within 14 days after the service of this Writ on you, counting the day of service, or, if you are served out of the jurisdiction, within such other period of time as the Court may order, you must either satisfy the claim or return to the Registrar of the Financial Services Division, Court Office, PO Box 495, George Town, Grand Cayman, KY1-1106, Cayman Islands, the accompanying Acknowledgment of Service stating therein whether you intend to contest these proceedings.

If you fail to satisfy the claim or to return the Acknowledgment within the time stated, or if you return the Acknowledgment without stating therein an intention to contest the proceedings, the Plaintiff may proceed with the action and judgment may be entered against you forthwith without further notice.

Issued this 15th day of July 2025

NOTE - This Writ may not be served later than 4 calendar months (or, if leave is required to effect service out of the jurisdiction, 6 months) beginning with the date of issue unless renewed by order of the Court.

## IMPORTANT

Directions for Acknowledgment of Service are given with the accompanying form

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 ( )**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

| | |
|---|---|
| **(1)** | **MARK ERIC PATRICK** |
| **(2)** | **PAUL MURPHY** |
| **(3)** | **CDMCFAD, LLC** |
| **(4)** | **DFW CHARITABLE FOUNDATION** |
| **(5)** | **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** |
| **(6)** | **CLO HOLDCO, LTD.** |

Defendants

---

**STATEMENT OF CLAIM**

---

**INTRODUCTION**

1    The Plaintiff, Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "**Company**"), is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Ltd, 68 Fort Street, George Town, PO Box 31726, Grand

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Cayman KY1-1207. The authorised and issued share capital of the Company is divided into Participating Shares and Management Shares.

2    The Company was placed into court supervised liquidation and Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited were appointed as joint official liquidators (the "**JOLs**") pursuant to an order of this Honourable Court dated 6 May 2025.

3    The Company was, between November 2011 and 18 December 2024, the sole limited partner of Charitable DAF Fund, LP (the "**Fund**").  At all relevant times, the net asset value of the Fund's assets was c. US$270million.

4    The Fund is a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organisations in the U.S. namely The Dallas Foundation; the Greater Kansas City Community Foundation; the Santa Barbara Foundation and The Community Foundation of North Texas (the "**Charities**"). These charities are the owners or the ultimate beneficial owners of Participating Shares in the Company.

5    In March 2021, Mark Patrick (the "**First Defendant**") was appointed the sole director and registered as the sole Management Shareholder of the Company.  In April 2021, Paul Murphy (the "**Second Defendant**") was appointed by the First Defendant as a second director of Holdco.

6    By virtue of a series of transactions or purported transactions between March 2024 and March 2025, unbeknownst to the holders of the Participating Shares (the "**Participating Shareholders**")  of the Company, Mr Patrick caused:

6.1    the Company, with the agreement and concurrence of Mr Murphy, to assign its interest in the Fund to the Third Defendant, a Delaware limited liability company, formed in

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

2

December 2024 and controlled by Mr Patrick, in exchange for a membership interest in that entity;

6.2 the Company, with the agreement and concurrence of Mr Murphy, to issue and allot further Participating Shares (representing a majority of the issued participating share capital) to the Fourth Defendant, a Delaware company, incorporated in December 2024 and controlled by Mr Patrick;

6.3 the Third Defendant to redeem the Company's membership interest in the Third Defendant for a consideration of c. US$1.6 million, representing approximately 0.59% of the total net asset value of the assets held by the Fund; and

6.4 the Company, with the agreement and concurrence of Mr Murphy, to be placed into voluntary liquidation after having made a final distribution to all Original Participating Shareholders (defined below) in the Company of the proceeds of redemption,

collectively the "**Impugned Transactions**".

7 The First and Second Defendants effected the Impugned Transactions in breach of their fiduciary and other duties to the Company in order to bring ownership of the Fund and its assets, with a net value of c. US$270 million (as assessed at 30 September 2024), under Mr Patrick's effective control to the exclusion of the interests of the Charities. The Charities, as the original, and rightful, ultimate beneficiaries of the Fund, have been left with nothing.

8 Further, during the period March 2021 to June 2024, the First and Second Defendants, in breach of fiduciary duty, caused the Company to pay excessive fees and expenses to Mr Patrick.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

3

## THE PARTIES

<u>The Company</u>

9      The Company is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Limited, Ltd, 68 Fort Street, George Town, PO Box 31726, Grand Cayman, KY1-1207, Cayman Islands.

10     The directors of the Company are Mr Patrick (appointed on 25 March 2021) and Mr Murphy (appointed by Mr Patrick on 22 April 2021).

11     The Company has been governed by the following memorandum and articles of association from time to time:

11.1     The memorandum and articles of association dated 27 October 2011; and

11.2     The amended and restated memoranda and articles of association dated 19 January 2015; 24 January 2024; and 20 February 2025 respectively.

The Company remains governed by the memorandum and articles of association as amended and restated on 20 February 2025 (the "**Articles**") save that the Company reserves the right to challenge the validity of the Articles.

12     Save as set out above, the Company will rely on the Articles and all previous iterations for their applicable full terms and effect.

13     Pursuant to the Articles and at all relevant times, the authorised share capital of the Company was US$50,000 divided into 100 Management Shares of US$0.01 par value each and 4,999,900 Participating Shares of US$0.01 par value each.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

4

**Page 8 of 83**

14     The Articles (with reference to the defined term of 'Restricted Person') require that the Participating Shareholders must at all times qualify as a tax-exempt organisation pursuant to section 501(c)(3) of the United States Internal Revenue Code of 1986 ("**IRC**").

15     The Participating Shares do not have voting rights but confer the right to participate in the profits or assets of the Company including by way of the receipt of dividends (Article 12).

16     The Management Shares have voting rights but confer no other right to participate in the profits or assets of the Company (Article 11).

17     The Participating Shareholders therefore have the entirety of the economic interest in the Company, whereas the Management Shareholders have the control rights.

18     On 7 November 2011, the Company issued:

      18.1     300 Participating Shares to The Highland Capital Management Partners Charitable Trust #2 ("**Trust #2**"); and

      18.2     100 Management Shares to Grant Scott.

19     On 30 November 2011, Trust #2 transferred its 300 Participating Shares equally amongst:

      19.1     Highland Kansas City Foundation, Inc.;

      19.2     Highland Dallas Foundation, Inc.[1]; and

      19.3     Highland Santa Barbara Foundation, Inc.,

      collectively, the "**Supporting Organisations**".

---

[1]Since June 2024, Highland Dallas Foundation, Inc. has also done business as 'NexPoint Philanthropies Dallas, Inc.', per an Assumed Name Certificate filed with the Secretary of State of Texas.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

5

   

**Page 9 of 83**

20    On 12 August 2015, the Company issued 5 Participating Shares to the Community Foundation of North Texas, ("**CFNT**", and together with the Supporting Organisations the "**Original Participating Shareholders**") for Highland Capital Management, L.P. Charitable Fund at CFNT.

21    On 25 March 2021, the Management Shares were transferred to Mr Patrick and he continues to hold these shares.

22    The Participating Shares held by the Original Participating Shareholders represented the entire issued Participating Share capital of the Company until 7 February 2025. On that date, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to issue 318 Participating Shares to the Fourth Defendant, DFW Charitable Foundation ("**DFW**"), significantly diluting the shareholdings of the Original Participating Shareholders and the indirect economic interest of the Charities.

23    Until 18 December 2024, the sole asset of the Company was its limited partnership interest in the Fund (the "**Partnership Interest**").

24    As a result of the Impugned Transactions, the Company now has no material assets.

DFW

25    DFW (the Fourth Defendant) is a non-profit non-stock corporation incorporated in Delaware on 9 December 2024, which is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes.

26    DFW is the majority Participating Shareholder of the Company by virtue of the purported share issuance on 7 February 2025, and Mr Patrick is its registered director, president and sole member.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

6

<u>The Fund</u>

27    The Fund is a Cayman Islands exempted limited partnership formed on 28 October 2011 (registration no. 53083), having its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

28    The Fund is governed by the Second Amended and Restated Exempted Limited Partnership Agreement dated 11 March 2024 (the "**LPA**"). The initial exempted limited partnership agreement of the Fund was dated 25 October 2011, was amended and restated on 7 November 2011 and further amended on 26 July 2022 (with effect from 24 March 2021). The Company will rely on the LPA for its applicable full terms and effect.

29    Mr Patrick was instrumental in the establishment of the Company, the Fund and the Fund structure.

30    Until 18 December 2024, the Company was the sole limited partner of the Fund.

31    On 18 December 2024, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to transfer its limited partnership interest to CDMCFAD, LLC ("**CDM**") (the Third Defendant) in exchange for a membership interest in CDM.

32    The original general partner of the Fund was Charitable DAF GP, LLC (the "**Original GP**"), a Delaware limited liability company registered as a foreign company in the Cayman Islands. The Original GP was the general partner from the Fund's formation until 7 March 2024.

33    On 7 March 2024, the Original GP was replaced by CDH GP, Ltd. (the "**New GP**") (the Fifth Defendant).

34    The sole asset of the Fund is its 100% shareholding in CLO HoldCo, Ltd. ("**CLO HoldCo**") (the Sixth Defendant), a Cayman Islands exempted company incorporated with limited liability,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

7

having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

35    The assets of the Fund were valued at c. $270 million in September 2024.

<u>The New GP</u>

36    The New GP (the Fifth Defendant) is a Cayman Islands exempted company incorporated on 27 February 2024, having its registered office located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

37    Mr Patrick is the New GP's sole director and sole shareholder.

38    The New GP is a defendant to these proceedings in two capacities: (i) in its capacity as General Partner; and (ii) for and on behalf of the Fund in order to join the Fund as a defendant to these proceedings.

<u>CDM</u>

39    CDM (the Third Defendant) is a limited liability company incorporated in Delaware on 12 December 2024, having its registered address c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

40    CDM is governed by the terms of a Limited Liability Company Agreement dated 18 December 2024.

41    Since 18 December 2024, the primary asset of CDM has been the limited partnership interest in the Fund.

42    The sole manager of CDM is Mark Patrick.

43    From 18 December 2024 to 27 March 2025, the sole member of CDM was the Company.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

8

44      On 27 March 2025, Mr Patrick caused CDM to redeem the Company and admit DFW as the sole participating member.

<u>CLO HoldCo</u>

45      CLO HoldCo (the Sixth Defendant) is a Cayman Islands exempted company incorporated on 13 December 2010, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands, and which is the Fund's main subsidiary.

46      The directors of CLO Holdco are Messrs Patrick and Murphy.

47      The sole shareholder of CLO Holdco is the Fund.

<u>The Directors</u>

*Mark Patrick*

48      Mr Patrick (the First Defendant) is a U.S. resident who is:

48.1    a director, holds the offices of (i) President, (ii) General Counsel, and (iii) Chief Investment Officer and is the current Management Shareholder of the Company;

48.2    the Manager of CDM (the Third Defendant);

48.3    the sole director and the sole member of DFW (the Fourth Defendant);

48.4    the sole director and sole shareholder of the New GP (the Fifth Defendant); and

48.5    a director of CLO HoldCo (the Sixth Defendant).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

9

49 Mr Patrick was employed as tax counsel by Highland Capital Management, L.P. ("**Highland**") from 2008 to 2021 and as tax counsel by Highgate Consulting Group, Inc. d/b/a Skyview Group from March 2021 to October 2024.

*Paul Murphy*

50 Mr Murphy (the Second Defendant) is a Cayman Islands resident who is:

    50.1 a director of the Company;

    50.2 a director of CLO HoldCo (the Fifth Defendant); and

    50.3 a director of various other entities in the Charitable DAF structure.[2]

51 Mr Patrick and Mr Murphy are referred to herein as the "**Directors**".

## THE CHARITABLE PURPOSE OF THE FUND

52 The Fund was formed on 28 October 2011 at the instigation of Mr James Dondero, a U.S. resident and the founder of Highland to enable certain assets, held through the shares in CLO Holdco, to be donated to a charitable foundation.

53 Upon the formation of the Fund, the Company was admitted as a limited partner and, by way of capital contribution, contributed all of the outstanding equity interests in CLO HoldCo to the Fund.

54 The purpose of the Fund was to make investments for the ultimate benefit of the Original Participating Shareholders and the Charities:

---

[2]Mr Murphy was appointed to the board of directors of the following entities on 22 April 2021; Liberty CLO Holdco, Ltd., Liberty Sub., Ltd., HCT Holdco 2, Ltd. and MGM Studios Holdco, Ltd. at the same time as Charitable DAF HoldCo, Ltd and CLO HoldCo, Ltd.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

10

54.1    The recitals to the LPA of the Fund provide that the purpose of the Fund was to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of the Limited Partner and its Indirect Charitable Owners*…".

54.2    Clause 1.3 of the LPA provides that "… *the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners*".

54.3    Clause 1.6(a) of the LPA provides that "*the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*".

54.4    "Indirect Charitable Owners" is defined in the LPA as "*the indirect equity owners of the Limited Partners which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.*" i.e., the Company's Participating Shareholders or the Charities.

54.5    Clause 4.2(a) of the LPA provides that "*Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses*…".

54.6    The LPA does not modify the statutory duty of the General Partner to act in good faith and in the interests of the Fund.

55    The Charities are the following four US charitable or non-profit foundations:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

11

55.1    *The Dallas Foundation*: a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets.

55.2    *Greater Kansas City Community Foundation*: a charitable entity established in Missouri in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds.

55.3    *Santa Barbara Foundation*: a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

55.4    *North Texas Community Foundation*: which manages assets totalling $513 million and donated $38.9 million to local non-profits in 2023.

56    The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (the "**Supported Organisations**") hold their interests in the Company through their respective Supporting Organisation namely Highland Dallas Foundation, Inc. as the Supporting Organisation for The Dallas Foundation; Highland Kansas City Foundation, Inc. as the Supporting Organisation for the Greater Kansas City Community Foundation; Highland Santa Barbara Foundation, Inc as the Supporting Organisation for the Santa Barbara Foundation.

57    CFNT holds its Participating Shares in the Company directly.

**THE TAX STRUCTURE**

58    As a matter of U.S. tax law, in order for the Supported Organisations to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore corporate blocker entity, namely the Company:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

12

58.1     S501(c)(3) of the IRC provides that charitable organisations which meet certain criteria are exempt from state and federal taxes except to the extent that it receives income classified as unrelated business taxable income ("**UBTI**"); and

58.2     the Supported Organisations and their Supporting Organisations meet the criteria of s501(c)(3). They are therefore generally exempt from U.S. state and federal taxes, with a few exceptions, including to the extent that they receive UBTI.

59     As a matter of U.S. tax law, at least a portion of income received directly from the Fund by the Supported Organisations would likely be considered UBTI.

60     In order to insulate the Supported Organisations from UBTI, instead of holding their interest in the Fund directly, they held through an offshore corporate blocker structure, namely the Company.

**THE SUPPORTED ORGANISATIONS CONTROL THE SUPPORTING ORGANISATIONS**

61     The Supporting Organisations were incorporated in Delaware by Mr Dondero on or about 22 November 2011 for the purpose of making charitable donations to their respective charity from the proceeds of dividends received by the Supporting Organisations from the Company.

62     Supporting organisations under the IRC are tax exempt charitable organisations that provide financial or operational support to one or more public charitable organisations (called "supported organisations"). Because of the link with the supported public charities, supporting organisations are classified as public charities themselves, as opposed to private foundations, despite the fact that a supporting organisation's sources of funding may be limited to a single individual, which would otherwise cause the entity to be classified as a private foundation.

63     Contributions to supporting organisations, as public charities, qualify for the highest tax deductibility thresholds under the IRC (up to 50% of the taxpayer's adjusted gross income, or

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

13

60%, in the case of cash gifts) instead of the substantially lower threshold for contributions to private foundations (30% of adjusted gross income, regardless of the character of the contribution).

64    The Supporting Organisations are "Type I" tax exempt organisations under the IRC which means they must be organised and operated exclusively to support and benefit their relevant charity and controlled by that charity:

64.1    S509(a)(3) of the IRC contains the qualifications for a "supporting organisation". Under that section, a supporting organisation is a tax-exempt entity that must be organised and then operate exclusively for either (i) the benefit of, (ii) to perform the functions of, or (iii) to carry out the purposes of one or more supported organisations.  The supported organisations must also be s501(c)(3) entities;

64.2    There are three types of supporting organisations, known as "Type I", "Type II" and "Type III". S509(a)(3)(B)(i), (ii) and (iii) sets out the requirements for each "Type", respectively;

64.3    S509(a)(3)(B)(i) provides that a Type I supporting organisation must be operated, supervised or controlled by the supported organisation; and

64.4    S509(a)(3)(C) provides that the supporting organisation may not be controlled by a disqualified person, other than the foundation managers and the supported organisation.

65    The Supporting Organisations are so controlled by the respective Supported Organisations.

66    The Supporting Organisations are governed by the terms of their respective Certificate of Incorporation and by-laws (the "**Bylaws**").

67    The Certificates of Incorporation provide (amongst other things) that:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

14

67.1   the Supporting Organisation:

(a)   is organised and shall be operated exclusively for charitable, educational and scientific purposes;

(b)   is organised and operated exclusively to support and benefit the particular charity that controls it; and

(c)   is a non-profit non-stock corporation and cannot issue any capital stock;

67.2   no part of the net earnings of the Supporting Organisation shall be distributable to the directors and officers of the Supporting Organisation or other private persons save that the Supporting Organisation can pay reasonable compensation for services rendered; and

67.3   net earnings can be used to make grants, loans and similar payments for charitable, educational and scientific purposes to benefit the relevant Supported Organisation.

68   The Bylaws provide that (amongst other things):

68.1   There are two classes of members of the Supporting Organisations with one member in each such class:

(a)   the institutional member (the "**Institutional Member**") which shall be the Supported Organisation; and

(b)   the individual member (the "**Individual Member**") which shall be Mr Dondero or an individual designated as the Individual Member in the Bylaws.

68.2   In terms of voting on a matter submitted to a vote of the members (except as otherwise provided in the Bylaws):

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

15

(a)      the Institutional Member is entitled to two votes; and

(b)      the Individual Member is entitled to one vote.

68.3    Institutional membership is not transferable or assignable.

68.4    Individual membership is transferable or assignable only upon approval of the Institutional Member.

68.5    Both the Institutional Member and the Individual Member must be present in person or by represented proxy to constitute a quorum at all meetings of members.

68.6    There shall be three directors of the board of the Supporting Organisation. Two directors shall be elected annually by the Institutional Member and one director shall be elected annually by the Individual Member.

69    The relationship between the Supporting Organisations and their respective Supported Organisation are governed by separate operating/legal relationship agreements (collectively "**Operating Agreements**"). These agreements provide, among other things, that:

69.1    the Supported Organisation will provide certain services to the Supporting Organisation;

69.2    the Supported Organisation will appoint two of the three directors of the Supporting Organisation as required by Bylaws; and

69.3    in consideration for the services provided by the Supported Organisation to the Supporting Organisation, the Supporting Organisation shall pay a fee to the Supported Organisation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

16

70    Mr Dondero sits on the board of each of the Supporting Organisations with two other directors from each of the Supported Organisations respectively.

71    The relationships, rights and obligations created by and between the Supported Organisations and the Supporting Organisations pursuant to the agreements entered into between them were at all material times in summary that:

71.1    the Supported Organisations control the Supporting Organisations through their majority voting interest and their ability to elect a majority of the directors of the Supporting Organisations;

71.2    the Supporting Organisations support the Supported Organisations by way of making grants to them from time to time from their assets, including any dividends received from the Company;

71.3    the Supporting Organisations have no ability to pay dividends to any private person or make payments to their directors (save reasonable reimbursement for reasonable out-of-pocket expenses) and can only make grants to the relevant Charity in furtherance of their charitable purposes; and

71.4    while Mr Dondero sits on the board of the Supporting Organisations, he does not control them, as a supermajority of the votes are always held by the respective Charity.

72    The Company will rely on the Certificates of Incorporation, Bylaws, Operating Agreements and terms of the IRC for their applicable full terms and effect.

**THE CONTROL POSITION OF MR PATRICK OVER THE COMPANY AND THE FUND**

73    The terms of the LPA grant sole control over the management and distribution of the Fund's assets to the General Partner. The terms of the Articles grant sole control over the management and distribution of the Company's assets to the Management Shareholder.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

17

The LPA

73.1   Clause 1.12

(i)   The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

73.2   Clause 1.6

(i)   *Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*

(ii)   *Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

18

*hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.*

<u>The Articles</u>

73.3    Article 11

*The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganization or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.*

73.4    Article 12

*Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.*

73.5    Article 13

*…the rights attached to any such Class may… only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes case at such a meeting.*

73.6    Article 84 (d)

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

19

*The office of Director shall be vacated if the Director…is removed from office by Ordinary Resolution.*

*The definition of Ordinary Resolution is a vote of the Management Shares.*

73.7    Article 99

*Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.*

73.8    Article 104

*Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.*

74    The Management Shares in the Company and the General Partner in the Fund have at all material times been held and/or controlled by a single individual who, as a result, has sole control of the Fund structure (the "**Control Position**"):

74.1    In or around November 2011:

(a)    Grant Scott was appointed as the sole director and allotted the 100 Management Shares of the Company; and

(b)    Grant Scott became the holder of the membership interest in the Original GP and was appointed the Manager thereof,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

20

Case 19-34054-MDC Case 25-11137-MFW Doc 453-1 Doc 6002-2 Filed 02/27/26 Entered 02/27/25 of 863 03:35 Desc
Exhibit G - Part 2   Page 345 of 881

**FSD2025-0201**                    **Page 24 of 83**                    **2025-07-15**

thereby assuming the Control Position from that date.

74.2   In or around 24 March 2021, Mr Scott:

(a)   assigned 100% of the membership interest in the Original GP to Mr Patrick pursuant to an Assignment and Assumption of Membership Interests Agreement, which membership interest gave Mr Patrick the sole right to manage the Original GP;

(b)   transferred to Mr Patrick the 100 Management Shares in the Company; and

(c)   resigned as a director of the Company and resolved to appoint Mr Patrick as the sole director in his place.

74.3   On 25 March 2021, Mr Patrick was entered into the Company's Register of Members as the holder of the Management Shares.

74.4   Mr Patrick therefore assumed the Control Position from that date.

74.5   On 22 April 2021, Mr Patrick resolved to appoint Mr Murphy as a second director of the Company.

74.6   On 7 March 2024, by way of a Deed of Assignment and Assumption, Mr Patrick, as managing member of the Original GP, caused the Original GP to transfer its general partnership interest in the Fund to the New GP.

74.7   Mr Patrick is the sole shareholder and director of the New GP.

74.8   Mr Patrick therefore remains in the Control Position and was in such position at all relevant times since 25 March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

21

75    Further, the sole asset of the Fund is its shares in CLO Holdco (the Sixth Defendant).  Mr Patrick and Mr Murphy are the directors of CLO Holdco and were appointed on 2 April 2021 and 22 April 2021 respectively.

76    The Control Position was not and is not a term of art but was nevertheless a legal and factual position:

76.1   where a single individual was the sole Management, and therefore voting, Shareholder of the Company;

76.2   where the same individual was a director of the Company;

76.3   where the same individual was the sole shareholder or controller of the General Partner;

76.4   where the same individual was a director of the General Partner;

76.5   where the same individual was in complete and effective control of at least the Company, of the General Partner, of the Fund and of CLO Holdco;

76.6   where the same individual was in effective sole control of all assets of the Fund;

76.7   where the same individual had no economic, residual, beneficial or winding up interest in assets of the Company;

76.8   where the same individual had no economic, residual, beneficial or winding up interest in assets of the General Partner;

76.9   where the same individual had no economic, residual, beneficial or winding up interest in assets of the Fund;


FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

22

**Page 26 of 83**

76.10   where the same individual was, irrespective of his or her formal positions, functions or duties, including as a director, acting as a trustee, fiduciary or in a trustee-like or fiduciary-like position with respect to the assets held by the Fund;

76.11   where the same individual was at all times acting solely for the benefit or the ultimate benefit of the Original Participating Shareholders and/or through them the Supported Organisations and/or through them the Charities; and

76.12   in the alternative to the plea directly above, where the duties otherwise owed by the same individual as a matter of law, including as a director, were affected and/or altered by the existence of the structure as pleaded above, including the facts and matters relating to the Control Position and including the fact that the structure as pleaded above was designed and intended to be solely for the benefit or the ultimate benefit of the Original Participating Shareholders, and/or through them the Charities.

**EVENTS RESULTING IN THE COMPANY HAVING NO MATERIAL ASSETS AND THE DILUTION OF THE SUPPORTING ORGANISATIONS' INTERESTS**

<u>Plan to defeat the interests of the Original Participating Shareholders</u>

77   On 9 November 2023, Shields Legal Group ("**Shields Legal**") (the U.S. attorneys for the Company) sent to Campbells LLP ("**Campbells**") (then Cayman Islands attorneys for the Company) a work plan (the "**Work Plan**") relevant to the Company, the Fund and CLO HoldCo.

78   It can be inferred, and is averred, that the purpose of the Work Plan and the subsequent advice and steps taken as detailed below was to seek to entrench Mr Patrick's Control Position and defeat the interests of the Original Participating Shareholders.

79   The Work Plan stated that (amongst other things):

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

23

79.1    the advice required related to "...*potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc*..."; and

79.2    "...*we may need to rely on opinions and memoranda in potential future disputes*..."

80    The Work Plan set out the issues on which the Directors sought advice, including among other things the following questions:

80.1    'Can the controlling person dilute shares, e.g., the Participation Shares?'

80.2    'Can the controlling person redeem shares, e.g., the Participation Shares?'

80.3    'Is there any Cayman law requirement that the Company distribute money upwards to the next level of entities (Highland Dallas Foundation, Inc. and others)?'

80.4    'Could the Company liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless?'

80.5    'What can be done at this point to make [the share transfers in the Company from Mr Scott to Mr Patrick] bullet proof?'

81    The Directors were advised that any steps taken in relation to the proposed issuance of new Participating Shares and withholding dividends must be in compliance with their fiduciary duties and taken in the best interest of the Company:

81.1    On 8 January 2024, Walkers (Cayman) LLP ("**Walkers**") (also then Cayman Islands counsel for the Company) provided advice on issues set out in the Work Plan to the effect that (amongst other things)*:*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

24

**Page 28 of 83**

(a) the Directors have power under the Articles to issue new Participating Shares that dilute the current Participating Shareholders, but must consider their fiduciary duties (including the duty to act in the best interests of the Company) when issuing such shares;

(b) the Participating Shares are non-redeemable;

(c) while payment of a dividend or other distribution is at the discretion of the Directors, if the Company were to have distributable reserves available, there may be a question of whether the Directors would be acting in its best interests to not pay some dividend or distribution; and

(d) the Directors have fiduciary duties to the Company which are paramount when considering (i) making a distribution and (ii) the distributable reserves available from which to make payments; they must have regard to what is in the Company's best interests, its future cash requirements, and its present and future solvency.

82  In February 2024, without telling the Supporting Organisations or the Charities, Mr Patrick sought to form a new entity to replace the Original GP. On 5 February 2024, Walkers emailed Mr Patrick to ask whether that entity should be a Cayman LLC or an exempted company, to which he responded later that day: "*Doesn't matter to me. Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection.*"

83  On 27 February 2024, without telling the Supporting Organisations or the Charities, the New GP (the Fifth Defendant) was incorporated in the Cayman Islands.

84  On 7 March 2024, Mr Patrick, in his capacity as Managing Member of the Original GP, and without telling the Supporting Organisations or the Charities, executed a written consent for the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

25

Case 19-34054 Case 5111 37c B521 Doc Filed 002/27/26 07/20 25 Page 36 of 83 03:35    Desc
Exhibit G - Part 2    Page 350 of 881

FSD2025-0201    **Page 29 of 83**    2025-07-15

transfer of the GP Interest to the New GP, thereby replacing the Fund's General Partner. The Supporting Organisations subsequently discovered this change only by chance in February 2025.

85    In or around August 2024, the Supporting Organisations were provided with a financial analysis (prepared by NexPoint Advisors LP) of the Fund's annual expenses which showed or appeared to show increases in expenditure, particularly as follows (and without prejudice to any further relevant facts and matters relating to Directors' fees or expenses):

85.1    directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased further to around US$2.25 million in the first half of 2024; and

85.2    expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

86    On 13 September 2024, without telling the Supporting Organisations or the Charities, the Directors resolved (amongst other things) with respect to Mr Patrick's compensation:

86.1    to increase Mr Patrick's salary to US$850,000 per annum;

86.2    include a long-term incentive ("**LTI**") tied to the Fund's returns, being 7.5% of annualised net fund returns in excess of 10% (capped at 25% annualised return); and

86.3    the Company should assess legal expenses attributable to investment which impacted the LTI compensation and then determine whether the LTI compensation should be increased.

87    On 1 October 2024, without telling the Supporting Organisations or the Charities:

87.1    the Directors resolved (amongst other things) that Mr Patrick would receive:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

26

(a)   an LTI payment of US$975,000; and

(b)   an 'annual discretionary bonus' for 2023 at an amount of 2.5 times his base salary.

87.2   Previously, in or around October 2021, Mr Patrick had signed an 'employment agreement' for his position at the Company, for the period commencing 24 March 2021, which provides that Mr Patrick:

(a)   shall receive a base salary of US$850,000;

(b)   shall receive an LTI payment for the period 24 March 2021 to 24 March 2024 in the amount of US$4,759,000; and

(c)   is eligible for both annual and discretionary bonuses as determined at the 'sole and absolute discretion of the Directors'.

88   Comparatively, Mr Scott's salary during his tenure in the Control Position was approximately US$60,000 per annum. Notwithstanding the above, the Supporting Organisations were not informed of these increases to the Directors' fees, remuneration and/or benefits.

89   In late October 2024, as a result of concerns arising from this additional expenditure, the Supporting Organisations requested that Mr Patrick provide relevant financial information for the Company and the Fund.  Mr Patrick did not do so.

90   On 11 November 2024, Holland and Knight ("**H&K**"), U.S. attorneys for the Supporting Organisations, issued a letter to Mr Murphy advising that the Supporting Organisations no longer had confidence in the governance of the Company and/or the Fund and considered that a reorganisation of the governance structures was required to protect the charitable efforts of the Supporting Organisations (the "**No Confidence Letter**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

27

91    On 26 November 2024, Mr Patrick sought advice from Walkers as to whether the Company could issue further Participating Shares to a new non-profit organisation to dilute the Supporting Organisations so as to weaken any winding-up petition brought by the Supporting Organisations on just and equitable grounds. Mr Murphy wrote that:

> "*Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluting them therefore the company should be wound up or an order made for change of management /revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground…*"

92    On 27 November 2024, Walkers responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition will be taken into consideration and would likely help.

93    On 9 December 2024, DFW was incorporated as a non-profit non-stock company in Delaware, by or with the assistance of Mr Douglas Mancino, partner of U.S. firm, Seyfarth Shaw LLP ("**Seyfarth**"), who, worked alongside Mr Patrick in the establishment of the Company and the Fund structure. The sole member of DFW was and is Mr Patrick.

94    On 7 February 2025, 318 Participating Shares were issued to DFW.

95    On 20 February 2025, Mr Patrick as the Management Shareholder of the Company resolved to adopt the Amended and Restated Memorandum and Articles of Association dated 20 February 2025 which, among other things:

95.1    Amended the Memorandum at paragraph 3 to give the Company charitable objects;

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

28

95.2    Amended article 70 to introduce the concept of a Management Director (being a director holding the Management Share) and to weight the voting such that on all matters the Management Director had 10 votes and any other directors had 1 vote;

95.3    Deleted the previous articles 70 and 71 giving the right to appoint alternate directors and proxies. By email dated 27 February 2025, Walkers confirmed that the purpose of this deletion was to "*avoid the risk of 'outsiders' being brought into the fold*".

96    The Company reserves its position in respect of the validity of these amendments.

<u>The purported restructuring: Mr Patrick causes the assignment of the Partnership Interest to CDM</u>

97    On 12 December 2024, CDM was incorporated as a limited liability company in Delaware.

98    On 18 December 2024, without telling the Supporting Organisations or the Charities, the Directors of the Company resolved (the "**Transfer Resolutions**") to approve the transfer of the entirety of the Company's limited partnership interest in the Fund to CDM, in consideration for the contribution by the sole member of CDM of 100% of the membership interest in CDM. The Transfer Resolutions provide (amongst other things) that, based apparently on U.S. tax advice, the transfer of the limited partnership interest to CDM:

98.1    "*…would help insulate the DAF from exposure to [Dondero] and his entities who may be at risk of causing the [IRS] to revoke the tax-exempt status of one or more of the Participating Shareholders/supporting organizations which could imperil the assets of the Company*";

98.2    "*The IRS would look favorably upon any and all attempts for DAF to maintain its influence from what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement*";

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

29

98.3 As a Delaware limited liability company (CDM): "…*as permitted under the LLC Act, the terms of the LLC Agreement eliminate the fiduciary duties of the manager of the Transferee*".

99 On 18 December 2024, without telling the Supporting Organisations or the Charities, the Company, CDM and the New GP entered into a Deed of Assignment and Assumption (the "**Deed**") which was executed by Mr Patrick on behalf of each of (i) the Company in his capacity as Director; (ii) CDM in his capacity as Manager; and (iii) the New GP in his capacity as Director. Pursuant to the terms of the Deed:

99.1 The Company assigned its entire limited partnership interest in the Fund to CDM (the "**CDM Assignment**").

99.2 The New GP provided its written consent to the CDM Assignment and the admission of CDM as the new limited partner, in accordance with clause 1.11(a) of the LPA.

99.3 CDM agreed to exercise its reasonable best endeavours to ensure that 100% of the membership interest in CDM held by Mr Patrick would be transferred to the Company (the "**CDM Membership Interest**").

100 On 18 December 2024, the Company (as member) and Mr Patrick (as manager) entered into a Delaware law governed Limited Liability Company Agreement in respect of CDM (the "**LLC Agreement**").

101 The LLC Agreement, materially provides (amongst other things) that:

"*Fair Market Value shall have the meaning set forth in Section 6.9(b).*

*…*

*The initial Manager shall be Mark Patrick.*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

30

…

*6.5 No Duties to the Company. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.*

…

*6.9 Valuation of Company Assets.*

*(a) General. The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.*

*(b) Binding Effect. The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.*

…

*7.3 Redemption. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

31

*Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal amount of the Fair Market Value of such Member's Interest being redeemed, as determined by the Manager in its sole discretion."*

102   The Company will rely on the terms of the LLC Agreement for their applicable full terms and effect.

103   The effect of these transactions was that:

103.1   CDM was inserted into the corporate structure below and as a subsidiary of the Company and would hold the entirety of the limited partnership interest in the Fund previously held by the Company; and

103.2   The Company would hold the entire membership interest in CDM, with the result that the Company's sole asset, having previously been its limited partnership interest in the Fund, was exchanged for the CDM Membership Interest

(the "**Restructuring**")

104   The Restructuring was at an undervalue and not in the interests of the Company (in that the CDM Membership Interest was less valuable than the limited partnership interest that the Company assigned to CDM) because (amongst other things)*:*

104.1   The General Partner owed fiduciary duties to the Company in the Fund, but the Manager (Mr Patrick) did not owe any fiduciary duties to CDM; and

104.2   The CDM Membership Interests were susceptible to being redeemed by Mr Patrick (as Manager) in his sole discretion and for any reason, for "fair market value" as defined by Article 6.9, i.e. a "good faith determination of the value".

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

32

105    On 3 April 2025, the Company obtained retrospective advice from Leading Counsel on the steps taken by the Company in December 2024 to effect the Restructuring and whether the transfer is "*open to challenge by the Participating Shareholders*", which advice:

105.1    refers to the justifications for the decisions taken as set out in the Restructuring Resolutions, and considers that, if called upon to justify the purpose of those decisions, the Directors would need to explain:

(a)    how the penalisation or loss of tax-exempt status any of the current Participating Shareholders could have "*imperil[ed]*" the *"assets"* of the Company;

(b)    the detrimental issues the Company was facing that the Directors believed would be mitigated by the interposition of CDM into the Fund structure; and

(c)    how and/or why the Restructuring would (i) benefit the Company and (ii) reduce the influence of Mr Dondero; and

105.2    considers that a shareholder reviewing the reasons listed in the Restructuring Resolutions "*might suggest that the contents of the resolution are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board*".

<u>Persistent and continual lack of information for the Supporting Organisations</u>

106    On 23 January 2025, having received no response from Mr Murphy to the No-Confidence Letter, Julie Diaz, the CEO of The Dallas Foundation, sent Mr Patrick an email advising that the Supporting Organisations needed to better understand the Company's/Fund's asset position, and requesting certain information be provided by 10 February 2025.

107    Having received no response, on 28 January 2025, Ms Diaz sent a further email to the Directors expressing serious concern (i) that the Supporting Organisations' requests for information

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

33

continued to be disregarded, and (ii) about the ongoing lack of transparency on the part of the Directors.

108    On 30 January 2025, Mr Murphy replied to Ms Diaz stating that the Directors:

108.1    had not received the 23 January email – but understood the next step was for the Directors to "*present directly*" to the Supporting Organisations to address the No-Confidence Letter; and

108.2    are cooperating with the Supporting Organisations to provide additional information – but "*have no legal obligation to do so*" and such cooperation "*should not be construed as an implicit acknowledgement of any duty to continue providing information to you*".

109    On 31 January 2025, Mr Michael Stockham of H&K responded to Mr Murphy noting that he and Mr Patrick were fiduciaries, managing US$270 million in assets for the benefit of charities that support the most vulnerable (i.e. the Charities) and: "*[w]hatever your side's obvious antagonism to Mr Dondero, the fact remains that the underlying assets are ultimately for these charitable missions.*"

110    On 4 February 2025, Mr Murphy responded that while open to resolving the concerns, they (i.e. the Directors) were struggling to understand the Supporting Organisations' change in position.

111    On 7 February 2025, H&K responded that the Directors were fiduciaries in control of US$270 million for the benefit of charities: "*these monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed and … fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees*".

112    On 14 February 2025, H&K received a letter from Mr Mancino which rejected the accuracy of the reported increases in expenditure. On 27 February 2025, H&K responded that his clients

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

34

were frustrated by the lack of transparency and refusal to answer simple queries about the financial position. In response, Seyfarth sought available dates for Mr Murphy to make the promised presentation to the Supporting Organisations. H&K responded the next day with three potential dates/times for the proposed call between 26 March and 3 April 2025. Mr Mancino did not respond.

113    On 20 March 2025, Mr Mancino sent a letter purportedly on behalf of the Company to the IRS about alleged undue influence and control exercised over the Supporting Organisations by Mr Dondero. The letter makes serious and unsubstantiated allegations about the Supporting Organisations, absent evidential support, including that they each (i.e. all of them): "*operates for Mr Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets…*".

114    On 3 April 2025, Mr Mancino sent an email to H&K stating that he had just learned there was a call scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried the apparent source of confusion.

115    Mr Mancino, and Mr Patrick and Mr Murphy (each in part through Mr Mancino as an instructed attorney) acted in bad faith by maintaining a pretence of actual or potential cooperation with the Supporting Organisations when this was not the case, and by sending or causing to be sent the email of 20 March 2025 in secret:

115.1    four (4) months after the Directors and/or the Company transferred away the Company's interest in the Fund without telling the Supporting Organisations or the Charities;

115.2    two (2) months after the Directors and/or the Company diluted the existing Participating Shareholders without telling the Supporting Organisations or the Charities (see below);

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

35

115.3   one (1) week after the Directors and/or the Company redeemed the Company's interest
in CDM without telling the Supporting Organisations or the Charities (see below);

115.4   one (1) day after the Directors placed the Company in voluntary liquidation, without
telling the Supporting Organisations or the Charities.

Purported Share Issuance and allotment to DFW

116   In November 2024, without telling the Supporting Organisations or the Charities, the Directors
began seeking advice from Walkers on whether the Company could issue new Participating
Shares that would have the effect of diluting the existing Participating Shareholders - "*in light
of a possible just and equitable winding up petition*" being filed by one of the Supporting
Organisations.

117   On 7 February 2025, Walkers advised that, while there must be a corporate benefit to the
exercise of the power, the Articles grant the Directors power to issue new shares that dilute the
Participating Shareholders, and recommended the shares be issued sooner than later, and
before any winding up petition was presented, since any alteration to the Company's
membership made after the presentation of the petition would be void.

118   On 7 February 2025, without telling the Supporting Organisations or the Charities, the Directors
resolved to issue 318 Participating Shares to DFW (the "**Share Issue Resolutions**"), resulting
in DFW owning 51.04% of the Participating Shareholding and the dilution of the Supporting
Organisations from an aggregate shareholding of 100% to 48.96% (the "**Share Issuance**").
The Share Issue Resolutions provided that:

118.1   Participating Shareholders had requested information and made false and misleading
claims about the Company and its finances which the Directors believe were directed
by Mr Dondero.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

36

118.2   Based apparently on U.S. tax advice:

   (a)   There was a heightened risk the IRS could revoke the tax-exempt status of the Participating Shareholders which could imperil the status and assets of the Company.

   (b)   Increasing the number of Participating Shareholders would mitigate the undue influence and private inurement of Mr Dondero.

   (c)   The IRS would look favourably upon attempts by the Fund to maintain its independence from his (i.e. Mr Dondero's) attempts to use the Fund for his private benefit.

118.3   The Directors believed the Share Issuance to DFW would protect the Company and the Participating Shareholders and resolved that the Share Issuance to DFW be approved.

119   On 5 March 2025, Leading Counsel (Mr Tony Beswetherick KC) issued draft retrospective (but final) advice to the Company on the Share Issuance in which he opined (amongst other things) as follows:

119.1   where Articles confer a power on directors to issues shares, that power is a fiduciary one and must only be exercised for proper purposes; an issue of shares "…*deliberately aimed at altering the balance of power between*" is problematic; the power should not be exercised with a view to altering an existing balance of power, irrespective of whether the directors consider that doing so is in the interests of the company;

119.2   the effect of the Share Issuance was that, if there were to be a company meeting or proposal to approve a modification that affects the Participating Shareholders' rights,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

37

the ability of the prior Participating Shareholders to vote down such a change was negatively affected (DFW now having over 50% of the total Participating Shares);

119.3   it is not immediately clear from the Share Issue Resolutions whether the justifications stated were actually relevant to the Directors' decision. If they were relevant, it is not explained why the issue of shares to DFW would prevent false claims being made by Mr Dondero; it may be that those matters are part of the context, rather than part of the reason for the decision; and

119.4   the Participating Shareholders might suggest the Share Issue Resolutions are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board.

<u>Plan to redeem the Original Participating Shareholders</u>

120     In January and February 2025, the Directors, in connection with a plan to try to redeem the Participating Shareholders and/or the CDM Membership Interest held by the Company, and without telling the Supporting Organisations or the Charities, sought to obtain an analysis of the fair market value of the Participation Shares, and the discount that should be applied to such valuation, given the limited rights conferred upon Participating Share under the Articles.

*Historic ValueScope Valuations*

121     At the request of the Company, ValueScope, Inc. ("**ValueScope**") conducted a series of valuation analyses of 100 Participation Shares on a net asset value ("**NAV**") basis between December 2020 and September 2024 to determine their fair market value ("**FMV**"). These valuations were apparently prepared for internal reporting purposes and apparently applied consistent methodologies throughout the period. The results of these valuations are summarised below:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

38

| Valuation date | NAV | NAV Per Share | Combined Discounts | FMV Per Share | FMV (100 shares) |
|---|---|---|---|---|---|
| 31 December 2020 | $176.96M | $580,193 | 17.0% | $481,468 | $48,146,754 |
| 31 December 2021 | $243.19M | $797,343 | 11.6% | $705,210 | $70,521,019 |
| 31 December 2022 | $276.24M | $905,711 | 15.4% | $766,549 | $76,654,941 |
| 31 December 2023 | $277.57M | $910,076 | 14.0% | $782,847 | $78,284,712 |
| 30 September 2024 | $269.05M | $882,140 | 13.9% | $759,614 | $75,961,370 |

122    The final NAV-based valuation prepared by ValueScope prior to the Restructuring was dated
       7 January 2025, and gave a valuation of 100 Participating Shares as at 30 September 2024
       (the "**September 2024 Valuation**").

*PwC and FTI*

123    On 14 January 2025, Walkers inquired with PwC about a valuation of "*the shares of Charitable
       DAF Holdco*". In that email, Walkers, presumably on instructions from the Directors, listed the
       Supporting Organisations as "*potential adverse parties*".

124    On 7 February 2025, Walkers informed PwC that CDM had been inserted into the structure
       and requested that a second valuation be prepared of all the CDM Membership Interest, which
       valuation Walkers said was also to rely on the NAV as previously advised (rather than leaving

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

39

PwC to determine their own valuation methodology). PwC responded that their initial view is "*there is no meaningful difference*" between the two valuations requested - "*i.e. the economic interest in the underlying NAV still fully accrues to the participating shareholders*" - but that voting power/control remains with Mr Patrick (or with entities he controls). PwC asked for further information about what Mr Patrick was trying to achieve by the Restructuring to help them understand the valuation implications.

125    On 10 February 2025, PwC suggested a call with Walkers to discuss the second valuation, which call took place on 11 February 2025, and was also attended by Mr Patrick's '*onshore and Delaware counsel*'. Following that call, PwC declined to take on the instructions:

> "*... our view is that the new Delaware entity (CDMCFAD) effectively has full economic interest and control over the Fund, so we don't really see a basis for applying any discounts to the underlying Fund NAV for that entity. As it relates to the participating shareholders' interest in Charitable DAF Holdco, Ltd., we don't think we can reliably estimate the value/discount given the current fact pattern. While we could make hypothetical assumptions about how the articles may be interpreted, and/or how future cash flows may or may not be distributed, the impact on value is so substantial that we don't think it would be a meaningful exercise (i.e. we'd end up with the discount being 100% in one scenario, but 0% in another). On that basis, I don't think there is a fee / scope that can work for us currently.*"

*The FTI Memo*

126    On 13 February 2025, without telling the Supporting Organisations or the Charities, the Company engaged FTI Consulting in London ("**FTI**") to advise on (i) the discount applicable (if any) to a valuation considering how the rights attached to Participation Shares differed from those typically associated with ordinary shares, and (ii) the impact of the existence of an additional share class (being the Management Shares held by Mr Patrick). FTI's engagement

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

40

**Page 44 of 83**

letter also stated that "*The Memo will also include a valuation of the ordinary shares of CDMCFAD, LLC, the immediate subsidiary of Charitable DAF HoldCo*".

127  On 2 March 2025, FTI provided a draft memorandum to Walkers/the Company.

128  On 27 March 2025, FTI issued its final memorandum (the "**FTI Memo**"), which stated (amongst other things) that the rights of Participating Shares were extremely limited, and the potential distribution of cash was highly dependent on a member's alignment with the Fund's mission. The FTI Memo concluded that a "limited discount" for lack of control and marketability should be applied where a member is aligned with the Fund's mission (said to be close to the range concluded by ValueScope in its 7 January ValueScope Report, i.e. a discount of 13.9%), and a "high discount" of 95% where a member is not.

*Legal advice sought*

129  On 25 February 2025, without telling the Supporting Organisations or the Charities, the Directors sought advice from Walkers and Shields Legal on any powers under the Articles to enable the removal of the Supporting Organisations, including by (i) redemption of the Participating Shares (Art 14 and 28), (ii) a forced transfer of Participating Shares held by a Restricted Person (Art 21) (iii) or an alternative course whereby DFW repurchased the shares, which could then be cancelled, and new shares issued which are redeemable by the Company. Walkers advised that both redemption and forced transfers were not permitted but agreed with the alternative course involving DFW.

130  On 5 March 2025, as stated above, Leading Counsel provided retrospective advice to the Company regarding the Share Issuance, which also considered whether the Directors had power under the Articles to redeem the Participating Shares. Leading Counsel opined that they did not, on the basis that the Participating Shares were not issued as redeemable shares, and could not be redeemed unless there were a prior variation of the rights ascribed to them. That said, any proposal to vary the rights attached to the shares to make them redeemable would

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

41

**Page 45 of 83**

support an argument "*that the [DFW Share Issue] was itself procured with a view, ultimately, to disenfranchising the pre-existing Participating Shareholders*".

131    On 17 March 2025, Mr Patrick wrote to Walkers in the following terms:

> "*Agree we need to finalise the [FTI valuation] reports …We should request any limits on use removed.*
>
> *We are seeking U.S. tax counsel to send emails to Paul and I that the non profits are Restricted Persons and/or best interests of the Company to have non dondero holders of its interests.  After that, an alternative approach is to give them what they want – liquidate Holdco Ltd after its only investment is redeemed by the US. LLC pursuant to U.S. counsel advice above, that it's in the best interests of the Company to redeem all non-profits affiliated with Dondero. US LLC has same valuation conducted on its shares as the participation shares. so we would redeem the LLC interest, then distribute the proceeds out of Holdco Ltd., and file articles of Dissolution for Charitable daf Holdco Ltd before a wind up petition is filled.  That would put us on the "high ground" to fight (rather the way this is currently heading in a defensive posture). they would have to scrap their wond up petition and fight for reinstatement, gripe about the valuations, and file fiduciary breach actions …*
>
> *We will stage this in light of the Doug letter, new advice of two separate U.S Tax counsel, and seeing how successful (or not) our outreach to the Texas attorney general office is.*
>
> *Note US LLC would make DFW its sole owner.*"

132    The email of 19 March 2025 makes plain that the Directors, or at least Mr Patrick, intended to liquidate the Company without notice to the Supporting Organisations and to otherwise obstruct

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

42

the Supporting Organisations' ability to exercise any right to petition to wind up the Company on just and equitable grounds.

133   On 20 March 2025, Walkers provided comments on the FTI draft valuation, and FTI responded. These comments include, amongst other things:

> "Walkers: *It is stated at [3.2(2)] that "there is no overriding duty of DAF's Directors to act in the shareholders' interest. The Directors will act according to the best interest of the company, that is, to achieve the charitable causes that are aligned with DAF's mission". However, as a matter of Cayman law, directors owe duties to the company, and must act in its best interests [which are] generally regarded as the interests of the members as a whole, and in certain circumstances the objects of the company may be taken into account when determining what is in its best interests.*

> FTI: *Can you explain how it was in the interests of the company to materially dilute the existing shareholders*?

> …

> Walkers: *It is stated at [3.10] that "the Participating Shareholders do not have any rights to cause a liquidation/winding up of the company". However, the Participating Shareholders do have the right to seek a winding up of the company, as conferred upon them by the Companies Act (rather than the Articles).*

> FTI: *Why won't they just do this immediately and seek distributions? Isn't the ability to trigger a liquidation contradictory with point 1 which states "Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed"*.

> …

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

43

Walkers: *As per our comments, please could you delete references to our advice so as to avoid any potential arguments about waiver of privilege.*

FTI: *Your advice is important in us arriving at our conclusions. I understand from our legal team that we either (i) keep the reference to your advice or (ii) address the memo to you. Are you expecting there to be litigation in relation to the proposed transaction?*

…

Walkers: *Our client now seeks a valuation report which may, in connection with a proposed redemption of the membership interests in CDM, be disclosed to third parties and relied on to establish fair market value of both the membership interests in CDM, and in turn HoldCo.*

FTI: *This is a material change in the purpose and access rights of the report. Please provide more detail of the transaction. Is it the case that Mark will make CDM redeem the shares owned in by DAF? And who would you like to share the report with? And on what basis (e.g. non-reliance)? We also note our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares. To do a valuation, we would need to do a more detailed exercise, including valuing the underlying assets."*

134   On 21 to 24 March 2025, FTI and Walkers had an exchange (amongst other things) as follows*:*

"FTI: *If the firm was wound down, would it result in distributions to the existing participating shareholders? Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing? Given they haven't received dividends since 2019, why haven't the participating shareholders triggered a wind down? If they can trigger a wind down and then in short order receive $300m of distributions, it does change things re discount.*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

44

Walkers: *if HoldCo was wound up, the Participating Shareholders would receive distributions which would be made pari passu, and Mark (if he was the liquidator) would not be able to ensure the existing Participating Shareholders get nothing. Whilst the Participating Shareholders have the right to seek to wind up under the Companies Act, they need a proper basis to do so… We can only assume [they] have not commenced proceedings seeking to wind the company up because they do not have a proper basis on which to do so …*

*…*

FTI: *Would an absence of distributions be sufficient grounds to make an application to wind the company up? If the participating shareholders did make the application, would Mark be able to issue a vast number of shares to another party before the distributions were made thereby ensuring the existing shareholders received very little?*

Walkers: *A Participating Shareholder may consider an absence of distributions sufficient grounds for a winding up order on the just and equitable basis… But it is difficult for us to say whether that petition would be successful. If (a) a Participating Shareholder presented a petition; (b) new shares were purportedly issued; and (c) the Court then made a winding up order, the issue of the new shares would be void and not impact the amounts the Participating Shareholders would receive.*"

135    On 26 and 27 March 2025, FTI and Walkers had an exchange (amongst other things) as follows:

"Walkers: *We have discussed with our client and onshore counsel and set out some amendments in the attached. In addition, we note (1) we have not received any material addressing reliance on the memo by CDM; and (2) the "Limitations and restrictions" section still provides that the memo "should not be used to support a transaction". For*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

45

*the memo to be useful in the circumstances, CDM [and HoldCo] need to be able to rely on it or a separate memo would need to be addressed to CDM on which it may rely.  Further, both entities need to be able to rely on the memo(s) to support the proposed transaction.*

FTI: *What is the intention of adding that directors should act in the interests of future members? I am struggling to understand how a director could act in a manner which is beneficial for future shareholders which is not also helpful for existing shareholders.*

*The limitations in our note will remain. To do a valuation to support a transaction, we will need to do significantly more detailed work. This is an unusual/complicated situation.  We are open to doing a fairness opinion on the transaction. But this will require approval from our risk committee and more information on the transaction and situation. We are happy for CDM to have our memo on a non-reliance basis. But this memo should not be used to support a transaction.*"

*March 2025 ValueScope Valuation*

136    Following the Restructuring, ValueScope was requested by Shields Legal, without telling the Supporting Organisations or the Charities, to prepare two valuation analyses:

136.1   100% Membership Interest in CDM; and

136.2   Certain Participating Shares of the Company as at 25 March 2025 (the "**March 2025 Valuation**").

137    The March 2025 Valuation had the same instructions, definition of value and scope of work as the September 2024 Valuation. Like the September 2024 Valuation, the March 2025 Valuation also referenced a 30 September 2024 balance sheet (and did not refer to any later analysis of

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

assets and liabilities). As shown below, the September 2024 Valuation and March 2025 Valuation produced very different results.

138    A comparative summary of the September 2024 and March 2025 Valuations is set out below:

| Valuation Date | DLOC* | DLOM** | Valuation Basis | FMV (100 Shares) |
|---|---|---|---|---|
| 30 September 2024 | 8.1% | 6.3% | NAV | $75,961,370 |
| 25 March 2025 | 99.2% | 20.00% | DCF*** | $536,784 |
| **Difference** | **+91.1%** | **+13.7%** | | **-$75,424,586** |

*DLOC – Discounted for Lack of Control

**DLOM – Discounted for Lack of Marketability

***DCF – Discounted Cash Flow

139    The March 2025 Valuation stated: "*for the valuation of non-controlling assets in holding companies such as DAF, the asset-based approach is most commonly used [as Valuescope had always done previously].  When applied to such companies, the approach consists of measuring the underlying net asset value of an entity (the fair market value of the entity's assets less the fair market value of its liabilities).  The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.  However, in the case of the participation shares under consideration, the asset-based approach is not applicable. These shares do not confer control and only have a claim in respect of the underlying assets in a winding up.*"

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

47

140     ValueScope does not appear to have considered whether winding up was a possibility, and therefore, whether value could have been realised that way and by reference to NAV.

141     For reasons which are unclear to the Company, the March 2025 Valuation expressly rejected the asset-based (NAV) approach on the basis that the economic benefits of the Participating Shares in the Company were contingent on discretionary distributions by its manager. The report states.

> *'Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of these shares are contingent upon discretionary distributions by the director. As such, their value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality'.*

142     Accordingly, the methodology applied in the March 2025 Valuation was markedly different from the methodology applied in the September 2024 Valuation. Instead of relying on discounted net assets, the March 2025 Valuation:

142.1     applied a discounted cash flow ("**DCF**") methodology to estimate the present value of expected future distributions, rather than an asset-based approach, as had been applied in at least the past five annual valuations by ValueScope;

142.2     determined the FMV of 100 Participating Shares to be US$536,784;

142.3     applied a discount of 99.2% for DLOC; and

142.4     applied a discount of 20.00% for DLOM.

143     The DCF model is based on the present value of future distributions to the Company. ValueScope's report shows that these were estimated based on historic distributions themselves controlled by Mr Patrick.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

48

**Page 52 of 83**

144     Based on the valuations above, between 30 September 2024 and 25 March 2025, the FMV of 100 Participating Shares in the Company apparently declined from US\$75,961,370 to US\$536,784, representing a reduction in value of 99.29% in less than a six month period, in which the Restructuring occurred, attributable to a change in valuation basis (amongst other things) from NAV to DCF.

145     Furthermore, ValueScope does not appear to have sense-tested their valuation.  Although they identified "total equity" of c. US\$270 million and concluded that all of the Participation Shares had a value of only c. US\$1.6 million, they did not address themselves to who benefitted from the residual value of c. US\$268 million.

<u>Admission and Redemption</u>

146     On 27 March 2025, Mr Patrick, as manager of CDM, executed a written consent (the "**Manager Consent**") to (a) cause CDM to admit DFW as an additional member of CDM pursuant to the terms of an Admission and Amendment No.1 Agreement (the "**Admission Agreement**") and (b) redeem the CDM Membership Interest held by the Company pursuant to the terms of a Redemption and Amendment No. 2 Agreement (the "**Redemption Agreement**" and together with the Admission Agreement, the "**Restructure Agreements**"):

146.1   The recitals to the Manager Consent stated that the redemption of the Company's membership interest was justified by reason of alleged attempts by the Supporting Organisations to exert control, and the potential loss of their (i.e. the Supporting Organisations') non-profit and tax-exempt status:

> *"… the Manager has formed the view that the Current Member, by virtue of being a member of the Company and having as Participating Shareholders the Highland Foundations, poses a material risk to the Company, its assets, and the Mission Statement of DAF due to, among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

49

**Page 53 of 83**

*over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii)"*

146.2   The Manager Consent further stated:

*"WHEREAS, in connection with the Restructure Agreements and the transactions contemplated thereby, the Manager (on behalf of the Company) obtained a valuation report of the membership interests of the Company from ValueScope and FTI Consulting, copies of which are attached hereto as Exhibit E, which valuation reports have informed the Manager the fair market value of the membership interests"*

146.3   Exhibits C and D to the Manager Consent are documents purportedly containing information regarding various alleged U.S. tax issues relating to the Company.

146.4   Exhibit C is the letter from Mr Mancino to the IRS dated 20 March 2025, in which Mr Mancino (amongst other things) stated:

(a)     there has been "deterioration" of the Company's relationship with Highland Dallas Foundation, Inc. ("**HDF**") due to the undue influence and control exercised over HDF by Mr Dondero.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

50

(b)     the information in the letter will demonstrate clearly that Mr Dondero's influence and control is an inappropriate donor relationship with representatives of the HDF who serve on the Board of Directors of and as officers of HDF.

(c)     such undue influence and control potentially jeopardises the tax-exempt status of HDF as an organisation described in s.501(c)(3) and, at a minimum, causes it to fail to remain a supporting organisation described in s. 509(a)(3).

146.5   Exhibit D is an advice produced by Carrington Coleman (U.S. law firm) dated 25 March 2025 (the "**Carrington Advice**") which amongst other things:

(a)     asserts that Mr Dondero has been attempting "*through his control of the Highland SOs, to exert dominion and control over the cash and property he previously donated to DAF and for which he claimed charitable deductions, all for his personal benefit.*"

(b)     suggests that Mr Dondero was using the Company as his personal "*piggy bank*", and that it may be perceived by the IRS that the Fund has been or is his financial alter ego.

(c)     concludes that "*the IRS will look favourably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero, and the entities controlled by him to use DAF for his private benefit and inurement.*"

146.6   Exhibit E contained two valuation reports:

(a)     The first was a ValueScope valuation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

51

(b) The second is the FTI Memo referred to above, in which FTI expressly stated that the analysis in the FTI Memo should not be used in support of a transaction, but which Mr Patrick, in any event:

(i) expressly relied upon in the Manager Consent to determine the fair market value of the CDM Membership Interest and the basis for the redemption of the Company's interests; and

(ii) permitted Carrington Coleman to refer to and rely on in the FTI Memo (indeed, having provided the 27 March 2025 copy which was a draft copy only).

146.7 On 27 March 2025, without telling the Supporting Organisations or the Charities, Mr Patrick executed the:

(a) Admission Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192; and

(b) Redemption Agreement under which CDM redeemed the Company's membership interest in CDM for the same sum of US$1,637,192 (the "**Redemption Sum**").

147 On 27 March 2025, without telling the Supporting Organisations or the Charities, the Company entered into a letter agreement with CDM (the "**Letter Agreement**"), pursuant to which the Company assigned to CDM various contracts and agreements to which the Company was a party, listed in Schedule A to the Letter Agreement and CDM agreed to assume the liabilities and obligations in respect of those contracts.

148 On 2 April 2025, the Directors of the Company, by way of written resolution:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

52

**Page 56 of 83**

148.1 Noted the redemption of the Company's membership interest in CDM for the Redemption Sum (the "**Redemption**").

148.2 Resolved to pay a dividend to the Original Participating Shareholders of US$1,612,192.01 in the amount of (i) US$528,587.54 with respect to each of HDF, Highland Kansas City Foundation, Inc. and Highland Santa Barbara Foundation, Inc.; and (ii) US$26,429.39 with respect to CFNT.

149 The substantive financial effect of the Redemption, under which DFW did or was committed to make a capital contribution equivalent to the Redemption Sum to CDM, and the CDM Membership Interest held by the Company were redeemed for the Redemption Sum, was that the Company's membership interest in CDM was purchased by or otherwise transferred to DFW for the Redemption Sum.

150 The substantive effect of the overall transaction or series of transactions pleaded above, including the Impugned Transactions already pleaded, was that:

150.1 The Company realised its interest in the Fund, which had a NAV of c. US$270 million, for c. US$1.6 million.

150.2 The Company made a distribution to the Original Participating Shareholders (c. US$1.6 million).

150.3 The Supporting Organisations and the Charities were actually or effectively divested of their indirect interest in the Fund, and the assets underlying the Fund; and

150.4 The Original Participating Shareholders were diluted from 100% of the economic interests in the Company to less than 50%.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

53

<u>Voluntary Liquidation and Supervision Order</u>

151  On 2 April 2025, the Directors resolved, without telling the Supporting Organisations or the Charities, to place the Company into voluntary liquidation and appoint Mitchell Mansfield and William Clarke (the JVLs) of Kroll (Cayman) Ltd as voluntary liquidators.

152  However, unaware of the voluntary liquidation, on 10 April 2025, the Supporting Organisations presented a petition seeking the winding up of the Company on a just and equitable basis, under section 92(e) of the Companies Act (2025 Revision) (the "**J&E Petition**").

153  On 25 April 2025, Walkers and Shields Legal held a call to discuss the J&E Petition.  Following that call, Mr Patrick wrote in an email that the "*message ideas*" "*for Monday*" were to "*poison the well*", by which he meant to create a negative impression of Mr Dondero in the eyes of the Court.

154  On 6 May 2025, Justice Jalil Asif KC made a supervision order, under which voluntary liquidation of the Company was to be continued under the supervision of the Court pursuant to s.131 of the Companies Act (As Revised), and the JOLs were appointed.

**OBLIGATIONS OWED BY THE DIRECTORS**

155  At all material times, the Directors, as directors, owed the following duties individually to the Company:

155.1  A fiduciary duty to act *bona fide* in what he considers to be the best interests of the Company (the "**Best Interests Duty**").

155.2  A fiduciary duty to exercise his powers for a proper purpose, and for the purposes for which they were conferred (the "**Proper Purpose Rule**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

54

155.3   A fiduciary duty not to place himself in a position where his personal interest actually or potentially conflicted with his duty of loyalty to the Company (the "**First No-Conflicts Duty**").

155.4   A fiduciary duty not to place himself in a position where his duty to another actually or potentially conflicted with his duty of loyalty to the Company (the "**Second No-Conflicts Duty**").

155.5   A fiduciary duty to not make an unauthorised profit from or by reason of his fiduciary position (the "**No Profit Duty**").

155.6   A fiduciary duty not to accrue or take a benefit or commercial opportunity from the Company without the full and informed consent of the Company (the "**No Self-Dealing Rule**").

155.7   A duty to exercise reasonable skill, care, and diligence in the performance of his role and function as director (the "**Reasonable Care Duty**").

156   With respect at least to Mr Patrick, his duties above and the standard to which he was obliged to comply with such duties are affected by being in the Control Position and the trustee or trustee-like position he occupied. Paragraph 76 above is also relied upon.

157   The Company reserves its position as to whether Mr Patrick, by reason of being in the Control Position and the trustee or trustee-like position he occupied, was an express or other trustee of the assets of the Fund for the Original Participating Shareholders and, through or in addition to them, the Charities.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

55

**ATTRIBUTION OF KNOWLEDGE AND INTENTION**

158    As a matter of Cayman Islands law, Mr Patrick's intention and knowledge of facts and matters for all such purposes relevant to this claim is to be attributed to each of DFW, CDM, and the New GP on the basis of at least the following facts:

    158.1    As regards DFW, Mr Patrick is listed under DFW's certificate of incorporation, dated 9 December 2024, as "the member of the corporation", and the Admission Agreement showed he served as its "President". Mr Patrick is also the registered director of DFW. Mr Patrick the agent of DFW, in which capacity Mr Patrick executed the Admission Agreement.

    158.2    As regards CDM, Mr Patrick is described under the LLC Agreement as the "Manager" of CDM, in which role Mr Patrick was CDM's agent, and in which capacity he (i) executed the Deed of Assignment and Assumption on behalf of CDM, and (ii) executed a written 'Manager Consent' (the **"Manager Consent"**) approving the Redemption and Admission Agreements; and executed the Redemption and Admission Agreements.

    158.3    As regards the New GP, Mr Patrick was and remains its director, and therefore its agent (in which capacity, Mr Patrick executed the Deed of Assignment and Assumption on the New GP's behalf). Further, Mr Patrick is the sole shareholder of the New GP.

159    Further, if applicable, as a matter of the laws of the State of Delaware, Mr Patrick's knowledge and intention is to be attributed to DFW, CDM, and the New GP on a like basis.

**CLAIMS AGAINST THE DEFENDANTS**

<u>Breaches of fiduciary and other duty</u>

160    The First and Second Defendants, and each of them, in their capacity as a Director of the Company, acted in breach of their fiduciary and other duties to the Company as follows.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

56

<u>Restructuring, including the CDM Assignment</u>

161    The Directors (and each of them), in procuring, directing or effecting the Restructuring as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring, directing or effecting the Restructuring as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

161.1    The Plaintiff relies on paragraphs 77 to 105 above.

161.2    With the assistance of Mr Mancino, Mr Patrick took steps to form CDM and appoint himself as Manager of CDM.

161.3    Mr Patrick designed and/or negotiated and/or directed and/or effected the Restructuring in his capacity as Director of the Company, Director of the New GP, and Manager of CDM, being each of the parties to the Deed, and signed the Deed on behalf of each party.

161.4    The Directors (and each of them) approved the transfer of the Company's entire limited partnership interest in the Fund (having net assets worth c. US$270 million) to CDM, a Delaware entity whose LLC Agreement excluded any fiduciary obligations owed by its Manager (i.e. Mr Patrick) to CDM itself or to its members; in exchange for membership interest in CDM, which interest was capable of being extinguished, by redemption, and for a "fair value", determined at the discretion of the Manager (i.e. Mr Patrick).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

57

161.5 The Restructuring was of no benefit to the Company and not in its best interests, and Mr Patrick was subject to conflicts of interest (First and Second No-Conflicts Duties) and committed acts of self-dealing.

161.6 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known that the Company was proposing to exchange the Partnership Interest for a membership interest in CDM that was subject to redemption entirely at Mr Patrick's discretion, and for a "*fair value*" determined, in good faith, in his discretion.

(b) knew or ought to have known that the Company was therefore proposing to trade its Partnership Interest, which was not in practical terms defeasible, for an interest that could be extinguished: (i) at a time over which it had no control, (ii) for a price over which it had very limited control and (iii) for a potential valuation basis which excluded a net asset valuation of the assets held in the Fund.

(c) knew or ought to have known that the CDM Membership Interest was to be in a Delaware-incorporated company whose LLC Agreement excluded any fiduciary obligations owed by its Manager either to CDM itself or to its members and was therefore less valuable than the Partnership Interest.

(d) knew or ought to have known that the CDM Assignment was therefore a transaction at an undervalue.

161.7 It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from CDM without the full authorisation or full and informed consent of the Company.

161.8 Further, and in any event, the Directors (and each of them) acted when each of them:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

58

(a)    knew or ought to have known that the CDM Assignment was the first step in a series of connected future transactions, including those pursuant to the CDM Assignment, the Share Issuance, the Admission Agreement, the Redemption Agreement and the Redemption, under which the Directors were able to and ultimately did procure the redemption of the Company's CDM Membership Interest, thus extinguishing the Company's interest in the Fund, for an undervalue.

(b)    knew or ought to have known that:

(i)     the full terms and effect of the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

(ii)    the full terms and effect the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk to the Company, which was not itself a Donor Advised Fund and/or did not enjoy or require tax-exempt status under s.501(c)(3) of the U.S. Internal Revenue Code.

(iii)   other approaches to address concerns with respect to the tax-exempt status of the HDF short of undertaking the Restructuring (and entering into the CDM Assignment) included notifying the HDF of the conflict and/or concerns and requesting it to remedy it or them.

(iv)    even if the facts and matters alleged in relation to the HDF were correct, there was more than a possibility, after an extended passage of time and at least two levels of appeal, that a U.S. tax audit would result in an adverse determination with respect to the tax-exempt status of the HDF.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

59

(v)   the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

(c)   knew or ought to have known that they were keeping the Restructuring, the CDM Assignment, CDM itself and all the surrounding circumstances secret from the Participating Shareholders.

162   By reason of the foregoing breaches of duty or any of them:

162.1   The CDM Assignment is void, alternatively voidable and hereby avoided.

162.2   CDM holds the Partnership Interest on trust or constructive trust for the Company.

162.3   CDM is required to re-transfer the Partnership Interest to the Company and account for any profits on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

<u>Share Issuance</u>

163   The Directors (and each of them), in procuring, directing or effecting the Share Issuance as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty.  Additionally, Mr Patrick, in procuring, directing or effecting the Share Issuance as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

163.1   The Plaintiff relies on paragraphs 77 to 84, 91 to 96 and 106 to 119 above.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

60

163.2   The Directors (and each of them) designed and/or engineered the Share Issuance, having sought legal advice in relation to the powers conferred on them as Directors of the Company, for the improper purpose of:

   (a)   diluting without any proper reason or corporate purpose the existing Participating Shareholders and/or depriving the ability of the Supporting Organisations to continue to comprise a majority of the Participating Shareholders.

   (b)   inserting DFW as a new Participating Shareholder, an entity under the sole control of Mr Patrick, to obstruct and/or prejudice and/or adversely affect the exercise of a Participating Shareholders' right to petition for the just and equitable winding-up of the Company.

163.3   The Directors (and each of them) acted when each of them:

   (a)   knew or ought to have known the issue and allotment of shares at par to DFW was of no benefit to the Company.

   (b)   knew or ought to have known that the exercise of the power to issue shares and allot them to DFW was for the improper purpose of diluting the interest of the Original Participating Shareholders.

   (c)   knew or ought to have known that the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was a response to the prospect that the Supporting Organisations might present a petition for the winding-up of the Company on a just and equitable basis, as indeed they did on 10 April 2025 in ignorance of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

61

(d)　　knew or ought to have known that the sole or primary purpose of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was to insert a new majority Participating Shareholder (under their or at least Mr Patrick's control) into the Company's share capital structure to (if they or at least Mr Patrick deemed fit) to oppose the actions of the Supporting Organisations and/or the Original Participating Shareholders, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

163.4　Mr Patrick designed and/or directed and/or effected the Share Issuance in his capacity as Director of the Company, even though he was 'President' of DFW and the sole member and the sole director of DFW.

163.5　It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from DFW (if not also from CDM) without the full authorisation or full and informed consent of the Company.

164　By reason of the foregoing breaches of duty or any of them:

164.1　the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW is void, alternatively voidable and hereby avoided.

164.2　DFW holds its shares on trust or constructive trust for the Company.

164.3　DFW is required to concur in the rescission of the allotment and to re-transfer its shares to the Company on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

62

164.4   The Company's register of shareholders shall be rectified accordingly.

<u>Admission and Redemption</u>

165   The Directors (and each of them), in procuring or entering into the Admission Agreement and the Redemption Agreement, and/or in procuring, directing or effecting the Redemption acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty.  Additionally, Mr Patrick, in procuring or entering into the Admission Agreement and the Redemption Agreement, or in procuring, directing or effecting the Redemption as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

165.1   The Plaintiff relies on paragraphs 120 to 150 above.

165.2   The Directors (and each of them) acted when each of them:

(a)   knew or ought to have known that:

(i)   proceeding on the basis of the Seyfarth/Mancino letter to the IRS dated 20 March 2025 was flawed or unreasonable.

(ii)   proceeding was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

(iii)   the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

(iv)   proceeding on the basis of the March 2025 Valuation and the FTI Report was flawed in that: (i) the 99.2% discount in value proposed by the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

63

ValueScope Report was a manifestly excessive discount, and resulted in the Company parting with its indirect ownership of 99% of the economic interest in the Fund (which had net assets worth c. US$270 million) for a mere US$1,637,192; and (ii) as pleaded above, the FTI Report expressly stated that *"this memo should not be used to support a transaction."*

(v)  the Admission Agreement and the Redemption Agreement were steps in a series of connected transactions, including those pursuant to the CDM Assignment, the Share Issuance, under which the Directors were able to and ultimately did procure the extinguishment of the Company's interest in the Fund, through the redemption of the Company's membership interest in CDM, for an undervalue.

(b)  knew or ought to have known that the sole or primary purpose of the Admission Agreement, the Redemption Agreement and the Redemption was to ensure that the Company was fully and finally deprived of an asset (its interest in the Fund) at an undervalue; and to enable a third party, DFW, controlled by Mr Patrick, to procure ownership of an interest in the Fund in complete replacement of the Company.

165.3  Mr Patrick designed and/or negotiated and/or directed and/or effected the Admission Agreement, the Redemption Agreement and the Redemption as Director of the Company, even though he was Manager of CDM and 'President' of DFW, sole member of CDM and sole member and sole director of DFW.

166  By reason of the foregoing breaches of duty or any of them:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

64

166.1   DFW holds the CDM Membership Interest on trust or constructive trust for the Company.

166.2   DFW is required to concur in the transfer of the CDM Membership Interest to the Company or as the Company directs on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

Further claims against Mr Murphy

167     In respect of any breach of duty as set out above for which Mr Patrick alone is liable:

167.1   At all material times, Mr Murphy worked in close concert with Mr Patrick, including at his direction.

167.2   Mr Murphy knew or ought to have known all the facts and matters pleaded above as known or ought to have been known by Mr Patrick.

167.3   Mr Murphy knew or ought to have known of all the facts and matters pertaining to such breach or breaches by Mr Patrick.

167.4   Mr Murphy took no steps to stop Mr Patrick or to prevent or report the breach or breaches of duty by Mr Patrick.

167.5   Mr Murphy accepted and acquiesced in all steps and actions suggested, promoted or effected by Mr Patrick.

167.6   Mr Murphy accepted and acquiesced in the breach or breaches of duty by Mr Patrick.

167.7   As a consequence, Mr Murphy has acted in breach of his duties to the Company, including the Best Interests Duty and the Reasonable Care Duty.


FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

65

Directors' Fees, Remuneration and Expenses

168   The Company is still unclear as to what precise fees or remuneration or emoluments or benefits were afforded to the Directors and from what source, and as to the proper expenses of the Company, in the period after March 2021 and thus reserves its position.

169   As is pleaded above in paragraphs 85 to 89, the Directors approved large increases for Mr Patrick's remuneration, benefits or emoluments: by around 1 October 2024, Mr Patrick's remuneration comprised a base salary of US$850,000, a bonus of 2.5 times that base salary, an LTI incentive payment of US$975,000; for the period March 2021 to March 2024, Mr Patrick was entitled to an aggregate LTI payment of US$4,759,000; and eligibility for discretionary and annual bonuses in addition, to be determined at the sole and absolute discretion of the Directors. By contrast, Mr Scott's annual salary and entire benefits during his tenure in the Control Position was US$60,000.

170   Insofar as the Directors (or each of them) approved of or procured any payment or benefit to or for Mr Patrick or Mr Murphy more than the sum of US$60,000 per annum each in respect of fees or remuneration or emoluments or benefits, such sum was excessive and conferred in breach of duty to the Company, including the Best Interests Duty, the Proper Purpose Rule, the first No-Conflicts Duty, the No Self-Dealing Rule and the Reasonable Care Duty.

171   Further, as is pleaded above, the Directors (or each of them) approved or caused the payment of considerable sums by way of expenses, amounting for example to US$18.3 million for the first half of 2024, and US$18.6 million spent over 2023.  Such expenses may include the expenses incurred in effecting the transactions which are the subject matter of these proceedings.  The reasonableness or *bona fides* of these expenses is not accepted by the Company.

172   The Company claims:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

66

172.1 Full information, documents and discovery as to the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

172.2 Full information, documents and discovery as to expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

172.3 Repayment to the Company of all fees or remuneration or emoluments or benefits paid or claimed by Mr Patrick or Mr Murphy and each of them in excess of US$60,000 per annum; together with all improperly paid expenses caused or procured by Mr Patrick or Mr Murphy (or damages or equitable compensation in relation thereto).

Unlawful Means Conspiracy

173 The facts and matters pleaded above amount to an unlawful means conspiracy as follows:

173.1 It is unclear when the conspiracy began but it appears to have started by around the start of 2024.

173.2 The original conspirators were Mr Patrick and Mr Murphy. The Company is unaware of the circumstances in which Mr Patrick and Mr Murphy agreed or combined and is unable to plead further pending further information or discovery.

173.3 As they were incorporated and participated in the facts and matters pleaded above, the New GP, CDM and DFW joined the conspiracy but remain liable in damages for all losses, including prior to joining the conspiracy.

173.4 The conspiracy was a conspiracy to injure the Company.

173.5 The overt acts of the conspiracy were all the facts and matters pleaded above, including as breaches by Mr Patrick or Mr Murphy.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

67

173.6   The unlawful means of the conspiracy were all the facts and matters pleaded above as breaches of duty by Mr Patrick or Mr Murphy.

173.7   Each of the conspirators intended to injure the Company. This averment is an inference from all the facts and matters pleaded above.

173.8   As a consequence, the Company has suffered loss and damage, as a result of the Restructuring, the CDM Assignment, and the Admission and Redemption, and the combined effect thereof, as set out above.

Proprietary claim and/or unconscionable receipt

174   The facts and matters pleaded above give rise to claims by the Company for unconscionable receipt as follows:

174.1   CDM received the Company's Partnership Interest in the Fund under the CDM Assignment.

174.2   The knowledge of CDM was and is that of Mr Patrick.

174.3   The breaches of duty in relation to the CDM Assignment above are relied upon.

174.4   CDM knew that the CDM Assignment was at an undervalue and that causing or procuring the Company to enter into the CDM Assignment was a breach of fiduciary duty by Mr Patrick and/or Mr Murphy.

174.5   By reason of the foregoing, it is unconscionable for CDM to retain the Partnership Interest in the Fund and CDM is liable to account to the Company in equity, by restoring Partnership Interest in the Fund to the Company and/or accounting for any profits or otherwise accounting to the Company in equity.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

68

Unjust Enrichment

175    In receiving the Company's Partnership Interest in the Fund, CDM was unjustly enriched at the Company's expense and is liable to the Company in restitution:

175.1    The Partnership Interest was transferred on the basis that there was a valid assignment agreement effecting that transfer.

175.2    That basis has totally failed, the CDM Assignment being either void, or avoided hereby.

Alter Ego and Lifting the Corporate Veil

176    In order to obtain the return to it of the Partnership Interest in the Fund, together with an Account of Profits, the Company does not need as a matter of law to make any allegation of "alter ego" or to lift the corporate veil in relation to CDM or DFW.

177    If, contrary to the paragraph above, the Company does so need, it makes the following allegations for the purposes of all relevant claims or causes of action set out above.

177.1    CDM is the "alter ego" of Mr Patrick.

177.2    DFW is the "alter ego" of Mr Patrick.

177.3    In relation to the receipt of any property by CDM directly or indirectly from the Company or the accrual of any profits or benefits by reason of such receipt, the corporate veil should be lifted, with the consequence that such receipt and such profits or benefits should be treated as those of Mr Patrick personally.

177.4    In relation to the receipt of any property by DFW directly or indirectly from the Company or the accrual of any profits or benefits by reason of such receipt, the corporate veil should be lifted, with the consequence that such receipt and such profits or benefits should be treated as those of Mr Patrick personally.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

69

PARTICULARS

(a)    In relation to CDM:

    (i)    Mr Patrick was and is the Manager. There are no other officers or managers.

    (ii)    Mr Patrick was and is the managing member.

    (iii)    CDM was incorporated at Mr Patrick's instigation in order to enter into the CDM Assignment or a transaction of like nature.

    (iv)    CDM's sole or primary purpose was to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company.

    (v)    CDM exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

(b)    In relation to DFW:

    (i)    Mr Patrick was and is the 'President'. There are no other officers or managers.

    (ii)    Mr Patrick was and is the sole member.

    (iii)    Mr Patrick was and is the sole registered director.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

70

(iv)    DFW was incorporated at Mr Patrick's instigation in order to enter into a transaction whereby it would in effect take over the Company's interest in CDM pursuant to the CDM Assignment.

(v)    DFW's sole or primary purpose was (i) to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company, (ii) to be the ultimate vehicle by which Mr Patrick would so control of the Company's Partnership Interest in the Fund and (iii) to be a newly-inserted majority Participating Shareholder (under at least Mr Patrick's control) in the Company's share capital structure to oppose the actions of the Supporting Organisations, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

(vi)    DFW exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

<u>Loss and Damage</u>

178    As a consequence of the above, the Company has suffered loss and damage, including but not limited to:

178.1    Its Partnership Interest in the Fund.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

71

178.2 The costs and expenses incurred in relation to the CDM Assignment, the Share Issuance, the Letter Agreement and the Redemption (including all legal or other advice taken in relation thereto).

178.3 Excessive Directors' fees or remuneration or emoluments or benefits.

178.4 Improper expenses (if any).

178.5 The lost opportunity cost of the Fund and its subsidiaries deploying such funds (as set out in (1), (2) and (3) above) elsewhere, and the consequent fall in value of the Company's interest in the Fund.

178.6 The legal and liquidation costs of investigating the conspiracy, and the costs of these proceedings.

**RESERVATION OF POSITION**

179 The Company and the JOLs (who direct the Company in bringing these proceedings) fully reserve their position to apply to amend this claim in any way or to bring fresh or further proceedings against any of the Defendants (whether in the Cayman Islands or elsewhere) in the name of the Company or in the name of the JOLs.

**OTHER**

180 CLO Holdco is joined as a party to these proceedings in order that, as the main subsidiary of the Fund, it may abide by any Order that the Court may make.

**INTEREST**

181 The Company claims interest pursuant to section 34 of the *Judicature Act (2021 Revision)* and the *Judgment Debts (Rates of Interest) Rules (2021 Revision)*, alternatively pursuant to the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

72

Court's equitable jurisdiction, compounded in equity at quarterly rests, alternately at common law, for such period and at such rate as the Court thinks just.

**PRAYER FOR RELIEF**

In the premises, the Company claims:

(1)    Damages or equitable compensation.

(2)    Orders for restitution or disgorgement.

(3)    Orders for the restoration of property to the Company.

(4)    Interlocutory or final injunctions as may be necessary or appropriate.

(5)    Orders for the appointment of a Receiver or Receivers, as may be necessary or appropriate.

(6)    Orders for the provision of documents or information at an early interlocutory stage.

(7)    Orders for the cancellation of the Share Issuance, as appropriate.

(8)    Rectification of the register of the Company, as appropriate.

(9)    Orders pursuant to s.99 of the Companies Act (as revised), as appropriate.

(10)   An Account of the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

(11)   An Account of all expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

73

(12)   All other Accounts, including an Account of Profits, or Inquiries as may be necessary or appropriate; and further Orders to give effect to the outcome of such Accounts or Inquiries, including Orders for payment of sums to the Company.

(13)   All such declarations as may be necessary or appropriate, including to give effect to the continuing interest of the Company in the Fund on the basis of a proprietary interest, trust, constructive trust or otherwise.

(14)   All such other relief relating to the Impugned Transactions as may be necessary or appropriate.

(15)   Interest as above.

(16)   Further or other relief.

(17)   Costs.

DATED  this 15th day of July 2025

_____

**Maples and Calder (Cayman) LLP**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

74

**DIRECTIONS FOR ACKNOWLEDGMENT OF SERVICE**

**OF WRIT OF SUMMONS**

182    The accompanying form of Acknowledgment of Service should be completed by an Attorney acting on behalf of the Defendant or by the Defendant if acting in person.

After completion it must be delivered or sent by post to the Law Courts, PO Box 495G, George Town, Grand Cayman, KY1-1106, Cayman Islands.

183    A Defendant who states in the Defendant's Acknowledgment of Service that the Defendant intends to contest the proceedings must also serve a Defence on the Attorney for the Plaintiff (or on the Plaintiff if acting in person).

If a Statement of Claim is indorsed on the Writ (i.e. the words "Statement of Claim" appear on the top of page 2), the Defence must be served within 14 days after the time for acknowledging service of the Writ, unless in the meantime a summons for judgment is served on the Defendant.

If the Statement of Claim is not indorsed on the Writ, the Defence need not be served until 14 days after a Statement of Claim has been served on the Defendant.

If the Defendant fails to serve his Defence within the appropriate time, the Plaintiffs may enter judgment against the Defendant without further notice.

184    A Stay of Execution against the Defendant's goods may be applied for where the Defendant is unable to pay the money for which any judgment is entered.  If a Defendant to an action for a debt or liquidated demand (i.e. a fixed sum) who does not intend to contest the proceedings

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiffs, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

states, in answer to Question 3 in the Acknowledgment of Service, that the Defendant intends to apply for a stay, execution will be stayed for 14 days after that Defendant's Acknowledgment, but the Defendant must, within that time, issue a Summons for a stay of execution, supported by an affidavit of the Defendant's means.  The affidavit should state any offer which the Defendant desires to make for payment of the money by instalments or otherwise.

**See overleaf for Notes for Guidance**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

2

**Notes for Guidance**

1    Each Defendant (if there are more than one) is required to complete an Acknowledgment of Service and return it to the Courts Office.

2    For the purpose of calculating the period of 14 days for acknowledging service, a writ served on the Defendant personally is treated as having been served on the day it was delivered to the Defendant.

3    Where the Defendant is sued in a name different from the Defendant's own, the form must be completed by the Defendant with the addition in paragraph 1 of the words "sued as (the name stated on the Writ of Summons)".

4    Where the Defendant is a FIRM and an attorney is not instructed, the form must be completed by a PARTNER by name, with the addition in paragraph 1 of the description "Partner in the firm of (......................................)" after that Partner's name.

5    Where the Defendant is sued as an individual TRADING IN A NAME OTHER THAN THAT PERSON'S OWN, the form must be completed by the Defendant with the addition in paragraph 1 of the description "trading as (...........................)" after that Defendant's name.

6    Where the Defendant is a LIMITED COMPANY the form must be completed by an Attorney or by someone authorised to act on behalf of the Company, but the Company can take no further step in the proceedings without an Attorney acting on its behalf.

7    Where the Defendant is a MINOR or a MENTAL PATIENT, the form must be completed by an Attorney acting for a guardian *ad litem*.

8    A Defendant acting in person may obtain help in completing the form at the Courts Office.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

3

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD        OF 2025 (      )

BETWEEN:

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

<u>Plaintiff</u>

**AND**

| (1) | **MARK ERIC PATRICK** |
|---|---|
| (2) | **PAUL MURPHY** |
| (3) | **CDMCFAD, LLC** |
| (4) | **DFW CHARITABLE FOUNDATION** |
| (5) | **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** |
| (6) | **CLO HOLDCO, LTD.** |

<u>Defendants</u>

### ACKNOWLEDGMENT OF SERVICE
### OF WRIT OF SUMMONS

If you intend to instruct an Attorney to act for you, give that Attorney this form IMMEDIATELY.

Important.  Read the accompanying directions and notes for guidance carefully before completing this form.  If any information required is omitted or given wrongly, THIS FORM MAY HAVE TO BE RETURNED.

Delay may result in judgment being entered against a Defendant whereby he may have to pay the costs of applying to set it aside.

---

1.     State the full name of the Defendant by whom or on whose behalf the service of the Writ is being acknowledged.

---

2.     State whether the Defendant intends to contest the proceedings (tick appropriate box)

| ☐ | yes | ☐ | no |
|---|-----|---|-----|

3.  If the claim against the Defendant is for a debt or liquidated demand, AND the Defendant does not intend to contest the proceedings, state if the Defendant intends to apply for a stay of execution against any judgment entered by the Plaintiff (tick box)

☐ yes              ☐    no

Service of the Writ is acknowledged accordingly

(Signed)......................................................

Attorney for

2

### Notes on address for service

Attorney: where the Defendant is represented by an attorney, state the attorney's place of business in the Cayman Islands. A Defendant may not act by a foreign attorney.

Defendant in person: where the Defendant is acting in person, the Defendant must give the Defendant's post office box number and the physical address of the Defendant's residence or, if the Defendant does not reside in the Cayman Islands, the Defendant must give an address in Grand Cayman where communications for the Defendant should be sent. In the case of a limited company, "residence" means its registered or principal office.

Indorsement by plaintiff's Attorney (or by plaintiff if suing in person) of that Plaintiff's name, address and reference, if any, in the box below.

> Maples and Calder (Cayman) LLP
> PO Box 309 Ugland House
> Grand Cayman KY1-1104
>
> Cayman Islands: CJM/JRN/LRA/TQR/858403-01

Indorsement by defendant's Attorney (or by defendant if suing in person) of that defendant's name, address and reference, if any, in the box below.

3

# EXHIBIT 60

November 11, 2024

**From**: Highland Dallas Foundation, Inc.
Highland Kansas City Foundation, Inc.
Highland Santa Barbara Foundation, Inc.

**To**:   Mr. Paul Murphy
Director of Charitable DAF HoldCo, Ltd.
and Charitable DAF Holdings Corp.
paul@gkmanagement.com.ky

Dear Mr. Murphy:

We write to you collectively on behalf of the following organizations:

1.   Highland Dallas Foundation, Inc., a participation shareholder in Charitable DAF HoldCo, Ltd., of which you are a director along with Mark Patrick. As you know, Mr. Patrick also is the managing member of the Charitable DAF GP, LLC, which governs the related Charitable DAF Fund, LP.

2.   Highland Kansas City Foundation, Inc., also a participation shareholder in Charitable DAF HoldCo, Ltd.

3.   Highland Santa Barbara Foundation, Inc., also a participation shareholder in Charitable DAF Holdco, Ltd.

Highland Dallas Foundation, Inc is a supporting organization of The Dallas Foundation. Highland Kansas City Foundation, Inc. is a supporting organization of Greater Kansas City Community Foundation. Highland Santa Barbara Foundation, Inc. is a supporting organization of Santa Barbara Foundation. The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (collectively the "Foundations") have worked closely with their respective supporting organizations named above to award grants and funding to a wide range of charitable causes that have made tangible, lasting impacts on the communities they serve. Our primary commitment has been, and always will be, our concern for the community, respect for donors, thoughtful giving, and careful investing—core values that have guided each of us throughout our existence.

With these core values and with the well-being of these Foundations in mind, we write you to voice that we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "DAF-related entities"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable. Recently, various competing constituencies provided the Foundations with conflicting information related to the operations and financial inner

Docusign Envelope ID: 1CD84226830-494A-A1FF-B8548594517B

Mr. Paul Murphy
November 11, 2024
Page 2

workings of the DAF-related entities. This conflicting information raises significant concerns
about how the corpus of these funds is administered and spent. The Foundations have no real
pathway to verify the information as the current governance structures prevent them from receiving
such information, and indeed, efforts to secure additional information have been rebuffed. As a
result, these recent submissions demonstrate that the current governance structure is ill-equipped
to address such allegations and provide sufficient protection to the economic funds that support so
many charitable efforts.

Further, because we have substantial concerns, out of an abundance of caution, and until an
accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion
of further assets of DAF-related entities. We urge you to take our accounting and governance
concerns seriously because depletion of assets in the DAF-related entities has a direct impact on
our mission and the charitable good works in our communities.

Thank you for your attention to this matter. Our counsel with the law firm of Holland & Knight
LLP is copied on this letter should you have any questions.

Sincerely yours,

HIGHLAND DALLAS FOUNDATION, INC.

By: _____
       Julie Diaz
       Vice President

HIGHLAND KANSAS CITY FOUNDATION, INC.

By: _____
       Debbie Wilkerson
       Vice President

HIGHLAND SANTA BARBARA FOUNDATION, INC.

By: _____
       Jacqueline M. Carrera
       Secretary and Treasurer

cc:   David M. Rosenberg
      (via email at david.rosenberg@hklaw.com)

      Michael Stockham
      (via email at michael.stockham@hklaw.com)

# EXHIBIT 61

## Rachel Baxendale

| | |
|---|---|
| **From:** | Paul Murphy <paul@gkmanagement.com.ky> |
| **Sent:** | 26 November 2024 6:32 PM |
| **To:** | Mark Patrick; Geoffrey Sykes |
| **Cc:** | Brandon R. Schaller; dmancino@seyfarth.com; Shawn Raver; Bart Higgins; Lauren Vernon; Philip Aubry; Barnaby Gowrie |
| **Subject:** | RE: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181] |

---

[this message is from an external sender]

Thanks for this Geoffry,

Mark, I'll let Walkers come back but here are my thoughts:

1. Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful that they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluting them therefore the company should be wound up or an order made for change of management/revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground to claim just and equitable grounds.

2. Management shareholders have a right to object to the winding up but they have no special status by virtue of being management shares. I'll have to double check the docs but this would be different if there were something in the articles of association/share issuance agreement where there was an explicit provision where they had agreed not to present a winding up petition. The just and equitable ground is specifically designed to prevent unfair prejudice to a shareholder.

3. I think our main point is to stress that if they take any action they significantly undermine Donderro's position in the bankruptcy and UBS action because he will be seen as the alter ego of DAF as they've always claimed. Additionally, taking steps to preserve independence improves the DAFs standing in those proceedings. This isn't related to the advice but something for the call next week.

Paul.

---

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** Tuesday, November 26, 2024 5:43 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; dmancino@seyfarth.com; Paul Murphy <paul@gkmanagement.com.ky>; Shawn Raver <sraver@dafholdco.com>; Bart Higgins <bhiggins@shieldslegal.com>; Lauren Vernon <Lauren.Vernon@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Subject:** Re: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181]

Another consideration,  is that Holdco has management shares. Does the equitable theory take into account the rights of the owner of the management shares when the non-control shares want equitable relief. If the management shareholders, disagrees, are those powers and right abdicated in a equitable wind down proceedong? Seems the Management Shareholder has a right to express its rights as to whether the company should be wound down or not.

**443**

On Tue, Nov 26, 2024, 4:26 PM Mark Patrick <mpatrick@dafholdco.com> wrote:

Charitable DAF Holdco holds only one asset - LP interest in charitable daf fund LP.  As a limited partner, Holdco cannot force the partnership to wind its affairs?

On Tue, Nov 26, 2024, 4:11 PM Mark Patrick <mpatrick@dafholdco.com> wrote:

If new participating shares are issued to a new non-profit,  and say per Paul's point they try to implement an "equitable" winding down of the company, but the new shareholders objects, would that help? Also, what could possibly be the basis for any "equitable" liquidation if the Articles don't give such rights.

On Tue, Nov 26, 2024, 3:34 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

Hi Brandon


Thanks for your time on the phone last week and the below.


As discussed, please see attached in draft the high priority memo as updated with a new Section E in respect of winding up petitions on the just and equitable ground.


We look forward to speaking with you tomorrow morning.


Best regards,


**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** Friday, November 22, 2024 1:36 PM
**To:** dmancino@seyfarth.com; Philip Aubry <Philip.Aubry@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Paul Murphy <paul@gkmanagement.com.ky>; mpatrick@dafholdco.com; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** DAF - Participating Shares Summary

**444**

**[this message is from an external sender]**

---

Doug and Walkers team,


As discussed, here are our notes from a review of the provisions applicable to Participating Shares in the Articles for Charitable DAF HoldCo, Ltd. As you know, we are not licensed in the Cayman Islands, so we would appreciate Walkers' help to confirm/expand our views.


**Rights of Participating Shares*:**


Rights

1. Participate (receive) discretionary dividends. See "Participating Share" and Articles generally.
2. If new shares/classes are issued, and the change would materially adversely vary the Participating Shares, then 2/3rds Participating Shareholder consent is required. See #13.
   a. Issuance of authorized but unissued Participating Shares (i.e., dilution of existing shareholders) makes this consent right contingent on outstanding shares. See #14 and #7.
3. Rights to assets in a winding up in accordance with the waterfall. See #122-124.
4. Certain foundations own 100 Participating Shares out of a total of authorized 4,999,900 Participating Shares. See #7.


No rights

1. Cannot vote shares. See #12.
2. Cannot redeem shares. See "Participating Shares."
3. No rights to information. See #12.
4. No rights to attend meetings. See #12.
5. No rights to notice of meetings. See #12.
6. No rights to pro rata distributions based on % of Participating Shares. See #105.
7. No rights to appoint or remove directors or officers. See Articles generally and #65.
8. No rights to receive notice of issuance of additional shares. See Articles generally.
9. No rights to receive notice of distributions to other Participating Shareholders. See Articles generally.
10. No pre-emptive rights. See Articles generally.

**445**

Restrictions

1. If a Participating Shareholder is (i) in breach of any law, (ii) is not a non-profit, or (iii) the directors are of the opinion such Shareholder might result in the Company incurring additional liability, including for legal reasons, the directors may require such Shareholder to transfer its shares. See #21. *Walkers to review.*
2. May be diluted by the directors issuing additional Participating Shares. See #8.
   a. Including additional pari passu shares. See #14.
   b. Dilution may, ultimately, affect the ability of the existing Participating Shareholders to consent to changes to the rights attached to the Participating Shares. See #14, #7, and Articles generally.

*Suggest the foundations confirm that they have the latest version of the Articles (attached). We suspect they do not.

Best regards,

Brandon

**Brandon R. Schaller**

**ATTORNEY**

16400 Dallas Parkway, Suite 300

Dallas, TX 75248

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

**SHIELDSLEGAL.COM**

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message. You should not copy it or disclose its contents to any other person. Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses. This e-mail message does not contain or constitute legal advice and/or federal tax advice. The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

**446**

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

**447**

# EXHIBIT 62

## Rachel Baxendale

| | |
|---|---|
| **From:** | Barnaby Gowrie |
| **Sent:** | 27 November 2024 9:09 AM |
| **To:** | Mark Patrick; Paul Murphy |
| **Cc:** | Geoffrey Sykes; Brandon R. Schaller; dmancino@seyfarth.com; Shawn Raver; Bart Higgins; Lauren Vernon; Philip Aubry |
| **Subject:** | RE: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181] |
| **Attachments:** | Aquapoint L.P. v Xiaohu Fan (CICA (Civil) Appeal No. 14 of 2022).pdf; In the matter of Sigma Finance Corporation (Cause No. FSD 171 of 2024 (DDJ) 19 July 2024).pdf |

Hi Mark, Paul

Thanks for your emails.  Our answers to Mark's questions are as follows, and we generally agree with Paul's comments in respect of them:

1. *If new participating shares are issued to a new non-profit,  and say per Paul's point they try to implement an "equitable" winding down of the company, but the new shareholders objects, would that help?*
   a. Yes, if other shareholders are opposed to an equitable winding up that will be taken into consideration and would likely help.  However, it may not be determinative – the question will still be whether, in all of the circumstances, it is just and equitable for the company to be wound up.

2. *Also, what could possibly be the basis for any "equitable" liquidation if the Articles don't give such rights.*
   a. The right to seek a winding up order on the just and equitable ground is provided by legislation (see the Companies Act (2023 Revision) sections 92(e)) and 95(3)).

3. *Charitable DAF Holdco holds only one asset - LP interest in charitable daf fund LP.  As a limited partner, Holdco cannot force the partnership to wind its affairs?*
   a. As a limited partner of Charitable DAF Fund LP, Charitable DAF HoldCo Ltd does have standing to present a petition seeking the winding up of Charitable DAF Fund LP, including on the just and equitable basis.

4. *Another consideration,  is that Holdco has management shares. Does the equitable theory take into account the rights of the owner of the management shares when the non-control shares want equitable relief. If the management shareholders, disagrees, are those powers and right abdicated in a equitable wind down proceeding? Seems the Management Shareholder has a right to express its rights as to whether the company should be wound down or not.*
   a. As above, on the hearing of a winding up petition on the just and equitable ground, the question will be whether, in all of the circumstances, it is just and equitable for the company to be wound up.  The rights and views of the holder of the management shares will be relevant to that consideration, but may not be determinative.  If a winding up order is made and a liquidator appointed, the rights of the holder of the management shares will be varied in line with relevant legislation and the articles.  Noting the meeting tomorrow morning we have not explored this in detail but please let us know if you would like further advice in that regard.

5. *Please provide a couple Cayman Cases where Equitable wind up occurred for my review based on mismanagement, etc.  I'd like some context if this procedure is extra ordinary / rare or an action that does occur leading to Cayman Case Law.*
   a. Winding up orders on the just and equitable ground are not extraordinary or rare in the Cayman Islands.  Please see attached two Cayman decisions involving winding up orders on the just and equitable ground (noting that partnerships may be wound up on the just and equitable ground under the same provisions as companies, and that the *Aquapoint* decision is currently on appeal to the Judicial Committee of the Privy Council).

Please let us know if you would like anything further before the meeting tomorrow morning.

Best regards,

**448**

Barney

**Barnaby Gowrie**
Partner
**Walkers (Cayman) LLP**

**T** +1 345 914 6365  |  **M** +1 345 525 3385
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** Tuesday, November 26, 2024 6:44 PM
**To:** Paul Murphy <paul@gkmanagement.com.ky>
**Cc:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Brandon R. Schaller <bschaller@shieldslegal.com>; dmancino@seyfarth.com; Shawn Raver <sraver@dafholdco.com>; Bart Higgins <bhiggins@shieldslegal.com>; Lauren Vernon <Lauren.Vernon@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Subject:** Re: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

1. Agreed about the perception.

However,  I have been exploring funding a large campus in DFW  with a major church building, housing, and conference center, and exhibitions. In addition we been having exploring other large donations in the future on the scale of tens of millions leading to hundreds millions for educational buildings for an existing University in Dallas.

People I have spoken to have suggested I form a non profit now to work these endeavors.

On Tue, Nov 26, 2024, 5:31 PM Paul Murphy <paul@gkmanagement.com.ky> wrote:

Thanks for this Geoffry,

Mark, I'll let Walkers come back but here are my thoughts:

1. Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful that they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluting them therefore the company should be wound up or an order made for change of management/revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground to claim just and equitable grounds.

2. Management shareholders have a right to object to the winding up but they have no special status by virtue of being management shares. I'll have to double check the docs but this would be different if there were something in the articles of association/share issuance agreement where there was an explicit provision where

**449**

they had agreed not to present a winding up petition. The just and equitable ground is specifically designed to prevent unfair prejudice to a shareholder.

3. I think our main point is to stress that if they take any action they significantly undermine Donderro's position in the bankruptcy and UBS action because he will be seen as the alter ego of DAF as they've always claimed. Additionally, taking steps to preserve independence improves the DAFs standing in those proceedings. This isn't related to the advice but something for the call next week.

Paul.

---

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** Tuesday, November 26, 2024 5:43 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; dmancino@seyfarth.com; Paul Murphy <paul@gkmanagement.com.ky>; Shawn Raver <sraver@dafholdco.com>; Bart Higgins <bhiggins@shieldslegal.com>; Lauren Vernon <Lauren.Vernon@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Subject:** Re: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181]

Another consideration,  is that Holdco has management shares. Does the equitable theory take into account the rights of the owner of the management shares when the non-control shares want equitable relief. If the management shareholders, disagrees, are those powers and right abdicated in a equitable wind down proceedong? Seems the Management Shareholder has a right to express its rights as to whether the company should be wound down or not.

On Tue, Nov 26, 2024, 4:26 PM Mark Patrick <mpatrick@dafholdco.com> wrote:

Charitable DAF Holdco holds only one asset - LP interest in charitable daf fund LP.  As a limited partner, Holdco cannot force the partnership to wind its affairs?

On Tue, Nov 26, 2024, 4:11 PM Mark Patrick <mpatrick@dafholdco.com> wrote:

If new participating shares are issued to a new non-profit,  and say per Paul's point they try to implement an "equitable" winding down of the company, but the new shareholders objects, would that help? Also, what could possibly be the basis for any "equitable" liquidation if the Articles don't give such rights.

On Tue, Nov 26, 2024, 3:34 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

**450**

Hi Brandon

Thanks for your time on the phone last week and the below.

As discussed, please see attached in draft the high priority memo as updated with a new Section E in respect of winding up petitions on the just and equitable ground.

We look forward to speaking with you tomorrow morning.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** Friday, November 22, 2024 1:36 PM
**To:** dmancino@seyfarth.com; Philip Aubry <Philip.Aubry@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Paul Murphy <paul@gkmanagement.com.ky>; mpatrick@dafholdco.com; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** DAF - Participating Shares Summary

[this message is from an external sender]

---

Doug and Walkers team,

As discussed, here are our notes from a review of the provisions applicable to Participating Shares in the Articles for Charitable DAF HoldCo, Ltd. As you know, we are not licensed in the Cayman Islands, so we would appreciate Walkers' help to confirm/expand our views.

**Rights of Participating Shares*:**

Rights

1. Participate (receive) discretionary dividends. See "Participating Share" and Articles generally.
2. If new shares/classes are issued, and the change would materially adversely vary the Participating Shares, then 2/3rds Participating Shareholder consent is required. See #13.

    a. Issuance of authorized but unissued Participating Shares (i.e., dilution of existing shareholders) makes this consent right contingent on outstanding shares. See #14 and #7.

3. Rights to assets in a winding up in accordance with the waterfall. See #122-124.
4. Certain foundations own 100 Participating Shares out of a total of authorized 4,999,900 Participating Shares. See #7.

No rights

1. Cannot vote shares. See #12.
2. Cannot redeem shares. See "Participating Shares."
3. No rights to information. See #12.
4. No rights to attend meetings. See #12.
5. No rights to notice of meetings. See #12.
6. No rights to pro rata distributions based on % of Participating Shares. See #105.
7. No rights to appoint or remove directors or officers. See Articles generally and #65.
8. No rights to receive notice of issuance of additional shares. See Articles generally.
9. No rights to receive notice of distributions to other Participating Shareholders. See Articles generally.
10. No pre-emptive rights. See Articles generally.

Restrictions

1. If a Participating Shareholder is (i) in breach of any law, (ii) is not a non-profit, or (iii) the directors are of the opinion such Shareholder might result in the Company incurring additional liability, including for legal reasons, the directors may require such Shareholder to transfer its shares. See #21. *Walkers to review*.
2. May be diluted by the directors issuing additional Participating Shares. See #8.

    a. Including additional pari passu shares. See #14.
    b. Dilution may, ultimately, affect the ability of the existing Participating Shareholders to consent to changes to the rights attached to the Participating Shares. See #14, #7, and Articles generally.

*Suggest the foundations confirm that they have the latest version of the Articles (attached). We suspect they do not.

**452**

Best regards,

Brandon

**Brandon R. Schaller**

**ATTORNEY**

16400 Dallas Parkway, Suite 300

Dallas, TX 75248

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

**SHIELDSLEGAL.COM**

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message. You should not copy it or disclose its contents to any other person. Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses. This e-mail message does not contain or constitute legal advice and/or federal tax advice. The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

**453**

# EXHIBIT 63



# Walkers

# Participating Shareholder Rights
# **Charitable DAF Holdco Ltd.**

Making financial services work

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore



# Binding Effect of Articles of Association

# Binding Effect of Articles of Association

"… the binding effect of the Articles as they stand … is given statutory force by section 25(3) of the Companies Law which reads:

'(3) Where registered the said articles of association shall bind the company and the members thereof to the same extent as if each member had subscribed his name and affixed his seal thereto, and there were in such articles contained a covenant on the part of himself, his heirs, executors and administrators to conform to all the regulations contained in such articles subject to this law; ….'"

(*In the Matter of Strategic Turnaround Master Partnership Ltd* [2008] CIGC J1128-1, per Chief Justice Smellie at paragraph 135)



PM-1/85

# Participation in Discretionary Dividends

# Participate in Discretionary Dividends

"The Participating Shares shall confer upon the Shareholders … the right to participate in the profits or assets of the Company in accordance with these Articles." **(Art 12)**



# Participation in Discretionary Dividends

"The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit." **(Art 102)**

"Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares." **(Art 105)**

**Participating Shareholders do not have:**

- **the right to cause or vote on distributions;**

- **the right to pro rata distributions based on their shareholding;**

- **the right to annual or timed distributions; or**

- **the right to receive notice of distributions to other Participating Shareholders.**

# Removal of Directors

# Removal of Directors

"Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution." (Art 65)

**Participating Shareholders do not have:**

- the right to remove Directors; or

- the right to appoint Directors.

**Note: the right to appoint Directors is held by the Management Shareholder and the Directors, and the right to remove Directors is held solely by the Management Shareholder (Articles 64, 65, and 69, and Definition of "Ordinary Resolution").**

# Modification of Rights

Walkers | Making financial services work

PM-1/91

# Modification of Rights

"… the rights attached to [any] Class may … only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting." **(Art 13)**

**Participating Shareholders do not have:**

* **the right to cause a distribution; or**

* **the right to amend the Articles.**



PM-1/92

# Modification of Rights – Issuance of Shares

"The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not … be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company." **(Art 14)**

"… all Shares for the time being unissued shall be under the control of the Directors who may:

(a)   issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

(b)   and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued." **(Art 7)**

**Participating Shareholders do not have:**

* **the right to vote on the issuance of further Participating Shares;**

* **pre-emption rights; or**

* **the right to receive notice of such issuance.**



PM-1/93

# Modification of Rights – Issuance of Shares

"The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each…" **(Art 7)**

**Note:** Of the authorised share capital of the Company, 305 Participating Shares have been issued. In accordance with the Articles, the Directors may unilaterally issue additional Participating Shares and thereby dilute the power of existing shareholders for the purposes of voting on matters that may materially adversely vary or abrogate the rights of the Participating Shareholders.

**Additional Note: many of the rights that shareholders of a company typically hold (e.g. the right to receive notices, and the right to vote at general meetings, including in respect of the appointment and removal of directors) are held by the Management Shareholder (Mark Patrick) rather than the Participating Shareholders. In addition, the Directors (Mark Patrick and Paul Murphy) have the ability to unilaterally declare dividends and issue new Participating Shares without the approval of the Participating Shareholders (or the Management Shareholder).**

PM-1/94

# Share Redemption

# Share Redemption

""**Participating Share"** means a non-voting, participating, <u>non-redeemable share</u> in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles…"

"… the Company shall have <u>power to redeem</u> or purchase any of its shares and to sub-divide or consolidate the said shares or any of them…" **(Paragraph 7, Memorandum)**

"The rights conferred upon the holders of the Participating Shares … shall not … be deemed to be materially adversely varied or abrogated by … <u>the redemption</u> or purchase of any Participating Shares of any Class by the Company." **(Art 14)**

**Participating Shareholders do not have:**

- the right to redeem their shares; or

- the right to vote on the Company's redemption of their shares.

# Transfer of Shares

# Share Transfer by Notice of the Directors – Restricted Person

"If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles." **(Art 21)**

"**Restricted Person**" means any Person holding Participating Shares:

  a)  in breach of the law or requirements of any country or governmental authority;

  b)  that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501 (c)(3) of the Code; or

  c)  in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered."

**Note: the Directors have duties to act, and to exercise their powers, in the best interests of the Company. The scope of those duties includes continually evaluating whether any Participating Shareholder may pose a threat to the Company which could cause them to fall within the definition of Restricted Person, and how best to protect the Company against any such threat.**



PM-1/98

# General Meetings

PM-1/99

# General Meetings

"Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company..." **(Art 12)**

**Participating Shareholders do not have:**

* **the right to receive notice of general meetings;**

* **the right to attend general meetings;**

* **the right to speak at general meetings;**

* **the right to vote at general meetings; or**

* **the right to information regarding proceedings of general meetings.**



PM-1/100

# Limited Information Rights

PM-1/101

# Limited Information Rights

"The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors." **(Art 108)**

"The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and <u>no Shareholder</u> (not being a Director) <u>shall have any right of inspecting any account or book or document of the Company</u> except as conferred by law or authorised by the Directors or by Ordinary Resolution." **(Art 110)**

**Participating shareholders have <u>very limited</u> information rights. Specifically, the articles do not provide the Participating Shareholders with the following:**

* **the right to inspect any account;**

* **the right to inspect any book; or**

* **the right to inspect any document of the Company.**

Further to the above, we note that :

* This only applies to the limited company which issued the participation shares, i.e. DAF HoldCo;

* It does not apply to subsidiary entities;

* It does not apply to entities in which DAF HoldCo holds a passive interest; and

* There is no "look- through" down through all the entities in the structure.



# EXHIBIT 64

**Rhiannon Zanetic**

**Subject:** [EXTERNAL]-RE: DAFHoldCo information request

**From:** Michael.Stockham@hklaw.com
**Date:** February 7, 2025 at 12:43:56 PM CST
**To:** Paul Murphy
<paul@gkmanagement.com.ky>, Julie Diaz
<jdiaz@dallasfoundation.org>,
mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson
<wilkerson@growyourgiving.org>, Jackie Carrera
<jcarrera@sbfoundation.org>,
David.Rosenberg@hklaw.com,
DMancino@seyfarth.com
**Subject: [EXTERNAL]-RE: DAFHoldCo
information request**

> **CAUTION:** This email originated from outside of the
> organization. Do not click links or open attachments unless
> you recognize the sender and know the content is safe.

Paul-

I appreciate your email, and your willingness to find a
framework to resolve the concerns, but am flummoxed
by your, "struggle" to understand our growing
frustration.

I do not believe it should be difficult to comprehend the
request for transparency around $270 million dollars
you control as a fiduciary for the benefit of charities in
Dallas, Kansas City, and Santa Barbara. Indeed, these
odd legal and rhetorical machinations of yours and Mr.
Patrick miss the point. These monies are for improving
the quality of life of children, building pathways for
everyone to have a fair opportunity to succeed, and—
among other things—creating a lasting impact on
young minds by fostering a love for education. They are
not meant to pay you and Mr. Patrick millions in
director fees. If I'm wrong, please educate me.

Your failure to be forthcoming about the underlying
assets, the investment philosophy of the fund, and the
"revised" governance, have caused me to start digging.
I am not only a lawyer but also a Certified Fraud
Examiner and a Certified Compliance & Ethics

1

Professional, and what I have found is nothing short of alarming.

- As I mentioned, director fees for 2024 appeared to be on track to exceed $5 million, which was an over 12,000 percent increase—up from zero. It is hard to fathom what you and Mr. Patrick have changed or contributed to the funds to warrant such a drastic change in director fees. I could be wrong, but if so, then tell me why. What is the dramatic value add?

- As I understand it, the annualized expenses of the funds were on pace to outstrip the actual return on the investments. So I am at a loss as to how you can justify running the fund at a loss while apparently paying the directors handsomely and freezing Supporting Organizations (the shareholders) out of basic information.

On November 6, 2024, we had an introductory video call with Doug Mancino, who announced himself as Compliance Counsel. But no details of the assets or financial condition of the funds were communicated.

On November 20, 2024, we had another video call with folks from your side, including ValueScope, and it was informative; however, the thrust of the presentation was why you refused proposed investments from NexPoint. It had nothing to do with the underlying assets and financial conditions of the fund. This was perplexing as ValueScope has been the valuation firm for the fund for years; yet they were silent about the condition of the fund.

On December 11, 2024, we had a video call with you, Doug Mancino, and your Cayman counsel. The thrust of that discussion was your vision of running the fund more as an institutional investment vehicle and a promise to provide financial information in the future. But the presentation again lacked any information on the underlying assets and financial conditions of the fund. It did, however, include a discussion that the Supporting Orgs had no right to information under the structure of the funds.

Shortly after the December 11 call, we received your first demand to withdraw our concerns about the governance of the funds, and it also advanced that if the Supporting Organizations wanted more

transparency they must sign a non-disclosure agreement with a liquidated damages clause. Which is, quite frankly, ridiculous.

In sum, and as I understand the thread running through the communications, your continuing posture is the following. The Supporting Orgs have no right to information. And, if the Supporting Organizations want more information, they must both recant their governance concerns and then sign the NDA. Those are both coercive non-starters. Again, if I'm wrong please tell me how.

Finally, and this I find perhaps the most egregious, I just discovered through my own research that Mark Patrick cancelled the Delaware charter of Charitable DAF GP, LLC on October 30, 2024 and rechartered it in Cayman. I can find no legitimate reason to recharter the general partner, and instead believe it to be a move to further insulate Mr. Patrick's and your actions by retreating from jurisdiction in the United States and offshore the entity in its entirety. If I've misunderstood, please let me know in detail how, but I remain skeptical. Further, in the calls listed above, not one representative from your side spoke up to explain, or even mention, the rechartering of the general partner. That is a striking repeated omission.

So the change of tone should not provide any struggle to puzzle through. Over the last three months, you have not provided any information about the assets and financial health of the fund. You have demanded that information only flows under an NDA with liquidated damages. You continually issue a veiled threat that information is a privilege not a right under the agreements. Expenses have gone through the roof, and the governance has been changed to further insulate it in a foreign jurisdiction. To say the least, I see red flags all over this situation, but have not received any facts, yet, that tell me they are unwarranted.

If I'm wrong, fine. It won't be the first time. But this also isn't my first rodeo, and the way to diffuse this is through immediate full transparency and facts. So if I've misunderstood, and your intent is to provide a fully transparent briefing to the Supporting Organizations without coercive caveats, then we stand ready to have that conversation after receiving the basic financial information requested by Julie Diaz in her January 23, 2025 email.

**Michael Stockham, JD, CFE, CCEP** | **Holland & Knight**

Partner

Holland & Knight LLP

One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201

Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435

michael.stockham@hklaw.com | www.hklaw.com

Add to address book | View professional biography

*Licensed to practice law in Texas, Kansas, and New York
 CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com
 CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Tuesday, February 4, 2025 9:31 AM
**To:** Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

*[External email]*
Dear Mike,
We remain open to finding a framework within which we can resolve your clients' concerns.
I don't want to repeat points already made in my email dated 30th January 2025, but our understanding was that we were to prepare a presentation for the Foundations to address these concerns. This was a course of action suggested by you in our call last year and one which we thought was very sensible.
We are struggling to understand what happened between 21st January (when David Rosenburg, from your firm, confirmed a video conference would be acceptable) and 23rd January when an email was sent to Mark's old email address repeating various allegations that we were going to address in the presentation.

We remain committed to trying to work with
your clients and would be grateful if you could
confirm your clients' willingness to do so.
Many thanks,
Paul.

---

**From:** Michael.Stockham@hklaw.com
<Michael.Stockham@hklaw.com>
**Sent:** Friday, January 31, 2025 3:32 PM
**To:** Paul Murphy <paul@gkmanagement.com.ky>; Julie
Diaz <jdiaz@dallasfoundation.org>;
mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson
<wilkerson@growyourgiving.org>; Jackie Carrera
<jcarrera@sbfoundation.org>;
David.Rosenberg@hklaw.com;
DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

Paul-

I have added Doug Mancino to this email chain, as you
are represented by counsel, I believe it appropriate to
loop him in for this communication. I also told you that
I had a tendency toward the blunt.

I am appalled by your response. As fiduciaries, you and
Mr. Patrick manage $270 million in assets for the
benefit of charities that support the most vulnerable in
their communities. Whatever your side's obvious
antagonism to Mr. Dondero, the fact remains that the
underlying assets are ultimately for these charitable
missions. And your focus and mission should be not
only to ensure the success of the investments, but
transparency to the ultimate beneficiaries. The assets
are for their benefit, not Mr. Dondero, not Mr. Patrick,
and not you.

The Supporting Organizations have legitimate concerns.
The last information they received from SEI in July of
2024 — before Mr. Patrick shut down that line of
communication and information — showed legal
expenses had increased to $6 million in the first six
months of 2024 compared to $4 million for all of 2022.
If annualized, and at that pace, legal expenses
appeared to be on path to exceed $12 million for 2024.
That's a 300% increase. Director fees skyrocketed from
$40 thousand in 2022 to $2.25 million in the first six
months of 2024. Again, annualized, these fees are on a
path to exceed $5 million in 2024. That is a 12,400%
increase. Yet, no information has been provided by you

and Mr. Patrick, no clarity given. It appears that total expenses for 2024, if annualized, were on pace to exceed $36 million. Even if you earned a return of 10 percent on the $270 million invested, the fund would be at $11 million of negative revenue for 2024. If the information we received is wrong, then please explain why, and provide the detailed information to disabuse us of these concerns. But telling us we have no legal right to the answers is not workable.

Upon Mr. Patrick taking control, you and he should have immediately engaged with the Supporting Organizations to explain the transition, your plans, and how the assets are being managed. I would have thought that a fiduciary would have engaged in a campaign of maximum transparency and disclosure. Instead, as to the actual financial condition of the assets, you have been opaque at best and purposefully elusive at worse, and your email below retreats into statements about having no legal obligation to disclose the activities of the funds. And it seems to condition further transparency on the Supporting Organizations recanting their earlier expressed concerns. I think you should reconsider such an entrenchment.

The Supporting Organizations have no interest in the animosity or dysfunction between Mr. Patrick and Mr. Dondero. What they do have an interest in, is an active campaign by you and Mr. Patrick to continue to manage the assets in a shroud of mystery, dripping out details and information whenever you deem it appropriate. To do so simply proves our concerns that the governance structure of these entities is broken.

Yes, it is true that we have been in discussions for months about transparency, and you provided some information. However, what has been ignored are the repeated requests for a simple set of financials. But how hard is it to create a short PowerPoint on the current state of financial statements, a simple diagram of the alleged new governance structure (who are the advisory board members?), your visions for the funds, and then provide a one-hour briefing to the Supporting Organizations? If you are truly managing the funds to the institutional-investor standards represented in our call, these details should be at your fingertips. Yet somehow this has all devolved into delays and posturing related to the dust up between Messrs. Dondero and Patrick.

That type of myopic thinking is not appropriate in this situation. The Supporting Organizations deserve

6

answers, and the transparency needs to happen sooner rather than later. And, the answer you provided, which essentially said that you can tell the organizations to pound sand and they should be grateful for the information you do provide, is not acceptable.

**Michael Stockham, JD, CFE, CCEP** | **Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435
michael.stockham@hklaw.com | www.hklaw.com

Add to address book | View professional biography

*Licensed to practice law in Texas, Kansas, and New York
CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com
CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Thursday, January 30, 2025 12:13 PM
**To:** Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

*[External email]*
Dear Julie,

I am an independent director of Charitable DAF HoldCo, Ltd. (which I believe is the entity you refer to as "DAF HoldCo" in your email dated 28 January 2025 (the "**28 January Email**")).

As an initial matter, I hope you will find the tone of this initial response to the 28 January Email conciliatory as I am keen to avoid any misunderstandings in circumstances where I had understood the next steps following the meetings between our respective legal

representatives (Douglas Mancino and David Rosenberg) in December last year was for us to present directly to the foundations/supporting organizations in order to address some of the concerns in the letter dated 11 November 2024 (the "**11 November Letter**"). This proposed presentation would supplement the two Zoom conference calls with your attorneys held by me and our independent valuation experts, ValueScope, in December last year as well as the ValueScope 9/30/24 report sent to you on 7 January that provided a balance sheet and information on all investment holdings.

As recently as 21 January 2025, David again confirmed that a Zoom conference call with yourselves would be an effective way to address your concerns and move forward in a cooperative manner.

Given our transparency and cooperation with the foundations/supporting organizations, as well as the agreed way forward, it was surprising to receive the 28 January Email which repeats some of the allegations in the 11 November Letter. Please note that neither Mark nor myself received your email dated 23 January 2025 given that it was sent to an out-of-use email address for Mark (which I understand he communicated to you and your assistant in person) and did not copy me. Therefore, the basis of the concerns and request to wind-up expressed in the 28 January Email, appears to be the single failure to respond to an email that was sent to a defunct email address. Having now been reminded that the email address is not functional, I hope you can take some comfort that you were not being ignored.
However, given the content and tone of the 28 January Email and David's request to progress the direct presentation to the foundations/supporting organizations only 7 days prior on 21 January 2025, there seems to be a disconnect between the conciliatory approach adopted in the latter and the more aggressive position set out in the former.

For our part, at this stage we are more than happy to continue to engage with the foundations/supporting organizations in an

effort to provide clarity on investments and the DAF HoldCo governance structure.

I must, however, record that we have some growing concern around the content and circumstances your email of 23 January 2025, specifically that it might be interpreted as a premise to attempt to inappropriately exercise control over DAF HoldCo and/or its assets. As a reminder, when the participating shares in DAF HoldCo were issued to the supporting organizations, there was no conveyance of voting rights or control, and it has always been well understood that such shares did not convey voting rights or control. In particular, without waiving applicable privileges, we are advised that any attempt to exert control of DAF HoldCo or its assets by James Dondero would be both inappropriate, unlawful and inconsistent with DAF HoldCo's charitable mission. We are deeply concerned that this outreach, which began following Mark's resignation from Skyview in October 2024, may be the supporting organizations acting as proxy for Mr. Dondero. We hope we are wrong, but the supporting organizations have received the same ValueScope quarterly financial reports and charitable distributions over time without change and without issue.

Please let us know if you are prepared to withdraw the allegations made in the 11 November Letter and the 23 and 28 January Emails and are content to proceed with our proposed delivery of the presentation which we are confident will provide a complete answer to your concerns.

Finally, as a matter of record, it is important that I outline the following:

> The 11 November 2024 Letter was not directly sent to me. I received it from Charitable DAF HoldCo's US attorneys who had, in turn, received it from a US law firm acting for Mr. Dondero. As set out above, this supports our belief, which is also based on other actions we have seen to date, that Mr. Dondero is seeking to improperly

exerting influence over the foundations and supporting organizations for self-serving purposes to the detriment of DAF HoldCo, the foundations and supporting organizations.

We note that your communications to date contain several misstatements of fact and we reject all of your allegations. DAF HoldCo holds itself to the highest standards in achieving its goal of maximizing returns in risk-adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF HoldCo's independence and are advised by best-in-class, independent experts.

Whilst we are cooperating with the foundations/supporting organizations to provide additional information we have no legal obligation to do so (which is not disputed). In no way should our cooperation be construed as an implicit acknowledgment of any duty to continue providing information to you or as a waiver of any DAF HoldCo's rights and remedies.

We look forward to hearing from you in relation to the proposed presentation and withdrawal of the allegations.

Kind regards,

Paul.

**Paul Murphy**
**G.K. Management Limited**
P.O. Box 10729
Suite 1, Artemis House
67 Fort Street
Grand Cayman  KY1-1007
Cayman Islands
**Phone:** +1 345 946 3459
**Mobile:** +1 345 324 1121
**Fax:** +1 345 946 3493
**E-mail :** paul@gkmanagement.com.ky

**From:** Julie Diaz <jdiaz@dallasfoundation.org>
**Sent:** Tuesday, January 28, 2025 9:14 PM
**To:** Mark Patrick <MPatrick@CharitableDAF.com>; Paul
Murphy <paul@gkmanagement.com.ky>
**Cc:** Debbie Wilkerson
<wilkerson@growyourgiving.org>; Jackie Carrera
<jcarrera@sbfoundation.org>;
Michael.Stockham@hklaw.com; Rosenberg, David M
(DFW - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

Mark and Paul-

We have great concern that our reasonable requests
below have not been acknowledged. This failure to
provide the courtesy of a response continues a pattern
of a lack of communication and transparency as to
assets and financials of DAF HoldCo under your
stewardship. These failures exacerbate the concerns we
previously communicated in our letter to Paul in
November 2024 (copy attached), which highlighted our
concerns that the governance of the DAF HoldCo has
failed in its current structure. The situation as it now
stands is untenable. The lack of engagement on the
true financial condition of the DAF HoldCo and the
underlying assets leads us to believe that you have
rejected our request to revise the governance of the
DAF HoldCo and related structure. As such we are
requesting that DAF HoldCo and the related entities be
wound up and the underlying assets be distributed in
kind to the Supporting Organizations so they can
manage those assets for the benefit of the charities and
the communities they serve. As previously requested,
until these issues are resolved, we are insisting that you
do not dissipate the assets further.

**From:** Julie Diaz
**Sent:** Thursday, January 23, 2025 9:45 AM
**To:** MPatrick@CharitableDAF.com
**Cc:** Debbie Wilkerson
<wilkerson@growyourgiving.org>; Jackie Carrera
<jcarrera@sbfoundation.org>
**Subject:** DAFHoldCo information request

Hi Mark –

Since we spoke last fall, the three CEOs from Santa Barbara, Kansas City, and Dallas community foundations (copied here) were discussing our plans for 2025 and wanted to reach out to you to check in on the DAFHoldCo.  We have been discussing the need for a better understanding of the assets and thought it would be helpful if you could provide us with several detailed reports now that the new structure is in place.

Specifically, could you send:

- **Income Statements for the last for years**: A complete set of income statements (or profit and loss statements) for the last four fiscal years (2021-2024), including any supplemental notes or breakdowns that provide insight into revenue streams and expenses
- **Listing of Underlying Assets**: A detailed listing of the underlying assets held by DAF HoldCo, including both tangible and intangible assets. This should include any real estate, investments, intellectual property, or other significant assets that contribute to the company's operations or value.
- **Audited Financial Statements**: The most recent audited financial statements for DAFHoldCo, including the balance sheet, statement of cash flows, and any related auditor's reports. Please include any supplementary schedules or disclosures that are typically associated with these statements.
- **Current Structure of DAFHoldCo Operations:** An up-to-date organizational chart or structural overview detailing the key divisions, subsidiaries, and any relevant operational or financial entities that comprise the DAFHoldCo structure, including any significant changes that may have occurred over the last few years.

As you can appreciate, our job as leaders of our respective community foundations is to ensure proper stewardship of the charitable assets that are owned by our organizations.  We are grateful for the decade plus of charitable investments that we have been able to make from the proceeds of the DAFHoldCo and would like to have confidence that this vehicle will continue to grow and make

additional meaningful contributions to our
respective communities.

Please let us know your ability to get this information
to us by Feb. 10, 2025.

Thank you and happy New Year.

---



**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

NOTE: This e-mail is from a law firm, Holland & Knight LLP
("H&K"), and is intended solely for the use of the individual(s) to
whom it is addressed. If you believe you received this e-mail in
error, please notify the sender immediately, delete the e-mail
from your computer and do not copy or disclose it to anyone else.
If you are not an existing client of H&K, do not construe anything

in this e-mail to make you a client unless it contains a specific
statement to that effect and do not disclose anything to H&K in
reply that you expect it to hold in confidence. If you properly
received this e-mail as a client, co-counsel or retained expert of
H&K, you should maintain its contents in confidence in order to
preserve the attorney-client or work product privilege that may
be available to protect confidentiality.

**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas
Foundation**
Pegasus Park
3000 Pegasus Park
Drive, Suite 930
Dallas, Texas 75247

<~WRD0000.jpg>  <~WRD0000.jpg>  <~WRD0000.jpg>

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities")
Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by
other than intended recipients is prohibited. If received in error, please immediately delete this
email from your computer, destroy any hard copies and notify the sender. NexPoint Securities
archives email, which are subject to review by NexPoint Securities and various regulators. This
email is for informational purposes only and is not an offer, recommendation or solicitation to
purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes
no representation about the accuracy or completeness of information herein. Past performance is
not indicative of future returns. Investments may lose money and such investment losses are not
insured.

DISCLAIMER: This email is intended for the recipient(s) only
and should not be copied or reproduced without explicit
permission. The material provided herein is for informational
purposes only and does not constitute an offer or
commitment, a solicitation of an offer, or any advice or
recommendation, to enter into or conclude any transaction. It
may contain confidential, proprietary, or legally privileged
information. If you received this message in error, please
immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal
department at Skyview Group. This message and any attachments hereto may constitute
attorney work product or be protected by the attorney-client privilege. Do not disclose this
message or any attachments hereto without prior consent of a member of the legal department at
Skyview Group.

# EXHIBIT 65

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

---

**WRITTEN RESOLUTIONS OF THE**
**DIRECTORS OF THE COMPANY DATED 2 APRIL 2025**

---

Capitalised terms used herein shall have the meaning ascribed to such terms in the Company's Amended and Restated Memorandum and Articles of Association (as adopted by Special Resolution dated 20 February 2025), unless the context otherwise requires.

The undersigned, being all the Directors of the Company for the time being, hereby take the following actions and adopt the following resolutions.

1.      **VOLUNTARY LIQUIDATION**

1.1      **IT IS NOTED** that:

(a)      the Company's sole investment, being 100% of the limited liability company interests in CDMCFAD, LLC, a Delaware limited liability company, was redeemed on 27 March 2025 (the "**CDMCFAD Redemption**");

(b)      proceeds lawfully available for distribution from the CDMCFAD Redemption in the amount of $1,612,192 were distributed to holders of Participating Shares of the Company by way of a cash dividend paid on April 2;

(c)      the Company will not be engaging in any further business or investment activity and the operations of the Company have been fully wound down;

(d)      the Company has no assets and no liabilities;

(e)      in the circumstances, there is no reason for the Company to continue as a going concern and the Directors are of the view that the Company should therefore be wound up voluntarily;

(f)      Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands have indicated that they consent to act as joint voluntary liquidators of the Company (the "**JVLs**") if so appointed;

(g)      the Directors have received and reviewed a liquidation proposal from the JVLs, together with its terms and conditions (the "**Liquidation Proposal**");

(h)      the Directors have conducted a full enquiry into the Company's affairs and to the best of the Directors' knowledge and belief the Company will be able to pay its debts in full together with interest at the prescribed rate within twelve-month period from the commencement of the voluntary winding up; and

(i)      the Directors have received a form of the declaration of solvency for execution pursuant to section 124 of the Companies Act (as amended) (the "**Declaration of Solvency**").

35894721.2.C8689.187150

1.2   **IT IS RESOLVED** that:

    (a)   the Liquidation Proposal be approved;

    (b)   the Directors recommend to Mark Patrick, being the only Shareholder having the right to receive notice of, attend, speak at and vote at general meetings of the Company, that:

        (i)   the Company be wound up voluntarily; and

        (ii)   Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd be appointed as the JVLs of the Company; and

    (c)   if the Company is wound up voluntarily, each Director execute the Declaration of Solvency.

## 2.   GENERAL AUTHORISATION

2.1   **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, any Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an **"Attorney"** or **"Authorised Signatory"** respectively), and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

## 3.   RATIFICATION OF PRIOR ACTIONS

3.1   **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.


_____
Mark Patrick
**Director**


_____
Paul Murphy
**Director**


2

**337**

# EXHIBIT 66

**||| Walkers**

**BY EMAIL**

25 April 2025                                               Our Ref: PP/PA/187150

Johnstone Law
10 Market Street, PO Box 926
Grand Cayman KY1-9006

Dear Mr Johnstone

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

1.      We act as Cayman Islands counsel to the Company.

2.      We refer to the documents served yesterday by your firm on the Company at its
        registered office, which include a winding up petition ("**Petition**"), an application for the
        appointment of provisional liquidators ("**PL Application**"), and a cover letter of service
        ("**Service Letter**").

**The Company is already in Voluntary Liquidation**

3.      Please note the following (all documents enclosed):

        (a)      On 29 March 2025, Mitchell Mansfield and William Clarke of Kroll (Cayman)
                 Ltd executed a consent to act as joint voluntary liquidators of the Company
                 ("**JVLs**").

        (b)      On 2 April 2025: (i) the directors of the Company executed written resolutions
                 including to recommend to the management shareholder that the Company be
                 wound up voluntarily and the JVLs be appointed; (ii) the management
                 shareholder executed special resolutions that the Company be wound up
                 voluntarily and the JVLs be appointed; and (iii) the directors of the Company
                 executed a declaration of solvency.

        (c)      On 14 April 2025, Gazette Issue No. 8/2025 was published, which included
                 notice that on 2 April 2025 the Company was placed into Voluntary Liquidation
                 and the JVLs appointed.

4.      Further, please see enclosed:

        (a)      The current Memorandum and Articles of the Company, dated 20 February
                 2025 ("**M&A**").

**WALKERS**                                                                                       Page 2

      (b)      The current Register of Members of the Company, dated 25 April 2025.

      (c)      An email chain between your firm and our firm dated 23-24 April 2025.

5.      As outlined above, the Company is in Voluntary Liquidation.

6.      That fact should have been evident from a search of the Gazette prior to service, as per the enclosed notice referred to at paragraph 3(c) above.

7.      Further, the email chain referred to at paragraph 4(c) above is all that we received from your firm by way of pre-action correspondence.  We enquired as to the nature of the proceedings to be served, and had we been informed that it was a winding up petition and application for the appointment of provisional liquidators (rather than simply that the proceedings were in the process of being served on the Company's registered office), we would have informed you that the Company was already in Voluntary Liquidation.

8.      There is nothing in the M&A which entitles your clients to receive notice from the Company of its entry into Voluntary Liquidation.

**The appropriate course of action**

9.      As the Company is already in Voluntary Liquidation, the Petition and PL Application are plainly redundant, and we invite your clients to withdraw them without delay.

10.      If the JVLs (or your clients) consider it appropriate that the Voluntary Liquidation be brought under the supervision of the court, any of them may make an application for a supervision order pursuant to the Companies Act section 131.  If your clients would like to discuss such an application with the JVLs, including in respect of funding, please let us know.

11.      In the event that the Petition and PL Application are not withdrawn, or at the very least the hearing of the PL Application (which we understand from your firm's Service Letter is listed on Monday 28 April 2025 at 2pm) is not adjourned, this letter must be brought to the attention of the Court, and we will appear on behalf of the Company.

12.      If it becomes appropriate to do so, we will put this letter before the Court including on the question of costs.

Yours faithfully

*Walkers (Cayman) LLP*

**WALKERS (CAYMAN) LLP**

Direct Tel: +1 345 914 6365
Email: Barnaby.Gowrie@walkersglobal.com

# EXHIBIT 67



<span>IN</span> **THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO.      OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD**

---

**PETITION FOR COURT SUPERVISION
OF A VOLUNTARY LIQUIDATION**

---

**TO:     THE GRAND COURT OF THE CAYMAN ISLANDS**

THE **HUMBLE PETITION** of (1) The Highland Dallas Foundation, Inc, (2) The Highland Kansas City Foundation, Inc, (3) The Highland Santa Barbara Foundation, Inc, (4) The HCMLP Charitable Fund (the *Supporting Organisations* or *Petitioners*), in their capacity as members of Charitable DAF Holdco, Ltd (the *Company* or *HoldCo*):

1.     The purpose of this petition (the *Supervision Application*) is to seek an order that the voluntary liquidation of the Company continue under the supervision of this Honourable Court pursuant to section 131 of the Companies Act (2025 Revision) (the *Act*) and Order 15, Rule 3 of the Companies Winding Up Rules (2023 Consolidation) (the *CWR*). The Company was placed into voluntary liquidation, and Mitchell Mansfield and William Clarke (together, the *JVLs*) of Kroll (Cayman) Ltd, pursuant to written resolutions of the directors of the Company dated 2 April 2025.

2.     The petitioning Supporting Organisations are non-profit charitable entities exempt from taxation under s.501(c)(3) of the US Internal Revenue Code who collectively hold (or in light of recent developments allegedly held) 100% of the Participating Shares in the Company. Holders of Participating Shares are entitled under the Company's Amended and Restated Memorandum and Articles of Association dated 20 February 2025 (the *Articles*) to participate in the profits or assets of the Company but are not entitled to attend, to speak at, or to vote at general meetings. By contrast, holders of Management Shares are entitled to attend, to speak at and to vote at any general meeting, but have no right to participate in the profits or assets of the Company.

3.   HoldCo is a Cayman Islands exempt company formed on 27 October 2011 (registration no. 263805) whose registered office is Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands. HoldCo is purportedly governed by the Articles.

4.   HoldCo is (or at least was) the limited partner of Charitable DAF Fund, LP (the **Fund**), a Cayman Islands limited partnership formed on 28 October 2011 (registration no. 53083) whose registered office is Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands. The Fund is, to the best of the Petitioners' knowledge, governed by the Amended and Restated Limited Partnership Agreement dated 7 November 2011 (the **ARLPA**).

5.   This Petition refers to the Supporting Organisations' petition seeking the winding up of the Company on just and equitable grounds dated 10 April 2025 (the **J&E Petition**), and the summons for the appointment of provisional liquidators dated 10 April 2025 (the **PL Summons**), in Proceedings FSD. No. 99 of 2025, the latter of which is listed for hearing before this Honourable Court on 29 April 2025 (the **Hearing**) – copies of which are at **Schedules A** and **B**, respectively.

**VOLUNTARY LIQUIDATION OF THE COMPANY**

6.   On 23 April 2025 at 1:42pm, Johnstone Law (the Petitioners' attorneys) sent an email to Walkers (Cayman) LLP advising that they acted for the Supporting Organisations and seeking confirmation as to whether Walkers acted for and were instructed to accept service on the Company's behalf.

7.   On 24 April 2025 at 11:35am, Walkers responded to Johnstone Law requesting confirmation of the nature of the proceeding to be served – but not addressing whether they acted for or had instructions to accept service on the Company's behalf. Johnstone Law replied that given their failure to respond the day prior, the papers would be served on HoldCo's registered office. That same day, copies of the Petition, the PL Summons and supporting materials were served on the Company's registered office.

8.   On 25 April 2025, the Petitioners were preparing for the Hearing of the J&E Petition / PL Summons and in the course of finalising the hearing materials for delivery to the Court. At 3.32pm that day however Johnstone Law received a letter from Walkers (the **Walkers Letter**) that stated *inter alia*:

(a)   On 2 April 2025, nearly four weeks ago: (i) HoldCo was placed into voluntary liquidation, and the JVLs appointed, by way of written resolutions of the directors, and (ii) the directors had executed a declaration of solvency with respect to the Company.

(b) On 14 April 2025, Gazette Issue No. 8/2025 (the *Gazette*) was published, which included notice that the Company was placed into voluntary liquidation.

(c) Nothing in the Articles entitled the Petitioners to receive notice from the Company of its entry into Voluntary Liquidation, and "[*t*]*he fact should have been evident from a search of the Gazette prior to service, as per the enclosed notice*".

(d) As the Company was already in voluntary liquidation, the Petition and Summons were "*plainly redundant*" and should be withdrawn. If they were not withdrawn, this letter must be brought to the Court's attention at the Hearing, at which Walkers will appear for the Company and seek costs if appropriate.

9. Enclosed to the Walkers Letter were copies of the following:

(a) director resolutions dated 2 April 2025 (the *Director Resolutions*);

(b) management shareholder resolution dated 2 April 2025;

(c) the JVLs' consents to act;

(d) declaration of solvency;

(e) the Gazette;

(f) the Articles;

(g) the Company's register of members as at 25 April 2025.

10. Although not stated anywhere in the Walkers Letter, the enclosures revealed the following matters, which were previously unknown to the Petitioners:

(a) On 7 February 2025, HoldCo allotted 318 participating shares to an entity named 'DFW Charitable Foundation' (*DFW*) – the effect being the substantial dilution of the Supporting Organisations' interest in the Company, from a cumulative holding of **100%** of the Participation Shares to **48.9%**. The Petitioners have since discovered that DFW is a Delaware company incorporated on 9 December 2024, registered to Mark Patrick's home address and Mark Patrick being the sole member. Mark Patrick is a director of and holds the Management Shares in HoldCo. DFW was purportedly granted charitable status by the State of Delaware on 7 February 2025, the same day it was allotted 318 participating shares in the Company.

(b) On 20 February 2025, HoldCo amended its Articles by way of special resolution, such special resolution passed solely by Mark Patrick.

(c)     The Company's sole investment, being an interest in an entity by the name of CDMCFAD
LLC was redeemed on 27 March 2025 and, on 2 April 2025, the proceeds available for
distribution from this redemption were distributed in the amount of US$1,612,192
purportedly to HoldCo's participating shareholders;

(d)     As at 2 April 2025, the Company has no assets.

11.     On 27 April 2025, Johnstone Law responded to the Walkers Letter setting out the Petitioners'
serious concerns arising from the matters disclosed therein, and stating *inter alia*:

(a)     There can be no honest, reasonable or lawful justification or basis for the Company taking
the steps it has, or for doing so without notifying and consulting the Petitioners in advance,
and the subsequent failure to provide notice of such actions makes clear the information
was deliberately withheld (supported further by the matters being disclosed only 1 clear
working day before the Hearing).

(b)     The steps were taken while the Supporting Organisations and HoldCo were engaged in
correspondence about financial irregularities and lacking transparency on the part of the
Company and its underlying interests. The failure of HoldCo (through its current directors
or its US attorneys) to disclose this information in the course of that correspondence is
proof of the utmost bad faith and deception on the part of HoldCo and its directors.

(c)     The fact that the JVLs appointed by the Company have themselves taken no steps to
inform the Supporting Organisations of such matters since their appointment causes
them to conclude the JVLs lack sufficient independence required to protect the interests
of the Supporting Organisations and the Company as a whole.

(d)     The Walkers Letter makes it more, not less, essential that independent officer holders
operating under the Court's supervision are appointed over the Company without delay.
The Supporting Organisations will not withdraw the Petition or the PL Summons, but plan
to issue or at least finalise additional proceedings on 28 April 2025, and to invite the Court
to appoint Margot MacInnis and Sandipan Bhowmik as official liquidators of the Company
at the Hearing – and seeking the Company's agreement by 12pm on 28 April 2025.

(e)     The Supporting Organisations were, until 7 February 2025, and in law remain, owners of
99% of the economic interest in HoldCo. They do not approve of the purported share
dilution nor the appointment of JVLs and their rights are fully reserved, and in the
circumstances, it is inappropriate for assets of the Company, or any related entities, to
be used for the purpose of payment of legal fees.

(f)     A request for details of DFW, including when it was formed and received charitable status,
the identity of its owners/controllers, its registered address and centre of operations.

(g)     A request for confirmation by 8pm on 27 April 2025: (i) what has become of the Company's interest in the Fund, and (ii) to whom and in what amounts were the distributions referred to in the Director Resolutions transferred.

12.    No response was received from Walkers by 8pm on 27 April 2025. At 9:16pm, Johnstone Law sent an email to Walkers noting the failure to provide the information and requesting that, in the circumstances and, if within their knowledge, the JVLs provide such information.

**NOTICE OF SUPERVISION APPLICATION**

13.    In the circumstances, in particular that the Supporting Organisations (and purportedly DFW, although the Petitioners do not accept the validity of the share allotment to DFW) are the Company's only contributories – and given the clear evidence that the Supporting Organisations' interests in the Company have been diluted and the assets of the Company dissipated without notice or justification – the Petitioners respectfully request the Court exercise its discretion to dispense, as it is entitled to do, with the notice requirements in O.15 of the CWR.

**APPLICATION FOR SUPERVISION ORDER**

14.    The Petitioners respectfully seek an Order from this Honourable Court that the voluntary liquidation of the Company continue under the supervision of the Court pursuant to section 131 of the Act, and that Margot MacInnis and Sandipan Bhowmik of Grant Thornton be appointed as joint official liquidators (together, the *JOLs*) of the Company, for the following reasons:

(a)     The making of a supervision order will allow the JOLs to conduct a proper investigation of the affairs of the Company and conduct an orderly winding up under the supervision of this Honourable Court for the benefit of all stakeholders.

(b)     There is to say the least a large cloud hanging over Mr Patrick and Mr Murphy, as directors of HoldCo, who should not be allowed or entitled, irrespective of the professionalism of the JVLs, to retain the role and functions that directors normally retain attendant upon voluntary liquidations.

(c)     The Supporting Organisations, as the owners of 100% of the economic interest in the Company (at least prior to the purported allotment of shares to DFW on 7 February 2025) should be entitled to choose the liquidator, or at least a liquidator not appointed by the directors, the conduct of whom has raised serious concerns even prior to the events disclosed in the Walkers Letter.

(d)     Court supervision will result in an indisputably more effective, economic, and expeditious liquidation of the Company in the interests of the Supporting Organisations as contributories. Save in respect of any claim the Supporting Organisations save, there

does not appear to be any creditors.

(e)    An investigation into the allegations of misconduct on the part of the management of the Company will be substantially expedited and more effective if conducted by official liquidators, who are not the same persons as the JVLs.

(f)    Should an investigation identify transactions that should be set aside, or claims that should be advanced, whether against the directors of the Company or third parties, such actions are most appropriately and effectively undertaken by official liquidators, who are not the same persons as the JVLs.

(g)    As the holder of the Management Shares in the Company (Mr Patrick) is resident in the US and as are many of the entities related to and with whom the Fund transacts, it is highly likely, if not certain, that the liquidators will need to instruct attorneys in the US, obtain recognition under chapter 15 of the US Bankruptcy Code, and commence proceedings in the US to recover any assets wrongfully dissipated. Such steps necessitate the liquidation being conducted under the supervision of the Court.

15.    Ms MacInnis and Mr Bhowmik of Grant Thornton:

(a)    are "qualified insolvency practitioners" as defined in s.89 of the Act and as prescribed by Regulation 4 of the Insolvency Practitioners' Regulations (2023 Consolidation) (**IPR**);

(b)    meet the residency requirements contained in Regulation 5, IPR;

(c)    meet the independence requirements prescribed by Regulation 6, IPR;

(d)    meet the insurance requirements prescribed by Regulation 7, IPR, and Grant Thornton holds a trade licence which authorises its staff to carry on business as professional insolvency practitioners; and

(e)    consent to their appointment as official liquidators of the Company, if so appointed.

**YOUR PETITIONERS THEREFORE HUMBLY PRAY THAT:**

1.    The voluntary liquidation of the Company be continued under the supervision of the Court pursuant to s.131 of the Act and O.15, r.8 of the CWR.

2.    Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands, be appointed as joint official liquidators (**JOLs**) of the Company pursuant to s.132 of the Act.

3.    The JOLs have the power to act jointly and severally.

**Page 7 of 10**

4.      The JOLs shall not be required to give security for their appointment.

5.      The JOLs be authorised pursuant to s.110(2)(a) of the Act, to jointly and severally exercise all of the powers specified in Part II of the Third Schedule to the Act..

6.      The JOLs be authorised pursuant to s.110(2)(a) of the Act to exercise the following powers in Part I of the Third Schedule to the Act, without the further sanction or intervention of the Court:

a.      The power to bring or defend any action or other legal proceeding in the name and on behalf of the company;

b.      The power to carry on the business of the company so far as may be necessary for its beneficial winding up;

c.      The power to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the company and a contributory or alleged contributory or other debtor or person apprehending liability to the company.

d.      The power to deal with all questions in any way relating to or affecting the assets or the winding up of the company, to take any security for the discharge of any such call, debt, liability or claim and to give a complete discharge in respect of it.

e.      The power to engage staff, agents and/or consultants in the Cayman Islands and elsewhere to assist the JOLs in the performance of their functions; and

f.      The power to engage attorneys and other professionally qualified persons in the Cayman Islands and elsewhere to assist the JOLs in the performance of their functions.

7.      The JOLs be specifically authorised and entitled without the further sanction of the Court to undertake the following:

a.      Presenting a petition for the winding up of the exempted limited partnership, Charitable DAF Fund, LP (the Fund).

b.      Taking control of the Company's subsidiaries, joint ventures, investments, associated companies, businesses, or other entities (collectively referred to as the "Associated Companies") in which the Company holds an interest (or such shares of such Subsidiaries and/or Associated Companies as are owned directly or indirectly by the Company), in each case, wherever located, as the JOLs see fit. Additionally, to call or cause to be called meetings of such Subsidiaries and/or Associated Companies, and to sign resolutions (in accordance with the provisions of any relevant constitutional or related documentation of

such companies) and take such other steps, including applications to and communications with appropriate courts and/or regulators, as the JOLs consider necessary to appoint or remove directors, legal representatives, officers, and/or managers to or from such Subsidiaries and/or Associated Companies. In each case, take the necessary steps to ensure that the registered agents (or other equivalent corporate administrators) of such Subsidiaries or Associated Companies implement the changes to the boards of directors, legal representatives, officers, and/or managers of such companies or entities. This includes (without limitation) effecting changes to the company registers of such Subsidiaries or Associated Companies as may be deemed appropriate by the JOLs. Furthermore, to take such other actions in relation to all such Subsidiaries or Associated Companies as the JOLs see fit for the purpose of protecting the assets of the Company and managing its affairs (which, to avoid any doubt, shall include the assets and affairs of the Subsidiaries and Associated Companies).

c.  Issuing and pursuing an application by summons for an order appointing themselves or other fit and proper persons as joint provisional liquidators of the Fund.

d.  Locating and taking possession of and preserving all the Company's books, records and other papers (whether hard copy, digital or otherwise).

e.  Identifying the nature and location of all property and assets which appear to belong to the Company.

f.  Getting in or otherwise securing and protecting all such property and assets.

g.  Investigating the costs and expenses incurred by the Company.

h.  Identifying any creditors of the Company.

i.  Investigating the promotion, business, dealings, and affairs of the Company.

j.  Investigating whether the Company or the JOLs may have any claims (either in this jurisdiction or elsewhere) against any officer or employee or former officer or employee of the Company, or against any other person or persons.

k.  Commencing and pursuing any such or other claims, if the JOLs are of the view that that is necessary or desirable in order to protect the ability of the Company or any liquidator of the Company to pursue any such claims or otherwise to preserve the value of any such claims.

l.  Seeking registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the liquidation.

m.  Carrying on the business of the Company so far that may be beneficial for the Company, its

creditors.

n.   Being at liberty to complete or terminate any contracts or transactions entered into by the Company.

o.   Retaining and operating the existing bank or other accounts of the Company and where necessary opening new accounts.

p.   Taking control of or redirecting any email or other digital communication method used for the purposes of the Company's business or affairs.

q.   Applying to the Court for directions, including on short notice, including for Orders to vary these powers and functions.

8.   The Court dispenses with the requirement for this Supervision Application and the hearing of this Supervision Application to be advertised pursuant to O.15 of the CWR.

9.   The JOLs' remuneration and expenses be paid out of the assets of the Company in accordance with s.109 of the Act, Part III of the Regulations, and O.20 of the CWR.

10.  The costs of this Supervision Application shall be paid out of the assets of the Company as an expense in the liquidation, such costs to be taxed if not agreed with the JOLs.

11.  The JVLs shall prepare a final report and accounts for the period from the commencement of the voluntary liquidation until the date of the supervision order, and deliver such report to the JOLs within 28 days of this Order.

12.  Such further or other orders be made as the Court shall deem fit.


**AND** your Petitioner will ever pray etc.

Dated 28th April 2025

_Johnstone Law_

_____

**Johnstone Law Ltd.**
Attorneys for the Petitioners


**THIS PETITION** was presented by Johnstone Law Ltd., attorneys for the Plaintiffs, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/00016**)

### NOTICE OF HEARING

**TAKE NOTICE THAT** the hearing of this Petition will take place at the Law Courts, George Town, Grand Cayman, Cayman Islands on                          at        am.

Any correspondence or communication with the Court relating to the hearing of this Petition should be addressed to the Registrar of the Financial Services Division of the Grand Court at PO Box 495, George Town, Grand Cayman KY1-1106, Cayman Islands; Tel: +1(345)949-4296.

# EXHIBIT 68

Commercial in Confidence

THE COMPANIES ACT (AS AMENDED)


NOTICE OF APPOINTMENT OF OFFICIAL LIQUIDATORS


**Charitable DAF HoldCo, Ltd - In Official Liquidation (the "Company")**

**Registration No: 263805**

**Grand Court FSD Cause No: 0116-2025 (JAJ)**


**TAKE NOTICE** that by order of the Grand Court made on 6 May 2025, that the Company, registration number 263805 whose registered office is situated at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands, was ordered to be wound up in accordance with the Companies Act (As Amended).

**AND FURTHER TAKE NOTICE** that Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, PO Box 1044, Grand Cayman, Cayman Islands KY1-1102 ("**GTSS**"), were appointed as the Joint Official Liquidators ("**JOLs**") of the Company.

Creditors of the Company are invited to prove their debts or claims and to establish any title they may have under the Companies Act (As Amended). The proof of debt form can be requested by contacting us via the email below.

Dated this 7th day of May 2025

**Contact for enquiries:**
Margot MacInnis / Sandipan Bhowmik
Telephone: +1 (345) 949 7100
Email: cdaf.core@uk.gt.com

**Mailing address for service:**
2nd Floor, Century Yard
Cricket Square
PO Box 1044
Grand Cayman
Cayman Islands, KY1-1102

# EXHIBIT 69

**Charitable DAF HoldCo, Ltd. - In Official Liquidation (the "Company")**

**Registration No: 263805**

**Grand Court Cause No: FSD 116-2025 (JAJ)**

**NOTICE OF THE FIRST MEETING OF CONTRIBUTORIES** of the Company is to be held on 9 July 2025 at 9.00am (Cayman time) at the offices of Grand Thornton Specialist Services (Cayman) Limited.

Attendance by telephone conference will also be possible. Those contributories wishing to attend the meeting by this means are required to advise the JOLs of their intention to do so, and apply for confidential dial-in details, by no later than 4:00pm (Cayman time) on 4 July 2025 at the contact for enquiries listed below.

Corporate contributories entitled to attend the meeting in person or by telephone conference must appoint a proxy by completing and returning a proxy form, which you may also obtain by contacting the JOLs.

The completed proxy form must be returned to the offices of Grant Thornton Specialist Services (Cayman) Limited or submitted by email to the e-mail address listed below by 4:00pm (Cayman time) on 4 July 2025.

Dated: 2 June 2025

**Margot MacInnis**
Joint Official Liquidator

**Contact for enquiries:**
Margot MacInnis / Sandipan Bhowmik
Telephone: +1 (345) 949 7100
Email: CDAF.Core@uk.gt.com

**Mailing address for service:**
2nd Floor, Century Yard
Cricket Square
PO Box 1044
Grand Cayman
Cayman Islands, KY1-1102

# EXHIBIT 70



**Seyfarth Shaw LLP**

2029 Century Park East

Suite 3500

Los Angeles, California  90067-3021

**T** (310) 277-7200

**F** (310) 201-5219

dmancino@seyfarth.com

T (310) 201-5241

www.seyfarth.com

February 14, 2025

## <u>VIA FAX</u>

Michael Stockham
Partner
Holland & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, TX 75201

Re:   Future Correspondence with Directors of Charitable DAF Holdco, Ltd. ("Charitable DAF")

I am writing you because I am disappointed by the increasingly hostile and accusatorial tone of your emails to Paul Murphy and Mark Patrick. After I re-read your Friday January 31st and Friday February 7th emails to Paul, Mark and Julie Diaz, the tone of which was, in my view, "over the top" of reasonableness even for someone who describes himself as having "tendency toward the blunt," I decided it was time to clear the air about several of your allegations and request that all future communications to my client and its representatives from you or your firm and from representatives of your clients such as Julie Diaz be sent through me only.

First, Charitable DAF is not paying Paul or Mark "millions in director fees," as alleged in your January 31st email. The information supplied by SEI is simply incorrect. Also, all compensation decisions are supported by outside expert opinions. Similarly, for 2024 the legal spend did not exceed $10 million and as matters are settled will continue to fall in 2025 and 2026. Furthermore, as was discussed in ValueScope's November 18, 2024 presentation, virtually all non-transactional legal expenses relate to claims brought by, or initiated due to actions of Mr. Dondero's many adversaries.

Second, it is hard to understand the change of heart about ValueScope and the nature and amount of the information it provides to your clients about Charitable DAF investments. It appears that when Grant Scott, Mr. Dondero's close friend, was Charitable DAF's sole director, the degree of detailed information provided in ValueScope's valuation analysis was fine (see, e.g., the valuation analysis dated March 31`, 2020 attached). Now that Mark has left Skyview and is not rubber-stamping investment requests from NextPoint, as was Grant Scott, the tone of communications has become increasingly hostile and the demands for information have only increased, even though, as you yourself acknowledged in one of our early calls, Participating Shareholders of Charitable DAF have no rights to information and what they already get exceeds that to which they are entitled.

Finally, the controlling role and influence that Mr. Dondero and his agents such as Lucy Bannon appear to be exerting over the Supporting Organizations raise significant private benefit concerns that call into question whether one or more of the Supporting Organizations is at risk

Michael Stockham
February 14, 2025
Page 2

of becoming a Restricted Person as that term is defined Article 21 of Charitable DAF's Articles of Association. I know David will be familiar with the seminal Tax Court decision in *American Campaign Academy v. Commissioner,* 92 T.C. 1053 (1989),which involved the denial of section 501(c)(3) exemption because the Internal Revenue Service concluded that the organization was operated for the substantial nonexempt purpose of benefitting private interests. We offer no opinion on that question but raise it as a matter of concern to Charitable DAF.

In closing, Paul is still willing to have a Zoom call with representatives the Supporting Organizations as we agreed to in December 2024. There should be no pre-conditions other than that the call not be recorded and that your clients acknowledge the importance of keeping the contents of the call confidential.

Very truly yours,

SEYFARTH SHAW LLP

Douglas M. Mancino

cc. David Rosenberg, Paul Murphy and Mark Patrick

DMM:kcl

316209527v.3

# EXHIBIT 71

# Holland & Knight

One Arts Plaza | 1722 Routh Street, Suite 1500 | Dallas, TX 75201-2532 | T 214.964.9500 | F 214.964.9501
Holland & Knight LLP | www.hklaw.com

Michael Stockham
+1 214-969-2515
Michael.Stockham@hklaw.com

February 27, 2025

*Via Email: dmancino@seyfarth.com*

Douglas M. Mancino, Esq.
Seyfarth Shaw LLP
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021

Re: Charitable DAF Holdco, Ltd. ("Charitable DAF")

Doug-

I received your letter dated February 14, 2025. I apologize if you believe my previous emails to be "over the top." However, what you perceive as "hostility" is nothing more than frustration at the circuitous dialogue and veiled threats we receive in response to simple and repeated requests for transparency as to the finances and governance of Charitable DAF. So far, our specific concerns have been met with denials but no real data on the particular issues raised. In a world where Messrs. Dondero and Patrick appear to be feuding, the Supporting Organizations can, at best, adopt a position of "trust but verify." They will, therefore, continue to push for transparency.

Further, the frustration you perceive arises from comments in many of the communications we have received from you and your clients attempting to position the Supporting Organizations as being manipulated by Mr. Dondero. The Supporting Organizations are nobody's patsy, proxy, or puppet. To suggest otherwise insults the intellect and professionalism of the executive leadership at each of the Supporting Organizations.

Paul Murphy continues to assert that he is ready to present to the Supporting Organizations and clear up all the misunderstandings. You know our concerns; let us get to it. Please propose dates in the next two weeks on which Paul is ready to present to, and answer questions from, the Supporting Organizations.

Sincerely yours,

Michael W. Stockham

cc:     David Rosenberg

#517320412_v1

# EXHIBIT 72



Seyfarth Shaw LLP
2029 Century Park East
Suite 3500
Los Angeles, California  90067-3021
T (310) 277-7200
F (310) 201-5219

dmancino@seyfarth.com
T (310) 201-5241

www.seyfarth.com

March 20, 2025

**FEDEX**

TEGE Referrals Group
Internal Revenue Service
1100 Commerce Street
MC 4910 DAL
Dallas, TX 75242-1027

Re:    Highland Dallas Foundation, Inc. (EIN: 45-3961755)

Dear Sir or Madam:

I am writing on behalf of my client, Charitable DAF Holdco, Ltd., a Cayman Islands exempt[1] company ("DAF Holdco"), concerning the deterioration of its relationship with one of its Participating Shareholders, Highland Dallas Foundation, Inc. ("Highland Dallas"). Highland Dallas is a supporting organization of the Dallas Foundation.[2]

The deterioration of this relationship is due directly to the undue influence and control exercised over Highland Dallas by James D. Dondero and his affiliates, as described in this Form 13909, *Tax-Exempt Organization Complaint (Referral)*. This disclosure letter supplements in detail and in exhibits the more general information described in the accompanying Form 13909 and is an integral part of that form (collectively, the Form 13909 and this letter are referred to as the "Referral").

We believe the information described in this Referral will demonstrate clearly that Mr. Dondero's influence and control is an inappropriate donor relationship with representatives of the Dallas Foundation who serve on the Board of Directors of and as officers of Highland Dallas. We believe this undue influence and control potentially jeopardizes the tax-exempt status of Highland Dallas as an organization described in section 501(c)(3) and, at a minimum, causes it to fail to remain a supporting organization described in section 509(a)(3) because of the

---

[1] To be clear, DAF Holdco is not a tax-exempt organization under U.S. tax law, notwithstanding the use of the term "DAF" in its corporate name.. However, under its Cayman Islands Articles of Association, a "Restricted Person," i.e., an entity that *cannot* own Participating Shares, is an organization that is *not* described in section 501(c)(3) of the Code. As a consequence, all Participating Shareholders of DAF Holdco must be and remain organizations described in section 501(c)(3).

[2] The Dallas Foundation is a tax-exempt community foundation described in sections 501(c)(3), 509(a)(1) and 170(b)(1)(A)(vi) of the Internal Revenue Code of 1986 (the "Code").

excessive influence of a disqualified person and substantial contributor, i.e., Mr. Dondero, under section 509(a)(3)(C).

This Referral is divided into three major parts, with multiple subparts.

Part I provides the Internal Revenue Service (the "IRS" or the "Service") with extensive factual information concerning Highland Dallas, its governance and control. As will be seen, Mr. Dondero exerts undue influence and control over Highland Dallas directly, as a director, President and substantial contributor, and indirectly through his and his associates' influence over Highland Dallas's supported organization representatives on the Highland Dallas Board of Directors, and the Dallas Foundation itself.

Part II provides the IRS with background information on DAF Holdco and Mr. Dondero's efforts to exert dominion and control over DAF Holdco and its assets. Because Highland Dallas is a Participating Shareholder of DAF Holdco, Mr. Dondero's efforts (both successful and unsuccessful) to control DAF Holdco for his personal gain directly affect Highland Dallas financially and provide him an additional amount of private benefit and private inurement from a donation where he once benefitted from a charitable contribution deduction to a charitable remainder trust ("CRT").

As will be discussed in Part III, the tax discussion section, Mr. Dondero's influence and control is pervasive and is exercised primarily for Mr. Dondero's financial benefit directly and for the financial benefit he derives indirectly through several entities owned or controlled by him. We believe he therefore derives more than insubstantial benefit form Highland Dallas and causes its net earnings to inure to his benefit, all in violation of section 501(c)(3)'s most basic operational requirements. Also, at a minimum, we believe his influence and control over Highland Dallas has caused it to become a private foundation, thereby subjecting Mr. Dondero to Chapter 42 excise tax exposure.

     I.       **Background Concerning the Formation and Legal Structure of Highland Dallas, Highland Capital Management, L.P., and NexPoint Advisors, L.P.**

   **A. Highland Dallas**

Highland Dallas was incorporated as a Delaware nonprofit nonstock corporation by Mr. Dondero in 2011 in connection with his desire to form three tax-exempt public charities to become the three remaindermen of a CRT of which he was the income beneficiary. Highland Dallas applied for and was recognized by the IRS as a charitable organization described in section 501(c)(3) of the Code and as a supporting organization of the Dallas Foundation described in section 509(a)(3) of the Code. Highland Dallas did not register as a foreign corporation to do business in Texas until 2020.

At the time of its formation, Mr. Dondero became the sole "individual" member of Highland Dallas, with the legal power to select one director. The Dallas Foundation became the sole "institutional" member of Highland Dallas, with the power to select two directors. Thus, in 2011, Highland Dallas satisfied the requirements for being classified as a Type I supporting organization of the Dallas Foundation.

In addition, Mr. Dondero, in 2011, became and remains today the President of Highland Dallas and a member of its Board of Directors.

The other two supporting organizations are the Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara") (EIN: 45-3962008) and the Highland Kansas City Foundation, Inc. ("Highland Kansas City") (EIN: 45-3961865). These two supporting organizations of the Santa Barbara Foundation and Greater Kansas City Community Foundation, respectively, also have the same legal structure as Highland Dallas and, like Highland Dallas, each owns 100 Participating Shares of DAF Holdco.

We do not believe either Highland Santa Barbara or Highland Kansas City is as easily manipulated by Mr. Dondero and his affiliates as Highland Dallas because, according to their Forms 990 for 2023 (which is the last year those forms are available on Guidestar.com), Participating Shares of DAF Holdco are their only assets. By contrast, Mr. Dondero has made substantial additional contributions to Highland Dallas after 2011, either directly or through trusts or other entities owned or controlled by Mr. Dondero, some of which will be addressed later in this Referral. Thus, we believe Mr. Dondero is in a position to exert greater influence as a substantial contributor to Highland Dallas on the Directors of Highland Dallas appointed by the Dallas Foundation (including the Dallas Foundation's President & CEO, Julie Diaz).[3]

### B. Mr. Dondero and Highland Capital Management, L.P.

Highland Capital Management, L.P. ("HCM") is an investment management firm located in Dallas, Texas that was co-founded in 1993 and controlled by Mr. Dondero and individuals close to him. As described on page 7 of the *Special Turnover Petition* filed by UBS Securities LLC and UBS AG London Branch in the New York Supreme Court in 2023, a complete copy of which is enclosed with this Referral as Exhibit 1 (the "2023 UBS Petition"), before HCM filed for bankruptcy, "HCM was an investment management firm that managed billions of dollars of assets 'through its organizational structure of approximately 2,000 separate business entities.'" (citation omitted). It is estimated by a plaintiff in another action that, at its height, HCM managed as much as $40 billion in assets.

Mr. Dondero was not only HCM's co-founder with Mark Okada,[4] he served as HCM's President and Chief Executive Officer until he was removed by the bankruptcy trustee in 2020.

---

[3] By way of example, the consolidated financial statements of the Dallas Foundation for 2023 available on its website include the assets of seven supporting organization, including Highland Dallas. Page 22 of the statements disclose that approximately $163.4 million of its assets were held by supporting organizations. On page 19, it appears that approximately $92.3 million (almost 57%) represent Highland Dallas assets. Also, in 2023, Highland Dallas received almost $34 million in charitable contributions, presumably all from Mr. Dondero and entities affiliated with or controlled by him. Thus, it is understandable why the Dallas Foundation representatives who serve on the Highland Dallas Board would acquiesce to almost any request or demand made by Mr. Dondero or one of his associates such as Lucy Bannon.

[4] In the Dallas Foundation's 2022 Form 990, the most recent available on Guidestar.com, Mr. Okada was listed as a member of the Board of Governors of the Dallas Foundation. On its website, the Dallas Foundation identifies another confidant and employee of Mr. Dondero, Lucy Bannon, as an "Advisory Member" of the Board of Governors (last visited March 5, 2025). Thus, Mr. Dondero continues to exert substantial indirect influence over Highland Dallas's supported organization, the Dallas Foundation.

### C.  Mr. Dondero, NexPoint Advisors, L.P., and NexPoint Hospitality Trust

In 2012, prior to his removal as President of HCM in 2020, Mr. Dondero formed NexPoint Advisors, L.P. ("NexPoint Advisors"), a Dallas-based portfolio real estate and investment firm. NexPoint Advisors is one of a vast array of entities operating under the "NexPoint" umbrella. After the HCM bankruptcy, Mr. Dondero and his affiliates seamlessly shifted their operations from HCM to NexPoint Advisors and its affiliates.

As alleged in another lawsuit filed in 2021 in the United States Bankruptcy Court of the Northern District of Texas by Marc S. Kirshner as a litigation trustee in the HCM bankruptcy case, "NexPoint [Advisors] was effectively a shell entity that Dondero created in March 2012 to siphon profits from [HCM] in order to evade [HCM's] creditors." *See Complaint and Objection to Claims,* in *Kirschner v. Dondero, et. Al.* Case No. 19-34054-sgj11, at pages 18-21, a copy of which is attached as Exhibit 3.

Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), a grantor trust, allegedly owns 99.9% of NexPoint Advisors. Mr. Dondero is the income beneficiary of Dugaboy and his sister, Nancy Dondero, is the family trustee of Dugaboy.

One of the entities affiliated with and advised by NexPoint Advisors is NexPoint Hospitality Trust, an open-ended real estate investment trust (the "REIT") based in Ontario, Canada. The REIT was formed in 2018 for the purpose of acquiring and operating income-producing hotel properties in the United States. The REIT's investment interests (called "Units") were listed for public trading on the TSX Venture Exchange of the Toronto Stock Exchange ("TSXV").

Dugaboy contributed 1,500,000 Class B non-voting Units of the REIT to Highland Dallas on December 24, 2019 and also granted Highland Dallas an "embedded" put option to sell them back to Dugaboy for $6.19 per share (the "Put Option"). The net asset value of the REIT as of December 24, 2019 was $6.19 per share. The Put Option is exercisable at any time prior to December 24, 2026. *See* the Dugaboy/REIT documents included as Exhibit 2.

The significance of the Put Option at that time is that the Class B non-voting Units could be treated for valuation purposes as equivalent to the Class A voting Units, which were owned or controlled by Mr. Dondero. Therefore, for purposes of determining their fair market value on the date of the charitable contribution, the valuation firm could value them as if they were voting Units unreduced by a 2.9% discount for lack of control. That allowed Dugaboy to claim a charitable deduction in 2019 of $11,505,000, which we assume passed through to Mr. Dondero as the income beneficiary of Dugaboy. We also assume that Highland Dallas signed a Form 8283, *Noncash Charitable Contributions,* form acknowledging it received the Units that would have been included with Mr. Dondero's 2019 Form 1040 along with a qualified appraisal of the Units (we have no actual knowledge of this, however).

On information and belief, we believe Mr. Dondero has used his influence and control over Highland Dallas to cause it defer exercising the Put Option at least through the effective time of the merger for at least three reasons.

- First, the forbearance to exercise the Put Option allows Mr. Dondero and Dugaboy to enjoy the benefits of an interest-free loan of $9,285,000 (the put exercise price ($6.19 x 1,500,000 units) while the Put Option remains outstanding and unexercised.

March 20, 2025
Page 5

- Second, the forbearance to exercise the Put Option effectively has protected Mr. Dondero from the declining value of the REIT between December 2019 and November 2024. As of November 22, 2024, the reported fair value of the Units was $0.015 per Unit, so the fair value on that date of 1,500,000 Units was only $22,500, less than one percent of the Put Option value of $9,285,000.

- Third, most charitable organizations have a policy of immediately selling contributed shares that are listed for trading on a stock exchange in order both to diversify and to reinvest the sale proceeds in a manner that aligns more closely with the charity's investment policy. Had Highland Dallas sold the Units on the TSXV at any time within three years after their receipt, Highland Dallas would have been required to file a Form 8282, *Donee Information Return,* with the Service that would likely have reflected a much lower value of the original contribution amount claimed in 2019. Thus, in effect, Highland Dallas was acting to protect Mr. Dondero from having to address the precipitous fall in fair market value as the REIT Units plummeted in value beginning shortly after the gift was made.

Highland Dallas's failure to exercise the Put Option up until now becomes all the more significant because on November 25, 2024, the REIT announced the execution of a definitive agreement (the "Merger Agreement") pursuant to which the REIT will be dissolved and its subsidiary entities will be merged with and into entities owned or controlled, directly or indirectly, by NexPoint Diversified Real Estate Trust. Under the Merger Agreement, The proposed price per Unit is $0.36 per Unit. According to the press release issued by the REIT announcing the merger, "[t]he proposed price of US$0.36 per Unit represents a premium of approximately 2300% to the 30-day volume weighted average price per Unit on the TSXV ended November 22, 2024 of US$0.015."

Last month, in a press release issued on February 21, 2025, it was announced that a majority of minority votes approved of the merger. Under Canadian law, when a person such as Mr. Dondero owns or controls a majority of a Canadian public company's voting shares, a transaction such as this merger must be approved by two-thirds of the minority shares, or in this instance the 5,131,020 Class B non-voting Units.

Based on public filings with the U.S. Securities and Exchange Commission, we believe the REIT had approximately 29,353,660 Units, of which 82.52% were owned by entities owned or controlled by Mr. Dondero.

We have to assume that Highland Dallas voted its 1,500,000 Units in favor of the merger at Mr. Dondero's request.[5] That suggests that the merger needed Highland Dallas's 29.2% (almost one-third of the two-thirds vote required) of minority Unit's approval. That also suggests that

---

[5] We understand that the Board of Directors of Highland Dallas usually acts by Unanimous Written Consent Without a Meeting, which means the Mr. Dondero along with the two Dallas Foundation Board appointees would have approved voting in favor of the merger. Presumably the same would be true if a decision were taken by the Board to refrain from exercising the Put Option.

Highland Dallas chose not to exercise its Put Option to permit Mr. Dondero to retain control over the REIT even as its finances deteriorated.

We have no way of knowing whether Highland Dallas will exercise the Put Option before the REIT is dissolved (projected for the end of the first quarter of 2025, i.e., by the end of this month), but clearly if it fails to do so this will result in a $9 million inappropriate windfall to both Dugaboy and Mr. Dondero. Obtaining the answer to this question would only require the IRS to open an examination of Highland Dallas and issue an Information Document Request and/or issue a third-party subpoena to Dugaboy.[6]

### D. Highland Dallas's Assumed Name

In March 2024, Highland Dallas filed an Assumed Name certificate with the Texas Secretary of State to permit it to operate under the name "NexPoint Philanthropies Dallas, Inc." This is consistent with Mr. Dondero's current ownership and control of NexPoint Advisors and his loss of control of HCM in the bankruptcy and consistent with the goal of allowing a private company (NexPoint) and Mr. Dondero to take credit for and enjoy the halo effect from NexPoint Philanthropies Dallas's (really Highland Dallas's) charitable giving.

### E. Mr. Dondero's Firearms Contributions to Highland Dallas

Several years ago, Mr. Dondero (either directly or through entities owned and controlled by him) made contributions of a collection of firearms to Highland Dallas. Presumably, a Highland Dallas officer signed the donee acknowledgement on Form 8283, *Noncash Charitable Contributions*, and checked the box "No" asking whether the organization intended to use the property for an unrelated use, because checking "Yes" would limit Mr. Dondero's charitable contribution deduction to his adjusted basis and not its appraised fair market value. This in itself demonstrates Mr. Dondero's improper influence over the Dallas Foundation representatives serving as Board members and officers of Highland Dallas, especially as it is hard to believe a supporting organization of a community foundation could possibly use firearms in a related trade or business.

But to further demonstrate his abuse and diversions of assets for his own benefit, earlier this year in 2025 he diverted a substantial debt service payment of $1.3 million on a loan owed to one of DAF Holdco's subsidiaries to pay for a specially-designed and built vault for those firearms (shotguns). That diversion of assets has caused a default of that loan that has now landed in Texas State court, thereby depleting DAF Holdco's assets further because of legal fees. It is unknown whether the vault was requested by anyone associated with the Dallas Foundation serving as a director or officer of Highland Dallas, such as Julie Diaz, but we believe it likely was.

### F. Mr. Dondero's Character

Mr. Dondero has a demonstrated pattern of behavior of stealing assets from those he perceives as adversaries. What is also demonstrated by even a cursory reading of the 2023 UBS Petition

---

[6] We will be happy to provide the IRS with a copy of the S-4 filed with the SEC available on EDGAR and the REIT's press releases that were used to develop this data.

and the *First Amended Original Complaint* filed by Highland Employee Retention Assets LLC against Mr. Dondero and his affiliates on July 15, 2024 in the U.S. District Court for the Northern District of Texas, Dallas Division, a complete copy of which is enclosed as Exhibit 4 with this Referral (the "2024 Complaint"), Mr. Dondero, to put it mildly, has no respect for corporate formalities and is willing to engage in self-dealing to strip entities of their assets without regard to any fiduciary duty of care or loyalty to serve his personal needs and to benefit himself financially to the detriment of others, including his own former HCM employees.[7]

The 2023 UBS Petition outlines how Mr. Dondero, facing a $1 billion judgment, directed various entities he owned and controlled to shift substantially all of their assets offshore to a Cayman Islands insurance company for a fraudulent insurance policy. The 2023 UBS Petition is an attempt to collect on a 2020 $1 billion judgment in favor of the UBS entities. Mr. Dondero has been so successful at hiding assets that the UBS entities have not been paid.

The 2024 Complaint seeks recovery of hundreds of millions from Mr. Dondero. It describes how a former Mr. Dondero employee at HCM, Patrick Daugherty, had a falling out with Mr. Dondero. After the falling out, Mr. Dondero took extraordinary steps to ruin Mr. Daugherty's life—depriving him of assets, removing his long-term incentive plan, embroiling him in lawsuits, and the list goes on.

These are not isolated incidents. In the ACIS Capital Management, L.P. matter,[8] Mr. Dondero had a falling out with Josh Terry, a former employee of HCM, and took extraordinary steps to ruin Mr. Terry's life—the same playbook as above with Mr. Daugherty.

In fact, Mr. Dondero and his litigiousness is widely known in the Dallas/Fort Worth area. Mr. Dondero is variously described as "Highland Capital's Giraffe-Eating Hedge Fund Manager" (Dallas Observer June 1, 2012), and "the distressed debt investor who was once a scourge to private equity. . . " (Financial Times March 10, 2023).

As it relates to this Referral more specifically, in a May 3, 2023 post entitled "James Dondero: Dallas's Surprising Philanthropy Hero," the post states: "Most gifts are made through the Highland Dallas Foundation, Inc., the philanthropic arm of Highland Capital Management." Note that this post appears to have been prepared by Mr. Dondero himself and appeared three years after he was ousted as HCM's President. What's more to the point is that it outlines in Mr. Dondero's own words the likely failures of Highland Dallas to comply with the section 509(a)(3) operational test discussed below. A copy of that post is included as Exhibit 6.

### G. Skyview Group

Skyview Group is a back-office and administrative service provider whose clients consist 99% of entities affiliated with or controlled by Mr. Dondero. Mr. Mark Patrick was engaged as a tax

---

[7] *See also In Re: Highland Capital Management L.P. v. Dondero,* Case No. 19-34054-sgj11 (June 6, 2021), a decision by the U.S. Bankruptcy Court for the Northern District of Dallas. In that opinion, the Bankruptcy Judge found Mr. Dondero to be in contempt for violating a temporary restraining order. A copy of that opinion is enclosed as Exhibit 5.

[8] We can provide the IRS with a copy of this complaint if that would be of interest.

March 20, 2025
Page 8

consultant by Skyview Group until Mr. Patrick resigned in October 2024 on the advice of the undersigned counsel. Skyview Group charged DAF Holdco management fees for its services.

Skyview Group is nominally owned and controlled by Scott Ellington, who was HCM's Chief Legal Officer and General Counsel until his removal by the bankruptcy trustee in 2021. Despite this nominal ownership and control by Mr. Ellington, Mr. Dondero controls all compensation decisions, including decisions relating to Mr. Ellington's compensation, and thus dominates Skyview Group as if he owned it himself.

Since Mr. Patrick's resignation from Skyview Group, Mr. Patrick has been directly employed and compensated by DAF Holdco rather than Skyview Group. In addition, Mr. Patrick, again acting on advice of counsel, caused DAF Holdco to give six-months' notice in October 2024 to Skyview Group that it was terminating its contract with Skyview Group.

Mr. Dondero became furious when he learned of these actions, and that is when (for the first time in over a decade) Highland Dallas and Dallas Foundation executives and attorneys started raising questions about DAF Holdco's investments and management. In addition, this is when Highland Dallas, and Julie Diaz (who serves as both the President of the Dallas Foundation and as a Director and Vice President of Highland Dallas), began voicing concerns over DAF Holdco's investment performance, concerns that were never raised when Mr. Dondero's lackey, Grant Scott was rubber-stamping NexPoint and other Dondero-related investments and that were never raised prior to Mr. Patrick's resignation from Skyview Group.

## II.    DAF Holdco

### A. The Grant Scott Control Era

Back in 2011, when Highland Dallas and the two other supporting organizations were being formed, one of the highly successful types of investments designed and marketed by HCM through investment partnerships were collateralized loan obligations, or CLOs.

A CLO is a single security backed by a pool of corporate debt issued by corporate borrowers with low credit ratings or loans taken out by private equity firms to conduct leveraged buyouts. With a CLO, the investor receives scheduled debt payments from the underlying loans, assuming most of the risk in the event of a default. In exchange for taking on that default risk, the investor is offered greater diversity and the potential for higher-than-average investment returns. DAF Holdco was formed initially in 2011 to hold partnership interests in partnerships that held CLOs.

Mr. Dondero caused DAF Holdco to be formed to have a structure through which he could have his CRT make remainder interest distributions of the Participating Shares of DAF Holdco to Highland Dallas and to the other two supporting organizations.[9] How CLOs work is not relevant

---

[9] This is documented in Part III, Line 4a of each of the three supporting organizations' Form 990, *Return of Organization Exempt From Income Tax*, for 2023 (the last year for which a Form 990 for the organizations was posted on Guidestar.com).

to this Referral except to the extent that Management Shares of DAF Holdco were initially issued to Mr. Dondero's college roommate and long-time close friend, Grant Scott.[10]

Grant Scott's ownership of the Management Shares from 2011 to 2021 effectively allowed Mr. Dondero to retain control of DAF Holdco and, thereby, use DAF Holdco's assets as a piggybank for other investments described below. Management Shares have no economic right to distributions; the value for Mr. Dondero is in their control over DAF Holdco and the ability to utilize its assets either to make dividend distributions to the Participating Shareholders (i.e., the supporting organizations) or to fund Dondero-managed investments on non-market terms and with below-market returns on investment.

NexPoint Advisors repeatedly reached out to DAF Holdco for investment-backing with below market terms and rates of returns while under the control of Grant Scott. Grant Scott consummated these transactions without hiring outside counsel or valuation experts for DAF Holdco. The lack of arms'-lenggth dealing inder Grant Scott's control is made patently obvious in the ValueScope November 18, 2024 presentation materials included as Exhibit 7. The economics of these transactions clearly show that Mr. Dondero was directing Grant Scott to cause DAF Holdco to enter into below-market deals for DAF Holdco that redirected the profits to Mr. Dondero and entities he owns. In other words, Mr. Dondero was stealing from DAF Holdco and, in turn, the supporting organizations.

Mr. Dondero's theft was not limited to below-market transactions. In March 2020, Mr. Dondero and his affiliates directed Grant Scott to make a $1 million payment to an entity called Tall Pine Group, LLC. The payment was allegedly for professional services rendered, but no such services were rendered to DAF Holdco. In subsequent court filings, it became clear that the $1 million went to pay Mr. Dondero's affiliates' employment compensation bonuses, which could not be paid in the normal course because HCM was subject to various bankruptcy restrictions at the time. Further detail is available in the *Kirschner* Complaint, at page 61, a copy of which is attached hereto as Exhibit 2.

B. The Mark Patrick Control Era (including present day)

Grant Scott assigned the Management Shares to Mark Patrick in March 2021. Mr. Patrick now controls DAF Holdco and the timing of distributions to the supporting organizations, including Highland Dallas. Mr. Patrick also controls the negotiations and approvals of the terms and conditions of all investments since he assumed control. Since then, under Mark Patrick's leadership DAF Holdco has begun to diversify away from Dondero-managed investments.

Total DAF Holdco (including its subsidiaries) exposure to Dondero-managed investments was over $100 million in June 2023. Because of the formation history of DAF Holdco and the various transactions between DAF Holdco and Dondero-managed investments, DAF Holdco has been named as a defendant in numerous lawsuits claiming it is an alter ego of Mr. Dondero and his

---

[10] On pages 7 and 8 of the litigation trustee's Complaint and Objection to Claims in *Kirschner v, Dondero* included as Exhibit 2, the trustee described Grant Scott as follows: "Dondero personally selected Scott as his successor to run the Charitable DAF Fund. . . . Scott has no training in finance or compliance and no investment experience. Scott routinely rubber-stamped Dondero's and [HCM's] directives without asking questions or requesting additional information."

entities and that the initial funds transferred to DAF Holdco from the CRT were fraudulent transfers. These lawsuits have been very expensive and time-consuming for DAF Holdco, which disadvantages Highland Dallas and the other Participating Shareholders because the payment of legal fees depletes available cash.

Because Mr. Patrick viewed the $100 million exposure to Dondero-related and the lawsuits as a risk to DAF Holdco (and therefore the Participating Shareholders), he has taken steps to create layers of independence between DAF Holdco and Mr. Dondero. As documented by an independent valuation consultant, ValueScope, LLC (a copy of the ValueScope report is enclosed as Exhibit 7), upon assuming control of DAF Holdco, Mr. Patrick engaged independent counsel to assist him in negotiating "market" terms and returns on investment for investments with all outside parties, especially those controlled by or affiliated with Mr. Dondero, such as NexPoint Advisors. Neither Mr. Dondero nor his associates expected this because no market discipline was exercised by DAF Holdco when it was controlled by Mr. Dondero's college roommate and close friend Grant Scott.

Outside counsel and valuation experts frequently either negotiated more market-standard (and more favorable to DAF Holdco) terms for Dondero-managed investments or advised against the transactions on the terms proposed by Mr. Dondero (via his various entities, including NexPoint Advisors). And, because Mr. Patrick refused to simply rubber-stamp Dondero-related investment asks, Mr. Dondero became upset with Mr. Patrick and demanded that Mr. Patrick provide him with increased levels of control over DAF Holdco, including meetings between Mr. Patrick and Mr. Dondero three times per week when he was still a consultant with Skyview Group and permitting one of Mr. Dondero's affiliates increased access to DAF Holdco information and finances. Mr. Patrick refused these requests.

Mr. Patrick also hired an independent director for DAF Holdco, Paul Murphy. During Mr. Scott's control, Mr. Scott served as sole director and sole person in control. There was no requirement under Cayman law to hire an independent director; Mr. Patrick did so for the benefit of DAF Holdco (and, indirectly, Highland Dallas and the other Participating Shareholders).

Mark Patrick also resigned from Skyview Group in October 2024. As noted above, Mr. Dondero effectively controls Skyview Group, and it is nominally owned by one of his affiliates, Scott Ellington. Mr. Dondero viewed this as the last straw—he viewed this as his final loss of control over DAF Holdco and its assets. On the same day, in order to complete the separation, Mr. Patrick directed DAF Holdco to terminate a services agreement with Skyview Group.

Mr. Patrick's resignation from Skyview Group was recommended by outside counsel, including this firm. Mr. Patrick recognizes he has fiduciary duties to DAF Holdco and its subsidiaries. Mr. Dondero created tension with these duties by demanding that Mr. Patrick rubber-stamp Dondero-managed investments, as did Grant Scott. For example, in September 2024, Mr. Dondero recommended that DAF Holdco consummate a real property acquisition on The Campus at Legacy (described in Exhibit 7) for $45 million and provide one of Mr. Dondero's entities a repurchase option if the price were to appreciate. In no uncertain terms, DAF Holdco would take all the downside financial and real estate risk and transfer the upside financial benefit to Mr. Dondero if this proposal had been accepted. This was typical for Dondero-managed investments.

Mr. Dondero also demanded that Mr. Patrick cause DAF Holdco to wire one of Mr. Dondero's offshore entities, Sentinel, $1.5 million in November 2023. Mr. Patrick sought the advice of outside counsel, who told Mr. Patrick the payment would be "impermissible and illegal for a number of reasons". Mr. Patrick accordingly refused the payment (i.e., embezzlement) request.

Mr. Dondero's behavior and attitude toward DAF Holdco is nothing if not consistent. Whether Mr. Scott or Mr. Patrick was in control, Mr. Dondero never abandoned the belief that the assets he caused his CRT to distribute to DAF Holdco remained his own. Mr. Patrick's steps toward independence and then resigning from Skyview Group in October 2024 led to Mr. Dondero exerting his influence over Highland Dallas in a manner we believe results in improper private benefit accruing to him as discussed in the tax aspects portion of this disclosure letter.

Following Mr. Patrick's resignation from Skyview Group, Mr. Dondero directed his entities to cease all principal and interest payments owed on Dondero-managed investments to DAF Holdco and its subsidiaries, which has led to several ongoing lawsuits discussed below and outlined in Exhibit 7. It is inevitable that Mr. Patrick will receive the same treatment as Mr. Daugherty and Mr. Terry (described above)—he will be subject to frivolous, vexatious lawsuits and harassment because he is Mr. Dondero's newest villain.

### C. October 2024 to Present

The events that have unfolded show Mr. Dondero's anger at his loss of control of DAF Holdco's assets. Mr. Patrick met with Highland Dallas shortly after his resignation from Skyview Group and assured Julie Diaz of Highland Dallas and the Dallas Foundation that his resignation would not modify management of distributions to the Dallas Foundation. Mr. Patrick believed the meeting went well; Ms. Diaz voiced no concerns and actually requested additional distributions.

Shortly thereafter, Highland Dallas and the two other Participating Shareholders hired the law firm Holland & Knight (which had already represented the Dallas Foundation for years) to represent them and to send a "no confidence" letter to DAF Holdco. This purported lack of confidence was a new sentiment by Highland Dallas, which had never previously expressed any concern when it received ValueScope reports from Grant Scott. The "no confidence" letter came out of the blue—there were no calls, emails, or other communications that expressed a lack of confidence or requested any information whatsoever.

DAF Holdco subsequently learned that Mr. Dondero directed his subordinates at Skyview Group and NexPoint Advisors to provide false and misleading financial information to Highland Dallas and to the other Participating Shareholders. Rather than contact DAF Holdco or Mr. Patrick to question this information (especially given the questionable source), Highland Dallas sent the "no confidence" letter without any attempt to verify it. (As a post-script, DAF Holdco has refuted the false and misleading information, but the dispute continues because it was never really about that.)

Despite the November 11, 2024 date on the "no confidence" letter, DAF Holdco did not receive it until December 6, 2024, after the November 18, 2024 presentation to the supporting organizations' attorneys, Holland &Knight. In addition, DAF Holdco received the "no confidence letter from Mr. Dondero's personal attorneys, who do not represent Highland Dallas or the other Participating Shareholders.

DAF Holdco responded and voiced its concerns that Mr. Dondero was directing Highland Dallas to take these actions. Recall that Mr. Dondero is a Director and President of Highland Dallas. Holland & Knight ignored the accusations that Mr. Dondero was calling the shots and began sending acrimonious (but toothless) emails to DAF Holdco. Finally, Julie Diaz, a Director and Vice President of Highland Dallas (and President of the Dallas Foundation), sent an email requesting a winding up of DAF Holdco and distribution of all of its assets to Highland Dallas and the other Participating Shareholders.

Paul Murphy, an independent Director of DAF Holdco, made a presentation to the supporting organizations' attorneys from Holland & Knight in which he reviewed all of the governance and management improvements that have already been made, but they persist behind the scenes to facilitate Mr. Dondero's attempts to undermine Mr. Patrick and regain control over DAF Holdco's assets for use by NexPoint for investments.

DAF Holdco was contacted in February 2025 by Cayman Islands counsel stating they represent "DAF 2." DAF Holdco believes this "DAF 2" is an attempt by Mr. Dondero and his affiliates to fraudulently obtain DAF's assets.

In February 2025, DAF Holdco subsidiaries filed two lawsuits against Mr. Dondero's entities for non-payment on Dondero-managed investments. Mr. Patrick also directed a non-DAF entity he controls to file a third lawsuit against Mr. Dondero's entities for non-payment. These lawsuits are fundamentally the same as other lawsuits where creditors have sued Mr. Dondero and his entities for nonpayment. Mr. Dondero has not changed—he refuses to pay his debts and he believes he is the rightful owner of DAF Holdco's assets. Mr. Dondero's instrument is Highland Dallas. He controls Highland Dallas and will cause it to continue its crusade against DAF Holdco. As noted by James Seery, the HCM bankruptcy trustee who removed Mr. Dondero from HCM, Mr. Dondero will "burn the place down" if he does not get his way.

### III. Discussion of Tax Exemption-Related Lack of Compliance and Outright Avoidance

In order for an organization to qualify for tax-exempt status under section 501(a) of the Code as a charitable organization described in section 501(c)(3) of the Code, it must be organized and operated exclusively for one or more charitable purposes described in section 501(c)(3) and the Treasury Regulations promulgated thereunder. We do not question whether Highland Dallas is organized for charitable purposes, nor do we question whether Highland Dallas's grantmaking to the Dallas Foundation and other bona-fide charitable organizations is consistent with its charitable purposes.

We do question whether Mr. Dondero's influence and control over at least Highland Dallas has allowed some portion of their net earnings to indirectly inure to Mr. Dondero's benefit as a result of his historic access to DAF Holdco's assets at below market rates and terms that appear to have been acquiesced to by each supporting organization. As we discuss below, Mr. Dondero's influence and control over DAF Holdco when Grant Scott was the Management Shareholder was never of concern, especially to Highland Dallas, even as each supporting organization received periodic valuation reports prepared by ValueScope detaining DAF Holdco's NexPoint investments. See report prepared for Grant Scott by ValueScope, attached hereto as Exhibit 8. In fact, we believe those valuation reports were used by each of them to prepare their Forms 990 and to prepare consolidated financial statements.

We also believe that each of the supporting organizations operates for Mr. Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets now that Mr. Patrick declined NexPoint investment requests that are both on non-market proposed terms and provide below market returns on investment.

If Highland Dallas elects not to exercise the Put Option before the REIT dissolves, we believe that would be an excess benefit transaction under section 4958 of the Code in which the organization managers had to have knowingly participated.

We also believe Mr. Dondero exercises such control as a substantial contributor of Highland Dallas, resulting from gifts he has made since the initial gift of Participating Shares were made by the CRT in 2011, that Highland Dallas should no longer satisfy the requirement in section 509(a)(3)(C) that there be no control by disqualified persons.

Finally, as discussed briefly below, we believe the donor advised fund rules in section 4966 and 4967 may be implicated, but have insufficient knowledge of the facts to assert conclusively that they do apply.

### A. Private Benefit

We respectfully submit that Highland Dallas in particular no longer satisfies the operational test of section 501(c)(3) because its actions taken at Mr. Dondero's direction serve his private interests more than incidentally as prohibited by Treasury Regulation § 1.501(c)(3)-1(d)(1)(ii).

As we have outlined above, Mr. Dondero and affiliates such as NexPoint Advisors used DAF Holdco, when it was controlled by Grant Scott, as his personal piggybank. And, when Grant Scott controlled DAF Holdco, neither Julie Diaz (in her capacity as Director and Vice President of Highland Dallas) nor the Dallas Foundation questioned whether DAF Holdco's investment were prudent or generated market returns. Rather, even as they received and used for tax and financial reporting purposes the ValueScope valuation opinions which disclosed DAF Holdco's NexPoint and other Dondero-related investments, they never questioned whether the terms were market terms or whether the asset allocations were prudent. It was only **after** Mr. Patrick took over as Management Shareholder of DAF Holdco and (a) started declining NexPoint investment asks—really demands, (b) started diversifying DAF Holdco's investments away from NexPoint investments, (c) began demanding repayment of amounts owed with respect to NexPoint investments, and (d) Mr. Patrick resigned from Skyview Group and terminated its contract for back office and other services, that the supporting organizations collectively hired outside counsel and, under the lead of Julie Diaz, a Director and Vice President of Highland Dallas began sending no-confidence emails to DAF Holdco Directors (including Mr. Patrick and Mr. Murphy) demanding information to which they were not even legally entitled (a fact that their attorneys openly acknowledged in a Zoom call) and a complete restructuring of DAF Holdco to bring it back under Mr. Dondero's control.

In the seminal decision, *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), the Tax Court concluded that the absence of private inurement to the benefit of a private shareholder or individual does not end the analysis of whether an organization satisfies the operational test of exemption under section 501(c)(3). it went on to state: "when the Court concludes that no prohibited inurement of net earnings exists, it cannot stop there but must

inquire further and determine whether a prohibited private benefit is conferred."(citations omitted) *Id.* at 1070. It concluded that "an organization's conferral of benefits on disinterested persons may cause it to serve 'a private interest' within the meaning of section 1.501(c)(3)-1(d)(1)(ii)." *Id.* at 1070.

Finally, after looking at the organization's exclusive source of funding (much the same as Mr. Dondero's exclusive funding of Highland Dallas), control of a majority of the Board by members of the Republican Party (analogous to Mr. Dondero's role as President and Director of Highland Dallas and his substantial influence over the two Dallas Foundation directors evidenced by their epiphany that something has to be done since Mr. Dondero no longer controls DAF Holdco), and several other factors, "we conclude that petitioner is operated for the benefit of private interests, a nonexempt purpose." *Id.* at 1080.

In another case, *Airlie Foundation, Inc. v. United States,* 55 F.3d 684 (D.C. Cir. 1995), the relationship between the founder and executive director of the foundation bears a strong resemblance to the relationship between Mr. Dondero and Highland Dallas and served as a basis for sustain the Service's revocation of its section 501(c)(3) exemption on the ground that it provided more than incidental private benefit to the founder. Although the actual basis for revocation of exemption was a finding of inurement of net earnings, the pervasive control of the founder clearly influenced the D.C. Circuit to affirm the District Court and, equally important, the court cited *American Campaign Academy* for the proposition that an organization does not operate exclusively for tax-exempt purpose if it serves a private interest rather than a public interest and "[t]his requirement applies to the organization's actual, not purported purposes." *Id.* at 75 AFTR 2d 95-2068, 95-2071.

## B. Potential Inurement

Section 501(c)( also requires that "no part of the net earnings " of the organization may "inure to the benefit of any private shareholder or individual." As observed in the *Airlie Foundation* case, "the extent of the inurement is immaterial." *Id.* As noted in that case, and as is the case with Mr. Dondero, the founder of Airlie Foundation, Inc. "established and controlled a network of taxable and tax-exempt entities. The transactions that took place within the network organizations formed the basis for the IRS's revocation of AFI's tax-exempt status, as discussed at length by the district court."

We respectfully submit that if the Service audits Highland Dallas it will identify many more instances of inurement, beyond the single instance of forgiving $33,672 by Airlie Foundation, Inc. owed by one of the founder's affiliated entities. The Dugaboy effective interest-free loan and potential windfall if Highland Dallas fails to exercise its Put Option should be enough, but we believe there will be many other transactions such as management and administrative fees that generate income for Dondero-related entities.

As discussed above in Section II.A., during the Grant Scott control era of DAF Holdco, Mr. Dondero's effective control of DAF Holdco led DAF Holdco to make investments that benefitted him personally. These investment deprived DAF Holdco of assets that could be distributed to Participating Shareholders, including Highland Dallas.

### C.  The Failure to Exercise the Put Option as an Excess Benefit Transaction

As you know, section 4958 treats as excess benefit transactions between a public charity such as Highland Dallas and a disqualified person such as Mr. Dondero economic arrangements that are above or below market between them. Section 4958(c)(3)(A) also treats as "automatic" excess benefit transactions "any grant, loan, compensation or other similar payment to" a disqualified person such as a substantial contributor.

We believe, upon examination, the Service will find that Highland Dallas has engaged in multiple automatic excess benefit transactions with Mr. Dondero or entities owed and controlled by him such as NextPoint Advisors.

First, the forbearance to exercise the Put Option effectively created an interest free loan to Dugaboy, a disqualified person. Thus, the mere fact it has remained outstanding for years means it is an automatic excess benefit transaction that requires not only the payment of the 25% excise tax by Dugaboy but also the correction of it through the payment of the full $9,250,000 plus interest.

Second, if NexPoint Advisors performs investment management services for a fee, that would be an automatic excess benefit transaction requiring not only correction but also payment of the 25% excise tax. In fact, we know from public SEC filings that NexPoint Advisors or one of its affiliates does perform investment management services for the REIT, which may itself be an excess benefit transaction requiring correction.

Finally, while other excess benefit transactions may be identified during an examination of Highland Dallas, any forbearance to exercise the Put Option to benefit Dugaboy should be regarded, at a minimum, as a "similar payment" given the fact that Mr. Dondero benefits economically in a substantial way from that forbearance.

Given that the other two directors must act to approve these actions, it is likely they have done so knowingly and willfully.

### D.  Potential Non-Compliance with Section 509(a)(3) Operational Test Sufficient to Cause Highland Dallas to be Reclassified as a Private Foundation and Thus Subject to Chapter 42 Rules

In Mr. Dondero's article entitled "James Dondero: Dallas's Surprising Philanthropy Hero" (May 3, 2023, copy enclosed as Exhibit 6), Mr. Dondero said as follows:

> "Mr. Dondero and his firm have supported The Family Place, The Dallas Zoo, SMU's Tower Scholars program, The Perot Museum of Nature and Science, Education Is Freedom, and many more local charity organizations. Most gift are made through the philanthropic arm of Highland Capital Management."

Thus, in his own words, Mr. Dondero has acknowledged Highland Dallas has violated the section 509(a)(3) operational test in Treasury Regulation § 1.509(a)-4(e)(1) concerning permissible beneficiaries of a supporting organization and should be re-classified as a private foundation. That would mean that all dealings between Highland Dallas and entities owned or controlled by Mr. Dondero should be scrutinized to determine whether they constitute acts of

self-dealing described in section 4941 of the Code or violate other provisions of Chapter 42 of the Code, such as the taxable expenditure rules in section 4945.

Under Treasury Regulation § 1.509(a)(-4(e)(1), "[a] supporting organization will be regarded as 'operated exclusively' to support one or more specified publicly supported organizations . . . **only if it engages solely in activities which support or benefit the specified publicly supported organizations."** (emphasis supplied)

The only exception to the requirement that a supporting organization benefit the supported organization "solely" is when the supporting organization provides benefits to individual members of the charitable class benefitted by the supported organization, such as by granting scholarships to graduates of a particular high school for college. *See, e.g., Nellie Callahan Scholarship Fund v. Commissioner,* 73 T.C. 626 (1980). The word "solely" is unambiguous; therefore, Mr. Dondero's own acknowledgement that Highland Dallas is the source of his funding of other admittedly charitable organizations provides conclusive evidence that Highland Dallas fails the operational test of section 509(a)(3).

Furthermore, section 509(a)(3)(C) provides that a supporting organization may not be controlled directly or indirectly by a disqualified person. A substantial contributor to a supporting organization is a disqualified person under section 4946(a)(1)(A). Thus, Mr. Donero's Dugaboy gift of the REIT Units to Highland Dallas made him a disqualified person and his effective veto power places him in control of Highland Dallas.

Therefore, we respectfully submit that that the Service should examine Highland Dallas to determine if it should be reclassified as a private foundation for the foregoing reasons and, if it is so-reclassified, all transactions between Mr. Dondero and his related or controlled entities should be evaluated to determine whether any constitute acts of self-dealing under section 4941. This should include the failure on the part of Highland Dallas to exercise its Put Option

### E. Potential Non-Compliance with Section 4966/4967 Rules Applicable to Donor Advised Funds

Finally, we respectfully submit that the Service should examine Highland Dallas to determine whether it, in effect, functions as a donor advised fund of Mr. Dondero given the fact he provided substantially all of its funding, effectively controls it and may personally benefit financially more than incidentally through entities he owns or controls from management fees, charity special events such as banquets and other means.

       *           *           *           *

Representatives of DAF Holdco will be available to be interviewed by the Service in a manner that will not result in compromising confidentiality under section 6103 and without the need for an administrative summons.

Very truly yours,

SEYFARTH SHAW LLP

Douglas M. Mancino

cc. Mark Patrick, Paul Murphy and Texas, California and Missouri Offices of the Attorney General (Charitable Trusts Sections)

DMM

## LIST OF EXHIBITS

1. Special Turnover Petition filed in March 2023 in *UBS Securities LLC and UBS AG London Branch v. James Dondero et. al.*, in the Supreme Court of the State of New York
2. Complaint and Objection to Claims filed in October 2021 in *Kirschner v. Dondero et.al.,* Case No. 19-34054-sgj11 in U.S. Bankruptcy Court, Northern District of Texas
3. Documents pertaining to The Dugaboy Investment Trust charitable contribution of 1,500,000 Class Units of NexPoint Hospitality Trust to Highland Dallas
4. Plaintiff's First Amended Complaint filed in July 2024 in *Highland Employee Retention LLC v James Dondero et.al.,* Case No. 3:24-cv-00498-K, in the U.S. District Court for the Northern District of Texas
5. Bankruptcy Court Memorandum Opinion issued in June 2021 in *In Re: Highland Capital Management, L.P. v. James Dondero,* Case No. 19-34054-sgj11
6. Post dated May 3, 2023 by James Dondero entitled: "James Dondero: Dallas's Surprising Philanthropy Hero"
7. ValueScope, LLC Slide Deck presented to Supporting Organizations' legal counsel in a Zoom call on November 18, 2024
8. Example of ValueScope, Inc. Valuation Analysis prepared for Grant Scott when he was in control of DAF Holdco

316700053v.11

# EXHIBIT 73

CHARITABLE DAF HOLDCO, LTD
(THE "COMPANY")

## WRITTEN RESOLUTIONS OF THE DIRECTORS
## OF THE COMPANY DATED April 2 2025

1. **ASSIGNMENT OF UNDERTAKINGS**

1.1 **IT IS NOTED** that:

    (a) the Directors have received a draft letter agreement to assign all of the contracts listed in Schedule A of the letter agreement ("**Assigned Contracts**") from the Company to CDMCFAD, LLC (the "**Document**"); and

    (b) in connection with the Assigned Contracts, CDMCFAD, LLC has agreed to assume all responsibilities and risks in any manner connected with the Assigned Contracts, whether now existing or hereafter arising.

1.2 **IT IS RESOLVED** that:

    (a) in the opinion of the Directors, the entry into and performance by the Company of its obligations under the Document would be in the best interests of the Company;

    (b) the transactions contemplated by the Document be approved;

    (c) the Company enter into the Document;

    (d) the form of the Document be approved on behalf of the Company subject to such amendments and additions thereto as any Director or (if applicable) any Attorney or Authorised Signatory (defined below) in their absolute discretion and opinion deem appropriate, the signature of any Director or any Attorney or Authorised Signatory on the Document being due evidence for all purposes of the approval of any such amendment or addition and the final terms thereof on behalf of the Company;

    (e) the Company do give, make, sign, execute and deliver all such notes, deeds, agreements, letters, notices, certificates, acknowledgements, instructions, fee letters and other documents (whether of a like nature or not) (the "**Ancillary Documents**") as may in the sole opinion and absolute discretion of any Director or any Attorney or Authorised Signatory be considered necessary or desirable for the purpose of compliance with any condition precedent or the coming into effect of or otherwise giving effect to, consummating or completing or procuring the performance and completion of all or any of the transactions contemplated by or referred to in the Document and the Company do all such acts and things as might in the opinion and absolute discretion of any Director or any Attorney or Authorised Signatory be necessary or desirable for the purposes stated above;

    (f) the Ancillary Documents be in such form as any Director or any Attorney or Authorised Signatory in their absolute discretion and opinion approve, the signature of any Director or any Attorney or Authorised Signatory on any of the Ancillary Documents being due evidence for all purposes of their approval of the terms thereof on behalf of the Company; and

    (g) the Document and Ancillary Documents, where required to be executed by the Company (whether under hand or as a deed), be executed by the signature thereof of any Director

1

or any Attorney or Authorised Signatory and where required to be sealed, by affixing thereto of the Seal of the Company, witnessed as required by the Articles of Association of the Company.

2.  GENERAL AUTHORISATION

2.1  IT IS RESOLVED that, in connection with or to carry out the actions contemplated by the foregoing resolutions, any Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

3.  RATIFICATION OF PRIOR ACTIONS

3.1  IT IS RESOLVED that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.


_____

Mark Patrick
**Director**


_____

Paul Murphy
**Director**


*Before me, Mark Patrick, personally appeared to be the person whose name is subscribed to the foregoing Instrument and acknowledged to me that he executed for purposes expressed therein.*

NATALIE R OLVERA
Notary ID #130890197
My Commission Expires
March 29, 2027

*Natalie Olvera, as Notary Public*

*My commission expires 3/29/27*

*State of Texas County of Dallas*

PAUL MURPHY HAS

**SIGNED IN THE PRESENCE OF**

_____

Amy Altneu
Notary Public in and for The Cayman Islands
Dated this 2 day of April , 20 25
(My commission expires on 31 January 20 26 )

35941326.1.C8689.187150

2

# EXHIBIT 74

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

---

**WRITTEN RESOLUTIONS OF THE SOLE VOTING SHAREHOLDER**
**OF THE COMPANY DATED 2 APRIL 2025**

---

Capitalised terms used herein shall have the meaning ascribed to such terms in the Company's Amended and Restated Memorandum and Articles of Association (as adopted by Special Resolution dated 20 February 2025) (the "**Articles**"), unless the context otherwise requires.

The undersigned, being the only Shareholder of the Company having the right to receive notice of, attend, speak at and vote at general meetings and having considered the written resolutions of the Directors dated 2 April 2025 which state that the Directors recommend that the Company be wound up voluntarily and that Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands be appointed as the joint voluntary liquidators of the Company (the "**JVLs**"), hereby consents to the following actions and adopts the resolutions set out below.

1.      **VOLUNTARY LIQUIDATION**

1.1     **IT IS RESOLVED BY SPECIAL RESOLUTION** that:

      (a)      the Company be wound up voluntarily; and

      (b)      Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd be appointed as the JVLs of the Company.

1.2     **IT IS RESOLVED BY ORDINARY RESOLUTION** that:

      (a)      the JVLs be authorised, in accordance with Article 123 of the Articles, to divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for that purpose, set such value as they deem fair upon any property to be divided as aforesaid and may determine how such division will be carried out as between the Participating Shareholders or different Classes; and

      (b)      the JVLs shall have the power to retain the Company's administrator, manager or such other person as determined by the JVLs to assist them in discharging any registration and notification obligations and any obligation to complete the Company's final filings and retain records pursuant to the US Foreign Account Tax Compliance Act and/or Common Reporting Standard and/or Economic Substance Reporting.

_(signature)_

_____

Mark Patrick

# EXHIBIT 75

**Rhiannon Zanetic**

| | |
|---|---|
| **From:** | David.Rosenberg@hklaw.com |
| **Sent:** | 18 March 2025 09:27 |
| **To:** | Mancino, Douglas; Michael.Stockham@hklaw.com |
| **Cc:** | Paul Murphy |
| **Subject:** | RE: Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this. |

Doug, we are available on:

- Wednesday March 26, after 4:00 p.m. U.S. Central Daylight Time.

- Monday, March 31, until 12:00 p.m. U.S. Central Daylight Time.

- Thursday, April 3 until 12:00 p.m. U.S. Central Daylight Time.

**David Rosenberg | Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | www.hklaw.com
_____
Add to address book | View professional biography

---

**From:** Mancino, Douglas
**Sent:** Monday, March 17, 2025 1:00 PM
**To:** Rosenberg, David M (DAL - X61508) ; Stockham, Michael W (DAL - X62515)
**Cc:** Paul Murphy
**Subject:** Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this.

Doug

**Douglas Mancino** (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326
DMancino@seyfarth.com | www.seyfarth.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

# EXHIBIT 76

**Rhiannon Zanetic**

| | |
|---|---|
| **From:** | David.Rosenberg@hklaw.com |
| **Sent:** | 03 April 2025 09:51 |
| **To:** | Mancino, Douglas |
| **Cc:** | Michael.Stockham@hklaw.com; Paul Murphy |
| **Subject:** | RE: Zoom call with Paul Murphy |

Doug, no such call is on our calendar, so I am not sure of the source of the confusion.  We will circle back with our clients and provide some windows starting on April 16.

I wish your wife the best of health with her back.  Thanks.

David Rosenberg | Holland & Knight
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas Texas 75201 Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | https://urldefense.proofpoint.com/v2/url?u=http-
3A__www.hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-
v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpS
NaOg8_Sk5D&s=dUaYK7RyBQ-__Uvhuz_UbZY9LLgA8fqgfSQfMU9IREk&e=

-----Original Message-----
From: Mancino, Douglas <DMancino@seyfarth.com>
Sent: Thursday, April 3, 2025 9:47 AM
To: Rosenberg, David M (DAL - X61508) <https://urldefense.proofpoint.com/v2/url?u=http-3A__David.Rosenberg-
40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-
v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpS
NaOg8_Sk5D&s=dK186X1LRwbLe82XNr4DiwVprLY83NgIEL5KUk2L9wM&e=>
Cc: Stockham, Michael W (DAL - X62515) <https://urldefense.proofpoint.com/v2/url?u=http-3A__Michael.Stockham-
40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-
v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpS
NaOg8_Sk5D&s=H8AOyc2PQyRIKod6ljjomBwRDxne7__BsTh9i-RGFDY&e=>; Paul Murphy
<paul@gkmanagement.com.ky>
Subject: Zoom call with Paul Murphy

Good morning. I just learned there is a call scheduled with Paul Murphy tomorrow that I do not have on my calendar. Did
I miss an evite? If so I apologize.
I need to be on any such call. I am unavailable tomorrow as I am in Miami for a wedding. I am in New Zealand next week
leaving on April 7th and returning on April 14th. I have to take my wife for CT scans of her back on the 15th so the zoom
meeting can be rescheduled on the 16th or thereafter but I need to be on the zoom call.
Let me know what dates work for your clients.
Sorry for any inconvenience
Doug

Sent from my iPhone

Douglas  Mancino (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326 DMancino@seyfarth.com |

**1356**

-------------------------------------------------
CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.
-------------------------------------------------

**1357**

# EXHIBIT 77



*I  THE GRA  D CO  RT OF THE CAYMA  ISLA  DS*

*FI  A  CIAL SERVICES DIVISIO*

                                        *CA  SE  O  FSD* 99 *OF*          JAJ

*I  THE MATTER OF SECTIO      OF THE COMPA  IES ACT        REVISIO*

*A  D I   THE MATTER OF CHARITA  LE DAF HOLDCO  LTD*

---

**WI  DI  G  P PETITIO**

---

*TO      T  e Grand Court o  t  e Cayman Islands*

**THE H  M  LE PETITIO**  of the ***Supporting Organisations*** (as defined below) (the
***Petitioners***), in their capacity as members of Charitable DAF Holdco, Ltd (the ***LP***) (and
indirectly by way of separate petition the Charitable DAF Fund, LP (the ***Fund***)) shows that:

**A      I  TROD  CTIO**

1.      The Petitioners respectfully seek:

    (a)      an order pursuant to section 92(e) of the Companies Act (2025 Revision) (the
    ***Act***) that the LP be wound up on the basis that it is just and equitable to do
    so; and

    (b)      the appointment of Margot MacInnis and Sandipan Bhowmik of Grant
    Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard,
    Cricket Square, George Town, Grand Cayman, Cayman Islands as joint
    official liquidators (the ***JOLs***) of the Fund; and/or

    (c)      such other orders as the Court considers to be appropriate.

### *THE F    D*

2. The Fund is a Cayman Islands limited partnership formed on 28 October 2011 (registration number 53083) whose registered office is Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

3. The Fund is governed by the Amended and Restated Limited Partnership Agreement dated 7 November 2011 (the ***ARLPA***).

4. The Fund invests in securities for the purpose of benefiting, directly and indirectly, its Supporting Organisations (as defined below) which support various charitable causes in the U.S., including education, veteran and first responder welfare, medical research, economic and community initiatives, and youth and family programs.

5. The LP is the sole limited partner of the Fund and is a Cayman Islands exempt company incorporated on 27 October 2011 (registration number 263805) whose registered office is Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

6. The LP is governed by the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (the ***Articles***).

7. The general partner of the Fund is (or at least was at the time of the Fund's formation and pursuant to the ARLPA) Charitable DAF GP, LLC (the ***GP***), a Delaware company incorporated on 25 October 2011, whose registered office is Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

*Ownership and Management*

8. The Fund was formed to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code (the **Code**) … for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" (ARLPA, Recitals).

9. The Petitioners understand that exempt entities under section 501(c)(3) of the Code, commonly referred to as charitable organisations, must be operated exclusively for charitable purposes and not for the benefit of private interests. 'Supporting organizations' under section 509(a)(3) of the Code must carry out such exempt purposes by supporting *other* charities.

10. In this context:

(a) The LP holds ninety-nine percent (99%) of the economic interest in the Fund. The other one per cent (1%) in the Fund is held by the GP or its successor as GP.

(b)     The LP issued 305 participation shares (the *Participation Shares*) that are held by four Delaware corporate entities, namely: The Highland Dallas Foundation, Inc. (*HDF*), The Highland Kansas City Foundation, Inc. (*HKCF*), The Highland Santa Barbara Foundation, Inc. (*HSBF*), and The HCMLP Charitable Fund (*HCMLP*) (together, the *Supporting Organisations*).

(c)     Each Supporting Organisation provides funding to its respective U.S. charitable foundation (together, the *Charities*) which are the ultimate beneficial owners of the Fund's entire economic interest.

(d)     The LP also issued 100 management shares (the *Management Shares*) which attach the only voting rights for all shareholders of the LP.  The terms of the ARLPA and the Articles together grant complete management control of the Fund to the holder of the Management Shares, and the holder of the entire issued share capital in the GP (the *Membership Interest*).

11.     The Management Shares and the Membership Interest have at all material times been held by a single individual who, as a result, has sole control of the Fund structure (the *Control Position*).

*C*     *THE PETITIO ERS*

12.     As stated above, the Petitioners (the Supporting Organisations) are non-profit charitable entities exempt from taxation under section 501(c)(3) of the \ Code and through the LP hold 99% of the economic interest in the Fund.

13.     The Supporting Organisations provide funding directly to the Charities as follows:

(a)     HDF holds 32.87% of the Participating Shares. HDF provides funding to The Dallas Foundation, a charitable entity established in Texas in 1929, which has awarded over $1 billion in grants and manages over $500 million in assets.

(b)     HKCF holds 32.87% of the Participating Shares. HKCF provides funding to the Greater Kansas City Community Foundation, a charitable entity established in Kansas in 1978 which has awarded over $7 billion in grants and currently manages over $5 billion in assets.

(c)     HSBF holds 32.787% of the Participating Shares. HSBF provides funding to the Santa Barbara Foundation, a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

(d)     HCMLP holds 1.639% of the Participating Shares. HCMLP provides funding to the North Texas Community Foundation, which manages assets totaling $513 million and donated $38.9 million to local nonprofits in 2023.

14. Since the Fund's inception in 2011, through profits generated by the Fund the Supporting Organisations have granted over $42 million to charitable foundations and have funded $32 million in total commitments, including donations to 275 organisations, with average annual grant payments of $3.7 million.

## D    ACKGRO    D

15. The Fund was created in 2011 on the instructions of James Dondero. Mr Dondero is the President of NexPoint Advisors, L.P. (**NexPoint**), an alternative investment firm registered with the U.S. Securities and Exchange Commission (**SEC**), and the former President of Highland Capital Management, L.P. (**Highland**), also an SEC registered investment advisor which he founded in 1993. Mr Dondero is a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles he utilises to donate such funds to charitable organisations. Mr Dondero holds no ownership or control stake in the Fund or any related entities, although he sits on the boards of the Supporting Organisations.

16. From the Fund's formation until March 2021, the Control Position was held by Grant Scott. On 25 March 2021, Mr Scott: (i) resigned as director of the Fund and the LP, (ii) appointed Mark Patrick as director of the Fund and the LP, and (iii) transferred to Mr Patrick the Management Shares in the LP and Management Interest in the GP.  Mr Patrick therefore assumed the Control Position from that date.

17. From 2008 to 2021, Mr Patrick was employed as tax counsel by Highland Capital Management, LP (**Highland**), an investment advisor founded by Mr Dondero. From March 2021 to October 2024, Mr Patrick was employed as tax counsel by Skyview Group (**Skyview**). In both positions, Mr Patrick acted as an advisor to Mr Dondero and entities owned or affiliated to him.

18. On 22 April 2021, Paul Murphy, a Cayman Islands resident, was appointed as director of the LP.

19. On 16 October 2019, Highland filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code in the Northern District of Texas (the **Highland Bankruptcy**). The Highland Bankruptcy plan was confirmed in February 2021, and the estate remains open as it makes distributions to creditors.

## E    *EVE   TS FOLLOWI   G MR PATRICK S ASS   MPTIO    OF THE CO   TROL POSITIO*

20. Since assuming the Control Position, Mr Patrick has used that position to advance his own interests to the detriment of the LP, the Fund, the Supporting Organisations and the Charities.

*Non-disclosure of personal interest in grant*

21. In June 2023, Mr Patrick made a request that the Highland Dallas Foundation (i.e. the Supporting

Organization that supports the Dallas Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, it was discovered that the directors of the entity were Mr Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr Patrick had made the grant request without disclosing his and/or his family's involvement.

22. The grant payment was authorised on 5 September 2023, but Mr Patrick was informed that further payments were unlikely.

*Attempt to obtain secret profit*

23. In September 2023, Mr Dondero was contacted by Kevin Cronin of Fortaris Capital Advisors (**Fortaris**), a firm providing litigation support and investigative services which, at the time, was engaged by the Fund on an unrelated matter.

24. Mr Cronin disclosed to Mr Dondero that Mr Patrick had approached him with a proposition whereby Mr Patrick (on behalf of the Fund) would engage an entity controlled by Mr Cronin (other than Fortaris) at a monthly fee of between US$25,000 and US$50,000, and that this fee would be split between Fortaris and Mr Patrick as a supplement to Mr Patrick's compensation.

25. Mr Cronin refused Mr Patrick's proposal.

26. Mr Patrick's attempt to obtain a secret, undisclosed personal profit from the Fund would, if successful, have constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. It was otherwise a breach of Mr Patrick's duties to the LP and, through the LP, to the Fund.

*Unauthorised use of MNPI / Insider Trading*

27. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (**MNPI**) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities and other laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (the **Compliance Policy**). NexPoint and its affiliates, and Skyview, require their employees to abide by the Compliance Policy at all times and employees are required to confirm in writing each quarter that they will not use MNPI while trading. Mr Patrick completed an annual 2023, Q4 2023, Q1 2024 and Q2 2024 certifications, among others.

28. In late August 2024, Mr Patrick contacted the attorneys to the Dallas Foundation to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr Patrick through his employment at Skyview and constituted MNPI. On the basis of this MNPI, Mr Patrick advised the Dallas Foundation to

exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

29. Upon receipt of the allegations against Mr Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr Patrick's knowledge, so as to avoid potentially tipping off Mr Patrick. The investigation concluded that Mr Patrick's actions constituted a serious breach of his compliance and employee obligations and that Mr Patrick had attempted a serious breach of U.S. securities laws.

30. Mr Patrick resigned from Skyview immediately before the internal investigation was finalised. At the same time, he terminated the Fund's services agreement with Skyview. That termination was not in the interests of the Fund, was for Mr Patrick's own self-protection and was otherwise a breach of Mr Patrick's duties to the LP and, through the LP, to the Fund.

*Financial Irregularities in the Fund / Unexplained Expenditure*

31. A review of the Fund's financial records conducted by Skyview covering the calendar years ending 2018 to 2023 and the first half of 2024 showed significant increases in expenditures, notably:

   (a) **Directors ees**, which increased from US$40,000 in 2022 to almost US$600,000 in 2023, and in the first half of 2024 alone, increased further to around US$2.25 million; and

   (b) **E penses overall**, which for the first half of 2024 were around US$18.3 million, with a further US$18.6 million being spent in the calendar year 2023.

32. In October 2024, the Charities requested that Mr Patrick provide financial information about the Fund entities to seek to understand these increases in expenditures. This information was not provided.

33. In November 2024, Holland and Knight (**H&K**), the Charities' US attorneys, delivered a letter to Mr Murphy from the Charities advising that the Charities no longer had confidence in the governance of the Fund and considered that a reorganisation was required (the **No Confidence Letter**). No response to the No Confidence Letter was received.

34. In January 2025, further correspondence was sent to Mr Patrick and Mr Murphy advising that a better understanding of the Fund's asset position was needed and expressing serious concern that the Charities' requests for information continued to be disregarded, reflecting an ongoing lack of transparency on the part of Mr Patrick and Mr Murphy. Mr Murphy responded via email to this request noting that he and Mr Patrick would "*present directly to the foundations/supporting organisations*" to address some of the concerns in the No Confidence Letter.

35.    H&K responded to Mr Murphy's email noting, *inter alia*, that the Supporting Organisations had legitimate concerns and highlighted that "*the last information they received from in July of 2024, before Mr Patrick shut down [communication] showed that legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022*" (a 300% increase, if annualized) and "*director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024*" (a 12,400% increase, if annualized).

36.    In February 2025, further correspondence was sent between H&K and Douglas Mancino (**Mr Mancino**) of Seyfarth Shaw LLP (**Seyfarth**), US counsel purporting to act for the Fund, whereby Seyfarth rejected the reported increases in legal and directors' fees and provided a valuation of the Fund from 2020 to support the suggestion that similar information was provided to the Charities when Mr Scott was in the Control Position. It is clear that Mr Patrick and/or Mr Murphy has instructed Seyfarth, purportedly on behalf of the Fund, to take a hostile, indignant and non-neutral stance when faced with reasonable requests on behalf of the Charities, as ultimate beneficiaries of the assets of the Fund. Such conduct is a breach of their duties to the LP and, through the LP, to the Fund.

37.    H&K responded to Seyfarth that the Charities were becoming frustrated by the ongoing lack of transparency and refusal to respond to simple inquiries about the financial position and governance of the Fund. Seyfarth sent an email to H&K requesting available dates for Mr Murphy to make the promised presentation to the Charities. The next day, H&K suggested three potential dates/times for such a call between 26 March and 3 April 2025, but did not receive any response. On 3 April 2025, Seyfarth sent an email to H&K stating that they had just learned that a call was scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried the source of confusion. Seyfarth has made no further efforts to schedule the meeting, nor has it otherwise provided any of the requested financial information.

*Replacement of GP without notification*

38.    In February 2025, H&K discovered that Mr Patrick had redomiciled and replaced the general partner of the Fund, without notice to the Charities, almost one year prior.

39.    On 27 February 2024, CDH GP, Ltd (the **New GP**) was incorporated in the Cayman Islands (registration number 407515) with its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

40.    Mr Patrick is the sole director of the New GP.

*Sale of assets*

41.    Following Mr Patrick's resignation from Skyview and his termination of Skyview's services agreement with the Fund, the Petitioners have become aware that assets of the Fund have been

sold without explanation, at values which appear to be below-market.

*Hunter Mountain*

42.     In February 2025, an individual associated with Mr Patrick, Shawn Raver, asked for the in-bound wire instructions for one of Mr Dondero's affiliates that owned a position in a trust called Hunter Mountain. Hunter Mountain is an indirect majority owned subsidiary of the Fund and owns the majority of the distribution rights of the equity position in the Highland Bankruptcy. The residual value of the Highland estate should be distributed to Hunter Mountain at the close of the Highland Bankruptcy.

43.     According to Hunter Mountain's own filings, this value has been calculated in excess of $100 million gross, with approximately $17 million net value. After additional inquiries from accounting staff, Mr Raver disclosed that the entire Hunter Mountain position had been sold, at potentially a substantial undervalue, to an unidentified party for $1 million. The Fund has not disclosed the identity of the purchaser.  In the absence of a further or better explanation, there is the inference of self-dealing, fair dealing, no profit or conflict rules

*Atlas IDF, L.P.*

44.     Atlas IDF, L.P. is a fund controlled by its general partner Atlas IDF GP, LLC, a wholly owned subsidiary of the Fund.  The economic beneficiaries of Atlas IDF are the holders of annuity policies issued by Crown Global Insurance Company.  The majority annuity policyholder is Empower Dallas Foundation (**EDF**), a charitable foundation for which Mr Dondero serves as President whose purpose is to benefit the Dallas Foundation.

45.     On 20 February 2025, Mr Patrick in his capacity as the general partner of Atlas IDF GP, LLC, sent a letter to Crown Global Insurance advising of the intention to dissolve Atlas in accordance with the partnership agreement dated 30 November 2015 on the basis of:

(a)     concerns about the long-term availability and viability of back-office support;

(b)     unsuccessful efforts to sell the defaulted Notes issued by HCRE Partners (one of Mr Donero's affiliates) dated 7 May 2014 in the amount of $2.3M and 27 May 2014 in the amount of $5M, held by the Partnership; and

(c)     the decision by an affiliate of the GP to purchase the Notes at a price above their appraised value of zero dollars to facilitate an orderly wind-up.

46.     At the time, the amounts outstanding on the two Notes, including accumulated interest, were in excess of $13M. The intention was to sell the Notes collectively for $500,000.  Mr Patrick launched litigation related to these Notes prior to the 20 February 2025 and attempted sale of the Notes to

an affiliate.

47.    On 27 February 2025, H&K as counsel for EDF (the policyholder), sent an email to Crown Global advising that the foundation was gathering information and requested that Crown Global therefore withdraw its consent to the proposed sale of the Notes.

48.    On 28 February 2025, Mr Patrick sent a further letter to Crown Global noting the revocation of consent to sell the Notes, and further noting that: "*in addition to the purchase of the "Notes" for $500,000, we also intend to include a provision in the purchase and sale documents that, if the Notes are repaid in full within 12 months, all amounts received (minus fees and expenses of collection and purchase price) will be remitted to you as the sole limited partner of Atlas IDF, LP.*" The initial zero valuation and proposed $500,000 sale price is commercially unjustifiable.

*Attorney General Investigation*

49.    The Petitioners have been informed that on 14 March 2025, the Texas Attorney General (**Texas AG**) commenced an investigation into Charitable DAF GP, LLC (the Fund's former general partner) in relation to the organisation, conduct and management of Charitable DAF GP, LLC, and its related entities.

50.    It is understood that the Texas AG has the power to investigate a charity, should it deem necessary, to determine whether a charity is complying with Texas law.

51.    The Charities have requested information about the investigation from the Texas AG, but do not have knowledge of any further details.

**F    GROUNDS FOR WINDING UP**

52.    The Supporting Organizations bring this Petition based on the multiple concerns identified above about the governance of the LP and the Fund, including potential mismanagement of assets and/or use of assets for purposes other than to benefit and support the Charities, as the ultimate beneficial owners of the Fund's interest, in carrying out their charitable purposes, in accordance with the terms of the ARLPA, on the basis of a complete breakdown in confidence in the person in the Control Position.

53.    Accordingly, the Petitioners seek a winding up of the LP on a just and equitable basis and in particular, without limitation, on the following grounds (each discussed in detail below):

(a)    governance issues and mismanagement; and

(b)    the need for an investigation into the recent activities and expenditure of the Fund; and

(c)    justifiable loss of faith and confidence in the management of the Fund.

*F*   ***APPLICATIO***

54.   Given the above, the Petitioners seek an order that the LP be wound up pursuant to section 92(e) of the Act.

55.   The Petitioners also seek an order appointing Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands, as the joint official liquidators (*JOLs*) of the LP.

56.   Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd:

(a)   are "qualified insolvency practitioners" as defined in section 89 of the Act and as prescribed by Regulation 4 of the Insolvency Practitioners' Regulations (2023 Consolidation) (*IPR*);

(b)   meet the residency requirements contained in Regulation 5 of the IPR;

(c)   meet the independence requirements prescribed by Regulation 6 of the IPR;

(d)   meet the insurance requirements prescribed by Regulation 7 of the IPR and A&M holds a trade licence which authorises its staff to carry on business as professional insolvency practitioners; and

(e)   consent to their appointment as official liquidators of the LP, if so appointed by the Court.

***YO  R PETITIO  ERS THEREFORE H  M  LY PRAY THAT*** –

1.   The LP be wound up by the Court in accordance with section 92(e) of the Act.

2.   Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands be appointed as the joint official liquidators (the *JOLs*) of the LP.

3.   The JOLs be authorized to act jointly and severally in their capacity as liquidators of the LP.

4.   The JOLs shall not be required to give security for their appointment.

5.   In addition to their powers prescribed in Part II of the Third Schedule to the Act, which are exercisable without sanction of this Honourable Court, the JOLs may also without further sanction or intervention from this Honourable Court exercise the following powers set out in Part I of the Third Schedule to the Act:

(a)   The power to engage staff, agents and/or consultants (whether or not as employees of the LP) in the Cayman Islands and elsewhere to assist the JOLs in the performance of their

functions; and

    (b)    The power to engage attorneys and other professionally qualified persons in the Cayman Islands and elsewhere to assist the JOLs in the performance of their functions.

6.    The JOLs be authorised to do any act or thing considered by them to be necessary or desirable in connection with the liquidation of the LP.

7.    The JOLs' remuneration and expenses be paid out of the assets of the LP in accordance with section 109 of the Act, Part III of the Regulations, and CWR Order 20.

8.    The costs of this Petition shall be paid out of the assets of the LP as an expense in the liquidation, such costs to be taxed if not agreed with the JOLs.

9.    The JOLs shall be at liberty to apply to further directions concerning their functions and the exercise or the proposed exercise of their powers.

10.    Such further or other orders and directions be made as the Court shall deem fit.

**A D** your Petitioners will ever pray etc.

Dated 10 April 2025

*Johnstone Law* (signature)

_____

**Jo nstone La  Ltd**

            **OTE**  This Petition is intended to be served on:

    **CHARITA  LE DAF HOLDCO  LTD** at its registered office at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands

.

**THIS PETITIO**  was presented by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Re  AJ RZ**   )

### *OTICE OF HEARI G*

**TAKE  OTICE THAT** the hearing of this Petition will take place at the Law Courts, George Town, Grand Cayman, Cayman Islands on  April 29 2025   at 2:00pm ~~am.~~

Any correspondence or communication with the Court related to the hearing of this Petition should be addresses to the Registrar of the Financial Services Division of the Grand Court at PO Box 495, George Town, Grand Cayman, KY1-1106, Cayman Islands.

# EXHIBIT 78

**CAYMAN ISLANDS**



# COMPANIES ACT

## (2025 Revision)

**Supplement No. 3 published with Legislation Gazette No. 6 dated 28th January, 2025.**

# PUBLISHING DETAILS

Cap. 22 [Law 3 of 1961 and 12 of 1962] of the 1963 Revised Edition of the Laws consolidated with Laws 12 of 1962, 9 of 1966, 1 of 1971, 7 of 1973, 24 of 1974, 25 of 1975, 19 of 1977, 16 of 1978, 6 of 1980, 21 of 1981, 34 of 1983, 2 of 1984, 22 of 1984, 15 of 1985, 38 of 1985, 24 of 1987, 14 of 1988, 14 of 1989, 10 of 1990, 3 of 1991, 23 of 1991 (part), 11 of 1992, 3 of 1993, 23 of 1993, 33 of 1993, 2 of 1994, 8 of 1994, 14 of 1996, 26 of 1997, 4 of 1998, 6 of 1998, 20 of 1998 (part), 5 of 1999, 7 of 2000 (part), 5 of 2001, 10 of 2001, 29 of 2001, 46 of 2001, 22 of 2002, 26 of 2002, 28 of 2003, 13 of 2006, 15 of 2007, 12 of 2009, 33 of 2009, 37 of 2010, 16 of 2011, 29 of 2011, 6 of 2012, 14 of 2012, 29 of 2012, 1 of 2013, 6 of 2013, 14 of 2015, 3 of 2016, 2 of 2017, 42 of 2017, 37 of 2018, 46 of 2018, 10 of 2019, 4 of 2020, 19 of 2020 and Acts 56 of 2020, 60 of 2020, 6 of 2021, 15 of 2023, 11 of 2024 and the Companies (Amendment of Schedule) Order, 2011, Schedule 4 of the Companies Law Departmental Notice, 2015, Schedule 4 of the Companies Law Departmental Notice, 2017, the Companies (Amendment of Section 254) Regulations, 2022, the Companies (Amendment of Schedule 4) Order, 2023, the Companies (Amendment of Schedule 5) Order, 2023 and the Companies (Amendment of Schedule 5) Order, 2024.

Revised under the authority of the *Law Revision Act (2020 Revision)*.

Originally enacted —

| | |
|---|---|
| Cap. 22-1st January, 1964 | Law 10 of 2001-25th May, 2001 |
| Law 9 of 1966-14th March, 1966 | Law 29 of 2001-26th September, 2001 |
| Law 1 of 1971-15th December, 1970 | Law 46 of 2001-14th January, 2002 |
| Law 7 of 1973-28th June, 1973 | Law 22 of 2002-5th December, 2002 |
| Law 24 of 1974-22nd November, 1974 | Law 26 of 2002-5th December, 2002 |
| Law 25 of 1975-9th December, 1975 | Law 28 of 2003-3rd December, 2003 |
| Law 19 of 1977-10th November, 1977 | Law 13 of 2006-1st June, 2006 |
| Law 16 of 1978-8th September, 1978 | Law 15 of 2007-17th September, 2007 |
| Law 6 of 1980-17th March, 1980 | Law 12 of 2009-20th March, 2009 |
| Law 21 of 1981-13th October, 1981 | Law 33 of 2009-2nd December, 2009 |
| Law 34 of 1983-24th November, 1983 | Law 37 of 2010-15th September, 2010 |
| Law 2 of 1984-28th February, 1984 | Law 16 of 2011-11th April, 2011 |
| Law 22 of 1984-7th September, 1984 | Law 29 of 2011-18th November, 2011 |
| Law 15 of 1985-24th May, 1985 | Law 6 of 2012-29th August, 2012 |
| Law 38 of 1985-19th December, 1985 | Law 14 of 2012-31st August, 2012 |
| Law 24 of 1987-17th November, 1987 | Law 29 of 2012-19th November, 2012 |
| Law 14 of 1988-9th September, 1988 | Law 1 of 2013-10th January, 2013 |



Law 14 of 1989-5th September, 1989

Law 10 of 1990-18th July, 1990

Law 3 of 1991-21st February, 1991

Law 23 of 1991-12th December, 1991

Law 11 of 1992-13th July, 1992

Law 3 of 1993-26th March, 1993

Law 23 of 1993-29th September, 1993

Law 33 of 1993-29th November, 1993

Law 2 of 1994-9th March, 1994

Law 8 of 1994-23rd September, 1994

Law 14 of 1996-5th September, 1996

Law 26 of 1997-9th March, 1998

Law 4 of 1998-4th March, 1998

Law 6 of 1998-9th March, 1998

Law 20 of 1998-15th February, 1999

Law 5 of 1999-14th April, 1999

Law 7 of 2000- 20th July, 2000

Law 5 of 2001-20th April, 2001

Law 6 of 2013-15th March, 2013

Law 14 of 2015-12th August, 2015

Law 3 of 2016-6th May, 2016

Law 2 of 2017-27th February, 2017

Law 42 of 2017-16th November, 2017

Law 37 of 2018-22nd November, 2018

Law 46 of 2018-17th December, 2018

Law 10 of 2019-26th July, 2019

Law 4 of 2020-31st January, 2020

Law 19 of 2020-20th May, 2020

Act 56 of 2020-7th December, 2020

Act 60 of 2020-16th December, 2020

Act 6 of 2021-8th December, 2021

Act 15 of 2023-23rd November, 2023

Act 11 of 2024-11th December, 2024

Consolidated and revised this 1st day of January, 2025.

*Note (not forming part of this Act): This revision replaces the 2023 Revision which should now be discarded.*

83.    Execution of deeds, etc., by attorney ...................................................68
84.    Power of company to have official seal for use abroad ........................68
85.    Authentication of documents ................................................................69
**Arrangements and Reconstructions**                                              **69**
86.    Power to compromise with creditors and members ...............................69
87.    Provisions for facilitating reconstruction and amalgamation of companies ............70
88.    Power to acquire shares of dissentient shareholders ...........................71

# PART 5 - Company Restructuring and Winding up of Companies and Associations

**Preliminary**                                                                   **72**
89.    Definitions...........................................................................................72
90.    Alternative modes of winding up .........................................................73
91.    Jurisdiction of the Court .....................................................................73
**Company Restructuring**                                                         **74**
91A.   Interpretation of "company" ................................................................74
91B.   Appointment of a restructuring officer .................................................74
91C.   Appointment of an interim restructuring officer ...................................75
91D.   Restructuring officer...........................................................................76
91E.   Variation or discharge of the order appointing a restructuring ..............76
91F.   Removal and replacement of restructuring officers ..............................77
91G.   Stay of proceedings ...........................................................................78
91H.   Enforcement of creditors' security .......................................................78
91I.   Power to compromise with creditors and members within restructuring officer proceeding.......79
91J.   Provisions for facilitating reconstruction and amalgamation of companies ..............80
**Winding up by the Court**                                                       **81**
92.    Circumstances in which a company may be wound up by the Court ........81
93.    Definition of inability to pay debts......................................................81
94.    Application for winding up ...................................................................81
95.    Powers of the Court ............................................................................82
96.    Power to stay or restrain proceedings..................................................84
97.    Avoidance of attachments and stay of proceedings .............................84
98.    Notice of winding up order ..................................................................84
99.    Avoidance of property dispositions, etc. ..............................................85
100.   Commencement of winding up by the Court .........................................85
101.   Company's statement of affairs...........................................................85
102.   Investigation by liquidator ..................................................................86
103.   Duty to co-operate and the private examination of relevant persons ........87
**Official Liquidators**                                                          **88**
104.   Appointment and powers of provisional liquidator ...............................88
105.   Appointment of official liquidator ........................................................89
106.   Appointment of joint liquidators ..........................................................89
107.   Removal of official liquidators .............................................................89
108.   Qualifications of official liquidators .....................................................89
109.   Remuneration of official liquidators and restructuring officers.................89
110.   Function and powers of official liquidators...........................................90



Companies Act (2025 Revision)                                    Arrangement of Sections

**General Powers of the Court**                                                  **91**
111.   Power to stay winding up ........................................................................91
112.   Settlement of list of contributories ...........................................................91
113.   Power to make calls...............................................................................92
114.   Inspection of documents by creditors, etc. ................................................92
115.   Meetings to ascertain wishes of creditors or contributories ....................92
**Voluntary Winding up**                                                         **93**
116.   Circumstances in which a company may be wound up voluntarily.........................93
117.   Commencement of winding up.................................................................93
118.   Effect on business and status of the company ..........................................94
119.   Appointment of voluntary liquidator ........................................................94
120.   Qualifications of voluntary liquidators .....................................................95
121.   Removal of voluntary liquidators ............................................................95
122.   Resignation of voluntary liquidator .........................................................95
123.   Notice of voluntary winding up ...............................................................96
124.   Application for supervision order ............................................................96
125.   Avoidance of share transfers .................................................................96
126.   General meeting at year's end ................................................................97
127.   Final meeting prior to dissolution ............................................................97
128.   Effect of winding up on share capital of company limited by guarantee .................97
129.   Reference of questions to Court .............................................................98
130.   Expenses of voluntary winding up ..........................................................98
**Winding up subject to the supervision of the Court**                           **98**
131.   Application for supervision order.............................................................98
132.   Appointment of official liquidator ............................................................99
133.   Effect of supervision order ....................................................................99
**Offences of fraud, etc.**                                                      **99**
134.   Fraud, etc. in anticipation of winding up .................................................99
135.   Transactions in fraud of creditors .........................................................100
136.   Misconduct in course of winding up .....................................................100
137.   Material omissions from statement relating to company's affairs ...................101
**General provisions**                                                           **101**
138.   Getting in the company's property..........................................................101
139.   Provable debts ..................................................................................102
140.   Distribution of the company's property ...................................................102
141.   Preferential debts ..............................................................................102
142.   Secured creditors ..............................................................................103
143.   Preferential charge on goods distrained................................................103
144.   Effect of execution or attachment .........................................................103
145.   Voidable preference...........................................................................104
146.   Avoidance of dispositions made at an undervalue...................................104
147.   Fraudulent trading .............................................................................105
148.   Supply of utilities...............................................................................105
149.   Interest on debts ...............................................................................106
150.   Currency of the liquidation ..................................................................106
**Dissolution of a Company**                                                     **107**
151.   Dissolution following voluntary winding up .............................................107
152.   Dissolution following winding up by the Court .........................................107
153.   Unclaimed dividends and undistributed assets........................................107



**Insolvency rules and regulations**      **108**
154. Insolvency Rules Committee .................................................................108
155. Powers of the Insolvency Rules Committee ........................................108

### PART 6 - Removal of Defunct Companies

156. Company not operating may be struck off register ..............................109
156A. Striking off for failure to pay fine ...................................................109
157. Company being wound up may be struck off register for want of liquidator, etc. ...............109
158. Registrar to publish fact of company being struck off register.............109
159. Company, member or creditor may apply to court for company to be reinstated ...................110
160. Liability of members of company to remain .........................................110
161. Registrar not liable for any act performed under this Part.....................110
162. Vesting of property .............................................................................111

### PART 7 - Exempted Companies

163. What companies may apply to be registered as exempted companies...................111
164. Registration of exempted companies ..................................................111
165. Declaration by proposed company......................................................111
166. Shares shall be non-negotiable..........................................................111
167. *Repealed* ..........................................................................................111
168. Annual return .....................................................................................111
169. Annual fee .........................................................................................112
170. Failure to comply with section 168 or 169 ..........................................112
171. Registrar to give notice .....................................................................112
172. False statement in declaration ...........................................................112
173. Penalty for false declaration...............................................................113
174. Prohibited enterprises.........................................................................113
175. Prohibited sale of securities................................................................113
176. Penalty for carrying on business contrary to this Part...........................113
177. Electronic business by exempted companies........................................114

### PART 8 - Exempted Limited Duration Companies

178. Exempted company may apply to be registered as an exempted limited duration company..........................................114
179. Registration as an exempted limited duration company ........................114
180. Contents of articles of association ......................................................115
181. Cancellation of registration ................................................................115
182. Electronic business by exempted limited duration companies ................116

### PART 8A - Special Economic Zone Companies

182A. Exempted company may apply to be registered as a special economic zone company .........116
182B. Registration as a special economic zone company ...............................117
182C. Cancellation of registration ................................................................117



Arrangement of Sections                        Companies Act (2025 Revision)

## SCHEDULE 3                                                                181

**Powers of Liquidators**                                                   **181**
**PART 1** .................................................................................181
**Powers exercisable with sanction**                                        **181**
**PART 2** .................................................................................182
**Powers exercisable without sanction**                                     **182**

## SCHEDULE 4                                                                183

**APPROVED STOCK EXCHANGES**                                                **183**

## SCHEDULE 5                                                                186

**FEES**                                                                    **186**
**PART 1** .................................................................................186
**PART 1A** ...............................................................................186
**PART 1B** ...............................................................................187
**PART 2** .................................................................................187
**PART 3** .................................................................................187
**PART 3A** ...............................................................................188
**PART 4** .................................................................................188
**PART 5** .................................................................................189
**PART 6** .................................................................................189
**PART 6A** ...............................................................................189
**PART 7** .................................................................................190
**PART 8** .................................................................................190
**PART 9** .................................................................................191

## ENDNOTES                                                                  193

Table of Legislation history:.......................................................193



(4)    In this section —

"**dissenting shareholder**" includes a shareholder who has not assented to the scheme or contract and any shareholder who has failed or refused to transfer that person's shares to the transferee company, in accordance with the scheme or contract.

# PART 5 - Company Restructuring and Winding up of Companies and Associations

## Preliminary

## Definitions

**89**.   In this Part —

"**company**" includes a foreign company in respect of which the Court has made a winding up order;

"**contributory**" means —

(a)    every person liable by virtue of section 49 to contribute to the assets of a company in the event that it is wound up under this Act; and

(b)    every holder of fully paid up shares of a company;

"**controller**" means a person appointed by the Authority pursuant to the regulatory laws to take control of a company;

"**document**" includes any device by means of which information is recorded or stored;

"**foreign company**" means any body corporate incorporated outside the Islands;

"**foreign practitioner**" means a person who is qualified under the law of a foreign country to perform functions equivalent to those performed by official liquidators under this Act or by trustees in bankruptcy under the *Bankruptcy Act (1997 Revision)*;

"**limited partnership**" means an ordinary limited partnership registered in accordance with section 49 of the *Partnership Act (2024 Revision)* or an exempted limited partnership registered in accordance with section 9 of the *Exempted Limited Partnership Act (2021 Revision)*;

"**official liquidator**" means the liquidator of a company which is being wound up by order of the Court or under the supervision of the Court and includes a provisional liquidator;

"**prescribed**" means prescribed by the Insolvency Rules Committee;



"**professional service provider**" means a person who contracts to provide general managerial or administrative services to a company on an annual or continuing basis;

"**qualified insolvency practitioner**" means a person holding the qualifications specified in the regulations made by the Insolvency Rules Committee under section 155 or such other qualifications as the Court considers appropriate for the conduct of the winding up of a company;

"**Rules**" mean rules prescribed by the Insolvency Rules Committee;

"**shadow director**" means, in relation to a company, any person in accordance with whose directions or instructions the directors of the company are accustomed to act, but the person is not deemed to be a shadow director by reason only that the directors act on advice given by that person in a professional capacity; and

"**winding up order**" includes an order that a voluntary winding up continue under the supervision of the Court and references to a company being wound up by the Court includes a company which is being wound up under the supervision of the Court.

## Alternative modes of winding up

**90**.　A company may be wound up —

    (a)　compulsorily by order of the Court;

    (b)　voluntarily —

        (i)　by virtue of a special resolution;

        (ii)　because the period, if any, fixed for the duration of the company by its articles of association has expired; or

        (iii)　because the event, if any, has occurred, on the occurrence of which its articles of association provide that the company shall be wound up; or

    (c)　under the supervision of the Court.

## Jurisdiction of the Court

**91**.　The Court has jurisdiction to make winding up orders in respect of —

    (a)　an existing company;

    (b)　a company incorporated and registered under this Act;

    (c)　a body incorporated under any other law; and

    (d)　a foreign company which —

        (i)　has property located in the Islands;

        (ii)　is carrying on business in the Islands;

        (iii)　is the general partner of a limited partnership; or



     (iv)  is registered under Part 9.

# Company Restructuring

## Interpretation of "company"

**91A**. For the purposes of sections 91B, 91C, 91D, 91E, 91F, 91G, 91H, 91I and 91J, "**company**" means —

    (a)  any company liable to be wound up under section 91; or

    (b)  any other entity or partnership to which the provisions of this Part apply in respect of the entity's or partnership's winding up.

## Appointment of a restructuring officer

**91B.**(1)  A company may present a petition to the Court for the appointment of a restructuring officer on the grounds that the company —

    (a)  is or is likely to become unable to pay its debts within the meaning of section 93; and

    (b)  intends to present a compromise or arrangement to its creditors (or classes thereof) either, pursuant to this Act, the law of a foreign country or by way of a consensual restructuring.

(2)  A petition under subsection (1) may be presented by a company acting by its directors, without a resolution of its members or an express power in its articles of association.

(3)  The Court may, on hearing a petition under subsection (1) —

    (a)  make an order appointing a restructuring officer;

    (b)  adjourn the hearing conditionally or unconditionally;

    (c)  dismiss the petition; or

    (d)  make any other order as the Court thinks fit, except an order placing the company into official liquidation, which the Court may only make in accordance with sections 92 and 95 if a winding up petition has been presented in accordance with sections 91G and 94.

(4)  A restructuring officer appointed by the Court under subsection (3)(a) shall have the powers and carry out only such functions as the Court may confer on the restructuring officer in the order appointing the restructuring officer, including the power to act on behalf of the company.

(5)  Where the Court makes an order under subsection (3)(a), the Court shall set out in the order —

    (a)  the manner and time within which the restructuring officer shall give notice of the restructuring officer's appointment to —



      (i)   the company's creditors, including any contingent or prospective creditors;

      (ii)  the company's contributories; and

      (iii) the Authority, in respect of any company which is carrying on regulated business;

   (b)   the manner and extent to which the powers and functions of the restructuring officer shall affect and modify the powers and functions of the board of directors; and

   (c)   any other conditions to be imposed on the board of directors that the Court considers appropriate, in relation to the exercise by the board of directors of its powers and functions.

(6)   Where a company which is carrying on a regulated business presents a petition under subsection (1), the directors of the company shall, immediately after presenting the petition, serve notice of the petition on the Authority.

(7)   A director who fails to comply with subsection (6) commits an offence and is liable to a fine of ten thousand dollars.

## Appointment of an interim restructuring officer

**91C.**(1)   A company may, where it is in the interests of the company to do so, make an *ex parte* application to the Court for the appointment of a restructuring officer on an interim basis pending the hearing of the petition under section 91B(1).

(2)   An application under subsection (1) may be presented by a company acting by its directors without a resolution of its members or an express power in its articles of association.

(3)   The Court may, on hearing an application under subsection (1), appoint a restructuring officer on an interim basis, on such terms and conditions as the Court thinks fit.

(4)   A restructuring officer appointed on an interim basis by the Court under subsection (3) shall have the powers and carry out only such functions as the Court may confer on that restructuring officer in the order appointing the restructuring officer, including the power to act on behalf of the company.

(5)   Where the Court makes an order under subsection (3), the Court shall set out in the order —

   (a)   the manner and time within which the restructuring officer shall give notice of the restructuring officer's appointment to —

      (i)   the company's creditors, including any contingent or prospective creditors;

      (ii)  the company's contributories; and



(iii) the Authority, in respect of any company which is carrying on regulated business;

(b) the manner and extent to which the powers and functions of the restructuring officer shall affect and modify the powers and functions of the board of directors; and

(c) any other conditions to be imposed on the board of directors that the Court considers appropriate, in relation to the exercise by the board of directors of its powers and functions.

(6) Where a company which is carrying on a regulated business makes an application under subsection (1), the directors of the company shall, immediately after making the application, serve notice of the application on the Authority.

(7) A director who fails to comply with subsection (6), commits an offence and is liable to a fine of ten thousand dollars.

## Restructuring officer

**91D.**(1) A restructuring officer appointed under section 91B or 91C shall be a qualified insolvency practitioner.

(2) Where two or more persons are appointed as restructuring officers under section 91B or 91C, they shall be authorised to act jointly and severally, unless their powers are expressly limited by an order of the Court.

(3) A restructuring officer appointed under section 91B or 91C is an officer of the Court.

(4) Notwithstanding subsection (1), where the Court has appointed a qualified insolvency practitioner to act as a restructuring officer, the Court may appoint a foreign practitioner to act as a restructuring officer in addition to the qualified insolvency practitioner.

(5) A foreign practitioner appointed by the Court to act as a restructuring officer shall not act as the sole restructuring officer of a company.

(6) The remuneration of a restructuring officer appointed under section 91B or 91C shall, on the application of the restructuring officer, be fixed by the Court from time to time in accordance with section 109.

(7) A restructuring officer, a creditor of the company, including a contingent or prospective creditor, or a contributory of the company may apply to the Court to determine any question arising in the course of carrying out the restructuring officer's functions.

## Variation or discharge of the order appointing a restructuring

**91E.**(1) At any time after the appointment of a restructuring officer by the Court under section 91B or 91C —



(a)  the company acting by its directors;

(b)  a restructuring officer appointed under section 91B or 91C;

(c)  a creditor of the company, including a contingent or prospective creditor;

(d)  a contributory of the company; or

(e)  the Authority, in respect of any company which is carrying on a regulated business,

may apply by way of summons to the Court for the variation or discharge of the order appointing the restructuring officer.

(2)  An application under subsection (1)(a) may be presented by a company acting by its directors without a resolution of its members or an express power in its articles of association.

(3)  The Court may, on hearing an application under subsection (1) —

(a)  vary the order appointing the restructuring officer;

(b)  discharge or continue the order appointing the restructuring officer;

(c)  adjourn the hearing conditionally or unconditionally;

(d)  dismiss the application; or

(e)  make any other order as the Court thinks fit, except an order placing the company into official liquidation, which the Court may only make in accordance with sections 92 and 95 if a winding up petition has been presented in accordance with sections 91G and 94.

## Removal and replacement of restructuring officers

**91F.** (1)  A restructuring officer may be removed from office and replaced by an alternative restructuring officer by order of the Court made on the application of —

(a)  the company acting by its directors;

(b)  a creditor of the company, including a contingent or prospective creditor;

(c)  a contributory of the company; or

(d)  the Authority, in respect of any company which is carrying on a regulated business.

(2)  An application under subsection (1)(a) may be presented by a company acting by its directors without a resolution of its members or an express power in its articles of association.

(3)  A restructuring officer who has been removed and replaced pursuant to subsection (1) shall prepare a report and accounts for the restructuring officer replacing the removed restructuring officer, within twenty-one days of the date of removal and replacement.



## Stay of proceedings

**91G.**(1)  At any time —

    (a)  after the presentation of a petition for the appointment of a restructuring officer under section 91B, but before an order for the appointment of a restructuring officer is made, and when the petition has not been withdrawn or dismissed; and

    (b)  when an order for the appointment of a restructuring officer is made, until the order appointing the restructuring officer has been discharged,

no suit, action or other proceedings, other than criminal proceedings, shall be proceeded with or commenced against the company, no resolution shall be passed for the company to be wound up and no winding up petition may be presented against the company, except with the leave of the Court and subject to such terms as the Court may impose.

(2)  Where at any time referred to in subsection (1), there are criminal proceedings pending against the company in a summary court, the Court, the Court of Appeal or the Privy Council —

    (a)  the company acting by its directors;

    (b)  a creditor of the company, including a contingent or prospective creditor;

    (c)  a contributory of the company; or

    (d)  the Authority, in respect of any company which is carrying on regulated business,

may apply to the court in which the proceedings are pending for a stay of the proceedings and the court to which the application is made, may stay the proceedings on such terms as it thinks fit.

(3)  In this section —

    (a)  references to a suit, action or other proceedings include a suit, action or other proceedings in a foreign country; and

    (b)  references to other proceedings include any court supervised insolvency or restructuring proceedings against the company.

## Enforcement of creditors' security

**91H.**Notwithstanding the presentation of a petition for the appointment of a restructuring officer or the appointment of a restructuring officer by the Court under section 91B or 91C, a creditor who has security over the whole or part of the assets of the company is entitled to enforce the creditor's security without the leave of the Court and without reference to the restructuring officer appointed under section 91B or 91C.



## Power to compromise with creditors and members within restructuring officer proceeding

**91I.** (1) Where a restructuring officer is appointed to a company and a compromise or arrangement is proposed between the company and its creditors or any class of them, or the company and its members or any class of them, the Court may, on the application of the restructuring officer, order a meeting of the creditors or class of creditors, or of the members of the company or class of members, as the case may be, to be summoned in such manner as the Court directs.

(2) If a majority in number representing seventy-five per cent in value of the creditors or class of creditors, as the case may be, present and voting either in person or by proxy at the meeting, agree to any compromise or arrangement, the compromise or arrangement shall, if sanctioned by the Court, be binding on all the creditors or the class of creditors, as the case may be, and also on the company.

(3) If seventy-five per cent in value of the members or class of members, as the case may be, present and voting either in person or by proxy at the meeting, agree to any compromise or arrangement, the compromise or arrangement shall, if sanctioned by the Court, be binding on all the members or class of members, as the case may be, and also on the company.

(4) An order made under subsection (2) or (3) shall have no effect until a copy of the order has been delivered to the Registrar for registration, and a copy of every such order shall be annexed to every copy of the memorandum of association of the company issued after the order has been made, or, in the case of a company not having a memorandum, of every copy so issued of the instrument constituting or defining the constitution of the company.

(5) If a company makes default in complying with subsection (4), the company and every officer of the company who is in default shall be liable to a fine of two dollars for each copy in respect of which default is made.

(6) In this section, "**arrangement**" includes a reorganisation of the share capital of the company by the consolidation of shares of different classes or by the division of shares into shares of different classes or by both those methods.



**Provisions for facilitating reconstruction and amalgamation of companies**

**91J.** (1) Where an application is made to the Court under section 91I for the sanctioning of a compromise or arrangement proposed between a company and any such persons as are specified in that section, and it is shown to the Court that the compromise or arrangement has been proposed for the purpose of or in connection with a scheme for the reconstruction of any company or companies or the amalgamation of any two or more companies, and that under the scheme the whole or any part of the undertaking or the property of any company concerned in the scheme (in this section referred to as "**a transferor company**") is to be transferred to another company (in this section referred to as "**the transferee company**") the Court, may either by the order sanctioning the compromise or arrangement or by any subsequent order make provision for —

　　(a) the transfer to the transferee company of the whole or any part of the undertaking and of the property or liabilities of any transferor company;

　　(b) the allotting or appropriation by the transferee company of any shares, debentures, policies, or other like interests in that company which under the compromise or arrangement are to be allotted or appropriated by that company to or for any person;

　　(c) the continuation by or against the transferee company of any legal proceedings pending by or against any transferor company;

　　(d) the dissolution, without winding up, of any transferor company;

　　(e) the provisions to be made for any person who within such time and in such manner as the Court directs dissents from the compromise or arrangement; and

　　(f) such incidental, consequential and supplemental matters as are necessary to secure that the reconstruction or amalgamation is fully and effectively carried out.

　(2) Where an order under this section provides for the transfer of property or liabilities, that property shall, by virtue of the order, be transferred to and vest in, and those liabilities shall, by virtue of the order, be transferred to and become the liabilities of, the transferee company, and any such property shall, if the order so directs, be freed from any charge which is, by virtue of the compromise or arrangement, to cease to have effect.

　(3) Where an order is made under this section, every company in relation to which the order is made shall cause a copy thereof to be delivered to the Registrar for registration within seven days after the making of the order, and if default is made in complying with this subsection, the company and every officer of the company who is in default shall be liable to a default fine.

　(4) In this section —

　　"**property**" includes property, rights and powers of every description;



"**liabilities**" includes duties; and

"**transferee company**" means any company or body corporate established in the Islands or in any other jurisdiction.

# Winding up by the Court

## Circumstances in which a company may be wound up by the Court

**92**.  A company may be wound up by the Court if —

(a)  the company has passed a special resolution requiring the company to be wound up by the Court;

(b)  the company does not commence its business within a year from its incorporation, or suspends its business for a whole year;

(c)  the period, if any, fixed for the duration of the company by the articles of association expires, or whenever the event, if any, occurs, upon the occurrence of which it is provided by the articles of association that the company is to be wound up;

(d)  the company is unable to pay its debts; or

(e)  the Court is of opinion that it is just and equitable that the company should be wound up.

## Definition of inability to pay debts

**93**.  A company shall be deemed to be unable to pay its debts if —

(a)  a creditor by assignment or otherwise to whom the company is indebted at law or in equity in a sum exceeding one hundred dollars then due, has served on the company by leaving at its registered office a demand under that person's hand requiring the company to pay the sum so due, and the company has for the space of three weeks succeeding the service of such demand, neglected to pay such sum, or to secure or compound for the same to the satisfaction of the creditor;

(b)  execution of other process issued on a judgment, decree or order obtained in the Court in favour of any creditor at law or in equity in any proceedings instituted by such creditor against the company, is returned unsatisfied in whole or in part; or

(c)  it is proved to the satisfaction of the Court that the company is unable to pay its debts.

## Application for winding up

**94**.  (1)  An application to the Court for the winding up of a company shall be by petition presented either by —

(a)  the company;



(b)   any creditor or creditors (including any contingent or prospective creditor or creditors);

(c)   any contributory or contributories; or

(d)   subject to subsection (4), the Authority pursuant to the regulatory laws.

(2)   Where expressly provided for in the articles of association of a company, the directors of a company incorporated before the 31st August, 2022, the commencement date of *the Companies (Amendment) Act, 2021 [Act 6 of 2021]* have the authority to —

(a)   present a winding up petition; or

(b)   where a winding up petition has been presented, apply for the appointment of a provisional liquidator, on behalf of the company without the sanction of a resolution passed at a general meeting.

(2A) Subject to subsection (2B), the directors of a company incorporated after the 31st August, 2022, the commencement date of the *Companies (Amendment) Act, 2021 [Act 6 of 2021]* may present a winding up petition on behalf of the company on the grounds that the company is unable to pay its debts within the meaning of section 93 or where a winding up petition has been presented, apply on behalf of the company, for the appointment of a provisional liquidator.

(2B) The articles of association of a company may expressly remove or modify the directors' authority to present a winding up petition or apply for the appointment of a provisional liquidator on the company's behalf.

(3)   A contributory is not entitled to present a winding up petition unless either —

(a)   the shares in respect of which that person is a contributory, or some of them, are partly paid; or

(b)   the shares in respect of which that person is a contributory, or some of them, either were —

(i)    originally allotted to that person, or have been held by that person, and registered in that person's name for a period of at least six months immediately preceding the presentation of the winding up petition; or

(ii)   have devolved on that person through the death of a former holder.

(4)   A winding up petition may be presented by the Authority in respect of any company which is carrying on a regulated business in the Islands upon the grounds that it is not duly licensed or registered to do so under the regulatory laws or for any other reason as provided under the regulatory laws or any other law.

## Powers of the Court

**95**.   (1)    Upon hearing the winding up petition the Court may —



    (a)   dismiss the petition;

    (b)   adjourn the hearing conditionally or unconditionally;

    (c)   make a provisional order; or

    (d)   any other order that it thinks fit,

but the Court shall not refuse to make a winding up order on the ground only that the company's assets have been mortgaged or charged to an amount equal to or in excess of those assets or that the company has no assets.

(2)   The Court shall dismiss a winding up petition or adjourn the hearing of a winding up petition on the ground that the petitioner is contractually bound not to present a petition against the company.

(3)   If the petition is presented by members of the company as contributories on the ground that it is just and equitable that the company should be wound up, the Court shall have jurisdiction to make the following orders, as an alternative to a winding-up order, namely —

    (a)   an order regulating the conduct of the company's affairs in the future;

    (b)   an order requiring the company to refrain from doing or continuing an act complained of by the petitioner or to do an act which the petitioner has complained it has omitted to do;

    (c)   an order authorising civil proceedings to be brought in the name and on behalf of the company by the petitioner on such terms as the Court may direct; or

    (d)   an order providing for the purchase of the shares of any members of the company by other members or by the company itself and, in the case of a purchase by the company itself, a reduction of the company's capital accordingly.

(4)   Where an alternative order under subsection (3) requires the company not to make any, or any specified, alteration in the memorandum or articles of association, the company does not have power, without the leave of the Court, to make any such alteration in breach of that requirement.

(5)   Any alteration in a company's memorandum or articles of association made by virtue of an alternative order under subsection (3) is of the same effect as if duly made by resolution of the company, and the provisions of this Act shall apply to the memorandum or articles of association as so altered accordingly.

(6)   A copy of an alternative order made under subsection (3) altering, or giving leave to alter, a company's memorandum or articles of association shall be filed by the company with the Registrar within fourteen days of the making of the order.



## Power to stay or restrain proceedings

**96**. At any time after the presentation of a winding up petition and before a winding up order has been made, the company or any creditor or contributory may —

    (a) where any action or proceeding against the company, including a criminal proceeding, is pending in a summary court, the Court, the Court of Appeal or the Privy Council, apply to the court in which the action or proceeding is pending for a stay of proceedings therein; and

    (b) where any action or proceeding is pending against the company in a foreign court, apply to the Court for an injunction to restrain further proceedings therein,

and the court to which application is made may, as the case may be, stay or restrain the proceedings accordingly on such terms as it thinks fit.

## Avoidance of attachments and stay of proceedings

**97**. (1) When a winding up order is made or a provisional liquidator is appointed, no suit, action or other proceedings, other than criminal proceedings, shall be proceeded with or commenced against the company except with the leave of the Court and subject to such terms as the Court may impose.

(1A) Where a winding up order is made or a provisional liquidator is appointed in respect of a company, and there are criminal proceedings pending against the company in a summary court, the Court, the Court of Appeal or the Privy Council —

    (a) the company;

    (b) a creditor of the company;

    (c) a contributory of the company; or

    (d) subject to section 94(4), the Authority, in respect of any company which is carrying on regulated business, may apply to the court in which the proceedings are pending for a stay of the proceedings and the court to which the application is made, may stay the proceedings on such terms as it thinks fit.

(2) When a winding up order has been made, any attachment, distress or execution put in force against the estate or effects of the company after the commencement of the winding up is void.

## Notice of winding up order

**98**. When a winding up order is made, the liquidator shall —

    (a) file a copy of the winding up order with the Registrar; and

    (b) publish notice of the winding up in the Gazette and any newspaper in which the winding up petition was advertised.



## Avoidance of property dispositions, etc.

**99**.  When a winding up order has been made, any disposition of the company's property and any transfer of shares or alteration in the status of the company's members made after the commencement of the winding up is, unless the Court otherwise orders, void.

## Commencement of winding up by the Court

**100**. (1)  If, before the presentation of a petition for the winding up of a company by the Court —

   (a)  a resolution has been passed by the company for voluntary winding up;

   (b)  the period, if any, fixed for the duration of the company by the articles of association has expired;

   (c)  the event upon the occurrence of which it is provided by the articles of association that the company is to be wound up has occurred; or

   (d)  a restructuring officer has been appointed pursuant to section 91B or 91C and the order appointing the restructuring officer has not been discharged,

   the winding up of the company is deemed to have commenced at the time of passing of the relevant resolution or the expiry of the relevant period or the occurrence of the relevant event or the date of the presentation of the petition to appoint a restructuring officer pursuant to section 91B.

   (2)  In any other circumstance not specified in subsection (1), the winding up of a company by the Court is deemed to commence at the time of the presentation of the petition for winding up.

## Company's statement of affairs

**101**. (1)  Where the Court has made a winding up order or appointed a provisional liquidator, the liquidator may require some or all of the persons mentioned in subsection (3) to prepare and submit to that person a statement in the prescribed form as to the affairs of the company.

   (2)  The statement shall be verified by an affidavit sworn by the persons required to submit it and shall show —

   (a)  particulars of the company's assets and liabilities, including contingent and prospective liabilities;

   (b)  the names and addresses of any persons having possession of the company's assets;

   (c)  the assets of the company held by those persons;

   (d)  the names and addresses of the company's creditors;

   (e)  the securities held by those creditors;

   (f)  the dates when the securities were respectively given; and

   (g)  such further or other information that the liquidator may require.



(3)   The persons referred to in subsection (1) are —

   (a)   persons who are or have been directors or officers of the company;

   (b)   persons who are or have been professional service providers to the company; and

   (c)   persons who are or have been employees of the company, during the period of one year immediately preceding the relevant date.

(4)   Where any persons are required under this section to submit a statement of affairs to the liquidator, they shall do so, subject to subsection (5), before the end of the period of twenty-one days beginning with the day after that on which the prescribed notice of the requirement is given to them by the liquidator.

(5)   The liquidator may release a person from an obligation imposed on that person under subsection (1) or, when giving the notice mentioned in subsection (4) or subsequently, the liquidator may extend the time for compliance; and if the liquidator refuses to extend the time for compliance, the Court may do so.

(6)   In this section —

   "**relevant date**" means —

   (a)   in a case where a provisional liquidator is appointed, the date of that person's appointment; and

   (b)   in any other case, the commencement of the winding up.

(7)   A person who, without reasonable excuse, fails to comply with any obligation imposed under this section commits an offence and is liable on conviction to a fine of ten thousand dollars.

## Investigation by liquidator

**102**. (1)   Where a winding up order is made by the Court, the liquidator shall be empowered to investigate —

   (a)   if the company has failed, the causes of the failure; and

   (b)   generally, the promotion, business, dealings and affairs of the company,

   and to make such report, if any, to the Court as that person thinks fit.

(2)   Subject to obtaining the directions of the Court, the liquidator shall have power to —

   (a)   assist the Authority and the Royal Cayman Islands Police Service to investigate the conduct of persons referred to in section 101(3); and

   (b)   institute and conduct a criminal prosecution of persons referred to in section 101(3).

(3)   Subject to obtaining the prior approval of the company's creditors, if it is insolvent, or its contributories, if it is solvent, the directions given under



subsection (2) may include a direction that the whole or part of the costs of investigation and prosecution be paid out of the assets of the company.

### Duty to co-operate and the private examination of relevant persons

**103**. (1)   This section applies to any person who, whether resident in the Islands or elsewhere —

    (a)   has made or concurred with the statement of affairs;

    (b)   is or has been a director or officer of the company;

    (c)   is or was a professional service provider to the company;

    (d)   has acted as a controller, advisor or liquidator of the company or receiver or manager of its property;

    (e)   not being a person falling within paragraphs (a) to (c), is or has been concerned or has taken part in the promotion, or management of the company,

and such person is referred to in this section as the "**relevant person**".

(2)   It is the duty of every relevant person to co-operate with the official liquidator.

(3)   While a company is being wound up, the official liquidator may at any time before its dissolution apply to the Court for an order —

    (a)   for the examination of any relevant person; or

    (b)   that a relevant person transfer or deliver up to the liquidator any property or documents belonging to the company.

(4)   Unless the Court otherwise orders, the official liquidator shall make an application under subsection (3) if that person is requested in accordance with the rules to do so by one-half, in value, of the company's creditors or contributories.

(5)   On an application made under subsection (3)(a), the Court may order that a relevant person —

    (a)   swear an affidavit in answer to written interrogatories;

    (b)   attend for oral examination by the official liquidator at a specified time and place, or

    (c)   do both things specified in paragraphs (a) and (b).

(6)   The Court may direct that any creditor or contributory of the company be permitted by the official liquidator to participate in an oral examination.

(7)   The Court shall have jurisdiction —

    (a)   to make an order under this section against a relevant person resident outside the Islands; and



(b)  to issue a letter of request for the purpose of seeking the assistance of a foreign court in obtaining the evidence of a relevant person resident outside the jurisdiction.

# Official Liquidators

## Appointment and powers of provisional liquidator

**104**. (1)  Subject to this section and any rules made under section 155, the Court may, at any time after the presentation of a winding up petition but before the making of a winding up order, appoint a liquidator provisionally.

(2)  An application for the appointment of a provisional liquidator may be made under subsection (1) by a creditor or contributory of the company or, subject to subsection (6), the Authority, on the grounds that —

(a)  there is a *prima facie* case for making a winding up order; and

(b)  the appointment of a provisional liquidator is necessary in order to —

(i)  prevent the dissipation or misuse of the company's assets;

(ii)  prevent the oppression of minority shareholders; or

(iii)  prevent mismanagement or misconduct on the part of the company's directors.

(3)  An application for the appointment of a provisional liquidator may be made under subsection (1) by the company and on such an application the Court may appoint a provisional liquidator if it considers it appropriate to do so.

(4)  A provisional liquidator shall carry out only such functions as the Court may confer on that person and that person's powers may be limited by the order appointing that person.

(5)  The remuneration of the provisional liquidator shall be fixed by the Court from time to time on that person's application and the Court shall in fixing such remuneration act in accordance with rules made under section 155.

(6)  An application for the appointment of a provisional liquidator may be presented by the Authority on the grounds under subsection (2), in respect of any company which is carrying on a regulated business in the Islands upon the grounds that it is not duly licensed or registered to do so under the regulatory laws or for any other reason as provided under the regulatory laws or any other law regardless of whether or not the Authority presented the winding up petition.



### Appointment of official liquidator

**105.** (1)  For the purpose of conducting the proceedings in winding up a company and assisting the Court therein, there may be appointed one or more than one person to be called an official liquidator or official liquidators; and the Court may appoint to such office such person as it thinks fit, and if more persons than one are appointed to such office, the Court shall declare whether any act hereby required or authorised to be done by the official liquidator is to be done by all or any or more of such persons.

(2)  The Court may also determine whether any and what security is to be given by an official liquidator on that person's appointment; and if no official liquidator is appointed, or during any vacancy in such office, all the property of the company shall be in the custody of the Court.

(3)  The liquidator shall, within twenty-eight days of the date upon which the winding up order is made, summon —

(a)  a meeting of the company's creditors if the order was made on the grounds that the company is insolvent; or

(b)  a meeting of the company's contributories if the order was made on grounds other than insolvency,

for the purposes of resolving any other matters which the liquidator puts before the meeting.

(4)  The Court may make an order dispensing with the need to summon a meeting under this section or extending the time within which it shall be summoned.

### Appointment of joint liquidators

**106.**  When two or more persons are appointed to the office of liquidator, either provisionally or as official liquidators, they shall be authorised to act jointly and severally, unless their powers are expressly limited by order of the Court.

### Removal of official liquidators

**107.**  An official liquidator may be removed from office by order of the Court made on the application of a creditor or contributory of the company.

### Qualifications of official liquidators

**108.** (1)  A foreign practitioner may be appointed to act jointly with a qualified insolvency practitioner.

(2)  Official liquidators are officers of the Court.

### Remuneration of official liquidators and restructuring officers

**109.** (1)  The expenses properly incurred in the winding up, including the remuneration of the liquidator, are , subject to subsection (2), payable out of the company's assets in priority to all other claims.



(2) Where a company is wound up, the expenses properly incurred in any petition for a restructuring officer and during the term of appointment of the restructuring officer appointed —

  (a)  under section 91B(3)(a); or

  (b)  on an interim basis under section 91C(3), including the remuneration of the restructuring officer, are payable out of the company's assets in priority to all other claims.

(3) There shall be paid to a restructuring officer, including a restructuring officer appointed on an interim basis, and the official liquidator, such remuneration, by way of percentage or otherwise, that the Court may direct acting in accordance with rules made under section 155.

(4) If more than one restructuring officer, including a restructuring officer appointed on an interim basis, is appointed by the Court under section 91B or 91C, the remuneration paid under subsection (3) shall be distributed among the restructuring officers in such proportions as the Court may direct.

(5) If more than one official liquidator is appointed by the Court when a company is wound up, the remuneration paid under subsection (3) shall be distributed among the official liquidators in such proportions as the Court may direct.

## Function and powers of official liquidators

**110**. (1)  It is the function of an official liquidator —

  (a)  to collect, realise and distribute the assets of the company to its creditors and, if there is a surplus, to the persons entitled to it; and

  (b)  to report to the company's creditors and contributories upon the affairs of the company and the manner in which it has been wound up.

(2) The official liquidator may —

  (a)  with the sanction of the Court, exercise any of the powers specified in Part I of Schedule 3; and

  (b)  with or without that sanction, exercise any of the general powers specified in Part 2 of Schedule 3.

(3) The exercise by the liquidator of the powers conferred by this section is subject to the control of the Court, and subject to subsection (5), any creditor or contributory may apply to the Court with respect to the exercise or proposed exercise of such powers (hereinafter referred to as a "sanction application").

(4) In the case of —

  (a)  a solvent company, a sanction application may only be made by a contributory and the creditors shall have no right to be heard;

  (b)  an insolvent company, a sanction application may only be made by a creditor and the contributories shall have no right to be heard; and



(c) a company whose solvency is doubtful, a sanction application may be made by both contributories and creditors and both contributories and creditors shall have a right to be heard.

(5) For the purposes of exercising the powers specified under paragraph 3 of Part 1 of Schedule 3, a person shall be treated as related to a company if the person —

(a) has acted for the company as a professional service provider;

(b) is or was a shareholder or director of the company or of any other company in the same group as the company;

(c) has a direct or indirect beneficial interest in the shares of the company; or

(d) is a creditor or debtor of the company.

.

# General Powers of the Court

## Power to stay winding up

**111**. (1) The Court may at any time after an order for winding up, on the application either of the liquidator or any creditor or contributory, and on proof to the satisfaction of the Court that all proceedings in the winding up ought to be stayed, make an order staying the proceedings either all together or for a limited time, on such terms and conditions as the Court thinks fit.

(2) The Court may at any time after the liquidation has commenced under section 116(c), but before the final meeting has been held as provided for in section 127, on the application of the liquidator accompanied by —

(a) a special resolution stating that the company will not be wound up and setting out the reasons for such decision;

(b) proof of a recall notice published in the Gazette; and

(c) such other documents as the Court may consider necessary,

make an order to recall the liquidation, place the company into active status and place the company back into good standing as it was prior to the commencement of liquidation under section 116(c), on such terms and conditions as the Court thinks fit.

(3) A company shall, within seven days of the making of an order under this section, forward a copy of the order to the Registrar who shall enter it in the records relating to the company.

## Settlement of list of contributories

**112**. (1) The liquidator shall settle a list of contributories, if any, for which purpose that person shall have power to adjust the rights of contributories amongst themselves.



(2)  In the case of a solvent liquidation of a company which has issued redeemable shares at prices based upon its net asset value from time to time, the liquidator shall have power to settle and, if necessary rectify the company's register of members, thereby adjusting the rights of members amongst themselves.

(3)  A contributory who is dissatisfied with the liquidator's determination may appeal to the Court against such determination.

## Power to make calls

**113**. (1)  The Court may, at any time after making a winding up order, and either before or after it has ascertained the sufficiency of the company's assets, make calls on all or any of the contributories for the time being settled on the list of the contributories —

(a)  to the extent of their liability, for the payment of any money which the Court considers necessary to satisfy the company's debts and liabilities and the expenses of winding up; and

(b)  to the adjustment of the rights of the contributories among themselves,

and make an order for payment of any call so made.

(2)  In making a call the Court may take into consideration the probability that some of the contributories may partly or wholly fail to pay it.

## Inspection of documents by creditors, etc.

**114**. (1)  At any time after making a winding up order the Court may make such orders as it thinks fit for —

(a)  the inspection of the company's documents by creditors and contributories; and

(b)  the preparation of reports by the official liquidator and the provision of such reports to the company's creditors and contributories.

(2)  A contributory shall be entitled to make an application under this section notwithstanding that the company is or may be insolvent and the Court shall not refuse to make an order upon the application of a contributory merely by reason of the fact that the company is or may be insolvent.

## Meetings to ascertain wishes of creditors or contributories

**115**. (1)  The Court shall, as to all matters relating to the winding up, have regard to wishes of the creditors or contributories and for that purpose it may direct reports to be prepared by the official liquidator and meetings of creditors or contributories to be summoned.

(2)  If it considers it necessary to do so, the Court may direct that separate meetings be held of different classes of creditors or contributories.



(3) Subject to Rules made under section 155, meetings may be requisitioned by creditors, if the company is insolvent, or by contributories if the company is solvent.

(4) The votes of creditors and contributories shall be counted by reference to —

    (a) the value of their debts, in the case of creditors;

    (b) the number of votes, in the case of contributories whose shares carry voting rights under the articles of association of the company; and

    (c) the par value of all the shares held, in the case of contributories whose shares do not carry votes under the articles of association of the company and, where there are no par value shares, the net asset value of the company shown.

## Voluntary Winding up

### Circumstances in which a company may be wound up voluntarily

**116**. A company incorporated and registered under this Act or an existing company may be wound up voluntarily —

    (a) when the period, if any, fixed for the duration of the company by its memorandum or articles of association expires;

    (b) if the event, if any, occurs, on the occurrence of which the memorandum or articles of association provide that the company is to be wound up;

    (c) if the company resolves by special resolution that it be wound up voluntarily; or

    (d) if the company in general meeting resolves by ordinary resolution that it be wound up voluntarily because it is unable to pay its debts.

### Commencement of winding up

**117**. (1) A voluntary winding up is deemed to commence —

    (a) at the time of the passing of the resolution for winding up; or

    (b) on the expiry of the period or the occurrence of the event specified in the company's memorandum or articles of association,

notwithstanding that a supervision order is subsequently made by the Court.

(2) Subject to any contrary provision in its memorandum or articles of association, the voluntary winding up of an exempted limited duration company is taken to have commenced upon the expiry of a period of ninety days starting on —

    (a) the death, insanity, bankruptcy, dissolution, withdrawal, retirement or resignation of a member of the company;



    (b)   the redemption, repurchase or cancellation of all the shares of a member of the company; or

    (c)   the occurrence of any event which, under the memorandum or articles of association of the company, terminates the membership of a member of the company,

unless there remain at least two members of the company and the company is continued in existence by the unanimous resolution of the remaining members pursuant to amended memorandum and articles of association adopted during that period of ninety days.

## Effect on business and status of the company

**118**. (1)  In the case of a voluntary winding up, the company shall from the commencement of its winding up cease to carry on its business except so far as it may be beneficial for its winding up.

(2)  Notwithstanding anything to the contrary contained in the company's articles of association, its corporate state and powers shall continue until the company is dissolved.

## Appointment of voluntary liquidator

**119**. (1)  One or more liquidators shall be appointed for the purpose of winding up the company's affairs and distributing its assets.

(2)  When the winding up has commenced in accordance with the company's memorandum or articles of association upon the termination of a fixed period or the occurrence of an event —

    (a)   the persons designated as liquidators in the memorandum or articles of association shall become such liquidators automatically from the commencement of the winding up; or

    (b)   if no such person is designated in the memorandum or articles of association or the person designated is unable or unwilling to act, the directors shall convene a general meeting of the company for the purpose of appointing a liquidator.

(3)  Except in the case of a person designated as liquidator in the company's memorandum or articles of association, the appointment of a voluntary liquidator shall take effect upon the filing of that person's consent to act with the Registrar.

(4)  If a vacancy occurs by death, resignation or otherwise in the office of voluntary liquidator appointed by the company —

    (a)   the company in a general meeting may fill the vacancy; or

    (b)   the Court may fill the vacancy on the application of any contributory or creditor.



(5) On the appointment of a voluntary liquidator all the powers of the directors cease, except so far as the company in a general meeting or the liquidator sanctions their continuance.

(6) When two or more persons are appointed as voluntary liquidators jointly, they shall be authorised to act jointly and severally unless their powers are expressly limited by the resolution or articles of association under which they are appointed.

## Qualifications of voluntary liquidators

**120**. Any person, including a director or officer of the company, may be appointed as its voluntary liquidator.

## Removal of voluntary liquidators

**121**. (1) A voluntary liquidator may be removed from office by a resolution of the company in a general meeting convened especially for that purpose.

(2) A general meeting of the company for the purpose of considering a resolution to remove its voluntary liquidator may be convened by any shareholder or shareholders holding not less than one fifth of the company's issued share capital.

(3) Whether or not a general meeting has been convened in accordance with subsection (2), any contributory may apply to the Court for an order that a voluntary liquidator be removed from office on the grounds that that person is not a fit and proper person to hold office.

## Resignation of voluntary liquidator

**122**. (1) Where two or more persons are appointed as joint voluntary liquidators, they may resign by filing a notice of resignation with the Registrar, so long as at least one of them continues in office.

(2) Except as provided in subsection (1), a voluntary liquidator wishing to resign shall —

(a) prepare a report and accounts; and

(b) convene a general meeting of the company for the purpose of accepting that person's resignation and releasing that person from the performance of any further duties, and shall cease to hold office with effect from the date upon which the resolution is passed.

(3) In the event that the company fails to pass a resolution accepting that person's resignation, the voluntary liquidator may apply to the Court for an order that that person be released from the performance of any further duties.



## Notice of voluntary winding up

**123**. (1)   Within twenty-eight days of the commencement of a voluntary winding up, the liquidator or, in the absence of any liquidator, the directors shall —

    (a)   file notice of the winding up with the Registrar;

    (b)   file the liquidator's consent to act with the Registrar;

    (c)   file the director's declaration of solvency with the Registrar (if the supervision of the court is not sought);

    (d)   in the case of a company carrying on a regulated business, serve notice of the winding up upon the Authority; and

    (e)   publish notice of the winding up in the Gazette.

    (2)   A director or liquidator who fails to comply with this section commits an offence and is liable to a fine of ten thousand dollars.

## Application for supervision order

**124**. (1)   Where a company is being wound up voluntarily its liquidator shall apply to the Court for an order that the liquidation continue under the supervision of the Court unless, within twenty-eight days of the commencement of the liquidation, the directors have signed a declaration of solvency in the prescribed form in accordance with subsection (2).

    (2)   A declaration of solvency means a declaration or affidavit in the prescribed form to the effect that a full enquiry into the company's affairs has been made and that to the best of the directors' knowledge and belief the company will be able to pay its debts in full together with interest at the prescribed rate, within such period, not exceeding twelve months from the commencement of the winding up, as may be specified in the declaration.

    (3)   A person who knowingly makes a declaration under this section without having reasonable grounds for the opinion that the company will be able to pay its debts in full, together with interest at the prescribed rate, within the period specified commits an offence and is liable on summary conviction to a fine of ten thousand dollars and to imprisonment for two years.

## Avoidance of share transfers

**125**. Any transfer of shares, not being a transfer with the sanction of the liquidator, and any alteration in the status of the company's members made after the commencement of a voluntary winding up is void.



## General meeting at year's end

**126**. (1)  In the event of a voluntary winding up continuing for more than one year, the liquidators shall summon a general meeting of the company at the end of the first year from the commencement of the winding up and at the end of each succeeding year and such meetings shall be held within three months of each anniversary of the commencement of the liquidation.

(2)  At each meeting the liquidator shall lay before the meeting a report and account of that person's acts and dealings and the conduct of the winding up during the preceding year.

(3)  A liquidator who fails to comply with this section commits an offence and is liable on conviction to a fine of ten thousand dollars.

## Final meeting prior to dissolution

**127**. (1)  As soon as the company's affairs are fully wound up, the liquidator shall make a report and an account of the winding up showing how it has been conducted and how the company's property has been disposed of and thereupon shall call a general meeting of the company for the purpose of laying before it the account and giving an explanation for it.

(2)  At least twenty-one days before the meeting the liquidator shall send a notice specifying the time, place and object of the meeting to each contributory in any manner authorised by the company's articles of association and published in the Gazette.

(3)  The liquidator shall, no later than seven days after the meeting, make a return to the Registrar in the prescribed form specifying —

(a)  the date upon which the meeting was held; and

(b)  if a quorum was present, particulars of the resolutions, if any, passed at the meeting.

(4)  A liquidator who fails to call a general meeting of the company as required by subsection (1) or fails to make a return as required by subsection (3) commits an offence and is liable on conviction to a fine of ten thousand dollars.

## Effect of winding up on share capital of company limited by guarantee

**128**.  Where a company limited by guarantee and having a capital divided into shares is being wound up voluntarily, any share capital that may not have been called upon shall be deemed to be an asset of the company, and to be a specialty debt due from each member to the company to the extent of any sums that may be unpaid on any shares held by that person, and payable at such time as may be appointed by the liquidator.



**Reference of questions to Court**

**129**. (1)   The voluntary liquidator or any contributory may apply to the Court to determine any question arising in the voluntary winding up of a company or to exercise, as respects the enforcing of calls or any other matter, all or any of the powers which the Court might exercise if the company were being wound up under the supervision of the Court.

(2)   The Court, if satisfied that the determination of the question or the required exercise of power will be just and beneficial, may accede wholly or partly to the application on such terms and conditions as it thinks fit, or make such other order on the application as it thinks just.

(3)   The voluntary liquidator shall, within seven days of the making of an order under this section, forward a copy of the order to the Registrar who shall enter it in that person's records relating to the company.

**Expenses of voluntary winding up**

**130**. (1)   The expenses properly incurred in the winding up, including the remuneration of the liquidator, are payable out of the company's assets in priority to all other claims.

(2)   The rate and amount of the liquidator's remuneration shall be fixed and payment authorised by resolution of the company.

(3)   Each report and account laid before the company in general meetings by its liquidator shall contain all such information, including the rate at which the liquidator's remuneration is calculated and particulars of the work done, as may be necessary to enable the members to determine what expenses have been properly incurred and what remuneration is properly payable to the liquidator.

(4)   If the company fails to approve the liquidator's remuneration and expenses or the liquidator is dissatisfied with the decision of the company, that person may apply to the Court which shall fix the rate and amount of that person's remuneration and expenses.

## Winding up subject to the supervision of the Court

**Application for supervision order**

**131**. When a resolution has been passed by a company to wind up voluntarily, the liquidator or any contributory or creditor may apply to the Court for an order for the continuation of the winding up under the supervision of the Court, notwithstanding that the declaration of solvency has been made in accordance with section 124, on the grounds that —

(a)   the company is or is likely to become insolvent; or



    (b)   the supervision of the Court will facilitate a more effective, economic or expeditious liquidation of the company in the interests of the contributories and creditors.

### Appointment of official liquidator

**132**. (1)  When making a supervision order the Court —

    (a)   shall appoint one or more qualified insolvency practitioners; and

    (b)   may, in addition, appoint one or more foreign practitioners,

as liquidator or liquidators of the company and section 105 shall apply as if the Court had made a winding up order.

(2)  Unless a voluntary liquidator is appointed as an official liquidator, that person shall prepare a final report and accounts within twenty-eight days from the date of the supervision order.

### Effect of supervision order

**133**. A supervision order shall take effect for all purposes as if it was an order that the company be wound up by the Court except that —

    (a)   the liquidation commenced in accordance with section 117; and

    (b)   the prior actions of the voluntary liquidator shall be valid and binding upon the company and its official liquidator.

## Offences of fraud, etc.

### Fraud, etc. in anticipation of winding up

**134**. (1)  Where a company is ordered to be wound up by the Court, or passes a resolution for voluntary winding up, any person, who is or was an officer, professional service provider, voluntary liquidator, restructuring officer or controller of the company and who, within the twelve months immediately preceding the commencement of the winding up, has —

    (a)   concealed any part of the company's property to the value of ten thousand dollars or more or concealed any debt due to or from the company;

    (b)   removed any part of the company's property to the value of ten thousand dollars or more;

    (c)   concealed, destroyed, mutilated or falsified any documents affecting or relating to the company's property or affairs;

    (d)   made any false entry in any documents affecting or relating to the company's property or affairs;

    (e)   parted with, altered or made any omission in any document affecting or relating to the company's property or affairs; or



(f)   pawned, pledged or disposed of any property of the company which has been obtained on credit and has not been paid for (unless the pawning, pledging or disposal was in the ordinary way of the company's business),

with intent to defraud the company's creditors or contributories commits an offence and is liable on conviction to a fine and to imprisonment for five years.

(2)   In this section —

"**officer**" includes a shadow director.

## Transactions in fraud of creditors

**135**. Where a company is ordered to be wound up by the Court or passes a resolution for voluntary winding up, any officer, restructuring officer, controller or professional service provider of the company who —

(a)   has made or caused to be made any gift or transfer of, or charge on, or has caused or connived at the levying of any execution against, the company's property; or

(b)   has concealed or removed any part of the company's property,

with intent to defraud the company's creditors or contributories commits an offence and is liable on conviction to a fine and to imprisonment for five years.

## Misconduct in course of winding up

**136**. (1)   Where a company is being wound up, whether by the Court or voluntarily, a person who is or was a director, officer, restructuring officer, controller or professional service provider of the company and who —

(a)   does not to the best of that person's knowledge and belief fully and truly discover to the liquidator —

(i)   all the company's property (except such part as has been disposed of in the ordinary way of the company's business);

(ii)   the date on which and manner in which the company's property or any part thereof property was disposed of, if it was disposed of;

(iii)   the persons to whom any property was transferred, if it was disposed of; or

(iv)   the consideration paid for any property which was disposed of;

(b)   does not deliver up to the liquidator or does not deliver up in accordance with the directions of the liquidator any of the company's property which is in that person's custody or under that person's control, and which that person is required by law to deliver up;

(c)   does not deliver up to the liquidator or does not deliver up, in accordance with the directions of the liquidator, all documents in that person's custody



or under that person's control which belong to the company and which that person is required by law to deliver up;

(d) knows or believes that a false debt has been proved by any person in the winding up and fails to inform the liquidator of such knowledge or belief as soon as practicable;

(e) prevents the production of any document affecting or relating to the company's property or affairs; or

(f) destroys, mutilates, alters or falsifies any books, papers or securities, or makes or is privy to the making of any false or fraudulent entry in any register, book of account or document belonging to the company,

with intent to defraud the company's creditors or contributories commits an offence and is liable on conviction to a fine of twenty five thousand dollars or to imprisonment for a term of five years, or to both.

(2) In this section —

"**officer**" includes a shadow director.

### Material omissions from statement relating to company's affairs

**137**. (1) Where a company is being wound up, whether by the Court or voluntarily, a person who is or was a director, an officer, a manager, restructuring officer, controller or a professional service provider of the company, commits an offence if that person makes any material omission in any statement relating to the company's affairs, with intent to defraud the company's creditors or contributories.

(2) A person who commits an offence under subsection (1) is liable on conviction to a fine of twenty-five thousand dollars or to imprisonment for a term of five years, or to both.

(3) In this section —

"**officer**" includes a shadow director.

# General provisions

### Getting in the company's property

**138**. (1) Where any person has in that person's possession any property or documents to which the company appears to be entitled, the Court may require that person to pay, transfer or deliver such property or documents to the official liquidator.

(2) Where the official liquidator seizes or disposes of any property which that person reasonably believed belonged to the company, that person shall not be personally liable for any loss or damage caused to its true owner except in so far as such loss or damage is caused by that person's own negligence.



## Provable debts

**139**. (1)  All debts payable on a contingency and all claims against the company whether present or future, certain or contingent, ascertained or sounding only in damages, shall be admissible to proof against the company and the official liquidator shall make a just estimate so far as is possible of the value of all such debts or claims as may be subject to any contingency or sound only in damages or which for some other reason do not bear a certain value.

(2)  Foreign taxes, fines and penalties shall be admissible to proof against the company only if and to the extent that a judgment in respect of the same would be enforceable against the company pursuant to the *Foreign Judgments Reciprocal Enforcement Act (1996 Revision)* or any laws permitting the enforcement of foreign taxes, fines and penalties.

## Distribution of the company's property

**140**. (1)  Subject to subsection (2), the property of the company shall be applied in satisfaction of its liabilities *pari passu* and subject thereto shall be distributed amongst the members according to their rights and interests in the company.

(2)  The collection in and application of the property of the company referred to in subsection (1) is without prejudice to and after taking into account and giving effect to the rights of preferred and secured creditors and to any agreement between the company and any creditors that the claims of such creditors shall be subordinated or otherwise deferred to the claims of any other creditors and to any contractual rights of set-off or netting of claims between the company and any person or persons (including without limitation any bilateral or any multi-lateral set-off or netting arrangements between the company and any person or persons) and subject to any agreement between the company and any person or persons to waive or limit the same.

(3)  In the absence of any contractual right of set-off or non set-off, an account shall be taken of what is due from each party to the other in respect of their mutual dealings, and the sums due from one party shall be set-off against the sums due from the other.

(4)  Sums due from the company to another party shall not be included in the account taken under subsection (3) if that other party had notice at the time they became due that a petition for the winding up of the company was pending.

(5)  Only the balance, if any, of the account taken under subsection (3) shall be provable in the liquidation or, as the case may be, payable to the liquidator as part of the assets.

## Preferential debts

**141**. (1)  In the case of an insolvent company, the debts described in Schedule 2 shall be paid in priority to all other debts.



(2)   The preferential debts shall —

(a)   rank equally amongst themselves and be paid in full unless the assets available, after having exercised any rights of set-off or netting of claims, are insufficient to meet them in which case they shall abate in equal proportions; and

(b)   so far as the assets of the company available for payment of general creditors are insufficient to meet them, have priority over the claims of holders of debentures secured by, or holders of any floating charge created by the company, and be paid accordingly out of any property comprised in or subject to that charge.

## Secured creditors

**142**. (1)   Notwithstanding that a winding up order has been made, a creditor who has security over the whole or part of the assets of a company is entitled to enforce that person's security without the leave of the Court and without reference to the liquidator.

(2)   Where the liquidator sells assets on behalf of a secured creditor, that person is entitled to deduct from the proceeds of sale a sum by way of remuneration equivalent to that which is or would be payable under section 109.

## Preferential charge on goods distrained

**143**. In the event of a landlord or other person entitled to receive rent distraining or having distrained on any goods or effects of the company within three months preceding the date of the winding up order, the debts to which priority is given by section 141 shall be a first charge on the goods or effects so distrained on or the proceeds of sale thereof.

## Effect of execution or attachment

**144**. (1)   Where a creditor has issued execution against the goods or land of a company or has attached any debt due to it, and the company is subsequently wound up, that person is not entitled to retain the benefit of the execution or attachment against the liquidator unless that person has completed the execution or attachment before the commencement of the winding up.

(2)   Notwithstanding subsection (1) —

(a)   where a creditor has had notice of a meeting having been called at which a resolution for voluntary winding up is to be proposed, the date on which that person had notice is substituted for the purpose of subsection (1) for the date of commencement of the winding up;

(b)   a person who purchases in good faith under a sale by the bailiff any goods of a company on which execution has been levied in all cases acquires a good title to them against the liquidator; and



    (c)   the rights conferred by subsection (1) on the liquidator may be set aside by the Court in favour of the creditor to such extent and subject to such terms as the Court thinks fit.

  (3)   For the purposes of this Act —

    (a)   an execution against goods is completed by seizure and sale;

    (b)   an execution against securities is completed upon making a charging order absolute;

    (c)   an attachment of a debt is completed by receipt of the debt; and

    (d)   an execution against land is completed by the registration of a charging order.

## Voidable preference

**145**. (1)   Every conveyance or transfer of property, or charge thereon, and every payment obligation and judicial proceeding, made, incurred, taken or suffered by any company in favour of any creditor at a time when the company is unable to pay its debts within the meaning of section 93 with a view to giving such creditor a preference over the other creditors shall be voidable upon the application of the company's liquidator if made, incurred, taken or suffered within six months immediately preceding the commencement of a liquidation.

  (2)   A payment made as aforesaid to a related party of the company shall be deemed to have been made with a view to giving such creditor a preference.

  (3)   For the purposes of this section a creditor shall be treated as a "related party" if it has the ability to control the company or exercise significant influence over the company in making financial and operating decisions.

## Avoidance of dispositions made at an undervalue

**146**. (1)   In this section and section 147 —

    (a)   "**disposition**" has the meaning ascribed in Part VI of the *Trusts Act (2021 Revision)*;

    (b)   "**intent to defraud**" means an intention to wilfully defeat an obligation owed to a creditor;

    (c)   "**obligation**" means an obligation or liability (which includes a contingent liability) which existed on or prior to the date of the relevant disposition;

    (d)   "**transferee**" means the person to whom a relevant disposition is made and shall include any successor in title; and

    (e)   "**undervalue**" in relation to a disposition of a company's property means —

       (i)   the provision of no consideration for the disposition; or



(ii)   a consideration for the disposition the value of which in money or monies worth is significantly less than the value of the property which is the subject of the disposition.

(2)   Every disposition of property made at an undervalue by or on behalf of a company with intent to defraud its creditors shall be voidable at the instance of its official liquidator.

(3)   The burden of establishing an intent to defraud for the purposes of this section shall be upon the official liquidator.

(4)   No action or proceedings shall be commenced by an official liquidator under this section more than six years after the date of the relevant disposition.

(5)   In the event that any disposition is set aside under this section, then if the Court is satisfied that the transferee has not acted in bad faith —

(a)   the transferee shall have a first and paramount charge over the property, the subject of the disposition, of an amount equal to the entire costs properly incurred by the transferee in the defence of the action or proceedings; and

(b)   the relevant disposition shall be set aside subject to the proper fees, costs, pre-existing rights, claims and interests of the transferee (and of any predecessor transferee who has not acted in bad faith).

**Fraudulent trading**

**147**. (1)   If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose the liquidator may apply to the Court for a declaration under this section.

(2)   The Court may declare that any persons who were knowingly parties to the carrying on of the business in the manner mentioned in subsection (1) are liable to make such contributions, if any, to the company's assets as the Court thinks proper.

**Supply of utilities**

**148**. (1)   If a request is made by or with the concurrence of the liquidator (including a provisional liquidator) or a restructuring officer for the giving, after the effective date, of any of the supplies mentioned in subsection (2), the supplier —

(a)   may make it a condition of the giving of the supply that the liquidator (including a provisional liquidator) or restructuring officer personally guarantees the payment of any charges in respect of the supply; but

(b)   shall not make it a condition of the giving of the supply, or do anything which has the effect of making it a condition of the giving of the supply,



that any outstanding charges in respect of a supply given to the company before the effective date are paid.

(2) The supplies referred to in subsection (1) are —

(a) a supply of electricity;

(b) a supply of water; and

(c) a supply of telecommunication services.

(3) In this section —

"**effective date**" means —

(a) the date on which the provisional liquidator was appointed;

(b) the date on which the winding up order was made; or

(c) the date on which the restructuring officer was appointed.

## Interest on debts

**149**. (1) Subject to subsection (5), in a winding up interest is payable in accordance with this section on any debt proved in the winding up, including so much of any such debt as represents interest on the remainder of the debt.

(2) Any surplus remaining after the payment of the debts proved in a winding up shall, before being applied for any other purpose, be applied in paying interest on those debts in respect of the period during which they have been outstanding since the company went into liquidation.

(3) All interest under this section ranks equally, whether or not the debts on which it is payable ranked equally.

(4) The rate of interest payable under this section in respect of any debt is the greater of —

(a) the rate applicable to the currency of the liquidation prescribed from time to time by the *Judgment Debts (Rates of Interest) Rules (2021 Revision)* made under section 34 of the *Judicature Act (2021 Revision)*; and

(b) the rate applicable to that debt apart from the winding up.

(5) No interest shall be payable if the liquidation is concluded in less than six months or the accrued amount is less than five hundred dollars.

## Currency of the liquidation

**150**. (1) In the case of a solvent liquidation, a company's creditors are entitled to receive payment of their debts in the currency of the obligation.

(2) In the case of an insolvent liquidation, a company's liabilities shall be translated into the functional currency of the company at the exchange rates ruling —

(a) on the date of the commencement of the voluntary liquidation; or

(b) on the day upon which the winding up order is made.



(3) For the purposes of this section the functional currency of a company is the currency of the primary economic environment in which it operated as at the commencement of the liquidation.

# Dissolution of a Company

## Dissolution following voluntary winding up

**151**. (1) The Registrar shall, within three days of receiving a liquidator's return under section 127(3), register such return.

(2) Upon the expiration of three months from the registration of the return the company is deemed to be dissolved.

(3) Notwithstanding subsection (2), the Court may, on the application of the liquidator or any other person who appears to the Court to be interested, make an order deferring the date at which the dissolution of the company is to take effect to such date as the Court thinks fit.

(4) An application under this section shall not be made after the company is deemed to have been dissolved.

(5) An order of the Court made under this section shall be registered with the Registrar within seven days of the date upon which it was made.

## Dissolution following winding up by the Court

**152**. (1) When the affairs of the company have been completely wound up, the Court shall make an order that the company be dissolved from the date of that order or such other date as the Court thinks fit, and the company shall be dissolved accordingly.

(2) The effect of an order for dissolution in respect of a segregated portfolio is that its creditors' claims against the company shall be extinguished, notwithstanding that the company has not been liquidated and dissolved.

(3) The official liquidator shall file the order for dissolution with the Registrar.

(4) An official liquidator who fails to file the order for dissolution with the Registrar within fourteen days from the date, upon which it was perfected, commits an offence and is liable on summary conviction to a penalty of ten dollars for every day during which that person is so in default.

## Unclaimed dividends and undistributed assets

**153**. (1) Any unclaimed dividends or undistributed assets in the possession or control of the liquidator or former liquidator of a company shall be held by that person as trustee upon trust for the benefit of the contributories or creditors to whom such funds are owed.



(2)   At the end of one year after the dissolution of the company, the former liquidator shall transfer any funds or other assets held on trust by that person to the Minister charged with responsibility for Finance who shall manage them in accordance with Part VIII of the *Public Management and Finance Act (2020 Revision)*.

## Insolvency rules and regulations

### Insolvency Rules Committee

**154**. (1)   There shall be established an Insolvency Rules Committee comprising —

    (a)   the Chief Justice or other judge nominated by the Chief Justice in that person's place who shall be chairperson;

    (b)   the Attorney General or that person's nominee;

    (c)   two attorneys-at-law appointed by the Chief Justice on the recommendation of the Cayman Islands Legal Practitioners Association;

    (d)   a qualified insolvency practitioner appointed by the Chief Justice upon the recommendation of the Cayman Islands Institute of Professional Accountants;

    (e)   a person appointed by the Chief Justice who, in that person's opinion, demonstrates a wide knowledge of law, finance, financial regulation or insolvency practice; and

    (f)   a qualified insolvency practitioner appointed by the Chief Justice on the recommendation of the Recovery and Insolvency Specialists Association.

(2)   The quorum of the Insolvency Rules Committee shall be the chairperson and three other members of the Committee; and the chairperson shall have a casting vote.

### Powers of the Insolvency Rules Committee

**155**. (1)   The Insolvency Rules Committee shall have power —

    (a)   to make rules and prescribe forms for the purpose of giving effect to Parts 4, 5 and 16;

    (b)   to prescribe court fees to be paid in connection with —

        (i)   applications under Part 4;

        (ii)   winding up proceedings under Part 5; and

        (iii)   applications under Part 16; and

    (c)   to make rules for the purpose of specifying —

        (i)   the qualifications which must be held by a person appointed to the office of official liquidator;



     (ii)    persons who are disqualified from holding office as official liquidator either generally or in relation to a particular company which is not in liquidation before the court;

     (iii)   the nature and scope of professional indemnity insurance, if any, required to be held by persons appointed to the office of official liquidators; and

     (iv)   the nature and scope of security bonds, if any, required to be posted by persons appointed to the office of official liquidator.

(2)    The Insolvency Rules Committee, after consultation with the Authority and with any organisation representing insolvency practitioners in the Islands, shall make rules prescribing the rates of fees which may be charged by an official liquidator.

# PART 6 - Removal of Defunct Companies

### Company not operating may be struck off register

**156**. (1)   Where the Registrar has reasonable cause to believe that a company is not carrying on business or is not in operation, that person may strike the company off the register and the company shall thereupon be dissolved.

(2)   A request on behalf of the company to strike the company off the register shall be accompanied by a fee of seventy-five dollars.

### Striking off for failure to pay fine

**156A**.Where an administrative fine imposed in accordance with section 26 of the *Beneficial Ownership Transparency Act, 2023 [Act 13 of 2023]* remains unpaid for ninety days after imposition of the fine, the Registrar may strike the company off the register and the company shall thereupon be dissolved.

### Company being wound up may be struck off register for want of liquidator, etc.

**157**. Where a company is being wound up, and the Registrar has reasonable cause to believe either that no liquidator is acting, or that the affairs of the company are fully wound up, that person may strike the company off the register and the company shall thereupon be dissolved.

### Registrar to publish fact of company being struck off register

**158**. The Registrar shall immediately publish a Government Notice to the effect that the company in question has been struck off the register, the date on which it has been struck off and the reason therefor. Such notice shall be gazetted.



### Vesting of property

**162**. Any property vested in or belonging to any company struck off the register under this Act shall thereupon vest in the Minister charged with responsibility for Finance and shall be subject to disposition by the Cabinet, or to retention for the benefit of the Islands.

# PART 7 - Exempted Companies

## What companies may apply to be registered as exempted companies

**163**. Any proposed company applying for registration under this Act, the objects of which are to be carried out mainly outside the Islands or pursuant to a licence to carry on business in the Islands to which section 174 refers, may apply to be registered as an exempted company.

## Registration of exempted companies

**164**. On being satisfied that section 165 has been complied with, the Registrar shall register the company as an exempted company.

## Declaration by proposed company

**165**. A proposed exempted company applying for registration as an exempted company shall submit to the Registrar a declaration signed by a subscriber to the effect that the operation of the proposed exempted company will be conducted mainly outside the Islands or pursuant to a licence to carry on business in the Islands to which section 174 refers.

## Shares shall be non-negotiable

**166**. The shares of an exempted company shall be non-negotiable and shall be transferred only on the books of the company.

## *Repealed*

**167**. **Repealed** by section 3 of the *Companies (Amendment) Act, 2016 [Law 3 of 2016]*.

## Annual return

**168**. In January of each year after the year of its registration each exempted company that does not hold a licence to carry on business in the Islands to which section 174 refers shall furnish to the Registrar a return which shall be in the form of a declaration that —

> (a) since the previous return or since registration, as the case may be, there has been no alteration in the memorandum of association, other than an alteration in the name of the company effected in accordance with section 31 or an alteration already reported in accordance with section 10;



(aa) states the nature of the business;

(b) the operations of the exempted company since the last return or since registration of the exempted company, as the case may be, have been mainly outside the Islands; and

(c) section 174 has been and is being complied with.

## Annual fee

**169.** (1) Every exempted company shall, in January of each year after the year of its registration, pay to the revenues of the Islands the annual fee specified in Part 4 of Schedule 5.

(2) Each such annual fee referred to in subsection (1) shall be tendered with the return required by section 168.

(3) An exempted company which defaults in submitting its annual return under section 168 or the fee specified in subsection (1) shall incur a penalty of —

(a) 33.33% of the annual fee specified in subsection (1) if the return is submitted or the fee and penalty are paid between the 1st April and the 30th June;

(b) 66.67% of the annual fee specified in subsection (1) if the return is submitted or the fee and penalty are paid between the 1st July and the 30th September; and

(c) 100% of the annual fee specified in subsection (1) if the return is submitted or the fee and penalty are paid between the 1st October and the 31st December.

## Failure to comply with section 168 or 169

**170.** Any exempted company which fails to comply with section 168 or 169 shall be deemed to be a defunct company and shall thereupon be dealt with as such under Part 6 but without prejudice to its being registered again as though it were being registered for the first time.

## Registrar to give notice

**171.** Before taking action under section 170, the Registrar shall give one month's notice to the defaulting company and, if the default is made good before the expiry of such notice, sections 168 and 169 shall be deemed to have been complied with.

## False statement in declaration

**172.** If any declaration under section 165 or 168 contains any wilful false statement or misrepresentation the company shall, on proof thereof, be liable to be immediately dissolved and removed from the register and in such case any fee tendered under section 26(4) or 169 shall be forfeited to the Minister charged with responsibility for Finance for credit to the general revenue.



## Penalty for false declaration

**173**. Every director and officer of a company who knowingly makes or permits the making of any such declaration knowing it to be false commits an offence and is liable on summary conviction to a fine of five thousand dollars and to imprisonment for a term of one year, or to both.

## Prohibited enterprises

**174**. (1)    An exempted company shall not carry on a trade or business in the Islands with any person, except in furtherance of the business of the exempted company carried on outside of the Islands, unless that exempted company holds a licence to carry on business in the Islands under any applicable law.

(2)    Nothing in this section shall be construed so as to prevent an exempted company effecting and concluding contracts in the Islands and exercising in the Islands all its powers necessary for the carrying on of its business outside the Islands.

(3)    An exempted company that holds a licence to carry on business in the Islands under any applicable law, shall from the date of issue of such licence, continue for all purposes as if incorporated and registered as an ordinary resident company under and subject to this Act the provisions of which shall apply to the company and to persons and matters associated with the company as if the company were incorporated and registered under this Act except as provided in section 7(1)(a), 8(1) and (4), 13(1)(a), 26(3), 30(3), 31(1), 41(2), 42, 50(2), 166, 169, 175 or 252(2).

## Prohibited sale of securities

**175**. An exempted company that is not listed on the Cayman Islands Stock Exchange is prohibited from making any invitation to the public in the Islands to subscribe for any of its securities.

## Penalty for carrying on business contrary to this Part

**176**. If an exempted company carries on any business in the Islands in contravention of this Part then, without prejudice to any other proceedings that may be taken in respect of the contravention, the exempted company and every director, provisional director and officer of the exempted company who is responsible for the contravention commits an offence and is liable on summary conviction to a fine of one hundred dollars for every day during which the contravention occurs or continues, and the exempted company shall be liable to be immediately dissolved and removed from the register.



**Electronic business by exempted companies**

**177**. Nothing in this Act shall prohibit an exempted company from offering, by electronic means, and subsequently supplying, real or personal property, services or information from a place of business in the Islands or through an internet service provider or other electronic service provider located in the Islands.

# PART 8 - Exempted Limited Duration Companies

**Exempted company may apply to be registered as an exempted limited duration company**

**178**. (1)   An exempted company may, at any time, apply to the Registrar to be registered as an exempted limited duration company.

(2)   An application may also be made under subsection (1) at the same time as an application is made —

   (a)   to register a proposed company as an exempted company;

   (b)   to re-register an ordinary non-resident company as an exempted company; or

   (c)   to register a company by way of continuation as an exempted company.

(3)   An application under subsection (1) shall, in addition to any other fee that may be payable, be accompanied by an application fee of two hundred dollars.

**Registration as an exempted limited duration company**

**179**. (1)   The Registrar shall register as an exempted limited duration company an exempted company that has made application under section 178 if —

   (a)   the company has at least two subscribers or two members;

   (b)   where the company was not already registered as a company prior to the application —

     (i)   the memorandum of association of the company limits the duration of the company to a period of thirty years or less; and

     (ii)   the name of the company includes at its end "Limited Duration Company" or "LDC"; and

   (c)   where the company was already registered as a company prior to the application —

     (i)   the Registrar has been supplied, where the duration of the company is not already limited to a period of thirty years or less with a certified copy of a special resolution of the company altering its memorandum of association to limit the duration of the company to a period of thirty years or less; and



# SCHEDULE 3

## Powers of Liquidators

*(section 110)*

### PART 1

### Powers exercisable with sanction

1.   Power to bring or defend any action or other legal proceeding in the name and on behalf of the company.

2.   Power to carry on the business of the company so far as may be necessary for its beneficial winding up.

3.   Power to dispose of any property of the company to a person who is or was related to the company.

4.   Power to pay any class of creditors in full.

5.   Power to make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the company or for which the company may be rendered liable.

6.   Power to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the company and a contributory or alleged contributory or other debtor or person apprehending liability to the company.

7.   Power to deal with all questions in any way relating to or affecting the assets or the winding up of the company, to take any security for the discharge of any such call, debt, liability or claim and to give a complete discharge in respect of it.

8.   The power to sell any of the company's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels.

9.   The power to raise or borrow money and grant securities therefor over the property of the company.

10.  The power to engage staff (whether or not as employees of the company) to assist that person in the performance of that person's functions.

11.  The power to engage attorneys and other professionally qualified persons to assist that person in the performance of that person's functions.



## *PART 2*

## Powers exercisable without sanction

1.     The power to take possession of, collect and get in the property of the company and for that purpose to take all such proceedings as that person considers necessary.

2.     The power to do all acts and execute, in the name and on behalf of the company, all deeds, receipts and other documents and for that purpose to use, when necessary, the company seal.

3.     The power to prove, rank and claim in the bankruptcy, insolvency or sequestration of any contributory for any balance against that person's estate, and to receive dividends in the bankruptcy, insolvency or sequestration in respect of that balance, as a separate debt due from the bankrupt or insolvent and rateably with the other separate creditors.

4.     The power to draw, accept, make and indorse any bill of exchange or promissory note in the name and on behalf of the company, with the same effect with the respect of the company's liability as if the bill or note had been drawn, accepted, made or indorsed by or on behalf of the company in the course of its business.

5.     The power to promote a scheme of arrangement pursuant to section 86.

6.     The power to convene meetings of creditors and contributories.

7.     The power to do all other things incidental to the exercise of that person's powers.



# EXHIBIT 79

**CAYMAN ISLANDS**



**Companies Act**

**(2023 Revision)**

# COMPANIES WINDING UP RULES

**(2023 Consolidation)**

**Supplement No. 4 published with Legislation Gazette No. 1 dated 12th January, 2023.**

## PUBLISHING DETAILS

The Companies Winding Up Rules, 2018 made by the Insolvency Rules Committee on 27th November, 2017 as amended by the Citation of Acts of Parliament Act, 2020 [Act 56 of 2020].

Consolidated with —
      Companies Winding Up (Amendment) Rules 2022-29th July, 2022.

Consolidated this 31st day of December, 2022.



6.    Removal of Voluntary Liquidator (O.13, r.6) ........................................................82
7.    Voluntary Liquidator's Reporting Obligations (O.13, r.7)......................................83
8.    Form and Content of Reports and Accounts (O.13, r.8) ........................................83
9.    Voluntary Liquidator's Remuneration (O.13, r.9) ..................................................84
10.   Applications to Court (O.13, r.10)...........................................................................84
11.   General Meetings of the Company (O.13, r.11) .....................................................86
12.   Voluntary Liquidator's Final Return (O.13, r.12) ...................................................86

### ORDER 14    88

### DIRECTOR'S DECLARATION OF SOLVENCY    88
1.    Form and Content of Declaration of Solvency (O.14, r.1) ......................................88
2.    Delivery and Registration of Declaration of Solvency (O.14, r.2) ..........................88

### ORDER 15    89

### APPLICATION FOR SUPERVISION ORDER    89
1.    Introduction (O.15, r.1)...........................................................................................89
2.    Application under section 124 (O.15, r.2) ...............................................................89
3.    Application under section 131 (O.15, r.3) ...............................................................90
4.    Supporting Affidavits (O.15, r.4) .............................................................................90
5.    Hearing of section 124 Petition (O.15, r.5) .............................................................91
6.    Release of Voluntary Liquidator (O.15, r.6) ............................................................92
7.    Delivery of Company's Books and Records (O.15, r.7) ...........................................92
8.    Supervision Order (O.15, r.8)..................................................................................92

### ORDER 16    93

### PROOF OF DEBTS IN OFFICIAL LIQUIDATION    93
### PART I: PROCEDURE FOR PROVING    93
1.    Introduction (O.16, r.1)............................................................................................93
2.    Form and Content of Proof (O.16, r.2) ....................................................................93
3.    Supply of proof of debt forms (O.16, r.3).................................................................94
4.    Cost of proving (O.16, r.4) .......................................................................................94
5.    Withdrawal and variation of proof (O.16, r.5)...........................................................94
6.    Admission and rejection of proof (O.16, r.6)............................................................94
7.    Admission without proof of debt (O.16, r.7).............................................................95
8.    Inspection of Proofs of Debts (O. 16, r. 8)...............................................................95
### PART II: QUANTIFICATION OF CLAIM    95
9.    Enforcement of Subordination, Set-Off (or Non Set-Off) and Netting Agreements (O.16,
      r.9).............................................................................................................................95
10.   Mutual credit and set-off (O.16, r.10) ......................................................................96
11.   Pre-liquidation Interest on Debts (O.16, r.11) .........................................................96
12.   Post-liquidation Interest on Debts (O.16, r.12) ........................................................96
13.   Determination of the currency of the liquidation (O.16, r.13)...................................97
14.   Payments of a periodical nature (O.16, r.14)...........................................................97
15.   Debts payable at a future date (O.16, r.15) .............................................................98
16.   Contingent claims (O.16, r.16) ................................................................................98
### PART III: APPEAL AGAINST REJECTION OF PROOF    98
17.   Introduction (O.16, r.17)...........................................................................................98
18.   Application to Court (O.16, r.18) ..............................................................................99
19.   [No order] (O.16, r.19) .............................................................................................99



# ORDER 15

## APPLICATION FOR SUPERVISION ORDER

### Introduction (O.15, r.1)

**1**.    (1)    An application for a supervision order must be made by a company's voluntary liquidator in accordance with section 124 of the Law if its directors fail to make and deliver their declaration of solvency to the voluntary liquidator within 28 days of the commencement of the liquidation.

(2)    Notwithstanding that a declaration of solvency has been duly made in accordance with section 124 of the Law, the voluntary liquidator or any contributory or any creditor may apply to the Court for a supervision order on the grounds contained in section 131 of the Law.

### Application under section 124 (O.15, r.2)

**2**.    (1)    The requirement to apply for a supervision order under section 124 of the Law shall apply only if the voluntary liquidation was commenced on or after 1 March 2009.

(2)    An application for a supervision order under section 124 shall be made by petition.

(3)    A petition under this Rule shall contain —

(a)    particulars of the company's incorporation;

(b)    particulars of the method by which the company was put into voluntary liquidation;

(c)    particulars of the persons who are or were directors of the company on the date on which its voluntary liquidation commenced;

(d)    a statement that the voluntary liquidator did not receive, within 28 days of the commencement of the liquidation, a declaration of solvency in the prescribed form signed by all of the company's directors; and

(e)    if the voluntary liquidator is a qualified insolvency practitioner, a statement that the voluntary liquidator consents to being appointed as official liquidator; or

(f)    if the voluntary liquidator is not a qualified insolvency practitioner or is unable to comply with the independence requirements of the Regulations or is unwilling to be appointed as official liquidator, the name and address of a qualified insolvency practitioner nominated for appointment as official liquidator.

---



(4)    Every petition under this Rule must be presented within 35 days of the date upon which the liquidation is deemed to have commenced under section 117(1) of the Law.

(5)    Unless the voluntary liquidator is a qualified insolvency practitioner who is willing and properly able to accept appointment as official liquidator, the voluntary liquidator must give notice of the petition to the company's members by whatever means is provided in its articles of association for giving notice of a general meeting of the company.

## Application under section 131 (O.15, r.3)

**3**.    (1)    An application by a voluntary liquidator, contributory or creditor for a supervision order to be made under section 131 shall be made by petition.

(2)    A petition under this Rule shall contain full particulars of the grounds upon which it is presented.

(3)    Upon the presentation of a petition under this Rule, the petitioner must at the same time issue a summons for directions in respect of the matters contained in this Rule.

(4)    Upon hearing the summons for directions, the Court shall either —

(a)    make a supervision order, if the Court is satisfied that the company's members consent or do not object to an order being made; or

(b)    fix a hearing date and make such directions as the Court thinks appropriate in respect of the following matters —

(i)    whether the petition should be served and, if so, upon whom it should be served;

(ii)    whether the petition should be advertised and, if so, in what manner it should be advertised;

(iii)    the manner in which further evidence is to be given; and

(iv)    such other procedural matters as the Court thinks fit.

(5)    A petition under this Rule may be presented at any time.

## Supporting Affidavits (O.15, r.4)

**4**.    (1)    The petition shall be verified by an affidavit that the statements in the petition are true, or are true to the best of the deponent's knowledge, information and belief.

(2)    An affidavit verifying a petition under Rule 2 shall be sworn by the voluntary liquidator personally.

(3)    An affidavit verifying a petition under Rule 3 shall be sworn by —

(a)    the petitioner; or



  (b) the voluntary liquidator; or

  (c) any director, officer or agent of the petitioner who has been concerned in and has personal knowledge of the matters giving rise to the petition.

 (4) Unless the voluntary liquidator is a qualified insolvency practitioner who is willing and properly able to accept appointment as official liquidator, a petition under Rule 2 or Rule 3 must also be supported by an affidavit sworn by the person or persons nominated for appointment as official liquidator and containing the information required by Order 3, rule 4.

## Hearing of section 124 Petition (O.15, r.5)

**5**. (1) If the voluntary liquidator is a qualified insolvency practitioner who has sworn an affidavit verifying that the voluntary liquidator is willing and properly able to accept appointment as official liquidator, a Judge may make a supervision order under section 124 of the Law without the need for any hearing if the Judge is satisfied that —

  (a) notice of the petition has been given to the company's creditors and, if it appears to the voluntary liquidator that the company may in fact be solvent, to its shareholders; and

  (b) there is no reason to believe that any creditor or, if applicable, any shareholder objects to the appointment of the voluntary liquidator as official liquidator.

 (2) In any other case, the voluntary liquidator shall apply to fix a date for hearing the petition in open court and –

  (a) give notice of the hearing of the petition to the company's creditors and, if applicable, to its shareholders in whatever manner is likely to bring it to their attention; and

  (b) advertise the hearing of the petition once in a newspaper having a circulation within the Islands and, if the company is carrying on business outside the Islands, once in a newspaper having a circulation in a country in which the company appears most likely to have creditors, in which case the advertisement shall be published in the official language of such country.

 (3) An advertisement under this Rule shall be in CWR Form No. 22.

 (4) Any member or creditor of the company may appear on the petition and be heard upon the question of who should be appointed as official liquidator provided that that member or creditor has given notice of their intention to do so and has complied with the requirements of Order 3, rule 8(3).



## Release of Voluntary Liquidator (O.15, r.6)

**6**.  (1)    Unless a voluntary liquidator is appointed as official liquidator, the voluntary liquidator shall cease to hold office automatically upon the making of a supervision order.

      (2)    When a voluntary liquidator ceases to hold office in accordance with this Rule, the voluntary liquidator shall prepare a final report and accounts for the period from the commencement of the voluntary liquidation until the date of the supervision order.

      (3)    The voluntary liquidator shall deliver the voluntary liquidator's final report and accounts to the official liquidator within 28 days of the date upon which the supervision order was made and the official liquidator shall —

          (a)    file the report and accounts in Court; and

          (b)    publish the report and accounts to the company's members and creditors in such manner as the official liquidator thinks fit.

      (4)    Having delivered the voluntary liquidator's final report and accounts, the voluntary liquidator may apply (but shall not be obliged to apply) to the Court for an order that the voluntary liquidator's accounts (including the amount of the voluntary liquidator's remuneration) be approved and that the voluntary liquidator be released from the performance of any further duties.

## Delivery of Company's Books and Records (O.15, r.7)

**7**.  (1)    A voluntary liquidator  who ceases to hold office upon the making of  a supervision  order shall forthwith deliver to the voluntary liquidator's successor the company's books and a copy of the voluntary liquidator's liquidation files (maintained in accordance with Order 26, rule 2).

      (2)    The official liquidator shall allow the voluntary liquidator to have unrestricted access to the company's books and records for the purpose of preparing the voluntary liquidator's report in compliance with Order 13, rule 8.

## Supervision Order (O.15, r.8)

**8**.  (1)    A supervision order shall be in CWR Form No 23.

      (2)    The requirements of Order 3, rules 22 and 23 shall apply to supervision orders as they apply to winding up orders.

      (3)    On the making of a supervision order all the powers of the directors cease, save that directors retain residual powers to allow them to initiate an appeal against the supervision order.



# EXHIBIT 80

**Charitable DAF HoldCo, Ltd (In Official Liquidation)**
**(the "Company")**
**Registration No: 263805**
**Grand Court Cause No: FSD 116 of 2025 (JAJ)**

---

**Written resolutions of the Joint Official Liquidators of the Company**

---

**WHEREAS**

- The Company is currently in official liquidation and under the control of the Joint Official Liquidators, Sandipan Bhowmik and Margot MacInnis, both of Grant Thornton Specialist Services (Cayman) Limited (the "**JOLs**") having been appointed by the Grand Court of the Cayman Islands on 6 May 2025;

- The Company's registered office is presently situated at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, George Town, Grand Cayman KY1-9010, Cayman Islands; and

- The JOLs consider it in the best interests of the liquidation to transfer the registered office of the Company to HSM Corporate Services Ltd, 68 Fort Street, George Town, PO Box 31726, Grand Cayman KY1-1207, Cayman Islands.

**IT IS HEREBY RESOLVED THAT:**

1. The registered office of the Company be transferred from Campbells Corporate Services Limited to HSM Corporate Services Ltd, with effect from 1 July 2025.

2. The JOLs be and are hereby authorised to take all necessary steps and execute all documents required to give effect to this resolution, including instructing HSM Corporate Services Ltd to attend to the necessary filings with the Registrar of Companies in relation to this matter.

Dated this 1st day of July 2025.

_____                    _____
Sandipan Bhowmik                                      Margot MacInnis
Joint Official Liquidator                             Joint Official Liquidator

Grant Thornton Specialist Services (Cayman) Limited
2nd Floor, Century Yard, Cricket Square,
PO Box 1044, Grand Cayman, KY1-1102
Cayman Islands,
T: +1(345) 949 7100
E: cdaf.core@uk.gt.com



*Filed: 02-Jul-2025 10:57 EST*
*Auth Code: D3456823Z717*

# EXHIBIT 81



Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

**D** +1 345 914 5898
**T** +1 345 949 2648
**F** +1 345 949 8613
**E** MGoodman@campbellslegal.com

campbellslegal.com

Our Ref: MGM/ROD/18955-44959
Your Ref:

CAYMAN | BVI | HONG KONG

**BY EMAIL**

Johnstone Law
Unit 9, Tropic Centre
18 Earth Close,
PO Box 926,
Grand Cayman, KY1-9006
Cayman Islands

30 May 2025

Dear Sirs

**Re: Charitable DAF Holdco, Ltd. (in Official Liquidation) (the "Company")**
**FSD Cause No. 116 of 2025 (JAJ)**

We refer to your letters dated 22 and 30 May 2025 sent on behalf of the joint official liquidators (the "**JOLs**") of the Company. Capitalised terms, unless otherwise defined, adopt the definitions applied in our letters dated 12 and 16 May 2025 ("**Our Letter**") which were addressed to the JOLs.

As a preliminary point, we received a letter from Maples and Calder dated 28 May 2025 indicating that they have recently been instructed to act for the JOLs. We understood, based on your 22 May letter, that Johnstone Law were engaged as counsel by the JOLs (subject to sanction by the Court). In circumstances where two law firms are now corresponding with us, purportedly on behalf of the JOLs, it is incumbent on the JOLs to immediately clarify the situation.

Please confirm, by **no later than 5pm on Monday, 2 June 2025**, the respective roles of Maples and Calder and Johnstone Law.

**Attendance at the Directions Hearing**

1.   Your letters repeatedly assert that our clients have "*no standing in the liquation*". This is patently incorrect. The JOLs were specifically authorised to commence proceedings against our client as a direct result of the evidence and draft order prepared by your firm, on behalf of the petitioner, at

the supervision hearing.[1] This resulted in the Court making an Order which granted the JOLs authority to present a petition / seek the appointment of provisional liquidators to the Fund before they could possibly have had an opportunity to consider the relevant facts, or if such steps were necessary or appropriate. In the circumstances, it is obvious that, (i) your firm cannot objectively advise the JOLs, and (ii) the Fund, as a party named in the Appointment Order, have standing to address the Court on those provisions.

2. As Lord Millet observed on behalf of the Privy Council in *Deloitte and Touche AG v Johnson,*[2] "*Orders made by the court are coercive. Every order of the court affects the freedom of action of the party against whom it is made*". Accordingly, when determining whether an applicant has standing, the Court will first consider if it has jurisdiction to make the order, and secondly, in words of Lord Millet, whether the applicant has a "*legitimate interest in the relief which they seek*". Clearly, given the Fund is the party directly affected by the inclusion of these '*coercive*' provisions, they have standing to bring an application to have the offending paragraphs removed from the Appointment Order.

3. As regards the reporting 'Protocol' proposed in Our Letter and referred to at the Directions Hearing, your 22 May letter, despite seeking "*assurances regarding the assets under the control of*" our clients, did not address the Protocol, or take us up on our offer to "*discuss the terms of the Protocol in further detail*". We were therefore surprised to hear Mr Johnstone summarily dismiss the Protocol as "*paper thin*" at the Directions Hearing. For the avoidance of doubt, our clients' offer to enter into a reporting Protocol in respect of material transactions remains open (to which, see paragraph 12 below).

4. As to the balance of the entirely baseless criticisms in your 30 May letter, we have no obligation to, and no intention of, addressing these. The appropriate forum to address those issues was in front of Mr Justice Asif KC at the Directions Hearing. They warrant no further comment.

**JOLs' Powers**

5. As regards paragraph 3 of your 22 May letter, the powers conferred on liquidators by the CWR and the Act to collect in the books and records of a company in liquidation, including those in paragraph 1 of Part II to Schedule 3, are to be exercised by the liquidator in respect the "*property of the Company*" and / or "*the company's books and records*". As these statutory powers do not extend to distinct legal entities which are not the subject of a liquidation or other court order, it follows

---

[1] Your 22 May letter indicates that these provisions were granted by the Court "*on the basis of the evidence before it*", although it is notable that you have not provided the transcript of the petition hearing (insofar as it relates to paragraphs 6(a) and (b) of the Appointment Order) we requested in Our Letter, or confirmation as to whether these provisions were addressed in legal submissions.
[2] [1999] CILR 297

that our clients' documents are not the "*property of the Company*" and JOLs have no basis to claim that the Company is entitled to these documents.

6. Further, any duty which Messrs Patrick or Murphy owe to the JOLs in their capacity as former directors of the Company does not extend to the books and records of the CDM Entities which are separate entities over which the JOLs have no power or authority. It is plainly incorrect to suggest that directors of the CDM Entities can disregard their duties to those companies on the basis of your assertion that they fall within the definition of "relevant persons" under s.103 of the Act. Directors are bound by duties under common law and statute to protect the interests, confidentiality, and assets of the companies they serve. To comply with your baseless requests would place them in breach of those duties unless and until a court determines otherwise.

7. If the JOLs believe it necessary to investigate particular transactions involving the CDM Entities, the proper course is to seek the appropriate order from the Grand Court under section 103 or 138 of the Act. This approach ensures that the statutory process is respected and our clients' rights are protected.

**Response to Requests in your 22 May Letter**

8. In response to the requests listed at paragraph 5 of your 22 May letter, please see the Schedule to this letter which lists each of the CDM Entities we represent.

9. As to paragraphs 5(b), (c) and (d), for the reasons outlined above, your request for extensive documentation, including registers, asset holdings, and transaction histories, has no legal basis. Nor is there any basis on which the JOLs can demand "*firm undertakings*" from our clients not to deal with their assets.

10. We do not understand the reference to the purported transaction involving Hunter Mountain Trust in your 30 May letter. The bare assertion of a proprietary claim (which is made for the first time in this letter) is completely unsubstantiated and legally flawed. Needless to say, the JOLs have no interest, proprietary or otherwise, in any assets held by the Fund and our clients do not need to seek approval or consult with the JOLs regarding transactions in the ordinary course of business.

11. Notwithstanding, our clients have already offered to enter into a reporting Protocol in an effort to assuage any misplaced concerns the JOLs may have regarding the commercial activities of the Fund and the risk of dissipation of assets outside of the ordinary course of business. However, it is notable that your letters have eschewed this reasonable and constructive proposal in favour of misconceived and unsustainable requests of our clients.

3203729-1

#3248355v4

12. We now enclose a draft reporting Protocol whereby our clients offer to provide, *inter alia*, the following information to the JOLs:

    (a) a report listing all transactions undertaken by the Fund, or any of the CDM Entities, since 27 March 2025 which exceed US$5,000,000;

    (b) a 'business plan' explaining the ordinary day to day business of the Fund;

    (c) a monthly transactions report; and

    (d) advance notice of any single transaction exceeding US$5,000,000, or any series of transactions in an aggregate amount exceeding US$5,000,000 (save for transactions in the ordinary course of business involving or related to the renumeration of employees, officers and directors, agents, advisors and / or service providers).

13. For the avoidance of doubt, our clients reject the suggestion that they are under any duty to provide this information. However, in circumstances where the CDM Entities, including the Fund, are operating in the ordinary course to make investments on behalf of, and to support charitable causes, our clients are offering this Protocol to ensure that these charitable operations are not unnecessarily impacted by the JOLs.

14. Please confirm your agreement to, or provide any comments on, the draft protocol by **3pm on Wednesday, 4 June 2025**.

**Paragraphs 6(a) and 6(b) of the Appointment Order**

15. With regard to paragraphs 6(a) and (b) of the Appointment Order, as noted above and in Our Letter, we have serious concerns regarding the propriety of the JOLs seeking to retain the same counsel who had expressly sought, and obtained, an order that the JOLs be authorised to present a petition for the winding up of, and appointment of provisional liquidators to, the Fund "*if so advised*".  There is simply no legal or practical basis for the JOLs to present a petition for the winding up of the Fund and, as foreshadowed at the Directions Hearing, our clients intend to apply to have paragraphs 6(a) and (b) struck from the Appointment Order.

16. It is well established in this jurisdiction that, per Mr Justice Jones KC in *Re ICP Strategic Credit Income Fund Limited*,[3] "*an official liquidator's power to 'bring or defend any action or other legal proceeding in the name and on behalf of the company' is exercisable only with the sanction of the Court.*"  In addition, when determining whether to sanction such proceedings, "*the court must be satisfied that they have causes of action against the proposed defendants with a reasonable prospect of success*

---

[3] [2014] 1 CILR 314

*and that the interests of the creditors will be best served by allowing proceedings to be commenced. As officers of the court, official liquidators are expected to behave in an exemplary manner and to perform their duties and exercise their powers fairly. The court will not allow its official liquidators to threaten or commence litigation speculatively as a means of extracting a settlement from a party against whom there is no genuine cause of action or no evidence from which to infer that a possible cause of action has any real prospect of success*" (at paragraph 10).

17. Accordingly, it is clear that, despite the inexplicable inclusion of paragraphs 6(a) and (b) in the Appointment Order, the JOLs should be expected to obtain Court sanction before issuing any proceedings in the name of the Company. However, were the JOLs to seek sanction for the presentation of a winding up petition against the Fund, such an application would be destined to fail in circumstances where, for the reasons outlined in Our Letter, there is no genuine cause of action and no realistic prospect of the petition being successful.

18. Furthermore, given these provisions were sought and included in the Appointment Order without any proper consideration of the underlying transactions or the relevant facts, our clients have serious concerns with the manner in which the JOLs, presumably influenced by legal counsel, appear to have predetermined the course of the liquidation and the investigations which will be required into the affairs of our clients. Such conduct by the JOLs, without first ensuring they are "*thoroughly acquainted with the affairs of the company*" clearly disregards the dicta of the Court of Appeal in *In re Contract Corporation, Gooch's Case* (as applied by the Cayman Islands Court of Appeal in *In Re China Branding Group Ltd*).[4] In the circumstances, Mr Justice Jones KC's observation at paragraph 11 in *Re ICP Strategic Credit Income Fund Limited* that "*the Court's decision to sanction the commencement of litigation can never be entirely divorced from questions about how and by whom it will be financed*" seems particularly relevant.

19. We enclose herewith a draft Summons seeking a variation of the Appointment Order by removing paragraphs 6(a) and (b). As stated at the Directions Hearing, our instructions are to file this Summons and, given the narrow scope of the issue to be determined, to request that it is heard with the existing JOLs' sanction application on 24 June 2025.

20. However, in the circumstances, including, *inter alia*, the reasons set out above, we believe it would be practical for the JOLs to agree to vary the Appointment Order without requiring the issuance of

---

[4] In *re Contract Corporation, Gooch's Case* [1871] 12 LR Ch App 207, p 211: "*In truth, it is of the utmost importance that <u>the liquidator should, as the officer of the Court, maintain an even and impartial hand between all the individuals whose interests are involved in the winding up. He should have no leaning for or against any individual whatever. It is his duty to the whole body of shareholders, and to the whole body of creditors, and to the Court, to make himself thoroughly acquainted with the affairs of the company</u>; and to suppress nothing, and to conceal nothing, which has come to his knowledge in the course of his investigation, which is material to ascertain the exact truth in every case before the Court. And it is for the Judge to see that he does his duty in this respect*" (emphasis added).

3203729-1

#3248355v4

a Summons and the associated hearing costs. We therefore invite the JOLs to agree a consent order agreeing that paragraphs 6(a) and (b) should be struck from the Appointment Order which we can jointly submit for His Lordship's consideration.

21. Please confirm by **3pm (Cayman Islands time) on Wednesday, 4 June 2025**, if the JOLs are amenable to agreeing a consent order in the manner proposed. If we do not hear from you before this, we are instructed to file a Summons without further notice to you and will rely on this letter for costs purposes.

Yours faithfully,

**Campbells LLP**

6

**Schedule**

(i)      CDH GP, Ltd. (Cayman Islands)

(ii)     CDMCFAD, LLC (Delaware)

(iii)    Charitable DAF Fund 2, LP (Cayman Islands)

(iv)     Charitable DAF Fund, LP (Cayman Islands)

(v)      CLO HoldCo, Ltd. (Cayman Islands)

(vi)     Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii)    HCT Holdco 2, Ltd. (Cayman Islands)

(viii)   MGM Studios Holdco, Ltd. (Cayman Islands)

(ix)     Liberty CLO HoldCo, LLC (Delaware)

(x)      Liberty Sub, Ltd. (Delaware)

(xi)     Charitable DAF Holdings Corp. (Delaware)

(xii)    DST Investco, LLC (Delaware)

(xiii)   Allanon Capital Management LLC (Texas)

7

3203729-1

#3248355v4

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

———————————

**PROTOCOL IN RESPECT OF CHARITABLE DAF FUND, LP**

———————————

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court (the "**Supervision Application**") pursuant to s.131 Companies Act (2025 Revision) (the "**Act**").

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025 (the "**Order**"), the Court determined the Supervision Application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmilk be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

Paragraph 6, 6(a) and 6(b) of the Order provide as follows:

> "*The JOLs are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:*
>
> (a)    *The power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;*
>
> (b)    *The power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised…*"

(the "**DAF Provisions**")

2033932-1

#3253267v2

**1105**

Charitable DAF Fund, LP ("**DAF LP**") was not represented at the Supervision Application and understands that that the DAF Provisions were included in the Order "*on the basis of the evidence before* [the Court]".[1]

HoldCo was, and DAF LP is, part of a larger group of entities (collectively the "**DAF Structure**") whose establishment and aim is, according to its '**Mission Statement**', to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". "**CDM Entities**" means the DAF Structure entities listed on Annexure 1 hereto.

**Preliminary statement**

The purpose of this Protocol (the "**Protocol**") is to ensure the efficient and orderly administration of DAF LP, the CDM Entities, and the liquidation estate of HoldCo. The Protocol is designed to avoid conflict between the JOLs and DAF LP, to assuage any concerns the JOLs may have regarding the commercial activities of DAF LP with respect to the risk of dissipation / misuse of assets outside of the ordinary course of business, and, subject to the approval of the Court, to facilitate the removal of the DAF Provisions from the Order (without prejudice to the JOLs entitlement to seek sanction in the ordinary manner and in accordance with the Act and the Companies Winding Up Rules (2023 Consolidation)).

**Background**

DAF LP is a Cayman Islands limited partnership formed on 28 October 2011. CDH GP Ltd (the "**GP**"), is a Cayman Islands company incorporated in or around 7 February 2024 and is the general partner of DAF LP. Mark Patrick and Paul Murphy are the directors of the GP (the "**Directors**"). Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. From its incorporation until March 2025 when it was placed in voluntary liquidation, Holdco was the limited partner of DAF LP through which it indirectly owned the other entities in the DAF Structure.

**1. Notices**

> In the interests of expedience, the JOLs and the Directors agree that any notices or coummincation required under this Protocol shall be sent by email as follows:

> a) To the JOLs:

>> Margot MacInnis - margot.macinnis@uk.gt.com
>> Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com
>> CDAF Core - CDAF.Core@uk.gt.com

> b) To the Directors:

---

[1]Letter dated 22 May from Johnstone Law to Campbells.

Mark Patrick - mpatrick@dafholdco.com
Paul Murphy - paul@gkmanagement.com.ky

**2    Transactional Reporting**

2.1    Upon execution of this Protocol, the Directors will provide a report to the JOLs listing all transactions undertaken by DAF LP, or any of the CDM Entities, since 27 March 2025 which exceed US$5,000,000.

2.2    The Directors shall provide a business plan within 21 days of the signing of this Protocol which can be revised from time-to-time if it is determined to be necessary by the Directors and within the ordinary course of buisness for DAF LP (the "**Business Plan**"). Steps taken with respect to the management of DAF LP will be considered to be in the ordinary course of business if they are provided for in the Business Plan.

2.3    The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of DAF LP and the CDM Entities in accordance with the Mission Statement. The Directors shall provide a monthly transactions report to the JOLs so they have oversight of DAF LP's investment activity and financial performance, and the steps being taken by the Directors in the ordinary course of DAF LP's business.

2.4    If the JOLs have any doubt about whether a transaction is or is not in the ordinary course of DAF LP's business, they may contact the Directors for clairfation.

2.5    The Directors will endeavour to provide advance notice to the JOLs in respect of any single transaction of DAF LP exceeding US$ 5,000,000 or any series of transactions in an aggregate amount exceeding US$5,000,000 **SAVE THAT** advance notice is not required, in relation to any single transaction or series of transactions in the ordinary course of business involving or related to the renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.6    Notwithstanding anything to the contrary in this Protocol, the Directors shall be under no obligation to undertake any action or refrain from taking any action to the extent they deem it reasonably necessary to comply with their legal obligations to the CDM Entities.

**3    Legal and Professional Fees**

The JOLs acknowledge DAF LP's need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of DAF LP or the CDM Entites to seek legal or professional advice.

**4    Consultation**

Save in exceptional circumstances, the JOLs shall provide notice to the Directors of any intended exercise of powers by them which would be consistent with the DAF Provisions, and the JOLs shall discuss and consult with the Directors in respect of any intended action against DAF LP or the CDM

3

**1107**

Entities. The JOLS shall provide advice notice of any intended exercise of their powers without sanction by the Court with respect to DAF LP or any CDM Entity that could reasonably be expected to exceed the powers granted to the JOLs by the Court.

**5     Confidentiality**

5.1    In respect of any information of whatever nature relating to any member of the CDM Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (herinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

    (a)    keep the Confidential Information confidential and will not disclose it to anyone except as provided for by paragraph 6.2 below; and

    (b)    ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2    The JOLs may disclose Confidential Information:

    (a)    to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall be notified by the JOLs to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

    (b)    where required or requested by any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency; or

    (c)    with the Directors' prior written consent.

**6     Formalities**

6.1    This Protocol may not be waived, varied or amended without consent in writing from all parties.

6.2    This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

6.3    For the avoidance of doubt this Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the adjudication of the Grand Court of the Cayman islands.

6.4    In the event that either party considers that the other party has acted contrary to this Protocol, it shall first raise the matter by telephone or by email with an explanation of the basis for such

4

complaint and thereafter allow a reasonable period for the other party to remedy the situation or provide an explanation for its conduct.  If either party considers that the issue is not resolved then a conference call will be scheduled for a discussion between the Directors and the JOLs (and their respective legal advisors if necessary).  Only in the event that there remains a dispute after these steps have been taken will either party refer the matter to the Court.

[SIGNATURES]

5

**Annexure 1 – List of CDM Entities**

(i)      CDH GP, Ltd. (Cayman Islands)

(ii)     CDMCFAD, LLC (Delaware)

(iii)    Charitable DAF Fund 2, LP (Cayman Islands)

(iv)     Charitable DAF Fund, LP (Cayman Islands)

(v)      CLO HoldCo, Ltd. (Cayman Islands)

(vi)     Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii)    HCT Holdco 2, Ltd. (Cayman Islands)

(viii)   MGM Studios Holdco, Ltd. (Cayman Islands)

(ix)     Liberty CLO HoldCo, LLC (Delaware)

(x)      Liberty Sub, Ltd. (Delaware)

(xi)     Charitable DAF Holdings Corp. (Delaware)

(xii)    DST Investco, LLC (Delaware)

(xiii)   Allanon Capital Management LLC (Texas)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

_____

**SUMMONS**

_____

**LET ALL PARTIES CONCERNED** attend before the Judge in Chambers, at the Law Courts, George Town, Grand Cayman on      day of            2025, at          am/pm, on the hearing of an application by Charitable DAF Fund, LP (the "**DAF LP**") that:

1.  The supervision order in these proceedings dated 6 May 2025 which ordered, *inter alia*, that the voluntary liquidation of Charitable DAF HoldCo, Ltd be continued under the supervision of the Court pursuant to s.131 of the Companies Act (2025 Revision) and O.15, r.8 of the Companies Winding Up Rules (2023 Consolidation) (the "**Supervision Order**") be varied such that paragraphs 6(a) and 6(b) of the Supervision Order, which authorised the joint official liquidators to take certain steps in respect of DAF LP, be deleted forthwith.

2.  Such further or other orders and directions as the Court thinks fit.

3.  Orders as to costs.

This **Summons** was filed by Campbells LLP, Attorneys-at-Law for and on behalf of the DAF LP, whose address for service is Floor 4 Willow House, Cricket Square, George Town, Grand Cayman (Ref: MGM/ROD/18955-44959).

#3245656v1

**1111**

Dated: [.] May 2025

_____

**Campbells LLP**

Attorneys for the Charitable DAF Fund, LP


**TO:**             The Registrar of the Financial Services Division

**AND TO**:         Johnstone Law, Attorneys for the Joint Official Liquidators

**TIME ESTIMATE**:  1 hour


2

This **Summons** was filed by Campbells LLP, Attorneys-at-Law for and on behalf of the DAF LP, whose address for service is Floor 4 Willow House, Cricket Square, George Town, Grand Cayman (Ref: MGM/ROD/18955-44959)

#3245656v1

**1112**



5 June 2025
aj@j-law.ky
+1 (345) 929 3000
Ref: 00022

Campbells LLP
Floor 4, Willow House Cricket Square
Grand Cayman, KY1-9010
Cayman Islands

**By email: mgoodman@campbellslegal.com**

Dear Colleagues

**Charitable DAF HoldCo, Ltd (In Official Liquidation) (the *Company*) | FSD No. 116 of 2025 (JAJ)**

We refer to your letter dated 30 May 2025 and our recent correspondence in relation to the above matter.

**Maples engagement**

1.   The JOLs have engaged both Johnstone Law (***JL***) and Maples and Calder (Cayman) LLP (***Maples***) in these proceedings and their respective involvement subject to the JOLs oversight and instruction. Both engagements are subject to the sanction of the Court.

**Directions Hearing**

2.   The Directions Hearing related to an application for sanction under s.110 of the Act of the attorneys engaged by the JOLs. Irrespective of wider questions of standing (see below), your clients have and had no arguable standing to appear on a sanction application, being neither creditors nor contributories of the Company. You avoid this question because there is no answer to it.

3.   With respect to your assertion that the specific terms of the Appointment Order give your clients standing to challenge it – you are simply wrong.

**JOLs' Powers and Requests for Information**

4.   The JOLs assert no right to the books and records of your clients under their powers to collect in the books and records of the Company and your refusal to cooperate on this basis is entirely unhelpful.

5.   The JOLs were appointed on 6 May 2025 and have now been in office almost a month. Despite ample opportunity, almost no information of substance or genuine utility has been provided to the JOLs by the majority of parties, your clients included. Instead, the weeks since the JOLs' appointment have been occupied with meritless challenges and tenuous technical objections at best rather than assisting the liquidators in their investigation of the C$270m that has been removed from the Company.



Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman
PO Box 926, 10 Market St, Grand Cayman, KY1-9006
345 929 3000 | info@j-law.ky | www.j-law.ky | LinkedIn

**1113**

6. It is mandatory for your clients to cooperate with the JOLs and they are choosing not to do so. If required, as warned, the JOLs will take steps to obtain the information they require with the assistance of the Court.

**Protocol**

7. The JOLs' preliminary view is that the Company may have inter alia clear prima facie proprietary and other claims to the asset transferred pursuant to the transfer of the Company's interest in the Charitable DAF Fund, LP to your client, CDMCFAD, LLC, pursuant to a deed of assignment and assumption on 18 December 2024 (the **Deed**). Nothing in your letter changes that analysis.

8. The protocol you propose is entirely inappropriate both to responding to proprietary claims and to the current circumstances. No dealing of any nature is appropriate in assets over which proprietary claims are asserted, whether in the ordinary course of business or subject to any threshold. Further, no expenditure from these assets on legal or any other professional fees is appropriate at any time.

9. It is in any event impossible for the JOLs to engage with the protocol in circumstances where they have no serious knowledge or understanding of what is happening at any underlying level. Your clients have had since 12 May 2025 to provide that knowledge and understanding and continue to decline to provide it to the JOLs. We again urge all your clients to set aside their distractive tactics and cooperate, and provide all information and documents, in an open and frank manner.

10. In the circumstances, the JOLs require your clients to provide undertakings by **3pm on 6 June 2025** that there will be no dealing in the assets formerly owned by the Company, and the provision of full and complete information on the whereabouts, ownership and control of all assets owned by the Company (directly or indirectly, legally or beneficially) prior to execution of the Deed. Nothing short of those assurances and undertakings is acceptable at this stage to the JOLs.

**Hunter Mountain Investment Trust**

11. We highlight below one specific aspect of the JOLs' concerns about dealing in assets. This relates to the Hunter Mountain Investment Trust (**HMIT**) transaction. As stated in our 30 May letter, the JOLs have become aware that your clients have, since receipt of the JOLs letter dated on 12 May 2025 (the **Initial Letter**), and without notice to the JOLs, sought approval of a transaction involving HMIT. We requested information about this transaction and sought your urgent confirmation that no transactions will be undertaken involving any assets held by them.

12. HMIT was formerly the sole beneficiary of the Rand PE Fund, I, LP. The disclosure of those for whom you act includes a number of entities unknown to the JOLs, and does not include the HMIT Entities[1] which formerly held Fund assets.

---

[1] '**HMIT Entities**' defined in Settlement Agreement as Hunter Mountain Investment Trust, Beacon Mountain LLC, Rand Advisors LLC, Rand PE Fund I, L,P, Rand-PE Fund Management, LLC, Atlas IDF, LP, and Atlas IDF GP, LLC

**1114**

13.    In your 30 May letter, you stated that your clients *"do not understand the reference to the purported transaction involving HMIT"*. The JOLs have however since been provided with a copy of a settlement agreement between the Highland Entities[2] and the HMIT Entities[3] (the **Settlement Agreement**) which was **executed by Mark Patrick on behalf of the HMIT Entities** on <u>19 May 2025</u> – a mere matter of days after receipt of the Initial Letter.

14.    Under the Settlement Agreement, HMIT stands to receive *inter alia* (i) initial payment of US$500,000, (ii) promissory note with an original face amount of $24,268,621.69 and other interests, (iii) distributions from its *Class 10 Interest* until 2029, and (iv) distributions from various other interests.

15.    This appears to be a transaction involving assets which at some stage were indirectly owned by the Company, although your clients' continued non-disclosure makes it difficult for the JOLs to conduct a full and complete analysis of the true position. It is particularly concerning however that this transaction was executed after the JOLs' appointment and without notice to the JOLs, and it would be inappropriate for this transaction to be approved without their input, or at the very least prior to the JOLs being fully apprised of the nature and circumstances giving rise to this transaction. Please provide a full explanation, with all relevant details, by return.

**Appointment Order**

16.    It is a matter for your clients if they wish to seek to challenge the Appointment Order, albeit such an application would clearly be hopeless.

17.    The evidence supporting the applications in FSD No. 99 and FSD No. 116 was uncontested, and the issues ventilated over the course of two hearings during which Justice Asif KC engaged with the parties as to the form of the draft order, and indeed variously amended its terms (which is abundantly clear on the face of the draft and final versions).

18.    The JOLs do not consent to the proposed (or any other) variation of the Appointment Order.

**Conclusion**

19.    The JOLs would prefer to work cooperatively and constructively with your clients to protect the assets of the Fund and to "hold the ring", to obtain information necessary for the JOLs' investigations, and to expedite the conclusion of those investigations. They have provided a more than significant opportunity for your clients to offer and provide such cooperation, but it has not been forthcoming. On the contrary, your clients have continued to deal in assets to which the JOLs assert claims, without notice to the JOLs and have behaved antagonistically and obstructively.

20.    Should your clients fail to provide the information and undertakings requested by **4pm** on **6 June 2025**,

---

[2] '**Highland Entities**' defined in H Settlement MIT Agreement as Highland Capital Management, L.P, Highland Claimant Trust, Highland Litigation Sub-Trust, and Highland Indemnity Trust

[3] As defined in [1] above.

the JOLs will seek the assistance of the Court on these matters, without further notice.

Yours faithfully

**Johnstone Law**



Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

**BY EMAIL**

**D** +1 345 914 5898
**T** +1 345 949 2648
**F** +1 345 949 8613
**E** MGoodman@campbellslegal.com

Johnstone Law
Unit 9, Tropic Centre
18 Earth Close,
PO Box 926,
Grand Cayman, KY1-9006
Cayman Islands

campbellslegal.com

Our Ref:  MGM/ROD/18955-44959
Your Ref:

CAYMAN | BVI | HONG KONG

9 June 2025

Dear Sirs

**Re: Charitable DAF Holdco, Ltd. (in Official Liquidation) (the "Company")**
**FSD Cause No. 116 of 2025 (JAJ)**

1. Further to previous correspondence in relation to this matter, we enclose herewith a revised reporting protocol for the JOLs' consideration.

2. As indicated in previous correspondence, we believe the appropriate course of action is for the JOLs to engage on the terms of the protocol, which will appease any concerns they may have regarding the dissipation or misuse of the Fund's assets outside of the ordinary course of business during the currency of the liquidation.

3. For convenience, our clients' proposed amendments are tracked in the enclosure and serve to; (i) remove the value threshold from the historical reporting obligation at paragraph 2.1, and (ii) reduce the value threshold for the provision of advance notice at paragraph 2.5.

4. Please confirm your agreement to, or provide any comments on, the draft protocol by **3pm on Wednesday, 11 June 2025**, failing which we are instructed to file a Summons without further notice and will rely on this letter, and previous correspondence, for costs purposes.

Yours faithfully,

*Campbells LLP*

3203729-1

#3264473v1

**1117**

**Campbells LLP**

3203729-1

#3264473v1

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

—————————

**PROTOCOL IN RESPECT OF CHARITABLE DAF FUND, LP**

—————————

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund (the "**Highland Foundations**") sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court (the "**Supervision Application**") pursuant to s.131 Companies Act (2025 Revision) (the "**Act**").

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025 (the "**Order**"), the Court determined the Supervision Application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmilk be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

Paragraph 6, 6(a) and 6(b) of the Order provide as follows:

"*The JOLs are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:*

(a)     *The power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;*

(b)     *The power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised…*"

(the "**DAF Provisions**")

2033932-1

#3253267v3#3253267v3#3253267v2

**Formatted:** Font: Bold

**Formatted:** Font: (Default) Calibri, 10 pt

1119

Charitable DAF Fund, LP ("**DAF LP**") was not represented at the Supervision Application and understands that that the DAF Provisions were included in the Order "*on the basis of the evidence before* [the Court]".[1]

HoldCo was, and DAF LP is, part of a larger group of entities (collectively the "**DAF Structure**") whose establishment and aim is, according to its '**Mission Statement**', to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". "**CDM Entities**" means the DAF Structure entities listed on Annexure 1 hereto.

**Preliminary statement**

The purpose of this Protocol (the "**Protocol**") is to ensure the efficient and orderly administration of DAF LP, the CDM Entities, and the liquidation estate of HoldCo. The Protocol is designed to avoid conflict between the JOLs and DAF LP, to assuage any concerns the JOLs may have regarding the commercial activities of DAF LP with respect to the risk of dissipation / misuse of assets outside of the ordinary course of business, and, subject to the approval of the Court, to facilitate the removal of the DAF Provisions from the Order (without prejudice to the JOLs entitlement to seek sanction in the ordinary manner and in accordance with the Act and the Companies Winding Up Rules (2023 Consolidation)).

**Background**

DAF LP is a Cayman Islands limited partnership formed on 28 October 2011. CDH GP Ltd (the "**GP**"), is a Cayman Islands company incorporated in or around 7 February 2024 and is the general partner of DAF LP. Mark Patrick and Paul Murphy are the directors of the GP (the "**Directors**"). Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. From its incorporation until March 2025 when it was placed in voluntary liquidation, Holdco was the limited partner of DAF LP through which it indirectly owned the other entities in the DAF Structure.

**1. Notices**

In the interests of expedience, the JOLs and the Directors agree that any notices or coummincation required under this Protocol shall be sent by email as follows:

a) To the JOLs:

Margot MacInnis - margot.macinnis@uk.gt.com
Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com
CDAF Core - CDAF.Core@uk.gt.com

---

[1] Letter dated 22 May from Johnstone Law to Campbells.

2

#3253267v3

**Formatted:** Font: (Default) Calibri, 10 pt

b)  To the Directors:

> Mark Patrick - mpatrick@dafholdco.com
> Paul Murphy - paul@gkmanagement.com.ky

**2**     **Transactional Reporting**

2.1     Upon execution of this Protocol, the Directors will provide a report to the JOLs listing all transactions undertaken by DAF LP, or any of the CDM Entities, since 27 March 2025 ~~which exceed US$5,000,000~~.

2.2     The Directors shall provide a business plan within 21 days of the signing of this Protocol which can be revised from time-to-time if it is determined to be necessary by the Directors and within the ordinary course of buisness for DAF LP (the "**Business Plan**"). Steps taken with respect to the management of DAF LP will be considered to be in the ordinary course of business if they are provided for in the Business Plan.

2.3     The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of DAF LP and the CDM Entities in accordance with the Mission Statement. The Directors shall provide a monthly transactions report to the JOLs so they have oversight of DAF LP's investment activity and financial performance, and the steps being taken by the Directors in the ordinary course of DAF LP's business.

2.4     If the JOLs have any doubt about whether a transaction is or is not in the ordinary course of DAF LP's business, they may contact the Directors for clairfation.

2.5     The Directors will endeavour to provide advance notice to the JOLs in respect of any single transaction of DAF LP exceeding US$ ~~5~~1,000,000 or any series of transactions in an aggregate amount exceeding US$~~5~~1,000,000 **SAVE THAT** advance notice is not required, in relation to any single transaction or series of transactions in the ordinary course of business involving or related to (i) the proper operation and administration of the DAF Structure; and (ii) the renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.6     Notwithstanding anything to the contrary in this Protocol, the Directors shall be under no obligation to undertake any action or refrain from taking any action to the extent they deem it reasonably necessary to comply with their legal obligations to the CDM Entities.

**3**     **Legal and Professional Fees**

> The JOLs acknowledge DAF LP's need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of DAF LP or the CDM Entites to seek legal or professional advice.

**4**     **Consultation**

3

> **Formatted:** Font: (Default) Calibri, 10 pt

#3253267v3

Save in exceptional circumstances, the JOLs shall provide notice to the Directors of any intended exercise of powers by them which would be consistent with the DAF Provisions, and the JOLs shall discuss and consult with the Directors in respect of any intended action against DAF LP or the CDM Entities. The JOLS shall provide advice notice of any intended exercise of their powers without sanction by the Court with respect to DAF LP or any CDM Entity that could reasonably be expected to exceed the powers granted to the JOLs by the Court.

**5      Confidentiality**

5.1      In respect of any information of whatever nature relating to any member of the CDM Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (herinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

(a)      keep the Confidential Information confidential and will not disclose it to anyone except as provided for by paragraph 65.2 below;

(a)(b)      Not disclose any Confidential Information to Mr James Dondero, the Highland Foundations, or any known affiliates or service providers of these individuals / entities; and

(b)(c)      ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2      The JOLs may disclose Confidential Information:

(a)      Subject to the restrictions in paragrpah 5.1(b), to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall be notified by the JOLs to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b)      where required or requested by any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency; or

(c)      with the Directors' prior written consent.

**6      Formalities**

6.1      This Protocol may not be waived, varied or amended without consent in writing from all parties.

**Formatted:** Font: (Default) Calibri, 10 pt

4

**1122**

6.2     This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

6.3     For the avoidance of doubt this Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the adjudication of the Grand Court of the Cayman islands.

6.4     In the event that either party considers that the other party has acted contrary to this Protocol, it shall first raise the matter by telephone or by email with an explanation of the basis for such complaint and thereafter allow a reasonable period for the other party to remedy the situation or provide an explanation for its conduct.  If either party considers that the issue is not resolved then a conference call will be scheduled for a discussion between the Directors and the JOLs (and their respective legal advisors if necessary).  Only in the event that there remains a dispute after these steps have been taken will either party refer the matter to the Court.

[SIGNATURES]

**Formatted:** Font: (Default) Calibri, 10 pt

5

#3253267v3

**1123**



**Annexure 1 – List of CDM Entities**

(i)      CDH GP, Ltd. (Cayman Islands)

(ii)     CDMCFAD, LLC (Delaware)

(iii)    Charitable DAF Fund 2, LP (Cayman Islands)

(iv)     Charitable DAF Fund, LP (Cayman Islands)

(v)      CLO HoldCo, Ltd. (Cayman Islands)

(vi)     Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii)    HCT Holdco 2, Ltd. (Cayman Islands)

(viii)   MGM Studios Holdco, Ltd. (Cayman Islands)

(ix)     Liberty CLO HoldCo, LLC (Delaware)

(x)      Liberty Sub, Ltd. (Delaware)

(xi)     Charitable DAF Holdings Corp. (Delaware)

(xii)    DST Investco, LLC (Delaware)

(xiii)   Allanon Capital Management LLC (Texas)

**Formatted:** Font: (Default) Calibri, 10 pt



**Our ref:**     CJM/JRN/858403-000001/83247181
**Direct tel:**   +1 345 814 5245 / +1 345 814 5497
**Email:**       caroline.moran@maples.com / luke.armitage@maples.com

**By Email**

Campbells LLP
Floor 4, Willow House
Cricket Square
Grand Cayman
KY1-9010
Cayman Islands

Attn: Mark Goodman

19 June 2025

Dear Colleagues

**Charitable DAF HoldCo, Ltd (In Official Liquidation) (the "Company")**

**FSD Cause No: 2025-116 (JAJ)**

1    We refer to your letter to Johnstone Law dated 9 June 2025 and the previous correspondence in relation to the draft protocol as to the conduct and management of Charitable DAF Fund, LP (the "**Fund**") and related entities.

2    The JOLs appreciate your clients preparing a revised version of the protocol (the "**CDM Protocol**"). However, the JOLs' position is that the terms proposed by your clients are inadequate to serve the purpose of the protocol in a number of respects.

3    Rather than seek to significantly amend the CDM Protocol, the JOLs have prepared their own version in a form acceptable to them (copy enclosed) (the "**JOLs' Protocol**").  The JOLs' Protocol approximates as much as possible the level of protection that the JOLs/Company could expect to receive from an injunction order against your clients and ancillary disclosure orders.  This is both necessary and justified in the present circumstances.  Please note that whilst we are happy to use the language of "protocol", we will require any agreed scheme to be incorporated into an undertaking given formally in writing to the Court not only by your clients but also by the clients of Baker & Partners and Kobre & Kim (each of whom are copied to this letter).

4    Without being exhaustive, some of the aspects of the CDM Protocol which are unacceptable to the JOLs are:

**Maples and Calder (Cayman) LLP**
PO Box 309  Ugland House  Grand Cayman KY1-1104  Cayman Islands
Tel +1 345 949 8066  Fax +1 345 949 8080  **maples.com**

4.1    There is no provision expressly requiring CDH GP, Ltd. (the "**GP**"), CDMCFAD, LLC ("**CDM**") and DFW Charitable Foundation ("**DFW**") from disposing of or diminishing the value of any interest they hold in the Fund and its assets. This is an essential term that is needed in order to preserve the status quo whilst the JOLs continue their investigations.

4.2    Similarly, there should be an express requirement that Mark Patrick and Paul Murphy (together, the "**Directors**") and DFW must preserve any assets in their possession or control which have been previously been paid to them by the Company, the Fund and/or CDM, whether by way of distribution, divided or otherwise.

4.3    In relation to the proposed historical transaction report, the CDM Protocol would only require the Directors to provide confirmation of all transactions of the Fund and related entities since 27 March 2025 (i.e. just over 2 months ago). That period is obviously inadequate to serve the purpose of the protocol. The JOLs' position is that the period should commence on no later than 27 February 2024, being the date that the GP was incorporated and took over management of the Fund. Further, your clients' proposed reporting period would not cover the full period of the relevant sequence of transactions involved in the DAF Restructuring, which is not acceptable to the JOLs.

4.4    The CDM Protocol is lacking in any details of what is to be included in the historical transaction report (and in the monthly transaction reports moving forward). This is provided for at sections 3.1-3.2 and 4.9-4.12 of the JOLs' Protocol. This will add necessary certainty to your clients' obligations and will minimise the scope for future disputes about what is required. The required details are uncontroversial and we expect your clients will have no objection to them.

4.5    The CDM Protocol also would not require your clients to give full disclosure of the Fund's and related entities' assets and their current value. This is necessary in order for the JOLs to be able to properly police your clients' property preservation obligations referred to above and properly assess any requests by your clients to approve certain transactions moving forward.

4.6    The CDM Protocol is lacking any meaningful details as to what is to be included in the business plan for the ongoing management of the Fund and related entities and the deadline by which it should be submitted to the JOLs for approval. The JOLs' Protocol expressly provides for the information that is to be included in the business plan and requires the business plan to be provided to the JOLs within 21 days of execution of the protocol (with the JOLs then having 21 days to agree to it or reject it, in which case the JOLs can seek appropriate relief from the Court).

4.7    As there is likely scope for debate as to what is meant by the "ordinary course of business", we propose that your clients provide a written outline of what activities are within the Fund's "ordinary course of business" for the JOLs' approval. Your clients' proposed Protocol also does not prevent your clients from undertaking transactions that are not in the Fund's ordinary course of business. That is, for obvious reasons, an essential requirement for the JOLs and has therefore been included in the JOLs' Protocol.

4.8    The protocol needs to put in place protections for the period between the protocol being executed and the Business Plan being agreed. The JOLs' position is that the appropriate way to address this is to require that your clients must provide the JOLs with at least 7 days'

**1126**

advance notice of any transactions affecting the Fund, or any assets of the Fund, and for the JOLs to review and approve the transactions.

4.9    The US$1,000,000 threshold for transactions that are to be reported to the JOLs in the monthly transaction reports is still far too high.  The threshold should be set at what would be a typical threshold for a freezing injunction and disclosure orders, say US$10,000.  In addition, merely requiring the Directors to "endeavour" to provide advance notice of transactions is not sufficient.  The Directors must be required to provide written notice of a proposed transaction and the JOLs will then have the opportunity to approve or reject if it appears to be outside of the Fund's ordinary course of business or otherwise raises concerns.

4.10    Clause 2.6 of the CDM Protocol is not acceptable to the JOLs.  It is far too broad and leaves it up to the Directors to take virtually any action if they, in their discretion, consider it reasonably necessary to comply with their legal obligations.

4.11    Clause 4 of the CDM Protocol is also unacceptable to the JOLs.  The clause as presently drafted presupposes that the JOLs would consciously decide to exceed their powers, which the JOLs wholly disagree with.  The JOLs will exercise their powers in accordance with the order appointing them, any sanction obtained from the Court and their powers under the Companies Act (As Revised). If the JOLs need to obtain sanction to exercise a certain power, the JOLs will make a sanction application and attend to service as required.

5    Please confirm your clients' agreement to giving an undertaking to the Court in the form of the enclosed Protocol or provide comments by no later than 12pm on Thursday, 26 June 2025.  If ultimately the Protocol cannot be agreed by our respective clients, the JOLs reserve all of their rights to take other appropriate protective measures.

Yours faithfully

*Maples and Calder (Cayman) LLP*

Maples and Calder (Cayman) LLP

With copy to:

Baker & Partners
PO Box 636
Buckingham Square
720 West Bay Road
Grand Cayman
KY1-1107
Cayman Islands
Attn: Jennifer Colegate

Kobre & Kim
9 Forum Lane
Camana Bay

Grand Cayman
KY1-9006
Cayman Islands
Attn: Peter Tyers-Smith

### PROTOCOL AND COURT UNDERTAKING IN RESPECT OF CHARITABLE DAF FUND, LP (THE "FUND") AND THE FUND ENTITIES

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court pursuant to s.131 Companies Act (2025 Revision).

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025, the Court determined the supervision application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmik be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

**Preliminary statement**

The Fund is a Cayman Islands exempted limited partnership formed on 28 October 2011. CDH GP, Ltd. (the "**GP**"), is a Cayman Islands company incorporated on 27 February 2024 and is the general partner of the Fund. Mark Patrick is the sole director of the GP. Mr Patrick is also the Manager of CDMCFAD, LLC ("**CDM**") and the registered director, president and sole member of DFW Charitable Foundation ("**DFW**"). HoldCo was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. Until its voluntary liquidation on 2 April 2025, the directors of HoldCo were Mr Patrick and Paul Murphy (the "**Directors**"). From its incorporation until 27 March 2025, HoldCo was the sole limited partner of the Fund through which it indirectly owned the other entities in the DAF Structure (the "**Fund Entities**")[1]. For the avoidance of doubt, "Fund Entities" includes any other entities identified pursuant to clause 4.4(a) below.

The purpose of this protocol (the "**Protocol**") is to ensure the efficient and orderly administration of the Fund and the Fund Entities. The Protocol is designed to avoid conflict between the JOLs and the Fund, to assuage any concerns the JOLs may have regarding the commercial activities of the Fund and the Fund Entities with respect to the risk of dissipation / misuse of assets, and to (subject to compliance with the terms of this Protocol) avoid the need for the JOLs to seek injunctions and ancillary disclosure orders against the Fund and/or the Fund Entities.

**1    Notices**

    1.1    In the interests of expedience, the JOLs and the Directors agree that any notices or communication required under this Protocol shall be sent by email as follows:

        (a)    To the JOLs:

        Margot MacInnis - margot.macinnis@uk.gt.com

        Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com

        CDAF Core - CDAF.Core@uk.gt.com

        (b)    To the Directors, the Fund, the GP, CDM and DFW:

        Mark Patrick - mpatrick@dafholdco.com and mpatricktax1040@gmail.com

---

[1] As listed in Schedule A to the Protocol

Paul Murphy - paul@gkmanagement.com.ky

**2       Preservation of Property**

2.1     The GP, CDM and DFW each agree that they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature), whether held directly or indirectly, in the Fund, and/or the Fund Entities and/or any assets of the Fund.

2.2     The Directors and DFW each agree that they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish any assets in their possession or control, whether they are in or outside the Cayman Islands, which were, are or may be received (whether directly or indirectly) by way of distribution, disposition, dividend, benefit, payment or other transfer from the HoldCo, and/or CDM and/or the Fund, and/or the Fund Entities and/or any assets of the Fund.

2.3     The Directors, the Fund, GP, CDM and DFW each agree that they shall not do anything to cause, procure, incite, promote or assist a breach by any other party of the above clauses 2.1 and 2.2 of this Protocol.

**3       Historical Transaction Report and Disclosure of Assets**

3.1     Within 14 days of the execution of this Protocol, the Directors shall provide to the JOLs a written report listing all transactions undertaken by the Fund and/or any of the Fund Entities since 27 February 2024 to the date of the report (the **"Historical Transaction Report"**). For each transaction in the Historical Transaction Report, the Directors shall include at least the following details:

(a)     The date of the transaction;

(b)     The identity of any party(ies) depositing funds in respect of the transaction;

(c)     The identity of any party(ies) receiving funds in respect of the transaction; and

(d)     An explanation as to the nature and purpose of the transaction.

3.2     Notwithstanding the above, the Historical Transaction Report must include the following:

(a)     Full details of all entities owned by the Fund, whether through any Fund Entity or any other subsidiaries, whether directly or indirectly or solely or jointly owned, or otherwise.

(b)     With respect to the Fund Entities, full details of the holders of shares or other membership interests, directors, officers or other controllers, and places and details of incorporation.

(c)     Insofar as not covered by the above, full details of all assets owned by the Fund and their current values, whether the Fund holds such assets through any Fund Entity or any other subsidiaries, whether directly or indirectly or solely or jointly owned, or otherwise.

**1130**

(d)    Full details of all disposals, assignments, transfers, sales, purchases or other transactions in respect of all or part of any asset owned by the Fund, whether the Fund holds such assets through any Fund Entity or any other subsidiaries, whether directly or indirectly or solely or jointly owned, or otherwise for the period commencing on 27 February 2024 until the date of the Historical Transaction Report.

(e)    Full details of every payment by way of salary, bonus, dividend, distribution or other compensation made to the Directors and/or any other officer, employee or consultant by HoldCo, the Fund, the GP, CDM, DFW or any of the Fund Entities between 27 February 2024 and the date of the Historical Transaction Report. Such information is to include the dates and amounts of each payment, the basis of the payment, the identity of the paying party, and full details of the account into which payment was made.

(f)    Full details of every payment to any attorney, lawyer, third party consultant, accountant, or external professional services advisor, whether a firm, partnership, company or individual, by HoldCo, the Fund, the GP, CDM, DFW or any of the Fund Entities between 27 February 2024 and the date of the Historical Transaction Report. Such information is to include the dates and amounts of each payment, the basis of the payment, the identity of the paying party, and full details of the account into which payment was made.

(g)    Full and complete copies of all financial statements or records, including statements prepared on a consolidated basis and/or management accounts prepared in respect of the Fund, the GP, CDM, DFW or any of the Fund Entities between 27 February 2024 and the date of the Historical Transaction Report ("**Statements, Records and Accounts**"). Any Statements, Records and Accounts provided must be independently prepared and verified by a reputable accountancy firm to the satisfaction of the JOLs.

(h)    Full data and documents in support of the above. Copy documents shall be provided in electronic form but must be identified in clear terms (on a category basis) in the Historical Transaction Report.

(i)    The Directors must sign the Historical Transaction Report and confirm its accuracy.

## 4    Regulation of the Fund

<u>Business Plan</u>

4.1    Within 21 days of signing this Protocol, the Directors shall provide to the JOLs a written business plan (the "**Business Plan**").

4.2    The Business Plan shall set out the Directors' proposal as to the ongoing operations and management of the Fund and the Fund Entities. The Business Plan requires the approval of the JOLs.

4.3    If agreement is not reached on the terms of the Business Plan within 21 days of the JOLs' receipt of it, or such other date as agreed between the Directors and the JOLs in writing,

**1131**

the JOLs may apply to the Court for directions or seek any other relief they deem appropriate.

4.4     The Business Plan shall include, at a minimum, the following information:

     (a)     A current and accurate group structure chart, clearly identifying all entities within the DAF Structure (including any of those not listed in Schedule A to this Protocol), their jurisdiction of incorporation, and their inter-relationships;

     (b)     Up-to-date director registers for each of the Fund Entities, including full names, appointment dates, and any changes since the last reporting period;

     (c)     Current member (shareholder or partner) registers for each of the Fund Entities, detailing ownership interests, classes of shares or partnership interests, and any recent transfers or changes; and

     (d)     A detailed outline of the proposed operations and strategic objectives of the Fund and the Fund Entities. This should include key initiatives, anticipated expenditures, revenue projections, and any material contracts or engagements expected to be entered into.

4.5     The items listed in 4.4(a)-(c) above will be prepared by an independent advisor, [insert independent advisor] to be selected by the JOLs within [ ] days (the "**[  ] Advice**") on the following terms:

     (a)     The instructions provided to [  ] shall be those set out at clauses 4.4(a)-(c) above; and

     (b)     The JOLs shall be informed of, and given the opportunity to participate in, any discussions between the Directors and [  ] in respect of the [  ] Advice; and

     (c)     The [  ] Advice shall be incorporated in the Business Plan as an exhibit to the Business Plan in the same form as it was provided to the Directors.

4.6     The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of Fund and the Fund Entities in accordance with the Business Plan (once agreed).

4.7     Any proposed revisions to the Business Plan must be submitted to the JOLs for prior written approval before implementation.

<u>Overriding Principles applicable at all times</u>

4.8     Where any proposed transaction, distribution, disposition, dividend, benefit, payment or other transfer which affects the Fund, or any assets of the Fund, is with or to any of the Directors, the GP, CDM or DFW or their nominees, those parties (and each of them) shall not be entitled to execute or complete such transaction, distribution, disposition, dividend, benefit, payment or other transfer unless in receipt of the prior written approval of the JOLs.

4.9     In respect of any proposed transaction, distribution, disposition, dividend, benefit, payment or other transfer which affects the Fund, or any assets of the Fund, which exceeds

US$10,000, or any series of transactions that are connected or related in any way in an aggregate amount exceeding US$10,000:

(a)     The Directors and the GP shall inform the JOLs in writing in advance of any such proposed transaction, distribution, disposition, dividend, benefit, payment or other transfer, and shall explain full details of the nature and purpose of the proposed transaction, distribution, disposition, dividend, benefit, payment or other transfer, together with documentary support to the satisfaction of the JOLs;

(b)     Such advance information and explanation of proposed transactions shall be provided at least 7 days prior unless the circumstances are an extreme emergency, in which case the information and explanation shall be provided as soon as possible and the urgent nature and inability to provide at least 7 days' prior notice shall be explained by the Directors in writing as soon as possible; and

(c)     No such transactions will be executed without the prior written approval of the JOLs.

<u>Monthly Transaction Reports</u>

4.10    Commencing on the date that the Business Plan is agreed and until further agreement or order of the Court, the Directors shall, within 7 days of the end of each calendar month, provide the JOLs with a written report listing all transactions  that have been undertaken by the Fund and/or any of the Fund Entities during the calendar month just passed (the "**Monthly Transaction Report**").

4.11    Notwithstanding the above, the first Monthly Transaction Report shall list all such transactions dating back to the date of the provision of the Historical Transaction Report to the JOLs.

4.12    For each transaction in a Monthly Transaction Report, the Directors shall include the following details:

(a)     The date of the transaction;

(b)     The identity of any party(ies) depositing funds in respect of the transaction;

(c)     The identity of any party(ies) receiving funds in respect of the transaction; and

(d)     An explanation as to the nature and purpose of the transaction.

<u>Legal expenses</u>

4.13    The JOLs acknowledge the need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of the Fund, the GP, CDM, DFW, the Directors or the Fund Entities to seek legal or professional advice.  However, it is agreed that any and all such expenses shall not be paid for out of assets which currently are or formerly were assets of the Fund, whether held directly or indirectly.

## 5  Confidentiality

5.1     In respect of any information of whatever nature relating to the Fund or any of the Fund Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (hereinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

(a)     keep the Confidential Information confidential and will not disclose it to anyone except as provided for by clause 5.2 below;

(b)     not disclose any Confidential Information to Mr James Dondero, the Highland Foundations, or any known affiliates or service providers of these individuals / entities (except to the extent that any of them become members of the Company's liquidation committee and the information is provided to them in furtherance of the JOLs' duty to consult with the liquidation committee); and

(c)     ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2     The JOLs may disclose Confidential Information:

(a)     to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall be notified by the JOLs to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b)     where required for the purpose of any application to, or directed by, any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency;  or

(c)     with the Directors' prior written consent.

## 6  The Directors

6.1     Each of the Directors will procure that the Fund, CDM, DFW, the GP, the other Director and the Fund Entities fully comply with this Protocol.

## 7  Reservation of Rights

7.1     Nothing in this Protocol shall prevent or inhibit the JOLs from making any application to any Court of competent jurisdiction for any relief or remedy which the JOLs in their absolute discretion consider necessary or appropriate.

## 8  Formalities

8.1     This Protocol may not be waived, varied or amended without consent in writing from all parties.

**1134**

8.2     This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

8.3     This Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the exclusive jurisdiction of the Grand Court of the Cayman Islands.

## SCHEDULE A: LIST OF FUND ENTITIES / ENTITIES IN THE DAF STRUCTURE

(i) CDH GP, Ltd. (Cayman Islands)

(ii) CDMCFAD, LLC (Delaware)

(iii) Charitable DAF Fund 2, LP (Cayman Islands)

(iv) Charitable DAF Fund, LP (Cayman Islands)

(v) CLO HoldCo, Ltd. (Cayman Islands)

(vi) Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii) HCT Holdco 2, Ltd. (Cayman Islands)

(viii) MGM Studios Holdco, Ltd. (Cayman Islands)

(ix) Liberty CLO HoldCo, LLC (Delaware)

(x) Liberty Sub, Ltd. (Delaware)

(xi) Charitable DAF Holdings Corp. (Delaware)

(xii) DST Investco, LLC (Delaware)

(xiii) Allanon Capital Management LLC (Texas)

(xiv) DFW Charitable Foundation (Delaware)

(xv) CLO HoldCo LLC (Delaware)

(xvi) Rand Advisors LLC (Delaware)

(xvii) CDHC Royse City Land LLC (Texas)

(xviii) Royse City Land Company LLC (Texas)

(xix) CDHC Assets LLC (Texas)

(xx) CDHC Fort Worth Land LLC (Texas)

(xxi) CDHC Stewart Creek LLC (Texas)

(xxii) BVP Property LLC (Delaware with CA registration)

**1136**



Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

**D** +1 345 914 5898
**T** +1 345 949 2648
**F** +1 345 949 8613
**E** MGoodman@campbellslegal.com

campbellslegal.com

Our Ref: MGM/ROD/18955-44959
Your Ref:

CAYMAN | BVI | HONG KONG

**BY EMAIL**

Maples and Calder (Cayman) LLP
Ugland House
PO Box 309
Grand Cayman, KY1-1104
Cayman Islands

29 June 2025

Dear Sirs

**Re: Charitable DAF Holdco, Ltd. (in Official Liquidation) (the "Company")**
**FSD Cause No. 116 of 2025 (JAJ)**

1. We refer to your letter dated 19 June 2025 (the "**Protocol Letter**"), to previous correspondence between this firm and Johnstone Law regarding a draft reporting protocol in respect of the assets and operations of Charitable DAF Fund, LP and related entities, to the letter sent by the joint official liquidators (the "**JOLs**") of the Company to the Trustees of the Highland Capital Management L.P. (the "**Trustees**") dated 24 June 2025 (the "**Trustee Letter**"), and to the **enclosed** stipulation dated 27 June 2025 entered into in between the Dallas Foundation and the HMIT Entities in the Highland Capital Management L.P. bankruptcy proceedings and which has been filed with the United States Bankruptcy Court (the "**Stipulation**").

2. Capitalised terms, unless otherwise defined, adopt the definitions applied in the Protocol Letter.

**Previous Correspondence in respect of CDM Protocol and JOLs' standing**

3. Before addressing the draft protocol enclosed with the Protocol Letter, it appears to be necessary to remind the JOLs of our previous correspondence with Johnstone Law regarding the CDM Protocol and the JOLs' standing to take steps against the Fund.

4. The JOLs have not established any direct or indirect beneficial interest in or creditor claim against the Fund or the CDM Entities. At most, the JOLs appear to have formed the view that they have an as yet unparticularized and unasserted claim to an indirect beneficial interest in the CDM Entities.

3203729-1

#3282196v7

**1137**

It is not necessary for us to pass comment on any such claim, other than to note that, even if the JOLs were able to establish an indirect beneficial interest in the Fund or any of the CDM Entities, that would not displace the directors' control of the CDM Entities.

5. We would remind you that the CDM Entities are managed by professionally qualified individuals who have repeatedly acknowledged their obligations to the companies to which they are appointed, and whose actions are guided by legal and other professional advice. The JOLs have no mandate or authority to interfere with the management of the CDM Entities by those individuals.

6. However, in good faith, and without any legal obligation to do so, the CDM Entities voluntarily offered a transactional reporting protocol to the JOLs in an effort to alleviate (unwarranted) concerns the JOLs had with respect to the management of the CDM Entities and to demonstrate that their business operations were and are being conducted appropriately and transparently. This offer was made to the JOLs, by letter dated 16 May 2025. It is our clients' view that the JOLs, acting objectively, would have considered this protocol to be perfectly sufficient to allow them to discharge any duty they had to exercise oversight of the management of the CDM Entities.

7. However, Johnstone Law engaged in correspondence with this firm on behalf the JOLs but inexplicably refused to meaningfully engage with our clients' offer to provide a reporting protocol. Consequently, under cover of letter dated 30 May 2025, we sent a draft of the CDM Protocol to Johnstone Law and invited their agreement or comments. As noted at paragraph 13 of that letter, "*our clients reject the suggestion that they are under any duty to provide this information. However, in circumstances where the CDM Entities, including the Fund, are operating in the ordinary course to make investments on behalf of, and to support charitable causes, our clients are offering this Protocol to ensure that these charitable operations are not unnecessarily impacted by the JOLs*."

8. Johnstone Law responded on 5 June 2025 and again inexplicably refused to engage with the CDM Protocol. Our response dated 9 June 2025 reiterated that our clients are under no obligation to provide information to the JOLs, but were willing to do so "*in an attempt to assuage the JOLs' misplaced concerns and demonstrate that the CDM Entities are operating in the ordinary course of business*".

9. In a subsequent letter also dated 9 June 2025, the CDM Entities enclosed a revised version of the CDM Protocol which removed the value threshold from the proposed historical reporting protocol, and reduced the value threshold for the provision of advance notice from $5m to $1m. The letter reiterated the CDM Entities belief that "*the appropriate course of action is for the JOLs to engage on the terms of the protocol, which will appease any concerns they may have regarding the dissipation or misuse of the Fund's assets outside of the ordinary course of business during the currency of the liquidation*."

10. We note that at the hearing of the JOLs' sanction application on 24 June 2025, His Lordship, in obiter dictum, indicated that entry into a protocol seemed a sensible course of action. We believe that Court appointed liquidators acting objectively and in an even-handed manner would have accepted the original CDM Protocol, and that the JOLs' failure to do so indicates a predetermination that the conduct of the CDM Entities and their management merit investigation, which position is inconsistent with the JOLs' duty to "*maintain an even and impartial hand*".[1] However, we hope that the JOLs are willing to moderate their position in light of judicial encouragement to do so.

**The JOLs' Protocol**

11. In light of the foregoing, it is no surprise that our clients fundamentally object to the approach adopted in the JOLs' Protocol, which is completely inappropriate and unwarranted. The proposed restrictions, controls and undertakings sought by the JOLs would impose severe limitations on our clients' ability to operate, and would have the practical effect of placing their ongoing charitable activities under the de facto control of the JOLs, notwithstanding that no such legal authority exists.

12. Your references to the JOLs requiring what are, in effect, restrictions mirroring injunctive relief is entirely misguided. The only circumstances in which the draconian conditions sought in the JOLs' Protocol could be imposed would be if the JOLs, with the sanction of the Grand Court, sought and obtained a freezing injunction. That injunction would require the JOLs to, *inter alia*, make out a good arguable case (where it is denied that such a case exists) and provide evidence of that there is a real risk of dissipation of assets (where the CDM Protocol clearly demonstrates there is no such risk). Furthermore, were the JOLs to seek injunctive relief the CDM Entities would at least have the benefit of the protection afforded by the cross-undertaking in damages (which they do not have under the JOLs' Protocol). Following recent authority,[2] that cross-undertaking in damages would likely need to be supported by an indemnity from relevant stakeholders. The JOLs' Protocol seeks all of the benefits of an injunction without the JOLs or those funding them assuming any of the burdens that such relief would entail.

13. If the JOLs believe that injunctive or other restrictive relief is warranted, the proper course is for them to make an application to the Court in the ordinary course and satisfy these well-established

---

[1] See In *re Contract Corporation, Gooch's Case* [1871] 12 LR Ch App 207, p 211: "*In truth, it is of the utmost importance that the liquidator should, as the officer of the Court, maintain an even and impartial hand between all the individuals whose interests are involved in the winding up. He should have no leaning for or against any individual whatever. It is his duty to the whole body of shareholders, and to the whole body of creditors, and to the Court, to make himself thoroughly acquainted with the affairs of the company; and to suppress nothing, and to conceal nothing, which has come to his knowledge in the course of his investigation, which is material to ascertain the exact truth in every case before the Court. And it is for the Judge to see that he does his duty in this respect*" (emphasis added).

[2] See *Hunt v Ubhi* [2023] EWCA Civ 417 which cited SC Mezhdunarodniy Promyshlenniy Bank v Pugachev [2015] EWCA Civ 139

3

legal requirements. Our clients will of course strenuously resist any such application. However, there is no lawful or reasonable basis for the JOLs to seek to impose such intrusive restrictions on the CDM Entities, nor to demand undertakings that would exceed what the Court could properly order on an application for interim relief. If the JOLs and our clients are unable to agree the terms of a protocol, the correct course of action is to have the Court determine the scope of any such protocol as opposed to the JOLs seeking injunctive relief - the specter of which seems to be threatened in the Protocol Letter.

**The Stipulation**

14. Further, we note the Dallas Foundation and other entities referred to in the Stipulation as the 'Foundation Parties', have now entered into a binding term sheet (the "**Term Sheet**") with the HMIT Entities. As you can see, the Foundation Parties withdrew their objections to the Settlement Motion (defined below) with prejudice. At the hearing of the Settlement Motion, Mr. Dondero was allowed to testify in opposition to the settlement on behalf of a family trust (Dugaboy), though we understand that a material portion of his attempted testimony was stricken or subject to successful objection, and it appears that the US Bankruptcy Court gave his testimony no weight. Ms Diaz of the Dallas Foundation, who signed the Term Sheet on behalf of the Foundation Parties, swore affidavits on behalf of the petitioners in both the just and equitable winding up, and supervision applications. Ms Diaz's evidence in the supervision application, which was provided on behalf of all 'Supporting Organisations', was that a supervision order was required in order to "*allow the JOLs to conduct a proper investigation of the affairs of the Company*"[3] (as you know, this evidence is disputed).

15. Page two of the Term Sheet mandates that the Dallas Foundation will undertake various actions in relation to "DAF", which is described in the Term Sheet as "*the historical corporate structure of Charitable DAF Holdco, Ltd, its parents and subsidiaries, in existence as of January 1, 2024, and changes thereto*" (which would include the CDM Entities). These actions include the Dallas Foundation agreeing to meet with Mr Raver (as a representative of HMIT) to review the DAF structure and the balance sheets of DAF as of 30 September 2024, 31 December 2024 and 31 March 2025. The Term Sheet also provides that the Dallas Foundation will be provided with "*an accounting of any transfer assets from an entity within the DAF structure during the periods covered by the balance sheets to any other entity, including another entity within the DAF structure*".

16. This meeting is now scheduled for 2 July 2025. The meeting will be face to face, and Mr. Raver intends to provide additional balance sheet information beyond that required under the Term Sheet. The meeting (defined as the "DF Meeting") is specifically described as a confidential settlement meeting "*with an eye to commencing negotiations with DF about the use of current*

---

[3] Paragraph 15(a) of the Second Affidavit of Julie Diaz dated 29 April 2025.

3203729-1

#3282196v7

*support organization(s) or the creation of new support organizations to support the DF and as appropriate the other Foundations mentioned above (the "Resolution").*" The Term Sheet also provides for the prospect of a subsequent meeting which Mr Patrick will attend with the objective being to further discussions toward a "Resolution". The Term Sheet explicitly provides that if the parties can agree on a Resolution, then "*Mr. Patrick, the Supporting Organization, and Dallas Foundation shall jointly request a meeting with the JOLs and the DF, with a view toward winding up the liquidation proceedings of Charitable DAF Holdco, Ltd., including not seeking any equitable wind up of Charitable DAF Fund, LP., all of which should be able to be accomplished expeditiously in the event of agreements hoped to be achieved upon the meeting described above*".

17. That the lead petitioner—having given evidence on behalf of all Supporting Organisations at the supervision application—has now entered into the Term Sheet is a clear indication that there is no longer any justification for the investigations it originally proposed (and which the JOLs appear to be myopically pursuing), and no real or justifiable risk of asset dissipation, particularly given that the CDM Entities' balance sheets and financial information will be shared with the Dallas Foundation. Given that the Term Sheet contemplates the Dallas Foundation and Supporting Organisations requesting a meeting with the JOLs with a view to concluding the liquidation of the Company and avoiding any application to wind up the Fund, it is difficult to reconcile the actions of the JOLs with the stated intention of the purported primary stakeholder.

**Updated CDM Protocol**

18. Notwithstanding, our clients remain willing to agree a reasonable protocol that provides the JOLs with an appropriate level of visibility into relevant matters while preserving our clients' right to conduct their charitable operations in the ordinary course of business. We do not, however, accept that the JOLs' Protocol represents a fair or proportionate proposal - it is neither necessary nor justified.

19. In particular, we make the following general observations:

  (a) The JOL's Protocol seeks to prohibit entirely lawful transactions from being conducted in the ordinary course of business, absent Court order, and effectively subjects all of the CDM Entities' operations to prior approval and veto - a degree of control that (i) is completely unwarranted, and (ii) could only properly be obtained through injunctive relief.

  (b) The financial thresholds, advance approvals, and granularity of the reporting provisions proposed in the JOLs' Protocol would materially and unfairly impede the CDM Entities' ordinary and necessary charitable operations and increase the costs of those operations to no obvious benefit to those entities.

3203729-1

#3282196v7

(c) The JOLs' request that the CDM Entities provide extensive documentation, including registers, asset holdings, and transaction histories, appears to simply repeat misconceived requests made by Johnstone Law on behalf of the JOLs and has no legal basis. As stated in response to those previous requests, "*Directors are bound by duties under common law and statute to protect the interests, confidentiality, and assets of the companies they serve. To comply with your baseless requests would place them in breach of those duties unless and until a court determines otherwise.*"[4]

(d) Your letter asserts that the scope of disclosure sought by the JOLs' Protocol is necessary to enable the JOLs "*to properly police* [our] *clients' property preservation obligations*". There is simply no basis for this assertion, which was also addressed in correspondence with Johnstone Law when it was suggested the JOLs are somehow authorized to "hold the ring" in order to protect the assets of the Fund.[5]

(e) Similarly, for the reasons outlined above, your proposal to set the advance reporting threshold at US$10,000 as "*that would be a typical threshold for a freezing injunction and disclosure order*" is wholly unrealistic and impractical. Despite the JOLs not having obtained a freezing injunction, the CDM Entities are willing to set a reporting threshold which would afford the JOLs advance notice of substantial and meaningful transactions. However, requiring the CDM Entities to provide advance notice of such de minimus transactions, and to wait for the JOLs to prospectively approve these transactions, would severely hamper the charitable operations of the CDM Entities.

20. We **enclose** a revised version of the CDM Protocol with this letter. This updated version reflects a number of clarifications aimed at addressing the JOLs' concerns, while preserving our clients' ability to conduct their affairs in the ordinary course of business. These revisions are marked-up against the previous version of the CDM Protocol sent to Johnstone Law on 9 June 2025 and include, *inter alia*:

(a) Confirmation that the CDM Entities will engage Armanino LLP as an independent accounting firm to provide the financial reporting and accounting analysis required under the CDM Protocol;

---

[4] Paragraph 6 of Campbells letter to Johnstone Law dated 30 May 2025.
[5] Paragraph 17 of Campbells letter to Johnstone Law dated 9 June 2025. "*As we have explained numerous times and attempted to demonstrate by way of our proposed reporting protocol, the CDM Entities, including the Fund, are operating in the ordinary course to support charitable causes and their assets do not need to be protected by the JOLs.*"

(b) Inclusion of the details which are to be provided in the Historical and Monthly Transaction Reports (which reflect the information requested at sections 3.1 and 4.12 of the JOLs' Protocol;

(c) Inclusion of wording at paragraph 2.6 which would require the JOLs to consult with the 'Directors' before unilaterally contacting our clients' third-party service providers. Unfortunately, given the JOLs repeated attempts to interfere with our clients' lawful operations (to which, see below regarding the Trustee Letter), we believe this is necessary;

(d) Extension of the date for the Historical Transaction Report to 1 July 2024 (we understand that the Skyview Group had access to the CDM Entities' financials through to 30 June 2024 so the JOLs can obtain any older financial information from other sources); and

(e) Reduction of the value threshold for the provision of advance notice from US$1m to US$250,000.

21. We invite the JOLs to consider the revised draft of the CDM Protocol and to engage with us to agree terms that are reasonable and proportionate. For the reasons outlined above, our clients are unwilling to accept the fundamentally disproportionate proposals set out in the JOLs' Protocol. However, they remain open to agreeing an appropriate protocol to facilitate the JOLs' ongoing investigations (which the Dallas Foundation no longer support or think necessary) and to avoid the need for unnecessary and costly Court proceedings.

22. Please confirm your agreement to, or provide any comments on, the revised CDM Protocol by **5pm on 4 July 2025**.

23. If, notwithstanding the proffered protocol, the JOLs consider it necessary to seek injunctive relief that is, of course, a matter for them, but given the extensive correspondence on this issue we would expect (i) any application for injunctive relief to be served on this firm where it would be plainly inappropriate to proceed on an ex parte basis; or (ii) at the very least, if the JOLs do seek injunctive relief on an ex parte basis, that this and previous correspondence regarding the protocol be provided to the Court in furtherance of the JOLs' duty of full and frank disclosure.

**Trustee Letter**

24. We refer to the Trustee Letter, which related to the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith*, Case No. 19-34054-sgj11 (Bankr. N.D.Tex.) [Dkt. 4216] (the "**Settlement Motion**"). We understand that your firm were also copied to this correspondence.

7

25. The Trustee Letter, sent on the eve of the hearing of the Settlement Motion, requested an adjournment to afford the JOLs additional time to progress their investigations of the HMIT Entities, or alternatively, that the Trustees defer making distributions to the HMIT Entities to allow the JOLs time to carry out investigations "*without the risk of asset dissipation in connection with protocol discussions*".  The protocol discussions were referred to in the JOLs' Letter, which notes that the JOLs "*are concerned to ensure the parameters of the protocol mitigate the risk of asset dissipation pending the completion of their investigations.*"

26. Quite how the JOLs were able to form the extraordinary view that a professionally qualified director acting with the benefit of legal and other professional advice seeking approval from the US Court to enter into a settlement with a resultant accretion to HMIT of $67 million might represent an attempt at asset dissipation calls for an explanation in and of itself, but particularly in light of the repeated attempts by the CDM Entities to engage in discussions with the JOLs and Johnstone Law about the terms of a protocol which was directly aimed at addressing the JOLs' (baseless) concerns in that regard.

27. To address unparticularised assertions in Johnstone Law's letters dated 30 May and 5 June 2025 of proprietary claims to certain assets of the CDM Entities, including in respect of assets which were the subject of the HMIT settlement agreement, our first letter dated 9 June 2025, to which we did not receive a reply, is worth repeating:

> "*Your reference to the so-called HMIT transaction is vague, speculative, and appears to rely on materials filed in separate bankruptcy proceedings in the United States concerning entities related to Mr James Dondero (the individual who swore evidence in support of FSD No. 99 seeking to have the Company and the Fund wound up on a just and equitable basis and who agreed to fund those proceedings). Given the assertions in your letter alleging the JOLs have received minimal cooperation, it is curious that you have such detailed knowledge of a transaction undertaken by entities which the JOLs have no interest in. Please confirm the source of this information.*
>
> *Further, it is clear that the Settlement Agreement benefits the HMIT Entities (as defined in your letter) and, accordingly, there is no question that assets of the CDM entities are being dissipated or misused. Taking your unfounded assertions in relation to the proprietary claims at their height, the HMIT transaction would inure to the benefit of the liquidation estate. It is perhaps telling that it is our understanding the HMIT transaction does not benefit Mr Dondero and his broader interests. In the circumstances, we do not understand*

3203729-1

8

*why the JOLs would not support the HMIT transaction even if a proprietary claim has not been established.*

*Our clients do not accept that any transaction involving the HMIT Entities warrants the JOLs' oversight, and they are not aware of any basis on which the JOLs are entitled to be 'notified' or to 'approve' their lawful dealings. Your claim that HMIT was formerly the beneficiary of a fund in which the Company had an indirect interest does not confer any rights on the JOLs in relation to any of the assets involved in the HMIT transaction.*"

28. By failing to accurately address the correspondence relating to the CDM Protocol and any of the points made in our letter of 9 June 2025, the Trustee Letter was vague and misleading, and it is regrettably the case that the JOLs' attempt to interfere with the Settlement Motion in this manner can only be described as improper.

29. The fact that entities affiliated with Mr. Dondero immediately seized upon the Trustee Letter to support their own request for an adjournment, in circumstances where their previous application for an adjournment had been refused, leads to the impression that this was the true purpose of the Trustee Letter.

30. Similarly, the JOLs' initial failure to engage with the proposed protocol at all, and the insistence now that the protocol must replicate the effect of injunctive relief, do nothing to dispel the impression of a tendency towards bias in favour of the position of Mr. Dondero and his affiliates, particularly in light of Mr. Dondero's subsequent testimony at the Settlement Motion.

31. We reserve the right to refer to this and previous correspondence in any subsequent proceedings.

Yours faithfully

*Campbells LLP*

**Campbells LLP**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

                                                                    **FSD NO. 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

_____

**PROTOCOL IN RESPECT OF CHARITABLE DAF FUND, LP**

_____

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund (the "**Highland Foundations**") sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court (the "**Supervision Application**") pursuant to s.131 Companies Act (2025 Revision) (the "**Act**").

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025 (the "**Order**"), the Court determined the Supervision Application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmilk be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

Paragraph 6, 6(a) and 6(b) of the Order provide as follows:

> "*The JOLs are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:*
>
> (a)    *The power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;*
>
> (b)    *The power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised…*"

(the "**DAF Provisions**")

Charitable DAF Fund, LP ("**DAF LP**") was not represented at the Supervision Application and understands that that the DAF Provisions were included in the Order "*on the basis of the evidence before* [the Court]".[1]

HoldCo was, and DAF LP is, part of a larger group of entities (collectively the "**DAF Structure**") whose establishment and aim is, according to its '**Mission Statement**', to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". "**CDM Entities**" means the DAF Structure entities listed on Annexure 1 hereto.

**Preliminary statement**

The purpose of this Protocol (the "**Protocol**") is to ensure the efficient and orderly administration of DAF LP, the CDM Entities, and the liquidation estate of HoldCo. The Protocol is designed to avoid conflict between the JOLs and DAF LP, to assuage any concerns the JOLs may have regarding the commercial activities of DAF LP with respect to the risk of dissipation / misuse of assets outside of the ordinary course of business, and, subject to the approval of the Court, to facilitate the removal of the DAF Provisions from the Order (without prejudice to the JOLs entitlement to seek sanction in the ordinary manner and in accordance with the Act and the Companies Winding Up Rules (2023 Consolidation)).

**Background**

DAF LP is a Cayman Islands limited partnership formed on 28 October 2011. CDH GP Ltd (the "**GP**"), is a Cayman Islands company incorporated in or around 7 February 2024 and is the general partner of DAF LP. Mark Patrick is the director of the GP and Paul Murphy and Mark Patrick are the directors of the Cayman-domiciled operating entities owned by DAF LP (the "**Directors**"). Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. From its incorporation until March 2025 when it was placed in voluntary liquidation, Holdco was the direct or indirect limited partner of DAF LP through which it indirectly owned the other entities in the DAF Structure.

**1. Notices**

1.2    In the interests of expedience, the JOLs and the Directors agree that any notices or coummincation required under this Protocol shall be sent by email as follows:

    a)    To the JOLs:

          Margot MacInnis - margot.macinnis@uk.gt.com
          Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com
          CDAF Core - CDAF.Core@uk.gt.com

---

[1]Letter dated 22 May from Johnstone Law to Campbells.

2

b) To the Directors:

Mark Patrick - mpatrick@dafholdco.com

Paul Murphy - paul@gkmanagement.com.ky

**2**   **Transactional Reporting**

2.1   The CDM Entities have engaged Armanino LLP ("**Armanino**"), an independent accountancy firm to provide the financial statement reporting and accounting analysis required under this Protocol.

2.2   Within 14 days of the execution of this Protocol, the Directors shall provide to the JOLs a written report listing all Transactions (as defined below) undertaken by the CDM Entities between 1 July 2024 and the date of this Protocol (the "**Historical Transaction Report**"). For each Transaction in the Historical Transaction Report, the Directors shall include the following details:

(a)   The date of the Transaction;

(b)   The identity of any party(ies) depositing funds in respect of the Transaction;

(c)   The identity of any party(ies) receiving funds in respect of the Transaction; and

(d)   An explanation as to the nature and purpose of the Transaction.

"**Transaction(s)**" as used in this Protocol shall mean the acquisition or disposition of assets in a single transaction or series of related transactions that is equal to or exceeds US$10,000; provided, however, that "Transaction(s)" shall not include renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.3   Within 21 days of the signing of this Protocol, the Directors shall provide a business plan to the JOLs (which can be revised from time-to-time if it is reasonably determined to be necessary by the Directors and within the ordinary course of busisness for DAF LP and the CDM Entities) (the "**Business Plan**"). The Business Plan shall set out the Directors' proposal as to the ongoing operations and management of DAF LP and the CDM Entities. Steps taken with respect to the management of DAF LP and the CDM Entities will be considered to be in the ordinary course of business if they are provided for in the Business Plan.

2.4   The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of DAF LP and the CDM Entities in accordance with the Business Plan.

2.5   Armanino shall provide a monthly Transactions report and balance sheet (the "**Monthly Transaction Report**") to the JOLs so they have oversight of DAF LP's investment activity and financial performance, and the steps being taken by the Directors in the ordinary course of DAF LP's business.  For each Transaction in the Monthly Transaction Report, Armanino shall include the following details:

3

(e) The date of the Transaction;

(f) The identity of any party(ies) depositing funds in respect of the Transaction;

(g) The identity of any party(ies) receiving funds in respect of the Transaction; and

(h) An explanation as to the nature and purpose of the Transaction.

2.6 If the JOLs have any doubt about whether a Transaction is or is not in the ordinary course of DAF LP's business, the JOLs shall consult with the Directors who agree to make reasonable efforts to provide clairfation. For the avoidance of doubt, the JOLs shall not unilaterally contact third party service providers of the CDM Entities in respect of any Transaction, or any any anticipated transaction which they have been put on notice of pursuant to paragraph 2.7, without first consulting with, and seeking clarifcation from, the Directors.

2.7 The Directors will use reasonable efforts to provide advance notice to the JOLs in respect of any disposition of assets in a single transaction or series of related transactions that is equal to or exceeds US$250,000 **SAVE THAT** advance notice is not required in relation to any disposition related to (i) the operation or administration of the DAF Structure in the ordinary course of business or (ii) the renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.8 Notwithstanding anything to the contrary in this Protocol, the Directors shall be under no obligation to undertake any action or refrain from taking any action to the extent they deem it reasonably necessary to comply with their legal obligations to the CDM Entities.

## 3 Legal and Professional Fees

3.1 The JOLs acknowledge DAF LP's need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of DAF LP or the CDM Entites to seek legal or professional advice.

## 4 Consultation

4.1 The JOLs shall provide notice to the Directors of any intended exercise of powers by them which would be consistent with the DAF Provisions, and the JOLs shall discuss and consult with the Directors in respect of any intended action against DAF LP or the CDM Entities.

## 5 Confidentiality

5.1 In respect of any information of whatever nature relating to any member of the CDM Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (herinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

4

(a) keep the Confidential Information confidential and will not disclose it to anyone except as provided for by paragraph 5.2 below;

(b) not disclose any Confidential Information to Mr James Dondero, the Highland Foundations, or any known affiliates or service providers of these individuals / entities; and

(c) ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2   The JOLs may disclose Confidential Information:

(a) Subject to the restrictions in paragraph 5.1(b), to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall agree in writing to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b) where required or requested by any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency;  or

(c) with the Directors' prior written consent.

**6**   **Formalities**

6.1   This Protocol may not be waived, varied or amended without consent in writing from all parties.

6.2   This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

6.3   For the avoidance of doubt this Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the adjudication of the Grand Court of the Cayman islands.

6.4   In the event that either party considers that the other party has acted contrary to this Protocol, it shall first raise the matter by telephone or by email with an explanation of the basis for such complaint and thereafter allow a reasonable period for the other party to remedy the situation or provide an explanation for its conduct.  If either party considers that the issue is not resolved then a conference call will be scheduled for a discussion between the Directors and the JOLs (and their respective legal advisors if necessary).  Only in the event that there remains a dispute after these steps have been taken will either party refer the matter to the Court.

5

[SIGNATURES]

6

**1151**

**Annexure 1 – List of CDM Entities**

(i)      CDH GP, Ltd. (Cayman Islands)

(ii)     CDMCFAD, LLC (Delaware)

(iii)    Charitable DAF Fund 2, LP (Cayman Islands)

(iv)     Charitable DAF Fund, LP (Cayman Islands)

(v)      CLO HoldCo, Ltd. (Cayman Islands)

(vi)     Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii)    HCT Holdco 2, Ltd. (Cayman Islands)

(viii)   MGM Studios Holdco, Ltd. (Cayman Islands)

(ix)     Liberty CLO HoldCo, LLC (Delaware)

(x)      Liberty Sub, Ltd. (Delaware)

(xi)     Charitable DAF Holdings Corp. (Delaware)

(xii)    DST Investco, LLC (Delaware)

(xiii)   Allanon Capital Management LLC (Texas)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

_____

**PROTOCOL IN RESPECT OF CHARITABLE DAF FUND, LP**

_____

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund (the "**Highland Foundations**") sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court (the "**Supervision Application**") pursuant to s.131 Companies Act (2025 Revision) (the "**Act**").

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025 (the "**Order**"), the Court determined the Supervision Application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmilk be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

Paragraph 6, 6(a) and 6(b) of the Order provide as follows:

> "*The JOLs are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:*
>
> (a) *The power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;*
>
> (b) *The power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised...*"

(the "**DAF Provisions**")

Charitable DAF Fund, LP ("**DAF LP**") was not represented at the Supervision Application and understands that that the DAF Provisions were included in the Order "*on the basis of the evidence before* [the Court]".[1]

HoldCo was, and DAF LP is, part of a larger group of entities (collectively the "**DAF Structure**") whose establishment and aim is, according to its '**Mission Statement**', to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". "**CDM Entities**" means the DAF Structure entities listed on Annexure 1 hereto.

**Preliminary statement**

The purpose of this Protocol (the "**Protocol**") is to ensure the efficient and orderly administration of DAF LP, the CDM Entities, and the liquidation estate of HoldCo. The Protocol is designed to avoid conflict between the JOLs and DAF LP, to assuage any concerns the JOLs may have regarding the commercial activities of DAF LP with respect to the risk of dissipation / misuse of assets outside of the ordinary course of business, and, subject to the approval of the Court, to facilitate the removal of the DAF Provisions from the Order (without prejudice to the JOLs entitlement to seek sanction in the ordinary manner and in accordance with the Act and the Companies Winding Up Rules (2023 Consolidation)).

**Background**

DAF LP is a Cayman Islands limited partnership formed on 28 October 2011. CDH GP Ltd (the "**GP**"), is a Cayman Islands company incorporated in or around 7 February 2024 and is the general partner of DAF LP. Mark Patrick is the director of the GP and Paul Murphy and Mark Patrick are the directors of the ~~GP~~Cayman-domiciled operating entities owned by DAF LP (the "**Directors**"). Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. From its incorporation until March 2025 when it was placed in voluntary liquidation, Holdco was the direct or indirect limited partner of DAF LP through which it indirectly owned the other entities in the DAF Structure.

**1. Notices**

1.2    In the interests of expedience, the JOLs and the Directors agree that any notices or coummincation required under this Protocol shall be sent by email as follows:

a)    To the JOLs:

Margot MacInnis - margot.macinnis@uk.gt.com
Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com
CDAF Core - CDAF.Core@uk.gt.com

---

[1] Letter dated 22 May from Johnstone Law to Campbells.

2

**1154**

b) To the Directors:

Mark Patrick - mpatrick@dafholdco.com

Paul Murphy - paul@gkmanagement.com.ky

## 2 Transactional Reporting

2.1 ~~Upon~~ The CDM Entities have engaged Armanino LLP ("**Armanino**"), an independent accountancy firm to provide the financial statement reporting and accounting analysis required under this Protocol.

2.1 ~~Within 14 days of the~~ execution of this Protocol, the Directors ~~will~~shall provide ~~a report~~ to the JOLs a written report listing all ~~transactions~~ Transactions (as defined below) undertaken by ~~DAF LP, or any of the CDM Entities, since 27 March 2025.~~

2.2 ~~The~~ the CDM Entities between 1 July 2024 and the date of this Protocol (the "**Historical Transaction Report**"). For each Transaction in the Historical Transaction Report, the Directors shall ~~provide a business plan within~~include the following details:

(a) The date of the Transaction;

(b) The identity of any party(ies) depositing funds in respect of the Transaction;

(c) The identity of any party(ies) receiving funds in respect of the Transaction; and

(d) An explanation as to the nature and purpose of the Transaction.

"**Transaction(s)**" as used in this Protocol shall mean the acquisition or disposition of assets in a single transaction or series of related transactions that is equal to or exceeds US$10,000; provided, however, that "Transaction(s)" shall not include renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

~~2.2~~2.3 ~~Within~~ 21 days of the signing of this Protocol, the Directors shall provide a business plan to the JOLs (which can be revised from time-to-time if it is reasonably determined to be necessary by the Directors and within the ordinary course of ~~buisness~~busissness for DAF LP and the CDM Entities) (the "**Business Plan**"). The Business Plan shall set out the Directors' proposal as to the ongoing operations and management of DAF LP and the CDM Entities. Steps taken with respect to the management of DAF LP and the CDM Entities will be considered to be in the ordinary course of business if they are provided for in the Business Plan.

2.4 The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of DAF LP and the CDM Entities in accordance with the ~~Mission Statement. The Directors~~Business Plan.

3

2.32.5  Armanino shall provide a monthly ~~transactions~~Transactions report and balance sheet (the "**Monthly Transaction Report**") to the JOLs so they have oversight of DAF LP's investment activity and financial performance, and the steps being taken by the Directors in the ordinary course of DAF LP's business.  For each Transaction in the Monthly Transaction Report, Armanino shall include the following details:

> (e)   The date of the Transaction;
>
> (f)   The identity of any party(ies) depositing funds in respect of the Transaction;
>
> (g)   The identity of any party(ies) receiving funds in respect of the Transaction; and
>
> (h)   An explanation as to the nature and purpose of the Transaction.

2.42.6  If the JOLs have any doubt about whether a ~~transaction~~Transaction is or is not in the ordinary course of DAF LP's business, ~~they may contact~~ the JOLs shall consult with the Directors ~~for~~ who agree to make reasonable efforts to provide clairfation. For the avoidance of doubt, the JOLs shall not unilaterally contact third party service providers of the CDM Entities in respect of any Transaction, or any any anticipated transaction which they have been put on notice of pursuant to paragraph 2.7, without first consulting with, and seeking clarifcation from, the Directors.

2.52.7  The Directors will ~~endeavour~~use reasonable efforts to provide advance notice to the JOLs in respect of any disposition of assets in a single transaction ~~of DAF LP exceeding US$ 1,000,000~~ or ~~any~~ series of related transactions ~~in an aggregate amount exceeding US$1,000~~that is equal to or exceeds US$250,000 **SAVE THAT** advance notice is not required~~,~~ in relation to any ~~single transaction or series of transactions in the ordinary course of business involving or~~ disposition related to (i) the ~~proper~~ operation ~~and~~or administration of the DAF Structure~~; and~~ in the ordinary course of business or (ii) the renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.62.8  Notwithstanding anything to the contrary in this Protocol, the Directors shall be under no obligation to undertake any action or refrain from taking any action to the extent they deem it reasonably necessary to comply with their legal obligations to the CDM Entities.

**3      Legal and Professional Fees**

3.1     The JOLs acknowledge DAF LP's need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of DAF LP or the CDM Entites to seek legal or professional advice.

**4      Consultation**

4.1     ~~Save in exceptional circumstances, the~~The JOLs shall provide notice to the Directors of any intended exercise of powers by them which would be consistent with the DAF Provisions, and the JOLs shall

4

discuss and consult with the Directors in respect of any intended action against DAF LP or the CDM Entities. ~~The JOLS shall provide advice notice of any intended exercise of their powers without sanction by the Court with respect to DAF LP or any CDM Entity that could reasonably be expected to exceed the powers granted to the JOLs by the Court.~~

## 5 Confidentiality

5.1 In respect of any information of whatever nature relating to any member of the CDM Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (herinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

   (a) keep the Confidential Information confidential and will not disclose it to anyone except as provided for by paragraph 5.2 below;

   (b) ~~Not~~not disclose any Confidential Information to Mr James Dondero, the Highland Foundations, or any known affiliates or service providers of these individuals / entities; and

   (c) ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2 The JOLs may disclose Confidential Information:

   (a) Subject to the restrictions in ~~paragrpah~~paragraph 5.1(b), to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall ~~be notified by the JOLs~~agree in writing to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

   (b) where required or requested by any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency; or

   (c) with the Directors' prior written consent.

## 6 Formalities

6.1 This Protocol may not be waived, varied or amended without consent in writing from all parties.

6.2 This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

5

6.3    For the avoidance of doubt this Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the adjudication of the Grand Court of the Cayman islands.

6.4    In the event that either party considers that the other party has acted contrary to this Protocol, it shall first raise the matter by telephone or by email with an explanation of the basis for such complaint and thereafter allow a reasonable period for the other party to remedy the situation or provide an explanation for its conduct.  If either party considers that the issue is not resolved then a conference call will be scheduled for a discussion between the Directors and the JOLs (and their respective legal advisors if necessary).  Only in the event that there remains a dispute after these steps have been taken will either party refer the matter to the Court.

[SIGNATURES]

6

**1158**

**Annexure 1 – List of CDM Entities**

(i)     CDH GP, Ltd. (Cayman Islands)

(ii)    CDMCFAD, LLC (Delaware)

(iii)   Charitable DAF Fund 2, LP (Cayman Islands)

(iv)    Charitable DAF Fund, LP (Cayman Islands)

(v)     CLO HoldCo, Ltd. (Cayman Islands)

(vi)    Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii)   HCT Holdco 2, Ltd. (Cayman Islands)

(viii)  MGM Studios Holdco, Ltd. (Cayman Islands)

(ix)    Liberty CLO HoldCo, LLC (Delaware)

(x)     Liberty Sub, Ltd. (Delaware)

(xi)    Charitable DAF Holdings Corp. (Delaware)

(xii)   DST Investco, LLC (Delaware)

(xiii)  Allanon Capital Management LLC (Texas)

#3253267v5

# EXHIBIT 82



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

(RPJ)

**CAUSE NO: FSD 201 OF 2025 (  )**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

       **CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

   **(1)**   **MARK ERIC PATRICK**

   **(2)**   **PAUL MURPHY**

   **(3)**   **CDMCFAD, LLC**

   **(4)**   **DFW CHARITABLE FOUNDATION**

   **(5)**   **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

   **(6)**   **CLO HOLDCO, LTD.**

Defendants

---

**SUMMONS**

---

THIS SUMMONS was issued by Maples and Calder, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403.01/83663834)

**LET THE PLAINTIFF AND THE DEFENDANTS** attend before the Judge in Chambers at the Law Courts, George Town, Grand Cayman on the [31] day of [July] 2025 at [9:00 a.m.] upon an application by the Plaintiff for Orders in terms of the draft annexed hereto.

DATED this 15th day of  July       2025

*Maples and Calder (Cayman) LLP*
_____

**Maples and Calder (Cayman) LLP**


TO:           The Registrar of the Financial Services Division


AND TO:      (1)    Mark Eric Patrick

             (2)    Paul Murphy

             (2)    CDMCFAD, LLC

             (3)    DFW Charitable Foundation

             (4)    CDH GP, Ltd. as general partner for and on behalf of Charitable DAF Fund, LP, and in its capacity as general partner

             (5)    CLO HoldCo, Ltd.


TIME ESTIMATE:  The estimated length of the hearing of this summons is 1 day.


THIS SUMMONS was issued by Maples and Calder, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403.01/83663834)

Case 19-34054-sgj11 Doc 4521-7 Filed 02/27/26 Entered 02/27/26 16:03:35    Desc
Exhibit G - Part 2    Page 653 of 881
**Page 3 of 16**

FSD2025-0201    2025-07-15

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

CAUSE NO: FSD 201 OF 2025 ( )

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

Plaintiff

**AND**

(1)    **MARK ERIC PATRICK**

(2)    **PAUL MURPHY**

(3)    **CDMCFAD, LLC**

(4)    **DFW CHARITABLE FOUNDATION**

(5)    **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

(6)    **CLO HOLDCO, LTD.**

Defendants

---

**[DRAFT] ORDER**

---

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

**PENAL NOTICE**

**IF YOU THE DEFENDANTS, AND EACH OF YOU, DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND LIABLE TO BE FINED OR TO HAVE YOUR ASSETS SEIZED AND (IF A NATURAL PERSON) BE LIABLE TO IMPRISONMENT.**

**ANY DIRECTOR, OFFICER OR MANAGER OF ANY CORPORATE DEFENDANT MAY BE LIABLE TO BE FINED OR TO HAVE YOUR ASSETS SEIZED AND (IF A NATURAL PERSON) ALSO BE LIABLE TO IMPRISONMENT IN RESPECT OF ANY CONTEMPT OF COURT BY THE CORPORATE DEFENDANT.**

**ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE DEFENDANTS OR ANY OF THEM TO BREACH THE TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

**UPON** the Summons of the Plaintiff dated 15 July 2025 (the "**Summons**");

**AND UPON** hearing Counsel for the Plaintiff and Counsel for the [  ] Defendants;

**AND UPON** reading the sworn evidence listed in Schedule C to this Order;

**IT IS ORDERED** as follows:

1        **Preservation of Property**

      1.1        Until trial or further Order, the Defendants will:

           (a)        Preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature),

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

2

whether held directly or indirectly, in Charitable DAF Fund, LP (the "**Fund**"), the Fund Entities (defined in Schedule A hereto) and/or any assets of the Fund;

(b)     Procure that the Fund Entities and their wholly owned subsidiaries will not in any way dispose of, deal with, encumber, transfer or diminish the value of any of their assets; and

(c)     Preserve and will not in any way dispose of, deal with, encumber, transfer or diminish any assets in their possession or control, whether they are in or outside the Cayman Islands, which were, are or may be received (whether directly or indirectly):

(i)      by way of distribution, disposition, dividend, benefit, payment or other transfer from (as the case may be) the Plaintiff, the Fund, any of the Third to Fifth Defendants, the Fund Entities and/or their wholly owned subsidiaries; or

(ii)     from any assets of the Fund, the Fund Entities and/or their wholly owned subsidiaries.

1.2     The Defendants shall not do anything to cause, procure, incite, promote or assist a breach by any other Defendant of the above clause 1.1.

2     **Disclosure of Information**

2.1     The Defendants (and each of them) must within 21 days of the date of this Order provide an affidavit (by themselves or by their proper officer) setting out (to the best of their ability):

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

3

(a)     Full details of all entities owned by the Fund, whether through any Fund Entity or any other subsidiaries, whether directly or indirectly or solely or jointly owned, or otherwise.

(b)     With respect to the Fund Entities and any other entities identified under paragraph (i) above, full details of the holders of shares or other membership interests, directors, officers or other controllers, and places and details of incorporation.

(c)     Full details of every payment by way of salary, bonus, dividend, distribution, expenses, or other compensation made to the First or Second Defendants and/or any other officer or employee, or for their direct or indirect benefit, by the Plaintiff, the Fund, the Third Defendant, the Fourth Defendant, the Fifth Defendant, or any of the Fund Entities (or any other entities identified under paragraph 2.1(a) above) between 25 March 2021 and the date of this Order. Such information is to include the dates and amounts of each payment, the basis of the payment, the identity of the paying party, and full details of the account into which payment was made.

(d)     Without prejudice to the above, full details of every payment to any attorney, lawyer, third party consultant, accountant, or external professional services advisor, whether a firm, partnership, company or individual, by the Plaintiff, the Fund, the Third Defendant, the Fourth Defendant, Fifth Defendant, or any of the Fund Entities (or any other entities identified under paragraph 2.1(a) above) between 25 March 2021 and the date of this Order. Such information is to include the dates and amounts of each payment, the basis of the payment, the identity of the paying party, and full details of the account into which payment was made.

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

4

2.2 In addition to the information in paragraph 2.1(a)-(d) above and insofar as not already covered above, the Fifth Defendant must include in its affidavit:

(a) Full details of all assets owned by the Fund (whether registered in the name of the Fund or in the name of the General Partner on behalf of the Fund) and their estimated current values.

(b) Full details of all disposals, assignments, transfers, sales, purchases or other transactions in respect of all or part of any asset owned by the Fund, for the period commencing on 25 March 2021 until the date of this Order. Such details must include (a) the date of the transaction; (b) the identity of any party(ies) depositing funds in respect of the transaction; (c) the identity of any party(ies) receiving funds in respect of the transaction; and (d) an explanation as to the nature and purpose of the transaction.

2.3 In addition to the information in paragraph 2.1(a)-(d) above and insofar as not already covered above, the Sixth Defendant must include in its affidavit:

(a) Full details of all assets owned by each of the Fund Entities or any of their wholly owned subsidiaries and their current estimated values.

(b) Full details of all disposals, assignments, transfers, sales, purchases or other transactions in respect of all or part of any asset owned by any Fund Entity or any of their wholly owned subsidiaries, for the period commencing on 25 March 2021 until the date of this Order. Such details must include (a) the date of the transaction; (b) the identity of any party(ies) depositing funds in respect of the transaction; (c) the identity of any party(ies) receiving funds in respect of the

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

5

transaction; and (d) an explanation as to the nature and purpose of the transaction

3    The affidavits required pursuant to paragraphs 2.1 to 2.3 above shall have exhibited to them true copy documents:

    3.1    Full and complete copies of all existing financial statements or records, including statements prepared on a consolidated basis and/or management accounts and/or ledgers, prepared in respect of the Fund, the Third Defendant, the Fourth Defendant, the Fifth Defendant, the Sixth Defendant or any of the Fund Entities or any other entities identified under paragraph 2.1(a) above between 25 March 2021 and the date of this Order.

    3.2    Full data and documents in support of the information required pursuant to paragraphs 2.1 to 2.3 above.

Copy documents shall be provided in electronic form but must be identified in clear terms (on a category basis) in the respective affidavit.

4    **Monthly Reports**

    4.1    Until trial or further Order:

        (a)    The Defendants (and each of them) must within 7 days of the end of each calendar month after this Order is made, provide the Company with a written report, listing all transactions that have been undertaken by each of them, the Fund, and any of the Fund Entities or any other entities identified under paragraph 2.1(a) above during the calendar month just passed (the "**Monthly Transaction Report**").

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

6

(b) For each transaction in a Monthly Transaction Report, the following details shall be included:

   (i)   The date of the transaction;

   (ii)  The identity of any party(ies) depositing funds in respect of the transaction;

   (iii) The identity of any party(ies) receiving funds in respect of the transaction; and

   (iv)  An explanation as to the nature and purpose of the transaction.

5   **Exceptions to this Order**

5.1   This Order does not prohibit:

   (a)   The Defendants, the Fund Entities or their wholly owned subsidiaries from making any payments in an amount of US$10,000 or less that are reasonably necessary in the ordinary course of business to keep the corporate Defendants, the Fund Entities or their wholly owned subsidiaries in good standing; or

   (b)   The Fifth Defendant or Sixth Defendant from making payment from Fund assets of their reasonable legal fees and expenses, but prior to making any such payment, the Fifth Defendant or Sixth Defendant (as applicable) must give 3 days' written notice to the Plaintiff setting out full details of where the money that is being used for the payment has been sourced from.

5.2   To the extent that any Defendant, Fund Entity or any of their wholly owned subsidiaries wishes to (i) make any payment or otherwise deal with its assets for the purpose of

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

7

preserving, improving or maintaining the value of its assets; or (ii) make any new investments, they may make a written request (in the case of a Fund Entity or one of their wholly owned subsidiaries, through the Sixth Defendant) to the Plaintiff to undertake the proposed transaction. Such request must include full supporting information and documentation as well as an explanation of the rationale for the transaction. The Plaintiff shall be required to give its approval or non-approval to the proposed transaction within 7 days of the request being made. Should the Plaintiff not approve the proposed transaction, the party making the request shall not consummate the proposed transaction.

6     **Effect of this Order**

6.1     A Defendant who is an individual who is ordered not to do something must not do it themselves or in any other way. The Defendant must not do it through others acting on that Defendant's behalf or on that Defendant's instructions or with that Defendant's encouragement.

6.2     <u>Set off by Banks</u> - This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to any Defendant before it was notified of the Order.

6.3     <u>Withdrawals by any Defendant</u> - No bank need enquire as to the application or proposed application of any money withdrawn by any Defendant if the withdrawal appears to be permitted by this Order.

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

8

7    **Parties other than the Plaintiff and Defendants**

7.1    <u>Effect of this Order</u> - It is a contempt of Court for any person notified of this Order knowingly to assist in or permit a breach of the Order. Any person doing so may be sent to prison, fined, or have that person's assets seized.

7.2    <u>Effect of this Order outside the Cayman Islands</u> - The terms of this Order do not affect or concern anyone outside the jurisdiction of this Court until it is declared enforceable or is enforced by a court in the relevant country and then they are to affect such person only to the extent they have been declared enforceable or have been enforced UNLESS such person is:

(a)    a person to whom this Order is addressed or an officer or an agent appointed by power of attorney of such a person; or

(b)    a person who is subject to the jurisdiction of this Court and (i) has been given written notice of this Order at that person's residence or place of business within the jurisdiction of this Court and (ii) is able to prevent acts or omissions outside the jurisdiction of this court which constitute or assist in a breach of the terms of this order.

7.3    <u>Assets located outside the Cayman Islands</u> -

(a)    Nothing in this order shall, in respect of assets located outside the Cayman Islands, prevent any person other than the Defendants from complying with: (1) what that person reasonably believes to be their obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between that person and the Respondent; and  (2) any orders of the courts of that country or state,

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

9

provided that reasonable notice of any application for such an order, being not less than 28 days, is given to the Plaintiff's attorneys.

8 **Undertakings**

8.1 The Plaintiff gives to the Court the undertakings set out in Schedule B to this Order.

9 **Duration of this Order**

9.1 This Order will remain in force until after final judgment in these proceedings unless before then it is varied or discharged by further Order of the Court.

10 **Costs**

10.1 The Defendants shall be jointly and severally liable to pay the Plaintiff's costs of the Summons, such costs to be taxed if not agreed.

11 **Variation of this Order**

11.1 Any Defendant (or anyone notified of this Order) may apply to the Court at any time to vary this Order (or so much of it as affects that person), but anyone wishing to do so must first inform the Plaintiffs' attorneys in writing on not less than 28 days' notice.

12 **Leave to serve out of the jurisdiction**

12.1 The Plaintiff has leave to serve the Writ, the Statement of Claim, this Order, the Summons and evidence in support, and all other documents associated with these proceedings on:

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

10

     (a)    The First Defendant in the United States of America in accordance with the laws of that country as to service on individuals; and

     (b)    The Third and Fourth Defendants in the United States of America in accordance with the laws of that country as to service on corporations.

12.2    The First Defendant, the Third Defendant and the Fourth Defendant shall have 28 days after service to file their Acknowledgement of Service.

**NAME AND ADDRESS OF PLAINTIFF'S ATTORNEYS**

The Plaintiff's attorneys are: Maples and Calder (Cayman) LLP, Ugland House, PO Box 309, Grand Cayman, Cayman Islands KY1-1104

DATED this     day of     2025

FILED this     day of     2025

_____

**THE HONOURABLE JUSTICE [SURNAME OF JUDGE]**

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

11

## SCHEDULE A: LIST OF FUND ENTITIES

(i) Charitable DAF Fund 2, LP (Cayman Islands)

(ii) Charitable DAF Fund, LP (Cayman Islands)

(iii) CLO HoldCo, Ltd. (Cayman Islands)

(iv) Liberty CLO HoldCo, Ltd. (Cayman Islands)

(v) HCT Holdco 2, Ltd. (Cayman Islands)

(vi) MGM Studios Holdco, Ltd. (Cayman Islands)

(vii) Liberty CLO HoldCo, LLC (Delaware)

(viii) Liberty Sub, Ltd. (Delaware)

(ix) Charitable DAF Holdings Corp. (Delaware)

(x) DST Investco, LLC (Delaware)

(xi) Allanon Capital Management LLC (Texas)

(xii) CLO HoldCo LLC (Delaware)

(xiii) Rand Advisors LLC (Delaware)

(xiv) CDHC Royse City Land LLC (Texas)

(xv) Royse City Land Company LLC (Texas)

(xvi) CDHC Assets LLC (Texas)

(xvii) CDHC Fort Worth Land LLC (Texas)

(xviii) CDHC Stewart Creek LLC (Texas)

(xix) BVP Property LLC (Delaware with CA registration)

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213                                                          12

## SCHEDULE B: UNDERTAKINGS GIVEN BY THE PLAINTIFF

(1)   Anyone notified of this Order will be given a copy of it by the Plaintiffs' attorneys.

(2)   The Plaintiff will pay the reasonable costs of anyone other than any Defendant which have been incurred as a result of this Order including the costs of ascertaining whether that person holds any of such Defendant's assets and that if the Court later finds that this Order has caused such a person loss, and decides that the person should be compensated for that loss, the Plaintiffs will comply with any Order the Court may make above.

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213                                                                                    13

Case 19-34054-11376c4153-1-Doc-4e8302/27e0607/2t125ed Page 726 of 673:35 Desc
Exhibit G - Part 2 Page 666 of 881
**Page 16 of 16**

FSD2025-0201

2025-07-15

**SCHEDULE C: SWORN EVIDENCE CONSIDERED BY THE JUDGE**

The Judge read the following sworn evidence before making this Order:

(1)　　The First Affidavit of Margot MacInnis sworn on 15 July 2025 together with its exhibit MM-1;

(2)　　…

(3)　　…

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213　　　　　　　　　　　　　　　　　　　　14

# EXHIBIT 83

Patrick - Direct                              132

1    Q    Of all the people in the world, Mr. Scott decided to

2    transfer it to you, correct?

3    A    Yeah.  Mr. Scott transferred those interests to me.

4    Q    Okay.  And you accepted them, right?

5    A    Yes.

6    Q    You're not getting paid anything for taking on this

7    responsibility, correct?

8    A    I am not paid by any of the entities depicted on this

9    chart.

10   Q    And Mr. Scott used to get $5,000 a month, didn't he?

11   A    I believe that's what he testified to.

12   Q    Yeah.  But you don't get anything, right?

13   A    Correct.

14   Q    In fact, you get the exact same salary and compensation

15   from Skyview that you had before you became the authorized

16   representative of the DAF entities and CLO Holdco.  Correct?

17   A    Correct.

18          MR. MORRIS:  Okay.  Your Honor, if I may just take a

19   moment, I may be done.

20          THE COURT:  Okay.

21      (Pause.)

22          MR. MORRIS:  Your Honor, I have no further questions.

23          THE COURT:  All right.  Pass the witness.  Any

24   examination of the witness?

25                        CROSS-EXAMINATION

# EXHIBIT 84

Case 1:19-cr-00545-RLF Document 25 Filed 02/25/20 Page 2 of 2
Case 9:19-cr-00454-RLF Document 27-28 Entered 05/28/21 Page 2 of 2
Exhibit 4 - Charitable Recipient Part 2 Responsive Disclosures    Page 120 of 307

**EXHIBIT 4**



Registration No.: 53083

Date of Incorporation: 28 October 2011

Client No.: KY059900

REGISTER OF MEMBERS
FOR:
CHARITABLE DAF FUND, LP

| Share Class: | General Partner |
| Nominal Value: | USD 0.00 |
| Voting Rights: | Yes |
| Conditional: | NO |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| CHARITABLE DAF GP, LLC The Corporation Trust Company Corporation Trust Center 1209 Orange St New Castle 19801 Wilmington DE USA | 25 Oct 2011 | New Partner | 1.00 | 25 Oct 2011 : Initial Exempted Limited Partnership Agreement dated 25 Oct 2011 | No Cert | | | |
| | | | | | | Nil | 1.00 | |

Notes:

# EXHIBIT 85

## CAUSE NO. _____

| | |
|---|---|
| **THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC.,** | |
| *Plaintiffs*, | **IN THE TEXAS BUSINESS COURT** |
| **v.** | **1ST DIVISION** |
| **MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd.,** | **DALLAS, TEXAS** |
| *Defendants.* | |

### PLAINTIFFS' ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER

**TO THE HONORABLE JUDGE OF SAID COURT:** The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc., (collectively, the "Plaintiffs" or "Supporting Organizations") file this Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Application for Appointment of Receiver, and in support thereof, respectfully show the Court as follows:

### I.     PRELIMINARY STATEMENT

1.1     Defendant, Mark Patrick, through a host of corporate manipulations, took over $270 million in cash and assets that supported some of the most important community-based

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 1**

charities in the country. In Patrick's own testimony from just last Wednesday, June 25th, the

Supporting Organizations, plaintiffs here, were left with "nothing."[1]

1.2     Through the mechanism of Charitable DAF GP, LLC (organized in Delaware) and

later via a secretly incorporated entity, CDH GP, Ltd., Mark Patrick held the sole control position

of what was a $270 million charitable fund (Charitable DAF Fund, LP) that four charities and the

Supporting Organizations relied on to perform vital and sustained philanthropic work in specific

communities in the United States.   Patrick flagrantly violated both his express and implied

fiduciary duties to the Supporting Organizations. He did so in order to redirect the fund's beneficial

ownership to a brand-new sham charitable organization controlled by him, DFW Charitable

Foundation. These actions come against a backdrop and pattern of sustained self-aggrandizement

by Patrick using the fund's resources and his technical authority over them.   If the Defendants here

are not immediately prevented from taking further adverse actions, then placed into receivership

and subjected to judicial scrutiny, the Plaintiffs will be cut off from the lifeblood of their charitable

work by the very person whose duty was to act in their interests.   Accordingly, Plaintiffs seek a

Temporary Restraining Order and Temporary Injunction freezing the funds, followed by the

appointment of a Receiver over the funds and the organization holding them.

## II.     DISCOVERY CONTROL PLAN AND MONETARY RELIEF

2.1     Plaintiffs intend that discovery be conducted under Level 2 as set forth in Rule

190.3 of the Texas Rules of Civil Procedure.   Plaintiffs reserve the right to request to conduct

discovery pursuant to "Level 3" as set forth in Rule 190 of the Texas Rules of Civil Procedure.

---

[1] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11 (App. Pg. 200)

2.2    Plaintiffs seek damages in excess of $5,000,000 exclusive of interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs.

## III.    PARTIES

3.1    The **Highland Dallas Foundation, Inc. ("HDF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HDF provides funding to The Dallas Foundation, a Texas charitable entity established in 1929, which has awarded over $1 billion in charitable grants that support a broad range of public needs.

3.2    **The Highland Kansas City Foundation, Inc. ("HKCF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HKCF provides funding to the Greater Kansas City Community Foundation, established in 1978, which has awarded over $7 billion in in charitable grants that support a broad range of public needs.

3.3    **The Highland Santa Barbara Foundation, Inc. ("HSBF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HSBF provides funding to the Santa Barbara Foundation, established in 1928, that supports a broad range of public needs.

3.4    **DFW Charitable Foundation ("DFWCF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code.  It was organized on December 9, 2024, with Defendant Mark Patrick as DFWCF's sole member.  It purports to be a nonprofit nonstock corporation serving exclusively charitable purposes.  DFWCF is headquartered at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254.  DFWCF maintains a registered office at Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801, where it may be served with process.

3.5 **Mark Patrick ("Patrick")** is an individual who resides in Texas and holds management control over the Fund structure, as explained more thoroughly below. Patrick resides and may be served with process at 6716 Glenhurst Drive, Dallas, Texas 75254, or served anywhere he may be found.

3.6 **CDMCFAD, LLC** is a Delaware limited liability company with headquarters at 6716 Glenhurst Drive, Dallas, Texas 75254. It may be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

3.7 **CDH GP, Ltd**. is a Cayman Island limited company with its registered office at Campbells Corporate Services Limited, Floor 4 Willow House, Cricket Square, Grand Cayman Ky1-9010. It may be served with process through Patrick, its 100% owner and sole director, at 6716 Glenhurst Drive, Dallas, Texas 75254, or anywhere he may be found.

3.8 **CHARITABLE DAF GP, LLC** is a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands. It may be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

## IV. JURISDICTION AND VENUE

4.1 Pursuant to Government Code § 25A.004, this Court has jurisdiction over this matter because the amount in controversy exceeds $5 million excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

- and is an action regarding the governance, governing documents, or internal affairs of organizations, namely Charitable DAF Fund, L.P., and DAF HoldCo, Ltd;

---

- and is an action by an owner of an organization, namely the Supporting Organizations as participating and beneficial owners of DAF HoldCo, Ltd and thereby Charitable DAF, L.P., and is brought against a controlling person and managerial official of the organization, namely Patrick, Charitable DAF, GP, LLC, CDH GP, Ltd and Patrick's controlled entities, DFWCF, and CDMCFAD, LLC; and alleges numerous fiduciary and other breaches of Patrick's, Charitable DAF, GP, LLC's, and CDH GP, Ltd's obligations in the capacity of a controlling person and managerial official of DAF HoldCo, Ltd and Charitable DAF, L.P.;

- and is an action alleging that Patrick, as a controlling person, and managerial official, with the entities he dominated and used, breached a duty owed to the Supporting Organizations as a controlling owner of DAF HoldCo, Ltd, CDMCFAD, LLC, and Charitable DAF, L.P., DFW Charitable Foundation by reason of the Patrick's status as an owner of management interests, controlling person, and managerial official, including the breach of a duty of loyalty and good faith.

4.2     The Court also has related supplemental jurisdiction per Government Code § 25A.004.

4.3     The Court also maintains plenary power to appoint a receiver under Texas Government Code § 24.003, Texas Civil Practice and Remedies Code § 64.001(a)(3), Texas Business and Organizations Code §§ 11.401 and 11.410, and through the Court's inherent powers at equity.

4.4     Personal jurisdiction is proper by Texas courts pursuant to Texas Civil Practice & Remedies Code § 17.042 because Defendants committed tortious actions, including Texas resident,

Mark Patrick, who improperly took approximately $270 million in value, and other conduct within Texas, incorporated herein, which are the subject of this Petition. Defendants are therefore subject to specific personal jurisdiction because of the complained-of acts that they committed in Texas. Defendants all have substantial business operations, assets, and other connections to Texas. Defendants are subject to general personal jurisdiction in Texas because they both reside in, and have continuous and systematic contacts with, Texas. Defendants have also consented to the jurisdiction of Texas courts.

4.5    Venue is proper in this county under Texas Civil Practice & Remedies Code § 15.002 because Defendant Patrick is a resident of Dallas County, Texas and Patrick undertook and directed a substantial portion of the complained-of acts in Dallas County, Texas. On information and belief, DFWCF, CDH GP, Ltd. and CDMCFAD are headquartered in Dallas County. Dallas County is within the 1st Division of the Texas Business Court.

## V.    FACTUAL BACKGROUND

### A. *The Fund Structure*

5.1    James Dondero was the President of Highland Capital Management, L.P. ("**Highland**"), an SEC registered investment advisor. At Mr. Dondero's direction, in 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. The goal was to create a permanent, self-sustaining, self-governing charitable infrastructure to facilitate sustained philanthropic efforts in specific communities in the United States.

5.2    To that end, in 2011, "Charitable DAF Fund, L.P. ("**Charitable DAF Fund**") was formed to hold the donated assets.

5.3    The Charitable DAF Fund primarily holds assets through a wholly-owned subsidiary entity called CLO HoldCo, Ltd. ("**CLO HoldCo**").

5.4    At the same time the Charitable DAF Fund was created, Charitable DAF HoldCo, Ltd ("**Charitable DAF HoldCo**"), a Cayman Islands entity, was also organized. Charitable DAF HoldCo held all of the economic interest in the Charitable DAF Fund. In other words, Charitable DAF HoldCo was the beneficial owner of all monies flowing from the assets held in the Charitable DAF Fund.

5.5    The ultimate purpose of forming Charitable DAF Fund and Charitable DAF HoldCo was to benefit certain, substantial regional nonprofit charities and their supporting organizations in California, Kansas, and Texas. Participating shares in Charitable DAF HoldCo were therefore issued to four Supporting Organizations, which were the ultimate beneficial owners of the assets held in the Charitable DAF Fund. Together, the four Supporting Organizations owned 100% of Charitable DAF HoldCo. The four Supporting Organization held their beneficial ownership in the assets of the Charitable DAF Fund by virtue of those Participating Shares in Charitable DAF HoldCo. Put simply: the four Supporting Organizations owned 100% of Charitable DAF HoldCo, which was the beneficial owner of all the assets in the Charitable DAF Fund. Three of the four Supporting Organizations are the Plaintiffs in this Lawsuit.

5.6    In turn and as intended, the funds provided to the Plaintiff Supporting Organizations from the Charitable DAF Fund empowered them to provide funding directly to charitable foundations in three regions of the United States. Specifically, The Dallas Foundation, The Greater Kansas City Community Foundation, and The Santa Barbara Foundation (together, the "**Charities**") are each affiliated with one of the Supporting Organizations and receive regular grants for charitable work ultimately funded by Charitable DAF Fund.

5.7     Since the Charitable DAF Fund's inception, the Supporting Organizations have granted over $42 million to charitable organizations, including donations to 275 organizations, with average annual grant payments of $3.7 million. The Supporting Organizations and the charitable organizations perform irreplaceable philanthropic work in their respective communities, and do so in a steady, reliable manner that permits them to build progress on initiatives year after year.

### B. *Control of the Fund*

5.8     The founders of the Charitable DAF Fund and of Charitable DAF HoldCo wanted to ensure that the fund assets were professionally managed by experts. So, although the Supporting Organizations were the sole beneficiaries of the Charitable DAF Fund and together held all of the economic interest in it, management control of the Charitable DAF Fund and Charitable DAF HoldCo was vested not with those organizations but rather in "Management Shares," with general partner status. These "Management Shares" provided the only voting rights for any and all shareholders in Charitable DAF HoldCo. But they did not convey a right to any economic benefit of the assets in the Charitable DAF Fund, which belonged solely to the Supporting Organizations.

5.9     So, the "Management Shares" exercised control over the assets and over the operations of Charitable DAF HoldCo, even though they conveyed no economic benefit. In the interest of efficient management, the Management Shares and general partner status in the Charitable DAF Fund were concentrated in one person, the "**Control Position**." The Control Position was therefore responsible to manage the Charitable DAF Fund and Charitable DAF HoldCo for the economic benefit of their economic beneficiaries—the "Supporting Organizations," which held their "Participating Shares." The Control Position therefore owed the

---

Supporting Organizations fiduciary duties of candor, care, and loyalty, including a prohibition against any self-dealing.

5.10    In essence, the governing documents of Charitable DAF HoldCo grant complete control of Charitable DAF Fund structure to the holder of the 100 Management Shares in Charitable DAF HoldCo. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Charitable DAF Fund structure.

5.11    The Charitable DAF Fund, however, is also expressly, separately controlled by the Control Position. Similar to control over Charitable DAF HoldCo, control over the Charitable DAF Fund is separate from the beneficial economic ownership of the Charitable DAF Fund (which belongs entirely to the Supporting Organizations). Control over the Charitable DAF Fund was reposited in the Control Position through its complete ownership of a Delaware entity named Charitable DAF GP, LLC[2] (the "**Delaware GP**"). The Delaware GP was the managing general partner in the Charitable DAF Fund.

5.12    The Amended and Restated Limited Partnership Agreement of the Charitable DAF Fund, dated November 7, 2011 (the "**ARLPA**"), and the Amended and Restated Memorandum and Articles of Association of the LP dated January 19, 2015 ("**Articles**"), govern the Charitable DAF Fund and its partners. The ARLPA makes it clear the Control Position is to exercise his powers for the sole benefit of the Supporting Organizations.

5.13    For example, the Preamble to the ARLPA states:  "WHEREAS, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code

---

[2] The Charitable DAF GP, LLC, held all the general partnership shares in Charitable DAF Fund, which provided all management control over the Charitable DAF Fund, but conveyed no beneficial economic interest.

of 1986, as amended and the parties hereto desire for the Partnership to be for the economic benefit

of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein[.]"

5.14    Likewise, Section 1.3 (Purpose and Powers) states that the Control Position must

manage the fund assets "*for the purpose of benefitting, directly or indirectly, the Indirect

Charitable Owners.*"[3]

5.15    Section 1.6 (Powers) likewise emphasizes:   "[T]he General Partner [Control

Position] . . . is hereby granted the right, power and authority to do on behalf of the Partnership all

things which, in the General Partner's sole discretion, are necessary or appropriate to manage the

Partnership's affairs and fulfill the purposes of the Partnership; *provided, however that the

Partnership's assets and investments shall be for the benefit of the Limited Partners and not for

the economic benefit of the General Partner.*"[4]

5.16    The ARLPA thus provides that Charitable DAF Fund was formed to make

investments, directly or indirectly, "for the economic benefit of the Limited Partner [DAF HoldCo]

and its Indirect Charitable Owners" and contemplates the engagement of investment (and other

service) advisors to achieve this. In this context, the Control Position is responsible for the

governance and management functions of the Charitable DAF Fund as required for it to carry out

its sole purpose of benefiting the Supporting Organizations and the Charities they support. The

ARLPA is infused throughout with the singular command: The Control Position has great authority

but is required to act with fidelity in exercising it for the benefit of the Supporting Organizations.

5.17    Grant Scott was initially selected for the Control Position. Mr. Scott was a longtime

friend of Mr. Dondero's and a lawyer in North Carolina. Mr. Dondero knew and trusted Mr. Scott.

---

[3] Emphasis added.
[4] Emphasis added.

Mr. Scott effectively served the Supporting Organizations' charitable purposes in his role in the Control Position. For this, Mr. Scott received $60,000 in annual compensation—a compensation rate that remained unchanged for the better part of decade. During this time, the Supporting Organizations and their respective charitable foundations made great strides in creating philanthropic, and charitable, work that was efficient, that was steady and reliable, and that grew and built on their progress year after year.

C. *Mark Patrick's Assumption of Control*

5.18    Highland filed for bankruptcy in October 2019 ("**Highland Bankruptcy**") and, as a result, the Charitable DAF Fund became engaged in certain disputes arising from the bankruptcy, increasing the time and responsibilities associated with the Control Position. Mr. Scott did not feel qualified to manage those disputes and decided to resign from the Control Position.

5.19    Mark Patrick, a tax attorney and employee of Mr. Dondero who had played a significant role in developing the overall Charitable DAF Fund structure while at Highland, suggested to Mr. Scott and Mr. Dondero that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected Charitable DAF Fund.  At the time, Patrick was an employee of Mr. Dondero's enterprises and was serving as Mr. Dondero's attorney and Mr. Dondero had no objection to Mr. Scott transferring the Control Position to Patrick. As a result of his attorney and employee status, Mr. Patrick owed significant fiduciary duties to Mr. Dondero's entities and to the Charitable DAF Fund structure—fiduciary duties that he has violated in a series of self-serving and self-dealing transactions.

5.20    On March 25, 2021, Mr. Scott resigned and appointed Patrick as director of DAF HoldCo, transferring all his management shares and membership interest to Patrick for nominal consideration. Patrick therefore assumed the Control Position from that date. Patrick then hired

Paul Murphy, a Cayman Islands' director, to join him in his efforts to abscond with the $270 million in assets.

5.21    At the time Patrick assumed the Control Position, he was employed at Skyview Partners, a service organization that provided support primarily to Mr. Dondero and entities in which Mr. Dondero had an interest. As an employee of Skyview, he owed fiduciary duties to his employer.

### D.  *Patrick's Breaches of Fiduciary Duty*

5.22    In 2023, while still employed by Dondero entities, and as the sole fiduciary for the Charitable DAF Fund and DAF HoldCo, Patrick initiated a two-year pattern of malfeasance all culminating in his current effort to abscond with $270 million. His initial small infidelities quickly blossomed into a brazen, fraudulent play for the Charitable DAF Fund and its $270 million in holdings, putting at risk the charitable works supported by the Supporting Organizations.

### E.  *Undisclosed Self-Dealing*

5.23    In June 2023, Patrick requested that The Highland Dallas Foundation, Inc. direct $10,000 to Creative HEARTS TX, a non-profit entity formed on June 13, 2023. Patrick expected this to be an annually recurring donation. Patrick failed to disclose that he, his wife, and daughter were the directors of this entity, which had been created approximately two weeks earlier. The Highland Dallas Foundation, Inc. funded an initial $10,000 contribution but declined to commit to doing so annually.

### F.  *Attempted Fraudulent Kickback Scheme*

5.24    In September 2023, Patrick approached Kevin Cronin, CEO of Fortaris Capital Advisors, proposing a fraudulent kickback scheme to personally benefit Patrick. Fortaris previously provided legitimate services to the Charitable DAF Fund. Now, Patrick proposed that

the Charitable DAF Fund engage a new vendor controlled by Mr. Cronin. Patrick proposed that

the Charitable DAF Fund pay this sham vendor a monthly fee of $25,000-$50,000. The sham

vendor, however, would not provide any services to the Charitable DAF Fund. Instead, Patrick

expected to collect half of the fee as undisclosed supplemental compensation. That is, he expected

to collect something for nothing in a classic fraud.

5.25    Mr. Cronin declined and relayed what occurred to Mr. Dondero. Mr Dondero then

confronted Patrick, who admitted that what Mr. Cronin reported was true.

5.26    Mr. Dondero ensured that Supporting Organizations were also informed about

Patrick's kickback scheme. Despite significant concern, the Supporting Organizations had doubts

about whether, based on the governing documents and Patrick's positions, they could remove

Patrick from the Control Position.

### G. *Insider Trading*

5.27    In August 2024, Patrick tried to capitalize on material non-public information

obtained through his employment at Skyview to advise The Dallas Foundation to exercise a put

option in a NexPoint affiliated asset, constituting attempted violations of U.S. securities laws. The

Dallas Foundation declined to trade on Patrick's improper tip.

5.28    Skyview's compliance department conducted an internal investigation that

concluded Patrick's actions constituted serious breaches of compliance obligations and attempted

serious breaches of U.S. securities laws.

5.29    Patrick resigned from Skyview immediately before the investigation was finalized

and simultaneously terminated the Charitable DAF Fund's services agreement with Skyview

without justification and against the Charitable DAF Fund's interests.

### H. *Financial Irregularities and Lack of Transparency*

---

5.30    After resigning from Skyview, Patrick began shrouding the Charitable DAF Fund structure's overall financial reporting and communications to the point that the Supporting Organizations were essentially cut off from any view into the financial transactions and soundness of the fund. As of September 2024, the Charitable DAF Fund held approximately $270 million strictly for the financial benefit of the Supporting Organizations and ultimately their supported Charities.

5.31    But a review of the Charitable DAF Fund's last accessible financial records showed dramatic and unexplained increases in expenditures:

- Directors' fees increased from $40,000 in 2022 to almost $600,000 in 2023, and to approximately $2.25 million in the first half of 2024 alone (a 12,400% increase from 2022 if annualized).

- Legal expenses increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022 (a 300% increase if annualized).

- Overall expenses for the first half of 2024 were around $18.3 million, compared to $18.6 million for all of 2023.

5.32    Despite repeated requests from the Supporting Organizations and their counsel and counsel for the Charitable DAF Fund, Patrick and Murphy have ignored and refused to provide requested financial information or explanations for these dramatic expenditure increases.

5.33    Patrick must have personally benefited from the dramatic increases in director's fees and, given Patrick's prior attempt to implement a kickback scheme through Mr. Cronin, the other remarkable increases in expenses raise deep concerns about potential self-dealing.

**I.    *Patrick Ignores the Supporting Organizations Concerns***

5.34    On November 11, 2024, given what the Supporting Organizations already knew, the three major Supporting Organizations drafted a letter to Murphy, the Cayman Islands director, stating that "we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "**DAF-related entities**"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable."[5]

5.35    The letter continued, "because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."[6]

5.36    Patrick and Murphy never responded to the letter, other than a threat that if the Supporting Organizations did not withdraw it, then Patrick and Murphy would embark on an effort at the Internal Revenue Service to revoke the Supporting Organizations' charitable status.

5.37    In January 2025, the Supporting Organizations demanded Patrick and Murphy provide clarity into the Charitable DAF Fund's financial position, expressing dismay that Patrick and Murphy continued to ignore their repeated requests for information. Murphy responded via email to this request stating that he and Patrick would "present directly to the foundations/supporting organi[z]ations" to address some of the concerns in the No Confidence Letter. Murphy never did.[7]

---

[5] *See* Ex. 4-A, Ltr. of Nov. 11, 2024 (Appx. Pg. 162-163)
[6] *Id.*
[7] *See* Ex. 4-B, Email chain ending Jan. 23, 2025 (Appx. Pg. 171)

5.38    Counsel for the Supporting Organizations and for the Charitable DAF Fund exchanged further communications, but Patrick, Murphy, and the Charitable DAF Fund's counsel never provided answers and information in response to the Supporting Organizations' basic requests. Instead, they wrapped all their future communications in half-truths and subterfuge.[8] At the same time, they offered the Supporting Organizations vague assurances that all their maneuvers were to improve the structure, focus, and performance of the fund, for the benefit of the Supporting Organizations.

5.39    The Charitable DAF Fund's counsel promised a meeting to address the Supporting Organizations' concerns, but after the Supporting Organizations' counsel suggested dates, the Charitable DAF Fund and its counsel delayed and delayed until it eventually went silent.[9]

5.40    In the interim, Patrick accelerated his multi-year fraud.

### J.  *Dilution Scheme and Liquidation Maneuver*

5.41    Between December 2024 and the present, Patrick executed a series of moves to dilute the Supporting Organization's interests in the Charitable DAF Fund, and alienate those same assets entirely away from them. The purpose and result of Patrick's moves was to entirely eliminate the Supporting Organization's ownership of the Charitable DAF Fund assets. In short, he stole them.

5.42    In December 2024, Patrick formed new entities (as described below) with Patrick as the sole director. He then replaced the current entities holding and controlling the Charitable DAF Fund with his own entities, essentially transferring all ownership and control to himself in a brazen act of self-dealing. He never notified the Supporting Organizations of this massive

---

[8] *See* Exs. 4-A, Ltr. of Feb. 14, 2025 & Ex. 4-C Ltr. of Feb. 27, 2025 (Appx. Pg. 162-182).
[9] *See* Ex. 4-C, Email chain ending April 9, 2025 (Appx Pg. 179-182).

reorganization of the Charitable DAF Fund. Indeed, the Supporting Organizations found out about this monumental reorganization only when Patrick and his counsel had to admit it in a Cayman court as part of the Supporting Organization's successful effort to appoint Cayman Liquidators to unravel Patrick's fraud in that jurisdiction.

5.43    In a move that would make most fraudsters blanch, and certainly continued to violate all his fiduciary duties, on December 9, 2024, Patrick formed Defendant DFWCF (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Patrick named himself the Sham Charity's sole member and its registered address was Patrick's home. Patrick then issued his charity a fifty-one percent (51%) interest in the charitable assets. In essence, Patrick awarded himself the ability to distribute over half of the Charitable DAF Fund's $270 million in economic interest to his own entity, from his living room in Dallas.

5.44    Three days later, on December 12, 2024, Patrick incorporated CDMCFAD, LLC, a Delaware limited liability company.

5.45    In secret, and without notice to the Supporting Organizations, on December 18, 2024, Charitable DAF HoldCo transferred to CDMCFAD, LLC 100 percent of its interest in Charitable DAF Fund, and Charitable DAF HoldCo acquired 100 percent of the interest in CDMCFAD, LLC. As a result, CDMCFAD effectively was inserted as a blocking company in between Charitable DAF HoldCo, owned by the Supporting Organizations, and the Charitable DAF Fund itself (where the assets resided). Suddenly, the Supporting Organizations no longer held a 100 beneficial interest in the entity that held the assets of Charitable DAF Fund. Instead, Patrick ensured a different and new entity (CDMCFAD) held Charitable DAF Fund.

5.46    Patrick's fraud continued to evolve in February 2025. On February 7, 2025, again without notice to the Supporting Organizations, DAF HoldCo (in an *ultra vires act)* allotted 318

participating shares to DFWCF, the Sham Charity controlled by Patrick. This sham dilution reduced the Supporting Organizations' cumulative holding in Charitable DAF HoldCo from 100% of the participation shares to 48.9%. Following the new issuance: (i) HDFI's interest was diluted from 32.787% to 16.05%; (ii) HKCF's interest was diluted from 32.787% to 16.05%; (iii) HSBFI's interest was diluted from 32.787% to 16.05% and (iv) the HCMLP Charitable Fund's[10] interest was diluted from 1.639% to 0.80%. Said another way, Patrick absconded with over half of the participating interest of the Supporting Organizations and other charitable funds. Before, during, and after this action—and at all times it was contemplated and executed—Patrick and Charitable DAF HoldCo still owed fiduciary duties to the Supporting Organizations.

5.47    In February 2025, the Sham Charity acquired IRS 501(c)(3) tax exempt status. The By-Laws of the Charitable DAF Fund required that its limited partnership interests be owned by an entity with such tax-exempt status. Therefore, obtaining 501(c)(3) status for the Sham Charity was a necessary step to effectuate Patrick's complete control of the assets of Charitable DAF Fund.

5.48    On March 27, 2025, Patrick caused CDMCFAD (the holder of $270 million in assets) to issue shares to the Sham Charity, *and only to the Sham Charity*. He issued no shares in CDMCFAD to the Supporting Organizations. His fraudulent scam was nearly complete. Now, Patrick's Sham Charity controlled all the direct economic interest in the entity Patrick had inserted between Charitable DAF HoldCo and the assets in Charitable DAF Fund, and the Supporting Organizations were left out in the cold.

5.49    On April 2, 2025, Patrick caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million. That is, he exchanged $270 million for $1.6

---

[10] The HCMLP Charitable Fund is a separate charity which provides funding for the North Texas Community Foundation. While it is not a named plaintiff, the damages it incurred because of the acts of Patrick are notable and relevant to show Patrick's impact across the State of Texas.

million, a ridiculous transaction bereft of reasonably equivalent value.[11] After the transaction, Charitable DAF HoldCo purportedly had no assets and no remaining interest in Charitable DAF Fund. As a result, Patrick's Sham Charity, Defendant DFWCF, was the sole limited partner and beneficial owner of Charitable DAF Fund, through its now-100% ownership of CDMCFAD, and CDMCFAD's 100% ownership of the fund. This final step completely severed the Supporting Organizations and their nonprofit charities from the assets of the Charitable DAF Fund. In Patrick's own words under oath, "the entity in liquidation [Charitable DAF Holdco, Ltd.] owns nothing."[12]

5.50    Before the start of these self-dealing transactions, in October 2024, the Supporting Organizations owned 100% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Supporting Organizations owned Participation Shares worth zero. While Patrick allegedly distributed a paltry portion of $1.6 million to the Supporting Organizations, receipt of those funds has yet to be verified. Again, all of his self-dealing activity took place with no clarity or transparency. Patrick converted the Supporting Organizations' assets to Patrick's personal benefit and ownership, and violated his fiduciary duties of care, candor, and loyalty that he owed to the Supporting Organizations.

### K.   *The Cayman Island Proceedings*

5.51    On April 2, 2025, again unbeknownst to the Supporting Organizations, Patrick placed DAF HoldCo into *voluntary* liquidation in the Cayman Islands through written resolutions of directors executed by Patrick, with joint voluntary liquidators appointed.

5.52    But the Supporting Organizations already did know: that Patrick had (1) actively thwarted all financial transparency; (2) refused to address the Supporting Organizations well-

---

[11] *See* Ex. 3, p. 5, Written Resolutions of the Directors of the Company dated 2 April 2025 (Appx. Pg. 102-103)
[12] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, CaseNo. 19-34054-sgj-11; (Appx. Pg. 200).

founded concerns including their expression of no-confidence; (3) engaged in a pattern of fraudulent self-dealing; (4) taken all participating ownership from the Supporting Organizations without any approval or appropriate compensation; and (5) and restructured the underlying funds. This was enough to convince the Supporting Organizations to take action.

5.53    The Supporting Organizations filed an *involuntary* Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.*  Absent doing so, the Supporting Organizations would not have learned about Patrick's voluntary liquidation.

5.54    Cayman Islands counsel for the Supporting Organizations alleged essentially the same facts as recounted in this Petition before the Grand Court. However, Defendants DFWCF and CDMCFAD are Delaware-organized entities and were not expressly named in the Grand Court proceedings.

5.55    The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things[13]:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

---

[13] Ex. 8, Supervision Order (Appx. Pg. 244-246)

6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:

a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

5.56    While the Cayman Islands-appointed official liquidators now conduct their investigation of the assets and other matters pertaining to the Cayman Islands' proceedings, Defendants Patrick, DFWCF, and CDMCFAD (all sited in the United States, and more specifically Dallas County) remain in actual control and beneficial ownership of all assets that were held by the Charitable DAF Fund and DAF HoldCo.  In the meantime, the rightful beneficial owners, the Supporting Organizations, are without the benefit of the considerable assets formerly held by the Charitable DAF Fund and without any insight into the current status and security of the assets. This not only damages the Supporting Organizations, but the charitable causes in their communities that rely on funding from the Charitable DAF Fund.

## VI.    CAUSES OF ACTION

### Count I - Breach of Fiduciary Duty Against Patrick,  CDH GP, Ltd., and Charitable DAF GP, LLC

6.1    Paragraphs 1.1 - 5.56 are incorporated as if fully restated herein.

6.2    In "a limited partnership, the general partner stands in the same fiduciary capacity to the limited  partners as a trustee stands to the beneficiaries of a trust."  *Hughes v. St. David's Support Corp.,* 944 S.W.2d 423, 425–26 (Tex. App.—Austin 1997, writ denied); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) (There "has never been any serious doubt that

the general partner of a Delaware limited partnership owes fiduciary duties."). Likewise, under traditional principles of equity, and various statutes generally hold that a manager of an LLC would qualify as a fiduciary of that LLC and its members. *Auriga Capital Corp. v. Gatz Properties,* 40 A.3d 839, 850 (Del. Ch. 2012), judgment entered sub nom. *Auriga Capital Corp. v. Gatz Properties, LLC* (Del. Ch. 2012), aff'd, 59 A.3d 1206 (Del. 2012); *Davis v. Crawford*, 700 S.W.3d 438, 449 (Tex. App.—Eastland 2024, no pet.) ("[T]he relationship between a managing member of an LLC and a nonmanaging member is similar to that of a general partner/limited partner relationship, and that such an arrangement thereby creates a fiduciary obligation on the part of the managing member.").

6.3     By virtue of Patrick's Control Positions related to the overall Charitable DAF Fund structure and specifically DAF HoldCo and the Charitable DAF Fund, Patrick owed fiduciary duties to the Plaintiffs.

6.4     Patrick breached his fiduciary duties to the Plaintiffs by stripping them of their legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.5     Patrick breached these duties through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.6     Patrick breached his fiduciary duties by mismanaging the Charitable DAF Fund's finances, and dramatically increasing director compensation to his own benefit.

6.7    Patrick breached his fiduciary duty by successfully soliciting a charitable contribution ultimately from a Supporting Organization to a charity controlled by Patrick and his immediate family without disclosing the relationship.

6.8    The actions incorporated herein have wrongfully deprived the Plaintiffs of substantial economic support and assets, harming, and threatening irreparable harm to, the Plaintiffs and the Charities that they support. Plaintiffs have suffered damages as a result of Patrick's breach of his fiduciary duties.

### Count II - Constructive Fraud Against Patrick

6.9    Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.10    "Constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Hubbard v. Shankle*, 138 S.W.3d 474, 483 (Tex. App.—Fort Worth 2004, pet. denied).  "[I]n a claim for constructive fraud, the actor's intent is irrelevant." *Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856, 879 (Tex. App.—El Paso 2021, pet. denied).  "[C]onstructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Id.*

6.11    As a fiduciary, Patrick's conduct in diluting the Plaintiffs' interests, selling assets at below-market values to undisclosed parties, and liquidating DAF HoldCo and transferring its interests to the Sham Charity without notice constitutes constructive fraud.

6.12    Patrick injured public interests by his conduct. Plaintiffs have suffered damages as a result of Patrick's fraud.

### Count III - Unjust Enrichment Against Patrick, CDMCFAD, and DFWCF

6.13    Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 23**

6.14   A claim of unjust enrichment applies when a party obtains "a benefit from another by fraud, duress, or the taking of an undue advantage." *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010)).

6.15   Patrick and DFWCF stripped the Plaintiffs of their rightful legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.16   Patrick and DFWCF took these interests and assets for their own benefit via fraud and taking undue advantage of the access available through the Control Positions and overlapping control with DFWCF.

6.17   Patrick also took undue advantage through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.18   Patrick and DFWCF have been unjustly enriched at the expense of the Plaintiffs. Plaintiffs have been damages by Patrick's unjust enrichment.

## Count IV – Conversion Against Patrick, CDMCFAD, and DFWCF

6.19   Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.20   Conversion requires a showing that (1) the plaintiff owned, had legal possession, or was entitled to possession of the property, (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights, and (3) the defendant refused the plaintiff's demand for return of the property. *Automek, Inc. v. Orandy*, 105 S.W.3d 60, 63 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

6.21 The Plaintiffs held legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.22 Patrick with DFWCF has unlawfully and without authorization, assumed and exercised dominion over the Plaintiffs' legal, equitable, and beneficial interests in the Charitable DAF Fund structure including their participation in DAF HoldCo, the Charitable DAF Fund, and Charitable DAF Fund assets through the dilution scheme that diverted all the legal and beneficial economic interests to Patrick's controlled entity, DFWCF.

6.23 The Plaintiffs requested distribution in kind of the Charitable DAF Fund structure assets, which Patrick and now, DFWCF, have ignored and refused. Plaintiffs have been damages as a result of these conversions.

**Count V – Imposition of Constructive Trust Against Patrick, CDMCFAD, and DFWCF**

6.24 Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.25 "A constructive trust is considered a legal fiction and is a creation of equity to prevent a wrongdoer from profiting from his wrongful acts." *In re Harding*, 563 S.W.3d 366, 372 (Tex. App.—Texarkana 2018, no pet.). "[T]o obtain a constructive trust, [a party] must prove: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res." *Id.* (cleaned up).

6.26 Patrick through DFWCF has breached his fiduciary relationship with the Plaintiffs by converting legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit, resulting in the unjust enrichment of DFWCF and Patrick.

6.27    All the legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit in the overall Charitable DAF Fund structure should be imposed with a constructive trust running to the benefit of the Plaintiffs.

## VII.    EMERGENCY APPLICATION FOR RECEIVERSHIP

7.1    Paragraphs 1.1 - 5.56 are incorporated as if fully restated herein.

7.2    The Plaintiffs seek the immediate appointment of a receiver over Defendants DFWCF and CDMCFAD, LLC (the "**Receivership Entities**") under three independent bases: Texas Civil Practice & Remedies Code §§ 64.001(a)(3), (7), Texas Business and Organizations Code § 11.410, and the Court's inherent equitable powers.

### A.    *Texas Civil Practice & Remedies Code*

7.3    [U]nder section 64.001 of the Texas Civil Practice and Remedies Code ("**CPRC**"), a court may appoint a receiver in an action between "partners or others jointly owning or interested in any property or fund," CPRC §§ 64.001(a)(3) or "in any case in which a receiver may be appointed under the rules of equity." CPRC §§ 64.001(a)(7);  *Elliott v. Weatherman*, 396 S.W.3d 224, 228 (Tex. App.—Austin 2013, no pet.).

7.4    A party with a probable interest or a right to the property or fund has standing to seek the appointment of a receiver. CPRC § 64.001(b). "[T]he property or fund must be in danger of being lost, removed, or materially injured." *Id.*

7.5    A probable interest exists by statute in actions between partners and in actions between joint owners of property. CPRC § 64.001(a)(3).

7.6    One purpose of a receivership is to preserve assets and resolve issues relating to an entity's affairs where there are allegations of fraud or improper activities. *See Floyd v. MMWKM*

---

*Advisors, LLC*, No. 05-23-00638-CV, 2024 WL 549036 at *2 (Tex. App. – Dallas 2024, pet. denied, reh'g denied).

**B.** *Texas Business and Organizations Code*

7.7     Like CPRC § 64.001, a court that has subject matter jurisdiction over specific property of a domestic or foreign entity in Texas may appoint a receiver for that property in several scenarios, including an action between "partners or others jointly owning or interested in the property or fund." Tex. Bus. & Orgs. Code § 11.403(a)(3).

7.8     Additionally, under Section 11.410 of the Texas Business and Organizations Code ("TBOC"), a court may appoint a receiver for all of the property, in and outside Texas, of a foreign entity doing business in Texas and its business if the court determines, in accordance with the ordinary usages of equity, that circumstances exist that necessitate the appointment of a receiver even if a receiver has not been appointed by another court. TBOC § 11.410(a).

**C.** *Rules of Equity*

7.9     In addition to specific statutory authority to appoint receivers, Texas courts retain inherent equitable power to do so. The CPRC, § 64.004 makes clear that the rules of equity control the appointment and power of a receiver unless inconsistent with a statutory provision.

**D.** *Receivership Standards Under Texas Law and Equity*

7.10    "The appointment of a receiver lies within the sound discretion of the trial court." *In re Estate of Herring*, 983 S.W.2d 61, 65 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.). "The appointment of a receiver, either as authorized by statute or usages of equity, will not be disturbed on appeal unless the record reveals a clear abuse of discretion." *O & G Carriers, Inc. v. Smith Energy 1986-A P'ship*, 826 S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 1992, no writ).

7.11    The party submitting an application for appointment of a receiver bears the burden of proof to present evidence justifying the appointment. *Furgerson v. First Nat'l Bank*, 218 S.W.2d 1019, 1020 (Tex. Civ. App. – Texarkana 1949, no writ). The party can meet that burden by submitting a sworn verification supporting the claimed grounds for the appointment, *In re Estate of Herring*, 983 S.W.2d 61, 65 (Tex. App. – Corpus Christi 1999, no pet.), and a court may consider oral testimony as evidence in support of an application. *See Furgerson*, 218 S.W.2d at 1020.

7.12    An application seeking a receivership pursuant to a statutory provision must allege facts that meet the elements of the provision. *Associated Bankers Credit Co. v. Meis*, 456 S.W.2d 744, 748 (Tex. Civ. App. – Corpus Christi 1970, no writ). The facts alleged in the application will be construed as favorably as possible for the applicant. *Couch Mortgage Co. v. Roberts*, 544 S.W.2d 944, 946-47 (Tex. Civ. App. – Houston [1st Dist.], no writ).

7.13    Conduct that supports a cause of action for fraud or breach of fiduciary duties is often the same type of conduct that supports an application for a receivership. *Ritchie v. Rupe*, 443 S.W.3d 856, 873 (Tex. 2014).

## E. *The Supporting Organizations are entitled to the Emergency Appointment of a Receiver to Oversee the Receivership Entities*

7.14    The Plaintiffs have an ownership interest in their participating shares in DAF HoldCo and thereby its economic ownership of the Charitable DAF Fund and the assets that were rightfully held by the Charitable DAF Fund and entrusted to the control of Patrick.

7.15    Patrick wrongfully caused the Plaintiffs' participation shares to be diluted and then caused the Plaintiffs' beneficial economic interests in the Charitable DAF Fund structure to be wrongfully transferred to a collection of sham entities wholly dominated by Patrick.

7.16    Charitable DAF Fund was valued at $270 million as recently as September 2024. Now no assets remain in the Charitable DAF Fund structure.  The Plaintiffs have not received any

just compensation, participation, or other consideration for the conversion of their substantial interests in the Charitable DAF Fund structure.

7.17    Receivership Entities now maintain complete management control and beneficial rights over the Charitable DAF Fund structure's substantial assets or otherwise possess those assets to the exclusion of Charitable DAF Fund.

7.18    Patrick dominates and controls the Receivership Entities.  As shown, Patrick has demonstrated a pattern of selling assets at below-market values, attempting to engage in self-dealing transactions, transacting assets at non-market terms in potential self-dealing transactions, dramatically increasing internal and professional administrative expenses that burdens and dissipates charitable assets, and secreting his activities while controlling assets dedicated to charitable causes.  To preserve assets from further dissipation, a receiver should replace Patrick's oversight of the Receivership Entities and their assets, which were wrongfully acquired and held.

7.19    The Plaintiffs have been stripped of access to the benefit of assets meant to support charitable causes, resulting in financial distress and immediately threatening planned and ongoing support of countless charities including education, medical research, and community initiatives.

7.20    The Plaintiffs have demonstrated a strong likelihood of success on their claims given the documented pattern of breaches, financial irregularities and successful litigation in the Cayman Islands.

7.21    The Plaintiffs have demonstrated a clear and compelling need for immediate court oversight to prevent further injury and preserve the charitable assets at risk due to Patrick's actions via the Receivership Entities.

7.22    The participating shares in DAF HoldCo as well as assets valued at $270 Million are in danger of being lost, removed, or materially injured and circumstances exist to necessitate

the appointment of a receiver to conserve the property, fund, and avoid further, irreparable harm to Plaintiffs.

7.23    Given Patrick's demonstrated and recent malfeasance using the Receivership Entities as tools of fraud, no other adequate remedy exists under law.

### Count VI – APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION PENDING APPROVAL OF RECEIVERSHIP

8.1.    Plaintiffs seek immediate injunctive relief preventing the Defendants from further use, transfer, dispersal, and/or alienation of the assets that were held in the Charitable DAF Fund as of the instant date of this filing, regardless of where they are presently held.  If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment. This application is supported by the sworn declarations of Julie Diaz and James David Dondero.

8.2.    A writ of injunction is proper where "the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant," or where "a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual," or where "irreparable injury to real or personal property is threatened, irrespective of any remedy at law." Tex. Civ. Prac. & Rem. Code § 65.011.  "A temporary injunction pending trial on the merits 'may be and usually is issued in connection with any species of litigation where it is necessary to preserve the status quo pending a final adjudication of the rights of the parties.'" *Lometa Bancshares, Inc. v. Potts*, 952 S.W.2d 631, 633 (Tex. App.-Austin 1997) (*quoting Turcotte v. Alice Nat'l Bank*, 402 S.W.2d 894, 896 (Tex.1966)). "In cases like the present, an applicant for the writ must show (1) a probable right to

recover on the merits after final hearing and (2) a probable and irreparable injury unless the writ

is issued." *Lometa*, 952 S.W.2d at 633 (citing Tex. Civ. Prac. & Rem. Code Ann. § 65.011 (West

1997); *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993); *Sun Oil Co. v. Whitaker*, 424 S.W.2d

216, 218 (Tex.1968)).

8.3.    Texas courts universally recognize that in cases where dispersal or liquidation of

assets required to pay a judgment is likely, temporary injunctive relief is proper to preserve the

status quo and ensure that the efficacy of ultimate relief for the Plaintiffs is not defeated by

financial machinations while the case is pending.  In other words, "the adequacy of an available

legal remedy must be judged in the circumstances of the particular case[,]" and "[i]n such

circumstances, any legal remedy by way of a judgment for money damages is properly viewed as

inadequate on the ground that the funds may be reduced pending final hearing and thus be

unavailable in their entirety[.]"  *Lometa*, 952 S.W.2d at 633; *see also Minexa Arizona, Inc. v.

Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ); *Sonics Int'l Inc. v.

Dorchester Enters.*, 593 S.W.2d 390, 393 (Tex.Civ.App.—Dallas 1980, no writ*); Baucum v.

Texam Oil Corp.*, 423 S.W.2d 434, 442 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.).

8.4.    The above authorities support the award of the temporary injunctive relief requested

herein, because the assets formerly held in the Charitable DAF Fund for the benefit of the Plaintiffs

are already being alienated from their beneficial owners and the conduct of Defendants

demonstrates the likelihood of their continued transfer, alienation, expenditure, and dispersal while

this case is pending and before the rights of the Plaintiffs to those funds can be vindicated.

8.5.    Unless enjoined, Patrick and the other Defendants will cause and continue to cause

irreparable harm to Plaintiffs for which there is no adequate remedy at law; including, without

limitation, the dispersal, expenditure, transfer, and further alienation of more than $270 Million

that can never be replaced because the Defendants will lack the means to do so.

8.6.     Plaintiffs will therefore suffer immediate and irreparable injury without adequate

remedy at law if a Temporary Restraining Order ("**TRO**") is not granted against the Defendants.

Accordingly, Plaintiffs request the Court issue a TRO that freeze:

(a) all assets that were held in the Charitable DAF Fund as of the instant date of this filing,
    and

(b) prohibiting Patrick and the other Defendants, or anyone acting in concert with them
    or at their direction, from any use, expenditure, transfer, dispersal, dilution,
    encumbrance, or alienation of any of those funds pending resolution of Plaintiff's
    Motion for Temporary Injunction.

8.7.     The harm to Plaintiffs is imminent, and if the Court does not issue a TRO and

injunctive relief, it will be irreparably injured, as set forth herein. Conversely, the granting of a

TRO will merely require Defendants to refrain from doing anything with the funds for two weeks.

If the Defendants prevail on the merits, the funds will still be available to them for their use in

future.  The balance of burdens thus strongly favors Plaintiffs, who stand to lose everything absent

immediate injunctive relief—over Defendants, who will at most suffer a minor inconvenience if

they ultimately prevail.

8.8.     The issuance of injunctive relief will not disserve the public interest. Balancing the

equities and other factors, including the significant potential for irreparable harm to the Plaintiffs

and the lack of harm to Defendants due to the entry of a TRO, demonstrates that the relief will not

disserve the public interest. Indeed, freezing the funds at issue in place to ensure that this fraudulent

scheme is not permitted consummation absent judicial scrutiny serves the public interest by protecting vital charitable interests.

8.9.    A temporary restraining order is necessary to maintain the *status quo* during the pendency of this action. *See In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) ("defining the status quo as "the last, actual, peaceable, non-contested status which preceded the pending controversy.") The facts above establish the required elements for Plaintiffs to obtain a TRO against Defendant, specifically: (1) a cause of action against Defendants with a probable right to relief; (2) a probable, imminent, and irreparable injury to Plaintiffs in the interim; (3) the threatened injury outweighs any damage the injunction might cause the opposing party; and (4) the injunction will not disserve the public interest. *See Butnaru v. Ford Motor Co*., 84 S.W.3d 198. 204 (Tex. 2002).

**A.  *Plaintiffs have a Probable Right to the Relief Sought in their Claims Against Defendants.***

8.10.    Plaintiffs easily satisfy this test. Establishing a probable right to relief does not require the applicant for a TRO to establish that it will prevail at trial. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Instead, this element requires only that the applicant allege a cause of action and present evidence that tends to sustain that cause of action. *See Miller Paper Co. v. Roberts Paper Co*., 901 S.W.2d 593, 597 (Tex. App.— Amarillo 1995, no writ). The cause of action itself need not involve permanent injunctive relief—the trial court "[has] discretion to preserve the status quo so long as [a movant] demonstrate[s] his probable right to recover damages." *Metcalfe*, 863 S.W.2d at 58; *see also Gryphon Master Fund, L.P. v. Path 1 Network Technologies, Inc*., No. 3:06 CV 0107 D, 2007 WL 1723703, at *5 (N.D. Tex., Jun. 14, 2007) (citing *Metcalfe*).

8.11.    Plaintiffs have a probable right to the relief sought on its claims for breach of fiduciary duty, constructive fraud, unjust enrichment, and conversion. As alleged in more detail

above, Defendants have committed and continue to commit acts that have raided four vital

charitable organizations of $270 Million that forms the lifeblood of vital philanthropic efforts

relied upon by key communities across the nation. The evidence summarized herein thus

establishes that these injuries arise as a direct result of Defendants' conduct.

**B.** ***Plaintiffs Will Suffer Immediate, Irreparable Injury in the Absence of a Temporary Restraining Order and Temporary Injunction.***

8.12.    Plaintiffs will suffer immediate, irreparable injury in the absence of a temporary

restraining order and temporary injunction, as summarized above. Plaintiffs will suffer precisely

the sort of irreparable injuries Texas courts have sought to prevent by granting temporary

injunctive relief. *Lometa*, 952 S.W.2d at 633; see also *Minexa Arizona, Inc. v. Staubach*, 667

S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ); *Sonics Int'l Inc. v. Dorchester Enters*.,

593 S.W.2d 390, 393 (Tex.Civ.App.—Dallas 1980, no writ*); Baucum v. Texam Oil Corp*., 423

S.W.2d 434, 442 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.).

8.13.    Plaintiffs have no adequate remedy at law. Without injunctive relief, the assets

intended to benefit the Plaintiffs will be spent, dispersed, transferred, and alienated while this

litigation unfolds. These losses, as well as others which will inevitably occur if Defendants are

not enjoined, cannot be compensated in monetary terms once the funds are dispersed, and are the

types of harm for which injunctive relief is particularly necessary and appropriate.

8.14.    Accordingly, and in order to preserve the status quo during the pendency of this

action, Defendants should be cited to appear and show cause why the funds at issue should not be

frozen for the pendency of this Action, and why Defendants should not be temporarily restrained

during the pendency of this action from directly or indirectly using, spending, transferring,

encumbering, dispersing, or further alienating the funds and assets that were held in the Charitable

DAF Fund as of as of the instant date of this filing.

8.15.    Plaintiffs seek a temporary restraining order and temporary injunction against Defendants freezing all funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing, and enjoining Defendants and any others acting by, for, or in concert with them, including but not limited to their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of the order by personal service or otherwise, from either directly or indirectly: spending, dispersing, using, encumbering, transferring, or alienating those funds and assets.

8.16.    Plaintiffs further seeks a receivership over the funds and assets and the entities holding the funds and assets, whereupon the temporary injunctive relief sought here may properly expire because the assets will then be under the control of a receiver answering to this Court.

8.17.    Plaintiffs is willing to post a bond in an amount directed by the Court.

## VIII.   PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A.    Appoint a receiver to take possession and control of all assets, properties, and operations of DFW Charitable Foundation and CDMCFAD, LLC;

B.    Enjoin Defendants from further disposing of, transferring, encumbering, or dissipating any Charitable DAF Fund and DAF HoldCo assets;

C.    Require the reversal of the dilution scheme and unauthorized asset transfers;

D.    Impose a constructive trust over the res of DAF HoldCo, CDMCFAD, LLC and the Charitable DAF Fund wrongfully taken from the Plaintiffs;

E.    Award actual damages in an amount to be proven at trial;

F.    Award exemplary damages as permitted by law;

G.    Award attorneys' fees and costs;

H.    Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**McCarty Law PLLC**

*/s/ Darren L. McCarty*
Darren L. McCarty
State Bar No. 24007631
darren@mccartylawpllc.com
316 West 12th Street
Suite 400
Austin, Texas 78701
512-827-2902

- and -

**DUANE MORRIS LLP**

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
100 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 257-7213 – Telephone
(214) 292-8442 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

    I hereby certify that a true and correct copy of the foregoing document was served by

electronic means on this day, July 1, 2025, on all counsel or parties of record.

*/s/ Darren L. McCarty*
Darren L. McCarty

---

## VERIFICATION

I, Julie Diaz, Vice President of Highland Dallas Foundation, Inc., and President of The Dallas

Foundation, have read the above and foregoing Petition and the facts stated therein are true and

correct to the best of my knowledge and belief.

Julie Diaz

My name is Julie Diaz, my date of birth is ___3/23/64___, and my address

is ___5711 Prestwick Lane___ I declare under penalty of perjury that the foregoing is true and
___Dallas___
correct.

Executed in ___Barnstable___ County, State of ___MA___, on the ___1___ day

of ___July___, 2025

Julie Diaz

# EXHIBIT 86

# Paul Murphy

Independent Director

Charitable DAF Holdco, Ltd.

4th December 2024

# Introduction

This discussion is intended to give beneficiaries of Charitable DAF Holdco, Ltd ("DAF") an insight into the leadership and governance of the charity since the appointment of Mark Patrick and Paul Murphy as directors in 2021.

We will discuss:

- Legacy issues the DAF faced.

- Resolution of those issues since 2021.

- Future of the DAF

Whilst we welcome an open dialogue, there are certain matters that are confidential to the DAF and we mean no discourtesy to the foundations by refusing to provide information on certain issues.

# Legacy Issues (pre-2021)

Grant Scott was the sole managing member and director of the DAF from its incorporation in 2012.

Mark Patrick was transferred the management shares in 2021 and appointed as a director immediately after.

Mr. Patrick identified a number of issues facing the DAF:

- Fund transfers to Mr. Dondero's affiliates for services that were not performed:

  - Tall Pines transaction in HCM LP Ch. 11 (19-34054-sgj11) (US. Bankruptcy N.D. TX.).

  - US$1m to Issac Leventon, Scott Ellington and others.

- Mr. Scott authorizing the DAF to commence actions against Josh Terry and affiliated entities to bolster claims brought by Mr. Dondero.

- Improper payment of US$300,000 from Mr. Terry to DAF at Mr. Scott's direction.

# Legacy Issues (pre-2021)

Mr. Patrick was aware that serious allegations had been brought against the DAF that it was Mr. Dondero's "alter ego" and entities, including the DAF, were used as "lifeboats" to defeat creditor claims:

- Bankruptcy proceedings in Texas District Court (Case no: 3:21-cv-00880-X, 00881-X, 01010-X. 01378-X and 01379-X).

- UBS proceedings in New York Supreme Court (Index No: 650744/2023).

These claims, if successful, could potentially result in all of the DAF's assets being paid to the Trustee in Bankruptcy for distribution to creditors and/or UBS.

# Legacy Issues (pre-2021)

Finally, upon investigation, it was evident that:

- There were no independent directors or advisors to the DAF.

- There was a lack of corporate governance.

- Investments had been made with Nexpoint Advisors, Mr. Dondero's investment manager, that were not reflective of market standards, were not risk adjusted, generated below market returns and, in some cases, seemed to "shore up" failing or illiquid investments. This includes purchasing Midwave debt under Mr. Scott's tenure which the DAF has historically extended to the equity holders in the position but to the detriment of the DAF.

In these circumstances, and with particular regard to the allegations made in bankruptcy proceedings and by UBS, it was clear that the DAF had to impose policies and procedures to mitigate these allegations, protect the DAF's assets and generate risk adjusted returns to ensure the foundations would continue to receive distributions into the future.

# Resolution of Legacy Issues

Since becoming managing member and a director, Mr. Patrick has:

- Appointed Paul Murphy as an independent director. Mr. Murphy:

    - was called to the Bar of England and Wales in 2004 and Cayman Bar in 2012.

    - practiced as a litigation, insolvency and restructuring attorney handling cases predominantly with connections to the USA. He was a "recommended attorney" in the Legal 500 in 2017.

    - Since 2018, has worked as an independent director and been general counsel for a BNY Mellon backed US reinsurance company with a focus on asset management strategies.

- Brought in third-party law firms and valuation experts to negotiate deal terms, substantially improving DAF's investment protections and overall returns.

# Resolution of Legacy Issues

Both Mr. Patrick and Mr. Murphy, since their appointment as directors, have:

- Adopted institutional grade investment committee guidelines.

- Formed an investment committee to advise on investments with best-in-class mangers including the former head of Harvard's fixed income portfolio.

- Adopted a mission statement.

- Terminated Skyview Group's servicing contract (a Scott Ellington owned and controlled entity) saving the DAF US$1m p.a. in servicing fees and creating distance from existing litigation.

- Overseen the dismissal of the UBS action in New York supreme court (the only defendant to have defeated UBS' allegations).

# Issues Currently Facing the DAF

In addition to the pre-2021 issues, the DAF has several threats to its charitable mission and assets:

- Nov 2023, Mr. Dondero demanded that the DAF pay $1.5m for services from Skyview Group to Sentinel Reinsurance Ltd. (both Mr. Dondero affiliated entities). These services were not requested by the DAF and it received no benefit from them. Upon advice of counsel no payment was made.

- Upon Mr. Patrick's resignation from Skyview in 2023, there are various facts which suggest Mr. Dondero is attempting to impose his will on the DAF including:

  - Using the participating shareholders to exercise leverage over the DAF including sending "lack of confidence" correspondence to Mr. Murphy (although not received directly by Mr. Murphy).

  - Aggressive communication with Mr. Patrick.

  - Small Bay II, an investment managed by Nexpoint Advisors, has withheld payment of $8.25m.

# Future of the DAF

It is Mr. Patrick and Mr. Murphy's intention to:

- Wind down any lawsuits which were encouraged by or caused by an affiliation with Mr. Dondero.

- Rebalance the DAF's investment portfolio over the next three years to maximize returns for DAF and its shareholders.

- Continue to work to prevent future litigation and protect DAF and its shareholders.

- Build on the existing corporate governance to ensure the DAF's assets generate attractive but risk adjusted yields to maximize distributions to its shareholders.

# EXHIBIT 87

## Rachel Baxendale

| | |
|---|---|
| **From:** | David N. Corkern <DCorkern@CCSB.com> |
| **Sent:** | 18 December 2024 11:24 PM |
| **To:** | Brandon R. Schaller |
| **Cc:** | Bart Higgins; Brian P. Shaw |
| **Subject:** | DAF--proposed reorganization |

CAUTION: This email originated from outside of the organization.

Brian,

In accordance with our conversation this morning with Mark Patrick, here are my initial thoughts regarding the U.S. tax issues that merit a reorganization of Charitable DAF Holco, Ltd. ("DAF"). It is my understanding that DAF currently has four (4) non-voting participating shareholders/supporting organizations, each of which is an IRC Section 501(c)(3) organization (per filings with the IRS) and controlled, directly or indirectly, by James Dondero ("Dondero"). You have detailed instances in which you believe Dondero has acted in ways that create a per se conflict of interest between him and each of the participating shareholders that he controls, as well as DAF. For example, it is my understanding that as recently as November, 2023, Dondero requested the current manager of DAF to transfer approximately $1,000,000 to Sentinel Reinsurance, Ltd. (a Dondero-controlled entity) in payment of legal fees unrelated to DAF or its charitable purposes. It is my further understanding that Grant Scott, the prior manager of DAF and a college friend of Dondero, had a history of using DAF funds to benefit Dondero personally. While the current manager has been acting independently of Dondero and those under Dondero's influence and/or control, this pattern of Dondero's using DAF as his personal "piggy bank" has caused the perception among many of Dondero's creditors that DAF has been or is as his financial alter ego. As such, DAF runs an increased risk of being embroiled in litigation directed against Dondero and his entities.

To the extent that the participating shareholders/supporting organizations have either encouraged or acquiesced in Dondero's accessing DAF funds for his personal benefit, either directly or through the entities that he controls or in which he has considerable financial interest, those organizations run the risk of losing their tax-exempt status with the IRS. Each IRC Section 501(c)(3) organization must be organized and operating primarily for charitable purposes. Treas. Reg. Section 1.501(c)(3)-1(c)(1) provides that an organization will not be compliant with the operational test "if more than an insubstantial part of its activities is not in furtherance of an exempt purpose." Additionally, an IRC Section 501(c)(3) organization cannot be operated for the benefit of an individual or entity—private benefit/private inurement prohibition.

Given what has been detailed about Dondero's past and continued actions with the participating shareholders/supporting organizations and DAF, there is a heightened risk that the IRS could revoke the tax-exempt status of one or more of said participating shareholders/supporting organizations, which could imperil the status and assets of DAF. To help insulate DAF from any such exposure and to facilitate and expand its charitable purposes, DAF is considering a two-prong restructure/reorganization that will bring in additional participating shareholders and create a Delaware blocking LLC. Clearly, expanding the number of shareholders of DAF will dilute the influence of Dondero and the entities controlled by him and, as such, will broaden the charitable scope of DAF for the benefit of the public. The IRS will look favorably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement.

David


**David N. Corkern**
*Senior Counsel*



**525**

O 214.855.3099
DCorkern@CCSB.com / ccsb.com

Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St / Suite 5500 / Dallas, TX 75202

Admitted in Texas, Louisana, and D.C.
LLM in Taxation
**Board Certified Tax Law Specialist —
Louisiana Board of Legal Specialization**

**David N. Corkern**
*Senior Counsel*



O 214.855.3099
DCorkern@CCSB.com / ccsb.com

Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St / Suite 5500 / Dallas, TX 75202

Admitted in Texas, Louisana, and D.C.
LLM in Taxation
**Board Certified Tax Law Specialist —
Louisiana Board of Legal Specialization**

This electronic message is confidential and is intended only for the use of the individual to whom it is addressed. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, you are hereby notified that any use, dissemination, distribution or reproduction of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify me by electronic message or telephone at 214-855-3000, and delete the message from your system. Carrington, Coleman, Sloman & Blumenthal, L.L.P. www.carringtoncoleman.com

**526**

# EXHIBIT 88

CAUSE NO. _____

| | |
|---|---|
| **THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC.,,** | |
| *Plaintiffs*, | **IN THE TEXAS BUSINESS COURT** |
| **v.** | **1ST DIVISION** |
| **MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd.,** | **DALLAS, TEXAS** |
| *Defendants.* | |

## TEMPORARY RESTRAINING ORDER
## AND ORDER SETTING HEARING FOR TEMPORARY INJUNCTION

After considering the application for temporary restraining order filed by The Highland

Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa

Barbara Foundation, Inc., (collectively, the "Plaintiffs"), Plaintiff's Original Petition, Application

for Temporary Restraining Order and Temporary Injunction, and Emergency Application for

Appointment of Receiver (the "Petition"), the Affidavit of Julie Diaz in support of the injunctive

relief sought in the Petition (the "Affidavit"), and statements of counsel, the Court finds there is

evidence that harm is imminent to Plaintiffs, and if the Court does not issue the temporary

restraining order, Plaintiffs will be irreparably injured because they will be denied their rights to

realize the full value of the assets that were held in the Charitable DAF Fund, L.P. (the "Charitable

DAF Fund") expressly held for the Plaintiffs' as indirect charitable owners if Defendants transfer,

conceal, encumber or endanger those assets or liquidate or modify the governance or ownership

of Charitable DAF Fund or any of its affiliates or subsidiaries, or the DFW Charitable Foundation,

or any of its affiliates or subsidiaries, CDMCFAD, LLC, or any of its affiliates or subsidiaries,

Charitable DAF GP, LLC, or any of its affiliates or subsidiaries, and CDH GP, Ltd. or any of its

affiliates or subsidiaries (collectively the "Covered Entities") and that the injury to Plaintiffs will

be irreparable because of the inability to recover the assets coupled with the likely insolvency of

Defendants.

Therefore, by this order, the Court:

(a)  restrains, enjoins, and prohibits Defendants and Defendants' respective agents,
servants, employees, representatives, and all other persons acting under the aegis of,
in concert with, or for Defendants, from transferring, concealing, withdrawing,
alienating, expending, dispersing, or otherwise disposing of any and all funds, assets,
receivables, or shares ever held by the Covered Entities, regardless of where they are
presently held;

(b)  restrains, enjoins, and prohibits Defendants and Defendants' respective agents,
servants, employees, representatives, and all other persons acting under the aegis of,
in concert with, or for Defendants, from taking any action to dissolve, winddown,
liquidate, or otherwise alter the corporate standing of Covered Entities;

(c)  restrains, enjoins, and prohibits Defendants and Defendants' respective agents,
servants, employees, representatives, and all other persons acting under the aegis of,
in concert with, or for Defendants, from taking any action to modify or alter the
corporate governance of the Covered Entities, including but not limited to any
amendment to their respective bylaws or organizational documents;

(d) restrains, enjoins, and prohibits Defendants and Defendants' respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for Defendants, from taking any action to modify or alter the current ownership of the Covered Entities, including but not limited to the admission of new shareholders, partners, members, or other equity interest holders or the transfer of any shares, partnership interests, member interests, or other equity interests to any other party;

(e) restrains, enjoins, and prohibits Defendants and Defendants' respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for Defendants, from altering, concealing, or destroying any business records concerning the Defendants, including any transfers of funds, assets, receivables, or shares to the Defendants;

(f) restrains, enjoins, and prohibits Defendants and Defendants' respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for Defendants, from exercising any control over the Covered Entities;

(g) orders the clerk to issue notice to Defendants, that the hearing on Plaintiff's application for temporary injunction is set for July _____, 2025, at _____ a.m./p.m. to determine whether this temporary restraining order should be made a temporary injunction pending a full trial on the merits; and

(h) Sets bond at $_____, which may be paid by Plaintiff with check (or by attorney or law firm check) payable to the [Dallas County District Clerk], approved and conditioned as the law requires.

Once effective, this temporary injunction shall remain in full force and effect until it expires

fourteen (14) days after the date and hour of issue reflected below, unless extended by this Court

or by agreement of the parties.

SO ORDERED.

SIGNED on July ___, 2025, at _____ a.m./p.m.

_____
JUDGE PRESIDING

# EXHIBIT 89

**DuaneMorris**®

*FIRM and AFFILIATE OFFICES*

NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
BOSTON
HOUSTON
DALLAS
FORT WORTH
AUSTIN

HANOI
HO CHI MINH CITY
SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NORTH JERSEY
LAS VEGAS
SOUTH JERSEY
SYDNEY
MYANMAR

ALLIANCES IN MEXICO

JOSEPH M. COX
PARTNER
DIRECT DIAL: +1 214 257 7252
PERSONAL FAX: +1 214 853 9480
E-MAIL: JMCox@duanemorris.com

*www.duanemorris.com*

July 11, 2025

Mr. Brian Shaw                                                    *Sent via email*
Carrington, Coleman, Sloman, & Blumenthal
901 Main Street, Suite 5500
Dallas, Texas 75202
bshaw@ccsb.com

      **Re:** **The Highland Dallas Foundation, Inc, et al v. Mark Patrick, et al,**
              **Cause No. 25-BC01B-0027**
              **Rule 11 Agreement**

Dear Mr. Shaw:

      Pursuant to Texas Rule of Civil Procedure 11, the parties in this matter The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. (collectively "Plaintiffs"), and Mark Patrick, DFW Charitable Foundation, CDMCFAD, LLC, and CDH GP, Ltd. (collectively "Defendants"), agree to the following:

(1) The "Covered Entities" as referred to herein is defined to include collectively Charitable DAF Fund, LP and/or any of its subsidiaries, the DFW Charitable Foundation and/or any of its subsidiaries, CDMCFAD, LLC and/or any of its subsidiaries, and/or any of its subsidiaries, and CDH GP, Ltd. and/or any of its subsidiaries.

(2) Defendants shall have until Monday, July 14, 2025, to file a challenge to the court's jurisdiction (the "Plea").

(3) Plaintiffs shall have until Monday, July 21, 2025, to file a response to the Plea.

(4) Defendants shall have until Thursday, July 24, 2025, to file a reply to the Plea.

(5) The Parties agree to the following limits on discovery prior to any hearing on Plaintiffs' application for temporary injunction/appointment of receiver (the "Temporary Injunction")

DuaneMorris

Brian Shaw, Esq.
July 11, 2025
Page 2

in this matter (these limits shall have no effect on any discovery conducted after the Temporary Injunction is decided):

    a. Plaintiffs and Defendants each (not per party) may serve 25 requests for production to the other, may serve 5 interrogatories, may serve 10 requests for admission, and may take 3 depositions (2 of which shall be limited to 3 hours, and one of which shall be limited to 6 hours, the selection of the witness for the six hour deposition to be determined by the party seeking the deposition).

    b. The Parties shall serve all discovery requests no later than Wednesday, July 16, 2025.

    c. Responses to the written discovery and substantial completion of related any related document production shall be served as follows: (1) if the Court denies the Plea as to any Defendant, seven business days after the Court order denying the Plea is entered; (2) if the Court grants the Plea as to all Defendants, then responses to written discovery shall not be due, if at all, until seven business days after the Court's order granting the Plea is reversed or overturned.

    Depositions shall take place within seven days after the written discovery responses and documents are served as set forth in c. above.

(6) If the Court denies the Plea, the Temporary Injunction shall be heard as reasonably practicable after the ruling, unless stayed by an appellate court. If the Plea is granted, but is later reversed or overturned, the same timelines for discovery provided in (5) above shall be followed and the Parties shall then seek to expeditiously set a hearing before the Court.

(7) Pending the Court's decision on the Temporary Injunction or grant of the Plea relating to the Temporary Injunction or Plea), the Covered Entities and their respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for any Covered Entity, agree:

    a. not to transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares outside of the ordinary course of business;

    b. not take any action to increase the compensation paid to any employee of the Covered Entities;

    c. not to take any action to dissolve, winddown, liquidate, or otherwise alter the corporate standing of Covered Entities;

    d. not to take any action to modify or alter the corporate governance of the Covered Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

    e. not to take any action to sell, exchange, or dispossess any asset of one of the Covered Entities unless (i) the sale is to a bona third party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide

DUANE MORRIS

Brian Shaw, Esq.
July 11, 2025
Page 3

purchaser is made aware of this Rule 11 Agreement, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the Covered Entities;

    f.  not to alter, conceal, or destroy any business records concerning the Defendants, including any transfers of funds, assets, receivables, or shares to the Defendants;

(8) This Agreement shall be filed with the Court and, as provided in the first sentence of this letter, constitutes an enforceable agreement pursuant to Texas Rule of Civil Procedure 11. This Agreement shall expire and be of no force or effect on the earlier of (a) thirty days after a final order of the Court dismissing this case or (b) the Court's ruling on Plaintiffs' current request for a temporary injunction (or as subsequently amended). This does not prevent a party from requesting that a court of appeals issue an order to keep this Rule 11 Agreement in place during the pendency of such appeal or any objection to such request.

If the terms above accurately reflect our agreement, please acknowledge your agreement by signing below.

Best regards.

Sincerely,

Joseph M. Cox

AGREED TO FORM AND CONTENT:

_____
Brian Shaw, Counsel for Defendants

JMC/kr
cc:   (all via email)
      Darren McCarty, Esq.
      Craig Warner, Esq.
      Clients

DM1\16831875.1

# EXHIBIT 90

E-filed in the Office of the Clerk
In the Business Court of Texas
7/14/2025 11:05 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § § § | THE BUSINESS COURT OF TEXAS <br><br> FIRST DIVISION |
| Plaintiffs, | § § | |
| v. | § § | |
| MARK PATRICK, DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC, and CDH GP, LTD., | § § § § § § § | Cause No. 25-BC-01B-0027 |
| Defendants. | § | |

## DEFENDANTS' MOTION TO DISMISS
## AND PLEA TO THE JURISDICTION

**Brian P. Shaw**
  Texas Bar No. 24053473
**Monica E. Gaudioso**
  Texas Bar No. 24084570
**Andrea C. Reed**
  Texas Bar No. 24121791
**Emily H. Owen**
  Texas Bar No. 24116865
**CARRINGTON, COLEMAN,**
  **SLOMAN & BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, Texas 75202

***Attorneys for Defendants***

# T<small>ABLE OF</small> C<small>ONTENTS</small>

Table of Contents ............................................................... 2

Table of Authorities ........................................................... 4

Table of Abbreviations and Defined Terms ............................. 7

Summary of the Motion ...................................................... 8

Factual Background ........................................................... 10

  A.  The Dondero Organizations pleaded themselves out of this Court's jurisdiction ..................................................... 10

  B.  Faced with mounting litigation losses, Dondero seeks to control the Charitable DAF to use its resources for his own ends. .......... 11

  C.  Seeking to gain control of the Charitable DAF for his own purposes, Dondero manufactures allegations of wrongdoing, many of them years old. ........................................ 15

  D.  The Dondero Organizations do not own any of the Charitable DAF entities or allege standing facts to support jurisdiction ............... 15

    1.  The Charitable DAF Fund ........................................ 16

    2.  Charitable DAF HoldCo—the Debtor ........................ 19

    3.  The Current Charitable DAF Fund ........................... 22

  E.  This case is Dondero's latest attempt to take control over the Charitable DAF so that he can misuse its assets for his own personal benefit. .......................................... 25

Legal Standards ............................................................... 26

Argument and Authorities ................................................. 27

  A.  This Court does not have statutory subject matter jurisdiction ... 27

    1.  The Dondero Organizations cannot establish subject matter jurisdiction under § 25A.004(b)(4) because they are not "owners." ...................................................... 27

    2.  This Court lacks jurisdiction under § 25A.004(b)(2) because the Dondero Organizations don't have standing to sue over the Charitable DAF's governance, governing documents, or internal affairs ........................................................... 29

3.   The Dondero Organizations do not have standing under § 2
5A.004(b)(5). ...............................................................34

B.   The Dondero Organizations do not have standing because their
claims, if they had any merit, would belong solely to the Debtor. 35

Conclusion ............................................................42

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*In re Ascot Fund Limited,*
  603 B.R. 271 (Bankr. S.D.N.Y. 2019) ................................................ 40

*Austin Nursing Center v. Lovato,*
  171 S.W.3d 845 (Tex. 2005) ............................................................ 35

*Ayerst (Inspector of Taxes) v. C&K (Construction) Ltd.*
  [1975].......................................................................................... 39

*Bickham v. Dallas County,*
  612 S.W.3d 663 (Tex. App.—Dallas 2020, pet. denied)............... 31, 33

*Bland Indep. School Dist. v. Blue,*
  34 S.W.3d 547 (Tex. 2000) ............................................................. 27

*In re Bullmore,*
  300 B.R. 719 (Bankr. D. Neb. 2003) ................................................ 41

*Cobb v. Cent. States,*
  461 F.3d 632 (5th Cir.2006) ............................................................ 39

*In re Dexterity Surgical, Inc.,*
  365 B.R. 690 (Bankr. S.D. Tex. 2007)............................................... 38

*In re Educators Group Health Trust,*
  25 F.3d 1281 (5th Cir. 1994) ........................................................... 37

*In re Estate of Devitt,*
  758 S.W.2d 601 (Tex. App.—Amarillo 1988, writ denied) ................. 32

*Foss v. Harbottle*
  (1843) 67 Eng. Rep. 189, 202 (Eng.) ............................................... 37

*Genssler v. Harris Cnty.,*
  584 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 2010, no
  pet.) ................................................................................................. 30

*Heckman v. Williamson Cnty.,*
    369 S.W.3d 137 (Tex. 2012) ............................................................... 15

*In re Highland Capital Mgmt., L.P.,*
    No. 19-34054-SGJ11, 2021 WL 3418657 (Bankr. N.D. Tex.
    Aug. 4, 2021) ........................................................................ 11,14,36

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp.,*
    522 F.3d 575 (5th Cir. 2008) .............................................................. 37

*Jose Carreras, M.D., P.A. v. Marroquin,*
    339 S.W.3d 68 (Tex. 2011) ................................................................. 33

*JSFN, LLC. V. SJ Properties, LLC,*
    No. 10-16-00362-cv, 2018 WL 1867105 (Tex. App.—Waco
    Apr. 18, 2018, no pet.) ....................................................................... 32

*Matter of Highland Capital Mgmt., L.P.,*
    116 F.4th 422 (5th Cir. 2024) ....................................................... 13, 14

*Moser, Trustee of Estate of Mason v. Dillon Investments,*
    *LLC,*
    649 S.W.3d 259 (Tex. App.—Dallas 2022, no pet.) ...................... 36, 37

*In re NC12, Inc.,*
    478 B.R. 820 (Bankr. S.D. Tex. 2012) ............................................... 38

*In re Ocean Rig UDW Inc.,*
    570 B.R. 687 (Bankr. S.D.N.Y. 2017) ................................................ 40

*Ritchie v. Rupe,*
    443 S.W.3d 856 (Tex. 2014) .............................................................. 31

*In re SPhinX, Ltd.,*
    351 B.R. 103 (Bankr. S.D.N.Y. 2007) ................................................ 40

*Tex. Ass'n of Bus. v. Tex. Air Control Bd.,*
    852 S.W.2d 440 (Tex. 1993) .............................................................. 26

*Tex. Dept. of Parks and Wildlife v. Miranda,*
    133 S.W.3d 217 (Tex. 2004) .............................................................. 26

*Town of Shady Shores v. Swanson,*
    590 S.W.3d 544 (Tex. 2019) ..............................................................26

*Williams v. Stevens,*
    No. 05-22-00440-CV, 2023 WL 5621835 (Tex. App.—
    Dallas Aug. 31, 2023, no pet.).......................................................31

**Statutes**

26 U.S.C.A. § 170(a)(1) ......................................................................30

11 U.S.C. § 541(a)(1)...........................................................................36

TEX. GOV'T CODE § 25A.001(11)........................................................28

TEX. GOV'T CODE § 25A.004 ..............................................................31

TEX. GOV'T CODE § 25A.004(b) ..........................................................32

TEX GOV'T CODE § 25A.004(b)(2) ................................................27, 29

TEX. GOV'T CODE § 25A.004(b)(4) ................................................27, 28

TEX. GOV'T CODE § 25A.004 (b)(5) ....................................................27

**Other Authorities**

Companies Act, 2025, s.110 ..........................................................39, 41

Companies Act, 2025, s.110 and p.2.1 ...............................................39

Grand Court. Companies Act, 2025, s.108...........................................39

Grand Court Rules, O. 15 r. 12A (Cayman Islands 2022)....................38

## TABLE OF ABBREVIATIONS AND DEFINED TERMS

| Term | Definition | Pages |
|------|-----------|-------|
| Charitable DAF | The Charitable DAF Entities collectively | 8 |
| Charitable DAF Entity | DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC, or CDH GP, Ltd. individually | 8 |
| The Charitable DAF Fund | Charitable DAF Fund, L.P. | 16 |
| Charitable DAF HoldCo or Debtor | Charitable DAF HoldCo, Ltd. | 9 |
| Dondero Organizations | Plaintiffs The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. collectively | 8 |
| Highland | Highland Capital Management, L.P. | 14 |

Defendants Mark Patrick, DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC, and CDH GP, Ltd. (each a "Charitable DAF Entity," and collectively the "Charitable DAF" or "Charitable DAF Entities") ask the Court to dismiss this action because the Court lacks subject matter jurisdiction over the claims brought by Plaintiffs The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. (all of which James Dondero swore he serves on the board of directors for—and swore that he is funding this litigation—collectively the "Dondero Organizations").

## SUMMARY OF THE MOTION

This Court lacks subject matter jurisdiction over the claims asserted by the Dondero Organizations on at least two bases: (1) the claims do not fall under the Court's subject matter jurisdiction under the Government Code, and (2) the Dondero Organizations lack standing to bring these claims.

First, the Dondero Organizations' pleading demonstrates that the Government Code's jurisdictional requirements are not met. The Dondero Organizations admit they are not an owner of any Charitable

DAF Entity, only that they had "participating shares" in Charitable DAF HoldCo, Ltd., a different entity in wind-up proceedings in the Cayman Islands ("Charitable DAF HoldCo" or the "Debtor"), which is not a party here. Yet they argue at the same time that their lawsuit falls under this Court's jurisdiction as (1) an action by an owner of an organization brought against that organization; (2) an action alleging the breach of a duty owed to them as owners of an organization; and (3) an action regarding the governance, governing documents, or internal affairs of an organization. It is none of those on its face.

While *someone* could pursue Dondero's unfounded and unmeritorious claims against the Charitable DAF, the Dondero Organizations cannot—they are not the class of litigants entitled to bring an action complaining about the governance, governing documents, or internal affairs of organizations that *they do not own* by their own admission. This Court lacks a statutory basis to exercise subject matter jurisdiction under the Government Code.

The Court also lacks subject matter jurisdiction because the Dondero Organizations do not have standing to bring their claims. The Dondero Organizations do not have a justiciable interest in the claims

they assert because they do not have a sufficient relationship to any Charitable DAF Entity. The only entity that (a) has any relationship to any Charitable DAF Entity and (b) arguably has standing to assert the claims brought by the Dondero Organizations, are the Cayman liquidators of the non-party Debtor.[1] Accordingly, the Charitable DAF respectfully requests that the Court dismiss this suit for lack of subject matter jurisdiction.

## FACTUAL BACKGROUND

### A. The Dondero Organizations pleaded themselves out of this Court's jurisdiction.

The Dondero Organizations' Petition, including Dondero's attached sworn declaration, provides this Court with all it needs to find that it lacks subject matter jurisdiction over *these* claims between *these* parties.

To aid the Court's review of this jurisdictional challenge, the Charitable DAF therefore summarizes the portions of the Dondero Organizations' pleading and sworn proof that pleaded them out of this Court's jurisdiction.

---

[1] Even if these claims were brought by the Cayman liquidators, the Charitable DAF denies that any wrongdoing occurred.

This factual background relies only on the Dondero Organizations'
Original Petition and attachments, published and unpublished court
opinions and rulings, and other facts subject to judicial notice. It is
organized in three sections: (1) general background of this dispute, (2) a
brief statement regarding Dondero's oft-repeated, years-old and
pretextual false allegations of wrongdoing, and (3) the facts that show the
Dondero Organizations pleaded themselves out of this Court.

**B.    Faced with mounting litigation losses, Dondero seeks to
control the Charitable DAF to use its resources for his own
ends.**

One of the most extraordinary things so far in this case is Dondero's
admission in his Declaration that he alone is financing this litigation. Ex.
6 to Orig. Pet. ¶¶ 35-36, Appx. 219-210. Dondero of course claims
altruistic intentions. *Id.*

Dondero originally set up the Charitable DAF for "efficient
management" such that power over it was "concentrated in one person."
Orig. Pet. ⁋ 5.9. Initially Dondero put Grant Scott in place, "Dondero's
long-time friend, college housemate, and best man at his wedding" who
later "resigned from that role [] after apparent disagreements with Mr.
Dondero." *In re Highland Capital Mgmt., L.P.*, No. 19-34054-SGJ11,

2021 WL 3418657, at *1 (Bankr. N.D. Tex. Aug. 4, 2021), *vacated and remanded sub nom. Matter of Highland Capital Mgmt., L.P.*, 98 F.4th 170 (5th Cir. 2024). Now the control person is Mark Patrick, who was *not* Dondero's long-time friend, college housemate, or best man at his wedding. Instead, Mr. Patrick is a tax attorney who Dondero swore is "well-qualified tax counsel." Orig. Pet. ¶ 5.19; *see also id.* Ex. 6 to Orig. Pet ¶ 34, Appx. 219.

Mark Patrick is not in sole control of the Charitable DAF—he ceded unilateral control to "a person named Paul Murphy based in the Cayman Islands …" Ex. 6 to Orig. ¶ 19, Appx. 214. So two individuals currently control the Charitable DAF. *Id.*

Dondero swears that Mr. Patrick "became openly hostile towards the Charities, my affiliated companies, and me." *Id.* ¶ 33, Appx. 219. It is true that, among other things, entities controlled by the Charitable DAF requested that entities controlled by Dondero pay substantial obligations owed to the Charitable DAF, and Dondero refused. *E.g.* Cause No. 25-BC01B-004; *Atlas IDF, LP v. NexPoint Real Estate Partners, LLC, et al*; In the Texas Business Court, First Division (where a Charitable DAF controlled entity demands payment on ~$12M demand notes; Dondero's

entity and sister, as trustee of his trust, refuse to pay the Charitable DAF; and Dondero's sister cross claims against Mark Patrick and Shawn Raver).[2] Seeking payment on ~$12M demand notes—money that would further the Charitable DAF's philanthropic mission—is in no way improper. *See, e.g. Matter of Highland Capital Mgmt., L.P.*, 116 F.4th 422, 429, 439 (5th Cir. 2024) (affirming summary judgment in favor of Highland, the payor, against Dondero and his entities, the payees, on promissory notes for "more than $60 million of unpaid principal and interest").[3]

It is also true that "communications between Mr. Patrick, Skyview, and [Dondero] began to become less frequent" as Mark Patrick and Paul Murphy sought to fortify the independence of the Charitable DAF. Ex. 6 to Orig. Pet. ¶ 20, Appx. 214. For example, NexPoint is Dondero's newest "alternate investment firm," after his former alternative investment

---

[2] Atlas is not owned by the Charitable DAF. A Charitable DAF Subsidiary is the investment manager of Atlas.

[3] In addition to the $60 million notes judgment against him and his entities affirmed by the Fifth Circuit Court of Appeals, and the bankruptcies of Highland and Acis Capital Management, Dondero also faces an action in New York State Court by UBS AG for over $1 billion. Index No. 650744/2023; *UBS Securities LLC v. Dondero et al*, In the Supreme Court of the State of New York, New York County; https://news.bloomberglaw.com/banking-law/ubs-sues-highlands-dondero-over-1-billion-it-won-in-long-fight.

firm, Highland Capital Management, L.P. ("Highland"), was forced to file
bankruptcy. *Highland Capital*, 116 F.4th at 429; Ex. 6 to Orig. Pet. ¶ 3,
Appx. 210-211. As Dondero notes in his Declaration, at one point
"NexPoint provided, without charge, investment ideas to" the Charitable
DAF. Ex. 6 to Orig. Pet. ¶ 20, Appx. 214. In the best interests of the
Charitable DAF, the Charitable DAF no longer accepts Dondero's
"investment ideas," *i.e.* investing in Dondero's deals. Ex. 6 to Orig. Pet. ¶
20, Appx. 214. In addition, Mark Patrick resigned from his position at
Skyview, "a service organization that provided support primarily to Mr.
Dondero and entities in which Mr. Dondero had an interest." Orig. Pet. ¶
5.21; *see also In re Highland Capital Mgmt., L.P.*, No. 19-34054-SGJ11,
2022 WL 3959550, at *16 (Bankr. N.D. Tex. Aug. 30, 2022) ("Skyview
being owned and operated by individuals previously employed by
Highland"). Mark Patrick had no legal obligation to work for Dondero's
companies, or  to accept their services on behalf of the Charitable DAF,
or  to have the Charitable DAF make investments in Dondero's self-
interested transactions, *i.e.* his "investment ideas." Ex. 6 to Orig. Pet. ¶
20, Appx. 214.

**C.     Seeking to gain control of the Charitable DAF for his own purposes, Dondero manufactures allegations of wrongdoing, many of them years old.**

For purposes of this Motion, the Court is to "construe the plaintiff's pleadings liberally, taking all factual assertions as true …" *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 150 (Tex. 2012). Thus the Charitable DAF will not address here the Dondero Organizations' false allegations regarding Mark Patrick. Orig. Pet. ¶¶ 6.1-6.27.

However, as the Dondero Organizations are aware—because they are a party to the proceeding—Mark Patrick refuted in detail and under oath these false allegations in the Cayman proceeding for the Debtor on June 4, 2025. Notably, the other independent director, Paul Murphy, continues to serve the Charitable DAF alongside Mr. Patrick. Ex. 6 to Orig. Pet. ¶ 19, Appx. 214.

**D.     The Dondero Organizations do not own any of the Charitable DAF entities or allege standing facts to support jurisdiction.**

The following sections demonstrate each instance where the Dondero Organizations admit they have no ownership interest in any of the Charitable DAF Entities they sued in Business Court, or where the evidence attached to the Petition rebuts their allegations, such that they

cannot rely on the Business Court jurisdictional Sections 25A.004(b)(2),

(b)(4), or (b)(5) of the Government Code.

## 1.   The Charitable DAF Fund

The Dondero Organizations correctly identify that $270 million in

allegedly "stolen" assets are held by non-party Charitable DAF Fund,

L.P. ("The Charitable DAF Fund"). Orig. Pet. ¶ 5.2. But as shown in more

detail in the chart below, the only direct ownership interests any of the

Dondero Organizations ever held were "Participating Shares" in non-

party Charitable DAF HoldCo, Ltd. (the Debtor), which was the *limited*

*partner* of the Charitable DAF Fund. *Id*. ¶ 5.3; *see also* Ex. 2-A to Orig.

Pet., Appx. 49.[4]

| Pls.' Allegation | Evidence |
| --- | --- |
| "Non-Party] Charitable DAF Fund, L.P. ("Charitable DAF Fund") was formed to hold donated assets." (Orig. Pet. ¶ 5.2)<br><br>"The Charitable DAF Fund primarily holds assets through a [non-party] wholly owned subsidiary called CLO HoldCo, Ltd. ("CLO HoldCo")." (¶ 5.3) | The Dondero Organizations do not allege that they have a direct ownership interest in the Charitable DAF Fund itself. *See generally* Orig. Pet. |

---

[4] The Dondero Organizations expressly state that they had no ownership interest in
the general partner of Charitable DAF Fund, Defendant Charitable DAF Fund GP,
LLC. Orig. Pet. §§ 1.2, 3.8, 5.11.

| Pls.' Allegation | Evidence |
|---|---|
| "At the same time the Charitable DAF Fund was created, [non-party] Charitable DAF HoldCo, Ltd ("Charitable DAF HoldCo"),[5] a Cayman Island entity, was also organized. Charitable DAF HoldCo held all of the economic interest in the Charitable DAF Fund. In other words, Charitable DAF HoldCo was the beneficial owner of all monies flowing from the assets held in the Charitable DAF Fund." (¶ 5.4) | Charitable DAF HoldCo was the limited partner of the Charitable DAF Fund. (Ex. 2-A, Appx. 49). In other words, the Dondero Organizations held "Participating Shares" (described more fully below) in the former limited partner of the Charitable DAF Fund. |
| "Participating shares in Charitable DAF HoldCo were therefore issued to four Supporting Organizations,[6] which were the ultimate beneficial owners of the assets held in the Charitable DAF Fund. Together, the four Supporting Organizations owned 100% of Charitable DAF HoldCo." (¶ 5.5) | The only "economic interest" Charitable DAF HoldCo possessed in the Charitable DAF Fund was to **discretionary** distributions— "Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner[.]" (*Id.* ¶ 4.2(a), Appx. 58) |
| "Control over the Charitable DAF Fund was reposited in the Control Position through its complete ownership of a Delaware entity named Charitable DAF GP, LLC (the 'Delaware GP'). The Delaware | As the former limited partner in the Charitable DAF Fund, Charitable DAF Holdco was prohibited from participating in the "management of or have any control over [Charitable DAF |

[5] Defendants also define Charitable DAF HoldCo as the Debtor, but the Charitable DAF Entities use "Charitable DAF HoldCo" in the charts because that is how the Dondero Organizations refer to it in the Original Petition.
[6] The "Supporting Organizations" are defined as Plaintiffs The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. Orig. Pet. at 1.

| Pls.' Allegation | Evidence |
|---|---|
| GP was the managing general partner in the Charitable DAF Fund." (¶ 5.11) | Fund]'s business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership." (*Id.* ¶ 1.6(b), Appx. 51)<br><br>Charitable DAF HoldCo expressly "consent[ed] to the exercise by the General Partner of the Powers conferred on it by this Agreement." (*Id.*) Beyond that consent, Charitable DAF HoldCo had **no** voting or consent rights, or rights to information, related to the management of Charitable DAF Fund. (*See generally id.*) |

Based on the Dondero Organizations' own pleadings and evidence, the Dondero Organizations held "Participating Shares" (the limited nature of which is described in Section B below) in the limited partner of the Charitable DAF Fund. In essence, the Dondero Organizations were a limited partner of a limited partner of the Charitable DAF Fund. And Charitable DAF HoldCo, as the former limited partner in the Charitable DAF Fund, was only entitled to discretionary distributions from Charitable DAF Fund, determined by the General Partner in its *sole discretion*.

## 2.    Charitable DAF HoldCo—the Debtor

Based on the pleadings and evidence presented by the Dondero
Organizations themselves, their so-called "Participating Shares" in a
non-party—the Debtor currently in wind-up proceedings in the Cayman
Islands—entitled them to discretionary dividends determined by the
Control Position of the Debtor in their sole discretion. And their
continued participation in the Debtor was far from guaranteed.

| Pls.' Allegations | Evidence |
|---|---|
| "[M]anagement control of the Charitable DAF Fund and Charitable DAF HoldCo was vested not with those [Supporting] Organizations but rather in 'Management Shares,' with general partner status. These 'Management Shares' provided the only voting rights for any and all shareholders in Charitable DAF HoldCo. But they did not convey a right to any economic benefit of the assets in the Charitable DAF Fund, which belonged solely to the Supporting Organizations." (¶ 5.8) | Management Shares are defined as "a voting non participating share in the capital of [Charitable DAF HoldCo][.]"  (Ex. 2-B at Appx. 71). Management Shares "carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company." (*Id.* ¶ 11)<br><br>"Participating Shares" are defined as "a non-voting, participating, non-redeemable share in the capital of [Charitable DAF HoldCo][.]" (*Id.* at Appx. 72). Participating Shares "shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding- |

| Pls.' Allegations | Evidence |
|---|---|
| | up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles." (*Id.* ¶ 19) |
| "So, the 'Management Shares' exercised control over the assets and over the operations of the Charitable DAF HoldCo, even though they conveyed no economic benefit. [T]he Management Shares and general partner status in the Charitable DAF Fund were concentrated in one person, the 'Control Position.'" (¶ 5.9, *see also* ¶ 5.10) | The Director(s) of Charitable DAF HoldCo had considerable power: "[T]he Directors **may** from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorize payment of the same out of the funds of the Company lawfully available therefor." (*Id.* ¶ 108) "[A]ll dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares." (*Id.* ¶ 113) There is no restriction on the dilution of any shares, including Participating Shares, in Charitable DAF Holdco, nor did the Dondero Organizations have any right to notice or input on any dilutive event: |

| Pls.' Allegations | Evidence |
|---|---|
| | • "[T]he Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them[.]" (*Id.* ¶ 7_<br><br>• "[A]ll Shares for the time being unissued shall be under the control of the Directors who may: issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine." (*Id.* ¶ 7(a) )<br><br>• "The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not . . . be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company." (*Id.* ¶ 21) |

| Pls.' Allegations | Evidence |
|---|---|
|  | The Dondero Organizations had no information rights—"[N]o Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorized by the Directors or by Ordinary Resolution." (*Id.* ¶ 118.) |

Thus, the Dondero Organizations' so-called "Participating Shares" in the non-party Debtor entitled them to very little except for *discretionary* dividends determined by the Control Position of Debtor in their sole discretion. And Debtor, in turn, was only entitled to discretionary distributions from Charitable DAF Fund as determined by the General Partner in its sole discretion.

### 3.   The Current Charitable DAF Fund

James Dondero and Julie Diaz's declarations are riddled with mischaracterizations and mistruths regarding the alleged "dilution scheme and liquidation maneuver" vetted by a bevy of outside counsel and advisors by which the Charitable DAF was restructured beginning

in December 2024.[7] The Charitable DAF denies it committed any wrongdoing in connection with the restructure. As noted above, the Dondero Organizations, as Participating Shareholders *only* in the Debtor, had no right to vote on these transactions, nor did they have any right to any information or notice about them. *See supra* § B. Furthermore, the Participating Shares are subject to express dilution and liquidation rights, which the Dondero Organizations conveniently ignore:

> 21.  The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.

*See* Ex. 2-B to Orig. Pet. § 21, Appx. 76.

> **POWERS AND DUTIES OF DIRECTORS**
>
> 80.  Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

*Id.* § 80, Appx. 83.

---

[7] For purposes of this Motion, the Charitable DAF will not address the Dondero Organizations' false allegations regarding Mark Patrick's actions, all of which were done in the best interests of the Charitable DAF, and specifically to uphold its charitable purpose.

**WINDING UP**

130. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

131. Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

    (a)    first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

    (b)    second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

132. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes.  The liquidator may, with the like sanction, vest the whole or any part of such

*Id.* § 132, Appx. 91.

But even so, what is clear from the Dondero Organizations'
allegations is they *do not own* any interest in any Charitable DAF Entity.
The Dondero Organizations repeatedly disclaim ownership in any
Charitable DAF Entity:[8]

- "The purpose and result of Patrick's moves was to entirely eliminate the Supporting Organization's ownership of the Charitable DAF Fund assets." Orig. Pet. § 5.41.

- "In December 2024, Patrick formed new entities (as described below) with Patrick as the sole director. He then replaced the current entities holding and

[8] While the Dondero Organizations bring claims against CDH GP, Ltd., there are no real factual allegations contained in their Petition about this Charitable DAF Entity. *See generally id.* But they do allege that they have no ownership interest in CDH. *Id.* § 3.7; Ex. 1-C.

**DEFENDANTS' MOTION TO DISMISS AND PLEA TO THE JURISDICTION**—Page 24

controlling the Charitable DAF Fund with his own entities, essentially transferring all ownership and control to himself[.]" *Id.* § 5.42.

- "Patrick formed Defendant DFWCF [], a Delaware non-profit corporation. Patrick named himself [DFWCF's] sole member[.]" *Id.* § 5.43; *see also id.* § 3.4 and Ex. 1-A.

- "On April 2, 2025, Patrick caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million. . . . As a result . . . Defendant DFWCF, was the sole limited partner and beneficial owner of Charitable DAF Fund, through its now-100% ownership of CDMCFAD, and CDMCFAD's 100% ownership of the fund." *Id.* § 5.49 (emphasis added).

Thus, nothing in the 71 paragraphs of factual allegations in the Petition changes the fact that the Dondero Organizations have only ever owned one thing—Participating Shares (with extremely limited rights) in the Debtor, which is not a party to this suit and is currently in wind-up proceedings in the Cayman Islands.

**E.    This case is Dondero's latest attempt to take control over the Charitable DAF so that he can misuse its assets for his own personal benefit.**

Dondero admits he is personally financing this litigation and that he sits on the board of his Organizations. Ex. 6 to Orig. Pet. ¶¶ 35-36, Appx. 219-210. He controls this litigation.

## Legal Standards

When subject matter jurisdiction is in question, the trial court must determine at its earliest opportunity whether it has jurisdiction before allowing the litigation to proceed. *Tex. Dept. of Parks and Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). "To establish subject matter jurisdiction, a plaintiff must allege facts that affirmatively demonstrate the court's jurisdiction to hear the claim." *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019).

When a plea to the jurisdiction is based on the pleadings, the trial court must determine if the plaintiffs have alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). "If the pleadings do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the plaintiffs should be afforded the opportunity to amend." *Miranda*, 133 S.W.3d at 226-27. However, if as here "the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Id.* at 227.[9]

---

[9] The Court may consider evidence that the Dondero Organizations attached to their Original Petition. *Bland Indep. School Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000).

## ARGUMENT AND AUTHORITIES

### A. This Court does not have statutory subject matter jurisdiction.

The Dondero Organizations allege this Court has jurisdiction under Government Code § 25A.004(b)(2), (b)(4), and (b)(5). Orig. Pet. ¶ 4.1. But they cannot establish subject matter jurisdiction under any of these subdivisions based on their own pleading. They admit they are not owners of any Charitable DAF Entity, precluding jurisdiction under § 25A.004(b)(4). And as non-owners, they do not have a valid cause of action, and thus cannot invoke jurisdiction, under § 25A.004(b)(2). And the Dondero Organizations failed to sufficiently plead derivative standing to invoke jurisdiction under § 25A.004(b)(5).

### 1. The Dondero Organizations cannot establish subject matter jurisdiction under § 25A.004(b)(4) because they are not "owners."

Under § 25A.004(b)(4), the Business Court has jurisdiction over "an action *by an organization, or an owner of an organization*, if the action: (A) is brought *against* an owner, controlling person, or managerial official of *the organization*; and (B) alleges an act or omission by the person in the person's capacity as an owner, controlling person, or managerial

official of the organization." TEX. GOV'T CODE § 25A.004(b)(4) (emphasis added).

An "owner" is defined as "an owner of an organization" and includes: "(A) a shareholder or stockholder of a corporation or other organization; (B) a general or limited partner of a partnership or an assignee of a partnership interest in a partnership; (C) a member of, or an assignee of a membership interest in, a limited liability company; and (D) a member of a nonprofit organization." TEX. GOV'T CODE § 25A.001(11).

The Dondero Organizations do not fit this definition. The Dondero Organizations name DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC, and CDH GP, Ltd. as Defendants. But the Dondero Organizations' pleadings show they are not "owners" of any of these entities. According to the Original Petition, DFW Charitable Foundation's "sole member" is Mark Patrick. Orig. Pet. ¶ 3.4. CDMCFAD, LLC is "100% own[ed]" by DFW Charitable Foundation. *Id.* ¶ 5.49. Charitable DAF GP, LLC, before its dissolution, was owned by Mark Patrick as its sole managing member. *Id.* ¶ 5.11. And CDH GP, Ltd.'s "100% owner and sole director" is Mark Patrick. *Id.* ¶ 3.7. Thus, §

25A.004(b)(4) does not apply because the Dondero Organizations are not owners, controlling persons,[10] or managerial officials of any Charitable DAF Entity.

Because the Dondero Organizations pleaded they are not "owners" of each of the four Charitable DAF Entities—as that term is defined in the statute—they pleaded themselves out of this Court's jurisdiction under § 25A.004(b)(4).

**2.    This Court lacks jurisdiction under § 25A.004(b)(2) because the Dondero Organizations don't have standing to sue over the Charitable DAF's governance, governing documents, or internal affairs.**

Under § 25A.004(b)(2), the Business Court has jurisdiction over an "action regarding the governance, governing documents, or internal affairs of an organization." TEX GOV'T CODE § 25A.004(b)(2). This ground fails because the Dondero Organizations do not have § 25A.004(b)(2) standing to maintain a cause of action regarding the Charitable DAF's governance, governing documents, or internal affairs.

---

[10] The Dondero Organizations affirmatively plead that "management control of the Charitable DAF Fund and Charitable DAF HoldCo was vested not with [the Dondero Organizations] but rather in 'Management Shares,'" which "provided the only voting rights for any and all shareholders in Charitable DAF HoldCo." Orig. Pet. ¶ 5.8. So even to the extent the Dondero Organizations may attempt to argue some version of "they have indirect control over the Charitable DAF Entities through the non-party Charitable DAF HoldCo" could confer jurisdiction under these sections, the Dondero Organizations have pleaded out of such jurisdiction.

As discussed above, the Dondero Organizations are not owners of any of the Charitable DAF Entities. Instead, the Dondero Organizations were the limited partner of a non-party limited partner (the Debtor—Charitable DAF HoldCo) of the Charitable DAF Fund,  originally set up by Dondero in 2011, that received discretionary distributions to be used for charitable donations. Orig. Pet. ¶¶ 5.1-5.6. Charitable donations, of course, receive favorable tax treatment ultimately benefiting Dondero. *E.g.* 26 U.S.C.A. § 170(a)(1).

Yet the Dondero Organizations now claim this Court has jurisdiction by complaining about the governance, governing documents, or internal affairs of distinct legal entities—the Charitable DAF Entities. *Genssler v. Harris Cnty.*, 584 S.W.3d 1, 8 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("Generally, a business entity exists as a separate legal entity . . ."). But a person does not have a cause of action to complain about the internal affairs of distinct entities in which it has no interest. That's the gist of the Dondero Organizations' argument—that they can somehow complain in this Court about the governance, governing documents, or internal affairs of a stranger. No such cause of action exists now, nor was one created by Government Code § 25A.004. The Dondero

Organizations essentially ask this Court to read such a cause of action into the Government Code. The Court cannot.

Standing to sue may be predicated on either statutory or common law. *Bickham v. Dallas County*, 612 S.W.3d 663, 669 (Tex. App.—Dallas 2020, pet. denied). "The legislature may grant private standing to bring [an] action[], but it must do so clearly." *Id*. Courts "apply a strict rule of construction to statutory enforcement schemes and imply causes of action only when the drafter's intent is clearly expressed from the language written." *Id*. (citation modified).

Texas courts are hesitant to read a cause of action into a statute if one is not explicitly created. *See Ritchie v. Rupe*, 443 S.W.3d 856, 875 (Tex. 2014) (refusing to read a cause of action for certain remedies into a statute where such a remedy was not explicitly specified). In line with this hesitation, courts regularly reason that jurisdictional statutes do not create causes of action. *See e.g., Williams v. Stevens*, No. 05-22-00440-CV, 2023 WL 5621835 at *5 (Tex. App.—Dallas Aug. 31, 2023, no pet.) (noting that a "jurisdictional statute establishing that district courts shall have original jurisdiction of civil actions … does not create a cause of action"); *In re Estate of Devitt*, 758 S.W.2d 601, 607 (Tex. App.—Amarillo 1988,

writ denied) (reasoning that a statute providing the appropriate court with jurisdiction to hear a will contest does not create a cause of action for a will contest).

Here the jurisdictional statute provides the Business Court with "civil jurisdiction concurrent with district courts" over a limited list of actions. TEX. GOV'T CODE § 25A.004(b). In other words, it provides that the Business Court is an appropriate forum to litigate certain *existing* causes of action. The jurisdictional statute does not provide a source of duty or otherwise create causes of action. Instead, it simply delineates what falls within the Business Court's limited jurisdiction.

"Without a breach of a legal right belonging to the plaintiff, no cause of action can accrue to his benefit." *JSFN, LLC. V. SJ Properties, LLC*, No. 10-16-00362-cv, 2018 WL 1867105 at *2 (Tex. App.—Waco Apr. 18, 2018, no pet.) (citing *Nobles v. Marcus*, 533 S.W.2d 923, 927 (Tex. 1976)). Plenty of existing causes of action can be maintained in the Business Court under § 25A.004(b)(2). An action by Dondero's Organizations complaining that wholly separate and distinct entities are not being run the way Dondero wishes is not one of them.

Under the Dondero Organizations' interpretation of § 25A.004(b)(2), any stranger to an entity who does not agree with a decision of that entity can challenge that entity's governance, governing documents, or internal affairs. The consequence of such an interpretation would be chaos. Exxon could file suit in this Court against Chevron because its CEO declined to do business with Exxon, under the auspices that Exxon disagreed with the corporate governance decisions and governing documents of Chevron. Such an absurd result was not the legislature's intent when it drafted the Business Court's limited jurisdiction. *See Jose Carreras, M.D., P.A. v. Marroquin*, 339 S.W.3d 68, 73 (Tex. 2011) ("We also interpret statutes to avoid an absurd result"). Because the Dondero Organizations do not have standing to bring a claim that invokes § 25A.004(b)(2) (and because the provision itself does not create a private right of action that would trigger this Court's jurisdiction), § 25A.004(b)(2) does not confer subject matter jurisdiction over this lawsuit. *See Bickham*, 612 S.W.3d at 670.

### 3. The Dondero Organizations do not have standing under § 25A.004(b)(5).

The Dondero Organizations allege that the Court has jurisdiction under § 25A.004(b)(5)—"an action alleging that an owner, controlling person, or managerial official breached a duty owed to an organization or an owner of an organization by reason of the person's status as an owner, controlling person, or managerial official, including the breach of a duty of loyalty or good faith." *Id.* § 25A.004(b)(5). But the Dondero Organizations: (1) do not state anywhere in their Petition that they are bringing this action derivatively on behalf of any entity in which they had an interest (which may in turn give rise to a fiduciary duty); (2) do not cite to any provision of either the Texas Business Organizations Code, or another state's laws, that would authorize the filing of this suit on behalf of any entity in which they had any interest, and (3) do not demonstrate that they have met any prerequisites for derivative standing under any state's laws. Accordingly, the Dondero Organizations failed to sufficiently plead that the Court has jurisdiction under § 25A.004(b)(5).

But even if they sufficiently pleaded a derivative action on behalf of an entity in which they had an interest, they do not have standing to

bring those claims by virtue of the Cayman wind-up proceeding,
addressed in Section B below.

## B. The Dondero Organizations do not have standing because their claims, if they had any merit, would belong solely to the Debtor.

The Dondero Organizations also lack traditional standing to bring
their claims, depriving the Court of subject matter jurisdiction.

"A plaintiff must have both standing and capacity to bring a
lawsuit." *Austin Nursing Center v. Lovato,* 171 S.W.3d 845, 848 (Tex.
2005). "The issue of standing focuses on whether a party has a sufficient
relationship with the lawsuit so as to have a 'justiciable interest' in its
outcome." *Id.*

As they state in their Petition, the Dondero Organizations already
filed an involuntary Petition for Winding Up the Debtor—Charitable
DAF HoldCo—in the Grand Court of the Cayman Islands.[11] Orig. Pet.
¶ 5.53. And as they admit, the Dondero Organizations "alleged
essentially the same facts recounted in this Petition before the Grand

---

[11] As the attachments to the Dondero Organizations' Petition demonstrate, Mark
Patrick made no objection to the voluntary liquidation being brought under the
supervision of the Grand Court. Orig. Pet. App. 154.

Court." *Id*. ¶ 5.54.[12] The proceedings in the Cayman Islands culminated in the appointment of independent liquidators. *Id*. ¶ 5.51. These liquidators are already empowered to wind-up the Debtor and distribute its assets, if any. The liquidators, appointed by the Grand Court of the Cayman Islands, have *exclusive* standing and power to pursue any claims against the Charitable DAF on behalf of the Debtor arising out of the actions the Dondero Organizations complain of here, if they choose to do so.

This situation is similar to when a domestic entity enters bankruptcy. A bankrupt debtor's assets, including its claims against third-parties, are vested in the bankruptcy estate. *See Moser, Trustee of Estate of Mason v. Dillon Investments, LLC*, 649 S.W.3d 259, 263 (Tex. App.—Dallas 2022, no pet.) (citing 11 U.S.C. § 541(a) and *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008)). The property of

---

[12] This appears to be the Dondero Organizations' pattern—recycle its allegations against Mark Patrick in as many forums as possible and hope they are successful in one of them. As another example, the Dallas Foundation filed an objection to a settlement in the Highland bankruptcy, objecting to the transfer of a promissory note to an entity controlled by the Charitable DAF on similar grounds. *See* Objection of the Dallas Foundation and Crown Global Life Insurance, Ltd, ECF No. 4231, *In re Highland Capital Mgmt., L.P.*, (No. 19-34054-SGJ11). This was withdrawn at the hearing on June 25, 2025, and the settlement was approved by the Bankruptcy Court, the week before this suit was filed in the Business Court. *See* Order Approving Settlement between Highland Entities and the HMIT Entities, ECF No. 4297, *In re Highland Capital Mgmt., L.P.*, (No. 19-34054-SGJ11).

a bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The phrase 'all legal or equitable interests of the debtor in property' has been construed broadly, and includes 'rights of action' such as claims based on state or federal law." *Highland Capital Mgmt. LP v. Chesapeake Energy Corp.,* 522 F.3d 575, 584 (5th Cir. 2008). Where a legal claim is vested in a bankruptcy estate, the trustee of that estate "has exclusive standing to bring a claim on behalf of the bankruptcy estate." *Moser*, 649 S.W.3d at 265 (citation modified).

With respect to claims asserted against a corporation's directors and officers, the bankruptcy estate "succeeds to any right of action the debtor corporation may have to recover damages for misconduct, mismanagement, or neglect of duty by a corporate officer or director." *In re Educators Group Health Trust,* 25 F.3d 1281, 1284 (5th Cir. 1994). Therefore "the trustee may prosecute a cause of action based on the fraud of the officers, directors, or shareholders for fiduciary misconduct, unlawful diversion of assets, or upon a statutory liability created by the law of the state of incorporation." *Id.* If under the law of

the state of formation[13] of an entity in bankruptcy, "the debtor could have raised these claims at the commencement of its case—that is, in these particular circumstances, if the claims are derivative to the corporation—*the claims will belong to the estate.*" *In re Dexterity Surgical, Inc.*, 365 B.R. 690, 695 (Bankr. S.D. Tex. 2007) (emphasis added) (citing *In re Educators Group Health Trust,* 25 F.3d 1281, 1284 (5th Cir.1994); *In re MortgageAmerica Corp.,* 714 F.2d 1266, 1276 (5th Cir.1983)). "If a cause of action belongs to the estate, then the Trustee has exclusive standing to assert the claim." *In re NC12, Inc.*, 478 B.R. 820, 831 (Bankr. S.D. Tex. 2012) (citing *Schertz–Cibolo–Universal City, Indep. Sch. Dist. (In re Educators Grp. Health Trust)*, 25 F.3d 1281, 1284 (5th Cir.1994)). The court in *NC12* consequently held "[i]f the Plaintiffs and Intervenors lack standing to bring claims, the Court must dismiss the claims for lack of subject matter jurisdiction." *Id.* (citing *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas*

---

[13] Here, the place of formation of the Debtor is the Cayman Islands. Orig. Pet. ¶ 5.4. Under Cayman law, an organization owns a claim where it sustains an actionable loss, not the organization's owner. *Foss v. Harbottle*, (1843) 67 Eng. Rep. 189, 202 (Eng.). In fact, if an owner wants to pursue a derivative claim before the Grand Court, the owner must obtain leave from the Grant Court. Grand Court Rules, O. 15 r. 12A (Cayman Islands 2022). Therefore, under the law of the place of formation, the claims brought by the Dondero Organizations belong to the Debtor. *See Dexterity Surgical*, 365 B.R. at 695.

*Petroleum),* 522 F.3d 575, 583 (5th Cir.2008) ("If the claims belong to the estate, then it was not error for the bankruptcy court to deny remand (because it has jurisdiction over all property of the estate) and dismiss the claims (because the trustee has exclusive standing to assert claims belonging to the estate)."); *Cobb v. Cent. States,* 461 F.3d 632, 635 (5th Cir.2006) ("[T]he issue of standing is one of subject matter jurisdiction."). In other words, the derivative claims of a debtor's owners belong to the bankruptcy estate, and no one else has standing to assert those claims.

The same is true under the law of the Cayman Islands. In a wind-up conducted under Cayman law, when a court supervised liquidation begins, the debtor is divested of the beneficial ownership of its assets and a statutory trust applies to those assets. *Ayerst (Inspector of Taxes) v. C&K (Construction) Ltd.* [1975] AC 167, 179. The Grand Court appoints joint official liquidators, who are officers of the Grand Court. Companies Act, 2025, s.108. These liquidators have the power to investigate the debtor's affairs, collect and realize the debtor's assets (if any), and distribute those realizations to those that are entitled to them. Companies Act, 2025, s.110. The liquidators can also (1) bring legal

proceedings in the debtor's name; and (2) take possession of the debtor's property, including taking all proceedings required for this purpose. Companies Act, 2025, s.110, p.1.1 and p.2.1.

In fact, United States courts regularly characterize Cayman liquidation proceedings as "foreign main proceedings" deserving of recognition under chapter 15 of the United States Bankruptcy Code. *See, e.g., In re Ascot Fund Limited*, 603 B.R. 271, 278 (Bankr. S.D.N.Y. 2019) ("[C]ourts in this district have consistently recognized Cayman Islands liquidation proceedings as 'foreign proceedings' for purposes of chapter 15 of the Bankruptcy Code."). This recognition is sweeping. "[U]pon recognition of the foreign proceeding as a 'foreign main proceeding…' the foreign representative may operate the debtor's business and exercise the rights and powers of a trustee under Bankruptcy Code sections 363 and 552." *In re SPhinX, Ltd.*, 351 B.R. 103, 115 (Bankr. S.D.N.Y. 2007) (citing 11 U.S.C. § 1520(a)(1)-(3)). In other words, a Cayman liquidator in a foreign main proceeding under Chapter 15 has the sole right to prosecute a debtor's claims. And Dondero is well aware of this fact—in 2017, when he was President of Highland, a United States bankruptcy court ruled that Cayman liquidation proceedings were foreign main proceedings

under Chapter 15, over Highland's objection. *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 690 (Bankr. S.D.N.Y. 2017); Orig. Pet. Apx. 210 ⁋ 3.

The Dondero Organizations' claims center on the Charitable DAF's alleged manipulation of the Debtor by redeeming the Dondero Organizations' Participating Shares in the Debtor for $1.6 million. Orig. Pet. ¶ 5.49. Setting aside (a) that the organizational documents expressly permit this and (b) the Dondero Organizations did not sue in the Business Court derivatively on behalf of the Debtor, because the Debtor is in wind-up proceedings in the Caymans, all of its claims (including the ones here) belong to the insolvency estate. The fact that the liquidation proceedings are pending in the Cayman Islands does not change this fact. *See In re Bullmore*, 300 B.R. 719, 724 (Bankr. D. Neb. 2003) (noting a winding-up proceeding in the Cayman Islands is "analogous" to the filing of a United States bankruptcy case and that the appointment of liquidators "terminated the authority of the directors of the company and put the operation of the company into the hands of the [liquidators] pending final order."); *see also* Companies Act, 2025, s.110. The liquidators, as the Cayman Islands' equivalent to a bankruptcy trustee, have exclusive authority and standing to pursue the claims alleged by the Dondero

Organizations on behalf of the Debtor. The Dondero Organizations therefore lack standing, and the Court does not have subject matter jurisdiction over this lawsuit.

### CONCLUSION

The Charitable DAF stands ready to defend every action it took in the best interests of the Charitable DAF and to uphold its charitable purpose, in the face of a multi-pronged effort by Dondero—often through his proxies—to take control of the Charitable DAF for Dondero's own purposes.

But *who*, if anyone, brings those claims, and *where* they must be brought, are foundational. The Dondero Organizations cannot proceed in this Court because they fail to establish a statutory basis for its jurisdiction. The Dondero Organizations are not owners of the Charitable DAF and lack standing to bring claims against the DAF in the Business Court. If anyone, the Caymanian liquidators on behalf of the Debtor would have exclusive standing to bring the claims asserted by the Dondero Organizations. The Charitable DAF therefore requests that the Court dismiss this case for lack of subject matter jurisdiction.

Respectfully submitted,

/s/ *Brian P. Shaw*
**Brian P. Shaw**
  Texas Bar No. 24053473
  Email:  bshaw@ccsb.com
**Monica E. Gaudioso**
  Texas Bar No. 24084570
  Email: mgaudioso@ccsb.com
**Andrea C. Reed**
  Texas Bar No. 24121791
  Email:  areed@ccsb.com
**Emily H. Owen**
  Texas Bar No. 24116865
  Email:  eowen@ccsb.com
**CARRINGTON, COLEMAN,**
  **SLOMAN & BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, Texas 75202
(214) 855-3000 – Telephone
(214) 580-2641 – Facsimile

**ATTORNEYS FOR
DEFENDANTS**


## CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to BCLR 5 that, exclusive of the contents identified in BCLR 5(a) and inclusive of all footnotes and endnotes, this document contains 7436 words as counted by the word count function of Microsoft Word. I further certify this document complies with the Court's judge-specific guidelines regarding word limits and formatting.

/s/ *Brian P. Shaw*
Brian P. Shaw

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2025, a copy of the foregoing document was electronically served on all counsel of record in accordance with TEX. R. CIV. P. 21a.

/s/ *Brian P. Shaw*
Brian P. Shaw

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brian Shaw on behalf of Brian Shaw
Bar No. 24053473
bshaw@ccsb.com
Envelope ID: 103122585
Filing Code Description: Motions - All Other
Filing Description: DEFENDANTS MOTION TO DISMISS AND PLEA TO THE JURISDICTION
Status as of 7/15/2025 8:57 AM CST

Associated Case Party: The Highland Dallas Foundation, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jason E.Boatright | | JEBoatright@duanemorris.com | 7/14/2025 11:05:56 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 7/14/2025 11:05:56 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 7/14/2025 11:05:56 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 7/14/2025 11:05:56 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 7/14/2025 11:05:56 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 7/14/2025 11:05:56 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 7/14/2025 11:05:56 PM | SENT |
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 7/14/2025 11:05:56 PM | SENT |

Associated Case Party: DFW Charitable Foundation

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 7/14/2025 11:05:56 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 7/14/2025 11:05:56 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 7/14/2025 11:05:56 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 7/14/2025 11:05:56 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 7/14/2025 11:05:56 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Judy Garrison | | jgarrison@ccsb.com | 7/14/2025 11:05:56 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 7/14/2025 11:05:56 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brian Shaw on behalf of Brian Shaw
Bar No. 24053473
bshaw@ccsb.com
Envelope ID: 103122585
Filing Code Description: Motions - All Other
Filing Description: DEFENDANTS MOTION TO DISMISS AND PLEA TO THE JURISDICTION
Status as of 7/15/2025 8:57 AM CST

Case Contacts

| Sherry Stewart | | sstewart@ccsb.com | 7/14/2025 11:05:56 PM | SENT |
|---|---|---|---|---|
| Business Court 1B | | BCDivision1B@txcourts.gov | 7/14/2025 11:05:56 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 7/14/2025 11:05:56 PM | SENT |

# EXHIBIT 91

# MEMORANDUM

**Date: July 9, 2021**

**To:  Mark Patrick**

**Company:  Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd.**

**From:  Haynes and Boone, LLP, by Kenneth Bezozo**

**Subject:  Donor Advised Funds ("*DAFs*"), Sponsoring Organizations and
Supporting Organizations -- The Reasons for Making Investments in
Offshore Jurisdictions**

---

1.  *What are Donor Advised Funds, Sponsoring Organizations and Supporting
Organizations?*

A donor advised fund, or DAF, is a separately managed charitable investment account
established by a donor within a public charity (a section 501(c)(3) organization), which is
generally referred to as a sponsor.  Sponsors may include a community foundation, university,
religious organization, or financial institution.  The donor (or the donor's designee) typically
maintains certain advisory privileges over the DAF funds or account – specifically with respect
to charities that should receive donations, although the DAF account is fully and completely
owned and controlled by the sponsor.

In some cases, a sponsor can create as a subsidiary a "supporting organization" which also is a
Section 501(c)(3) public charity.  A supporting organization is a separate entity controlled by the
sponsor through its ability to elect a majority of the supporting organization's governing
board.  Because of this control, a supporting organization is treated financially as part of a
consolidated unit with the sponsor.

Here, for example, The Dallas Foundation formed, and owns and controls, a supporting
organization named Highland Dallas Foundation, Inc. ("***Highland Dallas Foundation***") to assist
The Dallas Foundation in carrying out its charitable mission in helping support a wide variety of
community affairs.  Donations were made to the Highland Dallas Foundation as both the sponsor
and the supporting organization.  The Highland Dallas Foundation from time to time makes
distributions of funds to The Dallas Foundation which in turn makes further distributions to local
public charities.  ***Exhibit 1*** attached shows these above-described entities, as well as other
entities referenced herein that are pertinent to this donor advised fund.

2.  *How Does a Donor Establish a DAF Account?*

To establish a DAF fund or account, a donor must make an irrevocable contribution of assets,
such as cash, stock or securities or other business or financial assets, to a sponsoring public
charity. The donor's contribution is recorded and recognized as a donation to the sponsoring

public charity of the DAF. A donor can make additional contributions to the sponsoring organization whenever they choose.

Because a contribution to a sponsoring organization is, for tax purposes, the equivalent of a contribution to a public charity and because the donor gets an immediate tax benefit for the contribution, the contribution, when made, is permanent and irrevocable. This is true even though the donor contribution to the sponsoring organization is in an account that grows tax-free and the donor has advisory rights as to where to invest the assets and donations made from these assets.

Here, the Highland Dallas Foundation is the sponsor of the DAF account which it fully owns and controls. Although the donor has advisory rights regarding investments and donations to charities (by way of a board seat he fills in the supporting organization), the Highland Dallas Foundation has full authority and control over all such decision-making.

3. ***What Type of Investments Can be Made by a Sponsor/Supporting Organization?***

A sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are able to invest in a wide variety of assets including, but not limited to, marketable securities, financial assets, businesses, real estate, private equity and hedge funds. But because the sponsor and supporting organization are both public charities that are tax-exempt organizations, their investments must take into account all laws that could possibly effect their tax-exempt status.

a. ***Can a Sponsor and its Supporting Organization Invest in a Hedge Fund, Private Equity Fund or Similar Investment Vehicle?***

The short answer is yes, but as stated above, a sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are both public charities that are tax-exempt organizations. As a strong general rule, a tax-exempt organization will avoid any investments that will subject it to federal or state taxes. A tax-exempt organization is generally exempt from all federal and state taxes except to the extent it receives income classified as unrelated business taxable income (UBTI), which would be taxed at a 21% rate. The term "unrelated business taxable income" generally means the income derived from an unrelated trade or business regularly conducted by the tax-exempt organization. UBTI also can arise from the receipt of income from debt-financed investments, which is why hedge and private equity funds generally utilize a special investment structure to ensure tax-exempt investors do not have UBTI.

To prevent UBTI from flowing through to a tax-exempt organization, a corporation can be utilized to "block" this income at the corporate level, which is accomplished by having a corporation interposed between the tax-exempt organization and the hedge fund, such as The Charitable DAF Holdco, Ltd. (a corporate blocker) from the Charitable DAF Fund, L.P. Using a structure in this manner is often described as using a "blocker" because the UBTI is blocked out and does not flow through to the tax-exempt investor. Instead, the UBTI is included in the income of, and subject to tax in, the blocker corporation. The blocker corporation thereafter distributes the income to the tax-exempt

Case 19-34054-sgj11 Doc 4523-7 Filed 09/27/21 Entered 09/27/21 06:03:35 Desc
Exhibit G - Part 2 Page 781 of 881
Case 19-34054-sgj11 Doc 2642-37 Filed 09/20/21 Entered 09/20/21 22:39:00 Page 4 of 6
Exhibit 3 - July 9 2021 Memo on DAFs and Sponsoring Orgs Page 4 of 6

investor through the payment of dividends which are not UBTI and therefore not taxable to a tax-exempt organization.

Although using a domestic corporate blocker can avoid the problem of having UBTI passed through to a tax-exempt sponsor or its supporting organization, a U.S.-based blocker corporation will be required to pay corporate and state-level income tax on the income they receive from an investment fund.

    b. *Are There Particular Jurisdictions in Which Hedge and Private Equity Funds form Investment Partnerships and Blocker Corporations for their tax-exempt investors?*

It is common for hedge and private equity funds that have tax-exempt investors such as The Dallas Foundation and Highland Dallas Foundation to utilize an offshore structure to form its investment partnership. In addition, these funds may form offshore blocker corporations as well as for other reasons including the ability to make non-U.S. investments or U.S. investments that do not give rise to U.S. tax for foreign investors (i.e., U.S. investments that do not cause the investor to be "engaged in a U.S. trade or business.") Jurisdictions such as Bermuda and the Cayman Islands are typically used because those countries do not have an income tax regime.

By utilizing an offshore structure with corporate blockers, hedge and private equity funds can ensure their tax-exempt investors will not receive any UBTI from investments held by The Dallas Foundation or Highland Dallas Foundation. In addition, to the extent the sole source of UBTI is through debt financing (which is often the case in a hedge fund), then using an offshore corporate blocker can eliminate this type of UBTI (because the debt financing will not flow through the corporate blocker to taint the income received by the tax-exempt investor). This allows the sponsor (i.e., Highland Dallas Foundation), as well as any other charities that receive distributions from Highland Dallas Foundation or The Dallas Foundation, to receive the largest possible distributions.

Utilizing an offshore structure for hedge and private equity funds in the manner described above for tax-exempt investors is a best practice used by many U.S. law firms representing U.S. hedge and private equity funds. In fact, if a U.S. law firm didn't use offshore blockers in the manner described above, it could be considered a poor practice.

In summary, using an offshore blocker corporation, such as Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd., for many hedge funds minimizes taxes and increases the net after-tax cash flow to the tax-exempt investors because investments grow tax-free, giving a sponsor, such as Highland Dallas Foundation, the potential to create even more capital for philanthropic giving.

4.   *Who Has Control and Authority over the Assets Held by the Sponsor?*

Because a DAF is an account within a sponsor organization, the sponsoring organization has full, complete and final control over the funds in the DAF, which is the case here with the sponsor, the Highland Dallas Foundation. Although the supporting organization permits the donor or the donor's designee to recommend how funds should be invested and how funds should be

Case 19-34054sasgj25-11376-4525-7 Doc4e902/27/i26 07201a25d 02/27e26cif6303:35   Desc
Exhibit G - Part 2   Page 782 of 881
Case 19-34054-sgj11 Doc2642837-3ed 0f/e09/20/25nterEnte07/e09/20/2562390:P4ageDesc
Exhibit 3 - July 9   2021 Memo on DAFs and Sponsoring Orgs   Page 5 of 6
EXHIBIT 3

distributed to other public charities, Highland Dallas Foundation must approve any investments and all distributions to charities.

In this case, the donor of the charitable DAF, or his designee, is able to appoint a representative to the board of the Highland Dallas Foundation, which allows the donor to recommend investments or distributions to charitable organizations, i.e., organizations that are tax-exempt under Internal Revenue Code section 501(c)(3) and classified as public charities under Internal Revenue Code section 509(a).  But the donor (or the donor's designee) only has advisory privileges over making investments and the distribution of funds.

5. ***What Are the Benefits to a Donor of a Contribution to a DAF account?***

A DAF account allows a donor who makes an irrevocable charitable contribution to the DAF account to receive an immediate tax deduction, and with the ability to recommend distributions be made by the sponsor to specific charities either presently or in the future.  Also, if the donor contributes certain appreciated assets to the DAF account, such as stock or securities, the donor avoids the recognition of any gain in these appreciated assets.  This is a significant additional benefit to donors made available in the Internal Revenue Code.

The DAF assets that are not immediately distributed to charities are then invested and depending on the type of investments and the jurisdiction in what the investments are made, the assets may grow tax-free.

**578**

Case 19-34054-sgj11 Doc 4525-7 Filed 02/27/26 Entered 02/27/26 03:35 Desc
Exhibit G - Part 2   Page 783 of 881
Case 19-34054-sgj11 Doc 2554-2 Filed 07/09/21 Entered 07/09/21 20:22:00 Page 6 of 6
Exhibit 3 - July 9   2021 Memo on DAEs and Sponsoring Orgs   Page 6 of 6

**EXHIBIT 3**

### Exhibit 1

### Charitable DAF/CLO Holdco
### Structure Chart



**579**

# EXHIBIT 92

## EXECUTIVE EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (the "**Agreement**") is made and entered into effective as of March 24, 2021 (the "**Effective Date**"), by and between MARK PATRICK ("**Executive**") and CHARITABLE DAF HOLDCO, LTD., a Cayman Islands company (the "**Company**"), as a "**Party**" or collectively as the "**Parties**".

**WHEREAS**, the Company has employed Executive on the terms and conditions set forth herein since March 24, 2021; and

**WHEREAS**, Executive agrees to be employed by the Company on such terms and conditions as set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants, promises, and obligations set forth herein, the Parties agree as follows:

1.    **Employment Term**. Executive's employment hereunder shall be effective as of the Effective Date and shall continue until terminated pursuant to Section 5 of this Agreement.

2.    **Position and Duties**.

    **2.1**    **Position**. During the Employment Term, Executive shall serve as the President and CEO, Chief Investment Officer, Chief Financial Officer, and General Counsel of the Company, reporting to the Directors of the Company (the "**Directors**"). In such position, Executive shall have such duties, authority, and responsibilities as shall be determined from time to time by the Directors, which duties, authority, and responsibilities are consistent with Executive's position.

    **2.2**    **Duties**. During the Employment Term, Executive shall perform such duties, as are reasonably assigned to Executive and devote a reasonable amount of Executive's business time and attention to the performance of Executive's duties, including, without limitation, service as an officer for other affiliates and subsidiaries of the Company.

3.    **Place of Performance**. The principal place of Executive's employment shall be the place as determined by the Parties; however, Executive shall be permitted to work remotely so long as doing so does not interfere with the Executive's responsibilities under this Agreement. Executive may also be required to travel on Company business during the Employment Term. The Company may provide a remote travel office, or transportation, to accommodate the Executive in his performance of his duties.

4.    **Compensation**.

    **4.1**    **Base Salary**. Beginning with the 2023 calendar year, the Company shall pay Executive an annual base salary of $850,000 (the "**Base Salary**") in periodic installments in accordance with customary payroll practices and applicable wage payment laws. Notwithstanding the foregoing, the Executive's annual base salary may be advanced in one or more installments from time to time pursuant to a Director's resolution, but in such amounts not to exceed one year of Base Salary. The Base Salary may be adjusted within the first sixty

(60) days of any calendar year by an amendment to this Agreement in accordance with Section 14 below.

**4.2**    **Annual Bonus**. For each fiscal year of the Employment Term, Executive shall be eligible to earn an annual bonus (the "**Annual Bonus**"). The decision to provide an Annual Bonus and the amount and terms of such Annual Bonus shall be in the sole and absolute discretion of the Directors, which may be paid in advance of the close of any one year. The Directors may establish and approve written criteria or guidelines that may be taken into account when determining whether an Annual Bonus should be paid and the amount in which it is paid. In exercising their discretion, the Directors will take into account industry standards in relation to annual bonuses awarded to people employed in comparable positions to Executive.

**4.3**    **Discretionary Bonuses**. At any time and from time to time during the Employment Term, the Executive shall be eligible to earn discretionary bonuses (each a "**Discretionary Bonus**"). Such Discretionary Bonuses shall be at the sole and absolute discretion of the Directors.

**4.4**    **Long Term Incentive Plan**:  Executive shall participate in the Long Term Incentive Plan ("**LTIP**").  The LTIP will cover a period of three (3) years.  For purposes of this agreement, the LTIP will cover the period from March 24, 2021 through March 24, 2024 (the "**First LTIP**") and is awarded in the total amount of $4,759,000.  The second LTIP period will cover the period from March 25, 2024 through March 24, 2027 (the "**Second LTIP**"). The Second LTIP may be awarded at the discretion of the Directors through a cash payment made at the end of 2027, or by periodic awards in the equity of investments of the Company, or a combination of both.

**4.5**    **Retirement Incentive Plan**.  At the discretion of the Directors, the Company may authorize a "Retirement Incentive Plan" to be put into place on behalf of the Executive.

**4.6**    **Employee Benefits**. During the Employment Term, Executive shall be entitled to participate in an employee benefit plan, including but not limited to health insurance, disability benefits, and retirement plan or other benefit practices and programs as may be implemented from time to time by the Company (collectively, "**Employee Benefit Plans**"), to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law.

**4.7**    **Vacation; Paid Time Off**. During the Employment Term, Executive shall be entitled to forty (40) days of paid vacation per calendar year (prorated for partial years). Executive shall receive other paid time off in accordance with Company policies as may exist from time to time or as otherwise determined by the Directors.

**4.8**    **Business Expenses**. Executive shall be entitled to reimbursement for all reasonable and necessary out-of-pocket business, entertainment, and travel expenses incurred by Executive in connection with the performance of Executive's duties hereunder.

**4.9** **Indemnification**. In the event that Executive is made a party or threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative, or investigative (a "**Proceeding**"), other than any Proceeding initiated by Executive or the Company related to any contest or dispute between Executive and the Company or any of its affiliates or subsidiaries with respect to this Agreement or Executive's employment hereunder, by reason of the fact that Executive is or was a director or officer of the Company, or any affiliate or subsidiary of the Company, or is or was serving at the request of the Company as a director, officer, member, employee, or agent of another corporation or a partnership, joint venture, trust, or other enterprise, Executive shall be indemnified and held harmless by the Company from and against any liabilities, costs, claims, and expenses, including all costs and expenses incurred in defense of any Proceeding (including attorneys' fees).

**5.** **Employment Term and Termination of Employment**. The initial term of employment of Executive shall be the period from the Effective Date until December 31, 2021, and thereafter shall automatically renew from year-to-year for additional one (1) year periods, unless either Party provides written notice of non-renewal to the other Party within sixty (60) days prior to the expiration of the applicable Employment Term, or Executive's employment is otherwise terminated in accordance with this Section 5 below (the "**Employment Term**"). In the event of non-renewal of the Employment Term by either Party, Executive shall be entitled to payment of the Severance Payment Amount (as defined in Section 5.2(d) below). The Employment Term and Executive's employment hereunder may be terminated by either the Company or Executive at any time and for any reason; provided that, unless otherwise provided herein, either Party shall be required to give the other Party at least sixty (60) days advance written notice of any termination of Executive's employment. On termination of Executive's employment during the Employment Term, Executive shall be entitled to the compensation and benefits described in this Section 5 and shall have no further rights to any compensation or any other benefits from the Company or any of its affiliates.

**5.1** **For Cause or Without Good Reason**.

(a) Executive's employment hereunder may be terminated by the Company for Cause or by Executive without Good Reason. If Executive's employment is terminated by the Company for Cause or by Executive without Good Reason, Executive shall be entitled to receive:

(i) any accrued but unpaid Base Salary and accrued but unused vacation which shall be paid on the Termination Date (as defined below);

(ii) any earned but unpaid Annual Bonus with respect to any completed calendar year immediately preceding the Termination Date, which shall be paid on the otherwise applicable payment date; provided that, if Executive's employment is terminated by the Company for Cause, then any such accrued but unpaid Annual Bonus shall be forfeited;

(iii) reimbursement for unreimbursed business expenses properly incurred by Executive in accordance with Section 4.8 of this Agreement; and

(iv)     such employee benefits, if any, to which Executive may be entitled under the Company's employee benefit plans as of the Termination Date; provided that, in no event shall Executive be entitled to any payments in the nature of severance or termination payments except as specifically provided herein; and

(v)     accrued and unpaid First or Second LTIP.

Items 5.1(a)(i) through 5.1(a)(v) are referred to herein collectively as the "**Accrued Amounts**". For the avoidance of doubt, any LTIP that has awarded any exposure to an investment such as equity shall be deemed vested if not vested already.

(b)     For purposes of this Agreement, "**Cause**" shall mean:

(i)     Executive's conviction of or plea of guilty or nolo contendere to a crime that constitutes a felony (or state law equivalent);

(ii)     Executive's material breach of the provisions of this Agreement in the course of performing Executive's duties that results in material harm to the Company; or

(iii)     Executive is deemed by a court of competent jurisdiction to have engaged in any act or omission constituting willful misconduct, gross negligence, or fraud in the course of performing Executive's duties.

Notwithstanding the foregoing, for subsections (i) to (iii), the Employment Term and Executive's employment shall not be deemed to have been terminated for Cause unless the Company shall have given Executive: (A) written notice setting forth the reasons for the Company's intention to terminate Executive's employment for Cause, and (B) a reasonable opportunity, not to exceed thirty (30) days, to cure such default.

(c)     For purposes of this Agreement, "**Good Reason**" shall mean the occurrence of any of the following, in each case during the Employment Term, without Executive's written consent:

(i)     a material reduction of, or failure to pay, Executive's Base Salary; or

(ii)     a material, adverse change in Executive's authority, duties, or responsibilities (other than (i) temporarily while Executive is physically or mentally incapacitated, (ii) where, if applicable, in Executive's capacity as a director, officer, managing member or other position to exert control or influence in the Company or subsidiary (**"Controlling Position"**), the Executive has directed or caused a material adverse change himself, (iii) where the Company's business has materially changed through no fault of the Company, (iv) or as required by applicable law); or

(iii)     Company's material breach of the provisions of this Agreement.

Executive cannot terminate employment for Good Reason unless: (i) Executive has provided written notice to the Company of the existence of the circumstances providing grounds for termination for Good Reason within fifteen (15) days of the initial existence of such grounds, and (ii) the Company has had at least thirty (30) days from the date on which such notice is provided to cure such circumstances. Executive agrees and acknowledges that if he holds a Controlling Position he is obliged to act in good faith and with all due diligence and expedition to help the Company cure any such grounds.

**5.2**    **Without Cause or for Good Reason**. The Employment Term and Executive's employment hereunder may be terminated by Executive (i) for Good Reason, (ii) by the Company without Cause, or in the event of non-renewal of the Employment Term in accordance with Section 5. In the event of such termination, Executive shall be entitled to receive the Accrued Amounts and, subject to Executive's compliance with Section 6, Section 7, and Section 8 of this Agreement, Executive shall be entitled to receive the following:

(a)    continued Base Salary for twelve (12) months following the Termination Date payable in equal installments, but no less frequently than monthly;

(b)    a payment equal to the product of (i) the Annual Bonus, if any, that Executive would have earned for the fiscal year in which the Termination Date (as determined in accordance with Section 5.5) occurs based on achievement of the applicable performance goals for such year and (ii) a fraction, the numerator of which is the number of days Executive was employed by the Company during the year of termination and the denominator of which is the number of days in such year (the "**Pro-Rata Bonus**"), plus any accrued but unpaid Discretionary Bonuses as determined by the Directors. These amounts shall be paid on the date that Annual or Discretionary Bonuses are normally paid;

(c)    If Executive timely and properly elects health continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"), the Company shall reimburse Executive for the monthly COBRA premium paid by Executive for Executive and Executive's dependents. Such reimbursement shall be paid to Executive on the seventh (7th) day of the month immediately following the month in which Executive timely remits the premium payment. Executive shall be eligible to receive such reimbursement until the earliest of: (i) the date Executive is no longer eligible to receive COBRA continuation coverage; and (ii) the date on which Executive becomes eligible to receive substantially similar coverage from another employer or other source; and

(d)    An early termination payment in the nature of a severance payment in the amount of $10,000,000 payable at termination (the "**Severance Payment Amount**").

**5.3** **Death or Disability**.

(a)     Executive's employment hereunder shall terminate automatically on Executive's death during the Employment Term, and the Company may terminate Executive's employment on account of Executive's Disability.

(b)     If Executive's employment is terminated during the Employment Term on account of Executive's death or Disability, Executive (or Executive's estate and/or beneficiaries, as the case may be) shall be entitled to receive the following:

(i)     the Accrued Amounts; and,

(ii)     a lump sum payment equal to the Pro-Rata Bonus, and any accrued but unpaid discretionary bonuses, if any, that Executive earned for the fiscal year in which the termination date occurs which shall be payable on the date that annual bonuses are normally paid to the Company's executives, but in no event later than three (3) months following the end of the fiscal year in which the termination date occurs; and,

(iii)     in the event of the Executive's death or disability, the Company shall pay the Executive's estate an amount equal to the Severance Payment Amount.

Notwithstanding any other provision contained herein, all payments made in connection with Executive's Disability shall be provided in a manner which is consistent with federal and state law.

(c)     For purposes of this Agreement, "**Disability**" shall mean a condition that entitles Executive to receive long-term disability benefits under the Company's long-term disability plan, or if there is no such plan, Executive's inability, due to physical or mental incapacity, to perform the essential functions of Executive's job, with or without reasonable accommodation, for a period of ninety (90) consecutive days or a period of ninety (90) days in any one hundred eighty (180) day period. Any question as to the existence of Executive's Disability as to which Executive and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to Executive and the Company. If Executive and the Company cannot agree as to a qualified independent physician, each shall appoint such a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and Executive shall be final and conclusive for all purposes of this Agreement.

**5.4**     **Notice of Termination**. Any termination of Executive's employment hereunder by the Company or by Executive during the Employment Term (other than termination pursuant to Section 5.3(a) on account of Executive's death) shall be communicated by written notice of termination ("**Notice of Termination**") to the other party hereto in accordance with Section 20 herein. The Notice of Termination shall specify:

(a)     The termination provision of this Agreement relied upon;

(b)     To the extent applicable, the facts and circumstances claimed to provide a basis for termination of Executive's employment under the provision so indicated;

(c)     To the extent applicable, the date notice of intention to terminate Executive's employment was provided or the date notice of existence of the circumstances providing grounds for termination for Good Reason was provided; and

(d)     The applicable Termination Date.

**5.5**     **Termination Date**. Executive's "**Termination Date**" shall be:

(a)     If Executive's employment hereunder terminates on account of Executive's death, the date of Executive's death;

(b)     If Executive's employment hereunder is terminated on account of Executive's Disability, the date that it is determined that Executive has a Disability;

(c)     Unless otherwise indicated herein, if the Company terminates Executive's employment hereunder for Cause, the date the Notice of Termination is delivered to Executive. If the Company is required to give notice of intention to terminate Executive's employment and an opportunity to cure, and Executive fails to cure same, the date on which the cure period expires;

(d)     If the Company terminates Executive's employment hereunder without Cause, the date specified in the Notice of Termination, which shall be no less than sixty (60) days following the date on which the Notice of Termination is delivered;

(e)     If Executive terminates Executive's employment hereunder without Good Reason, the date specified in Executive's Notice of Termination, which shall be no less than sixty (60) days following the date on which the Notice of Termination is delivered;

(f)     If Executive terminates Executive's employment hereunder with Good Reason, and subject to Executive providing written notice to Company of the existence of the circumstances providing grounds for termination for Good Reason within fifteen (15) days of the initial existence of such grounds, and (ii) the Company having had at least thirty (30) days from the date on which such notice is provided to cure such circumstances and fails to cure same, the date on which the cure period expires; and

(g)     In the event of non-renewal of the Employment Term by either Party, the date specified in the Notice of Termination, which shall be no less than sixty (60) days following the date on which the Notice of Termination is delivered

**5.6**     **Resignation of All Other Positions**. On termination of Executive's employment hereunder for any reason, Executive shall be deemed to have resigned from all positions that Executive holds as an officer or director of the Company or any of its affiliates or subsidiaries.

**6.    Cooperation**. The parties agree that certain matters in which Executive will be involved during the Employment Term may necessitate Executive's cooperation in the future. Accordingly, following the termination of Executive's employment for any reason, to the extent reasonably requested by the Directors, Executive shall cooperate with the Company, its affiliates and subsidiaries in connection with matters arising out of Executive's service to the Company; its affiliates or subsidiaries, provided that, the Company shall make reasonable efforts to minimize disruption of Executive's other activities. The Company shall reimburse Executive for reasonable expenses incurred in connection with such cooperation.

**7.    Confidential Information**. Executive understands and acknowledges that during the Employment Term, Executive will have access to and learn about Confidential Information, as defined below.

**7.1    Confidential Information Defined**.

(a)    Definition.

For purposes of this Agreement, "**Confidential Information**" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, device configurations, embedded data, compilations, metadata, technologies, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the Company, or its businesses including its affiliates and subsidiaries, or any existing or prospective customer, supplier, investor or other associated third party, or of any other person or entity that has entrusted information to the Company or its businesses including its affiliates and subsidiaries in confidence.

Executive understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

Executive understands and agrees that Confidential Information includes information developed by Executive in the course of employment by the Company, its affiliates or subsidiaries as if the Company, its affiliates or subsidiaries furnished the same Confidential Information to Executive in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to Executive; provided that, such disclosure is through no direct or indirect fault of Executive or person(s) acting on Executive's behalf.

(b)    <u>Disclosure and Use Restrictions</u>.

Executive agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company, its affiliates or subsidiaries) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Company, its affiliates or subsidiaries and, in any event, not to anyone outside of the direct employ of the Company, its affiliates or subsidiaries, except as required in the performance of Executive's authorized employment duties to the Company or with the prior written consent of the Directors acting on behalf of the Company, its affiliates or subsidiaries, as applicable, in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company, its affiliates or subsidiaries except as required in the performance of Executive's authorized employment duties to the Company, its affiliates or subsidiaries or with the prior consent of the Directors acting on behalf of the Company, its affiliates or subsidiaries, as applicable, in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent).

(c)    <u>Permitted Disclosures</u>. Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. Executive shall promptly provide written notice of any such order to the Directors.

(d)    <u>Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016 ("DTSA")</u>. Notwithstanding any other provision of this Agreement:

(i)    Executive will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that:

       (A)     is made (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (2) solely for the purpose of reporting or investigating a suspected violation of law; or

       (B)     is made in a complaint or other document filed under seal in a lawsuit or other proceeding.

       (ii)     If Executive files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Executive may disclose the Company's trade secrets to Executive's attorney and use the trade secret information in the court proceeding if Executive:

       (A)     files any document containing trade secrets under seal; and

       (B)     does not disclose trade secrets, except pursuant to court order.

## 8.    **Restrictive Covenants**.

    **8.1**    **Acknowledgement**. Executive understands that the nature of Executive's position gives Executive access to and knowledge of Confidential Information and places Executive in a position of trust and confidence with the Company, its affiliates and subsidiaries. Executive understands and acknowledges that the services Executive provides to the Company, its affiliate and subsidiaries are unique, special, or extraordinary.

    Executive further understands and acknowledges that the Company's ability to reserve these for the exclusive knowledge and use of the Company, its affiliates and subsidiaries is of great competitive importance and commercial value to the Company, its affiliates and subsidiaries and that improper use or disclosure by Executive is likely to result in unfair or unlawful competitive activity.

    **8.2**    **Non-Competition**. Because of the Company's legitimate business interest as described herein and the good and valuable consideration offered to Executive, during the Employment Term and for a period of one (1) year, beginning on the last day of Executive's employment with the Company, Executive agrees and covenants not to engage in Prohibited Activity within the areas in which the Company has conducted business.

    For purposes of this Section 8.2, "**Prohibited Activity**" is activity in which Executive contributes Executive's knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, employee, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to an entity engaged in the same or similar business as the Company, or its affiliates. Prohibited Activity also includes activity that may require or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information.

Nothing herein shall prohibit Executive from purchasing or owning less than one percent (1%) of the publicly traded securities of any corporation, provided that such ownership represents a passive investment and that Executive is not a controlling person of, or a member of a group that controls, such corporation.

This Section 8 does not, in any way, restrict or impede Executive from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. Executive shall promptly provide written notice of any such order to the Directors.

**8.3**     **Non-Solicitation of Employees**. Executive agrees and covenants not to directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any employee of the Company, or attempt to do so, for a period of one (1) year, to run consecutively, beginning on the last day of Executive's employment with the Company.

**8.4**     **Non-Solicitation of Customers**. Executive understands and acknowledges that because of Executive's experience with and relationship to the Company, its affiliates and subsidiaries, Executive will have access to and learn about the Company's, its affiliates' and subsidiaries' customer information. "**Customer Information**" includes, but is not limited to, names, phone numbers, addresses, email addresses, order history, order preferences, chain of command, decisionmakers, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to services.

Executive understands and acknowledges that loss of this customer relationship and/or goodwill will cause significant and irreparable harm.

Executive agrees and covenants, for a period of one (1) year, not to directly or indirectly solicit, contact (including but not limited to email, regular mail, express mail, telephone, fax, instant message, or social media), attempt to contact, or meet with the Company's, its affiliates' or its subsidiaries' customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company, its affiliates or subsidiaries.

**9.**     **Acknowledgement**. Executive acknowledges and agrees that the services to be rendered by Executive to the Company, its affiliates and subsidiaries, are of a special and unique character; that Executive will obtain knowledge and skill relevant to the Company's, its affiliates' and subsidiaries' industries, their methods of doing business and marketing strategies by virtue of Executive's employment; and that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interest of the Company, its affiliates and subsidiaries.

Executive further acknowledges that the benefits provided to Executive under this Agreement, including the amount of Executive's compensation, reflects, in part, Executive's obligations and the Company's rights under Section 7 and Section 8, of this Agreement; that

Executive has no expectation of any additional compensation, royalties, or other payment of any kind not otherwise referenced herein in connection herewith; and that Executive will not suffer undue hardship by reason of full compliance with the terms and conditions of Section 7 and Section 8 of this Agreement or the Company's enforcement thereof.

**10. Remedies**. In the event of a breach or threatened breach by Executive of Section 7 and Section 8 of this Agreement, Executive hereby consents and agrees that the Company, its affiliates and subsidiaries shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, and that money damages would not afford an adequate remedy, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

**11. Proprietary Rights**.

**11.1 Work Product**. Executive acknowledges and agrees that all right, title, and interest in and to all writings, works of authorship, technology, inventions, discoveries, processes, techniques, methods, ideas, concepts, research, proposals, materials, and all other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by Executive individually or jointly with others during the Employment Term and relate in any way to the business or contemplated business, products, activities, research, or development of the Company, its affiliates or subsidiaries or result from any work performed by Executive for the Company, its affiliates or subsidiaries (in each case, regardless of when or where prepared or whose equipment or other resources are used in preparing the same), all rights and claims related to the foregoing, and all printed, physical and electronic copies, and other tangible embodiments thereof (collectively, "**Work Product**"), as well as any and all rights in and to US and foreign (a) patents, patent disclosures and inventions (whether patentable or not), (b) trademarks, service marks, trade dress, trade names, logos, corporate names, and domain names, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing, (c) copyrights and copyrightable works (including computer programs), mask works, and rights in data and databases, (d) trade secrets, know-how, and other confidential information, and (e) all other intellectual property rights, in each case whether registered or unregistered and including all registrations and applications for, and renewals and extensions of, such rights, all improvements thereto and all similar or equivalent rights or forms of protection in any part of the world (collectively, "**Intellectual Property Rights**"), shall be the sole and exclusive property of the Company, its affiliates or subsidiaries, as applicable.

**11.2 Work Made for Hire; Assignment**. Executive acknowledges that, by reason of being employed by the Company, its affiliates or subsidiaries, at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in 17 U.S.C. § 101 and such copyrights are therefore owned by the Company, its affiliates or subsidiaries, as applicable. To the extent that the foregoing does not apply, Executive hereby irrevocably assigns to the Company, its affiliates or subsidiaries, as applicable, for no additional consideration, Executive's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including the right

to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Company's, its affiliates' or subsidiaries' rights, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company, its affiliates, subsidiaries or assigns, would have had in the absence of this Agreement.

**11.3** **Further Assurances; Power of Attorney**. During and after the Employment Term, Executive agrees to reasonably cooperate with the Company, its affiliates, subsidiaries and assigns to (a) apply for, obtain, perfect, and transfer to the Company, its affiliates or subsidiaries, as applicable, the Work Product as well as any and all Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (b) maintain, protect and enforce the same, including, without limitation, giving testimony and executing and delivering to the Company, its affiliates and subsidiaries, as the case may be, any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as shall be requested by the Company, its affiliates or subsidiaries. Executive hereby irrevocably grants the Company, its affiliates or subsidiaries, as applicable, power of attorney to execute and deliver any such documents on Executive's behalf in Executive's name and to do all other lawfully permitted acts to transfer the Work Product to the Company, its affiliates or subsidiaries, as the case may be. The power of attorney is coupled with an interest and shall not be affected by Executive's subsequent incapacity.

**11.4** **No License**. Executive understands that this Agreement does not, and shall not be construed to, grant Executive any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software, or other tools made available to Executive by the Company.

**12.** **Security**.

**12.1** **Security and Access**. Executive agrees and covenants (a) to comply with all security policies and procedures as in force from time to time including without limitation those regarding the Company's, its affiliates' or subsidiaries' facilities, IT resources and communication technologies ("**Facilities and Information Technology Resources**"); (b) not to access or use any Facilities and Information Technology Resources except as authorized by the Company, its affiliates or subsidiaries; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of Executive's employment by the Company, its affiliates or subsidiaries whether termination is voluntary or involuntary. Executive agrees to promptly notify the Company, its affiliates or subsidiaries, as applicable, in the event Executive learns of any violation of the foregoing by others, or of any other misappropriation or unauthorized access, use, reproduction, or reverse engineering of, or tampering with any Facilities and Information Technology Resources or other Company, affiliate or subsidiary property or materials by others.

**13.** **Entire Agreement**. Unless specifically provided herein, this Agreement contains all of the understandings and representations between Executive and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter. The

parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

**14.** **Modification and Waiver**. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by Executive and the Director of the Company. No waiver by either of the parties of any breach by the other party hereto of any condition or provision of this Agreement to be performed by the other party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the parties in exercising any right, power, or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

**15.** **Severability**. Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement.

The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law.

The parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

**16.** **Captions**. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

**17.** **Counterparts**. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

**18.** **Section 409A**.

**18.1** **General Compliance**. This Agreement is intended to comply with Section 409A or an exemption thereunder and shall be construed and administered in accordance with Section 409A. Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from

service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Any payments to be made under this Agreement upon a termination of employment shall only be made upon a "separation from service" under Section 409A. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement comply with Section 409A, and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by Executive on account of non-compliance with Section 409A.

**18.2** **Specified Employees**. Notwithstanding any other provision of this Agreement, if any payment or benefit provided to Executive in connection with Executive's termination of employment is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A and Executive is determined to be a "specified employee" as defined in Section 409A(a)(2)(b)(i), then such payment or benefit shall not be paid until the first payroll date following the six-month anniversary of the Termination Date or, if earlier, on Executive's death (the "**Specified Employee Payment Date**"). The aggregate of any payments that would otherwise have been paid before the Specified Employee Payment Date and interest on such amounts calculated based on the applicable federal rate published by the Internal Revenue Service for the month in which Executive's separation from service occurs shall be paid to Executive in a lump sum on the Specified Employee Payment Date and thereafter, any remaining payments shall be paid without delay in accordance with their original schedule.

**18.3** **Reimbursements**. To the extent required by Section 409A, each reimbursement or in-kind benefit provided under this Agreement shall be provided in accordance with the following:

    (a)    the amount of expenses eligible for reimbursement, or in-kind benefits provided, during each calendar year cannot affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year;

    (b)    any reimbursement of an eligible expense shall be paid to Executive on or before the last day of the calendar year following the calendar year in which the expense was incurred; and

    (c)    any right to reimbursements or in-kind benefits under this Agreement shall not be subject to liquidation or exchange for another benefit.

**18.4** **Tax Gross-ups**. Any tax gross-up payments provided under this Agreement shall be paid to Executive on or before December 31 of the calendar year immediately following the calendar year in which Executive remits the related taxes.

**19.** **Successors and Assigns**. This Agreement is personal to Executive and shall not be assigned by Executive. Any purported assignment by Executive shall be null and void from the initial date of the purported assignment. The Company may assign this Agreement to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or

substantially all of the business or assets of the Company. This Agreement shall inure to the benefit of the Company and permitted successors and assigns.

**20.**   **Notice**. Notices and all other communications provided for in this Agreement shall be in writing and shall be delivered personally or sent by registered or certified mail, return receipt requested, or by overnight carrier to the parties at the addresses set forth below (or such other addresses as specified by the parties by like notice):

> If to the Company:
>
> CHARITABLE DAF HOLDCO, LTD.
>
> PAUL MURPHY
> paul@gkmanagement.com.ky
>
> If to Executive:
>
> MARK PATRICK
> Mpatricktax1040@gmail.com

**21.**   **Representations of Executive**. Executive represents and warrants to the Company that:

> (a)   Executive's acceptance of employment with the Company and the performance of duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which Executive is a party or is otherwise bound.
>
> (b)   Executive's acceptance of employment with the Company and the performance of duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.

**22.**   **Withholding**. The Company shall have the right to withhold from any amount payable hereunder any Federal, state, and local taxes in order for the Company to satisfy any withholding tax obligation it may have under any applicable law or regulation.

**23.**   **Survival**. Upon the expiration or other termination of this Agreement, the respective rights and obligations of the parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the parties under this Agreement.

**24.**   **Governing Law and Jurisdiction.** This agreement is governed by and shall be construed in accordance with the laws of Cayman Islands. Each of the parties hereto irrevocably agrees that the courts of Cayman Islands shall have exclusive jurisdiction to hear and determine any suit, action or proceeding, and to settle any disputes, which may arise out of or in connection with this agreement and, for such purposes, irrevocably submits to the exclusive jurisdiction of such courts.

    **25.**  <u>**Acknowledgement of Full Understanding**</u>. EXECUTIVE ACKNOWLEDGES AND AGREES THAT EXECUTIVE HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. EXECUTIVE ACKNOWLEDGES AND AGREES THAT EXECUTIVE HAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF EXECUTIVE'S CHOICE BEFORE SIGNING THIS AGREEMENT.

[<em><strong>SIGNATURE PAGE FOLLOWS</strong></em>]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**COMPANY:**

CHARITABLE DAF HOLDCO, LTD.

By: _____

Name: Paul Murphy
Title: Director

**EXECUTIVE:**

_____

MARK PATRICK

# EXHIBIT 93

**VALUATION ANALYSIS OF**
**100% MEMBERSHIP INTEREST IN**
**CDMCFAD, LLC**

**AS OF**
**MARCH 25, 2025**

Prepared for:

Mr. Bart F. Higgins
Attorney
Shields Legal Group





March 26, 2025

Mr. Bart F. Higgins
Attorney
Shields Legal Group
16400 Dallas Parkway
Dallas, Texas 75248

### RE: Valuation Analysis of Membership Interest in CDMCFAD, LLC

Dear Mr. Higgins:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of the 100% non-controlling membership interest (the "Subject Interest" or the "Membership Interest") in CDMCFAD, LLC (the "Company") as of March 25, 2025 (the "Valuation Date").[1]  This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of membership interests), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

## DEFINITION AND PREMISE OF VALUE

The standard of value is fair market value.  Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60.  These factors include:

1.  The nature of the business and its history from inception.
2.  The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3.  The book value and the financial condition of the business.
4.  The earning capacity of the business.
5.  The dividend-paying capacity of the business.
6.  Whether the enterprise had goodwill or other intangible value.

---

[1]   Our analysis assumes that the Company and CLO HoldCo's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

Mr. Bart F. Higgins
March 26, 2025
Page 2

7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The valuation is conducted under the assumption that the Company will continue as a going concern.[2] The liquidation premise of value was considered but deemed inapplicable, as the going-concern premise reflects the "highest and best use" of the Membership Interest. The Membership Interest does not confer control and has an extremely limited claim to the underlying net asset value of CLO HoldCo, Ltd ("CLO HoldCo"). Economic benefits are contingent on discretionary distributions made by the Company's manager ("Management"). Given these characteristics, the going concern approach appropriately reflects their value.

**SCOPE OF WORK**

To gain an understanding of Company's operations, we reviewed the Company's financial and operational data and spoke with Management. To understand the environment in which Company operates, we researched relevant information concerning the US private equity, hedge funds & investment vehicles industry. We also studied economic conditions as of the Valuation Date and their impact on the Company and its industry.

We valued the Subject Interest in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Balance sheet for CLO HoldCo as of September 30, 2024

- The Limited Liability Company Agreement of CDMCFAD, LLC, as of December 18, 2024

- Information regarding the Company's history and current operations

---

[2] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

Mr. Bart F. Higgins
March 26, 2025
Page 3

- Historical distributions from CLO HoldCo

- The organizational structure chart for CDMCFAD, LLC

- Discussions with Management

- Pepperdine 2024 Private Capital Markets Report, dated June 10, 2024

- IBISWorld Industry Report 52599, *Private Equity, Hedge Funds & Investment Vehicles in the US*, October 2024

The procedures employed in valuing the Subject Interest included such steps that we considered necessary, including (but not limited to):

- An analysis of the general economic environment and industry as of the Valuation Date

- An interview with Management regarding expectations for future distributions

- An application of appropriate valuation techniques and procedures, including the income approach

- An analysis of other pertinent facts and data influencing our conclusion of value

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

Mr. Bart F. Higgins
March 26, 2025
Page 4

**CONCLUSION OF VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**

**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | |
|---|---|---|
| | **Value** | **Reference** |
| **Income Approach** | | |
| Value of Subject Interest, Minority, Marketable | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability  20.0% | ($408,339) | *Schedule C.4* |
| **Value of Subject Interest, Minority, Non-Marketable** | **$1,637,192** | |

We are independent of the Company and its affiliates and have no current or prospective economic interest in the assets that are the subject of this analysis.  Our fee for these valuation services was in no way influenced by the results of our analysis.  The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report.  If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

*ValueScope*

ValueScope, LLC

# TABLE OF CONTENTS

**ENGAGEMENT OVERVIEW** ...................................................................................................**1**

DESCRIPTION OF THE ASSIGNMENT ........................................................................ 1

SCOPE.......................................................................................................................... 1

PROCEDURES.............................................................................................................. 1

**COMPANY OVERVIEW**.......................................................................................................**2**

CDMCFAD, LLC OVERVIEW......................................................................................... 2

CAPITALIZATION TABLE .............................................................................................. 2

COMPANY STRUCTURE CHART .................................................................................. 3

FINANCIAL POSITION .................................................................................................. 3

SUBJECT INTEREST OVERVIEW.................................................................................. 6

**ECONOMIC AND INDUSTRY OVERVIEW**..........................................................................**8**

OVERVIEW OF THE U.S. ECONOMY........................................................................... 8

OVERVIEW OF THE PRIVATE EQUITY… & INVESTMENT VEHICLES INDUSTRY................ 16

**VALUATION METHODOLOGY** ........................................................................................**17**

VALUATION APPROACHES......................................................................................... 17

VALUATION METHODS ............................................................................................... 18

SUMMARY OF THE VALUATION APPROACHES AND METHODS ..................................... 18

**VALUATION ANALYSIS** ...................................................................................................**20**

INCOME APPROACH ANALYSIS ................................................................................. 20

**CONCLUSION OF VALUE - SUBJECT INTEREST**............................................................**22**

DISCOUNT FOR LACK OF MARKETABILITY .............................................................. 22

PRE-IPO STUDIES....................................................................................................... 34

APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST ................. 35

DISCOUNT ADJUSTMENT DISCUSSION.................................................................... 36

SUBJECT INTEREST DISCOUNT CALCULATION........................................................ 37

FAIR MARKET VALUE CONCLUSION.......................................................................... 38

**ASSUMPTIONS AND LIMITING CONDITIONS** .............................................................**39**

**APPRAISAL CERTIFICATION** .........................................................................................**44**

**TABLE OF SCHEDULES**

**VALUATION SUMMARY** ................................................................. **SUMMARY SCHEDULE**

**HISTORICAL FINANCIAL ANALYSIS** ................................................................................. **A**

HISTORICAL DISTRIBUTIONS TABLE .................................................................. A.1

HISTORICAL DISTRIBUTIONS CHARTS ............................................................... A.2

CLO HOLDCO, LTD - SUMMARY BALANCE SHEET ........................................... A.3

**INCOME APPROACH** ............................................................................................. **B**

DISCOUNTED CASH FLOW (DCF) ANALYSIS ..................................................... B.1

SENSITIVITY ANALYSIS – HYPOTHETICAL RISK-FREE BOND ............................ B.2

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS** ....................................... **C**

RESTRICTED STOCK STUDIES............................................................................. C.1

RESTRICTED STOCK STUDIES SUMMARY STATISTICS....................................... C.2

DLOM QUALITATIVE SCORING .......................................................................... C.3

CALCULATION OF MARKETABILITY DISCOUNT................................................. C.4

DLOM FOOTNOTES AND COMMENTS............................................................... C.5

## ENGAGEMENT OVERVIEW

**DESCRIPTION OF THE ASSIGNMENT**

We were retained to perform an independent valuation analysis to determine the fair market value of the 100% non-controlling membership interest (the "Subject Interest" or the "Membership Interest") in CDMCFAD, LLC (the "Company") as of March 25, 2025 (the "Valuation Date").[3] This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of membership interests), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

**SCOPE**

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections. The first section outlines the description, scope, and procedures of our analysis. The second section provides a brief description of the Company and the Subject Interest. The third section includes a discussion of the national economy and the industry in which the Company operates. The fourth section details a discussion of valuation theory and methodology. The fifth section presents our valuation analysis, and the sixth section presents our conclusion of the fair market value of the Subject Interest.

**PROCEDURES**

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances. We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information, as well as on other data obtained through additional research. A full discussion of the methodologies employed appears in the following sections of this report.

---

[3] Our analysis assumes that the Company and CLO HoldCo's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

# COMPANY OVERVIEW

### CDMCFAD, LLC OVERVIEW[4]

CDMCFAD, LLC is a Delaware limited liability company formed in December 2024.  Upon the members' acceptance of the interest, the members agreed to the provisions of the Limited Liability Company Agreement of CDMCFAD, LLC (the "Company Agreement") and the Companies Law of the state of Delaware (as amended from time to time, the "Law"). As a holding company, the Company's underlying assets have been allocated across a broad range of asset classes, including but not limited to cash and cash equivalents, public equity, private equity, private credit, real estate, and other alternative investments.

### CAPITALIZATION TABLE

The Company's membership interest is held by Charitable DAF HoldCo, Ltd.  Mark Patrick is the Manager of the Company.

---

[4]    Based on the Company Agreement and a discussion with Management.

## COMPANY STRUCTURE CHART



## FINANCIAL POSITION

The Company's only asset stems from its indirect interest in CLO HoldCo, Ltd ("CLO HoldCo"). The Company provided an unaudited balance sheet (the "Balance Sheet") for CLO HoldCo as of September 30, 2024. Based on a review of the Balance Sheet, CLO HoldCo reported total assets of $316.3 million, including $138.4 million of cash & cash equivalents, $175.3 million of other investments, and $2.5 million of other assets. CLO HoldCo reported total liabilities of $47.2 million. CLO HoldCo has net assets of $269.1

million on its books as of September 30, 2024.  The Balance Sheet is presented below and
in Schedule A.3.

### CLO HoldCo, Ltd - Summary Balance Sheet

| | Balance Sheet as of: | |
|---|---|---|
| | 9/30/2024 | |
| | Actual | % |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| | | |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| | | |
| **Total Assets** | 316,257,723 | 100.0% |
| | | |
| **Total Liabilities** | 47,204,916 | 14.9% |
| | | |
| **Total Equity** | 269,052,808 | 85.1% |
| | | |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

CLO HoldCo historically paid distributions of $819,050 in 2019, $619,050 in 2020,
$834,450 in 2021, $968,950 in 2022, $950,881 in 2023, and $317,796 in the first three
quarters of 2024.  Fourth quarter distributions were historically larger than in the first
three quarters.[5]   Historical Distributions are presented in the following charts and in
Schedules A.1 and A.2.

---

[5]    Distributions are typically paid a few months following the end of a quarter.  As a result, fourth quarter
distributions may be paid in the first or second quarter of the following calendar year.



Note: Q4 2024 distributions have not yet been paid



**SUBJECT INTEREST OVERVIEW**

The Subject Interest consists of a 100% non-controlling membership interest in the Company.  The Subject Interest may receive discretionary cash distributions from time to time.  The rights and limitations of the Membership Interest are defined by the Company Agreement and are directly influenced by the discretion and actions of Management.

The Company Agreement grants Management substantial discretion over distributions, interest allocation, governance, and financial transparency, leaving members with little influence over corporate decisions.  The Membership Interest is subject to transfer restrictions and limited access to information, with limited voting rights and no ability to amend governing documents.  Given these extensive limitations, the Membership Interest represents a highly restricted and passive financial interest with little control or enforceable rights.

### Limited Rights Over Distributions

Members do not have:

- The right to cause, vote on, or receive distributions.
- The right to annual, timed, or guaranteed distributions.
- The ability to amend the Company Agreement to modify distribution rights.

### Governance and Voting Limitations

Members do not have:

- The right to remove or appoint Management.
- The right to vote on the issuance of additional membership interest, receive notice of such issuance, or exercise pre-emption rights.
- The right to vote on or receive notice of membership redemptions.

The appointed Management has full control over the management, operations, and affairs of the Company, including the reallocation of the membership interests on terms they determine.  Since members do not have voting or approval rights over reallocation, the membership interest may be reallocated at any time, potentially impacting the economic interests associated with existing interest.  Additionally, the transfer of membership interest requires Management consent, and Management may reject transfers at their discretion.  Furthermore, Management may cause any membership interest to be redeemed by the Company for any reason.

*Restrictions on Meetings and Information Access*

Members do not have:

- The right to receive notice of, attend, speak at, or vote at general meetings.
- The right to inspect company records, accounts, or documents, except at Management's sole discretion.
- The ability to modify or amend the Company Agreement in any capacity.

For further details, refer to Appendix A for key provisions of the Company Agreement.

**ECONOMIC AND INDUSTRY OVERVIEW**

**OVERVIEW OF THE U.S. ECONOMY**

In the third quarter of 2024, the US economy expanded at a faster pace than in the second quarter.  Inflation, which peaked at 8.99% in June 2022, declined to 2.73% by November 2024, reflecting progress toward the Federal Reserve's target.  After a prolonged period of elevated interest rates to curb inflation, signs of a cooling labor market and stable prices led the Fed to cut rates by 25 basis points in December.  The rate hikes that began in 2023 initially resulted in an inverted yield curve, signaling investor concerns about an economic slowdown, but the curve has since normalized following the presidential election.  Meanwhile, US equity markets gained momentum, with major indices ending the year higher, supported by easing inflation and expectations of further monetary policy accommodation.

**Gross Domestic Product[6]**

Real gross domestic product (GDP) increased at an annual rate of 3.1 percent in the third quarter of 2024, following an increase of 3.0 percent in the second quarter. The acceleration in real GDP in the third quarter primarily reflected accelerations in exports, consumer spending, and federal government spending.  These movements were partly offset by a downturn in private inventory investment and a larger decrease in residential fixed investment.



---

[6]    U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Third Quarter 2024. (Release Date: 12/19/2024).

## *Population*

Population growth is an important driver of long-term growth in an economy.  The total population increased from 335.9 million in November 2023 to 337.7 million in November 2024.[7]  The working-age population (15-64) increased from 208.9 million in November 2023 to 209.0 million in November 2024.[8]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic.  It partially recovered in just several months and has been trending upward/flat.   In November 2023, the civilian labor force participation rate was 62.8% and stands at 62.5% as of November 2024.[9]





---

[7]   U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[8]   Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[9]   U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

ECONOMIC AND INDUSTRY OVERVIEW

### Employment

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 227,000 in November 2024 and the unemployment rate changed little at 4.2 percent. Employment trended up in health care, leisure and hospitality, government, and social assistance. Retail trade lost jobs.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased from 7.0% in November 2023 to 7.7% in November 2024.[10]





Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will increase from 4.0 percent in 2024 to 4.3 percent in 2025 and then decrease to 4.1 percent in 2027.

---

[10]    U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

### Inflation

According to the BLS, The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.3 percent in November on a seasonally adjusted basis, after rising 0.2 percent in each of the following 4 months. Over the last 12 months, the all-items index increased 2.7 percent before seasonal adjustment.[11]

The index for shelter rose 0.3 percent in November and was the main factor in the all items increase. The food index increased 0.4 percent in November. The index for food away from home rose 0.5 percent over the month, while the index for food at home rose 0.3 percent. The energy index fell 0.2 percent over the month, after being unchanged in the preceding month.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has declined significantly since a year ago, November 2023, declining from 53.20% to 5.10% in November 2024[12].The forecasters predict current-quarter headline CPI inflation will average 2.2 percent at an annual rate, down from the prediction of 2.5 percent in the previous survey[13].



---

[11]  Federal Reserve Bank of St. Louis, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[12]  Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[13]  Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters,* November 15, 2024.

### *Interest Rates*

The interest rate on the three-month Treasury bill declined from 5.20% as of December 29, 2023, to 4.23% as of December 31, 2024.[14]  The interest rate on the ten-year Treasury note increased from 3.88% as of December 29, 2023, to 4.58% as of December 31, 2024.[15]



The interest rate on Moody's Aaa-rated corporate bonds increased from 4.65% as of December 29, 2023, to 5.40% as of December 31, 2024.[16] The interest rate on the Moody's Baa-rated corporate bonds increased from 5.49% to 6.00% over the same time.[17]



---

14    Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS],
       retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.
15    Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved
       from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.
16    Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond
       Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.
17    Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond
       Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

In the last twelve months, the yield curve transitioned from being inverted to normal, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill increasing between December 29, 2023, to December 31,2024 from -0.59% to a positive 0.70%.[18]



### Corporate Profits

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) decreased slightly by 15 billion in the third quarter of 2024 from the second quarter of 2024.



---

[18]    U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed January 10, 2025.

### Stock Markets[19]

The stock markets gained momentum from December 29, 2023, to December 31, 2024. The S&P 500 Index (SPY) closed at 475.31 on December 29, 2023, and closed higher at 586.08 on December 31, 2024.  The Dow Jones Industrial Average Index (DIA) closed at 376.87 on December 29, 2023, and closed higher at 425.50 on December 31, 2024.  The NASDAQ Composite Index (QQQ) closed at 409.52 on December 29, 2023, and closed higher at 511.23 on December 31, 2024.  In the graph below, the December 30, 2022, values were set to 100.



### Construction & Housing Starts

Construction spending and housing starts are two other important indicators for the economy.  Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment.  Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy.  Housing starts decreased from 1.510 million units in November 2023 to 1.289 million units in November 2024.[20]  Construction spending, a seasonally adjusted annual figure, increased from $2.09 trillion in November 2023 to $2.15 trillion in November 2024.[21]

---

19  CapIQ Database, last accessed January 10, 2025.
20  U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.
21  U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.



**Consumer Sentiment**

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has increased from 61.30 a year ago in November 2023 to 71.80 in November 2024. Although it has increased significantly from a year ago, the index is still well below the pre-COVID high of 101.0 in February 2020.[22] The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions. The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S. This is considered a leading indicator of future consumer expenditures and economic activity.



---

[22] University of Michigan, *Surveys of Consumers*, November 2024

## OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY[23]

This industry is composed of private equity funds, hedge funds, closed-end funds, unit investment trusts and other financial vehicles.  Entities in this industry manage securities or other assets on behalf of shareholders, unit holders or other beneficiaries to achieve high returns on targeted investments.  This industry excludes insurance and employee-benefit funds, open-end investment funds and trusts, estates and agency accounts.

### Executive Summary

In recent years, industry assets have become increasingly integral to institutional investors' portfolios and the larger asset management market. Institutional investors are individuals or organizations that trade securities in such substantial volumes that they qualify for lower commissions and fewer protective regulations since it's assumed that they're knowledgeable enough to protect themselves. Increasing demand from institutional investors has contributed to the surge in the industry's assets under management (AUM) and revenue during the current period.

In recent years, the industry has continued to enmesh itself more deeply within the broader financial ecosystem despite the challenges posed at the onset of the period. The pandemic, mainly in the first quarter of 2020, contributed to revenue declines for many operators. Many portfolios, previously thought to be sound investments, were reevaluated and businesses pivoted their strategies due to the unprecedented nature of the crisis. However, as inflation was rampant in the latter part of the period, the FED increased interest rates to control high inflation, although as inflationary pressures eased in 2024, the FED cut interest rates, which will increase liquidity in financial markets. The Fed is anticipated to cut rates further in 2025, increasing liquidity and driving the shift of investments into equities from fixed-income securities. Overall, over the past five years, industry revenue grew at a CAGR of 4.2% to $310.1 billion, including an increase of 2.5% in 2025 alone. Industry profit has climbed significantly and will comprise 49.6% of revenue in the current year.

Industry revenue will grow at a CAGR of 2.7% to $353.7 billion over the five years to 2030. The Federal Reserve is anticipated to cut interest rates as inflationary pressures continue to ease. These declining interest rates will increase liquidity in the markets. Private equity firms and hedge funds will have less difficulty raising capital for investments. As characteristics of the financial system change in light of post-financial crisis banking regulations and regulators' recognition of the importance of hedge funds within the financial system, hedge funds will likely experience heightened oversight.

---

[23]    IBISWorld Industry Report 52599, March 2025, *Private Equity, Hedge Funds & Investment Vehicles in the U.S.*

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

## VALUATION APPROACHES

### *Income Approach*

The income approach quantifies the present value of anticipated future income generated by a business or an asset. Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes. One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow. The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate. The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

### *Market Approach*

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets. Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset. Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions. The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

### *Asset-Based (Cost) Approach*

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities. Replacement cost is often a primary indicator of the value of a business' assets. The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it. Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors. The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

## VALUATION METHODS

The following are common valuation methods used under the three approaches:

    A. Income Approach
        1.  Discounted Cash Flow Method (multi-period model)
        2.  Direct Capitalization Method (single period model)
        3.  Excess Earnings Method

    B. Market Approach
        1.  Guideline Public Company Method
        2.  Merger and Acquisition Method

    C. Asset-Based Approach
        1.  Reproduction Cost Method
        2.  Replacement Cost Method
        3.  Net Asset Value Method

## SUMMARY OF THE VALUATION APPROACHES AND METHODS

For the valuation of non-controlling interests in holding companies such as the Company, the asset-based approach is most commonly used.  When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities).  The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

However, in the case of the Membership Interest under consideration, the asset-based approach is not applicable.  The Subject Interest does not confer control and only have a claim in respect of the underlying assets of CLO HoldCo in a winding up.  Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of this interest are contingent upon discretionary distributions by Management.  As such, the value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality.

Given the nature of the Membership Interest, the income approach, specifically the discounted cash flow (DCF) method, is the most appropriate valuation methodology.[24] This approach estimates the present value of expected future distributions, if any, based

---

[24]    The market approach was considered but deemed inapplicable due to the absence of comparable transactions involving securities with characteristics similar to the Membership Interest.

on reasonable assumptions regarding Management's discretion in making such distributions.  If no future distributions are expected, the value of the Subject Interest would be nominal.  The DCF method captures the time value of money and the risk associated with the uncertainty of future distributions, providing a more accurate measure of the fair market value of the Membership Interest.

**VALUATION ANALYSIS**

**INCOME APPROACH ANALYSIS**

The income approach estimates the fair market value of an interest based on the present value of expected future economic benefits.  In the case of the Membership Interest, these economic benefits are exclusively tied to discretionary distributions made by Management, rather than earnings or cash flows of the underlying NAV of the Company or CLO HoldCo.  The approach involves forecasting expected future distributions and discounting them to present value using a rate of return that reflects the risk associated with the uncertainty and discretionary nature of these distributions.  The resulting present value represents the fair market value of the Subject Interest.

*Discounted Cash Flow Method*

We developed a DCF model to determine the fair market value of the Subject Interest as of the Valuation Date.  The DCF method projects the distributions that the member is expected to receive.  Each projected distribution is discounted to present value using a rate that reflects the risk associated with the uncertainty and discretionary nature of these payments.

*Projected Distributions*

Distributions to the holders of the Subject Interest were projected based on discussions with Management and a review of historical distributions.  Management indicated that the timing and size of future distributions will be discretionary, and that the Company does not intend to establish reserves for distributions.

Despite this discretion, Management currently intends to maintain distributions to the holders of the Subject Interest at levels consistent with those paid by CLO HoldCo over the past 12 to 24 months.  We projected distributions to occur quarterly, with the next four quarters reflecting the average distribution of the corresponding quarters from the prior two years, totaling approximately $950,000.  Beyond this period, distributions were assumed to grow at an annual rate of 2.5%, consistent with expected inflation, in perpetuity.

*Cost of Equity*

A cost of equity of 68.3% was applied to discount the expected discretionary distributions to the holders of the Subject Interest, reflecting their high-risk profile, lack of claim on underlying NAV, and absence of control over distributions.  This rate was selected based on the third quartile of required returns for pre-seed venture capital investments from the Pepperdine 2024 private capital markets report, aligning with the speculative nature

Case 19-34054Case 19-11376c 3531-Doc File 9402/27/2607/2te25d Page 726 of 763:35    Desc
Exhibit G - Part 2    Page 831 of 881

VALUATION ANALYSIS

of potential cash flows, significant legal and governance risks, and the inability to force a sale or liquidity event.  The Subject Interest exhibits characteristics similar to early-stage equity investments, where cash flows are highly uncertain, illiquidity risks are substantial, and investor returns are largely dependent on discretionary managerial decisions.  Given these factors, a higher-end venture capital return benchmark was deemed appropriate.

### Conclusion – Income Approach Analysis

Based on the forecasts and methodologies presented in this analysis, the income approach indicated a minority and marketable value of the Subject Interest of $2,045,531 as of the Valuation Date.

This conclusion of value implies a discount for lack of control (DLOC) of 99.2%, calculated as the concluded marketable value of the Subject Interest divided by the NAV of CLO HoldCo.[25]

To assess the impact of the discount rate, a sensitivity analysis was performed under the hypothetical assumption that projected distributions followed the risk profile of a risk-free perpetual bond with identical expected cash flows.  In this scenario, a 4.65% discount rate, equivalent to the 30-year US Treasury yield as of the Valuation Date, was applied.  Under this assumption, the minority, marketable value of the Subject Interest would be $44.7 million, resulting in an implied DLOC of 83.4%.  However, this analysis does not reflect the substantial risks associated with the Subject Interest.

---

[25]  Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls.  Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

## CONCLUSION OF VALUE - SUBJECT INTEREST

Based on the methodologies presented in this analysis, it is our opinion that the value of the Subject Interest on a minority and marketable basis, as of the Valuation Date, can reasonably be stated as $2,045,531.

## DISCOUNT FOR LACK OF MARKETABILITY

A discount for lack of marketability (DLOM) is necessary to determine the fair market value of the Subject Interest, as it cannot be readily sold or liquidated in an active market. The absence of a public exchange and transfer restrictions further constrain liquidity.  A review of restricted stock studies was conducted to support the DLOM, examining the price differences between freely traded shares and comparable shares with resale restrictions.  These studies provide empirical evidence of the impact of illiquidity on value, reinforcing the rationale for applying a marketability discount.

### *Restricted Stock Studies*

The restricted stock studies reviewed included data from 1966 through 2010.  The studies analyzed the difference in prices between publicly traded stock and restricted stocks of the same entity.  The restricted stocks were identical to the traded stock except for marketability.  A summary of the mean and median discounts of the restricted stock studies is presented in the following figure.

CONCLUSION OF VALUE - SUBJECT INTEREST

**Summary of Restricted Stock Studies**



## SEC Institutional Investor Study[26]

The SEC Institutional Investor Study is a comprehensive restricted stock study with 398 transactions from January 1, 1966, through October 22, 1969.  The study analyzed differences in discounts based on the following categories: trading market, type of institution purchasing the security, transaction size, sales of the issuer, and earnings of the issuer.  The study found significant differences in discounts for type of exchange, sales, and earnings of the issuer.  Stocks listed on the major exchanges had lower

---

[26]   U.S. Securities and Exchange Commission, "Institutional Investor Report," 92nd Congress, 1st Session, House Documents No. 92-4, Part 5, 1971.

discounts than smaller exchanges and over-the-counter stocks.  The study found higher discounts for companies with smaller sales and lower earnings.

### Johnson & Racette Study[27]

Richard Johnson and George Racette performed a study on restricted securities purchased by registered investment companies between 1967 and 1973.  The study included 86 observations sent from 75 investment companies that met the selection criteria.  Johnson and Racette's analysis indicated an average marketability discount of 34%, in line with the range with the most common observations of 30-40%.

### Gelman Study[28]

Milton Gelman of National Economic Research Associates, Inc. conducted a study of 89 restricted stock transactions executed by four investment companies from 1968 to 1970.  The investment companies were formed in 1968 to specialize in restricted securities.  A significant portion of the funds of the investment companies were invested in restricted stock transactions consisting of shares of large and small companies listed on large and small exchanges, over the counter, purchased directly from the companies, or from selling stockholders.  Gelman's analysis found mean and median discounts of approximately 33%.  In addition, 59% of the transactions had discounts of 30% or more and 36% of the transactions had discounts of 40% or more.

### Trout Study[29]

Robert R. Trout, a principal of Trout, Shulman & Associates, analyzed 60 transactions involving the purchase of restricted stock by mutual funds from 1968 to 1972.  Trout performed a regression analysis to determine the relationship between discounts and certain variables such as exchange listing, number of shares outstanding, and transaction size relative to total outstanding shares.  Trout's findings suggested an intercept or implied mean and median discount of 43.5%.

---

[27] Richard D. Johnson and George A. Racette, "Discounts on Letter Stock Do Not Appear to Be a Good Base on Which to Estimate Discounts for Lack of Marketability on Closely Held Stocks," *Taxes—The Tax Magazine*, August 1981, 574-581.

[28] Milton Gelman, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely-Held Company, "*The Journal of Taxation*, June 1972, 353-354.

[29] Robert R. Trout, "Estimation of the Discount Associated With the Transfer of Restricted Securities," *Taxes—The Tax Magazine*, June 1977, 381-385.

### Moroney Study[30]

Robert E. Moroney of Moroney, Beissner & Co. in Houston presented his restricted stock study to the Texas CPA Tax Institute in November 1972.  The study was subsequently published in 1973.  The analysis focused on 146 transactions in restricted securities by 10 registered investment companies.  The discounts ranged from a 30% premium to a 90% discount with a mean and median discount of 35.8% and 32.8%, respectively.

### Maher Study[31]

Michael Maher, a former estate and gift tax agent with the Internal Revenue Service, published his study results in 1976.  The study observed discounts for 34 restricted stock transactions from 1966 to 1973.  The results of his study suggested a mean discount for his total and adjusted analyses of 35.4% and 34.7%, respectively.

### Standard Research Consultants Study[32]

A 1983 study by two Standard Research consultants, William F. Pittock and Charles H. Stryker, CPA, observed discounts relating to 28 private placements of common stock from October 1978 to June 1982.  The discounts varied from 7% to 91% with a median of 45%.  The results of the study tend to suggest higher discounts for companies with smaller revenues.

### Wruck Study[33]

Karen Wruck's Harvard University study on firm value analyzed 83 sales of unregistered securities from 1979 to 1984, 37 of which were observable and included in the study's sample.  On average, the offering price of the unregistered securities was set at 86.5% of the market price of the stock on the day before the announcement, indicating a discount of 13.5%.  The median discount indicated was similar at 12.2%.

---

[30]   Robert E. Moroney, "Most Courts Overvalue Closely Held Stocks," *Taxes—The Tax Magazine*, March 1973, 144-155.

[31]   J. Michael Maher, "Discounts for Lack of Marketability for Closely Held Business Interests," *Taxes—The Tax Magazine*, September 1976, 562-570.

[32]   William F. Pittock and Charles H. Stryker, "Revenue Ruling 77-287 Revisited," *SRC Quarterly Reports*, Spring 1983, 1-3, cited in Quantifying Marketability Discounts by Z. Christopher Mercer, 63.

[33]   Karen H. Wruck, "Equity Ownership Concentration and Firm Value, Evidence From Private Equity Financings," *Journal of Financial Economics*, Vol. 23. 1989, 3-1.

**FMV Opinions Study[34]**

The FMV Study included over 230 transactions from 1980 through April 1997, the date of the most recent amendment of Rule 144. The mean and median discounts were 22.3% and 20.1%, respectively. The authors of the study made the following generalization regarding their analysis:

- Companies with higher revenues resulted in lower discounts and vice versa
- Companies with unrestricted stock traded on exchanges exhibited lower discounts
- Discounts were higher for blocks exceeding 10% of ownership
- Discounts for companies with capitalization under $50 million ranged from 30% to 40%

**Barclay, Holderness, Sheehan Study[35]**

Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan's study observed private placements of large-percentage blocks of stock from 1980 to 1996. Specifically, the study analyzed private placements to a variety of different types of investors, namely active investors, passive investors, and management. Active investors were found to be willing to pay higher prices in their placements, indicating lower discounts, while management placements had the highest discounts, although they were found to not have a statistically significant difference from private placements. In total, the average discount across all private placements was 18.7% while the median discount was 17.4%.

**Hertzel & Smith Study[36]**

A 1993 study by Michael Hertzel and Richard L. Smith analyzed private placements between 1980 between 1987. The study's sample included private placements of 106 companies listed on the NYSE and AMEX exchanges as well as OTC firms. While the mean and median indicated discounts were 20% and 13%, respectively, more than 35% of the private placements observed had discounts greater than 25%.

---

[34] Hall, Lance S., and Timothy C. Polacek, "Strategies for Obtaining the Largest Valuation Discounts," *Estate Planning*, January/February 1994. pp. 38-44.

[35] Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan, "Private Placements and Managerial Entrenchment," *The Journal of Corporate Finance*, 2007, Vol. 13, Issue 4, 461-484.

[36] Michael Hertzel and Richard L. Smith, "Market Discounts and Shareholder Gains for Placing Equity Privately," *The Journal of Finance*, Vol. 48, No. 2. June 1993, 459-485.

## Management Planning Study[37]

Management Planning, Inc.  published the results of a study performed from 1980-1996 by Robert P. Oliver, ASA and Roy H.  Meyers, ASA, CFA.  They started with a base on 231 transactions and looked at discounts from the total sample, discounts from 53 transactions without registration rights, and discounts from 27 transactions with registration rights.  A summary of the mean and median discounts from their study is presented in the following table.

**Results of Management Planning Study**

| Discount | Entire Sample of 231 Transactions | 53 Transactions without Registration Rights | 27 Transactions with Registration Rights |
|---|---|---|---|
| Low | N/A | 3.0% | N/A |
| Mean | 29.0% | 27.0% | 12.8% |
| Median | 28.0% | 25.0% | 9.1% |
| High | N/A | 58.0% | N/A |

The authors cite the difference between discounts with and without registration rights as evidence of the lack of marketability on an investment.  Certain factors were also cited by the authors as the most influential in determining discounts.  The factors include:

- Companies with higher revenues tend to have lower discounts
- Companies with higher earnings tend to have lower discounts
- Higher per share prices tend to have lower discounts
- Lower price volatility tends to result in lower discounts
- Block sizes representing a higher percentage of average trading volume tend to have higher discounts
- Large dollar blocks tend to have lower discounts

## Hertzel, Lemmon, Linck, Rees Study[38]

A 2001 study by Michael Hertzel, Michael Lemmon, James Linck, and Lynn Rees analyzed private placements from 1980 to 1996.  A total of 619 private placements were ultimately selected for the sample, which primarily consisted of small-cap, technology companies as 79% of the sample companies were traded on the NASDAQ exchange and the mean market value of equity for the companies was $188 million.  Of the 619 private

---

[37]  A Study by Management Planning Inc. published in Z. Christopher Mercer, "Analysis of Restricted Stocks of Public Companies 1980-1995," *Quantifying Marketability Discounts*, Peabody Publishing, 1997, Chapter 12, 345-370.  Retrieved from John J. Stockdale Sr., *BVR's Guide to Discounts for Lack of Marketability.* 5th ed. Vol. 1. Portland, OR: Business Valuation Resources, LLC, 2013.

[38]  Michael Hertzel, Michael Lemmon, James S. Linck, and Lynn L. Rees, "Long-Run Performance Following Private Placements of Equity," workpaper, Dec. 21, 2001.

placements in the sample, 404 had sufficient information and disclosures to determine relevant discounts.  The study indicated a mean discount of 16.5% and a median discount of 13.4%.

**Wruck & Wu Study[39]**

A study by Karen Wruck and YiLin Wu in 2008 supplemented Ms. Wruck's 1989 study and analyzed private placements of companies  between 1980 and 1999.  1,976 private placements were selected in the sample.  Of these, 1,854 had data for observed discounts.  The study found a mean discount of 11.33% and a median discount of 10.96%.

**Angrist, Curtis, Kerrigan (MPI) Study[40]**

A study by Ezra Angrist, Harry Curtis, III, CFA, ASA, and Daniel Kerrigan, CFA in 2011 grouped a total of 402 transactions of unregistered stock into four groups based on the timing of the issuances in respect to the changes in holding period restrictions per Rule 144 as follows:

**Results of Angrist, Curtis, Kerrigan (MPI) Study**

| Period | Observations | Mean Discount | Median Discount |
|--------|--------------|---------------|-----------------|
| Pre-1990 | 79 | 30.5% | 32.3% |
| 1990 - Apr 1997 | 110 | 25.1% | 22.5% |
| May '97 - Feb '08 | 164 | 20.8% | 16.6% |
| Feb '08 - Dec '08 | 49 | 5.9% | 5.0% |
| Total | 402 | 22.1% | 19.6% |

Results of the study show that as restriction periods have declined, so have discounts.

**Willamette Management Associates Study[41]**

Willamette performed an analysis of 33 private placements of restricted stock from January 1, 1981 through May 27, 1984.  There was a brief overlap in the latter part of the period included in the Standard Research Consultants Study.  The Willamette study resulted in a mean discount of 31.2%.

---

[39]   Karen H. Wruck and Yi Lin Wu, "Business Relationships, Corporate Governance, and Performance: Evidence From Private Placements of Common Stock," *Journal of Corporate Finance*, 15, 2009, 30-47.
[40]   Ezra Angrist, Harry Curtis III, and Daniel Kerrigan, "Regression Analysis and Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 30, No. 1 Spring 2011, 36-48.
[41]   Shannon Pratt, Robert F. Reilly, and Robert P. Schweihs, *Valuing a Business*, 2nd edition, 247.

### Silber Study[42]

William L. Silber, a professor of finance and economics at the Stern School of Business at New York University analyzed 69 private placements from 1981 through 1989. Silber's study results ranged from a 12.7% premium to an 84% discount with a mean discount of 33.8%. Silber also cited in his findings that discounts are larger when the block of restricted stock is large relative to the total shares outstanding and the dollar size is inversely related to the discount.

### Krishnamurthy, et al. Study[43]

Srinivasan Krishnamurthy, Pual Spindt, Venkat Subramaniam, and Tracie Woidtke's 2001 study analyzed private placements from 1983 to 1992. The study performed different discount calculations for the following classifications: 1) restricted shares, 2) shares with registration pending, 3) shares not known to be restricted, and 4) shares with pending registration or not known to be restricted (groups 2 and 3 combined). The mean discounts for Groups 1-4 were 34.0%, 23.3%, 15.4%, and 16.0%, respectively. The overall mean discount was 19.4%.

### Wu Study[44]

YiLin Wu's study on private placements was published in the Journal of Financial Economics in 2004. The study analyzed 301 private placements taking place from 1986 to 1997. Mean and median discounts of 8.7% and 19.8%, respectively, were observed.

### Bajaj Study[45]

The Bajaj study expands on previous restricted stock studies, namely by Wruck and by Hertzel and Smith. This study analyzed 88 private placements occurring between 1990 and 1995. The 88 observations revealed results ranging from a premium of approximately 14% to a discount of 68%, with mean and discounts of 22% and 21%, respectively. The authors note four characteristics to consider regarding the target firm and private placement itself when analyzing discounts: the percentage of total shares offered, business risk, financial distress, and total proceeds.

---

[42]    William L. Silber, "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," *Financial Analysts Journal*, July-August 1991, 60-64.

[43]    Srinivasan Krishnamurthy, Paul Spindt, Venkat Subramaniam, and Tracie Woidtke, "Does Investor Identity Matter in Equity Issues? Evidence From Private Placements," *Journal of Financial Intermediation*, 14, 2005, 210–238.

[44]    Yi Lin Wu, "The Choice of Equity Selling Mechanisms," *Journal of Financial Economics*, 74, 2004, 93-119.

[45]    Mukesh Bajaj, David J. Denis, Stephen P. Ferris, and Atulya Sarin, "Firm Value and Marketability Discounts," *Journal of Corporation Law*, Vol. 27, Fall 2001, 89-115.

### Johnson Study (Business Valuation Review)[46]

Bruce A. Johnson, ASA of Munroe, Park & Johnson conducted a restricted stock study from 1991 to 1995. The study included 72 private placements with results varying from a 10% premium to a 60% discount with a mean discount of 20%. Johnson also cited four important factors to consider when evaluating potential discounts: positive net income, sales volume, transaction value, and net income strength.

### Finnerty Study[47]

John D. Finnerty, professor of finance at Fordham University, performed two studies to compare the impact of the changes in law regarding restriction periods for private placements that occurred in 1997 and 2008. The first study focused on private placements that occurred in 1997 and resulted in mean and median discounts of 26% and 20%, respectively. The second study focused on private placements from 1997 to 2008 and resulted in mean and median discounts of 22% and 16%, respectively.

### Chaplinsky Purchase Discount and Warrant Study[48]

Susan Chaplinsky's and David Haushalter's 2010 study analyzed private placements with a concentration on contract terms. The study asserts that companies that are riskier and have poorer performance more commonly have private placement contracts with contingency terms rather than just offering a pure discount. The indicated mean discount considering only the purchase discount was 19%, and the median was 15%. The indicated mean discount considering purchase discounts as well as warrants was 17%, and the median was 14%.

### Brophy PIPE Study[49]

David J. Brophy, Paige P. Ouimet, and Clemens Sialm of the University of Michigan performed a 2006 study that compared the effects of issuing private placements to hedge fund investors versus other investors. The study indicated a mean discount of 14% when private placements were issued to hedge funds, but the mean discount when the issuance involved other investors was just 9%.

---

[46] Bruce A. Johnson, "Quantitative Support for Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 18, No. 4, December 1999, 152-155.

[47] John D. Finnerty, "An Average-Strike Put Option Model of the Marketability Discount," *The Journal of Derivatives*, April 19, 2012, 53-69.

[48] Susan Chaplinsky and David Haushalter, "Financing Under Extreme Risk: Contract Terms and Returns to Private Investments in Public Equity," *Review of Financial Studies*, 2010, 23 (7), 2,789-2,820.

[49] David Brophy, Paige Ouimet, and Clemens Sialm, "Hedge Funds as Investors of Last Resort?" workpaper, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=782791.

## Columbia Financial Advisors Study[50]

This study focused on the effect of the Rule 144 holding period reduction to one year. The study considered two periods: January 1, 1996, to April 30, 1997, and May 1, 1997, to December 31, 1998.  The one-year holding period became effective April 29, 1997.  A summary of the study results is presented in the following table.

**Summary of Columbia Financial Advisors Study**

|                        | January 1, 1996 to April 30, 1997 | May 1, 1997 to December 31, 1998 |
|------------------------|:---------------------------------:|:--------------------------------:|
| Number of Transactions | 23    | 15    |
| Low                    | 0.8%  | 0.0%  |
| Mean                   | 21.0% | 13.0% |
| Median                 | N/A   | 9.0%  |
| High                   | 67.5% | 30.0% |

## Meidan Study[51]

Danny Meidan's 2006 study observed PIPE transactions between 1996 and 2003.  The study categorized a total of 1,726 total private placement transactions into three groups: placements issued at discounts greater than 30%, placements issued between a 30% discount and 5% premium, and placements issued at a premium greater than 5%.  The majority of these transactions fell into the 30% discount to 5% premium category at 1,278 placements, or roughly 74% of the total sample.  The weighted average of the mean discounts was calculated as 9.8%.

## Verdasca Study[52]

Andrew Verdasca of the Leonard N. Stern School of Business of New York University performed a 2007 study on a sample of 771 private placement transactions.  The study found a discount range from a 78% discount to a 93% premium, but both the mean and median results indicated discounts of approximately 10%.

---

[50]  Kathryn F. Aschwald, "Restricted Stock Discounts Decline as Result of 1-Year Holding Period," *Shannon Pratt's Business Valuation Update*, Vol. 6, No. 5, May 2000, 1-5.

[51]  Danny Meidan , "The Informativeness of Offer Characteristics Versus Investor Identity in PIPE Transactions," April 2, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=894689.

[52]  Andrew Verdasca , "Common Stock PIPE Discounts and Long-Term Performance," April 2, 2007, www.stern.nyu.edu/cons/groups/content/documents/webasset/uat_024319.pdf.

### Billett & Floros Study[53]

Matthew T. Billett and Ioannis V. Floros' 2012 study focuses on two key features of financial relationships, contract terms and investor identity, in regard to private placements between 2001 and 2008.  These factors were found to both complement and substitute for the other depending on individual circumstances.  By analyzing 12,004 transactions in the PlacementTracker and PrivateRaise databases, the study concluded a median discount of 26.7%.

### Stout Risius Ross Study[54]

Aaron M. Stumpf, CPA/ABV, Robert L. Martinez, and Christopher T. Stallman of the valuation firm Stout Risius Ross performed a study of restricted stock transactions from September 2005 through May 2010, focusing on discounts associated with shorter holding periods.  The chosen time period includes transactions both before and after Rule 144 implementation.  The study found that for all transactions considered, the average and median discounts were 10.9% and 9.3%, respectively.  Stout Risius Ross also found that the most significant and reliable factors influencing discounts were subject company volatility, block size, dividends, profitability, growth, and size.

### Harris-Trugman Study[55]

William Harris, AM of Trugman Valuation Associates, Inc.'s study was performed to analyze the impact of the economic recession on implied restricted stock discounts and the statistical relationships between implied restricted stock discounts and various company-specific variables.  The study originally included 80 transactions of restricted stock sales that took place in 2007-2008.  Due to the volatility of the Rule 144 holding period implementation, an additional 56 transactions were included in 2011.  For the 47 transactions that took place prior to Rule 144 implementation, the average and median discounts were 17.9% and 14.8%, respectively.  The 89 transactions analyzed after the rule implantation had average and median discounts of 15.9% and 14.3%, respectively.  The overall group indicated mean and median discounts of 16.6% and 14.3%, respectively.  The Harris-Trugman study noted that the only company-specific variable that had a notable statistical relationship with the implied discounts was volatility.

---

[53]  Matthew Billett and Ioannis Floros, "Do Investor Identity and Contract Terms Interact? Evidence From the Wealth Effects of Private Placements," workpaper, April 2012, papers.ssrn.com/sol3/papers.cfm?abstract_id=1784498.

[54]  Aaron Stumpf, Robert Martinez, and Christopher Stallman, "The Stout Risius Ross Restricted Stock Study: A Recent Examination of Private Placement Transactions From September 2005 Through May 2010," *Business Valuation Review*, Vol. 30, No. 1, Spring 2011, 36-48.

[55]  William Harris, "Trugman Associates, Inc. (TVA) Restricted Stock Study—An Update," *Business Valuation Review*, Vol. 30, No. 4, Winter 2011, 132-139.

## Summary of Restricted Stock Studies

The restricted stock studies previously mentioned were performed based on data from 1966 to 2010.  Reported mean discounts range from 8.7% to 35.6%.  The average of reported mean discounts was 20.8%, while the median was 19.4%.   Reported median discounts range from 9.0% to 45.0%.  The average of reported median discounts was 19.9%, while the median was 15.3%.

Some of the variation in the studies has to do with the specific periods analyzed.  Prior to April 1997, the SEC-required holding period for restricted stocks was two years.  That was decreased to one year on April 29, 1997.  Similarly, the holding period was reduced from one year to six months effective February 15, 2008.

The following table shows the summary statistics for studies based upon the period studied.

### Analysis of Restricted Stock Studies for Different Periods

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | Mean | Median |
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |
| | | |

The studies also cited several company and security specific factors in determining the estimated discount.

**PRE-IPO STUDIES**

In recent years, a number of pre-IPO studies were performed to support marketability discounts. The methodology applied in these studies is based on the initial offering price (the price prior to public trading). This price is reduced by the price per share at the time of the last private transaction (which must be less than five months prior to the initial offering to qualify for the study) and adjusted by an appropriate index to account for related market or sector movements over the five-month period. The resulting amount is divided by the initial offering price to arrive at the appropriate discount. The pre-IPO methodology of determining marketability discounts is a relevant method as private stockholders experience an inability to freely sell their stock in the open market, similar to restricted stockholders. Furthermore, private stockholders differ from unrestricted public stockholders, much like restricted stockholders, because there is not a public forum in which investments can be easily liquidated (which is only one of the differences between private and public stockholders).

*Emory Studies*

John Emory, Sr., ASA began his pre-IPO studies with Baird & Co. and continued his studies with his own firm, Emory Business Valuation, LLC. Emory has completed nine studies with the original published in June 1986. The first eight studies eliminated development-stage companies, companies with historical operating losses and companies with IPO prices less than $5 per share. The ninth study deviated from the previous studies as follows:

- Included only companies with "com" in their names

- Review period was increased from 18 months in the previous studies to 35 months

- All transactions were actual sales as opposed to the previous studies that included options

- Most of the companies did not have earnings

The study consisted of 53 transactions. The mean and median discounts by study are presented in the following chart.



**Willamette Management Associates Pre-IPO Study**

This study observed 556 companies and 1,007 transactions from 1975 through 1997.  The adjusted mean discount[56] for each time period varied from 28.9% to 56.8%.  The mean for the entire review period was 44.2%.  The median discount range was from 31.8% to 73.1% with the overall median at 50.4%.  The Willamette study found the standard mean discount was greater than 35% for all but three of the 14 periods in the study and that median discounts exceeded 40% in all but one year.

**Valuation Advisors Pre-IPO Study**

Two studies were conducted by Valuation Advisors for the calendar years of 1999 and 2000.  The mean discount of these studies was 48.9%.  The key feature of this study was the inclusion of holding period based upon the length of time between the private transaction and the IPO.  The study confirmed the author's initial hypothesis that higher discounts accompany longer holding periods.

**APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST**

While there are potential application problems associated with various studies, especially the pre-IPO studies, a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest.  The mean and median discounts from the restricted stock studies ranged from 9% to 45%.  The findings of the restricted stock studies as well as additional private placement studies by Hertzel and Smith suggest discounts can vary greatly depending on size, profitability and other company or security specific factors.

---

[56]    Excluded highest and lowest deciles of indicated discounts

The latest restricted stock studies indicate mean and median marketability discounts in 14% range.  We view the latest restricted stock studies as shorter term and therefore have taken the full sample of restricted stock studies into account in our analysis.  Our analysis compares these interests to the comparable transactions and makes adjustments from the baseline discounts noted in the comparable transactions.  Since the latest one-year study does not measure restricted securities with similar hold periods relative to the vast majority of other discount studies and since it has a relatively small sample size, we relied upon all the restricted stock studies' findings as the basis for our comparison.

The pre-IPO studies may be less indicative of appropriate marketability discounts, as much of the differences in the transaction prices between pre-IPO and IPO may include event premiums, such as the securing of additional capital which promotes the viability of the company.  We did not use these studies for our analysis.

### Factors Affecting Marketability

Based on the SEC Study, we noticed that as company size and profitability decreases, the marketability discount associated with restricted stock in these companies increase.  We also note that various other factors affected discounts observed in the other studies.  Most notably, the following affect marketability discounts:

- Increase in dividend payment decreases marketability discounts
- Increase in the size of interest and amount of control decreases discounts
- Increase in financial strength of the company decreases discounts
- Increase in restrictions increases marketability discounts

Given the characteristics of size, lack of distribution history, etc., we concluded a 20.8% marketability discount, with a standard deviation of 8.2%, as the baseline observed from all the restricted stock studies we reviewed.

### DISCOUNT ADJUSTMENT DISCUSSION

In the following sections, we adjust the marketability discount to reflect the attributes of the Subject Interest.

The analysis originates with the baseline discount concluded in the previous section.  Then, our analysis reviews several factors that affect marketability for both the interests being valued and the comparable interest which provides the base of comparison.  Each interest is assigned a ranking from 1 to 5 (from Poor to Strong) based upon the respective feature.  Then, the feature ranking for the Subject Interest is subtracted from the feature ranking from the comparable interest.  This results in a range of outputs from -4 to +4

(from significantly worse to significantly better). The output is then multiplied by the standard deviation of the restricted stock studies (lack of marketability) to give an indication as to the adjustment necessary to the baseline discount based upon this feature. An importance factor (from low to high) is also attributed to each feature to provide a final scaling factor for the specific feature.

Once the individual feature scaling factors are computed, the baseline discounts are adjusted upward and downward by multiplying the baseline discount by the product of all relevant feature scaling factors.

## SUBJECT INTEREST DISCOUNT CALCULATION

### *Adjustment Analysis – Marketability*

The Subject Interest is characterized by a lack of rights and, is therefore, somewhat riskier and more volatile. The Membership Interest has restrictions on the transfer of the interest and only have a claim in respect of the underlying assets in a winding up.

The 20.8% baseline lack of marketability discount of the comparable investments reflects the discount that would apply to the Subject Interest if it had illiquidity features similar to restricted stock. Since the Subject Interest did not exhibit these exact characteristics, further adjustments were necessary to conclude fair market value.

Schedule C.3 summarizes the differences between the Subject Interest and the comparable investments used in our analysis. Overall, these factors resulted in a modest decrease in the discount from the baseline.

Based on the analyses and procedures outlined herein, we concluded that a lack of marketability discount of 20.0% is appropriate for the Subject Interest.

**FAIR MARKET VALUE CONCLUSION**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**

**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | 20.0% | ($408,339) | *Schedule C.4* |
| **Value of Subject Interest, Minority, Non-Marketable** | | **$1,637,192** | |

Our conclusion of value implies an expected payback period of 1.27 years for the Subject Interest.  Our conclusion of value is presented in the Summary Schedule as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report.  We relied on information received as indicative of the Company as of the Valuation Date.  We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation.  Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data.  Our analysis was based in part on this information as well as on other data we developed.  We have no obligation to update this report or our conclusion of value for information that comes to our attention after the date of this report.

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, LLC is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated.  They should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever.  Notwithstanding the foregoing, the valuation report and its contents may be disclosed to third parties, including potential investors, acquirers, and advisors, to establish the fair market value of the Company or in connection with transactions involving the Company, without requiring prior written consent from ValueScope, LLC.  Additionally, the Company may distribute this report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, LLC, and we shall have no responsibility for any such unauthorized change.

The valuation report has been prepared based on specific assumptions, methodologies, and data outlined herein.  This report may be used alongside other appraisals or studies for comparative or analytical purposes.  The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts.  The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, other than as expressly permitted herein, without the express written consent of ValueScope, LLC.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

**OPERATIONAL ASSUMPTIONS**

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

**COMPETENT MANAGEMENT ASSUMED**

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership.  This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

**NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION**

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement.  If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, LLC must be made in advance. ValueScope, LLC reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s).  We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

## NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE

No opinion is rendered as to legal fee or property title.  No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

## LIENS AND ENCUMBRANCES

ValueScope will give no consideration to liens or encumbrances except as specifically stated.  We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks.  We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

## INFORMATION PROVIDED BY OTHERS

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain.  All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

## PROSPECTIVE FINANCIAL INFORMATION

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted.  Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA).  We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation guidelines.

## REGULATORY AND ENVIRONMENTAL CONSIDERATIONS

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

## POTENTIAL FUTURE SALES

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided.  An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time.  Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

**INDEMNIFICATION BY THE COMPANY**

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement.  Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement.  In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

**APPRAISAL CERTIFICATION**

I certify that, to the best of my knowledge and belief:

1.  We have not inspected certain assets, properties, or business interests encompassed by this appraisal.

2.  We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.

3.  We have no personal interest or bias with respect to the subject matter of this report or the parties involved.

4.  Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.

5.  To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.

6.  No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.

7.  The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.

8.  This report and analysis were prepared under the direction of Steven C. Hastings.

9.  I am in compliance with all professional appraisal certifications and licensing.

10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.


By:     ValueScope, LLC


Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, LLC

## APPENDIX A
## KEY COMPANY AGREEMENT PROVISIONS

1. With the meaning and for purposes of the Act, the purpose and scope of the Company shall include any lawful action or activity permitted to a limited liability company under the Act, as determined by the Manager. [Section 2.3]

2. Except as otherwise provided in this Agreement, Profits and Losses for each Fiscal Period shall be allocated as follow: (a) Profits shall be allocated among the Members in the following order and priority: (i) First, among the Members on a pro rata basis so as to reverse prior allocations of Losses for prior Fiscal Periods under Sections 4.1(b)(ii) until cumulative Profit allocated under this Section 4.1(a)(i) equals the cumulative Losses allocated under Section 4.1(b)(ii); and (ii) Second, among the Members in proportion to their Allocation Percentages. [Section 4.1(a)]

3. The Manager may at any time in its sole discretion to the extent the Company has cash and any property available for distribution taking into account current and anticipated needs (including without limitation operating expenses, debt service, guaranteed payments and a reserve for future operating costs), distribute such excess cash and any property available for distributions to the Members in accordance with their respective Allocation Percentages. [Section 5.1(b)]

4. Except as otherwise specifically provided in this Agreement, the Company and its business shall be managed, controlled and operated exclusively by the Manager, which shall be the "manager" of the Company within the meaning of Section 18-101 of the Act and shall have all of the powers and authority in respect of the Company permitted to managers under the Act. [Section 6.1]

5. The initial Manager shall be Mark Patrick. In the event that Mark Patrick dies or is unable to serve as such, the will or other testamentary documentation for Mark Patrick shall designate a successor Manager. To the extent that the will or other related documentation for Mark Patrick fails to provide for a successor Manager or if any such designated individual shall be unable or is unwilling to fill such position, the managing shareholder of Charitable DAF HoldCo, Ltd., shall appoint a successor Manager. To the extent that Mark Patrick desires to resign as Manager, he shall appoint his successor. [Section 6.2]

6. Notwithstanding any provision of this Agreement to the contrary, any contract agreement, deed, lease, note or other document or instrument executed on

behalf of the Company by a Manager shall be deemed to have been duly executed by the Company; no Member's signature shall be required in connection with the foregoing and third parties shall be entitled to rely upon the Manager's power to bind the Company without otherwise ascertaining that the requirements of this Agreement have been satisfied. [Section 6.3(a)]

7.  To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement the Manager is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the Manager shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in its "good faith" or under another express standard, the Manager shall act under such express standard and shall not be subject to any other or different standard. [Section 6.3(c)]

8.  Except as set forth in Section 6.2, no Member shall have any right to vote with respect to any Company action. [Section 6.4]

9.  To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing. [Section 6.5]

10. The Company shall maintain true and proper books, records, reports, and accounts in which shall be entered all transactions of the Company. The Company shall also maintain all schedules to this Agreement and shall update such schedules promptly upon receipt of new information relating thereto. Notwithstanding anything in Section 18-305 of the Act, except as provided in Section 6.8(b), no Member shall have any right to review or inspect any of the books or records of the Company or receive any other Company information. [Section 6.8(a)]

11. To the fullest extent permitted by law, a Member shall not Transfer all or any portion of its Interest without the prior written consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion. [Section 7.1]

12. No Member shall resign from the Company or otherwise cease to be a Member without the consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion. [Section 7.2]

13. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal amount of the Fair Market Value of such Member's Interest being redeemed, as determined by the Manager in its sole discretion. [Section 7.3]

14. There shall be no requirement of annual or periodic meetings of the Company's members or managers within the meaning of the Act. [Section 10.1]

15. Any action of the Manager may be taken by written consent of the Manager. Any consent or approval required by this Agreement to be "written" may also be made by the use of electronic transmission. [Section 10.2]

16. This Agreement may be amended, in whole or in part, only through a written amendment executed by the Manager. [Section 10.4]

# APPENDIX B
## QUALIFICATIONS OF THE APPRAISER

*Steven C.  Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA*
**Principal**
**shastings@valuescopeinc.com, 817-481-4901**

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

## EMPLOYMENT HISTORY

*2006 – Present*                                                                                   *ValueScope, LLC*

*Principal*
Mr.  Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis.  As a CPA with significant valuation and financial reporting experience, Mr.  Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

*2001 – 2006*                                                                                   *Value Capital, LLC*

*Principal*
Mr.  Hastings served as a principal with Value Capital, LLC.  During his tenure at Value Capital Mr.  Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries.  He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions.  His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000*                                          *Finance Commission of Texas*

*Director*
The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner.  As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets.  Mr.  Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight  for  compliance  with  Texas's  banking  rules  and  regulations.   He  was

instrumental in assisting the Savings and Loan Department in writing new Mortgage Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001*                                                                 *MedCare Financial Solutions, Inc.*

*President*
Mr.  Hastings served as an officer of MedCare Financial Solutions, Inc.  and MedCapital Funding Corporation.   MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers.   MedCare Financial Solutions provided other financial and operational services to health care providers.   These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending.   Mr.  Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

1986 – 1994                                                                              *H.D.  Vest Financial Services*

*Executive Vice President and CFO*
As executive vice president and CFO of H.D.  Vest Financial Services, Mr.  Hastings assisted in placing over $1.5 billion annually in investment.  Responsible for day-to-day financial operations and capital structuring, Mr.  Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers.  Mr.  Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr.  Hastings supervised stockbrokers' and investment advisors' day-to-day activities.  As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies.  Being licensed in life, disability, health, property and casualty insurance, Mr.  Hasting was instrumental in implementing this line of business at HD Vest.

1979 – 1986                                                                                     *Arthur Andersen & Co.*

*Senior Manager*
Mr.  Hastings served as a senior manager with significant responsibilities in the several industries.  He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona

Bachelor of Science - Indiana University, Bloomington, Indiana

**CERTIFICATIONS AND LICENSES**

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

**ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS**

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

**RECENT IRS CASES - OFFICE OF CHIEF COUNSEL**

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.
- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.
- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C.  Docket No.  1045-13, Estate of Jinana M.  Bowey, et al, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.
- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C.  Docket No.  8401-13, Estate of Edward S.  Redstone, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.
- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C.  Docket No.  223630-12, Michael Tricarichi, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C.  Docket No.  6936-10, et al, John M.  Alterman, et al, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No.  8097-13, *Sumner Redstone, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.*
- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No.  20177-11, *Richard H.  Cullifer, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.*
- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

**RECENT IRS CASES – LMSB AUDIT DIVISION**

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.
- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.
- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.
- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.
- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

**RECENT DEPARTMENT OF JUSTICE CASE**

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America.  Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No.  4:16-cv-03302, ALPC Services of Texas, Inc.  v.  United States of America and Internal Revenue Service.  Valuation issues report, 2017.
- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No.  12-844, *The Estate of David W.  Longaberger v. The United States.*  Valuation issues report, 2014.

**RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS**

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al.  Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.
- Expert Report June 2018
- Deposition Testimony May 2019

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al. Fraudulent transfer, solvency and economic damages.
- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.
- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No. CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al. Economic damages related to lost wages.
- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No. 2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.
- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No. 14-671C. Always at Market, Inc. v. United States of America (DOD/DOJ). Army & Air Force Exchange Service economic damages.
- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No. CV-05-1483, General Medicine, PC v. Healthsouth Corporation v. General Medicine, PC. Economic damages related to contract dispute.
- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

 "Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International


**WHITE PAPERS**

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v.  Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

**SCHEDULES**

**CDMCFAD, LLC**
**Table of Contents**

**Valuation Date: March 25, 2025**

| Table of Contents | |
|---|---|
| **Schedule Name** | **Schedule** |
| **Valuation Summary and Conclusion** | Summary Schedule |
| | |
| **Historical Financial Analysis** | |
| Historical Distributions Table | Schedule A.1 |
| Historical Distributions Charts | Schedule A.2 |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.3 |
| | |
| **Income Approach Analysis** | |
| Synthesis of Net Cash Flow | Schedule B.1 |
| Sensitivity Analysis - Hypothetical Risk-Free Bond | Schedule B.2 |
| | |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Restricted Stock Studies | Schedule C.1 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.2 |
| DLOM Qualitative Scoring | Schedule C.3 |
| Calculation of Marketability Discounts | Schedule C.4 |
| DLOM Footnotes and Comments | Schedule C.5 |

| CDMCFAD, LLC | Summary Schedule |
|---|---|
| **Valuation Summary and Conclusion** | **Valuation Date: March 25, 2025** |

*Synthesis of Fair Market Value*

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | **Value** | **Reference** |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| **Value of Subject Interest, Minority, Non-Marketable** | | **$1,637,192** | |

| CDMCFAD, LLC | Schedule A.1 |
|---|---|
| **Historical Financial Analysis** | **Valuation Date: March 25, 2025** |

*Historical Distributions Table*

| Quarterly Distributions - Previous 5 Years | |
|---|---|
| **Quarter** | **Total** |
| **31-Mar-19** | $90,750 |
| **30-Jun-19** | 90,125 |
| **30-Sep-19** | 84,875 |
| **31-Dec-19** | 553,300 |
| **2019 Subtotal** | **$819,050** |
| **31-Mar-20** | 62,750 |
| **30-Jun-20** | 66,500 |
| **30-Sep-20** | 65,500 |
| **31-Dec-20** | 424,300 |
| **2020 Subtotal** | **$619,050** |
| **31-Mar-21** | 77,625 |
| **30-Jun-21** | 91,375 |
| **30-Sep-21** | 97,375 |
| **31-Dec-21** | 568,075 |
| **2021 Subtotal** | **$834,450** |
| **31-Mar-22** | 104,125 |
| **30-Jun-22** | 116,125 |
| **30-Sep-22** | 112,750 |
| **31-Dec-22** | 635,950 |
| **2022 Subtotal** | **$968,950** |
| **31-Mar-23** | 107,875 |
| **30-Jun-23** | 102,750 |
| **30-Sep-23** | 106,625 |
| **31-Dec-23** | 633,631 |
| **2023 Subtotal** | **$950,881** |
| **31-Mar-24** | 106,467 |
| **30-Jun-24** | 105,127 |
| **30-Sep-24** | 106,202 |
| **31-Dec-24** | **TBD** |
| **2024 Subtotal** | **$317,796** |
| **Grand Total (2019 - 2024)** | **$4,510,177** |

Note:  Payments are typically made two to three months following the end of each period.

| CDMCFAD, LLC | Schedule A.2 |
|---|---|
| **Historical Financial Analysis** | **Valuation Date: March 25, 2025** |

*Historical Distributions Charts*





Note: Q4 2024 distributions have not yet been paid

| CDMCFAD, LLC | Schedule A.3 |
|---|---|
| **Historical Financial Analysis** | **Valuation Date: March 25, 2025** |

*CLO HoldCo, Ltd - Summary Balance Sheet*

|  | Balance Sheet as of: | |
|---|---|---|
|  | **9/30/2024** | |
|  | **Actual** | **%** |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

**CDMCFAD, LLC** — Schedule B.1
**Income Approach Analysis** — Valuation Date: March 25, 2025

*Synthesis of Net Cash Flow*

| | | **For the Projected Period Ending:** | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
| Projected Distributions | | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ WACC = | 68.3% | 0.9663 | 0.8484 | 0.7449 | 0.6540 | 0.5742 | 0.5041 | 0.4426 | 0.3886 | 0.3412 | 0.2995 | 0.2630 | 0.2309 | |
| **Present Value (PV) Net Cash Flow** | | **$613,430** | **$90,926** | **$77,423** | **$69,593** | **$373,598** | **$55,377** | **$47,153** | **$42,384** | **$227,533** | **$33,726** | **$28,718** | **$25,813** | |

| | |
|---|---|
| PV net cash flow | $1,685,675 |
| PV residual value | $359,856 |
| **Value of Subject Interest, Minority, Marketable** | **$2,045,531** |
| Less: Discount for Lack of Marketability | |
| *(see schedule C.4)* | 20.0% |
| **Value of Subject Interest, Minority, Non-Marketable** | **$1,637,192** |

| Key Valuation Statistics | |
|---|---|
| CLO HoldCo Net Asset Value | $269,052,808 |
| Implied Discount for Lack of Control | 99.2% |
| Valuation as a % of NAV | 0.6% |
| Estimated Payback Period (Years) | 1.27 |

**Residual Value - Gordon Growth Model**

| | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 68.3% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 1.5x |
| Residual value : | $1,558,568 |
| x PV factor : | 0.2309 |
| PV residual value : | $359,856 |

**CDMCFAD, LLC**
**Income Approach Analysis**

**Schedule B.2**
**Valuation Date: March 25, 2025**

*Sensitivity Analysis - Hypothetical Risk-Free Bond*

| | | For the Projected Period Ending: | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
| Projected Distributions | | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ Risk Free Rate = 4.7% | | *0.9970* | *0.9858* | *0.9746* | *0.9636* | *0.9527* | *0.9420* | *0.9313* | *0.9208* | *0.9104* | *0.9001* | *0.8899* | *0.8799* | |
| **Present Value (PV) Net Cash Flow** | | **$632,896** | **$105,644** | **$101,300** | **$102,540** | **$619,894** | **$103,473** | **$99,219** | **$100,433** | **$607,158** | **$101,348** | **$97,180** | **$98,370** | |

| | |
|---|---|
| PV net cash flow | $2,769,456 |
| PV residual value | $41,969,350 |
| **Value of Subject Interest, Minority, Marketable** | **$44,738,806** |
| Less: Discount for Lack of Marketability | 20.0% |
| *(see schedule C.4)* | |
| **Value of Subject Interest, Minority, Non-Marketable** | **$35,807,821** |

| Key Valuation Statistics | |
|---|---|
| CLO HoldCo Net Asset Value | $269,052,808 |
| Implied Discount for Lack of Control | 83.4% |
| Valuation as a % of NAV | 13.3% |
| Estimated Payback Period (Years) | 26.53 |

| Residual Value - Gordon Growth Model | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 4.7% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 46.5x |
| Residual value : | $47,699,415 |
| x PV factor : | *0.8799* |
| PV residual value : | $41,969,350 |

**CDMCFAD, LLC**
**Discount for Lack of Marketability (DLOM) Analysis**

Schedule C.1
Valuation Date: March 25, 2025

*DLOM Determination - Restricted Stock Studies*

| | | Study | Period Covered | | | Observations | Reported | Reported |
|---|---|---|---|---|---|---|---|---|
| | Name of Study | Date | From | To | Sub-Sample | | Mean | Median |
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

Restricted Stock Studies

**CDMCFAD, LLC**
**Discount for Lack of Marketability (DLOM) Analysis**     **Valuation Date: March 25, 2025**

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | Mean | Median |
|---|---|---|
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |
| | | |

| CDMCFAD, LLC | Schedule C.3 |
|---|---|
| Discount for Lack of Marketability (DLOM) Analysis | Valuation Date: March 25, 2025 |

*DLOM Qualitative Scoring*

| Feature | Restricted Stock | Rating | Discount for Lack of Marketability (DLOM) Analysis | Rating | Advantage |
|---|---|---|---|---|---|
| Asset liquidity | Securities examined in marketability studies often are of smaller industrial operating companies, often with poor cash flows. | Fair | A majority of investments are in illiquid securities with poor cash flows. However, CLO HoldCo has approximately $91 million in net cash, representing approximately 34% of net asset value. | Strong | Better |
| Cash flow expectations | Restricted securities typically have a lower likelihood of paying dividends since they are associated with emerging companies. | Fair | Distributions are entirely dependent on manager discretion as to the timing and amount. Distributions are not required. However, regular distributions have been made over the last five years. | Good | Slightly better |
| Contingent liabilities | Moderate probability of contingent liabilities depending on type of company and size.  Smaller companies can fall prey to securities litigation. | Fair | Higher probability of contingent liabilities. CLO HoldCo has been engaged in numerous litigation matters. | Weak | Slightly worse |
| Debt capacity | Company leverage is usually on the higher side, as they are typically in the emerging stage. | Weak | CLO HoldCo has a small amount of debt representing 15% of net asset value. | Good | Better |
| Redemption/ withdrawal | No redemption rights. | Poor | No redemption rights. | Poor | Equal |
| Transfer restrictions | Transfer restrictions are limited to securities laws, with holding periods of two years.  Holding period was shortened to one year in 1997, but studies generally relate to two year holds. Once the restriction time period is complete, no restrictions on transfer exist. Markets are liquid for non-restricted shares. | Fair | Transfers must be approved by the managers. | Poor | Worse |
| Value of entity | Companies range in size, however, restricted securities are more commonly utilized by smaller companies in the development stage. Approximately 50 percent of the companies issuing restricted stock included in the Silber study had sales less than $40 million. | Fair | Members have extremely limited rights to the underlying net asset value. CLO HoldCo is expected to generate revenue well in excess of the expected distributions. | Good | Slightly better |
| Value of interest | Purchasers of restricted securities tend to be institutional or private investors that are active in the public markets.  The analysis associated with these types of securities precludes small holders from purchasing. Size of interests tend to be moderate. | Fair | At the manager's discretion, members may be diluted through the issuance of additional membership interests to non-existing members. | Poor | Worse |

| CDMCFAD, LLC | Schedule C.4 |
|---|---|
| **Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: March 25, 2025** |

*Calculation of Marketability Discounts*

| Feature | Net Advantage | Gross Adjustment | Importance | Weight | Adjustment | Scaling Adjustment | Final Adjustment |
|---|---|---|---|---|---|---|---|
| | | | | | | F = 1+E or | |
| | A (Schedules B) | B = F(A) | C | D = F(C) | E = B x D | 1/(1-E) | |
| **Marketability Factors** | | | | | | | |
| Asset liquidity | Better | -16% | High | 100% | -16% | 86% | -2.9% |
| Cash flow expectations | Slightly better | -8% | High | 100% | -8% | 92% | -1.4% |
| Contingent liabilities | Slightly worse | 8% | High | 100% | 8% | 108% | 1.4% |
| Debt capacity | Better | -16% | Low | 25% | -4% | 96% | -0.7% |
| Redemption/ withdrawal | Equal | 0% | High | 100% | 0% | 100% | 0.0% |
| Transfer restrictions | Worse | 16% | High | 100% | 16% | 116% | 2.8% |
| Value of entity | Slightly better | -8% | Medium | 50% | -4% | 96% | -0.8% |
| Value of interest | Worse | 16% | Low | 25% | 4% | <u>104%</u> | <u>0.8%</u> |
| **Net Scaling Adjustment** | **G = Product (F$_i$), i = 1 to n** | | | | | **96%** | **-0.8%** |

| **Marketability Discount** | | | | | | | |
|---|---|---|---|---|---|---|---|
| Unadjusted discount | H (See Report) | | | | 20.8% | | |
| Scaling adjustment | G (See above) | | | | <u>96%</u> | | |
| **Concluded Marketability Discount** | **I = G x H** | | | | | **20.0%** | |

**CDMCFAD, LLC**                                              **Schedule C.5**
**Discount for Lack of Marketability (DLOM) Analysis**        **Valuation Date: March 25, 2025**

*DLOM Footnotes and Comments*

---

**A)**   Our comparison matrix ranks the features of the Subject Interest and the comparable interests on a scale from 1 to 5.

1 = Poor   2 = Weak   3 = Fair   4 = Good   5 = Excellent

We then subtract the Subject Interest feature score from the comparable feature score to determine the advantage.

0 = Equal   1 = Slightly Better    2 = Better          3 = Much Better      4 = Significantly Better
            -1 = Slightly Worse   -2 = Worse          -3 = Much Worse      -4 = Significantly Worse

**B)**   B is calculated as the weighted average standard deviation of the comparable investments in closed end funds multiplied by the Advantage Score.

**C)**   The importance of the feature is assessed.
1 = Low                 2 = Medium          3 = High

**D)**   Weights are allocated as follows:
Low = 25%              Medium = 50%        High = 100%

**E)**   To compute the adjustment, B is multiplied by D.

**F)**   The scaling adjustment is computed as 1+E if E > 0 or 1/(1-E) if E < 0 for the particular feature.

**G)**   The net scaling adjustment for marketability factors is the product of all marketability features' scaling adjustments.

**H)**   This is the concluded baseline marketability discount determined for comparable investments.

**I)**   This is the baseline marketability discount multiplied by the scaling factor.

# EXHIBIT 94

CB-407515

# Certificate Of Incorporation

I, **JOY A. RANKINE**  Assistant Registrar of Companies of the Cayman Islands
DO HEREBY CERTIFY, pursuant to the Companies Act,  that all requirements of the said
Act in respect of registration were complied with by

**CDH GP, Ltd.**

an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect from the
27th day of February Two Thousand Twenty-Four

Given under my hand and Seal at George Town in the
Island of Grand Cayman this 27th day of February
Two Thousand Twenty-Four



**Assistant Registrar of Companies,**
**Cayman Islands.**

Authorisation Code : 241009667437
www.verify.gov.ky
28 February 2024

| | e e r |
|---|---|

1 Supervision Order in the Grand Court of the Cayman Islands FSD2025-0116 ( A )
2 Curriculum Vitae of Margot MacInnis
3 Certificate of Incorporation - Charitable DAF Holdco, Ltd
4 Charitable DAF HoldCo Articles of Association
5 Amended and Restated Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd
6 Register of Members Charitable DAF Holdco Ltd
7 Resolutions of the Sole Director (100 mgmt shares)
8 Share Transfer (100 Mgmt Shares) from Grant ames Scott to Mark E. Patrick
9 Director Resolutions - Appointment of Paul Murphy
10 Director Report of Charitable DAF Holdco, Ltd
11 IRS Determination Letter to Highland Dallas Foundation
12 Share Transfer Form
13 Highland Dallas Foundation Share Transfer
14 IRS Determination Letter to Highland Kansas City Foundation
15 Highland Kansas City Foundation Share Transfer
16 IRS Determination Letter to Highland Santa Barbara Foundation
17 Highland Santa Barbara Foundation Share Transfer
18 IRS Determination Letter to CFNT
19 Share Transfer Form of CFNT
20 DFW Share Transfer
21 Director Resolutions (Share Issuance to DFW)
22 December 2023 Register of Directors of Charitable DAF Holdco Ltd
23 Highland Dallas Foundation SO Agreement
24 Highland Kansas City Foundation SO Agreement
25 Highland Santa Barbara Foundation SO Agreement
26 Highland Dallas Foundation Certificate of Formation
27 Highland Kansas City Foundation Certificate of Formation
28 Highland Santa Barbara Foundation Certificate of Formation
29 Highland Dallas Foundation By-Laws
30 Highland Kansas City Foundation By-Laws
31 Highland Santa Barbara Foundation By-Laws
32 Structure chart of the DAF Structure prior to the Relevant Transactions
33 Structure chart of the DAF Structure after to the Relevant Transactions
34 Certificate of Registration of Charitable DAF Fund LP
35 A R Exempted Limited Partnership Agreement of Charitable DAF Fund, LP
36 Second A R Exempted Limited Partnership Agreement of Charitable DAF Fund, LP
37 Charitable DAF GP LLC Managing Member Consent to Assignment to CDH GP Ltd
38 Section 10- Replacement of Charitable DAF GP LLC
39 Register of Members for CDH GP Ltd
40 CLO HoldCo, Ltd Register of Members as of 5.19.2021
41 CLO HoldCo, Ltd CORIS Report
42 CLO HoldCo, Ltd - Members Articles of Association
43 CLO HoldCo, Ltd Certificate of Incorporation
44 Director Resolutions to Transfer Fund from HoldCo to CDM for CDM Shares
45 Deed of Assignment Assumption to CDM
46 Director Resolutions - Redemption of CDM Shares
47 CDM Certificate of Formation
48 CDM LLC Agreement
49 Certificate of Incorporation of DFW Charitable Foundation
50 March 2025 ValueScope Valuation of Participation Shares of HoldCo
51 September 2024 ValueScope Valuation
52 Letter Agreement
53 CDM Redemption Agreement (Amendment 1)
54 CDM Redemption Agreement (Amendment 2)
55 CDM Manager Consent to Admission and Redemption
56 Expenses
57 09.13.2024 Director Resolutions re. M. Patrick Compensation
58 10.01.2024 - Director Resolutions re. M. Patrick Compensation
59 Statement of Claim
60 No Confidence Letter
61 Email from Mr Murphy to Mr Patrick
62 Email from Walkers to the Directors
63 Walkers Presentation - Participating Shareholder Rights Charitable DAF HoldCo Ltd
64 Emails ( ulie Diaz, Paul Murphy, Michael Stockham)
65 Charitable DAF Holdco Resolutions re Voluntary Liquidation
66 Walkers Letter re Charitable DAF Holdco in Voluntary Liquidation
67 Supervision Petition in the Grand Court of the Cayman Islands FSD 2025-0116 ( A )
68 Charitable DAF HoldCo - Gazette - Notice of Appointment OL
69 Charitable DAF HoldCo - Compass - Notice of First Meeting of Contributories
70 February 14, 2025 Seyfarth Letter
71 February 27, 2025 H K Letter
72 Seyfarth Letter to IRS
73 Director Resolutions - Assignment of Contracts to CDM

74  Sole Voting Shareholder Resolutions (Voluntary Liquidation)
75  March 2025 Emails (D. Mancion   D. Rosenberg)
76  April 2025 Emails (D. Mancion   D. Rosenberg)
77     E Petition
78  Companies Act
79  Winding Up Rules
80  Filed Resolutions re Change of Registered Office - Charitable DAF Holdco, Ltd
81  Various May   une 2025 Letters and Drafts of the Protocol
82  Injunction Application
83  Hr g Tr. 132:10-11, In re Highland Capital Management, L.P., No. 19-34054-sgj-11, Bankr. N.D. Tex. (Dallas Div.)  un. 8, 2021, ECF No. 2440
84  Charitable DAF Fund, LP Register of Members as of 5.19.2021
85  Supporting Organizations Texas Business Court TRO Petition
86  Paul Murphy 12.4.2024 Presentation Slides
87  12.18.2024 Carrington Coleman Email
88  Proposed Order (Rule 11 Agreement)
89  Final Rule 11 Agreement
90  Defendants MTD    Plea to the  urisdiction
91  Haynes    Boone Memo
92  Mark Patrick Employment Agreement
93  March 2025 ValueScope Valuation Membership Interests of CDM
94  Certificate of Incorporation - CDH GP, Ltd.