IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 19-34054-SGJ-11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Chapter 11 |
| Debtor. | April 24, 2026 |
| | 9:36 A.M. |

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE BRAD W. ODELL
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor: Willkie Farr & Gallagher LLP
BY: MARK STANCIL, ESQUIRE
1875 K Street, NW
Washington, DC 20006
(202) 303-1133

Pachulski Stang Ziehl & Jones LLP
BY: JOHN A. MORRIS, ESQUIRE
1700 Broadway, Suite 36th Floor
New York, New York 10019
(212) 561-7760

APPEARANCES CONTINUED ON THE NEXT PAGE.

Audio Recorder: Nicholas Noble
Earle Cabell Federal Building
501 West 10th Street
Dallas, Texas 75242

Transcription Service: Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES (CONTINUED):

For Shields Legal Group, P.C., CLO Holdco, Ltd., Kelly Hart & Pitre ("HMIT Entities"):

Kelly Hart & Pitre
BY: LOUIS M. PHILLIPS, ESQUIRE
301 Main Street, Suite 1600
Baton Rouge, Louisiana 70801
(225) 381-9643

Kelly Hart & Pitre
BY: AMELIA L. HURT, ESQUIRE
301 Main Street, Suite 1600
Baton Rouge, Louisiana 70801
(504) 434-6742

For Dugaboy Investment Trust:

Morgan Lewis
BY: MICHAEL EDNEY, ESQUIRE
1717 Main Street, Suite 3200
Dallas, Texas 75201
(214) 466-4000

For the Dondero Entities:

Stinson LLP
BY: DEBORAH ROSE DEITSCH-PEREZ, ESQUIRE
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
(214) 560-2201

(The proceedings commenced at 9:36 a.m.)

THE COURT: The Court is going to call the case, we're here on a special setting in the Highland Capital Management case, Case Number 19-34054. We're here on a motion for protective order filed by the Debtor Highland Capital Management. And then we have joinder by several parties with a response by Dugaboy Investment Trust.

We're also here on a motion to quash which was filed by Shields Legal Group, CLO Holdco, and Kelly Hart & Pitre. And I believe we have responses to that, as well.

So let me start off by taking appearances. Let me first get appearances for the Debtor.

MR. STANCIL: Thank you, Your Honor.

Mark Stancil from Willkie Farr & Gallagher for the Debtor. And I'm joined as well by my colleagues at my firm plus Mr. Morris and his colleagues from Pachulski Stang Ziehl & Jones. And our client Mr. Seery and his team are also on the line today.

THE COURT: Okay. And then let me get appearances on behalf of what I'm going to refer to as the "HMIT Entities."

MR. PHILLIPS: Good morning, Your Honor.

Louis M. Phillips, Kelly Hart, on behalf of the HMIT Entities. And also, Your Honor, would you like for me to make an appearance in connection with the Shields Law firm, Kelly Hart, and CLO Holdco, or just the HMIT Entities at this point?

THE COURT: No, Mr. Phillips. If you're going to be appearing on behalf of the Shields Law Firm, you're welcome to make an appearance on that, as well.

MR. PHILLIPS: Yes, Your Honor. I'm making an appearance for the HMIT Entities, the Shields Law Firm, Kelly Hart, and also CLO Holdco. And my workmate, Amelia Hurt from Kelly Hart, is on the phone. Also, client representative Mark Patrick is on the call, as well.

THE COURT: Okay. All right. And then appearances on behalf of the Dugaboy Trust?

MR. EDNEY: Good morning, Your Honor.

This is Michael Edney from the Morgan Lewis Law Firm on behalf of the Dugaboy Investment Trust. I am joined by Michael Gattis from the King Spalding Law Firm. Mr. Harper from King Spalding Law Firm was not able to attend today due to protracted trial proceedings, but I'll be handling the argument on behalf of Dugaboy Investment Trust.

THE COURT: Okay. One moment, we're working through some technology while I'm starting here.

(Pause)

THE COURT: All right. Do we have any other parties that are wishing to make an appearance in this matter?

(No audible response)

THE COURT: Okay. Hearing none, that will be great. I'm going to ask you real quick, Mr. Phillips, mainly because

you had mentioned that your client is there, Mr. Mark Patrick. I didn't see any witness and exhibit list filed. I'm assuming nobody, or you are not intending to call any witnesses in this matter?

MR. PHILLIPS: No, Your Honor.

THE COURT: Okay.

MR. PHILLIPS: My client representative for the HMIT Entities and CLO Holdco is Mr. Patrick, and he's just observing.

THE COURT: Okay. All right. I just wanted to make sure --

MR. PHILLIPS: And I -- yeah.

THE COURT: I just wanted to make sure because I think we do have some other parties that have dialed in. And usually if we're going to have an evidentiary hearing, I try to get an understanding of everybody that may be dialed in that's listening in and who they are affiliated with.

So before we get started, let me see first if the parties have reached any agreements on all these matters.

MR. STANCIL: No, Your Honor. I think we have sort of a fundamental disagreement.

THE COURT: Okay. Well, I was --

MR. PHILLIPS: (Indiscernible).

THE COURT: I was optimistic that maybe the parties were able to come to some term or some agreement on this deal.

Mr. Phillips, you were going to say something. I didn't want to cut you off.

MR. PHILLIPS: Your Honor, I'm sorry. Yes, I was going to agree with Mr. Stancil.

THE COURT: Okay. All right. The next thing I have for the parties, and I'm trying to think through all of this, but I've got a real question. And it's not something I think I have to solve today, but I've got a real question about whether or not I have jurisdiction to even consider the underlying motion, the Rule 60(b) motion.

Obviously, Dugaboy Investment Trust has already filed an appeal on that matter. The appeal is pending, as I understand it, and has been fully briefed. And so, I guess my question that I'd like to have some understanding on is, and maybe I'll start with you, Mr. Edney, is how does this Court have jurisdiction over the underlying motion at this time to even consider whether we need to deal with this discovery dispute?

MR. EDNEY: Sure, Your Honor. You're correct. There was a timely filed appeal, and that is pending in front of the district court. And I would tend to agree with Your Honor that that would deprive the Court of jurisdiction to go back and adjust the order based on what happened at the time. But this motion is based on emerging evidence of misconduct and fraud and newly discovered evidence.

And I do believe the Court maintains jurisdiction to correct that. Otherwise, we'd have this protracted logjam where we'd have to wait for that timely filed appeal to resolve itself before a Rule 60 motion could be decided, which it has its own time limits, time limits which aren't stayed by dependency of an appeal.

So, we can research that a bit further for Your Honor. It obviously hasn't been briefed, but I am confident that there will be some authority for a Rule 60(b) motion to proceed when there's an appeal of the underlying order pending based on what happened back then.

THE COURT: Okay.

MR. STANCIL: Your Honor, I think I can solve this.

THE COURT: Hold on one moment, Mr. Stancil. Okay.

MR. STANCIL: Yes.

THE COURT: I'm going to give everybody their opportunity to talk. So, please understand I'm not going to cut anybody off.

Okay, but let me make sure that I understand. And this will somewhat play into the underlying motions we have set for today. The fraud though, Mr. Edney, if I'm understanding correctly, isn't fraud that occurred post-settlement. The allegations are fraud that occurred pre-settlement, correct?

MR. EDNEY: Correct. It is evidence that emerged after the order but about events occurring before the order.

THE COURT: Okay.

MR. EDNEY: Right. So, it would not have been error for the previous bankruptcy judge to approve the settlement order due to this late emerging evidence because this late emergency evidence wasn't apparent at the time. But it is evidence of events that occurred prior to the order approving the settlement.

THE COURT: Okay. Mr. Stancil.

MR. STANCIL: So, thank you, Your Honor. With respect to jurisdiction, I believe the answer is supplied by Rule 62.1, which states that Your Honor has jurisdiction to deny the motion. And I'll walk through it in a second. But would have to ask for jurisdiction back for it to incline to grant the 60(b) motion.

So, Rule 62.1 says if a timely motion is made for relief that the Court lacks authority to grant because of an appeal that has been docketed as pending, the Court may, one, defer considering the motion; two, deny the motion; or, three, state either that it would grant the motion if the Court of Appeals remands for that purpose or that the motion raises a substantial issue.

I think this is often referred to as an indicative ruling under 62.1(a). So, that's how the Rules Committee has solved this 60(b) issue. So, we believe Your Honor will deny the motion and you have clear jurisdiction and authority to do

that under 62.1.

THE COURT: Okay. Well, let me say this. Well, first, Mr. Phillips, did you have anything that you wanted to say in respects to the subject matter jurisdiction issue?

MR. PHILLIPS: No, Your Honor. We agree with Mr. Stancil's perspective. We do not want our silence -- we don't want to create a back and forth, baseball-bat hand-over-hand. We do not agree with the representations made by counsel for Dugaboy that evidence was unavailable, that it was newly discovered, anything like that.

This is all, I think it's been demonstrated by the papers that that's demonstrably false. So, I don't want my silence -- I agree with Mr. Stancil's analysis of the way the Court is directed by Rule 62 to resolve the issues before it, but I don't want to go unresponded to the suggestion that there is any basis for a Rule 60 motion.

THE COURT: Okay. All right. Well, and again, I'm not going to decide that today, but I do bring it up to the parties and as you all prepare for a May 11th trial, that will be something that we'll need to address. So, maybe I'm giving you a little foreshadowing of what the Court's going to want to have some better resolution and understanding on as we come to the actual underlying motion.

The next issue that I've kind of identified as I've looked over you all's pleadings and the various motions and

joinders and supplemental -- or declarations and supplements, as well as responses and replies, is the concern that I have that ultimately depending on how the Court rules, we're looking at delay.

So this, again, I'll start with you, Mr. Edney. I mean, we've got over, some of these requests for discovery are over 90 requests. I mean, this is pretty extensive discovery that you've requested. I mean, should I be anticipating that I'm going to get a motion to continue the May 11th hearing because we're going to have some question of whether or not you can process and get prepared with all the discovery you've requested if I allow it to continue to go forward?

MR. EDNEY: Your Honor, I think that is a possibility. And, you know, let me say this. I think because of the dispute about whether there should be any discovery at all, what has been skipped over here a bit is some of the natural process that would have gone on had there not been that dispute. That is, you know, the other side looking at the particular requests saying, you know, this is feasible, this is too broad. You know, we can do this, but that's too much.

That hasn't occurred, unfortunately. We haven't had that kind of natural meet-and-confer process. We've asked for it, but it hasn't happened. And because of that, because of this underlying question, this claim by my brother counsel on the other side that there should be no discovery at all, you

know, I think the requests do remain broad.

I would anticipate, Your Honor, if that we could clear the threshold objection of there only being unilateral discovery, not bilateral discovery, and that we get to the point where we're talking about what discovery is returned by the other side. Brother counsel and I will go through a process to work that out. We'll go through a process to narrow it. We'll go through a process to talk about feasibility.

But I do imagine that that may take some time once this objection is cleared. And it wouldn't surprise me at all if the parties together, or us individually, ask Your Honor to push the May 11th trial back so that process that should have been going on earlier can work itself out. I guess that's the beginnings of a response to your question, Your Honor.

THE COURT: Okay. Let me ask you this. Have you heard anything from this entity, which I'm going to ask more questions about, but this entity ValueScope with a subpoena requires their responses to be done today by 5 p.m. Has your side heard anything from ValueScope?

MR. PHILLIPS: Your Honor, Louis M. Phillips, I represent ValueScope as well. And ValueScope joined into the motion for protective order in the original joinder that was --

THE COURT: Well, that answers that question, Mr. Phillips.

MR. PHILLIPS: Yeah. At 4546, that was our original

joinder. We did -- ValueScope was served with a subpoena. And we responded for ValueScope by joining the motion for protective order sought by Highland in all respects.

THE COURT: Okay.

MR. EDNEY: And Your Honor, that, you know, the ValueScope issue, I don't want to accelerate the merits into this discovery question, but the ValueScope value, the valuation for ValueScope, that facilitated the restructuring of the issue in the 60(b) motion, that's going to be a very important issue in this case. So I'm glad Your Honor's attention was drawn to it.

MR. PHILLIPS: And Your Honor, in response to that, I would say it's absolutely not important to this case, but --

THE COURT: Okay. Gentlemen, the Court has read the pleadings. I'm aware of the arguments. I'm trying to see if we can cut to the chase and get to what really needs to be discovered and what can, what we can move on from. And so I understand the arguments.

I understand this Court -- or I say this Court, I mean, this judge, I've been on, or my staff and I have been on this case now for maybe five months. We're drinking from a fire hose to try to get an understanding of what Highland was and how all of these entities relate to each other and how, at the end of the day, the actions that are being alleged as the fraudulent actions here have any play with this bankruptcy

estate and with the settlement.

And so I understand you guys want to argue your points. I've read them. So what I want to try to do here for the time that we have is try to get to the bottom of this and try to see where we end up. So I've got some questions that I'm going to be asking and wanting to get some understanding so that I can kind of better address this discovery issue.

So let me start off, and Mr. Stancil, most of these questions may be coming to you mainly because you represent Highland. So to the extent that -- and forgive me, I'm not quite sure, Mr. Stancil, if you're kind of more the litigation counsel, if Mr. Morris, I believe he's on, if he's going to need to address some of these.

But let me understand, first off, kind of the corporate structure of Highland prepetition. And I understand I'm going way back and I'm getting into the basics here, but I got to understand this as a judge. So prepetition, what was the corporate structure of Highland?

MR. STANCIL: I invite Mr. Morris to jump in. I think that question alone, prepetition, would probably take quite a while.

MR. MORRIS: Sure.

MR. STANCIL: Go ahead, John.

MR. MORRIS: Let me try, Your Honor. This is John Morris, Pachulski Stang Ziehl & Jones, for Highland.

Prepetition, Highland was a limited partnership. It had two tiers of limited partners. The senior limited partner was Hunter Mountain Investment Trust. They held 99.5 percent of the limited partnership interests. Subordinated to HMIT was a handful of both individual and other entity-type holders or limited partners who collectively held one-half of one percent of the limited partnership interests.

Within that one half of one percent is Dugaboy. Dugaboy held exactly 0.188 percent of the limited partnership interests. And those limited partnership interests were subordinated to HMIT in terms of distribution. And that structure was adopted into the plan of reorganization so that you have in Class 10 -- in Class 8, you have general unsecured creditors.

Class 9 was another class of general unsecured creditors that was created that was subordinate to the Class 8 claims so that they would not get paid until the Class 8 general unsecured creditors got paid in full. So that's Class 9.

Class 10 is the holder of the former senior prepetition limited partnership interest. And that's HMIT. And that's the subject of the 9019 motion because one aspect of the 9019 motion was to fix the value of the HMIT prepetition interest. That value was established by allocating the capital that existed as of the petition date.

And then you have in Class 11, the former subordinated limited partners of Highland, which includes Dugaboy. And so Dugaboy, under the limited partnership agreement, but most importantly, under the plan, which has never been challenged, gets not a nickel unless and until HMIT gets paid in full. HMIT's claim has now been fixed at an amount of over $300 million on a net basis. And I don't think there's any dispute that HMIT will never get paid in full, which does raise the question of what are we doing here?

But that's the prepetition corporate structure, Your Honor.

THE COURT: Okay. Thank you, Mr. Morris. And so to make sure that I understand it, that structure was actually arranged, as I read it, by Mr. Dondero prepetition and many years before the actual bankruptcy filing?

MR. MORRIS: That's correct, Your Honor. That was in existence for many, many years. In 2015, long before I ever heard of Highland, there was a restructuring into which Mr. Dondero and Mr. Okada's interests were placed into HMIT. There's a note that went back to Highland. Mr. Dondero and Mr. Okada got their own consideration, but that's how long HMIT has been the senior 99-1/2 percent limited partner of Highland. It goes back to 2015, I think a full four years before the petition date. And it was done under Mr. Dondero's exclusive control.

THE COURT: Okay. And then as part of the restructuring plan, as I understand it, essentially old equity was wiped out. Essentially all equity was wiped out of the reorganized Debtor, and we have various trusts that are established. In particular, you have the claimant trust. And old equity got a beneficial interest in the claimant trust and every other creditor likewise. But it was also established to be based on the priorities as the plan provided.

And as you just mentioned, Class 8 and 9 were general unsecured creditors. Class 10 was HMIT. And I believe another company has some claim in Class 10 of $10 million or so. And then Class 11 is the remaining half of one percent of the original owners of Highland.

MR. MORRIS: You have that almost exactly right.

THE COURT: Okay.

MR. MORRIS: I'm going to give you two very, very specific clarifications.

THE COURT: Okay.

MR. MORRIS: The prepetition limited partners placed into Class 10 and Class 11 were given, their interests were extinguished. There was never equity. They were limited partners, which is equity with a small E, I suppose. But their interests were extinguished and they received contingent unvested interests in Class 10 and 11. And that was one of the important things that happened with the settlement with HMIT.

Their interest became fixed and it's no longer contingent. It's in a fixed amount.

So that's one little thing I want to make sure Your Honor understands that until last summer's hearings where we were able to fix the interest, they were contingent and unvested. And the other thing is you're absolutely right. There is another holder of a Class 10 interest, not because it was a prepetition limited partner, but as the result of an agreement that was made in December of 2024 between Highland and an entity called HCLOM.

It's HCLO Management. HCLO Management had a claim against Highland. It's another entity that was controlled by Mr. Dondero. The long and the short of it is the resolution of the dispute over that claim placed HCLOM into Class 10. But just for context, Your Honor, that was kind of the precipitating event from our perspective as to how we wound up negotiating with HMIT because we insisted as a condition of that settlement in December 2014 that HMIT consent to the placement of HCLOM into Class 10 so that there was no misunderstanding because it would impact HMIT's rights.

And in January after that settlement was announced, Mr. Phillips informed me that Mr. Dondero and his counsel had given HMIT's consent without Mr. Patrick's authority. And that is the first time that I learned that Mr. Patrick and Mr. Dondero were no longer seeing eye to eye, and that

Mr. Patrick had alleged that Mr. Dondero acted without authority and purported to bind HMIT.

But that's a long-winded answer to is there another claimant in Class 10? There is, but not as a result of their prepetition limited partnership holdings.

THE COURT: Okay. When you said that the settlement that was approved fixed the contingent claims, does that also mean it fixed the contingent claims that are Class 11 or just fixed the contingent claim of HMIT?

MR. MORRIS: So absolutely perfect question.

And on June 25th, 2025, the Court approved the settlement with HMIT, and it fixed only HMIT's Class 10 claim. We later, we being Highland, later made a separate motion to fix the value of each of the Class 11 interests. That was the subject of a separate motion.

We had a hearing on that in September. And Judge Jernigan entered a separate order that's not directly relevant to this proceeding whereby she fixed not only Dugaboy's, but all of the holders of the Class 11 interests. So that did happen, but it happened subsequently and as part of a separate motion.

THE COURT: Okay. Continuing my questions to better understand Highland, any investment that was being managed by Highland was actually, as I understand it, placed into a separate entity and that I think if I look at the settlement

agreement, there's this gigantic list of entities that are called Highland Parties. And maybe this wasn't for everyone, but like Highland CLO Funding Limited, Highland HCF Advisor Limited, Highland Multi Strategy Credit Fund L.P., Highland Multi Strategy Credit Fund GP LP. All of those entities were formed as part of Highland's operations to hold various different investment vehicles. Is that accurate?

MR. MORRIS: I think it's generally accurate. Prepetition Highland had many, many, many, many, many different entities, some of which did nothing. Some of them just held interests in certain assets. At the end of the day, they all became part of the estate. And under Mr. Seery's leadership, we have done what is necessary to either monetize or otherwise close out virtually all of those entities.

THE COURT: Okay, which now leads me to the next question, which is I'm trying to understand what are the HMIT entities and what are the DAF Entities? And so I don't know if that's a question for Mr. Phillips to address or Mr. Morris.

Well, let me stop. Again, I do want to give all parties. Mr. Edney, did you have anything that you wanted to state on behalf of your client as to whether or not what we've just been talking about is accurate?

MR. EDNEY: Yes, Your Honor. So I think one of the key aspects that's important to keep an eye on is that when we talk about this prepetition restructuring that involved these

Hunter Mountain entities, these HMIT entities that took over a significant limited partnership interest, the purpose of that was for Mr. Dondero, who was the owner of Highland, to provide the value of much of his equity to charitable organizations, right?

And I think one of the issues that we're going to be discussing in the Rule 60(b) is how that has been disrupted and thwarted by some of the restructurings that Mr. Patrick did. But this was an effort for Mr. Dondero to benefit charities in large part, and it's an effort that has been falling apart over the course of the last year and a half.

THE COURT: Okay, but I'm asking about Highland's structure.

MR. EDNEY: Yes.

THE COURT: Do you have anything that is different than what Mr. Morris said about Highland's structure prepetition and then what the plan or the reorganized better looks like?

MR. EDNEY: Yeah, no, I don't really. I will say this, that the fixing of Hunter Mountain's interest, that was part of the settlement order that's being challenged here and being challenged on appeal. But yes, I think Mr. Morris had it largely correct.

THE COURT: Okay, all right. Mr. Morris, did you want to take on the questions on HMIT's structure or

Mr. Phillips?

MR. MORRIS: Sure.

THE COURT: Okay.

MR. MORRIS: Sure. And Mr. Phillips may have more to add. My understanding is that both the creation of the HMIT series of entities as well as the creation of the DAF series of entities was really simply a tax-driven exercise in order to avoid the payment of taxes on the income that was being generated from Highland.

And in order to create the Hunter Mountain Investment Trust, Mr. Dondero had to, from a legal perspective, give up control. And he originally placed, it's literally called the control person. It is the administrator of the Hunter Mountain Investment Trust. He originally gave the keys to the Hunter Mountain Investment Trust to his friend, John Honis and then, I apologize, I forget if it was in 2021 or '22, as the litigation accelerated post-confirmation.

For reasons that I don't know, Mr. Honis gave Mr. Patrick the keys. And so Mr. Patrick became holder of the HMIT enterprise. It was a fairly complicated structure, the sole purpose of which my understanding is, was to avoid the payment of taxes until sometime in 2024.

Based on my reading of the papers and certainly to my knowledge based on what I learned in January of 2025, Mr. Patrick was doing exactly what Mr. Dondero wanted him to

do, vis-a-vis Highland. He was suing Highland at every opportunity. And then, they came to their disassociation. And here we are with HMIT trying to resolve litigation with Highland.

But as a matter of fact, Your Honor, that enterprise, the HMIT enterprise, was done in order to save on taxes, as was the DAF enterprise. This is my understanding. They created this blocker entity. I think in Dugaboy's own papers, if you read carefully, you'll see that very little of the money that's held by the DAF is distributed to charities over time. It's really just a hedge fund in the Cayman Islands by another name that Mr. Dondero has controlled.

But be that as it may, the important point here, Your Honor, is that there is no relationship between HMIT and the DAF enterprise other than Mr. Patrick was given the keys to both. And under the law, under the documents, he has control. He's always had control, at least since he was given the keys.

Mr. Honis gave him the keys to HMIT and a gentleman named Grant Scott, who is Mr. Dondero's longtime friend, also, I think, got uncomfortable with the litigation. And in about March or April 2021, I think, he turned over control of the DAF to Mr. Patrick. And the DAF, too, was engaged in very substantial litigation with Highland up until the spring of 2025 when we reached this agreement.

So there are two different silos of entities, if you

will, both of which were created for the sole purpose, really, of tax avoidance, and both of which are and have been and remain under the exclusive control of Mr. Patrick since 2021-2022.

THE COURT: Okay. I'm looking at these charts. And so, I mean, Mr. Edney, you're welcome to jump in. But I'm looking at the charts from your -- this is from the motion to vacate or overturn the order approving the settlement.

So we've got Beacon Mountain, LLC. We've got Rand PE Fund I, LP. We've got an Atlas IDF, LP. We've got Rand Advisors, Rand PE, Atlas IDF. Those are all the HMIT entities, correct?

MR. EDNEY: Is that a question to me, Your Honor?

THE COURT: Yeah. Well, I'll take an answer from anybody.

MR. EDNEY: Yes, Your Honor. I think they're largely referred to as the HMIT entities.

THE COURT: Okay. And the only way that they have any interest in Highland or the Debtor is through the ownership between Hunter Mountain Investments or HMIT. And it's 99.5 percent ownership interest. Is that right?

MR. PHILLIPS: Your Honor, if I could, Louis M. Phillips. That is correct. I would add to -- I'm not going to adopt Mr. Morris's descriptive phraseology, but I would adopt his suggestion to the Court that we have two different silos.

The DAF is a charitable enterprise. And there is some -- and then let's just call Dugaboy, Mr. Dondero.

Mr. Dondero is a party to -- he's the control person, we say, of certain foundations and support organizations that have been related to the DAF and its affiliates. Mr. Patrick is in charge of the DAF and its affiliates. There's one of those entities that is in liquidation in the Caymans, but those entities historically were not involved in HMIT.

HMIT is the owner of the equity in Highland, the 99.5 percent equity in Highland. And that is its own -- that's one silo. And you're correct, Your Honor, that the HMIT entities were parties to the settlement because Highland, and we understood that, and reciprocally, we wanted releases. So the HMIT entities were parties to the settlement primarily for purposes of the release provisions Highland, as you pointed out, had an extensive list of entities for which it wanted releases. And HMIT had its list of entities to be released, as well.

And because the DAF had been involved through CLO Holdco and various DAF Entities in litigation with Highland, all of those entities wanted releases. And we worked out through the settlement reciprocal releases that involved parties that were related to the settling parties, but did not hold equity in Highland. The HMIT entities did not hold equity in Highland. They are parties so that they could get released

by Highland.

And many of the Highland entities that Your Honor mentioned and Mr. Morris discussed, Highland wanted releases for those entities, as well, from HMIT and the HMIT entities. So the number of parties to the settlement were in effect, they're really two parties to the settlement as far as exchange of interest and value. And that is HMIT, Hunter Mountain Investment Trust, and Highland. The other parties to the settlement are there for their being released. And I wanted to make that clear.

The DAF is a release party in the settlement. And that's because the DAF had been sued by Highland, for example, for fraudulent transfer, disputed for various and sundry claims in the, quote, Kirschner litigation, the litigation sub-trust. And those entities wanted dismissal from that litigation. And Highland wanted releases from those entities because those entities had been involved in litigation.

So all of this, and I think what we said in the papers is correct. But all of this, we dispute the suggestion that HMIT was set up as part of the charitable enterprise. The charitable enterprise is the DAF. And HMIT is the owner, or was the owner of Highland. I agree with Mr. Morris's description of the effect of confirmation of the plan, who granted contingent beneficial interest that would not vest unless and until there was a vesting. And part of our

settlement was that we would not vest, but we would have claims. And the settlement outlines how those claims would be treated.

The one other thing I'd like to point out, and this is, I'm going back a couple of steps, but I did interject myself. With respect to the additional, the HCLOM $10 million that went into Class 10, the reason that that settlement stood was because HMIT made a deal, settled its claims against HCLOM. And now that 10 percent, while it is part of an order that Mr. Morris and Highland are subject to, HCLOM and HMIT made a deal that HMIT gets, I think, 95 percent of any money that HCLOM might be entitled to, because we were going to file a motion to reconsider without a settlement because of the lack of authority in signing HMIT's name to the deal with Highland.

Instead, we made a deal with HCLOM to take, HMIT take 95 percent of any distribution to HCLOM. I wanted to put that -- that's the full picture of the $10 million that was added to the Class 10 claims.

THE COURT: Okay. So, but Mr. Phillips, as I'm understanding it, you're saying that HMIT and DAF are two separate organizational structures, there's no ownership between the two.

MR. PHILLIPS: At this point, there is an ownership. Historically, there was not. But at this point, CLO Holdco is the owner of HMIT.

THE COURT: And that's the entity that is owned by Mr. Patrick?

MR. PHILLIPS: Well, it's owned by the DAF, one of the DAF Entities --

THE COURT: Okay.

MR. PHILLIPS: -- under the entity that's in litigation -- that's in liquidation.

THE COURT: Okay. All right. Mr. Edney, let me hear from you on any of that.

MR. EDNEY: Yes, Your Honor. You know, the structure is no question complicated. Let me point out, I think, something that is fundamental, though. What you're going to hear about in the Rule 60 is a lot about the corporate restructurings. By the time we got to the settlement, Mr. Patrick had engaged in an effort to try to separate the charitable exercises from HMIT.

Prior to the settlement, in 2024, Hunter Mountain was owned by the Atlas Fund. And the Atlas Fund was owned by the Dallas Foundation. So the point of Hunter Mountain was to benefit one of Dallas's oldest charities. Patrick reorganized that, right, and got it out from under the Atlas Fund or in a transaction that I think raises very serious questions that we'll talk about when we get to the substantive hearings. And then he engaged in yet another restructuring when he put it in association with the DAF to put it under his sole control as

opposed to the three variable entities that owned the DAF.

So to say that there's a silo between the Charitable Entities and Hunter Mountain is part of the problem, right? It's part of the restructuring that Mr. Patrick pulled off, we believe for his own personal benefit. And I don't want to accelerate the merits here, but to say that there's the charities on the one hand and Hunter Mountain on the other, we do contest that.

And I think one of the points of the charts in the Rule 60(b) motion is to walk the Court through how that happened or how that was attempted to happen and the inappropriateness of that.

THE COURT: Okay, let me ask you this.

MR. PHILLIPS: I --

THE COURT: Hold on one second, Mr. Phillips.

Let me ask you this, Mr. Edney, because I think this may go to -- and this goes to, I think, what I believe your client's position is. But if I'm understanding you correctly on why you're saying that these structures were originally put into place, this is before any of the alleged fraudulently restructures by Mr. Patrick, was that profits of Highland were to flow up into these charitable organizations, correct?

MR. EDNEY: Exactly.

THE COURT: Okay, hold on one second. Hold on one second.

MR. MORRIS: Yeah, that's not accurate, but --

THE COURT: Hold on one second.

MR. PHILLIPS: That's not accurate, Your Honor.

THE COURT: Okay, hold on, gentlemen. Please hold on, okay? Like I said, I'm going to give everybody their opportunity here.

So my question to you is, if that is the case and Highland is defunct, what is, I'm trying to understand how then the Hunter Management or Hunter Mountain Trust, HMIT, has its settlement, has anything to do with how that affects these charitable trusts or these charities if the funding source for these charities already is defunct?

MR. EDNEY: I see. Yeah, I mean, Your Honor, if there were no money to get up to Class 10, that might be an issue. But the reason there is this settlement is that there may be, right? And so what we're dealing with here, and I think -- I don't want to get too far into the bankruptcy, but I think the creditors have largely been satisfied.

What we're dealing with at this point in these bankruptcy proceedings is what is left over. And our concern is that that Hunter Mountain was organized to be an asset of the Dallas Foundation up until February 2025, where the Dallas Foundation, part of Mr. Dondero's charitable legacy, would be the beneficiary of what's left over in this bankruptcy.

And Mr. Patrick organized it, reorganized it, so the

proceeds of this bankruptcy or what's left over would blow up the entities that are controlled by him. And that is of great concern to Mr. Dondero because that's not what he had in mind when he put together this structure.

THE COURT: Okay. Right, but --

MR. MORRIS: If I may, Your Honor, when you're ready.

THE COURT: Hold on one second, Mr. Morris, because I've got to follow up to that. And then I'm going to let you say what you would like to say.

But the question, though, from what you just stated is an issue between the money going from Hunter -- HMIT to those charities. That's not a bankruptcy issue. The bankruptcy issue is, is Highland paying out to its creditors like it should? And if it pays to Hunter Mountain the money that is supposed to go to Hunter Mountain, then it's done what the bankruptcy has provided, correct?

MR. EDNEY: Well, I guess my answer to that question would be yes and no. The primary purpose of any bankruptcy is to protect creditors. And what we would traditionally understand the creditors have been largely taken care of in this bankruptcy and now we're dealing with what's left over.

The bankruptcy plan, however, converted the equity holders like HMIT, like Dugaboy, like others into a type of creditor assigned to the class status, right? And that's why there was this process over the summer. And Mr. Dondero was

concerned about how that process works out because he wants the destination of those funds to be charitable, not personal, not personal to Mr. Patrick. And --

THE COURT: Okay, but Mr. Edney, I apologize that I'm cutting you off, but --

MR. EDNEY: Of course, Your Honor.

THE COURT: -- the issue is he wants to control, he's asking this Court potentially to control how Hunter Management or Hunter Mountain moves those funds to where he wanted them to go, not how the Debtor gets those funds to where he wants them to go.

MR. EDNEY: Right.

THE COURT: Right? I mean, the Court only has the ability to govern what the Debtor -- where the Debtor is supposed to pay its creditors or as now equity, and it doesn't have the ability to direct where equity sends its money.

MR. EDNEY: Fair enough, Your Honor.

THE COURT: Okay.

MR. EDNEY: But Mr. Patrick, by entering into a settlement with the Debtor, had massive consequences as to what equity, what those equitable entities now turned into Class 10 and 11 creditor-like entities received. And we believe that if Mr. Patrick had not tried to conceal his restructurings and not engaged in misconduct and fraud -- and I do understand that the opposing counsel disagrees with these characterizations, but if

he had not, he would not have had authority to enter into that settlement.

Mr. Patrick is the wrong person to be making decisions on behalf of equity. And it had a massive consequence about what equity would take from this bankruptcy process. That's why we think the settlement should be set aside.

THE COURT: Okay. Mr. Morris?

MR. MORRIS: If I may, Your Honor.

THE COURT: Yeah.

MR. MORRIS: Yeah. First of all, Your Honor, again, your question is exactly the right question. I wrote on my paper as Mr. Edney was talking, that this is an intercreditor dispute. I don't mean that, right? These are former limited partners, so I'm using the phrase creditor colloquially, but this is an intercreditor dispute that has absolutely nothing to do with Highland.

The point that was made just now that somehow the Court shouldn't have been able to approve of the agreement because of some misconduct on the part of Mr. Patrick is exactly wrong. There is no dispute. There has never been a dispute that Mr. Patrick was given the authority to run HMIT.

If you simply look at the claimant trust, not the claimant trust agreement, the Hunter Mountain Investment Trust Agreement, it says very clearly -- and, frankly, until this

moment, I didn't even think this was in dispute -- that Mr. Patrick has sole authority over HMIT, including the authority to settle claims.

He had that authority when he was given the keys back in 2021, 2022. He had the authority when he entered into the settlement agreement. He had the authority on June 25th when the Court approved the settlement agreement, and he has that authority today. In fact, no party has ever sought to remove Mr. Patrick as the administrator of HMIT.

So again, I don't know what we're doing here. I don't know what the basis of this claim is. He had the authority to enter into the settlement agreement. It's in the trust agreement itself. If he engaged in wrongdoing, if Dugaboy or somebody else ever actually proves that and, of course, the Cayman Islands Court has already rejected this factual basis for purposes of assessing whether or not to impose injunctive relief, they'll have a claim against Mr. Patrick. That's not going to undo this settlement.

UNIDENTIFIED SPEAKER: Right.

MR. MORRIS: I've said this many times to my colleagues. Even if the joint official liquidators somehow prevail on a breach of fiduciary duty claim in the Cayman Islands, that's not going to retroactively say, Mark Patrick didn't have authority on June 25th, 2025 to get this settlement approved. And the proof is in the pudding, Your Honor.

I think there was a very inaccurate statement here about HMIT being somehow existing for the benefit of charities. That's exactly wrong. HMIT does not exist for the benefit of charities. And you don't have to take my word for it. Just take the word for it of the representatives of the Dallas Foundation who testified to that in their deposition. And it was after providing that testimony that they withdrew their objection to the 9019 settlement with prejudice, leaving Mark Patrick in place as the administrator of HMIT.

Dugaboy is here with absolutely no connection to DAF, with absolutely no connection to HMIT whatsoever in any way, shape or form. And they claim to be here acting on behalf of the charities. Where are the charities? The charities settled with HMIT, okay? The Dallas Foundation did. The Dondero Foundations, they're still in the Cayman Islands taking their direction from Mr. Dondero and losing, right?

We were told last June, just wait, Judge Jernigan. You should adjourn this hearing. Because the JOLs need to complete their investigation. And Judge Jernigan said, I see no connection between what's happening in the Cayman Islands and what's happening in my courtroom. We're going to proceed. She did. She ruled. She granted the motion.

Several weeks later, Dugaboy comes back with the conclusions of the JOL's investigation in the form of this writ and summons that was filed in the Cayman Islands. And they

made a motion for a stay. And they said, oh, please, now you have to stay it this entity in the Cayman Islands that I have absolutely no connection to has completed their investigation. And they've got these wonderful claims that you should wait for the Cayman Islands Court to rule.

Judge Jernigan said, no, I don't see the connection between the DAF and HMIT. I don't see the connection between the Cayman Islands and anything that's happening in my courtroom. And she denied that motion.

Fast forward to December. They have a two-day hearing in the Cayman Islands on the facts that were adduced by the official liquidators. A ruling comes out in February that I think we've established Mr. Dondero certainly knew about in advance. And they deny the motion for injunctive relief in its entirety.

And so I really -- you may hear a sense of frustration in my voice, Your Honor. If you do, there is a sense of frustration in my body because I don't know what we're doing here. Mr. Patrick had the authority. He still has the authority. He's never been removed. Nobody's even threatening to remove him. What are we doing?

This seems like a great waste of time that at the end of the day, just to finish up, Your Honor pointed out correctly, this is an intercreditor dispute. It's nothing more than that, if it's that at all.

THE COURT: Okay.

MR. PHILLIPS: Your Honor, if I could say something now?

THE COURT: Yeah, Mr. Phillips, please be brief.

MR. PHILLIPS: I will. But I think the most egregious misstatement is to rely on the connection of the Dallas Foundation, which was an objecting party and with whom HMIT settled. And part of that settlement, as Mr. Morris has pointed out, the Dallas Foundation withdrew its objection with prejudice.

THE COURT: Okay.

MR. PHILLIPS: With prejudice.

THE COURT: All right. Thank you.

All right. Here's the next thing I'm trying to understand. And Mr. Morris, this is probably going to go back to you. The Kirschner litigation. What I'm trying to understand there is, is it's my understanding that they were suing or Mr. Kirschner is the trustee of the litigation trust, which was established under the plan. As part of that trust, he was suing multiple parties. In particular, it looked like the majority of the ownership structure and maybe up the chain of the ownership structure related to Highland.

Is that fair? And can give me some more understanding of the Kirschner litigation?

MR. MORRIS: Sure, sure. Sure. So in our disclosure

statement, I've described for you the structure of the interests in the proposed claimant trust, Class 8, Class 9, Class 10, Class 11.

In our disclosure statement that was prepared in the fall of 2020, we projected that Class 8 would recover 70 percent on the dollar and that Class 9 would receive nothing. Class 10 would receive nothing. Class 11 would receive nothing.

And in order to try to maximize recoveries for creditors in negotiations with the Creditors Committee, we wound up agreeing that there would be a litigation sub-trust that was created. Ultimately, Mark Kirschner became the litigation trustee. And they would pursue any additional claims that the estate might have in order to maximize recovery from creditors and to try to get that 70 percent number up.

They filed their complaint in October of 2021. It asserted a host of causes of action for fraudulent transfers and other claims against Hunter Mountain. I think there was a claim for breach of a note. So there was a potpourri of claims, if you will, that was asserted by Mr. Kirschner in the fall of 2021. And the whole purpose of the complaint was to try to make sure that the unsecured creditors in Classes 8 and 9 received as much value as possible.

Fast forward to 2023. Our nation emerged from COVID. Asset values increased. Mr. Seery and his team worked their

tails off to try to maximize value. And so from 2021 to 2023, '24, they were monetizing assets and they ultimately exceeded expectations. And so creditors received considerably more than had been projected in the fall of 2020 in the depths of COVID. And there came a time when we decided to put the Kirschner litigation on ice.

(Echo sound)

MR. MORRIS: And the -- Debra, can you unmute your phone, please? Thank you.

Consensually, all parties agreed to stay the Kirschner litigation, I think it was the spring of 2023. It could have been 2024. And that's where it remained. And ultimately, when Class 8 got paid in full and a substantial distribution had been made to Class 9, the justification for the HMIT litigation, from the claimant trust's perspective, started to evaporate because the point of the exercise was to recover additional monetary -- you know, more money to go to Class 8 and 9, but it looked like they were -- that there was a chance that they could get paid in full.

And as of now, I think Class 8 has been paid in full. Class 9 has been paid about 90 percent. And there, today, depending on what happens with this case, theoretically, subject to the indemnification reserve, which is the highest priority in the structure, there could be enough to pay.

And so when we entered into negotiations with Mr.

Phillips on behalf of HMIT, the question that we have to ask ourselves is who is actually the beneficiary of the Kirschner litigation? And at this point, we decided the beneficiary of that litigation really is HMIT as the Class 10 holder.

The merits of the claim never changed. The only thing that changed was where is the value in these claims? Who would benefit from the value? And since Classes 8 and 9 have largely been paid in full, although not wholly on the Class 9 side, HMIT really was next in line as the beneficiary. So that lawsuit ceased to have meaningful value to the estate, not because there was any question about the merits of the claim.

And I appreciate that Dugaboy and Mr. Dondero and others on the bottom of the V will take a different view. I don't think that's for the Court to decide today. But if the question is, why did we transfer that as part of the settlement? It's because HMIT ultimately became the likely beneficiary of those claims. Whatever value they have, that value inures to the benefit of HMIT. And so it just made sense to give it to them. I hope that answers your question.

THE COURT: It does.

Mr. Edney, did you have anything that you wanted to state as to that?

MR. EDNEY: Yes, Your Honor. Briefly, we have a different perspective than Mr. Morris. If the value of the Kirschner litigation has abated to the estate, they should have

dismissed it. Instead, they gave it to Mr. Patrick to use as a cudgel to get Mr. Dondero of his back for bringing to light his theft of the DAF and of HMIT from the Charitable Entities.

And that is a particularly distasteful aspect of this settlement. And it is one that brings very much to fore the misconduct and fraud that Mr. Patrick was engaged in.

MR. EDNEY: Your Honor?

MR. PHILLIPS: -- that integrated into the settlement.

THE COURT: Okay. Hold on one second, Mr. Phillips. I've got a question for Mr. Edney that I want to ask first.

Okay. Did I just hear you correctly that your client's position is that instead of having assigned the litigation to Hunter Mountain, that they should have just dismissed the litigation?

MR. EDNEY: Yes, Your Honor.

THE COURT: Okay. Mr. Phillips? And I don't want to go back and forth and have attacks on parties and --

MR. PHILLIPS: I cannot --

THE COURT: -- who they think are bad guys, not bad guys. I understand that. I just, I'm trying to understand the underlying facts because I'm trying to dictate what is going to govern this discovery. So, Mr. Phillips?

MR. PHILLIPS: Your Honor, number one, Mr. Morris is exactly right in his description of the Kirschner litigation.

Some of the parties that were parties to the Kirschner litigation, defendants in the Kirschner litigation, I represented and they have all been dismissed as part of the releases and subsequent to the settlement, a dismissal of one client that was not encompassed by the release. But the Kirschner litigation was against a number of parties and individuals, including Mr. Dondero.

And Mr. Morris is exactly correct. The beneficiary of the Kirschner litigation would have been HMIT, given the fact that the assets of Highland look like they will pay and will pay the classes of creditors above Class 10, and will generate a distribution to Class 10. But because of that, Highland -- HMIT is the beneficiary of the Kirschner litigation.

Now, that's it in a nutshell. And there's various and sundry things going on. I'm not representing HMIT in the Kirschner litigation, but that has a life of its own out here. And the suggestion in the face of -- there are two lawsuits, two claims and proceedings that have been instituted by Dondero-sponsored entities. One is the Cayman proceeding. One is the Dallas Business Court proceeding.

For counsel for Dugaboy to keep slinging defamatory allegations of crime and fraud when the Cayman proceeding expressly said that the JOL sponsored by Dondero could not meet a motion to dismiss standard on either. And the Texas Business

Court action has been abated because the Dondero-sponsored petitioners would not and could not join necessary parties.

Your Honor, it's very difficult for me -- Mr. Morris mentioned frustration. My client representative with no basis whatsoever, upon no evidence whatsoever, is having his name run through the mud by a lawyer who just filed a notice of appearance in this case today --

THE COURT: Okay.

MR. PHILLIPS: -- in the face of actual proceedings and ruling in one case that dismissed any and all claims that he's suggesting and he's got to use as a basis for reconsideration when in fact the Dallas Foundation and Dugaboy had full access to any and all information prior to the settlement as set forth in the papers and in the reply.

So please, Your Honor, I would request that Your Honor limit the ability of counsel to cast aspersions, allegations of criminal conduct, allegations of fraud, because they are groundless. And I cannot sit by and listen to them without having to respond.

THE COURT: Okay. All right. Yes. Look, I understand that the parties, the principals of the various entities that we're discussing here today have their -- strongly have their disagreements. Let's keep this to what are the issues for this Court and stay off of, as Mr. Phillips put it, mudslinging against both sides.

This goes as to Mr. Dondero and it goes to as Mr. Patrick. Okay. All right.

MS. DEITSCH-PEREZ: Your Honor, would you like to hear from someone who represents defendants in Kirschner or?

MR. PHILLIPS: Your Honor, we object.

THE COURT: Hold on a second, Mr. Phillips. I'm sorry. Could you state your name for the record?

MS. DEITSCH-PEREZ: Yes. This is Deborah Deitsch-Perez from Stinson.

THE COURT: Okay.

MS. DEITSCH-PEREZ: If you recall, I was before you some months ago when we had an initial conference in Kirschner. I represent some of the defendants. The case is now set for a status conference in front of Judge Scholer and I did want to just respond to two things that were said about the Kirschner case by lawyers not involved in it, if I may.

THE COURT: Okay, hold on one second. Do you -- what I'm just trying to understand about the Kirschner litigation is what was the intention of it and then ultimately the assignment of it went to Hunter Mountain.

Okay. It's my understanding and I don't think any party can disagree with this, but it's my understanding that the purpose of the litigation by the trust was to try to recover funds to help pay creditors and then once it determined that creditors were going to get paid in other means, it saw

the litigation as a way to try to settle issues for the estate and that it ultimately became part of a settlement.

MR. PHILLIPS: Correct.

THE COURT: Do you disagree with that, Ms. Deitch-Perez?

MS. DEITSCH-PEREZ: Your Honor, initially --

THE COURT: I don't want to know about what parties are arguing in the Kirschner litigation, whether they agree or disagree. I'm trying to understand what is its role in this settlement, in this bankruptcy. That's what I'm wanting to make sure I understand.

MS. DEITSCH-PEREZ: And that's exactly what I want to address, but initially it was an action by a litigation trustee to marshal assets for the estate. When it became clear the money was not needed to do that, it was voluntarily stayed by the litigation trustee and it was only reactivated when it was assigned to HMIT.

HMIT is not doing this as the estate. HMIT could be Joe Smith off the street. It is simply a party to whom some property has been sold. The property happens to be the Kirschner claims that are being used, however they're being used, but this is not something for the benefit of the estate anymore. This is something that's just been traded to HMIT. That was my point, Your Honor.

THE COURT: Okay. All right.

MS. DEITSCH-PEREZ: And there is a motion, a pending motion to dismiss.

THE COURT: Okay, I appreciate that. Thank you.

MR. MORRIS: Fifteen seconds?

THE COURT: Fifteen seconds, starting now.

MR. MORRIS: I agree with that. It is just more of an intercreditor dispute at this point. I think Your Honor should be aware that whatever umbrage may be taken today of the transfer of the Kirschner litigation was not the subject of an objection as part of the 9019 hearing.

And I would just want to remind the Court and everybody here that the settlement, including the transfer of the Kirschner litigation has been fully consummated. And that's why Highland doesn't appear before Your Honor in these status conferences.

We've given control of the litigation to HMIT. HMIT is doing with it what it will. And it would have been a breach of Highland's fiduciary duties to just walk away from a lawsuit that somebody else had value, that thought had value and was willing to pay us for it.

THE COURT: Okay. Thank you, Mr. Morris. Let me, that actually leads into my next line of questioning, which is I'm trying to understand what has been done under the settlement and where things stand as far as consummating the settlement. And so I've got the settlement in front of me

here.

MR. MORRIS: Great.

THE COURT: So I see --

MR. MORRIS: If I may, Your Honor.

THE COURT: Yeah, go ahead, Mr. Morris.

MR. MORRIS: Sure. The settlement was substantially consummated within days. In fact, there is pending before Judge Kincaid right now -- let me back up for a second. We, I think we use shorthand unfairly here. We refer to the settlement as a 9019 settlement. The motion was actually made pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 363. And it was made pursuant to both because there were certain assets that were sold that HMIT had no right to.

HMIT had no right to the Kirschner litigation. HMIT had no right to obtain the Dugaboy note. They never asserted otherwise. But we gave certain assets that were illiquid assets from the Highland Estate's perspective. It was another reason why the settlement was so good for Highland because it allowed us to monetize certain illiquid assets.

But the important point here is that it was consummated within days so that when Dugaboy appealed the granting of the 9019/363 order, we made a motion to dismiss. And we made a motion to dismiss on statutory mootness grounds. That motion to dismiss is available, Your Honor, on the docket as part of the appeal. We told Judge Kincaid that the appeal

should be dismissed because the settlement was substantially consummated.

And with particularity here, Highland transferred cash to Dugaboy -- to HMIT. Highland transferred the Dugaboy note because Dugaboy had a very substantial note in which it was the maker. Highland was the beneficiary. It was a very long-term note. We tendered that to HMIT under the settlement agreement.

And in fact, while Dugaboy today complains that Mr. Patrick somehow lacks authority, last December Dugaboy did what it was supposed to do and it complied with the terms of the note. And it made the payment under the note to Mr. Patrick as required in his capacity as the head of HMIT. So they validated his position then.

But the note was transferred. Payments had been made to HMIT under the note. The Kirschner litigation was transferred. I don't remember off the top of my head what it -- oh, there was a lot of litigation dismissed. There was a whole -- I mean, this was so important for Highland. There's been a whole host of litigation that HMIT had commenced against Highland that's been dismissed with prejudice.

So I think that's the totality of the performance. There's nothing left to do under the settlement except to make future payments which are conditioned on there being no threats as that is defined under the settlement agreement. There

obviously are continuing threats. So we won't be making any payments to HMIT in the near future until those threats dissipate.

But otherwise, Your Honor, the settlement has been fully consummated as we've, I think, proven and are waiting to hear from Judge Kincaid about.

THE COURT: Okay. So in looking through this, I see in Paragraph 1 under the agreement there were stays pending approval of various -- or pending the approval of the -- by the bankruptcy court of the settlement. And then I'm assuming all those stays took place. And then after the Court approved it, as you stated, there was dismissal of litigation as well as the assignment of the Kirschner litigation. There was an initial cash payment of $500,000 as I see it. And that was made?

MR. MORRIS: Yes. And I think there was a subsequent -- yes, that was made. That was made promptly. And I think there was a subsequent payment of $10 million.

MR. PHILLIPS: Yes. Yes.

THE COURT: Okay.

MR. MORRIS: Yeah.

THE COURT: And that was done as well? There's been no --

MR. MORRIS: Everything that has been required to be done has been done.

THE COURT: Okay.

MR. MORRIS: And the only thing that hasn't been paid, the only thing that hasn't been done, I believe, are -- we'd give HMIT all the money today if we got a general release from Mr. Dondero and his affiliates, but we know that that will never happen. So we have to reserve money as part of the indemnification reserve. And as long as there continues to be the specter and threat of litigation, we'll continue to do that.

THE COURT: Okay. So I want to understand, Mr. Morris, the flow of funds here. So is there funds being held by the Debtor, by the Reorganized Debtor?

MR. MORRIS: So, great question. And I'm going to say that I'm highly confident in what I'm about to say. And I really -- my credibility is all I have here. So I want to be really precise here. Right now, there is still a claimant trust. There is still an indemnity trust. There is still Highland, right?

As Your Honor knows from prior hearings, including last Friday's, we need to get to the dissolution process by August. That is the goal. But currently, there is some amount of money, a portion of which is held in the indemnity trust. A portion of the cash, I think, is still held at Highland. But that cash is available to both fund operations and to -- which includes the cost of litigation, defending litigation -- because I think at this point, we're only playing defense here

-- and to fund indemnity reserves going forward.

So, you know, there is still cash. I don't know the number off the top of my head. The number had been disclosed to HMIT as part of the settlement negotiations. And it was shared with Dugaboy as part of the discovery process. But there is still cash out there. And there may be a couple of assets that remain to be monetized. I don't know if that answers your question.

THE COURT: Okay. That's in Highland, the Reorganized Debtor?

MR. MORRIS: Actually, most of the cash is in the Highland indemnity trust.

THE COURT: Okay.

MR. MORRIS: Okay. Which is the vehicle that will live in perpetuity until we either get a release or the threat of litigation ends. But I explained to you earlier, Class 8, Class 9, Class 10, Class 11, those were the former creditors or holders of limited partnership interests under the plan and the claimant trust Agreement.

Higher in priority than any of them are the Debtor and the claimant trust indemnity obligations. And they have very substantial indemnity obligations. And so the claimant trust initially and now really the indemnity trust is holding cash for the purpose of satisfying its indemnification obligations.

This is something that was litigated all the way up to the Fifth Circuit. The Fifth Circuit has validated the indemnity trust. The Fifth Circuit has validated the idea that the indemnity obligations are senior to any creditor or former holder of a limited partnership interest.

So that's really at the top. That's where most of the cash is held right now. That's where it will remain to be held until we can finally end this litigation.

THE COURT: Okay. Here's the question I'm trying to get an understanding of. So funds, there were funds in the claimant trust. There may still be -- there still are funds in the claimant trust because we were fighting over some of them last week.

Those funds, once all claims are resolved, the funds -- the claimant trust is to dissolve and the efforts are to try to get that dissolved by August of this year. I can't remember the date, the exact day. But once that's done, assuming that gets done and there's funds still in the claimant trust, those funds will go to Highland, the Reorganized Debtor, or to the indemnity trust?

MR. MORRIS: No, let me clarify. The dissolution process pertains to Highland Capital Management, L.P. And that process will begin, not end, on August 11th. Once you begin the dissolution process, you have to go through the process of winding up. I don't know how long that will take.

There's modest cash in the Highland Claimant Trust side. Most of the cash that exists today is in the indemnity trust right now. There is the reserve for Mr. Daugherty --

THE COURT: Right.

MR. MORRIS: -- that we talked about last week that certainly exists.

THE COURT: Okay.

MR. MORRIS: So that's kind of sacrosanct. But most of the cash today is in the Highland -- is in the indemnity trust. And it's Highland, not the claimant trust that will be -- whose dissolution will commence on August 11th.

THE COURT: Okay, but, well, but the claimant trust is supposed to terminate on August 11th, correct?

MR. MORRIS: The trust has to dissolve. I know that part. And I --

THE COURT: Okay. And once it dissolves, the funds go from the trust to where?

MR. MORRIS: Everything goes into the indemnity trust.

THE COURT: Okay. And then once the trustee of the indemnity trust determines that any of indemnity obligations are no longer, then where do those funds go?

MR. MORRIS: It will go to HMIT and that little entity that we talked about earlier, HCLOM --

THE COURT: Okay.

MR. MORRIS: -- on a pro-rata basis because they're both in Class 10. So it wouldn't all go to HMIT. I think under the plan and having consensually put HCLOM into Class 10, they would share on a pro-rata basis any remaining assets.

THE COURT: Based on their claim amounts. Okay, this is probably a question for Mr. Phillips because this was really more your client's agreement with the Dallas Foundation. But I'm assuming that your clients, as part of the settlement, as I understood it, the stipulation entered into between HMIT and the Dallas Foundation was made part of the settlement that was approved. Those stipulations are being complied with?

MR. PHILLIPS: Your Honor, we think that the Dallas Foundation immediately after executing the stipulation violated it. We were -- in fact, we had a meet, a structure for meeting to try to resolve issues.

The day of our first meeting, I received a communication from counsel for the Dallas Foundation, who was driving to the meeting. And he said, I just need to tell you that we -- my client sued HMIT, sued to get an injunction today. And I just -- I didn't know about it. But my client -- I said, wait, we're supposed to meet in an hour and a half as part of our negotiation structure in the stipulation so that we can try to resolve our differences and get to a second meeting.

And I thought that was the point. And he said, I thought so, too. But we made the determination, that was July

2nd. We made the -- what was that, a week after the hearing? We set up the meeting and I went to Dallas. And the meeting was at the Dallas Foundation. And I think the purpose of the lawsuit was to cause us to not meet. And I told counsel for the Dallas Foundation that we were going to meet and we would be there at the appointed time.

And we went to the meeting, we provided the documentation and the documents that we were supposed to provide, the financial information that we were supposed to provide. We had a meeting that lasted probably 45 minutes, during which I pointed out that I thought that the stipulation, Dallas Foundation, was in violation of the stipulation. And clearly, there was never any intention of the Dallas Foundation to meet.

We've done -- I will say this, we have done everything that the stipulation required HMIT and any of the DAF Entities to do. But I have not been able to set up a second meeting because I've gotten no response since July 2nd that, in my attempt to set up meetings as set forth in the stipulation, I received no response from the Dallas Foundation or any of the DAF Entities that they would agree to a separate meeting.

And frankly, I saw no reason to call an end to it an impasse, because they -- it was clear to me that they never really intended to comport with the stipulation. But as far as

our side of the stipulation, we've done everything that we were supposed to do.

THE COURT: Is your client still holding the funds as the stipulation required?

MR. PHILLIPS: I think so, yes.

THE COURT: Okay. All right. ValueScope. What is ValueScope and how does it play into all of this?

MR. PHILLIPS: ValueScope does not play --

THE COURT: Mr. Phillips?

MR. PHILLIPS: ValueScope does not play into all of this. But ValueScope provided valuation services that had nothing to do with the settlement. It provided valuation services with respect to the DAF and valuation issues that arose in connection with restructuring of the DAF and also restructuring of certain of the HMIT entities which are not being told, of course, is that every action taken by Mr. Patrick was backed by a valuation from ValueScope and these parties had known about ValueScope since 2021.

And of course, of course, there was no suggestion by Dugaboy, the Dallas Foundation, any of the parties that are now complaining mightily and losing, by the way, that ValueScope was in any way, shape, or form relevant to the 9019 settlement and the 363 sale portion of the settlement.

So ValueScope has nothing to do with the settlement. ValueScope provided valuation in connection with down the line

restructurings of, first of all, in the DAF arena, the DAF that has nothing to do with the settlement. Secondly, prior to the settlement, far prior to the settlement, valuations in connection with restructuring of the HMIT entities. And as we suggested and as the papers show, Dugaboy knew and all the parties knew about ValueScope from 2021 forward.

THE COURT: Okay. All right, Mr. Edney, I'm going to ask you to try to do this as brief as you can, but I want to give you the time to do it. I want to understand how the restructuring of the DAF Entities, as I understand it, in your allegations plays into the settlement issue that was approved by the Court previously.

MR. EDNEY: Yes, Your Honor. I'll try to do this both a concise way and a way that keeps the temperature down. But our contention is that the various restructurings -- and the ValueScope valuations were an important part of this because it allowed assets to be moved around, not for value, but for pennies on the dollar -- took assets away from the Charitable Entities, including the Hunter Mountain asset, which is an asset that is key to the settlement, and put them within Mr. Patrick's personal control and benefit.

We believe if those restructurings had been transparent, if Mr. Patrick hadn't taken steps to make them -- to conceal them, that by the time he arrived on the settlement date, he would not have had the authority to enter into the

settlement in the first place. He would have been removed.

And we further contend, Your Honor, that, and I think if you look back at the record on this, this settlement process initiated about May 19th, in public view, May 19th, 2025. It was concluded by June 25th, 2025. And there was a very hurried process that was trying to get in front of the transparency that was coming. The transparency that Mr. Patrick knew was coming, but the rest of us found out about over the summer, fall, and winter of 2025 leading to this motion.

THE COURT: Okay. Mr. Edney, do you disagree that Mr. Patrick is still, I'm not sure exactly the correct term, but the control party for HMIT? I mean, he hasn't been removed yet, correct?

MR. EDNEY: He has not been removed yet.

THE COURT: Okay.

MR. EDNEY: That's correct.

THE COURT: So he's still there. Now, the DAF restructurings, do you disagree that they were known at the time of the motion and the filing of the motion to approve settlement?

MR. EDNEY: Yes, I disagree with that, Your Honor. The details, the movements, and the justifications for those restructurings and their effect, they became revealed starting with the allegations in the statement of claim in July of 2025.

This is information that the liquidators in the

Cayman Islands got access to only because they were able to step into the shoes of the entity down there and get access to their communications with counsel and otherwise, and came into focus as the underlying evidence for those allegations in the statement of claim became revealed and became available for use in domestic court proceedings.

THE COURT: Okay.

MR. EDNEY: And we're prepared to walk through this on the merits of the 60(b) motion. We understand the timing of when this evidence came to light is an issue and we're prepared to document it.

THE COURT: Okay. And so as concisely as you can, tell me what it is that you believe is discovery that you need from these parties related to that.

MR. EDNEY: Sure, Your Honor. So I would put it in two categories. I think you heard today in strongly worded terms that counsel for Mr. Patrick's entity disagrees with my characterization of the events and, frankly, the characterization of the events by the liquidators in the Cayman Islands.

Part of the purpose of the discovery is to be prepared to rebut those denials more fully. That's why we are asking questions about the restructurings, the valuation with ValueScope, a very important part of this, and the compensation to Mr. Patrick. That's category one.

Category two, in terms of the discovery that's directed at Highland is about the extent to which Highland was made aware of these restructurings, knew about it, and the extent to which it drove the manner in which and the timing on which the settlement was entered

So that's my most concise description, Your Honor.

THE COURT: Okay.

MR. EDNEY: And if our requests are too broad, I will tell you that you have my firm commitment that I'm willing to work with opposing counsel to get them more over the target. But that interim process before we usually appear before a federal judge like yourself, Your Honor, that hasn't happened because of --

THE COURT: I understand that's your position.

MR. EDNEY: Yeah.

THE COURT: There was no typical response and then discussions and motions to compel or now a motion for protective order.

But let me just make sure. So category one is you're seeking discovery on evidence to back up or support or -- yeah, I mean, basically backup, support your allegations that these restructurings of the DAF Entities were fraudulent. Is that correct? That's one. And I guess with the purpose of saying that if they were fraudulent, then Mr. Patrick somehow wouldn't have had authority to sign on behalf of HMIT for this

settlement.

MR. EDNEY: That's correct, Your Honor.

THE COURT: Okay. And then category two, as you put it, is what knowledge did Highland have of all of that? And I guess I'm not quite sure why that matters what Highland's knowledge is, but that's correct. Highland's knowledge of these restructurings and whether or not they knew or should have known that somehow these were all fraudulent.

MR. EDNEY: Yes, Your Honor. I mean, I think one of the things that we're hearing from Highland in the papers, and I will say that their papers are highly factual, which I think probably begs the question for discovery.

But one of the things we're hearing from Highland is that all this stuff we're talking about Mr. Patrick's misconduct, it's adjacent to the settlement or it's adjacent to the bankruptcy process. We want to be prepared to rebut that argument with facts. And so if our requests were too broad, that's what we're really after. And we're willing to work with opposing counsel to get it targeted, Your Honor.

THE COURT: Okay.

MR. MORRIS: Your Honor?

THE COURT: Hold on. I'm going to give everybody a chance to --

MR. MORRIS: Oh, sorry.

THE COURT: I'm going to give everybody a chance to

respond. I've got some more questions for Mr. Edney real quick.

Mr. Edney, I want to walk through and get an understanding of where we would be at if the settlement is basically overturned. And that would be at, I think where we would be at would be the Kirschner litigation would still be controlled by the estate. And they would still be potentially pursuing that.

MR. EDNEY: Yes, Your Honor.

THE COURT: The other part of that would be HMIT would not have a fixed claim. It would still be considered a contingent claim, but still part of Class 10.

MR. EDNEY: Yes, Your Honor.

THE COURT: And presumably Class 11 claimants would still be in a contingent situation. Do you agree with that so far?

MR. EDNEY: Yes, Your Honor. And I think

THE COURT: Okay.

MR. EDNEY: Yes, Your Honor.

THE COURT: Okay. So if that were the case and the litigation trustee continued to pursue the litigation and let's say ultimately was successful and brought money back in, that money would then, again, go and be paid out according to the plan, which would be paid to Class 10 first. And then if there's anything that remains after paying off Class 10, Class

11.

But importantly, Class 10 is Hunter Mountain or HMIT. And it appears that they're going to get the lion's share of whatever funds that would be generated from this litigation if the estate were controlling it still, and those funds would go to Hunter Mountain first.

Okay. So as I see the settlement agreement, all that's been done is changed who's controlling the Kirschner litigation. And ultimately, the same beneficiary is the party that's now controlling it as it would be the same beneficiary if the Debtor controlled it and ultimately paid out under the plan. Do you disagree with that? Do you see something that I'm not seeing?

MR. EDNEY: Yes, there's one other aspect, Your Honor. I think Mr. Morris covered this. One of the things that happened in the settlement is that Hunter Mountain dropped numerous claims about the administration of the bankruptcy estate that I think -- I know there's a disagreement on this, but would have generated significant value for equity, right?

So it wasn't just the money that would be coming out of the estate as it is now that are at issue, but there's also affirmative claims about how equity has been treated that I guess numerous parties, including the estate that were released through the settlement. And those claims would be not released.

THE COURT: Okay. And so those would still exist that Hunter Mountain would be pursuing as a counter plaintiff?

MR. EDNEY: That's right.

THE COURT: Okay. All right.

MR. EDNEY: And I mean, I think you're hearing it from us, but our view ultimately is that Hunter Mountain needs to be under a responsible steward who's looking after the interests of equity and the charities.

THE COURT: Okay.

MR. EDNEY: Not itself.

THE COURT: All right. I want to -- you said something that now makes me ask the question. Why is that this Court's purview?

MR. EDNEY: Right. Well, I think Your Honor, it is this Court's purview because a person who was not acting by his fiduciary duties has released all sorts of assets that belong to the charities and others. And you may say, well, just take that up with Mr. Patrick but, unfortunately, Mr. Patrick is effectively judgment proof. So by letting the estate off the hook and letting others off the hook, that settlement has created permanent damage to those beneficiaries.

MR. PHILLIPS: Your Honor?

THE COURT: All right. Hold on, Mr. Phillips. Hold on. All right.

MR. EDNEY: I know Mr. Phillips disagrees. And look,

I'm sorry. Some of these words are harsh, but I mean, unfortunately --

MR. PHILLIPS: Well, they're also not relevant to anything and not ever raised --

MR. EDNEY: All right, Mr. Phillips. I don't interrupt you. But also the standard here is -- one of the standards that we're proceeding under is fraud. So I mean, the words are going to be a little harsh, right?

THE COURT: Okay.

MR. EDNEY: It's just part of the Rule 60(b) exercise. And for that, I apologize.

THE COURT: All right. All right. Thank you.

Let me -- I'm going to hear from Mr. Stancil, I believe is now going to -- I want to hear from you, Mr. Stancil I guess your client's position as to these two categories. And --

MR. STANCIL: Sure.

THE COURT: Go ahead.

MR. STANCIL: So Your Honor, we're coming back. I was trying -- I had tried to sketch out a background of this case that I could do in five minutes, which now seems almost laughable. But I don't need to do any of that.

I think what we're here on today is their request for discovery. And those two categories, I think, are not surprising that that's how they describe it. But I think it

skips over what we agree. I think we agree with Dugaboy is the actual standard for getting discovery.

So the baseline is you don't get discovery in aid of a 60(b) motion just because you file a 60(b) motion. That is undisputed. There is Fifth Circuit case file out the wazoo that says as much. And in order to be entitled to any discovery, which it's important to bear in mind, is new -- which is a repeat of discovery we already did in support of the original 9019 discovery. In order to get that, you have to make some prima facie showing. You have to have something new and within a very specific category and time window. Something that is new and could not have been discovered to reasonable diligence within 28 days of the entry of the judgment.

And so let me start with what Mr. Edney said about what did Highland know and when did it know it. Paraphrasing, that's the category two. Well, we already produced to all the parties in the 9019 hearing the first time around the communications between Highland and HMIT leading up to the settlement. That's already been done. That's why you don't get to just reopen discovery and send new discovery requests without making a showing that you have something new that was or couldn't have been discovered in the time. So we've already done that.

The broader category about fraud, sort of that first category, I heard a general description that the details did

not emerge until the summer, fall, winter. That's just not belied -- that's just not consistent with the record and their own record. I have, if Your Honor, if you'll bear with me for, I think I can do this in literally five minutes. I have a little timeline that I could put up, but I think we'll show you kind of what was known.

If that's okay with Your Honor, Mr. Levy, I think has the technical capacity to do it.

THE COURT: Okay, that's fine. I will state this for you, Mr. Stancil. At least on our end, you're kind of coming in a little choppy. Your video's not very clear and you're going in and out. So hopefully -- okay, I do have a slide deck up. So go ahead.

MR. STANCIL: I got rid of the earbuds. Is that better? The audio?

THE COURT: Yes, I can hear you.

MR. PHILLIPS: Yes.

MR. STANCIL: Okay, so all right. So this is the timeline and we start with this. These are the bookend dates that are relevant for a new evidence claim. So we've got the settlement, which was first negotiated starting in March and announced in May of 2025, right? And then there's a bunch of discovery we'll get to.

June 30th, it's approved. July 28th, 2025, that's the deadline for a 59(b) new trial motion. And that matters

because you have to show, if you want to say there's new evidence, you have to show that it's evidence that you didn't have or could not reasonably have discovered within that new trial window. So anything that they knew or reasonably could have discovered by July 28th, 2025 cannot be the basis for their motion and, therefore, cannot be the basis for their claim for discovery.

So I can quickly walk through, Your Honor, and we will supply this deck, these slides to the Court and, of course, to opposing counsel. And you'll see in here, we have docket cite by docket cite that will show you where to find these things. And this has to be just not just new evidence, but evidence that would change the outcome, right?

So April 10, 2025. Will you flip to the next slide, please? There may be a little lag. There we go.

So April 10, 2025, there is a declaration or affidavit filed by Mr. Dondero in the Cayman Islands with respect to this DAF entity. And I would just ask Your Honor to look at this document. It's docket number, it's Exhibit 7 to our motion for protective order. And just to pull out a couple of examples, and I won't do this sort of chapter and verse for each one, but this idea that no one knew what was going on with the restructuring of DAF is absurd.

So if you would look at, if you flip to Paragraph 32 of that exhibit, and I'm not saying that we all need to do it

together right now, Your Honor, but if I remember from my law clerk days, it's always nice to have a specific cite to go to. Paragraph 32, Mr. Patrick is using the control position for his own enrichment rather than to benefit the supporting organizations and the causes they support.

Paragraph 39, while Mr. Patrick, of course -- pardon me. Paragraph 39 describes that or alleges that Mr. Patrick was selling -- had sold the entire Hunter Mountain position to an unidentified party for a million dollars and says that's not a legitimate fiduciary sale.

May 10th -- or pardon me, May 2nd, the supporting organizations file a petition in the Cayman Islands. They say, we would like you to take over and supervise dissolution of the DAF. And in that document, I would recommend to the Court Paragraph 10, Subparagraphs Alpha through Delta, and that lays out this entire restructuring of DAF. So it is on -- it goes through Paragraph A, 7 February 2025, here's what Holdco did, 20 February 2025, it goes through chapter and verse on this purported restructuring.

Okay, so we knew no later than early May, they knew no later than early May that DAF had been restructured. There's nothing new here. There's all sorts of allegations in here with a score of the same allegations that they make against Mr. Patrick here and claim it's new evidence. But it gets -- it goes on.

We have June 9th, in the 9019 itself, the Dallas Foundation makes a submission to the 9019. They litigate that, there's discovery. The discovery's extension -- is extensive, pardon me; 4,000 pages of documents in response to Dugaboy's discovery requests. So there's just simply no plausible basis that people were not aware that DAF had been restructured.

They are alleging in the Caymans at the very same time. They could have asked Mr. Patrick any question they want. They could have asked for documents. They did, in fact, ask Highland for its communications with Hunter Mountain leading up to the settlement, and we gave it to them. Okay, so that's discovery.

Mr. Patrick is deposed, Mr. Seery is deposed. We have multiple witnesses. I think there were 4,000 pages, and then you get to the June 25 hearing. It's an all-day evidentiary hearing. Even though Mr. Dondero's Dugaboy had not joined the Dallas Foundation objection, the judge allowed, when the Dallas Foundation withdrew its objection, the judge allowed Dugaboy to assert the same objection that Dallas had asserted, and so they got that there.

All-day evidentiary hearing, 128 exhibits, live testimony from Mr. Seery, Mr. Patrick, Mr. Dondero, all subject to cross. They could have, could have, could have made all of this stuff. There's nothing new. But let's go just a few weeks beyond that, and I'll start moving at a faster clip here.

July 1st, 2025, so we're well within (audio interference). This is the very day after Judge Jernigan denied the 90 -- or granted the 9019 approval. This is where this Texas lawsuit is filed. It's in the Texas Business Court. It is massive. I think the complaint alone is 80 pages perhaps, and tons of attachment, and it lays out the exact same scheme.

Then, July 15, 2025, the joint official liquidators in the Caymans, who are, you guessed it, they are the Dondero Foundation of which Mr. Dondero is the president. He is also the head of Dugaboy -- and I want to commend this to Your Honor in particular because you will find this July 15, 2025 writ that was filed in the Cayman Islands action. You will find this cited dozens of times in the 60(b) motion, claiming to be new evidence.

But under Rule 60(b)(2), it cannot be new because it was there within this time horizon, so they had all this information. They could have brought all of this before. They didn't. It's over and over again. There's the July 17, Dugaboy motion to stay the 9019 order, which was denied. I believe that even attached the Cayman action, so the idea that these details were not known and couldn't have been known by July 28 are false.

July 21, the joint official liquidators filed a Chapter 15 recognition proceeding in the District of Delaware.

Again, all of this is here. So the short answer to the discovery motion actually in front of the Court today is there's not a whiff, not one whiff of actually new evidence. If Your Honor just compares the 60(b) motion on one hand, and I've done this many times, and this stack of material that I just went through on the other, these allegations are all here.

And so they can take their chances on the 11th as to whether that will entitle them to relief on the 60(b) motion, but they're not as a matter of law entitled to discovery in aid of that motion unless they can actually make a showing to Your Honor. Otherwise, we'd be reopening stuff constantly and all the time.

I have more to say on the Caymans and the fraud, but let me pause if Your Honor has any questions on what is or is not new. There's literally not a single new piece of information here.

THE COURT: Okay, I don't know that I have any questions. Again, Mr. Stancil, I've read the pleadings. We've looked through, I can't say I've looked through all hundreds of pages of the exhibits, but we've certainly got them. Please, if you would file this, if you want to file this deck on the docket so that we can have it as well as the other parties, that's fine.

I understand the legal argument. I'm trying, again, to get to the practical. And so unless you have something else

related to trying to get to a resolution of this, I think I'll let Mr. Phillips make any statement he would like, and then I've got just one more question for all the parties to understand, you know, who we're really talking about deposing here.

MR. STANCIL: Well, Your Honor, let me -- I do have a practical, very practical solution, I think, that is correct under the law, which is the opportunity for offensive discovery is legally wrong. What they are entitled to do on the 11th, they can come in and put on their case, and if they can make the showing to impress Your Honor, they're entitled (audio interference) -- if they want to --

THE COURT: Sorry, Mr. Stancil.

MR. STANCIL: -- call a witness, they can call their own -- yes.

THE COURT: Mr. Stancil, your audio cut out.

THE COURT: Okay, I'm sorry, Your Honor.

THE COURT: May I make a suggestion? Why don't you go ahead and cut off your video, and hopefully that'll solve the audio problem.

MR. STANCIL: This is what I get for coming into my real office for some reason, so I get bad internet.

So, Your Honor, I think the bottom line is that they should come in on the 11th and put on their case. If you want the exceptional remedy of reopening discovery in aid of a 60(d)

motion, you have to make a showing that you have something that is new or prima facie evidence of fraud on the Court. We could get into what they've shown as to whether they have any disagreement between -- with Mr. Patrick, and we can get into the depths of what the Cayman Islands decision that was recently rendered actually says.

But they haven't shown any showing whatsoever that this Court was misled, that there was fraud in the settlement. And Your Honor has, I think, been getting at all those practical issues. So, they should be denied any affirmative discovery, which is essentially because we've already done discovery on the 9019 motion, and they can come in and make their showing, if they can, on the 11th. And we should be able to move on with this hearing -- pardon me, with this case.

And I guess I don't want to steal Mr. Phillips' thunder. I know he probably has some stronger views on some of the things I said.

THE COURT: All right. Thank you, Mr. Stancil.

Mr. Phillips?

MR. PHILLIPS: Yes, Your Honor. Thank you. I'll be brief, as brief as I can be. Now, I would throw up a couple of additional things that might be lost in the flurry. They've been mentioned, and they've been briefed and shown to the Court. But if we start with, just as Mr. Stancil has outlined, the Dallas Foundation objection and compare that to the Dugaboy

objection, the Dugaboy objection did not adopt in any way, shape, or form the Dallas Foundation objection. The Dallas Foundation, rather than proceed with their objection, dismissed their objection with prejudice.

Neither Dugaboy nor the Dallas Foundation ever sought documentary discovery from any of the parties that they now say they have to discover information from. Despite the fact, as outlined by Mr. Stancil, that the entirety of the restructuring was known to Dondero, Dugaboy, the foundations, at the -- far before the hearing.

As we point -- as Highland pointed out in his reply in Footnote 8, there's much to be said now about the compensation paid, and there needs to be discovery about that. Well, if you look at the Dallas Foundation objection, it says that the compensation went up from 40 to 600 to 2.2 million through the first half of 2024. And what Footnote 8 also says is that if they had asked, they would have found out that the compensation of $13 million was paid before the end of 2024, far before the hearing. They never asked for that information, but now they need to discover it.

And the Court asked for a practical approach. And counsel for Dugaboy is, of course, hedging and not being open kimono, because if you look at Mr. Dondero's testimony in the 9019, what you'll find is that one of Mr. Dondero's complaints about the settlement was -- and I don't know how he really has

the complaint, except he says, Highland should have sued Seery for stealing, Mr. Seery and the management group and Pachulski for stealing $700 million from the estate. And he also said in his testimony that he was bringing -- very, very quickly would be bringing a RICO action to establish that the entirety of the bankruptcy process was a RICO criminal enterprise headed up by the evil Mr. Seery and the evil Mr. Morris and his evil law firm.

So if you want to know what the practical considerations of undoing the settlement, which I don't think the Court can do, there's been a sale, there's been an assignment, there's been a transfer of assets. That's one of the things that this lawyer for Dugaboy is seeking to impose upon this Court.

Some type, and this is what they would suggest, Highland -- Hunter Mountain Investment Trust should be doing under its newly constructed control people. We don't know who they would be because they'd never offered any suggestions in any Court, in any pleading, in any even allegation who the new control person would be for Hunter Mountain Investment Trust.

But I guarantee you this, if Mr. Dondero was in charge of Hunter Mountain Investment Trust and this settlement is undone, he's already testified what he wants to do, which is sue Mr. Seery and Mr. Morris for stealing $700 million from the bankruptcy estate and to bring a RICO action that the

bankruptcy process was a criminal enterprise. Now, we reviewed those allegations and we reviewed the litigation through other counsel's eyes, mine.

We decided, and we had some support for our decision. Judge Jernigan had stated in every single case brought before her that either there was no standing or there was no colorable claim asserted. We suggested that getting HMIT the entitlement of receipt of the Dugaboy note, perhaps a $24 million payday at the end of the day or $18 million payday at the end of the day, to receive the Kirschner litigation which had been generated and brought for the benefit of the estate, which includes equity, which includes claims and our claim is not paid.

And finally, for cash that might, if we could get through all the claims and the indemnity trust could get resolved, would generate approximately 75 to 85 to 100 million dollars in cash for HMIT. We traded these claims against the estate by which HMIT in its equity position or Class 10 position was in fact paying Ms. Morris's firm to litigate against it. We said stop that and give us our money.

And so the practical considerations include very dire consequences for the judicial process, this Court, all parties, and HMIT if HMIT was forced to undergo some type of Dondero control.

THE COURT: Okay. I hear what you're saying on what happens if the settlement is reversed. I'm asking practicality

for this discovery dispute.

Okay. So if you have something --

MR. PHILLIPS: We agree with Mr. Stancil that --

THE COURT: -- other than they shouldn't get anything, then feel free to share it.

MR. PHILLIPS: I have nothing other than they shouldn't get anything, Your Honor.

THE COURT: Okay, all right. Mr. Edney, I'm going to ask you this. Who are the parties that you believe you need to depose? Is it just -- is it the same three that have been mentioned in all the pleadings, Mr. Seery, Mr. Murphy and Mr. Patrick?

MR. EDNEY: Yes, Your Honor. So in the negotiations that led to the order before Your Honor, the parties agreed to limit our depositions to one full-length, eight-hour deposition and two four-hour depositions.

We have proposed negotiating -- I'm sorry, we have proposed deposing Mr. Patrick for the long deposition, one of his co-trustees, Mr. Murphy, for the four-hour deposition, and then Mr. Seery for the other four-hour deposition.

For Highland's part, they have proposed the depositions of Mr. Dondero and his sister, Nancy Dondero, and her role as trustee at the Dugaboy Investment Trust.

THE COURT: Okay. Do we have these depositions scheduled and on the books at all? I realize they're trying to

quash all that, but I'm just trying to find out whether this is going to be done before May 1st, which is the Court's deadline to have all discovery. I mean, have the parties at least talked and said --

MR. EDNEY: Your Honor? Your Honor, no --

THE COURT: -- if the judge doesn't grant your motion, then this is the dates we're going to do these depositions?

MR. EDNEY: Your Honor, no. I don't think that that's probably feasible at this point, the May 1st cutoff for --

THE COURT: Okay.

MR. EDNEY: -- at least deposition discovery. I think what's being proposed currently is if Your Honor denies in part or in whole the motion for protective order that the parties will finish their document production by August 28th, I think probably there's going to have to be a discussion, if you deny the motion for protective order, between the parties about the feasibility of some of these document requests and to narrow it and to avoid disputes before the Court.

I think the current intention would be to try to take these depositions during the week of May 4th in advance of the hearing.

THE COURT: Okay.

MR. EDNEY: So with the benefit of whatever documents

that are produced. So that schedule probably would require some adjustment, Your Honor, that May 1st deadline, Your Honor. Just given where we are today on the 24th and if there is document production, the feasibility of getting that done and digested prior to May 1st.

THE COURT: Okay. Let me ask this next question. Earlier, I asked a question about subject matter jurisdiction and Mr. Stancil brought up Rule 62.1, which I think is an appellate rule. But there's also Federal Bankruptcy Rule 8008, which provides extremely similar or basically I think states the same thing at 62.1 states.

One of these potentials is that the Court abates this matter pending the appeal to understand what the appeal is going to be done.

I take it your position, Mr. Edney, one was that the Court has jurisdiction regardless of that rule. Mr. Stancil's position is the Court should look to the other section or the other part of that rule that says I can just deny your motion under Rule 60(b). I guess the question that I have for the parties is, is that if the Court determines that this thing just gets held in abeyance until the district court resolves or rules on the settlement appeal, what effect does that have on the estate in this litigation?

And so I don't know. Maybe Mr. Morris.

MR. STANCIL: Your Honor, I may turn that over to

Mr. Morris.

THE COURT: Yeah, I was going to say maybe Mr. Morris needs to address that question first.

MR. MORRIS: Yeah, I mean, look, Your Honor, we think that the matter is ripe to be denied right now. I think we've laid out the law in our brief. Mr. Stancil has done it again earlier today. We don't think the Court has jurisdiction to grant the motion.

But given the inability of Dugaboy even today to specifically identify not just say there's new stuff out there, but today they still cannot. And this is about their fifth chance. They had the opportunity in the motion in response to our extraordinarily limited discovery in opposition to this motion. Here today at oral argument, they cannot identify a single fact that was not known to them as of July 28th that could not have been discovered with reasonable diligence. They still have not identified a specific fact.

Under Rule 60(b)(2) or (3) newly discovered evidence or fraud, not one fact.

THE COURT: Okay.

MR. MORRIS: And on that basis, Your Honor, I think the Court should adhere to the schedule. If there's any document production to be provided, Your Honor can make that order. I'm prepared to take depositions next week if Your Honor orders it. I don't -- for the reasons Mr. Stancil stated

and I won't go over, we don't think that's appropriate here, but you're the judge and we don't want delay. That's the one thing that we don't want.

We've now adjourned this thing twice. I actually did ask and Your Honor has it in the papers. I asked them for depositions of their witnesses in the event our motion was overturned. We never got a response to that.

THE COURT: Okay.

MR. MORRIS: I want to take -- if Your Honor is going to order depositions, let's do that next week. Let's get this over with. There's no reason for delay.

THE COURT: All right. All right. Thank you.

Mr. Edney, the question is --

MR. EDNEY: Yes, sir.

THE COURT: The question is this. What effect does it have if the Court just stays this, your pending 60(b) motion until the district court rules on the motion or the appeal of the settlement.

MR. EDNEY: Your Honor, so obviously, there are time limits on Rule 60 motions, and we couldn't wait for that appeal to resolve itself to bring the motion itself. We do think Your Honor -- and I want to study this a little bit more on jurisdiction, but we do think Your Honor has -- if Your Honor believes that the motion is appropriate and well taken to ask for the case back, just as contemplated by Federal Rule

Appellate Procedure 62 and indicate that it intends to grant it, therefore, moving the appeal. And I think that that's something that the Court should explore.

As far as -- our position on deferring it until the appeal is over, my client is not with me in this room today, so I don't feel comfortable stating a position on that exactly, but I'd be willing to get back to the Court on the --

THE COURT: Well, you don't need to do that.

Okay, Mr. Phillips, is your position the same as --

MR. PHILLIPS: My position, Your Honor, --

THE COURT: -- counsel for --

MR. PHILLIPS: Yes, thank you. The position of the respondents to the subpoena, I mean, as we -- yes, my position is the same. Let's get this over with. I don't know how we get document discovery when certain of our subpoenas are returnable after the hearing date and one is returnable a week after the hearing date.

So we think there should be -- I'm just repeating myself now, Your Honor, and I embrace and adopt what Mr. Morris argued and put before the Court. But we don't want to leave this hanging. We want to move it along because we know, we know when they get before Your Honor and Your Honor is faced with when they put on their case, there won't be one.

THE COURT: Okay, all right.

All right. I appreciate the parties. I appreciate

the parties indulging the Court with trying to get a better handle and understanding of the case, the settlement, all that has gone on. The Court is going to take this motion under advisement but understands the need for a quick and rapid ruling. And so the Court intends to do so.

The Court will either advise the parties of its oral -- a time for its oral ruling or will enter a written ruling depending on the Court's review. But with that, that will be where the matter stands at this moment. And we will be adjourned.

MR. PHILLIPS: Thank you, Your Honor, very much.

UNIDENTIFIED SPEAKER: Thank you so much. Thank you very much, Your Honor.

(The proceedings were adjourned at 11:55 a.m.)

* * * * *

CERTIFICATE

I, DIPTI PATEL, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and transcribed to the best of my ability.

______________________________

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts Date: April 30, 2026