Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com

KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

**THE DUGABOY INVESTMENT TRUST'S REPLY IN SUPPORT OF ITS MOTION
FOR RELIEF FROM ORDER AND MOTION TO VACATE**

**TABLE OF CONTENTS**

A.   This Court Can and Should Issue an Indicative Ruling to Assist the District Court's
Resolution of the Pending Appeal ................................................................................................ 3

B.   Highland's Cayman Argument Is Incorrect, Overreads the February Ruling, and Does
Not Defeat Dugaboy's Rule 60 Motion ...................................................................................... 5

C.   Dugaboy Has Met the Standard for Newly Discovered Evidence under Rule 60(b)(2)... 10

   1.   Highland's Rule 60(b)(2) Argument Uses the Wrong Deadline: In Bankruptcy, the
   Relevant Rule 59 Window Closed on July 14, Not July 28.................................................. 10

   2.   Highland Misunderstands What Counts As Newly Discovered Evidence ................... 15

   3.   Highland's Case Law Does Not Support its Argument................................................ 17

   4.   Highland's Chart Grossly Oversimplifies Events........................................................ 18

D.   Dugaboy Has Established Fraud Under Rule 60(b)(3).................................................... 24

   1.   Patrick's Reorganization Scheme Directly Implicates HMIT and the Settlement ....... 25

   2.   The HMIT Trust Agreement *Automatically* Removed Mark Patrick's Authority........ 27

E.   Dugaboy Did Not Ratify or Waive its Challenge to Mark Patrick's Authority................ 30

F.   This Court Has Broad Discretion to Vacate the Settlement Order Due To Chief Judge
Jernigan's Refusal to Recuse Herself ........................................................................................ 32

   1.   28 U.S.C. § 455(a) Required Chief Judge Jernigan To Recuse................................... 33

   2.   The Court Should Vacate The 9019 Settlement Order Under Rule 60(b)(6) If It
   Determines That 28 U.S.C. § 455(a) Required Chief Judge Jernigan To Recuse ................ 38

CERTIFICATE OF SERVICE ................................................................................................ 41

**INTRODUCTION**

Dugaboy respectfully asks the Court to grant its Motion under Federal Rule of Civil Procedure 60(b) and reconsider and vacate the predecessor judge's approval of the Rule 9019 Settlement.  There are many reasons both legal and factual and equitable why it should do so.

*First*, Highland spends very little effort arguing that Mark Patrick's conduct was not wrongful.  It instead argues that Dugaboy should have pierced through Mr. Patrick's deception more quicky.  In cases of such alleged misconduct, rarely do courts—much less courts of equity— fault parties for not detecting concealed misconduct more quickly. And this Court should not fault Dugaboy here.  Mr. Patrick concealed his misconduct, and the evidence detailing it was revealed after the prior judge's ruling approving the settlement in question.

*Second*, Highland's efforts to show Dugaboy and/or Jim Dondero had known of (let alone "ratified") Patrick's conduct from the outset founder on both facts and law.  Not only does Highland cite the wrong Rule and misstate the time limit for its "new trial" argument by two weeks; i. t has tangled itself up during the worst, most consequential, and outcome-determinative two weeks it could possibly have chosen.  In those extra two weeks that Highland erroneously seeks to include in the time period where a motion for new trial was possible, the Liquidators that had stepped into the shoes of Cayman Island entities Mr. Patrick purported to control detailed the mechanism and the lack of justification for his restructuring of assets away from the charities for which they were intended.  These revelations showed the self-dealing at issue here.  Even with this July 15 filing from the Cayman Liquidators, only the Liquidators' allegations were revealed.  The admissible evidence—the emails, corporate documents, and other evidence uncovered by the Liquidators—was only provided in subsequent filings by the Liquidators over the next six months. It is this *evidence* that enabled the motion to vacate before the Court now.

Highland's argument that Dugaboy could have somehow replicated the results of the Liquidators' investigation through the limited discovery provided prior to the 9019 approval order is without merit. The Liquidators were able to unpack Patrick's fraud only by stepping into the shoes of the Cayman Charitable DAF Holdco entity and getting access to the corporate restructuring documents from that Company's lawyers and advisers. The period of time between the motion to approve the 9019 settlement to the order doing so was just a touch over a month. As Highland's counsel described at the recent hearing on the motion for protective order, the discovery process attendant to such bankruptcy proceedings is not like that in district courts; it is time compressed and "imperfect" (Mr. Morris's words). That this "imperfect" process would have laid bare the scope and depth of Mr. Patrick's actions—especially when Mr. Patrick said during his deposition that he did not know whether he had moved Hunter Mountain under the chain of ownership of the charity run from his basement (DFW Charitable)—is far-fetched. It is for this reason that everyone—Dugaboy, the Liquidators, and the Texas Attorney General—asked the Court to wait before approving the settlement for the results of the pending investigations. Rule 60 and this Court's equitable powers are the appropriate vehicles for addressing the evidence later uncovered by the pending Liquidators' investigation. .***Third***, Highland's efforts to divorce Mr. Patrick's misconduct from these bankruptcy proceedings or from Mr. Patrick's authority to enter into the settlement are not well taken. What the Court and the bankruptcy process deserved was an honest broker acting in the best interests of third-party charities. What it got was Mr. Patrick, who had reorganized all the entities so that any settlement would redound solely for his own benefit, and he made decisions accordingly. He was a different person than the actor honoring fiduciary duties who should have been negotiating with Highland. Had Mr. Patrick's conduct not been concealed prior to the 9019 proceedings, a court would have removed him from his position

2

or enjoined his from dealing away an asset of Hunter Mountain's magnitude. But this is not just a prediction of what judicial action would have been. It is the automatic operation of the governing documents. That is because the founders of the Hunter Mountain Investment Trust provided that its administrator would lose authority to act *automatically* if he engaged in misconduct or breached fiduciary duties, not just with respect to Hunter Mountain but *in any capacity*. The governing documents demanded an above-board actor as administrator. And the evidence revealed by the Liquidators subsequent to the settlement approval order shows the misconduct and breaches prior to the order that automatically stripped him of authority at the time of that misconduct. Mr. Patrick did not have authority to cause Hunter Mountain to enter into the settlement at issue.

*Finally*, Highland's attempts to fault Dugaboy for somehow concealing or misrepresenting to this Court either the content of the Cayman court's ruling or the circumstances of Chief Judge Jernigan's recusal fail on the evidence. Dugaboy did no such thing, and this Court was in no way misled.

## ARGUMENT

### A. This Court Can and Should Issue an Indicative Ruling to Assist the District Court's Resolution of the Pending Appeal

For the reasons Dugaboy explained at the April 24, 2026 hearing and in its follow-up letter to the Court (Dkt. 4563), this Court can and should keep the Rule 60(b) motion and issue an indicative ruling that will aid the District Court's resolution of the pending appeal. The Fifth Circuit has recognized that when new evidence relevant to a district court's order is discovered while an appeal of that order is pending, the "proper procedure for addressing such newly discovered evidence would be . . . to file a Rule 60(b)(2) motion to set aside the judgment in the district court and to seek an indicative ruling pursuant to Rule 62.1." *Malik v. United States Dep't of Homeland Sec.*, 78 F.4th 191, 202 (5th Cir. 2023); *see also* Wright & Miller, Fed. Prac. & Proc.

Civ. § 2911 (3d ed.) ("When a district court concludes that newly discovered evidence warrants

vacatur of a judgment that is already on appeal, the court can issue an indicative ruling, thereby

allowing the court of appeals to remand the matter to the district court and obviating the need for

the appeal.") (citing *Amarin Pharms. Ireland Ltd. v. FDA*, 139 F. Supp. 3d 437 (D.D.C. 2015)).

The Court should not, as Highland prefers (Dkt. 4564), simply drop the matter in a way that will

be helpful to no one.

Furthermore, Dugaboy's Motion under Rule 60(b) also seeks this Court's reconsideration

of several rulings made by the predecessor bankruptcy judge.  Dkt. 4513 at 33–50.  A bankruptcy

court's decision on a motion for reconsideration is generally an interlocutory order.  *See, e.g.*, *In

re ProvideRX of Grapevine, LLC*, 507 B.R. 132, 141–43 (Bankr. N.D. Tex. 2014).  That further

supports this Court's authority to consider the Rule 60(b) motion and make an indicative ruling

pending the District Court's resolution of the appeal.

Highland's only real argument against an indicative ruling is its contention that the newly

discovered evidence is not relevant.  *See* Dkt. 4535 at 46–49.  That is both wrong and misplaced,

being a fact-heavy argument that should be resolved at the merits stage and not a preemptive strike

to bar the Court from ever reaching the merits. Furthermore, Highland's assertions that Patrick's

transactions "have nothing to do with Highland, Dugaboy, the 9019 Settlement . . .or the manner

in which Patrick exercised such authority and control in entering into the 9019 Settlement," *id.* at

27, ignores entirely the actual substance of Dugaboy's argument.  As Dugaboy has established,

the newly discovered evidence shows that the Rule 9019 settlement was not in fact "negotiated

and entered into by . . . the HMIT Entities without collusion or fraud [and] in good faith."  Dkt.

4513 at 27–29.  It shows that "Patrick remained in his position only because of fraudulent efforts

to cover up his misconduct and that, indeed, he was seeking the settlement to deter investigation

4

into it." *Id.* at 34.

This evidence is relevant because Highland cannot legitimately dispute that a finding of good faith by Mark Patrick was a necessary prerequisite to the predecessor judge's approval of the settlement. In fact, Highland essentially concedes that finding *was* necessary. *See* Dkt. 4535 at 53 ¶ 27 (arguing that "any complaint . . . regarding the terms of the 9019 Settlement is completely undercut by the public disclosure and Court approval of those terms," and that the record shows that the settlement was "negotiated at arm's-length in good faith"). Accordingly, Highland's reliance on *Greon v. Holding Cap. Grp., Inc. (In re PBS Foods, LLC)*, 549 B.R. 586, 598–606 (Bankr. S.D.N.Y. 2016), is misplaced. That case involved newly discovered evidence that was concededly *not* relevant. *Greon*, 549 B.R. at 599, 603 (stating that the new documents did "not contain information that is directly relevant to this action" and did "not substantiate, or even support" the movant's allegations of misrepresentation, fraud, or misconduct). Here, by contrast, the newly discovered evidence is central to the merits arguments set forth in Sections D and E below.

Lastly, and tellingly, Highland offers no response to Dugaboy's point that the Court should allow testimony and evidence on the Rule 60(b) motion now lest it be spoiled because memories fade and witnesses become unavailable—exactly Highland's preferred outcome. *See* Dkt. 4563.

**B. Highland's Cayman Argument Is Incorrect, Overreads the February Ruling, and Does Not Defeat Dugaboy's Rule 60 Motion**

Highland's reliance on the February 10, 2026 Cayman Grand Court ruling does not defeat Dugaboy's Rule 60 motion. Highland treats that ruling as if it were a merits determination exonerating Patrick, eliminating concerns about the challenged restructuring, and undermining Dugaboy's standing in this Court. It did none of those things. The Grand Court denied a stringent form of interim "proprietary" relief because, under the Cayman Exempted Limited Partnership Act

5

("ELP Act"), the Donor-Advised Fund ("DAF") Holdco had not shown a sufficiently arguable proprietary interest in downstream Fund assets for purposes of that specific remedy. *Charitable DAF Holdco, Ltd. (in Official Liquidation) v. Patrick*, [2026] CIGC (FSD) 9, ¶¶ 130–40, 146–57 (Grand Ct. Cayman Is. Feb. 10, 2026). That was a Cayman-specific remedy for interim injunctive relief. It is not a merits judgment exonerating Patrick from wrongdoing, not a finding that the challenged restructuring was proper, and is not controlling on any issue before this Court under U.S. law.

The balance of the Grand Court's order confirms the point. It did not dismiss the underlying breach-of-duty theory as insubstantial. It described the principal allegation as a serious one: that the directors had stripped the company of its only asset to seize control and enrich themselves without the scrutiny of the charitable entities. *Id.* ¶¶ 246–52. The court then held that DAF and the Joint Official Liquidators had "a case which the Directors need to answer" and that there was "a serious issue to be tried" as to whether the restructuring was carried out in breach of duty. *Id.* ¶¶ 253–54. Just as importantly, the Grand Court expressly declined to decide whether that case was likely to succeed. *Id.* ¶ 255. Highland's narrative therefore omits the part of the February ruling most important to this Court: that it refused one form of interim relief but did not reject the core fiduciary-breach allegations on the merits.

The contention that Dugaboy possessed or knew of an advance draft of the Grand Court's order is simply false.  Highland tries to connect the disparate dots by pointing to Dondero's involvement in Dugaboy and the charitable entities as justifying imputing his knowledge to Dugaboy.  This ignores a fundamental tenet of U.S. corporate law that "separately incorporated organizations are separate legal units with distinct legal rights and obligations." *Dewberry Grp., Inc. v. Dewberry Eng'gs Inc.*, 604 U.S. 321, 327 (2025) (quoting *Agency for Int'l Development v.*

6

*All. for Open Soc'y Int'l Inc.*, 591 U.S. 430, 435 (2020)). Even if entities share common ownership or are affiliated, they are separate and distinct individuals under the law. *Id.* Such distinctions may only be disregarded in extraordinary circumstances, such as veil-piercing or in cases of alter ego, none of which Highland pleads here. Nor could it, as Dugaboy and the charitable entities are distinct corporate entities with individual identities and purposes.

Even if Dondero might have served as a conduit for actual knowledge to the entities, imputation is improper. An individual's knowledge is imputed to the corporation only if "acquired [in] furtherance of the corporation's business or within the course of the employment of an individual serving in some corporate representative capacity[.]" *In re Sunpoint Sec., Inc.*, 377 B.R. 513, 562 (E.D. Tex. Bankr. 2007). The key is therefore on which entity's behalf Dondero acted when allegedly receiving knowledge of the Grand Court's decision. Although Highland fails to allege exactly when Dondero learned of the decision, it claims that the "Foundations' counsel was on the call for the Cayman Status Quo hearing" which indicates the Foundations' knowledge of the decision. Dkt. 4568 at 2. Its accusation rests on inference, not evidence. Even if Dondero received advance notice of the decision from the Foundations' counsel, this information cannot be imputed to Dugaboy as Dondero was acting in his capacity with the Foundations, rather than on behalf of Dugaboy. Highland has shown no actual transmission of knowledge to Dugaboy, no agency relationship making Dondero's knowledge Dugaboy's knowledge, and no domination so complete as to warrant the extreme remedy of disregarding corporate formalities.

In addition, Highland continues to misread the content of the Grand Court's ruling in briefing and in letters before this Court. Dugaboy is mindful of this Court's admonition against "mudslinging" but Highland's continued insistence that Dugaboy is "misleading" the Court cannot go unanswered.

7

Highland contends that the Grand Court "effectively dismissed the claims of fraud" and only maintained the fiduciary duty claims. Dkt. 4568 at 2. This is wrong. The Grand Court discussed both fraud and fiduciary allegations at length, stating it "has been persuaded that [DAF] and the Joint Official Liquidators have a claim which "the Directors need to answer in relation to the divestiture of [DAF's] limited partner interest in the Fund[.]" Dkt. 4534-4 at ¶ 253. Further, the Grand Court states that "there is a serious issue to be tried as to whether the Directors acted in breach of duty *in undertaking the restructuring.*" *Id.* at ¶ 254 (emphasis added). While Highland focuses narrowly on the words "breach of duty," the Grand Court's decision is clear that the allegations forming the basis of the Company's fraud claim—namely Patrick's scheme to restructure away hundreds of millions of dollars devoted to charitable endeavors to line his own pockets—present "a serious issue to be tried[.]" *Id.* Nowhere does the Grand Court dispose of any claims of fraud. Its narrow holding is limited to denying the requested preliminary injunction under its consideration of the balance of convenience in exercise of its discretion, *id.* at ¶ 256, despite the "serious issue to be tried" and "real . . . prospect of success at trial" on the underlying claims. *Id.* at ¶¶ 254–55.

Highland also complains of Dugaboy mischaracterizing its briefing as asserting "that the allegations of Patrick's misconduct had no merit and that no one should be allowed to ask any further questions about it." Dkt. 4568 at 2 (citing Dkt. 4567 at 1). But Highland's briefing speaks for itself, where it claimed "the Cayman Islands court . . . dismissed the claims of fraud" under "a standard akin to a motion to dismiss." Dkt. 4533 at 16, 15 (emphasis omitted). Highland did so in its unsuccessful Motion for a Protective Order to block any further discovery into Patrick's fraud, which this Court has denied. *See* Dkt. 4599 (May 6, 2026 order).

8

Finally, the entire discussion of the Grand Court's February ruling is mooted by the Cayman Court of Appeal's April 22, 2026 decision granting the preliminary injunction the Joint Official Liquidators had sought in the Grand Court. *See* Dkt. 4567-1. The Court of Appeal reinstated broad interim restraints that prohibit Patrick and other respondents and fund entities from transferring assets outside the ordinary course of business, increasing remuneration, altering governance, winding down entities, or destroying records pending disposition of the appeal. Ex. 6, Certificate of Order ¶¶ 1–3 & sch. 1, *Charitable DAF Holdco, Ltd. (in Official Liquidation) v. Patrick*, Cause No. CICA 003 of 2026 (Ct. App. Cayman Is. Apr. 22, 2026) (Dkt. 4567-1). On the same record, the Court of Appeal found an injunction is necessary to protect the assets targeted by Patrick's fraudulent scheme. *Id.* at 2–4.

While this interim order does not adjudicate the ultimate merits of the claims against Patrick, it effectively overrules the Grand Court's finding that good reason did not support the belief that "the relevant assets will be adversely dealt with" due to the safeguards provided by the "Texas Rule 11 Agreement." Dkt. 4534-4 at ¶ 240. While Highland contends that the April decision "did not reverse any portion of the Grand Court's remedial ruling," Dkt. 4568 at 1 (revisions omitted), it effectively supersedes and nullifies the Grand Court's order. And it extends to numerous Fund Entities,[1] most significantly Patrick's own sham DFW charitable entity as well as HMIT. That breadth matters because Highland asks this Court to treat the February Grand Court ruling as if it eliminated any live concern about asset transfers, compensation changes, governance changes, wind-downs, or record preservation. It also matters because Highland asks this Court to

---

[1] CDH GP, Ltd.; CDMCFAD, LLC; Charitable DAF Fund, LP; Charitable DAF Fund 2, LP; CLO HoldCo, Ltd.; Liberty CLO HoldCo, Ltd.; HCT Holdco 2, Ltd.; MGM Studios HoldCo, Ltd.; CLO HoldCo LLC; Rand Advisors LLC; and — most significantly — DFW Charitable Foundation, as well as HMIT. April 22, 2026 Order at sch. 1.

9

believe that the Cayman liquidation proceeding has no bearing on HMIT. That is wrong for the reasons discussed in Section E below.

### C. Dugaboy Has Met the Standard for Newly Discovered Evidence under Rule 60(b)(2)

Dugaboy shows that its new evidence meets the appropriate definition of newly discovered evidence under Rule 60(b)(3) and does so within the correct time frame prescribed by the rules on motion for new trial. This showing begins from two first principles and then proceeds to clear and consequential facts.

***First***, "newly discovered" does not mean the same thing as "new." In other words, what matters is when ***Dugaboy (or James Dondero) learned*** (or reasonably should have learned) of the evidence or conduct, not when it actually occurred. That is why wrongful conduct by Patrick prior to the Settlement can be "newly discovered" to the extent Dugaboy or Dondero only learned about it after the Settlement.

***Second***, to the extent Dugaboy or Dondero were aware of some discrete facts prior to the Settlement, they lacked sufficient context to reveal the full scope of Patrick's scheme. Prior to the two major disclosures from the Caymans in July and December of 2025, as Dugaboy has showed at length, they had only pieces of the puzzle and could not discern the whole picture. *See* Opening Brief, Dkt. 4513 at 27–29.

Now comes a baffling misreading of the law with spectacularly bad consequences for Highland.

### 1. Highland's Rule 60(b)(2) Argument Uses the Wrong Deadline: In Bankruptcy, the Relevant Rule 59 Window Closed on July 14, Not July 28

Highland's "no newly discovered evidence" argument rests on a threshold error about the governing deadline. Highland repeatedly asserts that because the Settlement Order was entered on

June 30, 2025, Dugaboy had until July 28, 2025 — 28 days later — to move for a new trial under Civil Rule 59(b). Obj. ¶¶ 6, 33, 58–63. That is the ordinary civil deadline, but it is not the deadline in a bankruptcy case. Civil Rule 60(b)(2) permits relief from a final order based on "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2). In bankruptcy, however, Civil Rule 59 applies only as modified by Bankruptcy Rule 9023, which provides that a motion for a new trial or to alter or amend a judgment "must be filed within 14 days after the judgment is entered." Fed. R. Bankr. P. 9023(a), (b). Bankruptcy Rule 9024 then makes Civil Rule 60 applicable in bankruptcy cases. Fed. R. Bankr. P. 9024(a). Thus, Rule 60(b)(2)'s diligence inquiry asks whether the evidence could reasonably have been discovered in time to file within the bankruptcy Rule 9023 period, not within Civil Rule 59's ordinary 28-day period.

That distinction is dispositive. The Settlement Order was entered on June 30, 2025. Dkt. 4297. Applying Bankruptcy Rule 9023 and the time-computation rules in Bankruptcy Rule 9006(a), the deadline to file a Rule 9023 motion was July 14, 2025. Fed. R. Bankr. P. 9006(a)(1), 9023(b). The Court could not enlarge that deadline. Fed. R. Bankr. P. 9006(b)(2). Highland's July 28 date impermissibly tacks two extra weeks onto the period of time during which Dugaboy could theoretically have moved for a new trial. That matters because the central Cayman materials were not discovered by the actual new-trial deadline of July 14. The Cayman Court sanctioned the JOL litigation on July 14, 2025 — the final day of the bankruptcy Rule 9023 window. Cayman Sanction Order, Reply Ex. __. The Joint Official Liquidators filed their Statement of Claim the next day, July 15, 2025. Dkt. 4326, Ex. A; Obj. ¶ 34. The Chapter 15 petition and MacInnis Declaration were filed on July 21, 2025. Dkt. 4521, Ex. G; Obj. ¶ 34.

Highland's timing argument depends on treating those July 15 and July 21 materials as if

11

they could have supported a Rule 9023 motion merely because they existed before July 28. But July 28 is not the operative date. Once the Settlement Order was entered on June 30, the bankruptcy new-trial deadline expired on July 14. Fed. R. Bankr. P. 9023(b). And even though the Cayman Court sanctioned the JOL litigation on July 14, Dugaboy could not reasonably have obtained, analyzed, authenticated, and incorporated into a Rule 9023 motion that same day foreign-court materials that were not even filed in the Cayman court until July 15. Rule 60(b)(2) requires reasonable (emphasis added) diligence. *See Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 639 (5th Cir. 2005) (requiring due diligence and materiality for Rule 60(b)(2) relief); *Johnson Waste Materials v. Marshall*, 611 F.2d 593, 597 (5th Cir. 1980) (same). The compressed bankruptcy deadline is precisely why Rule 60(b)(2), through Bankruptcy Rule 9024, is the proper procedural vehicle here.

The following timeline identifies the material evidence that came to light only after the July 14, 2025 expiration of the Rule 9023 window.

| DATE | EVENT | SOURCE |
|---|---|---|
| June 26, 2025 | Cohen & Co issued the Rand PE Fund I, L.P. 2024 Audit dated as of February 24, 2025. Revealed<br>• Beacon Mountain was sold on February 12, 2025,<br>• The $1 million sale value was set solely on the transaction price,<br>• The auditors were not informed of the subsequent $23.5 million value of Beacon/HMIT,<br>• Auditors did not know Patrick dealt Beacon/HMIT to himself;<br>• Patrick redeemed out the investors of Rand PE Fund before he sold Beacon/HMIT, and<br>• First admissible evidence of $1 million sale price.<br>The audit was issued one day after the 9019 Hearing and only four days before the Settlement Order was entered on June 30, 2025, leaving Dugaboy without a meaningful opportunity to obtain, analyze, and present it | Dkt. 4513-48, Rand Fund 2024 Audit (dated June 26, 2025). |

| | before the Court approved the Settlement. | |
|---|---|---|
| July 14, 2025 | Cayman Court grants sanction to JOLs to commence litigation against Patrick and other defendants for breaches of fiduciary duty, unlawful means conspiracy, unjust enrichment, and equitable relief. **This occurred on the final day of the Rule 9023 window—too late for Dugaboy to incorporate into a same-day motion.** | Dkt. 4513-G, MacInnis Decl. ¶ 72 (Dkt. 4-60, Case 25-11376-BLS, Filed 07/21/25). |
| July 15, 2025 | JOLs file the sealed Writ and Statement of Claim in the Cayman Court, commencing litigation against Patrick, Murphy, CDMCFAD ("CDM"), DFW Charitable Foundation, CDF GP, and CLO HoldCo. The Statement of claim, for the first time, revealed<br>• The extent of Patrick's compensation take,<br>• The self-dealing by which he took such compensation,<br>• The internal, otherwise privileged communications of Charitable DAF Holdco, Ltd. that demonstrated the intent and planning to commit fraud and breach of fiduciary duty, and<br>• The exact timing and mechanics of how Patrick restructured the DAF.<br>**However, these only were allegations and Dugaboy had to wait for publicly filed evidence in support of these allegations.** | Dkt. 4513-B, Statement of Claim (FSD 201 of 2025 (RPJ) (Filed 07/15/25)); First MacInnis Aff., TDIT004967– TDIT006484. |
| July 15, 2025 | First application of Margot MacInnis sworn and filed in Cayman Court in support of the Statement of Claim. This was not obtained by Dugaboy or its affiliates until at the earliest October 2025. The Affidavit presents, for the first time, the JOLs' investigation findings with 94 supporting exhibits, including:<br>• Internal Patrick emails directing creation of untraceable entities (Ex. 2, First MacInnis Aff., TDIT005476);<br>• The November 26, 2024 email laying out Patrick's DFW Foundation scheme (Ex. 2, First MacInnis Aff., TDIT005481);<br>• Director resolutions awarding Patrick $975,000 LTI and 2.5x base salary bonus (Ex. 2, First MacInnis Aff. TDIT005735-38);<br>• Employment agreement backdated to March 2021 with $4,759,000 LTI (Ex. 2, First MacInnis Aff., TDIT005743); and<br>• Documents showing the CDM Assignment and Redemption that left CLO HoldCo with only $1.6 million from a $270 million interest. (Ex. 2, First MacInnis Aff., TDIT005903-77). | Ex. 2, First MacInnis Aff.. |

| July 15, 2025 | JOLs file application for proprietary injunction to prevent defendants from dealing with HoldCo's assets, together with disclosure orders and leave to serve U.S.-based defendants. | Dkt. 4513-G, MacInnis Decl. ¶ 73, Exs. 59, 82–83 (Case 25-11376-BLS, Dkt. 4, Filed 07/21/25). |
|---|---|---|
| July 17, 2025 | Dugaboy files its Motion to Stay 9019 Order (Dkt. 4326), promptly alerting the Court to the JOL petition and requesting 90 days to investigate allegations of fraud. **This confirms Dugaboy's diligence. It moved within two days of receiving the JOL materials, but after the Rule 9023 window had already expired.** | Dkt. 4513-30, Motion to Stay 9019 Order (Dkt. 4326, Filed 07/17/25). |
| July 21, 2025 | Declaration of Margot MacInnis is filed in Chapter 15 Petition for Recognition of Foreign Main Proceeding in the U.S. Bankruptcy Court for the District of Delaware (Case No. 25-11376-BLS). The MacInnis Declaration provides a comprehensive account of <ul><li>Patrick's elimination of his fiduciary duties through insertion of CDMCFAD (¶104),</li><li>The DAF restructuring documents (¶¶ 26-39),</li><li>ValueScope's fraudulent March 25, 2025 valuation disclosed(¶35);</li><li>The lack of transparency (¶¶ 43-61), and</li><li>The Cayman litigation (¶¶ 62-76).</li></ul> <b>This filing provided the first comprehensive, U.S.-court-of-record account synthesizing the JOLs' findings into a single narrative for Dugaboy's use.</b> | Dkt. 4513-G, 3-46, MacInnis Decl. in Support of Delaware Chapter 15 Petition (Case 25-11376-BLS, Dkt. 4, Filed 07/21/25). |
| July 31, 2025 | Cayman Court enters Consent Order imposing undertakings on Named Defendants and CDM Entities to prevent asset dissipation and provide transparency/disclosure to JOLs. | Ex. 1, MacInnis Supplemental Decl. ¶¶ 8–10 (Case 25-11376-BLS, Dkt. 22, Filed 08/27/25). |
| August 27, 2025 | JOLs file Supplemental Declaration of Margot MacInnis and Motion for Provisional Relief (turnover of books and records) in the Chapter 15 case, revealing that service providers Carrington Coleman internal memoranda; ValueScope, Hunton, and Seyfarth Shaw refused to produce records in connection with their engagement by HoldCo. | Ex. 1, MacInnis Supplemental Decl. ¶15 (Case 25-11376-BLS, Dkt. 22, Filed 08/27/25). |
| September 12, 2025 | Defendants provide income statements as the first substantive financial disclosure to JOLs, showing directors' fees of approximately $11.6 million for 2024 alone across three entities controlled by Patrick. **This far exceeds what was known at the time of the 9019** | Dkt. 4315-I, Third Affidavit of Margot MacInnis (Filed Under Seal, November 2025) ¶¶ |

| | | |
|---|---|---|
| | **Hearing on June 25, 2025. This also provides the first admissible evidence of such payments.** | 63–64. |
| November 2025 | Third Affidavit of Margot MacInnis filed under seal, detailing:<br>• Total payments to Patrick of $10,548,778 in salary bonuses, and LTI in 2024 (¶65);<br>• Patrick's transfer of his family home to a trust and discharge of mortgage in January 2025 (¶53);<br>• Ongoing breaches of the Interim Undertakings (¶106); and<br>• Discovery that the Defendants transferred $2.68 million to law firms and ValueScope before the July 31 injunction hearing (¶106). | Dkt. 4315-I, MacInnis Affidavit 3 (Filed Under Seal, November 2025). |
| December 15–16, 2025 | Two-day injunction hearing in the Cayman Court. | Dkt. 4315-I, Third Affidavit of Margot MacInnis (Filed Under Seal, November 2025) ¶ 150. |

### 2. Highland Misunderstands What Counts As Newly Discovered Evidence

Highland's contrary position misunderstands what counts as "newly discovered" evidence. Highland argues that Dugaboy's evidence fails to satisfy Rule 60(b)(2) because it "did not exist at the time of trial," or else could have been discovered earlier, is cumulative, immaterial, or outcome-neutral. Obj. ¶ 59. But Rule 60(b)(2) does not require that the documentary form of the evidence exist before judgment; it requires that the evidence concern facts that existed and could not, with reasonable diligence, have been discovered in time to move under Rule 59(b), as modified here by Rule 9023. Fed. R. Civ. P. 60(b)(2); Fed. R. Bankr. P. 9023(b), 9024(a). The Fifth Circuit made that distinction in *Chilson v. Metropolitan Transit Authority*, 796 F.2d 69 (5th Cir. 1986). There, the plaintiff claimed he was fired for criticizing MTA's contract with a consultant; after judgment, he relied on a later internal audit showing MTA had overpaid that consultant by about $2.6 million during the same period. *Id.* at 69–70. The district court rejected the audit as later-

created evidence, but the Fifth Circuit reversed because the relevant evidence was not the post-trial audit as a document — it was the preexisting overpayment the audit revealed. *Id.* at 70–72; *see also id.* at 72 ("[W]hat is critical is the content of the evidence, not the form in which it comes."). That principle defeats Highland's attempt to label the Cayman materials as categorically too late. The Patrick-related conduct existed before the Settlement Order, but the filed JOL pleadings, the MacInnis Declaration, and the supporting materials that exposed, organized, and authenticated that conduct did not become available to Dugaboy in time to file a Rule 9023 motion by July 14.

The cases Highland cites do not change the result. Decisions such as *General Universal Systems, Inc. v. Lee*, 379 F.3d 131 (5th Cir. 2004),[2] and *NLRB v. Jacob E. Decker & Sons*, 569 F.2d 357 (5th Cir. 1978),[3] reject Rule 60(b)(2) relief for after-occurring facts or later-created evidence that is not evidence of facts existing at the relevant time. Dugaboy is not relying on a later event that changed the facts after the Settlement Order. Dugaboy relies on later-disclosed evidence of preexisting misconduct, ownership transfers, self-dealing, compensation, concealment, and control issues that bore directly on whether the 9019 Settlement was negotiated and presented in good faith. That is the *Chilson* scenario, not the *General Universal* or the *Decker* scenario. *Chilson*, 796 F.2d at 72–73.

Highland may establish Dugaboy or Dondero knew some facts before July 14. Obj. ¶¶ 34–36. But partial suspicion is not the same as possession of material, admissible, court-authorized evidence sufficient to support a post-judgment motion. Rule 60(b)(2) asks whether the evidence

---

[2] In *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131 (5th Cir. 2004), after GUS lost its copyright claims, it relied on statements made in a later proceeding and on an expert report prepared after final judgment, contending that those materials showed HAL had copied portions of its software. *Id.* at 156–58.
[3] In *NLRB v. Jacob E. Decker & Sons*, 569 F.2d 357 (5th Cir. 1978), the employer relied on felony convictions that occurred after the administrative hearing. *Id.* at 363–65.

16

could have been discovered with reasonable diligence in time to file the Rule 59 motion; it does not penalize a movant for lacking the full evidentiary picture until after the deadline. Fed. R. Civ. P. 60(b)(2); *see Chilson*, 796 F.2d at 73; *Harrison v. Byrd*, 765 F.2d 501, 503 (5th Cir. 1985). Here, before July 14, Dugaboy had only pieces of the puzzle and not the whole picture. The JOL Statement of Claim and MacInnis materials supplied the missing evidentiary context after the bankruptcy Rule 9023 deadline expired.

This is also why Dugaboy's prompt July 17 stay motion does not undermine its Rule 60(b)(2) position. To the contrary, it confirms diligence. Once the JOL Statement of Claim was filed on July 15, Dugaboy promptly brought the issue to this Court's attention. *See* Dkt. 4326. By then, of course, the Rule 9023 period had already expired. At the same time, the MacInnis Declaration and Chapter 15 materials, *i.e.*, the 94 Cayman exhibits, still had not been filed in the Delaware bankruptcy court. Dkt. 4521, Ex. G; Obj. ¶ 34. Highland cannot convert Dugaboy's prompt effort to alert the Court into proof that Dugaboy could have filed a fully supported Rule 9023 motion by July 14.

Accordingly, Highland's Rule 60(b)(2) timing objection should be rejected at the threshold. Even accepting Highland's premise that Rule 59's new-trial framework applies to this contested Rule 9019 settlement order, the applicable deadline in bankruptcy was July 14, 2025, not July 28, 2025. Fed. R. Bankr. P. 9023(b). The key Cayman evidentiary materials were not reasonably available in a filed and usable form by that date. Rule 60(b)(2), made applicable by Bankruptcy Rule 9024, is therefore the proper vehicle for Dugaboy's newly discovered evidence arguments.

### 3. Highland's Case Law Does Not Support its Argument

In *Gov't Fin. Servs. One Ltd. Partnership v. Peyton Place, Inc.*, 62 F.3d 767 (5th Cir. 1995), key language—on which that court based its holding—clearly distinguishes the case from this one.

17

*See* Dkt. 4535 at 33 n.97.  In *Peyton Place*, the movant "did not contend in its memoranda in support of its Rule 60(b)(2) motion or in its brief on appeal that it did not have access to the document either before or during the trial."  *Peyton Place, Inc.*, 62 F.3d at 771.  "Therefore," the Fifth Circuit "conclude[d] that Peyton Place failed to demonstrate to the district court that it could not have obtained the information before or during the trial even if it had exercised due diligence." *Id.; see also id*. at 772 (similar, regarding additional documents).  Highland also selectively cites *Longden v. Sunderman*, 979 F.2d 1095 (5th Cir. 1992).  Dkt. 4535 at 33 n. 97.  In that case, it was "undisputed that the evidence offered by [the movant] *was in her files prior to the May 1 hearing*." *Longden*, 979 F.2d at 1103 (emphasis added).

Here, by contrast, Dugaboy has explained that the proceedings in the Cayman Islands investigating Patrick's and his associates' malfeasance were subject to a confidentiality restriction until December 2025.  Dkt. 4513 at 28–29; *see also id.* at 39–40.  Therefore, Dugaboy did not know of the particular documents or "have access to" them or have them "in [their] files" when the Rule 9019 motion was heard and decided, and *Peyton Place* and *Longden* provide no support to Highland. Moreover, other evidence came out after the June 2025 settlement hearing, notwithstanding Dugaboy's diligent inquiry, because of Patrick's own obfuscation.  Dkt. 4513 at 39; *see* Sections C(5). and E(1).

### 4.  Highland's Chart Grossly Oversimplifies Events

Highland attempts to demonstrate that Dugaboy knew every material fact well in advance of the 9019 Settlement by presenting a chart that purports to show that each item of allegedly newly discovered evidence was already known to Dugaboy before July 28, 2025. Reply at 21–22. Highland's chart, however, is a gross oversimplification that conflates Dugaboy's awareness of certain underlying corporate events with knowledge of the specific facts and concealment that

18

form the basis of Dugaboy's Rule 60(b)(2) motion. As demonstrated in the chart below, the sources

Highland cites do not establish prior knowledge of the material facts at issue, and therefore do not

refute Dugaboy's showing under Rule 60(b)(2):

| Highland's Alleged "Old" Information | Highland's Cited Sources of Prior Knowledge | Why This Does Not Refute Rule 60(b)(2) |
|---|---|---|
| "Patrick has controlled DAF Entities since 2021." | Dondero Affidavit (Apr. 16, 2025); Winding Up Petition (Apr. 23, 2025); Dallas Foundation Objection (June 9, 2025); Foundations Action (July 1, 2025). | The Dondero Affidavit and Winding Up Petition raised *concerns* about Patrick's control but did not contain the transactional documentation (share transfers, resolutions, assignments) that would be necessary at an evidentiary hearing to prove the scope and method of control. Ex. 3, Affidavit of Jim Dondero; Dkt. 4315-E (Winding Up Petition). The Dallas Foundation Objection (Dkt. 4231) expressed suspicion but explicitly stated it lacked sufficient information to make detailed allegations and requested further investigation.<br><br>None of these documents contained the actual April 2, 2021, CLOH shareholder resolutions or the March 21, 2021, DAF GP Assignment & DAF Holdco Share Transfer. Those documents first appeared in connection with the MacInnis Affidavit. *See* Ex. 2 First MacInnis Aff., (2021 CLOH Shareholder Resolution, MM-1, 1439 n.13); (DAF GP Assignment & DAF Holdco Share Transfer, MM-1, 1439 n.1). Suspicion of control is not the same as possession of authenticated evidence proving, how, when, and through what mechanism control was obtained. |
| "Patrick has controlled HMIT Entities since 2022" | Dondero Affidavit (April 16, 2025); Dallas Foundation Objection (June 9, 2025); MIPA (Aug. 1, 2022); Atlas GP Consents (Oct. 13, 2022); HMIT Appointment (Aug. 12, 2022). | Highland cites the Membership Interest Purchase Agreement, Atlas GP Consents, and HMIT Appointment documents with Bates references (Dkt. 4255, Exs. 75, 82, 86–88), but these are Highland's own trial exhibits that it introduced at the 9019 Hearing. **Critically, at his June 23, 2025 deposition, Patrick could not identify who owned CDMCFAD, stating he would need to "revisit the actual organizational documents."** 4315-49, 6/23/2025 Patrick Deposition, 7:22–25. Two days later at the 9019 Hearing, Patrick readily confirmed that |

| | | |
|---|---|---|
| | | CDMCFAD owned Charitable DAF Fund, LP and that DFW Charitable Foundation was the "ultimate beneficial owner." 4315-23, 6/25/25 Hearing Transcript, 174:8–14. Yet when pressed on the December 2024 transaction (in which Patrick caused Charitable DAF Holdco to transfer its entire $270 million interest in the Fund to CDMCFAD), Patrick repeatedly claimed not to recognize "Charitable DAF Holdco," demanding corporate documents and asserting "there could be a lot of entities called that." *Id.* at 177:21–24. The Court "fe[lt] like [Patrick was] feigning confusion." *Id.* at 182:4–15. Immediately thereafter, Patrick confirmed he was involved in the transaction and that CDMCFAD obtained its interest "from an entity called Charitable DAF Holdco, Ltd." *Id.* at 187:7–12. **This was the first time Dugaboy learned of Patrick's ownership in these entities.** |
| "CDH GP replaced DAF GP as general partner of DAF Fund" | Winding Up Petition (Apr. 23, 2025); Dallas Foundation Objection (June 9, 2025); Raver Deposition (June 20, 2025); JOL Writ (July 15, 2025); Ch. 15 Petition (July 21, 2025). | Highland's own chart concedes that the JOL Writ (July 15, 2025) and Chapter 15 Petition (July 21, 2025) are among the sources both of which post-date July 14, 2025. The earlier sources (Dkt. 4315-E, ¶¶ 38–40, Winding Up Petition, Dkt. 4231, 10, Dallas Foundation Objection) mentioned that CDF GP had replaced DAF GP but **did not contain the underlying GP Assignment document or explain that CDH GP was a newly formed shell entity, incorporated February 27, 2024, with Patrick as sole director, created specifically to wrest control from the existing governance structure.** The replacement's significance, as part of a broader scheme to funnel $270 million away from the charities, was not evident from the bare fact of the GP change. |
| "DFW Foundation was formed by Patrick with Patrick as its sole member." | Supervision Application (May 2, 2025); Dallas Foundation Objection (June 9, 2025); Foundations Action (July 1, 2025); JOL Writ (July 15, 2025); Ch. 15 Petition (July | The Supervision Application (filed May 2, 2025) was filed in the Cayman Court; it is a protective filing requesting court oversight of the liquidation. Dkt. 4521-G, Ex. 67. **It did not detail DFW Foundation's role as the vehicle through which Patrick would become the ultimate beneficial owner of $270 million in charitable assets. The Dallas Foundation Objection raised "suspicions" about Patrick** |

| | 21, 2025). | **and referenced the existence of DFW Foundation but expressly noted it lacked discovery to make full allegations.** Dkt 4315-3, 3. Notably, at his June 23 deposition, Patrick himself refused to confirm whether DFW Foundation was the ultimate owner, testifying he "just [didn't] want to go beyond what [he had] a hundred percent knowledge of." Dkt. 4513-49 at 8:1-6. The full picture that DFW Foundation was created in December 2024 specifically to receive participating shares and become the sole remaining member of CDM after Redemption, came from the July 15, 2025 MacInnis Affidavit and its internal communications. *See* Ex. 2 First MacInnis Aff, ¶38. |
|---|---|---|
| "DAF HoldCo issued participating shares to DFW Foundation, diluting supporting organizations." | Supervision Application (May 2, 2025); Dallas Foundation Objection (June 9, 2025); Raver Deposition (June 20, 2025); JOL Writ (July 15, 2025); Ch. 15 Petition (July 21, 2025). | Again, Highland's own chart concedes the JOL Writ and Chapter 15 Petition as sources, both post-dating July 14. The Supervision Application did not attach or describe the share issuance resolution, the amended Memorandum and Articles (filed February 21, 2025), or quantify the dilution (from 100% to 48.96%). The Raver Deposition (June 20, 2025) was taken only five days before the 9019 Hearing and ten days before the Settlement Order. **At the hearing itself, the Court was not presented with the full transactional chain.** The first document to lay out the complete dilution mechanism, with attached resolutions, valuations and the FTI/ValueScope analyses showing the shares were issued at approximately a 95% discount, was the July 15, 2025 MacInnis Affidavit. *See* Ex. 2 First MacInnis Aff., TDIT005636.  The attachments to that affidavit revealed for the first time privileged communications showing the dilution was not to issue additional shares to a charitable beneficiary as provided by the documents, but rather to better position Patrick and his coconspirators in future litigation against the Charities.  *Id.* at TDIT005481–005486. |
| "DAF HoldCo transferred DAF Fund to CDM, DCM redeemed DAF HoldCo, | Supervision Application (May 2, 2025); Dallas Foundation Objection (June 9, 2025); Patrick | **This is the heart of the scheme:** the exchange of an approximately $270 million limited partnership interest for a $1.6 million CDM membership interest. The pre-July 14 sources Highland identifies did not contain the |

21

| | | |
|---|---|---|
| supporting organizations left with no remaining interest in DAF Fund." | Deposition (June 23, 2025); Raver Deposition (June 20, 2025); 9019 Hearing Transcript; JOL Writ (July 15, 2025); Ch. 15 Petition (July 21, 2025). | underlying transactional documents and did not establish that the $270 million interest was exchanged for a $1.6 million CDM membership interest as part of a coordinated scheme. Patrick himself actively obstructed inquiry into the transaction at his June 23, 2025 deposition and at the 9019 Hearing. Dkt. 4513-23 at 173:13–177:22. Dugaboy was not aware of full picture with supporting documentation until the First MacInnis Affidavit was released on July 15, 2025. *See* Ex. 2 First MacInnis Aff., at ¶40. In particular, the ValueScope March 25, 2025 valuation used to justify Patrick's actions was not available until it was filed by MacInnis on July 21, 2025.  *See* 4315-G, at Ex. 50.  Finally, it was not known until Dugaboy obtained the First Affidavit of MacInnis that these actions were taken because Patrick was leaked information about the Charities intent to file DAF Holdco for liquidation, and the actions were taken with the intention of relocating the assets before that filing.  *See* Ex. 2, First MacInnis Aff. at MM-1, p. 1058.  The 9019 Hearing Transcript thus demonstrates the *absence* of available evidence: objectors raised concerns but lacked the underlying documents to prove the scheme. |
| "Beacon Mountain (and HMIT indirectly) was sold to CLOH, Patrick controlled CLOH, DFW Foundation is ultimate owner." | Dondero Affidavit (Apr. 16, 2025); Winding Up Petition (Apr. 23, 2025); Dallas Foundation Objection (June 9, 2025); Raver Dep. (June 20, 2025); Patrick Dep. (June 23, 2025); Littleton Dep. (June 23, 2025); Highland Ex. 95; 9019 Hearing Transcript; Email (Mar. 12, 2025); Beacon Mountain LLC Agreement (Feb. 12, 2025). | The depositions were taken only days before the hearing, June 20 and 23, 2025, and Patrick evaded questions about the ultimate ownership of the entities. He testified that Beacon Mountain was the ultimate owner of Hunter Mountain when in fact DFW Foundation sat above it. Highland's Exhibit 95 at the 9019 Hearing did not disclose that fact. Dkt. 4255–95. The truth was not exposed until the July 15, 2025 JOL filings. The Beacon Mountain LLC Agreement (February 12, 2025) was a Patrick-controlled document that Dugaboy did not possess until it was produced as an exhibit to the JOL pleadings. |
| "Atlas IDF placed into dissolution" | Dondero Affidavit (Apr. 16, 2025); | **Here, Highland is wrong. Atlas IDF, L.P. never was in dissolution, rather it was its** |

| | | |
|---|---|---|
| | Winding Up Petition (Apr. 23, 2025); Dallas Foundation Objection (June 9, 2025). | **subsidiary Rand PE Fund I, L.P. That Dondero did not even know which entity was dissolving demonstrates the lack of information available at that time.** Moreover, the Rand Fund 2024-2025 Liquidating Audit, which confirmed that Rand Fund's sole asset (Beacon Mountain) had been disposed of on February 12, 2025, was not issued until June 26, 2025, only **one day after the 9019 Hearing and four days before the Settlement Order was entered, and was not provided to Rand Fund's limited partners until months later.** Dkt. 4513-48. |
| "Allegations regarding DAF directors' fees, expenses and remuneration" | Dondero Affidavit (Apr. 16, 2025); Winding Up Petition (Apr. 23, 2025); Dallas Foundation Objection (June 9, 2025); Foundations Action (July 1, 2025); JOL Writ (July 15, 2025); Ch. 15 Petition (July 21, 2025). | Highland labels these "allegations" that were precisely known, but the pre-hearing documents contained only general references to "increased expenses." At the time, Dugaboy had no admissible evidence of expenses or specific amounts. The actual quantum, $10,548,778 paid to Patrick in 2024, including $850,000 base salary, $4,759,000 LTI (backdated to 2021), $975,000 additional LTI, and a 2.5x base salary bonus, was first documented in the July 2025. Ex. 2, First MacInnis Affidavit (MM-1, 694–722). Moreover, the Third MacInnis Affidavit (November 2025) revealed that total directors' fees across three entities were $11.6 million for 2024 alone, information that was not disclosed until September 12, 2025, when Defendants first produced income statements to the JOLs. The Dallas Foundation Objection and Winding Up Petition mentioned "concerns" about expenses but did not have access to those numbers. (Winding Up Petition - Dkt. 4315-E, Dallas Foundation Objection – Dkt. 4231) |
| "Allegations regarding Creative HEARTS TX donation." | Dondero Affidavit (Apr. 16, 2025); Winding Up Petition (Apr. 23, 2025); Dallas Foundation Objection (June 9, 2025); Foundations Action (July 1, 2025). | The Creative HEARTS TX donation of $10,000 to Patrick's family-run nonprofit was a well-known, if small example of his fraudulent intent. This was provided as evidence of Patrick's pattern and practice of self-dealing with DAF assets, but the CREATIVE HEARTS transaction was not part of the series of transactions that composed Patrick's later $270 million fraudulent scheme. Under *Chilson*, what matters is whether the *full evidentiary picture* was available, not whether one fragment was. 796 F.2d at 70–71. |

23

| "Allegations regarding proposed fee split with Cronin/Fortaris Capital Advisors" | Dondero Affidavit (Apr. 16, 2025); Winding Up Petition (Apr. 23, 2025); Dallas Foundation Objection (June 9, 2025); Foundations Action (July 1, 2025). | Same analysis as Creative HEARTS TX. Patrick's proposed (and rejected) kickback scheme from September 2023 is another example of his pattern and practice of self-dealing with DAF assets, but the inchoate Fortaris transaction was not part of the series of transactions that composed Patrick's later $270 million fraudulent scheme. *See* 796 F.2d at 70–71. |

### D. Dugaboy Has Established Fraud Under Rule 60(b)(3)

As argued at the April 24, 2026 hearing, it is Dugaboy's contention that Mark Patrick's systematic concealment of his misconduct constitutes a "fraud on the court" even within the narrow scope of Rule 60(b)(3). More particularly, a "fraud on the court" requires concealing facts that would have caused the Court to rule differently if it had known the truth. Patrick pulled this off at several stages:

- The predecessor judge would not have approved the Settlement had she known how Patrick's misconduct nullified HMIT's capacity to make that Settlement.

- 

- The Cayman Grand Court and/or the Texas Business Court might have ruled sooner or differently on injunctive relief if they knew what Patrick had concealed.

- Dugaboy and the DAF would have raised certain objections sooner than they did (or sought discovery on certain topics sooner than they did), if they had known then what we learned later. But at the time of the Settlement they only had pieces of the puzzle and not the whole picture.

- That is why both Dugaboy and the Texas Attorney General's Office both asked the predecessor judge to delay or stay its ruling on the 9019 Settlement for a few weeks to await the results of the Joint Official Liquidators' investigations in the Cayman Islands—which the court denied. *See* Dkts. 4326 and 4308; Dkt. 4333 (order).

Finally, it bears emphasis that to the extent Dugaboy establishes evidence of "fraud" under Rule 60(b)(3), it does ***not*** also have to show that same evidence was "newly discovered" and can avoid all of the timing difficulties discussed in the previous section.

24

### 1. Patrick's Reorganization Scheme Directly Implicates HMIT and the Settlement

Highland repeatedly assures the Court that there is "nothing to see here," denying any connection between the Donor-Advised Fund ("DAF") reorganization and HMIT and the Rule 9019 Settlement while noting that the Cayman Decision "never mentions HMIT (or any other HMIT Entity) or the 9019 Settlement." *See* Highland's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate, Dkt. 4535, at ¶¶ 38 n. 76, 40. But this obfuscates the reality that Mark Patrick's fraud against the DAF and the charitable entities is directly relevant to the Settlement — as Dugaboy explained in its opening brief. *See* Dugaboy's Motion for Relief from Order and Motion to Vacate, Dkt. 4513, at 3–4, 7–29, 33–43.

Documents filed by the Joint Official Liquidators in the Cayman Islands show how Patrick made sure that HMIT was folded into the DAF structure through the sale of Beacon Mountain's interest in HMIT to CLO HoldCo. This transaction ensured Patrick's control over HMIT's assets, enabling him to take over $270 million in assets belonging to the charitable entities. Patrick also took care to ensure this restructuring was virtually untraceable. *See* Caymans Ex. B, Statement of Claim, ¶ 82 (instructing his attorneys to make the new entity "***hard to find or track, or trace. Or find owners, etc. Generic name. Strong litigation protection***." (emphasis added)). Of course HMIT and its related entities were not mentioned by name in the documents arising from the Caymans proceedings—the JOLs' July 2025 Statement of Claim, the Grand Court's February 10, 2026 decision, or the Court of Appeal's April 22, 2026 decision—or the 9019 Settlement—because that was exactly what Patrick intended by weaving his complex web of intermediary companies. *See* Exhibit 49, Transcript of Deposition of Mark Patrick, 8:1–6; 11:10–12:7. This Court should not credit Highland's argument, which is made possible only by the very fraud at issue.

25

The Cayman Liquidators' July 2025 filings showed that Patrick's sham charity, the DFW Foundation, was reorganized into its role as the ultimate beneficial owner of Hunter Mountain, the settling entity.  Documents from the Cayman filings reveal that Patrick is the registered director, sole member, and president of the DFW Foundation—despite Patrick's best attempts to avoid identifying himself as the sole economic beneficiary of the DFW Foundation.  *See* Caymans Ex. G, First Affidavit of Margot MacInnis dated July 15, 2025 at ¶¶ 11.5, 31.4, and 31.5.  *See also* Exhibit 49, Deposition Transcript of Mark Patrick, 8:1–6, 11:10–12:7 (June 23, 2025).  The DFW Foundation enabled Patrick to steal the DAF's more than $270 million in charitable assets.  Patrick intentionally misled the charitable entities about his self-dealing transactions. The transactions resulted in Patrick having complete control of HMIT's new buyer.  *See* Caymans Ex. G (MacInnis Declaration dated July 21, 2025) at Ex. 44–47, 49, 52–55, 60–65, 70–71, 75–76, and 86.  Had this series of transactions been revealed before the June 25, 2025 hearing on the 9019 settlement, the Court would have known that the HMIT owners who signed the 9019 settlement came to their ownership only recently and through Patrick's fraud and breach of fiduciary duty.

Further, Patrick's self-dealing transactions to transfer the economic benefit of HMIT from the Dallas Foundation to himself violated Sections 206 and 215 of the Investment Advisors Act.[4] When Patrick caused HMIT to be traded to the DAF structure under his new DFW Foundation, he was the control person of Rand Advisors.  Thus, the transaction was a prohibited principal transaction that is void and subject to recission.  *See* Securities and Exchange Commission, Interpretation of Section 206(3) of the Investment Advisers Act of 1940, Inv. Adv. Act Rel. No. 1732 (July 17, 1998), 63 Fed. Reg. 39,056 (July 23, 1998) (internal citations omitted); 15 U.S.C.

---

[4] Highland fails to address this point in its Response.

§80b-15(b); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 367 (S.D.N.Y. 2011) (citing *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 24 (1979)).

Accordingly, rescission of that trade renders the 9019 Settlement void because Highland signed the agreement with the wrong owner of HMIT. Patrick's concealment of the DFW Foundation's ownership of HMIT and his relationship to the Foundation prevented the objecting parties from making the connection between the 9019 Settlement and HMIT sooner. Accordingly, Highland's argument here is not only wrong–it is also enabled by Patrick's complex fraud and material omission. Crediting Highland on this point would only reward that fraud.

### 2. The HMIT Trust Agreement *Automatically* Removed Mark Patrick's Authority

And finally, this Court's proper consideration of the evidence of Patrick's fraud is critically important because that fraud *automatically stripped his authority* to act on behalf of Hunter Mountain. Hunter Mountain's governing Trust Agreement—which was designed to protect the Trust's corpus from the type of theft perpetrated by Patrick—automatically removes Hunter Mountain's Administrator upon any one of several "Trigger Event[s]." The term "Trigger Event" includes "any conduct by [the Administrator] constituting . . . Cause." Reply Exhibit 4, Trust Agreement, Reply, § 1.[5] "Cause" includes, among other things, "a breach of fiduciary duties" and

---

[5] The original Trust Agreement, dated December 17, 2015, contemplated that John Honis would serve as Administrator of Hunter Mountain. *See* Ex. 4, Trust Agreement, at 1. Consequently, Honis was defined in the Agreement as the "Administrator." *Id.* Other terms in the Trust Agreement explicitly refer to Honis by name, including the terms "Honis Cause" and "Honis Trigger Event." But the Agreement also made clear that "[w]henever this Trust Agreement refers to the Administrator, such reference shall include any successor Administrator appointed under this paragraph." *Id.*, § 17. Further, the Agreement made clear that "each successor Administrator shall be deemed to have assumed the duties hereby undertaken by the Administrator." On August 12, 2022, Mark Patrick was appointed the successor Administrator of Hunter Mountain, making all provisions of the Trust Agreement applicable to him as if he stepped into the shoes of Honis.

27

"dishonesty, fraud, or willful misconduct." It also includes bad faith or theft on the part of [the Administrator]that is injurious to any of the Applicable Entities," *Id.* at 1.[6] And the Trust Agreement makes clear that *any* act constituting "Cause" is a "Trigger Event," upon which "the Administrator shall immediately be removed without any action by the Delaware Trustee or any other party." *Id.*, § 16. So the removal provision of Hunter Mountain's Trust Agreement is self-executing and effectuated Patrick's immediate removal upon any act of dishonesty, fraud, willful misconduct, or fiduciary breach.

As set forth in Dugaboy's opening brief and above, Patrick's myriad bad acts constituted cause that automatically removed him as Administrator long before the Rule 9019 Settlement was executed. As a preliminary matter, there is no question that Mark Patrick as the Hunter Mountain Trust Administrator had fiduciary duties. The Trust Agreement specifically provides that Patrick had "all implied duties (including fiduciary duties) or liabilities existing at law or in equity with respect to the Trust" and was required to "perform [his] duties in good faith." Trust Agreement §8(b).

Even more to the point, the Trust Agreement provides that "whenever a conflict of interest exists or arises," the Administrator was required to "resolve such conflict of interest, take such action or provide such terms, considering in each case solely the interests of the Trust and the beneficial owner." As set forth in greater detail in the Dugaboy's Motion, Patrick acted in myriad ways for his own personal benefit and contrary to the interests of the Trust and the Trust's ultimate

---

*See* Exhibit 5, Appointment of Successor Administrator, Reply Thus, for the ease of reference and to avoid confusion, Dugaboy has dropped the name "Honis" from the terms "Honis Cause" and "Honis Trigger Event" to make clear that those terms apply to Patrick as successor Administrator.

[7] Furthermore, actions by James Dondero—such as approving a payment—are not imputed to Dugaboy or other entities for purposes of ratification absent a formal agency relationship. *See* Section B above.

beneficial owner, the Dallas Foundation, whose interests Patrick obliterated to benefit a sham charity he created and ran.

Specifically, in February 2025, Patrick caused Rand PE Fund to sell its interest in Beacon Mountain (and therefore Beacon Mountain's interest in Hunter Mountain) to CLO Holdco (an entity he controlled and which provided no benefit to the Dallas Foundation) for $1 million. *See* Exhibit 23, Transcript of Hearing dated June 25, 2025 ("9019 Hrg. Tr.") at 173:22–174:14. [Opening Brief Exs. 20 and 21 (emails between Raver and Rice) and Ex 23 (June 25, 2025 9019 Hearing Tr). The effect of this transfer was to deprive the ultimate beneficial owner of Hunter Mountain (a venerable Dallas charity) of an asset that within weeks would become worth as much as 100 times more by virtue of the 9019 Settlement Agreement Patrick sought and negotiated. Patrick's consummation of the restructuring of HMIT's ownership while negotiating for vastly more than the Trust had obtained for its prior beneficial owner alone effectuated Patrick's removal as Administrator and his authority to act for Hunter Mountain.

And Patrick committed numerous other "dishonest" and "fraud[ulent]" acts as well as breaches of fiduciary duty that triggered his automatic termination, stripping him of authority to enter into the Settlement.   He did not tell the other Rand PE Fund limited partners that he was looking to sell Beacon Mountain's interest in Hunter Mountain, nor that he had actually sold the interest.   He did not engage a legitimate third-party firm to value the interest (and if he did, did not disclose that he was negotiating the 9019 for substantially more value). He did not tell the Atlas IDF limited partners that he was selling the Beacon Mountain Interest in Hunter Mountain to a company he controlled, nor obtain their written consent, as required.  *See* 4513-50, Amended & Restated Limited Partnership Agreement of Atlas IDF, LP (as of Nov. 30, 2015), § 3.01.  All of this breached his fiduciary duties and was very definitely "dishonest."

29

In sum, there can be no doubt that Patrick's acts constituted "Cause" that initiated a "Trigger Event" that automatically removed him as Administrator of Hunter Mountain. And because he was stripped of his authority to act for Hunter Mountain, Patrick had no authority to enter into the Rule 9019 Settlement Agreement on its behalf, rendering his execution of that settlement a nullity.

**E. Dugaboy Did Not Ratify or Waive its Challenge to Mark Patrick's Authority**

Highland contends in its Response that "Dugaboy and other Dondero-controlled entities have, when it suits them, openly and repeatedly recognized Patrick's authority and control over" HMIT Entities and DAF Entities. *See* Resp. at 14. In making this assertion, Highland points to a slew of Dugaboy contractual obligations and performances as demonstrating that such acts "validated and ratified Patrick's control over" HMIT Entities and DAF Entities. *See* Resp. at 15–16. Highland's position is legally wrong as it not only conflates ratification of a contract with ratification of authority but, even assuming Dugaboy's contractual performances could show an intent to ratify Patrick's authority, Highland fails to demonstrate the necessary elements of ratification under Texas law.

Highland overstretches the doctrine of ratification, wrongly arguing that Dugaboy's contractual performances operate to validate, ratify and waive challenges to Patrick's authority. As an example, Highland points to the fact that "Dugaboy recognized the 9019 Settlement transfer of the Dugaboy Note from Highland to HMIT as well as Patrick's control of HMIT by paying HMIT the $1.357 million in principal and interest then due on the Dugaboy Note" to support its contentions. *See* Obj. at 15. But Highland cannot reasonably argue that Dugaboy was required to breach a contract and default on an eight-figure loan obligation just to preserve its Rule 60(b) argument that Patrick lacks authority over the HMIT Entities and DAF Entities. In fact, the Fifth

30

Circuit has held that performance under a contract (such as a payment obligation), by itself, is insufficient to establish ratification of authority.[7] In *Global Towing, L.L.C. v. Marine Technical Services, Inc.*, 2000 WL 1901699, at \*3–\*4 (5th Cir. Dec. 15, 2000), the court rejected an argument that payments for survey work under a contract signed by an agent of a company (which were later ratified by another agent who did have authority to sign contracts) ratified said agent's authority, at large, to sign contracts on behalf of his company. The court noted that "an earlier ratification of an unauthorized act does not necessarily ratify all future unauthorized acts," and, thus, distinguished between ratifying a specific contract via fulfilling a payment obligation and ratifying an agent's general authority. *See id.* Here, Dugaboy's payment under the Dugaboy Note to HMIT, while effectively operating to validate and ratify the Dugaboy Note, does not go as far as to validate and ratify Patrick's authority in all other respects.  Such a premise extends equally to the other six examples Highland cites. *See* Resp. at 14–15. Thus, Highland's recitation of a handful of contracts and performances cannot demonstrate that Dugaboy ratified Patrick's authority.

Furthermore, the ratification and waiver arguments are meaningless here because they are contract-law doctrines that might help Highland if it were suing Dugaboy for **refusing** to pay the Note. But Dugaboy reasonably chose to pay the Note exactly to avoid that lawsuit.  Those contract doctrines are not issue-preservation rules and in no way preclude Dugaboy from challenging Patrick's authority in the very different context of the Rule 60(b) proceeding.

Even assuming Highland can establish Patrick's authority to make decisions on behalf of HMIT Entities and DAF Entities by simply pointing to Dugaboy's contractual performances, Highland fails to demonstrate the necessary and well-established elements of ratification.  Under

---

[7] Furthermore, actions by James Dondero—such as approving a payment—are not imputed to Dugaboy or other entities for purposes of ratification absent a formal agency relationship.  *See* Section B above.

Texas law, to establish the ratification of an act or contract, a party must show "(1) approval by act, word, or conduct; (2) with full knowledge of the facts of the earlier act; and (3) with the intention of giving validity to the earlier act." *In re Gulley*, 436 B.R. 878, 877 (Bankr. N.D. Tex. 2010) (internal citations omitted); *see also Yturria v. Kerr-Mcgee Oil & Gas Onshore, LLC*, 291 F. App'x 626, 636 (5th Cir. 2008).

Highland fails to establish elements (2) and (3). *First,* for Dugaboy to ratify Patrick's authority, Dugaboy must have had full knowledge of the facts supporting or undermining Patrick's supposed authority. A central contention in this case is that Dugaboy lacked knowledge of facts undermining Patrick's authority because Patrick fraudulently concealed those facts. Thus, Dugaboy could not have ratified Patrick's authority as it lacked the requisite knowledge to do so. *Second,* and independently of the previous element*,* Highland cannot establish that Dugaboy had any intention of validating Patrick's authority when, again, its central contention in this case is that Patrick lacked authority. One cannot simultaneously validate a person's authority and challenge the same person's authority. It is an all or nothing proposition, and Dugaboy has consistently held that Patrick lacks authority over the HMIT Entities and DAF Entities. More importantly, Highland's contention that Dugaboy recognizes Patrick's authority "when it suits them" (Resp. 14) is fundamentally at odds with the consistency requirement necessary to establish the third element of demonstrating ratification. Accordingly, Highland fails to show that Dugaboy either ratified or waived its challenge to Patrick's authority.

### F. This Court Has Broad Discretion to Vacate the Settlement Order Due To Chief Judge Jernigan's Refusal to Recuse Herself

The Court should vacate the 9019 Settlement Order if it concludes that: (1) 28 U.S.C. § 455(a) required Chief Judge Jernigan to disqualify herself; or (2) that Rule 60(b)(6) justifies vacatur on account of Chief Judge Jernigan's unlawful failure to recuse. Highland does not deny that vacatur

32

would be required if the Court reaches these conclusions. But it insists that Chief Judge Jernigan

was under no statutory obligation to recuse—and that even Rule 60(b)(6) would not authorize

vacatur of the 9019 Settlement Order. Highland is mistaken on both counts.

### 1.   28 U.S.C. § 455(a) Required Chief Judge Jernigan To Recuse

Highland contends Chief Judge Jernigan was under no statutory obligation to recuse because

it insists that Chief Judge Jernigan recused herself "voluntarily" rather than in response to the Fifth

Circuit's "corrective action." The premise of Highland's argument is false, and even if it were true

the conclusion does not follow.

Highland fixates on whether the Fifth Circuit Judicial Council's resolutions of the judicial

complaints filed against Chief Judge Jernigan should be characterized as "corrective action" that

prompted Chief Judge Jernigan to recuse—or whether this Court should believe that Chief Judge

Jernigan, after denying no fewer than five separate motions to recuse in the bankruptcy court,[8]

abruptly changed her mind and "voluntarily" recused herself on December 18, 2025, for reasons

having nothing to do with the Fifth Circuit Judicial Council's investigation and resolution of the

numerous judicial-misconduct complaints that had been filed against her. *See* Highland's Obj.,

ECF No. 4535, at pp. 40–44. But Chief Judge Elrod's orders to make clear Chief Judge Jernigan's

recusal was part and parcel of the "corrective action" needed to secure dismissal of the judicial-

misconduct complaints. The order dismissing Complaint No. 05-26-90042 states:

> While the judge remains steadfast that she has no bias or animus against any party
> in any matter pending before her, she has also recused herself from all matters
> related to the company's bankruptcy case that are currently pending before her.

---

[8.]*See* Dkt. 2060 (first Motion to Recuse); Dkt. 3406 (second Motion to Recuse); Dkt. 3570 (third
Motion to Recuse); Motion to Recuse Pursuant to 18 U.S.C. §§ 144 and 455, *Kirschner v. Dondero
et al.*, Case No. 21-03076-sgj, Dkt. 309 (N.D. Tex. Feb. 27, 2023) (fourth Motion to Recuse, filed
in the *Kirschner* adversary litigation); Dkt. 4372 (fifth Motion to Recuse).

> I find, without regard to the veracity of the allegations in the complaint, *that these actions constitute appropriate corrective action that acknowledges and remedies the problems raised by the complaint*. This aspect of the complaint is therefore subject to conclusion under 28 U.S.C. § 352(b)(2).

*In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, Case No. 05-26-90042 at 7 (Dec. 29, 2025), available at https://tinyurl.com/yynh3u67 (emphasis added); *see also In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, Case No. 05-26-90045 at 3 (Dec. 29, 2025), available at https://tinyurl.com/2vka5dn6. Chief Judge Elrod specifically found that Chief Judge Jernigan's recusal constitutes "appropriate corrective action" and that her recusal "acknowledges and remedies the problems raised by the complaint." So it is entirely truthful for Dugaboy to describe the recusal decision as "corrective action" necessary for Chief Judge Elrod to dismiss the judicial-misconduct complaints. And this resolution of the judicial-misconduct complaints against Chief Judge Jernigan was unusually serious. Apart from these complaints against Chief Judge Jernigan, only three of the more than 400 Fifth Circuit judicial-misconduct complaints resolved since December 2019 have been resolved by the Chief Judge through corrective action, rather than a finding of insubstantiality. And the Fifth Circuit's Chief Judge has not referred a complaint to a special committee for imposition of sanctions since 2015.

Highland seizes on a footnote in which Chief Judge Elrod disclaimed ruling on whether Chief Judge Jernigan was statutorily compelled to recuse herself:

> Neither the judge's recusal nor anything in this order should be interpreted as an opinion or reflection on the merits of the judge's prior decision not to recuse, which has been addressed by the Fifth Circuit and is currently pending before the Supreme Court, or the validity of any decision, ruling, or order that she has issued in any judicial proceeding.

34

*In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002,* Case No. 05-26-90042 at 6 n. 3 (Dec. 29, 2025). But Dugaboy never asserted or even suggested that Chief Judge Elrod had found that Chief Judge Jernigan had violated 28 U.S.C. § 455(a) by failing to recuse. And Dugaboy is not claiming that the Fifth Circuit Judicial Council ruled on whether 28 U.S.C. § 455(a) required Chief Judge Jernigan's recusal. To the contrary, Dugaboy's Rule 60(b) motion made clear that the 28 U.S.C. § 455(a) issue needs to be resolved in the ongoing court proceedings and *not* by the Fifth Circuit Judicial Council, as judicial-misconduct proceedings cannot be used to vacate previously issued rulings. *See* Rule 60(b) Motion, ECF No. 4513, at 45 ("[T]here are judicial proceedings to address consequences for rulings in a case. The Judicial Conduct and Discipline Rules are clear that proceedings thereunder are not to be used to reverse rulings in pending cases, because all the parties to those cases should be heard on such rulings.").

Yet none of this changes the fact that Chief Judge Jernigan's recusal was "corrective action" needed to resolve the judicial-misconduct proceedings and induce Chief Judge Elrod to dismiss the judicial-misconduct complaints, as Chief Judge Elrod's orders explicitly describe Chief Judge Jernigan's recusal decisions as "corrective action" to those ends. So Highland's objection to Dugaboy's characterizations of Chief Judge Elrod's orders are baseless, as is its claim that Chief Judge Jernigan "voluntarily" recused herself. Chief Judge Jernigan recused to resolve the judicial-misconduct complaints against her, and she would not have done so absent the Fifth Circuit Judicial Council's investigation and resolution of those complaints.

It also does not matter whether Chief Judge Jernigan's recusal was "voluntary" or taken in response to the Fifth Circuit Judicial Council's investigation and resolution of the judicial-misconduct complaints. The issue for this Court to resolve is whether Chief Judge Jernigan's recusal was required by 28 U.S.C. § 455(a). The answer to that question does not depend on

whether or to what extent the Fifth Circuit Judicial Council nudged Chief Judge Jernigan into finally recusing herself after years of refusing to do so. Dugaboy readily acknowledges that neither Chief Judge Elrod nor the Fifth Circuit Judicial Council ruled on whether Chief Judge Jernigan was statutorily compelled to recuse herself, even as they described her recusal as "appropriate corrective action that acknowledges and remedies the problems raised by the complaint." *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002,* Case No. 05-26-90042 at 7 (Dec. 29, 2025). It is the responsibility of *this* Court to determine whether 28 U.S.C. § 455(a) required Chief Judge Jernigan to recuse—as she finally did in December of 2025 after years of steadfast refusals. It is not bound to rule one way or the other on that question by anything the Fifth Circuit Judicial Council did.

As for the merits of the recusal issue, Highland insists that Chief Judge Jernigan "*never* had a duty to recuse herself under Section 455." Highland's Obj., ECF No. 4535, at p. 42. But Highland presents no argument to this effect. It simply points out that Chief Judge Jernigan denied five previous recusal motions before changing her stance and recusing herself in December 2025, and it notes that the Fifth Circuit had refused to order Chief Judge Jernigan's recusal on mandamus. Chief Judge Jernigan's previous rulings on the recusal issue are not binding on this Court, especially now that she has recused herself from this case. And the Fifth Circuit held only that the Dondero parties had failed to make the demanding showing needed to compel Chief Judge Jernigan's recusal on a writ of mandamus. *See Dondero v. Jernigan*, No. 24-10287, 2025 WL 1122466, at *3 (5th Cir. Apr. 16, 2025) ("Mandamus relief is a 'drastic and extraordinary' remedy 'reserved for really extraordinary causes.'" (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004)). The Fifth Circuit never conducted de novo review of whether 28 U.S.C. § 455(a) required Chief Judge Jernigan to recuse herself. It acknowledged that Chief Judge Jernigan's

36

rulings on the recusal issue were reviewable only for abuse of discretion,[9] and then it applied an extra layer of deference while conducting mandamus review, where the writ can issue only when a petitioner shows that his entitlement to the writ is "clear and indisputable." *Id.* at *4 ("[T]he Dondero Parties must show that their right to the writ is 'clear and indisputable.' That is, it must be clear and indisputable that Chief Judge Jernigan is required to recuse. . . . The Dondero Parties fail to meet this high burden." (citation omitted)). The Fifth Circuit also acknowledged that "a strong argument could be made that [Chief Judge Jernigan] had a duty to recuse," yet made clear that it was denying relief only because of the highly deferential standard of review that governed its consideration of the appeal:

> Due to the similarities between the characters in Chief Judge Jernigan's novel and the litigants currently before her court, *a strong argument could be made that she had a duty to recuse*. But, while some similarities between the books and the cases before Chief Judge Jernigan may raise cause for concern, *the similarities are not close enough to find that the district court abused its discretion denying the petition*.

*Id.* at *7 (emphasis added). For Highland to claim that the Fifth Circuit ruled as a matter of binding precedent that Chief Judge Jernigan's novel-writing "is 'insufficient' to warrant 'a recusal order'" is nothing short of misrepresentation. Highland's Obj., ECF No. 4535, at p. 43. The Fifth Circuit merely held that this evidence was insufficient to qualify as a "clear and indisputable showing" that Chief Judge Jernigan had abused her discretion by failing to recuse. That hardly precludes this Court from determining as a de novo matter that recusal was warranted under 28 U.S.C. § 455(a), and there is no "law of the case" on that question.

---

9.  *See Dondero v. Jernigan*, No. 24-10287, 2025 WL 1122466, at *4 (5th Cir. Apr. 16, 2025) ("Recusal decisions are reviewed for abuse of discretion").

**2.  The Court Should Vacate The 9019 Settlement Order Under Rule 60(b)(6) If It Determines That 28 U.S.C. § 455(a) Required Chief Judge Jernigan To Recuse**

Highland contends it would be impractical to undo Chief Judge Jernigan's previous rulings if this Court determines that 28 U.S.C. § 455(a) required her recusal. Highland's Obj., ECF No. 4535, at p. 44. But the decision whether to vacate the 9019 Settlement Order is governed by the three factors established in *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988), which requires courts to consider "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Id.* at 864. And as Dugaboy explained in its Rule 60(b) motion, Chief Judge Jernigan's novel-writing activities undermine public confidence in the judicial process because she wrote and published two novels *while this case was pending* that pit a heroic Texas bankruptcy judge who resembles Chief Judge Jernigan against a villainous hedge-fund manager named Cade Graham who resembles Mr. Dondero. The protagonist of the books, Bankruptcy Judge Avery Lassiter, serves in the Northern District of Texas, graduated from the University of Texas School of Law,[10] is married to a retired police officer,[11] and owns two Cavalier King Charles dogs.[12] The bankruptcy judge has acknowledged that "the protagonist characters in her books (Judge Avery Lassiter and Max Lassiter) may resemble herself and her spouse." *In re Highland*

---

[10]  *Compare* Stacey Jernigan, *He Watches All My Paths* 165 (referring to Lassiter's "University of Texas Law School days") *with* Judge Stacey G. C. Jernigan Bio ("J.D., University of Texas School of Law, 1989"), http://bit.ly/4ndIg2r.

[11]  *Compare* Stacey Jernigan, *Hedging Death* 18 ("Max [Lassiter] had 'escaped the confinement of the police department' and retired a couple of years ago . . . ."); *with* About Me, *SJ Novels* (noting that Judge Jernigan "is married to a retired police officer"), https://sjnovels.com/about-the-author ("About Me").

[12]  *Compare* Stacey Jernigan, *Hedging Death* 79 ("'Baxter Squared' was Max's nickname for the two new Cavalier King Charles Spaniel puppies that Avery recently adopted[.]") *with* About Me, *SJ Novels* (noting that Chief Judge Jernigan has "two Cavalier King Charles Spaniels"), About Me.

38

*Capital Management, L.P.*, No. 19-34054-SGJ-11, 2023 WL 2395677, at *16 (Bankr. N.D. Tex. Mar. 6, 2023).

The similarities between the fictional Mr. Graham and Mr. Dondero are even more striking. Mr. Dondero's Highland was for years known as "Ranger Asset Management,"[13] while Mr. Graham's hedge fund is called "Ranger Capital." See Stacey Jernigan, *Hedging Death* 18. The fictional Mr. Graham and the real Mr. Dondero even have the same hair color and height.[14] And the books paint an exceeding dark picture of Mr. Graham and the entire hedge-fund industry, deriding "high-flying hedge fund managers [that] essentially suck up money ("fresh powder" they call it) like an i-Robot vacuum cleaner from every corner of the universe and invest it, generally earning compensation of 20% of the assets they invest and another 2% of the profits that the assets earn." Stacey Jernigan, *He Watches All My Paths* 78; *see also id.* ("They make money no matter what—whether their investments are successful or not—because of their 20% cut."); *id.* at 61 ("[M]aybe they were hedge fund managers—they had that air of hubris about them that was so characteristic of those Wall Street assholes.").

Highland does not deny any of these similarities. Nor does Highland attempt to explain how leaving Chief Judge Jernigan's previous rulings in this case undisturbed would *not* present a "risk of undermining the public's confidence in the judicial process," especially now that Chief Judge Jernigan has recused herself from the case. *Liljeberg*, 486 U.S. at 864. Instead, Highland relies on the Fifth Circuit's refusal to issue a writ of mandamus and acts as though that disposes of Dugaboy's Rule 60(b)(6) arguments. *See* Highland's Obj., ECF No. 4535, at p. 45 ("Dugaboy's

---

[13.] *Kirschner v. Dondero*, No. 3:21-03076-sgj (Bankr. N.D. Tex. Feb. 27, 2023), Dkt. 310 at 16–17.

[14.] *See* Stacey Jernigan, *Hedging Death* 22, 107 (describing Graham as "fifty-something" with "silver hair" and "a tanned complexion" and "tall, well-built, and handsome, with a confident Texas swagger").

argument fails here just as it has previously failed at the Fifth Circuit."). But the Fifth Circuit did not resolve whether Chief Judge Jernigan's novel-writing activities might cause an objective observer to question her impartiality, and it did not rule on whether public confidence in the judicial process would be undermined by leaving Chief Judge Jernigan's previous rulings in place. And the Fifth Circuit certainly did not regard the recusal arguments as lacking merit.[15] Rather, it acknowledged that "a strong argument could be made that [Chief Judge Jernigan] had a duty to recuse." *Dondero v. Jernigan*, No. 24-10287, 2025 WL 1122466, at *7 (5th Cir. Apr. 16, 2025).

Dated: May 8, 2026

Respectfully submitted,

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com

KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

---

[15]. Highland's Obj., ECF No. 4535, at p. 45.

40

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 8, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper