**EXHIBIT 26**



**Deferred Variable
Annuity Policy**

**This Policy is a Deferred Variable Annuity (DVA) Policy. This Policy is Non-Participating.** Crown Global Life Insurance Ltd., a Bermuda Class C insurance company, will pay, subject to the provisions of this Policy, the Annuity Payments to the Beneficiaries as provided by this Policy, provided that the Policy is In Force.

Signed for the Insurer at its Home Office located at Hamilton, Bermuda on the Issue Date.

12/15/15 Ken Goertzen,

12/16/15 Janita Burkey

**THIS IS A LEGAL CONTRACT.
PLEASE READ IT CAREFULLY.**

THE INSURER IS INCORPORATED IN BERMUDA AND IS REGISTERED AS A CLASS C INSURER IN BERMUDA PERMITTING IT TO WRITE DEFERRED VARIABLE ANNUITY POLICIES AND CONDUCT OTHER LONG-TERM INSURANCE BUSINESS. THE INSURER IS NOT AUTHORIZED IN ANY JURISDICTION OTHER THAN BERMUDA TO CARRY ON ANY INSURANCE BUSINESS. POLICY ACCOUNT VALUES UNDER THIS POLICY ARE BASED ON THE INVESTMENT EXPERIENCE OF A SEPARATE ACCOUNT ESTABLISHED UNDER THIS POLICY AND THE PRIVATE ACT. THE POLICY ACCOUNT VALUES UNDER THIS POLICY MAY INCREASE OR DECREASE IN AMOUNT. INVESTMENTS OF FUNDS HELD IN THE SEPARATE ACCOUNT MAY BE MADE IN NON-U.S. INVESTMENTS AS WELL AS U.S. INVESTMENTS. THE ASSETS IN THE SEPARATE ACCOUNT MAY BE ADVERSELY AFFECTED BY CHANGES IN FOREIGN GOVERNMENTS, AND OTHER ECONOMIC AND POLITICAL EVENTS, WHICH MIGHT NOT AFFECT U.S. INVESTMENTS OR ENTITIES, AND BY FLUCTUATIONS IN THE ENTITIES, AND BY FLUCTUATIONS IN THE VALUE OF FOREIGN CURRENCY.

**Crown Global
Life Insurance Ltd.**

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

*continued on next page*

30218



**Deferred Variable Annuity Policy**

Crown Global
Life Insurance Ltd.

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

THIS POLICY CANNOT BE TRANSFERRED, ASSIGNED, HYPOTHECATED, OR PLEDGED, WITHOUT THE INSURER'S PRIOR WRITTEN CONSENT, WHICH THE INSURER MAY WITHHOLD IN ITS SOLE AND ABSOLUTE DISCRETION. THIS POLICY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER U.S. FEDERAL OR STATE SECURITIES LAWS OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND, THEREFORE, CANNOT BE TRANSFERRED UNLESS SO REGISTERED OR UNLESS SUCH REGISTRATION IS NOT REQUIRED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THIS POLICY IS AN APPROPRIATE INVESTMENT ONLY FOR PURCHASERS WHO ARE QUALIFIED PURCHASERS WITHIN THE MEANING OF THE U.S. INVESTMENT COMPANY ACT OF 1940 AND ACCREDITED INVESTORS WITHIN THE MEANING OF RULE 501(a) OF REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933. THIS POLICY IS ALSO APPROPRIATE ONLY FOR SOPHISTICATED PURCHASERS WHO, AMONG OTHER THINGS, HAVE NO NEED FOR ACCESS TO AMOUNTS DESCRIBED IN THE POLICY. ADDITIONAL INFORMATION ON THE RISKS OF PURCHASING A POLICY APPEARS IN THE CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, AS AMENDED THROUGH THE DATE HEREOF, DESCRIBING THE POLICY.

**THE INSURER MAKES NO REPRESENTATION AS TO THE TAX TREATMENT OF THIS POLICY FOR U.S. FEDERAL INCOME TAX PURPOSES OR FOR THE PURPOSES OF THE TAX LAWS OF ANY OTHER JURISDICTION. NO REPRESENTATION IS MADE THAT A PROPOSED POLICYHOLDER WOULD NOT BE SUBJECT TO AUDIT OR EXAMINATION BY THE TAX AUTHORITIES OF ANY JURISDICTION AS A RESULT OF PURCHASING A POLICY.**

**NO REPRESENTATION IS MADE REGARDING THE LIKELIHOOD THAT THE CURRENT U.S. FEDERAL INCOME TAX LAWS, REGULATIONS AND OFFICIAL INTERPRETATIONS OF THE LAW MAY BE CHANGED IN THE FUTURE. IT IS POSSIBLE THAT SUCH CHANGES COULD OCCUR, AND THAT SUCH CHANGES COULD APPLY TO THE POLICY, AND COULD APPLY RETROACTIVELY. THE INSURER HAS RESERVED THE RIGHT IN ITS SOLE AND ABSOLUTE DISCRETION TO MAKE CHANGES TO THE POLICY THAT IT DEEMS NECESSARY TO PRESERVE THE EXPECTED TAX CONSEQUENCES OF THE OWNERSHIP OF THE POLICY AS A RESULT OF CHANGES IN THE LAWS OF THE U.S. OR ANY OTHER JURISDICTION.**



## Policy Data Page

### General Policy Data

**All amounts expressed in "$" or "dollars" are in United States dollars**

| | |
|---|---|
| Proposed Policyholder: | Proposed Annuitant: |
| Empower Dallas Foundation, Inc | Grant Scott |

| | |
|---|---|
| Proposed Annuitant's Date of Birth: | Gender: |
| 29 May, 1962 | Male |

Policy Effective Date: 10 Dec, 2015    Issue Date: 10 Dec, 2015

Annuity Starting Date: Deferred

until Annuitant's 85th birthday

at the latest

| Beneficiary: | Beneficiary Interest | Revocable/Irrevocable? |
|---|---|---|
| Empower Dallas Foundation, Inc | 100% | Irrevocable |

Separate Account number : 30218

### Premium Amounts

| | |
|---|---|
| Initial Premium: | $ 15,903,108.54 |
| Premium Limit: | n/a |
| Premium Deposit: | n/a |

Net Premiums will be deposited to the Separate Account established by the Insurer with respect to the Policy.



## Policy Data Page

### Initial Allocation of Payments to Investment Options

| Investment Options | Initial Allocation |
| --- | --- |
| 1. IDF: Atlas IDF, LP/ Rand Advisors LLC | 100% |

Custodian Bank:     n/a

Investment Manager:   n/a



## Policy Data Page

### Policy Fees and Charges

| Charge | Due Date | Amount of Charge |
|---|---|---|
| Policy Administration Fee | In equal installments in advance on each Liquidity Date | $2,900 per annum |
| Agreed Upon Procedures Fee | Annually | As charged by the outside auditors, currently $1,975. |
| DAC Charges | Each date the Insurer receives a Premium | 0.25% of the amount of Premium payment. *See* Section 9.2 of the Policy. |
| Management & Expense Fee | In advance on each Liquidity Date | The following annual rates expressed as a percentage of the Policy Account Value:<br><br>0.45% p.a $10mm of Premium<br><br>0.35% p.a. $11-20mm of Premium<br><br>0.25% p.a. $21mm+of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm<br><br>(adjusted for additional premium payments and withdrawals, as applicable)<br><br>*See* Section 9.3 of the Policy. |
| Policy Set-Up Deposit | Upon submission of the completed Annuity Application Form. | N/A |
| Acceptance Fee | Each date the Insurer receives a Premium payment | Zero |
| Taxes | When paid by the Insurer or its affiliate | *See* Section 9.7 of the Policy. |



## Table of Contents

General Policy Data ............................................................................................................ 3

Initial Allocation of Payments to Investment Options ............................................. 4

Policy Fees and Charges ................................................................................................ 5

**Article I    General Provisions**..................................................................................**15**

Section 1.1    Consideration ........................................................................ 15

Section 1.2    Entire Policy........................................................................... 15

Section 1.3    Survival of Representations, Warrants, Covenants ...................... 15

Section 1.4    Amendment or Modification................................................... 15

Section 1.5    Misstatement of Age................................................................ 15

Section 1.6    Non-Participating Policy ........................................................ 16

Section 1.7    Ownership of Assets................................................................ 16

Section 1.8    Rule of Construction .............................................................. 16

Section 1.9    Governing Law ...................................................................... 16

Section 1.10   Effective Date of Coverage...................................................... 16

**Article II    Premium Provisions**...............................................................................**17**

Section 2.1    Premiums .............................................................................. 17

Section 2.2    Insurer's Right to Refuse Premiums......................................... 17

Section 2.3    Nonpayment of Premium......................................................... 18

**Article III   Termination Provisions**..........................................................................**19**

Section 3.1    Insurer's Cancellation Rights.................................................. 19

Section 3.2    Reinstatement ....................................................................... 20

**Article IV   Premium Investment; Policy Account Values**...................................**21**

Section 4.1    The Separate Account.............................................................. 21

Section 4.2    Premiums .............................................................................. 21

Section 4.3    Allocations to Investment Options ........................................... 21

Section 4.4    Compliance with Investor Control Rules.................................... 22

Section 4.5    Changes in Allocations to Investment Options ........................... 23

Section 4.6    Responsibility for Selecting Investment Options ......................... 23

Section 4.7    Appointment of Investment Manager and Custodian Bank ........... 24

Section 4.8    Timing of Allocations ............................................................. 24

Section 4.9    Investment of Separate Account Assets...................................... 24

Section 4.10   Request for Extension of Investment Rights  With Respect
to Adequate Diversification.................................................... 26

Section 4.11   Changes in Investment Options ............................................... 26

Section 4.12 Policy Account Value ................................................................... 27

**Article V Transfers Among Investment Options ..........................................28**
Section 5.1 General ...................................................................................... 28
Section 5.2 Conditions on Transfer .............................................................. 28
Section 5.3 Liability ...................................................................................... 29
Section 5.4 Limits on Right of Transfer ......................................................... 29

**Article VI Annuity Provisions ....................................................................30**
Section 6.1 Annuity Payments...................................................................... 30
Section 6.2 Annuity Percentage ................................................................... 30
Section 6.3 No Guaranteed Payments .......................................................... 30
Section 6.4 Annuity Starting Date................................................................. 31
Section 6.5 Change of Annuity Starting Date ................................................ 31
Section 6.6 Annuity Income Options ............................................................. 31
Section 6.7 Maturity Payment....................................................................... 32

**Article VII Loan Provisions..........................................................................33**
Section 7.1 Policy Loans .............................................................................. 33

**Article VIII Surrender Provisions ..................................................................34**
Section 8.1 General...................................................................................... 34
Section 8.2 Full Surrender............................................................................ 34
Section 8.3 Partial Surrender ....................................................................... 34

**Article IX Policy Fees and Charges ............................................................36**
Section 9.1 Policy Administration Fee ........................................................... 36
Section 9.2 DAC Charges ............................................................................ 36
Section 9.3 Management & Expense Fee ...................................................... 36
Section 9.4 Policy Set-Up Deposit................................................................ 36
Section 9.5 Acceptance Fee......................................................................... 36
Section 9.6 Surrender Charge ...................................................................... 37
Section 9.7 Taxes........................................................................................ 37
Section 9.8 Agreed Upon Procedures Fee .................................................... 37
Section 9.9 Deductions for Fees and Charges............................................... 37
Section 9.10 Custodian Bank and Investment Manager Fees .......................... 37

**Article X Death Benefit Provisions.............................................................39**
Section 10.1 Death Benefit............................................................................. 39
Section 10.2 Due Proof of Death .................................................................... 40



**Article XI  Owner, Beneficiary, Assignment** ....................................................**41**

Section 11.1   Proposed Policyholder ...................................................................... 41

Section 11.2   Change of Proposed Policyholder ................................................... 41

Section 11.3   Proposed Annuitant ......................................................................... 41

Section 11.4   Change of Proposed Annuitant ...................................................... 41

Section 11.5   Beneficiary ....................................................................................... 42

Section 11.6   Change of Beneficiary ..................................................................... 42

Section 11.7   Assignment ...................................................................................... 42

**Article XII Other General Provisions** ...................................................................**44**

Section 12.1   Periodic Reports ............................................................................. 44

Section 12.2   Currency and Place of Payment ..................................................... 44

Section 12.3   Notices, Requests and Elections .................................................... 44

Section 12.4   Policy Settlement ............................................................................. 45

Section 12.5   Deferment ........................................................................................ 45

Section 12.6   Incontestability ................................................................................. 45

Section 12.7   Policyholder Information ................................................................... 46

Section 12.8   Tax Matters ...................................................................................... 46

Section 12.9   Limitation on Liability of Insurer ...................................................... 47



## Definitions

**Acceptance Fee** – The fee deducted by the Insurer as stated in the Policy Data Page and described in Section 9.5.

**Accredited Investor** – An "accredited investor" as defined in Rule 501(a) under Regulation D of the Securities Act.

**Age** –  A Proposed Annuitant or Proposed Joint Annuitant's age on their last birthday.

**Agreed Upon Procedures ("AUP") Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.8.

**Annuity Application Form** – The annuity application provided by the Insurer as completed and signed by the Proposed Policyholder.

**Annuity Payments** – The benefits payable to the Beneficiary under Section 6.1 of this Policy (each an "Annuity Payment").

**Annuity Starting Date** – The date on which Annuity Payments under Section 6.4 of this Policy commence.

**Beneficiary** – The persons or entities designated as such on the Annuity Application Form, as amended from time to time, by the Proposed Policyholder, who is entitled to receive Annuity Payments under the Policy, and distributions following the death of the Proposed Policyholder as applicable, in accordance with the terms of the Policy.

**Business Day** – Any day on which banks in the U.S. and Bermuda are open for business.

**Claim Date** – The date on which the Insurer receives written notice and due proof of death of the Proposed Annuitant (or the survivor of the Proposed Joint Annuitants) in accordance with Section 10.2 at the Insurer's Home Office.

**Code** – The U.S. Internal Revenue Code of 1986, as amended.

**Confidential Private Placement Memorandum** – The confidential private placement memorandum describing the Policy including all schedules, appendices, attachments,



exhibits, amendments and supplements thereto, as amended and restated from time to time.

**Contestable Period** – The period of time described in Section 12.6 which extends for two (2) years from the Issue Date during the lifetime of the Proposed Annuitant.

**DAC Charges** – The amount deducted by the Insurer as set forth in the Policy Data Page and described in Section 9.2.

**Death Benefit** – The death benefit calculated and payable under the provisions of Article X of this Policy.

**Fees and Charges** – Any applicable fees and charges due under the Policy including, without limitation, the Policy Administration Fee, the DAC Charges, the Management & Expense Fee, the Acceptance Fee, Taxes, and the Agreed Upon Procedures Fee.

**FINMA** – The Swiss Financial Market Supervisory Authority.

**Full Surrender** – A Surrender pursuant to Section 8.2.

**Grace Period** – A period of thirty days following the date on which the Insurer makes available to the Proposed Policyholder information indicating that (i) the Policy Account Value is less than $250,000, or (ii) the Policy Account Value is insufficient to pay the Fees and Charges due under the Policy without the Policy Account Value becoming less than $250,000 following payment of such Fees and Charges.

**Home Office** – The Insurer's office in Hamilton, Bermuda. The Insurer's mailing address is Crown Global Life Insurance Ltd., Canon's Court, 22 Victoria Street, Hamilton HM 12, Bermuda, email: info@crownglobalinsurance.com, facsimile: +1-345-945-6121.

**IDF** – An insurance dedicated fund.

**In Force** – A condition that the Policy has not terminated.

**Initial Premium** – The first Premium payment by the Proposed Policyholder as shown on the Policy Data Page.

**Insurance Dedicated Fund** – An Investment Option involving investment in an investment fund generally formed as a limited partnership or limited liability company



(i) which is intended to operate as an insurance dedicated fund (an "IDF") and (ii) investment in which is available only to a U.S. or non-U.S. insurance company that regularly engages in the sale of life insurance policies and annuity policies in the ordinary course of its business and is acquiring interests in the IDF to hold in a Separate Account established in connection with a Policy and not as part of the general assets of the insurance company.

**Insurer** – Crown Global Life Insurance Ltd. The Insurer has elected under Code section 953(d) to be treated as a U.S. domestic corporation for U.S. federal income tax purposes.

**Investment Adviser Act** – The U.S. Investment Adviser Act of 1940, as amended.

**Investment Company Act** – The U.S. Investment Company Act of 1940, as amended.

**Investment Option** – A separate investment option consisting of all or a portion of the assets held in a Separate Account and managed by the investment manager identified therein directly or through an IDF.

**IRS** – The U.S. Internal Revenue Service.

**Issue Date** – The issue date of the Policy as stated on the Policy Data Page.

**Joint Life Annuity** – An annuity issued on the life of two Proposed Annuitants and under which payments continue as long as either Proposed Annuitant is alive.

**Liquid Asset Subaccount** – A Subaccount of the Separate Account, the funds in which are primarily invested in interest-bearing commercial bank accounts.

**Liquidity Date** – The last Business Day of each calendar quarter.

**Managed Subaccount** – An Investment Option where assets held in a Subaccount are managed by an investment manager unrelated to the Insurer.  For the avoidance of doubt, a Managed Subaccount does not include an IDF.

**Management & Expense Fee** – The Management & Expense Fee as stated on the Policy Data Page and described in Section 9.3.



**Minimum Liquid Asset Allocation** – An amount not in excess of the expected annual Fees and Charges related to the Policy that the Insurer may place in the Liquid Asset Subaccount.

**Net Premium** – A Premium payment less applicable Fees and Charges, including, without limitation, the Acceptance Fee set forth on the Policy Data Page and described in Section 9.5.

**Next Available Liquidity Date** – For any specified day, the Liquidity Date on or next following the 100th calendar day following the specified day.

**Partial Surrender** – A Surrender pursuant to Section 8.3.

**Policy** – This Deferred Variable Annuity (DVA) Policy offered by the Insurer.

**Policy Account Value** – The net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid Fees or Charges.

**Policy Administration Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.1.

**Policy Anniversary** – The anniversary of the Policy Effective Date.

**Policy Data Page** – The pages of this Policy titled "Policy Data Page." The Insurer will reissue these pages by means of an endorsement whenever the information on the Policy Data Page is amended, in accordance with the Policy.

**Policy Effective Date** – The "Policy Effective Date" of this Policy as stated on the Policy Data Page.

**Policy Set-Up Deposit** – A non-refundable screening deposit due upon submission of the completed Annuity Application Form as stated on the Policy Data Page and described in Section 9.4.

**Policy Year** – Any one year period beginning on the Policy Effective Date or a Policy Anniversary and ending on the day before the next Policy Anniversary.

**Premiums** – The Initial Premium and any subsequent Premiums paid to the Insurer under this Policy.



**Private Act** – The private act entitled "The Scottish Annuity & Life International Insurance Company (Bermuda) Ltd. Consolidation and Amendment Act 2001," as amended and consolidated from time to time.

**Proposed Annuitant** – The individual whose life is used to determine the duration of the period during which the Annuity Payments will be paid by the Insurer.

**Proposed Joint Annuitants** – Each Proposed Annuitant (each being a "Proposed Joint Annuitant") when a second Proposed Annuitant is designated under the Policy and a Joint Life Annuity is selected. Each Proposed Annuitant, including the second Proposed Annuitant, is to generally be designated by the Proposed Policyholder in the Annuity Application Form but may be designated by the Proposed Policyholder after the Issue Date with the consent of the Insurer. The second named Proposed Annuitant shall be designated as the Proposed Joint Annuitant by the Proposed Policyholder in the Annuity Application Form and reflected as such on the Policy Data Page.

**Proposed Policyholder** – Proposed Policyholder means the individual or entity that proposes or is considering the purchase of a Policy pursuant to the Confidential Private Placement Memorandum. This term shall include a person who has become an actual policyholder through the purchase of a Policy or pursuant to a change made pursuant to Section 11.2.

**Qualified Purchaser** – A Qualified Purchaser within the meaning of Section 2(a)(51) of the Investment Company Act.

**SEC** – The U.S. Securities and Exchange Commission.

**Securities Act** – The U.S. Securities Act of 1933, as amended.

**Separate Account** – A separate investment account established by the Insurer for this Policy pursuant to the terms hereof, and Bermuda law (including the Private Act), the assets of which can be used for the sole purpose of paying claims under this Policy. A Separate Account is not a legal entity under Bermuda law and any references to the Separate Account performing any tasks means the Insurer in respect of the Separate Account.

**Single Life Annuity** – An annuity measured by the life of a single Proposed Annuitant.



**Subaccount** – A subaccount established by the Insurer as a bookkeeping entry within the Separate Account.

**Surrender** – A surrender under Article VIII including a Full Surrender under Section 8.2 and a Partial Surrender under Section 8.3.

**Taxes** – The taxes defined in Section 9.7 of this Policy.

**Unscheduled Premium** – Any Premium payment other than the Initial Premium or a Premium scheduled on the Policy Data Page or as set forth in an endorsement or attachment to the Policy.

**U.S. Treasury Regulations** – The U.S. Treasury regulations promulgated under the Code, as amended.



## Article I        General Provisions

### Section 1.1        Consideration

This Policy is issued in consideration of the payment of the Initial Premium.

### Section 1.2        Entire Policy

This Policy, any endorsements or riders, and the Annuity Application Form constitute the entire contract between the Proposed Policyholder and the Insurer. The Proposed Policyholder, on behalf of the Proposed Policyholder, the Proposed Annuitant, and the Beneficiaries represents, acknowledges, and agrees that the Insurer has relied, and is entitled to rely, upon the accuracy of the information and statements made in the Annuity Application Form in deciding to issue this Policy.

### Section 1.3        Survival of Representations, Warrants, Covenants

The representations, warrants, covenants, and other statements made in the Annuity Application Form are incorporated herein by reference and shall survive the execution of this Policy.

### Section 1.4        Amendment or Modification

The Insurer cannot modify the Policy without the Proposed Policyholder's consent, provided that, the Insurer may take any action it deems necessary in order to preserve the U.S. tax treatment of the Policy without the Proposed Policyholder's consent, so long as the Insurer provides 90 days prior notice of any such proposed action to the Proposed Policyholder and discusses with the Proposed Policyholder the legal basis for such change.

### Section 1.5        Misstatement of Age

If the Age of any Proposed Annuitant or Proposed Joint Annuitant is misstated on the Annuity Application Form, the Insurer will adjust the Annuity Payments to reflect the correct Age. Any amount that the Insurer has overpaid as a result of any such misstatement shall be deducted from future Annuity Payments made under the Policy. The Insurer will require due proof of the Age or survival of any person on



whose continued life any payment or benefit under the Policy is dependent. It is the Proposed Policyholder's obligation to provide proof that is satisfactory to the Insurer.

### Section 1.6      Non-Participating Policy

This Policy is non-participating, which means that the Proposed Policyholder will not share in the Insurer's profits or surplus earnings and that the Insurer will not pay dividends on this Policy.

### Section 1.7      Ownership of Assets

Assets held in the Separate Account are the sole property of the Insurer. The Proposed Policyholder will have no direct proprietary interest in the assets held in any separate account, including, without limitation, the Separate Account with respect to this Policy.

### Section 1.8      Rule of Construction

For purposes of this Policy, the period denoted by the phrase "prior to a Liquidity Date" shall include the Liquidity Date.

### Section 1.9      Governing Law

The Policy will be governed by the laws of Bermuda without regard to its conflict of laws principles, including without limitation, the Private Act and the Life Insurance Act, 1978 as may be amended from time to time.

### Section 1.10      Effective Date of Coverage

Coverage of the Proposed Annuitants under this Policy will begin on the Policy Effective Date.



## Article II    Premium Provisions

### Section 2.1    Premiums

The minimum Initial Premium payable under the Policy is $2 million. Such minimum may be met by aggregating Policies having initial Premiums of $1 million each and purchased by the same Proposed Policyholder. The Insurer has not placed a limitation on the maximum amount of Premiums that may be contributed by a Proposed Policyholder. Subject to Section 2.2, additional Premium Payments may be made at any time and from time to time as the Proposed Policyholder's financial situation permits, provided that the minimum additional Premium Payment may not be less than the minimum Unscheduled Premium.

The Initial Premium is due on the Issue Date. Premiums must be paid or mailed from outside the U.S. to the Insurer at its Home Office. Upon request, a receipt will be provided at the Insurer's Home Office (or other non-U.S. jurisdiction designated by the Insurer from time to time).

No Initial Premium or additional Premium payments may be made from the U.S. by any Proposed Policyholder (nor will the same be accepted by the Insurer) if said Proposed Policyholder is in the U.S. at the time the decision to make said Premium payment occurs. Further, the Proposed Policyholder may not direct that a Premium payment be made while the Proposed Policyholder is in the U.S. even if the Premium payment is made from outside the U.S.

Premium payments are generally to be made in U.S. Dollars. The Insurer may, in its sole and absolute discretion, accept certain in-kind asset contributions as Premium payments. The Insurer may reject in-kind asset contributions in its sole and absolute discretion.

### Section 2.2    Insurer's Right to Refuse Premiums

The Insurer reserves the right to refuse Premiums and to return Premiums with interest if such Premiums would adversely affect the U.S. tax consequences the Policy is intended to provide or the tax consequences under the laws of any other applicable jurisdiction.



The Insurer reserves the right not to accept any Premium payments from a Proposed Policyholder who ceases to be a Qualified Purchaser or an Accredited Investor. The Insurer may require any Proposed Policyholder to provide confirmation of the Proposed Policyholder's status as a Qualified Purchaser or an Accredited Investor before accepting any additional Premium payments. However, subject to any other limitation set forth in this Section 2.2, Premium payments during a Policy Year that do not exceed the sum of expected Fees and Charges under the Policy for the Policy Year will be accepted.

**Section 2.3      Nonpayment of Premium**

If no Premiums are paid after the Initial Premium, the Policy will continue In Force as long as the Policy Account Value is sufficient to pay any applicable Fees and Charges and, following the payment of such Fees and Charges, the Policy Account Value is $500,000 or more.



## Article III    Termination Provisions

### Section 3.1    Insurer's Cancellation Rights

The Insurer may, in its sole and absolute discretion, cancel the Policy and distribute the Policy Account Value to the Proposed Policyholder if:

1.  The Policy Account Value is less than $250,000 at the end of any calendar quarter prior to the Annuity Starting Date but following the Insurer's acceptance of the Initial Premium payment, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity; or

2.  The continuing existence of the Policy would require the Insurer, the Policy or the Separate Account backing the Policy to register, or make information filings, with the SEC under the Securities Act, the U.S. Investment Company Act, the U.S. Investment Adviser Act, each as amended from time to time, or the securities laws of any jurisdiction in which the Insurer, the Policy or the Separate Account is not currently registered or required to make information filings; or

3.  The Proposed Policyholder or the Proposed Annuitant (or any Proposed Joint Annuitant) changes his or her country of residence for tax, securities regulation, or other purposes; or

4.  Subject to the provisions of section 12.6 of the Policy, any declaration in the Annuity Application Form is not exact, truthful, and complete in all material respects; or

5.  If the Proposed Policyholder fails to comply with the terms of any of the covenants or declarations made in the Annuity Application Form.

Prior to the Policy termination, the Insurer will provide 90 day notice of such termination to the Proposed Policyholder, which notice shall include the reason for such termination.  The Insurer will pay to the Proposed Policyholder the amount, if any, of the Policy Account Value determined as of the Next Available Liquidity Date. Surrender charges will not apply.



**Section 3.2**      **Reinstatement**

If the Policy terminates as the result of the expiration of a Grace Period, it may not be reinstated unless reinstatement is required by Bermuda law.



## Article IV      Premium Investment; Policy Account Values

### Section 4.1      The Separate Account

The Insurer will establish a Separate Account pursuant to the terms of the Private Act to hold assets that fund obligations arising under each Policy issued by it together with any supplementary contracts hereunder and certain other funds. Income, gains, or losses of each Separate Account are credited to or charged against the assets held in such Separate Account, without regard to other income, gains, or losses of any other Separate Account or business of the Insurer. Under the terms of this Policy and the laws of Bermuda, assets allocated or credited to each Separate Account are the property of the Insurer and the Proposed Policyholder has no direct proprietary interest in such assets.

### Section 4.2      Premiums

Net Premiums received by the Insurer with respect to the Policy will be credited to the related Separate Account. To the extent that Premiums are insufficient to pay all Fees and Charges due to the Insurer under the Policy, the Insurer will deduct Fees and Charges from the Separate Account.

Amounts payable to the Proposed Policyholder or any Beneficiary under the Policy will be made by the Insurer from the related Separate Account to the Proposed Policyholder or Beneficiary in accordance with the terms of this Policy. The Insurer will establish Subaccounts within the Separate Account for each Investment Option selected by the Proposed Policyholder. Each Subaccount will correspond to an Investment Option. The Insurer may from time to time change the Investment Options and investment managers available to Proposed Policyholders, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager).

### Section 4.3      Allocations to Investment Options

On the Annuity Application Form, the Proposed Policyholder will designate the initial allocation of Net Premiums among the available Investment Options and on each Liquidity Date a Proposed Policyholder's Net Premiums will be allocated among the



Investment Options according to the allocation percentages selected. Allocation percentages must be zero or a whole number not less than ten nor greater than 100. The sum of the allocation percentages must equal 100. The Insurer will document the initial allocation on the Policy Data Page. The Insurer has reserved the right to require allocation of an amount equal to the expected aggregate quarterly Fees and Charges related to the Policy to the Liquid Asset Subaccount before application of the allocation percentages designated by the Proposed Policyholder. In addition, the Insurer may transfer amounts from other Investment Options and Subaccounts to the Liquid Asset Subaccount equal to the expected quarterly Fees and Charges.

The specific Investment Options can generally be divided into two categories: IDFs and Managed Subaccounts. The Insurer is not obligated to offer both IDFs and Managed Subaccounts as Investment Options at any time. Accordingly, at any given time only one of these types of Investment Options may be available.

The Insurer and its affiliates make no recommendations, and provide no investment advice, as to the selection of, and allocations to, Investment Options. The Insurer has not evaluated any of the investment manager's investment performance and makes no recommendation regarding the selection of any investment manager or any IDF. The Insurer does not act as a custodian of cash or investments held in the Separate Account.

### Section 4.4    Compliance with Investor Control Rules

The Proposed Policyholder agrees that, except for the selection of the allocation of Separate Account assets among Investment Options as contemplated in Section 4.3, and changes to such allocations as contemplated in Section 4.5, it will not select, identify or recommend, nor will it contact any investment manager for the purpose of influencing, any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount, including, without limitation, an investment manager with respect to an IDF in which funds held in a particular Subaccount are invested.

A Proposed Policyholder may not have direct contact or communicate with the investment manager of either an IDF or a Managed Subaccount and may not directly participate in the management of the Separate Account or any IDF or Managed Subaccount.



### Section 4.5        Changes in Allocations to Investment Options

The Proposed Policyholder may, at quarterly intervals, reallocate funds among then available Investment Options but may do so no more than twice per calendar year. If a change in allocation percentages requires a transfer of funds between Investment Options, there may be a delay after the Separate Account receives the proceeds from one Investment Option until the next date on which it is possible to reinvest the funds in a different Investment Option. During this delay period (which may be up to one calendar quarter), funds will be invested in the Liquid Asset Subaccount. The Proposed Policyholder acknowledges that this delay may result in the funds having a lower return for this period.

In the event of such a delay, the funds from the liquidated investments will be invested in the Liquid Asset Subaccount until the next Liquidity Date at which time the funds will be re-allocated (together with any related earnings) to the applicable Subaccount originally designated by the Proposed Policyholder for the transfer.

Unless and until the Proposed Policyholder notifies the Insurer in writing of a new Net Premium allocation, the Net Premium allocations as specified in "Initial Allocation of Payment to Investment Options" on the Policy Data Page will continue to apply to any additional Premium payments.

### Section 4.6        Responsibility for Selecting Investment Options

The Insurer does not and will not make any recommendation as to the Proposed Policyholder's selection or retention of investment managers, allocation of assets among Subaccounts, Investment Options, or investments in particular securities or categories of securities, nor will it evaluate the investment performance of any investment manager. Inclusion of an Investment Option shall not be deemed to be a recommendation of that investment or as an indication that such an investment is suitable for the Proposed Policyholder.

Each Proposed Policyholder acknowledges, represents, warrants, and covenants that it is solely responsible for determining for themselves whether a particular Investment Option is suitable in light of their individual situations. The Insurer and its affiliates make no recommendations, and provide no advice, as to the selection of Investment Options and provide no warranty, representation, or indemnity with respect to the



performance of any Investment Option. Each Proposed Policyholder should consult his or her personal financial advisor concerning Premium allocations.

### Section 4.7      Appointment of Investment Manager and Custodian Bank

The Insurer shall have the right, exercisable in its sole and absolute discretion, to appoint, change, or remove the investment manager and custodian bank with respect to each Investment Option or Separate Account, provided that an investment manager shall only be removed for cause (as described in the Insurer's investment management or similar agreement with such investment manager).  A Proposed Policyholder may recommend to the Insurer one or more investment managers or custodian banks who meet the Insurer's general requirements after the initial policy date, but the Insurer may accept or reject such recommendation in its sole and absolute discretion.

### Section 4.8      Timing of Allocations

The Insurer will allocate the Proposed Policyholder's Net Premiums among one or more Investment Options in the percentages specified on the Policy Data Page, as amended from time to time at the written request of the Proposed Policyholder, within two business days  following the date the Insurer receives the Net Premiums. Net Premiums received and which are to be allocated to an Investment Option will be initially invested in the Liquid Asset Subaccount and subsequently allocated (together with any related earnings) within two business days to the applicable Investment Option (subject to deferral due to liquidity constraints imposed by the applicable investment manager or IDF and subject to such provisions as to valuation and unit calculation as may be specified by the applicable investment manager).

### Section 4.9      Investment of Separate Account Assets

The Insurer will require each investment manager with respect to a portfolio of an IDF or Managed Account held in the Separate Account and the investment manager of each investment fund or other investment fund in which the assets of the Separate Account are invested, to comply with the following:

1.      Investment of assets held in each Subaccount will be sufficiently diversified to comply with the requirements of U.S. Treasury Regulation section 1.817-5(b). Assets of any investment fund relying upon a "look-through" basis for purposes



of meeting such diversification requirements will themselves be sufficiently diversified so as to allow the Subaccount to comply with such requirements.

2.    The investment manager and its employees who are responsible for investment decisions will not accept investment recommendations or make any investment decisions regarding the direct or indirect investment of Separate Account assets based, in whole or in part, on information regarding any investment or group of investments received from any Proposed Policyholder or any representative or adviser of a Proposed Policyholder.

3.    No Proposed Policyholder (or any representative or adviser of a Proposed Policyholder) will have the right or be permitted to select or identify any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount.

4.    The investment manager will not commit to invest assets of any Subaccount (or of any underlying investment fund or Managed Account in which a Subaccount has invested directly or indirectly) in mutual funds or other collective investment funds or publicly available investment products (including, without limitation, market-linked deposits and flexible deposits) managed, advised and/or distributed by the investment manager or its affiliates and will only do so if (a) in the investment manager's sole judgment at the time the investment is made, such fund or product is appropriate within the investment objectives and policies of the Subaccount fund or Managed Account and (b) no more than 55% of the assets on an initial purchase basis (excluding market value increases) of the Subaccount fund or Managed Account are invested in such funds or products at any time. Subject to the foregoing, for the avoidance of doubt, assets may be invested in an IDF.

5.    In accordance with Section 4.4, except for general descriptions of the investment policies of the Investment Options, there will not be any direct or indirect prearrangement, plan or agreement between any Proposed Policyholder (or any Proposed Policyholder's advisers or representatives) and the investment manager (or any of its employees) regarding the investments to be made directly or indirectly by any Subaccount.



**Section 4.10     Request for Extension of Investment Rights
                  With Respect to Adequate Diversification**

A Proposed Policyholder may make a request for an extension of the Proposed Policyholder's investment rights described in Section 4.4 and partial or complete release of the investment manager's obligations in Section 4.9 to adequately diversify the assets held in the Separate Account by delivering a written request to the Insurer's Home Office expressing a specific desire for the same. The Insurer may grant or deny such requests in its sole and absolute discretion, for any reason or for no reason whatsoever. Any such request must be approved by the Insurer in writing (and, in the case of an IDF, may also require the consent of the IDF). Absent written approval of the request, the request shall be deemed to have been denied.

The Insurer expresses no opinion and makes no representations or warranties regarding the tax consequences under the laws of the U.S. or any other jurisdiction of the Insurer's decision to grant such requests. By making such a request, a Proposed Policyholder waives any claim against the Insurer, its shareholders, directors, officers, employees, agents or affiliates on behalf of the Proposed Policyholder, any Beneficiaries or any other person for any loss from the Insurer's decision to grant or deny the Proposed Policyholder's request and agrees to hold harmless hereunder the Insurer and its shareholders, directors, officers, employees, agents or affiliates for any such loss.

**Section 4.11     Changes in Investment Options**

The Insurer at any time may add additional Investment Options, remove or restrict existing Investment Options, or add or eliminate an investment manager subject to any required regulatory approval, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager). If an Investment Option is removed or restricted or an investment manager is terminated, the Insurer may eliminate the Investment Option as an option for future Premium payments or transfers and may also transfer funds from the Subaccount in which assets invested in the terminated Investment Option were held, to the Liquid Asset Subaccount. An affected Proposed Policyholder may submit instructions to adjust the allocation of Net Premiums among the remaining Investment Options, without charge, for a period of 60 days following receipt of the Insurer's notice of any



such termination. The Insurer will implement those instructions on the Next Available Liquidity Date after receipt.

### Section 4.12    Policy Account Value

The Policy Account Value is equal to the net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid fees or expenses. The Insurer will determine the Policy Account Value on each Liquidity Date. The Separate Account value will increase or decrease, depending upon the investment experience of the related Subaccounts.

Assets allocated or credited to a Separate Account may be commingled with assets allocated or credited to another Separate Account for purposes of investment. In such circumstances, the Insurer may determine the Policy Account Value of each such Separate Account by the use of accumulation units, which are calculated separately with respect to each commingled investment. The accumulation unit value for each commingled investment will vary to reflect the investment experience of the assets invested therein.

The value of an accumulation unit will be determined on each Liquidity Date. When a commingled investment is made, the Insurer will credit the Separate Account with a number of accumulation units determined by dividing the amount of the investment by the value of the accumulation unit. When assets allocated or credited to a Separate Account are withdrawn from an investment, the accumulation units are reduced.



## Article V        Transfers Among Investment Options

### Section 5.1        General

The Proposed Policyholder may request one transfer among Investment Options per calendar quarter, but no more than twice per calendar year.

### Section 5.2        Conditions on Transfer

To effect any transfer, the Proposed Policyholder must submit a transfer request to the Insurer. All transfers are subject to the following conditions:

1.      Any applicable Fees and Charges will be deducted from the Subaccount or from the amount which is transferred.

2.      Transfers will be effected within 60 days following receipt by the Insurer of a transfer request. Actual settlement of a disposition or redemption from the relevant Subaccount, and reinvestment of the proceeds may be delayed as described below.

3.      Any transfer request must clearly specify: (a) the amount which is to be transferred; and (b) the Subaccounts which are to be affected.

4.      Payments to effect a transfer are subject to the disbursement rules and restrictions of the Subaccount(s).

5.      The minimum amount that may be transferred in a single transfer will be the lesser of $250,000 or the entire interest in a Subaccount.

6.      No transfer may be made from the Liquid Asset Subaccount if the amount remaining therein would not equal or exceed the Minimum Liquid Asset Allocation.

7.      In the case of an IDF, any additional conditions set forth in the governing documents in the IDF must be satisfied.



### Section 5.3          Liability

Neither the Insurer nor any of the Insurer's affiliates will be liable for any losses incurred as a result of transfers made in accordance with a Proposed Policyholder's transfer request including lower returns which may result.

### Section 5.4          Limits on Right of Transfer

The Insurer may in its sole and absolute discretion defer the right of transfer for any period when it reasonably determines that additional time is necessary to obtain sufficient cash to make the transfer payments. Additional limitations on transfer may be imposed under the terms of any IDF in which assets held in a Separate Account are invested.  For the avoidance of doubt, a transfer described in this Section 5.4 is a situation where a change from one Investment Option to another Investment Option occurs.



## Article VI     Annuity Provisions

### Section 6.1     Annuity Payments

The Insurer will make periodic payments to the Beneficiaries beginning on the Annuity Starting Date and continuing thereafter on each Policy Anniversary to an account located outside the U.S. The amount of each Annuity Payment will equal the product of the applicable Annuity Percentage and the Policy Account Value (determined as of the end of the calendar quarter immediately preceding each Annuity Payment) and will vary depending upon the investment experience of the Investment Options in which the Separate Account assets are invested and the age of the Proposed Annuitant.

### Section 6.2     Annuity Percentage

The Annuity Percentages are listed in the Appendix I to this Policy. The applicable Annuity Percentage will, depend upon the benefit option selected by the Policyholder. In the case of a Single Life Annuity, the Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants. The Annuity Percentage is adjusted for each Annuity Payment.

### Section 6.3     No Guaranteed Payments

The Policy Account Value, and thus, the Annuity Payments may increase or decrease depending upon the investment experience of the Investment Options selected by the Proposed Policyholder. The sole source for the payment of the Annuity Payments are the assets held in the Separate Account backing the Policy. The Policy does not provide for guaranteed annuity or death benefits. All payments, including upon the death of the Proposed Policyholder or Proposed Annuitant (or Proposed Joint Annuitants) are strictly limited to the assets held in the Separate Account backing the Policy and no Annuity Payments or any other payments under the Policy are payable from any other source.



### Section 6.4        Annuity Starting Date

The Annuity Starting Date must be on the first day of a calendar quarter and may not be later than the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty-fifth (85th) birthday. If the Proposed Policyholder has not chosen an Annuity Starting Date, then the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty- fifth (85th) birthday shall be the Annuity Starting Date.

### Section 6.5        Change of Annuity Starting Date

The Proposed Policyholder may change the Annuity Starting Date prior to the then current Annuity Starting Date by delivering a written notice to the Insurer. The new Annuity Starting Date may not be before the Next Available Liquidity Date for any Investment Option under the Policy as of the date the Insurer receives the notice from the Proposed Policyholder, and may not be later than the first day of the calendar month following the Proposed Annuitant's 85th birthday. Distributions must commence after the Annuity Starting Date in accordance with requirements under the Code.

### Section 6.6        Annuity Income Options

Two (2) basic benefit options are offered under the Policy: (i) a Single Life Annuity, and (ii) a Joint Life Annuity. The benefit option may be changed by the Proposed Policyholder; however, no such change may be made at any time on or after the Annuity Starting Date. A Policyholder may change the selection of any benefit option by giving the Insurer at least thirty (30) calendar days' written notice prior to the Annuity Starting Date from outside the U.S.

In the case of a Single Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants.

Under both basic benefit options, the amount of each annual Annuity Payment made on or after the Annuity Starting Date will vary in accordance with the age of the Proposed Annuitant (or Proposed Joint Annuitant(s)) and the investment performance of the assets held in the Separate Account and shall be computed by the Insurer's



actuary each year (and recomputed on the annual anniversary date each year thereafter) by multiplying the applicable Annuity Percentage in the Annuity Percentage Table attached as Appendix I to this Policy by the then current Policy Account Value as of the Annuity Starting Date and predetermined on the annual anniversary date each year thereafter. If the Policy Account Value is zero, then all payments will cease. All Annuity Payments shall be made to an account outside the U.S. The Insurer may consider the adoption of additional benefit options at the request of a Proposed Policyholder.

### Section 6.7    Maturity Payment

Upon the death of the Proposed Annuitant (or survivor of the Proposed Joint Annuitants), the Insurer will pay to the Beneficiaries, or their successors as Beneficiaries, as the case may be, the balance of the Policy Account Value.



## Article VII   Loan Provisions

### Section 7.1   Policy Loans

The Proposed Policyholder shall have no guaranteed rights or privileges with respect to loans under a Policy. The Insurer may, in its sole and absolute discretion consider whether to facilitate a Proposed Policyholder's request to pledge a Policy as collateral security for a loan to be made by the Insurer or institutional or other third party lenders. A pledge of a Policy as collateral security for a loan may be effected only with the prior written consent of the Insurer, which may be granted or denied in the Insurer's sole and absolute discretion.



## Article VIII    Surrender Provisions

### Section 8.1    General

At any time after the Issue Date and prior to the Annuity Starting Date, the Proposed Policyholder may request one or more withdrawals under the Policy from the Separate Account in the form of a Partial Surrender. Withdrawals are possible up to 100% of the Policy Account Value. Should the Policy Account Value be equal to or less than $250,000, the Policy will lapse. The rights of a Proposed Policyholder to make a Surrender under the Policy shall be subject to the consent of all Beneficiaries who have been irrevocably designated by the Proposed Policyholder under the Policy. Subject to this Article VIII, the Proposed Policyholder may Surrender the Policy, in whole or in part, by filing a written request with the Insurer at the Insurer's Home Office at any time during the lifetime of the Proposed Annuitant. The Policy Account Value which is the subject of the Surrender will be determined as of the Next Available Liquidity Date occurring after the Insurer receives the request to Surrender.

Although the amount of the Surrender proceeds will be determined as of the Next Available Liquidity Date after receipt of the Surrender request, the Insurer will use reasonable efforts to pay Surrender proceeds as soon as practicable whether on a Liquidity Date or another date (subject to such liquidity constraints and provisions as to valuation and unit calculation as may be specified by the investment manager of the applicable Investment Option).

### Section 8.2    Full Surrender

If the Proposed Policyholder requests a Full Surrender of the Policy Account Value of the Policy, the Policy will terminate on the date the Proposed Policyholder submits its Surrender request in accordance with Section 12.3.

### Section 8.3    Partial Surrender

The Proposed Policyholder may request a Partial Surrender of the Policy for up to and including 90% of the Policy Account Value of the Policy. No more than one Partial Surrender may be requested by the Proposed Policyholder during each quarter of a Policy Year. As provided in Section 3.1, any Partial Surrender that causes the Policy Account Value to be reduced to an amount that is less than



$250,000 may be deemed by the Insurer to be a request for Full Surrender and if so deemed will cause the Policy to be terminated, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity. If the Policy Account Value is reduced to an amount that is less than $250,000, then the Insurer shall have the right, exercisable in its sole and absolute discretion, to treat a Partial Surrender request as a Full Surrender request.

Each Partial Surrender will reduce the Policy Account Value and the amount of any Annuity Payment to be paid after the Annuity Starting Date. An amendment to the Policy will be sent to the Proposed Policyholder outside the U.S. for countersignature upon any request for a Partial Surrender under the Policy. Said amendment shall become a part of the Policy.



## Article IX       Policy Fees and Charges

### Section 9.1       Policy Administration Fee

The Insurer will deduct the Policy Administration Fee from the Separate Account as set forth in the Policy Data Page for general administrative expenses.

### Section 9.2       DAC Charges

The amount deducted by the Insurer as set forth on the Policy Data Page to pay for the costs imposed by virtue of the treatment of certain deferred acquisition costs for U.S. federal income tax purposes under section 848 of the Code. The amount of the DAC Charge as set forth on the Policy Data Page shall be adjusted to reflect any change in the applicable U.S. federal income tax rate.  The Insurer shall provide the Proposed Policyholder notice of any change in the DAC Charge.

### Section 9.3       Management & Expense Fee

The Insurer will deduct the Management & Expense Fee from the Separate Account. The Management & Expense Fee is an on-going insurance administration fee described on the Policy Data Page.

### Section 9.4       Policy Set-Up Deposit

The Policy Set-Up Deposit is due to the Insurer as set forth on the Policy Data Page upon submission of the completed Annuity Application Form by the Proposed Policyholder. The Policy Set-Up Deposit will be paid into the General Account of the Insurer.  Upon issuing the Policy, an amount equal to the Policy Set-Up Deposit will be used to offset the Acceptance Fee.  If for any reason, a Policy is not issued, the Insurer will retain the Policy Set-Up Deposit to cover medical, underwriting, administration and any other costs incurred by the Insurer in the processing of the application.

### Section 9.5       Acceptance Fee

The Insurer will deduct the Acceptance Fee set forth in the Policy Data Page on each date the Insurer receives a Premium payment.



### Section 9.6     Surrender Charge

Surrender charges will not apply to this Policy.

### Section 9.7     Taxes

The Insurer will deduct only those Taxes (as defined below) paid by the Insurer or its affiliates to any governmental entity that relate to the Policy or the related Separate Account. These taxes (the "Taxes") exclusively include withholding taxes, excise taxes, sales taxes, stamp taxes, value added taxes, state taxes imposed on the Insurer or its affiliates, and taxes imposed on Subpart F income of a Separate Account attributable to its investment in a controlled foreign corporation, as well as the deferred tax amount and any interest charge or other taxes imposed on the investments of a Separate Account in a passive foreign investment company, or under the corresponding tax laws of other jurisdictions.

The Insurer may, in its sole and absolute discretion, pay Taxes when due and deduct such amounts from the Separate Account at a later date. The Insurer will, in its absolute discretion, determine when Taxes have resulted from the investment experience of any Subaccount or receipt by the Insurer of Premiums.

### Section 9.8     Agreed Upon Procedures Fee

The Insurer will deduct the Agreed Upon Procedures Fee from the Separate Account if the Proposed Policyholder instructs the Insurer to engage a third party audit firm to review charges and provide an Agreed Upon Procedures (AUP) report.

### Section 9.9     Deductions for Fees and Charges

The Fees and Charges are paid to the Insurer under the Policy initially by making deductions from Premiums and then by making deductions from the Separate Account. To the extent that the Insurer deducts Fees and Charges from the Separate Account, amounts will be deducted first from the Liquid Asset Subaccount and then from the Subaccounts pursuant to the terms of the Policy.

### Section 9.10     Custodian Bank and Investment Manager Fees

Each custodian bank and investment manager will separately deduct any applicable fees charged by it from any Separate Account or Investment Option for which it is acting as custodian or investment manager, as the case may be. The fees of the



custodian bank and investment manager are calculated on an individual basis and may vary depending upon the investment manager and Investment Option(s) selected by the Proposed Policyholder. The list of investment managers and custodians retained by the Insurer is available from the Insurer upon request.



## Article X    Death Benefit Provisions

### Section 10.1    Death Benefit

If all Beneficiaries and any alternative Beneficiaries predecease the Proposed Policyholder and Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected), then the benefits payable under the Policy to the Beneficiaries or alternative Beneficiaries shall be paid to the Proposed Policyholder until the first to die of the Proposed Policyholder or Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected).

If none of the Beneficiaries or alternative Beneficiaries survives the Proposed Annuitant(s), then the Policy Account Value shall be paid to the Proposed Policyholder upon the Proposed Annuitant's death (or survivor of the Proposed Joint Annuitants' death, in the case where a Joint Life Annuity benefit option is selected).

If the Proposed Policyholder is not living at the time any benefit under the Policy is payable to the Proposed Policyholder, then such benefit shall be paid to the Proposed Policyholder's estate, if then open, or if not then to his heirs *per stirpes*, in accordance with the laws of succession in the jurisdiction of the Proposed Policyholder's last known domicile on the date of the Proposed Policyholder's death.

If the Proposed Policyholder is not an individual, then the Proposed Annuitant (or the younger of the Proposed Joint Annuitants or the survivor of the Proposed Joint Annuitants) shall be recognized as the "primary Proposed Annuitant" and treated as the Proposed Policyholder of the Policy. Any change in the designation of such Proposed Annuitant (or Proposed Joint Annuitant) following the Issue Date (in the case where the Proposed Policyholder is not an individual) shall be treated as the death of the Proposed Policyholder.

If the Proposed Policyholder dies prior to the "annuity starting date" (defined under Code Section 72(c)(4) as the first day of the first period for which an amount is received as an annuity under the contract; such definition possibly differing from the Annuity Starting Date designated under the Policy), then the Proposed Policyholder's entire interest in the Policy shall be distributed to the Beneficiaries within five (5) years from the date of the Proposed Policyholder's death, unless the Beneficiaries



elect to receive such interest in distributions made over their life or lives (or over a period not extending beyond their respective life expectancies), and such distributions begin within one (1) year from the date of the Proposed Policyholder's death. Any such election must be made in writing and received by the Insurer at the Insurer's Home Office within 180 calendar days from the date of the Proposed Policyholder's death.

If the Proposed Policyholder dies on or after the "annuity starting date" (as defined under Code Section 72(c)(4)) and before the entire interest in the Policy has been distributed, the remaining portion of the Policy Account Value shall be distributed to the Beneficiaries at least as rapidly as under the method of distributions being used as of the date of the Proposed Policyholder's death.

Notwithstanding any provision of the Policy, all Death Benefits must be distributed in compliance with the provision of section 72(s) of the Code. Death Benefits payable hereunder will be includible in the gross income of the Beneficiary.

### Section 10.2    Due Proof of Death

Due proof of death is one of the following received at the Insurer's Home Office in a form satisfactory to the Insurer in its absolute discretion:

1.    A certified copy of a death certificate;

2.    A certified copy of a decree of a court of competent jurisdiction as to the finding of death; or

3.    Any other proof of death satisfactory to the Insurer.



## Article XI    Owner, Beneficiary, Assignment

### Section 11.1    Proposed Policyholder

The Proposed Policyholder is the person so named on the Policy Data Page or his or her assignee in accordance with a valid assignment as provided in Section 11.2.

Under Bermuda law, the Proposed Policyholder or his personal representative, trustee in bankruptcy or legal assignee will be the owner of the rights to payments under the Policy. While the Proposed Policyholder is alive, all rights in the Policy belong to the Proposed Policyholder and may be exercised without the consent of any Beneficiary, provided that, once an irrevocable designation of Beneficiary is filed, changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary. All of the Proposed Policyholder's rights in the Policy belong to the estate of the Proposed Policyholder if the Proposed Policyholder dies before the Proposed Annuitant. Joint ownership is permitted.

### Section 11.2    Change of Proposed Policyholder

The Proposed Policyholder may change the ownership of the Policy by submitting a request to the Insurer's Home Office and obtaining written approval of the Insurer. Any approved change will take effect on the date specified in the approval.

### Section 11.3    Proposed Annuitant

The Proposed Policyholder has the right to designate one Proposed Annuitant or two Proposed Joint Annuitants. The Proposed Annuitants or Proposed Joint Annuitants will be as stated in the Annuity Application Form, unless otherwise endorsed at issue or subsequently changed.

### Section 11.4    Change of Proposed Annuitant

Each Proposed Policyholder will have the right to designate and in some cases change the Proposed Annuitant or Proposed Joint Annuitant.



### Section 11.5    Beneficiary

The Proposed Policyholder shall initially designate one or more Beneficiaries on the Policy Data Page. All designations of Beneficiaries are revocable unless specified as irrevocable by the Proposed Policyholder. Once an irrevocable designation of Beneficiary is filed, any changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary under the Policy.

### Section 11.6    Change of Beneficiary

Except in the case of an irrevocable Beneficiary, the Proposed Policyholder may change the Beneficiaries by filing a written request from outside the U.S. with the Insurer at its Home Office at any time prior to the Annuity Starting Date. In the case of an irrevocable Beneficiary, the consent of the irrevocable Beneficiary to the change is also required. The change will take effect as of the date the notice is received by the Insurer subject to any payment made or action taken by the Insurer before the Insurer receives the document at its Home Office. A new Beneficiary designation will automatically revoke all prior designations (except an irrevocable Beneficiary designation where the consent of the irrevocable Beneficiary has not been obtained). The Insurer will not be liable for any payment made or action taken before the effective date of the change of Beneficiary.

### Section 11.7    Assignment

The Proposed Policyholder may transfer, assign, or pledge the Policy or any of their rights under the Policy, including a Section 1035 exchange of the Policy with another carrier, without the prior written consent of the Insurer, provided that the Policy may not be assigned unless (i) it is registered under the U.S. federal securities and/or state securities laws or the securities laws of any other jurisdiction unless such registration is not required or an exemption from registration is available and (ii) the assignee is a Qualified Purchaser and Accredited Investor. The Insurer may require satisfactory evidence as to the non-applicability of any such registration requirement or the availability of an exemption from any applicable registration requirement and the Insurer may in its discretion for this purpose request, at the transferor's expense, a favourable legal opinion from transferor's counsel that the provisions of this Section 11.7 have been met.



The Insurer represents and warrants that, subject to the foregoing, it will fully cooperate with any assignment, transfer or exchange, including a "1035" exchange of the Policy with another carrier and will cooperate to exchange underlying IDFs or sub-accounts with such carrier.  Failure by the Insurer to cooperate with the Proposed Policyholder in a proposed 1035 exchange or other transfer, assignment, or pledge of the Policy or any of the Proposed Policyholder's rights under the Policy, such failure to cooperate as determined by a final judgement in a Bermuda court or other court of relevant jurisdiction, among any other injunctive or other relief resulting therefrom, will result in liquidated damages to the Proposed Policyholder equal to the sum of the (a) then Policy Account Value and (b) any fees or charges, including Management and Expense Fees, accruing during the period that the non-cooperation (as determined by the a Bermuda court or other court of relevant jurisdiction) exists and is continuing, and the Insurer shall be strictly liable for payment of such amount to the Proposed Policyholder.  For the avoidance of doubt, the Proposed Policyholder shall be entitled to its Policy Account Value separate from the liquidated damages amount provided for herein.   The Proposed Policyholder (x) acknowledges that the Insurer's ordinary and customary process for 1035 exchanges includes obtaining satisfactory assurance from the transferor of compliance with relevant tax and disclosure laws with respect to the Policy and indemnification from the new carrier regarding any tax obligations relating to the Policy  and (y) agrees that following the Insurer's 1035 exchange process will not be considered to be a failure to cooperate by the Insurer.



## Article XII   Other General Provisions

### Section 12.1   Periodic Reports

The Insurer will make available to the Proposed Policyholder, for every calendar quarter or portion thereof during which the Policy is In Force, a report that shows activity in the Proposed Policyholder's Separate Account. The Proposed Policyholder expressly authorizes the Insurer to rely upon the information or valuations provided by the selected investment manager and custodian without further inquiry or verification of any kind, nature, or description. Each quarterly statement will set forth the Policy Account Value less applicable expenses and charges at the beginning and end of the reporting period and aggregate adjustments to the same throughout. These quarterly statements shall be made available to the Proposed Policyholder at the Insurer's Home Office. The Insurer will forward annual Separate Account statements to an address of the Proposed Policyholder outside of the U.S. if a request to do so is made by the Proposed Policyholder in writing and delivered to the Insurer's Home Office.

### Section 12.2   Currency and Place of Payment

All transactions between the Proposed Policyholder and the Insurer will be made in U.S. dollars unless otherwise confirmed by the Insurer in writing. All Payments will be made outside the U.S.

### Section 12.3   Notices, Requests and Elections

To be effective, all notices, requests, and elections the Proposed Policyholder makes under the Policy must be in writing, signed by the Proposed Policyholder or sent electronically or via facsimile by the Proposed Policyholder and received by the Insurer. Unless otherwise provided, all notices, requests and elections will be effective when received by the Insurer. Notices, requests and elections may be made by the Proposed Policyholder under the Policy in writing, signed by the Policyholder, sent by facsimile or electronic communication and received by the Insurer at its Home Office or administrative office, provided that the Insurer will not be liable for following instructions communicated by facsimile or electronically and, provided further that acceptance of facsimile or electronic communication by the Insurer will not impose any requirement on the Insurer to employ any procedures to confirm that instructions



received by facsimile communication are genuine. Any notice or report required to be given by the Insurer to the Proposed Policyholder or any other person will be deemed given when sent to such person or such person's authorized representative.

## Section 12.4    Policy Settlement

Prior to any payment of a Death Benefit, due certified proof of death must be submitted to the Insurer.

## Section 12.5    Deferment

The Insurer will execute allowable requests for a transfer, Full Surrender or Partial Surrender by the Proposed Policyholder within 60 days of a request. Such requests may require conversion of certain Investment Option assets to cash or in-kind distributions, where possible. This may take longer than 60 days for a variety of reasons, including underlying restrictions on redemptions of assets held pursuant to an Investment Option. In such cases, the Insurer will take reasonable steps to comply with such requests at the earliest time possible.  The foregoing will be subject to time restrictions within the Insurance Dedicated Fund purchased by a Subaccount.

## Section 12.6    Incontestability

Except as expressly provided in the Policy, the Insurer will not contest the validity of the Policy for misstatement, misrepresentation or non-disclosure after the Policy has been In Force for two years from the Issue Date during the lifetime of the Proposed Annuitant. The Policy will be voidable in the event of fraud at any time. If the validity of the Policy is so contested, then (1) the Insurer's obligation to pay Annuity Payments under the Policy will terminate as of the date the Insurer discovers such misstatement, misrepresentation or non-disclosure, and (2) the Policy Account Value will be determined as of the Next Available Liquidity Date occurring after the Insurer discovers such misstatement, misrepresentation or non-disclosure and returned to the Proposed Policyholder or the Beneficiaries within 90 days. The Insurer will notify the Proposed Policyholder that the Policy is so terminated and such notice will include the date of termination. The return of the Policy Account Value will be in full and final satisfaction of all the Insurer's obligations under the Policy. Following the return of the Policy Account Value, the Policy will be void.



### Section 12.7 Policyholder Information

The Insurer may disclose Policyholder information to third parties such as banks or independent asset managers. Specifically with respect to banking relationships in Switzerland and in accordance with FINMA Newsletter 18 (2010) "handling of Life insurance with separately managed accounts/portfolios" dated December 20, 2010, the Insurer may disclose Policyholder or source of funding information to banking partners including Policyholder name, date of birth, nationality and address. In any event, the Insurer may be required to confirm in accordance with FINMA Newsletter 18 (2010) that the insurance product related to account openings is set up as a life insurance product according to the legal provisions, including provisions concerning biometric risks, of the Insurer's domicile.

Each U.S. person who has a financial interest in or signature or other authority over any foreign financial accounts, including bank, securities, or other types of financial accounts, in a foreign country, if the aggregate value of these financial accounts exceeds $10,000 at any time during the calendar year, must report that relationship each calendar year by filing Form TD F 90-22.1 (Report of Foreign Bank and Financial Accounts), commonly referred to as an "FBAR", with the Department of the Treasury on or before June 30 of the succeeding year. In addition, and irrespective of the independent FBAR filing obligations that a Proposed Policyholder (or its owner) who is a U.S. person may have, U.S. person directors, officers, or employees of the Insurer who have signature authority over the Separate Account, Subaccounts, or other accounts with respect to the Policy would need to file an FBAR with respect to such accounts and so will the Insurer itself as a U.S. Person with a financial interest in such accounts. On the basis of such filings, the IRS could request information with respect to such filings and the Proposed Policyholder acknowledges that the Insurer may provide such FBAR-related information to the IRS if requested to do so.

### Section 12.8 Tax Matters

The Proposed Policyholder acknowledges that he or she is responsible for complying with all tax reporting, filing and payment obligations with respect to this Policy in any jurisdiction in which the Proposed Policyholder is subject to tax. The Proposed Policyholder must consult its own tax advisor with respect to such obligations. The Insurer has not provided, and shall have no responsibility for providing, advice to the Proposed Policyholder with respect to such issues.



**Section 12.9      Limitation on Liability of Insurer**

**THE LIABILITY OF THE INSURER FOR BENEFITS UNDER THE POLICY OR FOR ANY LOSS OR OTHER DAMAGES WITH RESPECT TO THE POLICY IS LIMITED TO THE POLICY ACCOUNT VALUE.**



## Appendix I - Annuity Percentage Table

| Annuitant's Age | Life Expectancy | Annuity Percentage | Annuitant's Age | Life Expectancy | Annuity Percentage |
|---|---|---|---|---|---|
| 10 | 86.2 | 1.1601% | 63 | 33.9 | 2.9499% |
| 11 | 85.2 | 1.1737% | 64 | 33.0 | 3.0303% |
| 12 | 84.2 | 1.1876% | 65 | 32.0 | 3.1250% |
| 13 | 83.2 | 1.2019% | 66 | 31.1 | 3.2154% |
| 14 | 82.2 | 1.2165% | 67 | 30.2 | 3.3113% |
| 15 | 81.2 | 1.2315% | 68 | 29.2 | 3.4247% |
| 16 | 80.2 | 1.2469% | 69 | 28.3 | 3.5336% |
| 17 | 79.2 | 1.2626% | 70 | 27.4 | 3.6496% |
| 18 | 78.2 | 1.2788% | 71 | 26.5 | 3.7736% |
| 19 | 77.3 | 1.2937% | 72 | 25.6 | 3.9063% |
| 20 | 76.3 | 1.3106% | 73 | 24.7 | 4.0486% |
| 21 | 75.3 | 1.3280% | 74 | 23.8 | 4.2017% |
| 22 | 74.3 | 1.3459% | 75 | 22.9 | 4.3668% |
| 23 | 73.3 | 1.3643% | 76 | 22.0 | 4.5455% |
| 24 | 72.3 | 1.3831% | 77 | 21.2 | 4.7170% |
| 25 | 71.3 | 1.4025% | 78 | 20.3 | 4.9261% |
| 26 | 70.3 | 1.4225% | 79 | 19.5 | 5.1282% |
| 27 | 69.3 | 1.4430% | 80 | 18.7 | 5.3476% |
| 28 | 68.3 | 1.4641% | 81 | 17.9 | 5.5866% |
| 29 | 67.3 | 1.4859% | 82 | 17.1 | 5.8480% |
| 30 | 66.3 | 1.5083% | 83 | 16.3 | 6.1350% |
| 31 | 65.3 | 1.5314% | 84 | 15.5 | 6.4516% |
| 32 | 64.3 | 1.5552% | 85 | 14.8 | 6.7568% |
| 33 | 63.3 | 1.5798% | 86 | 14.1 | 7.0922% |
| 34 | 62.3 | 1.6051% | 87 | 13.4 | 7.4627% |
| 35 | 61.4 | 1.6287% | 88 | 12.7 | 7.8740% |
| 36 | 60.4 | 1.6556% | 89 | 12.0 | 8.3333% |
| 37 | 59.4 | 1.6835% | 90 | 11.4 | 8.7719% |
| 38 | 58.4 | 1.7123% | 91 | 10.8 | 9.2593% |
| 39 | 57.4 | 1.7422% | 92 | 10.2 | 9.8039% |
| 40 | 56.4 | 1.7730% | 93 | 9.6 | 10.4167% |
| 41 | 55.4 | 1.8051% | 94 | 9.1 | 10.9890% |
| 42 | 54.4 | 1.8382% | 95 | 8.6 | 11.6279% |
| 43 | 53.4 | 1.8727% | 96 | 8.1 | 12.3457% |
| 44 | 52.4 | 1.9084% | 97 | 7.6 | 13.1579% |
| 45 | 51.5 | 1.9417% | 98 | 7.1 | 14.0845% |
| 46 | 50.5 | 1.9802% | 99 | 6.7 | 14.9254% |
| 47 | 49.5 | 2.0202% | 100 | 6.3 | 15.8730% |
| 48 | 48.5 | 2.0619% | 101 | 5.9 | 16.9492% |
| 49 | 47.5 | 2.1053% | 102 | 5.5 | 18.1818% |
| 50 | 46.5 | 2.1505% | 103 | 5.2 | 19.2308% |
| 51 | 45.5 | 2.1978% | 104 | 4.9 | 20.4082% |
| 52 | 44.6 | 2.2422% | 105 | 4.5 | 22.2222% |
| 53 | 43.6 | 2.2936% | 106 | 4.2 | 23.8095% |
| 54 | 42.6 | 2.3474% | 107 | 3.9 | 25.6410% |
| 55 | 40.6 | 2.4631% | 108 | 3.7 | 27.0270% |
| 56 | 40.7 | 2.4570% | 109 | 3.4 | 29.4118% |
| 57 | 39.7 | 2.5189% | 110 | 3.1 | 32.2581% |
| 58 | 38.7 | 2.5840% | 111 | 2.9 | 34.4828% |
| 59 | 37.8 | 2.6455% | 112 | 2.6 | 38.4615% |
| 60 | 35.8 | 2.7933% | 113 | 2.4 | 41.6667% |
| 61 | 35.8 | 2.7933% | 114 | 2.1 | 47.6190% |
| 62 | 34.9 | 2.8653% | 115 | 1.9 | 52.6316% |