**EXHIBIT 33**

www.sglawyers.com

**SadisGoldberg**LLP

January 29, 2016

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, Texas  75201

Dear Sirs:

You have requested our ("our", "we" or "Sadis & Goldberg LLP" as the context may require) opinion concerning certain U.S. federal income tax issues relating to investments made by two tax-exempt supporting organizations identified herein in variable annuity contracts issued by Crown Global Life Insurance Ltd. under the facts discussed below.

Part I of this letter describes our factual investigation. Part II of this letter sets forth a statement of the relevant facts which you have reviewed and confirmed to us to be accurate and complete in all material respects.  Part III of this letter then lists certain assumptions that you have authorized us to make in rendering our opinion, and which you have confirmed are correct and reasonable, and Part IV of this letter states the opinion that is being requested.  In Part V of this letter, we describe the relevant U.S. federal income tax provisions, rulings of the Internal Revenue Service and relevant tax cases relating to the opinion requested.  Part VI of this letter sets forth our opinion, together with your permitted use of and reliance on this opinion letter.

I.      **FACTUAL INVESTIGATION**

**For purposes of rendering the opinions expressed below, we have been furnished and have reviewed the following documentation (the "Relevant Documents"):**

1.    The Okada Family Foundation, Inc. certificate of incorporation filed on February 10, 2015.

2.    The Okada Family Foundation, Inc. bylaws dated March 9, 2015.

3.    The Okada Family Foundation, Inc. draft IRS Form 1023 - Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code.

4.    The Supporting Organization Operating Agreement entered into between The Okada Family Foundation, Inc. and The Dallas Foundation.

5.    Empower Dallas Foundation, Inc. certificate of incorporation filed on February 10, 2015.

6.    Empower Dallas Foundation, Inc. bylaws dated March 9, 2015.

7.    Empower Dallas Foundation, Inc. draft IRS Form 1023 - Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code.

8.    The Supporting Organization Operating Agreement entered into between Empower Dallas Foundation, Inc. and The Dallas Foundation.

1

9. Mark Okada 12/08/2015 donation of $5,345,021.50 to The Okada Family Foundation Inc. Nexbank Statement Transaction entries from 11/10/2015 to 12/10/2015

10. Mark Okada 12/22/2015 donation of $2,138,333.33 to The Okada Family Foundation Inc. Nexbank Statement Transaction entries from 11/28/2015 to 12/28/2015

11. Jim Dondero 12/08/2015 donation of $16,034.978.50 to Empower Dallas Foundation, Inc. Nexbank Statement Transaction entries from 11/10/2015 to 12/10/2015

12. Jim Dondero 12/22/2015 donation of $6,415,000 to Empower Dallas Foundation, Inc. Nexbank Statement Transaction entries from 11/28/2015 to 12/28/2015

13. The Okada Family Foundation, Inc. Unanimous Written Consent of Directors in Lieu of Special Meeting, December 9th, 2015.

14. Empower Dallas Foundation, Inc. Unanimous Written Consent of Directors in Lieu of Special Meeting, December 9th, 2015.

15. The Okada Family Foundation, Inc.:  Crown Global Due Diligence Declaration Signed 12/09/2015

16. The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy #30219, effective December 11, 2015

17. The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy #30219, Term Sheet 12/09/2015

18. The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Application Form, 12/09/2015

19. The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy FATCA Waiver, 12/09/2015

20. The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy Structure Chart 12/09/2015

21. The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: JPM Growth Series Supplement

22. The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: JPM Hedge Series Supplement

23. The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Limited Power of Attorney, 12/09/2015

24. The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Atlas IDF, LP, Private Placement Memorandum

25. The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Rand PE Fund I, LP, Private Placement Memorandum

26. The Okada Family Foundation, Inc.:  Nexbank Wire Transfer Department: $5,301,065.12 wire premium to Crown Global on 12/10/2015

27. The Okada Family Foundation, Inc.:  Nexbank Transaction detail entries from 11/28/2015 to 12/28/2015 for additional wire premium to Crown Global of $2,117,423.00 on 12/22/2015.

28. The Empower Dallas Foundation, Inc.:  Crown Global Due Diligence Declaration Signed 12/09/2015

29. The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy #30218, effective December 11, 2015

30. The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy #30218, Term Sheet 12/09/2015

31. The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Application Form, 12/09/2015

32. The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy FATCA Waiver, 12/09/2015

33. The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy Structure Chart 12/09/2015

34. The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: JPM Growth Series Supplement

35. The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: JPM Hedge Series Supplement

36. The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Limited Power of Attorney, 12/09/2015

37. The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Atlas IDF, LP, Private Placement Memorandum

38. The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Rand PE Fund I, LP, Private Placement Memorandum

39. The Empower Dallas Foundation, Inc.:  Nexbank Wire Transfer Department: $15,903,108.54 wire premium to Crown Global on 12/10/2015

40. Empower Dallas Foundation, Inc.:  Nexbank Transaction Account detail from 11/28/2015 to 12/28/2015 indicating wire of $6,352,270 for additional premium to Crown Global on 12/22/2015

41. Back Office Shared Services Agreement by and among Highland Capital Management, L.P. and Rand Advisors, LLC dated October 10, 2013.

3

42. Amendment to Back Office Shared Services Agreement between Highland Capital Management, L.P. and Rand Advisors, LLC dated October 14, 2014.

43. Contribution Agreement between Highland Capital Management, L.P. and Hunter Mountain Investment Trust, dated December 21, 2015

44. Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated December 21st, 2015

45. Partnership Interest Purchase Agreement among The Dugaboy Investment Trust, The Mark and Pamela Okada Family Trust-Exempt Trust #1, The Mark and Pamela Okada Family Trust-Exempt Trust #2, Mark K. Okada, and Hunter Mountain Investment Trust, dated December 24, 2015

46. Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated December 24th, 2015.

We are not aware of any documents other than the Relevant Documents that would alter our conclusions. We have assumed the genuineness of all signatures, the legal capacity of natural persons, the authenticity of all documents submitted to us as originals and the conformity with original documents of all documents submitted to us as copies, the fact that each party to an agreement has the power and capacity to execute, deliver and perform all obligations under such documents, the due authorization of all requisite action with respect to such documents (including the execution and delivery thereof) by each party thereto, and the validity and binding effect of such documents upon each party. We have also assumed that all factual assertions in the Relevant Documents are accurate and complete in all material respects. We have no reason to believe that any of the foregoing assumptions are unreasonable.

## II. STATEMENT OF FACTS

A. The Dallas Foundation ("TDF") is a Texas non-profit corporation exempt from federal income taxation under Section 501(c)(3) of the U.S. Internal Revenue Code, as amended ("Code"), and a public charity described in Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Code.

B. The principal objective of TDF is to solicit, receive and accept property to be administered, used and applied for charitable purposes, primarily, but not exclusively in or for the benefit of Dallas County, Texas. TDF is not controlled by James Dondero, Mark Okada or Highland Capital Management, L.P.

C. Empower Dallas Foundation, Inc. ("Supporting Organization #1") is a Delaware non-profit non-stock charitable corporation which has been established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of TDF.

D. The Okada Family Foundation, Inc. ("Supporting Organization #2") is a Delaware non-profit non-stock charitable corporation which has been established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of TDF.

E. Supporting Organization #1 and Supporting Organization #2 each expect to obtain a determination letter from the U.S. Internal Revenue Service ("IRS") that each such Supporting Organization,

4

respectively, is a tax-exempt organization described in Section 501(c)(3) of the Code and a "Type I" supporting organization described in Section 509(a)(3) of the Code. For the avoidance of doubt, such tax-exempt status is expected to be effective retroactively to the date of each Supporting Organization's formation, respectively.

F.   As a result of qualifying as Type I supporting organizations under Section 509(a)(3) of the Code, Supporting Organization #1 and Supporting Organization #2 will each be exempted from private foundation status under Section 509(a) of the Code.

G.   Mary M. Jalonick is the President and Chief Executive Officer of TDF, and is the Incorporator of both Supporting Organization #1 and Supporting Organization #2.[1]

H.   Supporting Organization #1 has been formed at the request of James Dondero. On December 8, 2015, Mr. Dondero contributed $16,034,978.50 to Supporting Organization #1. On December 22, 2015, Mr. Dondero contributed $6,415,000 to Supporting Organization #1. At the present time, Mr. Dondero is the only contributor to Supporting Organization #1. Although Mr. Dondero made a recommendation to the Board as to how the Board should invest such contributions (as described below), the Board of Supporting Organization #1 is not contractually obligated to follow the investment recommendations of Mr. Dondero at the time such contributions are made or at any later date.

I.   Supporting Organization #2 has been formed at the request of Mark Okada. On December 8, 2015, Mr. Okada contributed $5,345,021.50 to Supporting Organization #2. On December 22, 2015 Mr. Okada contributed $2,138,333.33 to Supporting Organization #2. Although Mr. Okada made a recommendation to the Board as to how such contributions should be invested (as described below), the Board of Supporting Organization #2 is not contractually obligated to follow the investment recommendations of Mr. Okada at the time such contributions are made or at any later date.

J.   Under the relevant governing documents, TDF has total control over both Supporting Organization #1 and Supporting Organization #2, as the institutional member ("Institutional Member") of each Supporting Organization. The Institutional Member appoints the majority of each Supporting Organization's Board of Directors. The Board of Directors of each Supporting Organization appoints the officers of the Supporting Organization. The officers of each Supporting Organization can be removed with or without cause by the Board of Directors of such Supporting Organization.

K.   Supporting Organization #1 currently has a three-person Board of Directors. Mary M. Jalonick and Gary W. Garcia are the institutional directors ("Institutional Directors") of the Board of Supporting Organization #1. Gary W. Garcia currently serves as Senior Director of Development of TDF. The third member of the Board is W. Grant Scott II. Mr. Scott is an attorney engaged in private practice at Myers Bigel Sibley Sajovec, P.A. in Raleigh, North Carolina and knows Mr. Dondero from college.

L.   Supporting Organization #2 also currently has a three-person Board of Directors. Mary M. Jalonick and Gary W. Garcia are the Institutional Directors. Mark Okada is the third member of the Board.

M.   Mr. Dondero has recommended to the Board of Supporting Organization #1 that it invest its assets

---

[1] See Dallas Foundation's web page for background: www.dallasfoundation.org.

in a private placement deferred variable annuity policy ( referred to herein as a "Variable Contract" or "Deferred Variable Annuity Policy") to be issued by Crown Global Life Insurance Ltd., a Bermuda-based insurance company ("Crown Global") that is a life insurance company within the meaning of the Code. Mr. Okada has made the same investment recommendation to the Board of Supporting Organization #2.  However, the Boards of each Supporting Organization are not bound by those recommendations, and retain the authority to reallocate premiums or assets to different IDFs or managed accounts available under the Crown Global Variable Contracts.

N.  Crown Global maintains a segregated asset account ("Separate Account") pursuant to Bermuda law to hold assets that fund obligations arising under each Variable Contract issued by it.  Under the terms of the Contracts and Bermuda law, assets allocated or credited to each Separate Account are the property of the insurance company and the policyholder has no direct proprietary interest in such assets.  Rather, the Supporting Organizations have only a contractual claim against Crown Global to collect cash from Crown Global in the form of annuity payments or other withdrawals available under the Variable Contract.  The performance of the investments held in the applicable Separate Account provide the measure for the economic return to the investor in the Variable Contract. The Crown Global Variable Contracts purchased by the Supporting Organizations provided that the investor was permitted to choose among certain "insurance dedicated funds" ("IDF" as further defined below) and managed accounts selected by Crown Global as available investments that could be held in the Separate Account identified in the Contract. One such IDF that was designated by Crown Global as an available investment option that the investors in the Variable Contract were permitted to select is Atlas IDF, LP ("Atlas IDF"), a newly formed Delaware "series" limited partnership managed by Rand Advisors, LLC ("Rand Advisors").  The Variable Contract also lists two other IDFs as investment options which the policyholder is able to select, JP Morgan Access Growth Strategies Insurance Fund, and JP Morgan Hedge Growth Strategies Insurance Fund.  None of the IDFs or other managed funds available under the Variable Contracts will be funds that are offered to the general public under the IRS rulings discussed herein.

O.  The Variable Contract does not immediately payout distributions in accordance with a distribution schedule.  The policyholders, Supporting Organization #1 and Supporting Organization #2 have the ability to make partial(s) or a full surrender of the Variable Contract at quarterly intervals, subject to applicable surrender charges.  Further, as policyholders, Supporting Organization #1 and Supporting Organization #2 can decide at quarterly intervals (but no more than twice per calendar year) to reallocate funds from one investment option provided under the Variable Contract to another investment option offered by Crown Global under the Variable Contract.

P.  Crown Global, in its sole and exclusive discretion, can determine the investment offering within its offered insurance products and is under no legal requirement to make any particular offering of an investment strategy currently or in the future or to maintain an investment strategy offering. Crown Global, in its sole and absolute discretion, can terminate or remove an investment offering at any time in the future. All decisions as to the choice of IDFs or managed accounts that are made available for selection by the investor in the Variable Contract are made by Crown Global in its sole and absolute discretion.  Mr. Dondero recommended to the Board of Supporting Organization #1 that it select Atlas IDF as the measuring investment under its Variable Contract.  Mr. Okada made the same investment recommendations to the Board of Supporting Organization #2 as those made by Mr. Dondero to Supporting Organization #1.

Q.  On December 9, 2015, the Directors of Supporting Organization #1 and Supporting Organization #2 each unanimously approved resolutions authorizing the acquisition by the Supporting Organization

6

of the Deferred Variable Annuity Policy from Crown Global, and authorized the officers of the Supporting Organization to take any and all further actions to carry out such acquisition.

R. On December 10, 2015, Supporting Organization #1 wired an initial premium to Crown Global of $15,903,108.54 with respect to the Variable Contract.  On December 22, 2015, Supporting Organization #1 wired additional premium of $6,352,270 to Crown Global with respect to the Variable Contract.

S. Effective December 11th, 2015, Crown Global issued Deferred Variable Annuity Policy #30218 to Supporting Organization #1.  Supporting Organization #1 is named the policyholder and irrevocably the sole beneficiary of the Variable Contract.

T. On December 10, 2015, Supporting Organization #2 wired an initial premium to Crown Global of $5,301,065.12 with respect to the Variable Contract.  On December 22, 2015, Supporting Organization #2 wired additional premium of $2,117,423.00 to Crown Global with respect to the Variable Contract.

U. Effective December 11th, 2015, Crown Global issued Deferred Variable Annuity Policy #30219 to Supporting Organization #2.  Supporting Organization #2 is named the policyholder and irrevocably the sole beneficiary of the Variable Contract.

V. Crown Global is a subsidiary of Crown Global Insurance Group and is not affiliated with or controlled by Mr. Dondero or Mr. Okada, or Highland Capital Management, L.P. ("Highland"), which is the business conducted by Messrs. Dondero and Okada.  Highland is an investment manager business, with significant assets under management, located in Dallas, Texas.  Crown Global has made an election under the Code to be treated as a domestic life insurance company.

W. In addition to acting as the investment manager of Atlas IDF, Rand Advisors will also act as the investment manager of Rand PE Fund I, L.P., a Delaware "series" limited partnership private investment fund ("PE Portfolio Fund"), to which Atlas IDF will initially allocate 55% of its investment portfolio and which: (x) is expected to initially invest in the Highland Transaction (as defined below), and (y) will potentially make investments in other private equity transactions.  The Supporting Organizations have not been offered the opportunity to invest directly in the PE Portfolio Fund, and Crown Global has not designated the PE Fund as an available investment option for inclusion in a Separate Account with respect to the Variable Contracts purchased by the Supporting Organizations.

X. Atlas IDF has been organized by Rand Advisors as an "insurance-dedicated fund" (i.e., an investment fund that only admits institutional investors that are insurance companies and certain other eligible investors described in Treasury Regulation section 1.817(h)-5(f)(3)). The confidential private placement memorandum of Atlas IDF provides that Series 1 of Atlas IDF will invest: (x) approximately 45% of its portfolio in traded assets (including, without limitation, distressed debt instruments), to be selected and managed by Rand Advisors, and (y) approximately (but not more than) 55% of its portfolio in private equity investments, to be selected and managed by Rand Advisors. The percentage of Atlas IDF's assets invested in specific private equity investments is not fixed, and is subject to change by Rand Advisors.  However, Atlas IDF is required to satisfy the portfolio diversification requirements set forth in Section 1.817-5(b)(1) of the Treasury Regulations.

Y. At the outset, Crown Global will be the only insurance company owning a limited partnership interest in Atlas IDF. However, the governing documents of Atlas IDF permit other insurance companies to invest directly in Atlas IDF on behalf of their separate accounts established in connection with variable annuities and insurance contracts. Thus, Interests in Atlas IDF are not being offered for sale to the "general public" (within the meaning of IRS Rulings and Regulations discussed below), and thus such other investors could invest in Atlas IDF only indirectly by purchasing a Variable Contract from Crown Global (if Crown Global were to make the Atlas IDF available as an eligible investment). The PE Portfolio Fund in which Atlas IDF will invest is not an IDF. PE Portfolio Fund will have other direct investors that are not affiliates of Crown Global. Rand Advisors anticipates that it will market PE Portfolio Fund, or subsequent series thereof, to other investors in the future.

Z. Rand Advisors is owned and controlled by John Honis. In addition, Mr. Honis owns and controls the general partner entities of Atlas IDF and PE Portfolio Fund. Mr. Honis has over 25 years of investment management and business experience, and is not controlled by Highland, nor by Mr. Dondero, nor Mr. Okada.

AA. Mr. Honis was previously a Partner and Head of Private Equity at Highland. Although Mr. Honis has retired from that position, he still currently serves on: (x) the Board of Trustees for each of Highland's affiliated registered investment companies, and receives compensation in connection with each of the foregoing, and (y) the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies for investment funds operated by Highland, and receives compensation in connection with each of the foregoing. Mr. Honis does not currently own any limited partnership interests in Highland and does not have any direct share in the profits or revenues of such company. However, as part of his retirement, Mr. Honis is in the process of receiving payments in the total amount of $3 million from certain affiliates of Highland.

BB. The governing documents of Atlas IDF require such fund to comply with the portfolio diversification requirements in Section 817(h) of the Code. Similarly, the Variable Contracts each require the Separate Accounts established in connection with such Contracts to satisfy such portfolio diversification requirements. Each of the Variable Contracts specifically provides that the policyholder is not permitted to have direct contact with the investment manager of any IDF or managed subaccount held in the Separate Account and may not participate in the management of the Separate Account or any IDF or managed subaccount.

CC. It was anticipated solely among Rand Advisors, Strand Advisors (the General Partner of Highland Capital Management), James Dondero, and Mark Okada that the first series of PE Portfolio Fund would acquire all or substantially all of the non-voting limited partnership interests in Highland from Highland, including newly-issued limited partnership interests, or from trusts or other affiliates of Mr. Dondero or Mr. Okada (collectively, the "Highland Transaction"). Although with respect to any trusts, the Trustees would have to evaluate and approve any transaction independently and during the time of the relevant acquisition. During this time, the PE Portfolio Fund and Highland did not negotiate documentation for the legal terms of the Highland Transaction. Further, there was no assurances that such transaction would be consummated as it was understood that it would have to be negotiated, the respective parties had not made any offer (and would not until after the PE Portfolio Fund had assets), and that all parties would be separately represented by legal counsel. It was nonetheless the intention of such parties that the

8

transaction should come about.

DD. At the time that the Supporting Organizations acquired their ownership interests in their Variable Contracts and had selected the Rand IDF as to investment to be held in the Separate Account, PE Portfolio Fund had not entered into a binding contract to acquire the previously described limited partnership interests in Highland, and the Institutional Members of the Boards of the Supporting Organizations did not have any knowledge of the terms of the investment subsequently made by the Rand PE Fund in Highland.

EE. On December 21, 2015, as part of the Highland Transaction, Hunter Mountain Investment Trust (a special purpose vehicle of PE Portfolio Fund) acquired through a contribution of cash and note, newly issued limited partnership interests in Highland Capital Management, L.P.

FF. On December 24, 2015, as part of the Highland Transaction, Hunter Mountain Investment Trust acquired through purchase from trusts affiliated with Mr. Dondero and Mr. Okada, and Mr. Okada individually, newly reclassified limited partnership interests in Highland Capital Management, L.P.

GG. Hunter Mountain Investment Trust's acquisition of substantially all the interests in Highland Capital Management, L.P. was at a substantial discount to book value.  The substantial discount offered reflects the overall donative intent of Mr. Dondero and Mr. Okada to engage in the transaction.

HH. The Variable Contract/Separate Account structure may provide a federal income tax advantage to the Supporting Organizations if the income realized by such Supporting Organizations as a result of ownership of their Variable Contracts would not be treated as taxable unrelated business taxable income ("UBTI") under the Code.  In contrast, if either Supporting Organization were to acquire a direct ownership interest in an investment partnership such as Atlas IDF, such Supporting Organization would almost certainly realize taxable UBTI if Atlas IDF owned, directly, or through other partnerships, equity interests in business partnerships (such as Highland) or debt-financed assets.

II. The Variable Contract/Separate Account structure may also provide state and local tax advantages to the Supporting Organizations since the structure enables the Supporting Organizations to avoid being treated as engaged in business in the states and localities in which the underlying portfolio companies that are partnerships are engaged in business.

JJ. Crown Global has represented that (1) it qualifies as a life insurance company under the Code; (2) it has made an effective election to be treated as a domestic corporation for U.S. federal income tax purposes; and (3) the terms of the Variable Contracts to be purchased by the Supporting Organizations would meet the requirements of Section 72 of the Code to be treated as annuity contracts under such Code Section if such Contracts were held by a "natural person" (within the meaning of Code Section 72(u)).

KK. Mr. Dondero and Mr. Okada (the "Donors") are entering into the transactions described herein based on a donative intent to provide funds to be used by TDF, a public charity.

LL. Prior to making any investments in the Variable Contracts to be issued by Crown Global, the Dallas Foundation had their independent financial consultant evaluate John Honis, as an investment

9

manager acting through Rand Advisors, and the proposed investment strategy offered by him through an insurance dedicated fund that combined a private equity and liquid investment strategy for the Supporting Organizations.

MM. The Dallas Foundation's independent financial consultant recommended to The Dallas Foundation that such investment strategies used by John Honis would be a prudent investment by each of the Supporting Organizations through a deferred variable contract policy issued by an insurance company.

NN. Prior to making any investments in the Variable Contracts to be issued by Crown Global, the Board of each Supporting Organization received (1) the confidential private placement memorandum prepared by Crown Global with respect to the Variable Contracts, and (2) the confidential private placement memorandum detailing the terms of the Atlas IDF.

OO. The decision made by each Board to invest in its Variable Contract and to designate the Atlas IDF as the designated investment to be made by the Separate Account of Crown Global were made on the basis of the anticipated investment returns on the underlying investments that will be made and managed by Rand Advisors.

## III. ASSUMPTIONS MADE

You have authorized us to make the following assumptions for the purpose of rendering our opinion stated herein:

A. Mr. Honis will manage the investments of Rand IDF and the PE Portfolio Fund in order to provide attractive returns to the current and future investors in such funds. Mr. Honis' performance will affect his ability to attract additional investors to such funds (including separate series funds) as well as any other funds subsequently managed by Rand Advisors.

B. Atlas IDF will, at all times, comply with the applicable diversification requirements under Section 817(h) of the Code. In order to achieve such compliance, Atlas IDF will restrict the ownership of equity interests in Atlas IDF to those investors described in Treasury Regulation 1.817-5(f).

C. The Boards of the Supporting Organizations will control any decisions made to be made as the owner of the Variable Contract, including any decisions to withdraw funds from the Variable Contract, to move funds from Atlas IDF to other investments that Crown Global may offer under the Variable Contract, or to invest additional funds of the Supporting Organization in Atlas IDF through the Variable Contract.

D. Highland is a successful investment management firm and it would be able to raise additional capital from other sources if it chose to do so.

E. The intentions of the parties are that, for federal income tax purposes,: (1) Crown Global will at all times be treated as the owner of the limited partnership interests in Atlas IDF that provide an

10

economic return for the Variable Contracts owned by the Supporting Organizations; (2) each Supporting Organization will be treated as the owner of its Variable Contract; (3) Mr. Dondero and Mr. Okada will each be treated as having made charitable contributions in cash to their Supporting Organizations in the amounts described in the facts above; (4) any sales of partnership interests in Highland by Mr. Dondero or Mr. Okada, any trust established by M. Dondero or Mr. Okada or any related party to such Donors, to the PE Portfolio Fund will be treated as sales occurring between the applicable seller and the PE Portfolio Fund.

F. Neither Supporting Organization will incur "acquisition indebtedness" within the meaning of Section 514 of the Code with respect to its Variable Contract at any time.

## IV. REQUESTED OPINIONS

You have asked us to render an opinion on the following issues:

1. Whether the Internal Revenue Service could successfully contend that, under the facts and assumptions described above, the owners of the Variable Contracts, i.e., the two Supporting Organizations, are to be treated as owners for federal income tax purposes of the underlying investments held in the Crown Global Separate Accounts established in connection with such Variable Contracts.

2. Whether the income realized by the Supporting Organizations from their investment in the Variable Contracts will be exempt from the tax imposed under Section 511 of the Code on the "unrelated business taxable income" of tax-exempt entities described in Section 511(a).

## V. LEGAL ANALYSIS

**Tax Benefits for Tax-Exempt Organizations Investing in Variable Annuity Contracts**

U.S. tax-exempt entities described in Section 501 of the Code, such as the Supporting Organizations, are subject to federal income tax on their unrelated business taxable income (UBTI). UBTI is defined in Section 512 as income from a "trade or business" that is regularly carried on by the tax-exempt organization, or a partnership in which it a partner, and which is not substantially related to the exempt organization's exempt purpose or function. UBTI also includes income from "debt-financed property" as defined in Section 514. Debt-financed property is property held to produce income with respect to which "acquisition indebtedness" exists at any time in the taxable year (or, if the property is sold or disposed during the year, with respect to which there was any acquisition indebtedness at any time during the 12-month period ending on the date of such disposition).

Section 512(b)(1) specifically exempts "annuities" from UBTI, along with other notable categories of investment income, including interest, dividends, capital gains and rent from real property. However, the specific statutory exemptions from UBTI do not apply to the extent such income items are unrelated debt-financed income under Code Section 514. Where debt-financed property is involved, UBTI includes the income from the property multiplied by its "debt-basis percentage" (a percentage equal to "average acquisition indebtedness" divided by "average adjusted basis").

11

The term "annuities" is not defined in Section 512 or the Treasury regulations ("Regulations") thereunder. There is also no comprehensive definition of annuity or "annuity contract' in Section 72 (governing tax treatment of distributions from life insurance and annuity contracts) or elsewhere in the Code. The Regulations under Section 72 provide that an annuity contract that is subject to the rules of Section 72 includes a contract that is recognizable as an annuity under the "customary" practices of life insurance companies. See Treas. Reg. Section 1.72-2(a)(1). Under Section 72, if the entire value of an annuity contract is applied to a stream of periodic payments, each of these payments will be partly included in income and (because of nondeductible premium payments) partly excludible as a return of capital, pursuant to an "exclusion ratio". Under Section 72(e)(2)(A), any non-annuity amount received under an annuity contract (including withdrawals and partial surrenders) on or after the "annuity starting date" are treated as "gross income". Any non-annuity amounts received **before** the annuity starting date may be treated as gross income or a return of the policyholder's investment in the contract under rules set forth in Section 72(e)(3).

**Tax Status of Separate Accounts**. Life insurance companies have segregated asset accounts that are created and regulated under the laws of various states or foreign jurisdictions. These accounts are typically formed for the purpose of segregating assets attributable to variable life insurance contracts, variable annuities and group contracts from the general assets of the life insurance company. In Revenue Ruling 78-204, the IRS ruled that a segregated asset account established by a life insurance company is not an organization that can be taxed separately from the insurance company. The Ruling states that if a segregated asset account holds assets pursuant to contracts described in former Code section 801(g)(1) (which includes variable annuity contracts or contracts with reserves based on a segregated asset account), it is taxed as part of the insurance company.

**Code Section 817: Statutory Diversification Requirements**. To discourage consumer use of various insurance type products as investment vehicles, Congress in 1984 granted the Treasury authority to prescribe diversification standards for the investment of variable contract assets held in segregated asset accounts. The legislative history states the Congress's goal in so doing was "to deny annuity or life insurance treatment for investments that are publicly available to investors and investments which are made, in effect, at the direction of the investor." *H.R. Conf. Rep. No. 98-561, at p. 1055 (1984)*.

Under the Treasury Regulations, a separate account will be considered adequately diversified if no more than 55% of the total value of the account is represented by any one investment; no more than 70% of the total value of the account is represented by any two investments; no more than 80% of the total value is represented by any three investments; and no more than 90% of the total value is represented by any four investments. Treas. Regs. Sec. 1.817-5(b)(1).

For purposes of testing diversification, Section 817(h)(4) and Section 1.817-5(f) of the Regulations provide a look through for assets held in certain investment entities, including partnerships, trusts and investment companies, provided that the beneficial interest in the investment entity are held by one or more segregated asset accounts of one or more insurance companies, and public access to such investment entity is available exclusively (except as otherwise permitted by Regs. Sec. 1.817-5(f)(3)) through the purchase of a variable contract. As previously discussed, the Separate Accounts established in connection with the Variable Contracts are expected to satisfy the diversification

requirements of Code Section 817.  In order to satisfy the diversification requirements, Atlas IDF will satisfy the requirements of the Section 817 regulations to qualify for "look through" treatment.

## A. INVESTOR CONTROL ISSUES.

In the 1970's the IRS grew concerned that taxpayers were avoiding federal income tax by "wrapping" their investments in "investment annuity contracts" which created the possibility of major tax shelter abuse.  Such transactions were structured as follows:  Each investment annuity contract paid an annuity based on the investment return and market value of the contract's segregated asset account.  A third party custodian, typically a bank, held and invested the segregated account's assets according to the annuity owner's directions.  In response to such transactions, the IRS issued four revenue rulings between 1977 and 1982 describing the circumstances in which owners of variable annuity contracts or variable life insurance contracts would be treated and taxed as owners of the underlying assets because of their control of the investments.  The revenue rulings applied to variable annuity contracts and variable life insurance contracts the federal income tax principle that a person other than the person holding legal title to the property is treated as the owner for tax purposes if that other person possesses the "benefit and burdens" or "incidents of ownership" of such property.  See generally *Commissioner v. Sunnen*, 33 U.S. (1948); *Helvering v. Clifford*, 309 U.S. 331 (1940); *Corliss v. Bowers*, 281 U.S. 376 (1930).

**Revenue Ruling 77-85**.  This Ruling concludes that the annuity owner is, for federal income tax purposes, the owner of the separate account assets under the following conditions:

1. the annuity owner controls the investment of the separate account assets;

2. the annuity has the power to vote any securities in the account; and

3. the annuity owner can withdraw any or all of the assets at any time.

**Revenue Ruling 80-274**.  The second Ruling similarly concludes that the investor in the annuity contract was treated as the owner of a bank certificate of deposit (CD) underlying a variable annuity contract when the contract owner transferred the CD to the life insurance company in exchange for the variable annuity contract and the insurance company is expected to hold the CD for the investor's benefit.

**Revenue Ruling 81-225**.  This Ruling applies the investor control principle to five different situations, and thus is considered the most important ruling on the principle.  In four of the fact patterns considered, the annuity owner- not the insurance company- is considered the owner of the mutual fund investments underlying the annuity contract because the mutual fund investments were available for direct purchase by the general public.  In the fifth fact pattern, the insurance company, rather than the annuity owner, is considered the owner of the mutual fund investments because such shares were not available for direct purchase by the general public; they were only available through the purchase of a variable contract. The Ruling states that in factual situations one through four, the insurance company is "little more than a conduit between the policyholders and their mutual fund shares."

**Revenue Ruling 82-54**.  In this fourth "investor control" Ruling, the annuity owners direct the insurance company to invest in shares of any or all of three mutual funds that are **not** available to the public.  One mutual fund invests primarily in common stocks, another in bonds, and the third in money market

instruments.  The investors chose the original allocation of the investments among the three funds and have the unlimited right reallocate before the annuity contract's maturity date.   The IRS held that the annuity owners' ability to choose the contract's investments did not constitute sufficient control to cause them to be treated as owners of the mutual fund shares.  In its analysis, the IRS reiterated its position in Revenue Ruling 81-225 that public availability of investments will cause annuity owners to be treated as owners of the underlying mutual fund shares.

**Christoffersen v.  United States**.  In 1984, the United States Court of Appeals for the Eighth Circuit upheld the IRS's investor control theory of Revenue Ruling 81-225 in *Christoffersen v. United States*.  The taxpayers in *Christoffersen* had purchased a variable annuity contract that reflected the investment return and market value of the insurance company's separate account assets.  The taxpayers had the power to direct the investment of premiums in any one or all of six publicly available mutual funds, to reallocate their investment among such funds at any time, to make withdrawals, to surrender the contract, and to apply the contract's accumulated value to provide annuity payments.

**Post-Christoffersen Legislation**.   After the Eighth Circuit Court's decision in the *Christoffersen* case, the Congress enacted Code section 817, which aims to discourage use of variable annuities and life insurance primarily as investment vehicles.   Before the issuance of further revenue rulings in 2003 (discussed below), some commentators had suggested that the enactment of the diversification requirements under Code section 817(h) (and other measures) effectively rendered *Christoffersen* (and Revenue Ruling 81-225) obsolete.  This view was supported by language in the General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 ("DEFRA Blue Book") indicating that the Congress introduced the diversification requirements in Section 817(h) to address any and all concerns with respect to investor control of assets underlying insurance company variable contracts.  The Joint Committee on Taxation wrote the following:

> In authorizing Treasury to prescribe diversification standards, the Congress intended that the standards be designed to deny annuity or life insurance treatment for investments that are publicly available to investors and investments which are made, in effect, at the direction of the investor.

When the Treasury issued its proposed regulations under Code section 817(h), it sidestepped the investor control issue.  In its preamble to such regulations, the Treasury expressly noted that the regulations "do not provide guidance concerning the circumstances in which investor control of the investments of a segregated asset account may cause the investor, rather than the insurance company, to be treated as the owner of the asset in the account."  The preamble further stated that guidance on investor control issues would be provided in separate regulations or rulings.

**Revenue Rulings 2003-91 and 2003-92**.  The subsequent major guidance issued by the IRS on the investor control issues with respect to variable contracts was in the form of two revenue rulings issued in 2003.  Revenue Ruling 2003-91 involved a life insurance company that offered variable life insurance and variable annuity contracts.   The assets that funded the contracts were held in a separate account that was divided into various sub-accounts.  Each sub-account offered a different strategy.  Under the facts of this ruling, an individual purchased a life insurance contract and at the time of purchase, the

14

holder specified the allocation of premiums paid among the sub-accounts. The investments could be reallocated, at the direction of the holder, among the twelve sub-accounts, each representing a different investment strategy, at any time. Investment in the sub-accounts was available solely through the purchase of the insurance contract.

All decisions concerning the choice of the investment adviser, and any changes with respect to the sub-accounts offered, were made by the insurance company in its sole and absolute discretion. No arrangement, plan, contract, or agreement exists between the contract holder and the insurance company or between the contract holder and the investment advisor regarding the specific investments or investment objective of the sub-accounts. The contract holder could not communicate directly or indirectly with the insurance company concerning the selection or substitution of the investment advisor or other managers of the account or sub-accounts. The contract holder had no legal, equitable, direct, or indirect interest in any of the assets held by a sub-account; rather the contract holder had only a contractual claim against the insurance company to collect cash from the insurance company in the form of death benefits, or cash surrender values under the contract. Revenue Ruling 2003-91 concluded that the holder of a variable contract under such facts was not the owner of the assets that funded the variable contract for federal income tax purposes because the holder did not have direct or indirect control over the separate account.

Revenue Ruling 2003-92 clarified and amplified Revenue Ruling 81-22, by stating that a variable contract holder was the owner of interests in an unregistered partnership (e.g., a hedge fund or private equity fund) where the interests in such partnership were not available exclusively through the purchase of a life insurance policy or annuity contract. In effect this Ruling confirmed the position taken by the IRS in private letter rulings that the term "general public" included individuals purchasing partnership interests in private placement transactions. More recently, the IRS has confirmed that the fact that a similar fund is available to the public will not cause the fund held by the insurance company's separate account to be treated as being publicly available. See, e.g., Private Letter Ruling 20147007 (April 25, 2014).

**Webber v. Commissioner.**  On June 30, 2015, the Tax Court issued a 92-page opinion in the case of *Webber v. Commissioner* affirming the enforceability of the IRS' investor control doctrine.  Mr. Webber was a venture capital investor and private equity fund manager who established a grantor trust to purchase private placement variable life insurance policies insuring the lives of two elderly relatives. The policies were purchased from a Cayman life insurance company and the taxpayer and his family members were listed as the beneficiaries. The premiums paid for each policy, after deduction of a mortality risk premium and other applicable charges, were placed in a separate account underlying the policy. The Tax Court summarized the investor control doctrine[2] as follows:

> The "investor control" doctrine posits that, if a policyholder has sufficient "incidents of ownership" over the assets in a separate account underlying a variable life insurance or annuity policy, the policyholder rather than the insurance company will be considered the owner of those assets for Federal income tax purposes. The critical "incident of ownership" that emerges from these rulings is the power to decide what specific

---

[2] *Webber v. Com'r*, 144 T.C. No. 17 (2015), at pp. 55-56.

> investments will be held in the account. . . . Other "incidents of ownership" emerging from these rulings include the powers to vote securities in the separate account; to exercise other rights or options relative to these investments; to extract money from the account by withdrawal or otherwise; and to derive, in other ways, what the Supreme Court has termed "effective benefit" from the underlying assets.

The assets in these separate accounts purchased investments in startup companies which, as the Tax Court noted, the taxpayer was intimately familiar with, and also in which he invested personally and through the funds he managed. After examining the facts, including thousands of emails sent by Webber to parties acting as his agent with "recommendations" that were routinely followed by the "investment managers" of the accounts, the Tax Court determined that the taxpayer effectively dictated both the companies in which the separate accounts would invest and all actions taken with respect to these investments.

The IRS cited the "investor control" doctrine and other principles, and concluded that the taxpayer had retained sufficient control and incidents of ownership over the assets in the separate accounts to be treated as their owner for federal income tax purposes. The IRS thus treated the taxpayer as having received the dividends, interest, capital gains, and other income realized by the separate accounts. The IRS also assessed accuracy related penalties on the taxpayer under Code section 6662.

The Tax Court held that the IRS' pronouncements enunciating the investor control doctrine are entitled to deference and weight and that Webber "retained control and incidents of ownership over the assets" and was therefore "taxable on the income earned on those assets during the taxable years at issue." In holding that the taxpayer was the owner of investments held under the variable annuity contract , as contract owner, the taxpayer had (a) unfettered ability to select investments for the separate accounts under the contract, and neither the issuer nor the investment manager of the separate account exercised any independent investment discretion, (b) dictated all actions the separate account took with respect to ongoing investments,[3] (c) had numerous ways to extract cash from the contract without a surrender of the contract[4] and without loans against the contract, and he frequently exercised such power (e.g., by selling assets to the separate accounts, by borrowing money from the separate accounts, and by having the separate account make investments that generated liquidity for the taxpayer), and (d) derived other economic benefits, including causing the separate accounts to make investments that were used for personal pleasure by the taxpayer (including a winery, a Big Sur resort, and a Canadian hunting lodge), that discharged the contract owner's personal commitments, and that bolstered investments held by the taxpayer outside the contract.

Consequently, the Tax Court upheld the IRS' deficiency determinations for the most part but concluded that the taxpayer as not liable for the penalty assessments (even though the taxpayer was widely believed by tax advisors to have flagrantly disregarded the most minimal of standards to avoid investor control). The facts described herein concerning the investments made by the Supporting Organizations

---

[3] Giving the contract owner SEC-mandated voting rights with respect to underlying investments is not sufficient to establish investor control. Rev. Rul. 81-225, 1981-2 C.B. 12.
[4] The contract owner's right to surrender the contract is not sufficient to establish investor control. Rev. Rul. 81-225, 1981-2 C.B. 12.

in the Variable Contracts issued by Crown Global in no way resemble the facts considered by the court in the *Webber* case.

**Application of the Investor Control Precedents to the Variable Contracts.**

Both Supporting Organizations certificates of incorporation state in the "Second" clause:

"The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit The Dallas Foundation, a Texas nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by The Dallas Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. . . . [T]he corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code."

The "Second" paragraph quoted from each certificate of incorporation is clear that the respective Supporting Organization is formed to operate exclusively "to support and benefit" The Dallas Foundation.   Further the "Eighth" paragraph of the certificate of incorporation for each Supporting Organization indicates that upon its dissolution, all of its assets are to be distributed to The Dallas Foundation.

Each Supporting Organization will be classified as a "Tier 1" supporting organization for federal income tax purposes. A "Tier 1" Supporting Organization, from time to time, will provide its supported organization, The Dallas Foundation, distributions of cash. The IRS web page describes the relationship as:

"**Type I.** A Type I supporting organization must be operated, supervised or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. The relationship between the supported organization(s) and the supporting organization is sometimes described as *similar to a parent-subsidiary relationship*. (emphasis added.)"[5]

 Section 2.13 "Control of Investments" within the bylaws of each Supporting Organization provide that The Dallas Foundation, as Institutional Member, "shall have the sole and exclusive power and authority to direct the management and investment of the assets" of each Supporting Organization. This power affirmatively rests exclusively in the hands of The Dallas Foundation's Institutional Members and no other officer or director of the respective Supporting Organization. This mandate is reflected in the bylaws' Section 2.13 as:

 "Such power and authority shall be exercised by the Institutional Member in its sole discretion and shall be separate and independent of any power and authority of the Board of Directors and officers of the

---

[5]See, https://www.irs.gov/Charities-&-Non-Profits/Charitable-Organizations/Supporting-Organizations-Requirements-and-Types

Corporation **which have no power or authority** with respect to the matters delegated hereby to the Institutional Member with respect to investments" (emphasis added).

Therefore, the Supporting Organizations' Individual Directors and officers, including Grant Scott or Mark Okada, have no power or authority with respect to matters assigned to The Dallas Foundation with respect the decision to purchase the Variable Contracts.

This power within Section 2.13(d) vested with the Institutional Member includes control of decisions with respect to:

"the power to acquire life insurance policies, annuities, and/or other insurance or similar products (including the exercise or non-exercise or any rights, or the prosecution or defense of any disputes with the issuer or other parties regarding legal, regulatory, contractual, or other matters, arising under or relating to such products) ..."

Section 2.13(e) of the bylaws extends the power to the Institutional Members to include:

"the power to direct, and delegate to, the officers of the Corporation the taking of such acts and the execution of such documents as may be necessary to effectuate the decisions of the Institutional Member with respect to investments."

The Dallas Foundation holds the Institutional Member seats on the board of the Supporting Organizations per Section 2.1 of the respective bylaws. The Dallas Foundation has appointed as Directors Gary W. Garcia and Mary M. Jalonick per the respective "Statement of Incorporator."

Thus, the corporate provisions for each Supporting Organization's certificate of incorporation and bylaws is absolutely clear that The Dallas Foundation controls all of the respective Supporting Organization's activities, including investments, purchases of the Variable Contracts, grants, and operating costs and expenses, and is entitled solely and exclusively to the economic benefit of such Supporting Organization's investments, including from the Variable Contracts.

Supporting Organization #1 received a donation of cash of $16,034,978.50 on December 8, 2015 from Mr. Dondero. Supporting Organization #2 received a donation of cash of $5,345,021.50 from Mr. Okada on December 8, 2015. After the cash donation was made, the Board of Directors of each Supporting Organization authorized the purchase of a Variable Contract offered by Crown Global through a Resolution of Unanimous Consent on December 9, 2015. Effective December 11, 2015, Crown Global issued Variable Contracts #30218 and #30219 to Supporting Organization #1 and Supporting Organization #2, respectively. The Variable Contracts offered investment opportunities in three Insurance Dedicated Funds, including Atlas IDF. The Dallas Foundation, acting as the Institutional Board member of each Supporting Organization, directed the premiums to be allocated 100% to Atlas IDF.

Each Variable Contract, in the respective "Policy Data Page" to the Deferred Variable Annuity Policy, indicates under "Beneficiary" the sole beneficiary as the respective purchasing Supporting Organization #1 and Supporting Organization #2, and such designation is "irrevocable".

18

Therefore, it is without question that the investment decision to purchase the Variable Contract and allocate the premium to Atlas IDF was made by The Dallas Foundation. Through this decision by The Dallas Foundation, the investment performance of Atlas IDF will accrete to each respective Supporting Organization, and therefore, ultimately, to The Dallas Foundation. Ultimately, The Dallas Foundation will solely and exclusively derive any and all of the economic benefits from the Variable Contracts issued by Crown Global. Concomitantly, neither the Donors nor the Donors' agents, affiliates, related parties etc. derive any of the economic benefits from the Variable Contract's performance through the investment decisions made by Rand Advisors within Atlas IDF.

Each Variable Contract policy provides in Sections 4.5 and 5.1 the allowance that the Supporting Organization can reallocate funds, at quarterly intervals (but no more than twice per calendar year), among the available investment options provided in the Contract. Therefore, The Dallas Foundation, should it no longer want exposure to Atlas IDF, has the right to reallocate funds to another investment offering.

Crown Global, through Sections 4.7 and 4.11 of each Variable Contract policy, has the sole and absolute discretion to terminate Atlas IDF as an investment offering available to each Supporting Organization. Each Supporting Organization has the right to fully or partially surrender the Variable Contract back to Crown Global, in accordance with Sections 8.2 and 8.3 of the policies. No more than one partial surrender may be requested by the policyholder during each quarter of a policy year.

As discussed above, Atlas IDF will qualify for look through treatment for purposes of satisfying the diversification requirements of Section 817 of the Code. In order to qualify for such look through treatment, it is essential to conclude that the equity interests in the Rand IDF have not been offered to the "general public". Since the offering documents for the Rand IDF provide for such restricted access to the fund, we have assumed that the Rand IDF has satisfied, and will continue to satisfy this requirement.

The PPM for Atlas IDF provides that approximately 45 percent of its assets will be invested in a portfolio of high yield debt instruments and other securities selected by, and managed by the investment manager of the IDF, Rand Advisors. Under the governing documents of the Variable Contracts and the Atlas IDF, the Supporting Organizations are not provided with any opportunities to participate in any purchase or sale or other investment decisions made with respect to the IDF's debt portfolio, and we have been instructed to assume that the Supporting Organizations and their agents will not attempt to do so.

The PPM for Atlas IDF further provides that approximately (but no more than) 55 percent of the IDF's portfolio will be invested in private equity investments through an investment made by the IDF in the Rand PE Fund 1. Although it was anticipated that the Rand PE Fund would seek to make an investment in limited partnership interests in Highland, the terms of such investment were negotiated by Rand Advisors, as investment manager of the PE Fund, the Supporting Organizations were not provided with any opportunity to participate in such negotiations, and in fact purchased their Variable Contracts before any such investment in Highland was made by the PE Fund. There was no guarantee that the Highland investment would in fact be made and there was no provision for unwinding the investment by

19

Crown Global in Atlas IDF or the investments made by each Supporting Organization in its Variable Contract if such were the case.

Further, the governing documents of the Rand PE Fund provide that all investment decisions with respect to such Fund are to be made by Rand Advisors, and we have been instructed to assume that the Supporting Organizations and their agents will not attempt to participate in such decisions. The owners of the Variable Contracts will not have the ability to exercise any voting rights with respect to securities held by the Atlas IDF or Rand PE Fund, and such owners of the Variable Contracts will not have the ability to require any distributions by the insurance company pursuant to withdrawal rights in such contracts to be made in kind rather than in cash. Due to the nature of the illiquid private equity investments in the Separate Accounts, the Variable Contracts contain certain limitations on the ability of the owners of such contracts to withdraw funds.

On December 21, 2015, Rand Advisor's special purpose vehicle, Hunter Mountain Investment Trust, controlled by the Rand PE Fund, executed a Contribution Agreement with Highland Capital Management. L.P., in exchange for newly-issued limited partnership interests in Highland Capital Management, L.P. (the "Contribution Transaction"). On December 24, 2015, Rand Advisor's special purpose vehicle, Hunter Mountain Investment Trust, controlled by the Rand PE Fund, executed a Purchase and Sale Agreement to acquire interests in Highland Capital Management, L.P. from The Dugaboy Investment Trust, The Mark and Pamela Okada Family Trust-Exempt Trust #1, The Mark and Pamela Okada Family Trust-Exempt Trust #2, and Mark K. Okada (the "Purchase Transaction" and together with the Contribution Transaction, the "Highland Transaction").

The Highland Transaction was negotiated between Rand Advisors and the respective Highland counterparties and their legal representatives. Prior to consummation of the Highland Transaction, neither The Dallas Foundation nor the Supporting Organizations directed, compelled, or caused Rand Advisors to make the investment in the Highland Transaction.

The investor control doctrine was created to prevent the policyholder or beneficiary of an insurance product that qualifies under Section 72 of the Code from directly or indirectly making investment decisions with respect to the investment assets within the insurance product. The concern was that policyholders and beneficiaries should not be able to direct the investments and receive the economic benefit of those directions within an insurance product. That is the fundamental principle laid out in in the recent Tax Court case of *Webber v. Commissioner*.

Therefore, applying that *Webber* principle of the investor control doctrine to the Highland Transaction, it is not a legally significant fact that the Donors to each of the Supporting Organization are also participants in the Highland Transaction because the beneficiary of the economics from the investment performance of the Variable Contracts are not the Donors but rather are the Supporting Organizations and ultimately The Dallas Foundation.

As further support for our view, Rand Advisors made the independent investment decision to participate and negotiate the Highland Transaction. Moreover, it is clear that Rand Advisors was not taking directions nor compelled by The Dallas Foundation or the Supporting Organizations to enter into the Highland Transaction. Accordingly, there is no way the Highland Transaction can in any way be

20

characterized as "control" by The Dallas Foundation or the Supporting Organizations over the investment activities of Atlas IDF and its respective investment accounts.

The facts and circumstances of the purchase of the Variable Contracts by the Supporting Organizations support the conclusion that Crown Global is the owner of Atlas IDF and its investments, and that the Supporting Organizations will not be treated as the owner of the investments. The facts present none of the factors that the Tax Court found determinative in *Webber*. In particular:

- Neither The Dallas Foundation nor the Supporting Organizations have any ability to select investments in Atlas IDF held by the Variable Contracts;
- Neither The Dallas Foundation nor the Supporting Organizations have any ability to vote securities owned by Atlas IDF or the ability to exercise other options with respect to such investments;
- Other than the right to partially or fully surrender the Variable Contracts, the Supporting Organizations cannot withdraw funds indirectly out of the Variable Contracts. In particular, neither The Dallas Foundation nor the Supporting Organizations can cause Atlas IDF to purchase assets from The Dallas Foundation or the Supporting Organizations. Nor can The Dallas Foundation or the Supporting Organizations borrow funds from Atlas IDF or otherwise engage in any transaction with Atlas IDF.

In addition, the facts and circumstances closely track the facts and circumstances of Revenue Ruling 2003-91's safe harbor provisions. In addition to the facts recited above:

- There is no arrangement, plan, contract, or agreement between The Dallas Foundation or the Supporting Organizations and Crown Global or Rand Advisers as to the investments to be held in Atlas IDF.
- The Dallas Foundation and the Supporting Organizations have no right to, and will not, communicate with any investment officer of Crown Global or its affiliates or with any Investment Manager regarding the selection, quality, or rate of return of any specific investment or group of investments held in Atlas IDF.
- The Dallas Foundation and the Supporting Organizations have no legal, equitable, direct, or indirect interest in any of the assets held by Atlas IDF. Rather the Supporting Organizations only have a contractual claim against Crown Global to collect cash from the Variable Contracts.
- All decisions concerning the choice of Insurance Dedicated Fund offerings, or any of Crown Global's investment officers involved in the investment activities of any Insurance Dedicated Fund, are made by Crown Global in its sole and absolute discretion.[6]

---

[6] See also, P.L.R. 9752061 (Dec. 24,1997) ("Policyholder influence over the way the investments are managed will be limited to selecting an investment manager from a pool of investment managers whose credentials have been evaluated and approved by Taxpayer. These investment managers may be recommended to Taxpayer by one or more Policyholders. Taxpayer will be under no obligation to approve any such recommendations. Moreover, once Policyholder makes an initial selection, the investment manager can only be changed by Taxpayer and not by Policyholder"; Taxpayer (the issuing insurance company) was held to be the owner of the assets held under the contract).

21

- Neither The Dallas Foundation nor the Supporting Organizations have any right to, and will not, communicate with Crown Global concerning the selection or substitution of any investment manager or insurance dedicated fund involved in the investment activities of Atlas IDF.

In sum, based upon these facts, we believe that the Supporting Organizations will not be treated as the owners of the investments and other assets held in the Separate Accounts, since the Supporting Organizations will not have the types of control which the IRS has viewed as essential in order to apply the investor control doctrine to make another person other that the holder of the assets (i.e., the insurance company) the owner for tax purposes.

B. **UNRELATED BUSINESS TAXABLE INCOME ISSUES FOR INVESTORS IN DEFERRED VARIABLE ANNUITY CONTRACTS**.

As discussed above, we have reached the conclusion that under the facts and assumptions set forth herein, for federal income tax purposes, the insurance company should be treated as the owner of the assets in the Separate Account (i.e., the equity interests in the Rand IDF), and each of the Supporting Organizations should be treated as owners of their respective Variable Contract. We have also been instructed to assume that neither Supporting Organization has, or will ever, incur "acquisition indebtedness" with respect to its Variable Contract.

**Possible Application of Section 72(u) of the Code**. In 1986, Congress was concerned that employers were utilizing deferred annuity contracts to fund nonqualified deferred compensation arrangements on a tax-favored basis, and that this was acting as a disincentive to employers to fund benefits through qualified retirement plans. Section 72(u) was added to the Code to curtail such activity. The legislative history to section 72(u) states:

> The committee believes that the present-law rules relating to deferred annuity contracts present an opportunity for employers to fund, on a tax-favored basis, significant amounts of deferred compensation for employees. This favorable tax treatment may create a disincentive for employers to provide benefits to employees under qualified pension plans, which are subject to significantly greater restrictions.[7]

Section 72(u) states, in relevant part, that "any annuity contract" owned by "a person who is not a natural person" (e.g., a corporation) shall not be treated as an annuity contract for purposes of the income tax provisions of the Code (Sections 1-1563, known as Subtitle A), other than Subchapter L (i.e., Sections 801-848 relating to insurance companies). The effect of this rule was to eliminate the deferral of income tax for the corporate investor in the contract on the "inside buildup" income of the annuity contract. If a non-natural person does hold an annuity contract and no exception applies, then Section 72(u)(1)(B) provides that the "income of the contract" for any taxable year is "ordinary income" that the owner is treated as receiving or accruing during that taxable year.

---

[7] S. Rep. No. 99-313, at 567 (1986).

**Exemptions under Section 72(u)**. We would also note that the drafters of Section 72(u) also inserted some specific exemptions in Section 72(u)(3). For example, Section 72(u)(3)(B) provides that Section 72(u) does not apply to any annuity contract held under a qualified plan described in Section 401(a) of the Code or an "individual retirement plan" (i.e., individual retirement accounts and individual retirement annuities described in Section 7701(a)(37)). Section 72(u) also contains an exemption for "immediate annuities" held by any non-natural person. The inclusion of these exemptions indicates that Section 72(u) is designed to eliminate the tax deferral benefit that taxable corporations could derive from investments in deferred annuity contracts. We are not aware of any policy reason why a deferred annuity contract held by a qualified plan or an IRA should be exempted from Section 72(u) but one held by a tax-exempt corporation should be covered, and we have found nothing in the brief legislative history of this Code provision that addresses this issue. Consequently, the failure of the drafters to include an exemption from Section 72(u) for other tax-exempt entities that are not qualified plans or IRAs appears to be an oversight or drafting error.

**Definition of "Income on the Contract"**. Section 72(u) provides its own special definition of "income on the contract" in Section 72(u)(2). Such income is defined as the *excess of* (1) the sum of the "net surrender value' of the contract at the close of the taxable year plus all distributions under the contract received during the taxable year or any prior taxable year, *over* (2) the sum of premiums paid on the contract (net of dividends) plus all amounts includible in income for prior taxable years under Section 72(u). It is significant that the income to be recognized by the owner of the annuity contract is the net change in value of the contract rather than the actual net income realized by the separate account of the insurance company that has issued the annuity contract backed by the separate account. In effect, Section 72(u) does **not** provide for income taxation of the holder of the contract as if the contract owner owned the underlying assets in the insurance company's separate account.

The Supporting Organizations are corporations, and thus non-natural persons within the meaning of Section 72(u). Section 512(b), which contains a specific exclusion from UBTI for "annuities" is in Subtitle A of the Code. Thus, the Section 72(u) could be interpreted to provide that the UBTI exclusion for "annuities" would not apply to a tax-exempt corporation that owned a variable annuity contract. We have found no evidence in the legislative history that would indicate that Section 72(u) was intended to change the character of the income recognized by tax-exempt corporations that owned variable annuity contracts. Even if the specific exclusion from UBTI for "annuities" were held inapplicable to the income derived by the Supporting Organizations from the Variable Contracts, there are alternative provisions of the tax law that could be cited to support an exclusion of the income from such Contracts from UBTI.

**Treasury Regulations Defining Investment Income Excluded from UBTI.** Section 512(b) of the Code states that certain income items, including "annuities", interest, dividends, royalties, real property rents and gains realized on sale, exchange or disposition of property (other than inventory or property held primarily for sale to customers in the ordinary course of a trade or business) are specifically excluded from UBTI. Congress subsequently amended Section 512(b)(1) to add "payments with respect to securities loans" and "amounts received or accrued as consideration for entering into agreements to make loans" to the list of items excluded from UBTI. In the 1990's there were many new types of financial instruments, including equity swaps and total return swaps, that were made available and tax counsel sought advice from the Treasury for further clarification of the UBTI rules for investments made

23

by tax-exempt entities in such financial instruments.   In 1992, the Treasury amended Section 1.512(b)-1 of the Regulations to provide that the specific exclusion from UBTI in Section 512(b)(1) also applies to "income from notional principal contracts" (as defined in the Regulations) and "other substantially similar income from ordinary and routine investments to the extent determined by the Commissioner...."

Thus, it can be argued that the income required to be recognized by a Supporting Organization under Section 72(u) as a result of its investment in the Variable Contract could still qualify for exclusion under this Treasury Regulation as "substantially similar income from ordinary and routine investments". We have found no revenue ruling or case which has addressed this issue.  We would note, however, that Section 72(u) by its terms is only applicable to "annuity contracts".  Thus, if the Supporting Organizations had instead purchased variable life insurance policies, Section 72(u), by its terms, would not be applicable.  If Congress intended to eliminate the UBTI exemptions applicable to tax-exempt corporations that invested in variable contracts, it is unclear why the Section 72(u) provision by its terms is only applicable to "annuities" and not variable life insurance policies.

**Unrelated Trade or Business.**

The tax on UBTI was passed into law to rectify situations where an exempt organization could engage in any trade or business, secure in the knowledge that the profits generated from such trade or businesses would not be subject to tax, assuming the funds from such trade or business were received by the exempt organization. As stated in the House Committee Report:

> The problem at which the tax on unrelated business income is directed here is primarily that of unfair competition.  The tax-free status of these section 101 organizations enables them to use their profits tax-free to expand operations, while their competitors can expand only with the profits remaining after taxes.  Also, a number of examples have arisen where these organizations have, in effect, used their tax exemption to buy an ordinary business.[8]

Under Section 511 of the Code, gross income of a tax-exempt organization will be treated as UBTI if:

1.  It is income from a "trade or business";

2. The trade or business" is "regularly carried on" by the organization or a partnership in which it is a member; and

3. The conduct of the "trade or business" is not substantially related to the purposes of the organization.

In order for the IRS to assert that some or all of the income from Variable Contracts constitutes UBTI, the IRS will need to establish that some or all of the income from the Variable Contracts is "trade or business" income.  Thus, unless the Variable Contracts were deemed to be partnership interests, or the

---

[8] H. Rep't No. 2319, 81st Cong., 2d Sess. 33-37 (1950).

24

activity of acquiring such Variable Contracts were deemed to be a business activity, the income items recognized by the Supporting Organizations would not be treated as UBTI.

In general, a trade or business for UBTI purposes is based on Section 162 principles, and is viewed as an activity that produces income from the sale of a product or performance of services. In a 1969 Revenue Ruling, the IRS held that a tax-exempt entity's investment in insurance and annuity contracts was not a business activity. See Revenue Ruling 69-74. The IRS will not be able to establish an unrelated trade or business with respect to either Supporting Organization. The Variable Contracts are contractual entitlements only, and any economics paid or accrued are paid or accrued with respect to such contract.

As discussed in detail in this letter, we do not believe that the Supporting Organizations could be treated as the tax owners of the underlying partnership investments of the Separate Accounts under the IRS's "investor control" doctrine discussed in detail above. The facts and assumptions described above do not support treating the Supporting Organizations as partners in the Atlas IDF, the Rand PE Fund or the underlying Highland limited partnership.

**Code Section 514(g) Amendment**. Section 72(u) was added to the Code in 1986. Two years **earlier**, Congress had amended Code Section 514 (by adding a new subsection (g)) to specifically grant regulatory authority to the Treasury to issue regulations "necessary or appropriate" to prevent the avoidance of the debt-financed income rules through the use of "segregated asset accounts". The legislative history of the 1984 legislation specifically states that such regulations, if issued, shall only apply prospectively. We have found no reference to the 1984 amendment to Section 514 in the legislative history of Section 72(u). As of the date of this letter, the Treasury has not issued any proposed regulations to implement Section 514(g). Further, there have been no regulations issued or proposed under Section 72(u).

**Private Letter Rulings under Section 72(u).** There are two IRS private letter rulings, published in 2002 and 1997, that appear to have addressed the tax treatment of tax-exempt corporations that have made investments in variable annuities backed by separate accounts that held UBTI generating assets. PLR 20020647 (dated Nov. 13, 2001); PLR 9708022 (dated Nov. 26, 1996). These PLRs focus on the application of Section 72(u) and the use of group annuity contracts (GACs) purchased by a foundation or endowment (i.e., a non-natural person). The underlying investment of the GAC was a real estate partnership (presumably funded with debt financing). The PLRs state that while the GAC was subject to Section 72(u) in the hands of the tax-exempt organizations, the annuity continued to be treated as a valid variable contract under Section 817(d) of the Code. As a result of Section 72(u) being applicable, the life insurer would issue a Form 1099 to the endowment or foundation for any current income required to be recognized by reason of Section 72(u).

The tax issue is the character of the income to such tax-exempt entities. The two letter rulings, state, in essence, that in the view that the contract's status as an annuity contract under Subchapter L of the Code (relating to insurance company taxation), "the tax treatment of the contract holder under Section 72(u)(1)(A) does not preclude the contract from satisfying the requirements of Section 817(d)(2)(A) for purposes of determining the taxpayer's income." As such, the rulings conclude that the contracts do provide for the "payment of annuities." This would support the conclusion that the "income on the

25

contract" received by the Supporting Organizations constitutes "annuity" income and therefore does not constitute UBTI.  It is our understanding the counsel for insurance companies generally are of the view that such PLRs support the position that the character of the contract holder's income is "annuity" income or other investment income exempt from UBTI despite the fact that the GAC is subject to Section 72(u).

In addition, another private letter ruling, published in 1990, supports the contention that the income reportable by each Supporting Organization does not constitute UBTI.  In PLR 9009047, a trust was requesting a ruling that it qualified as a charitable remainder unitrust.  The trustee of the trust intended to invest all the trust's assets in a deferred annuity contract.  The ruling acknowledges that the annuity contract to be acquired by the trust will be subject to Code section 72(u) because the trust is not a natural person and the trust is not holding the annuity as an agent for a natural person.  The ruling concludes that the trust will qualify as a charitable remainder unitrust and therefore the trust "will be exempt from taxes imposed by subtitle A of the Code unless it has any unrelated business taxable income as defined in section 512 of the Code and the regulations applicable thereto."  Immediately thereafter, the ruling states that the trust will include in its ordinary income for any tax year the "income on the [annuity] contract" in accordance with Code section 72(u).  This again supports the conclusion that amounts reportable by a tax-exempt organization with respect to an annuity contract will not constitute UBTI.[9]

Private letter rulings of this type are issued to a particular taxpayer in response to a request from the taxpayer for an interpretation of the tax law to a particular set of facts. PLRs may not be cited as precedent and generally may not be relied upon by as taxpayer other than the taxpayer which applied for and received the PLR.  However, PLRs are typically viewed by tax counsel as indicative of the interpretations of the tax law that IRS personnel would likely apply to other taxpayers with the same issue.

**Mark to Market Taxation of an Annuity Contract under Section 72(u) Supports Exclusion from UBTI.** Even if the "income on the contract" that will be reported to each Supporting Organization is not considered an amount from an annuity because of Code section 72(u), alternative arguments exist that support the contention that the "income on the contract" does not constitute UBTI.

As discussed above, the "income on the contract" that will be reportable to each Supporting Organization will represent the increase in value of the assets underlying the Variable Contracts. The manner in which the contract owner's annual income inclusion is calculated under Section 72(u) resembles a mark-to-market approach to determining the investor's gain from ownership of the contract during the applicable taxable year. Essentially, the "income on the contract" represents the amount that would be realized if all the assets underlying the Separate Accounts were sold for their fair market value at the close of each taxable year. As noted above, Section 512(b)(5) contains a broad exemption from UBTI for gains realized on sales, exchanges or "other dispositions" of property (other

---

[9] This conclusion is also supported by commentators. *See* Zaritsky, Lane & Danforth, <u>Federal Income Taxation of Estates and Trusts</u>, §14.03[6][a][iv] ("Because the income option CRUT is tax exempt, no tax is due on the current accumulations").

than inventory or dealer assets). Furthermore, gain realized by tax-exempt investors under the mark-to-market rules of Code Section 1256 are entitled to the UBTI exclusion provided by Section 512(b)(5).

The UBTI exclusion does not apply to gains or losses from the sale, exchange, or other disposition of property that is (i) stock in trade or other property of a kind which would properly be included in the inventory of the organization if on hand at the close of the taxable year, or (ii) property held primarily for sale to customers in the ordinary course of the trade or business. The investments underlying the Variable Contracts should not constitute inventory or property held primarily for sale to customers in the ordinary course of a trade or business. Accordingly, even if the "income on the contract" does not constitute annuity income, it is analogous to gains from the sale, exchange or other disposition of property that is not inventory or held for sale to customers, which is excluded from UBTI.

**Notional Principal Contract or Other Ordinary or Routine Investment Income.** Additionally, each Supporting Organization is an owner of an investment contract issued by Crown Global. Even if such contract is excluded from being treated as an annuity contract under the literal reading of Section 72(u), such contract more closely resembles a "notional principal contract" or "other ordinary or routine investment" referred to in the exclusions from UBTI of Section 1.512(b)-1(a) of the Regulations.

**Failure to Qualify for the Section 512(b)(1) Exclusion Does Not Result in UBTI.** Section 512(b) provides a special exclusion for certain types of investment income, but the failure to qualify for the specific exclusions in such Section does not automatically result in UBTI classification for the income items. Section 72(u) provides that the income to be recognized by the non-natural owner of the annuity account is treated as "ordinary income". Ordinary income is not of necessity characterized as UBTI; interest income, royalties and real property rents, for example, are also items of ordinary income that qualify for exemption from UBTI.

**There is No Federal Income Tax Authority to Support an IRS Position that the Income from the Variable Contracts is UBTI.**

Unable to find an unrelated trade or business upon which to base a conclusion that the Supporting Organizations receive UBTI (as discussed above), the IRS would need to develop a legal theory that the character of trade or business income that flows to Crown Global maintains its character as the income (i.e., UBTI) received by the Supporting Organizations. The IRS would encounter at least three problems with any such legal theory.

First, corporate entities similar to Crown Global are regularly used to "block" a tax-exempt organization from receiving UBTI. Under this planning technique, the corporate blocker reports any income that would have been UBTI if received directly by the tax-exempt on its own corporate tax return. Any amounts distributed by such corporation to its shareholder are generally dividend income, which is excluded from UBTI.[10] In this instance, any trade or business income will be reported by Crown Global on its own federal income tax return. Therefore, any amounts received by the Supporting Organizations should be classified as a dividend or other distribution that would not constitute UBTI.

---

[10] Code § 512(b)(1).

Second, the Variable Contracts are similar to a derivative contract, as both are contractual obligations between two unrelated parties who both rely on other party's credit quality and risk, which may be significantly different than the risk profile of the reference assets underlying the contract. Further, one party to the contract typically "hedges" its obligations, similar to Crown Global hedging its obligations by purchasing interests in Atlas IDF, L.P.[11] Derivative financial instruments are regularly used to convert or block certain types of income to the desired derivative income by changing the legal relationship and risks from holding the investments directly versus obtaining a counterparty's promise to return similar economics.

Similar examples are found in the context of FIRPTA assets[12] and a foreign investor investing in U.S. assets indirectly through derivative contracts. With respect to FIRPTA, foreign investors can avoid the application of FIRPTA withholding by acquiring a synthetic long position in U.S. real estate through a derivative product. The IRS has concluded that this type of position is not a U.S. real property interest that would be subject to FIRPTA withholding.[13] Another example is a foreign investor gaining exposure to U.S. investment assets by entering into a derivative contract with a foreign counterparty bank. The foreign bank will acquire the investment assets. From the foreign investor's standpoint, the derivative contract converts U.S. source income on the U.S. investment assets into foreign source income, thereby avoiding exposure to U.S. income tax or withholding tax.[14]

The above examples demonstrate that federal tax laws respect the difference between holding a certain investment asset directly and another where one has economic exposure to the investment asset indirectly through a contractual promise by a counterparty. These examples are closely analogous, if not nearly identical, to the issuance of a variable annuity contract by a life insurance company that provides the investor a return measured by a Separate Account owned by the insurance company. The only difference is that the contractual relationship is also regulated under an insurance regime.

Third, an IRS legal theory that some portion of the Variable Contract's income is UBTI would expose a significant flaw. Such a legal theory would require that the same amount of income be taxed twice, without reduction for the amount paid by the first party. Specifically, the income from the Variable Contract is reported on Crown Global's U.S. federal income tax return. To then require the Supporting Organizations to also report such income as UBTI would be axiomatic to tax law principles of not taxing different taxpayers on the same income received. Even double tax regimes, such as the corporate income and dividend tax, do not tax the same amount of income to two different taxpayers twice. Rather, first the corporate earnings are taxed at a corporate rate; then the corporation only has the after-tax dollars to distribute to shareholders in the form of a dividend.

---

[11] Generally, it does not make a difference from a tax perspective if one of the parties to the derivative is fully hedged or is not, or actually owns the referenced assets. The income from the derivative contract is not treated for tax purposes as income on the underlying referenced investment assets. *See* Rubinger, Jeffrey, *IRS Rules Total Return Swap Tied to Real Estate Index Is Not Subject to FIRPTA,* Journal of Taxation (Sept. 2008).

[12] FIRPTA refers to the provisions of the Code added by the Foreign Investment in Real Property Tax Act of 1980 (FIRPTA), which impose federal income tax on foreign persons disposing of United States real property interests.

[13] Rev. Rul. 2008-31, 2008-26 I.R.B.1180.

[14] Treas. Reg. § 1.863-7(b)(1).

**A Possible Legal Theory Available to Support a UBTI Position by the IRS Would Be to Disregard the Variable Contracts Issued by Crown Global as Shams**

The discussion above indicates that the IRS would not have a strong legal basis to support the position that the Variable Contract income is UBTI. Therefore, the only plausible legal theory the IRS could assert to cause the underlying UBTI earned within a Variable Contract flow directly to a Supporting Organization would be to make a sham transaction (*i.e.,* economic substance) argument. Under such an argument, the IRS would treat each Supporting Organization as direct investors in Atlas IDF and ignore, for tax purposes, Crown Global and its contractual relationship with each Supporting Organization. As discussed below, the IRS will encounter substantial factual hurdles to overcome before it could successfully apply such a legal theory to the Variable Contracts in order to treat any underlying UBTI received by Crown Global as taxable to the Supporting Organizations.

The focus of the sham transaction doctrine is to determine whether a transaction has economic effects other than the creation of tax benefits.[15] Courts have stated that a multi-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, containing tax-independent considerations, and not structured solely by tax-avoidance features should be respected.[16] Furthermore, "the existence of a tax benefit resulting from a transaction does not automatically make it a sham as long as the transaction is imbued with tax-independent considerations."[17] If an investment is one for which Congress has specifically bestowed a tax incentive, the investment, if imbued with economic substance, will not be considered a sham merely because the taxpayer could not expect profits apart from tax benefits.[18]

The transactions between each Supporting Organization and Crown Global, as represented, appear to have ample economic substance and are far from empty transactions entered into solely to generate tax benefits. In fact, the following facts support the assertion that the transactions between the Supporting Organizations and Crown Global have economic substance and are not "shams":

- Crown Global is a Bermuda-based insurance company subject to the insurance laws of Bermuda;
- Crown Global was not formed solely for the purpose of entering into the transactions; rather it has been existence for many years prior to issuing the Variable Contracts;
- Crown Global has customers beyond the Supporting Organizations;
- Crown Global continues to market a variety of insurance-based products;
- Crown Global has employees who are undertaking the respective roles befitting an insurance company, according to its website;
- The Variable Contracts were negotiated between Crown Global and each Supporting Organization with specified pricing and contractual terms being agreed upon;

[15] *Kirchman v. Com'r,* 862 F.2d 1486, 1492 (11th Cir. 1989).

[16] *Frank Lyon Co. v. United States,* 435 U.S. 561, 583-84 (1978).

[17] *Holladay v. Com'r,* 649 F.2d 1176, 1179 (5th Cir. 1981).

[18] Bittker & Lokken: Federal Taxation of Income, Estates, and Gifts, § 4.3.4A. *But see In re CM Holdings, Inc.,* 301 F.3d 96, 105 (3rd Cir. 2002) ("Choosing a tax-favored investment vehicle is fine, but engaging in an empty transaction that shuffles payments for the sole purpose of generating a deduction is not.")

- Crown Global received a premium for each Variable Contract which was deposited in accounts owned and controlled by Crown Global;
- Crown Global's fee charged within the Variable Contracts is based upon the value of the respective Variable Contracts and not upon any anticipated tax benefits;
- Crown Global's fee appears commensurate with fees charged by other insurers;
- Presumably, Crown Global will continue to operate as an insurance company after any termination of the Variable Contracts;
- Each Supporting Organization's creation and existence is not transitory;
- Crown Global negotiated and entered into a Participation Agreement with the investment manager for Atlas IDF; and
- Crown Global received the Atlas IDF Private Placement Memorandum and completed the applicable subscription documents when Crown Global received a premium that was allocated to Atlas IDF.

Based upon such facts, a court would likely determine that Crown Global (a) is a real third-party insurance company, independently owned, and not affiliated with the Supporting Organizations (or their respective principals and agents) in any form, (b) has many customers, (c) operates in a regulatory environment and that it offers a variety of insurance products, and (d) it was not formed for the specific purpose of entering into the transactions.  The Variable Contracts were intended to comply with the insurance regulatory laws governing Crown Global.  Any conflicts between Crown Global and each Supporting Organization would have to be resolved under the terms of the respective Variable Contracts.  Each Supporting Organization has no legal rights normally associated with a subscriber to the Atlas IDF.  Nor have the Supporting Organizations completed subscription documents with Atlas IDF.  Rather, Crown Global invested the premium received from each Supporting Organization in Atlas IDF, and has all the rights and entitlements normally associated with an investor in entities similar to Atlas IDF.

The foregoing demonstrates that a court would likely reject the application of the sham transaction or economic substance doctrine to the Variable Contracts issued by Crown Global to each Supporting Organization, and therefore reject any assertion that any UBTI realized with respect to the assets held in the Separate Account referenced in the Variable Contract should flow to the Supporting Organization.  Rather, the IRS would have to address analogous legal positions directly adverse to such an assertion.

**Overall Conclusion with Respect to UBTI.**

After reviewing the respective legal authorities, arguments, and positions that the IRS could attempt to assert, we believe there are at least three supportive arguments, when considered together and presented to a court, to support our opinion.  These supportive arguments are as follow: (1) the Variable Contracts income would not generate UBTI to the Supporting Organizations because such income is annuity income; 2) if the "income on the contract" was not considered annuity income, but rather (a) income reported on a "mark to market" method (which represents the changes in value of the Variable Contracts on year over year basis), (b) income from a notional principal contract, or (c) income from ordinary and routine investments, such "income on the contract" would still not be UBTI; and 3) IRS

30

would have little, if any, legal support for its position supporting UBTI inclusion by the Supporting Organizations but rather have adverse legal authorities in other financial contexts.

Therefore, we feel that if challenged by the IRS, each of Supporting Organization #1 and Supporting Organization #2 would have a more likely than not (a greater than 50% chance of success) in a court of law, to uphold the position that any income from the Variable Contracts reported by each Supporting Organization would not be UBTI income.

Although we have reached this level of opinion, it is not to suggest that the likelihood of success is not much greater than may be indicated by our opinion level, but rather, reflects only upon the lack of direct legal precedents which we can refer for giving our opinion.   If the IRS were to litigate this position, we would anticipate that the taxpayer would likely win, and that legal authority would exist, such that if at that time we would have been able to reach a higher opinion level.  We reiterate that our opinion is a very strong "more likely than not" level of opinion.

## VI. OPINION RENDERED

Based upon the accuracy of the statement of facts contained herein and the assumptions set forth above, and the legal analysis set forth above it is our opinion that:

1. If the Internal Revenue Service were to assert, in reliance on the "investor control doctrine", as currently interpreted, that  Supporting Organization #1 and Supporting Organization #2 should be treated as the owners, for federal income tax purposes, of the investments held in the Separate Accounts of Crown Global associated with the Variable Contracts owned by Supporting Organization #1 and Supporting Organization #2, a court should conclude that such investor control doctrine should not apply to  Supporting Organization #1 and Supporting Organization #2 (a confidence level that there is a greater than 50% likelihood that the position will be upheld by a court if challenged by the Internal Revenue Service), but rather, for federal income tax purposes, a court should conclude Crown Global is the owner of the investments held in such Separate Accounts, including without limitation, to those investments held in Atlas IDF (a confidence level that there is a greater than 50% likelihood that the position will be upheld by a court if challenged by the Internal Revenue Service).

2. It is more likely than not (i.e., a greater than 50% likelihood) that the position that the income realized by the Supporting Organization #1 and Supporting Organization #2 from their ownership of the Variable Contracts will not be classified as unrelated business table income within the meaning of Section 511 of the Code, will be upheld by a court if challenged by the Internal Revenue Service.

************

The legal opinion expressed above is subject to the assumptions, exceptions, restrictions, and qualifications stated herein as well as the following qualifications and limitations:

1. **This letter and the legal opinion contained herein are limited to the matters expressly set forth herein, and no legal opinion shall be implied or may be inferred beyond the matters expressly so stated.   As such,**

(a) The opinion is limited to the specific federal tax issues addressed herein;

(b) Additional issues may exist that could affect the federal income tax treatment of matters that are the subject of this opinion and this opinion does not provide a conclusion with respect to any additional issues; and

(c) With respect to any significant federal tax issues outside the limited scope of this opinion, this opinion was not written, and cannot be used by the taxpayer, for the purpose of avoiding penalties that may be imposed by the taxpayer.

2.  The legal opinion set forth herein represents our best professional judgment and is not a guarantee or warranty of any of the matters discussed herein.

3.  This letter and the legal opinion expressed herein are rendered as of the date hereof, and are based upon relevant provisions of the Code and the Treasury regulations thereunder, and upon relevant judicial precedents and other authorities, as they exist as of the date of this legal opinion. These authorities are subject to change at any time, and if they do change, it may be necessary to re-examine this legal opinion. In that regard, we expressly disclaim any undertaking to advise you of any changes in applicable law, facts or any other matters that may come to our attention after the date hereof which may alter, in whole or in part, the legal opinion expressed herein. In addition, the legal opinion expressed in this letter is based solely on the accuracy of the facts and assumptions expressly stated herein, and the conclusions, statements and views expressed herein cannot be relied on, and may change, if any of the facts or assumptions described herein are, or later become, inaccurate or incomplete in any respect.

4. This letter communicates legal advice, and has been prepared in anticipation of potential litigation concerning the tax consequences described herein. It is intended that this letter be protected from discovery under the attorney-client privilege and work product doctrine to the extent provided by law. Disclosure of this letter and the information communicated in it should be carefully controlled so that disclosure is not made in a manner that will invalidate the protected status of the information.

5. We confirm that there is no limitation on the disclosure by you or any other parties to the transaction discussed of the tax treatment or tax structure as described in this letter. The implications of any such disclosure on attorney-client privilege or other applicable legal protections should be carefully considered prior to any such disclosure.

This letter may be relied upon by the addressee only and may not be relied upon by, nor may copies be delivered to, any other person without our prior written consent.

Very truly yours,

*Sadis & Goldberg LLP*

32