# EXHIBIT 12

HCMLPHMIT00003673



Registration No.: **263805**
Date of Incorporation: **27 October 2011**
Client No.: **KY059904**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | |
|---|---|
| Share Class: | **Management** |
| Nominal Value: | **USD 0.01** |
| Voting Rights: | Yes |
| Conditional: | NO |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **Grant Scott** Highland Capital Managment, L.P. 13455 Noel Road, Suite 800 Dallas Texas 75240 USA | 7 Nov 2011 | Allotment | 100.00 | 7 Nov 2011 : Allotment of 100.0 Management share(s) for USD0.01 / share to Mr. Grant Scott pursuant to minutes/resolutions dated 07 Nov 2011 | No Cert | | | |
| | | Transfer | (100.00) | 25 Mar 2021 : Transfer of 100.0 Management share(s) from Mr. Grant Scott to Mark E. Patrick pursuant to resolutions dated 25 Mar 2021 | | | | |
| | | | | | | Nil | Nil | 25 Mar 2021 |
| **WNL Limited** Walkers Corporate Services Limited Walker House 87 Mary Street George Town Grand Cayman KY1-9005 Cayman Islands | 7 Nov 2011 | Allotment | 1.00 | 7 Nov 2011 : Allotment of 1.0 Management share(s) for USD0.01 / share to WNL Limited pursuant to minutes/resolutions dated 07 Nov 2011 | No Cert | | | |
| | | Repurchase | (1.00) | 7 Nov 2011 : Repurchase of 1.0 Management share(s) from WNL Limited pursuant to resolutions | No Cert | | | |

Date printed: 19 May, 2021

[1 / 2]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

PATRICK_000017

HCMLPHMIT00003674

**intertrust** GROUP

Registration No.: **263805**
Date of Incorporation: **27 October 2011**
Client No.: **KY059904**

PATRICK_000018

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | dated 07 Nov 2011. | | | | |
| | | | | | | Nil | Nil | 7 Nov 2011 |
| Mark E. Patrick | 25 Mar 2021 | Transfer | 100.00 | 25 Mar 2021 : Transfer of 100.0 Management share(s) from Mr. Grant Scott to Mark E. Patrick pursuant to resolutions dated 25 Mar 2021 | No Cert | | | |
| | | | | | | 100 | 100.00 | |

Notes:

| |
|---|

Date printed: 19 May, 2021

[2 / 2]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

HCMLPHMIT00003675

# EXHIBIT 13

HCMLPHMIT00003676

 intertrust
GROUP

Registration No.: **263805**
Date of Incorporation: **27 October 2011**
Client No.: **KY059904**

PATRICK_000019

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

Share Class: **Participating**
Nominal Value: **USD 0.01**
Voting Rights: Yes
Conditional: NO

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| The Highland Capital Management Partners Charitable Trust #2<br>Highland Capital Management, L.P.<br>13455 Noel Rd, Suite 800<br>Dallas<br>TX 75240<br>USA | 7 Nov 2011 | Allotment | 300.00 | 7 Nov 2011 : Allotment of 300.0 Participating share(s) for USD0.01 / share to The Highland Capital Management Partners Charitable Trust #2 pursuant to minutes/resolutions dated 07 Nov 2011 | No Cert | | | |
| | | Transfer | (100.00) | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Kansas City Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | | | | |
| | | New Certificate | 200.00 | 30 Nov 2011 : New certificate No. 0 issued for remaining balance of 200.0 Participating share(s) | No Cert | | | |
| | | Transfer | (100.00) | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Dallas Foundation, Inc | | | | |

Date printed: 19 May, 2021

[1 / 3]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

HCMLPHMIT00003677



Registration No.: **263805**

Date of Incorporation: **27 October 2011**

Client No.: **KY059904**

PATRICK_000020

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | pursuant to resolutions dated 30 Nov 2011 | | | | |
| | | New Certificate | 100.00 | 30 Nov 2011 : New certificate No. 0 issued for remaining balance of 100.0 Participating share(s) | No Cert | | | |
| | | Transfer | (100.00) | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Santa Barbara Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | | | | |
| | | | | | | Nil | Nil | 30 Nov 2011 |
| **Highland Kansas City Foundation, Inc** | 30 Nov 2011 | Transfer | 100.00 | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Kansas City Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | No Cert | | | |
| | | | | | | 100 | 100.00 | |
| **Highland Dallas Foundation, Inc** | 30 Nov 2011 | Transfer | 100.00 | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Dallas Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | No Cert | | | |
| | | | | | | 100 | 100.00 | |
| **Highland Santa Barbara Foundation, Inc** | 30 Nov 2011 | Transfer | 100.00 | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management | No Cert | | | |

Date printed: 19 May, 2021

[2 / 3]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

HCMLPHMIT00003678



Registration No.: **263805**

Date of Incorporation: **27 October 2011**

Client No.: **KY059904**

PATRICK_000021

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Partners Charitable Trust #2 to Highland Santa Barbara Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | | | | |
| | | | | | | 100 | 100.00 | |
| Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT 306 W. 7th St., Suite 1045 Fort Worth TX 76102 USA | 13 Aug 2015 | Allotment | 5.00 | 13 Aug 2015 : Allotment of 5.0 Participating share(s) for USD0.01 / share to Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P, Charitable Fund at CFNT pursuant to minutes/resolutions dated 12 Aug 2015 | No Cert | | | |
| | | | | | | 100 | 5.00 | |

Notes:

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[3 / 3]

HCMLPHMIT00003679

# EXHIBIT 14

HCMLPHMIT00003680



## Delaware

PAGE 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "CHARITABLE DAF GP, LLC", FILED IN THIS OFFICE ON THE TWENTY-FIFTH DAY OF OCTOBER, A.D. 2011, AT 11:23 O'CLOCK A.M.

5056341  8100

111131792

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9113377

DATE: 10-25-11

PATRICK_000036

HCMLPHMIT00003681

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:26 AM 10/25/2011
FILED 11:23 AM 10/25/2011
SRV 111131792 - 5056341 FILE

# CERTIFICATE OF FORMATION

## OF

## CHARITABLE DAF GP, LLC

The undersigned hereby executes this Certificate of Formation of Charitable DAF GP, LLC (the "**Company**"), for the purpose of forming a limited liability company pursuant to the Delaware Limited Liability Company Act.

1. The name of the Company is **Charitable DAF GP, LLC.**

2. The address of the registered office of the Company in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, County of New Castle, State of Delaware 19901. Its registered agent at such address is The Corporation Trust Company.

IN WITNESS WHEREOF, the undersigned, an authorized person of the Company, has caused this Certificate of Formation to be duly executed as of the 24th day of October, 2011.

By: _____
James S. Seevers, Jr.
Authorized Person

78673.000002 EMF_US 37662262v2

PATRICK_000037

HCMLPHMIT00003682

# EXHIBIT 15

HCMLPHMIT00003683

ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST AGREEMENT (this "Agreement") is made and entered into as of the 24 day of March, 2021, by and between Grant J. Scott (the "Assignor") and Mark E. Patrick.

WHEREAS, Assignor is the legal and beneficial owner of one hundred percent (100%) of the limited liability company interest (the "Membership Interest") in Charitable DAF GP, LLC, a Delaware limited liability company (the "Company"), and Assignor desires to assign the Membership Interest to Assignee, upon the terms and conditions set forth herein; and

WHEREAS, Assignee desires to accept an assignment of the Membership Interest (such right, title and interest in and to the Membership Interest, together with, if any: (i) Assignor's capital account, (ii) the Assignor's rights in and to specific Company property, (iii) Assignor's rights to participate in the management of the Company, (iv) Assignor's rights to distributions, reimbursements or other payments (including any distributions of cash flow which have not been distributed), (v) rights to profits, losses and other allocations, and (vi) all other rights and benefits of Assignor in the Company with respect to the Membership Interest assigned hereby to Assignee being herein sometimes collectively referred to as the "Assigned Interest").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree as follows:

1.      Assignment and Assumption of Assigned Interest. Assignor does hereby unconditionally and irrevocably assign, transfer, set over and deliver unto the Assignee, its successors and assigns, the Assigned Interest, including, but not limited to the profits, losses, capital and cash flow, if any, allocable to the Assigned Interest, free and clear of any and all liens, security interests, encumbrances, claims, rights of another, rights of first refusal, covenants, conditions, reservations and any and all other restrictions. Assignee does hereby accept the Assigned Interest and agrees to be bound by and assume all obligations under the limited liability company agreement of the Company.

2.      Substitute Member. Assignor hereby acknowledges that Assignee is hereby admitted as a substitute member of the Company with respect to the Membership Interest from and after the date hereof as a result of this Agreement.

3.      Effective Date. This Agreement is effective as of the date first above mentioned.

4.      Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one Agreement. This Agreement and any signed agreement or instrument entered into in connection with this Agreement or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine, PDF or other electronic means, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

PATRICK_000006

HCMLPHMIT00003684

ASSIGNOR:

Name:  Grant J. Scott

ASSIGNEE:

Name:  **Mark E. Patrick**

[Signature Page for Assignment of Membership Interest Agreement]

078673.0000002 EMF_US 84142968v2

PATRICK_000007

HCMLPHMIT00003685

# EXHIBIT 16

HCMLPHMIT00003686

Form 1023                    Highland Dallas Foundation, Inc.                    TIN: 45-3961755

**Attachment 2**

*Part II, Line 1*          Certificate of Incorporation

78673.000002 EMF_US 38799980v1

HCMLPHMIT00003687

# Delaware

PAGE   1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND DALLAS

FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY

OF NOVEMBER, A.D. 2011, AT 7:34 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE

NEW CASTLE COUNTY RECORDER OF DEEDS.

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9177054

5069985   8100

111224468

DATE: 11-23-11

You may verify this certificate online
at corp.delaware.gov/authver.shtml

HCMLPHMIT00003688

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 09:17 PM 11/22/2011*
*FILED 07:34 PM 11/22/2011*
*SRV 111224468 - 5069985 FILE*

## CERTIFICATE OF INCORPORATION

### OF

## HIGHLAND DALLAS FOUNDATION, INC.

FIRST: The name of the corporation is Highland Dallas Foundation. Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit The Dallas Foundation, a Texas nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by The Dallas Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws: provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions

HCMLPHMIT00003689

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to The Dallas Foundation. If The Dallas Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 2h day of November, 2011.

_____
James Dondero

HCMLPHMIT00003690

# EXHIBIT 17

HCMLPHMIT00003691

INTERNAL REVENUE SERVICE                     DEPARTMENT OF THE TREASURY
P. O. BOX 2508
CINCINNATI, OH  45201

Date:                                  Employer Identification Number:
      **JAN 19 2013**                        ████1755
                                       DLN:
HIGHLAND DALLAS FOUNDATION INC               ██████8022
C/O HUNTON & WILLIAMS LLP              Contact Person:
MARGARET S ALFORD                        SHEILA M ROBINSON          ID# ██1220
1445 ROSS AVE STE 3700                 Contact Telephone Number:
DALLAS, TX  75202                        (877) 829-5500
                                       Accounting Period Ending:
                                         December 31
                                       Public Charity Status:
                                         509(a)(3)
                                       Form 990 Required:
                                         Yes
                                       Effective Date of Exemption:
                                         November 22, 2011
                                       Contribution Deductibility:
                                         Yes
                                       Addendum Applies:
                                         No


Dear Applicant:

We are pleased to inform you that upon review of your application for tax
exempt status we have determined that you are exempt from Federal income tax
under section 501(c)(3) of the Internal Revenue Code.  Contributions to you are
deductible under section 170 of the Code.  You are also qualified to receive
tax deductible bequests, devises, transfers or gifts under section 2055, 2106
or 2522 of the Code.  Because this letter could help resolve any questions
regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified
as either public charities or private foundations.  We determined that you are
a public charity under the Code section(s) listed in the heading of this
letter.

Specifically, we have determined that you are a Type I supporting organization
under section 509(a)(3).  A Type I supporting organization is operated,
supervised, or controlled by one or more publicly supported organizations.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public
Charities, for some helpful information about your responsibilities as an
exempt organization.

                                                      Letter  947 (DO/CG)

HCMLPHMIT00003692

HIGHLAND DALLAS FOUNDATION INC

Sincerely,

*Holly O. Paz*

Holly O. Paz
Director, Exempt Organizations
Rulings and Agreements

Enclosure:  Publication 4221-PC

Letter  947 (DO/CG)

HCMLPHMIT00003693

# EXHIBIT 18

HCMLPHMIT00003694

Form 1023                         Highland Dallas Foundation, Inc.                    TIN: 45-3961755

## Attachment 4

*Part IV*        Narrative Description of Activities

The Applicant is organized and will be operated exclusively as a supporting organization within the meaning of section 509(a)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), to support and benefit The Dallas Foundation ("TDF"), a Texas nonprofit corporation. TDF is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code and a public charity described in section 509(a)(1) of the Code.

The Applicant received its funding as one of three charitable remainder beneficiaries of a charitable remainder trust created by James Dondero, which terminated on November 30, 2011. As the attached Schedule D reflects, the Applicant qualifies as a Type I supporting organization within the meaning of section 509(a)(3)(B)(i) because a majority of its board is elected by TDF.

The Applicant's supported organization, TDF, is the oldest community foundation in Texas and serves donors and nonprofit agencies throughout North Texas. As a community foundation, TDF offers a range of ways for local philanthropists to assist the community, including donor advised funds, designated and agency endowment funds, field of interest funds, scholarship funds, and unrestricted funds. TDF focuses on challenges facing North Texas and searches for nonprofit agencies that address these issues most efficiently and effectively, and it assists in connecting donors to causes they care about. In 2010, TDF paid out $31,408,988 in grants to charitable organizations in North Texas. The Applicant will support and benefit TDF by making grants directly to TDF in support of its charitable purposes. In addition, upon the direction and on behalf of TDF, the Applicant may make grants to such other public charities that TDF wishes to benefit in furtherance of TDF's exempt purposes. The total annual grants from the Applicant to or on behalf of TDF are expected to average approximately $1,000,000 per year.

78673.000002 EMF_US 38799980v1

HCMLPHMIT00003695

# EXHIBIT 19

Reserved for Possible Supplementation

HCMLPHMIT00003696

# EXHIBIT 20

HCMLPHMIT00003697

Form 1023                    Highland Dallas Foundation, Inc.              TIN: 45-3961755

## Attachment 3

*Part II, Line 5*      Bylaws

78673.000002 EMF_US 38799980v1

HCMLPHMIT00003698

# BYLAWS
# OF

# HIGHLAND DALLAS FOUNDATION, INC.

HCMLPHMIT00003699

## TABLE OF CONTENTS

**Page**

ARTICLE I OFFICES .................................................................................................1

    Section 1.1       Registered Office ..........................................................................1
    Section 1.2       Other Offices................................................................................1

ARTICLE II MEMBERSHIP ........................................................................................1

    Section 2.1       Classes and Number.....................................................................1
    Section 2.2       Voting ...........................................................................................1
    Section 2.3       Transfer of Membership ..............................................................1
    Section 2.4       Resignation of Member................................................................2
    Section 2.5       Place of Meetings.........................................................................2
    Section 2.6       Annual Meetings..........................................................................2
    Section 2.7       Special Meetings..........................................................................2
    Section 2.8       Notice of Meetings of Members ..................................................2
    Section 2.9       Quorum ........................................................................................3
    Section 2.10     Voting ...........................................................................................3
    Section 2.11     Proxies.........................................................................................3
    Section 2.12     Action by Written Consent ..........................................................3

ARTICLE III DIRECTORS ..........................................................................................4

    Section 3.1       General Powers ............................................................................4
    Section 3.2       Number of Directors ....................................................................4
    Section 3.3       Vacancies.....................................................................................4
    Section 3.4       Place of Meetings.........................................................................4
    Section 3.5       Committees of Directors ..............................................................4
    Section 3.6       Compensation of Directors ..........................................................4
    Section 3.7       Annual Meeting ...........................................................................4
    Section 3.8       Additional Regular Meetings .......................................................5
    Section 3.9       Special Meetings..........................................................................5
    Section 3.10     Method and Timing of Notice......................................................5
    Section 3.11     Purpose not Required in Notice ...................................................5
    Section 3.12     Waiver of Notice..........................................................................5
    Section 3.13     Action by Written Consent. .........................................................6
    Section 3.14     Validation of Action by Consent .................................................6
    Section 3.15     Quorum and Manner of Acting.....................................................6
    Section 3.16     Resignation and Removal of Directors ........................................6

ARTICLE IV OFFICERS..............................................................................................6

    Section 4.1       Officers ........................................................................................6
    Section 4.2       Election, Term of Office and Eligibility......................................7

HCMLPHMIT00003700

Section 4.3        Subordinate Officers .................................................................7
Section 4.4        Removal .....................................................................................7
Section 4.5        The President .............................................................................7
Section 4.6        The Secretary ............................................................................7
Section 4.7        The Assistant Secretaries ..........................................................7
Section 4.8        Chairman ...................................................................................8
Section 4.9        The Chief Financial Officer .......................................................8
Section 4.10       The Assistant Chief Financial Officers .....................................8
Section 4.11       Delegation of Duties ..................................................................8

ARTICLE V BOOKS AND RECORDS ........................................................................8

Section 5.1        Location .....................................................................................8
Section 5.2        Inspection ..................................................................................9

ARTICLE VI MISCELLANEOUS PROVISIONS ........................................................9

Section 6.1        Fiscal Year .................................................................................9
Section 6.2        Depositories ...............................................................................9
Section 6.3        Checks, Drafts and Notes ...........................................................9
Section 6.4        Contracts and Other Instruments ...............................................9
Section 6.5        Conflicts of Interest ...................................................................9
Section 6.6        Waivers of Notice .....................................................................10
Section 6.7        Ownership Interests in Other Entities .....................................10
Section 6.8        Indemnification ........................................................................10
Section 6.9        Amendment of Bylaws .............................................................11

HCMLPHMIT00003701

BYLAWS

OF

HIGHLAND DALLAS FOUNDATION, INC.

## ARTICLE I

## OFFICES

Section 1.1    Registered Office. The registered office of Highland Dallas Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2    Other Offices. The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II

## MEMBERSHIP

Section 2.1    Classes and Number. The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2    Voting. Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members. In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3    Transfer of Membership. Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member

-1-

HCMLPHMIT00003702

interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4     Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5     Place of Meetings. All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6     Annual Meetings. Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7     Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting.   The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8     Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the

-2-

HCMLPHMIT00003703

facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9    Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10    Voting. When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11    Proxies. At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12    Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

HCMLPHMIT00003704

## ARTICLE III

## DIRECTORS

Section 3.1    General Powers.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2    Number of Directors.  The number of Directors that shall constitute the Board of Directors shall be three (3).  Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member.  Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3    Vacancies.  If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy.  If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director.  Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4    Place of Meetings.  The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5    Committees of Directors.  The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6    Compensation of Directors.  Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7    Annual Meeting.  The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors.  If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of

-4-

Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8    Additional Regular Meetings. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9    Special Meetings. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10    Method and Timing of Notice. Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

Section 3.11    Purpose not Required in Notice. Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12    Waiver of Notice. Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

HCMLPHMIT00003706

Section 3.13    Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14    Validation of Action by Consent. All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15    Quorum and Manner of Acting. A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16    Resignation and Removal of Directors. Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

## ARTICLE IV

## OFFICERS

Section 4.1    Officers. The officers of the Corporation shall include a President and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

-6-

HCMLPHMIT00003707

Section 4.2     Election, Term of Office and Eligibility. The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof. Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3     Subordinate Officers. The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4     Removal. The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5     The President. The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6     The Secretary. The Secretary shall:

(a)     keep the minutes of the meetings of the members and of the Board of Directors;

(b)     see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)     be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d)     in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7     The Assistant Secretaries. If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant

-7-

HCMLPHMIT00003708

Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8    Chairman.  The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9    The Chief Financial Officer.  The Chief Financial Officer, if any, shall:

(a)    receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things:  keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b)    render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c)    in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10    The Assistant Chief Financial Officers.  If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11    Delegation of Duties.  In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V

## BOOKS AND RECORDS

Section 5.1    Location.  The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

-8-

HCMLPHMIT00003709

Section 5.2    Inspection. The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1    Fiscal Year. The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2    Depositories. The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3    Checks, Drafts and Notes. All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4    Contracts and Other Instruments. The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances.

Section 6.5    Conflicts of Interest. No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

HCMLPHMIT00003710

Section 6.6     Waivers of Notice.  Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members, Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7     Ownership Interests in Other Entities.  Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8     Indemnification.

(a)     Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators.  The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise.  The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)     If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the

-10-

HCMLPHMIT00003711

unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c)     The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d)     The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e)     To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f)     Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g)     The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9     Amendment of Bylaws. Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the

-11-

HCMLPHMIT00003712

Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

-12-

HCMLPHMIT00003713

# EXHIBIT 21

HCMLPHMIT00003714

# Delaware

PAGE 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND SANTA BARBARA FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2011, AT 7:36 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9177064

DATE: 11-23-11

5069989  8100

111224480

You may verify this certificate online
at corp.delaware.gov/authver.shtml

HCMLPHMIT00003715

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:17 PM 11/22/2011
FILED 07:36 PM 11/22/2011
SRV 111224480 - 5069989 FILE

CERTIFICATE OF INCORPORATION

OF

HIGHLAND SANTA BARBARA FOUNDATION, INC.

FIRST: The name of the corporation is Highland Santa Barbara Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated, exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit Santa Barbara Foundation, a California nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code of 1986 as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by Santa Barbara Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions

HCMLPHMIT00003716

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH:  The corporation shall have perpetual existence.

SEVENTH:  To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH:  Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to Santa Barbara Foundation. If Santa Barbara Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH:  In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH:  The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 22nd day of November, 2011.

_____
James Dondero

- 2 -

HCMLPHMIT00003717

# EXHIBIT 22

HCMLPHMIT00003718

IRS  DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI  OH  45999-0023

Date of this notice:  12-02-2011

Employer Identification Number:
████2008

Form:  SS-4

Number of this notice:  CP 575 E

HIGHLAND SANTA BARBARA FOUNDATION
INC
13455 NOEL RD STE 800
DALLAS, TX  75240

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.

WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

Thank you for applying for an Employer Identification Number (EIN).  We assigned you EIN ████2008.  This EIN will identify you, your business accounts, tax returns, and documents, even if you have no employees.  Please keep this notice in your permanent records.

When filing tax documents, payments, and related correspondence, it is very important that you use your EIN and complete name and address exactly as shown above.  Any variation may cause a delay in processing, result in incorrect information in your account, or even cause you to be assigned more than one EIN.  If the information is not correct as shown above, please make the correction using the attached tear off stub and return it to us.

Assigning an EIN does not grant tax-exempt status to non-profit organizations. Publication 557, *Tax Exempt Status for Your Organization*, has details on the application process, as well as information on returns you may need to file.  To apply for formal recognition of tax-exempt status, most organizations will need to complete either Form 1023, *Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code*, or Form 1024, *Application for Recognition of Exemption Under Section 501(a)*.  Submit the completed form, all applicable attachments, and the required user fee to:

Internal Revenue Service
PO Box 12192
Covington, KY  41012-0192

The Pension Protection Act of 2006 contains numerous changes to the tax law provisions affecting tax-exempt organizations, including an annual electronic notification requirement (Form 990-N) for organizations not required to file an annual information return (Form 990 or Form 990-EZ).  Additionally, if you are required to file an annual information return, you may be required to file it electronically. Please refer to the Charities & Non-Profits page at www.irs.gov for the most current information on your filing requirements and on provisions of the Pension Protection Act of 2006 that may affect you.

To obtain tax forms and publications, including those referenced in this notice, visit our Web site at www.irs.gov.  If you do not have access to the Internet, call 1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

(IRS USE ONLY)    575E                    12-02-2011  HIGH  O  9999999999  SS-4

**IMPORTANT REMINDERS:**

* Keep a copy of this notice in your permanent records.  **This notice is issued only one time and the IRS will not be able to generate a duplicate copy for you.**

* Use this EIN and your name exactly as they appear at the top of this notice on all your federal tax forms.

* Refer to this EIN on your tax-related correspondence and documents.

* Provide future officers of your organization with a copy of this notice.

If you have questions about your EIN, you can call us at the phone number or write to us at the address shown at the top of this notice.  If you write, please tear off the stub at the bottom of this notice and send it along with your letter.  If you do not need to write us, do not complete and return the stub.  Thank you for your cooperation.

                    Keep this part for your records.          CP 575 E (Rev. 7-2007)

-------------------------------------------------------------------------------

Return this part with any correspondence                                CP 575 E
so we may identify your account.  Please
correct any errors in your name or address.                             9999999999

Your Telephone Number  Best Time to Call  DATE OF THIS NOTICE:  12-02-2011
(    )    -                                EMPLOYER IDENTIFICATION NUMBER:  ████2008
_____  _____       FORM:  SS-4          NOBOD


INTERNAL REVENUE SERVICE                  HIGHLAND SANTA BARBARA FOUNDATION
CINCINNATI  OH   45999-0023               INC
IlıIıIıIdıIdıIdıIdıIdıIlıulIuulıIıIdıIdı   13455 NOEL RD STE 800
                                          DALLAS, TX  75240

HCMLPHMIT00003720

# EXHIBIT 23

HCMLPHMIT00003721



### SANTA BARBARA FOUNDATION

**BOARD OF TRUSTEES**

Pamela Gann
**Chair**

Stephen Hicks
**Vice Chair**

Susan T. Richards
**Treasurer**

Nicolasa Sandoval, Ph.D.
**Secretary**

Diane Adam
Phil Alvarado
Randall Day
Donna France
Angel Iscovich, M.D.
Danna McGrew
Robert C. Nakasone
Ernesto Paredes
Cathy Pepe
James Rogers
Matt Rowe
Ginger Salazar
Tracy Stouffer
Michael D. Young, Ph.D.

**President & CEO**
Jacqueline M. Carrera

**South County Headquarters**
1111 Chapala Street, Suite 200
Santa Barbara, CA 93101-3100
Phone: (805) 963-1873
Fax: (805) 966-2345

**North County Headquarters**
2625 S. Miller Street, Suite 101
Santa Maria, CA 93455-1777
Phone: (805) 346-6123
Fax: (805) 346-6125

**SBFoundation.org**

 @sbfoundation
 @sbfoundation
 /santa-barbara-foundation
 @santabarbarafoundation

July 9, 2021

Honorable Stacy G. C. Jernigan
United States Bankruptcy Judge
Northern District of Texas

Re:     Highland Dallas Foundation, Inc.

Dear Judge Jernigan:

The Santa Barbara Foundation ("SBF") is a community foundation incorporated in 1928 under the laws of the state of California as a nonprofit corporation to enrich the lives of the people of Santa Barbara County through philanthropy. The mission of SBF is to mobilize collective wisdom and philanthropic capital to build empathetic, inclusive, and resilient communities. Working in partnership with individuals, families, community organizations, nonprofits, businesses, and government, SBF funds a wide range of initiatives, projects, and organizations. SBF has supported nearly every Santa Barbara County nonprofit organization and essential community project during its 93-year history and continues to serve as one of the largest private funding sources for area nonprofits, agencies, and college-bound students.

In 2020, SBF awarded $31 million in grants, received $36 million in contributions, and had $514 million in assets. Nonprofit support included annual grant programs (behavioral health, health care, food, shelter & safety, and child care), laying the groundwork for workforce development strategies, and creating the Collaboration for Social Impact to help nonprofits with capacity building and leadership development. Additionally, SBF co-organized and co-led the countywide COVID-19 Joint Response Effort, broadened its grantmaking to include small businesses through the Santa Barbara Better Together Fund, co-led the 2020 census efforts with the County of Santa Barbara, sponsored and produced educational events to promote diversity, equity, inclusion and access, and continued its annual funding of the Scholarship Foundation of Santa Barbara. Grants are made through SBF from various types of funds, including donor advised, donor designated, and field of interest. Discretionary grants, totaling over $7 million in 2020, are also supported by SBF's unrestricted contributions and investment income.

### Supporting Organizations

SBF works with entities organized under Section 509(a)(3) of the Internal Revenue Code as supporting organizations to SBF for the specific and primary purpose of benefiting, performing functions of, and engaging in activities consistent with SBF's charitable purposes. SBF appoints a majority of the members of the governing boards of the supporting organizations. Each governing board may create its own investment policy and grant guidelines. Each organization is a separate legal entity required to file

HCMLPHMIT00003722

Honorable Stacy G. C. Jernigan                    July 9, 2021                    Page 2

its own IRS Form 990, "Return of Organization Exempt from Income Tax". SBF and its supporting organizations are considered under SBF's control and thus consolidated in SBF's audited financial statements.

## Overview of Highland Santa Barbara Foundation, Inc.

Highland Santa Barbara Foundation, Inc. (HSBF) was formed in November 2011 as a Delaware nonprofit nonstock corporation to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of SBF. HSBF is a Type I supporting organization under Section 509(a)(3) of the Internal Revenue Code. SBF is a supported organization under Section 509(a)(1) of the Internal Revenue Code.

The Bylaws of HSBF describe the governance of HSBF by its members, directors, and officers. HSBF has two classes of members, institutional and individual, and one member in each class. SBF is the institutional member. James Dondero is the individual member. HSBF has three directors, two elected by SBF and one elected by James Dondero. The president, secretary, and any other officers of HSBF are elected by the three directors.

SBF and HSBF have an operating agreement whereby SBF provides grant administration and other services to HSBF and HSBF pays support fees to SBF. The fees are calculated using a tiered schedule based on the fair market value of 100 participation shares of Charitable DAF HoldCo, Ltd., which is the primary asset of HSBF. The fair market value is determined by an independent valuation firm at least annually.

## Relationship and Mission Advancement

SBF meets annually with HSBF to discuss SBF activities, alignment of SBF priorities and focus areas with HSBF philanthropic objectives, and proposed HSBF funding for the upcoming year. Since its inception, HSBF has funded over $5 million of the grants awarded by SBF, including nearly $3 million in Santa Barbara County. See HSBF, Inc. History, attached.

HSBF has augmented SBF's discretionary grants in the areas of: early childhood, youth, and workforce development and education; scholarships; veterans and military education and job training; Community Caregiving Initiative; and Food Action Plan. HSBF has also funded grants to specific organizations, including: $400,000 to Children's Museum of Santa Barbara d.b.a. MOXI - The Wolf Museum of Exploration and Innovation; $90,000 to Reasoning Mind, Inc. for identified local schools to participate in a math literacy program; and $30,000 to Boy Scouts of America - Los Padres Council for rebuilding of Camp Rancho Alegre following the Whittier Fire.

Thank you.

Sincerely,

*Jacqueline M Carrera*

Jacqueline M. Carrera
President & Chief Executive Officer

HCMLPHMIT00003723

# EXHIBIT 24

HCMLPHMIT00003724

# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND KANSAS

CITY FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-THIRD

DAY OF NOVEMBER, A.D. 2011, AT 4:23 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE

NEW CASTLE COUNTY RECORDER OF DEEDS.

Jeffrey W. Bullock, Secretary of State

5070449  8100

111227849

AUTHENTICATION: 9179752

DATE: 11-28-11

You may verify this certificate online
at corp.delaware.gov/authver.shtml

HCMLPHMIT00003725

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 05:03 PM 11/23/2011*
*FILED 04:23 PM 11/23/2011*
*SRV 111227849 - 5070449 FILE*

## CERTIFICATE OF INCORPORATION

## OF

## HIGHLAND KANSAS CITY FOUNDATION, INC.

FIRST:  The name of the corporation is Highland Kansas City Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND:  The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit the Greater Kansas City Community Foundation, a Missouri nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by the Greater Kansas City Community Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD:  The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH:  The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH:  No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation

HCMLPHMIT00003726

exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to the Greater Kansas City Community Foundation. If the Greater Kansas City Community Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 22_ day of November, 2011.

_____
James Dondero

- 2 -

78673.000002 EMF_US 37829386v4

HCMLPHMIT00003727

# EXHIBIT 25

HCMLPHMIT00003728



GREATER KANSAS CITY
COMMUNITY FOUNDATION℠

July 7, 2021

To Whom It May Concern:

Thank you for this opportunity to share our experience working with the Highland Kansas City Foundation, Inc.

I represent the Greater Kansas City Community Foundation, which exists to serve philanthropic donors by providing vehicles for their charitable giving. The Community Foundation was founded in 1978, and now has an asset base of more than $4 billion, housing thousands of donor-advised funds, scholarship funds, supporting organizations and other charitable funds and accounts established by individuals, families and businesses. In 2020, the Community Foundation's donors used their charitable dollars to grant over $550 million to their favorite causes across the country.

The Community Foundation currently works with 18 supporting organizations, one of which is the Highland Kansas City Foundation, established in 2011. Supporting organizations operate under their own legal entities but require the Community Foundation's active oversight and involvement. The Community Foundation's Board of Directors controls the Board of the Highland Kansas City Foundation. The Community Foundation oversees all of the Highland Kansas City Foundation's grants, ensuring every dollar is distributed for charitable purposes.

Since 2011, the Highland Kansas City Foundation has granted more than $9 million to support education and college preparation, historical preservation, medical research, veterans, the arts, the environment and more.

The Community Foundation's mission is to increase philanthropy and connect donors to the causes they care about, and we are honored to further the Highland Kansas City Foundation's generosity through significant annual distributions to important causes in our country.

Sincerely,

Deborah L. Wilkerson
President & CEO

HCMLPHMIT00003729

# EXHIBIT 26

HCMLPHMIT00003730

# BYLAWS

## OF

## HIGHLAND KANSAS CITY FOUNDATION, INC.

HCMLPHMIT00003731

# TABLE OF CONTENTS

**Page**

ARTICLE I     OFFICES ............................................................................... 1

     Section 1.1     Registered Office ...................................................... 1
     Section 1.2     Other Offices ............................................................ 1

ARTICLE II     MEMBERSHIP .................................................................. 1

     Section 2.1     Classes ....................................................................... 1
     Section 2.2     Voting ........................................................................ 1
     Section 2.3     Transfer of Membership ........................................ 1
     Section 2.4     Resignation of Member .......................................... 2
     Section 2.5     Place of Meetings .................................................... 2
     Section 2.6     Annual Meetings ..................................................... 2
     Section 2.7     Special Meetings ..................................................... 2
     Section 2.8     Members' List ........................................................... 2
     Section 2.9     Notice of Meetings of Members ............................ 2
     Section 2.10    Quorum ..................................................................... 3
     Section 2.11    Voting ........................................................................ 3
     Section 2.12    Proxies ...................................................................... 3
     Section 2.13    Action by Written Consent .................................... 3

ARTICLE III     DIRECTORS ..................................................................... 4

     Section 3.1     General Powers ....................................................... 4
     Section 3.2     Number of Directors ............................................... 4
     Section 3.3     Vacancies ................................................................. 4
     Section 3.4     Place of Meetings .................................................... 4
     Section 3.5     Committees of Directors ........................................ 4
     Section 3.6     Compensation of Directors .................................... 4
     Section 3.7     Annual Meeting ...................................................... 5
     Section 3.8     Additional Regular Meetings ............................... 5
     Section 3.9     Special Meetings ..................................................... 5
     Section 3.10    Method and Timing of Notice ............................... 5
     Section 3.11    Purpose not Required in Notice ............................ 6
     Section 3.12    Waiver of Notice ..................................................... 6
     Section 3.13    Action by Written Consent .................................... 6
     Section 3.14    Validation of Action by Consent .......................... 6
     Section 3.15    Quorum and Manner of Acting ............................ 6
     Section 3.16    Resignation and Removal of Directors ............... 7
     Section 3.17    Chairman Presiding ............................................... 7

ARTICLE IV     OFFICERS ........................................................................ 7

     Section 4.1     Officers ...................................................................... 7

-i-

HCMLPHMIT00003732

Section 4.2    Election, Term of Office and Eligibility.................................................7
Section 4.3    Subordinate Officers.............................................................................7
Section 4.4    Removal.................................................................................................7
Section 4.5    The President ........................................................................................8
Section 4.6    The Secretary .......................................................................................8
Section 4.7    The Assistant Secretaries .....................................................................8
Section 4.8    The Chief Financial Officer .................................................................8
Section 4.9    The Assistant Chief Financial Officers.................................................9
Section 4.10   Delegation of Duties ............................................................................9

ARTICLE V    BOOKS AND RECORDS........................................................................9

Section 5.1    Location ................................................................................................9
Section 5.2    Inspection .............................................................................................9

ARTICLE VI    MISCELLANEOUS PROVISIONS........................................................9

Section 6.1    Fiscal Year ...........................................................................................9
Section 6.2    Depositories .........................................................................................9
Section 6.3    Checks, Drafts and Notes.....................................................................9
Section 6.4    Contracts and Other Instruments .......................................................10
Section 6.5    Waivers of Notice ..............................................................................10
Section 6.6    Ownership Interests in Other Entities ................................................10
Section 6.7    Indemnification. .................................................................................10
Section 6.8    Amendment of Bylaws. ......................................................................12

HCMLPHMIT00003733

# BYLAWS

## OF

## HIGHLAND KANSAS CITY FOUNDATION, INC.

### ARTICLE I

### OFFICES

Section 1.1    Registered Office.  The registered office of Highland Kansas City Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2    Other Offices.  The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

### ARTICLE II

### MEMBERSHIP

Section 2.1    Classes.  The Corporation shall have two classes of members, the Institutional Member, which shall be the Greater Kansas City Community Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2    Voting.  Except as otherwise provided in these Bylaws, each member shall be entitled to one vote upon each matter submitted to a vote of the members.  In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3    Transfer of Membership.  Institutional Membership in the Corporation is not transferable or assignable.  Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document designate an individual, or series of individuals, to serve as a successor Individual Member, and such designation may be a current appointment or an appointment to take effect upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member.  Each successor Individual Member shall succeed to the rights of the initial Individual Member.  Each successor Individual Member may in the same manner designate an individual, or

-1-

HCMLPHMIT00003734

series of individuals, to serve as successor Individual Member, and such designation may be a current appointment or an appointment to take effect upon the occurrence of a future contingency such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such appointments, the one bearing the earliest date shall control. Each Individual Member may at any time revoke his or her appointment notice or other document in whole or in part by written notice delivered to the Institutional Member. If at any time there is no Individual Member and no individual has been designated in accordance with the foregoing provisions of this Section to act as such, then the Individual Member shall be the individual designated by a majority of the eldest generation of then living descendants of James Dondero that has at least one descendant then living.

Section 2.4  Resignation of Member.  A member may resign at any time upon written notice to the Secretary.

Section 2.5  Place of Meetings.  All meetings of the members shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6  Annual Meetings.  An annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting.  The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.9 below.

Section 2.7  Special Meetings.  Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting.  Such request shall state the purpose or purposes of the proposed meeting.   The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.9 below.

Section 2.8  Members' List.  At least ten days before every meeting of members, a complete list of the members entitled to vote at said meeting, arranged in alphabetical order, shall be prepared by the Secretary.  Such list shall be open to the examination of any member, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten days prior to the meeting at the place where the meeting is to be held.  The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any member who is present.

Section 2.9  Notice of Meetings of Members.  When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting.  Notice shall be given (a) by written notice delivered personally,

HCMLPHMIT00003735

(b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.10   Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business except as otherwise provided by Law, the Certificate of Incorporation or these Bylaws. If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall again be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.11   Voting. When a quorum is present at any meeting, the vote of a majority of the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.12   Proxies. At any meeting of the members, a member is entitled to be counted as present and to vote by written proxy executed by that member or his or her duly authorized attorney-in-fact. No proxy shall be valid after three (3) months from the date of its execution.

Section 2.13   Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by that number of members necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.13. Prompt notice of the taking of an action by the members without a

-3-

HCMLPHMIT00003736

meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

## ARTICLE III

## DIRECTORS

Section 3.1    General Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2    Number of Directors. The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3    Vacancies. If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4    Place of Meetings. The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5    Committees of Directors. The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6    Compensation of Directors. Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and

-4-

HCMLPHMIT00003737

expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7    Annual Meeting. The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8    Additional Regular Meetings. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9    Special Meetings. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10  Method and Timing of Notice. When notice is required to be given for a meeting of the Board of Directors, such notice shall specify the date, time, and location of the meeting and shall be given to each Director at least ten (10) days prior to the meeting. Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

HCMLPHMIT00003738

Section 3.11   Purpose not Required in Notice.  Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12   Waiver of Notice.  Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice.  A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13   Action by Written Consent.  Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by that number of Directors necessary to authorize or take such action at a meeting at which all Directors entitled to vote thereon were present and voted.  A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13.  Prompt notice of the taking of an action by the Board of Directors without a meeting by less than unanimous written consent shall be given to each Director who did not consent in writing to the action.  Each such consent must state the date of each Director's signature.  Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14   Validation of Action by Consent.  All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held.  At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice.  If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15   Quorum and Manner of Acting.  Except as otherwise provided in these Bylaws, a quorum for the transaction of business at any meeting of the Board of Directors shall consist of all three of the then serving Directors.  Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors.  A Director shall be considered present at any meeting of the Board of Directors if the Director participates in person or by proxy or if during the meeting he or she can communicate with all other persons

-6-

HCMLPHMIT00003739

participating in the meeting by using conference telephone or another suitable electronic communications system. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16   Resignation and Removal of Directors. Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

Section 3.17   Chairman Presiding. If a Chairman is appointed by the Board of Directors, the Chairman shall preside at all meetings of the Board of Directors and in general shall perform all duties incident to a nonexecutive chairman of a board of directors.

## ARTICLE IV

## OFFICERS

Section 4.1   Officers. The officers of the Corporation shall be a President, a Secretary and a Chief Financial Officer. One person may hold any number of said offices.

Section 4.2   Election, Term of Office and Eligibility. The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof. Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers need be members of the Board of Directors.

Section 4.3   Subordinate Officers. The Board of Directors may appoint such Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4   Removal. The President, the Secretary and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

-7-

HCMLPHMIT00003740

Section 4.5    The President. The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6    The Secretary. The Secretary shall:

(a)    Keep the minutes of the meetings of the members and of the Board of Directors;

(b)    See that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)    Be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized;

(d)    In general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7    The Assistant Secretaries. If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8    The Chief Financial Officer. The Chief Financial Officer shall:

(a)    Receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b)    Render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation;

-8-

HCMLPHMIT00003741

(c)    In general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.9    The Assistant Chief Financial Officers. If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.10    Delegation of Duties. In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V

## BOOKS AND RECORDS

Section 5.1    Location. The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2    Inspection. The books, accounts, and records of the Corporation shall be open to inspection by any member of the Board of Directors at all times; and open to inspection by the members at such times, and subject to such regulations as the Board of Directors may prescribe, except as otherwise provided by statute.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1    Fiscal Year. The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2    Depositories. The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3    Checks, Drafts and Notes. All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or

HCMLPHMIT00003742

agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4    Contracts and Other Instruments.  The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances.

Section 6.5    Waivers of Notice.  Whenever any notice is required to be given under the provisions of the statutes or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members, Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.6    Ownership Interests in Other Entities.  Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.7    Indemnification.

(a)    Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any

-10-

HCMLPHMIT00003743

such proceeding in advance of its final disposition upon receipt by the corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)     If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c)     The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d)     The Corporation may maintain insurance, at its expense, to protect itself and any Director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e)     To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

HCMLPHMIT00003744

(f)     Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g)     The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.8     Amendment of Bylaws.

(a)     The members, by the affirmative unanimous vote of the members entitled to vote, may, at any annual or special meeting if notice of such alteration or amendment of the Bylaws is contained in the notice of such meeting, adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors.

(b)     The Board of Directors, by unanimous vote, may adopt, amend, or repeal these Bylaws at any meeting, except as provided in Section 6.8(a), above.  Any alterations or amendments to these Bylaws made by the Board of Directors may be altered or repealed by the members.

-12-

HCMLPHMIT00003745


**HUNTON&**
**WILLIAMS**

HUNTON & WILLIAMS LLP
FOUNTAIN PLACE
1445 ROSS AVENUE
SUITE 3700
DALLAS, TEXAS  75202-2799

TEL.  214 • 979 • 3000
FAX  214 • 880 • 0011

ANDREW W. LAWRENCE
DIRECT DIAL: 214 • 979 • 3052
EMAIL: alawrence@hunton.com

FILE NO: 78673.000002

November 9, 2011

Deborah L. Wilkerson                                                      *Via E-Mail*
General Counsel
Greater Kansas City Community Foundation
9001 W. 110th Street, Suite 220
Overland Park, KS  66210

     Re:    Highland Capital Management Partners Charitable Trust #2

Dear Debbie:

    In accordance with your request during our telephone conversation last week, the paragraphs below describe briefly the proposed distribution of assets from Highland Capital Management Partners Charitable Trust #2 (the "Trust") to a to-be-formed supporting organization (i.e., Highland Kansas City Foundation, Inc.) with respect to which the Greater Kansas City Community Foundation ("GKCCF") is the supported organization.

    1.    The Trust. As you know, James Dondero, as the Settlor, and Grant Scott, as the Trustee, established the Trust by a trust agreement dated December 1, 2006 (the "Trust Agreement"). Under the terms of the Trust Agreement, Mr. Dondero, as Settlor, is entitled to name remainder beneficiaries and substitute new remainder beneficiaries from time to time until the remainder interest is ultimately distributed.

    2.    Assets of the Trust/Cayman Islands Company. The remainder interest will be comprised solely of one hundred percent (100%) of the non-voting shares (the "Shares") of Charitable DAF HoldCo, Ltd., a Cayman Islands corporation ("HoldCo"). Highland Kansas City Foundation, Inc. will receive one-third (1/3) of the Shares. HoldCo will own one hundred percent (100%) of the limited partner interests in Charitable DAF Fund, LP, a Cayman Island limited partnership, which, in turn, will own one hundred percent (100%) of the shares of CLO Holdco, Ltd., a Cayman Islands exempted company, which, in turn, owns minority equity interests in Cayman Islands investment companies that own portfolios of debt instruments issued by various public companies.

ATLANTA  AUSTIN  BANGKOK  BEIJING  BRUSSELS  CHARLOTTE  DALLAS  HOUSTON  LONDON  LOS ANGELES
McLEAN  MIAMI  NEW YORK  NORFOLK  RALEIGH  RICHMOND  SAN FRANCISCO  TOKYO  WASHINGTON
www.hunton.com

HCMLPHMIT00003746



**HUNTON&**
**WILLIAMS**

November 9, 2011
Page 2

3.    The Supporting Organizations. Mr. Dondero intends to name as the remainder beneficiaries of the Trust three supporting organizations (each an "SO", collectively, the "SOs"), each of which will support one of three separate community foundations. Each SO will receive an equal number of HoldCo Shares. Highland Capital Management, L.P. currently receives management fees from the companies that own the corporate debt portfolios and will continue to receive those fees under existing agreements with those companies after the Holdco Shares are transferred to the SOs.

4.    Use of Multiple Supporting Organizations. Rather than the remainder interest being distributed in its entirety to just one or two SOs, the remainder interest is being distributed in equal shares to the three SOs out of an abundance of caution in light of the excess benefit transaction rules under Section 4958(c)(3) of the Code, such that no SO will own more than fifty percent (50%) of the stock of HoldCo.

Please let me know if you have additional questions regarding this matter.

Very truly yours,

Andrew W. Lawrence

AWL/bt

cc:    Alexander G. McGeoch, Esq.
       Douglas M. Mancino, Esq.

HCMLPHMIT00003747

# EXHIBIT 27

HCMLPHMIT00003748

CHARITABLE DAF HOLDCO, LTD

(the "Company")

SHARE TRANSFER FORM

Dated 24 March 2021

I, **Grant James Scott** (the "Transferor"), for good and valuable consideration received by me from **Mark E. Patrick** (the "Transferee"), do hereby:

1.  transfer to the Transferee 100 Management Shares (the "**Shares**") for the par value of $0.01 each standing in my name in the register of members of the Company to hold unto the Transferee, his executors, administrators and assigns, subject to the several conditions on which I held the same at the time of execution of this Share Transfer Form; and

2.  consent that my name remains on the register of the Company until such time as the Company enters the Transferee's name in the register of the Company.

SIGNED by TRANSFEROR:                             )
                                                 )  _____
                                                    Name:  Grant J. Scott

And the Transferee does hereby agree to take the Shares subject to the same conditions.

SIGNED by TRANSFEREE:                             )
                                                 )  _____
                                                    Name:  Mark E. Patrick

1

078673.0000002 EMF_US 84436263v1

PATRICK_000005

HCMLPHMIT00003749

# EXHIBIT 28

HCMLPHMIT00003750

**CHARITABLE DAF HOLDCO, LTD**
**(THE "COMPANY")**

---

**WRITTEN RESOLUTIONS OF THE SOLE DIRECTOR**
**OF THE COMPANY DATED** *March* 25 **2021**

---

**1.    SHARE TRANSFER**

1.1    **IT IS NOTED** that the Director has received a duly executed share transfer form relating to the transfer by Grant James Scott of 100 Management Shares to Mark E. Patrick.

1.2    **IT IS RESOLVED** that:

(a)    the following share transfer (the "**Transfer**") be and is hereby ratified, confirmed and approved:

| TRANSFEROR | TRANSFEREE | NO OF SHARES | DATE OF TRANSFER |
|---|---|---|---|
| Grant James Scott | Mark E. Patrick | 100 Management Shares | 24 March 2021 |

(b)    the Company's registered office provider be instructed to update the Register of Members of the Company to reflect the Transfer.

**2.    GENERAL AUTHORISATION**

2.1    **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, the Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as the Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

**3.    RATIFICATION OF PRIOR ACTIONS**

3.1    **IT IS RESOLVED** that any and all actions of the Company, or of the Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, the Director prior to such action being taken.

1

PATRICK_000003

HCMLPHMIT00003751

These written resolutions are signed by the sole Director of the Company.


Mark E. Patrick

PATRICK_000004

HCMLPHMIT00003752

# EXHIBIT 29

HCMLPHMIT00003753

CLO HOLDCO, LTD.
(THE "COMPANY")

---

WRITTEN SHAREHOLDER RESOLUTIONS OF THE SOLE
SHAREHOLDER OF THE COMPANY
MADE ON _April  2_ 2021

---

The undersigned, being the sole holder of Shares of the Company having the right to receive notice of, attend and vote at general meetings hereby resolves the following shareholder resolutions.

1. **REMOVAL OF DIRECTOR AND APPOINTMENT OF NEW DIRECTOR**

1.1   **IT IS RESOLVED** by ordinary resolutions that:

(a)   Grant James Scott be and is hereby removed as a Director of the Company with effect from the date of these resolutions;

(b)   Mark E. Patrick be and is hereby appointed as a Director of the Company with effect from the date of these resolutions until such time as such Director resigns or is removed or otherwise disqualified in accordance with the Articles of Association of the Company;

(c)   the Register of Directors of the Company be amended to note the removal of the Director and the appointment of the new Director, all as set out in these resolutions; and

(d)   the Company's registered office be and is hereby instructed to notify the Registrar of Companies in the Cayman Islands of the removal of Mark E. Patrick as a Director of the Company and the appointment of Grant James Scott as a Director of the Company.

BY _____
Mark E. Patrick for and on behalf of

Charitable DAF GP, LLC, the general partner of Charitable DAF Fund, L.P.

1

PATRICK_000002

HCMLPHMIT00003754

# EXHIBIT 30

HCMLPHMIT00003755

**THE COMPANIES LISTED IN THE ATTACHED SCHEDULE
(EACH A "COMPANY" AND TOGETHER THE "COMPANIES")**

---

**WRITTEN RESOLUTIONS OF THE SOLE DIRECTOR
OF EACH COMPANY DATED** April 22, 2021

---

## 1. APPOINTMENT OF DIRECTOR

1.1 **IT IS NOTED** that the Directors wish to appoint Paul Murphy as a Director of each Company with effect from the date of these resolutions and that such proposed Director has indicated a willingness to hold such office and has executed a letter of consent and/or a services agreement in relation thereto (such appointment, the "**Director's Appointment**").

1.2 **IT IS RESOLVED** that:

(a) the Director's Appointment be and is hereby approved with effect from the date of these resolutions until such time as the Director resigns or is removed from office in accordance with the Articles of Association of each Company; and

(b) the registered office service provider be and is hereby instructed to update the Register of Directors of each Company and to make the necessary filings with the Registrar of Companies to reflect the Director's Appointment.

## 2. GENERAL AUTHORISATION

2.1 **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, the Director or any officer or (if applicable) any attorney or duly authorised signatory of each Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of each Company, to do such further acts and things as the Director or any officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of each Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

## 3. RATIFICATION OF PRIOR ACTIONS

3.1 **IT IS RESOLVED** that any and all actions of each Company, or of the Director or any officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, the Director prior to such action being taken.

*[Remainder of page left blank intentionally]*

1

21250473.2 G0639.159068

HCMLPHMIT00003756

These written resolutions are signed by the sole Director of the Company.

**Mark E. Patrick**

3

Error! Unknown document property name.

HCMLPHMIT00003757

## Schedule
### (List of Companies)

Charitable DAF HoldCo, Ltd.

CLO HoldCo, Ltd.

Liberty CLO Holdco, Ltd.

Liberty Sub, Ltd.

HCT Holdco 2, Ltd.

MGM Studios Holdco, Ltd.

3

21250473.2 G0639.159068

HCMLPHMIT00003758

# EXHIBIT 31

HCMLPHMIT00003759

Case 19-34054-sgj11 Doc 2547-31 Filed 07/09/21    Entered 07/09/21 17:06:29    Page 2 of 18

# Charitable Giving Overview

## GRANT SUMMARY : 2012-2020

HCMLPHMIT00003760

# Highlights

The following provides an overview of philanthropic activities across the group of charitable entities that operate as supporting organizations to community foundation: the Highland Dallas Foundation, Inc., the Highland Santa Barbara Foundation, Inc., and the Highland Kansas City Foundation, Inc. (together the "Supporting Organizations" or "we").

Each of the entities within the Supporting Organizations has its own independent board, which provides oversight for the organization's grantmaking activity.

Data represents activity between January 1, 2012, and December 31, 2020 unless otherwise noted.

**$42M+**   Since 2012, the Supporting Organizations have committed over $42 million to nonprofit organizations operating across a range of issue areas.

**$32M+**   We have funded over $32 million of our total commitments; remaining commitments are comprised of future scheduled installments of multiyear grants.

**$3.7M**   Average annual grant payments total $3.7 million.

**275+**   The Supporting Organizations have made donations to more than 275 individual organizations.

**2029**   Through our multiyear grants we have over $10 million in funds committed through 2029.

HCMLPHMIT00003761

GRANTS OVERVIEW

# Total committed: $42.7 million[1]



The Supporting Organizations have committed **$42,688,403** in grants to nonprofits across a range of issue areas, with a focus on:

- civic and cultural institutions in the Dallas-Ft. Worth area;
- education;
- support for military, veterans, and first responders;
- health and medical research;
- economic and community development initiatives; and
- youth and family.

GRANT COMMITMENTS BY ISSUE AREA[2]

- Civic & Cultural Institutions
- Education & Research
- Military, Veterans & First Responders
- Health
- Economic & Community Development
- Youth & Family
- Other

48% / 24% / 9% / 6% / 5% / 4% / 4%

1. As of 12/31/2020. Figures rounded to the nearest hundred thousand. 2. Represents amount committed in grants since 2012 (inclusive of funded and unfunded commitments). Unfunded commitments represent installment payments for multiyear grants to be paid at future dates following a schedule included in the grant agreement. Issue areas defined by HCP. Grants categorized by purpose and/or use of funds. "Other" category inclusive of grants related to the following issue areas: Animals & Environments; Arts, Culture & Humanities; Faith-Based Causes; and Global Affairs.

HCMLPHMIT00003762

GRANTS OVERVIEW

# Total funded: $32.5 million[1]



The Supporting Organizations have funded **$32,548,403** in grants, representing payments made directly to nonprofit organizations that are improving lives and addressing pressing issues in our local community—and beyond.



GRANTS FUNDED BY ISSUE AREA[2]

- Civic & Cultural Institutions
- Education & Research
- Military, Veterans & First Responders
- Health
- Economic & Community Development
- Youth & Family
- Other

1. As of 12/31/2020.  Figures rounded to the nearest hundred thousand.  2. Represents amount committed in grants since 2012 (inclusive of funded and unfunded commitments). Unfunded commitments represent installment payments for multiyear grants to be paid at future dates following a schedule included in the grant agreement. Issue areas defined by HCP. Grants categorized by purpose and/or use of funds. "Other" category inclusive of grants related to the following issue areas: Animals & Environments; Arts, Culture & Humanities; Faith-Based Causes; and Global Affairs.

HCMLPHMIT00003763

GRANTS OVERVIEW

# Average annual funding: $3.7 million[1]

TOTAL GRANT PAYMENTS ($M)[2]



1. As of 12/31/2020.  Figures rounded to the nearest hundred thousand.  2. Represents amount paid in grants and/or grant installments during each calendar year. Not inclusive of grants committed but not funded.

HCMLPHMIT00003764

GRANTS OVERVIEW

# Highlights of grants' impact

## Supporting 4,000 military and law enforcement members

Grants to the Center for BrainHealth helped provide training and other programming to members of the military, veterans, and local law enforcement that aims to improve the cognitive health—all at no cost.

## Enabling 1.2M visitors to make memorable experiences with wildlife

Grants funding the construction of the new hippo exhibit and providing support for the organization's membership program helped the Dallas Zoo draw a record-breaking 1.2 million visitors in 2017.

## Providing a path to safety for 11,000 victims of family violence

Grants to The Family Place helped the organization serve more than 11,000 clients in 2019, including providing more than 62,000 days of Emergency Shelter.

## Supporting and defending 8,000 abused children

Grants to the Dallas Children's Advocacy Center helped the organization serve over 8,000 children who have been abused each year,

## Providing educational opportunities for 600 low-income students in southeast Dallas

Grants to expand the Cristo Rey Dallas campus in Pleasant Grove enable the school to accommodate up to 600 students. 95% of CRD students are the first in their families to attend college, and with a 100% college acceptance rate, the expansion will help create an estimated 570 first-generation college students every four years.

HCMLPHMIT00003765

GRANT HIGHLIGHT

# Dallas Zoo

## About the Dallas Zoo

The Dallas Zoological Society (the "Zoo"), the largest zoological park in Texas, has become a staple in the Dallas community over its 130-year history. Home to over 430 different species, the Dallas Zoo engages and educates visitors, while seeking to create a better world for animals.

### Promoting Visitor Engagement: Grant to Support Zoo Membership

The Supporting Organizations have supported the Zoo's membership program since 2014 through a series of multiyear grants that help the Dallas Zoo continue to reach new audiences. In the first full year of the grant, the Zoo welcomed a record 600,000 guests, and that number has steadily increased since. With our support, the Zoo continues to find new ways to deliver unforgettable experiences. As a result, it regularly ranks in the top-10 zoos in the U.S. by USA Today.

### Increasing Community Access: Grant to Support Discounted Admission

The Supporting Organizations pursue grant opportunities that increase community access to local civic and cultural institutions. With this goal, we expanded our support of the Zoo in 2017 to include the annual sponsorship of the "Penguin Days" program. The grant enables the Zoo to reduce the price of general admission to $7 on select days from December-February, making the Zoo more accessible to the North Texas Community and allowing families who might not otherwise visit the Zoo to do so in an affordable way.

### Opening a New Exhibit: Grant to Support Construction of an Educational/Event Space at the Hippo Exhibit

The Zoo announced in early 2016 that it was planning to break ground on a new exhibit that would bring hippos to the Zoo for the first time in 16 years. The project also marked the first major exhibit opening at the Zoo since 2010. The Supporting Organizations contributed to this project through a grant that helped establish a 4,485-square-foot indoor/outdoor multipurpose event space, which engages visitors in interactive activities that further the Zoo's animal education mission. Currently, the space is a walkthrough exhibit highlighting conservation efforts of hippo habitats around the world. This exhibit helped increase attendance to a record-breaking 1.2 million visitors in 2017.

Issue Area: **Civic & Cultural Institutions**



HCMLPHMIT00003766

GRANT HIGHLIGHT

# George W. Bush Presidential Center

## About the George W. Bush Presidential Center

The George W. Bush Presidential Center (the "Bush Center") is comprised of the George W. Bush Presidential Library and Museum, which houses the official records of the presidency of George W. Bush, and the George W. Bush Institute, an action-oriented, nonpartisan policy organization. Through these dual operations, the Bush Center works to both preserve history and shape the future. The Bush Center is uniquely equipped to promote leadership development, advance policy initiatives, and inspire action on a local, national, and global scale. Its work covers three major Impact Centers: Domestic Excellence; Global Leadership; and Engagement. Through these Impact Centers, the Bush Center is dedicated to solving some of today's most pressing challenges.

## Driving a Local Institution's Ambitious Global Agenda: Grant Supporting the Construction of the Bush Center in Dallas

In 2008, the Bush Center officially selected Dallas as its permanent home, announcing plans to construct its building on the campus of SMU. The Supporting Organizations helped make the vision of the Bush Center's Dallas home a reality, making a grant to help complete construction and design for the building. On May 1, 2013, the Bush Center opened its doors to the public. In its first five years after opening, the Bush Center welcomed over $1.6 million visitors.

## Securing a Legacy and Driving Engagement: Grant Supporting the Center's Long-term Operations and Engagement Agenda

In 2018, the Bush Center launched an important fundraising initiative to ensure its mission endures for generations to come. With its "A Charge to Keep" capital campaign, the Bush Center aimed to raise funds that would sustain its operations beyond the lifetimes of President and Mrs. Bush.

The Supporting Organizations made a grant to help ensure the Bush Center can continue its important work well into the future. The grant specifically focused on the public speaker series, Engage at the Bush Center. The series brings newsmakers, thought leaders, and authors to the Bush Center for thought-provoking panel discussions and keynote conversations that allow guests to connect with the Bush Center in a meaningful way and dive deeper into many of today's most pressing policy areas and issues.

Issue Area: **Civic & Cultural Institutions**

HCMLPHMIT00003767

GRANT HIGHLIGHT

# Perot Museum

### About the Perot Museum

The Perot Museum of Nature and Science (the "Perot") promotes science and education in the North Texas community through hands-on exhibits, educator resources, unique films, and other special programming that engages audiences of all ages.

### Helping Establish a World Class Museum in Downtown Dallas: Grant to Support Construction of the New Perot Museum:

With support from Dallas' philanthropic community, the Perot Museum opened a new building in December 2012. With its bold architectural design, it quickly became a fixture in its new location in Dallas' Victory Park. The project also sparked a renewed commitment to inspire minds and improve community achievement, giving rise to new initiatives that promote science learning.

The Supporting Organizations contributed to the project by issuing a challenge grant, which matched donations, inciting additional giving and helping complete the project's capital campaign. Since then, we have contributed additional funding to support ongoing educational programming, special exhibitions, and community engagement initiatives.

### Increasing Community Access: Grant to Support the Perot's Traveling Exhibition Programs

In 2014, the Supporting Organizations began issuing a series of grants to support the traveling exhibitions program. The initial exhibition, the "The World's Largest Dinosaurs" exhibition, educated audiences on the gigantic sauropods that once roamed the earth, drawing nearly 200,000 visitors to the museum. Since then, our grants have made possible the many captivating exhibitions that have been hosted by the Perot, covering a range of subject areas. With two special exhibitions held each year, the grants enable the museum to deliver new experiences that give visitors a reason to keep coming back and serve as a complement to the museum's 11 permanent exhibit halls. The program draws exhibitions from around the globe to the Perot, providing the North Texas community with access to world-class educational experiences. All the special exhibition grants include funding that allows the Perot to make all traveling exhibitions bilingual (with programming in both English and Spanish). These exhibits have helped increase community access to the North Texas Hispanic population.

Issue Area: **Civic & Cultural Institutions**



HCMLPHMIT00003768

GRANT HIGHLIGHT

# Cristo Rey Dallas

## About Cristo Rey Dallas

Cristo Rey Dallas College Prep ("CRD") is a private, independent Catholic high school located in the Pleasant Grove area of Southeast Dallas. The Cristo Rey Network's formula for success is a proven, revolutionary model of college preparatory high school curriculum accessible to those of limited financial resources. It integrates rigorous college preparatory academics with professional work experience through the Corporate Work Study Program—a key component of the fiscal sustainability of the Cristo Rey model. Through the Work Study Program, students work in a professional setting five days per month to earn the majority of their tuition. The 144 job partners include some of Dallas's most prominent companies.



*The Cristo Rey model is proven, with 100% of graduates gaining acceptance to a two- or four-year college and 90% matriculating. For students in Pleasant Grove—where only 4% of the population graduated from college—CRD offers access and opportunity that can change their trajectory.*

## Building Space for Innovation: Grant to Support CRD Campus Expansion and Renovations

The 30th school in the nationwide Cristo Rey network, CRD opened in August 2015, operating out of an old elementary school and aging gymnasium. They quickly outgrew the space and had to begin turning away prospective students. In 2019, CRD launched a $15 million capital campaign to expand the campus, adding new academic and athletic buildings and conducting much needed renovations on the existing buildings.

The Supporting Organizations issued the campaign's lead grant, helping build a new 37,000 sq. ft. Innovation Center, which boasts spaces for fine arts and counseling. The campaign also created a new cafeteria and gymnasium, as well as a new soccer field – something the school never had before. The new buildings opened in time for the 2020 school year.

The Supporting Organizations also helped provide space for CRD students off campus in a centrally located office building near Downtown Dallas. The space gave students a place to study and complete work study programs that were moved to Work From Home due to the pandemic.

Issue Area: **Education & Research**



HCMLPHMIT00003769

GRANT HIGHLIGHT

# Education Is Freedom

## About Education Is Freedom

Education Is Freedom ("EIF") is committed to transforming students' lives through education. With a focus on college planning, the organization provides underserved students in the North Texas community with a range of resources to ensure every student has the opportunity to pursue a college education.

EIF's higher education advisors work onsite at public high schools across the region, helping students and their families navigate the college process. In 20XX, EIF helped high school seniors complete 21,000 college applications and receive over $132 million in scholarships.

In addition to their college planning initiatives, EIF operates a number of supplementary programs to enhance access to postsecondary education and promote workforce readiness.

### Developing a Skilled and Educated Workforce: Grant Supporting the Mayor's Intern Fellows Program

In 2008, EIF worked with the Mayor's Office to create the Mayor's Intern Fellows Program ("MIFP"), an initiative to provide workforce readiness. The program provides Dallas high school students with internship opportunities at local companies, nonprofits, and government entities. Through the eight-week, paid internship, students gain real-world experience and insight into the professional opportunities available to them. Not only does the program prepare students for future careers, but it also connects local businesses with the future workforce, promoting collaboration to strengthen the pipeline of talent.

The Supporting Organizations have issued grants to EIF to support the MIFP. The grants have helped EIF put on the program's annual Job Fair. Held in the spring, the Job Fair provides an opportunity for students to interview with prospective employers in the hopes of securing an internship for the summer. Education Is Freedom conducts extensive training with the students throughout the program, offering workshops and coaching on everything from interview preparation to professional etiquette.

In 2018, over 2,400 students from 52 high schools applied for the program. Of those applicants, 1,050 were selected to attend the Job Fair. At the 2018 Job Fair, over 200 employers from across the Dallas-Fort Worth region interviewed internship candidates, ultimately offering positions to 395 students for the summer. In addition to the Job Fair, our grants have funded internships at various nonprofit partners, covering the cost for organizations that might not otherwise be able to hire paid interns.

Issue Area: **Education & Research**

HCMLPHMIT00003770

GRANT HIGHLIGHT

# SMU Tower Center

## About the SMU Tower Scholars Program

The Southern Methodist University ("SMU") Tower Scholars Program provides top undergraduate students with an opportunity to integrate public policy and international affairs into their studies through a dedicated curriculum of academic coursework and real-world experiences. Students in the program receive a minor in public policy and international affairs, offered through SMU's John Goodwin Tower Center for Political Studies (the "Tower Center").

" *The Tower Scholar Program's resources and curriculum allow me to not only learn public policy principles through lectures, but also gain tactile experience with practicums and classes taught by policy practitioners. Without this program, I would have been unable to experience and explore my interest in public policy."*

*– Tower Scholar, Class of 2020*

### Investing in the Next Generation of Policymakers: Grant to Endow the Tower Scholars Undergraduate Program at SMU

In 2014, the Supporting Organizations worked with the Tower Center to create a dedicated undergraduate program that carries out the center's mission of bridging the gap between the scholarship and practice of politics and striving to inspire ethical public service. The grant established an endowment that provides long-term funding for the Tower Scholars Program.

A hallmark of the program is its interdisciplinary focus. Over 75% of the Tower Scholars either earned or are pursuing more than one major—and that is in addition to the minor they earn in the program. Outside the classroom, each student is involved in multiple on-campus organizations, many in leadership positions.

The Supporting Organizations' grant makes possible the unique academic experiences—from meeting with global leaders, to working on real policy issues for major corporations—offered to the Tower Scholars. The program accepts 10 students each year, and recently welcomed its eighth cohort.

Issue Area: **Education & Research**



HCMLPHMIT00003771

GRANT HIGHLIGHT

# Center for BrainHealth

### About the Center for BrainHealth

The Center for BrainHealth ("CBH"), part of The University of Texas at Dallas, is a research institute committed to enhancing, protecting and restoring brain health across the lifespan. CBH is composed of independent labs that are responsible for more than 60 fully funded research projects that investigate brain health, injury, and disease. Many of the center's programs use functional and structural neuroimaging techniques to better understand the neurobiology supporting cognition and emotion in health and disease. Areas of research include addiction, aging, Alzheimer's disease, autism, multiple sclerosis, social cognition, and traumatic brain injuries.

### Applying Innovative Research to Improve the Lives of Post-9/11 Veterans and First Responders: Grant Supporting the Warriors Program Through the Brain Performance Institute

In 2015, CBH broke ground on new building dedicated to translating leading-edge science to scalable solutions for the public at large. Through construction of the Brain Performance Institute, CBH sought to extend the reach and applications of its research, providing solutions to the public to maximize brain performance in health, injury, and disease.

The Supporting Organizations made a grant to help fund the construction of the Brain Performance Institute and expand CBH's Warrior Initiative, which that focused on translating research into cognitive therapies for former military personnel. The Warrior Initiative was established to provide high performance brain training to current and former military service men and women and their families.

The goal of the Warrior Initiative program is to arm veteran and active-duty service members with the necessary tools to achieve successful, enriching, and fulfilling lives by proactively optimizing brain performance, building resilience in cognitive brain function, and reversing losses in cognitive capacity. The program was expanded in 2016 to support first responders, specifically focusing on local law enforcement.

The grant help create a space in the Brain Performance Institute building specifically for veterans, first responders, and their families, where these groups are able to come together in a safe, relaxing environment and get to know other members of service before and after training sessions.

Issue Area: **Military, Veterans & First Responders**



HCMLPHMIT00003772

GRANT HIGHLIGHT

# Friends of the Dallas Police

## About Friends of the Dallas Police

The Friends of Dallas Police was founded in 1982 to recognize the commitment that the employees of the Dallas Police Department make to better the city and its residents' quality of life. The organization's mission is to raise and provide funds to be used to host a major awards banquet each year honoring Dallas Police Department personnel for outstanding performance in the line of duty. Over the years, approximately 4,400 awards have been presented to officers and civilian staff, and more than $43,000 in educational scholarships have been awarded to their children.

### Helping Show Appreciation and Recognition to Local Law Enforcement: Grant Supporting the Annual Awards Program

The Supporting Organizations have provided grants to help the Friends of the Dallas Police show appreciation to the men and women of the Dallas Police Department who risk their lives every day to make Dallas a safer city. Our grants have helped fund the annual awards event hosted by the Friends of the Dallas Police, which honors and recognizes outstanding employees throughout the Dallas Police Department.

Through our grants, the Supporting Organizations have facilitated the production of the annual awards program, enabled sworn and non-sworn employees and their spouses to attend the event, and provided educational sponsorships for children of police officers.

The Supporting Organizations have also drawn on its philanthropic network to provide gifts to award recipients and their families, including tickets to visit organizations like the Dallas Zoo, George W. Bush Presidential Center, and Perot Museum.

Issue Area: **Military, Veterans & First Responders**



HCMLPHMIT00003773

GRANT HIGHLIGHT

# Snowball Express

### About Snowball Express

Snowball Express (now part of the Gary Sinise Foundation) serves the children of fallen military heroes. By providing events and other experiences in a stress-free environment, the organization is creating a community to learn, grow, and make lasting memories with new friends.

The organization hosts an annual five-day experience for 1,750+ children of the fallen and their surviving parent or guardian. As a therapeutic retreat with a blend of fun and inspiring programs, these families can lean on their peers for support. The organization also hosts community-driven events for these families all year long. From baseball games, to arts and educational opportunities, to camping trips, the events strengthen the local networks of Gold Star families, helping children and surviving spouses to build bonds with the only people who can truly understand their loss: each other.

### Supporting Families of Fallen Service Members: Grant to Support Programming for Gold Star Children

In 2014, Myles Eckert, the nine-year-old son of U.S. Army Sergeant was killed in Iraq on active duty, gave a $20 bill that he found to a veteran in a pay-it-forward act of kindness towards our military. Myles's story was shared widely online, and the gift quickly received national attention.

In honor of Myles Eckert's gift, the Supporting Organizations issued a challenge grant to Snowball Express to support the organization's programming for children that have lost one or both parents during active service.

The grant inspired significant giving from individuals and organizations around the world, enabling Snowball Express to expand its services for Gold Star children and their families.

Snowball Express used the proceeds from the challenge grant to provide services to over 8,000 Gold Star children in 2014—almost 6,000 more than the year before and a new record for the organization.

Issue Area: **Military, Veterans & First Responders**



HCMLPHMIT00003774

GRANT HIGHLIGHT

# Dallas Children's Advocacy Center

## About Dallas Children's Advocacy Center

Dallas Children's Advocacy Center ("DCAC") is the only agency of its kind in Dallas County, working in agreement with public and private agencies to investigate, prosecute, and provide healing services for child abuse cases in Dallas County. DCAC reduces the re-victimization of the child, removes barriers to investigation and treatment, and enhances criminal prosecution with its distinctive multidisciplinary approach to these complex and severe cases.

### Fostering Crucial Collaboration: Grant to Support DCAC's Operations and Strengthen Collaboration Among Agencies Involved in Child Abuse Cases

The Supporting Organizations have been a longtime partner of the Dallas Children's Advocacy Center ("DCAC"), issuing annual grants that provide funding for a range of operating costs. The grants help DCAC serve over 8,000 children (and their non-offending family members) each year who were sexually abused, severely physically abused, or who had witnessed a violent crime. DCAC's average client is a 9-year-old girl, sexually abused by someone she knows and trusts.

The grants also support DCAC in its efforts to foster crucial collaboration across government agencies and other organizations involved in child abuse cases. The DCAC building houses the Child Abuse Unit of the Dallas Police Department, six units of CPS, and a Dallas County Assistant District Attorney. Having all of these professionals under one roof drives collaboration and communication in the very sensitive cases that DCAC coordinates.

Not only have the Supporting Organizations been a long-time financial supporter of DCAC, we have also provided support in other ways, leveraging connections with our network of nonprofit partners. Most recently, we worked with the Dallas Zoo to provide animal encounter demonstrations during DCAC's summer camps, which serve as a way to deliver ongoing support to—and help build a community for—children who have experienced trauma.

Issue Area: **Youth & Family**



HCMLPHMIT00003775

GRANT HIGHLIGHT

# The Family Place

## About The Family Place

The Family Place was founded in 1978 and has grown to become the largest family violence prevention agency in North Texas, providing shelter and assistance to victims across the region along with counseling and education. Since its founding, the organization has served over 839,000 clients through counseling, shelter, and hotline responses.

In 2019, The Family Place served nearly 12,000 clients, providing over 62,000 days of emergency shelter, over 36,000 days of transitional housing, and over 18,000 hours of counseling to nonresidential clients, and over 8,000 hours of counseling to batterers. All services are in Spanish and in English.

## Providing Support for Victims of Family Violence Across North Texas

The Family Place empowers victims of family violence by providing safe housing, counseling, and skills that create independence while building community engagement and advocating for social change to stop family violence.

While The Family Place supports clients in several different ways, its Residential Services, which provide safe shelter for families affected by violence, are one of crucial components of its work. These services include the Emergency Shelter Services, which provide immediate shelter for families escaping abuse, and the Supportive Living Program, which provides long-term housing for families as they rebuild their lives. Not only does the organization provide necessities like food, clothing, and transportation, but it also offers childcare, legal services, counseling, and case management.

As The Family Place expanded, its Residential Services were constrained by the capacity of its emergency shelters, and at many times the organization had to house clients in hotels and other temporary housing in order to meet demand.

In 2016, the Supporting Organizations issued a challenge grant to help The Family Place build a new shelter facility to expand its Residential Services. The new facility provides space and support services for over 2,000 victims per year. It also includes onsite Medical and Dental Clinics and even an Animal Kennel so families can bring their beloved pets with them to safety. The shelter has been operating at full capacity since October 2017. With the new facility, The Family Place now has three emergency shelters, providing 177 shelter beds each night, and three counseling centers.

Issue Area: **Youth & Family**

HCMLPHMIT00003776

# EXHIBIT 32

HCMLPHMIT00003777



**the family place**
*Where family violence stops*

July 7, 2021

To Whom It May Concern:

I am pleased to write this letter outlining the relationship between The Family Place and the Highland Dallas Foundation. The Family Place empowers victims of family violence by providing safe housing, counseling and skills that create independence while building community engagement and advocating for social change to stop family violence. Our agency provides emergency shelter, individual and group counseling, case management, transitional housing as well as other essential services to help those seeking refuge from family violence. The Family Place provides free, comprehensive services in both Spanish and English that prevent violence and fully support women, children, and men on their path from fear to safety.

In 2020, The Family Place successfully navigated through COVID-19 and the barriers it presented, serving 11,933 unduplicated clients across our programs. Our emergency shelters served 678 women, 886 children and 58 men for a total of 62,118 shelter nights. 98% of our shelter clients did not return to their abuser after exiting one of our shelters. In our counseling programs, we served 2,258 clients, an 11.5% increase over 2019. 98% of our counseling clients reported feeling safer after attending counseling at The Family Place. At our on-site medical and dental clinics, we treated 778 clients and referred 571 clients to more intensive medical and dental services.

The Highland Dallas Foundation has been a long-standing partner with The Family Place in providing services to domestic violence clients. In 2016, The Family Place launched a 5-year, $16.5 million dollar capital campaign to build a new facility specifically designed to provide all necessary services for victims seeking shelter and counseling. The Family Place successfully reached our capital campaign goal due in large part to the commitment of a $1 million matching grant by the Highland Dallas Foundation. In December 2016, the Highland Dallas Foundation donated $13,950 for Christmas gifts for our clients. In 2017, when the Highland Hippo Hut was opened at the Dallas Zoo, the Highland Dallas Foundation generously invited our shelter clients to a special Mother's Day luncheon.

The collaboration between the Highland Dallas Foundation and The Family Place has been instrumental in providing community exposure and awareness of domestic violence in our community as well as providing essential services to family violence victims. With our new facility, completed in 2017, The Family Place has been able to expand programs and execute on the long-range plans developed for these programs. For victims of family violence, The Family Place is the Dallas area's leading organization delivering proven programs that address emotional and physical abuse and incest. Without the ongoing support of the Highland Dallas Foundation, The Family Place would not be able to successfully serve our domestic violence clients who are in desperate need of support.

Sincerely,

Paige Flink
CEO, The Family Place

P.O Box 7999
Dallas, Texas 75209
214 559 2170
fax 214 443 7797
www.familyplace.org

**BOARD OF DIRECTORS**
**PRESIDENT**
Harold Ginsburg
**TREASURER**
Wes McCown
**SECRETARY**
Thomas McCollum
**V.P. COMMUNITY ENGAGEMENT**
Clarisa Lindenmeyer
**V.P. DEVELOPMENT**
Lindsay Jacaman
**V.P. FACILITIES**
Jim Buddrus
**V.P. HUMAN CAPITAL**
David Oliver
**V.P. LONG RANGE PLANNING**
Radhika Zaveri
**V.P. NOMINATIONS**
Belinda Griffin
**V.P. PUBLIC AFFAIRS**
Delia Jasso
**GENERAL COUNSEL**
Kristin Bauer
Eric White

Sandra Aguirre
Lisa Armstrong
Mandy Austin
Steven Bauer
Melinda Bell
Laurie Berger
Nancy Bierman
Julie Bosché
Eric Chandler
Kerry Cole
Nicole Collias
Barbara Durham
Monika Flood
Theresa Flores
Beth Garvey
Lauran Goldberg
Carlos Gonzalez-Jaime
Michelle Goolsby
Rhonda Green
Tasha Grinnell
Johnese Howard
Stacee Johnson-Williams
Linda Knox
Holly Krug
Emily Maduro
Margo McClinton Stoglin
Mary McNulty
Sam Megally
Aaliyah Miranda
Mike Montgomery
Tiffany Moon
Elizabeth Soab
Nathaniel St. Clair
Kristen Sanger
Ryan Scripps
Carol Seay
Lisa Singleton
Ghousuddin Syed
Jill Tananbaum
Samantha Wortley
Ana Yoder

**Chief Executive Officer**
Paige Flink



HCMLPHMIT00003778

# EXHIBIT 33

HCMLPHMIT00003779

**CRISTO REY**
DALLAS COLLEGE PREP

9701 San Leon Ave. Dallas, TX 75217

### Cristo Rey Dallas Update

Cristo Rey Dallas (CRD) is incredibly grateful for the gifts from Highland Dallas Foundation, Inc. CRD is excited to have the Highland Capital Academic Center and the NexBank Gymnasium in the Innovation Center on our campus. These naming rights were given as the result of a donation that Highland Dallas Foundation, Inc.made to our Innovation Center Capital Campaign. These facilities truly impact our students and allow us to provide our services to our population of 465 students.

CRD also receives support from Highland Dallas Foundation, Inc. through the Corporate Work Study Program (CWSP). Cornerstone Healthcare and NexBank both currently have one job team (a team of 4 students) that work in their offices. In the upcoming year, NexBank will host two teams of students. One team is funded through the gift from Highland Dallas Foundation, Inc. and the other is supported by NexBank. The work study program allows students to earn about 60% percent of their tuition to CRD, and the involvement in the work study program makes such a difference in the lives of the 8 students that work in those businesses.

Finally, CRD is incredibly thankful for the remote workspace at Cityplace Tower. CWSP has been greatly affected by COVID-19. This year, many partners were unable to host students in their offices. The space at Cityplace Tower allows 30 students to work remotely for their job partners each day which means that about 120 students benefit from the offices each week. Without this space, CRD would not have the capacity to allow these students to work remotely.

The support of Highland Dallas Foundation, Inc. has meant so much to us at CRD. We are so appreciative, and we look forward to continuing our partnership for many years.

cristoreydallas.org

HCMLPHMIT00003780

# EXHIBIT 34

HCMLPHMIT00003781



**Dallas Children's Advocacy Center (DCAC)**
**Partnership with Highland Dallas Foundation, Inc.**

**Organization Mission and History**
The mission of DCAC is *to improve the lives of abused children in Dallas County and to provide national leadership on child abuse issues*. Since opening its doors in 1991, DCAC has served more than 60,000 of the most severely abused children and their non-offending family members in Dallas County. In FY2021, DCAC will serve 8,400 children and their non-offending family members.

DCAC was created to coordinate the investigation of child abuse cases that rise to the criminal level in a seamless, collaborative process. We facilitate a coordinated approach to child abuse cases that results in more successful investigation and prosecution outcomes and provides a less traumatic response to child victims and families. DCAC partners with 39 organizations to form a Multidisciplinary Team (MDT) that includes medical, legal, and law enforcement and is designed to ensure child clients receive the appropriate services for healing and safety.

In 2015 DCAC's Partner Relations Team began reading all reports of abuse and neglect made to DFPS in Dallas County as part of a state-wide effort to ensure every child who needs services from a children's advocacy center (CAC) gets them. In FY2019 we read 28,131 reports of child abuse for Dallas County. At the beginning of March 2020 before COVID-19 safety measures were implemented, we had experienced a 15% increase in the number of cases read. While case reports went down during quarantine, we have projected and experienced a dramatic increase in cases; at the end of February 2021, we had experienced a 35% increase in cases read year-over-year.

In addition to supportive services provided by the MDT, DCAC also provides the following Core Programs at no cost to our clients. Please note, for the second half of FY2020, DCAC provided therapy and family advocacy services via a HIPPA-approved telehealth platform, Doxy.me. Forensic interviews were always conducted on-site during quarantine.  Below you will find details and outcomes for FY 2020.

*Forensic Interview Program*
Trained DCAC forensic interviewers conduct interviews of children, both as a first step in the child's healing process and as a vital component of the investigation and prosecution of alleged perpetrators. The result is a legally defensible investigative interview of each alleged child victim. During FY2020, DCAC conducted 1,921 forensic interviews.

*Family Advocacy Program*
The Family Advocacy Team is committed to helping each family navigate the complex process of investigation, prosecution and healing after a child makes an outcry of abuse. The team helps the family learn about their rights and resources available to them during crisis as well as provides tangible, critical needs items like clothing, toiletries, and financial assistance on an as-needed basis. During FY 2020, the Family Advocacy Program supported 7,431 children and their non-offending family members.

*Evidence-Based Therapy Program*

HCMLPHMIT00003782



The Evidence-Based Therapy Program provides clients and their non-offending caregivers with cutting-edge, no-cost therapeutic services. Treatment is informed by an initial assessment to enhance engagement between families and therapists toward the recovery of children. When clients are assessed at the end of treatment, over 70% report a reduction in trauma symptoms. During FY 2020, the DCAC Therapy Program provided services to 2,498 clients.

### *Education Program*

DCAC has pioneered a comprehensive, multi-part training curriculum that provides holistic responses to Texas child abuse reporting laws. In the past year, 100,405 people were educated in our curriculum by means of in-person instruction or online learning. In addition to our cutting-edge curriculum, we also host a Lecture Series at the Center. Lecture Series topics are designed to provide continuing education for medical, legal, clinical, law enforcement and other children's advocacy professionals. Since the start of the pandemic, we moved all lecture series' online; we continue to provide this education virtually and as such have discovered we can reach even more professional.

### Partnership with Highland Dallas Foundation, Inc.

Since 2016, Highland Dallas Foundation, Inc. has supported DCAC through yearly, general operating investments towards our mission. We have received over $85,000 over the past five years through sponsorship of our Art for Advocacy event as well as from a golf tournament where DCAC was the dedicated beneficiary. This funding has been critical to the sustainability of our programs and each dollar allows us to serve our clients with transformative services at no cost to them. Alongside the financial commitment, Highland Dallas Foundation, Inc. has gone above and beyond in introducing us to additional community advocates who individually support our efforts as well. The ripple effect of our partnership with Highland Dallas Foundation, Inc. is invaluable and for that we are so grateful.

HCMLPHMIT00003783

# EXHIBIT 35

HCMLPHMIT00003784

Case 19-34054-sgj11 Doc 2546-35 Filed 07/09/21 Entered 07/09/21 23:42:09 Page 2 of
Case 3:21-cv-00842-B Document 2 Filed 04/12/21 Page 1 of 26 PageID 1
Exhibit 34-Part 2 Page 113 of 156

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| CHARITABLE DAF FUND, L.P. and CLO HOLDCO, LTD., *directly and derivatively,* §§§§ | |
| *Plaintiffs,* §§ | |
| v. § | Cause No. _____ |
| HIGHLAND CAPITAL MANAGEMENT, L.P. , HIGHLAND HCF ADVISOR, LTD., and HIGHLAND CLO FUNDING, LTD., *nominally,* §§§§§§ | |
| *Defendants.* § | |

---

## ORIGINAL COMPLAINT

---

## I.

## <u>INTRODUCTION</u>

This action arises out of the acts and omissions of Defendant Highland Capital

Management, L.P. ("<u>HCM</u>"), which is the general manager of Highland HCF Advisor, Ltd.

("<u>HCFA</u>"), both of which are registered investment advisers under the Investment Advisers Act of

1940 (the "<u>Advisers Act</u>"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("<u>HCLOF</u>")

(HCM and HCFA each a "<u>Defendant</u>," or together, "<u>Defendants</u>"). The acts and omissions which

have recently come to light reveal breaches of fiduciary duty,  a pattern of violations of the

Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement,

among others, which have caused and/or likely will cause Plaintiffs damages.

---

[1] https://adviserinfo.sec.gov/firm/summary/110126

HCMLPHMIT00003785

At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

---

Original Complaint

Page 2

HCMLPHMIT00003786

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## PARTIES

1.      Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2.      Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

3.      Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4.      Defendant Highland HCF Advisor, Ltd. is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5.      Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

6.      Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

HCMLPHMIT00003787

## III.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

8.      Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

## IV.

## RELEVANT BACKGROUND

### HCLOF IS FORMED

10.      Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

11.      Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

Original Complaint                                                                                     Page 4

HCMLPHMIT00003788

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

**The Harbourvest Settlement with
Highland Capital Management in Bankruptcy**

16.     On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

---

Original Complaint                                                                                          Page 5

HCMLPHMIT00003789

17.     The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18.     Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19.     Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20.     Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21.     In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054, Doc. 1057.

22.     The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23.     Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24.     HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

HCMLPHMIT00003790

25.     Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26.     While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million). Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27.     In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values were starting to recover.

28.     HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29.     On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30.     HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31.     On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

_____

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

Original Complaint                                                                                      Page 7

HCMLPHMIT00003791

32.     An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

33.     As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

34.     HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

35.     Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

36.     At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

37.     It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

38.     On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

39.     The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

HCMLPHMIT00003792

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40. Typically, the value of the securities reflected by a market price quote.

41. However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42. There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43. Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

44. Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45. It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; or (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46. For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

HCMLPHMIT00003793

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47.     Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48.     Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth—Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49.     Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50.     Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51.     That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52.     The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

---

Original Complaint

Page 10

Case 19-34054-sgj11 Doc 2547-35 Filed 07/09/21 Entered 07/09/21 23:42:09 Page 12 of
Case 3:21-cv-00842-B Document 1 Exhibit 34 Part 24 Filed 04/12/23 Page 12 of 26   Page 11 of 26   PageID 11
150

53.     Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54.     HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### *Breaches of Fiduciary Duty*

55.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56.     HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57.     The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

HCMLPHMIT00003795

58. HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

59. In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

60. The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

61. While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

62. HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

63. As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

64. The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

---

HCMLPHMIT00003796

65.     This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

66.     The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

67.     The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

68.     HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

69.     This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

70.     It also violated HCM's own internal policies and procedures.

---

Original Complaint

Page 13

HCMLPHMIT00003797

71.     Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

72.     HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

73.     HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

74.     In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

75.     At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

HCMLPHMIT00003798

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

76. Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

77. Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

78. Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equatization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

79. Seery's knowledge is imputed to HCM.

80. Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

HCMLPHMIT00003799

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81.     As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82.     Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83.     Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84.     Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85.     In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

---

HCMLPHMIT00003800

Case 19-34054-sgj11 Doc 2546-35 Filed 07/09/21 Entered 07/09/21 08:26:39 Page 18 of 30
Case 3:21-cv-00842-B Document 1-2 Filed 04/12/21 Page 17 of 26  PageID 17
Exhibit 34 Part 24 Page 129 of 156

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86.    Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87.    What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88.    Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89.    For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90.    HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91.    Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

HCMLPHMIT00003801

## SECOND CAUSE OF ACTION
### Breach of HCLOF Company Agreement
### (By Holdco against HCLOF, HCM and HCFA)

92.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.     On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.     The Company Agreement governs the rights and duties of the members of HCLOF.

95.     Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.     Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.     The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.     Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.     Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

HCMLPHMIT00003802

100. Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

101. No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

102. Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
*Negligence*
**(By the DAF and CLO Holdco against HCM and HCFA)**

103. Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

104. Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

105. Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

106. Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

107. It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

HCMLPHMIT00003803

**108.** It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

**109.** It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

**110.** Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

**111.** Defendants' negligence foreseeably and directly caused Plaintiff harm.

**112.** Plaintiff is thus entitled to damages.

**FOURTH CAUSE OF ACTION**
***Racketeering Influenced Corrupt Organizations Act***
**(CLO Holdco and DAF against HCM)**

**113.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**114.** Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

**115.** HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

---

Original Complaint

HCMLPHMIT00003804

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including

Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations

owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116.    The association-in-fact was bound by informal and formal connections for years

prior to the elicit purpose, and then changed when HCM joined it in order to achieve the

association's illicit purpose. For example, HCM is the parent and control person over HCFA,

which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are

registered investment advisors and provide advisory and management services to HCLOF.

117.    Defendants injured Plaintiffs through their continuous course of conduct of the

HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery

and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a

case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118.    HCM operated in such a way as to violate insider trading rules and regulations when

it traded with Harbourvest while it had material, non-public information that it had not supplied to

Harbourvest or to Plaintiffs.

119.    In or about November 2020, HCM and Harbourvest entered into discussions about

settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through

the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests

in HCLOF.

120.    On or about each of September 30, 2020, through December 31, 2020, Seery,

through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive

at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

---

Original Complaint                                                                                    Page 21

HCMLPHMIT00003805

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

121. On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

122. Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

123. However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

124. The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

125. On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

Original Complaint                                                                    Page 22

HCMLPHMIT00003806

126. In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

127. Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company. The news of the MGM purchase should have caused Seery to revalue the HCLOF investment in MGM.

128. In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equatization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio.

129. Seery was at all relevant times operating as an agent of HCM.

130. This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

131. The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

HCMLPHMIT00003807

as here, the interstate wires are used as part of a "scheme or artifice ... for obtaining money or property by means of false ... pretenses, [or] representations[.]"

132. Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133. Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

**FIFTH CAUSE OF ACTION**
*Tortious Interference*
**(CLO Holdco against HCM)**

134. Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135. At all relevant times, HCM owned a 0.6% interest in HCLOF.

136. At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137. Section 6.2 of HCLOF Company agreement provides that when a member "other than ... CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138. HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

---

Original Complaint

Page 24

HCMLPHMIT00003808

Case 19-34054-sgj11 Doc 2547-35 Filed 07/09/21 Entered 07/09/21 08:26:23 Page 26 of
Case 3:21-cv-00842-B Document 1-1 Filed 04/12/21 Page 25 of 26 PageID 25
Exhibit 34 Part 24 Page 137 of 156

139.     HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

140.     But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

141.     Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

**VI.**

**JURY DEMAND**

142.     Plaintiff demands trial by jury on all claims so triable.

**VII.**

**PRAYER FOR RELIEF**

143.     Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

    a.   Actual damages;

    b.   Disgorgement;

    c.   Treble damages;

    d.   Exemplary and punitive damages;

    e.   Attorneys' fees and costs as allowed by common law, statute or contract;

    f.   A constructive trust to avoid dissipation of assets;

    g.   All such other relief to which Plaintiff is justly entitled.

HCMLPHMIT00003809

Dated:  April 12, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*

**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
     jeb@sbaitilaw.com

**Counsel for Plaintiffs**

HCMLPHMIT00003810

# EXHIBIT 36

HCMLPHMIT00003811



Registration No.: **249232**
Client No.: **KY057017**

REGISTER OF DIRECTORS
FOR:
**CLO HOLDCO, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 17 Dec 2010 | 17 Dec 2010 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 17 Dec 2010 | 24 Mar 2021 |
| **Mark E. Patrick**<br>. | Director | 24 Mar 2021 | 31 Mar 2021 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 31 Mar 2021 | 02 Apr 2021 |
| **Mark E. Patrick**<br>. | Director | 02 Apr 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |

Date printed: 19 May, 2021

[1 / 1]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

HCMLPHMIT00003812

# EXHIBIT 37

HCMLPHMIT00003813



Registration No.: **263805**
Client No.: **KY059904**

REGISTER OF DIRECTORS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited** <br> Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 04 Nov 2011 | 04 Nov 2011 |
| **Grant James Scott** <br> Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 04 Nov 2011 | 25 Mar 2021 |
| **Patrick Mark** <br> Highland Capital Management, L.P.; 13455 Noel Rd, Suite 800; Dallas; TX 75240; USA. | Director | 25 Mar 2021 | |
| **Paul Murphy** <br> Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

HCMLPHMIT00003814

# EXHIBIT 38

HCMLPHMIT00003815



Registration No.: **269389**
Date of Incorporation: **6 June 2012**
Client No.: **KY061847**

REGISTER OF MEMBERS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

| | |
|---|---|
| Share Class: | **Ordinary** |
| Nominal Value: | **USD 0.01** |
| Voting Rights: | Yes |
| Conditional: | No |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| WNL Limited Walkers Corporate Services Limited Walker House 87 Mary Street George Town Grand Cayman KY1-9005 Cayman Islands | 6 Jun 2012 | Allotment | 1.00 | 6 Jun 2012 : Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 26 Jun 2012 : Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 26 Jun 2012 | | | | |
| | | | | | | Nil | Nil | 26 Jun 2012 |
| CLO HOLDCO, LTD. Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 26 Jun 2012 | Transfer | 1.00 | 26 Jun 2012 : Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 26 Jun 2012 | No Cert | | | |
| | | | | | | 100 | 1.00 | |

Notes:

Date printed: 19 May, 2021

[1 / 2]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

HCMLPHMIT00003816


intertrust
GROUP

Registration No.: **269389**
Date of Incorporation: **6 June 2012**
Client No.: **KY061847**

REGISTER OF MEMBERS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

HCMLPHMIT00003817

# EXHIBIT 39

HCMLPHMIT00003818

**intertrust** GROUP

Registration No.: **269389**
Client No.: **KY061847**

REGISTER OF DIRECTORS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited** <br> Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 26 Jun 2012 | 26 Jun 2012 |
| **Grant James Scott** <br> Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 26 Jun 2012 | 24 Mar 2021 |
| **Mark E. Patrick** <br> Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 24 Mar 2021 | |
| **Paul Murphy** <br> Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

HCMLPHMIT00003819

# EXHIBIT 40

HCMLPHMIT00003820



Registration No.: **293607**
Client No.: **KY073541**

REGISTER OF DIRECTORS
FOR:
**MGM STUDIOS HOLDCO, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>190 Elgin Avenue; George Town; Grand Cayman KY1-9001; Cayman Islands. | Director | 12 Nov 2014 | 12 Nov 2014 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 12 Nov 2014 | 24 Mar 2021 |
| **Mark E. Patrick**<br>. | Director | 24 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

HCMLPHMIT00003821

# EXHIBIT 41

HCMLPHMIT00003822



Registration No.: **293607**
Date of Incorporation: **12 November 2014**
Client No.: **KY073541**

REGISTER OF MEMBERS
FOR:
**MGM STUDIOS HOLDCO, LTD.**

Share Class:        **Ordinary**
Nominal Value:      **USD 0.01**
Voting Rights:      Yes
Conditional:        No

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| WNL Limited 190 Elgin Avenue George Town Grand Cayman KY1-9001 Cayman Islands | 12 Nov 2014 | Allotment | 1.00 | 12 Nov 2014: Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 12 Nov 2014: Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 12 Nov 2014 | | | | |
| | | | | | | Nil | Nil | 12 Nov 2014 |
| CLO HOLDCO, LTD. Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 12 Nov 2014 | Transfer | 1.00 | 12 Nov 2014: Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 12 Nov 2014 | No Cert | | | |
| | | | | | | 100 | 1.00 | |

Notes:

Date printed: 21 May, 2021

[1 / 1]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

HCMLPHMIT00003823

# EXHIBIT 42

HCMLPHMIT00003824



Registration No.: **249848**
Client No.: **KY058111**

REGISTER OF DIRECTORS
FOR:
**HCT HOLDCO 2, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited** <br> Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 30 Dec 2010 | 30 Dec 2010 |
| **Grant James Scott** <br> Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 30 Dec 2010 | 24 Mar 2021 |
| **Mark E. Patrick** <br> . | Director | 24 Mar 2021 | |
| **Paul Murphy** <br> Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

HCMLPHMIT00003825

# EXHIBIT 43

HCMLPHMIT00003826



Registration No.: **249848**

Date of Incorporation: **29 December 2010**

Client No.: **KY058111**

REGISTER OF MEMBERS
FOR:
**HCT HOLDCO 2, LTD.**

Share Class: **Ordinary**

Nominal Value: **USD 1.00**

Voting Rights: Yes

Conditional: No

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited** Walkers Corporate Services Limited Walker House 87 Mary Street George Town Grand Cayman KY1-9005 Cayman Islands | 29 Dec 2010 | Allotment | 1.00 | 29 Dec 2010: Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 30 Dec 2010: Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 30 Dec 2010 | | | | |
| | | | | | | Nil | Nil | 30 Dec 2010 |
| **Highland Capital Management Partners, Charitable Trust #2** 13455 Noel Road Suite 800 Dallas TX 75240 USA | 30 Dec 2010 | Transfer | 1.00 | 30 Dec 2010: Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 30 Dec 2010 | No Cert | | | |
| | | Transfer | (1.00) | 24 Oct 2011: Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CLO HOLDCO, LTD. pursuant to resolutions dated Contribution | | | | |

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 2]

HCMLPHMIT00003827



Registration No.: **249848**
Date of Incorporation: **29 December 2010**
Client No.: **KY058111**

REGISTER OF MEMBERS
FOR:
**HCT HOLDCO 2, LTD.**

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| | | | | Agreement | | | | |
| | | | | | | Nil | Nil | 24 Oct 2011 |
| CLO HOLDCO, LTD. Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 24 Oct 2011 | Transfer | 1.00 | 24 Oct 2011: Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CLO HOLDCO, LTD. pursuant to resolutions dated Contribution Agreement | No Cert | | | |
| | | | | | | 100 | 1.00 | |

Notes:

Date printed: 21 May, 2021

[2 / 2]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

HCMLPHMIT00003828