**EXHIBIT 35**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In Re:

HIGHLAND CAPITAL
MANAGEMENT, L.P.,

  Debtor.

  ) **Case No. 19-34054-sgj-11**
  ) Chapter 11
  )
  ) Dallas, Texas
  ) Tuesday, June 8, 2021
  ) 9:30 a.m. Docket
  )
  ) - SHOW CAUSE HEARING (2255)
  ) - MOTION TO MODIFY ORDER
  )   AUTHORIZING RETENTION OF
  )   JAMES SEERY (2248)
  ) - MOTION FOR ORDER FURTHER
  )   EXTENDING THE PERIOD WITHIN
  )   WHICH DEBTOR MAY REMOVE
  )   ACTIONS (2304)
  )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtor:  Jeffrey Nathan Pomerantz
  PACHULSKI STANG ZIEHL & JONES, LLP
  10100 Santa Monica Blvd.,
   13th Floor
  Los Angeles, CA  90067-4003
  (310) 277-6910

For the Debtor:  John A. Morris
  Gregory V. Demo
  PACHULSKI STANG ZIEHL & JONES, LLP
  780 Third Avenue, 34th Floor
  New York, NY  10017-2024
  (212) 561-7700

For the Debtor:  Zachery Z. Annable
  HAYWARD & ASSOCIATES, PLLC
  10501 N. Central Expressway,
   Suite 106
  Dallas, TX  75231
  (972) 755-7104

2

APPEARANCES, cont'd.:

For the Charitable DAF,        Mazin A. Sbaiti
CLO Holdco, Show Cause         Jonathan E. Bridges
Respondents, Movants,          SBAITI & COMPANY, PLLC
and Sbaiti & Company:          Chase Tower
                               2200 Ross Avenue, Suite 4900W
                               Dallas, TX  75201
                               (214) 432-2899

For Mark Patrick:              Louis M. Phillips
                               KELLY, HART & HALLMAN, LLP
                               301 Main Street, Suite 1600
                               Baton Rouge, LA 70801
                               (225) 338-5308

For Mark Patrick:              Michael D. Anderson
                               KELLY, HART & HALLMAN, LLP
                               201 Main Street, Suite 2500
                               Fort Worth, TX  76102
                               (817) 332-2500

For James Dondero:             Clay M. Taylor
                               Will Howell
                               BONDS ELLIS EPPICH SCHAFER
                                 JONES, LLP
                               420 Throckmorton Street,
                                 Suite 1000
                               Fort Worth, TX  76102
                               (817) 405-6900

For the Official Committee     Matthew A. Clemente
of Unsecured Creditors:        SIDLEY AUSTIN, LLP
                               One South Dearborn Street
                               Chicago, IL  60603
                               (312) 853-7539

For the Official Committee     Paige Holden Montgomery
of Unsecured Creditors:        SIDLEY AUSTIN, LLP
                               2021 McKinney Avenue, Suite 2000
                               Dallas, TX  75201
                               (214) 981-3300

Recorded by:                   Michael F. Edmond, Sr.
                               UNITED STATES BANKRUPTCY COURT
                               1100 Commerce Street, 12th Floor
                               Dallas, TX  75242
                               (214) 753-2062

HCMLPHMIT00002717

3

Transcribed by:                    Kathy Rehling
                                   311 Paradise Cove
                                   Shady Shores, TX   76208
                                   (972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

HCMLPHMIT00002718

4

DALLAS, TEXAS – JUNE 8, 2021 – 9:30 A.M.

THE COURT: All right. We have settings in Highland this morning. We have three settings. We have the show cause hearing with regard to a lawsuit filed in the District Court. We have a couple of more, I would say, ministerial matters, although I think we do have objections. I know we have objections. We have a motion to extend the removal period in this case as well as a motion to modify the order authorizing Mr. Seery's retention.

So let's go ahead and start out by getting appearances from the lawyers who are participating today. I'll get those now.

MR. MORRIS: Good morning, Your Honor.

THE COURT: Good morning.

MR. MORRIS: John Morris from Pachulski, Stang, Ziehl & Jones for the Debtor. I'm joined with me this morning by my colleagues, Jeffrey Pomerantz, Greg Demo, and Zachery Annable.

THE COURT: Okay.

MR. MORRIS: We do have a proposal on how to proceed today, a substantial portion of which is in agreement with the Respondents.

THE COURT: Okay.

MR. MORRIS: So, at the appropriate time, I'd be happy to present that to the Court.

THE COURT: All right. Well, let's get all the

HCMLPHMIT00002719

5

appearances and then I'll hear from you on that.

MR. SBAITI:  Your Honor, my name is -- would you like me to approach, Your Honor?

THE COURT:  Yes, please.

MR. SBAITI:  It's my first time appearing in Bankruptcy Court, Your Honor.  My name is Mazin Sbaiti.  I'm here on behalf of the charitable DAF Fund, CLO Holdco, and the Respondents to the show cause hearing.  We are also representing them as the Movants on the motion to modify the Court's order appointing Mr. Seery.

THE COURT:  All right.  Thank you.

MR. BRIDGES:  Jonathan Bridges, Your Honor, with Mr. Sbaiti, also representing the Charitable DAF and CLO Holdco, as well as our firm that is named in the show cause order.

THE COURT:  Okay.

MR. BRIDGES:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. PHILLIPS:  Good morning, Your Honor.  Louis M. Phillips from Kelly Hart Hallman here on behalf of Mark Patrick in the show cause matter.  I'm joined with my colleague Michael Anderson from the Kelly Hart firm here in Fort Worth.  And that's the matter that we're involved in, the show cause auction.

THE COURT:  All right.  Thank you, Mr. Phillips.

MR. TAYLOR:  Good morning, Your Honor.  Clay Taylor

HCMLPHMIT00002720

6

of Bonds Ellis Eppich Schafer Jones here on behalf of Jim Dondero.  I have Mr. Will Howell here with me from my firm.

THE COURT:  All right.  Thank you.

MR. CLEMENTE:  Good morning, Your Honor.  Matthew Clemente from Sidley Austin on behalf of the Committee.  I'm here with my partner, Paige Montgomery.

THE COURT:  Okay.  Thank you.

MR. CLEMENTE:  Good morning.

THE COURT:  All right.  Just to remind people, we do have participants on the WebEx, but in setting the hearing I made clear that participants today needed to be here live in the courtroom.  So the WebEx participants are going to be only observers.

We have a camera on the screen here that is poised to capture both the lawyer podium as well as the witness box, and then another camera on the bench.

So, please be mindful.  We want the lawyers to speak from the podium so that they are captured and heard by the WebEx.  And so hopefully we don't have any cords you will trip over.  We've worked hard to make it easy to maneuver around the courtroom.

All right.  So, Mr. Morris, you had a proposal on how we would approach this today?

MR. MORRIS:  I do, Your Honor.  And it's rather brief, but I think it makes a lot of sense.

HCMLPHMIT00002721

There are three motions on the calendar for today, --

THE COURT:  Uh-huh.

MR. MORRIS:  -- only one of which required the personal appearance of certain parties.

THE COURT:  Uh-huh.

MR. MORRIS:  And for that reason, and because, frankly, it was the first of the three motions filed, we believe that that ought to go first.

THE COURT:  Okay.

MR. MORRIS:  And then it can be followed by the motion for reconsideration of the July order, assuming time permits, and then the motion to extend the removal deadline.

And with respect to the contempt motion, Your Honor, the parties have agreed that each side shall have a maximum of three hours to make opening statements, closing arguments, direct and cross-examination of witnesses.

You know, I did point out to them that from time to time Your Honor has used the Court's discretion to adjust the time --

THE COURT:  Uh-huh.

MR. MORRIS:  -- if the Court is making inquiries, and I guess we'll deal with that matter as it comes.  But as a general matter, that is what we've agreed to.  And I would propose that, unless anybody has any objections, that we just proceed on that basis.

HCMLPHMIT00002722

8

THE COURT:  Okay.

MR. MORRIS:  And I could -- I could go right forward.

THE COURT:  So, three hours in the aggregate?

MR. MORRIS:  Uh-huh.

THE COURT:  It doesn't matter how people spend it -- with argument, examination, cross -- three hours in the aggregate?

MR. MORRIS:  Correct.

THE COURT:  Okay.  So, Nate, you'll be the timer on that.

MR. MORRIS:  Yeah.  We thought it was very important to get this done today, with people coming in from out of town.

THE COURT:  Okay.  Sounds fine.

MR. MORRIS:  So does the Court want to inquire if anybody has any questions or comments?

THE COURT:  I do.  Well, I see Mr. Bridges getting up.  You confirm that that's agreeable?

MR. BRIDGES:  Thank you, Your Honor.  Yes, that's agreeable.  We have one slight difference in our proposal.  We would suggest to Your Honor that the motion for modification, if Your Honor decides our way, would moot the entire motion for contempt.  And we'd suggest, if that possibility is realistic, that we would go first with that motion, perhaps obviate having to have the evidence presented and the lengthy

HCMLPHMIT00002723

9

hearing.

The motion for modification, Your Honor, asks the Court to reconsider -- to modify that order because of jurisdictional and other shortcomings in it that make the order unenforceable.  And because that's the order that is the subject of the contempt motion, we'd ask Your Honor to consider putting that motion first.

THE COURT:  Okay.  Or second?  Ahead of the contempt matter?

MR. BRIDGES:  Ahead of the contempt matter, --

THE COURT:  Uh-huh.

MR. BRIDGES:  -- because it has a possibility --

THE COURT:  We have the removal matter, which I think is the shortest.  All right.

MR. BRIDGES:  No objection to that, Your Honor.  That's correct.

THE COURT:  Okay.  So, Mr. Morris, that's fine by you?

MR. MORRIS:  Your Honor, that doesn't make a lot of sense to us.  We don't believe there's any basis for the Court to reconsider, modify, or amend in any way the July order.  But even if we were wrong about that, that would not retroactively validate conduct which was otherwise wrongful at the time it was committed.

The contempt motion needs to go first.  The other motion

HCMLPHMIT00002724

10

will have no impact on whether or not there is a finding of contempt of court.

THE COURT: All right. And update me on this. There was something filed yesterday, a notice of a proposed form of order that the Debtor had proposed, that I think was not agreed to, where there would be a change about any action that goes forward, the cause of action would be in the sole jurisdiction of the Court, and you all agreed to change that part of the order, correct?

MR. MORRIS: So, just as a division of labor for Your Honor, I'm doing the contempt motion.

THE COURT: Okay. That's Mr. Pomerantz's?

MR. MORRIS: Mr. Pomerantz is going to take care of that.

MR. POMERANTZ: Yes, Your Honor. Good morning. Good to see you again.

THE COURT: Good to see you.

MR. POMERANTZ: Yes, Your Honor, that's correct. If Your Honor recalls, there's really three aspects of the January 9th and the July 16th order. First, requiring people to come to Bankruptcy Court before commencing or pursuing an action. Second, for the Bankruptcy Court to have the sole and exclusive authority to determine whether the claim is a colorable claim of willful negligence or gross misconduct. And then third, if Your Honor passed the claim through the

gate, whether you would have jurisdiction.

In Your Honor's January 9th and July 16th orders, you said you would have exclusive jurisdiction.  In the motion for reconsideration, and particularly the reply, Movants said, if you just change that and say that if passes through the gate that you'd have jurisdiction only to the extent you would otherwise have it, that would resolve the motion, in the same way that the plan of reorganization was amended.

We proposed that.  They rejected it.  We put it before Your Honor.  So we believe that it moots out a good portion -- actually, we think it should moot out the entire motion.  They obviously disagree.  But we definitely agree it moots out the most significant portion of their motion, which is that Your Honor would take jurisdiction to adjudicate a matter on an exclusive basis when you might not otherwise have jurisdiction on an exclusive basis.

THE COURT:  Okay.  Well, --

MR. BRIDGES:  Your Honor, may I respond to that?

THE COURT:  You may.  And --

MR. BRIDGES:  Thank you, Your Honor.

THE COURT:  -- why -- could you clarify why you think it would moot out the entire show cause matter?  I wouldn't be retroactively changing my order.  Is that what you're proposing?

MR. BRIDGES:  Your Honor, with all respect, we

HCMLPHMIT00002726

12

believe the order is defective and unenforceable and has to be modified in order to fix it.  And because of the defects, we're -- we're actually arguing, Your Honor, that it is unenforceable in a contempt proceeding.  That is exactly what our argument is.

THE COURT:  Okay.  I think I'm getting way farther down this road than maybe I want to right now.  But I guess here's the elephant in the room, I feel like:  *Republic Supply versus Shoaf*.

MR. BRIDGES:  Uh-huh.

THE COURT:  The U.S. Supreme Court *Espinosa* case, for that matter.  If I accept your argument that maybe there was a flaw in those orders, that maybe they went too far, don't you have a problem with those two cases?

MR. BRIDGES:  Your --

THE COURT:  The orders weren't appealed.

MR. BRIDGES:  I understand completely, Your Honor.

THE COURT:  Uh-huh.

MR. BRIDGES:  And I think the answer is no because of the *Applewood* case from the Fifth Circuit.  The *Applewood* case cited in our reply brief explains that in order for an order, a final order of the Bankruptcy Court to have exculpatory effect, in order for it to release claims, for example, that the claims at issue must be enumerated in the order.  It's not enough to have a blanket statement like the order, the July

HCMLPHMIT00002727

13

order has, like the January order has, saying that Mr. Seery's claims -- claims cannot be brought against him for ordinary negligence at all.  The -- Your Honor, we're delving into my argument.

THE COURT:  Okay.

MR. BRIDGES:  And I was hoping to do this on a preliminary basis.

THE COURT:  Right.

MR. BRIDGES:  I don't mean to bog you down with that. But Your Honor, no, mandatory authority from the Fifth Circuit after *Shoaf* limits *Shoaf's* application and says that it does not extinguish the claims that are not specifically enumerated in the order.  And the reason for that is because it doesn't give the kind of notice to the parties that they would need to make an appearance and object to those orders at the time.  It actually helps to stem the amount of litigation at the time rather than to encourage it.

THE COURT:  All right.  Well, you'll get your opportunity to make your full argument on this.  But I'm not convinced, preliminarily, at least, to affect my decision on the sequence, okay?  So even if it potentially wastes time under your view of the law, I am going to do the removal matter first -- the extension of time request, I should say -- and then the show cause and then the motion to modify.  And I realize, those last two matters, everything is kind of

HCMLPHMIT00002728

14

interrelated.  All right?

MR. BRIDGES:  Yes, Your Honor.

THE COURT:  All right.  So, with that decided, is there a desire on the part of the lawyers to make opening statements, or shall we just go to the motions?  And, of course, people can use their three hours for oral argument, however much they want to use for oral argument.

MR. MORRIS:  Your Honor, the -- to be clear, the six-hour time limit only applies to the contempt proceeding.

THE COURT:  Oh, yes.  Yes.  Uh-huh.

MR. MORRIS:  And I do want to make an opening statement.

THE COURT:  Okay.

MR. MORRIS:  So, as the Movant, I'd like to go first.

THE COURT:  You want to make opening statements?

MR. BRIDGES:  Yes.  Yes, Your Honor.

THE COURT:  Okay.  Okay.

MR. BRIDGES:  I believe we've got a PowerPoint prepared that I think can lay out our side of it.

THE COURT:  Okay.

MR. BRIDGES:  I don't think we're participating in the motion to extend the removal time.

THE COURT:  Okay.

MR. BRIDGES:  That's going first.

THE COURT:  All right.

HCMLPHMIT00002729

MR. BRIDGES:  So we'll wait until that is --

THE COURT:  Well, so we don't get confused on the timing, let's just do the motion to extend right now.  And I think we only had one objection.  As Mr. Sbaiti just pointed out, they're not objecting on that one.  We have a Dondero objection.  So let's, without starting the timer, hear that one.  Okay?

MR. DEMO:  Good morning, Your Honor.  Greg Demo; Pachulski, Stang, Ziehl & Jones.

THE COURT:  Good morning.

MR. DEMO:  I'll be arguing the removal motion and then turn it over.

It's fairly basic and straightforward, Your Honor.  We're asking for a further extension of the statutory deadline to remove cases until December 14th, 2021.  The deadline is procedural only.  As Your Honor is well aware, there's a lot of moving parts in this case.  You know, we don't know to this date, really, the full universe of what could actually be out there.  So we're just asking for a short extension of the removal period to cover through December.

I know that there was an objection from Mr. Dondero.  I know that he argues that 9006 does not allow us to extend that deadline past the effective date of the plan, and he cites one case for that purpose, which is *Health Support*.  I think it's out of Florida.  That case dealt with the extension of the

HCMLPHMIT00002730

16

two-year extension of the statute of limitations and was very clear that you can't use 9 --

THE COURT:  You mean the 546 deadline?

MR. BRIDGES:  Yes.  Yes.

THE COURT:  Okay.

MR. BRIDGES:  That you can't use 9006 to extend non-bankruptcy deadlines.  That's not what we're doing here, Your Honor.  We're using 9006 to extend the bankruptcy deadline to remove the cases.

THE COURT:  Uh-huh.

MR. DEMO:  And we'd just ask Your Honor for the extension through December.

THE COURT:  Okay.  I'll hear Mr. Dondero's counsel.

MR. HOWELL:  Good morning, Judge.  Will Howell for Mr. Dondero.

So, the argument here is not that the Court can't do this. I was just pointing that there is an outside limit to what we're doing.  And so if you look at the cases that the Debtor cites in support of this motion, the one that is most apt was when Judge Nelms did a fourth extension of time.  But those were all 90-day extensions.  Here, we're in a situation where the Debtor is asking for a fourth 180-day extension of time, and this is really where the, you know, objection came -- or, the response in opposition came from.  They specifically asked that it be without prejudice to further extensions.

HCMLPHMIT00002731

And so, at some point, you know, does 9006 have an outside limit?  You know, do we need to see some sort of a light at the end of the tunnel here?

So we would ask that the motion, at a minimum, be denied in part with respect to this open-ended request for extension beyond two years for a 90-day period.  The other cases that they cite, they have one extension here, one extension there, 120 days here, but not 180 days after 180 days after 180 days, and then asking specifically for without prejudice to further extensions beyond two years.  So that's -- that's where this comes from.

THE COURT:  All right.  Do you think it matters that this is a very complex case?

MR. BRIDGES:  I --

THE COURT:  There's litigation here, there, and everywhere.

MR. HOWELL:  I also think, you know, *Mirant* was complex.  I think *Pilgrim's Pride* was complex.  I think, you know, it is not out of bounds for the Court to grant a fourth extension.

THE COURT:  Uh-huh.

MR. BRIDGES:  But to -- you know, at some point -- you know, maybe the Court could grant a 90-day extension and make them come back a little more frequently to kind of corral this thing, rather than just saying "This grant of 180 days,

18

the fourth time, is going to be without prejudice to further extensions." It just gets kind of large.

THE COURT: Okay. Mr. Demo, your motion. You get the last word.

MR. DEMO: Your Honor, I mean, it is without prejudice for further extensions, but that doesn't mean that Your Honor is granting the further extensions now. It means we'll have to come back. We'll have to make our case for why an extension is necessary. And, you know, if Your Honor doesn't want to give us another extension past December 2021, Your Honor doesn't have to. This is not an order saying that it's a limitless grant.

You know, I'd also ask, you know, quite honestly, why Mr. Dondero has such an issue with this. He hasn't said that any of these cases involve him. He hasn't given any reasons why this affects him. He hasn't given any reason why this damages him at all. So I do, I guess, wonder as an initial matter kind of why we're here, you know, why we're responding to Mr. Dondero's request, when that request really has no impact on him.

And then, Your Honor, to the extent that you are inclined to limit this, I would say, you know, we would ask for a reasonable extension of time. We do think an extension of time, because of the complexity of this case, through December is warranted. But if Your Honor for some reason does agree

HCMLPHMIT00002733

that a shorter extension is necessary under 9006 -- I don't think it is -- we'd just ask that Your Honor grant us leave to come back for further extensions of time.

THE COURT:  Okay.  All right.  I will -- I'll grant a 90-day extension, without prejudice for further extensions.

MR. DEMO:  Thank you, Your Honor.

THE COURT:  Maybe in 90 days we'll be farther down the road and we won't need any more extensions, but you'll have the ability to argue for more if you think it's really necessary.  All right.  So that will bring us to around September 14th, I guess.

All right.  Well, let's go ahead and hear opening statements with regard to the show cause matter.  And again, if you want to roll in arguments about the -- well, no, you said the six hours only applies to show cause, so we'll not hear opening statements with regard to the Seery retention modification, just show cause.

MR. MORRIS:  All right.  Before I begin, Your Honor, I have a small deck to guide --

THE COURT:  Okay.

MR. MORRIS:  -- to guide my opening statement.

THE COURT:  All right.

MR. MORRIS:  Can I approach the bench?

THE COURT:  You may.  And is your legal assistant going to share her content --

20

MR. MORRIS:  Yes.

THE COURT:  -- so people on the WebEx will see?  Okay.

MR. MORRIS:  That's the intention, Your Honor.

THE COURT:  Okay.

MR. MORRIS:  All right.  Are you ready for me to proceed?

THE COURT:  I am.  And obviously, everyone has a copy?

MR. MORRIS:  Yes.

THE COURT:  Your opponents have a copy of this?

MR. MORRIS:  Yep.

THE COURT:  Okay.  Although we hope to see it on the screen.

OPENING STATEMENT ON BEHALF OF THE DEBTOR

MR. MORRIS:  Good morning, Your Honor.  John Morris; Pachulski, Stang, Ziehl & Jones; for the Debtor.

We're here today on the Debtor's motion to hold certain entities and individuals in contempt of court for violating a very clear and specific court order.  I hope to be relatively brief in my opening here, Your Honor, and I'd like to begin where I think we must, and that is, how do we -- how do we prove this and what do we have to prove?

The elements of a claim for contempt of court are really rather straightforward.  The Movant must establish by clear

HCMLPHMIT00002735

and convincing evidence three things.

THE COURT:  Let me stop you and stop the clock. We're not seeing the shared content.

MR. MORRIS:  Uh-huh.

THE COURT:  Did you want her to go ahead and share her content?

MR. MORRIS:  I did.

THE COURT:  Okay.

MR. MORRIS:  I was hoping that she'd do that.

THE COURT:  All right.  It says it's receiving content.

MR. MORRIS:  There we go.  It's on my screen, anyway.

THE COURT:  Oh, here it is.  I don't know why it's not on my Polycom.  Can you all see it out there?

(Chorus of affirmative replies.)

THE COURT:  Okay.  Very good.

MR. MORRIS:  Okay.

THE COURT:  You may proceed.

MR. MORRIS:  Thank you, Your Honor.

So, there's three elements to the cause of action for contempt, for civil contempt.  We have to prove by clear and convincing evidence that a court order was in effect; that the order required certain conduct by the Respondents; and that the Respondent failed to comply with the Court's order.

We've cited in the footnote the applicable case law from

22

the Fifth Circuit, and I don't believe that there's any dispute that is indeed the legal standard.

The intent of the Respondents as to liability is completely irrelevant. It doesn't matter if they thought they were doing the right thing. It doesn't matter if they believed in their heart of hearts that the court order was invalid. These are the three elements, and we will be able to establish these elements not by clear and convincing evidence, but if we ever had to, beyond reasonable doubt.

If we can go to the next slide, please.

We begin with the Court's order, the Court's July 9 order. And that order states very clearly what conduct was required. And the conduct that was required was that no entity could commence or pursue -- those are really the magic words -- commence or pursue a claim against Mr. Seery without the Bankruptcy Court doing certain things. And we've referred to this as the gatekeeper. And the only question I believe the Court has to ask today is whether the Respondents commenced or pursued a claim against Mr. Seery without seeking Bankruptcy Court approval, as set forth in this order.

I'll dispute that there's anything ambiguous about this. I'll dispute that it could not be clearer what conduct was prohibited. It could not be clearer. The only question is whether the conduct constitutes the pursuit of a claim.

Let's see what they did. If we could go to the next

HCMLPHMIT00002737

slide.  There will be no dispute about what they did.  And what they did is, a week after filing a lawsuit against the Debtor and two others arising out of the HarbourVest settlement, a settlement that this Court approved, after notice and a hearing and participation by the Respondents, after they had the opportunity to take discovery, after they had the opportunity to examine Mr. Seery about the value of HarbourVest's interest in HCLOF, after all of that, they brought a lawsuit after Mr. Patrick took control of the DAF and CLO Holdco.  And that lawsuit related to nothing but the HarbourVest suit, and it named in Paragraph 2, right up above, Mr. Seery as a potential party.  And a week later, Your Honor, they filed what we call the Seery Motion, and it was a motion for leave to amend their complaint to add Mr. Seery as a defendant.

We believe that that clearly violates the Court's July 7 order.  And indeed, again, these are facts.  They're not -- they're not in dispute.  Just look at the first sentence of their motion.  The purpose of the motion was to name James Seery as a defendant.  That was the purpose of the motion.  And the way that they made the motion, Your Honor -- and these are undisputed facts -- the way they made the motion, Your Honor, shows contemptuous intent.  We don't have to prove intent, but I think it might be relevant when you get to remedies.  Okay?

24

And so how do I -- why do I say that?  Because they made this motion, Your Honor, and they didn't have to.  Everybody knows that under Rule 15 they could have amended the complaint if they wanted to.  If they wanted to, they didn't need the Court's permission.  What they wanted to do was try to get the District Court to do what they knew they couldn't.  And that's contemptuous.

And they did it, Your Honor, without notice to the Debtor. Even after the Debtor had accepted service of the complaint, even after we told them, if you go down this path, we're going to file a motion for contempt, they did it anyway.  They didn't serve the Debtor.  They didn't give the Debtor a courtesy copy.  They didn't notify the Debtor.  The only thing that happened was the next day, when the District Court dismissed it without prejudice, they sent us a copy of that notice.  And within three days, we were here.

A court order was in effect.  Mr. Patrick is going to admit to that.  There's not going to be any dispute about that.  The order required that the Respondents come to this Court before they pursue a claim against Mr. Seery, and they failed to comply with that order.  The facts, again -- if we can go to the next slide.  We can look at some of the detail, because the timeline is mindboggling.

Mr. Patrick became the Plaintiffs' authorized representative on March 24th.  And folks, when I took their

HCMLPHMIT00002739

25

depositions, weren't specific about dates, and that's why some of the entries here refer to sometime after, but there's no question that the order of events is as presented here and as the evidence will show today.

The evidence will show that sometime after Patrick became the Plaintiffs' authorized representative, Mr. Dondero informed Mr. Patrick that Highland had usurped an investment opportunity from the Plaintiffs.  Mr. Patrick is going to testify to that.  Mr. Patrick is also going to testify that, without prompting, without making a request, D.C. Sauter, the general counsel of NexPoint Advisors, recommended the Sbaiti firm to Mr. Patrick.  Mr. Patrick considered nobody else.

Mr. Patrick retained the Sbaiti firm in April.  In other words, within 12 days of the filing of the complaint.  They're retained and they conduct an investigation.  You're going to hear the assertion of the attorney-client and the common interest privilege every time I ask Mr. Dondero what he and Mr. Sbaiti talked about and whether they talked about naming Jim Seery as a defendant.  But with Patrick's authorization, the Sbaiti firm filed the complaint on April 12th, just days after they were retained.

It's like a -- it's an enormous complaint.  I don't know how they did that so quickly.  But in any event, the important point is that they all worked together.  None of this happened until Mr. Patrick became the authorized representative.

HCMLPHMIT00002740

26

Mr. Patrick is going to tell you, Your Honor, he's going to tell you that he had no knowledge of any wrongdoing by Mr. Seery prior to the time he assumed the rein of the DAF and the CLO Holdco.  He had no knowledge, Your Honor, of any claims that the DAF and CLO Holdco had against the Debtor until he became the Plaintiffs' authorized representative and Mr. Dondero spoke to him.

If we can flip to the next page.  Mr. Dondero has effective control of the DAF.  He has effective control of CLO Holdco. You're going to be bombarded with corporate documents today, because they're going to show you -- and they want you to respect the corporate form, they really want you to follow the rules and respect the corporate form, because only Mr. Scott was responsible for the DAF and CLO Holdco until he handed the reins on March 24th to Mr. Patrick.  Mr. Dondero has nothing to do with this.  He's going to tell you.  He's going to tell you he had nothing to do with the selection of Mr. Patrick as Mr. Scott's replacement.

The facts are going to show otherwise, Your Honor.  The DAF is a $200 million charitable organization that is funded almost exclusively with assets derived from Highland or Mr. Dondero or the Get Good Trust or the Dugaboy Trust.  The evidence is going to show that at all times these entities had shared services agreements and investment advisory agreements with HCMLP.  The evidence will show that HCMLP at all times

HCMLPHMIT00002741

27

was controlled by Mr. Dondero.

And it made sense.  The guy put in an awful lot of money for charitable usage.  Is he really just going to say, I don't really care who runs it?  The evidence is going to show that between October 2020 and January 2021, Grant Scott actually exercised independence.  Grant Scott was Mr. Dondero's childhood friend.  They went to UVA together.  They were roommates.  Mr. Scott was the best man at Mr. Dondero's wedding.  But we were now in bankruptcy court.  We're now in the fishbowl.  And I will -- this may be a little argument, but there's no disputing the facts that Mr. Scott acted independently, and he paid the price for it.  Mr. Scott did it three times.

He did it when he amended CLO Holdco's proof of claim to take it down to zero.  He did it again after he withdrew the objection to the HarbourVest settlement motion.  And he did it again when he settled the lawsuit that the Debtors had brought against CLO Holdco.  And that -- and on each of those three occasions, the evidence will show that Mr. Scott did not communicate with Mr. Dondero in advance, that Mr. Dondero found out about these acts of independence after the fact, and that each time he found out about it he had a little conversation with Mr. Scott.

Mr. Dondero is going to tell you about it, and he's going to tell you that he told Mr. Scott each act was inappropriate.

28

You may have heard that word before.  Each act was not in the best interests of the DAF.

The last of those conversations happened either on or just after January 26th.  And by January 31st, Mr. Scott gave notice of his resignation.  And you're going to see that notice of resignation.  And he asks for releases.

Mr. Patrick becomes, almost two months later, the successor to Mr. Scott.  Mr. Dondero is going to say he has no idea how that happened.  He was just told after the fact that Mr. Patrick and Mr. Scott had an agreement.  He's going to tell you they had an agreement and he just heard about it afterwards.  He didn't really -- for two months, I guess, he sat there after Mr. Scott told him that he wanted out and did nothing to try to find out who's going to take control of my charitable foundation with $200 million.  He wasn't interested.

But here's the thing, Your Honor.  If we go to the next slide.  Let's see what Mr. Scott said at his deposition last week.  Question, "Do you know who selected Mark?"  Answer, "I do not."  Question, "Do you know how Mark was selected?"  Mark is a reference to Mark Patrick.  "I do not."  "Did you ever ask Mark how he was selected?"  "I did not."  "Did you ever ask Mark who selected him?"  "I did not."  "Did you ever ask anybody at any time how Mr. Patrick was selected to succeed you?"  "No, I did not."  "Did you ever ask anybody at any time

HCMLPHMIT00002743

29

as to who made the decision to select Mr. Patrick to succeed you?"  "No, I did not."

So I don't know what happened between Mr. Patrick and Mr. Dondero when Mr. Patrick supposedly told Mr. Dondero that there was an agreement with Mr. Scott, but that is news to Mr. Scott.  He had no idea.

Your Honor, we are going to prove by clear and convincing evidence that each of the Respondents violated a very clear and specific court order.  And unless the Court has any other questions, I'll stop for now.

THE COURT:  No questions.

MR. MORRIS:  Thank you, Your Honor.

THE COURT:  All right.  Who is making the argument for the Respondents?

MR. SBAITI:  Your Honor, I am.  I'm just trying to put the PowerPoint up on the WebEx.

THE COURT:  Okay.

MR. SBAITI:  Sorry about that.

MR. MORRIS:  Your Honor, I'll try not to make this a practice, but can I inquire as to how much time I used?

THE COURT:  Oh.  Nate?

THE CLERK:  About thirteen minutes.

THE COURT:  Thirteen minutes?

MR. MORRIS:  Thank you very much.

THE COURT:  Okay.  All right.

30

MR. SBAITI:  Your Honor, our PowerPoint is a little bit longer than that one.  May I approach with a copy?

THE COURT:  You may.  Uh-huh.

(Pause.)

MR. SBAITI:  Your Honor, it does feel good to be back in the courtroom.

THE COURT:  Okay.

MR. SBAITI:  It's been a long time.

THE COURT:  Yes.  For us, too.

MR. SBAITI:  Jut wish it wasn't under a circumstance where someone is trying to sanction me.

But we're going to be dividing up this oral argument a little bit.  Also, to just kind of break up a little bit of the monotony, because I think we have a lot to cover at the opening stage of this.  And I'll try to be as expeditious as I can be.

OPENING STATEMENT ON BEHALF OF THE SHOW CAUSE RESPONDENTS

MR. SBAITI:  Your Honor, the thing we -- the thing we open with is the due process issue that we raised in our brief.  And where this really arises from is the Court's show cause order calls us violators before we've had a chance to respond to the allegations and before we've obviously been able to approach this hearing.  And the word violators means something to us, Your Honor, because I've been a lawyer for a long time, my partner has been a lawyer for a long time, our

HCMLPHMIT00002745

clients have never been sanctioned, we've never been sanctioned, and for us to be labeled violators first by counsel and then in a court order makes us wonder whether or not this process is already prejudged or predetermined.

THE COURT:  I actually want to address that.  Turn off the clock.

Just so you know, I looked this up a while back, because we gave a bankruptcy judges panel at some CLE.  The average bankruptcy judge in our district, back when I looked, signs over 200 orders a week.

MR. SBAITI:  Sure.

THE COURT:  Many of those -- in fact, most of them -- are submitted by lawyers.  So, you know, a big chunk of my week is signing orders.  And I obviously give more scrutiny to those that are substantive in nature.  Okay?  If someone submits to me a 50-page debtor-in-possession financing order, I will look at that much more carefully than what I consider a mere procedural order setting a hearing.

So I regret that that word was used, but I can assure you I fairly quickly set that -- signed that, I should say -- regarding it as a merely procedural order setting a hearing.  Okay?  So it's as simple as that.  There was no hmm, I like that word, violator.  I had a stack, if you will, an electronic stack of probably 200 orders in front of me the day I signed that.  Okay?

32

So, if that makes anyone feel any better, I don't know, but that's the reality.

Okay.  You can start the clock again.

MR. SBAITI:  And I appreciate Your Honor saying that. It does make us feel better, both about where the -- the genesis of the order and the impact and its reflection on what Your Honor thinks in terms of going into this.

The other thing that obviously raised concerns, and I assume this comes from the same place, was four days ahead of that order counsel told us the Court was going to order everyone to be in person, and they had advance notice of that, and we weren't sure how they had advance notice of that.  I guess they assumed --

THE COURT:  I can assure you right here on the record I never had ex parte communications with any lawyer in this case, on this matter or any other matter.  Okay?  Again, those are pretty strong words to venture out there with, which your pleading did venture out there with those words.

My courtroom deputy, Traci, I think answers her phone 24 hours a day.  So I'm quite sure she had communications with the lawyers about this, just like she probably had communications with you and your firm and every other firm in this case.  Okay?

MR. SBAITI:  Like I said, Your Honor, we appreciated what Your Honor -- appreciate what Your Honor said, but that

HCMLPHMIT00002747

issue obviously stuck out -- stuck out to us, in combination. So I'll move on from that issue.

This has to do with the lawsuit that was filed, and the lawsuit, the genesis of the lawsuit, I think it's important to say, because the argument has been raised in the briefing and we wanted to address it upfront, why the lawsuit comes about. And it comes about because of the Advisers Act and the responsibilities that the Debtor has to the assets of the funds that it manages. And the Advisers Act imposes a duty not only on Highland but obviously on its control people and its supervised people. And the lawsuit has to do with HCLOF, which is what HarbourVest owned a piece of. And Highland, as the advisor to HCLOF and the advisor to the DAF, owed fiduciary duties to CLO Holdco, which is the DAF's holding entity of its assets in HCLOF, but Highland Capital was also an advisor, a registered investment advisor to the DAF directly at the time. And so those federally-imposed fiduciary duties lie at the crux of that lawsuit.

Moving on, Mr. Seery testified at the hearing that was in this Court to be -- to get him appointed, and this was Exhibit 2 that was presented by the Debtor, and on Page 16 at the bottom he says -- of the transcript, he says, I think, from a high level, the best way to think about the Debtor is that it's a registered investment advisor. As a registered investment advisor, which is really any advisor of third-party

HCMLPHMIT00002748

money over $25 million, it has to register with the SEC, and it manages funds in many different ways.

In the middle of the next page he says, In addition, the Debtor manages about $2 billion, $2 billion in total managed assets, around $2 billion in CLO assets, and then other securities, which are hedge funds -- other entities, rather, which are hedge funds or PE style.  Private equity style.

On Page 23 towards the bottom he says, As I said, the Investment Advisers Act puts a fiduciary duty on Highland Capital to discharge its duty to the investors.  So while we have duties to the estate, we also have duties, as I mentioned in my last testimony, to each of the investors in the funds. CLO Holdco would be an investor in one of those funds, HCLOF.

He goes on to say, Some of them are related parties, and those are a little bit easier.  Some of them are owned by Highland.  HCLOF was not owned by Highland.  But there are third-party investors in these funds who have no relation whatsoever to Highland, and we owe them a fiduciary duty both to manage their assets prudently but also to seek to maximize value.

Now, the lawsuit alleges that Seery testified that the HarbourVest portion of Highland CLO Funding was worth $22-1/2 million.  Now, Mr. Morris wants the Court to hinge on the fact that, well, no one asked him whether he was lying.  But that's not really the standard, and it certainly isn't the standard

when someone's an investment advisor and owes fiduciary duties, which include fiduciary duties to be transparent with your investors.

It also includes fiduciary duties not to self-deal.

The lawsuit also alleges that, in reality, those assets were worth double that -- double that amount at the time.  We found out just, you know, in late March/early April that a third -- from a third party who had access to the underlying valuations at the time that those values were actually double and that there was a misrepresentation, giving rise to the lawsuit.  That change in circumstance is the key issue behind the lawsuit.

We allege that Mr. Seery and the Debtor, as RIAs, had a duty to not self-deal and be fully transparent with that information, and we think both of those things were violated under the Advisers Act.

We don't allege that the HarbourVest settlement should be undone or unwound.  We can't unscramble that egg.  We do seek damages, as I believe is our right, arising out of the wrongdoing and the process of pushing forth the settlement.

I think one of the allegations in the actual motion for the show cause order was that this was going to undo all of the hard work that Court had done and basically unwind and try to re-piece Humpty Dumpty back together again.  But that's simply not the case.  Nowhere in our allegations or in the

HCMLPHMIT00002750

36

relief that we request are we trying to undo the HarbourVest settlement as such.

Now, whether the lawsuit should be dismissed under the affirmative defenses that they bring up -- res judicata, waiver, release -- all of those are questionable under the Advisers Act, given the change of circumstance, and therefore are also questions on the merits. They don't go to the colorability of the underlying claims in and of themselves, which I think is important.

So we asked for leave to amend from the Court. And what they want us to do, Your Honor, is they want to sanction us for asking. They're saying asking for leave to amend is the same thing as pursuing a claim. And I'll get to the specifics on that in a little bit. But that's the frame. Can we be sanctioned for asking a court, any court, even if it's the wrong court, for permission to bring the lawsuit? They don't cite a single case that says that that, in and of itself, is sanctionable conduct, us asking.

So I'd like to introduce some of the Respondents.

Your Honor, may I have one of these waters?

THE COURT:  Certainly.

MR. SBAITI:  Thank you.

THE COURT:  That's why they're there, by the way.

MR. SBAITI:  I didn't know if they belonged to somebody else.

HCMLPHMIT00002751

37

THE COURT:  We've scattered water bottles around for people.

MR. SBAITI:  I appreciate it.  Thank you, Your Honor.

THE COURT:  So if you see these little ones, that's for anyone.

MR. SBAITI:  So, this is an org chart, and you'll see it as -- the exhibits that the Debtor's going to bring up. And when we talk about the DAF, Your Honor -- I don't know if that's visible to you.  We're on Slide 19, if you're looking at it on paper.  There's a little number at the lower right-hand corner.  The charitable DAF GP, LLP and then the Charitable DAF Holdco, Ltd. together are the principles of the Charitable DAF Fund, LP.  And so when we refer to the DAF or the Charitable DAF, that's really the entity structure that we're referring to.  And then the GP and Holdco Ltd. have a managing member.  It used to be Grant Scott at the time this was done.  Today, it's Mr. Mark Patrick, who's in the room, sitting next to Mr. Bridges.

The DAF is a charitable fund.  It's funded over $32 million, as the evidence will show, including Dallas-Fort Worth organizations, The Family Place, Dallas Children's Advocacy, Center for Brain Health, the Crystal Ray Initiative, Friends of the Dallas Police, Snowball Express, various community and education initiatives, Dallas Arts, museums, the Perot Museum, Dallas Zoo.  That evidence is undisputed, Your

HCMLPHMIT00002752

38

Honor.  The DAF is a real fund.  It is a real charitable fund. It does real good in the community.

Now, Respondents -- Holdco, which you will see at the bottom of that chart, is essentially the investment arm. There are assets that the DAF owns in various pots, and Holdco is the actual business engine that generates the money from those assets that then -- that then gets passed up to the charitable -- the four charitable foundations at the top.

I'll go back to Slide 21.  And if you look at the top, Your Honor, the Dallas Foundation, Greater Kansas City Community, Santa Barbara Foundation, The Community Foundation of North Texas:  Those are the charities that then themselves bestow the funds onto the actual recipients.  So the money flows up as dividends or distributions, and then gets contributed.

CLO Holdco invests those assets, and it's an important part of the business model, so that you're not sending out principal.  It's the money that CLO makes, the profits, if you will, that it is able to generate that gets donated and makes its way into the community.

So there's an important feature to the structure in that it has to be able to generate money.  It's not just money that sits there and waits to be distributed.  There's active investing going on.

Mr. Mark Patrick owns the control shares of the entities

HCMLPHMIT00002753

comprising the DAF and CLO Holdco, as I showed you, and the beneficiary charitable foundations hold what we call beneficial interests, where they just get money. They don't have a vote.

Mr. Patrick cares about the public service the DAF engages in. He's been an advisor to the DAF, CLO Holdco, and its predecessor, Mr. Scott, since its inception. He receives no compensation for the job he's doing today. And you'll hear how he became -- how he inured to the control position of the DAF and CLO Holdco from him, but it doesn't involve Mr. Dondero, and the absence of someone saying that it did, I think, is going to be striking by the end of the presentation of evidence.

Their only argument against you, Your Honor, is going to be you just can't believe them. But not believing witnesses is not a substitute for the lack of affirmative evidence.

Mr. Patrick has said all along he authorized the filing of the motion for leave to add Mr. Seery to the lawsuit in District Court. He doesn't believe the motion to amend violated this Court's orders, for the reasons stated in our responsive filings to the motions for contempt and show cause order. That's why he authorized it.

My firm, Sbaiti & Company, we're a small Dallas litigation boutique retained by the DAF and CLO Holdco to file the lawsuit. We did an investigation. I'm tickled to death that

HCMLPHMIT00002754

Mr. Morris loved our complaint so much and gave us the compliment that we got it done in a short amount of time, but we did get it done in a short amount of time, because, in the end, it's a rather simple issue, as I was able to lay it out in about three or four bullet points in a previous slide.

The written aspect of that doesn't take that long, as Your Honor knows, but the idea that there's a suspicion that we didn't write it or someone else wrote it and ghost-wrote it and gave it to us, which I think is the insinuation he was making, is completely unfounded.  There's no evidence of that.

We carefully read Your Honor's orders.  We developed a good-faith basis, as required by Rule 11, that the lawsuit and the motion to add Mr. Seery were not filed in bad faith or for an improper purpose.  We don't think they're frivolous.  We don't think they're in violation of Your Honor's orders, given the current state of the law.

Mr. Dondero is one of the settlors of the CRT, of the Charitable Remainder Trust that ultimately provided assets to CLO Holdco and the DAF.  He does care about the DAF's mission. I think Mr. Morris hit the nail on the head.  Of course Mr. Dondero cares about what happens to it.  He's one of the settlors, and it was his funds that initially were put into it, so he's allowed to care.  And I don't think him caring is insidious, and him caring doesn't mean he has control and doesn't mean he's the driving force behind some insidious

HCMLPHMIT00002755

conspiracy that they're trying to insinuate exists.

He is an advisor to the DAF and CLO Holdco.  It is a lot of money and it needs advice, and he's an advisor to Mr. Patrick.  We don't run away from any of those facts, Your Honor.

We also don't run away from the fact that he was the source of some of the information that came in to that complaint and that he relayed some of that information.  The content, we do claim work product privilege and attorney-client privilege, because he's an agent of our client, and as lawyers doing an investigation, the content of our communications is protected under the attorney-client and work product privileges, as well as the joint interest privilege.  But the fact that we admit that those communications happened, we're not running away from that fact.

So, what does he have to do with this?  It's interesting that that opening argument you just heard spent about three minutes on contempt and the other fourteen or fifteen minutes or so on Mr. Dondero.  And only on Mr. Dondero.  There's a negative halo effect, I believe, that they're trying to get this Court to abide by.  They want to inflame Your Honor and hopefully capture -- cultivate and then capitalize on whatever antipathy you might have for Mr. Dondero, and then sweep us all in under that umbrella and sanction everybody just because he had some involvement.

HCMLPHMIT00002756

But whatever involvement he has, which we admit he had some involvement in helping us marshal the facts, that's not a basis for us to be sanctioned if there isn't an actual sanctionable conduct that -- as we say there isn't.

We think there's an ulterior motive.  That's why Mr. Morris just announced to Your Honor, Mr. Dondero controls it all.  The ulterior motive, I believe, is, down the line, when they want to argue some kind of alter ego theory, they want to lay that foundation here.  I don't think this is the appropriate time for that foundation, and I don't think any of the information and the evidence they're trying to marshal in front of you is really going to be relevant to the very specific question that's before Your Honor:  Does our motion asking the District Court to add Mr. Seery violate your order, or violate it in a way that can be -- that we can be sanctioned for?  We don't believe it violates it.

So, the three core standards that have to be met.  First of all, civil contempt requires a valid, enforceable order. It's not debatable and it's not -- I don't think that's a shocking statement.  Then they have to have clear and convincing evidence of a violation of a specific unambiguous term therein.  Mr. Morris wants his version of the word pursue to be unambiguous, and I think the word pursue is unambiguous. But the way he wants you to construe it makes it completely ambiguous, and we'll -- I'll get to that in a moment.

HCMLPHMIT00002757

43

Now, for sanctioning counsel, the Fifth Circuit has held you have to find bad faith.  We're adjudged under a slightly separate standard under the Fifth Circuit law.  So the contempt motion, though, to the extent it seeks to impose double and treble attorney's fees, those are in punitive fines.  They are not compensatory.  So criminal contempt standards are raised, and so they have to show a violation in bad faith.  In other words, our arguments that we're making have to be bad faith, not simply that we're wrong, and they have to show beyond a reasonable doubt, usually in front of a jury.  The U.S. Supreme Court explained the difference and the different procedural protections that have to be involved if they're really going to seek double and treble compensatory damages.

Now, he's right.  Saying we intended -- saying that we didn't mean to violate it isn't necessarily a defense.  But what you're actually going to hear from him is the opposite argument, that even though we didn't violate it, we wanted to.  That's what he says.  That's why he quoted you the opening section of our motion asking for permission to sue Mr. Seery, because that's a statement of purpose.  And he says you should sanction them right there.  That's literally what he said.  It's right there, their purpose.  If intent is irrelevant to them, it's irrelevant as to us.  The fact that we wanted to sue Seery is fully admitted.  We don't deny the fact that we

HCMLPHMIT00002758

44

believe Mr. Seery should be a defendant in this lawsuit. But the fact that we didn't sue him is why we didn't violate the order. And they can't say that the fact that we eventually wanted to sue him means we did violate the order. That door swings both ways, Your Honor.

We don't think any element is met. The order, while writ large, prohibits suing Mr. Seery without permission, and we did not sue James Seery, pure and simple. The July 12 -- 14th, 2020 order purports to reserve exclusively to this Court that which, according to the statutes and the case law, we believe the Court can't exclusively reserve to itself. And Your Honor, the order prohibits commencing and pursuing a claim against Jim Seery without coming here first to decide the colorability of such a claim.

They, I believe, admit that we didn't commence a claim against Jim Seery. I think they've admitted that now. So now we're talking about what does pursue mean? We didn't pursue a claim against Jim Seery. Is asking for leave to bring suit the same thing as pursuing a claim? That's the question that's really before Your Honor. Lawyers never talk of pursuing a claim that hasn't been filed. We don't say, I'm pursuing a claim and I'm going to file it next week or next year. Usually, that type of language is in an order, because when the order happens, there may already be claims against Mr. Seery. And so the pursuit of claim is supposed to attack

those cases, to come here and show colorability, presumably, before they continue on with those lawsuits.  It doesn't mean asking for permission.

If it did mean asking for permission, then complying with Your Honor's order would be a violation.  If the motion for leave is a violation because it is pursuing a claim, if I had filed that motion in this Court, it would still be pursuing a claim without Your Honor's permission.  I'd have to get permission just to ask for permission.  It puts us in this endless loop of, well, if asking for permission is pursuing a claim, and pursuing a claim is without permission violates the Court's order, we'd always be in violation of the Court's order just for asking, just for following Your Honor's edict.

THE COURT:  I'm just, I'm going to interject.  You were supposed to, under the order, file a motion in this Court.

MR. SBAITI:  I understand that, Your Honor, and I think that we can get to the specifics on why we disagree with how the motion went, Your Honor.  We hadn't sued Mr. Seery.  So as long as we dealt with the order, which is what our position is, then we don't believe we violated the order.

THE COURT:  You think the order was ambiguous, requiring a motion to be filed in the Bankruptcy Court?

MR. SBAITI:  Your Honor, what we believe is that the order was ambiguous in terms of whether us asking for

HCMLPHMIT00002760

permission in the District Court was in and of itself a violation of the order.  We don't think it was.  Actually, we don't think the order's ambiguous to that extent.  The second we file a suit against Mr. Seery and we don't have some resolution of the issue, then I think the question of sanctionability comes in.  But we never filed suit, Your Honor.

The Court doesn't say I can't seek permission in the District Court or that we can't go to the District Court with -- which has general jurisdiction over this case, and has jurisdiction, we believe, over the actual case and controversy that's being raised.  But the idea of pursuit being a violation of the order, of the letter of that order, is nonsensical under that, it leads to an absurd result, and it's plainly vague and ambiguous, Your Honor.

Asking Judge Boyle or asking a District Court for permission is not a violation of this Court's order, not the way it was written and not -- and I don't even believe it was a violation necessarily of the Court's -- of the language that the Court has.  We -- it doesn't unambiguously prevent us from asking the District Court for leave.

The Court's order yesterday, Your Honor, applied this very rule.  The TRO -- you said the TRO did not specifically state, Turn your cell phone over.  And you denied motion for sanctions on that.  That's basically the argument we're making

HCMLPHMIT00002761

47

here, Your Honor.  We think that was the correct ruling, and we think the same type of ruling applies here.

Your order yesterday also determined that the Court ultimately believes that hiring lawyers to file motions should not be viewed as having crossed the line into contemptuous behavior.  That's essentially the argument they want you to buy, that there's somehow a vindictiveness behind this and an insidious plan to violate court orders, Your Honor.  We don't have any evidence of that.

THE COURT:  Okay.  Take the words vindictiveness and insidious out of the equation.  That's making things personal, and I don't like that.  The key is the literal wording of the order, is it not?

MR. SBAITI:  Your Honor, the key, I believe, is the --

THE COURT:  No entity may commence or pursue a cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court first determining, after notice, that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery and specifically authorizing such entity to bring such a claim. So I'm trying to understand why you argue that filing a motion asking the District Court for permission is not inconsistent

with this order.

MR. SBAITI:  Because it's not commencing a claim, Your Honor.  It's not commencing a claim against him.

THE COURT:  Okay.  So is your argument that if Judge Boyle authorizes amendment of the pleading to add Mr. Seery and then you do it, at that point they may have grounds for a motion for contempt, but not yet, because she has not actually granted your motion?

MR. SBAITI:  Correct, Your Honor.  I mean, in a nutshell.  In fact, that's one of -- I think that's probably our next argument.  We think, in a sense, this argument is incredibly premature.  There is three ways that this -- well, I'd like to address this, so I've got -- I've got a diagram that I think will actually help elucidate what our thought process was.

There's three things she could have done.  She could have referred -- referred it to Your Honor, which is what we expected was likely to happen.

THE COURT:  But you didn't file a motion for referral of the motion before her.

MR. SBAITI:  Well, no, I don't mean in respect of enforcing the reference.  The referral we thought was most likely going to happen because it's an associated case, and we actually put those orders in front of her, so we expected that those orders would end up -- that the question would

49

ultimately end up in front of Your Honor on that basis.

She could have denied our motion outright, in which case we haven't filed a claim, we haven't violated it, or she could have granted our motion and done one of two things. She could have granted it to the extent that she thought leave would be proper but then referred it down, or she could have decided -- taken the decision as the court with general jurisdiction and simply decided it all on her own. She had all of those options, Your Honor, and none of them results in a claim being commenced or pursued without the leave of this Court, if leave is absolutely necessary, Your Honor. And that's the point that we were trying to make.

Your Honor, the -- there's -- you know, there's no evidence that, absent an order from a court with jurisdiction, that we were going to file a claim against Mr. Seery, that we were going to commence or pursue a claim against Mr. Seery. We were cognizant of Your Honor's order. We considered that. And the reason we filed them the way we did is because, according to the statutes and the case law, this is the type of case that would be subject to a mandatory withdrawal of the reference.

And so there's this paradox that arises, Your Honor. And the paradox that arises is that we show up and immediately go, well, we need to be back in the District Court. So we filed our motion there, and I don't think that was contemptuous, it

HCMLPHMIT00002764

50

wasn't intended to be contemptuous of the Court, but we showed the orders to the Court, made the same arguments that we have been making here, that we believe that there's problems with the order, we believe the order oversteps its jurisdiction and maybe is unenforceable, and it's up to that District Court, as it has been in almost all of these other gatekeeper order cases that get filed. None of them result in sanctions, Your Honor. What they result in is a District Court deciding, well, either they refer it or they decide I don't need to refer it. But I don't think that that is the same thing as commencing or pursuing a claim in the end, Your Honor, because all we did was ask for permission, and permission could have been denied or granted or granted in part.

Your Honor, they haven't cited an injury. You've heard the testimony, Your Honor, that they -- the first time they knew we had filed a motion -- which I don't understand why that's the first time they knew we had filed a motion; we told them we were going to file the motion -- was when I forwarded an email saying that it's been denied without prejudice, Your Honor. Well, that means they didn't have to do any work to respond to the motion. They didn't have to do any work to do any of the other things.

And one hundred percent of the damages that they're going to say they incurred is the litigation of this contempt hearing or this sanction motion, as opposed to some other

HCMLPHMIT00002765

51

simpler remedy, like going in to Judge Boyle and saying, Your Honor, all that needs to go, which is what they eventually did.  But they would have had to incur those costs anyway because they're now moving to enforce the reference.  They filed a 12(b)(6).  That briefing would have existed regardless of whether or not we had filed our motion, regardless of whether the sanctions hearing had commenced.

Your Honor, I'm going to let my partner, Mr. Bridges, address this part of it, if I could.  I think that gets into more of the questions that you asked, and I think he can answer them a lot better than I can.

THE COURT:  Okay.

MR. SBAITI:  Thank you.

THE COURT:  That's fine.

MR. BRIDGES:  Thank you, Your Honor.  And I do want to address pointedly the questions that you're asking.  First, though, I was hoping to back up to some preliminary remarks that you made and say that I find the 200 orders a week just mindboggling.  It amazes me, and puts the entire hearing in a different perspective for me.  I'm grateful that you shared that with us.

Your expression of regret about naming us violators was very meaningful to me.  It causes me -- well, the strong words in our brief were mine.  I wrote them.  And your expression of regret causes me to regret some of those words.  I'm hopeful

HCMLPHMIT00002766

52

that you can understand, at least in part, our reaction out of concern.

And Your Honor, it's awkward for me to talk about problems with your order, and that's the task that's come to me, to list and talk through four of them and why we think they put us in a really awkward position in deciding what to do in this case, in the filing of it, in where we filed it, and in how we sought leave to go forward against Mr. Seery.  That was awkward and difficult for us, and I'm hopeful that I can explain that and that you'll understand, if I'm blunt about problems with the order, that I mean it very respectfully. Two hundred orders a week is still very difficult for me to get my mind around.

The four issues in the order start with the gatekeeping. Then, secondly, in the preliminary remarks, I made mention of the *Applewood* case and the notice that the order releases some claims.  Its effect of --

THE COURT:  And by the way, I mean, you might elaborate on the facts and holding of *Applewood*, because I came into this thinking *Republic Supply v. Shoaf*, and for that matter, as I said, *Espinosa*, were much more germane.  And so, you know, you'll have to elaborate on *Applewood*.  I remember that case, but it's just not one people cite as frequently as those two.

MR. BRIDGES:  Yes, Your Honor.  And our reply brief

HCMLPHMIT00002767

devotes a page to the case, and I'm hopeful that I can remember it well enough to give you what you're looking for about it, but I would point you to our reply brief on that topic as well.

The *Shoaf* case that *Applewood* quotes from and distinguishes and expressly limits, the *Shoaf* case actually has been cautioned and limited and distinguished numerous times, if you Shepardize it, and the *Applewood* case is the leading case, and it also is from the Fifth Circuit, that describes and cabins the effects of *Shoaf*.  And in *Applewood*, what happened is a bankruptcy confirmation order became final with releases in it, and the court held that exculpatory orders in a final order from the Bankruptcy Court do not have res judicata effect and do not release claims unless those claims are enumerated in the exculpatory order.  And --

THE COURT:  Okay.  So it was about specificity more than anything else, right?

MR. BRIDGES:  Yes, Your Honor. It was a --

THE COURT:  Okay.

MR. BRIDGES:  -- a blanket release, a blanket --

THE COURT:  Okay.

MR. BRIDGES:  -- exculpatory order that didn't specify what claims were released by what parties, and therefore the parties didn't have the requisite notice.

In my mind, Your Honor, it's comparable to the Texas

54

Supreme Court's holdings on what's required in a settlement release in terms of a disclaimer of reliance, --

THE COURT: Okay. But, again, --

MR. BRIDGES: -- that if you aren't --

THE COURT: -- it's about specificity --

MR. BRIDGES: Yes, Your Honor.

THE COURT: -- more than anything else? And then we've got the U.S. Supreme Court *Espinosa* case subsequent.

MR. BRIDGES: Okay. Your Honor, I'm not sure what *Espinosa* you're referring to. Can you tell me why that applies?

THE COURT: Well, it was a confirmation order. It was in a Chapter 13 context. And there were provisions that operated to discharge student loan debt, --

MR. BRIDGES: Uh-huh.

THE COURT: -- which, of course, cannot be discharged without a 523 action, a separate adversary proceeding. Nevertheless, the confirmation order operated to do what 523 suggests you cannot do, discharge student loan debt through a plan confirmation order.

The U.S. Supreme Court says, well, that's unfortunate that the confirmation order did something which it doesn't look like you can do, but no one ever objected or appealed. That's my recollection of *Espinosa*. So it seems to be the same holding as *Republic Supply v. Shoaf*. And what I -- why I

HCMLPHMIT00002769

55

asked you to elaborate on *Applewood* is because it does seem to deal with the specificity of the order versus the enforceability, no?

MR. BRIDGES:  Your Honor, if it's not obvious already, I'm not prepared to argue *Espinosa*.  And your explanation of it is very helpful to me.  I think you're right that the specificity issue from *Applewood* is what we're relying on.  And it sounds like --

THE COURT:  Okay.  So, that being the case, how was this order not specific?  Okay?

MR. BRIDGES:  That's easy, Your Honor, because it doesn't say which parties are releasing which claims.  And what we're talking specifically about there -- as we go through the order, I can show you the language -- but what we're talking about specifically are the ordinary negligence and breach of fiduciary duty claims that your order doesn't provide for at all.  Rather, it says colorability of gross negligence or willful wrongdoing, if I remember the words precisely, that's what must be shown to pursue a case -- a cause of action against Mr. Seery, thereby -- thereby indicating that claims for mere negligence, not gross negligence, or breach of fiduciary duty, which is an even lesser standard, that those claims are prohibited entirely.

And by having that kind of general all-encompassing release or exculpation for potential liability involving

HCMLPHMIT00002770

negligence, and most importantly, fiduciary duty breach under the Advisers Act, that that kind of exculpation under *Applewood* is not enforceable and has no res judicata effect because it wasn't -- those claims weren't enumerated in the order.

That for it to have the intended exculpatory effect, if that was what was intended, that the fiduciary duty claims and the parties who those claims may belong to would have to have been enumerated.

And indeed, that kind of specificity, what was required in *Applewood*, isn't even possible for a claim that hasn't yet occurred for future conduct.  It's not possible to enumerate the details, any details, of a future claim, because the underlying act -- if the underlying basis, facts for that claim, haven't yet happened.  It's something to happen in the future.

And here, that's what we're dealing with.  We're dealing with conduct that took place well after the January and July 2020 orders that had that exculpatory effect.  Is -- is that clear?

THE COURT:  Understood.

MR. BRIDGES:  Thank you, Your Honor.  So, the four areas of the order, the four functions that the order does that are problematic to us that led us to do what we have done are the gatekeeping function; the release; the fact that by

HCMLPHMIT00002771

stating sole jurisdiction, that it had a jurisdiction-stripping effect; and then, finally, jurisdiction asserting, where, respectfully, Your Honor, we think to some extent the order goes beyond what this Court's jurisdiction is.  And so that not only claiming exclusive jurisdiction, but claiming jurisdiction over all actions against Mr. Seery, as described in the order, is going too far.

And those are the four issues I want to talk about one at a time, and here -- I went two screens instead of one.  There we go.  And here's the order.  I have numbered the highlights here out of sequence because this is the sequence that I wish to talk about them and that I think their significance to our decision applies.

Before we get into the words of this July 16, 2020 order, I want to mention the January order as well.  Although the motion for contempt recites both orders, we don't actually think the January order applies to us, because our lawsuit against Mr. Seery is not about his role as a director at Strand in any way.  We didn't make an issue of that, other than in a footnote in our brief, because we don't think that distinction matters much since the orders essentially say the same things.

I'm not sure that it matters whether we have potentially violated one order or two.  If Your Honor finds we've violated one, I think we're on the hook regardless.  If Your Honor

finds that we didn't violate the July order, I don't think you will find that we violated the January order, either.  So my focus is on the July order.

The gatekeeping function comes from the preliminary language about commencing or pursuing a claim or cause of action against Mr. Seery.  And it says what you want us to do first before bringing such a claim.

The second issue of the release comes a little bit later.  It's the colorable claim of willful misconduct or gross negligence language.  In other words, because only claims of willful misconduct or gross negligence can pass the bar, can pass muster under this order, that lesser claims -- ordinary negligence and breach of fiduciary duty -- that those claims are released by this order.  That's the second argument.

Third is your reference to sole jurisdiction and the effect that that has of attempting to say that other courts, courts of original jurisdiction, do not have jurisdiction because it solely resides here.  That's the third thing I want to address.

And then the fourth is the notion that we have to come to this Court first for any action that fits the description of an action against Mr. Seery, when some actions are, through acts of Congress, removed from what this Court has the power to address.  Under 157(d) of Title 28, Your Honor, there are some kinds of actions which withdrawal of the reference is

HCMLPHMIT00002773

mandatory, and therefore this court lacks jurisdiction to address those.

And so those are the four issues I want to tackle, starting with the first, the gatekeeping. Your Honor, Section 28 -- Section 959 of Title 28 appears to be precisely on point. It calls -- it is called by some courts an exception to the Barton Doctrine, which we believe is the only basis, the Barton Doctrine, for this Court to claim that it has jurisdiction or sole jurisdiction and can require us to come here first. We think the Barton Doctrine is the only basis for that. We haven't seen anything in the briefing from opposing counsel indicating there was another basis for it. We think we're talking about the Barton Doctrine here as the basis for that.

959 is exception to the Barton Doctrine, and we think it explicitly authorizes what we have done.

Secondly, Your Honor, the order, the gatekeeping functions of the order are too broad because of its incorporation of the jurisdictional problems and the release problem that we'll talk about later. But for problem number one, the key issue that we're talking about is 959 as an exception to the Barton Doctrine. And I went the wrong way.

THE COURT: So, we could go down a lot of rabbit trails today, and I'm going to try not to do that, but are you saying the very common practice of having gatekeeping

HCMLPHMIT00002774

60

provisions in Chapter 11 cases is just defective law under 28 U.S.C. § 959(a)?

MR. BRIDGES: Can I say yes and no?

THE COURT: Okay.

MR. BRIDGES: Yes, to some extent, for some claims. No as to other claims to another extent. We are not saying gatekeeping orders are altogether wrong, --

THE COURT: Okay.

MR. BRIDGES: -- no.

THE COURT: Okay.

MR. BRIDGES: There are problems with gatekeeping orders that do more than what the law, Section 959 in particular, allows them to do.

THE COURT: Okay. Be more explicit. I'm not -- I think you're saying, no, except when certain situations exist, but I don't know what the certain situations are.

MR. BRIDGES: And Your Honor, you're exactly right. It's complicated, and it takes a long explanation. Let me start --

THE COURT: Okay. I really want to know, --

MR. BRIDGES: Yeah, me, too.

THE COURT: -- since I do these all the time, and most of my colleagues do.

MR. BRIDGES: Thank you, Your Honor. And 959 is on the screen. Managers of any property --

HCMLPHMIT00002775

THE COURT:  Uh-huh.

MR. BRIDGES:  -- is what we're talking about, including debtors in possession.  Now, it starts off by saying trustees, receivers.  I mean, this is exactly what the Barton Doctrine is about, right?  We're talking about trustees and receivers, but not just them.  We're also talking about managers of any property, including debtors in possession, --

THE COURT:  Uh-huh.

MR. BRIDGES:  -- may be sued without leave of the court appointing that.  That's contrary to the Barton Doctrine so far.

With respect to what I've numbered five here -- these numbers are mine -- the quote is directly verbatim out of the U.S. Code, but the numbering one through five is mine.  With respect to what acts or transactions in carrying on business connected with such property.

And so, Your Honor, what we're talking about isn't Barton Doctrine is inapplicable, or you can't have a gatekeeping order for any claims, but it's about managers of property. And one of the hornbook examples of this is the grocery store that files for bankruptcy and then, when --

THE COURT:  Slip-and-fall.

MR. BRIDGES:  You've got it, Your Honor.

THE COURT:  Uh-huh.

MR. BRIDGES:  And because they're managing property,

HCMLPHMIT00002776

62

--

THE COURT:  So your cause of action, if it went forward, is the equivalent of a slip-and-fall --

MR. BRIDGES:  Yes, Your Honor.

THE COURT:  -- in a grocery store?

MR. BRIDGES:  Yes, Your Honor.

THE COURT:  Okay.  Let me skip ahead.  What about the last sentence of 959(a)?

MR. BRIDGES:  959(b)?  Or 959(a)?

THE COURT:  No, of 959(a).

MR. BRIDGES:  What we're looking at here?

THE COURT:  That's the sentence that I have always thought was one justification for a gatekeeper provision.  And I know, you know, a lot of others feel the same.

MR. BRIDGES:  Are we talking about what I have listed in number five here?

THE COURT:  No.  I'm talking about the last sentence of 959(a).  Such actions, okay, shall be subject to the general equity power of such court, you know, meaning the Bankruptcy Court, so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to a trial by jury.

Isn't that one of the provisions that lawyers sometimes rely on in arguing a gatekeeper provision is appropriate?

MR. BRIDGES:  Certain --

HCMLPHMIT00002777

THE COURT:  You, Bankruptcy Judge, have the power, the general equity power, so far as the same may be necessary to the ends of justice?

MR. BRIDGES:  Your Honor, you bet.  Absolutely, there is equitable power to do more.  There's no doubt that there are reliance -- there is reliance on that in many instances.  So I'm not sure -- I'm not sure I'm responding to your point.

THE COURT:  Well, again, I think this is the third or fourth argument down the line that really you start with in the analytical framework here, but I guess I'm just saying I always thought a gatekeeping provision was consistent, entirely consistent with 28 U.S.C. § 959(a), the last sentence.

MR. BRIDGES:  When you're dealing --

THE COURT:  You disagree with that?

MR. BRIDGES:  I do, Your Honor.

THE COURT:  Okay.

MR. BRIDGES:  And it's not that the Court lacks equitable powers to do more.  It's that those equitable powers are affected by when management of other parties, third parties' property is at issue.

What we're talking about is similar to yesterday's contempt order.  When you set the basis of describing what it is that Highland's business is, that they're a registered investment advisor in the business of buying, selling, and

64

managing assets -- assets, of course, are property, and that property is not just Highland's, but it's third-party property, as if a railroad loses luggage belonging to its customers.  Rather than the railroad with a trustee appointed having mismanaged railroad property, we're talking about third-party property here, third-party property that belongs to the CLOs, about a billion dollars of assets in these CLO SPEs that Highland manages.

And again, the slide that Mr. Sbaiti showed you showing Highland, yes, they manage their own assets, the assets of the Debtor, but also of the third parties, including the Charitable DAF and CLO Holdco, and that the Advisers Act imposes fiduciary duties on them that are unwaivable when they're doing that.

In *Anderson*, the Fifth Circuit called 959 an exception to the rule requiring court's permission for leave to sue.  In *Hoffman v. City of San Diego* much more recently, relying on this statute again, the court rejected a *Barton* challenge and called it a statutory exception.  And in *Barton* itself, from a century ago, the U.S. Supreme Court even acknowledged there that where a receiver misappropriated the property of another -- not the debtor's property, the property of another -- that the receiver could still be sued personally, without leave of court.

Absent *Barton*, absent applicability of the Barton

65

Doctrine, Your Honor, the gatekeeper order is problematic.

*Barton* applies where a court has appointed a trustee, and I don't think, Your Honor, under the circumstances in this case, that it is fair to say Mr. Seery was appointed, as opposed to approved by this Court.  And it involves a trustee's actions under the powers conferred on him.  The Barton Doctrine is not about a broader exculpation of the trustee.

Here, what the Debtor asked for in its motion for approval, approval of hiring Mr. Seery, what it asked for specifically in the motion was that the Court not interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and asking the Court to uphold the board's decision to appoint Mr. Seery as the CEO as long as they are attributable to any rationale business purpose.

At the hearing, Your Honor, at the hearing, we've quoted your comments saying that the evidence amply shows a sound business justification and reasonable business judgment on the part of the Debtor in proposing that Mr. Seery be CEO and CRO.  Your Honor, respectfully, those words don't sound like the judge using its discretion to choose -- appoint a trustee.  They sound like the Court exercising deference to the business judgment of a business.  And appropriately so.  We don't have trouble with application of the business judgment rule.  Our problem is with application of it and the Barton Doctrine.

HCMLPHMIT00002780

Those two do not go together.  A trustee has protection because it's acting under color of the court that appointed it.  A court that merely deferred to someone else's appointment, that's not what the Barton Doctrine is about. The Barton Doctrine is about the court's function that the trustee takes on, not deference to the business judgment of the debtor in possession or the other fiduciary appointed by the court.

Problem one was the gatekeeping.  Problem two is about the release and the *Applewood* case.  Your Honor, again, ordinary negligence and ordinary fiduciary duty breaches do not rise to the level of gross negligence and willful misconduct.  And because of that, the language of this order appears to be barring them entirely.  No entity may bring a lawsuit against Mr. Seery in certain circumstances without the Bankruptcy Court doing what?  Determining that the cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery.

A breach of fiduciary duty under the Advisers Act can be unintentional, it can fall short of gross negligence by miles, and to exculpate Mr. Seery from those kinds of claims entirely is to make him no longer a fiduciary.  A fiduciary duty that is unenforceable makes someone not a fiduciary.  That's plainly not what Mr. Seery thinks his role is.  It's inconsistent with the Advisers Act.  And Your Honor, the

HCMLPHMIT00002781

notion that he would not owe his clients fiduciary duties as he manages their assets would require disclosures under the SEC regulations.  It creates all kinds of problems to state that a fiduciary under the Advisers Act does not have enforceable fiduciary duties.  The order appears to be releasing all of those.  But for *Applewood's* specificity requirement, it would be doing that.

As an asset manager under the Advisers Act, Mr. Seery is managing assets belonging to CLO Holdco and The Charitable DAF.  That's precisely what the District Court action is about, those fiduciary duties.  And Mr. Seery, in describing these recently in testimony here -- forgive me for reading through this, Your Honor, but it is pretty short -- Mr. Seery testifies, I think, from a high level, the best way to think about the Debtor is that it's a registered investment advisor.  As a registered investment advisor, which is really any advisor of third-party money over $25 million, it has to register with the SEC and it manages funds in many different ways.  The Debtor manages approximately $200 million current values -- it was more than that of the start of the case -- of its own assets.

I'm pausing there, Your Honor.  $200 million of its own assets, but we're about to talk about third-party assets.

It doesn't have to be a registered investment advisor for those assets, but it does manage its own assets, which include

HCMLPHMIT00002782

directly-owned securities, loans, from mostly related entities but not all, and investments in certain funds, which it also manages.

And then here it comes:  In addition, the manager -- the Debtor manages about roughly $2 billion, $2 billion in total managed assets, around $2 billion in CLO assets, and then other entities, which are hedge funds or PE style.

We also had to get a very good understanding of each of the funds that we manage.  And as I said, the Investment Advisers Act puts a fiduciary duty on Highland Capital to discharge its duty to the investors.  So while we have duties to the estate, we also have duties, as I mentioned in my last testimony, to each of the investors in the funds.

Now, some of them are related parties, and those are a little bit easier.  Some of them are owned by Highland.  But there are third-party investors in these funds who have no relation whatsoever to Highland, and we owe them a fiduciary duty both to manage their assets prudently but also to seek to manage -- maximize value.

Those duties do not require -- requires the opposite of what I mean.  They don't merely require avoiding gross negligence or willful wrongdoing.  When you're managing assets of others, the fiduciary duties that you owe are far stricter than that.  The highest duty known to law is a fiduciary duty.

The order is inconsistent with that testimony,

69

acknowledging the fiduciary duties owed to The Charitable DAF and to CLO Holdco. It appears to release the Debtor -- maybe not the Debtor. My slide may be wrong about that. It appears to release Seery from having to uphold these duties.

In addition to problems with the gatekeeping under the Barton Doctrine, in addition to the release problem and *Applewood* and the unwaivable fiduciary duties under the Advisers Act, there's also a problem with telling other courts that they lack jurisdiction. Your Honor knows bankruptcy court law -- bankruptcy -- and the Bankruptcy Code far better than I do, I'm certain. But a first principle, I believe, of bankruptcy law is that this Court's jurisdiction is derivative of the District Court's. And the only doctrine I've heard of that can allow this Court to exercise exclusive jurisdiction of the District Court that it sits in is the Barton Doctrine, which, again, is very problematic to apply in this case, for the reasons we've discussed already.

By claiming to have -- by stating in the order that this Court has sole jurisdiction, it appears to either be inclusive of the District Court, which I understand Your Honor doesn't think her order can be read that way, but if it's not read that way, then it results in telling the District Court that it doesn't have the original jurisdiction that Congress has given it. And that's problematic in the order as well.

THE COURT: Let me ask you. If you think the word

"power" had been used, or "authority," versus "jurisdiction," that would have cured it?

MR. BRIDGES:  I think there would still have been other problems.  Would it have cured this?  I don't think so, Your Honor, because, again, I think the only basis for that power is the Barton Doctrine.

THE COURT:  Okay.

MR. BRIDGES:  To listen to opposing counsel, you'd think that our jurisdictional argument was entirely about the jurisdiction stripping.  It's not.  Frankly, Your Honor, that's maybe even a lesser point.  A key problem here to is the assertion of jurisdiction, not over any of the claims, but over all of the claims, because of 157(d), Your Honor, because some claims, some causes of action, have been put outside the reach of bankruptcy, the Bankruptcy Court, and those actions may in some instances fit within your description of the cases that are precluded here.

That's a problem jurisdictionally with this Court's ability to say it retains jurisdiction or that it has, that it asserts jurisdiction.  Over what?  Any kind of claim or cause of action against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor.

Some claims that fit into that bucket also fit into the description in 157(d) of cases that require both consideration

of bankruptcy law and federal laws affecting interstate commerce or regulating it.  Right?  Some cases must fall into -- under 157(d), despite having something to do with Mr. Seery's role as a chief executive officer.  And Your Honor, the Advisers Act fiduciary duty claims asserted by Respondents in the District Court are such claims.  They cannot be decided without considering the Advisers Act.

There are also RICO claims that, of course, require consideration of the RICO statute.  But the Advisers Act claims absolutely require consideration of both bankruptcy law and this Court's order exonerating -- exculpating Mr. Seery from some liability, in addition to the unwaivable fiduciary duties imposed by the Advisers Act.

The assertion of jurisdiction here blanketed, in a blanket manner, over all claims against Mr. Seery in any way related to his CEO role is a 157(d) problem that the order has no -- has no solution for and we see no way around.  157(d) requires withdrawal of the reference, makes it mandatory, when a case requires considerations of federal law implicating interstate commerce.

Your Honor, we think we had to do it the way we did, filing in the District Court instead of filing here, in order to preserve our jurisdictional arguments.  To come to this Court with a motion and then what?  Immediately file a motion to withdraw the reference on our own motion here?  To come

HCMLPHMIT00002786

72

here and ask for a decision on colorability, when first colorability would exclude the claims that we're trying to bring, at least some of them, the mere negligence, mere fiduciary duty breaches, because they don't rise to the level necessarily of gross negligence or willful wrongdoing.

Your Honor, coming here and asking this Court to rule on that may well have waived our jurisdictional objections. Coming here to this Court and doing that and immediately filing a motion --

THE COURT:  I don't get it.

MR. BRIDGES:  The ordinary --

THE COURT:  Subject matter jurisdiction, if it's a problem, it's not waivable.

MR. BRIDGES:  The ordinary issue -- the ordinary waiver rule, Your Honor, is that when you come and ask for a court to rule on something, that you waive your right to -- to later -- you're estopped judicially from taking the contrary position.

THE COURT:  Okay.  Well, again, I don't get it.  If you filed your motion and I ruled in a way you didn't like, you would appeal to the District Court.

MR. BRIDGES:  Yes, Your Honor.  An appeal to the District Court, we would be entitled to do.  I understand, no matter what happens here, we can appeal to the District Court. That's different from whether or not, by coming here first,

HCMLPHMIT00002787

73

have we waived or have we created an estoppel situation, in terms of arguing jurisdiction.

THE COURT:  Okay.

MR. BRIDGES:  Because of the problems with the order, we thought we were in a situation where coming here would waive rights that we could avoid waiving by asking in the District Court.

In other words, there was a jurisdictional paradox:  How does a party ask a court to do something it believes the court lacks the power to do?  That's the spot we found ourselves in. What were we supposed to do?

Your Honor, it is definitely a complex case.  And coming into this matter with over 2,000 filings on the docket before I had ever heard of Highland was a very daunting thing, coming into this case.  And whether or not there's something that we missed is certainly possible, but these orders that are the subject of the contempt motion, these orders are not things that we overlooked.  These are things that we studied carefully, that we did not ignore or have disdain for, but that affected and changed our actions.

And in the Slide #3 from Mr. Morris's -- from Mr. Morris's presentation, in his third slide, he quotes from the first page of our motion for leave, the motion that he says exhibits our contemptuous behavior.

The second paragraph is kind of tiny print there, Your

HCMLPHMIT00002788

Honor, and it's not highlighted, but I'd like to read it. Seery is not named in the original complaint, but this is only out of an abundance of caution due to the Bankruptcy Court in HCM's pending Chapter 11 proceeding having issued an order prohibiting the filing of any causes of action against Seery in any way related to his role at HCM, subject to certain prerequisites.  In that order, the Bankruptcy Court also asserts sole jurisdiction over all such causes of action.

Your Honor, our intent was not to violate the order.  Our intent was to be cautious about how we proceeded, to fully disclose what we were doing, and to do it in a District Court that absolutely could refer the matter here to this Court for a decision, but to do it in a way that didn't waive our jurisdictional arguments, that didn't waive our arguments regarding the release of the very claims we were trying to bring, by first having to prove that they were colorful claims of willful misconduct or gross negligence, when we were trying to assert claims that weren't willful negligence or gross -- gross negligence or willful misconduct.  That was what I was trying to say.

Your Honor, this was not disregard of your order.  If we're wrong on the law, we're wrong on the law, but it's not that we disregarded your order or lacked respect for it.  We disclosed it.

Mr. Morris has argued in the briefs that we attempted to

HCMLPHMIT00002789

75

do this on an ex parte basis.  Your Honor, we did not attempt to do this on an ex parte basis.  And if there are errors, they probably are mine.  I know one error is mine.  On the civil cover sheet in the filing in the District Court, I noted and passed on that we should check the box for related case and list this case on there.  I did not follow up to make sure that it happened, and administratively, it didn't happen.  We did not check the box on the civil cover sheet.  Mr. Morris is correct that we failed to do that.  He's incorrect that that was sneaky or intentional.  It was my error, having noticed it but not followed up.

Your Honor, similarly, the argument that we didn't serve them with the motion I think is disingenuous.  What happened, Your Honor, is that counsel for the Debtor had agreed to accept service of the complaint itself against the Debtor before the motion for leave, and after accepting service, I was under the impression that they'd be monitoring the docket, especially when I emailed them, informed them that we were filing the motion for leave to amend, because I was required to submit a certificate of conference on that motion.  I informed them in a polite email.  The polite email is not quoted in their brief.  It is included in the record, and it's quoted in full in our brief.

The email exchange indicates to them, Thank you for pointing out the Court's orders.  We've carefully studied them

HCMLPHMIT00002790

and we don't think what we're doing is a violation of those orders.

That we didn't serve them is because we thought they already knew that the motion was coming and would be monitoring the docket, and we didn't know which lawyers they were going to have make an appearance in that case, so we wouldn't have known who to serve. But if not serving them -- first, the Rules do not require that service. But if not serving them out of politeness --

THE COURT: Mr. Morris is standing up. Did --

MR. MORRIS: I move to strike all of this, Your Honor. If Counsel wants to take the stand and raise his hand, he should testify under oath. I'm just going to leave it at that. He's not on their witness list.

THE COURT: All right. I overrule. You can continue.

MR. BRIDGES: Thank you, Your Honor.

If failure to serve them was an error, it was mine. I know of no rule that requires it.

THE COURT: Can I ask you, you were talking about the cover sheet mistake in not checking the box. What about your jurisdictional statement in the actual complaint not mentioning 28 U.S.C. § 1334 as a possible basis for subject matter jurisdiction? Do you think that was a mistake as well, or was that purposeful, not necessary?

HCMLPHMIT00002791

77

MR. BRIDGES:  Candidly, Your Honor, standing here right now, I have no recollection whatsoever of it.

THE COURT:  You mention 28 U.S.C. § 1331, and then 1367 supplemental jurisdiction, but you don't mention 1334.

MR. BRIDGES:  I suspect it's true, but Mr. Sbaiti would have written that.

THE COURT:  Okay.

MR. BRIDGES:  I have no recollection of --

THE COURT:  Okay.

MR. BRIDGES:  -- making any decision at all --

THE COURT:  All right.

MR. BRIDGES:  -- with regards to that.

THE COURT:  Okay.

MR. BRIDGES:  Your Honor, you've been very patient with a very long opening argument, and I'm very grateful for that.  Please know that we take this Court's order seriously. We voluntarily appeared here before the Court ordered us to do so by filing our motion asking for a modification of the order we're accused now of having been in violation of.

And the last thing I'd like to say, Your Honor, Mr. Morris's brief claims that the first he knew of the motion, the motion seeking leave to add Mr. Seery to the District Court claim, the first he knew of that was when Mr. Sbaiti forwarded him the District Court's order dismissing that motion, denying that motion without prejudice.

HCMLPHMIT00002792

78

Your Honor, in a civil contempt proceeding, where the issue is compensating, not punishing, if the aggrieved party didn't even know about the action until it had been denied by the District Court, we submit that there can be no harm from that having taken place.

That's all I have for opening.  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

Before we give you a time check, do we have other opening statements?

MR. ANDERSON:  Yes.  Yes, Your Honor.  Michael Anderson on behalf of Mr. Patrick.  If we need to take a break, that's fine, too.

THE COURT:  Well, how long do you plan to use?

MR. ANDERSON:  No more than ten minutes, for sure.

THE COURT:  Let's go ahead and do that, and then we'll take a break.

MR. POMERANTZ:  Your Honor, after, I would ask the opportunity to respond to Mr. Bridges' argument.  Probably another ten minutes.

THE COURT:  All right.  Let's go ahead and take a ten-minute break.  And Mr. Taylor, you're going to have something, because you --

MR. TAYLOR:  Five.

THE COURT:  Okay.  We'll take a ten-minute break. And Nate, can you give them a time?

HCMLPHMIT00002793

79

THE CLERK:  I'm showing it was about 59-1/2 minutes.

THE COURT:  Fifty-nine and a half?  And is that subtracting some for my questioning?

THE CLERK:  I stopped whenever you talked, maybe a little over --

THE COURT:  Okay.  So he stopped it whenever I asked questions and you answered, so 59 minutes has been used by the Respondents.

All right.  We'll take a ten-minute break.  We'll come back at 11:35.

THE CLERK:  All rise.

(A recess ensued from 11:25 a.m. to 11:37 a.m.)

THE COURT:  All right.  We're going back on the record in the Highland matter.  We have further opening statements.  Counsel, you may proceed.

OPENING STATEMENT ON BEHALF OF MARK PATRICK, RESPONDENT

MR. ANDERSON:  Thank you.  May it please the Court, Counsel.  Michael Anderson on behalf of Respondent, Mark Patrick.

Your Honor, after listening to this and looking at the filings in this case, this issue of whether there's contempt -- and I would argue there's not -- is ripe for decision.  We have no real undisputed facts for purposes of the contempt issue.  We have your Court's July order, the subject of Mr. Bridge's arguments.  We have the Plaintiffs in the underlying

80

lawsuit at issue.  They commenced the lawsuit in April of this year.  There's absolutely nothing improper about that filing. It's not subject to the contempt.  A week later, there is a motion for leave to add Mr. Seery.  That's the issue.  There's no dispute over that.  There's no dispute that Mr. Patrick authorized the filing of the motion for leave.

And so then the question becomes we look at the Court's July order, did a motion for leave, did that violate the terms of the order?  The motion for leave is not commencing a lawsuit.  It's also not pursuing a claim, because whether or not the Court grants the motion, denies the motion, or whatever the Court does, nothing happened, because the day after the motion for leave was filed it was dismissed *sua sponte* without prejudice because not all parties had been served in the case.

It was permission asked one day.  The matter was mooted the following day by the District Court.  And so that is completely undisputed.

And so the question is, is asking permission, is that commence?  I think everybody says there's no way that's commencing a lawsuit because you have asked permission.  The question, then, is it pursuing a claim?  And the argument, well, no, that's not pursuing a claim; it's asking permission.

And I think it's also important to note that when the motion for leave was filed, there were no secrets there.  I

HCMLPHMIT00002795

mean, I'm coming in this after the fact, representing Mr. Patrick.  You look at a motion for leave, and right there on Page 1 it talks about Your Honor's order.  Page 2, it quotes the order and it gives the reasons, there's arguments being made as to why that order doesn't bar adding Mr. Seery as a defendant in the lawsuit, many of the arguments that Mr. Bridges made.

So that's where we are.  And so when I hear, hey, we've got six hours, three hours and three hours, and we're going to split this up, you know, maybe too simplistic from Fort Worth, but I'm like, wait a second, this is all undisputed.  It's totally undisputed.  The -- whether or not the prior order is enforceable or not enforceable, those are all legal arguments.  You know, no witnesses are necessary for that.  And as I understood, right before we broke, counsel stood up and he's going to do what generally doesn't happen in opening statements, which is respond to opening statements, which shows that that's a legal issue.

And so it really does come down to undisputed facts.  There's no testimony.  No -- nothing is necessary.  And a lot of what this comes down to is the old statement, you know, is it better to ask forgiveness or permission?  And usually that statement comes up when somebody has already done something:  Hey, I'm going to go do it anyway and I'll ask for forgiveness later.  Well, what the Plaintiffs in the underlying case did

HCMLPHMIT00002796

82

was ask permission.  Motion for leave.  That is not contemptuous.  And there's literally no damages.  As was pointed out, by the time counsel found out, it had already been dismissed.

The last thing I want to point out, Your Honor, is that the argument from opposing counsel was, well, under Rule 15 of the Federal Rules of Civil Procedure, since parties hadn't answered yet, the Plaintiffs in the underlying case could have just simply added Mr. Seery as a defendant and moved on that way, but then that would be another ball of wax and then we would be addressing issues as far as whether or not there is a violation of the Court's order, notwithstanding Mr. Bridge's arguments.  But then we would have those issues.  But that's not what happened.  Everybody knows that's not what happened.  It was a motion for leave that was resolved the following day.

And so, Your Honor, for those reasons, and those undisputed reasons, we would request that the Court at the end of this hearing deny the request for sanctions and a contempt finding against our client, Mr. Patrick.

Mr. Phillips is going to address one brief issue bankruptcy-wise I believe that was raised earlier.

THE COURT:  Okay.  Mr. Phillips?

MR. PHILLIPS:  Your Honor, thank you very much.  Louis M. Phillips on behalf of Mark Patrick.

The only thing that I would point out, Your Honor, and I'm

going to do -- try to simplistically, because that's about the level at which I operate, boil down the questions about the order.

This order was an employment order.  The problem that Mr. Bridges has elucidated to Your Honor is that the precise effect, one of the precise effects of that order is to bar the claims of third parties that arise into the future on the basis of the employment of Mr. Seery, because the order required that all claims asserting gross negligence or willful misconduct need to be brought before you to determine that they're colorable.

One question I have is, does it apply to the lawsuit that was filed?  Doesn't apply unless the effect of the order was to release those claims and preclude any party from bringing those claims at all.  And while you can say correctly that this Court issues gatekeeper orders all of the time, one thing I cannot imagine that you would say is that in employment orders you release claims of third parties existing and as may arise in the future that could be brought against the party employed to be a CRO of a debtor, who, by his own testimony, says we do all kinds of stuff in the billions of dollars for third parties that we owe fiduciary duties to.

There's no way, Your Honor, that you were considering your July order to bar third-party claims arising from breach of fiduciary duties by Mr. Seery to third parties who held third-

HCMLPHMIT00002798

84

party claims that did not involve some assertion that, in his capacity as CRO, he was in some way acting within the scope of his authority as CRO for the Debtor and yet committed negligence against the Debtor.

Now, if the order was asserting that you know what a lot of people in this courtroom know, that the standard of liability for a CRO doing work for a debtor, just like the standard of liability for the president of a corporation or an officer of the corporation, is as long as you're within the course and scope of your employment, your actions for the corporation have -- can -- the corporation takes care of you because there's no personal claim unless you're outside the scope, and you're outside the scope if you commit gross negligence or willful misconduct.

That, if you're restating the standard of care and standard of liability for a CRO, we have no problem with that, because Mr. Patrick did not authorize a cause of action arising against Mr. Seery against the Debtors for damage to the Debtors.  He authorized the filing of a complaint in the District Court with jurisdiction for a third-party claim for breach of a fiduciary duty to a third party that Mr. Seery admits he owes, and then sought leave because they didn't understand the order that Your Honor issued.  It couldn't have been to release the breach of fiduciary duty claims that wouldn't rise to gross negligence or willful misconduct, it

HCMLPHMIT00002799

couldn't be that, but it might be.  But if it did, under an employment order?  That's very different from *Espinosa*, that's very different from *Shoaf*, when you're at the end of a case in a confirmation of a plan and you're talking about matters arising in the past.

This order, if it has the effect it could be read to have, precludes any third party from asserting a breach of fiduciary duty against Seery for actions that violate the duty to that third party, when Seery's biggest job, it looks to us like, is running third-party money.  That could not have been what Your Honor was thinking.

And so all I'm pointing out is I'm trying to distill down. The lawsuit doesn't involve gross negligence or willful misconduct allegations.  It involves breach of fiduciary duty, breach of the Advisers Act, et cetera, et cetera.  Mr. Patrick authorized that lawsuit.

Now, what we're here for today is to determine whether the complaint, which was not against the Debtor -- which was not against Seery, the motion for leave, which did not -- all they did was ask for permission, not forgiveness.  And we can't understand how the Debtor should be saying, all they had to do was amend.  Well, if they amended, would we be in hotter water than we are today for asking for permission to sue?  I think we would have been, that should have been the prescribed course, when we are more concerned and we are more risk-averse

HCMLPHMIT00002800

by asking for leave rather than just amending by right. Absolutely, that makes no sense. We can't be held to be more contemptuous because we asked for permission, when we could have just sued him, because they're saying asking for permission was wrong. Certainly, suing him would have been wrong. That would have been easier.

THE COURT: But Mr. Phillips, the issue is you all didn't come to the Bankruptcy Court and ask permission.

MR. PHILLIPS: Look at your order, Your Honor.

THE COURT: It's right in front of me.

MR. PHILLIPS: Right. That order either doesn't apply to the claims that were brought or it released the claims that were brought. That's our point. It couldn't have released them. Does it apply to them? Thank you.

THE COURT: Okay. Mr. Taylor?

MR. TAYLOR: Good morning.

THE COURT: Good morning.

OPENING STATEMENT ON BEHALF OF JAMES DONDERO

MR. TAYLOR: Your Honor, Clay Taylor on behalf of Jim Dondero. I'll be very brief because I know we've already spent a lot of time on opening argument. But I do think it is appropriate to, one, first look at who brought the lawsuit, CLO Holdco & DAF. That was authorized -- it's undisputed it was authorized by Mr. Patrick. There is no dispute about that. There's no dispute who the Plaintiffs are. But yet my

HCMLPHMIT00002801

client is up here as an alleged violator.

I think it's very clear, as all the parties have said, there's no dispute as to there's an order, there was a complaint, and there was a motion for leave.

It seems to me that the rest of the evidentiary hearing that you may be about to go through is going to be about pin the blame on Mr. Dondero. It is undisputed that he is not a control person for the DAF or CLO Holdco. The only type of evidence you will hear is going to be insinuation that he somehow controls Mr. Patrick and used to control Mr. Scott. There will be no direct evidence that he authorized this or that he's the control person and the proper corporate authorized representative that signed off on the --

It seems to me, Your Honor, first of all, that's a discrete issue that should be able to be decided separately from this, and the first gating issue is, was there indeed a violation of this Court's order? It would seem to me that there is no disputes about those facts and that we should bifurcate that, and if you then find that there is a violation and find that there is any even need to move into who the alleged violators are, that then we could have that evidentiary portion. But there is no reason to do that now before there's even been found to be a violation.

THE COURT: All right. Thank you.

All right. Well, someone made the point rebuttals in

88

opening statements are not very common, --

MR. POMERANTZ:  Your -- Your --

THE COURT:  -- but you can use your three hours however you want.

OPENING STATEMENT ON BEHALF OF THE DEBTOR

MR. POMERANTZ:  Your Honor, I didn't intend to stand up.

THE COURT:  Okay.

MR. POMERANTZ:  I also didn't intend to have the motion to modify the sealing order presented to Your Honor, which it was in the course of that opening argument.  And despite your comments at the beginning of the hearing, the Movants have taken Your Honor down a series of rabbit holes that have really no relevance to the contempt motion.  And notwithstanding, as I said, your ruling that basically the contempt would go first and the modification would go second, there they were, persistent in making all the arguments why this Court should modify the order.

They're just really trying to obfuscate the simple issue that Mr. Morris presented and raised at the beginning of the hearing:  Did they violate the order by pursuing a claim?  We think the answer is undoubtedly yes.

I'm not going to try to address each of the issues they raised in connection with the modification motion in detail.  I have a lengthy presentation.  I'll do it at the appropriate

HCMLPHMIT00002803

89

time.  But there are a few issues I want to address.  I want to address one of the last points Mr. Bridges raised first. If they thought that the order was a problem, they could have filed their motion to modify that order before Your Honor. They could have had that heard first.  There was no statute of limitations issue in connection with the HarbourVest matter. They could have come to Your Honor to do that.  But no, they didn't.  They went to the District Court first, and it was only after we filed our contempt motion that they came back and said, well, Your Honor, you should modify the order. Their argument that if they did that there would have been waiver and estoppel is just an after-the-fact justification for what they did and what they tried to do, which was unsuccessful.  They tried to have the District Court make the decision.

And why?  Your Honor, they've filed motions to recuse before Your Honor.  They -- they -- it's no secret the disdain they have for Your Honor's rulings as it relates to them. They wanted to be out of this courtroom and in another courtroom.

And their belated argument, Mr. Bridges falling on the sword, that they failed to check the box, inadvertent, it's on me, it's very curious.  Because if they had done so and had referred to the correct 1334 jurisdictional predicate, as Your Honor had mentioned, the complaint would have been referred to

HCMLPHMIT00002804

90

this Court and the entire trajectory of the proceedings would have been different. They would have had the opportunity to take their shot to go to District Court and argue that your order didn't apply.

Your Honor, they say the January 9th order is not relevant. It is entirely relevant. It covered the independent directors and their agents. Yes, Mr. Seery is an independent director, but he was also an agent of the independent directors and carried out the duties. You heard argument at the July 16th hearing that Mr. Seery had been acting as the chief executive officer for several months. And why is it important? Mr. Bridges said, well, if we violated one order, we violated the other. It's important because, Your Honor, number one, Mr. Dondero supported that order. We would never have had an independent board in this case if Mr. Dondero, the decision-making -- of the Debtor at that time, supported that order and supported the exculpations that are now claimed to have been invalid.

And also Your Honor heard testimony at the confirmation hearing that the independent directors would never have taken this job, would never have taken this job because of the potential for litigation, litigation that we've now had to endure for several months. So to come back 16 months later and say, well, you know, you couldn't really exculpate them, it's really an employment order: It was an employment order.

HCMLPHMIT00002805

91

They know it.  We know it.  Your Honor knows it.  It was a resolution of corporate governance issues that changed the whole trajectory of the case, and luckily it -- luckily, Your Honor approved it.

The question just is whether they violated the order, period.  And I'll have a lot to say about res judicata, but I won't go in too much in detail, but I will just briefly address their arguments.  They're correct and the Court is correct that there's a difference between *Applewood* and *Shoaf*.  And Your Honor got the exact difference.  In one case, a release was not specific, *Applewood*.  In one case it was.  *Shoaf* hasn't been discredited by *Applewood*.  It was different facts.  In fact, *Shoaf* relied on two Supreme Court cases, the *Stoll* case and the *Chicot* case, both for the propositions that a court that enters an order, a clear order, even if it didn't have jurisdiction, that cannot be attacked in res judicata.  So here what we have is clear, unambiguous, you come to this Court before commencing or pursuing a claim.  That's the clarity.  The focus on the releases, that's not what we're here for today, that's not what we're here for on a contempt motion, on whether the release covered them or it didn't cover them.  We're here on the clear issue of did they violate the language, and we submit that they did.

And similarly, *Espinosa* applies.  Your Honor, just to quote some language, "Appellees could have moved to remand the

HCMLPHMIT00002806

92

action to state court after it improperly -- after its improper removal to the federal court or challenge the district court's exercise in jurisdiction on direct appeal. Because they did neither, they are now barred by principles of res judicata."

Res judicata actually does apply, and I will speak about it in much more detail in the modification motion.

With respect to *Barton*, Your Honor, we disagree with their argument that Mr. Seery is not a court-appointed agent. We've briefed it extensively in our motion to modify. *Barton* applies to debtors in possession. *Barton* applies to general partners of the debtor. *Barton* applies to chief restructuring orders -- officers who are approved by the debtor. And it applies to general counsel who are appointed by the chief restructuring order. Officer.

So the argument that *Barton* is somehow inapplicable is just wrong. Your Honor knows that. Your Honor has written extensively on *Barton* in connection with your *Ondova* opinion.

Some of the argument about 959 is all wrong, as well. Your Honor got it right that 959 applies to slip-and-fall cases or torts, injuries to parties that are strangers to this process. There is a legion of cases that I will cite to Your Honor in connection with argument. 959 does not apply here. There's nothing more core to this case than the transactions surrounding the resolution of the HarbourVest claims.

HCMLPHMIT00002807

93

We also disagree, Your Honor, that the complaint is subject to mandatory withdrawal of the reference. We've -- one of our exhibits in the motion to modify is our motion to enforce the reference. We think Movants have it completely wrong. This is not the type of case that will be subject to withdrawal -- mandatory withdrawal of the reference, and in any event, for this contempt motion, it's irrelevant.

And they argue -- one of the other points Mr. Bridges raises is that, because this Court would not have had jurisdiction under 157 because of the mandatory withdrawal, then Your Honor could not legally act as a gatekeeper. But they haven't addressed *Villegas v. Schmidt*. We've raised it throughout this case. And again, in these series of pleadings, they don't even address it. And *Villegas v. Schmidt* was a *Barton* case. It was a *Barton* case where the -- where the argument was that *Barton* does not apply because it's a *Stern* claim and the Bankruptcy Court would not have jurisdiction. And *Villegas* said no, it does apply. And Your Honor even cited that in your *Ondova* case. And why does it apply? Because there's nothing inconsistent with a Bankruptcy Court having exclusive decision to make a *Barton* determination.

In fact, in that case *Villegas* said, you can't go to the District Court for that decision, it is the Bankruptcy Court's decision.

HCMLPHMIT00002808

94

So, again, it's a red herring, Your Honor.  Your Honor had the ability to act as an exclusive gatekeeper for these types of actions.

With that, Your Honor, I'll leave the rest of my argument for the next motion.

THE COURT:  All right.  Thanks.

All right.  Nate, let's give everyone their time.

THE CLERK:  That was just about eight and a half additional from the Debtor, and then altogether the other ones were just shy of fourteen minutes.  Thirteen minutes and fifty seconds for the other three combined.  Do you want me to --

THE COURT:  Yes, I meant for Debtor combined versus --

THE CLERK:  Oh.  Oh.

THE COURT:  Respondents combined.

THE CLERK:  So that would be twenty one and a half the Debtor.  Let me do the math on the other one.  Be an hour twelve minutes and fifty seconds for --

THE COURT:  Okay.  All right.  Got that?  Debtors used a total of twenty one and a half minutes; Responders have used an hour twelve minutes and fifty seconds.

All right.  Mr. Morris, you may call your first witness.

MR. MORRIS:  Thank you very much, Your Honor.  The Debtor calls Mark Patrick.

THE COURT:  All right.  Mr. Patrick?  Please approach

Patrick - Direct                        95

our witness stand and I'll swear you in.  Please raise your

right hand.

        (The witness is sworn.)

            THE COURT:  All right.  Please take a seat.

            MARK PATRICK, DEBTOR'S WITNESS, SWORN

                    DIRECT EXAMINATION

BY MR. MORRIS:

Q    Good afternoon, Mr. Patrick.

A    Good afternoon.

Q    Can you hear me okay?

A    Yes, I can.

Q    Okay.  You have before you several sets of binders.

They're rather large.  But when I deposed you on Friday, we

did that virtually.  Now, I may direct you specifically to one

of the binders or one of the documents from time to time, so I

just wanted you to know that those were in front of you and

that I may be doing that.

     Mr. Patrick, since March 1st, 2001 [sic], you've been

employed by Highland Consultants, right?

A    I believe the name is Highgate Consultants doing business

as Skyview Group.

Q    Okay.  And that's an entity that was created by certain

former Highland employees, correct?

A    That is my understanding, correct.

Q    And your understanding is that Mr. Dondero doesn't have an

HCMLPHMIT00002810

Patrick - Direct                                                    96

ownership interest in that entity, correct?

A    That he does not.  That is correct.

Q    And your understanding is that he's not an employee of that -- of Skyview, correct?

A    That is correct.

Q    Prior to joining Skyview on March 1st, you had worked at Highland Capital Management, LP for about 13 years, correct?

A    Correct.

Q    Joining in, I believe, early 2008?

A    Correct.

Q    Okay.  I'm going to refer to Highland Capital Management, LP from time to time as HCMLP.  Is that okay?

A    Yes.

Q    While at HCMLP, you served as a tax counselor, correct?

A    No, I would like to distinguish that.  I did have the title tax counsel.  However, essentially all my activities were in a non-lawyer capacity, being the client representative.  I would engage other outside law firms to provide legal advice.

Q    Okay.  So you are an attorney, correct?

A    Yes, I am.

Q    But essentially everything you did at Highland during your 13 years was in a non-lawyer capacity, correct?

A    Correct.

Q    In fact, you didn't even work in the legal department; is

HCMLPHMIT00002811

Patrick - Direct                                      97

that right?

A    That is correct.  I worked for the tax department.

Q    Okay.  Let's talk about how you became the authorized representative of the Plaintiffs.  You are, in fact, authorized representative today of CLO Holdco, Ltd. and Charitable DAF, LP, correct?

A    Charitable DAF Fund, LP.  Correct.

Q    And those are the two entities that filed the complaint in the United States District Court against the Debtor and two other entities, correct?

A    Correct.

Q    And may I refer to those two entities going forward as the Plaintiffs?

A    Yes.

Q    You became the authorized representative of the Plaintiffs on March 24th, 2021, the day you and Mr. Scott executed certain transfer documents, correct?

A    Correct.

Q    And you had no authority to act on behalf of either of the Plaintiffs before March 24th, correct?

A    Correct.

Q    The DAF controls about $200 million in assets, correct?

A    The Plaintiffs, you mean?  CLO Holdco and Charitable DAF Fund, LP.

Q    Yes.

HCMLPHMIT00002812

Patrick - Direct                                    98

A     Around there.

Q     Okay.  Let me try and just ask that again, and thank you for correcting me.  To the best of your knowledge, the Plaintiffs control about $200 million in assets, correct?

A     Net assets, correct.

Q     Okay.  And that asset base is derived largely from HCMLP, Mr. Dondero, or Mr. Dondero's trusts, correct?

A     Can you restate that question again, Mr. Morris?

Q     Sure.  The asset base that you just referred to is derived largely from HCMLP, Mr. Dondero, or donor trusts?

A     The way I would characterize it -- you're using the word derived.  I would characterize it with respect to certain charitable donations --

Q     Uh-huh.

A     -- that were -- that were made at certain time periods, where the donors gave up complete dominion and control over the respective assets and at that time claimed a federal income tax deduction for that.

I do -- I do believe that, as far as the donor group, as you specified, Highland Capital Management, I recall, provided a donation to a Charitable Remainder Trust that eventually had expired and that eventually such assets went into the supporting organizations.  And then I do believe Mr. Dondero also contributed to the Charitable Remainder Trust No. 2, which seeded substantial amounts of the original assets that

HCMLPHMIT00002813

Patrick - Direct                                                          99

were eventually composed of the $200 million.  And then from time to time I do believe that Mr. Dondero's trusts made charitable donations to their respective supporting organizations.

Q    Okay.  Thank you.

A    Is that responsive?

Q    It is.  It's very responsive.  Thank you very much.  So, to the best of your knowledge, the charitable donations that were made that form the bases of the assets came from those three -- primarily from those three sources, correct?

A    Well, you know, there's two different trusts.  There's the Dugaboy Trust and the Get Good Trust.

Q    Okay.

A    Then you have Mr. Dondero and Highland Capital Management.  So I would say four sources.

Q    Okay.  All right.  Thank you.  Prior to assuming your role as the authorized representative of the Plaintiff, you had never had meaningful responsibility for making investment decisions, correct?

A    I'm sorry.  You kind of talk a little bit fast.  Please slow it down --

Q    That's okay.

A    -- and restate it.  Thank you.

Q    And I appreciate that.  And any time you don't understand what I'm saying or I speak too fast, please do exactly what

HCMLPHMIT00002814

Patrick - Direct                                    100

you're doing.  You're doing fine.

Prior to assuming your role as the authorized representative of the Plaintiffs, you never had any meaningful responsibility making investment decisions.  Is that correct?

A    To whom?

Q    For anybody.

A    Well, during my deposition, I believe I testified that I make investment decisions with respect to my family.  Family and friends come to me and they ask me for investment decisions.  I was -- in my deposition, I indicated to you that I was a board member of a nonprofit called the 500, Inc.  They had received a donation of stock in Yahoo!, and the members there looked to me for financial guidance.  As an undergrad at the University of Miami, I was a -- I was a finance major, and so I do have a variety of background with respect to investments.

Q    Okay.  So you told me that from time to time friends and family members come to you for investing advice.  Is that right?

A    That is correct.

Q    And when you were a young lawyer you were on the board of a nonprofit that received a donation of Yahoo! stock and the board looked to you for guidance.  Is that correct?

THE COURT:  Just a moment.  I think there's an objection.

HCMLPHMIT00002815

Patrick - Direct                                             101

MR. MORRIS:  Uh-huh.

THE COURT:  Go ahead.

MR. ANDERSON:  So far -- relevance, Your Honor.  This is way out of the bounds of the contempt proceeding.  You know, what he did as a young person with Yahoo! stock.  We're here to -- he authorized the lawsuit.  They filed the lawsuit.  That's it.  Getting into all this peripheral stuff is completely irrelevant.

THE COURT:  Your response?

MR. MORRIS:  My response, Your Honor, is very simple.  Mr. Patrick assumed responsibility, and you're going to be told that he exercised full and complete authority over a $200 million fund that was created by Mr. Dondero, --

THE COURT:  Okay.

MR. MORRIS:  -- that funds -- that is funded virtually by Mr. Dondero, and for which -- Mr. Patrick is a lovely man, and I don't mean to disparage him at all -- but he has no meaningful experience in investing at all.

THE COURT:  All right.  Counsel, I overrule.  I think there's potential relevance.

And may I remind people that when you're back at counsel table, please make sure you speak your objections into the microphone.  Thank you.

BY MR. MORRIS:

Q   When you were a young lawyer, sir, you were on the board

HCMLPHMIT00002816

Patrick - Direct                                    102

of a nonprofit that received a donation of Yahoo! stock and the board looked to you for guidance, correct?

A    Yes, correct.

Q    And -- but during your 13 years at Highland, you never had formal responsibility for making investment decisions, correct?

A    That is correct.

Q    Yeah.  In fact, other than investment opportunities that you personally presented where you served as a co-decider, you never had any responsibility or authority to make investment decisions on behalf of HCMLP or any of its affiliated entities, correct?

A    That is correct.

Q    And at least during your deposition, you couldn't identify a single opportunity where you actually had the authority and did authorize the execution of a transaction on behalf of HCMLP or any of its affiliates, correct?

A    Correct.

Q    And yet today you are now solely responsible for making all investment decisions with respect to a $200 million charitable fund, correct?

A    Yes, but I get some help.  I've engaged an outside third party called ValueScope, and they have been as -- effectively working as a "gatekeeper" for me, and I look to them for investment guidance and advice, and I informally look to Mr.

Patrick - Direct                                    103

Dondero since the time period of when I took control on March 24th for any questions I may have with respect to the portfolio.  So I don't feel like I'm all by myself in making decisions.

Q    Okay.  I didn't mean to suggest that you were, sir, and I apologize if you took it that way.  I was just asking the question, you are the person now solely responsible for making the investment decisions, correct?

A    Yes.

Q    Okay.  Let's talk about the circumstances that led to the filing of the complaint for a bit.  On April 12, 2021, you caused the Plaintiffs to commence an action against HCMLP and two other entities, correct?

A    Correct.

Q    Okay.  One of the binders -- you've got a couple of binders in front of you.  If you look at the bottom, one of them says Volume 1 of 2, Exhibits 1 through 18.  And if you could grab that one and turn to Exhibit 12.  Do you have that, sir?

A    It says -- it says the original complaint.  Is that the right one?

Q    That is the right one.  And just as I said when we were doing this virtually last Friday, if I ask you a question about a particular document, you should always feel free to review as much of the document as you think you need to

HCMLPHMIT00002818

Patrick - Direct                                            104

competently and fully answer the question.  Okay?

A    Okay.  Thank you.

Q    All right.  You instructed the Sbaiti firm to file that complaint on behalf of the Plaintiffs, correct?

A    Correct.

Q    And to the best of your recollection, the Plaintiffs returned -- retained the Sbaiti firm in April, correct?

A    Correct.

Q    So the Sbaiti firm was retained no more than twelve days before the complaint was filed, correct?

A    Correct.

Q    You personally retained the Sbaiti firm, correct?

A    Correct.

Q    And the idea of filing this complaint originated with the Sbaiti firm, correct?

A    Correct.

Q    Before filing -- withdrawn.  Before becoming the Plaintiffs' authorized representative, you hadn't had any communications with anyone about potential claims that might be brought against the Debtor arising out of the HarbourVest settlement, correct?

A    That is correct.

Q    Now, after you became the Plaintiffs' authorized representative, Mr. Dondero communicated with the Sbaiti firm about the complaint that's marked as Exhibit 12, correct?

HCMLPHMIT00002819

Patrick - Direct                                         105

A    Yes.  After he brought certain information to myself and then that I engaged the Sbaiti firm to launch an investigation, I also wanted Mr. Dondero to work with the Sbaiti firm with respect to their investigation of the underlying facts.

Q    Okay.  Mr. Dondero did not discuss the complaint with you, but he did communicate with the Sbaiti firm about the complaint, correct?

A    I believe -- yeah.  I heard you slip in at the end "the complaint."  I know he communicated with the Sbaiti firm.  I can't -- I can't say what he said or didn't say with respect to the -- the actual complaint.

Q    Okay.  But Mr. Dondero got involved in the process initially when he brought some information to your attention concerning the HarbourVest transaction, correct?

A    Correct.

Q    And he came to you with the HarbourVest information after you assumed your role as the authorized representative of the Plaintiffs on March 24th, correct?

A    That is correct.

Q    At the time he came to you, you did not have any specific knowledge about the HarbourVest transaction, correct?

A    I did not have specific knowledge with respect to the allegations that were laid out and the facts with respect to the original complaint.  I think I had just had a general

HCMLPHMIT00002820

Patrick - Direct                                        106

awareness that there was a HarbourVest something or other, but the specific aspects of it, I was unaware.

Q   Okay.  And you had no reason to believe that Mr. Seery had done anything wrong with respect to the HarbourVest transaction at the time you became the Plaintiffs' authorized representative, correct?

A   That is correct.

Q   But you recall very specifically that some time after March 24th Mr. Dondero told you that an investment opportunity was essentially usurped or taken away, to the Plaintiffs' harm and for the benefit of HCMLP, correct?

A   That is correct.

Q   And after Mr. Dondero brought this information to your attention, you hired the Sbaiti firm to launch an investigation into the facts, correct?

A   Correct.

Q   You had never worked with the Sbaiti firm before, correct?

A   That is correct.

Q   And you had hired many firms as a tax counselor at HCMLP, but not the Sbaiti firm until now.  Correct?

A   That is correct.

Q   You got to the Sbaiti firm through a recommendation from D.C. Sauter, correct?

A   Correct.

Q   Mr. Sauter is the in-house counsel, the in-house general

Patrick - Direct                                          107

counsel at NexPoint Advisors, correct?

A    Correct.

Q    You didn't ask Mr. Sauter for a recommendation for a lawyer; he just volunteered that you should use the Sbaiti firm.  Correct?

A    That is correct.

Q    And you never used -- considered using another firm, did you?

A    When they were presented to me, they appeared to have all the sufficient skills necessary to undertake this action, and so I don't recall interviewing any other firms.

Q    Okay.  Now, after bringing the matter to your action, Mr. Dondero communicated directly with the Sbaiti firm in relation to the investigation that was being undertaken.  Correct?

A    That is correct.

Q    But you weren't privy to the communications between Mr. Dondero and the Sbaiti firm, correct?

A    I did not participate in those conversations as the -- what I, again, considered Mr. Dondero as the investment advisor to the portfolio, and he was very versant in the assets.  I wanted him to participate in the investigation that the Sbaiti firm was undertaking prior to the filing of this complaint.

Q    Let's talk for a minute about the notion of Mr. Dondero being the investment advisor.  Until recently, the entity

HCMLPHMIT00002822

Patrick - Direct                                              108

known as the DAF had an investment advisory committee with HC -- an investment advisory agreement with HCMLP.  Correct?

A    It's my understanding that the investment advisory agreement existed with the Plaintiffs, CLO Holdco, as well as Charitable DAF Fund, LP, up and to the end of February, throughout the HarbourVest transaction.

Q    Okay.  And since February, the Plaintiffs do not have an investment advisory agreement with anybody, correct?

A    That is correct.

Q    Okay.  So Mr. Dondero, if he serves as an investment advisor, it's on an informal basis.  Is that fair?

A    After I took control, he serves as an informal investment advisor.

Q    Okay.  So there's no contract that you're aware of between either of the Plaintiffs and Mr. Dondero pursuant to which he is authorized to act as the investment advisor for the Plaintiffs, correct?

A    That is correct.

Q    Okay.  When you communicated with Grant Scott -- withdrawn.  You know who Grant Scott is, right?

A    Yes, I do.

Q    He's the gentleman who preceded you as the authorized representative of the Plaintiffs, correct?

A    Yes.

Q    Okay.  You communicated with Mr. Scott from time to time

HCMLPHMIT00002823

Patrick - Direct                                    109

during February and March 2021, correct?

A    February and March are the dates?  Yes.

Q    Yeah.  And from February 1st until March 21st -- well,
withdrawn.  Prior to March 24th, 2021, Mr. Scott was the
Plaintiffs' authorized representative, correct?

A    Correct.

Q    And you have no recollection of discussing with Mr. Scott
at any time prior to March 24th any aspect of the HarbourVest
settlement with Mr. Scott.  Correct?

A    Correct.

Q    And you have no recollection of discussing whether the
Plaintiffs had potential claims that might be brought against
the Debtor.  Correct?  Withdrawn.  Let me ask a better
question.

You have no recollection of discussing with Mr. Scott at
any time prior to March 24th whether the Plaintiffs had
potential claims against the Debtor.  Correct?

A    That is correct.

Q    You and Mr. Scott never discussed whether either of --
either of the Plaintiffs had potential claims against Mr.
Seery.  Correct?

A    Correct.

Q    Okay.  At the time that you became their authorized
representative, you had no knowledge that the Plaintiffs would
be filing a complaint against the Debtors relating to the

HCMLPHMIT00002824

Patrick - Direct                                    110

HarbourVest settlement less than three weeks later, correct?

A    That is correct.

Q    Okay.  Now, if you look at Page 2 of the complaint, you'll see at the top it refers to Mr. Seery as a potential party.  Do you see that?

A    Yes, I do.

Q    Okay.  You don't know why Mr. Seery was named -- withdrawn.  You don't know why Mr. Seery was not named as a defendant in the complaint, correct?

A    No, I -- that's correct.  I do not know why he was not named.  That's in the purview of the Sbaiti firm.

Q    Okay.  And the Sbaiti firm also made the decision to name Mr. Seery on Page 2 there as a potential party when drafting the complaint, correct?

A    That's what the document says.

Q    And you weren't involved in the decision to identify Mr. Seery as a potential party, correct?

A    That is correct.  Again, I rely on the law firm to decide what parties to bring a suit to -- against.

Q    Okay.  Okay.  Do you recall the other day we talked about a document called the July order?

A    Yes.

Q    Okay.  That's in -- that's in Tab 16 in your binder, if you can turn to that.  And take a moment to look at it, if you'd like.  And my first question is simply whether this is

HCMLPHMIT00002825

the July order, as you understand it.

(Pause.)

A    Yes, it is.  I was just looking for the gatekeeper provision.  It looks like it's Paragraph 5.  So, --

Q    Okay.  Thank you for that.  About a week after the complaint was filed, you authorized the Plaintiffs to file a motion in the District Court for leave to amend the Plaintiffs' complaint to add Mr. Seery as a defendant.  Correct?

A    I authorized the filing of a motion in Federal District Court that would ask the Federal District Court whether or not Jim Seery could be named in the original complaint with respect to the gatekeeper provision cited in that motion and with respect to the arguments that were made in that motion.

Q    Okay.  Just to be clear, if you turn to Exhibit 17, the next tab, --

A    I'm here.

Q    -- do you see that document is called Plaintiffs' Motion for Leave to File First Amended Complaint?

A    Yes.

Q    And that's the document that you authorized the Plaintiffs to file on or about April 19th, correct?

A    Correct.

Q    Okay.  And can we refer to that document as the motion to amend?

HCMLPHMIT00002826

Patrick - Direct                                          112

A    Yes.

Q    Okay.  You were aware of the July order at Tab 16 before you authorized the filing of the motion to amend.  Correct?

A    Yes, because it's cited in the motion itself.

Q    Okay.  And at the time that you authorized the filing of the motion to amend, you understood that the July order was still in effect.  Correct?

A    Yes, because it was referenced in the motion, so my assumption would be it would still be in effect.

Q    Okay.  Before the motion to amend was filed, you're -- you are aware that my firm and the Sbaiti firm communicated by email about the propriety of filing the motion to amend?

A    Before it was filed?  Communications between your firm and the Sbaiti firm?  I would have to have my recollection refreshed.

Q    I'll just ask the question a different way.  Did you know before you authorized the filing of the motion to amend that my firm and the Sbaiti firm had engaged in an email exchange about the propriety of filing the motion to amend in the District Court?

A    It's my recollection -- and again, I could be wrong here -- but I thought the email exchange occurred after the fact, not before.  But again, I -- I just --

Q    Okay.  In any event, on April 19th, the motion to amend was filed.  Correct?

HCMLPHMIT00002827

Patrick - Direct                                    113

A    Correct.

Q    That's the document that is Exhibit 17.  And you personally authorized the Sbaiti firm to file the motion to amend on behalf of the Plaintiffs, correct?

A    Correct.

Q    And you authorized the filing of the motion to amend with knowledge -- withdrawn.

Can you read the first sentence of the motion to amend out loud, please?

A    Yeah.  (reading)  Plaintiffs submit this motion under Rule 15 of the Federal Rules of Civil Procedure for one purpose: to name as defendant one James P. Seery, Jr., the CEO of defendant Highland Capital Management, LP (HCM) and the chief perpetrator of the wrongdoing that forms the basis of the Plaintiffs' causes of action.

Q    And does that fairly state the purpose of the motion?

MR. SBAITI:  Objection, Your Honor.  Asks him to make a legal conclusion about the purpose of the legal motion filed in court that he didn't draft.

THE COURT:  Okay.  I overrule.  You can answer if you have an answer.

THE WITNESS:  It's always been my general understanding that the purpose of filing this motion was to go to the Federal District Court and ask that Court of reference to this Court whether or not Mr. Seery could be named with

HCMLPHMIT00002828

Patrick - Direct                                        114

respect to the original complaint, citing again the gatekeeper

provisions and citing the various arguments that we've heard

much earlier.

BY MR. MORRIS:

Q    Okay.  You personally didn't learn anything between April 9th, when the complaint was filed, and April 19th, when the motion to amend was filed, that caused you to authorize the filing of the motion to amend, correct?

A    That is correct.

Q    In fact, you relied on the Sbaiti firm with respect to decisions concerning the timing of the motion to amend.  Correct?

A    Correct.

Q    And you had no knowledge of whether anyone acting on behalf of the Plaintiffs ever served the Debtor with a copy of the motion to amend.  Correct?

A    Yes.  I have no knowledge.

Q    Okay.  And you have no knowledge that the Sbaiti firm ever provided my firm with a copy of the motion to amend.  Correct?

A    I cannot recall one way or another.

Q    Okay.  You never instructed anyone on behalf -- acting on behalf of the Plaintiffs to inform the Debtor that the motion to amend had been filed, correct?

A    That is correct.

Q    And that's because you relied on the Sbaiti firm on

HCMLPHMIT00002829

Patrick - Direct                                    115

procedural issues, correct?

A    That is correct.

Q    You didn't consider waiting until the Debtor --

     (Interruption.)

Q    -- had appeared in the action before authorizing the filing of the motion --

A    Yeah, --

          THE COURT:  Yes.  Y'all are being a little bit loud. Okay.

          A VOICE:  Sorry.

          MR. MORRIS:  No problem.

          MR. PHILLIPS:  I've heard that before, Your Honor, and I apologize.

          THE COURT:  I bet you have.  Thank you.

          MR. MORRIS:  Admonish Mr. Phillips, please.

          THE COURT:  Okay.

          MR. MORRIS:  He's always the wild card.

          MR. PHILLIPS:  I admonish --

          MR. MORRIS:  He's always the wild card.

          MR. PHILLIPS:  I admonish myself.

          THE COURT:  All right.  I think he got the message. Continue.

BY MR. MORRIS:

Q    You didn't consider waiting until the Debtor had appeared in the action before filing the motion to amend, correct?

HCMLPHMIT00002830

A    Again, I am the client and I rely upon the law firm that's engaged with respect to making legal decisions as to the timing and notice and appearance and what have you.  I'm a tax lawyer.

Q    Okay.  You wanted the District Court to grant the relief that the Plaintiffs were seeking.  Correct?

A    I wanted the District Court to consider, under the gatekeeper provisions of this Court, whether or not Mr. Seery could be named in the original complaint.  That's -- that, from my perspective, is what was desired.

Q    All right.  You wanted the District Court to grant the relief that the Plaintiffs were seeking, correct?

MR. SBAITI:  Objection, Your Honor.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  Again, I would characterize this motion as not necessarily asking for specific relief, but asking the Federal District Court whether or not, under the gatekeeper provision, that Mr. Seery could be named on there.  What happens after that would be a second step.  So I kind of -- I dispute that characterization.

BY MR. MORRIS:

Q    All right.  I'm going to cross my fingers and hope that Ms. Canty is on the line, and I would ask her to put up Page 57 from Mr. Patrick's deposition transcript.

HCMLPHMIT00002831

Patrick - Direct                                    117

THE COURT:  There it is.

MR. MORRIS:  There it is.  It's like magic.  Can we go down to Lines 18 through 20?

BY MR. MORRIS:

Q   Mr. Patrick, during the deposition on Friday, did I ask you this question and did you give me this answer?  Question, "Did you want the Court to grant the relief you were seeking?" Answer, "Yes."

A   I -- and it was qualified with respect to Lines 12 through 17.  In my view, when I answered yes, I was simply restating what I stated in Line 12.  I wanted the District Court to consider this motion as to whether or not Mr. Seery could be named in the original complaint or the amended complaint pursuant to the existing gatekeeper rules and the arguments that were made in that motion.  That's -- that's what I wanted.  And so then when I was asked, did you want the Court to grant the relief that you were seeking, when I answered yes, it was from that perspective.

Q   Okay.  Thank you very much.  If the District Court had granted the relief that you were seeking, you would have authorized the Sbaiti firm to file the amended complaint naming Mr. Seery as a defendant if the Sbaiti firm recommended that you do so.  Correct?

A   If the Sbaiti firm recommended that I do so.  That is correct.

HCMLPHMIT00002832

Q    Okay.  Let's talk for a little bit about the line of succession for the DAF and CLO Holdco.  Can we please go to Exhibit 25, which is in the other binder?  It's in the other binder, sir.

(Pause.)

Q    I guess you could look on the screen or you can look in the binder, whatever's easier for you.

A    Yeah.  I prefer the screen.  I prefer the screen.

Q    Okay.

A    It's much easier.

Q    All right.  We've got it in both spots.  But do you have Exhibit 25 in front of you, sir?

A    Yes, I do.

Q    All right.  Do you know what it is?

A    This is the organizational chart depicting a variety of charitable entities as well as entities that are commonly referred to the DAF.  However, when I look at this chart, I do not look at and see just boxes, what I see is the humanitarian effort that these boxes represent.

          MR. MORRIS:  Your Honor, may I interrupt?

          THE COURT:  You may.

          MR. MORRIS:  Okay.

BY MR. MORRIS:

Q    I appreciate that, and when your lawyers get up to ask you questions, I bet they'll want to know just what you were about

to tell me.  But I just want to understand what this chart is.
This chart is the DAF, CLO Holdco, structure chart.  Correct?

A    Correct.

Q    Okay.  And you were personally involved in creating this
organizational structure, correct?

A    I -- yes.

Q    Okay.  And from time to time, the Charitable DAF Holdco
Limited distributes cash to the foundations that are above it.
Correct?

A    Correct.

Q    All right.  I want to talk a little bit more specifically
about how this happens.  The source of the cash distributed by
Charitable DAF Holdco Limited is CLO Holdco, Ltd., that
entity, the Cayman Islands entity near the bottom.  Correct?

        MR. ANDERSON:  Your Honor, I have an objection.
Completely irrelevant.  I'm objecting on relevance grounds.
This has nothing to do with the contempt proceeding.  We've
already gone over that he authorized the filing of the
complaint, that he authorized the filing of the motion to
amend.  It's all in the record.  This is completely irrelevant
at this point.

        THE COURT:  Okay.  Relevance objection.  Your
response?

        MR. MORRIS:  I believe that it's relevant to the
Debtor's motion to hold Mr. Dondero in contempt for pursuing

Patrick - Direct                                        120

claims against Mr. Seery, in violation of the July 7 order.  I think an understanding of what the Plaintiffs are, how they're funded, and Mr. Dondero's interest in pursuing claims on behalf of those entities is relevant to the -- to the -- just -- it's just against him.  It's not against their clients, frankly.  It's just against Mr. Dondero.

THE COURT:  I overrule.

MR. MORRIS:  I'll try and -- I'll try and make this quick, though.

BY MR. MORRIS:

Q    CLO Holdco had two primary sources of capital.  Is that right?

A    Two primary sources of capital?

Q    Let me ask it differently.  There was a Charitable Remainder Trust that was going to expire in 2011, correct?

A    That is correct.

Q    And that Charitable Remainder Trust had certain CLO equity assets, correct?

A    Correct.

Q    And the donor to that Charitable Remainder Trust was Highland Capital Management, LP.  Correct?

A    Not correct.  After my deposition, I refreshed my memory. There were two Charitable Remainder Trusts that existed, which I think in my mind caused a little bit of confusion.  The Charitable Remainder Trust No. 2, which is the one that

HCMLPHMIT00002835

expired in 2011, was originally funded by Mr. Dondero.

Q    Okay.  So, so the Charitable Remainder Trust that we were talking about on Friday wasn't seeded with capital from Highland Capital Management, it came from Mr. Dondero personally?

A    That is correct.

Q    Okay.  Thank you.  And the other primary source of capital was the Dallas Foundation, the entity that's in the upper left-hand corner of the chart.  Is that correct?

A    No.

Q    The -- you didn't tell me that the other day?

A    You said -- you're pointing to the Dallas Foundation.  That's a 501(c)(3) organization.

Q    I apologize.  Did you tell me the other day that the Dallas Foundation was the second source of capital for HCLO Hold Company?

A    No, I did not.  You --

     (Pause.)

Q    Maybe I know the source of the confusion.  Is the Highland Dallas Foundation something different?

A    Yes.  On this organizational chart, you'll see that it has an indication, it's a supporting organization.

Q    Ah, okay.  So, so let me restate the question, then.  The second primary source of capital for CLO Holdco, Ltd. is the Highland Dallas Foundation.  Do I have that right?

HCMLPHMIT00002836

Patrick - Direct                                                    122

A    Yes.

Q    Okay.  And the sources of that entity's capital were grantor trusts and possibly Mr. Dondero personally.  Correct?

A    In addition -- per my refreshing my recollection from our deposition, the other Charitable Remainder Trust, I believe Charitable Remainder Trust No. 1, which expired later, also sent a donation, if you will, or assets to -- and I cannot recall specifically whether it was just the Highland Dallas Foundation or the other supporting organizations that you see on this chart.

Q    But the source of that -- the source of the assets that became the second Charitable Remainder Trust was Highland Capital Management, LP.  Is that right?

A    I think that is accurate from my recollection.  And again, I'm talking about Charitable Remainder Trust No. 1.

Q    Okay.  So is it fair to say -- I'm just going to try and summarize, if I can.  Is it fair to say that CLO Holdco, Ltd. is the investment arm of the organizational structure on this page?

A    Yes.

Q    And is it fair to say that nearly all of the assets that are in there derived from either Mr. Dondero, one of his trusts, or Highland Capital Management, LP?

A    Yes.  It's like the Bill Gates Foundation or the Rockefeller Foundation.  These come from the folks that make

HCMLPHMIT00002837

Patrick - Direct                                        123

their donations and put their name on it.

Q    Okay.

         MR. MORRIS:  Now, now, Your Honor, I'm going to go back just for a few minutes to how Mr. Scott got appointed, because I think that lays kind of the groundwork for his replacement.  It won't take long.

         THE COURT:  Okay.  I have a question either --

         MR. MORRIS:  Sure.

         THE COURT:  -- for you or the witness.  I'm sorry, but --

         MR. MORRIS:  Sure.  Yeah.

         THE COURT:  -- the organizational chart, it's not meant to show everything that might be connected to this substructure, right?  Because doesn't CLO Holdco, Ltd. own 49.02 percent of HCLOF, --

         MR. MORRIS:  That --

         THE COURT:  -- which gets us into the whole HarbourVest transaction issue?

         MR. MORRIS:  You're exactly right, Your Honor.

         THE COURT:  Okay.

         MR. MORRIS:  But that's just an investment that HCLO Holdco made.

         THE COURT:  Right.

         MR. MORRIS:  Right?  And so I -- let me ask the witness, actually.

HCMLPHMIT00002838

THE COURT:  Okay.  Thank you.  Thank you.

MR. MORRIS:  Let me ask the witness.  Yeah.

THE COURT:  I just want my brain --

MR. MORRIS:  Right.

THE COURT:  -- to be complete on this chart.

BY MR. MORRIS:

Q   Mr. Patrick, there are three entities under CLO Holdco, Ltd.  Do you see that?

A   Yes.

Q   And does CLO Holdco, Ltd. own one hundred percent of the interests in each of those three entities?

A   Yes.

Q   Do you know why those three entities are depicted on this particular chart?  Is it because they're wholly-owned subsidiaries?

A   Correct.

Q   Okay.  And CLO Holdco, Ltd. has interests in other companies.  Isn't that right?

A   It has other investments.  That is correct.

Q   And the reason that they're not depicted on here is because they're not wholly-owned subsidiaries, they're just investments; is that fair?

A   That is fair.

MR. MORRIS:  Does that--?

THE COURT:  Yes.

HCMLPHMIT00002839

Patrick - Direct                                                     125

MR. MORRIS:  Okay.

THE COURT:  Uh-huh.

BY MR. MORRIS:

Q    So, so let's go back to Mr. Grant for a moment.  Mr. Scott, rather.  Mr. Dondero was actually the original general partner.  If you look at this chart, while it's still up here, you see on the left there's Charitable DAF GP, LLC?

A    Yes.

Q    And the Charitable DAF GP, LLC is the general partner of the Charitable DAF Fund, LP.  Correct?

A    Correct.

Q    And on this chart, Grant Scott was the managing member of Charitable DAF GP, LLC.  Right?

A    Correct.

Q    Okay.  But Mr. Dondero was the original general partner of that entity, correct?

A    That is correct.  But I do want to point out, I just note that the GP interest is indicating a one percent interest and the 99 interest to Charitable DAF Holdco.  I believe that's incorrect.  It's a hundred percent by Charitable DAF Holdco, Ltd., and the Charitable DAF GP interest is a noneconomic interest.  So that should actually reflect a zero percent to the extent it may indicate some sort of profits or otherwise.

Q    Okay.  Thank you for the clarification.  Can you turn to Exhibit 26, please, in your binder?  And is it your

HCMLPHMIT00002840

Patrick - Direct                                    126

understanding that that is the amended and restated LLC
agreement for the DAF GP, LLC?

A    Yes.

Q    Okay.  And this was amended and restated effective as of
January 1st, 2012, correct?

A    Yes.

Q    And if you go to the last page, you'll see there are
signatures for Mr. Scott and Mr. Dondero, correct?

A    Yes.

Q    And Mr. Dondero is identified as the forming -- former
managing member and Mr. Scott is identified as the new
managing member.   Correct?

A    Correct.  That's what the document says.

Q    And it's your understanding that Mr. Dondero had the
authority to select his successor.  Correct?

A    Correct.

Q    In fact, it's based on your understanding of documents and
your recollection that Mr. Dondero personally selected Mr.
Scott as the person he was going to transfer control to,
correct?

A    Upon advice of Highland Capital Management's tax
compliance officer, Mr. Tom Surgent.

Q    What advice did Mr. Surgent give?

A    He gave advice that, because Mr. Dondero -- and this is
what I came to an understanding after the fact of this

HCMLPHMIT00002841

transaction, because I was not a part of it -- that by Mr. Dondero holding that GP interest, that it would be -- the Plaintiffs, if you will, would be an affiliate entity for regulatory purposes, and so he advised that if he -- if Mr. Dondero transferred his GP interest to Mr. Scott, it would no longer be an affiliate, is my recollection.

Q    Okay.  You didn't appoint Mr. Scott, did you?

A    No.

Q    That was Mr. Dondero.  Is that right?

A    Yes.

Q    Okay.  Let's go to 2021.  Let's come back to the current time.  Sometime in February, Mr. Scott called you to ask about the mechanics of how he could resign.  Correct?

A    That is correct.

Q    But the decision to have you replace Mr. Scott was not made until March 24th, the day you sent an email to Mr. Scott with the transfer documents.  Correct?

A    That is correct.

Q    And it's your understanding that he could have transferred the management shares and control of the DAF to anyone in the world.  Correct?

A    Correct.

Q    That's what the docu... that he had the authority under the documentation, as you understood it, to freely trade or transfer the management shares.  Correct?

HCMLPHMIT00002842

Patrick - Direct                                    128

A    Wait.  Now, let's be precise here.

Q    Okay.

A    Are you talking about the GP interests or the management shares held by Charitable DAF Holdco, Ltd.?

Q    Let's start with the management shares.  Can you explain to the Court what the management shares are?

        MR. ANDERSON:  Your Honor?  Hang on one second.  Your Honor, I want to object again on relevance.  We're going way beyond the scope of the contempt issue, whether or not --

        MR. MORRIS:  This is about control.

        MR. ANDERSON:  -- the motion to amend somehow violated the prior order of this Court.  Getting into the management structure, transfer of shares, that's way outside the bounds.  I object on relevance.

        THE COURT:  Okay.  Relevance objection?

        MR. MORRIS:  Your Honor, they have probably 30 documents, maybe 20 documents, on their exhibit list that relate to management and control.  I'm asking questions about management and control.  Okay?  This is important, again, to (a) establish his authority, but (b) the circumstances under which he came to be the purported control person.

        THE COURT:  Okay.  Overruled.  Go ahead.

        THE WITNESS:  It might be helpful to look at the organizational chart, but if not -- but I'll describe it to you again.  With respect to the entity called --

HCMLPHMIT00002843

MR. MORRIS:  Hold on one second.  Can we put up the organizational chart again, Ms. Canty, if you can?  There you go.

THE WITNESS:  Okay.  So with respect to the Charitable DAF Holdco, Ltd., it is my understanding that Mr. Scott, he organized that entity when he was the independent director of the Charitable Remainder Trust, and he caused the issuance of the management shares to be issued to himself. And then those are, again, noneconomic shares, but they are control shares over that entity.

And I think, to answer your question, is -- it -- he alone decides who he can transfer those shares to.

BY MR. MORRIS:

Q    Do I have this right, that whoever holds the noneconomic management shares has the sole authority to appoint the representatives for each of the Charitable DAF entities and CLO Holdco?  It's kind of a magic ticket, if you will?

A    It -- I think there's a -- the answer really is no from a legal standpoint, because Charitable DAF Holdco is a limited partner in Charitable DAF Fund, LP, so it does not have authority -- authority under all -- the respective entities underneath that.  It could cause a redemption, if you will, of Charitable DAF Fund.  And so, really, the authority -- the trickle-down authority that you're referencing is with respect to his holding of the Charitable DAF GP, LLC interest.  It's a

HCMLPHMIT00002844

Patrick - Direct                                    130

member-managed Delaware limited liability company.  And from that, he -- that authority kind of trickles down to where he can appoint directorships.

Q    All right.  I think I want to just follow up on that a bit.  Which entity is the issuer of the manager shares, the management shares?

A    Yeah, the -- per the organizational chart, it is accurate, it's the Charitable DAF Holdco, Ltd. which issued the management shares to Mr. Scott.

Q    Okay.  And that's why you have the arrow from Mr. Scott into that entity?

A    Correct.

Q    And do those -- does the holder of the management shares have the authority to control the Charitable DAF Holdco, Ltd.?

A    Yes.

Q    Okay.  And as the control person for the Charitable DAF Holdco, Ltd., they own a hundred -- withdrawn.  Charitable DAF Holdco Limited owns a hundred percent of the limited partnership interests of the Charitable DAF Fund, LP.  Correct?

A    Correct.

Q    And so does the holder of that hundred percent limited partnership interest have the authority to decide who acts on behalf of the Charitable DAF Fund, LP?

A    I would say no.  I mean, you know, just -- I would love to

HCMLPHMIT00002845

Patrick - Direct                                    131

read the partnership agreement again.  But I, conceptually, what I know with partnerships, I would say the limited partner would not.  It would be through the Charitable DAF GP, LLC interest.

Q    The one on the left, the general partner?

A    The general partner.

Q    I see.  So when Mr. Scott transferred to you the one hundred percent of the management shares as well as the title of the managing member of the Charitable DAF GP, LLC, did those two events give you the authority to control the entities below it?

A    Yes.

Q    Thank you.  And so prior to the time that he transferred those interests to you, is it your understanding that Mr. Scott had the unilateral right to transfer those interests to anybody in the world?

A    Yes.

Q    Okay.  And you have that right today, don't you?

A    Yes, I do.

Q    If you wanted, you could transfer it to me, right?

A    Yes, I could.

Q    Okay.  But of all the people in the world, Mr. Scott decided to transfer the management shares and the managing member title of the DAF GP to you, correct?

A    Restate that question again?

HCMLPHMIT00002846

Patrick - Direct                                    132

Q    Of all the people in the world, Mr. Scott decided to transfer it to you, correct?

A    Yeah.  Mr. Scott transferred those interests to me.

Q    Okay.  And you accepted them, right?

A    Yes.

Q    You're not getting paid anything for taking on this responsibility, correct?

A    I am not paid by any of the entities depicted on this chart.

Q    And Mr. Scott used to get $5,000 a month, didn't he?

A    I believe that's what he testified to.

Q    Yeah.  But you don't get anything, right?

A    Correct.

Q    In fact, you get the exact same salary and compensation from Skyview that you had before you became the authorized representative of the DAF entities and CLO Holdco.  Correct?

A    Correct.

        MR. MORRIS:  Okay.  Your Honor, if I may just take a moment, I may be done.

        THE COURT:  Okay.

    (Pause.)

        MR. MORRIS:  Your Honor, I have no further questions.

        THE COURT:  All right.  Pass the witness.  Any examination of the witness?

                    CROSS-EXAMINATION

HCMLPHMIT00002847

BY MR. ANDERSON:

Q    Mr. Patrick, I just had a few follow-up questions.  When you authorized the filing of the lawsuit against Highland Capital Management, LP, Highland HCF Advisor Limited, and Highland CLO Funding, Limited, when that lawsuit was filed in April of this year, was Mr. Seery included as a defendant?

A    No.

Q    Have the two Plaintiffs in that lawsuit, have they commenced any lawsuit against Mr. Seery?

A    No.

Q    Have they pursued any lawsuit against Mr. Seery?

A    No.

Q    Have they pursued a claim or cause of action against Mr. Seery?

A    No.

Q    At most, did the Plaintiffs file a motion for leave to add Mr. Seery as a defendant?

        MR. MORRIS:  Objection, Your Honor.  To the extent that any of these questions are legal conclusions, I object. He's using the word pursue.  If he's trying -- if he's then going to argue that, But the witness testified that he didn't pursue and that's somehow a finding of fact, I object.

        THE COURT:  Okay.  I understand.

        MR. MORRIS:  Yeah.

        THE COURT:  But I overrule.  He can answer.

HCMLPHMIT00002848

Patrick - Cross                                        134

MR. MORRIS:  That's fine.

THE WITNESS:  Can you restate the question again?

BY MR. ANDERSON:

Q    Sure.  On behalf of the Plaintiffs -- well, strike that. Did the Plaintiffs pursue a claim or cause of action against Mr. Seery?

A    No.

Q    At most, did the Plaintiffs file a motion for leave to file an amended complaint regarding Mr. Seery?

A    Yes.  But, again, I viewed the motion as simply asking the Federal District Court whether Mr. Seery could or could not be named in a complaint, and then the next step might be how the Federal District Court might rule with respect to that.

Q    And we have -- it's Tab 17 in the binders in front of you. That is Plaintiffs' motion for leave.  If you could turn to that, please.

A    Yes.  I've got it open.

Q    Is the Court's July order, the Bankruptcy Court's July order, is it mentioned on the first page and then throughout the motion for leave to amend?

A    Yes, it is.  I see it quoted verbatim on Page 2 under Background.

Q    Was the Court's order hidden at all from the District Court?

A    The document speaks for itself.  It's very transparent.

HCMLPHMIT00002849

Patrick - Cross                                    135

Q    Was there any effort whatsoever to hide the prior order of
the Bankruptcy Court?

A    No.

          MR. ANDERSON:  Pass the witness.

          THE COURT:  Okay.  Other examination?

          MR. SBAITI:  Yes, Your Honor.  Just a couple of
questions.

                    CROSS-EXAMINATION

BY MR. SBAITI:

Q    Do you mind flipping to Exhibit 25, which I believe is the
org chart, the one that you were looking at before?

A    Okay.

Q    It'll still be in --

A    Okay.  Yeah.

Q    -- the defense binder.  No reason to swap out right now.

A    I've got the right binders.  Some of them are repeatable
exhibits, so --

Q    Yeah.

A    -- I have to grab the right binder.  Yes.

Q    As this org chart would sit today, is the only difference
that Grant Scott's name would instead be Mark Patrick?

A    Yes.

Q    Was there ever a period of time where Jim Dondero's name
would sit instead of Grant Scott's name prior?

A    Yes, originally, when this -- yes.

HCMLPHMIT00002850

Patrick - Cross                                    136

Q    So did Mr. Dondero both have the control shares of the GP, LLC and DAF Holdco Limited?

A    No, I believe not.  I believe he only held the Charitable DAF GP interest and that Mr. Scott at all times held the Charitable DAF Holdco, LTD interest, until he decided to transfer it to me.

Q    Can you just tell us how Mr. Scott came to hold the control shares of the Charitable DAF Holdco, LTD?

A    When he was the independent trustee of the Charitable Remainder Trust, he caused that -- the creation of that entity, and that's how he became in receipt of those management shares.

Q    And does the Charitable DAF GP, LLC have any control over Charitable DAF Fund, LP's actions or activities?

A    Yes, it does.

Q    What kind of control is that?

A    I would describe complete control.  It's the managing member of that entity and can -- and effectively owns, you know, the hundred percent interest in the respective subsidiaries, and so the control follows down.

Q    And when did Mr. Scott replace Mr. Dondero as the GP -- managing member of the GP?

A    Well, I think as the -- and Mr. Morris had shown me with respect to that transfer occurring on March 2012.

Q    So nine years ago?

HCMLPHMIT00002851

Patrick - Cross                                137

A    Yes.

Q    Does Mr. Dondero today exercise any control over the activities of the DAF Charitable -- the Charitable DAF, GP or the Charitable DAF Holdco, LTD?

A    No.

Q    Is he a board member of sorts for either of those entities?

A    No.

Q    Is he a board members of CLO Holdco?

A    No.

Q    Does he have any decision-making authority at CLO Holdco?

A    None.

Q    The decision to authorize the lawsuit and the decision to authorize the motion that you've been asked about, who made that authorization?

A    I did.

Q    Did you have to ask for anyone's permission?

A    No.

        MR. SBAITI:  No more questions, Your Honor.

        THE COURT:  Okay.  Any -- I guess Mr. Taylor, no.

    All right.  Any redirect?

                REDIRECT EXAMINATION

BY MR. MORRIS:

Q    Since becoming the authorized representative of the Plaintiffs, have you ever made a decision on behalf of those

HCMLPHMIT00002852

Patrick - Cross                                     138

entities that Mr. Dondero disagreed with?

A    I have made decisions that were adverse to Mr. Dondero's financial -- financial decision.  I mean, financial interests.  Whether he disagreed with them or not, I don't -- he has not communicated them to me.  But they have been adverse, at least two very strong instances.

Q    Have you ever -- have you ever talked to him about making a decision that would be adverse to his interests?  Did he tell -- did --

A    I didn't -- I don't -- I did not discuss with him prior to making the decisions that I made that were adverse to his economic interests.

MR. MORRIS:  Okay.  No further questions, Your Honor.

THE COURT:  Any further examination?  Recross on that redirect?

MR. ANDERSON:  No further questions.

MR. SBAITI:  No further questions, Your Honor.

MR. ANDERSON:  Sorry.

THE COURT:  Nothing?

MR. ANDERSON:  I think we're good.

THE COURT:  Okay.  I have one question, Mr. Patrick.  My brain sometimes goes in weird directions.

EXAMINATION BY THE COURT

THE COURT:  I'm just curious.  What are these Cayman Island entities, charitable organizations formed in the Cayman

HCMLPHMIT00002853

Patrick - Examination by the Court                    139

Islands?

THE WITNESS:  Yeah.  I'll keep it as simple as I can, even though I'm a tax lawyer, so I won't get into the tax rules, but the Cayman structure is modeled after what you typically see in the investment management industry, and so I -- and I won't reference specific entities here with respect to the Highland case, but I think you'll note some similarities, if you think about it.  They're -- it's described as an offshore master fund structure where you have a -- and that would be the Charitable DAF Fund that's organized offshore, usually in the Cayman or Bermuda Islands, where the general partner, typically, in the industry, holds the management --

THE COURT:  Yeah.  Let --

THE WITNESS:  Okay.

THE COURT:  -- me just stop you.  I've seen this enough --

THE WITNESS:  Yeah, it's

THE COURT:  -- to know that it happens in the investment world.  But in --

THE WITNESS:  Yeah.

THE COURT:  You know, usually, I see 501(c)(3), you know, domestically-created entities for charitable purposes, so I'm just curious.

THE WITNESS:  Yes.

HCMLPHMIT00002854

Patrick - Examination by the Court                140

THE COURT:  Uh-huh.

THE WITNESS:  The offshore master fund structure typically will have two different types of -- they call it foreign feeder funds.  One foreign feeder fund is meant to accommodate foreign investors; the other foreign feeder fund is meant to accommodate U.S. tax-exempt investors.

Why, why is it structured that way?  In order to avoid something called -- I was trying not to be wonkish -- UBTI.  That's, let's see, Un -- Unrelated Trader Business Income.  I probably have that slightly wrong.  But it's essentially, it's a means to avoid active business income, which includes debt finance income, which is what these CLOs tend to be, that would throw off income that would be taxable normally if the exempts did not go through this foreign blocker, and it converts that UBTI income -- it's called (inaudible) income -- into passive income that flows -- that flows up to the charities.

And so it's very typical that you'll have a U.S. tax-exempt investor, when they make an investment in a fund, prefer to go through an offshore feeder fund, which is actually Charitable DAF Holdco, LTD.  That's essentially what, from a tax perspective, represents as a UBTI blocker entity.  And then you have the offshore investments being held offshore because there's a variety of safe harbors where the receipt of interest, the portfolio interest exception, is not taxable.

HCMLPHMIT00002855

The creation of capital gains or losses under the -- they call it the trading, 864(b) trading safe harbor, is not taxable. So that's why you'll find these structures operating offshore to rely on those safe harbor provisions as well as -- as well as what I indicated with respect to the two type blocker entities.  It's very typical and industry practice to organize these way.  And so when this was set --

THE COURT:  It's very typical in the charitable world to --

THE WITNESS:  In the investment management --

THE COURT:  -- form this way?

THE WITNESS:  In the investment management world, when you have charitable entities that are taking some exposure to assets that are levered, to set this structure up in this way.  It was modeled after -- they just call them offshore master fund structures.  They're known as Mickey Mouse structures, where you'll have U.S. investors --

THE COURT:  Yes.  I -- yes, I --

THE WITNESS:  -- enter through a U.S. partnership, and the foreign investors enter through a blocker.

THE COURT:  It was really just the charitable aspect of this that I was --

THE WITNESS:  Yeah.  Yeah.

THE COURT:  -- getting at.

THE WITNESS:  Yeah.  No, but I'm just trying to

HCMLPHMIT00002856

Patrick - Recross                           142

emphasize if --

THE COURT:  All right.  It's --

THE WITNESS:  Yeah.

THE COURT:  -- neither here nor there.  All right.

MR. SBAITI:  Your Honor, may I ask a slightly clarifying leading question on that, because I think I understand what he was trying to say, just for the record?

THE COURT:  Well, --

MR. MORRIS:  I object.

THE COURT:  -- I tell you what.  Anyone who wants to ask one follow-up question on the judge's question can do so. Okay?  You can go first.

MR. SBAITI:  I'll approach, Your Honor.

THE COURT:  Okay.

RECROSS-EXAMINATION

BY MR. SBAITI:

Q    Would it be a fair summary of what you were saying a minute ago that the reason the bottom end of that structure is offshore is so that it doesn't get taxed before the money reaches the charities on the U.S. side?

A    Tax -- it converts the nature of the income that is being thrown off by the investments so that it becomes a tax friendly income to the tax-exempt entity.  Passive income. That's --

Q    So, essentially, --

THE COURT:  Okay.  Okay.

MR. SBAITI:  -- so it doesn't get taxed before it hits the --

THE COURT:  I said one question.

MR. SBAITI:  Sorry, Your Honor.

THE COURT:  Okay.  He answered it.

MR. PHILLIPS:  And I have one question, Your Honor

THE COURT:  Okay.

MR. PHILLIPS:  I don't know if I need to ask this question, but I'd rather not ask you if I need to ask it.

THE COURT:  Go ahead.

MR. PHILLIPS:  But if I do, you know, I could --

THE COURT:  Go ahead.

MR. PHILLIPS:  Well, okay.

RECROSS-EXAMINATION

BY MR. PHILLIPS:

Q   We've talked about the offshore structure.  Are the foundations in the top two tiers of the organizational chart offshore entities?

A   No.

Q   They're --

A   They're onshore entities.  They're tax-exempt entities.

Q   Thank you.

A   The investments are offshore.

Q   Thank you.

HCMLPHMIT00002858

THE COURT:  Mr. Morris?  One question.

FURTHER REDIRECT EXAMINATION

BY MR. MORRIS:

Q    Do you hold yourself out as an expert on the organizational structures in the Caribbean for charitable organizations?

A    I hold myself out as a tax professional versant on setting up offshore master fund structures.  It's sort of a bread-and-butter thing.  But there are plenty of people that can testify that this is very typical.

Q    Uh-huh.  Okay.

THE COURT:  Okay.  Thank you.

All right.  You are excused, Mr. Patrick.  I suppose you'll want to stay around.  I don't know if you'll potentially be recalled today.

(The witness steps down.)

THE COURT:  All right.  We should take a lunch break. I'm going to put this out for a democratic vote.  Forty-five minutes?  Is that good with everyone?

MR. SBAITI:  Do we have to leave the building to eat, Your Honor, or is there food in the building?

THE COURT:  I think --

MR. SBAITI:  I'm sorry to ask that question, but --

THE COURT:  Yes.  You know what, there used to be a very bad cafeteria, but I think it closed.  Right, Mike?  So,

HCMLPHMIT00002859

you know, --

MR. SBAITI: Sorry I asked that.

A VOICE: Hate to miss that one.

THE COURT: Is 45 minutes not enough since you have to go off campus? I'll give you an hour. It just means we stay later tonight.

A VOICE: Can we just say 2:00 o'clock?

MR. SBAITI: That's fine with us, Your Honor.

THE COURT: 2:00 o'clock. That's 50 minutes. See you then.

MR. SBAITI: Thank you.

A VOICE: Your Honor, can we just get a time check?

THE COURT: Okay.

THE CLERK: Yeah. The Debtors are at an hour and eleven minutes. Respondents at an hour nineteen.

THE COURT: And hour and eleven and an hour and nineteen.

A VOICE: Wait, that's not right.

A VOICE: That can't be right.

A VOICE: Two hours? We started at --

THE COURT: Okay. So, again, their side, the collective Respondents?

THE CLERK: An hour and eleven, responding to your questions, --

A VOICE: Yeah, he's not recording --

HCMLPHMIT00002860

146

THE CLERK:  So an hour and eleven and an hour and nineteen.

THE COURT:  But they were already over an hour --

A VOICE:  Yeah.  It's been over three hours.

THE COURT:  -- with opening statements.

THE CLERK:  An hour and twelve.  Yes.  They were very short with the questioning.  It was only like --

THE COURT:  Okay.  We'll double-check that over the break with the court reporter.

A VOICE:  All right.  Thank you, Your Honor.

THE COURT:  We'll double-check and let you know.

THE COURT:  All rise.

(A luncheon recess ensued from 1:09 p.m. until 2:03 p.m.)

THE COURT:  All right.  Please be seated.  We're going back on the record in Highland after our lunch break.  I'm going to confirm time.  We've had the Debtor an aggregate of an hour and eleven minutes.  The Respondents, an aggregate of an hour and twenty minutes.  Okay?  So we've gone two hours and thirty-one minutes.

If it seems like we've been going longer, it's because we did not do the clock on the opening matters regarding removal, extension of time.  And then when I interjected with questions, we stopped the clock.  All right?  So let's go.

You may call your next witness, Mr. Morris.

MR. MORRIS:  Thank you, Your Honor.  The Debtor calls

HCMLPHMIT00002861

James Dondero.

THE COURT:  All right.

A VOICE:  He had to step down the hall.  We had a little trouble getting through security.  Let me --

THE COURT:  All right.  Mr. Dondero, you've been called as the next witness.  So if you'll approach our witness stand, please.  All right.  Please raise your right hand.

(The witness is sworn.)

THE COURT:  All right.  Please be seated.

JAMES D. DONDERO, DEBTOR'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MORRIS:

Q    Good afternoon, Mr. Dondero.

A    Good afternoon.

Q    Can you hear me?

A    Yes.

Q    Okay.  So, you were here this morning, correct?

A    Yes.

Q    All right.  So, we're going to put up -- we'll put it up on the screen, but if you'd prefer to look at a hard copy in the binder that's marked Volume 1 of -- 2 of 2, I'd ask you to turn to Exhibit 25.  Or you could just follow on the screen.  And this is a one-page document, so maybe that's easier.

A    Sure.

Q    Do you have it?  All right.

HCMLPHMIT00002862

Dondero - Direct                                            148

A     Yes.

Q     This is the organizational chart for what's known as the DAF, correct?

A     Yes.

Q     And Mark Patrick set up this structure, correct?

A     I believe he coordinated.  I believe it was set up by third-party law firms.  I believe it was Hutton or a firm like that.

Q     Mr. Patrick participated in the creation of this structure because you gave him the task of setting up a charitable entity for Highland at that time, correct?

A     Yes.

Q     And you approved of this organizational structure, correct?

A     Yes.

Q     And Grant Scott was the Trustee of the DAF for a number of years, correct?

A     I often use that word, trustee, but technically I think it's managing member.

Q     That's right.  I appreciate that.  I was using your word from the deposition.  But is it fair to say that, to the best of your knowledge, Grant Scott was the sole authorized representative of the entity known as the DAF from 2011 until just recently?

A     Sole -- I would describe it more he was in a trustee

HCMLPHMIT00002863

Dondero - Direct                                          149

function.

Q    Uh-huh.

A    Advice was being provided by Highland on the investment side.  He wasn't expected to be a financial or an investment expert.  And then accounting, tax, portfolio, tracking, you know, compliance with all the offshore formation documents, that was all done by Highland as part of a shared services agreement.

Q    Okay.  I appreciate that, but listen carefully to my question.  All I asked you was whether he was the authorized representative, the sole authorized representative for the ten-year period from 2011 until recently.

A    Yes.

Q    Okay.

A    I believe so.

Q    Thank you.  You served as the managing member of the DAF GP, LLC before Mr. Scott, correct?

A    Yes.

Q    Okay.  And if you turn to Exhibit 26 in your binder, that's the amended and restated limited liability company agreement for the DAF GP, LLC, correct?

A    Yes.

Q    And on the last page, that's your signature line, right?

A    Yes.

Q    And you stepped down as the managing member on March 12,

HCMLPHMIT00002864