2012, and were replaced by Mr. Scott, correct?

A    Yes.

Q    And as you recall it, Mr. Scott came to be appointed the trustee of the DAF based on your recommendation, right?

A    Based on my recommendation?  Yes, I would say that's fair.

Q    And you made that recommendation to Mr. Patrick, right?

A    I -- I don't remember who I made the recommendation to. But I would echo the testimony of Mark Patrick earlier that the purpose of stepping down was to make the DAF unaffiliated or independent versus being in any way affiliated.

        MR. MORRIS:  I move to strike.

BY MR. MORRIS:

Q    And I'd ask you to listen carefully to my question.

        THE COURT:  Sustained.

BY MR. MORRIS:

Q    You made the recommendation to Mr. Patrick, correct?

A    I would give the same answer again.

Q    Okay.

        MR. MORRIS:  Can we please put up Mr. Dondero's deposition transcript from last Friday at Page 297?

        I believe, Your Honor, that the court reporter thought that this was a continuation of a prior deposition, and that's why the pages begin in the, you know, high in the 200s and not at Page 1.  Just to avoid any confusion.

BY MR. MORRIS:

HCMLPHMIT00002865

Q    Mr. Dondero, do you see the transcript in front of you?

A    Yes.

Q    Okay.  Were you asked this question and did you give this answer?  "Who did you make the" -- question, "Who did you make the recommendation to?"  Answer, "It would have been Mark Patrick."

A    I don't recall right now as I sit here, and it seems like I was speculating when I answered, but it -- it probably would have been Mark Patrick.  I just don't have a specific recollection.

Q    You made the recommendation to Mr. Patrick because he was responsible for setting up the overall structure, correct?

A    I -- I can't testify to why I did something I don't remember.  I think that would be --

Q    Can we --

A    -- speculative.

Q    Are you finished, sir?

A    Yeah.

Q    Okay.

        MR. MORRIS:  Can we go to Page 299, please?

BY MR. MORRIS:

Q    Lines 6 through 10.  Did I ask this question and did you give me this answer?  Question, "But why did you select Mr. Patrick as the person to whom to make your recommendation?"  Answer, "Because he was responsible for setting up the overall

HCMLPHMIT00002866

Dondero - Direct                                       152

structure."

Were you asked that question and did you give that answer last Friday?

A    Yes.

Q    Thank you.  But it's your testimony that you don't really know what process led to Mr. Scott's appointment, correct?

A    No, I -- I said I was refreshed by Mark Patrick's testimony earlier.

Q    Yeah.  Were you refreshed that, in fact, you specifically had the authority to and did appoint Grant Scott as the managing member of the DAF GP, LLC?

A    I -- I don't know.

Q    Well, you're referring to Mr. Patrick's testimony and I'm asking you a very specific question.  Did you agree -- is your memory refreshed now that you're the person who put Grant Scott in the position in the DAF?

A    I -- I don't know if I owned those secret shares that -- well, they're not secret, but shares that could appoint anybody on the planet.  I guess if I was in that box at that time before Grant, then I would have had that ability.  I'm not denying at all that I recommended Grant.  I'm just saying I don't -- I don't remember if I went specifically to him or if it was Thomas Surgent that was orchestrating it at the time.  I don't remember.

Q    Do you deny that you had the authority to and that you did

HCMLPHMIT00002867

Dondero - Direct                                    153

appoint Grant Scott as your successor?

MR. TAYLOR:  Your Honor, objection to the extent it calls for a legal conclusion.  I can't get close to a mic, so --

THE COURT:  I overrule the objection.

THE WITNESS:  Can you repeat the question for me?

BY MR. MORRIS:

Q    Do you deny that you had the authority to and that you did, in fact, appoint Grant Scott as your successor?

A    It'd be better to say I don't -- I don't -- no, I don't remember or I didn't know the details at the time.  But, again, I -- I assume I owned those shares.  And, again, I do remember recommending Grant and -- but exactly how it happened, I don't remember.

Q    Did you hear Mark Patrick say just an hour ago that you appointed Grant Scott as your successor?

MR. SBAITI:  Objection, Your Honor.  Misstates testimony.  The witness testified he transferred shares. That's different than an appointment power.

THE COURT:  Response?  I can't remember the exact way you worded it, to be honest.

MR. MORRIS:  Neither can I, but I'll even take it that way.

THE COURT:  Okay.

MR. MORRIS:  I think he's wrong, but I'll even take

HCMLPHMIT00002868

it that way.

THE COURT:  Okay.

BY MR. MORRIS:

Q   Mr. Dondero, did you listen to Mark Patrick say that you are the person who made the decision to transfer the shares to Mr. Scott in 2012?

A   Yes, I heard him say that.

Q   Okay.  So, do you -- do you dispute that testimony?

A   I -- I don't have any better knowledge to dispute or confirm.

Q   You and Mr. Scott have known each other since high school, correct?

A   Yes.

Q   You spent a couple of years at UVA together, correct?

A   Yes.

Q   You were housemates together, correct?

A   Yes.

Q   He was the best man at your wedding, correct?

A   Yes.

Q   He's a patent lawyer, correct?

A   Yes.

Q   He had no expertise in finance when -- when he was appointed as your successor to the DAF, correct?

A   Correct.

Q   To the best of your knowledge, at the time Mr. Scott

HCMLPHMIT00002869

Dondero - Direct                                    155

assumed his position, he had never made any decisions concerning collateralized loan obligations, correct?

A    Correct, but he wasn't hired for that.  That wasn't his position.

Q    Was he the person who was going to make the decisions with respect to the DAF's investments?

A    My understanding on how it was structured was the DAF was paying a significant investment advisory fee to Highland. Highland was doing portfolio construction and the investment selection of -- or the investment recommendations for the portfolio.  There is an independent trustee protocol that I believe was adhered to, but it was never my direct involvement.  It was always the portfolio managers or the traders.

You have to provide three similar or at least two other alternatives, and then with a rationale for each of them, but a rationale for why you think one in particular is better. And the trustee looks at the three, evaluates them.  And the way I understand it always worked, that it works at pretty much every charitable trust or trust that I'm aware of, they generally, if not always, pick alongside the -- or, pick the recommendation of their highly-paid investment advisory firm.

Q    And are you the highly-paid investment advisory firm?

A    Highland was at the time, yes.

Q    And you controlled Highland, right?

HCMLPHMIT00002870

Dondero - Direct                                      156

A    Yes.

Q    Okay.  But at the end of the day, is it your understanding that Mr. Scott had the exclusive responsibility for making actual decisions on behalf of the charitable trust that you had created?

A    Yeah, I mean, subject to the protocol I just described.

Q    Yeah, okay, so let's keep going.  Mr. Scott had no experience or expertise running charitable organizations at the time you decided to transfer the shares to him, correct?

A    Yes, I believe that's correct.

Q    Okay.  You didn't recommend Mr. Scott to serve as the DAF's investment advisor, did you?

A    No.

Q    And until early 2021, as you testified, I believe, already, HCMLP served as the DAF's investment advisor, correct?

A    Yes.

Q    And until early 2021, all of the DAF's day-to-day operations were conducted by HCMLP pursuant to a shared services agreement, correct?

A    Yes.

Q    And from the time the DAF was formed until January 9, 2020, you controlled HCMLP, correct?

A    Yes.

Q    You can't think of one investment decision that HCMLP

recommended that Mr. Scott ever rejected in the ten-year period, correct?

MR. SBAITI:  Objection, Your Honor.  Lacks foundation.

THE COURT:  Response?

MR. MORRIS:  I'm not quite sure what to say, Your Honor.  The witness has already testified that HCMLP was the investment advisor, made recommendations to Mr. Scott, and that Mr. Scott was the one who had to make the investment decisions at the end of the day.

MR. SBAITI:  He's not here as a witness for HCMLP. He's here in his personal capacity.  There's no foundation he'd have personal knowledge of which specific investments were proposed, which ones were rejected or accepted.  He said it was done by the portfolio manager.

THE COURT:  Okay.  I overrule.  He can answer if he has an answer.

BY MR. MORRIS:

Q   Sir, you can't think of one investment decision that HCMLP ever recommended to Mr. Scott that he rejected, correct?

A   I can't think of one, but I would caveat with I wouldn't have expected there to be any.

Q   So you expected him to just do exactly what HCMLP recommended, correct?

A   No.  I would expect him to sort through the various

HCMLPHMIT00002872

investments when he was given three or four to choose from and be able to discern that, just as we had with our expertise, which was much greater than his, discern which one was the best and most suitable investment, the best risk-adjusted investment, that he would come to the same conclusion.

Q    Okay.  You can't think of an investment that Mr. Scott ever made on behalf of the DAF that didn't originate with HCMLP, correct?

A    Again, no, but I wouldn't expect there to be.

Q    Okay.  And that's because you expected all of the investments to originate with the company that you were controlling, correct?

A    We were the hired investment advisor with fiduciary responsibility --

Q    Uh-huh.

A    -- and with a vested interest in making sure the DAF performance was the best it could be.

Q    Okay.  Let --

A    He was, as you said, a patent attorney.  It would have been unusual for him to second-guess.  I'm sure, in any private investment or any investment that was one off or didn't have comps, you know, he probably sought third-party valuations.  But you would have to talk to him about that, or the people at Highland that did that.

        MR. MORRIS:  I move to strike.  It's a very simple

HCMLPHMIT00002873

Dondero - Direct                              159

question.

THE COURT:  Sustained.

BY MR. MORRIS:

Q   Sir, you can't think of one investment that Mr. Scott made on behalf of the DAF that did not originate with HCMLP, correct?

A   I'm going to give the same answer.

Q   Okay.  Let's go to Page 371 of the transcript, please. Lines 7 through 11.

Oh, I apologize.  I think I might -- I think I meant 317. I think I got that inverted.  Yeah.

Did I ask this question and did you give this answer: "Can you think of any investment that Mr. Scott made on behalf of the DAF that didn't original with HCMLP?"  Answer, "He wasn't the investment advisor, but no, I don't -- I don't recall."

Is that the answer you gave on Friday?

A   Yes.

Q   Thank you.  Let's --

MR. SBAITI:  Just for clarification, Your Honor, --

THE COURT:  Pardon?

MR. SBAITI:  -- the deposition was last Tuesday, not on Friday.

MR. MORRIS:  I stand corrected, Your Honor.

THE COURT:  Okay.

HCMLPHMIT00002874

MR. MORRIS:  I apologize.

THE COURT:  Okay.

MR. MORRIS:  I apologize if the Court thinks I misled it.

BY MR. MORRIS:

Q   Let's talk about Mr. Scott's decision during the bankruptcy case that preceded his resignation.  After HCMLP filed for bankruptcy, CLO Holdco, Ltd. filed a proof of claim, correct?

MR. ANDERSON:  Your Honor, I haven't objected yet, but we literally haven't covered anything that deals with commencing or pursuing a claim or cause of action.  I'm going to object.  This is way outside, again, the bounds of the contempt hearing.  It's -- otherwise, it's other discovery for something else.  It literally has nothing to do with pursue a claim or cause of action.

THE COURT:  We have another relevance objection. Your response?

MR. MORRIS:  Your Honor, the evidence is going to show that Mr. Dondero told Mr. Scott on three separate occasions that his conduct, which were acts of independence, were inappropriate and were not in the best interests of the DAF.  Within days of the third strike, he resigned.  Okay?

I think it's relevant to Mr. Dondero's control of the DAF. I think that the moment that Mr. -- this is the argument I'm

HCMLPHMIT00002875

going to make.  I'll make it right now.  You want me to make it now, I'll make it now.  The moment that Mr. Scott exercised independence, Mr. Dondero was all over him, and Mr. Scott left.  That's what happened.  The evidence is going to be crystal clear.

And I think that that control of the DAF is exactly what led to this lawsuit.  And what led -- and I'm allowed to make my argument.  So that's why it's relevant, Your Honor, because I think it shows that Mr. Scott -- Mr. Scott, after exercising independence, was forced out.

MR. ANDERSON:  That doesn't move the needle one bit as to whether a lawsuit was commenced or a claim or cause of action was pursued, which is the subject of the contempt motion.  It doesn't move the needle one bit as to those two issues, as to whether that has any bearing on was it commenced or was it pursued.

MR. MORRIS:  Your Honor, I appreciate the very narrow focus that counsel for a different party is trying to put on this, but it is absolutely relevant to the question of whether Mr. Dondero was involved in the pursuit of these claims.  All right?  That's what the order says.  Pursue.

THE COURT:  All right.  Overruled.

BY MR. MORRIS:

Q   After HCMLP filed for bankruptcy, CLO Holdco filed a proof of claim, correct?

Dondero - Direct                              162

A    I believe so.

Q    And in the fall of 2020, Mr. Scott amended the proof of claim to effectively reduce it to zero, correct?

A    I -- I guess.

Q    And Mr. Scott made that decision without discussing it with you in advance, correct?

A    Yes.

Q    But you did discuss it with him after you learned of that decision, correct?

A    I don't -- I don't recall.  I'm willing to be refreshed, but I don't remember.

Q    Well, you told him specifically that he had given up bona fide claims against the Debtor, correct?

A    Let me state or clarify my testimony this way.  Um, --

        MR. MORRIS:  Your Honor, it's really just a yes or no question.  His counsel can ask him if he wants to clarify, but it's really just a yes or no question.

BY MR. MORRIS:

Q    You told Mr. Scott that he gave up bona fide claims against the Debtor, correct?

        THE COURT:  Okay.

        THE WITNESS:  I don't know if I told him then with regard to those claims.

BY MR. MORRIS:

Q    Okay.  Can we go to Page 321 of the transcript?  At the

HCMLPHMIT00002877

Dondero - Direct                                          163

bottom, Line 21?  22, I apologize.

Did I ask this question and did you give this answer? "And what do you" -- Question, "And what do you recall about your discussion with Mr. Scott afterwards?"  Answer, "That he had given up bona fide claims against the Debtor and I didn't understand why."

Did I ask that question and did you give that answer last Tuesday?

A    Yes.

Q    Okay.  A short time later, in December, the Debtor filed notice of their intention to enter into a settlement with HarbourVest, correct?

A    Yes.

Q    And CLO Holdco, under Mr. Scott's direction, filed an objection to that settlement, correct?

A    Yes.

Q    And that settlement, the substance of that settlement was that the Debtor did not have the right to receive HarbourVest's interests in HCLOF at the time, correct?

A    I don't remember the exact substance of it.

Q    Okay.  But you do remember that you learned that Mr. Scott caused CLO Holdco to withdraw the objection, correct?

A    Yes, ultimately.

Q    Okay.  And again, Mr. Scott did not give you advance notice that he was going to withdraw the HarbourVest

HCMLPHMIT00002878

Dondero - Direct                                      164

objection, correct?

A    No, he -- he did it an hour before the hearing.  He didn't give anybody notice.

Q    You learned that Mr. Scott caused CLO Holdco to withdraw its objection to the HarbourVest settlement at the hearing, correct?

A    Yes.

Q    And you were surprised by that, weren't you?

A    I believe everybody was.

Q    You were sur... you were surprised by that, weren't you, sir?

A    Yes.

Q    And you were surprised by that because you believed Mr. Scott's decision was inappropriate, right?

A    Partly inappropriate, and partly because 8:00 o'clock the night before he confirmed that he was going forward with the objection.  And I think the DAF's objection was scheduled to be first, I think.

Q    After you learned that Mr. Scott instructed his attorneys to withdraw the CLO Holdco objection to the HarbourVest settlement, you again spoke with Mr. Scott, correct?

A    Yes.

Q    And that conversation took place the day of the hearing or shortly thereafter, correct?

A    Yes.

HCMLPHMIT00002879

Q    And during that conversation, you told Mr. Scott that it was inappropriate to withdraw the objection, correct?

A    Yes.

Q    And in response, Mr. Scott told you that he followed the advice of his lawyers, correct?

A    Yes.

Q    But that didn't -- that explanation didn't make sense to you, right?

A    Yes.

Q    In fact, you believed that Mr. Scott failed to act in the best interests of the DAF and CLO Holdco by withdrawing its objection to the HarbourVest settlement, correct?

A    Yes.

Q    And while you didn't specifically use the words fiduciary duty, you reminded Mr. Scott in your communications with him that he needed to do what was in the best interests of the DAF, correct?

A    Yes.

Q    You're the founder of the DAF, correct?

A    I put it -- I put it in motion.  Yeah.  I tasked Mark Patrick and third-party law firms to do it, but if that boils down to founder, I guess yes.

Q    Uh-huh.  And you're the primary donor to the DAF, correct?

A    Yes.

Q    You're the investment advisor to the DAF, or at least you

HCMLPHMIT00002880

Dondero - Direct                                    166

were at that time?

A    Yes.

Q    And because you served in these roles, you expected Mr. Scott to discuss his decision to withdraw the HarbourVest objection in advance, correct?

A    Yes, I -- I think it was even broader than that.  I mean, he was having health and anxiety issues, and to the extent he felt overwhelmed, I -- you know, yeah, you should do what's in the best interests at all times, but -- but yes, I thought it would be helpful if he conferred with me or Mark Patrick or whoever he was comfortable with.

Q    Mr. Dondero, you specifically believed that Mr. Scott's failure to tell you that he was going to withdraw the HarbourVest objection in advance was inappropriate, right?

A    Yes.

Q    Even though he was the sole authorized representative, you believed that, because you were the founder of the DAF, the primary donor of the DAF, and the investment advisor to the DAF, he should have discussed that before he actually made the decision, correct?

A    No.  What I'm saying is at 8:00 o'clock at night, when he confirms to numerous people he's ready to go first thing with his objection, and then he or counsel or some combination of them change their mind and don't tell anybody before the hearing, that's odd and inappropriate behavior.

HCMLPHMIT00002881

MR. MORRIS:  Can we go to Page 330 of the transcript, please?

And Your Honor, before I read the testimony, there is an objection there.  So I'd like you to rule --

THE COURT:  Okay.

MR. MORRIS:  -- before I do that.  It can be found at -- on Page 330 at Line 21.

(Pause.)

MR. MORRIS:  Here we go.  Page 30, beginning at Line 19.  330, rather.

THE COURT:  Okay.

(Pause.)

THE COURT:  Okay.  I overrule that objection.

BY MR. MORRIS:

Q   Mr. Dondero, were you asked this question and did you give this answer last Tuesday?  Question, "Do you believe that he had an obligation to inform you in advance?"  Answer, "I don't know if I would use the word obligation, but, again, as the founder or the primary donor and continued donor to the DAF, and as the investment advisor fighting for above-average returns on a daily basis for the fund, significant decisions that affect the finances of the fund would be something I would expect typically a trustee to discuss with the primary donor."

Did you give that answer the other day, sir?

HCMLPHMIT00002882

Dondero - Direct                                        168

A    Yes.

Q    If Mr. Patrick decides tomorrow to withdraw the lawsuit that's in District Court, does he have an the obligation to tell you in advance?

A    Again, I wouldn't use the word obligation.  But something that I think ultimately is going to be a $20 or $30 million, if not more, benefit to the DAF, to the detriment of Highland, if you were to give that up, I would expect him to have a rationale and I would expect him to get other people's thoughts and opinions before he did that.

Q    Okay.  But does he have to get your opinion before he acts?

A    No, he does not.

Q    Okay.  So he -- Mr. Patrick could do that tomorrow, he could settle the case, and if he doesn't come to you to discuss it in advance, you won't be critical of him, right?

A    He doesn't have the obligation, but there's -- there's a reasonableness in alignment of interests.  I -- a growing entrepreneur sets up a trust, a lot of times they'll put their wife in charge of it, and she hires investment advisers and whatever, but they've got the best interests at mind for the charity or the children or whatever.

You know, people who go rogue and move in their own self-interest or panic, that stuff can happen all the time.  It doesn't make it appropriate, though.

HCMLPHMIT00002883

Q    A couple of weeks after Mr. Scott withdraw the objection to the HarbourVest settlement, he entered into a settlement agreement with the Debtor pursuant to which he settled the dispute between the Debtor and CLO Holdco, correct?

A    Yes.

Q    Okay.  You didn't get advance notice of that third decision, correct?

A    No.

Q    Can we go to Page -- Exhibit 32 in your binder?  And this is the settlement agreement between CLO Holdco and the Debtor, correct?  Attached as the exhibit.  I apologize.

A    Yes.

Q    And do you understand that that's Mr. Scott's signature on the last page?

A    Yep.

Q    And you learned about this settlement only after it had been reached, correct?

A    Yep.

Q    And you believed Mr. Scott's decision not to pursue certain claims against the Debtor or to remove HCMLP as the manager of the CLOs was not in the best interests of the DAF, correct?

A    Correct.

Q    And you let Mr. Scott know that, correct?

A    Yes.

HCMLPHMIT00002884

Dondero - Direct                    170

Q    After learning about the settlement agreement on January 26th, you had one or two conversations with Mr. Scott on this topic, correct?

A    Yes.

Q    And your message to Mr. Scott was that the compromise or settlement wasn't in the DAF's best interest, correct?

A    It was horrible for the DAF.

Q    Uh-huh.  And you told him that, right?

A    Yes.

Q    Okay.  From your perspective, any time a trustee doesn't do what you believe is in the trust's best interest, you leave yourself open to getting sued, correct?

A    Who is "you" in that question?

Q    You.  Mr. Dondero.

A    Can you repeat the question, then, please?

Q    Sure.  From your perspective, any time you're a trustee and you don't believe that the trustee is doing what's in the best interests of the fund, the trustee leaves himself open to getting sued, correct?

A    I don't know who the trustee leaves himself open to, but as soon as you go down a path of self-interest or panic, you -- you potentially create a bad situation.  But I don't know who holds who liable.

Q    Did you believe that Mr. Scott was acting out of self-interest or panic when he decided to settle the dispute with

HCMLPHMIT00002885

the Debtor on behalf of CLO Holdco?

A    Yes.

Q    Did you tell him that?

A    He told me that.

Q    He told you that he was acting out of panic or desperation?  With self-int... withdrawn.  Withdrawn.  Did he tell you that he was acting out of self-interest?

A    He was having health problems, anxiety problems, and he didn't want to deal with the conflict.  He didn't want to testify.  He didn't want to come to court.  He didn't want to do those things.  And I told him I didn't think the settlement was going to get him out of that stuff.  I think, you know, it got him out of some issues, but I think you guys are going to go after him for other stuff.  But he -- he panicked.

        MR. MORRIS:  I move to strike the latter remark.

        THE COURT:  Sustained.

BY MR. MORRIS:

Q    Shortly after you had the conversation with Mr. Scott, he sent you notice of his intent to resign from his positions at the DAF and CLO Holdco, correct?

A    Yes.

Q    Okay.  Let's take a look at that, please.  Exhibit 29.  This is Mr. Scott's notice of resignation, correct?

A    Yes.

Q    He sent it only to you, correct?

HCMLPHMIT00002886

Dondero - Direct                                    172

A    Yes.

Q    A couple of days before he sent this, he told you he was considering resigning; isn't that right?

A    Yes.

Q    Okay.  And he told you he was considering resigning because he was suffering from health and anxiety issues regarding the confrontation and the challenges of administering the DAF given the bankruptcy, correct?

A    Yes.

Q    He didn't tell you that he made the decision -- withdrawn. Did you tell him in this same conversation -- withdrawn.  Is this the same conversation where you conveyed the message that the compromise or settlement wasn't in the best interests of the DAF?

A    You mean the conversation -- or the resignation? Is that -- can you rephrase the question, please?

Q    Yeah, I apologize.  It's my fault, sir.  You testified that after the January 26th hearing you had a conversation with Mr. Scott where you told him that the compromise or settlement was not in the best interests of the DAF, correct?

A    Yes.

Q    Okay.  Did Mr. Scott share with you his concerns about anxiety and health issues in that same conversation, or was it in a subsequent conversation?

A    It was at or around that time.  I -- I don't remember

Dondero - Direct                                        173

which conversation.

Q    Okay.

A    But it was right at or around that time.

Q    All right.  You never asked Mr. Scott to reconsider, did you?

A    No.

Q    You don't recall sending this notice of resignation to anyone, do you?

A    No.

Q    You don't remember notifying anyone that you'd received notice of Mr. Scott's intent to resign from the DAF, do you?

A    It was -- yeah, no, I -- I don't remember.  It was a busy time around that time and this was a secondary issue.

Q    Okay.  So the fact that the person who has been running the DAF for a decade gives you and only you notice of his intent to resign was a secondary issue in your mind?

A    Yes, because when I talked to him at about that time, I said, okay, well, it's going to take a while.  I don't even know how the mechanism works.  But don't do anything adverse to the DAF, don't do anything else until, you know, you've figured out transition.

Q    Uh-huh.

A    And so once he had confirmed he wouldn't do anything outside normal course until he transitioned, I didn't worry about this.  I had bigger issues to worry about at the time.

HCMLPHMIT00002888

Dondero - Direct                                        174

Q     In the third paragraph of his email to you, he wrote that his resignation will not be effective until he approves of the indemnification provisions and obtains any and all necessary releases.  Do you see that?

A     Yes.

Q     And that was the condition that on January 31st Mr. Scott placed on the effectiveness of his resignation, correct?

A     Condition?  Yeah, I -- I think he's trying to state the timing will happen after that.

Q     After he gets the release, right?

A     Yes.

Q     And he wanted the release because you'd told him three different times that he wasn't acting in the best of the DAF, correct?

          MR. TAYLOR:  Objection, Your Honor.

          MR. SBAITI:  Objection.  Calls for --

          MR. TAYLOR:  Objection.  Calls for speculation.

          THE WITNESS:  Yeah, I --

          THE COURT:  Sustained.

          THE WITNESS:  I can't take that jump.  Yeah.

BY MR. MORRIS:

Q     In response to this email from your lifelong friend, you responded, if we could scroll up, about whether divest was a synonym -- if we can look at the first one -- whether divest is a synonym for resigned.  Do I have that right?

HCMLPHMIT00002889

A   (no immediate response)

Q   If you will look at your response on Monday morning at 9:50.

A   Yes.

Q   Okay.  And then after Mr. Scott responds, you respond further, if we can scroll up, and you specifically told him, "You need to tell me ASAP that you have no intent to divest assets."  Correct?

A   Yes.

Q   And you wrote that because you believed some of his behavior was unpredictable, right?

A   I think I wrote that because the term divest in investment terms means sale or liquidate, but I guess it had a different legal term in the way he was looking at it.  I wasn't aware at that time of the shares that could be bequeathed to anybody, and I think the divest refers to that, but I wasn't aware that that's how the structure worked at that time, and I was worried that divest could be the investment term and I -- it wouldn't have been appropriate for him to liquidate the portfolio.

Q   So, and you wanted to make sure he wasn't liquidating or intending to liquidate any of the CLOs, correct?

A   Correct.

Q   Okay.  So he's still the authorized, the sole authorized representative, but you wanted to make sure that he didn't do

Dondero - Direct                                          176

anything that you thought was inappropriate.  Fair?

A    It's because I had talked to him before this and he said he wasn't going to do anything outside normal course, and then the word divest scared me, but I didn't realize it was a legal term in this parlance here.

Q    And so after he explained, you still wanted to make sure that he wasn't divesting any assets, correct?

A    Yes.

Q    Okay.  Since February 1st, you've exchanged exactly one text messages with Mr. Scott; is that right?

A    I think there've been several, several text messages.  But one on his birthday.

Q    Yeah.  And you haven't spoken to him in months, correct?

A    In a couple months, yes.

Q    All right.  Let's talk about the replacement of Mr. Scott.  With -- with Mr. Scott's notice, someone needed to find a replacement, correct?

A    Yes.

Q    And the replacement was going to be responsible for managing a charitable organization with approximately $200 million of assets, most of which was seeded directly or indirectly through you, correct?

A    Yes.

Q    And the replacement was going to get his and her -- his or her investment advice from you and NexPoint Advisors; do I

HCMLPHMIT00002891

have that right?

A    That was the plan.

Q    Okay.  Ultimately, Mr. Patrick replaced Mr. Scott, correct?

A    Yes.

Q    But it's your testimony that you had no knowledge that Mr. Patrick was going to replace Mr. Scott until after it happened on March 24, 2021.  Correct?

A    That's correct.  I believe it happened suddenly.

Q    So, for nearly two months after you had received notice of Mr. Scott's intent to resign, you were uninvolved in the process of selecting his replacement, correct?

A    I was uninvolved.  I'd say the process was dormant for an extended period of time until Mark Patrick came on board, and then Mark Patrick ran the process of interviewing multiple potential candidates.

Q    Mark Patrick didn't have any authority prior to March 24th, correct?

A    Is March 24th the date that he transitioned the shares to himself from Grant Scott?

Q    Yep.

A    That's when he then became the trustee of the DAF, yes.

Q    Do you know -- do you know who was instructing Mr. Patrick on who to interview or how to carry the process out?

A    He was doing that on his own with, I think,

HCMLPHMIT00002892

recommendations from third-party tax firms.

Q    So Mr. Patrick was trying to find a successor to Mr. Scott, even though he had no authority to do that, and you were completely uninvolved in the whole process?  Do I have that right?

A    I was uninvolved, yes.  He was trying to facilitate it for the benefit of his friendship with Grant Scott and knowing that it -- it -- with his resignation, it had to transition to somebody.  And he enjoys working on the DAF, he enjoys the charitable stuff in the community, and he was the most appropriate person to work on helping Grant transition.

MR. MORRIS:  All right.  I move to strike, Your Honor.  It's hearsay.

THE COURT:  Sustained.

BY MR. MORRIS:

Q    You're aware that Mr. Seery was appointed the Debtor's CEO and CRO last summer, correct?

A    Yes.

Q    And you're aware that Mr. Seery's appointment was approved by the Bankruptcy Court, correct?

A    Yes.

Q    And you were aware of that at the time it happened, correct?

A    Yes.

Q    And even before that, in January of 2020, you consented to

HCMLPHMIT00002893

a settlement where you gave up control of the Debtor. Correct?

A    To the independent board for a consensual Chapter 11 restructuring that would leave Highland intact.

Q    And do you understand that the gatekeeper provision in the July order is exactly like the one that you agreed to in January except that it applies to Mr. Seery instead of the independent directors?

A    I -- I learned a lot about that today, but I don't think it's appropriate to move what applied to the board to the CEO of a registered investment advisor.

Q    Okay.  I'm just asking you, sir.  Listen carefully to my question.  Were you aware in January 2020 that you agreed to a gatekeeper provision on behalf of the independent board?

A    Generally, but not specifically.

Q    Okay.

A    Not -- not like what we've been going over today.

Q    Okay.  And you knew that Mr. Seery had applied to be appointed CEO subject to the Court's approval, correct?

A    Wasn't it backdated to March?  I -- I think the hearing was in June, but it was backdated for -- for money and other purposes, right?  I -- that's my recollection.  I don't remember otherwise.

Q    You do remember that Mr. Seery got -- he got -- his appointment got approved by the Court, right?

HCMLPHMIT00002894

Dondero - Direct                                180

A    Yes.  But, as far as the dates are concerned, I thought it was either in March or retroactive to March.  Maybe it was June or July.

Q    And you --

A    But I don't remember.

Q    Did you have your lawyers review the motion that was filed on behalf of the Debtor?

A    I'm -- I assume they do their job.  I -- if they didn't, I don't know.

Q    Okay.  That's what you hired them to do; is that fair?

A    Yes.

Q    Okay.  Can we go to Exhibit 12, please?  I think it's in Binder 1.  You've seen this document before, correct?

A    Yes.

Q    In fact, you saw versions of this complaint before it was filed, correct?

A    Yes, I saw one or two versions towards the end.  I don't know if I saw the final version, but --

Q    Sir, you participated in discussions with Mr. Sbaiti concerning the substance of this complaint before it was filed, correct?

A    Some.  I would just use the word some.

Q    Okay.  Can you describe for me all of your conversations with Mr. Sbaiti concerning the substance of this complaint?

        MR. SBAITI:  Your Honor, I would object on the basis

HCMLPHMIT00002895

Dondero - Direct                                      181

of work product privilege and attorney-client communications. He was an agent for my client, the DAF, at the time he was having these discussions with us, and our discussions with him were work product.  So to the extent he can reveal the conversations without discussing the actual content, we would raise privilege objection, Your Honor.

THE COURT:  Mr. Morris?

MR. MORRIS:  Your Honor, there is no privilege here. That's exactly why I asked Mr. Patrick the questions earlier today.  Mr. Dondero is not party to any agreement with the DAF today.  It's an informal agreement, perhaps, but there is no contractual relationship, there is no privity any longer between Mr. Dondero or any entity that owns and controls in the DAF, as far as I know.  If they have evidence of it, I'm happy to listen, but that -- that's exactly why I asked those questions of Mr. Patrick earlier today.

THE COURT:  All right.

MR. SBAITI:  Your --

THE COURT:  That was the testimony.  There's an informal arrangement, at best.

MR. SBAITI:  Well, Your Honor, I would suggest that that doesn't necessarily mean that he isn't an agent of the DAF.  It doesn't have to be a formal agreement for him to be an agent of the DAF.

Everyone's agreed he was an advisor.  Everyone's agreed he

HCMLPHMIT00002896

Dondero - Direct                                    182

was helping out.  That is an agency relationship.  It doesn't have to be written down.  It doesn't have to be a formal investment advisory relationship.  He's still an agent of the DAF.  He was requested to do something and agreed to do it under the expectation that all of us had that those would be privileged, Your Honor.  That is -- that is sufficient -- that is sufficient, I would argue, to get us where we need to be.  The privilege should apply, Your Honor, and they don't have a basis for, I would say, invading the privilege, Your Honor.

THE COURT:  Well, do you have any authority?  Because it just sounds wrong.  He's not an employee of your client.  He doesn't have any contractual arrangement with your client.

MR. SBAITI:  Your Honor, I would dispute the idea that he has no contractual arrangement with my client.  The question was asked, do you have a -- do you have a written agreement, and then the question was, so you don't have a contract, and the answer was no, I don't have a contract, building upon that first -- that first question.  But the testimony as he just recounted is that there is an agreement that he would advise Mr. Patrick and he would advise the DAF.

THE COURT:  Okay.

MR. SBAITI:  That's -- that's a contract.

THE COURT:  Okay.  My question was, do you have any legal authority?  That's what I meant when I said authority.  Any legal authority to support the privilege applying in this

HCMLPHMIT00002897

kind of --

MR. SBAITI:  In an informal arrangement, Your Honor? I don't have one at my fingertips at the moment, Your Honor, but I don't know that that should be a reason to invade the privilege.

And I would just add, Your Honor, I would just add, we've already -- because of the purpose of these questions, you've heard Mr. Morris state several times that the purpose is to show that Mr. -- that Mr. Dondero had some role in advising and participating in the creation of this complaint.  That's been conceded by myself.  I believe it was conceded by Mr. Dondero.

The actual specific facts, the actual specific conversations, Your Honor, shouldn't be relevant at this point and they shouldn't be admissible, given -- given the relevancy, given the perspective of the privilege.

THE COURT:  Okay.

MR. MORRIS:  If I might --

THE COURT:  I overrule your objection.  I don't think a privilege has been shown here --

MR. SBAITI:  And Your Honor, --

THE COURT:  -- and I think it's relevant.

MR. SBAITI:  -- I would ask if we could *voir dire* the witness on the basis of the privilege, if that's --

THE COURT:  All right.  You may do so.

HCMLPHMIT00002898

Dondero - Voir Dire                                    184

VOIR DIRE EXAMINATION

BY MR. SBAITI:

Q   Mr. Dondero, do you have a relationship with the DAF?

A   Yes.

Q   How would you describe that relationship?

A   I view myself and my firm as the investment advisor.  I was actually surprised by the testimony today that there wasn't a contract in place, but there should be one.  There should be one soon, in my opinion.

Q   Have you -- did you hear Mr. Patrick testify earlier that he comes to you for advice?

A   Yes.

Q   Is that --

A   As he should.  Yeah.

Q   Is that true?

A   Yes.

Q   When you render that advice, do you render that advice with some expectation about him following or listening to that advice?

A   Okay, I think there's only been one investment or one change in the DAF portfolio since Mark Patrick's been involved, only one, and it was a real estate investment that I wasn't directly involved in.  And so the people who put that investment forward worked with Mark without my involvement, and then I think Mark got third-party appraisal firms and

HCMLPHMIT00002899

third-party valuation firms involved to make sure he was comfortable, which was a good process.

Q   When you supplied information to Mr. Patrick, do you do so under the belief that there is a contractual, informal or formal, relationship?

MR. MORRIS:  Objection to the form of the question.

THE COURT:  Overruled.

MR. SBAITI:  What specific form?

THE COURT:  Overruled.

MR. SBAITI:  Thank you.

THE WITNESS:  Yes.  I believe it -- it's a relationship that can and should be papered as -- soon. That's my -- I mean, unless I get some reason from counsel not to, I think it's something that should be memorialized.

BY MR. SBAITI:

Q   And when you have that -- in that relationship, when you communicate with Mr. Patrick about matters, investment or otherwise, is there an expectation of privacy?

A   Yes.

Q   When Mr. Patrick -- did Mr. Patrick request that you interface with my firm and myself, as he testified earlier?

A   Yes.

Q   And when he did so, did he ask you to do so in an investigatory manner?

MR. MORRIS:  Objection to the form of the question.

THE COURT:  Sustained.  Rephrase.

BY MR. SBAITI:

Q    Did he tell you why he wanted you to talk to us?

A    Yeah.  At that point, he had started an investigation into the HarbourVest transaction.

Q    And -- and when he -- when you were providing information to us, did he tell you whether he wanted you to help the Sbaiti firm conduct the investigation?

A    The -- overall, the financial numbers and tables in there were prepared by not myself, but I -- I did -- I did help on -- on the -- some of the registered investment advisor issues as I understood them.

Q    Okay.  And the communications that you had with us, was that part of our investigation?

        MR. MORRIS:  Objection to the form of the question.

        THE COURT:  Overruled.

        THE WITNESS:  Yes.

BY MR. SBAITI:

Q    And did you understand that we had been retained by Mr. Patrick on behalf of the DAF and CLO Holdco?

A    Yes.

Q    And did you appreciate or have any understanding of whether or not you were helping the law firm perform its legal function on behalf of the DAF and CLO Holdco?

A    Perform its legal function?  I was just helping with

HCMLPHMIT00002901

Dondero - Voir Dire                                    187

regard to the registered investment advisor aspects of the overall, you know, like that.

Q    Let me ask a more simple question.  Did you -- did you appreciate that you were assisting a law firm in its representation of the DAF?

A    Yes.

Q    And you were helping the law -- and were you helping the law firm develop the facts for a complaint?

A    Yes.  I would almost say, more importantly, I wanted to make sure that there weren't errors in terms of understanding either how CLOs worked or how the Investment Advisers Act worked.  So I was -- it was almost more of a proofing.

MR. SBAITI:  Your Honor, based upon that, I mean, he's helping a law firm perform its function for the client. That's an agency relationship that gets cloaked.  You can call him a consulting expert.  You can call him, to a certain extent, a fact witness, Your Honor.  If we want to take a break, I'm sure we could find authority on that basis for a work product privilege pretty easily.

But he's an agent of the DAF.  Even if it's an informal agency relationship, that's still agency.  He's in some respects, I guess, an agent of the law firm, to the extent he's helping us perform our legal work.  And it seems like invading that privilege at this juncture is (a) unnecessary, because we've already conceded that there's been

conversations, which I think is the relationship they wanted to establish.  And it's not unusual for a law firm to use someone with specialized knowledge to understand some of the intricacies of the actual issues that they're -- that they're getting ready to litigate.

THE COURT:  Okay.  I find no privilege.  All right.  That's the ruling.

MR. BRIDGES:  Your Honor, may I add one thing to the objection for the record?

THE COURT:  Okay, we have a rule, one lawyer per witness.  Okay?  So, thank you.  A District Court rule, by the way, not mine.

MR. SBAITI:  Your Honor, may we take a short recess, given the Court's ruling?

THE COURT:  Well, I'd really like to finish this witness.  How much longer do you have?

MR. MORRIS:  About eight more questions.

THE COURT:  All right.  We'll take a break after the direct, okay?

MR. SBAITI:  Your Honor, I would ask that we -- if he's going to ask him more questions about the content of the communications, I ask respectfully for a recess so we can figure out what to do about that.  Because, right now, there's a ruling that he's going to have to reveal privileged information, and we don't have a way to go around and figure

out how to resolve that issue if we needed to.

THE COURT:  Okay.  I've ruled it's not privilege.  Okay?

MR. SBAITI:  I understand that, Your Honor, but --

THE COURT:  Your client is CLO Holdco and the DAF.

MR. SBAITI:  Yes, Your Honor.

THE COURT:  Representative, Mark Patrick.  No contract with Mr. Dondero.  The fact that he may be very involved I don't think gives rise to a privilege.  That's my ruling.

MR. SBAITI:  I understand, Your Honor.  I understand, Your Honor, but I'm asking for a recess so that we can at least undertake to provide Your Honor with some case law on a reconsideration before we go there, because that bell can't be unrung.

MR. MORRIS:  Your Honor, if I may?

MR. SBAITI:  And it's --

THE COURT:  Uh-huh.

MR. MORRIS:  I'm happy to give them ten minutes, Your Honor, as long as they don't talk to the witness.

THE COURT:  Okay.

MR. MORRIS:  I want to give them the opportunity.  Go right ahead.

THE COURT:  All right.  We'll take a ten-minute break.

MR. SBAITI:  Thank you.

THE COURT:  It's 3:05.

THE CLERK:  All rise.

(A recess ensued from 3:03 p.m. until 3:17 p.m.)

THE CLERK:  All rise.

THE COURT:  Okay.  Please be seated.  Going back on the record in Highland.  Mr. Sbaiti?

MR. SBAITI:  Yes, Your Honor.  May I approach?

THE COURT:  You may.

MR. SBAITI:  Your Honor, we have some authority to support the position we'd taken.  We'd ask the Court to reconsider your ruling on the privilege.

The first bit of authority is Section 70 of the Restatement (Third) of Law Governing Lawyers.  Privileged persons within the meaning of Section 68, which governs the privilege, says that those persons include either agents of either the lawyer or the client who facilitate communications between the two in order for the lawyers to perform their function.

Another case that we found is 232 F.R.D. 103 from the Southern District of New York, 2005.  It's *Express Imperial Bank of U.S. v. Asia Pulp Company*.  And in that case, Your Honor, the consultant was a -- had a close working relationship with the company and performed a similar role to that of the employee and was assisting the law firm in

HCMLPHMIT00002905

Dondero - Voir Dire                                      191

performing their functions, and the court there found that the work product privilege -- actually, the attorney-client privilege -- attached in what they called a Functional Equivalents Doctrine, Your Honor.

And here we have pretty much the same set of facts that's pretty much undisputed. The fact that there -- and the fact that there isn't a written agreement doesn't mean there isn't a contractual arrangement for him to have rendered services and advice. And the fact that he's, you know, recruited by us to help us perform our functions puts him in the realm, as I said, of something of a consulting expert.

Either way, the work product privilege, Your Honor, should apply, and we'd ask Your Honor not to invade that privilege at this point, Your Honor. And I'll ask you to reconsider your prior ruling.

Furthermore, I believe Mr. Morris, you know, in making his argument, is trying to create separation. The fact that he has no relationship, that the privilege can be invaded, seems to defeat the whole premise of his whole line of questioning.

So, once again, Your Honor, I just -- it's a tit for a tat there, and it seems to kind of eat itself. Either he is working with us, which we've admitted he is working with us, us being the law firm, and helping us do our jobs, or he's not. And if he's not, then this should be done.

THE COURT: Okay.

HCMLPHMIT00002906

MR. MORRIS:  Your Honor, briefly?

THE COURT:  Well, among other things, what do you want me to do?  Take a break and read your one sentence from the Restatements and your one case?  And could you not have anticipated this beforehand?

MR. SBAITI:  Your Honor, --

THE COURT:  This is not the way we work in the bankruptcy courts, okay?  We're business courts.  We have thousands of cases.  We expect briefing ahead of time.

MR. SBAITI:  Your Honor, this has been a rather rushed process anyway.  And to be honest, --

THE COURT:  When was the motion filed?

MR. SBAITI:  Your Honor, --

THE COURT:  More than a month ago.

MR. SBAITI:  -- his deposition was a week ago.

THE COURT:  Well, okay.  So you could not have anticipated this issue until his deposition one week ago?

MR. SBAITI:  Your Honor, this issue arose at the deposition, obviously, because that's what he's quoting from.  However, at least to us, this is such a well-settled area, and to be honest, --

THE COURT:  Such a well-settled area that you have one sentence from the Restatement and one case from the Southern District of New York?

MR. SBAITI:  No, Your Honor.  I think the work

HCMLPHMIT00002907

product privilege lexicon -- we had ten minutes to try to find something more on point than the general case law that applies the work product privilege to people that work with lawyers, consultants who work with lawyers, employees who work with lawyers, even low-down employees who normally wouldn't enjoy the privileges that attach to the corporation, when they work with the company for -- when they work with the company lawyers, it typically attaches.

THE COURT:  You know, obviously, I know a few things about work product privilege, but he doesn't check any of the boxes you just listed out.

MR. SBAITI:  I disagree, Your Honor.

THE COURT:  He's not an employee.  He's not a low-level employee.

MR. SBAITI:  He's a consultant.

THE COURT:  With no agreement.

MR. SBAITI:  With a verbal agreement.  He's an advisor.  And he was recruited by us, and at the request of the DAF, of the head of the DAF, Mr. Patrick, to help us do our job for the DAF.  I don't --

THE COURT:  Okay.  Mr. Morris, what do you want to say?

MR. MORRIS:  Just briefly, Your Honor.  This issue has been ripe since last Tuesday.  They directed him not to answer a whole host of questions about his involvement at the

HCMLPHMIT00002908

deposition last Tuesday, so they've actually had six days to deal with this. That's number one.

Number two, there's absolutely nothing inconsistent with the Debtor's position that Mr. Dondero is participating in the pursuit of claims and at the same time saying that his communications with the Sbaiti firm are not privileged. There's nothing inconsistent about that.

So the argument that he just made, that somehow because we're trying to create separation, that that's inconsistent with our overall arching theme that Mr. Dondero is precisely engaged in the pursuit of claims against Mr. Seery, I think that takes care of that argument.

Finally, your Honor, with respect to this consultancy arrangement, not only isn't there anything in writing, but either you or Mr. Sbaiti or I, I think, should ask Mr. Dondero the terms of the agreement. Is he getting paid? Is he doing it for free? Who retained him? Was it Mr. -- because the -- there's no such thing. There's no such thing.

The fact of the matter is what happened is akin to I have a slip-and-fall case and I go to a personal injury lawyer and I bring my brother with me because I trust my brother with everything. It's not privileged. Any time you bring in somebody who is not the attorney or the client, the privilege is broken. It's really quite simple. Unless there's a common interest. They can't assert that here. There is no common

HCMLPHMIT00002909

interest.  So --

THE COURT:  Okay.  Mr. Sbaiti, I'll give you up to three more minutes to *voir dire* Mr. Dondero to try to establish some sort of agency relationship or other evidence that you think might be relevant.

VOIR DIRE, RESUMED

BY MR. SBAITI:

Q   Mr. Dondero, when you provided information to the law firm, were you doing so under an agency relationship?  Do you know what an agency relationship is?

A   Generally.  When you're working on the -- or why don't you tell me?

Q   Tell me your understanding, so we can use --

A   That you're working for the benefit or as a proxy for the other entity or the other firm or the other person.

Q   Right.  So you're working for the DAF?

A   Yes.

Q   Do you do work for the DAF?

A   Yes.  As I stated, I'm surprised there isn't -- when we reconstituted after leaving Highland, we put in shared services agreements in place and asset management agreements in place and tasked people with doing that for most of the entities.  There might be still a few contracts that are being negotiated, but I thought most of them were in place.

So I would imagine that there'll be an asset management

HCMLPHMIT00002910

agreement with the DAF back to NexPoint sometime soon, so it -- it's --

Q    Let me ask you this question.  When you were providing information to us and having conversations with us, were you doing that as an agent of the DAF, the way you described it, --

A    Yes.

Q    -- on their behalf?

A    Yes.

Q    Were you also doing it to help us do our jobs for the DAF?

A    Yes.

Q    Did you respond to requests for information from myself?

A    Yes.

Q    Did you help coordinate other -- finding other witnesses or sources of information at my request?

A    Yes.

Q    Did you do so based upon any understanding that I was working on behalf of the DAF for that?

A    Yes.  I knew -- I knew you were working for the DAF.  No one else, yeah.

Q    And so -- and so did you provide any expertise or any in-depth understanding to myself in helping me prepare that complaint?

A    I think so, but I give a lot of credit to your firm for researching things that I -- I knew reasonably well but then

HCMLPHMIT00002911

you guys researched in even more depth.

MR. MORRIS:  I'd move to strike the answer as nonresponsive.

THE COURT:  Sustained.

BY MR. SBAITI:

Q    Let me ask the question again.  When you were providing us information and expertise, were you doing so knowing you were working -- helping us work for the DAF?

A    Yes.

Q    Now, did you demand any compensation for that?

A    No.

Q    Do you require compensation necessarily to help the DAF?

A    No.

Q    Do you do other things for the DAF sometimes without compensation?

A    Right.  We do the right thing, whether we get paid for it or not.  Yes.

Q    Had you known that our communications were not necessarily part of an agency relationship with the DAF, as you understood it, that you were just some guy out on the street, would you have had the same conversations with us?

A    (sighs)

Q    Let me ask a better question.  If I had come to you working for someone that wasn't the DAF, you didn't already have a relationship with, would you have given us the same

HCMLPHMIT00002912

help?

A    I wouldn't have been involved if it was somebody else.

Q    Is the reason you got involved because we were the lawyers for the DAF?

A    Correct.

        MR. MORRIS:  Objection.  It's just leading.  This is all leading.

        THE WITNESS:  Correct.

        THE COURT:  Sustained.

        MR. SBAITI:  Can --

        THE WITNESS:  Yeah.  Sorry.

BY MR. SBAITI:

Q    Do you get -- do -- did you -- did you do work for the -- did you provide the help for the DAF laboring under the understanding that there was an agreement?

        MR. MORRIS:  Objection; leading.

        THE COURT:  Sustained.

BY MR. SBAITI:

Q    Earlier you testified you believed there was an agreement?

A    I thought that was an agreement, and I thought there will be one shortly if there isn't one, yes.

Q    Okay.

A    And so we -- I've been operating in a bona fide way in the best interests of the DAF throughout -- assuming there was an agreement, but even if there wasn't a formal one, I would

HCMLPHMIT00002913

still be moving in the best interests of the DAF and helping your firm out or --

Q   And you did that because you believed there was an agreement or soon would be?

A   Yes.

MR. SBAITI:  Your Honor, I mean, I believe we've established a dual role here, both as an agent of the DAF and as an agent of the law firm, Your Honor.

THE COURT:  Okay.  Just a minute.  I'm looking at Texas authority on common interest privilege to see if there's anything that --

(Pause.)

THE COURT:  All right.  Again, it would have been very nice to get briefing ahead of time.  I think this absolutely could have been anticipated.

I do not find the evidence supports any sort of protection of this testimony under work product privilege, common interest privilege.  I just haven't been given authority or evidence that supports that conclusion.  So the objections are overruled.

Mr. Morris, go ahead.

DIRECT EXAMINATION, RESUMED

BY MR. MORRIS:

Q   Can you describe for the Court the substance of your communications with Mr. Sbaiti concerning the complaint?

A    As I've stated, directing him toward the Advisers Act and then largely in a proofing function regarding CLO nomenclature and some of the other fund nomenclature that sometimes gets chaotic in legal briefs.

Q    Did you communicate in writing at any time with anybody at the Sbaiti firm regarding any of the matters that are the subject of the complaint?

A    I can't remember anything in writing.  Almost everything was verbal, on the phone.

Q    You don't tend to write much, right?

A    Periodically.

Q    Did you communicate with Mr. Patrick?  Did you communicate with anybody in the world in writing regarding the substance of anything having to do with the complaint?

        MR. SBAITI:  Objection, Your Honor.  Argumentative.

        THE COURT:  Overruled.

        THE WITNESS:  I --

        MR. SBAITI:  Your Honor, may I just -- one housekeeping.  Rather than raise the same objection, may we have a standing objection, just so we're not disruptive, as to the privilege, just for preservation purposes, on the content of these communications?  Otherwise, I'll just make the same objections and we can go through it.

        THE COURT:  Well, disruptive as it may be, I think you need to object to every --

HCMLPHMIT00002915

Dondero - Direct                                    201

MR. SBAITI:  Okay.

THE COURT:  -- question you think the privilege applies to.

MR. SBAITI:  I will do so.  Thank you, Your Honor.  Uh-huh.

BY MR. MORRIS:

Q   Mr. Dondero, the question was whether you've ever communicated with anybody in the world in writing concerning anything having to do with the complaint?

A   Not that I remember.

Q   Okay.

MR. MORRIS:  I will point out, Your Honor, that last week, when the privilege was asserted, I had requested the production of a privilege log.  I was told -- I forget exactly what I was told, but we never received one.  I'll just point that out as well.

THE COURT:  Okay.

BY MR. MORRIS:

Q   You provided comments to the drafts of the complaint before it was filed, correct?

A   Yes, a few.

Q   Can you describe for the Court all of the comments that you provided to earlier drafts of the complaint?

MR. SBAITI:  Your Honor, we object on the basis of privilege and work product and joint -- joint interest

HCMLPHMIT00002916

privilege.

THE COURT:  Overruled.

THE WITNESS:  It's along the lines of things I've said in this court several times.  The obligations under the Advisers Act cannot be negotiated away and they cannot be waived by the people involved, full stop.  I remember giving the -- Mazin the example of the only reason why we're in a bankruptcy is from an arbitration award that, even though we did what was in the best interests of the investors, we got the investors out more than whole over an extended period of time, they got an arbitration award that said when we purchased some of the secondary interests we should have offered them up to the other 800 members in the committee besides the -- the 800 investors in the fund besides the eight people on the committee who had approved it and that the committee couldn't approve a settlement that went against the Advisers Act and the Advisers Act stipulates specifically that you have to offer it up to other investors before you take an opportunity for yourself.  And someday, hell or high water, in this court or some other, we will get justice on that.  And that was the primary point that I reminded Mazin about.

BY MR. MORRIS:

Q    And that's exactly the conversation you had with Mark Patrick that started this whole thing, correct?

A    No.

HCMLPHMIT00002917

Dondero - Direct                                              203

Q   You told Mark Patrick that you believe the Debtor had usurped a corporate opportunity that should have gone to the DAF, didn't you?

A   That was not our conversation.

Q   So when Mr. Patrick testified to that earlier today, he just got it wrong, right?

A   Well, maybe later on, but it wasn't that in the beginning. The beginning, any conversation I had with Mark Patrick in the beginning was smelling a rat in the way that the Debtor had priced the portfolio for HarbourVest.

Q   Hmm.  So you're the one, again, who started that piece of the discussion as well, correct?

A   Started the -- I -- I guess I smelled a rat, but I put the person who could do all the numbers in touch with the Sbaiti firm.

Q   And was the rat Mr. Seery?

A   Was the rat Mr. Seery?  Or the independent board.  Or a combination thereof.  I believe the independent board knew exactly what Seery was doing with --

Q   Do you have any idea --

A   -- HarbourVest.

Q   Do you have any idea why, why the Sbaiti firm didn't name the whole independent board in the -- in the motion for leave to amend?

A   I don't know.  Maybe they will at some point.

HCMLPHMIT00002918

Q    Yeah.

A    I don't know.

Q    But did you tell the Sbaiti firm that you thought the whole independent board was acting in bad faith and was a rat?

MR. SBAITI:  Your Honor, I object on the basis of privilege.

THE COURT:  Overruled.

MR. SBAITI:  All three.

THE WITNESS:  I knew Jim Seery was and I knew Jim Seery had weekly meetings with the other independent board members, so the HarbourVest settlement was significant enough that it would have been approved, but I don't have direct knowledge of their involvement.

BY MR. MORRIS:

Q    And so you -- but you believed Jim Seery was certainly a rat, right?

A    Oh, I -- there was a defrauding of third-party investors to the tune of not insignificant 30, 40, 50 million bucks, and it was obfuscated, it was -- it was highly obfuscated in the 9019.

Q    Did you think Mr. Seery was a rat, sir?  Yes or no?

A    I believe he had monthly financials.  He knew that the numbers presented in the 9019 were wrong.  And if that makes him a rat, that makes him a rat.  Or maybe he's just being aggressive for the benefit of his incentive or for the estate.

HCMLPHMIT00002919

Dondero - Direct                              205

But I -- I believe those things wholeheartedly.

Q    Did you tell the Sbaiti firm you thought Jim Seery was a rat?

MR. SBAITI:  Objection, Your Honor.  Privilege.

THE COURT:  Overruled.

THE WITNESS:  I -- I don't remember using those words.

BY MR. MORRIS:

Q    Did you tell the Sbaiti Firm that you thought Jim Seery had engaged in wrongful conduct?

MR. SBAITI:  Your Honor, objection.  Privilege.

THE COURT:  Overruled.

THE WITNESS:  I believe he violated the Advisers Act, and I was clear on that throughout.

BY MR. MORRIS:

Q    Listen carefully to my question.  Did you tell the Sbaiti firm that you believed that Jim Seery engaged in wrongful conduct?

MR. SBAITI:  Objection, Your Honor.  Calls for privileged communications.

THE COURT:  Overruled.

THE WITNESS:  I think I gave the answer.  I'll give the same answer.  I believe he violated the Advisers Act.

BY MR. MORRIS:

Q    What other wrongful conduct did you tell the Sbaiti firm

HCMLPHMIT00002920

you thought Mr. Seery had engaged in?

MR. SBAITI:  Same objection, Your Honor.

THE COURT:  Overruled.

MR. SBAITI:  Calls for privileged communications.

THE COURT:  Overruled.

THE WITNESS:  I -- I just remember the obfuscating and mispricing portfolio violations of the Advisers Act was all I discussed with the Sbaiti firm regarding Seery's behavior.

BY MR. MORRIS:

Q    Did you talk to them about coming to this Court under the gatekeeper order to see if you could get permission to sue Mr. Seery?

A    I --

MR. SBAITI:  Objection, Your Honor.  Calls for privileged communication.

THE COURT:  Overruled.

THE WITNESS:  I wasn't involved in any of the --

BY MR. MORRIS:

Q    Did you --

A    -- tactical stuff on who to sell or -- who to sue or when or whatever.

Q    Did you tell the Sbaiti firm that you thought they should sue Mr. Seery?

MR. SBAITI:  Objection, Your Honor.  Calls for

privileged communication.

THE COURT:  Overruled.

MR. SBAITI:  I'll also say, Your Honor, the question is getting a little argumentative.

THE WITNESS:  I didn't get directly --

THE COURT:  Overruled.

THE WITNESS:  I didn't get directly involved in who was -- who was specifically liable.

BY MR. MORRIS:

Q    How many times did you speak with the Sbaiti firm concerning the complaint?

A    Half a dozen times, maybe.

Q    Did you ever meet with them in person?

A    I've only met with them in person a couple, three times. And I don't think any of them -- no, it was, excuse me, it was on deposition or other stuff.  It wasn't regarding this.

Q    Did you send them any information that was related to the complaint?

A    I did not.

Q    Did you ask anybody to send the Sbaiti firm information that related to the complaint?

A    I did not.  I -- I was aware that Hunter Covitz was providing the historic detailed knowledge to the firm, but it -- it wasn't -- I don't believe it was me who orchestrated that.

HCMLPHMIT00002922

Dondero - Direct                                          208

Q    Did you talk to anybody at Skyview about the allegations
that are contained in the complaint before it was filed?

A    I don't -- I don't remember.

Q    Have you ever talked to Isaac Leventon or Scott Ellington
about the allegations in the complaint?

A    No.  They weren't involved.

Q    How about -- how about D.C. Sauter?  You ever speak to him
about it?

A    I don't --

        MR. TAYLOR:  Objection, Your Honor.

        THE WITNESS:  I don't remember.

        MR. TAYLOR:  At this point, D.C. Sauter is indeed an
employee of Skybridge and is a general counsel for some of the
entities which he worked for.  And to the extent he's trying
to ask for those communications, that would be invasion of the
privilege.

        MR. MORRIS:  I'll withdraw it, Your Honor.  That's
fair.

        THE COURT:  Okay

        MR. MORRIS:  That's fair.

        THE COURT:  Question withdrawn.

        THE WITNESS:  I thought you only had eight more
questions.

        MR. MORRIS:  Opened the door.

BY MR. MORRIS:

Dondero - Direct                             209

Q    Can you describe the general fact -- withdrawn.  You provided facts and ideas to the Sbaiti firm in connection with your review of the draft complaint, correct?

A    Ideas and proofreading.

Q    Anything beyond what you haven't described already?

A    Nope.

Q    Okay.  Who is your primary contact at the Sbaiti firm, if you had one?

A    Mazin.

Q    Okay.  Did you suggest to Mr. Sbaiti that Mr. Seery should be named as a defendant in the lawsuit before it was filed?

        MR. SBAITI:  Your Honor, calls for privileged communication.  We object --

        THE COURT:  Overruled.

        MR. SBAITI:  -- to that answer.

        MR. SBAITI:  Okay.

        THE WITNESS:  Again, no.  I wasn't involved with the tactics on who would be defendants and when or if other people would be added.

BY MR. MORRIS:

Q    Did you -- are familiar with the motion to amend that was filed by the Sbaiti firm?

A    I'm more familiar with it after today --

Q    Right.

A    -- than I was before.

HCMLPHMIT00002924

Dondero - Direct                                          210

Q    And were you aware that that motion was going to be filed prior to the time that it actually was filed?

A    I -- I don't remember.  Probably.

Q    And who would have been the source of that information? Would that have been Mr. Sbaiti?

A    Yes.

Q    Okay.  And did you express any support for the decision to file the motion for leave to amend in the District Court?

A    I -- I wasn't involved.  It was very complicated legal preservation conver... -- I wasn't involved.  I knew the conversations were going on between different lawyers, but I wasn't involved in the ultimate decision.  I didn't encourage, applaud, or even know exactly what court it was going to be filed in.

        MR. MORRIS:  All right.  I have no further questions, Your Honor.

        THE COURT:  All right.  Pass the witness.

        MR. ANDERSON:  We have no questions, Your Honor.

        THE COURT:  Okay.  Any questions from Respondents?

        MR. SBAITI:  No questions.

        THE COURT:  Okay.  Mr. Taylor?

                CROSS-EXAMINATION

BY MR. TAYLOR:

Q    Mr. Dondero, --

HCMLPHMIT00002925

Dondero - Cross                              211

A    Yes, sir.

Q    -- you are not the authorized representative of CLO

Holdco, are you?

A    No.

Q    You're not the authorized representative for the DAF, are

you?

A    No.

Q    Do you know who that person is as we sit here today?

A    Yes.

Q    Who is that?

A    Mark Patrick.

Q    Thank you.

        MR. TAYLOR:  No further questions.

        THE COURT:  Any redirect on that cross?

        MR. MORRIS:  I do not, Your Honor.  I would just like

to finish up the Debtor's case in chief by moving my exhibits

into evidence.

        THE COURT:  Okay.  Mr. Dondero, you're excused.

    (The witness steps down.)

        THE COURT:  All right.  So you have no more

witnesses; you're just going to offer exhibits?

        MR. MORRIS:  Yes, Your Honor.

        THE COURT:  Okay.

        MR. MORRIS:  So, at Docket #2410, --

        THE COURT:  Uh-huh.

HCMLPHMIT00002926

212

MR. MORRIS:  -- the Court will find Exhibits 1 through 53.

THE COURT:  Uh-huh.

MR. MORRIS:  In advance, Your Honor, I've conferred with the Respondents' counsel.  They had previously objected to Exhibits 15 and 16, which I believe were the Grant Scott deposition transcripts.  They objected to them on the grounds of lack of completeness because I had taken the time to make deposition designations, but I'm happy to put the entirety of both transcripts into evidence, and I hope that that will remove the objections to Exhibits 15 and 16.

THE COURT:  All right.  Before we confirm, let's just make sure we have the right one.

MR. MORRIS:  Oh, I apologize.

THE COURT:  I have 16 as the July order.

MR. MORRIS:  I apologize.  You're absolutely right, Your Honor.  What I was referring to was -- oh, goodness.  One second.  (Pause.)  I was referring to Exhibits 23 and 24. Those are Mr. Scott's deposition designations.  They had lodged an informal objection with me on grounds of completeness.  And in order to resolve that objection, we're happy to put the entirety of both transcripts in.

THE COURT:  All right.  So if our Respondents could confirm with the agreement to put in the entire depos at 23 and 24, you stipulate to 1 through 53?

HCMLPHMIT00002927

MR. PHILLIPS:  We also -- Your Honor, --

MR. MORRIS:  Yeah, I was going to take them one at a time.  Just take those two.

MR. PHILLIPS:  Yeah, can we just take those two?  Confirmed?

MR. MORRIS:  Okay.

THE COURT:  Oh, okay.

MR. PHILLIPS:  Because there are other -- there are other -- we exchanged objections to each other's witness and exhibit lists.  And so I think you can handle the rest of them kind of in a bunch, right?

MR. MORRIS:  Yeah.  Yeah, there's two bunches, actually.

MR. PHILLIPS:  Yeah.

THE COURT:  Okay.  So you have just now stipulated to 23 and 24 being admitted --

MR. MORRIS:  Correct.

THE COURT:  -- with the full depos?  Okay.

MR. PHILLIPS:  Yes, ma'am.  Thank you.

THE COURT:  All right.

(Debtor's Exhibits 23 and 24 are received into evidence.)

MR. MORRIS:  And then the next two that they objected to are Exhibits 15 and 16.  15 is the January order and 16 is the July order.  They objected on relevance grounds.  I think 16 -- these are the two orders that the Debtors contend the

HCMLPHMIT00002928

214

Respondents have violated, so I don't understand the relevance objection, but that's what it was and that's my response.

MR. PHILLIPS:  Resolved, Your Honor.

THE COURT:  Okay.  15 and 16 are admitted.

(Debtor's Exhibits 15 and 16 are received into evidence.)

MR. MORRIS:  Okay.  And then the last objection relates to a group of exhibits.  They're Exhibits 1 through 11.  Those exhibits I think either come in together or stay out together.  They are exhibits that relate to the HarbourVest proceedings, including deposition notices, including I think the transcript from the hearing, the Court's order, the motion that was filed.

The Debtor believes that those documents are relevant because they go right to the issue of the gatekeeper order and had they filed, had the Respondents followed the gatekeeper order, this is -- this is why they didn't do it.  You know what I mean?  That's the argument, is that the Respondents, one of the reasons the Respondents -- argument -- one of the reasons the Respondents didn't come to this Court is because they knew this Court had that kind of record before it.  And I think that's very relevant.

THE COURT:  All right.  Response?

MR. PHILLIPS:  Your Honor, we think that these exhibits are not relevant.  We have a very focused, we think, -- we have the Court's order.  Those objections are withdrawn.

HCMLPHMIT00002929

We have the complaint.  We have the motion to amend.  And the issue is whether the motion to amend, which was dismissed one day, or the next day after it was filed, constitutes criminal -- constitutes contempt.

So we think the prior proceedings go to their underlying argument, which is the lawsuit or the complaint is no good, and that has nothing to do with -- there's been no foundation laid and it's not relevant what happened in connection with the HarbourVest settlement.  It is what it is, and there's no dispute that it is what it is, but it's not relevant to establish any type of -- they've even said intent is not even relevant here.  So we -- that's -- we think all of that goes out and simplifies the record, because it has nothing to do with whether or not there was a contempt.

THE COURT:  Response?

MR. MORRIS:  We withdraw the exhibits, Your Honor. I'm just going to make it simple for the Court.

THE COURT:  Okay.

MR. MORRIS:  I'm just going to make it simple for the Court.

THE COURT:  1 through 11 are withdrawn.

(Debtor's Exhibits 1 through 11 are withdrawn.)

MR. MORRIS:  So, the balance, there was no objection. So all of the Debtor's exhibits on Docket #2410 -- let me restate that.  Exhibits 12 through 53 no longer have an

HCMLPHMIT00002930

216

objection.  Is that correct?

MR. PHILLIPS:  Yes.

MR. MORRIS:  Okay.  And then --

MR. PHILLIPS:  Confirmed.

THE COURT:  Okay.

(Debtor's Exhibits 12 through 53 are received into evidence.)

MR. MORRIS:  Okay.  Thank you.  And then we filed an amended list, I believe, yesterday --

THE COURT:  Uh-huh.

MR. MORRIS:  -- to add Exhibits 40 -- 54 and 55.

THE COURT:  Uh-huh.

MR. MORRIS:  And those exhibits are simply my firm's billing records.

THE COURT:  Okay.

MR. MORRIS:  You know, we added Mr. Demo to the witness list in case there was a need to establish a foundation.  That's the only thing he would testify to.  I don't know if there's an objection to those two exhibits, because we hadn't had an opportunity to confer.

THE COURT:  Any objection?

MR. PHILLIPS:  Your Honor, we're not going to require authenticity and foundation for -- we have the right, we think, to say that they're not a ground -- we're not going to challenge that they are the bills, and the bills say what they

HCMLPHMIT00002931

217

say.  We don't need Mr. -- we don't need a witness to authenticate those exhibits.  But we reserve all substantive rights with respect to the effect of those exhibits.

THE COURT:  All right.  54 and 55 are admitted.

(Debtor's Exhibits 54 and 55 are received into evidence.)

MR. MORRIS:  And with that, Your Honor, the Debtor rests.

THE COURT:  Okay.  All right.  Respondents?

(Counsel confer.)

MR. PHILLIPS:  If I could have a second?

THE COURT:  Okay.

A VOICE:  Sorry, Your Honor.

(Pause.)

MR. PHILLIPS:  Your Honor, we have filed in our witness and exhibit list, and I have to say I don't have the number, but we'll get the docket entry number, but we have 44 exhibits.  There's an objection to Exhibit #2, which is -- thank you -- it's Document 2411, Your Honor.  Thank you.

THE COURT:  Uh-huh.

MR. PHILLIPS:  There is a pending objection to Exhibit #2 which we have not resolved.  There's no objection to any other exhibit.  But in reviewing our exhibit list, I found that we had some -- some mistakes and duplications.

So, with respect to 2411, we would withdraw Exhibit 13, 14, and 29, and we would offer Exhibit 1, and then 30 through

HCMLPHMIT00002932

218

44, with 13, 14, and 29 deleted.

THE COURT:  Okay.  So 1, 3 through 12, --

MR. PHILLIPS:  Yes.

THE COURT:  -- 15 through 28, and then 30 --

MR. PHILLIPS:  And then 30 through 44.

THE COURT: -- through 44?  Do you confirm, Mr. Morris?

MR. MORRIS:  Yes, Your Honor.  The only objection we have is to Exhibit #2.

THE COURT:  And that's -- he's not offering that?

MR. MORRIS:  Yeah.

MR. PHILLIPS:  Not at this time, Your Honor.

THE COURT:  Okay.

MR. PHILLIPS:  We would have to have testimony about that.

THE COURT:  Okay.  All right.  So those are admitted.

MR. PHILLIPS:  Okay.

(Mark Patrick's Exhibits 1, 3 through 12, 15 through 28, and 30 through 44 are received into evidence.)

THE COURT:  By the way, it looks like Exhibit 44 is at a different docket number, Docket 2420.  Correct?  You have --

MR. SBAITI:  Your Honor, I believe Exhibit 44 is the hearing transcript from the July approval hearing.  At least that's what it's supposed to be.

HCMLPHMIT00002933

219

THE COURT:  Okay.

MR. SBAITI:  It was Exhibit 2 on the Debtor's list, and then I think they took it off, so we had to add it.

MR. PHILLIPS:  Oh, okay.  I was looking -- oh, that's right.  They -- that's correct, Your Honor.

THE COURT:  Okay.

MR. PHILLIPS:  Exhibit 44 was added --

THE COURT:  Okay.

MR. PHILLIPS:  -- because the Debtor's withdrew it, and so it was added in the second -- in the supplemental and amended list.  The -- the one that I was talking about was the prior list.

THE COURT:  Okay.  So that's at Docket 2420?

MR. PHILLIPS:  Yes.

THE COURT:  You're not offering 45 or 46?

MR. PHILLIPS:  No, I think we'd offer 45 and 46 as well.  I'm sorry.

THE COURT:  Okay.  Any objections, Mr. Morris?

MR. MORRIS:  No, Your Honor.

THE COURT:  Okay.  So 45 and 46 are admitted as well.  They're at Docket Entry 2420.

    (Mark Patrick's Exhibits 45 and 46 are received into evidence.)

THE COURT:  All right.  Your witnesses?

MR. PHILLIPS:  Your Honor, could we have five minutes

HCMLPHMIT00002934

220

to just see what we're -- our plan is, and then we'll be back at 4:00?

THE COURT:  Okay.  We'll be back at 4:00.

MR. PHILLIPS:  Thank you.

THE CLERK:  All rise.

(A recess ensued from 3:55 p.m. until 4:04 p.m.)

THE CLERK:  All rise.

THE COURT:  Please be seated.  All right.  Back on the record in Highland.  Mr. Phillips?

MR. PHILLIPS:  Your Honor, with the introduction of the Respondents -- CLO Holdco, DAF Fund, LP, and Mark Patrick, those Respondents, and we consider Mark Patrick a Respondent although not formally named as a Respondent because he is the party who authorized the filing of the Seery motion -- we rest.

THE COURT:  You rest?  Okay.  Well, Mr. Morris, closing arguments?

MR. MORRIS:  How much time do I have?

THE COURT:  You've got a lot more time than you probably thought you were going to.  You're under an hour.

MR. MORRIS:  42 minutes?

THE COURT:  How much?

THE CLERK:  42 minutes.

THE COURT:  42 minutes?  Feel free not to use it all.

MR. SBAITI:  Out of curiosity, how long do we have?

HCMLPHMIT00002935

221

THE COURT:  You have a lot of time, which I hope you won't use.

THE CLERK:  Hour and twenty-five minutes or so.

MR. SBAITI:  I was afraid it was going to be an hour and twenty, so --

MR. PHILLIPS:  No, not either.

MR. MORRIS:  I don't suspect I'll use all the time.

THE COURT:  Okay.  Thank you.

MR. MORRIS:  May I proceed?

THE COURT:  You may.

CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

MR. MORRIS:  Good afternoon, Your Honor.  John Morris; Pachulski Stang Ziehl & Jones; for the Debtor.  I'd like to just make some closing remarks after the evidence has closed.

This is a very, very important motion, Your Honor.  I take this stuff seriously.  It's only the second contempt motion I've ever brought in my life.  I've never gone after another law firm.  But these facts and circumstances require it, because my client is under attack, and these orders were entered to prevent that.

It is serious stuff.  There's no question in my mind, there's no question the evidence showed, clear and convincingly, beyond reasonable doubt, that they violated this Court's order.

HCMLPHMIT00002936

222

I started off with three very simple prongs.  So simple you'd think I'd remember them.  Number one, was a court order in effect?  There is no dispute.  The court order was in effect.

Number two, did the order require certain conduct by the Respondent?  We believe it did.  We heard an hour-long argument styled as an opening statement, but it was really argument and not an opening statement, about all the defects in the order.  But the one thing that is crystal clear in the order are the words commence or pursue.  You've been told many times by the Respondent that nobody has commenced an action against Mr. Seery.  That is true.  We all know what the word commence means.  We all know what the word pursue means.

I heard argument this morning that pursue means after a claim is filed you pursue a case.  That's the way lawyers talk about it.  But that doesn't make any sense, Your Honor, because once you've commenced the action you've violated the order.  It's commence or pursue, it's in the disjunctive, and you can't read out of the order the concept of pursuit by making it an event that happens after the commencement, because that's exactly what they're trying to do.  They're trying to read out of the order the word pursuit.

And I ask you to use very simple common sense.  If filing a motion for leave to amend a complaint to add Mr. Seery as a defendant is not pursuit, what is?  What is?  There's nothing

left.  You commence an action or you do something less than commencing an action when you're going after the man.  That's what pursuit means.  They're going after the man.  And they asked the District Court to do what they knew they couldn't.

Mr. Phillips is exactly right.  I made the point about Rule 15 because they knew they couldn't do it.  I'm not suggesting that they should have.  I'm suggesting that the reason that they didn't is because they knew they were -- they were in a bad place.  Because if they really just wanted to name Mr. Seery as a defendant, they wouldn't have done it.  They knew commence was crystal clear.

What they're trying to do is claim that somehow there's an ambiguity around the word pursuit.  Does that make any sense at all?  Filing a motion for leave to amend the complaint.  And Mr. Patrick, to his credit, candidly admitted that if the motion was granted, they were suing, yeah, as long -- as long as the Sbaiti firm, you know, recommended it.  That's what would have happened.

Those orders that you signed, nothing, absolutely meaningless from their point of view.  They believed they were wrong.  They believed that they were overbroad.  They believed they were too narrow.  They believed they were vague.  They believed they were without authority.  They don't get to be the gatekeeper.  They want to be the gate -- that's this Court's decision.  That's why we went through all of the

HCMLPHMIT00002938

224

processes that we did.  And they just flagrantly said, I don't agree.  I don't agree because it's wrong this way and it's wrong that way and it's wrong the other way, and therefore let me go find a higher authority to validate my thinking.  That's not the way this process is supposed to work.

The independent directors and Mr. Seery relied on the gatekeeper in accepting their positions.  It was a quid pro quo.  Mr. Dondero agreed to the exact same provision, the exact same gatekeeper provision in the January order that he now complains about today, that the DAF complains about today.  Where were these people?

As the Court knows, nobody appealed either order.  The Debtor, the independent board, Mr. Seery expected that the plain and unambiguous words would be honored and enforced.  I think that's fair.  I think that's the way the process is supposed to work.

Instead, we have games.  We have these linguistic gymnastics.  We have statements that are too cute by half.  Mr. Dondero won't even admit that he appointed Mr. Scott back in 2012.  I couldn't even get him to do that, really, even though the documents say it, even though Mr. Patrick says it.

I'll take the Respondents one at a time in a moment, but I just want to deal with some of the more interesting arguments they make.  The order was vague because it didn't say you can't seek leave from the District Court to amend your

HCMLPHMIT00002939

complaint to add Mr. Seery.  They said that that's what makes the order vague.

Your Honor, if you had thought to put that language in, you know what they would have done?  They would have sued Mr. Seery in New York State Supreme Court, where he lives, and said, the order didn't say I couldn't do that.  Where does it end?

There's a reason why the order was crafted broadly to say no commencement or pursuit without Bankruptcy Court  approval. You have to bring a colorable claim.

We heard an argument this morning that they couldn't possibly have brought that motion for reconsideration first. You know, the one they filed about eight hours after we filed the contempt motion.  They couldn't possibly have brought that motion before the motion for leave to amend because somehow they would have been estopped or they would have been found to have waived some right.

How could it be that anybody reasonably believes that complying with a court order results in a waiver of some right?  It just -- these are games.  These are not good arguments.  And they certainly don't carry the day on a contempt motion.

We've heard repeatedly, the District Court denied the motion without prejudice, how have you been harmed?  They shouldn't be able to rely on the District Court's prudence to

HCMLPHMIT00002940

protect themselves.  The question shouldn't be, have you been harmed since the District Court didn't grant the motion?  No. The question should be, were we harmed by the attempt to name Mr. Seery a defendant, in violation of court orders, without notice?  Without notice.

I'm told they assumed that I'd be checking the dockets.  I wasn't checking the docket, Your Honor.  I hadn't filed an appearance in the case.  And, in fact, if you look at the exhibits, because I could pull it out, but we put in the communications between the lawyers.  The last communication was from Mr. Pomerantz, and the last communication from Mr. Pomerantz said, Don't do it or we're going to file a motion for contempt.  That's now in the evidence.

So, having sent that message, I wasn't going to check the docket to see if they really were going to go ahead and do it. I didn't think they would.  And if they did, I certainly thought I'd get notice of it.  Nothing.

And, again, I don't really need to establish intent at all in order to meet my burden of clear and convincing evidence of a contempt of court, but I think it is relevant when the Court hopefully finds liability and is considering damages, because that's really the most important point I have to make right now, is the Court needs to enforce its own orders, because if the Court doesn't, or doesn't impose a penalty that's meaningful, this is just going to continue.  And Your Honor,

HCMLPHMIT00002941

it's all in the record.  Your Honor knows this.  Mr. Daugherty has gone through it.  Right?  Mr. Terry went through it.  UBS went through it.  You've seen litigation now for a year and a half.  It's happening in New York, right, the Sbaiti firm is reopening the Acis case.  we've got this other lawsuit that's filed by an entity with like a five-tenths of one percent interest who's complaining about the SSP transaction that Mr. -- that the Debtor engaged in.  There's no end here.

We need the Court to pump the brakes.  We need the Court to exercise its authority.  We need the Court to protect the estate fiduciary that it approved.

It is true, Mr. Seery is not a trustee.  But it is also true that he is a third-party outsider who came into this case with the expectation and the promise in an order that he wouldn't be subjected to frivolous litigation, that this Court would be the arbiter of whether claims could be pursued against him.  That was the code of conduct.  That was the quid pro quo.  That was the deal that Mr. Seery made.  It's the deal that the board members made.

What gives these people the right to just say, your order is wrong, and because I think your order is wrong I'm going to go to the District Court, and if the District Court agrees, too bad, and if the District Court doesn't agree, we'll be back before Your Honor, and no harm, no foul?  No.  It can't be.  It can't be that that's the way this process works.  It

HCMLPHMIT00002942

just can't.

So, Your Honor, let me take the Defendants one at a time, the Respondents one at a time. CLO Holdco and the DAF are corporate entities. They've done what they've done. Mr. Patrick, bless him, I think he's a lovely man. I don't think he quite bargained for what he's getting right now, but nevertheless he is where he is and he's willing to stand up and be counted, and for that, at least, I admire his courage. He's willing to say, I authorized those. But you know what? It's a violation of the law, it's a violation of this Court's order to file that motion, and so he has -- and he was very candid today. He knew of the order. Right? He knew it was in effect. He pointed out that it was in their papers. Right?

They're trying to be cute, they're trying to thread this needle, but it has no hole in it. They keep -- they keep doing this. Well, maybe if we do it this way, maybe if we do it -- no. The order was crystal clear.

The Sbaiti firm. They're probably fathers and husbands and good people and I wish them no ill will, but this is wrong. This is wrong. To come into a court you've never been in before and in less than twelve days to jump the shark like this in twelve -- in less than twelve days, because Mr. Patrick said they weren't hired until April, and the complaint was filed on the 12th.

HCMLPHMIT00002943

We're told that they understood this was an overwhelming case with two -- why don't you take your time?  What was the rush?  Why not wait until the Defendant -- the Debtor appeared in the action before rushing to do this?

It's bad conduct, Your Honor, and that's really a very important point that I have to make, is that there's lots of lawyers who are engaging in highly-questionable conduct here that, from my perspective, goes well beyond the bounds of zealous advocacy.

It's not aggressive lawyering.  I love aggressive lawyering.  I really do.  Respectful, honest -- and I don't, you know, I don't want to say that they're dishonest people. I don't mean to do that.  But I think, I think they made a gross error in judgment, and there's no question that they violated this Court's order.

And then that leaves Mr. Dondero.  I don't even know what to say about his testimony, Your Honor.  He pursued claims against Mr. Seery.  He thinks he's a rat.  He's the one who started the whole process.  He's the one who put the bug in Mark Patrick's ear.  All of this is uncontested.  Right? Uncontested.

I don't have to go back in time.  We can talk about what happened to Grant Scott.  It's a very sad story.  Mr. Scott, I think, did his honest best to do what he believed, on the advice of counsel, was in the best interest of the DAF.  And

Mr. Dondero, as you hear time and time again when he speaks about Mr. Seery, it was inappropriate.  He's the arbiter of what's in the best interest of entities that other people control.  And they pay a price.  And they pay a price.  And so Mr. Dondero felt it was his job, even though he tries to distance himself from the DAF -- I have no responsibility, I don't -- I'm not involved -- until, until somebody wants to sue Seery and the Debtor.  Then he'll go all in on that, no matter how specious the claim may be.

The Debtor's not going to fold its tent because a motion for leave to amend was denied without prejudice.  That's not the point.  The point is that people need to respect this Court, people need to respect the Court's orders, and those that aid and abet or otherwise support the violation of court orders ought to be held to account, Your Honor.

I have nothing further.

THE COURT:  All right.  Thank you.  Respondents?

CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

MR. SBAITI:  Your Honor, the fact that we're here on a motion for leave, and the motion for leave is what they're saying is pursuing a claim under the Court's order, and then you hear that the mere act of investigating a claim against Mr. Seery is also pursuing a claim, this goes to the infinite regression problem with this word pursue the way they want to construe it, Your Honor.  Asking for permission is not

HCMLPHMIT00002945

231

pursuing a claim and can't be the definition of pursuing a claim because it's not doing anything other than asking for permission.

We didn't file a suit. We didn't commence a suit. I think that's established. We did not pursue a claim. Mr. Morris ignores, I think, the very commonsensical aspect that we put out in the opening, which is that the reason pursue -- and sometimes the language in these types of orders is, instead of pursue, it's maintain -- but the reason that word is there is because sometimes the case has already been started when the order is entered. And so to pursue a claim, *i.e.*, one that's already been filed as of the date of the order, that would be lost if the commencement of that claim hadn't happened until after the -- until the -- if the commencement happened before the order was filed. That's the --

THE COURT: Okay. So are you saying it's a sequential thing?

MR. SBAITI: I'm not sure I understood your question, Your Honor. I'm sorry.

THE COURT: Well, I'm trying to understand what it is you're saying about how pursue should be interpreted.

MR. SBAITI: Sure.

THE COURT: I think you're saying you have to -- you can either have -- well, we've got a prohibition on commencing

HCMLPHMIT00002946

an action.

MR. SBAITI:  Yes.

THE COURT:  And then the separate word pursue, I think you're saying that must refer to you already have an action that's been commenced and you're continuing on with it. Is that what you're saying?

MR. SBAITI:  Yes, Your Honor.

THE COURT:  Then why not use the word continue?

MR. SBAITI:  Well, Your Honor, the choice of --

THE COURT:  Kind of like 362(a) of the Bankruptcy Code, you know, is worded.

MR. SBAITI:  Well, Your Honor, the choice of the wording of pursue at that point, Your Honor, I believe ends up being ambiguous, because by filing the motion here that would be pursuing a claim under that definition.  So before I got permission to pursue a claim, I've got to pursue a claim. That's the problem that they have with the words that they're trying to get you to adopt, or the meaning of the words they're trying to get you to adopt.

If I came to this Court and said, Judge, I need permission, I need leave to file suit against Mr. Seery, and then the question is, well, you're not allowed to seek leave because that's pursuing the claim, it's infinitely regressive. And in fact, his closing argument just proved how it's infinitely regressive.

HCMLPHMIT00002947

233

THE COURT:  Okay.  Let me -- I'm not following this infinitely regressive or whatever the term was.

MR. SBAITI:  Yes.

THE COURT:  Just answer this very direct question. Why did you not file a motion for leave in the Bankruptcy Court?  That would have clearly, clearly complied with the July order.

MR. SBAITI:  Your Honor, I believe we explained this in the opening.  I took a stab at it.  Mr. Bridges took a stab at it.  We did not believe coming here and asking for leave and asking for -- for Your Honor to do what we don't believe Your Honor can do, would effectuate an estoppel or a waiver, which we didn't think was in the best interest of our client to have.  Your Honor, this happens -- I don't believe this is the --

THE COURT:  Okay.  Connect the dots.  Make that clear as clear can be for me.  You file a motion for leave --

MR. SBAITI:  Yes.

THE COURT:  -- to file this District Court action against the Debtor and Seery, and if I say yes, everything is fine and dandy from your perspective.  If I say no, tell me again what your estoppel argument is.

MR. SBAITI:  Your Honor, the key question is whether us putting the Court's ability to decide colorability and the Court's gatekeeper functions, for us to invoke those functions

concerned us because there's case law that says that that effectuates an estoppel.  And so we don't get our chance in front of an Article III judge to make that in the first instance.

THE COURT:  Okay.  Tell me what cases you're talking about and the exact context of those cases.

MR. SBAITI:  Your Honor, I would have to defer to my partner on this one, Your Honor.

THE COURT:  Okay.

MR. SBAITI:  So, --

THE COURT:  Because I'm just letting you know --

MR. SBAITI:  Yes.

THE COURT:  -- I am at a complete loss.  I'm at a complete loss understanding what you're saying.  I am.

MR. SBAITI:  Well, Your Honor, the --

THE COURT:  I don't understand.  If you have followed the order to the letter and I tell you no, --

MR. SBAITI:  Then --

THE COURT:  -- what, you're saying you were worried you'd be estopped from appealing my order to the District Court and saying abuse of discretion or invalid order in the first place?  You'd be estopped from taking an appeal?

MR. SBAITI:  No, Your Honor.  We wouldn't be estopped from taking an appeal.

THE COURT:  Then why didn't you follow the letter of

235

the order?

MR. SBAITI:  For one thing, Your Honor, asking the District Court made sense to us, given the order and given our understanding of the law.  Certainly, we had other options, as Your Honor is pointing out.  We could have come here.  Our read of the law, our understanding of what we were doing, made it -- put us in, like I said, put us in the sort of jurisdictional and paradoxical position.

THE COURT:  This is your chance to tell me exactly which law you think applies here.  What case?  What statute?

MR. SBAITI:  Your Honor, like I said, I don't have those at the moment.

THE COURT:  Why not?  Your whole argument rides on this, apparently.

MR. SBAITI:  Well, Your Honor, I don't know that our whole argument rides on that.

THE COURT:  Okay.

MR. SBAITI:  I mean, our argument rides on we don't think we violated the letter of the order.  I think that's really what I'm -- what we're here to say, is that we didn't commence a lawsuit and we didn't pursue a claim by filing for leave in the District Court, just like filing for leave in this Court would not be pursuing a claim.  It would be filing for leave.

THE COURT:  I agree.  Filing a motion for leave in

236

this Court would be exactly what the order contemplated.

MR. SBAITI:  I understand, Your Honor.

THE COURT:  What you did is not exactly what the order contemplated.

MR. SBAITI:  Your Honor, but we're -- we're moving back and forth between two concepts.  One, your question is why didn't we file for leave?

THE COURT:  Uh-huh.

MR. SBAITI:  And the answer to that, I've tried to explain.  And if we -- if you'd like us to bring up the case law or to give you a better articulation of our concern, I'm happy to defer to my partner.

What I'm really here to say, Your Honor, is a very simple point, though.  Just because we didn't file for leave here and we filed for leave in the District Court doesn't mean we violated your order, and that's the point I'm trying to make, Your Honor.  And I think that's the simplest point I can make. Asking the Article III judge for leave to amend, for leave to amend to add Mr. Seery, doesn't violate, facially, at least as we read it, Your Honor's order.  It's not commencing a suit and it's not -- it's not pursuing a claim against him.  It's all preliminary to pursuing a claim against him, because a claim hasn't even been filed.

The judge could have -- the judge could have -- the District Court could have denied it, the District Court could

HCMLPHMIT00002951

have referred it down here, the District Court could have decided part of it and then asked Your Honor to rule on some portion of it.  There are innumerable ways that could have gone.  That fork -- those forks in the road is precisely why we say this is not pursuing the claim.  Otherwise, where does it stop?

Does pursuing a claim happen just when we file the motion for leave?  Why didn't it happen when we started the investigation?  If pursuing a claim means having the intent and taking steps towards eventually filing a lawsuit, that's the point that I'm making that it is infinitely regressive, and that's exactly what Mr. Morris argued to you.

He said Mr. Dondero, by merely speaking to me, is pursuing a claim and that violates your order.  Speaking to me.  Even if we had never filed it.  Speaking is pursuing a claim.

THE COURT:  I don't agree with that, for what it's worth.

MR. SBAITI:  Okay.  But that was his argument.  I'm just responding to it.

THE COURT:  Okay.

MR. SBAITI:  And if that's not pursuing a claim, filing a motion for leave likewise wouldn't be pursuing a claim.  I understand it's an official act in a court, but we did it in a Court that is an adjutant to this Court.  This Court is an adjutant to that Court.  It's the Court with

238

original jurisdiction over the matter.  So we didn't go to New York.  We didn't go to the state court in New York where I learned Mr. Seery lives.  We came to the Northern District of Texas, understanding that this Court and this Court's orders had to be -- had to be addressed.  And that's the very first thing we did.  We asked the Court to address it.

That judge could either decide to send it down here, which is normally what I think -- what we understood would happen.  So it's not like we were avoiding it.  But we wanted to invoke the jurisdiction which we, as the Plaintiff, we believe we had the right to invoke.  We're allowed to choose our forum.  So that's the forum we chose for the primary case, which there's not a problem, no one's raised an issue with us filing the underlying lawsuit.

Adding Mr. Seery to that lawsuit and filing a motion for leave in the same court where we actually had the lawsuit, knowing that it might get -- that might get decided or referred in some way, doesn't strike me as being anything improper, because he didn't get sued and we don't know what Judge Boyle would have said had the motion gone forward.  And for them to speculate and to say that, well, this is exactly the type of thing you have to protect against, I completely disagree.

The case law that they cited for you on these -- on most of these orders really do discuss the fact that you have

HCMLPHMIT00002953

somebody who is actually protecting the underlying property of the Debtor. This claim comes from a complete third party that Mr. Seery himself has admitted under oath he owes a fiduciary duty to. Two third parties. One is an investor of a fund that he manages, and one to a fund that the Debtor, with Mr. Seery as the head of it, was an advisor for up until recently.

Those fiduciary duties exist. We felt like there was a valid claim to be brought against Mr. Seery. And the only reason -- and he says this like it's a negative; I view it as a positive -- the reason he wasn't named is because of Your Honor's orders. And so we asked a Court, the Court with general jurisdiction, to address it for us or to tell us what to do. And I don't see how that is a violation of this Court's order, nor is it contemptuous of this Court's order.

If every time one of these issues came up it was a contempt of the court that appointed a trustee, we'd see a lot more contempt orders.

Interestingly, the cases that were thrown out to you in the opening argument by the other side, for example, *Villages* [sic] *v. Schmidt*, was a trustee case, but not one that involved a sanction. And the trustee case specifically in that case held that the Barton Doctrine didn't have an exception for *Stern* cases, whereas the cases we cited to you, *Anderson*, for example, in the Fifth Circuit, which is 520 F.2d 1027, expressly held that Section 959 is an exception to the

HCMLPHMIT00002954

240

Barton Doctrine.

And my partner, Mr. Bridges, can walk through the issues that we had on the enforceability of the order, but all -- to me, all of that is sort of a secondary issue because, *prima facie*, we didn't violate this order. I understand it may irritate the Debtor and may raise questions about why the motion wasn't filed here versus the District Court. But it was a motion for leave. In order to sanction us, Your Honor would have to find that asking for permission is sanctionable conduct in the gatekeeper order. Even if we ask the wrong court. Simply asking the wrong court is sanctionable, not knowing what that court would have done, not knowing what that court's mindset was, not even having the benefit of the argument. And that's, I guess, where this bottom -- the bottom line is for me.

The evidence that they put on for you, Your Honor. Everything you heard was evidence in the negative. You know, they talk about the transition from Mr. Dondero to Mr. Scott and Mr. Scott to Mr. Patrick, but if you actually look at the evidence he wants you to see and he wants you to rule on, it's the evidence that wasn't there. It's the evidence that Mr. Dondero had no control. In fact, I believe that was the basis he argued for why there should be no privilege. And all he said is that he was promoting it.

But the fact of the matter is, like I said, all of that is

241

secondary to the core issue that we didn't violate the order. We didn't take steps to violate the order. We took steps to try to not violate the order. And they want you to punish us to send a message. Even used words like the Court needs to enforce its own orders. And he did that as a transition away from the idea that there were no damages, Your Honor, and I think that has implications.

And then he said you have to enforce a meaningful penalty. Well, Your Honor, I don't think that is the purpose of these sanctions. These sanctions are supposed to be remedial, according to the case law, according to the case law that they cite. So a meaningful --

THE COURT: Coercive or remedial.

MR. SBAITI: Sorry?

THE COURT: Coercive or remedial. Civil contempt.

MR. SBAITI: Sure, Your Honor. But usually coercive sanctions require someone to do something or they are sanctioned until they do it.

THE COURT: Coerced compliance. Coerced compliance --

MR. SBAITI: Yes.

THE COURT: -- with an existing order.

MR. SBAITI: Yes.

THE COURT: Uh-huh.

MR. SBAITI: The last thing, he says you have to

HCMLPHMIT00002956

242

protect the estate of the fiduciary and his expectation -- I believe he's talking about Mr. Seery -- his expectation that the Court would be the gatekeeper.  And Your Honor, that argument rings a little bit hollow here, given that what they're really saying is that we should have come here first and asked for permission.  But that insinuates that, by coming here, the case is dead on arrival, which I don't think is the right argument.

I think the issue for us has been, who do we have to ask and who can we ask to deal with the Court's gatekeeper order?  I believe we chose a court, a proper court, a court with jurisdiction, to hear the issue and decide the issue.  Your Court's -- Your Honor's indication of the jurisdiction of this Court we believed invoked the District Court's jurisdiction at the same time.

And so the last thing is he said -- the last thing, and getting back to the core issue, is Mr. Morris wants you to believe that we intended to violate the order, and now, as an afterthought, we're using linguistic gymnastics to get around all of that.  But it's not linguistic gymnastics.  Linguistic gymnastics is saying that pursue means doing anything in pursuit of a claim.  That's a little -- I believe that's almost a direct quote.  They're chasing the man.  Well, that's the infinite regression that I talked about, Your Honor, that it's going to be impossible in any principled way to reconcile

243

Mr. Morris's or the Debtor's definition of pursue with any logical, reasonable limitation that is readable into the order, Your Honor.

And I'm going to defer to my partner, Mr. Bridges -- oh, go ahead.

THE COURT: I'm going to stop you. I mean, we have the linguistic argument. But how do you respond to this?

MR. SBAITI: Sure.

THE COURT: What if I tell you, in my gut, this appears to be an end run? An end run. I mean, I'm stating something that should be obvious, right? An end run around this Court. This Court spent hours, probably, reading a motion to compromise issues with HarbourVest, issues between the Debtor and HarbourVest. I had objections. An objection from CLO Holdco that was very document-oriented, as I recall. Right of first refusal. HarbourVest can't transfer its 49.98 percent interest in HCLOF, right? Talk about alphabet soup. We definitely have it.

MR. SBAITI: Yes.

THE COURT: Without giving CLO Holdco the first right to buy those assets. Read pleadings. Law clerk and I stay up late. And then, you know, we get to the hearing and there's the withdrawal -- we heard a little bit about that today -- withdrawal of the objection. We kind of confirmed that two or three different ways on the record. And then I remember going

244

to Mr. Draper, who represents the Dugaboy and Get Good Trusts. You know, are you challenging the legal propriety of doing this?  And he backed off any objection.

So the Court ended up having a hearing where we went through what I would call the standard 9019 prove-up, where we looked at was it in the best interest, was it fair and equitable given all the risks, rewards, dah, dah, dah, dah. You know, HarbourVest had initially, you know, started at a $300 million proof of claim, eye-popping, but this all put to bed a very complicated claim.

MR. SBAITI:  Yeah.

THE COURT:  Tell me something that would make me feel better about what is, in my core, in my gut, that this is just a big, giant end run around the Bankruptcy Court approval of the HarbourVest settlement, which is not on appeal, right? There are a gazillion appeals in this case, but I don't think the HarbourVest --

A VOICE:  It is on -- it is on appeal, Your Honor.

THE COURT:  Is it?  Oh, it is on appeal?  Okay.  So I may be told --

MR. SBAITI:  I didn't know.

THE COURT:  I may be told, gosh, you got it wrong, Judge.  You know, that happens sometimes.

So, this feels like an end run.  You know, the appeal is either going to prevail or not.  If it's successful, then, you

HCMLPHMIT00002959

245

know, do you really need this lawsuit?  You know, I don't --
okay.  Your chance.

MR. SBAITI:  Thank you, Your Honor.

THE COURT:  Uh-huh.

MS. SBAITI:  Your Honor, this wouldn't be the first
case where finality or where there was a settlement -- I'm not
familiar as well with bankruptcy, but certainly in litigation
-- where the settlement then reveals -- well, after a
settlement is done, after everyone thinks it's done, some new
facts come to light that change people's views about what
happened before the settlement or before the resolution.  And
that's what happened here, Your Honor.  This is what we've
pled.  And this is what we understand.

    There were the instances of Mr. Seery's testimony where he
testified to the value of the HarbourVest assets.  I believe,
as I recall, he testified in I believe it's the approval
hearing that Your Honor is talking about that the settlement
gave HarbourVest a certain amount of claims of I think it's,
Series 8 and then Series 9 claims, and that those were
discounted to a certain dollar value that he quantified as
about $30, $31 million.  And the way he ratified and justified
the actual settlement value, the actual money or value he was
conferring on HarbourVest, given the critique of HarbourVest
claims that he was settling, is he explained it this way.  He
said $22-1/2 million of this whole pot that I'm giving them

HCMLPHMIT00002960

246

pays for the HarbourVest -- HarbourVest's interests in HCLOF -- it's alphabet soup again -- and Highland CLO Funding, Limited.  And so it's the other $9 million that's really settling their claims.  And given the amount of expense it's going to take, so on and so forth, $9 million seems like a reasonable amount to settle them with, especially since we're just giving them claims.

So that $22-1/2 million everyone apparently took to the bank as being the value, including CLO Holdco at the time, because they didn't have the underlying valuations.  Highland was supposed to give the updated valuations.

So, fast-forward a couple of months -- and this is what we've played in our lawsuit, Your Honor; this is why I don't think it's an end run -- we pled in our lawsuit just a couple months later Highland -- I believe some of the people that worked at Highland started leaving, according to some mechanisms that I saw where Highland didn't want to keep all the staff and so the staff was migrated to other places.  And one of those gentlemen, I believe Mr. Dondero referred to him as a gentleman named Hunter Covitz, and Hunter Covitz, who's also an investor in HCLOF, he owns a small piece of HCLOF, he had the data, he had some of the information that showed that, actually, in January, when Mr. Seery said that the HarbourVest settlement was worth 22 -- excuse me, the HarbourVest interests in HCLOF were worth $22-1/2 million, that they're

HCMLPHMIT00002961

247

actually worth upwards of $45 million.

And so that information, Your Honor, we believe gives us a different -- a different take on what happened and what was supposed to happen.  This is strictly about the lack of transparency.

THE COURT:  Okay.  Assuming --

MR. SBAITI:  Yeah.

THE COURT:  -- I buy into your argument that this is newly-discovered evidence --

MR. SBAITI:  Yes.

THE COURT:  -- CLO Holdco would not have had reason to know -- I guess that's what you're saying, right?

MR. SBAITI:  I'm saying they -- they didn't know.

THE COURT:  That they didn't know.

MR. SBAITI:  Uh-huh.

THE COURT:  And didn't have reason to know.  I'm trying to figure out who's damaged here.

MR. SBAITI:  Well, CLO Holdco, my client, is damaged, Your Honor.

THE COURT:  How?

MR. SBAITI:  Because one of the aspects of the -- of Highland, one of the issues under, excuse me, of Highland's advisory, is that it has a fiduciary duty.  And that fiduciary duty, at least here, entails two, if not, three prongs.  The first prong is they have to be transparent.  You can't say --

248

THE COURT: How is -- you know, I know a lot about fiduciary duties, believe it or not. How is CLO Holdco harmed and the DAF harmed?

MR. SBAITI: Because, Your Honor, they lost out on an investment opportunity to buy the piece of -- the HarbourVest piece. They would have been able to go out and raise the money. They had the opportunity --

THE COURT: Okay.

MR. SBAITI: They would have had the opportunity to make a different argument.

THE COURT: What you're saying, you're saying, if they had known what they didn't have reason to know, that it was worth, let's say, $45 million, that they would have gone out and raised money and said, oh, we do want to exercise this right of first refusal that we decided we didn't have and gave in on, we're going to press the issue and then outbid the $22 million, because we know it's worth more? Is that where you're going? I'm trying to figure out where the heck you're going, to be honest.

MR. SBAITI: That's -- Your Honor, I'd push back on a little of the phrasing, only because the way these duties -- the way we understand the SEC's duties work when you're an investment advisor is you have a transparency obligation and an obligation --

THE COURT: Yes. Yes.

HCMLPHMIT00002963

MR. SBAITI:  -- not to divert these.  So, yes, CLO Holdco would have at least had the opportunity and been offered the opportunity, which it could have taken advantage of, to, if the assets were really on the block for $22-1/2 million, they should have been able to buy their percentage pro rata share of that $22-1/2 million deal.  I mean, in a nutshell, that's -- that's where we believe we've been harmed.  And we believe that the obfuscation of those values and, to a certain extent, the misrepresentation of those values in the settlement is not cleansable by the argument, well, you should have asked.

Well, you should have asked is fine in normal litigation, but when the person you should have asked actually owes you a positive duty to inform, we believe that the should-have-asked piece doesn't really apply and there's -- and that's, that's the basis of our case.

So it's not an end run around the settlement, Your Honor.  I think I opened with we're not trying to undo the settlement.  We're not saying HarbourVest has to take its interest back.  We're not saying the settlement has to go on.  We're not even saying any of the things that happened in Bankruptcy Court need to change.  But Section 959 is pretty clear that this is management of third-party property --

THE COURT:  I guess -- okay.  Again, rabbit trail, maybe.  But CLO Holdco still owns its same 49.02 percent

HCMLPHMIT00002964

interest that it did before this transaction.  So if there's value galore in HCLOF, it still has its 49.02 percent interest.  What am I missing?

MR. SBAITI:  Oh, I think Your Honor's assuming that HCLOF bought the piece back from HarbourVest.  It didn't.

THE COURT:  No, I'm not.

MR. SBAITI:  Oh.

THE COURT:  I'm not assuming that.

MR. SBAITI:  Well, --

THE COURT:  I know that now the Debtor has, what, fifty point, you know, five percent of HCLOF, whereas it only had, you know, a fraction.

MR. SBAITI:  Point six-ish.  Yeah.

THE COURT:  Point six-ish, and HarbourVest had 49.98.

MR. SBAITI:  Right.

THE COURT:  So, again, please educate me.  I'm really trying to figure out how this lawsuit isn't just some crazy end run around a settlement I approved.  And moreover, what's the damages?

MR. SBAITI:  Well, Your Honor, --

THE COURT:  What's the damages?  CLO Holdco still has its 49.02 percent interest in HCLOF.

MR. SBAITI:  Your Honor, again, --

THE COURT:  What am I missing?  I must be missing something.

HCMLPHMIT00002965

251

MR. SBAITI:  I think so, Your Honor.

THE COURT:  What?

MR. SBAITI:  The damages is the lost opportunity, the lost opportunity to own more of HCLOF.

THE COURT:  Oh, it could have owned the whole darn thing?

MR. SBAITI:  I could have owned 90 -- whatever 49 plus 49.98, 98.98 percent.

THE COURT:  But --

MS. SBAITI:  Or some pro rata portion.

THE COURT:  But Mr. Seery had some information that you think he was holding back from CLO Holdco that CLO Holdco had no reason to know?

MR. SBAITI:  Yes, Your Honor.  The -- the -- what he testified to that the value of those assets, excuse me, the value of the HarbourVest interests in HCLOF or its share of the underlying assets being $22-1/2 million was either, one, intentionally obfuscated, or, two, and I don't think this excuses it at all, he simply used ancient data and simply never updated himself, not for the Court and not for any representations to the investors, who he himself testified under oath in this Court that he has a fiduciary duty to under the Investment Advisers Act.

THE COURT:  This could get very --

MR. SBAITI:  So that's injury to my client, Your

HCMLPHMIT00002966

252

Honor.

THE COURT:  This could get really dangerous.  Maybe --

MR. SBAITI:  I'm sorry.

THE COURT:  This could get really dangerous.  Maybe I should cut off where I'm going on this.

MR. SBAITI:  Okay.

THE COURT:  Of course, someone dangled it out there in a pleading.  You know where I'm going, right?

MR. SBAITI:  I'm not sure I do, Your Honor.

THE COURT:  Hmm.  I do read the newspaper, but someone put it in a pleading.  HCLOF owns MGM stock, right?  Is that what this is all about?  Is that what this is all about?  Or shall we not do this on the record?

MR. SBAITI:  Well, Your Honor, this has nothing -- I don't -- I don't think this has anything to do with the MGM stock one way or the other.

THE COURT:  You don't?  OH?

MR. SBAITI:  Your Honor, my charge as a counsel for the DAF is pretty straightforward.  We looked at the claims.  We looked at the newly-discovered information.  We talked to the people who had it, Your Honor.  That was our investigation.  We put together a complaint.  We believed that we had a good basis to file suit, despite Your Honor's -- the settlement approval.  We expressly, because we understand how

finality is so critical in a bankruptcy context, we expressly didn't ask for rescission.  We expressly didn't ask for anything that would undo the settlement.

Asking for damages because of how the settlement happened, through no fault of the Court's, of course, but asking for damages is not, at least not as I see it, an end run around the Court's settlement, and it's a legitimate claim.  And I don't think this is far from the first time that new evidence has come up that's allowed someone to question how something was done that actually -- that actually damaged them.

THE COURT:  Usually, they come in for a motion to reopen evidence to the court who issued the order approving the settlement.

MR. SBAITI:  Well, Your Honor, I mean, that's --

THE COURT:  Newly-discovered evidence.

MR. SBAITI:  That would be the case in a final judgment, Your Honor.  But, you know, our understanding of the way the settlement worked was that that was not necessarily going to be -- not the direction anybody wanted to go, but seeking damages on a straight claim for damages, which we're allowed to seek, which I think is our prerogative to seek, we went that direction.

THE COURT:  Okay.  Okay.

MR. SBAITI:  But this --

THE COURT:  My last question.

HCMLPHMIT00002968

254

MR. SBAITI:  Yes, Your Honor.

THE COURT:  Again, I have to know.  You have filed some sort of pleading to reopen litigation against Acis in New York?  I'm only asking this because it's part of what's going on here.  What is going on here?

MR. SBAITI:  Your Honor, that's a -- that's a separate lawsuit, and it's not to reopen litigation against Acis.  It deals with post-plan confirmation mismanagement by Acis.

THE COURT:  Oh, okay.  Okay.

MR. SBAITI:  Yeah.

THE COURT:  All right.

MR. SBAITI:  But I believe there's a motion in front of Your Honor, just to -- that gave notice that the suit was filed, but I believe Mr. -- well, a bankruptcy lawyer filed it.  I don't know.

THE COURT:  A motion or a notice?  I don't know.

MR. SBAITI:  I don't know, Your Honor.  That's above my paygrade.

THE COURT:  I have not seen it.  Okay?

MR. SBAITI:  Okay.

THE COURT:  Maybe it's there, but no one has called it to my attention.

MR. SBAITI:  With the Court's permission, I'm going to yield time to Mr. Bridges.

HCMLPHMIT00002969

255

THE COURT:  Okay.  Mr. Bridges?

CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

MR. BRIDGES:  Thank you, Your Honor.  I'm grateful that you asked most of those questions to Mr. Sbaiti.  I would not have been able to answer them.  The one I can answer is the one about judicial estoppel.  Apparently, I did a pretty lousy job earlier.  I think I'm prepared to do a better job now.

The case law I'd like to refer you to is the Texas Supreme Court's 2009 decision in *Ferguson v. Building Materials*, 295 S.W.3d 642.  And this was my concern and my issue, perhaps because I used to teach it and so it was at the front of my mind.  But contrary to what you would think and what you said earlier, it's not your ruling against us that would create a judicial estoppel problem.  It's if you ruled in our favor.  And I know that seems weird.  Let me explain.

The two things that have to take place for there to be judicial estoppel are, first, successfully maintaining a position in one proceeding, and then taking an inconsistent position in another.  And Your Honor, what we talked about earlier is the notion that your July order forecloses the key claim that Mr. Sbaiti was just describing, that Mr. Seery should have known.  Not that he was grossly negligent or did intentional wrong, but that he breached fiduciary duties because he should have known and should have disclosed.

HCMLPHMIT00002970

256

And if your order forecloses that and we come and convince you that we nonetheless have colorable claims, colorable claims of gross negligence or willful wrongdoing, that we ultimately are unable to prove, our lawsuit could fail, even though we had proved -- in the lawsuit we had proved he should have known and that he breached fiduciary duties, but we would be estopped, having succeeded from coming here and asking in compliance with the order and its colorability rule, that we would be estopped from then saying that this Court lacked the authority to have issued that order in the first place, to have released the claim on the mere breach of fiduciary duty or ordinary negligence.  That's the inconsistency that I was concerned about.

By coming here rather than trying to make our objection and our position known without submitting to the foreclosure of that claim that is, in many ways, the most important, the headliner from our District Court complaint, is the concern, Your Honor.  And frankly, if Your Honor's order does foreclose that, then we're in serious trouble.  That's the claim that we're trying to preserve.

But Your Honor, I don't think it was in anyone's contemplation in July of 2000 that what that order would do is terminate -- 2020; sorry, Your Honor -- in July of 2020, that that order would terminate future claims that might arise based on future conduct that had not yet happened in Mr.

HCMLPHMIT00002971

257

Seery's role.  Not in his role as a manager of the Debtor's property, but in his role as a registered investment advisor on behalf of his clients and their property.  And that is the concern that the judicial estoppel argument is about.

THE COURT:  I still don't understand.  I'm very well aware of judicial estoppel, the old expression, you can't play fast and loose with the court.  Take one position in one court, you're successful, and then take another position in another court.  That's the concept.

MR. BRIDGES:  Coming here --

THE COURT:  How is this judicial estoppel if you had done what I think the order required and asked this Court for leave?  What -- and I said fine, you have leave.  Where's the judicial estoppel problem?

MR. BRIDGES:  If you say fine, you have leave, but that leave is only, as the order states, because we have colorable claims of gross negligence, colorable claims of intentional wrongdoing, what happens to our mere negligence and mere breach of fiduciary duty claims?  Are they foreclosed?  The order on its face --

THE COURT:  Well, I would interpret the order to be yes, and then you could appeal me, and the Court would either say it's too late to appeal that because you didn't appeal it in July 2020, or fine, I'll hear your appeal.  Where's the estoppel?

HCMLPHMIT00002972

MR. BRIDGES:  Your Honor, our claims that this Court lacks the authority either to have made that order in the first place or the jurisdiction to rule on colorability now because of Section -- the mandatory abstention provision, whose section number I've now lost.  That if we come to you and ask you to rule on those things, have we not thereby waived on appeal our claim that you couldn't rule in the first place on those things?

That is what our motion for leave in the District Court argues, is that there's -- there are jurisdictional shortcomings with your ability to decide what we're asking that Court to decide.  And Your Honor, by coming here first and then appealing, that's what we fear we would have lost. And instead of coming here and appealing, what we -- what we would have done, in the alternative, I guess, would be to come here and ask you not to rule but move to withdraw the reference of our own motion.

That two-step, filing here and filing a motion to withdraw the reference on the thing we filed here, we didn't think was required, nor could we find any case law or rule saying that that was appropriate.

THE COURT:  Okay.

MR. BRIDGES:  These are not games, Your Honor.  We were not trying to play games.  We aren't bankruptcy court lawyers.  We're not regularly in front of the Bankruptcy

HCMLPHMIT00002973

Court.  So the notion why didn't we come here first isn't exactly at the top of our mind.  The question for trial lawyers typically is, where can we file this, what are the permissible venues, not why don't we come to Bankruptcy Court?  Especially when your order appears to say that causes of action that don't rise to the level of gross negligence or intentional wrongdoing are already foreclosed.

Your Honor, the January order, I think I have to just briefly address again, even though I don't understand why it makes a difference.  Apparently, counsel thinks it makes a difference because Mr. Dondero apparently supported it in some way.  Our position is, for whatever difference it makes, the January versus the July, we don't believe there's anything in the District Court complaint putting at issue Mr. Seery's role as a director, so we don't understand how that order is implicated.

Again, I'm not sure that matters at all.  I'm not raising it as a defense.  I'm just telling Your Honor this is all about the July order, from our perspective.  Certainly, the July order puts his role as a CEO -- certainly, the District Court case puts his role as a CEO at issue, and that's what the July order is about.

Your Honor, the *Applewood* case requires specifics in order to terminate our rights to sue and to bring certain causes of action, and without that kind of specificity, Your Honor, we

HCMLPHMIT00002974

believe that that order fails to preclude, fails to have preclusive effect as to these later-arising claims. And we would submit not only that it was not contemplated, but that it was not intended to have that effect, and that even Mr. Seery's testimony suggests that that's not how he understood that order to be effective.

Counsel argued that the Barton Doctrine does apply here and rattled off the names of cases that don't -- to my knowledge, no case, no case that I can find deals with this type of deferential order where someone is asked -- where a court is asked to defer to the business judgment of an entity in approving an appointment, and nonetheless deciding that the Barton Doctrine applies. That's not what *Villegas* holds. That's not what *Espinosa* holds. I don't think *Barton* is applicable in a situation like that. Certainly, it's outside of the context of what *Barton* anticipated itself over a century ago when it was decided.

Your Honor, if we're wrong, please know we're wrong in earnest. These are not games. These are not sneakiness. No such motivation is at issue here. I was hopeful that that would be plain from the text of the motion for leave itself. If it's not, I'd offer this in addition. The docket at the District Court shows that immediately upon filing the motion for leave, a proposed order was filed with it asking to have the proposed complaint deemed filed, which as soon as I saw I

HCMLPHMIT00002975

asked us to immediately retract it and to substitute a new proposed order that does not ask for the amended complaint to be deemed filed.  That is not what we wanted.

And the fear was what if our motion is granted because the District Court says you have the right, you don't even need leave, but as to the Bankruptcy Court, you're on your own, this is at your own risk, I'm not going to rule on any of the jurisdictional questions that you attempt to raise?  We did not want our complaint deemed filed for that reason.  What we did want was for a court where we did not risk judicial estoppel to decide whether or not our key claim under the Advisers Act had been foreclosed by your July order, and that was the key and motivating factor.

On top of that, Your Honor, instead of arguing the meaning of the word pursue, let me just say this.  We understood pursue in that context to refer to claims or causes of action, not potential, unfiled, unasserted, contemplated claims or causes of action.  That until a claim or cause of action is actually asserted in some way, that it can't be pursued, and that the reference here was to two kinds of action, those that had not yet been commenced -- and your order foreclosed the commencing of them without permission -- and those that had been commenced.  And your order couldn't foreclose the commencing of them because they hadn't been commenced yet, but your order did foreclose pursuing them.

HCMLPHMIT00002976

262

And that was my reading of what that order said.  And it fits with this notion that a claim or cause of action isn't something you're considering or even researching.  It didn't dawn on us that researching or talking to a client about a potential claim could violate the order because in some respect that conversation could be in pursuit of the claim.

By the same notion, we didn't think asking a court with original jurisdiction according to Congress, asking a court to decide whether or not we were foreclosed from bringing our claims in a motion for leave was violating your order.

We don't have much else, Your Honor.  In terms of the need to enforce compliance with your orders, if we understand them, we sure as heck are going to follow them.  And if we've misconstrued the term pursue, I'm certainly very sorry about that.

I appreciate counsel saying he thinks we're probably good people.  I did not think what we did was any kind of gross error in judgment.  I thought that what we were doing was preserving our clients' rights, going to a court of competent jurisdiction, and asking the question, can we do what we think we ought to be able to do, but is -- frankly, Your Honor, we're a bit confused about because of the order that seems on its face to foreclose the very lawsuit that we think we should be bringing on behalf on this charitable organization that foreclosed it months before the conduct at issue that gave

HCMLPHMIT00002977

263

rise to the complaint.  And with that conundrum, knowing what to do was not obvious or easy for the lawyers or for the client who was dependent on his lawyers to give him good, sound advice.

I'm very grateful for you giving us the time and for your very pointed questions.  Thank you, Your Honor.

THE COURT:  Thank you.  All right.  Who's next?

CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

MR. ANDERSON:  May it please the Court, Michael Anderson on behalf of Mr. Patrick, Mark Patrick.

You know, this is a contempt proceeding.  It's very serious.  And, you know, my stomach aches for the people here.

THE COURT:  Mine does, too, by the way.

MR. ANDERSON:  It truly aches.

THE COURT:  Uh-huh.

MR. ANDERSON:  And I mean what I said when I did opening, when I said we don't need a hearing, an evidentiary hearing.  And I still don't believe we did, because it comes down to what does the word pursue mean, because there's already been an acknowledgement --

THE COURT:  Do you all want to withdraw all your exhibits?  I've got a lot of exhibits that I now need to go through.  If I admit them into evidence, I'm going to read them.

MR. ANDERSON:  No, I understand.

HCMLPHMIT00002978

THE COURT:  Uh-huh.

MR. ANDERSON:  But it does come down to the word pursue.  Counsel has already said commence doesn't do it, and so then it's pursue.

And I could ask Your Honor, what did you mean when you said pursue in the July order, but I'm not going to say that. And I asked my client on the stand, you know, did you pursue a claim or cause of action?  And then it was very telling.  What happened with counsel?  He stood up and objected to me even asking if it was pursued.  And it dawned on me, if he's going to object, does pursue have some sort of legal -- that was his objection.  It was he objected on legal grounds.  Does that have some sort of legal meaning?

This is contempt.  You can't be held in contempt unless it is bright-line clear that you have deviated from a standard of conduct and there's no ambiguity.  Well, clearly, there is ambiguity, because over on this side of the room we say filing a motion for leave can't be pursue.  We can look at the order and we know it doesn't mean pursue because I just heard Your Honor say you should have filed a motion for leave in this Court before doing anything.  All right?  So if that -- if that is what without the Bankruptcy Court first determining, if that's what the motion for leave is, well, then if we go up to the first sentence, No entity may commence or pursue a claim or cause of action, then it has this, without the

HCMLPHMIT00002979

Bankruptcy Court first determining, that means -- if pursue means a motion for leave, if that's what that means, then that order says you can't commence or file a motion for leave before you file a motion for leave.  Because that's what it means.  If pursue means motion for leave and you've said you should have come here and filed a motion for leave because it says, Debtor, without the Bankruptcy Court first determining that notice that such claim or cause of action represents a colorable claim, and specifically authorizing.  The vehicle to do that would be a motion for leave, right?  And you can't pursue anything until a motion for leave has been filed.

Now, where was the motion for leave?  And I understand, Your Honor, you know, no expert at reading the room, obviously, you're frustrated that the motion for leave was filed in the District Court and not in this Court.  But it doesn't change the fact, and neither did any of the evidence, change anything, is what does pursue mean?

And if someone says, well, it's obviously clear it means x, well, is it really obviously clear it means filing a motion for leave?  Because nobody on my side, when you read it, when you say pursue, can read it that way.  And if we're going to have contempt sanctions being posed, and there has to be clear and convincing evidence or beyond reasonable doubt, depending upon, you know, I don't think you have to get to that part, but clear --

HCMLPHMIT00002980

THE COURT:  This is not criminal contempt.

MR. ANDERSON:  Clear and convincing is the civil standard for contempt.

THE COURT:  Right.

MR. ANDERSON:  And if pursue is open to that much interpretation, it's not the kind of thing that can be held in contempt on.  And I understand the frustration.  I hear the frustration.  I hear counsel talk about that was not their intent when they filed it.  You know, I heard Mr. Patrick get up there.  I heard counsel say, hey, Mr. Patrick's doing his job, he's a good guy, seems like a good guy.  Well, Mr. Patrick's up there.  Look, they filed the underlying lawsuit.  Nobody -- there's no motion for that in this Court about the underlying lawsuit.  It's only about the motion for leave.  That's all we're here about.

And so you go to that, and we've heard all these arguments about it, and we've been here almost as long as the motion for leave was actually on file before it was sua sponte dismissed without prejudice.

And so I go back to that and I say that, if pursue means filing a motion for leave, then that order would require an order for anyone to violate -- it would be violated upon the filing of a motion for leave, because you can't pursue something until the Bankruptcy Court has already first determined, after notice, that such claim or cause of action

HCMLPHMIT00002981

represents a colorable claim and specifically authorizing the entity to bring such a claim.  Because that -- we already know that's a motion for leave in and of itself.  Therefore, pursue, just simply filing a motion for leave will put you in that.

But that gets into all these -- we don't need to be having this discussion about, you know, is a motion for leave pursue?  Is pursue a motion for leave?  I've heard both arguments here.  It doesn't justify contempt.  And I know -- and so certainly with respect to my side, I, you know -- given that, I would request that the Court deny the request for contempt.

And again, I want to say, too, look, we hear you.  Absolutely hear you.  Understand the frustration.  Totally hear you on that.

I'm going to turn over the balance of my time to Mr. Phillips, --

THE COURT:  Okay.

MR. ANDERSON:  -- unless you have any questions, Your Honor.  I appreciate it.

THE COURT:  Okay.  I do not.

CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

MR. PHILLIPS:  Your Honor, Louis M. Phillips, and I'll be brief.  I'm going to try to bring it down to -- I was not involved.  We are -- we are here because of the indemnification provisions of CLO Holdco representing Mr.

HCMLPHMIT00002982

Patrick individually.  My firm was not involved in the litigation.  We were hired to represent CLO Holdco and some of the defendants in the UCC litigation, and our role has expanded to do some other stuff, particularly represent Mr. Patrick because of the indemnification provisions of the Holdco entity documents.  He's entitled to indemnification and we're providing a defense for him.  That's why we're here.

So I come way after the order.  We have not been involved in anything.  But I think I'm just going to try to distill everything about the order and about the concern and about the litigation, because the Court is asking about is this an end run on the settlement?  The Court is also saying, all you had to do was come here first.

But let's look.  We're here about one thing, the motion for leave.  And as Mr. Anderson pointed out, the commence or pursue a claim, according to the order, commence or pursue can only occur after the Court has authorized the litigation. Okay.  So that's what the order says.  You can't commence or pursue.

Counsel for the Debtors says, well, it can't be after commencement because you've already commenced the action.  So pursue has to mean something before the commencement of the action.  It would mean something before the commencement of the action under this order.

But it doesn't mean something before the Court approves

HCMLPHMIT00002983

the commencement of the action, because commence or pursue under this order does not occur before the Court has acted. That's the language of the order.  It only occurs after the Court has authorized it.  That's the context in which commence or pursue exists, after this Court has authorized.

Okay.  So it can't be pursuit before the Court has authorized without commencement because it only is triggered by the Court's authorization of the action, which means, before you commence it, actions in time take time, before you commence the action, you have to pursue the action to commence it.  But you can't do that until you've approved it.  All right?

That's the temporal concern and why we say the motion for leave can't be pursuit of an action under this order.  It might be pursuit under another definition or another order. In other words, maybe an order could be issued saying, you can't file a motion for leave in any other court but this one. I don't know whether it'd be a good order, but the order could say that.  But when you say all you had to do was file a motion for leave in this Court and everything would be okay, no.  The motion for leave is not, under this order, pursuit. Pursuit only occurs under this order after you've done something, after Your Honor has done something.

So if a motion for leave is violative at the District Court, the motion for leave would be violative here, because

HCMLPHMIT00002984

it occurs before Your Honor has taken action.

Now, clearly, you want people to ask, but just as clearly, and this was the point of my remarks earlier at the tail-end of opening, just as clearly, I have a question, because frankly, I understand what these guys are saying.  These guys haven't really said it.  They're a little shame-faced at what these guys are asking.  Because what these guys are asking is whether or not an employee Seery, as the CRO -- and we heard, oh, he bargained for it, he wouldn't have done it without getting the order and the protections because -- did he bargain for not having to comply with the Investor Advisory Act?  Did he bargain for not having a fiduciary duty to third parties?  Because the one thing that Mr. Bridges has been trying to tell you is that, under this order, if it's interpreted one way, you would never authorize a violation of the Investment Advisory Act because it wouldn't necessarily be gross negligence or willful misconduct.

In other words, in employing Seery, did the Debtor go out in this disclosure statement and say, we are advisor to $1.2 billion of third-party money, and guess what, our CRO has no fiduciary duty to you?  We have forestalled any claim under the Investment Advisory Act in our employment order.  Did that happen?

Because if that happened, I don't know if the Court was really thinking that way, because that -- that can't happen in

HCMLPHMIT00002985

a confirmation order before, under the Fifth Circuit authority, after disclosure statement, plan, et cetera, et cetera, because that's a third party release of claims that may -- that haven't occurred yet. You would be releasing because you would be saying you have no right. You have no right. This is not temporal. This is saying you have no right, if it's saying that, to bring an Investment Advisory -- Investment Advisory Act or a Breach of Fiduciary Duty Act that's not gross negligence or willful misconduct forever upon an employment order.

Now, if that's not what it means, then we have another conundrum. The other conundrum -- and I'm new to this, maybe this has been thought out by everybody, but I don't think so. The other conundrum is this order doesn't apply to actions that don't involve willful -- gross negligence or willful misconduct. It only applies to those types of actions. So, frankly, I don't know what the order does.

I think the problem -- I probably shouldn't be the purviewer of who ought to know because my standard's probably really low, given my capacity here. But I'm a guy off the street. Seery gets hired to run the Debtor. Seery testifies and he admits, we've got Investment Advisory Act all over the place. We're making lots of fees out of administering all this third-party money. Do they know? Do they know he's immune? Do the third parties know?

HCMLPHMIT00002986

272

Now, a standard about managing the Debtor?  Absolutely. That's just pure D Chapter 11, pure D corporate, pure D standard liability if you're operating an entity.  You're not liable for gross negligence or willful misconduct.  You're not.  And so any claim for damage to the Debtor or to the estate by actions taken in the CRO capacity, absolutely. Absolutely.  You don't want a bunch of yoyos suing, you did something against the Debtor and the Debtor is now worth $147 less than it was because you did something, you were negligent and you forgot to put the dog out.  No.  It's got to be gross negligence or willful misconduct if you are talking about running the Debtor and running the estate.

But that's not what we have here.  And you can ask all the questions you want about whether the lawsuit's any good, but that's not what's up before the Court.  What's up before the Court is whether filing a motion for leave is contempt.  And under this order, you're saying, all you had to do is come here.  Well, in one reading of it, you'd have never got relief because you can't bring the kind of action.  I foreclosed it by employing Seery.  He no longer has a fiduciary duty and is no longer bound by the Investment Advisory Act.  Case closed. Get out of here.  Unless you can formulate something around so that you can establish gross negligence or willful misconduct, I've done away with all those causes of action.

I don't think that's what happened.  And if that's not

HCMLPHMIT00002987

what happened, this doesn't apply because it shouldn't apply to third-party actions.  It should apply to actions for damage to the estate by creditors of the estate for whom Seery is acting as CRO of the Debtor, who is the -- in possession of the estate.  That makes perfect sense.  Perfect sense.  And nobody would say that you shouldn't have sole authority to determine whether a CRO who's acting for the estate and damages the estate -- because that'd be a claim against the estate.  That would be an administrative claim against the estate.  That is just hornbook law.

That's the way I see this order.  And I admit I didn't write it.  I admit I didn't submit it.  I admit I didn't litigate it.  I admit I'm coming in late.  But sometimes maybe a fresh pair of elderly, trifocal-assisted eyes doesn't hurt. Because I will tell you, Judge, on one read this Court says don't bother coming here because you don't have the kind of claim that can be brought, even if you're a third party.  And the only way that happens is if Seery's released from any obligation under the Investment Advisory Act, and I think everybody would like to know that.  And he can't be sued for breach of fiduciary duty to third parties that he admits he owes.  I think people would like to know that.

And if it doesn't, then this is not -- this order is not about that.  But the fact -- I've been at this 40 years, and I usually don't want to talk about myself.  There's really not a

HCMLPHMIT00002988

lot to talk about.  But I hear Mr. Morris how he's never done this, he's never done that.  I hear this, I'm a good -- you know, whatever.  I'm confused.  I've been doing this 41 years.  Bankruptcy, 39.7.  I must be crazy, but that's what I've been doing.  And I'm confused because I don't even know if they needed to come here.  I don't even know if, had they come here, if they could have even presented an action for gross -- for negligence or breach of fiduciary duty, could have -- gross negligence or willful misconduct?  I don't know whether this order just applies to Seery's duties as CRO vis-a-vis creditors of the estate and property of the estate and damage to the estate.  Because that's not what we're dealing with here.

     The point is, Judge, this is contempt.  And I understand Your Honor knows all about contempt.  Your Honor knows about *Matter of Hipp*.  Your Honor knows about civil contempt authorization for bankruptcy courts.  Your Honor knows that you can't operate without the right to impose civil contempt sanctions.  And Your Honor knows, and I agree with Your Honor, that civil contempt is both remedial and coercive.

     But how do you coerce around my questions?  Maybe I am all wet, but if I am, I don't think I am, and I don't understand that I am, and that's why I'm concerned about going off into this contempt wilderness and millions in fees, when the motion for leave was dismissed and when the lawsuit doesn't ask for

HCMLPHMIT00002989

or includes most of its claims.  I don't even -- I have not studied the lawsuit.  I wasn't involved in it.  But if it's a breach of fiduciary duty and Advisory Act and it says what you've been told it says, that he should have pulled up different stuff, that the valuation metrics were different, that he shouldn't have used it, I don't know that they're saying fraud.  I don't know that they're saying he knew he was doing -- I think they're saying he breached the Investment Advisory Act.  And that's not gross negligence or willful misconduct.  Then does this order apply or this order -- does this order foreclose that?

     The fact is, I think we could have decided this on the pleadings and on the order.  We didn't.  The fact that Mr. Dondero did A, B, C.  And I will tell you this.  Mr. Patrick has stood up.  He's going to get a harpoon, he's going to get a harpoon, subject to his right to appeal.  But he has told this Court.  We represent him.  We're not trying to get him out of having authorized the order.  It's very important for this Court to understand.  Mr. Patrick is one of these entities.  Mr. Dondero can holler and scream all he wants to.  Mr. -- and look, did he terminate Grant Scott?  If I'm Grant Scott, and this is my best friend and I was in his wedding and I was his roommate and I was his best friend and I'm doing this stuff for $5,000 and I do something and $5,000 a month and I do something and I get hollered at and I've got a full a

HCMLPHMIT00002990

276

law practice, I'm an IP lawyer, why don't I just tell him to go jump in a lake, which is the other way you could look at Grant Scott leaving.  I want you to jump in a lake.  I'm out of here.  I don't need this.

Thank you.

THE COURT:  All right.  Thank you.

MR. DEMO:  Your Honor, how much time do they have left, --

THE COURT:  Um, --

MR. DEMO:  -- to be honest?

THE COURT:  Nate, are you -- 26 minutes?  All right.

MR. TAYLOR:  I'll go way under, Your Honor.

THE COURT:  Okay.

CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

MR. TAYLOR:  Your Honor, Clay Taylor.  I'm here on behalf of Mr. Dondero.  He was named as an individual alleged violator within the order.

THE COURT:  Okay.  I'm getting lawyers mixed up.  Mr. Anderson, who did you represent?

MR. ANDERSON:  Mr. Patrick.  Mr. Phillips and I represent --

THE COURT:  You're Mr. Patrick?

MR. PHILLIPS:  We're Mr. Patrick.

THE COURT:  You're both --

MR. PHILLIPS:  Mr. Patrick.

HCMLPHMIT00002991

THE COURT: Okay. I'm sorry. I'm getting my Fort Worth law firms mixed up. Okay.

MR. TAYLOR: That's quite all right. Clay Taylor from Bonds Ellis here on behalf of Mr. Dondero. And we're here because he was named in the alleged violator motion within the order as an alleged violator. We don't think that he is, for the reasons that we're about to explain, but we were ordered to appear --

A VOICE: No.

MR. TAYLOR: -- and so therefore we are appearing and telling you why we're not an alleged violator.

First of all, for all the reasons that Mr. Sbaiti and Mr. Bridges and Mr. Phillips and Mr. Anderson said, the court order was in effect. We agree with that. It required certain conduct to be done. Yes, it did. It said you couldn't commence something. It said you couldn't pursue it. I think we have gone through what the pursuit and commence. Nobody is arguing that anything was commenced. It comes down to pursuit.

But let's talk about what the evidence shows about Mr. Dondero. It shows that Mr. Dondero believes that there have been breaches of fiduciary duty. He thinks that there has been negligence committed. He believes that actions should be taken. We don't run away from that. He, frankly, told you that.

HCMLPHMIT00002992

But here, he didn't take any action to pursue it.  The DAF did.  CLO Holdco did.  It's undisputed that he's not an officer, director, or control person for either of those entities.  The act we're here on is a motion for leave to file an amended complaint to include Mr. Seery.  That's -- Mr. Dondero didn't take any of those acts.  He believes it should have been done, but he's not the authorizing person.

He might have -- let's just pretend that he thought he was authorizing something.  It doesn't matter that he thought he could authorize something or that he was trying to push for it.  The fact remains he can't authorize it.  You know, he can say, I declare war on Afghanistan.  Well, he can't.  Congress can't.  He can write a letter to his Congressman.  He already wrote a letter to his Congressman.  He talked.  He talked with the head of the acting CLO -- CLO Holdco and he said, I think there's something wrong here.  I think you should be looking into it.  You know what, he goes, you might be right.  Go talk with Mazin about it.  Give him some data.  Conduct an investigation.  They did.  And then they went to the authorizing person and they filed a motion for leave to include Mr. Seery.  Mr. Dondero did nothing wrong in that.

Now, there is some personal animosity.  I think that Your Honor has probably seen there seems to be some personal animosity between Mr. Seery and Mr. Dondero, and that's unfortunate.  But just because there's some personal animosity

HCMLPHMIT00002993

doesn't mean that maybe something wasn't done wrong. Maybe that Mr. Dondero -- he's certainly allowed to at least tell people, well, I think there was something done wrong. And if there is an action to be had, then those appropriate entities can take it. But he didn't do those things.

And so even if he says, just like Michael Scott, "I declare bankruptcy," it doesn't matter. You have to take the certain actions.

THE COURT: I got it. I don't know if everyone did.

MR. TAYLOR: Yes, well, yeah, you have to be a *The Office* fan.

But so that's where we stand. And for all the reasons the prior people have discussed, I don't think that there was any violation of this Court's order. But even if there was, Mr. Dondero in this situation was not the one. We're going to have to deal with the other order that came out yesterday in due course, but for this discrete issue that is before this Court today, Mr. Dondero didn't violate anything.

Thank you.

THE COURT: All right. Mr. Morris, you get the last word.

REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

MR. MORRIS: Thank you, Your Honor. These are going to be discrete points because it's truly rebuttal. I'm going to try to respond to certain points.

HCMLPHMIT00002994

Mr. Bridges and Mr. Phillips made extensive arguments about why they believe the order is wrong, why it's overreaching. They tried to get into your head to think about what you intended or what you thought. The fact of the matter is, the answer to all of those questions -- first of all, none of it's relevant to this motion because we've got the order -- but the answer is very simple. Forget about coming here to seek leave to amend to add Mr. Seery. We can avoid Mr. Sbaiti's concerns about judicial estoppel or something. Why didn't they just file the motion for reconsideration? They filed that after they filed the motion for leave to amend, after we filed the motion for contempt. Only then did they file the motion for reconsideration.

Now, we think it's ill-thought-out. We think it's problematic. Probably not today, is my guess, we'll argue to you as to why we think that motion ought to be denied. But if they truly believed that the order was infirm in any way, wouldn't the proper thing to have been to come here and tell you that? Wouldn't the proper thing to be to come to the court that issued the order that you have a problem with and ask the court to review it again? And if Your Honor overruled the motion, to appeal it.

Why are we even doing this? Why did they do it? It's not we. Why did they do it? Right? And that solves almost everything they've said. That's point one.

HCMLPHMIT00002995

281

Point two, the January order.  The January order is very important.  It's important not just because it applies to directors, but it's important because Mr. Dondero agreed to it, and it also applies -- I want to get it -- Paragraph 10. It's Exhibit 15.  It applies to the independent directors and the independents directors' agents.  If a CEO is not an agent of an independent director, I'm not sure what is.  The independent directors are the body that appointed the CEO. The CEO, Mr. Seery, is acting on behalf of the board.  This is the order that Mr. Dondero agreed to.  It's the order -- take out the word independent director; put in Mr. Seery -- it's the order everybody's complaining about.  But even the January order certainly applied to Mr. Seery.  That's point two.

Point three.  I've heard a lot of concerns about the slippery slope and what does pursuit mean and does talking to a lawyer mean pursuit and doing an investigation being pursuit.  I don't know, Your Honor, and I don't care, because that's not what we're here to talk about.  We're here to talk about a specific act -- not a hypothetical, not a slippery slope.  We're talking about the filing of a motion for leave to amend a complaint to add Mr. Seery as a defendant.  That's all we're talking about.  So, you know, the rest of it, it's just noise.  And the only question is whether, and I think it's pretty clear, that means pursuit.

Another version on the theme of was there any alternative

HCMLPHMIT00002996

282

to filing the motion in the District Court, I think there was. The Sbaiti firm did file that suit against Acis in New York. And if Your Honor checks the docket in the Acis bankruptcy, I think you'll find that there's a motion from Mr. Rukavina, for a comfort order, basically, saying that -- asking the court to declare that the filing of the complaint in New York against Acis didn't violate the plan injunction.  I think I have that right.

But I point that out, Your Honor -- it's not evidence in the record, but the Court can certainly take judicial notice of what's on its docket -- I point that out because there's another example of a lawyer who is very active in this case who actually -- now, he already commenced the suit, so he did -- they did both simultaneously, so I don't want to suggest that that's the perfect thing to have done, but at least he's here asking for -- he's bringing it to your attention, he's telling you it's happened, he's asking for a comfort order, and someday Your Honor may rule on it.  I don't know.

Number six, what's with the pursuit of Mr. Seery?  What is with the pursuit of Mr. Seery?  Is there any doubt in anybody's mind that the Debtor is going to have to indemnify Mr. Seery and will bring in another law firm?  And while I don't think it will ever happen in a hundred billion years, if there is a judgment against Mr. Seery, isn't that going to be the Debtor's responsibility?  Why are they even bothering to

HCMLPHMIT00002997

do this?  I think it's a fair question for the Court to ask.

I think Mr. Taylor came up and talked about animosity. How do you explain going after Jim Seery?  How do you do it? He's going to be indemnified.  It's in -- it's in like three different orders.  It's in the confirmation order.  It's in the CEO order.  It's -- it's probably as a matter of law. It's in the Strand partnership agreement.  It's -- he's been indemnified like 12 different times.  What is the purpose, other than to make Mr. Seery's life miserable?  There is none. You'll never hear a rational explanation for why they're doing this.

THE COURT:  Just so you know, I've not looked at any of the pleadings in the District Court --

MR. MORRIS:  And I'm not asking you to.

THE COURT:  -- other than what has been presented to me today.

MR. MORRIS:  Yeah.  That's fine, Your Honor.

THE COURT:  But I'm very flipped out about the causes of action against the Debtor, --

MR. MORRIS:  Yeah.

THE COURT:  -- who hasn't reached an effective date.

MR. MORRIS:  Well, --

THE COURT:  And I'm most interested to know what the defenses, motions --

MR. MORRIS:  We'll get to that.

HCMLPHMIT00002998

284

THE COURT:  -- are going to be raised in that regard.

MR. MORRIS:  We will get to that in due course.

I do want to point out, just to be clear, because we keep hearing that they learned about, you know, all of these horrible things after the fact.  In the complaint, which I think is Exhibit 12, --

THE COURT:  I'm there.

MR. MORRIS:  -- at Paragraph 127, the Plaintiffs allege, "Mr. Seery was informed in late December 2020 at an in-person meeting in Dallas, to which Mr. Seery had to fly, that HCO" -- excuse me "HCLF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the board, of a potential purchase of the company.  The news of the MGM purchase should have caused Seery to revalue."

I cannot begin to tell you the problems with that paragraph.  We're not going to discuss them today.  I made a promise to these folks that we wouldn't get into the merits of the complaint.  But Your Honor was onto something before, and those issues, you know, may see the light of day one day.  And if they do, folks are going to have to deal with it.  But I will point out that at the time the communication was made, the other TRO was in effect.  We didn't bring that one to the Court's attention.  But the important point there, Your Honor, is December 2020.  It is December 2020.  That is the

HCMLPHMIT00002999

allegation that's being made against Mr. Seery.  And the fact of the matter is, because I've done the research myself, the Court will find that on December 23rd, the day the HarbourVest settlement motion was filed, it was fully public knowledge that Amazon and Apple, I think, had shut down negotiations with MGM at that time.  Right?  So the big secret information, it was in the public domain on December 23rd.

There will also never be any evidence ever that Mr. Seery got on a plane and flew to Dallas in December 2020, but that's a minor point.

I'd like to just conclude, Your Honor, by saying I've heard pleas that they understand.  They understand, Your Honor, now they understand.  It would be good if they promised the Court that they won't seek to assert claims against Mr. Seery anywhere but in this Court and comply with the order as it's written.  That, that, that would be taking a little bit of responsibility.

I have nothing further, Your Honor.

THE COURT:  Okay.  Thank you.

All right.  Let me give you some clue of when I'm going to be able to rule.  I've been glancing at my email in hopes that something set tomorrow would go away, but that's not happening.  I've got a hearing that I've been told will take all day tomorrow on a case involving a half-built hotel, luxury hotel in Palm Springs, California.  So I have to spend

HCMLPHMIT00003000

286

the next I don't know how long getting ready for that hearing tomorrow, and then I have what looks like a full day of hearings Thursday, including you people coming back on something.

MR. POMERANTZ:  Your Honor, I was going to address that.  We have Dugaboy's motion to enforce compliance on the 2015(3) reports.

THE COURT:  That's what it was.

MR. POMERANTZ:  Since we haven't gotten to the motion to modify the Seery order, my suggestion would be we use that time -- of course, Dugaboy, I'm not sure if they're on the phone.  They're not here.  I'm not sure that's time sensitive. But if Your Honor wanted to have a hearing on that motion, which was contemplated to take place today, the Debtor would be okay having that motion heard on Thursday, perhaps by WebEx, unless Your Honor wants us to stay here, which we would if you do, and then reschedule the 2015(3) motion.

But again, that wasn't my motion.  It's Dugaboy's.  I'm not sure Mr. Draper is on.  But we obviously have some calendar issues.

MR. MORRIS:  And Your Honor, just to complete it, I think also on Thursday the Court is supposed to hear HCRE and Highland Capital Management Services motions for leave to amend their complaint in the promissory note litigation against each of them.  I think that's also on the calendar for

Thursday.  I don't expect that -- I hope that doesn't take very long, but that's also, I believe, on the calendar.

THE COURT:  Okay.  Mr. Draper, are you out there?

MR. PHILLIPS:  I didn't see him on the list, Your Honor.  I was just looking.  But --

THE COURT:  Okay.  All right.  Well, --

MR. PHILLIPS:  What is the question?  I can send him a text real quick.

THE COURT:  Well, just have -- if you all could follow up with Traci Ellison, my courtroom deputy, tomorrow, I am perfectly happy to continue the motion to modify the Seery order to Thursday morning at 9:30 if Draper is willing to continue the 2015 motion.

MR. POMERANTZ:  I know, if I was him, my first question would be is what times does the Court have available?  We could work that through Ms. Ellison.

THE COURT:  Yes.  And I'm just letting you know -- talk to her.  Okay.  Number one, I'll do these by video, okay?  WebEx.  But I know I don't have any time Wednesday, and Thursday's a busy day.

We have court Friday morning at 9:30 in--?

THE CLERK:  Cici's Pizza.

THE COURT:  Cici's Pizza?  That's not going to take very long, right?

THE CLERK:  I don't think so.

HCMLPHMIT00003002

THE COURT:  I can potentially do something, you know, 10:00 o'clock Friday morning.  Other than that, then you've got to wait a while, because I have a seven-day trial, live human beings in the courtroom starting next Monday.  And so my point is mainly to tell you, as much as I would like to rule very, very fast, it's going to be, it looks like, a couple of weeks or so before I can give you a ruling on this.

MR. BRIDGES:  Your Honor?

THE COURT:  Yes?

MR. BRIDGES:  May I?  It's our motion.  I would propose, if counsel would agree, that we just submit it on the papers.

THE COURT:  Everybody good with that?  I'm certainly good with that.

MR. POMERANTZ:  Your Honor, I'd like there to be argument.  I have a lengthy argument.  I think I'd like to address a number of the things that -- Mr. Bridges made his argument today.  Okay?

THE COURT:  Okay.

MR. POMERANTZ:  His deck, it was entitled, Motion to Modify.

THE COURT:  Okay.

MR. POMERANTZ:  So that's very nice of him, but I would like to make my argument.

THE COURT:  Okay.  Let's try to nail this down right

HCMLPHMIT00003003

289

now.  Friday at 10:00 o'clock, can we do the oral argument WebEx?

MR. POMERANTZ:  On that one, yes, Your Honor.

THE COURT:  On that one?  Everybody good?  Okay.  So we'll come back Friday, 10:00 o'clock, WebEx, for that motion.

You know, I'm going to say a couple of things where -- I've leaned toward thinking this is a pretty simple motion before me, the motion for contempt, but when people offer into evidence documents, I read your documents.  Okay?  That's my duty.  And so I have however many exhibits I admitted today that I am going to look at and see how they sway me one way or another on this issue.  But I will tell you that my gut is there has been contempt of court.  Okay?  I don't see anything ambiguous at all about Paragraph 5 of my July 16th, 2020 order.  Somebody may think I overreached, but if that was the case, someone should have argued at the time I was overreaching.  Someone should have appealed the order.  And I think it's a *Shoaf/Espinosa* problem at this point for anyone to argue about the enforceability of that order.

I think there's nothing ambiguous in the wording. Pursue is not ambiguous.  There's nothing confusing about the requirement that any entity who wanted to sue or pursue a claim, you know, commence claim, pursue a claim against Mr. Seery, had to come to the Bankruptcy Court.  Standard-fare gatekeeping order.

HCMLPHMIT00003004

So what I'm going to be looking at is, do these documents I admitted into evidence change my view on that, and then the harder question is who of the alleged contemnors am I going to think it's clear and convincing committed contempt and -- who are the contemnors, and then, of course, what are the damages? Coercive or compensatory damages?

So, again, you know how I feel, to the extent that's helpful in your planning purposes.  I'm pretty convinced contempt of court has occurred.  It's just a matter of who's a contemnor and what are the damages.

I'll say a couple of remaining things.  I continue to be frustrated, I think was the word people used, about unproductive ways we all spend our time.  I am going to spend I don't know how many more hours drafting another ruling on a contempt motion, and attorneys' fees are through the roof. And, you know, I dangled out there a question I couldn't resist about MGM.

And I will tell you, I mean, someone mentioned about their stomach aching.  Personal story, I could hardly sleep the night it became public about the Amazon purchase, because, silly me, maybe, I'm thinking game-changer.  This is such potentially a windfall, an economic windfall.  Maybe this could be the impetus to make everyone get in a room and say look, we've got this wonderful windfall of money.  I don't know how much is owned directly or indirectly by the Debtor of

HCMLPHMIT00003005

291

MGM stock.  I don't know how much the Debtor  manages.  I don't know how much, you know, some other entity.  I know it's probably spread out in many different entities.  But I know, I know because I listen, that one or more of the Highland-managed CLOs has some of this, and I think I read -- remember that HCLOF, which now Highland owns more than 50 percent of, has some of this stock.  Right?

MR. DONDERO:  Do you want to know what happened?

THE COURT:  Oh.

A VOICE:  No.

THE COURT:  Well, okay.  So, you know, I can understand I'm getting into maybe uncomfortable territory in a public proceeding, so I'll stop.

But, you know, do we need to set up a status conference?  Do you all need to like talk about this?  Am I just being naïve?  Couldn't this be a game-changer, where maybe it would give new incentive to --

MR. POMERANTZ:  Your Honor, I would -- he's been pretty quiet through the whole hearing, Mr. Clemente.  He has the Committee, that a couple of people you've heard have sold claims.  They're now held by other parties.

You know, the door is always open.  I don't think this is going to be game-changer, unfortunately.  We would like nothing more, as Debtor's counsel.  We don't enjoy coming to Your Honor for contempt hearings.

HCMLPHMIT00003006

292

Mr. Clemente said that it was productive.  We would sure participate.  But right now, we have creditors who are very angry that millions and millions of dollars have been spent on really a waste of time and a waste of the Court's time and a waste of everyone's time and eating into the creditors' money. So I would ask Mr. Clemente to address that.

MR. CLEMENTE:  I'm here.

THE COURT:  Yes, he's way in the back, hoping to be ignored.

MR. CLEMENTE:  It's too cold, Your Honor, where I was sitting.  For the record, Your Honor, --

THE COURT:  I noticed some entity called Muck Holdings bought HarbourVest, according to the docket.

MR. CLEMENTE:  That's correct.  Muck Holdings bought HarbourVest, and I believe also the Acis claim, and then there's a different entity that bought the Redeemer claim.

THE COURT:  Uh-huh.

MR. CLEMENTE:  So, as we mentioned in our -- one of our pleadings, I think it was the retention pleading for Teneo, the Committee consists of two members currently, Meta-e and UBS.

THE COURT:  Uh-huh.

MR. CLEMENTE:  Obviously, Your Honor just approved the UBS settlement recently.  The U.S. Trustee is aware of the make-up of the Committee, and is currently comfortable with

HCMLPHMIT00003007

293

the Committee maintaining a two-person membership at this point.

In terms of whether the MGM transaction is a game-changer, we've not yet seen, to Your Honor's point, how all of that rolls up through the various interests that the Debtor may or -- you know, may have --

THE COURT:  Okay.

MR. CLEMENTE:  -- that would be implicated by the MGM transaction.  If ultimately the MGM transaction has to actually occur, right?  I mean, so, you know, just based on what I read in the public documents, we're not sure when that transaction may actually happen.  But obviously it's a good thing for the Debtor's estate because it's going to recognize value for the estate.

In terms of whether it ultimately changes how Mr. Dondero, you know, wishes to proceed, that's entirely up to him, Your Honor.  But we don't see it as something at this point that would suggest that there's an overall back to let's talk about a pot plan because of where the MGM transaction might ultimately come out.

So I don't know if that's helpful to Your Honor, but those are -- that's my perspective.

THE COURT:  Well, and I'm not trying to, you know, push a pot plan on anyone.

MR. CLEMENTE:  No, I understand.

HCMLPHMIT00003008

294

THE COURT:  I'm just saying it looked like an economic windfall.  I just -- I don't know how much is Highland versus other entities in the so-called byzantine complex, but, gosh, I just hoped that there might be something there to change the dynamic of, you know, lawsuit, lawsuit, lawsuit, lawsuit, motion for contempt, motion for contempt.

MR. CLEMENTE:  Agreed, Your Honor.

THE COURT:  Uh-huh.

MR. CLEMENTE:  And like I said, it was a very positive development obviously for the creditors for the Debtor.  But whether it's the game-changer that Your Honor would envision, I'm not sure that I can suggest at this point that it is.

I think that, you know, obviously, we don't like to see these lawsuits continue to be filed.  That's the whole point of the gatekeeper order, Your Honor.

THE COURT:  Uh-huh.

MR. CLEMENTE:  I didn't say anything during the hearing, but obviously the January 9th order, as Your Honor has said many times, was in the context of a trustee being appointed.

THE COURT:  Right.  Right.

MR. CLEMENTE:  Right?  So, and the July 16th order, very similar vein, it's an outshoot of that.  In fact, it was contemplated in the January 9th settlement that a CEO could be

appointed.

So I think, again, it's just -- it's important, the context in which that January 9th order came into play, for this very reason, so we could avoid this type of litigation, Your Honor.

THE COURT:  Uh-huh.

MR. CLEMENTE:  And so again, I didn't -- I obviously didn't rise to mention that during the hearing, but Your Honor is already aware of that.  I didn't need to remind Your Honor of that.

THE COURT:  Uh-huh.  Okay.

MR. CLEMENTE:  Anything else for me, Your Honor?

THE COURT:  No.  Thank you.

MR. CLEMENTE:  Okay, then, Your Honor.

THE COURT:  Sorry I picked on you.  But, all right.  Well, again, I hope the message has landed in the way I hope will matter, and that is I'm going to look at your documents but I feel very strongly that, unless there's something in there that, whoa, is somehow eye-opening, I'm going to find contempt of court.  It's just a matter of who and what the damages are.  There's just not a thing in the world ambiguous about Paragraph 5 of the July 9th, 2020 order.  So I'll get to it as soon as we humanly can get to it.

Mr. Morris, anything else?

MR. MORRIS:  Nothing.  No, thank you.

HCMLPHMIT00003010

296

THE COURT:  I guess I'll see you Thursday on the WebEx.  Thank you.

THE CLERK:  All rise.

(Proceedings concluded at 6:00 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling**                                          **06/09/2021**

_____          _____

Kathy Rehling, CETD-444                                          Date
Certified Electronic Court Transcriber

HCMLPHMIT00003011

297

INDEX

PROCEEDINGS                                                4

OPENING STATEMENTS (Show Cause)
- Mr. Morris                                             21
- Mr. Sbaiti                                             31
- Mr. Bridges                                            52
- Mr. Anderson                                           80
- Mr. Phillips                                           83
- By Mr. Taylor                                          87
- By Mr. Pomerantz                                       88

WITNESSES

Debtor's Witnesses

Mark Patrick
- Direct Examination by Mr. Morris                       95
- Cross-Examination by Mr. Anderson                     132
- Cross-Examination by Mr. Sbaiti                       135
- Redirect Examination by Mr. Morris                    137
- Examination by the Court                              138
- Recross-Examination by Mr. Sbaiti                     142
- Recross-Examination by Mr. Phillips                   143
- Further Redirect Examination by Mr. Morris            144

James D. Dondero
- Direct Examination by Mr. Morris                      147
- *Voir Dire* Examination by Mr. Sbaiti                 184
- Direct Examination (Resumed) by Mr. Morris            199
- Cross-Examination by Mr. Taylor                       210

EXHIBITS

Debtor's Exhibits 1 through 11               Withdrawn 215
Debtor's Exhibits 12 through 53               Received 216
Debtor's Exhibits 15 and 16                   Received 214
Debtor's Exhibits 23 and 24                   Received 213
Debtor's Exhibits 54 and 55                   Received 217

Mark Patrick's Exhibits 1, 3 through 12,      Received 218
15 through 28, and 30 through 44

Mark Patrick's Exhibits 45 and 46             Received 219

HCMLPHMIT00003012

298

INDEX
Page 2

CLOSING ARGUMENTS

- Mr. Morris                                          221
- Mr. Sbaiti                                          230
- Mr. Bridges                                         255
- Mr. Anderson                                        263
- Mr. Phillips                                        267
- Mr. Taylor                                          276
- Mr. Morris                                          279

RULINGS

Motion for Entry of an Order Further Extending the Period    19
Within Which It May Remove Actions Pursuant to 28 U.S.C.
§ 1452 and Rule 9027 of the Federal Rules of Bankruptcy
Procedure filed by Debtor (2304)

Show Cause Hearing (2255) – *Taken Under Advisement*         285

Motion to Modify Order Authorizing Retention of James        285
Seery filed by Plaintiffs CLO Holdco, Ltd., The
Charitable DAF Fund, L.P. (2248) – *Taken Under Advisement*

END OF PROCEEDINGS                                           296

INDEX                                                    297-298

HCMLPHMIT00003013