# EXHIBIT 36

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In Re:                          )    **Case No. 19-34054-sgj-11**
                                )    Chapter 11
HIGHLAND CAPITAL                )
MANAGEMENT, L.P.,               )    Dallas, Texas
                                )    June 8, 2023
    Reorganized Debtor.         )    9:30 a.m. Docket
                                )
                                )    HMIT'S MOTION FOR LEAVE TO
                                )    FILE VERIFIED ADVERSARY
                                )    PROCEEDING (3699)
_____  )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Reorganized          John A. Morris
Debtor:                      Gregory V. Demo
                             Hayley R. Winograd
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

For the Reorganized          Jeffrey Nathan Pomerantz
Debtor:                      PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd., 13th
                               Floor
                             Los Angeles, CA  90067
                             (310) 277-6910

For Hunter Mountain          Sawnie A. McEntire
Investment Trust:            Timothy J. Miller
                             PARSONS MCENTIRE MCCLEARY, PLLC
                             1700 Pacific Avenue, Suite 4400
                             Dallas, TX  75201
                             (214) 237-4303

For Hunter Mountain          Roger L. McCleary
Investment Trust:            PARSONS MCENTIRE MCCLEARY, PLLC
                             One Riverway, Suite 1800
                             Houston, TX  77056
                             (713) 960-7305

HCMLPHMIT00003014

2

APPEARANCES, cont'd.:

| | |
|---|---|
| For Hunter Mountain Investment Trust: | Deborah Deitsch-Perez STINSON 2200 Ross Avenue, Suite 2900 Dallas, TX  75201 (214) 560-2218 |
| For Muck Holdings, et al.: | Brent Ryan McIlwain HOLLAND & KNIGHT, LLP 300 Crescent Court, Suite 1100 Dallas, TX  75201 (214) 964-9481 |
| For James P. Seery, Jr.: | Mark Stancil Joshua Seth Levy WILLKIE FARR & GALLAGHER, LLP 1875 K Street, NW Washington, DC  20006 (202) 303-1133 |
| Recorded by: | Michael F. Edmond, Sr. UNITED STATES BANKRUPTCY COURT 1100 Commerce Street, 12th Floor Dallas, TX  75242 (214) 753-2062 |
| Transcribed by: | Kathy Rehling 311 Paradise Cove Shady Shores, TX  76208 (972) 786-3063 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

HCMLPHMIT00003015

3

DALLAS, TEXAS - JUNE 8, 2023 - 9:42 A.M.

THE CLERK:  All rise.  United States Bankruptcy Court for the Northern District of Texas, Dallas Division, is now in session, The Honorable Stacey Jernigan presiding.

THE COURT:  Good morning.  Please be seated.  All right.  We are here this morning for a setting in Highland.  This is on a motion of Hunter Mountain for leave to file an adversary proceeding.  I will start out by getting appearances from lawyers in the courtroom.

MR. MCENTIRE:  Yes, Your Honor.  Sawnie McEntire along with my partner Roger McCleary and Tim Miller on behalf of Hunter Mountain Investment Trust, Ltd.

THE COURT:  Thank you.

MR. MORRIS:  Good morning, Your Honor.  John Morris, Pachulski Stang Ziehl & Jones, for the Reorganized Highland, for the Highland Claimant Trust.  I'm joined by Mr. Pomerantz, Mr. Demo, and Ms. Winograd.

THE COURT:  Good morning.

MR. STANCIL:  Good morning, Your Honor.  Mark Stancil from Willkie Farr & Gallagher for Mr. Seery.  I'm joined by my colleague Josh Levy.

THE COURT:  Good morning.

MR. MCILWAIN:  Good morning, Your Honor.  Brent McIlwain from Holland & Knight here for Muck Holding, LLC, Jessup Holdings, LLC, Farallon Capital Management, LLC, and

4

Stonehill Capital Management, LLC.

THE COURT:  Thank you.  All right.  Is that all of our lawyer appearances?  I know we have observers on the WebEx, but I assume you are just observers.  We scheduled this to be a live hearing for participants.

All right.  Well, we had some ground rules for how this would go forward today.  We, of course, have had two -- I call them hearings on what kind of hearing we're going to have.  We've had two status conferences.  And so our ground rules were set.  Three hours of total presentation time for each the Movant and the aggregate Respondents.  We also had an order regarding what discovery would or would not be allowed.

And to my surprise, there were a flurry of pleadings.  We're a few minutes late getting out here because we were trying to digest what was filed late yesterday and into the night.

So I understand we have a controversy about a couple of expert witnesses who were listed on Monday on the Movants' exhibit and witness list.  And I've seen a motion to exclude the expert witnesses' testimony.  And I think we need to address that right off the bat.  I don't want to take too much time on this, because, again, we're going to finish today, and I won't let this housekeeping matter eat into our three hours, but I want to get going.  So I'll hear from Movant, Mr. McEntire.

5

MR. STANCIL:  Your Honor, may --

THE COURT:  Go ahead.

MR. STANCIL:  We moved to exclude, so I would propose that my colleague, Mr. Levy, address this motion very briefly if --

THE COURT:  Well, I guess --

MR. STANCIL:  Or I will do as --

THE COURT:  -- that actually makes sense.

MR. STANCIL:  Okay.

THE COURT:  I was thinking Mr. McEntire teed up the issue, but I suppose you did with the motion to exclude.  So, Counsel?

MR. LEVY:  Thank you, Your Honor.  Josh Levy on behalf of Mr. Seery.

So, we think our papers largely speak for themselves, but two additional points we'd like to raise.  In the response filed by Hunter Mountain this morning, and this is Docket Entry 3828, in Paragraph 11, they argue that this is a bench hearing on colorability, not a trial where junk science is a concern.  But junk science is precisely what they're trying to introduce here.  They have raised two expert witnesses, one who purports to be an expert in compensation but has no experience whatsoever in evaluating compensation, and they provide no methodology for their conclusion.

For example, they claim to have identified red flags.

HCMLPHMIT00003018

6

They never explain what those red flags are, why they are red flags, or how they determined they were red flags.  This is junk science, precisely what the Federal Rules are designed to exclude.

But that shouldn't detract from the broader procedural point that this is the first time we're hearing about expert witnesses, at 10:00 p.m. three days before the hearing.  This is a trial by ambush.  This motion was filed in March, we've been litigating this motion for over two months now, and this is the first time we're hearing about any expert witnesses.

As Your Honor noted, we've had multiple conferences. We've had rules setting the ground rules for this hearing. We've had orders setting the scope of discovery.  But now Hunter Mountain is trying to pull a bait-and-switch.  After never mentioning any experts, after obtaining orders limiting the scope of discovery, they then wait until right before the hearing to disclose their experts, ensuring that these experts are insulated from any kind of discovery and can ambush us at the hearing.

I'm happy to answer any other questions, but we believe they should be excluded and the accompanying exhibits should also be excluded.

THE COURT:  All right.  Thank you.  And the accompanying exhibits, I don't review exhibits before a trial or a hearing because I don't know what's going to be objected

HCMLPHMIT00003019

7

to and admitted.  So do you want to point out, were there expert reports in the proposed exhibits?

MR. LEVY:  These were charts and analyses prepared by their experts, not actual expert reports.

THE COURT:  Okay.

MR. LEVY:  In their witness and exhibit list, Hunter Mountain included several paragraphs that I guess serves as what would be their expert reports.  And then it would be Exhibits 39 through 52, which consist of CVs, materials reviewed, and then what they term "data charts" prepared by their experts.

THE COURT:  39 through 52?  Oh, I'm looking at the wrong exhibit notebook.  Oh.

(Pause.)

THE COURT:  Okay.  Here we go.  All right.  No questions at this time.

Mr. McEntire?

MR. MCENTIRE:  Yes, Your Honor.  May I proceed?

THE COURT:  You may.

MR. MCENTIRE:  Again, my presentation and response is subject to our objection concerning that any evidence is being admitted for any purpose, other than what we believe is the proper standard of review.  So my response and our offer of these experts is subject to that objection.

With that said, Mr. Levy's argument he just presented to

HCMLPHMIT00003020

8

the Court presupposes that my client has a duty under 9014 to provide a report, which we do not; to provide detailed disclosures, which we do not, because 9014 is specifically exempted from the scope of Rule 26.  What we did, we didn't have to do.  What we did, and I made the decision to provide them some disclosure and identification of who they were, their backgrounds, and --

THE COURT:  Well, let me stop you.

MR. MCENTIRE:  Certainly.

THE COURT:  "What we did, we didn't have to do."  The Local Rules, first of all, do require an exhibit and witness list.  And --

MR. MCENTIRE:  We've provided that.

THE COURT:  I know.  I know.  But you -- I thought I heard you --

MR. MCENTIRE:  No, no.

THE COURT:  -- saying you didn't have to do that.  You do have to do that.

MR. MCENTIRE:  No, no, no.

THE COURT:  But I guess what you're saying is --

MR. MCENTIRE:  What we provided was more than what the Local Rules require.

THE COURT:  How so?

MR. MCENTIRE:  We provided CVs.  We provided their backgrounds.  We disclosed in the actual witness description

HCMLPHMIT00003021

who they were and the key components of their opinions. And we refer to their data charts. That is not something that the Local Rule requires.

THE COURT: Okay. Well, let me back up. We have our Local Rules, but then we had our two status conferences --

MR. MCENTIRE: Yes.

THE COURT: -- on what the format of the hearing --

MR. MCENTIRE: Yes.

THE COURT: -- would be.

MR. MCENTIRE: Yes.

THE COURT: And, of course, there was extensive discussion, evidence or no evidence? What did the legal standard, colorability, require?

MR. MCENTIRE: Yes.

THE COURT: And I came out in the end and said, if people want to put on witnesses, they're entitled to put on witnesses. I think there may be a mixture of a fact question and law question on colorability. So, and then I set a three-hour time limit and I said, if someone wants to depose Mr. Seery and Mr. Dondero, they can, but no more discovery other than that. Okay?

MR. MCENTIRE: I understand.

THE COURT: Why then did you not say, well, wait, Judge, if it's going to be evidence, we're just letting you know, in full disclosure, we might call a couple of experts,

HCMLPHMIT00003022

and this may impact your decision on what kind of discovery can happen.  And this may impact your decision on whether three hours each side is enough.

MR. MCENTIRE:  Well, Your Honor, in fairness, I don't think we had made a final decision to actually designate any experts.  And at the time, the focus was on other witnesses.  But there was no exclusion, there was no limitation at all on my right to bring an expert.  And the Rules are very clear.  And the Court's --

THE COURT:  But I specifically limited discovery, and it was on your motion.  It was on your motion we set the hearing on --

MR. MCENTIRE:  Actually, --

THE COURT:  You know, did you need a continuance, because if we were going to have evidence, maybe you needed a continuance.  And then there was a discovery issue raised.

MR. MCENTIRE:  To be clear, Your Honor, I'm looking at your orders.

THE COURT:  Got them in front of me.

MR. MCENTIRE:  Your order of May 26, 2023.  You said, You can put on your witnesses and the Court is going to rule.  You made no limitations as to who the witnesses would be.  Your order did not limit the scope of witnesses to simply Mr. Seery or Mr. Dondero.  In fact, any suggestion that you did limit the witnesses is contrary --

HCMLPHMIT00003023

THE COURT:  Now, which order are you looking at?

MR. MCENTIRE:  I'm looking at the May 26, 2023 order, Page 51, Lines 3 through 14.

THE COURT:  Okay.

MR. MCENTIRE:  You also stated --

THE COURT:  I have -- have I entered three orders on this?  I've got a May 10th order.  I've got a May 22nd order.

MR. MCENTIRE:  And I would also point out, Your Honor, --

THE COURT:  Could you answer my question?  I want to look at what you're looking at.

MR. MCENTIRE:  Certainly.

THE COURT:  Here we -- this is the one.  Okay.  Aha.  Okay.  May 26.

MR. MCENTIRE:  Page 51, Lines 3 through 14.

THE COURT:  I've entered three orders on what kind of hearing we're going to have.  Okay.  So you're looking where?

MR. MCENTIRE:  Page 51, Lines 3 through 14.  "You can put on your witnesses."

THE COURT:  Page 51?

MR. MCENTIRE:  Yes, ma'am.

THE COURT:  Oh.  You're looking at a transcript, not the order.

MR. MCENTIRE:  That's right.  I apologize.

THE COURT:  Okay.

HCMLPHMIT00003024

12

MR. MCENTIRE:  Yeah, I'm looking at the transcript from the hearing.

THE COURT:  Okay.  Well, I'm looking at my order.

MR. MCENTIRE:  And the order, the order also specifies no limitation at all in connection with the -- the --

THE COURT:  But my order was based on what was discussed that day.

MR. MCENTIRE:  And what was --

THE COURT:  If you had said, hmm, Judge, if you're going to allow evidence, we may call a couple of experts, then there would have been a whole discussion about that and did I need to limit the discovery, as I did.  And there would have been a whole discussion of, well, three hours, three hours each side, is that going to be enough if we have experts?

MR. MCENTIRE:  The discovery ruling that you made was on my motion, and at the time I was not seeking to take any expert depositions.  And you denied my request to take ample discovery.  You limited my right to take only one deposition, without documents.

    The issue of taking expert discovery was not even on the table.  However, you made it very --

THE COURT:  Well, that's my point precisely.  The whole purpose of the hearing was, what kind of hearing are we going to have on June 8th?

HCMLPHMIT00003025

13

MR. MCENTIRE:  I understand.  And our position --

THE COURT:  We had already had one status conference on argument only versus evidence.  And I allowed you all to file some briefing, which you did.  And then I issued an order after the briefing, saying, I think I should allow evidence on the colorability question.  I'm not forcing anyone to put on evidence, but if you want to put on evidence, you can.

And then you filed your motions and we had the next status conference on what kind of hearing we're going to have.  And there was more argument:  We don't think the evidence is appropriate, but if evidence is appropriate, we want you to continue the hearing to allow all kinds of discovery.  I don't know what.  And it was right before Memorial Day, and I hated the fact that a bunch of subpoenas were going to go out and ruin people's holidays.  But there was no discussion then of, okay, but just so you know, since you have made the ruling that evidence can come in, we're going to have a couple of experts.

MR. MCENTIRE:  As I've already mentioned, Your Honor, we had not made a decision to call experts at that time.  We made a decision to call the experts shortly before we filed our designations.

The point here is this.  The Rules do not require me to provide any more disclosure than I have.  I have gone over and above the Local Rules.

HCMLPHMIT00003026

If the Court believes that it would have allowed more time for this hearing, I would advise the Court that opposing counsel vehemently opposed any type of postponement or continuance. The discovery that I was requesting was discovery from fact witnesses. Experts were not at issue at that time. Experts are --

THE COURT: Because --

MR. MCENTIRE: -- at issue now.

THE COURT: -- nobody knew that experts might be called.

MR. MCENTIRE: I have a right to call experts, Your --

THE COURT: It changes the whole complexion.

MR. MCENTIRE: But I have a right to call experts, under the Rules. I have a right, a fundamental due process -- let me -- may I finish, Your Honor? A fundamental due process right to call experts. Their attempt to charge some type of *Daubert* challenge is nothing but a shotgun blast on the wall, having no meaning at all. At a minimum, I have a right to put the witnesses on the stand and we'll have a *Daubert* hearing.

If they want more time, they need to ask for it. They didn't ask for it. Their solution is to strike my experts, which is improper. It would be improper for this Court to strike my experts when they have been properly tendered under the Local Rules. They have not cited an alternative remedy.

15

If they want the alternative remedy, they need to ask the Court.

THE COURT:  My next question is:  How do you propose to get this all done in only three hours?

MR. MCENTIRE:  We intend to move quickly.

THE COURT:  But, see, now they, I'm guessing, prepared their case assuming there weren't going to be experts.  And they, if they're good lawyers, which I know you all are, they have their script of the kind of things they were going to ask the witnesses.

MR. MCENTIRE:  Well, did they have a --

THE COURT:  And now they've got to carve out time for two last-minute experts?

MR. MCENTIRE:  They had an option.  And one of the options was they could have called me up on Tuesday and asked for their depositions and I probably would have agreed.

THE COURT:  I already said no depositions except Seery and Dondero.

MR. MCENTIRE:  Then they could have come and filed a different kind of motion with the Court.

Their only remedy that they're seeking is a draconian one. There are other options that are more consistent with the implementation of due process here, Your Honor, not striking my experts, which were properly identified under the Local Rules.

HCMLPHMIT00003028

16

If the Court is going to strike my experts, note our objection.  We are tendering our experts.  We will put -- like to put a proffer on for the Fifth Circuit or for the appellate process.  But if the Court is going to strike our experts, then it needs to do so.  We object because we have done everything correctly.

THE COURT:  Okay.  Here's another problem.  I have not had time to process their motion to exclude.  Beyond the procedural issues, they are saying junk science, that there's inadequate expertise on the part of I guess at least one of them regarding executive compensation.  I haven't had -- they filed their motion to exclude at 4:00-something yesterday.  Okay?

MR. MCENTIRE:  I understand.

THE COURT:  Now, yeah, I could have stayed up all night.  I stayed up pretty late anyway, by the way.  But --

MR. MCENTIRE:  Well, first of all, --

THE COURT:  -- I haven't even had the time to process and intelligently rule on their motion --

MR. MCENTIRE:  I appreciate that, and I'll respect --

THE COURT:  -- as far as the --

MR. MCENTIRE:  I'll respect the Court's statement.

THE COURT:  -- junk science argument.

MR. MCENTIRE:  I'll respect the Court's statement.  Their process and the procedure they've adopted is improper,

17

because if you're going to have a *Daubert* hearing, that's a live hearing.  Or they're going to have to have evidence to support their challenge.  This is simply a conclusory shotgun blast on the wall, Your Honor.

If you even want to consider a *Daubert* challenge, the proper procedure is to put the witnesses on the stand and have an opportunity to have a proffer of evidence and a cross-examination.  That's the proper procedure.  Throwing something and innuendo and rhetoric and conclusions is not a proper *Daubert* motion at all.  The Court could deny their *Daubert* motion just on those grounds.

THE COURT:  I'm not going to rule on a motion that I've barely had a chance to read, not to mention your response that was filed at 8:00-something this morning.

MR. MORRIS:  It was.

MR. MCENTIRE:  It was.  Well, then the option is you need to continue the proceeding to allow the experts to take the stand.

THE COURT:  Well, I know you have thought on that, but here is something I'm contemplating doing.  We'll go forward with the hearing in the manner my order said we would go forward with it.  My, I guess, Order #3 of my three orders.  And at the end of the evidence, you can argue in closing, each of you, why we should keep the evidence open to come back another day on only the experts.  But time matters.  If you've

HCMLPHMIT00003030

18

all already used your three hours on each side, then are we going to come back for five minutes on each of them? I mean, I don't know.

And then, of course, I would have to, if I ruled in that way, I believe I would have to give them a chance to depose these people.

MR. MCENTIRE: I think that would be reasonable.

THE COURT: Okay. But you think you can get all of your evidence in, other than your experts, and your opening statement, if any, your closing argument, if any, in three hours?

MR. MCENTIRE: I'll do my best.

THE COURT: Well, if you -- it's not a matter of -- I'm just saying this may all be an academic argument, because I'm not increasing this to more than three hours each. We've fully vetted that.

MR. MCENTIRE: Well, what the Court is then doing by virtue of your ruling is that you're making me actually present my evidence in a shortened form today, two hours, two and a half hours, not knowing how -- whether or not you are actually going to allow experts.

So, without the certainty, I will have to abbreviate my entire presentation, giving them the advantage of putting more evidence on than I, in an effort to anticipate a positive ruling, which you're not prepared to provide yet. And so I'm

HCMLPHMIT00003031

19

actually being penalized.

THE COURT:  Counsel, we had two status conferences on what kind of hearing we were going to have.

MR. MCENTIRE:  I understand.

THE COURT:  Now, the fact that you had not decided your strategy for this hearing, that's not my fault.  Again, we had two hearings on what kind of hearing we were going to have today.  We could have fully vetted this.  I could have heard about the experts, I could have decided if we were going to continue the hearing past June 8th, could have decided if we were going to allow more depositions.

MR. MCENTIRE:  Your Honor, --

THE COURT:  I could have fully studied the merits of the motion to exclude and decided if this is junk science or not.

MR. MCENTIRE:  I would request a ruling at this time, Your Honor, on the experts.  If you are not inclined to provide a ruling to me on the experts at this time, I would effectively be penalized on my time limits.  I will have to set aside enough time to put the experts on, not knowing, not knowing whether you're going to give me the opportunity to do so until the end of the day.  And that would be -- that would be punishment.

THE COURT:  Isn't this going to be just preparing your case you would have -- I mean, going forward with your

HCMLPHMIT00003032

20

case the way you would have?

MR. MCENTIRE:  No, I don't -- really don't think so. I think there's --

THE COURT:  I mean, --

MR. MCENTIRE:  There's a difference.

THE COURT:  -- you did not prepare your witnesses and your possible cross-examination with the expectation of I'll get my two experts in?

MR. MCENTIRE:  My -- of course.  But the point is, then I'm going to have to set aside a half an hour or maybe even longer from my other witness preparations, not knowing whether you'll even give me that time.

THE COURT:  Isn't the other side going to have to do the very same thing?

MR. MCENTIRE:  No.

THE COURT:  Why not?  They don't know how I'm going to rule.  I don't know how I'm going to rule.  I have not studied the motion to exclude the way I should.

MR. MCENTIRE:  Okay.  Well, Your Honor, we request a ruling now.  But if the Court is not inclined to do so, please note our objection.

THE COURT:  All right.  I'll give the Movants the last word.  And I say "Movants" plural.  I'm trying to remember where I saw a joinder and when I did not.  Did I see a joinder?  I can't remember.

HCMLPHMIT00003033

21

MR. MORRIS:  Can we just have a moment, Your Honor?

THE COURT:  Okay.  Okay.

MR. MCILWAIN:  Your Honor, my clients did file a joinder, but --

THE COURT:  Okay.

MR. MCILWAIN:  -- I'm going to let them handle this.

THE COURT:  Okay.

(Pause.)

THE COURT:  Counsel?

MR. LEVY:  Thank you, Your Honor.  Two brief points we'd like to make.  The first is on the Rules.  So, Hunter Mountain is focused on Rule 26(a) regarding reports.  However, Rule 26(b) applies to contested matters under Rule 9014.  And as we explain in Paragraph -- we explain in our brief, that -- or, in Paragraph 19 of our brief, that under Rule 26(b) we're entitled to depose the experts.

And so we agree with Your Honor's suggestion that if there's going to be any sort of experts, then we need the opportunity to depose them.  This is Rule 26(b)(4)(A), which expressly does apply to contested matters under Bankruptcy Rule 9014(b).

The second point is we agree with the approach Your Honor has proposed.  We think, for today, both sides can put on their full cases without expert witnesses.  Both sides can have the full three hours, which should address Hunter

HCMLPHMIT00003034

Mountain's concern.  And if Your Honor decides at the conclusion of the hearing that expert testimony would be helpful, then we could take the opportunity to depose their experts and then come back for an additional half-hour for each side to address any expert testimony that Your Honor believes would be helpful.

THE COURT:  Okay.  Is your proposal that you each today would be limited to two and a half/two and a half?  Or three/three, and then another hour, 30 minutes/30 minutes, if I --

MR. LEVY:  Three/three.

THE COURT:  -- decide to allow any experts?

MR. LEVY:  Yeah.  Three.  Three and three for each side, the hearing contemplated by Your Honor's orders, today.  And if Your Honor decides that expert testimony would be helpful, we could come back for an hour, for half an hour on each side, regarding experts.

THE COURT:  All right.  Mr. McEntire, what about that?

Oh, I'm sorry, did you --

MR. STANCIL:  Oh, I'm sorry.  Just one additional point, Your Honor.  We would ask that Your Honor's ruling on the ultimate admissibility of this be limited to what they've actually put in front of us.  The day for the hearing is today, so I think I'd like -- I'd suspect Your Honor would

HCMLPHMIT00003035

like to avoid another raft of submissions.  So we would just ask that they live or die with what they've said in the way of methodology, disclosures, and the like.

THE COURT:  Okay.  Mr. McEntire, this seems like the best of all worlds, maybe.

MR. MCENTIRE:  Well, it may be the best of the worlds in which we're operating.

My first position is that the experts are admissible, period.  And the Rules do not require anything more than what we've already done.  In fact, we've done more than we were supposed to.

THE COURT:  What is your argument about 26(b)(4), which --

MR. MCCLEARY:  If they want to take a deposition, they could have called me up and asked for it.

MR. STANCIL:  Your Honor, I was --

THE COURT:  Wait a second.  They were under a court order.  Okay?

MR. MCENTIRE:  They could have -- they could have sought --

THE COURT:  They were under my order.  Okay?  They would have been violating my order if they had done it.

MR. STANCIL:  I was also, Your Honor, I was in a --

THE COURT:  Not to mention that it was --

MR. STANCIL:  I was in an airplane from 9:00 a.m.

HCMLPHMIT00003036

24

Tuesday until 9:00 p.m. Tuesday.

THE COURT:  I'm surprised a lot of you got here, with the Martian atmosphere that I saw pictures of.

Yes.  That's not realistic, to think that you disclose an expert on Monday for a Thursday hearing and they can call you up and --

MR. MCENTIRE:  The other --

THE COURT:  -- quickly put together a deposition.  So, --

MR. MCENTIRE:  Sure.  The other option, --

THE COURT:  Uh-huh.

MR. MCENTIRE:  -- of course, Your Honor, as I mentioned before, and I'm not going to repeat myself, is they -- there's other forms of relief they could seek.  But under the circumstances, and in light of your apparent leaning on the issue, then this is the best under the circumstances that they've suggested.  We'd like an hour each.

I would also point out that -- well, anyway, that's it, Your Honor.  Thank you.

THE COURT:  All right.  So we are going to go forward as planned, three hours/three hours.  No experts today.  In making your closings -- well, this is kind of awkward.  I'm trying to think if we really have closing arguments, when you don't know if it's -- it doesn't seem to make sense.  Like, I guess we could have closing arguments if you want, subject to

HCMLPHMIT00003037

25

supplementing your closing arguments if we come back a second day with the experts.  Okay?

And I'm not making a ruling today on the motion to exclude.  I'm going to hear what I hear.  And maybe what we'll do is I'll give you a placeholder hearing if we're going to come back on the experts.  Then I'll go back and read the motion, the response, and make my ruling on are we coming back for another day of experts.  Okay?  Got it?

And with regard to the comment about not adding to, I think that's a fair point.  You can't add new exhibits that the expert might talk about or that you might want me to consider between now and whenever the tentative day two is.

MR. MCENTIRE:  Understand.  We agree with that.

THE COURT:  Okay.

MR. MCCLEARY:  Your Honor, there is one -- one exhibit that has a small typo transcription of a number on it.  So we would like to substitute for that.  It's a minor detail.  But I'll provide opposing counsel with that.  But it's very minor.

THE COURT:  You have it today, I presume?

MR. MCCLEARY:  Yes, we have it.

THE COURT:  Okay.  So as long as you hand it to them today.

MR. STANCIL:  No objection, Your Honor.  We do -- I think someone is back at the office working on a short reply

on our motion, which I assume we could file in support of -- I mean, we filed our motion.  They filed an opposition.  I assume we would be entitled under the Rules to file a short reply on the actual exclusion issue.

THE COURT:  That is fair, but let's talk about timing.  You said someone is back at the office working on it.  Could you get it on file by Monday?

MR. STANCIL:  Yes, ma'am.

THE COURT:  Okay.  Then that'll be allowed if it's filed by the end of the day Monday.

MR. MCCLEARY:  Your Honor, I'm providing a copy of Exhibit 43 to opposing counsel, which is the substitute exhibit.

And obviously, we'd like to have an opportunity to respond to what their filing is on Monday.

THE COURT:  No.  I mean, motion, response, reply.  That's all our Rules permit.  Okay?  Motion, response, reply.  Okay.

MR. MCCLEARY:  Yes, Your Honor.

THE COURT:  All right.  Well, with that, do the parties want to make opening statements?  If so, Mr. McEntire, you go first.

MR. MCENTIRE:  Yes, Your Honor.  We have a PowerPoint I would like to utilize, if I could.

THE COURT:  You may.

MR. MORRIS: Your Honor, before we get to that, the Plaintiff has objected to virtually every single exhibit that we have. Should we deal with the evidence first, because I don't want to refer to documents or evidence in my opening that they're objecting to. They've literally objected to every single exhibit except one, although I think they're withdrawing certain of those objections.

I don't -- I don't know if the Court has had an opportunity to see the objection that was filed to the exhibits.

THE COURT: That was what was filed like at 11:00 last night or so?

MR. MORRIS: That's right.

THE COURT: Okay.

MR. MORRIS: And so at 2:00, 3:00, 4:00, 5:00 o'clock this morning, I actually typed out a response that I'd like to hand up to the Court. But we've got to resolve the evidentiary issues before we get to this.

THE COURT: Okay. Well, --

MR. MORRIS: And I don't know what their position is going to be --

THE COURT: -- as a housekeeping matter, let's do that first. And let's start with the Movants' exhibits. Do we have any stipulations on admissibility of Movants' exhibits?

HCMLPHMIT00003040

MR. MORRIS:  So, if I understand correctly, Your Honor, you'd like to know if we object to any of their exhibits first?

THE COURT:  Yes.  And --

MR. MORRIS:  Okay.

THE COURT:  -- we'll hold --

MR. MORRIS:  Because we have very limited objections.

THE COURT:  Yes.  We're going to keep on hold for now your exhibits to the expert-related, --

MR. MORRIS:  Yes.

THE COURT:  -- your objections to the expert-related ones.

MR. MORRIS:  Right.  I think -- I think --

THE COURT:  So let's not talk about, for this moment, --

MR. MORRIS:  39 --

THE COURT:  -- 39 through 52.

MR. MORRIS:  Okay.

THE COURT:  But as for 1 through 38 or 53 through 80, do the Respondents have objections?

MR. LEVY:  Yes, Your Honor.  We have very limited objections.

THE COURT:  Okay.

MR. LEVY:  So, the three to which we object in their entirety are Exhibits 24, 25, and 76, all of which we object

to on relevance grounds.

Exhibits 24 and 25 are email correspondence between counsel in an unrelated state court matter where Mr. Seery is responding to a third-party subpoena regarding the preservation of his text messages on his iPhone.  This has absolutely nothing to do with whether or not the Movants have stated a colorable claim for breach of fiduciary duties.

What this appears to be is related to an entirely separate motion raised by Dugaboy regarding the preservation of Mr. Seery's iPhone.  So we object to Exhibits 24 and 25 because they have simply nothing to do with the issues in this hearing.

We also object to Exhibit 76, which is a filing from two years ago in a different bankruptcy matter, from *Acis*, regarding an injunction in place in that -- in that plan about issues that -- that occurred before the bankruptcy was in place.  So this is just an entirely different case from issues that arose many, many years ago that, again, has nothing to do with this case.

THE COURT:  This was whether the *Acis* plan injunction barred some lawsuit?

MR. LEVY:  Exactly.

THE COURT:  Okay.  Okay.  Is that all?

MR. LEVY:  We also have limited objections to certain exhibits that we think are admissible for the -- for the fact

they're said, but not the truth of the matter asserted.

For example, Exhibits 1 and 2 are complaints filed in those actions.  We have no objection to those coming in, but not for the truth of the matter asserted.  These are advocacy pieces and pleadings.  They're not actually substantive evidence.

And we would have similar -- similar objections to Exhibits 4, 6, 11, --

THE COURT:  Wait.  4 is James Dondero Handwritten Notes, May 2021.

MR. LEVY:  Yes.

THE COURT:  Okay.

MR. LEVY:  So, we have no objection to that coming into evidence.

THE COURT:  Uh-huh.

MR. LEVY:  But there are -- those are hearsay. They're not admissible standing by themselves for the truth of the matter asserted.

THE COURT:  Okay.

MR. LEVY:  And Exhibit 6 are news articles. Similarly, they're hearsay, but we have no objection to them coming in.  They're admissible for the fact that they're published, but not the truth of the matter asserted.

THE COURT:  Okay.

MR. LEVY:  Exhibit 11, which is a motion filed by the

HCMLPHMIT00003043

31

Debtor. Similarly, it's for -- we have no objection to anything on the docket coming in, but anything that's an advocacy piece, like a motion as opposed to an order, we think is not admissible for the truth of the matter asserted.

And that would be a similar objection, then, for Exhibit 58, which is a complaint.

Exhibits 59, 60, and 61 are -- are letters by counsel for Mr. Dondero to the U.S. Trustee's Office. We similarly have no objection to that coming in, but not for the truth of the matter asserted.

And Exhibits 62 and 63, Exhibit 62 is an attorney declaration attaching, similarly, documents that are -- that are advocacy pieces.

And Exhibit 63 appears to be an asset chart prepared by counsel. So it would be a similar objection.

And Exhibit 66 also is a declaration attaching documents.

No objections to those coming in, but not for the truth of the matter asserted.

Exhibits 72, 73, and 74 are all -- well, 72 are press articles. 73 and 74 are briefs. We don't object to that coming in, but we object to it being admitted for the truth of the matter asserted.

And similarly, Exhibit 80 is a pleading in an SDNY bankruptcy. We have no objection to that coming in, but not for the truth of the matter asserted.

HCMLPHMIT00003044

And finally, Exhibits 81, 82, 83 don't specify particular documents.  They appear to largely be reservations of rights.  And so we would likewise reserve our right to object once we see any specific documents --

THE COURT:  Okay.

MR. LEVY:  -- admitted under these exhibits.

THE COURT:  Okay.  Mr. --

MR. LEVY:  And I understand my colleague has an objection to Exhibit 5.

MR. MORRIS:  Exhibit 5, which is the subject, I believe, of an unopposed sealing motion.  That document has to do with purported restrictions on certain securities.  Since it's subject to a sealing motion, I don't want to say too much more than that, other than that -- we don't think it should be admitted, because you can just see from the information on the document that it was created after the termination of a shared services agreement.

However, I'm hopeful that I can resolve the issue by simply stipulating that in December 2020 MGM was on a restricted list.  What that means, what the consequences of it, the rest of it can be the subject of discussion.  But if they're trying to get that document in for that particular fact, we would stipulate to it in order to resolve that dispute.

THE COURT:  All right.  Well, that's lots to respond

to, Mr. McCleary.  Why don't we start with the outright objections:  24, 25.  It's apparently text messages related to Mr. Seery's iPhone.  I know we've got another motion pending out there that's not set today regarding Mr. Seery's iPhone.

MR. MCCLEARY:  Yes, Your Honor.  Well, as the Court is aware, we've attempted to get discovery from Mr. Seery in relation to the allegations in this lawsuit.  And by the way, all of our exhibits that we're tendering are subject to our objections that this should not be an evidentiary hearing.  I just want to make that clear.

THE COURT:  Understood.

MR. MCCLEARY:  Okay.  Thank you.  So, we're not waiving that.

The Exhibits 24 and 25 are relevant to the fact that he's -- he's not preserving information that is relevant to the claims in this lawsuit.  And that also is something that is a factor in the colorability of our claims in this case.

THE COURT:  How?

MR. MCCLEARY:  Well, there is an effort, we believe, underway to not have information available for us to discover.  And it reflects that they have been involved in providing -- we think supports -- providing material nonpublic information to other people that would be in his phone.  And we want him to preserve it.  And we think the fact that he is not is evidence that supports the colorability of our claims.

34

THE COURT:  So, --

MR. MCENTIRE:  Your Honor, this --

THE COURT:  No.  No.  I'm processing that.  You're wanting the Court to receive into evidence a text that may say something like, I delete messages periodically on my phone, to support your claim that you have a colorable claim that some sort of improper insider disclosure of information and insider trading is going on?  He said he had an automatic delete feature on his phone; therefore, he -- that must be evidence of a colorable claim for insider trading.  That's the argument?

MR. MCENTIRE:  May I add to it, supplement, Your Honor?  Mr. Seery, in his deposition, indicated that he did receive a text message that he had recently reviewed from Stonehill in February of 2021.  To the extent, however, that is inconsistent with the fact that he has an automatic delete button, suggesting to me that certain text messages have been selectively saved and some other messages have been not selectively saved.

THE COURT:  We don't have that motion set today.

MR. MCENTIRE:  This is not -- that has nothing to do with the motion.  It has to do with the fact that what is being presented to the Court in response, the Respondents' argument, is a selected window, a selected picture, that is -- distorts the reality of what we think has been destroyed

HCMLPHMIT00003047

evidence.

Mr. Seery can't save one message that may be helpful to them and not save others that may not be.  And it is inconsistent with the notion that this automatic delete button was already in effect, so why does he have one favorable message?  That's why it's relevant.

THE COURT:  Maybe he stopped using the automatic delete after --

MR. MCENTIRE:  No, he didn't at this time, Your Honor.

THE COURT:  Well, --

MR. MCENTIRE:  That's the relevance.

THE COURT:  So, --

MR. MCCLEARY:  And he should never have used it, Your Honor, given his role and responsibilities.

THE COURT:  We don't have that motion set today.  What is the content of these emails?  February 16th, March 10th, 2023?  What is the content, for me to really zero in --

MR. LEVY:  I have --

THE COURT:  -- on relevance or not.

MR. LEVY:  -- copies of the emails, if that would be helpful --

THE COURT:  Okay.

MR. LEVY:  -- to Your Honor.

THE COURT:  Well, you know, now I'm seeing them, so I

36

don't know what the big deal is if --

MR. LEVY:  As Your Honor can see, these are emails between counsel regarding preservation, which has nothing to do with whether there are colorable claims for fiduciary duties.

I'll add that -- and to show that this has nothing to do with this case and it is an attempt to generate a fishing expedition for documents in an entirely unrelated motion, we had a meet-and-confer where we represented to the counsel bringing that motion that we have been able to recover the text messages from the iCloud.

And so this is really just a sideshow.  It has nothing to do with the issues of the colorability of claims for breach of fiduciary duties.  It should not be introduced into evidence in this hearing.

THE COURT:  All right.  I'm going to sustain the objection, but this is without prejudice to you re-urging admission of these messages at the hearing on the motion regarding Mr. Seery's phone.  Okay?  Now, --

MR. MCCLEARY:  That's as to 24 and 25, Your Honor?

THE COURT:  Correct.  And let's go now to the other one, the Exhibit 76, the *Acis*-related document, the relevance of that.  Statement of Interested Party in Response to Motion of NexPoint to Confirm Discharge or Plan Injunction Does Not Bar Suit, or Alternatively, for Relief from All Applicable

Injunctions.

What is the relevance for today's matter?

MR. MCCLEARY:  Your Honor, this is background of pleadings and just background information generally to support the allegations made in the case and the background.

THE COURT:  What do you mean, background?

MR. MCCLEARY:  Kind of the history relative to the claims trading and relative to the claims of the use of insider information.

THE COURT:  Okay.  Be more specific, because I certainly have a background education on *Acis* litigation.

(Pause.)

MR. MCCLEARY:  Yeah.  Your Honor, this is a data point that is referred to in one of our experts' data charts, I believe, so --

THE COURT:  All right.  So let's just carry that to --

MR. MCCLEARY:  Yes.

THE COURT:  I'm just going to mark it as carried along with 39 through 62, related to the experts.

(HMIT's Exhibits 39 through 62 and Exhibit 76 carried.)

THE COURT:  Okay.  What about all of these objections that we don't object *per se* but we want it clear that the documents are not being offered for the truth of the matter asserted because there's hearsay?

HCMLPHMIT00003050

MR. MCENTIRE:  Your Honor, I'll let Mr. McCleary address all of those.

I want to point out one exception, and that is Exhibit #4, which are handwritten notes from Mr. Jim Dondero.  Those are not -- they are being offered for the truth of the matter asserted because it's an admission of a party opponent in these proceedings, and that's Farallon.  They reflect significant statements and admissions by Farallon, which are not hearsay.  It's an exception to the hearsay rule.  And they're being offered for more -- they are being offered for the truth of the matter asserted, because -- and it's admissible in that format.

THE COURT:  But are you referring to hearsay within hearsay?  Because there would be, I guess -- I guess the handwritten notes of Mr. Dondero are his hearsay, and then you're saying there's --

MR. MCENTIRE:  So, this is reflecting statements made to Mr. Dondero that are admissions of a party opponent.

MR. LEVY:  None of that has been established.  These are not notes from anybody at Farallon or Stonehill which could potentially be a party admission.  These are notes by Mr. Dondero about what was purportedly said by somebody else, and there's no evidence that these were kept in the regular course of business.

This is hearsay and hearsay within hearsay.  And this

39

could be established in testimony, but it can't be admitted --
the document can't be admitted to speak on behalf of a third
person who's not here.

MR. MCENTIRE: Well, first of all, I agree, we'd need
to lay a foundation. But that's not the purpose of this
discussion right now. I am simply advising the Court that
once I lay a foundation, it comes in for all purposes. It
comes in as an admission of a party opponent.

MR. LEVY: It is not an admission of a party
opponent. It is not notes or statements by any actual
defendant. These are notes by Mr. Dondero being introduced
for his own benefit. It is not a party admission.

THE COURT: Okay. I'm going to carry that one. If
one of the witnesses that's on the witness stand -- well,
presumably Mr. Dondero will be called -- we can get context at
that time and decide if it's appropriate to let it in and let
you cross-examine him on them if that's going to come in. All
right? So we'll carry this one.

Anything else, though, unique, or can we consider as a
batch all these other objections to -- most of them being
pleadings, not all of them but a lot of them -- that the
Respondents just want it clear that they're not being offered
for the truth of the matter asserted? Your response?

MR. MCCLEARY: They're, again, largely data points
relied on by experts in the course of coming up with their

HCMLPHMIT00003052

40

opinions and just setting the background and history of the claims trading.

THE COURT:  Well, then which ones are data points? Because I just need to carry those, right?  If they're not being offered for any other reason.

MR. MCCLEARY:  Well, I would have to -- we would have to refer to the charts of the experts, Your Honor, to determine that on all of them.

MR. MCENTIRE:  In order to facilitate this, may I make a suggestion, Your Honor?  We'll agree that if we're going to offer anything that he's identified other than for the purposes indicated, we will advise the Court.  Otherwise, we'll accept the limitations imposed.  And as we go through, if we offer an exhibit that is more than the truth -- if we are offering it for the truth of the matter asserted, we will advise the Court, and then we could take it up then.  I'm just trying to get the ball rolling.

THE COURT:  Okay.  Well, that's still going to be a time-consuming thing, maybe.  But, okay.  Just, when we start the clock here -- very shortly, I hope -- I want people clear that when you make objections, that counts against your three hours.  Okay?  All right?

MR. LEVY:  Okay.  Understood, Your Honor.

MR. MCCLEARY:  Your Honor, we have certainly made objection to some of their exhibits.

HCMLPHMIT00003053

THE COURT:  All right.  Well, shall we turn to those now?

MR. MCCLEARY:  Yes, Your Honor.

MR. MORRIS:  Your Honor, they objected to every single exhibit except one, so let's be clear.

THE COURT:  Okay.

MR. MORRIS:  If they're withdrawing them, that's fine.

MR. MCCLEARY:  Well, --

MR. MORRIS:  But let's be clear.

MR. MCCLEARY:  -- we are not withdrawing our general objection to all the evidence, of course.  Just --

THE COURT:  Okay.  Let me just say for the record right now, I understand and you are preserving for all purposes your ability to argue on appeal that it was error for the Court to consider any evidence.  Okay?  You have not waived that argument by --

MR. MCCLEARY:  Thank you.

THE COURT:  -- now --

MR. MCCLEARY:  Thank you.  We can have --

THE COURT:  -- agreeing to the admission of anybody's exhibit or offering your own exhibits.

MR. MCCLEARY:  And we could have a running objection on that basis, on relevance to all the witnesses and the evidence that they offer on that basis.  I would request that.

42

THE COURT: Well, okay, let me be clear. Relevance. Your argument is that no evidence is relevant because the Court doesn't need to consider any evidence --

MR. MCCLEARY: Yes, Your Honor.

THE COURT: -- on the colorability issue. You've got a running objection. It's not destroyed for appeal purposes. Okay?

MR. MCCLEARY: Thank you, Your Honor. Then, subject to that, in terms --

MR. MORRIS: I'm sorry to interrupt, but --

MR. MCCLEARY: Sure.

MR. MORRIS: -- would it be helpful if I gave the Court my list so she can see --

MR. MCCLEARY: Sure.

MR. MORRIS: -- what the --

MR. MCCLEARY: Sure.

MR. MORRIS: Okay. May I approach, Your Honor?

THE COURT: You may. I'm not sure, if everything has been objected to, I'm not sure how --

MR. MORRIS: Because I've tried -- I've tried to organize it in a way that would be helpful.

THE COURT: Okay.

(Pause.)

MR. MCCLEARY: Okay. Your --

THE COURT: I'm ready.

HCMLPHMIT00003055

43

MR. MCCLEARY:  -- Honor, yes.

THE COURT:  Uh-huh.

MR. MCCLEARY:  So, we are withdrawing our objections, other than the general objections to relevance based on the evidentiary nature of the proceeding, to Exhibits 1 and 2.

With respect to 3, this is a verified petition to take deposition for suit and seek documents filed on July 22, 2021. We object on the grounds of relevance and hearsay to that.  Is that --

THE COURT:  Well, --

MR. MORRIS:  I don't -- I don't understand this one.

THE COURT:  This --

MR. MCCLEARY:  Is that, I'm sorry, is that your #11?

MR. MORRIS:  Yeah.

MR. MCCLEARY:  All right.  We withdraw our objection to #3, subject to our general objection.

On Exhibit 4, we object to relevance and hearsay on a verified amended petition to take deposition before suit and seek documents.

THE COURT:  Okay.  This is my time to hear your argument.  And we're going to be here --

MR. MORRIS:  Can I -- can I do this here?  It's going to be much quicker.

THE COURT:  What do you mean?  Do what here?

MR. MORRIS:  So, if you just follow the chart that I

HCMLPHMIT00003056

44

gave the Court, --

THE COURT:  Uh-huh.

MR. MORRIS:  -- Section A is a list of exhibits that they've objected to.  Those exhibits are in the right-hand column.

At the same time, they are offering the exact same exhibits into evidence on their exhibit list.  I don't understand how they can offer their exhibits and object to ours.

MR. MCCLEARY:  Counsel.  I'm sorry.  We've already told them that, subject to our general objection, we'll withdraw the objections to those exhibits.

MR. MORRIS:  Right.  So can we agree that all objections to Section A are withdrawn?

MR. MCCLEARY:  Subject to the general objection, yes.

MR. MORRIS:  Thank you.

THE COURT:  Okay.  So, --

MR. MORRIS:  That's going to be much quicker.

THE COURT:  -- 11, 34, 2, 46, 42, 38, 41, 39, 40, and various attachments to Highland Exhibits 5 are withdrawn.  So, admitted by stipulation.

(Debtors' Exhibits 2, 11, 34, 38, 39, 40, 41, 42, 46 are received into evidence.  Certain attachments to Debtors' Exhibit 5 are received into evidence.)

MR. MORRIS:  And to make this easy, Your Honor, at

some point I hope later today, but perhaps tomorrow, we'll slap a caption on this, we'll file it on the docket, so that, you know, an appellate court, if necessary, can follow along. But I think that we've just stipulated that all of the exhibits identified in Section A of this document are -- the objections have been withdrawn.

THE COURT: Okay.

MR. MCCLEARY: Subject to the general objections.

MR. MORRIS: Right. That gets us -- I'm going to jump to Section C, because I think the same is true. Section C identifies all exhibits that each party has taken from the docket. And you can see from Footnote 4, the Court can take judicial notice under Federal Rule of Evidence 201, we've just had the discussion about whether or not any of them would be limited for purposes of the truth of the matter asserted, but all of the exhibits identified in Section C I think the Court can take judicial notice of because they're on a docket.

THE COURT: Response?

MR. MORRIS: And so I would respectfully request that they withdraw their objections to anything in Section C.

THE COURT: Response, Mr. McCleary?

MR. MCCLEARY: I understand the Court can take judicial notice of those, Your Honor, but they do contain irrelevant and hearsay information also.

MR. MORRIS: The hearsay, I think that we just had

the discussion. I mean, if there's something that he wants to really point out at this point that I can respond to. But we would agree that advocacy pieces shouldn't be offered for the truth of the matter asserted. Court orders, on the other hand, are law of the case.

THE COURT: So, I mean, it's the very same situation we just addressed with your own exhibits. You have a lot of court filings. And they didn't have a problem with it, as long as everyone knew advocacy was not being accepted for the truth of the matter asserted.

MR. MCCLEARY: Well, --

THE COURT: Isn't this the same thing?

MR. MCCLEARY: -- they're not offering it for the truth of the matter asserted. That's one thing. And certainly the Court can take judicial notice. We do object to the extent they're offering Exhibits 6 through 10 for the truth of the matter asserted.

MR. MORRIS: Well, let me check those.

THE COURT: Well, --

MR. MCCLEARY: I'm sorry. 6, 7, uh -- (pause).

THE COURT: Those are orders of --

MR. MORRIS: Yeah.

THE COURT: -- courts.

MR. MORRIS: Yeah. They're orders of the Court.

MR. MCCLEARY: The orders are not relevant, Your

HCMLPHMIT00003059

Honor.

THE COURT:  Explain.

MR. MCCLEARY:  Well, they have not demonstrated that the orders that they seek to introduce are relevant.  They have orders regarding, for example, the contempt proceedings that are irrelevant to these proceedings.  And prejudicial under 403.

THE COURT:  All right.  Shall I take a five- or ten-minute break?  Let me -- I think I've been very generous by not starting the clock yet on the three hours/three hours.

MR. MCCLEARY:  Appreciate that.

THE COURT:  But here's how we do things in bankruptcy court.  And I don't mean to talk down to anyone.  I don't know, you may appear in bankruptcy court every day of your life.  But we expect counsel to get together ahead of time and stipulate to the admissibility of as many exhibits as you can.  If there's a preservation of rights here and there, fine.  But we --

MR. MCCLEARY:  Maybe if we take --

THE COURT:  You know, --

MR. MCCLEARY:  We can try to --

THE COURT:  -- helping everyone to understand, --

MR. MCCLEARY:  Sure.

THE COURT:  -- we have thousands of cases in our court.

HCMLPHMIT00003060

48

MR. MCCLEARY:  Sure.

THE COURT:  And this is just something we have to do to give all parties their day in court when they need time. And so --

MR. MCCLEARY:  If you'd like us to take ten minutes and try to narrow this, we certainly --

THE COURT:  Okay.  With everybody understanding you should have taken the ten minutes before we got here.  But, again, when I say three hours, --

MR. MORRIS:  Yeah.

THE COURT:  -- that's what I meant.  Okay?

MR. MCCLEARY:  Yes, Your Honor.

THE COURT:  So we'll take a ten-minute break.

THE CLERK:  All rise.

(A recess ensued from 10:42 a.m. until 10:54 a.m.)

THE CLERK:  All rise.

THE COURT:  All right.  Please be seated.  Have we reached agreements on some of these exhibits?

MR. MCCLEARY:  Your Honor, we have agreed on the ones that we can agree on, and we announced that to the Court with respect to the Paragraph A items that the Court's already ruled on.

I would like to point out to the Court that we just got their objections handed to us right before the hearing.  We filed ours last night.  So we didn't --

HCMLPHMIT00003061

49

THE COURT:  At 11:00-something, right?

MR. MCCLEARY:  Yes, Your Honor, but we did --

THE COURT:  Okay.  Well, okay.  So I guess your point is you want to make sure I'm annoyed with everyone, not just selective of you.

MR. MCCLEARY:  Well, --

THE COURT:  I mean, exhibit lists were filed Monday. So I don't know why on Tuesday people were not on the phone saying, you know, or Wednesday morning at the latest.

MR. MCCLEARY:  Sure.  And we haven't had much of an opportunity, in fairness, to consider their objections and respond because we just received them right at the time of the hearing, just before the hearing started.

Your Honor, we would urge our objections to Exhibit #4. We've objected to this petition to take deposition before suit and seek documents on the basis of relevance and hearsay. They have a number of pleadings in other matters that have nothing to do with, frankly, the colorability standard in this case.  And this is an example.

THE COURT:  Okay.  This is the time for me to hear specific objections and what the basis is, and not just --

MR. MORRIS:  Can we go back --

THE COURT:  -- a category.

MR. MCCLEARY:  Yeah.

MR. MORRIS:  Can we go back to my way?  Because it's

HCMLPHMIT00003062

50

just going to be much faster.  It really will be.  Right?  We -- Category 1, A and C, we dealt with.  Category B, --

THE COURT:  Well, we dealt with A.

MR. MORRIS:  Right.  And --

THE COURT:  All of those are withdrawn, and they are admitted by stipulation.

MR. MORRIS:  Right.

MR. MCCLEARY:  Subject to --

THE COURT:  Category C, --

MR. MCCLEARY:  -- the general objections.

THE COURT:  -- I'm not sure we're to closure on.

MR. MORRIS:  Um, --

THE COURT:  Are we to closure on C?  Are you stipulating?

MR. MCCLEARY:  No.  We are not stipulating on C.

MR. MORRIS:  Let's do them one at a time.

MR. MCCLEARY:  I have not had an opportunity to -- to --

MR. MORRIS:  Let's do them one at a time.

MR. MCCLEARY:  Have not had an opportunity to look at each and every one of these, Your Honor.  Because we did just get these.

THE COURT:  Okay.

MR. MCCLEARY:  But generally --

THE COURT:  If we have not wrapped this up in 15

51

minutes, we're just going to start, and you can object the old-fashioned way.  But I'm telling all lawyers here, objections count against your time.  Okay?

MR. MORRIS:  And I'd move for the admission of all of our exhibits right now, then.

THE COURT:  Okay.

MR. MORRIS:  So let him -- let -- put him on the clock and let's go.

THE COURT:  Okay.  So, 15 minutes.  Let start going through everything except Category A.

MR. MORRIS:  Number 4?

MR. MCCLEARY:  Number 4, Your Honor, we object on the basis of relevance and hearsay.

MR. MORRIS:  Okay.  My response to that, Your Honor, and this will be my response -- this is in Section B of my outline --

THE COURT:  Uh-huh.

MR. MORRIS:  Okay?  They object to Exhibits 3, 4, 5, and 9.  These are Mr. Dondero's prior sworn statements.  You just heard his lawyer stand here and tell the Court that somehow his handwritten notes should be admissible as an admission.  You know what he did?  He testified four different times under oath.  That's Exhibits 3, 4, 5, and 9.  Sworn statements.

They come into evidence not as hearsay but under Federal

52

Rule of Evidence 801(d)(1).  It's beyond -- the notion that they can prove a colorable claim and that it's not relevant that he's got diametrically different -- he's got four different statements, now five with his notes, he's got five different statements.  Doesn't that go to the colorability of these claims?

We believe it does.  That's the basis for the introduction of these documents into evidence.

THE COURT:  Okay.  Mr. McCleary, your response?

MR. MCCLEARY:  Well, it's a verified amended petition, Your Honor, in another matter, to -- before suit to seek documents.  Has nothing to do with the merits of this case and our motion for leave.  So we object on the grounds of relevance and hearsay.

THE COURT:  Well, since they're prior sworn statements of Mr. Dondero, --

MR. MCCLEARY:  Well, then they might -- if they want to use it later to impeach, they can try to do that, but they have to lay the foundation.

THE COURT:  What about 801(d)(1)?

MR. MCCLEARY:  Again, relevance, Your Honor.

THE COURT:  Okay.  I overrule.  Those are --

MR. MCCLEARY:  And Mr. --

MR. MORRIS:  Okay.

THE COURT:  Those are going to be admitted.

HCMLPHMIT00003065

53

MR. MCCLEARY:  By the way, on hearsay, Mr. Dondero is not Hunter Mountain.  So when he argues that these are admissions, they're not admissions by Hunter Mountain.

MR. MORRIS:  Your Honor, the only piece of evidence, literally the only piece of evidence they have are the words out of Mr. Dondero's mouth.  There is no evidence, there will be no evidence of a *quid*, a *pro*, or a *quo*.  There will be no evidence other than what Mr. Dondero testifies to --

MR. MCCLEARY:  Well, --

MR. MORRIS:  -- about what he was told.  There will be no evidence that there was a meaningful relationship between Mr. Seery and Ms. -- and Farallon and Stonehill.  There will be no evidence, none, that Farallon and Stonehill rubber-stamped Mr. Seery's compensation package.  Nothing.  The only thing we have are going to be the words out of Mr. Dondero's mouth and these notes that just showed up.  And these statements --

MR. MCCLEARY:  Your Honor?

THE COURT:  Okay.  Counsel, I mean, it just feels like --

MR. MORRIS:  It's --

THE COURT:  -- if notes get in, then sworn statements of Mr. Dondero should get in.  Right?

MR. MCCLEARY:  Your Honor, he's making arguments, closing arguments, opening arguments, trying to run out the

HCMLPHMIT00003066

54

clock.  We objected to relevance, and we stand on our

objection.

THE COURT:  Okay.

MR. MCCLEARY:  And on hearsay.

THE COURT:  I'll admit 3, 4, 5, and 9.

(Debtors' Exhibits 3, 4, 5, and 9 are received into

evidence.)

MR. MORRIS:  Section E.

MR. MCCLEARY:  I'm sorry.  So our objections are

overruled?

THE COURT:  They are overruled.

MR. MCCLEARY:  On 3, 4, 5?

THE COURT:  And 9.

MR. MORRIS:  Section E of my outline.

MR. MCCLEARY:  What about 6?

THE COURT:  That's not --

MR. MORRIS:  Well, --

THE COURT:  Well, I don't --

MR. MORRIS:  -- it would -- it would --

THE COURT:  Let's go back to C.  I'm not clear if

we're to closure on Section C.

MR. MORRIS:  I'll let Counsel go through --

THE COURT:  And 6 is within Section C.

MR. MORRIS:  I'll let Counsel go through each one,

one at a time.

HCMLPHMIT00003067

MR. MCCLEARY:  No.  That's all right.  If you want to go through, you have them lumped in.  Yeah, I think it'd probably be quickest if, frankly, we just go down the list, Your Honor.  Frankly.

THE COURT:  Well, you've got ten minutes left.

MR. MCCLEARY:  Okay.  We object to #6, memorandum and opinion order granting Dondero's motion to remand, on the basis of relevance and hearsay.

THE COURT:  Overruled.  I can take judicial notice under 201 of that.  So 6 is admitted.

(Debtors' Exhibit 6 is received into evidence.)

MR. MCCLEARY:   We object to Exhibits 7 and 8 on the grounds of relevance.  7 on relevance and hearsay, and 8 on relevance.

MR. MORRIS:  I'll take 7 first, Your Honor.

THE COURT:  Okay.

MR. MORRIS:  It's an order dismissing Mr. Dondero's 202 petition.  That 202 petition sought discovery on the basis of the exact same so-called insider trading claims that Hunter Mountain is asserting today.

I think it's not only relevant, it's almost dispositive that a Texas state court heard the exact same -- or, actually, not the exact same, because Mr. Dondero changed his story so many times -- but heard a version, I think Versions 1, 2, and 3, of this insider trading and would not even give them

56

discovery.

So when the Court considers whether or not there's a colorable claim here, I think it ought to think about what a Texas state court decided on not whether or not they have colorable claims, whether or not they're even entitled to discovery. I think it's very relevant. Move for its admission right now.

MR. MCCLEARY: Your Honor, it's ironic, because at that hearing counsel for the Respondents was arguing that it ought to be this Court that considers what discovery is appropriate.

THE COURT: Okay. Well, obviously, you can argue about that, but, again, I think I can take judicial notice of this. Right?

MR. MCCLEARY: Well, we argue that it's not relevant, Your Honor, and it is the --

THE COURT: Okay.

MR. MCCLEARY: 7 is not relevant and is hearsay.

THE COURT: Okay.

MR. MORRIS: Number 8, --

THE COURT: Objection is overruled.

MR. MCCLEARY: Overruled?

THE COURT: And so 7 is admitted.

(Debtors' Exhibit 7 is received into evidence.)

MR. MCCLEARY: 8 is our verified petition. And we

HCMLPHMIT00003069

57

object on the grounds of relevance.

MR. MORRIS:  You know, Your Honor, if I really had the time and the patience to do this, I think I'd find this document attached to Mr. McEntire's affidavit that's on their exhibit list.

But to speed this up just a little bit, how could their 202 petition that sought discovery on the basis of the very same insider trading allegation not be relevant?  It's a judicial order.  You can take notice of it.  And it's incredibly relevant that a second Texas state court heard the same allegations that they're presenting to you as colorable and said no, you're not getting discovery.

MR. MCCLEARY:  We don't know why they made that order, Your Honor.  They could have simply accepted the opposition's arguments that this Court had jurisdiction and should consider what discovery ought to be done.

THE COURT:  Overruled.

MR. MCCLEARY:  It's not relevant to our --

THE COURT:  I admit 8.

MR. MORRIS:  Next?

MR. MCCLEARY:  Overruled?

THE COURT:  Yes.

(Debtors' Exhibit 8 is received into evidence.)

MR. MCCLEARY:  The declaration of James Dondero.  I think we withdrew the Dondero --

58

THE COURT:  Right.

MR. MCCLEARY:  -- declarations.  If it --

THE COURT:  It's --

MR. MCCLEARY:  Numbered -- I'm sorry, #9.

THE COURT:  9.  I've already checked it as admitted.

MR. MCCLEARY:  If you want to -- if you want to offer #9, they can offer it.

THE COURT:  It's admitted.  I've already --

MR. MCCLEARY:  Okay.

THE COURT:  -- said.

MR. MCCLEARY:  Number 10.  It's an order denying our second Rule 202 petition.  And we object to it on relevance, Your Honor.

THE COURT:  Same objection.  It's overruled.  It's admitted.

   (Debtors' Exhibit 10 is received into evidence.)

MR. MCCLEARY:  Number 12, 13, and -- 12 and 13 are correspondence regarding resignation letters.  We object on grounds of relevance.

THE COURT:  Wait.  Did we skip 11 for a reason?

MR. MCCLEARY:  Pardon me?

THE COURT:  Did we skip 11 for a reason?

MR. MCCLEARY:  We only have it --

THE COURT:  Oh, wait.  It's already admitted by stipulation.

HCMLPHMIT00003071

MR. MCCLEARY:  Yeah, and we have --

MR. MORRIS:  That's the one --

MR. MCCLEARY:  We have our general objection.

MR. MORRIS:  That's the one exhibit that they didn't object to.

THE COURT:  Okay.

MR. MCCLEARY:  We only had our general objection with respect to that.

THE COURT:  Okay.  Thank you.  Thank you.

MR. MCCLEARY:  On 12 --

THE COURT:  Uh-huh.

MR. MCCLEARY:  -- and 13, those are correspondence regarding resignations.  We object on the grounds of relevance.

MR. MORRIS:  So, the relevance of that, Your Honor, is to show that when Mr. Dondero sent this email to Mr. Seery in December 2020, he had absolutely no relationship to Highland, had absolutely no duty to Highland, had absolutely no reason to send this email to Highland.  He wasn't in control of Highland.  He wasn't --

If they'll stipulate to this, that's fine.  He wasn't in control.  He had no authority to do anything.  He couldn't effectuate trades.  He wasn't there.  And that's what these documents are intended to prove.

THE COURT:  Okay.  Why are we -- this is --

MR. MCCLEARY:  Because there are --

THE COURT:  Some of this stuff, I mean, --

MR. MCCLEARY:  There are other agreements.

THE COURT:  -- is no big deal.  Right?

MR. MCCLEARY:  Sub-advisory agreements, other agreements that he had under which he had a responsibility to make the communications regarding material nonpublic information that he made.  So this is simply irrelevant, Your Honor.

THE COURT:  I overrule.  I mean, again, I don't --

MR. MCCLEARY:  Okay.

(Debtors' Exhibits 12 and 13 are received into evidence.)

MR. MCCLEARY:  Number 14, --

THE COURT:  You're both giving me just a lot of background that I already have, but of course a Court of Appeals --

MR. MORRIS:  That's why we --

THE COURT:  -- isn't going to have it.

MR. MORRIS:  Yep.

MR. MCCLEARY:  Well, #14, Exhibit 14, we object on the grounds of relevance and hearsay.

THE COURT:  Okay.  Wait a minute.  We skipped 13 because -- why?  Oh, wait, that was, I'm sorry, 12 and 13 --

MR. MORRIS:  Yes.

THE COURT:  -- where I've overruled the objection and

61

admitted.

Okay.  Go ahead.

MR. MCCLEARY:  14, we object on the grounds of relevance and hearsay, Your Honor.

MR. MORRIS:  I'm just going to make this real quick, Your Honor.  Here's the thing.  This Court knows it.  It's actually facts that cannot be disputed because they're subject of court orders.

As the Court will recall, beginning in late November 2020 continuing through late December 2020, Mr. Dondero was engaged in a continuous pattern of interference with Highland's business and trading.  It was the subject of the TRO, which is why the TRO is relevant.

Your Honor will recall that at the end of November Mr. Dondero attempted to stop Mr. Seery from trading in Avaya stock.  On December 3rd is when he sent this threatening email, text message, to Mr. Dondero [sic].  It caused us to get the TRO.

Your Honor will recall on December 16, 2020, that's when we had the hearing on Mr. Dondero's motion to try to stop Mr. Seery from trading in the CLOs that the Court dismissed as frivolous and granted the directed verdict of Highland.

So, that's December 16.  He sends this email about MGM on December 17th.  And what happens on December 18th?  More interference with Highland's business.  It's a matter of --

HCMLPHMIT00003074

62

beyond dispute. It's law of the case at this point because that's the subject of the contempt order. And the Court found that, after -- after hours, on December 18th, Hunter Covitz told Mr. Dondero that Mr. Seery was again trying to trade in Avaya stock, and within a day or two Mr. Dondero was again interfering it, and that's what led to the second -- to the first contempt order.

So all of these documents are relevant to show motive and what was happening. This email was not sent for any legitimate purpose. The evidence is just overwhelming. And it's not -- it's not like, oh, that's an argument we're making. Between the TRO and the contempt order, it's law of the case. He was interfering with Highland's business nonstop for thirty days, including the day before he sent this email and the day after he sent the email.

THE COURT: Okay.

MR. MCCLEARY: Your Honor, this is a lawsuit or an effort to file a lawsuit on behalf of Hunter Mountain Investment Trust, not James Dondero. And as much as Counsel wants to make this about Jim Dondero and attack him, this is a different case. So this exhibit has nothing to do with the claims in this lawsuit. It's not relevant. And hearsay.

MR. MORRIS: The only evidence is Mr. Dondero. It's -- could not be more relevant.

THE COURT: Okay. I overrule. I'm admitting this.

HCMLPHMIT00003075

And so we're --

MR. MCCLEARY:  Uh, --

THE COURT:  It's 14.  It's -- how far?

MR. MCCLEARY:  14.  Exhibit 15 is where we are, Your Honor.

THE COURT:  Okay.

(Debtors' Exhibit 14 is received into evidence.)

THE COURT:  15.

MR. MORRIS:  Oh, that's -- that's the contempt order. And so these contain the judicial findings that are now beyond dispute that Mr. Dondero was engaged in interfering with Highland's business after the TRO was entered on December 10th.

THE COURT:  Okay.  Again, my own orders, --

MR. MCCLEARY:  Your Honor, it's not --

THE COURT:  -- I can take judicial notice of --

MR. MCCLEARY:  It's --

THE COURT:  -- under the Federal Rules of Evidence.

MR. MCCLEARY:  It's --

THE COURT:  201.

MR. MCCLEARY:  We simply object as not relevant.  We object based on Federal Rule of Evidence 403.  Any possible relevance is outweighed by the prejudice.  And we object on the grounds of hearsay, Your Honor.

THE COURT:  Prejudice?  Prejudice?  They're orders I

HCMLPHMIT00003076

64

issued.  I'm going to be prejudiced by my own orders?

MR. MCCLEARY:  Uh, well, --

THE COURT:  I don't --

MR. MCCLEARY:  -- Hunter Mountain will be.

THE COURT:  Okay.  I'll overrule.

(Debtors' Exhibit 15 is received into evidence.)

THE COURT:  I'll tell you what.  We're out of our -- well, we've get probably 30 seconds left.  Anything that we can maybe knock out to not have eat into your three hours?  Both of you?

MR. MCCLEARY:  Your Honor, we filed written objections to all of these exhibits.  We urge those objections.  16.

THE COURT:  I know, but this is your chance to argue why your objections have merit.  I can -- we can just --

MR. MCCLEARY:  Because, well, obviously, we're talking about pleadings and filings in other matters.  The evidence that they're trying to use to impugn Jim Dondero, which has nothing to do with the merits of HMIT's claims and allegations of insider trades.

THE COURT:  Okay.  A lot of this is articles.  Articles, articles, articles about MGM.

MR. MCCLEARY:  On the articles, Your Honor, subject to our general objection, we'll withdraw the objections to the articles if they'll agree to the articles that we've offered.

HCMLPHMIT00003077

65

MR. MORRIS:  Your Honor, we didn't lodge an objection to their articles.

MR. MCCLEARY:  Okay.

MR. MORRIS:  And just so, if anybody is keeping track at home, this is Item B on the list that I created earlier this morning.

THE COURT:  Okay.  So, 25 through 30 are articles. Those are admitted by stipulation.  Nothing is about the truth of the matter asserted.  They're just articles that were out there for --

MR. MORRIS:  Right.  I would just --

MR. MCCLEARY:  Yes.

THE COURT:  -- the world.

MR. MORRIS:  Just so we're clear, it's Exhibits 25, 6 -- 25, 26, 27, 28, 29, and 30.

THE COURT:  Right.

(Debtors' Exhibits 25 through 30 are received into evidence.)

MR. MORRIS:  And so, yes, those are all articles. They have their articles.  Exhibit 72.

THE COURT:  Oh, and 34 is another one.  So that's admitted as well.

MR. MORRIS:  Yes.

MR. MCCLEARY:  Yes, Your Honor.

(Debtors' Exhibit 34 is received into evidence.)

HCMLPHMIT00003078

THE COURT:  Okay.  Well, we're out of time, so as for the others, they can offer them the old-fashioned way if they want to, you can object the old-fashioned way, and it eats into both of your three hours.

MR. MCCLEARY:  Yes, Your Honor.

THE COURT:  Okay.  Let's hear opening statements.

And by the way, before we wrap up today, I'm going to say out loud everything I've admitted so we're all crystal clear on what's in the record.  This has been a bit chaotic.

MR. MCCLEARY:  Okay.  Understood.

THE COURT:  So, Caroline is going to be the keeper of our time over here.  And if the judge ever interrupts you, she's going to stop the timer.  Okay?

MR. MCENTIRE:  Thank you.

THE COURT:  I hope I won't any more, but you may proceed.

MR. MCENTIRE:  No, I appreciate it.  Thank you.  Can you see it, Your Honor?

THE COURT:  I can, yes.  Thanks.

MR. MCENTIRE:  Can opposing counsel see it?

MR. MORRIS:  Yes, sir.

MR. MCENTIRE:  All right.

THE COURT:  And I'm just going to ask everyone who has a PowerPoint today, can I get a hard copy --

MR. MCENTIRE:  Certainly.

THE COURT:  -- before we close?

MR. MCENTIRE:  Certainly.

THE COURT:  Okay.  Thank you.

OPENING STATEMENT ON BEHALF OF HUNTER MOUNTAIN INVESTMENT

TRUST

MR. MCENTIRE:  May it please the Court, Your Honor, at this time I'll be providing the opening statement on behalf of Hunter Mountain Investment Trust.  It is a Delaware trust. Mark Patrick, who's in the courtroom, is the Administrator. He will be one of the witnesses that you'll hear today.

Hunter Mountain Investment Trust is the former 99.5 percent equity holder, currently classified as a Class 10 contingent beneficiary under the Claimant Trust Agreement.  It is active in supporting various entities that in turn support charities throughout North Texas.

Your Honor, this is not an ordinary claims-trading case. I know the Court made those references in one of the hearings, and I wanted to more clearly respond.  This has different indicia.  An ordinary claims-trading case is normally outside the purview of the bankruptcy court.  What makes this different is that we're involving, we believe and allege, breaches of fiduciary duty of the Debtor-in-Possession's CEO and the Trustee.

It involves also aiding and abetting by the entities that actually acquired the claims.  And that falls into the

68

category of willful misconduct.

It also involves injury to the Reorganized Debtor and to the Claimant Trust.  Ordinarily, a claims trade would not involve injury to the estate or the reorganized debtor.  Here, we have alleged that it has.  And the injury takes the form of unearned excessive fees that Mr. Seery has garnered as a result of his relationship and arrangements, as we have alleged, with the Claims Purchasers.

During the course of my presentation today, I'll be referring to the Claims Purchasers as the collective of Farallon, Stonehill, Muck, and Jessup.

I would like to briefly discuss some of the issues that have already been presented to the Court, just to make sure that this record is clear.

Can you please continue?

We don't believe the *Barton* Doctrine is applicable.  I believe that precedent is very clear that the *Barton* Doctrine deals with proceedings in other courts, and the various standards and requirements of *Barton* do not apply if in fact we're coming to the Court and filing the proceeding in the court where the Trustee was actually appointed.

And so I think that the law is clear.  And this is Judge Houser here in the Northern District of Texas in the case *In re Provider Meds*.  And she makes very clear that the standard for granting leave to sue here is actually less stringent than

69

a 12(b)(6) plausibility standard.  So if there is any issue as to what standard this Court should be applying to the -- to this process, we believe it's a 12(b)(6) standard, confined to the four corners of the document.

If the Court wishes to consult the documents that are referred to in the four corners of the petition or complaint, it may do so.

But the standard here is even more flexible than a standard plausibility.  Our evidence, though, achieves the standard of plausibility as well.

The *In re Deepwater Horizon* case is another important case.  That's a Fifth Circuit case.  A plaintiff's claim is colorable if it can allege standing and the elements necessary to state a claim on which relief could be granted.  Defining a colorable claim as one with some possible validity.  I don't have to prove my case today.  I didn't have to prove my case in the prior hearings.  I have to prove sufficient allegations, not evidence, but sufficient allegations to show that it has some possible basis of validity.

Possible basis of validity.  We're not here talking about likelihoods.  We're not here talking about *prima facie* evidence.  We're not here talking about probabilities.  We're talking about something less than plausibility.  But, again, we achieve plausibility.

A colorable claim is defined as one which is plausible or

HCMLPHMIT00003082

70

not without merit. These are various cases from around the country. The colorable claim requirement is met if a committee has asserted claims for relief that, on appropriate proof, would allow recovery. On appropriate proof. We're not required to put on that proof today, Your Honor.

Courts have determined that a court need not conduct an evidentiary hearing, but must ensure that the claims do not lack any merit whatsoever. We submit that our claims have substantial merit and deserve the opportunity to initiate our proceedings, have an opportunity to conduct discovery. And if they want to file a 12(b)(6) motion before this judge, before you, they can do so. If they want to file a motion for summary judgment, they can do so. But at this juncture, they cannot, and at this juncture this Court should not consider evidence in making its determination.

Standing under Delaware law. The Funds have collectively really hit the standing issue hard. I think it's easily resolved. First of all, it's clear that a beneficial owner has standing to bring a derivative action. Under Delaware law, a beneficial owner has a right to bring a derivative action on behalf of the -- against the trustee.

So the issue is, am I a beneficial owner? As a contingent beneficiary in Class 10, and that's the Court's inquiry here, do I qualify as a beneficial owner? And I think that Delaware law is clear that, by not limiting it to only vested

HCMLPHMIT00003083

interests, by not limiting it only to immediate beneficiaries, they are not -- they are not extending the scope of the statute to contingent beneficiaries.  And this is consistent with the laws around the country, because even Texas recognizes that an unvested contingent beneficiary has a property right to protect.

Even Mr. Seery admitted in his deposition that a unvested contingent interest is in the nature of a property right.  If you have a property right, that property right can be abused.  If you have a property right, that property right, whether it's inchoate or not, it can be abused, it can be misappropriated, and you could become aggrieved.  And that is the constitutional standard for standing:  Is Hunter Mountain Investment Trust aggrieved?  And the answer is yes.

Contingent beneficiaries from around the country, in addition to Mr. Seery's admission that we have a property interest, contingent beneficiary has standing.  This is the *Smith v. Clearwater* case on Slide 11.  Very clearly, they say that even if it's subject to a future event.  Their argument is that Mr. Seery has not certified Hunter Mountain as in the money.  We believe we are in the money.  That's a different issue.  We believe he should certify, in the discharge of his duties.  That's a different issue.

But even assuming his case -- his argument for a moment, their argument is that since he's not done that act, which we

72

also challenge and criticize that he's not done that act, that we can't qualify to bring this case.  Well, that's not what the law is, that even an unvested interest, a contingent interest, has a right.

Slide 12.  This is the State of Illinois.  Despite the fact that interest is contingent and may not vest in possession, you still have a right to protect what you have. And you have standing to bring a cause of action.

The Claimant Trust Agreement, by the way, suggests that we have no vested interest, and they'll likely argue that point. But the point there is the law says that's irrelevant.  If it's an inchoate interest, if it's potentially vested in the future, that's what imbues you with standing.

And in any event, the Claimant Trust Agreement is subject to Delaware trust law, and they can't get around that.  They can say whatever they want to say in the agreement to try to block us from participation, but it's still subject to Delaware trust law, and Delaware trust law does not draw a distinction between vested or unvested.

The State of Missouri:  There is no dispute in this case that the future -- that future beneficiaries have standing to bring an accounting action, whether they're vested or contingent.  The *Bucksbaum* case.  Article III standing exists, constitutional standing, including discretionary beneficiaries, have long been permitted to bring suits to

HCMLPHMIT00003085

73

redress trustees' breaches of trust.  This applies not only to our standing as an individual plaintiff, which we've brought, but also in our standing -- in our capacity seeking to bring a derivative action to benefit the Claimant Trust of the Reorganized Debtor.  Both are permitted under this law under these cases.

An interest -- in the *Mayfield* case, an interest is any interest, whether legal or equitable or both, vested, contingent, defeasible, or indefeasible.  So the unilateral self-serving wording of the Claimant Trust does not abrogate our right to bring the claim.

I'd like to talk briefly about fiduciary duties.  We know that Mr. Seery has fiduciary duties to the estate when he was the CEO prior to the effective date.  We allege that he breached those fiduciary duties, and that gives us standing to bring the claim that we have brought for breaching fiduciary duties, causing damages that are accruing post-effective date.

In the *Xtreme Power* case, again, the directors can either appear on both sides of the transaction or expect to derive any personal financial benefit.  We are alleging that Mr. Seery engaged in self-dealing.  We allege that he engaged in self-dealing by arriving at an understanding where he could put business allies -- whether you call them friends, business allies, close acquaintances -- on the committee, the Oversight Board that would ultimately oversee his compensation, which,

HCMLPHMIT00003086

74

in the context of this case, makes no sense and it is excessive.

Muck is a specially -- special-purpose entity of Farallon. Farallon acquired the claims, created Muck to do the job. Muck is now on the Oversight Board.

Jessup. Jessup is a special-purpose entity, a shell created by Stonehill. Stonehill bought the claims, funneled the money through Jessup. Jessup is now on the Oversight Board. Jessup and Muck -- and by the way, the principals in Farallon are actually the representatives from Muck on the Oversight Board. So there's no suggestion that there's really a distinct corporate relationship here.

Michael Linn, who is a principal at Farallon. You'll hear his name today, throughout today. He actually is a representative of the Oversight Board, dealing with Mr. Seery and negotiating Mr. -- I put negotiation in quotes -- negotiating Mr. Seery's compensation.

I'd like to talk very briefly about background. We took Mr. Seery's deposition. I was unaware of this. I now know it. Perhaps the Court was already aware of it. This is Mr. Seery's first job as a CEO of any debtor. This is the first time Mr. Seery has ever been a chief restructuring officer. This is the first time Mr. Seery has ever been the CEO of a reorganized debtor. This is the first time that he's served as a trustee post-effective date. However, his compensation

75

is excessive and not market-driven, and there's a reason for that. We believe and we allege that it's a *quid pro quo* because of prior relationships with Farallon and Stonehill.

Farallon and Stonehill are hedge funds, Your Honor. They created their special-purpose entities on the eve of this transaction simply to take the title to the claims, but the money is going upstream.

Seery has a relationship with Farallon. Do we know the full extent of that relationship? No. We have been deprived of discovery. We attempted to get the discovery in the state court 202 process. We were denied for reasons not articulated in the court's order.

We attempted to get the discovery here that the Court refused under the last hearing about these relationships.

So what we do have begins to put the pieces of the puzzle together. And sufficient is more than plausible. It is more than colorable.

We know that Mr. Seery went on a meet-and-greet trip to Farallon's offices in 2017. Didn't have to. He was trying to cultivate a business relationship. Farallon was important to him.

We know that in 2019 he was no longer with Guggenheim Securities. He goes out to Farallon's offices for another meet-and-greet and he specifically meets with the two principals who are reflected in Mr. Dondero's notes, Raj Patel

76

and Michael Linn.

We know that in June 2020 Farallon emailed Seery.  This is after Mr. Seery becomes the CEO.  He says, "Congratulations. We're monitoring what you're doing."

Seery's relationship with Stonehill.  These are all -- this is all before what we believe to be the events that are at issue in this case.  We believe that -- represented Stonehill in the *Blockbuster* bankruptcy proceeding.  There was an objection to a document.  Mr. Seery was involved in the *Blockbuster* proceedings.  Stonehill was one of his many clients on the committee that he represented.

We know that Stonehill is actively involved in one of Mr. Seery's charities in New York.  We know that he sent text messages to Mr. Seery in February of 2021, wanting to know how to get involved in this bankruptcy.

Farallon and Stonehill were strangers to this bankruptcy. They weren't creditors.  They were encouraged and they came into this process.

Farallon and Stonehill have not denied any of our allegations.  They are not putting any evidence on today.  We allege that these relationships was based and founded upon a *quid pro quo*.  I'll scratch your back; you scratch mine.  You give me some information; I want to evaluate these claims. And, by the way, we're going to be on the Oversight Board, or you're going to put us on the Oversight Board, or by default

we'll be on the Oversight Board, and we'll work out your compensation agreement.

Mr. Seery also has an established relationship with Stonehill.

I like to have a timeline of certain events. This is not all of the relevant events, but this can give you a quick picture. We know that Mr. Dondero sent an email to Mr. Seery in December of 2020 relating to MGM. It is undisputed that Mr. -- that Farallon emailed Seery, Mr. Seery, in January of 2021 if there was a path to get information regarding the claims for sales. Mr. Seery says he never responded to it, but we know that this entity, Farallon, got deeply involved in buying these claims shortly after this email.

We have the Claimant Trust Agreement suddenly being amended to not have a base fee, but now we're going to incorporate a success participation fee. As part of a plan, we're not criticizing that, but suddenly the vehicle for post-effective date bonuses is being created.

The Debtors' analysis comes out in association with the plan confirmation. It projects a 71.32 percent recovery for Class 8 and Class 9, and those are the principal classes we're talking about. 95 percent -- 98 percent of all of the claims here are in Class 8 and Class 9, until you get to us, Class 10.

71.32 percent of Class 8 means that Farallon and Stonehill

78

will get less than about a six percent internal rate return on their $163 million investment, which they have never denied. That is not a hedge fund investment goal.  Investment -- hedge funds like these companies, they go for 38, 40, 50 percent of returns.  Who would ever invest $163 million on a distressed asset that's not collateralized with only an expectation of an internal rate of turn of six percent?  But that's going to be the evidence before the Court.  That does not make any financial, rational wisdom at all.

The plan is confirmed.  It's undisputed that Stonehill contacts Seery after the plan is confirmed to want to know how to get involved.  They have phone calls after this text message.  Muck is created on March 9.  We know from Mr. Seery's deposition that Farallon told Seery that six days later they bought the claims.  All the claims, by the way, when I say bought the claims, it's everything except UBS.  To our knowledge.  They may have negotiated the paperwork back then, but the claims transfers did not occur until the summer. All the other claims involved, the claims transfers were filed with this Court in mid-April and at the end of April.

Tim Cournoyer removes MGM from the restricted list.  Tim Cournoyer is an employee of Highland.  Well, it tells us that MGM was on the restricted list and there should be no discussion about MGM, but there was.  There was discussions about MGM, and Mr. Dondero is going to testify to that.

HCMLPHMIT00003091

79

And we also know that the HarbourVest settlement was consummated during this period of time.  If it had been on the restricted list, as it was, that transaction should never have occurred.  But it did occur.  This Court ordered it.  It approved it.  And I'm not challenging -- we're not challenging that settlement.  It is done.  That is done.  What we are challenging is the fact that Mr. Seery is actively involved in using inside material nonpublic information.

Jessup Holdings is created shortly thereafter, on April 8th.  We have claims settling on April 30th.  The Acis claim is transferred to Muck -- that's Farallon -- on April 16.  The Redeemer and Crusader are all transferred on April 30th.

Stonehill and Farallon never deny that they did no due -- that they failed to do due diligence.  We allege that there was no due diligence.  And that relies in significant part upon Mr. Dondero.  But now, because we have Mr. Seery's deposition, it also relies upon Mr. Seery's admissions in deposition, because he says he never opened up a data room, he doesn't know what due diligence they did.  Farallon says the only due diligence they did is they talked to Jim Seery.  And how do you invest $163 million, or $10 million or $50 million, whatever the part is, with an internal rate of return six percent, only on the advice of Mr. Seery, who's never been a trustee or a CEO before, unless there's something going on?

Your Honor, public announcement of MGM on May 26th.  On

HCMLPHMIT00003092

80

May 28th, two days later, Mr. Dondero calls Farallon.  It took Mr. Dondero or his group a few days, a week or so, to even understand who -- that Farallon was involved, because the registrations for Muck and Jessup did not disclose their principals, did not even disclose addresses.  They were shell -- they were companies that came in in the last minute to buy these claims incognito, frankly.

They found out that Farallon was involved.  They had a call initially with Raj Patel, who is the principal of Farallon.  He has three conversations total:  One with Mr. Patel and two with Michael Linn.  Michael Linn was the one responsible for these claim purchases.  Patel admitted that Farallon relied exclusively on Seery and did no due diligence.  Linn rejected the premium to sell.  The evidence you'll hear today, that Mr. Linn rejected a premium up to 40 percent to sell the claims.  He actually said he would not sell at all because he was told by Mr. Seery that the claims were too valuable.

That is evidence of insider trading.  Specifically, they said they were very optimistic about MGM and they were unwilling to sell because Seery said too valuable.

We have -- these are the purchases.  This is where the Class 9 claims fall.  And keep in mind -- Tim, go back -- that $95 million of this upside potential is being told, at least to the publicly available information, that you're never going

HCMLPHMIT00003093

81

to get there.  Yet 95 -- $95 million is allocated to this category.  So Class 8 is $275 million.  Class 9 is 29 -- $95 million.

Next.

So we have the evidence that you'll hear today.  Farallon admitted the timing.  No due diligence, never denied by the Claim Purchasers.  Based upon material nonpublic information.  That's our allegation.  Purchased over $160 million.  This is never denied by the Claims Purchasers.  They purchased claims when the return on investment was highly doubtful.  Maximum expected annual rate of return, assuming publicly-available information, was approximately six percent, and that is totally atypical of what a hedge fund would seek.

Insider information.  We're not talking about just MGM.  The Respondents want to narrow the Court's inquiry.  This is much larger than MGM.  MGM is a part of it, it's a big part of it, but it's not the only part of it.  It's other assets.  Portfolio companies.  Other invested assets.  There's a lot of money out there, and it was never disclosed during the ordinary course of the bankruptcy, for reasons that the Court already knows, in terms of asset values.  How does someone come in and purchase distressed assets, claims, without any understanding of what assets are backing those claims, when there's no publicly-available information there to do it and there's no evidence, no indication, no statement that actually

HCMLPHMIT00003094

82

due diligence was done?

That right there, without anything else, makes our claims plausible.  You don't have to prove insider trading by direct evidence.  Nobody's going to admit that they did something wrong.  You prove it circumstantially, and we've cited cases and we'll give you cases to that effect.

Next.

We have material nonpublic information.  It is very clear that Mr. Dondero on December 17th sent this email, not just to Mr. Seery but to several other individuals, including lawyers. It states that he'd just gotten off a board call.  A pre-board call.  The update, he provides the update.  Active diligencing.  It's probably a first-quarter event.  We can scour all of the other media documents that are in evidence, both from us and them, and you're not going to find any indication anywhere that a board member has said, guys, gals, it's going to be a probable first-quarter event.  That's material nonpublic information.

THE COURT:  By the way, you all objected to this exhibit.

MR. MCENTIRE:  No, this is my exhibit.

THE COURT:  We spent --

MR. MCENTIRE:  I did not.  They objected to this.

MR. MORRIS:  Your Honor, we didn't object to it, and that is the one exhibit that they did not object to.

HCMLPHMIT00003095

83

THE COURT:  Oh, it is?

MR. MORRIS:  Nobody objected to this exhibit.

MR. MCENTIRE:  I'm not going to object to this exhibit, Your Honor.

THE COURT:  Okay.  It's a different version.

MR. MCENTIRE:  Fair enough.

THE COURT:  Okay.  It was a different email around that same time frame.

MR. MCENTIRE:  So just --

THE COURT:  Apologies.  We stopped the clock.

MR. MCENTIRE:  This -- my next exhibit is simply a demonstrative, but I just want the Court to understand that MGM is no small matter here and Mr. Seery did testify in deposition that it probably made up $450 million.  He was pretty close.

MR. MORRIS:  Your Honor, I object to this demonstrative.  There is no evidence in the record.  It's not cited to anything.  We're not just going to start putting up stuff on the screen that we like.

MR. MCENTIRE:  Excuse me.  I'm not offering this document into evidence.

MR. MORRIS:  I don't care.  The Court shouldn't be seeing a demonstrative exhibit that contains matters that are never going to be in the record.

THE COURT:  Okay.

84

MR. MCENTIRE:  I disagree.  I can put the data in the record.

May I proceed?

MR. MORRIS:  But you didn't.

THE COURT:  Okay.  I'm not considering the truth of this until and unless I get evidence of this.

MR. MCENTIRE:  Fair enough.  But the point is this, Mr. Seery has conceded in deposition that between the institutional funds and the CLOs, there's a lot of MGM securities and stock.  We're talking a lot of money.  We're not talking about just Highland Capital's investment.

You can skip the next slide.  Skip.

So, rumors versus material nonpublic information.  They can talk all day long, and if they want to use their time doing this, they can.  There's a difference between rumor and actual material nonpublic information.  Rumor from undocumented sources, lack of clarity, lack of timing.  There is no -- there's no debate that a lot of people knew that maybe MGM might be for sale.  Maybe they wouldn't.  Sometimes it falls apart, you know.  But the point is a board member is telling someone that there's a probable event in the first quarter of 2021.  That is definite, specific, and it comes from the highest authority.  That is -- if that's not material and public information, I don't know what could be.

Classic indications of insider trading.  You have to have

HCMLPHMIT00003097

85

a tipper with access to MNPI.  Here, we know that Mr. Seery, if he's the tipper, we allege he's the tipper -- and these are words of art out of case law, by the way -- he has access to information about MGM.  He has access about asset values, projected values.  He has a relationship.  We believe he has a very strong relationship.  It's more than just social acquaintances.  He's giving congratulatory emails.  He's getting solicitations.  He's solicited.  Benefits received. We know what the benefits are.  They get the opportunity to invest money with huge upside.

There was a point mentioned some time ago that, well, only -- only the sellers really have the grievance.  Well, Your Honor, we have a right to start our lawsuit and do some discovery, because, frankly, a lot of sellers have big-boy agreements.  They say, you don't sue me if I have MNPI.  I don't sue you if you have MNPI.  We have mutual releases. Let's go by our way.  Everybody's happy.  We're not going to come back and see each other ever again.

That's one of the things we're being deprived of here. But otherwise, what we have here is a colorable plan.  We've asked for the communications with the sellers.  We can't get it.  We have here an email.

Next.

We have here an email.  This actually -- you'll hear Mr. Dondero say this actually reflects three communications.  Raj

86

Patel, Farallon, bought it because of Seery.  Mr. Dondero contacted Mr. Patel and says, Raj Patel bought it because of Seery.  50 to 70 percent's not compelling.  Class 8.  50 percent, 70 percent.  Give you a 30 percent to 40 percent premium.  Not compelling.  I ain't going to sell.  Ask what would be compelling.  Nothing.  No offer.  Bought in February/March.  We now know the time frame.  We know that Stonehill is communicating with them and we know that Farallon has been just communicating with Mr. Seery.  Bought assets with claims.  It's not just the MGM.  It's not just the portfolio companies and other assets.  It's also the claims.

Well, what are the claims?  It's the claims against Mr. Dondero.  Well, how would they know about all this if there's no due diligence and there's no evidence of any due diligence before you?  130 percent of costs, not compelling, no counter.  Mr. Dondero's angry.  Discovery is coming.

Atypical behaviors are also circumstantial evidence of insider trading.  We have strange behaviors here, Judge.  We have a vast majority of the claim value is acquired by only two entities post-confirmation.  Most significant claims are only owned by two entities who were strangers to the whole process.

The removal of -- and Mr. Morris offered to stipulate.  The sudden removal of MGM from the compliance list in April of 2021 -- by the way, the removal doesn't cleanse the MNPI.  If

HCMLPHMIT00003099

you have material nonpublic information because you received it from Mr. Dondero, the fact that Mr. Dondero's no longer employed by Highland Capital or no longer directly or formally affiliated doesn't cleanse the MNPI.

We have no due diligence, regardless of the significant nine-digit numbers, and we have no rational explanation of why this kind of money would be invested when they're projecting an actual loss, if -- a modest return at best for Class 8 and a loss for Class 9.

Insider trading can be proved by circumstantial evidence, Your Honor. No fraudster, no person who's done wrong is going to admit to it, so you look for the classic -- you look for the classic elements. And that's what we had here. And we have alleged all of this in our pleadings. Not in extraneous evidence. Within the four corners of our pleadings. And that's why we have a plausible claim.

You know, I believe it's Rule 8, Rule 9 of the Federal -- you have to require specificity in a fraud claim. Well, this is not a fraud claim. This is a different claim. But we have provided specificity that passes the smell test of colorability. We have provided specificity that would satisfy even more stringent requirements under 12(b)(6).

The plan analysis. This is a, I think, a document admitted by everyone. Mr. Seery has testified that this projection of 71.32 percent for Class 8 came out in February

HCMLPHMIT00003100

of 2021 and never changed, all the way up to the effective date.

So this is what the public believed. This is what the public knew. And if this was all that Farallon and if is all that Stonehill had access to, that means that they were going to lose their entire investment on Class 9. They bought UBS at a loss to begin with. And on the other three investments, they were going to get a very, very modest, minor return, six percent over three years, or even less. That is not what hedge funds do.

Seery's excessive post-effective date compensation. We have obtained no discovery from Farallon or Stonehill in this regard, but we know that he had no prior experience. We know that the award that was given him was not market-based, even though the self-serving documents that have been produced and that are attached to their exhibit list suggests a robust negotiation. Well, they were robust without any kind of reality check in the real world about whether it was market-supported. None. Mr. Seery has admitted to that.

It was not lowered. He's making $1.8 million a year right now, with most -- a lot of the assets already sold, the reorganization done. All they're doing now is monetizing assets. He's getting $1.8 million. He's got 11 people working for him. And then he has a bonus, a bonus that is -- increases significantly with his ability to recover for Muck,

Jessup, Farallon, and Stonehill.

And in the absence of -- if we were really dealing with uncertainty and risk, then that may be another issue, but here we're dealing with entities that already know that they're going to get a payday and they already have. They've already made about a $170 million return -- 170 percent return, excuse me -- over and above the original investment, when they were projected to actually lose money.

Just so you know, we have over $534 million of cash that has been basically monetized, and out of that, $203 million in total expenses -- $277 million to Class 8 and -- and -- 1 through 7, and Class 8 distributors. Excuse me, creditors. Even if you take -- if you take out the alleged obligations of Mr. Dondero on the promissory note cases, that still leaves over $100 million available, which puts us in the money. Puts us in the money. And the fact that you have $203 million of expenses in a case of this nature is part of our claim, is that we have delay actions. We have a situation where Mr. Seery is continuing to receive $1.8 million a year on a slow pace to monetize, paying other professionals, when this could have been over a long time ago. That's part of our allegations. It's not part of any valuation motion. It's actually in our allegations.

I'm going to reserve the rest. I think that's my opening statement, Your Honor. I'm going to reserve the rest for my

HCMLPHMIT00003102

closing.  And let me see.  Yes, that's right.  And thank you for your time.

THE COURT:  All right.  Caroline, how much time was that?

THE CLERK:  Thirty-four minutes and 27 seconds.

THE COURT:  Thirty-four minutes and 37 seconds.  Okay.

THE CLERK:  Twenty-seven.

THE COURT:  Oh, 27.  Okay.

MR. MCENTIRE:  Thirty-four minutes?

MR. MCCLEARY:  Thirty-four minutes.

MR. MORRIS:  Your Honor, I do have hard copies of my short slide presentation.

THE COURT:  All right.  You may approach.

And Mr. McEntire, are you going to give me your PowerPoint later, hard copies later?

MR. MCENTIRE:  Yes, Your Honor.  I found one typo and I'd like to fix one typo and then we'll give it to you.

THE COURT:  Okay.

OPENING STATEMENT ON BEHALF OF THE DEBTORS

MR. MORRIS:  Good morning, Your Honor.  John Morris, Pachulski Stang Ziehl & Jones, for Highland Capital Management and the Claimant Trust.

I want to be fairly brief because I really want to focus on the evidence.  I look forward to Your Honor hearing from

Mr. Seery so that he could clear up a lot of the misleading statements that were just made.

The Court is here today on a gatekeeper function, and we're delighted that the gatekeeper exists.  We're delighted that the Court will have an opportunity, after considering evidence, to determine whether or not these claims are actually colorable.

There's -- there were a lot of conclusory statements I just heard.  There were a lot of assumptions that were made.  There were a lot of misleading statements that were made.  At the end of the day, what the Court is going to be asked to do is to decide whether, in light of the evidence, do these claims stand up on their own?  And they do not.

And let me begin by saying that I made a mistake a couple of weeks ago.  If we can go to Slide 1.  I told Your Honor that you were the sixth body to consider these insider trading claims.  Based on Hunter Mountain's exhibit list, there is actually one more, and I'll get to that in a moment.  So you're actually -- this is the seventh attempt to peddle these claims to one body or another.

The first was Mr. Dondero's 202 petition.

Everything I have here, Your Honor, is footnoted to evidence.  Okay?

So, Footnote 1, you can look in the paragraphs of Mr. Dondero's petition, his amended petition, his declaration,

92

where he makes the same allegations.  Again, I misspeak.  Not the same allegations.  Different versions of the allegations that are being presented today concerning insider trading.

He did it three times.  The Texas state court said no discovery.  In October of 2021, Douglas Draper wrote an extensive letter to the U.S. Trustee, setting forth the same allegations.  You can find them at our Exhibit 5.  It's attachment Exhibit A, Pages 6 through 11.  Compare them to the allegations that are being made by Hunter Mountain today.  The U.S. Trustee's Office took no action.

Mr. Rukavina followed up with the same thing to the same body in November of 2021.  You can see where his allegations of insider trading are made and *quid pro quo* and all the rest of it.  Again, they took no action.

The one that I don't have on this chart because I didn't -- I made the chart last week and then was unavailable.  Mr. Rukavina sent a second letter.  And you can find that at Plaintiffs' Exhibit 61.  And in Plaintiffs' Exhibit 61, you'll see that Mr. Rukavina sent yet another letter to the U.S. Trustee's Office on May 11, 2022.

And these are all really important, right?  The U.S. Trustee's Office has oversight responsibility for matters including claims trading.  That's their job.  They took three different swings at this.  And these are pages of allegations. 6 to 11.  9 to 13.  We think it's very important that the

HCMLPHMIT00003105

Court look at what was told to the U.S. Trustee's Office.  And you're going to hear Mr. Seery testify that Highland has never heard from the U.S. Trustee's Office concerning any of these allegations or any of the other allegations that are set forth in Mr. Rukavina and Mr. Draper's letter.  Never.  Declined to even initiate an investigation.

Hunter Mountain filed its own 202 petition.  It boggles my mind that they try to create distance with Mr. Dondero, because the whole petition, like this whole complaint, is based on Mr. Dondero.  He submitted a declaration alleging the same insider trading case, and a second Texas state court said I'm not even giving you discovery.  We know that's the result.

But the best is the Texas State Securities Board.  I think we're going to hear testimony that Mr. Dondero or somebody under his control is the one who filed the complaint with the Texas State Securities Board.  Who would be the better body to assess whether or not there's insider trading than a securities board?  I can't imagine there's a better body.  They did an investigation.  Mr. Dondero could have told them anything he wanted.  I'm sure he did.  And they wrote in their motion in Paragraph 37 one of the reasons they have colorable claims is the investigation is ongoing.

Much to their dismay, I'm sure, two days before our opposition was due, the Texas State Securities Board said, we've looked at the complaint, we've done our investigation,

HCMLPHMIT00003106

94

and we're not taking any action.  You can find that, Your Honor, Footnoted 5 at Exhibit 33.

You are now the seventh body who's being asked -- and you're being asked to do substantially more than any of the other prior bodies were.  The Texas state courts were being asked, just let them have discovery.  They said no.  The U.S. Trustee's Office, charged with the responsibility of looking at claims trading, said, I'm not going to investigate.  I know what you've told me.  No.  The Texas State Securities Board.  Insider trading, insider trading.  I'm not doing an investigation.  I'm not doing anything.  And now they want to come here and engage in, you know, in expensive, long litigation over the same claims nobody else would touch.

Can we go to the next slide?

Mr. Dondero's email.  Good golly.  "Amazon and Apple are in the data room."  There's a hundred articles out there that they're putting into evidence that say that.  "Both continue to express material interest."  There's a hundred articles out there that say that.  "Probably a first-quarter event.  Will update as facts change."

There will not be any evidence that he ever updated anybody, because that wasn't the purpose of this, as Your Honor will recall.  He had an axe to grind.

And I direct your -- I don't direct the Court to do anything -- I ask the Court to take a look at our opposition

HCMLPHMIT00003107

95

to the motion, in Paragraphs 23 to 25, where we cite to extensive evidence, all of which is now part of the record, showing just what was happening, from the moment he got fired on October 10th until the end of the year, with the interference, with the interference, with the threats, with the TRO.  It was nonstop.

Was this email sent in good faith by somebody who owed no duty to anybody?  Or was it really just another attempt -- and this is why the gatekeeper is so important, because I think that's exactly what this Court is supposed to do:  Is this a good-faith claim?  Is this a claim that's made in good faith?  It can't be.  And you know why?  You know what's -- you know what's -- I'll just say it now.  I won't even save it for cross.

Remember the HarbourVest settlement that they're making so much, you know, about?  Mr. Dondero is the tipper.  According to him, he gave Mr. Seery inside information.  According to him, Mr. Seery abused it by engaging in the HarbourVest transaction.  But Mr. Dondero filed an extensive objection to the HarbourVest settlement and never said a word about this, because that wasn't on his mind at the time.  The email was sent in order to interfere.  And when that failed, he's trying to play gotcha now.  It's ridiculous.

He owed no duty to Highland.  It would have been a breach of his own duty to MGM to share that information at that

96

period of time.

The shared services agreement.  They don't help him.  Mr. Dondero has nothing to do with that.  Highland is providing services.  He's not providing services to Highland.  Highland was providing.  We had already given notice of termination.  We had already had our plan and disclosure -- we had already had our disclosure statement approved.  We were weeks away from confirmation.  Please.

And the *Wall Street Journal* article on December 21st at Exhibit 27, that's not your garden-variety *Wall Street Journal* article, because it specifically says that investment bankers were engaged to start a formal process.  The investment bankers are identified by name.  Something has changed.  Anybody could see that.

Yes, there were rumors for a long time.  Nobody had ever said there was a formal process.  Nobody had ever said investment bankers had ever been hired.  Nobody had ever identified those investment bankers.  Right?  I mean, just the world changed.

If you can go to the next slide.

You know, before I get to the next slide in too much detail, *quid pro quo*.  We look at it as *quid*.  Did he -- is there any evidence that he actually gave anybody material nonpublic inside information?  The answer is going to be no.  The *quo* is the relationship.  And I'm not going to spend too

HCMLPHMIT00003109

much time on that now.  But wait until you hear Mr. Seery testify as to the actual facts about his relationship. Because some of what we just heard is mind-boggling, that little -- that little page from the *Blockbuster* case, like, 14 years ago, where Farallon was one of a group of people who Jim Seery never met.  Like, the stretch, what they're trying to do is beyond the pale.  But I'm delighted to have Mr. Seery sit in the box and answer all the questions they want to ask him about his relationship with Farallon and Stonehill.

But getting to the point, the *quid pro quo*.  The *quo* is they fixed his compensation?  Are you kidding me?  They rubber-stamped his compensation?  Highland and Mr. Seery and the board are alleged to have negotiated?  There's nothing alleged.  There are facts.  There is evidence.  It is beyond dispute.  If you look, just for example, right, they take issue with his salary?  The salary was fixed by this Court in 2020.  Without objection.  He's getting the exact same salary that he ever got.

You'll hear that it's a full-time job.  Your Honor knows better than anybody in this courtroom, other than me, perhaps, the litigation burden that's been placed on this man.  He has no other income.  He doesn't do anything else.  This is a full-time job.  It's the exact same job that he had when Your Honor approved his compensation package three years ago, without a raise.  They didn't give him a nickel more.  Not one

HCMLPHMIT00003110

98

nickel.  It's outrageous.

The balance of his compensation, of which he has not yet received a nickel, is exactly what this Court would want somebody in Mr. Seery's position to do.  It aligns his interests with his constituency.  Not with Stonehill.  Not with Farallon.  With all creditors.  The greater the recovery, the greater the bonus.  Outrageous, right?  Remarkable, isn't it?  Only in their world.

If Your Honor can go back to Mr. Rukavina's letter, because this is where it all -- that's where it all starts from.  Like, excessive compensation.  Mr. Rukavina, I don't know how he did this, why he did it, what it was based on.  He actually told the U.S. Trustee's Office that they thought Mr. Seery made $50 million.  It's in the letter.  $50 million, they told the U.S. Trustee's Office he made.  It's footnoted, so you can go find it.  It's right there, at Page 14.  Quote, Seery's success fee could approximate $50 million.

$8.8 million is what he's making.  They think that's excessive?  What do they think he should make?  Three?  Five? We're not going to hear that.  But that's what this case is about.  You just heard counsel in his opening statement.  He literally said the only thing at issue is his compensation. And that has to be the case, because if there was -- if there was no claims trading, UBS and HarbourVest and Acis, right, the Redeemer Committee, they would all still be holding these

HCMLPHMIT00003111

99

claims today.

When Stonehill and Farallon acquired the claims, they were all allowed. There was no debate about what the claims were. If they held the claims today, they would be worth the exact same amount of money, only a different person would be benefitting from it.

So the case actually is only about Mr. Seery's compensation. And they've moved the goalposts, as often happens in this courtroom, from rubber-stamping -- I'll give you what you want. When I hear rubber-stamp, I hear, you make a demand and I'll give it to you. And now they realize, when they see the negotiation -- because it's in evidence, it's just the documents, you can see the board minutes -- what do we, doctor the board minutes and they should get discovery because we doctored the board minutes? The board minutes show a four-month negotiation with an Independent Board member fully involved. It's mind-boggling. It's actually -- well, I'll just leave it at that.

Next slide. Last slide. Let me finish up. Three of the four sellers were former Committee members. Mr. Dondero agreed that Committee members would have access to special nonpublic inside information as part of the protocols, as part of the corporate governance settlement. He agreed to that. These are the people who got abused? These are the people who didn't know what was happening? Committee members and

HCMLPHMIT00003112

100

HarbourVest, probably one of the biggest and most sophisticated funds in the world, didn't know what was happening? They got abused? Stonehill and Farallon took advantage of them?

If you read their pleadings closely, they actually allege, and I don't -- I don't know if there'll ever be any evidence of this -- but they actually allege that -- I forget which -- oh, somebody is an investor in Stonehill and Farallon, and so the theory is one of the sellers is an investor in Farallon. So not only did they abuse, they abused one of their own investors. Like, this is not a colorable claim. This is ridiculous.

None of the claims sellers are here. Sophisticated people who -- who -- right? Mr. Dondero could pick up the phone and say, hey, guys, you got ripped off. You sold your claims when you shouldn't have. They had an unfair advantage.

Nobody's here. Where is anybody complaining? They're not going to because they cut a deal that they thought was good for them at the time. In hindsight, maybe they have regrets. Right? We all have regrets sometimes in hindsight. But that doesn't create a claim.

We've heard so much about what hedge funds would get and how much and is this rational? The fact of the matter is, at the time Mr. Dondero had his phone call on May 28th, UBS had not been purchased, although MGM had already been announced.

HCMLPHMIT00003113

101

So when they talk about MGM, maybe it's the fact -- and this is in evidence -- maybe it's the fact that, two days before, the MGM-Amazon deal actually was publicly announced.  It actually was.  So maybe when they say, hey, yeah, we like MGM, because, you know, that just -- that just got announced. Maybe that happened.

But at the end of the day, the claims that they bought, if you just look at the claims that were purchased at the time he had the conversation, all Mr. Seery had to do was meet projections and they were going to get $33 million in two years.  A 30 percent return in two years.  I don't know.  That doesn't -- that doesn't sound crazy to me.  Doesn't sound crazy to me.  It certainly doesn't create a colorable claim, just because they think that Farallon or Stonehill -- there's not going to be any evidence of Farallon or Stonehill's risk profile.  There's not going to be any evidence of Farallon or Stonehill's, you know, expected returns.  There's not going to be any evidence at all about what due diligence they did or didn't do, other than what comes out of Mr. Dondero's mouth, as usual.

Mr. Dondero -- and let's look at what's going to come out of Mr. Dondero's mouth.  He has multiple sworn statements. I'm going to take his notes and they're going to become mine. I'll put him on notice right now.  Because those notes bear no relationship to the evolution of his sworn statements over

HCMLPHMIT00003114

time.

The first time he mentions MGM in a sworn statement is two years after the fact in Version #5. That's a colorable claim? You want -- you want to oversee a litigation, or maybe it gets removed to the district court, maybe I get lucky to be in front of a jury, and I'll have Mr. Dondero explain how it took him five tries before he could write down the letters MGM. Not a colorable claim. No evidence against Stonehill whatsoever. Zero. Zero. Never spoke to them. There's no colorable claim here, Your Honor.

I'm going to turn the podium over to Mr. Stancil to talk about the law.

THE COURT: Okay.

OPENING STATEMENT ON BEHALF OF JAMES P. SEERY, JR.

MR. STANCIL: Thank you, Your Honor. Mark Stancil, counsel for Mr. Seery. But I'm going to just very briefly address a few legal points. And I actually mean briefly.

THE COURT: Okay.

MR. STANCIL: I'll come back to a good bit of this in closing as time permits.

I heard Mr. McEntire say *Barton* doesn't apply. I would encourage him to start with what the gatekeeping order actually says. Here it is. This is in -- it's in the plan. Your Honor has confirmed it. The question we have in terms of what standard applies is, what does this order mean? Well, we

HCMLPHMIT00003115

think that's going to be clear. It's not what they think the word "colorable" would mean in other contexts. It's not what they think they should have to satisfy now that they have a theory. It's, what does this mean?

And we'll get into some of the additional evidence from Your Honor's order at the time, later in closing.

Next slide, please.

But let me just start to say I'm awfully surprised to hear him say that he doesn't believe *Barton* applies, because the order says that it does. This is Paragraph 80 of the confirmation order. It says that the Court has statutory authority to approve the gatekeeper provision under these sections of the Bankruptcy Code. The gatekeeper provision is also within the spirit of the Supreme Court's *Barton* Doctrine. The gatekeeper provision is also consistent with the notion of a pre-filing injunction to deter vexatious litigants that has been approved by the Fifth Circuit in such cases as *Baum v. Blue Moon Ventures*.

So I think it is impossible, and respectfully, Your Honor, it's law of the case. This is what the order is based on. The day for objecting to what's in the confirmation order is long gone.

So let me come back, then -- first slide, please -- and I'll just very briefly give you a little legal framework for what we're going to be arguing to you later in closing.

104

So, *Barton* does require a *prima facie* showing. That is *Vistacare* and plenty of other cases. That is more than a 12(b)(6) standard, Your Honor. Numerous courts agree. And in fact, as you'll hear us discuss later, Judge Houser's opinion is not to the contrary, because she said explicitly, I'm not applying *Barton*. So anything that they're relying on for what *Barton* requires from that opinion is *dicta*. But we can show you case after case after case, and we will, to show that *Barton* requires evidentiary hearings.

Here's a point, this third bullet here is something I have not heard a single word in all of the briefing and ink that has been spilled and in as long as we've been here this morning, is what is a gatekeeping order doing if all it does is reproduce a 12(b)(6) standard? That's what they say. In fact, they're actually saying it's even lower. Now I think I heard them say it's even lower than a 12(b)(6) standard.

That makes no sense whatsoever. We've just shown you that this gatekeeping order was imposed consistent with *Barton* and vexatious litigant principles. Later I will walk Your Honor through factual findings that you made detailing the vexatious litigation, detailing the abuses. The notion that the gate is the same gate that every other litigant who hasn't demonstrated that record of bad faith is absurd, and it serves no purpose.

And as Mr. Morris described, Hunter Mountain woefully,

HCMLPHMIT00003117

105

woefully violates any *prima facie* showing.  And we'll get into a little bit more exactly how that works.

We are going to ask this Court, in addition to ruling that *Barton* applies and that they've failed it, we're going to ask this Court, respectfully, to please consider ruling on multiple independent grounds as well.  We know there's a penchant for appeals and appeals upon appeals.  So we will argue to Your Honor, although we will largely spare you another rehash of our briefs, but we will explain to Your Honor why they do lack standing to bring this claim as a matter of Delaware law.  And there was a lot of fuzzing up about constitutional standing and Delaware law.  Not necessary.

If -- we will be happy to rely on our pleadings here, but on Page 27 of the Claimant Trust Agreement, that's what defines their rights under Delaware law, and they were talking about how beneficial owners under Delaware law have standing.  Well, are they beneficial owners?  They are not.  Equity holders -- this is in Paragraph C, Page 27 of the Claimant Trust Agreement -- Equity holders will only be deemed beneficiaries under this agreement upon the filing of a payment certification with the bankruptcy court, at which time the contingent trust interests will vest and be deemed equity trust interests.

They are not beneficial owners of squat.  That has not

106

happened.

And last, Your Honor, we will -- and I will organize this for Your Honor in closing as well -- we would ask you to rule on a straight-up 12(b)(6) standard as an alternative, because we know what's coming on appeal and we think their complaint collapses under its own weight. You heard Mr. Morris detailing their own math shows significant returns. You'll also hear us describe how they have nothing but mere conclusions and naked assertions upon information and belief but unsupported.

*Iqbal* and *Twombly* would still apply under their 12(b)(6) standard, especially, and perhaps even more with a heightened standard under Rule 9(b), because they're essentially alleging some version of fraud, it sounds like.

They're never going to get there, Your Honor. All we would ask is for a full record to take inevitably, unfortunately, to the Court of Appeals.

And I think Mr. -- I'm not sure which of my colleagues will be speaking briefly for Holland & Knight, but I'll just turn it over to them.

THE COURT: All right. Mr. McIlwain?

OPENING STATEMENT ON BEHALF OF THE CLAIM PURCHASERS

MR. MCILWAIN: Thank you, Your Honor. I'll be even briefer. Brent McIlwain here for the Claim Purchasers.

Your Honor, Mr. McEntire stated to this Court that my

HCMLPHMIT00003119

107

clients have never denied any of this.  In fact, in his reply, he says, The Claim Purchasers do not deny that they invested over $163 million.  We do not deny that we did not due diligence, we do not deny that we refused to sell our claims at any price, and we do not deny that we invested the claims at what is, at best, a low ROI.

We had no duty to answer to HMIT or Mr. McEntire.  We had no duty when we bought these claims to -- we had no duties to any creditor.  We had -- it was a bilateral agreement with a third party.  And frankly, Your Honor, it's not Mr. Dondero's or HMIT's business what due diligence we did and what information that we obtained.

But I will tell you right now, Your Honor, we were very careful in our pleadings to not bring issues of fact, because this -- HMIT has been chasing my clients, obviously, based on the notes that were presented in the initial PowerPoint, it was a -- it's retribution.  It's retribution for not agreeing to sell the claims to Mr. Dondero when he offered to purchase at a 40 percent premium.

And Your Honor, when I look at that note, it's interesting, because I hadn't seen the note, obviously, until it showed up on the exhibit list.  When you look at that note, I think it's -- I think it's very interesting.  To the extent it was contemporaneous, I don't know.  But what it shows, it shows that if you're a hammer, everything's a nail.  And Mr.

HCMLPHMIT00003120

108

Dondero is a vexatious litigator. And what did he write down? Discovery to follow.

But my question is this. Who was trying to trade on inside information? Mr. Dondero was offering a 40 percent premium, allegedly, on the cost. What information did he have? Certainly, he had inside information.

My client owed no duty to Mr. Dondero. My client owed no duty to anybody in this estate at the time of these claims purchase.

And Your Honor, we talk a lot about -- or, it's been talked a lot of insider trading. These are claims trades. I think the Court honed in on this from the very get-go. The Court does not have a role in claims trades. There's a 3001 notice that's filed post-claims trade, but there's no requirement that there's Court approval.

And these aren't securities. It's not as if we're trading claims and it could benefit or hurt you based on some equity position that you're going to obtain. We obtained claims that had been settled, they were litigated heavily, and the most that we can obtain is the amount of the claim. And that is, as Mr. Morris stated, all that changed was the name of the claimant. That's all. Because the claims didn't increase in value based on the trade.

Your Honor, our pleadings, I think, speak for themselves in terms of you really -- you really don't have to consider

HCMLPHMIT00003121

evidence, from our perspective, to determine that this proposed complaint has no merit and is not plausible and presents no colorable claims.

The gatekeeper provision, and we're going to talk a lot about that today, obviously, right, requires that Mr. Dondero establish a *prima facie* case that the claims have some plausibility. If you can simply write down allegations, file a motion for leave and attach those allegations and say, Your Honor, you have to take all these as true, the gatekeeper has no meaning. There's no point in having a gatekeeper provision.

And in summary, Your Honor, what -- and I think Mr. Morris honed in on this specifically -- this really comes down to compensation. Right? Because this -- the allegation is that my clients purchased claims, presumably at a discount, right, based on some inside information, which we obviously deny, but we don't have to put that at issue today. For what purpose? For what purpose? So we got inside information from Mr. Seery so that we could then scratch his back on compensation on the back-end?

Your Honor, there is no reason that my clients need to be involved in this litigation. If HMIT thinks that this -- that they have a claim against Mr. Seery for excessive compensation, they can -- they could have brought such a gatekeeper motion, or a motion for leave under the gatekeeper

HCMLPHMIT00003122

110

provision, without including my clients.  Why did they include my clients?  They included my clients because my clients did not sell to Mr. Dondero when he called, unsolicited, to try to get information.  It's retribution.  And that's what a vexatious litigator does, and that's why the gatekeeper provision is in place.

I'll reserve the rest for closing, Your Honor.

THE COURT:  All right.  Caroline, what was the collective time of the Respondents?

THE CLERK:  Twenty-eight minutes and 37 seconds.

THE COURT:  Twenty-eight minutes, 37 seconds.

All right.  Well, let's talk about should we take a lunch break now?  I'm thinking we should, because any witness is going to be, I'm sure, more than an hour.  So can you all get by with 30 minutes, or do you need 45 minutes?  I'll go with the majority vote on this.

(Counsel confer.)

MR. MCENTIRE:  1:00 o'clock.  45 minutes.

MR. MORRIS:  40 minutes, whatever.  1:00 o'clock?

THE COURT:  We'll come back at 1:00 o'clock.

MR. MORRIS:  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.

THE CLERK:  All rise.

(A luncheon recess ensued from 12:19 p.m. until 1:05 p.m.)

THE CLERK:  All rise.

111

THE COURT:  All right.  Please be seated.  We're going back on the record in the Highland matter, the Hunter Mountain motion for leave to file lawsuit.

I'll just let you know that at 1:30 we're going to take probably what will be a five-minute break, maybe ten minutes at the most, because I have a 1:30 motion to lift stay docket. Just looking at the pleadings, I really think maybe one is going to be resolved and it won't be more than five or ten minutes.  So whoever is on witness stand can either just stay there, because I think we won't be finished, or you can take a bathroom break or whatever.  All right?  So, it's video, the 1:30 docket.

All right.  So, Mr. McEntire, are you ready to call your first witness?

MR. MCENTIRE:  I am, Your Honor.

THE COURT:  Okay.

MR. MCENTIRE:  May I proceed?

THE COURT:  You may.

MR. MCENTIRE:  At this time, Hunter Mountain calls Mr. James Dondero.

THE COURT:  All right.  Mr. Dondero, welcome.  If you could find your way to the witness box, I will swear you in once you're there.  It looks like you've got lots of notebooks there.  Please raise your right hand.

(The witness is sworn.)

HCMLPHMIT00003124

Dondero - Direct                              112

THE COURT:  All right.  Thank you.  You may be seated.

MR. MCENTIRE:  I'm not familiar with your procedure.  Should I approach the -- here to --

THE COURT:  If you would, unless you're having --

MR. MCENTIRE:  That's fine.

THE COURT:  -- any kind of --

MR. MCENTIRE:  That's fine.  I'm not.

THE COURT:  -- knee issues or, you know, sometimes people want to stay seated for that reason.

MR. MCENTIRE:  Your Honor, again, my tender of Mr. Dondero as a witness is subject to our running objection on the evidentiary format.

THE COURT:  Understood.

JAMES DAVID DONDERO, HUNTER MOUNTAIN INVESTMENT TRUST'S

WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MCENTIRE:

Q    Mr. Dondero, would you state your full name for the record, please?

A    James David Dondero.

Q    With whom are you currently -- what company are you currently affiliated with?

A    Founder and president of NexPoint.

Q    All right.  And I think the Court is well aware, but would

HCMLPHMIT00003125

Dondero - Direct                                    113

you just briefly describe your prior affiliation with -- was
it Highland Capital?

A     Yes.

Q     What was that affiliation?

A     President and founder for 30 years, and then to facilitate
an expeditious resolution of the estate I handed the reins to
three Independent Board members and I became a portfolio
manager until October of -- I was an unpaid portfolio manager
until October of '20.

Q     Thank you, sir.  Do you have any current official position
with Hunter Mountain Investment Trust?

A     No.

Q     Can you describe for us, sir, any actual or control you
attempt to exercise on the business affairs of Hunter Mountain
Investment Trust?

A     None.

Q     Are you -- do you have any official legal relationship
with Hunter Mountain Investment Trust where you can attempt to
exercise either direct or indirect control over Hunter
Mountain Investment Trust?

A     I do not.

Q     Did you participate -- personally participate in the
decision of whether or not to file the proceedings that are
currently pending before Judge Jernigan?

A     I did not.

HCMLPHMIT00003126

Dondero - Direct                                    114

Q    As the former CEO of Highland Capital, are you familiar with the types of assets that Highland Capital owned?  On the petition date?

A    Yes.

Q    And have you been monitoring these proceedings and the disclosures in these proceedings since the petition date?

A    Yes.

Q    Okay.  Can you describe generally for me the types of assets on the petition date that Highland Capital owned?  The types of assets?  Describe the types of assets -- companies, stocks, securities, whatever, whatever you -- however you would describe it.

A    There were some securities, but it was primarily investments in private equity companies and interests in funds.

Q    Okay.  I've heard the term portfolio company.  What is a portfolio company?

A    A portfolio company would be a private equity company that we controlled a majority of the equity and appointed and held accountable the management teams.

Q    Would there be separate management, separate boards, for those portfolio companies?

A    Yes.

Q    All right.  How many portfolio companies were there on the petition date, if you're aware?  If you recall?

HCMLPHMIT00003127

Dondero - Direct                                115

A    Half a dozen, of different sizes.

Q    Can you identify the names, if you recall?

A    Yes.

Q    What are those names?

A    Trussway, Cornerstone, some small -- Carey International, CFA, SSP Holdings.  Yeah, to a lesser extent, OmniCare.

Q    All right.

A    Or, um, --

Q    In addition to the portfolio --

A    Sorry.

Q    -- of companies in which Highland Capital would own interests, did Highland also have interests in various funds?

A    Yes.  I said OmniCare.  I meant OmniMax, I think was the name.

Q    What type of funds?

A    I'm sorry.  The funds were usually funds that we were invested in or seeded or managed.  So they're things like Multistrat, Restoration, a Korea fund, PetroCap.

Q    Are these managed funds by Highland Capital?  Or were they?

A    Yes.  Pretty much, with the exception of PetroCap.  We were a minority -- a minority -- a large -- a large minority investor with a sub-advisor.

Q    Did Highland Capital Management on the petition date own an interest, a direct security interest in MGM?

HCMLPHMIT00003128

Dondero - Direct                                    116

A     Yes.  And I -- yes.

Q     Did the various portfolio companies that you've identified, did one or more of those portfolio companies also own MGM stock?

A     Yes.

Q     Did the various funds that you've identified, did one or more of those funds also own MGM stock?

A     Yes.  Between -- yes.  Between the CLOs, the funds, Highland directly, it was about $500 million that eventually got taken out for about a billion dollars.

Q     Okay.  $500 million is what you said?

A     Approximately.  Depending on what mark, what time frame. But ultimately they got taken out for about a billion dollars.

Q     Okay.  And as a consequence of these investments, significant investment -- first of all, how would you describe that magnitude of investments?  Is that a significant investment from the perspective of MGM?

A     Yes.

Q     As a consequence, what role, if any, did you play in terms of MGM's governance?  Were you -- did you become a member of the board of directors?

A     Yes.  I was a board member for approximately ten years, and myself and the president of Anchorage, between our two entities, we had a majority of the equity in MGM.

Q     Okay.  If there was a third party, not familiar with the

HCMLPHMIT00003129

Dondero - Direct                                117

management of Highland Capital, who had been monitoring these bankruptcy proceedings as you have, was there any way that a third-party stranger to this bankruptcy proceeding could, from your perspective, actually appreciate or identify the -- all the details of the investments that Highland Capital had?

MR. MORRIS:  Objection to the form of the question. It calls for speculation.  He's not here as an expert today. He shouldn't be allowed to testify what a third party would or wouldn't have thought or known.

MR. MCENTIRE:  Well, I'll --

THE COURT:  I'll overrule.

BY MR. MCENTIRE:

Q    Mr. Dondero?

A    The disclosures in the Highland bankruptcy were scant.  I think there was six or eight line items listed, the descriptions of which were limited.  But it didn't include -- it didn't include a broad listing of all the funds, and it didn't include subsidiaries or any net value or any offsetting liabilities or risks of any of the underlying companies or investments, either.

MR. MCENTIRE:  Would you put up Exhibit 3, please?

BY MR. MCENTIRE:

Q    Mr. Dondero, we're going to -- do you have a screen in front of you as well?

A    Yes.

HCMLPHMIT00003130

Dondero - Direct                                            118

Q    We're going to put up Exhibit 3, and I'm going to ask you some questions about it.  First of all, would you identify Exhibit 3?

A    It didn't come up on my screen yet.

Q    Still not up there?

A    Yes.  Now it is.

Q    Can you identify Exhibit 3, please?

    (Discussion.)

Q    There we go.  Mr. Dondero, would you identify Exhibit 3, please?

A    This was an email I sent to Compliance and relevant people to put -- to put MGM on the restricted list.

Q    It indicates it was on December 17, 2020.  Did you personally author this email?

A    Yes.

Q    You sent it to multiple individuals, including Mr. Surgent.  Was Mr. Surgent an attorney at Highland Capital at the time?

A    He was head of compliance for both organizations.

Q    Scott Ellington?  Is he an attorney?  Was he an attorney at the time?

A    He's the general counsel of Highland.

Q    You also sent it to someone at NexPoint Advisors, Jason Post.  Who is Mr. Post?

A    Mr. Post was head of compliance at NexPoint Advisors and a

HCMLPHMIT00003131

Dondero - Direct                                           119

subordinate of Thomas Surgent's.

Q    Jim Seery.  Mr. Seery, of course.  You also addressed it to Mr. Seery?

A    Yes.

Q    It says, Trading Restrictions Re: MGM Material Nonpublic Information.  What did you mean by the term "material nonpublic information"?

A    Material nonpublic information is when you have material nonpublic information that the public does not have, and it essentially makes you an insider and restricts you from trading.

Q    All right.  It says, Just got off a pre-board call.

    First of all, you generated this in the ordinary course of your business, did you not?

A    Um, --

Q    This email.

A    Yes.

Q    Okay.

A    Yes.

Q    And --

A    Any restricted list.  Restricted list items happen all the time in the normal course of business.

Q    And you've maintained a copy of this email as well, have you not?

A    I'm sure we have one.  I don't have it personally.

HCMLPHMIT00003132

Dondero - Direct                                    120

Q    Fair enough.  But you're -- you have -- you have access and custody over emails, correct?

A    Not any of my Highland emails.

Q    But those were left.  Right?

A    Yes.  Yes.

MR. MORRIS:  Your Honor, I mean, he's leading the witness at this point, so I'm just --

MR. MCENTIRE:  That's fine.

MR. MORRIS:  I'm just --

THE COURT:  Okay.  Sustained.

MR. MORRIS:  -- going to be sensitive to it.

THE COURT:  Sustained.

BY MR. MCENTIRE:

Q    Mr. -- this is a true and accurate copy of the email that you sent, is it not?

A    It appears to be.

MR. MCENTIRE:  At this time, I would offer Exhibit 3 into evidence, Your Honor.

THE COURT:  Okay.  I'm looking through what we admitted earlier.  Did we not --

MR. MCENTIRE:  This already may be in evidence.

THE COURT:  Yes.  I'm --

MR. MCENTIRE:  I don't --

THE COURT:  Was there any objection?

MR. MORRIS:  There wasn't.  I mean, --

HCMLPHMIT00003133

THE COURT:  I think there was an objection that I overruled.

MR. MORRIS:  No.  There wasn't.  I mean, unfortunately, we've gotten the short end of the stick here, because all of their documents are in evidence, and I got caught short because I'm going to have to do it the old-fashioned way.  But yes, this is in evidence.

MR. MCENTIRE:  Okay.  Fair enough.

MR. MORRIS:  Because -- actually got through all of their documents.

MR. MCENTIRE:  Fair enough.

THE COURT:  Okay.  All right.

BY MR. MCENTIRE:

Q    So, Mr. --

THE COURT:  So it's in evidence.

BY MR. MCENTIRE:

Q    -- Dondero, going back to Exhibit 3, it says, Just got off a pre-board call.

Is that the MGM board, a pre-board call?

A    Yes.

Q    What is a pre-board call?

A    It's a pre-board call that usually sets the agenda.  And, again, myself and the Anchorage guys, we would move in locksteps, in a coordinated fashion, generally, in terms of agenda and company policy.

HCMLPHMIT00003134

Dondero - Direct                                    122

Q    It says, Update is as follows.  Amazon and Apple actively diligencing in the data room.

What was your understanding of -- of -- what was your intent in conveying that information to the recipients?

A    The intent was really in the last sentence, or second-to-last sentence, that the transaction was likely to close.  Amazon had come back.  We had turned Amazon away earlier in the year at $120 a share, and they said they wouldn't be willing to pay more.  And --

THE COURT:  Is there an objection?

MR. MORRIS:  There is an objection.  None of this was shared with Mr. Seery, all of this background that we're -- that we're doing.  He -- I would request that we stick with the -- only the information that was given to Mr. Seery, like -- like he's talking about his intent.  Like, who cares at this point?

MR. MCENTIRE:  Well, --

MR. MORRIS:  This is what Mr. Seery got.

THE COURT:  Okay.  What is your response to that?

MR. MCENTIRE:  I have a response to -- well, they've -- they've questioned his intent in sending this in his opening statement.

MR. MORRIS:  Ah.

MR. MCENTIRE:  And I'm trying to make it clear what his intent was.

HCMLPHMIT00003135

MR. MORRIS:  So, you know what, Your Honor?  *Quid pro quo*.  Now we're going to do a real *quid pro quo*.  He can ask him about his intent, and then he can't object to all of the other documents and exhibits that I say prove that this was here only to interfere with Mr. Seery's trading activity.  I'll do that *quid pro quo*.

MR. MCENTIRE:  May I proceed, Your Honor?

THE COURT:  You may.  Objection is overruled.

BY MR. MCENTIRE:

Q    Mr. Dondero, what was your intent in communicating --

A    Okay.

Q    -- that probably a first-quarter event?  What was your understanding?

A    After 30 years of compliance education:  Taint one, taint all.  We were all sitting together.  I -- the trading desk was right outside my desk.  All the employees of Highland that would eventually move to NexPoint, all the ones that would eventually move to Skyview, all the ones that eventually moved to Jim Seery, were all within 30 feet of my desk.

Q    What do you mean by "Taint one, taint all"?

A    That's a compliance concept that, as a professional, you have a responsibility, when you are in possession of material nonpublic information, to put something on the restricted list so that it's not traded.  Okay?  And you can't -- one person can't sit in their cube and say they know something and not

HCMLPHMIT00003136

Dondero - Direct                                           124

tell anybody else, such that the rest of the organization

trades.  That's not the way compliance works.

Q    It says also no -- also, any sales are subject to a

shareholder agreement.

What was the meaning of that or the intent of that?

A    There was a stringent shareholder agreement, particularly

among the board members, that no shares could be bought or

sold without approval of the company.

Q    The company here being MGM?

A    MGM, yes.

Q    What is a restricted list?

A    A restricted list is when you believe as an investment

professional that you have material nonpublic information, you

notify Compliance, and then Compliance notifies the entire

organization and prevents any trading in that security.

Q    You mentioned the doctrine taint one, taint all.  If an

individual or -- if an individual within a company setting is

found to have traded on material nonpublic information, what

is the potential consequence or sanction?

MR. MORRIS:  Objection, Your Honor.  This is like a

legal conclusion.  He's not a law enforcement officer.  He's

not a securities officer.  What are we doing?

MR. MCENTIRE:  I can rephrase.

THE COURT:  Okay.  He's going to rephrase.

BY MR. MCENTIRE:

HCMLPHMIT00003137

Dondero - Direct                                    125

Q    Based upon your years -- based upon your years of experience as a board member of MGM, based upon your years of experience as a CEO of Highland Capital and an executive that trades in securities and has sold securities, what is your understanding, from a non-legal perspective, of what the risks are associated with trading on material nonpublic information?

A    You could be -- you would be fired from the organization if you did.  You could be banned from the securities industry. The industry can shut down the -- or, the SEC can shut down the advisor or they can fine the advisor.

Q    Do you know what a compliance log is?

A    Yes.

Q    Should MGM have been placed on a compliance log at NexPoint?

A    Throughout the organization -- throughout the organization, it should -- it should and it was on all -- at all organizations, yes.

Q    Should it have been placed on a -- on a compliance log to Highland Capital, from your perspective?

A    Yes.

Q    Can you give us any explanation of why, to your knowledge, why MGM would be taken off the restricted list in April of 2021 at Highland Capital?

A    When an investment professional puts something on the restricted list, in order for it to come off the restricted

HCMLPHMIT00003138

Dondero - Direct                                    126

list, the material nonpublic information has to be public.  So there has to be a cleansing that occurs by the company.

Q    To the extent that you were no longer affiliated with Highland Capital in the early portion, the first quarter of 2021, does that somehow cleanse the material nonpublic information that you identified?

A    It does not.

Q    Why not?

A    Because the -- it -- the company hasn't -- the company didn't come out and make public the information that we knew from a private perspective that the transaction was about to go through.

Q    You sat here during opening statements when Mr. Morris referred to the various news coverage and media coverage concerning MGM and the fact that people had expressed interest in buying in the past?

A    Yes.  And at the board level, we had entertained numerous ones.  There were rumors that had no basis in fact, and there were negotiations we had with people that were never in the news.  But none of them got to this degree of certainty where it was going to close within a couple months.

Q    From your perspective as an investment professional, with the years of experience that you described for the Court, what is the difference between receiving an email from a board member such as yourself and rumors or suggestions of possible

HCMLPHMIT00003139

Dondero - Direct                                              127

sale in the media?

A    I knew with certainty from the board level that Amazon had hit our price, agreed to hit our price, and it was going to close in the next couple months.

Q    That's not rumor or innuendo; that's hard information from a member of the MGM board?

A    Correct.

        MR. MCENTIRE:  All right.  You can take that down, please, Tim.

BY MR. MCENTIRE:

Q    I want to talk a little bit about due diligence.  When you were the chief executive officer of Highland Capital, --

A    Yes.

Q    -- can you tell us whether Highland Capital ever involved itself in the acquisition of distressed assets?

A    Yes.  We did a fair amount of investing in distressed assets.

Q    What is a distressed asset?

A    It's something that trades at a discount, where the certainty and the timing of realizations or contractual obligations is uncertain.

Q    Is a -- well, let me back up.  Has Highland -- did Highland Capital ever invest in unsecured claims in connection with bankruptcy proceedings?

A    Yes.

HCMLPHMIT00003140

Q    And in terms of the -- on the spectrum of risk, where does an unsecured creditor claim in a bankruptcy proceeding kind of rank in terms of the uncertainties or risk, from your perspective?

A    It's high risk.  It's a -- yeah, it would be highly-distressed, generally.

Q    Explain to us -- I know the Court is very familiar with claims trading.  Explain to us from your perspective as an investment -- a seasoned investment expert or executive what those risks are.  What types of risk are associated with such an investment?

A    You have to evaluate the assets tied to the claim specifically.  Or if it's an unsecured in general, the assets in general in the estate.

You have to handicap the realization that a distressed seller might not get full value for something.  You have to handicap the likelihood around that.  And then you have to handicap the timing, and then you have to handicap the expenses and the other obligations of the estate, and then handicap risk items that aren't known or that are difficult if not impossible to underwrite, like unknown litigation or last-minute litigation or claims or something.

Q    And all these handicapping, this handicapping process, how does that impact the price or the investment that you're willing to make?  Generally?

HCMLPHMIT00003141

Dondero - Direct                                          129

A    Generally, you put a much higher discount rate.  You know, like if you would do debt at 10 percent and a normal public equity at a 15 percent return, you would do distressed or private equity investing at a 20, 25 percent return expectation to offset the risk and the unknowns.

Q    In order to handicap an investment in an unsecured creditor's claim appropriately to reach an informed decision, what type of data would you need to have access to?

          MR. MORRIS:  Objection to the form of the question. He's not here as an expert.  He's here as a fact witness.  He should -- he should limit himself to that instead of talking about what investors should be doing.

          MR. MCENTIRE:  Well, Your Honor, with all due respect, he's here as the former CEO of Highland Capital.  He has experience, firsthand knowledge experience, and he also has expertise because of his education, his career, and training.

     And again, there's no limitation here under the Rules about what type of information I can elicit from him in this proceeding.  This is, whether you call it expert testimony, I call it personal knowledge, but it has some expert aspects to it, but I think that's fair and appropriate.

          THE COURT:  Well, I think you can ask what kind of data would you rely on, would Highland Capital or entities he's been in charge of rely on, --

HCMLPHMIT00003142

Dondero - Direct                                    130

MR. MCENTIRE:  I understand.

THE COURT:  -- but not what would people rely on.  So I sustain the objection partially.

MR. MCENTIRE:  All right.

BY MR. MCENTIRE:

Q   Mr. Dondero, I'll rephrase the question.  When you were the chief executive officer of Highland Capital before Mr. Seery took the reins, and you, your company, Highland Capital, was investing in an unsecured creditor's claims, what due diligence, what type of information would you expect your team to explore and investigate?

A   Sure.  Distressed investment in a trade claim would be among our thickest folders, it would be among our most diligenced items, because you have those three buckets, the value of the assets, again, and the ability and timing of monetization of those as a not strong -- as a weak seller, and then you would have the litigation or claims against those, and then you would have to also have a third section of analysis for the litigation risk of the estate overall.

Q   What type of legal analysis or legal due diligence would you have required as the CEO of Highland Capital?

A   At Highland, we would have had third-party law firms, in addition to our own legal staff, in addition to our own business professionals, reviewing all the analysis and the assumptions.

HCMLPHMIT00003143

Q    With regard to a financial analysis, what types of financial due diligence would you have required?

A    It would have been a detailed -- a detailed analysis of all the cash flows on the particular underlying investments, and an evaluation and valuation of what those companies or investments were worth.

Q    Why is it important to look at the underlying value of the asset?

A    Because that -- those are what will be monetized in order to give you a return on the claims or securities that you buy in a distressed situation.

MR. MCENTIRE:  Tim, would you please put up Exhibit 4?

MR. MORRIS:  Your Honor, I don't mean to be monitoring your time, but we're at the 1:30 --

THE COURT:  I was just checking the clock here. Let's do take a break.  So, --

MR. MCENTIRE:  All right.

MR. MORRIS:  Your Honor, can we have an instruction to the witness not to --

THE COURT:  Yes.

MR. MORRIS:  -- look at his phone and not to confer with anybody?  Because we had that incident once before.

THE COURT:  Okay.  Well, I don't --

THE WITNESS:  I don't have my phone.

HCMLPHMIT00003144

THE COURT:  Okay.

THE WITNESS:  My phone's at the front desk.

THE COURT:  So, no discussions with your lawyers or -- I guess he doesn't have his phone -- during this break.

MR. MORRIS:  Thank you, Your Honor.

THE COURT:  All right.  So, I really think this will take five minutes, so don't go far.

(Off the record, 1:33 p.m. to 1:47 p.m.)

THE COURT:  Okay.  We will go back on the record, then, in the Highland matter.

MR. MCENTIRE:  I'm just going to grab him right now.

THE COURT:  Okay.  We are, for the record, waiting on Mr. Dondero to take his place again on the witness stand.

(Pause.)

THE COURT:  All right, Mr. Dondero.  We're ready for you to resume your testimony.

All right.  Mr. McEntire, you may proceed.

MR. MCENTIRE:  Thank you, Your Honor.

DIRECT EXAMINATION, RESUMED

BY MR. MCENTIRE:

Q   Mr. Dondero, when we left off, I was just putting up what I requested as Exhibit 4.

MR. MCENTIRE:  And Tim, if you can put that back up, please.

BY MR. MCENTIRE:

Q    Mr. Dondero, can you identify Exhibit #4, please?

A    Yes.   These are notes I took contemporaneous with three conversations with guys at Farallon.

Q    I didn't quite hear you.  Did you say contemporaneous?

A    Yes.

Q    So, you say with three conversations.  Who were the conversations with?

A    One was with Raj Patel that was fairly short, and he deflected me to Mike Linn, who was the portfolio manager in charge and had done the transactions.

Q    Which transactions?

A    The buying of the claim, the Highland claims.

Q    All right.  And what was your purpose in making these notes?

A    We'd been trying nonstop to settle the case for two-plus years.  We'd been counseled that it was a Kabuki dance that would just, you know, all settle at the end, and it never quite happened that way.  And when we heard the claims traded, we realized there were new parties to potentially negotiate to resolve the case.

The ownership was initially hidden, but we were able to find out pretty quickly that Farallon was Muck.  So I reached out the Farallon guys.

Q    All right.  And were you ever able at that time to determine who was affiliated with Jessup, the other special-

Dondero - Direct                                    134

purpose entity?

A   We -- initially, we thought Farallon was all of the entities.  We didn't find out about Stonehill -- it was more difficult and they had taken more efforts to hide the ownership in Stonehill.  We didn't find out for two more months.

Q   So your first conversation was with Mr. Patel?

A   Yes.

Q   And did you call him?

A   Yes.

Q   Your first entry, there's a 28 on the left-hand side.  What does that 28 refer to, if you recall?

A   That was the date, I believe.

Q   Do you believe it was May 28th?

A   Yes.

Q   What makes you believe that?

A   That's what it says.

Q   Okay.  Raj Patel --

       THE COURT:  Is there a way you can show the words that are cut off?

       MR. MCENTIRE:  On this particular one, I can't, Your Honor.  We tried, but we can't.  No.

       THE COURT:  If I look in the notebook, can I see it?

       MR. MCENTIRE:  I don't think so.  I think this is -- what you see is exactly what's in the notebook.  It's the same

HCMLPHMIT00003147

document.  This is how -- how we -- this is how we have it.

BY MR. MCENTIRE:

Q    Mr. Patel.  Who is Mr. Patel?

A    He's Mike Linn's boss.  He's head of -- I believe head of credit at Farallon.

Q    Okay.  And Farallon is based where, if you know?

A    San Francisco.

Q    And what kind of company is Farallon, if you know?

A    They -- they look a lot like Highland.  Well, they do real estate.  They do hedge funds.  They do -- they don't do as many 40 Act or retail funds, but they're -- they're an investor.

Q    Mr. Patel.  What did he tell you during this phone call?

A    That he bought it because Seery told him to buy it and they had made money with Seery before.

Q    All right.  And how long did the call last?

A    Not long.

Q    Okay.  You said he referred you to Mr. -- who was the person?

A    To Mike Linn.

Q    Who is Mike Linn?

A    Mike Linn is a portfolio manager that works for Mr. Patel.

Q    And did you call Mr. Linn?

A    Yes.

Q    All right.  The notes here, do these reflect several

Dondero - Direct                                    136

conversations?

A    The first one reflects a conversation with Raj Patel, and then the rest of it reflects two conversations with Mike Linn.

Q    All right.  Where does the first conversation with Mike Linn start and where does it end?

A    It ends -- it begins at the 50, 70 cents.  We knew that they had -- that the claims had traded around 50 cents.  And I said we'd be willing to pay 70 cents.  We'd like to prevent the $5 million-a-month burn.  We'd like to buy your claims.

Q    Why 70 cents?  What was -- what was that all about?

A    I was trying to give them a compelling premium that was still less than I had offered the UCC three months earlier.

Q    And so you have:  Not compelling, Class 8.  What does that mean?

A    He said that was -- he just said 70 cents wasn't compelling.

Q    There's a reference to:  Asked what would be compelling.  Was that a question you asked him?

A    Yes.

Q    And what was his response?

A    He said he had no offer.  And he -- we had heard he paid 50 cents and I offered him 70 cents and then -- but he was clear to me that he wouldn't tell me what he paid.  And so the next time I called him I -- I -- instead of just making it cents on the dollar, I said I'd pay 130 percent of whatever he

HCMLPHMIT00003149

Dondero - Direct                                      137

did pay.  You don't have to tell me what you paid, but I'll pay you 30 percent more than you paid, you know, a couple months ago.  And -- or we thought they notified the Court when they just bought it, but they had actually negotiated buying it back in February.  January or February.  So --

Q   Who told you that they bought it in February or March time frame?

A   He did.

Q   Okay.  Was this during the first or the second phone --

MR. MORRIS:  I apologize for interrupting.  Who's the "he"?

MR. MCENTIRE:  Mike Linn.

THE WITNESS:  Mike Linn.

MR. MORRIS:  Thank you so much.

MR. MCENTIRE:  I'll make sure the record --

BY MR. MCENTIRE:

Q   Mike Linn --

A   Yes.

Q   -- told you that Farallon had bought their interest in the claims back in the February or March time frame?

A   Yes.

Q   All right.  Bought assets with claims.  What does that refer to?

A   He said it wasn't compelling because he said Seery told him it would be worth a lot more.  He -- he confirmed what Raj

Dondero - Direct                                    138

said, that -- I said, do you realize the estate is spending $5 million a month on legal fees?  That, you know, you should want to sell this thing.  And he said Seery told him it was worth a lot more and there were claims and litigation beyond the asset value.

Q    You offered him 40 to 50 percent premium.  What is that?

A    That's what the 70 cents on the 50 cents represents.  And then I changed the dialogue to I'll pay you 130 percent of whatever your cost was.  And he said, not compelling.  And then I, both -- both calls, I pressed him, what price would he offer at?  And he said he had no offer, he wasn't willing to sell.

Q    The 130 percent of cost, not compelling, was that in the second or the third call with Mr. Linn?

A    It was at my third and final call with Farallon.  My second call with Mike Linn was the 130 percent of cost.

Q    And he said not compelling?  You put it in quotation marks?

A    Yep.

Q    And then you said, no counter.  What does that mean?

A    He wouldn't -- he wouldn't give an offer, he wouldn't give a price at which he would sell.

Q    What did Mike Linn tell you, in effect, with regard to his due diligence that Farallon had undertaken?

A    When I -- when I told him about the risks and the

HCMLPHMIT00003151

Dondero - Direct                                139

litigation and the burn, he said he wasn't following the case, he wasn't aware of it, he was depending on Jim Seery.

Q    What, if anything, did Michael Linn tell you about MGM?

A    That was more the initial Raj Patel call, where he said we bought it because he was very optimistic regarding MGM.

Q    Okay.  Did you have any understanding when he first got his optimism about MGM?

A    No.  He just said that's why they had bought it initially, they were very optimistic about MGM.

Q    That's why they had bought it initially?

A    Yes.

Q    And they had bought it initially in the February-March time frame?

A    Yes.

Q    And that -- would you -- does that predate the public disclosure of the MGM sale to Amazon?

A    Yes.

Q    Substantially by a couple of months?

A    Yes.

Q    I'd like to turn your attention now to a different topic.

        MR. MCENTIRE:  And Tim, if you could pull up Exhibit 8, please.

     I believe this document is already in evidence, Your Honor.

        THE COURT:  8 is?

HCMLPHMIT00003152

Dondero - Direct                                      140

MR. MCENTIRE:  Oh, by the way, I offer Exhibit 4 into evidence.

BY MR. MCENTIRE:

Q    Let me ask you a couple quick questions.

THE COURT:  Is there an objection?

MR. MORRIS:  Nope.

THE COURT:  Okay.  4 is admitted.

(Hunter Mountain Investment Trust's Exhibit 4 is received into evidence.)

BY MR. MCENTIRE:

Q    Exhibit 8.

MR. MORRIS:  I apologize, Your Honor.  Just one caveat.  It's not for the truth of the matter asserted; it's for what his impressions were at the time.

MR. MCENTIRE:  Well, --

MR. MORRIS:  This is what he wrote down.  I don't --

MR. MCENTIRE:  I'm offering it for the truth of the matter asserted.

MR. MORRIS:  Okay.  And I object to that extent. This --

MR. MCENTIRE:  Let me --

MR. MORRIS:  Can I *voir dire*?  Can I *voir dire*?  May I do --

MR. MCENTIRE:  May I finish my statement that I was --

HCMLPHMIT00003153

Dondero - Direct                                                   141

THE COURT:  Let him finish, and then --

MR. MCENTIRE:  Thank you.

THE COURT:  -- you can.

MR. MCENTIRE:  I am offering it for the truth of the matter asserted because these are documents that were prepared contemporaneously, it's an exception to the hearsay rule and reflects admissions of a -- of an adverse party.  Admissions that are adverse to their interests.  Declarations of interest adverse to their interest and admissions of an adverse party contemporaneously recorded.  And so that's why I'm offering it.

MR. MORRIS:  For all purposes?

THE COURT:  Okay.  Let me have you point me to the exact hearsay exception.  I understand this hearsay exception you're arguing for the hearsay within the hearsay, the party opponent exception.  But it's technically hearsay of Mr. Dondero, even though he's here on the stand.

MR. MCENTIRE:  Well, I could lay a foundation, then.

BY MR. MCENTIRE:

Q   Mr. Dondero, --

THE COURT:  Well, no.  I'm asking for what your --

MR. MCENTIRE:  It's --

THE COURT:  -- rule reference is.

MR. MCENTIRE:  I don't have the Rules with me right this second.  It's 803(1) --

HCMLPHMIT00003154

Dondero - Direct                                    142

(Discussion.)

MR. MCENTIRE:  All right.  Well, it's -- it's admissible under several categories.  It's not hearsay because it's an admission of a party opponent.  It's also an admission under 803(1), present sense impression.  It's also admissible --

THE COURT:  So you say it's Mr. Dondero's statement describing or explaining an event --

MR. MCENTIRE:  Yes.

THE COURT:  -- or admission made while or immediately after the declarant perceived it?

MR. MCENTIRE:  Yes.  It's also a record of a regularly-conducted activity, which is 803(6).  And I think it's also not technically hearsay because it's also an admission of a party.  So, this --

THE COURT:  Well, that's the hearsay within the hearsay.

MR. MORRIS:  Yeah.

THE COURT:  But I'm -- I'm --

MR. MORRIS:  That can't possibly be right.  I can't go back to my hotel right now and write down that he told me that he did a bad thing and come in here tomorrow and say he admitted he did a bad thing because it's in my notes.

MR. MCENTIRE:  Well, --

MR. MORRIS:  That's can't possibly be the law.

HCMLPHMIT00003155

MR. MCENTIRE:  Well, --

MR. MORRIS:  That's not the law.

MR. MCENTIRE:  There are two hearsay issues here. One is whether this is a business record or otherwise qualifies as an exception to the hearsay rule, and then there's an internal hearsay issue of whether or not what Mr. Patel and Mr. --

THE COURT:  You haven't established the business record exception.  Okay?

MR. MCENTIRE:  I'm prepared to lay the foundation right this second.  At this moment.

THE COURT:  You may proceed.

BY MR. MCENTIRE:

Q   Mr. Dondero, is this a document that was generated by you in the ordinary course of your business?

A   Yes.

Q   Did you have personal knowledge when you recorded this document?

A   Yes.

Q   You personally recorded this document, correct?

A   Yes.

Q   And you have had custody of this document.  Correct?

A   Yes.

Q   And this is --

MR. MCENTIRE:  That's a -- that's a business record,

Dondero - Voir Dire                                     144

Your Honor.

MR. MORRIS:  May I, Your Honor?

THE COURT:  You may.

MR. MORRIS:  Okay.

VOIR DIRE EXAMINATION

BY MR. MORRIS:

Q    Where's the document now?  How come it's -- how come it's cut off?

A    I don't know.

Q    Do you have the document today?  How come we're looking at a document that's cut off?

A    I'm sure we have it somewhere.  I don't have it.

MR. MORRIS:  So, number one, Your Honor, we don't have the actual document.  We have a partial document.

Number two, let's talk about it for a second.

BY MR. MORRIS:

Q    You say that you do this in the ordinary course of business.  What's the purpose of taking these notes?

A    When I'm starting negotiation with somebody new on something complicated and I don't know what their concerns or rationale is going to be, I take little notes like this.

Q    And is it -- is it the purpose of it to capture the important things that are going on in the conversation?

A    So I know next time how to address it differently, you know.

HCMLPHMIT00003157

Q    That's not my question.  My question is, is the purpose of taking notes so that you have a written record of the important points that you discussed?

A    Yes, so I know how to address it the next time.

Q    Okay.  And among the important points that you never put down on these notes was the letters MGM.  Is that correct?

A    Correct.

Q    Okay.  And you never put down here that Michael Linn told you he wasn't following the case, correct?

A    No, I did not.

Q    Okay.

A    But it was --

Q    And --

A    Yeah.  But I --

Q    That --

        MR. MORRIS:  Your Honor, if this is --

        MR. MCENTIRE:  (faintly)  This is *voir dire* of the witness for a business record exception.

        MR. MORRIS:  No, because --

        THE COURT:  Overruled.

        MR. MORRIS:  Thank you.

BY MR. MORRIS:

Q    Mr. Patel wouldn't tell you how much he paid and that's why you didn't write it down, right?

A    Mr. Patel told me he bought it because of Seery.  My

Dondero - Voir Dire 146

conversation was very short with him. That was one of the few things he said. Linn said he wouldn't sell it because he didn't find it compelling.

Q    Okay.

A    And Linn was the one who wouldn't tell me --

Q    Okay.

A    -- the price.

Q    But -- but even though you took these notes to write down things that you thought were important, you didn't write down MGM. Correct?

A    Yes.

Q    And you didn't write down that anybody was very optimistic about MGM. Correct?

A    No, I did not.

Q    And you didn't write down that Mr. Linn told you he wasn't following the case. Correct?

A    Well, he said the same thing Patel said about he bought it because of Seery. He did confirm that. I didn't see any reason to write that again.

Q    You didn't -- you never wrote it down. Not once. Not -- there's nothing about again, right. You never wrote down that --

A    No, I did write --

Q    -- anybody ever told you they weren't following the case. Correct?

HCMLPHMIT00003159

Dondero - Voir Dire                                       147

A   Correct.

Q   Okay.

A   But I wrote down that he bought it because of Seery.

Q   Okay.

MR. MORRIS:  Your Honor, no objection.  It can go in.

MR. MCENTIRE:  Okay.

THE COURT:  Wait.  Did you just say no objections?

MR. MORRIS:  Except -- except for the hearsay on hearsay.  It can't possibly be an admission.  It's his -- it's his notes.  This is what he wrote.  It can come in for that purpose.  It's -- it's a -- that's what he's testified to, and I can't object to that.  But it can't possibly come in as an admission against Farallon.

MR. MCENTIRE:  Well, I disagree.

MR. MORRIS:  That's the point.

MR. MCENTIRE:  Well, first of all, I disagree.  This is otherwise admissible, and it can come.  I think that's really, Your Honor, that's really the weight it's going to be given.  It comes in.  He's not making an objection to its admissibility.  And if he wants to argue the weight of the document, that's a different issue.

MR. STANCIL:  Your Honor, if I may.

THE COURT:  You may.

MR. STANCIL:  The second layer of hearsay goes to whether this is a statement by Farallon.  It is a statement by

HCMLPHMIT00003160

Mr. Dondero of what he heard, what he says he heard Farallon say.  801(d) refers to, when they're talking about an opposing party statement, made by the party, not made by a listener who says he heard the party.  This is classic hearsay within hearsay.  It's not admissible for that purpose.

THE COURT:  Okay.  I sustain the objection, and -- but I'm still struggling to understand what the Respondents have agreed to.  Because --

MR. MORRIS:  That -- that this is what he claims to have written down.  I mean, right?  So, so --

THE COURT:  Okay.

MR. MORRIS:  -- a present sense impression.

THE COURT:  So, it is admitted as Mr. Dondero's present sense impression, but it's not admitted as to the truth of anything that Claims Purchasers may have said.

MR. MORRIS:  And -- and the --

THE COURT:  That's what you're saying?

MR. MORRIS:  Yes.  And the most important thing is that he's testified that the purpose of the notes was to capture the things that were important that he was told.  And we've established what he wasn't told.

MR. MCENTIRE:  Okay.  I believe the document is in evidence, Your Honor.

THE COURT:  Exhibit 4 is in evidence.  But, again, there's no admission in here as to what Claims Purchasers

HCMLPHMIT00003161

Dondero - Direct                                    149

testified as to.

MR. MCENTIRE:  Well, they haven't testified yet because --

THE COURT:  This is what he --

THE DEFENDANT:  I understand.  I understand.

THE COURT:  -- he says he remembers.

MR. MCENTIRE:  Okay.  So, --

THE COURT:  It's sort of an --

MR. STANCIL:  Your Honor, just so we're clear for our record, this is not admitted for the truth of what Farallon is purported to have said.

MR. MCENTIRE:  Correct.

THE COURT:  Correct.

MR. MCENTIRE:  This --

MR. STANCIL:  Thank you.

MR. MCENTIRE:  This is offered for the truth of what Mr. -- Mr. Dondero recalls them saying.

THE COURT:  Okay.

MR. MCENTIRE:  In part.

THE COURT:  I think -- I think we're on the same page now.  I think.  I think.

    (Hunter Mountain Investment Trust's Exhibit 4 is received into evidence.)

MR. MCENTIRE:  All right.  May I proceed, Your Honor?

THE COURT:  You may.

HCMLPHMIT00003162

Dondero - Direct                                    150

MR. MCENTIRE:  Can you please put up Exhibit 8, please?  And I believe this document has been put into evidence --

THE COURT:  It is.

MR. MCENTIRE:  Thank you.

BY MR. MCENTIRE:

Q    Mr. Dondero, this document is a -- part of a -- the Court's docket.  It was filed on February 1, 2021, if you could go to the top upper banner.  It's Debtors' Notice of Filing of Plan Supplement of the Fifth Amended Plan of Reorganization of Highland Capital Management, as Modified.

Do you see that?

A    Yes.

Q    I'll direct your attention, --

MR. MCENTIRE:  If you could go to Page 4, please, for me, Tim.

BY MR. MCENTIRE:

Q    Page 4 has a schedule, a plan analysis and a liquidation analysis.  Do you see that?

A    Yes.

Q    All right.  For Class 8, what does it identify that is being projected for distributions to the general unsecured claims for Class 8?

A    71.3 percent.

Q    What percentage is being identified that will be

HCMLPHMIT00003163

Dondero - Direct                                      151

distributed to Class 9?

A     9, no distribution.

Q     No distribution?  All right.  Mr. Dondero, in Paragraph --
I'm going to give you a piece of paper.

        MR. MCENTIRE:  Can you just give me a piece of paper
real quick?

BY MR. MCENTIRE:

Q     I'm handing you a piece of paper and I'm --

A     Okay.  Thank you.

Q     Mr. Dondero, in our complaint in this case, the proposed
complaint in this case, we allege that Class 8 had a total of
$270 million, the claims that were purchased by Farallon and
Stonehill had a face value in Class 8 of $270 million.  Would
you write that number down?

        And assuming that this was public information that was
available in February of 2021 at 71.32 percent, --

        MR. MORRIS:  Objection, Your Honor.  That's an
assumption not in evidence.  He hasn't laid a foundation for
what was available in February in 2021.

BY MR. MCENTIRE:

Q     Mr. Dondero, according to --

        THE COURT:  Wait.  Are you going to respond, or are
you just going to --

        MR. MCENTIRE:  I'll rephrase the question.

        THE COURT:  -- rephrase?  Okay.

HCMLPHMIT00003164

Dondero - Direct                                    152

BY MR. MCENTIRE:

Q    According to the document that is identified as Exhibit #8 that says that 71.32 percent is the anticipated projected payout on Class 8 claims, what is 71.32 percent of the face value of the claims that were purchased?

A    About $192 million.

Q    $192 million?  And assuming for a moment that, as alleged by Hunter Mountain in this case, that $163 million was actually used to purchase the Class 8 claims, what is the difference?

A    About $30 million.

Q    A little less than that, isn't it?  Or is the number --

A    Yeah.  $28 million or whatever.

Q    $28 million?  And based upon your years of experience in running Highland Capital, being involved in the purchase of unsecured claims, being involved in investigating and acquiring distressed assets, that return over a two-year period, is that the kind of return that a hedge fund would typically -- you would expect to receive?

        MR. MORRIS:  I just want to make sure that -- because the question changed a little bit in the middle.  If he wants to ask him if he would have made the investment, that's fine. But he should not be permitted to testify as to what any other investor, including the ones who purchased these claims, would have done.  Every -- there's different risk profiles.  He can

Dondero - Direct                                    153

testify to whatever he wants about himself.

THE COURT:  Sustained.

BY MR. MCENTIRE:

Q    Go ahead.  Based upon your experience at Highland Capital, would Highland Capital have ever acquired those claims based upon that kind of return over two years?  For a distressed asset such as this?

A    No.

Q    Why not?

A    It's below a debt level return that you could get on high-rated assets with certainty.  It's --

Q    What do you mean by it's below -- below a debt return that you could get on collateralized assets?  What do you mean by that?

A    I think in this case the debt that the Debtor put in place paid 12, 13 percent and was triple secured or whatever.  So no one would buy the residual claims for an 8 percent compounded, whatever that $28 million works out to.

MR. MORRIS:  I move to strike, Your Honor.  He shouldn't be talking about or testifying to what other people might do.

THE WITNESS:  Well, we --

THE COURT:  This is --

THE WITNESS:  We would never have done that.

THE COURT:  This is --

HCMLPHMIT00003166

MR. MCENTIRE:  He would not have.

THE COURT:  -- Highland, not nobody.  Okay.

BY MR. MCENTIRE:

Q   Mr. Dondero, and what is it about the fact that these claims are not collateralized that impacts the decision-makers, from your perspective?

A   You have all the risk that the $205 million of expenses this estate has currently paid grows to $300 or $400 million. You know, you have the risk that other litigation regarding Seery violating the Advisers Act --

MR. MORRIS:  I move to strike, Your Honor.

THE WITNESS:  -- results in --

THE COURT:  Sustained.

THE WITNESS:  -- expenses.

BY MR. MCENTIRE:

Q   Just respond to my question, sir.  What does the fact about not being collateralized, how does that impact the decision-maker's --

A   Well, I was trying to answer it.  You just have all kinds of residual risk of bad acts that have happened at the estate or expenses increasing or whatever.

MR. MORRIS:  I move to strike the phrase "bad acts," Your Honor.

THE COURT:  Overruled.

BY MR. MCENTIRE:

HCMLPHMIT00003167

Dondero - Direct                                      155

Q    What did you mean by that?  What did you mean by "bad acts"?

A    We've highlighted it in a lot of complaints.  There's been several violations of the Advisers Act.

MR. MORRIS:  Move to strike, Your Honor.  It's a legal conclusion.

THE COURT:  Sustained.

BY MR. MCENTIRE:

Q    Mr. Dondero, are you familiar with an entity known as NHF?

A    Yes.

Q    What is NHF?

A    A NexPoint hedge fund.  It was a closed-in fund that we manage still to this day at NexPoint.  The name has changed to NXDT.

Q    Was NHF publicly traded?

A    It -- yeah, it's a publicly-traded equity.  It's a closed-in fund, technically, but it's a publicly-traded security.

Q    What -- what is your affiliation with NHF?

A    I'm the portfolio manager.

Q    And, again, what are your responsibilities as the portfolio manager?

A    To optimize the portfolio and hopefully exceed investor expectations.

Q    Have you become aware that Stonehill was purchasing MGM stock in the first quarter of 2021?  And NHF?

HCMLPHMIT00003168

A    Yes.  We believe -- we're able to demonstrate from Bloomberg records, on the Bloomberg terminal, they show up as holders and purchasers in the -- in the first few months of 2021.

Q    What magnitude?

A    I think it was one of their top equity positions.  It was about six million bucks.

MR. MCENTIRE:  Can you put up the chart?  This is for demonstrative purposes only.

I'm not offering this chart into evidence, Your Honor.  It's simply a demonstration.  Or a demonstrative.

MR. MORRIS:  Your Honor, there's no such thing.

MR. MCENTIRE:  There is.

MR. MORRIS:  A demonstrative has to be based on evidence.  A demonstrative is supposed to summarize evidence.  You don't put up a demonstrative until --

THE COURT:  All right.  What's your response to that?

MR. MCENTIRE:  That I'm about to walk through some points where he can establish as a point of evidence, and then we can talk about it.  Demonstratives, demonstratives are used all the time, Your Honor.

MR. MORRIS:  It's to --

THE COURT:  Well, they summarize evidence.

MR. MORRIS:  It's to summarize evidence.

THE COURT:  Yes.  So, --

HCMLPHMIT00003169

Dondero - Direct                              157

MR. MCENTIRE:  Well, this is --

THE COURT:  -- you can elicit the evidence, and then if this chart seems to summarize whatever he testifies as to, then --

MR. MCENTIRE:  All right.

THE COURT:  -- then I think maybe you can put it up.

MR. MCENTIRE:  Mr. -- you can take it down, Tim.

BY MR. MCENTIRE:

Q   Mr. Dondero, do you have an understanding of how much total distributions have been paid to date in the Highland bankruptcy?

A   I believe the Class 8 -- the 1 through 7 was only about $10 million.  I believe Class 8 got $260 or $270 million so far.

Q   All right.  And do you have an understanding of what the total amount of expenses are?

A   Total expenses paid to date was $203 million.  $205 million.

Q   So the -- the -- there's a rough approximation between the professional expenses and the actual all proofs of claim; is that correct?

A   There is, yeah, a ratio, and -- yes.

Q   The total cash flow, if you add those two together, what are they?  What are they approximately?

A   $470 million.

HCMLPHMIT00003170

Dondero - Direct                                        158

Q    $470 million?  And do you understand that the -- that the Reorganized Debtor and the Claimant Trust would have more than sufficient assets to reach Class 10 where Hunter Mountain is currently located, even setting aside the claims against you?

A    Correct.  There's $57 million of cash on the balance sheet, net of a couple million today, I guess.  And then there's $100 million of other assets.

MR. MCENTIRE:  Reserve the rest of my questions.  Reserve the rest of my questions, Your Honor.

THE COURT:  Okay.  Pass the witness.

MR. MCENTIRE:  Could I have my time estimate?

THE COURT:  Yes.  Caroline?

THE CLERK:  (faintly)  As of right now, we are at 81 minutes, so --

MR. MCENTIRE:  Thank you.

THE COURT:  That was 81 minutes total?

THE CLERK:  Yes.

THE COURT:  Okay.

MR. MORRIS:  May I proceed, Your Honor?

THE COURT:  You may.

CROSS-EXAMINATION

BY MR. MORRIS:

Q    Good afternoon, Mr. Dondero.

A    Good to see you.

Q    My pleasure.  Do you know an attorney named Ronak

HCMLPHMIT00003171

Dondero - Cross                                    159

(phonetic) Patel?

A    Is that Rakhee that they call --

Q    Could be.  Do you know an attorney named Rakhee Patel?

A    There was a Rakhee Patel, I believe, early in the *Acis* case.

Q    Let me try --

A    I'm not -- I've never met her.

Q    Let me try this differently.

A    Okay.

Q    Did you ever meet with the Texas State Securities Board?

A    No.

Q    Did anybody acting on your behalf ever file a complaint with the Texas State Securities Board?

A    No.

Q    Do you know if anybody's filed a complaint with the Texas State Securities Board?  About Highland?

A    I believe you covered it earlier.  Mark Patrick.

Q    Mark Patrick what?

A    I guess he did, or Hunter Mountain did, or the DAF did.  I don't -- I don't know.

Q    Did you ever speak with Mark Patrick about a TSSB investigation of Highland?

A    No.

Q    Okay.  Why do you think Mark Patrick knows about the TSSB investigation of Highland?

HCMLPHMIT00003172

MR. MCENTIRE:  Objection to form.  Calls for speculation.  He's just established that he's never --

THE WITNESS:  I don't know.

MR. MCENTIRE:  -- talked to Mark Patrick.

MR. MORRIS:  Okay.

THE COURT:  Okay.  Sustained.

MR. MORRIS:  Okay.

BY MR. MORRIS:

Q   Have you ever seen the draft Hunter Mountain complaint in this case?

A   No.

Q   Okay.  I think you testified a moment ago that Amazon had hit MGM's price by December 17th.  Do I have that right?

A   Yes.

Q   Okay.  Then how come you didn't say that in your email to Mr. Seery?

A   Your best practices and typical practices, when you put it on the restricted list, is to just give as little information as possible so that the inside information isn't promulgated specifically throughout the organization and leaked --

Q   So, --

A   -- throughout the organization.

Q   So, even though your intent was to convey information to Mr. Seery, you didn't actually tell him the truth, right?  You didn't tell him that Amazon had actually hit the stock price.

HCMLPHMIT00003173

Right?

A    I wouldn't characterize it that way.

Q    Okay.  In fact, all you told him was that they were interested.  Isn't that right?

A    I wasn't telling him anything.  I was telling Compliance, as an investment professional, that it needed to be on the restricted list because we were in possession of material nonpublic information regarding a merger that was going to go through shortly.  Or in the next few months.

Q    Is it your testimony that, as of December 17th, Amazon had made an offer that was acceptable to MGM?

A    Yeah, we were going into -- that's what the board meeting was.  We were going into exclusive negotiations to culminate the merger with them.

Q    Okay.  I think you have a binder there of our exhibits. If you can go to #11.

A    Which one?

        MR. MORRIS:  May I approach?

        THE WITNESS:  Sure.

    (Pause.)

BY MR. MORRIS:

Q    That's your email, sir, right?

A    Yes.

Q    Okay.  It doesn't say anything about Amazon hitting the price, right?

HCMLPHMIT00003174

Dondero - Cross                                    162

A    It doesn't need to.

Q    In fact, it still mentions Apple, doesn't it?  Why did you feel the need to mention Apple if Amazon had already hit the price?

A    The only way you generally get something done at attractive levels in business is if two people are interested.

Q    But why weren't you -- why were you creating a story for the Compliance Department when the whole idea was to be transparent so they would understand what was happening?  Why would you create a story that differed from the facts?

A    It didn't differ from the facts, and it's not a story.  It's a, we have material nonpublic information.  Please put this on the restricted list.  And --

Q    But that -- but you said Amazon and Apple are actively diligencing and they're in the data room.  Do you see that?

A    That's true.

Q    So, even though -- you know what, I'll move on.  But this -- this doesn't say what you testified to earlier, that Apple hit the -- that Amazon hit the price.  Right?  Can we just agree on that?

A    Well, agree that it doesn't have to and it's not supposed to.

         MR. MORRIS:  I move to strike.  I just want --

         THE COURT:  Sustained.

BY MR. MORRIS:

Q   -- you to -- I want you to just work with me here.  You did not tell the Compliance Department that Apple -- that Amazon had hit the strike price.  Right?  Isn't that correct?  That's not what this email says?

A   The -- you can pull up a hundred of these type emails.  They're not specific.

MR. MORRIS:  I'm going to move to strike and I'm just going to ask you, --

THE COURT:  Sustained.

BY MR. MORRIS:

Q   -- because you testified to one thing, and I just want to make clear that you told the Compliance Department something different.  Can we just agree on that?

MR. MCENTIRE:  Well, Your Honor, may I respond to his motions to strike?  I think he's becoming argumentative.

THE COURT:  Could you speak into the mic, --

MR. MCENTIRE:  I can.

THE COURT:  -- please.

THE COURT:  He's becoming argumentative.  And I think it's very clear that, if he asks a question, the witness has a right to respond.  I think his answers are totally responsive.  And I don't think anything should be struck.

THE COURT:  Okay.  Your question was you didn't put in there anything about it hit the strike price --

MR. MORRIS:  He didn't --

HCMLPHMIT00003176

Dondero - Cross                                      164

THE COURT:  -- or whatever?

MR. MORRIS:  He didn't -- he didn't tell the Compliance Department what he just testified to.  In fact, he told the Compliance Department something very different. That's all I'm asking.

THE COURT:  And I think that's just a yes or no.

MR. MORRIS:  Okay.

BY MR. MORRIS:

Q    Yes or no?  You told the Compliance Department something different than what was actually happening?

A    That's not true.

Q    Oh.

A    Exactly what was here, what was happening.  I didn't give more detail, which is more hearsay.

Q    Okay.  If somebody was filing -- following the Highland bankruptcy, they would have known that MGM was very important, right?

A    You'd have to show me where.  I don't -- I don't see it in any of the bankruptcy --

Q    You don't think that that's true?

A    I didn't see it in any of the public filings.

Q    Do you remember we were here two years ago on this very day, June 8, 2021, for the second contempt hearing?  You sat in that very witness box during the second contempt hearing? Remember that?  That was two years ago.

A    I remember sitting in the box.  What are you asking?

Q    And do you remember that that was just a few days after MGM had announced its deal with Amazon?

A    I -- I don't remember -- I -- was that the day the judge was hopeful that would lead to a resolution of the case?

Q    Exactly.  So, --

A    Okay.

Q    -- Judge Jernigan certainly knew that MGM was important.  Right?

A    Yes.

Q    And she's a bankruptcy judge, right?

A    Yes.

Q    And she was overseeing the bankruptcy case, right?  Correct?

A    Yes.

Q    And the very first thing when she walked in the door two years ago on this day was, oh my goodness, MGM, they have a deal, maybe we can finally get to a settlement.  Right?

A    And I wish she had pushed on that.

Q    Do you --

A    And I remember you guys dismissing it.

Q    Do you think she had material nonpublic inside information?

A    No, I don't think so.

Q    She probably learned it in the bankruptcy case, right?

HCMLPHMIT00003178

Dondero - Cross                                          166

A    Yeah.

Q    Okay.  Do you believe Mr. Seery sold any MGM securities between the day you sent your email and the day the Amazon deal was announced on May 26th?

A    I don't know.

Q    Do you -- so you have no knowledge?  Let's do this a different way.  You have no basis to say that Mr. Seery sold any MGM securities between the moment you sent this email on December 17th and the day the Amazon deal was announced on May 26th.  Correct?

A    I'm sorry.  Just to clarify, you're saying sold, not bought, right?  You're not asking me if --

Q    I'll do either way.

A    Okay.

Q    Fair point.

A    Sure.

Q    Very fair point.

A    Okay.

Q    Do you believe that Mr. Seery engaged in any transactions of MGM securities between those two relevant data points?

A    Yes.

Q    Okay.  What do you think he did?

A    The HarbourVest transaction.

Q    Okay.  So, you learned about the HarbourVest transaction when?

HCMLPHMIT00003179

A    When it was filed.

Q    And that was on December 23rd.  Do you remember that?

A    Yes.

Q    It was just less than a week after you sent your email, right?

A    Yes.

Q    And do you remember that you filed an objection to the HarbourVest settlement?

A    Yes.

Q    And you're the one who gave Mr. Seery this material nonpublic inside information, right?

A    Yes.

Q    Did you object to the HarbourVest settlement on the basis that Mr. Seery was engaging in insider trading?

A    Not then, I don't think.  I believe --

Q    You didn't, right?  Even though it was happening at the exact same moment, the very -- within a week of you giving him this information.  He's announcing that he's doing this settlement and you don't say a word.  Isn't that right?

A    Because I delegated the responsibility to Compliance by notifying them of material nonpublic information, and Compliance should hold the organization accountable. Compliance is separate and discrete from management. Compliance reports to the SEC.

Q    You filed a 15-page objection to the settlement, didn't

HCMLPHMIT00003180

you?

A    I don't -- I don't know.

Q    Did you tell Judge Jernigan that Mr. Seery was doing bad?

A    Not then.  I think a month later, two months later.

Q    Even though you knew what was happening, you didn't say anything, right?

A    I -- I'm not responsible for all the filings.  I --

Q    Even though it's under your name?

A    Correct.

Q    How about -- how about CLO Holdco?  Did CLO Holdco file an objection to the HarbourVest settlement?

A    I -- I don't know which entities did, but it -- whatever entities that were in control that could did, eventually, when they found out, you know, and -- but did -- did they, within a week or contemporaneously?  No.  It was right around the holidays.  A lot of people weren't paying attention.  You guys were trying to rush the HarbourVest thing through.

Q    Sir, CLO Holdco filed an objection, claiming that it was entitled to purchase the HarbourVest interests in HCLOF because it had a right of first refusal, right?  Isn't that right?

A    Okay.  I -- what ultimately governs the --

Q    Isn't that right?

A    I don't -- okay.

Q    It's really just yes or no.

HCMLPHMIT00003181

Dondero - Cross                                      169

A    I don't know.

Q    If you don't remember, that's fine.

A    I don't remember, yeah.

        MR. MCENTIRE:  Your Honor, would he please give the witness an opportunity to answer?  He's interrupted three times in less than five seconds.  Give the witness an opportunity to respond.

        MR. MORRIS:  This is real easy stuff.

        THE COURT:  Okay.

        MR. MORRIS:  I'm trying to cross him here.

        MR. MCENTIRE:  Your Honor, with all due respect, he's making it very difficult because he's being very aggressive --

        MR. MORRIS:  Nah.

        MR. MCENTIRE:  -- and he's interrupting the witness.

        MR. MORRIS:  I would never.

        THE COURT:  Okay.  I don't feel the need to do that right now, but I will -- I will consider your request.

        THE WITNESS:  Can I give a complete answer to his last question, or one that I'd like to be my answer on the record?

        THE COURT:  Go ahead.

        THE WITNESS:  The governing responsibility as a registered investment advisor is you're not allowed to buy back from investors fund interests or investments unless you offer it to everybody else, in writing, in that fund first.

HCMLPHMIT00003182

That's the Investment Advisers Act as I understand it, and that is what was improper in the HarbourVest transaction.  I mean, besides the fact that the pricing was wrong, they misled HarbourVest.  And I know HarbourVest hasn't complained, but just because your investors don't complain doesn't mean you can rip them off.

        MR. MORRIS:  I'd really move to strike the entirety of the answer, Your Honor.

        THE COURT:  Granted.

BY MR. MORRIS:

Q    Mr. Dondero, HC --

A    I'm not going to -- I'm not answering any more questions unless I can answer that question with that answer, --

Q    Mr. Dondero, do you --

A    -- because I believe it's responsive.

Q    Do you remember that CLO Holdco withdrew their objection?

A    I --

Q    To the HarbourVest settlement?

A    I don't remember.

Q    Do you remember that's really when Grant Scott left the scene?

A    I don't --

Q    He thought it was inappropriate for them to withdraw, right?

A    I don't remember all the details.  I know they made some

HCMLPHMIT00003183

Dondero - Cross                              171

mistakes, and there's a tolling agreement against Kane's

(phonetic) firm for making mistakes, and, you know, whatever.

But I -- I don't remember all the details.

Q   And a couple of months later, you conspired with Mr.

Patrick to try to sue Mr. Seery in order to try to get that

very same interest in HCLOF, right?

            MR. MCENTIRE:  Your Honor, I have to object.  There's

no foundation and it's also highly argumentative and I move to

object.  That's a -- that's a question asked in bad faith.

            THE WITNESS:  I deny any conspiring.

            MR. MORRIS:  Okay.

            THE COURT:  Sustained.

BY MR. MORRIS:

Q   In April, Mr. Patrick filed a lawsuit on behalf of CLO

Holdco a couple of weeks after getting appointed as the head

of CLO Holdco and the DAF about the HarbourVest settlement.

Isn't that right?

A   I believe so.

Q   Okay.  And you worked with him on that, right?

A   I -- I did not work with him on that.  I was very just

tangentially aware.

Q   Okay.

            MR. MORRIS:  I'm just going to refer the Court -- I'm

going to move for the admission into evidence of the second

contempt order.

HCMLPHMIT00003184

THE COURT:  Exhibit what?

MR. MORRIS:  Just one moment, Your Honor.

(Pause.)

MR. MORRIS:  You know what, I don't know that I have it on the list.  I'm just going to ask the Court to take judicial notice.  We had a hearing two years ago to this day, and the Court found in the order that it entered at the conclusion of that hearing that Mr. Patrick had abdicated his responsibility to Mr. Seery.  It's one of the reasons why Mr. Seery wasn't held in contempt of Court.  And I'd like -- I'd like Counsel to address it now.

MR. MCENTIRE:  Yeah, I'll -- you said Seery, didn't you?

MR. MORRIS:  Oh, sorry.  I said Seery.  I meant Dondero.

MR. MCENTIRE:  (faintly)  Also, I believe it's entirely irrelevant.  Judicial -- taking judicial --

THE COURT:  Would you speak in the microphone, please?

MR. MCENTIRE:  I'm sorry.  Taking judicial notice of something that is utterly irrelevant is not necessary, not appropriate.  What this Court did two years ago roughly to the day -- and I assume he's correct -- has no bearing on anything before the Court today.  Nothing.  This has zero connection, nexus, under any analysis, any fair scrutiny, dealing with the

Dondero - Cross                                              173

colorability of the claim that Hunter Mountain, who was not involved in those proceedings, is trying to advance here.  And it would be -- it would be improper for this Court to even take it under judicial notice.

THE COURT:  Okay.  Response?

MR. MORRIS:  Can I respond?

THE COURT:  Uh-huh.

MR. MORRIS:  Okay.  So, Your Honor, I'm going to move for the introduction into evidence of Exhibit 45.  It is the Charitable DAF complaint that was filed in the federal district court on April 12, 2021, under the direction of Mark Patrick, who today stands here as the representative of Hunter Mountain.

This was the complaint, if Your Honor will recall, that they tried to amend and we had a hearing here about the circumstances, because that amendment was going to name Mr. Seery personally, in violation of the gatekeeper order. Right?

THE COURT:  Uh-huh.

MR. MORRIS:  And so it is all tied together.  If you go to Paragraph 77 of this exhibit, it says, HCLOF holds equity in MGM Studio.  This is the exact same transaction, right?  So, so Mr. Dondero says, I gave Mr. Seery inside information, he violated all of these things in the HarbourVest transaction, even though he didn't say a word

HCMLPHMIT00003186

then, and here, while it's still on the restricted list, before the Amazon deal is announced, they're actually in court saying that they should be entitled to acquire that same asset that Mr. Seery supposedly acquired improperly.  He wants it for himself.

I mean, are you kidding me?  It's not relevant?

THE COURT:  I overrule the relevance objection.  It's admitted.

MR. MORRIS:  Thank you.  And 45 is admitted, Your Honor?

THE COURT:  45 is admitted.

MR. MORRIS:  Okay.

(Debtors' Exhibit 45 is received into evidence.)

MR. MCENTIRE:  Just, Your Honor, I was identifying my objection in connection with his original request that you take something under --

THE COURT:  Would you speak in the microphone?  Again, we --

MR. MCENTIRE:  Yes.  My original objection was addressing his request of you, Your Honor, to take something under judicial notice.  I want to make sure my objection is also lodged with regard to Exhibit 45, which I understand you've overruled.

THE COURT:  Correct.

MR. MCENTIRE:  Okay.

HCMLPHMIT00003187

Dondero - Cross                                       175

THE COURT:  It is so noted.

MR. MORRIS:  Okay.

THE COURT:  You've objected and I've admitted it.

MR. MORRIS:  And I think I've said this already, but the reason that we're requesting the Court take judicial notice of its order on the second contempt proceeding is because it shows that Mr. Dondero and Mr. Patrick worked together, in violation of the gatekeeper, to try to suit Mr. Seery to obtain the interest in HCLOF that he is sitting here today saying somehow that Mr. Seery wrongfully acquired, even though he didn't say a word at the time.

THE COURT:  Okay.  So now we're talking about not Exhibit 45 --

MR. MORRIS:  Yes.

THE COURT:  -- but the order that was entered --

MR. MORRIS:  Correct.

THE COURT:  -- regarding the filing of Exhibit 45?

MR. MORRIS:  Exactly.

THE COURT:  Someone is going to need to give me a docket entry number before we're done here.

MR. MORRIS:  Okay.

THE COURT:  I can and will take judicial notice of that, but I need to have it --

MR. MCENTIRE:  So I assume, for the record, my objection is overruled?

HCMLPHMIT00003188

THE COURT:  Your objection is overruled.

MR. MCENTIRE:  Thank you.

MR. MORRIS:  All right.

BY MR. MORRIS:

Q    You mentioned something about, I think, was it NXDT or NHF?

A    Yes.

Q    And just let me see if I can do it this way.  Right?  So there used to be a fund known as the NexPoint Strategic Opportunities Fund, right?

A    Yes.

Q    Okay.  And in 2020 that was a closed-in fund.  Correct?

A    Yes.

Q    And it traded under the ticker symbol NHF, correct?

A    Yes.

Q    And then late in 2021 the name of the fund was changed to NexPoint Diversified Real Estate Trust, correct?

A    Yes.

Q    And the ticker symbol changed from NHF to NXDT, correct?

A    Yes.

Q    And then it became a REIT the following year, right?

A    Yes.

Q    And I'm just going to refer to these letters as the Fund; is that fair?

A    That's fine.

HCMLPHMIT00003189

Dondero - Cross                                              177

Q    For purposes of these questions.  And you were the Fund's portfolio manager, the president, the principal executive officer, correct?

A    Yes.

Q    And another entity that you controlled, NexPoint Advisors, provided advisory services to the Fund, correct?

A    Yes.

Q    And you controlled NexPoint Advisors at all times, correct?

A    Yes.

Q    Okay.  And the Fund was publicly traded, right?

A    Yes.

Q    And the Fund owned shares of MGM at the end of 19 -- at the end of 2020, correct?

A    Yes.

Q    In fact, as of December 2020, MGM was one of the Fund's ten largest holdings, with -- valued at over $25 million.  Isn't that right?

A    Yes.

Q    And by the end of 2021, MGM was the Fund's fifth largest holding, with assets -- with a value of over $40 million.  Correct?

A    Yes.

Q    And the Fund also held MGM common stock indirectly; isn't that right?

HCMLPHMIT00003190

Dondero - Cross                                              178

A     Yes.

Q     In fact, when the Amazon deal closed at the -- in March of 2022, the Fund issued a press release disclosing that it stood to receive over $125 million on the MGM shares that it held directly and indirectly.  Correct?

A     We issued several press releases.  I don't remember --

Q     Okay.  Do you remember that, that as a result of the MGM sale, the Fund was expected to receive approximately $126 million?

A     Yes.

Q     Okay.

A     Roughly.

Q     All right.  In October 2020, just a few weeks before you sent your email, the Fund announced the commencement of a tender offer to acquire outstanding shares at a certain price.  Correct?

A     Yeah, I believe so.

Q     And you authorized that, right?

A     Yes.

Q     And when a fund acquires shares and then retires them, the shareholders who did not tender consequently own a larger percentage of the fund than they did before the tender, correct?

A     Yes.

Q     Okay.  And the tender was completed in January, in the

HCMLPHMIT00003191

first week of January 2001 [sic], correct?

A    I don't remember when it was complete.

Q    It started at the end of October 2020, and it ended sometime in January '21.  Is that fair?

A    Okay.  I don't remember.  Okay.

Q    Do you want me to refresh your recollection?

A    I'm just saying I don't remember.

Q    Yeah, okay.

A    I'm not dis...

Q    Okay.

A    -- denying it.  I just don't remember the exact dates.

(Discussion.)

MR. MORRIS:  Your Honor, can I mark for identification purposes Plaintiffs' Exhibit -- I'm just going to call it 100, to see if it refreshes the witness's recollection?

THE COURT:  You may mark it.

MR. MORRIS:  Okay.

THE COURT:  We'll see where it goes from there.

(Debtors' Exhibit 100 is marked for identification.)

BY MR. MORRIS:

Q    So, I've put --

MR. MCENTIRE:  Hold it.  Your Honor, I think we're now marking exhibits that we haven't put on an exhibit list.

MR. MORRIS:  I'm trying to refresh his recollection.

HCMLPHMIT00003192

MR. MCENTIRE:  Okay.

MR. MORRIS:  Yeah.

MR. MCENTIRE:  Well, --

THE COURT:  Yes.

MR. MORRIS:  Okay?  I haven't offered it in -- I haven't offered it --

THE COURT:  I've not admitted -- I don't know what it is.  I haven't admitted it yet.  I'm waiting.

MR. MORRIS:  I haven't offered it into evidence.  He said he doesn't remember, --

THE COURT:  Okay.

MR. MORRIS:  -- I've got an SEC document here, and I'm going to try and refresh his recollection.

THE COURT:  Okay.

BY MR. MORRIS:

Q    You're familiar with these forms, right?

A    Generally.

Q    In fact, in fact, you sign them in your capacity as the fund portfolio manager, right?  Your signature is put on it, anyway?

A    Generally.

Q    Yeah.  And do you see that this is the Form N-CSR that was filed with the SEC at the end of 2001 [sic] on behalf of NexPoint Diversified Real Estate Trust?

A    Yes.

HCMLPHMIT00003193

Dondero - Cross                                      181

Q    Okay.  So if you just turn to Page 16.  And the numbers are kind of at the bottom in the middle of the page.  You'll see the notes to the consolidated financial statements.

A    Yes.

Q    Okay.  And Note 1 discusses the organization.  Do you see that?

A    Yes.

Q    And at the bottom of the left-hand column, it says, On January 8, 2021, the company announced the final result of its exchange offer pursuant to which the company purchased the company's outstanding -- the company's common shares in exchange for certain consideration.

     Do you see that?

A    Yes.

Q    That's a reference to the tender offer that you authorized at the end of October, correct?

A    Yes.

Q    And then at the bottom it says, The company share -- company -- excuse me.  I strike that.  It says, quote, The common shares at a price of $12 per common share, for an aggregate purchase price of approximately $125 -- $105 million.  Upon retirement of the repurchased shares, the net asset value was $152 million, or $17.41 million.

     Do you see that?

A    Yes.

HCMLPHMIT00003194

Dondero - Cross                                      182

Q    Does that refresh your recollection that the tender offer was completed at the beginning of January?

A    Yes.

Q    And that's with all of the MGM stock that the Fund still owned at that time, right?

A    Yeah.  We -- we didn't -- we didn't violate --

Q    You didn't --

A    We didn't -- we didn't violate like Seery did.  We didn't sell any shares or buy shares.

Q    Okay.

          MR. MORRIS:  I'm going to move to strike that, Your Honor.

          THE COURT:  So granted.

          MR. MCENTIRE:  Well, Your Honor, I've actually got a response to his motion to strike.  This entire inquiry is irrelevant.

          MR. MORRIS:  Not --

          MR. MCENTIRE:  This has no relevance at all in connection with the allegations that we're making in this case.

          THE COURT:  Your response?

          MR. MORRIS:  My response, Your Honor, if you ask me -- let me just get a few more questions.  He personally owned shares in the Fund.  The Fund owned shares in MGM.  And notwithstanding the restricted material, this is the insider,

HCMLPHMIT00003195

Dondero - Cross                                      183

and he is benefiting from himself through the Fund's repurchase of these shares in the tender offer, and he went and he had substantial holdings.  I'll get to that in a minute.

So he is actually doing something worse than what Mr. Seery -- what he accuses Mr. Seery of, because he's buying shares for his own personal benefit.  Right?  He's the insider.  Right?  And the Fund owns the shares directly. There's never going to be an allegation that HCLOF ever owned any MGM stock.  Never.

THE COURT:  Okay.  I'm going to allow this. Obviously, on redirect, you can further question on this --

MR. MCENTIRE:  Well, --

THE COURT:  -- to --

MR. MCENTIRE:  Well, first of all, his suggestions and his accusations are purely argumentative.

THE COURT:  Would you please speak in the microphone? We --

MR. MCENTIRE:  Well, he's standing in the way, Your Honor.

THE COURT:  Well, --

MR. MCENTIRE:  It's irrelevant.

THE COURT:  There are two.  There's room for both of you.

Continue.  Go ahead.

HCMLPHMIT00003196

Dondero - Cross                                      184

MR. MCENTIRE:  It's entirely irrelevant, and it's argumentative.

THE COURT:  Okay.  Overruled.  You can continue.

BY MR. MORRIS:

Q    You did own an awful lot of the Fund's shares, didn't you?

A    I owned some.

Q    You owned some?  You owned millions, right?

A    Yes.

Q    Okay.  And as a result of the tender, you owned a greater interest of the Fund, right?

A    Yes.

Q    And therefore you owned a greater number -- a greater portion of the MGM stock, the $125 million of MGM stock that was owned directly and indirectly by the Fund, correct?

A    You do know insiders weren't permitted to participate in the tender, which would have kept my percentage the same.

Q    Sir, you benefitted -- you didn't stop the tender, right? You didn't say, now I know what's going to happen, I should stop it?  You benefitted from the tender.  Can we just agree on that?

A    I did everything I was supposed to do, notifying Compliance.  If they thought it was material, they would have -- it was in their hands once I notified Compliance of the material --

Q    Okay.

HCMLPHMIT00003197

Dondero - Cross                                              185

A    -- nonpublic information.

Q    I appreciate that.  I just want --

A    It wasn't my responsibility to do Compliance's job to call you or call --

Q    Okay.

A    -- the SEC or call anybody else.

Q    But you will agree that, even though you had material nonpublic inside information, you didn't take any steps to stop the tender, correct?

A    The tender was for a relatively small amount of the stock. But I did -- I would -- it would not be my responsibility to change or adjust the tender --

Q    Okay.

A    -- or what was happening.

Q    Okay.  And then the last question is, you benefitted from the tender because the Fund repurchased shares, which increased your percentage ownership of the Fund, and therefore your percentage ownership of the MGM shares that were held directly and indirectly.  Is that fair?

A    Marginally, I guess.  Yes.

Q    Okay.  From the -- from the millions of shares, you would describe it as marginal?  Okay.

     Let me move on.  You've testified now that you spoke with representatives of Farallon in the late spring, I guess beginning on May 28th.  Right?

HCMLPHMIT00003198

Dondero - Cross                                     186

A    Yes.

Q    And that was two days after the MGM deal was publicly announced, correct?

A    Yes.

Q    Okay.  And had you ever communicated with Mr. Patel before that phone call?

A    I don't believe so.

Q    And then you spoke with Mr. Linn shortly after?

A    Yes.

Q    Had you ever spoken with Mr. Linn before that phone call with Mr. Linn?

A    I don't believe so.

Q    So these phone calls were the very first time that you ever spoke to either one of these gentlemen.  Is that right?

A    That I can remember.

Q    Okay.

A    If I ran into them at --

Q    Uh-huh.

A    -- a conference a decade ago, I don't know, but --

Q    And they told you that they bought the shares in the February-March time frame, right?

A    Yes.

Q    And you have no reason to dispute that, correct?

A    Correct.

Q    Okay.  And you didn't know how much they had paid for the

HCMLPHMIT00003199

Dondero - Cross                                    187

claims as a result of these conversations, correct?

A    They did not admit a price.

Q    Okay.  And it's your testimony that there wasn't sufficient information in the public for them to buy -- this is your view -- that there wasn't sufficient information in the public to justify their purchases.  Is that your view?

A    Correct.

Q    And even though you didn't think there was sufficient information in the public, you were prepared to pay 30 percent more than they did, right?

A    Yes.

Q    And is that because you were 30 percent more irrational than them or because you had material nonpublic inside information?

          MR. MCENTIRE:  Objection.  Argumentative, Your Honor.

          THE COURT:  Overruled.

          THE WITNESS:  Even at a 30 percent premium, it was less than I offered the UCC several months earlier, number one.

     Number two, I was still under the illusion there was a desire to resolve the place, not burn it down.  You know, there was -- all the original members were happy to sell at $150 million.  It was a $500 or $600 million estate.  There should be $400 or $500 million of residual value.  It shouldn't all be going out the door to lawyers and others.

HCMLPHMIT00003200

Dondero - Cross                                                    188

BY MR. MORRIS:

Q    You were willing to pay 30 percent more for an unknown purchase price, 30 percent more of an unknown purchase price, at a moment that you didn't believe there was sufficient information to buy the claims, correct?

A    You have a couple misstatements in there.  The Grosvenor piece was public.  The Grosvenor piece traded at $67 million.  So we knew that piece trade at around 50 cents.  We knew from people in the marketplace the other pieces were trading right around that level.

So I wasn't just offering 30 percent on any willy-nilly number, 130 percent of any willy-nilly number.  I knew they had paid around 50, 60 cents.  And so I was offering 30 percent more than that.  Thirty percent more than $150 million, call it $200 million.  I had offered $230 or $240 million to resolve the whole estate before the plan went effective, and I got no response from the original UCC members.

Q    So why didn't you just try to settle the case with them?  Why did you try to buy the claim?  Why, if you had these new people, and your good intentions were to finally get to a settlement of the case, why didn't you say, hey, guys, how do we resolve the case?  Why did you want to buy the claims at a 30 percent premium over what they paid with no knowledge and no diligence, according to you?  Can you explain that to Judge

HCMLPHMIT00003201

Dondero - Cross                                189

Jernigan?

A    Because Seery told them to hold on, don't worry, they were going to make $270 million.

Q    That doesn't answer my question. Why didn't you try -- you had new owners. Why didn't you try to settle with them?

A    When someone owns an asset, buying their asset is settling with them. What claim does Farallon have against us? At that point, they had no claims against us.

Q    It doesn't settle the case, does it?

A    But if we owned all the claims, it would settle the case. Just like if Seery had objected to the claims trading that they were supposed to give written notice to the Court, he had enough cash on the balance sheet to buy and retire all the claims.

Q    All right. Let's go back, I apologize, to that Exhibit 11. No, it's not Exhibit 11. I think it's their Exhibit 4, your notes.

        MR. MORRIS: Your Honor, may I have -- just have one moment?

        THE COURT: You may.

        MR. MORRIS: Can you tell me how long I've been going? That's really my question.

        THE CLERK: So, on cross, --

        MR. MORRIS: Yeah.

        THE CLERK: -- you've been going for 32 minutes.

HCMLPHMIT00003202

Dondero - Cross                                    190

MR. MORRIS:  Okay.  Trying to speed this up.

BY MR. MORRIS:

Q   All right.  So, do we have your handwritten notes, which are Exhibit 4, in this binder?  Oh.

THE COURT:  Do you want to put it up again on the screen?

MR. MORRIS:  Ms. Canty, if you're listening and you can do that, that would be great.  If not, --

(Discussion.)

MS. CANTY:  One second, John.

MR. MORRIS:  All right.  He -- he's got it.

THE COURT:  Okay.

BY MR. MORRIS:

Q   Okay.  So, I just -- I just want to make -- you know, follow up on a few questions I asked you earlier on *voir dire*.  So, these are your notes, right, and you said you write down the important stuff.  Correct?

A   I write down, yeah, the stuff I thought I would need for the next call.

Q   Okay.  And, you know, again, just so we have it all in one spot, it doesn't say anything about MGM.  Correct?

A   It does not.

Q   It doesn't say anything about a *quid pro quo*, correct?

A   *Quid pro*?  Uh, no, it does not.

Q   It doesn't say anything at all about Mr. Seery's

HCMLPHMIT00003203

compensation, correct?

A    It does not.

Q    It doesn't say anything about the sharing of material nonpublic inside information, correct?

A    When I told them discovery was coming, that was my response to I knew they had traded on material nonpublic information.

Q    Okay.  That -- you told them that?

A    Yes.

Q    Is that what you're saying now?

A    Yes.

Q    Oh, so that's what you told them?  They didn't tell you that; that's what you told them?

A    Yes.

Q    And that's why you wanted discovery, right?

A    I thought it would be a lot easier to get discovery on a situation like this than it has been for the last two years, yes.

Q    Okay.  Um, --

A    In fact, I told them that it would be coming in the next few weeks.  And this has been a couple years.

Q    And that's exactly what you did, right?

A    Well, we've been trying for two years to get --

Q    Right.

A    -- discovery in this.

Dondero - Cross                                    192

Q    Okay.  So you filed your Texas 202, right?

A    I don't know who filed what.

Q    That was the one by Mr. Sbaiti that was filed under your name?  Do you remember that?

A    Generally.

Q    Okay.  Let's take a quick look at that document.  It's #3 in our binder.

A    Binder #3?

     (Discussion.)

          MR. MORRIS:  Okay.  I think #3 is in evidence, Your Honor.

          THE WITNESS:  Number 3 is in evidence.

          THE COURT:  Yes.

          MR. MORRIS:  Okay.

          THE COURT:  It is.

BY MR. MORRIS:

Q    And if you can turn to the last page, Mr. Dondero.  Page 8.

A    Yes.

Q    Okay.  And that's your signature, right?

A    Yes.

Q    And you verified that this document was true and correct within the best of your personal knowledge, correct?

A    Yes.

Q    Did you read it before you signed it?

HCMLPHMIT00003205

Dondero - Cross                                              193

A    Probably.

Q    You don't recall doing that?

A    Not at this moment.

Q    And you may not have.  Is that fair?

A    No, I probably did.  Do you have a question?

Q    I'm just wondering if you signed it or not.

A    I did sign it.

Q    Okay.  Good.  So, can you go to Paragraph 21?  Well, let's start at Paragraph 20.  It says that Mr. Seery, quote, has an age-old connection to Farallon, and upon information and belief, advised Farallon to purchase the claims.

     Do you see that?

A    Yes.

Q    And then the next paragraph you refer to the telephone call that you had with Michael Linn, right?

A    Yes.

Q    It doesn't refer to any phone call with Mr. Patel, correct?

A    It does not.

Q    And the only reason that you swore under oath you were told that Farallon purchased the claims was because of Farallon's, quote, prior dealings with Mr. Seery.  Correct?  In Paragraph 21, it says, Relying entirely on Mr. Seery's advice solely because of their prior dealings?

A    Yes.

HCMLPHMIT00003206

Dondero - Cross                                          194

Q    Okay.  You didn't -- you didn't swear under oath at that time that you were told that they bought the claims because of MGM.  Right?

A    If you're asking if this is -- it seems like it's not complete, if that's what you're asking me.

Q    I'm not asking you that.  I'm asking you what -- I'm asking you to confirm that you swore under oath to the Texas state court, just weeks after you had these conversations, about what you were told concerning Farallon's purchase of the claims.

I'm focused on Paragraph 21.  The only reason that you gave, that you told the Texas state court under oath, was that Farallon told you they bought their claims because of their prior dealings with Seery.  Right?

A    Yeah.  And that's true.  And that's consistent with what I've said.

Q    Okay.  You didn't say anything about MGM, correct?

A    Correct.

Q    You didn't say anything about a *quid pro quo*, correct?

A    Correct.

Q    You didn't say anything about Mr. Seery's compensation.  Correct?

A    I did not.

Q    You didn't say anything about the sharing of material nonpublic inside information, correct?

HCMLPHMIT00003207

Dondero - Cross                                         195

A     Different document, different purposes.

Q     Well, but that's now two documents.  You have your notes and you had this document, neither one of which say any of those things.  Fair?

A     Different documents, different purposes.  I don't know if that's --

Q     Is it fair that neither one of those documents say any of those things?

A     It's fair that they don't all match.

Q     Okay.  Okay.  Well, that's a fair statement.  Let's go to the next one.  Do you remember the next year you filed an amended petition?

A     What tab?

Q     That's -- I appreciate that.  It's Tab 4.  Do you see at the last page you've again signed a verification?

A     Yep.

Q     And do you see this one's filed with the Texas state court on May 2, 2022?

A     Yes.

Q     And you swore under oath that this statement was complete, true, and accurate to the best of your knowledge, correct?

A     Yes.

Q     Okay.  Can you go to Page 5, please?

A     Yes.

Q     Directing your attention to Paragraph 23, do you see where

HCMLPHMIT00003208

Dondero - Cross                                        196

you say now that Farallon was relying, quote, on Mr. Seery's say-so because they had made so much money in the past when Mr. Seery told them to purchase claims.

Do you see that?

A    Yes.

Q    Again, you don't say anything about MGM, correct?

A    Correct.

Q    Again, you don't say anything about material nonpublic inside information, correct?

A    Well, on 24 it does.  Right?  Mr. Seery had inside information on the price and value of claims.  So, you've got to look at all of the bullet points.

Q    But that's not the paragraph where you're talking -- that's -- it says, in other words.  That's not the paragraph where you're describing your conversation with Farallon. That's your interpretation of it, correct, just as you just said?

A    (no immediate response)

Q    You told -- I'm sorry.  I should let you finish the answer.  That's your interpretation of it, correct?

A    Well, I'm reading all the bullets in aggregate, and it's -- it's a picture of material information shared by Seery, not just MGM or one particular investment, but on all the other assets that aren't detailed in any of the public filings, also.

HCMLPHMIT00003209

Dondero - Cross                                197

Q    The only -- the only point I want to make, I think we can agree on this --

A    Okay.

Q    -- is that you believed that Mr. Seery gave them material nonpublic inside information.  Farallon never told you that.  Isn't that true?  That's why you wanted discovery?

A    They said they relied on him and did no diligence of their own.  They were very express -- explicit about that.

Q    Okay.  Can you answer my question now?

A    Which -- I thought -- that does, --

Q    You concluded --

A    -- yes.

Q    -- that Mr. Seery gave them material nonpublic inside information.  They never told you that.  Fair?

A    They said they relied on -- solely on Seery, didn't buy it for any other reason, and they did no due diligence of their own.

Q    Okay.  Let's go to the next one.  Now, the no-due-diligence part, that's not in any version we've seen, right?  That's something that you just --

A    No, no, --

Q    -- that you're just testifying to now?  That's not in your notes, it's not in Version 1, and it's not in this version, correct?

A    Well, let's go back to the Linn one, because when I was

Dondero - Cross                                     198

going back and forth and he wouldn't give a price, he kept

saying, Seery told us it's worth a lot more.  And I kept

saying, you've got to look at the burn, you've got to look at

the professionals.  And --

Q    Okay.

A    -- that's --

Q    Shortly after this, you filed yet another declaration,

right?

A    Yes.

Q    Uh-huh.  Can you turn to #5?  And this is another version

of your recollection of what you were told, correct?  In

Paragraph 2?

A    These are all -- I don't know why you're saying they're

different.  They're all the same.  They're just slightly

different verbiage.  What's the major difference between any

of them?

Q    I'll ask, I'll ask you the question.  The question is, you

had never written in any of the prior versions that they

didn't do any due diligence; isn't that right?  You never --

you never talked about their due diligence in any prior

version, correct?

A    It's all -- it's all the same version.  I don't -- some

versions --

Q    Can you answer my question?

A    I don't know.  I don't know --

HCMLPHMIT00003211

Dondero - Cross                          199

Q    Which --

A    -- which ones included which -- I don't --

Q    We've just looked at them.  Do you want to look at them again?

A    I just looked at one page in the other one and it was five pages.  I just looked at the one page and I found two or three things --

Q    Your notes --

A    -- it didn't include, but --

MR. MORRIS:  You know what.  I don't want to argue. They say what they say, Your Honor, and I would ask the Court to look carefully at our objection to the motion because we lay all of this out.

Your Honor can -- here's the point, because I do want to finish up right now.  There are five different versions of this conversation.  They're laid out in the brief.  And the question that you have to ask yourself, Your Honor, is, if you allow this case to go forward, how do they make a colorable claim when the story keeps changing?

And I'll just leave it at that, because, you know, the last version says MGM for the first time.  Like, it comes out of nowhere.  This -- his notes don't say it, he hasn't testified that that's what he was told, but somehow that's in his sworn statement.

So I'm just going to rest on the papers, because this is