# EXHIBIT 56

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - -

In Re:                          Case No. 19-34054-sgj11

HIGHLAND CAPITAL MANAGEMENT,

L.P.,

     Debtor.                    Chapter 11

- - - - - - - - - - - - - - - - - - - - - - - -X.

REMOTE VIDEO-RECORDED DEPOSITION of

JULIE DIAZ

Sunday, June 22, 2025

1:37 p.m. Central Time

Reported Stenographically by:

Gail L. Inghram,

BA, RDR, CRR, RSA, CA-CSR No. 8635

WHEREUPON, the remote video-recorded deposition of JULIE DIAZ was held via video-conferencing on Sunday, June 22, 2025, beginning at approximately 1:37 p.m. Central Time, the proceedings being recorded stenographically by Gail Inghram, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Shorthand Reporter, and transcribed under her direction, there being present:

Case 19-34054-sgj11   Doc 4608-59   Filed 05/08/26   Entered 05/08/26 23:42:09   Desc

Deposition of Julie Diaz          Exhibit 56   Page 4 of 48          In re Highland Capital Management, L.P.

A P P E A R A N C E S:

[All parties appeared via remote videoconferencing.]


On behalf of Highland Capital Management, and the Highland

Claimant Trust:

    JOHN MORRIS, ESQ.

    jmorris@pszjlaw.com

    GREGORY V. DEMO, ESQ.

    gdemo@pszjlaw.com

    JEFFREY POMERANTZ, ESQ.

    jpomerantz@pszjlaw.com

    HAYLEY WINOGRAD, ESQ.

    hwinograd@pszjlaw.com

        PACHULSKI STANG ZIEHL & JONES

        780 Third Avenue, 34th Floor

        New York, New York 10017-2024

        310.277.6910


On behalf of Highland Litigation Trustee:

    ROBERT S. LOIGMAN, ESQ.

    robertloigman@quinnemanuel.com

        QUINN EMANUEL URQUHART & SULLIVAN, LLP

        51 Madison Avenue 22nd Floor

        New York, New York 10010

        212.849.7615

A P P E A R A N C E S (Cont'd):

On behalf of Defendant Dallas Foundation and Crown Global
Life Insurance:

    MATTTHEW OKIN, ESQ.

    mokin@okinadams.com

    DAVID CURRY, ESQ.

    dcurry@okinadams.com

        OKIN ADAMS BARTLETT CURRY LLP

        1113 Vine Street, Suite 240

        Houston, Texas 77002

        713.228.4100


On behalf of Defendant Dugaboy Investment Trust:

    MICHAEL LANG, ESQ.

    mlang@cwl.law.com

        CRAWFORD WISHNEW & LANG PLLC

        1700 Pacific Avenue, Suite 2390

        Dallas, Texas 75201

        214.817.4500

A P P E A R A N C E S (Cont'd):

On Behalf of Hunter Mountain Investment Trust:

    LOUIS M. PHILLIPS, ESQ.

    lphillips@kellyhart.com

    AMELIA L. HURT, ESQ.

    ahurt@kellyhart.com

        KELLY HART & HALLMAN LLP

        301 Main Street, Suite 1600

        Baton Rouge, Louisiana 70801

        225.381.9643

VIDEOGRAPHER:

    PAUL D'AMBRA

ALSO PRESENT:

    NATHAN HALL, Pachulski Stang Ziehl & Jones

    JAMES SEERY

    TORREY LITTLETON

    SHAWN RAVER

                              - - -

                          I N D E X

                              - - -

EXAMINATION OF:                                      PAGE

JULIE DIAZ

          By Attorney Morris ...............8


                      E X H I B I T S
HIGHLAND:                                            PAGE


Highland 1    Objection of the Dallas ..........63

              Foundation and Crown Global to

              Motion for Entry of An Order

              Approving Settlement

              (15 pages)

Case 19-34054-sgj11   Doc 4608-59   Filed 05/08/26   Entered 05/08/26 23:42:09   Desc

Exhibit 56   Page 8 of 48

Deposition of Julie Diaz                                                  In re Highland Capital Management, L.P.

DEPOSITION SUPPORT INDEX

QUESTIONS INSTRUCTED NOT TO ANSWER:

PAGE   LINE

(None)

REQUEST FOR PRODUCTION OF DOCUMENTS

PAGE   LINE

(None)

STIPULATIONS

PAGE   LINE

(None)

QUESTIONS MARKED

PAGE   LINE

(None)

REPORTER'S NOTE:

QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT NECESSARILY

REFLECT A DIRECT QUOTE.

Page 8

- - -

P R O C E E D I N G S

- - -

WHEREUPON,

JULIE DIAZ,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY ATTORNEY MORRIS:

Q. Good afternoon, Ms. Diaz. Can you hear me okay?

A. I can.

Q. My name is John Morris. I'm an attorney for Highland Capital Management, and we're here to take your deposition today in connection with the Dallas Foundation's objection to a certain settlement.

Are you aware of that?

A. Yes, I am.

Q. Have you ever been deposed before?

A. Yes, I have.

Q. Okay. So just some quick ground rules so we're on the same page.

Page 9

I'm going to ask a series of questions, and it's very important that you allow me to finish my question before you begin the answer.

Is that fair?

A. Yes.

Q. I will try to allow you to finish your answer before I begin a question; but if I fail to do so, will you let me know that?

A. Yes, I will.

Q. If I ask a question that you don't understand, will you let me know that?

A. I will.

Q. If you need a break at any time, I'm happy to accommodate you; but I just ask that you not seek a break while a question is pending unless you need to consult with your lawyer about privilege questions.

Is that fair?

A. Yes.

Q. Are you affiliated with the Dallas Foundation?

A. Yes. I am the president and CEO.

Q. When did you become the president and CEO of the Dallas Foundation?

Page 10

A. Formally, April 1st, 2024. Prior to that, I was interim CEO; and have been with the foundation for six years.

Q. Are you familiar with the company called Highland Capital Management, LP?

A. Yes, I am.

Q. Are you aware that Highland Capital Management, LP, filed for bankruptcy back in 2019?

A. Yes, I am.

Q. Are you aware that the Dallas Foundation recently filed in the bankruptcy court an objection to a proposed settlement between certain Highland affiliates and certain affiliates of Hunter Mountain Investment Trust?

A. Yes, I am.

Q. Are you aware of the parties to the settlement agreement that the Dallas Foundation has objected to?

A. Can you clarify that question.

Q. Can you identify the parties on the Highland side that are -- that executed the settlement agreement that the Dallas Foundation objected to?

A. No.

Page 11

Q. Can you identify the parties -- withdrawn.

Are you aware that there are parties -- are you aware that Hunter Mountain Investment Trust is a party to the settlement agreement?

A. Yes, I am.

Q. Are you aware that a gentleman named Mark Patrick signed the agreement on behalf of the Hunter Mountain Investment Trust?

A. I'm aware of his involvement.

Q. But you're not aware as you sit here right now that Mr. Patrick signed on behalf of Hunter Mountain Investment Trust?

A. No.

Q. Can I refer to Hunter Mountain Investment Trust as "HMIT" for purposes of the deposition?

A. Yes, you may.

Q. Are you aware that there are other entities that are affiliated with HMIT that are also party to the settlement agreement?

A. Yes, I am.

Q. Can we generally refer to all of the affiliates of HMIT and HMIT itself as "the HMIT

Page 12

entities" for purposes of today's deposition?

A.   Yes.

Q.   Did you review the Dallas Foundation's objection before it was filed?

A.   Yes, I did.

Q.   Were you responsible for authorizing its filing?

A.   Yes.

Q.   Are you aware that the objection was filed on behalf of an entity called Empower Dallas Foundation?

A.   Yes.

Q.   Are you familiar with that entity?

A.   Yes, I am.

Q.   What is the Empower Dallas Foundation?

A.   Empower Dallas Foundation is a supporting organization that is sponsored by the Dallas Foundation.  It's a grant-making organization that's been in existence for at least 10 years.

Q.   Do you know who formed Empower Dallas Foundation?

A.   Yes.  I'm aware that it came from Jim Dondero.

Q.   What do you mean that it came from Jim

Page 13

Dondero?

A.   Well, that the donation was made from Mr. Dondero.

Q.   Did Mr. Dondero make a donation to Empower Dallas Foundation?

A.   Yes.

Q.   And does Empower Dallas Foundation fund the Dallas Foundation?

A.   Technically, it is a -- we are a -- it is a supporting organization of the Dallas Foundation, which is an IRS entity for which it makes grant recommendations that then flow to a donor-advised fund that then the Dallas Foundation effectuates, basically, the grant.

Q.   Do you know if the Dallas -- did I step on your words?

A.   No.

Q.   Do you know if the Dallas --withdrawn.

Do you know if Empower Dallas Foundation had any contractual obligation to make donations to the Dallas Foundation?

A.   I believe that through its charitable status, it is required to make contributions on a regular basis.  And we also have governance that

Page 14

oversees activity within all of our charitable funds.

Q.   Is there an agreement of any kind between the Dallas Foundation and Empower Dallas Foundation?

A.   Yes.  We have a fund agreement.

Q.   And under that fund agreement, is the Dallas Foundation entitled to receive contributions from Empower Dallas?

A.   Yes.  I don't know the technical language offhand.

Q.   Do you know if Mr. Dondero plays any role in the management of Empower Dallas Foundation?

A.   What do you mean by "management"?

Q.   Does he have any involvement in --

A.   Yes.  As any fundholder, he would have involvement in making recommendations for grants he would like to put into the community, as all of our fundholders do.

Q.   Does he play any other role, to the best of your knowledge, with respect to the Empower Dallas Foundation?

A.   No.

Q.   Are you familiar with --

Page 15

A.   Oh, sorry.  May I correct myself?

The Empower Dallas Foundation does have its own governance, of which he is president of the foundation.  I'm the vice president.  And we have a treasurer.  As with all of our supporting orgs, the Dallas Foundation has majority oversight.

Q.   The Dallas Foundation has majority oversight of Empower Dallas Foundation?

A.   Yes.

Q.   And how does it exercise that oversight?

A.   In voting.

Q.   And who gets to vote?

A.   The officers:  the president, the vice president, and the treasurer.

Q.   Of which entity?

A.   Of the supporting organization, the Empower Dallas Foundation.

Q.   Can you identify who those people are.

A.   Jim Dondero is the president; I'm the vice president; and our CFO, Torrey Littleton, is the treasurer.

Q.   How about the Okada Family Foundation? Are you familiar with that?

Page 16

A. Oh, excuse me -- sorry.

I'm -- I need to correct myself. That is for Empower Dallas, because we have two funds I'm confusing. Empower Dallas Foundation, I am the president; Torrey is the treasurer; and we have a secretary.

For consent agendas, Jim Dondero plays an individual member role.

Q. Ma'am, what are you reading right now?

A. I'm looking at the structure of our supporting organizations.

Q. Can you just hold that up for me so I can see what you're looking at.

A. It literally lists that for all of them.

Q. Do you have any other documents with you today?

A. Just my notes.

Q. Can I ask you to put those away for now.

A. Oh, sure.

Q. How about the Okada Family Foundation; is that another supporting organization?

A. Yes, it is.

Q. And do you know if Mr. Dondero has any

Page 17

involvement with that entity?

A. It does not have any involvement with that entity.

Q. Okay. Do you know if Mr. Dondero played any role in the Dallas Foundation's decision to object to the proposed settlement between the Highland entities and the HMIT entities?

A. Did not have any role.

Q. Did you ever speak to him about the objection?

A. I have spoken to him in the last six months.

Q. Did you ever speak with him about the objection?

A. No.

Q. Did you speak with him about any of the facts that are set forth in the objection?

A. No.

Q. Was Mr. Dondero a source for some of the facts that are set forth in the Dallas Foundation's objection?

A. No.

Q. Did Mr. Dondero or anyone acting on his behalf provide any information to the Dallas

Page 18

Foundation that the Dallas Foundation used in its objection?

A. Repeat the question.

Q. Did Mr. Dondero or anybody you believe was acting on his behalf provide any information that the Dallas Foundation used in its objection?

A. I'll abstain from answering that.

Q. Excuse me?

A. I'd rather not answer that question.

Q. I appreciate that, but you have to.

A. Well, there's a lot of context around the formation of where we are today. So I have been engaged with our counterpart over the last six years, so I have a lot of information from working through our grant-making and the management of the assets over the past six years.

So in that same vein, I've learned a lot from many interested parties.

Q. Okay. So I ask you to listen carefully to my question, because it's rather precise.

Do you know if Mr. Dondero or anybody you believed was acting on his behalf provided the Dallas Foundation with any information that is -- that was used to prepare the objection?

Page 19

A. No.

Q. Are you familiar with the objection?

A. I am familiar. I authorized it and read it.

Q. And it's your testimony that Jim Dondero wasn't the source of any information that's in that objection. Is that fair?

A. That is fair.

Q. Do you know where the idea of filing the objection originated?

A. I don't.

Q. Do you know whose idea, who came up with the idea to object to this -- withdrawn.

Do you know whose idea it was to object to the Highland/HMIT settlement?

ATTORNEY OKIN: Okay. Actually, Ms. Diaz, before you answer, just want to caution you that as long as it's not conveying advice of counsel, you can answer the question.

A. You'll have to repeat that. I don't understand that.

BY ATTORNEY MORRIS:

Q. Do you know who came up with the idea of objecting to the proposed Highland/HMIT settlement?

Page 20

A.    I believe it came out of discussions in another settlement.

Q.    What settlement are you referring to?

A.    In the Cayman Islands.

Q.    What settlement is that?

A.    Well, it has to do with the three large supporting orgs and an entity called DAF Holdco.

Q.    Which three large supporting orgs are you referring to?

A.    Kansas City Foundation; Santa Barbara Foundation; Highland Dallas Foundation; and really in a small way, North Texas Community Foundation.  All --

Q.    And I apologize.  What did you just refer to those entities as?  Supporting organizations?

A.    Yes.

Q.    The Kansas -- and you called it the Kansas City --

A.    Foundation.

Q.    -- Foundation, the Santa Barbara Foundation and the Dallas Foundation?  And those are three additional supporting organizations of the Dallas Foundation?

Page 21

A.    Sorry.  We have three -- four community foundations; right?  Dallas Foundation, Santa Barbara Foundation, Kansas City Foundation, and North Texas Community Foundations.

The three -- Kansas City, Dallas and Highland -- I'm sorry -- Dallas, Kansas City, and Santa Barbara all have supporting organizations that were the result of contributions from Highland Capital in 2011.

Q.    Do you know if Mr. Dondero has any relationship to the Dallas, Kansas City, or Santa Barbara Foundations that you just identified?

A.    My understanding is they have -- he has the same structure of supporting org with Kansas City, Santa Barbara, and Dallas.

Q.    Is he the president of each, to the best of your knowledge?

A.    Yes.

Q.    And are those the entities that commenced the Cayman Islands proceedings, to the best of your understanding?

A.    Yes.

Q.    Is it your understanding that Mr. Dondero directed those entities to do so?

Page 22

A.    No.

Q.    Who directed those entities to do so, to the best of your knowledge?

A.    CEOs of the organizations.

Q.    And who are they?

A.    Debbie Wilkerson is the CEO of Kansas City.  Jackie Carrera is the CEO of Santa Barbara.  Rose Bradshaw is the CEO of North Texas Community Foundation, although she did not enter in, in the formal filing.  They have a very de minimis role in the asset.

Q.    Are you aware that Mr. Dondero filed a declaration or an affidavit in the Cayman Islands in support of the Community Foundation's litigation that they commenced?

A.    I did see that.

Q.    Did you read it?

A.    Yeah.

Q.    Did you see any familiarity between that declaration and the Dallas Foundation's objection?

A.    I think there were some similarities because of the nature of the activities that have been happening.

Q.    Did you learn, when you read

Page 23

Mr. Dondero's declaration in the Cayman Islands, that he's actually funding that litigation on behalf of the supporting organizations?

A.    No, that's not when I learned that.

Q.    That's not when you learned it or -- withdrawn.

Are you aware that he's funding that litigation?

A.    Yes.

Q.    When did you learn that he was funding that litigation?

A.    Before we got into litigation.

Q.    Is he funding this litigation on behalf of the Dallas Foundation?

A.    Yes, he is.

Q.    And how much money did he provide for the funding of this litigation?

A.    We have not agreed on an amount.  As with any of our fundholders', legal expenses will get paid through by the fund.  So that's a very common business practice.  And it would go until the legal issues ceased.

Q.    But he's made a commitment to fund -- to personally fund the expenses of the Dallas Foundation in connection with this litigation; is

Page 24

that right?

A.   Yes.

Q.   Are you aware of any particular reason that that's not disclosed in the Dallas Foundation's objection?

A.   I'm not aware.

Q.   Why did the Dallas Foundation file the objection on behalf of Empower Dallas Foundation?

A.   Well, we filed the objection on behalf of both Empower and Okada Family Foundation, in essence, because the person who has been overseeing the activity ceased to communicate with us as of last fall.  And there were enough irregularities in our communication and accounting leading up to then some pretty dramatic changes in valuations that raised a red flag for us.

Q.   Who is the person that you're referring to?

A.   Mark Patrick.

Q.   And did the Empower Dallas Foundation ask the Dallas Foundation to file this objection on its behalf?

A.   As fiduciaries of all of our charitable assets, we oversee the activity; and

Page 25

when there is any irregular activity, we investigate.

Q.   I appreciate that.  I'm just asking you if the Empower Dallas Foundation asked the Dallas Foundation to file the objection on its behalf.

A.   Well, since I am representative of the Empower Dallas Foundation, I don't have to ask anybody except ourselves to do that.

Q.   And did you confer with Mr. Dondero about that decision?

A.   I think we informed him.

Q.   Did he review a copy of the objection before it was filed?

A.   Not to my knowledge, no.

Q.   Are you aware that the Dallas Foundation also filed the objection on behalf of certain segregated accounts held at Crown Global Life Insurance Limited?

A.   Yes.

Q.   Can I refer to Crown Global Life Insurance Limited as just "Crown Global"?

A.   Yes.

Q.   And can I refer to the segregated accounts that are identified in the Dallas

Page 26

Foundation's objection as "the segregated accounts"?

A.   Yes.

Q.   And are you familiar with those segregated accounts?

A.   At a high level.

Q.   What's your understanding at a high level of what those segregated accounts are?

A.   That the Crown Global assets are really insurance annuities that pay out to the fund; and that's the source of income for charitable purposes.

Q.   Where does the income from the annuity flow to?

A.   Flows to the supporting organizations.

Q.   And then the supporting organizations have the proceeds from the annuity available for the foundations; is that fair?

A.   Yes.

Q.   And do you know who took out these insurance policies or these annuities?  Which of the -- withdrawn.

Can you identify the supporting organization that funded the purchase of the annuities?

Page 27

A.   Empower Dallas Foundation and Okada Family Foundation.

Q.   And is the cash that is thrown off from the annuities -- withdrawn.

To the best of your understanding, is the cash that's thrown off from the annuities the sole source of income for Empower Dallas Foundation and the Okada Foundation?

A.   That's my understanding.

Q.   Is it your understanding that the Dallas Foundation has not received anything of value from Empower Dallas Foundation or the Okada Family Foundation other than proceeds from the annuities?

A.   That's my understanding.

Q.   Do you know why the Dallas Foundation filed the objection on behalf of the segregated accounts at Crown Global?

A.   Yes.

Q.   Why did the Dallas Foundation file its objection on behalf of the segregated accounts?

A.   As I said earlier, because there had been activity and essentially a write-down of 40 percent of value, we were concerned that there were activities within Crown Global for the

Page 28

organizations that support that that we did not have any, you know, access to, vision or communication around.

Q.   Does the Dallas Foundation have any relationship with Crown Global?

A.   Yes.

Q.   As it pertains to -- what relationship does the Dallas Foundation have with Crown Global?

A.   Well, I don't understand on a transactional, but we get quarterly reports from them.  They obviously send the proceeds to us.  I mean, they are a fiduciary to us in the same way we are to others.

Q.   Crown Global is?

A.   Yeah.

Q.   With respect to the disbursement of proceeds from the annuity?

A.   Yes.

Q.   Okay.  So the proceeds from the annuity don't go to Empower Dallas or the Okada Family Foundation; they get remitted directly to the Dallas Foundation.

Do I have that right?

A.   No.  They go -- they go to the

Page 29

supporting organizations.  But in our governance that -- I refer to both as -- it flows into our finance office, and then they get allocated to the foundations.

Q.   You mentioned that there was a 40 percent write-down in value.  Is that with respect to the annuities?

A.   I don't know all of the transactions that led up to that.  But what we understood, there were a few -- sorry.

There are a few requests for us to approve that we didn't understand and sent them to our counsel, and then got the first-quarter report for March 30th, and it was significantly lower and we didn't know why.

So in asking for that, we found out there was a decline.

Q.   And is that -- is it your understanding that it's the decline in value -- withdrawn.

Is it your understanding that it's the unexplained decline in value that caused the Dallas Foundation to file the objection on behalf of the segregated accounts?

A.   Yes.

Page 30

Q.   Did anybody ask the Dallas Foundation to file the objection on behalf of the segregated accounts?

A.   No.

Q.   Can you identify the owner of the segregated accounts on behalf of -- on whose behalf the Dallas Foundation filed the objection?

Withdrawn.  Too many words.

Do you know who owns the segregated accounts?

A.   No.  I won't guess.

Q.   Are you aware that the owner of the segregated accounts is Crown Global?

A.   Oh, yes.

Q.   And so is that your understanding, that Crown Global --

A.   Yes.

Q.   -- owns the segregated accounts?

A.   Yes.

Q.   Did anybody from the Dallas Foundation seek Crown Global's consent and approval before filing the objection on behalf of the segregated accounts?

A.   Yes.

Q.   Yes?

Page 31

And who at Crown Global gave the authorization, if you know?

A.   Mr. -- the CEO and their chief legal, Hernandez -- Paul --

ATTORNEY OKIN:  Let me interrupt here too, John.  You're acting as though the objection was filed solely by the Dallas Foundation.  We represent two clients here.  We represent the Dallas Foundation and Crown Global.

And you're putting Ms. Diaz in a position where I think she thinks she has to justify having -- Crown Global's actions when they -- we represent them as well.

ATTORNEY MORRIS:  Well, as I read the pleading that you filed, it said the Dallas Foundation -- I won't --

ATTORNEY OKIN:  I think that's a --

ATTORNEY MORRIS:  I'll ask the questions, and we'll --

ATTORNEY OKIN:  Take a look at our signature block.  It says clearly that we're doing it on behalf of the Dallas Foundation and Crown Global.

BY ATTORNEY MORRIS:

Q.   Ms. Diaz, do you know if the Dallas

Deposition of Julie Diaz                                                    In re Highland Capital Management, L.P.

Page 32

Foundation ever appeared in the Highland bankruptcy case before it filed this objection?

A. I do not believe so.

Q. To the best of your knowledge, the Dallas Foundation never filed a claim against Highland in the Highland bankruptcy case; correct?

A. No.

Q. To the best of your knowledge -- withdrawn.

Have you ever heard of the Highland Claimant Trust?

A. No.

Q. So is it fair to say that you have no reason to believe that the Dallas Foundation has any interest in the Highland Claimant Trust?

A. No. That is not -- that's not fair to claim.

Q. So is it your testimony that you believe the Dallas Foundation has a direct or indirect interest in the Highland Claimant Trust?

A. What you asked me was had we ever participated and did we then have any result from it.

I don't know the answer to that

Page 33

question.

Q. I apologize if my questioning wasn't clear to you. Let me try again.

To the best of your knowledge, the Dallas Foundation has never appeared in the Highland bankruptcy case until it filed the objection that we're talking about today; correct?

A. I don't know the answer to that.

Q. But to the -- you have no knowledge that they ever did; is that fair?

A. I have no knowledge.

Q. Okay. And you have no knowledge that the Dallas Foundation ever filed a claim against Highland in the Highland bankruptcy case; correct?

A. I have no knowledge of that.

Q. And you have no knowledge that the Dallas Foundation has any interest of any kind in the Highland Claimant Trust; correct?

A. I do not agree with that statement.

Q. What knowledge do you have that the Dallas Foundation has an interest in the Highland Claimant Trust?

A. Because of the relationship between

Page 34

Hunter Mountain and how it feeds up to Crown Global and, therefore, the supporting organizations.

Q. It might be my fault that I'm not being clear, but I'm really just focused on Highland right now. Has nothing to do with Crown Global --

A. Okay.

Q. -- or Hunter Mountain; it's just Highland.

A. Okay.

Q. Are you aware that as a result of the bankruptcy, an entity Called the Highland Claimant Trust was formed?

A. I was not, no.

Q. Okay. So if you weren't aware that an entity called the Highland Claimant Trust was formed, is it also fair to say you have no knowledge that the Dallas Foundation has an interest in the Highland Claimant Trust?

A. Okay.

Q. Okay. And does the Dallas Foundation have any contractual relationship with Highland Capital Management, LP?

A. No.

Page 35

Q. Has the Dallas Foundation ever had a contractual relationship with Highland Capital Management, LP, to the best of your knowledge?

A. No.

Q. Does the Dallas Foundation have any contractual relationship with an entity called the Highland Claimant Trust, to the best of your knowledge?

A. No.

Q. And to the best of your knowledge, has the Dallas Foundation ever had a contractual relationship with an entity called the Highland Claimant Trust?

A. No.

Q. Do you have any reason to believe, as you sit here today, that Highland Capital Management, LP, owes any duties or obligations to the Dallas Foundation?

ATTORNEY OKIN: Object to form.

BY ATTORNEY MORRIS:

Q. You can answer.

A. Can you ask the question again.

Q. Sure.

As you sit here today, do you have any reason to believe that Highland Capital

Page 36

Management, LP, owes any duties or obligations to the Dallas Foundation?

ATTORNEY OKIN: Object to form.

A. No.

BY ATTORNEY MORRIS:

Q. As you sit here today, do you have any reason to believe that Highland Capital Management, LP, ever had any duties or obligations that it owed to the Dallas Foundation?

ATTORNEY OKIN: Object to form.

A. No.

BY ATTORNEY MORRIS:

Q. Are you aware that if the settlement agreement between the Highland entities and the HMIT entities is approved, the HMIT entities will receive cash and other assets pursuant to the terms of the settlement agreement?

A. I'm assuming that there is assets within the agreement.

Q. Have you reviewed the settlement agreement yourself, Ms. Diaz?

A. No.

Q. Are you generally familiar with the terms of the settlement agreement?

Page 37

A. At a high level.

Q. What's your understanding at a high level?

A. That once the settlement is complete, that Hunter Mountain will receive assets of some size that will flow up to Crown Global.

Q. Do you know if the requirement that the assets flow up to Crown Global is part of the settlement agreement that's before the Court and that the Dallas Foundation is objecting to?

A. That was our understanding.

Q. From the agreement itself?

A. I have not seen the settlement agreement.

Q. So you authorized an objection to a settlement agreement that you haven't seen; is that fair?

A. That's fair.

Q. Do you have any reason to believe that the Dallas Foundation has a right to recover any of the assets you just described that HMIT will receive if the settlement is approved by the Court?

ATTORNEY OKIN: Object to form.

A. Can you repeat the question.

Page 38

BY ATTORNEY MORRIS:

Q. Do you have any reason to believe that the Dallas Foundation has a right to recover any portion of the assets that HMIT will receive if the settlement agreement is approved by the bankruptcy court?

ATTORNEY OKIN: Object to form.

A. My job is to protect the charitable assets under our organization's fiduciary compliance role; and so if there is any opportunity for assets to either be diminished or not move forward, it's my job to ensure that I've done everything I can to recover them.

BY ATTORNEY MORRIS:

Q. But do you have an understanding as to whether or not -- withdrawn.

I think you just testified that it's your understanding at a high level that HMIT will receive certain assets if the settlement agreement is approved.

Do I have that right?

A. Yes.

Q. Do you have an understanding that the Dallas Foundation is entitled to receive all or any portion of the assets that HMIT would receive

Page 39

under the settlement agreement?

ATTORNEY OKIN: Object to form.

A. I don't know that.

BY ATTORNEY MORRIS:

Q. You don't know that?

A. (Shakes head.)

Q. Have you asked anybody whether the Dallas Foundation has a right to recover any portion of the assets that HMIT will receive under the settlement agreement?

ATTORNEY OKIN: Before you answer that, Ms. Diaz, I'll just remind you: Other than disclosing any of your conversations with counsel for you or for the foundation.

BY ATTORNEY MORRIS:

Q. But you can answer the question.

A. You'll have to ask the question again.

Q. No problem. I appreciate that.

Did you ever ask anybody whether the Dallas Foundation had a right to receive any of the assets that HMIT will receive under the settlement agreement?

A. Like somebody-who in your question?

Q. Anybody. Did you ever ask the question of anybody? Let's just start with "yes"

Page 40

or "no."

A. Yes.

Q. And who did you ask?

A. I'll strike that, because it would be -- I couldn't tell you definitively I did that.

Q. Did Mr. Dondero tell you that the Dallas Foundation had a right to the assets that HMIT was going to receive under the settlement agreement?

A. No.

Q. And you don't recall asking that question of anybody; is that fair?

A. The only person I talked to this -- about these assets to is Mark Patrick.

Q. And did Mr. Patrick tell you that the Dallas Foundation had a right to recover any of the proceeds under the HMIT/Highland settlement agreement?

A. I don't know.

Q. Have you ever received any documents that lead you to believe that the Dallas Foundation has an ownership interest in any of the assets that HMIT will receive under the settlement agreement?

Page 41

ATTORNEY OKIN: Object to form.

A. My understanding is that through the Hunter Mountain settlement, that those assets flow into the Atlas fund that I know Mark Patrick was managing. So indirectly.

BY ATTORNEY MORRIS:

Q. Is there a document that you reviewed that leads you to believe that the assets HMIT receives will go to the Atlas fund?

A. No.

Q. Can you identify with any specificity which Atlas entity you have in mind that's expected to receive the proceeds from the HMIT/Highland settlement?

A. No.

Q. Do you know if the Atlas entity that you just identified, does that have any obligation to disburse any of the assets it may receive from HMIT?

A. I don't know.

Q. Okay. Let's -- do you have any reason to believe that the Dallas Foundation will be impacted in any way if the settlement between Highland and the HMIT entities is approved?

A. As I said, because the Crown Global is

Page 42

to disburse money that it receives from Atlas, then there would be an impact. That's why we filed the objection.

Q. Is it fair to say that the Dallas Foundation's concern is what happens to the assets that HMIT receives after the settlement is approved and it's not with the agreement itself?

A. I can't answer that.

Q. If Mark Patrick hadn't done anything to change any of the structure that's described in the Dallas Foundation's objection such that the Dallas Foundation's expectations as set forth in its objection were met, would the Dallas Foundation have any reason to object to this settlement?

ATTORNEY OKIN: Objection; form.

A. I don't know.

BY ATTORNEY MORRIS:

Q. Isn't the problem here that you're concerned about what happens to the money after it's received by HMIT?

A. I'm concerned that the case that's pending in the Cayman Islands shows that $300 million of charitable assets have vanished and that the same type of behavior is happening

Page 43

in Crown Global and impacts those funds to the tune of $25 million.

Q. But that has nothing to do with Highland.

Fair enough?

A. I don't know.

Q. Do you have any basis to say that Highland has any involvement in anything you just described?

A. Well, I'm not a lawyer and, technically, I don't know how to answer that. But Highland has been involved from day one.

Q. Involved in what?

A. The original contribution to set up the supporting orgs with those shares; like I said, I -- all the different legal entities -- GPs, LPs, et cetera -- I leave you all to track.

Q. If the Court approved the settlement and Mark Patrick decided to give all of the proceeds to the Dallas Foundation, would the Dallas Foundation have any reason to object to the settlement?

ATTORNEY OKIN: Object to form.

A. I think we'd want to know more.

///

Deposition of Julie Diaz                                    In re Highland Capital Management, L.P.

Page 44

BY ATTORNEY MORRIS:

Q. What would you want to know?

A. What are the assets that we would be receiving? What would the structure be?

Q. Well, the assets are set forth in the settlement agreement; right? So there's no mystery about the assets.

Fair enough?

A. I don't know that. I don't know -- are they -- is it cash? Is it securities? What are the nature of the -- I would want to know a lot more before accepting all things like that.

Q. Do you know if Crown Global ever appeared in the Highland bankruptcy?

A. I don't know.

Q. Do you know if the segregated accounts ever filed a notice of appearance in the Highland bankruptcy?

A. I don't know.

Q. Do you know if Crown Global ever filed a claim against Highland in the Highland bankruptcy?

A. I don't know.

Q. Do you know if the segregated accounts ever filed a claim against Highland in the

Page 45

Highland bankruptcy?

A. I don't know.

Q. Do you know if Crown Global has an interest in the Highland Claimant Trust?

A. No. No, I don't know.

Q. Do you know if the segregated accounts have an interest in the Highland Claimant Trust?

A. I don't know.

Q. Do you know if Crown Global has any contractual relationship with Highland?

A. I don't know.

Q. Do you know if Crown Global has any contractual relationship with the Highland Claimant Trust?

A. No.

Q. I'm going to take Mr. -- I think it's Mr. Littleton's deposition next.

A. Yep.

Q. Do you know if he is affiliated with Crown Global in any way?

A. No. He's an employee of the Dallas Foundation.

Q. Thank you.

Do you know if Crown Global has any right to recover any of the assets that HMIT and

Page 46

the HMIT entities may receive under the settlement agreement?

ATTORNEY OKIN: Object to form.

A. I don't know.

BY ATTORNEY MORRIS:

Q. Have you asked that question of anybody?

ATTORNEY OKIN: Other than your lawyers, you can answer that, Ms. Diaz.

ATTORNEY MORRIS: Please --

BY ATTORNEY MORRIS:

Q. Was the answer "no," Ms. Diaz?

A. Ask the question again, please.

Q. Have you ever asked anybody whether Crown Global had the right to receive any of the assets that Highland will convey to HMIT under the settlement agreement?

A. No.

Q. We're using the phrase "HMIT entities" to mean the entities on whose behalf Mark Patrick signed the settlement agreement; right? Are we on the same page?

A. That's what you're telling me.

Q. Okay. Are you familiar with any of those entities?

Page 47

A. Tell me what they are.

Q. Are you familiar with any of the Rand entities?

A. I'm familiar with Rand.

Q. And what's your familiarity with Rand?

A. Certainly it was another vehicle that flowed through to Atlas. And when Mr. Patrick came to see me last October, told me that there might be some issues with Rand and that structure might be changing. That's vague.

Q. Let's stick with the Hunter Mountain Investment Trust.

Are you aware of any assets that the Hunter Mountain Investment Trust owns today?

A. No.

Q. Was it your understanding that Mr. Patrick controlled Rand?

A. Yes.

Q. And is it your understanding that he controls Rand today?

A. Yes.

Q. And going back to Hunter Mountain Investment Trust, you're not aware of any assets that that entity holds today; correct?

A. No.

Page 48

Q.   Were you --

A.   I'm assuming Rand is one of the assets, I guess.

Q.   Were you ever -- did you ever know -- were you ever aware of any asset that HMIT owned?

A.   Well, Atlas.

Q.   It's your understanding --

A.   Yeah, I feel like I'm being quizzed on Hunter Mountain Trust.

ATTORNEY OKIN:  Let me interrupt here. John, two things.

One, if you want to show her an org chart so she can actually see these entities in a way that actually would help her remember them. Nobody can possibly keep them in their mind cold.

And, second, Ms. Diaz is not going to be our witness on this Hunter Mountain structure and the Rand structure.  You can keep asking her questions about it and testing her memory on it, but I don't think you're going to find that the answers are going to be any different.

Mr. Littleton will talk to these issues, yes.  I can't promise you he'll be able to answer every one of your questions.  But to the extent you want somebody with the Dallas

Page 49

Foundation's knowledge of the workings of that structure, he's the one to ask about that.

ATTORNEY MORRIS:  I'll continue to ask the questions, but I appreciate that.

BY ATTORNEY MORRIS:

Q.   Do you know if the Dallas Foundation ever received anything of value from any of the HMIT entities?

A.   Crown Global.

Q.   Crown Global is not an HMIT entity. So I'm asking you to just focus on the entities that Mark Patrick controlled, the Rand entities, the Atlas entities and Hunter Mountain.

Did any of those entities ever give anything of value to the Dallas Foundation?

A.   Not directly that I'm aware of, no.

Q.   Did any of those entities ever have any business dealings with the Dallas Foundation?

A.   Only in the relationship with Crown Global.

Q.   Do you have any understanding as to whether any of the HMIT entities owes any duties or obligations to the Dallas Foundation today?

ATTORNEY OKIN:  Objection to form.

A.   I don't know.

Page 50

BY ATTORNEY MORRIS:

Q.   I understand there was some corporate reorganization earlier this year.  I think that's described in the Dallas Foundation's objection.

Is that just generally fair?

A.   As it relates to Mr. Patrick?

Q.   Yes.

A.   (Nods head.)

Q.   Okay.  Do you have any reason to believe that before Mr. Patrick effectuated those changes, that any of the HMIT entities owed any duty or obligation to the Dallas Foundation?

ATTORNEY OKIN:  Objection to form.

A.   I don't know.

BY ATTORNEY MORRIS:

Q.   Are you aware that HMIT filed a couple of years ago a motion in the bankruptcy court for permission to bring certain claims against Highland Capital Management and a gentleman named James Seery?

A.   No.

Q.   Nobody ever told you that; is that fair?

A.   Fair.

Q.   Are you aware that Highland contends

Page 51

that the settlement agreement that it has entered into with the HMIT entities is the product of good-faith, arm's-length negotiations?

A.   Am I aware?  No.

Q.   Do you have any knowledge of the nature of any negotiations between the Highland entities and the HMIT entities?

A.   I'm aware that it's been going on for four years.

Q.   I'm just talking about the settlement agreement now.

A.   Okay.

Q.   Do you have any knowledge of any facts concerning the negotiation of that particular settlement agreement?

A.   No.

Q.   Do you have any knowledge of any facts that might suggest that the settlement agreement was not the product of good-faith, arm's-length negotiations?

A.   No.

Q.   Do you have any reason to believe that the proposed settlement is unfair to Highland Capital Management, LP?

ATTORNEY OKIN:  Object to form.

Page 52

BY ATTORNEY MORRIS:

Q.   You can answer, ma'am.

A.   I don't know.

Q.   Do you know whether the proposed settlement is unfair to the Highland Claimant Trust?

A.   I don't know.

ATTORNEY OKIN:  Object to form.

BY ATTORNEY MORRIS:

Q.   You don't have a view on that; is that fair?

A.   Yes.

Q.   And is it fair that in connection with the preparation and the filing of the objection -- withdrawn.

The Dallas Foundation, in its objection, does not contend that the settlement is unfair to Highland Capital Management; is that correct?

A.   I don't know.

Q.   You reviewed and authorized the filing of the objection; isn't that right, ma'am?

A.   Right.

Q.   And you're familiar with the document that you authorized to be filed; fair?

Page 53

A.   Yes.

Q.   And based on your recollection, do you recall the Dallas Foundation making any assertion or claim that the settlement agreement was unfair to Highland Capital Management, LP, or any of its affiliates?

A.   The claim was that it was unfair to the supporting organizations.

Q.   And how is the settlement agreement unfair to the supporting organizations?

A.   Because we would -- well, what we claimed is that because of our lack of transparency of the flow of those funds and the changes in the fund recently, that the supporting organizations were losing their assets and any potential future assets.

Q.   Is there any other basis that you're aware of by which the Dallas Foundation contends that the settlement agreement is unfair to it?

A.   No.

Q.   Does the Dallas Foundation contend that the settlement agreement is unfair to Hunter Mountain Investment Trust?

A.   I don't know.

Q.   As the person who authorized the

Page 54

filing of the objection on behalf of the Dallas Foundation, do you have any reason to believe that the terms of the settlement are unfair to the Hunter Mountain Investment Trust?

A.   I do not.

Q.   Are you aware that under the settlement agreement, the HMIT entities and the Highland entities are releasing each other from all liabilities except for the liabilities arising under the settlement agreement?

A.   I'm assuming that's what the settlement is intended to do.

Q.   And the Dallas Foundation doesn't have any concern about the scope of the mutual releases; is that fair?

ATTORNEY OKIN:  Objection to form.

A.   I don't know.

BY ATTORNEY MORRIS:

Q.   As the person who authorized the filing of the objection on behalf of the Dallas Foundation, do you recall there being any statement in the objection where the Dallas Foundation expressed any concern at all about the scope of the mutual releases that are in the settlement agreement?

Page 55

ATTORNEY OKIN:  Object to form.  The document speaks for itself.  I mean, if you want to show it to her and ask her to find it, that's fine.

BY ATTORNEY MORRIS:

Q.   You can answer, ma'am.

A.   I don't --

Q.   I'm sorry?

A.   I don't recall that.

Q.   Okay.  Thank you.

Are you aware of any facts that could give rise to a claim by the Dallas Foundation against any Highland entity?

ATTORNEY OKIN:  Object to form.

A.   Repeat the question.

BY ATTORNEY MORRIS:

Q.   Are you aware of any facts that would support a claim by the Dallas Foundation against Highland Capital Management, LP, or the Highland Claimant Trust?

ATTORNEY OKIN:  Object to form.

A.   No.

BY ATTORNEY MORRIS:

Q.   Do you understand the basis for the Dallas Foundation's objection?

Deposition of Julie Diaz                                    In re Highland Capital Management, L.P.

Page 56

A.   Yes.

Q.   Can you articulate that for me. What's your understanding of the basis of the Dallas Foundation's objection?

ATTORNEY OKIN:  Object to form.

A.   Our objection --

BY ATTORNEY MORRIS:

Q.   Pardon me?  What's that, ma'am?

ATTORNEY OKIN:  I said I object to the form of the question.

Go ahead.  You can answer.

A.   Our objection is based on -- and I've said this before -- the fact that there's been irregular significant erosion of the assets to date by the party who seems to control a lot of the liquidity flows and oversight of the assets.

And so with the backdrop of all of the work we're doing in the Cayman Islands to recover 300-plus million dollars, this seemed not insignificant to protect the $25 million for these two supporting organizations.

So as this happens on Wednesday, what we've learned is that every opportunity we can to slow down decisions that are made give us time to understand where -- what is happening with these

Page 57

charitable assets and where they are.

BY ATTORNEY MORRIS:

Q.   Do you have any reason to believe that Mark Patrick does not have the authority to enter into the settlement agreement on behalf of each of the HMIT entities?

ATTORNEY OKIN:  Object to the form of the question.

A.   I don't know what authority he has to enter into that.

BY ATTORNEY MORRIS:

Q.   Do you have any facts that you can share with me that suggest that Mr. Patrick does not have the legal authority to enter into the settlement agreement on behalf of any of the HMIT entities?

ATTORNEY OKIN:  Object to the form of the question.

A.   I don't.

BY ATTORNEY MORRIS:

Q.   Is it your understanding that Mr. Patrick was required to obtain the Dallas Foundation or Crown Global's consent before entering into this settlement agreement?

A.   I think what we would have appreciated

Page 58

and what had been our business as usual was information depo prior to and during anything that involved the assets under our aegis.

Q.   Do you know if any of the HMIT entities had an obligation or duty to provide information to the Dallas Foundation or Crown Global before entering into the settlement agreement?

ATTORNEY OKIN:  Object to the form of the question.

A.   I don't --

BY ATTORNEY MORRIS:

Q.   I'm sorry.  Ms. Diaz, you don't know?

A.   I don't contractually know that.  But whether it's authority that he was given or assumed, he should have communicated with us.

Q.   Should he have communicated with you before filing a lawsuit against the Highland -- withdrawn.

Do you believe that Mr. Patrick should have communicated with the Dallas Foundation before filing a lawsuit on behalf of Hunter Mountain Investment Trust against Highland, Mr. Seery, and others?

A.   I don't know.

Page 59

Q.   You don't have a view on that; is that fair?

A.   Fair.

Q.   I apologize if I asked this, but do you have any reason to believe that Mr. Patrick was required to obtain either the Dallas Foundation's or Crown Global's consent before entering into the settlement on behalf of the HMIT entities?

ATTORNEY OKIN:  Object to form of the question.

A.   I don't know.

BY ATTORNEY MORRIS:

Q.   Do you have any reason to believe that the Dallas Foundation or Crown Global has -- withdrawn.

Do you know if the Dallas Foundation has a direct ownership interest in any of the HMIT entities that are party to the settlement agreement?

A.   I don't believe so.

Q.   Do you know if Crown Global has a direct ownership interest in any of the HMIT entities that are party to the settlement agreement?

Page 60

A.  I don't know.

Q.  Do you know if the Dallas Foundation has an indirect ownership interest in any of the HMIT entities that are party to the settlement agreement?

A.  Indirect ownership?

ATTORNEY OKIN:  Object to the form of the question.

A.  I don't know.

BY ATTORNEY MORRIS:

Q.  Did you ever ask anybody?

A.  No.

Q.  No?

A.  No.

Q.  Do you know if Crown Global has an indirect ownership interest in any of the HMIT entities that are party to the settlement agreement?

ATTORNEY OKIN:  Object to the form of the question.

A.  I don't know.

BY ATTORNEY MORRIS:

Q.  Do you know if the Dallas Foundation has any right to control any of the HMIT entities?

Page 61

A.  No.

Q.  No, you don't know; or, no, they don't have that right?

A.  No, we don't have that right.

Q.  Do you know if Crown Global has the right to control any of the HMIT entities?

A.  I don't know.

Q.  Do you know if the Dallas Foundation has the right to approve transactions that are entered into by any of the HMIT entities?

A.  I don't know.

Q.  Do you know if Crown Global has the right to approve any transaction that's entered into by any of the HMIT entities?

A.  I don't know.

Q.  Do you know if Crown Global or the segregated accounts has any right to control any of the HMIT entities?

A.  I don't know.

Q.  Do you know if Crown Global or the segregated accounts has any right to approve transactions that any of the HMIT entities might enter into?

A.  I don't know.

Q.  Do you know if any of the HMIT

Page 62

entities were required to obtain the segregated accounts' consent before entering into the settlement agreement?

ATTORNEY OKIN:  Object to the form of the question.

A.  I don't know.

ATTORNEY MORRIS:  Okay.  We're going to put up on the screen -- Nathan, can you please put up on the screen the Dallas Foundation's objection.

BY ATTORNEY MORRIS:

Q.  And while we wait, Ms. Diaz, I will tell you that, you know, the good news with COVID -- or at least one piece of the good news -- is that we learned to do these remote depositions so people don't have to travel and it's much less expensive for clients.

The bad news is that I'm not in the room with you and we have to put documents on the screen, and sometimes that can be a little bit cumbersome.

The Dallas Foundation's objection is fairly lengthy.  This is not a test at all.  I am going to point to certain parts of the objection. But if you believe that you need to see any other

Page 63

portion of the document, will you let me know that so that I give you a chance to be fully informed?

A.  Yes.

ATTORNEY MORRIS:  Okay.  I think it's towards the end, Nathan, paragraph 32.

This will be -- let's just call it Highland 1.

(Whereupon, Exhibit Highland 1 was marked for identification and is attached hereto.)

BY ATTORNEY MORRIS:

Q.  So we've got up on the screen paragraph 32 of the objection.  And the third sentence states, "Unfortunately, it does not appear, however, that joint official liquidators are parties to or have authorized the settlement."

Do you see that?

A.  I see it.

Q.  Okay.  Are you aware that joint official liquidators were appointed by a Cayman court?

A.  Yes.

Q.  Do you know the entity over which the

Deposition of Julie Diaz                                                In re Highland Capital Management, L.P.

Page 64

joint official liquidators were appointed?

A.   I've met with them.

Entity?

ATTORNEY OKIN:  Ms. Diaz, maybe you need the question repeated.  You seem to be confused by the wrong part of it.

THE WITNESS:  Okay.

ATTORNEY MORRIS:  Thank you, Matt. That's fine.  That's fine.  I'll ask the question again.

BY ATTORNEY MORRIS:

Q.   Can you identify the entity that's the subject of the Cayman Islands liquidation proceeding?

A.   Yes; the DAF Holdco.

Q.   Are you aware that all of the HMIT entities are Delaware corporations?  Withdrawn.

Are you aware that all of the HMIT entities were formed under the laws of the State of Delaware?

A.   Sounds familiar.

Q.   And have you ever communicated with the joint official liquidators?

A.   Yes.

Q.   When did you do that?

Page 65

A.   Two weeks ago.

Q.   Did you make them aware of Highland's motion to have the settlement between the Highland entities and the HMIT entities approved?

A.   I'd have to look at my calendar.

Q.   Do you need your calendar to refresh your recollection as to whether or not you informed them of the Highland settlement motion?

A.   I would want to make sure that the day I met with them is clear in my mind as to this versus when we've talked to them.

Q.   Fair enough.

A.   As you can imagine, there's been a lot of detail around all of these cases.

Q.   Sure.  And I don't mean to be disrespectful at all, ma'am.  I apologize if you took it that way.

Do you recall ever making the joint official liquidators aware of the Dallas Foundation's objection to the settlement motion?

A.   As I said, I don't know if we've made them aware of the objection, except as it relates to ancillary activity that we're concerned about regarding Mark Patrick.

So this was filed on June 9th, and I

Page 66

would want to make sure that I spoke with them before or after that; and I don't have that.

Q.   Do you know if anybody provided a copy of the Dallas Foundation's objection to the joint official liquidators?

A.   I don't know that.

Q.   Did you ever consider doing that?

A.   I will after today.

Q.   Do you know if anybody asked the joint official liquidators to make an appearance in this case?

A.   I don't know that.

Q.   Did you ever ask the joint official liquidators to appear in this case?

A.   We've already precluded that we don't know whether I've actually talked to them about this case, so that's moot; right?

Q.   Okay.  Do you believe that Mr. Patrick was required to obtain the joint official liquidators' authorization before entering into the settlement agreement?

A.   I don't know that.

ATTORNEY OKIN:  Object to the form of the question.

///

Page 67

BY ATTORNEY MORRIS:

Q.   I'm sorry, ma'am.  What did you say?

A.   I don't know that.

Q.   Did you have any reason to believe that Mr. Patrick was required to obtain the joint official liquidators' consent before entering into this settlement agreement?

A.   I don't know.

Q.   Do you have any reason to believe that the joint official liquidators have any authority to reject the proposed settlement?

ATTORNEY OKIN:  Object to the form.

A.   I don't know.

BY ATTORNEY MORRIS:

Q.   A little bit further down, towards the bottom of this paragraph, there's a reference, it says that the Court-appointed fiduciary, quote, may -- withdrawn.

It says:

"Indeed, many of Mr. Patrick's actions, including the insertion of newly created entities into the fund's structure for the apparent purpose of diverting charitable assets, will now be subject to the scrutiny of an

Page 68

independent, Court-appointed fiduciary and may be subject to clawback or other avoidance actions in the Cayman liquidation or such other tribunal as has jurisdiction."

Do you see that?

A.   No.  You need to scroll down on the --

Q.   It's just at the end of paragraph 32 here.  It's the last sentence of 32.

A.   And so what's your question?

Q.   I just want to make sure that you and I are on the same page, because I'm going to ask some questions about this sentence.

A.   Yeah.

Q.   You're not an expert in Cayman Islands law; fair?

A.   Fair.

Q.   You're not a lawyer, are you?

A.   Nope.

Q.   You're not an expert on clawback or other avoidance actions, as that phrase is used in the Dallas Foundation's objection in paragraph 32; fair?

A.   Fair.

Q.   Do you have any understanding as to

Page 69

what facts must be established to succeed in a clawback or other avoidance action?

A.   Repeat the question.

Q.   Do you have any understanding as to what facts somebody needs to prove in order to succeed on a clawback or other avoidance action?

A.   Not in a corporate setting.

Q.   Is there any other type of setting that would pertain to the Dallas Foundation's claims against Mr. Patrick?

A.   No.

Q.   Okay.  Do you have a view as to the likelihood that the Dallas Foundation might succeed in clawing back or asserting another avoidance action to set aside the settlement agreement if it's approved by the bankruptcy court?

ATTORNEY OKIN:  Object to form.

A.   I don't know.

BY ATTORNEY MORRIS:

Q.   And you don't have a view; is that fair?

A.   No, I just really don't know --

Q.   If we could --

A.   -- whether we will.

Page 70

Q.   Okay.  You would have to speculate; is that fair?

A.   Yes.

ATTORNEY MORRIS:  Can we scroll down to paragraph 33, please.

ATTORNEY OKIN:  John, how much longer do you anticipate going?  We talked about these being an hour and a half.

ATTORNEY MORRIS:  Correct.  And we started at exactly 2:37 New York time.  I expect to finish at 4:07 New York time.

ATTORNEY OKIN:  Are we doing additional questions from anybody else?

ATTORNEY MORRIS:  Mr. Phillips, do you have any questions?

You're on mute, sir.

We'll be done in the 90 minutes.

ATTORNEY PHILLIPS:  Not at this time.

ATTORNEY MORRIS:  Okay.  Thank you.

BY ATTORNEY MORRIS:

Q.   So in paragraph 33, it says at the end, quote:  "Even if approved by this Court, consummation of the settlement is not likely to buy the peace the debtor now seeks."

Do you see that?

Page 71

A.   Yes.

Q.   Are you aware of anything in the Dallas Foundation's objection that suggests the Highland parties have done anything wrong here?

A.   Repeat that question.

Q.   Is there anything in the Dallas Foundation objection that you read and authorized to be filed that suggests that any of the Highland parties have done anything wrong?

ATTORNEY PHILLIPS:  I'm going to object to that question because you said that she read and authorized it to be filed.

ATTORNEY MORRIS:  I apologize.  I apologize.  Thank you.

BY ATTORNEY MORRIS:

Q.   Let me start again, Ms. Diaz.

Do you recall whether there's anything in the Dallas Foundation objection that asserts that any of the Highland parties have done anything wrong in connection with the entry into the settlement agreement?

A.   I don't recall.

Q.   Are you aware of any facts that cause you to believe that any of the Highland entities did anything wrong in negotiating and entering

Page 72

into the settlement agreement?

A.   I don't know.

Q.   If you're not aware of any facts suggesting that Highland has engaged in wrongdoing, do you know why the Dallas Foundation has informed the Court that consummation of the settlement is not likely to buy the peace the debtor now seeks?

ATTORNEY OKIN:  Object to form.

A.   I'll abstain from answering that.

BY ATTORNEY MORRIS:

Q.   That's not a thing, respectfully.

ATTORNEY MORRIS:  If -- Matt, if you want to just help your witness out.

ATTORNEY OKIN:  You want me to give her the answer?

BY ATTORNEY MORRIS:

Q.   Well, there's no abstention, so you have to answer the question, ma'am.

ATTORNEY OKIN:  As best you can answer it, Ms. Diaz, answer it.  If you can't answer it, tell him you can't answer it.

A.   And I'll just say, when you say "Highland," you want to be more specific?

///

Page 73

BY ATTORNEY MORRIS:

Q.   Sure.  Highland Capital Management, LP, the Highland Claimant Trust or the Highland Litigation Subtrust.

A.   And so repeat the question.

Q.   Okay.  If you don't have any facts suggesting that they've done anything wrong, why did the Dallas Foundation inform the Court, at the end of paragraph 33, that consummation of the settlement is not likely to buy the peace the debtor now seeks?

ATTORNEY OKIN:  Object to form.

BY ATTORNEY MORRIS:

Q.   You can answer.

ATTORNEY OKIN:  If you can answer it.

A.   Again, I'll just repeat that the peace that the debtor seeks will be tainted because of the harm that will come to the Dallas Foundation.

BY ATTORNEY MORRIS:

Q.   Anything else?

A.   No.

Q.   Is the Dallas Foundation considering bringing any claims against Highland, the Highland Claimant Trust or any of its fiduciaries?

Page 74

A.   (No audible response.)

Q.   I'm sorry, ma'am.  Did you answer?

A.   I did.  I said, "No."

Q.   Thank you.

In paragraph 34 --

ATTORNEY MORRIS:  Yeah, right there. Thank you Nathan --

BY ATTORNEY MORRIS:

Q.   -- it says, quote:  "There is ample evidence that Mr. Patrick has acted and is acting well outside the scope of his authority and fiduciary obligations."

Have I read that correctly?

A.   Yes.

Q.   Focusing solely on the settlement agreement, do you have any reason to believe that Mr. Patrick is acting outside of the scope of his authority in entering into the settlement agreement on behalf of each of the HMIT entities?

ATTORNEY OKIN:  Object to form.

A.   And I don't know.

BY ATTORNEY MORRIS:

Q.   Okay.  Focusing solely on the settlement agreement, do you have any reason to believe that Mr. Patrick is breaching his

Page 75

fiduciary obligations by entering into the settlement agreement on behalf of each of the HMIT entities?

A.   I don't know.

ATTORNEY MORRIS:  Can we scroll up to paragraph 16, please.

Do you see paragraph 16 concerns material nonpublic inside information?

A.   Yes.

Q.   And was Mr. Dondero the source of the information in this particular paragraph?

A.   No.

Q.   Who was?

A.   My attorneys.

Q.   That's how you learned about it; is that fair?

A.   Yes.

Q.   Do you see there's a reference to a put option in the last line of this paragraph?

A.   Yes.

Q.   Are you generally familiar with that put option?

A.   Yes.

Q.   And do you know who the counterparty is for that put option?

Page 76

A.   No, I don't.

Q.   You don't know?

A.   No.

Q.   Did you ever ask?

A.   I'm sure when we --

ATTORNEY OKIN:  Louis, you're not on mute, by the way.

BY ATTORNEY MORRIS:

Q.   Go ahead, Ms. Diaz.  I'm sorry.

A.   I'm sure when we received the contribution, we asked.  And you can ask our CFO that question.

My understanding from the original call in Labor Day weekend to our attorney was that we should call the put.  That was a 10-year, I believe, and this would have been at year 7; and we didn't understand why he would be calling to ask that.  And ...

Q.   Has the Dallas Foundation exercised the put as of today?

A.   Absolutely not.

Q.   Why not?

A.   We stopped all activity because this, again, was the beginning of, why is somebody doing that, not giving us the information, not

Page 77

talking to us directly; and that -- and at advice of counsel, we -- we have been very careful with any of our activities to date.

Q.   And do you know what material nonpublic inside information Mr. Patrick supposedly misused?

A.   I'll just tell you the quote he gave us, which was Jim Dondero's spiraling out of control and you need to do this because nothing appears to be what it is.

Q.   He didn't tell you who -- withdrawn.

Is that your basis for alleging that he had material nonpublic inside information --

A.   I'll -- well, I guess, I can't abstain.  I don't know.

Q.   Do you have any other --

A.   If my --

Q.   I'm sorry.

A.   Well, if my attorney says, "Don't do that," we don't do it.

Q.   I appreciate that.  I don't quarrel with you.  I'm just trying to learn facts here.

Can you identify any information that you believe Mr. Patrick had that constitutes material nonpublic inside information, as that

Page 78

phrase is used in the Dallas Foundation's objections?

A.   Right.

ATTORNEY OKIN:  Hold on, John.  I assume you're not -- I assume we're talking about information that's no longer nonpublic?

ATTORNEY MORRIS:  If -- if you all want to mark this -- I don't know what it is, Matt, so I can't say.  And it's not my information either.  So I'm happy to mark it confidential if you really prefer.

ATTORNEY OKIN:  I -- I don't even know if she knows the answer to the question.

A.   I don't know the answer to that.  But I will tell you that we quickly got a call from Skyview saying that Mark Patrick was no longer employed there and that that was confidential, yeah, insider information.

BY ATTORNEY MORRIS:

Q.   Oh, so somebody at Skyview told you that; is that fair?

A.   That's fair.

Q.   And who was that at Skyview?

A.   Well, it was an attorney for Skyview.

Q.   Was it D.C. Sauder?

Page 79

A.   No.  A woman.

Q.   Okay.  So a female attorney at Skyview told you that Mark Patrick had been terminated and that he had material nonpublic inside information.

Do I have that right?

A.   That they were investigating him and understood that we had called the -- he had called -- told us to call the put option.

Q.   Okay.  But as you sit here today, you're not able to tell me what material nonpublic inside information Mr. Patrick supposedly had; fair?

A.   Fair.

ATTORNEY MORRIS:  Ma'am, thank you so much.  I appreciate your time.

Matt, thank you for a professional deposition.

We'll see you all, I guess, in a little bit for the next deposition.

Thanks, folks.

THE COURT REPORTER:  Do you want a copy of the transcript?

ATTORNEY OKIN:  Yes, rushed, please. Whenever John gets it.

Page 80

ATTORNEY PHILLIPS:  Yes, expedited, like everybody else.

THE COURT REPORTER:  Mr. Lang, do you want a copy of the transcript?

ATTORNEY LANG:  Yes, please.

(Whereupon, at 3:08 p.m. Central Time, the proceedings concluded.)

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it.  DO NOT make marks or notations on the transcript volume itself.

Deposition of Julie Diaz                                            In re Highland Capital Management, L.P.

E R R A T A


           I wish to make the following changes,

  for the following reasons:

Page   Line

_____  _____   CHANGE: _____

REASON: _____

_____  _____   CHANGE: _____

REASON: _____

_____  _____   CHANGE: _____

REASON: _____

_____  _____   CHANGE: _____

REASON: _____

_____  _____   CHANGE: _____

REASON: _____

_____  _____   CHANGE: _____

REASON: _____

_____  _____   CHANGE: _____

REASON: _____

_____  _____   CHANGE: _____

REASON: _____

_____  _____   CHANGE: _____

REASON: _____

Case 19-34054-sgj11   Doc 4608-59   Filed 05/08/26   Entered 05/08/26 23:42:09   Desc

Deposition of Julie Diaz                    Exhibit 56   Page 30 of 48          In re Highland Capital Management, L.P.

C E R T I F I C A T I O N


         I hereby certify that I have read the

foregoing transcript of my deposition testimony,

and that my answers to the questions propounded,

with the attached corrections or changes, if any,

are true and correct.


-----------------------------------
JULIE DIAZ

Deposition of Julie Diaz                                                      In re Highland Capital Management, L.P.

CERTIFICATE OF SHORTHAND REPORTER


I, Gail Inghram, Registered Diplomate Reporter, Certified Realtime Reporter, Realtime Systems Administrator, CA-Certified Shorthand Reporter No. 8635, and Notary Public, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.


_____
Gail Inghram,
BA, RDR, CRR, RSA, CA-CSR No. 8635

## WORD INDEX

< $ >
$25  43:2  56:20
$300  42:24

< 1 >
1  6:14  63:8, 9
1:37  1:16  2:11
10  12:20
10010  3:24
10017-2024  3:16
10-year  76:15
11  1:8
1113  4:10
15  6:18
16  75:6, 7
1600  5:9
1700  4:18
19-34054-sgj11  1:5
1st  10:1

< 2 >
2:37  70:10
2011  21:9
2019  10:9
2024  10:1
2025  1:15  2:10
212.849.7615  3:25
214.817.4500  4:20
22  1:15  2:10
225.381.9643  5:11
22nd  3:23
2390  4:18
240  4:10

< 3 >
3:08  80:6
300-plus  56:19
301  5:9
30th  29:14
310.277.6910  3:17
32  63:6, 14  68:8, 9,
23
33  70:5, 21  73:9
34  74:5
34th  3:15

< 4 >

4:07  70:11
40  27:24  29:6

< 5 >
51  3:23

< 6 >
63  6:14

< 7 >
7  76:16
70801  5:10
713.228.4100  4:12
75201  4:19
77002  4:11
780  3:15

< 8 >
8  6:6
8635  1:22  84:8, 21

< 9 >
90  70:17
9th  65:25

< A >
able  48:23  79:11
Absolutely  76:21
abstain  18:7  72:10
77:15
abstention  72:18
accepting  44:12
access  28:2
accommodate  9:15
accounting  24:15
accounts  25:18, 25
26:2, 5, 8  27:18, 21
29:24  30:3, 6, 10, 13,
18, 23  44:16, 24  45:6
61:17, 21  62:2
acted  74:10
acting  17:24  18:5,
23  31:6  74:10, 17
action  69:2, 6, 15
actions  31:12  67:21
68:3, 21
activities  22:23
27:25  77:3

activity  14:1  24:12,
25  25:1  27:23  65:23
76:23
ADAMS  4:9
additional  20:24
70:13
Administrator  84:7
advice  19:18  77:1
aegis  58:3
affidavit  22:13
affiliated  9:21  11:21
45:19
affiliates  10:14, 15
11:25  53:6
affirmed  8:6
afternoon  8:12
agendas  16:7
ago  50:17  65:1
agree  33:21
agreed  23:18
agreement  10:18, 23
11:6, 9, 22  14:3, 6, 7
36:15, 18, 20, 22, 25
37:9, 12, 14, 16  38:5,
20  39:1, 10, 22  40:10,
19, 25  42:7  44:6
46:2, 17, 21  51:1, 11,
15, 18  53:4, 9, 19, 22
54:7, 10, 25  57:5, 15,
24  58:8  59:20, 25
60:5, 18  62:3  66:21
67:7  69:16  71:21
72:1  74:16, 19, 24
75:2
ahead  56:11  76:9
ahurt@kellyhart.com
5:7
alleging  77:12
allocated  29:3
allow  9:2, 7
AMELIA  5:6
amount  23:18
ample  74:9
ancillary  65:23
annuities  26:10, 21,
25  27:4, 6, 14  29:7
annuity  26:13, 17
28:18, 21
ANSWER  7:3  9:4, 8
18:9  19:17, 19  32:25

33:9  35:21  39:11, 16
42:8  43:11  46:9, 12
48:24  52:2  55:6
56:11  72:16, 19, 20,
21, 22  73:14, 15  74:2
78:13, 14
answering  18:7
72:10
answers  48:21  83:8
anticipate  70:7
anybody  18:4, 22
25:9  30:1, 20  39:7,
19, 24, 25  40:13  46:7,
14  60:11  66:3, 9
70:13
apologize  20:15  33:2
59:4  65:16  71:13, 14
apparent  67:23
appear  63:16  66:14
appearance  44:17
66:10
appeared  3:2  32:1
33:5  44:14
appears  77:10
appointed  63:22  64:1
appreciate  18:10
25:3  39:18  49:4
77:21  79:16
appreciated  57:25
approval  30:21
approve  29:12  61:9,
13, 21
approved  36:16
37:22  38:5, 20  41:24
42:7  43:18  65:4
69:16  70:22
Approving  6:17
approximately  2:11
April  10:1
arising  54:10
arm's-length  51:3, 19
articulate  56:2
aside  69:15
asked  25:4  32:22
39:7  46:6, 14  59:4
66:9  76:11
asking  25:3  29:16
40:12  48:18  49:11
asserting  69:14

Case 19-34054-sgj11   Doc 4608-59   Filed 05/08/26   Entered 05/08/26 23:42:09   Desc
Exhibit 56   Page 33 of 48

Deposition of Julie Diaz                                                   In re Highland Capital Management, L.P.

assertion  53:3
asserts  71:18
asset  22:11  48:5
assets  18:16  24:25
26:9  36:17, 19  37:5,
8, 21  38:4, 9, 11, 19,
25  39:9, 21  40:8, 15,
24  41:3, 8, 18  42:6,
24  44:3, 5, 7  45:25
46:16  47:13, 23  48:3
53:15, 16  56:14, 16
57:1  58:3  67:24
assume  78:5
assumed  58:16
assuming  36:19  48:2
54:11
Atlas  41:4, 9, 12, 16
42:1  47:7  48:6
49:13
attached  63:11  83:9
Attorney  6:6  8:11,
16  19:16, 22  31:5, 14,
17, 18, 20, 24  35:19,
20  36:3, 5, 11, 13
37:24  38:1, 7, 14
39:2, 4, 11, 15  41:1, 6
42:16, 18  43:23  44:1
46:3, 5, 8, 10, 11
48:10  49:3, 5, 24
50:1, 13, 15  51:25
52:1, 8, 9  54:16, 18
55:1, 5, 14, 16, 21, 23
56:5, 7, 9  57:2, 7, 11,
17, 20  58:9, 12  59:10,
13  60:7, 10, 19, 22
62:4, 7, 11  63:5, 12
64:4, 8, 11  66:23
67:1, 12, 14  69:18, 20
70:4, 6, 9, 12, 14, 18,
19, 20  71:10, 13, 15
72:9, 11, 13, 15, 17, 20
73:1, 12, 13, 15, 19
74:6, 8, 20, 22  75:5
76:6, 8, 14  77:19
78:4, 7, 12, 19, 24
79:2, 15, 24  80:1, 5
attorneys  75:14
audible  74:1

authority  57:4, 9, 14
58:15  67:10  74:11,
18
authorization  31:2
66:20
authorized  19:3
37:15  52:21, 25
53:25  54:19  63:17
71:7, 12
authorizing  12:6
available  26:17
Avenue  3:15, 23  4:18
avoidance  68:3, 21
69:2, 6, 15
aware  8:20  10:7, 11,
17  11:3, 4, 8, 11, 12,
20  12:9, 23  22:12
23:7  24:3, 6  25:16
30:12  34:12, 16
36:14  47:13, 23  48:5
49:16  50:16, 25  51:4,
8  53:18  54:6  55:11,
17  63:21  64:16, 18
65:2, 19, 22  71:2, 23
72:3

< B >
BA  1:22  84:21
back  10:8  47:22
69:14
backdrop  56:17
bad  62:18
BANKRUPTCY  1:1
10:8, 12  32:2, 6  33:6,
15  34:13  38:6  44:14,
18, 22  45:1  50:17
69:16
Barbara  20:11, 22
21:3, 7, 12, 16  22:8
BARTLETT  4:9
based  53:2  56:12
basically  13:14
basis  13:25  43:7
53:17  55:24  56:3
77:12
Baton  5:10
beginning  2:11  76:24
behalf  3:4, 19  4:3,
14  5:3  11:9, 13
12:10  17:25  18:5, 23

23:3, 14  24:8, 9, 23
25:6, 17  27:17, 21
29:23  30:2, 6, 7, 22
31:22  46:20  54:1, 20
57:5, 15  58:22  59:8
74:19  75:2
behavior  42:25
believe  13:23  18:4
20:1  32:3, 15, 20
35:15, 25  36:7  37:19
38:2  40:22  41:8, 22
50:10  51:22  54:2
57:3  58:20  59:5, 14,
21  62:25  66:18  67:4,
9  71:24  74:16, 25
76:16  77:24
believed  18:23
best  14:22  21:18, 22
22:3  27:5  32:4, 9
33:4  35:3, 7, 10
72:20
bit  62:20  67:15
79:20
block  31:21
bottom  67:16
Bradshaw  22:8
breaching  74:25
break  9:14, 16
bring  50:18
bringing  73:23
business  23:21  49:18
58:1
buy  70:24  72:7
73:10

< C >
CA-Certified  84:7
CA-CSR  1:22  84:21
calendar  65:5, 6
call  63:7  76:14, 15
78:15  79:9
called  10:5  12:10
20:7, 19  34:13, 17
35:6, 12  79:8, 9
calling  76:17
CAPITAL  1:6  3:4
8:16  10:5, 7  21:9
34:24  35:2, 16, 25
36:7  50:19  51:24

52:18  53:5  55:19
73:2
careful  77:2
carefully  18:20
Carrera  22:7
Case  1:5  32:2, 6
33:6, 15  42:22  66:11,
14, 17  84:16
cases  65:14
cash  27:3, 6  36:17
44:10
cause  71:23
caused  29:22
caution  19:17
Cayman  20:4  21:21
22:13  23:1  42:23
56:18  63:22  64:13
68:3, 15
ceased  23:22  24:12
Central  1:16  2:11
80:6
CEO  9:23, 25  10:2
22:6, 7, 8  31:3
CEOs  22:4
certain  8:19  10:14
25:18  38:19  50:18
62:24
Certainly  47:6
CERTIFICATE  84:2
Certified  2:14, 15
84:6
certify  83:6  84:10
cetera  43:17
CFO  15:22  76:11
chance  63:2
change  42:10  82:6, 8,
10, 12, 14, 16, 18, 20,
22
changes  24:16  50:11
53:14  81:3  82:3
83:9
changing  47:10
Chapter  1:8
charitable  13:23
14:1  24:25  26:12
38:8  42:24  57:1
67:24
chart  48:13
chief  31:3

City  20:11, 20  21:3, 5, 6, 11, 16  22:7
claim  32:5, 18  33:14  44:21, 25  53:4, 7  55:12, 18
Claimant  3:5  32:12, 16, 21  33:20, 24  34:14, 17, 20  35:7, 13  45:4, 7, 14  52:5  55:20  73:3, 24
claimed  53:12
claims  50:18  69:10  73:23
clarify  10:20
CLARITY  7:22
clawback  68:2, 20  69:2, 6
clawing  69:14
clear  33:3  34:5  65:10
clearly  31:21
clients  31:8  62:17
cold  48:15
come  73:18
commenced  21:21  22:15
commitment  23:23
common  23:21
communicate  24:12
communicated  58:16, 17, 21  64:22
communication  24:14  28:3
community  14:19  20:13  21:2, 4  22:9, 14
company  10:4
complete  37:4
compliance  38:10
concern  42:5  54:14, 23
concerned  27:24  42:20, 22  65:23
concerning  51:14
concerns  75:7
concluded  80:7
confer  25:10
confidential  78:11, 17
confused  64:6
confusing  16:4

connection  8:18  23:25  52:13  71:20
consent  16:7  30:21  57:23  59:7  62:2  67:6
consider  66:7
considering  73:22
constitutes  77:24
consult  9:17
consummation  70:23  72:6  73:9
Cont'd  4:1  5:1
contend  52:17  53:21
contends  50:25  53:18
context  18:11
continue  49:3
contractual  13:21  34:23  35:2, 6, 11  45:10, 13
contractually  58:14
contribution  43:14  76:11
contributions  13:24  14:9  21:8
control  56:15  60:24  61:6, 17  77:9
controlled  47:17  49:12
controls  47:20
conversations  39:13
convey  46:16
conveying  19:18
copy  25:13  66:3  79:23  80:4
corporate  50:2  69:7
corporations  64:17
correct  15:1  16:2  32:7  33:8, 16, 20  47:24  52:19  70:9  83:10  84:11
corrections  81:3  83:9
correctly  74:13
counsel  19:19  29:13  39:13  77:2  84:15
counterpart  18:13
counterparty  75:24
couple  50:16
COURT  1:1  10:12  37:9, 23  38:6  43:18  50:17  63:23  69:17

70:22  72:6  73:8  79:22  80:3
Court-appointed  67:17  68:1
COVID  62:14
CRAWFORD  4:17
created  67:22
Crown  4:3  6:15  25:18, 21, 22  26:9  27:18, 25  28:5, 9, 15  30:13, 16, 21  31:1, 9, 12, 23  34:2, 7  37:6, 8  41:25  43:1  44:13, 20  45:3, 9, 12, 20, 24  46:15  49:9, 10, 20  57:23  58:7  59:7, 15, 22  60:15  61:5, 12, 16, 20
CRR  1:22  84:21
cumbersome  62:21
CURRY  4:7, 9

< D >
D.C  78:25
DAF  20:8  64:15
DALLAS  1:3  4:3, 19  6:14  8:18  9:21, 25  10:11, 18, 23  12:3, 11, 15, 16, 18, 21  13:5, 7, 8, 10, 13, 15, 18, 20, 22  14:4, 8, 9, 13, 23  15:2, 6, 8, 9, 19  16:3, 4  17:5, 21, 25  18:1, 6, 24  20:12, 23, 25  21:2, 5, 6, 11, 16  22:20  23:14, 24  24:4, 7, 8, 21, 22  25:4, 5, 8, 16, 25  27:1, 7, 11, 12, 16, 20  28:4, 8, 21, 23  29:23  30:1, 7, 20  31:7, 9, 15, 22, 25  32:5, 15, 20  33:5, 14, 19, 23  34:19, 22  35:1, 5, 11, 18  36:2, 9  37:10, 20  38:3, 24  39:8, 20  40:8, 17, 22  41:22  42:4, 11, 12, 13  43:20, 21  45:21  48:25  49:6, 15, 18, 23  50:4, 12  52:16  53:3,

18, 21  54:1, 13, 20, 22  55:12, 18, 25  56:4  57:22  58:6, 21  59:6, 15, 17  60:2, 23  61:8  62:9, 22  65:19  66:4  68:22  69:9, 13  71:3, 6, 18  72:5  73:8, 18, 22  76:19  78:1
D'AMBRA  5:14
date  56:15  77:3
DAVID  4:7
day  43:12  65:9  76:14
dcurry@okinadams.com  4:8
de  22:11
dealings  49:18
Debbie  22:6
Debtor  1:8  70:24  72:8  73:11, 17
decided  43:19
decision  17:6  25:11
decisions  56:24
declaration  22:13, 20  23:1
decline  29:17, 19, 22
Defendant  4:3, 14
definitively  40:5
Delaware  64:17, 20
DEMO  3:8
DEPONENT  81:1
deposed  8:22
DEPOSITION  1:13  2:9  7:1  8:17  11:18  12:1  45:17  79:18, 20  81:3  83:7
depositions  62:16
described  37:21  42:10  43:9  50:4
detail  65:14
DIAZ  1:14  2:9  6:5  8:5, 12  19:17  31:10, 25  36:22  39:12  46:9, 12  48:16  58:13  62:12  64:4  71:16  72:21  76:9  83:12
different  43:16  48:21
diminished  38:11
Diplomate  2:14  84:5

**DIRECT** 7:23 32:20 59:18, 23
**directed** 21:25 22:2
**direction** 2:16
**directly** 28:22 49:16 77:1
**disburse** 41:18 42:1
**disbursement** 28:17
**disclosed** 24:4
**disclosing** 39:13
**discussions** 20:1
**disrespectful** 65:16
**DISTRICT** 1:2
**diverting** 67:24
**DIVISION** 1:3
**document** 41:7 52:24 55:2 63:1
**DOCUMENTS** 7:7 16:16 40:21 62:19
**doing** 31:22 56:18 66:7 70:12 76:25
**dollars** 56:19
**donation** 13:2, 4
**donations** 13:22
**Dondero** 12:24 13:1, 3, 4 14:12 15:21 16:7, 25 17:4, 20, 24 18:4, 22 19:6 21:10, 25 22:12 25:10 40:7 75:10
**Dondero's** 23:1 77:8
**donor-advised** 13:13
**dramatic** 24:16
**Dugaboy** 4:14
**duly** 8:6
**duties** 35:17 36:1, 8 49:22
**duty** 50:12 58:5

**< E >**
**earlier** 27:22 50:3
**effectuated** 50:10
**effectuates** 13:14
**either** 38:11 59:6 78:10
**EMANUEL** 3:22
**employed** 78:17 84:15
**employee** 45:21

**Empower** 12:10, 15, 16, 21 13:5, 7, 20 14:4, 9, 13, 23 15:2, 9, 19 16:3, 4 24:8, 10, 21 25:4, 8 27:1, 7, 12 28:21
**engaged** 18:13 72:4
**ensure** 38:12
**enter** 22:10 57:4, 10, 14 61:23
**entered** 51:1 61:10, 13
**entering** 57:24 58:7 59:8 62:2 66:20 67:6 71:25 74:18 75:1
**entities** 11:21 12:1 17:7, 8 20:16 21:20, 25 22:2 36:15, 16 41:24 43:16 46:1, 19, 20, 25 47:3 48:13 49:8, 11, 12, 13, 14, 17, 22 50:11 51:2, 7 54:7, 8 57:6, 16 58:5 59:9, 19, 24 60:4, 17, 25 61:6, 10, 14, 18, 22 62:1 64:17, 19 65:4 67:22 71:24 74:19 75:3
**entitled** 14:8 38:24
**entity** 12:10, 13 13:11 15:17 17:1, 3 20:7 34:13, 17 35:6, 12 41:12, 16 47:24 49:10 55:13 63:25 64:3, 12
**Entry** 6:16 71:20
**erosion** 56:14
**Errata** 81:5
**ESQ** 3:6, 8, 10, 12, 20 4:5, 7, 15 5:4, 6
**essence** 24:11
**essentially** 27:23
**established** 69:1
**et** 43:17
**everybody** 80:2
**evidence** 74:10
**exactly** 70:10
**EXAMINATION** 6:4

8:10
**examined** 8:8
**excuse** 16:1 18:8
**executed** 10:22
**exercise** 15:11
**exercised** 76:19
**Exhibit** 63:9
**existence** 12:19
**expect** 70:10
**expectations** 42:12
**expected** 41:13
**expedited** 80:1
**expenses** 23:19, 24
**expensive** 62:17
**expert** 68:15, 20
**expressed** 54:23
**extent** 48:25

**< F >**
**fact** 56:13
**facts** 17:18, 21 51:13, 17 55:11, 17 57:12 69:1, 5 71:23 72:3 73:6 77:22
**fail** 9:8
**fair** 9:5, 19 19:7, 8 26:18 32:14, 17 33:11 34:18 37:17, 18 40:13 42:4 43:5 44:8 50:5, 23, 24 52:11, 13, 25 54:15 59:2, 3 65:12 68:16, 17, 23, 24 69:22 70:2 75:16 78:21, 22 79:13, 14
**fairly** 62:23
**fall** 24:13
**familiar** 10:4 12:13 14:25 15:25 19:2, 3 26:4 36:24 46:24 47:2, 4 52:24 64:21 75:21
**familiarity** 22:19 47:5
**Family** 15:24 16:22 24:10 27:2, 13 28:22
**fault** 34:4
**feeds** 34:1
**feel** 48:8
**female** 79:2

**fiduciaries** 24:24 73:25
**fiduciary** 28:13 38:9 67:17 68:1 74:12 75:1
**file** 24:7, 22 25:5 27:20 29:23 30:2
**filed** 10:8, 12 12:4, 10 22:12 24:9 25:14, 17 27:17 30:7 31:7, 15 32:2, 5 33:6, 14 42:3 44:17, 20, 25 50:16 52:25 65:25 71:8, 12
**filing** 12:7 19:9 22:10 30:22 52:14, 21 54:1, 20 58:18, 22
**finance** 29:3
**financial** 84:17
**find** 48:20 55:3
**fine** 55:4 64:9
**finish** 9:3, 7 70:11
**first** 8:6
**first-quarter** 29:13
**flag** 24:17
**Floor** 3:15, 23
**flow** 13:12 26:14 37:6, 8 41:4 53:13
**flowed** 47:7
**Flows** 26:15 29:2 56:16
**focus** 49:11
**focused** 34:5
**Focusing** 74:15, 23
**folks** 79:21
**following** 82:3, 4
**follows** 8:8
**foregoing** 83:7 84:9, 10
**form** 35:19 36:3, 11 37:24 38:7 39:2 41:1 42:16 43:23 46:3 49:24 50:13 51:25 52:8 54:16 55:1, 14, 21 56:5, 10 57:7, 17 58:9 59:10 60:7, 19 62:4 66:23 67:12 69:18 72:9 73:12 74:20

**formal** 22:*10*
**Formally** 10:*1*
**formation** 18:*12*
**formed** 12:*21* 34:*14, 18* 64:*19*
**forth** 17:*18, 21* 42:*12* 44:*5*
**forward** 38:*12*
**found** 29:*16*
**Foundation** 4:*3* 6:*15* 9:*22, 25* 10:*3, 12, 18, 23* 12:*11, 15, 16, 18, 22* 13:*5, 7, 8, 11, 14, 21, 22* 14:*4, 5, 8, 14, 23* 15:*2, 4, 6, 8, 9, 19, 24* 16:*4, 22* 18:*1, 6, 24* 20:*11, 12, 14, 21, 22, 23, 25* 21:*2, 3* 22:*9* 23:*14, 25* 24:*7, 8, 10, 21, 22* 25:*4, 5, 8, 17* 27:*1, 2, 8, 11, 12, 13, 16, 20* 28:*4, 8, 22, 23* 29:*23* 30:*1, 7, 20* 31:*7, 9, 16, 22* 32:*1, 5, 15, 20* 33:*5, 14, 19, 23* 34:*19, 22* 35:*1, 5, 11, 18* 36:*2, 10* 37:*10, 20* 38:*3, 24* 39:*8, 14, 20* 40:*8, 17, 23* 41:*22* 42:*14* 43:*20, 21* 45:*22* 49:*6, 15, 18, 23* 50:*12* 52:*16* 53:*3, 18, 21* 54:*2, 13, 21, 23* 55:*12, 18* 57:*23* 58:*6, 21* 59:*15, 17* 60:*2, 23* 61:*8* 69:*13* 71:*7, 18* 72:*5* 73:*8, 18, 22* 76:*19*
**foundations** 21:*2, 4, 12* 26:*18* 29:*4*
**Foundation's** 8:*18* 12:*3* 17:*5, 22* 22:*14, 20* 24:*5* 26:*1* 42:*5, 11, 12* 49:*1* 50:*4* 55:*25* 56:*4* 59:*7* 62:*9, 22* 65:*20* 66:*4* 68:*22* 69:*9* 71:*3* 78:*1*
**four** 21:*1* 51:*9*
**fully** 63:*2*

**fund** 13:*8, 13* 14:*6, 7* 23:*20, 23, 24* 26:*11* 41:*4, 9* 53:*14*
**funded** 26:*24*
**fundholder** 14:*17*
**fundholders** 14:*20* 23:*19*
**funding** 23:*2, 7, 10, 13, 17*
**funds** 14:*2* 16:*3* 43:*1* 53:*13*
**fund's** 67:*22*
**further** 67:*15*
**future** 53:*16*

**< G >**
**Gail** 1:*21* 2:*13* 84:*5, 21*
**gdemo@pszjlaw.com** 3:*9*
**generally** 11:*24* 36:*24* 50:*5* 75:*21*
**gentleman** 11:*8* 50:*19*
**give** 43:*19* 49:*14* 55:*12* 56:*24* 63:*2* 72:*15*
**given** 58:*15*
**giving** 76:*25*
**Global** 4:*3* 6:*15* 25:*18, 21, 22* 26:*9* 27:*18, 25* 28:*5, 9, 15* 30:*13, 16* 31:*1, 9, 23* 34:*2, 7* 37:*6, 8* 41:*25* 43:*1* 44:*13, 20* 45:*3, 9, 12, 20, 24* 46:*15* 49:*9, 10, 20* 58:*7* 59:*15, 22* 60:*15* 61:*5, 12, 16, 20*
**Global's** 30:*21* 31:*12* 57:*23* 59:*7*
**go** 23:*21* 28:*21, 25* 41:*9* 56:*11* 76:*9*
**going** 9:*1* 40:*9* 45:*16* 47:*22* 48:*16, 20, 21* 51:*8* 62:*7, 24* 68:*12* 70:*7* 71:*10*
**Good** 8:*12* 62:*13, 14*
**good-faith** 51:*3, 19*

**governance** 13:*25* 15:*3* 29:*1*
**GPs** 43:*17*
**grant** 13:*12, 14*
**grant-making** 12:*18* 18:*15*
**grants** 14:*18*
**GREGORY** 3:*8*
**ground** 8:*24*
**guess** 30:*11* 48:*3* 77:*14* 79:*19*

**< H >**
**half** 70:*8*
**HALL** 5:*18*
**HALLMAN** 5:*8*
**happening** 22:*24* 42:*25* 56:*25*
**happens** 42:*5, 20* 56:*22*
**happy** 9:*15* 78:*10*
**harm** 73:*18*
**HART** 5:*8*
**HAYLEY** 3:*12*
**head** 39:*6* 50:*8*
**hear** 8:*13*
**heard** 32:*11*
**held** 2:*9* 25:*18*
**he'll** 48:*23*
**help** 48:*14* 72:*14*
**hereto** 63:*11*
**Hernandez** 31:*4*
**high** 26:*6, 7* 37:*1, 2* 38:*18*
**HIGHLAND** 1:*6* 3:*4, 19* 6:*12, 14* 8:*16* 10:*5, 7, 14, 22* 17:*7* 20:*12* 21:*6, 9* 32:*1, 6, 11, 16, 21* 33:*6, 15, 20, 23* 34:*6, 10, 13, 17, 20, 23* 35:*2, 7, 12, 16, 25* 36:*7, 15* 41:*24* 43:*4, 8, 12* 44:*14, 17, 21, 25* 45:*1, 4, 7, 10, 13* 46:*16* 50:*19, 25* 51:*6, 23* 52:*5, 18* 53:*5* 54:*8* 55:*13, 19* 58:*18, 23* 63:*8, 9* 65:*4, 8* 71:*4, 9, 19, 24* 72:*4, 24* 73:*2, 3, 23, 24*

**Highland/HMIT** 19:*15, 24*
**Highland's** 65:*2*
**HMIT** 11:*17, 21, 25* 17:*7* 36:*16* 37:*21* 38:*4, 18, 25* 39:*9, 21* 40:*9, 24* 41:*8, 19, 24* 42:*6, 21* 45:*25* 46:*1, 16, 19* 48:*5* 49:*8, 10, 22* 50:*11, 16* 51:*2, 7* 54:*7* 57:*6, 15* 58:*4* 59:*9, 19, 23* 60:*4, 16, 24* 61:*6, 10, 14, 18, 22, 25* 64:*16, 18* 65:*4* 74:*19* 75:*3*
**HMIT/Highland** 40:*18* 41:*14*
**hold** 16:*12* 78:*4*
**Holdco** 20:*8* 64:*15*
**holds** 47:*24*
**hour** 70:*8*
**Houston** 4:*11*
**Hunter** 5:*3* 10:*15* 11:*4, 10, 14, 16* 34:*1, 9* 37:*5* 41:*3* 47:*11, 14, 22* 48:*9, 17* 49:*13* 53:*22* 54:*4* 58:*22*
**HURT** 5:*6*
**hwinograd@pszjlaw.com** 3:*13*

**< I >**
**idea** 19:*9, 12, 13, 14, 23*
**identification** 63:*10*
**identified** 21:*13* 25:*25* 41:*17*
**identify** 10:*21* 11:*1* 15:*20* 26:*23* 30:*5* 41:*11* 64:*12* 77:*23*
**imagine** 65:*13*
**impact** 42:*2*
**impacted** 41:*23*
**impacts** 43:*1*
**important** 9:*2*
**including** 67:*21*
**income** 26:*11, 13* 27:*7*
**independent** 68:*1*

INDEX  7:*1*
indicate  81:*3*
indirect  32:*21*  60:*3,
6, 16*
indirectly  41:*5*
individual  16:*8*
inform  73:*8*
information  17:*25*
18:*5, 14, 24*  19:*6*
58:*2, 6*  75:*8, 11*
76:*25*  77:*5, 13, 23, 25*
78:*6, 10, 18*  79:*5, 12*
informed  25:*12*  63:*3*
65:*8*  72:*6*
Inghram  1:*21*  2:*13*
84:*5, 21*
insertion  67:*21*
inside  75:*8*  77:*5, 13,
25*  79:*4, 12*
insider  78:*18*
insignificant  56:*20*
INSTRUCTED  7:*3*
INSTRUCTIONS
81:*1*
Insurance  4:*4*  25:*19,
22*  26:*10, 21*
intended  54:*12*
interest  32:*16, 21*
33:*19, 23*  34:*20*
40:*23*  45:*4, 7*  59:*18,
23*  60:*3, 16*  84:*17*
interested  18:*18*
interim  10:*2*
interrupt  31:*5*  48:*10*
investigate  25:*2*
investigating  79:*7*
Investment  4:*14*  5:*3*
10:*15*  11:*5, 10, 14, 17*
47:*12, 14, 23*  53:*23*
54:*4*  58:*23*
involved  43:*12, 13*
58:*3*
involvement  11:*11*
14:*16, 18*  17:*1, 2*
43:*8*
irregular  25:*1*  56:*14*
irregularities  24:*14*
IRS  13:*11*

Islands  20:*4*  21:*21*
22:*13*  23:*1*  42:*23*
56:*18*  64:*13*  68:*15*
issues  23:*22*  47:*9*
48:*23*
its  12:*7*  13:*23*  15:*3*
18:*1, 6*  24:*23*  25:*5*
27:*20*  42:*13*  52:*16*
53:*5*  73:*24*  84:*17*

< J >
Jackie  22:*7*
JAMES  5:*19*  50:*20*
JEFFREY  3:*10*
Jim  12:*23, 25*  15:*21*
16:*7*  19:*5*  77:*8*
jmorris@pszjlaw.com
3:*7*
job  38:*8, 12*
JOHN  3:*6*  8:*15*
31:*6*  48:*11*  70:*6*
78:*4*  79:*25*
joint  63:*16, 21*  64:*1,
23*  65:*18*  66:*4, 9, 13,
19*  67:*5, 10*
JONES  3:*14*  5:*18*
jpomerantz@pszjlaw.c
om  3:*11*
JULIE  1:*14*  2:*9*  6:*5*
8:*5*  83:*12*
June  1:*15*  2:*10*
65:*25*
jurisdiction  68:*5*
justify  31:*12*

< K >
Kansas  20:*11, 19, 20*
21:*3, 5, 6, 11, 16*  22:*7*
keep  48:*15, 18*
KELLY  5:*8*
kind  14:*3*  33:*19*
know  9:*9, 12*  12:*21*
13:*15, 18, 20*  14:*10,
12*  16:*25*  17:*4*  18:*22*
19:*9, 12, 14, 23*  21:*10*
26:*20*  27:*16*  28:*2*
29:*8, 15*  30:*9*  31:*2,
25*  32:*25*  33:*9*  37:*7*
39:*3, 5*  40:*20*  41:*4,
16, 20*  42:*17*  43:*6, 11,*

24  44:*2, 9, 11, 13, 15,
16, 19, 20, 23, 24*  45:*2,
3, 5, 6, 8, 9, 11, 12, 19,
24*  46:*4*  48:*4*  49:*6,
25*  50:*14*  52:*3, 4, 7,
20*  53:*24*  54:*17*  57:*9*
58:*4, 13, 14, 25*  59:*12,
17, 22*  60:*1, 2, 9, 15,
21, 23*  61:*2, 5, 7, 8, 11,
12, 15, 16, 19, 20, 24,
25*  62:*6, 13*  63:*1, 25*
65:*21*  66:*3, 6, 9, 12,
16, 22*  67:*3, 8, 13*
69:*19, 23*  72:*2, 5*
74:*21*  75:*4, 24*  76:*2*
77:*4, 15*  78:*8, 12, 14*
knowledge  14:*22*
21:*18*  22:*3*  25:*15*
32:*4, 9*  33:*4, 10, 12,
13, 17, 18, 22*  34:*19*
35:*3, 8, 10*  49:*1*  51:*5,
13, 17*
knows  78:*13*

< L >
L.P  1:*7*
Labor  76:*14*
lack  53:*12*
LANG  4:*15, 17*  80:*3,
5*
language  14:*11*
large  20:*7, 9*
law  68:*16*
laws  64:*19*
lawsuit  58:*18, 22*
lawyer  9:*17*  43:*10*
68:*18*
lawyers  46:*9*
lead  40:*22*
leading  24:*15*
leads  41:*8*
learn  22:*25*  23:*10*
77:*22*
learned  18:*17*  23:*4,
5*  56:*23*  62:*15*  75:*15*
leave  43:*17*
led  29:*9*
legal  23:*19, 22*  31:*3*
43:*16*  57:*14*
lengthy  62:*23*

level  26:*6, 8*  37:*1, 3*
38:*18*
liabilities  54:*9*
Life  4:*4*  25:*19, 21*
likelihood  69:*13*
Limited  25:*19, 22*
LINE  7:*4, 8, 13, 17*
75:*19*  82:*5*
liquidation  64:*13*
68:*4*
liquidators  63:*16, 22*
64:*1, 23*  65:*19*  66:*5,
10, 14, 20*  67:*6, 10*
liquidity  56:*16*
listen  18:*19*
lists  16:*14*
literally  16:*14*
Litigation  3:*19*
22:*15*  23:*2, 8, 11, 12,
13, 17, 25*  73:*4*
little  62:*20*  67:*15*
79:*20*
LITTLETON  5:*20*
15:*22*  48:*22*
Littleton's  45:*17*
LLP  3:*22*  4:*9*  5:*8*
LOIGMAN  3:*20*
long  19:*18*
longer  70:*6*  78:*6, 16*
look  31:*20*  65:*5*
looking  16:*10, 13*
losing  53:*15*
lot  18:*11, 14, 18*
44:*12*  56:*15*  65:*13*
LOUIS  5:*4*  76:*6*
Louisiana  5:*10*
lower  29:*15*
LP  10:*5, 8*  34:*24*
35:*3, 17*  36:*1, 8*
51:*24*  53:*5*  55:*19*
73:*3*
lphillips@kellyhart.co
m  5:*5*
LPs  43:*17*

< M >
Ma'am  16:*9*  52:*2, 22*
55:*6*  56:*8*  65:*16*
67:*2*  72:*19*  74:*2*

79:*15*
Madison  3:*23*
Main  5:*9*
majority  15:*7, 8*
making  14:*18*  53:*3*
65:*18*
MANAGEMENT  1:*6*
3:*4*  8:*16*  10:*5, 8*
14:*13, 15*  18:*16*
34:*24*  35:*3, 17*  36:*1,*
*8*  50:*19*  51:*24*  52:*18*
53:*5*  55:*19*  73:*2*
managing  41:*5*
March  29:*14*
Mark  11:*9*  24:*20*
40:*15*  41:*4*  42:*9*
43:*19*  46:*20*  49:*12*
57:*4*  65:*24*  78:*8, 10,*
*16*  79:*3*
MARKED  7:*16*
63:*10*
MARKS  7:*22*  81:*6*
material  75:*8*  77:*4,*
*13, 25*  79:*4, 11*
Matt  64:*8*  72:*13*
78:*9*  79:*17*
MATTTHEW  4:*5*
mean  12:*25*  14:*15*
28:*13*  46:*20*  55:*2*
65:*15*
member  16:*8*
memory  48:*19*
mentioned  29:*5*
met  42:*13*  64:*2*
65:*10*
MICHAEL  4:*15*
million  42:*24*  43:*2*
56:*19, 20*
mind  41:*12*  48:*15*
65:*10*
minimis  22:*11*
minutes  70:*17*
misused  77:*6*
mlang@cwl.law.com
4:*16*
mokin@okinadams.co
m  4:*6*
money  23:*16*  42:*1, 20*
months  17:*13*
moot  66:*17*

MORRIS  3:*6*  6:*6*
8:*11, 15*  19:*22*  31:*14,*
*18, 24*  35:*20*  36:*5, 13*
38:*1, 14*  39:*4, 15*
41:*6*  42:*18*  44:*1*
46:*5, 10, 11*  49:*3, 5*
50:*1, 15*  52:*1, 9*
54:*18*  55:*5, 16, 23*
56:*7*  57:*2, 11, 20*
58:*12*  59:*13*  60:*10,*
*22*  62:*7, 11*  63:*5, 12*
64:*8, 11*  67:*1, 14*
69:*20*  70:*4, 9, 14, 19,*
*20*  71:*13, 15*  72:*11,*
*13, 17*  73:*1, 13, 19*
74:*6, 8, 22*  75:*5*  76:*8*
78:*7, 19*  79:*15*
Motion  6:*16*  50:*17*
65:*3, 8, 20*
Mountain  5:*3*  10:*15*
11:*4, 10, 14, 16*  34:*1,*
*9*  37:*5*  41:*3*  47:*11,*
*14, 22*  48:*9, 17*  49:*13*
53:*23*  54:*4*  58:*23*
move  38:*12*
mute  70:*16*  76:*7*
mutual  54:*14, 24*
mystery  44:*7*

< N >
name  8:*15*
named  11:*8*  50:*19*
NATHAN  5:*18*  62:*8*
63:*6*  74:*7*
nature  22:*23*  44:*11*
51:*6*
NECESSARILY  7:*22*
need  9:*14, 17*  16:*2*
62:*25*  64:*5*  65:*6*
68:*7*  77:*9*
needs  69:*5*
negotiating  71:*25*
negotiation  51:*14*
negotiations  51:*3, 6,*
*20*
neither  84:*15*
never  32:*5*  33:*5*
New  3:*16, 24*  70:*10,*
*11*

newly  67:*22*
news  62:*13, 15, 18*
Nods  50:*8*
nonpublic  75:*8*  77:*5,*
*13, 25*  78:*6*  79:*4, 12*
Nope  68:*19*
North  20:*13*  21:*4*
22:*8*
NORTHERN  1:*2*
Notary  84:*8*
notations  81:*6*
NOTE  7:*21*
notes  16:*18*
notice  44:*17*

< O >
object  17:*6*  19:*13, 15*
35:*19*  36:*3, 11*  37:*24*
38:*7*  39:*2*  41:*1*
42:*14*  43:*21, 23*  46:*3*
51:*25*  52:*8*  55:*1, 14,*
*21*  56:*5, 9*  57:*7, 17*
58:*9*  59:*10*  60:*7, 19*
62:*4*  66:*23*  67:*12*
69:*18*  71:*11*  72:*9*
73:*12*  74:*20*
objected  10:*19, 24*
objecting  19:*24*
37:*10*
Objection  6:*14*  8:*18*
10:*13*  12:*4, 9*  17:*11,*
*15, 18, 22*  18:*2, 6, 25*
19:*2, 7, 10*  22:*21*
24:*5, 8, 9, 22*  25:*5, 13,*
*17*  26:*1*  27:*17, 21*
29:*23*  30:*2, 7, 22*
31:*6*  32:*2*  33:*7*
37:*15*  42:*3, 11, 13, 16*
49:*24*  50:*4, 13*  52:*15,*
*17, 22*  54:*1, 16, 20, 22*
55:*25*  56:*4, 6, 12*
62:*10, 22, 24*  63:*14*
65:*20, 22*  66:*4*  68:*22*
71:*3, 7, 18*
objections  78:*2*
obligation  13:*21*
41:*18*  50:*12*  58:*5*
obligations  35:*17*
36:*1, 9*  49:*23*  74:*12*
75:*1*

obtain  57:*22*  59:*6*
62:*1*  66:*19*  67:*5*
obviously  28:*12*
October  47:*8*
offhand  14:*11*
office  29:*3*
officer  84:*8*
officers  15:*15*
official  63:*16, 22*
64:*1, 23*  65:*19*  66:*5,*
*10, 13, 19*  67:*6, 10*
Oh  15:*1*  16:*1, 21*
30:*14*  78:*20*
Okada  15:*24*  16:*22*
24:*10*  27:*1, 8, 12*
28:*21*
okay  8:*13, 24*  17:*4*
18:*19*  19:*16*  28:*20*
33:*13*  34:*8, 11, 16, 21,*
*22*  41:*21*  46:*24*  50:*9*
51:*12*  55:*10*  62:*7*
63:*5, 21*  64:*7*  66:*18*
69:*12*  70:*1, 19*  73:*6*
74:*23*  79:*2, 10*
OKIN  4:*5, 9*  19:*16*
31:*5, 17, 20*  35:*19*
36:*3, 11*  37:*24*  38:*7*
39:*2, 11*  41:*1*  42:*16*
43:*23*  46:*3, 8*  48:*10*
49:*24*  50:*13*  51:*25*
52:*8*  54:*16*  55:*1, 14,*
*21*  56:*5, 9*  57:*7, 17*
58:*9*  59:*10*  60:*7, 19*
62:*4*  64:*4*  66:*23*
67:*12*  69:*18*  70:*6, 12*
72:*9, 15, 20*  73:*12, 15*
74:*20*  76:*6*  78:*4, 12*
79:*24*
once  37:*4*
opportunity  38:*11*
56:*23*
option  75:*19, 22, 25*
79:*9*
Order  6:*16*  69:*5*
org  21:*15*  48:*12*
organization  12:*17,*
*19*  13:*10*  15:*18*
16:*23*  26:*24*
organizations  16:*11*
20:*17, 24*  21:*7*  22:*4*

23:3  26:15, 16  28:1  29:1  34:3  53:8, 10, 15  56:21
organization's  38:9
orgs  15:6  20:7, 9  43:15
original  43:14  76:13
originated  19:10
outcome  84:17
outside  74:11, 17
oversee  24:25
overseeing  24:12
oversees  14:1
oversight  15:7, 9, 12  56:16
owed  36:9  50:11
owes  35:17  36:1  49:22
owned  48:5
owner  30:5, 12
ownership  40:23  59:18, 23  60:3, 6, 16
owns  30:9, 18  47:14

< P >
p.m  1:16  2:11  80:6
PACHULSKI  3:14  5:18
Pacific  4:18
PAGE  6:4, 12  7:4, 8, 13, 17  8:25  46:22  68:12  82:5
pages  6:18
paid  23:20
paragraph  63:6, 14  67:16  68:8, 23  70:5, 21  73:9  74:5  75:6, 7, 11, 19
Pardon  56:8
part  37:8  64:6
participated  32:23
particular  24:3  51:14  75:11
parties  3:2  10:17, 21  11:1, 4  18:18  63:17  71:4, 9, 19  84:16
parts  62:24
party  11:5, 22  56:15  59:19, 24  60:4, 17

Patrick  11:9, 13  24:20  40:15, 16  41:4  42:9  43:19  46:20  47:7, 17  49:12  50:6, 10  57:4, 13, 22  58:20  59:5  65:24  66:18  67:5  69:10  74:10, 17, 25  77:5, 24  78:16  79:3, 12
Patrick's  67:20
PAUL  5:14  31:4
pay  26:10
peace  70:24  72:7  73:10, 16
pending  9:16  42:23
people  15:20  62:16
percent  27:24  29:6
permission  50:18
person  24:11, 18  40:14  53:25  54:19
personally  23:24
pertain  69:9
pertains  28:7
PHILLIPS  5:4  70:14, 18  71:10  80:1
phrase  46:19  68:21  78:1
piece  62:14
play  14:21
played  17:5
plays  14:12  16:7
pleading  31:15
Please  46:10, 13  62:8  70:5  75:6  79:24  80:5
PLLC  4:17
point  62:24
policies  26:21
POMERANTZ  3:10
portion  38:4, 25  39:9  63:1
position  31:11
possibly  48:15
potential  53:16
practice  23:21
precise  18:21
precluded  66:15
prefer  78:11
preparation  52:14

prepare  18:25
present  2:16  5:17
president  9:23, 24  15:3, 4, 15, 16, 21, 22  16:5  21:17
pretty  24:15
Prior  10:1  58:2
privilege  9:18
problem  39:18  42:19
proceeding  64:14
proceedings  2:12  21:21  80:7  84:9, 11, 12
proceeds  26:17  27:13  28:12, 18, 20  40:18  41:13  43:20
product  51:2, 19
PRODUCTION  7:7
professional  79:17
promise  48:23
proposed  10:13  17:6  19:24  51:23  52:4  67:11
propounded  83:8
protect  38:8  56:20
prove  69:5
provide  17:25  18:5  23:16  58:5
provided  18:23  66:3
Public  84:8
purchase  26:24
purpose  67:23
purposes  11:17  12:1  26:12
pursuant  36:17
put  14:19  16:19  62:8, 9, 19  75:19, 22, 25  76:15, 20  79:9
putting  31:10

< Q >
quarrel  77:21
quarterly  28:11
question  9:3, 8, 11, 16  10:20  18:3, 9, 20  19:19  33:1  35:22  37:25  39:16, 17, 23, 25  40:13  46:6, 13  55:15  56:10  57:8, 18  58:10  59:11  60:8, 20

62:5  64:5, 9  66:24  68:10  69:3  71:5, 11  72:19  73:5  76:12  78:13
questioning  33:2
QUESTIONS  7:3, 16  9:2, 18  31:19  48:19, 24  49:4  68:13  70:13, 15  83:8
quick  8:24
quickly  78:15
QUINN  3:22
quizzed  48:8
QUOTATION  7:22
QUOTE  7:23  67:17  70:22  74:9  77:7

< R >
raised  24:16
Rand  47:2, 4, 5, 9, 17, 20  48:2, 18  49:12
RAVER  5:21
RDR  1:22  84:21
read  19:4  22:17, 25  31:14  71:7, 12  74:13  83:6
reading  16:9  81:2
really  20:13  26:10  34:5  69:23  78:11
Realtime  2:14  84:6
reason  24:3  32:15  35:15, 25  36:7  37:19  38:2  41:21  42:14  43:21  50:9  51:22  54:2  57:3  59:5, 14  67:4, 9  74:16, 24  82:7, 9, 11, 13, 15, 17, 19, 21, 23
reasons  81:4  82:4
recall  40:12  53:3  54:21  55:9  65:18  71:17, 22
receive  14:8  36:17  37:5, 22  38:4, 19, 24, 25  39:9, 20, 21  40:9, 24  41:13, 19  46:1, 15
received  27:11  40:21  42:21  49:7  76:10
receives  41:9  42:1, 6
receiving  44:4

recollection  53:2  65:7
recommendations  13:12  14:18
record  84:11
recorded  2:12
recover  37:20  38:3, 13  39:8  40:17  45:25  56:18
red  24:16
reduced  84:13
refer  11:16, 24  20:16  25:21, 24  29:2
reference  67:16  75:18
referring  20:3, 10  24:19
REFLECT  7:23
refresh  65:6
regarding  65:24
Registered  2:13  84:5
regular  13:25
reject  67:11
related  84:15
relates  50:6  65:22
relationship  21:11  28:5, 7  33:25  34:23  35:2, 6, 12  45:10, 13  49:19
releases  54:15, 24
releasing  54:8
remember  48:14
remind  39:12
remitted  28:22
REMOTE  1:13  2:8  3:2  62:15
reorganization  50:3
Repeat  18:3  19:20  37:25  55:15  69:3  71:5  73:5, 16
repeated  64:5
report  29:14
Reported  1:20
Reporter  2:14, 15  79:22  80:3  84:2, 6, 8
REPORTER'S  7:21
reports  28:11
represent  31:8, 13
representative  25:7

REQUEST  7:7
requests  29:11
required  13:24  57:22  59:6  62:1  66:19  67:5
requirement  37:7
respect  14:22  28:17  29:7
respectfully  72:12
response  74:1
responsible  12:6
result  21:8  32:23  34:12
review  12:3  25:13
reviewed  36:21  41:7  52:21
right  11:13  16:9  21:2  24:1  28:24  34:6  37:20  38:3, 21  39:8, 20  40:8, 17  44:6  45:25  46:15, 21  52:22, 23  60:24  61:3, 4, 6, 9, 13, 17, 21  66:17  74:6  78:3  79:6
rise  55:12
ROBERT  3:20
robertloigman@quinn emanuel.com  3:21
role  14:13, 21  16:8  17:5, 9  22:11  38:10
room  62:19
Rose  22:8
Rouge  5:10
RSA  1:22  84:21
rules  8:24
rushed  79:24

< S >
Santa  20:11, 22  21:3, 7, 12, 16  22:8
Sauder  78:25
saying  78:16
says  31:21  67:17, 19  70:21  74:9  77:19
scope  54:14, 24  74:11, 17
screen  62:8, 9, 20  63:13

scroll  68:7  70:4  75:5
scrutiny  67:25
second  48:16
secretary  16:6
securities  44:10
see  16:13  22:16, 19  47:8  48:13  62:25  63:19, 20  68:6  70:25  75:7, 18  79:19
seek  9:16  30:21
seeks  70:24  72:8  73:11, 17
seen  37:13, 16
SEERY  5:19  50:20  58:24
segregated  25:18, 24  26:1, 5, 8  27:17, 21  29:24  30:2, 6, 9, 13, 18, 22  44:16, 24  45:6  61:17, 21  62:1
send  28:12
sent  29:12
sentence  63:15  68:9, 13
series  9:1
set  17:18, 21  42:12  43:14  44:5  69:15
setting  69:7, 8
Settlement  6:17  8:19  10:13, 18, 23  11:5, 22  17:6  19:15, 25  20:2, 3, 5  36:14, 18, 21, 25  37:4, 9, 13, 16, 22  38:5, 19  39:1, 10, 22  40:9, 18, 25  41:3, 14, 23  42:6, 15  43:18, 22  44:6  46:2, 17, 21  51:1, 10, 15, 18, 23  52:5, 17  53:4, 9, 19, 22  54:3, 7, 10, 12, 25  57:5, 15, 24  58:7  59:8, 19, 24  60:4, 17  62:3  63:18  65:3, 8, 20  66:21  67:7, 11  69:15  70:23  71:21  72:1, 7  73:10  74:15, 18, 24  75:2
Shakes  39:6

share  57:13
shares  43:15
SHAWN  5:21
Sheet  81:5
Shorthand  2:15  84:2, 7
show  48:12  55:3
shows  42:23
side  10:22
sign  81:5
signature  31:21
signed  11:9, 13  46:21
significant  56:14
significantly  29:14
similarities  22:22
sir  70:16
sit  11:12  35:16, 24  36:6  79:10
six  10:3  17:12  18:14, 16
size  37:6
Skyview  78:16, 20, 23, 24  79:2
slow  56:24
small  20:13
sole  27:7
solely  31:7  74:15, 23
somebody  48:25  69:5  76:24  78:20
somebody-who  39:23
sorry  15:1  16:1  21:1, 6  29:10  55:8  58:13  67:2  74:2  76:9  77:18
Sounds  64:21
source  17:20  19:6  26:11  27:7  75:10
speak  17:10, 14, 17
speaks  55:2
specific  72:24
specificity  41:11
speculate  70:1
spiraling  77:8
spoke  66:1
spoken  17:12
sponsored  12:17
STANG  3:14  5:18
start  39:25  71:16
started  70:10
State  64:19

statement  33:21
54:22
STATES  1:1  63:15
status  13:24
Stenographically
1:20  2:13  84:13
step  13:16
stick  47:11
STIPULATIONS
7:12
stopped  76:23
Street  4:10  5:9
strike  40:4
structure  16:10
21:15  42:10  44:4
47:9  48:17, 18  49:2
67:23
subject  64:13  67:25
68:2
Subtrust  73:4
succeed  69:1, 6, 14
suggest  51:18  57:13
suggesting  72:4  73:7
suggests  71:3, 8
Suite  4:10, 18  5:9
SULLIVAN  3:22
Sunday  1:15  2:10
supervision  84:14
supplied  81:5
SUPPORT  7:1
22:14  28:1  55:18
supporting  12:17
13:10  15:6, 18  16:11,
23  20:7, 9, 16, 24
21:7, 15  23:3  26:15,
16, 23  29:1  34:2
43:15  53:8, 10, 14
56:21
supposedly  77:6
79:13
sure  16:21  35:23
65:9, 15  66:1  68:11
73:2  76:5, 10
sworn  8:6
Systems  84:7

< T >
tainted  73:17
take  8:17  31:20

45:16
taken  84:9, 12
talk  48:22
talked  40:14  65:11
66:16  70:7
talking  33:7  51:10
77:1  78:5
technical  14:10
Technically  13:9
43:11
tell  40:5, 7, 16  47:1
62:13  72:22  77:7, 11
78:15  79:11
telling  46:23
terminated  79:3
terms  36:18, 25  54:3
test  62:23
testified  8:8  38:17
testify  8:6
testimony  19:5
32:19  81:4  83:7
testing  48:19
TEXAS  1:2  4:11, 19
20:13  21:4  22:9
Thank  45:23  55:10
64:8  70:19  71:14
74:4, 7  79:15, 17
Thanks  79:21
therefor  81:4
thing  72:12
things  44:12  48:11
think  22:22  25:12
31:11, 17  38:17
43:24  45:16  48:20
50:3  57:25  63:5
thinks  31:11
Third  3:15  63:14
three  20:6, 9, 24
21:1, 5
thrown  27:3, 6
Time  1:16  2:12
9:14  56:24  70:10, 11,
18  79:16  80:7
today  8:17  16:17
18:12  33:7  35:16, 24
36:6  47:14, 20, 24
49:23  66:8  76:20
79:10
today's  12:1

told  47:8  50:22
78:20  79:3, 9
TORREY  5:20
15:22  16:5
track  43:17
transaction  61:13
transactional  28:11
transactions  29:8
61:9, 22
transcribed  2:15
transcript  79:23
80:4  81:6  83:7
84:10
transparency  53:13
travel  62:16
treasurer  15:5, 16, 23
16:5
tribunal  68:4
true  83:10  84:11
Trust  3:5  4:14  5:3
10:15  11:5, 10, 14, 17
32:12, 16, 21  33:20,
24  34:14, 17, 20  35:7,
13  45:4, 7, 14  47:12,
14, 23  48:9  52:6
53:23  54:4  55:20
58:23  73:3, 24
Trustee  3:19
truth  8:7
try  9:7  33:3
trying  77:22
tune  43:2
two  16:3  31:8  48:11
56:21  65:1
type  42:25  69:8
typewriting  84:14

< U >
understand  9:12
19:21  28:10  29:12
50:2  55:24  56:25
76:17
understanding  21:14,
22, 24  26:7  27:5, 9,
10, 15  29:19, 21
30:15  37:2, 11  38:15,
18, 23  41:2  47:16, 19
48:7  49:21  56:3
57:21  68:25  69:4

76:13
understood  29:9  79:8
unexplained  29:22
unfair  51:23  52:5,
18  53:4, 7, 10, 19, 22
54:3
Unfortunately  63:15
UNITED  1:1
URQUHART  3:22
usual  58:1

< V >
vague  47:10
valuations  24:16
value  27:12, 24  29:6,
19, 22  49:7, 15
vanished  42:24
vehicle  47:6
vein  18:17
versus  65:11
vice  15:4, 15, 22
videoconferencing  3:2
video-conferencing
2:10
VIDEOGRAPHER
5:13
VIDEO-RECORDED
1:13  2:8
view  52:10  59:1
69:12, 21
Vine  4:10
vision  28:2
volume  81:2, 6
vote  15:14
voting  15:13

< W >
wait  62:12
want  19:17  43:24
44:2, 11  48:12, 25
55:2  65:9  66:1
68:11  72:14, 15, 24
78:8  79:22  80:4
way  20:13  28:13
41:23  45:20  48:14
65:17  76:7
Wednesday  56:22
weekend  76:14
weeks  65:1

Well  13:2  18:11
20:6  24:9  25:7
28:10  31:13, 14
43:10  44:5  48:6
53:11  72:18  74:11
77:14, 19  78:24
we're  8:17, 25  31:21
33:7  46:19  56:18
62:7  65:23  78:5
we've  56:23  63:13
65:11, 21  66:15
Wilkerson  22:6
WINOGRAD  3:12
wish  82:3
WISHNEW  4:17
withdrawn  11:2
13:19  19:13  23:6
26:22  27:4  29:20
30:8  32:10  38:16
52:15  58:19  59:16
64:17  67:18  77:11
witness  48:17  64:7
72:14
woman  79:1
words  13:16  30:8
work  56:18
working  18:15
workings  49:1
write-down  27:23
29:6
wrong  64:6  71:4, 9,
20, 25  73:7
wrongdoing  72:5

< Y >
Yeah  22:18  28:16
48:8  68:14  74:6
78:18
year  50:3  76:16
years  10:3  12:20
18:14, 16  50:17  51:9
Yep  45:18
York  3:16, 24  70:10,
11

< Z >
ZIEHL  3:14  5:18

## WORD LIST

**< $ >**
$25 (2)
$300 (1)

**< 1 >**
1 (3)
1:37 (2)
10 (1)
10010 (1)
10017-2024 (1)
10-year (1)
11 (1)
1113 (1)
15 (1)
16 (2)
1600 (1)
1700 (1)
19-34054-sgj11 (1)
1st (1)

**< 2 >**
2:37 (1)
2011 (1)
2019 (1)
2024 (1)
2025 (2)
212.849.7615 (1)
214.817.4500 (1)
22 (2)
225.381.9643 (1)
22nd (1)
2390 (1)
240 (1)

**< 3 >**
3:08 (1)
300-plus (1)
301 (1)
30th (1)
310.277.6910 (1)
32 (5)
33 (3)
34 (1)
34th (1)

**< 4 >**
4:07 (1)

40 (2)

**< 5 >**
51 (1)

**< 6 >**
63 (1)

**< 7 >**
7 (1)
70801 (1)
713.228.4100 (1)
75201 (1)
77002 (1)
780 (1)

**< 8 >**
8 (1)
8635 (3)

**< 9 >**
90 (1)
9th (1)

**< A >**
able (2)
Absolutely (1)
abstain (3)
abstention (1)
accepting (1)
access (1)
accommodate (1)
accounting (1)
accounts (20)
acted (1)
acting (6)
action (3)
actions (4)
activities (3)
activity (7)
ADAMS (1)
additional (2)
Administrator (1)
advice (2)
aegis (1)
affidavit (1)
affiliated (3)
affiliates (4)
affirmed (1)

afternoon (1)
agendas (1)
ago (2)
agree (1)
agreed (1)
agreement (59)
ahead (2)
ahurt@kellyhart.com (1)
alleging (1)
allocated (1)
allow (2)
AMELIA (1)
amount (1)
ample (1)
ancillary (1)
annuities (7)
annuity (4)
ANSWER (30)
answering (2)
answers (2)
anticipate (1)
anybody (16)
apologize (6)
apparent (1)
appear (2)
appearance (2)
appeared (4)
appears (1)
appointed (2)
appreciate (6)
appreciated (1)
approval (1)
approve (4)
approved (10)
Approving (1)
approximately (1)
April (1)
arising (1)
arm's-length (2)
articulate (1)
aside (1)
asked (8)
asking (5)
asserting (1)
assertion (1)
asserts (1)
asset (2)
assets (38)

assume (2)
assumed (1)
assuming (3)
Atlas (8)
attached (2)
Attorney (126)
attorneys (1)
audible (1)
authority (7)
authorization (2)
authorized (9)
authorizing (1)
available (1)
Avenue (3)
avoidance (5)
aware (42)

**< B >**
BA (2)
back (3)
backdrop (1)
bad (1)
BANKRUPTCY (15)
Barbara (7)
BARTLETT (1)
based (2)
basically (1)
basis (6)
Baton (1)
beginning (2)
behalf (35)
behavior (1)
believe (31)
believed (1)
best (12)
bit (3)
block (1)
bottom (1)
Bradshaw (1)
breaching (1)
break (2)
bring (1)
bringing (1)
business (3)
buy (3)

**< C >**
CA-Certified (1)
CA-CSR (2)

calendar  (2)
call  (5)
called  (10)
calling  (1)
CAPITAL  (17)
careful  (1)
carefully  (1)
Carrera  (1)
Case  (10)
cases  (1)
cash  (4)
cause  (1)
caused  (1)
caution  (1)
Cayman  (10)
ceased  (2)
Central  (3)
CEO  (7)
CEOs  (1)
certain  (7)
Certainly  (1)
CERTIFICATE  (1)
Certified  (3)
certify  (2)
cetera  (1)
CFO  (2)
chance  (1)
change  (10)
changes  (6)
changing  (1)
Chapter  (1)
charitable  (8)
chart  (1)
chief  (1)
City  (8)
claim  (9)
Claimant  (18)
claimed  (1)
claims  (3)
clarify  (1)
CLARITY  (1)
clawback  (4)
clawing  (1)
clear  (3)
clearly  (1)
clients  (2)
cold  (1)
come  (1)
commenced  (2)

commitment  (1)
common  (1)
communicate  (1)
communicated  (4)
communication  (2)
community  (6)
company  (1)
complete  (1)
compliance  (1)
concern  (3)
concerned  (4)
concerning  (1)
concerns  (1)
concluded  (1)
confer  (1)
confidential  (2)
confused  (1)
confusing  (1)
connection  (4)
consent  (6)
consider  (1)
considering  (1)
constitutes  (1)
consult  (1)
consummation  (3)
Cont'd  (2)
contend  (2)
contends  (2)
context  (1)
continue  (1)
contractual  (7)
contractually  (1)
contribution  (2)
contributions  (3)
control  (5)
controlled  (2)
controls  (1)
conversations  (1)
convey  (1)
conveying  (1)
copy  (4)
corporate  (2)
corporations  (1)
correct  (11)
corrections  (2)
correctly  (1)
counsel  (5)
counterpart  (1)
counterparty  (1)

couple  (1)
COURT  (14)
Court-appointed  (2)
COVID  (1)
CRAWFORD  (1)
created  (1)
Crown  (45)
CRR  (2)
cumbersome  (1)
CURRY  (2)

< D >
D.C  (1)
DAF  (2)
DALLAS  (160)
D'AMBRA  (1)
date  (2)
DAVID  (1)
day  (3)
dcurry@okinadams.com  (1)
de  (1)
dealings  (1)
Debbie  (1)
Debtor  (5)
decided  (1)
decision  (2)
decisions  (1)
declaration  (3)
decline  (3)
Defendant  (2)
definitively  (1)
Delaware  (2)
DEMO  (1)
DEPONENT  (1)
deposed  (1)
DEPOSITION  (11)
depositions  (1)
described  (4)
detail  (1)
DIAZ  (20)
different  (2)
diminished  (1)
Diplomate  (2)
DIRECT  (4)
directed  (2)
direction  (1)
directly  (3)
disburse  (2)

disbursement  (1)
disclosed  (1)
disclosing  (1)
discussions  (1)
disrespectful  (1)
DISTRICT  (1)
diverting  (1)
DIVISION  (1)
document  (4)
DOCUMENTS  (4)
doing  (5)
dollars  (1)
donation  (2)
donations  (1)
Dondero  (20)
Dondero's  (2)
donor-advised  (1)
dramatic  (1)
Dugaboy  (1)
duly  (1)
duties  (4)
duty  (2)

< E >
earlier  (2)
effectuated  (1)
effectuates  (1)
either  (3)
EMANUEL  (1)
employed  (2)
employee  (1)
Empower  (25)
engaged  (2)
ensure  (1)
enter  (5)
entered  (3)
entering  (9)
entities  (55)
entitled  (2)
entity  (19)
Entry  (2)
erosion  (1)
Errata  (1)
ESQ  (10)
essence  (1)
essentially  (1)
established  (1)
et  (1)
everybody  (1)

evidence  (1)
exactly  (1)
EXAMINATION  (2)
examined  (1)
excuse  (2)
executed  (1)
exercise  (1)
exercised  (1)
Exhibit  (1)
existence  (1)
expect  (1)
expectations  (1)
expected  (1)
expedited  (1)
expenses  (2)
expensive  (1)
expert  (2)
expressed  (1)
extent  (1)

< F >
fact  (1)
facts  (13)
fail  (1)
fair  (36)
fairly  (1)
fall  (1)
familiar  (14)
familiarity  (2)
Family  (6)
fault  (1)
feeds  (1)
feel  (1)
female  (1)
fiduciaries  (2)
fiduciary  (6)
file  (6)
filed  (25)
filing  (10)
finance  (1)
financial  (1)
find  (2)
fine  (3)
finish  (3)
first  (1)
first-quarter  (1)
flag  (1)
Floor  (2)
flow  (6)

flowed  (1)
Flows  (3)
focus  (1)
focused  (1)
Focusing  (2)
folks  (1)
following  (2)
follows  (1)
foregoing  (3)
form  (33)
formal  (1)
Formally  (1)
formation  (1)
formed  (4)
forth  (4)
forward  (1)
found  (1)
Foundation  (145)
foundations  (5)
Foundation's  (24)
four  (2)
fully  (1)
fund  (11)
funded  (1)
fundholder  (1)
fundholders  (2)
funding  (5)
funds  (4)
fund's  (1)
further  (1)
future  (1)

< G >
Gail  (4)
gdemo@pszjlaw.com  (1)
generally  (4)
gentleman  (2)
give  (6)
given  (1)
giving  (1)
Global  (41)
Global's  (4)
go  (7)
going  (13)
Good  (3)
good-faith  (2)
governance  (3)
GPs  (1)

grant  (2)
grant-making  (2)
grants  (1)
GREGORY  (1)
ground  (1)
guess  (4)

< H >
half  (1)
HALL  (1)
HALLMAN  (1)
happening  (3)
happens  (3)
happy  (2)
harm  (1)
HART  (1)
HAYLEY  (1)
head  (2)
hear  (1)
heard  (1)
held  (2)
he'll  (1)
help  (2)
hereto  (1)
Hernandez  (1)
high  (5)
HIGHLAND  (82)
Highland/HMIT  (2)
Highland's  (1)
HMIT  (54)
HMIT/Highland  (2)
hold  (2)
Holdco  (2)
holds  (1)
hour  (1)
Houston  (1)
Hunter  (19)
HURT  (1)
hwinograd@pszjlaw.com  (1)

< I >
idea  (5)
identification  (1)
identified  (3)
identify  (8)
imagine  (1)
impact  (1)
impacted  (1)

impacts  (1)
important  (1)
including  (1)
income  (3)
independent  (1)
INDEX  (1)
indicate  (1)
indirect  (4)
indirectly  (1)
individual  (1)
inform  (1)
information  (19)
informed  (4)
Inghram  (4)
insertion  (1)
inside  (6)
insider  (1)
insignificant  (1)
INSTRUCTED  (1)
INSTRUCTIONS  (1)
Insurance  (5)
intended  (1)
interest  (13)
interested  (1)
interim  (1)
interrupt  (2)
investigate  (1)
investigating  (1)
Investment  (13)
involved  (3)
involvement  (6)
irregular  (2)
irregularities  (1)
IRS  (1)
Islands  (8)
issues  (3)
its  (13)

< J >
Jackie  (1)
JAMES  (2)
JEFFREY  (1)
Jim  (6)
jmorris@pszjlaw.com  (1)
job  (2)
JOHN  (7)
joint  (11)
JONES  (2)

Deposition of Julie Diaz                                                          In re Highland Capital Management, L.P.

jpomerantz@pszjlaw.com (1)
JULIE (5)
June (3)
jurisdiction (1)
justify (1)

< K >
Kansas (9)
keep (2)
KELLY (1)
kind (2)
know (122)
knowledge (21)
knows (1)

< L >
L.P (1)
Labor (1)
lack (1)
LANG (4)
language (1)
large (2)
law (1)
laws (1)
lawsuit (2)
lawyer (3)
lawyers (1)
lead (1)
leading (1)
leads (1)
learn (3)
learned (6)
leave (1)
led (1)
legal (5)
lengthy (1)
level (5)
liabilities (2)
Life (3)
likelihood (1)
Limited (2)
LINE (6)
liquidation (2)
liquidators (11)
liquidity (1)
listen (1)
lists (1)
literally (1)

Litigation (10)
little (3)
LITTLETON (3)
Littleton's (1)
LLP (3)
LOIGMAN (1)
long (1)
longer (3)
look (2)
looking (2)
losing (1)
lot (6)
LOUIS (2)
Louisiana (1)
lower (1)
LP (11)
lphillips@kellyhart.com (1)
LPs (1)

< M >
Ma'am (10)
Madison (1)
Main (1)
majority (2)
making (3)
MANAGEMENT (19)
managing (1)
March (1)
Mark (14)
MARKED (2)
MARKS (2)
material (6)
Matt (4)
MATTTHEW (1)
mean (6)
member (1)
memory (1)
mentioned (1)
met (3)
MICHAEL (1)
million (4)
mind (3)
minimis (1)
minutes (1)
misused (1)
mlang@cwl.law.com (1)

mokin@okinadams.com (1)
money (3)
months (1)
moot (1)
MORRIS (69)
Motion (5)
Mountain (19)
move (1)
mute (2)
mutual (2)
mystery (1)

< N >
name (1)
named (2)
NATHAN (4)
nature (3)
NECESSARILY (1)
need (8)
needs (1)
negotiating (1)
negotiation (1)
negotiations (3)
neither (1)
never (2)
New (6)
newly (1)
news (3)
Nods (1)
nonpublic (7)
Nope (1)
North (3)
NORTHERN (1)
Notary (1)
notations (1)
NOTE (1)
notes (1)
notice (1)

< O >
object (35)
objected (2)
objecting (2)
Objection (63)
objections (1)
obligation (4)
obligations (6)
obtain (5)

obviously (1)
October (1)
offhand (1)
office (1)
officer (1)
officers (1)
official (11)
Oh (5)
Okada (7)
okay (29)
OKIN (52)
once (1)
opportunity (2)
option (4)
Order (2)
org (2)
organization (6)
organizations (15)
organization's (1)
orgs (4)
original (2)
originated (1)
outcome (1)
outside (2)
oversee (1)
overseeing (1)
oversees (1)
oversight (4)
owed (2)
owes (3)
owned (1)
owner (2)
ownership (6)
owns (3)

< P >
p.m (3)
PACHULSKI (2)
Pacific (1)
PAGE (10)
pages (1)
paid (1)
paragraph (13)
Pardon (1)
part (2)
participated (1)
particular (3)
parties (11)
parts (1)

party  (7)
Patrick  (31)
Patrick's  (1)
PAUL  (2)
pay  (1)
peace  (4)
pending  (2)
people  (2)
percent  (2)
permission  (1)
person  (5)
personally  (1)
pertain  (1)
pertains  (1)
PHILLIPS  (5)
phrase  (3)
piece  (1)
play  (1)
played  (1)
plays  (2)
pleading  (1)
Please  (7)
PLLC  (1)
point  (1)
policies  (1)
POMERANTZ  (1)
portion  (4)
position  (1)
possibly  (1)
potential  (1)
practice  (1)
precise  (1)
precluded  (1)
prefer  (1)
preparation  (1)
prepare  (1)
present  (2)
president  (10)
pretty  (1)
Prior  (2)
privilege  (1)
problem  (2)
proceeding  (1)
proceedings  (6)
proceeds  (8)
product  (2)
PRODUCTION  (1)
professional  (1)
promise  (1)

proposed  (6)
propounded  (1)
protect  (2)
prove  (1)
provide  (4)
provided  (2)
Public  (1)
purchase  (1)
purpose  (1)
purposes  (3)
pursuant  (1)
put  (11)
putting  (1)

< Q >
quarrel  (1)
quarterly  (1)
question  (39)
questioning  (1)
QUESTIONS  (12)
quick  (1)
quickly  (1)
QUINN  (1)
quizzed  (1)
QUOTATION  (1)
QUOTE  (5)

< R >
raised  (1)
Rand  (9)
RAVER  (1)
RDR  (2)
read  (8)
reading  (2)
really  (5)
Realtime  (3)
reason  (29)
reasons  (2)
recall  (7)
receive  (17)
received  (5)
receives  (3)
receiving  (1)
recollection  (2)
recommendations  (2)
record  (1)
recorded  (1)
recover  (7)
red  (1)

reduced  (1)
refer  (6)
reference  (2)
referring  (3)
REFLECT  (1)
refresh  (1)
regarding  (1)
Registered  (2)
regular  (1)
reject  (1)
related  (1)
relates  (2)
relationship  (11)
releases  (2)
releasing  (1)
remember  (1)
remind  (1)
remitted  (1)
REMOTE  (4)
reorganization  (1)
Repeat  (8)
repeated  (1)
report  (1)
Reported  (1)
Reporter  (9)
REPORTER'S  (1)
reports  (1)
represent  (3)
representative  (1)
REQUEST  (1)
requests  (1)
required  (6)
requirement  (1)
respect  (3)
respectfully  (1)
response  (1)
responsible  (1)
result  (3)
review  (2)
reviewed  (3)
right  (31)
rise  (1)
ROBERT  (1)
robertloigman@quinn
emanuel.com  (1)
role  (7)
room  (1)
Rose  (1)
Rouge  (1)

RSA  (2)
rules  (1)
rushed  (1)

< S >
Santa  (7)
Sauder  (1)
saying  (1)
says  (6)
scope  (4)
screen  (4)
scroll  (3)
scrutiny  (1)
second  (1)
secretary  (1)
securities  (1)
see  (13)
seek  (2)
seeks  (4)
seen  (2)
SEERY  (3)
segregated  (20)
send  (1)
sent  (1)
sentence  (3)
series  (1)
set  (6)
setting  (2)
Settlement  (84)
Shakes  (1)
share  (1)
shares  (1)
SHAWN  (1)
Sheet  (1)
Shorthand  (3)
show  (2)
shows  (1)
side  (1)
sign  (1)
signature  (1)
signed  (3)
significant  (1)
significantly  (1)
similarities  (1)
sir  (1)
sit  (5)
six  (4)
size  (1)
Skyview  (5)

slow  *(1)*
small  *(1)*
sole  *(1)*
solely  *(3)*
somebody  *(4)*
somebody-who  *(1)*
sorry  *(11)*
Sounds  *(1)*
source  *(5)*
speak  *(3)*
speaks  *(1)*
specific  *(1)*
specificity  *(1)*
speculate  *(1)*
spiraling  *(1)*
spoke  *(1)*
spoken  *(1)*
sponsored  *(1)*
STANG  *(2)*
start  *(2)*
started  *(1)*
State  *(1)*
statement  *(2)*
STATES  *(2)*
status  *(1)*
Stenographically  *(3)*
step  *(1)*
stick  *(1)*
STIPULATIONS  *(1)*
stopped  *(1)*
Street  *(2)*
strike  *(1)*
structure  *(9)*
subject  *(3)*
Subtrust  *(1)*
succeed  *(3)*
suggest  *(2)*
suggesting  *(2)*
suggests  *(2)*
Suite  *(3)*
SULLIVAN  *(1)*
Sunday  *(2)*
supervision  *(1)*
supplied  *(1)*
SUPPORT  *(4)*
supporting  *(23)*
supposedly  *(2)*
sure  *(9)*
sworn  *(1)*

Systems  *(1)*

< T >
tainted  *(1)*
take  *(3)*
taken  *(2)*
talk  *(1)*
talked  *(4)*
talking  *(4)*
technical  *(1)*
Technically  *(2)*
tell  *(10)*
telling  *(1)*
terminated  *(1)*
terms  *(3)*
test  *(1)*
testified  *(2)*
testify  *(1)*
testimony  *(4)*
testing  *(1)*
TEXAS  *(6)*
Thank  *(9)*
Thanks  *(1)*
therefor  *(1)*
thing  *(1)*
things  *(2)*
think  *(11)*
thinks  *(1)*
Third  *(2)*
three  *(5)*
thrown  *(2)*
Time  *(9)*
today  *(14)*
today's  *(1)*
told  *(5)*
TORREY  *(3)*
track  *(1)*
transaction  *(1)*
transactional  *(1)*
transactions  *(3)*
transcribed  *(1)*
transcript  *(5)*
transparency  *(1)*
travel  *(1)*
treasurer  *(4)*
tribunal  *(1)*
true  *(2)*
Trust  *(32)*
Trustee  *(1)*

truth  *(3)*
try  *(2)*
trying  *(1)*
tune  *(1)*
two  *(5)*
type  *(2)*
typewriting  *(1)*

< U >
understand  *(8)*
understanding  *(26)*
understood  *(2)*
unexplained  *(1)*
unfair  *(9)*
Unfortunately  *(1)*
UNITED  *(1)*
URQUHART  *(1)*
usual  *(1)*

< V >
vague  *(1)*
valuations  *(1)*
value  *(7)*
vanished  *(1)*
vehicle  *(1)*
vein  *(1)*
versus  *(1)*
vice  *(3)*
videoconferencing  *(1)*
video-conferencing
  *(1)*
VIDEOGRAPHER
  *(1)*
VIDEO-RECORDED
  *(2)*
view  *(4)*
Vine  *(1)*
vision  *(1)*
volume  *(2)*
vote  *(1)*
voting  *(1)*

< W >
wait  *(1)*
want  *(16)*
way  *(7)*
Wednesday  *(1)*
weekend  *(1)*
weeks  *(1)*

Well  *(17)*
we're  *(9)*
we've  *(5)*
Wilkerson  *(1)*
WINOGRAD  *(1)*
wish  *(1)*
WISHNEW  *(1)*
withdrawn  *(16)*
witness  *(3)*
woman  *(1)*
words  *(2)*
work  *(1)*
working  *(1)*
workings  *(1)*
write-down  *(2)*
wrong  *(6)*
wrongdoing  *(1)*

< Y >
Yeah  *(6)*
year  *(2)*
years  *(6)*
Yep  *(1)*
York  *(6)*

< Z >
ZIEHL  *(2)*