**EXHIBIT 57**

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

--------------------------

In Re:                              Case No. 19-34054-sgj11

HIGHLAND CAPITAL MANAGEMENT,

L.P.,

    Debtor.                         Chapter 11

--------------------------X.

REMOTE VIDEO-RECORDED DEPOSITION of

TORREY LITTLETON

Sunday, June 22, 2025

3:30 p.m. Central time

Reported Stenographically by:

Gail L. Inghram,

BA, RDR, CRR, RSA, CA-CSR No. 8635

Deposition of Torrey Littleton                                    In re Highland Capital Management, L.P.

WHEREUPON, the remote video-recorded deposition of TORREY LITTLETON was held via video-conferencing on Sunday, June 22, 2025, beginning at approximately 3:30 p.m. Central Time, the proceedings being recorded stenographically by Gail Inghram, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Shorthand Reporter, and transcribed under her direction, there being present:

Case 19-34054-sgj11   Doc 4608-60   Filed 05/08/26   Entered 05/08/26 23:42:09   Desc
Exhibit 57   Page 4 of 48

Deposition of Torrey Littleton                                    In re Highland Capital Management, L.P.

A P P E A R A N C E S:

[All parties appeared via remote videoconferencing.]


On behalf of Highland Capital Management, and the Highland

Claimant Trust:

   JOHN MORRIS, ESQ.

   jmorris@pszjlaw.com

   GREGORY V. DEMO, ESQ.

   gdemo@pszjlaw.com

   JEFFREY POMERANTZ, ESQ.

   jpomerantz@pszjlaw.com

   HAYLEY WINOGRAD, ESQ.

   hwinograd@pszjlaw.com

      PACHULSKI STANG ZIEHL & JONES

      780 Third Avenue, 34th Floor

      New York, New York 10017-2024

      310.277.6910


On behalf of Highland Litigation Trustee:

   ROBERT S. LOIGMAN, ESQ.

   robertloigman@quinnemanuel.com

      QUINN EMANUEL URQUHART & SULLIVAN, LLP

      51 Madison Avenue 22nd Floor

      New York, New York 10010

      212.849.7615

A P P E A R A N C E S (Cont'd):

On behalf of Defendant Dallas Foundation and Crown Global
Life Insurance:

    MATTTHEW OKIN, ESQ.

    mokin@okinadams.com

    DAVID CURRY, ESQ.

    dcurry@okinadams.com

        OKIN ADAMS BARTLETT CURRY LLP

        1113 Vine Street, Suite 240

        Houston, Texas 77002

        713.228.4100


On behalf of Defendant Dugaboy Investment Trust:

    MICHAEL LANG, ESQ.

    mlang@cwl.law.com

        CRAWFORD WISHNEW & LANG PLLC

        1700 Pacific Avenue, Suite 2390

        Dallas, Texas 75201

        214.817.4500

A P P E A R A N C E S (Cont'd):

On Behalf of Hunter Mountain Investment Trust:

    LOUIS M. PHILLIPS, ESQ.

    lphillips@kellyhart.com

    AMELIA L. HURT, ESQ.

    ahurt@kellyhart.com

        KELLY HART & HALLMAN LLP

        301 Main Street, Suite 1600

        Baton Rouge, Louisiana 70801

        225.381.9643

VIDEOGRAPHER:

    PAUL D'AMBRA

ALSO PRESENT:

    NATHAN HALL, Pachulski Stang Ziehl & Jones

    JAMES SEERY

    SHAWN RAVER

    JULIE DIAZ

```
                    - - -

           I  N  D  E  X

                    - - -



EXAMINATION OF:                              PAGE

TORREY LITTLETON

        Attorney Morris ..................8




PREVIOUSLY MARKED EXHIBITS REFERENCED:

NUMBER                          PAGE

Exhibit Highland 1 .........58
```

                    DEPOSITION SUPPORT INDEX

INSTRUCTION NOT TO ANSWER:

PAGE    LINE

 67       21




REQUEST FOR PRODUCTION OF DOCUMENTS

PAGE   LINE

(None)




STIPULATIONS

PAGE    LINE

(None)




QUESTIONS MARKED

PAGE    LINE

(None)




                    REPORTER'S NOTE:

QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT NECESSARILY

REFLECT A DIRECT QUOTE.

Page 8

- - -

PROCEEDINGS

- - -

WHEREUPON,

TORREY LITTLETON,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY ATTORNEY MORRIS:

Q. Actually, I just want to start by apologizing to the witness that I did not tell him that Sunday depositions were casual. Thanks for dressing up.

A. I appreciate it. No worries.

Q. And for some of us, Mr. Littleton, every day is Sunday unless we're going to court.

It's nice to meet you, sir.

A. Same here.

Q. Can you hear me okay, sir?

A. Yes, I can hear you.

Q. Okay. Good afternoon. My name is John Morris. I'm an attorney at a law firm who represents Highland Capital Management, LP, and

Page 9

the Highland Claimant Trust. And we're here today for your deposition in connection with the Dallas Foundation's objection to a certain proposed settlement agreement between Highland and some affiliates and some entities that are controlled by Mark Patrick.

Do you understand that?

A. Yes.

Q. Have you ever been deposed before, sir?

A. No. This is my first time.

Q. Okay. It's not -- just relax. It's a -- it's a formal process, but it's not a complicated process. I'm going to ask you a series of questions, and it's very important that you let me finish my question before you begin your answer. Okay?

A. Yes, sir.

Q. It's important that I allow you to finish your answer before I begin my next question; and if I fail to do that, will you let me know?

A. Yes, sir, I will.

Q. Do you understand that your testimony today is being transcribed by Gail, the court

Page 10

reporter?

A. Yes.

Q. So everything you and I say is going to be written down verbatim, or that's the goal anyway.

Do you understand that?

A. Yes, I do.

Q. Okay. If there's a question that I ask that you don't understand, will you let me know and I'll try to rephrase it?

A. Yes.

Q. From time to time your lawyer might object to some of my questions. It will give -- it's formal, legal stuff, lawyer stuff. It gives me a chance to think about whether there's a legal infirmity in my question, and it gives me an opportunity to rephrase it if I want.

But unless he directs you not to answer, I'm going to ask you to answer the question anyway. Okay?

A. Okay.

Q. Just so you're not surprised by the process.

If you need a break for any reason at any time, let me know, and I'll try to

Page 11

accommodate you as long as a question is not pending. Okay?

A. Yes.

Q. Are you affiliated with the Dallas Foundation, sir?

A. Yes, I am.

Q. In what capacity?

A. I am the CFO here at the Dallas Foundation.

Q. How long have you been the CFO of the Dallas Foundation?

A. I've been the CFO here since January 1st of 2022, but I've been with the organization for 13 years.

Q. And what are your duties and responsibilities as the CFO?

A. As the CFO, my main duty is to ensure the proper oversight and fiduciary stewardship of our charitable assets. That means having fiduciary oversight of our investments, our financial reporting, any legal aspects that may impact the foundation in any capacity.

I also serve as a board director as relates to some of our supporting organizations, part of our conversation here today with Empower

Page 12

Foundation and the Okada Family Foundation.

Q.   Are you a lawyer?

A.   No, sir.

Q.   Are you familiar with a company called Highland Capital Management, LP?

A.   Yes, sir.

Q.   Are you aware that that entity filed for bankruptcy a number of years ago?

A.   Yes, sir.

Q.   Are you aware that that entity used to be controlled by a gentleman named Jim Dondero?

A.   Yes, sir.

Q.   Okay.  Are you aware that the Dallas Foundation recently filed an objection in the bankruptcy court overseeing Highland's bankruptcy and the objection pertaining to a proposed settlement agreement between Highland and certain affiliates and certain entities that are controlled by Mr. Patrick?

A.   Yes, sir.

Q.   Did you review that objection before it was filed?

A.   Yeah, I read through the objections.  But for the most part, I rely on our legal team to give us a summary and kind of walk us through

Page 13

some of the pertinent details.

Q.   Are you familiar with the entities that Mr. Patrick signed that agreement on behalf of?

A.   Yeah; I believe it's the Hunter Mountain Investment Trust.

Q.   Right.  And you're aware that in addition to the Hunter Mountain -- can we refer to Hunter Mountain Investment Trust as "HMIT" today?

A.   Yes.

Q.   And are you aware that certain affiliates of HMIT are also party to the settlement agreement that is the subject of this proceeding?

A.   I am.

Q.   And can we refer to HMIT and those affiliates that are party to the agreement as "the HMIT entities"?

A.   Yes.

Q.   Okay.  It's going to make our day a little bit quicker and a little bit easier.

A.   Sure.

Q.   Do you know who approved the filing of the objection on behalf of the Dallas Foundation?

Page 14

A.   Yeah, so it was approved by President Julie Diaz.

Q.   Anybody else?

A.   Then our legal team helped us kind of put together the objection.

Q.   Do you know, have you ever met Jim Dondero?

A.   I have never met him personally, no.

Q.   Have you ever spoken with him?

A.   I think I was on one conference call with him one time that I can recall.

Q.   Okay.  Do you know if he had any role in the preparation of the Dallas Foundation's objection?

A.   I didn't have any exposure with Mr. Dondero.  So, no, I do not know.

Q.   Do you know where the idea of filing the objection originated?  Like, whose idea was it?

A.   Yes -- yes.

Q.   Whose idea was it to file the objection?

A.   Well, it's a combination of the Empower and Okada Foundation boards.  Just looking at some of the investment activity that

Page 15

transpired through the first quarter, we had some concerns about the activity.  And a portion of that activity was the sale of Hunter Mountain interests through the Rand PE Fund I that ultimately rolled up to the Atlas, LP Fund, which impacted the economic value of the portfolio that's held by Crown Global.

Q.   That's why the -- let's unpack that a little bit.  I asked where did the -- who came up with the idea of objecting?  Let's take that first.

A.   Sure, sure.  Yeah, I think it was the board of the foundations, so primarily Julie Diaz and myself just kind of thinking through the activity that we became aware of.

Q.   And Mr. Dondero is a member of the board; right?

A.   That's correct.

Q.   And it's just the three of you; correct?

A.   That's correct.

ATTORNEY OKIN:  Object to form.

BY ATTORNEY MORRIS:

Q.   The Dallas Foundation's objection refers to certain litigation pending in the

Deposition of Torrey Littleton          In re Highland Capital Management, L.P.

Page 16

Cayman Islands.

Are you aware of that?

A. Yes.

Q. Are you aware that Mr. Dondero is funding that litigation on behalf of the supporting organizations that commenced it?

A. Yes, sir.

Q. And you're aware that he's funding this litigation on behalf of the Dallas Foundation; correct?

A. That's correct.

Q. Do you know why Empower Dallas Foundation and the Okada Family Foundation didn't just file the objection in their own name rather than having the Dallas Foundation do it for them?

ATTORNEY OKIN: Object to form.

A. I think we looked it as the Dallas Foundation is the supporting organization of the two entities. And we felt that the Dallas Foundation and our president, Julie Diaz, we just decided to file it under the foundation based on a recommendation from our legal counsel.

BY ATTORNEY MORRIS:

Q. Are you aware that the objection is also filed on behalf of Crown Global Life

Page 17

Insurance, Limited?

A. Yes, sir.

Q. Okay. And what is Crown Global Life Insurance, Limited?

A. The Crown Global Life Insurance, Limited, is an issuer of insurance annuities.

Q. What -- what role does it play with respect to the Dallas Foundation?

A. Yeah, so it plays a role more so with the Empower Dallas and Okada Family Foundation. They each hold policies with Crown Global through the insurance annuities. So the legal contract is between Empower Dallas and Okada Family Foundation with Crown Global.

Q. And -- and is the withdrawn.

Does the annuity pay dividends or make other distributions?

A. Yeah, it makes distributions to the fund as fixed payments through the contract, yes, sir.

Q. And do those fixed payments go directly from Crown Global to Empower Dallas and the Okada Family Foundation respectively?

A. That's correct.

Q. And do you know what the annuities are

Page 18

invested in?

A. I don't know the actual underlying investments. I know the annuities have within them the Atlas IDF, LP Fund, and that they -- what ultimately rolls up is the Rand Fund I, the Beacon Mountain and the Hunter Mountain, HMIT, ultimately rolls up.

Q. And is -- are the annuities the sole source of Empower Dallas and the Okada Family Foundation's income, to the best of your knowledge?

A. That's correct, yes, sir.

Q. And does a portion of that income then flow up to the Dallas Foundation?

A. Well, the income doesn't flow to the Dallas Foundation. What does happen is, as Empower and the Okada Family Foundations make recommendations, those recommendations flow to the Dallas Foundation, to the corresponding donor-advised fund; and then ultimately those donor-advised funds make the grants out to the community.

We typically don't get any of the income through the Crown Global vehicle -- the Dallas Foundation doesn't get any income through

Page 19

the Crown Global vehicle.

Q. Is there anybody in the room with you right now?

A. No, sir.

Q. Do you have any device on other than the computer that we're sharing right now?

A. No. I have a fan on. Is it causing feedback?

Q. No, but I have a fan on too. Maybe it's --

A. Okay. Sorry. Yeah. Sorry about that.

Q. Do you have any notes or anything that you're reading from or that you're looking at?

A. No, sir, no.

Q. Okay. So there are these annuities. How did those annuities get funded? Do you know?

A. Yes. So back in 2015, I believe, in November of 2015, we funded the annuities with about $29 million. So contributions from -- I think it was about $22 million from the -- Mr. Dondero, and then I believe another $7 million from Mr. Okada, which ultimately were sent over to Crown Global to invest in the annuities.

Page 20

Q.   And under the annuities, they pay fixed amounts to both supporting organizations?

A.   Yes, sir, that's correct.

Q.   And is there any market risk that the supporting organizations have, or is this a -- is it your understanding that it's a contractual obligation of Crown Global to pay that fixed amount for some duration?

A.   Yeah, I believe Crown Global takes the risk. They have to pay a fixed amount through the obligation. I believe they take an M&E expense, which compensates for the risk.

Q.   What's that last piece? I missed --

A.   The M&E expenses, it's part of their -- we receive their statements quarterly. They have an administrative fee that they take, and then they have what they call an M&E expense, which it was explained a while back that's a percentage that they take to compensate for the risk associated with insurance annuities.

Q.   And is the annuity tied to a -- is it a fixed period of time, or is it tied to a particular event?

A.   That, I cannot answer.

Q.   Okay. But is it fair to say that the

Page 21

supporting organizations paid money to Crown Royal -- Crown Global -- it's getting late. Sorry.

ATTORNEY OKIN:   Sounds good.

THE WITNESS:   No. Sounds good, yeah.

BY ATTORNEY MORRIS:

Q.   Let me restate the question.

Is it your understanding that the supporting organizations paid money to Crown Global; and in exchange, they got annuities which produced a fixed stream of income for a period of time in the future? Is that right?

A.   That's correct.

Q.   Okay. And that the assets -- the segregated accounts themselves are owned by Crown Global; correct?

A.   I believe the Atlas IDF Fund, I believe Crown Global has partnership interests in that particular fund. I don't think they have any ownership of the other underlying segregated accounts. Not that I'm aware of.

Q.   Do the segregated accounts hold anything other than the annuities? Withdrawn.

Do the segregated accounts hold the annuities?

Page 22

A.   The segregated accounts, not to my knowledge do they hold the annuities. What I believe hold the annuities is the Atlas IDF, LP Fund holds the annuities.

Q.   But Crown Global is the one who takes the risk with respect to the investments in the annuities; correct?

A.   That's correct.

Q.   And do they take the risk as well with respect to the value of Atlas, for example?

A.   Yes, they do take the risk with the value of Atlas.

Q.   So whether Atlas is worth a dollar or a billion dollars, Crown Global has the same obligation to the supporting organizations to pay the fixed stream of income that it agreed to when it sold the annuity to them; correct?

A.   That's my understanding.

Q.   Okay. So that regardless of the value of the segregated accounts, the supporting organizations are guaranteed to receive the exact same amount of money over time as long as Crown Global complies with its obligations in the annuity contract; correct?

A.   Yes, sir.

Page 23

Q.   Okay. Do you know if the Dallas Foundation ever appeared in the Highland bankruptcy before it filed this objection?

A.   No, sir, I don't believe we did.

Q.   And as the CFO, is it fair to say that you know that the Dallas Foundation never filed a claim in the Highland bankruptcy?

A.   Yes, sir.

Q.   And do you also know that the Dallas Foundation does not have an interest in the Highland Claimant Trust that was formed as part of the plan of reorganization?

ATTORNEY OKIN:   Object to form.

BY ATTORNEY MORRIS:

Q.   Withdrawn. Let me lay a little bit of foundation.

Are you familiar with an entity called the Highland Claimant Trust?

A.   Yes.

Q.   Okay. Does the Dallas Foundation have, directly or indirectly, any interest in the Highland Claimant Trust?

ATTORNEY OKIN:   Object to form.

A.   What I could say is that it depends on the settlement with relationship with Hunter

Page 24

Mountain and indirectly with the roll-up that the beneficial interest to Empower and Okada Foundation and how that settlement impacts the economic interest there. I think that's where the Dallas Foundation could indirectly have some interest. While we're not the sole ownership of the Crown Global policy, we do have a relationship with Empower Dallas and the Okada supporting organizations.

BY ATTORNEY MORRIS:

Q. Well, you don't have an interest in what, did you say? The annuities?

A. We do have an interest in the annuity contracts.

Q. The Dallas Foundation didn't fund the annuity contracts; correct?

A. No, we did not fund them. But --

Q. And the Dallas Foundation doesn't own the annuity contracts; correct?

A. No, we don't own the annuity contracts. But what we do is we do have a fiduciary responsibility for any relationship that they financially to protect, preserve and to grow these charitable assets. And, ultimately, the supporting organizations, they roll up into

Page 25

our financial statements.

Q. Is it your understanding that Crown Global has a duty to distribute -- withdrawn.

Is it your understanding that Crown Global has a duty to make distributions to the Dallas Foundation?

A. No, sir. They make distributions to Empower and Okada supporting organizations.

Q. Do you have any reason to believe that Crown Global owes any duty at all to the Dallas Foundation with respect to the annuities?

ATTORNEY OKIN: Object to form.

A. There's no direct responsibility from Crown Global to the Dallas Foundation. But because of our relationship with Okada and Empower, there is an indirect relationship there, that we have an interest.

BY ATTORNEY MORRIS:

Q. And let's go beyond the annuities.

Do you know whether Crown Global has any direct duty to the Dallas Foundation for any reason?

ATTORNEY OKIN: Object to form.

A. I'm going to say not directly.

Page 26

BY ATTORNEY MORRIS:

Q. Okay. Thank you.

Does the Dallas Foundation carry on its balance sheet any interest in the Highland Claimant Trust?

A. No, sir.

Q. Do you know if the Dallas Foundation has any contractual relationship with Highland Capital Management or the Highland Claimant Trust?

A. No, sir, we don't.

Q. Do you have any reason to believe today that Highland Capital Management or the Highland Claimant Trust owes any duties or obligations to the Dallas Foundation?

ATTORNEY OKIN: Object to form.

A. I wouldn't say there was any duties or obligations to the Dallas Foundation. But I do think we have, again, some interest in the settlements and how the funds originally were supposed to flow up to Empower and Okada.

Empower and Okada, they roll up to the Dallas Foundation's financial statements. So I think there is some indirect interest in Highland Capital Claimant Trust and the decisions that are

Page 27

being made as it relates to the settlement.

BY ATTORNEY MORRIS:

Q. I'm going to respectfully move to strike and ask you to listen carefully to my question --

A. Yes, sir.

Q. -- and this will go very smoothly.

Do you have any reason to believe that Highland Capital Management or the Highland Claimant Trust owes any duties or obligations to the Dallas Foundation?

ATTORNEY OKIN: Objection; form.

THE WITNESS: My apologies.

ATTORNEY OKIN: Go ahcad.

A. No, sir.

BY ATTORNEY MORRIS:

Q. Are you aware that if the settlement between the Highland entities and the HMIT entities is approved, that the HMIT entities will receive cash and other assets as set forth in the agreement?

A. Yes.

Q. Do you have any reason to believe that the Dallas Foundation has a right to receive any of the cash or other assets that would be

Page 28

delivered to HMIT if the settlement is approved?

ATTORNEY OKIN: Object to form.

A.   Like I say based on the facts is that the interest in HMIT were sold for a million dollars. So I believe the current structure as of now, the two supporting organizations would not receive any settlements. They would not have any economic benefit of the settlement payout.

Based on the historical structure, yes, I would have said yes. We had interest in that settlement that would ultimately impact the fair market values for Empower and Okada.

BY ATTORNEY MORRIS:

Q.   Are you familiar with the fair market value of Empower and Okada?

A.   So the fair market value is through the insurance annuity. So based on the --

Q.   I'm sorry. Through the insurance what?

A.   It's the insurance through Crown Global, so they produce a fund statement on a quarterly basis. We use that to state the fair market value.

Q.   And is the fair market value based on anything other than the projected future income

Page 29

stream that you described earlier?

A.   I believe there is impact related to some of the sub accounts. One thing we do know is in February of 2025, we saw the fair market value increased by 918,000 due to the sale of Rand's interest in Hunter Mountain. So we do believe there are other assets that impact the fair market value.

Q.   But that's the fair market value of the annuities; is that right?

A.   The sale of the Rand -- the interest in the Hunter Mountain, the Rand?

Q.   Yeah, yeah. Is what you're describing the fair market value of the annuities that flows up to the supporting organizations?

A.   I believe we have a couple of investments that are within the Crown Global structure. I think you have insurance annuities, and then you have other assets that are also within that structure through the Atlas platform. The way I understand it, the Atlas platform allows for other alternative investments to be wrapped within the insurance annuities.

Q.   Did the supporting organizations have an ownership interest in Crown Global?

Page 30

A.   Yeah. They hold the policy, right? The supporting organizations hold the policy through Crown Global, so absolutely.

Q.   And the policy that you're referring to are the annuity policies?

A.   The annuity policies, that's correct.

Q.   And, again, just for clarity, it does not matter to the supporting organization what the value of the assets that are held by Crown Global is; what matters is the agreed-upon future flow of distributions; fair?

A.   That's fair, yes, sir. Yes.

Q.   Are you familiar at all with the structure of the Highland Claimant Trust?

A.   Not with the Highland Claimant Trust, no. I'm familiar with the structure of the -- the Rand structure here as relates to the Empower Dallas, and then I'm familiar with the DAF Holdco structure.

Q.   Are you familiar with the HMIT structure?

A.   I'm familiar -- I know how the structure flows up to the Atlas IDF Fund.

Q.   Have you reviewed any of the governing documents for HMIT or any of the Rand funds or

Page 31

any of the Atlas funds? Have you ever reviewed the governing documents?

A.   At a high level, I took a glance at the governing documents to get an understanding of the flow. I've seen organizational flow charts to kind of give me an idea of who owns what and how does it roll up ultimately to Crown Global.

Q.   Do you have any knowledge as to what, if any, role Crown Global played in the Highland bankruptcy?

A.   No, sir.

Q.   So we've talked about the Rand and the Atlas entities and Hunter Mountain, and we've referred to those that signed on to the agreement as "the HMIT entities"; right?

A.   Yes.

Q.   Do you know why each of the HMIT entities was created? Do you know what purpose they served?

A.   You know, I know that they create some vehicles that allow some different types of investments. I would imagine -- I don't know why the structures were created the way they were. We don't have that kind of insight. That's just

Page 32

an assumption.

Q.   Can you identify any assets that HMIT owns today?

A.   No, sir.

Q.   Were you ever able to identify any assets that HMIT owned?

A.   No.

Q.   In your duties as the CFO for the Dallas Foundation, did you ever make an inquiry as to what assets HMIT owned?

A.   We made an inquiry to the Atlas structure unsuccessfully over the years because they were able to get to the underlying assets to have a clear understanding of the holdings; so, no, I couldn't tell you that I was successful in understanding the underlying assets.

Q.   So you've been the CFO for three years now --

A.   Yes, sir.

Q.   -- and a half?
But you were with the organization for about six; right?

A.   For 13, 13 total.

Q.   Thank you.
So you've been with the organization

Page 33

long before Mark Patrick ever had any role with respect to the HMIT entities; right?

A.   Yes, sir.

Q.   Okay.  At any time that you've been with the Dallas Foundation, were you ever informed as to the assets that were held by HMIT?

A.   No, sir.

Q.   No; right?

A.   That's correct -- no.

Q.   Do you know today what assets are held by any of the HMIT entities?

A.   No, sir.

Q.   At any time during your tenure at the Dallas Foundation, were you ever informed as to what the assets were that any of the HMIT entities owned?

A.   No, sir.

Q.   Okay.  And did you ever think that, as part of your duties and responsibilities working for the Dallas Foundation, that you needed to know that information?

A.   Absolutely.  Yeah, we inquired on multiple occasions to get our auditors comfortable with the investment vehicle.

Q.   And you were never able to get that

Page 34

information, is that right?

A.   That's right.

Q.   And that was true for the entire time of your tenure at the Dallas Foundation?

A.   Yes, sir.

Q.   Okay.  In the course of your duties, did you ever communicate with anybody who was acting on behalf of HMIT?

A.   I had some communications with Mark Patrick, but I don't think he was over HMIT at the time.  I don't know.  So it's kind of hard to understand the transfer of a trustee or ownership or oversight those accounts had.
So at a high level, he was probably the person I tried to communicate with if we had any questions around the valuations.

Q.   But it wasn't necessarily because he was wearing the HMIT hat; it was because he wore a lot of hats.  Is that fair?

A.   That's fair, yes.

Q.   During the course of your tenure at the Dallas Foundation, did you ever once say to yourself, I need to speak to the guy who's the head of HMIT?

A.   No, we've never said that.

Page 35

Q.   Okay.  Did you ever say to yourself at any time during your tenure at the Dallas Foundation, I need to speak to the head of any of the HMIT entities?

A.   No, sir.

Q.   Do you know if the Dallas Foundation ever received anything of value from HMIT directly?

A.   I can't say directly, no.  I just assumed it had rolled up.  It was -- we had some value through the structure, I would imagine.

Q.   Do you know if the Dallas Foundation ever received anything of value directly from any of the HMIT entities?

A.   No, sir.

Q.   Do you know if any of the -- withdrawn.
Do you have any reason to believe that any of the HMIT entities owes a duty or obligation to the Dallas Foundation today?

ATTORNEY OKIN:  Object to the form.

A.   I believe that there's going to be impact to our economic interest in Crown Global. I do believe there's a fiduciary obligation to the Dallas Foundation to have communication if

Page 36

there are investment decisions that are being made that's going to impact that economic interest, positive or negatively.

BY ATTORNEY MORRIS:

Q.   Sorry. I may not have heard it clearly.

But do you believe that Highland Capital Management or the Highland Claimant Trust owes a fiduciary duty to the Dallas Foundation?

A.   Sorry. No. No. No. I thought you said HMIT. Sorry.

Q.   You know what? I probably did. Let's do that.

A.   Yeah.

Q.   Did you believe -- do you believe that any of the HMIT entities owes a fiduciary duty to the Dallas Foundation?

ATTORNEY OKIN:  Object to form.

A.   Again, I'll just restate what I said.

If it's starting to impact the economic interest for the value of the Crown Global policies, I do think there's a fiduciary obligation to have a conversation to inform of any investment decisions that are being made that could have significant impact to that

Page 37

value.

BY ATTORNEY MORRIS:

Q.   Okay. Are you aware that HMIT filed a motion in the bankruptcy court a couple of years ago seeking permission to file a lawsuit against Highland Capital Management and others?

A.   Yes, sir, I am aware of that.

Q.   You are.

Did HMIT seek the Dallas Foundation's approval before filing that motion?

A.   No, sir, not that I'm aware of.

Q.   Do you believe that HMIT was required to seek the Dallas Foundation's approval before filing that lawsuit?

A.   Again, I think it -- I don't know if "seek approval" is the right language I would use. But I do think informing the Dallas Foundation, that this could impact the economic interests of Empower and Okada Foundation.

Q.   And nobody ever told you that; is that right?

A.   That's correct.

Q.   How did you learn about the lawsuit that HMIT commenced against Highland and others a couple of years ago?

Page 38

A.   Well, as we kind of got -- one, it was kind of some news that was -- that came about through some other research. Currently, as of today, we have our legal team working, pulling together facts so they kind of reiterated some of the facts that could impact the overall case. So I will just lean on our legal team to kind of bring us up to speed on this fact-finding.

Q.   Do you know who authorized the filing of that motion?

A.   From HMIT?

ATTORNEY OKIN:  Object to form. Which motion do you mean, John?

ATTORNEY MORRIS:  The same one we're talking about, the motion for permission from the bankruptcy court to sue Highland and other parties.

ATTORNEY OKIN:  The one he told you he didn't even know about what was filed.

ATTORNEY MORRIS:  Hey, Matt, he did tell me. He actually did tell me --

ATTORNEY OKIN:  He told you he heard about it after, but go ahead.

BY ATTORNEY MORRIS:

Q.   So...

Page 39

A.   Yes, sir, I believe it was Mr. Mark Patrick that filed them.

Q.   That authorized the filing of that lawsuit?

A.   Yes, sir.

Q.   Do you think he did anything wrong in doing that?

ATTORNEY OKIN:  Object to form.

A.   What I can say is that it has impact -- it can potentially have some impact on the -- it's convoluted. I can't say he did anything wrong with filing that motion. But if it's going to impact the Empower and Okada Foundation, which is why I'm here today, is to represent those supporting orgs, you know, I think we have interest in the decisions that he's making, right?

BY ATTORNEY MORRIS:

Q.   Okay. But we can agree that he never sought nor obtained the Dallas Foundation's approval to file that motion; correct?

A.   Yes, sir, we can agree.

Q.   And can we also agree that you only heard about that lawsuit after it was commenced or after the motion was filed?

Page 40

A.   Yes, sir.

Q.   Okay.  Have you read the settlement agreement that is the subject of the Dallas Foundation's objection?

A.   Yeah, I've got some high-level facts related to the settlement agreement.  We had a legal team kind of -- again, we leaned on them to kind of pull out some of the important facts that could impact the Empower and Okada Foundation.

Q.   Do you know generally what HMIT is proposing to give and receive under the settlement agreement?

A.   Yes, sir, generally, I do know.  I believe they're trying to release liability on some of the claims.  I think that's part of the settlement agreement.  I'm also aware that there are future payouts that will be made to Hunter Mountain.

Q.   And are you aware of other assets that Hunter Mountain might receive if the settlement agreement is pursued?

A.   Yes.

Q.   And what other assets are you aware of?

A.   I know there's a large sum of assets,

Page 41

you know, in the -- 300 million, I think that's the amount of it that I don't recall.  But I couldn't go verbatim.

Q.   It's not your understanding that there's $300 million worth of anything that's related to that agreement --

A.   Oh, yeah, yeah, yeah.  But, yeah, it's not -- it's not there -- I was thinking about there was some data around -- I apologize if I'm getting my facts confused.

Q.   That's okay.

A.   Yeah, actually, there's a -- as it relates to the Empower and Okada, I believe there was an impact of roughly 23-plus million dollars, potentially.

Q.   But that has nothing to do with Highland; correct?

A.   That's correct.

Q.   And it has nothing to do with this settlement agreement; correct?

ATTORNEY OKIN:  Object to form.

A.   Well, I think if it has impact, ultimately, again, to Empower and Okada, again, we sold our interest in Highland Capital Management -- or Hunter Mountain for a million

Page 42

dollars.  So based on what we know is if there is a payout of $23 million, Empower and Okada, we won't benefit from it.

BY ATTORNEY MORRIS:

Q.   So is it fair to say that the Dallas Foundation's concern is not with the terms of the settlement agreement itself but with the disposition of the assets that Hunter Mountain will receive if the settlement agreement is approved?

ATTORNEY OKIN:  Object to form.

A.   Well, the only thing I would say about that is we have individuals making some questionable decisions and, you know, with charitable assets.  I believe Highland Dallas has entered into a settlement agreement with this individual.  I think that's -- that's what I could say is somewhat problematic.

BY ATTORNEY MORRIS:

Q.   What's problematic?

A.   Oh, we have an individual that's shifting around charitable assets out of the responsibility of Empower and Okada; right?  And, you know, Highland Capital has entered into an agreement with this individual.  I think we all

Page 43

understand the facts that are at play.

Q.   Do you have any reason to believe that the settlement agreement was not the product of an arm's-length, good-faith negotiation between adverse parties?

ATTORNEY OKIN:  Object to form.

A.   I can't say anything.  Yeah, I wasn't a part of those conversations, so I can't opine.

BY ATTORNEY MORRIS:

Q.   And you don't have any facts that would suggest that the settlement agreement is anything other than the product of good-faith, arm's-length negotiations; correct?

ATTORNEY OKIN:  Object to the form.

A.   I wasn't part of the conversation, so I can't opine.  But what I can state is that I believe there's significant impact to the Okada and Empower Dallas Foundation.

BY ATTORNEY MORRIS:

Q.   And that's as -- not as a result of the settlement agreement, but as a result of what the Dallas Foundation contends was the restructuring that Mr. Patrick engaged in earlier this year; fair?

ATTORNEY OKIN:  Object to form.

Page 44

A.   For the most part, I'd say that's fair.

BY ATTORNEY MORRIS:

Q.   Okay. Do you have any concerns that the settlement agreement is not the product of arm's-length, good-faith negotiations?

A.   I'd have to restate that, again, we have an individual who's moving around charitable assets. And, again, I think we understand the facts of restructuring, and the agreement was made to settle with this individual. So from our standpoint, again, it impacts the two supporting organizations that we are here representing.

So I think there's two things at play. The negotiations that you had with this individual, I can't opine whether or not that it wasn't done in good faith; but the impact of that settlement agreement does impact Okada and Empower Dallas.

Q.   And that's because as a result of Mr. Patrick's restructuring, the Dallas Foundation is concerned that it may not have -- it may not receive as much as it would have indirectly had the restructuring not taken place; fair?

Page 45

A.   That's fair.

ATTORNEY OKIN:  Object to form.

BY ATTORNEY MORRIS:

Q.   Okay. Do you have any reason to believe that the proposed settlement is unfair to Highland Capital Management, LP?

A.   Yeah, I don't have any reason to opine, no.

Q.   Okay. Do you have any reason to opine as to whether or not the proposed settlement agreement is unfair to the Highland Claimant Trust?

A.   No, sir.

Q.   Do you have any reason to opine that the proposed settlement agreement is unfair to the Highland Litigation Subtrust?

A.   No, sir.

Q.   Do you have any reason to opine that the settlement agreement is unfair to Hunter Mountain Investment Trust?

A.   No, sir. We can make good-faith settlements, given that there are facts that certain organizations or entities could be impacted, given what we've already talked about, what Mark Patrick has done with the

Page 46

restructuring.

Q.   So two things can be true, at the same time --

A.   Two things can be true.

Q.   Two things can be true at the same time; right, sir?  The settlement agreement can be a fair and reasonable settlement that's the product of arm's-length and good-faith negotiations; while at the same time, the Dallas Foundation can still have concerns over the disposition of the assets that Hunter Mountain receives as a result of this restructuring; fair?

A.   I think for the most part, that's fair. The only caveat I would add to that is if I'm negotiating with an individual that we know is causing harm to other organizations, I just say maybe we don't care about that. But from our standpoint, we do.

Q.   Do you have any reason to believe that the proposed settlement is unfair to any of the HMIT entities?

A.   No, sir.

Q.   Are you aware that under the settlement agreement, the HMIT entities are releasing the Highland parties from any liability

Page 47

other than that which arises out of the settlement agreement itself?

A.   Yeah. I believe that was a part of the settlement. That's why we have the settlement. Yeah.

Q.   Do you have any concern about the scope of the releases that the HMIT entities are providing?

ATTORNEY OKIN:  Object to form.

BY ATTORNEY MORRIS:

Q.   You can answer, sir.

A.   No, sir; only as it impacts, how does it impact or potentially can impact lost income for Okada and Empower.

Q.   Do you have any reason to believe that the granting of the releases in the proposed settlement agreement by the HMIT entities will have any impact at all on the supporting organizations?

ATTORNEY OKIN:  Object to form.

A.   Again, I think there's an economic interest in what does the settlement -- the loss of income streams to Empower and Okada, which we believe is true.

///

Deposition of Torrey Littleton

In re Highland Capital Management, L.P.

Page 48

BY ATTORNEY MORRIS:

Q.   I'm just focused on the releases now.

A.   Sure.

Q.   Do you have any reason to believe that the releases that the HMIT parties are granting under the proposed settlement will have any economic impact on the supporting organizations?

ATTORNEY OKIN:  Object to form.

A.   No, sir.

BY ATTORNEY MORRIS:

Q.   Okay.  Are you aware of any facts that could give rise to a claim by the Dallas Foundation against Highland?

ATTORNEY OKIN:  Object to form.

A.   Can you elaborate on that a little bit for me.

BY ATTORNEY MORRIS:

Q.   Sure.

So I'm just -- I'm wondering if you know of any facts that might give rise to a claim or a cause of action by the Dallas Foundation against Highland Capital Management.

ATTORNEY OKIN:  Object to form.

A.   Not directly, no, sir.

///

Page 49

BY ATTORNEY MORRIS:

Q.   Okay.  Are you aware of any facts that might give rise to a claim or cause of action that the Dallas Foundation could assert against the Highland Claimant Trust?

ATTORNEY OKIN:  Object to form.

A.   No, sir, not directly, no.

BY ATTORNEY MORRIS:

Q.   Do you understand the basis for the Dallas Foundation's objection to the proposed settlement?

A.   Absolutely, yes, I do.

Q.   Can you describe for me in your own words what your understanding is of the basis of the objection.

A.   Yeah.  We are aware that we sold Rand PE Fund, which rolls up to the Atlas IDF Fund, sold its interest in the Hunter Mountain for a million dollars; and we believe that we have significant future economic payments that would be paid out to Hunter Mountain that Empower and Okada would no longer benefit from.

Q.   Is it fair to say that the Dallas Foundation is concerned, not with the terms of the settlement agreement itself, but with the

Page 50

possibility that it may not get its fair share of the consideration that the HMIT entities are to receive under the settlement agreement?

ATTORNEY OKIN:  Object to form.

A.   Yeah, for the most part, that's the key -- that's our concern.

BY ATTORNEY MORRIS:

Q.   Okay.  Do you understand that Mark Patrick has entered into the settlement agreement with the Highland entities on behalf of each of the HMIT entities?

A.   That's my understanding.

Q.   Do you have any reason to believe that the governing documents for the HMIT entities did not authorize Mr. Patrick to enter into the settlement agreement on behalf of each of the HMIT entities?

ATTORNEY OKIN:  Object to form.

A.   You know, what I would say to that is, you know, regardless of the governing documents, I do believe there's a fiduciary obligation that Mr. Patrick had to the supporting organizations, to inform us of any significant investment decisions that could impact the economic interest in the Crown Global vehicle.

Page 51

So I just believe that, you know, just like any trustee investment advisor/control person, those are just normal conversations that we expect to have; and we not did not have that in this situation.

BY ATTORNEY MORRIS:

Q.   Okay.  Anything else?

A.   No, sir.

Q.   Okay.  You don't believe that Mr. Patrick was required to obtain the Dallas Foundation's consent before entering into the settlement agreement; fair?

A.   That's fair.

Q.   And you don't have any reason to believe that the Dallas Foundation has any right or ability to prevent Mr. Patrick from entering into the settlement agreement on behalf of the HMIT entities; fair?

ATTORNEY OKIN:  Object to form.

A.   You know, I think there's two things can be true again.  I think there's documentation which I haven't seen, but, again, there's a fiduciary obligation to the interested parties, I believe, just as any relationship with an investment advisor or control person.

Page 52

BY ATTORNEY MORRIS:

Q.   And in your view, does the fiduciary duty that you believe Mr. Patrick had as the representative of the HMIT entities, does that extend anywhere beyond the duty to inform?

ATTORNEY OKIN:  Object to form.

A.   Well, I'm just trying to think about -- you know, we advised $650 million of assets under management.  We have advisors all the time, before they make any decisions on the sale of investments, we're informed about it.  They kind of let us know if it's going to have impact to our portfolios.  And that's just an expectation that we have of any investment advisor or control person.

BY ATTORNEY MORRIS:

Q.   I appreciate that you have that expectation.  Do you have an expectation that the HMIT entities needed to obtain the Dallas Foundation's consent before entering into the settlement agreement?

A.   I'm not a legal person.  But I would imagine if you have the documentation legally, I don't know if you had to get our consent.  It's more so just a fiduciary obligation.

Page 53

Q.   And, legally, do you have any reason to believe that the Dallas Foundation has a legal right over transactions that Mark Patrick, in his capacity as the representative of any of the HMIT entities, wanted to enter into?

ATTORNEY OKIN:  Object to form.

A.   As an interested party, I think we have an ability to have conversations to see if this decision was made that negatively impacted the supporting organizations.  I think we do have a right there to really understand why this decision was made.  Why are we selling the interest for a million dollars?  Why now?  Why is the timing that happened now?  Because if nothing happened, what we know is we would have benefited from the settlement payouts.

BY ATTORNEY MORRIS:

Q.   Does the Dallas Foundation have a direct ownership interest in any of the HMIT entities?

A.   Not a direct ownership, no, sir.

Q.   Does the Dallas Foundation have any indirect ownership interest in any of the HMIT entities?

ATTORNEY OKIN:  Object to form.

Page 54

A.   Not directly.  The Dallas Foundation does not.

BY ATTORNEY MORRIS:

Q.   So no direct interest -- withdrawn.

No direct ownership interest and no indirect ownership interest; fair?

ATTORNEY OKIN:  Object to form.

A.   We do have an interest in -- because the assets roll up to our balance sheet overall, they would present an audited financial statement.  So we do have to understand the fluctuations in market value to explain not just to our board but to our auditors what's happened.  So we do have indirect interest.

BY ATTORNEY MORRIS:

Q.   And none of the HMIT entities appear as an asset on the Dallas Foundation's balance sheet; correct?

A.   Not directly.  But if they roll up and they feed into the Atlas IDF Fund, right, and then the Atlas IDF Fund, which is a part of the Crown Global annuities, feeds into our balance sheet, there is an indirect interest in HMIT.

Fair to say?

Q.   Does any Atlas entity appear on the

Page 55

Dallas Foundation balance sheet?

A.   Yeah, through the Crown Global annuity.  So if you look at the Crown Global statement, it lists an Atlas LP as the investment vehicle.

Q.   Do you know if the Dallas Foundation has any right to control any of the HMIT entities?

ATTORNEY OKIN:  Object to form.

A.   No, we can't directly control the HMIT entities.

BY ATTORNEY MORRIS:

Q.   Do you know if the Dallas Foundation has any right to approve or disapprove of any potential transaction that an HMIT entity was contemplating entering into?

A.   Yeah, so with the Atlas IDF Fund, what I can say is the Empower and Okada, they do have the opportunity to consent.

We had some notes that were -- there were some notes that Mark Patrick wanted to sell in February.  We had to get the consent of Crown Global in order to sell these notes; and we had -- we opined with Crown Global to withdraw consent, right?

Page 56

So he did reach out to Crown Global for consent in which the Empower and Okada had an opportunity to provide our recommendation.

Q. Let's focus on the settlement agreement.

Do you have any reason to believe that Mr. Patrick was required to obtain the consent of the Dallas Foundation before he signed it on behalf of the HMIT entities?

ATTORNEY OKIN: Object to form.

A. No.

BY ATTORNEY MORRIS:

Q. Do you have any reason to believe that Mr. Patrick was required to obtain the consent of the supporting organizations before entering into the settlement agreement on behalf of the HMIT entities?

ATTORNEY OKIN: Object to form.

A. No, sir.

BY ATTORNEY MORRIS:

Q. Do you have any reason to believe that Mr. Patrick was required to obtain the consent of Crown Global before entering into the proposed settlement agreement on behalf of each of the HMIT entities?

Page 57

ATTORNEY OKIN: Object to form.

A. No, sir.

BY ATTORNEY MORRIS:

Q. Do you have any reason to believe that Crown Global has any right to control any of the HMIT entities?

ATTORNEY OKIN: Object to form.

A. Not that I'm aware of, no.

BY ATTORNEY MORRIS:

Q. Do you have any reason to believe that -- we're going to move on.

So we're going to put up on the screen the Dallas Foundation's objection.

A. Yes, sir.

Q. It will just take a moment for my colleague to do that.

While he's doing that, let me just tell you that this can be a little bit of a cumbersome process. I'm doing this by Zoom. If there's any aspect of the document that you recall that you think you need to review to refresh your recollection or to put it in context, will you just let me know that so that I give you a full and fair opportunity to answer the questions?

Page 58

A. Yes, sir.

ATTORNEY MORRIS: Okay. Can we go to paragraph 32, please.

(Previously marked Highland Exhibit 1 introduced by counsel.)

BY ATTORNEY MORRIS:

Q. So I've put up on the screen, Mr. Littleton, the portion of the Dallas Foundation's objection that was filed in this case.

And you're familiar with that document; is that right?

A. Yeah. I couldn't repeat it back to you verbatim, but I understand some of the high-level facts in this objection.

Q. You give me comfort when you say that. You should not be able to repeat verbatim what this document is. So --

ATTORNEY OKIN: And, Mr. Littleton, although he didn't say it this time, he did say it in the prior one: If you need to see any more of this in order to be able to answer his questions, be sure to point that out.

THE WITNESS: Absolutely.

ATTORNEY MORRIS: I actually did say

Page 59

that. That's okay.

ATTORNEY OKIN: Did you say that this time? I know you said it last time.

ATTORNEY MORRIS: Sorry, I must be putting you to sleep.

ATTORNEY OKIN: That's a possibility.

BY ATTORNEY MORRIS:

Q. Looking at the third line, I'm just going to read this quote: "Unfortunately, it does not appear, however, that joint official liquidators are parties to or have authorized the settlement."

Do you see that sentence?

A. Yes, sir.

Q. Do you know the entity over which the joint official liquidators were appointed?

A. Yes, sir. It's the DAF Foundation Holdco.

Q. And that's in the Cayman Islands; is that right?

A. Yes, sir; that's correct.

Q. Are you aware that all of the HMIT entities are Delaware organizations?

A. Yes, sir; that's correct.

Q. Have you ever communicated with the

Page 60

joint official liquidators?

A.   No, not officially.  We do have a planned communication this week.

Q.   Do you know if anybody acting on behalf of the Dallas Foundation has ever informed the joint official liquidators of Highland's motion to have the settlement agreement approved?

A.   No, sir.

Q.   Do you know if anybody acting on behalf of the Dallas Foundation has provided a copy of the objection that's on the screen to the joint official liquidators?

A.   Not that I'm aware of, sir.

Q.   Do you have any reason to believe, as you sit here today, that the joint official liquidators have any knowledge of the settlement agreement that is going to be before the Court on Wednesday?

ATTORNEY OKIN:  Object to form.

A.   I can't directly say.

BY ATTORNEY MORRIS:

Q.   Okay.  You haven't had any communications with anybody in the world at any time that led you to believe that the joint official liquidators were informed of the

Page 61

proposed settlement agreement or the Dallas Foundation's objection; fair?

A.   That's fair, sir.

Q.   Okay.  Do you have any reason to believe that Mr. Patrick was required to obtain the authorization of the joint official liquidators before entering into this settlement agreement on behalf of the HMIT entities?

ATTORNEY OKIN:  Object to form.

A.   No, sir, I can't.  I can't speak to that.

BY ATTORNEY MORRIS:

Q.   Can you speak to whether or not the joint official liquidators have any right to veto or prevent the HMIT entities from entering into the settlement agreement?

A.   Again, I'm not a legal person, so I can't really opine on the official capacity of the joint liquidators and what they're capable of doing and not doing.  So I'm going to have to say, no, I can't answer that question.

Q.   Further down in the paragraph it states that:

"Indeed, many of Mr. Patrick's actions, including the insertion of

Page 62

newly created entities into the fund's structure for the apparent purpose of diverting charitable assets will now be subject to the scrutiny of an independent, Court-appointed fiduciary and may be subject to clawback or other avoidance actions in the Cayman liquidation or such other tribunal as has jurisdiction."

Have I read that correctly, sir?

A.   Yes, sir, you have.

Q.   Okay.  You're not an expert in Cayman Islands law; correct?

A.   No, sir.

Q.   I think you said earlier you're not a lawyer.  Right?

A.   That's correct.

Q.   Do you have any understanding as to what facts must be established in order to succeed in a clawback or avoidance action?

A.   It would just be assumption of mine that I would have, whether it's a breach of contract, discovery of various actions decision-making.  But, no, I can't give you a legal opinion.

Page 63

Q.   Do you have any view at all as to likelihood that the supporting organizations or the Dallas Foundation might succeed in clawing back or succeeding in other avoidance actions to set aside the settlement agreement if it's approved by the Court?

ATTORNEY OKIN:  Object to form.

And I'll also just remind you, Mr. Littleton, to the extent it's implicated, don't go into attorney-client privileged information that you may have received.

A.   Yeah, I can't -- I can't answer your question, Mr. Morris, on that one.

BY ATTORNEY MORRIS:

Q.   Is it fair to say you'd have to speculate as to whether or not -- let me just finish the question.

Is it fair to say that you would have to speculate as to whether or not the Dallas Foundation or anybody else might succeed in clawing back or avoiding the settlement agreement if it's approved by the Court?

ATTORNEY OKIN:  Object to form.

A.   It would be my opinion.  It would be speculation of how I feel, given the facts that

Page 64

I've seen and just some of the impact that we've seen on our supporting organizations; and I would just leave it there.

ATTORNEY MORRIS: Okay. If we could scroll up to paragraph 33, please.

BY ATTORNEY MORRIS:

Q. Okay. The last sentence of paragraph 33 says: "Thus, even if approved by this Court, consummation of the settlement is not likely to buy the peace the debtor now seeks."

Do you see that?

A. Yes, sir.

Q. Do you have any reason to believe that the Highland parties have done anything wrong in entering into this proposed settlement agreement?

ATTORNEY OKIN: Object to form.

A. You know, what I would say is we have an individual, in Mr. Patrick, that's moving around charitable assets; and we -- Highland Capital or the Highland entities have settled -- have made a settlement agreement with this individual, knowing some of the facts of how the charities are being negatively impacted. That's -- that would be my comment there.

///

Page 65

BY ATTORNEY MORRIS:

Q. I'm not asking about the impact on the charitable foundations, and I'm not asking about Mr. Patrick. I'm just asking if you have any facts that lead you to believe that Highland has engaged in any wrongdoing with respect to negotiation and entry into the proposed settlement agreement.

ATTORNEY OKIN: Object to form. He answered your question.

BY ATTORNEY MORRIS:

Q. You can answer, sir.

A. No, sir. I'll just leave it as I stated. That was my answer.

Q. All right. So I didn't hear any facts, so you don't have any facts. Is that fair?

ATTORNEY OKIN: Object to form; argumentative. Come on, John.

ATTORNEY MORRIS: Matt, I'm being --

ATTORNEY OKIN: You asked him if they did anything wrong. He told you they did something wrong by --

(Indiscernible cross-talk.)

THE COURT REPORTER: I'm sorry. I

Page 66

can't understand you both when you are talking at the same time.

BY ATTORNEY MORRIS:

Q. Mr. Littleton, are you aware of any facts that cause you to believe that the Highland parties have done anything wrong in entering into this agreement?

ATTORNEY OKIN: Object to form.

A. Again, I would just state that we have an individual who is moving around charitable assets, and I think we all are aware of the facts of what has taken place. Now, whether we want to consider that as anything wrong, in quotations, that's up for opinion.

In terms of "facts" facts, I can't -- no, I'm going to say, no, I don't have facts that I can with share you, Mr. Morris.

BY ATTORNEY MORRIS:

Q. And you don't even have any facts that suggest Highland had any role in moving the assets around that you just described; fair?

A. Yeah, I don't understand that Highland has moved around the assets. But I think when you're making a deal knowing that the individual that I'm settling with has done some things that

Page 67

are questionable, you know, I think that discussion can be up for debate, whether -- you know, charities are being impacted; significant dollars are not going to be going out to the community; there's a lot of uncertainty with these assets.

And we all know the facts. The facts are clearly outlined.

Q. Do you know why the Dallas Foundation contends that: "Even if approved by the Court, consummation of the settlement is not likely to buy the peace that the debtor now seeks"?

What's the basis for that, if you have any understanding at all?

A. That one there, sir, I'm not going to be able to answer that one for you.

Q. Are you aware of any potential claims that the Dallas Foundation is considering bringing against Highland Capital Management or the Highland Claimant Trust?

ATTORNEY OKIN: I'm going to instruct him not to answer that. To the extent that he would be aware of those, that would be --

ATTORNEY MORRIS: Why don't we just do "yes" or "no," Matt. Okay?

Deposition of Torrey Littleton                                    In re Highland Capital Management, L.P.

Page 68

ATTORNEY OKIN: No. I think -- I think whether or not there are any claims and whether we're considering any claims is attorney-client privilege. It's not a "yes" or "no" or detail; it's a not answer.

ATTORNEY MORRIS: I'll ask him on Wednesday.

ATTORNEY OKIN: Okay.

BY ATTORNEY MORRIS:

Q. Let's go to -- yeah, paragraph 34 says that "there is ample evidence that Mr. Patrick has acted and is acting well outside the scope of his authority and fiduciary obligations."

Do you see that?

A. Yes, sir, I do.

Q. Okay. I want to focus solely on the negotiation and execution of the settlement agreement.

Focusing --

A. Yes, sir.

Q. Focusing solely on the settlement agreement, do you believe that Mr. Patrick acted outside of the scope of his authority to negotiate and enter into the settlement agreement on behalf of each of the HMIT entities?

Page 69

ATTORNEY OKIN: Object to form of the question.

A. Again, I think it's something that I've stated a few times now. Two things can be true. I think we've already agreed on that.

BY ATTORNEY MORRIS:

Q. Which two things can be true here?

A. The good-faith conversation with the settlement; but at the same time, it could have a consequential impact on the Okada and Empower Dallas supporting organizations.

Q. Okay. Do you believe -- do you have any reason to believe that Mr. Patrick acted outside of his fiduciary obligations with respect to his negotiation and execution of the settlement agreement on behalf of the HMIT entities?

ATTORNEY OKIN: Object to form. Are you asking him personally or the organization that filed this?

ATTORNEY MORRIS: It's not a 30(b)(6) witness. I know the difference.

ATTORNEY OKIN: Just so we're clear.

A. Yeah, I do think there was a fiduciary obligation to inform and have a conversation with

Page 70

the interested parties.

BY ATTORNEY MORRIS:

Q. Okay. So, again, it's a duty to inform but nothing more; is that fair?

ATTORNEY OKIN: Object to form.

A. Yeah, yeah, again, I think it's, you know, something that we all expect to have, again, with our investment advisors, control persons, trustees.

BY ATTORNEY MORRIS:

Q. Okay. Can we go to paragraph 16, please.

Do you see paragraph 16 refers to material nonpublic information?

A. Yes, sir. I see it.

Q. Do you know what material nonpublic information is being referred to there?

A. No, sir.

Q. Did you ever ask anybody?

A. No. I didn't want to get involved in that conversation, no, sir. I did not ask anybody.

Q. Do you know where -- withdrawn.

Do you know the Dallas Foundation's source of information that enabled it to state,

Page 71

upon information and belief, that the information provided was obtained by Mr. Patrick through his employment at Skyview and constituted MNPI?

ATTORNEY OKIN: Object to form.

A. No, sir, I was not -- no.

BY ATTORNEY MORRIS:

Q. You don't know where that information came from?

A. No, sir.

Q. The next sentence refers to a put option.

Do you see that?

A. Yes, sir.

Q. Did the foundation have a put option?

A. Yeah, the Highland Dallas Foundation had a put option agreement with the Dugaboy Investment Trust. I think we had 1.5 million shares of NexPoint Hospitality Trust. I think it was a contribution that was given in 2019 with the 7-year put option.

Q. And is that option now expired?

A. I believe it converted into a different investment vehicle now.

Q. So the Dallas Foundation never exercised that option; correct?

Page 72

A.   Correct.

Q.   Why not?

A.   We didn't have a -- we didn't feel we had any reason to exercise the put option.

Q.   Did you ever do any analysis to try to determine what the economic impact would be on the Dallas Foundation if they actually exercised that put option?

A.   We had some conversations with our internal investment advisor, and at the time his recommendation was not to make any changes or call the put option.

Q.   Who was that advisor?

A.   Madden & Associates at the time -- excuse me.  Madden Asset Management.

Q.   Do you have the shares to exercise the put today?

A.   To be honest, Mr. Morris, there's a little bit of discovery we have to understand now that the shares have converted.  I believe they converted to a different vehicle in April of this year.

Q.   Are you aware that the Dallas Foundation lost $9 million by not exercising the put option before it converted?

Page 73

ATTORNEY OKIN:  Object to form.

A.   I think we -- so we do have some information that we just need to understand thoroughly about what's happened now that the assets transferred into a different vehicle.

BY ATTORNEY MORRIS:

Q.   Well, you're the CFO; right?  And I think you said that your duty is to be responsible for the foundation's assets; right?

A.   That's fair; yes, sir.

Q.   Were you aware that the put was going to convert before it actually converted?

A.   I was not aware of that.  I was not informed of that.

Q.   Were you ever told what the value would be to the Dallas Foundation if the Dallas Foundation exercised the put?

A.   Yeah, I believe you're correct, it was in the ballpark range of $9 million.

Q.   So is it fair to say that had the Dallas Foundation exercised the put, then it would have recovered $9 million?

A.   Yeah, I think that's fair, yeah.

Q.   What's the value of the shares that it received upon conversion?  Do you know that?

Page 74

A.   No, I don't know that.  We were just notified recently that the shares had converted.

Q.   Is one of the reasons that you didn't exercise the put option is because Dugaboy, Mr. Dondero's family trust, was the counterparty?

ATTORNEY OKIN:  Object to the form.

A.   No, sir, that wouldn't be the reason.

BY ATTORNEY MORRIS:

Q.   Do you think Mark Patrick breached his fiduciary duty by telling the Dallas Foundation that it should consider exercising a put that was worth $9 million?

ATTORNEY OKIN:  Object to form.

A.   You know, I think there was information that was not privy to individuals, so I don't know if we could rely on that information to make a decision.

BY ATTORNEY MORRIS:

Q.   This was a put that was owned by the Dallas Foundation; do I have that right?

A.   The Highland Dallas Foundation, supporting organization.

Q.   And what's the relationship between the Dallas Foundation and the Highland Dallas Foundation?

Page 75

A.   Very similar to the relationship between Empower Dallas and Okada Dallas.  The Highland Dallas Foundation is the supporting org that we have indirect oversight of.

Q.   And if the Highland Dallas Foundation had exercised the put, would that have inured to the benefit of the Dallas Foundation?

ATTORNEY OKIN:  Object to form.

A.   It ultimately would have.  What it would have benefited was the supporting organization to allow for more impactful grant-making.  So you would have had $9 million of liquidity that could be pushed out into the community.

ATTORNEY MORRIS:  Okay.  How much time do I have left, Matt?  I know you're watching.

ATTORNEY OKIN:  I lost track, I was so enraptured by your questions.

18 minutes.

ATTORNEY MORRIS:  You wouldn't be the first one.

Why don't we take a short break here.  I've got 18 minutes left.  If we could just take a five-minute break.

///

Page 76

(Recess taken from 4:42 p.m. to 4:49 p.m.)

BY ATTORNEY MORRIS:

Q.   Mr. Littleton, I think you answered this.  If I did, I apologize.

Can you confirm for me that you've never communicated with the joint official liquidators?

A.   Yes, sir.  That is correct, other than emails to set up a conversation.

Q.   Conversations that you did not participate in; is that right?

A.   Yeah, just for -- yeah, just for some questions they wanted to ask of the Dallas Foundation's finance team.

Q.   But did you participate -- so you spoke with the joint official liquidators' finance team?

A.   No.  They wanted to set up a call. That's the only time -- the only communication I've had.

Q.   And you haven't had that call yet; is that right?

A.   That's correct.

Q.   And that call is going to be scheduled

Page 77

for sometime in the future; fair?

A.   Yes, sir.

ATTORNEY MORRIS:  I have no further questions.

ATTORNEY PHILLIPS:  No questions.

ATTORNEY OKIN:  All right.

ATTORNEY MORRIS:  Mr. Littleton, thank you very, very much for your time and patience.

Matt, thank you for arranging this on short notice.

Gail, do you need anything else from anybody?

THE COURT REPORTER:  Okay.  I have copies for Mr. Morris, Mr. Lang, Mr. Okin, and Mr. Phillips.

Anybody else?

ATTORNEY OKIN:  Gail, we do want to read and sign both transcripts.

(Whereupon, at 4:50 p.m. Central Time the proceedings concluded.)

Deposition of Torrey Littleton                                    In re Highland Capital Management, L.P.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it.  DO NOT make marks or notations on the transcript volume itself.

Deposition of Torrey Littleton                                    In re Highland Capital Management, L.P.

E R R A T A

         I wish to make the following changes,

  for the following reasons:

Page   Line

_____  _____   CHANGE: _____

REASON: _____

_____  _____   CHANGE: _____

REASON: _____

_____  _____   CHANGE: _____

REASON: _____

_____  _____   CHANGE: _____

REASON: _____

_____  _____   CHANGE: _____

REASON: _____

_____  _____   CHANGE: _____

REASON: _____

_____  _____   CHANGE: _____

REASON: _____

_____  _____   CHANGE: _____

REASON: _____

_____  _____   CHANGE: _____

REASON: _____

C E R T I F I C A T I O N

I hereby certify that I have read the foregoing transcript of my deposition testimony, and that my answers to the questions propounded, with the attached corrections or changes, if any, are true and correct.

--------------------------------------
TORREY LITTLETON

Case 19-34054-sgj11   Doc 4608-60   Filed 05/08/26   Entered 05/08/26 23:42:09   Desc
Exhibit 57   Page 30 of 48

Deposition of Torrey Littleton    In re Highland Capital Management, L.P.

CERTIFICATE OF SHORTHAND REPORTER

I, Gail Inghram, Registered Diplomate

Reporter, Certified Realtime Reporter, Realtime

Systems Administrator, CA-Certified Shorthand

Reporter No. 8635, and Notary Public, the officer

before whom the foregoing proceedings were taken,

do hereby certify that the foregoing transcript

is a true and correct record of the proceedings;

that said proceedings were taken by me

stenographically and thereafter reduced to

typewriting under my supervision; and that I am

neither counsel for, related to, nor employed by

any of the parties to this case and have no

interest, financial or otherwise, in its outcome.

_____
Gail Inghram,
BA, RDR, CRR, RSA, CA-CSR No. 8635

## WORD INDEX

**< $ >**
$22   19:*21*
$23   42:*2*
$29   19:*20*
$300   41:*5*
$650   52:*8*
$7   19:*22*
$9   72:*24*   73:*19, 22*
74:*12*   75:*12*

**< 1 >**
1   6:*13*   58:*5*
1.5   71:*17*
10010   3:*24*
10017-2024   3:*16*
11   1:*8*
1113   4:*10*
13   11:*14*   32:*23*
16   70:*11, 13*
1600   5:*9*
1700   4:*18*
18   75:*19, 23*
19-34054-sgj11   1:*5*
1st   11:*13*

**< 2 >**
2015   19:*18, 19*
2019   71:*19*
2022   11:*13*
2025   1:*14*   2:*10*   29:*4*
21   7:*4*
212.849.7615   3:*25*
214.817.4500   4:*20*
22   1:*14*   2:*10*
225.381.9643   5:*11*
22nd   3:*23*
2390   4:*18*
23-plus   41:*14*
240   4:*10*

**< 3 >**
3:30   1:*15*   2:*11*
30(b)(6   69:*21*
300   41:*1*
301   5:*9*
310.277.6910   3:*17*
32   58:*3*

33   64:*5, 8*
34   68:*10*
34th   3:*15*

**< 4 >**
4:42   76:*1*
4:49   76:*2*
4:50   77:*19*

**< 5 >**
51   3:*23*
58   6:*13*

**< 6 >**
67   7:*4*

**< 7 >**
70801   5:*10*
713.228.4100   4:*12*
75201   4:*19*
77002   4:*11*
780   3:*15*
7-year   71:*20*

**< 8 >**
8   6:*7*
8635   1:*22*   81:*8, 21*

**< 9 >**
918,000   29:*5*

**< A >**
ability   51:*16*   53:*8*
able   32:*5, 13*   33:*25*
58:*17, 22*   67:*16*
absolutely   30:*3*
33:*22*   49:*12*   58:*24*
accommodate   11:*1*
accounts   21:*15, 21,*
*22, 24*   22:*1, 20*   29:*3*
34:*13*
acted   68:*12, 22*   69:*13*
acting   34:*8*   60:*4, 9*
68:*12*
action   48:*21*   49:*3*
62:*20*
actions   61:*25*   62:*7,*
*23*   63:*4*
activity   14:*25*   15:*2,*

*3, 15*
actual   18:*2*
ADAMS   4:*9*
add   46:*14*
addition   13:*8*
administrative   20:*16*
Administrator   81:*7*
adverse   43:*5*
advised   52:*8*
advisor   51:*25*   52:*15*
72:*10, 13*
advisor/control   51:*2*
advisors   52:*9*   70:*8*
affiliated   11:*4*
affiliates   9:*5*   12:*18*
13:*13, 18*
affirmed   8:*6*
afternoon   8:*23*
ago   12:*8*   37:*5, 25*
agree   39:*19, 22, 23*
agreed   22:*16*   69:*5*
agreed-upon   30:*10*
agreement   9:*4*   12:*17*
13:*3, 14, 18*   27:*21*
31:*15*   40:*3, 6, 12, 16,*
*21*   41:*6, 20*   42:*7, 9,*
*16, 25*   43:*3, 11, 21*
44:*5, 10, 18*   45:*11, 15,*
*19*   46:*6, 24*   47:*2, 17*
49:*25*   50:*3, 9, 16*
51:*12, 17*   52:*21*   56:*5,*
*16, 24*   60:*7, 17*   61:*1,*
*8, 16*   63:*5, 21*   64:*15,*
*21*   65:*8*   66:*7*   68:*18,*
*22, 24*   69:*16*   71:*16*
ahead   27:*14*   38:*23*
ahurt@kellyhart.com
5:*7*
allow   9:*19*   31:*22*
75:*11*
allows   29:*22*
alternative   29:*22*
AMELIA   5:*6*
amount   20:*8, 10*
22:*22*   41:*2*
amounts   20:*2*
ample   68:*11*
analysis   72:*5*
annuities   17:*6, 12, 25*
18:*3, 8*   19:*16, 17, 19,*

*25*   20:*1, 20*   21:*10, 23,*
*25*   22:*2, 3, 4, 7*   24:*12*
25:*12, 20*   29:*10, 14,*
*18, 23*   54:*22*
annuity   17:*16*   20:*21*
22:*17, 24*   24:*13, 16,*
*19, 20*   28:*17*   30:*5, 6*
55:*3*
ANSWER   7:*2*   9:*17,*
*20*   10:*19*   20:*24*
47:*11*   57:*24*   58:*22*
61:*21*   63:*12*   65:*12,*
*14*   67:*16, 22*   68:*5*
answered   65:*10*   76:*4*
answers   80:*8*
Anybody   14:*3*   19:*2*
34:*7*   60:*4, 9, 23*
63:*20*   70:*19, 22*
77:*12, 16*
anyway   10:*5, 20*
apologies   27:*13*
apologize   41:*9*   76:*5*
apologizing   8:*13*
apparent   62:*2*
appear   54:*16, 25*
59:*10*
appeared   3:*2*   23:*2*
appointed   59:*16*
appreciate   8:*16*
52:*17*
approval   37:*10, 13,*
*16*   39:*21*
approve   55:*14*
approved   13:*24*   14:*1*
27:*19*   28:*1*   42:*10*
60:*7*   63:*6, 22*   64:*8*
67:*10*
approximately   2:*11*
April   72:*21*
argumentative   65:*19*
arises   47:*1*
arm's-length   43:*4, 13*
44:*6*   46:*8*
arranging   77:*9*
aside   63:*5*
asked   15:*9*   65:*21*
asking   65:*2, 3, 4*
69:*19*
aspect   57:*20*

aspects  11:21
assert  49:4
asset  54:17  72:15
assets  11:19  21:14
24:24  27:20, 25  29:7,
19  30:9  32:2, 6, 10,
13, 16  33:6, 10, 15
40:19, 23, 25  42:8, 15,
22  44:9  46:11  52:9
54:9  62:3  64:19
66:11, 21, 23  67:6
73:5, 9
associated  20:20
Associates  72:14
assumed  35:10
assumption  32:1
62:21
Atlas  15:5  18:4
21:17  22:3, 10, 12, 13
29:20, 21  30:23  31:1,
14  32:11  49:17
54:20, 21, 25  55:4, 17
attached  80:9
Attorney  6:7  8:11,
24  15:22, 23  16:16,
23  21:4, 6  23:13, 14,
23  24:10  25:13, 19,
24  26:1, 16  27:2, 12,
14, 16  28:2, 13  35:21
36:4, 18  37:2  38:12,
14, 18, 20, 22, 24  39:8,
18  41:21  42:4, 11, 19
43:6, 9, 14, 19, 25
44:3  45:2, 3  47:9, 10,
20  48:1, 8, 10, 14, 17,
23  49:1, 6, 8  50:4, 7,
18  51:6, 19  52:1, 6,
16  53:6, 17, 25  54:3,
7, 15  55:9, 12  56:10,
12, 18, 20  57:1, 3, 7, 9
58:2, 6, 19, 25  59:2, 4,
6, 7  60:19, 21  61:9,
12  63:7, 14, 23  64:4,
6, 16  65:1, 9, 11, 18,
20, 21  66:3, 8, 18
67:21, 24  68:1, 6, 8, 9
69:1, 6, 18, 21, 23
70:2, 5, 10  71:4, 6
73:1, 6  74:6, 8, 13, 18

75:8, 15, 17, 20  76:3
77:3, 5, 6, 7, 17
attorney-client  63:10
68:4
audited  54:10
auditors  33:23  54:13
authority  68:13, 23
authorization  61:6
authorize  50:15
authorized  38:9
39:3  59:11
Avenue  3:15, 23  4:18
avoidance  62:7, 20
63:4
avoiding  63:21
aware  12:7, 10, 13
13:7, 12  15:15  16:2,
4, 8, 24  21:21  27:17
37:3, 7, 11  40:16, 19,
23  46:23  48:11  49:2,
16  57:8  59:22  60:13
66:4, 11  67:17, 23
72:23  73:11, 13

< B >
BA  1:22  81:21
back  19:18  20:18
58:13  63:4, 21
balance  26:4  54:9,
17, 22  55:1
ballpark  73:19
BANKRUPTCY  1:1
12:8, 15  23:3, 7
31:11  37:4  38:16
BARTLETT  4:9
based  16:21  28:3, 9,
17, 24  42:1
basis  28:22  49:9, 14
67:13
Baton  5:10
Beacon  18:6
beginning  2:11
behalf  3:4, 19  4:3,
14  5:3  13:3, 25  16:5,
9, 25  34:8  50:10, 16
51:17  56:9, 16, 24
60:5, 10  61:8  68:25
69:16
belief  71:1

believe  13:5  19:18,
22  20:9, 11  21:17, 18
22:3  23:4  25:10
26:12  27:8, 23  28:5
29:2, 7, 16  35:18, 22,
24  36:7, 15  37:12
39:1  40:14  41:13
42:15  43:2, 17  45:5
46:19  47:3, 15, 24
48:4  49:19  50:13, 21
51:1, 9, 15, 24  52:3
53:2  56:6, 13, 21
57:4, 10  60:14, 24
61:5  64:13  65:5
66:5  68:22  69:12, 13
71:22  72:20  73:18
beneficial  24:2
benefit  28:8  42:3
49:22  75:7
benefited  53:15
75:10
best  18:10
beyond  25:20  52:5
billion  22:14
bit  13:22  15:9
23:15  48:15  57:18
72:19
board  11:23  15:13,
17  54:13
boards  14:24
breach  62:22
breached  74:9
break  10:24  75:22,
24
bring  38:8
bringing  67:19
buy  64:10  67:12

< C >
CA-Certified  81:7
CA-CSR  1:22  81:21
call  14:10  20:17
72:12  76:19, 22, 25
called  12:4  23:17
capable  61:19
capacity  11:7, 22
53:4  61:18
CAPITAL  1:6  3:4
8:25  12:5  26:9, 13,
25  27:9  36:8  37:6

41:24  42:24  45:6
48:22  64:20  67:19
care  46:17
carefully  27:4
carry  26:3
Case  1:5  38:6  58:10
81:16
cash  27:20, 25
casual  8:14
cause  48:21  49:3
66:5
causing  19:7  46:16
caveat  46:14
Cayman  16:1  59:19
62:7, 12
Central  1:15  2:11
77:19
certain  9:3  12:17, 18
13:12  15:25  45:23
CERTIFICATE  81:2
Certified  2:14, 15
81:6
certify  80:6  81:10
CFO  11:8, 10, 12, 16,
17  23:5  32:8, 17
73:7
chance  10:15
CHANGE  79:6, 8, 10,
12, 14, 16, 18, 20, 22
changes  72:11  78:3
79:3  80:9
Chapter  1:8
charitable  11:19
24:24  42:15, 22  44:8
62:3  64:19  65:3
66:10
charities  64:23  67:3
charts  31:6
claim  23:7  48:12, 20
49:3
Claimant  3:5  9:1
23:11, 18, 22  26:5, 9,
14, 25  27:10  30:14,
15  36:8  45:11  49:5
67:20
claims  40:15  67:17
68:2, 3
CLARITY  7:22  30:7
clawback  62:6, 20

clawing  63:*3, 21*
clear  32:*14*  69:*23*
clearly  36:*6*  67:*8*
colleague  57:*16*
combination  14:*23*
Come  65:*19*
comfort  58:*16*
comfortable  33:*24*
commenced  16:*6*
37:*24*  39:*24*
comment  64:*24*
communicate  34:*7, 15*
communicated  59:*25*
76:*7*
communication  35:*25*
60:*3*  76:*20*
communications  34:*9*
60:*23*
community  18:*22*
67:*5*  75:*14*
company  12:*4*
compensate  20:*19*
compensates  20:*12*
complicated  9:*14*
complies  22:*23*
computer  19:*6*
concern  42:*6*  47:*6*
50:*6*
concerned  44:*22*
49:*24*
concerns  15:*2*  44:*4*
46:*10*
concluded  77:*20*
conference  14:*10*
confirm  76:*6*
confused  41:*10*
connection  9:*2*
consent  51:*11*  52:*20,*
*24*  55:*19, 22, 25*  56:*2,*
*7, 14, 22*
consequential  69:*10*
consider  66:*13*  74:*11*
consideration  50:*2*
considering  67:*18*
68:*3*
constituted  71:*3*
consummation  64:*9*
67:*11*
Cont'd  4:*1*  5:*1*

contemplating  55:*16*
contends  43:*22*  67:*10*
context  57:*23*
contract  17:*12, 19*
22:*24*  62:*23*
contracts  24:*14, 16,*
*19, 21*
contractual  20:*6*
26:*8*
contribution  71:*19*
contributions  19:*20*
control  51:*25*  52:*15*
55:*7, 10*  57:*5*  70:*8*
controlled  9:*6*  12:*11,*
*19*
conversation  11:*25*
36:*23*  43:*15*  69:*8, 25*
70:*21*  76:*10*
conversations  43:*8*
51:*3*  53:*8*  72:*9*
76:*11*
conversion  73:*25*
convert  73:*12*
converted  71:*22*
72:*20, 21, 25*  73:*12*
74:*2*
convoluted  39:*11*
copies  77:*14*
copy  60:*11*
correct  15:*18, 20, 21*
16:*10, 11*  17:*24*
18:*12*  20:*3*  21:*13, 16*
22:*7, 8, 17, 24*  24:*16,*
*19*  30:*6*  33:*9*  37:*22*
39:*21*  41:*17, 18, 20*
43:*13*  54:*18*  59:*21,*
*24*  62:*13, 17*  71:*25*
72:*1*  73:*18*  76:*9, 24*
80:*10*  81:*11*
corrections  78:*3*  80:*9*
correctly  62:*10*
corresponding  18:*19*
counsel  16:*22*  58:*5*
81:*15*
counterparty  74:*5*
couple  29:*16*  37:*4, 25*
course  34:*6, 21*
COURT  1:*1*  8:*18*
9:*25*  12:*15*  37:*4*
38:*16*  60:*17*  63:*6, 22*

64:*9*  65:*25*  67:*10*
77:*13*
Court-appointed  62:*5*
CRAWFORD  4:*17*
create  31:*21*
created  31:*19, 24*
62:*1*
cross-talk  65:*24*
Crown  4:*3*  15:*7*
16:*25*  17:*3, 5, 11, 14,*
*22*  18:*24*  19:*1, 24*
20:*7, 9*  21:*1, 2, 10, 16,*
*18*  22:*5, 14, 23*  24:*7*
25:*3, 6, 11, 15, 21*
28:*21*  29:*17, 25*  30:*3,*
*10*  31:*8, 10*  35:*23*
36:*22*  50:*25*  54:*22*
55:*2, 3, 23, 24*  56:*1,*
*23*  57:*5*
CRR  1:*22*  81:*21*
cumbersome  57:*19*
current  28:*5*
Currently  38:*3*
CURRY  4:*7, 9*

< D >
DAF  30:*18*  59:*17*
DALLAS  1:*3*  4:*3, 19*
9:*3*  11:*4, 8, 11*  12:*13*
13:*25*  14:*13*  15:*24*
16:*9, 12, 15, 17, 19*
17:*8, 10, 13, 22*  18:*9,*
*14, 16, 19, 25*  23:*1, 6,*
*9, 20*  24:*5, 8, 15, 18*
25:*7, 11, 15, 22*  26:*3,*
*7, 15, 18, 23*  27:*11, 24*
30:*18*  32:*9*  33:*5, 14,*
*20*  34:*4, 22*  35:*2, 6,*
*12, 20, 25*  36:*9, 17*
37:*9, 13, 17*  39:*20*
40:*3*  42:*5, 15*  43:*18,*
*22*  44:*19, 21*  46:*9*
48:*12, 21*  49:*4, 10, 23*
51:*10, 15*  52:*19*  53:*2,*
*18, 22*  54:*1, 17*  55:*1,*
*6, 13*  56:*8*  57:*13*
58:*8*  60:*5, 10*  61:*1*
63:*3, 19*  67:*9, 18*
69:*11*  70:*24*  71:*15,*
*24*  72:*7, 23*  73:*16, 21*

74:*10, 20, 21, 24*  75:*2,*
*3, 5, 7*  76:*14*
D'AMBRA  5:*14*
data  41:*9*
DAVID  4:*7*
day  8:*18*  13:*21*
dcurry@okinadams.co
m  4:*8*
deal  66:*24*
debate  67:*2*
Debtor  1:*8*  64:*10*
67:*12*
decided  16:*21*
decision  53:*9, 12*
74:*17*
decision-making
62:*24*
decisions  26:*25*  36:*1,*
*24*  39:*16*  42:*14*
50:*24*  52:*10*
Defendant  4:*3, 14*
Delaware  59:*23*
delivered  28:*1*
DEMO  3:*8*
depends  23:*24*
DEPONENT  78:*1*
deposed  9:*9*
DEPOSITION  1:*12*
2:*9*  7:*1*  9:*2*  78:*3*
80:*7*
depositions  8:*14*
describe  49:*13*
described  29:*1*  66:*21*
describing  29:*13*
detail  68:*5*
details  13:*1*
determine  72:*6*
device  19:*5*
DIAZ  5:*21*  14:*2*
15:*13*  16:*20*
difference  69:*22*
different  31:*22*
71:*23*  72:*21*  73:*5*
Diplomate  2:*14*  81:*5*
DIRECT  7:*23*  25:*14,*
*22*  53:*19, 21*  54:*4, 5*
direction  2:*16*
directly  17:*22*  23:*21*
25:*25*  35:*8, 9, 13*

48:24 49:7 54:1, 19 55:10 60:20
director 11:23
directs 10:18
disapprove 55:14
discovery 62:23 72:19
discussion 67:2
disposition 42:8 46:11
distribute 25:3
distributions 17:17, 18 25:6, 8 30:11
DISTRICT 1:2
diverting 62:3
dividends 17:16
DIVISION 1:3
document 57:20 58:12, 18
documentation 51:21 52:23
DOCUMENTS 7:7 30:25 31:2, 4 50:14, 20
doing 39:7 57:17, 19 61:20
dollar 22:13
dollars 22:14 28:5 41:14 42:1 49:19 53:13 67:4
Dondero 12:11 14:7, 16 15:16 16:4 19:22
Dondero's 74:5
donor-advised 18:20, 21
dressing 8:15
due 29:5
Dugaboy 4:14 71:16 74:4
duly 8:6
duration 20:8
duties 11:15 26:14, 17 27:10 32:8 33:19 34:6
duty 11:17 25:3, 6, 11, 22 35:19 36:9, 16 52:3, 5 70:3 73:8 74:10

< E >

earlier 29:1 43:23 62:15
easier 13:22
economic 15:6 24:4 28:8 35:23 36:2, 21 37:18 47:21 48:7 49:20 50:24 72:6
elaborate 48:15
emails 76:10
EMANUEL 3:22
employed 81:15
employment 71:3
Empower 11:25 14:24 16:12 17:10, 13, 22 18:9, 17 24:2, 8 25:9, 17 26:21, 22 28:12, 15 30:17 37:19 39:13 40:9 41:13, 23 42:2, 23 43:18 44:19 47:14, 23 49:21 55:18 56:2 69:10 75:2
enabled 70:25
engaged 43:23 65:6
enraptured 75:18
ensure 11:17
enter 50:15 53:5 68:24
entered 42:16, 24 50:9
entering 51:11, 16 52:20 55:16 56:15, 23 61:7, 15 64:15 66:6
entire 34:3
entities 9:5 12:18 13:2, 19 16:19 27:18, 19 31:14, 16, 19 33:2, 11, 16 35:4, 14, 19 36:16 45:23 46:21, 24 47:7, 17 50:2, 10, 11, 14, 17 51:18 52:4, 19 53:5, 20, 24 54:16 55:8, 11 56:9, 17, 25 57:6 59:23 61:8, 15 62:1 64:20 68:25 69:17
entity 12:7, 10 23:17 54:25 55:15 59:15

entry 65:7
Errata 78:5
ESQ 3:6, 8, 10, 12, 20 4:5, 7, 15 5:4, 6
established 62:19
event 20:23
evidence 68:11
exact 22:21
EXAMINATION 6:5 8:10
examined 8:8
example 22:10
exchange 21:10
excuse 72:15
execution 68:17 69:15
exercise 72:4, 16 74:4
exercised 71:25 72:7 73:17, 21 75:6
exercising 72:24 74:11
Exhibit 6:13 58:4
EXHIBITS 6:11
expect 51:4 70:7
expectation 52:14, 18
expense 20:12, 17
expenses 20:14
expert 62:12
expired 71:21
explain 54:12
explained 20:18
exposure 14:15
extend 52:5
extent 63:9 67:22

< F >
fact-finding 38:8
facts 28:3 38:5, 6 40:5, 8 41:10 43:1, 10 44:10 45:22 48:11, 20 49:2 58:15 62:19 63:25 64:22 65:5, 16 66:5, 11, 15, 16, 19 67:7
fail 9:21
fair 20:25 23:5 28:12, 14, 16, 22, 24 29:4, 8, 9, 14 30:11, 12 34:19, 20 42:5

43:24 44:2, 25 45:1 46:7, 12, 14 49:23 50:1 51:12, 13, 18 54:6, 24 57:24 61:2, 3 63:15, 18 65:17 66:21 70:4 73:10, 20, 23 77:1
faith 44:17
familiar 12:4 13:2 23:17 28:14 30:13, 16, 18, 20, 22 58:11
Family 12:1 16:13 17:10, 13, 23 18:9, 17 74:5
fan 19:7, 9
February 29:4 55:22
fee 20:16
feed 54:20
feedback 19:8
feeds 54:22
feel 63:25 72:3
felt 16:19
fiduciary 11:18, 20 24:22 35:24 36:9, 16, 23 50:21 51:23 52:2, 25 62:5 68:13 69:14, 24 74:10
file 14:21 16:14, 21 37:5 39:21
filed 12:7, 14, 22 16:25 23:3, 6 37:3 38:19 39:2, 25 58:9 69:20
filing 13:24 14:17 37:10, 14 38:9 39:3, 12
finance 76:15, 18
financial 11:21 25:1 26:23 54:10 81:17
financially 24:23
finish 9:16, 20 63:17
firm 8:24
first 8:6 9:11 15:1, 11 75:21
five-minute 75:24
fixed 17:19, 21 20:2, 7, 10, 22 21:11 22:16
Floor 3:15, 23
flow 18:14, 15, 18

26:21  30:11  31:5
flows  29:14  30:23
fluctuations  54:12
focus  56:4  68:16
focused  48:2
Focusing  68:19, 21
following  79:3, 4
follows  8:8
foregoing  80:7  81:9, 10
form  15:22  16:16  23:13, 23  25:13, 24  26:16  27:12  28:2  35:21  36:18  38:12  39:8  41:21  42:11  43:6, 14, 25  45:2  47:9, 20  48:8, 14, 23  49:6  50:4, 18  51:19  52:6  53:6, 25  54:7  55:9  56:10, 18  57:1, 7  60:19  61:9  63:7, 23  64:16  65:9, 18  66:8  69:1, 18  70:5  71:4  73:1  74:6, 13  75:8
formal  9:13  10:14
formed  23:11
forth  27:20
Foundation  4:3  11:5, 9, 11, 22  12:1, 14  13:25  14:24  16:10, 13, 15, 18, 20, 21  17:8, 10, 14, 23  18:14, 16, 19, 25  23:2, 6, 10, 16, 20  24:3, 5, 15, 18  25:7, 12, 15, 22  26:3, 7, 15, 18  27:11, 24  32:9  33:5, 14, 20  34:4, 22  35:3, 6, 12, 20, 25  36:9, 17  37:18, 19  39:14  40:9  43:18, 22  44:22  46:10  48:13, 21  49:4, 24  51:15  53:2, 18, 22  54:1  55:1, 6, 13  56:8  59:17  60:5, 10  63:3, 20  67:9, 18  71:14, 15, 24  72:7, 24  73:16, 17, 21  74:10, 20, 21, 24, 25  75:3, 5, 7

foundations  15:13  18:17  65:3
Foundation's  9:3  14:13  15:24  18:10  26:23  37:9, 13  39:20  40:4  42:6  49:10  51:11  52:20  54:17  57:13  58:9  61:2  70:24  73:9  76:15
full  57:24
Fund  15:4, 5  17:19  18:4, 5, 20  21:17, 19  22:4  24:15, 17  28:21  30:23  49:17  54:20, 21  55:17
funded  19:17, 19
funding  16:5, 8
funds  18:21  26:20  30:25  31:1
fund's  62:1
Further  61:22  77:3
future  21:12  28:25  30:11  40:17  49:20  77:1

< G >
Gail  1:21  2:13  9:25  77:11, 17  81:5, 21
gdemo@pszjlaw.com  3:9
generally  40:10, 13
gentleman  12:11
getting  21:2  41:10
give  10:13  12:25  31:6  40:11  48:12, 20  49:3  57:24  58:16  62:24
given  45:22, 24  63:25  71:19
gives  10:14, 16
glance  31:3
Global  4:3  15:7  16:25  17:3, 5, 11, 14, 22  18:24  19:1, 24  20:7, 9  21:2, 10, 16, 18  22:5, 14, 23  24:7  25:3, 6, 11, 15, 21  28:21  29:17, 25  30:3, 10  31:8, 10  35:23  36:22  50:25  54:22

55:2, 3, 23, 24  56:1, 23  57:5
go  17:21  25:20  27:7, 14  38:23  41:3  58:2  63:10  68:10  70:11
goal  10:4
going  8:18  9:14  10:3, 19  13:21  25:25  27:3  35:22  36:2  39:13  52:12  57:11, 12  59:9  60:17  61:20  66:16  67:4, 15, 21  73:11  76:25
Good  8:23  21:4, 5  44:17
good-faith  43:4, 12  44:6  45:21  46:8  69:8
governing  30:24  31:2, 4  50:14, 20
granting  47:16  48:5
grant-making  75:12
grants  18:21
GREGORY  3:8
grow  24:24
guaranteed  22:21
guy  34:23

< H >
half  32:20
HALL  5:18
HALLMAN  5:8
happen  18:16
happened  53:14, 15  54:13  73:4
hard  34:11
harm  46:16
HART  5:8
hat  34:18
hats  34:19
HAYLEY  3:12
head  34:24  35:3
hear  8:21, 22  65:15
heard  36:5  38:22  39:24
held  2:9  15:7  30:9  33:6, 10
helped  14:4
Hey  38:20
high  31:3  34:14

HIGHLAND  1:6  3:4, 19  6:13  8:25  9:1, 4  12:5, 17  23:2, 7, 11, 18, 22  26:4, 8, 9, 13, 14, 24  27:9, 18  30:14, 15  31:10  36:7, 8  37:6, 24  38:16  41:17, 24  42:15, 24  45:6, 11, 16  46:25  48:13, 22  49:5  50:10  58:4  64:14, 19, 20  65:5  66:5, 20, 22  67:19, 20  71:15  74:21, 24  75:3, 5
Highland's  12:15  60:6
high-level  40:5  58:15
historical  28:9
HMIT  13:9, 13, 17, 19  18:6  27:18, 19  28:1, 4  30:20, 25  31:16, 18  32:2, 6, 10  33:2, 6, 11, 15  34:8, 10, 18, 24  35:4, 7, 14, 19  36:11, 16  37:3, 9, 12, 24  38:11  40:10  46:21, 24  47:7, 17  48:5  50:2, 11, 14, 17  51:18  52:4, 19  53:4, 19, 23  54:16, 23  55:7, 10, 15  56:9, 16, 25  57:6  59:22  61:8, 15  68:25  69:16
hold  17:11  21:22, 24  22:2, 3  30:1, 2
Holdco  30:18  59:18
holdings  32:14
holds  22:4
honest  72:18
Hospitality  71:18
Houston  4:11
Hunter  5:3  13:5, 8, 9  15:3  18:6  23:25  29:6, 12  31:14  40:17, 20  41:25  42:8  45:19  46:11  49:18, 21
HURT  5:6
hwinograd@pszjlaw.com  3:13

**< I >**
idea  14:*17, 18, 21*
  *15:10*  31:*6*
identify  32:*2, 5*
IDF  18:*4*  21:*17*
  22:*3*  30:*23*  49:*17*
  54:*20, 21*  55:*17*
imagine  31:*23*  35:*11*
  52:*23*
impact  11:*22*  28:*11*
  29:*2, 7*  35:*23*  36:*2,*
  *20, 25*  37:*18*  38:*6*
  39:*10, 13*  40:*9*  41:*14,*
  *22*  43:*17*  44:*17, 18*
  47:*13, 18*  48:*7*  50:*24*
  52:*13*  64:*1*  65:*2*
  69:*10*  72:*6*
impacted  15:*6*  45:*24*
  53:*9*  64:*23*  67:*3*
impactful  75:*11*
impacts  24:*3*  44:*12*
  47:*12*
implicated  63:*9*
important  9:*15, 19*
  40:*8*
including  61:*25*
income  18:*10, 13, 15,*
  *24, 25*  21:*11*  22:*16*
  28:*25*  47:*13, 23*
increased  29:*5*
independent  62:*5*
INDEX  7:*1*
indicate  78:*3*
indirect  25:*17*  26:*24*
  53:*23*  54:*6, 14, 23*
  75:*4*
indirectly  23:*21*
  24:*1, 5*  44:*24*
Indiscernible  65:*24*
individual  42:*17, 21,*
  *25*  44:*8, 11, 16*  46:*15*
  64:*18, 22*  66:*10, 24*
individuals  42:*13*
  74:*15*
infirmity  10:*16*
inform  36:*24*  50:*23*
  52:*5*  69:*25*  70:*4*
information  33:*21*
  34:*1*  63:*11*  70:*14, 17,*

  *25*  71:*1, 7*  73:*3*
  74:*15, 16*
informed  33:*6, 14*
  52:*11*  60:*5, 25*  73:*14*
informing  37:*17*
Inghram  1:*21*  2:*13*
  81:*5, 21*
inquired  33:*22*
inquiry  32:*9, 11*
insertion  61:*25*
insight  31:*25*
instruct  67:*21*
INSTRUCTION  7:*2*
INSTRUCTIONS
  78:*1*
Insurance  4:*4*  17:*1,*
  *4, 5, 6, 12*  20:*20*
  28:*17, 18, 20*  29:*18,*
  *23*
interest  23:*10, 21*
  24:*2, 4, 6, 11, 13*
  25:*18*  26:*4, 19, 24*
  28:*4, 10*  29:*6, 11, 25*
  35:*23*  36:*3, 21*  39:*16*
  41:*24*  47:*22*  49:*18*
  50:*24*  53:*13, 19, 23*
  54:*4, 5, 6, 8, 14, 23*
  81:*17*
interested  51:*23*
  53:*7*  70:*1*
interests  15:*4*  21:*18*
  37:*19*
internal  72:*10*
introduced  58:*5*
inured  75:*6*
invest  19:*24*
invested  18:*1*
Investment  4:*14*  5:*3*
  13:*6, 9*  14:*25*  33:*24*
  36:*1, 24*  45:*20*  50:*23*
  51:*2, 25*  52:*14*  55:*4*
  70:*8*  71:*17, 23*  72:*10*
investments  11:*20*
  18:*3*  22:*6*  29:*17, 22*
  31:*23*  52:*11*
involved  70:*20*
Islands  16:*1*  59:*19*
  62:*13*
issuer  17:*6*

its  22:*23*  26:*4*  49:*18*
  50:*1*  81:*17*

**< J >**
JAMES  5:*19*
January  11:*13*
JEFFREY  3:*10*
Jim  12:*11*  14:*7*
jmorris@pszjlaw.com
  3:*7*
JOHN  3:*6*  8:*24*
  38:*13*  65:*19*
joint  59:*10, 16*  60:*1,*
  *6, 12, 15, 24*  61:*6, 14,*
  *19*  76:*7, 17*
JONES  3:*14*  5:*18*
jpomerantz@pszjlaw.c
om  3:*11*
JULIE  5:*21*  14:*2*
  15:*13*  16:*20*
June  1:*14*  2:*10*
jurisdiction  62:*9*

**< K >**
KELLY  5:*8*
key  50:*6*
kind  12:*25*  14:*4*
  15:*14*  31:*6, 25*  34:*11*
  38:*1, 2, 5, 7*  40:*7, 8*
  52:*12*
know  9:*22*  10:*10, 25*
  13:*24*  14:*6, 12, 16, 17*
  16:*12*  17:*25*  18:*2, 3*
  19:*17*  23:*1, 6, 9*
  25:*21*  26:*7*  29:*3*
  30:*22*  31:*18, 19, 21,*
  *23*  33:*10, 21*  34:*11*
  35:*6, 12, 16*  36:*12*
  37:*15*  38:*9, 19*  39:*15*
  40:*10, 13, 25*  41:*1*
  42:*1, 14, 24*  46:*15*
  48:*20*  50:*19, 20*  51:*1,*
  *20*  52:*8, 12, 24*  53:*15*
  55:*6, 13*  57:*23*  59:*3,*
  *15*  60:*4, 9*  64:*17*
  67:*1, 3, 7, 9*  69:*22*
  70:*7, 16, 23, 24*  71:*7*
  73:*25*  74:*1, 14, 16*
  75:*16*
knowing  64:*22*  66:*24*

knowledge  18:*11*
  22:*2*  31:*9*  60:*16*

**< L >**
L.P  1:*7*
LANG  4:*15, 17*
  77:*14*
language  37:*16*
large  40:*25*
late  21:*2*
law  8:*24*  62:*13*
lawsuit  37:*5, 14, 23*
  39:*4, 24*
lawyer  10:*12, 14*
  12:*2*  62:*16*
lay  23:*15*
lead  65:*5*
lean  38:*7*
leaned  40:*7*
learn  37:*23*
leave  64:*3*  65:*13*
led  60:*24*
left  75:*16, 23*
legal  10:*14, 16*  11:*21*
  12:*24*  14:*4*  16:*22*
  17:*12*  38:*4, 7*  40:*7*
  52:*22*  53:*2*  61:*17*
  62:*25*
legally  52:*23*  53:*1*
level  31:*3*  34:*14*
liability  40:*14*  46:*25*
Life  4:*4*  16:*25*  17:*3,*
  *5*
likelihood  63:*2*
Limited  17:*1, 4, 6*
LINE  7:*3, 8, 13, 17*
  59:*8*  79:*5*
liquidation  62:*8*
liquidators  59:*11, 16*
  60:*1, 6, 12, 16, 25*
  61:*7, 14, 19*  76:*8, 17*
liquidity  75:*13*
listen  27:*4*
lists  55:*4*
Litigation  3:*19*
  15:*25*  16:*5, 9*  45:*16*
little  13:*22*  15:*9*
  23:*15*  48:*15*  57:*18*
  72:*19*

LITTLETON 1:*13* 2:*9* 6:*6* 8:*5, 17* 58:*8, 19* 63:*9* 66:*4* 76:*4* 77:*7* 80:*12*
LLP 3:*22* 4:*9* 5:*8*
LOIGMAN 3:*20*
long 11:*1, 10* 22:*22* 33:*1*
longer 49:*22*
look 55:*3*
looked 16:*17*
looking 14:*25* 19:*14* 59:*8*
loss 47:*22*
lost 47:*13* 72:*24* 75:*17*
lot 34:*19* 67:*5*
LOUIS 5:*4*
Louisiana 5:*10*
LP 8:*25* 12:*5* 15:*5* 18:*4* 22:*3* 45:*6* 55:*4*
lphillips@kellyhart.com 5:*5*

< M >
M&E 20:*11, 14, 17*
Madden 72:*14, 15*
Madison 3:*23*
Main 5:*9* 11:*17*
making 39:*17* 42:*13* 66:*24*
MANAGEMENT 1:*6* 3:*4* 8:*25* 12:*5* 26:*9, 13* 27:*9* 36:*8* 37:*6* 41:*25* 45:*6* 48:*22* 52:*9* 67:*19* 72:*15*
Mark 9:*6* 33:*1* 34:*10* 39:*2* 45:*25* 50:*8* 53:*3* 55:*21* 74:*9*
MARKED 6:*11* 7:*16* 58:*4*
market 20:*4* 28:*12, 14, 16, 23, 24* 29:*4, 8, 9, 14* 54:*12*
MARKS 7:*22* 78:*6*
material 70:*14, 16*
Matt 38:*20* 65:*20* 67:*25* 75:*16* 77:*9*

matter 30:*8*
matters 30:*10*
MATTTHEW 4:*5*
mean 38:*13*
means 11:*19*
meet 8:*19*
member 15:*16*
met 14:*6, 8*
MICHAEL 4:*15*
million 19:*20, 21, 23* 28:*4* 41:*1, 5, 14, 25* 42:*2* 49:*19* 52:*8* 53:*13* 71:*17* 72:*24* 73:*19, 22* 74:*12* 75:*12*
mine 62:*21*
minutes 75:*19, 23*
missed 20:*13*
mlang@cwl.law.com 4:*16*
MNPI 71:*3*
mokin@okinadams.com 4:*6*
moment 57:*15*
money 21:*1, 9* 22:*22*
MORRIS 3:*6* 6:*7* 8:*11, 24* 15:*23* 16:*23* 21:*6* 23:*14* 24:*10* 25:*19* 26:*1* 27:*2, 16* 28:*13* 36:*4* 37:*2* 38:*14, 20, 24* 39:*18* 42:*4, 19* 43:*9, 19* 44:*3* 45:*3* 47:*10* 48:*1, 10, 17* 49:*1, 8* 50:*7* 51:*6* 52:*1, 16* 53:*17* 54:*3, 15* 55:*12* 56:*12, 20* 57:*3, 9* 58:*2, 6, 25* 59:*4, 7* 60:*21* 61:*12* 63:*13, 14* 64:*4, 6* 65:*1, 11, 20* 66:*3, 17, 18* 67:*24* 68:*6, 9* 69:*6, 21* 70:*2, 10* 71:*6* 72:*18* 73:*6* 74:*8, 18* 75:*15, 20* 76:*3* 77:*3, 7, 14*
motion 37:*4, 10* 38:*10, 13, 15* 39:*12, 21, 25* 60:*7*
Mountain 5:*3* 13:*6, 8, 9* 15:*3* 18:*6* 24:*1*

29:*6, 12* 31:*14* 40:*18, 20* 41:*25* 42:*8* 45:*20* 46:*11* 49:*18, 21*
move 27:*3* 57:*11*
moved 66:*23*
moving 44:*8* 64:*18* 66:*10, 20*
multiple 33:*23*

< N >
name 8:*23* 16:*14*
named 12:*11*
NATHAN 5:*18*
NECESSARILY 7:*22* 34:*17*
need 10:*24* 34:*23* 35:*3* 57:*21* 58:*21* 73:*3* 77:*11*
needed 33:*20* 52:*19*
negatively 36:*3* 53:*9* 64:*23*
negotiate 68:*24*
negotiating 46:*15*
negotiation 43:*4* 65:*7* 68:*17* 69:*15*
negotiations 43:*13* 44:*6, 15* 46:*9*
neither 81:*15*
never 14:*8* 23:*6* 33:*25* 34:*25* 39:*19* 71:*24* 76:*7*
New 3:*16, 24*
newly 62:*1*
news 38:*2*
NexPoint 71:*18*
nice 8:*19*
nonpublic 70:*14, 16*
normal 51:*3*
NORTHERN 1:*2*
Notary 81:*8*
notations 78:*6*
NOTE 7:*21*
notes 19:*13* 55:*20, 21, 23*
notice 77:*10*
notified 74:*2*
November 19:*19*
NUMBER 6:*12* 12:*8*

< O >

object 10:*13* 15:*22* 16:*16* 23:*13, 23* 25:*13, 24* 26:*16* 28:*2* 35:*21* 36:*18* 38:*12* 39:*8* 41:*21* 42:*11* 43:*6, 14, 25* 45:*2* 47:*9, 20* 48:*8, 14, 23* 49:*6* 50:*4, 18* 51:*19* 52:*6* 53:*6, 25* 54:*7* 55:*9* 56:*10, 18* 57:*1, 7* 60:*19* 61:*9* 63:*7, 23* 64:*16* 65:*9, 18* 66:*8* 69:*1, 18* 70:*5* 71:*4* 73:*1* 74:*6, 13* 75:*8*
objecting 15:*10*
objection 9:*3* 12:*14, 16, 21* 13:*25* 14:*5, 14, 18, 22* 15:*24* 16:*14, 24* 23:*3* 27:*12* 40:*4* 49:*10, 15* 57:*13* 58:*9, 15* 60:*11* 61:*2*
objections 12:*23*
obligation 20:*7, 11* 22:*15* 35:*20, 24* 36:*23* 50:*21* 51:*23* 52:*25* 69:*25*
obligations 22:*23* 26:*15, 18* 27:*10* 68:*13* 69:*14*
obtain 51:*10* 52:*19* 56:*7, 14, 22* 61:*5*
obtained 39:*20* 71:*2*
occasions 33:*23*
officer 81:*8*
official 59:*10, 16* 60:*1, 6, 12, 15, 25* 61:*6, 14, 18* 76:*7, 17*
officially 60:*2*
Oh 41:*7* 42:*21*
Okada 12:*1* 14:*24* 16:*13* 17:*10, 13, 23* 18:*9, 17* 19:*23* 24:*2, 8* 25:*9, 16* 26:*21, 22* 28:*12, 15* 37:*19* 39:*13* 40:*9* 41:*13, 23* 42:*2, 23* 43:*17* 44:*18* 47:*14, 23* 49:*22* 55:*18* 56:*2* 69:*10* 75:*2*

okay  8:21, 23  9:12, 17  10:8, 20, 21  11:2  12:13  13:21  14:12  17:3  19:11, 16  20:25  21:14  22:19  23:1, 20  26:2  33:4, 18  34:6  35:1  37:3  39:19  40:2  41:11  44:4  45:4, 9  48:11  49:2  50:8  51:7, 9  58:2  59:1  60:22  61:4  62:12  64:4, 7  67:25  68:8, 16  69:12  70:3, 11  75:15  77:13
OKIN  4:5, 9  15:22  16:16  21:4  23:13, 23  25:13, 24  26:16  27:12, 14  28:2  35:21  36:18  38:12, 18, 22  39:8  41:21  42:11  43:6, 14, 25  45:2  47:9, 20  48:8, 14, 23  49:6  50:4, 18  51:19  52:6  53:6, 25  54:7  55:9  56:10, 18  57:1, 7  58:19  59:2, 6  60:19  61:9  63:7, 23  64:16  65:9, 18, 21  66:8  67:21  68:1, 8  69:1, 18, 23  70:5  71:4  73:1  74:6, 13  75:8, 17  77:6, 14, 17
once  34:22
opine  43:8, 16  44:16  45:8, 9, 14, 18  61:18
opined  55:24
opinion  62:25  63:24  66:14
opportunity  10:17  55:19  56:3  57:24
option  71:11, 14, 16, 20, 21, 25  72:4, 8, 12, 25  74:4
order  55:23  58:22  62:19
org  75:3
organization  11:14  16:18  30:8  32:21, 25  69:19  74:22  75:11
organizational  31:5

organizations  11:24  16:6  20:2, 5  21:1, 9  22:15, 21  24:9, 25  25:9  28:6  29:15, 24  30:2  44:13  45:23  46:16  47:19  48:7  50:22  53:10  56:15  59:23  63:2  64:2  69:11
orgs  39:15
originally  26:20
originated  14:18
outcome  81:17
outlined  67:8
outside  68:12, 23  69:14
overall  38:6  54:9
overseeing  12:15
oversight  11:18, 20  34:13  75:4
owes  25:11  26:14  27:10  35:19  36:9, 16
owned  21:15  32:6, 10  33:16  74:19
ownership  21:20  24:6  29:25  34:13  53:19, 21, 23  54:5, 6
owns  31:6  32:3

< P >
p.m  1:15  2:11  76:1, 2  77:19
PACHULSKI  3:14  5:18
Pacific  4:18
PAGE  6:5, 12  7:3, 8, 13, 17  79:5
paid  21:1, 9  49:21
paragraph  58:3  61:22  64:5, 8  68:10  70:11, 13
part  11:25  12:24  20:14  23:11  33:19  40:15  43:8, 15  44:1  46:13  47:3  50:5  54:21
participate  76:12, 16
particular  20:23  21:19

parties  3:2  38:17  43:5  46:25  48:5  51:23  59:11  64:14  66:6  70:1  81:16
partnership  21:18
party  13:13, 18  53:7
patience  77:8
Patrick  9:6  12:19  13:3  33:1  34:10  39:2  43:23  45:25  50:9, 15, 22  51:10, 16  52:3  53:3  55:21  56:7, 14, 22  61:5  64:18  65:4  68:11, 22  69:13  71:2  74:9
Patrick's  44:21  61:24
PAUL  5:14
pay  17:16  20:1, 7, 10  22:15
payments  17:19, 21  49:20
payout  28:8  42:2
payouts  40:17  53:16
PE  15:4  49:17
peace  64:10  67:12
pending  11:2  15:25
percentage  20:19
period  20:22  21:12
permission  37:5  38:15
person  34:15  51:3, 25  52:15, 22  61:17
personally  14:8  69:19
persons  70:9
pertaining  12:16
pertinent  13:1
PHILLIPS  5:4  77:5, 15
piece  20:13
place  44:24  66:12
plan  23:12
planned  60:3
platform  29:20, 21
play  17:7  43:1  44:14
played  31:10
plays  17:9
please  58:3  64:5

70:12
PLLC  4:17
point  58:23
policies  17:11  30:5, 6  36:22
policy  24:7  30:1, 2, 4
POMERANTZ  3:10
portfolio  15:6
portfolios  52:13
portion  15:2  18:13  58:8
positive  36:3
possibility  50:1  59:6
potential  55:15  67:17
potentially  39:10  41:15  47:13
preparation  14:13
present  2:16  5:17  54:10
preserve  24:23
President  14:1  16:20
prevent  51:16  61:15
PREVIOUSLY  6:11  58:4
primarily  15:13
prior  58:21
privilege  68:4
privileged  63:10
privy  74:15
probably  34:14  36:12
problematic  42:18, 20
proceeding  13:15
proceedings  2:12  77:20  81:9, 11, 12
process  9:13, 14  10:23  57:19
produce  28:21
produced  21:11
product  43:3, 12  44:5  46:8
PRODUCTION  7:7
projected  28:25
proper  11:18
proposed  9:4  12:16  45:5, 10, 15  46:20  47:16  48:6  49:10  56:23  61:1  64:15  65:7

proposing 40:*11*
propounded 80:*8*
protect 24:*23*
provide 56:*3*
provided 60:*10* 71:*2*
providing 47:*8*
Public 81:*8*
pull 40:*8*
pulling 38:*4*
purpose 31:*19* 62:*2*
pursued 40:*21*
pushed 75:*13*
put 14:*5* 57:*12, 22*
58:*7* 71:*10, 14, 16, 20*
72:*4, 8, 12, 17, 25*
73:*11, 17, 21* 74:*4, 11,*
*19* 75:*6*
putting 59:*5*

< Q >
quarter 15:*1*
quarterly 20:*15*
28:*22*
question 9:*16, 21*
10:*8, 16, 20* 11:*1*
21:*7* 27:*5* 61:*21*
63:*13, 17* 65:*10* 69:*2*
questionable 42:*14*
67:*1*
QUESTIONS 7:*16*
9:*15* 10:*13* 34:*16*
57:*25* 58:*23* 75:*18*
76:*14* 77:*4, 5* 80:*8*
quicker 13:*22*
QUINN 3:*22*
QUOTATION 7:*22*
quotations 66:*13*
QUOTE 7:*23* 59:*9*

< R >
Rand 15:*4* 18:*5*
29:*11, 12* 30:*17, 25*
31:*13* 49:*16*
Rand's 29:*6*
range 73:*19*
RAVER 5:*20*
RDR 1:*22* 81:*21*
reach 56:*1*

read 12:*23* 40:*2*
59:*9* 62:*10* 77:*18*
80:*6*
reading 19:*14* 78:*2*
really 53:*11* 61:*18*
Realtime 2:*14* 81:*6*
reason 10:*24* 25:*10,*
*23* 26:*12* 27:*8, 23*
35:*18* 43:*2* 45:*4, 7, 9,*
*14, 18* 46:*19* 47:*15*
48:*4* 50:*13* 51:*14*
53:*1* 56:*6, 13, 21*
57:*4, 10* 60:*14* 61:*4*
64:*13* 69:*13* 72:*4*
74:*7* 79:*7, 9, 11, 13,*
*15, 17, 19, 21, 23*
reasonable 46:*7*
reasons 74:*3* 78:*4*
79:*4*
recall 14:*11* 41:*2*
57:*21*
receive 20:*15* 22:*21*
27:*20, 24* 28:*7* 40:*11,*
*20* 42:*9* 44:*23* 50:*3*
received 35:*7, 13*
63:*11* 73:*25*
receives 46:*12*
Recess 76:*1*
recollection 57:*22*
recommendation
16:*22* 56:*3* 72:*11*
recommendations
18:*18*
record 81:*11*
recorded 2:*12*
recovered 73:*22*
reduced 81:*13*
refer 13:*8, 17*
REFERENCED 6:*11*
referred 31:*15* 70:*17*
referring 30:*4*
refers 15:*25* 70:*13*
71:*10*
REFLECT 7:*23*
refresh 57:*22*
regardless 22:*19*
50:*20*
Registered 2:*13* 81:*5*
reiterated 38:*5*

related 29:*2* 40:*6*
41:*6* 81:*15*
relates 11:*24* 27:*1*
30:*17* 41:*13*
relationship 23:*25*
24:*8, 22* 25:*16, 17*
26:*8* 51:*24* 74:*23*
75:*1*
relax 9:*12*
release 40:*14*
releases 47:*7, 16*
48:*2, 5*
releasing 46:*25*
rely 12:*24* 74:*16*
remind 63:*8*
REMOTE 1:*12* 2:*8*
3:*2*
reorganization 23:*12*
repeat 58:*13, 17*
rephrase 10:*10, 17*
Reported 1:*20*
Reporter 2:*14, 15*
10:*1* 65:*25* 77:*13*
81:*2, 6, 8*
REPORTER'S 7:*21*
reporting 11:*21*
represent 39:*15*
representative 52:*4*
53:*4*
representing 44:*13*
represents 8:*25*
REQUEST 7:*7*
required 37:*12*
51:*10* 56:*7, 14, 22*
61:*5*
research 38:*3*
respect 17:*8* 22:*6, 10*
25:*12* 33:*2* 65:*6*
69:*14*
respectfully 27:*3*
respectively 17:*23*
responsibilities 11:*16*
33:*19*
responsibility 24:*22*
25:*14* 42:*23*
responsible 73:*9*
restate 21:*7* 36:*19*
44:*7*
restructuring 43:*23*
44:*10, 21, 24* 46:*1, 12*

result 43:*20, 21*
44:*20* 46:*12*
review 12:*21* 57:*21*
reviewed 30:*24* 31:*1*
Right 13:*7* 15:*17*
19:*3, 6* 21:*12* 27:*24*
29:*10* 30:*1* 31:*16*
32:*22* 33:*2, 8* 34:*1, 2*
37:*16, 21* 39:*17*
42:*23* 46:*6* 51:*15*
53:*3, 11* 54:*20* 55:*7,*
*14, 25* 57:*5* 58:*12*
59:*20* 61:*14* 62:*16*
65:*15* 73:*7, 9* 74:*20*
76:*12, 23* 77:*6*
rise 48:*12, 20* 49:*3*
risk 20:*4, 10, 12, 20*
22:*6, 9, 11*
ROBERT 3:*20*
robertloigman@quinn
emanuel.com 3:*21*
role 14:*12* 17:*7, 9*
31:*10* 33:*1* 66:*20*
roll 24:*25* 26:*22*
31:*7* 54:*9, 19*
rolled 15:*5* 35:*10*
rolls 18:*5, 7* 49:*17*
roll-up 24:*1*
room 19:*2*
Rouge 5:*10*
roughly 41:*14*
Royal 21:*2*
RSA 1:*22* 81:*21*

< S >
sale 15:*3* 29:*5, 11*
52:*11*
saw 29:*4*
says 64:*8* 68:*10*
scheduled 76:*25*
scope 47:*7* 68:*12, 23*
screen 57:*12* 58:*7*
60:*11*
scroll 64:*5*
scrutiny 62:*4*
see 53:*8* 58:*21*
59:*13* 64:*11* 68:*14*
70:*13, 15* 71:*12*
seek 37:*9, 13, 16*

seeking 37:5
seeks 64:10 67:12
seen 31:5 51:22
 64:1, 2
SEERY 5:19
segregated 21:15, 20,
 22, 24 22:1, 20
sell 55:21, 23
selling 53:12
sent 19:24
sentence 59:13 64:7
 71:10
series 9:15
serve 11:23
served 31:20
set 27:20 63:5
 76:10, 19
settle 44:11
settled 64:20
settlement 9:4 12:17
 13:14 23:25 24:3
 27:1, 17 28:1, 8, 11
 40:2, 6, 12, 16, 20
 41:20 42:7, 9, 16
 43:3, 11, 21 44:5, 18
 45:5, 10, 15, 19 46:6,
 7, 20, 24 47:2, 4, 5, 17,
 22 48:6 49:11, 25
 50:3, 9, 16 51:12, 17
 52:21 53:16 56:4, 16,
 24 59:12 60:7, 16
 61:1, 7, 16 63:5, 21
 64:9, 15, 21 65:8
 67:11 68:17, 21, 24
 69:9, 16
settlements 26:20
 28:7 45:22
settling 66:25
share 50:1 66:17
shares 71:18 72:16,
 20 73:24 74:2
sharing 19:6
SHAWN 5:20
sheet 26:4 54:9, 18,
 23 55:1 78:5
shifting 42:22
short 75:22 77:10
Shorthand 2:15 81:2,
 7
sign 77:18 78:5

signed 13:3 31:15
 56:8
significant 36:25
 43:17 49:20 50:23
 67:3
similar 75:1
sir 8:19, 21 9:10, 18,
 23 11:5 12:3, 6, 9, 12,
 20 16:7 17:2, 20
 18:12 19:4, 15 20:3
 22:25 23:4, 8 25:8
 26:6, 11 27:6, 15
 30:12 31:12 32:4, 19
 33:3, 7, 12, 17 34:5
 35:5, 15 37:7, 11
 39:1, 5, 22 40:1, 13
 45:13, 17, 21 46:6, 22
 47:11, 12 48:9, 24
 49:7 51:8 53:21
 56:19 57:2, 14 58:1
 59:14, 17, 21, 24 60:8,
 13 61:3, 10 62:10, 11,
 14 64:12 65:12, 13
 67:15 68:15, 20
 70:15, 18, 21 71:5, 9,
 13 73:10 74:7 76:9
 77:2
sit 60:15
situation 51:5
six 32:22
Skyview 71:3
sleep 59:5
smoothly 27:7
sold 22:17 28:4
 41:24 49:16, 18
sole 18:8 24:6
solely 68:16, 21
somewhat 42:18
Sorry 19:11 21:3
 28:18 36:5, 10, 11
 59:4 65:25
sought 39:20
Sounds 21:4, 5
source 18:9 70:25
speak 34:23 35:3
 61:10, 13
speculate 63:16, 19
speculation 63:25
speed 38:8

spoke 76:17
spoken 14:9
standpoint 44:12
 46:18
STANG 3:14 5:18
start 8:12
starting 36:20
state 28:22 43:16
 66:9 70:25
stated 65:14 69:4
statement 28:21
 54:11 55:4
statements 20:15
 25:1 26:23
STATES 1:1 61:23
Stenographically
 1:20 2:13 81:13
stewardship 11:18
STIPULATIONS
 7:12
stream 21:11 22:16
 29:1
streams 47:23
Street 4:10 5:9
strike 27:4
structure 28:5, 9
 29:18, 20 30:14, 16,
 17, 19, 21, 23 32:12
 35:11 62:2
structures 31:24
stuff 10:14
sub 29:3
subject 13:14 40:3
 62:4, 6
Subtrust 45:16
succeed 62:20 63:3,
 20
succeeding 63:4
successful 32:15
sue 38:16
suggest 43:11 66:20
Suite 4:10, 18 5:9
SULLIVAN 3:22
sum 40:25
summary 12:25
Sunday 1:14 2:10
 8:14, 18
supervision 81:14
supplied 78:5
SUPPORT 7:1

supporting 11:24
 16:6, 18 20:2, 5 21:1,
 9 22:15, 20 24:9, 25
 25:9 28:6 29:15, 24
 30:2, 8 39:15 44:12
 47:18 48:7 50:22
 53:10 56:15 63:2
 64:2 69:11 74:22
 75:3, 10
supposed 26:21
Sure 13:23 15:12
 48:3, 18 58:23
surprised 10:22
sworn 8:6
Systems 81:7

< T >
take 15:10 20:11, 16,
 19 22:9, 11 57:15
 75:22, 23
taken 44:24 66:12
 76:1 81:9, 12
takes 20:9 22:5
talked 31:13 45:24
talking 38:15 66:1
team 12:24 14:4
 38:4, 7 40:7 76:15,
 18
tell 8:13 32:15
 38:21 57:18
telling 74:10
tenure 33:13 34:4,
 21 35:2
terms 42:6 49:24
 66:15
testified 8:8
testify 8:6
testimony 9:24 78:4
 80:7
TEXAS 1:2 4:11, 19
Thank 26:2 32:24
 77:7, 9
Thanks 8:14
therefor 78:4
thing 29:3 42:12
things 44:14 46:2, 4,
 5 51:20 66:25 69:4,
 7
think 10:15 14:10
 15:12 16:17 19:21

21:*19*  24:*4*  26:*19, 24*
29:*18*  33:*18*  34:*10*
36:*22*  37:*15, 17*  39:*6,*
*16*  40:*15*  41:*1, 22*
42:*17, 25*  44:*9, 14*
46:*13*  47:*21*  51:*20,*
*21*  52:*7*  53:*7, 10*
57:*21*  62:*15*  66:*11,*
*23*  67:*1*  68:*1, 2*  69:*3,*
*5, 24*  70:*6*  71:*17, 18*
73:*2, 8, 23*  74:*9, 14*
76:*4*
**thinking**  15:*14*  41:*8*
**Third**  3:*15*  59:*8*
**thoroughly**  73:*4*
**thought**  36:*10*
**three**  15:*19*  32:*17*
**tied**  20:*21, 22*
**time**  1:*15*  2:*12*  9:*11*
10:*12, 25*  14:*11*
20:*22*  21:*12*  22:*22*
33:*4, 13*  34:*3, 11*
35:*2*  46:*3, 6, 9*  52:*10*
58:*20*  59:*3*  60:*24*
66:*2*  69:*9*  72:*10, 14*
75:*15*  76:*20*  77:*8, 20*
**times**  69:*4*
**timing**  53:*14*
**today**  9:*2, 25*  11:*25*
13:*10*  26:*13*  32:*3*
33:*10*  35:*20*  38:*4*
39:*14*  60:*15*  72:*17*
**told**  37:*20*  38:*18, 22*
65:*22*  73:*15*
**TORREY**  1:*13*  2:*9*
6:*6*  8:*5*  80:*12*
**total**  32:*23*
**track**  75:*17*
**transaction**  55:*15*
**transactions**  53:*3*
**transcribed**  2:*15*
9:*25*
**transcript**  78:*6*  80:*7*
81:*10*
**transcripts**  77:*18*
**transfer**  34:*12*
**transferred**  73:*5*
**transpired**  15:*1*
**tribunal**  62:*8*
**tried**  34:*15*

**true**  34:*3*  46:*2, 4, 5*
47:*24*  51:*21*  69:*5, 7*
80:*10*  81:*11*
**Trust**  3:*5*  4:*14*  5:*3*
9:*1*  13:*6, 9*  23:*11, 18,*
*22*  26:*5, 10, 14, 25*
27:*10*  30:*14, 15*  36:*8*
45:*12, 20*  49:*5*  67:*20*
71:*17, 18*  74:*5*
**Trustee**  3:*19*  34:*12*
51:*2*
**trustees**  70:*9*
**truth**  8:*7*
**try**  10:*10, 25*  72:*5*
**trying**  40:*14*  52:*7*
**two**  16:*19*  28:*6*
44:*12, 14*  46:*2, 4, 5*
51:*20*  69:*4, 7*
**types**  31:*22*
**typewriting**  81:*14*
**typically**  18:*23*

**< U >**
**ultimately**  15:*5*  18:*5,*
*7, 20*  19:*23*  24:*24*
28:*11*  31:*7*  41:*23*
75:*9*
**uncertainty**  67:*5*
**underlying**  18:*2*
21:*20*  32:*13, 16*
**understand**  9:*7, 24*
10:*6, 9*  29:*21*  34:*12*
43:*1*  44:*9*  49:*9*  50:*8*
53:*11*  54:*11*  58:*14*
66:*1, 22*  72:*19*  73:*3*
**understanding**  20:*6*
21:*8*  22:*18*  25:*2, 5*
31:*4*  32:*14, 16*  41:*4*
49:*14*  50:*12*  62:*18*
67:*14*
**unfair**  45:*5, 11, 15,*
*19*  46:*20*
**Unfortunately**  59:*9*
**UNITED**  1:*1*
**unpack**  15:*8*
**unsuccessfully**  32:*12*
**URQUHART**  3:*22*
**use**  28:*22*  37:*17*

**< V >**
**valuations**  34:*16*
**value**  15:*6*  22:*10, 12,*
*19*  28:*15, 16, 23, 24*
29:*5, 8, 9, 14*  30:*9*
35:*7, 11, 13*  36:*21*
37:*1*  54:*12*  73:*15, 24*
**values**  28:*12*
**various**  62:*23*
**vehicle**  18:*24*  19:*1*
33:*24*  50:*25*  55:*5*
71:*23*  72:*21*  73:*5*
**vehicles**  31:*22*
**verbatim**  10:*4*  41:*3*
58:*14, 17*
**veto**  61:*14*
**videoconferencing**  3:*2*
**video-conferencing**
2:*10*
**VIDEOGRAPHER**
5:*13*
**VIDEO-RECORDED**
1:*12*  2:*8*
**view**  52:*2*  63:*1*
**Vine**  4:*10*
**volume**  78:*2, 6*

**< W >**
**walk**  12:*25*
**want**  8:*12*  10:*17*
66:*12*  68:*16*  70:*20*
77:*17*
**wanted**  53:*5*  55:*21*
76:*14, 19*
**watching**  75:*16*
**way**  29:*21*  31:*24*
**wearing**  34:*18*
**Wednesday**  60:*18*
68:*7*
**week**  60:*3*
**Well**  14:*23*  18:*15*
22:*9*  24:*11*  38:*1*
41:*22*  42:*12*  52:*7*
68:*12*  73:*7*
**we're**  8:*18*  9:*1*  19:*6*
24:*6*  38:*14*  52:*11*
57:*11, 12*  68:*3*  69:*23*
**we've**  31:*13, 14*
34:*25*  45:*24*  64:*1*

69:*5*
**WINOGRAD**  3:*12*
**wish**  79:*3*
**WISHNEW**  4:*17*
**withdraw**  55:*24*
**withdrawn**  17:*15*
21:*23*  23:*15*  25:*4*
35:*17*  54:*4*  70:*23*
**witness**  8:*13*  21:*5*
27:*13*  58:*24*  69:*22*
**wondering**  48:*19*
**words**  49:*14*
**wore**  34:*18*
**working**  33:*19*  38:*4*
**world**  60:*23*
**worries**  8:*16*
**worth**  22:*13*  41:*5*
74:*12*
**wrapped**  29:*23*
**written**  10:*4*
**wrong**  39:*6, 12*
64:*14*  65:*22, 23*  66:*6,*
*13*
**wrongdoing**  65:*6*

**< Y >**
**Yeah**  12:*23*  13:*5*
14:*1*  15:*12*  17:*9, 18*
19:*11*  20:*9*  21:*5*
29:*13*  30:*1*  33:*22*
36:*14*  40:*5*  41:*7, 12*
43:*7*  45:*7*  47:*3, 5*
49:*16*  50:*5*  55:*2, 17*
58:*13*  63:*12*  66:*22*
68:*10*  69:*24*  70:*6*
71:*15*  73:*18, 23*
76:*13*
**year**  43:*24*  72:*22*
**years**  11:*14*  12:*8*
32:*12, 17*  37:*4, 25*
**York**  3:*16, 24*

**< Z >**
**ZIEHL**  3:*14*  5:*18*
**Zoom**  57:*19*

## WORD LIST

**< $ >**
$22  (1)
$23  (1)
$29  (1)
$300  (1)
$650  (1)
$7  (1)
$9  (5)

**< 1 >**
1  (2)
1.5  (1)
10010  (1)
10017-2024  (1)
11  (1)
1113  (1)
13  (3)
16  (2)
1600  (1)
1700  (1)
18  (2)
19-34054-sgj11  (1)
1st  (1)

**< 2 >**
2015  (2)
2019  (1)
2022  (1)
2025  (3)
21  (1)
212.849.7615  (1)
214.817.4500  (1)
22  (2)
225.381.9643  (1)
22nd  (1)
2390  (1)
23-plus  (1)
240  (1)

**< 3 >**
3:30  (2)
30(b)(6  (1)
300  (1)
301  (1)
310.277.6910  (1)
32  (1)
33  (2)

34  (1)
34th  (1)

**< 4 >**
4:42  (1)
4:49  (1)
4:50  (1)

**< 5 >**
51  (1)
58  (1)

**< 6 >**
67  (1)

**< 7 >**
70801  (1)
713.228.4100  (1)
75201  (1)
77002  (1)
780  (1)
7-year  (1)

**< 8 >**
8  (1)
8635  (3)

**< 9 >**
918,000  (1)

**< A >**
ability  (2)
able  (6)
absolutely  (4)
accommodate  (1)
accounts  (8)
acted  (3)
acting  (4)
action  (3)
actions  (4)
activity  (4)
actual  (1)
ADAMS  (1)
add  (1)
addition  (1)
administrative  (1)
Administrator  (1)
adverse  (1)
advised  (1)

advisor  (4)
advisor/control  (1)
advisors  (2)
affiliated  (1)
affiliates  (4)
affirmed  (1)
afternoon  (1)
ago  (3)
agree  (3)
agreed  (2)
agreed-upon  (1)
agreement  (57)
ahead  (2)
ahurt@kellyhart.com  (1)
allow  (3)
allows  (1)
alternative  (1)
AMELIA  (1)
amount  (4)
amounts  (1)
ample  (1)
analysis  (1)
annuities  (26)
annuity  (12)
ANSWER  (16)
answered  (2)
answers  (1)
Anybody  (11)
anyway  (2)
apologies  (1)
apologize  (2)
apologizing  (1)
apparent  (1)
appear  (3)
appeared  (2)
appointed  (1)
appreciate  (2)
approval  (4)
approve  (1)
approved  (10)
approximately  (1)
April  (1)
argumentative  (1)
arises  (1)
arm's-length  (4)
arranging  (1)
aside  (1)
asked  (2)

asking  (4)
aspect  (1)
aspects  (1)
assert  (1)
asset  (2)
assets  (34)
associated  (1)
Associates  (1)
assumed  (1)
assumption  (2)
Atlas  (19)
attached  (1)
Attorney  (143)
attorney-client  (2)
audited  (1)
auditors  (2)
authority  (2)
authorization  (1)
authorize  (1)
authorized  (3)
Avenue  (3)
avoidance  (3)
avoiding  (1)
aware  (32)

**< B >**
BA  (2)
back  (5)
balance  (5)
ballpark  (1)
BANKRUPTCY  (9)
BARTLETT  (1)
based  (6)
basis  (4)
Baton  (1)
Beacon  (1)
beginning  (1)
behalf  (22)
belief  (1)
believe  (62)
beneficial  (1)
benefit  (4)
benefited  (2)
best  (1)
beyond  (2)
billion  (1)
bit  (7)
board  (4)
boards  (1)

Case 19-34054-sgj11   Doc 4608-60   Filed 05/08/26   Entered 05/08/26 23:42:09   Desc
Exhibit 57   Page 43 of 48

Deposition of Torrey Littleton   In re Highland Capital Management, L.P.

breach  *(1)*
breached  *(1)*
break  *(3)*
bring  *(1)*
bringing  *(1)*
buy  *(2)*

< C >
CA-Certified  *(1)*
CA-CSR  *(2)*
call  *(6)*
called  *(2)*
capable  *(1)*
capacity  *(4)*
CAPITAL  *(16)*
care  *(1)*
carefully  *(1)*
carry  *(1)*
Case  *(4)*
cash  *(2)*
casual  *(1)*
cause  *(3)*
causing  *(2)*
caveat  *(1)*
Cayman  *(4)*
Central  *(3)*
certain  *(6)*
CERTIFICATE  *(1)*
Certified  *(3)*
certify  *(2)*
CFO  *(9)*
chance  *(1)*
CHANGE  *(9)*
changes  *(4)*
Chapter  *(1)*
charitable  *(9)*
charities  *(2)*
charts  *(1)*
claim  *(4)*
Claimant  *(16)*
claims  *(4)*
CLARITY  *(2)*
clawback  *(2)*
clawing  *(2)*
clear  *(2)*
clearly  *(2)*
colleague  *(1)*
combination  *(1)*
Come  *(1)*

comfort  *(1)*
comfortable  *(1)*
commenced  *(3)*
comment  *(1)*
communicate  *(2)*
communicated  *(2)*
communication  *(3)*
communications  *(2)*
community  *(3)*
company  *(1)*
compensate  *(1)*
compensates  *(1)*
complicated  *(1)*
complies  *(1)*
computer  *(1)*
concern  *(3)*
concerned  *(2)*
concerns  *(3)*
concluded  *(1)*
conference  *(1)*
confirm  *(1)*
confused  *(1)*
connection  *(1)*
consent  *(10)*
consequential  *(1)*
consider  *(2)*
consideration  *(1)*
considering  *(2)*
constituted  *(1)*
consummation  *(2)*
Cont'd  *(2)*
contemplating  *(1)*
contends  *(2)*
context  *(1)*
contract  *(4)*
contracts  *(4)*
contractual  *(2)*
contribution  *(1)*
contributions  *(1)*
control  *(6)*
controlled  *(3)*
conversation  *(7)*
conversations  *(5)*
conversion  *(1)*
convert  *(1)*
converted  *(6)*
convoluted  *(1)*
copies  *(1)*
copy  *(1)*

correct  *(36)*
corrections  *(2)*
correctly  *(1)*
corresponding  *(1)*
counsel  *(3)*
counterparty  *(1)*
couple  *(3)*
course  *(2)*
COURT  *(13)*
Court-appointed  *(1)*
CRAWFORD  *(1)*
create  *(1)*
created  *(3)*
cross-talk  *(1)*
Crown  *(45)*
CRR  *(2)*
cumbersome  *(1)*
current  *(1)*
Currently  *(1)*
CURRY  *(2)*

< D >
DAF  *(2)*
DALLAS  *(116)*
D'AMBRA  *(1)*
data  *(1)*
DAVID  *(1)*
day  *(2)*
dcurry@okinadams.com  *(1)*
deal  *(1)*
debate  *(1)*
Debtor  *(3)*
decided  *(1)*
decision  *(3)*
decision-making  *(1)*
decisions  *(7)*
Defendant  *(2)*
Delaware  *(1)*
delivered  *(1)*
DEMO  *(1)*
depends  *(1)*
DEPONENT  *(1)*
deposed  *(1)*
DEPOSITION  *(6)*
depositions  *(1)*
describe  *(1)*
described  *(2)*
describing  *(1)*

detail  *(1)*
details  *(1)*
determine  *(1)*
device  *(1)*
DIAZ  *(4)*
difference  *(1)*
different  *(4)*
Diplomate  *(2)*
DIRECT  *(7)*
direction  *(1)*
directly  *(12)*
director  *(1)*
directs  *(1)*
disapprove  *(1)*
discovery  *(2)*
discussion  *(1)*
disposition  *(2)*
distribute  *(1)*
distributions  *(5)*
DISTRICT  *(1)*
diverting  *(1)*
dividends  *(1)*
DIVISION  *(1)*
document  *(3)*
documentation  *(2)*
DOCUMENTS  *(6)*
doing  *(5)*
dollar  *(1)*
dollars  *(7)*
Dondero  *(6)*
Dondero's  *(1)*
donor-advised  *(2)*
dressing  *(1)*
due  *(1)*
Dugaboy  *(3)*
duly  *(1)*
duration  *(1)*
duties  *(7)*
duty  *(13)*

< E >
earlier  *(3)*
easier  *(1)*
economic  *(12)*
elaborate  *(1)*
emails  *(1)*
EMANUEL  *(1)*
employed  *(1)*
employment  *(1)*

Empower  (33)
enabled  (1)
engaged  (2)
enraptured  (1)
ensure  (1)
enter  (3)
entered  (3)
entering  (10)
entire  (1)
entities  (48)
entity  (6)
entry  (1)
Errata  (1)
ESQ  (10)
established  (1)
event  (1)
evidence  (1)
exact  (1)
EXAMINATION  (2)
examined  (1)
example  (1)
exchange  (1)
excuse  (1)
execution  (2)
exercise  (3)
exercised  (5)
exercising  (2)
Exhibit  (2)
EXHIBITS  (1)
expect  (2)
expectation  (3)
expense  (2)
expenses  (1)
expert  (1)
expired  (1)
explain  (1)
explained  (1)
exposure  (1)
extend  (1)
extent  (2)

< F >
fact-finding  (1)
facts  (28)
fail  (1)
fair  (42)
faith  (1)
familiar  (10)
Family  (8)

fan  (2)
February  (2)
fee  (1)
feed  (1)
feedback  (1)
feeds  (1)
feel  (2)
felt  (1)
fiduciary  (16)
file  (5)
filed  (12)
filing  (7)
finance  (2)
financial  (5)
financially  (1)
finish  (3)
firm  (1)
first  (5)
five-minute  (1)
fixed  (8)
Floor  (2)
flow  (7)
flows  (2)
fluctuations  (1)
focus  (2)
focused  (1)
Focusing  (2)
following  (2)
follows  (1)
foregoing  (3)
form  (53)
formal  (2)
formed  (1)
forth  (1)
Foundation  (101)
foundations  (3)
Foundation's  (20)
full  (1)
Fund  (18)
funded  (2)
funding  (2)
funds  (4)
fund's  (1)
Further  (2)
future  (6)

< G >
Gail  (7)
gdemo@pszjlaw.com

 (1)
generally  (2)
gentleman  (1)
getting  (2)
give  (10)
given  (4)
gives  (2)
glance  (1)
Global  (44)
go  (10)
goal  (1)
going  (23)
Good  (4)
good-faith  (6)
governing  (5)
granting  (2)
grant-making  (1)
grants  (1)
GREGORY  (1)
grow  (1)
guaranteed  (1)
guy  (1)

< H >
half  (1)
HALL  (1)
HALLMAN  (1)
happen  (1)
happened  (4)
hard  (1)
harm  (1)
HART  (1)
hat  (1)
hats  (1)
HAYLEY  (1)
head  (2)
hear  (3)
heard  (3)
held  (5)
helped  (1)
Hey  (1)
high  (2)
HIGHLAND  (59)
Highland's  (2)
high-level  (2)
historical  (1)
HMIT  (65)
hold  (7)
Holdco  (2)

holdings  (1)
holds  (1)
honest  (1)
Hospitality  (1)
Houston  (1)
Hunter  (18)
HURT  (1)
hwinograd@pszjlaw.c
om  (1)

< I >
idea  (5)
identify  (2)
IDF  (8)
imagine  (3)
impact  (29)
impacted  (5)
impactful  (1)
impacts  (3)
implicated  (1)
important  (3)
including  (1)
income  (10)
increased  (1)
independent  (1)
INDEX  (1)
indicate  (1)
indirect  (7)
indirectly  (4)
Indiscernible  (1)
individual  (11)
individuals  (2)
infirmity  (1)
inform  (5)
information  (12)
informed  (6)
informing  (1)
Inghram  (4)
inquired  (1)
inquiry  (2)
insertion  (1)
insight  (1)
instruct  (1)
INSTRUCTION  (1)
INSTRUCTIONS  (1)
Insurance  (12)
interest  (34)
interested  (3)
interests  (3)

internal *(1)*
introduced *(1)*
inured *(1)*
invest *(1)*
invested *(1)*
Investment *(18)*
investments *(7)*
involved *(1)*
Islands *(3)*
issuer *(1)*
its *(5)*

< J >
JAMES *(1)*
January *(1)*
JEFFREY *(1)*
Jim *(2)*
jmorris@pszjlaw.com *(1)*
JOHN *(4)*
joint *(12)*
JONES *(2)*
jpomerantz@pszjlaw.com *(1)*
JULIE *(4)*
June *(2)*
jurisdiction *(1)*

< K >
KELLY *(1)*
key *(1)*
kind *(13)*
know *(76)*
knowing *(2)*
knowledge *(4)*

< L >
L.P *(1)*
LANG *(3)*
language *(1)*
large *(1)*
late *(1)*
law *(2)*
lawsuit *(5)*
lawyer *(4)*
lay *(1)*
lead *(1)*
lean *(1)*
leaned *(1)*

learn *(1)*
leave *(2)*
led *(1)*
left *(2)*
legal *(14)*
legally *(2)*
level *(2)*
liability *(2)*
Life *(4)*
likelihood *(1)*
Limited *(3)*
LINE *(6)*
liquidation *(1)*
liquidators *(12)*
liquidity *(1)*
listen *(1)*
lists *(1)*
Litigation *(5)*
little *(7)*
LITTLETON *(12)*
LLP *(3)*
LOIGMAN *(1)*
long *(4)*
longer *(1)*
look *(1)*
looked *(1)*
looking *(3)*
loss *(1)*
lost *(3)*
lot *(2)*
LOUIS *(1)*
Louisiana *(1)*
LP *(7)*
lphillips@kellyhart.com *(1)*

< M >
M&E *(3)*
Madden *(2)*
Madison *(1)*
Main *(2)*
making *(3)*
MANAGEMENT *(15)*
Mark *(9)*
MARKED *(3)*
market *(11)*
MARKS *(2)*
material *(2)*

Matt *(5)*
matter *(1)*
matters *(1)*
MATTTHEW *(1)*
mean *(1)*
means *(1)*
meet *(1)*
member *(1)*
met *(2)*
MICHAEL *(1)*
million *(18)*
mine *(1)*
minutes *(2)*
missed *(1)*
mlang@cwl.law.com *(1)*
MNPI *(1)*
mokin@okinadams.com *(1)*
moment *(1)*
money *(3)*
MORRIS *(79)*
motion *(9)*
Mountain *(19)*
move *(2)*
moved *(1)*
moving *(4)*
multiple *(1)*

< N >
name *(2)*
named *(1)*
NATHAN *(1)*
NECESSARILY *(2)*
need *(7)*
needed *(2)*
negatively *(3)*
negotiate *(1)*
negotiating *(1)*
negotiation *(4)*
negotiations *(4)*
neither *(1)*
never *(7)*
New *(4)*
newly *(1)*
news *(1)*
NexPoint *(1)*
nice *(1)*
nonpublic *(2)*

normal *(1)*
NORTHERN *(1)*
Notary *(1)*
notations *(1)*
NOTE *(1)*
notes *(4)*
notice *(1)*
notified *(1)*
November *(1)*
NUMBER *(2)*

< O >
object *(53)*
objecting *(1)*
objection *(22)*
objections *(1)*
obligation *(10)*
obligations *(6)*
obtain *(6)*
obtained *(2)*
occasions *(1)*
officer *(1)*
official *(12)*
officially *(1)*
Oh *(2)*
Okada *(33)*
okay *(51)*
OKIN *(71)*
once *(1)*
opine *(8)*
opined *(1)*
opinion *(3)*
opportunity *(4)*
option *(11)*
order *(3)*
org *(1)*
organization *(8)*
organizational *(1)*
organizations *(27)*
orgs *(1)*
originally *(1)*
originated *(1)*
outcome *(1)*
outlined *(1)*
outside *(3)*
overall *(2)*
overseeing *(1)*
oversight *(4)*
owes *(6)*

owned  (5)
ownership  (9)
owns  (2)

< P >
p.m  (5)
PACHULSKI  (2)
Pacific  (1)
PAGE  (7)
paid  (3)
paragraph  (7)
part  (13)
participate  (2)
particular  (2)
parties  (11)
partnership  (1)
party  (3)
patience  (1)
Patrick  (27)
Patrick's  (2)
PAUL  (1)
pay  (5)
payments  (3)
payout  (2)
payouts  (2)
PE  (2)
peace  (2)
pending  (2)
percentage  (1)
period  (2)
permission  (2)
person  (6)
personally  (2)
persons  (1)
pertaining  (1)
pertinent  (1)
PHILLIPS  (3)
piece  (1)
place  (2)
plan  (1)
planned  (1)
platform  (2)
play  (3)
played  (1)
plays  (1)
please  (3)
PLLC  (1)
point  (1)
policies  (4)

policy  (4)
POMERANTZ  (1)
portfolio  (1)
portfolios  (1)
portion  (3)
positive  (1)
possibility  (2)
potential  (2)
potentially  (3)
preparation  (1)
present  (3)
preserve  (1)
President  (2)
prevent  (2)
PREVIOUSLY  (2)
primarily  (1)
prior  (1)
privilege  (1)
privileged  (1)
privy  (1)
probably  (2)
problematic  (2)
proceeding  (1)
proceedings  (5)
process  (4)
produce  (1)
produced  (1)
product  (4)
PRODUCTION  (1)
projected  (1)
proper  (1)
proposed  (13)
proposing  (1)
propounded  (1)
protect  (1)
provide  (1)
provided  (2)
providing  (1)
Public  (1)
pull  (1)
pulling  (1)
purpose  (2)
pursued  (1)
pushed  (1)
put  (20)
putting  (1)

< Q >
quarter  (1)

quarterly  (2)
question  (13)
questionable  (2)
QUESTIONS  (11)
quicker  (1)
QUINN  (1)
QUOTATION  (1)
quotations  (1)
QUOTE  (2)

< R >
Rand  (8)
Rand's  (1)
range  (1)
RAVER  (1)
RDR  (2)
reach  (1)
read  (6)
reading  (2)
really  (2)
Realtime  (3)
reason  (39)
reasonable  (1)
reasons  (3)
recall  (3)
receive  (10)
received  (4)
receives  (1)
Recess  (1)
recollection  (1)
recommendation  (3)
recommendations  (2)
record  (1)
recorded  (1)
recovered  (1)
reduced  (1)
refer  (2)
REFERENCED  (1)
referred  (2)
referring  (1)
refers  (3)
REFLECT  (1)
refresh  (1)
regardless  (2)
Registered  (2)
reiterated  (1)
related  (4)
relates  (4)
relationship  (9)

relax  (1)
release  (1)
releases  (4)
releasing  (1)
rely  (2)
remind  (1)
REMOTE  (3)
reorganization  (1)
repeat  (2)
rephrase  (2)
Reported  (1)
Reporter  (10)
REPORTER'S  (1)
reporting  (1)
represent  (1)
representative  (2)
representing  (1)
represents  (1)
REQUEST  (1)
required  (6)
research  (1)
respect  (7)
respectfully  (1)
respectively  (1)
responsibilities  (2)
responsibility  (3)
responsible  (1)
restate  (3)
restructuring  (6)
result  (4)
review  (2)
reviewed  (2)
Right  (38)
rise  (3)
risk  (7)
ROBERT  (1)
robertloigman@quinn
emanuel.com  (1)
role  (6)
roll  (5)
rolled  (2)
rolls  (3)
roll-up  (1)
room  (1)
Rouge  (1)
roughly  (1)
Royal  (1)
RSA  (2)

< S >
sale *(4)*
saw *(1)*
says *(2)*
scheduled *(1)*
scope *(3)*
screen *(3)*
scroll *(1)*
scrutiny *(1)*
see *(8)*
seek *(3)*
seeking *(1)*
seeks *(2)*
seen *(4)*
SEERY *(1)*
segregated *(6)*
sell *(2)*
selling *(1)*
sent *(1)*
sentence *(3)*
series *(1)*
serve *(1)*
served *(1)*
set *(4)*
settle *(1)*
settled *(1)*
settlement *(68)*
settlements *(3)*
settling *(1)*
share *(2)*
shares *(5)*
sharing *(1)*
SHAWN *(1)*
sheet *(6)*
shifting *(1)*
short *(2)*
Shorthand *(3)*
sign *(2)*
signed *(3)*
significant *(5)*
similar *(1)*
sir *(87)*
sit *(1)*
situation *(1)*
six *(1)*
Skyview *(1)*
sleep *(1)*
smoothly *(1)*
sold *(5)*

sole *(2)*
solely *(2)*
somewhat *(1)*
Sorry *(9)*
sought *(1)*
Sounds *(2)*
source *(2)*
speak *(4)*
speculate *(2)*
speculation *(1)*
speed *(1)*
spoke *(1)*
spoken *(1)*
standpoint *(2)*
STANG *(2)*
start *(1)*
starting *(1)*
state *(4)*
stated *(2)*
statement *(3)*
statements *(3)*
STATES *(2)*
Stenographically *(3)*
stewardship *(1)*
STIPULATIONS *(1)*
stream *(3)*
streams *(1)*
Street *(2)*
strike *(1)*
structure *(13)*
structures *(1)*
stuff *(2)*
sub *(1)*
subject *(4)*
Subtrust *(1)*
succeed *(3)*
succeeding *(1)*
successful *(1)*
sue *(1)*
suggest *(2)*
Suite *(3)*
SULLIVAN *(1)*
sum *(1)*
summary *(1)*
Sunday *(4)*
supervision *(1)*
supplied *(1)*
SUPPORT *(1)*
supporting *(30)*

supposed *(1)*
Sure *(6)*
surprised *(1)*
sworn *(1)*
Systems *(1)*

< T >
take *(9)*
taken *(5)*
takes *(2)*
talked *(2)*
talking *(2)*
team *(7)*
tell *(5)*
telling *(1)*
tenure *(4)*
terms *(3)*
testified *(1)*
testify *(1)*
testimony *(3)*
TEXAS *(3)*
Thank *(4)*
Thanks *(1)*
therefor *(1)*
thing *(2)*
things *(8)*
think *(50)*
thinking *(2)*
Third *(2)*
thoroughly *(1)*
thought *(1)*
three *(2)*
tied *(2)*
time *(31)*
times *(1)*
timing *(1)*
today *(12)*
told *(5)*
TORREY *(5)*
total *(1)*
track *(1)*
transaction *(1)*
transactions *(1)*
transcribed *(2)*
transcript *(3)*
transcripts *(1)*
transfer *(1)*
transferred *(1)*
transpired *(1)*

tribunal *(1)*
tried *(1)*
true *(10)*
Trust *(24)*
Trustee *(3)*
trustees *(1)*
truth *(3)*
try *(3)*
trying *(2)*
two *(10)*
types *(1)*
typewriting *(1)*
typically *(1)*

< U >
ultimately *(10)*
uncertainty *(1)*
underlying *(4)*
understand *(17)*
understanding *(13)*
unfair *(5)*
Unfortunately *(1)*
UNITED *(1)*
unpack *(1)*
unsuccessfully *(1)*
URQUHART *(1)*
use *(2)*

< V >
valuations *(1)*
value *(21)*
values *(1)*
various *(1)*
vehicle *(8)*
vehicles *(1)*
verbatim *(4)*
veto *(1)*
videoconferencing *(1)*
video-conferencing *(1)*
VIDEOGRAPHER *(1)*
VIDEO-RECORDED *(2)*
view *(2)*
Vine *(1)*
volume *(2)*

< W >

walk  *(1)*
want  *(6)*
wanted  *(4)*
watching  *(1)*
way  *(2)*
wearing  *(1)*
Wednesday  *(2)*
week  *(1)*
Well  *(10)*
we're  *(10)*
we've  *(6)*
WINOGRAD  *(1)*
wish  *(1)*
WISHNEW  *(1)*
withdraw  *(1)*
withdrawn  *(7)*
witness  *(5)*
wondering  *(1)*
words  *(1)*
wore  *(1)*
working  *(2)*
world  *(1)*
worries  *(1)*
worth  *(3)*
wrapped  *(1)*
written  *(1)*
wrong  *(7)*
wrongdoing  *(1)*

< Y >
Yeah  *(41)*
year  *(2)*
years  *(6)*
York  *(4)*

< Z >
ZIEHL  *(2)*
Zoom  *(1)*