**EXHIBIT 58**

## Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

§

In re                          § Chapter 11

HIGHLAND CAPITAL MANAGEMENT, L.P,   § Case No. 19-34054-sgj11

Reorganized Debtor.            §

§

-------------------------------------------------

ORAL DEPOSITION OF

MARK PATRICK

JUNE 23, 2025

(Reported remotely)

-------------------------------------------------

ORAL DEPOSITION OF MARK PATRICK, produced as a witness duly sworn by me at the instance of the Defendant, taken in the above-styled and numbered cause on the 23RD day of June, 2025, from 12:05 p.m. to 1:14 p.m., via Zoom videoconference before Ida Alcala, Certified Shorthand Reporter No. 12565, in and for the State of Texas, reported by oral stenographic means, pursuant to the Texas Rules of Civil Procedure, and the provisions stated on the record or attached hereto.

## Page 2

APPEARANCES

Mr. Sawnie A. Mcentire    (Via Videoconference)
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Ave Ste 4400
Dallas, Texas 75201-7324
214-237-4300

Mr. Michael Lang          (Videoconference)
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave Ste 2390
Dallas, Texas 75201
214-817-4500

Mr. Louis M. Phillips     (Via Videoconference)
KELLY HART ATTORNEYS AT LAW (LOUISIANA)
Baton Rouge Office
301 N. Main Street Ste. 1600
Baton Rouge, LA 70801
225-381-9643

Mr. John R. Morris        (Via Videoconference)
ATTORNEY AT LAW
P.O. Box 470472
Fort Worth, Texas 76147-0472
817-262-7762

Ms. Deborah A. 'Deborah' Newman  (Via Videoconference)
NEWMAN LAW FIRM
245 W. 18th Street
Houston, Texas 77008-4005
713-942-2501

Mr. Matthew Okin          (Via Videoconference)
OKIN ADAMS LLP
1113 Vine St Ste 240
Houston, Texas 77002-1044
713-228-4100
(CONTINUED ON NEXT PAGE)

## Page 3

(CONTINUED)

Mr. Andrew Kohl 'Drew' York     (Via Videoconference)
GRAY REED & MCGRAW
1601 Elm St. Ste 4600
Dallas, Texas 75201-7212
469-320-6114

Ms. Kathryn George              (Via Videoconference)
LATHAM AND WATKINS LLP
Chicago Office
330 North Wabash Avenue Ste 2800
Chicago, IL 60611
312-876-7700

ALSO PRESENT:

Ms. Amelia Hurt                 (Videoconference)
Mr. Jeff Pomerantz              (Videoconference)
Mr. Gregory Demo                (Videoconference)

## Page 4

I N D E X

PAGE

WITNESS: MARK PATRICK

Appearances............................... 2

Examination by Mr. Lang.................... 5

Examination by Mr. York................... 24

Further Examination by Mr. Lang........... 42

Changes and Signature..................... 44

Reporter's Certification.................. 46

INFORMATION REQUESTED TO BE FURNISHED

(None)

EXHIBITS INDEX

COUNSEL FOR DUGABOY INVESTMENT TRUST

| EXHIBITS | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 1 | Charitable DAF/CLO HoldCo Structure Chart | 8 |
| 2 | Rand Structure Chart | 8 |
| 3 | Proposed settlement agreement | 16 |



MARK PATRICK
IN RE: HIGHLAND CAPITAL MNGMT

June 23, 2025
5—8

Page 5

PROCEEDINGS

MARK PATRICK,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. LANG:

Q. Please state your name for the record.

A. Mark Patrick.

Q. And, Mr. Patrick, how are you currently employed?

A. I -- what do you mean by --

Q. Who's your -- who do you work for?

A. I work for DAF entities.

Q. And when you say the DAF entities, can you be more specific into which entities that are?

A. You know, there -- it's just a group of entities that hold investment assets for charitable purposes.

Q. Specifically, do you have the names of these entities?

A. Some -- some of them such as CLO HoldCO.

Q. Anybody else?

A. Liberty, I think. Charitable DAF HoldCo Inc, US entity, Charitable DAF Fund LP. I'm probably missing several others. It's a sophisticated structure, but that's generally the gist of when I refer to DAF entities.

Q. And what about Hunter Mountain? Are you employed by Hunter Mountain?

Page 6

A. Well, no -- I know -- I appreciate that. I'm -- like, when I think of employment, I'm also the preferred manager for Wind Advisers, which is an investment adviser that advises investment funds -- and then -- so then I have roles and that's why when you ask about employment, you know, there's -- it's kind of a different question than roles.

Q. That's fair. Tell you what. Why don't I put up a work chart and we'll talk through it. Will that work?

A. Yeah, I'll take a look anything.

Q. Okay. Do you see this chart?

A. Yes, I do.

Q. Okay. So this is the charitable DAFs, you know, the whole structure comp chart. Do you see that at the top?

A. Yes.

Q. Okay. Is this how the DAF CLO HoldCo structure currently looks today?

A. No, it does not.

Q. Okay. What is different?

A. Well, there's a lot of differences. I'd have to kind of see the specific documentation to be exact.

Q. Well, can you generally describe the -- the changes that have been made to this flowchart?

MR. MCENTIRE: I'll object as to form and relevance.

Page 7

A. Yeah. I mean, I -- I think I have already, you know, with respect to the listing of entities. You'd have to show me some documents with respect to these entities and I can, you know, walk you through it.

Q. Would charitable DAF GP LLC still the GP for charitable DAF CLO Co?

A. I don't -- I don't recall precisely and I, you know, I want -- I want to be -- when I give you an answer, a hundred percent accurate.

Q. Okay. Does charitable DAF Fund LP still own a hundred percent of CLO Hold Co?

A. Yes, that is my understanding.

Q. And this charitable DAF CLO CO limited still own a hundred percent of charitable DAF Fund LP?

MR. MCENTIRE: Objection, form.

A. No.

Q. (By Mr. Lang) Okay. Charitable DAF FUND LP, is that owned by CDM CFAD LLP?

MR. MCENTIRE: Objection, form.

A. That's my general -- that's my general understanding.

Q. (By Mr. Lang) Okay. And who owns CDM CFAD LLC?

A. Yeah, again, without corporate documents that you can present to me, I -- you know -- I -- I just don't want to be inaccurate.

Page 8

Q. Does DFW Charities own CDM CFAD LLC?

MR. MCENTIRE: Objection, form. Relevant.

A. Yeah, again, you know, Mr. Lang, you know, there are several entities in this structure, and I -- I just don't want to go beyond what I have a hundred percent knowledge of.

Q. I'm sharing this charitable DAF CLO CO structure chart as Exhibit 1, to be fair. And this is a RAND structured chart, which I'm marking as Exhibit 2. Do you recognize this document?

MR. MCENTIRE: Mark, at this time he's only asking whether you recognize it.

A. Yeah, I haven't made it to the bottom, I apologize.

MR. MCENTIRE: Okay.

A. What is the question now?

Q. (By Mr. Lang) Well, do you recognize this organizational structure? Let me change the question.

A. Do I recognize this structure. Generally -- very generally.

Q. Okay. And starting at the top, charitable DAF Holdings Corp, do you see that box?

A. Yes, I do.

Q. Is that owned by CLO HOLD CO?

MR. MCENTIRE: Objection, form.

A. I don't know -- I don't know. I can't recall



MARK PATRICK
IN RE: HIGHLAND CAPITAL MNGMT

June 23, 2025
9–12

Page 9

precisely if there's other entities in -- in between that, you know, whether that links up to CLO Hold Co.

Q. (By Mr. Lang) Does CLO Hold Co indirectly own charitable -- charitable DAF holdings Corp.?

MR. MCENTIRE: Objection, form.

A. Yeah, again, I can't answer with accuracy here unless you showed me a corporate -- some actual corporate filings or something like that.

Q. (By Mr. Lang) Is this generally the structure for the RAND -- structure -- is it generally a structure it looks like today?

MR. MCENTIRE: Objection, form.

A. What part of the structure are you referring to, Mr. Lang?

Q. (By Mr. Lang) Well, the whole thing. Charitable DAF Holdings Corp?

A. No.

Q. Does it own Rand Advises LLC?

A. Yeah, can you restate that question, again?

Q. Does charitable DAF Holdings Corp, top box, the sole member of Rand Advisers LLC? The green box to the left.

A. Yes, that is -- that is my understanding.

Q. Okay. Does charitable DAF holdings Corp, the box at the top, is it still the sole member of Rand PD fund

Page 10

management LLC?

A. I would -- I would believe so.

Q. Okay. And is RAND PE fund management LLP still the general partner for RAND PE Fund One LP? See it just below it?

A. Yes, I would believe so.

Q. And then charitable DAF Holdings Corp, the box at the top, is it still the sole member for Atlas IDF GP PLLC?

MR. MCENTIRE: Objection, form.

A. Yes, I would believe so.

Q. (By Mr. Lang) Okay. And is Atlas IDF GP LLC still the general corporate for Atlas IDF LP?

MR. MCENTIRE: Objection, form?

A. Yes, I would believe so.

Q. (By Mr. Lang) Okay. And is Atlas IDF LP still the 99 percent limited partner for RAND PE FUND I LP?

MR. MCENTIRE: Objection, form.

A. I'm trying to recall because I have RAND PE FUND in a wind down situation. So I -- I don't know if that is accurate or not offhand.

Q. (By Mr. Lang) And does RAND PE FUND ONE LP still the sole member of Beacon LLC?

MR. MCENTIRE: Objection, form.

A. No.

Q. (By Mr. Lang) Okay. Who -- who owns Beacon

Page 11

Mountain LLC?

A. An entity called CLO HOLD CO LLC.

Q. And that's different than CLO HOLD CO limited?

A. Yes.

Q. Who owns CLO HOLD CO LLP?

A. I believe it's CLO HOLD CO limited, from my understanding.

Q. And the CLO HOLD CO LLC owned Hunter Mountain?

A. No.

Q. Who owns Hunter Mountain?

A. Beacon Mountain LLC. And I would clarify one thing. I -- it's beneficial -- it's a beneficial ownership. Hunter Mountain investment trust is a trust.

Q. Okay. I appreciate that.

A. Can you do -- if you don't mind, do a summary? I just want to make sure that we're sort of accurate here?

Q. Okay. From what I understand --

A. Yeah, from Beacon Mountain ownership. I just want to make sure you are understanding is --

Q. Beacon Mountain LLC is owned by CLO HOLD CO LLC?

A. Yes.

Q. Beacon Mountain LLC owns Hunter or -- Hunter Mountain Investment Trust is owned by Beacon Mountain LLP?

A. Yes.

MR. MCENTIRE: Objection.

Page 12

A. (inaudible) beneficial.

MR. MCENTIRE: Yeah, I would object to mischaracterizing his testimony.

MR. LANG: Nobody's mischaracterizing.

Q. (By Mr. Lang) The beneficial owner of Hunter Mountain Investment Trust.

A. Yeah, this is all a current state.

Q. Current state.

And what is your role with Hunter Mountain Investment Trust?

A. My understanding is I'm the -- an administrator which is a -- the control person for that trust.

Q. Are you the control person for Beacon Mountain LLP?

A. Yes.

Q. Are you the control person for CLO HOLD CO LLC?

A. Yes.

Q. Are you the control person for RAND Advisers LLC?

A. Yes.

Q. Are you the control person for RAND PE FUND Management LLC?

A. Yes.

Q. Are you the control person for Atlas IDF GP LLC?

A. Yes.

Q. Are you the control person for the Charitable DAF Holdings Corp?



MARK PATRICK
IN RE: HIGHLAND CAPITAL MNGMT

June 23, 2025
13–16

Page 13

A. Yes.

Q. And you're the control person for Charitable DAF Fund LP?

I'll -- I'll go back here.

MR. MCENTIRE: Objection, form.

Q. (By Mr. Lang) Are you the control person for Charitable DAF Fund LP?

MR. MCENTIRE: Objection, form.

A. It's -- no, but you should ask me a follow-up question.

Q. What's your role at Charitable DAF Fund LP?

A. Yeah, I'm the control person for the general partner of that limited partnership.

Q. And who's the general partner of the limited partnership?

A. Yeah, and then this is where my memory is -- is -- I'd have to kind of revisit the actual organizational documents to give you a confident a hundred percent answer.

MR. MCENTIRE: Yeah, Mark, let's don't -- let's don't speculate unless he has a document, okay?

A. Yes.

Q. (By Mr. Lang) Are you the control person for CDMCFAD LLC?

MR. MCENTIRE: Can you repeat the question, I didn't hear it, Mr. Lang.

Page 14

Q. (By Mr. Lang) Mr. Patrick, are you the control person for CDMCFAD LLC?

A. I believe I am.

Q. Does that stand for anything out of curiosity?

A. I don't remember.

Q. All right.

MR. PHILLIPS: Objection, formatting.

Q. (By Mr. Lang) Did you -- you negotiated the settlement agreement that is the subject of (inaudible) correct?

A. Correct.

Q. Did you initiate settlement discussion with about events?

A. What do you mean by initiate.

Q. Well, did you approach them about settlement or did they approach you?

A. I'm sorry, you were slightly muffled there.

Q. I said did they approach you about settling or did you approach them about a potential settlement?

MR. PHILLIPS: Objection to the form of the question?

A. I can't -- I can't recall offhand. Who approached who or -- yeah.

Q. Under the settlement agreement, Hunter Mountain is to receive among other things the Dugaboy note and the

Page 15

Kirschner claims. Do you know what I'm referring to when I refer to the Dugaboy note and the Kirschner claims?

A. I -- I would appreciate it if you could pull up the -- the Dugaboy note document that you are referring to. There's an awful lot of Dugaboy notes out there, and -- and as a starter and I'd also appreciate if you could pull up for me the -- what you're referring to as the Kirschner Litigation complaint.

Q. I'm referring to what's in the settlement agreement. It refers to the Dugaboy note --

A. Well, then the document speaks for itself, sir. If you want to show me the document, I'll definitely testify to the accuracy of what I signed.

Q. I'm asking if you know what I'm referring to when I refer to the Dugaboy note and the Kirschner claims as re restricted at that point out from Patricia claims as referenced in the settlement agreement.

A. Yeah, and I'm asking you to show me the settlement agreement with the lines and then I -- and I'll verify that for you if you don't mind.

There's a lot of Dugaboy notes out there you have to appreciate that, Mr. Lang.

Q. Which one have you bargained to receive in the settlement agreement?

A. And -- and there's a lot of Kirschner litigation as

Page 16

well.

Q. Well, the Kirschner litigation is that -- Styled Kirschner versus Dondero Adversary Proceeding 2103076.

Are you familiar with that one?

A. I'm not familiar with that caption. If you could just show me the document that you're -- the complaint that you're referring to, then I will say that is -- that is the litigation that -- that we negotiated for.

Q. Okay.

A. You can bring up the settlement agreement, I'll happily verify that whatever is referenced in there is what I negotiated for, but I'm not gonna broad brush generically say that I negotiated for some Dugaboy note without a little more precision, if you don't mind.

Q. Can you see my screen?

A. Here we go. Yes.

Q. Okay. When I refer to the Dugaboy note, that's the note that I'm referring to. Does that help you?

MR. MCENTIRE: Well, for the record, Mr. Lang, can we just identify that you have put up the actual settlement agreement, is that correct?

MR. LANG: Yes. Sorry. Exhibit 3 will be the settlement agreement. The proposed settlement agreement.

A. Yes, so you're having me refer to the Dugaboy note dated May 31st, 2017, with a face amount of roughly



MARK PATRICK
IN RE: HIGHLAND CAPITAL MNGMT

June 23, 2025
17–20

Page 17

24 million as the maker and with Highland Capital Management collectively as the payee. That's what -- that's what you're referring me to.

Q. That's what I'm referring you to.

A. And what is your question?

Q. I'm -- I was just asking if you understand what I'm referring to when I say the Dugaboy note?

A. Okay. I understand now what you're referring to.

Q. And then the Kirchner claims are -- means all claims and causes of action that were asserted or could've been asserted by litigation trustee or the litigation subtrust in the capital amended. Do you see that?

A. Yes, I do.

Q. Okay. Let's go up and see the amenities claims. The amended complaint means the Amended Complaint and objection to claims Docket number 158 in Kirschner versus Dondero adversary proceeding 21-03076, do you see that?

A. Yes, I do.

Q. Okay. So if I refer to the Kirchner claims, you know what I'm referring to now?

A. Yes, I do. Thank you.

Q. Okay. How does Hunter Mountain value the Kirchner claims?

MR. MORRIS: Objection to the form of the question.

Page 18

A. Hunter Mountain is a non-living entity. It's a trust.

Q. (By Mr. Lang) Have you valued the Kirchner claims?

A. I have not had an appraised evaluation. I'm not qualified to appraise value.

Q. Do you have an estimated value of the Kirchner claims?

A. Estimate. Estimate. Who? Are you asking if I've estimated the value?

Q. Yes.

A. Of the Kirchner claim?

Q. Yes.

A. No.

Q. Have you done anything to determine the value of the Kirchner claims?

A. No.

Q. What does Hunter Mountain plan to do with the Kirchner claims after the settlement agreement if it's approved?

MR. MCENTIRE: Objection to the form of the question.

MR. PHILLIPS: Objection, form.

A. So you're asking me to speculate about my future actions --

Q. (By Mr. Lang) I'm not asking you --

Page 19

A. -- with respect that claim?

Q. What does Hunter Mountain plan to do with the Kirschner claims if the settlement agreement is pursued or --

A. What do you mean by plan?

Q. What is it's intention to do with the Kirschner claims if the settlement agreement is approved?

MR. PHILLIPS: Objection, form.

A. And again, what do you mean by to do?

Q. (By Mr. Lang) What -- are you going to dismiss the claims?

A. I don't -- I won't be the owner of the claim so I couldn't dismiss it.

Q. Is Hunter Mountain going to dismiss the claim?

A. I wouldn't want to -- want to speculate.

Q. Do you have any plans whatsoever sitting here today on what you're going to do -- what Hunter Mountain is going to do with the Kirchner claim if the settlement agreement is approved?

MR. PHILLIPS: Objection, form.

MR. MCENTIRE: Joined objection.

A. And again, help me understand better what you mean by plan because, you know, I have a -- it's -- I have a lot of plans for the weekend, but whether I do it or not, you know, is fairly speculative. You just got to help me kind

Page 20

of understand what you mean by that.

Q. (By Mr. Lang) I mean, what is your intent? What do you plan to do with the Kirchner claims if the settlement agreement is approved. Why is it such a hard question to answer? It seems very basic?

MR. PHILLIPS: Objection, form.

A. To be fair, Mr. Lang, if the agreement -- the settlement agreement is approved, then Hunter Mountain will have ownership over that claim, and -- one thing -- I guess one thing that is certain that I can tell you as far as a plan is to evaluate and decide what we are going to do.

Q. (By Mr. Lang) And that means pursuing the claims?

MR. MCENTIRE: Objection, form.

A. Wait. I'm sorry. Say that, again.

Q. (By Mr. Lang) I said, and does that include potentially pursuing the claims?

A. By whom?

Q. Hunter Mountain.

A. Oh, pursuing the claim. Well, yes, I would imagine it -- it involves a range of options.

Q. And what -- what is within that range of options that you can think of sitting here right now?

MR. PHILLIPS: Objection, form.

A. I don't know because I'll reach out to my legal advisors and they'll give me a range of options, but, you



MARK PATRICK
IN RE: HIGHLAND CAPITAL MNGMT

June 23, 2025
21–24

Page 21

know, I would say either move forward or not or whatnot, but I'll let the legal advisors tell me.

MR. MCENTIRE: Yeah, Mark, let me jump in here. You can try to answer the question if you can to the extent you're not relying upon legal advice, okay? And so feel free to do that. If you have to rely upon legal advice, then I instruct you not to answer.

A. At some point in the future, I'll rely upon legal advice to determine what my range of options are.

Q. Has Hunter Mountain performed any analysis of the Dugaboy note?

A. Has Hunter Mountain performed any analysis regarding the Dugaboy note?

Q. Like the valve of the Dugaboy note.

A. Oh, has Hunter Mountain itself determined the --

Q. Yes.

A. -- the -- the value of it. We'll, again, it's an entity and it doesn't, you know, think for itself so I would say, no.

Q. Has anybody with Hunter Mountain analyzed  the value of the Dugaboy note?

A. Anybody with? Again, what you are -- I'm the administrator but -- are you talking about people with a role?

Q. Have you? Have you performed any analysis of the

Page 22

value of the Dugaboy note?

A. No, again, because I'm not a qualified appraiser.

Q. Have you requested anyone to provide an analysis of the valve of the Dugaboy note?

A. Yes.

Q. Who have you requested the value of Dugaboy note?

A. A qualified appraisal company.

Q. Who is that qualified appraisal company?

A. It's a company called Weaver.

Q. Okay. Have they provided you with an opinion on the value of the Dugaboy note?

A. No.

Q. When do expect them -- let me ask this, have they told you when they may be able to provide the opinion of a value of the Dugaboy note?

MR. PHILLIPS: Objection to form?

A. I can't -- I can't recall offhand when they'll provide me an evaluation on that Dugaboy note?

Q. (By Mr. Lang) Okay.

MR. LANG: I'll pass the witness.

MR. MCENTIRE: I'm sorry, Mr. Lang, I couldn't hear you. I apologize.

MR. LANG: I said -- I said I'll pass the witness.

I think David or there are other attorneys

Page 23

that have questions.

MR. MCENTIRE: Okay.

Is there anyone else who wants to ask Mr. Patrick any questions?

MR. PHILLIPS: Michael could you take down a document?

MR. LANG: Yup, sorry. Thank you.

MR. PHILLIPS: I read it seven times now.

MR. LANG: I got it. I forgot it was up.

MR. MCENTIRE: Anybody else have any questions for Mr. Patrick?

MR. YORK: Go ahead, Matthew.

MR. OKIN: Can everybody hear me okay?

MR. PHILLIPS: Yes.

MR. OKIN: I think, Louis, you and I have an agreement that we were going to postpone our asking questions til tomorrow, is that correct?

MR. PHILLIPS: Correct, at 2:00 o'clock, right? 2:00 o'clock, right?

MR. OKIN: 2:00 o'clock tomorrow. So we'll defer our questions. We are going to take Mr. Patrick's deposition when we recommence at 2:00 o'clock tomorrow.

MR. MCENTIRE: Okay. Anyone else have any questions of Mr. Patrick.

MR. YORK: So -- this is Drew York, I do.

Page 24

Mr. Phillips, are you okay with me going forward now.

MR. PHILLIPS: I think we -- I forgot, I didn't get a chance to tell you, Mr. York, that I think Mr. Patrick --

Mr. Patrick you want to -- we don't want to wait til 2:00, so --

THE WITNESS: Yeah, let's just keep going.

MR. PHILLIPS: We can keep going. We can move straight on to you. I just didn't know if he wanted a five minute break.

MR. YORK: Let's take five minutes. Let's do that. Let's go off the record, take a five-minute break and come back, how's that?

MR. PHILLIPS: Okay.

(Recess at 12:33 p.m.)

(Resume at 12:41 p.m.)

MR. YORK: Let's go on the record.

EXAMINATION

BY MR. YORK:

Q. Mr. Patrick, good afternoon, my name is Drew York and I represent Patrick Daugherty in this matter. Are you familiar with Mr. Daugherty?

A. Yes.

Q. And how do you know Mr. Daugherty?



Page 25

A. I knew him from Highland.

Q. Were you also employed at Highland at one point in time?

A. Yes.

Q. What position?

A. I was in the tax department.

Q. Okay. Did you have a title?

A. I was a tax professional.

Q. How long were you employed at Highland?

A. Oh, from 2008 to 2021.

Q. And were you always employed in the position as a taxpayer professional at Highland during that time?

A. Yes.

Q. You mentioned earlier in response to some questions from Mr. Lang that you're currently the administrator or control person for Hunter Mountain, is that correct?

A. Yes.

Q. Okay. When did you take on that role?

A. I believe in 2022.

Q. Did you have -- do you remember when in 2022?

A. I think the latter part of the summer.

Q. Did you have any role at Hunter Mountain trust prior to that time in 2022 when you became the administrator?

A. Can you ask that question one more time?

Page 26

Q. Sure. Did you have any role at the Hunter Mountain trust prior to the time you became the administrator in 2022?

(Zoom call froze)

THE COURT REPORTER: Is everyone still there?

A. -- recall specifically, you know, so I, you know, I had no formal role.

Q. Okay. When you say you would speak to Mr. Hanus from time to time when he was the administrator, can you describe for me what it was that you would be conferring with him about?

A. Probably would have to be -- involved taxes.

Q. And why was he conferring with you on that based on your -- I assume role at Highland at the time, right?

MR. MCENTIRE: Objection, form.

Q. (By Mr. York) Actually, that's fair. I'll back up and let me ask this question. Did Mr. Hanus reach out to you in his role as the administrator for the Hunter Mountain trust while you were still in the tax department at Highland?

A. I can't recall specifically, but I'm confident that he and I spoke on occasion.

Q. And what do you recall the two of you speaking about?

A. It had to involve tax -- some sort of tax related

Page 27

type questions.

Q. Did you have any other involvement with the Hunter Mountain Trust at all? Not even in a formal role, but any involvement with the Hunter Mountain Trust at all prior to your becoming the administrator in 2022?

A. No.

Q. Were you ever counsel for the Hunter Mountain Trust?

A. No.

Q. Were you ever counsel to the Hunter Mountain Trust in any fashion?

A. No.

Q. Did you ever conduct any tax analysis with regard to the Hunter Mountain Trust when you were at Highland?

A. I can't recall, specifically.

Q. Can you recall even if you did, when?

A. Well, it'd probably be around -- I mean, it would be when that trust was, you know, created and after it was created.

Q. When was the trust created?

A. I don't recall, specifically.

Q. Do you recall who came up with the idea to create the trust?

A. The idea to create the trust. You know what, I actually do.

Page 28

Q. Who was that?

A. It was Thomas Surgeon. That's what I seem to recall. He -- he wanted that trust created.

Q. Why?

A. Well, I can't recall specifically, but he was in the compliance department at Highland.

Q. Earlier today Mr. Lang showed you those organizational structure charts that we looked at. I think Exhibit 1 which was the charitable DAF structure chart. And I -- as I understood from your testimony the chart that he put up is no longer accurate. Do you know why it's changed?

MR. PHILLIPS: Objection, form.

MR. MCENTIRE: Following the objection. He's already asked and answered this question too.

A. I'm trying to remember when that exhibit was put in to place, but -- any variably kind of complex sophisticated corporate structures, you know, they're generally -- just don't -- a lot of different reasons for -- for structures to kind of shift throughout the years.

Q. (By Mr. York) And you don't recall specifically when those changes were made to the structure?

A. Well, I think there's -- I guess I'm trying to expresses this -- it's rather fluid. A lot of these kind of structures, you know, just for an example, sometimes you make an investment of certain types and so then you want to



MARK PATRICK
IN RE: HIGHLAND CAPITAL MNGMT

June 23, 2025
29–32

Page 29

have a special purpose vehicle formed for that investment, and, you know, to hold it, and it can be for a variety of reasons and purposes and whatnot. So that's what I'm kind of saying that, that these structures are always sort of fluid when you have a variety of investment holdings as one reason, and as, you know, tax law changes can influence development of structures, legal -- corporate legal changes. That's why it's -- it's a very complex structure that has a lot of different things, and so you really have to see it and snapshot it in time, you know, but -- but it's always evolving in light of different considerations.

Q. Let's switch gears. Did you have any involvement in the creation and development of the charitable DAF?

MR. MCENTIRE: Objection, form.

MR. PHILLIPS: Objection, form.

A. If you don't mind, could you be a little more specific to what you're referring to charitable DAF?

Q. (By Mr. York) Sure.

Mr. Lang, can you put up the chart for me please, Exhibit 1.

MR. PHILLIPS: I'm having a hard time -- I know there's not a question pending, but what does this have to do with the Daugherty objection?

MR. MCENTIRE: I don't think it has anything to do with the objection.

Page 30

So, Mr. Lang -- I mean, Mr. York, I don't know how we go here.

MR. PHILLIPS: We're not going to allow any kind of amendment to pleadings or by additional evidence and that sort of thing. I'm just having a hard time with this folderol about -- Daugherty has an objection, but this is not part of it.

MR. YORK: Take down the exhibit for now, I'll go a different route.

Mr. Patrick, have you read Mr. Daugherty objection to the proposed settlement between Highland and the HMIT entities?

A. Yes.

Q. Are you aware that Highland has separately filed an adversary proceeding against Mr. Daugherty?

A. I have an awareness, yes.

Q. Okay. Have you ever read the settlement agreement between Highland and Mr. Daugherty?

A. No.

Q. In the course of the negotiations of the proposed settlement between Highland and the HMIT entities, was there ever any discussions about Mr. Daugherty unresolved class a claim?

MR. PHILLIPS: Objection to form.

A. Yes.

Page 31

Q. (By Mr. York) When did those take place?

A. I believe during the period of the -- the discussions around the settlement.

Q. Before or after the settlement agreement -- I'm sorry, strike that. Before or after the motion for entry for approval of settlement was filed with the Bankruptcy Court?

A. Oh, I can't recall with that sort of precision.

Q. Did it come up before the parties, that is Highland and HMIT entities reached an agreement in principle to the proposed settlement?

A. Yes, I --

Q. Who brought it up?

A. Not me, is what I can say because it's nothing that was really in my radar screen.

Q. Was it brought up by anybody else on the HMIT entities side?

MR. PHILLIPS: Objection, form.

MR. MCENTIRE: Let me jump in here. I would object to the extent that he's asking you to talk about discussions you've had with Mr. Lewis or other attorneys representing Hunter Mountain. If you can answer that without making reference to any such privileged discussions, you can do so. Otherwise, I will instruct you not to answer.

Page 32

A. Yeah, no -- I mean, we had substantial all legal involvement and so I think a lot of those discussions -- I mean, it wasn't necessarily me, but is lawyers to lawyers.

Q. (By Mr. York) Did you ever have any communications yourself with anyone on the Highland side regarding Mr. Daugherty unresolved Class A claim in the bankruptcy?

A. I just remember generally speaking -- and it coming up in the settlement negotiations.

Q. I understand that. So is your answer then, no, you did not have any direct conversations with anyone from Highland regarding Mr. Daugherty Class A claim?

A. I wish I could be that precise. I just don't recall. Maybe.

Q. Well, if you did, who would those conversations have been with?

A. Yeah, I don't want to speculate.

MR. MORRIS: Objection form.

Q. (By Mr. York) Are you aware that Highland is engaged in a dispute with the IRS regarding its tax filings from 2008 to 2010?

A. Yes.

Q. Okay. And have you been aware of that since, you know, since the time that you became the administrator at Hunter Mountain Trust?

A. Yes.



MARK PATRICK
IN RE: HIGHLAND CAPITAL MNGMT

June 23, 2025
33–36

Page 33

Q. And before that?

A. Yes.

Q. All right. What is your understanding of that dispute?

MR. PHILLIPS: Objection, form.

A. That there's a proposed adjustment with respect to the Highland tax return for 2007 and 2008.

Q. Have you had any discussions with anyone from Highland regarding that dispute?

A. When?

Q. At any point in time.

A. Oh, yeah, when I was employed by Highland, yes.

Q. Okay. What about since?

A. When I was employed by Skyview.

Q. When you were employed by Skyview?

A. Yeah.

Q. Okay. Who owns Skyview?

A. My understanding is a Scott Ellington.

Q. Okay. And who did you have those conversations with?

A. Oh, outside counsel.

Q. Other than counsel, have you had discussions with anyone else about the IRS audit dispute?

A. Oh, I'm sure I have.

Q. Do you recall who?

Page 34

A. Not really, specifically.

Q. Do you recall the last time you did?

A. No.

Q. Do you recall what was said?

A. No.

Q. Are you familiar with what's known an FPAA, F-P-A-A?

A. Yes, I am.

Q. What does that stand for?

A. Final partnership administrator adjustment.

Q. And is that a document or form, I guess, that is issued by the IRS with respect to an audit?

A. Yes, it is.

Q. All right. Do you know whether an FPAA has been issued with regard to Highlands tax filings for 2007-2008?

A. I may have known, but I may have forgotten. That's -- so I don't want to say, I don't know because I just can't -- I can't recall, but I may have known.

Q. I'm not sure -- so you just don't know as you sit here?

A. Well, I'm saying I guess I can't remember, but it's within a realm of possibility that I may have known at some point.

Q. Have you seen it?

A. It's been many years, and that's why my memory

Page 35

isn't precise enough to give you kind of an affirmative.

MR. MCENTIRE: Mark, don't speculate if you don't remember.

A. Yeah.

Q. (By Mr. York) Have you ever had any discussions with anyone concerning the FPAA if one has actually been issued for either Highland's 2007 at 2008 tax returns?

MR. PHILLIPS: Objection, form.

A. Can you state that again?

Q. (By Mr. York) Sure. Have you ever had any discussions with anyone to the best of your recollection about an FPAA if one has actually been issued concerning Highland's either 2007 or 2008 tax returns?

A. Yeah, I don't recall. If I have or have not, I just don't remember.

Q. You were asked earlier by Mr. Lang about who reached out first on the settlement discussions. Am I correct the settlement discussions between Highland and Hunter Mountain began sometime in, I think, March of this year? Is that right?

A. I -- I don't know with absolute precision, like, I was thinking April.

Q. Did you personally have any direct negotiations with anyone on the Highland side?

MR. MORRIS: Objection.

Page 36

A. Yes.

Q. (By Mr. York) Who was that?

A. Wait, so restate your question again.

Q. Yeah, my question was did you -- did you have any direct negotiations with anyone on Highland side relating to the proposed settlement?

A. Yes, I did.

Q. And my question then was, who --

MR. MCENTIRE: Objection.

A. The professionals at Highland.

Q. (By Mr. York) So you spoke just with the professionals at Highland? Nobody else?

A. No, I spoke to a lot of, you know, like, my team.

Q. Sure. I'm asking on the Highland side, who did you speak with?

A. Oh, the professionals there at Highland.

Q. Okay, which ones?

A. You know, Mr. Starey, and I guess when you say spoke with, I mean, do you, like, general discussions within a group typesetting. You know, Dave Clause and Tim Corinoir. Those are the names that come to mind.

Q. And you can't recall who initiated the settlement discussions -- the discussions about potentially settling the dispute between Highland and the Hunter Mountain entities, correct?



MARK PATRICK
IN RE: HIGHLAND CAPITAL MNGMT

June 23, 2025
37–40

Page 37

A. Yeah, I can't, specifically.

Q. You consider yourself to have had a close relationship with Jim Dondero in the past?

MR. MCENTIRE: Objection, form.

MR. PHILLIPS: Objection, form.

A. No.

MR. YORK: So you know that Highland at one point did characterize you as having a close relationship with Mr. Dondero over a more than decade period of time that you worked at Highland.

MR. PHILLIPS: Objection, form.

MR. MCENTIRE: Joined in the objection.

A. I didn't have that awareness.

Q. (By Mr. York) Do you still communicate with Mr. Dondero?

MR. PHILLIPS: Objection, form.

A. No.

Q. (By Mr. York) When was the last time you recall communicating with him?

MR. MCENTIRE: Objection, form.

A. I can't recall precisely.

Q. (By Mr. York) Was it some time within this calendar year?

MR. MCENTIRE: Same objection.

A. No.

Page 38

Q. (By Mr. York) Last year?

A. Yes.

Q. Do you recall when last year?

A. No.

Q. Can you tell me -- was it, you know, spring, summer, fall 2024? Any idea?

MR. PHILLIPS: Objection, form.

A. Well, I'm pretty confident it was in the summer.

Q. Okay.

A. But it may have been later, but at least the summer.

Q. All right. What do you recall the two of you discussing in the last conversation?

MR. MCENTIRE: Objection, form.

MR. PHILLIPS: Objection, form.

MR. MCENTIRE: Can we have an agreement that one attorney objects, it's good for all?

MR. YORK: Sure.

MR. PHILLIPS: It's fine with me. I can't speak for Mr. Lang or Okin.

MR. LANG: That's fine.

A. I just don't specifically remember.

Q. (By Mr. York) Has Highland capital ever had an ownership interest in Hunter Mountain Trust?

A. Highland Capital Management having an ownership in

Page 39

Hunter Mountain?

Q. Yeah.

A. To my understanding, no.

Q. Okay. Do you know how Hunter Mountain came to own Class B and Class C limited partnership interest in Highland Capital Management?

A. Yes.

Q. How?

A. Purchase and contribution.

Q. So are you saying that Hunter Mountain purchased Class B Limited partnership interest in Highland Capital?

MR. PHILLIPS: I'm going to object to form.

And counsel, where are we headed here?

MR. YORK: Just trying to make sure we have a full understanding when we go into this hearing. Hunter Mountain interest is as set forth in the -- in the proposed settlement relating to the capital account balance, that's all.

A. What was the question?

Q. Yeah, so did -- I was trying to understand when you said purchase and contribution, what do you mean by that? What's -- what's that number?

A. Yeah, yeah, my understanding is that Hunter Mountain had purchased the -- some interest in Highland Capital Management LP. I don't recall precisely the class

Page 40

and then it had also acquired interest in Highland Capital Management LP via a contribution contributing a note or an asset into it. Is what I -- is my general understanding.

Q. And is that note, that you're referring to, is that what Coakley has been called the Hunter Mountain Investment Trust note?

MR. PHILLIPS: Objection to form.

A. Yeah, I don't know what you're referring to. I'm just -- my general -- my general knowledge is that -- that there was a note contributed by Hunter Mountain into Highland in exchange for an interest.

Q. (By Mr. York) When did that occur to your knowledge?

MR. PHILLIPS: Objection, form.

A. I can't remember the years gone by.

Q. (By Mr. York) Was it while you were employed with Highland?

A. Yes.

Q. The last couple of questions here, I think, is Hunter Mountain paying the legal expenses for Mr. Phillips and his firm? Relating to the proposed settlement and, I guess, the defense of the proposed settlement at the upcoming hearing?

A. I believe so.

Q. Okay. Is there --

Case 19-34054-sgj11    Doc 4608-61    Filed 05/08/26    Entered 05/08/26 23:42:09    Desc
Exhibit 58    Page 12 of 13

MARK PATRICK
IN RE: HIGHLAND CAPITAL MNGMT

June 23, 2025
41–44

Page 41

MR. PHILLIPS: I'll answer that, yes.

MR. YORK: Mr. Phillips, if you want to go under oath we can put you under oath as a witness too, but --

MR. PHILLIPS: Let me rephrase. I hope so.

A. Yeah.

Q. (By Mr. York) Is there anyone that's making any payment or contribution to Hunter Mountain in relation to those legal expenses? In other words, is any third party paid Hunter Mountain or reimbursed Hunter Mountain for any legal expenses associated with the proposed settlement?

A. No, but -- except for the current ownership, you know, is probably funding it that way. So CLO HoldCo LLC would be making a contribution into Hunter Mountain to pay legal bills.

Q. All right.

A. And probably -- I'm kinda jumping -- probably go to Beacon Mountain first and then it would go to Hunter Mountain like that.

Q. On up the chain, so to speak?

A. Yeah. Well, I don't know how -- on up the chain -- yeah, until there's cash which would be CLO HoldCo.

Q. Okay. Are there any indemnifications agreements that Hunter Mountain has entered into where it is being indemnified by any parties relating to -- relating to the

Page 42

settlement at all?

MR. PHILLIPS: Objection, form.

A. Not to my -- not to my knowledge.

Q. Okay. All right.

MR. PHILLIPS: I would qualify that. If you're asking about the settlement agreement, could you put the settlement agreement up because there may be indemnification provisions in the settlement agreement. If you're asking for outside the settlement agreement, that's a different story.

MR. YORK: You took care of that for me Lewis.

A. Yeah, yeah, and no, I appreciate that clarification because I guess I should have asked you either or because I was getting confused thinking that maybe it also includes the settlement agreement. No, my answer is with respect to anything outside of a settlement agreement. There are no indignities to my general understanding.

Q. All right.

With that, I think, at this point, I'll pass the witness back to Mr. Lang, if he's got any further questions.

FURTHER EXAMINATION

BY MR. LANG:

Q. I have one question. You said that Rand PE Fund I, LP was in liquidation, do you recall that?

Page 43

A. Yeah, yeah, well, I call it a windup.

Q. Windup, okay.

A. Yeah, yeah. It's a windup.

Q. And then I could be wrong, but I think I recall that Mr. Raver testified that Atlas IDF LP was in liquidation, does that sound right?

MR. MCENTIRE: Objection, form.

A. Yeah, windup.

Q. (By Mr. Lang) You said windup also?

A. Yeah, but, but loosely termed they're one and the same.

MR. LANG: Okay. That's all I've got.

MR. MCENTIRE: Anybody else?

MR. OKIN: Well, we'll be back at 2:00 tomorrow.

MR. MCENTIRE: Yeah. Okay. I think that adjourns the deposition Ms. Court Reporter.

(End of Proceedings.)

Page 44

```
                    CHANGES AND SIGNATURE

PAGE   LINE   CHANGE                        REASON

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____

     _____
```



**MARK PATRICK**
**IN RE: HIGHLAND CAPITAL MNGMT**

June 23, 2025
45–47

## Page 45

I, MARK PATRICK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
MARK PATRICK

THE STATE OF TEXAS
COUNTY OF _____

Before me, _____, on this day personally appeared MARK PATRICK, known to me (or proved to me under oath or through _____)(description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 20___.

_____
Notary Public in and for
the State of Texas

## Page 46

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In re                         § Chapter 11
HIGHLAND CAPITAL MANAGEMENT, L.P,  § Case No. 19-34054-sgj11
Reorganized Debtor.           §
                              §

REPORTER'S CERTIFICATION
DEPOSITION OF MARK PATRICK
JUNE 23, 2025

I, IDA ALCALA, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, MARK PATRICK, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____, 2025, to the witness or to the attorney for the witness for examination, signature and return to me by _____, 2025;

That the amount of time used by each party at the deposition is as follows:

    Mr. Lang  :  (00:28)
    Mr. York  :  (00:27)

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:
Mr. Michael Lang, Attorney for Dugaboy Investment Trust.
Mr. Sawnie Mcentire, Attorney for Mark Patrick.
Mr. Drew York, Attorney for Patrick Daugherty.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action

## Page 47

in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of the Texas Rules of Civil Procedure will be certified to after they have occurred.

Certified to by me this 23rd day of June, 2025.

_____
Ida Alcala, CSR#12565
CSR Expiration Date: 12/31/26
Firm Registration No. CRF-3
1235 North Loop West
Suite 510
Houston, Texas 77008

FURTHER CERTIFICATION UNDER RULE 203 TRCP
The original deposition was/was not returned to the deposition officer on _____, 2025.
If returned, the attached Changes and Signature page contains any changes and the reasons therefor;
If returned, the original deposition was delivered to Mr. Mcentire, Custodial Attorney;
That $_____ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;
That the deposition was delivered in accordance with Rule 203.3 and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.
Certified to by me this _____ day of _____, 2025.

_____
Ida Alcala, CSR#12565
Firm Registration No. CRF-3
1235 North Loop West
Suite 510
Houston, Texas 77008
CSR Expiration Date: 12/31/26

