**EXHIBIT 59**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| In Re: | ) **Case No. 19-34054-sgj-11** |
|  | ) Chapter 11 |
|  | ) |
| HIGHLAND CAPITAL | ) Dallas, Texas |
| MANAGEMENT, L.P., | ) June 25, 2025 |
|  | ) 9:30 a.m. Docket |
| Reorganized Debtor. | ) |
|  | ) - MOTION TO EXTEND DURATION OF |
|  | ) TRUSTS (4213) |
|  | ) - MOTION TO APPROVE SETTLEMENT |
|  | ) (4216) |
|  | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Highland Capital      John A. Morris
Management Claimant Trust:    PACHULSKI STANG ZIEHL & JONES, LLP
                              780 Third Avenue, 34th Floor
                              New York, NY  10017-2024
                              (212) 561-7760

For the Highland Capital      Hayley R. Winograd
Management Claimant Trust:    Gregory V. Demo
                              PACHULSKI STANG ZIEHL & JONES, LLP
                              1700 Broadway, 36th Floor
                              New York, NY  10019
                              (212) 561-7732

For the Highland Capital      Jeffrey N. Pomerantz
Management Claimant Trust:    PACHULSKI STANG ZIEHL & JONES, LLP
                              10100 Santa Monica Blvd.,
                                13th Floor
                              Los Angeles, CA  90067
                              (310) 277-6910

For Marc S. Kirschner,        Robert Scott Loigman
Litigation Trustee:           QUINN EMANUEL URQUHART & SULLIVAN,
                                LLP
                              295 5th Avenue
                              New York, NY  10016
                              (212) 849-7000

APPEARANCES, cont'd.:

For the Hunter Mountain    Louis M. Phillips
Entities:    Amelia L. Hurt
    KELLY HART & PITRE
    301 Main Street, Suite 1600
    Baton Rouge, LA  70801
    (225) 381-9643

For the Dugaboy    Deborah Rose Deitsch-Perez
Investment Trust:    STINSON, LLP
    2200 Ross Avenue, Suite 2900
    Dallas, TX  75201
    (214) 560-2201

For the Dugaboy    Michael Justin Lang
Investment Trust:    CRAWFORD WISHNEW & LANG, PLLC
    1700 Pacific Avenue, Suite 2390
    Dallas, TX  75201
    (214) 817-4500

For Crown Global Life    David L. Curry, Jr.
Insurance, Ltd. and    OKIN ADAMS, LLP
The Dallas Foundation:    1113 Vine Street, Suite 240
    Houston, TX  77002
    (713) 228-4100

For Patrick Daugherty:    Andrew K. York
    Drake Rayshell
    Joshua Smeltzer
    GRAY REED & MCGRAW, LLP
    1601 Elm Street, Suite 4600
    Dallas, TX  75201
    (214) 954-4135

For the U.S. Trustee:    Erin Marie Schmidt
    OFFICE OF THE UNITED STATES
      TRUSTEE
    1100 Commerce Street, Room 976
    Dallas, TX  75242-1496
    (214) 767-1075

Recorded by:    Michael F. Edmond, Sr.
    UNITED STATES BANKRUPTCY COURT
    1100 Commerce Street, 12th Floor
    Dallas, TX  75242
    (214) 753-2062

3

Transcribed by:                    Kathy Rehling
                                   311 Paradise Cove
                                   Shady Shores, TX   76208
                                   (972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

4

DALLAS, TEXAS - JUNE 25, 2025 - 9:38 A.M.

THE CLERK:  All rise.  The United States Bankruptcy Court for the Northern District of Texas, Dallas Division, is now in session, the Honorable Stacey Jernigan presiding.

THE COURT:  Good morning.  Please be seated.

MR. LANG:  Good morning, Judge.

THE COURT:  All right.  We have Highland settings this morning, Case No. 19-34054.  We have two motions:  a motion to extend the duration of the Plan Trust, and then a motion under Rule 9019 to approve a settlement between the estate entities and Hunter Mountain entities.

All right.  So, lots to get to.  Let's quickly get appearances from the participating parties in interest this morning.

MR. MORRIS:  Good morning, Your Honor.  John Morris; Pachulski Stang Ziehl & Jones.  I'm joined by my colleagues Jeffery Pomerantz, Gregory Demo, and Hayley Winograd.  And we represent the Highland Capital Management Claimant Trust and Highland Capital Management, LP.

THE COURT:  Okay.  Good morning.  Other appearances?

MR. LOIGMAN:  Good morning, Your Honor.  Robert Loigman from Quinn Emanuel.  We represent the Highland Litigation Trustee, Marc Kirschner.

THE COURT:  Good morning.

MS. DEITSCH-PEREZ:  Good morning, Your Honor.  This

is Deborah Deitsch-Perez from Stinson representing the Dugaboy Trust on the motion to extend the duration of the Trust.

THE COURT: Good morning.

MS. DEITSCH-PEREZ: Good morning.

MR. LANG: Michael Lang for Dugaboy Investment Trust on the 9019 motion.

THE COURT: Good morning.

MR. LANG: Good morning.

MR. PHILLIPS: Good morning, Your Honor. Louis M. Phillips and Amelia L. Hurt; Kelly Hart Hallman -- Kelly Hart Pitre, Louisiana trade name, I don't know why -- appearing on behalf of Hunter Mountain Investment Trust and the Hunter Mountain entities in connection with the 9019 motion.

THE COURT: Good morning.

MR. YORK: Good morning, Your Honor. Drew York along with Joshua Smeltzer and Drake Rayshell from Gray Reed on behalf of Patrick Daugherty with regard to the 9019 motion.

THE COURT: Good morning. Ms. Schmidt?

MS. SCHMIDT: Erin Schmidt on behalf of the U.S. Trustee.

THE COURT: Good morning.

MR. CURRY: Good morning, Your Honor. David Curry from Okin Adams on behalf of The Dallas Foundation and Crown Global Life Insurance, Ltd.

THE COURT: Good morning.

All right.  Well, let me ask.  I'll start with Mr. Morris, given these are your motions.  Do you have any agreements about how you're going to proceed?  I'm wondering, first off, are we going to have joint presentations, joint evidence on both motions, or are we going to take one at the time?

MR. MORRIS:  Good morning, Your Honor.  Thank you very much for hearing us yesterday.  It's kind of a big day in the case.  We have a milestone that we hope will greatly advance the prosecution of this case, and, frankly, what remains to be done to complete the wind-up of Highland.

There are two motions before the Court.  The first is the motion to extend the Trusts.  That was filed at Docket No. 4213.  We're going to address that one first, Your Honor, because we have a resolution and a stipulation.  There's only one objecting party.  That was the Dugaboy Investment Trust.  And early this morning we reached an agreement whereby Dugaboy is going to withdraw its objection, with prejudice, subject to a stipulation that we will file with the Court but that contains the following terms.

THE COURT:  Okay.

MR. MORRIS:  Number one, Dugaboy agrees to withdraw its objection to the motion, with prejudice.

Number two, the Trusts expect to dissolve by August 11th, 2026, so that no further extension of the duration of the Trusts will be necessary.

THE COURT: Okay.

MR. MORRIS: And number three, Dugaboy hereby preserves and does not waive its right, if any, to object to any further attempts to extend the date by which the Trusts must be dissolved or to extend the duration of the Trusts.

THE COURT: Wait. I don't understand that third one. Could you repeat it?

MR. MORRIS: It's a reservation of rights.

THE COURT: Okay.

MR. MORRIS: And so Dugaboy preserves and does not waive its right, if any, to object --

THE COURT: Well, okay. I'm sorry. Maybe I zoned out or heard something different.

MR. MORRIS: Uh-huh.

THE COURT: I thought number two of the agreement was August 11th, 2026 would be it; there would be no further extensions.

MR. MORRIS: It's a statement of expectation. It's not a representation. It's not a warranty. We do not believe today, based on the facts and circumstances that we know of, that a further extension will be necessary, but we're not waiving the right to seek it if circumstances change or something unforeseen happens. And all Dugaboy is saying is that, okay, we reserve the right, if any, to object.

THE COURT: Okay.

8

MR. MORRIS: It's that simple.

THE COURT: Okay. It's sort of confusing, right?

MR. MORRIS: Yeah.

THE COURT: Okay.

MR. MORRIS: Perhaps. If you have any questions, let me try and clarify.

THE COURT: Well, I guess I'll just start with Ms. Deitsch-Perez. Would you come to the podium? We've got I don't know who on the camera, but we want to make sure everyone hears.

MS. DEITSCH-PEREZ: Okay. I'll take a stab at --

THE COURT: Do you confirm what you heard and do you have any clarification of Points 2 and 3?

MS. DEITSCH-PEREZ: Maybe I can make it clear. I confirm that is the stipulation that we agreed upon, and I think all that was intended is the Trusts and the Debtor are saying they expect to be done by August 11, 2026, so that they will not need to make this motion again, but they could not and would not promise that they will be done by then. So Dugaboy is withdrawing the objection to this particular extension but is not waiving the right to object to a further request for an extension. And that's the sum of it. Does that make sense to Your Honor?

THE COURT: It does.

MS. DEITSCH-PEREZ: Okay.

THE COURT: I'm hoping it'll be over by August 11th, 2026, and we'll see where we are at that time.

Well, one of my reasons for a slight bit of confusion is, in reading the 9019 settlement that is before the Court, I saw that there were some future installments payments, if you will, to HMIT, I think up through 2029, maybe.

MR. MORRIS: Sure.

THE COURT: So I was --

MR. MORRIS: So let me clarify.

THE COURT: Okay.

MR. MORRIS: The only thing that we said that we expect to happen as of, you know, by August 11th, 2026 is that the Trusts will be dissolved. But that is not the end of their life. It is a process. Once you file for dissolution, then you have to complete the wind-down. And completing the wind-down will require the completion of all litigation. It will -- right?

All we're talking about is dissolving the Highland Claimant Trust and the Highland Litigation Subtrust so that what remains after that is the Indemnity Trust. And the Indemnity Trust will be fully funded and will be prepared to go forward. And if we ever get to a point when there's no further litigation, the corpus of that will be distributed to whatever stakeholders are entitled to it at that time.

But when we talk about being done by next year, it doesn't

mean the case will be over. It simply means that the Claimant Trust and the Highland Litigation Subtrust will be dissolved. But they still have to complete the wind-up.

THE COURT: Okay. Gotcha.

MS. DEITSCH-PEREZ: And Dugaboy is reserving its rights to object to -- if something is happening that seems improper or untoward or they're seeking additional relief, obviously, we're not waiving the unknown now.

THE COURT: Okay. Gotcha. All right. Well, I appreciate the resolution of these issues. I assume no other party in interest is going to weigh in since we only had a Dugaboy objection.

MR. MORRIS: That was the only objection we had. I'm prepared to, if Your Honor thinks it's necessary or appropriate, or both, to make a very short proffer. A proffer.

THE COURT: Okay. I'll accept that proffer at this time.

MR. MORRIS: Okay. So, Your Honor, we filed on the docket at No. 4253 Exhibits 1 through 65, and we supplemented our exhibit list at Docket No. 4271 with two additional documents, which are Exhibits 66 and 67. We don't believe there's any objection to any of those documents, and we would respectfully move for their admission into evidence.

THE COURT: All right. Could you repeat the numbers

Seery - Proffer                          11

once again?

      MR. MORRIS:  Yes, Your Honor.  So, for the motion for an order further extending the duration of the Trusts, we have two docket entries that contain Highland's exhibits.  The first is Docket No. 4253, and that has Exhibits 1 through 65.

      THE COURT:  Okay.

      MR. MORRIS:  And then we supplemented at 4271 with Docket -- with Exhibit Numbers 66 and 67.

      THE COURT:  All right.  I presume there's no objection to these exhibits.

  All right.  They are admitted.

  (Claimant Trust's Exhibits 1 through 67 are admitted into evidence.)

      JAMES P. SEERY, JR., PROFFER OF TESTIMONY

      MR. MORRIS:  Okay.  So, Your Honor, if called to testify, James P. Seery, Jr., the Claimant Trustee of the Highland Claimant Trust, would testify as follows.

  At Exhibits 63 and 64, Highland filed excerpts of the Litigation Trust and the Litigation Subtrust -- the Claimant Trust and the Litigation Subtrust, and each of those excerpts contain Section 9.1, respectively.  That's the section of the Trusts that deal with the extensions that may be necessary from to the original three-year term.  And Mr. Seery would testify that he's familiar with those provisions and that he understands the requirements of those provisions include,

Seery - Proffer                                    12

among other things, the requirement that all objections to
claims and equity interests have been resolved and that all
assets that the Trustee believes might yield sufficient value
to the estate have been sold.

Mr. Seery would also testify that the Highland estate has
a number of assets in its possession today, certain of which
will be conveyed to Hunter Mountain if the 9019 motion is
approved.

Among those assets, Mr. Seery would testify that, in
accordance with the proposed settlement agreement, which is at
Exhibit 17, in Paragraph 5(b), the Court will see reference to
what's known as the Dugaboy Note.  The Dugaboy Note is an
asset of the estate that will go to Hunter Mountain if the
9019 motion is approved.  If it's not approved, then Mr. Seery
would testify that he's got to find another way to dispose of
it.  But it is an asset with a face amount today of about $17
million, so it has substantial value.

There is a note from Hunter Mountain.  That also will be
disposed of as set forth in Paragraph 4(a) of the proposed
settlement agreement.  That note is going to be used to reduce
the allowed amount of Hunter Mountain's Class 10 claim if the
settlement is approved.  But that note is also an asset of the
estate.  It's worth over $60 million.  I believe it actually
might be in the fifties.  But somewhere in the $50 to $60
million range.  And that's an asset that needs to be disposed

Seery - Proffer                                    13

of.

The estate has a contingent right to receive certain funds under its settlement with Mr. Okada, and it has the Kirschner Litigation. All of these assets will be disposed of. They're very illiquid assets, I'd call them, and it would be very helpful to the estate in moving this case forward if the 9019 motion is approved.

There are other assets that the estate has that will not be monetized by August 11th and which therefore require the extension of the Trusts. Mr. Seery would testify, if called to the stand, that the pursuit of the sale of these assets will yield proceeds that justified the continued pursuit of their monetization. They include interests in Highland CLO Funding, Ltd. Documents pertaining to that can be found at Exhibits 21 and 25.

The Claimant Trust also owns shares in Highland Capital Management Korea, Ltd. Documents relating to that asset can be found at Exhibits 18 through 20. That's an asset that, if Mr. Seery were to testify, he would say that he has been actively engaged in trying to liquidate that asset, but it's not going to be completed by August 11th.

There's also a note that is due from Highland Capital Management Korea, Ltd. That can be found at Exhibit 67. That's another asset that Mr. Seery has concluded and would testify to that he thinks is valuable for the estate but will

Seery - Proffer                                        14

not be monetized by the end of this extension period.

And then there's the bad faith award that the estate obtained against HCRE, which remains on appeal.  The appeal of that order can be found at Exhibit 15.  And there's no further cost, really, to waiting for the Court's decision, but that is an asset of the estate that remains to be monetized.

So there's two buckets of assets, one of which, hopefully, if the 9019 motion is approved, will go to HMIT and that will be helpful.  But there's another bucket of assets that are not implicated by the HMIT settlement that will not be monetized before August 11th that Mr. Seery would testify we need a little bit more time and that's why we're going to extend the Trusts.

Mr. Seery would also testify, finally, that there are claims and equity interests that remain unresolved.  They include Mr. Daugherty's Class 8 claim.  As Your Honor is probably aware at this point, Highland has objected to that claim.  It seeks to disallow, subordinate, that particular claim.  Otherwise, have it monetized for purposes of winding up the estate.

Mr. Daugherty has moved to dismiss that complaint.  That's his right.  But our scheduling order already takes us past August 11th.

And then, finally, we've got Dugaboy's Class 11 interest, which has not yet been allowed.  If the 9019 motion is

Seery - Proffer                                    15

approved today, we do expect to move quickly to get to that point so that we can finish that up.  But we don't foresee that being completed before August 11th, either.

So, in sum, Mr. Seery would testify that, from his perspective, the estate still has assets that are valuable to the estate that will not be monetized by August 11th, and there are still one claim and one equity interest that need to be resolved in order to satisfy the test, you know, to get to the dissolution.

So that would be the sum total of his testimony.  That's the completion of the proffer.  And unless Your Honor has any objections, we're prepared to move to the next motion.

THE COURT:  I have a couple of questions.

MR. MORRIS:  Sure.

THE COURT:  But first I'm going to go ahead and swear in Mr. Seery --

MR. MORRIS:  Great.

THE COURT:  -- to affirm this, as well as swear him in for what I'm sure will be future testimony today.

MR. MORRIS:  Sure.

MR. SEERY:  Would you like me to come --

THE COURT:  Well, you can just stand in place.  Just make sure we hear you.

(The witness is sworn as to both his proffer and future testimony.)

16

THE COURT: Okay. Thank you.

All right. My question is probably for you.

THE WITNESS: Uh-huh.

THE COURT: Just confirm my understanding. We have one claim and one --

MR. MORRIS: Equity interest.

THE COURT: -- equity interest to resolve? Mr. Daugherty's Class 8 claim and the Dugaboy what would be Class 11 interest?

MR. MORRIS: That is correct.

THE COURT: Did I hear that correctly, Mr. Seery?

THE WITNESS: That's correct, Your Honor.

THE COURT: Okay. Thank you.

And then my other question is, once again, a clarification. I pulled out of your attachments to your motion to extend the Exhibit B, Unresolved Pending Litigation.

MR. MORRIS: Uh-huh.

THE COURT: And at the time this was filed, May 8th, 2025, it showed nine pending matters at all court levels. And I think two of them now are finished. I'm sorry. This is a long question. But maybe I'm wrong. The first two matters, the recusal matter that was at the Fifth Circuit, as well as the gatekeeper appeal, which I know a motion to stay the mandate was at the Supreme Court, both of those are finished now? Done?

MR. MORRIS: Yes, Your Honor.

THE COURT: Okay. So the nine pending matters is now down to seven. And if the Court were to approve the 9019 today, I understand that, well, it looks like, at a minimum, two more would go away?

MR. MORRIS: Precisely.

THE COURT: We have an appeal at the District Court, what we call the Claims Trading Appeal, where Highland had sued -- I'm sorry, Hunter Mountain had sued Highland and others regarding the claims trading issue, I'll call it. So that would go away?

MR. MORRIS: Yes, Your Honor.

THE COURT: And then let me see what else. I've marked all over my chart.

MR. MORRIS: And then I believe Hunter Mountain's motion for leave to file a complaint in the Delaware Chancery Court --

THE COURT: Ah.

MR. MORRIS: -- to remove Mr. Seery will also be dismissed with prejudice --

THE COURT: Okay.

MR. MORRIS: -- if the 9019 motion is approved.

THE COURT: Okay. So, that, yes, Hunter Mountain v. Seery, the Court issued a stay on that being able to go forward in Delaware.

18

MR. MORRIS:  Precisely.

THE COURT:  So that would go away.

So, of the nine matters listed, we're down to five.  But I'll hear, I guess, about this later with Mr. Seery, the big what I would call Kirschner adversary against lots of defendants which has been abated for a long, long time now.  Hunter Mountain would basically receive that lawsuit with those claims?  The claims against it go away?  And I don't know what we'll hear, I don't know what Hunter Mountain will do with that big adversary, but maybe it doesn't know yet.  I don't know.

MR. MORRIS:  Yeah.

THE COURT:  So, --

MR. MORRIS:  Not a question we've concerned ourselves with, Your Honor.

THE COURT:  Okay.  So that, again, I'm kind of recapping everything.

(Counsel confer.)

MR. MORRIS:  Go ahead, Your Honor.

THE COURT:  So, again, I'm looking at the chart.  If anyone wants to know what I'm looking at, it's at Docket No. 4213-2, filed May 8th.  We're down to the HCRE --

MR. MORRIS:  Appeal.

THE COURT:  -- appeal.

MR. MORRIS:  Uh-huh.  Which is fully briefed and

we're just waiting for a decision.

THE COURT:  Okay.  So that bad faith decision may or may not stick, but it's hanging there on appeal.

MR. MORRIS:  Uh-huh.

THE COURT:  We're down to a Dugaboy -- what we called the Imaging Motion.  Or no?

MR. MORRIS:  Correct.  I guess that's been stayed, but that's out there.

THE COURT:  We have the valuation motion of Dugaboy, but I don't know, is it going to be moot after today?  I don't know what I'm going to hear today as far as the evidence.

MR. MORRIS:  So, that has -- great question -- two plaintiffs in that lawsuit, HMIT and Dugaboy.

THE COURT:  Oh, that's right.  So --

MR. MORRIS:  HMIT is going to dismiss it with prejudice.  Dugaboy will still have an active complaint.

THE COURT:  Appeal.

MR. MORRIS:  My hope is that --

THE COURT:  It's an appeal of --

MR. MORRIS:  Yes.

THE COURT:  Okay.

MR. MORRIS:  My hope is that, because we produced so much valuation information to HMIT, which then had to make available to Dugaboy because that's the way discovery works, that they'll withdraw that complaint.

THE COURT:  Okay.

MR. MORRIS:  I'm going to make that plea right on the record here, because they've now gotten everything they've asked for.  But that's their decision to make, and it's out there.  But HMIT is withdrawing itself as a party to that lawsuit, but it does remain in Dugaboy's lap.

THE COURT:  Okay.  So those potentially three things?

MR. MORRIS:  Yeah.

THE COURT:  Plus the Daugherty matter?

MR. MORRIS:  Yeah.

THE COURT:  Okay.  Mr. Seery, did I miss something?

THE WITNESS:  One clarification, Your Honor.  My apologies.  One clarification.  In the Class 11 subordinated interests, there's a Dugaboy capital account of $740,000.  There's also the Strand capital account -- both of these are controlled by Mr. Dondero -- of $994,000.  And then Mr. Okada and his affiliates have a combined capital account of $248,000.  So we'll -- I said just Dugaboy, but it's actually Dugaboy, Strand, and then Okada and two family trusts of his.

THE COURT:  Okay.

MR. MORRIS:  And if the 9019 motion is granted, --

THE WITNESS:  It's in the footnote.  It's in the footnote in the motion.

THE COURT:  Yes.  I actually had that in my notes.

MR. MORRIS:  Yeah.

21

THE COURT: So I glossed over Class 11 just being Dugaboy. There are Strand and Okada.

All right. So I appreciate that clarification. We're down hopefully to very little litigation. But we have no control over higher courts, when they have time to look at it.

MR. MORRIS: Or future litigation, now that the gatekeeper has been curtailed.

THE COURT: Okay. All right.

Anyone wish to say anything about this motion to extend?

All right. Well, based on the pleadings, the argument, the evidence, I do think it is necessary and appropriate and reasonable to extend the duration of the Highland Trusts through August 11th, 2026. The relief is something that is contemplated as a possibility under the trust documents. Moreover, I think the Court has some authority under Bankruptcy Rule 9006(b) and Bankruptcy Code Section 105 to grant this relief.

The evidence shows there are unliquidated assets and some unfinished litigation that must be resolved before the Trust is in a position to wind down. So, again, I think it's necessary, prudent, and in the best interest. The motion is granted, and the Court duly acknowledges the comments with regard to the stipulation of Dugaboy and the estate. All right.

MR. MORRIS: Thank you very much. So, may I move to

22

the 9019 motion?

THE COURT: You may.

MR. MORRIS: Okay. With respect to the 9019 motion, there were originally three Objecting Parties: the Dugaboy Investment Trust, Patrick Daugherty, and The Dallas Foundation and an entity called Crown Global.

I'm pleased to report, and I think Your Honor may already be aware, that a settlement has been reached to dispose of The Dallas Foundation and the Crown Global objection. There is a written agreement to that effect that effectuates that. And I'd like to just turn the podium over to Mr. Phillips. Louis Phillips represents the HMIT Entities. I know Mr. Curry is here on behalf of the objecting parties, The Dallas Foundation, but I think -- I think I'll let Mr. Phillips address, you know, the specific terms of the resolution of that objection.

THE COURT: All right. Thank you. And I will say that my staff reached out yesterday to -- I don't know if it was Mr. Curry or someone in your office -- wanting to know have you delivered exhibit notebooks. And it was at that point my staff heard, well, we've resolved.

MR. CURRY: We had just finished.

THE COURT: Okay. All right. So I'm happy to hear what the resolution is.

MR. PHILLIPS: Good morning, Your Honor. Louis M.

Phillips on behalf of the Hunter Mountain Investment Trust and the named parties therein.

We had a written stipulation that has been signed by my firm, by Mr. Curry's firm, by the Pachulski firm, and by the Quinn Emanuel firm that is to be submitted to the -- is to be filed on the record. It also contains a reference to a settlement agreement that will be attached. But we will read the stipulation into the record, if Your Honor would allow me to.

THE COURT: All right. You may.

MR. PHILLIPS: And Mr. Curry is here, and he can tell me whether or not I have read correctly, but I think I have it.

THE COURT: Okay. All right.

MR. PHILLIPS: (reading) Now, wherefore, it is jointly -- hereby jointly stipulated and agreed as follows. The Foundation Parties -- Mr. Curry's clients -- withdraw The Foundation Objection, which is a defined term in the stipulation, with prejudice, in accordance with the terms of the term sheet annexed hereto as Attachment 1. And Attachment 1 will be attached to the stipulation.

Paragraph 2. The Foundation Parties, the HMIT Entities -- that's Hunter Mountain Entities and the Movants; that is, Mr. Morris' client and Quinn Emanuel on behalf of the Litigation Subtrust -- agree that the following language shall be

24

contained in the proposed order on the 9019 motion.  And that's clearly the proposed order.  This is not dependent upon the motion being granted.  Notwithstanding anything in the settlement agreement or the 9019 order to the contrary, none of The Dallas Foundation, EDF, Okada Family, or Crown (The Foundation Parties) are or will be included in the definition of HMIT Releasors or Highland Releasors.  For the avoidance of doubt, however, any attempt by The Foundation Parties to assert a claim against an HMIT released party by, through, or under, including derivatively a Highland entity, or against a Highland released party by, through, or under, including derivatively an HMIT entity, is barred by this order and the settlement agreement.

        That is the sum and substance of the stipulation.  The settlement agreement we don't think needs to be read to the Court because it's a signed settlement agreement that will be attached as Attachment 1 to the stipulation.  And I believe I read it correctly.

            THE COURT:  Mr. Curry, did he read it correctly?

            MR. CURRY:  Mr. Phillips did read it correctly, Your Honor.  And thank you.

        And we want to thank Trustee's counsel and Mr. Phillips for working with us to address some very real concerns.  And through the stipulation, we still have some work to do, but we have the time to do it, and maybe move it to where we can

actually get it resolved.

THE COURT:  Okay.  Well, there are some things I am concerned -- well, I should say, all I really feel the need to go into is you're releasing your objection, your clients are, and all of the parties here, parties to the proposed settlement and the estates, the Debtors, Hunter Mountain, are agreeing that your clients are not releasors under the 9019 settlement if the Court approves it.

MR. CURRY:  Correct, Your Honor.  Unless and except our clients were to attempt to assert a released claim against a released party, and that's what the "provided, however" was to clarify.

MR. PHILLIPS:  And this doesn't affect the estate at all.  It basically affects the HMI -- the Hunter Mountain entities.  But the language that we have read in the stipulation has been agreed to and is contained within the order that will be proposed.

THE COURT:  Okay.  You said it better than I said it. The estate is releasing claims --

MR. PHILLIPS:  I can't believe that, Your Honor, but thank you.

THE COURT:  Well, the estate is releasing claims that it has --

MR. PHILLIPS:  Correct.

THE COURT:  -- or in Trusts have -- I shouldn't have

said the estate.  It's the Trust entities and what's left of the Reorganized Debtors are releasing any claims they have against Hunter Mountain in the proposed settlement --

MR. PHILIPS:  Yes.

THE COURT:  -- if it's approved.  But any direct claims of your clients are not --

MR. CURRY:  Well, direct claims that our client has or derivative claims, for example, against Hunter Mountain that are derivative through Hunter Mountain.

THE COURT:  Okay.  All right.

MR. PHILLIPS:  Yeah.

MR. CURRY:  Yeah.  That was the -- what we were trying to make sure.

THE COURT:  Yes.  All right.  Well, and when I said this is all I care about, what I mean is I don't even know who the heck Crown Insurance is.

MR. PHILLIPS:  Correct.

THE COURT:  There was a very interesting party in interest objection asserted by the Debtor.  And I've learned a lot about a lot of entities during all these years, but that was a new one on me.  I understood that it's somewhere in the framework of the --

MR. PHILLIPS:  Yes, Your Honor.

THE COURT:  -- Charitable DAF.

MR. PHILLIPS:  Let's say it's somewhere in the

universe, Your Honor.

THE COURT: The universe? Okay.

MR. PHILLIPS: The universe. Not necessarily the Charitable DAF or Hunter Mountain.

THE COURT: Okay.

MR. PHILLIPS: But in the universe.

THE COURT: Well, but the point is, we've announced anything relevant to --

MR. PHILLIPS: Correct.

THE COURT: -- the Reorganized Debtor, --

MR. PHILLIPS: Correct.

THE COURT: -- Claimant Trust, Subtrust.

MR. PHILLIPS: And the motion -- and the objections of all these entities are withdrawn with prejudice.

THE COURT: All right.

MR. CURRY: And Your Honor, the one thing that I will note, part of our agreement, and it's in the signed term sheet that you'll see, is that we've agreed that if there's a dispute over the settlement to withdraw our objection, this Court will have at least concurrent jurisdiction to resolve that dispute, because it is a settlement to resolve an objection to a core proceeding.

THE COURT: Okay. Thank you.

MR. PHILLIPS: And we have agreed and we do agree that the Court has jurisdiction. It has jurisdiction.

28

THE COURT:  Okay.  For what that is worth.

MR. PHILLIPS:  Well, that's what we can agree to.

THE COURT:  All right.  I appreciate that.

Anyone wish to say anything about what's been announced?

All right.  Well, I accept this resolution and withdrawal of --

MR. PHILLIPS:  Okay.  We will be filing --

THE COURT:  -- the objection.

MR. PHILLIPS:  We will be filing, at the close of this hearing, this stipulation, and we will be clicking whatever ECF box request that the Court so ordered on the stipulation.

THE COURT:  Okay.  We will be on the lookout for that.

All right.  Well, Mr. Lang, you stood up on behalf of Dugaboy.

MR. LANG:  I just want to make the Court aware of a letter that was sent last night that involves this from the Caymans, from Grant Thornton.

MR. PHILLIPS:  We object.

MR. LANG:  I just want to make the Court -- they were asking for a 45-day that the Joint Liquidators --

MR. PHILLIPS:  We object to this, Your Honor.  That's not a part of the record.  This is a person from outer space.  Not outer space, but the Cayman Islands.  And it's a letter

that we --

THE COURT: Coming from someone --

MR. PHILLIPS: It looks like a letter --

THE COURT: -- who is called Yosemite Sam, I understand, outside of court.

MR. PHILLIPS: Yeah. Yeah. I didn't want to bring that up, but Mr. Morris --

THE COURT: Okay. Well, it's stuck in my brain forever now.

MR. PHILLIPS: -- says it's his favorite cartoon character, so it must be okay.

THE COURT: Okay. Well, okay, I don't want to make light. I think this goes back to what I was saying about there are certain things I care about and certain things I don't care about. And I read from the pleadings, I haven't heard evidence but I've read from the pleadings that there is a lot going on in the Cayman Islands with regard to what I call the Charitable DAF structure or Hunter Mountain.

MR. LANG: Yes.

THE COURT: Parties in that universe. And I don't plan to exercise any control or jurisdiction over that, so I'm hesitant to hear what it is you want to present. I don't know, maybe on cross-examination of Mark Patrick today it may or may not be relevant. But what is it --

MR. LANG: All they ask for is a 45-day basically

abeyance or continuance of the decision on the 9019, to allow them to investigate and weigh in on it.

MR. PHILLIPS:  Your Honor?

MR. LANG:  They're Joint Liquidators.  That's -- I'm just making the Court aware of the request.

THE COURT:  Okay.  Well, they're not here to articulate that.  So I respect your wanting to be transparent and whatnot, but I'm not going to let it stop me from going forward today.  Okay.

MR. LANG:  Thank you.

THE COURT:  Thank you.

MR. PHILLIPS:  Your Honor, if I may be excused, that's our position with respect to the withdrawal.  We appreciate Your Honor's attention.  Thank you.

THE COURT:  Okay.  Thank you.

MR. CURRY:  Thank you, Your Honor.

THE COURT:  Anyone else wish to weigh in?

All right.  Well, I do, as I was saying, accept the withdrawal of The Dallas Foundation and related entities' objection to the 9019 settlement.

So does that leave only the Daugherty objection to the settlement?  Well, and the Dugaboy.

MR. MORRIS:  And the Dugaboy, yes.

THE COURT:  And Dugaboy, of course.

MR. MORRIS:  That's right.

31

THE COURT: Okay.

MR. MORRIS: So, --

THE COURT: So how did you want to proceed?

MR. MORRIS: So, the way I propose to proceed, Your Honor, I have an opening statement to make --

THE COURT: Okay.

MR. MORRIS: -- with a PowerPoint presentation to present. I would propose that, as the Movant, I go first. Then we can hear from Dugaboy, we can hear from Mr. Daugherty, and then we can put Mr. Seery on the stand.

Assuming that there is no challenge to Mark Patrick's authority to enter into the settlement agreement on behalf of all of the HMIT entities, I would not plan on calling either Mr. Dondero or Ms. Deitsch-Perez, who are under subpoena here, because the challenge to authority was really coming from The Dallas Foundation. Their objection has now been withdrawn. So as long as Mr. Daugherty -- well, really, as long as Dugaboy doesn't challenge Mr. Patrick's authority to enter into the settlement agreement on behalf of the HMIT entities, I think we'll just put on the one witness and be done.

THE COURT: All right. Just so we know what lies ahead, --

MR. MORRIS: Uh-huh.

THE COURT: -- I don't think that Dugaboy objected to Mr. Patrick's authority. I do recall it was just The

Foundation.

MR. LANG:  There was no objection on the -- there was no objection.

THE COURT:  Okay.  And same with Mr. Daugherty?  No objection about the authority of Mark Patrick to enter into the settlement?

MR. YORK:  There was no objection.

THE COURT:  All right.

MR. MORRIS:  All right.  May I proceed?

THE COURT:  You may proceed.

MR. MORRIS:  Okay.  So, may I approach, Your Honor?  I've got a --

THE COURT:  You may.  Is this a PowerPoint?  And everyone else has it, correct?

(Pause.)

THE COURT:  You may proceed.

MR. MORRIS:  Thank you, Your Honor.  John Morris; Pachulski Stang Ziehl & Jones; for Highland Capital Management, LP and the Highland Claimant Trust.

Before I begin, Your Honor, I'd like to move my exhibits into evidence because I will be referring to them in my opening.

THE COURT:  All right.  So I think I said on Monday the first thing I was going to ask, and I've already blown that, was did you all have good faith discussions regarding

33

admission of each other's exhibits?  And I did see Mr. Lang filed a day or two ago his list of objections.  It looked like you were like you were down to about nine or eleven exhibits you were objecting to.

(Counsel confer.)

THE COURT:  Out of 123 designations, which I think probably grew overnight to --

MR. MORRIS:  Oh, okay.  Well, --

MR. LANG:  I just have to make clear for the record.

MR. MORRIS:  You go ahead and do that.

MR. LANG:  Your Honor, I've been told that Dugaboy does challenge the authority.  It is not in our objection.

MR. PHILLIPS:  It's not in his --

THE COURT:  Well, can I ask why it was not in your objection?

MR. LANG:  I do not know.  I was not counsel of record when the objection was filed.  I do not know what was known or not known at that time.

THE COURT:  So, --

MR. LANG:  So I guess we just seek leave to --

THE COURT:  -- if you did not have him on -- was Mark Patrick on your exhibit list?  I don't think he was, right?

MR. LANG:  He was not.

THE COURT:  Okay.  So how would you address that? Again, we've had, I know, some back and forth over who was

going to represent Dugaboy on this matter.

MR. LANG:  Yes.

THE COURT:  I remember the substitutions and whatnot. But --

MR. LANG:  We found out late last night that The Foundation was resolving their issue, and that kind of left us in a position.

THE COURT:  So what are you saying?  You all were relying on --

MR. LANG:  Well, the issue had --

THE COURT:  -- The Foundation to carry the flag on this one?

MR. LANG:  They had raised the issue.  They were pursuing the issue.  We went through discovery and they were pursuing it.  It was already in front of the Court.

THE COURT:  All right.  What would you like to say, Mr. Morris?

MR. MORRIS:  Your Honor, this is more than disappointing.  The fact of the matter is Mr. Dondero is funding both the Cayman Islands litigation as well as The Dallas Foundation's prosecution of the objection.  The fact that The Dallas Foundation settled doesn't open the door to Mr. Dondero to assert objections that he's never asserted before.

I will tell you what will happen.  If Your Honor allows

35

this, I will have to call Mr. Dondero and Ms. Deitsch-Perez to the stand to offer evidence under subpoena that they personally acknowledge and understand, because Mr. Dondero's signature is on documents that were signed in the year 2025, that Mr. Patrick is authorized to represent HMIT. I really didn't want to do that. But if they want to pursue it, I'll have to do my job.

THE COURT: All right.

MR. LANG: And I want to clarify one thing.

THE COURT: Uh-huh.

MR. LANG: And it goes back to something we already discussed, which is the authority issue is derived from the Cayman Island Joint Liquidators' appointment on May 6th, 2020. And so how that changes the authority, it's -- I think the issue is does he have authority, like Mr. Morris --

THE COURT: All right. Well, before I comment, Mr. Phillips, it's your client representative that we're talking about here. What do you say?

MR. PHILLIPS: Very disappointing, but -- and further revealing the limits of my imagination. There is no objection to authority. There's no evidence of record of objection to authority. There's no evidence even in The Dallas Foundation's papers about authority. Dugaboy did not raise objections to authority. Daugherty did not raise objections to authority. And Mr. Morris was willing to release Ms.

Deitsch-Perez and Mr. Dondero from subpoena in connection with an order that this Court entered that Hunter Mountain objected to. And outside the Court, the evidence will establish, the evidence submitted by Mr. Morris will establish that Hunter Mountain, through authority of Mr. Patrick, objected to Ms. Deitsch-Perez signing on behalf of Hunter Mountain because she did not seek approval and did not have authorization to sign a stipulation before this Court.

Subsequently, after signing the stipulation and entry of the order, we suggested that we would not deal with Ms. Deitsch-Perez, we would only deal with unconflicted counsel, and we dealt with unconflicted counsel to make an agreement with HCLOM and another of Mr. Dondero's entities to avoid filing a motion for reconsideration before this Court based on the fact that, as we have suggested in the motion that we didn't file, Hunter Mountain's approval was not real.

So Mr. Morris has these people under subpoena because we signed an agreement that Mr. Dondero signed to avoid the filing of a motion for reconsideration before this Court, recognizing that Mr. Patrick had authority for Hunter Mountain to sign the agreement. And so that's the purpose of his subpoena.

But our position is there's no suggestion in pleadings by Dugaboy or Daugherty that challenge the authority of Mr. Patrick to execute on behalf of any of the Hunter Mountain

entities.  And the one party who, without suggesting an evidentiary basis, but that's fine, they say maybe they did have an evidentiary -- we -- and they withdrew their objection.

THE COURT:  Okay.  Let me --

MR. MORRIS:  Okay.  I'm sorry.  Just really --

THE COURT:  Thirty second.

MR. MORRIS:  Really quickly.

THE COURT:  Uh-huh.

MR. MORRIS:  The letter that Mr. Lang just referred to from the Joint Official Liquidators, addressed to us, asking for an extension of time, doesn't even challenge Mr. Patrick's authority to act today on behalf of the HMIT entities to enter into the settlement agreement.  The Joint Official Liquidators wrote to us last night, and they don't say what Mr. Lang is now saying.

MR. PHILLIPS:  And the only thing I would say is we got a letter by email from somebody who says, I am who I am. It came through email PDF.  We don't challenge the authority. But we would respectfully request -- we're not there.  We've made no appearance.  We don't challenge the authority.  But please wait -- ask the Court to wait the 45 minutes -- 45 days for us.  We got a letter.  PDF.  We don't know who sent it.

THE COURT:  Okay.

MR. PHILLIPS:  It wouldn't be admissible even if

someone tried to introduce it as evidence.

THE COURT: Okay. Let me just say a few things here. This has felt like a very strange sideshow, I'm going to say. When I read The Foundation's objection, I was, again, scratching my head, who in the heck is Crown Insurance? I know who Dallas Foundation is because there have been charts submitted to me in the past, and I know it's part of the I'm going to say Mr. Phillips' client set over the months, the Charitable Foundation structure. But I'm like, how in the heck do these people have standing? Okay? I have to always consider standing. That's every trial judge's first obligation, does this party have standing? Not a creditor. Not an equity holder. But somehow I guess they're going to explain through evidence how they're a person aggrieved by the proposed settlement.

So that's why I kind of -- hopefully, it doesn't sound flippant -- thought this sounded like a sideshow, because this is a stranger, really, to weigh in.

Okay. So now I'm hearing that a party in interest, which Dugaboy is -- I guess some might argue that, but I think they're affected by the settlement, so that makes them a party in interest -- you're making the same argument. And it's because of a rotation of counsel you didn't make it sooner.

Okay. So I'm just trying to be transparent here, tell you what the Court is thinking. I guess what the Court is

thinking is Mark Patrick is the client representative, so I'm told by the Movants on the 9019, and you, Mr. Phillips, he's the party representative for Hunter Mountain.

MR. PHILLIPS: Yes, Your Honor.

THE COURT: I don't, I guess, know what harm there is, except a longer hearing, in, okay, put him on the stand to testify about the bona fides of the settlement. It's more evidence. But if you all want to call Mr. Dondero, I'm going to require that.

MR. MORRIS: Your Honor?

THE COURT: I mean, as a counterbalance, since it's appearing from the pleadings to be --

MR. MORRIS: Your Honor, respectfully, Mr. Patrick is not on their witness list. He's not on our witness list.

THE COURT: Wasn't he on somebody's witness list?

MR. MORRIS: He was on The Dallas Foundation's witness list.

THE COURT: Oh.

MR. MORRIS: He's not on their witness list. He's not on our witness list. He should not testify today because they're raising an issue that they didn't raise ever before. This is improper. They should just be shut down here.

THE COURT: I think probably you should be shut down. But I kind of go back and forth, what's the harm in having the representative, the person I'm told is the representative of

Highland?

MR. PHILLIPS: Your Honor?

THE COURT: I could limit it to one hour. And the flip side is that Dondero himself, as I guess the representative of Dugaboy, would have to also take the stand, limited to one hour.

MR. PHILLIPS: I'd like to make one note, Your Honor, about the documents that Mr. Morris has introduced. That document list -- and I don't have the numbers in front of me -- but part of the presentation and the reason Mr. Patrick is not on the Movants' motion -- witness and exhibit list, the documents that have been introduced are all of -- include all of the documents evidencing Mr. Patrick's authority as the control person of the entire Hunter Mountain group.

THE COURT: Which they've stipulated.

MR. PHILLIPS: Which they've stipulated to.

THE COURT: Uh-huh.

MR. MORRIS: And to be clear, Your Honor, they can be found at Exhibits 70 through 104. We've got 34 documents in evidence that establish that Mr. Patrick is authorized to act on behalf of each of the HMIT entities. All that's going to happen is we're now going to spend time dealing with an issue that you already described as a sideshow, and we're going to do it for a party who didn't put Mr. Patrick on a witness list, who hasn't objected on this basis, and we've got a

mountain of evidence that shows that he's completely authorized to do this.  I just --

MR. PHILLIPS:  To which there's no objection.

MR. MORRIS:  And you can also look, Your Honor, at Exhibit 69.  That's the agreement that Mr. Dondero signed with Mr. Patrick after he got outed for authorizing Ms. Deitsch-Perez to sign a document on behalf of HMIT without Mark Patrick's knowledge or approval.  He signed that.  Six months ago.  And we're going to have a trial here over whether Mark Patrick is authorized to act on behalf of HMIT?

A VOICE:  That was long ago.

MR. MORRIS:  This is not -- this is not --

THE COURT:  We're not going to have a trial.  And I fully acknowledge that I am possibly abusing discretion by allowing this.  We have our rules, and our rules were not complied with, and it does feel a little bit like ambush.  Okay?

But on the flip side of it, it doesn't seem entirely unreasonable to have the representative, the purported representative of Hunter Mountain, who is the counterparty, if you will, to this very major settlement, take the stand.  And I'll limit it.  And, again, I condition it on Mr. Dondero, the ultimate beneficiary of the Dugaboy Trust, as it's been represented to me in prior filings, --

MR. MORRIS:  Correct.

THE COURT: -- he'll have to stay an equal amount of time on the stand. Okay?

MR. MORRIS: Okay.

THE COURT: Okay. Hang on. I've got my smarter staff member handing me a note. Okay.

(Pause.)

THE COURT: Okay. Well, so that's how we're going to stand.

Now, I am going to address Mr. Daugherty here. We're not going to let Mr. Daugherty cross-examine Patrick. Clearly, his objection has been around, and he never said anything about --

MR. YORK: Certainly not as to authority. However, we should be able to examine him as it relates to the portion of the objection that goes to whether the settlement is in the best interest, given the claims that are being -- the Kirschner claims that are being transferred by Highland to the HMIT entities.

THE COURT: All right. Well, you all are going to have to share your 30 minutes.

MR. YORK: That's fine.

THE COURT: Okay? We're giving 30 minutes to Debtor entities, Highland entities, and Hunter Mountain entities collectively, and 30 minutes to Dugaboy and Daugherty collectively. Okay? So, I'm going to have my law clerk

43

timing you like you're on the clock.

MR. MORRIS:  Okay.

THE COURT:  Okay?

MR. MORRIS:  May I proceed?

THE COURT:  You may proceed.

MR. MORRIS:  Thank you, Your Honor.  So, appearing at Docket 4255 is the Movants' exhibit list, with Exhibits 1 through 123.  At Docket 4277 are Exhibits 124 and 125.  And at Docket 4280, we've got Exhibit 126.

The Movants respectfully move into evidence all of those documents, with the exception of Exhibits 124 and 125 on Docket No. 4277.  Those are the transcripts of The Dallas Foundation representatives, and since we have reached an agreement and The Dallas Foundation has withdrawn their objection, we are not going to offer those two transcripts into evidence as part of the record in this matter.

But Exhibits 1 through 123, and Exhibit 126, we move into evidence.

THE COURT:  All right.  And as I thought we were going to start talking about a moment ago, Mr. Lang objected to 11 of these 123 designations.  Do those still remain?  If they do, we're just going to see if they want to be I think offered --

MR. LANG:  No, I think we've --

THE COURT:  -- the old-fashioned way, but I think

44

that might be more efficient.  I have, in your objection, which is at Docket 4273, you objected to Numbers 10, 12, 13, 57 and 59, and then 64 through 69.  Eleven items.

MR. LANG:  Mr. Morris clarified that 12 and 13 are one document.  But I still, I think that, again, for purposes of the authority issue, Exhibit 13 we don't think is relevant.

MR. MORRIS:  Exhibit 13, Your Honor.  We'll just take them one at a time.

THE COURT:  Yes, go ahead and address it.

MR. MORRIS:  Is relevant because it's simply a document that was provided to Highland by Hunter Mountain as part of the negotiations.  And we've been asked to produce all of the documents related to the negotiations.  This is one of the documents that we received.

THE COURT:  Okay.  And do I understand 12 and 13 are actually the same thing, or --

MR. MORRIS:  Yeah.  Well, 12 is the email, 13 is the attachment.

THE COURT:  Okay.  I overrule the relevance objection.  Those will be admitted.

(Claimant Trust's Exhibits 12 and 13 are admitted into evidence.)

MR. LANG:  57.

MR. MORRIS:  57 is also a part of the settlement documents.  It's, I think, an email exchange between Mr. Seery

and UBS, which was one of the Class 9 claimants, and we had to obtain their consent and that's part of the process of getting to the settlement agreement.

MR. LANG:  I think the objection is it doesn't include the attachment.

MR. MORRIS:  It's got all -- it's got numerous attachments on it.

MR. LANG:  To 57?

MR. MORRIS:  Yeah.

MR. LANG:  Mine did not.

MR. MORRIS:  Your Honor, we'll withdraw the exhibit.

THE COURT:  Okay.

MR. MORRIS:  Okay.

THE COURT:  59.  Well, you didn't address #10.

MR. LANG:  Oh, sorry.

THE COURT:  That was the first one.

MR. LANG:  Yeah.

MR. MORRIS:  We'll withdraw #10.

THE COURT:  All right.

MR. MORRIS:  Okay.

THE COURT:  So, 59?

MR. MORRIS:  59?  Your Honor, I'm not surprised they object, because it's at the core of the Court's ability to authorize this settlement.

MR. LANG:  We withdrew that.

MR. MORRIS: Oh, you withdrew that?

MR. LANG: Withdrew.

MR. MORRIS: Oh, okay. They withdrew that.

THE COURT: Okay. So, 59 will be admitted.

(Claimant Trust's Exhibit 59 is admitted into evidence.)

MR. MORRIS: And then I think the last is 64 to 69.

THE COURT: Uh-huh.

MR. MORRIS: We were actually prepared to withdraw those exhibits because we didn't think there was a challenge to authority. Now that there's a challenge to authority, we're going to offer all of those in because they're highly relevant to the acknowledge of Mr. Patrick's authority.

THE COURT: All right. And your objection was solely to relevance?

MR. LANG: The objection was relevance because they predate the May 6th issue in the Caymans, which is what caused the entire structure to -- the authority from the top down to be questioned.

THE COURT: All right. Well, you can cross-examine if you want on those items.

MR. LANG: Okay.

THE COURT: But I find they're relevant so they will be admitted, 64 through 69.

(Claimant Trust's Exhibits 64 through 69 are admitted into evidence.)

47

*[Court Edit:  Claimant Trust's Exhibits 1 through 9, 11 through 56, 58 through 123, and 126 are admitted into evidence.]*

THE COURT:  All right.  And as far as the exhibits of Dugaboy, I think it was just the plan and settlement agreement were all that had been designated.  Correct?

MR. LANG:  Yes.

MR. MORRIS:  No objection.

THE COURT:  So, no objection.  Those will be admitted.

(Dugaboy Investment Trust's exhibits are admitted into evidence.)

THE COURT:  And Daugherty's exhibits?

MR. YORK:  Yes, Your Honor.  So, Mr. Morris and I conferred yesterday about both sides' exhibits.  And my understanding is we've reached an agreement that both sides' exhibits are not objected to.  And so therefore we'd move to admit Daugherty's as well.

THE COURT:  All right.

MR. YORK:  1 through 42, I believe, it is.

THE COURT:  All right.  So you confirm?

MR. MORRIS:  Yes, Your Honor.

THE COURT:  All right.  The Court will admit all of Daugherty's 1 through 42, and they appear at Docket Entry 4266.

(Patrick Daugherty's Exhibits 1 through 42 are admitted into evidence.)

THE COURT:  All right.  Opening statements.

OPENING STATEMENT ON BEHALF OF THE CLAIMANT TRUST

MR. MORRIS:  All right.  Good morning, Your Honor. John Morris; Pachulski Stang Ziehl & Jones; for Highland Capital Management, LP and the Highland Claimant Trust.

If we can go to the first slide, Your Honor.  This is a 9019 motion.  It's not a terribly high bar.  What the Movant has to show here is that the settlement agreement was the product of arm's-length, good-faith negotiations, and effectively that it's in the best interests of its stakeholders.

THE COURT:  Did you want this put on the screen, or does everyone have a hard copy?

MR. MORRIS:  Counsel have a hard copy.

THE COURT:  Oh, okay.

MR. MORRIS:  Yeah.  The evidence is going to show, and there really is no dispute, that the settlement agreement is the product of arm's-length, good-faith negotiations.  Mr. Seery is going to testify that the negotiations began in late March and they concluded on May 19th.  Exhibits 2 through 57, with the exception of the one or two I just withdrew, reflect the parties' negotiations.  Mr. Seery is going to testify that the negotiations were conducted by Zoom, by phone call, there

was one in-person meeting, there was many, many email exchanges that are reflected in the exhibits.

Mr. Seery is going to testify about the substance of the negotiations at a high level. Originally, we had sought to have one agreement with Hunter Mountain and the DAF entities. Mr. Patrick was not comfortable with that. He wanted to run them separately. And there was a DAF agreement that was ultimately entered into but that nobody believed required court approval.

So, once that got completed and one of the Fifth Circuit appeals got dismissed as a result, we moved to the Hunter Mountain discussions. Those discussions were robust. There were issues about the timing of the effectiveness of certain of the benefits under the proposed agreement. Highland wanted the releases, for example, to be effective upon signing. Mr. Patrick was unwilling to agree to anything without this Court's approval.

So there were changes that were made over time in terms of the timing of the transfer of the consideration. There were discussions and negotiations and bids and asks about the amounts that would be paid, when they would be paid, the circumstances under -- that they would be paid. There was an enormous amount of information that was exchanged pursuant to a confidentiality agreement that now became public because it's relevant to the Debtors' burden or the Claimant Trust's

burden to carry the day here.

That information included claims information, the trust agreement itself, budgets, asset/liability valuation information, forecasted expenses, because HMIT rightly wondered, you know, what's going to happen to the money?  Is it going to be gone before it got its agreed-upon share?  So, you know, there will be, I think, indisputable evidence at the end of the day that the settlement is the product of arm's-length, good-faith negotiations.

If we move to the next slide, the evidence will also show that the proposed settlement is indisputably in the best interest of the Highland entities and their stakeholders. Upon court approval, all of the pending litigation that Your Honor identified earlier will be dismissed with prejudice, thereby greatly reducing litigation risk and attendant costs.

The stakeholders will also benefit from the allowance of the HMIT claim at a fixed amount of $337 million.  And we will explain -- Mr. Seery will explain to the Court how that number was arrived at.

The estates and their stakeholders will also benefit because, under the proposed settlement, as I indicated earlier, Highland will be able to monetize or otherwise dispose of a number of illiquid assets, including the Dugaboy Note and the estate claims in the Kirschner Litigation.  And perhaps most importantly to the estate, we are getting very,

very broad what we refer to as litigation protections from all of the Hunter Mountain entities.  It includes not only a release but a covenant not to sue as well as, you know, we could go through it, but -- but we believe that even if Mr. Dondero or somebody else obtains control of Hunter Mountain, unless somebody sets aside this agreement, those protections are going to inure to the benefit of the Trusts, the Indemnity Trust and all of its stakeholders until the end of time, and nobody is ever going to be able to set this agreement aside because it was negotiated in good faith, it was the product of arm's-length negotiations, and it's fair and reasonable to both sides.

So those litigation protections are paramount and they provide another indicator of the benefits that the Claimant Trust is going to receive.

The next slide, Your Honor, is a demonstrative exhibit, although, as always, we have citations to the very specific documents that are now in the record.  Mr. Seery will describe for you at a high level how the allowed claim of HMIT was calculated, and it's really just based on the limited partners' capital accounts as of the petition date.  And I'll just leave it at that for the moment.  There's no magic to it. It's objectively reasonable.  It's mathematics.  There's really no subjectivity that I'm aware of that goes into this. It's just, hey, let's look at the tax returns, let's look at

the financial statements, and let's look at the partnership agreement, and let's see how the capital account was structured as of the petition date.  And that's how you get to, really, $396 million less the amount of the Dugaboy Note.  I mean, the HMIT note.

The next slide.  With the settlement, the transfer of the Kirschner Litigation is in the best interests of the Movants.  I think Mr. Daugherty somehow suggests that really the best thing to do would be to prosecute that litigation.  We respectfully disagree.  In the Debtors' business -- in the Claimant Trust's business judgment, that would be exactly the wrong thing to do when you are settling with HMIT.

And why is that?  When we commenced the Kirschner Litigation a number of years ago, the Kirschner Litigation represented a potential source of funding for indemnification expenses, and at that time, for the payment in full to creditors.

By 2023, 2024, with the success of the Highland team's monetization of assets, the need to pursue and monetize the Kirschner claims became less clear, so we put it on ice.  And we voluntarily stayed the litigation to conserve resources.

The settlement with HMIT changes everything.  The claims are as valid today as they were yesterday, as they were before we signed the agreement, as they were when we commenced the action.  But they have very different value to Highland when

53

you're settling with HMIT. And that's why we're prepared to transfer the claims today.

Why? Because at this point, unlike when we commenced the action, Class 8 has been paid in full except for Mr. Daugherty's fully-reserved claim, right, in an amount that he agreed to for years and that he ratified and reaffirmed three different times in three different stipulations. That's the only thing that remains in Class 8.

THE COURT: And remind me of the dollar amounts on reserve.

MR. MORRIS: It's approximately $2.5 million. I can --

THE COURT: Okay.

MR. MORRIS: It's -- the dollar amount is specifically set forth --

(Pause.)

MR. MORRIS: It would be, I believe, in Exhibit 60, --

THE COURT: Okay.

MR. MORRIS: -- is the original tolling agreement. And in Paragraph 1 it has the very specific dollar amount. And then in Exhibits 62, 63 -- 61, 62, and 63, those are amendments to the tolling agreement that fully incorporated the original tolling agreement, including the reserve amount. So that amount has been there for years. Nobody has ever said

anything about it.  Nobody has ever tried to adjust it. Nobody has ever identified a change in circumstances that would suggest a change was appropriate.  But here we are.

So, why is it different and why does the Kirschner Litigation not have so much value to us when we're settling with Class 11?  Because Class 8 has been paid in full.  Class 9 has been paid 80 percent.  If the HMIT settlement is approved, it will receive another 10 percent.  So that all that remains is 10 percent of the Class 9s.

And most importantly, Your Honor, with the settlement with HMIT and the Claimant Trust's receipt of the litigation protections, the need for indemnification expenses is going to be greatly reduced.  We can give the money where it belongs because all we'll have left is Mr. Dondero and Dugaboy.  It really will literally be the only thing.  And we need a lot to deal with that, but not as much as we needed when we had to deal with them and HMIT.

And at the end of the day, once you're settling with HMIT, prosecution of the claims would only benefit HMIT, so why should we undertake the expense of doing that?

Is that clear to Your Honor?

THE COURT:  It is.

MR. MORRIS:  It is?  So, it's -- this has nothing to do -- and you're going to hear questions of Mr. Seery, did you value the Kirschner claims?  Are you giving them away for

free?  No, we didn't value them, because once you're settling with HMIT it doesn't really matter.  Once you have the litigation protections, once you know that HMIT is never going to be an adversary of yours, the monetization of the Kirschner claims would insure to their benefit because they will have an allowed claim of $330 million.  So even if we sued and even if we got a hundred million dollars, that's going to go to them.  Why would we pick up the tab today?  A very different scenario than when we prosecuted the case, when the case was commenced.

So, really, really, in the estate's best interest to get value for those claims.  The value is reflected in the totality of the agreement.  The Court really should look at the body of the consideration that's being received, including the litigation protections.

If we can go to the next slide, Your Honor.  As long as we're on the topic of Mr. Patrick's authority, Mr. Seery is going to testify to the work that he did to satisfy himself that Mr. Patrick was duly authorized to act on behalf of each of the HMIT entities in this case.

The next slide here shows an excerpt from the Hunter Mountain Trust Agreement.  It's Paragraph 7.  And it says, among other things, the Administrator -- who is Mark Patrick -- shall be duly authorized, from time to time, in his sole discretion, to manage the business and affairs of the Trust.

It continues by saying that the Administrator, Mr.

Patrick, shall also have the power to settle, compromise, submit to arbitration, or to submit to any court having jurisdiction in any matter, any matters that are in dispute.

So, you know, this is just one document. It's the Hunter Mountain document. We focus on the Hunter Mountain document because that's the only one of the HMIT entities that has a stake in the Claimant Trust. But, again, Your Honor, if you just -- Mr. Seery will, at a high level, confirm that Exhibits 70 through 104 are documents that definitively establish that Mr. Patrick has the authority to enter into each of these agreements on behalf of the HMIT entities.

Not only that, but he will describe, if asked by you or anybody cross-examining him, why nobody has the ability to interfere with the effectuation of his authority. He doesn't have to get anybody's consent. He doesn't have to -- right? This is all just crystal clear. And whatever entity far up the chain may exist, Your Honor should just think of as a shareholder. And if Coca-Cola came in here and they wanted to do a 9019 motion, a shareholder can't come in and stop Coca-Cola from doing that. If they don't like what Coca-Cola is doing, go file a derivative suit. Go sue Coca-Cola in another court at another time. Not that I'm inviting litigation against Mr. Patrick, but by analogy, this is what we're talking about.

There is no restriction on Mr. Patrick's authority. The

settlement is fair and reasonable.  He has authority under the governing documents to do what he has done here, and that is act in the best interests of the HMIT entities.  And so this is just one page.  Mr. Seery will explain, you know, just the work that he's done to satisfy himself.

The next slide, Your Honor, there's objections about how somehow the settlement agreement violates the plan or the absolute priority rule, all of that.  It's not accurate.  I'll just leave it at that in terms of how I characterize it.

The next slide is excerpts of -- I think it's the plan of reorganization, Your Honor.  And I think we admitted the plan last night.  That's Exhibit 126.  And they're -- these excerpts are really important because what they show is that Classes 9 and 10 have the indisputable right to accept less favorable treatment.  And that's what they've done.  Okay? And I think it's Article III, Section H, Subparts 9 and 10. Holders of Class 9 and 10 interests have the right to accept less favorable treatment.

And if we can go to the next slide, I'll just briefly describe the less favorable treatment that these stakeholders have in fact accepted.  As permitted by the plan, holders of Class 9 claims consented to the payment in full of Mr. Daugherty's Class 9 claim and the Class 10 distributions, in accordance with the settlement agreement, before their Class 9 claim is paid in full.

And that's Exhibit 59.  It may be among the most important documents that have been admitted this morning.  Exhibit 59 is the consent of the Class 9 holders other than Mr. Daugherty to accept lesser treatment.

So there's no violation of the plan at all.  HMIT is also accepting less favorable treatment than it might otherwise be entitled to if it ever successfully prosecuted its claim.  It has less favorable treatment because it's agreeing that it's not a Claimant Trust beneficiary, that its rights are limited to the rights that are given to it under the settlement agreement and nowhere else.  It's accepting less favorable treatment because it's agreeing that the Highland entities owe no duty of any kind to any HMIT entity except as provided for in the settlement agreement.  It's accepting restrictions on its ability to transfer its Class 10 interests -- more less-favorable treatment -- as a condition to the first and second distributions.  They have agreed that they are subject to Mr. Seery's determination that the Highland entities are not at that time under any Threat.  "Threat" is a defined term, and it has to do with litigation.

And so if Mr. Seery, in his sole discretion, believes that he needs to conserve resources because he remains years in the future under threat of litigation, he's not going to make the payments to HMIT, and HMIT is okay with that because they understand.

And, of course, in the end, they're accepting less favorable treatment because they're granting to the Claimant Trust the litigation protections.

All stakeholders have been paid in full except for the 10 percent of Class 9 and Mr. Daugherty's Class 8 claim.  That claim is the subject of an objection, and as I just walked Your Honor through, it has been fully reserved in an agreed-upon amount for years.

There was some questioning during Mr. Seery's -- one of Mr. Seery's I think three depositions in the last week -- about why he didn't offer Mr. Daugherty the same treatment that he offered to the other Class 9 holders because Mr. Daugherty had about an $800,000 Class 9 claim.  Your Honor will see in Exhibit 58 that that claim was paid in full, and Mr. Seery will explain that he found negotiating with Mr. Patrick to be difficult, number one.  And number two, it was an amount of money that the estate could afford.  And so the other Class 9 claims are substantially bigger, so rather than going through the process of attempting to negotiate with Mr. Daugherty, he just paid it in full.  The Claimant Trust had every right to do that.  And Mr. Daugherty should not be heard to complain that he actually got everything that he could have ever been entitled to.

THE COURT:  And --

MR. MORRIS:  Uh-huh?

THE COURT:  I don't mean to get you off-track.

MR. MORRIS:  That's all right.

THE COURT:  But Class 9 claimants, I'm trying to remember who else was in that class.  Was it a UBS --

MR. MORRIS:  UBS.

THE COURT:  -- claim?

MR. MORRIS:  Exactly right.

THE COURT:  Okay.

MR. MORRIS:  And then affiliates of Stonehill and Farallon.

THE COURT:  Okay.

MR. MORRIS:  Because they had purchased --

THE COURT:  They had Class 9 --

MR. MORRIS:  They had purchased originally I think it was Josh Terry, and the Redeemer Committee may have had a piece.  No, no.  No, no, no.  HarbourVest.  HarbourVest had a piece.  Right?  So, HarbourVest sold their claim, including the Class 9 claim.  Josh Terry sold his claim, including his Class 9 claim.  Then there's UBS, who still holds a piece of their claim, and Mr. Daugherty.  So, UBS, if you look at Exhibit 59, you'll see the signatures of UBS and the affiliates of Stonehill and Farallon, who all agreed to accept lesser treatment.

THE COURT:  Okay.

MR. MORRIS:  So, at the end of the day, Your Honor,

the last slide is a slide that I didn't intend to present,
frankly, because I didn't ever believe that there was going to
be a challenge to authority by anybody other than The Dallas
Foundation.  But as long as we have it attached, we might as
well see it.

As you can see, Your Honor, in the lower right-hand
corner, you can see Hunter Mountain is owned by Beacon
Mountain, which is owned by CLO Holdco.  Like, there is no --
and Mr. Patrick controls it.  And it's really on the other
side of the ledger, in the DAF house, so to speak, that any of
The Dallas Foundation got interested.

Dugaboy is not even on here, by the way.  Like, Dugaboy is
nobody.  The people in here who are now going to challenge the
authority of Mr. Patrick, no, not on here.  And they're going
to do it, they're going to do it without ever having given us
notice.

I know Your Honor made your ruling and we'll deal with it,
but I don't know if Your Honor was aware of this:  They're not
on here.

Your Honor, at the end of the day, this is a really,
really easy call to make from our perspective.  We have been
waiting for this moment for years.  Finally, a responsible
person understands that the way to preserve value is to put
the sword down.

Mr. Patrick, I don't know what happened between him and

62

Mr. Dondero.  I don't care.  I have no knowledge of that.  But clearly he is exercising independence.  And that's why we're here, because we finally have somebody who says, you know what, give me everything I can possibly get and I will stop fighting.  I wish other people would say that, because then this case would be over.  Then the case would really be over.

But getting to a settlement with the Class 10 interest holder who is going to have an allowed claim of $337 million, such that any value in the future is going to go to HMIT, I hope that that -- you know, this is an easy call to make, Your Honor.

I have nothing further at this time, but I look forward to putting Mr. Seery on the stand and making sure that Your Honor has, you know, an adequate, sufficient, overwhelming basis, frankly, to approve this motion.

THE COURT:  Okay.  I don't mean to stifle you, but --

MR. MORRIS:  Yeah.

THE COURT:  -- anything more for an opening statement?  Mr. Phillips, I'm doing friendlies and then friendlies.

OPENING STATEMENT ON BEHALF OF THE HUNTER MOUNTAIN ENTITIES

MR. PHILLIPS:  Your Honor, just briefly.  Louis M. Phillips on behalf of the Hunter Mountain entities.

We fully embrace and concur with everything that Mr. Morris has told the Court.  From our perspective, and the

reason that -- and you'll see, the documents include all of the back and forth -- we required the Court approval before the effectiveness of any releases, litigation protections, et cetera, for exactly the reason that we needed the Class 9 to agree.  And we obtained -- the Highland entities obtained the approval of the Class 9 creditors to our treatment, and I think that the bona fides of this settlement and the value of the settlement and our -- what we are giving in the settlement is, I think, established beyond even the slightest bit of question by the fact that the Class 9 creditors and the Oversight Board of the Claimant Trust all agreed that it was important enough to the estate to get this settlement with Hunter Mountain Investment Trust that they agreed to allow Hunter Mountain Investment Trust to receive the money set forth in the settlement upon the approval.  And we have agreed that, notwithstanding appeal rights of some people who really don't have the right to be here, but that's going to be determined by Your Honor, we're not worried about that.  We are giving our releases.  And the releases are effective upon approval by this Court.  We are not requiring any type of final unappealable order that doesn't -- that waits for years before the releases are effective.

Very importantly, it seems to me, from Your Honor's perspective, and I'm reluctant to suggest that I know about that, but our releases are given upon the approval by this

64

Court of the settlement. They're not -- if the settlement is reversed on appeal, our releases stay.

So the Class 9s that are above the Class 10 have voted, and they have approved, and Mr. Seery is going to testify about that. And we think that in and of itself is a monumental accomplishment. And we appreciate everything Mr. Morris has said. We agree with everything Mr. Morris has said. We agree with everything Mr. Morris has said about the absence of true objection. We agree with everything Mr. Morris has said about the fallacy of suggesting that Mr. Seery had to value the Hunter Mountain -- the Kirschner Litigation proceeds, of which would come to us.

The idea that we need to worry about how much Mr. Dondero entities can pay in connection with the Kirschner Litigation so that we could value the Kirschner Litigation based on what Mr. Dondero can pay, so that to suffice with an objection by Dugaboy maybe that there was no value given. I mean, that's all backwards. Value was given as described by Mr. Morris and will be established by the evidence submitted by Mr. Seery's testimony and the documents that are already in evidence.

And that is it from our standpoint, Your Honor. Thank you.

THE COURT: Thank you. All right. I'll hear from the Objectors. Daugherty's counsel, are you going to go first?

OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

MR. YORK: Thank you, Your Honor. If I may approach.

THE COURT: You may.

MR. YORK: Good morning, Your Honor. Drew York on behalf of Mr. Daugherty.

We're here today regarding the 9019 and Mr. Daugherty's objection. The 9019 motion should be denied. If you turn to the third slide in there, we say that Highland -- Highland, I'm referring to Highland collectively for the Movants -- attempts to put the cart before the horse. So really what's going on here, Your Honor, is we're just asking the Court to follow the rules of the road that it set forth in the plan, the confirmation order, and, frankly, even Highland to follow the terms of the settlement agreement it entered into with Mr. Daugherty.

None of that is happening here as a result of this proposed settlement that's being presented to you today for consideration.

The first problem with the motion and the proposed settlement is that it violates the absolute priority rule, it violates the express terms of the Court's plan, the confirmation order, as well as the Claimant Trust Agreement, because it attempts to fund the contingent Class 10 claims without first resolving, let alone satisfying, Mr. Daugherty's remaining Class 8 claim.

And then, secondly, the settlement agreement does not satisfy the *Jackson Brewing* factors because it prioritizes the HMIT insiders over the estate creditors, including Mr. Daugherty, and it forfeits potential recovery that would go to the benefit of those to creditors to appease litigation pressure.

So, first, I'm going to talk about why the settlement violates the plan, the confirmation order, and the Trust Agreement.

As everyone is aware, the HMIT entities are asserting a Class 10 claim.

If you turn to the next page, as Mr. Morris has acknowledged and admitted here today, Mr. Daugherty has a remaining Class 8 claim. And, importantly, Your Honor, because Mr. Morris and Highland continue to argue that that claim is fully reserved, I would point out that in the settlement agreement between Mr. Daugherty and Highland the parties characterized that claim as a contingent unliquidated claim. A contingent unliquidated claim. And in fact, they went so far, Highland did, in its adversary complaint on the next slide, Your Honor, to again refer to it as an unliquidated and contingent claim that is dependent on the final outcome of the 2008 audit, including the magnitude of any adjustments.

And so Highland cannot come into this courtroom and on the

one hand argue that that claim is fully reserved, and at the same time admit that it is a contingent unliquidated claim that is subject to a myriad of adjustments depending upon the outcome of that audit.

And in reality, when you look at the tolling agreement, there is nothing that the parties said that that was a fully reserved claim at all.  That's simply not what they agreed to. They just simply put a number in there, which was put into the reserve account at the time.  But it did not constitute a fully reserved claim at all.

Nor has Highland pointed to anything -- in the plan, the confirmation order, or the Claimant Trust Agreement -- that allows Highland to come in and violate those documents by simply saying that we fully reserved for Mr. Daugherty's claim.

THE COURT:  Okay.  Well, we're going to hear the evidence, but as I understood it, it was an agreed reserved amount.  And I asked earlier, was it $2.5 million or -- I feel like it was an agreed amount plus even some interest, acknowledging there might be time.  I don't remember every detail from this case, but I'm just telling you that's what my memory is.  Am I correct?

MR. YORK:  The --

THE COURT:  Mr. Daugherty agreed, here's what we'll agree is enough to set aside for our ultimately potentially

68

allowed claim, x amount plus interest?  Can you confirm?

MR. YORK:  What the tolling agreement provides is that Mr. Daugherty agreed to provide the tolling of the objection deadline.  Okay.  And Highland then agreed to put $2.56 million into the reserve.

And what the footnote says in the tolling agreement, Exhibit 60, is that the estimated amount of that claim as of -- and let's be clear about this -- as of October 23rd of 2020, was $2.56 million and change.  And that's it.  And I'm happy to have my colleague, Mr. Smeltzer, who is a tax attorney and deals with these issues all the time, can come up and explain why, at the end of the day, this is still a contingent unliquidated claim and it's subject to a myriad of factors that make it that that amount that Highland has set aside is not necessarily going to be a fully-reserved amount.

That is why the parties have -- had called it both in the settlement agreement and the tolling agreement, and Highland has continued to call it -- characterize it in its adversary complaint as a contingent unliquidated claim.  So --

THE COURT:  Okay.  It's hard to wrap my brain around it.  It's a claim that I understood really couldn't be liquidated with certainty until this potential audit of 2008 is final, and there was some discussion of how close to it being final was it.  But I guess -- well, I don't know where I'm going here except to say this could be a contingent

unliquidated claim for a -- you know, it's already, what, 17 years?

MR. YORK: Based -- from when the tax return was filed? I think that's correct, Your Honor.

THE COURT: Okay. Well, this is what the adversary is about, right? I guess they're finally saying it should be estimated, liquidated, pursuant to the Bankruptcy Code and we'll be done.

MR. YORK: Correct. In violation of the terms of the settlement agreement between Mr. Daugherty and Highland. Yes, that's --

THE COURT: Wait. Wait. What?

MR. YORK: So, the settlement agreement between Daugherty and Mr. Highland provides --

THE COURT: Mr. Highland?

MR. YORK: I'm sorry. I apologize. Between Mr. Daugherty and Highland --

THE COURT: Uh-huh.

MR. YORK: -- provides that the -- as long as the IRS audit has not had a final -- there's not a final determination, --

THE COURT: Uh-huh.

MR. YORK: -- then any litigation concerning the validity or the amount of Mr. Daugherty's claim is stayed and cannot be brought before the Court. And that's exactly what

their adversary complaint did, which is -- because they admit in their adversary complaint --

THE COURT: Well, okay. I won't pursue this anymore. But what's an estate to do? They're getting criticized for the Trust going on too long. Not by your client, but -- and meanwhile you want, I mean, 2032, are we still going to be waiting on the IRS?

MR. YORK: I don't know because we don't have any insight into what the IRS audit is.

THE COURT: Well, it's been 17 years.

MR. YORK: I understand, Your Honor.

THE COURT: So, --

MR. YORK: But the bottom line is this. The plan -- that Highland entered into the terms of that settlement agreement.

THE COURT: I'm going to say it right now. I'm not keeping this estate open until 2032. I just, I was --

MR. YORK: I presume that --

THE COURT: -- kind of flippantly throwing that out there.

MR. YORK: And --

THE COURT: But this happens in bankruptcy cases a lot, where you've got a contingent unliquidated claim, and there are provisions in the Bankruptcy Code to say what can be done in that scenario. The Court can estimate or liquidate.

71

MR. YORK:  Understood.  Your point to me was --
before was that's why Highland brought the adversary
complaint, and I was simply pointing out that, pursuant to the
express terms of the agreement that Highland reached with Mr.
Daugherty, Highland was -- is not allowed to bring the
adversary complaint to challenge the validity or amount of Mr.
Daugherty's claim so long as the IRS audit has not been -- had
a final determination.  That's exactly what's going on here
with the adversary complaint that they have filed.

THE COURT:  Okay.

MR. YORK:  Okay.  So I think Your Honor is familiar
with the terms of the plan, the Fifth Amended Plan and the
subordination.  But specifically we have two issues.  One
begins with the Claimant Trust Agreement in Section 5.1(c),
which provides that the equity holders shall not have any
rights under the agreement unless and until the Claimant
Trustee files with the Bankruptcy Court a certification that
all of general unsecured creditor beneficiaries have been paid
indefeasibly, in full, including, to the extent applicable,
all accrued and unpaid postpetition interest, consistent with
the plan, and all disputed claims have been resolved.

That has not happened here and it cannot happen because,
for one, Mr. Daugherty's unresolved Class 8 claim, and also
the remaining Class 9 claims, as I think you'll hear from Mr.
Seery.  And so there are no rights that can be given to the

HMIT entities pursuant to -- as a Class 10 holder, an allowed Class 10 holder, pursuant to the Claimant Trust Agreement.  So the proposed settlement violates the Claimant Trust Agreement's express terms.

It also violates the Court's confirmation order that was entered at -- specifically on Page 45 of the order, in Subparagraph (a):  The holders of the equity interests -- which would be the Class 10 and Class 11 equity interests -- that are junior to the claims in Class 8 and Class 9 will not receive or retain under the plan, on account of such junior claim interest, any property, unless and until the claims -- the claims, not the allowed claims, but the claims -- in Class 8 and Class 9 are paid in full, plus applicable interest.

That's exactly what the settlement that is proposed here is designed to do.

And if you turn two pages in, you'll see that in addition to the assignment of the Kirschner claims, what we're also having under this proposed settlement are interim cash distributions that would be made to the HMIT entities, interim cash distributions that theoretically could be made before the resolution of Mr. Daugherty's Class 8 claim, which would be in violation of the plan, the Claimant Trust Agreement, and the confirmation order.

And that is, as best as they put in their agreement, that's approximately $23 million in cash that would be paid

73

out theoretically in those interim distributions.

One of the things that Mr. Morris said in his opening was that they did not -- Mr. Seery did not negotiate with Mr. Daugherty because he was difficult to deal with. Well, that's surprising, Your Honor, considering, on the other hand, Mr. Morris says to the Court that there were repeated tolling agreements or amendments to the tolling agreement that were entered into by Mr. Daugherty willingly and voluntarily to benefit Highland.

And what really happened when Mr. Morris says that there were good-faith arm's-length negotiations, well, there may have been good-faith, arm's-length negotiations between the HMIT entities and Highland, but what happened here was that Highland actually sought to ice out Mr. Daugherty from all of this completely.

And how did that happen? Well, the evidence is going to show that Highland reached out to the other Class 9 creditors over a month in advance of the motion being filed, sought their consent to the proposed settlement, told them that Mr. Daugherty was not going to be a part of it, told them that Mr. Daugherty's Class 8 claim was going to have an adversary complaint filed against it, told them that once that adversary complaint was granted and the claim was disallowed, then those funds would waterfall down to Class 9, so the Class 9 creditors would get that -- those funds that theoretically are

74

part of Mr. Daugherty's Class 8 claim.

So at no point in time prior to the filing of the adversary proceeding, or even prior to the filing of the motion for approval of this proposed settlement, did Highland ever contact Mr. Daugherty to attempt to discuss any of this, because they simply wanted to ice him out.

THE COURT:  Okay.  I'm going to hear evidence.  I don't mean to cut you off, but --

MR. YORK:  Sure.

THE COURT:  -- I was told that Mr. Daugherty was paid $800,000 --

MR. YORK:  With respect to his --

THE COURT:  -- on his Class 9 claim.

MR. YORK:  Correct.

THE COURT:  Is that not true?

MR. YORK:  So, the day --

THE COURT:  Is that true?

MR. YORK:  It is true.  The day after the motion for entry of the proposed settlement was filed, Mr. Demo sent a letter to my office that was a payoff --

THE COURT:  I just wanted to -- I don't need to know every detail.

MR. YORK:  Yes.  Sure.

THE COURT:  Has he been paid?

MR. YORK:  His Class 9 claim was paid in full the day

after the proposed settlement was filed.

THE COURT:  Okay.  So what is the asserted amount of his Class 8 claim?

MR. YORK:  We -- again, both sides do not know because they do not have --

THE COURT:  What was the asserted amount in the proof of claim that's been reserved for, the Class 8 proof of claim?  What was the asserted amount?

MR. YORK:  It was listed as contingent unliquidated.  And as I understood it, and Your Honor --

MR. MORRIS:  No.  I think it's approximately $1.7 million, Your Honor.

MR. DAUGHERTY:  That's not true.

THE COURT:  $1.7 million?

MR. DAUGHERTY:  No.

THE COURT:  I would look it up, but I don't know if we --

MR. DAUGHERTY:  Your Honor, I'll tell you.  It was like $1.45 million, and then the interest to October, which was like another $1.3 million.  I'm estimating it.  But the total is around $2.6 million, $2.7 million at October/November 2020.  Up to that point.

THE COURT:  Okay.  Well, that's kind of a weird process here for an opening statement.  But I'm asking because, you know, I always try to stray people into let's be

pragmatic whenever I can.  And a pragmatic approach here might have been, if your client didn't think the reserve was big enough, you all could have a discussion about, oh, instead of $2.56 million, it now should, I don't know, $3 million, whatever you say the number is.  And there could have been a give and take, instead of all these people showing up in the court and having an all-day hearing.

So I'm just trying to understand that.  And you're saying, okay, violation of the absolute priority, when your client took a full payment on his Class 9 claim without Class 8 being quite paid in full.  I'm just trying to be pragmatic here. What would it take to make Mr. Daugherty happy?  Again, that's just the bankruptcy judge speaking on Chapter 11 world that's trying to get to a pragmatic result.

MR. YORK:  We're happy to have that discussion with the other side.  We were -- we --

THE COURT:  Well, what --

MR. YORK:  Yes.

THE COURT:  You can't tell me right now?  You're here ready to go to battle over this settlement, and I'm trying to figure out what might happen here that would make you all withdraw your objection.  And that's what we do in Chapter 11. If there's a way we can pragmatically resolve things, we do.

MR. YORK:  Sure.

THE COURT:  And it just, I'm picking on you because

we're talking about a $2.5 or so million claim in a situation where people are wanting the estate wrapped up and it's holding hundreds of millions of dollars, I guess.

MR. MORRIS:  Not that much, Your Honor.

THE COURT:  Not that much anymore.  Not that much anymore.  A lot has been paid out.  But a lot more than $2.56 million, shall we say.

MR. YORK:  Understood, Your Honor.  And I'm happy to have a conversation with Mr. Morris and see if we can reach a number that's agreeable to accept as, you know, the reserve.

THE COURT:  How hard could that be?  I don't mean to be --

MR. YORK:  Happy to do so.  Sure.

THE COURT:  How hard could that be, when we're talking about he's been paid $800,000 on his Class 9 ahead of his Class 8, which, to understand your argument, would be an absolute priority rule problem.  But, you know, --

MR. YORK:  Correct.  We indicated that --

THE COURT:  -- no picking and choosing what is problematic here.  And we're talking about $2.56 million is set aside, and we're talking about the prospect of liquidating it and paying whatever is appropriate way before the IRS is finished.  Maybe.  I don't know.  So how hard could it be to figure out --

MR. YORK:  I'm sure we can -- we can have a

conversation real quick and try to see if we can --

THE COURT:  Okay.  Well, it'll have to be during a break, --

MR. YORK:  Sure.  Happy to.

THE COURT:  -- because we're plowing ahead.  Okay. Anything else on your opening statement?

MR. YORK:  The only other thing I would point out with respect to the best interests of the estate is that the -- as part of the settlement, the Class 9 holders and the Class 10 holders are actually getting more favorable treatment than Mr. Daugherty's Class 8 claim because of the mutual releases that they're getting pursuant to the terms of the proposed settlement, including the fact that the Class 9 written consent holders who are all -- all have served on the board here are getting those releases as well under the proposed settlement.

THE COURT:  It's not a release by your client.

MR. YORK:  No, I understand that.  I understand that. But they're getting mutual releases from each other on litigation that Highland has -- the Claimant Trust, excuse me, has -- Trustee has, you know, consistently said that they had all of those parties, all of those defendants, dead to rights on.

So, that's all I have.

THE COURT:  Okay.  I really, I'm trying to focus on

people's standing.  Your client has standing.  He has a proof of claim that's unresolved.  But I'm just trying to understand the economic impact, I guess, on your client.  And all I'm hearing is, I don't know, that maybe he thinks more than $2.56 million ought to be reserved.  I mean, I'm --

MR. YORK:  Given the passage of time, and also given the fact that it's still undetermined as to what's going to happen with that audit and what the penalties might be, considering that the amount that was --

THE COURT:  But, again, this is bankruptcy-land.  We can't wait around 20 years, 30 years.  The Bankruptcy Code contemplates we can at some point estimate --

MR. YORK:  Sure.

THE COURT:  -- a contingent unliquidated claim.

MR. YORK:  I understand.

THE COURT:  So I -- all right.  Thank you.

MR. YORK:  Thank you.

THE COURT:  And Mr. Lang?

OPENING STATEMENT ON BEHALF OF THE DUGABOY INVESTMENT TRUST

MR. LANG:  We're down to three issues, one of which is the scope of the release, which I think we can work out with Mr. Morris, just to make sure people are carved out, being Dugaboy.

The second issue is the use of the dollar value from the capital account as the basis for the Class 10 claim versus

using the -- well, they're using it on the petition date versus using it -- the current capital account balance or the percentage interest of 99.5 percent, because that prevents the class, as structured, class level (inaudible).  And so we have an issue with why they're using the capital account as the basis for the allowed claim, when the plan is silent on how that equity interest is to be valued.

Does that make sense?

THE COURT:  Okay.  You have a problem with the valuation methodology used here, which was taking the capital account balances from --

MR. LANG:  On the petition date.

THE COURT:  -- on the petition date?

MR. LANG:  Versus using the ownership percentage of the equity on, as repeatedly stated, 99.5 percent of Highland is owned by HMIT, .5 is owned by the Class 11.

THE COURT:  Okay.  Well, I'm not sure what -- I guess you'll cross-examine Mr. Seery on different possible methodologies.

MR. LANG:  Yes.

THE COURT:  Okay.

MR. LANG:  And so then the third one is the authority issue on Mr. Patrick's authority to enter into the settlement agreement and the transfer of the Dugaboy Note to Mr. Patrick's entity, HMIT.

THE COURT:  All right.  And, again, I'll just clarify my understanding.  Dugaboy -- this came up earlier -- itself has a .1866 percent Class A limited partnership interest?

MR. LANG:  I think that's approximately right.  Not exact.  Is that Mr. Morris' sheet?

THE COURT:  It was in several pleadings.

MR. LANG:  Okay.  Yeah.

THE COURT:  Okay.  So the question will be, should that be valued at $740,000 or something different?

MR. LANG:  More -- there's $65 to $70 million in assets in the estate.  There's $20 million in Class 9 debt, is what Mr. Seery -- unpaid Class 9, is what Mr. Seery testified to.

THE COURT:  Uh-huh.

MR. LANG:  So it's $45 to $50 million would be left after payment of the Class 9.  And if they use the ownership percentages, Class 11 gets some money.  If they use a $333 million capital account, Class 11 gets nothing.

THE COURT:  Okay.  I presume that's a material difference, and I'm going to hear about that.

MR. LANG:  Yes.

THE COURT:  Okay.  And then I guess my other thoughts on his interest -- I say his; it's Dugaboy.  We tend to equate Dugaboy with Mr. Dondero since we've heard he and his family are the hundred percent beneficiaries.  There I guess is a

note that is addressed in the settlement.

MR. LANG:  Yes.

THE COURT:  I called it the $24.2 million note in my --

MR. LANG:  That was --

THE COURT:  -- preparation, but it's down to --

MR. LANG:  Seventeen-ish.

THE COURT:  -- $17 million or whatever.  So, right now, Highland is a payee on that note, as well as Get Good Trust, and Hunter Mountain under the proposed settlement gets to substitute in as a co-payee.

So I guess I'm just trying to, in my brain, figure out all the, just like I was doing with Mr. Daugherty, the economic impact of this settlement on your client.  And have I just addressed the two things in your view?

MR. LANG:  Yes.

THE COURT:  Okay.

MR. LANG:  I believe so.

THE COURT:  Okay.  Thank you.

All right.  Can we start with evidence?  At some point, we'll break for lunch, but we'll figure out as we go.  I don't want to be inconvenient to people if people have ordered lunch or something.

MR. MORRIS:  We are going to be finished with Mr. Seery on direct well before lunch.

Seery - Direct                                          83

THE COURT:  Okay.

MR. MORRIS:  Or by lunch, for sure.

THE COURT:  It's 11:30.

MR. MORRIS:  Yeah.

THE COURT:  So, all right.

MR. MORRIS:  I do -- I would be remiss if I didn't point out that Mr. Lang just raised yet another issue, the calculation of the allowed amount of HMIT's Class 10 claim. Nowhere in his pleading.  Again, hearing about this for the first time as I'm standing here.  He raised three issues, only one of which is in their pleading, only one of which I ever heard about from Dugaboy, and that is the scope of the release.

THE COURT:  Okay.  I don't know if it makes a material difference or not.  I am not a mathematician.  But --

MR. MORRIS:  So Highland -- the Movants call Mr. Seery.

THE COURT:  All right.  Mr. Seery, if you could approach the witness box.  I swore you in earlier for purposes of all testimony today, so you are under oath.

MR. SEERY:  Thank you, Your Honor.

JAMES SEERY, CLAIMANT TRUST'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. MORRIS:

Q   Good morning, Mr. Seery.

Seery - Direct                                              84

A    Good morning.

Q    Do you have three binders in front of you?

A    I have four binders in front of me.

Q    Okay.  I just want to make sure you have ours.

A    I think -- yes, sir.

Q    The fourth has the last few exhibits that we filed on the docket.

Should we wait for Mr. Edmond?

         THE WITNESS:  That would be good.

         THE COURT:  Yes.  I just noticed.  Okay.  The recording is always going, so never fear.

     (Pause.)

         THE COURT:  All right.

         THE WITNESS:  Apologies, Your Honor.

         THE COURT:  Oh, I didn't see what happened.  Was there a spill episode?

     And please, if people need breaks, let me know.  I sometimes go long without appropriate breaks, so let me know, anybody, if we need to break for bathroom.

         MR. MORRIS:  May I proceed, Your Honor.

         THE COURT:  You may.

         MR. MORRIS:  All right.

BY MR. MORRIS:

Q    Are you comfortable, Mr. Seery?

A    Yes.

Seery - Direct                                                    85

Q     I want to actually start a little unscripted with the argument that was just made on behalf of Mr. Daugherty.  Did you listen to that?

A     I did, Your Honor.  Yes, I did.  I'll speak to Your Honor.  Yes, I did, Your Honor.

Q     Did Mr. Daugherty have a Class 9 claim?

A     He did have a Class 9 claim.

Q     And what was the value of the Class 9 interest that he held?

A     It was approximately $3.7 million.

Q     And who are the other Class 9 claim holders?

A     There are three -- I'm sorry, there are four other Class 9 holders.  There is Muck Holdings, LLC.  There is Jessup Holdings, LLC.  There is UBS AG.  And there's UBS Securities, LLC.

Q     Okay.  And if you can turn to Exhibit 58, which is in Volume 1.

         A VOICE:  Mr. Morris, what was the exhibit number?

         MR. MORRIS:  It's 58.

         A VOICE:  Thank you.

         MR. MORRIS:  You're welcome.

BY MR. MORRIS:

Q     Do you have that in front of you, sir?

A     Yes.

Q     What is that?

Seery - Direct                                              86

A    That is a distribution notice to Mr. Daugherty from the Highland Claimant Trust with the eighth distribution.  And I believe this would be related to his Class 9 claim.  It may be some 8 -- some Class 8 as well.  But March 25 is -- I'm sorry, May 25, my eyes are not that great for close up, this is just related to the payoff of his Class 9 claim.  So he'd had a $3.7 million.  This was the last -- final payment, so he's been paid in full on his Class 9 claim.

Q    So do I have this right, that before you sent this $800,000-plus to him, he had already received $2.9 million on account of his Class 9 claim?

A    That's approximately correct, yes.

Q    And how many different distributions were made to Mr. Daugherty on account of his Class 9 claim before this last one?

A    Two -- two or three.  I believe the way we had phrased and put 8 is our total distributions including 8 and 9.  So he had a larger Class 8 claim as well.  I think it was approximately $8.25 million.  That's been paid in full.  His Class 9 claim was getting paid in full by this one.

Q    Okay.  And did Mr. Daugherty receive these prior distributions -- withdrawn.  Did the other holders of Class 9 claims also receive pro rata their Class 9 distributions at the same time as Mr. Daugherty?

A    Yes.  The distributions were pro rata.

Seery - Direct                                         87

Q    Okay.  Did Mr. Daugherty ever return any of the Class 9 checks that he received and say, oh my goodness, it violates the plan and the absolute priority rule and everything else because his Class 8 claim hasn't been paid in full?

A    No, he did not.

Q    Did he -- did he suggest that UBS or Muck or Jessup should return their checks that they received on account of their Class 9 claims because his Class 8 claim had remained unresolved?

A    No, he did not.

Q    Okay.  Let's go to the reason that we're really here today, the agreement itself.  Did you negotiate the settlement on behalf of the Highland entities?

A    Yes, I did.

Q    Can you describe for the Court how that came about?

A    In December, we had a hearing on -- this is a little bit convoluted, I apologize -- but in December we had a hearing on the HCLOM claim in court, and we settled that claim as a $10 million Class 10 interest.

We moved into the new year and we heard some -- at some point that HMIT disagreed with that settlement, even though HMIT had signed that settlement as acceptable to it in form and substance.  And the reason was because HMIT had been the only Class 10 -- not allowed, but the only Class 10 interest in -- under the plan, and defined that way, and we had agreed

Seery - Direct                                                88

pursuant to the plan to put HCLOM in there.

And although HMIT had signed in form and substance acceptable by its attorney, we learned that Mark Patrick had not been consulted and that attorney had simply -- because we were in the room -- had gone in and gotten permission from Mr. Dondero to approve that settlement in form and substance.  We didn't know it at the time.

That went away pretty quickly, and we understood that somehow it got resolved.

Shortly after that, sometime I believe in January or early February, there was contact between HMIT counsel and our counsel about a potential settlement.  And we had two issues, really, with Mr. Patrick, who controlled two separate entities.  There's the DAF entities he controlled and there's the HMIT entities.  And we wanted to make sure -- and we had disputes with both of them.  We had a Fifth Circuit appeal coming up in DAF and HMIT.  And so we were contacted and said, okay, we're willing to settle this if we can get to a place that makes sense to us.  And so that was the commencement of those negotiations.

Q    And can you describe -- how long did the negotiations last?

A    Well, there was negotiation around the NDA, which took some time, and I think we probably got that finalized at around the middle to end of March.  And then we began

Seery - Direct                                           89

negotiations in earnest during April.  And we took pretty much
the full month to get these negotiations done, maybe a month
and a half.

Q    Can you describe for the Court just how the negotiations
were conducted?

A    Well, initially, we ensured that the ground rules would be
set.  We didn't want to waste our time and expense if we
weren't going to reach agreement around particularly
litigation protections, because that's essential to us, and
having any settlement required that.

Secondly, we then -- from their side, they wanted
information.  So, pursuant to that NDA, which was rather
robust, we provided substantial information.

We then had a -- I believe one or two Zoom calls, and then
a face-to-face meeting, and then subsequently a number of Zoom
calls with our counsel -- usually, these were always with
counsel -- so, our counsel, their counsel, principals, my
team, Mr. Patrick and his team, to go through each of the
items that we exchanged.  And then we worked through a
framework to -- back and forth on that to a term sheet, to a
negotiated structured settlement along the lines of the one
you see.

Q    And did the parties exchange information as part of the
process?

A    Yeah.  As I explained, we, under our NDA, we gave a lot of

Seery - Direct                                                90

information.  We got information back from Mr. Patrick, Mr. Phillips, their teams, about the structure of their entities, how we could interact with them, who was responsible for each entity.  And that caused us to, frankly, move from just HMIT to a couple other entities to make sure we had full protection.

Q    Did you provide information concerning assets, budgets, expenses, and the like?

A    Yeah.  The detailed information we provided, it was pretty extensive.  So we gave a high-level view of our budget, assuming that we had a settlement with them.  We have an asset list that we keep and where each asset was located.  So, dollars amounts, what kind of form it was in, whether it was cash, whether it was U.S. Treasuries, whether it was, you know, equity interests.  Some couple other assets, as Mr. Morris explained in the opening, had not yet been disposed of.  And the valuations we put on those assets.

Q    Can you turn, I guess, to any volume, and let's just look at the exhibit list.  Are you generally familiar with the documentation concerning the negotiations?

A    Yes.

Q    Can you confirm that Exhibits 2 through 57 are the emails and information that were disclosed between the Highland side and the HMIT side during the negotiations?

A    Yes.  And I -- I could look through 2 through 57 now, but

Seery - Direct                                        91

--

Q    Yeah.

A    -- I have looked through them before, and this is the information back and forth.  We generally exchanged, other than at the face-to-face meeting, we exchanged information on Zoom calls as well, but when we get documents we gave them counsel-to-counsel.

Q    Okay.  And did you instruct me to produce all of the communications with the HMIT side in connection with the discovery requests that were served in this case?

A    Yes.  We had discovery requests that we went through in detail and reviewed them, and we produced in accordance with those requests.

Q    Are you aware of any document that we didn't produce that reflects the parties' negotiations of this agreement?

A    No, not at all.

Q    Can you describe for the Court the general deal points that were negotiated?  Withdrawn.  Who was your counterparty to these negotiations?

A    The principal on the HMIT side is Mr. Mark Patrick.  He had his team.  And I was responsible on our side with my team.

Q    And can you just describe for the Court what the primary negotiating points were between the two teams?

A    Yeah.  Number one for us was dismissal of outstanding litigations.  So we needed, with prejudice, dismissal of those

Seery - Direct                                                92

litigations.  Otherwise, why are we bothering?

Number two, we wanted to make sure that we had litigation protections.  These have been around since -- we came up with them during our mediation.  They're really important to us.  They set up a structure where we can actually count on the estate and the principals of the estate and the indemnified parties of the estate not being attacked.  So that was essential to us.

In exchange, we had to fix their claim and allow it in an amount pursuant to the plan, which requires us to fix an amount.  And that's the Class 10 interest that they have, which is senior to the Class 11 interests under the plan and the Claimant Trust Agreement.

And then the way the Trust is set up in the plan, it's a waterfall.  They -- we advocated for getting everything for us upfront and putting everything for them at the back.  They, understandably, didn't like that as much and wanted distributions upfront.  So we negotiated around those terms.  And I think those are the biggest terms.

We had some assets that we were -- we were -- difficult to monetize that we also were happy to dispose of in this way, with a credit, you know, towards their claim amount.

Q    Did you -- and I may have missed this; I apologize if I did -- but did you also negotiate the amounts and the timing of the distributions that would be made to the HMIT entities?

Seery - Direct                                     93

A    Yeah.  That's what I alluded to, where we -- we had hoped to get everything for us upfront, give them everything later. I think it's the *Wimpy* 'For a hamburger you give me today, I'll gladly pay you Tuesday' structure.  That didn't like that as much, so we did work on timing.  And that did bring into consideration the other Class 9 holders and timing with respect to payments to the Class 9.

Q    Was the topic of the allowed amount of HMIT's Class 10 interest the subject of negotiation?

A    The topic of the allowed --

Q    Did you discuss how the amount of its allowed interest would be calculated?

A    Oh, yeah, that was a, you know, a critical part of the -- or, you know, essential part of the structure.  What's the allowed amount they're going to get?  The plan requires an amount fixed for that class.  We had already had a $10 million HCLOM amount allowed into that class.  So we needed to fix that amount.

Q    So let's transition to that particular topic, the calculation of HMIT's Class 10 interest.  Are you familiar with the methodology that was used to arrive at the Class 10 amount?

A    Yes.

Q    Can you tell me the process, before we get to the methodology itself?  Like, what work was done to figure that

Seery – Direct                                            94

out?

A    Well, the structure of limited partnership is that the equity account is treated as what's called a capital account. Each limited partner in a limited partnership has a capital account that tracks their equity interest.  As a default rule, it's the amount that a limited partner can expect to get on a sale of the partnership or a liquidation of the partnership. So we used the capital account that had been maintained continuously by Highland to set their capital account amount.

I think the partnership agreement talks about 99-1/2 percent for HMIT.  It doesn't talk about dollars because that's kept in the accounting for the partnership.  And that amount was consistently kept by Highland up to the petition date.  And even after the petition date in the monthly operating reports.

Q    If you take a look back at the exhibit list, I would direct your attention to Page 12 of 15.  Actually, it starts at the Page 11.  At the bottom, it's got the heading, Capital Account Amounts.  Are you familiar with Exhibits 113 through 118?  And if you need to look at the exhibits, take your time.

A    Oh, I'm sorry.  I thought you told me 15.

Q    No.  One -- I did.  I mentioned Page 15.  But we're just looking at Exhibits 113 to 118.

THE COURT:  113 to what?

MR. MORRIS:  18.

Seery - Direct                                95

THE COURT:  Okay.

THE WITNESS:  Um, --

MR. MORRIS:  If you look at the index, Your Honor, at the bottom of Page 15 -- 11, you'll see a heading, Capital Accounts --

THE COURT:  Right.

MR. MORRIS:  -- Amounts.  And then that captures Exhibits 113 to 118.

THE WITNESS:  Yes.

BY MR. MORRIS:

Q    Are those the documents that you and your team relied upon in order to calculate the amount of the allowed Class 10 interest for HMIT?

A    These are some of them.  I don't know if you have the tax returns in here and the K-1s.  Oh, here they are.  115.

Q    Yeah.  That's 115?

A    Yeah.  You've got the K-1s for 2018, which fix an amount.  Those are signed by Mr. Dondero, and they give the amounts to each partner.  And then you've got the adjustments, because those are done in -- they're 2018 year-end.  They were done in September of 2019, about a month before the filing.

Q    And is that Exhibit 116?

A    It's 115 and 116.  I believe that's -- 116 is 2019, I believe, and that would have been signed postpetition by -- I believe that was signed by Waterhouse.

Seery - Direct                                    96

Q    Okay.

A    So it sets out the K-1.  The numbers that we have are slightly different because they're in the -- they're not middle of the year, but they're for the petition date of 10/16/19.  And there are -- there's economic activity that happens during the year, that you take the year-end from '18 and you have economic activity that would affect, pursuant to the partnership, the capital account of each partner during that year,  fixed it on the petition date, and then it's been forward since.

Q    Did you apply any of your own subjective views or beliefs in the calculation of the amount of the Class 10 interest held by HMIT?

A    No.  This was math.

Q    And did you hear Dugaboy's counsel suggest in the opening that there was a different methodology that perhaps you could have used, a pro rata methodology, instead of the methodology you used?

A    I heard what he said, but it doesn't make any sense.  You can't fix an amount that way.

Q    And do you understand that Dugaboy, under the partnership agreement, is subordinated to HMIT?

A    Dugaboy is subordinated under the partnership agreement for certain distributions.  But importantly for our purposes, they're subordinated under the plan.  So the Class 11

Seery - Direct                                                    97

interests are explicitly subordinated to the Class 10

interests, in both the plan and the Claimant Trust Agreement.

Q    Did the Debtor consider putting Dugaboy and HMIT in the

same class?  Back when the plan was being formulated?

A    I -- I don't recall.

Q    Do you recall why they're in separate classes?

A    They -- they're in separate classes because HMIT had a

senior -- a right to senior distributions under the

partnership agreement.  We set it up that way.  Nobody

objected to it.  That was part of the confirmed plan and the

confirmed order.

Q    Thank you very much.  Let's talk for just a moment about

Mr. Patrick's authority.  Before entering into the settlement

agreement, did you do anything to satisfy yourself that Mr.

Patrick had the authority to enter into the settlement

agreement on behalf of each of the HMIT entities?

A    Yes.

Q    What did you do to satisfy yourself?

A    Well, as a default rule, I always look at the agreements

that I'm going to enter into and the organizational docs.  And

we did do that.  We looked at each of the organizational docs

to --

Q    Let me stop you there for a second.  Are those the

documents that are in the exhibit list from 70 through 104?

A    I'd have to check the actual numbers, but --

Seery - Direct                                    98

Q    If you just look at the exhibit list.

A    Oh.

Q    It's at the front.  You'll see on Page 8 of 15 of the exhibit list there's a heading, --

A    Yes.

Q    -- E, Patrick Authority, and then I'm asking you if you are aware of what Exhibits 70 through 104 are?

A    Yes.  So, these, these are -- there's a number of organizational documents that we looked and made sure that Mr. Patrick had authority.

We also knew from our own files that Mr. Patrick, you know, previously had different interests assigned to him, and we know from Mr. Patrick and documents he's given us that John Honis, who was a former controller of some of -- controlled some of these entities and a friend of Dondero's who previously worked at Highland, is on some retail boards, in 2022 transferred those interests to an entity controlled by Mr. Patrick.

Moreover, Mr. Patrick was here in court as the HMIT Administrator, trying to sue the Highland estate.  He testified on behalf of HMIT as the Administrator.  And the documents are very clear that the Administrator has full control of these entities.

Q    We've heard some argument about a Cayman Islands proceeding.  Are you generally aware of what's happening in

Seery - Direct                                          99

the Cayman Islands?

A    I hesitate to say generally aware.  I'm aware that there's a proceeding in the Cayman Islands about involving a blocker corp.  And there's disclosure in this Court about what that entity is.  It's a blocker corp. in the Caymans that prevents the ultimate charitable entities -- and I put that in quotes -- to -- from receiving UBTI, which is Unrelated Business Income.  And in that case, they would have to pay tax on it, and the idea is that they don't want to pay taxes and they don't pay taxes.  So that corp. apparently is in some sort of proceeding.  That's on the DAF side.  That is not on the HMIT side.

Q    Okay.  So, based on the work that you did and the documents that you reviewed, did you form a view as to whether or not Mr. Patrick is authorized to enter into the settlement agreement on behalf of each of the HMIT entities?

A    Yes.

Q    And what view did you reach?

A    He has complete authority over each of these entities. They run up to entities that he controls or he owns.  And he's had that, and it's the structure that was set up a long time ago, and any changes to that structure are just consistent with the documents that let him do these things.  And the proceeding in Cayman, whatever that is, has no impact on Mr. Patrick's authority over these entities or any of the entities

Seery - Direct                                    100

in this chain.

Q    Did you see anything in the diligence that you conducted
that required Mr. Patrick to seek anybody's authority,
consent, or approval before entering into the settlement
agreement on behalf of the HMIT entities?

A    No.  And we could go through each document.  He has
complete authority on each of these entities.  And even the
objections that were filed that were withdrawn from The Dallas
Foundation, they have no -- it's absolutely clear that they
have no rights to deal with at all the management of each of
these entities.  They don't have an ownership interest in it.
Crown issued an annuity policy that's a variable policy.  They
have no rights.

Q    All right.  Let's turn to the agreement itself.  Can you
tell the Court why you believe that the settlement agreement
is in the Claimant Trust's best interests?

A    Number one, this case has been going on for a full five
years.  We have spent tens of millions of dollars dealing with
vexatious and frivolous litigation and attacks.  The
opportunity to settle with a Class 10 holder and allow their
claim under the terms of the settlement is extremely valuable
because it moves us much, much closer to a potential
resolution of this case, which we would all love to resolve.

     Number two, it's fair value for the estate.  We are making
sure, while we're paying some money out in front, we have

Seery - Direct                                        101

triggers on the backend payments to ensure that the Indemnity Trust has enough assets to protect parties if there are unforeseen litigations. And I can almost bet there'll be at least one or two of those. So it's really, really valuable in that respect.

Three, it cuts down tremendously on what future expenses could be. Because we have gotten these litigation protections, we've basically walled off a potential avenue to be attacked. And I think the structure of this deal is valuable, not only to the fiduciaries and folks who have been responsible for managing this process and who are indemnified by the Claimant Trust or HCMLP, it also enables us to, down the road, pay off the Class 9s and ultimately make distributions to the Class 10s.

Q   Is one of the other benefits to this agreement is that it enables the Claimant Trust to dispose of certain illiquid assets?

A   Well, that's a -- that is a benefit, because we do have to resolve these claims and dispose of these assets, and we're not in a position to hang around until 2030 or more to do that.

So we've got the Kirschner claims, which would go to HMIT. Again, the way that the waterfall is set up, to the extent that they have value, they are very expensive to pursue. We've spent a ton of money setting them up. We've produced

seven million documents, pages, and received zero in return. We stayed them because we didn't think we needed them for the Class 8 and 9 and it was prudent to do so, and the question was would we need them for indemnification.  So disposing of those claims now at this time as part of this settlement, where that value would go to Class 10 anyway, is very valuable.

Q    Had you made any efforts prior to entering into this agreement to monetize or otherwise sell the Dugaboy Note?

A    Yes.

Q    Can you describe for the Court what your efforts were in that regard?

A    So, we set out to try to monetize the Dugaboy Note.  I contacted -- we put together what we call a teaser, laying out what we knew about Dugaboy, at least up until the time that Dugaboy was no longer part of our computer system.  Laid out what we thought the assets were.  There's not a lot of public information.  Laid out the amortizing of the note.  It's a 3.2 percent-ish, 3.26 percent note, I believe, goes to 2047, '46 on the amortization, 2047.   And then presented that to I think it's five different investors in distressed funds.  Had no interest whatsoever.  One investor laughed at me, which I understood that he was aware of the parties and the principals and the collection efforts that would be difficult on that note.

Seery - Direct                                                    103

The note is performing, because if it hadn't performed I would have accelerated on the first second and we would have collected the whole thing.  But we've seen that show in the other Notes Litigation.  And so we didn't -- we didn't get any reception.

We also reached out to Mr. Dondero, in writing, through D.C. Sauder, and made them an offer and tried to get them to respond, and they indicated they had no interest in the note.

Q    Turning back to the exhibit list, if you can turn your attention to Page 11 of 15 of the exhibit list, is Section F, Exhibits 105 through 112, the documents that reflect the note and your efforts to dispose of the note?

A    Yes.

Q    And let's take a look at Exhibit 112 quickly, since that involves Mr. Dondero.  Can you just tell the Court what this exhibit is?

A    Yes.  This is an exchange between D.C. Sauder, Matt McGraner, both of whom work for Dondero, and Dave Klos, our CFO.  I'd authorized Dave to make an offer to them to see if we could get cash for the Dugaboy Note.  And as you see right below the reply from Mr. Klos, which is -- this is friendly, but Mr. Sauder's indication that they have no interest.

Q    Okay.  So Highland offered to sell the Dugaboy Note to Mr. Dondero or entities controlled by him, and that offer was rejected without a counteroffer.  Do I have that right?

Seery - Direct                                                    104

A    That's correct.

Q    Okay.  Let's finish up here.  Are you familiar with the objections of Dugaboy and Mr. Daugherty that the settlement somehow violates the plan because it's making distributions to Class 10 before junior classes are paid in full?

A    Yes.  I'm familiar with those.

Q    Do you believe the settlement violates the plan?

A    Not at all.

Q    And why is that?

A    The plan specifically contemplates that -- I don't think it's -- we showed the 9 and 10s, but I think it's any claimant could take less than is being offered by the plan.  What we did very specifically is go to the Class 9 claimants and discuss with them this opportunity to settle with HMIT and what it would take, which included some, as I described earlier, payments upfront.

After being fully informed -- they asked a lot of questions, they pushed back quite a bit, as you can expect that they would -- and we reached agreement with those Class 9 claimants in writing to approve the structure of the deal and the settlement and the concurrent payments, as well as the final small payment to Mr. Daugherty on behalf of his Class 9 claim.

Q    Could I trouble you to turn to Exhibit 59, please, Mr. Seery?

Seery - Direct                                                105

A    I've got it.

Q    Are you familiar with that document?

A    I am, yes.

Q    Can you explain to the Court what that document is?

A    This document is the written consent that we entered into with the Class 9 claimants, approving the settlement agreement as well as the payment to Mr. Daugherty.

Q    Okay.

A    And -- and -- so these -- the payment to Mr. Daugherty would have been non-pro rata, so they agreed to that.  And the concurrent payments under the settlement agreement to Class 10 were agreed to by the Class 9 claim holders.

Q    So looking at Page 2 at the top, do I have this right, that Mr. Daugherty's original Class 9 subordinated claim was in the amount of $3.75 million, and that with the payment described in this document his claim was paid in full?

A    That's correct, yes.

Q    And did he complain that he was getting paid in full but the other Class 9 holders were not?

A    No.  That had never been his complaint.

Q    Did he complain that he was getting paid in full on his Class 9 claim but his Class 8 claim remained unresolved?

A    No.  I think that, as indicated before in my testimony and indicated here, this was the last payment, the 781.  Before that, he'd received almost $3 million on account of his Class

Seery - Direct                                                                 106

9 claim.  And pro rata with the other Class 9 claimants.

Q    I think you mentioned that your understanding is that, under the plan, creditors can elect to receive less favorable treatment than the plan otherwise provides.  Is that right?

A    That's correct.  And I think that's a pretty standard provision in virtually every plan that I see.

Q    Can we just grab that for a second?  It's the last exhibit, 126, which is probably in the skinny binder, if you have one.

A    Yes.  Do you want me to go to the section?

Q    Yeah.  Just one minute.  I want to make sure the judge is with us.  Give her a second.

        MR. MORRIS:  Are you with us, Your Honor?

        THE COURT:  Yes.

        MR. MORRIS:  Okay.

BY MR. MORRIS:

Q    So if you can turn to Page 23 of Exhibit 126.  Does Section 9, under Treatment, Romanette (ii), is that the provision that you were just describing that gives Class 9 holders the ability to receive such other less-favorable treatment as to which such holder and the Claimant Trust may agree upon in writing?

A    That's correct.

Q    And the same is true with respect to the Class 10 claims, at the top of Page 24?

Seery - Direct                                            107

A     That's also correct, yes.

Q     All right.  And so was the consent that was executed by the Class 9 holders that's Exhibit 59 done in satisfaction of these plan provisions?

A     I'd say it's consistent with these.  They could elect to receive it or not, but this was, you know, did it under this provision and they were entitled to elect to take lesser treatment, if that's what they agree to.

Q     Okay.  Can you describe for the Court why you believe that the Class 9 claim holders are receiving less-favorable treatment under -- as a result of this settlement agreement than they would otherwise be entitled to under the plan?

A     Well, they would be entitled to receive payments in front of any payments that would be made to Class 10.  In addition, they would have been entitled to receive a pro rata distribution of the $800,000 that was paid to Mr. Daugherty, and they agreed to waive those provisions.

Q     Okay.  Is it your understanding that HMIT is also accepting less favorable treatment than it might otherwise receive if it pursued and succeeded in the prosecution of its claim?

A     I suppose, ultimately, if everything was resolved, that they could have gotten a Class 10 interest that wasn't structured along the lines of the settlement agreement.  So the settlement agreement takes some of that structure and what

Seery - Direct                                                  108

arguably would be value away from them, and this is the amount
that they've agreed to have as their allowed claim, as
structured by the settlement agreement.

Q    And is it your understanding that under the settlement
agreement HMIT has disavowed any rights under the Claimant
Trust Agreement?

A    Under the Claimant Trust Agreement, yes.  They have rights
under the settlement agreement to receive distributions, and
those will ultimately come from the Indemnity Trust as we wind
down the Claimant Trust.

Q    And did HMIT also agree that it would not be a Claimant
Trust beneficiary under the Claimant Trust?

A    Yes.  And that's very important to us because we have seen
lots of litigation, lots of emails, trying to use these types
of structures just to create claims, even when there's
literally no basis for it.  I should -- well, I'll control
myself.

Q    Yeah.  We can stop there.

        MR. MORRIS:  Your Honor, I have no further questions
at this time.

        THE COURT:  All right.  We're going to figure out,
are we taking a bathroom break or a short lunch break.  I'll
poll the audience and then I'll decide.  Do people want to
take maybe a 30 to 45-minute lunch break, or just a bathroom
break and keep going?

Seery - Direct                                        109

THE WITNESS:  Thirty minutes.

THE COURT:  I'll say -- are you going to have any further examination?

MR. PHILLIPS:  I'm going to maybe ask one question, just to bring it up.  It's already been -- but one question.

THE COURT:  Okay.  And then what about Dugaboy and Daugherty?  Guesstimate how much examination you'll have.

MR. YORK:  Fifteen minutes, maybe.

MR. LANG:  Twenty minutes or so.

THE COURT:  Why don't we take a five-minute bathroom break, --

MR. PHILLIPS:  Sure.

THE COURT:  -- and then we'll at least finish this witness.

MR. PHILLIPS:  Perfect.

THE COURT:  All right?

MR. PHILLIPS:  Thank you, Your Honor.

THE WITNESS:  Thank you.

THE CLERK:  All rise.

(A recess ensued from 12:07 p.m. until 12:15 p.m.)

THE CLERK:  All rise.

THE COURT:  Please be seated.

(Pause.)

THE COURT:  All right.  Can I get some help rounding people up?

Seery - Cross                                    110

(Pause.)

THE COURT:  All right.  We're missing -- okay.  We're going back on the record in Highland Capital.  We still have Mr. Seery on the witness stand.  Mr. Phillips, you had examination.  You said one question.

MR. PHILLIPS:  I did, Your Honor.  And I meant it.

THE COURT:  Okay.

CROSS-EXAMINATION

BY MR. PHILLIPS:

Q    Could you look at Exhibit 118, please?

A    You said 118?

Q    Yes, sir.

A    Certainly.

Q    Did the calculation of the Class 10 claim amount of $336,940,230.58, is that the result of applying the full value to the Highland or Highland Claimant Trust of the HMIT note receivable?

A    Apologies, because I can't read this because it's too small, but I can answer the question.

THE COURT:  Would you like this?

THE WITNESS:  I think I can answer the question without it.

THE COURT:  Okay.

THE WITNESS:  The -- what we used was the petition date capital account.

Seery - Cross                                                    111

BY MR. PHILLIPS:

Q    Correct.

A    And just like every other claim in bankruptcy, fixed at the petition date.  And what we subtracted from that petition date was the petition date amount principal and interest of that HMIT note which was owed to Highland Capital.

Q    Thank you.

THE COURT:  All right.  That was one question.

All right.  Counsel?

MR. YORK:  Thank you, Your Honor.  Get it organized here.

CROSS-EXAMINATION

BY MR. YORK:

Q    Good afternoon, Mr. Seery.

A    Good afternoon.

Q    Would you take a look at Exhibit 1 in Daugherty's witness and exhibit binder?  It's the settlement agreement between Highland and Mr. Daugherty, I believe.

A    Yes, I have it.

Q    All right.  And can you confirm that is the settlement agreement that Highland and Mr. Daugherty entered into in connection with the claims Mr. Daugherty asserted in the bankruptcy?

A    It appears to be, yes.

Q    Would you turn to Section 9, then, which is on Page #11,

Seery - Cross                                                    112

starts on Page #11?

A    Yes.

Q    And that relates to a reserved claim that Mr. Daugherty had as part of his proof of claim against Highland in the bankruptcy, correct?

A    That's correct.

Q    And would you agree with me that the second line of Section 9 there of the settlement agreement describes that claim as a contingent unliquidated claim against the Debtor?

A    I would not agree with you on that, no.

Q    Why not?

A    Because it says, Daugherty contends --

Q    Ah.  Daugherty contends.

A    -- he has a contingent unliquidated claim against the Debtor.

Q    Okay.  Well, why don't you then turn with me to Daugherty Exhibit #2, which is the -- which is the -- Highland's adversary complaint that was filed against Mr. Daugherty on I believe May 2nd of 2025.  Correct?

A    I don't recall the specific date and it's blurred at the top.  So if you say so, I'll accept that.

Q    All right.  And if you look at Paragraph 1, the third line, there's a sentence there that says, All of Mr. Daugherty's claims were settled except his unliquidated contingent claim that the Debtor has a continuing and

Seery - Cross                                113

indefinite obligation to make him whole if a tax refund he

apparently received for tax year 2008 on account of his

partnership interest is ever successfully challenged by the

IRS.

     Did I read that correctly?

A    You did read that correctly, yes.

Q    All right.  This reserved claim under the settlement

agreement is a Class 8 unsecured claim, correct?

A    It is the claim that he asserted and that we initially

classed under Class 8 in a fixed amount for a tax refund which

is on his statement that he got that he claims he's entitled

to more, which would be unsecured as of the petition date.  I

believe the amount on his payment statement from 2009 is

$1.475 million.

Q    All right.

          THE COURT:  Could you pull the microphone closer to

you?

          THE WITNESS:  I'm sorry, Your Honor.

          THE COURT:  Okay.  Good.

          MR. YORK:  All right.

BY MR. YORK:

Q    And, again, my question is pretty simple.  And it's a

Class 8 unsecured claim, right?

A    It's not a Class 8.  It was in Class 8.  It's been

objected to.

Seery - Cross                                              114

Q    Right.

A    So it is not in a class now at all.  We seek to disallow it in its entirety, or, at worst, subordinate it to all creditor claims.

Q    Understood.  But it has been asserted as a Class 8 general unsecured claim, right?

A    He asserted it as that, yes.

Q    Okay.  And is it fair to say that in the adversary complaint, if you go to Page -- I'm sorry, Paragraph 4 -- Highland alleges that:  However, even if Mr. Daugherty's claim is not disallowed in its entire -- I think that should be entirety.  Right?

A    It should be, yes.

Q    It remains contingent on the outcome of the 2008 audit.  Correct?  Did I read that correctly?

A    You did read that correctly, yes.

Q    And the next sentence says, It is unclear when, how, or if the 2008 audit will finally be resolved.  Correct?

A    Correct.

Q    And in fact, if you go to, then, Page #7 of the complaint and you look at Footnote 6, at the very end of that footnote it indicates that Highland has an understanding that the resolution may not be expected until approximately 2029.  Is that correct?

A    The litig... I can't read it because it's small, but the

Seery - Cross                                                    115

litigation may not be resolved.  The IRS has already issued a

final determination on the audit.

Q    How do you know that?

A    I was advised that by another partner.

Q    Who?

A    Kurt Plumer.

Q    Have you seen the FPAA that was issued by the IRS?

A    No, I have not.

Q    Have you asked for it?

A    Yes.

Q    You did, personally?

A    My lawyers did.

Q    Your lawyers did?

A    Yes.

Q    Okay.  But you -- but you did not, right?  Just to be

clear.

A    No, I did not.  My lawyers, acting at my direction, did.

Q    Asked the tax matters partner for Highland for that

information?

A    Asked Mr. Daugherty.

Q    Asked Mr. --

A    I think asked you, I'm sorry.

Q    Oh, asked me for that information?

A    Yes.

Q    Well, so tell me, why is Mr. Daugherty -- first off, do

Seery - Cross                                      116

you know if Mr. Daugherty has received the FPAA?

A    I don't know.

Q    Okay.  Do you know if anybody else has received an FPAA?

A    I was told there was a final determination.  I don't know if they've actually received an FPAA.  But I do know that Mr. Daugherty has produced a document where the IRS has requested additional information for him.  Since they hadn't done that for 17 years, I suspect that they've reached a final determination of the audit.

Q    All right.  So you don't know whether an FPAA has actually been issued?

A    I --

Q    True?

A    I don't know.  And for the Court's benefit, that's a Final Partnership something Determination.

Q    Okay.  What -- where --

THE COURT:  F-A --

THE WITNESS:  F-P-P -- I think it's --

MR. YORK:  F-P-A-A.

THE WITNESS:  -- F-P-A-A.

THE COURT:  Okay.  The court reporter will no doubt ask, so good.

BY MR. YORK:

Q    Tell me, where in the universe is it that -- is it Mr. Daugherty's obligation to provide Highland with the FPAA?

Seery - Cross                                                      117

A     I don't -- I don't think there's any such obligation that I've seen.

Q     And in fact, the IRS audit is handled by the tax matters partner for Highland Capital, correct?

A     The IRS audit for Highland Capital's -- from Highland Capital's position is handled by that.  The IRS handles their side.

Q     Right.  From Highland's side.  Okay.  And that tax matters partner is doing that on behalf of Highland Capital, right?

A     I think at this point it's doing it on behalf of the old Highland Capital, not Reorg Highland Capital.  We don't have any liability with respect to it, nor do we have any visibility as to what's going on in the tax audit.

Q     So even though, under the partnership agreement, that's the tax matters partner that's referred to, Highland Capital cannot compel that tax matters partner to provide that information to them, if an FPAA actually exists?

A     I don't think so.  That partnership agreement is the pre-effective date partnership agreement.

Q     All right.

A     The new Highland Reorg Debtor doesn't have these partners and is not a tax matter partner for those -- those audits.

Q     So let's go back, then, to Paragraph 4 of the adversary complaint that was filed.  And I want to look at the next sentence that Highland wrote there.  It says:  Moreover, if

Seery - Cross                                                118

the claim is not disallowed, it will need to be estimated, after taking into account the likely outcome of the 2008 audit, including adjustments that result therefrom.

Did I read that correctly?

A You read that correctly.

Q Have -- has anyone at Highland conducted any analysis as of today to determine what Mr. Daugherty's potential liability would be from that IRS audit if that audit was completed today and all interest and penalties were assessed as of today?

A Yes.

Q How much?

A It would be $1.475 million, the amount of his prepetition claim in his proof of claim. Since it's unsecured, whatever happens with the IRS is not a concern of Highland. His claim is that he didn't get that amount as a refund. Either he got that amount or he got some -- some lower amount. It would be a petition -- prepetition-date amount. And under Texas law, he would be entitled to prejudgment interest from 2009 to the petition date at a rate of five percent.

Q Which would be how much?

A It would be approximately $2.2 million in aggregate.

Q Okay. And there would be -- you're saying there would be no penalties or any other -- any other interests or assessments that would -- Mr. Daugherty would be liable for that Highland would also then be liable for under that claim?

Seery - Cross                                                    119

A    No.  There would not.  It would not impact his claim against Highland.  His claim against Highland is simply:  I did not get this refund.

He got the refund.  He's now claiming it might be adjusted.  If the IRS otherwise has penalties, interest against him for his tax attributes somewhere between 2009 and 2019, that wouldn't be subject to his proof of claim and it wouldn't be the responsibility of Highland.

Q    Even if Highland had promised at the time that that refund was made that it would -- it would make him whole with respect to any IRS audit whatsoever?

A    It simply --

MR. MORRIS:  Objection to the form of the question.

THE WITNESS:  It simply didn't do that.

MR. MORRIS:  Yeah.

THE COURT:  Okay.  Overruled.

THE WITNESS:  We can -- you could litigate the claim, but that's just not what it says.

BY MR. YORK:

Q    So you talked earlier about the Class 9 consent that was obtained, and no one from Highland reached out to Mr. Daugherty to try to seek his consent.  Right?

A    That's correct.

Q    Why not?

A    Because I didn't want to.

Seery - Cross                                                    120

Q    Why?

A    Because Mr. Daugherty is an extremely difficult person to deal with.  The last time I dealt with Mr. Daugherty on the phone with respect to anything, I had extreme difficulty and got sucked into a stalking lawsuit that I had to testify to that is a complete mess that I want nothing to do with.  So originally my counsel said, have no communication with him.  But with respect to this, we were objecting to his claim.  We knew he would try to hold this up.  You have tried to do that and demanded $20 million.  So that's why we didn't reach out to you.  We just paid the 9 and we have a fully-reserved amount on the 8.

Q    You thought that the stalking case that you were pulled into was completely fabricated, didn't you?

A    I thought that at the time.  I'm not as sure anymore.

Q    Oh, really?

A    Yeah.

Q    Okay.  And you actually also told Mr. Daugherty that Mr. Ellington, who brought that case, was a complete liar and POS, right?

A    I don't know if I used POS, but I do not think Mr. Ellington is an honest person.

          MR. MORRIS:  Your Honor, at some point I'm going to on relevance grounds.  I think we've got a settlement agreement before the Court that we're trying to get approved

Seery - Cross                                          121

today, not to take discovery on any other matters.

THE COURT:  Okay.  I'm going to overrule to the extent there was an objection, but I think it's appropriate to worry that we're straying down a road that is not relevant. So, --

MR. YORK:  Understood.

THE COURT:  -- reign it in.

MR. YORK:  All right.

BY MR. YORK:

Q    You'd agree that the -- under the terms of the proposed settlement, there will be some interim distributions will be made to the HMIT entities in cash totaling approximately $23 million.  Correct?

A    Not necessarily, no.

Q    Why not?

A    Because there's an initial distribution.  I believe it's $10 million.

Q    Yes.

A    And then subsequent distributions are predicated on whether there are threats, either outstanding litigation or threats as defined in the agreement.

Q    And so long as those threats don't occur, then those interim -- those additional interim distributions will be made, right?

A    Yes.  The Indemnity Trust would make those distributions

Seery - Cross                                          122

at those times, and then I have to make -- it's a double
trigger, because it has to be no threats and I have to
determine that the Indemnity Trust had sufficient assets to
meet its obligations for both actual and contingent
indemnification obligations.

Q    But at a minimum, the HMIT entities will receive at least
$10 million?

A    Yes.

Q    On an interim basis?

A    Yes.

Q    All right.  And you'd agree with me that, under the terms
of the plan, the plan provides that the classes get paid in
order of priority, correct?

A    That's correct.

Q    All right.  And if you turn to Daugherty Exhibit 4, which
is the confirmation order, at Page 45.  And Subsection A there
in the middle of that has a sentence that says:  Accordingly,
as the holders of the equity -- excuse me.  Strike that.  Let
me start over.  Are you there yet, Mr. --

A    Now I am.

Q    All right.  Accordingly, as the holders of equity
interests that are junior to the claims in Class 8 and Class 9
will not receive or retain under the plan on account of such
junior claim interest in any property unless and until the
claims in Class 8 and Class 9 are paid in full, plus

Seery - Cross                                    123

applicable interest, --

Did I read all that correctly?

A    Yes.

Q    Okay.  And the term "Claim" there is a capitalized term, right?

A    Yes.

Q    It's not -- it doesn't say allowed claims.  It just says claims.  Right?

A    That's correct.

Q    All right.  All right.  Now, if you'd turn with me to the Claimant Trust Agreement, which is Daugherty Exhibit 5, and go to Section 5(c).  Excuse me.  5.1(c).  I apologize.

A    Yes.

Q    And this is -- this is -- relates to the contingent trust interests associated with the Class 10 and Class 11 limited partnership interests in Highland, correct?

A    Generally, yes.

Q    All right.  And you'd agree with me that, in the -- about four lines down, it says:  The Claimant Trustee shall allocate to each holder of allowed Class 10-B and C limited partnership interests and each holder of allowed Class 11 Class A limited partnership interests a contingent trust interest equal to the ratio that the amount of each holder's allowed Class 10 or Class 11 interest bears to the total amount of the Class 11 or -- Class 10 or Class 11 interest, excuse me, as applicable

Seery - Cross                                                124

under the plan.

Did I read all of that correctly?

A    I believe you did, yes.

Q    All right.  And under the terms of the proposed settlement, the HMIT entities are getting an allowed Class 10 interest, correct?

A    That's correct, yes.

Q    All right.  And then the next sentence goes on to say: The contingent trust interest shall not vest and the equity holder shall not have any rights under this agreement unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all GUC beneficiaries have been paid indefeasibly in full, including, to the extent applicable, all accrued and unpaid postpetition interest consistent with the plan and all disputed claims have been resolved.  The GUC Payment Certification.

Did I read that correctly?

A    You did, except you used the article "The" before "contingent trust interest" at the start of the sentence.

Q    Fair enough.  And the GUC beneficiaries there would be the general unsecured creditor beneficiaries, correct?

A    That's correct.

Q    And this certification has not been issued yet by the Claimant Trustee in this bankruptcy, correct?

A    That's correct.

Seery - Cross                                          125

Q    In part because of Mr. Daugherty's remaining unresolved Class 8 claim, correct?

A    In part, yes.

Q    And also in part because of the remaining Class 9 claimant holders who still have money owed to them on their Class 9 claims?

A    In part, yes.

Q    Okay.  Does the term of the proposed settlement agreement provide those Class 9 consent holders with releases from the HMIT entities?

A    No.

Q    It does not?

A    No.

Q    At all?

A    No.

Q    Even if they were in their capacity serving as board members for Highland Capital?

A    Certain of the Class 9 holders are also on the Oversight Board.  In their capacity as Oversight Board members, yes, they get -- they get broad releases.  UBS, for example, is not.  There are no releases in there for the two UBS entities.

Q    Would you now -- you can set that binder aside.  And if you'd turn with me to Exhibit 60 in the -- Highland's exhibit list.

A    Six zero?

Seery - Cross                                              126

Q    Yes, sir.

A    Yes.

Q    This is a copy of the tolling agreement extending objection deadline between -- that's on -- dated July 27th of 2022 between Mr. Daugherty and Highland Capital Management, LP and Highland Claimant Trust.  Correct?

A    Yes.  That's what it appears to be, yes.

Q    All right.  If you would, go with me to Page 2 at the bottom.  There is a Footnote #3.  Do you see that?

A    Yes.

Q    And that footnote relates to, up above, a defined term called a "Reserved Claim," the Reserved Claim being what was discussed earlier in Mr. Daugherty's settlement agreement with Highland, right?

A    That's correct, yes.

Q    And it states in here that that Reserved Claim means "the contingent and unliquidated claim as referenced in Proof of Claim #205."

     Did I read that portion of the footnote correctly?

A    Yes.

Q    All right.  And it goes further to say that the amount listed there of 2.65 million three hundred -- two point six -- let me start ever.  $2,650,353 is the amount estimated as of October 23, 2020.  Correct?

A    That's correct.

Seery - Cross                                           127

Q    All right.  It doesn't say it's -- anywhere in there that it's a fully -- it fully reserves that unliquidated contingent claim.  Correct?

A    In what you just read, no.

Q    All right.  And if you go to Page 1 -- or, I'm sorry, to Page 3, Paragraph 1, the covenant to reserve where Highland agrees to reserve $2,650,353 on account of the reserved claim, does it say anywhere in there that that is -- fully reserves that contingent unliquidated claim anywhere?

A    It says exactly what it says.  And you read it.

Q    That's not my question.  Does it say --

A    I don't -- well, it says, Further agree to reserve $2.650 [million] on account of the reserved claim in disputed claim reserve.

Q    All right.  Does it say anywhere in there that that is the fully-reserved amount of that claim?

A    Not in that sentence, no.

Q    Thank you.  All right.

          MR. YORK:  Your Honor, give me one second.  Let me confer.

          THE COURT:  Okay.

     (Pause.)

BY MR. YORK:

Q    Mr. Seery, UBS is one of the consent holders, Class 9 consent holders related to the HMIT settlement.  Correct?

Seery - Cross                                    128

A    There are two UBS entities, UBS AG 66 and UBS Securities,
LLC.

Q    All right.  Did either of those entities sit on the
Unsecured Creditors' Committee in this bankruptcy?

A    A UBS entity did.  I'm not sure which of those did, or
whether it was both with one counsel.  I don't -- there's a
UBS entity on that Creditors' Committee.

Q    Is the -- are the members of the Unsecured Creditors'
Committee within the definition of the Highland released
parties under the proposed HMIT settlement?  Do you know?

A    I don't know.  The members of the Creditors' Committee, I
believe, have exculpation anyway, so I don't -- I don't -- I
don't know if it captures the old members of the Creditors'
Committee.  I don't -- for example -- I don't think so.  I
don't -- I don't know.

            MR. YORK:  Pass the witness.

            THE COURT:  All right.  Mr. Lang?

            THE WITNESS:  Do you have a separate binder?

            MR. LANG:  No.

            THE WITNESS:  Okay.  Will you be using Mr.
Daugherty's binder?

            MR. LANG:  No.

                    CROSS-EXAMINATION

BY MR. LANG:

Q    All right, Mr. Seery.  Just to be clear, the Class B and C

Case 19-34054-sgj11 Doc 4082 Filed 05/08/26 Entered 05/08/26 23:42:09 Desc
Exhibit 50 - Part 1    Page 139 of 256

Seery - Cross                                          129

-- or the Class A interests and the -- of Highland under the plan, they have 99.5 percent of the -- Highland Capital Management.  Correct?

A    Could --

Q    Sorry.  The Class B and C --

A    Limited partnership interest.

Q    -- shareholder -- limited partnership interests were 99 point -- or, were .5 percent of Highland Capital Management?

A    I -- I'm not trying to be difficult.

Q    No, it's fine.  It's a terrible -- terrible --

A    I don't -- I just don't -- I don't understand your question.  I apologize.

Q    Okay.  So, at the time of the petition, --

A    Yes.

Q    -- Hunter Mountain Investment Trust owned 99.5 percent of Highland Capital Management?

A    It owned 99-1/2 percent of the limited partnership interest in Highland Capital Management.

Q    And the remainder -- and HMIT has the Class 10 claims.  Correct?

A    You said something, the remainder?  The --

Q    Oh, sorry.  The remaining interests are owned by the Class 11 claims under the plan.

A    The remaining partnership interests are among those entities I testified earlier to, which are Dugaboy, Strand, --

Q    And Okada?

A    -- Mark Okada individually, and two Mark Okada and Pamela Okada trusts.

Q    Okay.  And the total assets in the estate right currently you testified are between $65 to $70 million?

A    I -- off the top of my head, I don't recall, but it -- rough range, it could be in that general vicinity.  That does not include the payments that have to be made to the 9s and expenses.  So I believe there's documents in here that we could go through, if you like.

Q    And I believe you testified that the remaining unpaid 9s are owed approximately $20 million?

A    Approximately $20 million, yes.

Q    Okay.  And the plan does not say that the equity claims for Class 10 and 11 are to be determined by the capital account values of the limited partnership interests in the Debtor LP?

A    That's correct.  It says to set an amount.  It doesn't tell you how to do the amount.

Q    Okay.  And under the settlement agreement, Class 10 interests will be allowed in the amount of $336,940,230.58?

A    Approximately $336 million, yes.

Q    $336 million.  Fair.  And this is the capital account balance as of -- HMIT's capital account balance as of the petition date, less, I believe, the HMIT note?

Seery - Cross                                     131

A     That's correct.  So that amount is the net amount.

Q     The net?  And do you know how the capital account balances were calculated --

A     Yes.

Q     -- on the petition date?

A     Yes.

Q     And how were they calculated?

A     So, you take the 2018 year-end capital account amount, and then there's activity in the company that gets passed through through the partnership.  The partnership agreement -- in this instance, the prepetition Debtor partnership agreement passed through profits and losses on a pro rata basis.  There was activity in the first half of the year that affected that capital account.  You can see that reflected in the year-end auditeds as well as the K-1 statement that -- for 2018 that was given to HMIT.  That would be their 2018 year-end.  That then, from an accounting perspective, was used and brought down to the petition date.  And between the petition date and year-end 2019, there was additional capital activity, the biggest one of which was the reserve -- full reserve for the $50-plus million for the HMIT note.  And so then you'll see the 2009 auditeds that are signed off by Mr. Waterhouse.  And in those interim months, then you also see the gross amount of the partner capital each month in the monthly operating reports.

Seery - Cross                                    132

Q    And correct me if I'm wrong, but I believe you testified that the capital account balances continued to go down after 2019.  So you have the petition date, you have the next year, and did they continue to --

A    I don't think I testified to that.  What I testified to is that there was economic activity in 2019 that affected the year-end '18 to the petition date.  And then from the petition date there was year-end activity -- there was activity from the petition date to year-end '19 that would affect the capital account as reflected in the 2018 auditeds -- they weren't auditeds -- 2018 tax returns signed off by Waterhouse. The biggest part of that activity was the application or the reserve for the Hunter Mountain Note.

Q    And was there any activity after the 2019 tax return?

A    There was postpetition activity in the partnership, certainly.

Q    And did it reduce the capital accounts during those years?

A    I assume it would have reduced all of the capital accounts pro rata.

Q    Okay.  And why'd you use the petition date as the date to determine the value of the capital accounts?

A    Because this is bankruptcy and that's the date on which you fix all your claims and interests.

Q    If you used -- have you ever used equity ownership percentages to determine the payment to the equity versus

Seery - Cross                                                    133

their capital account balances?

A    In this case, or elsewhere?

Q    Elsewhere.

A    I think that's standard.  I can't cite you a specific thing, but typically when a partnership liquidates or a partnership is sold, amounts get distributed pursuant to the capital accounts and -- and -- in up to amounts in the capital accounts.

Q    You would agree, if you use the percentage of ownership, being 99.5 percent for Class 10 and the .5 percent for Class 11, would potentially leave money for the Class 11 creditors to recover?

A    I don't think so.  No, I don't agree with that.

Q    Why do you say that?

A    Because Class 11 is subordinated to Class 10.

Q    Okay.  So explain how, if $60 million exists and you pay $20 million to the Class 9, --

A    Roughly.  Yeah.

Q    Rough.  Just rough math.

A    Okay.

Q    That leaves $40 million.

A    Okay.

Q    Correct?  And if the ownership interests or the allowed claim for HMIT was 99.5 percent, wouldn't that leave .5 percent of $40 million for the remaining creditors?

Seery - Cross                                          134

A    That doesn't make any sense, because 99-1/2 percent of a senior thing means you get everything.  So that Class 10 has to be paid in full before the 11.

In addition, there's already an agreed-upon amount on HCLOM for $10 million.  So how do I give HCLOM $10 million and 99-1/2 percent to somebody else?  There has to be numbers.

Q    But to be clear, the plan does not say that the equity claims are determined on capital accounts.  Correct?

A    That's correct.

Q    All right.

MR. LANG:  No further questions.

THE COURT:  All right.  Any redirect?

MR. MORRIS:  Just one moment, Your Honor.

(Pause.)

MR. MORRIS:  We have no questions, Your Honor.

THE COURT:  All right.  Any redirect from --

MR. PHILLIPS:  No, Your Honor.  Thank you.

THE COURT:  -- the one question?

Okay.  Thank you, Mr. Seery.  You are excused from the witness box.

THE WITNESS:  Thank you, Your Honor.

(The witness steps down.)

THE COURT:  Okay.  I'm going to again take proposals. I can live with a 30-minute lunch break.  I and my staff can. But it's easier for us than all of you.  So do you all want to

negotiate for more?

MR. MORRIS:  I just wanted to let the Court know that, with that, the Movants rest.  We're not -- we're not going to call anybody else.

THE COURT:  Okay.

MR. MORRIS:  We reserve the right to cross-examine. We reserve the right to call rebuttal witnesses, including Ms. Deitsch-Perez and Mr. Dondero, depending on what testimony is elicited.  So we reserve the right to call rebuttal witnesses. But we're not calling anybody further on our direct case, and we rest.

THE COURT:  Okay.  So let me --

MR. MORRIS:  I'll let them --

THE COURT:  -- follow up on that point.

MR. MORRIS:  Uh-huh.

THE COURT:  There had been a discussion of Mr. Patrick.

MR. MORRIS:  Uh-huh.

THE COURT:  Limited to one total hour.  Thirty minutes collectively, Debtor and HMIT.  Thirty minutes collectively, Dugaboy and Daugherty.

MR. MORRIS:  You know what, Your Honor.

THE COURT:  You're -- you're not asking --

MR. MORRIS:  No, maybe I -- I forgot that you had told us we could do it, too.  So let's take the lunch break,

let us figure it out, we'll let you know when we come back.

THE COURT:  Well, I'm clarifying because I'm deciding --

MR. MORRIS:  Yeah.

THE COURT:  -- who gets to go first.

MR. MORRIS:  Understood.

THE COURT:  Each witness.

MR. MORRIS:  Understood.

THE COURT:  And I presume --

MR. MORRIS:  Understood.

THE COURT:  -- the Debtor/HMIT would go first.

MR. MORRIS:  Yeah.

THE COURT:  And then with regard to Dondero, --

MR. MORRIS:  Yeah.

THE COURT:  -- you all would go first.

MR. MORRIS:  So I withdraw what I said.  Let us confer during the lunch break and we'll figure out who's going first, whether we do rest or whether we put Mr. Patrick on for a short direct.

THE COURT:  Okay.  Which leads me to our lunch break. Do people want to negotiate for more than 30 minutes?  I don't want to make someone collapse if --

MR. MORRIS:  Thirty minutes, or 1:30?

MR. PHILLIPS:  1:30.

MR. MORRIS:  1:30, Your Honor.  It's nice and round.

MR. PHILLIPS: One clarification, Your Honor. Because I don't -- I don't -- if one side doesn't take the half hour, does that go over to the other side, or --

THE COURT: No.

MR. PHILLIPS: No?

THE COURT: I don't think -- I'm just giving --

MR. PHILLIPS: Great. Thank you.

THE COURT: And my law clerk said maybe I was confusing about that earlier today.

MR. MORRIS: Yeah.

THE COURT: One hour total, but 30 minutes each. And if one collective team doesn't use the whole 30 minutes, we're not --

MR. MORRIS: Yeah.

THE COURT: -- giving it to the other side. Okay?

MR. PHILLIPS: That was my question.

MR. MORRIS: Understood, Your Honor.

THE COURT: And while I'll let you all discuss whatever you want, what I envisioned is you all would go first with Mr. Patrick, --

MR. MORRIS: Uh-huh.

THE COURT: -- and then Dugaboy and Daugherty would go first on Mr. Dondero. But if you all collectively think it makes sense to do something different, I'll hear.

MR. MORRIS: No. That makes sense, Your Honor.

MR. PHILLIPS:  Thank you, Your Honor.

THE COURT:  All right.  So we'll come back at 1:30 --

MR. YORK:  Yes.

THE COURT:  -- and resume.

MR. YORK:  Thank you so much.

THE COURT:  Okay.  Thank you.

THE CLERK:  All rise.

(A luncheon recess ensued from 12:51 p.m. until 1:33 p.m.)

THE CLERK:  All rise.

THE COURT:  Please be seated.  All right.  We're back on the record in the Highland Capital matter, the Rule 9019 motion for approval of a settlement.  When we broke, we were waiting to talk about Mr. Patrick and Mr. Dondero as witnesses.  Are they going -- is Patrick going to be your witness?

MR. MORRIS:  No, Your Honor.  We're going to reserve our 30 minutes for rebuttal.

THE COURT:  Okay.  Thank you.

All right.  I'll hear from the Objectors now.

(Pause.)

MR. YORK:  Sorry, Your Honor.  I didn't realize they were going to observe.  So, --

THE COURT:  Well, yes.  If you understood what I was saying before the break, I presumed they might want to go first with Mr. Patrick, but it was -- you're the one who

wanted him, so if they want to go second, they can go second.

MR. YORK:  Well, --

THE COURT:  Well, I say "you're."  I'm sorry.

MR. LANG:  No, it's okay.

THE COURT:  Mr. Lang wanted to go --

MR. YORK:  Yeah.  So are we definitely doing Mark Patrick now?

MR. PHILLIPS:  No.

MR. YORK:  Oh, okay.

MR. PHILLIPS:  We just rested.

THE COURT:  Okay.

MR. MORRIS:  They can call whoever they want.

THE COURT:  They have rested.  If you don't want to go forward with any witnesses, you don't have to.

MR. YORK:  Oh, we --

THE COURT:  But you had wanted to go forward -- you wanted to question Patrick and I said, if he's going to be a witness, then Dondero should also be a witness.  Okay?  And at most an hour collectively for each witness.  If you don't want to call either one of them, you don't have to call either one of them.

MR. LANG:  We're going to.  I think that they were just going to call Daugherty first.  I didn't know if you had an order that you wanted to do this in.

THE COURT:  Well, no.  I don't care.  I guess I don't

care.  Was Daugherty listed?  I mean, --

MR. YORK:  Yes.

THE COURT:  I'm sorry.  Did you say Daugherty or Dondero?

MR. LANG:  Daugherty.

THE COURT:  Okay.  I'm sorry.  So you want to call Daugherty?

MR. YORK:  Yes.

THE COURT:  And you listed him as a witness?

MR. YORK:  Yes.

THE COURT:  So you may call Daugherty.

MR. YORK:  All right.

MR. MORRIS:  Yes.  I --

MR. YORK:  We'll call Patrick Daugherty, then.

THE COURT:  Okay.

MR. MORRIS:  I don't believe Dugaboy did, but --

MR. YORK:  Right.

MR. MORRIS:  -- if they -- if they want to call him, by all means.

THE COURT:  Okay.

MR. MORRIS:  Yep.

THE COURT:  All right.  Mr. Daugherty, if you could approach the witness box, I will swear you in.  Please raise your right hand.

PATRICK DAUGHERTY, PATRICK DAUGHERTY'S WITNESS, SWORN

Daugherty - Direct                                141

THE COURT: All right. Please be seated.

THE WITNESS: Oh, wow. A lot of water up here.

THE COURT: Plenty of water for everyone.

DIRECT EXAMINATION

BY MR. YORK:

Q    Good afternoon, Mr. Daugherty. Could you state your name for the record, please?

A    Patrick H. Daugherty.

Q    Mr. Daugherty, are you a creditor in the Highland Capital bankruptcy?

A    Yes, I am.

Q    All right. And would you turn to, in the Daugherty exhibit binder, turn to Exhibit 1, please?

A    Yes.

Q    And this is a settlement agreement between you and Highland Capital Management relating to claims -- your proof of claim that you made in this bankruptcy, correct?

A    Yes.

Q    And we looked earlier. You were in the courtroom for Mr. Seery's testimony, correct?

A    I was.

Q    All right. And we talked in Section 9 about the defined Reserved Claim in there. Do you remember that?

A    I did.

Q    All right. Can you describe what --

Daugherty - Direct                                    142

A     I consider it the Compensation Claim, but yes.

Q     Can you describe what the Reserved Claim is?

A     Yeah.  Basically, it, background, it dates back to the financial crisis of 2008, 2009.  Highland was on the brink of filing for bankruptcy.  We had a creditor bank led by Bank of America and Scotia, and we were in default.  And so the banks came in, declared default, and basically put a limit or terminated our ability to pay cash bonuses.  And that -- right after Lehman Brothers failed, so call it September 2008 and going into 2009.

      And the problem with that is we were losing people right and left.  We had about 22 senior-level guys.  We were down -- and I say guys.  I think there were some women, too.  But we were down to about 12 people.  And they were trying to stem the tide of people running out of the doors in order to save the value of Highland.  We started the year at about $40 billion under management, and by that time, we were -- I think we were as low as $19 or $20 billion under management.

      Hedge funds were rolling up.  CLOs did fine.  Private equity did fine.  Retail funds were having problems.  And separate accounts were okay.  But we were definitely a firm in crisis and trying to hold on to people.

      So the nature of this compensation claim, you know, every year, everybody except Dondero and Okada would get what's called a compensations and award letter.  Because Dondero and

Daugherty - Direct                                    143

Okada were really the only partners.  I think you can kind of see that, given your experience.  They were called the founding partners.  They were the only ones that got true distributions from the firm annually.  Guys like us, you know, the other 12 or so, we got cash bonuses and incentive comp and deferred comp.  And, you know, obviously, cash compensation was a big part of our compensation, and they were prohibited from the banks from paying it.

So Dondero, with the help of Rick Swadley and some of the other tax people, I don't know if we used out outside firms or not, they came up with this scheme, if you will, where Highland was going to go and use whatever they came up with with the partnerships and whatnot and then generate a tax refund to the senior-level guys.  As or in lieu of the cash bonuses that couldn't be paid, they were going to go make these elections and then we were going to get this money.

And if you look at our awards agreement, it says you're going to get $x$ amount of money.  And it's in the line that historically is the cash bonus.

Also, when we got like our email or whatever that year from Patrick Boyce, our CFO, he was like, Congratulations, your bonus this year was $x$.  And it was whatever that amount was on your compensation and award letter.

Well, several of us had the same accountant, John Garvey, at Bland Garvey.  Me, Joe Daugherty, and Davis Deadman.  And

Daugherty - Direct                                    144

we took this concept to our accountant and he's like, man, that's really precedent.  And so you guys are going to have to basically protect yourselves from -- sorry, go ahead.  Make your objection.  I'm sure I'm --

MR. MORRIS:  I just, I just don't remember what the question was at this point and he's testifying to --

THE WITNESS:  Why I got this thing.

THE COURT:  It was --

THE WITNESS:  My apologies.

MR. MORRIS:  -- to conversations and hearsay.

THE COURT:  What is the --

MR. YORK:  Let me ask a question and I'm going to try to --

THE COURT:  -- proof of claim about, was the essence of the question.

MR. YORK:  Yeah.  Right.

THE COURT:  So I sustain.  We're getting a little narrative, shall we say.

THE WITNESS:  My apologies.

MR. YORK:  So, --

THE WITNESS:  I'll tighten it up.

BY MR. YORK:

Q    All right.  So, Mr. Daugherty, what you were getting under this scheme, as you describe it, was a cash bonus that was masked as a refund, correct?

Daugherty - Direct                                    145

A    Look, Highland paid for it however they're going to pay for it.  They're the one who created whatever that they did.  But for us, it was a cash bonus.

Q    Okay.

A    But given that I was -- what I was just alluding to, there were concerns about the tax impacts if the IRS didn't agree with Highland.  And so what we did is we negotiated for and got from Dondero -- really, I mean, Jim ultimately made the decisions at Highland.  He said, look, if you don't -- if this doesn't work, if it doesn't go through, we'll make you whole.  And so we got that provision in the compensation and award letter that says if the actual refund deviates materially from the refund, then you'll get substitute compensation.  And that was enough for us, --

Q    And --

A    -- and that's what led to this claim.

Q    And was it your understanding that, in terms of making you whole, that was not just whatever you had to pay back for the refund, but also interest and penalties?

A    Yeah.

          MR. MORRIS:  Objection.  Leading.

          THE COURT:  Sustained.

          THE WITNESS:  That's fair enough.

BY MR. YORK:

Q    What was your understanding as to what that 'make you

Daugherty - Direct                                    146

whole' constituted?

A    It was basically to put me and the others back in the position of getting to that number that was listed in the document.  So if there were any interest, penalties, pullbacks from the IRS, then we would be made whole at that -- we'd get back the net of that number.  However, if the IRS was fine with it, we wouldn't get anything.

Q    So there's a chance, depending on how the IRS audit turns out, if the IRS says what Highland did was fine, then you don't owe the IRS anything, right?

A    Yeah.  That's been a critical thing, that I may not owe the IRS anything, and certainly I wouldn't expect Highland to give me anything.

Q    And at that point, what's been reserved as your reserved claim would effectively at that point, from the IRS perspective, the IRS audit perspective, would be a zero dollar amount, right?

A    Yeah.  I mean, more so.  I mean, Jim Seery offered to buy me out with an amount of the reserved claim.  And I said, listen, I'm not looking for a windfall here.  What I'm looking for is to be made whole, --

Q    Right.

A    -- it's my insurance policy on what I earned back in 2008, because the alternative is I will have ended up working for free in 2008, plus have to pay penalties and interest going

Daugherty - Direct                                    147

forward that could wipe out my net worth.

Q    All right.

A    So I wanted the insurance policy aspect of it.

Q    So you heard Mr. Seery's testimony earlier where he said the total amount you would owe was somewhere in the range of $1.4 to $1.5 million if there was --

A    He's wrong about that, if that's what he said.

Q    Why?

A    At the time -- I think the number he was referencing was in our claim number that I filed back in, I want to say, October 2020.  And the $1.45 million, what was in the compensation -- was the number in the compensation and awards letter.

The other number that I spoke about from the gallery out there was one point -- I don't know, whatever the interest -- whatever I guessed the interest might be.  And then I didn't have anything for penalties.  So, at that particular time, took those numbers and said, okay, if the IRS says no way on all this, this is what I'd have to pay, not including penalties.

Q    All right.  So you've seen today and you listened to the testimony about the footnote in Highland's adversary complaint against you in which they say that the resolution may not be until 2029 of this IRS audit?

A    That's correct.  I've heard that.

Daugherty - Direct                                      148

Q    All right.

A    I've seen it and heard it.

Q    All right.  As you've sat here today, have you done any calculation back of the napkin to try to estimate what your potential exposure would be to the IRS in terms of interest and penalties as a result of that audit dispute if it wasn't resolved until 2029?

A    Yeah.  I listened to the judge.  I went and ran '33 because that was a number that was just thrown out.  At '33, if it's 2033, it's $7.4 million, and if it's 2029 it's $5.7 million.

Q    What sort of financial impact would that have on you?

A    The latter would pretty much wipe me out.  I'm sorry.  The former would -- the $5.7 million would wipe me out.  The latter would cause me to file for bankruptcy.

Q    Okay.  Mr. Seery also discussed his -- that he had heard through the grapevine that the IRS audit had been resolved. Has anyone from Highland ever told you that the IRS audit is resolved?

A    No one's told me that from anywhere, anyhow, anyway.

Q    Have you had a conver... have you had -- so nobody at all, right?

A    No one at all.

Q    Have you -- did you have a conversation recently with Kurt Plumer over it?

Daugherty - Direct                                                149

A    I did.  I had lunch with him at Hillstone.

Q    Did he mention it at all?

A    No.

Q    All right.  Could you turn with me to, in your exhibit binder, Exhibit 8, please?

A    Yeah.

Q    All right.  Can you just identify for us what this document is?

A    This is a letter I got from the IRS dated November 20th, 2024, basically telling me that the case is open and I may owe money.

Q    And specifically, if we look at the first paragraph, it says, "Why You're Receiving This Letter," in bold, right?

A    It does.

Q    And then below that it says:  We might have to adjust your tax return based on our examination of the Highland Capital Management listed above.

     Did I read that part correctly?

A    Yes.

Q    And so is it your understanding that your -- that this is related to the IRS audit of Highland?

A    That is my understanding.

Q    And that your tax return, your personal tax return may be adjusted as a result of that?

A    Mine and my wife's.