Daugherty - Direct                                    150

Q    Which would mean you're subject to interests and penalties as well?

A    As is she.

Q    Okay.  And is this the only letter you've ever received from the IRS?

A    No.

Q    Related to the Highland Capital Management audit?

A    No.

Q    All right.  Do you receive these periodically?

A    Yes.  The initial one came I want to say about five months after we filed the returns in two thousand -- it was for the calendar year 2008, so it was April 15th, 2009, I want to say.  Maybe it was -- I think the first one came around October, late October 2009.

Q    And --

A    Like this.  I can't -- I don't remember it verbatim.

Q    Is this the last communication you have received from the IRS relating to Highland's IRS audit?

A    This was it.  Yeah.

Q    Okay.  Has anyone from the IRS ever told you that an FPAA has been issued --

A    No.

Q    -- with respect to the Highland's audit?

A    No.  I don't even know what that -- I didn't even know what that was.

Daugherty - Direct                                    151

Q    And you've never received an FPAA from the IRS, right?

A    I have not.

Q    And you've never -- nobody else has ever sent you an FPAA related to the Highland audit, right?

A    No.

          MR. MORRIS:  I'm being kind, but this is just --

          THE COURT:  It's leading.

          MR. MORRIS:  -- testifying from the podium.

          THE COURT:  Sustained.

          THE WITNESS:  Yeah.

BY MR. YORK:

Q    All right.  Mr. Daugherty, would you turn -- we'll switch topics real quick to the tolling agreement.  Would you turn in Volume 1 of the Highland exhibits to Exhibit 60, please?

A    Volume 1, and then which one, I'm sorry?

Q    Exhibit 60.

A    Yeah.  Yes, I'm there.

Q    Why did you enter into -- well, back up.  Strike that.  Start over.  This is the tolling agreement extending a claim objection deadline between you and Highland Capital and the Highland Claimant Trust as of July 27th, 2022, correct?

A    That is correct.

Q    And is it your signature on Page 6 or 7 of the document on the left-hand side?

A    It appears to be, yes.

Q    All right.  Why did you enter in this tolling agreement?
Why did you enter into --

A    I'm sorry, what was your question?

Q    Why did you enter into this tolling agreement?

A    Jim Seery had reached out to me in 2022 and said that they had a problem with -- the Court had an objection deadline that was running and that was somewhat inconsistent with the settlement agreement that we had just gotten approved in early March of 2022 that said they couldn't object, they being Highland, object to the legitimacy or amount of my compensation claim.

So he said, look, you know, we're in a little bit of a predicament here.  We can go to the Court or we can try and work this out.  And I'm like, hey, I'm fine to work it out.  I don't want the estate to be burdened or any way.  So we went back and forth on the document, and ultimately I felt that it was the right thing to do.  The spirit of our settlement was, you know, I -- they couldn't -- they couldn't challenge this part of my claim, but the *quid pro quo* was I'm not going to be able to beat them out on a technicality by running in here, saying, ah, the objection deadline, you know, expired.

So his solution seemed to be a reasonable one.  And we worked with their counsel, I think Demo and to some degree Morris, to work that out for them.

Q    How did the estimate come about in Footnote 3?

Daugherty - Direct                                               153

A    I don't know.  Nobody ever asked me about it.  There was no -- Mr. Morris is right, there was no negotiation about it.  Because, frankly, I didn't see that as my problem.  They had something to fulfill pursuant to the plan.  And there was no back and forth on that reserve amount with Seery whatsoever.  He just said, This is what we're doing and, you know, we're going to put this -- and my perception is I didn't have any right to challenge it other than what was in my settlement agreement.  And I looked at that as a one-time right to go and seek an estimate, and I didn't want to do it that early in the process.

Q    Would you take a look with me at the last recital that's on Page 3 of the document?  All right.  It says, --

A    Oh.  You're going to make me read.  All right.

Q    It says:  Whereas, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, and without any party admitting liability, fault, or wrongdoing, or releasing or waiving any rights or defenses with respect to the reserved claim, the parties desire to enter into this agreement to extend the claim objection deadline solely with respect to the reserved claim to January 11th, 2023 at 5:00 p.m. Central Time, defined as the Objection Deadline.

     Did I read that part correctly?

A    You did.

Q    What was your understanding of this recital provision

Daugherty - Direct                                                    154

being put in here?

A    Well, I think I just kind of summarized it.  There was a problem that the parties didn't, you know, fully recognize could occur that would give me a windfall, and so this was to kind of solve that on an interim basis until we got to a final resolution on this tax refund thing.

I mean, the honest truth, God -- Judge.  Not God, Judge.  But the honest-to-God's truth is Seery and I had a very good relationship, and we were going back and forth, and his view was that this thing could get resolved in 2022.

Q    Did you have an understanding as to whether or not you were reserving all rights with respect to your reserved claim under the terms of the tolling agreement?

A    Absolutely I did.  Both in emails and in the document.

Q    All right.

MR. YORK:  Pass the witness.

THE COURT:  All right.  Any cross?  I'm assuming Dugaboy did not have questions.  And, Mr. Daugherty, I should have --

MR. LANG:  No, we do not.

THE COURT:  Okay.  Thank you.  Cross?

CROSS-EXAMINATION

BY MR. MORRIS:

Q    Good afternoon, Mr. Daugherty.  Take your time.

A    How are you, Mr. Morris?

Q    Good.  I just have a few questions.  You have been paid in full on your Class 9 claim, correct?

A    Evidently, yes.

Q    And that Class 9 claim was for $3.7 million, correct?

A    I believe it was $3.75 million.

Q    Thank you for the clarification.  Do you recall how many payments you received that resulted in your receipt of $3.75 million?

A    I don't.

Q    When you received those payments, did you tell Mr. Seery -- did you send it back to Mr. Seery out of any concern that your Class 8 claim has not been resolved?

A    No.

Q    When you received those payments, did you object to Mr. Seery or to anybody else that it was improper for the other Class 9 holders to receive the payments when your Class 8 claim had not been resolved?

A    I had no idea what they were receiving.

Q    Did you have any reason to believe that you were receiving a benefit that the other Class 9 claim holders were not receiving?

A    Again, I had no idea what they were receiving, so I can't compare the two.

Q    Okay.  But it is true that you accepted without protest your Class 9 payments, even though your Class 8 claim had not

been resolved, correct?

A    I think that's accurate.

Q    Okay.  I think you mentioned in your proof of claim it had $1.4 million; is that right?

A    Again, I'm cuffing it.  If you could grab it, I'll -- I want to say it was -- the proof of claim had two components, as I mentioned.  There was a, as I mentioned, there was the compensation award amount from my compensation letter of like $1.475 million.

Q    Uh-huh.

A    Don't quote me on that, but close enough.

Q    Approximate.

A    And then an interest component that would take me up to that particular time if the IRS reversed it.

Q    Okay.

A    But no penalties were included.

Q    And that approximately $1.45 million, that's money that you received back in 2009?

A    I didn't get that full amount in 2009.  That was -- I don't want to broaden this up too much, but many times what was promised was not what was delivered.  So I got a lesser amount from the IRS.

Q    How much less did you receive?

A    I want to say, on a net basis, it was just under $1.2 million.

Daugherty - Cross                                                    157

Q    Okay.  And so it's true that you've had the benefit of the $1.2 million for 15 years now?

A    When you say the benefit, what do you mean?

Q    It went into your pocket 15 years ago.

A    Yeah, but it's a contingent liability I have back to the IRS, so I can't say that it's, you know, not without reservations.

Q    But you've had possession of that million and a half dollars now for 15 years, correct?

A    Right.  And with it comes an obligation --

Q    Okay.

A    -- contingent back to the IRS.

Q    Your claim is a prepetition claim; is that right?

A    What do you mean by my claim?  Are you talking about the compensation one?

Q    Yes.

A    Yeah.  I mean, that -- that contractual obligation originated in, well, yeah, February 2009.

Q    It's not an administrative claim, right?

A    I don't believe so, no.

Q    It's just -- it's just a claim that existed prior to the petition date.  Fair?

A    That is fair.

Q    Okay.  With respect to the reserve, you did agree to that amount of the reserve, fair?

Daugherty - Cross                                      158

A    I did not.  I mean, I -- I signed the document, but I did not agree to that amount.

Q    Well, --

A    I did not negotiate for it or anything like that.

Q    Well, but if you turn to Exhibit 60 that you just looked at, --

A    sure.

Q    -- and you go towards the end of the document, that is your signature on the first Page 7, right?

A    Yeah.  I've already admitted that.

Q    And Paragraph 1 of the agreement that you signed specifically set the reserve at the amount set forth in Paragraph 1, correct?

A    That much is true.

Q    Okay.  And you --

A    You just said, did I agree to it, and I'm like, it was in the document.

Q    It's in the agreement that you signed, correct?

A    For sure.

Q    Okay.  And you've never asked for that amount to be adjusted, correct?

A    I've spoken many times to Mr. Seery and told him that it will need to be adjusted upward as years go by.  We've had quite a dialogue along those lines.

Q    Okay.  But he's never agreed to do that, correct?

Daugherty - Cross                                    159

A     He said when the time comes, we'll figure out -- listen,
we had a very collaborative relationship up until like the
last year.  And so it was like, hey, I'm not going to press
you.  You don't -- he's fighting off Dondero right and left.
You know, and I'm like, I don't want to get in the middle of
all this.  You go do what you've got to do.  We'll both sit
tight.  In fact, there was dialogue to that very effect.

Q     Uh-huh.

A     And so this was just all part of sitting tight, thinking
that the right thing would be done when we got final analysis
to this.

Q     Okay.  So would you just agree with me that, since signing
this agreement, you haven't come to court to seek an
adjustment --

A     No.

Q     -- of the reserve?

A     I did not want to be a burden.

Q     Okay.  And since signing this agreement back in 2022, you
and Mr. Seery have not come to an agreement on any adjustment
to the reserve, correct?

A     We have not.

Q     Okay.  Do you believe that you have claims against
Highland's employees?

              MR. YORK:  I'm going to object on relevance grounds.
Also, outside the scope.

Daugherty - Cross                                    160

THE COURT:  What is the relevance?

MR. MORRIS:  We're going to get to the $20 million demand in a moment.  I'm laying the foundation.  But we have anybody on anybody --

THE COURT:  But what's the $20 million demand?

MR. MORRIS:  I'll get to it in a moment.

THE WITNESS:  There's --

THE COURT:  I can't figure out if --

MR. MORRIS:  I can make a proffer if you'd like.

THE COURT:  -- that's relevant.

MR. MORRIS:  I can make a proffer, Your Honor.  I'll tell you.  I'll tell you right now.

On June 5th, Mr. York called me and said that Mr. Daugherty asserts that he has claims against the Highland employees, and if Highland didn't pay him $20 million he was going to sue them, and he was going to file this objection together with a petition in the Supreme Court opposing Highland's request to stay the issuance of a mandate in the Fifth Circuit.

MR. YORK:  First off, if Mr. Morris is going to become a witness, we've got a problem here.  Secondly, any sort of communications between us would be 408.  And third, it's not relevant to the issue we're here on today.

THE COURT:  Okay.

MR. MORRIS:  My response to that, Your Honor?

Daugherty - Cross                                    161

THE COURT:  All right.  I'm going to allow a little latitude, --

MR. MORRIS:  Yeah.

THE COURT:  -- but I'm still unclear --

MR. MORRIS:  It's about -- it's about three questions.

THE COURT:  Okay.

MR. MORRIS:  It's about three questions.

THE COURT:  You may proceed.

BY MR. MORRIS:

Q    Do you believe you have claims against Highland's employees?

A    Me personally, no.

Q    Okay.  Do you -- did you authorize your lawyer to call me and to demand $20 million in exchange for a release and your standing down from filing any objection to this motion?

A    I'm not aware that that ever happened.  Nobody demanded anything of you.

Q    Really?

A    Yeah.

Q    Do you know that your lawyer used the number $20 million to me?

A    Oh, I've read the emails back and forth between you.

Q    So why don't you explain to Judge Jernigan what your understanding is as to what your lawyer meant when used $20

Daugherty - Cross                                    162

million to me.

A    I can't say for sure what he meant, but I can tell you from my perspective what I understood.

Q    What did you understand?

A    I have another entity that I picked up in the settlement with Highland called the Highland Employee Retention Asset Fund.  And again, pursuant to the settlement agreement, I mean -- I guess supposedly, I guess, when I think about it, I do have claims individually, because it's with me, that agreement.

But it said that Highland had to turn over all the books and records of the HERA fund.  And Mr. Morris was on many of those emails.  And they had turned over some of the books and records, but they didn't turn over any of the books and records that implicated Thomas Surgent and David Klos in defrauding HERA in allocating Highland's expenses when they were litigating me, against me, back to HERA.

So I do have a settlement agreement with Highland and these employees, but Highland Employee Retention Assets needs their books and records.  And we've made it very clear to you on numerous emails where you, you know, kind of muscled up on us and said this is all you're going to get and tough if you don't like it or whatever.

And so the deeper we get into this, we did get discovery from others, we found that Highland's been withholding

Daugherty - Cross                                   163

material information.

So as it relates to -- I mean, you're doing that little squeaky thing, and I think he's a fantastic lawyer, but the reality is you guys have created some damages to HERA that you may be accountable for.  Your clients, not you.

Q    Okay.  In the four years since we signed the settlement agreement, you've never asserted a breach of contract claim, have you?

A    Well, because we thought you were complying with it.  So if you want to go into the details there, in 2022, we were -- asked for more information.  2023, we asked for more information.  2024, we asked for more information.  And so those are continuing breaches.

Again, I -- I don't want to go to war with Highland. You're too damn good of an attorney, you're scaring me a little bit.  But --

Q    I don't want to.

A    You know, listen.  You know I think well of you.

Q    I appreciate that.

A    But, you know, I mean, I just wanted the information.  I'm not looking to go to war with you guys.  I got enough battles that I've got to fight.  And so, you know, I guess a number was thrown out or whatever.  I don't know the full context of it.  But it wasn't -- it wasn't for this IRS compensation issue.

Daugherty - Cross                                      164

Q    But what was the -- my last question.  What was the $20 million demand for?

A    Again, it's just a number.  Y'all were having settlement negotiations.  So, I mean, you work off of it.

Q    All right.

MR. MORRIS:  I have no further questions, Your Honor.

THE WITNESS:  Yeah.

THE COURT:  All right.  Any redirect?

MR. PHILLIPS:  I have no questions, Your Honor.

THE COURT:  All right.  Okay.

MR. YORK:  Apologies.  I wanted to make sure.

THE COURT:  Yes.

MR. YORK:  No redirect, Your Honor.

EXAMINATION BY THE COURT

THE COURT:  Okay.  If you've watched Highland hearings, you know the judge sometimes has questions.  I am still trying to understand the 1.4, the 1.2, the 1.475.  I understand broadly that, in essence, a cash bonus was negotiated back in early 2009, I think you said.

THE WITNESS:  Yes.

THE COURT:  After 2008.  And so that's, in essence, what was contractually negotiated.  But I understand there was a hook, if you will, we're calling it a contingency, whatever word you want to use, where if one day there was an IRS audit and I guess Highland had extra liability for 2008, that this

Daugherty - Examination by the Court                165

-- I don't know if I understood it or not.

THE WITNESS:  Do you want me to try and guess what you're asking, or --

THE COURT:  Try to guess what I'm asking.  Again, I'm --

THE WITNESS:  The liability -- so, Highland chose to use this tax scheme as a currency to pay us a cash bonus. From our perspective, we weren't stupid.  We're like, well, okay, that's great, but if the IRS says --

THE COURT:  Okay, I just want to know what -- you say you were contractually entitled to $1.4 million.

THE WITNESS:  That's what I was supposed to get for that bonus year.

THE COURT:  Okay.  But there was a tax contingency, if you will, where -- that's where I want you to jump in.

THE WITNESS:  So, Highland had a tax problem.  They came up with this mechanism to use whatever they were doing with the IRS to create the cash to pay us a bonus.  We looked at it and said, well, this looks fishy -- by the way, every year before that and after that, I've just gotten a cash bonus.  But for this one year, when the banks are saying, no, no, no, we get this.  And so we looked at this and said, look, this sounds fishy, but if you can't pull it off, we need to be made whole.  I can't be in a situation where here I am in 2025 and I may have to pay $5, $6 million to the IRS for the

pleasure of working at Highland.

THE COURT:  Okay.  See, that's where my disconnect is.

THE WITNESS:  Uh-huh.

THE COURT:  Because I thought this all turned on a Highland tax return.

THE WITNESS:  Oh, no, no.  So, Highland did the planning and the creation of the scheme, and I guess ultimately it was Highland's tax return, but it flowed through to us as pass-throughs.  K-1s, what have you.

THE COURT:  Right.

THE WITNESS:  So I guess it's both.

THE COURT:  Okay.  You were a partner.

THE WITNESS:  Well, that's debatable, too.  That's debatable, too, because I had a --

THE COURT:  Okay.  I thought you weren't, but --

THE WITNESS:  Well, I wasn't --

THE COURT:  But you got -- okay.  Let me just skip to, --

THE WITNESS:  Yeah.

THE COURT:  -- I guess, the important part.  You did, you got paid?  You said $1.2 million?

THE WITNESS:  Yeah.  I got a refund back from the IRS for around that amount.  Slightly under $1.2 million.

THE COURT:  So the contingency you are worried about

Daugherty - Examination by the Court 167

that you think gives you a contingent claim against Highland

is, what, the IRS comes back and says --

THE WITNESS: And they say, Give us that money back

plus interest plus penalties or we're taking your house. And

it's a very real threat, because this has gone on, as you've

noted, forever. And I went from having a one-point-whatever

bonus to possibly having to pay six, seven, eight, I don't

know how long this lasts, million dollars back to the IRS for

an election that was made by them. As a substitute for paying

me a cash bonus the regular way, they did it this way. And

that's why we put and negotiated for that term in the

compensation agreement that said, if for whatever reason the

actual refund is different, we get made whole.

THE COURT: Okay. I may be overthinking this, I do

do that sometimes, but I'm still, I'm trying to understand why

your claim would escalate up to, you know, you said maybe $5.7

million if, in 2029, this all plays out with the IRS.

THE WITNESS: That --

THE COURT: Because you've gotten the benefit of that

money and --

THE WITNESS: Well, no, because if the IRS says --

THE COURT: -- return on that.

THE WITNESS: Sorry. I didn't mean to interrupt.

THE COURT: You know what I'm saying? So I'm trying

to figure out why it would grow in the way that you're

Daugherty - Examination by the Court                168

suggesting.

THE WITNESS:  Can I respond?

THE COURT:  Yes.

THE WITNESS:  So I've gotten money that the IRS says is not mine.  Right?  And the IRS says --

THE COURT:  And you've had the use of it.

THE WITNESS:  Oh, yes.

THE COURT:  You've presumably invested it and --

THE WITNESS:  Well, no, I mean, you can't --

THE COURT:  Well, you've had the ability to.  Uh-huh.

THE WITNESS:  But you don't want to take risk with something that's not yours, so you're kind of limited, right?  But I have, I have that amount of money.  Here's the problem, Your Honor, with that.  If the IRS says, Give us back our money, here's the interest, here's the principal.  Oh, by the way, if it's $7, $8 million, I can't -- I don't have that.  I've got to file for bankruptcy in order to give the IRS back money that I'm having to pay them for the pleasure that I had of working for Highland in 2008 when I helped save the company and create a lot of the assets that paid all these people in the room.  MGM Studios, Trussway.

THE COURT:  Okay.

THE WITNESS:  Okay.

THE COURT:  Yeah.  We are going beyond this.

THE WITNESS:  Fair enough.

Daugherty - Examination by the Court          169

THE COURT:  I was just, I'm zeroing in on this because I'm trying to figure out, I mean, it matters to me if that reserve is likely fair enough, the reserve I'm told you agreed to is fair enough.  And I'm having trouble figuring out, I mean, if you've had the use of this money for 17 years or whatever that is, why you would get this extra interest add-on that you're -- $5.7 million or whatever it would be. You know, $3 million more.

THE WITNESS:  Can I answer that question?

THE COURT:  Uh-huh.

THE WITNESS:  Because the IRS didn't look at it as my money.  They looked at it as their money.  And so if you look at the plain language of the compensation award letter, if the actual amount deviates from the amount that was granted, then Highland was going to give me substitute compensation to make me whole.  Making me whole includes the penalties and the interest that I would owe the IRS.  Because if you look at it any other way, I had to pay money to work at Highland.

THE COURT:  Do I have that letter in my evidence?

THE WITNESS:  You should.  Drew?

THE COURT:  Do I?  Maybe I'll just cut this off and look at the letter.

MR. YORK:  It's at Daugherty 2, and it's at the back of --

THE WITNESS:  There's multiple letters, but this is

one of them.

THE COURT: The letter that you say this claim stems from.

THE WITNESS: Sure.

THE COURT: I'll just cut it off and look at that.

THE WITNESS: Yeah, you can tell her where it is.

MR. YORK: So I think it's at the back of the statement on PD-2. It's at the last page, Your Honor.

THE COURT: Which one?

MR. YORK: P -- Daugherty 2.

THE COURT: Oh, 2? I've got emails.

THE WITNESS: P-2? I don't think so.

THE COURT: Okay. We can move on.

MR. YORK: That's fine. We'll work this out.

THE COURT: Before we're done here today, I want to look at the letter to better understand how the claim could grow substantially to --

MR. YORK: Yeah.

THE COURT: -- $5.7 million by 2029. Okay. Thank you.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're excused.

THE WITNESS: Oh, I found -- I just found it and then I closed it.

THE COURT: Okay. Well, you can --

THE WITNESS:  My bad.

THE COURT:  -- call my attention to it when you find it.

THE WITNESS:  All right.

(The witness steps down.)

THE COURT:  All right.  Your next witness?

MR. YORK:  I believe we're calling Mark Patrick.

THE COURT:  All right, Mr. Patrick.  All right. Please raise your right hand.

MARK PATRICK, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

THE COURT:  All right.  Please be seated.

And, Courtney, you're going to start the clock going.  I show 2:12.  I don't know if my clock's right.

You may proceed.

MR. LANG:  And, Your Honor, may I hand the witness -- this is from Mr. Morris' opening.  May I use this as Exhibit 3?

THE COURT:  Oh, okay.  You're talking about the back page of his PowerPoint?

MR. LANG:  Yes.  Org chart.

THE COURT:  Yes.  I've got it in front of me.  And for the record, I'm going to put this PowerPoint, even though it's not an exhibit *per se*, as a demonstrative aid in the file for this matter.  And so it's the last item of the Highland PowerPoint.  All right.

MR. LANG: Yes.

DIRECT EXAMINATION

BY MR. LANG:

Q   Mr. Patrick, does this Hunter Mountain Investment Trust org chart that I just handed you accurately reflect the structure of the Hunter Mountain Investment Trust ownership today?

A   Just give me a few moments to review.

Q   Sure.

MR. LEWIS: Your Honor, I had mentioned early on that we object to this whole line of questioning because it's outside the scope of the objection of Dugaboy. And I don't want to interrupt, but I want to make sure that my objection is continuing, because this has nothing to do with the objection presented by Dugaboy.

THE COURT: All right.

MR. PHILLIPS: So we object to the question.

THE COURT: Okay. So the record will reflect basically a running objection from Hunter Mountain?

MR. PHILLIPS: We would appreciate that, Your Honor.

THE COURT: Okay. In light of the failure of Dugaboy to disclose Mark Patrick as a witness, as well as the failure to challenge in a written objection his authority. Okay. So I recognized that this was quite a persuasive objection, but given the magnitude, I would say, of what is going on here,

Patrick - Direct                                    173

potentially a settlement that could come very close to ending this long-running plan implementation process, I'm erring, if it's an error, I'm erring on the side of allowing this.  All right.  But you have a running objection that the record will reflect if one day there is an appeal.

MR. MORRIS:  And, Your Honor, the Highland Claimant Trust and the Highland Litigation Subtrust and Highland Capital Management, LP join Mr. Phillips' objection.

THE COURT:  Okay.  Understood.

MR. PHILLIPS:  Thank you very much, Your Honor.

THE COURT:  All right.

BY MR. LANG:

Q    Mr. Patrick, have you had time to study this Hunter Mountain Investment Trust org chart?

A    Yes, I have.

Q    And does this accurately show the ownership structure for Hunter Mountain Investment Trust today?

A    I'm not sure, without reviewing the underlying corporate documents on some of these entities that you have listed here.

Q    Did you help prepare this chart?

A    No.

Q    No?  Okay.  So Hunter Mountain Investment Trust is owned by Beacon Mountain, LLC, correct?

A    Yes.

Q    And Beacon Mountain, LLC is owned by CLO Holdco, LLC,

correct?

A    Correct.

Q    And CLO Holdco, LLC is owned by CLO Holdco, Limited?

A    That's correct.

Q    And CLO Holdco, Limited is owned by Charitable DAF Fund, LP?

A    Correct.

Q    And Charitable DAF Fund 1, LP is owned by CDMC FAD, LLC?

A    The ultimate beneficial owner is DFW Charitable Foundation.  To my -- to the best of my recollection, I would say that appears accurate.  I'm just not a hundred percent.

Q    Okay.  And --

A    But I am a hundred percent that DFW Charitable Foundation is the ultimate beneficial owner.  And I'm a hundred percent that Dugaboy Investment Trust has no interest in it.  And I'm also a hundred percent that The Dallas Foundation or any --

          MR. LANG:  Judge, I haven't asked --

          THE WITNESS:  -- or any other nonprofit has any --

          MR. LANG:  -- any of these questions.

          THE COURT:  Okay.  There's an objection, nonresponsive.  I sustain.

BY MR. LANG:

Q    Mr. Patrick, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct?

A    (Pause.)  I'm just waiting for a relevancy.  I don't

Patrick - Direct                                    175

understand how that's relevant to my authority --

THE COURT:  Okay.  You're not allowed to make a relevancy objection.  Okay.

MR. PHILLIPS:  Your Honor, I think the problem is that, if I could, we have made an objection.  And our objection, our running objection is founded on relevancy and founded on improper process.  So I would like to just tell the Court, and so my client representative can hear it, that the fact that I'm not standing up every time there's a problematic question, --

THE COURT:  Okay.

MR. PHILLIPS:  -- because every question is problematic, my objection is being maintained to every question that's being asked.

THE COURT:  Okay.  You understand that, right?

THE WITNESS:  I --

THE COURT:  There's a running relevancy objection.  You're the witness.  You can't make the objection.  But it's on the record for whatever use it might have down the road.

MR. PHILLIPS:  I have objected to every question that's coming in connection with this line of questioning on the basis of relevance.

THE COURT:  I got it.  I think we all have it.

MR. PHILLIPS:  I'm just --

MR. LANG:  Understood.

THE COURT:  Yes.  And you're thinking he's eating into your 30 minutes?

MR. LANG:  Yes.

THE COURT:  Okay.  We've got it.

THE CLERK:  I stopped the time.

MR. LANG:  So -- thank you.

THE COURT:  Did you stop the time for a minute?

THE CLERK:  Yes, I did.

MR. LANG:  Thank you.

THE COURT:  Okay.

BY MR. LANG:

Q    So, to my question, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct? Charitable DAF Holdco, Limited?

A    And where is that on the chart?

Q    I'm asking, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, Limited.

A    Can you show me a corporate document so I know the precise corporation you're referring to?

Q    You're the -- you are the manager of -- or the control person of CDHGP Limited, correct?

A    Again, I'd have to refresh my recollection, but I am the control person over CDMC.

Q    Okay.  And CDMC --

A    As well as Charitable DAF Fund.  I'll represent that to

you.

Q    Okay.  Was there a transaction in December of 2024 where Charitable DAF Holdco, Limited sold its interest or transferred its interest in Charitable DAF Fund, LP to CDMC FAD, LLC?

A    I know you're trying to help other litigation and --

MR. PHILLIPS:  Mark.

THE COURT:  Okay.  Nonresponsive.

THE WITNESS:  Your Honor, he's using your time to fish for other litigation to support that --

THE COURT:  Okay.  Okay.  We have a running objection to relevance.  I'm going to say that one more time.  Okay. Just answer the question as best you can.

THE WITNESS:  I'd have to review the corporate documents to refresh my recollection for that time period.

BY MR. LANG:

Q    Up until December of 2024, Charitable DAF Fund, LP was owned 100 percent by Charitable DAF Holdco, Limited, wasn't it?

A    I don't know what entity you're referring to without a refreshment of corporate documents of that entity.  There could be a lot of entities called that.

Q    You're aware that there is a proceeding in the Caymans investigating the December 2024 transaction that sold -- where Charitable DAF Holdco, Limited sold its interest in -- and or

transferred its interest in Charitable DAF Fund, LP to CDMC FAD, LLC?

A    There are several parts to that question.  So the answer is no.

Q    Are you aware of a proceeding pending in the Caymans involving Charitable DAF Holdco, Limited?

A    Again, I don't know what entity you're referring to.  Show me a -- show me a corporate document.

MR. LANG:  Your Honor, this was on the Foundation's exhibit list.  We cross-designated any document designated as an exhibit by any other party in this case.  And I'd like to hand this to the witness.

MR. MORRIS:  Which exhibit is it?

THE COURT:  Which is -- yes.

MR. LANG:  It was on the -- it was on the DAF -- or, the Foundation's exhibit list.

MR. MORRIS:  They haven't been admitted into evidence and they've withdrawn their objection.  We object, Your Honor.

THE COURT:  Yes, they've not been admitted.

MR. LANG:  Okay.  Well, can I --

MR. PHILLIPS:  We object to that, Your Honor.  We object to any witness --

MR. LANG:  We cross-designated every --

THE COURT:  I already discussed at the beginning what we were admitting and that was not disclosed.

Patrick - Direct                                         179

MR. LANG:  Okay.

THE COURT:  As I recall, I said you've only designated the plan and settlement agreement, and the answer was yes.

MR. LANG:  Okay.

BY MR. LANG:

Q    And we're aware that the Joint Official -- are you aware that there is a Joint Official Liquidator appointed over a Charitable DAF entity in the Cayman Islands?

MR. PHILLIPS:  Objection to form.

THE WITNESS:  Again, without more specific --

THE COURT:  Overruled.  Yes.

THE WITNESS:  -- specificity, there could be a thousand different actions that you're referring to, in my mind.

BY MR. LANG:

Q    Are you aware that the Joint Official Liquidators in the Caymans are investigating transactions involving Charitable DAF Fund, LP and Charitable DAF Holdco, Limited?

A    Again, again, I don't specifically know what you're referring to.

MR. PHILLIPS:  Your Honor, may I -- excuse me.  I don't know that my running objection includes an objection to form for each of the questions.  This objection is to form of the questions about, quote, --

Patrick - Direct                    180

THE COURT:  What's wrong with the form?

MR. PHILLIPS:  -- investigation.

THE COURT:  What is wrong with the form of that question?  I'm not clear.

MR. PHILLIPS:  My objection to form is that the question is an open-ended question with an undefined term, investigation.

THE COURT:  Overruled.  I don't think that's a vague term.  So you may answer.

THE WITNESS:  If you show me some document, some complaint or something, I'll be very happy to verify whatever questions related to that.  But just giving me verbal words of entities and names and actions, I don't know precisely what you are talking about.

BY MR. LANG:

Q    Mr. Patrick, who set up the entities in the Hunter Mountain Investment Trust org chart that is sitting in front of you?

A    I'm sorry.  Repeat the question?

Q    Who set up the various entities that are in the org chart that is on your -- on the stand?

MR. PHILLIPS:  Objection to form.  Set up.  What does that mean?

THE WITNESS:  It -- yeah, it's very --

THE COURT:  I think we know what it means.  Creating,

perhaps.

BY MR. LANG:

Q    Created?

A    Who?  Are you asking if I created it?

Q    Did you participate in creating them?

A    Did I participate?  In which ones?

Q    CDMC FAD, LLC.

A    What do you mean by participate?

Q    Were you involved in creating -- did you initiate the creation of CDMC FAD, LLC?

A    Lawyers were.

Q    Did you engage in any capacity on behalf of any entity? Were you involved in engaging the lawyers to set up CDMC FAD, LLC?

A    Yes, I engaged lawyers to set up entities.

        MR. LANG:  Objection.  Nonresponsive.

        THE COURT:  Sustained.

        MR. LANG:  Did you --

        THE COURT:  He asked about this one particular entity, I think.

BY MR. LANG:

Q    Did you --

A    Which entity, again, did you ask?

Q    CDMC FAD, LLC.

A    Yes, I believe I hired a lawyer.

Patrick - Direct                                    182

Q    And when did CDMC FAD, LLC become a hundred percent owner of Charitable DAF Fund, LP?

A    Around the end of March of 2025.  I believe.

Q    And were you involved in the transaction between -- in which CDMC FAD, LLC obtained a hundred percent interest in Charitable DAF Fund, LP?

A    What do you mean by involved?  How?

THE COURT:  Okay.  I can see what's happening here or I have an impression of what's happening here.  I feel like you're slowing down this process where I've given 30 minutes to this lawyer.  Okay?  And I feel like you're feigning confusion.  I don't mean to be insulting, but that's how it comes across.  Okay?  So I need you to speed up your answers and not be confused about things you shouldn't be confused about.  Okay?

THE WITNESS:  Okay.

THE COURT:  I feel like it's late 1980s *Dondi*.  Does anyone know what I mean by that?  Okay.  We've been there, done that, in the federal courts, and we don't like the looking at -- you're not looking up at the ceiling.  That's what they did in *Dondi*.  Confusion.  Delay.  Okay?

So I don't mean to chastise you.  I'm just telling you that you're going to make us be here a lot longer, and nobody wants that, because I will give him extra time for this.  Okay?

Patrick - Direct                                    183

THE WITNESS:  Understood.

THE COURT:  Thank you.

BY MR. LANG:

Q    Okay.  So you were involved in the transaction in which CDMC FAD, LLC acquired 100 percent ownership interest in Charitable DAF Fund, LP in or around March of 2025, correct?

A    Correct.

Q    Who did CDMC FAD, LLC obtain its interests in Charitable DAF Fund, LP from in March of 2025?

A    From an -- from an entity called Charitable DAF Holdco, Ltd.

Q    Charitable DAF Holdco, Ltd., the entity that I asked about earlier, correct?

A    Of the same name.

Q    Yes.  And Charitable DAF Holdco, Ltd. has had Joint Liquidated -- Liquidators, Joint Official Liquidators appointed over it in the Cayman Islands, correct?

A    Yes.

Q    And those Joint Official Liquidators were appointed over Charitable DAF Holdco, Limited in or around May 6th, 2025?

A    In May is what I recall.

MR. LANG:  Your Honor, we'll pass the witness.

THE COURT:  All right.  Do we have any questions?

MR. YORK:  No questions, Your Honor.

THE COURT:  Okay.  Any cross?

Patrick - Cross                                                        184

MR. MORRIS:  Just briefly, Your Honor.

CROSS-EXAMINATION

BY MR. MORRIS:

Q    Mr. Patrick, do you know who initiated the proceedings to get the appointment of the Joint Official Liquidators in the Cayman Islands?

A    The director and myself, we initially filed for a voluntary joint liquidation in May.

Q    And did there come a time when the Cayman court appointed the Joint Official Liquidators?

A    Yes.

Q    Do you know who asked the court to appoint the Joint Official Liquidators?

A    We did, as well as other -- it was an agreement with the participation holders of that entity.

Q    And who are the participation holders of that entity?

A    It was the DFW Charitable Foundation as a 51 percent holder as well as the Highland Dallas Foundation, Highland Santa Barbara Foundation, and the Highland Kansas City Foundation.

Q    And those three foundations that you just mentioned, do you know who controls them?

A    Jim Dondero.

Q    Is it your understanding that Mr. Dondero was funding the litigation in the Cayman Islands?

Patrick - Cross                                                    185

A    Yes.

Q    The Joint Official Liquidators, are you aware of any statement that they've ever made that you are not authorized to act on behalf of any of the HMIT entities?

A    Yeah, they've never made a statement that I'm not authorized to act under any of those entities.

Q    Okay.  Did you receive a letter last night that was purportedly authored by the Joint Official Liquidators?

A    Yes.

Q    Did you review that letter?

A    Yes.

Q    Did that letter refer to today's hearing?

A    Yes.

Q    Are you aware of the Joint Official Liquidators making any appearance in this proceeding?

A    No, I'm not aware they made any appearance in this proceeding.

Q    Based on your recollection of the contents of that letter, did the Joint Official Liquidators challenge your authority to enter into the settlement agreement on behalf of the HMIT entities?

A    No, they did not, because there's no ownership interest.

Q    Okay.  And what do you mean by that?

A    The entity in liquidation owns nothing.  And the DFW Charitable Foundation is the ultimate beneficial owner.

Q    Are you aware that The Dallas Foundation filed an objection to the settlement agreement on behalf of Empower Dallas Foundation, the Okada Family Foundation, and Crown Global?

A    Yes.

Q    Are you aware that that objection was withdrawn?

A    Yes.

Q    Was the withdrawal of that objection the product of negotiations that your counsel had with lawyers for The Dallas Foundation and Crown Global?

A    Yes, it was.

Q    Did The Dallas Foundation or Crown Global require you to surrender your control position of the HMIT entities as a condition to the withdrawal of their objection?

A    To give up my control?  No.

Q    They didn't ask you to do that, did they?

A    No.  No.

Q    You are the control person for each of the HMIT entities that are party to the settlement agreement, correct?

A    That is correct.

Q    Are you aware of any requirement in any of the governance documents --

        MR. CURRY:  Your Honor, I'm not questioning, but I'm going to object to the line of questioning here about what was asked and what was not received into negotiations, because,

frankly, you're getting an imperfect picture there.  And I

don't think it should be misrepresented.  The communications

didn't happen with Mr. Patrick.

THE COURT:  Okay.  I don't know if that objection was

a confidential settlement communications.

MR. CURRY:  It's a combination of foundation and that

he's going into confidential settlement discussions.

MR. MORRIS:  Your Honor, it's a very simple question.

I'll ask it again.

THE COURT:  Okay.  We'll let --

BY MR. MORRIS:

Q    To the best of best of your knowledge, Mr. Patrick, did

The Dallas Foundation or any of the entities on whose behalf

it filed its objection require you to surrender your position

as the control person of the HMIT entities in exchange for the

withdrawal of their objection?

A    No, they did not.

Q    Thank you.  Are you aware -- are you familiar with the

governance documents for the HMIT entities?

A    Yes, I am.

Q    Are you aware of any restriction on your ability to act on

behalf of those HMIT entities with respect to -- withdrawn.

Are you required to obtain the consent of anyone in order to

enter into the settlement agreement on behalf of the HMIT

entities?

A     No, I am not.  I'm the sole authority and control person for that entity.

Q     And do you believe that you're entering into the settlement agreement on behalf of the HMIT entities in good faith?

A     Yes, I do.

Q     Have you received legal counsel before entering into the agreement?

A     Yes, I have.

Q     Do you believe that you've negotiated the best terms that you could get on behalf of the HMIT entities?

A     Yes, I do.

Q     Do you believe that you received the information that you believed you required in order to make an informed decision before you entered into the settlement agreement on behalf of the HMIT entities?

A     Yes, I did.

        MR. MORRIS:  I have no further questions, Your Honor.

        THE COURT:  All right.  Mr. Phillips, anything from you?

        MR. PHILLIPS:  No questions.

        THE COURT:  Okay.  Any redirect?

        MR. LANG:  Briefly.

        THE COURT:  Uh-huh.

        MR. LANG:  Your Honor, because they mentioned the

letter of last night from Grant Thornton, the Liquidators, I'm going to offer that into evidence as the letter that we talked about this morning. But Mr. Morris directly asked him if he reviewed it and asked him questions about it.

THE COURT: Response?

MR. MORRIS: No objection, Your Honor. Go right ahead.

THE COURT: I'll admit it.

MR. LANG: This is --

THE COURT: Do I have it in my notebook?

MR. LANG: -- Dugaboy --

THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. LANG:

Q   Mr. Patrick, I've handed you --

THE COURT: We're going to call this Dugaboy 3?

MR. LANG: Dugaboy 3.

THE COURT: Okay.

(Dugaboy Investment Trust's Exhibit 3 is admitted into evidence.)

BY MR. LANG:

Q   Mr. Patrick, I've handed you a letter. It's from Grant Thornton dated June 24th, 2025. Do you see that?

A   Yes.

Q   And is this a true and correct copy of the letter that you

received or that you reviewed from the Joint Liquidators that you referred to in your answers to Mr. Morris' questions?

A    Well, it's a PDF.  I mean, I'm assuming it's from the Official Liquidators.

Q    But this is the letter you were referring to in your testimony a few minutes ago?

A    Yes.

Q    And do you see on the second paragraph it says that, on May 6th, 2025, the Grand Court of Cayman Islands Financial Services Division appointed Margot MacInnis and Sandipan Bhowmik, each of Grant Thornton Special Services (Cayman) Limited, as the Joint Official Liquidators of the company.  Do you see that?

A    Yes.

Q    And do you see on the second page, it says:  Since our appointment, we have been diligently investigating these transactions, including a corporate transaction that occurred in or around December 2024 where the company transferred a hundred percent of its interest in the Fund to CDMC FAD, LLC, which resulted in the company being the sole member of CDM and subsequent redemptions of the company's interests in CDM.

     Do you see that?

A    Yes.

Q    Is that your understanding of what is happening in the Caymans right now, is investigating these transactions?

Patrick - Recross                                        191

A    Correct.

          MR. LANG:  Pass the witness.

          MR. MORRIS:  May I just have that letter, please?

          THE COURT:  Any recross?

          MR. MORRIS:  Yeah, just real brief.

                    RECROSS-EXAMINATION

BY MR. MORRIS:

Q    None of the transactions that you were just asked about has anything to do with any of the HMIT entities, correct?

A    That's absolutely correct.

Q    Okay.  And now that we have the letter in the record, if you could look at the third paragraph.  Do you see --

A    Yeah.

Q    Do you see it refers to the Highland Dallas Foundation, Highland Santa Barbara Foundation, and Highland Kansas City Foundation?

A    Yes.

Q    Are those the three entities that you referred to earlier that are, to the best of your understanding, controlled by Mr. Dondero?

A    Yes.

Q    Okay.  And this is the letter that you said you reviewed and concluded that the Joint Official Liquidators weren't challenging your authority to enter into the agreement on behalf of the HMIT entities; do I have that right?

A    Yes.  Yes, you do.

MR. MORRIS:  I have no further questions, Your Honor.

THE COURT:  Okay.  I have a question or two.

EXAMINATION BY THE COURT

THE COURT:  And again, I apologize if I sounded harsh earlier.  I recognize different people present different ways when they testify.  It just appeared to me that maybe we were slowing things down unnecessarily.  All right?

THE WITNESS:  I apologize, too.  I'm just a little emotionally upset they're using this proceeding for a benefit someplace else.

THE COURT:  Okay.  My question, very general question:  Do you think this settlement is fair and equitable as far as HMIT is concerned?

THE WITNESS:  Absolutely.

THE COURT:  And could you tell me why?

THE WITNESS:  Yeah.  There was no obvious pathway for HMIT to, in my mind, to receive the residual interest of the bankruptcy estate without a settlement with the Debtor.  Otherwise, it just seemed to me that it would go on forever.  And then I balanced that against the existing litigation and the probability of the outcome weighted against the costs, and determined that it made sense from HMIT's perspective to enter into the settlement agreement.

THE COURT:  Okay.  And you understand that, as part

of this, you're giving up some litigation claims that have been waged now for a couple of years or more?

THE WITNESS:  That is correct, but I'm also receiving the Kirschner Litigation, which I did negotiate to receive.

THE COURT:  Okay.  And there was a note that the estate -- I've heard it called at some point the $57 million note that HMIT owed Highland, a December 2015 note -- that basically gets credited against the capital account.  You understand that?

THE WITNESS:  Yes, I do.

THE COURT:  Okay.  And then you understand that if I approve this deal, I'm not sure why there's going to be $500,000 to HMIT and then also another $10 million to HMIT, but subsequent payments could get held up if there are litigation threats to the Highland Claimant Trust.  You understand that, correct?

THE WITNESS:  Yes, I do.

THE COURT:  Okay.  I just, I have to ask.  I'm confused about what's going on here.  I thought that -- well, let me just ask this:  Would you consider yourself crossways with Mr. Dondero now?

THE WITNESS:  No, but I'll answer the question.  Upon advice of counsel, I quit Skyview Group.  And upon advice of counsel, I terminated the back office services that Skyview Group was providing to the DAF.

Patrick - Examination by the Court                194

THE COURT:  Okay.  Well, you said you're getting maybe a little emotional because of other litigation.  I'm just trying -- I don't understand what all that other --

THE WITNESS:  Unrelated -- well, unrelated to that. They're clearly trying to use this forum to benefit their Cayman actions.  They hired U.S. counsel called Reed Smith, and they've been begging for an organization chart to issue a variety of frivolous lawsuits against the operating DAF entities.  So I do apologize, but that's a little upsetting to me because I know we're going to -- that I've just fed them a list of targets in another unrelated matter.

THE COURT:  Okay.  Reed Smith.  Here we go again with -- they've made an appearance for Mr. Seery in this litigation.

MR. MORRIS:  Exactly.  And we have raised that issue.

THE COURT:  Okay.

MR. MORRIS:  And I'm surprised to hear that they think they still have the ability to do this.  But we will pursue that later.

THE COURT:  Okay.  All right.  I had nothing further. Thank you, Mr. Patrick.

(The witness steps down.)

THE COURT:  All right.  So where are we now?  I said that, again, just trying to balance the playing field, if Dugaboy was given the ability to question Mr. Patrick, then I

Dondero - Direct                                    195

would allow I guess you want to call it rebuttal in the form of the Debtor, Reorganized Debtor/Claimant to call Mr. Dondero. Do you choose to call him?

MR. MORRIS: I'm not.

THE COURT: Oh, and I guess I'll allow you, --

MR. MORRIS: Yeah.

THE COURT: -- if you want to put on your client representative, Mr. Lang.

MR. LANG: We call Jim Dondero.

THE COURT: All right. Yes, we are timing.

Please raise your right hand, sir, Mr. Dondero.

JAMES "JIM" DONDERO, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

THE COURT: All right. Thank you. The time is running.

THE WITNESS: Thank you for the time.

DIRECT EXAMINATION

BY MR. LANG:

Q    Mr. Dondero, do you claim that Mr. Patrick lost authority to enter into the 9019 settlement -- or, the settlement agreement that's the subject of the 9019 motion today?

A    Yes.

Q    And when do you claim Mr. Patrick lost authority to enter into that settlement agreement?

A    I think it's best if I give a timeline. He left Sky -- can I give a --

Dondero - Direct                                     196

MR. PHILLIPS:  Objection, Your Honor.  Nonresponsive.

THE COURT:  Overruled.  He can give a timeline.

THE WITNESS:  He left Skyview in October, November, walked out the door, never talked to anybody again, never talked to the charities again except through counsel.  Never collected severance, anything else.  Just walked out the door.

As part of Skyview's review of what he'd been working on and what was the nature and what might have been happening, they discovered numerous abnormalities.  They discovered--

THE COURT:  Do we have an objection?

MR. MORRIS:  We do.  We're not going to use this opportunity to smear Mr. Patrick.  If the notion is that the breach of the ability to act with authority occurred in May, he should start his timeline in May.

THE COURT:  Well, I assumed he was just giving background to explain.

THE WITNESS:  Yes.

THE COURT:  So I'll overrule.

THE WITNESS:  Thank you.  I'm going to just give you a little bit of background.  Everything that I'm stating is in the public record.  I won't do anything to besmirch Mark Patrick.  It's all in the public record.  It's all in the Cayman pleadings.  But there was affidavits regarding embezzlements by vendors where he would request overbilling and the money sent to his house.

MR. PHILLIPS:  Your Honor, we're talking about documents outside the scope, not identified, not listed. Objection.

THE WITNESS:  It's all --

MR. PHILLIPS:  This is not a timeline.

THE COURT:  This --

THE WITNESS:  It's --

THE COURT:  Sustained.  We don't have anything in the record.  This is --

THE WITNESS:  Okay.  It's all in the public arena. And so is the insider trading.

MR. PHILLIPS:  Objection, Your Honor.

THE WITNESS:  So, --

THE COURT:  Okay.  I sustain.

THE WITNESS:  Okay.  All right.

And then, yeah, and then there was monies missing.  There were large amounts of monies missing from the estate.  There was unexplained $16 million of expenses in '23.

MR. PHILLIPS:  Objection, Your Honor.  They're --

THE COURT:  Okay.  Explain the relevance, Mr. Lang.

MR. LANG:  I thought he was just giving a background.

THE COURT:  It's getting rather --

THE WITNESS:  Okay, Your Honor.  Well, --

THE COURT:  -- colorful, shall we say.  All right?

THE WITNESS:  Okay.  Without giving specifics

Dondero - Direct                                      198

regarding the embezzlement or --

MR. PHILLIPS:  Your Honor?

MR. MORRIS:  We move to strike, Your Honor.

MR. PHILLIPS:  We move to strike all of this.

MR. MORRIS:  We move to strike all of this.

THE COURT:  Okay.  I grant.  We don't have any evidence of embezzlement.

THE WITNESS:  Okay.  All right.  Without detailing any of the bad acts that we -- that it looked like happened from the investigation, we took all the bad acts and all the investigations and we gave them to the three underlying charities.  Let's remember the DAF is a legacy charity I set up 15 years ago, or actually, Mark Patrick did the documentation back when he was a loyal employee.  And it was three -- around $300 million and about $600 million of liability, I mean, legal claims and other things that were meant to be a family legacy, where the donations would help the community.  We've given out more than $50 million over the years.  And the recognition would help our various companies or our families.  That's what it was.  Okay?

Went to the three underlying charities who were the beneficiaries of the DAF as it existed:  Santa Barbara, Dallas Foundation, Kansas City.  These are large charities that have been around for a hundred years.  I don't control them by any form or fashion.  As a matter of fact, the Hunts are $4

Dondero - Direct                                199

billion out of the $6 billion in Kansas City.  I think I'm a hundred million or whatever.  The DAF was a hundred million. I think the Hunts would be disturbed to hear that I control it.

Anyway, so all those charities were beneficiaries.  And so we went to them with all the investigative results.  And at first, they tried to verify, they tried to have an audience with Mark Patrick.  They wanted details.  They wanted what -- financials.  They wanted to know what was happening.  And nothing was forthcoming from Mark Patrick.  He didn't think he owed them any fiduciary responsibilities.

MR. PHILLIPS:  Objection.  Hearsay.

THE WITNESS:  No, that's --

THE COURT:  What is the out-of-court statement?  I'm not sure.

MR. MORRIS:  Mark Patrick thinks that he doesn't owe any fiduciary duties.

MR. PHILLIPS:  They did an investigation.  They tried to do *x*.  They tried to do *y*.

THE COURT:  Oh, okay.  Technically not hearsay, but I think we're getting --

THE WITNESS:  Okay.

THE COURT:  -- a little far beyond the subject matter.  So if we could reign it in, please.

THE WITNESS:  Okay.  In February, they were noted,

Dondero - Direct                                        200

they were notified, or, in particular, Dallas Foundation was
notified that their Empower subsidiary, which owned a hundred
percent of the HMIT interests that we were talking about, was
transferred to an undisclosed company for a million dollars.
Without any transparency, without any understanding of who the
new owner was, they filed for receivership in Cayman.  To the
best of the charity's knowledge and based on all the
documentation --

         MR. PHILLIPS:  Your Honor, objection.

         THE COURT:  Okay.  Let me try to understand the
relevance.  Do you think I opened this up by asking if there
was a falling out essentially between you and Patrick?  Is
that why you're going into this?  Or --

         THE WITNESS:  No, no, no.  No.  The falling-out is
much bigger than this.  But I'm just saying the day
receivership was filed was the day Mark Patrick lost
authority.  And I think anybody would look at it that way.  It
was for liquidation in the Cayman --

         THE COURT:  Okay.  That's his view and we'll either
see the --

         THE WITNESS:  Okay.

         THE COURT:  -- documents that support that or not.

         THE WITNESS:  All right.  So, your -- yes.  Because
the question was when do I think he lost authority.  I -- you
could make the argument he lost it a lot sooner, because for

Dondero - Direct                                    201

months beforehand the charities had written him letters saying
they wanted their assets distributed in kind, they lost faith
in --

THE COURT:  Okay.

THE WITNESS:  Yeah.

MR. PHILLIPS:  Again, Your Honor, objection.

THE COURT:  This is hearsay.  Okay.  I sustain.

THE WITNESS:  Okay.  Well, they did.

So, eventually, and it takes a lot to get four little old
ladies at different charities to get together and agree to
file a charity in liquidation, but they did in the Caymans.
Okay?  And then lo and behold, the response from Mark Patrick
was, ha-ha, there are no assets there anymore, I moved them
all to my living room --

MR. PHILLIPS:  Move to strike, Your Honor.

THE WITNESS:  -- at DFW.

MR. PHILLIPS:  There's no evidence in the record of
this.  There was no evidence of any statement.  Move to
strike.

THE COURT:  There's not, right?

THE WITNESS:  Well, no, there is, because what Mark
Patrick --

THE COURT:  Sustained.  I don't have it.

MR. PHILLIPS:  Your Honor, there is no evidence of
any of this.

THE WITNESS:  Well, Mark Patrick's testimony, he said -- he said that our receivership was right after his receivership.  He had liquidated and taken all the assets out from Dallas, Santa Barbara, and whatever, and moved it all to his charity.  So when we tried -- when the poor charities in Texas in the U.S. tried to file for liquidation, his response was ha-ha.  And there were no assets there, you know, because he had already filed --

MR. PHILLIPS:  Objection.

THE WITNESS:  He -- he --

THE COURT:  Okay, I've sustained the objection to the ha-ha.  Okay.

THE WITNESS:  Okay.  But he had, he had filed --

MR. PHILLIPS:  Your Honor, please, move to strike.

THE COURT:  Okay.  Let's strike everything after that last question.  Ask your next question.

MR. LANG:  I don't remember what the first question was.

BY MR. LANG:

Q    What happened -- or, what's your understanding of the proceedings in the Caymans?

MR. PHILLIPS:  Your Honor, objection.  Form.  Understanding of the proceedings in the Caymans?

MR. LANG:  His understanding is, I mean, his understanding.  What's his endgame?

Dondero - Direct                                            203

THE COURT:  All right.  I sustain.

MR. LANG:  Okay.

THE WITNESS:  The Cayman Islands --

MR. PHILLIPS:  Your Honor?

MR. LANG:  Hold --

THE COURT:  I sustained, so --

THE WITNESS:  Oh, sustained.  Sorry.  Okay.

BY MR. LANG:

Q    What is your endgame with respect to your objection over the authority of Mr. Patrick to enter into the settlement agreement that is subject of the 9019?

A    The three charities in the U.S. are affected materially. Dallas Foundation can't make payroll as of October.  Dallas Foundation --

MR. PHILLIPS:  Your Honor, I'll object to this testimony.  The Dallas Foundation has withdrawn its objection on behalf of -- Dallas Foundation appearing on behalf of Empower, the Okada Family Foundation, and Crown Global.  The Dallas Foundation is no longer a party here and did not even object in its -- an individual capacity.  Object.

THE COURT:  I sustain the objection.  They had an objection.  They withdrew it.

Moreover, as I announced early on today, I was really questioning their standing to weigh in.

So in light of all of that, I'm not going to allow

Dondero - Direct                                    204

testimony regarding the impact there has been on Dallas Foundation as a result of something Mark Patrick may have done.  Okay?

THE WITNESS:  Okay.  I can answer it differently.

THE COURT:  Well, wait for your question.  Okay.

BY MR. LANG:

Q    Well, what -- what is the --

A    What is my goal?

Q    Well, yes, what is your goal?

THE COURT:  Okay.  Yes.  Why are you objecting?  Why is Dugaboy objecting?  How about that?

MR. LANG:  Safely.

THE WITNESS:  Safely.  Without stating where the assets are or might be, they are not with the three charities they were with a year ago.  They have zero.  And I would like to get those assets back.

(Pause.)

THE COURT:  Okay.  Go ahead.  I have a couple of questions, but maybe you'll hit on them.

MR. LANG:  Oh.

BY MR. LANG:

Q    Mr. Dondero, are you asking the Court to -- are you objecting to the settlement agreement that is the subject of the 9019, asking the Court to allow the Joint Liquidators in the Caymans to weigh in on the settlement agreement?

Dondero - Direct                                    205

A    Yes.  Or described a little differently, there's no irreparable harm --

MR. PHILLIPS:  Objection.  Nonresponsive.

BY MR. LANG:

Q    Well, let me ask you this:  Are you asking --

THE COURT:  Let him answer.

MR. LANG:  Yes.

THE COURT:  Go ahead and answer.

BY MR. LANG:

Q    Go ahead.

A    There's no irreparable harm for a bit of delay to get to the bottom of where the assets are and what bad deeds have occurred.

Q    Is that the reason why you're objecting, is to delay this for 45 days or so?

A    Well, I believe the HMIT million-dollar transaction in February was a steal.  I believe it was a stolen asset that he -- Mark Patrick's trying to monetize.  And I don't believe it's monetized at nearly its fair value.  And so I believe that it needs to be reviewed.

Q    Are you asking the Court to -- are you objecting simply to allow the Liquidators in the Caymans time to review this transaction and the settlement agreement?

A    Yes.  There needs to be more time.

Q    Okay.

Dondero - Cross                                    206

MR. LANG:  I'll pass the witness.

THE COURT:  All right.  Cross?

CROSS-EXAMINATION

BY MR. MORRIS:

Q    Good afternoon, Mr. Dondero.

A    How's it going?

Q    Okay.  You referred to the three underlying charities as being The Dallas Foundation, The Highland Santa Barbara Foundation, and The Highland Kansas City Foundation.  Do I have that right?

A    The three are The Dallas Foundation, Santa Barbara, Kansas City.  There's a holding company or there's an entity below it, below each one that I'm on the board of, but it's separate and distinct from the overall charity.

Q    Okay.  But the ones that are separate and distinct that have the Highland name, --

A    Yes.

Q    -- those are the ones that you control, correct?

A    No.  I'm on the board.  There's three or four people on the board.

Q    Okay.  But --

A    But we don't control.  Otherwise, you know, we would have not recommended the settlement.

Q    Does the Hunt family make their contributions to The Dallas Foundation, The Santa Barbara Foundation, and The

Kansas City Foundation, or do they make them to The Highland Dallas Foundation, The Highland Santa Barbara Foundation, and The Highland Kansas City Foundation?

A    Most families do it through DAF, so they probably have their own -- they're just involved with Kansas City, as far as I know.  I don't know if they're involved in any of these others.  But they probably have a Hunt Kansas City.

Q    But the ones with the Highland name are the ones who initiated the proceeding in the Cayman Islands to get the Joint Official Liquidators appointed over this entity down there, right?

A    Yes, I believe so.

Q    And you personally funded that litigation, correct?

A    The charities can't make payroll.

Q    And the charities, did you tell the charities what's happening here?

A    Yes.  They're aware.

Q    When did you tell the charities what's happening here?

A    They've known it for weeks.

Q    And they haven't filed any objection in this court, correct?

A    They thought it was best for Dallas to file it.

Q    And Dallas settled; isn't that right?

A    To the surprise of all the other charities.

Q    Okay.  So today, there's actually no charity who is

Dondero - Cross                                                    208

objecting to the settlement agreement, correct?

A    Because it was -- she got bludgeoned in depositions over the weekend and it happened last night and nobody was aware of it.

Q    I didn't bludgeon anybody.

A    Well, --

Q    I don't bludgeon people.

A    She switched course after a Sunday full-day deposition or half-day deposition.

Q    Okay.  So the charities that you speak of aren't objecting, correct?

A    Well, if we had more time.  We only had six hours' notice that Dallas fell away.  I think they probably would object.

Q    And you say -- you began to have concerns about Mark Patrick going all the way back to 2023, right?

A    2023?  A little bit, yeah.

Q    And then you had real concerns in 2024, right?

A    Yeah.  I mean, he's an odd duck, but he was really odd towards the end.

Q    Did you file a declara... is one of those public documents you mentioned in the Cayman Islands, that's your affidavit, right?

A    I believe so.

Q    Do you want to grab Binder 3 of 3?

A    Sure.

Dondero - Cross                                                209

Q    And turn to Exhibit 119?

A    Yes.

Q    Okay.  And this is the declara... this is the affidavit that you filed in the Cayman Islands?

A    Yes.

Q    And if you turn to Page 4, in Paragraph 25 you begin to recite events concerning Mark Patrick that concerned you, correct?

A    Yes.  I'm glad you're bringing this into evidence.

Q    Yes.  And in the two years since you started having concerns, has anybody sued Mark Patrick for breach of fiduciary duty?

A    No.

Q    Have you recommended to any of these charities:  Mark Patrick is doing wrong, let's go sue him?

A    We were unaware on 90 percent of it until he left.

Q    You were aware of everything that's in your declaration. It says in 2023, you have notice of these emails.  Right?  And you did an investigation in 2024, correct?

A    Yes.  But it took a while to get the affidavits from third parties.

Q    You had the whole investigation done in 2024 and nobody sued Mark Patrick, right?

A    We didn't sue him.  Correct.

Q    You're just mad that you lost control.  Isn't that right?

Dondero - Cross                                    210

A    No.

Q    Turn to Paragraph 33, please.  You accuse Mr. Patrick of misusing material nonpublic inside information.  Is that right?

A    Yes.

Q    What material nonpublic inside information did he abuse?

A    I wasn't involved in the specifics.  My understanding is that he had an awareness of a tender or some financial transaction and then was providing inside information to attorneys and then had them do something.  But I don't -- I don't know the specifics.

Q    Sir, under oath, in this affidavit that you submitted to the Cayman Islands, you accuse Mark Patrick of obtaining and abusing material nonpublic inside information.  Can you just tell Judge Jernigan what you had in mind?

A    Whatever it says I have in mind.  I'm just saying I didn't remember the specifics.  I can read it, though, if you'd like me to read it.

Q    Well, was it something about a put option?

A    Yes.

Q    Did he tell The Dallas Foundation that it had a put option?  Does that refresh your recollection?

A    I don't remember the details.

Q    Do you remember who the counterparty was to the put option?

Dondero - Cross                               211

A    Counterparty.  One of the mutual funds.

Q    Does it refresh your recollection that it was the Dugaboy?

A    No.

Q    Do you remember, sir?

A    I don't remember.

Q    I'm going to try.  I'm going to try and refresh your recollection.  Do you remember that Mark Patrick suggested to The Dallas Foundation that it could recover millions of dollars if it simply exercised the put option with Dugaboy?

A    My recollection is it was a mutual fund, and it wasn't millions of dollars, but it would disrupt the transaction that was already in place.  That's my recollection.

Q    Okay.

A    And I don't see Dugaboy anywhere in here, by the way.

Q    I know.  I was wondering if you could just -- I asked you, but it doesn't sound like you know specifically what the material nonpublic --

A    Well, --

Q    -- inside information is that you accused Mr. Patrick of abusing at that time.

A    I know it's been reported.  We can get you the details.

Q    Okay.  You, in fact, acted on behalf of HMIT, didn't you?

A    Who is HMIT?

Q    Apologies.  You personally -- there's no question in your mind that Mark Patrick is the Administrator at HMIT, correct?

Dondero - Cross                                              212

A    I'm sorry, I'm drawing a blank on HMIT.  What is HMIT?

Q    I apologize.  Hunter Mountain Investment Trust.

A    Oh.  Okay.

Q    I'm calling it HMIT.

A    Okay.  All right.  Sorry.

Q    I probably not saying it clearly.  I apologize.  H-M-I-T.
HMIT, that's what I call it.  Is there something better that
you prefer?

A    No, that's fine.  Yeah.

Q    Okay.  So HMIT.  Mark Patrick is the Administrator at
HMIT, right?

A    I believe his status, his dirty hands, I believe he's
trying to monetize a stolen asset.

          MR. PHILLIPS:  Objection, Your Honor.  Nonresponsive.

          THE COURT:  Sustained.

          THE WITNESS:  No, I -- I saw it.  I don't agree --

          MR. PHILLIPS:  Objection, Your Honor.

          THE COURT:  Sustained.

          MR. PHILLIPS:  Move to strike.

          THE COURT:  Granted.

          THE WITNESS:  I do not agree.

BY MR. MORRIS:

Q    Okay.  Has he -- he was at one time the Administrator.
You would agree with that, right?

A    Yes.

Dondero - Cross                                    213

Q    And did he stop becoming the Administrator in your mind when the Joint Official Liquidators were appointed?

A    Yes.  I believe.

Q    Okay.  So, in your mind, that's when it happened?

     Can you describe for the Court the relationship between the entity in the Cayman Islands and HMIT?

A    The entity in the Cayman Island, as far as we knew, was the org structure that all the assets were either in or controlled by in the organizational structure before all the HGEQ things that you went over earlier with Mark Patrick.

Q    Okay.  I'm not asking -- it's my fault.  Do you believe the entity in the Cayman Islands controls HMIT?

A    HMIT was one of the assets that were owned by the charities until it was moved for a million dollar to who know who.

Q    And do you know how many layers there are between the Cayman Islands entity and HMIT?

A    I do not.

Q    Is it fair to -- in your view, do you believe that the Cayman Islands entity had a direct -- withdrawn.  Do you believe that the Cayman Islands entity had an indirect ownership interest in HMIT?

A    We believed it was direct.

Q    Direct.  So it was the owner?

A    Well, it was -- it was the direct before it got moved in

Dondero - Cross                                    214

February.

Q    Hasn't Beacon always been the owner of -- the beneficial owner of HMIT?

A    Then it was Beacon that was moved.  There was -- charities were notified in February that, for $1 million, the HMIT was sold to an undisclosed, unknown person.

Q    Do you believe that the entity in the Cayman Islands ever had the ability to control Hunter Mountain Investment Trust?

A    Yeah.  It was an asset in the portfolio.

Q    And do you believe that that gives it the right to control HMIT?

A    Yes.  I think the Liquidators will prove that.  I think they can go back in time on bad acts and bad behavior and they can regroup assets to their rightful owners.

Q    So your concern here is not with corporate authority, it's with the bad acts.  Is that fair?

A    Well, no.  I think you lose your corporate authority when you're fiducially irresponsible or commit corporate crimes.

Q    Okay.  But you've never -- you've never brought a lawsuit accusing him of that.  Fair?

A    I think you'll see a litany of stuff come out of the Cayman Islands.

        MR. PHILLIPS:  Objection.  Nonresponsive.

        MR. MORRIS:  I'm sure we might someday.

        THE COURT:  Sustained.

Dondero - Cross                                    215

THE WITNESS:  Yeah.  But, no.  But I have not, no.

BY MR. MORRIS:

Q    Yeah.  But you personally, have you ever been the Administrator of Hunter Mountain Investment Trust?

A    Not that I'm aware of.

Q    Have you ever had any role whatsoever with respect to the Hunter Mountain Investment Trust?

A    Not that I -- not that I recall.

Q    Okay.  Do you recall last December we were here on some litigation concerning HCLOM's scheduled claim?

A    You have to give me more of a clue.

Q    Remember HCLOM had that $10 million scheduled claim and Highland had filed a bad faith motion and we were all here in court and we wound up settling that matter and HCLOM got a Class 10 interest for $10 million?

A    Yes, I vaguely remember that.

Q    Okay.  And you were here and you were representing HCLOM, right?

A    Okay.  I don't remember specifics, but, yes, go ahead.

Q    Okay.  And do you recall that Highland required Hunter Mountain Investment Trust's consent as part of the transaction?

A    Vaguely.

Q    And you personally authorized that consent back in December, didn't you?

Dondero - Cross                                         216

A    No.

Q    Who did?

A    Whoever would have spoke for HMIT at the time.

Q    Okay.  Let's take a look at Exhibit 68, please.

A    So, Binder 2?

Q    Yes, please.

A    Sorry, this says Pat Daugherty.  This is 1 of 3.  This one.  Okay.  Did you say 68?

Q    Yes.

A    It's not in here, either.  68.

Q    So you see that's an order of the Court?

A    Yes.

Q    And this resolves HCLOM's claim?  Take your time.

A    I'll leave it in case someone else needs it.  Okay.

Q    And do you see on the last page of the document there's an electronic signature by Deborah Deitsch-Perez at the Stinson firm as counsel for Hunter Mountain Investment Trust and Dugaboy Investment Trust?  Do you see that?

A    I'm sorry.  I went to the very last page with Mark and I. Is there another page?  Oh, okay.  Yes.  Okay.

Q    So you see Stinson has signed both on behalf of you personally and HCLOM, and at the bottom, Stinson and Ms. Deitsch-Perez has also signed on behalf of Hunter Mountain Investment Trust and the Dugaboy Investment Trust?  Do you see that?

Dondero - Cross                                                   217

A    Yes.  But then it's separate on 69, right?

Q    Yeah.  We're just looking at 68.

A    Okay.

Q    Do you know who authorized Ms. Deitsch-Perez to sign her name and tell the Court that the Dugaboy Investment Trust had approved this form of order both as to form and substance? Who acted on behalf of Dugaboy?

A    I have no idea.  I hope she keeps it straight when she's signing stuff.

Q    Well, on whose behalf are you here today?

A    Dugaboy's.

Q    And are you a representative of Dugaboy?

A    Representative?  I'm primary beneficiary until I pass.

Q    And who's the trustee of Dugaboy?

A    I believe it's my sister at the moment.

Q    Does she know you're here today testifying on behalf of Dugaboy?

A    She knows I'm in court.  I didn't -- I wasn't specific.

Q    Did you talk to her about the Dugaboy -- does she -- does she even know about the Dugaboy objection?

A    I don't know.

Q    Okay.  So how about Hunter Mountain Investment Trust?  Do you know who authorized Ms. Deitsch-Perez to sign this document on behalf of Hunter Mountain Investment Trust?

A    When was this?  In December or January?

Dondero - Cross                                          218

Q    Yeah.

A    I'm assuming -- I'm assuming Mark Patrick.

Q    Late December.

A    I'm assuming Mark Patrick.  But I don't know.

Q    Did you hear about a week later that Mr. Phillips called your lawyer and accused her of signing this document without authority from Hunter Mountain Investment Trust's authorized representative, Mr. Patrick?

A    In hindsight, he's been in on it for a while, so --

Q    What do you mean, he's been in on it for a while?

A    I think he knows the plan Mark Patrick's been putting in place for quite a while.

Q    But this document was signed without his knowledge or consent; isn't that right?

A    I don't know.

Q    And you had to sign a new agreement with Mark Patrick as the authorized representative of HMIT.  Didn't you do that, sir?

A    I don't know.

Q    Okay.  Let's take a look at guess I guess probably Exhibit 69.  So this is an intercreditor and participation agreement. Do you see that?

A    Yes.

Q    And it's dated January 10th, 2025, correct?

A    Yes.

Dondero - Cross                                    219

Q    And even though you -- even though Skyview had completed
this investigation in which it was alleged that Mr. Patrick
misused material nonpublic inside information and he had
terminated his relationship with Skyview, you still entered
into this agreement with him as the authorized representative
of HMIT, correct?

A    Those were different work streams, you know, so they were
-- but yes.

        MR. PHILLIPS:  Objection.  Nonresponsive.

        THE COURT:  Sustained.

BY MR. MORRIS:

Q    That is -- that is your signature on the last page,
correct?

A    Yeah.  I mean, --

Q    It's a simple question.  That's your signature, right?

A    Yes.

Q    And you understood that you were signing an agreement with
Mark Patrick, correct?

A    Yes.

Q    And you signed this agreement in order to avoid Mr.
Phillips filing a motion in this court for reconsideration of
an order that she signed not knowing that Hunter Mountain had
given its consent without authority.  Isn't that right?

A    No, I had no -- none of that --

Q    So what's your memory?  Why do you think you entered into

Dondero - Cross                                220

this agreement?

A    Because the lawyers put it in front of me as a finished product from what had been going on recently.

Q    And you had no understanding of what it was?

A    Not with the innuendo and agenda that you were describing. No.  I mean, I just -- I knew what it generally involved. That's it.

Q    But you would agree with me that you entered into an agreement knowing that Mark Patrick was signing on behalf of Hunter Mountain, correct?

A    Yes.

Q    I mean, it's right below your name, right?

A    Yes.

Q    You couldn't have missed it.

A    Yes.  That part, I'll agree with.

Q    Okay.  And you signed the agreement with Mark acting as the authorized agent and representative of Hunter Mountain, notwithstanding all of the bad acts that you supposedly were aware of at the time.  Correct?

A    Object to aware of at the time.  They were all coming together in parallel work paths.

          THE COURT:  Okay.

          MR. PHILLIPS:  Object.  Nonresponsive.

          THE COURT:  Sustained.  Like I told Mr. Patrick, the witness does not get to object.

Dondero - Cross                                        221

THE WITNESS:  Okay.

BY MR. MORRIS:

Q    And just to close the loop, Mr. Dondero, you fully funded The Dallas Foundation's objection, correct?

A    And I made additional donations so that they could pursue bad actors and get their money back.

Q    You funded the litigation so that The Dallas Foundation could pursue their objection, correct?

A    I made additional donations so that they could get some assets back so that they could be a charity again and make donations.

Q    Do you get a tax deduction for that donation?

A    Yes.

Q    Okay.  That's nice.
     Let's just finish up with the Joint Official Liquidators.  Have you spoken to them?

A    I do not believe so.

Q    Has anybody acting on your behalf spoken with the Joint Official Liquidators?

A    I don't know.  I think the Joint Official Liquidators are an accounting firm.  I think they're Grant Thornton.  I think people have spoken to the attorneys down there, but I don't know -- I haven't spoken to Grant Thornton and I don't know if anybody else has.

Q    Okay.  Did you see the letter that your counsel marked as

the exhibit, the one that was sent last night?

A    I've not heard it -- I've not read it, but I've heard you guys read it today.

Q    Yeah.  Are you aware of the Joint Official Liquidators saying at any time that they didn't believe Mark Patrick had the authority to enter into the settlement agreement on behalf of the HMIT entities?

A    I have not.

Q    Okay.

MR. MORRIS:  No further questions, Your Honor.

THE COURT:  All right.  Mr. Phillips?

MR. PHILLIPS:  Yeah.

THE COURT:  Wait.  What are we at timewise?

THE CLERK:  So their 30 minutes is over.  If you intended to give them 30 minutes for Patrick and --

THE COURT:  Yes.  Yes.  They collectively got 30 minutes.

THE CLERK:  For both of those --

THE COURT:  Yes.

THE CLERK:  -- witnesses.  Okay.  Yes, they're out.

THE COURT:  How much did Mr. Morris use?

THE CLERK:  Well, I don't know.  I just was --

THE COURT:  No, no, no, no.  30 minutes for each side for each Patrick and Dondero.

MR. MORRIS:  About eight minutes.

Dondero - Cross                                223

THE CLERK:  Yes.  Mr. Morris -- I think Mr. Phillips may have asked one question, but Mr. Morris mostly -- 30 minutes.

THE COURT:  No.  On this witness, Phillips hadn't gone.

THE CLERK:  No, not this witness.

THE COURT:  Okay.  That's all I care about, this witness.

THE CLERK:  I don't know this witness.

THE COURT:  Okay.  Do you have a question, Mr. Phillips?

THE CLERK:  I was doing 30 minutes for the total.

THE COURT:  No, no, no, no, no.

MR. PHILLIPS:  Your Honor, I can resolve this.  I can resolve this.  We have no questions.

THE COURT:  Okay.  Thank you.  Where are we?  Mr. Lang, any redirect?

MR. LANG:  I'm not sure.

THE COURT:  Okay.

THE WITNESS:  The last one.

MR. PHILLIPS:  Your Honor, the witness is telling the lawyer what question to ask.

THE COURT:  Okay.

MR. LANG:  I believe I've already asked, which is the endgame.

Dondero – Redirect                    224

THE COURT: Okay. Just let's move on. Anything else? What was the question?

REDIRECT EXAMINATION

BY MR. LANG:

Q    Mr. Dondero, what are you looking to accomplish through this objection?

MR. PHILLIPS: Asked and answered.

THE COURT: Sustained. Sustained. He did. He was asked and answered.

BY MR. LANG:

Q    The endgame in general.

MR. PHILLIPS: Asked and answered.

THE COURT: Answered and answered. Move on.

THE WITNESS: No, no. No, I haven't. No, I --

MR. PHILLIPS: Asked and answered. Move to strike.

THE COURT: You asked him this on your direct earlier.

MR. LANG: I did.

THE WITNESS: But, in general, regarding the --

MR. PHILLIPS: Your Honor?

THE WITNESS: Not just this.

THE COURT: Sustained. Ask another question.

MR. LANG: I don't have any more questions.

THE COURT: Okay. I have a question.

EXAMINATION BY THE COURT

Dondero - Examination by the Court                    225

THE COURT:  Here is something that I want to understand.  What I have before me is whether a settlement with Hunter Mountain, a settlement between the Highland entities, the Claimant Trust, the Subtrusts, and the Hunter Mountain entities, seven of them, is fair and equitable, is in the best interest of the estate.  If you were the director, the manager, the representative of Hunter Mountain estate, what would your answer be?

THE WITNESS:  It's not in the ZIP Code.

THE COURT:  It's not in the ZIP Code?

THE WITNESS:  Of fair.  Yes.

THE COURT:  Okay.  Why do you think it's not in the ZIP Code of fair?

THE WITNESS:  Okay.  We filed in Delaware on a $100 million judgment.  Pachulski was our counsel.  They told us --

THE COURT:  I know all this.

THE WITNESS:  It just --

THE COURT:  I'm talking about the settlement in front of me right now.

THE WITNESS:  -- we'd be in and out in three months, right?  We got liquidated instead.  We got liquidated for over $850 million, which not enough people talk about.  Okay?  It would've been $950 million if Seery had done a good job, but it was $850 million we got liquidated for.  Okay?  The POCs were pumped up.  People who supposedly had no claim, all of a

Dondero - Examination by the Court          226

sudden, $300 million.

There's $700 million missing or misallocated from the estate. Okay? There was -- all the original creditors, all the original creditors sold 99 percent of their interest for $160 million. The Farallon and Stonehill went to the beach. There was enough money on the balance sheet. Seery could have given them the $160 million and tossed us the keys. Instead, he had relations, deep relations, undisclosed business relationships with Farallon and Stonehill, --

THE COURT: Okay. I do want you to know --

THE WITNESS: No, but --

THE COURT: -- I've read all this many times.

THE WITNESS: Okay. But so -- so these --

THE COURT: I promise I read every piece of paper submitted.

THE WITNESS: Okay. So, so he sold the POCs to them, and it's been -- they've tripled their money in two and a half years. The professional fees have been $300-odd million. There's interrelationships between all the professionals -- Farallon, Stonehill, Grosvenor, the Hellman & Friedman guys, the Millennium guys who took whatever. All this stuff has to come out.

We're on the edge of a giant RICO case eventually. We're -- that's -- we're on the edge of a giant RICO case. And they should not be giving up their rights for $10, $20 million.

Dondero - Examination by the Court               227

It's crazy for them to give up their rights at Dallas Foundation for 10 or 20 million bucks.

There's $700 million missing.  All the original creditors sold for $160 million.  The estate was sold for over $850 million.  Where'd all the money go?  Where'd all the money go and why?  You know.

We get updates quarterly, once in a while, well, this much went out to this law firm, this much went out to this, whatever, but no one looks at the gross amount and where'd all the money go?  And why?  Why did it have to -- why did it have to go down like that?  Why do we have to fire --

THE COURT:  Okay.  I know you have an objection.

THE WITNESS:  -- all the employees?

THE COURT:  This is narrative.

MR. MORRIS:  Yeah.  And --

THE COURT:  I understand all --

MR. MORRIS:  -- I'm not going to cross-examine him, but this is -- this is not accurate.

THE COURT:  I understand all of these arguments.  You know, I --

THE WITNESS:  But I'm just --

THE COURT:  Your lawyers at least know, if you don't know, that we wrote a 100-plus-page opinion on the motion of Hunter Mountain to sue for all of this.  Okay?  So I promise I've heard this and looked at it.  But right now, Hunter

Dondero - Examination by the Court                228

Mountain, through Mark Patrick, you question his authority, but they are ready to lay down their swords and not pursue that motion for leave to sue based on the claims trading, and --

THE WITNESS:  Have you seen all the insider trading, Farallon, Stonehill?  Have you seen the trading and claims on insider information?  Have you seen all that stuff?

THE COURT:  I've seen the allegations but I --

THE WITNESS:  Well, why would you release all those people right now before the RICO?

THE COURT:  So I -- Dugaboy -- you've been asked what is your goal?  Dugaboy a .18 limited partnership interest --

THE WITNESS:  Correct.

THE COURT:  -- that is subordinated to Hunter Mountain.  I'm just trying to understand the scenario where it makes sense to keep fighting for years to come.

THE WITNESS:  Well, RICO transcends this, right?  I mean, RICO brings everybody in.  Until we get --

THE COURT:  Okay.  You think it's -- and my question, why is this not fair and equitable and in the best interest of the estate, you think it's better to litigate several more years and maybe have a chance, you know, --

THE WITNESS:  At $600 mill.  At $600 million.

THE COURT:  -- Hunter Mountain would have a chance to --

Dondero - Examination by the Court                  229

THE WITNESS:  $600 million.  Yes.

THE COURT:  Okay.

THE WITNESS:  Versus $20 million now.  But you have to remember, it's all part of -- you have to pay attention to this Mark Patrick stuff.

MR. PHILLIPS:  Your Honor?

THE COURT:  Okay.  Yes.  I asked my question.  I'm trying to understand why Dugaboy, why its position is this is not fair and equitable and in the best interest and in the range of reasonableness.  Those are the buzz words that a judge has to focus on.

THE WITNESS:  It's not fair to the charities.  I still think no one's ever seen --

THE COURT:  The charities aren't parties here.

THE WITNESS:  Not yet.  Give them a little time.  They just heard about the settlement yesterday.

THE COURT:  Well, isn't that what the Cayman Islands is all about?  What I do doesn't necessarily affect what's happening there.

THE WITNESS:  Well, no, but you're saying they're not here today.  If you delayed this three weeks, they'd be here.  It's just a couple --

THE COURT:  They were here and they chose to withdraw.

THE WITNESS:  One.  One.  Just one charity.  But the

others, if you give them some time, they'll be here.

THE COURT:  Okay.  Okay.  I think you've answered my question, your theory of how this should play out and how you want it to play out.  Okay.  All right.

THE WITNESS:  Thank you.

THE COURT:  That's all.  Thank you.

THE WITNESS:  Thank you for the time.

THE COURT:  Uh-huh.

(The witness steps down.)

THE COURT:  All right.  I think that concludes our evidence, correct?

MR. YORK:  Yes, Your Honor.  At least from Daugherty and --

THE COURT:  Okay.  The Objectors rest.  Any rebuttal?

MR. PHILLIPS:  No, Your Honor.

THE COURT:  Okay.

MR. YORK:  Your Honor, would it be okay if we took a five-minute comfort break?

THE COURT:  Yes.  We may as well turn it into a 10-minute break because that's what's going to happen.  All right.  We'll be back at 3:40.

THE CLERK:  All rise.

(A recess ensued from 3:30 p.m. until 3:44 p.m.)

THE CLERK:  All rise.

THE COURT:  Please be seated.  We're back on the

record in Highland Capital. I will hear closing arguments. And I dangled something out there before lunch and I've never heard any follow-up. I guess no agreement with Daugherty could be reached on the reserve?

MR. YORK: Haven't had that conversation, Your Honor.

THE COURT: You didn't have that conversation? Oh, well. Why didn't you have that conversation?

MR. YORK: We were, during the lunch break, working busily to prepare the rebuttal to Mr. Seery's testimony, --

MR. MORRIS: Yeah.

MR. YORK: -- Your Honor. And so --

THE COURT: Okay. You told me you'd talk about it.

MR. MORRIS: May I proceed, Your Honor?

THE COURT: I guess I don't matter. Do I not matter when I suggest something like that?

Okay. Go ahead.

CLOSING ARGUMENT ON BEHALF OF THE CLAIMANT TRUST

MR. MORRIS: Good afternoon, Your Honor. John Morris; Pachulski, Stang, Ziehl & Jones; for Highland Capital Management, LP and the Highland Claimant Trust and on behalf of the Highland Litigation Subtrust.

I know that we've got Bob Loigman in the courtroom, but I know that -- at least I hope he joins me in this closing argument. I suspect he does.

I don't want to be too long here, Your Honor. We don't

have a high burden.  This is a 9019 motion, for goodness' sakes.  I've never been involved in such a contentious 9019 motion in my life.  We had three depositions on Friday.  We had two on Sunday.  I think we had two on Monday.  For a 9019, I've had one witness sit multiple times.

It's been an extraordinary experience.  But at the end of the day, nobody's really challenging the settlement agreement.  You've got people challenging, you know, the Cayman Islands.  You've got people challenging, is it -- you know, can you jam it in under the plan?  We're not jamming anything under the plan.  We're following the plan provisions.

Nobody's challenging the bona fides of the motion.  Nobody is challenging whether it's the product of good-faith, arm's-length negotiations.

You heard Mr. Seery testify at length about the process.  You've got 55 different documents in the record proving that this agreement is the product of arm's-length, good-faith negotiations between parties represented by sophisticated counsel that resulted from an exchange of information, an exchange of proposals, back and forth, and here we are.

It's also in the best interests of the estate.  Really not challenged by anybody.  Nobody is contending that Highland is getting a raw deal here.  Nobody.  And the proof that Highland is getting fair consideration and that this settlement is in the best interest of the Claimant Trust and its stakeholders,

it's obvious we are terminating costly, wasteful, and I dare say frivolous litigation. We are disposing of several illiquid assets. We are getting litigation protections that will inure to the benefit of the released parties, the Highland release parties and it will, we believe, provide the protection that we deserve.

It's not just releases. It's covenants not to sue. It's all kinds of bells and whistles in there. Substantial benefits to the estate. And so nobody's really objecting to that.

Nobody's really objecting to the fairness of the settlement to the HMIT parties except for Mr. Dondero, and he's just mad that peace is breaking out. He's just mad because he's not going to be able to litigate anymore. It's not relevant to a 9019 motion. But even if it was, it's ridiculous. It's just ridiculous.

The settlement is fair and reasonable and in the best interest of the creditors. It's the product of good-faith, arm's-length negotiations. And on that alone, it should be approved.

We've had a lot of testimony today about Mark Patrick's authority. The only actual evidence that concerns Mark Patrick's authority are the exhibits in the binder and Jim Seery's testimony about the diligence that he did. And the exhibits in the binder all prove that Mark Patrick has the

authority to act and bind the HMIT entities to the settlement agreement.  It's Paragraph 7 of the HMIT trust agreement itself.

Did the objecting parties point you to one single document to support their speculative argument, because it's not anything more than that, that somehow Mark Patrick isn't authorized to do this?  There is not a scintilla of evidence that Mark Patrick is not authorized to do this.

And if Your Honor had any concerns about Mr. Patrick, I think he answered them at the end.  That he understood exactly what the terms of the agreement are.  That he had a reasonable opportunity to consult with counsel and to negotiate.  That he knows exactly what he's doing on behalf of these entities. That he believes the best path forward from the HMIT entities is to grab the value today instead of letting it waste.

We welcome Mr. Patrick to the table.  It makes a lot of sense.  We've been trying to get to this point forever.

Mr. Daugherty.  You know, I have no gripes with Mr. Daugherty.  I don't know quite what's motivating him these days, but he admitted and the evidence is clear that when he was a Class 9 claim holder, I forget if it's two or three or four occasions, he accepted $3.7 million in multiple payments, without any concern at all as to whether or not it violated the plan, even though his Class 8 claim had remained unresolved.

He didn't send the money back. He didn't say, Mr. Seery, you can't do this because it violates the plan. He knowingly and willingly accepted the benefits of being a Class 9 claim holder. And now he comes and objects on the basis that somehow it's not fair to him as a Class 8 holder? This is what we call estoppel. Right?

I wasn't in a position to really make the argument because I didn't quite understand it until today. Like, how does he come in today and say you can't do this, Your Honor? You can't allow Class 9 and 10 to get a nickel until he's done, when he himself has accepted millions of dollars before his claim is resolved? That doesn't sound right to me. And I don't think the Court should accept that argument.

Just quickly, because I don't want to give it any weight, frankly, but this whole business of the Cayman Islands and the JOLs, the only facts Your Honor has to take into account are that they were appointed before this motion was filed. They've never appeared here. They've never objected. And there is no evidence in the record to suggest, let alone to prove, that the JOLs contend that Mark Patrick does not have the authority to enter into the settlement on behalf of the HMIT entities. There's no evidence of any kind.

What you need to know and need to remember, though, is that whole proceeding in the Cayman Islands is being brought on behalf of not The Kansas City Foundation or The Dallas

Foundation, but The Highland Kansas City Foundation, The Highland Dallas. It's Mr. Dondero, and he's funding it, and it says it in Paragraph I think 47 or 48 of his declaration. He's funding all of that. And he funded The Dallas Foundation's objection here.

And that's why he's upset, because they settled last night without telling him because they didn't want any part of this, Your Honor. That's the truth. That's why they're not here. And they, right, they're the people who suggested that maybe something untoward happened and maybe someday -- because this is the way their objection is characterized. Complete speculation.

If you go back and look at the objection, it's someday, somebody might do something and might someday set it aside. That wasn't a proper basis at the time, but we know that Mark Patrick remains in control of the HMIT entities today because nobody has told the Court otherwise. And we know that The Dallas Foundation has withdrawn its objection. As I asked Mr. Patrick, have you been, you know, removed or clipped or terminated or in any way restricted in your capacity as the Administrator and control person of the HMIT entities as a result of the settlement, and the answer was no.

There's nothing to see here, Your Honor, except the opportunity for the Highland Claimant Trust and its affiliated entities in moving this case forward in an enormously positive

and constructive direction.

We have the opportunity today to put to rest a lot of pending litigation. We have the opportunity today to put to rest a lot of future potential litigation that undoubtedly would have come to pass had these entities remained under the indirect control of Mr. Dondero, because we know that that was the case.

If you remember, Your Honor, we sat here two years ago, June 8th, 2023, on the evidentiary hearing on Hunter Mountain's motion for leave to bring the claims trading case. And if Your Honor will remember, Mr. Patrick at that time was forced to admit that the entirety of that case came in from Mr. Dondero, that he had no knowledge of any facts that related to anything.

I would ask Your Honor to go and compare The Dallas Foundation's objection with Mr. Dondero's declaration that he filed in the Cayman Islands. I'm not going to say they're verbatim, but they are largely, largely the same. This is just Jim Dondero being Jim Dondero, and that is not a basis to overrule or deny the motion under Rule 9019.

It's a product of good faith negotiations, it is clearly in the best interests of the estate, and we respectfully request that as soon as possible Your Honor grant motion.

THE COURT: Okay.

MR. MORRIS: Thank you, Your Honor.

THE COURT: Any closing from the Movant, Co-Movant?

MR. PHILLIPS: Your Honor, thank you very much. Louis M. Phillips on behalf of the --

THE COURT: I don't know if you're the Co-Movant. You're a party to the proposed settlement.

MR. PHILLIPS: I'm not a Co-Movant.

THE COURT: Okay.

MR. PHILLIPS: I'm a party to the settlement.

THE COURT: Uh-huh.

MR. PHILLIPS: I didn't quite make it to that status to be a Co-Movant.

CLOSING ARGUMENT ON BEHALF OF THE HUNTER MOUNTAIN ENTITIES

MR. PHILLIPS: But anyway, we appreciate the Court's time. We appreciate the Court's attention. This was, as the evidence established, we provided and were provided an immense amount of information.

Much of the information, certainly the information about Mr. Patrick's control of the HMIT entities, was provided by us. It was reviewed by Mr. Seery. And Mr. Seery made a very strong case for the amount of diligence he did on our side of the equation. It's not nearly as relevant to Your Honor's decision about whether to approve the settlement whether we got a good deal or not, but the deal we got, we think, is very fair.

The deal we got was negotiated with counsel, with

businesspeople who are very sophisticated. We have agreed on the methodology and of the calculation of our Class 10 claim. The Debtor and the Debtor estate or the Claimant Trust or whoever held the HMIT note got full value for the HMIT note. Any additional value from the HMIT note would come back to HMIT. The Kirschner Litigation would be for the benefit of HMIT. The Dugaboy Note would be for the benefit of HMIT.

All of that is being put into a package and is being resolved, affiliated, administered in a very effective and efficient manner. We are getting some money. We appreciate. We tried to get more. We couldn't. They tried to pay less. We made a deal.

So, Your Honor, I echo and thank Mr. Morris for all of his comments. I appreciate counsel being involved here today. We think this is a fair and equitable settlement. There is no question under 9019 that this settlement should be approved. And the suggestion that this Court should allow itself to just be a vehicle for continued litigation, when we have analyzed it, perhaps from a different perspective, and made the decision that it is time to make our deal now, it is time to take HMIT out of the litigation picture and into the fold of a party in interest of a fixed claim with fixed treatment that's different from the plan, authorized by the plan. And we appreciate it.

Thank you, Your Honor.

THE COURT: Thank you. All right. Mr. Loigman, we didn't mean to ignore you.

CLOSING ARGUMENT ON BEHALF OF MARC S. KIRSCHNER, LITIGATION TRUSTEE

MR. LOIGMAN: Thank you, Your Honor. Robert Loigman, Quinn Emanuel. You didn't ignore me. Louis was just quicker to jump up than I was.

And I step up solely because you asked whether the Co-Movant had anything to add. And we have nothing further to add to what Mr. Morris said. We agree with it wholly. We think this is a fair and complete settlement, and we would ask that the Court approve the settlement under the 9019 motion.

THE COURT: Thank you.

MR. LOIGMAN: Thank You, Your Honor.

THE COURT: All right. The Objectors?

MR. MORRIS: Your Honor?

THE COURT: Oh.

MR. MORRIS: Just to clarify, the motion was made under 9019 and Section 363. I just don't want that to get lost. That's all.

THE COURT: Okay. 363, use of property. Okay. The Objectors?

CLOSING ARGUMENT ON BEHALF OF PATRICK DAUGHERTY

MR. YORK: Thank you, Your Honor. I'll be very brief.

I certainly appreciate that the Court desires to have this bankruptcy wrapped up, given how long it's gone on now, for six -- approximately six years in this court. The fact of the matter is that the settlement agreement that Highland proposes to enter into with Hunter Mountain Investment Trust entities violates the express terms of the plan, the confirmation order, and the Claimant Trust Agreement.

And they have not pointed to any language in there or to argue otherwise. Their only argument has been that they've set a reserve aside. And there's no provision in any of those documents that provides that that's an excuse for them to violate the express terms of the confirmation order, the plan, or the Claimant Trust Agreement, including specifically the language that Class 10 claims are not to receive or retain anything under the plan on account of their interest unless and until the Class 8 and Class 9 claims are paid in full plus applicable interest. And --

THE COURT: I really want to understand that argument. Mr. Seery correctly testified that, pretty much in every Chapter 11 plan we see, there's a disputed claim reserve. Well, I guess unless we have really unsophisticated creditors who don't insist on that. But we had sophisticated creditors. So why doesn't that mechanism, which I would call tried and true, we see it in most cases, why doesn't that resolve this issue you're raising?

MR. YORK: Well, --

THE COURT: And I focused in more than maybe I needed to about the nature of Mr. Daugherty's remaining claim, his Class 8 claim. What was the scope? What's the maximum amount it could be? When might it be resolved? Because I think we have a tried-and-true mechanism that addresses his concerns. Tell me why it doesn't.

MR. YORK: Well, --

THE COURT: Really, I want to understand what you think I'm missing.

MR. YORK: Well, so I think twofold, Your Honor. The first is that the dispute reserve that exists normally would be for whatever the amount of the disputed claim is. And here we're dealing with, as both sides have acknowledged, a claim that they at best could estimate, but they don't know for certain, given all of the machinations that could come out of the IRS audit.

And secondly, specifically with respect to the confirmation order, if it had said that the net 10 and 11 claims could be paid as long as the allowed 8 and 9 claims were paid, then the dispute reserve would provide that protection. But that's not what the language in the confirmation order says. It says claims, not allowed claims. And therefore it's referring to all claims, including disputed claims. And --

THE COURT: But we have a disputed claim reserve. Okay. We have a disputed claim reserve.

MR. YORK: There is, yes, there is a reserve.

THE COURT: So is it your argument that I can't approve a settlement like this until Mr. Daugherty's claim has been resolved with certainty, which might be in 2033 or whatever? I can't keep a bankruptcy estate open, allowing administrative expenses to continue to accrue, because of one contingent unliquidated claim that may never even develop.

MR. YORK: Your Honor, I appreciate the Court's frustration with that, but that's the way that the documents are written in terms of the confirmation order. And so it's an --

THE COURT: So the disputed claim reserve is meaningless?

MR. YORK: No, it is not -- a disputed claim reserve exists, but it does not, under the terms of the confirmation order, in terms of allowing the payment of Class 10 and Class 11 claims, those can't be done until the Class 8 claims are resolved.

THE COURT: You would have -- just a moment -- you would have me keep this estate open for as long as it takes, 2033, whatever, without allowing Class 10 and Class 11 theoretically to get anything?

MR. YORK: At least under --

THE COURT: Let's just let the -- with all respect to Mr. Seery, he's charging a handsome amount. It was agreed to or approved by the Court. Let's just let him continue accruing until 2033 because of Mr. Daugherty's prospect of the IRS saying you owe $1.4 million plus interest and penalties, when he's gotten the use of that all? Help me. This doesn't make sense to me.

MR. YORK: Sure. One way this could be solved is that the payments to -- the cash payments, for example, that are to be made to the HMIT entities, under the proposed settlement could be held in abeyance until the resolution of the Class 8 claim. The Court could modify the proposed settlement based on that. That's one way to deal with the issue, for example.

THE COURT: Do what? Hold it in abeyance?

MR. YORK: Yes. For -- the payments to be made to the Hunter Mountain Investment Trust under the proposed settlement could be -- could be done in accordance with the terms of the confirmation order. We'll just hold those payments until such time.

THE COURT: We who? Put it in the Court Registry?

MR. YORK: Or --

THE COURT: Where it will earn 0.18 percent?

MR. YORK: No. No. It can remain within the Claimant Trust until the time at which the Class 8 claim is

finally and fully resolved.

THE COURT: Okay. Meanwhile, I've approved the extension of the Trusts for one year, with Dugaboy saying, we don't think this should happen again and again and again. We reserve our rights. That's not a good solution.

MR. YORK: Your Honor, I understand the Court's frustration, but this is the terms of the plan and the confirmation order that were entered. Highland needs to follow it.

THE COURT: Okay. What about the estoppel argument that I heard Mr. Morris make?

MR. YORK: Well, sure. So, the first time they raise it is here today. And the one thing that -- the difference is that allowing this settlement to go forward is an effective liquidation of the estate versus where things are now, in which any payments that were made is not an effective liquidation. It doesn't expose anyone that would have priority to Class 10 with respect to anything that happens in the future from, you know, not having sufficient funds to deal with it. That's all.

THE COURT: Okay.

MR. YORK: Thank you, Your Honor.

THE COURT: Thank you. All right. Mr. Lang?

CLOSING ARGUMENT ON BEHALF OF DUGABOY INVESTMENT TRUST

MR. LANG: I'll be brief. Your Honor, there are

three issues that we've raised. One is the capital account balance being used for the claim for the Class 10 holders. The plan does not specify that the capital account balance is to be used. Allowing the $336 million claim to Class 10 ensures that Class 11 will not ever receive a dime. That's guaranteed.

Alternatively, upon the satisfaction of the Class 9, the $20 million approximately owed to Class 9, the holders of HMIT should receive 99.5 percent of the total residual. We think that would be a more fair outcome to the Class 11 claimants.

THE COURT: Wait, say again?

MR. LANG: That, so, of total assets, $70 million approximately, $20 million is owed to Class 9.

THE COURT: Uh-huh.

MR. LANG: Of the remainder from that, HMIT should receive 99.5 percent of those assets, whatever they are, the value, rather than a $336 million claim. That was the objection.

THE COURT: But I didn't get any evidence of a separate way of competing -- of doing that. I heard credible testimony from Mr. Seery about why he used the math he used and I didn't hear any countervailing evidence of, wait, this is a more fair, realistic way of computing it. And what I did hear is the .5 percent limited partnership interest of Dugaboy is subordinated in its payment rights under the limited

partnership agreement of Highland.

MR. LANG:  It's subordinated under the plan, but yes, the plan does not say to use --

THE COURT:  Under the partnership agreement is the reason the plan did it, is what I've been presented.

MR. LANG:  I believe Mr. Seery -- and I could be wrong -- I think I heard him say that he has used the other method, but I could have misheard him in the testimony.

THE COURT:  Well, that's not what I heard.  I heard him emphasizing the fact that the Class 8 interests, including that of Dugaboy, are subordinated with regard to payment rights under the Highland partnership agreement.  And so that's why he didn't think it made sense to just apply percentages.

MR. LANG:  That's what he testified to.

THE COURT:  So I'm just -- anyway, I'm just trying to figure out what the countervailing evidence is here to suggest his methodology is wrong.

MR. LANG:  I believe the partner -- or, the plan says that the Class 10, when the GUC certification is a Class 10, and the Class 11 received pro rata, it doesn't specify the account balance is to be used as the number to determine what they receive.

THE COURT:  Okay.  You want to point out what you are focused on?

MR. LANG:  I believe it's under Treatment.

THE COURT:  Okay.

MR. LANG:  Section --

THE COURT:  I don't want to hunt.  I want you to tell me what the language is that you think is supportive of that.

MR. LANG:  And the second -- I guess the secondary issue that we probably should just get to is the release.  We think it's broad, and just Dugaboy and Dondero are carved out.  And Mr. Morris did send me a proposal last -- yesterday evening that I haven't gotten to.  But that is an objection that we have, is just to make sure that the -- that nobody can argue that the release covers any claim Dugaboy might have, if any.

THE COURT:  Okay.  I think many hours ago I remember this being mentioned.  I guess it was a little bit more broad than just -- I think it was Highland employees.  I don't know.

What is the agreement, Mr. Morris, if you're awake there, on --

MR. MORRIS:  I am awake, Your Honor.  Apologies.

THE COURT:  Okay.  I didn't mean to be flippant.

MR. MORRIS:  Yeah.

THE COURT:  I get punchy and --

MR. MORRIS:  That's okay.  With respect to the release?

THE COURT:  Right.

MR. MORRIS:  We don't have an agreement.  We have an agreement -- well, I sent a proposal last night, but it didn't get responded to.  If they want to accept that proposal, that's terrific.

THE COURT:  Okay.  I don't know what the agreement says.  Are you saying you want to accept what they proposed last night?

MR. LANG:  No, I have edits to it.  I just couldn't -- I was tied up on another filing last night.  I have not been able to get to it today.

THE COURT:  Okay.  I'm going to make a ruling today.  Okay?  If it means y'all sit here in the courtroom a while, fine.  But just like all of you, I have a mountain of other stuff waiting for me, so I really want to rule today.  So, --

MR. LANG:  Understood.

THE COURT:  Yeah.

MR. LANG:  Maybe we can work on it as soon as I'm done and I can get back to 'em --

THE COURT:  Okay.

MR. LANG:  -- and get back to you.

Your Honor, the -- it's on Page 23 of the plan.  It talks about the Class 10 and Class 11, where the partnership interests, that their treatment, they shall receive as pro rata share of the contingent Claimant Trust interests.  And all we're asking is that be used or applied as a 99.5/.5

distribution.

(Pause.)

THE COURT:  I'm sorry.  Go ahead.

MR. LANG:  Oh, sorry.  I thought you were looking for it.

And the last issue is authority.  The only point of the authority argument, Your Honor, is that the Joint Administrators were appointed down in the Caymans to investigate the transaction that moved basically the entire ownership, because it's owned a hundred percent down to HMIT, out.  They're investigating the transactions.  They have not stipulated to authority.  They're looking at everything.  They've requested a 45-day delay on this motion.  And that's all that -- not even asking to deny the 9019.  They were just asking time to basically bless this transaction so that nobody could come back and make an issue of it.  But I understand your desire to rule today.

THE COURT:  Okay.  Any rebuttal?

MR. MORRIS:  Yeah, briefly, Your Honor.

REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE CLAIMANT TRUST

MR. MORRIS:  I just want to point the Court to two provisions of the operative documents that I think --

THE COURT:  Okay.

MR. MORRIS:  -- will resolve even further the issues that we've presented today.

The Claimant Trust Agreement -- and I apologize, I don't know if the whole document is in evidence, but I will respectfully suggest to the Court that the Claimant Trust Agreement provides in Article 5, Section 5.1(c), --

THE COURT:  Okay.  Let me catch up.

MR. MORRIS:  Yes.

(Counsel confer.)

THE COURT:  It's not Debtor's Exhibit 5.

MR. MORRIS:  Yeah.

THE COURT:  Daugherty's Exhibit 5?

MR. MORRIS:  It's Daugherty Exhibit 5?

MR. YORK:  Yes.

THE COURT:  Okay.

MR. YORK:  So we have a full copy at Daugherty --

THE COURT:  I've got it.  Daugherty's Exhibit 5.

MR. MORRIS:  Okay.  So if you could just go to Page 27, Your Honor.  And this is in response to Mr. Lang's argument about the calculation of the allowed claim.  You'll see it deals with contingent trust interests.  And the very last sentence says the equity trust --

THE COURT:  Wait.  What page again?

MR. MORRIS:  27.

THE COURT:  Okay.

MR. MORRIS:  Do you see Section C in the middle is Contingent Trust Interests?

THE COURT: No.

THE CLERK: It's 26 of the Claimant Trust Agreement, 27 of the --

THE COURT: Ah, it's 26. Yes. On the bottom, it's 26; on the top, it's 27 of 38.

MR. MORRIS: Okay.

THE COURT: Okay.

MR. MORRIS: And at the end of Section C, it says explicitly: The equity trust interests distributed to allowed holders of Class A limited partnership interests -- that's Dugaboy --

THE COURT: Uh-huh.

MR. MORRIS: -- shall be subordinated to the equity interests distributed to the allowed holders of Class B and C. That's Hunter Mountain. Okay?

So the trust agreement provides for exactly what we're doing here. Dugaboy is in fact subordinated to HMIT. It doesn't get paid until HMIT gets paid in full. And Mr. Seery I think compellingly testified as to the reasonable calculation that he did based on very objective numbers to determine each respective limited partner's capital account.

With respect to Mr. Daugherty, the plan, which is on the docket at 1943, has a definition of Disputed Claim Reserve. And it states, among other things, that the amount of the disputed claim upon which the disputed claim --

THE COURT: Give me the page number.

MR. MORRIS: I apologize, Your Honor.

THE COURT: I've got it right in front of me.

MR. MORRIS: It's Page 7 of the plan.

THE COURT: Okay. All right. I'm there. The Defined Term.

MR. MORRIS: So the Defined Term "Disputed Claim, Claims Reserve Amount" in the middle says: The amount of the disputed claim upon which the disputed claims reserve is calculated shall be -- they've got an A and then a B -- the amount agreed to by the holder of the disputed claim and the Claimant Trustee or Reorganized Debtor, as applicable. And then it says D: Or is otherwise ordered by the Bankruptcy Court, including an estimated -- an order estimating the disputed claim.

And that last provision is vital, Your Honor, because that is the hook upon which you can always hang your hat when you decide that we are not going to wait until 2023 [sic] when the IRS audit may be resolved, because you have the ability, as ordered by the Bankruptcy Court, including estimating the amount of the disputed claim. Which is one of the causes of action that we've asserted in the complaint. It's either to subordinate -- actually, it's to disallow, to subordinate, or to estimate. Because this case does have to end, Your Honor. We actually think he should be bound by the definition in B.

254

It is an agreed-upon amount.

I've heard the testimony from Mr. Daugherty that there was no negotiation, but he didn't deny that he signed a document that is called an agreement that sets forth the disputed claim amount.  And that is an agreement, and I think that satisfies that definition.  And even if it didn't, at some point this case has to end.

Thank you, Your Honor.

THE COURT:  Okay.  Thank you.

All right.  Well, it's been a long day and even a longer case.  I think a lot of people were on the receiving end of a little bit of my grumpiness at times today, and I apologize for that.

I always feel compelled to say to the lawyers and parties when I rule from the bench that I can assure you it's not knee-jerk.  I can assure you my law clerk and I have read every piece of paper submitted.  And we come in here I think well-prepared and we just want to listen to the evidence to see if it supports -- who it supports.  So I am going to rule from the bench.

I first want to make clear that with regard to the motion before the Court, the motion which was filed May 19th at Docket Entry 4216, pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 363, the Court is being asked to approve a very broad settlement that is between what are

defined as the HMIT entities, seven entities in all; Hunter Mountain Investment Trust; as well as Beacon Mountain, LLC; Rand Advisors, LLC; Rand PE Fund 1, LP; Rand PE Fund Management, LLC; Atlas IDF, LP; and Atlas IDF GP, PLLC.  So this proposed compromise and settlement is between all of those Hunter Mountain entities as well as the Reorganized Debtor, the Highland Claimant Trust, the Highland Litigation Subtrust, and the Highland Indemnity Trust.

I first will note that notice has been fulsome, reasonable under the circumstances, to provide due process to anyone affected by the proposed compromise.

The Court would note that the legal standard is a very well-known and established legal standard here.  Among other things, the Court is to look at whether the settlement is fair, reasonable, and in the best interest of the estate; whether it would appear reasonable business judgment has been exercised; is the compromise and settlement within the range of reasonableness?

And this involves looking at, among other things, the probability of success in the litigation -- that would be all the various litigation involving HMIT, if it were to go forward; the complexity and likely duration of further litigation and attendant expense, inconvenience, and delay; and all other factors bearing on the wisdom of the compromise. We know that's *Cajun Electric*, *Jackson Brewing*, *Foster*

*Mortgage*, among other cases.  I probably left out *AWECO*.

Anyway, applying all of those legal standards here, I do think the evidence was very thorough in showing that the compromise is a product of good faith and arm's-length negotiations.  Indeed, it was almost shocking to this Court when I saw the motion, having the history I have with all of the contested issues, adversary proceedings that have transpired over the past few years between Hunter Mountain and the Debtor.

I do think the evidence is that it's fair and equitable and in the best interest of the estate and within the range of reasonableness, given due regard for all of the expense, delay, and likelihood of success.

I'll just briefly recount that, as noted early today, there was an Exhibit B attached to the 9019 motion that listed nine unresolved pending pieces of litigation that the Highland entities are embroiled in.  Two of those are now gone.  This was filed May 8th, and as of January 25th, they're gone.  So seven pieces of litigation, of which two will go entirely away if I approve this settlement.  The Kirschner adversary claims against Hunter Mountain will go away.

We have very little, very little, relatively speaking, left in this bankruptcy case to resolve if I approve this settlement.  That alone is very, very significant.  Again, we have large shall I say issues with Hunter Mountain.  Highland

says Hunter Mountain owes the Highland entities something like $57.69 million on a note that Hunter Mountain is payor on dated December 21st, 2015.

The flip side of that is that Hunter Mountain was sued by Kirschner in the Kirschner action on various claims, including this $57 million note. We have had Hunter Mountain file multiple motions for leave to sue Highland, the Claimant Trust, Mr. Seery. And those have been denied, but are in appeal status or remand status or some further litigation status.

And again, we have numerous issues. Hunter Mountain having sought valuation. The Court denied that. It's on appeal.

So, so much goes away, so much further litigation goes away and we make a monumental step in ending this long-running case if I approve this settlement.

Now, on the flip side of this, I know that Dugaboy, through the voice of Mr. Dondero today, expressed that Hunter Mountain is, I forget the words he used, but not -- this isn't close to being fair and equitable as far as he was concerned for Hunter Mountain. That Hunter Mountain, in addition to being through with litigation in this bankruptcy-land, would be paid $500,000 within five days. They would also be paid separately $10 million as an initial distribution, with the hope of two more $6.5 million distributions in '27 and '28.

And it would get a note, which I think has $24 million -- I think it was less than that, $17 or $18 million left on it, perhaps, on which Dugaboy is a maker.  The debtor is one of the two payees.  The Debtor gives up its rights in that note.

It looks like Hunter Mountain is getting a lot.  And again, the way this estate has been liquidated, there is money that can flow to it as a Class 10 equity here, as the evidence has shown.

So I am approving the settlement.  I am specifically overruling the remaining objections of both Dugaboy and Mr. Daugherty.

As far as Mr. Daugherty's argument that the settlement violates the absolute priority rule or violates the terms of the plan or the confirmation order or the trust agreement by, putting words in his mouth, skipping over the full payment of whatever his Class 8 claim is going to be and allowing a subordinate class, Class 10, to get paid, I have flipped and studied the wording of the plan and the confirmation order and the defined term for Disputed Reserve.  And I referred to a disputed reserve as a tried-and-true provision in Chapter 11 plans.  I think it does what needs to happen for precisely this kind of situation, that as long as an appropriate amount is being held in reserve, and the Court can decide what is an appropriate amount, we don't have to hold up a bankruptcy estate for years and years.

So the disputed claim reserve is what allows me to find this is fair and equitable and this isn't some sort of violation of the absolute priority rule. I think this is precisely the reason the disputed claim reserve mechanism is in place, so that we can get on with the business of getting more people paid sooner.

And based on the evidence I've heard, it is an appropriate amount, I think. We're doing a lot of crystal-balling, what may or may not ever happen when, but I think, based on all the persuasive evidence I've heard, the Daugherty objection should be overruled.

As far as Dugaboy, I, as noted, am overruling that objection. I didn't have any persuasive evidence, solid evidence to show me that Mark Patrick doesn't have appropriate corporate governance authority to enter into this settlement agreement.

I realize there's a lot swirling around in the Cayman Islands, and that's going to play out however it plays out. But as of today, I don't have any evidence that he doesn't have authority currently to enter into the settlement. And it speaks volumes that The Foundation backed down. It would seem that they have been convinced that the lack-of-authority argument was not one they wanted to press today. So that is overruled.

I feel like we have all seen this movie many times before.

I wanted to understand, perhaps I went deeper than I needed to, I know Mr. Phillips thinks I went deeper than I needed in hearing some of the testimony from Mr. Patrick and Mr. Dondero, but I'm just trying to understand what's happening here. Why people who were so lockstep and friendly for years of this case suddenly, when we're right on the brink of maybe the case being put to bed -- I'm optimistic; it's not quite that close -- all of a sudden they're at loggerheads.

And so how many times have I seen this over the years, whether it's a breakdown in business and personal relationships, Mr. Daugherty, Mr. Terry, Grant Scott, now Mark Patrick? I'm probably leaving out someone. I don't know. I feel like I'm watching the same movie. Okay, now these two have parted ways. Now these two have parted ways.

And then, as I recall, when Grant Scott withdrew his objection to the HarbourVest settlement all these years ago, 2020, 2021, which he had been lodging for Charitable DAF, I think it was, --

MR. MORRIS: Yes, Your Honor.

THE COURT: -- then what happens? Well, I think Mark Patrick came in to work or replace Grant Scott, and then a bunch of people ended up getting sued in a different court regarding the settlement I approved, the HarbourVest settlement I approved.

So why am I saying this? I just, I'm trying to understand

things I'll never understand. I wanted to maybe hear something that would make me better understand what's happened now between Hunter Mountain, Mark Patrick, and Dondero and Dugaboy, because it sure seems like they were on the same team for many years. But it was very likely irrelevant, as Mr. Phillips kept getting up and down and saying. I just was seeing if it would lead to something relevant that would bear on the wisdom of this compromise, since that's one of my other legal standards. I'm supposed to consider all factors that might bear on the wisdom of the compromise. And so I guess that's where I was going in allowing all of that to come in.

All right. Well, while everyone is not thrilled with this compromise and settlement, I heartily congratulate the human beings that made it happen, and they know who they are. Maybe I do, maybe I don't. But I think it's rather amazing. And I hope that we are not coming to court for hearings in 2032. I don't know who among us will be alive. I'm not going to be alive by then. Certain people might cheer if that's the case. But I congratulate the human beings who made this happen. And you know who you are. Maybe I do, maybe I don't, but I congratulate you.

All right. So I reserve the right to supplement or amend this oral bench ruling in a more fulsome written order. I am asking Mr. Morris and his team to be the scriveners on that order. And obviously, you're going to run it by the other

lawyers here who participated today.

Is there anything else before we wrap it up?

MR. MORRIS:  Just one other thing, Your Honor.  And I greatly appreciate your comments.

When we draft the order, are we authorized to say that this settlement is approved not only pursuant to 9019 but to 363?  Because there are asset sales that are part of this.  We moved under that provision, and I didn't hear Your Honor reference that, --

THE COURT:  Okay.

MR. MORRIS:  -- but we would like to include that in the order.

THE COURT:  You may.  And that is precisely why I said I reserve the right to supplement or amend, because many times I get out of here and look at this transcript and, ooh, I forgot to say whatever.

MR. MORRIS:  Yeah.

THE COURT:  So I meant to say that and I didn't, so you may add that.

MR. MORRIS:  And I assume all Your Honor wants is a fairly simple form of order that incorporates --

THE COURT:  I do not want a 40-page order.

MR. MORRIS:  Right.

THE COURT:  Okay?

MR. MORRIS:  Just an order that incorporates your

comments on the record, and to the extent that Your Honor

wants to amend that, you'll do so at your leisure?

THE COURT:  Yes.

MR. MORRIS:  Perfect.

THE COURT:  All right.

MR. MORRIS:  Thank you.

THE COURT:  Thank you all.  We're adjourned.

MR. PHILLIPS:  Thank you, Your Honor.

THE CLERK:  All rise.

(Proceedings concluded at 4:38 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling**                              **06/27/2024**

_____        _____

Kathy Rehling, CETD-444                              Date
Certified Electronic Court Transcriber

264

INDEX

PROCEEDINGS                                                    4

OPENING STATEMENTS

By Mr. Morris                                                 48
By Mr. Phillips                                              62
By Mr. York                                                  64
By Mr. Lang                                                  79

WITNESSES

Claimant Trust's Witnesses

James P. Seery
 - Proffer of Testimony by Mr. Morris                        11
 - Direct Examination by Mr. Morris                          83
 - Cross-Examination by Mr. Phillips                        110
 - Cross-Examination by Mr. York                            111
 - Cross-Examination by Mr. Lang                            128

Patrick Daugherty's Witnesses

Patrick Daugherty
 - Direct Examination by Mr. York                           141
 - Cross-Examination by Mr. Morris                          154
 - Examination by the Court                                 164

Dugaboy Investment Trust's Witnesses

Mark Patrick
 - Direct Examination by Mr. Lang                           171
 - Cross-Examination by Mr. Morris                          184
 - Redirect Examination by Mr. Lang                         189
 - Recross-Examination by Mr. Morris                        191
 - Examination by the Court                                 192

James "Jim" Dondero
 - Direct Examination by Mr. Lang                           195
 - Cross-Examination by Mr. Morris                          206
 - Redirect Examination by Mr. Lang
 - Examination by the Court                                 224
 - Recross-Examination by Mr. Morris

INDEX

Page 2

EXHIBITS

<u>Claimant Trust's Exhibits (Motion to Extend Duration)</u>

1 through 67                                      Received    11

<u>Claimant Trust's Exhibits (Motion to Approve Settlement)</u>

1 through 123, 126                               Offered     43
10                                              Withdrawn    45
12                                               Received    44
13                                               Received    44
57                                              Withdrawn    45
59                                               Received    46
64-69                                            Received    46

<u>Dugaboy Investment Trust's Exhibits</u>

Plan and Settlement Agreement                    Received    47
Exhibit 3                                        Received   189

<u>Patrick Daugherty's Exhibits</u>

1-42                                             Received    47

CLOSING ARGUMENTS

By Mr. Morris                                               231
By Mr. Phillips                                             238
By Mr. Loigman                                              240
By Mr. York                                                240
By Mr. Lang                                                245
By Mr. Morris                                              250

RULINGS

Motion for an Order Further Extending Duration of Trusts    21
(4213)

266

INDEX
Page 3

RULINGS, cont'd.

Motion for Entry of an Order Pursuant to Bankruptcy      28/254
Rule 9019 and 11 U.S.C. § 363 Approving Settlement
with HMIT Entities and Authorizing Actions Consistent
Therewith (4216)

END OF PROCEEDINGS                                              263

INDEX                                                      264-266