**EXHIBIT 61**

EXHIBIT
6

CAUSE NO. _____

| | |
|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., et al., | |
| *Plaintiffs*, | |
| v. | IN THE TEXAS BUSINESS COURT |
| MARK PATRICK, et al., | |
| *Defendants*. | 1ST DIVISION |
| | DALLAS, TEXAS |

## DECLARATION OF JAMES DAVID DONDERO

I, **JAMES DAVID DONDERO**, of 300 Crescent Court, Suite 700, Dallas, Texas, United States, 75201, DECLARE under penalty of perjury:

1.    I am the President of NexPoint Advisors, L.P. (**NexPoint**), an investment advisor registered with the U.S. Securities and Exchange Commission (**SEC**). I am a Certified Public Accountant and Chartered Financial Analyst with over forty years of investment advisory experience managing billions of dollars of investments across various assets classes.

2.    I make this declaration from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

3.    I founded NexPoint in 2012. NexPoint is an alternative investment firm, with a particular focus on investment in the real estate sector. NexPoint has assets under management exceeding $16 billion in value.  I was formerly the President of Highland Capital Management, L.P. (**Highland**), also an SEC registered investment advisor which I founded in 1993. From that time until 2015, Highland was majority owned by me and/or

Copy from re:SearchTX

my affiliates. In December 2015, I divested my majority stake of Highland (*2015 Transaction*).

## THE FUND

4.   In addition to my business interests, I am a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles I utilize to donate such funds to charitable organizations.

5.   In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. In 2011, I requested the Donor Advised Fund (or DAF) to be formed and structured in a way that allowed these donations to be receipted and distributed to certain charitable foundations, as the ultimate beneficial owners of the Fund's economic interest. The structure proposed by the tax and legal advisors to effect this was for the Fund to have one limited partner (i.e. the LP) which would issue 'participation shares' to be held by certain charitable supporting organizations (together, the *Supporting Organizations*) and in turn each of those entities would provide funding directly to certain charitable foundations in the U.S. (together, the *Charities*).

6.   The Amended and Restated Limited Partnership Agreement of the Fund dated 7 November 2011 (*ARLPA*), and the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (*Articles*), govern the Fund and its partners.

7.   The LP held 100% of the economic interest in the Fund. The Fund's general partner, Charitable DAF GP, LLC (the *GP*), a Delaware company incorporated on 25 October 2011, held management shares.

8.   The LP issued 100 management shares (the *Management Shares*) with the only voting rights for any and all shareholders in the LP. In essence, the Articles and ARLPA therefore grant complete control of the Fund structure to the holder of the Management Shares in

Copy from re:SearchTX

the LP and the entirety of the issued share capital of the GP. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Fund structure (the **Control Position**).

9. The ARLPA provides that the Fund was formed to make investments, directly or indirectly, on behalf of certain entities "*for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" and contemplates the engagement of investment (and other service) advisors to effect this. In this context, the Control Position is responsible for the governance and management functions of the Fund as required in order for the Fund to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support.

10. The governing documents of the Fund plainly state in multiple places that all of the powers of the Control Position exist solely for the purpose of benefitting the Supporting Organizations and their Charities. This ubiquitous language was created for an express purpose. The expectation by the founders of the Fund (myself included) at the time it was formed was that the governing documents would ensure that the Control Position would be bound through his or her fiduciary obligations to safeguard and advance the interests of the charitable organizations that held actual beneficial ownership of the Fund.

**GRANT SCOTT**

11. I initially selected Grant Scott for the Control Position, a person I have known for years who also has great integrity.

12. From 2010 until the 2015 Transaction, the Fund operated as a non-discretionary advised account of Highland, meaning Highland provided back-and-middle-office staff to the Fund and also provided recommendations regarding potential investments to Mr. Scott as the Control Person. However, Mr. Scott had complete discretion in adopting or rejecting the

Copy from re:SearchTX

investment recommendations provided to the Fund by Highland. He also had final discretion over payments made by the Fund to third parties. In his position as the Control Person, Mr. Scott was paid $60,000 per annum.

13. After the 2015 Transaction, my affiliates and I no longer owned a majority stake in Highland. Subsequently, I was advised that, as a result of the change of ownership, the Fund was permitted to enter into a paying Investment Advisory Agreement with Highland. This form of investment advisory agreement was in place from January 2017 until it was terminated effective March 2021.

### MARK PATRICK

14. Mark Patrick was hired as Tax Counsel at Highland in 2008. His job duties included maximizing tax saving to Highland's limited partners, including me and my affiliates. In that role, Mr. Patrick directly represented me as my personal tax counsel. He represented me in tax efficiency planning and tax- deductible charitable giving, among other things. He provided the same services for various trusts and companies affiliated with me. Mr. Patrick served that role at Highland from 2008 until his departure in February 2021.

15. In March 2021, Mr. Patrick was hired by Skyview as Tax Counsel and continued to perform substantially similar tax counsel duties for me. At Mr. Patrick's request, his job title was changed to "Managing Director, Tax" in September 2021, although his role with respect to me and my affiliates remained substantially the same.

16. The legal structure of the Fund (including as regards its partners and ultimate beneficiaries as discussed above) was created in 2011 on the advice of Mr. Patrick working with outside counsel. Mr. Patrick advised me that, to avoid potential negative findings by the U.S. Internal Revenue Service, as the donor/grantor of assets to the Fund, I could not have any control over the Fund or its entities. I followed his advice as my tax counsel.

Copy from re:SearchTX

17. In March 2021, Mr. Scott informed me that he wanted to resign from the Control Position. The Fund had become engaged in certain disputes arising from the bankruptcy of Highland filed in 2019, and he did not believe he was equipped to handle those disputes. Mr. Patrick suggested to Mr. Scott and me that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected the Fund. At the time, Mr. Patrick was my attorney and Mr. Scott was my trusted friend, and I was happy for Mr. Scott to pass the Control Position to Mr. Patrick.

18. On 25 March 2021, Mr. Scott: (i) resigned as director of the LP, (ii) appointed Mr. Patrick as director of the LP, and (iii) transferred to Mr. Patrick the Management Shares for nominal consideration. Mr. Patrick therefore assumed the Control Position from that date.

19. At some point, I understand that a person named Paul Murphy based in the Cayman Islands also was appointed as director to the LP and a portion of the Fund's subsidiaries, giving those entities two directors. However, I understand that in the event of a dissenting vote by Mr. Murphy, Mr. Patrick's vote counts as the tiebreaker for corporate voting.

**MR. PATRICK'S CONTROL OF THE FUND**

20. In the initial period following Mr. Patrick's assumption of the Control Position, there was no noticeable change in the management of the Fund. NexPoint provided, without charge, investment ideas to the Fund, as Highland previously had done, and Mr. Patrick was free (as Mr. Scott had been) to decide whether or not the Fund wished to follow NexPoint's recommendations. This approach was similar to the non-discretionary advised account status of the Fund prior to 2017.

21. Subsequently, however, communications between Mr. Patrick, Skyview, and me began to become less frequent, and over time I came to suspect that Mr. Patrick was utilizing the Control Position not for the benefit of the Supporting Organizations, the Charities or the

Copy from re:SearchTX

Fund, but rather for his own personal enrichment.

22. On 28 June 2023, Mr. Patrick sent an email to Lauren Short, an employee of NexPoint, requesting that the Highland Dallas Foundation (i.e. the Supporting Organization that supports the Dallas Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, Ms. Short learned that the directors of the entity were Mr. Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr. Patrick had made the grant request without disclosing his and/or his family's involvement.

23. Ms. Short discussed the matter with Mr. Patrick, who did not provide many details, but said the non-profit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Ms. Short understood that Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. While Ms. Short inquired, there was no detail forthcoming as to whether or not Creative Hearts would be a pass-through donating the monies to other charities or would directly do any work with the trainers or speakers itself. There also was not clarity if Creative Hearts' members intended to take a salary from the grant. The grant payment was authorized on September 5, 2023, but Mr. Patrick was informed that further payments were unlikely. I was informed of this process by Ms. Short and her supervisor. Contemporaneously with the grant approval, my team also informed the Dallas Foundation of the situation.

24. As another example, in or around September 2023, I was contacted by Kevin Cronin of Fortaris Capital Advisors (**Fortaris**). Fortaris provides litigation support services including due diligence, internal investigations, fraud detection, asset verification and in-depth background checks. Mr. Cronin is a former police sergeant and Special Agent with the Department of Homeland Security.

Copy from re:SearchTX

25. Fortaris was at the time engaged by the Fund in respect of an unrelated matter and Mr. Cronin was known to me personally. In September 2023, Mr. Cronin and I met, and he informed me that he had been approached by Mr. Patrick with a proposition whereby Mr. Patrick (on behalf of the Fund) would engage an entity controlled by Mr. Cronin (other than Fortaris) at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr. Patrick as a supplement to Mr. Patrick's compensation. Mr. Cronin informed me that he had asked Mr. Patrick if this arrangement would amount to fraud, and that Mr. Patrick's response had been: *"you can't steal from yourself."*

26. Mr. Cronin informed me that he understood from this statement that Mr. Patrick believed he owned the Fund and could use the funds controlled by it however he pleased. Mr. Cronin further informed me that he was uncomfortable about Mr. Patrick's proposal and that he subsequently communicated this to Mr. Patrick, whereupon Mr. Patrick cut off all further communications between them.

27. Mr. Cronin's allegations that Mr. Patrick was seeking to make a secret, undisclosed personal profit from the Fund were extremely concerning. I have subsequently been informed by my attorneys in the United States that, had Mr. Cronin agreed with this proposal, it would have likely constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. Shortly after Mr. Cronin contacted me, I met with Mr. Patrick and confronted him about the allegations, which he admitted to me were true. I informed the Supporting Organizations about the matter and Mr. Patrick's admission. However, at the time, both the Supporting Organizations and I were concerned that under the Articles, the Supporting Organizations did not have the power (in their capacity as Participating Shareholders) to limit Mr. Patrick's powers or remove him from his position.

Copy from re:SearchTX

28.   Given the situations described above, and the lack of communication about the Fund, I became increasingly concerned about Mr. Patrick's management of the Fund, including the potential misuse and/or misappropriation of its assets. In June 2024 therefore I requested that my team at NexPoint analyze the financial information of the Fund that I had in my possession, covering the calendar years ending 2018 to 2023 and the first half of 2024. My team produced an annual expense summary of that information (the **Expense Summary**) which indicated substantial increases in expenditures during Mr. Patrick's tenure, particularly during early 2023 and mid-2024, as follows:

(a)   Directors' fees increased from around $40,000 in 2022 to almost $600,000 in 2023 – and increased even further to around $2.25 million in the first half of 2024 alone.

(b)   Expenses overall for the first half of 2024 were around $18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. $18.6 million).

29.   The Expense Summary reinforced my concern that Mr. Patrick is using the Control Position for his own enrichment rather than to benefit the Supporting Organizations and the causes they support. I therefore directed my employees at NexPoint to provide the Expense Summary to the Supporting Organizations, and which they promptly did.

30.   In August 2024, I became aware of yet another issue concerning Mr. Patrick. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (**MNPI**) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (**Compliance Policy**). NexPoint and its affiliates, and Skyview, require their employees to abide by the

Copy from re:SearchTX

Compliance Policy at all times and employees are required to confirm in writing on a quarterly basis that they will not use MNPI while trading. Mr. Patrick completed the annual 2023, Q4 2023, Q1 2024, and Q2 2024 certifications, among others.

31. I was informed that my director of charitable giving had been contacted by Ms. Diaz, the CEO of the Highland Dallas Foundation, Inc. (***Dallas Foundation***), one of the Charities. Ms. Diaz stated that on August 28, 2024, Mr. Patrick contacted the Dallas Foundation's attorney to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr. Patrick through his employment at Skyview and constituted MNPI, which is prohibited by U.S. securities laws from being disclosed and/or acted upon. On the basis of this MNPI, Mr. Patrick advised the Dallas Foundation to exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr. Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr. Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

32. Upon receipt of the allegations against Mr. Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr. Patrick's knowledge, so as to avoid potentially tipping off Mr. Patrick about the investigation. By the end of September 2024, the investigation was substantially complete, and the conclusion had been reached that Mr. Patrick's actions constituted a serious breach of his compliance and employee obligations. On October 1, 2024, as part of the finalization of the investigation report, Skyview's chief compliance officer interviewed Ms. Diaz about the allegations against Mr. Patrick, which I understand confirmed Skyview's conclusions. The final investigation report was issued on October 11,

Copy from re:SearchTX

2024 and concluded that Mr. Patrick had attempted a serious breach of U.S. securities laws.

33. On October 2, 2024, Mr. Patrick abruptly resigned his position from Skyview and thereafter became openly hostile towards the Charities, my affiliated companies, and me. Although neither I nor anyone at Skyview has direct evidence of Mr. Patrick having been tipped off about the investigation, the timing of his resignation causes me to conclude that Mr. Patrick became aware of the investigation into his behavior and resigned before the report was published.

34. On the same day that Mr. Patrick resigned his position at Skyview, he also terminated Skyview's service agreement with the Fund, and as a result all legal, compliance, back office and other services provided to the Fund. Mr. Patrick and Mr. Murphy have stated that that they intend to take on the role of investment advisors for the Fund. I am not aware of Mr. Murphy's qualifications for this role, nor am I aware of any third-party investment advisor that has been retained by the Fund to fill this role. Based on my knowledge and expertise in investment management, and my sixteen years working with Mr. Patrick as my counsel, I believe that Mr. Patrick is a well-qualified tax counsel, but does not have the experience, training, or expertise to be an investment professional.

**FUNDING OF PROCEEDINGS**

35. As stated above, I do not hold a controlling interest in any of the Charities or the Supporting Organizations. However, I sit on the boards of the Supporting Organizations for the purpose of understanding how the Charities are deploying the Fund's assets for charitable purposes, and the impact of those donations in the community. I am only one of three votes, and the other two votes on each board are held by the respective Charity. Historically, the boards have had no hesitation in exercising their powers to chart

Copy from re:SearchTX

independent courses even if those decisions differ from my preferences.

36. The Supporting Organizations approached me about the costs associated with legal action and their reticence to use funds that should and otherwise would be used for charitable purposes, and asked whether I would be prepared to fund the action personally. I agreed to do so. I have not and will not at any time receive a benefit, nor do I have control of the proceedings, because of this funding arrangement. The Supporting Organizations have decision making authority in relation to these proceedings. My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support.

***************REMAINER OF PAGE INTENTIONALLY LEFT BLANK***************

Copy from re:SearchTX

My name is James David Dondero, my date of birth is June 29, 1962, and my address is 300 Crecent Court, Dallas, Texas 75201. I declare under penalty of perjury that the foregoing is true and correct. Executed in Dallas County, State of Texas, on the 1st day of July 2025.

_____
**JAMES DAVID DONDERO**

Copy from re:SearchTX