**EXHIBIT 68**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1] | Case No. 25-11376 (___) |
| Debtor in a foreign proceeding. | |

**VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN
MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,
AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

---

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 170388. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 2

BACKGROUND ..................................................................................................................... 5

A.      Overview of HoldCo and its Stakeholders ................................................................. 5

      i.      The Charitable Structure ................................................................... 7

B.      Overview of the Fund ............................................................................................... 9

C.      Key Transactions Precipitating the Debtor's Liquidation ....................................... 10

      i.      The Relevant Transactions .............................................................. 10

           (A)      The LP/LLC Exchange .......................................................... 11

           (B)      DFW Share Issuance ............................................................. 12

           (C)      Redemption ........................................................................... 13

      ii.      The Remuneration Transactions ..................................................... 15

D.      Lack of Transparency and Misleading Disclosures Provided to Supporting Organizations .......................................................................................................... 16

E.      The Cayman Proceeding .......................................................................................... 20

      i.      Conduct of the Cayman Proceeding ............................................... 21

      ii.      Commencement of the Cayman Litigation ..................................... 23

      iii.      Injunction Application ..................................................................... 27

           1.      Serious Issues to be Tried ..................................................... 29

           2.      Balance of convenience ......................................................... 29

           3.      Disclosure of assets .............................................................. 32

           4.      Cross undertaking in damages .............................................. 33

F.      The Texas Proceeding .............................................................................................. 33

G.      This Chapter 15 Case ............................................................................................... 35

JURISDICTION AND VENUE ............................................................................................. 36

RELIEF REQUESTED..................................................................................................38

BASIS FOR RELIEF REQUESTED............................................................................39

    A.    HoldCo Is an Eligible "Debtor" Under Chapter 15 of the Bankruptcy Code...................39

    B.    The Cayman Proceeding is a Foreign Main Proceeding.....................................41

        i.    The Cayman Proceeding Constitutes a "Foreign Proceeding" ...........................42

        ii.    The Cayman Proceeding is a "Foreign Main Proceeding" ...............................45

    C.    In the Alternative, the Cayman Proceeding Should be Recognized as a Foreign Nonmain Proceeding.................................................................................49

    D.    The Petitioners Satisfy the Requirements of a "Foreign Representative" Under Section 101(24) of the Bankruptcy Code..........................................................50

    E.    The Petition Was Properly Filed and Satisfies the Requirements under Section 1515 of the Bankruptcy Code ........................................................................51

    F.    The Petitioners are Entitled to Automatic Relief Under Section 1520 of the Bankruptcy Code ......................................................................................52

    G.    The Petitioners are Entitled to Additional Relief Under Section 1521 of the Bankruptcy Code ......................................................................................53

        i.    The Foreign Representative is Entitled to Appropriate Relief Under Sections 1521 (a)(1), (2), (3), (4), (5), (6) and (7)........................................53

        ii.    Injunctive Relief is Appropriate.................................................................54

        iii.    Discovery Relief is Both Necessary and Appropriate to Uncover Assets and Determine Causes of Action ...................................................................56

    H.    The Injunctive Relief Order, As Entered by the Cayman Court, Should Be Fully Enforced Within the Territorial Jurisdiction of the United States Under Sections 105(a), 1507 and 1521(a)(7) of the Bankruptcy Code and Under Principles of Comity..................................................................................................59

    I.    Recognition of the Injunctive Relief Order is Warranted under Sections 1521(a)(7) and 1507 of the Bankruptcy Code ........................................................................63

        i.    Legal Standard for Relief Under Sections 1521(a)(7) and 1507 ..........................63

        ii.    Recognition of the Injunctive Relief Order is Appropriate under Sections 1521 and 1507 of the Bankruptcy Code ..........................................................66

    J.    Granting the Relief Requested herein, Including Recognition of the Cayman

Proceeding and Injunctive Relief Order, Are Not Manifestly Contrary to U.S.
Public Policy ..................................................................................................... 68

NOTICE ................................................................................................................. 69

CONCLUSION ........................................................................................................ 1

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re ABC Learning Ctr's, Ltd.,*
445 B.R. 318 (Bankr. D. Del. 2010) ..................................................................43, 57, 62

*Ackerman v. Levine,*
788 F.2d 830 (2d Cir. 1986) .........................................................................................62

*Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de CV (In re Vitro S.A.B. de CV),*
701 F.3d 1031,1057 (5th Cir. 2012) ............................................................................64

*In re Aerovias Nacionales de Colombia S.A. (In re Avianca),*
303 B.R. 1 (Bankr. S.D.N.Y. 2003) .............................................................................40

*In re Agrokor,*
591 B.R. 163 (Bankr. S.D.N.Y. 2018) ....................................................................60, 64

*In re Air Berlin PLC & Co. Luftverkehrs KG,*
No. 17-12282 (MEW) (Bankr. S.D.N.Y Aug. 18, 2017) ..............................................54

*In re AJW Offshore Ltd.,*
488 B.R. 551 (Bankr. E.D.N.Y. 2013) .........................................................................57

*American Film Technologies v. Taritero (In re American Film Technologies),*
175 B.R. 847 (Bankr. D. Del. 1994) .............................................................................66

*Amezcua v. Cortez,*
No. 3D20-1649 (Fla. 3d DCA Jan. 13, 2021) ..............................................................65

*In re Ascot Fund Ltd.,*
603 B.R. 271 (Bankr. S.D.N.Y. 2019) .........................................................................46

*In re Ashapura Minechem Ltd.,*
480 B.R. 129 (S.D.N.Y. 2012) .....................................................................................62

*In re Atlas Shipping A/S,*
404 B.R. 726 (Bankr. S.D.N.Y. 2009) ....................................................................59, 60

*In re Avanti Comms. Grp. PLC,*
582 B.R. 603 (Bankr. S.D.N.Y. 2018) .........................................................................65

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund,*
374 B.R. 122 (Bankr. S.D.N.Y. 2007) ...............................................................45, 49, 59

*In re Bemarmara Consulting A.S.*,
   Case No. 13-13037(KG) (Bankr. D. Del. Dec. 17, 2013)..........................................39, 40

*In re Berau Capital Res. PTE*,
   540 B.R. 80 (Bankr. S.D.N.Y. 2015)..........................................................................37, 40

*In re Betcorp Ltd.*,
   400 B.R. 266 (Bankr. D. Nev. 2009) ........................................................................42, 43

*In re British American*,
   488 B.R. 205 (Bankr. S.D. Fla 2013) ..............................................................................60

*In re Cell C Proprietary Ltd.*,
   571 B.R. 542 (Bankr. S.D.N.Y. 2017)......................................................................63, 65

*Cermesoni v. Maneiro*,
   144 So. 3d 627 (Fla. 3d DCA 2014) ...............................................................................65

*Clarkson v. Coughlin*,
   898 F. Supp. 1019 (S.D.N.Y. 1995).................................................................................54

*CohnReznick LLP v. Foreign Representatives of Platinum Partners Value*
   *Arbitrage Fund L.P. (In re Platinum Partners Value Arbitrage Fund L.P.)*,
   2018 U.S. LEXIS 109684 (S.D.N.Y. 2018)......................................................................58

*In re Comair Ltd.*,
   No. 21-10298(JLG), 2021 Bankr. LEXIS 3137 (Bankr. S.D.N.Y. Nov. 14,
   2021), appeal dismissed, No. 21 CIV. 10146 (AT), 2023 U.S. Dist. LEXIS
   6146 (S.D.N.Y. Jan. 12, 2023)........................................................................................56

*In re Countrywide Home Loans, Inc.*,
   384 B.R. 373 (Bankr. W.D. Pa. 2008) .............................................................................57

*In re Credito Real, S.A.B. de C.V., SOFOM, E.N.R.*,
   2025 Bankr.LEXIS 751 (Bankr. D. Del. April 1, 2025)..................................................59

*CT Inv. Mgmt v. Cozumel Caribe (In re Cozumel Caribe S.A. de C.V.)*,
   482 B.R. 96 (Bankr. S.D.N.Y. 2012)...............................................................................60

*In re Daebo Int'l Shipping Co., Ltd.*,
   543 B.R. 47 (Bankr. S.D.N.Y. 2015)...............................................................................63

*Daewoo Motor America, Inc. v. General Motors Corp.*,
   459 F.3d 1249 (11th Cir. 2006) .......................................................................................61

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*,
   737 F.3d 238 (2d Cir. 2013)..............................................................................................40

*In re Farfetch Limited (in Official Liquidation)*,
Case No. 24-11519 (CTG) (Bankr. D. Del. 2024).................................................37, 45

*Flynn v. Wallace (In re Irish Bank Resolution Corp. (In Special Liquidation))*,
538 B.R. 692 (D. Del. 2015).................................................................................46

*In re Foreign Econ. Indus. Bank*,
607 B.R. 160 (Bankr. S.D.N.Y. 2019).................................................................41

*In re Frontera Resources Caucasus Corp. and David Griffin*,
No. 19-13418 (MEW) (Bankr. S.D.N.Y Oct. 25, 2019).......................................53

*In re Garcia Avila*,
296 B.R. 95 (Bankr. S.D.N.Y. 2003)...................................................................54

*In re Global Ocean Carriers Ltd.*,
251 B.R. 31 (Bankr. D. Del. 2000)......................................................................37

*Gorsoan Ltd. v. Bullock*,
No. 2020-020803-CA-01 (Fla. 11th Cir. Ct. Feb. 17, 2021) ...............................65

*In re Hughes*,
281 B.R. 224 (Bankr. S.D.N.Y. 2002)............................................................56, 57

*In re IIG Glob. Trade Fin. Fund Ltd.*,
No. 20-10132 (MEW), 2023 Bankr. LEXIS 1145 (Bankr. S.D.N.Y. April 27,
2023) ....................................................................................................................45

*In re Glitnir banki hf.*, No. 08-14757 SMB, 2011 Bankr. LEXIS 3296 (Bankr.
S.D.N.Y. Aug. 19, 2011) ................................................................................56, 57

*In re Ir. Bank Resolution Corp. (In Special Liquidation)*,
2014 Bankr. LEXIS 1990 (D. Del. April 30, 2014)........................................42, 47

*In re Kane*,
628 F.3d 631 (3d Cir. 2000)................................................................................56

*Markus v. Rozhkov*,
615 B.R. 679 (S.D.N.Y. 2020)............................................................................56

*In re Markus*,
607 B.R. 379 (Bankr. S.D.N.Y. 2019)...........................................................56, 63

*In re Metcalfe & Mansfield Alternative Investments*,
421 B.R. 685 (Bankr. S.D.N.Y.2010)............................................................60, 62

*In re Millard*,
501 B.R. 644 (Bankr. S.D.N.Y. 2013).................................................................44

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
    471 B.R. 342 (Bankr. S.D.N.Y. 2012) .................................................................................56

*In re MMG LLC*,
    256 B.R. 544 (Bankr. S.D.N.Y. 2000) .................................................................................54

*In re Modern Land (China) Co.*,
    641 B.R. 768 (Bankr. S.D.N.Y. 2022) .................................................................................45

*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*,
    714 F.3d 127 (2d Cir. 2013) ...........................................................................................46, 48

*Nahar v. Nahar*,
    656 So. 2d 225 ......................................................................................................................65

*In re Neves*,
    570 B.R. 420 (Bankr. S.D. Fla. 2017) .................................................................................61

*In re Northshore Mainland Servs., Inc.*,
    537 B.R. 192 (Bankr. D. Del. 2015) ....................................................................................40

*In re Ocean Rig UDW Inc.*,
    570 B.R. 687 (Bankr. S.D.N.Y. 2017) .............................................................................43, 46

*In re Octaviar Admin Pty.*,
    511 B.R. 361 (Bankr. S.D.N.Y. 2014) .................................................................................37

*In re Oi S.A.*,
    587 B.R. 253 (Bankr. S.D.N.Y. 2018) .........................................................................60, 61, 63

*In re Olinda Star, Ltd.*,
    614 B.R. 28 (Bankr. S.D.N.Y. 2020) ..............................................................................64, 65

*In re Orion Healthcorp, Inc.*,
    596 B.R. 228 (Bankr. E.D.N.Y. 2019) .................................................................................57

*In re Overnight and Control Comm'n of Avémzit, S.A.*,
    385 B.R. 525 (Bankr. S.D.N.Y. 2008) .............................................................................42, 45

*In re Platinum Partners Value Arbitrage Fund L.P.*,
    583 B.R. 803 (Bankr. S.D.N.Y. 2018) .........................................................................56, 57, 58

*Principal Growth Strategies, LLC v. AGH Parent LLC*,
    615 B.R. 529 (D. Del. 2020) ................................................................................................44

*In re Recoton Corp.*,
    307 B.R. 751 (Bankr. S.D.N.Y. 2004) .................................................................................57

-vii-

*In re Rede Energia, S.A.*,
   515 B.R. 69 (Bankr. S.D.N.Y. 2014) .................................................................59, 60, 62, 65

*In re Silicon Valley Bank (Cayman Islands Branch)*,
   658 B.R. 75 (Bankr. S.D.N.Y. 2024) ..........................................................................43

*In re SphinX, Ltd.*,
   351 B.R. 103 (Bankr. S.D.N.Y. 2006) *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007) .....................50, 59

*In re Suntech Power Holdings Co.*,
   520 B.R. 399 (Bankr. S.D.N.Y. 2014).............................................................37, 45, 46, 48

*Swartzwelder v. McNeilly*,
   297 F.3d 228 (3d Cir. 2002)..........................................................................................66

*In re Symington*,
   209 B.R. 678 (Bankr. D. Md. 1997) ..............................................................................57

*Tahan v. Hodgson*,
   662 F.2d 862 (D.C. Cir. 1981).......................................................................................61

*In re Talal Qais Abdulmunem Al Zawawi*,
   634 B.R. 11 (Bankr. M.D. Fla. 2021); 637 B.R. 663 (M.D. Fla. 2022); appeal
   No. 22-11024, Doc 53-1 (11th Cir. April 3, 2024) .........................................................39

*In re U.S. Steel Canada Inc.*,
   571 B.R. 600 (Bankr. S.D.N.Y. 2017).............................................................................63

*Ungaro-Benages v. Dresdner Bank AG*,
   379 F.3d 1227 (11th Cir. 2004) .....................................................................................61

*In re Wilson*,
   413 B.R. 330 (Bankr. E.D. La. 2009) .............................................................................57

*In re Zais Inv. Grade Ltd. VII*,
   455 B.R. 839 (Bankr. D.N.J. 2011) ................................................................................40

**Statutes**

11 U.S.C. § 101(15) ...........................................................................................................39

11 U.S.C. § 101(24) ...........................................................................................................50

11 U.S.C. § 105(a) .........................................................................................................59, 66

11 U.S.C. § 109(a) .............................................................................................................40

11 U.S.C. § 542(e) .............................................................................................................56

11 U.S.C. § 1501 ................................................................................................................39, 60

11 U.S.C. § 1501(a) ...........................................................................................................45, 69

11 U.S.C. § 1501(b)(1) .............................................................................................................45

11 U.S.C. § 1502(1) ..................................................................................................................39

11 U.S.C. § 1502(2) ..................................................................................................................49

11 U.S.C. § 1502(4) ..................................................................................................................46

11 U.S.C. § 1502(5) .............................................................................................................49, 50

11 U.S.C. § 1506 ......................................................................................................................62

11 U.S.C. § 1507 ......................................................................................................................59

11 U.S.C. § 1507(a) ..................................................................................................................64

11 U.S.C. § 1509(b)(3) .............................................................................................................60

11 U.S.C. § 1517(a)(2) ..............................................................................................................50

11 U.S.C. § 1517(b)(1) .........................................................................................................41, 46

11 U.S.C. § 1517(b)(2) ..............................................................................................................49

11 U.S.C. § 1520(a) .............................................................................................................52, 53

11 U.S.C. § 1521 ......................................................................................................................52

11 U.S.C. § 1521(a)(7) .............................................................................................58, 59, 63, 66

11 U.S.C. § 1521(e) ..................................................................................................................54

11 U.S.C. § 1522 .................................................................................................................52, 63

**Regulations**

*In re Receivers Hugh Dickson & John Royle for an Ex Parte Order Pursuant to*
*28 U.S.C. § 1782 for Discovery in Aid of Foreign Proceedings*, Civil Action
No. 20-940 (ES) (MAH), 2020 U.S. Dist. LEXIS 71828 (D.N.J. Mar. 10,
2020) ...................................................................................................................................44

**Other Authorities**

H.R. Rep. No. 109-31(I), (2005)................................................................................................62

H.R. Rep. No. 109-31, pt. 1 ......................................................................................61

H.R. Rep. No. 109-31, pt. 1 (2005)...........................................................................64

Hon. Burton R. Lifland, Una O'Boyle, Esq. and Erin Healy Mautner, Esq.,
    *Chapter 15 of the United States Bankruptcy Code: An Annotated Section-By-*
    *Section Analysis* ......................................................................................41

Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited (the "Petitioners"), the duly appointed joint official liquidators (the "JOLs") of Charitable DAF HoldCo, Ltd (In Official Liquidation) ("HoldCo" or the "Debtor"), a Cayman Islands exempted company in official liquidation in the Cayman Islands (the "Cayman Proceeding"),[2] which was brought under the supervision of the Grand Court of the Cayman Islands Financial Services Division (the "Cayman Court") by an order dated May 6, 2025 (Cause No. FSD 116 of 2025) (JAJ) (the "Supervision Order"), by its undersigned United States counsel, Reed Smith LLP ("Reed Smith"), respectfully submit the *Official Form 401 Chapter 15 Petition for Recognition of a Foreign Proceeding* (ECF No. 1) and this *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (together, the "Petition"), the accompanying Declaration of Caroline Moran executed on July 21, 2025 (the "Moran Decl."), and the Declaration of Margot MacInnis executed on July 21, 2025 (the "MacInnis Decl." and, together with the Moran Decl., the "Declarations"), for entry of an order (the "Proposed Order"), substantially in the form attached hereto as Exhibit A, pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"): (a) recognizing the Cayman Proceeding as a foreign main proceeding under sections 1515 and 1517 of the Bankruptcy Code; (b) recognizing the Petitioners as the Debtor's foreign representatives under sections 101(24), 1509 and 1517 of the Bankruptcy Code; and (c) granting relief pursuant to sections 105(a), 1502, 1507, 1510, 1520 and 1521 of the Bankruptcy Code.

---

[2] Entitled *In the matter of section 131 of the Companies Act (2025 Revision) and in the matter of Charitable DAF HoldCo Ltd* FSD 116 of 20256 (JAJ).

## PRELIMINARY STATEMENT[3]

1.      On May 6, 2025, the Cayman Court appointed the JOLs, in their capacity as independent fiduciaries and court officers, to liquidate HoldCo under its supervision. Under Cayman law, the JOLs' duties include the collection, realization and distribution of the assets of HoldCo to its creditors and, if there is a surplus, to equity holders. Cayman law affords the JOLs authority to investigate HoldCo's business and affairs in furtherance of their duties.

2.      HoldCo is a Cayman Islands exempted company, formed in 2011 to serve as the sole limited partner of the Charitable DAF Fund, LP (the "Fund"), a Cayman Islands exempted limited partnership established to manage investments for the benefit of certain U.S. tax-exempt charitable organizations. For more than a decade, HoldCo facilitated significant charitable activity in the United States by distributing profits realized from the Fund's investment portfolio, which maintained a net asset value of approximately $270 million, to its ultimate, beneficial interest holders: four large, well established charities serving communities in need in the United States.

3.      Beginning in 2024, HoldCo's directors, Mr. Mark Patrick and Mr. Paul Murphy, executed a series of complex, interrelated transactions—without the knowledge of HoldCo's beneficial interest holders—that resulted in the dilution of HoldCo's beneficial interest holders' stake in HoldCo from 100% to under 50% and the divestment of HoldCo's interest in the Fund in exchange for a membership interest in a Delaware limited liability company that was purported to be redeemed for the sum of approximately $1.6 million. These transactions occurred not long after Mr. Patrick had approved significant increases in his remuneration package.

---

[3] Capitalized terms used in this section but not otherwise defined shall have the meanings ascribed to them elsewhere in this Petition.

-2-

4.      Since their appointment on May 6, 2025, the JOLs have conducted an extensive investigation, which is ongoing, into the facts and circumstances regarding these transactions. Based on the evidence amassed by the JOLs to date, on July 14, 2025, the Cayman Court granted leave to the JOLs to bring claims on behalf of HoldCo against Mr. Patrick, Mr. Murphy and certain other defendants for breaches of fiduciary and other duties, unlawful means conspiracy, unjust enrichment, restitution and other equitable relief and damages by way of filing a "Writ and Statement of Claim" (the "Statement of Claim"). On July 15, 2025, HoldCo proceeded to file the Statement of Claim with the Cayman Court, commencing litigation. At the same time, HoldCo filed an application for (a) a proprietary injunction to prevent the defendants from dealing with HoldCo's assets that are now held or controlled by the defendants together with disclosure orders (the "Injunction Application") and (b) leave to serve US-based defendants the Statement of Claim and the Injunctive Relief Application (the "Leave to Serve Application" and, together with the Injunctive Relief Application, the "Applications"). The Applications have been listed for hearing on July 31, 2025.

5.      The Petitioners now commence this case under chapter 15 of the Bankruptcy Code (this "Chapter 15 Case") to obtain recognition of the Cayman Proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code. The basis for recognition is straightforward. HoldCo is subject to official liquidation in the Cayman Islands, its jurisdiction of organization, which is being administered, since May 6, 2025, in accordance with Part V of the Cayman Islands Companies Act (2025 Revision) (the "Companies Act"), a law relating to, among other things, insolvency or the adjustment of debt, by JOLs appointed by the Cayman Court and under the supervision of the Cayman Court.

-3-

6. Chapter 15 of the Bankruptcy Code was enacted to provide effective mechanisms for dealing with cases of cross-border insolvency such as this one. Its express objectives include fostering: (a) cooperation between United States courts, trustees, examiners, debtors and debtors in possession, and the courts and other competent authorities of foreign countries; (b) greater legal certainty for trade and investment; (c) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor; and (d) protection and maximization of the value of the debtor's estate. These goals will be furthered by the granting of chapter 15 recognition here.

7. Recognition of the Cayman Proceeding as a foreign main proceeding is crucial for several reasons, including: (a) to assist the JOLs in fulfilling their duty under the relevant provisions of the Companies Act to investigate the assets, affairs, rights, liabilities, and obligations of the Debtor, including, if necessary, by compelling parties in interest to provide information requested by the JOLs; and (b) to prevent the further dissipation of assets that comprise the group of entities and affiliates that were formerly owned, directly or indirectly, by HoldCo and the Fund, including by recognizing and enforcing orders for injunctive relief with respect to persons or entities formerly affiliated with HoldCo as may be entered by the Cayman Court. Each of these reasons is squarely within and consistent with the broader goals underpinning the purpose of chapter 15 recognition. The Petitioners anticipate that the Chapter 15 Case will complement the Debtor's Cayman Proceeding to ensure the effective and economic administration of the Debtor's liquidation efforts.

## BACKGROUND

8. The following is an overview of the Debtor's business, capital structure, events leading to the Cayman Proceeding and this Chapter 15 Case as of the date of the filing of the Petition (the "Petition Date").

### A. Overview of HoldCo and its Stakeholders

9. HoldCo is a Cayman Islands exempted company, incorporated on October 27, 2011. Its registered office is at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.[4] (MacInnis Decl. ⁋ 8, Ex. 3)

10. HoldCo's share capital is divided into participating shares (the "Participating Shares"), which do not have voting rights but confer the right to participate in HoldCo's profits or assets including by way of the receipt of dividends, and management shares (the "Management Shares"), which have voting rights but confer no other right to participate in HoldCo's profits or assets. Accordingly, holders of Participating Shares (the "Participating Shareholders") have the entirety of the economic interest in HoldCo, whereas the holder of Management Shares (the "Management Shareholder") has the control rights. (MacInnis Decl. ⁋ 9, Ex. 5)

11. Until recently, four nonprofit corporations collectively held 100% of HoldCo's Participating Shares: Highland Dallas Foundation, Inc. (the "Highland Dallas Foundation"), Highland Kansas City Foundation, Inc. (the "Highland Kansas City Foundation"), Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara Foundation" and, together with Highland Dallas Foundation and Highland Kansas City Foundation, the "Supporting Organizations") and

---

[4] Previously, HoldCo maintained its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

The Community Foundation of North Texas ("CFNT," and, together with the Supporting Organizations, the "Original Participating Shareholders"). (MacInnis Decl. ¶ 10, Ex. 6)

12.    As of the date hereof, HoldCo has one Management Shareholder and five registered Participating Shareholders. The Management Shares in HoldCo are held entirely by Mr. Mark Eric Patrick, a U.S. resident, who is also a director of HoldCo. Mr. Patrick acquired the Management Shares on March 25, 2021, upon taking assignment of the Management Shares previously held by Mr. Grant Scott. HoldCo's second director is Mr. Paul Murphy, a Cayman Islands resident. (MacInnis Decl. ¶ 11, Exs. 6-10)

13.    As of the date hereof, the Participating Shareholders are:

(a)    Highland Dallas Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the Internal Revenue Code of 1986 (the "IRC") incorporated in Delaware on November 22, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;

(b)    Highland Kansas City Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on November 23, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;

(c)    Highland Santa Barbara Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on November 22, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;

(d)    CFNT for the Highland Capital Management, L.P. Charitable Fund at CFNT, a public charity exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Texas, which was issued 5 Participating Shares in HoldCo on August 12, 2015; and

    (e)    DFW Charitable Foundation ("DFW"), a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on December 9, 2024, which was issued 318 Participating Shares in HoldCo on February 7, 2025 ("DFW Share Issuance"). Mr. Patrick is its registered director, president and sole member.[5]

(MacInnis Decl. ⁋ 12, Exs. 11-21)

    **i.**    **The Charitable Structure**

14.    Four charities held the ultimate economic interest in HoldCo prior to the DFW Share Issuance and held Participating Shares, either directly or indirectly. They are:

    (a)    The Dallas Foundation ("TDF") (which controls Highland Dallas Foundation): a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets;

    (b)    Greater Kansas City Community Foundation ("GKCCF") (which controls Highland Kansas Foundation): a charitable entity established in Missouri in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds;

    (c)    Santa Barbara Foundation ("SBF" and, together with TDF and GKCCF, the "Charities," and each, a "Charity") (which controls Highland Santa Barbara Foundation): a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million; and

    (d)    CFNT is a charity established in 1981 which manages assets totaling $513 million and donated $38.9 million to local nonprofits in 2023. CFNT holds its Participating Shares in HoldCo directly (i.e., without interposing a supporting organization). Prior to the DFW Share Issuance, CFNT held 1.639% of the Participating Shares.

(MacInnis Decl. ⁋ 13, Ex. 19)

15.    Each of the Charities held its interests in HoldCo indirectly through Highland Dallas Foundation, Highland Kansas City Foundation, and Highland Santa Barbara Foundation respectively (i.e., TDF held its interest through the Participating Shares held by Highland Dallas Foundation, etc.). (MacInnis Decl. ⁋ 14, Exs. 23-25)

---

[5] HoldCo contests the validity of the DFW Share Issuance in the Cayman Litigation (defined below).

16. The Supporting Organizations were incorporated by Mr. James Dondero in November 2011 for the purpose of making charitable donations to their respective charity from the proceeds received by the Supporting Organizations from HoldCo. (MacInnis Decl. ¶ 15, Exs. 26-28)

17. Each of the Supporting Organizations is "organized and operated exclusively to support and benefit" its relevant, supported Charity. For US tax purposes, each Supporting Organization is classified as a Type I supporting organization of its respective Charity, which means that it is operated, supervised and controlled by that Charity. Consistent with this classification, the governance arrangements of each of the Supporting Organizations affords each Charity two votes and two director-nominees, to the individual member's (Mr. Dondero or his designee's) one vote and one director-nominee. (MacInnis Decl. ¶ 16, Exs. 23-28, 29-31)

18. HoldCo was formed for tax efficiency purposes to avoid a Charity or Supporting Organization becoming liable for "unrelated business taxable income" ("UBTI") with respect to investments it may wish to make in a hedge fund or private equity fund, here, the Fund, where substantial assets were held. (MacInnis Decl. ¶17, Ex. 92)

19. HoldCo was, between November 2011 and December 18, 2024, the sole limited partner of the Fund, a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organizations in the United States, through which it indirectly owned a larger group of entities (collectively, the "DAF Structure"). (MacInnis Decl. ¶ 18)

20. The role of HoldCo was to facilitate the making of discretionary cash distributions to Participating Shareholders, which would be drawn from the proceeds of investment returns made within asset-holding entities in the DAF Structure. (MacInnis Decl. ¶ 19, Exs. 32-33, 35-36)

B.    **Overview of the Fund**

21.    The Fund is a Cayman Islands exempted limited partnership formed October 25, 2011 (registration no. 53083), having its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands. The Fund is governed by the Second Amended and Restated Limited Partnership Agreement, dated March 11, 2024 (the "Fund LPA"). Prior to the Relevant Transactions, HoldCo was the sole limited partner of the Fund. (MacInnis Decl. ¶ 20. Exs. 34-36)

22.    The Fund was formed and operates to "make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of [HoldCo] and its Indirect Charitable Owners." (MacInnis Decl. ¶ 21, Ex. 5)

23.    Charitable DAF GP, LLC (the "Original GP"), a Delaware limited liability company registered as a foreign company in the Cayman Islands which was, at the Fund's formation and until March 7, 2024, the general partner of the Fund, at which time it was replaced by CDH GP, LTD (the "New GP" or "CDH"), a Cayman Islands exempt company incorporated on February 27, 2024, by Mr. Patrick, its sole director, at Mr. Patrick's instigation, without notice to the Original Participating Shareholders. (MacInnis Decl. ¶ 22, Exs. 37-39, 94)

24.    The Fund's sole asset is or was its ownership of 100% of the issued share capital, in CLO HoldCo Ltd ("CLO HoldCo"). CLO Holdco is organized as a Cayman Islands exempt company incorporated with limited liability, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands. (MacInnis Decl. ¶ 23 Exs. 32-33, 40-43)

25.    Based upon their initial research and investigation, the JOLs understand that the Fund's known subsidiaries, that it holds through CLO HoldCo (as listed in Schedule A of the

-9-

proposed order accompanying the Injunction Application (defined below), the "Fund Entities")
are mostly passive investment vehicles holding a mix of assets, including cash, promissory notes,
shares in Nexpoint[6] entities, publicly traded stock, real estate, receivables/proceeds from litigation
proceedings, receivable amounts from brokers, dividends due, and amounts due from affiliates.
(MacInnis Decl. ¶ 24, Ex. 82)

26.      At all relevant times, the Fund had a net asset value of approximately $270 million.
(MacInnis Decl. ¶ 25, Ex. 51)

## C.      **Key Transactions Precipitating the Debtor's Liquidation**

### i.      **The Relevant Transactions**

27.      Beginning in 2024, HoldCo's directors, Mr. Patrick and Mr. Murphy (together, the
"Directors") executed a series of complex, interrelated transactions without the knowledge or
consent of the Original Participating Shareholders. These transactions consisted of (a) HoldCo's
contribution of its interest in the Fund to a newly formed entity organized in Delaware,
CDMCFAD, LLC ("CDM"), controlled by Mr. Patrick, in exchange for membership interests in
CDM that, unlike the Original Participating Shareholders Participating Shares in HoldCo, were
redeemable and afforded HoldCo no fiduciary safeguards (the "LP/LLC Exchange"); (b) the DFW
Share Issuance, i.e., the purported issuance of 318 participating shares in HoldCo to DFW, a
Delaware nonprofit corporation incorporated and controlled by Mr. Patrick, on February 7, 2025,
sufficient to make it, rather than the Original Participating Shareholders, the majority owner of
HoldCo's participating shares; and (c) the purported redemption of HoldCo's interest in CDM in
exchange for approximately $1.6 million on March 27, 2025 (the "Redemption" and, together with

---

[6] Nexpoint is an investment management firm registered with the U.S. Securities and Exchange Commission that was founded by Mr. Dondero, who currently serves as its President.

the LP/LLC Exchange and the DFW Share Issuance, the "Relevant Transactions"). (MacInnis Decl. ¶ 26, Exs 20-21, 44-46)

(A) The LP/LLC Exchange

28. On December 12, 2024, CDM was incorporated as a limited liability company in Delaware. Mr. Patrick was the sole member of CDM. (MacInnis Decl. ¶ 27 Exs 47-48)

29. On December 18, 2024, without informing the Supporting Organizations or the Charities, (i) the Directors passed resolutions to transfer HoldCo's entire limited partnership interest in the Fund (the "Fund Partnership Interest") to CDM, in exchange for a contribution by CDM's sole member—Mr. Patrick—of 100% of the issued and outstanding membership interests in CDM; and (ii) HoldCo, CDM, and the New GP entered into a Deed of Assignment and Assumption, executed by Mr. Patrick in three capacities: on behalf of: (x) HoldCo, as Director; (y) CDM, as manager; and (z) the New GP, as Director, pursuant to which (a) HoldCo assigned its entire interest in the Fund to CDM (the "CDM Assignment"), (b) the New GP provided its written consent to the CDM Assignment and the admission of CDM as the new limited partner, in accordance with the Fund LPA, and (c) CDM agreed to exercise its reasonable best endeavors to ensure that 100% of the membership interest in CDM (the "CDM Membership Interest") would be transferred to HoldCo. (MacInnis Decl. ¶ 28, Exs. 44-45)

30. The LP/LLC Exchange occurred in at least two stages: (a) first, HoldCo transferred its entire interest in the Fund to CDM; and (b) second, CDM procured the transfer of 100% of its share capital to HoldCo, making HoldCo the sole membership interest holder of CDM rather than the sole limited partner in the Fund. The effect of the LP/LLC Exchange was that: (a) CDM was inserted into the corporate structure as a subsidiary of HoldCo and became the holder of the entire interest in the Fund previously held by HoldCo; and (b) HoldCo became the sole membership interest holder in CDM, resulting in its sole asset—formerly its 100% limited partnership interest

-11-

in the Fund—being exchanged for the CDM Membership Interest. (MacInnis Decl. ⁋ 29, Exs. 42, 45-46)

31.     The LP/LLC Exchange prejudiced the interests of HoldCo. The CDM Membership Interest was less valuable than the Fund Partnership Interest because, among other reasons, whereas the New GP had owed fiduciary duties to HoldCo in the Fund, the manager, Mr. Patrick, did not owe any fiduciary duties to CDM; and, unlike the Fund Partnership Interest, the CDM Membership Interest was susceptible to being redeemed by Mr. Patrick (as Manager) in his sole discretion and for any reason, for "fair market value" as defined by Article 6.9, i.e., a "good faith determination of value." (MacInnis Decl. ⁋ 30, Ex. 48)

(B)     DFW Share Issuance

32.     On December 9, 2024, DFW, a nonprofit non-stock corporation, was incorporated in Delaware exclusively for charitable purposes. (MacInnis Decl. ⁋ 31, Ex. 49)

33.     On February 7, 2025, without informing the Supporting Organizations or the Charities, the Directors passed resolutions for HoldCo to issue 318 Participating Shares to DFW, which, upon issuance, would allot DFW 51.04% of the Participating Shares of HoldCo. That same day, also without notice to the Supporting Organizations or the Charities, HoldCo issued and allotted 318 Participating Shares to DFW, resulting in DFW holding a 51.04% interest in HoldCo and diluting the Original Participating Shareholders' aggregate shareholding from 100% to 48.96%. (MacInnis Decl. ⁋ 32, Exs. 20-21)

(C)    Redemption

34.    Following the LP/LLC Exchange, ValueScope, Inc. ("ValueScope") was instructed without informing the Supporting Organizations or the Charities to prepare two valuation analyses: (a) the 100% membership interest in CDM; and (b) certain Participating Shares of HoldCo as of March 25, 2025 (the "March 2025 ValueScope Valuations"). Historically, between December 2020 and September 2024, ValueScope conducted a series of valuation analyses of 100 Participating Shares on a net asset value ("NAV") basis at HoldCo's request to determine their fair market value ("FMV"). The final NAV-based valuation prepared by ValueScope prior to the Relevant Transactions was dated January 7, 2025, and gave a valuation of 100 Participating Shares as of September 30, 2024. ValueScope determined that, as of September 30, 2024, the NAV of the Fund was $269.05 million, NAV per share was $882,140, FMV per share was $759,614 and the FMV of 100 Participating shares was $75,961,370. (MacInnis Decl. ¶ 33, Exs. 50-51, 93)

35.    The March 2025 ValueScope Valuations, however: (a) applied a discounted cash flow ("DCF") methodology to estimate the present value of expected future distributions, rather than the asset-based approach used in at least the prior five annual valuations by ValueScope; (b) determined the FMV of 100 Participating Shares to be $536,784; (c) applied a 99.2% discount for lack of control ("DLOC"); and (d) applied a 20.00% discount for lack of marketability ("DLOM"). The DCF model relied on projected future distributions to HoldCo, with those projections based on historical distributions that were also controlled by Mr. Patrick. (MacInnis Decl. ¶ 34, Exs. 50, 93)

36.    Accordingly, the FMV of 100 Participating Shares in HoldCo apparently declined from $75,961,370 on September 30, 2024, to $536,784 on March 25, 2025—a 99.29% reduction in less than six months, coinciding with the LP/LLC Exchange and attributable to the shift in valuation methodology from NAV to DCF. Although the March 2025 ValueScope Valuations

-13-

reports identified "total equity" of approximately $269 million and concluded that all Participating Shares had a combined value of only approximately $1.6 million, the analyses did not address who benefited from the residual value of roughly $267.4 million. (MacInnis Decl. ¶ 35, Ex. 50)

37. On March 27, 2025, without informing the Supporting Organizations or the Charities, HoldCo entered into a letter agreement with CDM (the "Letter Agreement"), pursuant to which HoldCo assigned to CDM various contracts and agreements to which it was a party. On the same day, Mr. Patrick executed, in his capacity as manager of CDM and president of DFW, the following, again without notice to the Supporting Organizations or the Charities: (i) an Admission and Amendment No. 1 Agreement between CDM and DFW, under which DFW was admitted as a member of CDM in exchange for a capital contribution of $1,637,192; and (ii) a Redemption and Amendment No. 2 Agreement under which CDM redeemed HoldCo's CDM shares for the same sum of $1,637,192 (the "Redemption Sum") (together, the "Admission and Redemption"). (MacInnis Decl. ¶ 36, Exs, 52-54)

38. Additionally, on March 27, 2025, Mr. Patrick, in his capacity as manager of CDM, executed a written consent (the "Manager Consent") approving the Admission and Redemption. The Manager Consent stated that the redemption of HoldCo's shares of CDM under the Letter Agreement was justified due to alleged attempts by the Supporting Organizations to exert control, and the potential loss of their nonprofit and tax-exempt status. (MacInnis Decl. ¶ 37, Ex. 55)

39. On April 2, 2025, the Directors, by written resolution: (a) noted the redemption of HoldCo's shareholding in CDM for the Redemption Sum; and (b) resolved to make a shareholder distribution totaling $1,612,192.01 (the "Redemption Distributions"). (MacInnis Decl. ¶ 38, Ex. 46)

40.     The substantive financial effect of the Redemption was that DFW paid the Redemption Sum to CDM, and HoldCo's shares in CDM were redeemed for that same amount—effectively transferring or selling HoldCo's interest in CDM to DFW for the Redemption Sum. As a result of the Redemption: (a) HoldCo realized its interest in the Fund, which had a NAV of approximately $269.1 million, for only around $1.6 million; (b) HoldCo purported to distribute that approximately $1.6 million to accounts in the name of the Participating Shareholders; (c) the Original Participating Shareholders, being the Supporting Organizations and CFNT were actually or effectively divested of their indirect interest—subject to the discretion of the person holding the Control Position—in the Fund and its underlying assets; and (d) the Original Participating Shareholders, being the Supporting Organizations and CFNT, whose economic interest in HoldCo had been diluted from 100% to 48.96% following the DFW Share Issuance, were entitled to their proportionate share of distributions in the amount of 48.96% of the Redemption Sum. As such, HoldCo had no assets at that time. (MacInnis Decl. ₱ 39)

### ii.     The Remuneration Transactions

41.     Following his appointment as director of HoldCo on March 25, 2021, Mr. Patrick resolved to dramatically increase his remuneration (collectively, the "Renumeration Transactions"). Specifically (and among other things):

(a)   Directors' fees increased from around $40,000 in 2022 to almost $600,000 in 2023.

(b)   On September 13, 2024, the Directors resolved to increase Mr. Patrick's salary to $850,000 per annum and approve a long-term incentive ("LTI") of 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).

(c)   On or around October 1, 2024:

(i)   The Directors resolved that Mr. Patrick was to receive an LTI payment of $975,000 and an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary.

-15-

> (ii)  Mr. Patrick signed an "employment agreement" for his position at HoldCo, effective as of March 24, 2021, which provided, among other things, for a base salary of $850,000 and an LTI payment of $4,759,000 for the period from March 24, 2021 to March 24, 2024.

(MacInnis Decl. ¶ 40. Exs. 56-58, 93)

42.  By way of contrast to the remuneration that Mr. Patrick resolved he should be awarded, his predecessor's salary (Grant Scott) during his tenure in the same position was approximately $60,000 per annum. (MacInnis Decl. ¶ 41, Ex. 83)

43.  As regards expenses, expenses overall for the first half of 2024 were around $18.3 million – almost the same amount spent over the entire course of 2023 (i.e., $18.6 million). (MacInnis Decl. ¶ 42, Ex. 56)

## D.  Lack of Transparency and Misleading Disclosures Provided to Supporting Organizations

44.  As more fully set forth in the Statement of Claim, prior to and during the time when the Directors were consummating the Relevant Transactions, the Directors persistently declined to disclose information regarding their actions and intentions notwithstanding the Supporting Organizations repeated requests. (MacInnis Decl. ¶ 43, Ex. 59)

45.  In November 2023, the Directors sought legal advice under Cayman law regarding the rights and duties of HoldCo's controlling person in connection with various matters including, diluting Participating Shares, redeeming Participating Shares, liquidating HoldCo to distribute its assets elsewhere or otherwise render the Participating Shares worthless, each in the context of potential future disputes with the Original Participating Shareholders. (MacInnis Decl. ¶ 44)

46.  In or around August 2024, the Supporting Organizations were provided with a financial analysis of the Fund's annual expenses, which showed—or appeared to show—a significant increase in expenditures, as described above, both with respect to Directors fees and overall expenses. (MacInnis Decl. ¶ 45, Ex. 56)

47.     In late October 2024, as a result of concerns from this additional expenditure, the Supporting Organizations requested that Mr. Patrick provide relevant financial information for the HoldCo and the Fund. Mr. Patrick did not do so. (MacInnis Decl. ⁋ 46)

48.     On November 11, 2024, Holland and Knight, LLP ("H&K"), U.S. attorneys for the Supporting Organizations, issued a letter to Mr. Murphy advising that the Supporting Organizations no longer had confidence in the governance of HoldCo and/or the Fund and considered that a reorganization of the governance structures was required to protect the charitable efforts of the Supporting Organizations (the "No Confidence Letter"). (MacInnis Decl. ⁋ 47, Ex. 60)

49.     On November 26, 2024, Mr. Patrick sought and obtained advice regarding whether HoldCo could issue further Participating Shares to a new nonprofit organization to dilute the Supporting Organizations so as to weaken any winding-up petition brought by the Supporting Organizations on just and equitable grounds. On November 27, 2024, Cayman Islands counsel responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition would be taken into consideration and would likely help. Mr. Patrick incorporated DFW as a nonprofit, non-stock corporation in Delaware on December 9, 2024. (MacInnis Decl. ⁋ 48, Exs. 49, 61-62)

50.     On December 11, 2024, Mr. Murphy and HoldCo's Cayman counsel gave a presentation to attorneys from H&K on behalf of the Supporting Organizations providing various assurances regarding governance matters being addressed by the Directors. The meeting was, by all accounts, positively regarded. The attorneys on behalf of the Supporting Organizations invited Mr. Murphy to make the same presentation directly to the Supporting Organizations. (MacInnis Decl. ⁋ 49, Ex. 63)

-17-

51. Nonetheless, the very next day, Mr. Patrick incorporated CDM and, on December 18, 2024, the Directors consummated the LP/LLC Exchange, each without disclosing the same to the Supporting Organizations. (MacInnis Decl. ¶ 50)

52. On January 23, 2025, having received no follow-up to the December 11, 2024 meeting with Mr. Murphy, Julie Diaz, the CEO of The Dallas Foundation, sent Mr. Patrick an email advising that the Supporting Organizations needed to better understand HoldCo and the Fund's asset position, and requesting certain information be provided by February 10, 2025. (MacInnis Decl. ¶ 51, Ex. 64)

53. Having received no response, on January 28, 2025, Ms. Diaz sent a further email to the Directors expressing serious concern: (i) that the Supporting Organization's requests for information continued to be disregarded, and (ii) about the ongoing lack of transparency on the party of the Directors. (MacInnis Decl. ¶ 52, Ex. 64)

54. On January 30, 2025, Mr. Murphy replied to Ms. Diaz stating that the Directors: (i) had not received the January 23 email, but understood the next step was for the Directors to "present directly" to the Supporting Organizations to address the No-Confidence Letter; and (ii) are coopering with the Supporting Organizations to provide additional information – but "have no legal obligation to do so" and such cooperation "should not be construed as an implicit acknowledgement of any duty to continue providing information to you." (MacInnis Decl. ¶ 53, Ex. 64)

55. On January 31, 2025, Mr. Michael Stockham of H&K responded to Mr. Murphy noting that he and Mr. Patrick were fiduciaries, managing $270 million in assets for the benefit of charities that support the most vulnerable (i.e., the Charities) and: "[w]hatever your side's obvious

antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions." (MacInnis Decl. ⁋ 54, Ex. 64)

56. On February 4, 2025, Mr. Murphy responded that while open to resolving the concerns, they (i.e., the Directors) were struggling to understand the Supporting Organization's change in position. (MacInnis Decl. ⁋ 55, Ex. 64)

57. On February 7, 2025, H&K responded that the Directors were fiduciaries in control of $270 million for the benefit of charities: "these monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed and … fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees." (MacInnis Decl. ⁋ 56, Ex. 64)

58. On the same date, without informing the Supporting Organizations, the Directors consummated the purported DFW Share Issuance. (MacInnis Decl. ⁋ 57, Ex. 21)

59. On February 14, 2025, H&K received a letter from Mr. Mancino, a partner in Seyfarth Shaw LLP ("Seyfarth"), a U.S. law firm apparently engaged by the Fund, which rejected the accuracy of the reported increases in expenditure. On February 27, 2025, H&K responded that his clients were frustrated by the lack of transparency and refusal to answer simple queries about the financial position. In response, Seyfarth sought available dates for Mr. Murphy to make the promised presentation to the Supporting Organizations. H&K responded the next day with three potential dates/times for the proposed call between March 26 and April 3, 2025. Mr. Mancino did not respond. (MacInnis Decl. ⁋ 58, Exs. 21, 70-71, 75)

60. On March 20, 2025, Mr. Mancio sent a letter purportedly on behalf of HoldCo to the IRS about Mr. Dondero's alleged influence and control over the Supporting Organizations. The letter makes serious and unsubstantiated allegations about the Supporting Organizations,

absent evidentiary support, including that they each (i.e., all of them): "operates for Mr. Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of [HoldCo] to wrest control of [HoldCo] and its assets. . ." (MacInnis Decl. ¶ 59, Ex. 72)

61. Commencing on March 27, 2025, the Directors initiated steps to effectuate the Redemption, which they consummated on April 2, 2025, without informing the Supporting Organizations. On that same day, the Directors resolved to place HoldCo into voluntary liquidation and appointed Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd as joint voluntary liquidators. (MacInnis Decl. ¶ 60, Exs. 46, 55, 65, 73-74)

62. Notwithstanding the consummation of the Redemption and the commencement of voluntary liquidation of HoldCo the day prior, April 3, 2025, Mr. Mancino sent an email to H&K stating that he had just learned there was a call scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried about the apparent source of confusion. (MacInnis Decl. ¶ 61, Ex. 76)

**E.      The Cayman Proceeding**

63. Unaware of the Directors resolution to place HoldCo into voluntary liquidation, on April 23, 2025, the Supporting Organizations presented a petition seeking the winding up of HoldCo on a just and equitable basis under section 92(e) of the Companies Act (the "J&E Petition"). It was only after filing the J&E Petition that the Directors disclosed they had consummated the Relevant Transactions and commenced a voluntary liquidation of HoldCo on April 2, 2025. (MacInnis Decl. ¶ 62, Exs. 66, 77)

64. On May 2, 2025, the Supporting Organizations filed a petition seeking an order for the voluntary liquidation of HoldCo—now a debtor—to continue under the supervision of the Cayman Court pursuant to section 131 of the Companies Act (the "Supervision Petition").

-20-

Following a hearing and review of the Supervision Petition, supporting affidavits and affirmations with exhibits, and the documents filed in Cause No. FSD 116 of 2025 (JAJ)—including the J&E Petition and the affidavits of the JOLs confirming their consent to act—the Cayman Court issued the Supervision Order. Pursuant to the Supervision Order, the voluntary liquidation of the Debtor was continued under the supervision of the Cayman Court, and the JOLs were appointed under section 131 of the Companies Act and Order 15, rule 8 of the Companies Winding Up Rules (2023 Consolidation) (the "Winding Up Rules"). (MacInnis Decl. ⁋ 63, Exs. 1, 67, 78-79)

65. Also pursuant to the Supervision Order, the Petitioners were authorized to exercise the following powers, among others, under Part I of Schedule 3 to the Companies Act without further Cayman Court sanction: (a) the power to commence legal proceedings in the name and on behalf of the Debtor to obtain information, documents, or the examination of individuals in the Cayman Islands or the United States; and (b) the power to apply in the Cayman Islands or the United States for the preservation, freezing, or attachment of assets to which the Debtor is or may arguably be entitled. Moreover, the Petitioners were authorized to seek registration or recognition of themselves and/or the Cayman Proceeding in any U.S. state for any purpose related to the exercise of the above-described powers in the Supervision Order. (MacInnis Decl. ⁋ 64, Ex. 78)

i. **Conduct of the Cayman Proceeding**

66. The JOLs have diligently performed their duties in progressing the Cayman Proceeding from and after their appointment. The JOLs have taken steps to fulfil their statutory obligations by: filing notice of the winding up with the Cayman Islands Registrar of Companies; circulating notices of the winding up to known stakeholders, service providers of HoldCo, and known contributories of HoldCo; publishing their notice of appointment in the Cayman Islands Gazette and Cayman Compass Newspaper; determining HoldCo should be treated as solvent for

-21-

the purposes of Section 110(4) of the Companies Act, as well as Orders 8 & 9 of the Winding Up Rules; determining the functional currency of the liquidation to be U.S. dollars pursuant to Order 16, Rule 13 of the Winding Up Rules; changing the registered office of HoldCo from Campbells Corporate Services Limited to HSM Corporate Services Ltd; publishing a Report to Contributories on July 2, 2025, and on July 3, 2025, convening the first meeting of contributories held on July 9, 2025. (MacInnis Decl. ¶ 65, Exs. 68-69, 78-80)

67.     Moreover, to identify, secure and recover HoldCo's books and records, the JOLs have: (a) issued formal correspondence to over 50 parties, including, directors, shareholders, banks, service providers, the prior appointed joint voluntary liquidators, notifying them of the JOLs appointment and requesting books and records; (b) issued requests to hold an interview with the directors; and (c) held discussions with various parties to discuss the history and financial affairs of HoldCo. (MacInnis Decl. ¶ 66)

68.     The JOLs have engaged extensively with representatives of various interested parties in connection with, among other things, seeking and obtaining sanction of the Cayman Court to engage Cayman and US counsel.[7] In addition, the JOLs, through counsel, have engaged with representatives of CDM, the New GP, and CLO HoldCo in relation to a potential protocol intended to allay the JOLs' concerns regarding asset dissipation, transparency and asset management while the JOLs progress their investigation. The JOLs, however, do not believe the protocol proposed by CDM, the New GP, and CLO HoldCo would adequately protect HoldCo's position and, to date, the parties have been unable to reach terms of agreement with respect to any protocol. (MacInnis Decl. ¶ 67, Ex. 81)

---

[7] In respect of which, on June 24, 2025, the Cayman Court sanctioned the engagements of Cayman and US counsel by the JOLs.

69.     Since the date of their appointment, the JOLs have conducted an extensive and detailed investigation into HoldCo's affairs, albeit that those investigations are not yet complete. This has involved a review of HoldCo's books and records (to the extent that they have been able to obtain them and to the extent that they are complete) and numerous inquiries and requests for information directed to persons previously involved with HoldCo. There have, however, been several limitations on the JOLs' investigations in connection with the information requests made from those persons previously involved in the HoldCo, including certain US-based service providers who have asserted that they do not recognize the JOLs authority under the Supervision Order, where the JOLs have not been able to obtain copies of the requested information. Notwithstanding these limitations, the JOLs' investigation has progressed sufficiently to enable them to identify significant areas of concern. (MacInnis Decl. ⁋ 68)

ii.     **Commencement of the Cayman Litigation**

70.     On July 4, 2025, the JOLs applied to the Cayman Court in the Cayman liquidation proceedings on an *ex parte* basis for sanction to commence litigation proceedings by way of filing a Writ and Statement of Claim (the "Statement of Claim") against the following defendants (collectively, the "Named Defendants"): (1) Mark Eric Patrick; (2) Paul Murphy; (3) CDM; (4)

-23-

DFW; (5) CDH as general partner for and on behalf of the Fund, and in its capacity as New GP;

and (6) CLO HoldCo (the "Cayman Litigation").[8] (MacInnis Decl. ⁋ 69, Ex. 59)

71.    A further description of each of the Named Defendants is as follows:

(a)    **Mr. Mark Patrick**. Mr. Patrick is a U.S. attorney and was employed as tax counsel by Highland Capital Management, L.P., an investment company founded by Mr. James Dondero, from 2008 – 2021 and as tax counsel by Highgate Consulting Group, Inc. d/b/a d/b/a Skyview Group from March 2021 to October 2024. He was instrumental in the creation of the Fund in 2011; in particular, he advised on the tax structure of using an offshore "blocker" company. Mr. Patrick is one of two directors of HoldCo, having been appointed as director on March 25, 2021. In that capacity, he was responsible for the supervision of the day-to-day operations of HoldCo. As director, Mr. Patrick owed, and continues to owe, fiduciary duties to HoldCo. Mr. Patrick was also: (i) the holder of all of the Management Shares in HoldCo; (ii) the manager of CDM; (iii) the sole member and sole director of DFW, which is now the sole member of CDM; (iv) the sole director and sole shareholder of CDH GP, Ltd, the New GP; and (v) a director of CLO HoldCo, the entity through which the Fund holds its assets.

(b)    **Mr. Paul Murphy**. Mr. Murphy was the other director of HoldCo, having been appointed so on April 22, 2021. Mr. Murphy is also a director of CLO HoldCo.

(c)    **CDM**. A limited liability company incorporated in Delaware on December 12, 2024. Mr. Patrick is the Manager of CDM. DFW has been the sole member of CDM since March 27, 2025.

(d)    **DFW**. A nonprofit, non-stock corporation incorporated in Delaware on December 9, 2024, by Mr. Douglas Mancino, a partner in Seyfarth Shaw LLP ("Seyfarth"), a U.S. law firm apparently engaged by the Fund. DFW is

---

[8] In determining whether to commence the Cayman Litigation, the JOLs gave due regard to the Named Defendants' likely defenses with respect to the propriety of the Relevant Transactions and the Remuneration Transactions. At a high level, the JOLs understand that the Named Defendants will seek to justify the Relevant Transactions on three independent grounds: (1) on the basis that the Original Participating Shareholders did not have an economic interest in HoldCo, which was formed simply to act as a throughput for discretionary, charitable donations to qualifying recipients (which were not necessarily the Supporting Organizations, CFNT or the Charities), such that the Original Participating Shareholders did not lose any cognizable interest because of the Relevant Transactions; (2) the Relevant Transactions were necessary and appropriate to protect HoldCo and its Directors from attempts by Mr. Dondero and the Supporting Organizations to improperly exercise dominion and control over HoldCo's assets, which would expose HoldCo (x) to breaches of US tax law and regulation and (y) claims from third parties that HoldCo and the Fund Entities were alter egos of Mr. Dondero in lawsuits against Mr. Dondero; and (3) on the basis that the Directors relied appropriately on third party valuation reports in effectuating the Redemption at FMV. The JOLs likewise understand that Mr. Patrick intends to rely on a third party report to justify the Remuneration Transactions. On the basis of the investigation conducted by the JOLs to date, the JOLs do not find these defenses and justifications to be availing or credible.

organized under the General Corporation Law of the State of Delaware exclusively for charitable purposes. The JOLs understand that DFW is now the holder of the majority of the Participating Shares in HoldCo pursuant to the DFW Share issuance on February 7, 2025, and controlled by Mr. Patrick as its sole member.

(e) **The New GP**. A Cayman Islands exempted limited company incorporated on February 27, 2024. It replaced the Original GP as the Fund's current general partner on March 7, 2024, after Mr. Patrick sought advice from Walkers on forming a new entity to replace the Original GP. On February 5, 2024, Shields Legal asked Mr. Patrick whether that entity should be a Cayman LLC or exempted company, to which he responded: "*Doesn't matter to me. Whatever from a strategic point of view – hard to find or track, or trace. Or find owners, etc. Generic name. Strong litigation protection.*"

(f) **CLO HoldCo**. A Cayman Islands exempted limited company. CLO HoldCo is the Fund's only direct subsidiary. The Fund held all of CLO HoldCo's issued shares.

(MacInnis Decl. ¶ 70)

72. HoldCo's claims pleaded in the Statement of Claim arise as a result of the breaches by the Directors of their fiduciary duties owed to HoldCo, having caused HoldCo to have dissipated its assets through a combination of (a) the Relevant Transactions and (b) the Remuneration Transactions, all of which were for the benefit of entities controlled by Mr. Patrick or for his benefit, personally. In addition to asserting claims against the Directors for willful breaches of their fiduciary duties to HoldCo, the Statement of Claim asserts claims against: (i) the Named Defendants for unlawful means conspiracy based on the Named Defendants having conspired and combined together to injure HoldCo by unlawful means and HoldCo having suffered loss and damage as a result; (ii) CDM for knowing receipt of HoldCo's property, its partnership interest in the Fund, which had been misappropriated from HoldCo by virtue of the Directors breach of fiduciary duties; and (iii) CDM for unjust enrichment on the basis that it received HoldCo's interest in the Fund without there being a valid assignment or other justification for that receipt, such that it is liable to HoldCo in restitution. (MacInnis Decl. ¶ 71, Ex. 59)

73.     At the hearing of the sanction application on July 14, 2025, to obtain an order granting the JOLs sanction to commence the Cayman Litigation, the JOLs were required to satisfy the Cayman Court in the Cayman Proceeding that: (a) the Cayman Litigation had a reasonable prospect of success; and (b) the interests of HoldCo's stakeholders were best served by the JOLs commencing the Cayman Litigation.[9] The Cayman Court granted sanction for the JOLs to commence the Cayman Litigation. (MacInnis Decl. ¶ 72, Ex. 85)

74.     On July 15, 2025, the Debtor proceeded to file the Statement of Claim with the Cayman Court to commence the Cayman Litigation (which has the cause number FSD 201 of 2025 (RPJ)). At the same time the JOLs filed an application for: (a) a proprietary injunction to prevent the Named Defendants from dealing with the assets of the Debtor that are held now held or controlled by the Named Defendant together with disclosure orders ("Injunction Application"); and (b) leave to serve the U.S.-based defendants with the Statement of Claim and Injunction Application ("Leave to Serve Application" and together with the Injunction Application, the "Applications"). (MacInnis Decl. ¶ 73, Exs. 59, 82-83)

75.     Additionally, on July 15, 2025, the Debtor: (1) emailed copies of the Statement of Claim and the Applications to the Cayman Islands attorneys for the Named Defendants and asked them to accept service; and (2) served copies of the Statement of Claim at the Cayman Islands registered addresses of CDH GP, Ltd. and CLO HoldCo, Ltd. The Applications have been listed for hearing on July 31, 2025 (the "Injunction Hearing Date"). (MacInnis Decl. ¶ 74)

76.     The Named Defendants are entitled to participate and be heard on that date. In the event the Named Defendants do not participate, the Cayman Court will hear the Injunction

---

[9] *Re ICP Strategic Credit Income Fund* [2014] 1 CILR 314.

-26-

Application on an *ex parte on notice* basis and, if the Injunction is granted, will schedule an *inter partes* hearing for a later date. (MacInnis Decl. ¶ 75. Exs. 82-83)

77. Should the Cayman Court grant the Injunctive Relief Application following the scheduled hearing on the Injunction Hearing date, and issue an order consistent with draft order for relief sought therein (the "Injunctive Relief Order"), the JOLs expect to seek recognition and enforcement of the Injunctive Relief Order against the Named Defendants on a provisional basis pursuant to section 1519 of the Bankruptcy Code pending the recognition of the Cayman Proceeding, at which time the JOLs also seek recognition of the Injunctive Relief Order in this Chapter 15 Case as set forth herein pursuant to sections 1507(a) and 1521(a) of the Bankruptcy Code. (MacInnis Decl. ¶ 76, Ex. 82)

### iii. Injunction Application

78. The Injunction Application seeks orders that:

    (a) the Named Defendants will (i) preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest of (of whatsoever nature) whether held directly or indirectly, in the Fund, the Fund Entities, and/or any assets of the Fund; and (ii) procure that the Fund Entities and their wholly owned subsidiaries will not in any way dispose of, deal with, encumber, transfer or diminish the value of any of their assets;

    (b) the Named Defendants will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish any assets in their possession or control, whether they are in or outside the Cayman Islands, which were, are or may be received (whether directly or indirectly): (i) by way of distribution, disposition, dividend, benefit, payment or other transfer from (as the case may be) HoldCo, the Fund, DFW, CDM, the New GP, the Fund Entities and/or their wholly owned subsidiaries; or (ii) from any assets of the Fund, the Fund Entities, and/or their wholly owned subsidiaries;

    (c) the Named Defendants shall not do anything to cause, procure, incite, promote or assist a breach by any other Named Defendant of the above sections (a) and (b); and

(d)    the Named Defendants shall make ancillary asset disclosures.

(MacInnis Decl. ¶ 77. Ex. 82)

79.    The basis for the injunctive relief sought is that the Named Defendants each own and/or control assets that HoldCo has an equitable proprietary interest in (or at least a seriously arguable case that it does):

(a)    Prior to the Relevant Transactions taking place, HoldCo held the Fund Partnership Interest, and thereby indirectly owned (99%) of all assets held by the Fund through its wholly owned subsidiary, CLO HoldCo (and its subsidiaries).

(b)    After the Relevant Transactions took place, and by reason of the Directors' breaches of fiduciary duty – (i) CDM now holds the Fund Partnership Interest, which continues to hold its assets through CLO HoldCo (and its subsidiaries); (ii) DFW is the sole member of CDM; (iii) Mark Patrick is the sole member of DFW; and (iv) Mark Patrick has full control over DFW, CDM, the New GP (and thus the Fund), and (together with Mr. Murphy) CLO HoldCo. Mr. Patrick therefore has the ability to control and/or deal with the Fund Partnership Interest and the Fund's assets, including any distributions of the Fund's assets received by CDM as its sole limited partner. Mr. Patrick now exercises this control free from the oversight previously exercised by the Supporting Organizations and CFNT through their holding of Participating Shares in HoldCo.

(MacInnis Decl. ¶ 78, Exs. 6, 40, 44-49. 52-55, 84)

80.    Moreover, HoldCo has at least a seriously arguable case that CDM and DFW hold these assets through steps taken by the Directors that amounted to breaches of fiduciary duty, and therefore that these assets are subject to a constructive trust in favor of HoldCo, which is the necessary pre-requisite for the Cayman Court to grant a proprietary injunction restraining the disposition of that property. (MacInnis Decl. ¶ 79, Moran Decl. ¶¶ 40, 42-45)

81.    Under Cayman law, to obtain proprietary injunctive relief, the Debtor must show: (1) the existence of a serious issue to be tried as to whether it has a proprietary interest in the assets (such that the claim would be capable of surviving summary judgment), (2) that the balance of convenience is in favor of granting the injunction; and (3) that it is otherwise just and convenient

-28-

to grant the injunction. Moreover, under Cayman law, a court may order defendants to disclose information if the Debtor demonstrates that it is just and convenient to do so. (MacInnis Decl. ¶ 80, Moran Decl. ¶¶ 42-45)

### 1. Serious Issues to be Tried

82. On July 14, 2025, the Cayman Court granted sanction for the JOLs to file the Statement of Claim and in doing so accepted that the merits of the JOLs' claims satisfied the relevant threshold for the sanction of commencement of claims by official liquidators (which is higher than the 'serious issue to be tried' threshold for a proprietary injunction). (MacInnis Decl. ¶ 81, Ex. 85)

83. The Directors and DFW have put forward explanations as to why the transfer of the Fund Partnership Interest to CDM was legally justifiable, which the JOLs do not believe stand up to scrutiny. (MacInnis Decl. ¶ 82. Exs. 44, 70, 72, 86-87)

### 2. Balance of convenience

84. The JOLs do not believe that the proprietary injunctions they seek would hinder the operation of the Fund or the Fund Entities in any material way. The Fund and the Fund Entities are mostly passive investment vehicles that hold shares or interests in other Fund Entities, cash, debt instruments, receivables, vacant land and/or stock in publicly traded companies. They are not, as far as the JOLs understand, engaged in the active trading of assets or the making of new investments on a frequent basis. (MacInnis Decl. ¶ 83, Ex. 82)

85. Accordingly, the JOLs believe that there is no justification for any new investments or other transactions to be made by any of those entities, beyond payments needed to stay in good standing and comply with their statutory obligations. (MacInnis Decl. ¶ 84)

86. Against that backdrop, the JOLs' position is that no dispositions of the assets of the Fund, the Fund Entities or any other subsidiaries above $10,000 need or should be made pending the determination of HoldCo's proprietary claim which, if successful, would see the Fund Partnership Interest returned to HoldCo and HoldCo would therefore wholly own (indirectly) all assets of the Fund, the Fund Entities and their wholly owned subsidiaries. Should any payments or dispositions be made by the Fund, the Fund Entities or any of their wholly owned subsidiaries that have the effect of harming the value of the Fund Partnership Interest, such payment or disposition would render the proprietary relief the JOLs are seeking much less effective. (MacInnis Decl. ¶ 85)

87. Notwithstanding the above, the JOLs recognize that there may become a need for certain payments or other dispositions of assets to be made to preserve, maintain or improve the value of existing assets held by the Named Defendants, the Fund Entities and/or their wholly owned subsidiaries. Accordingly, the JOLs' proposed order to the Injunctive Relief Application provides for:

(a) The entity concerned to make a written request to the JOLs to make any such payments, together with full supporting information and documentation as well as an explanation of the rationale for the transaction; and

(b) The JOLs to decide within 7 days whether to approve or disapprove the proposed transaction.

(MacInnis Decl. ¶ 86. Ex. 82)

88. The JOLs also recognize that there will likely be a need for certain payments to be made by the Named Defendants, the Fund Entities or their wholly owned subsidiaries that are reasonably necessary in the ordinary course of business to keep the corporate Named Defendants, the Fund Entities or their wholly owned subsidiaries in good standing. The JOLs' proposed order

-30-

to the Injunctive Relief Application allows for any such payments of $10,000 or less to be made. (MacInnis Decl. ⁋ 87, Ex. 82)

89. The JOLs are also unaware of any harm that would be caused to CDM by preserving the status quo in respect of the Fund Partnership Interest. By comparison, if a proprietary injunction is not granted and CDM were to transfer the Fund Partnership Interest to another party or otherwise deal with that interest in some way, HoldCo could be significantly prejudiced. Specifically, HoldCo's proprietary claim to the Fund Partnership Interest could be undermined or become more difficult to enforce. (MacInnis Decl. ⁋ 88)

90. As to whether damages would be an adequate remedy for HoldCo in lieu of proprietary relief, as far as the JOLs' are aware, CDM has no other assets beyond the Fund Partnership Interest and therefore would likely be unable to meet any order for damages made against it. Only an order for CDM (and the other Named Defendants, to the extent they hold assets that derive from the Fund Partnership Interest) to restore HoldCo's property could return HoldCo to the position it would have been in had the improper transactions carried out by the Named Defendants not taken place. The JOLs' believe that the only way to ensure that such an order will be effective at the conclusion of these proceedings is for a proprietary injunction to be granted against the Named Defendants in respect of that property in the interim. (MacInnis Decl. ⁋ 89)

91. Further, as explained above, HoldCo, its Supporting Organizations, the Charities and the Fund are part of a carefully constructed investment structure for: (i) the tax efficient treatment of charitable donations; and (ii) investments to be made for the ultimate benefit of the Charities and CFNT. Without the re-transfer of the Fund Partnership Interest to HoldCo, those parties may be unable to achieve their charitable objectives as effectively or at all. An award of damages in lieu of proprietary relief would mean that HoldCo would hold only cash and no other

assets or investments, and the Charities and Supporting Organizations would effectively be back to square one in terms of setting up a proper investment structure to carry out their investments and protect their tax-exempt status. (MacInnis Decl. ℙ 90)

### 3. Disclosure of assets

92. The JOLs have only limited information as to what assets each of the Named Defendants, Fund Entities and their wholly owned subsidiaries hold. Even so, the JOLs have no way of verifying this information or knowing if it is completely up to date. (MacInnis Decl. ℙ 91)

93. In circumstances where, in the JOLs' case, a misappropriation of the HoldCo's sole and valuable asset has already occurred, the JOLs believe protection is needed to prevent any further dissipation of assets from occurring in breach of any injunction that is granted. The JOLs believe that this protection can be afforded by way of disclosure orders in support of the injunction requiring the Named Defendants to disclose what assets they each hold and their approximate value. Having that information in hand will allow the JOLs (and the Cayman Court) to effectively police the injunction (in terms of preventing dissipation of Fund assets and thereby preserving the value of the Fund Partnership Interest). (MacInnis Decl. ℙ 92)

94. In addition, the proposed order in support of the Injunctive Relief Application seeks confirmation as to:

(a) All of the entities owned directly or indirectly by the Fund, including full details as to their owners, directors, officers or other controllers, and places and details of incorporation. This will allow the JOLs to have a complete picture of the Fund structure.

(b) All payments by way of salary, bonus, dividend, distribution or other compensation made to Mr. Patrick or Mr. Murphy by HoldCo, the Fund, DFW, CDM, the New GP, CLO HoldCo, or any of the Fund Entities or other entities revealed by (a) above since February 27, 2024.

(c) All payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor, whether a firm, partnership, company or individual, made by HoldCo, the Fund, DFW, CDM, the New GP, CLO

HoldCo, or any of the Fund Entities or other entities revealed by (a) above since February 27, 2024.

(MacInnis Decl. ¶ 93, Ex. 82)

### 4.      Cross undertaking in damages

95.      The Debtor is not offering to provide a cross-undertaking as to damages in the Injunction Application. This is because in this case, the JOLs are not only acting in the Debtor's best interests, but also in a position analogous to the public interest based on the charitable or non-profit status of at least the underlying Charities, which are the intended recipients of donations made from the Debtor. No cross-undertaking in damages should be required in such circumstances. (MacInnis Decl. ¶ 94)

## F.      The Texas Proceeding

96.      On July 1, 2025, the Supporting Organizations commenced an action (the "TRO Action") against defendants Mark Patrick, DFW, CDM, CDH, and the Original GP (collectively, the "TRO Defendants") by filing *Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver* (the "TRO Application") in the Texas Business Court, 1st Division (the "Texas Court"). Among other things, the TRO Action seeks: (1) a temporary restraining order; (2) a temporary injunction; and (3) the appointment of a receiver against some of the TRO Defendants arising from various breaches of fiduciary duties and related claims alleged to be owed to the Supporting Organizations directly. (MacInnis Decl. ¶ 95. Ex. 85)

97.      On July 2, 2025, during the hearing for the TRO Action, in lieu of a decision rendered by the Texas Court, and at the direction of the Texas Court, the parties entered into a Rule 11 Agreement under the Texas Rules of Civil Procedure (the "Rule 11 Agreement"), which the JOLs understand is a binding contract among the parties. The key points of the Rule 11

-33-

Agreement are: (a) that the TRO Defendants shall not make any payments or disbursements other than those in the ordinary course of business; (b) investments and monies must be kept in the existing entities that currently hold those investments and monies, provided that, if any investment is monetized on its own terms, then the entity may prudently reinvest the resulting cash proceeds into liquid securities; and (c) there shall be no changes to the corporate structure of ownership of the TRO Defendants. The Texas Court scheduled a further hearing on the TRO Action on July 24 and 25, 2025. (MacInnis Decl. ¶ 96, Ex. 88)

98.     Following the hearing on July 2, 2025, the parties to the TRO Action amended and modified the Rule 11 Agreement (the "Final Rule 11 Agreement") to: (a) provide the TRO Defendants the opportunity to challenge the Texas Court's jurisdiction (the "Plea") pursuant to a briefing schedule concluding on July 24, 2025; (b) clarify the parties' discovery rights with respect to the TRO Action; and (c) evidence the restrictions imposed upon the activities of the TRO Defendants and their subsidiaries pursuant to the Rule 11 Agreement pending a decision by the Texas Court of the TRO Action and the Plea. On July 14, 2025, the TRO Defendants filed a jurisdictional challenge, asserting that: (1) the Texas Court lacks subject matter jurisdiction to hear the TRO Action; and (2) the Supporting Organizations lack standing, suggesting that the JOLs, on behalf of HoldCo, are the appropriate parties to assert the claims alleged in the TRO Action. (MacInnis Decl. ¶ 97, Ex. 89-90)

99.     The JOLs support the Final Rule 11 Agreement in the near term in that it imposes restrictions on the covered entities regarding asset dissipation in the short term, pending the outcome of the Injunctive Relief Application filed by the JOLs in the Cayman Court and the recognition of relief as may be granted by the Cayman Court in this Chapter 15 Case. The JOLs believe that the Cayman Court is the appropriate forum to adjudicate causes of action that belong

to HoldCo as asserted in the Cayman Litigation. The JOLs are also cognizant of the need for administrative efficiency in connection with the Cayman Proceeding and their duties to realize upon HoldCo's assets, and, accordingly, reserve rights with respect to coordination and management of the TRO Action, the Cayman Litigation and this Chapter 15 Case. (MacInnis Decl. ¶ 98, Exs. 59, 89)

**G.      This Chapter 15 Case**

100.    On the Petition Date, the Petitioners commenced this Chapter 15 Case. (MacInnis Decl. ¶ 99)

101.    Consistent with the purpose of official liquidation under Part V of the Companies Act, the Petitioners are also empowered to investigate: (a) the causes for the failure of HoldCo, as necessary, and (b) generally, the promotion, business, dealings and financial affairs of HoldCo. *See* Companies Act, section 110(2). (MacInnis Decl. ¶ 100, Ex. 78)

102.    Section 97(1) of the Companies Act provides in relevant part that upon the entry of a winding up order against a company, no suit or other proceeding may be commenced or continued against the company except with leave of the Cayman Court and subject to such terms as the Cayman Court might impose. This automatic stay mirrors the stay imposed in United States bankruptcy proceedings and serves to, *inter alia*, facilitate the Petitioners' ability to deal with claims and creditors collectively and comprehensively. (MacInnis Decl. ¶ 101, Ex. 78)

103.    A general principle underlying the Companies Act and the Cayman Proceeding is that creditors are treated on a *pari passu* basis, subject to certain exceptions.[10] *See* Companies Act, section 140. (MacInnis Decl. ¶ 102, Ex. 78)

---

[10] For example, see sections 140 and 141 of the Companies Act.

104. Cayman liquidation proceedings are fair and equitable insofar as all creditors and interest holders have the opportunity to be heard by the Cayman Court and no creditors will be prejudiced on the sole basis that they are foreign based. All creditors are treated equally, regardless of where they are domiciled. (MacInnis Decl. ⁋ 103)

## JURISDICTION AND VENUE

105. The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.

106. Recognition of a foreign proceeding and other matters under chapter 15 of the Bankruptcy Code are core matters under 28 U.S.C. § 157(b)(2)(P).

107. This Chapter 15 Case has been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of the Petition in accordance with section 1515 of the Bankruptcy Code.

108. The Petitioners confirm their consent, pursuant to rule 7008 of the Bankruptcy Rules and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of final orders or judgments by the Court to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

109. Venue in this district is proper under 28 U.S.C. § 1410(1) because the Debtor has its principal assets in the United States located in Delaware, and 28 U.S.C. §1410(3) because it is

-36-

consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the Petitioners.

110. With regard to section 1410(1), the Debtor has an ownership interest in a $150,000 advance security retainer deposited with and held by Reed Smith in a trust account located in Wilmington, Delaware with M&T Bank (the "Reed Smith Retainer") in accordance with Delaware Rule of Professional Responsibility 1.5. *See, e.g., In re Farfetch Limited (in Official Liquidation),* Case No. 24-11519 (CTG) [D.I. 46] (Bankr. D. Del. 2024) (establishing venue in Delaware where Debtor held a retainer in the jurisdiction); *In re Berau Capital Res. PTE,* 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015) (finding that an attorney retainer was sufficient to establish venue); *In re Octaviar Admin Pty.,* 511 B.R. 361, 372-74 (Bankr. S.D.N.Y. 2014) (finding that an attorney retainer is sufficient to confer jurisdiction in the United States); *In re Suntech Power Holdings Co.,* 520 B.R. 399, 416 (Bankr. S.D.N.Y. 2014) (holding that establishing a deposit account in New York "had the effect of establishing a basis for venue in [the Southern District of New York] under 28 U.S.C. § 1410(1)"); *In re Global Ocean Carriers Ltd.,* 251 B.R. 31, 39 (Bankr. D. Del. 2000) (retainers held in escrow by counsel for a debtor in the United States is "property" in the United States).

111. With regard to section 1410(3): (i) the Debtor's economic stakeholders, the Supporting Organizations, are Delaware nonprofit corporations exempt from taxation under section 501(c)(3) of the Internal Revenue Code, (ii) the Debtor has past direct ownership of CDM, which is organized in Delaware, and (iii) prior to the commencement of the Cayman Proceeding, the Debtor and the Directors engaged Delaware counsel in connection with the Relevant Transactions.

112.  The statutory predicates for the relief requested in this Petition are sections 101(23)-(24), 105(a), 306, 542(e), 1502, 1504, 1507, 1509, 1510, 1512, 1515, 1516, 1517, 1520, 1521, 1522, and 1524 of the Bankruptcy Code and Bankruptcy Rule 2004.

## RELIEF REQUESTED

113.  The Petitioners have commenced this Chapter 15 Case as an ancillary proceeding to the Cayman Proceeding and respectfully file this Petition contemporaneously with the accompanying documentation required by sections 1504 and 1515 of the Bankruptcy Code.

114.  The Petitioners respectfully request that this Court enter an order, substantially in the form of the Proposed Order attached hereto as Exhibit A, pursuant to sections 105(a), 542(e), 1504, 1507, 1509, 1510, 1515, 1517, 1520 and 1521 of the Bankruptcy Code that:

(a)  recognizes the Cayman Proceeding as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code, or, in the alternative, as a foreign nonmain proceeding pursuant to section 1517(b)(2) of the Bankruptcy Code;

(b)  recognizes the Petitioners as the "foreign representatives" as defined in section 101(24) of the Bankruptcy Code;

(c)  recognizes and gives full force and effect in the United States to the Supervision Order and the Injunctive Relief Order, including any and all extensions or amendments thereof authorized by the Cayman Court and extending the protection of such orders;

(d)  grants the Debtor all of the relief afforded pursuant to section 1520 of the Bankruptcy Code, including, without limitation, the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and its property that is now within or in the future is located within the territorial jurisdiction of the United States;

(e)  authorizes the Debtor to conduct the examination of witnesses, the taking of evidence or the delivery of information concerning the Debtors' assets, affairs, rights, obligations or liabilities in accordance with section 1519(a)(3) and 1521(a)(4) of the Bankruptcy Code, Rule 2004 of the Bankruptcy Rules, and the Federal Rules of Civil Procedures, as incorporated by the Bankruptcy Rules;

(f)  authorizes the Debtor to compel all persons that hold recorded information, including books, documents, records, and papers relating to the Debtor's

property or financial affairs to turnover or disclose such recorded information in accordance with section 542(e), 1521(a)(4) and 1521(a)(7) of the Bankruptcy Code; and

(g) provides such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF REQUESTED

115. Chapter 15 of the Bankruptcy Code is designed to promote cooperation and comity between United States courts and foreign courts, to afford greater legal certainty for trade and investment, to protect and maximize the value of debtors' assets, and to facilitate the fair and efficient administration of cross-border insolvencies in a manner that protects the interests of all creditors and other interested parties, including the debtor. 11 U.S.C. § 1501.

116. Consistent with these principles, the Petitioners commence this action under chapter 15 of the Bankruptcy Code to obtain recognition of the Cayman Proceeding and certain related relief. This Chapter 15 Case seeks to complement the Cayman Proceeding to: (i) investigate, the assets, affairs, and liabilities of the Debtor that are within the territorial jurisdiction of the United States; (ii) ensure the effective and economical administration of the Debtor's liquidation; and (iii) protect against asset dissipation pending the outcome of the Petitioners' continuing investigations and the Cayman Litigation.

### A. HoldCo Is an Eligible "Debtor" Under Chapter 15 of the Bankruptcy Code

117. HoldCo qualifies as a "debtor" as such term is defined in section 1502(1), which provides that a debtor is "an entity that is the subject of a foreign proceeding." *See* 11 U.S.C. 1502(1). Here, HoldCo is an "entity," which includes a corporation. *See* 11 U.S.C. §§ 101(15) (definition of "entity," which includes a "person") and 101(41) (definition of "person," which includes a "partnership" and a "corporation"). HoldCo is: (1) a corporate entity organized under the laws of the Cayman Islands; and (2) is the subject of the Cayman Proceeding.

118. Accordingly, as courts, including courts in the Third Circuit have held, no further showing is required for HoldCo to qualify as a "debtor" eligible for relief under chapter 15 of the Bankruptcy Code. *See, e.g.*, Transcript of Hearing at 9, 3–18, *In re Bemarmara Consulting A.S.*, Case No. 13-13037(KG) (Bankr. D. Del. Dec. 17, 2013) [D.I. 38] (finding section 109(a) of the Bankruptcy Code to be inapplicable to Chapter 15 because section 109(a) "provides for [debtors]" under the Bankruptcy Code, and it is the foreign representative, and not the debtor in the foreign proceeding, who petitions the court in chapter 15 cases); *see also In re Talal Qais Abdulmunem Al Zawawi*, 634 B.R. 11 (Bankr. M.D. Fla. 2021); 637 B.R. 663 (M.D. Fla. 2022); appeal No. 22-11024, Doc 53-1 (11th Cir. April 3, 2024). Further, "[s]ection 1502 defines [d]ebtor as an entity that is the subject of a foreign proceeding. And there was nothing in that definition in Section 1502 which reflects upon a requirement that [d]ebtor have assets." *Bemarmara Consulting,* at pp. 9. Therefore, section 109(a) of the Bankruptcy Code does not apply and HoldCo qualifies as a debtor under chapter 15.

119. However, even if, as some courts in other circuits have held, section 109(a) applies to determine whether a foreign debtor is eligible to be a debtor in a chapter 15 case, HoldCo is an eligible debtor. *See, e.g., Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 241 (2d Cir. 2013) (holding that section 109(a) applies to chapter 15 debtors). Section 109(a) provides that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title." *See* 11 U.S.C. § 109(a). Accordingly, a foreign debtor can satisfy the section 109 requirement by possessing even a nominal amount of property in the United States. *See In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 200 (Bankr. D. Del. 2015) (stating that courts have determined that the property requirement of section 109(a) is satisfied by foreign debtors with "even a minimal amount of property located in the

-40-

United States") (citing *In re Aerovias Nacionales de Colombia S.A. (In re Avianca)*, 303 B.R. 1, 8 (Bankr. S.D.N.Y. 2003)); *In re Berau Capital Res. Pte. Ltd.*, 540 B.R. at 82 (holding that section 109(a) neither requires a specific quantum of property in the United States, nor states when or for how long that property must be located within the United States); *In re Zais Inv. Grade Ltd. VII*, 455 B.R. 839, 842 (Bankr. D.N.J. 2011) (finding that securities and cash pledged as collateral and held by a trustee are nominally the property of a Cayman Island corporation, and that the corporation is therefore an eligible debtor under section 109).

120.    HoldCo is eligible to be a debtor under section 109(a) of the Bankruptcy Code because it has property located in the United States consisting of the Reed Smith Retainer. For these reasons, HoldCo satisfies the requirements to be deemed a debtor under chapter 15 of the Bankruptcy Code whether or not section 109(a) of the Bankruptcy Code applies.

**B.      The Cayman Proceeding is a Foreign Main Proceeding**

121.    The Cayman Proceeding is entitled to recognition as a foreign main proceeding under chapter 15 of the Bankruptcy Code. Section 1517(a) of the Bankruptcy Code provides that, after notice and hearing, a court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if: (a) such foreign proceeding is a foreign main proceeding within the meaning of section 1502(4) and 1517(b)(1) of the Bankruptcy Code, (b) the foreign representative applying for recognition is a person or body, and (c) the petition meets the requirements of section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517; *see also* Hon. Burton R. Lifland, Una O'Boyle, Esq. and Erin Healy Mautner, Esq., *Chapter 15 of the United States Bankruptcy Code: An Annotated Section-By-Section Analysis* ("The decision to grant recognition is not dependent upon any findings about the nature of the foreign proceedings . . . [t]he requirements of this section . . . are all that must be fulfilled to attain recognition"); *see also In re Foreign Econ. Indus. Bank*, 607 B.R. 160, 168 (Bankr. S.D.N.Y. 2019) (internal citations omitted) ("The language of this section makes

-41-

clear that the decision whether to grant recognition is not dependent upon any findings about the nature of the foreign proceeding . . . [i]nstead, if the three requirements of this section are met, the court is obligated to grant recognition."). Section 1517(b) of the Bankruptcy Code provides that a foreign proceeding "shall be recognized . . . (1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1517(b)(1). Here, as explained below, all requirements for recognition of the Cayman Proceeding, the Petitioners, and this Petition are satisfied.

    i.      <u>**The Cayman Proceeding Constitutes a "Foreign Proceeding"**</u>

122.      The Cayman Proceeding qualifies as a "foreign proceeding" under chapter 15 of the Bankruptcy Code. Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

123.      Based on this definition, courts have held that a "foreign proceeding" is:

(a)    a proceeding;

(b)    that is either judicial or administrative;

(c)    that is collective in nature;

(d)    that is in a foreign country;

(e)    that is authorized or conducted under a law related to insolvency or the adjustment of debts;

(f)    in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and

(g)    which proceeding is for the purpose of reorganization or liquidation.

*See In re Ir. Bank Resolution Corp. (In Special Liquidation)*, 2014 Bankr. LEXIS 1990, at *40 (D. Del. April 30, 2014) (citing *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also*

-42-

*In re Overnight and Control Comm'n of Avćmzit, S.A.*, 385 B.R. 525, 532-33 (Bankr. S.D.N.Y. 2008) (discussing factors). As set forth in the Declarations, the Cayman Proceeding satisfies such requirements and, therefore, qualifies as a "foreign proceeding" for purposes of section 101(23) of the Bankruptcy Code.

124.    *First*, the Cayman Proceeding was brought pursuant to section 131 of the Companies Act. *See* Companies Act § 131. For purposes of chapter 15 recognition, "the hallmark of a 'proceeding' is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets." *Betcorp*, 400 B.R. at 278. Because the Cayman Proceeding operates under such a statutory framework, it satisfies the first factor of section 101(23) of the Bankruptcy Code.

125.    *Second*, the Cayman Proceeding is judicial in character. A liquidation proceeding is deemed judicial in character when it involves a court "exercis[ing] its supervisory powers." *In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010). Here, the Cayman Proceeding is subject to the control and supervision of the Cayman Court. Specifically, in the Cayman Proceeding, the Debtor's assets and affairs are subject to the control and supervision of the Cayman Court for the purpose of the liquidation, pursuant to the Supervision Order, which, *inter alia*, (i) appoints the JOLs as joint official liquidators, (ii) authorizes the Petitioners to commence legal proceedings in the name and on the behalf of the Debtor to obtain information or pursue a stay in the Cayman Islands or in the United States, and (iii) permits the Petitioners to present a petition for the winding up of the Fund. *See* Supervision Order ¶¶ 2-6; MacInnis Decl. ¶¶ 63-64.

126.    *Third*, the Cayman Proceeding is collective in nature in that it considers the rights of all of the Debtor's creditors and interest holders. *See* Moran Decl. at ¶ 57. A collective

-43-

proceeding is one in which all creditors' interests are adequately and fairly addressed. *See Betcorp Ltd.*, 400 B.R. at 281 (stating that a proceeding is collective where such proceeding "considers the rights and obligations of all creditors" in contrast to a non-collective proceeding, such as a "receivership remedy instigated at the request, and for the benefit, of a single secured creditor"). United States bankruptcy courts have recognized that Cayman liquidation proceedings qualify as collective judicial proceedings for the purposes of chapter 15 recognition. *See In re Silicon Valley Bank (Cayman Islands Branch)*, 658 B.R. 75, 92 (Bankr. S.D.N.Y. 2024) (citing *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 701-02 02 (Bankr. S.D.N.Y. 2017)) ("concluding, among other things, that the Cayman liquidation proceedings commenced under Part V of the Companies Law are unquestionably collective judicial proceedings"); *see also In re Millard*, 501 B.R. 644, 650 (Bankr. S.D.N.Y. 2013) (recognizing a Cayman Liquidation as a collective judicial proceeding irrespective of whether the debtor was solvent or insolvent). The Supervision Order was entered pursuant to Companies Act section 131, which sits within Part V. Therefore, the Court should find that the Cayman Proceeding is a collective one.

127.    *Fourth*, the Cayman Proceeding and the Cayman Court are located in the foreign territory of the Cayman Islands. United States courts have found that a proceeding in the Cayman Islands satisfies the foreign country requirement for the purposes of establishing a foreign proceeding. *See, e.g., Principal Growth Strategies, LLC v. AGH Parent LLC*, 615 B.R. 529 (D. Del. 2020); *In re Receivers Hugh Dickson & John Royle for an Ex Parte Order Pursuant to 28 U.S.C. § 1782 for Discovery in Aid of Foreign Proceedings*, Civil Action No. 20-940 (ES) (MAH), 2020 U.S. Dist. LEXIS 71828 (D.N.J. Mar. 10, 2020).

128.    *Fifth*, as described above, the Companies Act, which governs the Cayman Proceeding, relates to insolvency and the adjustment of debt. *See* Moran Decl, at ¶ 56. Specifically,

the Cayman Proceeding is governed by Part V of the Companies Act (which is the Cayman Islands statute applicable to corporate insolvencies and liquidations), in which the Debtor's assets and affairs are subject to the supervision of the Cayman Court, for the purpose of liquidation, pursuant to the Supervision Order made by the Cayman Court. *See* Supervision Order, ¶¶ 2-6.

129.    *Sixth*, the Cayman Proceeding subjects the Debtor's assets and affairs to the supervision of the Cayman Court during the pendency of the proceedings. *See* Supervision Order, generally; Moran Decl., at ¶¶ 58-59.

130.    *Finally*, the objective of the Cayman Proceeding is the liquidation of the Debtor. The Petitioners submit that the Supporting Organizations commenced the Cayman Proceeding for the purpose of liquidation, as required by section 101(23) of the Bankruptcy Code. *See* Moran Decl., at ¶¶ 58-59.

131.    As described above, the Cayman Proceeding satisfies all elements required for recognition as a foreign proceeding under section 101(23) of the Bankruptcy Code and applicable case law. United States courts have recognized collective proceedings similar to the Cayman Proceeding as "foreign proceedings" on numerous occasions. *See, e.g., In re Farfetch Limited (in Official Liquidation),* Case No. 24-11519 (CTG) [D.I. 46] (Bankr. D. Del. 2024) (recognizing a Cayman liquidation proceeding as a "foreign proceeding"); *In re IIG Glob. Trade Fin. Fund Ltd.,* No. 20-10132 (MEW), 2023 Bankr. LEXIS 1145 (Bankr. S.D.N.Y. April 27, 2023) (same); *In re Modern Land (China) Co.,* 641 B.R. 768 (Bankr. S.D.N.Y. 2022) (same); *In re Suntech Power Holdings Co.,* 520 B.R. at 399 (same).

**ii.    The Cayman Proceeding is a "Foreign Main Proceeding"**

132.    Chapter 15 of the Bankruptcy Code applies where a foreign representative seeks assistance in a United States Court. 11 U.S.C. § 1501(b)(1). The stated objectives of chapter 15

include: (i) cooperation between domestic courts and foreign courts in cross-border insolvency cases, (ii) "legal certainty for trade and investment," (iii) protection of all interested parties in a cross-border insolvency, and (iv) "maximization of the value of the debtor's assets." 11 U.S.C. § 1501(a); *see In re Oversight & Control Comm'n. of Avánzit*, S.A., 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008) (citing *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund*, 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007)). The Petitioners respectfully submit that each of these goals would be best achieved by recognizing that the Cayman Islands are the Debtor's COMI (defined and described below and that the Cayman Proceeding is therefore a "foreign main proceeding").

133. In addition to qualifying as a "foreign proceeding" under section 101(23) of the Bankruptcy Code, the Cayman Proceeding also qualifies as a "foreign main proceeding," which is defined in the Bankruptcy Code as "a foreign proceeding pending in the country where the debtor has the center of its main interests." *See* 11 U.S.C. § 1502(4); *see also* 11 U.S.C. § 1517(b)(1) (providing that an order of recognition as a foreign main proceeding shall be entered if the foreign proceeding that is subject to the petition "is pending in the country where the debtor has the center of its main interests"). The relevant time period for determining the location of a debtor's COMI is at or around the date on which the chapter 15 petition is filed. *See Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013); *Flynn v. Wallace (In re Irish Bank Resolution Corp. (In Special Liquidation))*, 538 B.R. 692, 697 (D. Del. 2015); *Ocean Rig UDW Inc.*, 570 B.R. at 705-06; *In re Ascot Fund Ltd.*, 603 B.R. 271, 279 (Bankr. S.D.N.Y. 2019); *In re Suntech Power Holdings Co.*, 520 B.R. at 416.

134. While the term COMI is not expressly defined in the Bankruptcy Code, bankruptcy courts have enumerated factors relevant to the determination of a debtor's COMI.

-46-

135. Delaware courts consider specific factors when assessing a Debtor's COMI. As an initial matter, section 1516 of the Bankruptcy Code provides that "[i]n the absence of evidence to the contrary, the debtor's registered office … is presumed to be the center of the debtor's main interests." Here, the Debtor's registered office is located in the Cayman Islands. Accordingly, the Debtor is entitled to the statutory presumption that its COMI is located in the Cayman Islands.

136. A court will also consider the following factors relevant to determining COMI:

(a)  the location of the debtor's headquarters;

(b)  the location of those who actually manage the debtor;

(c)  the location of the debtor's primary assets;

(d)  the location of the majority of the debtor's creditors or a majority of the creditors who would be affected by the case; and/or

(e)  the jurisdiction whose law would apply to most disputes.

See In re Ir. Bank Resolution Corp. (In Special Liquidation), 2014 Bankr. LEXIS 1990, at *138. Considering these factors, and for the reasons provided below, the Debtor's COMI is located in the Cayman Islands.

137. The Debtor was incorporated in 2011 in the Cayman Islands under the laws of the Companies Act. The Debtor has its registered office, and is headquartered, at HSM Corporate Service Ltd., 68 Fort Street, George Town, PO Box 31726, Grand Cayman KY1-1207, Cayman Islands.

138. Since the entry of the Supervision Order in the Cayman Proceeding on May 6, 2025, the Petitioners have assumed sole authority, subject to the supervision of the Cayman Court, to manage the Debtor's assets and administer its estate. See MacInnis Decl. ¶¶ 62-64. In connection therewith, the Petitioners have fulfilled their statutory obligations to publish and disseminate notices of HoldCo's winding up and their appointment, obtained sanction from the Cayman Court

-47-

to engage Cayman Islands and U.S. counsel, published a Report to Contributories on July 2, 2025, and, on July 3, 2025, convened the first meeting of contributories held on July 9, 2025, issued formal correspondence to over 50 parties, including, directors, shareholders, banks, service providers, the prior appointed joint voluntary liquidators, requesting books and records, held discussions with various parties regarding HoldCo's history and financial affairs, and commenced the Cayman Litigation and the Applications. In connection therewith, the Petitioners have made decisions regarding the Cayman Proceeding, retained U.S. counsel to advise the Petitioners on U.S. law matters, and maintained control over the Debtor. *Id.* at ¶¶ 62-68.

139.    The Petitioners have conducted these activities from their office in the Cayman Islands. Moreover, the actions of the Petitioners in connection with the Debtor's estate are subject to supervision by a Cayman Islands judge in the Cayman Court. *See id.*; *see also Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d at 137 ("[A]ny relevant activities, including liquidation activities and administrative functions, may be considered in the COMI analysis."); *In re Suntech Power Holdings Co.*, 520 B.R. at 416 (A "court may consider the location of the debtor's 'nerve center,' including from where the debtor's activities are directed and controlled, in determining a debtor's COMI."). Accordingly, the facts support a finding that those who actually manage the Debtor are located in the Cayman Islands.

140.    The Debtor's registered office, current management, accounting, planning, budgeting, and human resources materials are located in the Cayman Islands. As discussed below, discovery is necessary to determine additional information regarding the Debtor's assets other than the Reed Smith Retainer.

141. Based on the facts and circumstances set forth herein, there are no facts sufficient to rebut the presumption that the Debtor's COMI is in the Cayman Islands. Therefore, the Cayman Proceeding should be recognized as a foreign main proceeding.

142. Certain other factors also support a finding that the Debtor's COMI is located in the Cayman Islands. For instance, the outward appearance of the Debtor's COMI is an important consideration. All of the Debtor's recent activities have been conducted and ascertainable as being in the Cayman Islands. Accordingly, the Cayman Islands can be reasonably ascertainable by the Debtor's creditors and other stakeholders as the Debtor's COMI.

143. Additionally, having commenced the Cayman Litigation, the Debtor certainly holds causes of action in the Cayman Islands. While the Debtor may also hold claims in other jurisdictions, the location of causes of action in the Cayman Islands makes this factor at least neutral.

144. Based on these facts, the totality of the circumstances—particularly, the fact that the Debtor's nerve center has been the Cayman Islands since the appointment of the Petitioners as joint official liquidators—strongly weighs in favor of the conclusion that the Debtor's COMI is located in the Cayman Islands. Because the Cayman Proceeding is pending in the location of the Debtor's COMI, the Cayman Proceeding should be recognized as a foreign main proceeding.

C. **In the Alternative, the Cayman Proceeding Should be Recognized as a Foreign Nonmain Proceeding**

145. In the event that this Court determines that the Cayman Proceeding will not be deemed a "foreign main proceeding," it should instead recognize the Cayman Proceeding as a "foreign nonmain proceeding" as defined in section 1502(5) of the Bankruptcy Code. 11 U.S.C. § 1502(5). Under section 1517(b) of the Bankruptcy Code, a foreign proceeding shall be recognized as a foreign nonmain proceeding if it is pending in a country where the debtor has an

"establishment." *See* 11 U.S.C. § 1517(b)(2). Section 1502 of the Bankruptcy Code defines an "establishment" as "any place of operations where the debtor carries out a non-transitory economic activity." *See* 11 U.S.C. § 1502(2). The "establishment" requirement is satisfied by conducting business locally. *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. at 130-31, *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008).

146. The Debtor conducts pertinent economic activity in the Cayman Islands. As noted above, its headquarters is located in the Cayman Islands. Accordingly, the Petitioners submit that at a minimum, the Debtor maintains an establishment in the Cayman Islands where non-transitory economic activity takes place. Moreover, prior to the commencement of the Cayman Proceeding, and while the Debtor was approving the Relevant Transactions, one of the Directors, Mr. Murphy, was resident in the Cayman Islands. As explained above, the Petitioners have been continuing the operation of the Debtor during the winding up of its affairs pursuant to the Cayman Proceeding.

147. For these reasons, to the extent that this Court finds that the Cayman Proceeding is not a "foreign main proceeding," there are sufficient grounds for this Court to find that the Debtor has an "establishment" in the Cayman Islands and to recognize the Cayman Proceeding as a "foreign nonmain proceeding" per the definition provided in section 1502(5) of the Bankruptcy Code. See *In re SphinX, Ltd.*, 351 B.R. 103, 122 (Bankr. S.D.N.Y. 2006) *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007) (finding that "no negative consequences would appear to result from recognizing the [foreign] proceedings as nonmain proceedings, that is the better choice.").

**D. The Petitioners Satisfy the Requirements of a "Foreign Representative" Under Section 101(24) of the Bankruptcy Code**

148. For recognition under chapter 15, a foreign proceeding must also have a foreign representative. *See* 11 U.S.C. § 1517(a)(2) (providing that a foreign representative shall apply for recognition of the foreign proceeding). The Petitioners submit that this Chapter 15 Case was

commenced by a duly authorized "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code, which provides as follows:

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding. 11 U.S.C. § 101(24).

149. Pursuant to the Supervision Order, the Cayman Court authorized the appointment of Margot MacInnis and Sandipan Bhowmik as the JOLs, authorized and empowered them to act jointly and severally as the foreign representatives in connection with the Cayman Proceeding. *See* Supervision Order, ¶¶ 2-3. The Cayman Court, by way of the Supervision Order, further granted the JOLs the power to, among other things: (i) commence legal proceedings in the name and on behalf of the Debtor to obtain the information, documents, or examine individuals in the United States; (ii) apply for the preservation, freezing or attachment of assets to which the Debtor is or may be entitled; and (iii) seek registration or recognition of themselves and/or the Cayman Proceeding in any state in the United States for either of the reasons referenced in (i) or (ii). *See Id.* at ¶¶ 5-6. As a result of the authority granted by the Cayman Court and under United States law, the Petitioners are entitled to file this Chapter 15 Case in the United States for the purpose of having themselves, the Cayman Proceeding, the Supervision Order, and other orders of the Cayman Court recognized and enforced in the United States. *See Id.* ¶¶ 2-6.

**E.** **The Petition Was Properly Filed and Satisfies the Requirements under Section 1515 of the Bankruptcy Code**

150. The Petitioners duly and properly commenced this Chapter 15 Case by filing the Petition, accompanied by all fees, documents, and information required by the Bankruptcy Code, Bankruptcy Rules and Local Rules, including: (a) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1; (b) a list containing (i) the names and addresses

-51-

of all persons or bodies authorized to administer foreign proceedings of the Debtor, (ii) all parties to litigation pending in the United States in which the Debtor is a party at the time of the commencement of the Chapter 15 Case, and (iii) all entities against whom at relief is being sought under section 1519 of the Bankruptcy Code; (c) a statement identifying all of the Debtor's foreign proceedings that are known to the Petitioners; and (d) a certified copy of the Supervision Order.

151. Accordingly, because the Petition satisfies section 1517 of the Bankruptcy Code, the Court should recognize the Cayman Proceeding in this Chapter 15 Case. Granting such recognition will promote the United States public policy of respecting foreign proceedings as articulated in sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code. For these reasons, the conditions for recognition of the Cayman Proceeding are satisfied under section 1517 of the Bankruptcy Code.

**F.     The Petitioners are Entitled to Automatic Relief Under Section 1520 of the Bankruptcy Code**

152. Section 1520(a) of the Bankruptcy Code sets forth a series of statutory protections that automatically result from the recognition of a foreign proceeding as a foreign main proceeding, *see* 11 U.S.C. § 1520(a), including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to HoldCo and to its property that is located within the territorial jurisdiction of the United States. Given that the protections set forth in section 1520(a) flow automatically from the recognition of a foreign main proceeding under section 1517, the Petitioners respectfully submit that no further showing is required to the extent the Court recognizes the Cayman Proceeding as a foreign main proceeding.

**G.    The Petitioners are Entitled to Additional Relief Under Section 1521 of the Bankruptcy Code**

153.    Upon recognition of a foreign proceeding, section 1521 of the Bankruptcy Code provides specific grounds for additional relief. Specifically, section 1521 authorizes the Court to grant "any appropriate relief," including "any relief that may be available to a trustee" subject to certain limitations and provided that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. §§ 1521, 1522. Here, the Petitioners respectfully request that this Court grant relief under sections 1521(a)(1), (2), (3), (4), (5), (6) and (7) of the Bankruptcy Code.

**i.    The Foreign Representative is Entitled to Appropriate Relief Under Sections 1521 (a)(1), (2), (3), (4), (5), (6) and (7)**

154.    As stated below, the Petitioners seek further relief upon recognition in the form of availing themselves of discovery rights under the Bankruptcy Code to assist them in their investigation of the assets and affairs of the Debtor, to identify the location of property over which the Debtor has or may assert a proprietary interest, and in their efforts to recover books and records of the Debtor in the possession of third parties to investigate the location of the Fund and other assets of the Debtor. This will help avoid the potential loss of critical evidence relating to the Debtor's assets and liabilities, as well as causes of action against third parties.

155.    First, pursuant to sections 1521(a)(1), (2), and (3), the Petitioners request: (1) that this Court stay the commencement, continuation, or execution of any individual action or proceeding concerning the Debtor's assets, rights, obligations, or liabilities to the extent they have not already been stayed by section 1520(a); and (2) the Court suspend the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a). These provisions are necessary to ensure the Debtor's assets or interests in the United States are not dissipated during the course of the Cayman Proceeding.

-53-

156.    Second, to enable them to identify, protect, and preserve the Debtor's estate for the benefit of all its creditors, the Petitioners request that this Court entrust them with the administration or realization of all or part of the Debtor's assets within the territorial jurisdiction of the United States pursuant to section 1521(a)(5). *See IIG Global Trade Finance Fund Ltd.*, No. *20-10132 (MEW) (Bankr. S.D.N.Y Jan. 17, 2020)* ECF No. 9 (ordering that the administration or realization of all or parts of the assets of [the debtor] within the territorial jurisdiction of the U.S. is entrusted to its liquidators); *In re Frontera Resources Caucasus Corp. and David Griffin*, No. 19-13418 (MEW) (Bankr. S.D.N.Y Oct. 25, 2019) ECF No. 19 (ordering that the liquidators are entrusted with the administration and realization of [the debtor's] assets within the territorial jurisdiction of the United States); *In re Air Berlin PLC & Co. Luftverkehrs KG*, No. 17-12282 (MEW) (Bankr. S.D.N.Y Aug. 18, 2017) ECF. No. 24 (granting 1521(a)(5) relief). This authority would be consistent with the Petitioners' authority to administer the Debtor's assets under Cayman law.

157.    Finally, as discussed below, the Petitioners request that this Court provide discovery relief pursuant to sections 542(e), 1519(a)(3), 1521(a)(4), 1521(a)(7) of the Bankruptcy Code and Bankruptcy Rule 2004.

### ii.    Injunctive Relief is Appropriate

158.    The standards, procedures, and limitations applicable to an injunction also apply to relief sought under sections 1521(a)(1), (2), (3), and (6) of the Bankruptcy Code. *See* 11 U.S.C. § 1521(e). Generally, to obtain an injunction, a movant must demonstrate the likelihood of irreparable harm. *See Clarkson v. Coughlin*, 898 F. Supp. 1019, 1035 (S.D.N.Y. 1995). Irreparable harm in the chapter 15 context exists if there is a risk of disruption to the orderly and fair distribution of assets through dissenting creditor actions to the detriment of other creditors. *See, e.g., In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("[I]rreparable harm is present

-54-

when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and fair distribution of assets in a single, centralized forum.") (*quoting* Collier on Bankruptcy ¶ 304.05 (15th ed. Rev. 2003)); *In re MMG LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of other creditors").

159.    The risk of irreparable harm exists here, particularly in light of the consummation of the Relevant Transactions, which dispossessed the Debtor of its direct and indirect interests in the DAF Structure, and the risk that the Debtor's proprietary interests asserted in the Cayman Litigation could be further dissipated pending the outcome of the Cayman Litigation and the JOLs continuing investigation of the Relevant Transactions and the Remuneration Transactions. It is imperative that the Debtor's assets are protected while the JOLs' investigations are ongoing— recognition of the Injunctive Relief Order (discussed below) is therefore critical.

160.    Absent injunctive relief, the Debtor's efforts to orderly liquidate through the Cayman Proceeding and to maximize value for all stakeholders could be thwarted by the actions of the Named Defendants or other parties in interest, a result that is inconsistent with the Bankruptcy Code. The interests of affected parties under the Cayman Proceeding are sufficiently protected under section 1522(a) of the Bankruptcy Code because all similarly situated parties will be treated equally and fairly during the pendency of the Cayman Proceeding. Moreover, all parties will have the opportunity to be heard in the Cayman Proceeding and the Cayman Litigation. The injunction also will not cause undue hardship or prejudice to the rights of any U.S.-based creditors or other parties in interest and is consistent with principles of comity. Accordingly, the injunction should be granted.

161.    The ultimate goal of the Petitioners is to protect the Debtor and to preserve and maximize realization on the assets of the Debtor for the benefit of its creditors and other stakeholders. The additional relief requested by the Petitioners under sections 1521, 362, and 105 of the Bankruptcy Code will assist the Petitioners in carrying out their duties as joint official liquidators to achieve this goal and will promote the effective administration of the Cayman Proceeding.

### iii.    Discovery Relief is Both Necessary and Appropriate to Uncover Assets and Determine Causes of Action

162.    It is crucial that the Petitioners be permitted to take discovery pursuant to sections 1519(a)(3), 542(e), 1521(a)(4), and 1521(a)(7) of the Bankruptcy Code. The Petitioners seek discovery to: (i) locate the Fund and uncover related frauds and potential assets of the Debtor; and (ii) determine causes of action against and defenses to third parties. These rules indicate Congress's recognition of the need for foreign debtors to conduct discovery with respect to their assets, liabilities and affairs, including the investigation of potential causes of actions. *See, e.g., In re Comair Ltd.*, No. 21-10298(JLG), 2021 Bankr. LEXIS 3137, at *28 (Bankr. S.D.N.Y. Nov. 14, 2021), appeal dismissed, No. 21 CIV. 10146 (AT), 2023 U.S. Dist. LEXIS 6146 (S.D.N.Y. Jan. 12, 2023); *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 346 (Bankr. S.D.N.Y. 2012); *In re Glitnir banki hf.*, No. 08-14757 SMB, 2011 Bankr. LEXIS 3296 at *19 (Bankr. S.D.N.Y. Aug. 19, 2011); *In re Hughes*, 281 B.R. 224, 229 (Bankr. S.D.N.Y. 2002).

163.    Specifically, the discovery of third party causes of action could uncover "contingent property interests" of the Debtor. *See In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 346 (Bankr. S.D.N.Y. 2012) (citing *In re Kane*, 628 F.3d 631, 641 n.7 (3d Cir. 2000) (noting that property of the estate "encompasses contingent property interests such as causes of action")). The Petitioners are seeking discovery to promote a significant chapter 15 objective by

permitting the Petitioners to fulfill their roles. *See In re Markus*, 607 B.R. 379, 390 (Bankr. S.D.N.Y. 2019), *aff'd in part*, vacated in part on other grounds, remanded sub nom. *Markus v. Rozhkov*, 615 B.R. 679 (S.D.N.Y. 2020) (quoting *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. 803, 821 (Bankr. S.D.N.Y. 2018)).

164.    Additionally, section 542(e) provides "[s]ubject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee." 11 U.S.C. § 542(e). Foreign representatives in chapter 15 cases seeking court-ordered discovery at times seek relief pursuant to section 542(e), which is either directly applicable to chapter 15 cases or, in the alternative, delineate relief which can be granted by the court pursuant to section 1521(a)(4). *See In re Platinum Partners Value Arbitrage Fund, LP*, 583 B.R. 803 (Bankr. S.D.N.Y. 2018); *see also In re AJW Offshore Ltd.*, 488 B.R. 551, 564 (Bankr. E.D.N.Y. 2013) (finding that a foreign representative may seek disclosure pursuant to section 542(e)); *In re ABC Learning Ctr.'s, Ltd.*, 445 B.R. 318, 341 (Bankr. D. Del. 2010) (allowing the right to seek turnover under section 542).

165.    Following sections 542(e) and 1521(a)(4), Bankruptcy Rule 2004 provides an additional ground for a court to authorize discovery in a chapter 15 case, with the stated purpose of determining the nature and extent of the bankruptcy estate. *See In re Glitnir banki hf.*, No. 08-14757 (SMB), 2011 Bankr. LEXIS 3296, at *20 (Bankr. S.D.N.Y. Aug. 19, 2011). "The purpose of a Rule 2004 examination is to assist a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) (citation omitted).

In particular, discovery under Rule 2004 can be used to "facilitate[s] . . . the unearthing of frauds." *In re Orion Healthcorp, Inc.*, 596 B.R. 228, 235 (Bankr. E.D.N.Y. 2019) (citation omitted). Thus, Rule 2004 can be used as a "pre-litigation discovery device." *In re Wilson*, 413 B.R. 330, 336 (Bankr. E.D. La. 2009). Likewise, a Rule 2004 motion "need not be tied to specific factual allegations between parties." *See In re Symington*, 209 B.R. 678, 684 (Bankr. D. Md. 1997). Rather, Rule 2004 examinations may be "broad, unfettered and in the nature of a 'fishing expedition.'" *See In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 400 (Bankr. W.D. Pa. 2008); *see also In re Hughes*, 281 B.R. at 226 (same).

166.    Finally, courts have found that a foreign representative may be authorized to take discovery in accordance with section 542(e) and Bankruptcy Rule 2004 pursuant to sections 1507 and 1521(a)(7). *See CohnReznick LLP v. Foreign Representatives of Platinum Partners Value Arbitrage Fund L.P. (In re Platinum Partners Value Arbitrage Fund L.P.)*, 2018 U.S. LEXIS 109684, at *11 (S.D.N.Y. 2018); *Platinum Partners Value Arbitrage Fund*, 583 B.R. at 810. If recognition is granted, section 1507 of the Bankruptcy Code grants the bankruptcy court authority to "provide additional assistance to a foreign representative under this title or under other laws of the United States" provided that such assistance is "consistent with the principles of comity" and satisfies the fairness considerations set forth in section 1507(b). Thus, chapter 15 provides courts with broad, flexible, and pragmatic rules to fashion relief that is "largely discretionary and turns on subjective factors that embody principals of comity." *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. at 810 (Bankr. S.D.N.Y. 2018) (citation omitted). And, section 1521(a)(7) broadly affords a foreign representative "any additional relief that may be available to a trustee . . ." 11 U.S.C. § 1521(a)(7).

167. Here, the Petitioners must be afforded broad discovery rights in the United States to facilitate their investigations. First, this requires access to all documents relating to the Debtor's property or financial affairs, necessitating the need for section 542(e) relief. Second, the Petitioners must be able to broadly issue Rule 2004 examinations, as well as to be afforded all discovery rights under the Federal Rules of Civil Procedures, as incorporated by the Bankruptcy Rules. Only by affording the Petitioners the necessary tools to complete their investigations will the JOLs be able to maximize distributions such that creditors and interested parties are sufficiently protected.

**H.      The Injunctive Relief Order, As Entered by the Cayman Court, Should Be Fully Enforced Within the Territorial Jurisdiction of the United States Under Sections 105(a), 1507 and 1521(a)(7) of the Bankruptcy Code and Under Principles of Comity**

168. Upon recognition of the Cayman Proceeding as a foreign proceeding—whether main or nonmain—the Court has the authority to provide additional assistance to the JOLs pursuant to the Bankruptcy Code or other applicable laws of the United States, so long as such relief is consistent with principles of comity. *See* 11 U.S.C. §§ 1507 and 1521(a)(7). Indeed, "[t]he plain language of Bankruptcy Code sections 1521(a) and 1507 give this Court a broad grant of discretion to aid foreign courts in accordance with principles of comity." *See In re Credito Real, S.A.B. de C.V., SOFOM, E.N.R.*, 2025 Bankr.LEXIS 751, at *39 (Bankr. D. Del. April 1, 2025). Additionally, section 105(a) provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

169. Chapter 15 specifically contemplates that the court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief. *In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009); s*ee also, In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. at 333 ("relief [post-recognition] is largely discretionary and turns on subjective factors that embody principles of comity." (citing §§ 1507, 1521, and 1525).). Chapter

-59-

15 of the Bankruptcy Code empowers "courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives of the chapter in accordance with comity." *In re Rede Energia, S.A.*, 515 B.R. 69, 91 (Bankr. S.D.N.Y. 2014) (citing *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. at 333-34; *In re SPhinX, Ltd.*, 351 B.R. 103, 112 (Bankr. S.D.N.Y. 2006) ("chapter 15 maintains—and in some respects enhances—the 'maximum flexibility' . . . that section 304 provided bankruptcy courts in handling ancillary cases in light of principles of international comity and respect for the laws and judgments of other nations.") (internal citations omitted). These principles are embedded in the relief available under Chapter 15, which "provides courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives in the chapter in accordance with comity." *In re Rede Energia, S.A.*, 515 B.R. at 91.

170.   Accordingly, "[a]fter recognition, chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity." *In re British American*, 488 B.R. 205, 239 (Bankr. S.D. Fla 2013) (quoting *In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009)). Courts are "guided by the principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief." *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685, 696 (Bankr. S.D.N.Y.2010) (citing *In re Atlas Shipping*, 404 B.R. at 738); *see also CT Inv. Mgmt v. Cozumel Caribe (In re Cozumel Caribe S.A. de C.V.)*, 482 B.R. 96, 113 (Bankr. S.D.N.Y. 2012) (noting that comity is a "central tenet" in chapter 15 proceedings); 11 U.S.C. § 1501 (stating that the purpose of chapter 15 is to provide mechanisms for cooperation and comity between courts dealing with cross-border insolvency cases); *see also In re Agrokor*, 591 B.R. 163, 186 (Bankr. S.D.N.Y. 2018) ("Once a case is recognized as a foreign main proceeding, as has already occurred here, Chapter 15

specifically contemplates that the court will exercise its discretion consistent with principles of comity."); *In re Oi S.A.*, 587 B.R. 253, 264 (Bankr. S.D.N.Y. 2018) ("Chapter 15 … provides courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives of the chapter in accordance with comity.") (internal quotations and citations omitted).

171. Indeed, section 1509(b)(3) expressly states that upon the foreign representative's recognition, the Court "must grant comity or cooperation to the foreign representative." 11 U.S.C. § 1509(b)(3). Chapter 15's legislative history evidences this principle. Congress has stated that "comity is raised in the introductory language [of Chapter 15] to make clear that it is the central concept to be addressed." *In re Oi*, 587 B.R. at 264 (quoting H.R. Rep. No. 109-31, pt. 1, at 109 (2005), as reprinted in 2005 U.S.C.C.A.N. 88, 172).

172. In *Hilton v. Guyot*, the United States Supreme Court defined comity as follows:

> Comity in the legal sense, is neither a matter of absolute obligation, on the one hand, nor mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

159 U.S. 113, at 141. "Comity is a common law rule by which courts in the United States give deference to foreign judgments." *In re Neves*, 570 B.R. 420, 426 (Bankr. S.D. Fla. 2017).

173. The proponent of comity bears the initial burden to satisfy the comity considerations set forth in *Hilton v. Guyot*, which considers the following:

> (a) whether the foreign court was competent and used proceedings consistent with civilized jurisprudence; (b) whether the judgment was rendered by fraud; and (c) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just.

*Daewoo Motor America, Inc. v. General Motors Corp.*, 459 F.3d 1249, 1258 (11th Cir. 2006) (quoting *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004)).

-61-

174. The first factor requires the proponent of comity to "describe the process by which the [foreign order] was obtained, why that process is not unfair, and why it does not offend the United States' notions of justice." *In re Neves*, 570 B.R. at 426. Once the proponent of comity satisfies this burden, the burden shifts to the party opposing comity to show that the foreign order "violates American public policy notions of what is decent and just." *Id*. at 427; see also *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981) (a foreign judgment may not be recognized on comity if its recognition would be "repugnant to fundamental notices of what is decent and just"). This burden is "high and unfrequently met" and is applicable only in "clear-cut cases." *Ackerman v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986) (citations omitted).

175. Further, all relief under Chapter 15 is subject to the public policy exception set forth in section 1506. Under section 1506, the Court may refuse "to take an action governed by [Chapter 15] if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. This public policy exception is "narrowly construed, because the word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States.'" *In re ABC Learning Ctrs.*, 728 F.3d at 309 (quoting H.R. Rep. No. 109-31(I), at 109 (2005) reprinted in U.S.C.C.A.N. 88, 172); *see also In re Ashapura Minechem Ltd.*, 480 B.R. 129, 139 n.60 (S.D.N.Y. 2012) (internal quotations omitted) (citation omitted) (explaining that courts have "uniformly" interpreted the public policy exception "narrowly and applied it sparingly")

176. In considering comity, the relief granted in the foreign proceeding need not be identical to the relief that is available in the United States to be entitled to comity. *See In re Rede Energia*, 515 B.R. at 69. Indeed, the Restatement (Second) of Conflict of Laws states that the

-62-

principle of international comity should not be limited to monetary awards as foreign orders for equitable relief have been afforded comity in the United States. Restatement § 102.

177.    In that regard, under principles of comity, courts have recognized injunctions issued by foreign courts, even if such injunctions may not be enforceable in the United States. *See In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. at 700 (noting "[p]rinciples of comity in chapter 15 cases support enforcement of the [foreign order] in the United States whether or not the same relief could be ordered in a plenary case under chapter 11.").

## I.    Recognition of the Injunctive Relief Order is Warranted under Sections 1521(a)(7) and 1507 of the Bankruptcy Code

### i.    Legal Standard for Relief Under Sections 1521(a)(7) and 1507

178.    The Court has authority under sections 1521(a)(7) and 1507 to recognize and enforce the Injunctive Relief Order.

179.    Upon recognition of a foreign proceeding, section 1521(a)(7) authorizes the Court to grant "any appropriate relief" at the request of the foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors[,]" including any relief that may be available to a trustee or debtor-in-possession, subject to certain exceptions that do not apply here. 11 U.S.C. § 1521(a)(7); *see In re Cell C Proprietary Ltd.*, 571 B.R. 542, 554 (Bankr. S.D.N.Y. 2017) (noting that the list of "appropriate relief" under section 1521(a) is "non-exhaustive"); *In re Daebo Int'l Shipping Co., Ltd.*, 543 B.R. 47, 52–53 (Bankr. S.D.N.Y. 2015).

-63-

180.    The Court has "exceedingly broad" discretion to grant relief under section 1521(a). *In re Markus*, 610 B.R. at 76; *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 609 (Bankr. S.D.N.Y. 2017) (citation omitted). However, such relief may be granted "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a). An analysis under section 1522 requires a balancing test of the respective interests. *See In re Oi*, 587 B.R. at 265 (citing various cases).

181.    Furthermore, Section 1507 of the Bankruptcy Code also permits the Court to grant the requested relief as "additional assistance." 11 U.S.C. § 1507(a). *Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de CV (In re Vitro S.A.B. de CV)*, 701 F.3d 1031,1057 (5th Cir. 2012) (explaining that section 1507's "broad grant of assistance is intended to be a catchall"); *see also* H.R. Rep. No. 109-31, pt. 1, at 109 (2005) (noting that section 1507 authorizes "additional relief" beyond that available under section 1521 of the Bankruptcy Code). Though the "interplay between the relief available under sections 1507 and 1521 is far from clear," some courts analyze relief under these sections in a two-step approach: first considering relief under section 1521 and, if such relief is not available, then the Court may consider the relief requested under section 1507. *In re Olinda Star, Ltd.*, 614 B.R. 28, 47 (Bankr. S.D.N.Y. 2020) (citing various cases).

182.    To grant "additional assistance" under section 1507, the Court shall consider whether the additional assistance is consistent with principles of comity and whether it satisfies the following fairness considerations set forth in section 1507(b):

(1) just treatment of all holders of claims against or interests in the debtor's property;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of the debtor;

(4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

(5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b); *In re Agrokor*, 591 B.R. at 188-89

183. Courts have recognized and enforced foreign orders under sections 1521 and 1507 to give effect and ensure compliance with the foreign order. Such is the case with foreign confirmation orders or orders to facilitate their implementation. *In re Olinda Star, Ltd.*, 614 B.R. at 47-48 (recognizing BVI scheme of arrangement and entering a permanent injunction against acts that would interference with the scheme); *In re Avanti Comms. Grp. PLC*, 582 B.R. 603 (Bankr. S.D.N.Y. 2018) (recognizing and enforcing UK schemes of arrangement which, among other things, granted third party releases); *In re Cell C Proprietary Ltd.*, 571 B.R. at 551 (recognizing South African arrangement sanctioned by South African court); *In re Rede Energia S.A.*, 515 B.R. at 93-94 (recognizing Brazilian reorganization and confirmation decision and enjoining actions in the United States in contravention of the decision

184. American courts have also afforded comity to *ex parte* interim injunctions. For instance, in *Gorsoan Ltd. v. Bullock*, No. 2020-020803-CA-01 (Fla. 11th Cir. Ct. Feb. 17, 2021), the court recognized an *ex parte* interim injunction order issued by a Cypriot court freezing Bullock's assets worldwide. In so doing, the court noted its rich history of affording comity to foreign interim injunctions. *Id.* at p. 3; *see also Amezcua v. Cortez*, No. 3D20- 1649, at 6 (Fla. 3d DCA Jan. 13, 2021) (recognizing Mexican embargo order prohibiting transfer of condominium unit); *Cermesoni v. Maneiro*, 144 So. 3d 627, 629 (Fla. 3d DCA 2014); *Nahar v.Nahar*, 656 So. 2d 225, 229 (Fla. 3d DCA 1995.

### ii. Recognition of the Injunctive Relief Order is Appropriate under Sections 1521 and 1507 of the Bankruptcy Code

185. Section 1521(a)(7) of the Bankruptcy Code provides the granting of any additional relief – in this case, the recognition of the Injunctive Relief Order – that may otherwise be available to a trustee in bankruptcy. Here, such an Injunctive Relief Order may be enforceable in the United States under section 105(a). *See American Film Technologies v. Taritero (In re American Film Technologies)*, 175 B.R. 847, 855 (Bankr. D. Del. 1994) (utilizing section 105 to issue a preliminary injunction). Additionally, the standard for an injunction in the Cayman Islands is similar to that in the Third Circuit. *See* Moran Decl., at ¶ 42 (discussing the standard for injunctive relief in the Cayman Islands).[11] Indeed, as set forth in the Moran Declaration, the Cayman Court has already determined that (a) the Cayman Litigation had a reasonable prospect of success and (b) that the interests of the Debtor's stakeholders were best served by the JOLs commencing the Cayman Litigation. *See* Moran Decl., at ¶ 32.

---

[11] To determine whether to issue a preliminary injunction, a court must consider: (1) whether the movant has a reasonable probability of success on the merits; (2) whether irreparable harm would result if the relief sought is not granted; (3) whether the relief would result in greater harm to the non-moving party, and (4) whether the relief is in the public interest. *See Swartzwelder v. McNeilly*, 297 F.3d 228, 234 (3d Cir. 2002).

186.    Further, the Named Defendants have been afforded due process and given notice of the Injunctive Relief Application and the Injunction Hearing Date and will have the opportunity to appear at the hearing and respond to the Injunctive Relief Application before relief is granted by the Cayman Court. *See* Moran Decl., at ¶ 35. Moreover, the nature of the relief being sought is similar to the relief that has been raised among the parties in protocol discussions in the Cayman Proceeding and is, in substance, akin to the restrictions that the Named Defendants agreed to assume in the Rule 11 Agreement in the Texas Proceeding. *See* MacInnis Decl., at ¶¶ 68, 97. Therefore, to the extent the Injuncitve Relief Order is entered in the Cayman Islands, it should be recognized by this Court in the interests of comity.

187.    In addition, recognition of the Injunctive Relief Order satisfies the relevant equitable and practical considerations outlined in section 1507(b) of the Bankruptcy Code. First, the relief promotes fair and equitable treatment of all creditors by preserving the value of HoldCo's estate for the benefit of all stakeholders, rather than potentially allowing the Named Defendants to obtain an unfair advantage through the dissipation or diversion of assets. Second, recognition ensures that U.S.-based creditors are not exposed to procedural disadvantage in the Cayman Proceeding, as the Injunctive Relief Order operates neutrally to safeguard HoldCo's property pending full adjudication of the claims, rather than favoring any specific jurisdiction or creditor group. Third, the Injunctive Relief Order directly addresses and prevents improper transfers or dissipation of HoldCo's assets, which is essential to maintaining the status quo during the JOLs' ongoing investigation and the Cayman Litigation. Finally, the relief sought supports a distribution framework that is aligned, in substance, with U.S. bankruptcy priorities by ensuring assets are preserved for collective resolution and eventual equitable distribution. These considerations, grounded in the principles of comity and cross-border cooperation, strongly support recognition

-67-

of the Injunctive Relief Order, which represents the Cayman Court's necessary and proportionate response to the JOLs' and the Named Defendants' failure to reach agreement on a protocol to mitigate the risk of asset dissipation pending completion of the JOLs' investigation and the Cayman Litigation.

188.     Accordingly, the JOLs seek, should the Cayman Court issue the Injunctive Relief Order, full enforcement of the Injunctive Relief Order within the territorial jurisdiction of the United States to ensure that the mitigation of any risk of asset dissipation—including asset dissipation of funds for the benefit of U.S. charities—pending completion of the JOLs' investigation and the Cayman Litigation is applied consistently across the two relevant jurisdictions, furthering the very goals of international cooperation and assistance to foreign courts and principles of comity.

**J.      Granting the Relief Requested herein, Including Recognition of the Cayman Proceeding and Injunctive Relief Order, Are Not Manifestly Contrary to U.S. Public Policy**

189.     The requested relief herein advances the public policy objectives of chapter 15 of the Bankruptcy Code, including cooperation, fairness, and efficiency, and the protection and maximization of asset value. As set forth in the Moran Declaration, Cayman law provides a structured process for the liquidation of a debtor's assets, involving judicial oversight and opportunity for creditor participation, which is aligned with U.S. principles of due process and fair treatment of creditors. *See* Moran Decl. ¶¶ 29, 64. To aid an orderly liquidation, it is imperative that the Petitioners be afforded the necessary relief to both protect the Debtor's assets and conduct ongoing investigations—this includes recognition of the Cayman Proceeding and Injunctive Relief Order. Absent this Court granting the relief requested herein, there is a significant risk of further asset dissipation—particularly related to the Fund. Therefore, such relief promotes the fair and efficient administration of cross-border insolvency, protects the interests of all creditors and other

-68-

parties in interest, including the Debtor, and maximizes the value of the Debtor's assets. *See* 11 U.S.C. § 1501(a).

## NOTICE

190. Notice of this Petition has been provided in accordance with the terms set forth in the *Motion of Petitioners for Entry of an Order Scheduling a Hearing on Chapter 15 Petition for Recognition and Related Relief and Specifying Form and Manner of Service of Notice*. The Petitioners submit that such notice is proper, and that no other or further notice need be provided.

## CONCLUSION

WHEREFORE, the Petitioners respectfully request the Court to enter an order, substantially in the form attached as **Exhibit A**, granting the requested relief and such other and further relief as may be just and proper.

Dated: July 21, 2025
      Wilmington, Delaware

Respectfully submitted,

**REED SMITH LLP**

By:    /s/ *Jason D. Angelo*

Jason D. Angelo (No. 6009)
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone: +1.302.778.7500
Facsimile: +1.302.778.7575
E-mail: jangelo@reedsmith.com

-and-

Casey Laffey, Esq. (*pro hac vice* forthcoming)
Aaron Javian, Esq. (*pro hac vice* forthcoming)
Ian M. Turetsky, Esq. (*pro hac vice* forthcoming)
Richard C. Solow, Esq. (*pro hac vice* forthcoming)
**REED SMITH LLP**
599 Lexington Avenue
New York, NY 100220
Telephone: +1.212.521.5400
Facsimile: +1.713.521.5450
E-mail: claffey@reedsmith.com
      ajavian@reedsmith.com
      ituretsky@reedsmith.com
      rsolow@reedsmith.com

*Counsel to Margot MacInnis and Sandipan Bhowmik as Joint Official Liquidators of Chapter 15 Debtor*

## VERIFICATION OF PETITION

I, Margot MacInnis, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America, as follows:

My colleague, Sandipan Bhowmik, and I are the duly appointed Joint Official Liquidators of Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "Debtor"), a Cayman Islands exempted company in official liquidation in the Cayman Islands, which was brought under the supervision of the Grand Court of the Cayman Islands Financial Services Division by an order dated May 6, 2025 (Cause No. FSD 116 of 2025)(JAJ). As such, I have full authority to verify the foregoing Petition on behalf of the Debtor.

I have read the foregoing Petition, and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 21, 2025
Cayman Islands

/s/ Margot MacInnis
MARGOT MACINNIS

*Joint Official Liquidator of*
*Charitable DAF HoldCo, Ltd*
*(in Official Liquidation)*

# EXHIBIT A

Case 19-34054 Case 25-11674 Doc 8572 Doc 1 Filed 05/08/26 Entered 07/21/25 Page 05/08/26 23:42:09 Desc
Exhibit 68 Page 84 of 90

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1] | Case No. 25-11376 (___) |
| Debtor in a foreign proceeding. | |

## ORDER GRANTING RECOGNITION OF FOREIGN
## MAIN PROCEEDING AND DISCRETIONARY RELIEF

Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited (the "Petitioners"), the duly appointed joint official liquidators of Charitable DAF HoldCo, Ltd ("HoldCo" or the "Debtor"), a Cayman Islands exempted company in official liquidation in the Cayman Islands (the "Cayman Proceeding"), which was brought under the supervision of the Grand Court of the Cayman Islands Financial Services Division (the "Cayman Court") by an order dated May 6, 2025 (Cause No. FSD 116 of 2025) (JAJ) (the "Supervision Order"), by its undersigned United States counsel, Reed Smith LLP ("Reed Smith") having filed in their capacity as the authorized foreign representatives of HoldCo the Official Form Petition and the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Verified Petition")[2] and the accompanying Moran Decl. and MacInnis Decl., seeking relief pursuant to chapter 15 of the Bankruptcy Code; and upon due consideration of the Verified Petition, Moran Decl., MacInnis Decl., together with all exhibits thereto, in support of the Verified

---

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 170388. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Verified Petition.

Petition, as well as any objections thereto; and a hearing having been held on [DATE], 2025 (the "Hearing") to consider the Verified Petition, at which the Moran Decl. and MacInnis Decl. were received into evidence; and appropriate and timely notice of the filing of the Verified Petition and the Hearing thereon having been given by the Petitioners pursuant to section 1514 of the Bankruptcy Code; and such notice having been adequate and sufficient for all purposes; and no other or further notice being necessary or required; and all interested parties having had an opportunity to be heard at the Hearing; and after due deliberation and sufficient cause appearing therefore, the Court finds:[3] (i) it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(a), 11 U.S.C. §§ 109 and 1501 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012; (ii) venue is properly located in this district pursuant to 28 U.S.C. §§ 1410(1) and 1410(3); (iii) the Verified Petition was properly filed and served; (iv) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P); (v) the Debtor is subject to foreign main proceedings within the meaning of section 1502(4) and 1517(b)(1) of the Bankruptcy Code; (vi) the Petitioners are "persons" and the "foreign representatives" of the Debtor within the meaning of section 101(24) of the Bankruptcy Code; (vii) the Debtor's chapter 15 case was properly commenced pursuant to sections 1504, 1509 and 1515 of the Bankruptcy Code; (viii) the Debtor has its center of main interests in the Cayman Islands; (ix) the Verified Petition satisfies the requirements of section 1515 of the Bankruptcy Code and Rule 1007(a)(4) of the Bankruptcy Rules; (x) the Petitioners have demonstrated that the relief requested is necessary and appropriate, in the interests of the public and international comity,

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

consistent with the public policy of the United States, and warranted pursuant to sections 105(a), 362, 542, 1507(a), 1509(b)(2)-(3), 1520, 1521 and 1522 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules and will not cause hardship to creditors of the Debtor or other parties-in-interest that is not outweighed by the benefit of granting that relief; (xi) the interest of the public will be served by this Court's granting of the relief requested by the Petitioners; (xii) all of the relief contained in this Order is within the Court's jurisdiction, is essential to the success of the Cayman Proceeding, confers material benefits on, and is in the best interests of, the Debtor, its creditors, interest holders and other parties-in-interest, and critical and integral to the overall objectives of the liquidation and, with respect to injunctive relief, meets the legal and factual requirements for issuing an injunction; and (xiii) all creditors, interest holders and other parties-in-interest, including the Debtor, are sufficiently protected by the grant of relief ordered hereby in accordance with section 1522(a) of the Bankruptcy Code.

IT IS HEREBY ORDERED THAT:

1.      The Verified Petition is granted and any objections thereto are overruled with prejudice.

2.      The Debtor's Cayman Proceeding is granted recognition as a foreign main proceeding pursuant to sections 1517(a) and 1517(b)(1) of the Bankruptcy Code.

3.      All relief afforded to a foreign main proceeding automatically upon recognition pursuant to section 1520 of the Bankruptcy Code is granted including, without limitation, the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and its property that is now within or in the future is located within the territorial jurisdiction of the United States.

4.      The Petitioners are granted recognition as "foreign representatives" pursuant to section 101(24) of the Bankruptcy Code in respect of the Cayman Proceeding.

5. Pursuant to sections 1521(a)(1), (2) and (3) of the Bankruptcy Code, all persons and entities, other than the Petitioners and their representatives and agents, are hereby enjoined (to the extent they have not been stayed under section 1520(a)), in each case from:

    a.   executing against the assets of the Debtor;

    b.  commencing or continuing, including the issuance or employment of process, any judicial, quasi-judicial, administrative, regulatory, arbitral, or other action or proceeding, or to recover a claim, including, without limitation, any and all unpaid judgments, settlements or otherwise against the Debtor;

    c.  taking or continuing any act to create, perfect or enforce a lien or other security interest, setoff or other claim against the Debtor;

    d.  transferring, relinquishing or disposing of any property of the Debtor to any person or entity (as that term is defined in section 101(15) of the Bankruptcy Code) other than the Petitioners; and

    e.  commencing or continuing an individual action or proceeding concerning the assets, rights, obligations or liabilities of the Debtor;

provided, in each case, that such injunctions shall be effective solely within the territorial jurisdiction of the United States.

6. No persons or entities may take any action inconsistent with the Supervision Order, any order entered by the Cayman Court in relation to the Applications, and any orders issued in the Cayman Proceeding identified in the Verified Petition.

7. No action taken by the Petitioners in preparing, disseminating, applying for, implementing, or otherwise in connection with this Order, any order entered in respect of the Verified Petition, this Chapter 15 Case, any further order for additional relief in this Chapter 15 Case, or any adversary proceedings or contested matters in connection therewith, constitutes a waiver of any immunity afforded to the Petitioners as foreign representatives, including without limitation pursuant to section 1510 of the Bankruptcy Code.

8.      In accordance with sections 1519(a)(3) and 1521(a)(4) of the Bankruptcy Code, Rule 2004 of the Bankruptcy Rules, and the Federal Rules of Civil Procedure, as incorporated by the Bankruptcy Rules, the Petitioners are authorized to conduct the examination of witnesses, the taking of evidence, or the delivery of information concerning the Debtor's assets, affairs, rights, obligations, or liabilities.

9.      In accordance with sections 542(e), 1521(a)(4), and 1521(a)(7) of the Bankruptcy Code, subject to any applicable privilege, all persons that hold recorded information, including books, documents, records, and papers, relating to the Debtor's property or financial affairs are required to turnover or disclose such recorded information to the Petitioners.

10.      Pursuant to section 1521(a)(5) of the Bankruptcy Code, the administration or realization of all or part of the assets of Debtor within the territorial jurisdiction of the United States is hereby entrusted to the Petitioners and the Petitioners are hereby established as the exclusive representatives of Debtor in the United States.

11.      Pursuant to sections 105(a), 1507, and 1521(a)(7) of the Bankruptcy Code, the Injunctive Relief Order is hereby recognized, given full force and effect and is fully enforceable within the territorial jurisdiction of the United States.

12.      Notwithstanding any provision in the Bankruptcy Rules to the contrary, including, but not limited to, Bankruptcy Rules 7062 and 1018, (A) this Order shall be effective immediately and enforceable upon its entry; (B) the Petitioners are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (B) the Petitioners and the Debtor are authorized and empowered, and may in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

- 5 -

13.     A copy of this Order shall be served in accordance with *Order Scheduling Hearing on Chapter 15 Petitions and Relating Relief and Specifying Form and Manner of Service of Notice* (D.I. ●).  Such service shall be good and sufficient service and adequate notice for all purposes.

14.     This Court shall retain jurisdiction with respect to the effect, enforcement, amendment, or modification of this Order, any request for additional relief or any adversary proceeding brought in and through this chapter 15 case, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

15.     This Order shall be effective and enforceable immediately upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a).