**EXHIBIT 69**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1] | Case No. 25-11376 (___) |
| Debtor in a foreign proceeding. | |

**DECLARATION OF MARGOT MACINNIS IN SUPPORT OF
CHAPTER 15 PETITION FOR (I) RECOGNITION OF FOREIGN MAIN
PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III)
RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Margot MacInnis, pursuant to 28 U.S.C. § 1746, hereby declare (this "Declaration") under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

**A.      The Joint Official Liquidators and the Cayman Proceeding**

1.      My colleague, Sandipan Bhowmik, and I (the "Petitioners" or "JOLs") are the duly appointed Joint Official Liquidators of Charitable DAF HoldCo, Ltd (in Official Liquidation) ("HoldCo" or the "Debtor"), a Cayman Islands exempted company in official liquidation in the Cayman Islands (the "Cayman Proceeding"), which was brought under the supervision of the Grand Court of the Cayman Islands Financial Services Division (the "Cayman Court") by an order dated May 6, 2025 (Cause No. FSD 116 of 2025)(JAJ) (the "Supervision Order").[2]

---

[1] The Debtor is incorporated in the Cayman Islands as an exempted company, and registered with registration number 53083. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

[2] Ex. 1, Supervision Order in the Grand Court of the Cayman Islands FSD 2025-0116 (JAJ).

2. I respectfully submit this Declaration in support of the Petitioners' Verified Petition dated July 21, 2025 (the "Verified Petition")[3] seeking the United States Bankruptcy Court for the District of Delaware's (this "Court") (a) recognition of the Cayman Proceeding as a "foreign main proceeding" pursuant to 11 U.S.C. § 1517(b)(1) of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") or in the alternative as a "foreign nonmain proceeding" pursuant to section 1517(b)(2) of the Bankruptcy Code; (b) recognition of the Petitioners as "foreign representatives" of HoldCo, pursuant to sections 1509 and 1517 of the Bankruptcy Code; and (c) granting relief pursuant to sections 105(a), 1502, 1507, 1510, 1520 and 1521 of the Bankruptcy Code.

3. I am Managing Director of Grant Thornton Specialist Services (Cayman) Limited ("Grant Thornton"). I am one of the JOLs of HoldCo, alongside Mr. Bhowmik also of Grant Thornton. Mr. Bhowmik and I were appointed as JOLs of HoldCo by the Supervision Order.[4]

4. I have been practicing in the field of insolvency and financial investigations for over 25 years and have been appointed as an official liquidator of numerous companies and investment funds over this period. I am the practice leader for Grant Thornton UK's investments in Grant Thornton's Specialist Services practice in the Cayman Islands and the British Virgin Islands ("BVI"), as well as the Offshore Group leader. My practice over the past 25 or so years has focused on asset tracing and recovery, insolvency, and corporate recovery assignments in the Cayman Islands and Offshore. Over that period, I have taken voluntary and compulsory appointments in connection with entities that were solvent, insolvent and in some cases of doubtful solvency both in the Cayman Islands and BVI. I have been appointed liquidator on some of the

---

[3] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Verified Petition.

[4] Ex. 1, Supervision Order in the Grand Court of the Cayman Islands FSD 2025-0116 (JAJ).

most complex, contentious and high-profile liquidations in the Cayman Islands and BVI, and in circumstances where the result and return to stakeholders were objectively successful. I am a Chartered Accountant, CPA, and hold professional certifications with ACAMS and CFE. I have been a board member of both RISA, IWIRC Cayman Islands and the international board of IWIRC, a member of ABI and INSOL, and in my various roles with these organizations over the years I have sat on technical committees responsible for the creating and delivering the technical content for conferences, seminars and roundtables.[5]

5.      I am duly authorized to make this Declaration on behalf of the JOLs. I am fully familiar with the facts of this matter. Unless otherwise indicated, all statements contained herein are true to the best of my knowledge and based upon my personal knowledge of HoldCo's operations and financial condition, my review of relevant documents and my conversations with relevant personnel. I am over the age of 18 and, if called to testify, would testify competently about the facts set forth herein.

6.      I am familiar with the Model Law on Cross-Border Insolvency, adopted by the United Nations Commission on International Trade Law (UNCITRAL), and approved by a resolution of the United Nations General Assembly on December 15, 1997. I also understand that the Model Law has been adopted in the United States as chapter 15 of the Bankruptcy Code.

7.      I make this Declaration in my statutory capacity as an officer of the Cayman Court and request an extension of comity for the benefit of all of HoldCo's creditors and investors, whose interests I represent. For the reasons discussed below, I submit that: (a) Mr. Bhowmik and I are duly appointed "foreign representatives" of HoldCo in the Cayman Proceeding and that the Cayman Proceeding constitutes a "foreign proceeding" within the meaning of sections 101(23)

---

[5] Ex. 2, Curriculum Vitae of Margot MacInnis.

and (24) of the Bankruptcy Code, respectively; (b) this case was properly commenced in accordance with the requirements of chapter 15 of the Bankruptcy Code; and (c) the Cayman Proceeding satisfies all of the requirements to be recognized as a "foreign main proceeding" pursuant to sections 1502(4) and 1517(b)(1) of the Bankruptcy Code or in the alternative as a "foreign nonmain proceeding" pursuant to sections 1502(5) and 1517(b)(2) of the Bankruptcy Code.

## B. Overview of HoldCo and its Stakeholders

8. HoldCo is a Cayman Islands exempted company, incorporated on October 27, 2011.[6] Its registered office is at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.[7]

9. HoldCo's share capital is divided into Participating Shares, which do not have voting rights but confer the right to participate in HoldCo's profits or assets including by way of the receipt of dividends, and Management Shares, which have voting rights but confer no other right to participate in HoldCo's profits or assets.[8] Accordingly, Participating Shareholders have the entirety of the economic interest in HoldCo, whereas the Management Shareholder has the control rights.[9]

10. Until recently, four nonprofit corporations collectively held 100% of HoldCo's Participating Shares: Highland Dallas Foundation, Highland Kansas City Foundation, Highland Santa Barbara Foundation, and CFNT.[10]

---

[6] Ex. 3, Certificate of Incorporation - Charitable DAF Holdco, Ltd; Ex. 4, Charitable DAF HoldCo Articles of Association.

[7] Previously, HoldCo maintained its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

[8] Ex. 5, Amended and Restated Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd.

[9] Id.

[10] Ex. 6, Register of Members Charitable DAF Holdco Ltd.

- 4 -

11.     As of the date hereof, HoldCo has one Management Shareholder and five registered Participating Shareholders.[11] The Management Shares in HoldCo are held entirely by Mr. Mark Eric Patrick, a U.S. resident, who is also a director of HoldCo. Mr. Patrick acquired the Management Shares on March 25, 2021, upon taking assignment of the Management Shares previously held by Mr. Grant Scott.[12] HoldCo's second director is Mr. Paul Murphy, a Cayman Islands resident.[13]

12.     As of the date hereof, the Participating Shareholders are:

(a)     Highland Dallas Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on November 22, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;[14]

(b)     Highland Kansas City Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on November 23, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;[15]

(c)     Highland Santa Barbara Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on November 22, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;[16]

(d)     CFNT for the Highland Capital Management, L.P. Charitable Fund at CFNT, a public charity exempt from federal income tax under § 501(c)(3) of the IRC

---

[11] Id.

[12] Ex. 7, Resolutions of the Sole Director (100 Management Shares); Ex. 8, Share Transfer (100 Management Shares) from Grant James Scott to Mark E. Patrick.

[13] Ex. 6, Register of Members Charitable DAF Holdco Ltd; Ex. 9, Director Resolutions - Appointment of Paul Murphy; Ex. 10, Director Report of Charitable DAF Holdco, Ltd.

[14] Ex. 11, IRS Determination Letter to Highland Dallas Foundation; Ex. 12, Share Transfer Form; Ex. 13, Highland Dallas Foundation Share Transfer.

[15] Ex. 12, Share Transfer Form; Ex. 14, IRS Determination Letter to Highland Kansas City Foundation; Ex. 15, Highland Kansas City Foundation Share Transfer.

[16] Ex. 12, Share Transfer Form; Ex. 16, IRS Determination Letter to Highland Santa Barbara; Ex. 17, Highland Santa Barbara Foundation Share Transfer.

incorporated in Texas, which was issued 5 Participating Shares in HoldCo on August 12, 2015;[17] and

(e) DFW Charitable Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on December 9, 2024, which was issued 318 Participating Shares in HoldCo on February 7, 2025.[18] Mr. Patrick is its registered director, president and sole member.

### i. The Charitable Structure

13. Four charities held the ultimate economic interest in HoldCo prior to the DFW Share Issuance and held Participating Shares, either directly or indirectly. They are:

(a) The Dallas Foundation (which controls Highland Dallas Foundation): a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets;

(b) Greater Kansas City Community Foundation (which controls Highland Kansas Foundation): a charitable entity established in Missouri in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds;

(c) Santa Barbara Foundation (which controls Highland Santa Barbara Foundation): a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million; and

(d) CFNT is a charity established in 1981 which manages assets totaling $513 million and donated $38.9 million to local nonprofits in 2023. CFNT holds its Participating Shares in HoldCo directly (i.e., without interposing a supporting organization). Prior to the DFW Share Issuance, CFNT held 1.639% of the Participating Shares.[19]

14. Each of the Charities held its interests in HoldCo indirectly through Highland Dallas Foundation, Highland Kansas City Foundation, and Highland Santa Barbara Foundation

---

[17] Ex. 18, IRS Determination Letter to CFNT; Ex. 19, Share Transfer Form of CFNT.

[18] Ex. 20, DFW Share Transfer; Ex. 21, Director Resolution (Share Issuance to DFW).

[19] Ex. 19, Share Transfer Form of CFNT.

respectively (i.e., TDF held its interest through the Participating Shares held by Highland Dallas Foundation, etc.).[20]

15.     The Supporting Organizations were incorporated by Mr. James Dondero in November 2011 for the purpose of making charitable donations to their respective charity from the proceeds received by the Supporting Organizations from HoldCo.[21]

16.     Each of the Supporting Organizations is "organized and operated exclusively to support and benefit" its relevant, supported Charity.[22]  For U.S. tax purposes, each Supporting Organization is classified as a Type I supporting organization of its respective Charity, which means that it is operated, supervised and controlled by that Charity.[23] Consistent with this classification, the governance arrangements of each of the Supporting Organizations affords each Charity two votes and two director-nominees, to the individual member's (Mr. Dondero or his designee's) one vote and one director-nominee.[24]

17.     HoldCo was formed for tax efficiency purposes to avoid a Charity or Supporting Organization becoming liable for UBTI with respect to investments it may wish to make in a hedge fund or private equity fund, here, the Fund, where substantial assets were held.[25]

18.     HoldCo was, between November 2011 and December 18, 2024, the sole limited partner of the Fund, a Cayman Islands exempted limited partnership formed to invest and manage

---

[20] Ex. 23 Highland Dallas Foundation SO Agreement; Ex. 24 Highland Kansas City Foundation SO Agreement; Ex. 25 Highland Santa Barbara Foundation SO Agreement.

[21] Ex. 26, Highland Dallas Foundation Certificate of Formation; Ex. 27, Highland Kansas City Foundation Certificate of Formation; Ex. 28, Highland Santa Barbara Foundation Certificate of Formation.

[22] Id.

[23] Ex. 23 Highland Dallas Foundation SO Agreement; Ex. 24 Highland Kansas City Foundation SO Agreement; Ex. 25 Highland Santa Barbara Foundation SO Agreement.

[24] Ex. 29 Highland Dallas Foundation By-Laws; Ex. 30 Highland Kansas City Foundation By-Laws; Ex. 31 Highland Santa Barbara Foundation By-Laws.

[25] Ex. 91, Haynes & Boone Memo.

assets for the benefit or ultimate benefit of certain registered charitable organizations in the United States, through which it indirectly owned the DAF Structure.

19.     The role of HoldCo was to facilitate the making of discretionary cash distributions to Participating Shareholders, which would be drawn from the proceeds of investment returns made within asset-holding entities in the DAF Structure.[26]

## C.     Overview of the Fund

20.     The Fund is a Cayman Islands exempted limited partnership formed October 25, 2011 (registration no. 53083), having its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.  The Fund is governed by the Second Amended and Restated Limited Partnership Agreement, dated March 11, 2024.  Prior to the Relevant Transactions, HoldCo was the sole limited partner of the Fund.[27]

21.     The Fund was formed and operates to "make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of [HoldCo] and its Indirect Charitable Owners". [28]

22.     Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands which was, at the Fund's formation and until March 7, 2024, the general partner of the Fund, at which time it was replaced by CDH GP, LTD, a Cayman

---

[26] Ex. 32, Structure chart of the DAF Structure prior to the Relevant Transactions; Ex. 33, Structure chart of the DAF Structure after to the Relevant Transactions; Ex. 35, A&R Exempted Limited Partnership Agreement of Charitable DAF Fund, LP; Ex. 36, Second A&R Exempted Limited Partnership Agreement of Charitable DAF Fund, LP.

[27] Ex. 34, Certificate of Registration of Charitable DAF Fund LP; Ex. 35, A&R Exempted Limited Partnership Agreement of Charitable DAF Fund, LP; Ex. 36, Second A&R Exempted Limited Partnership Agreement of Charitable DAF Fund, LP.

[28] Ex. 5, Amended and Restated Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd.

Islands exempt company incorporated on February 27, 2024, by Mr. Patrick, its sole director, at Mr. Patrick's instigation, without notice to the Original Participating Shareholders.[29]

23. The Fund's sole asset is or was its ownership of 100% of the issued share capital, in CLO HoldCo Ltd.[30] CLO Holdco is organized as a Cayman Islands exempt company incorporated with limited liability, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.[31]

24. Based upon their initial research and investigation, the JOLs understand that the Fund's known subsidiaries, that it holds through CLO HoldCo (as listed in Schedule A of the proposed order accompanying the Injunction Application)[32], are mostly passive investment vehicles holding a mix of assets, including cash, promissory notes, shares in Nexpoint[33] entities, publicly traded stock, real estate, receivables/proceeds from litigation proceedings, receivable amounts from brokers, dividends due, and amounts due from affiliates.

25. At all relevant times, the Fund had a net asset value of approximately $270 million.[34]

---

[29] Ex. 37, Charitable DAF GP LLC Managing Member Consent to Assignment to CDH GP Ltd; Ex. 38, Section 10-Replacement of Charitable DAF GP LLC; Ex. 39, Register of Members for CDH GP Ltd.; Ex. 94, Certificate of Incorporation - CDH GP, Ltd.

[30] Ex. 40, CLO HoldCo, Ltd Register of Members as of 5.19.2021; Ex. 32, Structure chart of the DAF Structure prior to the Relevant Transactions; Ex. 33, Structure chart of the DAF Structure after to the Relevant Transactions.

[31] Ex. 41, CLO HoldCo, Ltd CORIS Report; Ex. 42, CLO HoldCo, Ltd - Members & Articles of Association; Ex. 43, CLO HoldCo, Ltd Certificate of Incorporation.

[32] Ex. 82, Injunction Application.

[33] Nexpoint is an investment management firm registered with the U.S. Securities and Exchange Commission that was founded by Mr. Dondero, who currently serves as its President.

[34] Ex. 51, September 2024 ValueScope Valuation.

**D.** **Key Transactions Precipitating the Debtor's Liquidation**

    **i.** **The Relevant Transactions**

26.      Beginning in 2024, HoldCo's Directors executed a series of complex, interrelated transactions without the knowledge or consent of the Original Participating Shareholders. These transactions consisted of (a) HoldCo's contribution of its interest in the Fund to a newly formed entity organized in Delaware, CDM, controlled by Mr. Patrick, in exchange for membership interests in CDM that, unlike the Original Participating Shareholders Participating Shares in HoldCo, were redeemable and afforded HoldCo no fiduciary safeguards;[35] (b) the DFW Share Issuance, i.e., the purported issuance of 318 participating shares in HoldCo to DFW, a Delaware nonprofit corporation incorporated and controlled by Mr. Patrick, on February 7, 2025, sufficient to make it, rather than the Original Participating Shareholders, the majority owner of HoldCo's participating shares;[36] and (c) the purported redemption of HoldCo's interest in CDM in exchange for approximately $1.6 million on March 27, 2025.[37]

    **1.** **The LP/LLC Exchange**

27.      On December 12, 2024, CDM was incorporated as a limited liability company in Delaware. Mr. Patrick was the sole member of CDM.[38]

28.      On December 18, 2024, without informing the Supporting Organizations or the Charities: (i) the Directors passed resolutions to transfer HoldCo's Fund Partnership Interest to CDM, in exchange for a contribution by CDM's sole member—Mr. Patrick—of 100% of the

---

[35] Ex. 44, Director Resolutions to Transfer Fund from HoldCo to CDM for CDM Shares; Ex. 45, Deed of Assignment & Assumption to CDM.

[36] Ex. 20, DFW Share Transfer; Ex. 21, Director Resolution (Share Issuance to DFW).

[37] Ex. 46, Director Resolutions - Redemption of CDM Shares.

[38] Ex. 47, CDM Certificate of Formation; Ex. 48, CDM LLC Agreement.

issued and outstanding membership interests in CDM;[39] and (ii) HoldCo, CDM, and the New GP entered into a Deed of Assignment and Assumption, executed by Mr. Patrick in three capacities: on behalf of: (x) HoldCo, as Director; (y) CDM, as manager; and (z) the New GP, as Director, pursuant to which: (a) HoldCo assigned its Fund Partnership Interest to CDM; (b) the New GP provided its written consent to the CDM Assignment and the admission of CDM as the new limited partner, in accordance with the Fund LPA; and (c) CDM agreed to exercise its reasonable best endeavors to ensure that the CDM Membership Interest would be transferred to HoldCo.[40]

29.     The LP/LLC Exchange occurred in at least two stages: (a) first, HoldCo transferred its entire interest in the Fund to CDM; and (b) second, CDM procured the transfer of 100% of its share capital to HoldCo, making HoldCo the sole membership interest holder of CDM rather than the sole limited partner in the Fund. The effect of the LP/LLC Exchange was that: (a) CDM was inserted into the corporate structure as a subsidiary of HoldCo and became the holder of the entire interest in the Fund previously held by HoldCo;[41] and (b) HoldCo became the sole membership interest holder in CDM, resulting in its sole asset—formerly its 100% limited partnership interest in the Fund—being exchanged for the CDM Membership Interest.[42]

30.     The LP/LLC Exchange prejudiced the interests of HoldCo. The CDM Membership Interest was less valuable than the Fund Partnership Interest because, among other reasons, whereas the New GP had owed fiduciary duties to HoldCo in the Fund, the manager, Mr. Patrick, did not owe any fiduciary duties to CDM; and, unlike the Fund Partnership Interest, the CDM Membership Interest was susceptible to being redeemed by Mr. Patrick (as Manager) in his sole

---

[39] Ex. 44, Director Resolutions to Transfer Fund from HoldCo to CDM for CDM Shares.

[40] Ex. 45, Deed of Assignment & Assumption to CDM.

[41] Ex. 32, Structure chart of the DAF Structure prior to the Relevant Transactions.

[42] Ex. 45, Deed of Assignment & Assumption to CDM; Ex. 46, Director Resolutions - Redemption of CDM Shares.

discretion and for any reason, for "fair market value" as defined by Article 6.9, i.e., a "good faith determination of value."[43]

### 2. DFW Share Issuance

31.    On December 9, 2024, DFW, a nonprofit non-stock corporation, was incorporated in Delaware exclusively for charitable purposes.[44]

32.    On February 7, 2025, without informing the Supporting Organizations or the Charities, the Directors passed resolutions for HoldCo to issue 318 Participating Shares to DFW, which, upon issuance, would allot DFW 51.04% of the Participating Shares of HoldCo. That same day, also without notice to the Supporting Organizations or the Charities, HoldCo issued and allotted 318 Participating Shares to DFW, resulting in DFW holding a 51.04% interest in HoldCo and diluting the Original Participating Shareholders' aggregate shareholding from 100% to 48.96%.[45]

### 3. Redemption

33.    Following the LP/LLC Exchange, ValueScope was instructed without informing the Supporting Organizations or the Charities to prepare two valuation analyses: (a) the CDM Membership Interest;[46] and (b) certain Participating Shares of HoldCo as of March 25, 2025.[47] Historically, between December 2020 and September 2024, ValueScope conducted a series of valuation analyses of 100 Participating Shares on a NAV basis at HoldCo's request to determine their FMV. The final NAV-based valuation prepared by ValueScope prior to the Relevant

---

[43] Ex. 48, CDM LLC Agreement.

[44] Ex. 49, Certificate of Incorporation of DFW Charitable Foundation.

[45] Ex. 20, DFW Share Transfer; Ex. 21, Director Resolution (Share Issuance to DFW).

[46] Ex. 93, March 2025 ValueScope Valuation of Membership Interests of CDM.

[47] Ex. 50, March 2025 ValueScope Valuation of Participation Shares of HoldCo.

Transactions was dated January 7, 2025, and gave a valuation of 100 Participating Shares as of September 30, 2024. ValueScope determined that, as of September 30, 2024, the NAV of the Fund was $269.05 million, NAV per share was $882,140, FMV per share was $759,614 and the FMV of 100 Participating shares was $75,961,370.[48]

34.     The March 2025 ValueScope Valuation, however: (a) applied a DCF methodology to estimate the present value of expected future distributions, rather than the NAV based approach used in at least the prior five annual valuations by ValueScope; (b) determined the FMV of 100 Participating Shares to be $536,784; (c) applied a 99.2% DLOC; and (d) applied a 20.00% DLOM.[49] The DCF model relied on projected future distributions to HoldCo, with those projections based on historical distributions that were also controlled by Mr. Patrick.[50]

35.     Accordingly, the FMV of 100 Participating Shares in HoldCo apparently declined from $75,961,370 on September 30, 2024, to $536,784 on March 25, 2025—a 99.29% reduction in less than six months, coinciding with the LP/LLC Exchange and attributable to the shift in valuation methodology from NAV to DCF.[51] Although the March 2025 ValueScope Valuation report identified "total equity" of approximately $269 million and concluded that all Participating Shares had a combined value of only approximately $1.6 million, the analysis did not address who benefited from the residual value of roughly $267.4 million.[52]

36.     On March 27, 2025, without informing the Supporting Organizations or the Charities, HoldCo entered into the Letter Agreement with CDM, pursuant to which HoldCo

---

[48] Ex. 51, September 2024 ValueScope Valuation.

[49] Ex. 50, March 2025 ValueScope Valuation of Participation Shares of HoldCo; Ex. 93, March 2025 ValueScope Valuation of Membership Interests of CDM.

[50] Id.

[51] Ex. 50, March 2025 ValueScope Valuation of Participation Shares of HoldCo.

[52] Id.

assigned to CDM various contracts and agreements to which it was a party.[53] On the same day, Mr. Patrick executed, in his capacity as manager of CDM and president of DFW, the following, again without notice to the Supporting Organizations or the Charities: (i) an Admission and Amendment No. 1 Agreement between CDM and DFW, under which DFW was admitted as a member of CDM in exchange for a capital contribution of $1,637,192;[54] and (ii) a Redemption and Amendment No. 2 Agreement under which CDM redeemed HoldCo's CDM shares for the same sum of $1,637,192.[55]

37. Additionally, on March 27, 2025, Mr. Patrick, in his capacity as manager of CDM, executed the Manager Consent approving the Admission and Redemption.[56] The Manager Consent stated that the redemption of HoldCo's shares of CDM under the Letter Agreement was justified due to alleged attempts by the Supporting Organizations to exert control, and the potential loss of their nonprofit and tax-exempt status.[57]

38. On April 2, 2025, the Directors, by written resolution: (a) noted the redemption of HoldCo's shareholding in CDM for the Redemption Sum; and (b) resolved to make a shareholder distribution totaling $1,612,192.01.[58]

39. The substantive financial effect of the Redemption was that DFW paid the Redemption Sum to CDM, and HoldCo's shares in CDM were redeemed for that same amount— effectively transferring or selling HoldCo's interest in CDM to DFW for the Redemption Sum. As a result of the Redemption: (a) HoldCo realized its interest in the Fund, which had a NAV of

---

[53] Ex. 52, Letter Agreement.

[54] Ex. 53, CDM Redemption Agreement (Amendment #1).

[55] Ex. 54, CDM Redemption Agreement (Amendment #2).

[56] Ex. 55 CDM Manager Consent to Admission and Redemption.

[57] Id.

[58] Ex. 46, Director Resolutions - Redemption of CDM Shares.

approximately $269.1 million, for only around $1.6 million; (b) HoldCo purported to distribute

that approximately $1.6 million to accounts in the name of the Participating Shareholders; (c) the

Original Participating Shareholders, being the Supporting Organizations and CFNT were actually

or effectively divested of their indirect interest—subject to the discretion of the person holding the

Control Position—in the Fund and its underlying assets; and (d) the Original Participating

Shareholders, being the Supporting Organizations and CFNT, whose economic interest in HoldCo

had been diluted from 100% to 48.96% following the DFW Share Issuance, were entitled to their

proportionate share of distributions in the amount of 48.96% of the Redemption Sum. As such,

HoldCo had no assets at that time.

### ii. The Remuneration Transactions

40. Following his appointment as director of HoldCo on March 25, 2021, Mr. Patrick

resolved to dramatically increase his remuneration. Specifically (and among other things):

(a) Directors' fees increased from around $40,000 in 2022 to almost $600,000 in 2023.[59]

(b) On September 13, 2024, the Directors resolved to increase Mr. Patrick's salary to $850,000 per annum and approve an LTI of 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).[60]

(c) On or around October 1, 2024:

(i) The Directors resolved that Mr. Patrick was to receive an LTI payment of $975,000 and an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary.[61]

(ii) Mr. Patrick signed an "employment agreement" for his position at HoldCo, effective as of March 24, 2021, which provided, among other

---

[59] Ex. 56, Expenses.

[60] Ex. 57, 09.13.2024 Director Resolutions re. M. Patrick Compensation.

[61] Ex. 58, 10.01.2024 - Director Resolutions re. M. Patrick Compensation.

things, for a base salary of $850,000 and an LTI payment of $4,759,000 for the period from March 24, 2021 to March 24, 2024.[62]

41. By way of contrast to the remuneration that Mr. Patrick resolved he should be awarded, his predecessor's salary (Grant Scott) during his tenure in the same position was approximately $60,000 per annum.[63]

42. As regards expenses, expenses overall for the first half of 2024 were around $18.3 million – almost the same amount spent over the entire course of 2023 (i.e., $18.6 million).[64]

## E. Lack of Transparency and Misleading Disclosures Provided to Supporting Organizations

43. As more fully set forth in the Statement of Claim, prior to and during the time when the Directors were consummating the Relevant Transactions, the Directors persistently declined to disclose information regarding their actions and intentions notwithstanding the Supporting Organizations repeated requests.[65]

44. In November 2023, the Directors sought legal advice under Cayman law regarding the rights and duties of HoldCo's controlling person in connection with various matters including, diluting Participating Shares, redeeming Participating Shares, liquidating HoldCo to distribute its assets elsewhere or otherwise render the Participating Shares worthless, each in the context of potential future disputes with the Original Participating Shareholders.

45. In or around August 2024, the Supporting Organizations were provided with a financial analysis of the Fund's annual expenses, which showed—or appeared to show—a

---

[62] Ex. 92, Mark Patrick Employment Agreement.

[63] Ex. 83, Hr'g Tr. 132:10-11, *In re Highland Capital Management, L.P.*, No. 19-34054-sgj-11, Bankr. N.D. Tex. (Dallas Div.) Jun. 8, 2021, ECF No. 2440.

[64] Ex. 56, Expenses.

[65] Ex. 59, Statement of Claim.

significant increase in expenditures, as described above, both with respect to Directors fees and overall expenses.[66]

46. In late October 2024, as a result of concerns from this additional expenditure, the Supporting Organizations requested that Mr. Patrick provide relevant financial information for the HoldCo and the Fund. Mr. Patrick did not do so.

47. On November 11, 2024, H&K, U.S. attorneys for the Supporting Organizations, issued a letter to Mr. Murphy advising that the Supporting Organizations no longer had confidence in the governance of HoldCo and/or the Fund and considered that a reorganization of the governance structures was required to protect the charitable efforts of the Supporting Organizations.[67]

48. On November 26, 2024, Mr. Patrick sought and obtained advice regarding whether HoldCo could issue further Participating Shares to a new nonprofit organization to dilute the Supporting Organizations so as to weaken any winding-up petition brought by the Supporting Organizations on just and equitable grounds.[68] On November 27, 2024, Cayman Islands counsel responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition would be taken into consideration and would likely help.[69] Mr. Patrick incorporated DFW as a nonprofit, non-stock corporation in Delaware on December 9, 2024.[70]

49. On December 11, 2024, Mr. Murphy and HoldCo's Cayman counsel gave a presentation to attorneys from H&K on behalf of the Supporting Organizations providing various

---

[66] Ex. 56, Expenses.

[67] Ex. 60, No Confidence Letter.

[68] Ex. 61, Email from Mr. Murphy to Mr. Patrick.

[69] Ex. 62, Email from Walkers to the Directors.

[70] Ex. 49, Certificate of Incorporation of DFW Charitable Foundation.

assurances regarding governance matters being addressed by the Directors.[71] The meeting was, by all accounts, positively regarded. The attorneys on behalf of the Supporting Organizations invited Mr. Murphy to make the same presentation directly to the Supporting Organizations.

50. Nonetheless, the very next day, Mr. Patrick incorporated CDM and, on December 18, 2024, the Directors consummated the LP/LLC Exchange, each without disclosing the same to the Supporting Organizations.[72]

51. On January 23, 2025, having received no follow-up to the December 11, 2024 meeting with Mr. Murphy, Julie Diaz, the CEO of The Dallas Foundation, sent Mr. Patrick an email advising that the Supporting Organizations needed to better understand HoldCo and the Fund's asset position, and requesting certain information be provided by February 10, 2025. [73]

52. Having received no response, on January 28, 2025, Ms. Diaz sent a further email to the Directors expressing serious concern: (i) that the Supporting Organization's requests for information continued to be disregarded; and (ii) about the ongoing lack of transparency on the party of the Directors.[74]

53. On January 30, 2025, Mr. Murphy replied to Ms. Diaz stating that the Directors: (i) had not received the January 23 email, but understood the next step was for the Directors to "present directly" to the Supporting Organizations to address the No-Confidence Letter; and (ii) are coopering with the Supporting Organizations to provide additional information – but "have no

---

[71] Ex. 63, Walkers Presentation - Participating Shareholder Rights Charitable DAF HoldCo Ltd.

[72] See ¶¶27-30, above.

[73] Ex. 64, Emails (Julie Diaz, Paul Murphy, Michael Stockham).

[74] Id.

legal obligation to do so" and such cooperation "should not be construed as an implicit acknowledgement of any duty to continue providing information to you." [75]

54. On January 31, 2025, Mr. Michael Stockham of H&K responded to Mr. Murphy noting that he and Mr. Patrick were fiduciaries, managing $270 million in assets for the benefit of charities that support the most vulnerable (i.e., the Charities) and: "[w]hatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions." [76]

55. On February 4, 2025, Mr. Murphy responded that while open to resolving the concerns, they (i.e., the Directors) were struggling to understand the Supporting Organization's change in position. [77]

56. On February 7, 2025, H&K responded that the Directors were fiduciaries in control of $270 million for the benefit of charities: "these monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed and … fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees." [78]

57. On the same date, without informing the Supporting Organizations, the Directors consummated the purported DFW Share Issuance. [79]

58. On February 14, 2025, H&K received a letter from Mr. Mancino, a partner in Seyfarth, a U.S. law firm apparently engaged by the Fund, which rejected the accuracy of the reported increases in expenditure. [80] On February 27, 2025, H&K responded that his clients were

---

[75] Id.

[76] Id.

[77] Id.

[78] Id.

[79] Ex. 21, Director Resolution (Share Issuance to DFW).

[80] Ex. 70, February 14, 2025 Seyfarth Letter.

frustrated by the lack of transparency and refusal to answer simple queries about the financial position.[81] In response, Seyfarth sought available dates for Mr. Murphy to make the promised presentation to the Supporting Organizations.[82] H&K responded the next day with three potential dates/times for the proposed call between March 26 and April 3, 2025. Mr. Mancino did not respond. [83]

59.     On March 20, 2025, Mr. Mancino sent a letter purportedly on behalf of HoldCo to the IRS about Mr. Dondero's alleged influence and control over the Supporting Organizations.[84] The letter makes serious and unsubstantiated allegations about the Supporting Organizations, absent evidentiary support, including that they each (i.e., all of them): "operates for Mr. Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of [HoldCo] to wrest control of [HoldCo] and its assets. . ."[85]

60.     Commencing on March 27, 2025, the Directors initiated steps to effectuate the Redemption, which they consummated on April 2, 2025, without informing the Supporting Organizations.[86] On that same day, the Directors resolved to place HoldCo into voluntary liquidation and appointed Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd as joint voluntary liquidators.[87]

---

[81] Ex. 71, February 27, 2025 H&K Letter.

[82] Ex. 75, March 2025 Emails (D. Mancion & D. Rosenberg).

[83] Id.

[84] Ex. 72, Seyfarth Letter to IRS.

[85] Id.

[86] Ex. 46, Director Resolutions - Redemption of CDM Shares; Ex. 55, CDM Manager Consent to Admission and Redemption; Ex. 73, Director Resolutions - Assignment of Contracts to CDM.

[87] Ex. 65, Charitable DAF Holdco Resolutions re Voluntary Liquidation; Ex. 74, Sole Voting Shareholder Resolutions (Voluntary Liquidation).

61.     Notwithstanding the consummation of the Redemption and the commencement of voluntary liquidation of HoldCo the day prior, on April 3, 2025, Mr. Mancino sent an email to H&K stating that he had just learned there was a call scheduled for the following day and seeking to reschedule.[88] H&K responded that no such call had been arranged and queried about the apparent source of confusion.[89]

## F.     The Cayman Proceeding

62.     Unaware of the Directors resolution to place HoldCo into voluntary liquidation, on April 23, 2025, the Supporting Organizations presented a petition seeking the winding up of HoldCo on a just and equitable basis under section 92(e) of the Companies Act.[90] It was only after filing the J&E Petition that the Directors disclosed they had consummated the Relevant Transactions and commenced a voluntary liquidation of HoldCo on April 2, 2025.[91]

63.     On May 2, 2025, the Supporting Organizations filed a petition seeking an order for the voluntary liquidation of HoldCo—now a debtor—to continue under the supervision of the Cayman Court pursuant to section 131 of the Companies Act.[92] Following a hearing and review of the Supervision Petition, supporting affidavits and affirmations with exhibits, and the documents filed in Cause No. FSD 116 of 2025 (JAJ)—including the J&E Petition and the affidavits of the JOLs confirming their consent to act—the Cayman Court issued the Supervision Order.[93] Pursuant to the Supervision Order, the voluntary liquidation of the Debtor was continued

---

[88] Ex. 76, April 2025 Emails (D. Mancion & D. Rosenberg).

[89] Id.

[90] Ex. 77, J&E Petition; Ex. 78, Companies Act.

[91] Ex. 66, Walkers Letter re Charitable DAF Holdco. Ltd in Voluntary Liquidation.

[92] Ex. 67, Supervision Petition in the Grand Court of the Cayman Islands FSD 2025-0116 (JAJ).

[93] Ex. 1, Supervision Order in the Grand Court of the Cayman Islands FSD 2025-0116 (JAJ).

under the supervision of the Cayman Court, and the JOLs were appointed under section 131 of the Companies Act and Order 15, rule 8 of the Winding Up Rules.[94]

64.     Also pursuant to the Supervision Order, the Petitioners were authorized to exercise the following powers, among others, under Part I of Schedule 3 to the Companies Act[95] without further Cayman Court sanction: (a) the power to commence legal proceedings in the name and on behalf of the Debtor to obtain information, documents, or the examination of individuals in the Cayman Islands or the United States; and (b) the power to apply in the Cayman Islands or the United States for the preservation, freezing, or attachment of assets to which the Debtor is or may arguably be entitled.[96] Moreover, the Petitioners were authorized to seek registration or recognition of themselves and/or the Cayman Proceeding in any U.S. state for any purpose related to the exercise of the above-described powers in the Supervision Order.[97]

### i.     **Conduct of the Cayman Proceeding**

65.     The JOLs have diligently performed their duties in progressing the Cayman Proceeding from and after their appointment.  The JOLs have taken steps to fulfil their statutory obligations: by filing notice of the winding up with the Cayman Islands Registrar of Companies; circulating notices of the winding up to known stakeholders, service providers of HoldCo, and known contributories of HoldCo; publishing their notice of appointment in the Cayman Islands Gazette and Cayman Compass Newspaper;[98] determining HoldCo should be treated as solvent for the purposes of Section 110(4) of the Companies Act, as well as Orders 8 & 9 of the Winding Up

---

[94] Id.; Ex. 78, Companies Act; Ex. 79, Winding Up Rules.

[95] Ex. 78, Companies Act.

[96] Id.

[97] Id.

[98] Ex. 68, Charitable DAF HoldCo - Gazette - Notice of Appointment JOL; Ex. 69, Charitable DAF HoldCo - Compass - Notice of First Meeting of Contributories.

Rules; determining the functional currency of the liquidation to be U.S. dollars pursuant to Order 16, Rule 13 of the Winding Up Rules; changing the registered office of HoldCo from Campbells Corporate Services Limited to HSM Corporate Services Ltd; publishing a Report to Contributories on July 2, 2025; and on July 3, 2025, convening the first meeting of contributories held on July 9, 2025.[99]

66.     Moreover, to identify, secure and recover HoldCo's books and records, the JOLs have: (a) issued formal correspondence to over 50 parties, including, directors, shareholders, banks, service providers, the prior appointed joint voluntary liquidators, notifying them of the JOLs appointment and requesting books and records; (b) issued requests to hold an interview with the directors; and (c) held discussions with various parties to discuss the history and financial affairs of HoldCo.

67.     The JOLs have engaged extensively with representatives of various interested parties in connection with, among other things, seeking and obtaining sanction of the Cayman Court to engage Cayman and U.S. counsel.[100]   In addition, the JOLs, through counsel, have engaged with representatives of CDM, New GP, and CLO HoldCo in relation to a potential protocol intended to allay the JOLs' concerns regarding asset dissipation, transparency and asset management while the JOLs progress their investigation.  The JOLs, however, do not believe the protocol proposed by CDM, the New GP, and CLO HoldCo would adequately protect HoldCo's position and, to date, the parties have been unable to reach terms of agreement with respect to any protocol.[101]

---

[99] Ex. 78, Companies Act; Ex. 79, Winding Up Rules; Ex. 80, Filed Resolutions re Change of Registered Office - Charitable DAF Holdco, Ltd.

[100] In respect of which, on June 24, 2025, the Cayman Court sanctioned the engagements of Cayman and U.S. counsel by the JOLs.

[101] Ex. 81, Various May & June 2025 Letters and Drafts of the Protocol.

68.     Since the date of their appointment, the JOLs have conducted an extensive and detailed investigation into HoldCo's affairs, albeit that those investigations are not yet complete. This has involved a review of HoldCo's books and records (to the extent that they have been able to obtain them and to the extent that they are complete) and numerous inquiries and requests for information directed to persons previously involved with HoldCo. There have, however, been several limitations on the JOLs' investigations in connection with the information requests made from those persons previously involved in the HoldCo, including certain U.S.-based service providers who have asserted that they do not recognize the JOLs authority under the Supervision Order, where the JOLs have not been able to obtain copies of the requested information. Notwithstanding these limitations, the JOLs investigation has progressed sufficiently to enable them to identify significant areas of concern.

### ii.     Commencement of the Cayman Litigation

69.     On July 4, 2025, the JOLs applied to the Cayman Court in the Cayman liquidation proceedings on an *ex parte* basis for sanction to commence litigation proceedings by way of filing the Statement of Claim[102] against the following defendants: (1) Mark Eric Patrick; (2) Paul Murphy; (3) CDM; (4) DFW; (5) CDH as general partner for and on behalf of the Fund, and in its capacity as New GP; and (6) CLO HoldCo.[103]

---

[102] Ex. 59, Statement of Claim; Ex. 85, Sanction to File Statement of Claim.

[103] In determining whether to commence the Cayman Litigation, the JOLs gave due regard to the Named Defendants' likely defenses with respect to the propriety of the Relevant Transactions and the Remuneration Transactions. At a high level, the JOLs understand that the Named Defendants will seek to justify the Relevant Transactions on three independent grounds: (1) on the basis that the Original Participating Shareholders did not have an economic interest in HoldCo, which was formed simply to act as a throughput for discretionary, charitable donations to qualifying recipients (which were not necessarily the Supporting Organizations, CFNT or the Charities), such that the Original Participating Shareholders did not lose any cognizable interest because of the Relevant Transactions; (2) the Relevant Transactions were necessary and appropriate to protect HoldCo and its Directors from attempts by Mr. Dondero and the Supporting Organizations to improperly exercise dominion and control over HoldCo's assets, which would (x) expose HoldCo (x) to breaches of US tax law and regulation and (y) claims from third parties that HoldCo and the Fund Entities were alter egos of Mr. Dondero in lawsuits against Mr. Dondero; and (3) on the basis that the Directors relied appropriately on third party valuation reports in effectuating the Redemption at FMV. The JOLs likewise

- 24 -

70.     A further description of each of the Named Defendants is as follows:

(a)     **Mr. Mark Patrick**. Mr. Patrick is a U.S. attorney and was employed as tax counsel by Highland Capital Management, L.P., an investment company founded by Mr. James Dondero, from 2008 – 2021 and as tax counsel by Highgate Consulting Group, Inc. d/b/a d/b/a Skyview Group from March 2021 to October 2024.  He was instrumental in the creation of the Fund in 2011; in particular, he advised on the tax structure of using an offshore "blocker" company. Mr. Patrick is one of two directors of HoldCo, having been appointed as director on March 25, 2021.  In that capacity, he was responsible for the supervision of the day-to-day operations of HoldCo.  As director, Mr. Patrick owed, and continues to owe, fiduciary duties to HoldCo. Mr. Patrick was also: (i) the holder of all of the Management Shares in HoldCo; (ii) the manager of CDM; (iii) the sole member and sole director of DFW, which is now the sole member of CDM; (iv) the sole director and sole shareholder of CDH GP, Ltd, the New GP; and (v) a director of CLO HoldCo, the entity through which the Fund holds its assets.

(b)     **Mr. Paul Murphy**. Mr. Murphy was the other director of HoldCo, having been appointed so on April 22, 2021.  Mr. Murphy is also a director of CLO HoldCo.

(c)     **CDM**. A limited liability company incorporated in Delaware on December 12, 2024, Mr. Patrick is the Manager of CDM.  DFW has been the sole member of CDM since March 27, 2025.

(d)     **DFW**. A nonprofit non-stock corporation incorporated in Delaware on December 9, 2024, by Mr. Douglas Mancino, a partner in Seyfarth, a U.S. law firm apparently engaged by the Fund.  DFW is organized under the General Corporation Law of the State of Delaware exclusively for charitable purposes.  The JOLs understand that DFW is now the holder of the majority of the Participating Shares in HoldCo pursuant to the DFW Share issuance on February 7, 2025, and controlled by Mr. Patrick as its sole member.

(e)     **The New GP**. A Cayman Islands exempted limited company incorporated on February 27, 2024.  It replaced the Original GP as the Fund's current general partner on March 7, 2024, after Mr. Patrick sought advice from Walkers on forming a new entity to replace the Original GP.  On February 5, 2024, Shields Legal asked Mr. Patrick whether that entity should be a Cayman LLC or exempted company, to which he responded: "*Doesn't matter to me. Whatever from a strategic point of view – hard to find or track, or trace. Or find owners, etc. Generic name.  Strong litigation protection.*"

---

understand that Mr. Patrick intends to rely on a third party report to justify the Remuneration Transactions. On the basis of the investigation conducted by the JOLs to date, the JOLs do not find these defenses and justifications to be availing or credible.

- 25 -

(f) **CLO HoldCo**. A Cayman Islands exempted limited company. CLO HoldCo is the Fund's only direct subsidiary. The Fund held all of CLO HoldCo's issued shares.

71. HoldCo's claims pleaded in the Statement of Claim arise as a result of the breaches by the Directors of their fiduciary duties owed to HoldCo, having caused HoldCo to have dissipated its assets through a combination of: (a) the Relevant Transactions; and (b) the Remuneration Transactions, all of which were for the benefit of entities controlled by Mr. Patrick or for his benefit, personally.[104] In addition to asserting claims against the Directors for willful breaches of their fiduciary duties to HoldCo, the Statement of Claim asserts claims against: (i) the Named Defendants for unlawful means conspiracy based on the Named Defendants having conspired and combined together to injure HoldCo by unlawful means and HoldCo having suffered loss and damage as a result; (ii) CDM for knowing receipt of HoldCo's property, its partnership interest in the Fund, which had been misappropriated from HoldCo by virtue of the Directors breach of fiduciary duties; and (iii) CDM for unjust enrichment on the basis that it received HoldCo's interest in the Fund without there being a valid assignment or other justification for that receipt, such that it is liable to HoldCo in restitution.[105]

72. At the hearing of the sanction proceeding on July 14, 2025, to obtain an order granting the JOLs sanction to commence the Cayman Proceeding, the JOLs were required to satisfy the Cayman Court in the Cayman liquidation proceedings that: (a) the Cayman Litigation had a reasonable prospect of success; and (b) the interests of HoldCo's stakeholders were best

---

[104] Ex. 59, Statement of Claim.

[105] Ex. 59, Statement of Claim.

served by the JOLs commencing the Cayman Litigation.[106] The Cayman Court granted sanction for the JOLs to commence the Cayman Litigation.[107]

73.     On July 15, 2025, the Debtor proceeded to file the Statement of Claim with the Cayman Court to commence the Cayman Litigation (which has the cause number FSD 201 of 2025 (RPJ)).[108] At the same time the JOLs filed an application for: (a) a proprietary injunction to prevent the Named Defendants from dealing with the assets of the Debtor that are held now held or controlled by the Named Defendant together with disclosure orders; and (b) leave to serve the U.S. based defendants with the Statement of Claim and Injunction Application.[109]

74.     Additionally, on July 15, 2025, the Debtor: (1) emailed copies of the Statement of Claim and the Applications to the Cayman Islands attorneys for the Named Defendants and asked them to accept service; and (2) served copies of the Statement of Claim at the Cayman Islands registered addresses of CDH GP, Ltd. and CLO Holdco, Ltd. The Applications have been listed for hearing on July 31, 2025.

75.     The Named Defendants are entitled to participate and be heard on that date.  In the event the Named Defendants do not participate, the Cayman Court will hear the Injunction Application on an *ex parte on notice* basis and, if the Injunction is granted, will schedule an *inter partes* hearing for a later date.[110]

76.     Should the Cayman Court grant the Injunctive Relief Application following the scheduled hearing on the Injunction Hearing date, and issue the Injunctive Relief Order, the JOLs

---

[106] *Re ICP Strategic Credit Income Fund* [2014] 1 CILR 314.

[107] Ex. 85, Sanction to File Statement of Claim.

[108] Ex. 59, Statement of Claim.

[109] Ex. 82, Injunction Application.

[110] Ex. 82, Injunction Application.

expect to seek recognition and enforcement of the Injunctive Relief Order against the Named

Defendants on a provisional basis pursuant to section 1519 of the Bankruptcy Code pending the

recognition of the Cayman Proceeding, at which time the JOLs will also seek recognition of the

Injunctive Relief Order in this Chapter 15 Case pursuant to sections 1507(a) and 1521(a) of the

Bankruptcy Code.[111]

### iii.   Injunction Application

77.      The Injunction Application seeks orders that:

(a)   the Named Defendants will: (i) preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest of (of whatsoever nature) whether held directly or indirectly, in the Fund, the Fund Entities, and/or any assets of the Fund; and (ii) procure that the Fund Entities and their wholly owned subsidiaries will not in any way dispose of, deal with, encumber, transfer or diminish the value of any of their assets;

(b)   the Named Defendants will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish any assets in their possession or control, whether they are in or outside the Cayman Islands, which were, are or may be received (whether directly or indirectly): (i) by way of distribution, disposition, dividend, benefit, payment or other transfer from (as the case may be) HoldCo, the Fund, DFW, CDM, the New GP, the Fund Entities and/or their wholly owned subsidiaries; or (ii) from any assets of the Fund, the Fund Entities, and/or their wholly owned subsidiaries;

(c)   the Named Defendants shall not do anything to cause, procure, incite, promote or assist a breach by any other Named Defendant of the above sections (a) and (b); and

(d)   the Named Defendants shall make ancillary asset disclosures.[112]

78.      The basis for the injunctive relief sought is that the Named Defendants each own

and/or control assets that HoldCo has an equitable proprietary interest in (or at least a seriously

arguable case that it does):

---

[111] Ex. 82, Injunction Application.

[112] Ex. 82, Injunction Application.

      (a)    Prior to the Relevant Transactions taking place, HoldCo held the Fund Partnership Interest, and thereby indirectly owned (99%) of all assets held by the Fund through its wholly owned subsidiary, CLO HoldCo (and its subsidiaries).[113]

      (b)    After the Relevant Transactions took place, and by reason of the Directors' breaches of fiduciary duty – (i) CDM now holds the Fund Partnership Interest, which continues to hold its assets through CLO HoldCo (and its subsidiaries); (ii) DFW is the sole member of CDM; (iii) Mark Patrick is the sole member of DFW; and (iv) Mark Patrick has full control over DFW, CDM, the New GP (and thus the Fund), and (together with Mr. Murphy) CLO HoldCo. Mr. Patrick therefore has the ability to control and/or deal with the Fund Partnership Interest and the Fund's assets, including any distributions of the Fund's assets received by CDM as its sole limited partner. Mr. Patrick now exercises this control free from the oversight previously exercised by the Supporting Organizations and CFNT through their holding of Participating Shares in HoldCo.[114]

79.     Moreover, HoldCo has at least a seriously arguable case that CDM and DFW hold these assets through steps taken by the Directors that amounted to breaches of fiduciary duty, and therefore that these assets are subject to a constructive trust in favor of HoldCo, which is the necessary pre-requisite for the Cayman Court to grant a proprietary injunction restraining the disposition of that property.[115]

80.     Under Cayman law, to obtain proprietary injunctive relief, the Debtor must show: (1) the existence of a serious issue to be tried as to whether it has a proprietary interest in the assets (such that the claim would be capable of surviving summary judgment); (2) that the balance of convenience is in favor of granting the injunction; and (3) that it is otherwise just and convenient

---

[113] Ex. 40, CLO HoldCo, Ltd Register of Members as of 5.19.2021; Ex. 84, Charitable DAF Fund, LP Register of Members as of 5.19.2021.

[114] Ex. 6, Register of Members Charitable DAF Holdco Ltd; Ex. 44, Director Resolutions to Transfer Fund from HoldCo to CDM for CDM Shares; Ex. 45, Deed of Assignment & Assumption to CDM; Ex. 46, Director Resolutions - Redemption of CDM Shares; Ex. 47, CDM Certificate of Formation; Ex. 49, Certificate of Incorporation of DFW Charitable Foundation; Ex. 52, Letter Agreement; Ex. 53, CDM Redemption Agreement (Amendment #1); Ex. 54, CDM Redemption Agreement (Amendment #2); Ex. 55, CDM Manager Consent to Admission and Redemption.

[115] See Moran Decl. ¶¶ 40, 42-45.

to grant the injunction. Moreover, under Cayman law, a court may order defendants to disclose information if the Debtor demonstrates that it is just and convenient to do so.[116]

### 1. Serious issues to be tried

81. On July 14, 2025, the Cayman Court granted sanction for the JOLs to file the Statement of Claim and in doing so accepted that the merits of the JOLs' claims satisfied the relevant threshold for the sanction of commencement of claims by official liquidators.

82. The Directors and DFW have put forward explanations as to why the transfer of the Fund Partnership Interest to CDM was legally justifiable, which the JOLs do not believe stand up to scrutiny as explained above.[117]

### 2. Balance of convenience

83. The JOLs do not believe that the proprietary injunctions they seek would hinder the operation of the Fund or the Fund Entities in any material way.[118] The Fund and the Fund Entities are mostly passive investment vehicles that hold shares or interests in other Fund Entities, cash, debt instruments, receivables, vacant land and/or stock in publicly traded companies. They are not, as far as the JOLs understand, engaged in the active trading of assets or the making of new investments on a frequent basis.

84. Accordingly, the JOLs believe that there is no justification for any new investments or other transactions to be made by any of those entities, beyond payments needed to stay in good standing and comply with their statutory obligations.

---

[116] See Moran Decl. ¶¶ 42-45.

[117] Ex. 44, Director Resolutions to Transfer Fund from HoldCo to CDM for CDM Shares; Ex. 70, February 14, 2025 Seyfarth Letter; Ex. 72, Seyfarth Letter to IRS; Ex. 86, Paul Murphy 12.4.2024 Presentation Slides; Ex. 87, 12.18.2024 Carrington Coleman Email.

[118] Ex. 82, Injunction Application.

85.     Against that backdrop, the JOLs' position is that no dispositions of the assets of the Fund, the Fund Entities or any other subsidiaries above $10,000 need or should be made pending the determination of HoldCo's proprietary claim which, if successful, would see the Fund Partnership Interest returned to HoldCo and HoldCo would therefore wholly own (indirectly) all assets of the Fund, the Fund Entities and their wholly owned subsidiaries. Should any payments or dispositions be made by the Fund, the Fund Entities or any of their wholly owned subsidiaries that have the effect of harming the value of the Fund Partnership Interest, such payment or disposition would render the proprietary relief the JOLs are seeking much less effective.

86.     Notwithstanding the above, the JOLs recognize that there may become a need for certain payments or other dispositions of assets to be made to preserve, maintain or improve the value of existing assets held by the Named Defendants, the Fund Entities and/or their wholly owned subsidiaries. Accordingly, the JOLs' proposed order to the Injunctive Relief Application provides for:

(a)     The entity concerned to make a written request to the JOLs to make any such payments, together with full supporting information and documentation as well as an explanation of the rationale for the transaction; and

(b)     The JOLs to decide within 7 days whether to approve or disapprove the proposed transaction.[119]

87.     The JOLs also recognize that there will likely be a need for certain payments to be made by the Named Defendants, the Fund Entities or their wholly owned subsidiaries that are reasonably necessary in the ordinary course of business to keep the corporate Named Defendants, the Fund Entities or their wholly owned subsidiaries in good standing. The JOLs' proposed order to the Injunctive Relief Application allows for any such payments of $10,000 or less to be made.[120]

---

[119] Ex. 82, Injunction Application.

[120] Id.

88.     The JOLs are also unaware of any harm that would be caused to CDM by preserving the status quo in respect of the Fund Partnership Interest. By comparison, if a proprietary injunction is not granted and CDM were to transfer the Fund Partnership Interest to another party or otherwise deal with that interest in some way, HoldCo could be significantly prejudiced. Specifically, HoldCo's proprietary claim to the Fund Partnership Interest could be undermined or become more difficult to enforce.

89.     As to whether damages would be an adequate remedy for HoldCo in lieu of proprietary relief, as far as the JOLs' are aware, CDM has no other assets beyond the Fund Partnership Interest and therefore would likely be unable to meet any order for damages made against it. Only an order for CDM (and the other Named Defendants, to the extent they hold assets that derive from the Fund Partnership Interest) to restore HoldCo's property could return HoldCo to the position it would have been in had the improper transactions carried out by the Named Defendants not taken place. The JOLs' believe that the only way to ensure that such an order will be effective at the conclusion of these proceedings is for a proprietary injunction to be granted against the Named Defendants in respect of that property in the interim.

90.     Further, as explained above, HoldCo, its Supporting Organizations, the Charities and the Fund are part of a carefully constructed investment structure for (i) the tax efficient treatment of charitable donations; and (ii) investments to be made for the ultimate benefit of the Charities and CFNT.[121] Without the re-transfer of the Fund Partnership Interest to HoldCo, those parties may be unable to achieve their charitable objectives as effectively or at all. An award of damages in lieu of proprietary relief would mean that HoldCo would hold only cash and no other assets or investments, and the Charities and Supporting Organizations would effectively be back

---

[121] See ¶¶13-19, above.

to square one in terms of setting up a proper investment structure to carry out their investments and protect their tax-exempt status.

### 3.  Disclosure of assets

91.     The JOLs have only limited information as to what assets each of the Named Defendants, Fund Entities and their wholly owned subsidiaries hold. Even so, the JOLs have no way of verifying this information or knowing if it is completely up to date.

92.     In circumstances where, in the JOLs' case, a misappropriation of the HoldCo's sole and valuable asset has already occurred, the JOLs believe protection is needed to prevent any further dissipation of assets from occurring in breach of any injunction that is granted. The JOLs believe that this protection can be afforded by way of disclosure orders in support of the injunction requiring the Named Defendants to disclose what assets they each hold and their approximate value. Having that information in hand will allow the JOLs (and the Cayman Court) to effectively police the injunction (in terms of preventing dissipation of Fund assets and thereby preserving the value of the Fund Partnership Interest).

93.     In addition, the proposed order in support of the Injunctive Relief Application seeks confirmation as to:

(a)     All of the entities owned directly or indirectly by the Fund, including full details as to their owners, directors, officers or other controllers, and places and details of incorporation. This will allow the JOLs to have a complete picture of the Fund structure.[122]

(b)     All payments by way of salary, bonus, dividend, distribution or other compensation made to Mr. Patrick or Mr. Murphy by HoldCo, the Fund, DFW, CDM, the New GP, CLO HoldCo, or any of the Fund Entities or other entities revealed by (a) above since February 27, 2024.[123]

---

[122] Ex. 82, Injunction Application.

[123] Id.

- 33 -

(c) All payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor, whether a firm, partnership, company or individual, made by HoldCo, the Fund, DFW, CDM, the New GP, CLO HoldCo, or any of the Fund Entities or other entities revealed by (a) above since February 27, 2024.[124]

**4.** **Cross undertaking in damages**

94. The Debtor is not offering to provide a cross-undertaking as to damages in the Injunction Application. This is because in this case, the JOLs are not only acting in the Debtor's best interests, but also in a position analogous to the public interest based on the charitable or non-profit status of at least the underlying Charities, which are the intended recipients of donations made from the Debtor. No cross-undertaking in damages should be required in such circumstances.

**G.** **The Texas Proceeding**

95. On July 1, 2025, the Supporting Organizations commenced the TRO Action against defendants Mark Patrick, DFW, CDM, CDH, and the Original GP by filing *Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver* in the Texas Business Court, 1st Division.[125] Among other things, the TRO Action seeks: (1) a temporary restraining order; (2) a temporary injunction; and (3) the appointment of a receiver against some of the TRO Defendants arising from various breaches of fiduciary duties and related claims alleged to be owed to the Supporting Organizations directly.[126]

96. On July 2, 2025, during the hearing for the TRO Action, in lieu of a decision rendered by the Texas Court, and at the direction of the Texas Court, the parties entered into a

---

[124] Id.

[125] Ex. 85, Supporting Organizations Texas Business Court TRO Petition.

[126] Id.

Rule 11 Agreement under the Texas Rules of Civil Procedure, which the JOLs understand is a binding contract among the parties.[127] The key points of the Rule 11 Agreement are: (a) that the TRO Defendants shall not make any payments or disbursements other than those in the ordinary course of business; (b) investments and monies must be kept in the existing entities that currently hold those investments and monies, provided that, if any investment is monetized on its own terms, then the entity may prudently reinvest the resulting cash proceeds into liquid securities; and (c) there shall be no changes to the corporate structure of ownership of the TRO Defendants.[128] The Texas Court scheduled a further hearing on the TRO Action on July 24 and 25, 2025.

97.     Following the hearing on July 2, 2025, the parties to the TRO Action amended and modified the Rule 11 Agreement to: (a) provide the TRO Defendants the opportunity to challenge the Texas Court's jurisdiction pursuant to a briefing schedule concluding on July 24, 2025; (b) clarify the parties' discovery rights with respect to the TRO Action; and (c) evidence the restrictions imposed upon the activities of the TRO Defendants and their subsidiaries pursuant to the Rule 11 Agreement pending a decision by the Texas Court of the TRO Action and the Plea.[129] On July 14, 2025, the TRO Defendants filed a jurisdictional challenge, asserting that: (1) the Texas Court lacks subject matter jurisdiction to hear the TRO Action; and (2) the Supporting Organizations lack standing, suggesting that the JOLs, on behalf of HoldCo, are the appropriate parties to assert the claims alleged in the TRO Action.[130]

98.     The JOLs support the Final Rule 11 Agreement in the near term in that it imposes restrictions on the covered entities regarding asset dissipation in the short term, pending the

---

[127] Ex. 88, Proposed Order (Rule 11 Agreement).

[128] Id.

[129] Ex. 89, Final Rule 11 Agreement.

[130] Ex. 90, Defendants' MTD & Plea to the Jurisdiction.

outcome of the Injunctive Relief Application filed by the JOLs in the Cayman Court and the recognition of relief as may be granted by the Cayman Court in this Chapter 15 Case.[131] The JOLs believe that the Cayman Court is the appropriate forum to adjudicate causes of action that belong to HoldCo as asserted in the Cayman Litigation.[132] The JOLs are also cognizant of the need for administrative efficiency in connection with the Cayman Proceeding and their duties to realize upon HoldCo's assets, and, accordingly, reserve rights with respect to coordination and management of the TRO Action, the Cayman Litigation and this Chapter 15 Case.

**H.     This Chapter 15 Case**

99.     On the Petition Date and in my capacity as one of the JOLs of the Debtor, I, alongside Mr. Bhowmik, filed a petition under chapter 15 of the Bankruptcy Code for recognition of the Cayman Proceeding, thereby commencing the Debtor's Chapter 15 Case.

100.     Consistent with the purpose of official liquidation under Part V of the Companies Act, section 110(2), the Petitioners are also empowered to investigate: (a) the causes for the failure of HoldCo, as necessary, and (b) generally, the promotion, business, dealings and financial affairs of HoldCo.[133]

101.     Section 97(1) of the Companies Act provides in relevant part that upon the entry of a winding up order against a company, no suit or other proceeding may be commenced or continued against the company except with leave of the Cayman Court and subject to such terms as the Cayman Court might impose.[134] This automatic stay mirrors the stay imposed in United

---

[131] Ex. 89, Final Rule 11 Agreement.

[132] Ex. 59, Statement of Claim.

[133] Ex. 78, Companies Act.

[134] Id.

States bankruptcy proceedings and serves to, *inter alia*, facilitate the Petitioners' ability to deal with claims and creditors collectively and comprehensively.

102. A general principle underlying the Companies Act and the Cayman Proceeding is that creditors are treated on a *pari passu* basis, subject to certain exceptions.[135]

103. Cayman liquidation proceedings are fair and equitable insofar as all creditors and interest holders have the opportunity to be heard by the Cayman Court and no creditors will be prejudiced on the sole basis that they are foreign based. All creditors are treated equally, regardless of where they are domiciled.

**I. Qualifications for Recognition and Jurisdiction in the United States**

104. On the Petition Date and in my capacity as one of the JOLs of the Debtor, I, alongside Mr. Bhowmik, filed a petition under chapter 15 of the Bankruptcy Code for recognition of the Cayman Proceeding, thereby commencing the Debtor's Chapter 15 Cases.

105. I was authorized pursuant to the Supervision Order to act as one of the JOLs of the Cayman Proceeding and to seek recognition and approval of the Cayman Proceeding as necessary, including as "foreign main proceedings" under the Bankruptcy Code. In light of the statutory presumption embodied in section 1516(a) of the Bankruptcy Code, the Bankruptcy Code's definition of "foreign representative," and the Supervision Order, I understand that I satisfy the requirements to serve as the "foreign representative" of the Cayman Proceeding.

106. I have been advised that, in order to qualify for recognition under chapter 15, the Verified Petition must meet certain requirements. In particular, it must be brought by a "foreign representative" of a "foreign proceeding" that is pending before a "foreign court," all as defined in the Bankruptcy Code.

---

[135] For example, see sections 140 and 141 of the Companies Act. Ex. 78, Companies Act.

107.     I am aware of the definition of "foreign representative," as referred to in 11 U.S.C. § 101(24), and I believe that the JOLs qualify as such. The JOLs were appointed by the Cayman Court pursuant to the Companies Act to act as the JOLs of HoldCo. Among other things, the JOLs are authorized to exercise the following powers under Part I of Schedule 3 to the Companies Act without further Cayman Court sanction: (a) the power to commence legal proceedings in the name and on behalf of HoldCo to obtain information, documents, or the examination of individuals in the Cayman Islands or the United States; and (b) the power to apply in the Cayman Islands or the United States for the preservation, freezing, or attachment of assets to which HoldCo is or may arguably be entitled. Moreover, the JOLs are authorized to seek registration or recognition of themselves and/or the Official Liquidation in any U.S. state for any purpose related to the exercise of the powers described in the Supervision Order.[136] As such, the JOLs are the persons responsible for representing HoldCo in the Cayman Proceedings and in all related matters, including this matter, and are therefore "foreign representatives" of HoldCo within the meaning of section 101(24) of the Bankruptcy Code.[137]

108.     I also have been advised that a "foreign court" is defined in section 1502 of the Bankruptcy Code as "a judicial or other authority competent to control or supervise a foreign proceeding." I respectfully submit that the Cayman Court qualifies as a foreign court for the purposes of section 1502.

109.     I understand that a "foreign proceeding" is defined as "a collective judicial . . . proceeding in a foreign country . . . under a law relating to insolvency or the adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a

---

[136] Id.

[137] Ex. 1, Supervision Order.

foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23). I respectfully submit that the Cayman Proceeding qualifies as such, since, by definition, it is a liquidation proceeding pursuant to and governed by the Companies Act under the collective judicial supervision of the Cayman Court for the benefit of all of HoldCo's creditors, and parties in interest.[138]

110.    I am also aware that section 1517(b)(1) of the Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign main proceeding" if the foreign proceeding is "pending in the country where the debtor has the center of its main interests". I understand that section 1516(c) of the Bankruptcy Code provides that a debtor's "registered office" is presumed to be the debtor's COMI in the absence of evidence to the contrary. Since HoldCo was formed under the laws of the Cayman Islands and maintains its registered office there,[139] I believe that there is no basis for rebutting this statutory presumption that is afforded. In any case, the facts clearly indicate that HoldCo's COMI is the Cayman Islands. As demonstrated by the facts included herein, I further believe that HoldCo is engaged in non-transitory economic activity in the Cayman Islands.

111.    As JOLs, we have displaced the prior board of directors of HoldCo. No action with respect to HoldCo, whether transactional-related or litigation-related, may be taken without the express approval and consent of myself and Mr. Bhowmik. All of HoldCo's known assets and interests are under the sole and exclusive control of the JOLs from the Cayman Islands. Consistent

---

[138] Id.; Ex. 77, J&E Petition.

[139] Ex. 3, Certificate of Incorporation - Charitable DAF Holdco, Ltd; Ex. 5, Amended and Restated Memorandum and Articles of Association of Charitable DAF; Ex. 80, Filed Resolutions re Change of Registered Office - Charitable DAF Holdco, Ltd.

with the Companies Act, the Winding Up Rules and the Supervision Order, Mr. Bhowmik and I have engaged in numerous activities to further HoldCo's liquidation.[140]

112.     Since our appointment by the Cayman Court, we have worked from our offices at Grant Thornton in the Cayman Islands, from which all decisions are made, and have: (i) retained Cayman Islands and U.S. legal counsel from our Cayman Islands offices and under Cayman Islands law; (ii) obtained certain books and records of HoldCo in the Cayman Islands; (iii) regularly communicated with creditors and shareholders from the Cayman Islands; and (iv) commenced investigations into the affairs of HoldCo and its subsidiaries, including taking steps to identify and seek discovery from potential parties in interest both within and outside the Cayman Islands. All relevant inquiries from creditors and other parties-in-interest are now directed to the JOLs.

113.     I have reviewed documentation issued by and to HoldCo prior to the Cayman Proceeding, including the Amended and Restated Memorandum and Articles of Association of HoldCo dated February 20, 2025, the Fund LPA, books and records of HoldCo, and various shareholder and directors resolutions of HoldCo. In all such documentation which I have reviewed, HoldCo is referred to and addressed as a Cayman Islands company. Thus, all parties-in-interest were aware that HoldCo was a Cayman Islands company. No creditor or stakeholder objected to the liquidation in the Cayman Islands and all major stakeholders are actively participating in the Cayman Proceeding. All creditors of HoldCo must submit their claims in the Cayman Proceeding, and stakeholders have the right to access the Cayman Court and appeal decisions of the JOLs.

114.     Based upon the above, I am confident that HoldCo's "nerve center" has been established in the Cayman Islands with the JOLs. I also believe that all relevant creditors,

---

[140] Ex. 1, Supervision Order; Ex. 78, Companies Act; Ex. 79, Winding Up Rules.

stakeholders, and shareholders regard HoldCo to be a Cayman Islands company and the Cayman Islands to be HoldCo's current "nerve center." I further believe it is clear that since the commencement of the Cayman Proceeding, HoldCo has been engaged in non-transitory economic activity in the Cayman Islands.

115.    In accordance with 11 U.S.C. § 1515(c), I am aware of no other pending foreign insolvency proceedings, except the Cayman Proceeding, in which HoldCo is the subject of the proceeding.

116.    In accordance with Rule 1007-1(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), a schedule of known and pending actions in the United States in which HoldCo is named as a party is attached to the Form 401 Petition, together with the disclosures required under Bankruptcy Rule 7007.1, the JOLs are authorized under Cayman Islands law, subject to sanction of the Cayman Court, to act on behalf of HoldCo in staying, defending against, or prosecuting these actions, as applicable.

## J.    Need for Broad Discovery Rights

117.    I am aware that this Court can afford the JOLs broad discovery rights pursuant to sections 542(e), 1521(a)(4), and 1521(a)(7) of the Bankruptcy Code.

118.    I am of the belief that the JOLs must be afforded broad discovery rights in the United States to facilitate their investigations, particularly with respect to the Fund. First, this requires access to all documents relating to the Debtor's property or financial affairs, necessitating the need for section 542(e) relief. Second, the Petitioners must be able to broadly issue Rule 2004 examinations, as well as to be afforded all discovery rights under the Federal Rules of Civil Procedures, as incorporated by the Bankruptcy Rules. Only by affording the Petitioners the

necessary tools to complete their investigations will the JOLs be able to maximize distributions such that creditors and interested parties are sufficiently protected.

### K. Need for Recognition of the Injunctive Relief Order

119. I am aware that this Court can recognize the Injunctive Relief Order under section 1507(b) after considering certain equitable and practical considerations. These include: (i) just treatment of all holders of claims against or interests in HoldCo's property; (ii) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims the Cayman Proceeding; (iii) prevention of preferential or fraudulent dispositions of property of HoldCo; (iv) distribution of proceeds of HoldCo's property substantially in accordance with the order prescribed under U.S. Bankruptcy law; and (v) if appropriate, the provision of an opportunity for a fresh start for HoldCo pursuant to the Cayman Proceeding.

120. I am of the belief that the Injunctive Relief Order should be recognized by this Court under section 1507(b). First, the relief promotes fair and equitable treatment of all creditors by preserving the value of HoldCo's estate for the benefit of all stakeholders, rather than potentially allowing the Named Defendants to obtain an unfair advantage through the dissipation or diversion of assets. Second, recognition ensures that U.S.-based creditors are not exposed to procedural disadvantage in the Cayman Proceeding, as the Injunctive Relief Order operates neutrally to safeguard HoldCo's property pending full adjudication of the claims, rather than favoring any specific jurisdiction or creditor group.[141] Third, the Injunctive Relief Order directly addresses and prevents improper transfers or dissipation of HoldCo's assets, which is essential to maintaining the status quo during the JOLs' ongoing investigation and the Cayman Litigation.[142] Finally, I have

---

[141] Ex. 82, Injunction Application.

[142] Id.

been advised that the relief sought supports a distribution framework that is aligned, in substance, with U.S. bankruptcy priorities by ensuring assets are preserved for collective resolution and eventual equitable distribution.

121.     Additionally, I have been advised that the Injunctive Relief Order can be recognized by this Court under section 1521(a)(7) of the Bankruptcy Code if such relief is otherwise available to a trustee in bankruptcy. The Cayman Court has already determined that: (a) the Cayman Litigation had a reasonable prospect of success; and (b) that the interests of the Debtor's stakeholders were best served by the JOLs commencing the Cayman Litigation.[143] Further, the Named Defendants have been afforded due process and given notice of the Injunctive Relief Application and the Injunction Hearing Date and will have the opportunity to appear at the hearing and respond to the Injunctive Relief Application before relief is granted by the Cayman Court.[144] Therefore, to the extent the Injuncitve Relief Order is entered in the Cayman Islands, I am of the belief it should be recognized by this Court in the interests of comity.

122.     For all of these reasons, I respectfully request that this Court enter an Order: (a) recognizing my colleague, Sandipan Bhowmik, and myself as duly authorized foreign representatives of HoldCo and the Cayman Proceeding as a foreign main proceeding, or in the alternative as a "foreign non main proceeding", under chapter 15 of the Bankruptcy Code; (b) granting relief pursuant to sections 105(a), 1502, 1507, 1510, 1520 and 1521 of the Bankruptcy Code; and (c) granting such other and further relief as this Court may deem just and proper.

*[Remainder of page intentionally left blank.]*

---

[143] Ex. 85, Sanction to File Statement of Claim.

[144] Ex. 82, Injunction Application.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 21, 2025
Cayman Islands

/s/ Margot MacInnis
MARGOT MACINNIS

*Joint Official Liquidator of
Charitable DAF HoldCo, Ltd
(in Official Liquidation)*

# EXHIBIT 1



FSD NO. 116 OF 2025 (JAJ)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**
**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD**

**BEFORE THE HONOURABLE JUSTICE JALIL ASIF KC**
**IN CHAMBERS**

**6 MAY 2025**

---

### SUPERVISION ORDER

---

**UPON** the petition filed on 2 May 2025 by (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund for an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd continue under the supervision of the Court pursuant to s.131 Companies Act (2025 Revision)

**AND UPON** hearing counsel for the Petitioners and counsel for DFW Charitable Foundation

**AND UPON** reading the petition herein, the affidavit of Julie Diaz and exhibit JD-2 sworn on 29 April 2025 and the affirmation of Rhiannon Zanetic and exhibit RMZ-1 signed (but not affirmed) on 29 April 2025

**AND UPON** reading the following documents filed in Cause FSD 2025-0099 (JAJ): the winding up petition filed on 10 April 2025, the first affidavit of Julie Diaz and exhibit JD-1 sworn on 10 April 2025, the affidavit of James Dondero and exhibit JDD-1 sworn on 9 April 2025 and the affidavit of Geoffrey Sykes and exhibit GS-1 sworn on 27 April 2025

**AND UPON** reading the affidavit of Margot Macinnis and exhibit MM-1 sworn on 28 April 2025 and the affidavit of Sandipan Bhowmik and exhibit SB-1 sworn on 28 April 2025 providing their consents to act as official liquidators of Charitable DAF HoldCo, Ltd

**IT IS HEREBY ORDERED that:**

1. The voluntary liquidation of Charitable DAF HoldCo, Ltd ("the Company") be continued under the supervision of the Court pursuant to s.131 of the Act and O.15, r.8 of the Companies Winding Up Rules (2023 Consolidation).

**THIS ORDER** was filed by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

*Filed: 09-May-2025 15:00 EST*
*Auth Code: C02067594574*

**Page 2 of 3**

2. The following persons are appointed as joint official liquidators of the Company:

| Name | Address | Contact Details |
|---|---|---|
| Margot MacInnis | Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands | +1 345 949 8588 margot.macinnis@uk.gt.com |
| Sandipan Bhowmik | | +1 345 949 8588 sandipan.bhowmik@uk.gt.com |

3. The joint official liquidators may act jointly and severally.

4. The joint official liquidators are not required to give security for their appointment.

5. The joint official liquidators are authorised to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:

   a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and

   b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

6. The joint official liquidators are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:

   a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

   b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

   c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

7. The Court dispenses with the requirement for the summons herein and the hearing of the summons to be advertised pursuant to CWR O.15.

8. The joint official liquidators' reasonable remuneration and expenses be paid out of the assets of the Company in accordance with s.109 of the Act, Part III of the Insolvency Practitioners Regulations and CWR O.20.

9. The joint voluntary liquidators shall prepare a final report and accounts for the period from the commencement of the voluntary liquidation until the date of this Order and shall deliver such report to the joint official liquidators within 28 days of this Order.

**THIS ORDER** was filed by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

Filed: 09-May-2025 15:00 EST
Auth Code: C02067594574

www.verify.gov.ky File#: 263805

10. The costs of this summons shall be paid out of the assets of the Company as an expense in the liquidation, such costs to be taxed on the indemnity basis if not agreed with the joint official liquidators.

**Dated 6 May 2025**

Filed   6 May 2025

**THE HONOURABLE JUSTICE JALIL ASIF KC**
**JUDGE OF THE GRAND COURT**

**THIS ORDER** was filed by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

# EXHIBIT 2

Commercial in confidence

# Margot MacInnis

## Partner, Practice Leader – Cayman Islands



**Contact details**

T +1 345 769 7218

E margot.macinnis@uk.gt.com

## Background

Margot is the head of Grant Thornton Specialist Services in the Cayman Islands. With over 25 years of experience in offshore and cross border restructuring and insolvency matters, Margot is an innovator and known for her leadership and success across dozens of high profile complex cross border asset recovery and insolvency cases.

Margot has extensive experience in insolvency and forensic assignments, including global asset recovery engagements. Margot is a certified fraud examiner and has provided expert or supporting forensic or financial analysis and regularly appointed to by the Cayman and BVI Courts and regulators in connection with provisional, official liquidation appointments as well as a Receiver in litigated disputes and other insolvency matters

Margot is regularly appointed by the Cayman court as an official on provisional liquidator to locate assets, secure and enforce collateral internationally and work closely with creditors and liquidation committees to establish strategy to maximise their return. Margot's experience covers various industries including funds and alternative investment, oil and gas, medical technology banking, mining, real estate and property investment and manufacturing companies. Her work often has a cross-border focus including work in Cayman, BVI, Asia, United States, Canada, Switzerland, U.K. and Europe.

## Professional Qualifications and Memberships

- Appointment Taker recognized by the Grand Court in the Cayman Islands and BVI Court.

- Member of the Association of Certified Fraud Examiners

- Member of the Association of Certified Anti Money Laundering Specialists

- Member of the New Brunswick Institute of Chartered Accountants, Canada

- Member of several other professional associations including:

  - NBICA (Canada),
  - Cayman Islands Society of Professional Accountants (CIIPA)
  - International Women's Insolvency & Restructuring Confederation (IWIRC)

## Relevant Experience

- Appointed Joint Provisional Liquidator of a Cayman top co Company trading on the NYSE, headquartered in HK with subsidiaries in BVI, PRC and Singapore with the entire group estimated to be worth north of US$1 billion. Work included pursuing litigation in HK and Cayman against former management and preserving assets in the PRC.

- Appointed Liquidator of a number of large US based hedge funds and appointed under Chapter 15 as the foreign representative including Sphinx Group of Companies, China Medical, and Platinum Partners.

- Regularly appointed with the Hong Kong office on cross-border insolvency matters, many of which involve hedge funds and developing realisation strategies in respect of the wind up of the portfolios or funds.

- Appointed under Chapter 15 as the foreign representative in a number of high-profile bankruptcy and restructuring cases including Richard Pelletier, China Medical, China Milk, William & Patricia Millard, Richard Pelletier and Platinum Partners.

- Appointed Liquidator (in Cayman) of a group of 22 companies with an investment strategy designed to achieve returns consistent with the performance of the S&P Index. Work included the winding up of the portfolio positions; obtaining Chapter 15 recognition; asset tracing and investigation of third-party claims; resolving issues relating to rights and interest of creditors and investors; and the successful scheme of arrangement to achieve distributions of the US$500m of assets and recoveries from the litigation strategy.

## An Industry Thought Leader

- Former Caribbean board member of International board of and local chapter of the Women's Insolvency & Restructuring Confederation (IWIRC)

- Who's Who Legal Global Elite Thought Leaders – Asset Recovery Expert 2021, 2022, 2023 and 2024

- Lexology Index (fka. Who's Who Legal) Country Awards, Cayman Islands - Experts 2024 and Consulting Experts – Asset Recovery 2024

- Who's Who Legal Thought Leaders - Restructuring & Insolvency Advisors 2022

- Who's Who Legal Advisors – Restructuring & Insolvency Advisors 2020

- Who's Who Legal's Restructuring and Insolvency Advisers – Leading Practitioner 2024

1

# EXHIBIT 3

WK–263805

# Certificate Of Incorporation

I, *FLOSSIEBELL M. MARAGH* *Assistant Registrar of Companies of the Cayman Islands*
*DO HEREBY CERTIFY, pursuant to the Companies Law  CAP. 22,  that all requirements of the said*
*Law in respect of registration were complied with by*

**Charitable DAF HoldCo, Ltd**

*an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect*
*from the 27th day of October Two Thousand Eleven*

*Given under my hand and Seal at George Town in the*
*Island of Grand Cayman this 27th day of October*
*Two Thousand Eleven*



**Assistant Registrar of Companies,**
**Cayman Islands.**

WK–263805

# Certificate Of Incorporation

I, **FLOSSIEBELL M. MARAGH** Assistant Registrar of Companies of the Cayman Islands DO HEREBY CERTIFY, pursuant to the Companies Law  CAP. 22,  that all requirements of the said Law in respect of registration were complied with by

## Charitable DAF HoldCo, Ltd

an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect from the 27th day of October Two Thousand Eleven

Given under my hand and Seal at George Town in the Island of Grand Cayman this 27th day of October Two Thousand Eleven

CERTIFIED TO BE A TRUE AND CORRECT COPY

Sig..

Flossiebell M. Maragh
Assistant Registrar

Date   27 October   2011

(SGD. FLOSSIEBELL M. MARAGH)

**Assistant Registrar of Companies, Cayman Islands.**

COPY

WK–263805

# Certificate Of Incorporation

I, **FLOSSIEBELL M. MARAGH** *Assistant Registrar of Companies of the Cayman Islands*
*DO HEREBY CERTIFY, pursuant to the Companies Law  CAP. 22,  that all requirements of the said*
*Law in respect of registration were complied with by*

### Charitable DAF HoldCo, Ltd

*an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect*
*from the 27th day of October Two Thousand Eleven*

*Given under my hand and Seal at George Town in the*
*Island of Grand Cayman this 27th day of October*
*Two Thousand Eleven*

CERTIFIED TO BE A TRUE AND CORRECT COPY

Sig..

Flossiebell M. Maragh
*Assistant Registrar*
Date    27 October   2011

(SGD. FLOSSIEBELL M. MARAGH)

**Assistant Registrar of Companies,**
**Cayman Islands.**

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS

# EXHIBIT 4

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD



**WALKERS**

Walker House, 87 Mary Street, George Town
Grand Cayman KY1-9001, Cayman Islands
T 345 949 0100  F 345 949 7886  www.walkersglobal.com
**REF: RP/GOL/H-109190**

4828489.1 H0851.109190

REGISTERED AND FILED
AS NO: 268805 THIS 27 DAY
OF October, 2011

Asst. Registrar of Companies
Cayman Islands

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

1.  The name of the company is Charitable DAF HoldCo, Ltd (the "**Company**").

2.  The registered office of the Company will be situated at the offices of Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands or at such other location as the Directors may from time to time determine.

3.  The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4.  The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5.  The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6.  The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7.  The capital of the Company is **US$50,000.00** divided into **5,000,000** shares of a nominal or par value of **US$0.01** each provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8.  The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



4828489.1 H0851.109190

The undersigned, whose name, address and description are set out below, wishes the Company to be incorporated as a company in the Cayman Islands in accordance with this Memorandum of Association, and agrees to take the number of shares in the capital of the Company as set out opposite the undersigned's name.

| NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER | NUMBER OF SHARES TAKEN BY SUBSCRIBER |
|---|---|
| Walkers Nominees Limited, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands | ONE SHARE |

(Sgd) Roderick Palmer

Roderick Palmer
as Authorised Signatory of Walkers Nominees Limited

Dated: 27 October 2011

(Sgd) Grainne O'Leary

Signature of Witness

Name: Grainne O'Leary

Address: 87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

Occupation: Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG. _____

Flossiebell M. Marash
Assistant Registrar

Date. 27 October, 2011

REGISTRAR OF COMPANIES EXEMPTED CAYMAN ISLANDS

2

4828489_1
4828489.1 H0851.109190

## TABLE OF CONTENTS

| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 3 |
| SHARES | 4 |
| MODIFICATION OF RIGHTS | 4 |
| CERTIFICATES | 5 |
| FRACTIONAL SHARES | 5 |
| LIEN | 5 |
| CALLS ON SHARES | 6 |
| FORFEITURE OF SHARES | 6 |
| TRANSFER OF SHARES | 7 |
| TRANSMISSION OF SHARES | 7 |
| ALTERATION OF SHARE CAPITAL | 8 |
| REDEMPTION, PURCHASE AND SURRENDER OF SHARES | 8 |
| TREASURY SHARES | 9 |
| GENERAL MEETINGS | 9 |
| NOTICE OF GENERAL MEETINGS | 10 |
| PROCEEDINGS AT GENERAL MEETINGS | 10 |
| VOTES OF SHAREHOLDERS | 11 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 12 |
| DIRECTORS | 12 |
| ALTERNATE DIRECTOR | 13 |
| POWERS AND DUTIES OF DIRECTORS | 13 |
| BORROWING POWERS OF DIRECTORS | 15 |
| THE SEAL | 15 |

i

4828489.1 H0851.109190

DISQUALIFICATION OF DIRECTORS ........................................................................ 15

PROCEEDINGS OF DIRECTORS ............................................................................... 16

DIVIDENDS ................................................................................................................ 17

ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ........................ 18

CAPITALISATION OF RESERVES ........................................................................... 19

SHARE PREMIUM ACCOUNT ................................................................................. 19

NOTICES ................................................................................................................... 20

INDEMNITY ............................................................................................................... 21

NON-RECOGNITION OF TRUSTS ........................................................................... 21

WINDING UP ............................................................................................................. 22

AMENDMENT OF ARTICLES OF ASSOCIATION ................................................... 22

CLOSING OF REGISTER OR FIXING RECORD DATE ............................................ 22

REGISTRATION BY WAY OF CONTINUATION ....................................................... 22

MERGERS AND CONSOLIDATION ......................................................................... 23

DISCLOSURE ........................................................................................................... 23

ii



COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

## TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

## INTERPRETATION

1.  In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

    "**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

    "**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

    "**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

    "**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

    "**Law**" means the Companies Law (as amended) of the Cayman Islands.

    "**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

    "**Office**" means the registered office of the Company as required by the Law.

    "**Ordinary Resolution**" means a resolution:

4828489.1 H0851.109190

(a) passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Law and these Articles, means the Register maintained by the Company pursuant to the Law and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law and includes any Branch Register(s) established by the Company in accordance with the Law.

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a share in the capital of the Company. All references to "Shares" herein shall be deemed to be Shares of any or all Classes as the context may require. For the avoidance of doubt in these Articles the expression "Share" shall include a fraction of a Share.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders

2

and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

2.  In these Articles, save where the context requires otherwise:

    (a)  words importing the singular number shall include the plural number and vice versa;

    (b)  words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

    (c)  the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

    (d)  reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

    (e)  reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;

    (f)  reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

    (g)  reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

3.  Subject to the preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

4.  The business of the Company may be commenced at any time after incorporation.

5.  The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

6.  The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

7.  The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Law and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Law, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Law.

3

4828489.1 H0851.109190

## SHARES

8. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

(b) grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

9. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

10. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

11. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MODIFICATION OF RIGHTS

12. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Shares of the relevant Class, or with the sanction of a resolution passed at a separate meeting of the holders of the Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that all such Classes would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes.

13. The rights conferred upon the holders of the Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation,

4

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD



Walker House, 87 Mary Street, George Town
Grand Cayman KY1-9001, Cayman Islands
T 345 949 0100  F 345 949 7886  www.walkersglobal.com

**REF: RP/GOL/H-109190**

4828489.1 H0851.109190

REGISTERED AND FILED
AS NO: 268805 THIS 27 DAY
OF October, 2011
Asst. Registrar of Companies
Cayman Islands

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

1. The name of the company is Charitable DAF HoldCo, Ltd (the "**Company**").

2. The registered office of the Company will be situated at the offices of Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is **US$50,000.00** divided into **5,000,000** shares of a nominal or par value of **US$0.01** each provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



4828489.1 H0851.109190

The undersigned, whose name, address and description are set out below, wishes the Company to be incorporated as a company in the Cayman Islands in accordance with this Memorandum of Association, and agrees to take the number of shares in the capital of the Company as set out opposite the undersigned's name.

| NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER | NUMBER OF SHARES TAKEN BY SUBSCRIBER |
|---|---|
| Walkers Nominees Limited, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands | ONE SHARE |

(Sgd) Roderick Palmer
_____
Roderick Palmer
as Authorised Signatory of Walkers Nominees Limited

Dated: 27 October 2011

(Sgd) Grainne O'Leary
_____
Signature of Witness

Name:       Grainne O'Leary

Address:    87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

Occupation: Secretary



CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG. _____
Flossiebell M. Marsh
Assistant Registrar

Date. 27 October, 2011

2

4828489_1
4828489.1 H0851.109190

## TABLE OF CONTENTS

| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 3 |
| SHARES | 4 |
| MODIFICATION OF RIGHTS | 4 |
| CERTIFICATES | 5 |
| FRACTIONAL SHARES | 5 |
| LIEN | 5 |
| CALLS ON SHARES | 6 |
| FORFEITURE OF SHARES | 6 |
| TRANSFER OF SHARES | 7 |
| TRANSMISSION OF SHARES | 7 |
| ALTERATION OF SHARE CAPITAL | 8 |
| REDEMPTION, PURCHASE AND SURRENDER OF SHARES | 8 |
| TREASURY SHARES | 9 |
| GENERAL MEETINGS | 9 |
| NOTICE OF GENERAL MEETINGS | 10 |
| PROCEEDINGS AT GENERAL MEETINGS | 10 |
| VOTES OF SHAREHOLDERS | 11 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 12 |
| DIRECTORS | 12 |
| ALTERNATE DIRECTOR | 13 |
| POWERS AND DUTIES OF DIRECTORS | 13 |
| BORROWING POWERS OF DIRECTORS | 15 |
| THE SEAL | 15 |

i

DISQUALIFICATION OF DIRECTORS ................................................. 15

PROCEEDINGS OF DIRECTORS ................................................. 16

DIVIDENDS ................................................. 17

ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ................................................. 18

CAPITALISATION OF RESERVES ................................................. 19

SHARE PREMIUM ACCOUNT ................................................. 19

NOTICES ................................................. 20

INDEMNITY ................................................. 21

NON-RECOGNITION OF TRUSTS ................................................. 21

WINDING UP ................................................. 22

AMENDMENT OF ARTICLES OF ASSOCIATION ................................................. 22

CLOSING OF REGISTER OR FIXING RECORD DATE ................................................. 22

REGISTRATION BY WAY OF CONTINUATION ................................................. 22

MERGERS AND CONSOLIDATION ................................................. 23

DISCLOSURE ................................................. 23

4828489.1 H0851.109190



COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

## TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

## INTERPRETATION

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

   "**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

   "**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

   "**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

   "**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

   "**Law**" means the Companies Law (as amended) of the Cayman Islands.

   "**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

   "**Office**" means the registered office of the Company as required by the Law.

   "**Ordinary Resolution**" means a resolution:

4828489.1 H0851.109190

(a)  passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)  approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Law and these Articles, means the Register maintained by the Company pursuant to the Law and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law and includes any Branch Register(s) established by the Company in accordance with the Law.

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a share in the capital of the Company. All references to "Shares" herein shall be deemed to be Shares of any or all Classes as the context may require. For the avoidance of doubt in these Articles the expression "Share" shall include a fraction of a Share.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a)  passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)  approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders

4828489.1 H0851.109190

and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

2.  In these Articles, save where the context requires otherwise:

    (a)  words importing the singular number shall include the plural number and vice versa;

    (b)  words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

    (c)  the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

    (d)  reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

    (e)  reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;

    (f)  reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

    (g)  reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

3.  Subject to the preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## PRELIMINARY

4.  The business of the Company may be commenced at any time after incorporation.

5.  The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

6.  The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

7.  The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Law and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Law, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Law.

4828489.1 H0851.109190

## SHARES

8. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

    (a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

    (b) grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

    and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

9. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

10. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

11. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MODIFICATION OF RIGHTS

12. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Shares of the relevant Class, or with the sanction of a resolution passed at a separate meeting of the holders of the Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that all such Classes would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes.

13. The rights conferred upon the holders of the Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation,

4

allotment or issue of further Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Shares of any Class by the Company.

## CERTIFICATES

14. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

15. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

## LIEN

16. The Company has a first and paramount lien on every Share (whether or not fully paid) for all amounts (whether presently payable or not) payable at a fixed time or called in respect of that Share. The Company also has a first and paramount lien on every Share (whether or not fully paid) registered in the name of a Person indebted or under liability to the Company (whether he is the sole registered holder of a Share or one of two or more joint holders) for all amounts owing by him or his estate to the Company (whether or not presently payable). The Directors may at any time declare a Share to be wholly or in part exempt from the provisions of this Article. The Company's lien on a Share extends to any amount payable in respect of it.

17. The Company may sell, in such manner as the Directors in their absolute discretion think fit, any Share on which the Company has a lien, but no sale shall be made unless an amount in respect of which the lien exists is presently payable nor until the expiration of fourteen days after a notice in writing, demanding payment of such part of the amount in respect of which the lien exists as is presently payable, has been given to the registered holder for the time being of the Share, or the Persons entitled thereto by reason of his death or bankruptcy.

18. For giving effect to any such sale the Directors may authorise some Person to transfer the Shares sold to the purchaser thereof. The purchaser shall be registered as the holder of the Shares comprised in any such transfer and he shall not be bound to see to the application of the purchase money, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the sale.

19. The proceeds of the sale after deduction of expenses, fees and commission incurred by the Company shall be received by the Company and applied in payment of such part of the amount in respect of which the lien exists as is presently payable, and the residue shall (subject to a like lien for sums not presently payable as existed upon the Shares prior to the sale) be paid to the Person entitled to the Shares immediately prior to the sale.

4828489.1 H0851.109190

## CALLS ON SHARES

20. The Directors may from time to time make calls upon the Shareholders in respect of any moneys unpaid on their Shares, and each Shareholder shall (subject to receiving at least fourteen days' notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on such Shares.

21. The joint holders of a Share shall be jointly and severally liable to pay calls in respect thereof.

22. If a sum called in respect of a Share is not paid before or on the day appointed for payment thereof, the Person from whom the sum is due shall pay interest upon the sum at the rate of eight percent per annum from the day appointed for the payment thereof to the time of the actual payment, but the Directors shall be at liberty to waive payment of that interest wholly or in part.

23. The provisions of these Articles as to the liability of joint holders and as to payment of interest shall apply in the case of non-payment of any sum which, by the terms of issue of a Share, becomes payable at a fixed time, whether on account of the amount of the Share, or by way of premium, as if the same had become payable by virtue of a call duly made and notified.

24. The Directors may make arrangements on the issue of partly paid Shares for a difference between the Shareholders, or the particular Shares, in the amount of calls to be paid and in the times of payment.

25. The Directors may, if they think fit, receive from any Shareholder willing to advance the same all or any part of the moneys uncalled and unpaid upon any partly paid Shares held by him, and upon all or any of the moneys so advanced may (until the same would, but for such advance, become presently payable) pay interest at such rate (not exceeding without the sanction of an Ordinary Resolution, eight percent per annum) as may be agreed upon between the Shareholder paying the sum in advance and the Directors.

## FORFEITURE OF SHARES

26. If a Shareholder fails to pay any call or instalment of a call in respect of any Shares on the day appointed for payment, the Directors may, at any time thereafter during such time as any part of such call or instalment remains unpaid, serve a notice on him requiring payment of so much of the call or instalment as is unpaid, together with any interest which may have accrued.

27. The notice shall name a further day (not earlier than the expiration of fourteen days from the date of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed the Shares in respect of which the call was made will be liable to be forfeited.

28. If the requirements of any such notice as aforesaid are not complied with, any Share in respect of which the notice has been given may at any time thereafter, before the payment required by notice has been made, be forfeited by a resolution of the Directors to that effect.

29. A forfeited Share may be sold or otherwise disposed of on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

30. A Person whose Shares have been forfeited shall cease to be a Shareholder in respect of the forfeited Shares, but shall, notwithstanding, remain liable to pay to the Company all moneys which at the date of forfeiture were payable by him to the Company in respect of the Shares

6

4828489.1 H0851.109190

forfeited, but his liability shall cease if and when the Company receives payment in full of the amount unpaid on the Shares forfeited.

31. A statutory declaration in writing that the declarant is a Director, and that a Share has been duly forfeited on a date stated in the declaration, shall be conclusive evidence of the facts in the declaration as against all Persons claiming to be entitled to the Share.

32. The Company may receive the consideration, if any, given for a Share on any sale or disposition thereof pursuant to the provisions of these Articles as to forfeiture and may execute a transfer of the Share in favour of the Person to whom the Share is sold or disposed of and that Person shall be registered as the holder of the Share, and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the disposition or sale.

33. The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which by the terms of issue of a Share becomes due and payable, whether on account of the amount of the Share, or by way of premium, as if the same had been payable by virtue of a call duly made and notified.

## TRANSFER OF SHARES

34. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

35. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor.

36. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

37. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

## TRANSMISSION OF SHARES

38. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

39. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to

7

decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

40. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

41. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

42. The Company may by Ordinary Resolution:

(a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

43. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION, PURCHASE AND SURRENDER OF SHARES

44. Subject to the Law, the Company may:

(a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

(b) purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c) make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law; and

(d) accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

8

4828489.1 H0851.109190

45. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

46. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

47. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

## TREASURY SHARES

48. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Law. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

49. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

50. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

   (a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

   (b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Law, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.

51. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

## GENERAL MEETINGS

52. The Directors may, whenever they think fit, convene a general meeting of the Company.

53. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

54. General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the

9

objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

55. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

56. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

57. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

58. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

59. No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

60. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

61. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

10

4828489.1 H0851.109190

62. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

63. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

64. The chairman may adjourn a meeting from time to time and from place to place either:

    (a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting); or

    (b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

        (i) secure the orderly conduct or proceedings of the meeting; or

        (ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

65. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

66. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

67. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

68. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

## VOTES OF SHAREHOLDERS

69. Subject to any rights and restrictions for the time being attached to any Share, on a show of hands every Shareholder present in person and every Person representing a Shareholder by proxy shall, at a general meeting of the Company, each have one vote and on a poll every

Shareholder and every Person representing a Shareholder by proxy shall have one vote for each Share of which he or the Person represented by proxy is the holder.

70. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

71. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

72. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

73. On a poll votes may be given either personally or by proxy.

74. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

75. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

76. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

77. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

78. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

79. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

## DIRECTORS

80. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

4828489.1 H0851.109190

81. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

82. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

83. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

84. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

85. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

86. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

## ALTERNATE DIRECTOR

87. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be deemed to be an officer of the Company solely as a result of his appointment as an alternate. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

88. Any Director may appoint any Person , whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

## POWERS AND DUTIES OF DIRECTORS

89. Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

90. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the

13

administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

91. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

92. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

93. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

94. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

95. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

96. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

97. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

4828489.1 H0851.109190

## BORROWING POWERS OF DIRECTORS

98. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

## THE SEAL

99. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

100. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

101. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

102. The office of Director shall be vacated, if the Director:

   (a)    becomes bankrupt or makes any arrangement or composition with his creditors;

   (b)    dies or is found to be or becomes of unsound mind;

   (c)    resigns his office by notice in writing to the Company;

   (d)    is removed from office by Ordinary Resolution;

   (e)    is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or

   (f)    is removed from office pursuant to any other provision of these Articles.

15

4828489.1 H0851.109190

## PROCEEDINGS OF DIRECTORS

103. The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

104. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

105. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one. A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

106. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

107. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

108. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

109. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

   (a)     all appointments of officers made by the Directors;

16

(b)  the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c)  all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

110.  When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

111.  A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

112.  The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

113.  The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

114.  Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

115.  A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

116.  All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

## DIVIDENDS

117.  Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Law and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

118.  Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

17

119. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

120. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

121. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

122. Subject to any rights and restrictions for the time being attached to any Shares, all dividends shall be declared and paid according to the amounts paid up on the Shares, but if and for so long as nothing is paid up on any of the Shares dividends may be declared and paid according to the par value of the Shares.

123. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

124. No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

125. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

126. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

127. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

128. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

129. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

4828489.1 H0851.109190

## CAPITALISATION OF RESERVES

130. Subject to the Law and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Shares held by them respectively, or

(ii) paying up in full unissued Shares or debentures of a nominal amount equal to that sum,

and allot the Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Shares,

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

## SHARE PREMIUM ACCOUNT

131. The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

132. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price

4828489.1 H0851.109190

provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

## NOTICES

133. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

134. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

135. Any notice or other document, if served by:

    (a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

    (b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

    (c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

    (d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

136. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

137. Notice of every general meeting of the Company shall be given to:

    (a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

    (b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

20

4828489.1 H0851.109190

No other Person shall be entitled to receive notices of general meetings.

## INDEMNITY

138. Every Director (including for the purposes of this Article any alternate Director appointed pursuant to the provisions of these Articles), Secretary, assistant Secretary, or other officer for the time being and from time to time of the Company (but not including the Company's auditors) and the personal representatives of the same (each an "**Indemnified Person**") shall be indemnified and secured harmless against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such Indemnified Person, other than by reason of such Indemnified Person's own dishonesty, wilful default or fraud, in or about the conduct of the Company's business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such Indemnified Person in defending (whether successfully or otherwise) any civil proceedings concerning the Company or its affairs in any court whether in the Cayman Islands or elsewhere.

139. No Indemnified Person shall be liable:

   (a) for the acts, receipts, neglects, defaults or omissions of any other Director or officer or agent of the Company; or

   (b) for any loss on account of defect of title to any property of the Company; or

   (c) on account of the insufficiency of any security in or upon which any money of the Company shall be invested; or

   (d) for any loss incurred through any bank, broker or other similar Person; or

   (e) for any loss occasioned by any negligence, default, breach of duty, breach of trust, error of judgement or oversight on such Indemnified Person's part; or

   (f) for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers, authorities, or discretions of such Indemnified Person's office or in relation thereto;

unless the same shall happen through such Indemnified Person's own dishonesty, wilful default or fraud.

## NON-RECOGNITION OF TRUSTS

140. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

4828489.1 H0851.109190

## WINDING UP

141.    If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

142.    If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Shareholders or different Classes.  The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

143.    Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

144.    For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days.  If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

145.    In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

146.    If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BY WAY OF CONTINUATION

147.    The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being

22

incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATION

148. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Law.

## DISCLOSURE

149. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

4828489.1 H0851.109190

### NAME, ADDRESS AND DESCRIPTION
### OF SUBSCRIBER

Walkers Nominees Limited, 87 Mary
Street, George Town, Grand Cayman
KY1-9005, Cayman Islands

(Sgd) Roderick Palmer

Roderick Palmer
as Authorised Signatory for and on behalf of Walkers
Nominees Limited

Dated:      27 October 2011

(Sgd) Grainne O'Leary

Signature of Witness

Name:        Grainne O'Leary

Address      87 Mary Street, George
             Town, Grand Cayman
             KY1-9001, Cayman Islands

Occupation:  Secretary



CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG.

Flossiebell M. Marsh
Assistant Registrar

Date. 27 October, 2011

4828489.1 H0851.109190

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD



Walker House, 87 Mary Street, George Town
Grand Cayman KY1-9001, Cayman Islands
T 345 949 0100   F 345 949 7886   www.walkersglobal.com

**REF: RP/GOL/H-109190**

4828489.1 H0851.109190

REGISTERED AND FILED
AS NO: 263805 THIS 27 DAY
OF October, 2011

Asst. Registrar of Companies
Cayman Islands

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

1. The name of the company is Charitable DAF HoldCo, Ltd (the "**Company**").

2. The registered office of the Company will be situated at the offices of Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is **US$50,000.00** divided into **5,000,000** shares of a nominal or par value of **US$0.01** each provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



4828489.1 H0851.109190

The undersigned, whose name, address and description are set out below, wishes the Company to be incorporated as a company in the Cayman Islands in accordance with this Memorandum of Association, and agrees to take the number of shares in the capital of the Company as set out opposite the undersigned's name.

| NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER | NUMBER OF SHARES TAKEN BY SUBSCRIBER |
|---|---|
| Walkers Nominees Limited, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands | ONE SHARE |

(Sgd) Roderick Palmer

Roderick Palmer
as Authorised Signatory of Walkers Nominees Limited

Dated:      27 October 2011

(Sgd) Grainne O'Leary

Signature of Witness

Name:        Grainne O'Leary

Address:     87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

Occupation:  Secretary



CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG. _____

Flossiebell M. Marad
Assistant Registrar

Date. 27 October, 2011

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS

2

4828489_1
4828489.1 H0851.109190

## TABLE OF CONTENTS

**CLAUSE**                                                                          **PAGE**

TABLE A ..................................................................................................................... 1

INTERPRETATION ...................................................................................................... 1

PRELIMINARY ............................................................................................................. 3

SHARES ....................................................................................................................... 4

MODIFICATION OF RIGHTS ...................................................................................... 4

CERTIFICATES ........................................................................................................... 5

FRACTIONAL SHARES .............................................................................................. 5

LIEN ............................................................................................................................. 5

CALLS ON SHARES ................................................................................................... 6

FORFEITURE OF SHARES ........................................................................................ 6

TRANSFER OF SHARES ............................................................................................ 7

TRANSMISSION OF SHARES .................................................................................... 7

ALTERATION OF SHARE CAPITAL .......................................................................... 8

REDEMPTION, PURCHASE AND SURRENDER OF SHARES ................................. 8

TREASURY SHARES ................................................................................................. 9

GENERAL MEETINGS ............................................................................................... 9

NOTICE OF GENERAL MEETINGS .......................................................................... 10

PROCEEDINGS AT GENERAL MEETINGS .............................................................. 10

VOTES OF SHAREHOLDERS ................................................................................... 11

CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS ...................... 12

DIRECTORS ............................................................................................................... 12

ALTERNATE DIRECTOR ........................................................................................... 13

POWERS AND DUTIES OF DIRECTORS ................................................................. 13

BORROWING POWERS OF DIRECTORS ................................................................ 15

THE SEAL ................................................................................................................... 15

4828489.1 H0851.109190

DISQUALIFICATION OF DIRECTORS .................................................................................. 15

PROCEEDINGS OF DIRECTORS ......................................................................................... 16

DIVIDENDS ......................................................................................................................... 17

ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION .................................... 18

CAPITALISATION OF RESERVES ....................................................................................... 19

SHARE PREMIUM ACCOUNT ............................................................................................. 19

NOTICES ............................................................................................................................. 20

INDEMNITY .......................................................................................................................... 21

NON-RECOGNITION OF TRUSTS ....................................................................................... 21

WINDING UP ........................................................................................................................ 22

AMENDMENT OF ARTICLES OF ASSOCIATION ................................................................ 22

CLOSING OF REGISTER OR FIXING RECORD DATE ......................................................... 22

REGISTRATION BY WAY OF CONTINUATION .................................................................... 22

MERGERS AND CONSOLIDATION ...................................................................................... 23

DISCLOSURE ...................................................................................................................... 23

4828489.1 H0851.109190





COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

## TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

## INTERPRETATION

1.  In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Law**" means the Companies Law (as amended) of the Cayman Islands.

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Law.

"**Ordinary Resolution**" means a resolution:

4828489.1 H0851.109190

(a)     passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)     approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Law and these Articles, means the Register maintained by the Company pursuant to the Law and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law and includes any Branch Register(s) established by the Company in accordance with the Law.

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a share in the capital of the Company. All references to "Shares" herein shall be deemed to be Shares of any or all Classes as the context may require. For the avoidance of doubt in these Articles the expression "Share" shall include a fraction of a Share.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a)     passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)     approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders

2

4828489.1 H0851.109190

and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

2.     In these Articles, save where the context requires otherwise:

(a)     words importing the singular number shall include the plural number and vice versa;

(b)     words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c)     the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)     reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)     reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;

(f)     reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

(g)     reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

3.     Subject to the preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

4.     The business of the Company may be commenced at any time after incorporation.

5.     The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

6.     The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

7.     The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Law and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Law, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Law.

3

## SHARES

8.  Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

    (a)  issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

    (b)  grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

    and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

9.  The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

10. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

11. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MODIFICATION OF RIGHTS

12. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Shares of the relevant Class, or with the sanction of a resolution passed at a separate meeting of the holders of the Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that all such Classes would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes.

13. The rights conferred upon the holders of the Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation,

4

4828489.1 H0851.109190

allotment or issue of further Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Shares of any Class by the Company.

## CERTIFICATES

14. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

15. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

## LIEN

16. The Company has a first and paramount lien on every Share (whether or not fully paid) for all amounts (whether presently payable or not) payable at a fixed time or called in respect of that Share. The Company also has a first and paramount lien on every Share (whether or not fully paid) registered in the name of a Person indebted or under liability to the Company (whether he is the sole registered holder of a Share or one of two or more joint holders) for all amounts owing by him or his estate to the Company (whether or not presently payable). The Directors may at any time declare a Share to be wholly or in part exempt from the provisions of this Article. The Company's lien on a Share extends to any amount payable in respect of it.

17. The Company may sell, in such manner as the Directors in their absolute discretion think fit, any Share on which the Company has a lien, but no sale shall be made unless an amount in respect of which the lien exists is presently payable nor until the expiration of fourteen days after a notice in writing, demanding payment of such part of the amount in respect of which the lien exists as is presently payable, has been given to the registered holder for the time being of the Share, or the Persons entitled thereto by reason of his death or bankruptcy.

18. For giving effect to any such sale the Directors may authorise some Person to transfer the Shares sold to the purchaser thereof. The purchaser shall be registered as the holder of the Shares comprised in any such transfer and he shall not be bound to see to the application of the purchase money, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the sale.

19. The proceeds of the sale after deduction of expenses, fees and commission incurred by the Company shall be received by the Company and applied in payment of such part of the amount in respect of which the lien exists as is presently payable, and the residue shall (subject to a like lien for sums not presently payable as existed upon the Shares prior to the sale) be paid to the Person entitled to the Shares immediately prior to the sale.

5

## CALLS ON SHARES

20. The Directors may from time to time make calls upon the Shareholders in respect of any moneys unpaid on their Shares, and each Shareholder shall (subject to receiving at least fourteen days' notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on such Shares.

21. The joint holders of a Share shall be jointly and severally liable to pay calls in respect thereof.

22. If a sum called in respect of a Share is not paid before or on the day appointed for payment thereof, the Person from whom the sum is due shall pay interest upon the sum at the rate of eight percent per annum from the day appointed for the payment thereof to the time of the actual payment, but the Directors shall be at liberty to waive payment of that interest wholly or in part.

23. The provisions of these Articles as to the liability of joint holders and as to payment of interest shall apply in the case of non-payment of any sum which, by the terms of issue of a Share, becomes payable at a fixed time, whether on account of the amount of the Share, or by way of premium, as if the same had become payable by virtue of a call duly made and notified.

24. The Directors may make arrangements on the issue of partly paid Shares for a difference between the Shareholders, or the particular Shares, in the amount of calls to be paid and in the times of payment.

25. The Directors may, if they think fit, receive from any Shareholder willing to advance the same all or any part of the moneys uncalled and unpaid upon any partly paid Shares held by him, and upon all or any of the moneys so advanced may (until the same would, but for such advance, become presently payable) pay interest at such rate (not exceeding without the sanction of an Ordinary Resolution, eight percent per annum) as may be agreed upon between the Shareholder paying the sum in advance and the Directors.

## FORFEITURE OF SHARES

26. If a Shareholder fails to pay any call or instalment of a call in respect of any Shares on the day appointed for payment, the Directors may, at any time thereafter during such time as any part of such call or instalment remains unpaid, serve a notice on him requiring payment of so much of the call or instalment as is unpaid, together with any interest which may have accrued.

27. The notice shall name a further day (not earlier than the expiration of fourteen days from the date of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed the Shares in respect of which the call was made will be liable to be forfeited.

28. If the requirements of any such notice as aforesaid are not complied with, any Share in respect of which the notice has been given may at any time thereafter, before the payment required by notice has been made, be forfeited by a resolution of the Directors to that effect.

29. A forfeited Share may be sold or otherwise disposed of on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

30. A Person whose Shares have been forfeited shall cease to be a Shareholder in respect of the forfeited Shares, but shall, notwithstanding, remain liable to pay to the Company all moneys which at the date of forfeiture were payable by him to the Company in respect of the Shares

6

4828489.1 H0851.109190

forfeited, but his liability shall cease if and when the Company receives payment in full of the amount unpaid on the Shares forfeited.

31. A statutory declaration in writing that the declarant is a Director, and that a Share has been duly forfeited on a date stated in the declaration, shall be conclusive evidence of the facts in the declaration as against all Persons claiming to be entitled to the Share.

32. The Company may receive the consideration, if any, given for a Share on any sale or disposition thereof pursuant to the provisions of these Articles as to forfeiture and may execute a transfer of the Share in favour of the Person to whom the Share is sold or disposed of and that Person shall be registered as the holder of the Share, and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the disposition or sale.

33. The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which by the terms of issue of a Share becomes due and payable, whether on account of the amount of the Share, or by way of premium, as if the same had been payable by virtue of a call duly made and notified.

## TRANSFER OF SHARES

34. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

35. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor.

36. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

37. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

## TRANSMISSION OF SHARES

38. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

39. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to

7

decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

40. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

41. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

42. The Company may by Ordinary Resolution:

    (a)    consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

    (b)    convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

    (c)    subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

    (d)    cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

43. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION, PURCHASE AND SURRENDER OF SHARES

44. Subject to the Law, the Company may:

    (a)    issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

    (b)    purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

    (c)    make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law; and

    (d)    accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

4828489.1 H0851.109190