## ENGAGEMENT OVERVIEW

### DESCRIPTION OF THE ASSIGNMENT

We were retained to perform an independent valuation analysis to determine the fair market value of following participation shares (the "Subject Interest" or the "Participation Shares") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of March 25, 2025 (the "Valuation Date").[3]

- 100 Participation Shares of DAF held by *Highland Dallas Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Kansas City Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Santa Barbara Foundation, Inc.*
- 5 Participation Shares of DAF held by *The Community Foundation of North Texas*

This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of shares), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

### SCOPE

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections. The first section outlines the description, scope, and procedures of our analysis. The second section provides a brief description of the Company and the Subject Interest. The third section includes a discussion of the national economy and the industry in which the Company operates. The fourth section details a discussion of valuation theory and methodology. The fifth section presents our valuation analysis, and the sixth section presents our conclusion of the fair market value of the Subject Interest.

### PROCEDURES

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances. We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information, as well as on other data obtained through additional research. A full discussion of the methodologies employed appears in the following sections of this report.

---

[3]  Our analysis assumes that the Company's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

## DAF OVERVIEW

### COMPANY OVERVIEW[4]

Charitable DAF HoldCo, Ltd is a Cayman Islands "company limited by shares" formed in October 2011. Upon the shareholders' acceptance of shares, the shareholders agreed to the provisions of the Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd (as amended from time to time in accordance with the provisions thereof, the "DAF Agreement") and the Companies Law of the Cayman Islands (as amended from time to time, the "Law"). As a holding company, DAF's predominant assets were historically interests in the equity tranches of Collateralized Loan Obligations ("CLOs"), the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities. In recent periods, however, the DAF's underlying assets have been allocated across a broader and more diverse range of asset classes, including but not limited to cash and cash equivalents, public equity, private equity, private credit, real estate, and other alternative investments.

### CAPITALIZATION TABLE

On February 7, 2025, the Company issued 318 participation shares to *DFW Charitable Foundation*, increasing the total number of participation shares to 623, composed of:

- 318 participation shares held by *DFW Charitable Foundation*
- 100 participation shares held by *Highland Dallas Foundation, Inc.*
- 100 participation shares held by *Highland Kansas City Foundation, Inc.*
- 100 participation shares held by *Highland Santa Barbara Foundation, Inc.*
- 5 participation shares held by *The Community Foundation of North Texas*

All the Company's management shares are held by Mark Patrick.

---

[4]    Based on the Company's memorandum and articles of association and information from Management.

## COMPANY STRUCTURE CHART



## FINANCIAL POSITION

The Company's only asset stems from its indirect interest in CLO HoldCo, Ltd ("CLO HoldCo"). The Company provided an unaudited balance sheet (the "Balance Sheet") for CLO HoldCo as of September 30, 2024. Based on a review of the Balance Sheet, CLO HoldCo reported total assets of $316.3 million, including $138.4 million of cash & cash equivalents, $175.3 million of other investments, and $2.5 million of other assets. CLO HoldCo reported total liabilities of $47.2 million.  CLO HoldCo has net assets of $269.1 million on its books as of September 30, 2024.  The Balance Sheet is presented below and in Schedule A.3.

## CLO HoldCo, Ltd - Summary Balance Sheet

| | Balance Sheet as of: 9/30/2024 | |
|---|---|---|
| | Actual | % |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

The Company paid distributions to the Participation Shareholders of $819,050 in 2019, $619,050 in 2020, $834,450 in 2021, $968,950 in 2022, $950,881 in 2023, and $317,796 in the first three quarters of 2024. Fourth quarter distributions were historically larger than in the first three quarters.[5] Historical Distributions are presented in the following charts and in Schedules A.1 and A.2.

---

[5] Distributions are typically paid a few months following the end of a quarter. As a result, fourth quarter distributions may be paid in the first or second quarter of the following calendar year.

DAF OVERVIEW



Note: Q4 2024 distributions have not yet been paid.



## SUBJECT INTEREST OVERVIEW

The Subject Interest consists of participation shares, which from time to time may receive discretionary cash distributions intended to support the charitable and expense goals of the holders.  The rights and limitations of the participation shares are defined by the DAF Agreement and are directly influenced by the discretion and actions of the Company's Management and directors.

The DAF Agreement grants the directors substantial discretion over distributions, share issuances, governance, and financial transparency, leaving participation shareholders with little influence over corporate decisions.  They are subject to potential dilutions, transfer restrictions, and limited access to information, with limited voting rights and no ability to amend governing documents.  Given these extensive limitations, the participation shares represent a highly restricted and passive financial interest with limited control or enforceable rights.

### *Limited Rights Over Distributions*

Participation shareholders do not have:

- The right to cause, vote on, or receive pro-rata distributions.
- The right to annual, timed, or guaranteed distributions.
- The right to receive notice of distributions made to other participation shareholders.
- The ability to amend the DAF Agreement to modify distribution rights.

### *Governance and Voting Limitations*

Participation shareholders do not have:

- The right to remove or appoint directors.
- The right to vote on the issuance of additional participation shares, receive notice of such issuance, or exercise pre-emption rights.
- The right to vote on or receive notice of share redemptions.

The appointed directors and Management have full control over the management, operations, and affairs of the Company (subject to requiring a two-thirds majority of the participation shareholders for any material adverse variation or abrogation of rights attached to the participation shares), including the issuance and purchase of shares on terms they determine.  Since participation shareholders do not have voting or approval rights over further issuances, additional participation shares may be issued at any time, potentially impacting the economic interests associated with existing shares (noting that

the purchase of participation shares, or issuance of further shares ranking pari passu or subsequent to the participation shares, is not regarded as causing a material adverse variation or abrogation of the rights of the participation shareholders).  Additionally, the transfer of participation shares requires director approval, and directors may reject transfer at their discretion.

### Restrictions on Meetings and Information Access

Participation shareholders do not have:

- The right to receive notice of, attend, speak at, or vote at general meetings.
- The right to inspect company records, accounts, or documents, except at the director's sole discretion (or in the very limited circumstances conferred by law).
- The ability to modify or amend the DAF Agreement in any capacity.

### Restricted Persons Clause

Certain individuals or entities may be classified as Restricted Persons, including:

- Any holder of participation shares in breach of applicable laws.
- Any holder that is not exempt from taxation under Section 501(c)(3).
- Any holder whose participation, in the opinion of the directors, could cause the Company to incur tax, legal, regulatory, administrative, or pecuniary liabilities that it would not otherwise face.

If the directors become aware that any participation shares are held by a Restricted Person, they may, by written notice, require the transfer of such shares in accordance with the DAF Agreement.

For further details, refer to Appendix A for key provisions of the DAF Agreement.

## ECONOMIC AND INDUSTRY OVERVIEW

### OVERVIEW OF THE U.S. ECONOMY

In the third quarter of 2024, the US economy expanded at a faster pace than in the second quarter. Inflation, which peaked at 8.99% in June 2022, declined to 2.73% by November 2024, reflecting progress toward the Federal Reserve's target. After a prolonged period of elevated interest rates to curb inflation, signs of a cooling labor market and stable prices led the Fed to cut rates by 25 basis points in December. The rate hikes that began in 2023 initially resulted in an inverted yield curve, signaling investor concerns about an economic slowdown, but the curve has since normalized following the presidential election. Meanwhile, US equity markets gained momentum, with major indices ending the year higher, supported by easing inflation and expectations of further monetary policy accommodation.

### Gross Domestic Product[6]

Real gross domestic product (GDP) increased at an annual rate of 3.1 percent in the third quarter of 2024, following an increase of 3.0 percent in the second quarter. The acceleration in real GDP in the third quarter primarily reflected accelerations in exports, consumer spending, and federal government spending. These movements were partly offset by a downturn in private inventory investment and a larger decrease in residential fixed investment.



---

[6] U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Third Quarter 2024. (Release Date: 12/19/2024).

## *Population*

Population growth is an important driver of long-term growth in an economy. The total population increased from 335.9 million in November 2023 to 337.7 million in November 2024.[7] The working-age population (15-64) increased from 208.9 million in November 2023 to 209.0 million in November 2024.[8]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic. It partially recovered in just several months and has been trending upward/flat. In November 2023, the civilian labor force participation rate was 62.8% and stands at 62.5% as of November 2024.[9]





---

[7]   U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[8]   Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[9]   U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

## Employment

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 227,000 in November 2024 and the unemployment rate changed little at 4.2 percent. Employment trended up in health care, leisure and hospitality, government, and social assistance. Retail trade lost jobs.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased from 7.0% in November 2023 to 7.7% in November 2024.[10]





Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will increase from 4.0 percent in 2024 to 4.3 percent in 2025 and then decrease to 4.1 percent in 2027.

---

10   U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

*Inflation*

According to the BLS, The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.3 percent in November on a seasonally adjusted basis, after rising 0.2 percent in each of the following 4 months. Over the last 12 months, the all-items index increased 2.7 percent before seasonal adjustment.[11]

The index for shelter rose 0.3 percent in November and was the main factor in the all items increase. The food index increased 0.4 percent in November. The index for food away from home rose 0.5 percent over the month, while the index for food at home rose 0.3 percent. The energy index fell 0.2 percent over the month, after being unchanged in the preceding month.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has declined significantly since a year ago, November 2023, declining from 53.20% to 5.10% in November 2024[12].The forecasters predict current-quarter headline CPI inflation will average 2.2 percent at an annual rate, down from the prediction of 2.5 percent in the previous survey[13].



---

[11] Federal Reserve Bank of St. Louis, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[12] Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[13] Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters,* November 15, 2024.

## Interest Rates

The interest rate on the three-month Treasury bill declined from 5.20% as of December 29, 2023, to 4.23% as of December 31, 2024.[14]  The interest rate on the ten-year Treasury note increased from 3.88% as of December 29, 2023, to 4.58% as of December 31, 2024.[15]



The interest rate on Moody's Aaa-rated corporate bonds increased from 4.65% as of December 29, 2023, to 5.40% as of December 31, 2024.[16] The interest rate on the Moody's Baa-rated corporate bonds increased from 5.49% to 6.00% over the same time.[17]



---

[14] Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[15] Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[16] Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last January 10, 2025.

[17] Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

In the last twelve months, the yield curve transitioned from being inverted to normal, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill increasing between December 29, 2023, to December 31,2024 from -0.59% to a positive 0.70%.[18]



### Corporate Profits

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) decreased slightly by 15 billion in the third quarter of 2024 from the second quarter of 2024.



---

[18]   U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates,* last accessed January 10, 2025.

### Stock Markets[19]

The stock markets gained momentum from December 29, 2023, to December 31, 2024. The S&P 500 Index (SPY) closed at 475.31 on December 29, 2023, and closed higher at 586.08 on December 31, 2024. The Dow Jones Industrial Average Index (DIA) closed at 376.87 on December 29, 2023, and closed higher at 425.50 on December 31, 2024. The NASDAQ Composite Index (QQQ) closed at 409.52 on December 29, 2023, and closed higher at 511.23 on December 31, 2024. In the graph below, the December 30, 2022, values were set to 100.



### Construction & Housing Starts

Construction spending and housing starts are two other important indicators for the economy. Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment. Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy. Housing starts decreased from 1.510 million units in November 2023 to 1.289 million units in November 2024.[20] Construction spending, a seasonally adjusted annual figure, increased from $2.09 trillion in November 2023 to $2.15 trillion in November 2024.[21]

---

[19]  CapIQ Database, last accessed January 10, 2025.

[20]  U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[21]  U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.



## Consumer Sentiment

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has increased from 61.30 a year ago in November 2023 to 71.80 in November 2024. Although it has increased significantly from a year ago, the index is still well below the pre-COVID high of 101.0 in February 2020.[22] The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions. The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S. This is considered a leading indicator of future consumer expenditures and economic activity.



---

[22]   University of Michigan, *Surveys of Consumers*, November 2024

## OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY[23]

This industry is composed of private equity funds, hedge funds, closed-end funds, unit investment trusts and other financial vehicles. Entities in this industry manage securities or other assets on behalf of shareholders, unit holders or other beneficiaries to achieve high returns on targeted investments. This industry excludes insurance and employee-benefit funds, open-end investment funds and trusts, estates and agency accounts.

### Executive Summary

In recent years, industry assets have become increasingly integral to institutional investors' portfolios and the larger asset management market. Institutional investors are individuals or organizations that trade securities in such substantial volumes that they qualify for lower commissions and fewer protective regulations since it's assumed that they're knowledgeable enough to protect themselves. Increasing demand from institutional investors has contributed to the surge in the industry's assets under management (AUM) and revenue during the current period.

In recent years, the industry has continued to enmesh itself more deeply within the broader financial ecosystem despite the challenges posed at the onset of the period. The pandemic, mainly in the first quarter of 2020, contributed to revenue declines for many operators. Many portfolios, previously thought to be sound investments, were reevaluated and businesses pivoted their strategies due to the unprecedented nature of the crisis. However, as inflation was rampant in the latter part of the period, the FED increased interest rates to control high inflation, although as inflationary pressures eased in 2024, the FED cut interest rates, which will increase liquidity in financial markets. The Fed is anticipated to cut rates further in 2025, increasing liquidity and driving the shift of investments into equities from fixed-income securities. Overall, over the past five years, industry revenue grew at a CAGR of 4.2% to $310.1 billion, including an increase of 2.5% in 2025 alone. Industry profit has climbed significantly and will comprise 49.6% of revenue in the current year.

Industry revenue will grow at a CAGR of 2.7% to $353.7 billion over the five years to 2030. The Federal Reserve is anticipated to cut interest rates as inflationary pressures continue to ease. These declining interest rates will increase liquidity in the markets. Private equity firms and hedge funds will have less difficulty raising capital for investments. As characteristics of the financial system change in light of post-financial crisis banking regulations and regulators' recognition of the importance of hedge funds within the financial system, hedge funds will likely experience heightened oversight.

---

[23] IBISWorld Industry Report 52599, March 2025, *Private Equity, Hedge Funds & Investment Vehicles in the U.S.*

# VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

## VALUATION APPROACHES

### Income Approach

The income approach quantifies the present value of anticipated future income generated by a business or an asset. Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes. One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow. The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate. The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

### Market Approach

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets. Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset. Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions. The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

### Asset-Based (Cost) Approach

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities. Replacement cost is often a primary indicator of the value of a business' assets. The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it. Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors. The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

## VALUATION METHODS

The following are common valuation methods used under the three approaches:

A. Income Approach
    1. Discounted Cash Flow Method (multi-period model)
    2. Direct Capitalization Method (single period model)
    3. Excess Earnings Method

B. Market Approach
    1. Guideline Public Company Method
    2. Merger and Acquisition Method

C. Asset-Based Approach
    1. Reproduction Cost Method
    2. Replacement Cost Method
    3. Net Asset Value Method

## SUMMARY OF THE VALUATION APPROACHES AND METHODS

For the valuation of non-controlling interests in holding companies such as DAF, the asset-based approach is most commonly used. When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

However, in the case of the participation shares under consideration, the asset-based approach is not applicable. These shares do not confer control and only have a claim in respect of the underlying assets in a winding up. Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of these shares are contingent upon discretionary distributions by the director. As such, their value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality.[24]

Given the nature of the participation shares, the income approach, specifically the discounted cash flow (DCF) method, is the most appropriate valuation methodology.[25]

---

[24] Previous valuations conducted by ValueScope did not account for the rights of the participation shares under the applicable law, specifically that these shares confer an extremely limited enforceable claim to the entity's underlying NAV.

[25] The market approach was considered but deemed inapplicable due to the absence of comparable transactions involving securities with characteristics similar to the participation shares.

This approach estimates the present value of expected future distributions, if any, based on reasonable assumptions regarding the manager's discretion in making such distributions. If no future distributions are expected, the value of the Subject Interest would be nominal. The DCF method captures the time value of money and the risk associated with the uncertainty of future distributions, providing a more accurate measure of the fair market value of the Participation Shares.

# VALUATION ANALYSIS

## INCOME APPROACH ANALYSIS

The income approach estimates the fair market value of an interest based on the present value of expected future economic benefits. In the case of the Participation Shares, these economic benefits are exclusively tied to discretionary distributions made by the director, rather than earnings or cash flows of the DAF's underlying assets. The approach involves forecasting expected future distributions and discounting them to present value using a rate of return that reflects the risk associated with the uncertainty and discretionary nature of these payments. The resulting present value represents the fair market value of the Subject Interest.

### Discounted Cash Flow Method

We developed a DCF model to determine the fair market value of the Subject Interest as of the Valuation Date. The DCF method projects the distributions that the Participation Shareholders are expected to receive. Each projected distribution is discounted to present value using a rate that reflects the risk associated with the uncertainty and discretionary nature of these payments.

### Projected Distributions

Distributions to the holders of the Subject Interest were projected based on discussions with Management and a review of historical distributions. Management indicated that the timing and size of future distributions will be discretionary, and that DAF does not intend to establish reserves for distributions.

Despite this discretion, Management currently intends to maintain distributions to the holders of the Subject Interest at levels consistent with those paid over the past 12 to 24 months. We projected distributions to occur quarterly, with the next four quarters reflecting the average distribution of the corresponding quarters from the prior two years, totaling approximately $950,000. Beyond this period, distributions were assumed to grow at an annual rate of 2.5%, consistent with expected inflation, in perpetuity.

### Cost of Equity

A cost of equity of 68.3% was applied to discount the expected discretionary distributions to the holders of the Subject Interest, reflecting their high-risk profile, extremely limited claim on underlying NAV, and absence of control over distributions. This rate was selected based on the third quartile of required returns for pre-seed venture capital investments from the Pepperdine 2024 private capital markets report, aligning with the speculative nature of potential cash flows, significant legal and governance risks, and the

inability to force a sale or liquidity event. The Subject Interest exhibits characteristics similar to early-stage equity investments, where cash flows are highly uncertain, illiquidity risks are substantial, and investor returns are largely dependent on discretionary managerial decisions. Given these factors, a higher-end venture capital return benchmark was deemed appropriate.

### Conclusion – Income Approach Analysis

Based on the forecasts and methodologies presented in this analysis, the income approach indicated a minority and marketable value of the Subject Interest of $2,045,531 as of the Valuation Date.

This conclusion of value implies a discount for lack of control (DLOC) of 99.2%, calculated as the concluded marketable value of the Subject Interest divided by the NAV of CLO HoldCo.[26]

To assess the impact of the discount rate, a sensitivity analysis was performed under the hypothetical assumption that projected distributions followed the risk profile of a risk-free perpetual bond with identical expected cash flows. In this scenario, a 4.65% discount rate, equivalent to the 30-year US Treasury yield as of the Valuation Date, was applied. Under this assumption, the minority, marketable value of the Subject Interest would be $44.7 million, resulting in an implied DLOC of 83.4%. However, this analysis does not reflect the substantial risks associated with the Subject Interest.

---

[26] Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls. Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

## CONCLUSION OF VALUE - SUBJECT INTEREST

Based on the methodologies presented in this analysis, it is our opinion that the value of the Subject Interest on a minority and marketable basis, as of the Valuation Date, can reasonably be stated as $2,045,531.

## DISCOUNT FOR LACK OF MARKETABILITY

A discount for lack of marketability (DLOM) is necessary to determine the fair market value of the Subject Interest, as it cannot be readily sold or liquidated in an active market. The absence of a public exchange and transfer restrictions further constrain liquidity. A review of restricted stock studies was conducted to support the DLOM, examining the price differences between freely traded shares and comparable shares with resale restrictions. These studies provide empirical evidence of the impact of illiquidity on value, reinforcing the rationale for applying a marketability discount.

### *Restricted Stock Studies*

The restricted stock studies reviewed included data from 1966 through 2010. The studies analyzed the difference in prices between publicly traded stock and restricted stocks of the same entity. The restricted stocks were identical to the traded stock except for marketability. A summary of the mean and median discounts of the restricted stock studies is presented in the following figure.

**Summary of Restricted Stock Studies**



## SEC Institutional Investor Study[27]

The SEC Institutional Investor Study is a comprehensive restricted stock study with 398 transactions from January 1, 1966, through October 22, 1969. The study analyzed differences in discounts based on the following categories: trading market, type of institution purchasing the security, transaction size, sales of the issuer, and earnings of the issuer. The study found significant differences in discounts for type of exchange, sales, and earnings of the issuer. Stocks listed on the major exchanges had lower

---

[27]   U.S. Securities and Exchange Commission, "Institutional Investor Report," 92nd Congress, 1st Session, House Documents No. 92-4, Part 5, 1971.

discounts than smaller exchanges and over-the-counter stocks.  The study found higher discounts for companies with smaller sales and lower earnings.

### Johnson & Racette Study[28]

Richard Johnson and George Racette performed a study on restricted securities purchased by registered investment companies between 1967 and 1973.  The study included 86 observations sent from 75 investment companies that met the selection criteria.  Johnson and Racette's analysis indicated an average marketability discount of 34%, in line with the range with the most common observations of 30-40%.

### Gelman Study[29]

Milton Gelman of National Economic Research Associates, Inc. conducted a study of 89 restricted stock transactions executed by four investment companies from 1968 to 1970.  The investment companies were formed in 1968 to specialize in restricted securities.  A significant portion of the funds of the investment companies were invested in restricted stock transactions consisting of shares of large and small companies listed on large and small exchanges, over the counter, purchased directly from the companies, or from selling stockholders.  Gelman's analysis found mean and median discounts of approximately 33%.  In addition, 59% of the transactions had discounts of 30% or more and 36% of the transactions had discounts of 40% or more.

### Trout Study[30]

Robert R. Trout, a principal of Trout, Shulman & Associates, analyzed 60 transactions involving the purchase of restricted stock by mutual funds from 1968 to 1972.  Trout performed a regression analysis to determine the relationship between discounts and certain variables such as exchange listing, number of shares outstanding, and transaction size relative to total outstanding shares.  Trout's findings suggested an intercept or implied mean and median discount of 43.5%.

---

[28]  Richard D. Johnson and George A. Racette, "Discounts on Letter Stock Do Not Appear to Be a Good Base on Which to Estimate Discounts for Lack of Marketability on Closely Held Stocks," *Taxes—The Tax Magazine*, August 1981, 574-581.

[29]  Milton Gelman, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely-Held Company, "*The Journal of Taxation*, June 1972, 353-354.

[30]  Robert R. Trout, "Estimation of the Discount Associated With the Transfer of Restricted Securities," *Taxes—The Tax Magazine*, June 1977, 381-385.

## Moroney Study[31]

Robert E. Moroney of Moroney, Beissner & Co. in Houston presented his restricted stock study to the Texas CPA Tax Institute in November 1972. The study was subsequently published in 1973. The analysis focused on 146 transactions in restricted securities by 10 registered investment companies. The discounts ranged from a 30% premium to a 90% discount with a mean and median discount of 35.8% and 32.8%, respectively.

## Maher Study[32]

Michael Maher, a former estate and gift tax agent with the Internal Revenue Service, published his study results in 1976. The study observed discounts for 34 restricted stock transactions from 1966 to 1973. The results of his study suggested a mean discount for his total and adjusted analyses of 35.4% and 34.7%, respectively.

## Standard Research Consultants Study[33]

A 1983 study by two Standard Research consultants, William F. Pittock and Charles H. Stryker, CPA, observed discounts relating to 28 private placements of common stock from October 1978 to June 1982. The discounts varied from 7% to 91% with a median of 45%. The results of the study tend to suggest higher discounts for companies with smaller revenues.

## Wruck Study[34]

Karen Wruck's Harvard University study on firm value analyzed 83 sales of unregistered securities from 1979 to 1984, 37 of which were observable and included in the study's sample. On average, the offering price of the unregistered securities was set at 86.5% of the market price of the stock on the day before the announcement, indicating a discount of 13.5%. The median discount indicated was similar at 12.2%.

---

[31] Robert E. Moroney, "Most Courts Overvalue Closely Held Stocks," *Taxes—The Tax Magazine*, March 1973, 144-155.

[32] J. Michael Maher, "Discounts for Lack of Marketability for Closely Held Business Interests," *Taxes—The Tax Magazine*, September 1976, 562-570.

[33] William F. Pittock and Charles H. Stryker, "Revenue Ruling 77-287 Revisited," *SRC Quarterly Reports*, Spring 1983, 1-3, cited in Quantifying Marketability Discounts by Z. Christopher Mercer, 63.

[34] Karen H. Wruck, "Equity Ownership Concentration and Firm Value, Evidence From Private Equity Financings," *Journal of Financial Economics*, Vol. 23. 1989, 3-1.

CONCLUSION OF VALUE - SUBJECT INTEREST

**FMV Opinions Study**[35]

The FMV Study included over 230 transactions from 1980 through April 1997, the date of the most recent amendment of Rule 144. The mean and median discounts were 22.3% and 20.1%, respectively. The authors of the study made the following generalization regarding their analysis:

- Companies with higher revenues resulted in lower discounts and vice versa
- Companies with unrestricted stock traded on exchanges exhibited lower discounts
- Discounts were higher for blocks exceeding 10% of ownership
- Discounts for companies with capitalization under $50 million ranged from 30% to 40%

**Barclay, Holderness, Sheehan Study**[36]

Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan's study observed private placements of large-percentage blocks of stock from 1980 to 1996. Specifically, the study analyzed private placements to a variety of different types of investors, namely active investors, passive investors, and management. Active investors were found to be willing to pay higher prices in their placements, indicating lower discounts, while management placements had the highest discounts, although they were found to not have a statistically significant difference from private placements. In total, the average discount across all private placements was 18.7% while the median discount was 17.4%.

**Hertzel & Smith Study**[37]

A 1993 study by Michael Hertzel and Richard L. Smith analyzed private placements between 1980 between 1987. The study's sample included private placements of 106 companies listed on the NYSE and AMEX exchanges as well as OTC firms. While the mean and median indicated discounts were 20% and 13%, respectively, more than 35% of the private placements observed had discounts greater than 25%.

---

[35] Hall, Lance S., and Timothy C. Polacek, "Strategies for Obtaining the Largest Valuation Discounts," *Estate Planning*, January/February 1994. pp. 38-44.

[36] Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan, "Private Placements and Managerial Entrenchment," *The Journal of Corporate Finance*, 2007, Vol. 13, Issue 4, 461-484.

[37] Michael Hertzel and Richard L. Smith, "Market Discounts and Shareholder Gains for Placing Equity Privately," *The Journal of Finance*, Vol. 48, No. 2. June 1993, 459-485.

## Management Planning Study[38]

Management Planning, Inc. published the results of a study performed from 1980-1996 by Robert P. Oliver, ASA and Roy H. Meyers, ASA, CFA. They started with a base on 231 transactions and looked at discounts from the total sample, discounts from 53 transactions without registration rights, and discounts from 27 transactions with registration rights. A summary of the mean and median discounts from their study is presented in the following table.

**Results of Management Planning Study**

| Discount | Entire Sample of 231 Transactions | 53 Transactions without Registration Rights | 27 Transactions with Registration Rights |
|---|---|---|---|
| Low | N/A | 3.0% | N/A |
| Mean | 29.0% | 27.0% | 12.8% |
| Median | 28.0% | 25.0% | 9.1% |
| High | N/A | 58.0% | N/A |

The authors cite the difference between discounts with and without registration rights as evidence of the lack of marketability on an investment. Certain factors were also cited by the authors as the most influential in determining discounts. The factors include:

- Companies with higher revenues tend to have lower discounts
- Companies with higher earnings tend to have lower discounts
- Higher per share prices tend to have lower discounts
- Lower price volatility tends to result in lower discounts
- Block sizes representing a higher percentage of average trading volume tend to have higher discounts
- Large dollar blocks tend to have lower discounts

## Hertzel, Lemmon, Linck, Rees Study[39]

A 2001 study by Michael Hertzel, Michael Lemmon, James Linck, and Lynn Rees analyzed private placements from 1980 to 1996. A total of 619 private placements were ultimately selected for the sample, which primarily consisted of small-cap, technology companies as 79% of the sample companies were traded on the NASDAQ exchange and the mean market value of equity for the companies was $188 million. Of the 619 private

---

[38] A Study by Management Planning Inc. published in Z. Christopher Mercer, "Analysis of Restricted Stocks of Public Companies 1980-1995," *Quantifying Marketability Discounts*, Peabody Publishing, 1997, Chapter 12, 345-370. Retrieved from John J. Stockdale Sr., *BVR's Guide to Discounts for Lack of Marketability*. 5th ed. Vol. 1. Portland, OR: Business Valuation Resources, LLC, 2013.

[39] Michael Hertzel, Michael Lemmon, James S. Linck, and Lynn L. Rees, "Long-Run Performance Following Private Placements of Equity," workpaper, Dec. 21, 2001.

placements in the sample, 404 had sufficient information and disclosures to determine relevant discounts. The study indicated a mean discount of 16.5% and a median discount of 13.4%.

## Wruck & Wu Study[40]

A study by Karen Wruck and YiLin Wu in 2008 supplemented Ms. Wruck's 1989 study and analyzed private placements of companies between 1980 and 1999. 1,976 private placements were selected in the sample. Of these, 1,854 had data for observed discounts. The study found a mean discount of 11.33% and a median discount of 10.96%.

## Angrist, Curtis, Kerrigan (MPI) Study[41]

A study by Ezra Angrist, Harry Curtis, III, CFA, ASA, and Daniel Kerrigan, CFA in 2011 grouped a total of 402 transactions of unregistered stock into four groups based on the timing of the issuances in respect to the changes in holding period restrictions per Rule 144 as follows:

### Results of Angrist, Curtis, Kerrigan (MPI) Study

| Period | Observations | Mean Discount | Median Discount |
|---|---|---|---|
| Pre-1990 | 79 | 30.5% | 32.3% |
| 1990 - Apr 1997 | 110 | 25.1% | 22.5% |
| May '97 - Feb '08 | 164 | 20.8% | 16.6% |
| Feb '08 - Dec '08 | 49 | 5.9% | 5.0% |
| Total | 402 | 22.1% | 19.6% |

Results of the study show that as restriction periods have declined, so have discounts.

## Willamette Management Associates Study[42]

Willamette performed an analysis of 33 private placements of restricted stock from January 1, 1981 through May 27, 1984. There was a brief overlap in the latter part of the period included in the Standard Research Consultants Study. The Willamette study resulted in a mean discount of 31.2%.

---

[40] Karen H. Wruck and Yi Lin Wu, "Business Relationships, Corporate Governance, and Performance: Evidence From Private Placements of Common Stock," *Journal of Corporate Finance*, 15, 2009, 30-47.

[41] Ezra Angrist, Harry Curtis III, and Daniel Kerrigan, "Regression Analysis and Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 30, No. 1 Spring 2011, 36-48.

[42] Shannon Pratt, Robert F. Reilly, and Robert P. Schweihs, *Valuing a Business*, 2nd edition, 247.

**Silber Study[43]**

William L. Silber, a professor of finance and economics at the Stern School of Business at New York University analyzed 69 private placements from 1981 through 1989. Silber's study results ranged from a 12.7% premium to an 84% discount with a mean discount of 33.8%. Silber also cited in his findings that discounts are larger when the block of restricted stock is large relative to the total shares outstanding and the dollar size is inversely related to the discount.

**Krishnamurthy, et al. Study[44]**

Srinivasan Krishnamurthy, Pual Spindt, Venkat Subramaniam, and Tracie Woidtke's 2001 study analyzed private placements from 1983 to 1992. The study performed different discount calculations for the following classifications: 1) restricted shares, 2) shares with registration pending, 3) shares not known to be restricted, and 4) shares with pending registration or not known to be restricted (groups 2 and 3 combined). The mean discounts for Groups 1-4 were 34.0%, 23.3%, 15.4%, and 16.0%, respectively. The overall mean discount was 19.4%.

**Wu Study[45]**

YiLin Wu's study on private placements was published in the Journal of Financial Economics in 2004. The study analyzed 301 private placements taking place from 1986 to 1997. Mean and median discounts of 8.7% and 19.8%, respectively, were observed.

**Bajaj Study[46]**

The Bajaj study expands on previous restricted stock studies, namely by Wruck and by Hertzel and Smith. This study analyzed 88 private placements occurring between 1990 and 1995. The 88 observations revealed results ranging from a premium of approximately 14% to a discount of 68%, with mean and discounts of 22% and 21%, respectively. The authors note four characteristics to consider regarding the target firm and private placement itself when analyzing discounts: the percentage of total shares offered, business risk, financial distress, and total proceeds.

---

[43] William L. Silber, "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," *Financial Analysts Journal*, July-August 1991, 60-64.

[44] Srinivasan Krishnamurthy, Paul Spindt, Venkat Subramaniam, and Tracie Woidtke, "Does Investor Identity Matter in Equity Issues? Evidence From Private Placements," *Journal of Financial Intermediation*, 14, 2005, 210–238.

[45] Yi Lin Wu, "The Choice of Equity Selling Mechanisms," *Journal of Financial Economics*, 74, 2004, 93-119.

[46] Mukesh Bajaj, David J. Denis, Stephen P. Ferris, and Atulya Sarin, "Firm Value and Marketability Discounts," *Journal of Corporation Law*, Vol. 27, Fall 2001, 89-115.

## Johnson Study (Business Valuation Review)[47]

Bruce A. Johnson, ASA of Munroe, Park & Johnson conducted a restricted stock study from 1991 to 1995. The study included 72 private placements with results varying from a 10% premium to a 60% discount with a mean discount of 20%. Johnson also cited four important factors to consider when evaluating potential discounts: positive net income, sales volume, transaction value, and net income strength.

## Finnerty Study[48]

John D. Finnerty, professor of finance at Fordham University, performed two studies to compare the impact of the changes in law regarding restriction periods for private placements that occurred in 1997 and 2008. The first study focused on private placements from 1991 to 1997 and resulted in mean and median discounts of 26% and 20%, respectively. The second study focused on private placements from 1997 to 2008 and resulted in mean and median discounts of 22% and 16%, respectively.

## Chaplinsky Purchase Discount and Warrant Study[49]

Susan Chaplinsky's and David Haushalter's 2010 study analyzed private placements with a concentration on contract terms. The study asserts that companies that are riskier and have poorer performance more commonly have private placement contracts with contingency terms rather than just offering a pure discount. The indicated mean discount considering only the purchase discount was 19%, and the median was 15%. The indicated mean discount considering purchase discounts as well as warrants was 17%, and the median was 14%.

## Brophy PIPE Study[50]

David J. Brophy, Paige P. Ouimet, and Clemens Sialm of the University of Michigan performed a 2006 study that compared the effects of issuing private placements to hedge fund investors versus other investors. The study indicated a mean discount of 14% when private placements were issued to hedge funds, but the mean discount when the issuance involved other investors was just 9%.

---

[47] Bruce A. Johnson, "Quantitative Support for Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 18, No. 4, December 1999, 152-155.

[48] John D. Finnerty, "An Average-Strike Put Option Model of the Marketability Discount," *The Journal of Derivatives*, April 19, 2012, 53-69.

[49] Susan Chaplinsky and David Haushalter, "Financing Under Extreme Risk: Contract Terms and Returns to Private Investments in Public Equity," *Review of Financial Studies*, 2010, 23 (7), 2,789-2,820.

[50] David Brophy, Paige Ouimet, and Clemens Sialm, "Hedge Funds as Investors of Last Resort?" workpaper, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=782791.

### Columbia Financial Advisors Study[51]

This study focused on the effect of the Rule 144 holding period reduction to one year. The study considered two periods: January 1, 1996, to April 30, 1997, and May 1, 1997, to December 31, 1998. The one-year holding period became effective April 29, 1997. A summary of the study results is presented in the following table.

**Summary of Columbia Financial Advisors Study**

|  | January 1, 1996 to April 30, 1997 | May 1, 1997 to December 31, 1998 |
|---|---|---|
| Number of Transactions | 23 | 15 |
| Low | 0.8% | 0.0% |
| Mean | 21.0% | 13.0% |
| Median | N/A | 9.0% |
| High | 67.5% | 30.0% |

### Meidan Study[52]

Danny Meidan's 2006 study observed PIPE transactions between 1996 and 2003. The study categorized a total of 1,726 total private placement transactions into three groups: placements issued at discounts greater than 30%, placements issued between a 30% discount and 5% premium, and placements issued at a premium greater than 5%. The majority of these transactions fell into the 30% discount to 5% premium category at 1,278 placements, or roughly 74% of the total sample. The weighted average of the mean discounts was calculated as 9.8%.

### Verdasca Study[53]

Andrew Verdasca of the Leonard N. Stern School of Business of New York University performed a 2007 study on a sample of 771 private placement transactions. The study found a discount range from a 78% discount to a 93% premium, but both the mean and median results indicated discounts of approximately 10%.

---

[51] Kathryn F. Aschwald, "Restricted Stock Discounts Decline as Result of 1-Year Holding Period," *Shannon Pratt's Business Valuation Update*, Vol. 6, No. 5, May 2000, 1-5.

[52] Danny Meidan , "The Informativeness of Offer Characteristics Versus Investor Identity in PIPE Transactions," April 2, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=894689.

[53] Andrew Verdasca , "Common Stock PIPE Discounts and Long-Term Performance," April 2, 2007, www.stern.nyu.edu/cons/groups/content/documents/webasset/uat_024319.pdf.

## Billett & Floros Study[54]

Matthew T. Billett and Ioannis V. Floros' 2012 study focuses on two key features of financial relationships, contract terms and investor identity, in regard to private placements between 2001 and 2008. These factors were found to both complement and substitute for the other depending on individual circumstances. By analyzing 12,004 transactions in the PlacementTracker and PrivateRaise databases, the study concluded a median discount of 26.7%.

## Stout Risius Ross Study[55]

Aaron M. Stumpf, CPA/ABV, Robert L. Martinez, and Christopher T. Stallman of the valuation firm Stout Risius Ross performed a study of restricted stock transactions from September 2005 through May 2010, focusing on discounts associated with shorter holding periods. The chosen time period includes transactions both before and after Rule 144 implementation. The study found that for all transactions considered, the average and median discounts were 10.9% and 9.3%, respectively. Stout Risius Ross also found that the most significant and reliable factors influencing discounts were subject company volatility, block size, dividends, profitability, growth, and size.

## Harris-Trugman Study[56]

William Harris, AM of Trugman Valuation Associates, Inc.'s study was performed to analyze the impact of the economic recession on implied restricted stock discounts and the statistical relationships between implied restricted stock discounts and various company-specific variables. The study originally included 80 transactions of restricted stock sales that took place in 2007-2008. Due to the volatility of the Rule 144 holding period implementation, an additional 56 transactions were included in 2011. For the 47 transactions that took place prior to Rule 144 implementation, the average and median discounts were 17.9% and 14.8%, respectively. The 89 transactions analyzed after the rule implantation had average and median discounts of 15.9% and 14.3%, respectively. The overall group indicated mean and median discounts of 16.6% and 14.3%, respectively. The Harris-Trugman study noted that the only company-specific variable that had a notable statistical relationship with the implied discounts was volatility.

---

[54] Matthew Billett and Ioannis Floros, "Do Investor Identity and Contract Terms Interact? Evidence From the Wealth Effects of Private Placements," workpaper, April 2012, papers.ssrn.com/sol3/papers.cfm?abstract_id=1784498.

[55] Aaron Stumpf, Robert Martinez, and Christopher Stallman, "The Stout Risius Ross Restricted Stock Study: A Recent Examination of Private Placement Transactions From September 2005 Through May 2010," *Business Valuation Review*, Vol. 30, No. 1, Spring 2011, 36-48.

[56] William Harris, "Trugman Associates, Inc. (TVA) Restricted Stock Study—An Update," *Business Valuation Review*, Vol. 30, No. 4, Winter 2011, 132-139.

## Summary of Restricted Stock Studies

The restricted stock studies previously mentioned were performed based on data from 1966 to 2010. Reported mean discounts range from 8.7% to 35.6%. The average of reported mean discounts was 20.8%, while the median was 19.4%. Reported median discounts range from 9.0% to 45.0%. The average of reported median discounts was 19.9%, while the median was 15.3%.

Some of the variation in the studies has to do with the specific periods analyzed. Prior to April 1997, the SEC-required holding period for restricted stocks was two years. That was decreased to one year on April 29, 1997. Similarly, the holding period was reduced from one year to six months effective February 15, 2008.

The following table shows the summary statistics for studies based upon the period studied.

### Analysis of Restricted Stock Studies for Different Periods

| Descriptive Statistics for Reported Mean and Median Discounts | Mean | Median |
|---|---|---|
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | **19.8%** |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | 20.8% | |

The studies also cited several company and security specific factors in determining the estimated discount.

**PRE-IPO STUDIES**

In recent years, a number of pre-IPO studies were performed to support marketability discounts. The methodology applied in these studies is based on the initial offering price (the price prior to public trading). This price is reduced by the price per share at the time of the last private transaction (which must be less than five months prior to the initial offering to qualify for the study) and adjusted by an appropriate index to account for related market or sector movements over the five-month period. The resulting amount is divided by the initial offering price to arrive at the appropriate discount. The pre-IPO methodology of determining marketability discounts is a relevant method as private stockholders experience an inability to freely sell their stock in the open market, similar to restricted stockholders. Furthermore, private stockholders differ from unrestricted public stockholders, much like restricted stockholders, because there is not a public forum in which investments can be easily liquidated (which is only one of the differences between private and public stockholders).

*Emory Studies*

John Emory, Sr., ASA began his pre-IPO studies with Baird & Co. and continued his studies with his own firm, Emory Business Valuation, LLC. Emory has completed nine studies with the original published in June 1986. The first eight studies eliminated development-stage companies, companies with historical operating losses and companies with IPO prices less than $5 per share. The ninth study deviated from the previous studies as follows:

- Included only companies with "com" in their names

- Review period was increased from 18 months in the previous studies to 35 months

- All transactions were actual sales as opposed to the previous studies that included options

- Most of the companies did not have earnings

The study consisted of 53 transactions. The mean and median discounts by study are presented in the following chart.



### Willamette Management Associates Pre-IPO Study

This study observed 556 companies and 1,007 transactions from 1975 through 1997. The adjusted mean discount[57] for each time period varied from 28.9% to 56.8%. The mean for the entire review period was 44.2%. The median discount range was from 31.8% to 73.1% with the overall median at 50.4%. The Willamette study found the standard mean discount was greater than 35% for all but three of the 14 periods in the study and that median discounts exceeded 40% in all but one year.

### Valuation Advisors Pre-IPO Study

Two studies were conducted by Valuation Advisors for the calendar years of 1999 and 2000. The mean discount of these studies was 48.9%. The key feature of this study was the inclusion of holding period based upon the length of time between the private transaction and the IPO. The study confirmed the author's initial hypothesis that higher discounts accompany longer holding periods.

### APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST

While there are potential application problems associated with various studies, especially the pre-IPO studies, a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest. The mean and median discounts from the restricted stock studies ranged from 9% to 45%. The findings of the restricted stock studies as well as additional private placement studies by Hertzel and Smith suggest discounts can vary greatly depending on size, profitability and other company or security specific factors.

---

[57] Excluded highest and lowest deciles of indicated discounts

CONCLUSION OF VALUE - SUBJECT INTEREST

The latest restricted stock studies indicate mean and median marketability discounts in 14% range. We view the latest restricted stock studies as shorter term and therefore have taken the full sample of restricted stock studies into account in our analysis. Our analysis compares these interests to the comparable transactions and makes adjustments from the baseline discounts noted in the comparable transactions. Since the latest one-year study does not measure restricted securities with similar hold periods relative to the vast majority of other discount studies and since it has a relatively small sample size, we relied upon all the restricted stock studies' findings as the basis for our comparison.

The pre-IPO studies may be less indicative of appropriate marketability discounts, as much of the differences in the transaction prices between pre-IPO and IPO may include event premiums, such as the securing of additional capital which promotes the viability of the company. We did not use these studies for our analysis.

### Factors Affecting Marketability

Based on the SEC Study, we noticed that as company size and profitability decreases, the marketability discount associated with restricted stock in these companies increase. We also note that various other factors affected discounts observed in the other studies. Most notably, the following affect marketability discounts:

- Increase in dividend payment decreases marketability discounts
- Increase in the size of interest and amount of control decreases discounts
- Increase in financial strength of the company decreases discounts
- Increase in restrictions increases marketability discounts

Given the characteristics of size, lack of distribution history, etc., we concluded a 20.8% marketability discount, with a standard deviation of 8.2%, as the baseline observed from all the restricted stock studies we reviewed.

### DISCOUNT ADJUSTMENT DISCUSSION

In the following sections, we adjust the marketability discount to reflect the attributes of the Subject Interest.

The analysis originates with the baseline discount concluded in the previous section. Then, our analysis reviews several factors that affect marketability for both the interests being valued and the comparable interest which provides the base of comparison. Each interest is assigned a ranking from 1 to 5 (from Poor to Strong) based upon the respective feature. Then, the feature ranking for the Subject Interest is subtracted from the feature ranking from the comparable interest. This results in a range of outputs from -4 to +4

(from significantly worse to significantly better). The output is then multiplied by the standard deviation of the restricted stock studies (lack of marketability) to give an indication as to the adjustment necessary to the baseline discount based upon this feature. An importance factor (from low to high) is also attributed to each feature to provide a final scaling factor for the specific feature.

Once the individual feature scaling factors are computed, the baseline discounts are adjusted upward and downward by multiplying the baseline discount by the product of all relevant feature scaling factors.

## SUBJECT INTEREST DISCOUNT CALCULATION

### Adjustment Analysis – Marketability

The Subject Interest is characterized by a lack of rights and, is therefore, somewhat riskier and more volatile. The Participation Shares have restrictions on the transfer of their shares and only have a claim in respect of the underlying assets in a winding up.

The 20.8% baseline lack of marketability discount of the comparable investments reflects the discount that would apply to the Subject Interest if it had illiquidity features similar to restricted stock. Since the Subject Interest did not exhibit these exact characteristics, further adjustments were necessary to conclude fair market value.

Schedule C.3 summarizes the differences between the Subject Interest and the comparable investments used in our analysis. Overall, these factors resulted in a modest decrease in the discount from the baseline.

Based on the analyses and procedures outlined herein, we concluded that a lack of marketability discount of 20.0% is appropriate for the Subject Interest.

**FAIR MARKET VALUE CONCLUSION**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

## $1,637,192
## ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | 20.0% | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | Shares | Fair Market Value |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

Our conclusion of value implies an expected payback period of 1.27 years for the Subject Interest. Our conclusion of value is presented in the Summary Schedule as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report. We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information as well as on other data we developed. We have no obligation to update this report or our conclusion of value for information that comes to our attention after the date of this report.

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, LLC is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated. They should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever. Notwithstanding the foregoing, the valuation report and its contents may be disclosed to third parties, including potential investors, acquirers, and advisors, to establish the fair market value of the Company or in connection with transactions involving the Company, without requiring prior written consent from ValueScope, LLC. Additionally, the Company may distribute this report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, LLC, and we shall have no responsibility for any such unauthorized change.

The valuation report has been prepared based on specific assumptions, methodologies, and data outlined herein. This report may be used alongside other appraisals or studies for comparative or analytical purposes. The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts. The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, other than as expressly permitted herein, without the express written consent of ValueScope, LLC.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

## OPERATIONAL ASSUMPTIONS

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

## COMPETENT MANAGEMENT ASSUMED

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership. This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

## NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement. If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, LLC must be made in advance. ValueScope, LLC reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s). We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

## NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE

No opinion is rendered as to legal fee or property title. No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

## LIENS AND ENCUMBRANCES

ValueScope will give no consideration to liens or encumbrances except as specifically stated. We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks. We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

## INFORMATION PROVIDED BY OTHERS

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

## PROSPECTIVE FINANCIAL INFORMATION

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA). We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation guidelines.

## REGULATORY AND ENVIRONMENTAL CONSIDERATIONS

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

## POTENTIAL FUTURE SALES

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

ASSUMPTIONS AND LIMITING CONDITIONS

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided. An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time. Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

## INDEMNIFICATION BY THE COMPANY

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement. Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement. In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

## APPRAISAL CERTIFICATION

I certify that, to the best of my knowledge and belief:

1. We have not inspected certain assets, properties, or business interests encompassed by this appraisal.

2. We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.

3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.

4. Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.

5. To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.

6. No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.

7. The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.

8. This report and analysis were prepared under the direction of Steven C. Hastings.

9. I am in compliance with all professional appraisal certifications and licensing.

10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.

By:     ValueScope, LLC

Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, LLC

## APPENDIX A
## KEY DAF AGREEMENT PROVISIONS

1. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restriction whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided. [Paragraph 7, Memorandum]

2. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

   a. issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

   b. and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

   and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued. [Article 7]

3. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, establishing and designated (or re-designated as the case may be) and the variations in the relative rights (including without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligation as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution. [Article 8]

4. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether

**VALUE**SCOPE, LLC

PM-1/351

absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerages as may be lawful on any issue of Shares. [Article 9]

5.  The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason. [Article 10]

6.  Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote in general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles. [Article 12]

7.  Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes. [Article 13]

APPENDIX A: KEY DAF AGREEMENT PROVISIONS

8.  The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares raking *pari passu* with or subsequent to them or the redemption of purchase of any Participating Shares of any Class by the Company. [Article 14]

9.  The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws. [Article 18]

10. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles. [Article 21]

11. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution. [Article 65]

12. Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed. [Article 72]

13. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article. [Article 77]

14. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor. [Article 100]

15. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors. [Article 101]

APPENDIX A:  KEY DAF AGREEMENT PROVISIONS

16. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rate basis as to the paid-up or par value of the Shares. [Article 105]

17. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions and regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors of by Ordinary Resolution. [Article 110]

## APPENDIX B
## QUALIFICATIONS OF THE APPRAISER

### Steven C. Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA
### Principal
### shastings@valuescopeinc.com, 817-481-4901

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

## EMPLOYMENT HISTORY

*2006 – Present*                                                                                           *ValueScope, LLC*

*Principal*

Mr. Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis. As a CPA with significant valuation and financial reporting experience, Mr. Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

*2001 – 2006*                                                                                                   *Value Capital, LLC*

*Principal*

Mr. Hastings served as a principal with Value Capital, LLC. During his tenure at Value Capital Mr. Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries. He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions. His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000*                                                      *Finance Commission of Texas*

*Director*

The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner. As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets. Mr. Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations. He was

**VALUE**SCOPE, LLC                                                                                              Page B-1

PM-1/355

APPENDIX B:  QUALIFICATIONS OF THE APPRAISER

instrumental in assisting the Savings and Loan Department in writing new Mortgage Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.


*1994 – 2001*                                                    *MedCare Financial Solutions, Inc.*

*President*

Mr. Hastings served as an officer of MedCare Financial Solutions, Inc. and MedCapital Funding Corporation.  MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers.  MedCare Financial Solutions provided other financial and operational services to health care providers.  These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending.  Mr. Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.


*1986 – 1994*                                                          *H.D. Vest Financial Services*

*Executive Vice President and CFO*

As executive vice president and CFO of H.D. Vest Financial Services, Mr. Hastings assisted in placing over $1.5 billion annually in investment.  Responsible for day-to-day financial operations and capital structuring, Mr. Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers.  Mr. Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr. Hastings supervised stockbrokers' and investment advisors' day-to-day activities.  As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies.  Being licensed in life, disability, health, property and casualty insurance, Mr. Hasting was instrumental in implementing this line of business at HD Vest.


*1979 – 1986*                                                              *Arthur Andersen & Co.*

*Senior Manager*

Mr. Hastings served as a senior manager with significant responsibilities in the several industries.  He consulted on accounting, finance, tax, operations, and systems issues.


**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona

APPENDIX B:  QUALIFICATIONS OF THE APPRAISER

Bachelor of Science - Indiana University, Bloomington, Indiana
**CERTIFICATIONS AND LICENSES**

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

**ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS**

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

**RECENT IRS CASES - OFFICE OF CHIEF COUNSEL**

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.
- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

APPENDIX B:  QUALIFICATIONS OF THE APPRAISER

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C.  Docket No.  1045-13, Estate of Jinana M.  Bowey, et al, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.
- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C.  Docket No.  8401-13, Estate of Edward S.  Redstone, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Economic interest in a corporation for gift tax purposes.
- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C.  Docket No.  223630-12, Michael Tricarichi, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.
- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C.  Docket No.  6936-10, et al, John M.  Alterman, et al, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.
- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No.  8097-13, *Sumner Redstone, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Economic interest in a corporation for gift tax purposes.*
- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No.  20177-11, *Richard H.  Cullifer, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.*
- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

## RECENT IRS CASES – LMSB AUDIT DIVISION

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.
- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.
- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.
- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.
- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

## RECENT DEPARTMENT OF JUSTICE CASE

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America. Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No. 4:16-cv-03302, ALPC Services of Texas, Inc. v. United States of America and Internal Revenue Service. Valuation issues report, 2017.
- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No. 12-844, *The Estate of David W. Longaberger v. The United States.* Valuation issues report, 2014.

## RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al. Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.
- Expert Report June 2018
- Deposition Testimony May 2019

APPENDIX B: QUALIFICATIONS OF THE APPRAISER

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al. Fraudulent transfer, solvency and economic damages.
- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.
- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No. CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al. Economic damages related to lost wages.
- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No. 2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.
- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No. 14-671C. Always at Market, Inc. v. United States of America (DOD/DOJ). Army & Air Force Exchange Service economic damages.
- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No. CV-05-1483, General Medicine, PC v. Healthsouth Corporation v. General Medicine, PC. Economic damages related to contract dispute.
- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

APPENDIX B:  QUALIFICATIONS OF THE APPRAISER

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

"Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International

## WHITE PAPERS

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v.  Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

**SCHEDULES**

VALUESCOPE, LLC

| Charitable DAF HoldCo, Ltd | |
| :--- | ---: |
| **Table of Contents** | **Valuation Date: March 25, 2025** |

## Table of Contents

| Schedule Name | Schedule |
| :--- | :--- |
| **Valuation Summary and Conclusion** | Summary Schedule |
| | |
| **Historical Financial Analysis** | |
| Historical Distributions Table | Schedule A.1 |
| Historical Distributions Charts | Schedule A.2 |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.3 |
| | |
| **Income Approach** | |
| Discounted Cash Flow (DCF) Analysis | Schedule B.1 |
| Sensitivity Analysis - Hypothetical Risk-Free Bond | Schedule B.2 |
| | |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Restricted Stock Studies | Schedule C.1 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.2 |
| DLOM Qualitative Scoring | Schedule C.3 |
| Calculation of Marketability Discount | Schedule C.4 |
| DLOM Footnotes and Comments | Schedule C.5 |

Case 19-34054-sgj11 Doc 4457 Filed 03/04/25 Entered 03/04/25 22:09:09 Desc Exhibit 69 - Part 5 Page 58 of 186

**Charitable DAF HoldCo, Ltd**
**Valuation Summary and Conclusion**

*Synthesis of Fair Market Value*

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | 20.0% | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | Shares | Fair Market Value |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

PM-1/364

**Charitable DAF HoldCo, Ltd**
**Historical Financial Analysis**

**Schedule A.1**
**Valuation Date: March 25, 2025**

*Historical Distributions Table*

| Organization / Holding | Highland Dallas Foundation, Inc. / 100 Participation Shares | Highland Kansas City Foundation, Inc. / 100 Participation Shares | Highland Santa Barbara Foundation, Inc. / 100 Participation Shares | The Community Foundation of North Texas / 5 Participation Shares | Total / 305 Participation Shares |
|---|---|---|---|---|---|
| | | Quarterly Distributions - Previous 5 Years | | | |
| 31-Mar-19 | 39,750 | - | $51,000 | - | $90,750 |
| 30-Jun-19 | 39,438 | - | 50,688 | - | 90,125 |
| 30-Sep-19 | 36,813 | - | 48,063 | - | 84,875 |
| 31-Dec-19 | 231,738 | - | 53,313 | - | 553,300 |
| 2019 Subtotal | $347,738 | $168,250 | $203,063 | $100,000 | $819,050 |
| 31-Mar-20 | 25,750 | - | 37,000 | - | 62,750 |
| 30-Jun-20 | 27,625 | - | 38,875 | - | 66,500 |
| 30-Sep-20 | 27,125 | - | 38,375 | - | 65,500 |
| 31-Dec-20 | 162,738 | 120,250 | 41,313 | 100,000 | 424,300 |
| 2020 Subtotal | $243,238 | $120,250 | $155,563 | $100,000 | $619,050 |
| 31-Mar-21 | 33,188 | - | 44,438 | - | 77,625 |
| 30-Jun-21 | 40,063 | - | 51,313 | - | 91,375 |
| 30-Sep-21 | 43,063 | - | 54,313 | - | 97,375 |
| 31-Dec-21 | 236,513 | 176,250 | 55,313 | 100,000 | 568,075 |
| 2021 Subtotal | $352,825 | $176,250 | $205,375 | $100,000 | $834,450 |
| 31-Mar-22 | 46,438 | - | 57,688 | - | 104,125 |
| 30-Jun-22 | 52,438 | - | 63,688 | - | 116,125 |
| 30-Sep-22 | 50,750 | - | 62,000 | - | 112,750 |
| 31-Dec-22 | 285,013 | 191,750 | 59,188 | 100,000 | 635,950 |
| 2022 Subtotal | $434,638 | $191,750 | $242,563 | $100,000 | $968,950 |
| 31-Mar-23 | 48,313 | - | 59,563 | - | 107,875 |
| 30-Jun-23 | 45,750 | - | 57,000 | - | 102,750 |
| 30-Sep-23 | 47,688 | - | 58,938 | - | 106,625 |
| 31-Dec-23 | 277,741 | 195,712 | 60,178 | 100,000 | 633,631 |
| 2023 Subtotal | $419,491 | $195,712 | $235,678 | $100,000 | $950,881 |
| 31-Mar-24 | 47,608 | - | 58,858 | - | 106,467 |
| 30-Jun-24 | 46,939 | - | 58,189 | - | 105,127 |
| 30-Sep-24 | 47,476 | - | 58,726 | - | 106,202 |
| 31-Dec-24 | TBD | TBD | TBD | TBD | TBD |
| 2024 Subtotal | $142,023 | $0 | $175,773 | $0 | $317,796 |
| Grand Total (2019 - 2024) | $1,939,952 | $852,212 | $1,218,013 | $500,000 | $4,510,177 |

Note: Payments are typically made a few months following the end of each period.







**Charitable DAF HoldCo, Ltd**
**Historical Financial Analysis**

**Schedule A.3**
**Valuation Date: March 25, 2025**

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: | |
| --- | --- | --- |
| | **9/30/2024** | |
| | **Actual** | **%** |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

Case 19-34054-sgj11 Doc 4517 Filed 08/07/25 Entered 08/07/25 23:42:09 Desc Exhibit 69 - Part 5 Page 61 of 186

**Charitable DAF HoldCo, Ltd**
**Income Approach**

**Schedule B.1**
**Valuation Date: March 25, 2025**

*Discounted Cash Flow (DCF) Analysis*

| | | | | | For the Projected Period Ending: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
| Projected Distributions | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ WACC = 68.3% | 0.9663 | 0.8484 | 0.7449 | 0.6540 | 0.5742 | 0.5041 | 0.4426 | 0.3886 | 0.3412 | 0.2995 | 0.2630 | 0.2309 | |
| **Present Value (PV) Net Cash Flow** | $613,430 | $90,926 | $77,423 | $69,593 | $373,598 | $55,377 | $47,153 | $42,384 | $227,533 | $33,726 | $28,718 | $25,813 | |

| | |
|---|---|
| PV net cash flow | $1,685,675 |
| PV residual value | $359,856 |
| **Value of Subject Interest, Minority, Marketable** | **$2,045,531** |
| Less: Discount for Lack of Marketability *(see schedule C.4)* | 20.0% |
| **Value of Subject Interest, Minority, Non-Marketable** | **$1,637,192** |
| Number of Subject Interest Participation Shares | 305 |
| **Value per Share, Minority, Non-Marketable** | **$5,368** |

| Key Valuation Statistics | |
|---|---|
| CLO HoldCo Net Asset Value | $269,052,808 |
| Implied Discount for Lack of Control | 99.2% |
| Valuation as a % of NAV | 0.6% |
| Estimated Payback Period (Years) | 1.27 |

| Residual Value - Gordon Growth Model | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 68.3% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 1.5x |
| Residual value : | $1,558,568 |
| x PV factor : | 0.2309 |
| PV residual value : | $359,856 |

PM-1/368

**Charitable DAF HoldCo, Ltd**
**Income Approach**

Schedule B.2
Valuation Date: March 25, 2025

*Sensitivity Analysis - Hypothetical Risk-Free Bond*

| | | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Projected Distributions | | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ Risk Free Rate = | 4.7% | 0.9970 | 0.9858 | 0.9746 | 0.9636 | 0.9527 | 0.9420 | 0.9313 | 0.9208 | 0.9104 | 0.9001 | 0.8899 | 0.8799 | |
| **Present Value (PV) Net Cash Flow** | | $632,896 | $105,644 | $101,300 | $102,540 | $619,894 | $103,473 | $99,219 | $100,433 | $607,158 | $101,348 | $97,180 | $98,370 | |

| | |
|---|---|
| PV net cash flow | $2,769,456 |
| PV residual value | $41,969,350 |
| **Value of Subject Interest, Minority, Marketable** | **$44,738,806** |
| Less: Discount for Lack of Marketability *(see schedule C.4)* | 20.0% |
| **Value of Subject Interest, Minority, Non-Marketable** | **$35,807,821** |
| Number of Subject Interest Participation Shares | 305 |
| **Value per Share, Minority, Non-Marketable** | **$117,403** |

| Key Valuation Statistics | |
|---|---|
| CLO HoldCo Net Asset Value | $269,052,808 |
| Implied Discount for Lack of Control | 83.4% |
| Valuation as a % of NAV | 13.3% |
| Estimated Payback Period (Years) | 26.53 |

| Residual Value - Gordon Growth Model | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 4.7% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 46.5x |
| Residual value : | $47,699,415 |
| x PV factor : | 0.8799 |
| PV residual value : | $41,969,350 |

PM-1/369

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

Schedule C.1
Valuation Date: March 25, 2025

*DLOM Determination - Restricted Stock Studies*

| | | Study | Period Covered | | | | Reported | Reported |
|---|---|---|---|---|---|---|---|---|
| | **Name of Study** | **Date** | **From** | **To** | **Sub-Sample** | **Observations** | **Mean** | **Median** |
| | **Restricted Stock Studies** | | | | | | | |
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | Mean | Median |
|---|---|---|
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |

*DLOM Qualitative Scoring*

| Feature | Restricted Stock | Rating | Discount for Lack of Marketability (DLOM) Analysis | Rating | Advantage |
|---|---|---|---|---|---|
| Asset liquidity | Securities examined in marketability studies often are of smaller industrial operating companies, often with poor cash flows. | Fair | A majority of investments are in illiquid securities with poor cash flows. However, CLO HoldCo has approximately $91 million in net cash, representing approximately 34% of net asset value. | Strong | Better |
| Cash flow expectations | Restricted securities typically have a lower likelihood of paying dividends since they are associated with emerging companies. | Fair | Distributions are entirely dependent on director discretion as to the timing and amount. Distributions are not required. Howevever, regular distributions have been made over the last five years. | Good | Slightly better |
| Contingent liabilities | Moderate probability of contingent liabilities depending on type of company and size. Smaller companies can fall prey to securities litigation. | Fair | Higher probability of contingent liabilities. The Company and CLO HoldCo has been engaged in numerous litigation matters. | Weak | Slightly worse |
| Debt capacity | Company leverage is usually on the higher side, as they are typically in the emerging stage. | Weak | CLO HoldCo has a small amount of debt representing 15% of net asset value. | Good | Better |
| Redemption/ withdrawal | No redemption rights. | Poor | No redemption rights. | Poor | Equal |
| Transfer restrictions | Transfer restrictions are limited to securities laws, with holding periods of two years. Holding period was shortened to one year in 1997, but studies generally relate to two year holds. Once the restriction time period is complete, no restrictions on transfer exist. Markets are liquid for non-restricted shares. | Fair | Transfers must be approved by the directors. | Poor | Worse |
| Value of entity | Companies range in size, however, restricted securities are more commonly utilized by smaller companies in the development stage. Approximately 50 percent of the companies issuing restricted stock included in the Silber study had sales less than $40 million. | Fair | Participating shareholders have no direct rights to the underlying net asset value other than in a winding up. CLO HoldCo is expected to generate revenue well in excess of the expected distributions. | Good | Slightly better |
| Value of interest | Purchasers of restricted securities tend to be institutional or private investors that are active in the public markets. The analysis associated with these types of securities precludes small holders from purchasing. Size of interests tend to be moderate. | Fair | Participation shareholders are small, private foundations. The foundations must be 501c3 non-profit organizations. At the director's discretion, participating shareholders may be diluted through the issuance of additional participation shares to non-existing participating shareholders. | Poor | Worse |

**Charitable DAF HoldCo, Ltd**  
**Discount for Lack of Marketability (DLOM) Analysis**

**Schedule C.4**  
**Valuation Date: March 25, 2025**

*Calculation of Marketability Discount*

| Feature | Net Advantage | Gross Adjustment | Importance | Weight | Adjustment | Scaling Adjustment | Final Adjustment |
|---|---|---|---|---|---|---|---|
| | | | | | | F = 1+E or | |
| | A (Schedules B) | B = F(A) | C | D = F(C) | E = B x D | 1/(1-E) | |
| **Marketability Factors** | | | | | | | |
| Asset liquidity | Better | -16% | High | 100% | -16% | 86% | -2.9% |
| Cash flow expectations | Slightly better | -8% | High | 100% | -8% | 92% | -1.4% |
| Contingent liabilities | Slightly worse | 8% | High | 100% | 8% | 108% | 1.4% |
| Debt capacity | Better | -16% | Low | 25% | -4% | 96% | -0.7% |
| Redemption/ withdrawal | Equal | 0% | High | 100% | 0% | 100% | 0.0% |
| Transfer restrictions | Worse | 16% | High | 100% | 16% | 116% | 2.8% |
| Value of entity | Slightly better | -8% | Medium | 50% | -4% | 96% | -0.8% |
| Value of interest | Worse | 16% | Low | 25% | 4% | 104% | 0.8% |
| **Net Scaling Adjustment** | G = Product (F$_i$), i = 1 to n | | | | | 96% | -0.8% |
| | | | | | | | |
| **Marketability Discount** | | | | | | | |
| Unadjusted discount | I (See Report) | | | | 20.8% | | |
| Scaling adjustment | G (See above) | | | | 96% | | |
| **Concluded Marketability Discount** | J = G x I | | | | | 20.0% | |

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

**Schedule C.5**
**Valuation Date: March 25, 2025**

*DLOM Footnotes and Comments*

A) Our comparison matrix ranks the features of the Subject Interest and the comparable interests on a scale from 1 to 5.

1 = Poor   2 = Weak   3 = Fair   4 = Good  5 = Excellent

We then subtract the Subject Interest feature score from the comparable feature score to determine the advantage.

0 = Equal   1 = Slightly Better   2 = Better   3 = Much Better   4 = Significantly Better
            -1 = Slightly Worse   -2 = Worse   -3 = Much Worse   -4 = Significantly Worse

B) B is calculated as the weighted average standard deviation of the comparable investments in closed end funds multiplied by the Advantage Score.

C) The importance of the feature is assessed.
1 = Low              2 = Medium         3 = High

D) Weights are allocated as follows:
Low = 25%            Medium = 50%      High = 100%

E) To compute the adjustment, B is multiplied by D.

F) The scaling adjustment is computed as 1+E if E > 0 or 1/(1-E) if E < 0 for the particular feature.

G) The net scaling adjustment for marketability factors is the product of all marketability features' scaling adjustments.

H) The net scaling adjustment for control factors is the product of all control features' scaling adjustments.

I) This is the concluded baseline marketability discount determined for comparable investments.

J) This is the baseline marketablity discount multiplied by the scaling factor.

K) This is the concluded baseline minority interest discount determined for comparable investments.

L) This is the baseline minority interest discount multiplied by the scaling factor.

M) This is the combined discount of both marketability and minority interest discounts.

# EXHIBIT 51

**VALUATION ANALYSIS OF**
**100 PARTICIPATION SHARES OF**
**CHARITABLE DAF HOLDCO, LTD**

**AS OF**
**SEPTEMBER 30, 2024**

Prepared for:

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd



**VALUE**SCOPE

a **marshall + stevens** company

January 7, 2025

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd
2101 Cedar Springs Road, Suite 1200
Dallas, Texas 75201

*RE: Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd*

Dear Mr. Patrick:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") out of an assumed 305 participation shares of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of September 30, 2024 (the "Valuation Date"). ValueScope has not independently verified the total number of participation shares outstanding.[1] This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.
2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.

---

[1] The Subject Interest is assumed to effectively represent approximately 32.8% of all participation shares.

Mr. Mark Patrick
January 7, 2025
Page 2

7.  The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.

8.  The marketability, or lack thereof, of the securities.

The premise of value followed herein is going concern.[2] The liquidation premise of value was considered and rejected as not applicable because the going-concern value results in a "highest and best use" value for the interest.

## SCOPE OF WORK

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's advisors. To understand the environment in which DAF operates, we researched relevant information concerning the collateralized debt industry. We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Financial statements for the Company as of September 30, 2024

- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd

- Information regarding the Company's history and current operations

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

---

[2] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

Mr. Mark Patrick
January 7, 2025
Page 3

## CONCLUSION OF VALUE

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$75,961,370**
**SEVENTY-FIVE MILLION NINE HUNDRED SIXTY-ONE THOUSAND THREE HUNDRED SEVENTY DOLLARS**

| FMV Summary | | |
|---|---:|---|
| Company Net Asset Value (NAV) | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | 305 | |
| **NAV Per Share** | **$882,140** | |
| **Applicable Discounts** | | |
| Discount for Lack of Control | 8.1% | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) |
| **FMV Per Share** | **$759,614** | |
| Subject Shares | 100 | |
| **FMV of Subject Interest** | **$75,961,370** | |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

*ValueScope, Inc.*

ValueScope, Inc.

**VALUE**SCOPE, Inc.

## TABLE OF CONTENTS

**ENGAGEMENT OVERVIEW** ................................................................................1

    DESCRIPTION OF THE ASSIGNMENT ............................................................ 1

    SCOPE ................................................................................................................ 1

    PROCEDURES .................................................................................................... 1

**DAF OVERVIEW** ..............................................................................................2

    COMPANY OVERVIEW ...................................................................................... 2

    SUBJECT INTEREST OVERVIEW .................................................................... 2

    HISTORICAL FINANCIAL ANALYSIS ............................................................... 2

**ECONOMIC AND INDUSTRY OVERVIEW** ........................................................4

    OVERVIEW OF THE U.S. ECONOMY ............................................................. 4

    OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY ................................................................................................................ 12

**VALUATION METHODOLOGY** .......................................................................15

    VALUATION APPROACHES .............................................................................. 15

    VALUATION METHODS .................................................................................... 16

    SUMMARY OF THE VALUATION APPROACHES AND METHODS ................. 16

**VALUATION ANALYSIS** .................................................................................17

    ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE ...................... 17

**CONCLUSION OF VALUE - SUBJECT INTEREST** ...........................................19

    DISCOUNT FOR LACK OF CONTROL ............................................................ 19

    DISCOUNT FOR LACK OF MARKETABILITY ................................................. 19

    CONCLUSION - SUBJECT INTEREST VALUE ............................................... 21

**ASSUMPTIONS AND LIMITING CONDITIONS** ...............................................23

**APPRAISAL CERTIFICATION** .......................................................................28

# TABLE OF SCHEDULES

**HISTORICAL VALUATION SUMMARY** ................................................................ **SUMMARY 1**

**CURRENT VALUATION SUMMARY**.................................................................. **SUMMARY 2**

**DAF NET ASSET VALUE ANALYSIS**.................................................................... **A**

    CLO HOLDCO, LTD - SUMMARY BALANCE SHEET ................................................A.1

    CHARITABLE DAF HOLDCO, LTD - SUMMARY BALANCE SHEET ...................................A.2

**DISCOUNT FOR LACK OF CONTROL (DLOC) ANALYSIS** .................................... **B**

    CLOSED-END FUND DATA - INVESTMENT GRADE BOND FUNDS...................................B.1

    CLOSED-END FUND DATA - US GENERAL EQUITY FUNDS ......................................B.2

    DLOC CONCLUSION....................................................................................B.3

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS** ....................... **C**

    DLOM DETERMINATION - PUT OPTION APPROACH ...........................................C.1

    PUT OPTION APPROACH - HISTORICAL VOLATILITY SUMMARY...............................C.2

    DLOM DETERMINATION - RESTRICTED STOCK STUDIES.......................................C.3

    DLOM DETERMINATION - RESTRICTED STOCK STUDIES SUMMARY STATISTICS ......... C.4

    DLOM CONCLUSION..................................................................................C.5

## ENGAGEMENT OVERVIEW

### DESCRIPTION OF THE ASSIGNMENT

We were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") out of an assumed 305 participation shares of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of September 30, 2024 (the "Valuation Date"). ValueScope has not independently verified the total number of participation shares outstanding.[3] This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

### SCOPE

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections. The first section outlines the description, scope, and procedures of our analysis. The second section provides a brief description of the Company and the Company's financial position. The third section includes a discussion of the national economy and the industry in which the Company operates. The fourth section details a discussion of valuation theory and methodology. The fifth section presents our valuation analysis, and the sixth section presents our conclusion and reconciliation of the fair market value of the Subject Interest.

### PROCEDURES

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances. We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information, as well as on other data obtained through additional research. A full discussion of the methodologies employed appears in the following sections of this report.

---

[3] The Subject Interest is assumed to effectively represent approximately 32.8% of all participation shares.

DAF OVERVIEW[4]

## COMPANY OVERVIEW

Charitable DAF HoldCo, Ltd is a Cayman Islands "company limited by shares" formed in October 2011. Upon the shareholders' acceptance of shares, the shareholders agreed to the provisions of the Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd (as amended from time to time in accordance with the provisions thereof, the "DAF Agreement") and the Companies Law of the Cayman Islands (as amended from time to time, the "Law"). As a holding company, DAF's predominant assets were historically interests in the equity tranches of Collateralized Loan Obligations ("CLOs"), the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities.

## SUBJECT INTEREST OVERVIEW

Based on information provided by the Company's management ("Management"), the Subject Interest shares are participation shares that from time to time are expected to receive cash distributions to fulfill certain charitable and expense goals of the owners of the participation shares. The Subject Interest shares are directly affected by the terms of the DAF Agreement and the actions of DAF's directors. According to the DAF Agreement, the appointed directors control the business, affairs, and power of the Company (Sections 72 and 77), including the issuance and purchase of shares on such terms and in such manner as the director determines (Sections 7-10). Director consent is also required for shareholders to transfer their interests in DAF (Section 18). Finally, although shareholders may determine the timing and amounts of dividends (Section 100), no dividend can exceed an amount approved by the directors (Section 101).

## HISTORICAL FINANCIAL ANALYSIS

We were provided with the Company's balance sheet as of September 30, 2024. These financial statements reflect various professional valuations of DAF's ultimate underlying assets.

As reported as of the Valuation Date, DAF's sole asset consisted of 100% of the equity of CLO HoldCo, Ltd ("CLO HoldCo"). CLO HoldCo is a holding company which invests in CLOs and other various investments. The net asset value for CLO HoldCo was reported as

---

[4] Based on the Company's memorandum and articles of association and information from management.

$269.1 million.  DAF reported no liabilities as of the Valuation Date.  As a result, DAF's book equity as of the Valuation Date was determined to equal $269.1 million.

DAF's balance sheet as of the Valuation Date is presented in Schedule A.2.

## ECONOMIC AND INDUSTRY OVERVIEW

### OVERVIEW OF THE U.S. ECONOMY

In the second quarter of 2024, the US economy experienced positive growth that surpassed the pace of the first quarter. Inflation has moderated significantly from its peak of 8.99% in June 2022 to 2.59% by August 2024, reflecting progress toward the Federal Reserve's inflation target. After an extended period of elevated interest rates to curb inflation, recent data pointed to a cooling labor market and continued price stability, prompting the Fed to cut rates by 50 basis points. The steady rate hikes initiated in 2023 led to an inverted yield curve, suggesting investor expectations of an economic slowdown. Nevertheless, US stock markets have gained momentum, with indices closing higher year-over-year, supported by declining inflation and anticipated further monetary easing.

### Gross Domestic Product[5]

Real gross domestic product (GDP) increased at an annual rate of 3.0 percent in the second quarter of 2024, following an increase of 1.6 percent in the first quarter. The acceleration in real GDP in the second quarter primarily reflected accelerations in consumer spending, private inventory investment, and nonresidential fixed investment. These movements were partly offset by a deceleration in residential fixed investment. Imports increased.



---

[5]     U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Second Quarter 2024. (Release Date: 9/26/2024).

ECONOMIC AND INDUSTRY OVERVIEW

### *Population*

Population growth is an important driver of long-term growth in an economy. The total population increased from 335.4 million in August 2023 to 337.2 million in August 2024.[6] The working-age population (15-64) increased from 208.7 million in August 2023 to 208.9 million in August 2024.[7]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic. It partially recovered in just several months and has been trending upward/flat. In August 2023, the civilian labor force participation rate was 62.8% and stands at 62.7% as of August 2024.[8]





---

[6] U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

[7] Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

[8] U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

## *Employment*

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 142,000 in August 2024 and the unemployment rate increased slightly to 4.2 percent. Job gains occurred in construction and healthcare.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased from 7.1% in August 2023 to 7.9% in August 2024.[9]





Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will be 4.2% for both 2026 and 2027.

---

[9] U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

*Inflation*

According to the BLS, The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.2 percent in August on a seasonally adjusted basis, after the same increase in July. Over the last 12 months, the all-items index increased 2.5 percent before seasonal adjustment.[10]

The index for shelter rose 0.5 percent in August and was the main factor in the all items increase. The food index increased 0.1 percent in August, after rising 0.2 percent in July. The index for food away from home rose 0.3 percent over the month, while the index for food at home was unchanged. The energy index fell 0.8 percent over the month, after being unchanged in the preceding month.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has declined significantly since a year ago, August 2023, declining from 88.97% to 24.05% in August 2024[11].The forecasters predict current-quarter headline CPI inflation will average 2.3 percent at an annual rate, down from the prediction of 2.8 percent in the previous survey[12].



---

[10]   Federal Reserve Bank of St. Louis, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

[11]   Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

[12]   Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters*, August 9, 2024.

## Interest Rates

The interest rate on the three-month Treasury bill declined from 5.32% as of September 29, 2023, to 4.52% as of September 30, 2024.[13] The interest rate on the ten-year Treasury note declined from 4.59% as of September 29, 2023, to 3.81% as of September 30, 2024.[14]



The interest rate on Moody's Aaa-rated corporate bonds declined from 5.36% as of September 29, 2023, to 4.72% as of September 30, 2024.[15] The interest rate on the Moody's Baa-rated corporate bonds declined from 6.37% to 5.44% over the same time.[16]



---

[13] Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

[14] Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

[15] Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last October 7, 2024.

[16] Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

In the last twelve months, the yield curve remained inverted, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill increasing/flattening between September 29, 2023, to September 30,2024 from -0.54% to 0.21%.[17]



### Corporate Profits

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) increased $132.4 billion in the second quarter of 2024 from the first quarter of 2024.



---

[17] U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed October 7, 2024.

### Stock Markets[18]

The stock markets gained momentum from September 29, 2023, to September 30, 2024. The S&P 500 Index (SPY) closed at 427.48 on September 29, 2023, and closed higher at 573.76 on September 30, 2024. The NASDAQ Composite Index (QQQ) closed at 334.95 on September 29, 2023, and closed higher at 423.12 on September 30, 2024. The Dow Jones Industrial Average Index (DIA) closed at 358.27 on September 29, 2023 and closed higher at 488.07 on September 30, 2024. In the graph below, the September 30, 2022, values were set to 100.



### Construction & Housing Starts

Construction spending and housing starts are two other important indicators for the economy. Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment. Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy. Housing starts increased from 1.305 million units in August 2023 to 1.356 million units in August 2024.[19] Construction spending, a seasonally adjusted annual figure, increased from $2.05 trillion in August 2023 to $2.13 trillion in August 2024.[20]

---

[18] CapIQ Database, last accessed October 7, 2024.

[19] U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

[20] U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.



## Consumer Confidence

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has decreased from 69.40 a year ago in August 2023 to 67.90 in August 2024. Although it has declined slightly from a year ago, the index is still well below the pre-COVID high of 101.0 in February 2020.[21] The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions. The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S. This is considered a leading indicator of future consumer expenditures and economic activity.



---

[21] University of Michigan, *Surveys of Consumers*, September 2024

## OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY[22]

This industry is composed of private equity funds, hedge funds, closed-end funds, unit investment trusts and other financial vehicles. Entities in this industry manage securities or other assets on behalf of shareholders, unit holders or other beneficiaries to achieve high returns on targeted investments. This industry excludes insurance and employee-benefit funds, open-end investment funds and trusts, estates and agency accounts.

### *Executive Summary*

In recent years, industry assets have become increasingly integral to institutional investors' portfolios and the larger asset-management market. Institutional investors are individuals or organizations that trade securities in such substantial volumes that they qualify for lower commissions and fewer protective regulations since it's assumed that they're knowledgeable enough to protect themselves. Increasing demand from institutional investors has contributed to the surge in the industry's assets under management (AUM) and revenue during the current period.

In recent years, the industry has continued to enmesh itself more deeply within the broader financial ecosystem despite challenges posed by the COVID-19 pandemic in 2020 and 2021. The pandemic, mainly in the first quarter of 2020, contributed to revenue declines for many operators. Many portfolios, previously thought to be sound investments, were reevaluated, and businesses pivoted their strategies due to the unprecedented nature of the crisis. In the past five years, industry revenue grew at a CAGR of 4.0% to $312.2 billion, including 5.2% in 2024 alone, when profit will increase to 48.9%.

Industry revenue will grow at a CAGR of 4.2% to $383.6 billion over the five years to 2029, when profit will rise to 50.5%. The Federal Reserve is increasing interest rates to quell historically high inflation. These higher interest rates are reducing liquidity in the markets. Private equity firms and hedge funds will have more difficulty raising capital for investments. As characteristics of the financial system change in light of post-financial crisis banking regulations and regulators' recognition of the importance of hedge funds within the financial system, hedge funds will likely experience heightened oversight.

### *Industry Performance*

The Federal Reserve has increased interest rates to combat rampant inflation, which has surged due to persistent supply chain issues and a global energy crisis. After lowering

---

[22] IBISWorld Industry Report 52599, July 2024, *Private Equity, Hedge Funds & Investment Vehicles in the U.S.*

rates to historic lows in response to the COVID-19 pandemic, the Fed began raising them in 2022, with the current target rate ranging from 5.25% to 5.50%. These higher rates are reducing liquidity in financial markets, compelling private equity and hedge funds to seek new methods of raising capital, while those unable to adapt are exiting the industry. The previous decade's low-interest-rate environment had been advantageous for these investment vehicles, as it led investors to shift away from fixed-income and credit securities in favor of potentially higher returns. With more accessible funds during that period, fundraising activity surged, and those who capitalized on lower rates are currently benefiting from reduced interest payments and enhanced returns.

Simultaneously, there is a growing interest in Environmental, Social, and Governance (ESG) factors among investors who wish to align their investments with their values. This shift has led private equity firms and hedge fund managers to increasingly incorporate ESG considerations into their investment strategies. For instance, investments are now evaluated for their long-term environmental impact. Investors are also demanding that companies disclose information about their environmental and social performance. In response, private equity firms and hedge funds are diversifying their workforces and integrating ESG principles into their organizational frameworks.

Moreover, minority stakes are becoming more common in private equity firms. As internal competition intensifies, firms are diversifying their investments and establishing smaller, targeted funds, driven by a decrease in liquidity. The significant volatility in prominent markets like the S&P 500 during the COVID-19 pandemic encouraged companies to acquire minority stakes either in other companies or investments. There is a trend towards large private equity groups acquiring minority stakes in one another, as firms seek creative strategies to unlock potential investments. Changes in management types, with CEOs preferring to retain control while leveraging private equity expertise for growth, have also contributed to this trend.

Finally, technology and data analytics are increasingly being utilized by private equity firms and hedge funds to enhance their investment processes. These firms are employing machine learning algorithms to analyze vast amounts of data—such as financial statements, news articles, and social media posts—to uncover trends and insights not immediately visible to human analysts. Additionally, some are automating back-office functions like accounting and compliance using artificial intelligence (AI), which improves task processing and operational efficiency.

### *Industry Outlook*

The Federal Reserve's ongoing battle against inflation is likely to result in volatile interest rates in the near future. As inflation continues to affect the U.S. economy, the Fed has signaled that it may maintain or further increase interest rates if necessary. These higher rates will reduce market liquidity, making it more challenging for hedge funds and private

equity firms to raise capital. Firms that cannot adapt may be forced out of the industry. Typically, investors turn to lower-risk investments, such as bonds, when interest rates are high, which will pose significant obstacles for the industry due to decreased liquidity and shifting investor preferences. Consequently, hedge funds and private equity firms will need to be more strategic and innovative in finding profitable investments as liquidity tightens.

At the same time, there is a sustained interest in Environmental, Social, and Governance (ESG) factors. Investors are increasingly concerned about the impact of their investments on the environment and society, seeking to align their portfolios with their values. Private equity firms and hedge fund managers are expected to continue integrating ESG considerations into their investment strategies, with climate change effects increasingly influencing investment decisions across various sectors. As environmental conditions worsen, the importance of selecting investments that contribute positively to the environment will grow. Additionally, as the population becomes more diverse, there is an expectation for hedge funds and private equity firms to reflect this diversity in their operations.

The use of technology and data analytics by private equity firms and hedge funds is expected to expand further. These firms will increasingly rely on advanced technology to identify and evaluate potential investments, and to manage and monitor existing portfolios. With the growing dependence on technology, cybersecurity will become increasingly critical, prompting firms to invest more in securing their technological networks. As artificial intelligence (AI) evolves, it will enable hedge funds and private equity firms to analyze extensive data sets in real-time, facilitating more informed trading and investment decisions. Given that data is now considered a crucial asset, industry players will use improved tools to access and analyze data, aiming to discover new investment opportunities.

Moreover, fintech is emerging as an attractive investment area for private equity, hedge funds, and investment vehicles. The rapidly growing fintech and biotechnology sectors, though currently constrained, are poised for future expansion and will likely attract increased investment. The proximity of Silicon Valley and Wall Street offers industry players easy access to cutting-edge technological innovations and robust financial networks, enhancing their ability to invest in promising new ideas. As the distinction between Silicon Valley and Wall Street continues to blur, private equity firms and hedge funds that can sift through the hype to find valuable opportunities will be well-positioned in the evolving fintech landscape.

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

## VALUATION APPROACHES

### Income Approach

The income approach quantifies the present value of anticipated future income generated by a business or an asset. Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes. One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow. The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate. The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

### Market Approach

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets. Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset. Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions. The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

### Asset-Based (Cost) Approach

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities. Replacement cost is often a primary indicator of the value of a business' assets. The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it. Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors. The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

## VALUATION METHODS

The following are common valuation methods used under the three approaches:

A. Income Approach
1. Discounted Cash Flow Method (multi-period model)
2. Direct Capitalization Method (single period model)
3. Excess Earnings Method

B. Market Approach
1. Guideline Public Company Method
2. Merger and Acquisition Method

C. Asset-Based Approach
1. Reproduction Cost Method
2. Replacement Cost Method
3. Net Asset Value Method

## SUMMARY OF THE VALUATION APPROACHES AND METHODS

For the valuation of non-controlling interests in holding companies such as DAF, the asset-based approach is most commonly used. When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

## VALUATION ANALYSIS

## ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE

DAF's ultimate holdings are interests in various investment assets. DAF's sole asset reported as of the Valuation Date consisted of 100% of the equity of CLO HoldCo. CLO HoldCo is a holding company which invests in CLOs and other investments. We relied upon DAF management's determination of CLO HoldCo's NAV based on the values of its various underlying investments and assets. CLO HoldCo's balance sheet as of the Valuation Date is shown in the following charts and in Schedule A.1.

As shown below, CLO HoldCo's primary assets consist of cash & cash equivalents and other investment investments[23]. CLO HoldCo reported $316.3 million in total assets. CLO HoldCo also reported $47.2 million in total liabilities as of the Valuation Date. Therefore, CLO HoldCo's equity can be reasonably stated as $269.1 million.

### CLO HoldCo, Ltd - Summary Balance Sheet

| | Balance Sheet as of: | |
| --- | --- | --- |
| | 9/30/2024 | |
| | Actual | % |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

---

[23] Other investments consist of investments in approximately 39 entities.

### *DAF NAV Conclusion*

As of the Valuation Date, DAF's balance sheet consisted solely of a 100% ownership interest in CLO HoldCo's equity.  Therefore, DAF's NAV can be reasonably stated as $269.1 million (rounded).  This analysis is summarized in the following table and in Schedule A.2.

|  | Balance Sheet as of: | |
| --- | --- | --- |
|  | 9/30/2024 | |
|  | Actual | % |
| **Assets** |  |  |
| CLO HoldCo, LTD | $269,052,808 | 100.0% |
| **Total Assets** | $269,052,808 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $269,052,808 | 100.0% |
| **Total Liabilities & Equity** | $269,052,808 | 100.0% |

## CONCLUSION OF VALUE - SUBJECT INTEREST

DAF's NAV was determined to equal $269.1 million as of the Valuation Date. Dividing this NAV by the 305 total participation shares outstanding results in a NAV per share of $882,140. However, sellers of fractional interests in holding companies rarely receive a price equal to the NAV of their investment. This is because the interest holders do not have direct control over the entity's assets and have a limited market for their interests. Therefore, in order to arrive at the fair market value of the Subject Interest shares that are the subject of this analysis, we applied relevant discounts (control and marketability).

### DISCOUNT FOR LACK OF CONTROL

Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls. Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

Due to the Company's ultimate holdings in debt and equity investments, the Company exhibits some of the characteristics of a closed-end fund. Closed-end funds, like open-ended mutual funds, are asset holding companies that typically hold a portfolio of publicly traded securities. However, unlike unit holders in open-ended funds, closed-end fund unit holders who wish to liquidate their investment cannot look to the fund to repurchase their shares. Rather, they must sell them on the open market. The price they receive is not usually equal to the fundamental or net asset value of the investment. Therefore, the fair market value of closed-end funds is generally described in terms of a discount or premium to net asset value.

To align with the Company's holdings, we selected closed-end fund data from investment grade bond funds and general equity funds. The investment grade bond fund data shown in Schedule B.1 indicated mean and median discounts of 2.9% and 2.5%, respectively. The general equity fund data shown in Schedule B.2 indicated mean and median discounts of 12.1% and 13.6%, respectively. Based on these indications, we selected a discount for lack of control of 8.1% to be applicable to the Subject Interest, as shown in Schedule B.3.

### DISCOUNT FOR LACK OF MARKETABILITY

Discounts for lack of marketability (DLOMs) are applied to the shares of private companies based on the premise that an asset or interest in an entity without a readily available market would sell for less to a hypothetical buyer than an identical asset or interest that is readily marketable. Several factors are widely recognized to affect

marketability, such as distributions or dividends, investment performance, holding period to complete a sale, and management performance, among others. We utilized two methods of quantifying a relevant DLOM: the put option approach and an analysis of restricted stock studies.

### Put Option Approach

The price of a contract providing the right to sell a number of shares (a put option) represents the difference between the non-marketable and marketable price of an asset. For example, if a holder of restricted or non-marketable stock purchases a put option on the underlying asset, the holder would be purchasing marketability. The price of the put determines the size of the DLOM.

In order to determine the price of such a put, we utilized the Black-Scholes put option model.[24] Based on our analysis, we determined that an appropriate volatility for investment grade bond funds and general equity bond funds such as DAF is approximately 12.3% (Schedule C.2) and between one half and one year (averaged to 0.75 years) would be required to sell the Subject Interest in an orderly transaction. As a result of these inputs, the put option approach indicated a discount for lack of marketability of 2.8%. This DLOM indication is presented in Schedule C.1.

### Restricted Stock Study Analysis

There are several studies that attempt to measure discounts for lack of marketability, and a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest.[25] As mentioned, we would expect between six months and one year to be required to sell the Subject Interest in an orderly transaction.

Schedule C.4 presents a summary of restricted stock studies performed involving issuances of shares during the time period 1997 through 2008, which is when the SEC-mandated lock-up period for restricted stocks was one year. Based on a range of low discounts of 9.0%-10.9%, we selected a 9.7% DLOM utilizing the findings of the restricted stock studies.

### DLOM Conclusion

The put option approach in Schedule C.1 indicated a DLOM of 2.8%. The restricted stock study analysis in Schedule C.4 indicated a DLOM of 9.7%. Based on these indications, we

---

[24] Black, F. and M. Scholes, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy*, May 1973

[25] See Schedule C.3

concluded a discount for lack of marketability of 6.3%. This conclusion is presented in Schedule C.5.

## CONCLUSION - SUBJECT INTEREST VALUE

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

### $75,961,370
### SEVENTY-FIVE MILLION NINE HUNDRED SIXTY-ONE THOUSAND THREE HUNDRED SEVENTY DOLLARS

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

Our conclusion of value is presented in Summary Schedule 2 as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report. We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information as well as on other data we developed. We have no obligation to update this

report or our conclusion of value for information that comes to our attention after the date of this report.

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, Inc. is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated; they should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever.  Neither the valuation report, nor its contents, nor any reference to the appraiser or ValueScope, Inc. may be referred to or quoted in any registration statement, prospectus, offering memorandum, sales brochure, other appraisal, loan or other agreement or document given to third parties without our prior written consent.  In addition, except as set forth in the report, our analysis and report are not intended for general circulation or publication, nor are they to be reproduced or distributed to third parties without our prior written consent.  Notwithstanding the foregoing, ValueScope, Inc. permits the Company to distribute this Report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, and we shall have no responsibility for any such unauthorized change.

The valuation may not be used in conjunction with any other appraisal or study.  The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts.  The appraisal was prepared solely for the purpose, function, and party so identified in the report.  The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, without the express written consent of ValueScope, Inc.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

## OPERATIONAL ASSUMPTIONS

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

## COMPETENT MANAGEMENT ASSUMED

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership.  This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

## NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement.  If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, Inc. must be made in advance. ValueScope, Inc. reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s).  We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

**NO CONSIDERATION IS RENDERED AS TO THE LAW OF THE CAYMAN ISLANDS**

No consideration is rendered as to the law of the Cayman Islands. Implications of Cayman Island jurisdiction are not considered.

**NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE**

No opinion is rendered as to legal fee or property title. No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

**LIENS AND ENCUMBRANCES**

ValueScope will give no consideration to liens or encumbrances except as specifically stated. We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks. We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

**INFORMATION PROVIDED BY OTHERS**

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

**PROSPECTIVE FINANCIAL INFORMATION**

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA). We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation

guidelines.

## REGULATORY AND ENVIRONMENTAL CONSIDERATIONS

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

## POTENTIAL FUTURE SALES

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

ASSUMPTIONS AND LIMITING CONDITIONS

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided.  An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time.  Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

## INDEMNIFICATION BY THE COMPANY

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement.  Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement.  In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

**APPRAISAL CERTIFICATION**

I certify that, to the best of my knowledge and belief:

1. We have not inspected certain assets, properties, or business interests encompassed by this appraisal.

2. We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.

3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.

4. Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.

5. To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.

6. No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.

7. The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.

8. This report and analysis were prepared under the direction of Steven C. Hastings.

9. I am in compliance with all professional appraisal certifications and licensing.

10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.

By:     ValueScope, Inc.

Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, Inc.

## APPENDIX: QUALIFICATIONS OF THE APPRAISER

### Steven C. Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA
### Principal
### shastings@valuescopeinc.com, 817-481-4901

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

## EMPLOYMENT HISTORY

*2006 – Present*                                                              *ValueScope, Inc.*

*Principal*

Mr. Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis. As a CPA with significant valuation and financial reporting experience, Mr. Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

*2001 – 2006*                                                                 *Value Capital, LLC*

*Principal*

Mr. Hastings served as a principal with Value Capital, LLC. During his tenure at Value Capital Mr. Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries. He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions. His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000*                                     *Finance Commission of Texas*

*Director*

The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner. As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets. Mr. Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations. He was instrumental in assisting the Savings and Loan Department in writing new Mortgage

APPENDIX: QUALIFICATIONS OF THE APPRAISER

Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001*                                                                 *MedCare Financial Solutions, Inc.*

*President*

Mr. Hastings served as an officer of MedCare Financial Solutions, Inc. and MedCapital Funding Corporation. MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers. MedCare Financial Solutions provided other financial and operational services to health care providers. These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending. Mr. Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

*1986 – 1994*                                                                         *H.D. Vest Financial Services*

*Executive Vice President and CFO*

As executive vice president and CFO of H.D. Vest Financial Services, Mr. Hastings assisted in placing over $1.5 billion annually in investment. Responsible for day-to-day financial operations and capital structuring, Mr. Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers. Mr. Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr. Hastings supervised stockbrokers' and investment advisors' day-to-day activities. As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies. Being licensed in life, disability, health, property and casualty insurance, Mr. Hasting was instrumental in implementing this line of business at HD Vest.

*1979 – 1986*                                                                                 *Arthur Andersen & Co.*

*Senior Manager*

Mr. Hastings served as a senior manager with significant responsibilities in the several industries. He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona
Bachelor of Science - Indiana University, Bloomington, Indiana

**VALUE**SCOPE, Inc.

APPENDIX: QUALIFICATIONS OF THE APPRAISER

## CERTIFICATIONS AND LICENSES

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

## ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

## RECENT IRS CASES - OFFICE OF CHIEF COUNSEL

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.
- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report September 2015

**VALUE**SCOPE, Inc.

- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C. Docket No. 1045-13, Estate of Jinana M. Bowey, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C. Docket No. 8401-13, Estate of Edward S. Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.
- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C. Docket No. 223630-12, Michael Tricarichi, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C. Docket No. 6936-10, et al, John M. Alterman, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No. 8097-13, *Sumner Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.*
- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No. 20177-11, *Richard H. Cullifer, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.*
- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

APPENDIX: QUALIFICATIONS OF THE APPRAISER

## RECENT IRS CASES – LMSB AUDIT DIVISION

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.
- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.
- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.
- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.
- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

## RECENT DEPARTMENT OF JUSTICE CASE

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America. Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No. 4:16-cv-03302, ALPC Services of Texas, Inc. v. United States of America and Internal Revenue Service. Valuation issues report, 2017.
- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No. 12-844, *The Estate of David W. Longaberger v. The United States.* Valuation issues report, 2014.

## RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al. Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.
- Expert Report June 2018
- Deposition Testimony May 2019

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al. Fraudulent transfer, solvency and economic damages.

APPENDIX: QUALIFICATIONS OF THE APPRAISER

- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.
- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No. CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al. Economic damages related to lost wages.
- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No. 2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.
- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No. 14-671C. Always at Market, Inc. v. United States of America (DOD/DOJ). Army & Air Force Exchange Service economic damages.
- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No. CV-05-1483, General Medicine, PC v. Healthsouth Corporation v. General Medicine, PC. Economic damages related to contract dispute.
- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

## SPEAKING ENGAGEMENTS

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

APPENDIX: QUALIFICATIONS OF THE APPRAISER

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

"Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International


## WHITE PAPERS

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v. Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

VALUESCOPE, Inc.

**SCHEDULES**

VALUESCOPE, Inc.

| Charitable DAF HoldCo, Ltd | |
|---|---|
| **Table of Contents** | **Valuation Date: September 30, 2024** |

| Table of Contents | |
|---|---|
| **Schedule Name** | **Schedule** |
| **Historical Valuation Summary** | Summary Schedule 1 |
| **Current Valuation Summary** | Summary Schedule 2 |
| | |
| **DAF Net Asset Value Analysis** | |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.1 |
| Charitable DAF HoldCo, Ltd - Summary Balance Sheet | Schedule A.2 |
| | |
| **Discount for Lack of Control (DLOC) Analysis** | |
| Closed-End Fund Data - Investment Grade Bond Funds | Schedule B.1 |
| Closed-End Fund Data - US General Equity Funds | Schedule B.2 |
| DLOC Conclusion | Schedule B.3 |
| | |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Put Option Approach | Schedule C.1 |
| Put Option Approach - Historical Guideline Company Volatility Summary | Schedule C.2 |
| DLOM Determination - Restricted Stock Studies | Schedule C.3 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.4 |
| DLOM Conclusion | Schedule C.5 |

**Charitable DAF HoldCo, Ltd**
**Historical Valuation Summary**

**Summary Schedule 1**
**Valuation Date: September 30, 2024**

| | For the Quarter Ended: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 9/30/2022 | 12/31/2022 | 3/31/2023 | 6/30/2023 | 9/30/2023 | 12/31/2023 | 3/31/2024 | 6/30/2024 | 9/30/2024 |
| Company Net Asset Value (NAV) | $289,502,301 | $276,241,856 | $275,227,939 | $270,414,002 | $288,884,011 | $277,573,090 | $272,449,558 | $270,432,538 | $269,052,808 |
| Discount for Lack of Control | 8.0% | 8.7% | 7.8% | 11.6% | 13.9% | 8.0% | 8.7% | 9.7% | 8.1% |
| Discount for Lack of Marketability | 7.0% | 7.3% | 7.1% | 6.6% | 6.4% | 6.5% | 6.6% | 6.2% | 6.3% |
| Combined Discount | 14.4% | 15.4% | 14.3% | 17.4% | 19.4% | 14.0% | 14.7% | 15.3% | 13.9% |
| FMV of Subject Interest (Per 100 Shares) | $81,212,514 | $76,654,941 | $77,292,849 | $73,202,932 | $76,331,301 | $78,284,712 | $76,173,502 | $75,101,687 | $75,961,370 |

| Charitable DAF HoldCo, Ltd | Summary Schedule 2 |
| Current Valuation Summary | Valuation Date: September 30, 2024 |

| FMV Summary | | |
|---|---|---|
| Company Net Asset Value (NAV) | $269,052,808 | Schedule A.2 |
| Shares Outstanding | 305 | |
| **NAV Per Share** | **$882,140** | |
| **Applicable Discounts** | | |
| Discount for Lack of Control | 8.1% | Schedule B.3 |
| Discount for Lack of Marketability | 6.3% | Schedule C.5 |
| Combined Discount | 13.9% | ($122,527) |
| **FMV Per Share** | **$759,614** | |
| Subject Shares | 100 | |
| **FMV of Subject Interest** | **$75,961,370** | |

| Charitable DAF HoldCo, Ltd | | Schedule A.1 |
| DAF Net Asset Value Analysis | | Valuation Date: September 30, 2024 |

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: | |
| | 9/30/2024 | |
| | Actual | % |
|---|---:|---:|
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| | | |
| **Other Assets** | | |
| Highland CLO Funding, Ltd. | 10,002,234 | 3.2% |
| Highland CLO Funding, Ltd. (Participation Rights) | 69,385 | 0.0% |
| MidWave Common | 1,640,571 | 0.5% |
| MidWave - Term Loan A | 85,552,571 | 27.1% |
| MidWave - Term Loan C | 40,174 | 0.0% |
| NexPoint Capital, Inc. (BDC) | 14,223,433 | 4.5% |
| NexPoint Real Estate Strategies Fund Z | 8,487,030 | 2.7% |
| NexPoint Real Estate Finance (NREF) | 6,174,381 | 2.0% |
| NexPoint Residential (NXRT) | 2,338,207 | 0.7% |
| NexPoint Diversified Real Estate (NXDT) | 2,331,025 | 0.7% |
| Small Bay II (Class I) | 3,770,609 | 1.2% |
| Small Bay II (Class II) | 4,047,276 | 1.3% |
| Small Bay II (Class III) | 2,357,682 | 0.7% |
| Polo Glen | 678,545 | 0.2% |
| NHT Holdco | 109,056 | 0.0% |
| ACHC | 158,525 | 0.1% |
| COLL | 115,804 | 0.0% |
| HRTX | 10,945 | 0.0% |
| ACRG/AU | 3,267 | 0.0% |
| ACRG/BU | 1,409 | 0.0% |
| TGTX | 333,308 | 0.1% |
| TMO | 282,686 | 0.1% |
| BIO | 111,081 | 0.0% |
| iHeart Communications | 365 | 0.0% |
| Multi Strat | 107,324 | 0.0% |
| Crusader Fund II, Ltd. | 38,131 | 0.0% |
| BVP Property | 94,000 | 0.0% |
| NCI Apache Trail | 1,104,000 | 0.3% |
| NCI Fort Worth Land | 874,200 | 0.3% |
| NCI Royse City Land | 11,448,367 | 3.6% |
| NCI Stewart Creek | 1,250,000 | 0.4% |
| NLA Assets | 1,766,000 | 0.6% |
| FFWM | 2,541,184 | 0.8% |
| SRG | 139,500 | 0.0% |
| SRTY | 2,380,529 | 0.8% |
| SQQQ | 1,818,805 | 0.6% |
| SPXU | 2,174,013 | 0.7% |
| Serengetti | 2,951,678 | 0.9% |
| Conservation Equity Fund | 3,253,139 | 1.0% |
| MMPQ | 527,460 | 0.2% |
| Total Wire Convertible Promissory Note | 20,560 | 0.0% |
| Sable Permian Resources | 2 | 0.0% |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| | | |
| **Total Assets** | 316,257,723 | 100.0% |
| | | |
| **Total Liabilities** | 47,204,916 | 14.9% |
| | | |
| **Total Equity** | 269,052,808 | 85.1% |
| | | |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

| Charitable DAF HoldCo, Ltd | Schedule A.2 |
| DAF Net Asset Value Analysis | Valuation Date: September 30, 2024 |

*Charitable DAF HoldCo, Ltd - Summary Balance Sheet*

|  | Balance Sheet as of: | |
|  | 9/30/2024 | |
|  | Actual | % |
| **Assets** | | |
| CLO HoldCo, LTD | $269,052,808 | 100.0% |
| **Total Assets** | $269,052,808 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $269,052,808 | 100.0% |
| **Total Liabilities & Equity** | $269,052,808 | 100.0% |

| Charitable DAF HoldCo, Ltd | Schedule B.1 |
|---|---|
| Discount for Lack of Control (DLOC) Analysis | Valuation Date: September 30, 2024 |

*Closed-End Fund Data - Investment Grade Bond Funds*

| Closed-End Fund Data - Investment Grade Bond Funds | | | | |
|---|---|---|---|---|
| **Fund Ticker** | **Fund Name** | **Net Asset Value** | **Market Price** | **Premium (Discount)** |
| BKT | BlackRock Income Trust, Inc. | $12.65 | $12.43 | (1.7%) |
| FMY | First Trust Mortgage Income Fund | $13.05 | $12.49 | (4.3%) |
| VBF | Invesco Bond Fund | $16.87 | $17.01 | 0.8% |
| VLT | Invesco High Income Trust II | $11.74 | $11.53 | (1.8%) |
| JLS | Nuveen Mortgage and Income Fund | $19.54 | $18.43 | (5.7%) |
| JMM | Nuveen Multi-Market Income Fund | $6.68 | $6.36 | (4.8%) |
| DMO | Western Asset Mortgage Opportunity Fund Inc. | $12.28 | $11.97 | (2.5%) |

| Summary Statistics | | |
|---|---|---|
| | Mean Premium (Discount) | (2.9%) |
| | Median Premium (Discount) | (2.5%) |
| | Standard Deviation | 2.2% |

*Sources: CEF Connect as of market close September 30, 2024*

| Charitable DAF HoldCo, Ltd | Schedule B.2 |
|---|---|
| **Discount for Lack of Control (DLOC) Analysis** | **Valuation Date: September 30, 2024** |

*Closed-End Fund Data - US General Equity Funds*

| Fund Ticker | Fund Name | Net Asset Value | Market Price | Premium (Discount) |
|---|---|---|---|---|
| | **Closed-End Fund Data - US General Equity Funds** | | | |
| ADX | Adams Diversified Equity Fund, Inc. | $24.31 | $21.56 | (11.3%) |
| BIGZ | BlackRock Innovat and Growth Term Trust | $8.54 | $7.55 | (11.6%) |
| CET | Central Securities Corp. | $56.17 | $45.84 | (18.4%) |
| CRF | Cornerstone Total Return Fund | $6.85 | $8.09 | 18.1% |
| GRF | Eagle Capital Growth | $12.03 | $9.88 | (17.9%) |
| FXBY | FOXBY Corp | $27.70 | $16.00 | (42.2%) |
| GDV | Gabelli Dividend & Income | $28.46 | $24.45 | (14.1%) |
| GAM | General American Investors | $62.92 | $53.61 | (14.8%) |
| USA | Liberty All-Star Equity | $7.17 | $7.10 | (1.0%) |
| ASG | Liberty All-Star Growth | $6.03 | $5.61 | (7.0%) |
| JCE | Nuveen Core Equity Alpha | $15.21 | $15.37 | 1.1% |
| RMT | Royce Micro-Cap Trust | $10.84 | $9.61 | (11.3%) |
| STEW | SRH Total Return Fund | $20.51 | $15.80 | (23.0%) |
| SPE | Special Opportunities | $16.37 | $13.91 | (15.0%) |
| FUND | Sprott Focus Trust | $8.91 | $7.70 | (13.6%) |

| Summary Statistics | | |
|---|---|---|
| | Mean Premium (Discount) | (12.1%) |
| | Median Premium (Discount) | (13.6%) |
| | Standard Deviation | 13.0% |

*Sources: CEF Connect as of market close September 30, 2024*

| Charitable DAF HoldCo, Ltd | Schedule B.3 |
|---|---|
| Discount for Lack of Control (DLOC) Analysis | Valuation Date: September 30, 2024 |

*DLOC Conclusion*

| Discount for Lack of Control Conclusion | | |
|---|---|---|
| DLOC Determination - Closed End Bond Funds (Mean) | 2.9% | *Schedule B.1* |
| DLOC Determination - Closed End Bond Funds (Median) | 2.5% | *Schedule B.1* |
| | | |
| DLOC Determination - Closed End Equity Funds (Mean) | 12.1% | *Schedule B.2* |
| DLOC Determination - Closed End Equity Funds (Median) | 13.6% | *Schedule B.2* |
| | | |
| **Concluded Discount for Lack of Control** | **8.1%** | |

| Charitable DAF HoldCo, Ltd | Schedule C.1 |
|---|---|
| Discount for Lack of Marketability (DLOM) Analysis | Valuation Date: September 30, 2024 |

*DLOM Determination - Put Option Approach*

### Discount for Lack of Marketability - Put Option Approach

**Option-Pricing Inputs:**

| | | | |
|---|---|---|---|
| Stock Price | S | $1.00 | |
| Strike Price | X | $1.00 | (Set to same as stock price) |
| Expected Life | T | 0.75 | (Years) |
| Volatility | s | 12.3% | Schedule C.2 |
| Risk-free rate | R | 4.18% | US Treasury Implied Yield for Expected Life |
| Dividend Yield | Q | 0.00% | * |

*Intermediate Calculations:*

| | | | *Intermediate Calculations:* | |
|---|---|---|---|---|
| $d1$ | 0.34756838 | | $-d1$ | -0.34756838 |
| $d2$ | 0.24104726 | | $-d2$ | -0.24104726 |
| $N(d1)$ | 0.63591782 | | $N(d1)$ | 0.36408218 |
| $N(d2)$ | 0.59524076 | | $N(d2)$ | 0.40475924 |

| Black-Scholes | | Black-Scholes | |
|---|---|---|---|
| Call Option Price | $0.06 | Put Option Price | $0.03 |

| Implied Discount for Lack of Marketability (DLOM) | 2.8% |
|---|---|

*\* Distributions not expected in the near future*

| Charitable DAF HoldCo, Ltd | | Schedule C.2 |
|---|---|---|
| Discount for Lack of Marketability (DLOM) Analysis | | Valuation Date: September 30, 2024 |

*Put Option Approach - Historical Guideline Company Volatility Summary*

| Historical Volatility Term | Bond Funds | | | | | Equity Funds | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | BKT | FMY | JMM | JLS | VBF | FXBY | GRF | EQS | SPE | RVT |
| 0.5 Years | 10.1% | 10.8% | 9.5% | 9.0% | 8.3% | 20.9% | 16.6% | 43.0% | 11.6% | 20.3% |
| 1 Year | 12.3% | 13.7% | 9.9% | 12.0% | 13.0% | 20.7% | 20.2% | 41.7% | 11.4% | 20.1% |
| 1.5 Years | 11.5% | 13.2% | 10.3% | 11.0% | 12.3% | 25.9% | 23.0% | 42.1% | 10.7% | 19.3% |
| 2 Years | 11.8% | 15.3% | 12.5% | 11.0% | 14.4% | 25.6% | 28.6% | 48.3% | 12.3% | 21.7% |
| 2.5 Years | 12.7% | 15.1% | 13.3% | 11.3% | 14.8% | 25.8% | 32.2% | 48.6% | 13.6% | 23.8% |
| 3 Years | 12.6% | 14.8% | 13.4% | 11.2% | 14.2% | 27.4% | 32.2% | 47.4% | 13.6% | 23.8% |
| 3.5 Years | 12.3% | 14.1% | 12.8% | 10.8% | 13.8% | 113.1% | 30.2% | 45.4% | 13.3% | 22.9% |
| 4 Years | 11.8% | 13.9% | 12.6% | 10.6% | 13.7% | 106.5% | 29.2% | 51.4% | 13.4% | 22.7% |
| 4.5 Years | 11.5% | 13.8% | 14.2% | 12.3% | 14.0% | 101.9% | 29.4% | 52.7% | 15.9% | 24.1% |
| 5.0 Years | 11.8% | 14.5% | 16.6% | 15.9% | 15.5% | 97.5% | 30.1% | 53.5% | 22.0% | 27.6% |

| Historical Volatility Term | Statistical Summary | | | | | |
|---|---|---|---|---|---|---|
| | Low | 25th % | Median | Mean | 75th % | High |
| 0.5 Years | 8.3% | 9.6% | 11.2% | 16.0% | 19.4% | 43.0% |
| 1 Year | 9.9% | 12.0% | 13.3% | 17.5% | 20.1% | 41.7% |
| 1.5 Years | 10.3% | 11.1% | 12.8% | 17.9% | 22.1% | 42.1% |
| 2 Years | 11.0% | 12.3% | 14.8% | 20.1% | 24.6% | 48.3% |
| 2.5 Years | 11.3% | 13.4% | 15.0% | 21.1% | 25.3% | 48.6% |
| 3 Years | 11.2% | 13.5% | 14.5% | 21.1% | 26.5% | 47.4% |
| 3.5 Years | 10.8% | 13.0% | 14.0% | 28.9% | 28.3% | 113.1% |
| 4 Years | 10.6% | 12.8% | 13.8% | 28.6% | 27.6% | 106.5% |
| 4.5 Years | 11.5% | 13.9% | 15.0% | 29.0% | 28.1% | 101.9% |
| 5.0 Years | 11.8% | 15.6% | 19.3% | 30.5% | 29.5% | 97.5% |

| Concluded Volatility | | 12.3% |
|---|---|---|

*Source: Yahoo Finance*

| Charitable DAF HoldCo, Ltd | Schedule C.3 |
|---|---|
| Discount for Lack of Marketability (DLOM) Analysis | Valuation Date: September 30, 2024 |

*DLOM Determination - Restricted Stock Studies*

| | Name of Study | Study Date | From | To | Sub-Sample | Observations | Reported Mean | Reported Median |
|---|---|---|---|---|---|---|---|---|
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

| Charitable DAF HoldCo, Ltd | Schedule C.4 |
|---|---|
| Discount for Lack of Marketability (DLOM) Analysis | Valuation Date: September 30, 2024 |

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | Mean | Median |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | 9.7% | |

| Charitable DAF HoldCo, Ltd | Schedule C.5 |
|---|---|
| Discount for Lack of Marketability (DLOM) Analysis | Valuation Date: September 30, 2024 |

*DLOM Conclusion*

| Discount for Lack of Marketability | | |
|---|---|---|
| DLOM Determination - Put Option Approach | 2.8% | *Schedule C.1* |
| DLOM Determination - Restricted Stock Studies | 9.7% | *Schedule C.4* |
| **Concluded Discount for Lack of Marketability** | **6.3%** | |

# EXHIBIT 52

March 27, 2025

Re: Letter Agreement re: Assignment of Undertakings

To whom it may concern:

This letter agreement (this "Agreement") is to confirm in writing an agreement made by Charitable DAF HoldCo, Ltd., a Cayman Islands limited company ("Holdco") and CDMCFAD, LLC, a Delaware limited liability company ("DAF"). Each party hereto may be referred to generically as a "Party" or collectively as the "Parties" in this Agreement.

WHEREAS, DAF completed a restructuring on March 27, 2025, that (i) issued new membership interests in DAF to DFW Charitable Foundation, a Delaware 501(c)(3) non-profit organization and (ii) redeemed the membership interests in DAF owned by Holdco (collectively, the "Issuance and Redemption Transaction");

WHEREAS, Mark Patrick and Paul Murphy, the Directors of Holdco intend to wind up the affairs of Holdco and engage liquidators to complete that process; and

WHEREAS, in connection with the Issuance and Redemption Transaction, Holdco and DAF have mutually agreed to assign all of the contracts and agreements listed on Schedule A hereto (collectively, the "Assigned Contracts") from Holdco to DAF.

NOW, THEREFORE, as material inducement to each Party entering this Agreement, and in consideration of the mutual representations and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Assignment of Undertakings. Subject to the terms hereof, Holdco hereby assigns the Assigned Contracts to DAF with effect on and from the date first written above in consideration for the assumption of liabilities set forth herein (the "Assignment of Undertakings").

2. Assumption of Liabilities. In connection with the Assignment of Undertakings, DAF has agreed to assume all responsibilities and risks in any manner connected with the Assigned Contracts, whether now existing or hereafter arising.

3. Further Assurances. Until such time as Holdco completes its liquidation, Holdco agrees to cooperate (at DAF's sole expense) with DAF to take any further actions requested by DAF in connection with this Assignment of Undertakings, including executing assignment or similar agreements necessary to cause DAF to enter into the Assigned Contracts and obtain consent from counterparties. Notwithstanding anything to the contrary set forth herein, DAF shall not be responsible for funding any litigation of adverse actions relating to Holdco arising after the date hereof.

4. Representations and Warranties. By its execution and delivery hereof, each of the Parties represents and warrants to the other Party that, as of the date hereof and after giving effect to this Agreement:

(a) (i) such Party has all requisite power and authority to execute and deliver this Agreement, (ii) this Agreement has been duly executed and delivered by each Party to the other, and (iii) this Agreement constitutes the legal, valid, and binding obligations of such Party, enforceable in accordance with its respective terms;

Letter Agreement re: Assignment of Undertakings                                    Page 1

**527**

(b) neither the execution, delivery, and performance of this Agreement, nor the consummation of any transactions contemplated herein or therein, will (i) contravene the terms of the trust agreement, limited liability company agreement, or other governing documents as applicable to such Party hereto; (ii) conflict with or result in any breach or contravention of, or the creation of (or the requirement to create) any lien under, or require any payment to be made under (a) any contractual obligation to which such Party is bound or affecting such Party or its respective properties or (b) any order, injunction, writ or decree of any governmental authority or any arbitral award to which such Party or such Party's property is subject; or (iii) violate any applicable law; and

(c) no approval, consent, exemption, authorization, or other action by, notice to, or filing with, any governmental authority or other person not previously obtained is necessary or required in connection with the execution, delivery, or performance by, or enforcement against, such Party to this Agreement.

5.      Assignment.  Neither Party may assign this Agreement without the other Party's prior written consent.

6.      Governing Law; Venue.  The Parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Texas and to the jurisdiction of the federal courts with jurisdiction covering Dallas, Texas, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of Texas or the federal courts with jurisdiction covering Dallas, Texas, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

7.      Further Assurances.  Each Party agrees to execute, acknowledge, and deliver such further instruments and to do all such other acts as may be reasonably necessary or appropriate in order to carry out the purposes and intent of this Letter.

8.      Notices.  All notices or requests required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given when hand delivered or sent by certified mail, return receipt requested, or by reputable overnight courier, in each case with receipt verified in writing, addressed in accordance with the respective Parties' signature on the signature pages hereto.

9.      Signature; Counterparts.  This Agreement may be executed electronically, or in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

10.     Enforceability.  If one or more provisions of this Agreement is found by a court of competent jurisdiction to be illegal, invalid, or unenforceable in whole or in part, the remaining terms and provisions of this Agreement shall remain in full force and effect disregarding such illegal, invalid, or unenforceable portion and such court shall be empowered to modify, if possible, such illegal, invalid, or unenforceable provision to the extent necessary to make it enforceable in accordance with the intent and purposes of the Parties expressed herein to the fullest extent permitted by applicable law.

11.     WAIVER OF JURY TRIAL.  EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF

529

THIS AGREEMENT OR THE SUBJECT MATTER HEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

12.    Merger; Amendment. This Agreement (i) is the only agreement between the Parties concerning the subject matter hereof and supersedes, terminates and cancels any prior statements, representations or agreements between the Parties concerning the subject matter hereof, (ii) is being executed by the Parties without reliance upon any representation, warranty, or other statement of any kind whatsoever, whether oral or written, which is not expressly set forth herein, and (iii) may not be changed orally, but only in a writing signed by duly authorized representatives of each of the Parties.

*[Remainder of Page Intentionally Blank]*

**529**

The undersigned have executed this Agreement as of the date first written above.

**Agreed and Accepted:**

**Charitable DAF HoldCo, Ltd.,**
a Cayman Islands limited company

By: _____
Name: Mark Patrick
Title: Director

By: _____
Name: Paul Murphy
Title: Director

Address for Notices:
Email: mpatrick@dafholdco.com
Email: pmurphy@dafholdco.com

**CDMCFAD, LLC,**
a Delaware limited liability company

By: _____
Name: Mark Patrick
Title: Manager

Address for Notices:
Email: mpatrick@dafholdco.com

530

## Schedule A

### Assigned Contracts and Agreements

1. Engagement Letter between Stone Hilton PLLC and Charitable DAF HoldCo, Ltd. dated February 27, 2025
2. Engagement Letter between Shields Legal Group, P.C. and Charitable DAF HoldCo, Ltd. (among others) dated September 27, 2023
3. Terms of Engagement by Walkers (Cayman) LLP to Charitable DAF HoldCo, Ltd.
4. Firestarter Proposal between Firestarter and Charitable DAF HoldCo, Ltd. dated January 15, 2025
5. Various ValueScope agreements, which we do not have
6. Engagement Letter between Seyfarth Shaw LLP and Charitable DAF HoldCo, Ltd. dated October 23, 2023
7. Engagement Letter between Deloitte Tax LLP and Charitable DAF HoldCo, Ltd. dated January 17, 2023
    a. Engagement Letter between Deloitte Tax LLP and Charitable DAF HoldCo, Ltd. dated February 7, 2022
8. Acknowledgment and Ratification Agreement among Grant James Scott, Charitable DAF HoldCo, Ltd., Charitable DAF GP, LLC, and Charitable DAF Fund, LP dated July 1, 2024
9. Engagement Letter among Charitable DAF HoldCo, Ltd. (and other DAF entities) and Carrington Coleman dated March 22, 2024
10. Engagement Letter among Charitable DAF HoldCo, Ltd., Charitable DAF GP, LLC, and Hueston Hennigan LLP dated January 26, 2024
11. In DAF's sole discretion, any other contract which they deem necessary to achieve a voluntary and solvent liquidation of Holdco

# EXHIBIT 53

# ADMISSION AND AMENDMENT NO. 1 AGREEMENT

This Admission and Amendment No. 1 Agreement (this "**Agreement**"), is entered into by the undersigned on March 27, 2025 (the "**Effective Date**"). Capitalized terms used herein and not otherwise defined shall have the meanings for such terms set forth in the LLC Agreement (as defined below).

## RECITALS

WHEREAS, CDMCFAD, LLC, a Delaware limited liability company (the "**Company**") is currently governed by that certain Limited Liability Company Agreement of the Company, dated as of December 18, 2024 (the "**LLC Agreement**");

WHEREAS, in accordance with the terms of the LLC Agreement, the parties hereto desire to: (i) admit the undersigned new Member (the "**New Member**") as an additional Member of the Company with the capital contribution of $1,637,192 (the "**Capital Contribution**") and Allocation Percentage set forth in Exhibit A hereto and (ii) amend Schedule A to the LLC Agreement as set forth in Exhibit A hereto to reflect the foregoing, as of the Effective Date; and

WHEREAS, the Manager hereby consents to and approves of the admission of the New Member and the amendments to Schedule A to the LLC Agreement as contemplated herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## AGREEMENTS

I.      **Admission.**  Each of the parties hereto hereby consents to the admission of the undersigned New Member as an additional Member of the Company. In exchange for the payment to the Company of the Capital Contribution, the New Member is hereby issued a limited liability company interest in the Company with an Allocation Percentage as set forth on Exhibit A attached hereto as of the Effective Date. Upon the execution of this Agreement, the undersigned New Member is hereby admitted as an additional Member of the Company as of the Effective Date and in such capacity, hereby agrees to and shall be bound by the terms of the LLC Agreement commencing as of the Effective Date. For the avoidance of doubt, the execution and delivery of this Agreement by the undersigned New Member shall constitute the execution and delivery of a counterpart signature page to the LLC Agreement as required under Section 2.6 of the LLC Agreement.

II.     **Amendments.**

A.      Schedule A of the LLC Agreement is hereby amended and restated in its entirety and replaced with Exhibit A attached hereto.

521677\00001\4928-6266-5259\1

**536**

### III.    Miscellaneous.

A.    Agreement in Effect.  Except as otherwise hereby amended, the LLC Agreement shall remain in full force and effect.

B.    Governing Law.  This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Delaware, all rights and remedies being governed by such laws.

C.    Counterparts.  This Agreement may be executed in counterparts (including by facsimile or other electronic transmission), each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

D.    Successors and Assigns.  This Agreement is binding upon and will inure to the benefit of the parties to this Agreement and their successors and assigns.

*[Signature Page Follows]*

2

**537**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and date first above written.

**MANAGER:**

Name: Mark Patrick

**NEW MEMBER:**

DFW CHARITABLE FOUNDATION

By: _____
Name: Mark Patrick
Title: President

EXHIBIT A

LIMITED LIABILITY COMPANY AGREEMENT

<u>SCHEDULE A</u>

MEMBER INFORMATION

**Revised: March 27, 2025**

| Name and Contact Information | Allocation Percentage |
|---|---|
| Charitable DAF Holdco, Ltd.<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 50% |
| DFW Charitable Foundation<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 50% |

# EXHIBIT 54

# REDEMPTION AND AMENDMENT NO. 2 AGREEMENT

This Redemption and Amendment No. 2 Agreement (this "**Agreement**"), is entered into by the undersigned on March 27, 2025 (the "**Effective Date**"). Capitalized terms used herein and not otherwise defined shall have the meanings for such terms set forth in the LLC Agreement (as defined below).

## RECITALS

WHEREAS, CDMCFAD, LLC, a Delaware limited liability company (the "**Company**") is currently governed by that certain Limited Liability Company Agreement of the Company, dated as of December 18, 2024 (as heretofore amended, the "**LLC Agreement**"); and

WHEREAS, in accordance with the terms of the LLC Agreement, Manager desires to: (i) redeem the entire limited liability company interest in the Company currently held by Charitable DAF HoldCo, Ltd. (the "**Redeemed Member**") effective as of the Effective Date for $1,637,192 (the "**Redemption Price**"), such amount being the Fair Market Value for the Redeemed Member's Interest as determined by the Manager, and (ii) amend Schedule A to the LLC Agreement as set forth in Exhibit A hereto to reflect the foregoing, as of the Effective Date.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## AGREEMENTS

**I.      Redemption.**   The Manager hereby approves and as of the Effective Date, the Redeemed Member's entire Interest in the Company is hereby redeemed by the Company for the payment of the Redemption Price.  As of the redemption contemplated by this Section I, the Redeemed Member shall cease to be a member of the Company and shall thereupon cease to have any rights or obligations as a member of the Company under the LLC Agreement, the Act or otherwise.

**II.      Amendments.**

A.      Schedule A of the LLC Agreement is hereby amended and restated in its entirety and replaced with Exhibit A attached hereto.

**III.      Miscellaneous.**

A.      Agreement in Effect.  Except as otherwise hereby amended, the LLC Agreement shall remain in full force and effect.

B.      Governing Law.  This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Delaware, all rights and remedies being governed by such laws.

521677\00001\4910-9195-6523\1

C. <u>Successors and Assigns</u>. This Agreement is binding upon and will inure to the benefit of the parties to this Agreement and their successors and assigns.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Manager executed this Agreement as of the day and date first above written.

**MANAGER:**

Name: Mark Patrick

## EXHIBIT A

## LIMITED LIABILITY COMPANY AGREEMENT

## SCHEDULE A

## MEMBER INFORMATION

### Revised:  March 27, 2025

| Name and Contact Information | Allocation Percentage |
| --- | --- |
| DFW Charitable Foundation<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 100% |

# EXHIBIT 55

**WRITTEN CONSENT
OF THE MANAGER
OF
CDMCFAD, LLC**

**March 27, 2025**

The undersigned, being the manager (the "Manager") of CDMCFAD, LLC, a Delaware limited liability company (the "Company"), does hereby consent to, adopt and approve, ratify and confirm by written consent the following resolutions and directs that this written consent be filed with the minutes of the proceedings of the Company:

**WHEREAS**, the current sole member of the Company is Charitable DAF Holdco, Ltd. (the "Current Member");

**WHEREAS**, the Company is currently governed by that certain Limited Liability Company Agreement of the Company, dated December 18, 2024 (the "LLC Agreement");

**WHEREAS**, the Company is part of a larger group of entities that include the Current Member (collectively the "DAF"), and the mission statement of the Current Member (which is representative of DAF as a whole) is as follows: "*Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*" (the "Mission Statement");

**WHEREAS**, the Highland Dallas Foundation, Inc., the Highland Kansas City Foundation, Inc., and the Highland Santa Barbara Foundation, Inc. (collectively, the "Highland Foundations") are Participating Shareholders in the Current Member and may be entitled to discretionary dividends if declared by the current Directors of the Current Member;

**WHEREAS**, the Manager has formed the view that the Current Member, by virtue of being a member of the Company and having as Participating Shareholders the Highland Foundations, poses a material risk to the Company, its assets, and the Mission Statement of DAF due to, among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii);

**WHEREAS**, and in connection therewith, the Manager desires to cause the Company to (i) admit DFW Charitable Foundation as an additional member of the Company and to amend the LLC Agreement to reflect the same, each pursuant to the terms of that certain Admission and Amendment No. 1 Agreement, a form of which is attached hereto as Exhibit A (the "Admission Agreement") and (ii) redeem the entire limited liability company interests in the Company held by the Current Member and to amend the LLC Agreement to reflect the same, each pursuant to the terms of that certain Redemption and Amendment No. 2 Agreement, a form of which is attached hereto as Exhibit B (the "Redemption Agreement" and together with the Admission Agreement, jointly, the "Restructure Agreements");

**WHEREAS**, in connection with the Restructure Agreements and the transactions contemplated thereby, the Manager (on behalf of the Company) obtained a valuation report of the membership interests

of the Company from ValueScope and (ii) FTI Consulting, copies of which are attached hereto as Exhibit E, which valuation reports have informed the Manager the fair market value of the membership interests;

**WHEREAS**, for the foregoing reasons, and others, the Manager has determined it to be in the best interests of the Company and its members for the Company to take all steps necessary to complete the transactions contemplated by the Restructure Agreements (such transactions collectively, the "Member Reorganization") so that the Company and DAF can again fulfill its Mission Statement and charitable purpose.

**NOW, THEREFORE, BE IT RESOLVED**, that the Member Reorganization is hereby approved in all respects in accordance with the terms set forth in the Restructure Agreements; and be it

**RESOLVED FURTHER**, that the terms, conditions and provisions of each of the Restructure Agreements are hereby approved in all respects; and be it

**RESOLVED FURTHER**, that the Manager, acting alone, be, and hereby is, authorized and empowered to execute and deliver in the name and on behalf of the Company and to cause the Company to perform its obligations under, such other and further agreements, instruments or documents (with such changes as the Manager deems necessary or advisable, such determination to be conclusively evidenced by the Manager's execution thereof) and to take all other actions that the Manager deems necessary or advisable to evidence and finalize the Member Reorganization and to carry out the intent and accomplish the purposes of these resolutions; and be it

**RESOLVED FURTHER**, that all acts of the Manager taken prior to the adoption of the foregoing resolutions, which acts are consistent with the purposes of the foregoing resolutions are hereby severally ratified, confirmed, approved and adopted as acts of the Company.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned has executed this written consent as of the date first set forth above.

MANAGER:

Name: Mark E. Patrick

# EXHIBIT 56

Confidential — Produced in Confidence

**Total Annual Expenses ($)**

| Expense | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 12/31/2022 | 12/31/2023 | 6/30/2024 |
|---|---|---|---|---|---|---|---|
| Legal Fee Expense | 66,797.39 | 116,173.18 | 398,091.82 | 4,346,447.57 | 4,337,827.65 | 8,044,320.10 | 6,184,744.91 |
| Investment Expense | - | - | - | - | - | 3,044,078.13 | 6,179,478.60 |
| Directors fees | - | - | - | 49,000.00 | 40,250.00 | 599,473.64 | 2,257,660.66 |
| Professional fees expense | 104,844.77 | 93,255.12 | 537,769.44 | 1,100,599.17 | 626,856.17 | 1,197,513.69 | 995,497.60 |
| Interest expense | 5,105,931.21 | 6,886,101.21 | 3,928,638.85 | 2,747,813.34 | 2,072,787.45 | 1,667,391.35 | 811,866.58 |
| Valuation services expense | - | - | 48,072.72 | 286,599.05 | 181,516.46 | 2,044,488.51 | 701,556.14 |
| Administration fees | 179,215.18 | 149,110.70 | 122,603.91 | 895,861.24 | 1,180,146.01 | 1,181,933.45 | 589,608.35 |
| Other expense | 344,897.87 | 1,062,261.79 | 679,023.69 | 388,462.74 | 449,838.72 | 805,068.65 | 571,048.05 |
| Dividend expense | - | 131,955.82 | 7,468.07 | 12,996.55 | 4,988,446.12 | 21,739.62 | 52,534.35 |
| Government fees | 46,343.20 | 52,782.23 | 30,765.73 | 251.20 | 4,647.69 | 7,076.35 | 1,468.44 |
| Management Fees | 5,472,982.35 | 4,468,290.73 | 3,576,464.98 | 230,460.41 | - | - | - |
| Trustee fees | 158,025.00 | 246,150.00 | 290,407.53 | 145,000.00 | - | - | - |
| Deferred Loan Fees Expense | (4,986.97) | 16,095.79 | 8,870.28 | - | 523.67 | - | - |
| Other Income | - | - | - | (2,400,000.00) | (12,768.67) | - | - |
| | 11,474,050.00 | 13,222,176.57 | 9,628,177.02 | 7,803,491.27 | 13,870,071.27 | 18,613,083.49 | 18,345,463.68 |

*Item flowing through other income as an expense was a true-up/correction of an item that had been booked incorrectly by the fund administrator

**Percentage of Total Expenses**

| Expense | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 12/31/2022 | 12/31/2023 | 6/30/2024 |
|---|---|---|---|---|---|---|---|
| Legal Fee Expense | 0.58% | 0.88% | 4.13% | 55.70% | 31.27% | 43.22% | 33.71% |
| Investment Expense | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 16.35% | 33.68% |
| Directors fees | 0.00% | 0.00% | 0.00% | 0.63% | 0.29% | 3.22% | 12.31% |
| Professional fees expense | 0.91% | 0.71% | 5.59% | 14.10% | 4.52% | 6.43% | 5.43% |
| Interest expense | 44.50% | 52.08% | 40.80% | 35.21% | 14.94% | 8.96% | 4.43% |
| Valuation services expense | 0.00% | 0.00% | 0.50% | 3.67% | 1.31% | 10.98% | 3.82% |
| Administration fees | 1.56% | 1.13% | 1.27% | 11.48% | 8.51% | 6.35% | 3.21% |
| Other expense | 3.01% | 8.03% | 7.05% | 4.98% | 3.24% | 4.33% | 3.11% |
| Dividend expense | 0.00% | 1.00% | 0.08% | 0.17% | 35.97% | 0.12% | 0.29% |
| Government fees | 0.40% | 0.40% | 0.32% | 0.00% | 0.03% | 0.04% | 0.01% |
| Management Fees | 47.70% | 33.79% | 37.15% | 2.95% | 0.00% | 0.00% | 0.00% |
| Trustee fees | 1.38% | 1.86% | 3.02% | 1.86% | 0.00% | 0.00% | 0.00% |
| Deferred Loan Fees Expense | -0.04% | 0.12% | 0.09% | 0.00% | 0.00% | 0.00% | 0.00% |
| Other Income | 0.00% | 0.00% | 0.00% | -30.76% | -0.09% | 0.00% | 0.00% |
| | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

**Percentage change Y/Y**

| Expense | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 12/31/2022 | 12/31/2023 | 6/30/2024 |
|---|---|---|---|---|---|---|---|
| Legal Fee Expense | - | 73.92% | 242.67% | 991.82% | -0.20% | 85.45% | -23.12% |
| Investment Expense | - | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 103.00% |
| Directors fees | - | 0.00% | 0.00% | 0.00% | -17.86% | 1389.38% | 276.61% |
| Professional fees expense | - | -11.05% | 476.66% | 104.66% | -43.04% | 91.03% | -16.87% |
| Interest expense | - | 34.86% | -42.95% | -30.06% | -24.57% | -19.56% | -51.31% |
| Valuation services expense | - | 0.00% | 0.00% | 496.18% | -36.67% | 1026.34% | -65.69% |
| Administration fees | - | -16.80% | -17.78% | 630.70% | 31.73% | 0.15% | -50.11% |
| Other expense | - | 207.99% | -36.08% | -42.79% | 15.80% | 78.97% | -29.07% |
| Dividend expense | - | 0.00% | -94.34% | 74.03% | 38282.85% | -99.56% | 141.65% |
| Government fees | - | 13.89% | -41.71% | -99.18% | 1750.20% | 52.26% | -79.25% |
| Management Fees | - | -18.36% | -19.96% | -93.56% | -100.00% | 0.00% | 0.00% |
| Trustee fees | - | 55.77% | 17.98% | -50.07% | -100.00% | 0.00% | 0.00% |
| Deferred Loan Fees Expense | - | -422.76% | -44.89% | -100.00% | 0.00% | -100.00% | 0.00% |
| Other Income | - | 0.00% | 0.00% | 0.00% | -99.47% | -100.00% | 0.00% |

# EXHIBIT 57

CHARITABLE DAF HOLDCO, LTD.
(THE "COMPANY")

WRITTEN RESOLUTIONS OF THE
DIRECTORS OF THE COMPANY

MADE ON 13th September 2024

The undersigned, being all of the Directors of the Company, hereby resolve, pursuant to the Articles of Association of the Company, the following directors' resolutions.

1. **REVIEW AND APPROVAL OF COMPENSATION FOR MARK PATRICK.**

1.1 **NOTED THAT:**

(a) Since 24 March 2021, Mr. Mark Patrick has been appointed as President, Chief Investment Officer and General Counsel of the Company, and appointed as President and Chief Investment Officer for seven subsidiaries/affiliated entities.

(b) In or about March 2024, the Company, including Charitable DAF Fund LP, engaged Mercer LLP to conduct an independent compensation review of Mr. Mark Patrick's duties as President, Chief Investment Officer and General Counsel of the Company, and as President and Chief Investment Officer for seven subsidiaries/affiliated entities.

(c) Mercer LLP prepared an independent report dated 26 August 2024 ("Mercer Report") which contains a summary of Mr. Patrick's roles and responsibilities and their methodology for calculating market comparables. At page 5 of that report, Mercer recommended that Mr Patrick's compensation be structured as follows:

   a. Base salary: USD $850,000 or USD $750,000 if general partner liability insurance can be acquired to mitigate Mr Patrick's personal risk exposure.

   b. Long-term incentive ("LTI") tied to DAF LP returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).

(d) The Mercer report raised two issue for the Company to consider::

   a. Whether performance for the LTI compensation be calculated based on 2021 performance or start for the 2022 cycle; and

   b. Whether the LTI calculation should be calculated net of all Company expenses or new of fund expenses only.

(e) On 12th September 2024, Mr. Paul Murphy, a co-director of the Company, spoke to Heidi O'Brien, a Partner at Mercer, to discuss the issues identified in 1, 1.1 (d) a. and b. Following this conversation and based on the fact that (i) Ms. O'Brien confirmed that it was not uncommon for similar companies to award employees for the complete fiscal year when starting part way through the year, and (ii) Mr. Patrick was appointed in March 2021, the Directors have concluded that Mr. Patrick's LTI compensation should be calculated on the basis of the 2021 cycle.

(f) In addition, the Directors have concluded that the Company should assess the legal expenses

338

attributable to investments which impact the LTI compensation and, after that assessment, determine whether the LTI compensation should be increased.

(g) Based on the knowledge of the Directors of Mr. Patrick's roles and responsibilities, the Mercer LLP report and fact that Mr. Patrick is considered a key employee, the Directors have concluded that Mr. Patrick's compensation should be set in accordance with the recommendation in the Mercer report with the additional caveat that Mercer identified that CEOs and CIOs are often compensated on the basis of a base salary, annual incentive and LTI and an annual incentive is not included in the Mercer report. The Directors have concluded that it is in the Company's interest to determine whether an annual incentive should also be included as part of Mr. Patrick's compensation and, if so, how this is to be assessed.

(h) Mr. Patrick has declared his interests to the Company in relation to the matters the subject of this resolution, being that Mr Patrick is Director of the Company, and also employed by the Company as President, Chief Investment Officer, and General Counsel of the Company.

1.2    **IT IS RESOLVED** by unanimous written resolution that:

(a) Mr. Patrick's compensation be fixed, in accordance with recommendation of the Mercer LLP report, as follows:

    a. Base salary: USD $850,000, provided that, 100% of the base salary for calendar year 2024 may be paid on or about the date of these resolutions.

    b. Long-term incentive tied to DAF LP returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return), less any amounts previously advanced to Mr. Patrick.

(b) The Directors will assess:

    a. Whether any adjustment should be made to the LTI calculation based on whether the calculation should be made net of all expenses or net of fund expenses; and

    b. Whether Mr. Patrick should receive an annual bonus and the basis of that annual bonus.

Executed by the Directors comprising the entire Board of Directors of the Company:

BY    _____
Paul Murphy - Director
CHARITABLE DAF HOLDCO, LTD.

BY    _____
Mark Patrick - Director
CHARITABLE DAF HOLDCO, LTD.

# EXHIBIT 58

CHARITABLE DAF HOLDCO, LTD.
(THE "COMPANY")

**WRITTEN RESOLUTIONS OF THE
DIRECTORS OF THE COMPANY**

**MADE ON 1 October 2024**

The undersigned, being all of the Directors of the Company, hereby resolve, pursuant to the Articles of Association of the Company, the following directors' resolutions. Any capitalized terms not defined herein are taken from the Directors' Resolution dated 12th September 2024.

**1. ESTABLISHMENT OF COMPENSATION COMMITTEE/GUIDELINES AND APPOINTMENT OF MEMBERS OF COMPENSATION COMMITTEE.**

1.1 **NOTED THAT:**

(a) The Company does not presently have a compensation committee and the Directors believe it is in the best interest of the Company to establish a compensation committee which will be guided and governed by compensation committee guidelines established by the Directors.

(b) Given the Directors knowledge and experience of the Company, the initial appointments to the compensation committee will be Mark Patrick and Paul Murphy.

1.2 **IT IS RESOLVED THAT:**

(a) The Company establish a compensation committee (**"Compensation Committee"**) and adopt the guidelines in the form substantially contained in Appendix 1 to these resolutions (**"Compensation Committee Guidelines"**).

(b) Mark Patrick and Paul Murphy be appointed to the Compensation Committee.

(c) The Company empowers the Compensation Committee to make recommendations to the Directors on all matters outlined in the Compensation Committee Guidelines, provided that, all recommendations by the Compensation Committee are subject to review and approval by the Directors.

(d) The Compensation Committee shall not make any recommendations in relation to Mark Patrick's compensation arising from the resolution passed by the Directors on 12th September 2024, in particular, the LTI payment and annual bonus resolution passed in these Directors' Resolutions paragraph number 2.

**2. FURTHER REVIEW AND APPROVAL OF COMPENSATION FOR MARK PATRICK AND EMPLOYMENT AGREEMENT.**

2.1 **NOTED THAT:**

(a) On 12 September 2024, the Directors passed a directors' resolution addressing Mark Patrick's compensation as a Director, President/CEO, Chief Investment Officer and General Counsel of the Company. The Directors approved compensation in the following amounts:

a. Base salary: USD $850,000.

340

b. LTI tied to Charitable DAF Fund LP ("DAF LP") returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).

(b) In addition, the Directors resolved that they would assess:

a. Whether any adjustment should be made to the LTI calculation based on whether the calculation should be made net of all expenses or net of fund expenses; and

b. Whether Mr. Patrick should receive an annual bonus and the basis of that annual bonus.

## LTI

(c) Paul Murphy noted that the return of the Company is impacted by whether legal expenses should be included as an operational expense of the Company (in which case the LTI payment would be lower) or whether legal expenses have been incurred not as an operational expense but as an expense to preserve, protect and maximize returns to the Company (in which case it is appropriate to exclude these expenses when assessing the Company's return thereby raising the LTI payment, in whole or in part).

(d) Paul Murphy, having a detailed and working knowledge of the Company's legal issues, and having commissioned Shawn Raver, legal advisor to the Company, to provide a breakdown of legal fees (i) which are attributable to the normal operation of the Company's investment portfolio, and (ii) which have been incurred to preserve, protect and maximize returns to the Company, who has assessed that 75% of those legal fees have been incurred to preserve, protect and maximize returns to the Company.

(e) Accordingly, the LTI calculation should be adjusted to award 75% of the difference between the figures noted in page 9 of the Mercer Report which is $975,000.[1]

## Annual Bonus

(f) Paul Murphy conducted an independent assessment of whether Mark Patrick should receive an annual bonus and the basis of that annual bonus having regard to the Mercer Report, further discussions with Heidi O'Brien (Partner at Mercer), further review of industry comparables with CEO/CIO roles in complex structured finance senior positions, and assessment of other charitable organisations/structures (acknowledging that the Company and its subsidiaries are not subject to United States of America regulations).

(g) Having (i) reviewed the Compensation Committee Guidelines and, (ii) a detailed working knowledge of the Company and Mark Patrick's roles and responsibilities, Paul Murphy assessed that Mark Patrick is eligible for an annual bonus in the amount of 2.5 times his base salary for the year 2023 and payable immediately for, inter alia, the following reasons:

a. CEOs and CIOs in comparable positions are typically awarded a base salary, annual bonus and form of long term incentive plan which is designed to compensate senior executives for their performance and value to a company on an annual and long term basis (see Mercer Report page 17, which is consistent with and supported by Paul Murphy's

---

[1] The calculation net of all expense is $4,459,000 and net of fund expenses is $5,759,000 leaving a difference of $1.3m of which $975,000 is 75%.

341

knowledge of US based asset managers).

    b.  The Company, in the absence of a senior executive willing to undertake the roles and responsibilities of a CEO, CIO and general counsel would, in the US, have to incur annual expenses of at least \$3-4m at the median range and \$5-6m at the upper range[2] to appropriately staff these positions.[3] By undertaking the roles of CEO, CIO and General Counsel, Mark Patrick would be undercompensated if the Company were only to award a base salary and LTI.

    c.  The Company has faced/is facing significant and complex legal issues in Texas, New York, the Cayman Islands and, until recently, Guernsey, which it has had to manage on a reactive and proactive basis and which Mark Patrick has been instrumental in the prosecution and defence of. These include sophisticated parties including US Bank, UBS and a Trustee in Bankruptcy.

    d.  Mark Patrick was instrumental in 2023/2024 defeating an action by UBS against the Company in New York which significantly reduced the Company's potential liabilities.

    e.  The risk profile to Mark Patrick as a director, CEO and CIO is high and his decision making will and is likely to be scrutinized which may lead to personal liability. He is undertaking these positions without the benefit of directors' and officers' insurance.

    f.  Mark Patrick has been instrumental in implementing and driving forward policies that will bring rigorous scrutiny and governance to the Company.

    g.  The Company's investments over the past three years have outperformed the S&P 500 significantly where the average returns for the S&P 500 over the same period returned 11.49% compared to 16.46% for the Company.

    h.  To date, Mark Patrick has not been awarded an annual bonus during his tenure at the Company nor has he received benefits which a CEO/CIO would typically enjoy.

(h)  These are not a comprehensive list of factors Paul Murphy took into account but form the basis of his independent conclusion that the Directors should (i) enter into an employment agreement in a form drafted by the Company's US and Cayman Islands counsel which reflects the on-going compensation package, and (ii) award an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary.

(i)  Mr. Patrick has declared his interests to the Company in relation to the matters the subject of this resolution, being that Mr Patrick is Director of the Company, and also employed by the Company as President, Chief Investment Officer, and General Counsel of the Company.

2.2    **IT IS RESOLVED** by unanimous written resolution that:

---

[2] Per Mercer Report at page 7 and adjusted to account for base compensation and annual bonus/long term incentive for general counsel.

[3] It is noted that the basis for these figures includes assessment of charities and foundations in the US which the Company is not. Whilst useful guidance, the Company must be mindful of the fact that the Company is a Cayman Islands company that holds complex structured financial products through Cayman Islands companies and is not bound by the same provisions that relate to US charities and foundations.

(a)  Mark Patrick be awarded:

    a.  An adjustment to the LTI incentive payment in the amount of $975,000.

    b.  An annual bonus for the year 2023, payable immediately, of 2.5 times his base salary.

    c.  No annual bonus for the years 2021 and 2022 given the entirety of the compensation package provided to Mark Patrick as of 12th September 2024 and the date of this resolution.

Executed by the Directors comprising the entire Board of Directors of the Company:

BY  _____

Paul Murphy - Director

CHARITABLE DAF HOLDCO, LTD.

BY  _____

Mark Patrick - Director

CHARITABLE DAF HOLDCO, LTD.

## APPENDIX 1
## COMPENSATION COMMITTEE GUIDELINES

### Compensation Policy for Executives and Directors

As adopted on October 1, 2024

### 1. Overview and Objectives

This document sets forth the Compensation Policy for Executives and Directors of Charitable DAF HoldCo, Ltd., its subsidiaries, and CDH GP, Ltd. (collectively, "**Company**").

Compensation is a key component of the Company's overall human capital strategy to attract, retain, reward, and motivate highly skilled individuals that will enhance the Company's value and otherwise assist the Company's to reach its long-term goals. Accordingly, the structure of this Policy is established to tie the compensation of each officer to the Company's goals and performance.

For purposes of this Policy, "Executive Officers" shall mean the Company's Chief Executive Officer, Chief Investment Officer, Chief Company Officer, and Chief Operating Officer, and such other executive officers as appointed by the Company from time to time.

For purposes of this Policy, "Directors" shall mean the Directors as defined in the organizational and governing documents of the Company.

This Policy is subject to applicable law and is not intended, and should not be interpreted as limiting or derogating from, provisions of applicable law to the extent not permitted.

This Policy shall apply to compensation agreements and arrangements which will be approved after the date on which this Policy is adopted and shall serve as Company's Compensation Policy for five (5) years, commencing as of its adoption, unless amended earlier.

The Compensation Committee and the Board of Directors of the Company (the "**Compensation Committee**" and the "**Board**", respectively) shall review and reassess the adequacy of this Policy from time to time.

The Compensation Committee and Board shall have regard to the fact that Charitable DAF HoldCo, Ltd. and its subsidiaries are incorporated and subject to Cayman Islands law ("**Cayman Islands Entities**"). Accordingly, whilst US law, regulation and industry standards ("**US Practices**") may be taken into account when considering the Objectives (as defined below), the US Practices are not binding on the Cayman Islands Entities, the Cayman Islands Entities having been purposely established as non-US entities, and the Compensation Committee will have regard to all factors which, in its discretion, achieve the Objectives (as defined below).

### 2. Objectives

Company's objectives and goals in setting this Policy are to attract, motivate and retain highly experienced leaders who will contribute to Company's success and enhance shareholder value, while demonstrating professionalism in a highly achievement-oriented culture that is based on merit and rewards excellent performance in the long term, and embedding Company's core values as part of a motivated behavior ("**Objectives**"). To that end, this Policy is designed, among others:

344

2.1. To closely align the interests of the Executive Officers and Directors with those of Company's shareholders in order to enhance shareholder value;

2.2. To align a significant portion of the Executive Officers' and Directors' compensation with Company's short and long-term goals and performance;

2.3. To provide the Executive Officers and Directors with a structured compensation package, including competitive salaries, performance-motivating cash and equity incentive programs and benefits;

2.4. To strengthen the retention and the motivation of Executive Officers and Directors in the long term; and

2.5. To provide appropriate awards in order to incentivize superior individual excellency and corporate performance.

3. **Compensation Instruments**

3.1 Compensation instruments under this Policy may include, but need not be limited to, the following:

    3.1.1 Base salary;

    3.1.2 Benefits;

    3.1.3 Annual cash bonuses;

    3.1.4 Change of control terms;

    3.1.5 Retirement and termination terms; and

    3.1.6 Long-term and short-term incentive payments

3.2 When fixing compensation instruments the Company may have regard to any matter which, in the Company's complete discretion, is commensurate with the Objectives. Without limitation, this may include:

    3.2.1 Assessing an Executive Officer and Director's performance with regard to their contribution to and management of any assets or investments the Company sources or owns from time to time;

    3.2.2 Assessing the performance of assets or investments of the Company in relation to overall returns to the Company;

    3.2.3 Mitigation of Company liabilities;

    3.2.4 Ensuring sound and prudent corporate governance including compliance with all legal, regulatory and industry standards;

    3.2.5 Efficient management of service providers;

345

3.2.6     Risk the Executive Officer and/or the Director is exposed to;

3.2.7     Responsibilities the Executive Officer and/or the Director undertakes; and

3.2.8     Achieving the Company's business and charitable objectives

4. **Benefits**

4.1     The following benefits may be granted to the Executive Officers and Directors in order, among other things, to comply with legal requirements:

4.1.1     Vacation days in accordance with market practice;

4.1.2     Sick days in accordance with market practice;

4.1.3     Convalescence pay according to applicable law;

4.1.4     Company may contribute on behalf of the Executive Officer or Director to an insurance policy (including, without limitation, split-dollar life insurance) or a pension fund, as allowed by applicable law and with reference to Company's policies and procedures and the practice in peer group companies (including contributions on bonus payments); and

4.1.5     Company may contribute on behalf of the Executive Officer or Director towards work disability insurance, as allowed by applicable law and with reference to Company's policies and procedures and to the practice in peer group companies.

4.2     In events of relocation or repatriation of an Executive Officer or Director to another geography, such Executive Officer or Director may receive other similar, comparable or customary benefits as applicable in the relevant jurisdiction in which he or she is employed or additional payments to reflect adjustments in cost of living. Such benefits may include reimbursement for out of pocket one-time payments and other ongoing expenses, such as housing allowance, car allowance, and home leave visit, etc.

4.3     Company may offer additional benefits to its Executive Officers and Directors, which will be comparable to customary market practices, such as, but not limited to: cellular and land line phone benefits, company car and travel benefits, reimbursement of business travel including a daily stipend when traveling and other business related expenses, insurances, other benefits (such as newspaper subscriptions, academic and professional studies), etc., provided, however, that such additional benefits shall be determined in accordance with Company's policies and procedures.

5. **Miscellaneous**

5.1     Nothing in this Policy shall be deemed to grant to any of Company's Executive Officers, employees, directors, or any third party any right or privilege in connection with their employment by or service to the Company, nor deemed to require Company to provide any compensation or benefits to any person. Such rights and privileges shall be governed by applicable personal

employment agreements or other separate compensation arrangements entered into between Company and the recipient of such compensation or benefits. The Board may determine that none or only part of the payments, benefits and perquisites detailed in this Policy shall be granted, and is authorized to cancel or suspend a compensation package or any part of it.

5.2     In the event that new regulations or law amendment in connection with Executive Officers' and Directors' compensation will be enacted following the adoption of this Policy, Company may follow such new regulations or law amendments, even if such new regulations are in contradiction to the compensation terms set forth herein.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This Policy is designed solely for the benefit of Company and none of the provisions thereof are intended to provide any rights or remedies to any person other than Company.

347

# EXHIBIT 59

FSD2025-0201 2025-07-15



IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 201 OF 2025 (     )

BETWEEN:

CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

Plaintiff

AND

(1)    MARK ERIC PATRICK

(2)    PAUL MURPHY

(3)    CDMCFAD, LLC

(4)    DFW CHARITABLE FOUNDATION

(5)    CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER

(6)    CLO HOLDCO, LTD.

Defendants

---

**WRIT OF SUMMONS**

---

TO:    (1)    **MARK ERIC PATRICK** of 6716 Glenhurst Drive, Dallas, Texas, 72554, United States of America

THIS WRIT was issued by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83527361)

FSD2025-0201 2025-07-15

(2)     **PAUL MURPHY** of Windsor Village #24, South Church Street, Grand Cayman, Cayman Islands

(3)     **CDMCFAD, LLC** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(4)     **DFW CHARITABLE FOUNDATION** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(5)     **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

(6)     **CLO HOLDCO, LTD.** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

THIS WRIT OF SUMMONS has been issued against you by the above-named Plaintiff in respect of the claim set out on the next page.

Within 14 days after the service of this Writ on you, counting the day of service, or, if you are served out of the jurisdiction, within such other period of time as the Court may order, you must either satisfy the claim or return to the Registrar of the Financial Services Division, Court Office, PO Box 495, George Town, Grand Cayman, KY1-1106, Cayman Islands, the accompanying Acknowledgment of Service stating therein whether you intend to contest these proceedings.

If you fail to satisfy the claim or to return the Acknowledgment within the time stated, or if you return the Acknowledgment without stating therein an intention to contest the proceedings, the Plaintiff may proceed with the action and judgment may be entered against you forthwith without further notice.

Issued this 15th day of July 2025

NOTE - This Writ may not be served later than 4 calendar months (or, if leave is required to effect service out of the jurisdiction, 6 months) beginning with the date of issue unless renewed by order of the Court.

### IMPORTANT

Directions for Acknowledgment of Service are given with the accompanying form

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 201 OF 2025 ( )

BETWEEN:

CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

<u>Plaintiff</u>

AND

| | | |
|---|---|---|
| (1) | MARK ERIC PATRICK | |
| (2) | PAUL MURPHY | |
| (3) | CDMCFAD, LLC | |
| (4) | DFW CHARITABLE FOUNDATION | |
| (5) | CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER | |
| (6) | CLO HOLDCO, LTD. | |

<u>Defendants</u>

---

**STATEMENT OF CLAIM**

---

**INTRODUCTION**

1      The Plaintiff, Charitable DAF HoldCo, Ltd (in Official Liquidation) (the **"Company"**), is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Ltd, 68 Fort Street, George Town, PO Box 31726, Grand

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Cayman KY1-1207. The authorised and issued share capital of the Company is divided into Participating Shares and Management Shares.

2    The Company was placed into court supervised liquidation and Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited were appointed as joint official liquidators (the "**JOLs**") pursuant to an order of this Honourable Court dated 6 May 2025.

3    The Company was, between November 2011 and 18 December 2024, the sole limited partner of Charitable DAF Fund, LP (the "**Fund**"). At all relevant times, the net asset value of the Fund's assets was c. US$270million.

4    The Fund is a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organisations in the U.S. namely The Dallas Foundation; the Greater Kansas City Community Foundation; the Santa Barbara Foundation and The Community Foundation of North Texas (the "**Charities**"). These charities are the owners or the ultimate beneficial owners of Participating Shares in the Company.

5    In March 2021, Mark Patrick (the "**First Defendant**") was appointed the sole director and registered as the sole Management Shareholder of the Company. In April 2021, Paul Murphy (the "**Second Defendant**") was appointed by the First Defendant as a second director of Holdco.

6    By virtue of a series of transactions or purported transactions between March 2024 and March 2025, unbeknownst to the holders of the Participating Shares (the "**Participating Shareholders**") of the Company, Mr Patrick caused:

6.1    the Company, with the agreement and concurrence of Mr Murphy, to assign its interest in the Fund to the Third Defendant, a Delaware limited liability company, formed in

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

2

December 2024 and controlled by Mr Patrick, in exchange for a membership interest in that entity;

6.2     the Company, with the agreement and concurrence of Mr Murphy, to issue and allot further Participating Shares (representing a majority of the issued participating share capital) to the Fourth Defendant, a Delaware company, incorporated in December 2024 and controlled by Mr Patrick;

6.3     the Third Defendant to redeem the Company's membership interest in the Third Defendant for a consideration of c. US$1.6 million, representing approximately 0.59% of the total net asset value of the assets held by the Fund; and

6.4     the Company, with the agreement and concurrence of Mr Murphy, to be placed into voluntary liquidation after having made a final distribution to all Original Participating Shareholders (defined below) in the Company of the proceeds of redemption,

collectively the **"Impugned Transactions"**.

7     The First and Second Defendants effected the Impugned Transactions in breach of their fiduciary and other duties to the Company in order to bring ownership of the Fund and its assets, with a net value of c. US$270 million (as assessed at 30 September 2024), under Mr Patrick's effective control to the exclusion of the interests of the Charities. The Charities, as the original, and rightful, ultimate beneficiaries of the Fund, have been left with nothing.

8     Further, during the period March 2021 to June 2024, the First and Second Defendants, in breach of fiduciary duty, caused the Company to pay excessive fees and expenses to Mr Patrick.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

3

## THE PARTIES

<u>The Company</u>

9    The Company is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Limited, Ltd, 68 Fort Street, George Town, PO Box 31726, Grand Cayman, KY1-1207, Cayman Islands.

10    The directors of the Company are Mr Patrick (appointed on 25 March 2021) and Mr Murphy (appointed by Mr Patrick on 22 April 2021).

11    The Company has been governed by the following memorandum and articles of association from time to time:

    11.1    The memorandum and articles of association dated 27 October 2011; and

    11.2    The amended and restated memoranda and articles of association dated 19 January 2015; 24 January 2024; and 20 February 2025 respectively.

The Company remains governed by the memorandum and articles of association as amended and restated on 20 February 2025 (the **"Articles"**) save that the Company reserves the right to challenge the validity of the Articles.

12    Save as set out above, the Company will rely on the Articles and all previous iterations for their applicable full terms and effect.

13    Pursuant to the Articles and at all relevant times, the authorised share capital of the Company was US$50,000 divided into 100 Management Shares of US$0.01 par value each and 4,999,900 Participating Shares of US$0.01 par value each.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

4

14　　The Articles (with reference to the defined term of 'Restricted Person') require that the Participating Shareholders must at all times qualify as a tax-exempt organisation pursuant to section 501(c)(3) of the United States Internal Revenue Code of 1986 ("**IRC**").

15　　The Participating Shares do not have voting rights but confer the right to participate in the profits or assets of the Company including by way of the receipt of dividends (Article 12).

16　　The Management Shares have voting rights but confer no other right to participate in the profits or assets of the Company (Article 11).

17　　The Participating Shareholders therefore have the entirety of the economic interest in the Company, whereas the Management Shareholders have the control rights.

18　　On 7 November 2011, the Company issued:

18.1　　300 Participating Shares to The Highland Capital Management Partners Charitable Trust #2 ("**Trust #2**"); and

18.2　　100 Management Shares to Grant Scott.

19　　On 30 November 2011, Trust #2 transferred its 300 Participating Shares equally amongst:

19.1　　Highland Kansas City Foundation, Inc.;

19.2　　Highland Dallas Foundation, Inc.[1]; and

19.3　　Highland Santa Barbara Foundation, Inc.,

collectively, the "**Supporting Organisations**".

---

[1]Since June 2024, Highland Dallas Foundation, Inc. has also done business as 'NexPoint Philanthropies Dallas, Inc.', per an Assumed Name Certificate filed with the Secretary of State of Texas.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

5

20    On 12 August 2015, the Company issued 5 Participating Shares to the Community Foundation of North Texas, ("**CFNT**", and together with the Supporting Organisations the "**Original Participating Shareholders**") for Highland Capital Management, L.P. Charitable Fund at CFNT.

21    On 25 March 2021, the Management Shares were transferred to Mr Patrick and he continues to hold these shares.

22    The Participating Shares held by the Original Participating Shareholders represented the entire issued Participating Share capital of the Company until 7 February 2025. On that date, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to issue 318 Participating Shares to the Fourth Defendant, DFW Charitable Foundation ("**DFW**"), significantly diluting the shareholdings of the Original Participating Shareholders and the indirect economic interest of the Charities.

23    Until 18 December 2024, the sole asset of the Company was its limited partnership interest in the Fund (the "**Partnership Interest**").

24    As a result of the Impugned Transactions, the Company now has no material assets.

<u>DFW</u>

25    DFW (the Fourth Defendant) is a non-profit non-stock corporation incorporated in Delaware on 9 December 2024, which is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes.

26    DFW is the majority Participating Shareholder of the Company by virtue of the purported share issuance on 7 February 2025, and Mr Patrick is its registered director, president and sole member.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

6

FSD2025-0201                                                    2025-07-15

## The Fund

27    The Fund is a Cayman Islands exempted limited partnership formed on 28 October 2011 (registration no. 53083), having its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

28    The Fund is governed by the Second Amended and Restated Exempted Limited Partnership Agreement dated 11 March 2024 (the "**LPA**"). The initial exempted limited partnership agreement of the Fund was dated 25 October 2011, was amended and restated on 7 November 2011 and further amended on 26 July 2022 (with effect from 24 March 2021). The Company will rely on the LPA for its applicable full terms and effect.

29    Mr Patrick was instrumental in the establishment of the Company, the Fund and the Fund structure.

30    Until 18 December 2024, the Company was the sole limited partner of the Fund.

31    On 18 December 2024, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to transfer its limited partnership interest to CDMCFAD, LLC ("**CDM**") (the Third Defendant) in exchange for a membership interest in CDM.

32    The original general partner of the Fund was Charitable DAF GP, LLC (the "**Original GP**"), a Delaware limited liability company registered as a foreign company in the Cayman Islands. The Original GP was the general partner from the Fund's formation until 7 March 2024.

33    On 7 March 2024, the Original GP was replaced by CDH GP, Ltd. (the "**New GP**") (the Fifth Defendant).

34    The sole asset of the Fund is its 100% shareholding in CLO HoldCo, Ltd. ("**CLO HoldCo**") (the Sixth Defendant), a Cayman Islands exempted company incorporated with limited liability,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

7

**Page 11 of 83**

having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

35      The assets of the Fund were valued at c. $270 million in September 2024.

The New GP

36      The New GP (the Fifth Defendant) is a Cayman Islands exempted company incorporated on 27 February 2024, having its registered office located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

37      Mr Patrick is the New GP's sole director and sole shareholder.

38      The New GP is a defendant to these proceedings in two capacities: (i) in its capacity as General Partner; and (ii) for and on behalf of the Fund in order to join the Fund as a defendant to these proceedings.

CDM

39      CDM (the Third Defendant) is a limited liability company incorporated in Delaware on 12 December 2024, having its registered address c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

40      CDM is governed by the terms of a Limited Liability Company Agreement dated 18 December 2024.

41      Since 18 December 2024, the primary asset of CDM has been the limited partnership interest in the Fund.

42      The sole manager of CDM is Mark Patrick.

43      From 18 December 2024 to 27 March 2025, the sole member of CDM was the Company.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

8

44 On 27 March 2025, Mr Patrick caused CDM to redeem the Company and admit DFW as the sole participating member.

## CLO HoldCo

45 CLO HoldCo (the Sixth Defendant) is a Cayman Islands exempted company incorporated on 13 December 2010, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands, and which is the Fund's main subsidiary.

46 The directors of CLO Holdco are Messrs Patrick and Murphy.

47 The sole shareholder of CLO Holdco is the Fund.

## The Directors

*Mark Patrick*

48 Mr Patrick (the First Defendant) is a U.S. resident who is:

48.1 a director, holds the offices of (i) President, (ii) General Counsel, and (iii) Chief Investment Officer and is the current Management Shareholder of the Company;

48.2 the Manager of CDM (the Third Defendant);

48.3 the sole director and the sole member of DFW (the Fourth Defendant);

48.4 the sole director and sole shareholder of the New GP (the Fifth Defendant); and

48.5 a director of CLO HoldCo (the Sixth Defendant).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

9

49     Mr Patrick was employed as tax counsel by Highland Capital Management, L.P. ("**Highland**") from 2008 to 2021 and as tax counsel by Highgate Consulting Group, Inc. d/b/a Skyview Group from March 2021 to October 2024.

*Paul Murphy*

50     Mr Murphy (the Second Defendant) is a Cayman Islands resident who is:

50.1     a director of the Company;

50.2     a director of CLO HoldCo (the Fifth Defendant); and

50.3     a director of various other entities in the Charitable DAF structure.[2]

51     Mr Patrick and Mr Murphy are referred to herein as the "**Directors**".

## THE CHARITABLE PURPOSE OF THE FUND

52     The Fund was formed on 28 October 2011 at the instigation of Mr James Dondero, a U.S. resident and the founder of Highland to enable certain assets, held through the shares in CLO Holdco, to be donated to a charitable foundation.

53     Upon the formation of the Fund, the Company was admitted as a limited partner and, by way of capital contribution, contributed all of the outstanding equity interests in CLO HoldCo to the Fund.

54     The purpose of the Fund was to make investments for the ultimate benefit of the Original Participating Shareholders and the Charities:

---

[2]Mr Murphy was appointed to the board of directors of the following entities on 22 April 2021; Liberty CLO Holdco, Ltd., Liberty Sub, Ltd., HCT Holdco 2, Ltd. and MGM Studios Holdco, Ltd. at the same time as Charitable DAF HoldCo, Ltd and CLO HoldCo, Ltd.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

10

54.1    The recitals to the LPA of the Fund provide that the purpose of the Fund was to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of the Limited Partner and its Indirect Charitable Owners…*".

54.2    Clause 1.3 of the LPA provides that "*… the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners*".

54.3    Clause 1.6(a) of the LPA provides that "*the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*".

54.4    "Indirect Charitable Owners" is defined in the LPA as "*the indirect equity owners of the Limited Partners which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.*" i.e., the Company's Participating Shareholders or the Charities.

54.5    Clause 4.2(a) of the LPA provides that "*Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses…*".

54.6    The LPA does not modify the statutory duty of the General Partner to act in good faith and in the interests of the Fund.

55      The Charities are the following four US charitable or non-profit foundations:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

11

55.1 *The Dallas Foundation*: a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets.

55.2 *Greater Kansas City Community Foundation*: a charitable entity established in Missouri in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds.

55.3 *Santa Barbara Foundation*: a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

55.4 *North Texas Community Foundation*: which manages assets totalling $513 million and donated $38.9 million to local non-profits in 2023.

56 The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (the **"Supported Organisations"**) hold their interests in the Company through their respective Supporting Organisation namely Highland Dallas Foundation, Inc. as the Supporting Organisation for The Dallas Foundation; Highland Kansas City Foundation, Inc. as the Supporting Organisation for the Greater Kansas City Community Foundation; Highland Santa Barbara Foundation, Inc as the Supporting Organisation for the Santa Barbara Foundation.

57 CFNT holds its Participating Shares in the Company directly.

## THE TAX STRUCTURE

58 As a matter of U.S. tax law, in order for the Supported Organisations to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore corporate blocker entity, namely the Company:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

12

58.1 S501(c)(3) of the IRC provides that charitable organisations which meet certain criteria are exempt from state and federal taxes except to the extent that it receives income classified as unrelated business taxable income (**"UBTI"**); and

58.2 the Supported Organisations and their Supporting Organisations meet the criteria of s501(c)(3). They are therefore generally exempt from U.S. state and federal taxes, with a few exceptions, including to the extent that they receive UBTI.

59 As a matter of U.S. tax law, at least a portion of income received directly from the Fund by the Supported Organisations would likely be considered UBTI.

60 In order to insulate the Supported Organisations from UBTI, instead of holding their interest in the Fund directly, they held through an offshore corporate blocker structure, namely the Company.

## THE SUPPORTED ORGANISATIONS CONTROL THE SUPPORTING ORGANISATIONS

61 The Supporting Organisations were incorporated in Delaware by Mr Dondero on or about 22 November 2011 for the purpose of making charitable donations to their respective charity from the proceeds of dividends received by the Supporting Organisations from the Company.

62 Supporting organisations under the IRC are tax exempt charitable organisations that provide financial or operational support to one or more public charitable organisations (called "supported organisations"). Because of the link with the supported public charities, supporting organisations are classified as public charities themselves, as opposed to private foundations, despite the fact that a supporting organisation's sources of funding may be limited to a single individual, which would otherwise cause the entity to be classified as a private foundation.

63 Contributions to supporting organisations, as public charities, qualify for the highest tax deductibility thresholds under the IRC (up to 50% of the taxpayer's adjusted gross income, or

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

13

Case 1:23-cv-11111-DJC Doc 60-25 Filed 05/08/26 Entered 05/08/26 13:42:35 Desc
Exhibit 69--Part 3 Page 176 of 186

60%, in the case of cash gifts) instead of the substantially lower threshold for contributions to private foundations (30% of adjusted gross income, regardless of the character of the contribution).

64 The Supporting Organisations are "Type I" tax exempt organisations under the IRC which means they must be organised and operated exclusively to support and benefit their relevant charity and controlled by that charity:

64.1 S509(a)(3) of the IRC contains the qualifications for a "supporting organisation". Under that section, a supporting organisation is a tax-exempt entity that must be organised and then operate exclusively for either (i) the benefit of, (ii) to perform the functions of, or (iii) to carry out the purposes of one or more supported organisations. The supported organisations must also be s501(c)(3) entities;

64.2 There are three types of supporting organisations, known as "Type I", "Type II" and "Type III". S509(a)(3)(B)(i), (ii) and (iii) sets out the requirements for each "Type", respectively;

64.3 S509(a)(3)(B)(i) provides that a Type I supporting organisation must be operated, supervised or controlled by the supported organisation; and

64.4 S509(a)(3)(C) provides that the supporting organisation may not be controlled by a disqualified person, other than the foundation managers and the supported organisation.

65 The Supporting Organisations are so controlled by the respective Supported Organisations.

66 The Supporting Organisations are governed by the terms of their respective Certificate of Incorporation and by-laws (the "**Bylaws**").

67 The Certificates of Incorporation provide (amongst other things) that:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

14

67.1 the Supporting Organisation:

    (a) is organised and shall be operated exclusively for charitable, educational and scientific purposes;

    (b) is organised and operated exclusively to support and benefit the particular charity that controls it; and

    (c) is a non-profit non-stock corporation and cannot issue any capital stock;

67.2 no part of the net earnings of the Supporting Organisation shall be distributable to the directors and officers of the Supporting Organisation or other private persons save that the Supporting Organisation can pay reasonable compensation for services rendered; and

67.3 net earnings can be used to make grants, loans and similar payments for charitable, educational and scientific purposes to benefit the relevant Supported Organisation.

68 The Bylaws provide that (amongst other things):

68.1 There are two classes of members of the Supporting Organisations with one member in each such class:

    (a) the institutional member (the "**Institutional Member**") which shall be the Supported Organisation; and

    (b) the individual member (the "**Individual Member**") which shall be Mr Dondero or an individual designated as the Individual Member in the Bylaws.

68.2 In terms of voting on a matter submitted to a vote of the members (except as otherwise provided in the Bylaws):

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

15

Case 1:19-34065-mkn Doc 600 Filed 07/08/26 Entered 05/08/26 23:42:35 Desc
Exhibit 69 - Part 3 Page 178 of 186

(a)     the Institutional Member is entitled to two votes; and

(b)     the Individual Member is entitled to one vote.

68.3    Institutional membership is not transferable or assignable.

68.4    Individual membership is transferable or assignable only upon approval of the Institutional Member.

68.5    Both the Institutional Member and the Individual Member must be present in person or by represented proxy to constitute a quorum at all meetings of members.

68.6    There shall be three directors of the board of the Supporting Organisation. Two directors shall be elected annually by the Institutional Member and one director shall be elected annually by the Individual Member.

69      The relationship between the Supporting Organisations and their respective Supported Organisation are governed by separate operating/legal relationship agreements (collectively **"Operating Agreements"**). These agreements provide, among other things, that:

69.1    the Supported Organisation will provide certain services to the Supporting Organisation;

69.2    the Supported Organisation will appoint two of the three directors of the Supporting Organisation as required by Bylaws; and

69.3    in consideration for the services provided by the Supported Organisation to the Supporting Organisation, the Supporting Organisation shall pay a fee to the Supported Organisation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

16

70　Mr Dondero sits on the board of each of the Supporting Organisations with two other directors from each of the Supported Organisations respectively.

71　The relationships, rights and obligations created by and between the Supported Organisations and the Supporting Organisations pursuant to the agreements entered into between them were at all material times in summary that:

71.1　the Supported Organisations control the Supporting Organisations through their majority voting interest and their ability to elect a majority of the directors of the Supporting Organisations;

71.2　the Supporting Organisations support the Supported Organisations by way of making grants to them from time to time from their assets, including any dividends received from the Company;

71.3　the Supporting Organisations have no ability to pay dividends to any private person or make payments to their directors (save reasonable reimbursement for reasonable out-of-pocket expenses) and can only make grants to the relevant Charity in furtherance of their charitable purposes; and

71.4　while Mr Dondero sits on the board of the Supporting Organisations, he does not control them, as a supermajority of the votes are always held by the respective Charity.

72　The Company will rely on the Certificates of Incorporation, Bylaws, Operating Agreements and terms of the IRC for their applicable full terms and effect.

**THE CONTROL POSITION OF MR PATRICK OVER THE COMPANY AND THE FUND**

73　The terms of the LPA grant sole control over the management and distribution of the Fund's assets to the General Partner. The terms of the Articles grant sole control over the management and distribution of the Company's assets to the Management Shareholder.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

17

The LPA

73.1   Clause 1.12

(i)   The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

73.2   Clause 1.6

(i)   *Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*

(ii)   *Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

18

*hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.*

<u>The Articles</u>

73.3    Article 11

*The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganization or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.*

73.4    Article 12

*Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.*

73.5    Article 13

*…the rights attached to any such Class may… only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes case at such a meeting.*

73.6    Article 84 (d)

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

19

*The office of Director shall be vacated if the Director...is removed from office by Ordinary Resolution.*

*The definition of Ordinary Resolution is a vote of the Management Shares.*

73.7 Article 99

*Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.*

73.8 Article 104

*Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.*

74 The Management Shares in the Company and the General Partner in the Fund have at all material times been held and/or controlled by a single individual who, as a result, has sole control of the Fund structure (the "**Control Position**"):

74.1 In or around November 2011:

(a) Grant Scott was appointed as the sole director and allotted the 100 Management Shares of the Company; and

(b) Grant Scott became the holder of the membership interest in the Original GP and was appointed the Manager thereof,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

20

thereby assuming the Control Position from that date.

74.2   In or around 24 March 2021, Mr Scott:

(a)     assigned 100% of the membership interest in the Original GP to Mr Patrick pursuant to an Assignment and Assumption of Membership Interests Agreement, which membership interest gave Mr Patrick the sole right to manage the Original GP;

(b)     transferred to Mr Patrick the 100 Management Shares in the Company; and

(c)     resigned as a director of the Company and resolved to appoint Mr Patrick as the sole director in his place.

74.3   On 25 March 2021, Mr Patrick was entered into the Company's Register of Members as the holder of the Management Shares.

74.4   Mr Patrick therefore assumed the Control Position from that date.

74.5   On 22 April 2021, Mr Patrick resolved to appoint Mr Murphy as a second director of the Company.

74.6   On 7 March 2024, by way of a Deed of Assignment and Assumption, Mr Patrick, as managing member of the Original GP, caused the Original GP to transfer its general partnership interest in the Fund to the New GP.

74.7   Mr Patrick is the sole shareholder and director of the New GP.

74.8   Mr Patrick therefore remains in the Control Position and was in such position at all relevant times since 25 March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

21

75 Further, the sole asset of the Fund is its shares in CLO Holdco (the Sixth Defendant). Mr Patrick and Mr Murphy are the directors of CLO Holdco and were appointed on 2 April 2021 and 22 April 2021 respectively.

76 The Control Position was not and is not a term of art but was nevertheless a legal and factual position:

76.1 where a single individual was the sole Management, and therefore voting, Shareholder of the Company;

76.2 where the same individual was a director of the Company;

76.3 where the same individual was the sole shareholder or controller of the General Partner;

76.4 where the same individual was a director of the General Partner;

76.5 where the same individual was in complete and effective control of at least the Company, of the General Partner, of the Fund and of CLO Holdco;

76.6 where the same individual was in effective sole control of all assets of the Fund;

76.7 where the same individual had no economic, residual, beneficial or winding up interest in assets of the Company;

76.8 where the same individual had no economic, residual, beneficial or winding up interest in assets of the General Partner;

76.9 where the same individual had no economic, residual, beneficial or winding up interest in assets of the Fund;

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

22

76.10    where the same individual was, irrespective of his or her formal positions, functions or duties, including as a director, acting as a trustee, fiduciary or in a trustee-like or fiduciary-like position with respect to the assets held by the Fund;

76.11    where the same individual was at all times acting solely for the benefit or the ultimate benefit of the Original Participating Shareholders and/or through them the Supported Organisations and/or through them the Charities; and

76.12    in the alternative to the plea directly above, where the duties otherwise owed by the same individual as a matter of law, including as a director, were affected and/or altered by the existence of the structure as pleaded above, including the facts and matters relating to the Control Position and including the fact that the structure as pleaded above was designed and intended to be solely for the benefit or the ultimate benefit of the Original Participating Shareholders, and/or through them the Charities.

## EVENTS RESULTING IN THE COMPANY HAVING NO MATERIAL ASSETS AND THE DILUTION OF THE SUPPORTING ORGANISATIONS' INTERESTS

<u>Plan to defeat the interests of the Original Participating Shareholders</u>

77       On 9 November 2023, Shields Legal Group ("**Shields Legal**") (the U.S. attorneys for the Company) sent to Campbells LLP ("**Campbells**") (then Cayman Islands attorneys for the Company) a work plan (the "**Work Plan**") relevant to the Company, the Fund and CLO HoldCo.

78       It can be inferred, and is averred, that the purpose of the Work Plan and the subsequent advice and steps taken as detailed below was to seek to entrench Mr Patrick's Control Position and defeat the interests of the Original Participating Shareholders.

79       The Work Plan stated that (amongst other things):

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

23

79.1   the advice required related to "…*potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc…*"; and

79.2   "…*we may need to rely on opinions and memoranda in potential future disputes…*"

80   The Work Plan set out the issues on which the Directors sought advice, including among other things the following questions:

80.1   'Can the controlling person dilute shares, e.g., the Participation Shares?'

80.2   'Can the controlling person redeem shares, e.g., the Participation Shares?'

80.3   'Is there any Cayman law requirement that the Company distribute money upwards to the next level of entities (Highland Dallas Foundation, Inc. and others)?'

80.4   'Could the Company liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless?'

80.5   'What can be done at this point to make [the share transfers in the Company from Mr Scott to Mr Patrick] bullet proof?'

81   The Directors were advised that any steps taken in relation to the proposed issuance of new Participating Shares and withholding dividends must be in compliance with their fiduciary duties and taken in the best interest of the Company:

81.1   On 8 January 2024, Walkers (Cayman) LLP ("**Walkers**") (also then Cayman Islands counsel for the Company) provided advice on issues set out in the Work Plan to the effect that (amongst other things):

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

24