## Stay of proceedings

**91G.**(1)   At any time —

    (a)   after the presentation of a petition for the appointment of a restructuring officer under section 91B, but before an order for the appointment of a restructuring officer is made, and when the petition has not been withdrawn or dismissed; and

    (b)   when an order for the appointment of a restructuring officer is made, until the order appointing the restructuring officer has been discharged,

no suit, action or other proceedings, other than criminal proceedings, shall be proceeded with or commenced against the company, no resolution shall be passed for the company to be wound up and no winding up petition may be presented against the company, except with the leave of the Court and subject to such terms as the Court may impose.

  (2)   Where at any time referred to in subsection (1), there are criminal proceedings pending against the company in a summary court, the Court, the Court of Appeal or the Privy Council —

    (a)   the company acting by its directors;

    (b)   a creditor of the company, including a contingent or prospective creditor;

    (c)   a contributory of the company; or

    (d)   the Authority, in respect of any company which is carrying on regulated business,

may apply to the court in which the proceedings are pending for a stay of the proceedings and the court to which the application is made, may stay the proceedings on such terms as it thinks fit.

  (3)   In this section —

    (a)   references to a suit, action or other proceedings include a suit, action or other proceedings in a foreign country; and

    (b)   references to other proceedings include any court supervised insolvency or restructuring proceedings against the company.

## Enforcement of creditors' security

**91H.**Notwithstanding the presentation of a petition for the appointment of a restructuring officer or the appointment of a restructuring officer by the Court under section 91B or 91C, a creditor who has security over the whole or part of the assets of the company is entitled to enforce the creditor's security without the leave of the Court and without reference to the restructuring officer appointed under section 91B or 91C.



Case 19-34054-sgj11 Doc 4593-7 Filed 05/08/26 Entered 05/08/26 23:42:39 Desc
Exhibit 69-Part 7 Page 2 of 181

## Power to compromise with creditors and members within restructuring officer proceeding

**91I.** (1) Where a restructuring officer is appointed to a company and a compromise or arrangement is proposed between the company and its creditors or any class of them, or the company and its members or any class of them, the Court may, on the application of the restructuring officer, order a meeting of the creditors or class of creditors, or of the members of the company or class of members, as the case may be, to be summoned in such manner as the Court directs.

(2) If a majority in number representing seventy-five per cent in value of the creditors or class of creditors, as the case may be, present and voting either in person or by proxy at the meeting, agree to any compromise or arrangement, the compromise or arrangement shall, if sanctioned by the Court, be binding on all the creditors or the class of creditors, as the case may be, and also on the company.

(3) If seventy-five per cent in value of the members or class of members, as the case may be, present and voting either in person or by proxy at the meeting, agree to any compromise or arrangement, the compromise or arrangement shall, if sanctioned by the Court, be binding on all the members or class of members, as the case may be, and also on the company.

(4) An order made under subsection (2) or (3) shall have no effect until a copy of the order has been delivered to the Registrar for registration, and a copy of every such order shall be annexed to every copy of the memorandum of association of the company issued after the order has been made, or, in the case of a company not having a memorandum, of every copy so issued of the instrument constituting or defining the constitution of the company.

(5) If a company makes default in complying with subsection (4), the company and every officer of the company who is in default shall be liable to a fine of two dollars for each copy in respect of which default is made.

(6) In this section, "**arrangement**" includes a reorganisation of the share capital of the company by the consolidation of shares of different classes or by the division of shares into shares of different classes or by both those methods.



## Provisions for facilitating reconstruction and amalgamation of companies

**91J**. (1) Where an application is made to the Court under section 91I for the sanctioning of a compromise or arrangement proposed between a company and any such persons as are specified in that section, and it is shown to the Court that the compromise or arrangement has been proposed for the purpose of or in connection with a scheme for the reconstruction of any company or companies or the amalgamation of any two or more companies, and that under the scheme the whole or any part of the undertaking or the property of any company concerned in the scheme (in this section referred to as "**a transferor company**") is to be transferred to another company (in this section referred to as "**the transferee company**") the Court, may either by the order sanctioning the compromise or arrangement or by any subsequent order make provision for —

    (a)   the transfer to the transferee company of the whole or any part of the undertaking and of the property or liabilities of any transferor company;

    (b)   the allotting or appropriation by the transferee company of any shares, debentures, policies, or other like interests in that company which under the compromise or arrangement are to be allotted or appropriated by that company to or for any person;

    (c)   the continuation by or against the transferee company of any legal proceedings pending by or against any transferor company;

    (d)   the dissolution, without winding up, of any transferor company;

    (e)   the provisions to be made for any person who within such time and in such manner as the Court directs dissents from the compromise or arrangement; and

    (f)   such incidental, consequential and supplemental matters as are necessary to secure that the reconstruction or amalgamation is fully and effectively carried out.

(2) Where an order under this section provides for the transfer of property or liabilities, that property shall, by virtue of the order, be transferred to and vest in, and those liabilities shall, by virtue of the order, be transferred to and become the liabilities of, the transferee company, and any such property shall, if the order so directs, be freed from any charge which is, by virtue of the compromise or arrangement, to cease to have effect.

(3) Where an order is made under this section, every company in relation to which the order is made shall cause a copy thereof to be delivered to the Registrar for registration within seven days after the making of the order, and if default is made in complying with this subsection, the company and every officer of the company who is in default shall be liable to a default fine.

(4) In this section —

"**property**" includes property, rights and powers of every description;

 

"**liabilities**" includes duties; and

"**transferee company**" means any company or body corporate established in the Islands or in any other jurisdiction.

# Winding up by the Court

## Circumstances in which a company may be wound up by the Court

**92.** A company may be wound up by the Court if —

    (a)    the company has passed a special resolution requiring the company to be wound up by the Court;

    (b)    the company does not commence its business within a year from its incorporation, or suspends its business for a whole year;

    (c)    the period, if any, fixed for the duration of the company by the articles of association expires, or whenever the event, if any, occurs, upon the occurrence of which it is provided by the articles of association that the company is to be wound up;

    (d)    the company is unable to pay its debts; or

    (e)    the Court is of opinion that it is just and equitable that the company should be wound up.

## Definition of inability to pay debts

**93.** A company shall be deemed to be unable to pay its debts if —

    (a)    a creditor by assignment or otherwise to whom the company is indebted at law or in equity in a sum exceeding one hundred dollars then due, has served on the company by leaving at its registered office a demand under that person's hand requiring the company to pay the sum so due, and the company has for the space of three weeks succeeding the service of such demand, neglected to pay such sum, or to secure or compound for the same to the satisfaction of the creditor;

    (b)    execution of other process issued on a judgment, decree or order obtained in the Court in favour of any creditor at law or in equity in any proceedings instituted by such creditor against the company, is returned unsatisfied in whole or in part; or

    (c)    it is proved to the satisfaction of the Court that the company is unable to pay its debts.

## Application for winding up

**94.** (1)    An application to the Court for the winding up of a company shall be by petition presented either by —

        (a)    the company;



(b) any creditor or creditors (including any contingent or prospective creditor or creditors);

(c) any contributory or contributories; or

(d) subject to subsection (4), the Authority pursuant to the regulatory laws.

(2) Where expressly provided for in the articles of association of a company, the directors of a company incorporated before the 31st August, 2022, the commencement date of *the Companies (Amendment) Act, 2021 [Act 6 of 2021]* have the authority to —

(a) present a winding up petition; or

(b) where a winding up petition has been presented, apply for the appointment of a provisional liquidator, on behalf of the company without the sanction of a resolution passed at a general meeting.

(2A) Subject to subsection (2B), the directors of a company incorporated after the 31st August, 2022, the commencement date of the *Companies (Amendment) Act, 2021 [Act 6 of 2021]* may present a winding up petition on behalf of the company on the grounds that the company is unable to pay its debts within the meaning of section 93 or where a winding up petition has been presented, apply on behalf of the company, for the appointment of a provisional liquidator.

(2B) The articles of association of a company may expressly remove or modify the directors' authority to present a winding up petition or apply for the appointment of a provisional liquidator on the company's behalf.

(3) A contributory is not entitled to present a winding up petition unless either —

(a) the shares in respect of which that person is a contributory, or some of them, are partly paid; or

(b) the shares in respect of which that person is a contributory, or some of them, either were —

(i) originally allotted to that person, or have been held by that person, and registered in that person's name for a period of at least six months immediately preceding the presentation of the winding up petition; or

(ii) have devolved on that person through the death of a former holder.

(4) A winding up petition may be presented by the Authority in respect of any company which is carrying on a regulated business in the Islands upon the grounds that it is not duly licensed or registered to do so under the regulatory laws or for any other reason as provided under the regulatory laws or any other law.

## Powers of the Court

95. (1) Upon hearing the winding up petition the Court may —



    (a)   dismiss the petition;

    (b)   adjourn the hearing conditionally or unconditionally;

    (c)   make a provisional order; or

    (d)   any other order that it thinks fit,

but the Court shall not refuse to make a winding up order on the ground only that the company's assets have been mortgaged or charged to an amount equal to or in excess of those assets or that the company has no assets.

(2)    The Court shall dismiss a winding up petition or adjourn the hearing of a winding up petition on the ground that the petitioner is contractually bound not to present a petition against the company.

(3)    If the petition is presented by members of the company as contributories on the ground that it is just and equitable that the company should be wound up, the Court shall have jurisdiction to make the following orders, as an alternative to a winding-up order, namely —

    (a)   an order regulating the conduct of the company's affairs in the future;

    (b)   an order requiring the company to refrain from doing or continuing an act complained of by the petitioner or to do an act which the petitioner has complained it has omitted to do;

    (c)   an order authorising civil proceedings to be brought in the name and on behalf of the company by the petitioner on such terms as the Court may direct; or

    (d)   an order providing for the purchase of the shares of any members of the company by other members or by the company itself and, in the case of a purchase by the company itself, a reduction of the company's capital accordingly.

(4)    Where an alternative order under subsection (3) requires the company not to make any, or any specified, alteration in the memorandum or articles of association, the company does not have power, without the leave of the Court, to make any such alteration in breach of that requirement.

(5)    Any alteration in a company's memorandum or articles of association made by virtue of an alternative order under subsection (3) is of the same effect as if duly made by resolution of the company, and the provisions of this Act shall apply to the memorandum or articles of association as so altered accordingly.

(6)    A copy of an alternative order made under subsection (3) altering, or giving leave to alter, a company's memorandum or articles of association shall be filed by the company with the Registrar within fourteen days of the making of the order.



## Power to stay or restrain proceedings

**96.** At any time after the presentation of a winding up petition and before a winding up order has been made, the company or any creditor or contributory may —

(a) where any action or proceeding against the company, including a criminal proceeding, is pending in a summary court, the Court, the Court of Appeal or the Privy Council, apply to the court in which the action or proceeding is pending for a stay of proceedings therein; and

(b) where any action or proceeding is pending against the company in a foreign court, apply to the Court for an injunction to restrain further proceedings therein,

and the court to which application is made may, as the case may be, stay or restrain the proceedings accordingly on such terms as it thinks fit.

## Avoidance of attachments and stay of proceedings

**97.** (1) When a winding up order is made or a provisional liquidator is appointed, no suit, action or other proceedings, other than criminal proceedings, shall be proceeded with or commenced against the company except with the leave of the Court and subject to such terms as the Court may impose.

(1A) Where a winding up order is made or a provisional liquidator is appointed in respect of a company, and there are criminal proceedings pending against the company in a summary court, the Court, the Court of Appeal or the Privy Council —

(a) the company;

(b) a creditor of the company;

(c) a contributory of the company; or

(d) subject to section 94(4), the Authority, in respect of any company which is carrying on regulated business, may apply to the court in which the proceedings are pending for a stay of the proceedings and the court to which the application is made, may stay the proceedings on such terms as it thinks fit.

(2) When a winding up order has been made, any attachment, distress or execution put in force against the estate or effects of the company after the commencement of the winding up is void.

## Notice of winding up order

**98.** When a winding up order is made, the liquidator shall —

(a) file a copy of the winding up order with the Registrar; and

(b) publish notice of the winding up in the Gazette and any newspaper in which the winding up petition was advertised.



Case 19-34054-sgj11 Doc 4691-7 Filed 05/08/26 Entered 05/08/26 23:42:39 Desc Exhibit 69-Part 7 Page 86 of 181

## Avoidance of property dispositions, etc.

99. When a winding up order has been made, any disposition of the company's property and any transfer of shares or alteration in the status of the company's members made after the commencement of the winding up is, unless the Court otherwise orders, void.

## Commencement of winding up by the Court

100. (1) If, before the presentation of a petition for the winding up of a company by the Court —

(a) a resolution has been passed by the company for voluntary winding up;

(b) the period, if any, fixed for the duration of the company by the articles of association has expired;

(c) the event upon the occurrence of which it is provided by the articles of association that the company is to be wound up has occurred; or

(d) a restructuring officer has been appointed pursuant to section 91B or 91C and the order appointing the restructuring officer has not been discharged,

the winding up of the company is deemed to have commenced at the time of passing of the relevant resolution or the expiry of the relevant period or the occurrence of the relevant event or the date of the presentation of the petition to appoint a restructuring officer pursuant to section 91B.

(2) In any other circumstance not specified in subsection (1), the winding up of a company by the Court is deemed to commence at the time of the presentation of the petition for winding up.

## Company's statement of affairs

101. (1) Where the Court has made a winding up order or appointed a provisional liquidator, the liquidator may require some or all of the persons mentioned in subsection (3) to prepare and submit to that person a statement in the prescribed form as to the affairs of the company.

(2) The statement shall be verified by an affidavit sworn by the persons required to submit it and shall show —

(a) particulars of the company's assets and liabilities, including contingent and prospective liabilities;

(b) the names and addresses of any persons having possession of the company's assets;

(c) the assets of the company held by those persons;

(d) the names and addresses of the company's creditors;

(e) the securities held by those creditors;

(f) the dates when the securities were respectively given; and

(g) such further or other information that the liquidator may require.



Case 19-34054-sgj11 Doc 4581-79 Filed 05/08/26 Entered 05/08/26 23:42:39 Desc Exhibit 69-Part 27 Page 9 of 181

(3)    The persons referred to in subsection (1) are —

    (a)   persons who are or have been directors or officers of the company;

    (b)   persons who are or have been professional service providers to the company; and

    (c)   persons who are or have been employees of the company, during the period of one year immediately preceding the relevant date.

(4)    Where any persons are required under this section to submit a statement of affairs to the liquidator, they shall do so, subject to subsection (5), before the end of the period of twenty-one days beginning with the day after that on which the prescribed notice of the requirement is given to them by the liquidator.

(5)    The liquidator may release a person from an obligation imposed on that person under subsection (1) or, when giving the notice mentioned in subsection (4) or subsequently, the liquidator may extend the time for compliance; and if the liquidator refuses to extend the time for compliance, the Court may do so.

(6)    In this section —

"**relevant date**" means —

    (a)   in a case where a provisional liquidator is appointed, the date of that person's appointment; and

    (b)   in any other case, the commencement of the winding up.

(7)    A person who, without reasonable excuse, fails to comply with any obligation imposed under this section commits an offence and is liable on conviction to a fine of ten thousand dollars.

## Investigation by liquidator

**102**. (1)    Where a winding up order is made by the Court, the liquidator shall be empowered to investigate —

    (a)   if the company has failed, the causes of the failure; and

    (b)   generally, the promotion, business, dealings and affairs of the company,

and to make such report, if any, to the Court as that person thinks fit.

(2)    Subject to obtaining the directions of the Court, the liquidator shall have power to —

    (a)   assist the Authority and the Royal Cayman Islands Police Service to investigate the conduct of persons referred to in section 101(3); and

    (b)   institute and conduct a criminal prosecution of persons referred to in section 101(3).

(3)    Subject to obtaining the prior approval of the company's creditors, if it is insolvent, or its contributories, if it is solvent, the directions given under



Case 19-34054-sgj11 Doc 4503-79 Filed 05/08/26 Entered 05/08/26 23:42:39 Desc
Exhibit 69-Part27 Page 548 of 865

subsection (2) may include a direction that the whole or part of the costs of investigation and prosecution be paid out of the assets of the company.

## Duty to co-operate and the private examination of relevant persons

**103**. (1)　This section applies to any person who, whether resident in the Islands or elsewhere —

(a)　has made or concurred with the statement of affairs;

(b)　is or has been a director or officer of the company;

(c)　is or was a professional service provider to the company;

(d)　has acted as a controller, advisor or liquidator of the company or receiver or manager of its property;

(e)　not being a person falling within paragraphs (a) to (c), is or has been concerned or has taken part in the promotion, or management of the company,

and such person is referred to in this section as the "**relevant person**".

(2)　It is the duty of every relevant person to co-operate with the official liquidator.

(3)　While a company is being wound up, the official liquidator may at any time before its dissolution apply to the Court for an order —

(a)　for the examination of any relevant person; or

(b)　that a relevant person transfer or deliver up to the liquidator any property or documents belonging to the company.

(4)　Unless the Court otherwise orders, the official liquidator shall make an application under subsection (3) if that person is requested in accordance with the rules to do so by one-half, in value, of the company's creditors or contributories.

(5)　On an application made under subsection (3)(a), the Court may order that a relevant person —

(a)　swear an affidavit in answer to written interrogatories;

(b)　attend for oral examination by the official liquidator at a specified time and place, or

(c)　do both things specified in paragraphs (a) and (b).

(6)　The Court may direct that any creditor or contributory of the company be permitted by the official liquidator to participate in an oral examination.

(7)　The Court shall have jurisdiction —

(a)　to make an order under this section against a relevant person resident outside the Islands; and



    (b)    to issue a letter of request for the purpose of seeking the assistance of a foreign court in obtaining the evidence of a relevant person resident outside the jurisdiction.

## Official Liquidators

### Appointment and powers of provisional liquidator

**104**. (1)    Subject to this section and any rules made under section 155, the Court may, at any time after the presentation of a winding up petition but before the making of a winding up order, appoint a liquidator provisionally.

(2)    An application for the appointment of a provisional liquidator may be made under subsection (1) by a creditor or contributory of the company or, subject to subsection (6), the Authority, on the grounds that —

    (a)    there is a *prima facie* case for making a winding up order; and

    (b)    the appointment of a provisional liquidator is necessary in order to —

        (i)    prevent the dissipation or misuse of the company's assets;

        (ii)    prevent the oppression of minority shareholders; or

        (iii)    prevent mismanagement or misconduct on the part of the company's directors.

(3)    An application for the appointment of a provisional liquidator may be made under subsection (1) by the company and on such an application the Court may appoint a provisional liquidator if it considers it appropriate to do so.

(4)    A provisional liquidator shall carry out only such functions as the Court may confer on that person and that person's powers may be limited by the order appointing that person.

(5)    The remuneration of the provisional liquidator shall be fixed by the Court from time to time on that person's application and the Court shall in fixing such remuneration act in accordance with rules made under section 155.

(6)    An application for the appointment of a provisional liquidator may be presented by the Authority on the grounds under subsection (2), in respect of any company which is carrying on a regulated business in the Islands upon the grounds that it is not duly licensed or registered to do so under the regulatory laws or for any other reason as provided under the regulatory laws or any other law regardless of whether or not the Authority presented the winding up petition.



## Appointment of official liquidator

**105**. (1)   For the purpose of conducting the proceedings in winding up a company and assisting the Court therein, there may be appointed one or more than one person to be called an official liquidator or official liquidators; and the Court may appoint to such office such person as it thinks fit, and if more persons than one are appointed to such office, the Court shall declare whether any act hereby required or authorised to be done by the official liquidator is to be done by all or any or more of such persons.

(2)   The Court may also determine whether any and what security is to be given by an official liquidator on that person's appointment; and if no official liquidator is appointed, or during any vacancy in such office, all the property of the company shall be in the custody of the Court.

(3)   The liquidator shall, within twenty-eight days of the date upon which the winding up order is made, summon —

(a)   a meeting of the company's creditors if the order was made on the grounds that the company is insolvent; or

(b)   a meeting of the company's contributories if the order was made on grounds other than insolvency,

for the purposes of resolving any other matters which the liquidator puts before the meeting.

(4)   The Court may make an order dispensing with the need to summon a meeting under this section or extending the time within which it shall be summoned.

## Appointment of joint liquidators

**106**. When two or more persons are appointed to the office of liquidator, either provisionally or as official liquidators, they shall be authorised to act jointly and severally, unless their powers are expressly limited by order of the Court.

## Removal of official liquidators

**107**. An official liquidator may be removed from office by order of the Court made on the application of a creditor or contributory of the company.

## Qualifications of official liquidators

**108**. (1)   A foreign practitioner may be appointed to act jointly with a qualified insolvency practitioner.

(2)   Official liquidators are officers of the Court.

## Remuneration of official liquidators and restructuring officers

**109**. (1)   The expenses properly incurred in the winding up, including the remuneration of the liquidator, are , subject to subsection (2), payable out of the company's assets in priority to all other claims.



(2) Where a company is wound up, the expenses properly incurred in any petition for a restructuring officer and during the term of appointment of the restructuring officer appointed —

    (a) under section 91B(3)(a); or

    (b) on an interim basis under section 91C(3), including the remuneration of the restructuring officer, are payable out of the company's assets in priority to all other claims.

(3) There shall be paid to a restructuring officer, including a restructuring officer appointed on an interim basis, and the official liquidator, such remuneration, by way of percentage or otherwise, that the Court may direct acting in accordance with rules made under section 155.

(4) If more than one restructuring officer, including a restructuring officer appointed on an interim basis, is appointed by the Court under section 91B or 91C, the remuneration paid under subsection (3) shall be distributed among the restructuring officers in such proportions as the Court may direct.

(5) If more than one official liquidator is appointed by the Court when a company is wound up, the remuneration paid under subsection (3) shall be distributed among the official liquidators in such proportions as the Court may direct.

## Function and powers of official liquidators

**110**. (1) It is the function of an official liquidator —

    (a) to collect, realise and distribute the assets of the company to its creditors and, if there is a surplus, to the persons entitled to it; and

    (b) to report to the company's creditors and contributories upon the affairs of the company and the manner in which it has been wound up.

(2) The official liquidator may —

    (a) with the sanction of the Court, exercise any of the powers specified in Part I of Schedule 3; and

    (b) with or without that sanction, exercise any of the general powers specified in Part 2 of Schedule 3.

(3) The exercise by the liquidator of the powers conferred by this section is subject to the control of the Court, and subject to subsection (5), any creditor or contributory may apply to the Court with respect to the exercise or proposed exercise of such powers (hereinafter referred to as a "sanction application").

(4) In the case of —

    (a) a solvent company, a sanction application may only be made by a contributory and the creditors shall have no right to be heard;

    (b) an insolvent company, a sanction application may only be made by a creditor and the contributories shall have no right to be heard; and

Revised as at 1st January, 2025



(c) a company whose solvency is doubtful, a sanction application may be made by both contributories and creditors and both contributories and creditors shall have a right to be heard.

(5) For the purposes of exercising the powers specified under paragraph 3 of Part 1 of Schedule 3, a person shall be treated as related to a company if the person —

(a) has acted for the company as a professional service provider;

(b) is or was a shareholder or director of the company or of any other company in the same group as the company;

(c) has a direct or indirect beneficial interest in the shares of the company; or

(d) is a creditor or debtor of the company.

.

## General Powers of the Court

### Power to stay winding up

111. (1) The Court may at any time after an order for winding up, on the application either of the liquidator or any creditor or contributory, and on proof to the satisfaction of the Court that all proceedings in the winding up ought to be stayed, make an order staying the proceedings either all together or for a limited time, on such terms and conditions as the Court thinks fit.

(2) The Court may at any time after the liquidation has commenced under section 116(c), but before the final meeting has been held as provided for in section 127, on the application of the liquidator accompanied by —

(a) a special resolution stating that the company will not be wound up and setting out the reasons for such decision;

(b) proof of a recall notice published in the Gazette; and

(c) such other documents as the Court may consider necessary,

make an order to recall the liquidation, place the company into active status and place the company back into good standing as it was prior to the commencement of liquidation under section 116(c), on such terms and conditions as the Court thinks fit.

(3) A company shall, within seven days of the making of an order under this section, forward a copy of the order to the Registrar who shall enter it in the records relating to the company.

### Settlement of list of contributories

112. (1) The liquidator shall settle a list of contributories, if any, for which purpose that person shall have power to adjust the rights of contributories amongst themselves.



Case 1:23-cv-11195-JGK-OTW Doc 7/28/25 Entered 05/23/25 23:42:35 Desc
Exhibit 69-Part 27 Page 15 of 165

(2) In the case of a solvent liquidation of a company which has issued redeemable shares at prices based upon its net asset value from time to time, the liquidator shall have power to settle and, if necessary rectify the company's register of members, thereby adjusting the rights of members amongst themselves.

(3) A contributory who is dissatisfied with the liquidator's determination may appeal to the Court against such determination.

## Power to make calls

113. (1) The Court may, at any time after making a winding up order, and either before or after it has ascertained the sufficiency of the company's assets, make calls on all or any of the contributories for the time being settled on the list of the contributories —

(a) to the extent of their liability, for the payment of any money which the Court considers necessary to satisfy the company's debts and liabilities and the expenses of winding up; and

(b) to the adjustment of the rights of the contributories among themselves,

and make an order for payment of any call so made.

(2) In making a call the Court may take into consideration the probability that some of the contributories may partly or wholly fail to pay it.

## Inspection of documents by creditors, etc.

114. (1) At any time after making a winding up order the Court may make such orders as it thinks fit for —

(a) the inspection of the company's documents by creditors and contributories; and

(b) the preparation of reports by the official liquidator and the provision of such reports to the company's creditors and contributories.

(2) A contributory shall be entitled to make an application under this section notwithstanding that the company is or may be insolvent and the Court shall not refuse to make an order upon the application of a contributory merely by reason of the fact that the company is or may be insolvent.

## Meetings to ascertain wishes of creditors or contributories

115. (1) The Court shall, as to all matters relating to the winding up, have regard to wishes of the creditors or contributories and for that purpose it may direct reports to be prepared by the official liquidator and meetings of creditors or contributories to be summoned.

(2) If it considers it necessary to do so, the Court may direct that separate meetings be held of different classes of creditors or contributories.



Case 1:19-34054-sgj11 Doc 4681-7 Filed 05/08/26 Entered 05/08/26 23:42:39 Desc
Exhibit 69-Part 27 Page 514 of 185

(3)  Subject to Rules made under section 155, meetings may be requisitioned by creditors, if the company is insolvent, or by contributories if the company is solvent.

(4)  The votes of creditors and contributories shall be counted by reference to —

(a)  the value of their debts, in the case of creditors;

(b)  the number of votes, in the case of contributories whose shares carry voting rights under the articles of association of the company; and

(c)  the par value of all the shares held, in the case of contributories whose shares do not carry votes under the articles of association of the company and, where there are no par value shares, the net asset value of the company shown.

## Voluntary Winding up

### Circumstances in which a company may be wound up voluntarily

**116**. A company incorporated and registered under this Act or an existing company may be wound up voluntarily —

(a)  when the period, if any, fixed for the duration of the company by its memorandum or articles of association expires;

(b)  if the event, if any, occurs, on the occurrence of which the memorandum or articles of association provide that the company is to be wound up;

(c)  if the company resolves by special resolution that it be wound up voluntarily; or

(d)  if the company in general meeting resolves by ordinary resolution that it be wound up voluntarily because it is unable to pay its debts.

### Commencement of winding up

**117**. (1)  A voluntary winding up is deemed to commence —

(a)  at the time of the passing of the resolution for winding up; or

(b)  on the expiry of the period or the occurrence of the event specified in the company's memorandum or articles of association,

notwithstanding that a supervision order is subsequently made by the Court.

(2)  Subject to any contrary provision in its memorandum or articles of association, the voluntary winding up of an exempted limited duration company is taken to have commenced upon the expiry of a period of ninety days starting on —

(a)  the death, insanity, bankruptcy, dissolution, withdrawal, retirement or resignation of a member of the company;



   (b)   the redemption, repurchase or cancellation of all the shares of a member of the company; or

   (c)   the occurrence of any event which, under the memorandum or articles of association of the company, terminates the membership of a member of the company,

unless there remain at least two members of the company and the company is continued in existence by the unanimous resolution of the remaining members pursuant to amended memorandum and articles of association adopted during that period of ninety days.

## Effect on business and status of the company

**118.** (1)   In the case of a voluntary winding up, the company shall from the commencement of its winding up cease to carry on its business except so far as it may be beneficial for its winding up.

(2)   Notwithstanding anything to the contrary contained in the company's articles of association, its corporate state and powers shall continue until the company is dissolved.

## Appointment of voluntary liquidator

**119.** (1)   One or more liquidators shall be appointed for the purpose of winding up the company's affairs and distributing its assets.

(2)   When the winding up has commenced in accordance with the company's memorandum or articles of association upon the termination of a fixed period or the occurrence of an event —

   (a)   the persons designated as liquidators in the memorandum or articles of association shall become such liquidators automatically from the commencement of the winding up; or

   (b)   if no such person is designated in the memorandum or articles of association or the person designated is unable or unwilling to act, the directors shall convene a general meeting of the company for the purpose of appointing a liquidator.

(3)   Except in the case of a person designated as liquidator in the company's memorandum or articles of association, the appointment of a voluntary liquidator shall take effect upon the filing of that person's consent to act with the Registrar.

(4)   If a vacancy occurs by death, resignation or otherwise in the office of voluntary liquidator appointed by the company —

   (a)   the company in a general meeting may fill the vacancy; or

   (b)   the Court may fill the vacancy on the application of any contributory or creditor.

 

(5)  On the appointment of a voluntary liquidator all the powers of the directors cease, except so far as the company in a general meeting or the liquidator sanctions their continuance.

(6)  When two or more persons are appointed as voluntary liquidators jointly, they shall be authorised to act jointly and severally unless their powers are expressly limited by the resolution or articles of association under which they are appointed.

## Qualifications of voluntary liquidators

**120**. Any person, including a director or officer of the company, may be appointed as its voluntary liquidator.

## Removal of voluntary liquidators

**121**. (1)  A voluntary liquidator may be removed from office by a resolution of the company in a general meeting convened especially for that purpose.

(2)  A general meeting of the company for the purpose of considering a resolution to remove its voluntary liquidator may be convened by any shareholder or shareholders holding not less than one fifth of the company's issued share capital.

(3)  Whether or not a general meeting has been convened in accordance with subsection (2), any contributory may apply to the Court for an order that a voluntary liquidator be removed from office on the grounds that that person is not a fit and proper person to hold office.

## Resignation of voluntary liquidator

**122**. (1)  Where two or more persons are appointed as joint voluntary liquidators, they may resign by filing a notice of resignation with the Registrar, so long as at least one of them continues in office.

(2)  Except as provided in subsection (1), a voluntary liquidator wishing to resign shall —

(a)  prepare a report and accounts; and

(b)  convene a general meeting of the company for the purpose of accepting that person's resignation and releasing that person from the performance of any further duties, and shall cease to hold office with effect from the date upon which the resolution is passed.

(3)  In the event that the company fails to pass a resolution accepting that person's resignation, the voluntary liquidator may apply to the Court for an order that that person be released from the performance of any further duties.



Case 19-34054-sgj11 Doc 4593-79 Filed 05/08/26 Entered 05/08/26 23:42:39 Desc
Exhibit 69 - Part 27 Page 19 of 165

## Notice of voluntary winding up

**123**. (1) Within twenty-eight days of the commencement of a voluntary winding up, the liquidator or, in the absence of any liquidator, the directors shall —

    (a) file notice of the winding up with the Registrar;

    (b) file the liquidator's consent to act with the Registrar;

    (c) file the director's declaration of solvency with the Registrar (if the supervision of the court is not sought);

    (d) in the case of a company carrying on a regulated business, serve notice of the winding up upon the Authority; and

    (e) publish notice of the winding up in the Gazette.

    (2) A director or liquidator who fails to comply with this section commits an offence and is liable to a fine of ten thousand dollars.

## Application for supervision order

**124**. (1) Where a company is being wound up voluntarily its liquidator shall apply to the Court for an order that the liquidation continue under the supervision of the Court unless, within twenty-eight days of the commencement of the liquidation, the directors have signed a declaration of solvency in the prescribed form in accordance with subsection (2).

    (2) A declaration of solvency means a declaration or affidavit in the prescribed form to the effect that a full enquiry into the company's affairs has been made and that to the best of the directors' knowledge and belief the company will be able to pay its debts in full together with interest at the prescribed rate, within such period, not exceeding twelve months from the commencement of the winding up, as may be specified in the declaration.

    (3) A person who knowingly makes a declaration under this section without having reasonable grounds for the opinion that the company will be able to pay its debts in full, together with interest at the prescribed rate, within the period specified commits an offence and is liable on summary conviction to a fine of ten thousand dollars and to imprisonment for two years.

## Avoidance of share transfers

**125**. Any transfer of shares, not being a transfer with the sanction of the liquidator, and any alteration in the status of the company's members made after the commencement of a voluntary winding up is void.



Case 1:23-cv-00544-egs 11-10766-MSB-7 Doc 79-5 06-26 Entered 05/06/26 23:42:35 Desc
Exhibit 69-Part 27 Page 20 of 165

## General meeting at year's end

**126**. (1)  In the event of a voluntary winding up continuing for more than one year, the liquidators shall summon a general meeting of the company at the end of the first year from the commencement of the winding up and at the end of each succeeding year and such meetings shall be held within three months of each anniversary of the commencement of the liquidation.

(2)  At each meeting the liquidator shall lay before the meeting a report and account of that person's acts and dealings and the conduct of the winding up during the preceding year.

(3)  A liquidator who fails to comply with this section commits an offence and is liable on conviction to a fine of ten thousand dollars.

## Final meeting prior to dissolution

**127**. (1)  As soon as the company's affairs are fully wound up, the liquidator shall make a report and an account of the winding up showing how it has been conducted and how the company's property has been disposed of and thereupon shall call a general meeting of the company for the purpose of laying before it the account and giving an explanation for it.

(2)  At least twenty-one days before the meeting the liquidator shall send a notice specifying the time, place and object of the meeting to each contributory in any manner authorised by the company's articles of association and published in the Gazette.

(3)  The liquidator shall, no later than seven days after the meeting, make a return to the Registrar in the prescribed form specifying —

(a)  the date upon which the meeting was held; and

(b)  if a quorum was present, particulars of the resolutions, if any, passed at the meeting.

(4)  A liquidator who fails to call a general meeting of the company as required by subsection (1) or fails to make a return as required by subsection (3) commits an offence and is liable on conviction to a fine of ten thousand dollars.

## Effect of winding up on share capital of company limited by guarantee

**128**. Where a company limited by guarantee and having a capital divided into shares is being wound up voluntarily, any share capital that may not have been called upon shall be deemed to be an asset of the company, and to be a specialty debt due from each member to the company to the extent of any sums that may be unpaid on any shares held by that person, and payable at such time as may be appointed by the liquidator.



## Reference of questions to Court

**129**. (1)  The voluntary liquidator or any contributory may apply to the Court to determine any question arising in the voluntary winding up of a company or to exercise, as respects the enforcing of calls or any other matter, all or any of the powers which the Court might exercise if the company were being wound up under the supervision of the Court.

(2)  The Court, if satisfied that the determination of the question or the required exercise of power will be just and beneficial, may accede wholly or partly to the application on such terms and conditions as it thinks fit, or make such other order on the application as it thinks just.

(3)  The voluntary liquidator shall, within seven days of the making of an order under this section, forward a copy of the order to the Registrar who shall enter it in that person's records relating to the company.

## Expenses of voluntary winding up

**130**. (1)  The expenses properly incurred in the winding up, including the remuneration of the liquidator, are payable out of the company's assets in priority to all other claims.

(2)  The rate and amount of the liquidator's remuneration shall be fixed and payment authorised by resolution of the company.

(3)  Each report and account laid before the company in general meetings by its liquidator shall contain all such information, including the rate at which the liquidator's remuneration is calculated and particulars of the work done, as may be necessary to enable the members to determine what expenses have been properly incurred and what remuneration is properly payable to the liquidator.

(4)  If the company fails to approve the liquidator's remuneration and expenses or the liquidator is dissatisfied with the decision of the company, that person may apply to the Court which shall fix the rate and amount of that person's remuneration and expenses.

## Winding up subject to the supervision of the Court

### Application for supervision order

**131**. When a resolution has been passed by a company to wind up voluntarily, the liquidator or any contributory or creditor may apply to the Court for an order for the continuation of the winding up under the supervision of the Court, notwithstanding that the declaration of solvency has been made in accordance with section 124, on the grounds that —

(a)  the company is or is likely to become insolvent; or



(b)     the supervision of the Court will facilitate a more effective, economic or expeditious liquidation of the company in the interests of the contributories and creditors.

## Appointment of official liquidator

**132**. (1)     When making a supervision order the Court —

(a)     shall appoint one or more qualified insolvency practitioners; and

(b)     may, in addition, appoint one or more foreign practitioners,

as liquidator or liquidators of the company and section 105 shall apply as if the Court had made a winding up order.

(2)     Unless a voluntary liquidator is appointed as an official liquidator, that person shall prepare a final report and accounts within twenty-eight days from the date of the supervision order.

## Effect of supervision order

**133**. A supervision order shall take effect for all purposes as if it was an order that the company be wound up by the Court except that —

(a)     the liquidation commenced in accordance with section 117; and

(b)     the prior actions of the voluntary liquidator shall be valid and binding upon the company and its official liquidator.

# Offences of fraud, etc.

## Fraud, etc. in anticipation of winding up

**134**. (1)     Where a company is ordered to be wound up by the Court, or passes a resolution for voluntary winding up, any person, who is or was an officer, professional service provider, voluntary liquidator, restructuring officer or controller of the company and who, within the twelve months immediately preceding the commencement of the winding up, has —

(a)     concealed any part of the company's property to the value of ten thousand dollars or more or concealed any debt due to or from the company;

(b)     removed any part of the company's property to the value of ten thousand dollars or more;

(c)     concealed, destroyed, mutilated or falsified any documents affecting or relating to the company's property or affairs;

(d)     made any false entry in any documents affecting or relating to the company's property or affairs;

(e)     parted with, altered or made any omission in any document affecting or relating to the company's property or affairs; or



(f) pawned, pledged or disposed of any property of the company which has been obtained on credit and has not been paid for (unless the pawning, pledging or disposal was in the ordinary way of the company's business),

with intent to defraud the company's creditors or contributories commits an offence and is liable on conviction to a fine and to imprisonment for five years.

(2) In this section —

"**officer**" includes a shadow director.

## Transactions in fraud of creditors

**135**. Where a company is ordered to be wound up by the Court or passes a resolution for voluntary winding up, any officer, restructuring officer, controller or professional service provider of the company who —

(a) has made or caused to be made any gift or transfer of, or charge on, or has caused or connived at the levying of any execution against, the company's property; or

(b) has concealed or removed any part of the company's property,

with intent to defraud the company's creditors or contributories commits an offence and is liable on conviction to a fine and to imprisonment for five years.

## Misconduct in course of winding up

**136**. (1) Where a company is being wound up, whether by the Court or voluntarily, a person who is or was a director, officer, restructuring officer, controller or professional service provider of the company and who —

(a) does not to the best of that person's knowledge and belief fully and truly discover to the liquidator —

(i) all the company's property (except such part as has been disposed of in the ordinary way of the company's business);

(ii) the date on which and manner in which the company's property or any part thereof property was disposed of, if it was disposed of;

(iii) the persons to whom any property was transferred, if it was disposed of; or

(iv) the consideration paid for any property which was disposed of;

(b) does not deliver up to the liquidator or does not deliver up in accordance with the directions of the liquidator any of the company's property which is in that person's custody or under that person's control, and which that person is required by law to deliver up;

(c) does not deliver up to the liquidator or does not deliver up, in accordance with the directions of the liquidator, all documents in that person's custody



or under that person's control which belong to the company and which that person is required by law to deliver up;

(d)   knows or believes that a false debt has been proved by any person in the winding up and fails to inform the liquidator of such knowledge or belief as soon as practicable;

(e)   prevents the production of any document affecting or relating to the company's property or affairs; or

(f)   destroys, mutilates, alters or falsifies any books, papers or securities, or makes or is privy to the making of any false or fraudulent entry in any register, book of account or document belonging to the company,

with intent to defraud the company's creditors or contributories commits an offence and is liable on conviction to a fine of twenty five thousand dollars or to imprisonment for a term of five years, or to both.

(2)   In this section —

"**officer**" includes a shadow director.

## Material omissions from statement relating to company's affairs

137. (1)   Where a company is being wound up, whether by the Court or voluntarily, a person who is or was a director, an officer, a manager, restructuring officer, controller or a professional service provider of the company, commits an offence if that person makes any material omission in any statement relating to the company's affairs, with intent to defraud the company's creditors or contributories.

(2)   A person who commits an offence under subsection (1) is liable on conviction to a fine of twenty-five thousand dollars or to imprisonment for a term of five years, or to both.

(3)   In this section —

"**officer**" includes a shadow director.

# General provisions

## Getting in the company's property

138. (1)   Where any person has in that person's possession any property or documents to which the company appears to be entitled, the Court may require that person to pay, transfer or deliver such property or documents to the official liquidator.

(2)   Where the official liquidator seizes or disposes of any property which that person reasonably believed belonged to the company, that person shall not be personally liable for any loss or damage caused to its true owner except in so far as such loss or damage is caused by that person's own negligence.



Case 1:23-cv-11195-JSR Doc #: 79-7 Filed: 05/08/26 Entered: 05/08/26 23:42:39 Desc
Exhibit 69 - Part 27 Page 25 of 165

## Provable debts

**139**. (1)  All debts payable on a contingency and all claims against the company whether present or future, certain or contingent, ascertained or sounding only in damages, shall be admissible to proof against the company and the official liquidator shall make a just estimate so far as is possible of the value of all such debts or claims as may be subject to any contingency or sound only in damages or which for some other reason do not bear a certain value.

(2)  Foreign taxes, fines and penalties shall be admissible to proof against the company only if and to the extent that a judgment in respect of the same would be enforceable against the company pursuant to the *Foreign Judgments Reciprocal Enforcement Act (1996 Revision)* or any laws permitting the enforcement of foreign taxes, fines and penalties.

## Distribution of the company's property

**140**. (1)  Subject to subsection (2), the property of the company shall be applied in satisfaction of its liabilities *pari passu* and subject thereto shall be distributed amongst the members according to their rights and interests in the company.

(2)  The collection in and application of the property of the company referred to in subsection (1) is without prejudice to and after taking into account and giving effect to the rights of preferred and secured creditors and to any agreement between the company and any creditors that the claims of such creditors shall be subordinated or otherwise deferred to the claims of any other creditors and to any contractual rights of set-off or netting of claims between the company and any person or persons (including without limitation any bilateral or any multi-lateral set-off or netting arrangements between the company and any person or persons) and subject to any agreement between the company and any person or persons to waive or limit the same.

(3)  In the absence of any contractual right of set-off or non set-off, an account shall be taken of what is due from each party to the other in respect of their mutual dealings, and the sums due from one party shall be set-off against the sums due from the other.

(4)  Sums due from the company to another party shall not be included in the account taken under subsection (3) if that other party had notice at the time they became due that a petition for the winding up of the company was pending.

(5)  Only the balance, if any, of the account taken under subsection (3) shall be provable in the liquidation or, as the case may be, payable to the liquidator as part of the assets.

## Preferential debts

**141**. (1)  In the case of an insolvent company, the debts described in Schedule 2 shall be paid in priority to all other debts.



(2)  The preferential debts shall —

    (a)  rank equally amongst themselves and be paid in full unless the assets available, after having exercised any rights of set-off or netting of claims, are insufficient to meet them in which case they shall abate in equal proportions; and

    (b)  so far as the assets of the company available for payment of general creditors are insufficient to meet them, have priority over the claims of holders of debentures secured by, or holders of any floating charge created by the company, and be paid accordingly out of any property comprised in or subject to that charge.

## Secured creditors

142. (1)  Notwithstanding that a winding up order has been made, a creditor who has security over the whole or part of the assets of a company is entitled to enforce that person's security without the leave of the Court and without reference to the liquidator.

(2)  Where the liquidator sells assets on behalf of a secured creditor, that person is entitled to deduct from the proceeds of sale a sum by way of remuneration equivalent to that which is or would be payable under section 109.

## Preferential charge on goods distrained

143. In the event of a landlord or other person entitled to receive rent distraining or having distrained on any goods or effects of the company within three months preceding the date of the winding up order, the debts to which priority is given by section 141 shall be a first charge on the goods or effects so distrained on or the proceeds of sale thereof.

## Effect of execution or attachment

144. (1)  Where a creditor has issued execution against the goods or land of a company or has attached any debt due to it, and the company is subsequently wound up, that person is not entitled to retain the benefit of the execution or attachment against the liquidator unless that person has completed the execution or attachment before the commencement of the winding up.

(2)  Notwithstanding subsection (1) —

    (a)  where a creditor has had notice of a meeting having been called at which a resolution for voluntary winding up is to be proposed, the date on which that person had notice is substituted for the purpose of subsection (1) for the date of commencement of the winding up;

    (b)  a person who purchases in good faith under a sale by the bailiff any goods of a company on which execution has been levied in all cases acquires a good title to them against the liquidator; and



    (c)    the rights conferred by subsection (1) on the liquidator may be set aside by the Court in favour of the creditor to such extent and subject to such terms as the Court thinks fit.

  (3)    For the purposes of this Act —

    (a)    an execution against goods is completed by seizure and sale;

    (b)    an execution against securities is completed upon making a charging order absolute;

    (c)    an attachment of a debt is completed by receipt of the debt; and

    (d)    an execution against land is completed by the registration of a charging order.

## Voidable preference

**145**. (1)    Every conveyance or transfer of property, or charge thereon, and every payment obligation and judicial proceeding, made, incurred, taken or suffered by any company in favour of any creditor at a time when the company is unable to pay its debts within the meaning of section 93 with a view to giving such creditor a preference over the other creditors shall be voidable upon the application of the company's liquidator if made, incurred, taken or suffered within six months immediately preceding the commencement of a liquidation.

  (2)    A payment made as aforesaid to a related party of the company shall be deemed to have been made with a view to giving such creditor a preference.

  (3)    For the purposes of this section a creditor shall be treated as a "related party" if it has the ability to control the company or exercise significant influence over the company in making financial and operating decisions.

## Avoidance of dispositions made at an undervalue

**146**. (1)    In this section and section 147 —

    (a)    "**disposition**" has the meaning ascribed in Part VI of the *Trusts Act (2021 Revision)*;

    (b)    "**intent to defraud**" means an intention to wilfully defeat an obligation owed to a creditor;

    (c)    "**obligation**" means an obligation or liability (which includes a contingent liability) which existed on or prior to the date of the relevant disposition;

    (d)    "**transferee**" means the person to whom a relevant disposition is made and shall include any successor in title; and

    (e)    "**undervalue**" in relation to a disposition of a company's property means —

        (i)    the provision of no consideration for the disposition; or



Case 19-34054-sgj11 Doc 4531-7 Filed 05/08/26 Entered 05/08/26 23:42:35 Desc
Exhibit 69-Part 27 Page 528 of 651

(ii) a consideration for the disposition the value of which in money or monies worth is significantly less than the value of the property which is the subject of the disposition.

(2) Every disposition of property made at an undervalue by or on behalf of a company with intent to defraud its creditors shall be voidable at the instance of its official liquidator.

(3) The burden of establishing an intent to defraud for the purposes of this section shall be upon the official liquidator.

(4) No action or proceedings shall be commenced by an official liquidator under this section more than six years after the date of the relevant disposition.

(5) In the event that any disposition is set aside under this section, then if the Court is satisfied that the transferee has not acted in bad faith —

(a) the transferee shall have a first and paramount charge over the property, the subject of the disposition, of an amount equal to the entire costs properly incurred by the transferee in the defence of the action or proceedings; and

(b) the relevant disposition shall be set aside subject to the proper fees, costs, pre-existing rights, claims and interests of the transferee (and of any predecessor transferee who has not acted in bad faith).

## Fraudulent trading

147. (1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose the liquidator may apply to the Court for a declaration under this section.

(2) The Court may declare that any persons who were knowingly parties to the carrying on of the business in the manner mentioned in subsection (1) are liable to make such contributions, if any, to the company's assets as the Court thinks proper.

## Supply of utilities

148. (1) If a request is made by or with the concurrence of the liquidator (including a provisional liquidator) or a restructuring officer for the giving, after the effective date, of any of the supplies mentioned in subsection (2), the supplier —

(a) may make it a condition of the giving of the supply that the liquidator (including a provisional liquidator) or restructuring officer personally guarantees the payment of any charges in respect of the supply; but

(b) shall not make it a condition of the giving of the supply, or do anything which has the effect of making it a condition of the giving of the supply,



Case 1:19-34054-sgj11 Doc 46581-79 Filed 05/06/26 Entered 05/06/26 23:42:39 Desc Exhibit 69-Part 27 Page 29 of 165

that any outstanding charges in respect of a supply given to the company before the effective date are paid.

(2) The supplies referred to in subsection (1) are —

    (a) a supply of electricity;

    (b) a supply of water; and

    (c) a supply of telecommunication services.

(3) In this section —

"**effective date**" means —

    (a) the date on which the provisional liquidator was appointed;

    (b) the date on which the winding up order was made; or

    (c) the date on which the restructuring officer was appointed.

## Interest on debts

**149**. (1) Subject to subsection (5), in a winding up interest is payable in accordance with this section on any debt proved in the winding up, including so much of any such debt as represents interest on the remainder of the debt.

(2) Any surplus remaining after the payment of the debts proved in a winding up shall, before being applied for any other purpose, be applied in paying interest on those debts in respect of the period during which they have been outstanding since the company went into liquidation.

(3) All interest under this section ranks equally, whether or not the debts on which it is payable ranked equally.

(4) The rate of interest payable under this section in respect of any debt is the greater of —

    (a) the rate applicable to the currency of the liquidation prescribed from time to time by the *Judgment Debts (Rates of Interest) Rules (2021 Revision)* made under section 34 of the *Judicature Act (2021 Revision)*; and

    (b) the rate applicable to that debt apart from the winding up.

(5) No interest shall be payable if the liquidation is concluded in less than six months or the accrued amount is less than five hundred dollars.

## Currency of the liquidation

**150**. (1) In the case of a solvent liquidation, a company's creditors are entitled to receive payment of their debts in the currency of the obligation.

(2) In the case of an insolvent liquidation, a company's liabilities shall be translated into the functional currency of the company at the exchange rates ruling —

    (a) on the date of the commencement of the voluntary liquidation; or

    (b) on the day upon which the winding up order is made.

 

(3)  For the purposes of this section the functional currency of a company is the currency of the primary economic environment in which it operated as at the commencement of the liquidation.

# Dissolution of a Company

## Dissolution following voluntary winding up

151. (1)  The Registrar shall, within three days of receiving a liquidator's return under section 127(3), register such return.

(2)  Upon the expiration of three months from the registration of the return the company is deemed to be dissolved.

(3)  Notwithstanding subsection (2), the Court may, on the application of the liquidator or any other person who appears to the Court to be interested, make an order deferring the date at which the dissolution of the company is to take effect to such date as the Court thinks fit.

(4)  An application under this section shall not be made after the company is deemed to have been dissolved.

(5)  An order of the Court made under this section shall be registered with the Registrar within seven days of the date upon which it was made.

## Dissolution following winding up by the Court

152. (1)  When the affairs of the company have been completely wound up, the Court shall make an order that the company be dissolved from the date of that order or such other date as the Court thinks fit, and the company shall be dissolved accordingly.

(2)  The effect of an order for dissolution in respect of a segregated portfolio is that its creditors' claims against the company shall be extinguished, notwithstanding that the company has not been liquidated and dissolved.

(3)  The official liquidator shall file the order for dissolution with the Registrar.

(4)  An official liquidator who fails to file the order for dissolution with the Registrar within fourteen days from the date, upon which it was perfected, commits an offence and is liable on summary conviction to a penalty of ten dollars for every day during which that person is so in default.

## Unclaimed dividends and undistributed assets

153. (1)  Any unclaimed dividends or undistributed assets in the possession or control of the liquidator or former liquidator of a company shall be held by that person as trustee upon trust for the benefit of the contributories or creditors to whom such funds are owed.



(2)  At the end of one year after the dissolution of the company, the former liquidator shall transfer any funds or other assets held on trust by that person to the Minister charged with responsibility for Finance who shall manage them in accordance with Part VIII of the *Public Management and Finance Act (2020 Revision)*.

## Insolvency rules and regulations

### Insolvency Rules Committee

154. (1)  There shall be established an Insolvency Rules Committee comprising —

(a)  the Chief Justice or other judge nominated by the Chief Justice in that person's place who shall be chairperson;

(b)  the Attorney General or that person's nominee;

(c)  two attorneys-at-law appointed by the Chief Justice on the recommendation of the Cayman Islands Legal Practitioners Association;

(d)  a qualified insolvency practitioner appointed by the Chief Justice upon the recommendation of the Cayman Islands Institute of Professional Accountants;

(e)  a person appointed by the Chief Justice who, in that person's opinion, demonstrates a wide knowledge of law, finance, financial regulation or insolvency practice; and

(f)  a qualified insolvency practitioner appointed by the Chief Justice on the recommendation of the Recovery and Insolvency Specialists Association.

(2)  The quorum of the Insolvency Rules Committee shall be the chairperson and three other members of the Committee; and the chairperson shall have a casting vote.

### Powers of the Insolvency Rules Committee

155. (1)  The Insolvency Rules Committee shall have power —

(a)  to make rules and prescribe forms for the purpose of giving effect to Parts 4, 5 and 16;

(b)  to prescribe court fees to be paid in connection with —

(i)  applications under Part 4;

(ii)  winding up proceedings under Part 5; and

(iii)  applications under Part 16; and

(c)  to make rules for the purpose of specifying —

(i)  the qualifications which must be held by a person appointed to the office of official liquidator;



>      (ii)   persons who are disqualified from holding office as official liquidator either generally or in relation to a particular company which is not in liquidation before the court;
>
>      (iii)   the nature and scope of professional indemnity insurance, if any, required to be held by persons appointed to the office of official liquidators; and
>
>      (iv)   the nature and scope of security bonds, if any, required to be posted by persons appointed to the office of official liquidator.

(2)    The Insolvency Rules Committee, after consultation with the Authority and with any organisation representing insolvency practitioners in the Islands, shall make rules prescribing the rates of fees which may be charged by an official liquidator.

# PART 6 - Removal of Defunct Companies

## Company not operating may be struck off register

156. (1)    Where the Registrar has reasonable cause to believe that a company is not carrying on business or is not in operation, that person may strike the company off the register and the company shall thereupon be dissolved.

(2)    A request on behalf of the company to strike the company off the register shall be accompanied by a fee of seventy-five dollars.

## Striking off for failure to pay fine

156A.Where an administrative fine imposed in accordance with section 26 of the *Beneficial Ownership Transparency Act, 2023 [Act 13 of 2023]* remains unpaid for ninety days after imposition of the fine, the Registrar may strike the company off the register and the company shall thereupon be dissolved.

## Company being wound up may be struck off register for want of liquidator, etc.

157.    Where a company is being wound up, and the Registrar has reasonable cause to believe either that no liquidator is acting, or that the affairs of the company are fully wound up, that person may strike the company off the register and the company shall thereupon be dissolved.

## Registrar to publish fact of company being struck off register

158.    The Registrar shall immediately publish a Government Notice to the effect that the company in question has been struck off the register, the date on which it has been struck off and the reason therefor. Such notice shall be gazetted.



## Vesting of property

**162**. Any property vested in or belonging to any company struck off the register under this Act shall thereupon vest in the Minister charged with responsibility for Finance and shall be subject to disposition by the Cabinet, or to retention for the benefit of the Islands.

# PART 7 - Exempted Companies

## What companies may apply to be registered as exempted companies

**163**. Any proposed company applying for registration under this Act, the objects of which are to be carried out mainly outside the Islands or pursuant to a licence to carry on business in the Islands to which section 174 refers, may apply to be registered as an exempted company.

## Registration of exempted companies

**164**. On being satisfied that section 165 has been complied with, the Registrar shall register the company as an exempted company.

## Declaration by proposed company

**165**. A proposed exempted company applying for registration as an exempted company shall submit to the Registrar a declaration signed by a subscriber to the effect that the operation of the proposed exempted company will be conducted mainly outside the Islands or pursuant to a licence to carry on business in the Islands to which section 174 refers.

## Shares shall be non-negotiable

**166**. The shares of an exempted company shall be non-negotiable and shall be transferred only on the books of the company.

## *Repealed*

**167**. **Repealed** by section 3 of the *Companies (Amendment) Act, 2016 [Law 3 of 2016]*.

## Annual return

**168**. In January of each year after the year of its registration each exempted company that does not hold a licence to carry on business in the Islands to which section 174 refers shall furnish to the Registrar a return which shall be in the form of a declaration that —

    (a)    since the previous return or since registration, as the case may be, there has been no alteration in the memorandum of association, other than an alteration in the name of the company effected in accordance with section 31 or an alteration already reported in accordance with section 10;



Case 1:23-cv-11195-SHS-OTW Document 207 Filed 05/07/25 Page 34 of 165
Exhibit 69 - Part 7 Page 34 of 165

(aa) states the nature of the business;

(b) the operations of the exempted company since the last return or since registration of the exempted company, as the case may be, have been mainly outside the Islands; and

(c) section 174 has been and is being complied with.

## Annual fee

169. (1) Every exempted company shall, in January of each year after the year of its registration, pay to the revenues of the Islands the annual fee specified in Part 4 of Schedule 5.

(2) Each such annual fee referred to in subsection (1) shall be tendered with the return required by section 168.

(3) An exempted company which defaults in submitting its annual return under section 168 or the fee specified in subsection (1) shall incur a penalty of —

(a) 33.33% of the annual fee specified in subsection (1) if the return is submitted or the fee and penalty are paid between the 1st April and the 30th June;

(b) 66.67% of the annual fee specified in subsection (1) if the return is submitted or the fee and penalty are paid between the 1st July and the 30th September; and

(c) 100% of the annual fee specified in subsection (1) if the return is submitted or the fee and penalty are paid between the 1st October and the 31st December.

## Failure to comply with section 168 or 169

170. Any exempted company which fails to comply with section 168 or 169 shall be deemed to be a defunct company and shall thereupon be dealt with as such under Part 6 but without prejudice to its being registered again as though it were being registered for the first time.

## Registrar to give notice

171. Before taking action under section 170, the Registrar shall give one month's notice to the defaulting company and, if the default is made good before the expiry of such notice, sections 168 and 169 shall be deemed to have been complied with.

## False statement in declaration

172. If any declaration under section 165 or 168 contains any wilful false statement or misrepresentation the company shall, on proof thereof, be liable to be immediately dissolved and removed from the register and in such case any fee tendered under section 26(4) or 169 shall be forfeited to the Minister charged with responsibility for Finance for credit to the general revenue.

 

## Penalty for false declaration

**173**. Every director and officer of a company who knowingly makes or permits the making of any such declaration knowing it to be false commits an offence and is liable on summary conviction to a fine of five thousand dollars and to imprisonment for a term of one year, or to both.

## Prohibited enterprises

**174**. (1) An exempted company shall not carry on a trade or business in the Islands with any person, except in furtherance of the business of the exempted company carried on outside of the Islands, unless that exempted company holds a licence to carry on business in the Islands under any applicable law.

(2) Nothing in this section shall be construed so as to prevent an exempted company effecting and concluding contracts in the Islands and exercising in the Islands all its powers necessary for the carrying on of its business outside the Islands.

(3) An exempted company that holds a licence to carry on business in the Islands under any applicable law, shall from the date of issue of such licence, continue for all purposes as if incorporated and registered as an ordinary resident company under and subject to this Act the provisions of which shall apply to the company and to persons and matters associated with the company as if the company were incorporated and registered under this Act except as provided in section 7(1)(a), 8(1) and (4), 13(1)(a), 26(3), 30(3), 31(1), 41(2), 42, 50(2), 166, 169, 175 or 252(2).

## Prohibited sale of securities

**175**. An exempted company that is not listed on the Cayman Islands Stock Exchange is prohibited from making any invitation to the public in the Islands to subscribe for any of its securities.

## Penalty for carrying on business contrary to this Part

**176**. If an exempted company carries on any business in the Islands in contravention of this Part then, without prejudice to any other proceedings that may be taken in respect of the contravention, the exempted company and every director, provisional director and officer of the exempted company who is responsible for the contravention commits an offence and is liable on summary conviction to a fine of one hundred dollars for every day during which the contravention occurs or continues, and the exempted company shall be liable to be immediately dissolved and removed from the register.



## Electronic business by exempted companies

**177**. Nothing in this Act shall prohibit an exempted company from offering, by electronic means, and subsequently supplying, real or personal property, services or information from a place of business in the Islands or through an internet service provider or other electronic service provider located in the Islands.

# PART 8 - Exempted Limited Duration Companies

## Exempted company may apply to be registered as an exempted limited duration company

**178**. (1)  An exempted company may, at any time, apply to the Registrar to be registered as an exempted limited duration company.

   (2)  An application may also be made under subsection (1) at the same time as an application is made —

   (a)  to register a proposed company as an exempted company;

   (b)  to re-register an ordinary non-resident company as an exempted company; or

   (c)  to register a company by way of continuation as an exempted company.

   (3)  An application under subsection (1) shall, in addition to any other fee that may be payable, be accompanied by an application fee of two hundred dollars.

## Registration as an exempted limited duration company

**179**. (1)  The Registrar shall register as an exempted limited duration company an exempted company that has made application under section 178 if —

   (a)  the company has at least two subscribers or two members;

   (b)  where the company was not already registered as a company prior to the application —

   (i)  the memorandum of association of the company limits the duration of the company to a period of thirty years or less; and

   (ii)  the name of the company includes at its end "Limited Duration Company" or "LDC"; and

   (c)  where the company was already registered as a company prior to the application —

   (i)  the Registrar has been supplied, where the duration of the company is not already limited to a period of thirty years or less with a certified copy of a special resolution of the company altering its memorandum of association to limit the duration of the company to a period of thirty years or less; and



# SCHEDULE 3

## Powers of Liquidators

*(section 110)*

### PART 1

### Powers exercisable with sanction

1.  Power to bring or defend any action or other legal proceeding in the name and on behalf of the company.

2.  Power to carry on the business of the company so far as may be necessary for its beneficial winding up.

3.  Power to dispose of any property of the company to a person who is or was related to the company.

4.  Power to pay any class of creditors in full.

5.  Power to make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the company or for which the company may be rendered liable.

6.  Power to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the company and a contributory or alleged contributory or other debtor or person apprehending liability to the company.

7.  Power to deal with all questions in any way relating to or affecting the assets or the winding up of the company, to take any security for the discharge of any such call, debt, liability or claim and to give a complete discharge in respect of it.

8.  The power to sell any of the company's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels.

9.  The power to raise or borrow money and grant securities therefor over the property of the company.

10. The power to engage staff (whether or not as employees of the company) to assist that person in the performance of that person's functions.

11. The power to engage attorneys and other professionally qualified persons to assist that person in the performance of that person's functions.



Revised as at 1st January, 2025                                          Page 181

Case 1:19-34065-seg11-1076-4509-7 Doc File 0025/08/267/Entered 025/05/226 123 23 39   Desc
Exhibit G9-Part27   Page 538 of 165

## *PART 2*

## Powers exercisable without sanction

1.  The power to take possession of, collect and get in the property of the company and for that purpose to take all such proceedings as that person considers necessary.

2.  The power to do all acts and execute, in the name and on behalf of the company, all deeds, receipts and other documents and for that purpose to use, when necessary, the company seal.

3.  The power to prove, rank and claim in the bankruptcy, insolvency or sequestration of any contributory for any balance against that person's estate, and to receive dividends in the bankruptcy, insolvency or sequestration in respect of that balance, as a separate debt due from the bankrupt or insolvent and rateably with the other separate creditors.

4.  The power to draw, accept, make and indorse any bill of exchange or promissory note in the name and on behalf of the company, with the same effect with the respect of the company's liability as if the bill or note had been drawn, accepted, made or indorsed by or on behalf of the company in the course of its business.

5.  The power to promote a scheme of arrangement pursuant to section 86.

6.  The power to convene meetings of creditors and contributories.

7.  The power to do all other things incidental to the exercise of that person's powers.



# EXHIBIT 79

**CAYMAN ISLANDS**



**Companies Act**

**(2023 Revision)**

# COMPANIES WINDING UP RULES

**(2023 Consolidation)**

**Supplement No. 4 published with Legislation Gazette No. 1 dated 12th January, 2023.**

## PUBLISHING DETAILS

The Companies Winding Up Rules, 2018 made by the Insolvency Rules Committee on 27th November, 2017 as amended by the Citation of Acts of Parliament Act, 2020 [Act 56 of 2020].

Consolidated with —
    Companies Winding Up (Amendment) Rules 2022-29th July, 2022.

Consolidated this 31st day of December, 2022.



6.　　Removal of Voluntary Liquidator (O.13, r.6) ........................................82
7.　　Voluntary Liquidator's Reporting Obligations (O.13, r.7) .......................83
8.　　Form and Content of Reports and Accounts (O.13, r.8) ........................83
9.　　Voluntary Liquidator's Remuneration (O.13, r.9) ..................................84
10.　Applications to Court (O.13, r.10) .........................................................84
11.　General Meetings of the Company (O.13, r.11) .....................................86
12.　Voluntary Liquidator's Final Return (O.13, r.12) ....................................86

## ORDER 14　　　　　　　　　　　　　　　　　　　　　　　　　　　88

### DIRECTOR'S DECLARATION OF SOLVENCY　　　　　　　　　　88
1.　　Form and Content of Declaration of Solvency (O.14, r.1) .....................88
2.　　Delivery and Registration of Declaration of Solvency (O.14, r.2) ..........88

## ORDER 15　　　　　　　　　　　　　　　　　　　　　　　　　　　89

### APPLICATION FOR SUPERVISION ORDER　　　　　　　　　　89
1.　　Introduction (O.15, r.1) ........................................................................89
2.　　Application under section 124 (O.15, r.2) .............................................89
3.　　Application under section 131 (O.15, r.3) .............................................90
4.　　Supporting Affidavits (O.15, r.4) ..........................................................90
5.　　Hearing of section 124 Petition (O.15, r.5) ...........................................91
6.　　Release of Voluntary Liquidator (O.15, r.6) ..........................................92
7.　　Delivery of Company's Books and Records (O.15, r.7) ..........................92
8.　　Supervision Order (O.15, r.8) ..............................................................92

## ORDER 16　　　　　　　　　　　　　　　　　　　　　　　　　　　93

### PROOF OF DEBTS IN OFFICIAL LIQUIDATION　　　　　　　　93
### PART I: PROCEDURE FOR PROVING　　　　　　　　　　　　　93
1.　　Introduction (O.16, r.1) ........................................................................93
2.　　Form and Content of Proof (O.16, r.2) ..................................................93
3.　　Supply of proof of debt forms (O.16, r.3) ..............................................94
4.　　Cost of proving (O.16, r.4) ...................................................................94
5.　　Withdrawal and variation of proof (O.16, r.5) ........................................94
6.　　Admission and rejection of proof (O.16, r.6) .........................................94
7.　　Admission without proof of debt (O.16, r.7) ..........................................95
8.　　Inspection of Proofs of Debts (O. 16, r. 8) ............................................95
### PART II: QUANTIFICATION OF CLAIM　　　　　　　　　　　　95
9.　　Enforcement of Subordination, Set-Off (or Non Set-Off) and Netting Agreements (O.16, r.9) ....................................................................................95
10.　Mutual credit and set-off (O.16, r.10) ...................................................96
11.　Pre-liquidation Interest on Debts (O.16, r.11) .......................................96
12.　Post-liquidation Interest on Debts (O.16, r.12) ......................................96
13.　Determination of the currency of the liquidation (O.16, r.13) .................97
14.　Payments of a periodical nature (O.16, r.14) .........................................97
15.　Debts payable at a future date (O.16, r.15) ..........................................98
16.　Contingent claims (O.16, r.16) .............................................................98
### PART III: APPEAL AGAINST REJECTION OF PROOF　　　　　98
17.　Introduction (O.16, r.17) .......................................................................98
18.　Application to Court (O.16, r.18) ...........................................................99
19.　[No order] (O.16, r.19) .........................................................................99



Case 19-34054-sgj11-15-1 Doc 3803-79 Filed 05/08/26 Entered 05/08/26 23:42:39 Desc
Exhibit 69-Part 27 Page 43 of 165

# ORDER 15

## APPLICATION FOR SUPERVISION ORDER

### Introduction (O.15, r.1)

**1.** (1) An application for a supervision order must be made by a company's voluntary liquidator in accordance with section 124 of the Law if its directors fail to make and deliver their declaration of solvency to the voluntary liquidator within 28 days of the commencement of the liquidation.

(2) Notwithstanding that a declaration of solvency has been duly made in accordance with section 124 of the Law, the voluntary liquidator or any contributory or any creditor may apply to the Court for a supervision order on the grounds contained in section 131 of the Law.

### Application under section 124 (O.15, r.2)

**2.** (1) The requirement to apply for a supervision order under section 124 of the Law shall apply only if the voluntary liquidation was commenced on or after 1 March 2009.

(2) An application for a supervision order under section 124 shall be made by petition.

(3) A petition under this Rule shall contain —

(a) particulars of the company's incorporation;

(b) particulars of the method by which the company was put into voluntary liquidation;

(c) particulars of the persons who are or were directors of the company on the date on which its voluntary liquidation commenced;

(d) a statement that the voluntary liquidator did not receive, within 28 days of the commencement of the liquidation, a declaration of solvency in the prescribed form signed by all of the company's directors; and

(e) if the voluntary liquidator is a qualified insolvency practitioner, a statement that the voluntary liquidator consents to being appointed as official liquidator; or

(f) if the voluntary liquidator is not a qualified insolvency practitioner or is unable to comply with the independence requirements of the Regulations or is unwilling to be appointed as official liquidator, the name and address of a qualified insolvency practitioner nominated for appointment as official liquidator.



(4) Every petition under this Rule must be presented within 35 days of the date upon which the liquidation is deemed to have commenced under section 117(1) of the Law.

(5) Unless the voluntary liquidator is a qualified insolvency practitioner who is willing and properly able to accept appointment as official liquidator, the voluntary liquidator must give notice of the petition to the company's members by whatever means is provided in its articles of association for giving notice of a general meeting of the company.

## Application under section 131 (O.15, r.3)

3. (1) An application by a voluntary liquidator, contributory or creditor for a supervision order to be made under section 131 shall be made by petition.

(2) A petition under this Rule shall contain full particulars of the grounds upon which it is presented.

(3) Upon the presentation of a petition under this Rule, the petitioner must at the same time issue a summons for directions in respect of the matters contained in this Rule.

(4) Upon hearing the summons for directions, the Court shall either —

    (a) make a supervision order, if the Court is satisfied that the company's members consent or do not object to an order being made; or

    (b) fix a hearing date and make such directions as the Court thinks appropriate in respect of the following matters —

        (i) whether the petition should be served and, if so, upon whom it should be served;

        (ii) whether the petition should be advertised and, if so, in what manner it should be advertised;

        (iii) the manner in which further evidence is to be given; and

        (iv) such other procedural matters as the Court thinks fit.

(5) A petition under this Rule may be presented at any time.

## Supporting Affidavits (O.15, r.4)

4. (1) The petition shall be verified by an affidavit that the statements in the petition are true, or are true to the best of the deponent's knowledge, information and belief.

(2) An affidavit verifying a petition under Rule 2 shall be sworn by the voluntary liquidator personally.

(3) An affidavit verifying a petition under Rule 3 shall be sworn by —

    (a) the petitioner; or



    (b)   the voluntary liquidator; or

    (c)   any director, officer or agent of the petitioner who has been concerned in and has personal knowledge of the matters giving rise to the petition.

(4)   Unless the voluntary liquidator is a qualified insolvency practitioner who is willing and properly able to accept appointment as official liquidator, a petition under Rule 2 or Rule 3 must also be supported by an affidavit sworn by the person or persons nominated for appointment as official liquidator and containing the information required by Order 3, rule 4.

## Hearing of section 124 Petition (O.15, r.5)

**5**.   (1)   If the voluntary liquidator is a qualified insolvency practitioner who has sworn an affidavit verifying that the voluntary liquidator is willing and properly able to accept appointment as official liquidator, a Judge may make a supervision order under section 124 of the Law without the need for any hearing if the Judge is satisfied that —

    (a)   notice of the petition has been given to the company's creditors and, if it appears to the voluntary liquidator that the company may in fact be solvent, to its shareholders; and

    (b)   there is no reason to believe that any creditor or, if applicable, any shareholder objects to the appointment of the voluntary liquidator as official liquidator.

(2)   In any other case, the voluntary liquidator shall apply to fix a date for hearing the petition in open court and –

    (a)   give notice of the hearing of the petition to the company's creditors and, if applicable, to its shareholders in whatever manner is likely to bring it to their attention; and

    (b)   advertise the hearing of the petition once in a newspaper having a circulation within the Islands and, if the company is carrying on business outside the Islands, once in a newspaper having a circulation in a country in which the company appears most likely to have creditors, in which case the advertisement shall be published in the official language of such country.

(3)   An advertisement under this Rule shall be in CWR Form No. 22.

(4)   Any member or creditor of the company may appear on the petition and be heard upon the question of who should be appointed as official liquidator provided that that member or creditor has given notice of their intention to do so and has complied with the requirements of Order 3, rule 8(3).



## Release of Voluntary Liquidator (O.15, r.6)

**6.** (1) Unless a voluntary liquidator is appointed as official liquidator, the voluntary liquidator shall cease to hold office automatically upon the making of a supervision order.

(2) When a voluntary liquidator ceases to hold office in accordance with this Rule, the voluntary liquidator shall prepare a final report and accounts for the period from the commencement of the voluntary liquidation until the date of the supervision order.

(3) The voluntary liquidator shall deliver the voluntary liquidator's final report and accounts to the official liquidator within 28 days of the date upon which the supervision order was made and the official liquidator shall —

    (a) file the report and accounts in Court; and

    (b) publish the report and accounts to the company's members and creditors in such manner as the official liquidator thinks fit.

(4) Having delivered the voluntary liquidator's final report and accounts, the voluntary liquidator may apply (but shall not be obliged to apply) to the Court for an order that the voluntary liquidator's accounts (including the amount of the voluntary liquidator's remuneration) be approved and that the voluntary liquidator be released from the performance of any further duties.

## Delivery of Company's Books and Records (O.15, r.7)

**7.** (1) A voluntary liquidator who ceases to hold office upon the making of a supervision order shall forthwith deliver to the voluntary liquidator's successor the company's books and a copy of the voluntary liquidator's liquidation files (maintained in accordance with Order 26, rule 2).

(2) The official liquidator shall allow the voluntary liquidator to have unrestricted access to the company's books and records for the purpose of preparing the voluntary liquidator's report in compliance with Order 13, rule 8.

## Supervision Order (O.15, r.8)

**8.** (1) A supervision order shall be in CWR Form No 23.

(2) The requirements of Order 3, rules 22 and 23 shall apply to supervision orders as they apply to winding up orders.

(3) On the making of a supervision order all the powers of the directors cease, save that directors retain residual powers to allow them to initiate an appeal against the supervision order.



# EXHIBIT 80

General Evidence Confidence

**Charitable DAF HoldCo, Ltd (In Official Liquidation)**
**(the "Company")**
**Registration No: 263805**
**Grand Court Cause No: FSD 116 of 2025 (JAJ)**

---

**Written resolutions of the Joint Official Liquidators of the Company**

---

**WHEREAS**

- The Company is currently in official liquidation and under the control of the Joint Official Liquidators, Sandipan Bhowmik and Margot MacInnis, both of Grant Thornton Specialist Services (Cayman) Limited (the "**JOLs**") having been appointed by the Grand Court of the Cayman Islands on 6 May 2025;

- The Company's registered office is presently situated at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, George Town, Grand Cayman KY1-9010, Cayman Islands; and

- The JOLs consider it in the best interests of the liquidation to transfer the registered office of the Company to HSM Corporate Services Ltd, 68 Fort Street, George Town, PO Box 31726, Grand Cayman KY1-1207, Cayman Islands.

**IT IS HEREBY RESOLVED THAT:**

1. The registered office of the Company be transferred from Campbells Corporate Services Limited to HSM Corporate Services Ltd, with effect from 1 July 2025.

2. The JOLs be and are hereby authorised to take all necessary steps and execute all documents required to give effect to this resolution, including instructing HSM Corporate Services Ltd to attend to the necessary filings with the Registrar of Companies in relation to this matter.

Dated this 1st day of July 2025.

Sandipan Bhowmik
Joint Official Liquidator

Margot MacInnis
Joint Official Liquidator

Grant Thornton Specialist Services (Cayman) Limited
2nd Floor, Century Yard, Cricket Square,
PO Box 1044, Grand Cayman, KY1-1102
Cayman Islands,
T: +1(345) 949 7100
E: cdaf.core@uk.gt.com



# EXHIBIT 81

# Campbells

Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

D +1 345 914 5898
T +1 345 949 2648
F +1 345 949 8613
E MGoodman@campbellslegal.com

campbellslegal.com

Our Ref: MGM/ROD/18955-44959
Your Ref:

CAYMAN | BVI | HONG KONG

**BY EMAIL**

Johnstone Law
Unit 9, Tropic Centre
18 Earth Close,
PO Box 926,
Grand Cayman, KY1-9006
Cayman Islands

30 May 2025

Dear Sirs

**Re: Charitable DAF Holdco, Ltd. (in Official Liquidation) (the "Company")**
**FSD Cause No. 116 of 2025 (JAJ)**

We refer to your letters dated 22 and 30 May 2025 sent on behalf of the joint official liquidators (the "**JOLs**") of the Company. Capitalised terms, unless otherwise defined, adopt the definitions applied in our letters dated 12 and 16 May 2025 ("**Our Letter**)" which were addressed to the JOLs.

As a preliminary point, we received a letter from Maples and Calder dated 28 May 2025 indicating that they have recently been instructed to act for the JOLs. We understood, based on your 22 May letter, that Johnstone Law were engaged as counsel by the JOLs (subject to sanction by the Court). In circumstances where two law firms are now corresponding with us, purportedly on behalf of the JOLs, it is incumbent on the JOLs to immediately clarify the situation.

Please confirm, by **no later than 5pm on Monday, 2 June 2025**, the respective roles of Maples and Calder and Johnstone Law.

<u>Attendance at the Directions Hearing</u>

1. Your letters repeatedly assert that our clients have *"no standing in the liquation"*. This is patently incorrect. The JOLs were specifically authorised to commence proceedings against our client as a direct result of the evidence and draft order prepared by your firm, on behalf of the petitioner, at

3203729-1

#3248355v4

1098

the supervision hearing.[1] This resulted in the Court making an Order which granted the JOLs authority to present a petition / seek the appointment of provisional liquidators to the Fund before they could possibly have had an opportunity to consider the relevant facts, or if such steps were necessary or appropriate. In the circumstances, it is obvious that, (i) your firm cannot objectively advise the JOLs, and (ii) the Fund, as a party named in the Appointment Order, have standing to address the Court on those provisions.

2. As Lord Millet observed on behalf of the Privy Council in *Deloitte and Touche AG v Johnson*,[2] "*Orders made by the court are coercive. Every order of the court affects the freedom of action of the party against whom it is made*". Accordingly, when determining whether an applicant has standing, the Court will first consider if it has jurisdiction to make the order, and secondly, in words of Lord Millet, whether the applicant has a "*legitimate interest in the relief which they seek*". Clearly, given the Fund is the party directly affected by the inclusion of these '*coercive*' provisions, they have standing to bring an application to have the offending paragraphs removed from the Appointment Order.

3. As regards the reporting 'Protocol' proposed in Our Letter and referred to at the Directions Hearing, your 22 May letter, despite seeking "*assurances regarding the assets under the control of*" our clients, did not address the Protocol, or take us up on our offer to "*discuss the terms of the Protocol in further detail*". We were therefore surprised to hear Mr Johnstone summarily dismiss the Protocol as "*paper thin*" at the Directions Hearing. For the avoidance of doubt, our clients' offer to enter into a reporting Protocol in respect of material transactions remains open (to which, see paragraph 12 below).

4. As to the balance of the entirely baseless criticisms in your 30 May letter, we have no obligation to, and no intention of, addressing these. The appropriate forum to address those issues was in front of Mr Justice Asif KC at the Directions Hearing. They warrant no further comment.

**JOLs' Powers**

5. As regards paragraph 3 of your 22 May letter, the powers conferred on liquidators by the CWR and the Act to collect in the books and records of a company in liquidation, including those in paragraph 1 of Part II to Schedule 3, are to be exercised by the liquidator in respect the "*property of the Company*" and / or "*the company's books and records*". As these statutory powers do not extend to distinct legal entities which are not the subject of a liquidation or other court order, it follows

---

[1] Your 22 May letter indicates that these provisions were granted by the Court "*on the basis of the evidence before it*", although it is notable that you have not provided the transcript of the petition hearing (insofar as it relates to paragraphs 6(a) and (b) of the Appointment Order) we requested in Our Letter, or confirmation as to whether these provisions were addressed in legal submissions.

[2] [1999] CILR 297

3203729-1

#3248355v4

2

1099

that our clients' documents are not the "*property of the Company*" and JOLs have no basis to claim that the Company is entitled to these documents.

6. Further, any duty which Messrs Patrick or Murphy owe to the JOLs in their capacity as former directors of the Company does not extend to the books and records of the CDM Entities which are separate entities over which the JOLs have no power or authority. It is plainly incorrect to suggest that directors of the CDM Entities can disregard their duties to those companies on the basis of your assertion that they fall within the definition of "relevant persons" under s.103 of the Act. Directors are bound by duties under common law and statute to protect the interests, confidentiality, and assets of the companies they serve. To comply with your baseless requests would place them in breach of those duties unless and until a court determines otherwise.

7. If the JOLs believe it necessary to investigate particular transactions involving the CDM Entities, the proper course is to seek the appropriate order from the Grand Court under section 103 or 138 of the Act. This approach ensures that the statutory process is respected and our clients' rights are protected.

**Response to Requests in your 22 May Letter**

8. In response to the requests listed at paragraph 5 of your 22 May letter, please see the Schedule to this letter which lists each of the CDM Entities we represent.

9. As to paragraphs 5(b), (c) and (d), for the reasons outlined above, your request for extensive documentation, including registers, asset holdings, and transaction histories, has no legal basis. Nor is there any basis on which the JOLs can demand "*firm undertakings*" from our clients not to deal with their assets.

10. We do not understand the reference to the purported transaction involving Hunter Mountain Trust in your 30 May letter. The bare assertion of a proprietary claim (which is made for the first time in this letter) is completely unsubstantiated and legally flawed. Needless to say, the JOLs have no interest, proprietary or otherwise, in any assets held by the Fund and our clients do not need to seek approval or consult with the JOLs regarding transactions in the ordinary course of business.

11. Notwithstanding, our clients have already offered to enter into a reporting Protocol in an effort to assuage any misplaced concerns the JOLs may have regarding the commercial activities of the Fund and the risk of dissipation of assets outside of the ordinary course of business. However, it is notable that your letters have eschewed this reasonable and constructive proposal in favour of misconceived and unsustainable requests of our clients.

3203729-1

#3248355v4

12. We now enclose a draft reporting Protocol whereby our clients offer to provide, *inter alia*, the following information to the JOLs:

   (a) a report listing all transactions undertaken by the Fund, or any of the CDM Entities, since 27 March 2025 which exceed US$5,000,000;

   (b) a 'business plan' explaining the ordinary day to day business of the Fund;

   (c) a monthly transactions report; and

   (d) advance notice of any single transaction exceeding US$5,000,000, or any series of transactions in an aggregate amount exceeding US$5,000,000 (save for transactions in the ordinary course of business involving or related to the renumeration of employees, officers and directors, agents, advisors and / or service providers).

13. For the avoidance of doubt, our clients reject the suggestion that they are under any duty to provide this information. However, in circumstances where the CDM Entities, including the Fund, are operating in the ordinary course to make investments on behalf of, and to support charitable causes, our clients are offering this Protocol to ensure that these charitable operations are not unnecessarily impacted by the JOLs.

14. Please confirm your agreement to, or provide any comments on, the draft protocol by **3pm on Wednesday, 4 June 2025.**

**Paragraphs 6(a) and 6(b) of the Appointment Order**

15. With regard to paragraphs 6(a) and (b) of the Appointment Order, as noted above and in Our Letter, we have serious concerns regarding the propriety of the JOLs seeking to retain the same counsel who had expressly sought, and obtained, an order that the JOLs be authorised to present a petition for the winding up of, and appointment of provisional liquidators to, the Fund *"if so advised"*. There is simply no legal or practical basis for the JOLs to present a petition for the winding up of the Fund and, as foreshadowed at the Directions Hearing, our clients intend to apply to have paragraphs 6(a) and (b) struck from the Appointment Order.

16. It is well established in this jurisdiction that, per Mr Justice Jones KC in *Re ICP Strategic Credit Income Fund Limited*,[3] *"an official liquidator's power to 'bring or defend any action or other legal proceeding in the name and on behalf of the company' is exercisable only with the sanction of the Court."* In addition, when determining whether to sanction such proceedings, *"the court must be satisfied that they have causes of action against the proposed defendants with a reasonable prospect of success*

---

[3] [2014] 1 CILR 314

3203729-1

4

#3248355v4

*and that the interests of the creditors will be best served by allowing proceedings to be commenced. As officers of the court, official liquidators are expected to behave in an exemplary manner and to perform their duties and exercise their powers fairly. The court will not allow its official liquidators to threaten or commence litigation speculatively as a means of extracting a settlement from a party against whom there is no genuine cause of action or no evidence from which to infer that a possible cause of action has any real prospect of success*" (at paragraph 10).

17. Accordingly, it is clear that, despite the inexplicable inclusion of paragraphs 6(a) and (b) in the Appointment Order, the JOLs should be expected to obtain Court sanction before issuing any proceedings in the name of the Company. However, were the JOLs to seek sanction for the presentation of a winding up petition against the Fund, such an application would be destined to fail in circumstances where, for the reasons outlined in Our Letter, there is no genuine cause of action and no realistic prospect of the petition being successful.

18. Furthermore, given these provisions were sought and included in the Appointment Order without any proper consideration of the underlying transactions or the relevant facts, our clients have serious concerns with the manner in which the JOLs, presumably influenced by legal counsel, appear to have predetermined the course of the liquidation and the investigations which will be required into the affairs of our clients. Such conduct by the JOLs, without first ensuring they are "*thoroughly acquainted with the affairs of the company*" clearly disregards the dicta of the Court of Appeal in *In re Contract Corporation, Gooch's Case* (as applied by the Cayman Islands Court of Appeal in *In Re China Branding Group Ltd*).[4] In the circumstances, Mr Justice Jones KC's observation at paragraph 11 in *Re ICP Strategic Credit Income Fund Limited* that "*the Court's decision to sanction the commencement of litigation can never be entirely divorced from questions about how and by whom it will be financed*" seems particularly relevant.

19. We enclose herewith a draft Summons seeking a variation of the Appointment Order by removing paragraphs 6(a) and (b). As stated at the Directions Hearing, our instructions are to file this Summons and, given the narrow scope of the issue to be determined, to request that it is heard with the existing JOLs' sanction application on 24 June 2025.

20. However, in the circumstances, including, *inter alia*, the reasons set out above, we believe it would be practical for the JOLs to agree to vary the Appointment Order without requiring the issuance of

---

[4] In *re Contract Corporation, Gooch's Case* [1871] 12 LR Ch App 207, p 211: "*In truth, it is of the utmost importance that the liquidator should, as the officer of the Court, maintain an even and impartial hand between all the individuals whose interests are involved in the winding up. He should have no leaning for or against any individual whatever. It is his duty to the whole body of shareholders, and to the whole body of creditors, and to the Court, to make himself thoroughly acquainted with the affairs of the company; and to suppress nothing, and to conceal nothing, which has come to his knowledge in the course of his investigation, which is material to ascertain the exact truth in every case before the Court. And it is for the Judge to see that he does his duty in this respect*" (emphasis added).

3203729-1

#3248355v4

a Summons and the associated hearing costs. We therefore invite the JOLs to agree a consent order agreeing that paragraphs 6(a) and (b) should be struck from the Appointment Order which we can jointly submit for His Lordship's consideration.

21. Please confirm by **3pm (Cayman Islands time) on Wednesday, 4 June 2025**, if the JOLs are amenable to agreeing a consent order in the manner proposed. If we do not hear from you before this, we are instructed to file a Summons without further notice to you and will rely on this letter for costs purposes.

Yours faithfully,

*Campbells LLP*

**Campbells LLP**

## Schedule

(i)      CDH GP, Ltd. (Cayman Islands)

(ii)     CDMCFAD, LLC (Delaware)

(iii)    Charitable DAF Fund 2, LP (Cayman Islands)

(iv)     Charitable DAF Fund, LP (Cayman Islands)

(v)      CLO HoldCo, Ltd. (Cayman Islands)

(vi)     Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii)    HCT Holdco 2, Ltd. (Cayman Islands)

(viii)   MGM Studios Holdco, Ltd. (Cayman Islands)

(ix)     Liberty CLO HoldCo, LLC (Delaware)

(x)      Liberty Sub, Ltd. (Delaware)

(xi)     Charitable DAF Holdings Corp. (Delaware)

(xii)    DST Investco, LLC (Delaware)

(xiii)   Allanon Capital Management LLC (Texas)

7

3203729-1

#3248355v4

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

FSD NO. 116 OF 2025 (JAJ)

IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

_____

## PROTOCOL IN RESPECT OF CHARITABLE DAF FUND, LP

_____

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court (the "**Supervision Application**") pursuant to s.131 Companies Act (2025 Revision) (the "**Act**").

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025 (the "**Order**"), the Court determined the Supervision Application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmilk be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

Paragraph 6, 6(a) and 6(b) of the Order provide as follows:

> "*The JOLs are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:*
>
> (a) *The power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;*
>
> (b) *The power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised...*"

(the "**DAF Provisions**")

2033932-1

#3253267v2

Charitable DAF Fund, LP ("**DAF LP**") was not represented at the Supervision Application and understands that that the DAF Provisions were included in the Order "*on the basis of the evidence before* [the Court]".[1]

HoldCo was, and DAF LP is, part of a larger group of entities (collectively the "**DAF Structure**") whose establishment and aim is, according to its '**Mission Statement**', to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". "**CDM Entities**" means the DAF Structure entities listed on Annexure 1 hereto.

**Preliminary statement**

The purpose of this Protocol (the "**Protocol**") is to ensure the efficient and orderly administration of DAF LP, the CDM Entities, and the liquidation estate of HoldCo. The Protocol is designed to avoid conflict between the JOLs and DAF LP, to assuage any concerns the JOLs may have regarding the commercial activities of DAF LP with respect to the risk of dissipation / misuse of assets outside of the ordinary course of business, and, subject to the approval of the Court, to facilitate the removal of the DAF Provisions from the Order (without prejudice to the JOLs entitlement to seek sanction in the ordinary manner and in accordance with the Act and the Companies Winding Up Rules (2023 Consolidation)).

**Background**

DAF LP is a Cayman Islands limited partnership formed on 28 October 2011. CDH GP Ltd (the "**GP**"), is a Cayman Islands company incorporated in or around 7 February 2024 and is the general partner of DAF LP. Mark Patrick and Paul Murphy are the directors of the GP (the "**Directors**"). Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. From its incorporation until March 2025 when it was placed in voluntary liquidation, Holdco was the limited partner of DAF LP through which it indirectly owned the other entities in the DAF Structure.

**1. Notices**

In the interests of expedience, the JOLs and the Directors agree that any notices or coummincation required under this Protocol shall be sent by email as follows:

a) To the JOLs:

Margot MacInnis - margot.macinnis@uk.gt.com
Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com
CDAF Core - CDAF.Core@uk.gt.com

b) To the Directors:

---

[1] Letter dated 22 May from Johnstone Law to Campbells.

2

Mark Patrick - mpatrick@dafholdco.com

Paul Murphy - paul@gkmanagement.com.ky

## 2  Transactional Reporting

2.1  Upon execution of this Protocol, the Directors will provide a report to the JOLs listing all transactions undertaken by DAF LP, or any of the CDM Entities, since 27 March 2025 which exceed US$5,000,000.

2.2  The Directors shall provide a business plan within 21 days of the signing of this Protocol which can be revised from time-to-time if it is determined to be necessary by the Directors and within the ordinary course of buisness for DAF LP (the "**Business Plan**"). Steps taken with respect to the management of DAF LP will be considered to be in the ordinary course of business if they are provided for in the Business Plan.

2.3  The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of DAF LP and the CDM Entities in accordance with the Mission Statement. The Directors shall provide a monthly transactions report to the JOLs so they have oversight of DAF LP's investment activity and financial performance, and the steps being taken by the Directors in the ordinary course of DAF LP's business.

2.4  If the JOLs have any doubt about whether a transaction is or is not in the ordinary course of DAF LP's business, they may contact the Directors for clairfation.

2.5  The Directors will endeavour to provide advance notice to the JOLs in respect of any single transaction of DAF LP exceeding US$ 5,000,000 or any series of transactions in an aggregate amount exceeding US$5,000,000 **SAVE THAT** advance notice is not required, in relation to any single transaction or series of transactions in the ordinary course of business involving or related to the renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.6  Notwithstanding anything to the contrary in this Protocol, the Directors shall be under no obligation to undertake any action or refrain from taking any action to the extent they deem it reasonably necessary to comply with their legal obligations to the CDM Entities.

## 3  Legal and Professional Fees

The JOLs acknowledge DAF LP's need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of DAF LP or the CDM Entites to seek legal or professional advice.

## 4  Consultation

Save in exceptional circumstances, the JOLs shall provide notice to the Directors of any intended exercise of powers by them which would be consistent with the DAF Provisions, and the JOLs shall discuss and consult with the Directors in respect of any intended action against DAF LP or the CDM

3

**1107**

Entities. The JOLS shall provide advice notice of any intended exercise of their powers without sanction by the Court with respect to DAF LP or any CDM Entity that could reasonably be expected to exceed the powers granted to the JOLs by the Court.

## 5 Confidentiality

5.1 In respect of any information of whatever nature relating to any member of the CDM Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (herinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

(a) keep the Confidential Information confidential and will not disclose it to anyone except as provided for by paragraph 6.2 below; and

(b) ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2 The JOLs may disclose Confidential Information:

(a) to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall be notified by the JOLs to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b) where required or requested by any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency; or

(c) with the Directors' prior written consent.

## 6 Formalities

6.1 This Protocol may not be waived, varied or amended without consent in writing from all parties.

6.2 This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

6.3 For the avoidance of doubt this Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the adjudication of the Grand Court of the Cayman islands.

6.4 In the event that either party considers that the other party has acted contrary to this Protocol, it shall first raise the matter by telephone or by email with an explanation of the basis for such

4

**1108**

complaint and thereafter allow a reasonable period for the other party to remedy the situation or provide an explanation for its conduct.  If either party considers that the issue is not resolved then a conference call will be scheduled for a discussion between the Directors and the JOLs (and their respective legal advisors if necessary).  Only in the event that there remains a dispute after these steps have been taken will either party refer the matter to the Court.

[SIGNATURES]

5

**1109**

Annexure 1 – List of CDM Entities

(i)      CDH GP, Ltd. (Cayman Islands)

(ii)     CDMCFAD, LLC (Delaware)

(iii)    Charitable DAF Fund 2, LP (Cayman Islands)

(iv)     Charitable DAF Fund, LP (Cayman Islands)

(v)      CLO HoldCo, Ltd. (Cayman Islands)

(vi)     Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii)    HCT Holdco 2, Ltd. (Cayman Islands)

(viii)   MGM Studios Holdco, Ltd. (Cayman Islands)

(ix)     Liberty CLO HoldCo, LLC (Delaware)

(x)      Liberty Sub, Ltd. (Delaware)

(xi)     Charitable DAF Holdings Corp. (Delaware)

(xii)    DST Investco, LLC (Delaware)

(xiii)   Allanon Capital Management LLC (Texas)

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

**FSD NO. 116 OF 2025 (JAJ)**

IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

---

**SUMMONS**

---

**LET ALL PARTIES CONCERNED** attend before the Judge in Chambers, at the Law Courts, George Town, Grand Cayman on          day of          2025, at          am/pm, on the hearing of an application by Charitable DAF Fund, LP (the "**DAF LP**") that:

1. The supervision order in these proceedings dated 6 May 2025 which ordered, *inter alia*, that the voluntary liquidation of Charitable DAF HoldCo, Ltd be continued under the supervision of the Court pursuant to s.131 of the Companies Act (2025 Revision) and O.15, r.8 of the Companies Winding Up Rules (2023 Consolidation) (the "**Supervision Order**") be varied such that paragraphs 6(a) and 6(b) of the Supervision Order, which authorised the joint official liquidators to take certain steps in respect of DAF LP, be deleted forthwith.

2. Such further or other orders and directions as the Court thinks fit.

3. Orders as to costs.

This **Summons** was filed by Campbells LLP, Attorneys-at-Law for and on behalf of the DAF LP, whose address for service is Floor 4 Willow House, Cricket Square, George Town, Grand Cayman (Ref: MGM/ROD/18955-44959).

#3245656v1

**1111**

Dated: [.] May 2025

_____

**Campbells LLP**

Attorneys for the Charitable DAF Fund, LP

| | |
|---|---|
| **TO:** | The Registrar of the Financial Services Division |
| **AND TO:** | Johnstone Law, Attorneys for the Joint Official Liquidators |
| **TIME ESTIMATE:** | 1 hour |

2

This **Summons** was filed by Campbells LLP, Attorneys-at-Law for and on behalf of the DAF LP, whose address for service is Floor 4 Willow House, Cricket Square, George Town, Grand Cayman (Ref: MGM/ROD/18955-44959)

#3245656v1



**JOHNSTONE**
LAW

5 June 2025
aj@j-law.ky
+1 (345) 929 3000
Ref: 00022

Campbells LLP
Floor 4, Willow House Cricket Square
Grand Cayman, KY1-9010
Cayman Islands

**By email: mgoodman@campbellslegal.com**

Dear Colleagues

**Charitable DAF HoldCo, Ltd (In Official Liquidation) (the *Company*) | FSD No. 116 of 2025 (JAJ)**

We refer to your letter dated 30 May 2025 and our recent correspondence in relation to the above matter.

**Maples engagement**

1. The JOLs have engaged both Johnstone Law (*JL*) and Maples and Calder (Cayman) LLP (*Maples*) in these proceedings and their respective involvement subject to the JOLs oversight and instruction. Both engagements are subject to the sanction of the Court.

**Directions Hearing**

2. The Directions Hearing related to an application for sanction under s.110 of the Act of the attorneys engaged by the JOLs. Irrespective of wider questions of standing (see below), your clients have and had no arguable standing to appear on a sanction application, being neither creditors nor contributories of the Company. You avoid this question because there is no answer to it.

3. With respect to your assertion that the specific terms of the Appointment Order give your clients standing to challenge it – you are simply wrong.

**JOLs' Powers and Requests for Information**

4. The JOLs assert no right to the books and records of your clients under their powers to collect in the books and records of the Company and your refusal to cooperate on this basis is entirely unhelpful.

5. The JOLs were appointed on 6 May 2025 and have now been in office almost a month. Despite ample opportunity, almost no information of substance or genuine utility has been provided to the JOLs by the majority of parties, your clients included. Instead, the weeks since the JOLs' appointment have been occupied with meritless challenges and tenuous technical objections at best rather than assisting the liquidators in their investigation of the C$270m that has been removed from the Company.



Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman
PO Box 926, 10 Market St, Grand Cayman, KY1-9006
345 929 3000 | info@j-law.ky | www.j-law.ky | LinkedIn

**1113**

6. It is mandatory for your clients to cooperate with the JOLs and they are choosing not to do so. If required, as warned, the JOLs will take steps to obtain the information they require with the assistance of the Court.

**Protocol**

7. The JOLs' preliminary view is that the Company may have inter alia clear prima facie proprietary and other claims to the asset transferred pursuant to the transfer of the Company's interest in the Charitable DAF Fund, LP to your client, CDMCFAD, LLC, pursuant to a deed of assignment and assumption on 18 December 2024 (the **Deed**). Nothing in your letter changes that analysis.

8. The protocol you propose is entirely inappropriate both to responding to proprietary claims and to the current circumstances. No dealing of any nature is appropriate in assets over which proprietary claims are asserted, whether in the ordinary course of business or subject to any threshold. Further, no expenditure from these assets on legal or any other professional fees is appropriate at any time.

9. It is in any event impossible for the JOLs to engage with the protocol in circumstances where they have no serious knowledge or understanding of what is happening at any underlying level. Your clients have had since 12 May 2025 to provide that knowledge and understanding and continue to decline to provide it to the JOLs. We again urge all your clients to set aside their distractive tactics and cooperate, and provide all information and documents, in an open and frank manner.

10. In the circumstances, the JOLs require your clients to provide undertakings by **3pm on 6 June 2025** that there will be no dealing in the assets formerly owned by the Company, and the provision of full and complete information on the whereabouts, ownership and control of all assets owned by the Company (directly or indirectly, legally or beneficially) prior to execution of the Deed. Nothing short of those assurances and undertakings is acceptable at this stage to the JOLs.

**Hunter Mountain Investment Trust**

11. We highlight below one specific aspect of the JOLs' concerns about dealing in assets. This relates to the Hunter Mountain Investment Trust (**HMIT**) transaction. As stated in our 30 May letter, the JOLs have become aware that your clients have, since receipt of the JOLs letter dated on 12 May 2025 (the **Initial Letter**), and without notice to the JOLs, sought approval of a transaction involving HMIT. We requested information about this transaction and sought your urgent confirmation that no transactions will be undertaken involving any assets held by them.

12. HMIT was formerly the sole beneficiary of the Rand PE Fund, I, LP. The disclosure of those for whom you act includes a number of entities unknown to the JOLs, and does not include the HMIT Entities[1] which formerly held Fund assets.

---

[1] '**HMIT Entities**' defined in Settlement Agreement as Hunter Mountain Investment Trust, Beacon Mountain LLC, Rand Advisors LLC, Rand PE Fund I, L.P, Rand-PE Fund Management, LLC, Atlas IDF, LP, and Atlas IDF GP, LLC

2

**1114**

13. In your 30 May letter, you stated that your clients *"do not understand the reference to the purported transaction involving HMIT"*. The JOLs have however since been provided with a copy of a settlement agreement between the Highland Entities[2] and the HMIT Entities[3] (the **Settlement Agreement**) which was **executed by Mark Patrick on behalf of the HMIT Entities** on <u>19 May 2025</u> – a mere matter of days after receipt of the Initial Letter.

14. Under the Settlement Agreement, HMIT stands to receive *inter alia* (i) initial payment of US$500,000, (ii) promissory note with an original face amount of $24,268,621.69 and other interests, (iii) distributions from its *Class 10 Interest* until 2029, and (iv) distributions from various other interests.

15. This appears to be a transaction involving assets which at some stage were indirectly owned by the Company, although your clients' continued non-disclosure makes it difficult for the JOLs to conduct a full and complete analysis of the true position. It is particularly concerning however that this transaction was executed after the JOLs' appointment and without notice to the JOLs, and it would be inappropriate for this transaction to be approved without their input, or at the very least prior to the JOLs being fully apprised of the nature and circumstances giving rise to this transaction. Please provide a full explanation, with all relevant details, by return.

**Appointment Order**

16. It is a matter for your clients if they wish to seek to challenge the Appointment Order, albeit such an application would clearly be hopeless.

17. The evidence supporting the applications in FSD No. 99 and FSD No. 116 was uncontested, and the issues ventilated over the course of two hearings during which Justice Asif KC engaged with the parties as to the form of the draft order, and indeed variously amended its terms (which is abundantly clear on the face of the draft and final versions).

18. The JOLs do not consent to the proposed (or any other) variation of the Appointment Order.

**Conclusion**

19. The JOLs would prefer to work cooperatively and constructively with your clients to protect the assets of the Fund and to "hold the ring", to obtain information necessary for the JOLs' investigations, and to expedite the conclusion of those investigations. They have provided a more than significant opportunity for your clients to offer and provide such cooperation, but it has not been forthcoming. On the contrary, your clients have continued to deal in assets to which the JOLs assert claims, without notice to the JOLs and have behaved antagonistically and obstructively.

20. Should your clients fail to provide the information and undertakings requested by **4pm** on **6 June 2025**,

---

[2] **'Highland Entities'** defined in H Settlement MIT Agreement as Highland Capital Management, L.P, Highland Claimant Trust, Highland Litigation Sub-Trust, and Highland Indemnity Trust

[3] As defined in [1] above.

3

**1115**

the JOLs will seek the assistance of the Court on these matters, without further notice.

Yours faithfully

**Johnstone Law**

**1116**



Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

D +1 345 914 5898
T +1 345 949 2648
F +1 345 949 8613
E MGoodman@campbellslegal.com

campbellslegal.com

Our Ref: MGM/ROD/18955-44959
Your Ref:

CAYMAN | BVI | HONG KONG

**BY EMAIL**

Johnstone Law
Unit 9, Tropic Centre
18 Earth Close,
PO Box 926,
Grand Cayman, KY1-9006
Cayman Islands

9 June 2025

Dear Sirs

**Re: Charitable DAF Holdco, Ltd. (in Official Liquidation) (the "Company")**
**FSD Cause No. 116 of 2025 (JAJ)**

1. Further to previous correspondence in relation to this matter, we enclose herewith a revised reporting protocol for the JOLs' consideration.

2. As indicated in previous correspondence, we believe the appropriate course of action is for the JOLs to engage on the terms of the protocol, which will appease any concerns they may have regarding the dissipation or misuse of the Fund's assets outside of the ordinary course of business during the currency of the liquidation.

3. For convenience, our clients' proposed amendments are tracked in the enclosure and serve to; (i) remove the value threshold from the historical reporting obligation at paragraph 2.1, and (ii) reduce the value threshold for the provision of advance notice at paragraph 2.5.

4. Please confirm your agreement to, or provide any comments on, the draft protocol by **3pm on Wednesday, 11 June 2025**, failing which we are instructed to file a Summons without further notice and will rely on this letter, and previous correspondence, for costs purposes.

Yours faithfully,

*Campbells LLP*

3203729-1

#3264473v1

1117

**Campbells LLP**

3203729-1

#3264473v1

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

FSD NO. 116 OF 2025 (JAJ)

IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

---

### PROTOCOL IN RESPECT OF CHARITABLE DAF FUND, LP

---

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund (the "Highland Foundations") sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("HoldCo") continue under the supervision of the Court (the "Supervision Application") pursuant to s.131 Companies Act (2025 Revision) (the "Act").

By order of the Grand Court of the Cayman Islands (the "Court") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025 (the "Order"), the Court determined the Supervision Application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmilk be appointed as Joint Official Liquidators (the "JOLs") of HoldCo.

Paragraph 6, 6(a) and 6(b) of the Order provide as follows:

> "*The JOLs are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:*
>
> (a)  *The power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;*
>
> (b)  *The power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised..."*

(the "DAF Provisions")

2033932-1

#3253267v3#3253267v3#3253267v2

Charitable DAF Fund, LP ("**DAF LP**") was not represented at the Supervision Application and understands that that the DAF Provisions were included in the Order "*on the basis of the evidence before* [the Court]".[1]

HoldCo was, and DAF LP is, part of a larger group of entities (collectively the "**DAF Structure**") whose establishment and aim is, according to its '**Mission Statement**', to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". "**CDM Entities**" means the DAF Structure entities listed on Annexure 1 hereto.

**Preliminary statement**

The purpose of this Protocol (the "**Protocol**") is to ensure the efficient and orderly administration of DAF LP, the CDM Entities, and the liquidation estate of HoldCo. The Protocol is designed to avoid conflict between the JOLs and DAF LP, to assuage any concerns the JOLs may have regarding the commercial activities of DAF LP with respect to the risk of dissipation / misuse of assets outside of the ordinary course of business, and, subject to the approval of the Court, to facilitate the removal of the DAF Provisions from the Order (without prejudice to the JOLs entitlement to seek sanction in the ordinary manner and in accordance with the Act and the Companies Winding Up Rules (2023 Consolidation)).

**Background**

DAF LP is a Cayman Islands limited partnership formed on 28 October 2011. CDH GP Ltd (the "**GP**"), is a Cayman Islands company incorporated in or around 7 February 2024 and is the general partner of DAF LP. Mark Patrick and Paul Murphy are the directors of the GP (the "**Directors**"). Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. From its incorporation until March 2025 when it was placed in voluntary liquidation, Holdco was the limited partner of DAF LP through which it indirectly owned the other entities in the DAF Structure.

**1. Notices**

In the interests of expedience, the JOLs and the Directors agree that any notices or coummincation required under this Protocol shall be sent by email as follows:

a) To the JOLs:

Margot MacInnis - margot.macinnis@uk.gt.com
Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com
CDAF Core - CDAF.Core@uk.gt.com

---

[1] Letter dated 22 May from Johnstone Law to Campbells.

#3253267v3

2

**Formatted:** Font: (Default) Calibri, 10 pt

b) To the Directors:

Mark Patrick - mpatrick@dafholdco.com
Paul Murphy - paul@gkmanagement.com.ky

## 2 Transactional Reporting

2.1 Upon execution of this Protocol, the Directors will provide a report to the JOLs listing all transactions undertaken by DAF LP, or any of the CDM Entities, since 27 March 2025 which exceed US$5,000,000.

2.2 The Directors shall provide a business plan within 21 days of the signing of this Protocol which can be revised from time-to-time if it is determined to be necessary by the Directors and within the ordinary course of buisness for DAF LP (the "**Business Plan**"). Steps taken with respect to the management of DAF LP will be considered to be in the ordinary course of business if they are provided for in the Business Plan.

2.3 The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of DAF LP and the CDM Entities in accordance with the Mission Statement. The Directors shall provide a monthly transactions report to the JOLs so they have oversight of DAF LP's investment activity and financial performance, and the steps being taken by the Directors in the ordinary course of DAF LP's business.

2.4 If the JOLs have any doubt about whether a transaction is or is not in the ordinary course of DAF LP's business, they may contact the Directors for clairfation.

2.5 The Directors will endeavour to provide advance notice to the JOLs in respect of any single transaction of DAF LP exceeding US$ 51,000,000 or any series of transactions in an aggregate amount exceeding US$51,000,000 **SAVE THAT** advance notice is not required, in relation to any single transaction or series of transactions in the ordinary course of business involving or related to (i) the proper operation and administration of the DAF Structure; and (ii) the renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.6 Notwithstanding anything to the contrary in this Protocol, the Directors shall be under no obligation to undertake any action or refrain from taking any action to the extent they deem it reasonably necessary to comply with their legal obligations to the CDM Entities.

## 3 Legal and Professional Fees

The JOLs acknowledge DAF LP's need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of DAF LP or the CDM Entites to seek legal or professional advice.

## 4 Consultation

**Formatted:** Font: (Default) Calibri, 10 pt

3

1121

Save in exceptional circumstances, the JOLs shall provide notice to the Directors of any intended exercise of powers by them which would be consistent with the DAF Provisions, and the JOLs shall discuss and consult with the Directors in respect of any intended action against DAF LP or the CDM Entities. The JOLS shall provide advice notice of any intended exercise of their powers without sanction by the Court with respect to DAF LP or any CDM Entity that could reasonably be expected to exceed the powers granted to the JOLs by the Court.

**5    Confidentiality**

5.1    In respect of any information of whatever nature relating to any member of the CDM Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (herinafter referred to as **"Confidential Information"**), the JOLs undertake that they will:

  (a)    keep the Confidential Information confidential and will not disclose it to anyone except as provided for by paragraph 6̶5.2 below;

  (a̶)(b)    Not disclose any Confidential Information to Mr James Dondero, the Highland Foundations, or any known affiliates or service providers of these individuals / entities; and

  (b̶)(c)    ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2    The JOLs may disclose Confidential Information:

  (a)    Subject to the restrictions in paragrpah 5.1(b), to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall be notified by the JOLs to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

  (b)    where required or requested by any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency; or

  (c)    with the Directors' prior written consent.

**6    Formalities**

6.1    This Protocol may not be waived, varied or amended without consent in writing from all parties.

**Formatted:** Font: (Default) Calibri, 10 pt

4

#3253267v3

1122

6.2     This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

6.3     For the avoidance of doubt this Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the adjudication of the Grand Court of the Cayman islands.

6.4     In the event that either party considers that the other party has acted contrary to this Protocol, it shall first raise the matter by telephone or by email with an explanation of the basis for such complaint and thereafter allow a reasonable period for the other party to remedy the situation or provide an explanation for its conduct.  If either party considers that the issue is not resolved then a conference call will be scheduled for a discussion between the Directors and the JOLs (and their respective legal advisors if necessary).  Only in the event that there remains a dispute after these steps have been taken will either party refer the matter to the Court.

[SIGNATURES]

**Formatted:** Font: (Default) Calibri, 10 pt

5

#3253267v3

**1123**

**Annexure 1 – List of CDM Entities**

(i)    CDH GP, Ltd. (Cayman Islands)

(ii)    CDMCFAD, LLC (Delaware)

(iii)    Charitable DAF Fund 2, LP (Cayman Islands)

(iv)    Charitable DAF Fund, LP (Cayman Islands)

(v)    CLO HoldCo, Ltd. (Cayman Islands)

(vi)    Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii)    HCT Holdco 2, Ltd. (Cayman Islands)

(viii)    MGM Studios Holdco, Ltd. (Cayman Islands)

(ix)    Liberty CLO HoldCo, LLC (Delaware)

(x)    Liberty Sub, Ltd. (Delaware)

(xi)    Charitable DAF Holdings Corp. (Delaware)

(xii)    DST Investco, LLC (Delaware)

(xiii)    Allanon Capital Management LLC (Texas)



**Formatted:** Font: (Default) Calibri, 10 pt

#3253267v3

1124



**Our ref:**     CJM/JRN/858403-000001/83247181
**Direct tel:**  +1 345 814 5245 / +1 345 814 5497
**Email:**       caroline.moran@maples.com / luke.armitage@maples.com

**By Email**

Campbells LLP
Floor 4, Willow House
Cricket Square
Grand Cayman
KY1-9010
Cayman Islands

Attn: Mark Goodman

19 June 2025

Dear Colleagues

**Charitable DAF HoldCo, Ltd (In Official Liquidation) (the "Company")**

**FSD Cause No: 2025-116 (JAJ)**

1    We refer to your letter to Johnstone Law dated 9 June 2025 and the previous correspondence in relation to the draft protocol as to the conduct and management of Charitable DAF Fund, LP (the "**Fund**") and related entities.

2    The JOLs appreciate your clients preparing a revised version of the protocol (the "**CDM Protocol**"). However, the JOLs' position is that the terms proposed by your clients are inadequate to serve the purpose of the protocol in a number of respects.

3    Rather than seek to significantly amend the CDM Protocol, the JOLs have prepared their own version in a form acceptable to them (copy enclosed) (the "**JOLs' Protocol**"). The JOLs' Protocol approximates as much as possible the level of protection that the JOLs/Company could expect to receive from an injunction order against your clients and ancillary disclosure orders. This is both necessary and justified in the present circumstances. Please note that whilst we are happy to use the language of "protocol", we will require any agreed scheme to be incorporated into an undertaking given formally in writing to the Court not only by your clients but also by the clients of Baker & Partners and Kobre & Kim (each of whom are copied to this letter).

4    Without being exhaustive, some of the aspects of the CDM Protocol which are unacceptable to the JOLs are:

**Maples and Calder (Cayman) LLP**
PO Box 309 Ugland House Grand Cayman KY1-1104 Cayman Islands
Tel +1 345 949 8066 Fax +1 345 949 8080 maples.com

**1125**

4.1    There is no provision expressly requiring CDH GP, Ltd. (the "**GP**"), CDMCFAD, LLC ("**CDM**") and DFW Charitable Foundation ("**DFW**") from disposing of or diminishing the value of any interest they hold in the Fund and its assets. This is an essential term that is needed in order to preserve the status quo whilst the JOLs continue their investigations.

4.2    Similarly, there should be an express requirement that Mark Patrick and Paul Murphy (together, the "**Directors**") and DFW must preserve any assets in their possession or control which have been previously been paid to them by the Company, the Fund and/or CDM, whether by way of distribution, divided or otherwise.

4.3    In relation to the proposed historical transaction report, the CDM Protocol would only require the Directors to provide confirmation of all transactions of the Fund and related entities since 27 March 2025 (i.e. just over 2 months ago). That period is obviously inadequate to serve the purpose of the protocol. The JOLs' position is that the period should commence on no later than 27 February 2024, being the date that the GP was incorporated and took over management of the Fund. Further, your clients' proposed reporting period would not cover the full period of the relevant sequence of transactions involved in the DAF Restructuring, which is not acceptable to the JOLs.

4.4    The CDM Protocol is lacking in any details of what is to be included in the historical transaction report (and in the monthly transaction reports moving forward). This is provided for at sections 3.1-3.2 and 4.9-4.12 of the JOLs' Protocol. This will add necessary certainty to your clients' obligations and will minimise the scope for future disputes about what is required. The required details are uncontroversial and we expect your clients will have no objection to them.

4.5    The CDM Protocol also would not require your clients to give full disclosure of the Fund's and related entities' assets and their current value. This is necessary in order for the JOLs to be able to properly police your clients' property preservation obligations referred to above and properly assess any requests by your clients to approve certain transactions moving forward.

4.6    The CDM Protocol is lacking any meaningful details as to what is to be included in the business plan for the ongoing management of the Fund and related entities and the deadline by which it should be submitted to the JOLs for approval. The JOLs' Protocol expressly provides for the information that is to be included in the business plan and requires the business plan to be provided to the JOLs within 21 days of execution of the protocol (with the JOLs then having 21 days to agree to it or reject it, in which case the JOLs can seek appropriate relief from the Court).

4.7    As there is likely scope for debate as to what is meant by the "ordinary course of business", we propose that your clients provide a written outline of what activities are within the Fund's "ordinary course of business" for the JOLs' approval. Your clients' proposed Protocol also does not prevent your clients from undertaking transactions that are not in the Fund's ordinary course of business. That is, for obvious reasons, an essential requirement for the JOLs and has therefore been included in the JOLs' Protocol.

4.8    The protocol needs to put in place protections for the period between the protocol being executed and the Business Plan being agreed. The JOLs' position is that the appropriate way to address this is to require that your clients must provide the JOLs with at least 7 days'

**1126**

advance notice of any transactions affecting the Fund, or any assets of the Fund, and for the JOLs to review and approve the transactions.

4.9 The US$1,000,000 threshold for transactions that are to be reported to the JOLs in the monthly transaction reports is still far too high. The threshold should be set at what would be a typical threshold for a freezing injunction and disclosure orders, say US$10,000. In addition, merely requiring the Directors to "endeavour" to provide advance notice of transactions is not sufficient. The Directors must be required to provide written notice of a proposed transaction and the JOLs will then have the opportunity to approve or reject if it appears to be outside of the Fund's ordinary course of business or otherwise raises concerns.

4.10 Clause 2.6 of the CDM Protocol is not acceptable to the JOLs. It is far too broad and leaves it up to the Directors to take virtually any action if they, in their discretion, consider it reasonably necessary to comply with their legal obligations.

4.11 Clause 4 of the CDM Protocol is also unacceptable to the JOLs. The clause as presently drafted presupposes that the JOLs would consciously decide to exceed their powers, which the JOLs wholly disagree with. The JOLs will exercise their powers in accordance with the order appointing them, any sanction obtained from the Court and their powers under the Companies Act (As Revised). If the JOLs need to obtain sanction to exercise a certain power, the JOLs will make a sanction application and attend to service as required.

5 Please confirm your clients' agreement to giving an undertaking to the Court in the form of the enclosed Protocol or provide comments by no later than 12pm on Thursday, 26 June 2025. If ultimately the Protocol cannot be agreed by our respective clients, the JOLs reserve all of their rights to take other appropriate protective measures.

Yours faithfully

*Maples and Calder (Cayman) LLP*

Maples and Calder (Cayman) LLP

With copy to:

Baker & Partners
PO Box 636
Buckingham Square
720 West Bay Road
Grand Cayman
KY1-1107
Cayman Islands
Attn: Jennifer Colegate

Kobre & Kim
9 Forum Lane
Camana Bay

JRN/858403-000001/83358083v1

3

1127

Grand Cayman
KY1-9006
Cayman Islands
Attn: Peter Tyers-Smith

**PROTOCOL AND COURT UNDERTAKING IN RESPECT OF CHARITABLE DAF FUND, LP (THE "FUND") AND THE FUND ENTITIES**

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court pursuant to s.131 Companies Act (2025 Revision).

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025, the Court determined the supervision application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmik be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

**Preliminary statement**

The Fund is a Cayman Islands exempted limited partnership formed on 28 October 2011. CDH GP, Ltd. (the "**GP**"), is a Cayman Islands company incorporated on 27 February 2024 and is the general partner of the Fund. Mark Patrick is the sole director of the GP. Mr Patrick is also the Manager of CDMCFAD, LLC ("**CDM**") and the registered director, president and sole member of DFW Charitable Foundation ("**DFW**"). HoldCo was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. Until its voluntary liquidation on 2 April 2025, the directors of HoldCo were Mr Patrick and Paul Murphy (the "**Directors**"). From its incorporation until 27 March 2025, HoldCo was the sole limited partner of the Fund through which it indirectly owned the other entities in the DAF Structure (the "**Fund Entities**")[1]. For the avoidance of doubt, "Fund Entities" includes any other entities identified pursuant to clause 4.4(a) below.

The purpose of this protocol (the "**Protocol**") is to ensure the efficient and orderly administration of the Fund and the Fund Entities. The Protocol is designed to avoid conflict between the JOLs and the Fund, to assuage any concerns the JOLs may have regarding the commercial activities of the Fund and the Fund Entities with respect to the risk of dissipation / misuse of assets, and to (subject to compliance with the terms of this Protocol) avoid the need for the JOLs to seek injunctions and ancillary disclosure orders against the Fund and/or the Fund Entities.

1    **Notices**

1.1    In the interests of expedience, the JOLs and the Directors agree that any notices or communication required under this Protocol shall be sent by email as follows:

(a)    To the JOLs:

Margot MacInnis - margot.macinnis@uk.gt.com

Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com

CDAF Core - CDAF.Core@uk.gt.com

(b)    To the Directors, the Fund, the GP, CDM and DFW:

Mark Patrick - mpatrick@dafholdco.com and mpatricktax1040@gmail.com

---

[1] As listed in Schedule A to the Protocol

**1129**

Paul Murphy - paul@gkmanagement.com.ky

## 2 Preservation of Property

2.1 The GP, CDM and DFW each agree that they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature), whether held directly or indirectly, in the Fund, and/or the Fund Entities and/or any assets of the Fund.

2.2 The Directors and DFW each agree that they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish any assets in their possession or control, whether they are in or outside the Cayman Islands, which were, are or may be received (whether directly or indirectly) by way of distribution, disposition, dividend, benefit, payment or other transfer from the HoldCo, and/or CDM and/or the Fund, and/or the Fund Entities and/or any assets of the Fund.

2.3 The Directors, the Fund, GP, CDM and DFW each agree that they shall not do anything to cause, procure, incite, promote or assist a breach by any other party of the above clauses 2.1 and 2.2 of this Protocol.

## 3 Historical Transaction Report and Disclosure of Assets

3.1 Within 14 days of the execution of this Protocol, the Directors shall provide to the JOLs a written report listing all transactions undertaken by the Fund and/or any of the Fund Entities since 27 February 2024 to the date of the report (the **"Historical Transaction Report"**). For each transaction in the Historical Transaction Report, the Directors shall include at least the following details:

    (a) The date of the transaction;

    (b) The identity of any party(ies) depositing funds in respect of the transaction;

    (c) The identity of any party(ies) receiving funds in respect of the transaction; and

    (d) An explanation as to the nature and purpose of the transaction.

3.2 Notwithstanding the above, the Historical Transaction Report must include the following:

    (a) Full details of all entities owned by the Fund, whether through any Fund Entity or any other subsidiaries, whether directly or indirectly or solely or jointly owned, or otherwise.

    (b) With respect to the Fund Entities, full details of the holders of shares or other membership interests, directors, officers or other controllers, and places and details of incorporation.

    (c) Insofar as not covered by the above, full details of all assets owned by the Fund and their current values, whether the Fund holds such assets through any Fund Entity or any other subsidiaries, whether directly or indirectly or solely or jointly owned, or otherwise.

**1130**

(d)    Full details of all disposals, assignments, transfers, sales, purchases or other transactions in respect of all or part of any asset owned by the Fund, whether the Fund holds such assets through any Fund Entity or any other subsidiaries, whether directly or indirectly or solely or jointly owned, or otherwise for the period commencing on 27 February 2024 until the date of the Historical Transaction Report.

(e)    Full details of every payment by way of salary, bonus, dividend, distribution or other compensation made to the Directors and/or any other officer, employee or consultant by HoldCo, the Fund, the GP, CDM, DFW or any of the Fund Entities between 27 February 2024 and the date of the Historical Transaction Report. Such information is to include the dates and amounts of each payment, the basis of the payment, the identity of the paying party, and full details of the account into which payment was made.

(f)    Full details of every payment to any attorney, lawyer, third party consultant, accountant, or external professional services advisor, whether a firm, partnership, company or individual, by HoldCo, the Fund, the GP, CDM, DFW or any of the Fund Entities between 27 February 2024 and the date of the Historical Transaction Report. Such information is to include the dates and amounts of each payment, the basis of the payment, the identity of the paying party, and full details of the account into which payment was made.

(g)    Full and complete copies of all financial statements or records, including statements prepared on a consolidated basis and/or management accounts prepared in respect of the Fund, the GP, CDM, DFW or any of the Fund Entities between 27 February 2024 and the date of the Historical Transaction Report ("**Statements, Records and Accounts**"). Any Statements, Records and Accounts provided must be independently prepared and verified by a reputable accountancy firm to the satisfaction of the JOLs.

(h)    Full data and documents in support of the above. Copy documents shall be provided in electronic form but must be identified in clear terms (on a category basis) in the Historical Transaction Report.

(i)    The Directors must sign the Historical Transaction Report and confirm its accuracy.

## 4    Regulation of the Fund

### Business Plan

4.1    Within 21 days of signing this Protocol, the Directors shall provide to the JOLs a written business plan (the "**Business Plan**").

4.2    The Business Plan shall set out the Directors' proposal as to the ongoing operations and management of the Fund and the Fund Entities. The Business Plan requires the approval of the JOLs.

4.3    If agreement is not reached on the terms of the Business Plan within 21 days of the JOLs' receipt of it, or such other date as agreed between the Directors and the JOLs in writing,

the JOLs may apply to the Court for directions or seek any other relief they deem appropriate.

4.4 The Business Plan shall include, at a minimum, the following information:

(a) A current and accurate group structure chart, clearly identifying all entities within the DAF Structure (including any of those not listed in Schedule A to this Protocol), their jurisdiction of incorporation, and their inter-relationships;

(b) Up-to-date director registers for each of the Fund Entities, including full names, appointment dates, and any changes since the last reporting period;

(c) Current member (shareholder or partner) registers for each of the Fund Entities, detailing ownership interests, classes of shares or partnership interests, and any recent transfers or changes; and

(d) A detailed outline of the proposed operations and strategic objectives of the Fund and the Fund Entities. This should include key initiatives, anticipated expenditures, revenue projections, and any material contracts or engagements expected to be entered into.

4.5 The items listed in 4.4(a)-(c) above will be prepared by an independent advisor, [insert independent advisor] to be selected by the JOLs within [ ] days (the "[ ] Advice") on the following terms:

(a) The instructions provided to [ ] shall be those set out at clauses 4.4(a)-(c) above; and

(b) The JOLs shall be informed of, and given the opportunity to participate in, any discussions between the Directors and [ ] in respect of the [ ] Advice; and

(c) The [ ] Advice shall be incorporated in the Business Plan as an exhibit to the Business Plan in the same form as it was provided to the Directors.

4.6 The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of Fund and the Fund Entities in accordance with the Business Plan (once agreed).

4.7 Any proposed revisions to the Business Plan must be submitted to the JOLs for prior written approval before implementation.

Overriding Principles applicable at all times

4.8 Where any proposed transaction, distribution, disposition, dividend, benefit, payment or other transfer which affects the Fund, or any assets of the Fund, is with or to any of the Directors, the GP, CDM or DFW or their nominees, those parties (and each of them) shall not be entitled to execute or complete such transaction, distribution, disposition, dividend, benefit, payment or other transfer unless in receipt of the prior written approval of the JOLs.

4.9 In respect of any proposed transaction, distribution, disposition, dividend, benefit, payment or other transfer which affects the Fund, or any assets of the Fund, which exceeds

**1132**

US$10,000, or any series of transactions that are connected or related in any way in an aggregate amount exceeding US$10,000:

(a) The Directors and the GP shall inform the JOLs in writing in advance of any such proposed transaction, distribution, disposition, dividend, benefit, payment or other transfer, and shall explain full details of the nature and purpose of the proposed transaction, distribution, disposition, dividend, benefit, payment or other transfer, together with documentary support to the satisfaction of the JOLs;

(b) Such advance information and explanation of proposed transactions shall be provided at least 7 days prior unless the circumstances are an extreme emergency, in which case the information and explanation shall be provided as soon as possible and the urgent nature and inability to provide at least 7 days' prior notice shall be explained by the Directors in writing as soon as possible; and

(c) No such transactions will be executed without the prior written approval of the JOLs.

Monthly Transaction Reports

4.10 Commencing on the date that the Business Plan is agreed and until further agreement or order of the Court, the Directors shall, within 7 days of the end of each calendar month, provide the JOLs with a written report listing all transactions that have been undertaken by the Fund and/or any of the Fund Entities during the calendar month just passed (the "**Monthly Transaction Report**").

4.11 Notwithstanding the above, the first Monthly Transaction Report shall list all such transactions dating back to the date of the provision of the Historical Transaction Report to the JOLs.

4.12 For each transaction in a Monthly Transaction Report, the Directors shall include the following details:

(a) The date of the transaction;

(b) The identity of any party(ies) depositing funds in respect of the transaction;

(c) The identity of any party(ies) receiving funds in respect of the transaction; and

(d) An explanation as to the nature and purpose of the transaction.

Legal expenses

4.13 The JOLs acknowledge the need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of the Fund, the GP, CDM, DFW, the Directors or the Fund Entities to seek legal or professional advice. However, it is agreed that any and all such expenses shall not be paid for out of assets which currently are or formerly were assets of the Fund, whether held directly or indirectly.

**1133**

## 5    Confidentiality

5.1    In respect of any information of whatever nature relating to the Fund or any of the Fund Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (hereinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

(a)    keep the Confidential Information confidential and will not disclose it to anyone except as provided for by clause 5.2 below;

(b)    not disclose any Confidential Information to Mr James Dondero, the Highland Foundations, or any known affiliates or service providers of these individuals / entities (except to the extent that any of them become members of the Company's liquidation committee and the information is provided to them in furtherance of the JOLs' duty to consult with the liquidation committee); and

(c)    ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2    The JOLs may disclose Confidential Information:

(a)    to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall be notified by the JOLs to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b)    where required for the purpose of any application to, or directed by, any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency;  or

(c)    with the Directors' prior written consent.

## 6    The Directors

6.1    Each of the Directors will procure that the Fund, CDM, DFW, the GP, the other Director and the Fund Entities fully comply with this Protocol.

## 7    Reservation of Rights

7.1    Nothing in this Protocol shall prevent or inhibit the JOLs from making any application to any Court of competent jurisdiction for any relief or remedy which the JOLs in their absolute discretion consider necessary or appropriate.

## 8    Formalities

8.1    This Protocol may not be waived, varied or amended without consent in writing from all parties.

**1134**

8.2 This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

8.3 This Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the exclusive jurisdiction of the Grand Court of the Cayman Islands.

**1135**

## SCHEDULE A: LIST OF FUND ENTITIES / ENTITIES IN THE DAF STRUCTURE

(i) CDH GP, Ltd. (Cayman Islands)

(ii) CDMCFAD, LLC (Delaware)

(iii) Charitable DAF Fund 2, LP (Cayman Islands)

(iv) Charitable DAF Fund, LP (Cayman Islands)

(v) CLO HoldCo, Ltd. (Cayman Islands)

(vi) Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii) HCT Holdco 2, Ltd. (Cayman Islands)

(viii) MGM Studios Holdco, Ltd. (Cayman Islands)

(ix) Liberty CLO HoldCo, LLC (Delaware)

(x) Liberty Sub, Ltd. (Delaware)

(xi) Charitable DAF Holdings Corp. (Delaware)

(xii) DST Investco, LLC (Delaware)

(xiii) Allanon Capital Management LLC (Texas)

(xiv) DFW Charitable Foundation (Delaware)

(xv) CLO HoldCo LLC (Delaware)

(xvi) Rand Advisors LLC (Delaware)

(xvii) CDHC Royse City Land LLC (Texas)

(xviii) Royse City Land Company LLC (Texas)

(xix) CDHC Assets LLC (Texas)

(xx) CDHC Fort Worth Land LLC (Texas)

(xxi) CDHC Stewart Creek LLC (Texas)

(xxii) BVP Property LLC (Delaware with CA registration)

**1136**



Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

D +1 345 914 5898
T +1 345 949 2648
F +1 345 949 8613
E MGoodman@campbellslegal.com

campbellslegal.com

Our Ref:  MGM/ROD/18955-44959
Your Ref:

CAYMAN | BVI | HONG KONG

**BY EMAIL**

Maples and Calder (Cayman) LLP
Ugland House
PO Box 309
Grand Cayman, KY1-1104
Cayman Islands

29 June 2025

Dear Sirs

**Re: Charitable DAF Holdco, Ltd. (in Official Liquidation) (the "Company")**
**FSD Cause No. 116 of 2025 (JAJ)**

1. We refer to your letter dated 19 June 2025 (the "**Protocol Letter**"), to previous correspondence between this firm and Johnstone Law regarding a draft reporting protocol in respect of the assets and operations of Charitable DAF Fund, LP and related entities, to the letter sent by the joint official liquidators (the "**JOLs**") of the Company to the Trustees of the Highland Capital Management L.P. (the "**Trustees**") dated 24 June 2025 (the "**Trustee Letter**"), and to the **enclosed** stipulation dated 27 June 2025 entered into in between the Dallas Foundation and the HMIT Entities in the Highland Capital Management L.P. bankruptcy proceedings and which has been filed with the United States Bankruptcy Court (the "**Stipulation**").

2. Capitalised terms, unless otherwise defined, adopt the definitions applied in the Protocol Letter.

**Previous Correspondence in respect of CDM Protocol and JOLs' standing**

3. Before addressing the draft protocol enclosed with the Protocol Letter, it appears to be necessary to remind the JOLs of our previous correspondence with Johnstone Law regarding the CDM Protocol and the JOLs' standing to take steps against the Fund.

4. The JOLs have not established any direct or indirect beneficial interest in or creditor claim against the Fund or the CDM Entities. At most, the JOLs appear to have formed the view that they have an as yet unparticularized and unasserted claim to an indirect beneficial interest in the CDM Entities.

3203729-1

#3282196v7

**1137**

It is not necessary for us to pass comment on any such claim, other than to note that, even if the JOLs were able to establish an indirect beneficial interest in the Fund or any of the CDM Entities, that would not displace the directors' control of the CDM Entities.

5. We would remind you that the CDM Entities are managed by professionally qualified individuals who have repeatedly acknowledged their obligations to the companies to which they are appointed, and whose actions are guided by legal and other professional advice. The JOLs have no mandate or authority to interfere with the management of the CDM Entitles by those individuals.

6. However, in good faith, and without any legal obligation to do so, the CDM Entities voluntarily offered a transactional reporting protocol to the JOLs in an effort to alleviate (unwarranted) concerns the JOLs had with respect to the management of the CDM Entities and to demonstrate that their business operations were and are being conducted appropriately and transparently. This offer was made to the JOLs, by letter dated 16 May 2025. It is our clients' view that the JOLs, acting objectively, would have considered this protocol to be perfectly sufficient to allow them to discharge any duty they had to exercise oversight of the management of the CDM Entities.

7. However, Johnstone Law engaged in correspondence with this firm on behalf the JOLs but inexplicably refused to meaningfully engage with our clients' offer to provide a reporting protocol. Consequently, under cover of letter dated 30 May 2025, we sent a draft of the CDM Protocol to Johnstone Law and invited their agreement or comments. As noted at paragraph 13 of that letter, *"our clients reject the suggestion that they are under any duty to provide this information. However, in circumstances where the CDM Entities, including the Fund, are operating in the ordinary course to make investments on behalf of, and to support charitable causes, our clients are offering this Protocol to ensure that these charitable operations are not unnecessarily impacted by the JOLs."*

8. Johnstone Law responded on 5 June 2025 and again inexplicably refused to engage with the CDM Protocol. Our response dated 9 June 2025 reiterated that our clients are under no obligation to provide information to the JOLs, but were willing to do so *"in an attempt to assuage the JOLs' misplaced concerns and demonstrate that the CDM Entities are operating in the ordinary course of business"*.

9. In a subsequent letter also dated 9 June 2025, the CDM Entities enclosed a revised version of the CDM Protocol which removed the value threshold from the proposed historical reporting protocol, and reduced the value threshold for the provision of advance notice from $5m to $1m. The letter reiterated the CDM Entities belief that *"the appropriate course of action is for the JOLs to engage on the terms of the protocol, which will appease any concerns they may have regarding the dissipation or misuse of the Fund's assets outside of the ordinary course of business during the currency of the liquidation."*

2

3203729-1

#3282196v7

**1138**

10. We note that at the hearing of the JOLs' sanction application on 24 June 2025, His Lordship, in obiter dictum, indicated that entry into a protocol seemed a sensible course of action. We believe that Court appointed liquidators acting objectively and in an even-handed manner would have accepted the original CDM Protocol, and that the JOLs' failure to do so indicates a predetermination that the conduct of the CDM Entities and their management merit investigation, which position is inconsistent with the JOLs' duty to "*maintain an even and impartial hand*".[1] However, we hope that the JOLs are willing to moderate their position in light of judicial encouragement to do so.

### The JOLs' Protocol

11. In light of the foregoing, it is no surprise that our clients fundamentally object to the approach adopted in the JOLs' Protocol, which is completely inappropriate and unwarranted. The proposed restrictions, controls and undertakings sought by the JOLs would impose severe limitations on our clients' ability to operate, and would have the practical effect of placing their ongoing charitable activities under the de facto control of the JOLs, notwithstanding that no such legal authority exists.

12. Your references to the JOLs requiring what are, in effect, restrictions mirroring injunctive relief is entirely misguided. The only circumstances in which the draconian conditions sought in the JOLs' Protocol could be imposed would be if the JOLs, with the sanction of the Grand Court, sought and obtained a freezing injunction. That injunction would require the JOLs to, *inter alia*, make out a good arguable case (where it is denied that such a case exists) and provide evidence of that there is a real risk of dissipation of assets (where the CDM Protocol clearly demonstrates there is no such risk). Furthermore, were the JOLs to seek injunctive relief the CDM Entities would at least have the benefit of the protection afforded by the cross-undertaking in damages (which they do not have under the JOLs' Protocol). Following recent authority,[2] that cross-undertaking in damages would likely need to be supported by an indemnity from relevant stakeholders. The JOLs' Protocol seeks all of the benefits of an injunction without the JOLs or those funding them assuming any of the burdens that such relief would entail.

13. If the JOLs believe that injunctive or other restrictive relief is warranted, the proper course is for them to make an application to the Court in the ordinary course and satisfy these well-established

---

[1] See In *re Contract Corporation, Gooch's Case* [1871] 12 LR Ch App 207, p 211: "*In truth, it is of the utmost importance that the liquidator should, as the officer of the Court, maintain an even and impartial hand between all the individuals whose interests are involved in the winding up. He should have no leaning for or against any individual whatever. It is his duty to the whole body of shareholders, and to the whole body of creditors, and to the Court, to make himself thoroughly acquainted with the affairs of the company; and to suppress nothing, and to conceal nothing, which has come to his knowledge in the course of his investigation, which is material to ascertain the exact truth in every case before the Court. And it is for the Judge to see that he does his duty in this respect*" (emphasis added).

[2] See *Hunt v Ubhi* [2023] EWCA Civ 417 which cited SC Mezhdunarodniy Promyshlenniy Bank v Pugachev [2015] EWCA Civ 139

3203729-1

#3282196v7

**1139**

legal requirements. Our clients will of course strenuously resist any such application. However, there is no lawful or reasonable basis for the JOLs to seek to impose such intrusive restrictions on the CDM Entities, nor to demand undertakings that would exceed what the Court could properly order on an application for interim relief. If the JOLs and our clients are unable to agree the terms of a protocol, the correct course of action is to have the Court determine the scope of any such protocol as opposed to the JOLs seeking injunctive relief - the specter of which seems to be threatened in the Protocol Letter.

**The Stipulation**

14. Further, we note the Dallas Foundation and other entities referred to in the Stipulation as the 'Foundation Parties', have now entered into a binding term sheet (the "**Term Sheet**") with the HMIT Entities. As you can see, the Foundation Parties withdrew their objections to the Settlement Motion (defined below) with prejudice. At the hearing of the Settlement Motion, Mr. Dondero was allowed to testify in opposition to the settlement on behalf of a family trust (Dugaboy), though we understand that a material portion of his attempted testimony was stricken or subject to successful objection, and it appears that the US Bankruptcy Court gave his testimony no weight. Ms Diaz of the Dallas Foundation, who signed the Term Sheet on behalf of the Foundation Parties, swore affidavits on behalf of the petitioners in both the just and equitable winding up, and supervision applications. Ms Diaz's evidence in the supervision application, which was provided on behalf of all 'Supporting Organisations', was that a supervision order was required in order to *"allow the JOLs to conduct a proper investigation of the affairs of the Company"*[3] (as you know, this evidence is disputed).

15. Page two of the Term Sheet mandates that the Dallas Foundation will undertake various actions in relation to "DAF", which is described in the Term Sheet as *"the historical corporate structure of Charitable DAF Holdco, Ltd, its parents and subsidiaries, in existence as of January 1, 2024, and changes thereto"* (which would include the CDM Entities). These actions include the Dallas Foundation agreeing to meet with Mr Raver (as a representative of HMIT) to review the DAF structure and the balance sheets of DAF as of 30 September 2024, 31 December 2024 and 31 March 2025. The Term Sheet also provides that the Dallas Foundation will be provided with *"an accounting of any transfer assets from an entity within the DAF structure during the periods covered by the balance sheets to any other entity, including another entity within the DAF structure"*.

16. This meeting is now scheduled for 2 July 2025. The meeting will be face to face, and Mr. Raver intends to provide additional balance sheet information beyond that required under the Term Sheet. The meeting (defined as the "DF Meeting") is specifically described as a confidential settlement meeting *"with an eye to commencing negotiations with DF about the use of current*

---

[3] Paragraph 15(a) of the Second Affidavit of Julie Diaz dated 29 April 2025.

3203729-1

#3282196v7

*support organization(s) or the creation of new support organizations to support the DF and as appropriate the other Foundations mentioned above (the "Resolution")."* The Term Sheet also provides for the prospect of a subsequent meeting which Mr Patrick will attend with the objective being to further discussions toward a "Resolution". The Term Sheet explicitly provides that if the parties can agree on a Resolution, then *"Mr. Patrick, the Supporting Organization, and Dallas Foundation shall jointly request a meeting with the JOLs and the DF, with a view toward winding up the liquidation proceedings of Charitable DAF Holdco, Ltd., including not seeking any equitable wind up of Charitable DAF Fund, LP., all of which should be able to be accomplished expeditiously in the event of agreements hoped to be achieved upon the meeting described above".*

17. That the lead petitioner—having given evidence on behalf of all Supporting Organisations at the supervision application—has now entered into the Term Sheet is a clear indication that there is no longer any justification for the investigations it originally proposed (and which the JOLs appear to be myopically pursuing), and no real or justifiable risk of asset dissipation, particularly given that the CDM Entities' balance sheets and financial information will be shared with the Dallas Foundation. Given that the Term Sheet contemplates the Dallas Foundation and Supporting Organisations requesting a meeting with the JOLs with a view to concluding the liquidation of the Company and avoiding any application to wind up the Fund, it is difficult to reconcile the actions of the JOLs with the stated intention of the purported primary stakeholder.

**Updated CDM Protocol**

18. Notwithstanding, our clients remain willing to agree a reasonable protocol that provides the JOLs with an appropriate level of visibility into relevant matters while preserving our clients' right to conduct their charitable operations in the ordinary course of business. We do not, however, accept that the JOLs' Protocol represents a fair or proportionate proposal - it is neither necessary nor justified.

19. In particular, we make the following general observations:

(a) The JOL's Protocol seeks to prohibit entirely lawful transactions from being conducted in the ordinary course of business, absent Court order, and effectively subjects all of the CDM Entities' operations to prior approval and veto - a degree of control that (i) is completely unwarranted, and (ii) could only properly be obtained through injunctive relief.

(b) The financial thresholds, advance approvals, and granularity of the reporting provisions proposed in the JOLs' Protocol would materially and unfairly impede the CDM Entities' ordinary and necessary charitable operations and increase the costs of those operations to no obvious benefit to those entities.

5

3203729-1

#3282196v7

**1141**

(c) The JOLs' request that the CDM Entities provide extensive documentation, including registers, asset holdings, and transaction histories, appears to simply repeat misconceived requests made by Johnstone Law on behalf of the JOLs and has no legal basis. As stated in response to those previous requests, "*Directors are bound by duties under common law and statute to protect the interests, confidentiality, and assets of the companies they serve. To comply with your baseless requests would place them in breach of those duties unless and until a court determines otherwise.*"[4]

(d) Your letter asserts that the scope of disclosure sought by the JOLs' Protocol is necessary to enable the JOLs "*to properly police* [our] *clients' property preservation obligations*". There is simply no basis for this assertion, which was also addressed in correspondence with Johnstone Law when it was suggested the JOLs are somehow authorized to "hold the ring" in order to protect the assets of the Fund.[5]

(e) Similarly, for the reasons outlined above, your proposal to set the advance reporting threshold at US$10,000 as "*that would be a typical threshold for a freezing injunction and disclosure order*" is wholly unrealistic and impractical. Despite the JOLs not having obtained a freezing injunction, the CDM Entities are willing to set a reporting threshold which would afford the JOLs advance notice of substantial and meaningful transactions. However, requiring the CDM Entities to provide advance notice of such de minimus transactions, and to wait for the JOLs to prospectively approve these transactions, would severely hamper the charitable operations of the CDM Entities.

20. We **enclose** a revised version of the CDM Protocol with this letter. This updated version reflects a number of clarifications aimed at addressing the JOLs' concerns, while preserving our clients' ability to conduct their affairs in the ordinary course of business. These revisions are marked-up against the previous version of the CDM Protocol sent to Johnstone Law on 9 June 2025 and include, *inter alia*:

(a) Confirmation that the CDM Entities will engage Armanino LLP as an independent accounting firm to provide the financial reporting and accounting analysis required under the CDM Protocol;

---

[4] Paragraph 6 of Campbells letter to Johnstone Law dated 30 May 2025.
[5] Paragraph 17 of Campbells letter to Johnstone Law dated 9 June 2025. "*As we have explained numerous times and attempted to demonstrate by way of our proposed reporting protocol, the CDM Entities, including the Fund, are operating in the ordinary course to support charitable causes and their assets do not need to be protected by the JOLs.*"

3203729-1

6

(b) Inclusion of the details which are to be provided in the Historical and Monthly Transaction Reports (which reflect the information requested at sections 3.1 and 4.12 of the JOLs' Protocol;

(c) Inclusion of wording at paragraph 2.6 which would require the JOLs to consult with the 'Directors' before unilaterally contacting our clients' third-party service providers. Unfortunately, given the JOLs repeated attempts to interfere with our clients' lawful operations (to which, see below regarding the Trustee Letter), we believe this is necessary;

(d) Extension of the date for the Historical Transaction Report to 1 July 2024 (we understand that the Skyview Group had access to the CDM Entities' financials through to 30 June 2024 so the JOLs can obtain any older financial information from other sources); and

(e) Reduction of the value threshold for the provision of advance notice from US$1m to US$250,000.

21. We invite the JOLs to consider the revised draft of the CDM Protocol and to engage with us to agree terms that are reasonable and proportionate. For the reasons outlined above, our clients are unwilling to accept the fundamentally disproportionate proposals set out in the JOLs' Protocol. However, they remain open to agreeing an appropriate protocol to facilitate the JOLs' ongoing investigations (which the Dallas Foundation no longer support or think necessary) and to avoid the need for unnecessary and costly Court proceedings.

22. Please confirm your agreement to, or provide any comments on, the revised CDM Protocol by **5pm on 4 July 2025**.

23. If, notwithstanding the proffered protocol, the JOLs consider it necessary to seek injunctive relief that is, of course, a matter for them, but given the extensive correspondence on this issue we would expect (i) any application for injunctive relief to be served on this firm where it would be plainly inappropriate to proceed on an ex parte basis; or (ii) at the very least, if the JOLs do seek injunctive relief on an ex parte basis, that this and previous correspondence regarding the protocol be provided to the Court in furtherance of the JOLs' duty of full and frank disclosure.


**Trustee Letter**


24. We refer to the Trustee Letter, which related to the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith*, Case No. 19-34054-sgj11 (Bankr. N.D.Tex.) [Dkt. 4216] (the "**Settlement Motion**"). We understand that your firm were also copied to this correspondence.

7

3203729-1

#3282196v7

25. The Trustee Letter, sent on the eve of the hearing of the Settlement Motion, requested an adjournment to afford the JOLs additional time to progress their investigations of the HMIT Entities, or alternatively, that the Trustees defer making distributions to the HMIT Entities to allow the JOLs time to carry out investigations "*without the risk of asset dissipation in connection with protocol discussions*". The protocol discussions were referred to in the JOLs' Letter, which notes that the JOLs "*are concerned to ensure the parameters of the protocol mitigate the risk of asset dissipation pending the completion of their investigations.*"

26. Quite how the JOLs were able to form the extraordinary view that a professionally qualified director acting with the benefit of legal and other professional advice seeking approval from the US Court to enter into a settlement with a resultant accretion to HMIT of $67 million might represent an attempt at asset dissipation calls for an explanation in and of itself, but particularly in light of the repeated attempts by the CDM Entities to engage in discussions with the JOLs and Johnstone Law about the terms of a protocol which was directly aimed at addressing the JOLs' (baseless) concerns in that regard.

27. To address unparticularised assertions in Johnstone Law's letters dated 30 May and 5 June 2025 of proprietary claims to certain assets of the CDM Entities, including in respect of assets which were the subject of the HMIT settlement agreement, our first letter dated 9 June 2025, to which we did not receive a reply, is worth repeating:

> "*Your reference to the so-called HMIT transaction is vague, speculative, and appears to rely on materials filed in separate bankruptcy proceedings in the United States concerning entities related to Mr James Dondero (the individual who swore evidence in support of FSD No. 99 seeking to have the Company and the Fund wound up on a just and equitable basis and who agreed to fund those proceedings). Given the assertions in your letter alleging the JOLs have received minimal cooperation, it is curious that you have such detailed knowledge of a transaction undertaken by entities which the JOLs have no interest in. Please confirm the source of this information.*
>
> *Further, it is clear that the Settlement Agreement benefits the HMIT Entities (as defined in your letter) and, accordingly, there is no question that assets of the CDM entities are being dissipated or misused. Taking your unfounded assertions in relation to the proprietary claims at their height, the HMIT transaction would inure to the benefit of the liquidation estate. It is perhaps telling that it is our understanding the HMIT transaction does not benefit Mr Dondero and his broader interests. In the circumstances, we do not understand*

3203729-1

8

#3282196v7

**1144**

*why the JOLs would not support the HMIT transaction even if a proprietary claim has not been established.*

*Our clients do not accept that any transaction involving the HMIT Entities warrants the JOLs' oversight, and they are not aware of any basis on which the JOLs are entitled to be 'notified' or to 'approve' their lawful dealings. Your claim that HMIT was formerly the beneficiary of a fund in which the Company had an indirect interest does not confer any rights on the JOLs in relation to any of the assets involved in the HMIT transaction."*

28. By failing to accurately address the correspondence relating to the CDM Protocol and any of the points made in our letter of 9 June 2025, the Trustee Letter was vague and misleading, and it is regrettably the case that the JOLs' attempt to interfere with the Settlement Motion in this manner can only be described as improper.

29. The fact that entities affiliated with Mr. Dondero immediately seized upon the Trustee Letter to support their own request for an adjournment, in circumstances where their previous application for an adjournment had been refused, leads to the impression that this was the true purpose of the Trustee Letter.

30. Similarly, the JOLs' initial failure to engage with the proposed protocol at all, and the insistence now that the protocol must replicate the effect of injunctive relief, do nothing to dispel the impression of a tendency towards bias in favour of the position of Mr. Dondero and his affiliates, particularly in light of Mr. Dondero's subsequent testimony at the Settlement Motion.

31. We reserve the right to refer to this and previous correspondence in any subsequent proceedings.

Yours faithfully

*Campbells LLP*

**Campbells LLP**

9

3203729-1

#3282196v7

**1145**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

_____

**PROTOCOL IN RESPECT OF CHARITABLE DAF FUND, LP**

_____

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund (the "**Highland Foundations**") sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court (the "**Supervision Application**") pursuant to s.131 Companies Act (2025 Revision) (the "**Act**").

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025 (the "**Order**"), the Court determined the Supervision Application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmilk be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

Paragraph 6, 6(a) and 6(b) of the Order provide as follows:

> "_The JOLs are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:_
>
> (a)     _The power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;_
>
> (b)     _The power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised..._"

(the "**DAF Provisions**")

2033932-1

#3253267v5

**1146**

Charitable DAF Fund, LP ("**DAF LP**") was not represented at the Supervision Application and understands that that the DAF Provisions were included in the Order "*on the basis of the evidence before* [the Court]".[1]

HoldCo was, and DAF LP is, part of a larger group of entities (collectively the "**DAF Structure**") whose establishment and aim is, according to its '**Mission Statement**', to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". "**CDM Entities**" means the DAF Structure entities listed on Annexure 1 hereto.

**Preliminary statement**

The purpose of this Protocol (the "**Protocol**") is to ensure the efficient and orderly administration of DAF LP, the CDM Entities, and the liquidation estate of HoldCo. The Protocol is designed to avoid conflict between the JOLs and DAF LP, to assuage any concerns the JOLs may have regarding the commercial activities of DAF LP with respect to the risk of dissipation / misuse of assets outside of the ordinary course of business, and, subject to the approval of the Court, to facilitate the removal of the DAF Provisions from the Order (without prejudice to the JOLs entitlement to seek sanction in the ordinary manner and in accordance with the Act and the Companies Winding Up Rules (2023 Consolidation)).

**Background**

DAF LP is a Cayman Islands limited partnership formed on 28 October 2011. CDH GP Ltd (the "**GP**"), is a Cayman Islands company incorporated in or around 7 February 2024 and is the general partner of DAF LP. Mark Patrick is the director of the GP and Paul Murphy and Mark Patrick are the directors of the Cayman-domiciled operating entities owned by DAF LP (the "**Directors**"). Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. From its incorporation until March 2025 when it was placed in voluntary liquidation, Holdco was the direct or indirect limited partner of DAF LP through which it indirectly owned the other entities in the DAF Structure.

**1. Notices**

1.2     In the interests of expedience, the JOLs and the Directors agree that any notices or coummincation required under this Protocol shall be sent by email as follows:

a)    To the JOLs:

      Margot MacInnis - margot.macinnis@uk.gt.com
      Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com
      CDAF Core - CDAF.Core@uk.gt.com

---

[1]Letter dated 22 May from Johnstone Law to Campbells.

2

b)  To the Directors:

>   Mark Patrick - mpatrick@dafholdco.com
>   Paul Murphy - paul@gkmanagement.com.ky

## 2      Transactional Reporting

2.1     The CDM Entities have engaged Armanino LLP ("**Armanino**"), an independent accountancy firm to provide the financial statement reporting and accounting analysis required under this Protocol.

2.2     Within 14 days of the execution of this Protocol, the Directors shall provide to the JOLs a written report listing all Transactions (as defined below) undertaken by the CDM Entities between 1 July 2024 and the date of this Protocol (the "**Historical Transaction Report**"). For each Transaction in the Historical Transaction Report, the Directors shall include the following details:

>   (a)  The date of the Transaction;
>
>   (b)  The identity of any party(ies) depositing funds in respect of the Transaction;
>
>   (c)  The identity of any party(ies) receiving funds in respect of the Transaction; and
>
>   (d)  An explanation as to the nature and purpose of the Transaction.

"**Transaction(s)**" as used in this Protocol shall mean the acquisition or disposition of assets in a single transaction or series of related transactions that is equal to or exceeds US$10,000; provided, however, that "Transaction(s)" shall not include renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.3     Within 21 days of the signing of this Protocol, the Directors shall provide a business plan to the JOLs (which can be revised from time-to-time if it is reasonably determined to be necessary by the Directors and within the ordinary course of busisness for DAF LP and the CDM Entities) (the "**Business Plan**"). The Business Plan shall set out the Directors' proposal as to the ongoing operations and management of DAF LP and the CDM Entities. Steps taken with respect to the management of DAF LP and the CDM Entities will be considered to be in the ordinary course of business if they are provided for in the Business Plan.

2.4     The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of DAF LP and the CDM Entities in accordance with the Business Plan.

2.5     Armanino shall provide a monthly Transactions report and balance sheet (the "**Monthly Transaction Report**") to the JOLs so they have oversight of DAF LP's investment activity and financial performance, and the steps being taken by the Directors in the ordinary course of DAF LP's business.  For each Transaction in the Monthly Transaction Report, Armanino shall include the following details:

3

#3253267v5

**1148**

(e)   The date of the Transaction;

(f)   The identity of any party(ies) depositing funds in respect of the Transaction;

(g)   The identity of any party(ies) receiving funds in respect of the Transaction; and

(h)   An explanation as to the nature and purpose of the Transaction.

2.6   If the JOLs have any doubt about whether a Transaction is or is not in the ordinary course of DAF LP's business, the JOLs shall consult with the Directors who agree to make reasonable efforts to provide clairfation. For the avoidance of doubt, the JOLs shall not unilaterally contact third party service providers of the CDM Entities in respect of any Transaction, or any any anticipated transaction which they have been put on notice of pursuant to paragraph 2.7, without first consulting with, and seeking clarifcation from, the Directors.

2.7   The Directors will use reasonable efforts to provide advance notice to the JOLs in respect of any disposition of assets in a single transaction or series of related transactions that is equal to or exceeds US$250,000 **SAVE THAT** advance notice is not required in relation to any disposition related to (i) the operation or administration of the DAF Structure in the ordinary course of business or (ii) the renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.8   Notwithstanding anything to the contrary in this Protocol, the Directors shall be under no obligation to undertake any action or refrain from taking any action to the extent they deem it reasonably necessary to comply with their legal obligations to the CDM Entities.

**3      Legal and Professional Fees**

3.1   The JOLs acknowledge DAF LP's need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of DAF LP or the CDM Entites to seek legal or professional advice.

**4      Consultation**

4.1   The JOLs shall provide notice to the Directors of any intended exercise of powers by them which would be consistent with the DAF Provisions, and the JOLs shall discuss and consult with the Directors in respect of any intended action against DAF LP or the CDM Entities.

**5      Confidentiality**

5.1   In respect of any information of whatever nature relating to any member of the CDM Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (herinafter referred to as **"Confidential Information"**), the JOLs undertake that they will:

4

#3253267v5

(a) keep the Confidential Information confidential and will not disclose it to anyone except as provided for by paragraph 5.2 below;

(b) not disclose any Confidential Information to Mr James Dondero, the Highland Foundations, or any known affiliates or service providers of these individuals / entities; and

(c) ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2 The JOLs may disclose Confidential Information:

(a) Subject to the restrictions in paragraph 5.1(b), to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall agree in writing to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b) where required or requested by any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency; or

(c) with the Directors' prior written consent.

## 6    Formalities

6.1 This Protocol may not be waived, varied or amended without consent in writing from all parties.

6.2 This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

6.3 For the avoidance of doubt this Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the adjudication of the Grand Court of the Cayman islands.

6.4 In the event that either party considers that the other party has acted contrary to this Protocol, it shall first raise the matter by telephone or by email with an explanation of the basis for such complaint and thereafter allow a reasonable period for the other party to remedy the situation or provide an explanation for its conduct. If either party considers that the issue is not resolved then a conference call will be scheduled for a discussion between the Directors and the JOLs (and their respective legal advisors if necessary). Only in the event that there remains a dispute after these steps have been taken will either party refer the matter to the Court.

#3253267v5

[SIGNATURES]

6

**Annexure 1 – List of CDM Entities**

(i)      CDH GP, Ltd. (Cayman Islands)

(ii)     CDMCFAD, LLC (Delaware)

(iii)    Charitable DAF Fund 2, LP (Cayman Islands)

(iv)    Charitable DAF Fund, LP (Cayman Islands)

(v)     CLO HoldCo, Ltd. (Cayman Islands)

(vi)    Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii)   HCT Holdco 2, Ltd. (Cayman Islands)

(viii)  MGM Studios Holdco, Ltd. (Cayman Islands)

(ix)    Liberty CLO HoldCo, LLC (Delaware)

(x)     Liberty Sub, Ltd. (Delaware)

(xi)    Charitable DAF Holdings Corp. (Delaware)

(xii)   DST Investco, LLC (Delaware)

(xiii)  Allanon Capital Management LLC (Texas)

#3253267v5

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

**FSD NO. 116 OF 2025 (JAJ)**

IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

_____

**PROTOCOL IN RESPECT OF CHARITABLE DAF FUND, LP**

_____

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund (the "**Highland Foundations**") sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court (the "**Supervision Application**") pursuant to s.131 Companies Act (2025 Revision) (the "**Act**").

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025 (the "**Order**"), the Court determined the Supervision Application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmilk be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

Paragraph 6, 6(a) and 6(b) of the Order provide as follows:

> "_The JOLs are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:_
>
> (a)    _The power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;_
>
> (b)    _The power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised..._"

(the "**DAF Provisions**")

2033932-1

#3253267v5

**1153**

Charitable DAF Fund, LP ("**DAF LP**") was not represented at the Supervision Application and understands that that the DAF Provisions were included in the Order "*on the basis of the evidence before* [the Court]".[1]

HoldCo was, and DAF LP is, part of a larger group of entities (collectively the "**DAF Structure**") whose establishment and aim is, according to its '**Mission Statement**', to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". "**CDM Entities**" means the DAF Structure entities listed on Annexure 1 hereto.

**Preliminary statement**

The purpose of this Protocol (the "**Protocol**") is to ensure the efficient and orderly administration of DAF LP, the CDM Entities, and the liquidation estate of HoldCo. The Protocol is designed to avoid conflict between the JOLs and DAF LP, to assuage any concerns the JOLs may have regarding the commercial activities of DAF LP with respect to the risk of dissipation / misuse of assets outside of the ordinary course of business, and, subject to the approval of the Court, to facilitate the removal of the DAF Provisions from the Order (without prejudice to the JOLs entitlement to seek sanction in the ordinary manner and in accordance with the Act and the Companies Winding Up Rules (2023 Consolidation)).

**Background**

DAF LP is a Cayman Islands limited partnership formed on 28 October 2011. CDH GP Ltd (the "**GP**"), is a Cayman Islands company incorporated in or around 7 February 2024 and is the general partner of DAF LP. Mark Patrick is the director of the GP and Paul Murphy and Mark Patrick are the directors of the ~~GP~~Cayman-domiciled operating entities owned by DAF LP (the "**Directors**"). Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. From its incorporation until March 2025 when it was placed in voluntary liquidation, Holdco was the direct or indirect limited partner of DAF LP through which it indirectly owned the other entities in the DAF Structure.

**1. Notices**

1.2     In the interests of expedience, the JOLs and the Directors agree that any notices or coummincation required under this Protocol shall be sent by email as follows:

    a)   To the JOLs:

        Margot MacInnis - margot.macinnis@uk.gt.com
        Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com
        CDAF Core - CDAF.Core@uk.gt.com

---

[1] Letter dated 22 May from Johnstone Law to Campbells.

2

#3253267v5

b) To the Directors:

Mark Patrick - mpatrick@dafholdco.com

Paul Murphy - paul@gkmanagement.com.ky

**2** **Transactional Reporting**

2.1 ~~Upon~~ The CDM Entities have engaged Armanino LLP ("**Armanino**"), an independent accountancy firm to provide the financial statement reporting and accounting analysis required under this Protocol.

~~2.1~~ Within 14 days of the execution of this Protocol, the Directors ~~will~~shall provide ~~a report~~ to the JOLs a written report listing all ~~transactions~~ Transactions (as defined below) undertaken by ~~DAF LP, or any of the CDM Entities, since 27 March 2025.~~

2.2 ~~The~~ the CDM Entities between 1 July 2024 and the date of this Protocol (the "**Historical Transaction Report**"). For each Transaction in the Historical Transaction Report, the Directors shall ~~provide a business plan within~~include the following details:

(a) The date of the Transaction;

(b) The identity of any party(ies) depositing funds in respect of the Transaction;

(c) The identity of any party(ies) receiving funds in respect of the Transaction; and

(d) An explanation as to the nature and purpose of the Transaction.

"**Transaction(s)**" as used in this Protocol shall mean the acquisition or disposition of assets in a single transaction or series of related transactions that is equal to or exceeds US$10,000; provided, however, that "Transaction(s)" shall not include renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

~~2.2~~2.3 Within 21 days of the signing of this Protocol, the Directors shall provide a business plan to the JOLs (which can be revised from time-to-time if it is reasonably determined to be necessary by the Directors and within the ordinary course of ~~buisness~~busisness for DAF LP and the CDM Entities) (the "**Business Plan**"). The Business Plan shall set out the Directors' proposal as to the ongoing operations and management of DAF LP and the CDM Entities. Steps taken with respect to the management of DAF LP and the CDM Entities will be considered to be in the ordinary course of business if they are provided for in the Business Plan.

2.4 The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of DAF LP and the CDM Entities in accordance with the ~~Mission Statement. The Directors~~Business Plan.

3

#3253267v5

**1155**

2.3**2.5** Armanino shall provide a monthly ~~transactions~~Transactions report and balance sheet (the "Monthly Transaction Report") to the JOLs so they have oversight of DAF LP's investment activity and financial performance, and the steps being taken by the Directors in the ordinary course of DAF LP's business. For each Transaction in the Monthly Transaction Report, Armanino shall include the following details:

(e) The date of the Transaction;

(f) The identity of any party(ies) depositing funds in respect of the Transaction;

(g) The identity of any party(ies) receiving funds in respect of the Transaction; and

(h) An explanation as to the nature and purpose of the Transaction.

2.4**2.6** If the JOLs have any doubt about whether a ~~transaction~~Transaction is or is not in the ordinary course of DAF LP's business, ~~they may contact~~ the JOLs shall consult with the Directors ~~for~~who agree to make reasonable efforts to provide clairfation. For the avoidance of doubt, the JOLs shall not unilaterally contact third party service providers of the CDM Entities in respect of any Transaction, or any any anticipated transaction which they have been put on notice of pursuant to paragraph 2.7, without first consulting with, and seeking clarifcation from, the Directors.

2.5**2.7** The Directors will ~~endeavour~~use reasonable efforts to provide advance notice to the JOLs in respect of any disposition of assets in a single transaction ~~of DAF LP exceeding US$ 1,000,000~~ or ~~any~~series of related transactions ~~in an aggregate amount exceeding US$1,000~~that is equal to or exceeds US$250,000 **SAVE THAT** advance notice is not required, in relation to any ~~single transaction or series of transactions in the ordinary course of business involving or~~ disposition related to (i) the ~~proper~~ operation ~~and~~or administration of the DAF Structure; ~~and~~ in the ordinary course of business or (ii) the renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.6**2.8** Notwithstanding anything to the contrary in this Protocol, the Directors shall be under no obligation to undertake any action or refrain from taking any action to the extent they deem it reasonably necessary to comply with their legal obligations to the CDM Entities.

**3 Legal and Professional Fees**

3.1 The JOLs acknowledge DAF LP's need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of DAF LP or the CDM Entites to seek legal or professional advice.

**4 Consultation**

4.1 ~~Save in exceptional circumstances, the~~The JOLs shall provide notice to the Directors of any intended exercise of powers by them which would be consistent with the DAF Provisions, and the JOLs shall

4

#3253267v5

**1156**

discuss and consult with the Directors in respect of any intended action against DAF LP or the CDM Entities. ~~The JOLS shall provide advice notice of any intended exercise of their powers without sanction by the Court with respect to DAF LP or any CDM Entity that could reasonably be expected to exceed the powers granted to the JOLs by the Court.~~

## 5       Confidentiality

5.1     In respect of any information of whatever nature relating to any member of the CDM Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (herinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

(a)    keep the Confidential Information confidential and will not disclose it to anyone except as provided for by paragraph 5.2 below;

(b)    ~~Not~~not disclose any Confidential Information to Mr James Dondero, the Highland Foundations, or any known affiliates or service providers of these individuals / entities; and

(c)    ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2     The JOLs may disclose Confidential Information:

(a)    Subject to the restrictions in ~~paragrpah~~paragraph 5.1(b), to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall ~~be notified by the JOLs~~agree in writing to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b)    where required or requested by any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency; or

(c)    with the Directors' prior written consent.

## 6       Formalities

6.1     This Protocol may not be waived, varied or amended without consent in writing from all parties.

6.2     This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

5

#3253267v5

6.3   For the avoidance of doubt this Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the adjudication of the Grand Court of the Cayman islands.

6.4   In the event that either party considers that the other party has acted contrary to this Protocol, it shall first raise the matter by telephone or by email with an explanation of the basis for such complaint and thereafter allow a reasonable period for the other party to remedy the situation or provide an explanation for its conduct.  If either party considers that the issue is not resolved then a conference call will be scheduled for a discussion between the Directors and the JOLs (and their respective legal advisors if necessary).  Only in the event that there remains a dispute after these steps have been taken will either party refer the matter to the Court.

[SIGNATURES]

6

#3253267v5

**Annexure 1 – List of CDM Entities**

(i)      CDH GP, Ltd. (Cayman Islands)

(ii)     CDMCFAD, LLC (Delaware)

(iii)    Charitable DAF Fund 2, LP (Cayman Islands)

(iv)    Charitable DAF Fund, LP (Cayman Islands)

(v)     CLO HoldCo, Ltd. (Cayman Islands)

(vi)    Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii)   HCT Holdco 2, Ltd. (Cayman Islands)

(viii)  MGM Studios Holdco, Ltd. (Cayman Islands)

(ix)    Liberty CLO HoldCo, LLC (Delaware)

(x)     Liberty Sub, Ltd. (Delaware)

(xi)    Charitable DAF Holdings Corp. (Delaware)

(xii)   DST Investco, LLC (Delaware)

(xiii)  Allanon Capital Management LLC (Texas)

#3253267v5

1159

# EXHIBIT 82



IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 201 OF 2025 (   ) (RPJ)

IN THE MATTER OF THE GRAND COURT ACT

BETWEEN:

CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

Plaintiff

AND

(1)    MARK ERIC PATRICK

(2)    PAUL MURPHY

(3)    CDMCFAD, LLC

(4)    DFW CHARITABLE FOUNDATION

(5)    CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER

(6)    CLO HOLDCO, LTD.

Defendants

---

**SUMMONS**

---

THIS SUMMONS was issued by Maples and Calder, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403.01/83663834)

**LET THE PLAINTIFF AND THE DEFENDANTS** attend before the Judge in Chambers at the Law Courts, George Town, Grand Cayman on the ³¹ day of ᴶᵘˡʸ 2025 at ⁹:⁰⁰ ᵃ·ᵐ· upon an application by the Plaintiff for Orders in terms of the draft annexed hereto.

DATED this 15th day of July 2025

*Maples and Calder (Cayman) LLP*

**Maples and Calder (Cayman) LLP**

TO:      The Registrar of the Financial Services Division

AND TO:    (1)    Mark Eric Patrick

           (2)    Paul Murphy

           (2)    CDMCFAD, LLC

           (3)    DFW Charitable Foundation

           (4)    CDH GP, Ltd. as general partner for and on behalf of Charitable DAF Fund, LP, and in its capacity as general partner

           (5)    CLO HoldCo, Ltd.

TIME ESTIMATE: The estimated length of the hearing of this summons is 1 day.

THIS SUMMONS was issued by Maples and Calder, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403.01/83663834)

FSD2025-0201

Case 19-34054-sgj11 Doc 4081-79 Filed 05/08/26 Entered 05/08/26 12:42:39 Desc
Exhibit 69 - Part 7 Page 115 of 165
Page 3 of 16

2025-07-15

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 201 OF 2025 ( )

IN THE MATTER OF THE GRAND COURT ACT

BETWEEN:

CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

Plaintiff

AND

(1)    MARK ERIC PATRICK

(2)    PAUL MURPHY

(3)    CDMCFAD, LLC

(4)    DFW CHARITABLE FOUNDATION

(5)    CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER

(6)    CLO HOLDCO, LTD.

Defendants

---

**[DRAFT] ORDER**

---

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

**PENAL NOTICE**

IF YOU THE DEFENDANTS, AND EACH OF YOU, DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND LIABLE TO BE FINED OR TO HAVE YOUR ASSETS SEIZED AND (IF A NATURAL PERSON) BE LIABLE TO IMPRISONMENT.

ANY DIRECTOR, OFFICER OR MANAGER OF ANY CORPORATE DEFENDANT MAY BE LIABLE TO BE FINED OR TO HAVE YOUR ASSETS SEIZED AND (IF A NATURAL PERSON) ALSO BE LIABLE TO IMPRISONMENT IN RESPECT OF ANY CONTEMPT OF COURT BY THE CORPORATE DEFENDANT.

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE DEFENDANTS OR ANY OF THEM TO BREACH THE TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.

**UPON** the Summons of the Plaintiff dated 15 July 2025 (the "**Summons**");

**AND UPON** hearing Counsel for the Plaintiff and Counsel for the [ ] Defendants;

**AND UPON** reading the sworn evidence listed in Schedule C to this Order;

**IT IS ORDERED** as follows:

1    **Preservation of Property**

    1.1    Until trial or further Order, the Defendants will:

        (a)    Preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature),

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

2

whether held directly or indirectly, in Charitable DAF Fund, LP (the "**Fund**"), the Fund Entities (defined in Schedule A hereto) and/or any assets of the Fund;

(b)     Procure that the Fund Entities and their wholly owned subsidiaries will not in any way dispose of, deal with, encumber, transfer or diminish the value of any of their assets; and

(c)     Preserve and will not in any way dispose of, deal with, encumber, transfer or diminish any assets in their possession or control, whether they are in or outside the Cayman Islands, which were, are or may be received (whether directly or indirectly):

(i)     by way of distribution, disposition, dividend, benefit, payment or other transfer from (as the case may be) the Plaintiff, the Fund, any of the Third to Fifth Defendants, the Fund Entities and/or their wholly owned subsidiaries; or

(ii)     from any assets of the Fund, the Fund Entities and/or their wholly owned subsidiaries.

1.2     The Defendants shall not do anything to cause, procure, incite, promote or assist a breach by any other Defendant of the above clause 1.1.

2     **Disclosure of Information**

2.1     The Defendants (and each of them) must within 21 days of the date of this Order provide an affidavit (by themselves or by their proper officer) setting out (to the best of their ability):

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

3

(a) Full details of all entities owned by the Fund, whether through any Fund Entity or any other subsidiaries, whether directly or indirectly or solely or jointly owned, or otherwise.

(b) With respect to the Fund Entities and any other entities identified under paragraph (i) above, full details of the holders of shares or other membership interests, directors, officers or other controllers, and places and details of incorporation.

(c) Full details of every payment by way of salary, bonus, dividend, distribution, expenses, or other compensation made to the First or Second Defendants and/or any other officer or employee, or for their direct or indirect benefit, by the Plaintiff, the Fund, the Third Defendant, the Fourth Defendant, the Fifth Defendant, or any of the Fund Entities (or any other entities identified under paragraph 2.1(a) above) between 25 March 2021 and the date of this Order. Such information is to include the dates and amounts of each payment, the basis of the payment, the identity of the paying party, and full details of the account into which payment was made.

(d) Without prejudice to the above, full details of every payment to any attorney, lawyer, third party consultant, accountant, or external professional services advisor, whether a firm, partnership, company or individual, by the Plaintiff, the Fund, the Third Defendant, the Fourth Defendant, Fifth Defendant, or any of the Fund Entities (or any other entities identified under paragraph 2.1(a) above) between 25 March 2021 and the date of this Order. Such information is to include the dates and amounts of each payment, the basis of the payment, the identity of the paying party, and full details of the account into which payment was made.

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

4

FSD2025-0201 **Page 7 of 16** 2025-07-15

2.2 In addition to the information in paragraph 2.1(a)-(d) above and insofar as not already covered above, the Fifth Defendant must include in its affidavit:

(a) Full details of all assets owned by the Fund (whether registered in the name of the Fund or in the name of the General Partner on behalf of the Fund) and their estimated current values.

(b) Full details of all disposals, assignments, transfers, sales, purchases or other transactions in respect of all or part of any asset owned by the Fund, for the period commencing on 25 March 2021 until the date of this Order. Such details must include (a) the date of the transaction; (b) the identity of any party(ies) depositing funds in respect of the transaction; (c) the identity of any party(ies) receiving funds in respect of the transaction; and (d) an explanation as to the nature and purpose of the transaction.

2.3 In addition to the information in paragraph 2.1(a)-(d) above and insofar as not already covered above, the Sixth Defendant must include in its affidavit:

(a) Full details of all assets owned by each of the Fund Entities or any of their wholly owned subsidiaries and their current estimated values.

(b) Full details of all disposals, assignments, transfers, sales, purchases or other transactions in respect of all or part of any asset owned by any Fund Entity or any of their wholly owned subsidiaries, for the period commencing on 25 March 2021 until the date of this Order. Such details must include (a) the date of the transaction; (b) the identity of any party(ies) depositing funds in respect of the transaction; (c) the identity of any party(ies) receiving funds in respect of the

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

5

FSD2025-0201 2025-07-15

transaction; and (d) an explanation as to the nature and purpose of the transaction

3  The affidavits required pursuant to paragraphs 2.1 to 2.3 above shall have exhibited to them true copy documents:

3.1  Full and complete copies of all existing financial statements or records, including statements prepared on a consolidated basis and/or management accounts and/or ledgers, prepared in respect of the Fund, the Third Defendant, the Fourth Defendant, the Fifth Defendant, the Sixth Defendant or any of the Fund Entities or any other entities identified under paragraph 2.1(a) above between 25 March 2021 and the date of this Order.

3.2  Full data and documents in support of the information required pursuant to paragraphs 2.1 to 2.3 above.

Copy documents shall be provided in electronic form but must be identified in clear terms (on a category basis) in the respective affidavit.

4  **Monthly Reports**

4.1  Until trial or further Order:

(a)  The Defendants (and each of them) must within 7 days of the end of each calendar month after this Order is made, provide the Company with a written report, listing all transactions that have been undertaken by each of them, the Fund, and any of the Fund Entities or any other entities identified under paragraph 2.1(a) above during the calendar month just passed (the "**Monthly Transaction Report**").

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

6

Case 1:19-34054-sgj11 1:19-03006-CSB-7 Doc 800 3200 Page 7/03/15 Filed 05/08/26 123.423.39 Desc
Exhibit 69--Part 2 Page 121 of 885

FSD2025-0201 **Page 9 of 16** 2025-07-15

(b)  For each transaction in a Monthly Transaction Report, the following details shall be included:

(i)  The date of the transaction;

(ii)  The identity of any party(ies) depositing funds in respect of the transaction;

(iii)  The identity of any party(ies) receiving funds in respect of the transaction; and

(iv)  An explanation as to the nature and purpose of the transaction.

## 5  Exceptions to this Order

5.1  This Order does not prohibit:

(a)  The Defendants, the Fund Entities or their wholly owned subsidiaries from making any payments in an amount of US$10,000 or less that are reasonably necessary in the ordinary course of business to keep the corporate Defendants, the Fund Entities or their wholly owned subsidiaries in good standing; or

(b)  The Fifth Defendant or Sixth Defendant from making payment from Fund assets of their reasonable legal fees and expenses, but prior to making any such payment, the Fifth Defendant or Sixth Defendant (as applicable) must give 3 days' written notice to the Plaintiff setting out full details of where the money that is being used for the payment has been sourced from.

5.2  To the extent that any Defendant, Fund Entity or any of their wholly owned subsidiaries wishes to (i) make any payment or otherwise deal with its assets for the purpose of

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

7

preserving, improving or maintaining the value of its assets; or (ii) make any new investments, they may make a written request (in the case of a Fund Entity or one of their wholly owned subsidiaries, through the Sixth Defendant) to the Plaintiff to undertake the proposed transaction. Such request must include full supporting information and documentation as well as an explanation of the rationale for the transaction. The Plaintiff shall be required to give its approval or non-approval to the proposed transaction within 7 days of the request being made. Should the Plaintiff not approve the proposed transaction, the party making the request shall not consummate the proposed transaction.

## 6    <u>Effect of this Order</u>

6.1    A Defendant who is an individual who is ordered not to do something must not do it themselves or in any other way. The Defendant must not do it through others acting on that Defendant's behalf or on that Defendant's instructions or with that Defendant's encouragement.

6.2    <u>Set off by Banks</u> - This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to any Defendant before it was notified of the Order.

6.3    <u>Withdrawals by any Defendant</u> - No bank need enquire as to the application or proposed application of any money withdrawn by any Defendant if the withdrawal appears to be permitted by this Order.

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

8

**Page 11 of 16**

## 7     Parties other than the Plaintiff and Defendants

7.1     <u>Effect of this Order</u> - It is a contempt of Court for any person notified of this Order knowingly to assist in or permit a breach of the Order. Any person doing so may be sent to prison, fined, or have that person's assets seized.

7.2     <u>Effect of this Order outside the Cayman Islands</u> - The terms of this Order do not affect or concern anyone outside the jurisdiction of this Court until it is declared enforceable or is enforced by a court in the relevant country and then they are to affect such person only to the extent they have been declared enforceable or have been enforced UNLESS such person is:

    (a)     a person to whom this Order is addressed or an officer or an agent appointed by power of attorney of such a person; or

    (b)     a person who is subject to the jurisdiction of this Court and (i) has been given written notice of this Order at that person's residence or place of business within the jurisdiction of this Court and (ii) is able to prevent acts or omissions outside the jurisdiction of this court which constitute or assist in a breach of the terms of this order.

7.3     <u>Assets located outside the Cayman Islands</u> -

    (a)     Nothing in this order shall, in respect of assets located outside the Cayman Islands, prevent any person other than the Defendants from complying with: (1) what that person reasonably believes to be their obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between that person and the Respondent; and (2) any orders of the courts of that country or state,

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

9

provided that reasonable notice of any application for such an order, being not less than 28 days, is given to the Plaintiff's attorneys.

## 8     Undertakings

8.1    The Plaintiff gives to the Court the undertakings set out in Schedule B to this Order.

## 9     Duration of this Order

9.1    This Order will remain in force until after final judgment in these proceedings unless before then it is varied or discharged by further Order of the Court.

## 10    Costs

10.1    The Defendants shall be jointly and severally liable to pay the Plaintiff's costs of the Summons, such costs to be taxed if not agreed.

## 11    Variation of this Order

11.1    Any Defendant (or anyone notified of this Order) may apply to the Court at any time to vary this Order (or so much of it as affects that person), but anyone wishing to do so must first inform the Plaintiffs' attorneys in writing on not less than 28 days' notice.

## 12    Leave to serve out of the jurisdiction

12.1    The Plaintiff has leave to serve the Writ, the Statement of Claim, this Order, the Summons and evidence in support, and all other documents associated with these proceedings on:

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

10

(a)    The First Defendant in the United States of America in accordance with the laws of that country as to service on individuals; and

(b)    The Third and Fourth Defendants in the United States of America in accordance with the laws of that country as to service on corporations.

12.2    The First Defendant, the Third Defendant and the Fourth Defendant shall have 28 days after service to file their Acknowledgement of Service.

**NAME AND ADDRESS OF PLAINTIFF'S ATTORNEYS**

The Plaintiff's attorneys are: Maples and Calder (Cayman) LLP, Ugland House, PO Box 309, Grand Cayman, Cayman Islands KY1-1104

DATED this       day of       2025

FILED this       day of       2025

_____

**THE HONOURABLE JUSTICE [SURNAME OF JUDGE]**

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213

11

### SCHEDULE A: LIST OF FUND ENTITIES

(i) Charitable DAF Fund 2, LP (Cayman Islands)

(ii) Charitable DAF Fund, LP (Cayman Islands)

(iii) CLO HoldCo, Ltd. (Cayman Islands)

(iv) Liberty CLO HoldCo, Ltd. (Cayman Islands)

(v) HCT Holdco 2, Ltd. (Cayman Islands)

(vi) MGM Studios Holdco, Ltd. (Cayman Islands)

(vii) Liberty CLO HoldCo, LLC (Delaware)

(viii) Liberty Sub, Ltd. (Delaware)

(ix) Charitable DAF Holdings Corp. (Delaware)

(x) DST Investco, LLC (Delaware)

(xi) Allanon Capital Management LLC (Texas)

(xii) CLO HoldCo LLC (Delaware)

(xiii) Rand Advisors LLC (Delaware)

(xiv) CDHC Royse City Land LLC (Texas)

(xv) Royse City Land Company LLC (Texas)

(xvi) CDHC Assets LLC (Texas)

(xvii) CDHC Fort Worth Land LLC (Texas)

(xviii) CDHC Stewart Creek LLC (Texas)

(xix) BVP Property LLC (Delaware with CA registration)

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213                                                                 12

FSD2025-0201                                                                                                      2025-07-15

### SCHEDULE B: UNDERTAKINGS GIVEN BY THE PLAINTIFF

(1)     Anyone notified of this Order will be given a copy of it by the Plaintiffs' attorneys.

(2)     The Plaintiff will pay the reasonable costs of anyone other than any Defendant which have been incurred as a result of this Order including the costs of ascertaining whether that person holds any of such Defendant's assets and that if the Court later finds that this Order has caused such a person loss, and decides that the person should be compensated for that loss, the Plaintiffs will comply with any Order the Court may make above.

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213                                                                                              13

### SCHEDULE C: SWORN EVIDENCE CONSIDERED BY THE JUDGE

The Judge read the following sworn evidence before making this Order:

(1)     The First Affidavit of Margot MacInnis sworn on 15 July 2025 together with its exhibit MM-1;

(2)     …

(3)     …

THIS ORDER was filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403-01/83693213                                                                    14

# EXHIBIT 83

Patrick - Direct                                        132

Q    Of all the people in the world, Mr. Scott decided to transfer it to you, correct?

A    Yeah.  Mr. Scott transferred those interests to me.

Q    Okay.  And you accepted them, right?

A    Yes.

Q    You're not getting paid anything for taking on this responsibility, correct?

A    I am not paid by any of the entities depicted on this chart.

Q    And Mr. Scott used to get $5,000 a month, didn't he?

A    I believe that's what he testified to.

Q    Yeah.  But you don't get anything, right?

A    Correct.

Q    In fact, you get the exact same salary and compensation from Skyview that you had before you became the authorized representative of the DAF entities and CLO Holdco.  Correct?

A    Correct.

        MR. MORRIS:  Okay.  Your Honor, if I may just take a moment, I may be done.

        THE COURT:  Okay.

    (Pause.)

        MR. MORRIS:  Your Honor, I have no further questions.

        THE COURT:  All right.  Pass the witness.  Any examination of the witness?

                        CROSS-EXAMINATION

# EXHIBIT 84

**intertrust** GROUP

Registration No.: 53083

Date of Incorporation: **28 October 2011**

Client No.: **KY059900**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF FUND, LP**

| | |
|---|---|
| Share Class: | **General Partner** |
| Nominal Value: | **USD 0.00** |
| Voting Rights: | Yes |
| Conditional: | NO |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| CHARITABLE DAF GP, LLC The Corporation Trust Company Corporation Trust Center 1209 Orange St New Castle 19801 Wilmington DE USA | 25 Oct 2011 | New Partner | 1.00 | 25 Oct 2011 : Initial Exempted Limited Partnership Agreement dated 25 Oct 2011 | No Cert | | | |
| | | | | | | Nil | 1.00 | |

Notes:

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

PATRICK_000016

# EXHIBIT 85

CAUSE NO. _____

| | |
|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | |
| | IN THE TEXAS BUSINESS COURT |
| *Plaintiffs,* | |
| v. | 1ST DIVISION |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd., | DALLAS, TEXAS |
| *Defendants.* | |

**PLAINTIFFS' ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION, AND EMERGENCY <u>REQUEST FOR APPOINTMENT OF RECEIVER</u>**

**TO THE HONORABLE JUDGE OF SAID COURT:** The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc., (collectively, the "Plaintiffs" or "Supporting Organizations") file this Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Application for Appointment of Receiver, and in support thereof, respectfully show the Court as follows:

## I. PRELIMINARY STATEMENT

1.1 Defendant, Mark Patrick, through a host of corporate manipulations, took over $270 million in cash and assets that supported some of the most important community-based

---

PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                                    **PAGE 1**

charities in the country. In Patrick's own testimony from just last Wednesday, June 25th, the Supporting Organizations, plaintiffs here, were left with "nothing."[1]

1.2    Through the mechanism of Charitable DAF GP, LLC (organized in Delaware) and later via a secretly incorporated entity, CDH GP, Ltd., Mark Patrick held the sole control position of what was a $270 million charitable fund (Charitable DAF Fund, LP) that four charities and the Supporting Organizations relied on to perform vital and sustained philanthropic work in specific communities in the United States.   Patrick flagrantly violated both his express and implied fiduciary duties to the Supporting Organizations. He did so in order to redirect the fund's beneficial ownership to a brand-new sham charitable organization controlled by him, DFW Charitable Foundation. These actions come against a backdrop and pattern of sustained self-aggrandizement by Patrick using the fund's resources and his technical authority over them.  If the Defendants here are not immediately prevented from taking further adverse actions, then placed into receivership and subjected to judicial scrutiny, the Plaintiffs will be cut off from the lifeblood of their charitable work by the very person whose duty was to act in their interests.  Accordingly, Plaintiffs seek a Temporary Restraining Order and Temporary Injunction freezing the funds, followed by the appointment of a Receiver over the funds and the organization holding them.

## II.    DISCOVERY CONTROL PLAN AND MONETARY RELIEF

2.1    Plaintiffs intend that discovery be conducted under Level 2 as set forth in Rule 190.3 of the Texas Rules of Civil Procedure.  Plaintiffs reserve the right to request to conduct discovery pursuant to "Level 3" as set forth in Rule 190 of the Texas Rules of Civil Procedure.

---

[1] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11 (App. Pg. 200)

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 2**

2.2     Plaintiffs seek damages in excess of $5,000,000 exclusive of interest, statutory

damages, exemplary damages, penalties, attorney's fees, and court costs.

### III.     PARTIES

3.1     **The Highland Dallas Foundation, Inc. ("HDF")** is a Delaware non-profit

corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HDF

provides funding to The Dallas Foundation, a Texas charitable entity established in 1929, which

has awarded over $1 billion in charitable grants that support a broad range of public needs.

3.2     **The Highland Kansas City Foundation, Inc. ("HKCF")** is a Delaware non-

profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code.

HKCF provides funding to the Greater Kansas City Community Foundation, established in 1978,

which has awarded over $7 billion in in charitable grants that support a broad range of public

needs.

3.3     **The Highland Santa Barbara Foundation, Inc. ("HSBF")** is a Delaware non-

profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code.

HSBF provides funding to the Santa Barbara Foundation, established in 1928, that supports a broad

range of public needs.

3.4     **DFW Charitable Foundation ("DFWCF")** is a Delaware non-profit corporation

exempt from taxation under Section 501(c)(3) of the Internal Revenue Code.  It was organized on

December 9, 2024, with Defendant Mark Patrick as DFWCF's sole member.  It purports to be a

nonprofit nonstock corporation serving exclusively charitable purposes.  DFWCF is headquartered

at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254.  DFWCF maintains a

registered office at Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle

County, Delaware 19801, where it may be served with process.

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 3**

3.5 **Mark Patrick ("Patrick")** is an individual who resides in Texas and holds management control over the Fund structure, as explained more thoroughly below. Patrick resides and may be served with process at 6716 Glenhurst Drive, Dallas, Texas 75254, or served anywhere he may be found.

3.6 **CDMCFAD, LLC** is a Delaware limited liability company with headquarters at 6716 Glenhurst Drive, Dallas, Texas 75254. It may be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

3.7 **CDH GP, Ltd**. is a Cayman Island limited company with its registered office at Campbells Corporate Services Limited, Floor 4 Willow House, Cricket Square, Grand Cayman Ky1-9010. It may be served with process through Patrick, its 100% owner and sole director, at 6716 Glenhurst Drive, Dallas, Texas 75254, or anywhere he may be found.

3.8 **CHARITABLE DAF GP, LLC** is a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands. It may be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

## IV. JURISDICTION AND VENUE

4.1 Pursuant to Government Code § 25A.004, this Court has jurisdiction over this matter because the amount in controversy exceeds $5 million excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

- and is an action regarding the governance, governing documents, or internal affairs of organizations, namely Charitable DAF Fund, L.P., and DAF HoldCo, Ltd;

PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                    PAGE 4

- and is an action by an owner of an organization, namely the Supporting Organizations as participating and beneficial owners of DAF HoldCo, Ltd and thereby Charitable DAF, L.P., and is brought against a controlling person and managerial official of the organization, namely Patrick, Charitable DAF, GP, LLC, CDH GP, Ltd and Patrick's controlled entities, DFWCF, and CDMCFAD, LLC; and alleges numerous fiduciary and other breaches of Patrick's, Charitable DAF, GP, LLC's, and CDH GP, Ltd's obligations in the capacity of a controlling person and managerial official of DAF HoldCo, Ltd and Charitable DAF, L.P.;

- and is an action alleging that Patrick, as a controlling person, and managerial official, with the entities he dominated and used, breached a duty owed to the Supporting Organizations as a controlling owner of DAF HoldCo, Ltd, CDMCFAD, LLC, and Charitable DAF, L.P., DFW Charitable Foundation by reason of the Patrick's status as an owner of management interests, controlling person, and managerial official, including the breach of a duty of loyalty and good faith.

4.2 The Court also has related supplemental jurisdiction per Government Code § 25A.004.

4.3 The Court also maintains plenary power to appoint a receiver under Texas Government Code § 24.003, Texas Civil Practice and Remedies Code § 64.001(a)(3), Texas Business and Organizations Code §§ 11.401 and 11.410, and through the Court's inherent powers at equity.

4.4 Personal jurisdiction is proper by Texas courts pursuant to Texas Civil Practice & Remedies Code § 17.042 because Defendants committed tortious actions, including Texas resident,

Mark Patrick, who improperly took approximately $270 million in value, and other conduct within Texas, incorporated herein, which are the subject of this Petition. Defendants are therefore subject to specific personal jurisdiction because of the complained-of acts that they committed in Texas. Defendants all have substantial business operations, assets, and other connections to Texas. Defendants are subject to general personal jurisdiction in Texas because they both reside in, and have continuous and systematic contacts with, Texas. Defendants have also consented to the jurisdiction of Texas courts.

4.5 Venue is proper in this county under Texas Civil Practice & Remedies Code § 15.002 because Defendant Patrick is a resident of Dallas County, Texas and Patrick undertook and directed a substantial portion of the complained-of acts in Dallas County, Texas. On information and belief, DFWCF, CDH GP, Ltd. and CDMCFAD are headquartered in Dallas County. Dallas County is within the 1st Division of the Texas Business Court.

## V. FACTUAL BACKGROUND

### A. *The Fund Structure*

5.1 James Dondero was the President of Highland Capital Management, L.P. ("**Highland**"), an SEC registered investment advisor. At Mr. Dondero's direction, in 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. The goal was to create a permanent, self-sustaining, self-governing charitable infrastructure to facilitate sustained philanthropic efforts in specific communities in the United States.

5.2 To that end, in 2011, "Charitable DAF Fund, L.P. ("**Charitable DAF Fund**") was formed to hold the donated assets.

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**

5.3     The Charitable DAF Fund primarily holds assets through a wholly-owned subsidiary entity called CLO HoldCo, Ltd. ("**CLO HoldCo**").

5.4     At the same time the Charitable DAF Fund was created, Charitable DAF HoldCo, Ltd ("**Charitable DAF HoldCo**"), a Cayman Islands entity, was also organized. Charitable DAF HoldCo held all of the economic interest in the Charitable DAF Fund. In other words, Charitable DAF HoldCo was the beneficial owner of all monies flowing from the assets held in the Charitable DAF Fund.

5.5     The ultimate purpose of forming Charitable DAF Fund and Charitable DAF HoldCo was to benefit certain, substantial regional nonprofit charities and their supporting organizations in California, Kansas, and Texas. Participating shares in Charitable DAF HoldCo were therefore issued to four Supporting Organizations, which were the ultimate beneficial owners of the assets held in the Charitable DAF Fund. Together, the four Supporting Organizations owned 100% of Charitable DAF HoldCo. The four Supporting Organization held their beneficial ownership in the assets of the Charitable DAF Fund by virtue of those Participating Shares in Charitable DAF HoldCo. Put simply: the four Supporting Organizations owned 100% of Charitable DAF HoldCo, which was the beneficial owner of all the assets in the Charitable DAF Fund. Three of the four Supporting Organizations are the Plaintiffs in this Lawsuit.

5.6     In turn and as intended, the funds provided to the Plaintiff Supporting Organizations from the Charitable DAF Fund empowered them to provide funding directly to charitable foundations in three regions of the United States. Specifically, The Dallas Foundation, The Greater Kansas City Community Foundation, and The Santa Barbara Foundation (together, the "**Charities**") are each affiliated with one of the Supporting Organizations and receive regular grants for charitable work ultimately funded by Charitable DAF Fund.

5.7    Since the Charitable DAF Fund's inception, the Supporting Organizations have granted over $42 million to charitable organizations, including donations to 275 organizations, with average annual grant payments of $3.7 million. The Supporting Organizations and the charitable organizations perform irreplaceable philanthropic work in their respective communities, and do so in a steady, reliable manner that permits them to build progress on initiatives year after year.

### B. *Control of the Fund*

5.8    The founders of the Charitable DAF Fund and of Charitable DAF HoldCo wanted to ensure that the fund assets were professionally managed by experts. So, although the Supporting Organizations were the sole beneficiaries of the Charitable DAF Fund and together held all of the economic interest in it, management control of the Charitable DAF Fund and Charitable DAF HoldCo was vested not with those organizations but rather in "Management Shares," with general partner status. These "Management Shares" provided the only voting rights for any and all shareholders in Charitable DAF HoldCo. But they did not convey a right to any economic benefit of the assets in the Charitable DAF Fund, which belonged solely to the Supporting Organizations.

5.9    So, the "Management Shares" exercised control over the assets and over the operations of Charitable DAF HoldCo, even though they conveyed no economic benefit. In the interest of efficient management, the Management Shares and general partner status in the Charitable DAF Fund were concentrated in one person, the "**Control Position**." The Control Position was therefore responsible to manage the Charitable DAF Fund and Charitable DAF HoldCo for the economic benefit of their economic beneficiaries—the "Supporting Organizations," which held their "Participating Shares." The Control Position therefore owed the

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 8**

Supporting Organizations fiduciary duties of candor, care, and loyalty, including a prohibition against any self-dealing.

5.10 In essence, the governing documents of Charitable DAF HoldCo grant complete control of Charitable DAF Fund structure to the holder of the 100 Management Shares in Charitable DAF HoldCo. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Charitable DAF Fund structure.

5.11 The Charitable DAF Fund, however, is also expressly, separately controlled by the Control Position. Similar to control over Charitable DAF HoldCo, control over the Charitable DAF Fund is separate from the beneficial economic ownership of the Charitable DAF Fund (which belongs entirely to the Supporting Organizations). Control over the Charitable DAF Fund was reposited in the Control Position through its complete ownership of a Delaware entity named Charitable DAF GP, LLC[2] (the "**Delaware GP**"). The Delaware GP was the managing general partner in the Charitable DAF Fund.

5.12 The Amended and Restated Limited Partnership Agreement of the Charitable DAF Fund, dated November 7, 2011 (the "**ARLPA**"), and the Amended and Restated Memorandum and Articles of Association of the LP dated January 19, 2015 ("**Articles**"), govern the Charitable DAF Fund and its partners. The ARLPA makes it clear the Control Position is to exercise his powers for the sole benefit of the Supporting Organizations.

5.13 For example, the Preamble to the ARLPA states: "WHEREAS, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code

---

[2] The Charitable DAF GP, LLC, held all the general partnership shares in Charitable DAF Fund, which provided all management control over the Charitable DAF Fund, but conveyed no beneficial economic interest.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 9**

of 1986, as amended and the parties hereto desire for the Partnership to be for the economic benefit

of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein[.]"

5.14 Likewise, Section 1.3 (Purpose and Powers) states that the Control Position must

manage the fund assets *for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.*[3]

5.15 Section 1.6 (Powers) likewise emphasizes: "[T]he General Partner [Control

Position] . . . is hereby granted the right, power and authority to do on behalf of the Partnership all

things which, in the General Partner's sole discretion, are necessary or appropriate to manage the

Partnership's affairs and fulfill the purposes of the Partnership; *provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*"[4]

5.16 The ARLPA thus provides that Charitable DAF Fund was formed to make

investments, directly or indirectly, "for the economic benefit of the Limited Partner [DAF HoldCo]

and its Indirect Charitable Owners" and contemplates the engagement of investment (and other

service) advisors to achieve this. In this context, the Control Position is responsible for the

governance and management functions of the Charitable DAF Fund as required for it to carry out

its sole purpose of benefiting the Supporting Organizations and the Charities they support. The

ARLPA is infused throughout with the singular command: The Control Position has great authority

but is required to act with fidelity in exercising it for the benefit of the Supporting Organizations.

5.17 Grant Scott was initially selected for the Control Position. Mr. Scott was a longtime

friend of Mr. Dondero's and a lawyer in North Carolina. Mr. Dondero knew and trusted Mr. Scott.

---

[3] Emphasis added.
[4] Emphasis added.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** PAGE 10

Mr. Scott effectively served the Supporting Organizations' charitable purposes in his role in the Control Position. For this, Mr. Scott received $60,000 in annual compensation—a compensation rate that remained unchanged for the better part of decade. During this time, the Supporting Organizations and their respective charitable foundations made great strides in creating philanthropic, and charitable, work that was efficient, that was steady and reliable, and that grew and built on their progress year after year.

### C. *Mark Patrick's Assumption of Control*

5.18    Highland filed for bankruptcy in October 2019 ("**Highland Bankruptcy**") and, as a result, the Charitable DAF Fund became engaged in certain disputes arising from the bankruptcy, increasing the time and responsibilities associated with the Control Position. Mr. Scott did not feel qualified to manage those disputes and decided to resign from the Control Position.

5.19    Mark Patrick, a tax attorney and employee of Mr. Dondero who had played a significant role in developing the overall Charitable DAF Fund structure while at Highland, suggested to Mr. Scott and Mr. Dondero that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected Charitable DAF Fund.  At the time, Patrick was an employee of Mr. Dondero's enterprises and was serving as Mr. Dondero's attorney and Mr. Dondero had no objection to Mr. Scott transferring the Control Position to Patrick. As a result of his attorney and employee status, Mr. Patrick owed significant fiduciary duties to Mr. Dondero's entities and to the Charitable DAF Fund structure—fiduciary duties that he has violated in a series of self-serving and self-dealing transactions.

5.20    On March 25, 2021, Mr. Scott resigned and appointed Patrick as director of DAF HoldCo, transferring all his management shares and membership interest to Patrick for nominal consideration. Patrick therefore assumed the Control Position from that date. Patrick then hired

Paul Murphy, a Cayman Islands' director, to join him in his efforts to abscond with the $270 million in assets.

5.21    At the time Patrick assumed the Control Position, he was employed at Skyview Partners, a service organization that provided support primarily to Mr. Dondero and entities in which Mr. Dondero had an interest. As an employee of Skyview, he owed fiduciary duties to his employer.

**D.   *Patrick's Breaches of Fiduciary Duty***

5.22    In 2023, while still employed by Dondero entities, and as the sole fiduciary for the Charitable DAF Fund and DAF HoldCo, Patrick initiated a two-year pattern of malfeasance all culminating in his current effort to abscond with $270 million. His initial small infidelities quickly blossomed into a brazen, fraudulent play for the Charitable DAF Fund and its $270 million in holdings, putting at risk the charitable works supported by the Supporting Organizations.

**E.   *Undisclosed Self-Dealing***

5.23    In June 2023, Patrick requested that The Highland Dallas Foundation, Inc. direct $10,000 to Creative HEARTS TX, a non-profit entity formed on June 13, 2023. Patrick expected this to be an annually recurring donation. Patrick failed to disclose that he, his wife, and daughter were the directors of this entity, which had been created approximately two weeks earlier. The Highland Dallas Foundation, Inc. funded an initial $10,000 contribution but declined to commit to doing so annually.

**F.   *Attempted Fraudulent Kickback Scheme***

5.24    In September 2023, Patrick approached Kevin Cronin, CEO of Fortaris Capital Advisors, proposing a fraudulent kickback scheme to personally benefit Patrick. Fortaris previously provided legitimate services to the Charitable DAF Fund. Now, Patrick proposed that

the Charitable DAF Fund engage a new vendor controlled by Mr. Cronin. Patrick proposed that the Charitable DAF Fund pay this sham vendor a monthly fee of $25,000-$50,000. The sham vendor, however, would not provide any services to the Charitable DAF Fund. Instead, Patrick expected to collect half of the fee as undisclosed supplemental compensation. That is, he expected to collect something for nothing in a classic fraud.

5.25    Mr. Cronin declined and relayed what occurred to Mr. Dondero. Mr Dondero then confronted Patrick, who admitted that what Mr. Cronin reported was true.

5.26    Mr. Dondero ensured that Supporting Organizations were also informed about Patrick's kickback scheme. Despite significant concern, the Supporting Organizations had doubts about whether, based on the governing documents and Patrick's positions, they could remove Patrick from the Control Position.

**G.** *Insider Trading*

5.27    In August 2024, Patrick tried to capitalize on material non-public information obtained through his employment at Skyview to advise The Dallas Foundation to exercise a put option in a NexPoint affiliated asset, constituting attempted violations of U.S. securities laws. The Dallas Foundation declined to trade on Patrick's improper tip.

5.28    Skyview's compliance department conducted an internal investigation that concluded Patrick's actions constituted serious breaches of compliance obligations and attempted serious breaches of U.S. securities laws.

5.29    Patrick resigned from Skyview immediately before the investigation was finalized and simultaneously terminated the Charitable DAF Fund's services agreement with Skyview without justification and against the Charitable DAF Fund's interests.

**H.** *Financial Irregularities and Lack of Transparency*

5.30 After resigning from Skyview, Patrick began shrouding the Charitable DAF Fund structure's overall financial reporting and communications to the point that the Supporting Organizations were essentially cut off from any view into the financial transactions and soundness of the fund. As of September 2024, the Charitable DAF Fund held approximately $270 million strictly for the financial benefit of the Supporting Organizations and ultimately their supported Charities.

5.31 But a review of the Charitable DAF Fund's last accessible financial records showed dramatic and unexplained increases in expenditures:

- Directors' fees increased from $40,000 in 2022 to almost $600,000 in 2023, and to approximately $2.25 million in the first half of 2024 alone (a 12,400% increase from 2022 if annualized).

- Legal expenses increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022 (a 300% increase if annualized).

- Overall expenses for the first half of 2024 were around $18.3 million, compared to $18.6 million for all of 2023.

5.32 Despite repeated requests from the Supporting Organizations and their counsel and counsel for the Charitable DAF Fund, Patrick and Murphy have ignored and refused to provide requested financial information or explanations for these dramatic expenditure increases.

5.33 Patrick must have personally benefited from the dramatic increases in director's fees and, given Patrick's prior attempt to implement a kickback scheme through Mr. Cronin, the other remarkable increases in expenses raise deep concerns about potential self-dealing.

**I.** *Patrick Ignores the Supporting Organizations Concerns*

5.34    On November 11, 2024, given what the Supporting Organizations already knew, the three major Supporting Organizations drafted a letter to Murphy, the Cayman Islands director, stating that "we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "**DAF-related entities**"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable."[5]

5.35    The letter continued, "because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."[6]

5.36    Patrick and Murphy never responded to the letter, other than a threat that if the Supporting Organizations did not withdraw it, then Patrick and Murphy would embark on an effort at the Internal Revenue Service to revoke the Supporting Organizations' charitable status.

5.37    In January 2025, the Supporting Organizations demanded Patrick and Murphy provide clarity into the Charitable DAF Fund's financial position, expressing dismay that Patrick and Murphy continued to ignore their repeated requests for information. Murphy responded via email to this request stating that he and Patrick would "present directly to the foundations/supporting organi[z]ations" to address some of the concerns in the No Confidence Letter. Murphy never did.[7]

---

[5] *See* Ex. 4-A, Ltr. of Nov. 11, 2024 (Appx. Pg. 162-163)
[6] *Id.*
[7] *See* Ex. 4-B, Email chain ending Jan. 23, 2025 (Appx. Pg. 171)

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                      **PAGE 15**

5.38     Counsel for the Supporting Organizations and for the Charitable DAF Fund exchanged further communications, but Patrick, Murphy, and the Charitable DAF Fund's counsel never provided answers and information in response to the Supporting Organizations' basic requests. Instead, they wrapped all their future communications in half-truths and subterfuge.[8] At the same time, they offered the Supporting Organizations vague assurances that all their maneuvers were to improve the structure, focus, and performance of the fund, for the benefit of the Supporting Organizations.

5.39     The Charitable DAF Fund's counsel promised a meeting to address the Supporting Organizations' concerns, but after the Supporting Organizations' counsel suggested dates, the Charitable DAF Fund and its counsel delayed and delayed until it eventually went silent.[9]

5.40     In the interim, Patrick accelerated his multi-year fraud.

### J.    *Dilution Scheme and Liquidation Maneuver*

5.41     Between December 2024 and the present, Patrick executed a series of moves to dilute the Supporting Organization's interests in the Charitable DAF Fund, and alienate those same assets entirely away from them. The purpose and result of Patrick's moves was to entirely eliminate the Supporting Organization's ownership of the Charitable DAF Fund assets. In short, he stole them.

5.42     In December 2024, Patrick formed new entities (as described below) with Patrick as the sole director. He then replaced the current entities holding and controlling the Charitable DAF Fund with his own entities, essentially transferring all ownership and control to himself in a brazen act of self-dealing. He never notified the Supporting Organizations of this massive

---

[8] *See* Exs. 4-A, Ltr. of Feb. 14, 2025 & Ex. 4-C Ltr. of Feb. 27, 2025 (Appx. Pg. 162-182).
[9] *See* Ex. 4-C, Email chain ending April 9, 2025 (Appx Pg. 179-182).

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER        PAGE 16**

reorganization of the Charitable DAF Fund. Indeed, the Supporting Organizations found out about this monumental reorganization only when Patrick and his counsel had to admit it in a Cayman court as part of the Supporting Organization's successful effort to appoint Cayman Liquidators to unravel Patrick's fraud in that jurisdiction.

5.43    In a move that would make most fraudsters blanch, and certainly continued to violate all his fiduciary duties, on December 9, 2024, Patrick formed Defendant DFWCF (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Patrick named himself the Sham Charity's sole member and its registered address was Patrick's home. Patrick then issued his charity a fifty-one percent (51%) interest in the charitable assets. In essence, Patrick awarded himself the ability to distribute over half of the Charitable DAF Fund's $270 million in economic interest to his own entity, from his living room in Dallas.

5.44    Three days later, on December 12, 2024, Patrick incorporated CDMCFAD, LLC, a Delaware limited liability company.

5.45    In secret, and without notice to the Supporting Organizations, on December 18, 2024, Charitable DAF HoldCo transferred to CDMCFAD, LLC 100 percent of its interest in Charitable DAF Fund, and Charitable DAF HoldCo acquired 100 percent of the interest in CDMCFAD, LLC. As a result, CDMCFAD effectively was inserted as a blocking company in between Charitable DAF HoldCo, owned by the Supporting Organizations, and the Charitable DAF Fund itself (where the assets resided). Suddenly, the Supporting Organizations no longer held a 100 beneficial interest in the entity that held the assets of Charitable DAF Fund. Instead, Patrick ensured a different and new entity (CDMCFAD) held Charitable DAF Fund.

5.46    Patrick's fraud continued to evolve in February 2025. On February 7, 2025, again without notice to the Supporting Organizations, DAF HoldCo (in an *ultra vires act)* allotted 318

participating shares to DFWCF, the Sham Charity controlled by Patrick. This sham dilution reduced the Supporting Organizations' cumulative holding in Charitable DAF HoldCo from 100% of the participation shares to 48.9%. Following the new issuance: (i) HDFI's interest was diluted from 32.787% to 16.05%; (ii) HKCF's interest was diluted from 32.787% to 16.05%; (iii) HSBFI's interest was diluted from 32.787% to 16.05% and (iv) the HCMLP Charitable Fund's[10] interest was diluted from 1.639% to 0.80%. Said another way, Patrick absconded with over half of the participating interest of the Supporting Organizations and other charitable funds. Before, during, and after this action—and at all times it was contemplated and executed—Patrick and Charitable DAF HoldCo still owed fiduciary duties to the Supporting Organizations.

5.47    In February 2025, the Sham Charity acquired IRS 501(c)(3) tax exempt status. The By-Laws of the Charitable DAF Fund required that its limited partnership interests be owned by an entity with such tax-exempt status. Therefore, obtaining 501(c)(3) status for the Sham Charity was a necessary step to effectuate Patrick's complete control of the assets of Charitable DAF Fund.

5.48    On March 27, 2025, Patrick caused CDMCFAD (the holder of $270 million in assets) to issue shares to the Sham Charity, *and only to the Sham Charity*. He issued no shares in CDMCFAD to the Supporting Organizations. His fraudulent scam was nearly complete. Now, Patrick's Sham Charity controlled all the direct economic interest in the entity Patrick had inserted between Charitable DAF HoldCo and the assets in Charitable DAF Fund, and the Supporting Organizations were left out in the cold.

5.49    On April 2, 2025, Patrick caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million. That is, he exchanged $270 million for $1.6

---

[10] The HCMLP Charitable Fund is a separate charity which provides funding for the North Texas Community Foundation. While it is not a named plaintiff, the damages it incurred because of the acts of Patrick are notable and relevant to show Patrick's impact across the State of Texas.

million, a ridiculous transaction bereft of reasonably equivalent value.[11] After the transaction, Charitable DAF HoldCo purportedly had no assets and no remaining interest in Charitable DAF Fund. As a result, Patrick's Sham Charity, Defendant DFWCF, was the sole limited partner and beneficial owner of Charitable DAF Fund, through its now-100% ownership of CDMCFAD, and CDMCFAD's 100% ownership of the fund. This final step completely severed the Supporting Organizations and their nonprofit charities from the assets of the Charitable DAF Fund. In Patrick's own words under oath, "the entity in liquidation [Charitable DAF Holdco, Ltd.] owns nothing."[12]

5.50    Before the start of these self-dealing transactions, in October 2024, the Supporting Organizations owned 100% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Supporting Organizations owned Participation Shares worth zero. While Patrick allegedly distributed a paltry portion of $1.6 million to the Supporting Organizations, receipt of those funds has yet to be verified. Again, all of his self-dealing activity took place with no clarity or transparency. Patrick converted the Supporting Organizations' assets to Patrick's personal benefit and ownership, and violated his fiduciary duties of care, candor, and loyalty that he owed to the Supporting Organizations.

### K.  *The Cayman Island Proceedings*

5.51    On April 2, 2025, again unbeknownst to the Supporting Organizations, Patrick placed DAF HoldCo into *voluntary* liquidation in the Cayman Islands through written resolutions of directors executed by Patrick, with joint voluntary liquidators appointed.

5.52    But the Supporting Organizations already did know: that Patrick had (1) actively thwarted all financial transparency; (2) refused to address the Supporting Organizations well-

---

[11] *See* Ex. 3, p. 5, Written Resolutions of the Directors of the Company dated 2 April 2025 (Appx. Pg.  102-103)
[12] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, CaseNo. 19-34054-sgj-11; (Appx. Pg. 200).

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                      **PAGE 19**

founded concerns including their expression of no-confidence; (3) engaged in a pattern of fraudulent self-dealing; (4) taken all participating ownership from the Supporting Organizations without any approval or appropriate compensation; and (5) and restructured the underlying funds. This was enough to convince the Supporting Organizations to take action.

5.53    The Supporting Organizations filed an *involuntary* Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.* Absent doing so, the Supporting Organizations would not have learned about Patrick's voluntary liquidation.

5.54    Cayman Islands counsel for the Supporting Organizations alleged essentially the same facts as recounted in this Petition before the Grand Court. However, Defendants DFWCF and CDMCFAD are Delaware-organized entities and were not expressly named in the Grand Court proceedings.

5.55    The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things[13]:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

---

[13] Ex. 8, Supervision Order (Appx. Pg. 244-246)

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                              **PAGE 20**

6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:

a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

5.56    While the Cayman Islands-appointed official liquidators now conduct their investigation of the assets and other matters pertaining to the Cayman Islands' proceedings, Defendants Patrick, DFWCF, and CDMCFAD (all sited in the United States, and more specifically Dallas County) remain in actual control and beneficial ownership of all assets that were held by the Charitable DAF Fund and DAF HoldCo.  In the meantime, the rightful beneficial owners, the Supporting Organizations, are without the benefit of the considerable assets formerly held by the Charitable DAF Fund and without any insight into the current status and security of the assets. This not only damages the Supporting Organizations, but the charitable causes in their communities that rely on funding from the Charitable DAF Fund.

## VI.    CAUSES OF ACTION

### Count I - Breach of Fiduciary Duty Against Patrick, CDH GP, Ltd., and Charitable DAF GP, LLC

6.1    Paragraphs 1.1 - 5.56 are incorporated as if fully restated herein.

6.2    In "a limited partnership, the general partner stands in the same fiduciary capacity to the limited  partners as a trustee stands to the beneficiaries of a trust." *Hughes v. St. David's Support Corp.,* 944 S.W.2d 423, 425–26 (Tex. App.—Austin 1997, writ denied); *Feeley v. NHAOCG, LLC,* 62 A.3d 649, 661 (Del. Ch. 2012) (There "has never been any serious doubt that

the general partner of a Delaware limited partnership owes fiduciary duties."). Likewise, under traditional principles of equity, and various statutes generally hold that a manager of an LLC would qualify as a fiduciary of that LLC and its members. *Auriga Capital Corp. v. Gatz Properties,* 40 A.3d 839, 850 (Del. Ch. 2012), judgment entered sub nom. *Auriga Capital Corp. v. Gatz Properties, LLC* (Del. Ch. 2012), aff'd, 59 A.3d 1206 (Del. 2012); *Davis v. Crawford,* 700 S.W.3d 438, 449 (Tex. App.—Eastland 2024, no pet.) ("[T]he relationship between a managing member of an LLC and a nonmanaging member is similar to that of a general partner/limited partner relationship, and that such an arrangement thereby creates a fiduciary obligation on the part of the managing member.").

6.3     By virtue of Patrick's Control Positions related to the overall Charitable DAF Fund structure and specifically DAF HoldCo and the Charitable DAF Fund, Patrick owed fiduciary duties to the Plaintiffs.

6.4     Patrick breached his fiduciary duties to the Plaintiffs by stripping them of their legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.5     Patrick breached these duties through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.6     Patrick breached his fiduciary duties by mismanaging the Charitable DAF Fund's finances, and dramatically increasing director compensation to his own benefit.

6.7    Patrick breached his fiduciary duty by successfully soliciting a charitable contribution ultimately from a Supporting Organization to a charity controlled by Patrick and his immediate family without disclosing the relationship.

6.8    The actions incorporated herein have wrongfully deprived the Plaintiffs of substantial economic support and assets, harming, and threatening irreparable harm to, the Plaintiffs and the Charities that they support. Plaintiffs have suffered damages as a result of Patrick's breach of his fiduciary duties.

### Count II - Constructive Fraud Against Patrick

6.9    Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.10    "Constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Hubbard v. Shankle*, 138 S.W.3d 474, 483 (Tex. App.—Fort Worth 2004, pet. denied). "[I]n a claim for constructive fraud, the actor's intent is irrelevant." *Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856, 879 (Tex. App.—El Paso 2021, pet. denied). "[C]onstructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Id.*

6.11    As a fiduciary, Patrick's conduct in diluting the Plaintiffs' interests, selling assets at below-market values to undisclosed parties, and liquidating DAF HoldCo and transferring its interests to the Sham Charity without notice constitutes constructive fraud.

6.12    Patrick injured public interests by his conduct. Plaintiffs have suffered damages as a result of Patrick's fraud.

### Count III - Unjust Enrichment Against Patrick, CDMCFAD, and DFWCF

6.13    Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**

6.14 A claim of unjust enrichment applies when a party obtains "a benefit from another by fraud, duress, or the taking of an undue advantage." *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010)).

6.15 Patrick and DFWCF stripped the Plaintiffs of their rightful legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.16 Patrick and DFWCF took these interests and assets for their own benefit via fraud and taking undue advantage of the access available through the Control Positions and overlapping control with DFWCF.

6.17 Patrick also took undue advantage through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.18 Patrick and DFWCF have been unjustly enriched at the expense of the Plaintiffs. Plaintiffs have been damages by Patrick's unjust enrichment.

### Count IV – Conversion Against Patrick, CDMCFAD, and DFWCF

6.19 Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.20 Conversion requires a showing that (1) the plaintiff owned, had legal possession, or was entitled to possession of the property, (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights, and (3) the defendant refused the plaintiff's demand for return of the property. *Automek, Inc. v. Orandy*, 105 S.W.3d 60, 63 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**

6.21    The Plaintiffs held legal, equitable, and beneficial interests in the Charitable DAF
Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial
assets held for the Plaintiffs' benefit.

6.22    Patrick with DFWCF has unlawfully and without authorization, assumed and
exercised dominion over the Plaintiffs' legal, equitable, and beneficial interests in the Charitable
DAF Fund structure including their participation in DAF HoldCo, the Charitable DAF Fund, and
Charitable DAF Fund assets through the dilution scheme that diverted all the legal and beneficial
economic interests to Patrick's controlled entity, DFWCF.

6.23    The Plaintiffs requested distribution in kind of the Charitable DAF Fund structure
assets, which Patrick and now, DFWCF, have ignored and refused. Plaintiffs have been damages
as a result of these conversions.

**Count V – Imposition of Constructive Trust Against Patrick, CDMCFAD, and DFWCF**

6.24    Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.25    "A constructive trust is considered a legal fiction and is a creation of equity to
prevent a wrongdoer from profiting from his wrongful acts." *In re Harding*, 563 S.W.3d 366, 372
(Tex. App.—Texarkana 2018, no pet.). "[T]o obtain a constructive trust, [a party] must prove:
(1) breach of a special trust, fiduciary relationship,  or actual  fraud;  (2) unjust enrichment of
the wrongdoer; and (3) tracing to an identifiable res." *Id.* (cleaned up).

6.26    Patrick through DFWCF has breached his fiduciary relationship with the Plaintiffs
by converting legal, equitable, and beneficial interests in the Charitable DAF Fund structure
including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for
the Plaintiffs' benefit, resulting in the unjust enrichment of DFWCF and Patrick.

6.27    All the legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit in the overall Charitable DAF Fund structure should be imposed with a constructive trust running to the benefit of the Plaintiffs.

### VII.    EMERGENCY APPLICATION FOR RECEIVERSHIP

7.1    Paragraphs 1.1 - 5.56 are incorporated as if fully restated herein.

7.2    The Plaintiffs seek the immediate appointment of a receiver over Defendants DFWCF and CDMCFAD, LLC (the "**Receivership Entities**") under three independent bases: Texas Civil Practice & Remedies Code §§ 64.001(a)(3), (7), Texas Business and Organizations Code § 11.410, and the Court's inherent equitable powers.

#### A.  *Texas Civil Practice & Remedies Code*

7.3    [U]nder section 64.001 of the Texas Civil Practice and Remedies Code ("**CPRC**"), a court may appoint a receiver in an action between "partners or others jointly owning or interested in any property or fund," CPRC §§ 64.001(a)(3) or "in any case in which a receiver may be appointed under the rules of equity." CPRC §§ 64.001(a)(7); *Elliott v. Weatherman*, 396 S.W.3d 224, 228 (Tex. App.—Austin 2013, no pet.).

7.4    A party with a probable interest or a right to the property or fund has standing to seek the appointment of a receiver. CPRC § 64.001(b). "[T]he property or fund must be in danger of being lost, removed, or materially injured." *Id.*

7.5    A probable interest exists by statute in actions between partners and in actions between joint owners of property. CPRC § 64.001(a)(3).

7.6    One purpose of a receivership is to preserve assets and resolve issues relating to an entity's affairs where there are allegations of fraud or improper activities. *See Floyd v. MMWKM*

---

*Advisors, LLC*, No. 05-23-00638-CV, 2024 WL 549036 at *2 (Tex. App. – Dallas 2024, pet. denied, reh'g denied).

## B. *Texas Business and Organizations Code*

7.7     Like CPRC § 64.001, a court that has subject matter jurisdiction over specific property of a domestic or foreign entity in Texas may appoint a receiver for that property in several scenarios, including an action between "partners or others jointly owning or interested in the property or fund." Tex. Bus. & Orgs. Code § 11.403(a)(3).

7.8     Additionally, under Section 11.410 of the Texas Business and Organizations Code ("TBOC"), a court may appoint a receiver for all of the property, in and outside Texas, of a foreign entity doing business in Texas and its business if the court determines, in accordance with the ordinary usages of equity, that circumstances exist that necessitate the appointment of a receiver even if a receiver has not been appointed by another court. TBOC § 11.410(a).

## C. *Rules of Equity*

7.9     In addition to specific statutory authority to appoint receivers, Texas courts retain inherent equitable power to do so. The CPRC, § 64.004 makes clear that the rules of equity control the appointment and power of a receiver unless inconsistent with a statutory provision.

## D. *Receivership Standards Under Texas Law and Equity*

7.10     "The appointment of a receiver lies within the sound discretion of the trial court." *In re Estate of Herring*, 983 S.W.2d 61, 65 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.). "The appointment of a receiver, either as authorized by statute or usages of equity, will not be disturbed on appeal unless the record reveals a clear abuse of discretion." *O & G Carriers, Inc. v. Smith Energy 1986-A P'ship*, 826 S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 1992, no writ).

7.11    The party submitting an application for appointment of a receiver bears the burden of proof to present evidence justifying the appointment. *Furgerson v. First Nat'l Bank*, 218 S.W.2d 1019, 1020 (Tex. Civ. App. – Texarkana 1949, no writ). The party can meet that burden by submitting a sworn verification supporting the claimed grounds for the appointment, *In re Estate of Herring*, 983 S.W.2d 61, 65 (Tex. App. – Corpus Christi 1999, no pet.), and a court may consider oral testimony as evidence in support of an application. *See Furgerson*, 218 S.W.2d at 1020.

7.12    An application seeking a receivership pursuant to a statutory provision must allege facts that meet the elements of the provision. *Associated Bankers Credit Co. v. Meis*, 456 S.W.2d 744, 748 (Tex. Civ. App. – Corpus Christi 1970, no writ). The facts alleged in the application will be construed as favorably as possible for the applicant. *Couch Mortgage Co. v. Roberts*, 544 S.W.2d 944, 946-47 (Tex. Civ. App. – Houston [1st Dist.], no writ).

7.13    Conduct that supports a cause of action for fraud or breach of fiduciary duties is often the same type of conduct that supports an application for a receivership. *Ritchie v. Rupe*, 443 S.W.3d 856, 873 (Tex. 2014).

E.    ***The Supporting Organizations are entitled to the Emergency Appointment of a Receiver to Oversee the Receivership Entities***

7.14    The Plaintiffs have an ownership interest in their participating shares in DAF HoldCo and thereby its economic ownership of the Charitable DAF Fund and the assets that were rightfully held by the Charitable DAF Fund and entrusted to the control of Patrick.

7.15    Patrick wrongfully caused the Plaintiffs' participation shares to be diluted and then caused the Plaintiffs' beneficial economic interests in the Charitable DAF Fund structure to be wrongfully transferred to a collection of sham entities wholly dominated by Patrick.

7.16    Charitable DAF Fund was valued at $270 million as recently as September 2024. Now no assets remain in the Charitable DAF Fund structure.  The Plaintiffs have not received any

PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                    PAGE 28

just compensation, participation, or other consideration for the conversion of their substantial interests in the Charitable DAF Fund structure.

7.17 Receivership Entities now maintain complete management control and beneficial rights over the Charitable DAF Fund structure's substantial assets or otherwise possess those assets to the exclusion of Charitable DAF Fund.

7.18 Patrick dominates and controls the Receivership Entities. As shown, Patrick has demonstrated a pattern of selling assets at below-market values, attempting to engage in self-dealing transactions, transacting assets at non-market terms in potential self-dealing transactions, dramatically increasing internal and professional administrative expenses that burdens and dissipates charitable assets, and secreting his activities while controlling assets dedicated to charitable causes. To preserve assets from further dissipation, a receiver should replace Patrick's oversight of the Receivership Entities and their assets, which were wrongfully acquired and held.

7.19 The Plaintiffs have been stripped of access to the benefit of assets meant to support charitable causes, resulting in financial distress and immediately threatening planned and ongoing support of countless charities including education, medical research, and community initiatives.

7.20 The Plaintiffs have demonstrated a strong likelihood of success on their claims given the documented pattern of breaches, financial irregularities and successful litigation in the Cayman Islands.

7.21 The Plaintiffs have demonstrated a clear and compelling need for immediate court oversight to prevent further injury and preserve the charitable assets at risk due to Patrick's actions via the Receivership Entities.

7.22 The participating shares in DAF HoldCo as well as assets valued at $270 Million are in danger of being lost, removed, or materially injured and circumstances exist to necessitate

the appointment of a receiver to conserve the property, fund, and avoid further, irreparable harm to Plaintiffs.

7.23 Given Patrick's demonstrated and recent malfeasance using the Receivership Entities as tools of fraud, no other adequate remedy exists under law.

### Count VI – APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION PENDING APPROVAL OF RECEIVERSHIP

8.1. Plaintiffs seek immediate injunctive relief preventing the Defendants from further use, transfer, dispersal, and/or alienation of the assets that were held in the Charitable DAF Fund as of the instant date of this filing, regardless of where they are presently held. If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment. This application is supported by the sworn declarations of Julie Diaz and James David Dondero.

8.2. A writ of injunction is proper where "the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant," or where "a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual," or where "irreparable injury to real or personal property is threatened, irrespective of any remedy at law." Tex. Civ. Prac. & Rem. Code § 65.011. "A temporary injunction pending trial on the merits 'may be and usually is issued in connection with any species of litigation where it is necessary to preserve the status quo pending a final adjudication of the rights of the parties.'" *Lometa Bancshares, Inc. v. Potts*, 952 S.W.2d 631, 633 (Tex. App.-Austin 1997) (*quoting Turcotte v. Alice Nat'l Bank*, 402 S.W.2d 894, 896 (Tex.1966)). "In cases like the present, an applicant for the writ must show (1) a probable right to

recover on the merits after final hearing and (2) a probable and irreparable injury unless the writ is issued." *Lometa*, 952 S.W.2d at 633 (citing Tex. Civ. Prac. & Rem. Code Ann. § 65.011 (West 1997); *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993); *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex.1968)).

8.3.    Texas courts universally recognize that in cases where dispersal or liquidation of assets required to pay a judgment is likely, temporary injunctive relief is proper to preserve the status quo and ensure that the efficacy of ultimate relief for the Plaintiffs is not defeated by financial machinations while the case is pending.  In other words, "the adequacy of an available legal remedy must be judged in the circumstances of the particular case[,]" and "[i]n such circumstances, any legal remedy by way of a judgment for money damages is properly viewed as inadequate on the ground that the funds may be reduced pending final hearing and thus be unavailable in their entirety[.]" *Lometa*, 952 S.W.2d at 633; *see also Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ); *Sonics Int'l Inc. v. Dorchester Enters.*, 593 S.W.2d 390, 393 (Tex.Civ.App.—Dallas 1980, no writ*); Baucum v. Texam Oil Corp.*, 423 S.W.2d 434, 442 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.).

8.4.    The above authorities support the award of the temporary injunctive relief requested herein, because the assets formerly held in the Charitable DAF Fund for the benefit of the Plaintiffs are already being alienated from their beneficial owners and the conduct of Defendants demonstrates the likelihood of their continued transfer, alienation, expenditure, and dispersal while this case is pending and before the rights of the Plaintiffs to those funds can be vindicated.

8.5.    Unless enjoined, Patrick and the other Defendants will cause and continue to cause irreparable harm to Plaintiffs for which there is no adequate remedy at law; including, without

limitation, the dispersal, expenditure, transfer, and further alienation of more than $270 Million that can never be replaced because the Defendants will lack the means to do so.

8.6.     Plaintiffs will therefore suffer immediate and irreparable injury without adequate remedy at law if a Temporary Restraining Order ("**TRO**") is not granted against the Defendants. Accordingly, Plaintiffs request the Court issue a TRO that freeze:

(a) all assets that were held in the Charitable DAF Fund as of the instant date of this filing, and

(b) prohibiting Patrick and the other Defendants, or anyone acting in concert with them or at their direction, from any use, expenditure, transfer, dispersal, dilution, encumbrance, or alienation of any of those funds pending resolution of Plaintiff's Motion for Temporary Injunction.

8.7.     The harm to Plaintiffs is imminent, and if the Court does not issue a TRO and injunctive relief, it will be irreparably injured, as set forth herein. Conversely, the granting of a TRO will merely require Defendants to refrain from doing anything with the funds for two weeks. If the Defendants prevail on the merits, the funds will still be available to them for their use in future. The balance of burdens thus strongly favors Plaintiffs, who stand to lose everything absent immediate injunctive relief—over Defendants, who will at most suffer a minor inconvenience if they ultimately prevail.

8.8.     The issuance of injunctive relief will not disserve the public interest. Balancing the equities and other factors, including the significant potential for irreparable harm to the Plaintiffs and the lack of harm to Defendants due to the entry of a TRO, demonstrates that the relief will not disserve the public interest. Indeed, freezing the funds at issue in place to ensure that this fraudulent

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 32**