**EXHIBIT 70**

Plaintiff
M MacInnis
Third Affidavit
November 2025
Exhibit MM-3

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 (RPJ)**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

| | | |
|---|---|---|
| **(1)** | **MARK ERIC PATRICK** | |
| **(2)** | **PAUL MURPHY** | |
| **(3)** | **CDMCFAD, LLC** | |
| **(4)** | **DFW CHARITABLE FOUNDATION** | |
| **(5)** | **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** | |
| **(6)** | **CLO HOLDCO, LTD.** | |

Defendants

---

**THIRD AFFIDAVIT OF MARGOT MACINNIS**

---

I, **MARGOT MACINNIS** of Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands MAKE OATH AND SAY as follows:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

1    I am the same Margot MacInnis who swore affidavits in these proceeding on 15 July 2025 ("**MacInnis 1**") and 24 July 2025 ("**MacInnis 2**").  Capitalised terms used in this affidavit have the same meaning as in MacInnis 1 and the other affidavits referred to below, to which I reply in this affidavit.

2    I am Managing Director of Grant Thornton Specialist Services (Cayman) Limited ("**Grant Thornton**").  I am one of the joint official liquidators ("**JOLs**") of Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "**Company**"), alongside Sandipan Bhowmik also of Grant Thornton. Mr Bhowmik and I were appointed as JOLs of the Company by an order of this Honourable Court dated 6 May 2025 in Cause No. FSD 116 of 2025 (JAJ) (the "**Appointment Order**").

3    I am duly authorised by my fellow JOL, Sandipan Bhowmik, to make this affidavit on the JOLs' behalf in support of the JOLs' summons dated 15 July 2025 (the "**Application**").  The purpose of this affidavit is to set out the JOLs' evidence in reply to the following affidavits filed by the Defendants:

3.1    First Affidavit of Paul Murphy sworn 18 September 2025 ("**Murphy 1**")[1] and its exhibit PM-1.

3.2    Second Affidavit of Mark Eric Patrick sworn 17 October 2025 ("**Patrick 2**") and its exhibit MEP-2.

3.3    Third Affidavit of Mark Eric Patrick sworn 17 October 2025 ("**Patrick 3**") and its exhibit MP-3.

3.4    The unsworn First Affidavit of Douglas M. Mancino dated 30 July 2025 ("**Mancino 1**") and its exhibits.

---

[1] I shall refer to the first affidavit of Paul Murphy dated 4 June 2025, filed in the Company's liquidation proceedings, as the "**Murphy Liquidation Affidavit**"

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

2

3.5   <mark>First Affidavit of Alexander L. Reid sworn 17 October 2025 ("**Reid 1**") and its exhibit AR-1.</mark>

4   The facts and matters set out in this affidavit that are within my own personal knowledge are true and correct.   Where the contents of this affidavit are not within my own personal knowledge, I have stated the source of my knowledge and such facts are true and correct to the best of my information and belief.

5   There is now produced and shown to me a paginated exhibit marked "**MM-3**". This contains true copies of certain documents to which I refer in this affidavit. Where I refer to a page in this affidavit, I am referring to a page in "**MM-3**".

6   This affidavit is structured as follows:

A   REPLY TO MURPHY 1 AND PATRICK 2**Error! Reference source not found.**

A1   Purported Justifications for the "DAF Restructuring"

A2   The correspondence with the Supporting Organisations leading up to the DAF Restructuring

A3   The Significant Increases in Mr Patrick's and Mr Murphy's Compensation

A4   D&O Insurance, Indemnification, and Payment of Legal Fees

A5   Interim Undertakings

A6   Injunction Application

A7   Other Matters

B   REPLY TO PATRICK 3

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

C REPLY TO MANCINO AND REID AFFIDAVITS

**A REPLY TO MURPHY 1 AND PATRICK 2**

**A1 Purported Justifications for the "DAF Restructuring"**

7 In MacInnis 1 at paragraphs 65 to 78, I went through the justifications provided by the Defendants for the DAF Restructuring in their evidence filed in the Company's liquidation proceedings to that point. Having now read the Defendants' responsive evidence, there do not appear to be any new justifications given for the DAF Restructuring beyond those I have already addressed in MacInnis 1.

The 'No Economic Interest Justification'

*Murphy 1*

8 In Murphy 1, Mr Murphy makes several assertions as to the nature of the Supporting Organisations' rights and interests in the Company including:

 8.1 At paragraph 13.2 – the Company's Participating Shares "*confer qualified rights to participate in the profits or assets of the Company*".

 8.2 At paragraph 16 – the Supporting Organisations were "*gifted [their] shares around the time of the Company's incorporation*".

 8.3 At paragraph 21 - "*I do not believe that it is disputed that the circa US$270 million in assets held by CLO and its subsidiaries (the "DAF Entities") were contributed neither by the Supporting Organisations nor the U.S. Charities*".

9 I understand these assertions to be directed at the Defendants' argument that the DAF Restructuring was justifiable because, on their case, the Supporting Organisations did not have

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

an economic interest in the Company but, rather, the Company's purpose was to act as a throughput for discretionary, charitable donations to qualifying recipients (which were not necessarily the Supporting Organisations or the Charities) (i.e. the 'No Economic Interest Justification'). Why the JOLs believe the 'No Economic Interest Justification' does not stand up to scrutiny is set out at paragraphs 66 to 69 of MacInnis 1. Mr Murphy has made no attempt to address the points made therein.

10   At paragraph 68 of Murphy 1, Mr Murphy relies on a single email exchange between Mr Dondero and Mr Patrick from over 10 years ago to support the proposition that the Supporting Organisations had no economic interest in the Company and its underlying assets[2]. The JOLs find this to be an unconvincing attempt to seek to justify retrospectively Mr Murphy's and Mr Patrick's conduct in transferring away the Company's only significant asset. It is not clear if Mr Murphy was even aware of that email exchange at the time of undertaking the DAF Restructuring. In any event, Mr Murphy has made no attempt to explain why, even if the Supporting Organisations' participating shares only entitled them to discretionary cash distributions for charitable uses[3], he thought it in their best interests to completely extinguish that right by way of the DAF Restructuring, which left the Company with no assets that would generate income to be able to make said discretionary distributions[4].

11   Furthermore, I note that pursuant to amendments to the Company's Articles approved by Mr Patrick and Mr Murphy in 2025, which appear to have been made without notice to or with the engagement of the Supporting Organisations, the Company's object was amended to benefitting "*community-focused non-profit foundations globally or for purposes recognised as charitable*", as determined by the directors (which did not exist in the prior iterations of the

---

[2] Page 1

[3] As set out in the first affidavit of Mark Patrick in his capacity as Management Shareholder dated 4 June 2025 filed in the Company's liquidation proceedings at paragraph 67, where the email exchange from 2014 referred to by Mr Murphy is referred to.

[4] i.e. the Partnership Interest

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

5

Articles).[5] The JOLs are concerned that this amendment was passed by Mr Patrick and Mr Murphy in an attempt to give them a purported basis to transfer the Company's sole valuable asset to another entity under their control, so long as they continued to expend some of the Fund's assets on charitable donations, whilst simultaneously paying themselves excessive compensation.

12   At paragraphs 28 to 29 of Murphy 1, he acknowledges that the express purpose of the Fund under the LPA was to benefit the "*Indirect Charitable Owners*".  As Mr Patrick observes at paragraph 64 of Patrick 2, distributions from the Fund were expressly intended to address the financial needs of the "*Indirect Charitable Owners*":

> "*Distributions shall be made to the Limited Partner* [the Company] *at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner <u>after taking into consideration</u> available cash and <u>the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses….</u>*" [emphasis added]

13   It does not appear to be in dispute that before the DAF Restructuring, the "*Indirect Charitable Owners*" were the Supporting Organisations or the Charities in their capacity as the indirect equity owners of the sole "*Limited Partner*", which under the LPA was defined as the Company. I understand one of the arguments put forward by Mr Patrick and Mr Murphy to be that because the definition of "*Limited Partner*" referred to the Company "*and each person subsequently admitted as a limited partner by the General Partner pursuant to the terms of the LPA*", this gave them the authority to approve the transfer of the Partnership Interest from the Company to CDM at a significant undervalue. In other words, they claim their actions were lawful because

---

[5] Similarly, the JOLs are concerned that Mr Patrick appears to have relied on the provision of the Company's Articles permitting the Company "*to do all such things [that] in the opinion of the Directors are or may be incidental or conducive to*" the Company's 'Mission Statement' as a broad mandate allowing him to effect the DAF Restructuring under the pretense of serving charitable purposes - see paragraph 44, footnote 11 of Patrick 2.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

the LPA did not forbid the admission of new limited partners and they were fulfilling the Fund's purpose. The JOLs find that to be an entirely unconvincing argument.

14    In any event, nowhere has it been explained in Mr Murphy's evidence or Mr Patrick's evidence how they satisfied themselves that it was in the Company's best interests and fulfilling of the Company's purpose in its Articles (being to provide donations to the "Indirect Charitable Owners" of the Company[6]) to transfer away the Company's only asset worth in the vicinity of US$270 million for minimal consideration.   The most that is offered by Mr Murphy is at paragraphs 32 and 33 of Murphy 1:

> "*32. If a Participating Shareholder became a Restricted Person, they could be forced to transfer their shares under Article 21 of the 2025 AOA **[MM-1/13]**. Therefore an "Indirect Charitable Owner" effectively meant a qualifying Participating Shareholder of the Company who was not a Restricted Person.*
>
> *33. I believe this had the effect of enabling the Company and its directors to uphold and give primacy to the charitable purpose of the CDAF Fund, and required the directors of the Company to discharge their fiduciary obligations in the interests of that purpose rather than particular beneficiaries.*"

15    The JOLs are of the view that Mr Murphy and Mr Patrick's "Restricted Person" concerns were greatly overblown and likely manufactured by Mr Patrick and Mr Murphy as a means of justifying their conduct in approving the DAF Restructuring. I refer to paragraph 43.10(c) below and paragraphs 70, 72, and 74 to 75 of MacInnis 1 on this issue.

---

[6] As Mr Murphy acknowledges at paragraph 18 of Murphy 1

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

*Patrick 2*

16  Mr Patrick also appears to advance the 'No Economic Interest Justification' at paragraphs 62 to 70 of Patrick 2 under the heading "Discretionary Nature of Participating Shares", and at paragraphs 71 to 79 in relation to Mr Patrick and Mr Murphy's decision to cause the Company to issue a majority shareholding to DFW as part of the DAF Restructuring. The JOLs do not believe that any of the points made by Mr Patrick therein stand up to scrutiny, let alone justify the DFW Share Issuance.

17  At paragraph 71 of Patrick 2, he reasons that issuing a majority shareholding in the Company to DFW "*would have the effect of diluting the holdings of the Highland Foundations and safeguarding the [Fund's] charitable mission*". The JOLs find it concerning that Mr Patrick has admitted in sworn evidence that he intentionally diluted the holdings of the Company's existing Participating Shareholders. The JOLs also do not understand how that dilution could "safeguard the Fund's charitable mission". In particular, whilst the dilution would introduce other shareholders into the Company, it would not sever any link between the Company and Mr Dondero through the Supporting Organisations, which remained Participating Shareholders. Further, it seems to the JOLs that the Defendants' explanations are inconsistent; on the one hand, they say that the Supporting Organisations had no economic interest in the Company and were merely the recipient of discretionary distributions, but, on the other, say that, through the Supporting Organisations Mr Dondero exercised power and control over the Fund. The two propositions cannot both be true. In reality, the position is that the Supporting Organisations had valuable economic rights in the Company, including upon winding up, but they did not have the ability to control the management of the Company.

18  Whilst Mr Patrick refers to his purported concerns that the Supporting Organisations had become 'Restricted Persons' to justify the DFW Share Issuance, the JOLs believe that the true

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

purpose of the DFW Share Issuance was to seek to weaken the prospects of any just and equitable winding up petition filed by the Supporting Organisations against the Company[7].

19    At paragraphs 66 to 68 of Patrick 2, Mr Patrick makes the points that: (i) payment of dividends by the Company to its Participating Shareholders (the Supporting Organisations) was at the discretion of the directors; and (ii) the Charities had contractual rights[8] to fees or distributions from their respective Supporting Organisations that were calculated as a percentage of the Company's NAV.

20    As regards (i), it is commonplace for the articles of association of Cayman Islands companies to give directors discretion as to the payment of dividends to participating shareholders.  As regards (ii), I note that Mr Patrick confirms that the quantum of the dividends that the Company historically paid to the Supporting Organisations mirrored those that the Supporting Organisations were obligated to pay to their respective Charities pursuant to their contractual rights: "*the quantum of their annual distributions [from the Company] was dependent on the contractual terms which governed the relationship between each of the Highland Foundations and their underlying charities.*" Yet at the same time, Mr Patrick appears to assert that because the Articles provide that dividends are at the discretion of the directors, this permitted the directors to entirely disregard the interests of the Supporting Organisations (and their respective Charities contractual rights to distributions) by transferring away the Company's sole valuable asset for minimal consideration.  The result of which was to reduce the Company's NAV by approximately 99%; rendering the Charities' contractual rights to distributions from their Supporting Organisations effectively worthless.  The JOLs believe that to be a wholly unsustainable assertion.

---

[7] See the advice Mr Patrick and Mr Murphy sought from Walkers on the DFW Share Issuance and the correspondence referred to in paragraphs 38 to 39 of MacInnis 1

[8] Under the 'Legal Relationship Agreement' for Highland Kansas City and the 'Operating Agreements' for Highland Dallas and Highland Santa Barbara, as described in paragraph 18.5 of MacInnis 1

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

9

21 As regards paragraph 72 of Patrick 2, contrary to what Mr Patrick asserts, the advice from Walkers *is* contested by the JOLs to the extent that Mr Patrick is relying on it to suggest that the DFW Share Issuance was lawful because the Supporting Organisations had no economic interest in the Company. In this regard, the second advice from Walkers referred to in paragraph 73 of Patrick 2 expressly acknowledges that the DFW Share Issuance would not have been in the best interests of the Company's existing shareholders[9]. I also note that, having read the two Walkers' advices, they are silent on whether the Directors were acting for an improper purpose in issuing a majority shareholding to DFW. Accordingly, the JOLs believe that the DFW Share Issuance was undertaken for an improper purpose in circumstances where the Directors had advice that it would not be in the best interests of the Company's existing Participating Shareholders but proceeded to do so in any event. In the premises, the JOLs believe the DFW Share Issuance amounted to a wilful breach of the Directors' fiduciary duties.

22 Further, Mr Patrick's suggestion that the Supporting Organisations had no economic interest in the Company appears to the JOLs to be at odds with the fact that the Articles expressly provide that the Participating Shareholders are entitled to share in the profits of the Company (as Mr Patrick admits). The Articles also provide that in the event of a liquidation, the assets of the Company shall be distributed to the Participating Shareholders and holder of the management shares *pari passu* after satisfaction of creditor claims (Article 122, internal page 146 of Exhibit MEP-2). The JOLs consider that this makes quite clear that the Participating Shareholders did hold a real economic interest in the Company. The JOLs believe that the Directors' decision to transfer the Company's major asset away without notice or fair value consideration, to the detriment of the Participating Shareholders, is a wilful breach of their duties.

23 As regards paragraph 74 of Patrick 2, he refers to email advice given by Maples in response to questions by Shields Legal (**"Shields"**) (on instructions from Mr Patrick and Mr Murphy) as

---

[9] Exhibit MM—1 at page 498, paragraph 18 of Walkers' draft advice memorandum

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

10

to the Directors' powers to issue shares under the Articles. Having read these emails, it appears to the JOLs that Shields provided Maples with no factual context for the proposed share issuance. Also, Maples were not asked to opine on whether the directors would be in breach of their duties by carrying out the share issuance. Shields simply asked Maples to advise on whether the directors had the power to issue new shares, and "*if the basis for that decision is the best interest of [the Company], what are some of the reasons they could cite for doing so?*". In other words, Shields asked Maples to *assume* that the Directors' decision was in the best interests of the Company. In the premises, the JOLs believe that this is yet another example of the Directors deliberately limiting the information provided to the Company's advisors as a means of obtaining the specific advice they were seeking in order to justify the DAF Restructuring.

24    At paragraph 81 of Patrick 2, Mr Patrick refers to the FTI Report and the ValueScope Reports and asserts that they "*concluded that the DAF's NAV was not a suitable method to value the Participating Shares*". However, from my reading of Patrick 2, Mr Patrick has not addressed any of the issues with those reports that I identified at paragraph 77 of MacInnis 1.

### The 'Dondero Control Justification'

25    In Murphy 1, Mr Murphy also makes several assertions that appear to be directed at the Defendants' argument that the DAF Restructuring was justified because it was necessary to create distance between the Fund and Mr Dondero, whom they allege was exercising dominion and control over the Supporting Organisations (i.e. the 'Dondero Control Justification'). One example is at paragraph 23 of Murphy 1:

> "*As noted at paragraphs 46 to 97 of my June Affidavit, a corporate restructuring (the "**DAF Restructuring**") took place in late 2024 and early 2025 because Mr. Patrick and I were concerned that James Dondero was seeking to exert improper dominion and control over the assets of CDAF Fund through the Supporting Organisations, which*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

*(amongst other value-destructive things such as the UBS litigation noted at paragraph 46.2 of my June Affidavit) could expose the Company (and, as its directors, Mr. Patrick and me) to potential breaches of U.S. tax laws and regulations*"

26      At paragraph 60 of Murphy 1, Mr Murphy asserts that the JOLs "*seem to have summarily discounted these critical matters, although it is unclear to me why they have done* so", and that the JOLs have "*align[ed] themselves with Mr Dondero*".  Contrary to this assertion - the JOLs have not aligned themselves with Mr Dondero – I have never met or spoken to Mr Dondero and I understand from my fellow JOL Mr Bhowmik that he has never met or spoken to Mr Dondero either.  The JOLs have analysed the facts of the DAF Restructuring objectively and taken appropriate advice, which has led the JOLs to decide that action should be taken to recover the Partnership Interest that has been misappropriated from the Company by the Defendants.  Mr Patrick and Mr Murphy's explanations for the DAF Restructuring have not been "summarily discounted" - the JOLs have thoroughly investigated them and taken advice on them.  The JOLs' findings on each of those explanations are as set out in paragraphs 65 to 78 of MacInnis 1 (paragraphs 70 to 76 with respect to the "Dondero Control Justification").  In the JOLs' view, Mr Murphy and Mr Patrick have not provided any credible answers to the points made therein.

27      The list of purported 'Dondero Concerns' are repeated at paragraph 44 of Patrick 2.  I address each of them below insofar as they are addressed in Murphy 1 and Patrick 2.

*The purported tax concerns arising from Mr Dondero's alleged attempts to exercise "dominion and control"*

28      At paragraphs 63.2, 68 and 74 of MacInnis 1, I referred to the Carrington Coleman Memo, which Mr Patrick and Mr Murphy relied upon to complete the DAF Restructuring.  As I explained, the JOLs have serious concerns about the veracity of the Carrington Coleman Memo.  On 18 September 2025, the JOLs obtained an order for provisional relief in the United

States Bankruptcy Court for the District of Delaware against various of the Company's former service providers, including Carrington Coleman, for turnover of copies of all books and records in the service providers' possession generated or received in their representation of, or engagement by the Company ("**US Discovery Order**") (pages 2 to 9).  The documents that have been produced have reinforced the JOLs' concerns about the Carrington Coleman Memo and the Directors' reliance on it.  For example, Carrington Coleman have produced:

28.1   An earlier version of the Carrington Coleman Memo dated 17 March 2025 (pages 10 to 26), of which the JOLs were not previously aware, which indicates that the author had not independently verified the facts that had been provided by Mr Patrick and Shields to Carrington Coleman in order to prepare their US law tax advice: "*I have not been asked to nor have I independently verified the facts that you [the memo is addressed to Charitable DAF Holdco Ltd] have provided to me as they relate to DAF, Dondero, SOs (individually or collectively, including tax-exempt status by the IRS), and other individuals or entities associated therewith or who may have contracted or interacted therewith.*" (page 10).  The 17 March 2025 version of the Carrington Coleman Memo also contains the statement: "*I cannot opine as to how the IRS will treat DAF's supporting organisations, as I do not have enough information about their internal operations*" (page 831)

28.2   An undated document entitled "Carrington Coleman Tax Legal Advice" (pages 27 to 28), which was supplied to Carrington Coleman by Shields by way of data-room upload. The exact date and author of the memo is unknown.  However, the JOLs believe it can be reasonably inferred from the following text that Mr Patrick and Mr Murphy were specifically seeking advice to support their rationalisation for, and the propriety of, the DAF Restructuring, which they anticipated would be challenged in the Cayman Islands Court:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

> "*1. Problem: avoid Cayman judge determines the MidCo Contribution Transaction (the "Contribution") is viewed as prejudicial to the participating shareholders and ignores the management's purported reliance and reasoning availing itself of Delaware law. The concern is the judge will likely say management has entrenched itself in light of the timing of the Contribution and the supporting organization letter.*
>
> *2. Solution: provide info such that Cayman court will be less inclined to second guess U.S. legal advice that management received to undertake the Contribution.*"

29    I also note on the subject of Mr Patrick and Mr Murphy's purported tax concerns that at paragraph 19 of Patrick 2, Mr Patrick refers to certain correspondence between him and Mr Mancino between 2011 and 2013[10], which he asserts demonstrates that: "*an overarching consideration when structuring and staffing the DAF, the Company and the Highland Foundations, was "to avoid a potential IRS argument that Mr Dondero would have indirect de facto control over the three supporting organizations [i.e. the Highland Foundations] as prohibited by section 509(a)(3)*". Mr Patrick appears to be referring specifically to the memo of advice issued by Mr Mancino to Mr Patrick dated 12 September 2013 with subject line "*Charitable DAF HoldCo, Ltd. and Highland Supporting Organizations – Succession Issues*"[11]. The full quote from the memo, which is largely omitted from Patrick 2, is as follows:

> "*Whichever approach is utilized, the question remains who can properly succeed Grant Scott as owner of the Management Shares and as the sole director of [the Company]. The designated successor should not be Mr. Dondero, a business partner, an entity more than 35% controlled by Mr. Dondero, an employee of such a controlled entity, or*

---

[10] At pages 49 to 61 of Exhibit MP-1

[11] At pages 62 to 66 of Exhibit MP-1

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

14

*certain family members (not including siblings). This is to avoid a potential IRS argument that Mr. Dondero thereby would have indirect de facto control over the three supporting organizations as prohibited by section 509(a)(3). Subject to these limitations, we believe that one workable approach would be for Mr. Dondero's sister to succeed Grant Scott as the owner of the Management Shares and as the sole director of HoldCo. His sister could be authorized to designate her own successor (or this could be handled in an amendment to the Articles of HoldCo), and thereafter the selection of the successor owner of the Management Shares could fall to the board of an entity over which Mr. Dondero does not have voting control (perhaps the board of one or more of the three supporting organizations).*"

30 The footnote to the third sentence of the above extract of the memo reads:

"*The concern would be that if Mr. Dondero (or a person or entity under his control) owns the Management Shares of HoldCo, he would then be in a position to cut off all funding to the three supporting organizations and, therefore, at least indirectly have the ability to influence the election of the "independent" directors of each SO by the Institutional Member.*"

31 It therefore appears to the JOLs that the "potential IRS argument" of indirect *de facto* control by Mr Dondero over the Supporting Organisations was raised in relation to a hypothetical scenario whereby Mr Dondero or an entity controlled by him was to be transferred the management shares in the Company and take over as sole director of the Company from Mr Scott. However, Mr Dondero did not become the sole management shareholder and did not become the sole director of the Company in place of Mr Scott - Mr Patrick did.

32 The JOLs have now filed the affidavit of Marvin Bradford Bedingfield sworn on 14 November 2025 in reply to Mancino 1 and Reid 1 ("**Bedingfield Affidavit**"). The Bedingfield Affidavit addresses matters of US tax law relevant to the purported tax concerns relied upon by Mr

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

15

Patrick and Mr Murphy to justify the DAF Restructuring. I have read the Bedingfield Affidavit and note that, *inter alia*, Mr Bedingfield concludes the following (at paragraphs 41 and 42):

"*Both Mr. Mancino and Mr. Reid note generally that an IRS investigation could result in significant costs[12] – but as noted above, those are costs to the Supporting Organization(s), not to the Company. Were the Supporting Organizations to lose their supporting organization status and become private foundations, they would still be 501(c)(3) private foundations (as is the DFW Foundation), and that would have no negative US tax consequences to the Company itself. Even if the IRS were to revoke entirely the 501(c)(3) status of one or more of the Supporting Organizations, that would not by itself result in liabilities or material negative consequences to the Company under US tax law – the Supporting Organization that lost its 501(c)(3) status might be forced to dissolve, and under its governing documents would be required to transfer its remaining assets to its Supported Organization (the community foundation that controls it), which could continue holding the participating shares. If for some reason the Supporting Organization were to find itself in receivership, the receiver would at most step into the shoes of the Supporting Organization as participating shareholder, but would not by virtue of such receivership have any more rights to access the underlying assets of the Company than did the Supporting Organization as participating shareholder.*

*Regardless of the potential result of the filing of the Form 13909 by Mr. Mancino on the potential public charity or 501(c)(3) status of the Highland Dallas Foundation, I do not see any material risk under US tax law to the underlying assets of the Company arising from any potential change in the tax-exempt status of one or more of the Supporting Organizations*"

---

[12] Mancino DM-1, paragraph 14; Reid AR-1, paragraph 70.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

33      The Bedingfield Affidavit has reinforced the JOLs' already strong belief that, when properly analysed, Mr Patrick's and Mr Murphy's purported concerns about the tax status of the Supporting Organisations are self-serving and do not justify their drastic actions in effecting the DAF Restructuring.

*The purported 'alter ego' concerns*

34      At paragraph 38 of Patrick 2, Mr Patrick refers to the "UBS Litigation" involving Mr Dondero and UBS.  The Company is not a party to the UBS Litigation and therefore the JOLs do not have a complete understanding of it.  However, the JOLs understand that the 'alter ego' claims made by UBS against CLO HoldCo (the Sixth Defendant) were dismissed pursuant to an order of the New York Supreme Court dated 8 July 2024 (page 29).  Mr Patrick asserts that the fact that CLO HoldCo was originally a defendant to the UBS Litigation "*caused Mr Murphy and I to be concerned that UBS (and/or other creditors) might seek collection from the DAF Structure on the basis that it constituted the 'alter ego' of Mr Dondero, and, as outlined in Murphy 1, was an important consideration when evaluating the DAF Restructuring.*"  The JOLs have taken US law advice on the test for a corporate entity to be treated as an individual's 'alter ego' under US law (privilege over which is not waived), from which the JOLs believe that the purported 'alter ego' concerns held by Mr Patrick and Mr Murphy were overstated and also did not justify the DAF Restructuring.

*The purported concerns about Mr Dondero misappropriating the assets of the DAF Structure and/or making demands to use those assets for certain transactions*

35      At paragraphs 34 and 35 of Patrick 2, Mr Patrick refers to an alleged incident in or around November 2023, when Mr Dondero asked Mr Patrick "*to transfer approximately US$1.5 million of the DAF's assets to offshore entities owned by Mr Dondero*" in order to settle Mr Dondero and Mr Ellington's legal fees relating to the UBS Litigation. Mr Patrick states that he refused to effect the transfer of funds requested by Mr Dondero because to do so would pose "*a real risk*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

17

*to the integrity of the DAF Structure*".  Mr Patrick's account therefore appears to be that Mr Dondero had no authority to issue commands or directives to Mr Patrick as to the use of the Fund's assets, and Mr Patrick had the power and authority to refuse to follow Mr Dondero's instructions (which he says he in fact did).  With that being so, the JOLs do not understand why Mr Patrick contends that it was necessary to implement the DAF Restructuring in order to remove the Fund and its assets from the control of Mr Dondero.  By Mr Patrick's own admission, Mr Dondero did not have control over decision-making with respect to the assets of the Company, the Fund, and the broader Fund structure prior to the DAF Restructuring - Mr Patrick did.

36    At paragraph 36 of Patrick 2, Mr Patrick refers to paragraphs 111 to 119 of his first affidavit filed in the Company's liquidation proceedings ("**Patrick 1**") wherein he listed potential transactions that he asserts would have ultimately benefitted Mr Dondero and related entities to the detriment of the Fund structure. I note that Patrick 1 confirms that Mr Patrick rejected all such potential transactions proposed to him after his appointment as the "Control Person" (as he refers to it)[13].  The JOLs believe this further demonstrates that there was no risk of Mr Dondero exercising control over the Fund structure in circumstances where Mr Patrick had the power to refuse to implement Mr Dondero's requested transactions (and did in fact refuse to implement them).  In short, once Mr Scott had ceased to hold the control position, and Mr Patrick had assumed it, any historic control alleged to have been exerted by Mr Dondero (through his close relationship with Mr Scott) was irrelevant.

37    The JOLs also find it ironic that Mr Patrick cites his concern that Mr Dondero was attempting to misappropriate the assets of the DAF Structure and use it "*as his own personal piggy-bank*" when that is precisely what appears to have been done by Mr Patrick (and Mr Murphy) through the DAF Restructuring.  That is, Mr Patrick has:

---

[13] See for example, paragraphs 113 to 116 of Patrick 1 in relation to transactions proposed by Mr Dondero or NexPoint that Mr Patrick on behalf of the Fund declined to proceed with.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

37.1    Misappropriated the Company's asset (the Partnership Interest) by transferring it to an entity owned and controlled by him (CDM);

37.2    Abused his control of the Fund and its subsidiary entities in the Fund structure by causing them to pay him grossly excessive salaries and bonuses using money that would otherwise be available for making distributions to the Supporting Organisations and onwards to the supported Charities (see paragraphs 52 to 57 below); and

37.3    Made token donations through DFW of approximately US$10,000 each to various charities for the months of July and August 2025[14] totalling US$266,323.58, and a further single donation of US$157,120.50 in September 2025, but by this stage Mr Patrick had already caused various Fund entities to pay him US$10,548,778 and US$3,325,000 in purported salaries and bonuses in 2024 and the first half of 2025 alone, respectively.

38    Mr Patrick also contradicts himself when seeking to explain the reasons for the DAF Restructuring where he states at paragraph 45 of Patrick 2 that "*I firmly believe that the steps undertaken as part of the DAF Restructuring were necessary to protect the DAF and its charitable mission…from retaliatory actions by Mr Dondero*", but then at paragraph 47 states that he anticipated that the DAF Restructuring <u>would</u> be met by retaliatory actions by Mr Dondero.  This is yet another reason why the JOLs believe the true purpose of the DAF Restructuring was to benefit Mr Patrick and Mr Murphy personally rather than any legitimate reason involving Mr Dondero.

39    In relation to the first step of the DAF Restructuring, at paragraph 58 of Patrick 2, Mr Patrick asserts that it was necessary to insert CDM into the structure between the Company and the Fund "*as a pre-emptive measure to enhance governance, mitigate alter-ego risk, and preserve*

---

[14] Pages 30 to 31.  The JOLs have obtained this information from DFW pursuant to the Interim Undertakings, which require retrospective disclosure of monthly transactions below US$50,000 and advance notice of payments over US$50,000.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

*compliance with U.S. charitable-tax requirements by guarding against improper interference by Mr Dondero.*"  Mr Patrick does not provide any detail of why inserting CDM into the structure would achieve the above outcomes.  It is unclear to the JOLs how or why inserting a new entity into the structure beneath the Company would in any way "enhance governance" or guard against any alleged improper interference by Mr Dondero in the Supporting Organisations' and/or Company's affairs.  The only examples Mr Patrick has provided of the alleged improper interference are instances where Mr Dondero asked Mr Patrick to undertake certain transactions on behalf of Fund entities, which Mr Patrick says he refused.  Mr Patrick retained the same power and authority to refuse to follow Mr Dondero's instructions as to the use of Fund assets both before and after CDM was inserted into the structure, which suggests to the JOLs that there was no actual risk of external interference in the Company's affairs by Mr Dondero whilst Mr Patrick was in control.  However, the interposition of CDM <u>did</u> enable Mr Patrick to procure the redemption of the Company's interest in it, whereas the Company held an unredeemable interest in the Fund prior to that point.  The JOLs believe that this was the real purpose that lay behind the insertion of CDM into the Fund structure.

<u>The Redemption</u>

40      At paragraph 84 of Patrick 2, he refers to a retrospective fairness opinion that CDM obtained from Weaver as to the fairness of the proceeds paid by the Company (under Mr Patrick and Mr Murphy's control) to the Supporting Organisations for the redemption of their Participating Shares (the **"Weaver Opinion"**)[15].  I note that Mr Patrick criticises the JOLs for not referring to the Weaver Opinion in MacInnis 1 (or the JOLs' evidence in support of the application for sanction to commence these proceedings) in circumstances where it was provided to the JOLs on 1 July 2025.  As to this:

---

[15] At pages 382 to 384 of Exhibit MEP-2

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

40.1 The Weaver Opinion was provided to the JOLs by Shields as part of the JOLs' efforts to obtain the Company's books and records. It was one document of many uploaded by Shields to the JOLs' data room on 1 July 2025 as part of Shields' second batch of uploaded documents. No specific attention was drawn to the Weaver Opinion by Shields or any of the Defendants at that time.

40.2 Having since reviewed the Weaver Opinion, the JOLs' have serious doubts as to its reliability, particularly considering that it was sought and obtained by CDM after the Redemption had already occurred. The Weaver Opinion is three pages long and appears to be mostly a series of disclaimers and caveats to the opinion, such as the following –

> "*We have not been asked to undertake, and have not undertaken, an independent verification of any information provided to or reviewed by us, nor have we been furnished with any such verification performed by Management or any other party and we do not assume any responsibility or liability for the accuracy or completeness thereof. …*
>
> *We did not perform either a selected public company analysis or a precedent transaction analysis because we were unable 1.1 to find public companies or precedent transactions with publicly disclosed financial information that we deemed sufficiently comparable to the Company or the Transaction, respectively. …*
>
> *The Opinion does not address any other aspect or implication of the Transaction, the Agreement, or any other agreement or understanding entered into in connection with the Transaction or otherwise, including: (a) the relative merits of the Transaction as compared to other business strategies that might have been available to the Company; (b) the Company's underlying business*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

21

*decision to effect the Transaction; (c) the fairness of any portion or aspect of the Transaction to creditors or other constituencies of the Company, or to any other party, and (d) the fairness of any portion or aspect of the Transaction to any one class or group of the Company's or any other party's security holders or other constituents vis-à-vis any other class or group of the Company's or such other party's security holders.*"

40.3   The Weaver Opinion also expressly relies on the FTI Report, which in turn was explicitly not to be distributed and was not to be used to support a transaction.

40.4   The Weaver Opinion was also referred to and relied upon in the evidence in support of DFW's application to remove the JOLs filed in the Company's liquidation proceedings (the "**Removal Application**").  On 5 September 2025, Maples sent a letter to Baker & Partners which set out the JOLs' position that the Removal Application was bound to fail (pages 32 to 42).  In that letter, Maples addressed the Weaver Opinion as follows –

"*(iv)   Your client alleges that, in seeking sanction to commence FSD Proceedings, the JOLs failed to disclose the Weaver Opinion (which opined that the proceeds paid to the Highland Foundations in their capacity as Participating Shareholders following the DAF Restructuring were fair). It is worth remembering that, in opposition to the JOLs' sanction application with respect to the engagement of counsel, your client, Mr Patrick, and Mr Murphy produced three voluminous affidavits (running to 142 pages of text and 1,699 pages of exhibits) outlining their justifications for the transactions in issue, all of which were sworn very shortly after the date of the Weaver Opinion. It is telling that in the volume of evidence filed, the Weaver Opinion was not mentioned once. Clearly that indicates that neither your client (nor Mr Patrick nor Mr Murphy) considers it material. We agree.*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

*(v)      Your client's recent reliance on the Weaver Opinion (obtained after the date of the JOLs' appointment) completely misses the point. The interposition of CDM between the Company and its interest in the Fund was part of the overall scheme that removed the Company's interest in the Fund from its economic stakeholders. The fact that CDM has managed to obtain a fairness opinion with respect to CDM's redemption of the Company does not answer the question of the propriety of interposing CDM between the Company and the Fund in the first place (or the broader transactions).*"

**A2    The correspondence with the Supporting Organisations leading up to the DAF Restructuring**

41    At paragraph 23 of Murphy 1, he states that:

"*It is important to note that Mr. Patrick and I took a staged approach towards the DAF Restructuring, which was responsive to increasingly aggressive actions taken by the Supporting Organisations, their legal advisors, and other parties associated with Mr. Dondero.  We had hoped that the Supporting Organisations would engage with us to allay our concerns about Mr. Dondero's overreach.  It was only when it became clear that Mr. Dondero, through the Supporting Organisations, had no intention of engaging with us in good faith that the final stages of the DAF Restructuring were implemented*".

42    Similarly, at paragraphs 59 and 60 of Patrick 2, he asserts that he and Mr Murphy decided to implement the DAF Restructuring because:

"*…it became increasingly clear that the Highland Foundations were adopting a hostile position and seemed determined to impugn my and Mr Murphy's management of the Company. Mr Mancino exchanged several emails and letters with H&K during this period, culminating in his letter dated 14 February 2025. In this letter, Mr Mancino addressed the Highland Foundation's incorrect assertions regarding director fees and*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

23

*legal expenditure, the provision of financial information to the Highland Foundations, and flagged his concerns regarding Mr Dondero's influence and control over the Highland Foundations…*

*Having received no response to Mr Mancino's letter [dated 14 February 2025], Mr Murphy and I concluded that it would be prudent to implement the CDM Restructuring*"

43      Those statements do not accord with the contemporaneous correspondence between representatives of the Supporting Organisations and Mr Murphy and Mr Patrick.  Whilst that correspondence is referred to in general terms in Murphy 1 and Patrick 2, from the JOLs' review, neither of them have squarely addressed the substance of the concerns raised by the Supporting Organisations in that correspondence and why their requests for information about the Company's affairs were refused (beyond asserting that they had no rights to the information).  Whilst the JOLs have not been provided with a full set of Mr Patrick or Mr Murphy's emails from their Company email addresses[16], the JOLs have in their possession the following correspondence between the Supporting Organisations on the one hand and Mr Murphy and Mr Patrick on the other in the period 11 November 2024 to 14 February 2025:

43.1    On 11 November 2024, the Supporting Organisations (minus CFNT), sent a letter to Mr Murphy in his capacity as a director of the Company and Charitable DAF Holdings Corp which set out that they "*no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the DAF-related entities, can function appropriately*" (pages 43 to 44) (which I refer to as the "No Confidence Letter" in MacInnis 1).  The No Confidence Letter referred to "*conflicting information*" that they had been provided with as to the "*financial inner workings of the DAF-related entities*", which gave rise to "*significant concerns about how the corpus of these funds*

---

[16] "@CharitableDAF.com" and "@dafholdco.com", as well as emails sent by either of Mr Patrick or Mr Murphy from other email addresses where they were acting qua director of the Company (e.g. "paul@gkmanagement.com.ky")

*is administered and spent*". The No Confidence Letter also conveyed that their efforts to obtain information from the Company on these matters had been "*rebuffed*", and suggested that "*because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities*".

43.2    On 23 January 2025, Ms Julie Diaz of the Highland Dallas Foundation sent an email to Mr Patrick on behalf of herself and the other CEOs of the Highland Santa Barbara Foundation and the Highland Kansas City Foundation (pages 45 to 58).  In her email, Ms Diaz stated that: "*We have been discussing the need for a better understanding of the assets and thought it would be helpful if you could provide us with several detailed reports now that the new structure is in place*".  Her email then requested (i) income statements for the Company for the previous four years; (ii) a listing of the Company's underlying assets; (iii) the Company's audited financial statements; and (iv) an explanation of the current structure of the Company and its subsidiaries.

43.3    On 28 January 2025, Ms Diaz sent a further email to Mr Patrick and Mr Murphy noting that a response had not been received to her 23 January 2025 email and asserting that: "*[t]his failure to provide the courtesy of a response continues a pattern of a lack of communication and transparency as to assets and financials of DAF Holdco under your stewardship. These failures exacerbate the concerns we previously communicated in our letter to [Mr Murphy] in November 2024*" (page 55).  The letter concluded by requesting that the Company be wound up and that Mr Murphy and Mr Patrick not dissipate the Company's assets until the Supporting Organisations' concerns had been resolved.

43.4    On 30 January 2025, Mr Murphy sent an email in response to Ms Diaz indicating that he had understood that "*the next steps following the meetings between our respective legal representatives (Douglas Mancino and David Rosenberg) in December last year*

*was for us to present directly to the foundations/supporting organisations in order to address some of the concerns in the letter dated 11 November 2024*" (pages 51 to 52). Mr Murphy noted that "*it was surprising to receive the 28 January Email which repeats some of the allegations in the 11 November Letter*" and informed Ms Diaz that he and Mr Patrick had not received Ms Diaz's 23 January email as it was sent to an out-of-use email address. The email also included the following paragraphs:

"*I must, however, record that we have some growing concern around the content and circumstances your email of 23 January 2025, specifically that it might be interpreted as a premise to attempt to inappropriately exercise control over DAF HoldCo and/or its assets. As a reminder, when the participating shares in DAF HoldCo were issued to the supporting organizations, there was no conveyance of voting rights or control, and it has always been well understood that such shares did not convey voting rights or control. In particular, without waiving applicable privileges, we are advised that any attempt to exert control of DAF HoldCo or its assets by James Dondero would be both inappropriate, unlawful and inconsistent with DAF HoldCo's charitable mission. We are deeply concerned that this outreach, which began following Mark's resignation from Skyview in October 2024, may be the supporting organizations acting as proxy for Mr. Dondero. We hope we are wrong, but the supporting organizations have received the same ValueScope quarterly financial reports and charitable distributions over time without change and without issue.*

*…*

*Whilst we are cooperating with the foundations/supporting organizations to provide additional information we have no legal obligation to do so (which is not disputed). In no way should our cooperation be construed as an implicit*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

*acknowledgment of any duty to continue providing information to you or as a waiver of any DAF HoldCo's rights and remedies.*" (pages 53 to 54)

43.5   It is not clear to the JOLs how Mr Murphy interpreted the Supporting Organisations' requests in Ms Diaz's email of 23 January 2025 for basic financial information and to not dissipate the Company's assets as "*a premise to attempt to inappropriately exercise control over [the Company] and/or its assets.*"

43.6   On 31 January 2025, Mr Michael Stockham of Holland & Knight, the US attorneys then acting for the Supporting Organisations, sent an email to Mr Murphy that included the following statements:

(a)   "*I am appalled by your response. As fiduciaries, you and Mr. Patrick manage $270 million in assets for the benefit of charities that support the most vulnerable in their communities. Whatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions. And your focus and mission should be not only to ensure the success of the investments, but transparency to the ultimate beneficiaries. The assets are for their benefit, not Mr. Dondero, not Mr. Patrick, and not you.*" [emphasis added] (pages 49 to 51).

I have emphasised the last sentence of this extract as it summarises the JOLs' position on the facts of this case and the JOLs' reason for commencing these proceedings – that is, Mr Patrick and Mr Murphy appear to have treated the Partnership Interest and the underlying assets it represents as their own, and justified it on the basis that those assets do not belong to Mr Dondero, when in fact the assets belong to none of them – they belong to the Company and enure to the ultimate benefit of the Supporting Organisations and their underlying

Charities[17]. As such, the JOLs on behalf of the Company see it as their duty and responsibility to seek to recover the Partnership Interest and preserve as much of the assets it represents as possible.

(b)     "*The Supporting Organizations have legitimate concerns. The last information they received from SEI in July of 2024 - before Mr. Patrick shut down that line of communication and information - showed legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022. If annualized, and at that pace, legal expenses appeared to be on path to exceed $12 million for 2024. That's a 300% increase. Director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024. Again, annualized, these fees are on a path to exceed $5 million in 2024. That is a 12,400% increase.*"

In fact, the JOLs have discovered that the director fees paid to Mr Murphy and Mr Patrick in 2024 were closer to US$11 million. The JOLs believe this level of compensation to be unjustified and approved by Mr Patrick and Mr Murphy in wilful breach of fiduciary duty.  I address this issue further at paragraphs 63 to 67 below.

(c)     "*The Supporting Organizations have no interest in the animosity or dysfunction between Mr. Patrick and Mr. Dondero. What they do have an interest in, is an active campaign by you and Mr. Patrick to continue to manage the assets in a shroud of mystery, dripping out details and information whenever you deem it appropriate. To do so simply proves our concerns that the governance structure of these entities is broken.*

---

[17] And Mr Patrick and Mr Murphy's fiduciary duties were to act in the best interests of the Company, which in effect meant the best interests of the Supporting Organisations and the Charities.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

28

*Yes, it is true that we have been in discussions for months about transparency, and you provided some information. However, what has been ignored are the repeated requests for a simple set of financials. But how hard is it to create a short PowerPoint on the current state of financial statements, a simple diagram of the alleged new governance structure (who are the advisory board members?), your visions for the funds, and then provide a one-hour briefing to the Supporting Organizations? If you are truly managing the funds to the institutional-investor standards represented in our call, these details should be at your fingertips. Yet somehow this has all devolved into delays and posturing related to the dust up between Messrs. Dondero and Patrick.*

*That type of myopic thinking is not appropriate in this situation. The Supporting Organizations deserve answers, and the transparency needs to happen sooner rather than later.*" (pages 50 to 51)

43.7   On 4 February 2025, Mr Murphy sent a short email response to Mr Stockham noting that he and Mr Patrick "*remain open to finding a framework within which we can resolve your clients' concerns.*" (pages 48 to 49). Mr Murphy's email did not address the concerns raised in Mr Stockham's email about the apparent significant increases in expenses and director compensation.

43.8   On 7 February 2025, Mr Stockham sent an email to Mr Murphy that began as follows:

"*I appreciate your email, and your willingness to find a framework to resolve the concerns, but am flummoxed by your, "struggle" to understand our growing frustration.*

*I do not believe it should be difficult to comprehend the request for transparency around $270 million dollars you control as a fiduciary for the benefit of charities in Dallas, Kansas City, and Santa Barbara. Indeed, these odd legal and*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)
29

*rhetorical machinations of yours and Mr. Patrick miss the point. These monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed, and among other things-creating a lasting impact on young minds by fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees. If I'm wrong, please educate me.*" (page 45)

43.9   In the same email, Mr Stockham explained the video calls that had taken place between representatives of the Supporting Organisations and representatives of the Company (under the control of Mr Patrick and Mr Murphy) on 6 November 2024, 20 November 2024, and 11 December 2024 (page 46).   Mr Stockham's account was that: (i) no information was provided to the Supporting Organisations on the underlying assets and financial condition of the Fund at those meetings; and (ii) shortly after the 11 December 2024 video call, the Supporting Organisations received a demand from Mr Patrick and Mr Murphy to withdraw their concerns about the governance of the Company and the Fund, which demand suggested that if the Supporting Organisations wished to receive more information, they needed to execute a non-disclosure agreement with a liquidated damages clause.   The JOLs do not presently have a copy of this demand letter to verify the above statements

43.10   On 14 February 2025, Doug Mancino of Seyfarth, sent a letter to Mr Stockham on behalf of the Company (pages 59 to 60).   In this letter, Mr Mancino made the following assertions:

(a)   "*First, Charitable DAF is not paying Paul or Mark "millions in director fees," as alleged in your January 31st email. The information supplied by SEI is simply incorrect.*"

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

30

==This assertion appears to be false.== As explained in paragraphs 63 to 67 below, the Defendants have disclosed that the ==director fees and expenses paid to Mr Murphy and Mr Patrick (which they themselves approved) exceeded US$11 million for 2024==. ==This is in addition to the US$500,000 paid to Mr Murphy in 2025[18] and the US$3,608,333 paid to Mr Patrick in 2025[19]== (of which the JOLs are aware), w==hich amounts were paid notwithstanding the Supporting Organisations had requested in their 11 November 2024 letter that there be no further dissipation of assets until their concerns were resolved.==

(b) "*[the Supporting Organisation's] demands for information have only increased, even though, as you yourself acknowledged in one of our early calls, Participating Shareholders of Charitable DAF have no rights to information and what they already get exceeds that to which they are entitled.*" (page 59)

==This illustrates that Mr Patrick and Mr Murphy were continuing to rely on their position that the Supporting Organisations had no legal rights to the financial information they were seeking as a basis for refusing to provide any such information to them. The JOLs do not know why Mr Murphy and Mr Patrick took this position.==

(c) "*Finally, the controlling role and influence that Mr. Dondero and his agents such as Lucy Bannon appear to be exerting over the Supporting Organizations raise significant private benefit concerns that call into question whether one or more of the Supporting Organizations is at risk of becoming a Restricted Person as that term is defined Article 21 of Charitable DAF's Articles of Association. I know David will be familiar with the seminal Tax Court decision in American Campaign*

---

[18] See paragraphs 60-62 below

[19] See paragraph 49 of MacInnis 1

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

31

*Academy v. Commissioner, 92 T.C. 1053 (1989),which involved the denial of section 501(c)(3) exemption because the Internal Revenue Service concluded that the organization was operated for the substantial nonexempt purpose of benefitting private interests. We offer no opinion on that question but raise it as a matter of concern to Charitable DAF.*" (pages 59 to 60)

Based on the documents and correspondence the JOLs have in their possession, this appears to be the first time the "Restricted Person" reasoning for the DAF Restructuring was raised in correspondence with the Supporting Organisations]. In that regard, I note that by the date of the Seyfarth letter, the first two steps in the DAF Restructuring had already been completed (the LP/LLC Exchange and DFW Share Issuance). It therefore appears to the JOLs that the "Restricted Person" reasoning was introduced at a late stage to support the final step of the DAF Restructuring – the Redemption and extinguishment of the Company's interest in the Fund. The JOLs have now also filed the Bedingfield Affidavit addressing matters of US tax law relevant to this issue, which is addressed at paragraphs 32 to 33 above.

43.11 I also note that at paragraph 60 of Patrick 2, Mr Patrick asserts that: "*Having received no response to Mr Mancino's letter [dated 14 February 2025], Mr Murphy and I concluded that it would be prudent to implement the CDM Restructuring. Accordingly, on 18 December 2024, the Company, CDM and the GP executed a Deed of Assignment and Assumption, the effect of which was to transfer the Company's interest in the DAF to CDM, with the Company obtaining 100% of the membership interest in CDM*". This statement is contradictory and false. It cannot have been the case that the lack of a response from the Supporting Organisations to Mr Mancino's letter of 14 February 2025 led Mr Patrick and Mr Murphy to implement the CDM Restructuring by way of executing the Deed of Assignment and Assumption almost two months earlier

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

32

on 18 December 2024. The JOLs believe this to be yet another concerning statement from Mr Patrick indicating that his underlying motivation for the DAF Restructuring was not as he suggests in his evidence.

44    It appears to the JOLs from the above correspondence that, contrary to what is suggested by Mr Murphy at paragraph 23 of Murphy 1, the Supporting Organisations' concerns about Mr Murphy and Mr Patrick's management of the Company and the Fund were conveyed in correspondence *before* Mr Murphy and Mr Patrick's concerns about "*Mr Dondero's overreach*" were conveyed to the Supporting Organisations.

45    Mr Murphy also points to no specific documentary evidence to substantiate his assertion that: "*It was only when it became clear that Mr. Dondero, through the Supporting Organisations, had no intention of engaging with us in good faith that the final stages of the DAF Restructuring were implemented*" (i.e. the suggestion that Mr Murphy and Mr Patrick only undertook those steps in response to an alleged lack of good faith engagement from the Supporting Organisations). At paragraph 94 of the Murphy Liquidation Affidavit, Mr Murphy makes a similar statement in response to the emails from Mr Stockham and Ms Diaz referred to above whereby they sought information about the Company and its assets: "*Given the position of Ms Diaz and Michael Stockham, I formed the view that the Highland Foundations had no genuine interest in seeking to resolve their perceived and unfounded grievances and Mr Patrick and I proceeded to execute the DFW Share Issuance.*" The JOLs find that to be an extraordinary admission that Mr Patrick and Mr Murphy made the deliberate decision to dilute the Supporting Organisations' shareholding in the Company by issuing shares to DFW (an entity controlled by Mr Patrick) in circumstances where –

45.1    The Supporting Organisations' grievances as to the apparent increase in expenses and director remuneration were not addressed by Mr Patrick or Mr Murphy in any way;

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

33

45.2    The Supporting Organisations' requests for financial information were not responded to or satisfied; and

45.3    The only response from Mr Patrick and Mr Murphy was to seek to point the finger at Mr Dondero's perceived influence as a basis for their own purported concerns about the Supporting Organisations' intentions.

46    In any event, the JOLs believe that Mr Murphy's sworn statements extracted at paragraph 45 above are contradicted by evidence that suggests that Mr Patrick and Mr Murphy were contemplating transferring away the Company's assets and/or the Fund's assets to new entities from as early as 9 November 2023. I refer to the following:

46.1    Paragraphs 76.3 and 76.4 of MacInnis 1 and the Work Plan prepared by Shields for the Company dated 9 November 2023[20].

46.2    On 23 January 2024, Shields sent an email to Walkers, then Cayman Islands attorneys for the Company, which set out some "*Proposed Cayman Restructuring Options*" in response to "*some very minor issues with the transfer of the membership interests and role of managing member of Charitable DAF GP, LLC from (i) James Dondero to Grant Scott and (ii) Grant Scott to Mark Patrick*" (pages 61 to 62). The proposed options included some that would appear to have had the effect of transferring away the Company's and/or the Fund's assets to new entities:

"*3.    HoldCo forms new LP and contributes old LP assets to new LP*

*a.    Create new Charitable DAF Fund II, LP*

*b.    Create new Charitable DAF GP II, LLC*

---

[20] At pages 1433 to 1440 of Exhibit MM-1

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

     *c.       HoldCo contributes old LP to new LP*

     *d.      New GP is managing member of new LP*

     *e.      Old LP dissolves and distributes all assets to new LP*

   *4.     Form new HoldCo and contribute old HoldCo assets to new Holdco*

     *a.      Create new Charitable DAF HoldCo II, Ltd. subsidiary of old HoldCo*

     *b.      Create new Charitable DAF Fund II, LP subsidiary of new HoldCo*

     *c.      Create new Charitable DAF GP II, LLC*

     *d.      New GP is managing member of new LP*

     *e.      Old HoldCo liquidates and contributes all assets to new HoldCo*

     *f.      New HoldCo issues new participation shares to old participation shareholders*".

46.3    On 8 March 2024, Shields sent an email to Walkers which set out Mr Patrick and Mr Murphy's objective as: "*…the goal is to reduce or eliminate the possibility of litigation filed from the participation shareholders to Charitable DAF HoldCo, Ltd. We understand that participation shareholders do not generally having [sic] voting rights under the articles, but they do have a consent right to actions that would modify the rights of the participation shares. We have discussed a couple solutions on our side, and we would appreciate your team's input and creativity.*" (pages 63 to 64).  The proposed "solutions" included the following:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

> "*Blocker LLCs (with participation shareholder consent)*
>
> \-    *Form new blocker LLCs between Charitable DAF HoldCo, Ltd. and the participation shareholders…*
>
> *Transfer Charitable DAF Fund, LP in some manner (without participation shareholder consent)*
>
> \-    *Charitable DAF HoldCo, Ltd. is a holding company. The assets are generally held at the CLO HoldCo, Ltd. and Liberty CLO HoldCo, Ltd. levels, so a transfer of Charitable DAF Fund, LP to a new holding company (e.g. Charitable DAF HoldCo, Ltd. #2) could provide some protection.*" (page 63)

47    It appears to the JOLs that the logical explanation for the short delay between each of the three steps of the DAF Restructuring was due to the time it took for Mr Patrick and Mr Murphy to find advisors who were willing to give opinions that said what they wanted them to say in order to provide a basis to justify each of those steps[21]. This is aptly demonstrated by the email from Mr Patrick to Walkers and Shields dated 17 March 2025, where Mr Patrick laid out his strategy to remove the Supporting Organisations from the structure or otherwise defeat their interest in the Company as follows:

> "*We are seeking U.S. tax counsel to send emails to both Paul and I that the non profits are Restricted Persons and/or best interests of the Company to have non dondero holders of the its (sic) interests.*
>
> *After that, an alternative approach is to give them what they want - liquidate Holdco Ltd after its only investment is redeemed by the US. LLC  pursuant to U.S. counsel advice*

---

[21] See the chronology of relevant events and correspondence with valuation and legal advisors with respect to the stages of the DAF Restructuring set out at paragraphs 37 to 48, 63, 71, 76 to 77 of MacInnis 1

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

36

*above*, that it's in the best interests of the Company to redeem all non-profits affiliated with Dondero.

*US LLC has same valuation conducted on its shares as the participation shares. so we would redeem the LLC interest, then distribute the proceeds out of Holdco Ltd., and file articles of Dissolution for Charitable daf Holdco Ltd before a wind up petition is filled.  That would put us on the "high ground" to fight (rather the way this is currently heading in a defensive posture). they would have to scrap their wond up petition and fight for reinstatement, gripe about the valuations, and file fiduciary breach actions (all of which they will do anyway under a wind up).*

*We will stage this in light of the Doug letter, new advice of two separate U.S Tax counsel, and seeing how successful (or not) our outreach to the Texas attorney general office is....*

*Note : US LLC would make DFW its sole owner.*" [emphasis added] (page 65)

48      In this respect, as Mr Murphy points out at paragraph 46 of Murphy 1, each of his director services agreements ("**DSAs**") with the Company and subsidiary entities (including the Fund) contained terms purporting to exonerate Mr Murphy of any liability for anything he did in reliance on professional advice unless through actual fraud or wilful default.  It is the JOLs' position that Mr Murphy and Mr Patrick's selective instructions and selective reliance on certain advices they obtained on the various steps of the DAF Restructuring (whilst discounting the views of other professional advisors who reached different conclusions, such as PwC[22]) was not in good faith, and their carrying out of those steps was a wilful breach of their fiduciary duties to the Company.

---

[22] See paragraph 77.4 of MacInnis 1

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

49      At paragraphs 63 and 67 of Murphy 1, Mr Murphy asserts that the reason the Supporting Organisations started to raise concerns about the governance of the Company in October 2024 was that "*Mr. Patrick and the DAF Fund had formally cut ties with Mr Dondero and Skyview*" and Mr Dondero was therefore allegedly driving the Supporting Organisations' concerns. In this regard, Mr Murphy omits to mention the fact that in or around August 2024, the Supporting Organisations were provided with a financial analysis (prepared by NexPoint Advisors LP) of the Fund's annual expenses which showed or appeared to show increases in expenditure, particularly as follows:

49.1    Directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased further to around US$2.25 million in the first half of 2024; and

49.2    Expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

50      As regards expenses, I note at paragraphs 51 and 138 of Patrick 2, he contends that of the US$18.3 million for the first half of 2024, this was partially offset by US$6.1 million of income. However, Mr Patrick appears to concede that total expenses were in fact at US$18.3 million (leaving aside any alleged offsetting income).

51      The Supporting Organisations' concerns about the apparent increase in expenses and director compensation, and requests for information about the Fund's assets and management, were subsequently conveyed to Mr Murphy and Mr Patrick in the correspondence listed at paragraph 43 above.  As noted above, Mr Murphy does not engage with the substance of the Supporting Organisations' questions and concerns in his affidavit but instead appears to have discounted them entirely because he believed Mr Dondero was driving them (the same view is expressed by Mr Patrick at paragraphs 54-56 of Patrick 2).  Even if Mr Murphy was correct in that view, the JOLs do not believe that it provides a justification for ignoring reasonable questions from the Supporting Organisations in response to evidence of significant increases in director

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

38

compensation and expenses that they, as the Participating Shareholders, found to be a cause for concern[23].

## A3   The Significant Increases in Mr Patrick's and Mr Murphy's Compensation

<u>Mr Patrick's excessive salaries and bonuses</u>

52   The excessive salaries and bonuses that Mr Patrick and Mr Murphy have resolved to pay Mr Patrick for his directorship of the Company are addressed at paragraph 49 of MacInnis 1.  As explained in more detail at paragraphs 63 to 69 below, the JOLs understand from the disclosure provided by the Defendants pursuant to the Interim Undertakings that Mr Patrick was paid a total of $13,873,778.03[24], comprising US$10,548,778 in 2024 and US$3,325,000 in the first six months of 2025[25].  The JOLs believe these payments to be grossly excessive and paid in breach of Mr Patrick's fiduciary duties to the Company.  The JOLs do not believe there to be any rational justification for the Directors to approve that level of compensation for Mr Patrick, particularly given Mr Patrick is a US tax lawyer and does not appear to have any relevant experience or qualifications to manage a fund with net assets of approximately US$270 million.

53   The JOLs also have grounds to believe that Mr Patrick used a portion of the above funds to acquire certain properties in the United States, over which the Company now asserts a proprietary tracing claim in its Amended Statement of Claim filed on 15 October 2025.  In particular, the JOLs' investigations have revealed the following:

53.1   On 4 November 2024, Mr Patrick and his wife, Darees Patrick, purchased a property at 4909 Minor Hill Road, Missouri, United States of America, for consideration of

---

[23] Which concerns have turned out to be entirely warranted, as further explained at paragraphs 49 to 51 of MacInnis 1 and paragraphs 52-69 below

[24] This figure includes discretionary bonuses paid to Mr Patrick totalling US$5,450,000.

[25] Pages 84 and 95

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

approximately US$1,664,500 (the "**Missouri Property**"). The purchase was recorded in a Trustee's Deed dated 4 November 2024 between Harold W. Cunningham and Wanda S. Cunningham, in their capacity as trustees of the Harold W. Cunningham and Wanda S. Cunningham Revocable Trust on the one hand, and Mr Patrick and Mrs Patrick on the other (pages 108 to 109).

53.2   On 20 November 2024, Mr Patrick and Mrs Patrick transferred title to the Missouri Property to the DAAM Real Estate Trust, of which Mr Patrick and Mrs Patrick are the trustees. The transfer was recorded in a Warranty Deed dated 20 November 2024 between Mr Patrick and Mrs Patrick in their personal capacities on the one hand, and Mr Patrick and Mrs Patrick in their capacity as trustees of the DAAM Real Estate Trust on the other (pages 110 to 111).

53.3   On 28 January 2025, Mr Patrick made a payment to Wells Fargo Bank, N.A. to fully repay a loan of US$300,000 and discharge a mortgage on Mr and Mrs Patrick's family home at 6716 Glenhurst Drive, Dallas, Texas, United States of America (the "**Texas Property**"). Mr Patrick's repayment of the loan and the discharge of the mortgage in respect of the Texas Property was recorded in a Deed of Release executed by Wells Fargo Bank, N.A. dated 28 January 2025 (pages 112 to 113).

54   Pursuant to the Amended Injunction Summons, the JOLs seek orders restraining Mr Patrick from transferring or dealing with those properties pending trial (see paragraph 148.3 below).

55   Mr Patrick relies solely on the Mercer Report to support the level of compensation he has paid himself from the Fund structure. I have addressed the Mercer Report at paragraph 78 of MacInnis 1. The JOLs do not believe the Mercer Report validates the level of compensation that Mr Patrick has been paid for his (former) directorship of the Company and management of other entities in the Fund structure. Whilst the issues with the Mercer Report and the Directors' reliance on it will be addressed in more detail in the JOLs' legal submissions, I note

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

that the Mercer Report does not set out or consider Mr Patrick's qualifications, experience or suitability to the role. As far as the JOLs are aware, Mr Patrick does not have any investment management qualifications or experience aside from his experience as the person in control of the Fund. In this regard, I refer to extracts of the transcript of Mr Patrick's testimony in the Highland Chapter 11 proceedings where he admitted he had no prior investment management experience (pages 114 to 118).

56    I also note that the Mercer Report assumes that the Fund is comparable to a "PE firm with AUM of $400m - $1bn".  The JOLs do not agree with that assumption based on the financial information that the Defendants have disclosed to the JOLs to date pursuant to the Interim Undertakings.  In particular, the JOLs understand that more than half of the c.US$270 million of net assets of the Fund structure are held in cash or cash equivalents.  Finally, I note that Mr Reid also appears to disagree with Mercer's assumption where he states at paragraph 25 of Reid 1 that: "*DAF LP's purpose is not to aggregate capital from investors in the expectation that invested capital will be managed in accordance with a well-defined investment strategy or to provide returns to investors based on the success of that strategy.  As such, the notion of an investment fund is inapplicable to DAF LP.*" [emphasis added]

57    At paragraph 134 of Patrick 2, he relies on another report prepared by ValueScope dated 20 November 2024 "*which shows the financial performance and returns made by the DAF Structure under my stewardship consistently beat returns made by the S&P 500*".  I have read ValueScope's report and do not believe that Mr Patrick's claim is correct.  At page five of the report[26], there is a chart purporting to show the Fund's performance by NAV against the S&P 500 as a benchmark for the period 1 March 2021 to 1 June 2024.  At the top of the chart, it states that "*DAF has performed **in line** with a benchmark S&P 500 Total Return Index from March 31, 2021 to June 30, 2024. DAF's returns generally exhibit less volatility than the S&P 500 over the period*" [emphasis added].  The chart also shows the cumulative returns of the

---

[26] Exhibit MEP-2 at page 160

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

Fund and the S&P 500 index meeting at the same point by 30 June 2024. There are other questions the JOLs have as to the methodology used in the ValueScope Report and the appropriateness of creating indexes comparing the S&P 500 with the Fund, but the chart alone rebuts Mr Patrick's assertion of outperforming the S&P 500 during his tenure as the person in charge of the Fund.

The Murphy DSAs

58      At paragraph 36 of Murphy 1, he explains the terms of his appointment as a director of the Company in April 2021 as follows:

> "*I negotiated the terms of my appointment with HAK (acting for the Company), and was appointed as a director of the Company on 21 April 2021. I did not speak to Mr. Patrick, or otherwise communicate with him, about the role until after my appointment. The agreed terms were set out in a DSA executed between me, the Company, and the eight other entities listed at Schedule 1 (including CDAF GP, CDAF Fund, and CLO) (together, the "Corporate Parties") on 21 April 2021*"

59      The compensation that Mr Murphy was entitled to under the 2021 DSA[27] mirrored that of his predecessor, Mr Scott, namely US$60,000 per year[28]. However, from this point on, when Mr Murphy's compensation was negotiated and agreed directly with his fellow director Mr Patrick[29], his compensation grew by many multiples and he was awarded a large bonus, many payments of which coincided with the timing of certain steps in the DAF Restructuring:

---

[27] As defined in Murphy 1. All references to "[insert year] DSA" in this affidavit shall have the same meaning as they have in Murphy 1

[28] In the case of the 2021 DSA, the compensation payable to Mr Murphy also included an uplift of US$500 per hour for any additional work carried out thereunder of more than 30 hours in any three-month period.

[29] As is admitted in the final sentence of paragraph 37 of Murphy 1

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

59.1 The 2021 DSA was further amended by way of an agreement signed by Mr Murphy and by Mr Patrick on behalf of the Companies (as defined therein)[30] dated 6 November 2023 (the 2023 DSA).  The 2023 DSA provides that the 2021 DSA is amended such that –

(a) Mr Murphy shall receive an annual fee of US$200,000; and

(b) The services Mr Murphy was to provide the Companies would be expanded to include, amongst other things, acting upon all lawful directions issued by Mr Patrick subject to Mr Murphy discharging his fiduciary duties to the Companies[31].

59.2 A further DSA dated 12 December 2024 signed by Mr Murphy and Mr Patrick on behalf of the Companies (the 2024 DSA) replaced the amended April 2021 DSA.  Pursuant to the 2024 DSA, Mr Murphy–

(a) Was to provide services in his capacity as a director of the Companies; and

(b) Was to be paid an annual fee of US$200,000 and a discretionary bonus or bonuses in an amount and time determined by Mr Patrick as the Chief Executive Officer of the Companies[32].

59.3 Four days later on 16 December 2024, a resolution of the board of directors of the Company, being Mr Patrick and Mr Murphy, was passed, which purported to award Mr Murphy a discretionary bonus of US$250,000 payable immediately[33].  The resolution is signed by both Mr Patrick and Mr Murphy.

---

[30] Meaning the Company and the other subsidiary entities listed in the schedule to the DSA for whom Mr Murphy was to act as a director

[31] Exhibit PM-1, page 54

[32] Exhibit PM-1, pages 126-127

[33] Exhibit PM-1, pages 128-129

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

59.4    The 2024 DSA was amended by way of an agreement dated 27 March 2025 signed by Mr Murphy and Mr Patrick on behalf of the Murphy Entities (the 2025 DSA).  Pursuant to the 2025 DSA, Mr Murphy –

(a)    Was to provide services in his capacity as a director of the Murphy Entities, which services were to include assisting "*the joint official liquidators of Charitable DAF including taking any and all steps necessary to defend any allegations against Mark Patrick arising from the management of Charitable DAF's affairs*"; and

(b)    Was to be paid an annual fee of US$500,000 to be paid in equal instalments on the last business day of each calendar month[34].

60    The 2025 DSA expressly provides that the Companies "*may pay the Director in advance for any fees or expenses in circumstances where the Companies may have an inability to discharge their financial obligations to the Director, for example, where freezing injunctions or temporary restraining orders may be sought against the Companies*".  In apparent reliance on this provision, Mr Murphy was paid the US$500,000 annual fee in a lump sum prior to the Directors resolving to put the Company into voluntary liquidation five days later on 2 April 2025[35].

61    The fact that Mr Murphy was awarded this compensation shortly after completing the DAF Restructuring and putting the Company into liquidation only reinforces the JOLs' concerns that the true purpose of the DAF Restructuring was to allow Mr Patrick and Mr Murphy to have full control of the Fund structure (without the imposition of the Company, Supporting Organisations and supported Charities that were the ultimate beneficial owners of the Fund) and thereby allow Mr Patrick and Mr Murphy to award themselves unjustifiably excessive compensation

---

[34] Exhibit PM-1, pages 147-148

[35] However, see paragraph 79 below.  It is unclear if the correct date of the 2025 DSA is 27 March 2025 or 27 May 2025

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

44

without any accountability to the Supporting Organisations.  I also note in this regard that the report that the JOLs received from the Company's former joint voluntary liquidators, Mitchell Mansfield and William Clarke of Kroll (the "**JVLs**"), shortly after the JOLs' appointment, indicates that Mr Patrick and Mr Murphy informed the JVLs that their engagement would be "*on the basis of a non-contentious straight forward liquidation of the Company*" (page 120). Further:

61.1   On 25 April 2025, Mr Patrick sent an email to Shields regarding his strategy for the hearing of the Supporting Organisation's application to put the Company into provisional liquidation, where Mr Patrick stated:

> "*Goal : Keep Kroll;  help Kroll understand management and directors actions, avoid Judicial liquidation.*" [emphasis added] (page 131)

61.2   Finally, in the extract of the email from Mark Patrick to Shields and Walkers dated 17 March 2025 to which I refer at paragraph 47 above, Mr Patrick laid out his strategy behind putting the Company into liquidation as follows:

> "*so we would redeem the LLC interest, then distribute the proceeds out of Holdco Ltd., and file articles of Dissolution for Charitable daf Holdco Ltd before a wind up petition is filled.  That would put us on the "high ground" to fight (rather the way this is currently heading in a defensive posture). [the Supporting Organisations] would have to scrap their wond up petition (sic) and fight for reinstatement, gripe about the valuations, and file fiduciary breach actions (all of which they will do anyway under a wind up).*" [emphasis added] (page 65)

These materials strongly suggest that Mr Patrick and Mr Murphy were seeking to have the Company wound up and dissolved without any proper investigation by the liquidators into the propriety of their conduct in effecting the DAF Restructuring.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

62      The JOLs understand that none of the above increases in the fees or remuneration paid to Mr Murphy were disclosed by Mr Murphy or Mr Patrick to the Supporting Organisations or the Charities in advance or at all.  The JOLs understand that the same is true with respect to the over US$10.5 million in director fees paid to Mr Patrick in 2024, as set out in part at paragraph 49 of MacInnis 1 and at paragraphs 63 to 67 below.

**The US$11.6 million of director fees for 2024**

63      As noted above, the JOLs' concerns as to the compensation Mr Patrick and Mr Murphy have been awarding themselves has magnified upon the review of the financial information that has been disclosed by the Defendants pursuant to the Interim Undertakings they gave to the Court[36].  On 12 September 2025, after several emails from Grant Thornton following up for proper disclosure[37], Mr Shawn Raver on behalf of the Defendants provided income statements for 7 of the 22 "CDM Entities" caught by the injunction order[38] (pages 134 to 140).  The income statements for Charitable DAF Holdings Corp., Liberty CLO Holdco, Ltd., and CLO HoldCo, each of which are direct or indirect wholly owned subsidiaries of the Fund, showed directors' fees amounting to a total of approximately US$11.6 million for the year 2024 alone (pages 137 to 139):

| Company | 2024 Directors' Fees |
| --- | --- |
| Liberty CLO Holdco Ltd. | US$225,000 |
| CLO HoldCo | US$974,666 |

---

[36] Pursuant to the Consent Order in these proceedings dated 31 July 2025

[37] I address in a separate section below the Defendants' various breaches of the undertakings to date (many of which are ongoing).

[38] 27 including the additional entities disclosed by the Defendants pursuant to the Interim Undertakings

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

| | |
|---|---|
| Charitable DAF Holdings Corp. | US$10,448,643.47 |
| **TOTAL** | **US$11,648, 309.47** |

64   The income statements did not show to which person or persons the directors' fees were paid. In response to a series of follow-on emails from Grant Thornton seeking further clarity, Mr Shawn Raver, the Company's former Chief Operating Officer and the person to whom Mr Patrick and the other Defendants have seemingly delegated their responsibility of providing disclosure to the JOLs pursuant to the Interim Undertakings (as defined below), provided a further breakdown of the US$11.6 million as follows (page 84):

| | 2024 | | | | |
|---|---|---|---|---|---|
| | Paul Murphy US$ | Mark Patrick US$ | Shawn Raver US$ | Compensation Study US$ | Total US$ |
| Salary | $216,667 | $3,464,500 | $268,978 | | |
| Bonus | $250,000 | $2,550,000 | $306,250 | | |
| LTI payment I | | $3,559,278 | | | |
| LTI payment II | | $975,000 | | | |
| Total Compensation | $466,667 | $10,548,778 | $575,228 | $99,804.75 | |
| | | | | Total Expenses | $11,648,309.47 |

65   The JOLs have since discovered that the US$10,548,778 paid to Mr Patrick was paid on the Company's behalf by the Company's then indirect subsidiaries over the course of eight months in 2024 as follows[39]:

| Date | Paying entity | Payment for | Amount (US) |
|---|---|---|---|
| 20-Feb-24 | Charitable DAF Holdings Corp. | Salary | $800,000 |
| 20-Feb-24 | Charitable DAF Holdings Corp. | Salary | $939,500 |
| 29-Feb-24 | CLO HoldCo, Ltd. | Salary | $25,000 |

---

[39] Page 141

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

| 29-Feb-24 | CLO HoldCo, Ltd. | Salary | $425,000 |
|---|---|---|---|
| 13-Sep-24 | Liberty CLO Holdco, Ltd. | LTI Payment 1 | $225,000 |
| 13-Sep-24 | Charitable DAF Holdings Corp. | Salary | $850,000 |
| 13-Sep-24 | Charitable DAF Holdings Corp. | Salary | $850,000 |
| 13-Sep-24 | Charitable DAF Holdings Corp. | LTI Payment 1 | $3,334,278 |
| 02-Oct-24 | Charitable DAF Holdings Corp. | Bonus | $2,125,000 |
| 02-Oct-24 | Charitable DAF Holdings Corp. | LTI Payment 2 | $975,000 |
| **TOTAL** | | | **$10,548,778** |

66      In relation to the timing of the above payments to Mr Patrick, I note that:

66.1    On 13 September 2024, Mr Patrick and Mr Murphy passed a Company board resolution approving a base salary of Mr Patrick for 2024 of US$850,000 and a LTI payment based on a percentage of annualised net Fund returns, which had yet to be calculated[40]. Despite this, immediately after the board resolution was executed, four payments were made to Mr Patrick comprised of US$1,700,000 for salary and US$3,559,278 in LTI payments. These payments were made on instructions from Mr Murphy to Mr Raver immediately after the 13 September 2024 board resolution was finalised and executed. In this regard, I refer to an email chain between Mr Murphy, Mr Patrick, Mr Raver, Shields and Campbells relating to the draft board resolution wherein Mr Murphy wrote: "*Shawn – can you make sure you're happy with the figures going out to MP re: baseline and LTI and get that wire ready to send today?*", and Mr Raver later in the chain confirmed: "*Paul - I will send the wire once you execute the resolutions.*" (page 160)

66.2    On 1 October 2024, Mr Patrick and Mr Murphy passed a Company board resolution approving an adjustment to Mr Patrick's LTI payment to increase it by US$975,000 and an annual bonus for the year 2023 in the amount of 2.5 times Mr Patrick's annual

---

[40] See Exhibit MM-1 at pages 695 to 696

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

48

salary[41].  These payments were made the next day on 2 October 2024, being the same day that Mr Patrick resigned from Skyview, as explained further at paragraph 75 below.

66.3    On 2 October 2024, after Mr Patrick's compensation had been dealt with and paid, Campbells commenced work on updating Mr Murphy's DSA to "*bolster the protections you have as a director*" – see the email from Campbells to Mr Murphy and Mr Patrick dated 2 October 2024, which attached a mark-up of the 2021 DSA (pages 161 to 176).

67    The balance of the payments made from the three subsidiary entities referenced above were paid to (i) Mr Murphy (US$466,667) and (ii) Mr Raver (US$575,228). Mr Murphy confirms at paragraph 76 of Murphy 1 that the amounts paid to him were paid from CLO HoldCo's operating accounts.

<u>The US$4.49 million of directors' fees for the first half of 2025 identified by the JOLs</u>

68    Pursuant to certain financial information provided by the Defendants pursuant to the Interim Undertakings, the JOLs have identified that for the period January to June 2025, CLO HoldCo and Charitable DAF Holdings Corp. made director and officer compensation payments totalling US$4,490,161.25 to Messrs Patrick, Murphy and Raver (page 177).

69    Of the US$4,490,161.25 in compensation payments, a sum of US$3,325,000 was paid to Mr Patrick, including salary payments of US$425,000 and a discretionary bonus of US$2,900,000.

<u>Mr Murphy's assertion that his increased workload justified his higher salaries and bonus</u>

70    As regards the suggestion in Murphy 1 that the significant increases in his salary and bonuses in 2024 and 2025 were justified because he had to take on more complex work, I note that when Mr Murphy was first appointed as a director of the Company on 21 April 2021, the

---

[41] See Exhibit MM-1 at pages 697 to 704

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

services he was to provide to the Company (and other entities included in the schedule 1 to the 2021 DSA, including the Fund) were as follows –

"*1. Review and approve or disapprove proposals for investments in amounts greater than $1 million supported by an economic analysis by Skyview and an independent appraisal. In the event the Director proposes to disprove an investment, he will give the Companies at least 30 days' notice of his intention to do so and provide detailed written reasons why;*

*2. To declare dividends from time to time subject to be satisfied that the Company declaring the dividend is solvent; and*

*3. Subject to being satisfied that the Company or Companies in question would not breach any applicable law or regulation, act upon the reasonable instructions of Skyview as the Director may be given from time to time.*[42]"

71    The above is consistent with the JOLs' understanding of how the Company and the Fund operated at that time – Skyview conducted investment analyses and made recommendations to the directors, which the directors then approved or rejected on behalf of the relevant entities. As set out in item 3 above, the directors were required to act upon the reasonable instructions of Skyview so long as they were satisfied that they would not be breaching any law or regulation in doing so. It therefore appears to the JOLs that the directors (Mr Murphy and Mr Patrick) had minimal substantive work to do[43]. The only other service Mr Murphy was to provide under the 2021 DSA was to declare dividends to the Company's participating shareholders (i.e. the Supporting Organisations), which is another fact that the JOLs believe undermines the Defendants 'No Economic Interest Justification' for transferring away the Company's sole valuable asset.

---

[42] Exhibit PM-1, page 230

[43] Not just in their capacity as directors of the Company, but as directors of all the entities listed in schedule 1 (including the Fund GP)

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

50

72  The 2023 DSA provided that, in addition to the services set out in the 2021 DSA, Mr Murphy was to provide the following services:

"*(i) undertake responsibility for all offshore matters involving the Companies;*

*(ii) involve himself in any onshore issues involving the Companies;*

*(iii) act upon all lawful directions issued by Mark Patrick subject to the Director discharging his fiduciary duties to the Companies including acting with independence of judgement; and*

*(iv) make himself available to the Companies at all times acting with due diligence and expedition[44].*"

73  It is unclear to the JOLs specifically what additional work was to be undertaken pursuant to (i) and (ii) above – i.e. "offshore matters" and "onshore matters" are not defined or particularised. It is also unclear to the JOLs what (iv) means and how it would not already be subsumed into the usual role and responsibilities of a director. It therefore appears that the only new "service" that Mr Murphy was to offer the Company (and subsidiary entities) pursuant to the 2023 DSA was to act upon all lawful directions issued by Mark Patrick. Accordingly, at this stage, Mr Murphy appears to have contractually agreed to act upon the reasonable instructions of Skyview (pursuant to the 2021 DSA) whilst also acting upon the lawful directions of Mark Patrick (pursuant to the 2021 DSA as amended by the 2023 DSA).

74  On 11 October 2024, Stephanie Vitiello, the Chief Compliance Officer at Skyview, issued a report as to concerns about potential insider trading by Mr Patrick (pages 190 to 194). The report noted that on 2 October 2024, before Ms Vitiello could interview Mr Patrick, he resigned as an employee of Skyview and terminated the services agreement between Skyview and the

---

[44] Exhibit PM-1, page 54

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

"DAF Entities"[45].  The report ultimately concluded that: "*Patrick materially violated Skyview's compliance policies and procedures. If the Dallas Foundation traded on Patrick's disclosure of MNPI[46], Patrick and the Dallas Foundation would likely have violated insider trading laws and triggered disclosure to the SEC*".  Having terminated the Skyview services agreement, Mr Patrick was then in a position of complete control of the Fund (through his directorship of the Company and Fund GP).  It was only then, as further explained below, that Mr Murphy began to be awarded excessive salaries and bonuses by Mr Patrick for his directorship roles.  This was notwithstanding that the only work Mr Murphy claims to have undertaken in that period, besides giving evidence in unparticularised Guernsey litigation and New York litigation, was carrying out the "DAF Restructuring", which the JOLs allege was a deliberate scheme to deprive the Company of the Partnership Interest at a significant undervalue.

75    It also appears to the JOLs that both Mr Patrick and Mr Murphy were aware that the Skyview report was forthcoming and took action to ensure Mr Patrick's self-awarded LTI payment was paid out before he resigned from Skyview and the report was issued.  I refer to an email chain between Mr Murphy, Mr Patrick, Shields and Campbells relating to the 1 October 2024 resolution of the board of the Company to approve Mr Patrick receiving an LTI payment of US$975,000 and an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary[47].  The first email in this chain is an email from Mr Murphy directed at Shields and Campbells asking them to review the draft 1 October 2024 board resolution, where Mr Murphy stated: "*Need this to be executed asap given matters with Skyview tomorrow.*"

76    On 12 December 2024, Mr Murphy entered into the 2024 DSA.  As with the 2023 DSA, the 2024 DSA was executed by Mr Murphy and Mr Patrick (acting on behalf of the Company and other subsidiary entities party to the DSA).  The list of services that Mr Murphy was to provide

---

[45] As defined therein, and including the Company and the Fund

[46] Material non-public information

[47] Page 198

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

to the Company and subsidiaries are listed in Schedule 2 to the 2024 DSA. As with the 2021 DSA (as amended), the list of services included "*to declare dividends from time to time subject to be [sic] satisfied that the Company declaring the dividend is solvent*"[48].

77   Schedule 3 to the 2024 DSA set out the fees that Mr Murphy was to be provided for his services, which were US$200,000 per year and "*a discretionary bonus or bonuses in an amount and time determined by the current Chief Executive Officer of the Companies [Mr Patrick] which may also include issuing equitable interests or creating a long-term incentive plan*". Mr Murphy was granted that right to a discretionary bonus by Mr Patrick (acting on behalf of the Company and other subsidiary Fund entities party to the DSA) six days prior to the LP/LLC Exchange effected by Mr Murphy and Mr Patrick, being the transactions pursuant to which the Partnership Interest was transferred from the Company to CDM in exchange for the sole membership of CDM.

78   At paragraph 65 of Murphy 1, he confirms that on 16 December 2024, four days after the 2024 DSA was executed, he and Mr Patrick in their capacity as directors approved a discretionary bonus to be paid to Mr Murphy in the amount of US$250,000, which amount was apparently determined by Mr Patrick in recognition of: "*(i) [Mr Murphy's] performance; (ii) [Mr Murphy's] contribution to the increased independence of the Company; and (iii) [Mr Murphy's] input into responding to the Supporting Organisations' behaviour in November/December 2024*". Based on Murphy 1 and Mr Murphy's other sworn evidence, (i) to (iii) appear to be references to Mr Murphy's role in carrying out the corporate steps to cut the Company and the Supporting Organisations out of the structure on the purported justification that to do so was necessary to distance the Fund from the perceived influence of Mr Dondero and avoid negative US tax consequences. As noted above, this "Dondero Control Justification" and why the JOLs believe it does not stand up to scrutiny have previously been addressed in MacInnis 1 at paragraphs 70 to 76. It is therefore the JOLs' belief that the award of the discretionary bonus to Mr Murphy

---

[48] Exhibit MP-1, page 126

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

by Mr Patrick in close proximity to their carrying out the first step in the DAF Restructuring (the LP/LLC Exchange) amounted to Mr Patrick awarding Mr Murphy special compensation for acting in accordance with Mr Patrick's instructions to complete the DAF Restructuring[49]. As such, the JOLs seek to recover this amount (and others) from Mr Murphy in the Amended Statement of Claim.

79      At paragraph 37 and elsewhere in Murphy 1, Mr Murphy refers to the 2025 DSA, which is dated 27 March 2025.  However, it appears likely to have been executed on or around 27 May 2025, given it refers to the Company being "*placed into court supervised liquidation in the Grand Court of the Cayman Islands on 6th May 2025*". This is broadly consistent with Mr Murphy's sworn evidence that the "*Company was not party to the 2025 DSA due to the fact that it was in voluntary liquidation*" (which I believe must be an error and is instead meant to refer to court supervised liquidation). I note that the 2025 DSA included the following:

79.1    The services Mr Murphy was to provide to the Companies (as defined) included to "*[a]ssist the joint official liquidators of [the Company] including taking any and all steps necessary to defend any allegations against Mark Patrick arising from the management of [the Company's] affairs.*"

79.2    Mr Murphy was to be paid US$500,000 in fees payable in monthly instalments and backdated to 1 January 2025. This amount was permitted to be paid by the Companies (as defined) "*in advance…in circumstances where the Companies may have an inability to discharge their financial obligations to [Mr Murphy], for example, where freezing injunctions or temporary restraining orders may be sought against the Companies*".  At paragraph 72 of Murphy 1, Mr Murphy confirms that he was paid the full US$500,000 in advance by CLO HoldCo sometime on or after 12 May 2025.

---

[49] Which, as noted above, the JOLs believe to have been a deliberate scheme to misappropriate the Partnership Interest in breach of their fiduciary duties to the Company.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

80      The JOLs believe these provisions may indicate that Mr Patrick approved significant compensation to Mr Murphy in circumstances where Mr Murphy had agreed to provide support in addressing any allegations relating to the management of the Company, including the claims now raised by the JOLs in these proceedings. The JOLs also believe that the timing of the US$500,000 payment to Mr Murphy, not long after the completion of the DAF Restructuring[50], suggests the payment was made partly to compensate Mr Murphy for his involvement in effecting each of the steps involved. Finally, the JOLs believe that Mr Patrick and Mr Murphy agreeing a justification for paying the annual fee to Mr Murphy in advance where there was a risk of "*freezing injunctions or temporary restraining orders*" shows that they understood the risk that the DAF Restructuring could be challenged and an injunction sought against the entities involved. Against that backdrop, it is unclear to the JOLs how Mr Patrick and Mr Murphy decided it was in the Companies' (as defined) best interests to pay Mr Murphy the full amount of his US$500,000 annual fees upfront (or at all).

81      Whilst the 2025 DSA required Mr Murphy to "*assist*" the JOLs, I understand that as a former director of the Company, Mr Murphy has an independent duty to cooperate with the JOLs in any event. In that respect, the JOLs consider that Mr Murphy (and Mr Patrick) failed to comply with their obligation to deliver up the Company's books and records. This failure is evidenced by the substantial volume of new documents (at least 500 comprising over 5,000 pages) produced under the US Discovery Order, which ought to have been delivered up by Mr Murphy (and Mr Patrick) following the JOLs' initial request on 6 May 2025. Further, the JOLs have yet to receive a statement of affairs for the Company from either Mr Murphy or Mr Patrick, as required under section 101 of the Companies Act.

82      At paragraph 78 of Murphy 1, he asserts that: "*[t]o the best of my knowledge, [the JOLs] have made no effort at all to investigate the nuances of the industry, my role or the work I have*

---

[50] Or, if the correct date of the 2025 DSA is in fact 27 March 2025, on the same date as the final step of the DAF Restructuring, being the redemption of the Company's membership in CDM on 27 March 2025

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

*actually performed in my time at the Company.*" As far as the JOLs are aware, Mr Murphy has no prior experience of managing an investment fund with net assets worth over US$270 million, let alone one which has been created to benefit underlying charities. As noted at paragraph 74 above, it appears that a main (or at least major) component of the work Mr Murphy has undertaken as a director of the Company has been the DAF Restructuring, which is the impugned conduct underpinning the Company's claims in these proceedings. The only other work disclosed in Murphy 1 is: (i) assisting with New York proceedings and giving evidence in Guernsey proceedings (of which minimal detail is given); and (ii) setting up various committees (which I address below).

83      In relation to Mr Murphy's point at paragraph 58 of Murphy 1 that he "*spent significant effort creating more independence in the corporate structure*" by way of "*establishing the conflicts committee and investment committee*":

83.1    It is unclear who sits on the conflicts committee and what, if any, work that committee has performed. The conflicts committee is not referred to or explained in any of Mr Murphy's or Mr Patrick's sworn evidence in these proceedings or the Company's liquidation proceedings.

83.2    It is unclear who sits on the investment committee and when exactly it was formed. It is referred to in Mr Murphy's presentation dated 3 December 2024[51], but there are no board resolutions creating the committee. The Company appears to have adopted investment committee guidelines by resolution dated 3 December 2024[52]. The resolution states that the guidelines were prepared by Mr Michael Llodra, but is silent as to who sits on the committee. No specific evidence has been given by Mr Murphy or Mr Patrick of what work the investment committee has done, if any, since its creation.

---

[51] Exhibit MEP-2, page 319
[52] See Exhibit MEP-2, at pages 1-9

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

83.3 ==Mr Patrick and Mr Murphy are the only appointed members of the compensation committee, having appointed themselves to it by way of a board resolution dated 1 October 2024[53].== The JOLs do not believe that Mr Murphy and Mr Patrick appointing themselves to the compensation committee and having absolute discretion as to what compensation to award each other as directors is consistent with creating "more independence" in the structure.  To the contrary, it appears to the JOLs to create an obvious conflict of interest between their fiduciary duties to the Company and their own self-interest in awarding themselves excessive compensation.

84 In any event, the JOLs do not see how the existence of these committees bears in any way on whether Mr Murphy and Mr Patrick's actions in carrying out the DAF Restructuring amounted to a breach of fiduciary duty or not.  Mr Murphy and Mr Patrick have not suggested that any of these committees reviewed and approved the DAF Restructuring.

**A4 D&O Insurance, Indemnification, and Payment of Legal Fees**

85 In Murphy 1, Mr Murphy asserts that it was not possible for him to obtain D&O insurance for his role as director of the Company (or any other entities for whom he was appointed a director under the DSAs).  At paragraph 39 of Murphy 1, he refers to a conversation he had with Hunton Andrews Kurth ("**HAK**"), the Company's US lawyers at the time, prior to accepting the appointment as a director:

> "*==HAK explained to me that D&O insurance was not available for the role with the Company due to its connections with Mr. Dondero, who (as noted above) is a prolific litigant.  This was widely known, and for this reason it was generally impossible to obtain any (or any cost-effective) D&O insurance==*"

---

[53] ==See Exhibit MM-1 at pages 695-696==

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

57

86    I note that Mr Murphy makes no attempt to explain in his evidence if he stress-tested what he was told by HAK.  I also note that Mr Murphy has not referred to any enquiries he made with D&O insurers or exhibited any contemporaneous correspondence to that effect.  It therefore appears to the JOLs that Mr Murphy did not approach any D&O insurance providers prior to accepting the appointment.  Mr Patrick does not address the issue of D&O insurance in either Patrick 2 or Patrick 3, and therefore the JOLs have assumed that he also does not have D&O insurance in place for his various directorships in the Fund structure[54].  If Mr Patrick does in fact have D&O insurance, the JOLs would expect him to be calling on that insurance rather than depleting the assets of the Fund and its subsidiaries by relying on the contractual indemnities he refers to at paragraphs 148 to 149 of Patrick 2.

87    Paragraph 39 of Murphy 1 continues with a reference to an opinion from Justice Jernigan in the Highland Chapter 11 proceedings dated 5 March 2023 where the following was stated:

> "*multiple witnesses testified that there was a phenomenon in the insurance industry colloquially referred to as the "Dondero Exclusion"—meaning that cost-effective liability insurance could not be obtained for the <u>officers of Highland because of the company's historical inclination toward litigation</u>*"

88    The above does not appear to the JOLs to have any direct bearing on Mr Murphy's ability or inability to obtain D&O insurance for his directorship of the Company.  Mr Murphy was not being employed as an officer of Highland - he was being appointed to the board of the Company, of which Mr Dondero was not a director or officer.  In any event, I note that the above opinion post-dates the pre-appointment discussions between Mr Murphy and HAK by two years, so it could not have formed part of Mr Murphy's reasoning for not seeking to obtain D&O insurance at the time of his appointment.

---

[54] Or at the very least, for his directorship/management of the Third through Sixth Defendants to these proceedings

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

58

89      As regards paragraphs 41 to 42 of Murphy 1 and paragraphs 148 to 149 of Patrick 2, which deal with the indemnity and exculpation provisions of the Company's Articles of Association (the "**Articles**") and other contractual indemnities relied upon by Mr Patrick, the scope and application of these provisions will be addressed in legal argument as necessary. A copy of the letters the JOLs received from Mr Patrick directly and Kobre & Kim (on behalf of Mr Murphy) seeking to call on their indemnity under the Articles for their legal costs to defend these proceedings, and the letter from Maples to Kobre & Kim dated 28 October 2025 in response, are exhibited at pages 199 to 205.

90      As regards paragraphs 43 to 46 of Murphy 1, which deal with the indemnity and exculpation provisions of Mr Murphy's DSA's, the scope and application of these provisions will also be addressed in legal argument as necessary.  On the JOLs' review of the DSAs, the JOLs believe that they evince a pattern of: (i) Mr Patrick increasingly rewarding Mr Murphy at each juncture of the DAF Restructuring; (ii) Mr Patrick and Mr Murphy agreeing to expand the scope of the indemnities to make express provision for the claims they expected would be made against them for their involvement in the DAF Restructuring; and (iii) Mr Patrick and Mr Murphy creating provisions for a right to indemnification and advancement of legal fees from the Fund and other entities that they anticipated would remain under their control (and whom would still hold assets) following the DAF Restructuring, rather than from the Company, which was left with no material assets and placed into liquidation.

91      In relation to (ii) and (iii), as Mr Murphy points out at paragraph 45 of Murphy 1, the indemnity provisions in the 2025 DSA were expanded such that:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

59

91.1 <mark>The indemnity was no longer given by the Company itself (which was by that stage in liquidation), but by all of the "Companies" as defined in 'Schedule 1: Parties' therein[55]; and</mark>

91.2 <mark>The following language was added expressly providing for advancement of legal fees to defend claims brought by the JOLs against Mr Murphy: "</mark>*The Companies shall also advance any documented costs and expenses incurred by the Director in relation to any and all proceedings arising from the liquidation of Charitable DAF including any allegations that the Director has been fraudulent, dishonest, wilfully negligent, wilfully defaulted or mismanaged Charitable DAF's affairs. The Companies agree to provide any necessary information that will allow the Director to assess the assets of the Companies and that the Companies will be jointly and severally liable for any indemnity.*"

92 The JOLs believe the nature of these amendments and their timing demonstrates that Mr Patrick and Mr Murphy were aware that what they had done in carrying out the DAF Restructuring could result in claims being made against them by the liquidators of the Company, which is precisely what has happened. The decision to expand the indemnity such that it was given by all the "Companies" rather than just the Company, appears to the JOLs to have been made by Mr Patrick and Mr Murphy in cognisance of the fact that the Company was left with no material assets following the DAF Restructuring and therefore would unlikely be able to satisfy any indemnity.

93 <mark>At paragraph 40 of Murphy 1, he asserts that: "</mark>*I would not have accepted any appointment to the board of the Company without the indemnity [in the DSAs and the Articles].*" <mark>The JOLs are perturbed that after having:</mark>

---

[55] The 'Companies' as listed at page 146 of PM-1 are: CDMCFAD,LLC, CDH GP, Ltd., Charitable DAF Fund 2, LP, Charitable DAF Fund, LP, CLO HoldCo, LLC, Charitable DAF Fund, L.P. (which appears to be a duplication), Acis CLO Value Fund II Charitable DAF Ltd, CLO HoldoCo, Ltd. and MGM Studios Holdco, Ltd.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

93.1   Made no attempt to obtain D&O insurance;

93.2   Caused the Company to agree broad indemnities in his favour that were expressed to apply specifically to "*any and all proceedings arising from the liquidation of Charitable DAF including any allegations that [Mr Murphy] has been fraudulent, dishonest, wilfully negligent, wilfully defaulted or mismanaged Charitable DAF's affairs*"; and

93.3   Carried out a series of transactions that had the effect of depriving the Company of its sole valuable asset and source of income,

Mr Murphy now expects the Company (and/or other entities listed in the DSAs) to honour the indemnity for his legal fees to defend claims made by the JOLs that he has acted in wilful breach of fiduciary duty by approving said transactions.  Indeed, from recent disclosure provided by the Defendants pursuant to the Interim Undertakings, it has been revealed that US$250,000 was paid to Kobre & Kim (Mr Murphy's legal counsel) by CLO HoldCo in apparent reliance on the indemnity and advancement provisions of the DSAs[56].

94   The JOLs' position is that if Mr Murphy or Mr Patrick intend to continue to rely on their directors' indemnities to cover their legal fees for defending these proceedings, they should have to (at a minimum):

94.1   Disclose precisely which indemnity they are relying upon;

94.2   Disclose which entity the funds are being paid from and on what basis; and

94.3   Give an undertaking to the Court to repay all of those amounts should it be proven at trial that the indemnities did not apply (e.g. where there is a finding that Mr Murphy and Mr Patrick acted in wilful breach of their fiduciary duties).

---

[56] Page 206

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

95    The above requirements are reflected in the Amended Injunction Summons (which I explain further at paragraphs 148 to 150 below).

**A5    Interim Undertakings**

96    The hearing of the Injunction Application was originally listed for 31 July 2025.  However, on the eve of the hearing the parties agreed a consent order providing for the adjournment of the injunction hearing subject to the Defendants giving certain undertakings to the Court pending the determination of the Injunction Application (the "**Interim Undertakings**").  The Interim Undertakings can be found at Schedule A of the consent order in these proceedings dated 31 July 2025 (the "**Consent Order**").  This section is broken down into two parts:

96.1    First, I address the JOLs' position on the inadequacy of the Interim Undertakings to protect the Company's position through to trial and the lack of proper transparency provided by the Defendants pursuant to the Interim Undertakings to date.

96.2    Second, I address some of the factual inaccuracies in Patrick 2 and Murphy 1 with respect to the Interim Undertakings (to the extent not already addressed elsewhere in this affidavit).

Inadequacy of the Interim Undertakings and lack of transparency by the Defendants

*Defendants' ability to exploit the 'ordinary course of business' exception*

97    Whilst the Interim Undertakings offer some protection, the JOLs' position has always been, and remains, that the Interim Undertakings would not adequately protect the Company's position in these proceedings through to a trial.  By way of one example only, the Interim Undertakings include carve-outs for the Defendants and CDM Entities to undertake "ordinary course of business" transactions[57], which the JOLs believe is being exploited. In particular, the

---

[57] See Schedule A to the Consent Order at paragraph 1(a) and paragraph 2(a)

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

JOLs are concerned that if such a carve-out remains through to trial, Mr Patrick and Mr Murphy will rely on it to continue to pay themselves excessive salaries and bonuses from one or more of the Defendants or Fund Entities[58]. In their present form, the Interim Undertakings would provide the JOLs with no ability to stop those payments being made.

98    From the disclosure of July 2025 transactions pursuant to the Interim Undertakings (which disclosure was provided over three months after the transactions occurred), it is also apparent that Mr Patrick and Mr Murphy are authorising significant payments by CLO HoldCo to Baker & Partners, DFW's counsel, to pay for DFW's legal fees of these proceedings and the liquidation proceedings (including, presumably, DFW's costs of preparing the Removal Application). In July 2025 alone, CLO HoldCo settled invoices to Baker & Partners on DFW's behalf totalling US$764,880.66, with a further US$254,847.40 paid to Baker & Partners in September 2025[59]. The JOLs assume that the payments are being made under the guise of the "ordinary course of business" exception, despite there being no apparent legal basis for CLO HoldCo to be liable for DFW's legal fees.

99    As part of the negotiations of the "protocol" and later, the Interim Undertakings, the JOLs sought the Defendants' agreement to a scheme whereby all transactions above a certain amount would need to first be approved by the JOLs. The Defendants and CDM Entities refused to agree to any such scheme. However, from the JOLs' experience of the Interim Undertakings in practice since then, the JOLs are of the view that nothing short of strict prohibitions on the Defendants' and Fund Entities' use of assets that the Company asserts a proprietary claim to[60] would suffice.

---

[58] Defined as "CDM Entities" in the Interim Undertakings but referred to as the "Fund Entities" in the Amended Injunction Summons

[59] Pages 247 and 267

[60] Or assets that are directly referable to the value of said proprietary claim (e.g. assets held by the Fund's subsidiaries, being the Fund Entities).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

*Inadequacy of disclosure provided pursuant to the Interim Undertakings*

100    Prior to the Interim Undertakings being in place, the JOLs did not have transparency into the Company's and the Fund's affairs.  Whilst Mr Patrick and Mr Murphy have provided some documents to the JOLs, the JOLs have not been provided with a complete set of the Company's books and records. This has necessitated the JOLs seeking provisional relief in the United States Bankruptcy Court against various of the Company's former service providers (including ValueScope and Carrington Coleman) for disclosure of various books and records belonging to the Company (see paragraph 28 above regarding the US Discovery Order). The JOLs obtained the US Discovery Order on 18 September 2025 and have been receiving and reviewing the disclosure on a rolling basis, with the final tranche of disclosure due from ValueScope on 31 October 2025.  Despite the JOLs requesting full provision of the Company's books and records and a statement of affairs from Mr Patrick and Mr Murphy pursuant to section 101 of the Companies Act, these have not been provided.  For example, the JOLs are aware that Mr Patrick and Mr Murphy used the Company email addresses set out in footnote 11 above, but to date neither Mr Patrick nor Mr Murphy have provided a full suite of those emails.

101    Now that the Interim Undertakings are in place, the level of transparency into the affairs of the Fund and the CDM Entities provided by the Defendants has only marginally improved.  As noted above, the Interim Undertakings provide the JOLs with a retrospective window into transactions below US$50,000 and a right to 7 days' notice of any transactions above US$50,000, but no ability to prevent any inappropriate or suspicious transactions.  If this arrangement were to continue through to trial, the JOLs believe it will have the effect of depleting the assets of the Fund structure and undermining the value of the Company's proprietary claim to the Partnership Interest and its traceable proceeds.

102    The JOLs' concerns have been heightened by the Defendants' overly restrictive interpretation of the Interim Undertakings.  On 30 September 2025, Maples sent a letter to Campbells

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

64

pointing out that the Defendants' and CDM Entities' disclosure of financial records to that point was incomplete and did not satisfy the requirements of the Interim Undertakings[61]. On 7 October 2025, Campbells sent a response to Maples whereby Campbells asserted that the Interim Undertakings only required the Defendants and CDM Entities to provide a consolidated balance sheet at the level of the Fund (rather than individual balance sheets and other financial statements and records for each Defendant and CDM Entity).  Campbells' letter reasoned that this was all that was required because a consolidated balance sheet (with no supporting information or records) is allegedly all that was provided to the Supporting Organisations in the past[62].  Campbells also asserted that because the Interim Undertakings refer to "existing and up to date" balance sheets and financial records, the Defendants and CDM Entities were only required to provide any financial statements that already existed and did not need to create any new records (including basic records such as balance sheets and profit and loss statements for each individual entity)[63]. In other words, the Defendants' position appears to be that they were only obliged to provide the JOLs with a simple (and not very informative) consolidated balance sheet for the Fund, and anything beyond that would only be voluntary.

103    Pausing there, the JOLs are surprised by Campbells' suggestion that there are no other "existing" financial records for a fund with net assets of c.US$270 million besides a one-page consolidated balance sheet at the Fund level.  In the JOLs' experience of such accounting and record-keeping matters, it would not ordinarily be possible to prepare a consolidated balance sheet for the Fund without the individual balance sheets for each of its subsidiaries. This could only be the case if an exercise was never undertaken to figure out which entities hold which assets – which would itself be quite shocking, and certainly not how the JOLs would expect a c.US$270 million fund to be run responsibly and in circumstances where the Fund is paying significant sums to a purported investment manager (Mr Patrick).

---

[61] Pages 686 to 688

[62] Pages 689 to 691 and 235

[63] Page 689

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

104   The Fund's consolidated balance sheet also does not have any line item for accounts payable, and the Fund does not maintain an accounts payable ledger[64]. It is unclear to the JOLs how the Fund accurately reports net assets and monitors the balance of accounts payable despite, for example, the fact that the JOLs are aware that there are 27 different law firms that have been engaged by entities in the Fund structure since the beginning of January 2025.

105   In the JOLs' view, the poor state of the accounting and record-keeping for the Fund structure under Mr Patrick's stewardship also calls into question what work Armanino[65] is being paid for and, more importantly, how Mr Patrick can appropriately discharge his duties without these basic accounting reports.  In circumstances where Mr Patrick's salary is allegedly comparable to roles in Publicly Traded REITs, PE firms etc (per the Mercer Report), the lack of proper accounting for the Fund and its many subsidiaries (including a lack of any audited accounts) suggests a concerning disregard for good governance and oversight.

106   Even in a hypothetical scenario in which the Interim Undertakings continued through to trial and offered what the JOLs believe to be a sufficient level of protection (which they do not), the Defendants have breached the Interim Undertakings and remain in breach in a number of material respects. The full suite of correspondence between the JOLs and the Defendants (acting through either Campbells or Mr Shawn Raver, the Company's former Chief Operating Officer) on the disclosure the Defendants have undertaken to the Court to provide is at pages 360 to 385.  A detailed chronology of this correspondence explaining the various breaches and/or issues the JOLs have encountered with the Defendants' disclosure to date is at pages 222 to 231. In summary:

106.1   Numerous financial records remain outstanding despite repeated requests from the JOLs, including 69 separate reports across 28 entities.  Income statements and

---

[64] See, for example, the email from Mr Raver to the JOLs dated 12 September 2025, where Mr Raver confirmed that there were no accounts payable on the Fund Entities' consolidated balance sheet as the accounting is conducted on a cash basis. Pages 437

[65] Armanino LLC - an accountancy firm engaged by Mr Patrick to provide financial reporting and fund accounting services.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

balance sheets for each Fund Entity have either been delayed or not provided at all. No working papers or supporting documentation have been provided to the JOLs to substantiate the consolidated Fund balance sheet dated 31 July 2025.

106.2   Despite multiple follow-ups from the JOLs, the Defendants have failed to explain why there is an apparent understatement of net assets of US$139,000,000 on CLO Holdco's balance sheet as at 30 June 2025. Separately, the JOLs were required to press for further information to explain discrepancies in information provided by the Defendants and reconstruct the Fund and Fund Entities' financials, including between the individual balance sheets and consolidated balance sheets, which remains unreconciled to the extent of US$259,000.

106.3   Multiple iterations of the Fund structure chart were provided by the Defendants, each correcting prior omissions or errors, causing the JOLs to have a lack of visibility over the full Fund structure until 25 September 2025, the date on which the fifth and final iteration of the structure chat was provided by the Defendants.

106.4   Monthly transaction listings for each Fund Entity have been provided to the JOLs consistently late or with incomplete information. For example, whilst the Interim Undertakings provide that the Defendants and Fund Entities are to provide a monthly transaction report for the previous month of transactions below US$50,000 and seven-days' notice of any transactions above US$50,000, the Defendants and Fund Entities initially only provided what transpired to be an incomplete list of transactions below US$50,000 for the month of July 2025.  Months later, on 24 October 2025, after numerous emails from the JOLs to Mr Raver whereby the JOLs were seeking to reconcile the financial information that we had been provided, the Defendants provided a full list of transactions for the month of July 2025.  The list included significant payments of US$2,680,000 to various law firms and ValueScope that had not previously been disclosed to the JOLs, including retainers of US$500,000 to

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

==Campbells, US$250,000 to Richards Layton & Finger, and US$90,000 to ValueScope.== A spreadsheet showing the payments disclosed in the original July 2025 transaction listing as against the payments disclosed in the updated July 2025 transaction listing is at page 692. ==It therefore appears to the JOLs that the Defendants were concerned about the prospects of injunctions being ordered against them at the original injunction hearing on 31 July 2025 and took steps to transfer out a significant amount of assets from CLO HoldCo to various law firms and ValueScope before any injunction could be granted.== The information confirming this position was not provided to the JOLs for a number of months.

106.5   The Fund seemingly operated without entity-level financial visibility, relying solely on consolidated reporting without supporting working papers, which the JOLs consider a fundamental lack of financial control and poor governance, as explained above. To the extent that working papers and supporting documentation for the balance sheets and income statements that have been provided do in fact exist, the Defendants should have provided those materials to the JOLs pursuant to the Interim Undertakings.

107   ==Should the above breaches of the Interim Undertakings continue, the JOLs may need to seek more stringent relief against the Defendants, such as the appointment of a receiver over CDM, the Fund GP and/or the Fund.== The fact that the JOLs may need to seek the appointment of a receiver was expressly foreshadowed to the Defendants by way of a letter from Maples to each of the Defendants' Attorneys[66] dated 15 July 2025 (pages 693 to 703)[67].

108   For the above reasons, the JOLs reject entirely Mr Patrick's assertion at paragraph 162 of Patrick 2 that the Defendants have provided "*full visibility of the financial position of the DAF structure*".

---

[66] Campbells, Baker & Partners and Kobre & Kim (the "**Defendants' Attorneys**").

[67] At paragraph 4 therein.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

68

Inaccuracies in Patrick 2 and Murphy 1 regarding the Interim Undertakings

109    At paragraph 81.4, Mr Murphy seems to suggest that there has been a *volte face* by the JOLs on the adequacy of the Interim Undertakings the Defendants have given to the Court pending the determination of the Injunction Summons.  That is false.  The JOLs' express position has always been that whilst the Interim Undertakings provide some protection, they do not adequately protect the Company's position in these proceedings through to trial, hence why the JOLs seek a broader range of injunctive and disclosure relief in the Amended Injunction Summons.  Further, the Interim Undertakings are expressed to apply only until the determination of the Injunction Application (not through to trial) and the Defendants expressly agreed therein that "*the issue of whether they are permitted to use funds that derive directly or indirectly from the limited partner interest in the Fund to pay their legal fees and other service providers will be determined at the [adjourned injunction hearing]*".  This was agreed in recognition of the JOLs' belief that restraints on the use of Fund assets to pay the Defendants' legal fees should be ordered in the circumstances of this case. It should therefore have been clear to Mr Murphy that the JOLs would not accept the Interim Undertakings as a protective measure through to trial.

110    At paragraph 147 of Patrick 2, he addresses the JOLs' position on the payment of the Defendants' and Fund Entities legal fees and expenses.  Mr Patrick refers to a letter from Campbells to Maples dated 8 September 2025 whereby Campbells communicated that the Defendants "*will not accept any undertakings which unduly restricts their ability to defend [these proceedings]*"[68].  On 15 October 2025, Maples sent a letter to the Defendants' Attorneys in response, which enclosed a draft Amended Injunction Summons and set out the JOLs' position on: (i) the scope of the Company's proprietary claim; and (ii) the payment of the Defendants' and Fund Entities' legal fees (pages 704 to 727).  I explain the JOLs' position on the extent to which the Defendants and Fund Entities should be able to pay their legal fees if

---

[68] Exhibit MEP-2, pages 478-480

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

69

injunctions are granted in more detail at paragraphs 148 to 150 below under the heading 'Amended Injunction Summons'.

111    The JOLs also take issue with the assertion made in Campbells' 8 September 2025 letter that: "*the legal costs being incurred [by the Defendants] - which are necessitated by the claims brought by your clients - are reasonable and proportionate having regard to the complexity of the Proceedings and the value of the assets in dispute.*" The total amount of legal fees incurred by the Defendants in relation to the Company's liquidation proceedings and these proceedings that the JOLs have been made aware of is US$4,256,882 being US$512,404 to Campbells[69], US$2,326,465 to Kobre & Kim[70], US$1,289,728 to Baker & Partners[71] and US$128,285 to Baker Hostetler[72]. The JOLs consider this level of legal fees to be wholly disproportionate to the work that has been done, particularly given these proceedings remain in their early stages[73] and there is no apparent need for DFW to be separately represented from Mr Patrick and the other Defendants he controls.

112    At paragraph 142 of Patrick 2, Mr Patrick states that a requirement that the "*Defendants and CDM Entities provide advance notice of all transactions over US$10,000 and await approval from the JOLs before proceeding…[was] already included in the Protocol offered to the JOLs*". That is incorrect – the Defendants and Fund Entities never offered a protocol whereby the JOLs would have the right to approve or reject proposed transactions.  Mr Patrick appears to admit this at paragraph 143 of Patrick 2 where he states that he was reluctant to agree to such a requirement.

---

[69] These are costs associated with Campbells' invoices relating to the Writ Proceedings pursuant to a proof of debt dated 31 October 2025 that Mark Patrick has lodged with the Company. This excludes fees that accrued in October 2025.

[70] This includes retainer amounts of US$750,000 and excludes fees that accrued in October 2025.

[71] This excludes fees that accrued in August 2025, September 2025 and October 2025.

[72] This is understood to be the legal fees associated with Reid 1.

[73] The "value of the assets in dispute" should not be a relevant consideration to the Defendants' when assessing the reasonableness of the legal fees that they are incurring.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

**A6      Injunction Application**

113     At paragraph 91 of MacInnis 1, I addressed factual matters that the JOLs believe to be relevant to the legal elements for obtaining the injunctions the JOLs seek.  Mr Patrick addresses points he believes to be relevant to those elements at paragraphs 152 to 175 of Patrick 2, and paragraph 114 of Patrick 3.  I reply to some of those points below insofar as they touch on matters of fact.  Where I have not replied to any points it is not because I agree with them – the legal elements for injunctions will be more fulsomely addressed in the Company's skeleton argument and oral submissions.

Serious issue to be tried

114     At paragraph 154 of Patrick 2, Mr Patrick seeks to downplay the fact that the JOLs have obtained sanction of this Honourable Court to commence these proceedings because:

114.1   There was no mention of the "DFW Summons" in the JOLs' evidence for the sanction application; and

114.2   There was very limited reference to the parties' correspondence about the "Protocol".

115     I understand that the DFW Summons is incapable of resolving the issues in dispute amongst all the parties to these proceedings.  This was explained to the Defendants' Attorneys in a letter from Maples dated 27 July 2025 (pages 796 to 802).  The Defendants' Attorneys have not responded to that explanation and DFW has made no attempt thereafter to list the DFW Summons for hearing.  As regards the Protocol correspondence, the inadequacy of the protocols offered by the Defendants prior to the JOLs commencing these proceedings is addressed at length in MacInnis 1 and further at paragraphs 151.1 to 151.2 below.

116     The JOLs do not agree with Mr Patrick's explanation of the scope of the Company's proprietary claim in these proceedings at paragraph 156 of Patrick 2 or paragraph 114(a)(i) of Patrick 3.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

The JOLs' position on this issue has been explained to the Defendants in a letter from Maples dated 15 October 2025 (pages 704-708) and will be expanded upon in legal argument. However, even if Mr Patrick were correct that the Company's proprietary claim is limited to the Partnership Interest in the Fund and nothing further, the JOLs believe the proprietary claim would be rendered futile (or at least lower in value) if the Fund and its subsidiaries, under the control of Mr Patrick, are permitted to freely dissipate their assets.

<u>Damages would not be an adequate remedy</u>

117   At paragraph 157 of Patrick 2 and paragraph 114(d)(ii) of Patrick 3, Mr Patrick addresses the potential loss or harm that would be suffered by the Supporting Organisations if injunctions are not granted and contends that any such loss could be adequately compensated in damages. This does not address the issue of what damage would be suffered by the <u>Company</u>, which I understand to be the relevant consideration. This issue will be addressed further in legal argument.

118   The JOLs also believe an award of damages in favour of the Company would not be an adequate remedy if injunctions were not granted and the Company succeeds on is proprietary claim at trial because:

118.1   There is no evidence before the Court to suggest that Mr Patrick, Mr Murphy, CDM or DFW have sufficient assets to satisfy an order requiring them to pay the Company what is likely to be a significant amount of damages.

118.2   Any payment of damages by the Fund, CLO HoldCo and/or the Fund Entities to the Company would be circular and would not provide any actual compensation to the Company. That is, the Company would recover the Partnership Interest and thereby own (directly or indirectly) the Fund, CLO HoldCo and the Fund Entities, such that any payment of damages they make to the Company would be sourced from the Company's own property (whether directly or indirectly held).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

Balance of convenience

119    At paragraph 160 of Patrick 2, he asserts that the Fund Entities *"…are actively managed. The injunction sought by the JOLs would seriously and unjustifiably interfere with that management. Any interference with the operation of these businesses has the potential to cause serious and irreparable harm to the CDM Entities"*. These appear to the JOLs to be unsubstantiated assertions. From my reading of Patrick 2 and Patrick 3, there is no detail of which Fund Entities are "actively managed", what that means in practice, and specifically how an injunction would interfere with the "businesses" of the Fund Entities.

120    Mr Patrick has produced a further document (the "**Damages Report**") prepared by ValueScope, the same entity that provided a report opining that a fair value for the redemption of the Partnership Interest was c.US$1.6 million (when it had net assets of c.US$270 million), which purports to assess the likely damage that the injunction will cause to the Fund, if granted[74]. The headline point of the Damages Report is that ValueScope opine that the estimated damage resulting from the injunction is the remarkable sum of US$126.7 million. The JOLs do not accept this for a number of reasons.

121    First, no permission has been granted to the Defendants to adduce expert evidence, and the Damages Report was only provided to the JOLs for the first time on 3 November 2025, although it was dated 29 July 2025. This obviously hampers the JOLs' ability to assess the report and respond to it, including by reference to expert evidence of their own. This is especially so in light of the fact that many of the claims made in the report are not supported by documentary evidence that the JOLs can investigate and verify.

122    Second, this document was prepared by ValueScope, the same entity that provided valuations that purported to justify Mr Patrick's decision in effect to sell the Partnership Interest to CDM for what appears to be a substantial undervalue. The JOLs therefore consider that valuations

[74] Pages 728 to 783

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

provided by ValueScope have already been shown to be unreliable documents that serve Mr Patrick's interests, and we hold justifiable doubts as to ValueScope's independence.

123 Third, the JOLs have been provided with at least some of the instructions given by Mr Patrick to ValueScope:

> "*We think the opposition will simply argue for something below $10mm and make the daf sound likes its just a giant escrow so no concern about damages from an asset freezing injunction.*
>
> *They likely plan to wing it and not have a Report from a third party valuation company to support their minimal request for a seven figure bond.*
>
> *Brandon is working on a narrative that details all the areas that could be damaged from a freezing injunction.*
>
> *Do you think ValueScope could prepare an analysis of a bond or cash deposit reflecting the estimated harm that could befall the daf from a freezing injunction taking into account Brandon's narrative, that we can submit to a court to indicate Dondero needs to deposit within 7 days of the order for the injunction?*" (page 784)

124 From this, it can be seen that ValueScope have been instructed to prepare a valuation analysis based on "*Brandon's narrative*". Whilst it is not entirely clear what this narrative entails, it underlines that the report is based on the version of events that Mr Patrick wanted them to use, rather than ValueScope having undertaken any independent verification of the facts that form part of "*Brandon's narrative".*

125 Fourth, the Damages Report is extremely thin on detail, and appears to adopt valuation mechanisms that suit Mr Patrick's purpose, but with no explanation, let alone justification, of why those mechanisms are appropriate. The Damages Report opines that damage is likely to

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

be caused by the injunction to ▮▮▮ projects that the Fund is currently undertaking, and I consider each of these projects, and the unsatisfactory nature of ValueScope's analysis, in the paragraphs below.

126   First, the Damages Report considers alleged lost opportunities in respect of land ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮. This is said to be vacant land, owned by the Fund, totalling around ▮▮▮▮▮▮▮▮▮▮ It is proposed that this land would be used for the ▮▮▮▮▮▮▮, which I understand to be a ▮▮▮▮▮▮▮▮▮▮; in short, the proposal appears to be that the Fund's land would be used ▮▮▮▮▮ ▮▮▮▮▮ that this use of land would be profitable, and that the injunction would impair the Fund's ability to negotiate with ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

127   The Damages Report says that the value of the ▮▮▮▮▮▮ was US$11.29m as at 21 August 2024. This is on the basis of a report prepared by "▮▮▮▮"[75], but no details are given as to how this figure was reached.  Then, with no explanation whatsoever, the Damages Report states that a multiple of 10x should be applied to assess the "improved" value of the ▮▮▮ ▮▮▮▮▮ if the land were to be used for the ▮▮▮▮▮▮▮, giving a value of US$112.9m, and a profit after cash flow and sale cost expenses of US$95.1m, that the Damages Report says will be lost if the injunction were to be granted.  To put it mildly, that appears to be an optimistic estimate, but since no explanation has been provided as to why a 10x multiple has been used, it is impossible for the JOLs to engage in a meaningful assessment.  All I can say at this stage is that a 10x multiplier of value seems both unlikely and is a round number that seems to have little close analysis behind it.

---

[75] ▮▮▮▮▮▮▮▮

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

128   Similarly, no explanation has been given as to why US$855,200 has been used for the 12-month cash flow figure or why 5% has been allowed for selling costs; there is nothing that explains why these are appropriate and realistic figures.

129   The exhibits to the Damages Report that concern the ████████████ are a series of documents that appear to illustrate that ████████████████████████████████, but they provide no support, as far as I can see, for the alleged increase in the ████████ ████████ value that will result from ████████████████████████████████ ████████ Rather, they are merely documents that provide a general explanation of the nature of the project.

130   Further, no real explanation is given as to the current likelihood that, but for the injunction, the project will go ahead as planned.  If it really were the case that the potential land improvement was 10x the relevant land's value, ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████.

131   <mark>Finally, it is not explained why it is said that the project will not go ahead if the injunction is granted,</mark> other than to "*impair the DAF's ability to* ████████████████████████". Whilst the ValueScope Report opines that the "*DAF  will be unable to engage with* ████████ ████████ *to secure the* ████████████████ no explanation is given of why this should be the case, and nor does this appear to be a matter that lies within ValueScope's expertise (being a matter of the scope of the injunction, as a matter of law).

██ ████████

132   As far as the JOLs understand it, this property comprises ██ ████ <mark>land with a present value of US$376,000 as at 26 August 2024</mark> (which is said to be ██████ valuation, but no concrete evidence is provided), which it is proposed to obtain a ████████████████ ████████████████████████████ It is said by ValueScope

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

that the project can be expected to turn a profit of c.US$5 million, but that the Fund will be

"███████████████████████████████████████████████████

███████████████████████████████

133   However, I would note the following:

133.1   ValueScope have assessed the value of the land ███████████████ ███████ i.e. they have allowed no discount for the possibility that ███████ ██████████████ █████████████████████████████ ████████████████████ ████████████████████████████████████ ████████████████████████████████████ The JOLs do not believe this approach is defensible.

133.2   ValueScope have applied a 5.5% cap rate and assumed selling costs of 5%, with no explanation as to why those rates are appropriate.

133.3   The Damages Report has again worked on the basis that the opportunity allegedly presented by the project will be lost entirely were the injunction to be granted.   No explanation is given as to how, exactly, the injunction would prevent the ██████████ or how it is that ValueScope are able to opine on this question.

████████████████████

134   ████████████████████████████████, I understand, a company ██████████ ████████████████████████████ and is an entity to which the Fund made a number of loans that accrue paid-in-kind (PIK) interest at an annual rate of 13% compounded monthly, with a par value of US$112.6 million at maturity on 31 December 2025, according to the Damages Report.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

135   ValueScope estimated that the injunction would cause the Fund a loss of US$25.9 million by comparison with the position it would have been in had it not been for the injunction, on the basis that (p.6) ████████████████████████████████ ████████████████ Rather, the Damages Report asserts, ███████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████

136   However, ValueScope's analysis is very difficult to follow; in particular, it is hard to understand what negative effect ValueScope think the injunction would have on the Fund's rights as a ████████████████

137   The key point appears to be an assumption on the part of ValueScope that the Fund's options without the injunction are either ███████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████ and the Amended Injunction Summons contains a carve-out for the reasonable legal fees that would be incurred in taking this course.  I do not see how the injunction would reduce the value of the Fund's investment in ████████ at all.

138   Further, even leaving that aside, there is no explanation provided by ValueScope for a number of the material assumptions made as part of their calculations:

138.1   ValueScope assumes that, if the Fund ██████████████████████ would recover 95% of par, but with no explanation as to why that is.

138.2   ValueScope assumes that the Fund will make only 70% of par if it cannot exit; this is said to be based on price discovery, but no documents are exhibited to support this figure.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

138.3    ValueScope assumes that, if the injunction is granted, ███████████████ is only 15%, by comparison with 50% ("*two equally likely*" scenarios) if the injunction is not granted.  Again, there is no explanation, let alone justification, as to why the injunction would produce such a different outcome.

███████████

139    ValueScope estimate US$700,000 of losses arising in relation to the ███████████ ████████████████████████████ That site is said to have had a value of US$570,000 on 11 October 2024 (again, this is said to be ██████ valuation, but no concrete evidence is provided).  In relation to this, it is said that the injunction would put a halt to talks that the Fund is participating in to lease around ████████ to a ███████████████ ██████████████████████████████████████████ ██████ However, no explanation is given as to why it is said that the injunction will have this effect, and I do not understand why it would.

140    Further, and like for the other properties, no explanation is given for the cap rate of 7% that ValueScope use, or why it is that 5% is a realistic estimate of selling costs.

*Attempts to address the Damages Report in correspondence*

141    Despite the obvious deficiencies in the Damages Report, on 12 November 2025, Maples wrote to Campbells (copying Kobre & Kim and Baker & Partners), seeking to learn more about the damage that the injunction is alleged to be likely to cause, and offering to seek to reach agreement on potential carve-outs to the injunction to address the Defendants' concerns in that respect:

> "*On the state of the evidence, including the Damages Report, the JOLs' view is that it is unrealistic to expect the Court to not grant any injunctive relief against your clients or to order fortification of a cross-undertaking in damages in an amount even remotely*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

79

approaching US$126 million.  In any event, to reduce the issues in dispute for the hearing, the JOLs believe there is considerable merit in the parties exploring whether agreement can be reached to address your clients' concerns regarding the alleged loss of opportunities set out in the Damages Report.

We previously wrote to your firm on 15 October 2025 seeking your clients' feedback on the proposed carve-outs to the injunctive relief sought by the JOLs and enclosing a draft amended injunction summons.  The draft amended injunction summons is yet to be filed.  We would therefore encourage your clients to make a proposal to the JOLs as to the protections that could be incorporated into any injunction order to alleviate the risk of alleged losses set out in the Damages Report.  In that regard, we note that the JOLs previously offered, in the context of the protocol and the interim undertakings, a scheme whereby the Defendants and Fund Entities could seek the JOLs' approval for any expenditure above a certain threshold, which your clients rejected.  Further, the injunction summons dated 15 July 2025 expressly provided for the Defendants and Fund Entities to seek the JOLs' approval to make any potentially profitable investments as follows:

> "5.2  To the extent that any Defendant, Fund Entity or any of their wholly owned subsidiaries wishes to (i) make any payment or otherwise deal with its assets for the purpose of preserving, improving or maintaining the value of its assets; or (ii) make any new investments, they may make a written request (in the case of a Fund Entity or one of their wholly owned subsidiaries, through the Sixth Defendant) to the Plaintiff to undertake the proposed transaction. Such request must include full supporting information and documentation as well as an explanation of the rationale for the transaction. The Plaintiff shall be required to give its approval or non-approval to the proposed transaction within 7 days of the request being made. Should the Plaintiff not approve the proposed

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

*transaction, the party making the request shall not consummate the proposed transaction."*

*An agreed scheme modelled on the above provision would appear to fully address the risk of alleged losses identified in the Damages Report.  In the alternative, if the parties cannot reach agreement, the appointment of receivers over the Fund would also fully address that risk.  In that case, professional Court-appointed receivers could independently determine whether or not to pursue the investments in question.  As we foreshadowed in our letter of 15 July 2025 (at the time of filing the injunction summons), the JOLs reserve the right to amend their application to seek the appointment of receivers over the Fund and/or other Defendants if necessary.*" (pages 785 to 787)

142  ==The JOLs are awaiting a response from Campbells to Maples' letter before finalising and filing the Amended Injunction Summons, but we intend to do so in any event prior to the hearing on 15-16 December 2025.==

Alleged Prejudice to Mr Murphy and Mr Patrick of an Injunction

143  At paragraph 88 of Murphy 1, he asserts that the Company's liquidation proceedings and the claims made by the Company against him in these proceedings "*affects my ability to accept appointments and casts a shadow over my role as an attorney at Stanbrook Prudhoe*" and that "*there is a significant risk that my ability to earn income from alternative sources is severely diminished until I am vindicated in these proceedings.*"  However, those statements only refer to the prejudice Mr Murphy alleges he would suffer from the <u>commencement</u> of those proceedings (which I understand is a matter of public record).  Mr Murphy has not addressed in Murphy 1 the matter of any alleged prejudice he would suffer by virtue of any injunctions ordered against him in these proceedings as distinct from the alleged prejudice he claims to have suffered from the proceedings generally.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

144 In any event, Mr Murphy appears to contradict himself at paragraph 9 of Murphy 1, where he states that: "*I have since been appointed to various boards of directors <u>and continue to be offered roles</u> which are a good fit for my particular background as a litigation lawyer*" (emphasis added). If Mr Murphy is continuing to be offered directorship roles then it casts doubt on the alleged prejudice he claims he has suffered from these proceedings. The JOLs also believe Mr Murphy's statement to be inconsistent with the bare assertion made in the letter from his attorneys, Kobre & Kim, to Maples dated 29 July 2025[76] that "*the imposition of injunctive relief…could lead to a loss of at least US$500,000 in income per annum (in today's value), for the duration of his working life*".

145 Mr Patrick does not appear to contend in his evidence that he personally would suffer any particular prejudice if injunctions were granted against him.

<u>Cross-undertaking in damages</u>

146 At paragraph 168 of Patrick 2, Mr Patrick asserts that because the initial tranche of funding provided to the Company by Crossvine has been exhausted, Mr Patrick has "*concerns…regarding Crossvine's ability willingness and ability to meet the any [sic] cross-undertaking in damages*". The JOLs do not believe that the exhaustion of the initial tranche of funding in any way speaks to Crossvine's ability to meet the cross-undertaking in damages that it has agreed to give (if required by the Court). The funding provided by Crossvine was only ever intended to be an initial tranche. The JOLs are in advanced discussions with several third-party funders, including Crossvine, as to the provision of further funding to cover the Company's legal costs and expenses through to trial.

---

[76] Exhibit PM-1, page 181

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

Fortification

147  The matter of fortification will be addressed in legal argument.  However, the JOLs do not believe fortification is necessary or appropriate given: (i) the strength of their case against the Defendants; (ii) the fact that the Defendants' actions have caused the Company to have no material assets with which to give a cross-undertaking in its own name; and (iii) the fundamental flaws in the Damages Report, being the sole piece of evidence the Defendants rely upon to assert that CDM and/or the Fund Entities would suffer significant damage from an injunction.  To the extent fortification of any cross-undertaking is required by the Court, the JOLs do not believe that it should be anywhere near the US$126 million amount sought by the Defendants.

Amended Injunction Summons

148  On 15 October 2025, Maples sent a letter to the Defendants' Attorneys which enclosed a draft amended version of the Injunction Summons (the "**Amended Injunction Summons**")[77].  The main changes to the original Injunction Summons were as follows:

148.1  Included an exception to the injunction for Mr Patrick and Mr Murphy to pay their reasonable living expenses up to a cap of US$10,000 per month from any compensation they have been paid by any of the corporate Defendants or Fund Entities.

148.2  The Defendants are not permitted to use assets ultimately deriving from the Fund (in respect of which the Company asserts a proprietary claim) to pay their legal fees and expenses, subject to the following exceptions –

---

[77] Pages 704 to 727

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

83

(a)   The Fund, CLO HoldCo and any of the Fund Entities are permitted to make payment of their reasonable legal fees and expenses.   The rationale for this exception being that those entities could only ever use "Fund assets" to pay for their legal fees given where they sit in the Fund structure.

(b)   Mr Patrick and Mr Murphy are permitted to pay their reasonable legal fees and expenses out of assets ultimately deriving from the Fund but only where the payment is being made pursuant to a contractual right of indemnification and advancement from an entity other than the Company, in which case they must comply with the requirements set out at paragraph 94 above.

148.3   Included a specific restraint on Mr Patrick transferring or dealing with the Missouri Property or the Texas Property, on the basis that the Company asserts a proprietary tracing claim in relation to those properties as explained at paragraphs 53 to 54 above.

149   Maples letter of 15 October 2025 sought answers from the Defendants as to the source of the funds being used to pay for their legal fees and whether any Defendants were relying on contractual indemnities to pay their legal fees out of assets ultimately deriving from the Fund or its subsidiaries.   The letters in response from Kobre & Kim and Campbells, both dated 27 October 2025, are at pages 788 to 795.   Whilst the JOLs had intended to finalise and file the Amended Injunction Summons after receipt of those responses, the JOLs decided to wait to review the Damages Report (once provided) before finalising the Amended Injunction Summons.

150   As noted at paragraph 142 above, the JOLs are awaiting a response from Campbells to Maples' letter dated 12 November 2025 in relation to the Damages Report before finalising and filing the Amended Injunction Summons, but we intend to do so in any event prior to the hearing on 15-16 December 2025.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

**A7    Other Matters**

151    Sections F through J of Patrick 2 do not appear to the JOLs to be directly relevant to the Injunction Application.  Accordingly, I do not propose to address those sections in detail, save to clarify the following points:

151.1  Protocol Correspondence: I have addressed the correspondence between the JOLs and the Defendants in relation to their proposed protocols at paragraphs 92 to 93 of MacInnis 1 and do not propose to repeat those points here.  However, since MacInnis 1 was filed, there has been some limited further correspondence between the parties which helps to further explain the inadequacies of the protocols proposed by the Defendants.  In particular, the letter from Maples to Campbells dated 27 July 2025[78], whereby Maples set out in detail at paragraphs 5 and 6 that none of the versions of the protocol offered by the Defendants included asset preservation undertakings, concluding that:

> "*If your clients genuinely were willing to give asset preservation undertakings previously as you suggest, then it bears explaining why they decided not to give those undertakings when the JOLs first (and second) requested them. Absent a satisfactory explanation, of which there isn't any, the JOLs are firmly of the view that your clients did not engage in the protocol correspondence in good faith.*"

Campbells did not respond to that letter.

151.2  I also note that, whilst the Defendants' protocols offered to provide a listing of all transactions undertaken by the Fund and its subsidiaries dating back to 1 July 2024, those protocols expressly stated that the transactions they would disclose: "*shall not*

---

[78] Which responded to a letter from Campbells dated 24 July 2025 (both of which are exhibited at pages 796 to 808

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

*include renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities."*[79] I now believe Mr Patrick included this proviso in order to allow him to conceal from the JOLs the excessive salaries and bonuses he had paid himself from Fund Entities in 2024 and continues to pay himself (see paragraphs 63 to 69 above as to the information the JOLs have since obtained about the compensation paid to Mr Patrick).

151.3    <u>HMIT Settlement and related correspondence</u>: The JOLs were not a party to the Highland Bankruptcy proceedings or the HMIT Settlement that is addressed at paragraphs 96 to 107 of Patrick 2 and therefore cannot comment on most of what is said in those paragraphs. However, I understand that Mr Patrick is critical in his affidavit of a letter that the JOLs sent to the litigation trustees of the Highland Bankruptcy in relation to the proposed HMIT Settlement dated 24 June 2025. The basis for the JOLs sending that letter was that the JOLs had limited information about the HMIT Settlement and we believed that we needed to understand the transaction before allowing it to proceed in the discharge of our duties to the Company and the Court (particularly given the quantum of the assets involved). The JOLs therefore do not understand the criticism from Mr Patrick. In the JOLs' view, Mr Patrick and Mr Murphy should have disclosed the HMIT Settlement and provided full information of it to the JOLs prior to it being consummated.

151.4    As regards paragraph 107 of Patrick 2, I reject the contention that the JOLs are not independent and are being influenced by the interests of Mr Dondero. The JOLs' actions in the liquidation and these proceedings are being motivated solely by our duty as Court-appointed officers to recover the assets of the Company that the JOLs believe have been misappropriated by the Defendants acting in concert. The JOLs have had

---

[79] See, for example, the "Revised Campbells Draft Protocol" referred to in paragraph 93.8 of MacInnis 1, page 1148 of Exhibit MM-1

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

no communications with Mr Dondero and cannot speak to the decision of Dugaboy to file a motion in the Highland Bankruptcy seeking to stay the HMIT Settlement.

151.5    Texas Proceedings: The Company is not a party to the Texas Proceedings nor the Rule 11 Agreement and so the JOLs are not able to comment on paragraphs 108 to 111 of Patrick 2. I have set out at paragraph 97 of MacInnis 1 the reasons why the JOLs believe that the Rule 11 Restrictions are not sufficient to protect the Company's position in these proceedings.  Those beliefs have only been strengthened following the JOLs' discovery of the US$13,873,778 in salaries and fees Mr Patrick has paid himself out of the Fund structure in 2024 and the first half of 2025 alone (see paragraphs 63 to 69 above).  The JOLs hold concerns that Mr Patrick will rely on the ordinary course of business exception to the Rule 11 Restrictions (and indeed the Interim Undertakings) to continue to pay himself grossly excessive compensation and thereby deplete the assets of the Fund structure if injunctions are not granted by this Honourable Court.

151.6    As regards the "CC Proposal" referred to at paragraphs 120 to 124 of Patrick 2, the JOLs have no direct knowledge of the CC Proposal and therefore cannot speak to Mr Patrick's assertion that the Supporting Organisations did not engage with that proposal. However, I have now read the CC Proposal exhibited to Patrick 2 and note that it does not address the issue of the excessive compensation that Mr Patrick has been paying himself from the Fund structure and what he proposes to do about it moving forward. If Mr Patrick were truly concerned about the Charities and not his own self-interest, the JOLs would have expected him to confirm in the CC Proposal that he would be willing to: (i) resign as a director of the Fund GP and all of the Fund's subsidiary entities; and (ii) cause CDM to return the Partnership Interest to the Company.  The JOLs firmly believe that Mr Patrick is not a fit and proper person to be managing the Fund's assets. The JOLs view the recovery of the Partnership Interest that belongs to the Company as a necessary first step to reclaim control of the Fund structure. Once that is achieved,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

the JOLs believe they will then need to assess, in consultation with the Court, a way forward for the Company and the Fund which is aimed at ensuring no further corporate governance issues arise and the Company and the Fund operate smoothly and for the sole benefit of the Supporting Organisations and the supported Charities, as they are meant to.  The JOLs expect such measures will likely include removing Mr Patrick and Mr Murphy as directors/managers of all the Fund Entities and appointing new independent management (subject to the approval of this Honourable Court).

151.7   Funding: At paragraphs 112 to 117 of Patrick 2, Mr Patrick takes issue with the funding that the JOLs have obtained for the liquidation and these proceedings to date. In reply to those paragraphs, I wish to note the following points –

(a)     It has only been necessary for the JOLs to obtain third party funding because of the actions of Mr Patrick and Mr Murphy in transferring away the Company's sole valuable asset (worth c. US$270 million) for nominal consideration, leaving the Company without material assets to pay for the legal fees of its asset recovery efforts. The JOLs therefore believe any purported concerns or objections that Mr Patrick has to the JOLs' funding arrangements to be purely tactical and consistent with what the JOLs perceive to be Mr Patrick's strategy of seeking to: (i) impede the JOLs' efforts to recover the Company's property; and (ii) avoid a determination of the JOLs' claims against him on the merits for as long as possible.

(b)     Mr Patrick asserts that the JOLs are conflicted and/or acting under the influence of Mr Dondero due to the initial tranche of funding being provided by Crossvine Litigation Funding LLC ("**Crossvine**").  The JOLs strongly reject that assertion. The JOLs have obtained sanction of this Honourable Court to enter into the funding agreement with Crossvine and are acting in what we believe to be the Company's best interest in seeking to recover its highly valuable property from

the Defendants. Neither Crossvine nor any parties connected with Crossvine (let alone Mr Dondero) have any control over or influence on the JOLs' investigations and decision-making. In any event, I understand that Mr Patrick's allegations against the JOLs are not a matter for determination on the Injunction Application and I understand those allegations will be considered at the hearing of the Removal Application. In that regard and for completeness, I exhibit at pages 809 to 819 a copy of a letter from Maples to Baker & Partners (DFW's attorneys) dated 5 September 2025, which sets out the JOLs' position on the Removal Application and why it is bound to fail.

(c) As regards paragraph 116 of Patrick 2, the JOLs have no information about the litigation proceedings to which any Fund Entities are party besides: (i) publicly available information; and (ii) the limited information amount of information that the Defendants have disclosed to the JOLs pursuant to the Interim Undertakings, which expressly requires the JOLs not to disclose the information to: "*Mr James Dondero, the Supporting Organisations (being Highland Santa Barbara Foundation, Highland Dallas Foundation, and Highland Kansas City Foundation), or any known affiliates or service providers of these individuals / entities, subject to where the JOLs' are required to disclose any such information in the discharge of their duties to the Court or as otherwise required by law.*"

(d) Mr Patrick also raises purported concerns about the funding provided by Crossvine having been exhausted. The JOLs believe these concerns to be misguided. As noted at paragraph 146 above, the JOLs only ever sought an initial tranche of funding from Crossvine – it was never intended by the JOLs that it would cover the full costs of the liquidation and these proceedings. The JOLs are presently in advanced discussions with third party funders to provide

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

89

a further tranche of funding that is intended to cover the duration of these proceedings. However, the Company's costs are being exacerbated by the hostile and highly defensive position of the Defendants, who have filed a combined six summonses in the liquidation proceedings and these proceedings already. The JOLs believe this to be part of the Defendants' strategy to stultify the progress of these proceedings and delay a determination of the JOLs' claims on their merits (whilst expending considerable sums on legal fees out of assets ultimately belonging to the Company in the process).

151.8   Alleged inaccuracies in MacInnis 1: At paragraph 118 of Patrick 2, Mr Patrick criticises me for not addressing Mr Dondero's position as President of each of the Supporting Organisations. The issue of what powers the President of the Supporting Organisations can exercise and whether they can circumvent the board of directors is addressed in the Bedingfield Affidavit at paragraph 25. I also note that Mr Patrick concedes that the President has "*all powers that are delegated [to the President] by the Board of Directors*" (emphasis added). Further, as Mr Mancino noted in his memo of advice to Mr Patrick dated 12 September 2013, "*the board of each supporting organization is controlled by the supported organisation...*"[80]. Mr Patrick has provided no evidence to suggest that the majority independent board of directors of each of the Supporting Organisations has delegated any specific powers to Mr Dondero as President. Mr Patrick's assertion that Mr Dondero has single-handedly caused the Supporting Organisations to take certain actions appears to be simply conjecture.

151.9   At paragraph 119 and footnote 23 of Patrick 2, he takes issue with my reference in MacInnis 1 to the Supporting Organisations making grants to their respective Charities from time to time from any dividends received from the Company. I do not believe that my evidence was inaccurate in any material respect – the issue appears to me to be

---

[80] Exhibit MP-1 at pages 62-66

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

90

one of terminology. As Mr Patrick admits, "*the terms of each charitable foundation's annual distributions from the Company [are] provided for in the Legal Relationship Agreement or Operating Agreements they entered into with the Supporting Organizations*". Whereas I referred to "dividends" paid by the Company to the Supporting Organisations, Mr Patrick refers to "distributions". Where I referred to the Supporting Organisations using those funds to make "grants" to their respective Charities, I accept that the proper terminology for these payments under the Legal Relationship Agreement or Operating Agreements are payment of fees to the Charities. Indeed, I believe I described it correctly at paragraph 18.5(b) of MacInnis 1 where I stated that those agreements provide that: "*in consideration for the services provided by the Charity to the Supporting Organisation, the Supporting Organisation shall pay an administrative fee to the Charity (most of which are based on a percentage of the market value of the assets held by the relevant Supporting Organisation)*". The JOLs also find it contradictory for Mr Patrick to assert that the Supporting Organisations and their respective Charities had no economic interest in the Company when at the same time he admits that there were contractual terms governing "*each charitable foundation's annual distributions from the Company*".

151.10 I note that at paragraph 125 of Patrick 2, he asserts that the "CDM Entities" (or "Fund Entities" as they are referred to in the Amended Injunction Summons) are not "mostly passive investment vehicles" because they have a number of actively managed business lines. However, Mr Patrick provides no details of which Fund Entities allegedly operate active business lines beyond the high-level business categories described in paragraph 125(a) to (d). The information that the JOLs have received from the Defendants to date pursuant to the Interim Undertakings has not revealed any new significant investments, trades or asset sales for the period from July 2025 onwards. Of the total of 14 transactions above US$50,000 that the Defendants have provided the JOLs with notice of, 11 relate to payment of legal fees or service providers. Further, the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

transaction listings provided to the JOLs for the months of July through September 2025 disclose Fund Entities receiving 32 payments from external parties, 30 of which represent passive income streams such as dividends, interest, rent or settlement distributions (pages 820 to 822).

151.11 At paragraphs 130 to 133, Mr Patrick addresses the Mercer report. I have addressed the Mercer Report at paragraphs 55 to 56 above and it will be addressed further in the JOLs' legal submissions.

151.12 As regards paragraph 137 of Patrick 2, the JOLs do not have sufficient information to take a position on the appropriateness of the compensation paid to the Fund's previous investment managers/advisors in the period 2014 to 2020. However, taking the list of payments exhibited at pages 422 to 423 of Exhibit MEP-2 at face value, I disagree with Mr Patrick's contention that the remuneration he has paid himself from the Fund structure represents only a "fraction" of the amounts paid to the investment managers/advisors associated with Mr Dondero in the period 2014 to 2020. Mr Patrick has been paid compensation of US$13,873,778.03 from the Fund structure in 2024 and the first half of 2025 alone. This represents approximately 209% of the fees Mr Patrick contends were paid to the Fund's previous investment managers/advisors for an equivalent 18-month period (US$30.85 million / 4.666 = US$6.61 million).

151.13 Fund structure chart: At paragraph 13 of Patrick 2, he exhibits a "structure chart of the DAF structure, both before and after the DAF Restructuring". However, the "before" chart he exhibits does not show the DAF structure prior to the DAF Restructuring and is misleading in that it shows CDM as the holder of the Partnership Interest, when in fact CDM was incorporated by Mr Patrick specifically for the purposes of carrying out the DAF Restructuring, one of the steps of which was the transfer of the Partnership Interest from the Company to CDM. The correct structure chart showing the position

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

92

prior to any steps had been taken in the DAF Restructuring is at page 823, whereby the Company held the Partnership Interest and CDM was not a part of the structure.

152   The only other part of Murphy 1 that I wish to respond to is paragraph 81, which is misleading in several respects. Without wishing to be exhaustive on matters that do not bear on the merits of the JOLs' case for injunctions against Mr Murphy and the other Defendants, I wish to note the following:

152.1   Contrary to what is suggested at paragraph 81.1 of Murphy 1 (and paragraph 144 of Patrick 2), the JOLs' case for urgency in having the Injunction Summons listed for hearing was conveyed to the Honourable Judge by letter dated 15 July 2025 (pages 824 to 827), and the hearing was listed on that basis.

152.2   Paragraphs 81.2 and 81.3 do not provide an accurate account of Maples' efforts, on instructions from the JOLs, to have the adjourned Injunction Summons listed for hearing[81]. An accurate chronology of Maples' attempts to find mutually available dates for the adjourned hearing of the Injunction Summons across the three firms acting for the Defendants can be provided if it would assist the Court.

**B      REPLY TO PATRICK 3**

153   The JOLs are perturbed that Mr Patrick has decided to incur unnecessary costs to have two different firms (Campbells and Baker & Partners) prepare two affidavits sworn by him that largely make the same points (Patrick 2 and Patrick 3). In this regard, I note that at the hearing of the JOLs' application for sanction to engage legal counsel, the Honourable Justice Asif commented on several occasions that he did not understand why DFW (an entity controlled by Mr Patrick and represented by Baker & Partners) needed to be separately represented from

---

[81] The adjournment being agreed by the parties on the eve of the original hearing date in conjunction with the Defendants giving asset preservation undertakings to the Court, and recorded in the Consent Order

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

Mr Patrick and the other Defendants he controls (all of whom are represented by Campbells). The relevant extracts from the transcript are as follows:

"*JUDGE: …I don't really understand why it's necessary for Mr Patrick to be separately represented, and simply because I gave him permission doesn't mean he has to take it up.*"[82]

"*JUDGE: Well, My Tyers-Smith, my query is this, if DFW and the management shareholder [Mr Patrick] are aligned, which seems to be they're very highly likely to be, I don't really understand why they need separate representation. And if they're not aligned, that means there must be a conflict between them. And I have a bit of difficulty in understanding how Mr Patrick can remain director of a company where he has a conflict*"[83].

154    This point was also addressed in a letter from Maples to Baker & Partners dated 15 August 2025 (pages 828 to 829): "*In circumstances where: (i) DFW was created and is controlled by Mr Patrick; and (ii) their interests in the defence of the FSD Proceedings are obviously aligned, there is no good reason for DFW to be separately represented to Mr Patrick in the FSD Proceedings (or the Liquidation Proceedings). At the sanction hearing on 24 June 2025, Justice Asif on many occasions emphasised that he considered it was unnecessary for DFW to be separately represented from Mr Patrick. We would encourage you to take up his Lordship's suggestion. Should you not do so, the JOLs reserve their right to make an appropriate application to the Court.*"

155    The JOLs also take issue with the significant amount of legal fees being incurred by DFW to Baker & Partners, which are being paid for by CLO HoldCo, despite there being no apparent reason for DFW to be separately represented from Mr Patrick. Accordingly, the JOLs reserve

---

[82] Exhibit MEP-2, page 36

[83] Exhibit MEP-2, page 60

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

94

the right to object to DFW's leading counsel making any oral submissions at the hearing of the Injunction Application.  Campbells has confirmed that Mr Patrick and the other Defendants he controls will already be represented by leading counsel at the hearing, such that it would only serve to chew up the available hearing time and increase costs for DFW to make the same or similar submissions.

156    From my reading of Patrick 3, most of it repeats the points already made in Patrick 2 and Reid 1, which only increases the JOLs' concerns and objections to DFW's unnecessary legal costs that are being paid for out of the Fund structure.  The JOLs therefore do not see the need to prepare a fulsome reply to Patrick 3.  The JOLs only wish to respond to the following handful of points made therein:

156.1    At paragraph 6 of Patrick 3, Mr Patrick takes issue with the Company's Amended Writ and Statement of Claim filed on 15 October 2025.  The Amended Writ is marked amended pursuant to Grand Court Rules ("**GCR**") O.20, r.3(1) and the Amended Statement of Claim is marked amended pursuant to GCR O.20, r.12(1). I understand from Maples that these are typographical errors and should refer to GCR O.20, r.1(1) and GCR O.20, r.3(1) respectively, pursuant to which I understand that the Company does not require leave of the Court or the agreement of the Defendants for the amendments.  If required by the Court, the JOLs will seek leave to file a further Amended Writ and Statement of Claim correcting these typographical errors.

156.2    At paragraph 59 of Patrick 3 onwards under the heading 'Inequitable Conduct', Mr Patrick makes various criticisms of the JOLs.  Mr Patrick's criticisms of the JOLs have culminated in DFW filing the Removal Application, which is conspicuously only mentioned in passing at paragraph 109 of Patrick 3 and not at all in Patrick 2. The JOLs believe it is telling of the lack of merit in those criticisms that neither Patrick 3 nor Patrick 2 addresses the letter from Maples to Baker & Partners dated 5 September 2025 setting

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

out the multitude of reasons why the Removal Application is bound to fail, which letter Maples has not received a response to (see paragraph 40.4 above).

156.3  At paragraph 78 of Patrick 3, he insinuates that the JOLs deliberately withheld the identity of a further senior counsel from whom the JOLs have taken advice on the merits of the Company's claims.  That is incorrect – the Honourable Justice Asif made sealing orders over various parts of MacInnis 5 filed in the liquidation proceedings, including the identity of the senior counsel in question.  The JOLs are therefore bound not to disclose the identity of that person to the Defendants.

156.4  At paragraphs 86 to 87 of Patrick 3, he alleges that Mr Andrew Ayres KC is conflicted from acting for the JOLs in this matter.  That allegation has already been addressed and rejected by the JOLs in a letter from Maples to Baker & Partners dated 15 August 2025 (pages 828 to 829). Baker & Partners has not responded to that letter.

156.5  The assertions made by Mr Patrick at paragraphs 110 to 111 are incorrect and misleading.  The JOLs' letter to the Court dated 15 July 2025 set out that the JOLs were concerned to get the injunction hearing listed before the long Court summer recess began on 1 August 2025 in circumstances where the Rule 11 Agreement in Texas (which provided only partial protection to the Company in these proceedings) may have been discharged by the end of that recess.

**C      REPLY TO MANCINO AND REID AFFIDAVITS**

157     I understand that the function of affidavits in Cayman Islands court proceedings such as these is to provide evidence, not to make legal or other arguments. I therefore do not seek to respond to the various arguments made in Mancino 1 and Reid 1. This is on the basis that, insofar as necessary and appropriate, these will be dealt with in the JOLs' legal submissions.  I also understand that neither Mr Mancino nor Mr Reid have any Cayman Islands law qualifications. However, it appears to the JOLs that in a number of instances, Mr Reid and Mr Mancino have

opined on the fiduciary duties of the Company's directors and whether the steps they took in relation to the DAF Restructuring were compliant with those duties.  These matters will also be dealt with in the JOLs' legal submissions.

158    At paragraph 32 above, I extracted what appears to be the key conclusions from the Bedingfield Affidavit, which contradict the evidence of Mr Mancino and Mr Reid.  In addition to those points, whilst I am not a US tax lawyer, I note an internal contradiction in Mr Reid's reasoning in that:

158.1  Mr Reid states that "*the key tax benefit enjoyed by the Supporting Organisations is that they are not classified as private foundations.*"[84]

158.2  Mr Reid goes on to reason that "*Mr Dondero's presence on the Board of the Highland Foundations is problematic because he is a Disqualified Person, and his presence on the board jeopardizes their tax status as non-private foundations.  If a Disqualified Person exercises substantial influence over a Supporting Organization, whether directly or indirectly, then the Supporting Organization would be subject to the private foundation rules, which involve greater scrutiny and a significant tax burden.*"[85]

158.3  However, in relation to DFW, which is controlled by Mr Patrick and after the DAF Restructuring became the sole member of CDM and thereby the indirect owner of the Fund, Mr Reid confirms that "*DFW is a U.S. private foundation, so it is subject to all U.S. tax laws affecting charitable organizations*".[86]

159    If that is the case, the JOLs struggle to understand how a risk of the Company's Participating Shareholders becoming private foundations justified transferring away the Company's

---

[84] Reid 1, paragraph 30

[85] Reid 1, paragraph 34

[86] Reid 1, paragraph 82

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

==significant asset to another entity (CDM) whose sole membership interest was owned by a private foundation (DFW), both of whom were controlled by Mr Patrick.==

160 Finally, I wish to address briefly the inaccuracies that Mr Reid and Mr Mancino allege were in MacInnis 1:

160.1 At paragraph 63 of Reid 1, Mr Reid misconstrues the following statement I made at paragraph 17 of MacInnis 1: "*[e]ach of the Charities held their interests in the Company indirectly through Highland Kansas Foundation, the Highland Dallas Foundation and the Highland Santa Barbara Foundation respectively (i.e. the Dallas Foundation held their interest through the Participating Shares held by Highland Dallas Foundation etc)*". Mr Reid interpreted that as suggesting that: "*each Supported Organization is the alter ego of its respective Supporting Organization, lacking a separate identity.*" That is not what I was suggesting. The point I was making is that it was ultimately the Charities (Supported Organisations) who stood to benefit in economic terms from the assets of the Company, which economic benefit would arise by way of distributions from the Company to its Participating Shareholders (the Supporting Organisations), which would then in turn be used to pay the fees that the Supported Organisations are contractually entitled to (calculated based on a percentage of the Company's NAV) from the Supporting Organisations.

160.2 At paragraphs 8 to 9 of Mancino 1 and various places in Reid 1, they take issue with my description of the Charities[87] being the "indirect beneficial owners" of the Company. What I meant by that term is explained above. However, I would also observe that this terminology is consistent with the way the Charities are described in the Fund LPA – the "*Indirect Charitable Owners*".

---

[87] Referred to as "Supported Organizations" in Mancino 1 and Reid 1

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

98

160.3 Mr Mancino's and Mr Reid's other comments on MacInnis 1 focus on US law tax issues. Having taken the US tax law advice referred to in MacInnis 1 (privilege over which is not waived) and having reviewed Mancino 1, Reid 1, and the Bedingfield Affidavit, the JOLs' views on the propriety of the DAF Restructuring, including the purported US tax law concerns relied upon by Mr Patrick and Mr Murphy for it, have not changed.

SWORN to at  George Town,    )
Grand Cayman, Cayman Islands,  )
this      day of November 2025  )
before me    )

_____
Margot MacInnis

_____
Notary Public

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

Plaintiff
M MacInnis
Third Affidavit
November 2025
Exhibit MM-3

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 (RPJ)**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

<u>Plaintiff</u>

**AND**

| | | |
|---|---|---|
| **(1)** | **MARK ERIC PATRICK** | |
| **(2)** | **PAUL MURPHY** | |
| **(3)** | **CDMCFAD, LLC** | |
| **(4)** | **DFW CHARITABLE FOUNDATION** | |
| **(5)** | **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** | |
| **(6)** | **CLO HOLDCO, LTD.** | |

<u>Defendants</u>

---

**EXHIBIT MM-3**

---

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

This is the Exhibit shown to me and marked "**MM-3**" to the Third Affidavit of **MARGOT MACINNIS**.

Sworn before me this _____ day of November 2025

_____

Notary Public

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000002/85175762)

2