**EXHIBIT 77**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

In re:
HIGHLAND CAPITAL MANAGEMENT, L.P.,
                                    Chapter 11
    Reorganized Debtor,    No. 19-34054-sgj11
----------------------------------------
HIGHLAND CAPITAL MANAGEMENT, L.P.,

    Plaintiff/Counter-Defendant,

            V.                 Adv. Proc. No.
                               25-03055-bwo
PATRICK HAGAMAN DAUGHERTY,

    Defendant/Counter-Plaintiff.
----------------------------------------

REMOTE DEPOSITION OF JAMES DONDERO

Friday, May 8, 2026

Reported by:

LISA M. MURACO, RPR, CCR-NJ

JOB NO. 53803

Friday, May 8, 2026

11:30 a.m.

REMOTE Deposition of JAMES DONDERO, held VIA ZOOM, before LISA M. MURACO, a Registered Professional Reporter, CCR-NJ, a Notary Public of the State of New York, New Jersey, Florida, Massachusetts.

A P P E A R A N C E S :


        PACHULSKI STANG ZIEHL & JONES

        On behalf of Highland Capital Management,

        and the Highland Claimant Trust

                1700 Broadway, 36th Floor

                New York, New York 10019

        BY:    JOHN MORRIS, ESQ.

                JEFF POMERANTZ, ESQ.

                ANDREA BATES, Legal Assistant



        WILLKIE FARR GALLAGHER

        Attorneys for Highland

                1875 K Street, N.W.

                Washington, DC 20006

        BY:    JOSH LEVY, ESQ.

                MARK STANCIL, ESQ.

A P P E A R A N C E S :


     KELLY HART

     Attorneys for HMIT

          400 Poydras Street

          Suite 1812

          New Orleans, LA 70130

     BY:   AMELIA HURT, ESQ.




     MORGAN LEWIS,

     Attorneys for the Witness

          1111 Pennsylvania Avenue, NW

          Washington, DC 20004

     BY:   MICHAEL EDNEY, ESQ.

A P P E A R A N C E S:


ALSO PRESENT:

Jordan Kitrick, Everest Tech

Time Cournoyer, General Counsel Highland

Capital

John Sheahan, US Trustee's Office

Danielle Pham, US Trustee's Office

Lisa Lambert, US Trustee's Office

Liz Young, US Trustee's Office

Deposition of James Dondero                                                In re Highland Capital Management, L.P.

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

- oOo -

J A M E S   D O N D E R O, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. MORRIS:

Q.    Good morning, Mr. Dondero.

A.    Good morning.

Q.    Can you hear me okay?

A.    Yes.

Q.    Okay.

I'll try to be efficient today. We've done this so many times.  So I'm going to skip the ground rules unless there's something of particular concern for you.

Is that okay?

A.    That's fine.

Q.    Are you ready to proceed?

A.    Yes.

Q.    The Dugaboy Boy Investment Trust is your family trust, correct?

A.    Yes.

Q.    And we're going to refer to that entity today as Dugaboy, okay?

A.    Yes.

Q.    You established Dugaboy; is that correct?

A.    Yes.

Q.    How did you choose the name?

A.    It's the name of an animal in Africa.

Q.    Okay.

When did you establish Dugaboy?

A.    I don't remember.  It's been around for a while, though.

Q.    You're the sole beneficiary of Dugaboy during your lifetime, correct?

A.    Yes.

Q.    And you understand that Dugaboy is controlled by a trustee, correct?

A.    I -- it has a trustee.  I don't know the exact rights and responsibilities.

Q.    Who is the trustee?

A.    My sister.

Q.    Does anybody have any rights -- withdrawn.

Does anybody -- withdrawn.

To the best of your knowledge, does anybody have the right to make decisions on behalf of Dugaboy other than your sister in her

capacity as the trustee?

A.    There are no other parties I'm aware of.

Q.    So is it fair to say that, to the best of your knowledge, Nancy is the only person authorized to make decisions on behalf of Dugaboy?

A.    Yes.

Q.    And when did -- withdrawn.

When did Nancy become Dugaboy's trustee?

A.    I don't recall.  Several years ago.

Q.    Is it fair to say she's been the trustee since at least before the Highland bankruptcy was commenced in the fall of 2019?

A.    I don't remember.

Q.    Do you know how she became Dugaboy's trustee?

A.    I don't remember.

Q.    Did you appoint Nancy as the trustee of Dugaboy?

A.    I -- I believe so.  I don't remember, though.

Q.    Do you know if you have the ability to remove Nancy as Dugaboy's trustee?

A.    I don't know.

Q.    Do you have any knowledge as to how Nancy might be removed as Dugaboy's trustee?

A.    I don't know.

Q.    Okay.

It fair to say that as the trustee, Nancy solely controls Dugaboy?

A.    I don't know.

Q.    Is there anybody else who you have reason to believe might control Dugaboy other than Nancy?

A.    I struggle with the word control.  I don't know specs that are within her discretion, or if there's asset managements or other agreements.  Like, I don't know.

Q.    Do you know if anybody has asset management agreements with Dugaboy?

A.    I don't know.

Q.    Does any entity owned or control by you have any agreement of any kind with Dugaboy?

A.    Don't know.

Q.    Do you have any role in the management of Dugaboy's assets?

MR. EDNEY:  I'm going to object to

the form of the question.

A.    I believe there's a large chunk of NexBank stock in Dugaboy.  I'm the chairman of NexBank.

Q.    Do you know if Nancy receives any advice on how to invest Dugaboy's assets?

A.    I don't know.

Q.    Have you ever provided any advice to Nancy as to how to manage Dugaboy's assets?

MR. EDNEY:  I'm going to object to the form of the question.

A.    I don't recall.

Q.    You have no memory of ever providing any advice to Nancy as to how Dugaboy should manage its assets; is that right?

A.    I can't remember any specifics as I sit here today.

Q.    How about generally?  Do you ever remember, in general, providing any advice to Nancy as to how Dugaboy should manage its assets?

A.    Not as I sit here today.

Q.    Do you recall if anybody while you were affiliated with Highland provided any advice to Nancy as to how Dugaboy should manage

its assets?

MR. EDNEY:  I'm going to object to the form of the question.

A.    I don't recall.

Q.    You have no memory of anybody at Highland ever providing any advice to Nancy as to how Dugaboy should manage its assets.

Is that your testimony?

MR. EDNEY:  I'm going to object to the form of question.

A.    I don't recall.

Q.    How about NexPoint?  Do you know if anybody at NexPoint has ever provided any advice to Nancy as to how Dugaboy should manage its assets?

MR. EDNEY:  I'm going to object to the form of the question.

A.    I don't recall.

Q.    So as you sit here today, you can't think of any time that anybody employed by NexPoint provided advice to Nancy as to how to manage Dugaboy's assets.

Do I have that right?

MR. EDNEY:  I object to the form of the question.

A.    I don't recall.

Q.    How about Skyview?  Are you familiar with an entity called Skyview?

A.    Yes.

Q.    Do you have an understanding as to the business of Skyview?

A.    Yes.

Q.    What's your understanding of Skyview's business?

A.    They provide HR, legal, and accounting services to several -- several of the entities that we manage money for, or several -- various different entities that we have that require those services.

Q.    Do you know if Skyview has ever provided any services to Dugaboy?

A.    I -- I don't know.  I don't know. Logically, they would, but I don't have a specific awareness.

Q.    So you have no personal knowledge of anybody at Skyview ever performing any services for the benefit of Dugaboy?

Do I have that right?

MR. EDNEY:  I'm going to object to the form of that question.

A.    Oh, I have awareness.  But like I said, it would be logical that they provided some accounting or HR or tax services for Dugaboy.

Q.    Are you aware of Nancy delegating any authority to act on Dugaboy's behalf to anybody in the world at any time?

MR. EDNEY:  I'm going to object to the form of that question.

A.    Not that I recall.

Q.    Has Nancy ever delegated any authority to you to act on Dugaboy's behalf?

MR. EDNEY:  I'm going to object to the form of the question.

A.    I don't know.

Q.    Okay.

So as you sit here today, you have no memory of Nancy ever delegating any authority to you to act on Dugaboy's behalf?

Do I have that right?

A.    I don't know.

Q.    Okay.

Do you have any recollection of Nancy ever delegating you to act as Dugaboy's agent for any purpose?

MR. EDNEY:  Object to the form of the question.

A.    I don't know.

Q.    So you have no personal knowledge of Nancy ever appointing you as an agent for Dugaboy?

Is that fair?

A.    I don't have specific awareness.

Q.    Okay.

A.    I don't know.  Yeah, and I don't know what happened or how the different roles in how -- who -- yeah, how responsibilities are shifted, or who they're directly part of.

Q.    Can you identify anybody who provides professional services for the benefit of Dugaboy today?

MR. EDNEY:  Object to the form of the question.

A.    I don't know.  I didn't -- I wasn't prepared for this as a relevant topic.

Q.    You needed to prepare yourself in order to learn who provides professional services to Dugaboy.

Do I have that right?

MR. EDNEY:  I'm going to object to

the form of the question.

A.    I'm not involved in the details, typically.

Q.    Okay.

Can you identify any law firm that represents Dugaboy.

A.    I believe Stinson represents Dugaboy quite a bit.

Q.    Can you name any other law firm that, as you sit here right now, you believe represents Dugaboy for any purpose.

MR. EDNEY:  Object to the form of the question.

A.    I don't want to -- I don't want -- I'm not a hundred percent certain.  I don't want to speculate.

Q.    Okay.

I don't want you to speculate either.

But do you have any -- do you have any basis to identify -- other than -- withdrawn.  Sorry.

Other than speculation, do you have any basis to identify any other law firm that provides legal services to Dugaboy today?

Deposition of James Dondero                                    In re Highland Capital Management, L.P.

A.    I don't want to speculate.

Q.    Okay.

How about accounting?  Do you know who provides accounting services to Dugaboy?

MR. EDNEY:  I'm going to object to the form of the question.

A.    I -- I do not have specific knowledge.

Q.    How about asset management advice? Do you have any knowledge as to who provides asset management advice to Dugaboy, if anybody?

MR. EDNEY:  Object to the form of the question.

A.    I do not.

Q.    Does Nancy -- is it your understanding that as the trustee of Dugaboy, Nancy has the power and authority to choose an investment advisor?

MR. EDNEY:  I'm going to object to the form of the question.

A.    I don't know.

Q.    Do you have any understanding as to whether a trustee -- withdrawn.

Have you ever given Nancy any advice on who to use as an asset manager?

A.      Not that I recall.

Q.      Do you know where Dugaboy's assets are held today?  What institution?

MR. EDNEY:  Object to the form of the question.

A.      I believe different asset -- multiple institutions.  Some are held at Raymond James.  I know Raymond James holds some.

Q.      Can you identify any other institution that you believe holds Dugaboy assets.

A.      Not that I recall.

Q.      If Nancy decided, is it your understanding that she would have the power and authority to move assets from Raymond James to a different financial institution?

MR. EDNEY:  Object to the form of the question.

A.      I don't know.

Q.      Do you know if you have any rights under the Dugaboy partnership -- Dugaboy trust agreement?

A.      I don't know.

Q.      Do you have any reason to believe

that Nancy needs to obtain your consent to take any act in her capacity as the trustee of the Dugaboy investment trust?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.

Q.    Do you have any knowledge as to what assets Dugaboy is invested in today?

MR. EDNEY:  Objection to the form of the question.

A.    It owns some stocks.  It owns a large chunk of NexBank.  And I believe some assorted real estate investments.

Q.    Do you know how Dugaboy came to own a large chunk of NexBank stock?

MR. EDNEY:  Objection to the form of the question.

A.    As an investor over the years to NexBank.

Q.    NexBank advised Nancy to purchase a chunk of its stock.

Is that your understanding?

MR. EDNEY:  Objection to the form of the question.  Misstates testimony.

A.    Yeah, no, that's not true.

Q.   I apologize, Mr. Dondero.  I may have misunderstood.

I'm trying to figure out if you have any knowledge as to how Dugaboy came to own a large chunk of NexBank stock, the entity in which you are affiliated?

MR. EDNEY:  That's not a question, Mr. Morris.  Please state one.

BY MR. MORRIS:

Q.   Do you know how Nancy came to invest on Dugaboy's behalf a large -- in a large chunk of NexBank stock?

MR. EDNEY:  Objection to the form of the question.

A.   Dugaboy was an early, if not an original investor, and the interest grew enormously over time.

Q.   And you advised her to do that; isn't that right?

MR. EDNEY:  Objection to the form of the question.

BY MR. MORRIS:

Q.   Withdrawn.

You advised her to invest in NexBank, correct?

MR. EDNEY:  Objection to the form of the question.

A.    I don't have a recollection of that.

Q.    Does Nancy have any investment experience, to the best of your knowledge?

MR. EDNEY:  Objection to the form of the question.

A.    Yes, she has some.

Q.    What's the asset base?  Do you know the current value of the Dugaboy asset base today?

MR. EDNEY:  Objection to the form of the question.

A.    No.

Q.    Do you know if it's more than $100 million?

A.    Yes.

Q.    Is it more than $200 million?

MR. EDNEY:  Objection to the form of the question.

A.    I believe so.

Q.    Do you believe it's more than -- that the assets that Dugaboy has are worth more than $300 million?

MR. EDNEY:  Objection to the form of

the question.

A.    The NexBank stock is worth quite a bit, and that's the primary asset in there. Oh, yes, I believe it's worth more than 300 million.

Q.    Is it worth more than 500 million?

MR. EDNEY:  Objection to the form of the question.

A.    I don't want to speculate beyond 300 million.

Q.    That's fair.

Does Dugaboy have any employees?

A.    No.

Q.    Does Dugaboy have any officers or directors?

MR. EDNEY:  Objection to the form of the question.

A.    No, not that I'm aware of.

Q.    Does Dugaboy have any relationship with any person or entity on a contract basis?

MR. EDNEY:  Objection to the form of the question.

A.    I would believe so.

Q.    Can you identify any.

MR. EDNEY:  Objection to the form of

the question.

A.    No.

Q.    Do you have any reason to believe that Dugaboy ever had an interest in Hunter Mountain Investment Trust?

MR. EDNEY:  Objection form of the question.

A.    I don't know.

Q.    As you sit here today, you have no reason to believe that Dugaboy ever had an interest in the Hunter Mountain Investment Trust?

Is that fair?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.

Q.    Do you have any reason to believe that Nancy needs to obtain your consent to take any action in your capacity as Dugaboy's trustee?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.

Q.    Do you have any reason to believe that Nancy needs to obtain anyone's consent to

take any action in her capacity as Dugaboy's trustee?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.

Q.    Do you control Dugaboy in any way?

A.    (Inaudible.)

Q.    I'm sorry.  Your voice faded, at least in my side.

A.    I said I don't know.

Q.    Thank you very much.

Are you authorized to make any decisions on Dugaboy's behalf?

MR. EDNEY:  Objection to the form of the question.

BY MR. MORRIS:

Q.    Withdrawn.

Do you know if you're authorized to make any decision on Dugaboy's behalf?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.

Q.    Have you ever made any decision on Dugaboy's behalf?

MR. EDNEY:  Objection to the form of

the question.

A.   It's a very static portfolio.  I can't remember the last time anything has moved in and out of it.  I don't know.

Q.   Well, Dugaboy does more than invest; isn't that right?

A.   I don't know.

Q.   Dugaboy is a litigant, isn't it?

A.   Yes.

Q.   Dugaboy has litigated against Highland for a long time, right?

A.   I guess.

Q.   And who makes decisions on Dugaboy's behalf with respect to litigation, to the extent that you know?

MR. EDNEY:  Objection to the form of the question.

A.   I don't know.

Q.   Have you ever made any decisions on of Dugaboy's behalf with respect to any aspect of litigation brought against Highland?

MR. EDNEY:  Objection to the form of the question.

A.   I don't know.

Q.   You don't know, as you sit here

right now, whether you have ever made a decision on Dugaboy's behalf with respect to any litigation brought against Highland?

Do I have that right?

MR. EDNEY:  Objection to the form of the question.

A.    I struggle with the word decision. I don't know where my authority begins and ends.  I didn't prepare on that, Dugaboy documents.

And I don't know where the decisionmaking process begins and ends with myself, the trustee, the lawyers, the in-house lawyers, et cetera.  I don't know.

Q.    Well, does anybody seek Dugaboy's consent before filing papers on Dugaboy's behalf?

MR. EDNEY:  Objection of the form of the question.

A.    I don't know.

Q.    You think -- do you have any reason to believe that Stinson files papers on Dugaboy's behalf without obtaining its client's consent?

MR. EDNEY:  Objection to the form of

the question.

A.    I assume everybody is operating properly and compliantly.  I don't know, and I don't want to speculate otherwise.

Q.    To the best of your knowledge, who is authorized to give instruction on Dugaboy's behalf with respect to litigation filings?

A.    I don't know.

Q.    Have you ever authorized a lawyer at any time to file papers on Dugaboy's behalf?

MR. EDNEY:  Objection to the form of the question.

A.    I don't recall.

Q.    Are you aware of Nancy ever authorizing a law firm to file papers on Dugaboy's behalf against Highland?

MR. EDNEY:  Objection to this form of the question.

A.    I don't know.

Can we take a break.

Q.    No.

Can we just -- I want to finish this line of questioning.

A.    Finish it.

Q.    I will do the best that I can.

Are you authorized to act on Dugaboy's behalf with respect to this litigation?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.

Q.    Did Nancy designate you to act on Dugaboy's behalf with respect to any aspect concerning the settlement between the HMIT entities and the Highland entities?

MR. EDNEY:  Objection to form.

A.    I don't know.  Not that I'm aware of.

Q.    Did you ever discuss -- withdrawn.

Are you aware that Dugaboy made a motion to vacate the order that was entered last June by the bankruptcy court approving the settlement between the HMIT entities and the Highland entities?

A.    Generally.  I don't know if that's what it's called.  But generally, yes.

Q.    What's your understanding of the nature of the motion that Dugaboy filed?

A.    It was to unwind the 9019 settlement.

Q.    And do you know who authorized the filing of the motion to undo the 9019 settlement on Dugaboy's behalf?

MR. EDNEY:  Objection to the form of the question.

A.    I do not.

Q.    Did you authorize any lawyer to file the motion to undo the 9019 order on Dugaboy's behalf?

A.    I don't know.  I'm willing to be educated.  But I don't know.

Q.    I'm -- I can't educate you.  These are facts in your head.

MR. MORRIS:  Why don't we take that break now, sir.  It's 9:03, or I guess 11:03 where you are.  Let's come back by 9:15 or 11:15.

And, please, consistent with rules, no discussions with counsel about the substance of the deposition.

(Recess is taken.)

BY MR. MORRIS:

Q.    I apologize.  Just a couple more questions on that topic, Mr. Dondero.

Do you know if Nancy designated you

to testify today as Dugaboy's agent?

A.    The whole process is and proper procedures to have me be agent on this litigation have been done properly based on everybody's role in the Dugaboy trust.

Q.    Okay.

I had asked you earlier if you had ever been designated as Dugaboy's agent for any purpose and you said you weren't aware of that.

Are you changing your testimony now after the break?

A.    Yes.

Q.    And did you speak with your lawyer on this topic during the break?

A.    Yes.

Q.    And after speaking with your lawyer, you're changing your testimony?

Do I have that right?

A.    I -- correct.

Q.    Why don't you tell me what the correct testimony is now that you've spoken with your lawyer.

A.    That is the correct testimony.  I wasn't -- we have many, many different entities, many, many different trustees, many,

many different roles of independents and agents.  And I'm well aware of the Dugaboy litigation.

But I wasn't aware particularly what process or protocol had been done behind the scenes to be -- for me to be the agent or representative of Dugaboy in this litigation.

But I was assured that everything that needed to be properly done was done.

Q.    So you just learned that during the break?

Do I have that right?

A.    Yes.

Q.    Okay.

And before the break, you were unaware that you had been designated as the agent by Dugaboy for today's deposition?

Do I have that right?

A.    I -- the questions you're asking me were regarding process and who approved and who whatever.  I wasn't aware of the process and that between internal counsel, external counsel, trustee role, Dugaboy documents, that I was properly made the agent.

And it all has been done.  I was

assured it's all been done properly, and I am the agent.

Q.   And who gave you the assurance that it was done properly?

A.   Counsel.

Q.   Is that Mr. Edney?

A.   Yes.

Q.   Did he describe for you what the process was?

A.   No.

Q.   Did you ask him what's the process?

A.   No.

Q.   Did you -- did you ask -- you don't care?  Is that fair?

You don't care what the process was.

Your lawyer told you on the break that you were the agent and the process was fine and you're good with that.

Is that fair?

A.   Yeah, the process is different. It's largely administrative each time.  It's different on every structure.

Q.   Do you know if there's any written document that reflects the designation of you as Dugaboy for this purpose?

A.    I do not.

Q.    Do you know if you've been designated by Dugaboy as Dugaboy's agent for any other litigation that concerns Highland?

A.    I don't know.

Q.    Should we take another break so you can ask Mr. Edney?

A.    If it's relevant, sure.

Q.    I'm just asking you the question.

So you have no knowledge, as you sit here right now, of ever having been designated as Dugaboy's agent for any litigation purpose relating to Highland?

Is that fair?

A.    I'm saying we do things properly and compliantly.  But it's subject to numerous documentations and hurdles.  And it's -- I imagine it's different in every case.

Q.    I appreciate that it may be different in every case.

And I'm not asking about process here.

I'm just asking if you know whether you've ever been designated by Dugaboy to act as its agent in connection with any litigation

pertaining to Highland other than this deposition?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.  I don't know, as I sit here.

Q.    One moment.

Did -- withdrawn.

I think you said earlier that you're aware that Dugaboy has made a motion to set aside the 9019 settlement; is that right?

A.    Yes.

Q.    Did you ever read Dugaboy's motion?

A.    I don't -- yes, yes.  But I haven't reread it recently.

Q.    Did you review the motion before it was filed?

A.    Yes.

Q.    Did you approve the motion before it was filed?

A.    Yes.

Q.    And did you offer comments to the motion before it was filed?

A.    I don't remember, specifically.

Q.    Did Isaac Leventon play in role in

preparing the motion?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.

Q.    Did anybody from Skyview play any role in connection with preparation of the motion?

A.    I don't know.

Q.    Did you ever discuss the motion with Nancy?

A.    Not specifically.

Q.    Did you discuss the motion with Nancy, generally?

A.    Yeah, I believe I did, generally. Yes.

Q.    What did you discuss with her?

A.    Just that Mark Patrick was continuing to be a person off the reservation.

Q.    Anything else?

A.    That's all I remember.

Q.    What did she say, if anything?

A.    She had known Mark for a long time. She was disappointed.  Disappointed that he was continuing to behave as he was.

Q.    Anything else?

A.     That's it.

Q.     Did you share any documents with Nancy concerning Dugaboy's motion?

A.     I did not.

Q.     Let's go back to the 9019 motion from last June.

Do you remember that Highland filed a motion for Court approval of the proposed settlement agreement between the HMIT entities and the Highland entities?

A.     Yes.

Q.     And do you recall that Dugaboy filed an objection to that motion?

A.     Yes.

Q.     Did you ever discuss that objection with Nancy?

A.     Not specifically.

Q.     Do you recall any conversation that you ever had with Nancy concerning Dugaboy's objection to Highland's 9019 motion?

MR. EDNEY:   Objection to the form of the question.

A.     I'll just repeat my general comments.

Q.     There's been a big proceeding --

withdrawn.

There's been a proceeding in the Cayman Islands involving the supporting organization.

You're aware of that, right?

A.    Yes.

Q.    And you submitted a declaration in connection with that proceeding, correct?

A.    Yes.

Q.    Did you ever discuss the Cayman proceedings with Nancy?

MR. EDNEY:  Objection to the form of the question.

A.    I mean, just generally.  When the Caymans put their piece together, I said it was damming and reflected premeditation on Mark's part.

Q.    Anything else?

A.    I don't believe anything more specific than that.

Q.    Did you give her -- did you ever e-mail or send to her any documents that were filed in the Cayman Island relating to the matters that the supporting organizations were prosecuting?

MR. EDNEY:  Objection to the form of the question.

A.    I don't believe so.

Q.    Do you know if anybody ever provided Nancy any documents that were filed in the Cayman Islands?

MR. EDNEY:  Objection to the form of the question.

And I'm going to instruct my client not to answer to the extent any information he has is from communications with counsel.

You can go ahead and answer the question, if you know otherwise.

A.    I'm not aware of her being in the workflow or the document flow at all.

Q.    And let's go back to the 9019.

Are you aware of her being in the workflow or document flow in connection with that matter?

MR. EDNEY:  I'm going to object to the form of the question and issue the same instruction.

And you can go ahead and answer, if you have knowledge outside of communication with counsel.

Deposition of James Dondero                                                In re Highland Capital Management, L.P.

A.      I am not aware.

Q.      Are you aware that the supporting organizations filed an action in Texas in July -- on July 1, 2025, against Mark Patrick and others?

A.      Yes.

Q.      And you submitted a declaration in connection with that, right?

A.      Yes.

Q.      Did you ever discuss -- can I refer to that proceeding as the Texas -- the Texas proceeding?

A.      Yes.

Q.      Did you ever have any discussion with Nancy at any time about the Texas proceeding?

A.      No, not that I remember at all.

Q.      So then is it fair to say, to the best of your recollection, you never provided Nancy with any information concerning the Texas proceeding?

MR. EDNEY:  Object to the form of the question and issue the same instruction.

You can answer to the extent it

doesn't involve communications with counsel.

A.    Yeah, I did not.

Q.    Are you aware that Dugaboy contends that the 9019 motion should be set aside based on newly discovered evidence?

A.    Yes.

Q.    Can you identify the newly discovered evidence for me.

MR. EDNEY:  Object to the form of the question.

BY MR. MORRIS:

Q.    All right.

Let me ask a new question.

Mr. Dondero, are you aware of any evidence that you learned after July 28, 2025, that pertains to Mark Patrick and allegations of wrongdoing?

MR. EDNEY:  I'll object to the form of question.

A.    Yes, I believe there were numerous things laid out in the Cayman litigation that we were unaware of.

Q.    Okay.

Can you identify any fact that you

were unaware of that was laid out in the Cayman litigation.

A.    Sure.  The value scope appraisal of the assets, the mechanisms by which Mark Patrick defrauded all the charities and moved things around and issued more shares to himself.

And also there was reference to him rushing the process and keeping it secret from the charities, based on a confidential informant.

Q.    Anything else?

MR. EDNEY:  Object to the form of the question.

A.    No.  Those are the things off the top of my head at the moment.

Q.    Okay.

Did you share any of those things at any time with Nancy?

MR. EDNEY:  I'm going to object to the form of the question and issue the same instruction about not providing information when counsel was present.

But if you have any other information, please go ahead and answer the

question.

MR. MORRIS:  Withdrawn.

BY MR. MORRIS:

Q.    Let me ask this question.

Were you ever party to a conversation with Nancy where a lawyer was present concerning Dugaboy's motion to vacate the 9019 proceeding?

A.    No.

Q.    Okay.

So now, let's go back to the question.

Did you ever discuss with Nancy any of the new information that you just identified?

A.    No.

Q.    So to the best of your knowledge, as you sit here today, Dugaboy is unaware of any of the newly discovered evidence that you just described, fair?

MR. EDNEY:  Objection to the form of the question.  Misstates testimony.

BY MR. MORRIS:

Q.    You can answer.

A.    I think all I'm saying is Nancy is

not aware of the details.

Q.    Okay.

In fact, she's not aware of any of the newly discovered evidence that you just described for me, to the best of your knowledge, correct?

MR. EDNEY:  Objection to the form of the question.

A.    To the best of my knowledge.

Q.    Thank you very much.

A.    There was one more thing from the Caymans that was highlighted and egregious.  It was regarding the expense earned.  The -- I believe it was 28 or 29 lawyers at law firms that had become 30 law firms, and then the tens of millions of compensation to Mark Patrick.

Q.    Okay.

So you -- you're telling me that you learned after July 28th about compensation issues?

A.    Yes, yes.  Sort of in that -- yes. In that period after mid July, whenever the Cayman complaint was made public.

Q.    Okay.

Mr. Dondero, the Cayman complaint

you're referring to, is that the writ and summons that the joint official liquidators filed in the Cayman Islands on or about July 15, 2025?

A.   Yes.

Q.   And it's that document that you're saying contains the information that you learned about Mark Patrick's compensation?

Do I have that right?

MR. EDNEY:  Objection to the form of the question.

A.   Yeah, I believe that's the extent, or I believe that's when we learned most of it. I think we learned more recently.  But that was the -- that was the first knowledge of the excessiveness.

Q.   What was the July 15th joint official liquidator writ; is that right?

A.   Yes, that's the document we're talking about.

Q.   Okay.

And how about the hiring of the law firms?

I think you said there were 28 or 30 law firms.

Did I hear that correctly?

A.     Yes.

Q.     When did you first learn that he had hired 28 or 30 law firms?

MR. EDNEY:  Objection to the form of the question.

A.     In that Cayman writ was when we found out about 28.  I think he added two or three more since then.  Maybe a couple more criminal attorneys.

Q.     So the compensation information and the law firms came from the writ.

Do I have that right?

MR. EDNEY:  Objection to the form of the question.

A.     Yes.

Q.     You mentioned value scope.

Did I hear that correctly?

A.     Yes.

Q.     You were aware before there was a Highland 9019 motion that Mark Patrick had sold Hunter Mountain for about a million dollars; isn't that right?

MR. EDNEY:  Objection to the form of the question.

A.     Yes, I believe so.

Q.     Okay.

So does the value scope appraisal relate to that sale, to the sale of Hunter Mountain?

MR. EDNEY:  Objection to the form of the question.

A.     The value scope appraisal, I believe, pertained to the 135 million in cash and 135 million of other assets that were on the balance sheets of the charities.

Q.     And do you know when that appraisal was issued?

A.     I -- again, we found out about it, that that was the justification for his testimony of the charities have nothing. They'll get nothing.

And his basis for removing all of their assets was that value scope appraisal or contrivance.  Whatever you want to call it.

Q.     Was the value scope appraisal an appraisal of Hunter Mountain?

A.     I don't believe so.

Q.     Do you know what the value scope appraised?

A.    I don't know when their appraisal was done, if it would have included Hunter Mountain on the balance sheet at the time.

I don't know when the value scope appraisal was done, if it was done before or after the transfer.  I don't know if it included it or not.

Q.    Do you recall when you first learned about the value scope appraisal?

A.    The value scope appraisal was something we found out about in the Cayman writ.

Q.    Okay.

So -- so to the best of your knowledge, the value scope appraisal is addressed within the July 15, 2025, writ that the JOLs filed in the Cayman Islands; is that right?

MR. EDNEY:  Objection to the form of the question.

A.    I'm sorry.  Can you repeat the question, just to...

Q.    Sure.

The value -- to the best of your memory, the value scope -- withdrawn.

To the best of your recollection, you learned about the value scope appraisal because it was discussed in the July 15, 2025, writ that the JOLs filed in the Cayman Islands; is that correct?

MR. EDNEY:  Objection to the form of the question.

A.    My recollection is we knew he had contrived the million and a half as the kiss-off money for the charity, so to speak. But we didn't know the basis for it.

And I think that basis for it being a value scope appraisal or a contrivance or whatever was made known to us in the writ.

Q.    Okay.

How did you learn of the writ?

A.    We learned of it right around when it was filed.  I'm not sure we even got a copy of it until a few days afterwards.

Q.    Would it refresh your recollection to -- to tell you that the writ was filed in the Cayman Islands on July 15th, and Dugaboy attached it to its motion for a stay of the 9019 order two days later on July 17th?

A.    Okay.

Q. So I'm asking you if you recall how you first -- withdrawn.

Did you ever see a copy of the writ?

A. Yes.

Q. Did you see a copy of the writ before Dugaboy filed its motion for a stay on July 17th?

MR. EDNEY: Objection to the form of the question.

A. Yes.

Q. How did you obtain a copy of the writ?

A. As soon as we got it and as soon as someone read it, it was -- you know, it was -- it was immediately -- it was considered unbelievable and sensational. And it was immediately brought to me.

Q. Okay.

You're aware that the supporting organizations sit on the liquidation committee of the DAF HoldCo entity in the Cayman Islands, right?

A. Yes.

Q. And you are a principal officer of the Highland Dallas Foundation, the Highland

Kansas City Foundation, and the Highland Santa Barbara Foundation, correct?

MR. EDNEY:  Objection to the form of the question.

A.    I'm one of the board members of those entities, yes.

Q.    And you're also designated as the principal officer, correct?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know that.

Q.    Okay.

MR. MORRIS:  Can I please ask that the court reporter put up Tab 2.  Which we'll mark as Exhibit 1.

(Dondero Exhibit 1, Form 990, marked for identification.)

MR. MORRIS:  And if we could scroll down just a little bit.

BY MR. MORRIS:

Q.    So this is Exhibit 1, Mr. Dondero.

MR. MORRIS:  And if you could stop right there.

BY MR. MORRIS:

Q.    Do you know what a Form 990 is?

Deposition of James Dondero                                                In re Highland Capital Management, L.P.

A.    No.

Q.    Do you see this document that is called a return of organization exempt from income tax?

A.    Yes.

Q.    Have you ever signed such a form?

A.    I don't know.

Q.    If I told you that we obtained this document from the IR -- from publicly available information, would that surprise you?

A.    No.

Q.    Do you see that this Form 990 was filed by the Highland Dallas Foundation Inc.?

A.    Does it matter that I can't see it or...

MR. EDNEY:  No, no, if you need to...

BY MR. MORRIS:

Q.    In box C.

A.    Okay.

MR. EDNEY:  Can you see it from there or do you need to get up?

THE WITNESS:  I'm going to get closer to the screen.

(Document review.)

A.    Highland Dallas Foundation Inc.

Q.    That's an entity that you formed, correct?

A.    That was an entity that was formed as part of the DAF structure.

MR. EDNEY:  Jim, why don't you come back to your seat.

MR. MORRIS:  Mike, can we get a laptop in front of him.

MR. EDNEY:  Yeah.  Yes, sir.

BY MR. MORRIS:

Q.    Mr. Dondero, can you see in box F that you are named as the principal officer of the Highland Dallas Foundation?

A.    Yes, I saw that when I was up there.

Q.    Okay.

And your address and the Highland Dallas Foundation address is the same, correct?

MR. EDNEY:  Jim, I can read it.

It says 2101 Cedar Springs, Suite 1200, Dallas, Texas 75201.

A.    That's not our address here, though, right.

That's at the Dallas foundation, I assume?

Q.    Mr. Dondero, can you put yourself in a position where you can be seen on the screen and see the exhibits as we're putting them up.

A.    They're getting a laptop as we speak.

Q.    Are you aware that you are the -- you were designated on Form 990 as the principal officer of the Highland Dallas Foundation?

A.    I -- I was not.

Q.    So as you sit here right now, you're learning for the first time that you've been designated by the Highland Dallas Foundation as its principal officer?

A.    I knew I was on the board.  I did not know I was a principal officer.

Q.    Did you know you signed tax returns on that entity's behalf?

A.    I did not, specifically.  I signed -- I signed a couple thousand tax returns every year.

MR. MORRIS:  Can we scroll down to the next Form 990.

Keep going.  Keep going.

Stop right there.

BY MR. MORRIS:

Q.   You're also the president; is that right.

Do you see that, sir?

A.   Yes, I see that.

Q.   Were you aware until this moment that you're the president of the Highland Dallas Foundation?

A.   I was not.

Q.   You're not aware of that?

A.   I was not.

Q.   Okay.

(Document review.)

MR. MORRIS:  Let's keep scrolling.

Keep going.

Okay.  Stop right there.

BY MR. MORRIS:

Q.   Do you see the page we're on now is the first page of the 2004 Form 990 for the Highland Kansas City Foundation?

THE WITNESS:  Thank you, sir.  I've got a laptop now.

MR. MORRIS:  Excellent.

MR. EDNEY:  You can't manipulate it. They have to move it.

THE WITNESS:  Oh, okay.

MR. EDNEY:  So just read what they show you.

BY MR. MORRIS:

Q.  Do you have the first page of the 2024 Form 990 in front of you?

A.  I do.  It looks similar to the other one.

Q.  Okay.

And do you understand today that you were designated as the principal officer of the Highland Kansas City Foundation?

A.  Yes.

Q.  Did you know that before today?

A.  I did not.

MR. MORRIS:  Can we scroll down, please.

BY MR. MORRIS:

Q.  Do you have any reason to believe that you're not the principal officer of both the Highland Dallas Foundation and the Highland Kansas City Foundation?

MR. EDNEY:  Objection to the form of the question.

A.  I do not, no.

MR. MORRIS:  Stop right there, please.

BY MR. MORRIS:

Q.    Do you see that you are designated as both the president and the director of the Highland Kansas City Foundation?

A.    Yes.

Q.    Are you learning that for the first time today?

A.    Yes.

Q.    Okay.

MR. MORRIS:  Let's keep scrolling down until we get to the last of the 990s.

(Document review.)

BY MR. MORRIS:

Q.    Great.

Do you see this is the Form 2024 Form 990 for the Highland Santa Barbara Foundation?

A.    Yes.

Q.    And do you see that you're designated as the principal officer for that entity?

A.    Yes.

Q.    Are you learning that for the first

time today?

A.    Yes.

Q.    Okay.

And let's go down and just confirm that he's also the president of this entity.

Right there.

Do you see you've been designated as both the director and the president of the Highland Santa Barbara Foundation?

A.    Yes.

Q.    Are you learning that for the first time today?

A.    Yes.

MR. MORRIS:  You can take that down.

BY MR. MORRIS:

Q.    So -- so these three entities, the Highland Dallas Foundation, the Highland Santa Barbara Foundation, and the Highland Kansas City Foundation, I'm going to refer to those collectively as the supporting organizations.

Is that is that okay?

A.    Yes.

Q.    You're aware that the supporting organizations were members of the liquidation committee of the entity that's in liquidation

in the Cayman Islands, correct?

A.    Yes.

Q.    Do you know when they were appointed?

A.    By the Court or...

Q.    When they were appointed to the liquidation committee?

A.    I think by the Court sometime in April or May.

Q.    Okay.

So members of the supporting organization -- who from the supporting organization represented those entities on the liquidation committee, if you know?

A.    I believe they are represented by Maples.

Q.    Okay.

So Maples is the law firm.

And who -- who from each of the Highland Dallas, Kansas City, and Santa Barbara, like what are the people that sat on the committee to represent those supporting organizations?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know if the president of each organization or their CFO was sitting on it.

They were represented by counsel at Holland & Knight that did most of the interaction with the Maples law firm and the advisory firm.

Q.    And in your capacity as the principal officer, director, and president of each of the supporting organizations, did you receive reports from time to time as to the liquidation's doings?

MR. EDNEY:  Objection to the form.

A.    No, zero, for a few reasons.

Q.    Do you know if the liquidation committee had an opportunity to review the writ before it was filed?

MR. EDNEY:  Objection to form.

A.    I do not know.

Q.    Do you know if the liquidation committee authorized the joint official liquidators to file the writ?

MR. EDNEY:  Objection to form.

A.    I know they authorized them to put the entity in liquidation and move as quickly

as possible.  I don't know what specific authority they gave.

Q.   Were you informed prior to July 15th that the JOLs were preparing a writ?

A.   No, it was a surprised -- surprise to all of us.

Q.   Okay.

So you learned that it's filed on the 15th and your testimony is that within 48 hours, Dugaboy prepared and filed a motion to stay the implementation of the 9019 order, correct?

MR. EDNEY:  Objection to form.

A.   There was urgency around the criminal activity, correct.  Yes.

Q.   Okay.

MR. MORRIS:  I move to strike the reference to criminal activity.  I didn't ask about that.

BY MR. MORRIS:

Q.   I'm just asking about your knowledge, sir.

To the best of your knowledge, Dugaboy obtained a copy of the order that was -- withdrawn.

To the best of your knowledge, Dugaboy obtained a copy of the JOLs' writ that was filed in the Cayman Islands on July 15th and attached it to its motion for stay of the 9019 order two days later; is that right?

MR. EDNEY:  Objection to form.

A.    We handled it with proper urgency. If those are the exact dates, I'm not disagreeing.

Q.    Did you have any discussion with Nancy about whether to file a motion for a stay?

A.    No.

Q.    Do you know who authorized the filing of the motion for a stay on Dugaboy's behalf?

A.    You mean, which law firm or which...

Q.    No.

Who -- who gave instructions on Dugaboy's behalf to file the motion for a stay?

A.    If I was -- it's probably my signature, if I was operating as an agent on it from the beginning, I guess.

Q.    And that's just a guess; isn't that right?

A.    No, that's probably correct.

Q.    So you were acting as -- I'm going to ask you again.  This is about the fourth time I'm asking you the question.

Tell me every single time you know of that you were designated as Dugaboy's agent to prosecute litigation with respect to Highland.

MR. EDNEY:  Objection to the form of the question.

A.    I believe that's largely been my role.  And it was handled properly, process-wise, between internal counsel, external counsel, Nancy in her role as trustee, and mine as beneficiary until my death of the trust.

Q.    Who told you you were Dugaboy's agent for purposes of filing the motion for a stay?

MR. EDNEY:  Objection to the form of the question.

A.    Who told me?  It seems like I've been in that role for quite a while.

Q.    Who put you in that role?

A.    The proper process between Nancy, as

an uninvolved trustee, and me, as the benefactor and grantor and beneficiary of the trust, and whatever other process or protocols needed to be followed.

Q.   Can you describe for me the process or protocols that were followed.

A.   No.  It would've all been proper legal work.

Q.   Can you describe for me the proper legal work.

A.   No.

Q.   Can you tell me when you were appointed Dugaboy's agent for these purposes.

A.   It appears that I have been that for quite some time.

Q.   What makes you think -- what makes that apparent?

MR. EDNEY:  Objection to the form of the question.

A.   It's not apparent.  My sister is not involved in the details.  There's various internal and external counsel involved.

But it sounds like, to the extent that anybody speaks for the trusts, it's me, as agent.

Q.    When you say she's not involved in the details, did she have any involvement whatsoever, to the best of your knowledge, with respect to the preparation and filing of the motion to vacate the 9019 order?

MR. EDNEY:  Objection to the form of the question.

A.    She had no involvement or awareness that I'm aware of.

Q.    Okay.

So you acted on Dugaboy's behalf.

Do I have that right?

A.    Yes.

Q.    And you didn't seek her consent, correct?

MR. EDNEY:  Objection to the form of the question.

A.    If it was necessary, I'm sure it was properly done by our extensive legal and compliance team.

Q.    Okay.  I move to strike.

I'm asking you for your memory, sir.

MR. EDNEY:  I object to the motion to strike.

A.    That is my -- that is my memory.

Q.    Do you have a specific recollection --

A.    No.

(Multiple speakers.)

Q.    -- again -- let me finish the question.  I appreciate that.

Do you have a specific recollection of your seeking Nancy's consent before authorizing the filing of the motion to vacate?

MR. EDNEY:  Objection to the form of the question.  Asked and answered.

A.    No.

Q.    Do you have any recollection of seeking or obtaining Nancy's consent before filing the objection to the 9019 motion last June?

MR. EDNEY:  Objection to the form of the question.

A.    My recollection -- my understanding is the agency, so to speak, or my agency was in place properly, as administered by the law firms and compliance.

Q.    What law firms administered the agency agreement that you're referring to?

MR. EDNEY:  Objection to the form of

the question.

A.    I don't -- I don't know.  I don't know if it was a formal agreement or an internal agreement.  I don't know.

Q.    Can you describe anything about the agreement.

A.    No.

Q.    Can you describe the subject matter of the agreement.

A.    Not beyond power for legal agency.

Q.    What's the power for legal agency?

A.    Act on behalf of Dugaboy in -- properly in legal matters.

Q.    You said a couple of times that it was properly done.

What's your basis for telling me that it was properly done?

A.    We run a highly compliant organization.  We have lots of people in compliance.  We have a lots of internal lawyers and external lawyers.  They handle this stuff in due course, and they handle it well.

Q.    Can you identify the people who were involved in the process of granting you agency from Dugaboy with respect to these litigation

matters.

A.    No.

MR. MORRIS:  Can we mark as Exhibit 2, Tab 13.

(Dondero Exhibit 2, Objection to the 9019 Motion, marked for identification.)

MR. MORRIS:  And while we're putting that up, I'm going to put up now, Mr. Dondero, Dugaboy's objection to the 9019 motion.  Okay.

BY MR. MORRIS:

Q.    We can scroll through as much of this document as you want.  I'm not going to ask you any particular questions.

Let me just start with the first one, which is:  Do you recall that Dugaboy filed an objection to the 9019 motion?

A.    Yes.

Q.    Do you know who -- who authorized Hunton Andrews Kurth to file this document on Dugaboy's behalf?

A.    Probably me.

Q.    Did you review it before it was filed?

A.    Yes.

Q.    Did you discuss it with Nancy before it was filed?

A.    I do not believe so.

Q.    Did you seek Nancy's consent or approval before authorizing the filing of this document?

MR. EDNEY:  Objection to the form of the question.

A.    Not that I recall.  But I don't know in the background if it was done as part of the process.  But I don't have knowledge of that either.

Q.    Okay.

So is it fair to say that, to the best of your knowledge, Nancy's consent or approval was not sought or obtained before this document was filed?

MR. EDNEY:  Objection to the form of the question.

A.    I'm saying I don't know.

Q.    Yeah, that's all.

So you lack knowledge, correct?

A.    I lack knowledge.

I mean, we can scroll to the end. It could be signed by me.  It could be signed

by her.  I don't know.  But it'll be -- it will have been done in a compliant way.

Q.    Yeah.

It's just signed by a lawyer.

A.    Okay.

Q.    Do you see that?

A.    Yes.

Q.    Were you familiar with this objection before it was filed?

A.    Yes.

Q.    Do you understand that Dugaboy did not object to the 9019 settlement on the grounds that Mark Patrick lacked authority to enter into the agreement on behalf of the HMIT entities?

MR. EDNEY:  Objection to the form of the question.

And I would instruct you not to answer with respect to any information you learned from counsel with respect to this particular matter.

If you have other knowledge, you can go ahead and answer the question.

A.    Yeah, I don't know.

Q.    You don't recall that Dugaboy did

not object to the 9019 settlement on the grounds that Mark Patrick lacked authority to enter into the agreement on behalf of the HMIT entities?

MR. EDNEY:  Objection.  Asked and answered.

A.    I don't know.

Q.    Well, as the person who was acting as the agent for Dugaboy, did you give any instruction as to -- as to whether or not Mark Patrick's authority should be addressed in the objection?

MR. EDNEY:  I'm going to object to that question and instruct him not to answer, as it calls for attorney-client privileged communication.

MR. MORRIS:  Fine.

BY MR. MORRIS:

Q.    Mr. Dondero, you said you reviewed this document before you authorized it to be filed, correct?

A.    Yes.

Q.    And before authorizing to be filed, did you believe that it stated all of the bases for objecting to the 9019 motion that Dugaboy

wanted to assert?

MR. EDNEY:  Objection to the form of the question.

A.    Yeah, I don't know.

Q.    You wouldn't have authorized this to be filed if you thought it was missing important objections, would you?

MR. EDNEY:  Objection to the form of the question.

BY MR. MORRIS:

Q.    You can answer.

A.    I rely on counsel regarding tactics and items that highlight and items they wait to highlight.

Q.    Great.

So in reliance on counsel, and based on your knowledge and experience, you believed at the time you authorized this to be filed, that it contained all of the objections that Dugaboy wanted to assert, correct?

MR. EDNEY:  I'm going to object that question and instruct my client not to answer because it calls for attorney-client privileged communication.

MR. MORRIS:  It doesn't.

I'm asking him for his --

(Multiple speakers.)

MR. EDNEY:  I'm sorry you feel that way.

My instruction not to answer stands.

MR. MORRIS:  All right.  I'm going to try again.

BY MR. MORRIS:

Q.    Mr. Dondero, when this was filed, you believe that it included all of the objections that Dugaboy should be asserting to the 9019 motion, correct?

MR. EDNEY:  I'm going to object to the form of the question.

MR. MORRIS:  You can answer that one.

A.    I don't know.  And I don't want to make a legal conclusion.

Q.    So as the agent for Dugaboy, is it possible that you authorized the filing of an objection that didn't include material objections that you now believe should have been asserted?

MR. EDNEY:  I'm objecting to the form of that question.

A.   Sure.

Q.   Yes?  The answer to that is yes?

A.   It's possible.

Q.   All right.

You're aware that the Dallas Foundation and an entity called Crown Global Life Insurance Company jointly filed an objection to the proposed settlement between the Highland and the HMIT entities, correct?

A.   Yes.

Q.   And we're going to refer to Crown Global Life Insurance Limited as Crown Global, okay?

A.   Yes.

Q.   And we'll refer to the joint objection that was filed by the Dallas Foundation and Crown Global as the Dallas Foundation objection, okay?

A.   Yes.

Q.   What is the Dallas Foundation, if you know?

A.   That's the primary charity, the umbrella charity above Highland Dallas.

Q.   Do you play any role with respect to the Dallas Foundation?

A.    Not that I'm aware of.

Q.    Are you aware that the Dallas Foundation objection was filed on behalf of entities called Empower Dallas Foundation and the Okada Family Foundation?

A.    Yes.

Q.    Do you know what Empower Dallas Foundation is?

A.    I believe it's a subsidiary charity of which I was the donor.

And the other one that you mentioned, Mark Okada's, was a subsidiary charity for assets he was -- charitable assets he was the donor of.

Q.    Okay.

Do you know when they were formed?

A.    I do not.

MR. MORRIS:  Let's put up Tab 1. We'll call it Exhibit 3.

(Dondero Exhibit 3, Organizational Chart, marked for identification.)

MR. MORRIS:  Which is an organizational chart.

BY MR. MORRIS:

Q.    Can you see that, sir?

A.    Yes.

Q.    Have you seen this before?

A.    If I have, not in a long time.

Q.    Okay.

Take as much time as you want to review it.

But my first question is whether this organizational chart reflects your understanding of the organization of the entities depicted therein for the period of time August 2022 through February 12, 2025?

(Document review.)

A.    Okay.  I see it.

What's the question?

Q.    The question is whether you have any -- any knowledge that any aspect of this organizational chart is inaccurate for the period of time reflected in the upper left-hand corner?

MR. EDNEY:  Objection to the form of the question.

A.    I do not have specific knowledge either way.

Q.    On the bottom, you see Hunter Mountain Investment Trust.

Do you see that?

A.     Yes.

Q.     Okay.

I'm going to refer to that as HMIT.

Is that okay?

A.     Sure.

Q.     You're aware that on Highland's petition date in October 2019, HMIT owned 99.5 percent of the limited partnership interest in Highland Capital Management LP, right?

A.     Yes.

Q.     We'll refer to Highland Capital Management LP as Highland, okay?

A.     Yes.

Q.     And on -- on the petition date, other entities, including Dugaboy, collectively owned the other one-half of one percent of the limited partnership interest of Highland, correct?

A.     Yes.

Q.     And those entities were subordinated to HMIT under the limited partnership agreement, correct?

MR. EDNEY:  Objection to the form of

the question.

A.    What was that last -- subordinate?

Q.    Yeah.

There were different classes of partnership interests under the -- under the then-effective limited partnership agreement of Highland, right?

MR. EDNEY:  I object to the form of the question.

A.    I don't know what you're asking. I'm sorry.

Q.    Do you recall that under the limited partnership agreement, there were -- there were different classes of limited partnership interests?

A.    Different classes, meaning what? Different entities or...

Q.    Okay.

Do you remember that there was a class A, a class B, and a class C?

A.    No.

Q.    Do you remember that HMIT held the class B and class C limited partnership interest, and the other one-half of one percent held the class A limited partnership interest?

A.    Okay.  No, I don't remember that.

Q.    Okay.

But you do know that Mark Patrick was the control person of HMIT during the period of time depicted in the upper left-hand corner.

Is that fair?

MR. EDNEY:  Objection to the form of the question.

A.    I don't want to comment generally on his authority.  Because there are things that void his authority, too.

Q.    Did any of those things occur before -- well, has anybody ever voided his authority?

MR. EDNEY:  Objection to the form of the question.

A.    I think his authority automatically voids.

Q.    So is it your testimony that you do not believe Mark Patrick controls Hunter Mountain today?

A.    Correct.

Q.    When did he lose the authority to manage Hunter Mountain?

A.    I think it was automatic, when he

went from being a normal trustee type administrator for the best interest of the charities, when he shifted to self-interest and contrived transactions, embezzlement, everything else, which I think rolls all the way back to '23 or '24.

I think he automatically lost authority then.

Q.   Who acts on behalf of Hunter Mountain today, to the best of your knowledge?

MR. EDNEY:  Objection to the form of the question.

A.   It's not him.  It should be -- it should be the underlying charities.

Q.   Okay.

I'm not asking who it should be, sir.  I'm asking you a very simple question.

To the best of your knowledge, can you identify the person that acts on behalf of HMIT today?

MR. EDNEY:  Objection to the form of the question.

A.   I believe he's commandeered it, and he's inappropriately tried to commandeer it.

But I believe he was automatically

eliminated from that role.

Q.    Okay.

      Please listen carefully to my question.

      Can you identify the person who controls Hunter Mountain today.

      MR. EDNEY:  Objection to the form of the question.  Asked and answered.

A.    I have asked and answered it.

Q.    Sir, has anybody ever asked a Court to remove Mark Patrick as the control person of Hunter Mountain Investment Trust?

      MR. EDNEY:  Objection to the form of question.

A.    I understand the documentation would be automatic.  Not necessarily requiring that.

      If it needs to be ratified, I don't know what the process is for that.

Q.    Okay.

      I'm going to move to strike.

      And I'm going to ask you to listen carefully to my question.

      MR. EDNEY:  I'm going to object to your motion strike.

      MR. MORRIS:  Great.

BY MR. MORRIS:

Q.   Do you know if anybody has ever asked a Court to remove Mark Patrick as the duly authorized representative of HMIT?

MR. EDNEY:  Objection.

A.   Not as I sit here today.

Q.   Do you know why nobody has ever sought to remove Mark Patrick as the authorized representative of HMIT?

MR. EDNEY:  Objection to the form of the question.

A.   I believe legal tactics have been to have him removed overall from the entire entity.  So I don't -- I believe I'm going to rely on counsel.  But I believe the tactics were to have him out entirely, of which I don't want to be a part of that.

Q.   In what proceeding has somebody sought to have Mr. Patrick removed entirely?

A.   Cayman and Dallas business court. Various regulatory bodies.

Q.   What regulatory bodies are you referring to?

A.   Texas AG.  Missouri AG.

Q.   Anything else?

A.     No.

Can we break for lunch or...

MR. MORRIS:  Sure.

How long would you like, sir?

MR. EDNEY:  Well, what works for you?  Can we do 45 minutes?

MR. MORRIS:  I would prefer less.  I would prefer a half an hour.  We started late at your request.

(Recess is taken.)

BY MR. MORRIS:

Q.     Mr. Dondero, are you ready to proceed?

A.     Yes.

Q.     Did you have any substantive conversations with your lawyer during the break about this deposition?

A.     No.

Q.     Earlier I had asked you about evidence that you learned after the hearing on the 9019 settlement.

Do you remember that?

A.     Yes.

Q.     And you described for me information concerning compensation.

Do you remember that?

A.    Yes.

Q.    And you told me that you learned that information in the joint official liquidator's writ, correct?

A.    Yes.

Q.    And the same is true with respect to Mr. Patrick's retention of 25 to 30 law firms.

You learned that in the writ, correct?

A.    Yes.

Q.    And the same is true with respect to value scope.

You learned in the writ, correct?

A.    Yeah.  We got a taste for all of it in the writ, yes.

Q.    Okay.

I just want to cover the two other items that I think you mentioned, one of which was rushing the process, keeping it secret.

Is that an accurate statement of information that you learned after the June hearing?

A.    Yes.

Q.    And what --

(Multiple speakers.)

A.   After the July -- after the July release of the writ.

Q.   Okay.

What do you mean by rushing the process, keeping it secret?

A.   There was an e-mail between Mark and one of his attorneys talking about a mole that they had on the other side, indicating that the charities were moving towards liquidation in Cayman and he needed to move fast.

Q.   And do you know who the mole was?

A.   We have suspicions, but we're working on it.

Q.   Who is the suspicion?

MR. EDNEY:   I'm going to object to the form of the question.

A.   Yeah, I don't want to -- I don't want to accuse or defame anybody until we know for sure.

Q.   Okay.

But you learned of this e-mail with the reference to the mole and the concept of rushing the process and keeping it secret in connection with the writ?

MR. EDNEY:  Objection to the form of the question.

A.    Yes.  In general, yes.

Q.    And have you been investigating the mole since the writ was filed last July 15, 2025?

MR. EDNEY:  Objection to the form of the question.

A.    Investigating, compiling evidence in all aspects of the allegations for the last six, seven months, yes.

Q.    And then I think the other thing you mentioned was -- and these are just my notes, so I may not have gotten this accurately.

But my notes say:  Mechanism: Issued more shares to himself.

Do you know what I'm referring to there?

MR. EDNEY:  Objection to the form of the question.

I don't think it's fair to ask Mr. Dondero to interpret your notes.

MR. MORRIS:  Okay.

BY MR. MORRIS:

Q.    But you can answer, sir.

Deposition of James Dondero                                                    In re Highland Capital Management, L.P.

A.    I -- I believe we had some indications that -- that charities have been wiped out for the million six.

We didn't know where that valuation came from.  And we didn't know that, as part and parcel of fleecing them out of their assets, he also, in the entities that they had interest in, he issued and diluted their shares enormously on new shares or his own charity or DFW or himself or whatever.

But the mechanisms by which he defrauded the charities weren't known or -- weren't known and the details weren't known until the writ came out.

Q.    So that also you learned about with respect to the writ.

Is that fair?

A.    Yes.

Q.    Okay.

Is there anything that we've missed in terms of information that you learned after the hearing?

MR. EDNEY:  Objection to the form of the question.

MR. MORRIS:  You can answer.

MR. EDNEY:  And I'm going to instruct him not to answer to the extent it calls for any communications with counsel.

MR. MORRIS:  Fantastic.

BY MR. MORRIS:

Q.    Let me ask the question again, because I definitely want to respect the privilege.

Are you aware of any facts that you learned after the hearing on the 9019 motion that you haven't shared with me already?

MR. EDNEY:  Object to the form of the question.

I'm going to instruct the client not to reveal any communications with counsel in his answer.

If he has a nonprivileged source for the information, he may share it.

A.    I think how best to be responsive here.

The writ represented allegations. We ran with them as quickly as possible, I believe.  As you noted a couple of days later.

But the evidence and the support in the specific e-mails and, you know, the org

charts showing the wiping out of assets and the charities, and so that stuff didn't come in for months later. And then it -- well, it all came in through counsel.

But anyway. All right. That's all I have to say on that.

Q.   Was it all -- do you know if it was all put before the Court in the Cayman Islands?

A.   I -- it -- I think they had an extensive compilation period that -- well, you know, extended through the writ and thereafter. You know, they were aware of the hearings in Jernigan's court and they asked for more time and Jernigan denied it.

So I don't know if that accelerated their timeframe in terms of trying to get something out.

And I don't know how complete their product was and how much of it came later.

Q.   Okay.

So I want to ask very specific questions.

You mentioned org charts.

Can you identify any org charts that you obtained after the June hearing.

MR. EDNEY:  Object to the form of the question.

A.     Not -- not specifically.

Q.     Can you identify any specific evidence that you haven't described for me that -- that you learned of after the June hearing on the 9019 hearing.

MR. EDNEY:  Object to the form of the question.

A.     I mean, I run a big business.  I'm not involved in the details.  But I know lots of stuff was compiled from things that came out of the Cayman.  And not just in July and August, but even recently.

You know, so I -- but I don't have direct awareness or I don't have the flow charts that show how the assets or monies disappeared or whatever.

Q.     Let me try and ask this question.

Other than what you have identified so far, you're not able to identify any specific evidence that you learned after the hearing on the 9019 motion.

Is that fair?

MR. EDNEY:  Object to the form of

the question.

A.     Yeah, well, what I'm saying is the allegations that were in the writ were not even -- were not known -- barely suspected in the June hearing.  And then the evidence supporting the writ trickled in and came in later.

Q.     Great.

What evidence supporting the writ trickled in later?

A.     The details, the e-mails, the creating org charts from the entities.  All that stuff came in later.

Q.     What --

(Multiple speakers.)

A.     The writ was -- the writ was allegations.  And they were allegations that were suspected but unknown in June.

Q.     Okay.

But -- but what evidence supporting the writ trickled in later?

You mentioned e-mails.

Do you know what e-mails you're referring to?

I'm trying to -- I want to see the evidence.

We're here the last business day before the trial.  I want to try to understand what evidence you're referring to.

So let me ask the question again.

What e-mails supported the writ that -- can you -- withdrawn.  I'm sorry.

Can you identify any e-mails that support the writ that came in after the writ was filed.

MR. EDNEY:  Object to the speech and question.

A.   I'm going to have to defer to counsel and our pleadings.  I assume relevant evidence is presented or will be presented. But I'm -- I'm not the keeper or presenter of the evidence.

Q.   Okay.

So you can't describe the evidence.

Is that fair?

MR. EDNEY:  Object to the form of the question.

A.   I believe I've described it already.

Q.   Okay.

But you can't describe it any further than you have.

Is that fair?

A.    Correct.

Q.    Thank you.

Do you know if the evidence that trickled in after the writ was filed was presented to the Court in the Cayman Islands?

MR. EDNEY:  Object to the form of question.

A.    I don't know.

Q.    Did you take any steps to make sure that the evidence that trickled in after the writ was filed was presented to the Cayman Court?

MR. EDNEY:  Object to the form of the question.

A.    No.  That would not have been my role.  The -- the joint liquidators were representing the charities.  They had counsel. DFW had objected to my participation.

So I was recused.  So I did not oversee, you know, minutiae or evidence or even aware of it.

Q.    Do you believe Maples competently represented the joint official liquidators?

MR. EDNEY:  Object to the form of

question.

A.   As far as -- as far as I know.  I think there's been fits and starts.  But I think they're on a good path now.

Q.   Do you have any reason to believe, as you sit here today, that Maples failed to represent all the evidence that supported the writ to the Cayman Court?

MR. EDNEY:  Objection to the form of the question.

A.   Yeah, I -- I -- when I say there were fits and starts, I think there was one hearing that they lost but then got overturned. And when they lost it, they didn't believe that it was an evidentiary hearing, so they didn't provide as much evidence.  But they did on the second hearing and won.

But again, this is all -- I get all of it secondhand.  None of it concurrent or realtime.  And, you know, none of it directly.

Q.   As you sit here today, the entity that's the subject of the proceedings in the Cayman Islands is Charitable DAF HoldCo Limited, correct?

A.   I have to lean on my lawyers for

that one.

Q.    You don't know what entity is the subject of the Cayman proceedings?

A.    I believe there's a complex holding company structure and there's a half a dozen entities.  And I'm not familiar with the names of which ones are actual defendants.

Q.    The evidence that you just described as being newly discovered, is that, in your mind, also evidence of fraudulent conduct by Mr. Patrick?

A.    Yes.  And it's a continuation of a scheme, I believe, too.

Q.    Okay.

Other than the evidence that you've described for me, did you learn of any additional evidence of the -- of fraud committed by Mr. Patrick after -- withdrawn.

I'm sorry.  That was bad.

Other than the information that you've shared with me as having been newly discovered, did you learn of any new facts supporting allegations of fraud against Mr. Patrick after the June 9019 hearing?

MR. EDNEY:  I'm going to object to

the form of that question.

I'm going to instruct the witness not to answer to the extent he has knowledge drawn from communications with his counsel that is privileged.

If he has some other source of that information, he may share it with you.

Go ahead, Jim.

MR. MORRIS:  I'm really just asking for facts, Mike.  I'm not sure why the objections are necessary.  I'm asking only for facts.  I'm not asking for anything about communications.

And just because he learns a fact from somebody, it's still a fact.

MR. EDNEY:  I mean, listen --

MR. MORRIS:  I'll reserve because I don't think that's proper.  But...

MR. EDNEY:  John, I just want to put you at ease about the nature of my objection.

I mean, Dugaboy has counsel that's investigating this stuff, and, you know, they are reporting to Mr. Dondero in a privileged setting regarding that.

You know, I don't want him revealing the conversations he's had with counsel about it.  Yes, he's had access to some documents that aren't privileged.  And, you know, I think he's doing his best to recall what is coming from them.

But frankly, those documents and/or time and speak for themselves.

MR. MORRIS:  Okay.  Mike, I really do appreciate that.  And I just want to have clarity on the record, because we're going to have an evidentiary hearing on Monday.

We're going to ask the Court to consider evidence of fraud or newly discovered evidence that wasn't available at a certain point in time.

And I think you're telling me right now that there is some of that evidence but you're not going to share it with me because it's subject to the attorney-client privilege; is that right?

MR. EDNEY:  No.  I think what I'm telling you is that, you know, he is perfectly fine talking to you about his

recollection of reading public documents.

But if you want to find out what evidence that we think is newly discovered, when it came in, and obviously the evidence has a provenance to it that will be documented, you need to look at the pleadings of Dugaboy, right.

I'm not going to let you get behind the -- the work of counsel in investigating this matter.

Look, it would be a different question, sir, if -- if, you know, this was about what Mr. Dondero did, right.

But this hearing coming up is about what others did.  And to some extent, what you're getting in our pleadings and what you've got in our papers is what you're seeing in the depositions, is what counsel has done to uncover it.

So it is a tricky privilege situation.  I think he's doing the best he can.  But as a steward of the privilege, I also need to protect it.  So...

MR. MORRIS:  And that's fair.

MR. EDNEY:  I don't think we're

laying a trap for you.  I guarantee you that the -- you know, we're going to be very transparent about the evidences that has come out of the Cayman process, and, you know, when it has come out of it and what the source of it is.  You know, whether be it the McGinnis affidavits over time, or the allegations in the writ down in the Cayman Islands.

So I just want to be transparent with you about our thinking on that.

It's -- yeah, this is an odd deposition insofar as you're -- you're questioning of derivative knowledge of events that are really happening elsewhere.

MR. MORRIS:  All right.  I appreciate that, Mike.  And I'm going to tell you, I don't think you're being transparent at all.  I think you're hiding the ball.

I'm sitting here one business day before the hearing, and I do not know, as I sit here today, what newly discovered evidence you all are relying on.

MR. EDNEY:  You'll get our reply

brief in a few hours.

MR. MORRIS:  I understand.  I understand.

I want it to be really clear that you're going to wait until the day before the hearing in your reply brief to describe for the first time what the newly discovered evidence is.  And --

(Multiple speakers.)

MR. EDNEY:  I mean, I don't agree with you --

MR. MORRIS:  I'm glad that we have that on the record.  I'm glad --

MR. EDNEY:  I don't agree with you that's a standard, and I do think the schedule is a little screwed up.  And I brought that to the attention of the Court and you pounded the table and proposed my modifications to the schedule.

So we're in -- you guys want to move this on a railroad, right, you know, we have to deal with the timing performances of the debtor.

MR. MORRIS:  Enough, Mike.  Enough. Enough.  It ain't the schedule.

Let's move on.  Okay.

You take that position.

BY MR. MORRIS:

Q.    So earlier, Mr. Dondero, you referred to regulatory agencies that are looking into Mr. Patrick's conduct.

Is that fair?

A.    Yes.

Q.    And you mentioned the Missouri attorney general.

Did I hear that correctly?

A.    Yes.

Q.    How do you know that the Missouri attorney general is looking into any allegations concerning Mark Patrick?

A.    I believe through counsel.

Q.    And what did counsel tell you?

MR. EDNEY:  Objection.  I'm going to instruct my client not to answer.

BY MR. MORRIS:

Q.    What is the Missouri attorney general investigating?

A.    All the issues we've discussed.

Q.    Do you know, did somebody acting on behalf of the supporting organizations file a

complaint with the Missouri Attorney General's Office?

MR. EDNEY:  Objection.  Lack of foundation.

A.    I don't know specifics, but I believe there's been outreach.

Q.    And who made the outreach, to the best of your knowledge?

A.    I don't know, specifically.

Q.    Sir, you told me that you believe there's been outreach.

What is your basis for telling me that you believe there's been outreach?

A.    Conversations with attorneys.

Q.    Do you know who made the outreach, sir?

A.    No.

Q.    Is it your understanding that investigations by attorneys general are generally private?

MR. EDNEY:  Objection to the form of the question.

MR. MORRIS:  Withdrawn.

BY MR. MORRIS:

Q.    Did Johnny Sutton contact the

attorney's general office in Missouri?

MR. EDNEY:  Objection to the form of the question.

A.    Not that I'm aware of.

Q.    Have you ever spoken to Johnny Sutton?

A.    Yes.

Q.    Johnny Sutton, he used to -- he's in Missouri, right?

A.    No, I believe he's in Austin, Texas.

Q.    But he was in Missouri, right?

He's affiliated with Mr. Ashcroft, right?

A.    I think Johnny Sutton's name and Ashcroft's name are both on the door.  But I'm not aware of Johnny's connection to Missouri.

Q.    Can you tell me anything about the Missouri attorney general's investigation of Mark Patrick.

A.    No.  I mean, I do believe some of it is confidential.  I think they'll express to professionals whether or not they have a strong interest in their pursuing it.

But you're right, in general, it's confidential and they don't keep you apprised

of all of the sausage meat.

Q.    When did the investigation begin, to the best of your knowledge?

A.    I don't know.

Q.    Has -- have the supporting organizations provided information to the attorney general?

MR. EDNEY:  Objection to the form of question.

A.    Again, well, it's just from conversation with lawyers, but I believe they had been queried, and I think they've been responsive directly through their counsel.

Q.    Okay.

So it's your understanding that the supporting organizations, through their counsel, have provided information to the Missouri attorney general.

Do I have that right?

A.    I believe both attorney generals.

Q.    Okay.

And is the Texas attorney general, like the Missouri attorney general in that you understand that there's been some, quote, reach out?

A.    Yes.

Q.    Okay.

When did that reach out happen?

A.    I think it's been ongoing.  I think early -- early after Mark Patrick's departure.

Q.    So your understanding is that the Texas attorney general has been investigating these matters since 2023 or 2024?

A.    2025.

Q.    Early 2025, correct?

A.    Yes.  Not '23 or '24.

Q.    Okay.

You said after he left, so I was just using that date.

And who reached out to the Texas attorney general with respect to Mr. Patrick?

A.    I think it's been various counsel. Various counsel at various times.

Q.    Just name the counsel.

THE WITNESS:  Is that proper, sir?

MR. EDNEY:  Good question.

Let's see if Mr. Morris can lay a foundation that's not privileged.

MR. MORRIS:  I've already laid a foundation.  And I can't imagine that it's

privileged.

If you want to instruct him not to answer, you go ahead.  But it's a really simple question.

BY MR. MORRIS:

Q.    What law firms contacted the Texas attorney general with respect to Mark Patrick?

MR. EDNEY:  If you know whether a law firm has contacted the Texas attorney general, you should answer the question, Jim.

A.    Hance Scarborough.

Q.    What's the name?

A.    Hance Scarborough.

Q.    And who do they represent?

A.    I believe they represented either -- yeah, me, as grantor.  I think myself, as grantor, actually.

THE COURT REPORTER:  Can you repeat that firm name.

THE WITNESS:  Hance Scarborough.

BY MR. MORRIS:

Q.    And that firm represented you in your individual capacity when they contacted the Texas attorney general regarding

Mark Patrick; is that right?

A. Yes, they're one of the firms.

Q. Thank you very much, sir.

Can you name any other firms, as you sit here right now.

A. On behalf of the charity, I know Holland & Knight has been in.

Q. Okay.

So --

(Multiple speakers.)

A. Significant numerous contact with them.

Q. So Holland & Knight on behalf of the supporting organizations or the Dallas foundation or both?

A. All three.

Q. All three supporting organizations?

A. Correct.

Q. So let me ask a clean question.

You know that Holland & Knight, on behalf of the supporting organizations, has been in communication with the Texas attorney general regarding Mark Patrick; is that right?

A. Yes.

Q. And it's your understanding that

Deposition of James Dondero                                    In re Highland Capital Management, L.P.

Holland & Knight initiated those discussions, fair?

MR. EDNEY:  Objection.  Lack of foundation.

A.    I don't know.  I don't know how it started.

Q.    But you do know that the Hance Scarborough firm, acting on your behalf, initiated their discussions with the attorney general, correct?

MR. EDNEY:  Objection.  Lack of foundation.

A.    Yes.  Early on, at our behest.

Q.    And you've done that several times in the Highland bankruptcy case, right?

You have filed complaints or initiated communications with government regulatory agencies, right?

A.    Yeah, at different times, when we thought there was criminal activity.

Q.    Right.

And remember, you had Dugaboy contact the Texas Securities Exchange Commission regarding matters that were the subject of the so-called insider trading case.

Do you remember that?

MR. EDNEY:  Objection to your question.

A.    They were bona fide insider trades with train tickets and nonpublic information and things that were bona fide criminal activity.

Q.    That's what you say.

But you know that the Texas -- the Texas Securities Commission closed their investigation and took no action; isn't that right?

A.    I believe that's correct.

Q.    Okay.

So you have your view and the Texas Securities Commission has its view.

Is that fair?

A.    Okay.

Q.    Yup.

And you also initiated the contact with the Texas attorney general that -- that prompted the filing of the letter last July, correct?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know if those two are connected.  But we -- we did reach out to the Texas attorney general in early '25.

Q.    And other than filing that letter, the Texas attorney general has taken no action against Mark Patrick.

Is that fair?

MR. EDNEY:  Objection to the form of the question.

A.    Well, the investigation is private. It's ongoing, as far as we know.  But that letter asks for more time.  And I believe it was ignored by the Court.

Q.    And other than that letter, the Texas attorney general has never made an appearance in the Highland bankruptcy case, correct?

MR. EDNEY:  Objection to the form of the question.

A.    As far as I know.

Q.    Do you recall some of the attorneys that represented your interest earlier included Davor Rukavina and Douglas Draper and Amy Ruhland?

A.    Yes.

Q.     And do you recall that the three of them sent multiple letters to the U.S. Trustee's Office in Washington, D.C., concerning the Highland bankruptcy case?

A.     Yes.

Q.     And none of those letters ever caused any action to be taken against Highland; is that right?

MR. EDNEY:  Objection to the form of the question.

A.     Not yet.  Well, not that I'm aware of.  Not yet.

Q.     And they were filed years ago, right?

They were filed in 2021 and 2022, right?

MR. EDNEY:  All right, Mr. Morris.

So listen, you guys have filed all these motions to limit discovery to things that are relevant.

And we have a hearing coming up in just a few hours on --

MR. MORRIS:  Stop --

MR. EDNEY:  -- (inaudible) -- with Hunter Mountain.  So --

Deposition of James Dondero                                    In re Highland Capital Management, L.P.

(Multiple speakers.)

MR. MORRIS:  I didn't file anything.

MR. EDNEY:  I mean, I am getting towards end of my latitude about collateral matters.

MR. MORRIS:  All right.  Great.

MR. EDNEY:  If you have a question or two left, great.  But you're getting very close to me, you know, redirecting this towards something that might actually be relevant to Monday.

And if you want to take that up with the Court, I think he'll have very low patience for it.

MR. MORRIS:  Mike, stop talking.

MR. EDNEY:  So wrap it up.

MR. MORRIS:  Stop talking.  Okay.

MR. EDNEY:  No, I'm going to make a record.

MR. MORRIS:  This is improper.

MR. EDNEY:  You're going to listen to me make a record.

MR. MORRIS:  This is improper. Okay.

I didn't file any motion to limit

anything.  Okay.

BY MR. MORRIS:

Q.    Mr. Dondero, this is your MO, isn't it?

You like to file complaints with regulatory agencies and then point to them as evidence that there's investigations and wrongdoing being investigated; isn't that right?

MR. EDNEY:  Objection to the form of the question.

BY MR. MORRIS:

Q.    This is what you do all the time, isn't it?

MR. EDNEY:  Objection to the form of the question.

A.    No.

Q.    Did somebody acting at your direction contact the U.S. Trustee's Office with respect to this matter?

A.    I hope so.

Q.    I'm not asking you what you hope. I'm asking if you know.

A.    I hope so.  I don't know, specifically.

Q.    Who's Mr. Tarasov (phonetic)?

A.    He's an attorney.

Q.    Has he filed an appearance in this case?

A.    I don't know.

Q.    Does he represent Dugaboy?

A.    Not that I'm aware of.

Q.    Do you know who he represents?

A.    I do not.

Q.    Do you know why he contacted the U.S. Trustee's Office?

A.    Maybe there were six U.S. trustee letters that need to be addressed.  I don't know.

Q.    Do you know who authorized him to contact the U.S. Trustee's Office?

A.    Nope.

Q.    How about Mr. Sutton?  Do you know who he represents?

A.    Sutton, I believe, represents Dugaboy.

Q.    Really?

A.    Or if not Dugaboy, then he represents me, I guess.  But one or the other.

Q.    So you don't know who he represents;

is that right?

A.    I -- I thought it was Dugaboy.  But if it's not Dugaboy, then it's me, personally.

Q.    Is he going to be at the trial on Monday?

A.    I don't know.

Q.    All right.

MR. MORRIS:  Can we go back to Exhibit 3, please.

BY MR. MORRIS:

Q.    All right.

Mr. Patrick became the control person of HMIT in August 2022, correct?

A.    I don't know.

Q.    He replaced Mr. Honis, right?

A.    Yes, he replaced Mr. Honis.

Q.    Mr. Honis had been the control person of the HMIT entities prior to Mr. Patrick, correct?

A.    Yes.

Q.    Who is Mr. Honis?

A.    Longtime friend of mine.  Board member in our retail mutual funds.  Independent board member on our independent retail mutual funds.

Q.   Do you know the circumstances by which Mr. Honis gave control of the HMIT entities to Mr. Patrick?

A.   I don't know.  I don't know specific details.

Q.   Did Mr. Honis want to step down as the control person of the HMIT entities?

A.   Yeah, I think he was tired of being deposed by you guys, you know.

Q.   Okay.

You don't dispute that Mr. Patrick replaced Mr. Honis as HMIT's control person in August 2022, do you?

MR. EDNEY:  Objection to the form of the question.

A.   I don't know that they -- I would have to rely on counsel for the accuracy of this chart.

Q.   I can take the chart down.

Do you need to check with counsel in order to be able to tell me that you're aware that Mr. Patrick replaced Mr. Honis as the control person of the HMIT entities?

A.   No, I know he replaced him.  I would have to check with counsel if you want me to

verify August 22, five years ago.

Q.    Okay.

I didn't mean to do that.  So let me ask it again.

Are you aware -- you don't dispute that Mr. Patrick replaced Mr. Honis as the control person of the HMIT entities, correct?

A.    Correct.

Q.    And Mr. Patrick has served as the control person of the HMIT entities on a continuous basis since replacing Mr. Honis.

Is that fair?

A.    That's not consistent with my testimony earlier.

Q.    Oh, that's because you think what, as a matter of -- withdrawn.

Can you tell me when Mr. -- withdrawn.

Is it your position that Mr. Patrick is not the control person of the HMIT entities today?

A.    Correct.

Q.    Do you know when he ceased to be the control person of the HMIT entities?

A.    When he failed to act properly and

for the benefit of -- in a normal trustee role, as soon as he -- the litany of things we've alleged in terms of embezzlement, self-dealing, and whatever, a lot of that stuff started in '23 and '24.  And I think as soon as the bad acts began he, was automatically removed.

Q.    And who removed him?

A.    I didn't take a person.  It was just automatic.

Q.    Pursuant to what?

A.    The document.

Q.    And did anybody ever replace him?

A.    He wouldn't really step aside, provide books and records, or...

Q.    I asked a simple question.

Did anybody replace him?

A.    I think, again, because it's automatic, I think it would be once he was automatically out, whoever else was in the chain of ownership.  Whether it was Crown or Dallas Foundation or whatever.  So I think at that point in time, it automatically moved to somebody else.

Q.    So going back to June 2025, you authorized the filing of an objection to the

9019 motion on behalf of Dugaboy, correct?

A.    Yes.

Q.    And none of what you just testified to is in Dugaboy's objection; is that right?

MR. EDNEY:  Objection to the form of the question.

A.    I'm not aware of when we were aware. I'm not aware that it's -- the automatic is affected by that or not.  I don't want to make legal conclusions or comments.

Q.    Well, you just said that he automatically lost his position as the control person in 2023 or 2024, when he stopped acting in the interest of the charities.

Do I have that right?

A.    That's how I read the paragraph.

Q.    Okay.

So why didn't you, on behalf of Dugaboy, put that in Dugaboy's objection to the 9019 settlement?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.

Q.    The Dallas Foundation objected to the settlement on the grounds that Mr. Patrick

wasn't authorized to act on behalf of the HMIT entities because of his conduct.

Are you aware of that?

A.   Yes.

Q.   One moment.

And after -- withdrawn.

After the Dallas Foundation filed its objection to the 9019 settlement on the grounds that Mark Patrick engaged in wrongful conduct, they took discovery.

Do you recall that?

A.   Not specifically, but yes.

Q.   And Dugaboy took discovery as well, right?

A.   Yes.

Q.   And you were the one who was acting on Dugaboy's behalf, right?

A.   Yes.

Q.   And you're familiar with the discovery process, aren't you?

A.   Yes.

Q.   And you understand that the Dallas Foundation and Dugaboy had the right to seek documents from Highland and from the HMIT entities, correct?

A.    I believe many requests were made and none were provided.

Q.    Are you aware that Dugaboy served document requests on Highland?

A.    I'm aware that the charities made numerous, numerous requests for books and records from Mark Patrick.  Never received them.

And Mark was, in his deposition, evasive and non-- nonresponsive for most of it.

Q.    Okay.

I want to distinguish any request that was made for information outside of the 9019 contested matter from information that was sought and received in the context and within the 9019 contested matter process.

Do you understand that?

A.    Yes.

Q.    Okay.

And do you understand that Dugaboy served document requests on Highland in the 9019 process?

A.    I assume so.

Q.    And are you aware that Highland produced over 4,000 pages of documents in

response to Dugaboy's request?

A.    I'm not aware of specifics, but...

Q.    As you sit here today, can you identify -- withdrawn.

As you sit here today, can you identify anything that Dugaboy requested that Highland failed to produce.

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.

Q.    Okay.

You cannot identify anything, as you sit here today, that Highland failed to produce in response to Dugaboy's discovery request.

Is that fair?

MR. EDNEY:  Same objection.

A.    I don't know.  And I wouldn't be the person to answer that.

Q.    Do you have any reason to believe that Highland failed to comply with any discovery request made by the Dallas Foundation or Dugaboy?

MR. EDNEY:  Same objection.

A.    I don't know.  And I wouldn't be in a position to know.

Q.    Okay.

Do you know if Dugaboy served any discovery request on the HMIT entities?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.

Q.    So as you sit here today, you have no reason to believe that Dugaboy sought documents from the HMIT entities, right?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.

Q.    Do you have any reason to believe that the HMIT entities ever failed to provide any documents in response to any request that was made by Dugaboy in connection with the 9019 proceeding?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.  And I wouldn't be in a position to know.

Q.    Okay.

Do you know if the Dallas Foundation served document requests on the HMIT entities?

A.    I don't know.

Q.     Do you have any reason to believe that the Dallas Foundation ever contended that the HMIT entities failed to comply with any discovery requests that they made?

MR. EDNEY:  We lost you there.

Mr. Morris, you cut out in the middle of your last question.  Sorry.

MR. MORRIS:  Can you hear me now?

MR. EDNEY:  Yup, you're back.  You froze for ten seconds.

BY MR. MORRIS:

Q.     Mr. Dondero, do you have any reason to believe, as you sit here today, that the HMIT entities failed to fully respond to all discovery requests that were made by the Dallas Foundation?

MR. EDNEY:  Objection to the form of the question.

A.     I don't know.  And I wouldn't be in a position to know.

Q.     Okay.

I don't know whether you would or you wouldn't be in a position.

But you would agree that, as you sit here today, you have no reason to believe that

HMIT failed to comply with any discovery request made by either Dugaboy or the Dallas Foundation, correct?

MR. EDNEY:  Objection to the form of the question.  Asked and answered.

A.    I have no relevant awareness, knowledge, or ability to comment.

Q.    Okay.

Are you aware of any motion to compel -- withdrawn.

Do you know what a motion to compel discovery is, right?

A.    Yes.

Q.    Okay.

Do you know if Dugaboy ever filed a motion to compel discovery against Highland in connection with the 9019 proceeding?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.

Q.    Do you know if Dugaboy ever filed a motion to compel discovery against the HMIT entities in connection with the 9019 proceeding?

A.    I don't know.

Q.    Do you know if the Dallas Foundation ever filed a motion to compel discovery against Highland in connection with the 9019 proceeding?

MR. EDNEY:  Same objection.

A.    I don't know.

Q.    Do you know if the Dallas Foundation ever filed a motion to compel discovery against the HMIT entities in connection with the 9019 hearing?

A.    (Inaudible.)

THE COURT REPORTER:  Can you repeat your answer.

THE WITNESS:  I don't know.

BY MR. MORRIS:

Q.    To the best of your knowledge, neither Dugaboy nor the Dallas Foundation ever contended before the hearing on the 9019 motion that Highland had failed to comply with any discovery, correct?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.

Q.    To the best of your knowledge, neither Dugaboy nor the Dallas Foundation ever

contended before the 9019 hearing that the HMIT entities failed to comply with their discovery obligations, correct?

A.    I don't know.

MR. EDNEY:  Objection to the form of the question.

BY MR. MORRIS:

Q.    I'm sorry.  What was the answer?

A.    I don't know.

Q.    Okay.

Are you aware of any limitations that were placed on the scope of discovery that the Dallas Foundation and that Dugaboy could have sought in connection with the 9019 motion?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.

Q.    Are you aware that a half a dozen people were deposed in connection with the 9019 motion?

MR. EDNEY:  Objection to the form of the question.

A.    I was not aware.

Q.    Are you aware that the Dallas Foundation and Dugaboy deposed Mark Patrick and

Shawn Raver in connection with the 9019 hearing?

MR. EDNEY:  Objection to the form of the question.

A.    Yes.

Q.    Okay.

Do you know whether Dugaboy or the Dallas Foundation ever contended before the June 25th hearing on the 9019 motion that Mr. Patrick failed to adequately respond to questions posed to him during the deposition?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.

Q.    Do you know whether Dugaboy or the Dallas Foundation ever made a motion to compel Mr. Patrick to answer questions that were perceived to be answered evasively in the deposition?

A.    I don't know.

Q.    As you sit here today, can you identify any fact that you believe was responsive to any question posed to Mr. Patrick during his deposition that he failed to disclose?

MR. EDNEY:  I object to the form of the question.

A.    I did not prepare -- review Mark Patrick's deposition.  I do not know.  I don't have specific awareness.

Q.    As you sit here today, can you identify any answer that Mr. Patrick gave during his deposition on the 9019 motion that Dugaboy contends was inaccurate or misleading?

MR. EDNEY:  I object to the form of the question.

A.    I do not know.

Q.    To the best of your knowledge, neither Dugaboy nor the Dallas Foundation ever contended before the 9019 hearing that Shawn Raver failed to adequately respond to questions posed to him during his deposition, correct?

MR. EDNEY:  Objection to form.

A.    I don't know.

Q.    As you sit here today, can you identify any fact that you believe was responsive to a question posed to Mr. Raver, that he failed to disclose?

MR. EDNEY:  Objection to form.

A.     I don't know.

Q.     As you sit here today, can you identify any answer that Mr. Raver provided during his deposition on the 9019 hearing that Dugaboy contends today was inaccurate or misleading?

A.     I do not know.

Q.     Do you know that the Dallas Foundation and Dugaboy also deposed James Siri (phonetic) and David Claus (phonetic)?

A.     I was not aware.

Q.     Okay.

Then I'll leave that alone.

You're aware that I took the depositions of Ms. Diaz and Mr. Littleton in connection with the Dallas Foundation objections, correct?

A.     Yes.

Q.     Are you familiar with their testimony?

A.     I never saw the deposition.

Q.     Are you aware that they testified that Mr. Patrick did not need to obtain the Dallas Foundation's consent to enter into the HMIT settlement on behalf of the HMIT entities?

MR. EDNEY:  Objection to the form of the question.

A.    I'm not aware of her testimony.

Q.    Is it your position that Mr. Patrick needed the Dallas Foundation's consent before entering into the HMIT settlement?

MR. EDNEY:  Objection to the form of the question.

A.    State of disarray.  I don't believe he had any authority by the time he got to June of '25.

Q.    Okay.

But Dugaboy didn't make that objection to the Court; is that right?

MR. EDNEY:  Objection to the form of the question.

A.    Not that I'm aware of or aware that it was necessarily to do that.

Q.    Okay.

Before Mr. Patrick automatically ceased to be the control person of the HMIT entities, it your understanding that he did have the authority to enter into settlement agreements without needing to obtain anybody else's consent?

MR. EDNEY:  Objection to the form of the question.

A.     No, I'm not -- no.

Q.     Whose consent did he need?

A.     It depends on what period of time. You go back to -- you go back to early '25, when all the underlying charities have said we've lost confidence with you, we believe you've embezzled money, we believe you're not working the best interest, we want our stuff distributed in kind, you can make the argument he lost all authority at that point.

You can make the argument -- yeah. But I'm just -- I'm not going to admit that he had any legitimate authority by the time June rolled around.

Q.     Great.

So I'm trying to -- my question was intended to address that point.

You're not able to tell me with specificity the date on which Mr. Patrick lost authority to act on behalf of the HMIT entities; is that right?

MR. EDNEY:  Objection to the form of the question.

Deposition of James Dondero                                In re Highland Capital Management, L.P.

A.    I said it earlier.  And, you know, we still have to peel back the onion on when the bad acts, the self-interest, the embezzlement, embezzlement in the form of compensation, when did all that stuff begin?

When did the bad acts begin that triggered the automatic?

But it was quite while ago.

Q.    Well, the first act that's in your sworn declaration is June 2023, when he asked for $10,000 charitable contribution to be made to a charity that him and his wife and his daughter controlled.

Do you remember that?

MR. EDNEY:  Objection to the form of the question.  Lack of foundation.

A.    I barely remember the incident you're describing.  But he didn't asked.  He had just taken it.  That was --

(Multiple speakers.)

Q.    Do you remember --

A.    It was -- (inaudible.)

Q.    Do you remember any so-called bad act that happened before that?

A.    Like I said, we're still peeling

back the onion.

Q.   I appreciate that.

Given all of the peeling that you've done, are you aware of any bad act that occurred before June of 2023?

A.   I don't know.  But it's definitely began around there.  I don't know if it began earlier than that.  But it definitely around then, for sure.

Q.   Great.

So in December 2022, would Mark Patrick have had the authority to enter into the HMIT settlement with the Highland entities?

A.   I don't know.

Q.   You don't have a view one way or the other.

Is that fair?

A.   We don't have enough detail and evidence.  Eventually a receiver gets placed in, and eventually everything gets discovered.  And we'll know then.

Q.   Sir, I'll try it this way.

Would John Honis have had the authority to enter into the HMIT settlement

agreement with the Highland entities?

MR. EDNEY:  I'm objecting to the form of the question.

A.    Generally, I believe so.

Q.    Okay.

So it's your understanding that under the terms of Hunter Mountain Investment Trust agreement, that the administrator or control person has the authority to settle matters on behalf of the trust without obtaining any anybody's consent.

Is that fair?

A.    I think there's a duty of care. Fiduciary responsibility of the owners are, you know.

Q.    Who owns -- I'm sorry.  Go ahead.

A.    Within that context.

Q.    You're aware that after I took the depositions of Ms. Diaz and Mr. Littleton, the Dallas Foundation withdrew their objection to the HMIT settlement with prejudice; isn't that correct?

MR. EDNEY:  Objection to the form of the question.

A.    Are you talking about the Sunday

afternoon badgering that you noticed the day before?  Is that the depo you're talking about?

Q.    Sir, can you answer my question.

A.    I'm trying to understand which depo you're talking about.

Q.    You're aware that I took the depositions of Ms. Diaz and Mr. Littleton, correct?

A.    Which one?  Or what day was it?

Q.    I only took their deposition once, sir.

A.    What day was it?

Q.    I have no idea.

What difference does it make?

A.    Just trying to get a sense for it in my mind.

Q.    You're aware that after those depositions, the Dallas Foundation withdrew its objection to the 9019 settlement with prejudice, correct?

MR. EDNEY:  Objection to the form of the question.

A.    I wasn't aware that it was with prejudice, but yes.

Q.    As you sit here today, you do not

understand that the Dallas Foundation withdrew their foundation with prejudice?

MR. EDNEY:  Lack of foundation. Objection to the form of the question.

A.    I knew they'd withdrawn it.  I didn't know it was with prejudice.

Q.    Okay.

And the Dallas Foundation's objection was based on allegations that Mark Patrick lacked authority to enter into the HMIT settlement agreement on behalf of the HMIT entities because he engaged in wrongful conduct; isn't that right?

MR. EDNEY:  Objection to the form of the question.

A.    Can you repeat it again, please.

Q.    The basis for the Dallas Foundation's objection to the 9019 settlement was that Mark Patrick had engaged in wrongful conduct such that he could not act on the HMIT entities' behalf; isn't that right?

A.    Generally.  I'd rather have a document to look at to answer that question, specifically.

Q.    Well, you're aware that the Dallas

Foundation filed their objection, correct?

A.   Yes.

Q.   And the Dallas Foundation had the opportunity to take discovery, correct?

A.   Yes.

Q.   And the Dallas Foundation took discovery, correct?

A.   Yes.

Q.   And the Dallas Foundation withdrew its objection with prejudice, correct?

MR. EDNEY:  Objection to the form of the question.

MR. MORRIS:  I apologize.

BY MR. MORRIS:

Q.   And you're aware that the Dallas Foundation withdrew its objection, correct?

A.   Yes.

Q.   I do listen.

Are you aware that in addition to withdrawing its objection, the Dallas Foundation, Crown Global, Empower Dallas, and the Okada Family Foundation also entered into a binding term sheet with the HMIT entities?

MR. EDNEY:  Objection to the form of the question.

A.     No, I was not aware of that.

Q.     Is that news to you today that the Dallas Foundation, Crown Global, Empower Dallas, and the Okada Family Foundation entered into a binding term sheet with the HMIT entities in connection with the withdrawal of its objection to the 9019 motion?

MR. EDNEY:  Objection to the form of the question.  Asked and answered.

A.     I never saw the paperwork.  I wasn't aware that it was a term sheet.

I know that Mark Patrick tried to orchestrate a settlement that also released the estate of bad actors in the estate.  But I'm not aware of the term sheet or the mechanism for the seller.

Q.     Are you aware that when -- when -- withdrawn.

Are you aware that following the Dallas Foundation's withdrawal of its objection, Mark Patrick retained the control position of the HMIT entities from the perspective of the Dallas Foundation?

MR. EDNEY:  Objection to the form of the question.

A.    I don't remember the specifics.

Q.    Do you know that the Mark Patrick signed an agreement on behalf of the HMIT entities with the Dallas Foundation, Crown Global, Empower Dallas, and the Okada Family Foundation that left him in place as the control person of the HMIT entities?

MR. EDNEY:  Objection to the form of the question.

A.    I -- I don't know the specifics.  I know -- I know he -- he gave releases, got releases, got no consideration.  Yeah.  But I don't know the specifics of the paperwork.

Q.    Okay.

It's on the docket.

A.    Okay.

MR. EDNEY:  Good point.

THE WITNESS:  Can we take a break again, please.

MR. MORRIS:  Sure.

How long would you like, sir?

THE WITNESS:  15 minutes.

MR. MORRIS:  We're running kind of late.  And I know we started late.  I'm concerned about the court reporter.

It's not that I mean to press you, but I think she expected the day to end earlier than it's going to be.

So let's come back at --

THE WITNESS:  2:30.

MR. MORRIS:  Mr. Dondero, you'll be responsible for this.

Take as long as you want.

MR. EDNEY:  We'll see you at the bottom of the hour, Mr. Morris.  Thank you.

(Recess is taken.)

BY MR. MORRIS:

Q.    In its current motion, Dugaboy contends that the settlement agreement that was approved last June should be set aside because Dugaboy has newly discovered evidence and uncovered evidence of fraud, correct?

A.    I believe that's what the pleadings say.

Q.    Okay.

Did you personally convey any of that newly discovered evidence or fraud to the Dallas Foundation, Crown Global, Empower Dallas, or the Okada Family Foundation?

A.    I did not.

Deposition of James Dondero                                    In re Highland Capital Management, L.P.

Q.     Why not?

A.     I wasn't person of knowledge or direct knowledge.  And all the people you mentioned were getting it directly from the liquidators -- (inaudible) -- anyway.

Q.     The liquidators of what?

A.     The liquidators or Stockton from Holland & Knight.  All the people you mentioned were getting direct channels from them.

Q.     Great.

So it's your understanding that the Dallas Foundation, Crown Global, Empower Dallas, and the Okada Family Foundation has all of the newly discovered evidence and all of the new evidence of fraud, and they got it through other channels.

Do I have that right?

MR. EDNEY:  Objection to the form of the question.

A.     I'm just saying I may keep them apprised.  I believe to the extent that they needed to or wanted to be appraised, they had their other channels of information.

Q.     Do you have reason to believe that the liquidators and Holland & Knight gave those

entities the newly discovered information and the new information about fraud?

Yes or no, do you have a reason to believe that?

MR. EDNEY: Objection to the form of the question.

A. I believe the liquidators have had numerous regular conversations with Holland & Knight and David Stockton, sometimes individually and sometimes with the charities on the phone. But I believe that's correct.

Q. The information in the writ, you thought was really powerful, right?

A. The allegations. Correct.

Q. And did you feel any responsibility at all to make sure that the Dallas Foundation, Crown Global, Empower Dallas, or the Okada Family Foundation was aware of that information?

MR. EDNEY: Objection to the form of the question.

A. I don't know why we keep going in circles on this.

I was recused from direct information. They had much more direct

information from the liquidators.  Whatever we got it in mid July, I believe they either got it before or contemporaneously.

So there was no reason for me to have to send it to them on the -- the 15th.  If that's what you're asking.

Q.    Yes.

And how about any of the e-mails or organizational charts that you mentioned earlier that trickled in after the writ was filed?

Do you know whether that information was provided to the Dallas Foundation, Crown Global, Empower Dallas, or the Okada Family Foundation?

A.    I believe, in general, we were the last to get information.  I believe, as liquidators uncovered information, they made it known to the charities, and then we would find out about it later.

Q.    Do you know if Holland & Knight represents the Dallas Foundation, Crown Global, Empower Dallas, or the Okada Family Foundation?

A.    I know they represent Dallas Foundation, Kansas City, Santa Barbara.  I do

not know if they represent Okada or Empower.

Q.    Okay.

And when I talk about the Dallas Foundation, I'm not talking about Highland Dallas Foundation.

I'm talking about the Dallas Foundation entity that filed the objection to the 9019.

Those are two different entities, right?

A.    Yes.

Q.    Okay.

So it's your understanding that Holland & Knight represents the supporting organizations.

Is that fair?

A.    Yes.

Q.    So the supporting organizations would've gotten all of this information from either the joint official liquidators or from Holland & Knight.

Is that your understanding?

A.    Yes.

Q.    Do you have any -- do you know if anybody provided this newly discovered evidence

and this evidence of fraud to the Dallas
Foundation, Crown Global, Empower Dallas, or
the Okada Family Foundation?

MR. EDNEY:  Objection to the form of the question.

BY MR. MORRIS:

Q.    You may answer.

A.    John, I feel like I've answered this like five times.

But you want me to answer it again?

Q.    Yeah.

Maybe I missed it, sir.  I really do apologize.  You know, I don't like repeat myself.  But I don't think I asked the question.

But go ahead.

A.    Okay.  The July 15th payment writ was allegations.  All the evidence came in subsequently over time.  The direct channels of communication, because I was recused, was between the charities and supporting orgs and the liquidators.

We have Stockton in the middle and Maples in the middle, with the Grant Thornton woman also involved.

I've said that four times.

And the information has come in over the last six, seven, eight months.  The evidence and the details supporting the excessive compensation, supporting the -- the e-mails supporting trying to camouflage and make sure that, you know, no one would ever find out about the machinations and the restructurings.

All of that stuff has come in over the last six, seven months.  That's why we're here with the Rule 60 now instead of whatever, August of last year.

Q.   Well, the joint official liquidators must have had some information because they made the allegations.

They didn't just make them up; is that right?

A.   That's right.  And they had quotes from e-mails.  They had snippets from e-mails.  Details permeating their thing.

But they didn't have the actual e-mails in their writ.  They didn't have the actual evidence.  That all came later.

Q.   All right.

I think the problem that I was having, Mr. Dondero, is that my understanding is that JOLs have the supporting organizations under liquidation committee.

And I think you've agreed with that; is that right?

A.    Yes.

Q.    But do the JOLs have any relationship with the Dallas Foundation, Crown Global, Empower Dallas, or the Okada Family Foundation?

A.    I think that's who they view their claim as.

Q.    Okay.  I didn't understand that.

A.    Okay.

Q.    In addition to the Highland Dallas Foundation, the Highland Kansas City Foundation, and the Highland Santa Barbara Foundation, your understanding is that the JOLs also believe their clients include the Dallas Foundation, Crown Global, Empower Dallas, and the Okada Family Foundation.

Do I have it right?

MR. EDNEY:  Objection to the form of the question.

A.   No, the three underlying supporting works.

(Multiple speakers.)

Q.   Exactly --

A.   Not Empower.

Q.   Right.

A.   Not the Okada Family Foundation.

Q.   Okay.

So now, we agree that the JOLs are only connected to the supporting organizations, right?

MR. EDNEY:  Objection to the form of the question.  Misstates testimony.

BY MR. MORRIS:

Q.   You can answer, sir.

Let me ask a different question.

Let's put the supporting organizations to the side because they're getting information from Holland & Knight and the JOLs.

Do you know whether anybody gave the Dallas Foundation, Crown Global, Empower Dallas, or the Okada Family Foundation the information that was in the writ and that trickled in after the writ was filed?

Deposition of James Dondero                                     In re Highland Capital Management, L.P.

A.    Not that I'm aware of.

Q.    Did you give them that information?

A.    No -- maybe this is why I keep struggling.

Where would I be getting it from?

Q.    You had the information.

You represented -- Dugaboy filed on July 17th a motion for a stay and attached the writ, correct?

A.    Yeah.  We had the writ.  But we didn't have -- we didn't have the underlying evidence in the writ.

Q.    Did you give -- did you give the writ to the Dallas Foundation, Crown Global, Empower Dallas, or the Okada Family Foundation?

MR. EDNEY:  Objection to the form of the question.

A.    No, they all got it, as far as we knew, directly from the Caymans.

Q.    Okay.

So you believe that they got the writ directly from the Caymans.

Is that your understanding?

A.    Yes.

Q.    Okay.

Do you also believe that those four entities as opposed to the supporting organizations also obtained the evidence that you referred to, the details that you referred to, that support the allegations in the writ?

Do they have that, too?

MR. EDNEY:  Objection to the form of the question.

A.     Yes, that is my belief, that they have been in the workstream and they get it, put it together, compile it, get versions of it long before we see it.

Q.     Okay.

And what is your basis for believing that the Dallas Foundation, Crown Global, Empower Dallas, and the Okada Family Foundation have the same information that you have, they just got it earlier?

MR. EDNEY:  Objection to the form of the question.

A.     They're not subject to recusal the way we are.  And they're not subject to some of the privy and publication issues as being somebody directly involved in the Cayman, as I understood it.

Their access is better and different than ours was.

Q.   Okay.

Neither the Dallas Foundation nor Crown Global nor Empower Dallas nor the Okada Family Foundation has joined Dugaboy's motion to set aside the order approving the HMIT settlement; is that right?

A.   I don't know.

Q.   Do you have any reason to believe that any of those entities have joined Dugaboy's motion to set aside the 9019 settlement?

A.   I don't know.  I don't believe so, but I don't know.

Q.   Do you control Empower Dallas?

A.   No.

Q.   Who controls Empower Dallas?

A.   It's a three-person board.  I don't have -- for tax purposes, it's a board.  It's not -- it's not controlled.  The president title is not a functioning executive --

Q.   Okay.

A.   -- power, as I understand it.

Q.   Have -- have -- Ms. Diaz is at both

the Dallas Foundation and the Highland Dallas Foundation, correct?

A.    Yes.

Q.    Did you ever tell Ms. Diaz, Ms. Diaz, we've got newly discovered information, we've got more evidence of fraud, you should join Dugaboy's motion to set aside the 9019 settlement?

Did you ever discuss it with her?

MR. EDNEY:  Objection to the form of the question.

A.    She had -- again, she gets information before we do.  She's -- you know, she's in the charity business.  She's not in the justice business.

Q.    Is that what she told you?

A.    No.  I didn't talk to her about it.

Q.    Did you ever recommend to the Dallas Foundation, Crown Global, Empower Dallas, or the Okada Family Foundation that they join in Dugaboy's motion?

MR. EDNEY:  Objection to the form of the question.

A.    I did not.

THE COURT REPORTER:  I'm sorry.  I

Deposition of James Dondero                                    In re Highland Capital Management, L.P.

didn't get his answer.

Q.    He said, I did not.

So you didn't feel any responsibility to try to solicit the Dallas Foundation, Crown Global, Empower Dallas, or the Okada Family Foundation to join Dugaboy in it motion to set aside the settlement, correct?

MR. EDNEY:  Objection to form.

A.    I did not.

Q.    Okay.

And to the best of your knowledge, neither the Dallas foundation nor Crown Global nor Empower Dallas nor the Okada Family Foundation has sought to rescind the binding term sheet that was signed last June on the ground of fraud or newly discovered evidence, correct?

MR. EDNEY:  Objection to the form of the question.

A.    I don't know.

Q.    Did you ever recommend to the Dallas Foundation, Crown Global, Empower Dallas, or the Okada Family Foundation that they try to get out from the agreement that they entered into with the HMIT entities as part of the

withdrawal of their objection to the HMIT

settlement?

MR. EDNEY:  Objection to form.

A.    I did not.

MR. MORRIS:  Can we go back to

Exhibit 3, please.

BY MR. MORRIS:

Q.    Can you see that, Mr. Dondero?

A.    Yup.

Q.    To the best of your knowledge,

Dugaboy has never had an interest of any kind

in any of the entities that are in the red

boxes; is that correct?

MR. EDNEY:  Objection to form.

(Document review.)

A.    As I sit here today, I don't think

so, but I would need to defer to counsel.

Q.    Okay.

Until early 2025, is it your

understanding that Crown Global was the sole

limited partner of Atlas IDF LP?

MR. EDNEY:  Objection to form.

A.    Yeah, I don't know.

Q.    Did you -- did you have an

understanding that Atlas IDF LP held the

ownership interest as reflected on this document in the entities below it?

MR. EDNEY:  Objection to form.

A.    Yeah, I don't know.

Q.    Are you aware that Atlas IDF LP only owned 99 percent of the limited partnership interest in Rand PE Fund I LP?

MR. EDNEY:  Objection to form.

A.    I can read the chart.

I don't have awareness, though.

Q.    All right.

I'm going to refer to Rand PE Fund I LP as Rand.

Is that okay?

A.    Sure.

Q.    Are you aware that the remaining one percent of Rand was held by two entities, one called Dolomiti LLC and one called Hakusan LLC?

MR. EDNEY:  Objection to form.

A.    This is not ringing a bell.

Q.    Do you know if Dugaboy ever held an interest in an entity called Dolomiti LLC?

A.    Not that I recall at this point.

Q.    On February 6, 2025, Mr. Patrick,

acting as the control person of Rand, redeemed the limited partnership interest held by Dolomiti LLC and Hakusan; isn't that right?

MR. EDNEY:  Objection to form.

A.    I do not have awareness of that.

MR. MORRIS:  Can we mark as Exhibit 4 the document that's Tab 14.

(Dondero Exhibit 4, Letter, marked for identification.)

BY MR. MORRIS:

Q.    300 Crescent Court, Suite 700, that's NexPoint's address, rights?

A.    Yes.

Q.    Have you ever heard of Dolomiti LLC?

A.    Not before today.

Q.    Why don't you take a moment and review this document.

Its -- its entirety is on the screen right now.  It's just those two paragraphs.

(Document review.)

A.    Okay.  I've read it.

Q.    Okay.

You see the document was sent by certified mail, return receipt requested, right?

A. Yes.

Q. Okay.

Do you have any reason to believe that Dolomiti didn't receive this letter in February 2025?

MR. EDNEY: Objection to form.

A. I have every reason to believe Mark Patrick didn't have authority to do it.

Q. Okay.

Do you know whether anybody acting on behalf of Dolomiti ever told him that?

MR. EDNEY: Objection to form.

A. I do not have awareness.

Q. Do you understand that pursuant to this document, Rand redeemed Dolomiti's less than one percent interest in that entity?

A. That appears to be what it says.

Q. And does it also appear to say that on the same date, in the same letter, Dolomiti was also informed that it was no longer entitled to exercise voting rights afforded to limited partners of Rand under the LPA?

A. That's what it says.

Q. Are you aware of anybody objecting on behalf of Dolomiti's behalf as to the

actions being taken by Rand as set forth in this letter?

MR. EDNEY:  Object to form.

A.     I do not have awareness.

Q.     Okay.

You understand, though, that following -- let's just go to the next page.

Do you see Mr. Patrick's signature there on behalf of Rand?

A.     Yes.

Q.     Okay.

Let's go to the next page.  I'm sorry.  Keep going.  Keep going.

Stop there.

2101 Cedar Springs Road.

Is that an address where Mr. Okada maintains an office?

A.     I don't know.

Q.     Do you know if Hakusan is an entity that was directly or indirectly owned by Mr. Okada?

A.     I do not.

Q.     Is it fair to say you have no knowledge that Hakusan ever objected to the actions being taken by Rand as set forth in

this letter?

A.    I do not know.

Q.    Is it your understanding, based on your experience, that following the redemption of the Dolomiti and Hakusan limited partnership interest, that Atlas would've become the 100 percent owner of the limited partnership of Rand?

MR. EDNEY:  Objection to form.

A.    I don't know.

Q.    Okay.

MR. MORRIS:  All right.  Let's go back to Exhibit 3, please.

BY MR. MORRIS:

Q.    Before we look at this document again, do you have any reason to believe that Rand did not give proper notice to Dolomiti and Hakusan in February 2025 that its interests were being redeemed in Rand, and that it would no longer have any voting rights?

MR. EDNEY:  Objection to form.

A.    I think we covered this.  But Mark Patrick as signatory, we do not believe had authority.

Q.    Okay.

Did anybody tell Mark Patrick that?

MR. EDNEY:  Objection to form.

MR. MORRIS:  Withdrawn.

Fair enough.

BY MR. MORRIS:

Q.    Did anybody ever tell Mark Patrick that he didn't have the authority to act on behalf of Rand to redeem the limited partnership interest held by Dolomiti and Hakusan?

MR. EDNEY:  Objection to form.

A.    Not that I'm aware of.  And not that I'm aware was necessary.

Q.    Okay.

So looking back on the chart that's on the board.  We've got Crown Global Life Insurance Limited, the Bermuda entity on the left, right?

Is it your understanding that Crown Global ever had any right to control any of the HMIT entities?

MR. EDNEY:  Objection to form.

A.    I don't want to speculate on a legal conclusion, when Mark Patrick drops out of authority, where authority falls back to.

Q.    Isn't the point of creating this structure to separate the economic beneficiaries from the controlling parties?

MR. EDNEY:  Objection to form.

A.    I would not say that.

Q.    No, you think that economic beneficiaries are permitted to control the -- the same entity and still maintain their -- their tax status?

MR. EDNEY:  Objection to form.

A.    I would not say that either.

Q.    Okay.

Can you tell me, based on your understanding, the circumstances under which an economic beneficiary of a -- of an organization can also control it -- withdrawn.

Your declaration sets out the distinction between economic beneficiaries and controlling entities, correct?

A.    I don't know.

MR. EDNEY:  Objection to form.

BY MR. MORRIS:

Q.    Do you know the difference between the participation shares and the management shares?

MR. EDNEY:  Objection to form.

A.    They're different in every transaction.  In every structure.

Q.    Okay.

For this structure, do you know there's a distinction between management shares and participation shares?

MR. EDNEY:  Objection to form.  Lack of foundation.

A.    I would have to be refreshed.

Q.    Okay.

We'll do that on Monday.

When John Honis controlled the boxes in red, did he share that control with any person, to the best of your knowledge?

MR. EDNEY:  Objection to form.

A.    I don't know the Crown Global or the Charitable DAF influence on -- or rights on the red boxes when John Honis was administering the red boxes.

Q.    Okay.

So the answer is you don't know?

A.    Yes.

Q.    Okay.

You're aware that Mark Patrick told

Crown Global in February of 2025 that he was going to liquidate Atlas, correct?

MR. EDNEY:  Objection to form.

A.     I do not have awareness of that.

MR. MORRIS:  Okay.  Can we put up Tab 4.  And let's call it Exhibit 5.

(Dondero Exhibit 5, Affidavit, marked for identification.)

MR. MORRIS:  And if we can go to paragraph 41.

BY MR. MORRIS:

Q.     Do you recall signing an affidavit in support of the supporting organizations' winding up petition that was filed in the Cayman Islands?

MR. EDNEY:  Mr. Morris, can I ask before you start asking questions about this document, that you show him what it is.  I think --

MR. MORRIS:  Sure.

MR. EDNEY:  -- we blew fast the first page awfully fast.

MR. MORRIS:  Can we go back up to the top, please.

MR. EDNEY:  Maybe not that page.

There we go.

BY MR. MORRIS:

Q.    All right.

Do you see that this is your affidavit?

A.    Sure.

Q.    Do you see in the upper right-hand corner, in the European style, it says it was filed on April 16, 2025?

A.    Yup.  Yes.

Q.    This is -- this is before there ever is a 9019 settlement motion, right?

A.    Yes.

Q.    And the reason that you signed this affidavit is because you wanted the supporting organizations' winding up petition to be granted, right?

A.    Yes.

Q.    Okay.

Who drafted this?

A.    I don't know.  It would have been some combination of in-house counsel and outside counsel.

Q.    In-house counsel where?  At Skyview?

A.    I don't know.

Q.    In-house counsel at NexPoint?

A.    I don't know.

Q.    So when you use the phrase in-house counsel, who are you referring to?

A.    Soughter (phonetic) handles most of this kind of stuff.  But I don't know for sure if it was him.

Q.    Did you review this document before you signed it?

A.    Yes.

Q.    Did you think that it was accurate at the time?

A.    Yes.

Q.    Okay.

Let's go to paragraph 41, please.

Okay.  The first sentence begins (as read):  On February 20, 2025, Mr. Patrick, in his capacity as the general partner of Atlas IDF GP LLC, sent a letter to Crown Global Insurance advising of the intention to dissolve Atlas in accordance with the partnership agreement dated November 30, 2015.

Other than the use of the European style for the dates, have I read that accurately?

A.    Yes.

Q.    So you knew before there ever was an 9019 settlement agreement that Mr. Patrick exercised his authority as the general partner of Atlas IDF GP LLC to dissolve Atlas, and that he gave notice of that effect to Crown Global, correct?

A.    Yes.

Q.    Okay.

And so, we saw the redemption letters of Dolomiti and Hakusan.

And now, we see that Mr. Patrick is giving notice to Crown Global of his intention to resolve Atlas.  And all of this is being disclosed before there's ever a 9019 settlement.

Is that fair?

MR. EDNEY:  Objection to form.

A.    I'm sorry.  What was the question again?

Q.    Mr. Patrick, in February of 2025, before there was a 9019 agreement, has told Dolomiti and Hakusan that it was redeeming their limited partnership interest in Rand, and he told Crown Global that he intended to

dissolve Atlas; is that right?

A.    Yes.

Q.    Okay.

Did anybody with that information seek injunctive relief?

Did anybody run into court to try to stop what he was doing?

A.    I don't know if we knew enough at the time, that he had lost his authority.  I don't know if we had enough information yet.

But I don't remember anybody running into court, no.

Q.    Did anybody object to these steps that he was taking?

A.    There was a lot of back-and-forth and objection regarding those notes in particular.  But I -- I don't remember the specifics.

Q.    He also -- you came to learn before you filed this affidavit that Mr. Patrick had caused Beacon Mountain to be sold for about a million dollars; is that right?

MR. EDNEY:  Objection to form.

A.    I don't remember.  I don't remember what was in Beacon Mountain.

Q.    Hunter Mountain?

A.    I don't remember what was in Beacon Mountain.

Q.    Let's look at your declaration?

MR. MORRIS:  Can we scroll up to, I guess, paragraph 38.

BY MR. MORRIS:

Q.    So you knew no later than April 16th that in February of 2025, Mr. Raver had asked for inbound wire instructions for an affiliate that owned a position in a trust called Hunter Mountain.

Do you see that?

A.    Yes.

Q.    What affiliate does that refer to?

A.    I don't know.

Q.    Is that Dolomiti?

A.    I don't know.

Q.    Did you know when you signed the affidavit?

MR. EDNEY:  Objection to form.

A.    I don't remember.

Q.    But you knew that Hunter Mountain owned most of the distribution rights of the equity position in Highland bankruptcy,

correct?

A.    Yes.

Q.    And as a result of inquiries -- if we can go to paragraph 39 -- you learned before there ever was a 9019 settlement, that Mr. Raver had disclosed that the entire Hunter Mountain position had been sold to an unidentified party for a million dollars, right?

MR. EDNEY:  Objection to form.

A.    Yeah, the affidavit says what it says.  But that's essentially what it says.

Q.    Right.

So did you ever learn who the buyer was of Beacon Mountain?

A.    I never saw the document.  I believe I heard through counsel that it was DFW.  I don't know for sure.  If that's a factual question.

Q.    But you knew the identity of the buyer before the 9019 hearing.

Isn't that fair?

MR. EDNEY:  Objection to form.

A.    No.

Q.    No?

When did you learn of the identity of the buyer?

A.     I don't know.  But it was -- we knew very little in June and July.

Q.     Did -- did you think to ask the question during discovery in connection with the 9019 motion?

Did anybody ask Mr. Raver or Mr. Patrick who bought -- who bought Beacon Mountain?

MR. EDNEY:  Objection to form.

A.     I don't know.

Q.     Are you aware of any reason why somebody couldn't have asked that deposition -- that question in either one of their depositions?

MR. EDNEY:  Objection to form. Assumes facts not in evidence.

A.     Maybe they did.  I don't know.

Q.     In fact, it is very possible that they did; isn't that right?

MR. EDNEY:  Objection to form.

A.     No idea.

Q.     And you never -- you never thought to suggest to anybody that somebody inquire as

to the identity of the buyer of Beacon Mountain

as part of the discovery process in the 9019

hearing.

          Is that fair?

     A.     I wasn't directly involved with the

questions set.

     Q.     You were fully aware that

Mark Patrick was taking for himself what you

believed to be oversized compensation long

before there was a 9019 settlement; isn't that

right?

          MR. EDNEY:   Objection to form.

     A.     I think we were aware of first 7 or

8 million, but not the next 15 million.

     Q.     All right.

          MR. MORRIS:   Let's go up to

     paragraph 31.

BY MR. MORRIS:

     Q.     I'm sorry, Mr. Dondero.

          Did I cut you off?

     A.     No, that's my recollection.   Let's

see what it says.

     Q.     So your declaration that was filed

in April, you noted that the fees went from

40,000 in 2022 to 600,000 in 2023 to 2 and a

quarter million dollars in the first half of '24 alone.

Do I have that right, in 31A?

A.   Yes, I believe this was accurate at the time.

Q.   Okay.

Did anybody think to ask Mr. Patrick or Mr. Raver during their depositions what compensation was paid in the second half of 2024 and the first half of 2025?

MR. EDNEY:  Objection to form.

A.   I mean, I don't know whether it came out of those depositions or Cayman stuff.  You know, there was a lot more directors' fees and a lot more compensation paid than these numbers.

Q.   I'm just asking you whether or not you're aware of any barrier to the Dallas Foundation or Dugaboy that would have prevented them from inquiring as to Mr. Patrick's or the director's compensation during the 9019 proceeding?

MR. EDNEY:  Objection to form.

A.   I don't know if people ask, like, how much money he stole lightly.

You know, can you update monies that you've stolen?

I don't know if all those questions were asked.

Q.   Did you do anything to make sure on Dugaboy's behalf that those questions were asked?

MR. EDNEY:  Objection to form.

I'm going to instruct him not to answer to the extent it calls for his communications with counsel that were handling those hearings.

The record of that case speaks for itself.

A.   I wasn't directly --

MR. EDNEY:  Don't answer the question.

MR. MORRIS:  He can -- why can't he answer the question?

MR. EDNEY:  Because it calls for privileged information.

I'm instructing him not to answer.

Move along, Counsel.

MR. MORRIS:  I'll try again.

BY MR. MORRIS:

Q.    Did it occur to you, Mr. Dondero, to try to obtain information as part of the discovery process concerning Mr. Patrick or the director's compensation?

MR. EDNEY:  Objection to form.

A.    I wasn't directly involved.  I left it in the competent hands of my attorneys.

Q.    How about the expenses?

Were you offended by the expenses that were being incurred by Mr. Patrick?

A.    I was offended by these expenses that we outlined in the affidavit.

Q.    Okay.

A.    And those were just the tip of the iceberg.

Q.    Do you know if Dugaboy made any effort to obtain information as part of the discovery process concerning the expenses that were being incurred?

MR. EDNEY:  Objection to form.

A.    I wasn't involved in the questions set.  I left it to the competent hands of the attorneys.

Q.    You accused Mr. Patrick of misusing material nonpublic inside information; is that

Deposition of James Dondero                                    In re Highland Capital Management, L.P.

right?

A.     Yes.

Q.     What material nonpublic inside information do you contend that Mr. Patrick abused?

A.     I don't remember exactly.  But I believe it was -- if it wasn't part of this affidavit, maybe the other affidavit.

But it was regarding a restructuring of a private REIT.  And yeah -- I believe the evidence was clear.  I don't remember whether it was e-mails or conversations with recently deceased Doug Mancino (Phonetic).

Q.     Mr. Patrick advised the Dallas Foundation to exercise a put option; isn't that right?

A.     Correct.

Q.     Who is on the other side of that transaction?

A.     One of the private REITs that we manage here.

Q.     What private REITs that you managed was the other side of the put option?

A.     A small little hospitality REIT.

Q.     And if the Dallas Foundation had

exercised that put option, do you have an understanding of how much money it would have received?

A.    No.

Q.    You didn't want the Dallas Foundation to exercise the put option; isn't that right?

A.    I didn't have an opinion.

Q.    The exercise of the put option would've been adverse to the REIT; isn't that right?

A.    The put option would've been outstanding for a long time.  It wasn't timely or helpful.  I think it was one of the many things Mark Patrick did to be punitive after he left.  I don't think the economic consequence was significant.

That's my recollection.

Q.    Well, how would it have been punitive?

A.    Well, it just would've affected liquidity on, you know, a hospitality company that was getting its feet back under itself post COVID.

Q.    So the exercise of put option would

have had adverse consequences for that entity, correct?

A.   I -- yeah, I believe it would have been --

(Multiple speakers.)

Q.   And that's --

A.   -- yes.

Q.   That's --

MR. EDNEY:  Hang on.  Let the man finish his answer.

Are you finished, Mr. Dondero?

A.   Yeah, I believe it was unnecessary and unhelpful in terms of long-term value for that entity.

Q.   For which entity?

A.   That small hospitality REIT.

Q.   If the Dallas Foundation had exercised the option, how much would the small hospitality REIT have to have paid?

A.   It was only a few million dollars. But I don't remember the exact amount.

But again, he -- except for inside information, he would have no basis for deciding to do it or not do it.

Q.   He didn't exercise any transaction,

did he?

A.   I don't remember.  It says what it says here.  I don't remember exactly.

Q.   Did you have any conversations with the Dallas Foundation about whether they should or shouldn't exercise the put option?

A.   I did not.

Q.   Did anybody acting on behalf of the small hospitality REIT?

A.   Don't know.

Q.   Do you know whether the Dallas Foundation ever exercised the put option?

A.   I do not.

Q.   Did the put option expire at some point?

A.   Not that I'm aware of.

Q.   Is the put -- was the put option in the money at this time?

A.   I don't know.

Q.   Did you ever report Mr. Patrick to the SEC?

A.   I don't know on this or on other things.  But we have a responsibility when we -- when we know registered investment advisors have done something improper.  We have a

responsibility to inform regulatory bodies.

So we were implying it -- here.  So if we were aware of anything, we did what we were supposed to do.

But I don't know, specifically.

Q.    So you don't know if back in August 2024, Mr. Patrick's abusive material, nonpublic inside information, caused you to contact the SEC?

A.    Like I said, I know as a registered investment advisor, just like the insider trading that Stone Hill did, we have an obligation to tell regulatory authorities.  And we -- we do tell regulatory authorities when we have an obligation to.

Q.    And I'm just asking you if you had an obligation in this case?

A.    I'm just saying if we did, we did.

Q.    So you don't know, as you sit here today, if you had an obligation.

Is that fair?

A.    Correct.  I don't know.

Q.    All right.

MR. MORRIS:  Let's take a ten-minute break.  I may be close to done here.

It is 1:27 or, I guess, 3:27 your time.  Let's actually take until 3:40.

(Recess is taken.)

BY MR. MORRIS:

Q.    Mr. Dondero, are you sure that the obligor on the put option was a small hospitality REIT?

A.    I'm not sure.  That's my recollection, as I sit here today.  But I have to refresh myself on it.

Q.    Okay.

The JOLs haven't joined Dugaboy's motion to vacate the 9019 settlement; is that right?

A.    I believe that's correct.

Q.    In fact, the JOLs have never appeared in the Highland bankruptcy case; is that right, to the best of your knowledge?

A.    I believe that's correct.

Q.    The supporting organizations haven't joined Dugaboy's motion to set the 9019 settlement agreement aside; is that correct?

A.    I believe that's correct.

Q.    And to the best of your knowledge, has any -- have any of the supporting

organizations ever appeared in the Highland bankruptcy case?

A.   I -- other than Julie Diaz that we've discussed, I do not believe so.

Q.   And Julie Diaz, as we discussed, did not appear in the Highland bankruptcy case on behalf of the Highland Dallas Foundation; she appeared in the case on behalf of the Dallas Foundation; is that correct?

A.   I believe that's correct.

Q.   Okay.

And neither the Dallas Foundation nor Crown Global decided to join Dugaboy's motion to vacate the settlement; is that right?

A.   I believe that's correct.

Q.   Okay.

Can you tell me why Dugaboy filed its motion to vacate the 9019 settlement when nobody else is joining it.

MR. EDNEY:   Objection to form.

A.   Those are two separate issues.

Q.   Okay.

I apologize.  Let's take them one at a time.

Can you tell me why Dugaboy decided

to file the motion to vacate.

A.    In a nutshell, where Patrick got no consideration, no meaningful consideration that he wasn't already entitled to, I guess, number one.

Number two, the Highland estate has been very unfortunate Chapter 11 that got flipped into a 7, but has been highly solvent since the beginning.  It's highly solvent now, with tens or hundreds of millions of reserve accounts.

There's been, in our belief, bad acts and bankruptcy fraud, none of which should have been released.  And Mark Patrick didn't deserve a release as part of it also.

Q.    Okay.

Do you recall Highland's plan of reorganization and its disclosure statement?

A.    Generally.

Q.    Do you recall that in November of 2020, Highland projected that general unsecured creditors in Class 8 would recover 70 percent?

A.    I thought it was even less.  But something around that number, yes.

Q.    And do you recall that Dugaboy and

other entities affiliated with you filed a host of objections to the plan?

A.    Yes.

Q.    Do you recall that none of those objections concerned valuation?

MR. EDNEY:  Objection to the form of question.

A.    That's not true.  I think the objections were largely around lack of transparency, mismarked assets, lack of detail on the assets that were ultimately sold for $850 million.  That if they had been sold well, would've been sold for $950 million against, you know, original claimants who all sold for 160 million, to affiliates or disclosed business relationships of Jim Siri and Grosvenor (phonetic.)

I think it's the biggest fraud that's occurred in bankruptcy in a decade.

Q.    So it's your recollection that you and others affiliated with you objected to Highland's plans on the grounds that the valuations were inaccurate?

A.    Yes.

Q.    Okay.

Can you think of any other reasons that Dugaboy filed the motion to vacate?

MR. EDNEY:  By the motion to vacate, you mean the one in February of 2026?

MR. MORRIS:  Yes, sir.

MR. EDNEY:  The Rule 60(b) motion, Jim.

A.    Yeah, I think I highlighted them. There's significant solvency and there always has been in the estate.  There's significant bad acts that will be more difficult to pursue, if the releases hold against Stone Hill and Fairlawn, in particular.

I think Mark Patrick had no meaningful consideration, and he gave himself releases.  I think it would be unconscionable for it not to be set aside.

Q.    Is it fair to say, based on your testimony, that you believe the settlement was in Highland's best interest?

MR. EDNEY:  Objection to the form of the question.

A.    I'm not even sure it was in Highland's interest.  I think it was in Stone Hill and Fairlawn's best interest.  And I think

it was in the best interest of professional

fees that are north of 300 million in an

$850 million estate. And likely to burn up the

150, 200 million that's left.

Q. Okay.

Are you aware that the supporting

organizations commenced an action in Texas

Business Court against Mark Patrick and others

on or about July 1, 2025?

A. Yes.

Q. Are you aware that that case was

abated?

MR. EDNEY: Objection to the form of

the question.

A. If abatement means waiting for

Cayman to join it, that's where I understand

that is.

Q. Great.

And let's use that definition of

abatement.

Is it your understanding that the

case was abated in September 2025 and it

remains abated today?

A. At the moment, yes.

Q. And do you know why the joint

official liquidators haven't joined that case?

MR. EDNEY:  Objection to the form of the question.

A.    I think it's a complicated answer. I don't want to speculate.  I don't know the exact reasons.

Q.    Okay.

Are you aware that the supporting organizations entered into a Rule 11 agreement with Mr. Patrick and the other defendants pending the abatement?

MR. EDNEY:  Objection to the form of the question.

Do you know what a Rule 11 agreement is, Jim?

THE WITNESS:  I do not.

MR. EDNEY:  Remember, he's not a lawyer.

MR. MORRIS:  Okay.

BY MR. MORRIS:

Q.    Are you aware of any agreement between the supporting organizations and Mr. Patrick and the other defendants arising out of or relating to the Texas business lawsuit?

A.     Is that the injunction that's in place?  Is that what the Rule 11 is?

Q.     I'm talking about an agreement, not an injunction.

MR. EDNEY:  Objection to the form of the question.

A.     I don't have awareness.

Q.     What injunction are you thinking about?

A.     The judge in the Dallas business court put in an induction Mark Patrick's activities that is in place.  Maybe not as tight as it should be, but it's in place.

Q.     Do you understand that Mr. Patrick voluntarily consented to the terms of that order?

MR. EDNEY:  Objection to the form of the question.

A.     I believed the judge asked both sides to agree on something and they did.

Q.     And pursuant to that agreement, Mark Patrick remains the sole authorized representative of the defendants in that lawsuit, correct?

MR. EDNEY:  Objection to the form of

the question.

A.    I don't know the specifics.

Q.    Did you ever try to find out the terms of the agreement or the injunction that you're referring to?

MR. EDNEY:  Objection to the form of the question.

A.    Not specifically.

Q.    Are you aware that the supporting organizations left Mr. Patrick in place as the control person of the defendants in the Dallas -- in the Texas business lawsuit?

A.    Like I said, you know, consistent with the injunction and a desire to move the case forward, yeah.

Q.    Okay.

So you're aware of that; is that right?

You're aware that the supporting organizations entered into an agreement pursuant to which Mr. Patrick remains in control of the defendants of the Texas business suit, correct?

MR. EDNEY:  Objection to the form of the question.

A.     At the moment, I believe that's the case.

Q.     Thank you very much.

Ms. McGinnis is one of the JOLs; is that right?

A.     Yes, I believe so.

Q.     Do you know how the JOLs were identified?

A.     It was a process.

Q.     Do you know anything about the process?

A.     A little bit, but not specifically.

Q.     Do you know if anybody had a prior relationship with either of the JOLs before they were engaged?

MR. EDNEY:  Objection to the form of the question.

MR. MORRIS:  Withdrawn.

BY MR. MORRIS:

Q.     Do you know of anybody that you're affiliated with that had a prior relationship with the JOLs before they were engaged?

MR. EDNEY:  Objection to form.

A.     I have no awareness of such regarding Grant Thornton and Maples.

Deposition of James Dondero                              In re Highland Capital Management, L.P.

Q.    Do you know if Scott Ellington had a prior relationship with Ms. McGinnis?

MR. EDNEY:  Objection to form.

A.    Not that I'm aware of.

Q.    Okay.

Are you aware that for two days in December 2025, the Cayman court heard argument on the JOLs' writ?

A.    Yes.

Q.    And the JOLs' writ was supplemented by further declarations that were filed on behalf of the JOLs; is that right?

A.    I don't have awareness of that.

Q.    Are you aware that the Cayman court issued a decision in early February with respect to the JOLs' request for proprietary injunction?

A.    My general awareness is they lost the stringent injunction that they had applied for in December, but they may have won most of it back on appeal recently.  That's my knowledge.

Q.    Let's take it one step at a time.

Is it your understanding that the JOLs -- withdrawn.

Is it your understanding that the Cayman trial court declined to issue any injunction following a two-day hearing in December?

MR. EDNEY:  Objection to form.

A.    That's not my understanding.

Q.    What -- what action on behalf of Mr. Patrick was enjoined by the Cayman trial court, to the best of your knowledge?

A.    To the best of my knowledge, they went to put in a strict injunction that would have stopped all the expense bleed and almost like a receiver.  And that was not granted.

But then the appellate court put back in most of the injunction, but not the highly restricted receiver-type injunction that they are highly confident they're going to get in September.

Q.    Okay.

I want to separate the appellate process from the trial court in the Cayman Islands.

Do you understand that?

A.    I've given my full general understanding.

Q.    You keep coming back to the appellate court.  And we're going to get to that and you can tell me about the appellate court.

I'm just asking if you're aware of any injunction that was issued by the Grand Court of the Cayman Islands Financial Services Division on the JOLs' writ following the two-day hearing in December?

MR. EDNEY:  Objection to form.

A.    I have the same answer.

Q.    They didn't issue any injunction; is that right?

MR. EDNEY:  Objection to form.

A.    They were looking for a very strict injunction and they didn't get it.  I don't know what they did get.

Q.    Okay.

So as you sit here today, you're not aware of the Grand Court of the Cayman Islands Financial Services Division enjoining Mr. Patrick in any way following the two-day hearing in December; is that right?

MR. EDNEY:  Objection to form.

A.    I know they didn't win in December.

They felt like they won at the appellate court recently. But that's all I know.

Q. Okay.

The appeal has not been heard; is that correct?

A. No, it has been.

Q. Your understanding is that the appellate court has already rendered a decision?

A. Correct.

Q. So what's going to happen in September?

A. That's the full injunction hearing.

The full evidentiary hearing, I understand, is in September. The appellate review, where they got appellate guys to fly in, that happened a month or two ago, reinstated some of the original injunction stuff and reversed the December judge, as far as I understand.

And then the true evidentiary hearing is coming in September. But that's all I know.

Q. Is it your understanding that what the appellate court did was adopt the terms of

the agreement in the Texas Business Court that had been agreed to by the supporting organizations and Mr. Patrick and the defendants there?

MR. EDNEY:  Objection to the form of the question.

A.    I'll state it one more time, because this is all I know.  December released the criteria of the injunction that was in place prior to December.  And they were disappointed by that.

When they got appellate relief, they put it back to where it was in September.  I don't know if it mirrors Texas Business Court or not.  So I can't answer affirmatively or negatively on that.

But the appellate court put it back to where it was prior to the December hearing.

And then the full evidentiary hearing is occurring in September, where they're optimistic based on all the facts and everything that they'll get a strong injunction in place.

Q.    Okay.

MR. MORRIS:  I've got nothing

further.

THE WITNESS:  Thank you.

MR. EDNEY:  All right.  Mr. Morris, I don't have any redirect.

Thank you very much for your time today.

We can go off the record.

(Time Noted:  5:06 p.m.)


                    ----------------------

                    JAMES DONDERO


Subscribed and sworn to before me
this        day of              2026.


-----------------------------------------

C E R T I F I C A T E


STATE OF NEW YORK     )

                      ) ss.:

COUNTY OF NEW YORK     )


         I, LISA M. MURACO, a Notary Public

within and for the State of New York, do

hereby certify:

         That JAMES DONDERO, the witness whose

deposition is hereinbefore set forth, was

duly sworn by me and that such deposition

is a true record of the testimony given by

such witness.

         I further certify that I am not

related to any of the parties to this

action by blood or marriage; and that I am

in no way interested in the outcome of this

matter.

         IN WITNESS WHEREOF, I have hereunto

set my hand this 8th day of May, 2026.

                              *Lisa M. Muraco*
                 --------------------------

                 LISA M. MURACO

I N D E X


WITNESS                                                      PAGE

JAMES DONDERO

MR. MORRIS                                                    7


                        E X H I B I T S

DESCRIPTION                                                  PAGE

Dondero Exhibit 1, Form 990                                   50


Dondero Exhibit 2, Objection to the                          67
9019 Motion


Dondero Exhibit 3, Organizational Chart                      74


Dondero Exhibit 4, Letter                                   156


Dondero Exhibit 5, Affidavit                                163

QUESTIONS INSTRUCTED NOT TO ANSWER

| Page | Line |
|------|------|
| 100  | 18   |
| 173  | 16   |

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: In re Highland Capital Management, L.P.
Dep. Date:     FRIDAY, MAY 8, 2026
Deponent:      JAMES DONDERO

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|-----|-----|-----------|-------------|--------|
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |

_____
Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS____DAY OF_____, 2026.


_____
(Notary Public)  MY COMMISSION EXPIRES:_____

## WORD INDEX

**< $ >**
**$10,000** 132:*11*
**$100** 21:*15*
**$200** 21:*18*
**$300** 21:*24*
**$850** 183:*12* 185:*3*
**$950** 183:*13*

**< 1 >**
**1** 39:*4* 50:*15, 16, 21*
74:*18* 185:*9* 197:*10*
**1:27** 180:*1*
**100** 159:*6* 198:*4*
**10019** 3:*8*
**11** 1:*5* 182:*7* 186:*9,*
*14* 187:*2*
**11:03** 29:*16*
**11:15** 29:*17*
**11:30** 2:*3*
**1111** 4:*14*
**12** 75:*11*
**1200** 52:*21*
**13** 67:*4*
**135** 46:*9, 10*
**14** 156:*7*
**15** 44:*4* 47:*16* 48:*3*
85:*5* 139:*22* 171:*14*
**150** 185:*4*
**156** 197:*12*
**15th** 44:*17* 48:*22*
60:*3, 9* 61:*3* 143:*5*
145:*17*
**16** 164:*9* 198:*4*
**160** 183:*15*
**163** 197:*12*
**16th** 168:*8*
**1700** 3:*7*
**173** 198:*4*
**17th** 48:*24* 49:*7*
149:*8*
**18** 198:*4*
**1812** 4:*6*
**1875** 3:*16*
**19-34054-sgj11** 1:*6*

**< 2 >**
**2** 50:*14* 67:*4, 5*

171:*25* 197:*12*
**2:30** 140:*5*
**20** 165:*17*
**200** 185:*4*
**20004** 4:*15*
**20006** 3:*17*
**2004** 54:*19*
**2015** 165:*22*
**2019** 9:*15* 76:*8*
**2020** 182:*21*
**2021** 110:*15*
**2022** 75:*11* 110:*15*
114:*13* 115:*13*
133:*11* 171:*25*
**2023** 104:*8* 118:*13*
132:*10* 133:*5* 171:*25*
**2024** 55:*6* 56:*17*
104:*8* 118:*13* 172:*10*
179:*7*
**2025** 39:*4* 40:*16*
44:*4* 47:*16* 48:*3*
75:*11* 85:*6* 104:*9, 10*
117:*24* 154:*19*
155:*25* 157:*5* 159:*18*
163:*1* 164:*9* 165:*17*
166:*21* 168:*9* 172:*10*
185:*9, 22* 190:*7*
**2026** 1:*18* 2:*2* 184:*4*
195:*15* 196:*21* 199:*4,*
*22*
**2101** 52:*20* 158:*15*
**22** 116:*1*
**23** 79:*6* 104:*11*
117:*5*
**24** 79:*6* 104:*11*
117:*5* 172:*2*
**25** 83:*8* 109:*3*
130:*11* 131:*6*
**25-03055-bwo** 1:*9*
**25th** 127:*9*
**28** 40:*16* 43:*14*
44:*24* 45:*4, 8*
**28th** 43:*19*
**29** 43:*14*

**< 3 >**
**3** 74:*19, 20* 114:*9*
154:*6* 159:*13* 197:*12*
**3:27** 180:*1*
**3:40** 180:*2*

**30** 43:*15* 44:*24* 45:*4*
83:*8* 165:*22*
**300** 22:*4, 9* 156:*11*
185:*2*
**31** 171:*17*
**31A** 172:*3*
**36th** 3:*7*
**38** 168:*6*
**39** 169:*4*

**< 4 >**
**4** 156:*7, 8* 163:*6*
197:*12*
**4,000** 120:*25*
**40,000** 171:*25*
**400** 4:*5*
**41** 163:*10* 165:*15*
**45** 82:*6*
**48** 60:*10*

**< 5 >**
**5** 163:*6, 7* 197:*12*
**5:06** 195:*8*
**50** 197:*10*
**500** 22:*6*
**53803** 1:*24*

**< 6 >**
**6** 155:*25*
**60** 146:*12*
**60(b** 184:*6*
**600,000** 171:*25*
**67** 197:*12*

**< 7 >**
**7** 171:*13* 182:*8*
197:*6*
**70** 182:*22*
**700** 156:*11*
**70130** 4:*7*
**74** 197:*12*
**75201** 52:*21*

**< 8 >**
**8** 1:*18* 2:*2* 171:*14*
182:*22* 199:*4*
**8th** 196:*21*

**< 9 >**

**9:03** 29:*15*
**9:15** 29:*17*
**9019** 28:*24* 29:*2, 8*
34:*11* 36:*5, 20* 38:*16*
40:*5* 42:*8* 45:*21*
48:*24* 60:*11* 61:*5*
64:*5* 65:*15* 67:*6, 10,*
*17* 69:*12* 70:*1, 25*
72:*12* 82:*21* 87:*10*
89:*7, 23* 94:*24* 118:*1,*
*20* 119:*8* 120:*14, 16,*
*22* 122:*16* 124:*17, 23*
125:*3, 9, 18* 126:*1, 14,*
*19* 127:*1, 9* 128:*8, 15*
129:*4* 135:*19* 136:*18*
138:*7* 144:*8* 151:*12*
152:*8* 164:*12* 166:*3,*
*15, 22* 169:*5, 21*
170:*7* 171:*2, 10*
172:*21* 180:*13, 21*
181:*18* 197:*12*
**99** 155:*6*
**99.5** 76:*9*
**990** 50:*16, 25* 51:*12*
53:*7, 23* 54:*19* 55:*6*
56:*18* 197:*10*
**990s** 56:*13*

**< A >**
**a.m** 2:*3*
**abated** 185:*12, 22, 23*
**abatement** 185:*15, 20*
186:*11*
**ability** 9:*24* 124:*7*
**able** 89:*21* 115:*21*
131:*20*
**abused** 175:*5*
**abusive** 179:*7*
**accelerated** 88:*15*
**access** 96:*3* 151:*1*
**accounting** 13:*11*
14:*3* 17:*3, 4*
**accounts** 182:*11*
**accuracy** 115:*17*
**accurate** 83:*21*
165:*11* 172:*4*
**accurately** 85:*14*
165:*25*
**accuse** 84:*19*
**accused** 174:*24*

**act** 14:*6, 12, 19, 24*
19:*2* 28:*1, 7* 33:*24*
66:*12* 116:*25* 119:*1*
131:*22* 132:*9, 24*
133:*4* 136:*20* 160:*7*
**acted** 64:*11*
**acting** 62:*2* 70:*8*
100:*24* 107:*8* 112:*18*
118:*13* 119:*16* 156:*1*
157:*10* 178:*8*
**action** 23:*19* 24:*1*
39:*3* 108:*11* 109:*5*
110:*7* 185:*7* 191:*7*
196:*17*
**actions** 158:*1, 25*
**activities** 187:*12*
**activity** 60:*15, 18*
107:*20* 108:*7*
**actors** 138:*14*
**acts** 79:*9, 19* 117:*6*
132:*3, 6* 182:*13*
184:*11*
**actual** 94:*7* 146:*22,*
*24*
**added** 45:*8*
**addition** 137:*19*
147:*16*
**additional** 94:*17*
**address** 52:*17, 18, 22*
131:*19* 156:*12*
158:*16*
**addressed** 47:*16*
70:*11* 113:*13*
**adequately** 127:*10*
128:*16*
**administer** 6:*12*
**administered** 65:*21,*
*23*
**administering** 162:*19*
**administrative** 32:*21*
**administrator** 79:*2*
134:*8*
**admit** 131:*14*
**adopt** 193:*25*
**Adv** 1:*9*
**adverse** 176:*10* 177:*1*
**advice** 11:*6, 8, 14, 19,*
*25* 12:*6, 14, 21* 17:*9,*
*11, 24*

**advised** 19:*20* 20:*18,*
*24* 175:*14*
**advising** 165:*20*
**advisor** 17:*18* 179:*11*
**advisors** 178:*24*
**advisory** 59:*7*
**Affidavit** 163:*7, 12*
164:*5, 15* 167:*20*
168:*20* 169:*11*
174:*12* 175:*8* 197:*12*
**affidavits** 98:*7*
**affiliate** 168:*10, 15*
**affiliated** 11:*24* 20:*6*
102:*12* 183:*1, 21*
189:*21*
**affiliates** 183:*15*
**affirmatively** 194:*15*
**afforded** 157:*21*
**Africa** 8:*6*
**afternoon** 135:*1*
**AG** 81:*24*
**agencies** 100:*5*
107:*18* 112:*6*
**agency** 65:*20, 24*
66:*10, 11, 24*
**agent** 14:*25* 15:*5*
30:*1, 3, 8* 31:*6, 17, 24*
32:*2, 17* 33:*3, 12, 25*
61:*22* 62:*6, 18* 63:*13,*
*25* 70:*9* 72:*19*
**agents** 31:*2*
**ago** 9:*12* 110:*13*
116:*1* 132:*8* 193:*17*
**agree** 99:*10, 14*
123:*24* 148:*9* 187:*20*
**AGREED** 6:*1, 5, 9*
147:*5* 194:*2*
**agreement** 10:*20*
18:*23* 36:*9* 65:*24*
66:*3, 4, 6, 9* 69:*14*
70:*3* 76:*24* 77:*6, 13*
134:*1, 8* 136:*11*
139:*3* 140:*14* 153:*24*
165:*22* 166:*3, 22*
180:*22* 186:*9, 14, 21*
187:*3, 21* 188:*4, 20*
194:*1*
**agreements** 10:*15, 17*
130:*24*

**ahead** 38:*12, 23*
41:*25* 69:*23* 95:*8*
105:*3* 134:*16* 145:*16*
**ain't** 99:*25*
**allegations** 40:*17*
85:*10* 87:*21* 90:*3, 16*
94:*23* 98:*8* 100:*15*
136:*9* 142:*14* 145:*18*
146:*16* 150:*5*
**alleged** 117:*3*
**AMELIA** 4:*8*
**amount** 177:*21*
**Amy** 109:*24*
**and/or** 96:*7*
**ANDREA** 3:*11*
**Andrews** 67:*20*
**animal** 8:*5*
**answer** 38:*10, 12, 23*
39:*25* 41:*25* 42:*24*
69:*19, 23* 70:*15*
71:*11, 23* 72:*5, 15*
73:*2* 85:*25* 86:*25*
87:*2, 16* 95:*3* 100:*19*
105:*3, 10* 121:*18*
125:*13* 126:*8* 127:*17*
128:*7* 129:*3* 135:*3*
136:*23* 145:*7, 10*
148:*15* 153:*1* 162:*22*
173:*10, 16, 19, 22*
177:*10* 186:*4* 192:*11*
194:*15* 198:*2*
**answered** 65:*11* 70:*6*
80:*8, 9* 124:*5* 127:*18*
138:*9* 145:*8*
**anybody** 8:*20, 22, 24*
10:*9, 16* 11:*23* 12:*5,*
*13, 20* 13:*21* 14:*7*
15:*14* 17:*11* 26:*15*
35:*5* 38:*4* 63:*24*
78:*14* 80:*10* 81:*2*
84:*19* 117:*12, 16*
130:*24* 144:*25*
148:*21* 157:*10, 24*
160:*1, 6* 167:*4, 6, 11,*
*13* 170:*8, 25* 172:*7*
178:*8* 189:*13, 20*
**anybody's** 134:*11*
**anyone's** 23:*25*
**anyway** 88:*5* 141:*5*

**apologize** 20:*1* 29:*23*
137:*13* 145:*13*
181:*23*
**apparent** 63:*17, 20*
**appeal** 190:*21* 193:*4*
**appear** 157:*18* 181:*6*
**appearance** 109:*16*
113:*3*
**appeared** 180:*17*
181:*1, 8*
**appears** 63:*14*
157:*17*
**appellate** 191:*14, 20*
192:*2, 3* 193:*1, 8, 15,*
*16, 25* 194:*12, 17*
**applied** 190:*19*
**appoint** 9:*20*
**appointed** 58:*4, 6*
63:*13*
**appointing** 15:*5*
**appraisal** 41:*3* 46:*3,*
*8, 12, 19, 21, 22* 47:*1,*
*5, 9, 10, 15* 48:*2, 13*
**appraised** 46:*25*
141:*22*
**appreciate** 33:*19*
65:*6* 96:*10* 98:*17*
133:*2*
**apprised** 102:*25*
141:*21*
**approval** 36:*8* 68:*5,*
*16*
**approve** 34:*19*
**approved** 31:*20*
140:*15*
**approving** 28:*17*
151:*7*
**April** 58:*9* 164:*9*
168:*8* 171:*24*
**argument** 131:*11, 13*
190:*7*
**arising** 186:*23*
**Ashcroft** 102:*12*
**Ashcroft's** 102:*15*
**aside** 34:*11* 40:*5*
117:*13* 140:*15* 151:*7,*
*12* 152:*7* 153:*7*
180:*22* 184:*17*
**asked** 30:*7* 65:*11*
70:*5* 80:*8, 9, 10* 81:*3*

Deposition of James Dondero                                                    In re Highland Capital Management, L.P.

82:*19*  88:*13*  117:*15*
124:*5*  132:*10, 18*
138:*9*  145:*14*  168:*9*
170:*14*  173:*4, 7*
187:*19*

**asking**  31:*19*  33:*9,*
*21, 23*  49:*1*  60:*21*
*62:4*  64:*22*  72:*1*
77:*10*  79:*16, 17*  95:*9,*
*11, 12*  112:*22, 23*
143:*6*  163:*17*  172:*17*
179:*16*  192:*5*

**asks**  109:*12*

**aspect**  25:*20*  28:*8*
75:*16*

**aspects**  85:*10*

**assert**  71:*1, 20*

**asserted**  72:*23*

**asserting**  72:*11*

**asset**  10:*14, 16*  17:*9,*
*11, 25*  18:*6*  21:*9, 10*
22:*3*

**assets**  10:*24*  11:*6, 9,*
*15, 21*  12:*1, 7, 15, 22*
18:*2, 12, 16*  19:*8*
21:*23*  41:*4*  46:*10, 19*
74:*13*  86:*7*  88:*1*
89:*17*  183:*10, 11*

**Assistant**  3:*11*

**assorted**  19:*13*

**assume**  27:*2*  52:*25*
91:*13*  120:*23*

**Assumes**  170:*18*

**assurance**  32:*3*

**assured**  31:*8*  32:*1*

**Atlas**  154:*21, 25*
155:*5*  159:*6*  163:*2*
165:*18, 21*  166:*5, 14*
167:*1*

**attached**  48:*23*  61:*4*
149:*8*

**attention**  99:*17*

**attorney**  100:*10, 14,*
*21*  101:*1*  102:*18*
103:*7, 18, 20, 22, 23*
104:*7, 16*  105:*7, 9, 25*
106:*22*  107:*9*  108:*21*
109:*3, 5, 15*  113:*2*

**attorney-client**  70:*15*
71:*23*  96:*21*

**Attorneys**  3:*15*  4:*4,*
*13*  6:*2*  45:*10*  84:*8*
101:*14, 19*  109:*21*
174:*7, 23*

**attorney's**  102:*1*

**August**  75:*11*  89:*14*
114:*13*  115:*13*  116:*1*
146:*13*  179:*7*

**Austin**  102:*10*

**authorities**  179:*13, 14*

**authority**  14:*6, 12, 19*
17:*17*  18:*16*  26:*8*
60:*2*  69:*13*  70:*2, 11*
78:*11, 12, 14, 17, 23*
79:*8*  130:*10, 23*
131:*12, 15, 22*  133:*12,*
*25*  134:*9*  136:*10*
157:*8*  159:*24*  160:*7,*
*25*  166:*4*  167:*9*

**authorize**  29:*7*

**authorized**  6:*11*  9:*6*
24:*12, 18*  27:*6, 9*
28:*1*  29:*1*  59:*21, 24*
61:*14*  67:*19*  70:*20*
71:*5, 18*  72:*20*  81:*4,*
*8*  113:*15*  117:*25*
119:*1*  187:*22*

**authorizing**  27:*15*
65:*9*  68:*5*  70:*23*

**automatic**  78:*25*
80:*16*  117:*9, 18*
118:*8*  132:*7*

**automatically**  78:*17*
79:*7, 25*  117:*6, 19, 22*
118:*12*  130:*20*

**available**  51:*9*  96:*16*

**Avenue**  4:*14*

**aware**  9:*2*  14:*5*
22:*18*  27:*14*  28:*12,*
*15*  30:*9*  31:*2, 4, 21*
34:*10*  37:*5*  38:*14, 17*
39:*1, 2*  40:*4, 15*  43:*1,*
*3*  45:*20*  49:*19*  53:*6*
54:*6, 10*  57:*23*  64:*9*
73:*5*  74:*1, 2*  76:*7*
87:*9*  88:*12*  92:*22*
102:*4, 16*  110:*11*
113:*7*  115:*21*  116:*5*
118:*7, 8*  119:*3*  120:*3,*
*5, 24*  121:*2*  124:*9*

126:*11, 18, 23, 24*
129:*11, 14, 22*  130:*3,*
*17*  133:*4*  134:*18*
135:*6, 17, 23*  136:*25*
137:*15, 19*  138:*1, 11,*
*15, 17, 19*  142:*18*
149:*1*  155:*5, 16*
157:*24*  160:*12, 13*
162:*25*  170:*13*  171:*7,*
*13*  172:*18*  178:*16*
179:*3*  185:*6, 11*
186:*8, 21*  188:*9, 17,*
*19*  190:*4, 6, 14*  192:*5,*
*20*

**awareness**  13:*19*
14:*1*  15:*8*  64:*8*
89:*16*  124:*6*  128:*5*
155:*10*  156:*5*  157:*13*
158:*4*  163:*4*  187:*7*
189:*24*  190:*13, 18*

**awfully**  163:*22*


**< B >**

**back**  29:*16*  36:*5*
38:*16*  42:*11*  52:*7*
79:*6*  114:*8*  117:*24*
123:*9*  131:*6*  132:*2*
133:*1*  140:*4*  154:*5*
159:*13*  160:*15, 25*
163:*23*  176:*23*  179:*6*
190:*21*  191:*15*  192:*1*
194:*13, 17*

**back-and-forth**
167:*15*

**background**  68:*10*

**bad**  94:*19*  117:*5*
132:*3, 6, 23*  133:*4*
138:*14*  182:*12*
184:*11*

**badgering**  135:*1*

**balance**  46:*11*  47:*3*

**ball**  98:*20*

**BANKRUPTCY**  1:*1*
9:*15*  28:*17*  107:*15*
109:*16*  110:*4*  168:*25*
180:*17*  181:*2, 6*
182:*13*  183:*19*

**Barbara**  50:*2*  56:*18*
57:*9, 18*  58:*21*

143:*25*  147:*18*

**barely**  90:*4*  132:*17*

**barrier**  172:*18*

**base**  21:*9, 10*

**based**  30:*4*  40:*5*
41:*10*  71:*16*  136:*9*
159:*3*  161:*13*  184:*18*
194:*21*

**bases**  70:*24*

**basis**  16:*21, 24*
22:*20*  46:*18*  48:*11,*
*12*  66:*16*  101:*12*
116:*11*  136:*17*
150:*14*  177:*23*

**BATES**  3:*11*

**Beacon**  167:*21, 25*
168:*2*  169:*15*  170:*9*
171:*1*

**began**  117:*6*  133:*7*

**beginning**  61:*23*
182:*9*

**begins**  26:*8, 12*
165:*16*

**behalf**  3:*5*  8:*25*  9:*6*
14:*6, 12, 19*  20:*11*
24:*13, 19, 24*  25:*14,*
*20*  26:*2, 17, 23*  27:*7,*
*10, 16*  28:*2, 8*  29:*3, 9*
53:*18*  61:*16, 20*
64:*11*  66:*12*  67:*21*
69:*14*  70:*3*  74:*3*
79:*9, 19*  100:*25*
106:*6, 13, 21*  107:*8*
118:*1, 18*  119:*1, 17*
129:*25*  131:*22*
134:*10*  136:*11, 21*
139:*3*  157:*11, 25*
158:*9*  160:*8*  173:*6*
178:*8*  181:*7, 8*
190:*12*  191:*7*

**behave**  35:*24*

**behest**  107:*13*

**belief**  150:*9*  182:*12*

**believe**  9:*22*  10:*10*
11:*2*  16:*7, 10*  18:*6,*
*11, 25*  19:*12*  21:*21,*
*22*  22:*4, 23*  23:*3, 10,*
*17, 24*  26:*22*  35:*14*
37:*19*  38:*3*  40:*21*
43:*14*  44:*12, 13*  46:*1,*

9, 23  55:19  58:15
62:11  68:3  70:24
72:10, 22  74:9  78:20
79:23, 25  81:12, 14,
15  86:1  87:23  91:22
92:23  93:5, 14  94:4,
13  100:16  101:6, 10,
13  102:10, 20  103:11,
20  105:16  108:13
109:12  113:20  120:1
121:19  122:8, 13
123:1, 13, 25  127:22
128:22  130:9  131:8,
9  134:4  140:18
141:21, 24  142:4, 7,
11  143:2, 16, 17
147:20  149:21  150:1
151:10, 14  157:3, 7
159:16, 23  169:16
172:4  175:7, 10
177:3, 12  180:15, 19,
23  181:4, 10, 15
184:19  189:1, 6
**believed**  71:17  171:9
187:19
**believing**  150:14
**bell**  155:21
**benefactor**  63:2
**beneficiaries**  161:3, 7,
18
**beneficiary**  8:11
62:15  63:2  161:15
**benefit**  13:22  15:15
117:1
**Bermuda**  160:17
**best**  8:23  9:5  21:5
27:5, 25  39:19  42:17
43:5, 9  47:14, 24
48:1  60:23  61:1
64:3  68:15  79:2, 10,
18  87:19  96:5  97:21
101:8  103:3  125:16,
24  128:13  131:10
153:11  154:10
162:15  180:18, 24
184:20, 25  185:1
191:9, 10
**better**  151:1
**beyond**  22:9  66:10

**big**  36:25  89:10
**biggest**  183:18
**binding**  137:23
138:5  153:14
**bit**  16:8  22:3  50:19
189:12
**bleed**  191:12
**blew**  163:21
**blood**  196:17
**board**  50:5  53:15
114:22, 24  151:19, 20
160:16
**bodies**  81:21, 22
179:1
**bona**  108:4, 6
**books**  117:14  120:6
**bottom**  75:24  140:10
**bought**  170:9
**box**  51:19  52:12
**boxes**  154:13  162:13,
19, 20
**Boy**  7:20
**break**  27:20  29:15
30:11, 14  31:11, 15
32:16  33:6  82:2, 16
139:18  179:25
**brief**  99:1, 6
**Broadway**  3:7
**brought**  25:21  26:3
49:17  99:17
**burn**  185:3
**business**  13:6, 9
81:20  89:10  91:1
98:21  152:14, 15
183:16  185:8  186:24
187:10  188:12, 22
194:1, 14
**buyer**  169:14, 21
170:2  171:1

**< C >**
**call**  46:20  74:19
163:6
**called**  7:1  13:3
28:21  51:3  73:6
74:4  155:18, 23
168:11
**calls**  70:15  71:23
87:3  173:10, 20
**camouflage**  146:6

**capacity**  9:1  19:2
23:19  24:1  59:8
105:24  165:18
**CAPITAL**  1:5, 7  3:5
5:7  76:10, 13  199:3
**care**  32:14, 15  134:13
**carefully**  80:3, 22
**case**  33:18, 20
107:15, 25  109:16
110:4  113:4  173:13
179:17  180:17  181:2,
6, 8  185:11, 22  186:1
188:15  189:2  199:3
**cash**  46:9
**caused**  110:7  167:21
179:8
**Cayman**  37:3, 10, 23
38:6  40:22  41:1
43:23, 25  44:3  45:7
47:11, 17  48:4, 22
49:21  58:1  61:3
81:20  84:11  88:8
89:13  92:6, 12  93:8,
23  94:3  98:4, 9
150:24  163:15
172:13  185:16  190:7,
14  191:2, 8, 21  192:7,
20
**Caymans**  37:15
43:12  149:19, 22
**CCR-NJ**  1:23  2:8
**ceased**  116:23  130:21
**Cedar**  52:20  158:15
**certain**  16:15  96:17
**certified**  156:24
**certify**  196:9, 15
**cetera**  26:14
**CFO**  59:2
**chain**  117:20
**chairman**  11:3
**changing**  30:10, 17
**channels**  141:9, 16,
23  145:19
**Chapter**  1:5  182:7
**charitable**  74:13
93:23  132:11  162:18
**charities**  41:5, 10
46:11, 16  79:3, 14
84:10  86:2, 12  88:2
92:18  118:14  120:5

131:7  142:10  143:19
145:21
**charity**  48:10  73:22,
23  74:9, 13  86:9
106:6  132:12  152:14
**Chart**  74:21, 23  75:8,
17  115:18, 19  155:9
160:15  197:12
**charts**  88:1, 23, 24
89:17  90:11  143:9
**check**  115:20, 25
**choose**  8:4  17:17
**chunk**  11:2  19:12,
15, 21  20:5, 11
**circles**  142:23
**circumstances**  115:1
161:14
**City**  50:1  54:20
55:12, 22  56:6  57:19
58:20  143:25  147:17
**claim**  147:13
**Claimant**  3:6
**claimants**  183:14
**clarity**  96:11
**class**  77:20, 23, 25
182:22
**classes**  77:4, 14, 16
**Claus**  129:10
**clean**  106:19
**clear**  99:4  175:11
**client**  38:9  71:22
87:14  100:19
**clients**  147:20
**client's**  26:23
**close**  111:9  179:25
**closed**  108:10
**closer**  51:24
**collateral**  111:4
**collectively**  57:20
76:17
**combination**  164:22
**come**  29:16  52:6
88:2  98:4, 5  140:4
146:2, 10
**coming**  96:6  97:14
110:21  192:1  193:22
**commandeer**  79:24
**commandeered**  79:23
**commenced**  9:15
185:7

comment 78:10 124:7
comments 34:22 36:24 118:10
Commission 107:24 108:10, 16 199:25
committed 94:18
committee 49:20 57:25 58:7, 14, 22 59:16, 21 147:4
communication 38:24 70:16 71:24 106:22 145:20
communications 38:11 40:1 87:3, 15 95:4, 13 107:17 173:11
Company 73:7 94:5 176:22
compel 124:10, 11, 16, 22 125:2, 8 127:16
compensation 43:16, 19 44:8 45:11 82:25 132:5 146:5 171:9 172:9, 15, 21 174:4
competent 174:7, 22
competently 92:23
compilation 88:10
compile 150:11
compiled 89:12
compiling 85:9
complaint 43:23, 25 101:1
complaints 107:16 112:5
complete 88:18
complex 94:4
compliance 64:20 65:22 66:20
compliant 66:18 69:2
compliantly 27:3 33:16
complicated 186:4
comply 121:20 123:3 124:1 125:19 126:2
concept 84:23
concern 7:15
concerned 139:25 183:5

concerning 28:9 36:3, 19 39:20 42:7 82:25 100:15 110:4 174:3, 18
concerns 33:4
conclusion 72:18 160:24
conclusions 118:10
concurrent 93:19
conduct 94:10 100:6 119:2, 10 136:13, 20
confidence 131:8
confident 191:17
confidential 41:10 102:21, 25
confirm 57:4
connected 109:2 148:10
connection 33:25 35:6 37:8 38:18 39:8 84:25 102:16 122:16 124:17, 23 125:3, 9 126:14, 19 127:1 129:16 138:6 170:6
consent 19:1 23:18, 25 26:16, 24 64:14 65:8, 14 68:4, 15 129:24 130:5, 25 131:4 134:11
consented 187:15
consequence 176:16
consequences 177:1
consider 96:15
consideration 139:12 182:3 184:15
considered 49:15
consistent 29:18 116:13 188:13
contact 101:25 106:11 107:23 108:20 112:19 113:16 179:9
contacted 105:6, 9, 24 113:10
contained 71:19
contains 44:7
contemporaneously 143:3
contend 175:4

contended 123:2 125:18 126:1 127:8 128:15
contends 40:4 128:9 129:5 140:14
contested 120:14, 16
context 120:15 134:17
continuation 94:12
continuing 35:18, 24
continuous 116:11
contract 22:20
contribution 132:11
contrivance 46:20 48:13
contrived 48:9 79:4
control 10:10, 12, 19 24:6 78:4 80:11 114:12, 17 115:2, 7, 12, 23 116:7, 10, 20, 24 118:12 130:21 134:9 138:21 139:7 151:16 156:1 160:20 161:7, 16 162:14 188:11, 22
controlled 8:15 132:13 151:21 162:13
controlling 161:3, 19
controls 10:7 78:20 80:6 151:18
conversation 36:18 42:6 103:11
conversations 82:16 96:2 101:14 142:8 175:12 178:4
convey 140:21
copy 48:18 49:3, 5, 11 60:24 61:2
corner 75:19 78:6 164:8
correct 7:21 8:2, 12, 15 20:25 30:19, 21, 23 37:8 43:6 48:5 50:2, 8 52:3, 18 58:1 60:12, 15 62:1 64:15 68:22 70:21 71:20 72:12 73:9 76:20, 24 78:22 83:5, 10, 14 92:2 93:24 104:10

106:18 107:10 108:13, 23 109:17 114:13, 19 116:7, 8, 22 118:1 119:25 124:3 125:20 126:3 128:18 129:17 134:22 135:8, 20 137:1, 4, 7, 10, 16 140:17 142:11, 14 149:9 152:2 153:7, 17 154:13 161:19 163:2 166:7 169:1 175:17 177:2 179:22 180:15, 19, 22, 23 181:9, 10, 15 187:24 188:23 193:5, 10
CORRECTIONS 199:4
correctly 45:1, 18 100:11
Counsel 5:6 29:19 31:22, 23 32:5 38:11, 25 40:2 41:23 59:4 62:13, 14 63:22 69:20 71:12, 16 81:15 87:3, 15 88:4 91:13 92:18 95:5, 22 96:2 97:9, 18 100:16, 17 103:13, 17 104:17, 18, 19 115:17, 20, 25 154:17 164:22, 23, 24 165:1, 4 169:17 173:11, 23
COUNTY 196:5
couple 29:23 45:9 53:20 66:14 87:23
Cournoyer 5:6
course 66:22
COURT 1:1 6:14 28:17 36:8 50:14 58:5, 8 80:10 81:3, 20 88:8, 13 92:6, 13 93:8 96:14 99:17 105:19 109:13 111:13 125:12 130:14 139:25 152:25 156:11 167:6, 12 185:8 187:11 190:7, 14 191:2, 9, 14, 21 192:2, 4, 7, 20

193:*1*, *8*, *25*  194:*1*, *14*, *17*
cover  83:*18*
covered  159:*22*
COVID  176:*24*
creating  90:*11*  161:*1*
creditors  182:*22*
Crescent  156:*11*
criminal  45:*10*  60:*15*, *18*  107:*20*  108:*6*
criteria  194:*9*
Crown  73:6, *11*, *12*, *17*  117:*20*  137:*21*  138:*3*  139:*4*  140:*23*  141:*12*  142:*17*  143:*13*, *22*  145:*2*  147:*9*, *21*  148:*22*  149:*14*  150:*15*  151:*5*  152:*19*  153:*5*, *12*, *22*  154:*20*  160:*16*, *19*  162:*17*  163:*1*  165:*19*  166:*6*, *13*, *25*  181:*13*
current  21:*10*  140:*13*
cut  123:*6*  171:*20*

< D >
D.C  110:*3*
DAF  49:*21*  52:*5*  93:*23*  162:*18*
DALLAS  1:*3*  49:*25*  51:*13*  52:*1*, *14*, *18*, *21*, *24*  53:*8*, *13*  54:*8*  55:*21*  57:*17*  58:*20*  73:*5*, *16*, *17*, *20*, *23*, *25*  74:*2*, *4*, *7*  81:*20*  106:*14*  117:*21*  118:*24*  119:*7*, *22*  121:*21*  122:*23*  123:*2*, *15*  124:*2*  125:*1*, *7*, *17*, *25*  126:*13*, *24*  127:*8*, *16*  128:*14*  129:*8*, *16*, *24*  130:*5*  134:*20*  135:*18*  136:*1*, *8*, *17*, *25*  137:*3*, *6*, *9*, *15*, *20*, *21*  138:*3*, *4*, *20*, *23*  139:*4*, *5*  140:*23*, *24*  141:*12*, *13*  142:*16*, *17*  143:*13*, *14*, *22*, *23*, *24*  144:*3*, *5*, *6*  145:*1*, *2*

147:*9*, *10*, *16*, *20*, *21*  148:*22*, *23*  149:*14*, *15*  150:*15*, *16*  151:*4*, *5*, *16*, *18*  152:*1*, *18*, *19*  153:*4*, *5*, *12*, *13*, *21*, *22*  172:*18*  175:*14*, *25*  176:*5*  177:*17*  178:*5*, *11*  181:*7*, *8*, *12*  187:*10*  188:*11*
damming  37:*16*
Danielle  5:*9*
date  76:*8*, *16*  104:*14*  131:*21*  157:*19*  199:*4*
dated  165:*22*
dates  61:*8*  165:*24*
DAUGHERTY  1:*10*
daughter  132:*13*
David  129:*10*  142:*9*
Davor  109:*23*
day  91:*1*  98:*21*  99:*5*  135:*1*, *9*, *12*  140:*2*  195:*15*  196:*21*
days  48:*19*, *24*  61:*5*  87:*23*  190:*6*
DC  3:*17*  4:*15*
deal  99:*22*
death  62:*15*
Debtor  1:*6*  99:*23*
decade  183:*19*
deceased  175:*13*
December  133:*11*  190:*7*, *20*  191:*4*  192:*9*, *23*, *25*  193:*19*  194:*8*, *10*, *18*
decided  18:*14*  181:*13*, *25*
deciding  177:*24*
decision  24:*19*, *23*  26:*2*, *7*  190:*15*  193:*9*
decisionmaking  26:*12*
decisions  8:*24*  9:*6*  24:*13*  25:*13*, *19*
declaration  37:*7*  39:*7*  132:*10*  161:*17*  168:*4*  171:*23*
declarations  190:*11*
declined  191:*2*
defame  84:*19*
Defendant/Counter-Plaintiff  1:*11*

defendants  94:*7*  186:*10*, *23*  187:*23*  188:*11*, *22*  194:*4*
defer  91:*12*  154:*17*
definitely  87:*7*  133:*6*, *8*
definition  185:*19*
defrauded  41:*5*  86:*12*
delegated  14:*11*
delegating  14:*5*, *18*, *24*
denied  88:*14*
Dep  199:*4*
departure  104:*5*
depends  131:*5*
depicted  75:*10*  78:*5*
depo  135:*2*, *4*
Deponent  199:*4*, *20*
deposed  115:*9*  126:*19*, *25*  129:*9*
DEPOSITION  1:*16*  2:*6*  6:*10*  29:*20*  31:*17*  34:*2*  82:*17*  98:*13*  120:*9*  127:*11*, *19*, *24*  128:*4*, *8*, *17*  129:*4*, *21*  135:*10*  170:*14*  196:*11*, *12*
depositions  97:*18*  129:*15*  134:*19*  135:*7*, *18*  170:*16*  172:*8*, *13*
derivative  98:*14*
describe  32:*8*  63:*5*, *9*  66:*5*, *8*  91:*18*, *24*  99:*6*
described  42:*20*  43:*5*  82:*24*  89:*5*  91:*22*  94:*8*, *16*
describing  132:*18*
DESCRIPTION  197:*9*
deserve  182:*15*
designate  28:*7*
designated  29:*25*  30:*8*  31:*16*  33:*3*, *11*, *24*  50:*7*  53:*7*, *13*  55:*11*  56:*4*, *22*  57:*7*  62:*6*
designation  32:*24*

desire  188:*14*
detail  133:*19*  183:*10*
details  16:*2*  43:*1*  63:*21*  64:*2*  86:*13*  89:*11*  90:*10*  115:*5*  146:*4*, *21*  150:*4*
DFW  86:*10*  92:*19*  169:*17*
Diaz  129:*15*  134:*19*  135:*7*  151:*25*  152:*4*, *5*  181:*3*, *5*
difference  135:*14*  161:*23*
different  13:*13*  15:*11*  18:*6*, *17*  30:*24*, *25*  31:*1*  32:*20*, *22*  33:*18*, *20*  77:*4*, *14*, *16*, *17*  97:*11*  107:*19*  144:*9*  148:*16*  151:*1*  162:*2*
difficult  184:*11*
diluted  86:*8*
direct  89:*16*  141:*3*, *9*  142:*24*, *25*  145:*19*
direction  112:*19*
directly  15:*13*  93:*20*  103:*13*  141:*4*  149:*19*, *22*  150:*24*  158:*20*  171:*5*  173:*15*  174:*6*
director  56:*5*  57:*8*  59:*9*
directors  22:*15*  172:*14*
director's  172:*21*  174:*4*
disagreeing  61:*9*
disappeared  89:*18*
disappointed  35:*23*  194:*10*
disarray  130:*9*
disclose  127:*25*  128:*24*
disclosed  166:*15*  169:*6*  183:*15*
disclosure  182:*18*
discovered  40:*6*, *9*  42:*19*  43:*4*  94:*9*, *22*  96:*16*  97:*3*  98:*23*  99:*8*  133:*21*  140:*16*,

*22* 141:*14* 142:*1*
144:*25* 152:*5* 153:*16*
**discovery** 110:*19*
119:*10, 13, 20* 121:*14,*
*21* 122:*3* 123:*4, 15*
124:*1, 12, 16, 22*
125:*2, 8, 20* 126:*2, 12*
137:*4, 7* 170:*6* 171:*2*
174:*3, 18*
**discretion** 10:*14*
**discuss** 28:*14* 35:*9,*
*12, 16* 36:*15* 37:*10*
39:*10* 42:*13* 68:*1*
152:*9*
**discussed** 48:*3*
100:*23* 181:*4, 5*
**discussion** 39:*14*
61:*10*
**discussions** 29:*19*
107:*1, 9*
**dispute** 115:*11* 116:*5*
**dissolve** 165:*20*
166:*5* 167:*1*
**distinction** 161:*18*
162:*6*
**distinguish** 120:*12*
**distributed** 131:*11*
**distribution** 168:*24*
**DISTRICT** 1:*2*
**DIVISION** 1:*3*
192:*8, 21*
**docket** 139:*15*
**document** 32:*24*
38:*15, 18* 44:*6, 19*
51:*2, 9, 25* 54:*13*
56:*14* 67:*13, 20* 68:*6,*
*17* 70:*20* 75:*12*
117:*11* 120:*4, 21*
122:*24* 136:*23*
154:*15* 155:*2* 156:*7,*
*17, 20, 23* 157:*15*
159:*15* 163:*18* 165:*8*
169:*16*
**documentation** 80:*15*
**documentations** 33:*17*
**documented** 97:*6*
**documents** 26:*10*
31:*23* 36:*2* 37:*22*
38:*5* 96:*4, 7* 97:*1*

119:*24* 120:*25* 122:*9,*
*15*
**doing** 96:*5* 97:*21*
167:*7*
**doings** 59:*12*
**dollars** 45:*22* 167:*22*
169:*8* 172:*1* 177:*20*
**Dolomiti** 155:*18, 23*
156:*3, 14* 157:*4, 11,*
*19* 159:*5, 17* 160:*9*
166:*11, 23* 168:*17*
**Dolomiti's** 157:*15, 25*
**DONDERO** 1:*16*
2:*6* 7:*7* 20:*1* 29:*24*
40:*15* 43:*25* 50:*16,*
*21* 52:*12* 53:*1* 67:*5,*
*9* 70:*19* 72:*9* 74:*20*
82:*12* 85:*22* 95:*24*
97:*13* 100:*4* 112:*3*
123:*12* 140:*6* 147:*2*
154:*8* 156:*8* 163:*7*
171:*19* 174:*1* 177:*11*
180:*5* 195:*12* 196:*10*
197:*5, 10, 12* 199:*4*
**donor** 74:*10, 14*
**door** 102:*15*
**Doug** 175:*13*
**Douglas** 109:*23*
**dozen** 94:*5* 126:*18*
**drafted** 164:*20*
**Draper** 109:*23*
**drawn** 95:*4*
**drops** 160:*24*
**due** 66:*22*
**Dugaboy** 7:*20, 24*
8:*1, 8, 12, 14, 25* 9:*7,*
*21* 10:*7, 10, 17, 21*
11:*3, 14, 20, 25* 12:*7,*
*14* 13:*16, 22* 14:*4*
15:*6, 16, 23* 16:*6, 7,*
*11, 25* 17:*4, 11, 16*
18:*11, 22* 19:*3, 8, 14*
20:*4, 15* 21:*10, 23*
22:*12, 14, 19* 23:*4, 10*
24:*6* 25:*5, 8, 10* 26:*9*
28:*15, 23* 30:*5* 31:*2,*
*7, 17, 23* 32:*25* 33:*3,*
*24* 34:*10* 36:*12* 40:*4*
42:*18* 48:*22* 49:*6*
60:*10, 24* 61:*2* 66:*12,*

*25* 67:*16* 69:*11, 25*
70:*9, 25* 71:*20* 72:*11,*
*19* 76:*17* 95:*22* 97:*7*
107:*22* 113:*6, 21, 23*
114:*2, 3* 118:*1, 19*
119:*13, 23* 120:*3, 20*
121:*6, 22* 122:*2, 8, 16*
124:*2, 15, 21* 125:*17,*
*25* 126:*13, 25* 127:*7,*
*15* 128:*9, 14* 129:*5, 9*
130:*13* 140:*13, 16*
149:*7* 153:*6* 154:*11*
155:*22* 172:*19*
174:*16* 181:*17, 25*
182:*25* 184:*2*
**Dugaboy's** 9:*10, 17,*
*25* 10:*3, 24* 11:*6, 9*
12:*22* 14:*6, 12, 19, 24*
18:*2* 20:*11* 23:*19*
24:*1, 13, 19, 24* 25:*13,*
*20* 26:*2, 15, 16, 23*
27:*6, 10, 16* 28:*2, 8*
29:*3, 8* 30:*1, 8* 33:*3,*
*12* 34:*13* 36:*3, 19*
42:*7* 61:*15, 20* 62:*6,*
*17* 63:*13* 64:*11* 67:*9,*
*21* 118:*4, 19* 119:*17*
121:*1, 14* 151:*6, 12*
152:*7, 21* 173:*6*
180:*12, 21* 181:*13*
**duly** 7:*2* 81:*4*
196:*12*
**duty** 134:*13*

**< E >**
**earlier** 30:*7* 34:*9*
82:*19* 100:*4* 109:*22*
116:*14* 132:*1* 133:*8*
140:*3* 143:*10* 150:*18*
**early** 20:*15* 104:*5,*
*10* 107:*13* 109:*3*
131:*6* 154:*19* 190:*15*
**earned** 43:*13*
**ease** 95:*20*
**economic** 161:*2, 6, 15,*
*18* 176:*16*
**EDNEY** 4:*16* 10:*25*
11:*10* 12:*2, 9, 16, 24*
13:*24* 14:*8, 13* 15:*1,*
*17, 25* 16:*12* 17:*5, 12,*

*19* 18:*4, 18* 19:*4, 9,*
*16, 23* 20:*7, 13, 20*
21:*1, 6, 12, 19, 25*
22:*7, 16, 21, 25* 23:*6,*
*14, 21* 24:*3, 14, 20, 25*
25:*16, 22* 26:*5, 18, 25*
27:*11, 17* 28:*4, 11*
29:*4* 32:*6* 33:*7* 34:*3*
35:*2* 36:*21* 37:*12*
38:*1, 7, 20* 39:*22*
40:*10, 19* 41:*13, 20*
42:*21* 43:*7* 44:*10*
45:*5, 14, 24* 46:*6*
47:*19* 48:*6* 49:*8*
50:*3, 9* 51:*16, 21*
52:*6, 10, 19* 54:*24*
55:*2, 23* 58:*24* 59:*13,*
*18, 23* 60:*13* 61:*6*
62:*9, 20* 63:*18* 64:*6,*
*16, 23* 65:*10, 17, 25*
68:*7, 18* 69:*16* 70:*5,*
*13* 71:*2, 8, 21* 72:*3,*
*13, 24* 75:*20* 76:*25*
77:*8* 78:*8, 15* 79:*11,*
*21* 80:*7, 13, 23* 81:*5,*
*10* 82:*5* 84:*16* 85:*1,*
*7, 19* 86:*23* 87:*1, 12*
89:*1, 8, 25* 91:*10, 20*
92:*7, 14, 25* 93:*9*
94:*25* 95:*16, 19*
96:*23* 97:*25* 98:*25*
99:*10, 14* 100:*18*
101:*3, 21* 102:*2*
103:*8* 104:*21* 105:*8*
107:*3, 11* 108:*2, 24*
109:*8, 18* 110:*9, 17,*
*24* 111:*3, 7, 16, 18, 21*
112:*10, 15* 115:*14*
118:*5, 21* 121:*8, 16,*
*23* 122:*4, 10, 18*
123:*5, 9, 17* 124:*4, 18*
125:*5, 21* 126:*5, 15,*
*21* 127:*3, 12* 128:*1,*
*10, 19, 25* 130:*1, 7, 15*
131:*1, 24* 132:*15*
134:*2, 23* 135:*21*
136:*3, 14* 137:*11, 24*
138:*8, 24* 139:*8, 17*
140:*9* 141:*18* 142:*5,*
*20* 145:*4* 147:*24*

148:*12*  149:*16*  150:*7,
19*  152:*10, 22*  153:*8,
18*  154:*3, 14, 22*
155:*3, 8, 20*  156:*4*
157:*6, 12*  158:*3*
159:*9, 21*  160:*2, 11,
22*  161:*4, 10, 21*
162:*1, 8, 16*  163:*3, 16,
21, 25*  166:*18*  167:*23*
168:*21*  169:*10, 23*
170:*11, 17, 22*  171:*12*
172:*11, 23*  173:*8, 16,
20*  174:*5, 20*  177:*9*
181:*20*  183:*6*  184:*3,
6, 21*  185:*13*  186:*2,
12, 17*  187:*5, 17, 25*
188:*6, 24*  189:*16, 23*
190:*3*  191:*5*  192:*10,
14, 24*  194:*5*  195:*3*
**educate**  29:*12*
**educated**  29:*11*
**effect**  6:*13*  166:*6*
**efficient**  7:*12*
**effort**  174:*17*
**egregious**  43:*12*
**eight**  146:*3*
**either**  16:*19*  68:*12*
75:*23*  105:*16*  124:*2*
143:*2*  144:*20*  161:*11*
170:*15*  189:*14*
**eliminated**  80:*1*
**Ellington**  190:*1*
**else's**  130:*25*
**e-mail**  37:*22*  84:*7, 22*
**e-mails**  87:*25*  90:*10,
21, 22*  91:*5, 7*  143:*8*
146:*6, 20, 23*  175:*12*
**embezzled**  131:*9*
**embezzlement**  79:*4*
117:*3*  132:*4*
**employed**  12:*20*
**employees**  22:*12*
**Empower**  74:*4, 7*
137:*21*  138:*3*  139:*5*
140:*23*  141:*12*
142:*17*  143:*14, 23*
144:*1*  145:*2*  147:*10,
21*  148:*5, 22*  149:*15*
150:*16*  151:*5, 16, 18*

**152**:*19*  153:*5, 13, 22*
**ends**  26:*9, 12*
**engaged**  119:*9*
136:*12, 19*  189:*15, 22*
**enjoined**  191:*8*
**enjoining**  192:*21*
**enormously**  20:*17*
86:*9*
**enter**  69:*14*  70:*3*
129:*24*  130:*23*
133:*12, 25*  136:*10*
**entered**  28:*16*
137:*22*  138:*4*  153:*24*
186:*9*  188:*20*
**entering**  130:*6*
**entire**  81:*13*  169:*6*
**entirely**  81:*16, 19*
**entirety**  156:*18*
**entities**  13:*12, 13*
28:*10, 18, 19*  30:*25*
36:*9, 10*  50:*6*  57:*16*
58:*13*  69:*15*  70:*4*
73:*9*  74:*4*  75:*10*
76:*17, 22*  77:*17*  86:*7*
90:*11*  94:*6*  114:*18*
115:*3, 7, 23*  116:*7, 10,
20, 24*  119:*2, 25*
122:*3, 9, 14, 24*  123:*3,
14*  124:*23*  125:*9*
126:*2*  129:*25*  130:*22*
131:*23*  133:*14*  134:*1*
136:*12, 21*  137:*23*
138:*6, 22*  139:*4, 7*
142:*1*  144:*9*  150:*2*
151:*11*  153:*25*
154:*12*  155:*2, 17*
160:*21*  161:*19*  183:*1*
**entitled**  157:*21*  182:*4*
**entity**  7:*24*  10:*19*
13:*3*  20:*5*  22:*20*
49:*21*  52:*2, 4*  56:*23*
57:*5, 25*  59:*25*  73:*6*
81:*14*  93:*21*  94:*2*
144:*7*  155:*23*  157:*16*
158:*19*  160:*17*  161:*8*
177:*1, 14, 15*
**entity's**  53:*18*
**equity**  168:*25*
**ERRATA**  199:*2*

**ESQ**  3:*9, 10, 18, 19*
4:*8, 16*
**essentially**  169:*12*
**establish**  8:*8*
**established**  8:*1*
**estate**  19:*13*  138:*14*
182:*6*  184:*10*  185:*3*
**et**  26:*14*
**European**  164:*8*
165:*23*
**evasive**  120:*10*
**evasively**  127:*18*
**events**  98:*15*
**Eventually**  133:*20, 21*
**Everest**  5:*5*
**everybody**  27:*2*
**everybody's**  30:*5*
**evidence**  40:*6, 9, 16*
42:*19*  43:*4*  82:*20*
85:*9*  87:*24*  89:*5, 22*
90:*5, 8, 19, 25*  91:*3,
14, 16, 18*  92:*4, 11, 21*
93:*7, 16*  94:*8, 10, 15,
17*  96:*15, 16, 19*  97:*3,
4*  98:*24*  99:*8*  112:*7*
133:*20*  140:*16, 17, 22*
141:*14, 15*  144:*25*
145:*1, 18*  146:*4, 24*
149:*12*  150:*3*  152:*6*
153:*16*  170:*18*
175:*11*
**evidences**  98:*3*
**evidentiary**  93:*15*
96:*12*  193:*14, 21*
194:*19*
**exact**  8:*17*  61:*8*
177:*21*  186:*6*
**Exactly**  148:*4*  175:*6*
178:*3*
**EXAMINATION**  7:*5*
**examined**  7:*3*
**Excellent**  54:*23*
**excessive**  146:*5*
**excessiveness**  44:*16*
**Exchange**  107:*23*
**executive**  151:*22*
**exempt**  51:*3*
**exercise**  157:*21*
175:*15*  176:*6, 9, 25*
177:*25*  178:*6*

**exercised**  166:*4*
176:*1*  177:*18*  178:*12*
**Exhibit**  50:*15, 16, 21*
67:*4, 5*  74:*19, 20*
114:*9*  154:*6*  156:*6, 8*
159:*13*  163:*6, 7*
197:*10, 12*
**exhibits**  53:*3*
**expected**  140:*2*
**expense**  43:*13*  191:*12*
**expenses**  174:*8, 9, 11,
18*
**experience**  21:*5*
71:*17*  159:*4*
**expire**  178:*14*
**EXPIRES**  199:*25*
**express**  102:*21*
**extended**  88:*11*
**extensive**  64:*19*
88:*10*
**extent**  25:*15*  38:*10*
39:*25*  44:*12*  63:*23*
87:*2*  95:*3*  97:*15*
141:*21*  173:*10*
**external**  31:*22*  62:*14*
63:*22*  66:*21*

**< F >**
**fact**  40:*25*  43:*3*
95:*14, 15*  127:*22*
128:*22*  170:*20*
180:*16*
**facts**  29:*13*  87:*9*
94:*22*  95:*10, 12*
170:*18*  194:*21*
**factual**  169:*18*
**faded**  24:*8*
**failed**  93:*6*  116:*25*
121:*7, 13, 20*  122:*14*
123:*3, 14*  124:*1*
125:*19*  126:*2*  127:*10,
24*  128:*16, 24*
**fair**  9:*4, 13*  10:*6*
15:*7*  22:*11*  23:*13*
32:*14, 19*  33:*14*
39:*18*  42:*20*  68:*14*
78:*7*  85:*21*  86:*17*
89:*24*  91:*19*  92:*1*
97:*24*  100:*7*  107:*2*
108:*17*  109:*7*  116:*12*

121:*15* 133:*18* 134:*12* 144:*16* 158:*23* 160:*4* 166:*17* 169:*22* 171:*4* 179:*21* 184:*18*

**Fairlawn** 184:*13*

**Fairlawn's** 184:*25*

**fall** 9:*15*

**falls** 160:*25*

**familiar** 13:*2* 69:*8* 94:*6* 119:*19* 129:*19*

**family** 7:*21* 74:*5* 137:*22* 138:*4* 139:*5* 140:*24* 141:*13* 142:*18* 143:*14, 23* 145:*3* 147:*10, 22* 148:*7, 23* 149:*15* 150:*16* 151:*6* 152:*20* 153:*6, 13, 23*

**Fantastic** 87:*4*

**far** 89:*21* 93:*2* 109:*11, 20* 149:*18* 193:*19*

**FARR** 3:*14*

**fast** 84:*11* 163:*21, 22*

**February** 75:*11* 155:*25* 157:*5* 159:*18* 163:*1* 165:*17* 166:*21* 168:*9* 184:*4* 190:*15*

**feel** 72:*3* 142:*15* 145:*8* 153:*3*

**fees** 171:*24* 172:*14* 185:*2*

**feet** 176:*23*

**felt** 193:*1*

**fide** 108:*4, 6*

**Fiduciary** 134:*14*

**figure** 20:*3*

**file** 27:*10, 15* 29:*7* 59:*22* 61:*11, 20* 67:*20* 100:*25* 111:*2, 25* 112:*5* 182:*1*

**filed** 28:*23* 34:*17, 20, 23* 36:*7, 12* 37:*23* 38:*5* 39:*3* 44:*3* 47:*17* 48:*4, 18, 21* 49:*6* 51:*13* 59:*17* 60:*8, 10* 61:*3* 67:*17, 24* 68:*2, 17* 69:*9* 70:*21, 23* 71:*6, 18*

72:*9* 73:*7, 16* 74:*3* 85:*5* 91:*9* 92:*5, 12* 107:*16* 110:*13, 15, 18* 113:*3* 119:*7* 124:*15, 21* 125:*2, 8* 137:*1* 143:*11* 144:*7* 148:*25* 149:*7* 163:*14* 164:*9* 167:*20* 171:*23* 181:*17* 183:*1* 184:*2* 190:*11*

**files** 26:*22*

**filing** 6:*3* 26:*16* 29:*2* 61:*15* 62:*18* 64:*4* 65:*9, 15* 68:*5* 72:*20* 108:*22* 109:*4* 117:*25*

**filings** 27:*7*

**financial** 18:*17* 192:*7, 21*

**find** 97:*2* 143:*19* 146:*8* 188:*3*

**fine** 7:*17* 32:*18* 70:*17* 96:*25*

**finish** 27:*22, 24* 65:*5* 177:*10*

**finished** 177:*11*

**firm** 16:*5, 9, 24* 27:*15* 58:*18* 59:*6, 7* 61:*17* 105:*9, 20, 23* 107:*8*

**firms** 43:*14, 15* 44:*23, 25* 45:*4, 12* 65:*22, 23* 83:*8* 105:*6* 106:*2, 4*

**first** 44:*15* 45:*3* 47:*8* 49:*2* 53:*12* 54:*19* 55:*5* 56:*8, 25* 57:*11* 67:*15* 75:*7* 99:*7* 132:*9* 163:*22* 165:*16* 171:*13* 172:*1, 10*

**fits** 93:*3, 12*

**five** 116:*1* 145:*9*

**fleecing** 86:*6*

**flipped** 182:*8*

**Floor** 3:*7*

**Florida** 2:*10*

**flow** 38:*15, 18* 89:*16*

**fly** 193:*16*

**followed** 63:*4, 6*

**following** 138:*19* 158:*7* 159:*4* 191:*3* 192:*8, 22*

**follows** 7:*4*

**force** 6:*13*

**form** 6:*6* 11:*1, 11* 12:*3, 10, 17, 24* 13:*25* 14:*9, 14* 15:*1, 17* 16:*1, 12* 17:*6, 12, 20* 18:*4, 18* 19:*4, 9, 16, 23* 20:*13, 20* 21:*1, 6, 12, 19, 25* 22:*7, 16, 21, 25* 23:*6, 14, 21* 24:*3, 14, 20, 25* 25:*16, 22* 26:*5, 18, 25* 27:*11, 17* 28:*4, 11* 29:*4* 34:*3* 35:*2* 36:*21* 37:*12* 38:*1, 7, 21* 39:*22* 40:*10, 19* 41:*13, 21* 42:*21* 43:*7* 44:*10* 45:*5, 14, 24* 46:*6* 47:*19* 48:*6* 49:*8* 50:*3, 9, 16, 25* 51:*6, 12* 53:*7, 23* 54:*19* 55:*6, 23* 56:*17, 18* 58:*24* 59:*13, 18, 23* 60:*13* 61:*6* 62:*9, 20* 63:*18* 64:*6, 16* 65:*10, 17, 25* 68:*7, 18* 69:*16* 71:*2, 8* 72:*14, 25* 75:*20* 76:*25* 77:*8* 78:*8, 15* 79:*11, 21* 80:*7, 13* 81:*10* 84:*17* 85:*1, 7, 19* 86:*23* 87:*12* 89:*1, 8, 25* 91:*20* 92:*7, 14, 25* 93:*9* 95:*1* 101:*21* 102:*2* 103:*8* 108:*24* 109:*8, 18* 110:*9* 112:*10, 15* 115:*14* 118:*5, 21* 121:*8* 122:*4, 10, 18* 123:*17* 124:*4, 18* 125:*21* 126:*5, 15, 21* 127:*3, 12* 128:*1, 10, 19, 25* 130:*1, 7, 15* 131:*1, 24* 132:*4, 15* 134:*3, 23* 135:*21* 136:*4, 14* 137:*11, 24* 138:*8, 24* 139:*8* 141:*18* 142:*5,* 20* 145:*4* 147:*24* 148:*12* 149:*16* 150:*7, 19* 152:*10, 22* 153:*8, 18* 154:*3, 14, 22* 155:*3, 8, 20* 156:*4* 157:*6, 12* 158:*3* 159:*9, 21* 160:*2, 11, 22* 161:*4, 10, 21* 162:*1, 8, 16* 163:*3* 166:*18* 167:*23* 168:*21* 169:*10, 23* 170:*11, 17, 22* 171:*12* 172:*11, 23* 173:*8* 174:*5, 20* 181:*20* 183:*6* 184:*21* 185:*13* 186:*2, 12* 187:*5, 17, 25* 188:*6, 24* 189:*16, 23* 190:*3* 191:*5* 192:*10, 14, 24* 194:*5* 197:*10*

**formal** 66:*3*

**formed** 52:*2, 4* 74:*16*

**forth** 158:*1, 25* 196:*11*

**forward** 188:*15*

**found** 45:*8* 46:*14* 47:*11*

**Foundation** 49:*25* 50:*1, 2* 51:*13* 52:*1, 14, 18, 24* 53:*9, 13* 54:*8, 20* 55:*12, 21, 22* 56:*6, 19* 57:*9, 17, 18, 19* 73:*6, 17, 18, 20, 25* 74:*3, 4, 5, 8* 101:*4* 104:*23, 25* 106:*15* 107:*4, 12* 117:*21* 118:*24* 119:*7, 23* 121:*21* 122:*23* 123:*2, 16* 124:*3* 125:*1, 7, 17, 25* 126:*13, 25* 127:*8, 16* 128:*14* 129:*9, 16* 132:*16* 134:*20* 135:*18* 136:*1, 2, 3* 137:*1, 3, 6, 9, 16, 21, 22* 138:*3, 4, 23* 139:*4, 6* 140:*23, 24* 141:*12, 13* 142:*16, 18* 143:*13, 15, 22, 23, 25* 144:*4, 5, 7* 145:*2, 3* 147:*9, 11, 17, 18, 19, 21, 22*

148:7, *22*, *23*  149:*14*, *15*  150:*15*, *16*  151:*4*, *6*  152:*1*, *2*, *19*, *20*  153:5, *6*, *12*, *14*, *22*, *23*  162:9  172:*19*  175:*15*, *25*  176:*6*  177:*17*  178:5, *12*  181:*7*, *9*, *12*
**Foundation's**  129:*24*  130:*5*  136:8, *18*  138:*20*
**four**  146:*1*  150:*1*
**fourth**  62:*3*
**frankly**  96:7
**fraud**  94:*17*, *23*  96:*15*  140:*17*, *22*  141:*15*  142:*2*  145:*1*  152:6  153:*16*  182:*13*  183:*18*
**fraudulent**  94:*10*
**Friday**  1:*18*  2:*2*  199:*4*
**friend**  114:*22*
**front**  52:9  55:6
**froze**  123:*10*
**full**  191:*24*  193:*13*, *14*  194:*19*
**fully**  123:*14*  171:7
**functioning**  151:*22*
**Fund**  155:*7*, *12*
**funds**  114:*23*, *25*
**FURTHER**  6:*5*, *9*  91:*25*  190:*11*  195:*1*  196:*15*

< G >
**GALLAGHER**  3:*14*
**General**  5:*6*  11:*19*  36:*23*  85:*3*  100:*10*, *14*, *22*  101:*19*  102:*1*, *24*  103:7, *18*, *22*, *23*  104:7, *16*  105:*7*, *10*, *25*  106:*23*  107:*10*  108:*21*  109:*3*, *5*, *15*  143:*16*  165:*18*  166:*4*  182:*21*  190:*18*  191:*24*
**generally**  11:*18*  28:*20*, *21*  35:*13*, *14*  37:*14*  78:*10*  101:*20*

134:*4*  136:*22*  182:*19*
**generals**  103:*20*
**General's**  101:*1*  102:*18*
**getting**  53:*4*  97:*16*  111:*3*, *8*  141:*4*, *9*  148:*19*  149:*5*  176:*23*
**give**  27:*6*  37:*21*  70:*9*  149:*2*, *13*  159:*17*
**given**  17:*24*  133:*3*  191:*24*  196:*13*
**giving**  166:*13*
**glad**  99:*12*, *13*
**Global**  73:*6*, *12*, *17*  137:*21*  138:*3*  139:*5*  140:*23*  141:*12*  142:*17*  143:*14*, *22*  145:*2*  147:*10*, *21*  148:*22*  149:*14*  150:*15*  151:*5*  152:*19*  153:5, *12*, *22*  154:*20*  160:*16*, *20*  162:*17*  163:*1*  165:*19*  166:6, *13*, *25*  181:*13*
**go**  36:*5*  38:*12*, *16*, *23*  41:*25*  42:*11*  57:*4*  69:*23*  95:*8*  105:*3*  114:*8*  131:*6*  134:*16*  145:*16*  154:*5*  158:*7*, *12*  159:*12*  163:*9*, *23*  164:*1*  165:*15*  169:*4*  171:*16*  195:*7*
**going**  7:*13*, *23*  10:*25*  11:*10*  12:*2*, *9*, *16*  13:*24*  14:*8*, *13*  15:*25*  17:*5*, *19*  38:*9*, *20*  41:*20*  51:*23*  53:*24*  54:*15*  57:*19*  62:*2*  67:*8*, *13*  70:*13*  71:*21*  72:*6*, *13*  73:*11*  76:*4*  80:*20*, *21*, *23*  81:*14*  84:*16*  87:*1*, *14*  91:*12*  94:*25*  95:*2*  96:*12*, *14*, *20*  97:*8*  98:*2*, *17*  99:*5*  100:*18*  111:*18*, *21*  114:*4*  117:*24*  131:*14*  140:*3*  142:*22*  155:*12*  158:*13*  163:*2*

173:*9*  191:*17*  192:*2*  193:*11*
**Good**  7:*7*, *8*  32:*18*  93:*4*  104:*21*  139:*17*
**gotten**  85:*14*  144:*19*
**government**  107:*17*
**GP**  165:*19*  166:*5*
**Grand**  192:*6*, *20*
**Grant**  145:*24*  189:*25*
**granted**  164:*17*  191:*13*
**granting**  66:*24*
**grantor**  63:*2*  105:*17*, *18*
**Great**  56:*16*  71:*15*  80:*25*  90:*7*  111:*6*, *8*  131:*17*  133:*10*  141:*10*  185:*18*
**grew**  20:*16*
**Grosvenor**  183:*17*
**ground**  7:*14*  153:*16*
**grounds**  69:*13*  70:*2*  118:*25*  119:*9*  183:*22*
**guarantee**  98:*1*
**guess**  25:*12*  29:*15*  61:*23*, *24*  113:*24*  168:*6*  180:*1*  182:*4*
**guys**  99:*20*  110:*18*  115:*9*  193:*16*

< H >
**HAGAMAN**  1:*10*
**Hakusan**  155:*18*  156:*3*  158:*19*, *24*  159:*5*, *18*  160:*10*  166:*11*, *23*
**half**  48:*9*  82:*8*  94:*5*  126:*18*  172:*1*, *9*, *10*
**Hance**  105:*12*, *14*, *21*  107:*7*
**hand**  196:*21*
**handle**  66:*21*, *22*
**handled**  61:*7*  62:*12*
**handles**  165:*5*
**handling**  173:*12*
**hands**  174:*7*, *22*
**Hang**  177:*9*
**happen**  104:*3*  193:*11*
**happened**  15:*11*

132:*24*  193:*17*
**happening**  98:*15*
**HART**  4:*3*
**head**  29:*13*  41:*16*
**hear**  7:*9*  45:*1*, *18*  100:*11*  123:*8*
**heard**  156:*14*  169:*17*  190:*7*  193:*4*
**hearing**  82:*20*  83:*23*  86:*22*  87:*10*  88:*25*  89:6, *7*, *23*  90:*5*  93:*13*, *15*, *17*  94:*24*  96:*12*  97:*14*  98:*22*  99:*6*  110:*21*  125:*10*, *18*  126:*1*  127:*2*, *9*  128:*15*  129:*4*  169:*21*  171:*3*  191:*3*  192:*9*, *23*  193:*13*, *14*, *22*  194:*18*, *20*
**hearings**  88:*12*  173:*12*
**held**  2:*7*  18:*3*, *7*  77:*22*, *25*  154:*25*  155:*17*, *22*  156:*2*  160:*9*
**he'll**  111:*13*
**helpful**  176:*14*
**hereinbefore**  196:*11*
**hereunto**  196:*20*
**hiding**  98:*19*
**HIGHLAND**  1:*5*, *7*  3:*5*, *6*, *15*  5:*6*  9:*14*  11:*24*  12:*6*  25:*11*, *21*  26:*3*  27:*16*  28:*10*, *19*  33:*4*, *13*  34:*1*  36:*7*, *10*  45:*21*  49:*25*  50:*1*  51:*13*  52:*1*, *14*, *17*  53:*8*, *13*  54:*7*, *20*  55:*12*, *21*  56:*6*, *18*  57:*9*, *17*, *18*  58:*20*  62:*8*  73:*9*, *23*  76:*10*, *13*, *14*, *19*  77:*7*  107:*15*  109:*16*  110:*4*, *7*  119:*24*  120:*4*, *21*, *24*  121:*7*, *13*, *20*  124:*16*  125:*3*, *19*  133:*13*  134:*1*  144:*4*  147:*16*, *17*, *18*  152:*1*  168:*25*  180:*17*  181:*1*, *6*, *7*  182:*6*, *21*  199:*3*

**Highland's** 36:*20*
76:*7* 182:*17* 183:*22*
184:*20, 24*
**highlight** 71:*13, 14*
**highlighted** 43:*12*
184:*8*
**highly** 66:*18* 182:*8,
9* 191:*16, 17*
**Hill** 179:*12* 184:*12,
25*
**hired** 45:*4*
**hiring** 44:*22*
**HMIT** 4:*4* 28:*9, 18*
36:*9* 69:*14* 70:*3*
73:*9* 76:*4, 8, 23*
77:*22* 78:*4* 79:*20*
81:*4, 9* 114:*13, 18*
115:*2, 7, 23* 116:*7, 10,
20, 24* 119:*1, 24*
122:*3, 9, 14, 24* 123:*3,
14* 124:*1, 22* 125:*9*
126:*1* 129:*25* 130:*6,
21* 131:*22* 133:*13, 25*
134:*21* 136:*11, 20*
137:*23* 138:*5, 22*
139:*3, 7* 151:*7*
153:*25* 154:*1* 160:*21*
**HMIT's** 115:*12*
**hold** 184:*12*
**HoldCo** 49:*21* 93:*23*
**holding** 94:*4*
**holds** 18:*8, 11*
**Holland** 59:*5* 106:*7,
13, 20* 107:*1* 141:*8,
25* 142:*8* 143:*21*
144:*14, 21* 148:*19*
**Honis** 114:*15, 16, 17,
21* 115:*2, 6, 12, 22*
116:*6, 11* 133:*24*
162:*13, 19*
**hope** 112:*21, 22, 24*
**hospitality** 175:*24*
176:*22* 177:*16, 19*
178:*9* 180:*7*
**host** 183:*1*
**hour** 82:*8* 140:*10*
**hours** 60:*10* 99:*1*
110:*22*
**HR** 13:*10* 14:*3*

**hundred** 16:*15*
**hundreds** 182:*10*
**Hunter** 23:*4, 11*
45:*22* 46:*4, 22* 47:*2*
75:*24* 78:*20, 24* 79:*9*
80:*6, 12* 110:*25*
134:*7* 168:*1, 11, 23*
169:*6*
**Hunton** 67:*20*
**hurdles** 33:*17*
**HURT** 4:*8*

**< I >**
**iceberg** 174:*15*
**idea** 135:*13* 170:*23*
**identification** 50:*17*
67:*6* 74:*21* 156:*9*
163:*8*
**identified** 42:*15*
89:*20* 189:*8*
**identify** 15:*14* 16:*5,
21, 24* 18:*10* 22:*24*
40:*8, 25* 66:*23* 79:*19*
80:*5* 88:*24* 89:*4, 21*
91:*7* 121:*4, 6, 12*
127:*22* 128:*7, 22*
129:*3*
**identity** 169:*20*
170:*1* 171:*1*
**IDF** 154:*21, 25*
155:*5* 165:*19* 166:*5*
**ignored** 109:*13*
**imagine** 33:*18*
104:*25*
**immediately** 49:*15, 17*
**implementation** 60:*11*
**implying** 179:*2*
**important** 71:*7*
**improper** 111:*20, 23*
178:*25*
**inaccurate** 75:*17*
128:*9* 129:*5* 183:*23*
**inappropriately** 79:*24*
**Inaudible** 24:*7*
110:*24* 125:*11*
132:*22* 141:*5*
**inbound** 168:*10*
**incident** 132:*17*
**include** 72:*21* 147:*20*

**included** 47:*2, 7*
72:*10* 109:*22*
**including** 76:*17*
**income** 51:*4*
**incurred** 174:*10, 19*
**Independent** 114:*23,
24*
**independents** 31:*1*
**indicating** 84:*9*
**indications** 86:*2*
**indirectly** 158:*20*
**individual** 105:*24*
**individually** 142:*10*
**induction** 187:*11*
**influence** 162:*18*
**inform** 179:*1*
**informant** 41:*11*
**information** 38:*10*
39:*20* 41:*22, 25*
42:*14* 44:*7* 45:*11*
51:*10* 69:*19* 82:*24*
83:*4, 22* 86:*21* 87:*18*
94:*20* 95:*7* 103:*6, 17*
108:*5* 120:*13, 14*
141:*23* 142:*1, 2, 12,
19, 25* 143:*1, 12, 17,
18* 144:*19* 146:*2, 15*
148:*19, 24* 149:*2, 6*
150:*17* 152:*6, 13*
167:*4, 10* 173:*21*
174:*2, 17, 25* 175:*4*
177:*23* 179:*8*
**informed** 60:*3*
157:*20*
**in-house** 26:*13*
164:*22, 24* 165:*1, 3*
**initiated** 107:*1, 9, 17*
108:*20*
**injunction** 187:*1, 4, 8*
188:*4, 14* 190:*17, 19*
191:*3, 11, 15, 16*
192:*6, 12, 16* 193:*13,
18* 194:*9, 22*
**injunctive** 167:*5*
**inquire** 170:*25*
**inquiries** 169:*3*
**inquiring** 172:*20*
**inside** 174:*25* 175:*3*
177:*22* 179:*8*

**insider** 107:*25* 108:*4*
179:*11*
**insofar** 98:*13*
**institution** 18:*3, 11,
17*
**institutions** 18:*7*
**instruct** 38:*9* 69:*18*
70:*14* 71:*22* 87:*2, 14*
95:*2* 100:*19* 105:*2*
173:*9*
**INSTRUCTED** 198:*2*
**instructing** 173:*22*
**instruction** 27:*6*
38:*22* 39:*24* 41:*22*
70:*10* 72:*5*
**instructions** 61:*19*
168:*10*
**Insurance** 73:*7, 12*
160:*17* 165:*20*
**intended** 131:*19*
166:*25*
**intention** 165:*20*
166:*13*
**interaction** 59:*6*
**interest** 20:*16* 23:*4,
11* 76:*10, 19* 77:*24,
25* 79:*2* 86:*8* 102:*23*
109:*22* 118:*14*
131:*10* 154:*11* 155:*1,
7, 23* 156:*2* 157:*16*
159:*6* 160:*9* 166:*24*
184:*20, 24, 25* 185:*1*
**interested** 196:*18*
**interests** 77:*5, 15*
159:*18*
**internal** 31:*22* 62:*13*
63:*22* 66:*4, 20*
**interpret** 85:*22*
**invest** 11:*6* 20:*10, 24*
25:*5*
**invested** 19:*8*
**investigated** 112:*8*
**investigating** 85:*4, 9*
95:*23* 97:*9* 100:*22*
104:*7*
**investigation** 102:*18*
103:*2* 108:*11* 109:*10*
**investigations** 101:*19*
112:*7*

**Investment** 7:*20* 17:*18* 19:*3* 21:*4* 23:*5*, *11* 75:*25* 80:*12* 134:*7* 178:*24* 179:*11*
**investments** 19:*13*
**investor** 19:*18* 20:*16*
**involve** 40:*1*
**involved** 16:*2* 63:*21*, *22* 64:*1* 66:*24* 89:*11* 145:*25* 150:*24* 171:*5* 174:*6*, *21*
**involvement** 64:*2*, *8*
**involving** 37:*3*
**IR** 51:*9*
**Isaac** 34:*25*
**Island** 37:*23*
**Islands** 37:*3* 38:*6* 44:*3* 47:*17* 48:*4*, *22* 49:*21* 58:*1* 61:*3* 88:*8* 92:*6* 93:*23* 98:*9* 163:*15* 191:*22* 192:*7*, *20*
**issue** 38:*21* 39:*23* 41:*21* 191:*2* 192:*12*
**issued** 41:*6* 46:*13* 85:*16* 86:*8* 190:*15* 192:*6*
**issues** 43:*20* 100:*23* 150:*23* 181:*21*
**items** 71:*13* 83:*19*
**it'll** 69:*1*
**its** 11:*15*, *20* 12:*1*, *7*, *15* 19:*21* 26:*23* 33:*25* 48:*23* 49:*6* 53:*14* 61:*4* 108:*16* 119:*8* 135:*18* 137:*10*, *16*, *20* 138:*7*, *20* 140:*13* 156:*18* 159:*18* 176:*23* 181:*18* 182:*18*

**< J >**
**JAMES** 1:*16* 2:*6* 18:*8*, *16* 129:*9* 195:*12* 196:*10* 197:*5* 199:*4*
**JEFF** 3:*10*
**Jernigan** 88:*14*
**Jernigan's** 88:*13*
**Jersey** 2:*10*

**Jim** 52:*6*, *19* 95:*8* 105:*11* 183:*16* 184:*7* 186:*15*
**JOB** 1:*24*
**JOHN** 3:*9* 5:*8* 95:*19* 133:*24* 145:*8* 162:*13*, *19*
**Johnny** 101:*25* 102:*6*, *8*, *14*
**Johnny's** 102:*16*
**join** 152:*7*, *20* 153:*6* 181:*13* 185:*16*
**joined** 151:*6*, *11* 180:*12*, *21* 186:*1*
**joining** 181:*19*
**joint** 44:*2*, *17* 59:*21* 73:*15* 83:*4* 92:*17*, *24* 144:*20* 146:*14* 185:*25*
**jointly** 73:*7*
**JOLs** 47:*17* 48:*4* 60:*4* 61:*2* 147:*3*, *8*, *19* 148:*9*, *20* 180:*12*, *16* 189:*4*, *7*, *14*, *22* 190:*8*, *10*, *12*, *16*, *25* 192:*8*
**JONES** 3:*4*
**Jordan** 5:*5*
**JOSH** 3:*18*
**judge** 187:*10*, *19* 193:*19*
**Julie** 181:*3*, *5*
**July** 39:*3*, *4* 40:*16* 43:*19*, *22* 44:*4*, *17* 47:*16* 48:*3*, *22*, *24* 49:*7* 60:*3* 61:*3* 84:*2* 85:*5* 89:*13* 108:*22* 143:*2* 145:*17* 149:*8* 170:*4* 185:*9*
**June** 28:*17* 36:*6* 65:*16* 83:*22* 88:*25* 89:*6* 90:*5*, *17* 94:*24* 117:*24* 127:*9* 130:*10* 131:*15* 132:*10* 133:*5* 140:*15* 153:*15* 170:*4*
**justice** 152:*15*
**justification** 46:*15*

**< K >**

**Kansas** 50:*1* 54:*20* 55:*12*, *22* 56:*6* 57:*18* 58:*20* 143:*25* 147:*17*
**Keep** 53:*24* 54:*14*, *15* 56:*12* 102:*25* 141:*20* 142:*22* 149:*3* 158:*13* 192:*1*
**keeper** 91:*15*
**keeping** 41:*9* 83:*20* 84:*6*, *24*
**KELLY** 4:*3*
**kind** 10:*20* 131:*11* 139:*23* 154:*11* 165:*6*
**kiss-off** 48:*10*
**Kitrick** 5:*5*
**knew** 48:*8* 53:*15* 136:*5* 149:*19* 166:*2* 167:*8* 168:*8*, *23* 169:*20* 170:*3*
**Knight** 59:*5* 106:*7*, *13*, *20* 107:*1* 141:*8*, *25* 142:*9* 143:*21* 144:*14*, *21* 148:*19*
**know** 8:*16* 9:*17*, *24* 10:*1*, *4*, *8*, *13*, *15*, *16*, *18*, *22* 11:*5*, *7* 12:*12* 13:*15*, *17* 14:*15*, *21* 15:*3*, *10*, *11*, *19* 17:*3*, *21* 18:*2*, *8*, *20*, *21*, *24* 19:*6*, *14* 20:*10* 21:*9*, *15* 23:*8*, *16*, *23* 24:*5*, *10*, *18*, *22* 25:*4*, *7*, *15*, *18*, *24*, *25* 26:*8*, *11*, *14*, *20* 27:*3*, *8*, *19* 28:*6*, *12*, *20* 29:*1*, *10*, *11*, *25* 32:*23* 33:*2*, *5*, *23* 34:*5* 35:*4*, *8* 38:*4*, *13* 46:*12*, *24* 47:*1*, *4*, *6* 48:*11* 49:*14* 50:*11*, *25* 51:*7* 53:*16*, *17* 55:*14* 58:*3*, *14* 59:*1*, *15*, *19*, *20*, *24* 60:*1* 61:*14* 62:*5* 66:*2*, *3*, *4* 67:*19* 68:*9*, *20* 69:*1*, *24* 70:*7* 71:*4* 72:*17* 73:*21* 74:*7*, *16* 77:*10* 78:*3* 80:*18* 81:*2*, *7* 84:*12*, *19* 85:*17* 86:*4*, *5* 87:*25* 88:*7*, *11*, *12*, *15*, *18* 89:*11*, *15*
**Kansas**
90:*22* 92:*4*, *9*, *21* 93:*2*, *20* 94:*2* 95:*23* 96:*1*, *5*, *24* 97:*12* 98:*2*, *5*, *6*, *22* 99:*21* 100:*13*, *24* 101:*5*, *9*, *15* 103:*4* 105:*8* 106:*6*, *20* 107:*5*, *7* 108:*9* 109:*1*, *11*, *20* 111:*9* 112:*23*, *24* 113:*5*, *8*, *10*, *14*, *15*, *18*, *25* 114:*6*, *14* 115:*1*, *4*, *9*, *16*, *24* 116:*23* 118:*23* 121:*10*, *17*, *24*, *25* 122:*2*, *6*, *12*, *20*, *21*, *23*, *25* 123:*19*, *20*, *22* 124:*11*, *15*, *20*, *21*, *25* 125:*1*, *6*, *7*, *14*, *23* 126:*4*, *9*, *17* 127:*7*, *14*, *15*, *20* 128:*4*, *12*, *20* 129:*1*, *7*, *8* 132:*1* 133:*6*, *7*, *15*, *22* 134:*15* 136:*6* 138:*12* 139:*2*, *10*, *11*, *13*, *24* 142:*22* 143:*12*, *21*, *24* 144:*1*, *24* 145:*13* 146:*7* 148:*21* 151:*9*, *14*, *15* 152:*13* 153:*20* 154:*23* 155:*4*, *22* 157:*10* 158:*18*, *19* 159:*2*, *10* 161:*20*, *23* 162:*5*, *17*, *22* 164:*21*, *25* 165:*2*, *6* 167:*8*, *10* 168:*16*, *18*, *19* 169:*18* 170:*3*, *12*, *19* 172:*12*, *14*, *24* 173:*1*, *3* 174:*16* 176:*22* 178:*10*, *11*, *19*, *22*, *24* 179:*5*, *6*, *10*, *19*, *22* 183:*14* 185:*25* 186:*5*, *14* 188:*2*, *13* 189:*7*, *10*, *13*, *20* 190:*1* 192:*17*, *25* 193:*2*, *23* 194:*8*, *14*
**knowledge** 8:*23* 9:*5* 10:*2* 13:*20* 15:*4* 17:*8*, *10* 19:*7* 20:*4* 21:*5* 27:*5* 33:*10* 38:*24* 42:*17* 43:*6*, *9* 44:*15* 47:*15* 60:*22*, *23* 61:*1* 64:*3* 68:*11*,

*15, 22, 23* 69:*22*
71:*17* 75:*16, 22*
79:*10, 18* 95:*4* 98:*14*
101:*8* 103:*3* 124:*7*
125:*16, 24* 128:*13*
141:*2, 3* 153:*11*
154:*10* 158:*24*
162:*15* 180:*18, 24*
190:*22* 191:*9, 10*
**known** 35:*22* 48:*14*
86:*12, 13* 90:*4*
143:*19*
**Kurth** 67:*20*

**< L >**
**L.P** 1:*5, 7* 199:*3*
**LA** 4:*7*
**lack** 68:*22, 23* 101:*3*
107:*3, 11* 132:*16*
136:*3* 162:*8* 183:*9,
10*
**lacked** 69:*13* 70:*2*
136:*10*
**laid** 40:*22* 41:*1*
104:*24*
**Lambert** 5:*10*
**laptop** 52:*9* 53:*4*
54:*22*
**large** 11:*2* 19:*12, 15*
20:*5, 11*
**largely** 32:*21* 62:*11*
183:*9*
**late** 82:*9* 139:*24*
**latitude** 111:*4*
**law** 16:*5, 9, 24* 27:*15*
43:*14, 15* 44:*22, 25*
45:*4, 12* 58:*18* 59:*6*
61:*17* 65:*21, 23* 83:*8*
105:*6, 9*
**lawsuit** 186:*25*
187:*24* 188:*12*
**lawyer** 27:*9* 29:*7*
30:*13, 16, 22* 32:*16*
42:*6* 69:*4* 82:*16*
186:*18*
**lawyers** 26:*13, 14*
43:*14* 66:*20, 21*
93:*25* 103:*11*
**lay** 104:*22*

**laying** 98:*1*
**lean** 93:*25*
**learn** 15:*22* 45:*3*
48:*16* 94:*16, 22*
167:*19* 169:*14* 170:*1*
**learned** 31:*10* 40:*16*
43:*19* 44:*8, 13, 14*
47:*8* 48:*2, 17* 60:*8*
69:*20* 82:*20* 83:*3, 9,
14, 22* 84:*22* 86:*15,
21* 87:*10* 89:*6, 22*
169:*4*
**learning** 53:*12* 56:*8,
25* 57:*11*
**learns** 95:*14*
**leave** 129:*13*
**left** 104:*13* 111:*8*
139:*6* 160:*18* 174:*6,
22* 176:*16* 185:*4*
188:*10*
**left-hand** 75:*18* 78:*5*
**Legal** 3:*11* 13:*10*
16:*25* 63:*8, 10* 64:*19*
66:*10, 11, 13* 72:*18*
81:*12* 118:*10* 160:*23*
**legitimate** 131:*15*
**letter** 108:*22* 109:*4,
12, 14* 156:*8* 157:*4,
19* 158:*2* 159:*1*
165:*19* 197:*12*
**letters** 110:*2, 6*
113:*13* 166:*11*
**Leventon** 34:*25*
**LEVY** 3:*18*
**LEWIS** 4:*12*
**Life** 73:*7, 12* 160:*16*
**lifetime** 8:*12*
**lightly** 172:*25*
**limit** 110:*19* 111:*25*
**limitations** 126:*11*
**Limited** 73:*12* 76:*9,
19, 23* 77:*6, 12, 14, 23,
25* 93:*24* 154:*21*
155:*6* 156:*2* 157:*22*
159:*5, 7* 160:*8, 17*
166:*24*
**line** 27:*23* 198:*3*
**liquidate** 163:*2*
**liquidation** 49:*20*
57:*24, 25* 58:*7, 14*

59:*15, 20, 25* 84:*10*
147:*4*
**liquidation's** 59:*12*
**liquidator** 44:*18*
**liquidators** 44:*2*
59:*22* 92:*17, 24*
141:*5, 6, 7, 25* 142:*7*
143:*1, 18* 144:*20*
145:*22* 146:*14* 186:*1*
**liquidator's** 83:*5*
**liquidity** 176:*22*
**LISA** 1:*23* 2:*7* 5:*10*
196:*7, 23*
**listen** 80:*3, 21* 95:*16*
110:*18* 111:*21*
137:*18*
**litany** 117:*2*
**litigant** 25:*8*
**litigated** 25:*10*
**litigation** 25:*14, 21*
26:*3* 27:*7* 28:*3* 30:*4*
31:*3, 7* 33:*4, 12, 25*
40:*22* 41:*2* 62:*7*
66:*25*
**little** 50:*19* 99:*16*
170:*4* 175:*24* 189:*12*
**Littleton** 129:*15*
134:*19* 135:*7*
**Liz** 5:*11*
**LLC** 155:*18, 19, 23*
156:*3, 14* 165:*19*
166:*5*
**Ln** 199:*4*
**logical** 14:*2*
**Logically** 13:*18*
**long** 25:*11* 35:*22*
75:*3* 82:*4* 139:*21*
140:*8* 150:*12* 171:*9*
176:*13*
**longer** 157:*20* 159:*20*
**long-term** 177:*13*
**Longtime** 114:*22*
**look** 97:*6, 11* 136:*23*
159:*15* 168:*4*
**looking** 100:*6, 14*
160:*15* 192:*15*
**looks** 55:*7*
**lose** 78:*23*

**lost** 79:*7* 93:*13, 14*
118:*12* 123:*5* 131:*8,
12, 21* 167:*9* 190:*18*
**lot** 117:*4* 167:*15*
172:*14, 15*
**lots** 66:*19, 20* 89:*11*
**low** 111:*13*
**LP** 76:*10, 14* 154:*21,
25* 155:*5, 7, 13*
**LPA** 157:*22*
**lunch** 82:*2*

**< M >**
**machinations** 146:*8*
**mail** 156:*24*
**maintain** 161:*8*
**maintains** 158:*17*
**man** 177:*9*
**manage** 11:*9, 15, 20,
25* 12:*7, 14, 22* 13:*12*
78:*24* 175:*21*
**managed** 175:*22*
**MANAGEMENT** 1:*5,
7* 3:*5* 10:*17, 24* 17:*9,
11* 76:*10, 14* 161:*24*
162:*6* 199:*3*
**managements** 10:*14*
**manager** 17:*25*
**Mancino** 175:*13*
**manipulate** 54:*24*
**Maples** 58:*16, 18*
59:*6* 92:*23* 93:*6*
145:*24* 189:*25*
**MARK** 3:*19* 35:*17,
22* 39:*4* 40:*17* 41:*5*
43:*16* 44:*8* 45:*21*
50:*15* 67:*3* 69:*13*
70:*2, 11* 74:*12* 78:*3,
20* 80:*11* 81:*3, 8*
84:*7* 100:*15* 102:*19*
104:*5* 105:*7* 106:*1,
23* 109:*6* 119:*9*
120:*7, 9* 126:*25*
128:*4* 133:*12* 136:*10,
19* 138:*12, 21* 139:*2*
156:*6* 157:*8* 159:*23*
160:*1, 6, 24* 162:*25*
171:*8* 176:*15* 182:*14*
184:*14* 185:*8* 187:*11,
22*

**marked** 50:*16* 67:*6* 74:*21* 156:*8* 163:*8*
**Mark's** 37:*16*
**marriage** 196:*17*
**Massachusetts** 2:*10*
**material** 72:*21* 174:*25* 175:*3* 179:*7*
**matter** 38:*19* 51:*14* 66:*8* 69:*21* 97:*10* 112:*20* 116:*16* 120:*14, 16* 196:*19*
**matters** 37:*24* 66:*13* 67:*1* 104:*8* 107:*24* 111:*5* 134:*10*
**McGinnis** 98:*7* 189:*4* 190:*2*
**mean** 37:*14* 61:*17* 68:*24* 84:*5* 89:*10* 95:*16, 22* 99:*10* 102:*20* 111:*3* 116:*3* 140:*1* 172:*12* 184:*4*
**meaning** 77:*16*
**meaningful** 182:*3* 184:*15*
**means** 185:*15*
**meat** 103:*1*
**Mechanism** 85:*15* 138:*15*
**mechanisms** 41:*4* 86:*11*
**member** 114:*23, 24*
**members** 50:*5* 57:*24* 58:*11*
**memory** 11:*13* 12:*5* 14:*18* 47:*25* 64:*22, 25*
**mentioned** 45:*17* 74:*12* 83:*19* 85:*13* 88:*23* 90:*21* 100:*9* 141:*4, 8* 143:*9*
**MICHAEL** 4:*16*
**mid** 43:*22* 143:*2*
**middle** 123:*7* 145:*23, 24*
**Mike** 52:*8* 95:*10* 96:*9* 98:*17* 99:*24* 111:*15*
**million** 21:*16, 18, 24* 22:*5, 6, 10* 45:*22* 46:*9, 10* 48:*9* 86:*3*

**millions** 43:*16* 182:*10*
**mind** 94:*10* 135:*16*
**mine** 62:*15* 114:*22*
**minutes** 82:*6* 139:*22*
**minutiae** 92:*21*
**mirrors** 194:*14*
**misleading** 128:*9* 129:*6*
**mismarked** 183:*10*
**missed** 86:*20* 145:*12*
**missing** 71:*6*
**Missouri** 81:*24* 100:*9, 13, 21* 101:*1* 102:*1, 9, 11, 16, 18* 103:*18, 23*
**Misstates** 19:*24* 42:*22* 148:*13*
**misunderstood** 20:*2*
**misusing** 174:*24*
**MO** 112:*3*
**modifications** 99:*19*
**mole** 84:*8, 12, 23* 85:*5*
**moment** 34:*7* 41:*16* 54:*6* 119:*5* 156:*16* 185:*24* 189:*1*
**Monday** 96:*13* 111:*11* 114:*5* 162:*12*
**money** 13:*12* 48:*10* 131:*9* 172:*25* 176:*2* 178:*18*
**monies** 89:*17* 173:*1*
**month** 193:*17*
**months** 85:*11* 88:*3* 146:*3, 11*
**MORGAN** 4:*12*
**morning** 7:*7, 8*
**MORRIS** 3:*9* 7:*6* 20:*8, 9, 22* 24:*16* 29:*14, 22* 40:*12* 42:*2, 3, 23* 50:*13, 18, 20, 22, 24* 51:*18* 52:*8, 11* 53:*22* 54:*1, 14, 17, 23* 55:*4, 16, 18* 56:*1, 3, 12, 15* 57:*14, 15* 60:*17, 20* 67:*3, 7, 11*

**70:**17, 18* 71:*10, 25* 72:*6, 8, 15* 74:*18, 22, 24* 80:*25* 81:*1* 82:*3, 7, 11* 85:*23, 24* 86:*25* 87:*4, 5* 95:*9, 17* 96:*9* 97:*24* 98:*16* 99:*2, 12, 24* 100:*3, 20* 101:*23, 24* 104:*22, 24* 105:*5, 22* 110:*17, 23* 111:*2, 6, 15, 17, 20, 23* 112:*2, 12* 114:*8, 10* 123:*6, 8, 11* 125:*15* 126:*7* 137:*13, 14* 139:*20, 23* 140:*6, 10, 12* 145:*6* 148:*14* 154:*5, 7* 156:*6, 10* 159:*12, 14* 160:*3, 5* 161:*22* 163:*5, 9, 11, 16, 20, 23* 164:*2* 168:*5, 7* 171:*16, 18* 173:*18, 24, 25* 179:*24* 180:*4* 184:*5* 186:*19, 20* 189:*18, 19* 194:*25* 195:*3* 197:*6*
**motion** 28:*16, 23* 29:*2, 8* 34:*10, 13, 16, 19, 23* 35:*1, 7, 9, 12* 36:*3, 5, 8, 13, 20* 40:*5* 42:*7* 45:*21* 48:*23* 49:*6* 60:*10* 61:*4, 11, 15, 20* 62:*18* 64:*5, 23* 65:*9, 15* 67:*6, 10, 17* 70:*25* 72:*12* 80:*24* 87:*10* 89:*23* 111:*25* 118:*1* 124:*9, 11, 16, 22* 125:*2, 8, 18* 126:*14, 20* 127:*9, 16* 128:*8* 138:*7* 140:*13* 149:*8* 151:*6, 12* 152:*7, 21* 153:*7* 164:*12* 170:*7* 180:*13, 21* 181:*14, 18* 182:*1* 184:*2, 3, 6* 197:*12*
**motions** 110:*19*
**Mountain** 23:*5, 11* 45:*22* 46:*5, 22* 47:*3* 75:*25* 78:*21, 24* 79:*10* 80:*6, 12* 110:*25* 134:*7* 167:*21, 25* 168:*1, 3, 12, 23*

**169:**7, 15* 170:*10* 171:*1*
**move** 18:*16* 54:*25* 59:*25* 60:*17* 64:*21* 80:*20* 84:*11* 99:*20* 100:*1* 173:*23* 188:*14*
**moved** 25:*3* 41:*6* 117:*22*
**moving** 84:*10*
**multiple** 18:*7* 65:*4* 72:*2* 84:*1* 90:*14* 99:*9* 106:*10* 110:*2* 111:*1* 132:*20* 148:*3* 177:*5*
**MURACO** 1:*23* 2:*7* 196:*7, 23*
**mutual** 114:*23, 24*

**< N >**
**N.W** 3:*16*
**name** 8:*4, 5* 16:*9* 102:*14, 15* 104:*19* 105:*13, 20* 106:*4* 199:*3*
**named** 52:*13*
**names** 94:*6*
**Nancy** 9:*5, 10, 20, 25* 10:*3, 7, 11* 11:*5, 9, 14, 20, 25* 12:*6, 14, 21* 14:*5, 11, 18, 24* 15:*5* 17:*15, 17, 24* 18:*14* 19:*1, 20* 20:*10* 21:*4* 23:*18, 25* 27:*14* 28:*7* 29:*25* 35:*10, 13* 36:*3, 16, 19* 37:*11* 38:*5* 39:*15, 20* 41:*19* 42:*6, 13, 25* 61:*11* 62:*14, 25* 68:*1*
**Nancy's** 65:*8, 14* 68:*4, 15*
**nature** 28:*23* 95:*20*
**necessarily** 80:*16* 130:*18*
**necessary** 64:*18* 95:*11* 160:*13*
**need** 51:*16, 22* 97:*6, 23* 113:*13* 115:*20* 129:*23* 131:*4* 154:*17*

**needed** 15:*21* 31:*9* 63:*4* 84:*11* 130:*5* 141:*22*
**needing** 130:*24*
**needs** 19:*1* 23:*18, 25* 80:*17*
**negatively** 194:*16*
**neither** 125:*17, 25* 128:*14* 151:*4* 153:*12* 181:*12*
**never** 39:*19* 109:*15* 120:*7* 129:*21* 138:*10* 154:*11* 169:*16* 170:*24* 180:*16*
**New** 2:*9* 3:*8* 4:*7* 40:*14* 42:*14* 86:*9* 94:*22* 141:*15* 142:*2* 196:*3, 5, 8*
**newly** 40:*6, 8* 42:*19* 43:*4* 94:*9, 21* 96:*15* 97:*3* 98:*23* 99:*7* 140:*16, 22* 141:*14* 142:*1* 144:*25* 152:*5* 153:*16*
**news** 138:*2*
**NexBank** 11:*3, 4* 19:*12, 15, 19, 20* 20:*5, 12, 25* 22:*2*
**NexPoint** 12:*12, 13, 21* 165:*1*
**NexPoint's** 156:*12*
**non** 120:*10*
**nonprivileged** 87:*17*
**nonpublic** 108:*5* 174:*25* 175:*3* 179:*8*
**nonresponsive** 120:*10*
**Nope** 113:*17*
**normal** 79:*1* 117:*1*
**north** 185:*2*
**NORTHERN** 1:*2*
**Notary** 2:*9* 7:*3* 196:*7* 199:*25*
**noted** 87:*23* 171:*24* 195:*8*
**notes** 85:*13, 15, 22* 167:*16*
**notice** 159:*17* 166:*6, 13*
**noticed** 135:*1*

**November** 165:*22* 182:*20*
**number** 182:*4, 6, 24*
**numbers** 172:*16*
**numerous** 33:*16* 40:*21* 106:*11* 120:*6* 142:*8*
**nutshell** 182:*2*
**NW** 4:*14*

**< O >**
**oath** 6:*12*
**object** 10:*25* 11:*10* 12:*2, 9, 16, 24* 13:*24* 14:*8, 13* 15:*1, 17, 25* 16:*12* 17:*5, 12, 19* 18:*4, 18* 38:*20* 39:*22* 40:*10, 19* 41:*13, 20* 64:*23* 69:*12* 70:*1, 13* 71:*21* 72:*13* 77:*8* 80:*23* 84:*16* 87:*12* 89:*1, 8, 25* 91:*10, 20* 92:*7, 14, 25* 94:*25* 128:*1, 10* 158:*3* 167:*13*
**objected** 92:*19* 118:*24* 158:*24* 183:*21*
**objecting** 70:*25* 72:*24* 134:*2* 157:*24*
**Objection** 19:*4, 9, 16, 23* 20:*13, 20* 21:*1, 6, 12, 19, 25* 22:*7, 16, 21, 25* 23:*6, 14, 21* 24:*3, 14, 20, 25* 25:*16, 22* 26:*5, 18, 25* 27:*11, 17* 28:*4, 11* 29:*4* 34:*3* 35:*2* 36:*13, 15, 20, 21* 37:*12* 38:*1, 7* 42:*21* 43:*7* 44:*10* 45:*5, 14, 24* 46:*6* 47:*19* 48:*6* 49:*8* 50:*3, 9* 55:*23* 58:*24* 59:*13, 18, 23* 60:*13* 61:*6* 62:*9, 20* 63:*18* 64:*6, 16* 65:*10, 15, 17, 25* 67:*5, 9, 17* 68:*7, 18* 69:*9, 16* 70:*5, 12* 71:*2, 8* 72:*21* 73:*8, 16, 18* 74:*3* 75:*20* 76:*25*

78:*8, 15* 79:*11, 21* 80:*7, 13* 81:*5, 10* 85:*1, 7, 19* 86:*23* 93:*9* 95:*21* 100:*18* 101:*3, 21* 102:*2* 103:*8* 107:*3, 11* 108:*2, 24* 109:*8, 18* 110:*9* 112:*10, 15* 115:*14* 117:*25* 118:*4, 5, 19, 21* 119:*8* 121:*8, 16, 23* 122:*4, 10, 18* 123:*17* 124:*4, 18* 125:*5, 21* 126:*5, 15, 21* 127:*3, 12* 128:*19, 25* 130:*1, 7, 14, 15* 131:*1, 24* 132:*15* 134:*20, 23* 135:*19, 21* 136:*4, 9, 14, 18* 137:*1, 10, 11, 16, 20, 24* 138:*7, 8, 21, 24* 139:*8* 141:*18* 142:*5, 20* 144:*7* 145:*4* 147:*24* 148:*12* 149:*16* 150:*7, 19* 152:*10, 22* 153:*8, 18* 154:*1, 3, 14, 22* 155:*3, 8, 20* 156:*4* 157:*6, 12* 159:*9, 21* 160:*2, 11, 22* 161:*4, 10, 21* 162:*1, 8, 16* 163:*3* 166:*18* 167:*16, 23* 168:*21* 169:*10, 23* 170:*11, 17, 22* 171:*12* 172:*11, 23* 173:*8* 174:*5, 20* 181:*20* 183:*6* 184:*21* 185:*13* 186:*2, 12* 187:*5, 17, 25* 188:*6, 24* 189:*16, 23* 190:*3* 191:*5* 192:*10, 14, 24* 194:*5* 197:*12*
**objections** 6:*6* 71:*7, 19* 72:*11, 22* 95:*11* 129:*17* 183:*2, 5, 9*
**obligation** 179:*13, 15, 17, 20*
**obligations** 126:*3*
**obligor** 180:*6*
**obtain** 19:*1* 23:*18, 25* 49:*11* 129:*23* 130:*24* 174:*2, 17*

**obtained** 51:*8* 60:*24* 61:*2* 68:*16* 88:*25* 150:*3*
**obtaining** 26:*23* 65:*14* 134:*11*
**obviously** 97:*4*
**occur** 78:*13* 174:*1*
**occurred** 133:*5* 183:*19*
**occurring** 194:*20*
**October** 76:*8*
**odd** 98:*12*
**offended** 174:*9, 11*
**offer** 34:*22*
**Office** 5:*8, 9, 10, 11* 101:*2* 102:*1* 110:*3* 112:*19* 113:*11, 16* 158:*17*
**officer** 6:*11* 49:*24* 50:*8* 52:*13* 53:*8, 14, 16* 55:*11, 20* 56:*22* 59:*9*
**officers** 22:*14*
**official** 44:*2, 18* 59:*21* 83:*4* 92:*24* 144:*20* 146:*14* 186:*1*
**Oh** 14:*1* 22:*4* 55:*1* 116:*15*
**Okada** 74:*5* 137:*22* 138:*4* 139:*5* 140:*24* 141:*13* 142:*17* 143:*14, 23* 144:*1* 145:*3* 147:*10, 22* 148:*7, 23* 149:*15* 150:*16* 151:*5* 152:*20* 153:*6, 13, 23* 158:*16, 21*
**Okada's** 74:*12*
**okay** 7:*9, 11, 16, 24* 8:*7* 10:*5* 14:*16, 22* 15:*9* 16:*4, 17* 17:*2* 30:*6* 31:*14* 40:*24* 41:*17* 42:*10* 43:*2, 17, 24* 44:*21* 46:*2* 47:*13* 48:*15, 25* 49:*18* 50:*12* 51:*20* 52:*16* 54:*12, 16* 55:*1, 9* 56:*11* 57:*3, 21* 58:*10, 17* 60:*7, 16* 64:*10, 21* 67:*10* 68:*13* 69:*5*

73:*13, 18*  74:*15*  75:*4, 13*  76:*3, 5, 14*  77:*18*  78:*1, 2*  79:*15*  80:*2, 19*  83:*17*  84:*4, 21*  85:*23*  86:*19*  88:*20*  90:*18*  91:*17, 23*  94:*14*  96:*9*  100:*1*  103:*14, 21*  104:*2, 12*  106:*8*  108:*14, 18*  111:*17, 24*  112:*1*  115:*10*  116:*2*  118:*17*  120:*11, 19*  121:*11*  122:*1, 22*  123:*21*  124:*8, 14*  126:*10*  127:*6*  129:*12*  130:*12, 19*  134:*5*  136:*7*  139:*14, 16*  140:*20*  144:*2, 12*  145:*17*  147:*14, 15*  148:*8*  149:*20, 25*  150:*13*  151:*3, 23*  153:*10*  154:*18*  155:*14*  156:*21, 22*  157:*2, 9*  158:*5, 11*  159:*11, 25*  160:*14*  161:*12*  162:*4, 11, 21, 24*  163:*5*  164:*19*  165:*14, 16*  166:*9*  167:*3*  172:*6*  174:*13*  180:*11*  181:*11, 16, 22*  182:*16*  183:*25*  185:*5*  186:*7, 19*  188:*16*  190:*5*  191:*19*  192:*18*  193:*3*  194:*24*

once  117:*18*  135:*10*
one-half  76:*18*  77:*24*
ones  94:*7*
ongoing  104:*4*  109:*11*
onion  132:*2*  133:*1*
oOo  6:*19*
operating  27:*2*  61:*22*
opinion  176:*8*
opportunity  59:*16*  137:*4*
opposed  150:*2*
optimistic  194:*21*
option  175:*15, 23*  176:*1, 6, 9, 12, 25*

177:*18*  178:*6, 12, 14, 17*  180:*6*
orchestrate  138:*13*
order  15:*22*  28:*16*  29:*8*  48:*24*  60:*11, 24*  61:*5*  64:*5*  115:*21*  151:*7*  187:*16*
org  87:*25*  88:*23, 24*  90:*11*
organization  37:*4*  51:*3*  58:*12, 13*  59:*2*  66:*19*  75:*9*  161:*15*
Organizational  74:*20, 23*  75:*8, 17*  143:*9*  197:*12*
organizations  37:*24*  39:*3*  49:*20*  57:*20, 24*  58:*23*  59:*10*  100:*25*  103:*6, 16*  106:*14, 17, 21*  144:*15, 18*  147:*3*  148:*10, 18*  150:*3*  163:*13*  164:*16*  180:*20*  181:*1*  185:*7*  186:*9, 22*  188:*10, 20*  194:*3*
orgs  145:*21*
original  20:*16*  183:*14*  193:*18*
Orleans  4:*7*
outcome  196:*18*
outlined  174:*12*
outreach  101:*6, 7, 11, 13, 15*
outside  38:*24*  120:*13*  164:*23*
outstanding  176:*13*
overall  81:*13*
oversee  92:*21*
oversized  171:*9*
overturned  93:*13*
owned  10:*19*  76:*8, 18*  155:*6*  158:*20*  168:*11, 24*
owner  159:*7*
owners  134:*14*
ownership  117:*20*  155:*1*
owns  19:*11*  134:*16*

< P >
p.m  195:*8*
PACHULSKI  3:*4*
page  54:*18, 19*  55:*5*  158:*7, 12*  163:*22, 25*  197:*4, 9*  198:*3*
pages  120:*25*
paid  172:*9, 15*  177:*19*
papers  26:*16, 22*  27:*10, 15*  97:*17*
paperwork  138:*10*  139:*13*
paragraph  118:*16*  163:*10*  165:*15*  168:*6*  169:*4*  171:*17*
paragraphs  156:*19*
parcel  86:*6*
part  15:*13*  37:*17*  52:*5*  68:*10*  81:*17*  86:*5*  153:*25*  171:*2*  174:*2, 17*  175:*7*  182:*15*
participation  92:*19*  161:*24*  162:*7*
particular  7:*15*  67:*14*  69:*21*  167:*17*  184:*13*
particularly  31:*4*
parties  6:*3*  9:*2*  161:*3*  196:*16*
partner  154:*21*  165:*18*  166:*4*
partners  157:*22*
partnership  18:*22*  76:*9, 19, 23*  77:*5, 6, 13, 14, 23, 25*  155:*6*  156:*2*  159:*5, 7*  160:*9*  165:*21*  166:*24*
party  42:*5*  169:*8*
path  93:*4*
patience  111:*14*
PATRICK  1:*10*  35:*17*  39:*4*  40:*17*  41:*5*  43:*16*  45:*21*  69:*13*  70:*2*  78:*3, 20*  80:*11*  81:*3, 8, 19*  94:*11, 18, 24*  100:*15*  102:*19*  104:*16*  105:*7*  106:*1, 23*  109:*6*

114:*12, 19*  115:*3, 11, 22*  116:*6, 9, 19*  118:*25*  119:*9*  120:*7*  126:*25*  127:*10, 17, 23*  128:*7*  129:*23*  130:*4, 20*  131:*21*  133:*12*  136:*10, 19*  138:*12, 21*  139:*2*  155:*25*  157:*8*  159:*23*  160:*1, 6, 24*  162:*25*  165:*17*  166:*3, 12, 21*  167:*20*  170:*9*  171:*8*  172:*7*  174:*3, 10, 24*  175:*4, 14*  176:*15*  178:*20*  182:*2, 14*  184:*14*  185:*8*  186:*10, 23*  187:*14, 22*  188:*10, 21*  191:*8*  192:*22*  194:*3*
Patrick's  44:*8*  70:*11*  83:*8*  100:*6*  104:*5*  128:*4*  158:*8*  172:*20*  179:*7*  187:*11*
payment  145:*17*
PE  155:*7, 12*
peel  132:*2*
peeling  132:*25*  133:*3*
pending  186:*11*
Pennsylvania  4:*14*
people  58:*21*  66:*19, 23*  126:*19*  141:*3, 8*  172:*24*
perceived  127:*18*
percent  16:*15*  76:*9, 18*  77:*24*  155:*6, 17*  157:*16*  159:*7*  182:*22*
perfectly  96:*25*
performances  99:*22*
performing  13:*21*
period  43:*22*  75:*10, 18*  78:*5*  88:*10*  131:*5*
permeating  146:*21*
permitted  161:*7*
person  9:*6*  22:*20*  35:*18*  70:*8*  78:*4*  79:*19*  80:*5, 11*  114:*13, 18*  115:*7, 12, 23*  116:*7, 10, 20, 24*  117:*8*  118:*13*  121:*18*  130:*21*  134:*9*  139:*7*

141:*2* 156:*1* 162:*15* 188:*11*
**personal** 13:*20* 15:*4*
**personally** 114:*3* 140:*21*
**perspective** 138:*23*
**pertained** 46:*9*
**pertaining** 34:*1*
**pertains** 40:*17*
**petition** 76:*8, 16* 163:*14* 164:*16*
**Pg** 199:*4*
**Pham** 5:*9*
**phone** 142:*11*
**phonetic** 113:*1* 129:*10* 165:*5* 175:*13* 183:*17*
**phrase** 165:*3*
**piece** 37:*15*
**place** 65:*21* 139:*6* 187:*2, 12, 13* 188:*10* 194:*9, 23*
**placed** 126:*12* 133:*20*
**Plaintiff/Counter-Defendant** 1:*8*
**plan** 182:*17* 183:*2*
**plans** 183:*22*
**play** 34:*25* 35:*5* 73:*24*
**pleadings** 91:*13* 97:*7, 16* 140:*18*
**Please** 20:*8* 29:*18* 41:*25* 50:*13* 55:*17* 56:*2* 80:*3* 114:*9* 136:*16* 139:*19* 154:*6* 159:*13* 163:*24* 165:*15*
**point** 96:*17* 112:*6* 117:*22* 131:*12, 19* 139:*17* 155:*24* 161:*1* 178:*15*
**POMERANTZ** 3:*10*
**portfolio** 25:*2*
**posed** 127:*11, 23* 128:*17, 23*
**position** 53:*2* 100:*2* 116:*19* 118:*12* 121:*25* 122:*21* 123:*20, 23* 130:*4*

138:*22* 168:*11, 25* 169:*7*
**possible** 60:*1* 72:*20* 73:*3* 87:*22* 170:*20*
**post** 176:*24*
**pounded** 99:*18*
**power** 17:*17* 18:*15* 66:*10, 11* 151:*24*
**powerful** 142:*13*
**Poydras** 4:*5*
**prefer** 82:*7, 8*
**prejudice** 134:*21* 135:*20, 24* 136:*2, 6* 137:*10*
**premeditation** 37:*16*
**preparation** 35:*6* 64:*4*
**prepare** 15:*21* 26:*9* 128:*3*
**prepared** 15:*20* 60:*10*
**preparing** 35:*1* 60:*4*
**PRESENT** 5:*4* 41:*23* 42:*7*
**presented** 91:*14* 92:*6, 12*
**presenter** 91:*15*
**president** 54:*2, 7* 56:*5* 57:*5, 8* 59:*1, 9* 151:*21*
**press** 140:*1*
**prevented** 172:*19*
**primary** 22:*3* 73:*22*
**principal** 49:*24* 50:*8* 52:*13* 53:*8, 14, 16* 55:*11, 20* 56:*22* 59:*9*
**prior** 60:*3* 114:*18* 189:*13, 21* 190:*2* 194:*10, 18*
**private** 101:*20* 109:*10* 175:*10, 20, 22*
**privilege** 87:*8* 96:*22* 97:*20, 22*
**privileged** 70:*16* 71:*24* 95:*5, 25* 96:*4* 104:*23* 105:*1* 173:*21*
**privy** 150:*23*
**probably** 61:*21* 62:*1* 67:*22*

**problem** 147:*1*
**Proc** 1:*9*
**procedures** 30:*3*
**proceed** 7:*18* 82:*13*
**proceeding** 36:*25* 37:*2, 8* 39:*11, 12, 16, 21* 42:*8* 81:*18* 122:*17* 124:*17, 24* 125:*4* 172:*22*
**proceedings** 37:*11* 93:*22* 94:*3*
**process** 26:*12* 30:*2* 31:*5, 20, 21* 32:*9, 11, 15, 17, 20* 33:*21* 41:*9* 62:*25* 63:*3, 5* 66:*24* 68:*11* 80:*18* 83:*20* 84:*6, 24* 98:*4* 119:*20* 120:*16, 22* 171:*2* 174:*3, 18* 189:*9, 11* 191:*21*
**process-wise** 62:*13*
**produce** 121:*7, 13*
**produced** 120:*25*
**product** 88:*19*
**Professional** 2:*8* 15:*15, 22* 185:*1*
**professionals** 102:*22*
**projected** 182:*21*
**prompted** 108:*22*
**proper** 30:*2* 61:*7* 62:*25* 63:*7, 9* 95:*18* 104:*20* 159:*17*
**properly** 27:*3* 30:*4* 31:*9, 24* 32:*1, 4* 33:*15* 62:*12* 64:*19* 65:*21* 66:*13, 15, 17* 116:*25*
**proposed** 36:*8* 73:*8* 99:*18*
**proprietary** 190:*16*
**prosecute** 62:*7*
**prosecuting** 37:*25*
**protect** 97:*23*
**protocol** 31:*5*
**protocols** 63:*3, 6*
**provenance** 97:*5*
**provide** 13:*10* 93:*16* 117:*14* 122:*14*
**provided** 11:*8, 24* 12:*13, 21* 13:*16* 14:*2*

38:*4* 39:*19* 103:*6, 17* 120:*2* 129:*3* 143:*13* 144:*25*
**provides** 15:*15, 22* 16:*25* 17:*4, 10*
**providing** 11:*13, 19* 12:*6* 41:*22*
**Public** 2:*9* 7:*3* 43:*23* 97:*1* 196:*7* 199:*25*
**publication** 150:*23*
**publicly** 51:*9*
**punitive** 176:*15, 20*
**purchase** 19:*20*
**purpose** 14:*25* 16:*11* 30:*9* 32:*25* 33:*12*
**purposes** 62:*18* 63:*13* 151:*20*
**Pursuant** 117:*10* 157:*14* 187:*21* 188:*21*
**pursue** 184:*11*
**pursuing** 102:*23*
**put** 37:*15* 50:*14* 53:*1* 59:*24* 62:*24* 67:*8* 74:*18* 88:*8* 95:*19* 118:*19* 148:*17* 150:*11* 163:*5* 175:*15, 23* 176:*1, 6, 9, 12, 25* 178:*6, 12, 14, 17* 180:*6* 187:*11* 191:*11, 14* 194:*13, 17*
**putting** 53:*3* 67:*7*

**< Q >**
**quarter** 172:*1*
**queried** 103:*12*
**question** 6:*7* 11:*1, 11* 12:*3, 10, 17, 25* 13:*25* 14:*9, 14* 15:*2, 18* 16:*1, 13* 17:*6, 13, 20* 18:*5, 19* 19:*5, 10, 17, 24* 20:*7, 14, 21* 21:*2, 7, 13, 20* 22:*1, 8, 17, 22* 23:*1, 7, 15, 22* 24:*4, 15, 21* 25:*1, 17, 23* 26:*6, 19* 27:*1, 12, 18* 28:*5* 29:*5* 33:*9* 34:*4* 35:*3* 36:*22* 37:*13* 38:*2, 8, 13, 21*

39:*23* 40:*11, 14, 20* 41:*14, 21* 42:*1, 4, 12, 22* 43:*8* 44:*11* 45:*6, 15, 25* 46:*7* 47:*20, 22* 48:*7* 49:*9* 50:*4, 10* 55:*24* 58:*25* 62:*4, 10, 21* 63:*19* 64:*7, 17* 65:*6, 11, 18* 66:*1* 68:*8, 19* 69:*17, 23* 70:*14* 71:*3, 9, 22* 72:*14, 25* 75:*7, 14, 15, 21* 77:*1, 9* 78:*9, 16* 79:*12, 17, 22* 80:*4, 8, 14, 22* 81:*11* 84:*17* 85:*2, 8, 20* 86:*24* 87:*6, 13* 89:*2, 9, 19* 90:*1* 91:*4, 11, 21* 92:*8, 15* 93:*1, 10* 95:*1* 97:*12* 101:*22* 102:*3* 103:*9* 104:*21* 105:*4, 10* 106:*19* 108:*3, 25* 109:*9, 19* 110:*10* 111:*7* 112:*11, 16* 115:*15* 117:*15* 118:*6, 22* 121:*9* 122:*5, 11, 19* 123:*7, 18* 124:*5, 19* 125:*22* 126:*6, 16, 22* 127:*4, 13, 23* 128:*2, 11, 23* 130:*2, 8, 16* 131:*2, 18, 25* 132:*16* 134:*3, 24* 135:*3, 22* 136:*4, 15, 23* 137:*12, 25* 138:*9, 25* 139:*9* 141:*19* 142:*6, 21* 145:*5, 15* 147:*25* 148:*13, 16* 149:*17* 150:*8, 20* 152:*11, 23* 153:*19* 166:*19* 169:*19* 170:*6, 15* 173:*17, 19* 183:*7* 184:*22* 185:*14* 186:*3, 13* 187:*6, 18* 188:*1, 7, 25* 189:*17* 194:*6*
**questioning** 27:*23* 98:*14*
**questions** 29:*24* 31:*19* 67:*14* 88:*22* 127:*11, 17* 128:*17* 163:*17* 171:*6* 173:*3,*

*6* 174:*21* 198:*2*
**quickly** 59:*25* 87:*22*
**quite** 16:*8* 22:*2* 62:*23* 63:*15* 132:*8*
**quote** 103:*24*
**quotes** 146:*19*

**< R >**
**railroad** 99:*21*
**ran** 87:*22*
**Rand** 155:*7, 12, 13, 17* 156:*1* 157:*15, 22* 158:*1, 9, 25* 159:*8, 17, 19* 160:*8* 166:*24*
**ratified** 80:*17*
**Raver** 127:*1* 128:*16, 23* 129:*3* 168:*9* 169:*6* 170:*8* 172:*8*
**Raymond** 18:*8, 16*
**reach** 103:*24* 104:*3* 109:*2*
**reached** 104:*15*
**read** 34:*13* 49:*14* 52:*19* 55:*2* 118:*16* 155:*9* 156:*21* 165:*17, 24* 199:*4*
**reading** 97:*1*
**Reads** 199:*4*
**ready** 7:*18* 82:*12*
**real** 19:*13*
**really** 95:*9* 96:*9* 98:*15* 99:*4* 105:*3* 113:*22* 117:*13* 142:*13* 145:*12*
**realtime** 93:*20*
**reason** 10:*10* 18:*25* 23:*3, 10, 17, 24* 26:*21* 55:*19* 93:*5* 121:*19* 122:*8, 13* 123:*1, 12, 25* 141:*24* 142:*3* 143:*4* 151:*10* 157:*3, 7* 159:*16* 164:*14* 170:*13* 199:*4*
**reasons** 59:*14* 184:*1* 186:*6*
**recall** 9:*12* 11:*12, 23* 12:*4, 11, 18* 13:*1* 14:*10* 18:*1, 13* 27:*13* 36:*12, 18* 47:*8* 49:*1* 67:*16* 68:*9* 69:*25*

77:*12* 96:*5* 109:*21* 110:*1* 119:*11* 155:*24* 163:*12* 182:*17, 20, 25* 183:*4*
**receipt** 156:*24*
**receive** 59:*11* 157:*4*
**received** 120:*7, 15* 176:*3*
**receiver** 133:*20* 191:*13*
**receiver-type** 191:*16*
**receives** 11:*5*
**Recess** 29:*21* 82:*10* 140:*11* 180:*3*
**recollection** 14:*23* 21:*3* 39:*19* 48:*1, 8, 20* 65:*2, 7, 13, 19* 97:*1* 171:*21* 176:*18* 180:*9* 183:*20*
**recommend** 152:*18* 153:*21*
**record** 96:*11* 99:*13* 111:*19, 22* 173:*13* 195:*7* 196:*13*
**records** 117:*14* 120:*7*
**recover** 182:*22*
**recusal** 150:*21*
**recused** 92:*20* 142:*24* 145:*20*
**red** 154:*12* 162:*14, 19, 20*
**redeem** 160:*8*
**redeemed** 156:*1* 157:*15* 159:*19*
**redeeming** 166:*23*
**redemption** 159:*4* 166:*10*
**redirect** 195:*4*
**redirecting** 111:*9*
**refer** 7:*23* 39:*10* 57:*19* 73:*11, 15* 76:*4, 13* 155:*12* 168:*15*
**reference** 41:*8* 60:*18* 84:*23*
**referred** 100:*5* 150:*4*
**referring** 44:*1* 65:*24* 81:*23* 85:*17* 90:*23* 91:*3* 165:*4* 188:*5*
**reflected** 37:*16*

75:*18* 155:*1*
**reflects** 32:*24* 75:*8*
**refresh** 48:*20* 180:*10*
**refreshed** 162:*10*
**regarding** 31:*20* 43:*13* 71:*12* 95:*25* 105:*25* 106:*23* 107:*24* 167:*16* 175:*9* 189:*25*
**Registered** 2:*8* 178:*24* 179:*10*
**regular** 142:*8*
**regulatory** 81:*21, 22* 100:*5* 107:*18* 112:*6* 179:*1, 13, 14*
**reinstated** 193:*18*
**REIT** 175:*10, 24* 176:*10* 177:*16, 19* 178:*9* 180:*7*
**REITs** 175:*20, 22*
**relate** 46:*4*
**related** 196:*16*
**relating** 33:*13* 37:*23* 186:*24*
**relationship** 22:*19* 147:*9* 189:*14, 21* 190:*2*
**relationships** 183:*16*
**release** 84:*3* 182:*15*
**released** 138:*13* 182:*14* 194:*8*
**releases** 139:*11, 12* 184:*12, 16*
**relevant** 15:*20* 33:*8* 91:*13* 110:*20* 111:*11* 124:*6*
**reliance** 71:*16*
**relief** 167:*5* 194:*12*
**rely** 71:*12* 81:*15* 115:*17*
**relying** 98:*24*
**remaining** 155:*16*
**remains** 185:*23* 187:*22* 188:*21*
**remember** 8:*9* 9:*16, 19, 23* 11:*16, 19* 25:*3* 34:*24* 35:*20* 36:*7* 39:*17* 77:*19, 22* 78:*1* 82:*22* 83:*1* 107:*22* 108:*1* 132:*14, 17, 21,*

23 139:*1* 167:*11, 17, 24* 168:*2, 22* 175:*6, 11* 177:*21* 178:*2, 3* 186:*17*
**REMOTE** 1:*16* 2:*6*
**remove** 9:*25* 80:*11* 81:*3, 8*
**removed** 10:*3* 81:*13, 19* 117:*6, 7*
**removing** 46:*18*
**rendered** 193:*8*
**reorganization** 182:*18*
**Reorganized** 1:*6*
**repeat** 36:*23* 47:*21* 105:*19* 125:*12* 136:*16* 145:*13*
**replace** 117:*12, 16*
**replaced** 114:*15, 16* 115:*12, 22, 24* 116:*6*
**replacing** 116:*11*
**reply** 98:*25* 99:*6*
**report** 178:*20*
**Reported** 1:*22*
**Reporter** 2:*8* 50:*14* 105:*19* 125:*12* 139:*25* 152:*25*
**reporting** 95:*24*
**reports** 59:*11*
**represent** 58:*22* 93:*7* 105:*15* 113:*6* 143:*24* 144:*1*
**representative** 31:*7* 81:*4, 9* 187:*23*
**represented** 58:*13, 15* 59:*4* 87:*21* 92:*24* 105:*16, 23* 109:*22* 149:*7*
**representing** 92:*18*
**represents** 16:*6, 7, 11* 113:*8, 19, 20, 24, 25* 143:*22* 144:*14*
**request** 82:*9* 120:*12* 121:*1, 14, 21* 122:*3, 15* 124:*2* 190:*16*
**requested** 121:*6* 156:*24*
**requests** 120:*1, 4, 6, 21* 122:*24* 123:*4, 15*
**require** 13:*14*

**requiring** 80:*16*
**reread** 34:*15*
**rescind** 153:*14*
**reservation** 35:*18*
**reserve** 95:*17* 182:*10*
**reserved** 6:*7*
**resolve** 166:*14*
**respect** 25:*14, 20* 26:*2* 27:*7* 28:*2, 8* 62:*7* 64:*4* 66:*25* 69:*19, 20* 73:*24* 83:*7, 12* 86:*16* 87:*7* 104:*16* 105:*7* 112:*20* 190:*16*
**respective** 6:*3*
**respond** 123:*14* 127:*10* 128:*16*
**response** 121:*1, 14* 122:*15*
**responsibilities** 8:*17* 15:*12*
**responsibility** 134:*14* 142:*15* 153:*4* 178:*23* 179:*1*
**responsible** 140:*7*
**responsive** 87:*19* 103:*13* 127:*23* 128:*23*
**restricted** 191:*16*
**restructuring** 175:*9*
**restructurings** 146:*9*
**result** 169:*3*
**retail** 114:*23, 24*
**retained** 138:*21*
**retention** 83:*8*
**return** 51:*3* 156:*24*
**returns** 53:*17, 20*
**reveal** 87:*15*
**revealing** 96:*1*
**reversed** 193:*19*
**review** 34:*16* 51:*25* 54:*13* 56:*14* 59:*16* 67:*23* 75:*6, 12* 128:*3* 154:*15* 156:*17, 20* 165:*8* 193:*16*
**reviewed** 70:*19*
**right** 8:*24* 11:*15* 12:*23* 13:*23* 14:*20* 15:*24* 16:*10* 20:*19* 25:*6, 11* 26:*1, 4*

30:*18* 31:*12, 18* 33:*11* 34:*11* 37:*5* 39:*8* 40:*13* 44:*9, 18* 45:*13, 23* 47:*18* 48:*17* 49:*22* 50:*23* 52:*23* 53:*11, 25* 54:*3, 16* 56:*1* 57:*6* 61:*5, 25* 64:*12* 72:*6* 73:*4* 76:*11* 77:*7* 88:*5* 96:*18, 22* 97:*7, 13* 98:*16* 99:*21* 102:*9, 11, 13, 24* 103:*19* 106:*1, 5, 23* 107:*15, 18, 21* 108:*12* 110:*8, 14, 16, 17* 111:*6* 112:*9* 114:*1, 7, 11, 15* 118:*4, 15* 119:*14, 17, 23* 122:*9* 124:*12* 130:*14* 131:*23* 136:*13, 21* 141:*17* 142:*13* 144:*10* 146:*18, 19, 25* 147:*6, 23* 148:*6, 11* 151:*8* 155:*11* 156:*3, 19, 25* 159:*12* 160:*18, 20* 164:*3, 12, 17* 167:*1, 22* 169:*9, 13* 170:*21* 171:*11, 15* 172:*3* 175:*1, 16* 176:*7, 11* 179:*23* 180:*14, 18* 181:*14* 188:*18* 189:*5* 190:*12* 192:*13, 23* 195:*3*
**right-hand** 164:*7*
**rights** 8:*17, 20* 18:*21* 156:*12* 157:*21* 159:*20* 162:*18* 168:*24*
**ringing** 155:*21*
**Road** 158:*15*
**role** 10:*23* 30:*5* 31:*23* 34:*25* 35:*6* 62:*12, 14, 23, 24* 73:*24* 80:*1* 92:*17* 117:*1*
**roles** 15:*11* 31:*1*
**rolled** 131:*16*
**rolls** 79:*5*
**RPR** 1:*23*

**Ruhland** 109:*24*
**Rukavina** 109:*23*
**Rule** 146:*12* 184:*6* 186:*9, 14* 187:*2*
**rules** 7:*14* 29:*18*
**run** 66:*18* 89:*10* 167:*6*
**running** 139:*23* 167:*11*
**rushing** 41:*9* 83:*20* 84:*5, 24*

**< S >**
**sale** 46:*4*
**Santa** 50:*1* 56:*18* 57:*9, 17* 58:*20* 143:*25* 147:*18*
**sat** 58:*21*
**sausage** 103:*1*
**saw** 52:*15* 129:*21* 138:*10* 166:*10* 169:*16*
**saying** 33:*15* 42:*25* 44:*7* 68:*20* 90:*2* 141:*20* 179:*18*
**says** 52:*20* 157:*17, 23* 164:*8* 169:*11, 12* 171:*22* 178:*2, 3*
**Scarborough** 105:*12, 14, 21* 107:*8*
**scenes** 31:*6*
**schedule** 99:*16, 19, 25*
**scheme** 94:*13*
**scope** 41:*3* 45:*17* 46:*3, 8, 19, 21, 24* 47:*4, 9, 10, 15, 25* 48:*2, 13* 83:*13* 126:*12*
**Scott** 190:*1*
**screen** 51:*24* 53:*2* 156:*18*
**screwed** 99:*16*
**scroll** 50:*18* 53:*22* 55:*16* 67:*12* 68:*24* 168:*5*
**scrolling** 54:*14* 56:*12*
**sealing** 6:*4*
**seat** 52:*7*
**SEC** 178:*21* 179:*9*

second 93:17 172:9
secondhand 93:19
seconds 123:10
secret 41:9 83:20
84:6, 24
Securities 107:23
108:10, 16
see 49:3, 5 51:2, 12,
14, 21 52:12 53:3
54:4, 5, 18 56:4, 17,
21 57:7 69:6 74:25
75:13, 24 76:1 90:24
104:22 140:9 150:12
154:8 156:23 158:8
164:4, 7 166:12
168:13 171:22
seeing 97:18
seek 26:15 64:14
68:4 119:23 167:5
seeking 65:8, 14
seen 53:2 75:2
self-dealing 117:3
self-interest 79:3
132:3
seller 138:16
send 37:22 143:5
sensational 49:16
sense 135:15
sent 110:2 156:23
165:19
sentence 165:16
separate 161:2
181:21 191:20
September 185:22
191:18 193:12, 15, 22
194:13, 20
served 116:9 120:3,
21 122:2, 24
services 13:11, 14, 16,
21 14:3 15:15, 23
16:25 17:4 192:7, 21
set 34:10 40:5
140:15 151:7, 12
152:7 153:7 158:1,
25 171:6 174:22
180:21 184:17
196:11, 21
sets 161:17
setting 95:25
settle 134:9

settlement 28:9, 18,
25 29:3 34:11 36:9
69:12 70:1 73:8
82:21 118:20, 25
119:8 129:25 130:6,
23 133:13, 25 134:21
135:19 136:11, 18
138:13 140:14 151:8,
13 152:8 153:7
154:2 164:12 166:3,
16 169:5 171:10
180:13, 22 181:14, 18
184:19
seven 85:11 146:3, 11
share 36:2 41:18
87:18 95:7 96:20
162:14
shared 87:11 94:21
shares 41:6 85:16
86:8, 9 161:24, 25
162:6, 7
Shawn 127:1 128:16
Sheahan 5:8
sheet 47:3 137:23
138:5, 11, 15 153:15
199:2
sheets 46:11
shifted 15:13 79:3
show 55:3 89:17
163:18
showing 88:1
side 24:9 84:9
148:18 175:18, 23
sides 187:20
signatory 159:23
signature 61:22
158:8 199:20
signed 6:11, 13 51:6
53:17, 19, 20 68:25
69:4 139:3 153:15
164:14 165:9 168:19
Significant 106:11
176:17 184:9, 10
signing 163:12
similar 55:7
simple 79:17 105:4
117:15
single 62:5
sir 29:15 52:10
54:4, 21 60:22 64:22

74:25 79:17 80:10
82:4 85:25 97:12
101:10, 16 104:20
106:3 133:23 135:3,
11 139:21 145:12
148:15 184:5
Siri 129:9 183:16
sister 8:19, 25 63:20
sit 11:17, 22 12:19
14:17 16:10 23:9
25:25 33:10 34:6
42:18 49:20 53:11
81:6 93:6, 21 98:23
106:5 121:3, 5, 13
122:7 123:13, 24
127:21 128:6, 21
129:2 135:25 154:16
179:19 180:9 192:19
sitting 59:2 98:21
situation 97:21
six 85:11 86:3
113:12 146:3, 11
skip 7:14
Skyview 13:2, 3, 6, 15,
21 35:5 164:24
Skyview's 13:9
small 175:24 177:16,
18 178:9 180:6
snippets 146:20
so-called 107:25
132:23
sold 45:21 167:21
169:7 183:11, 12, 13,
14
sole 8:11 154:20
187:22
solely 10:7
solicit 153:4
solvency 184:9
solvent 182:8, 9
somebody 81:18
95:15 100:24 112:18
117:23 150:24
170:14, 25
soon 49:13 117:2, 5
Sorry 16:22 24:8
47:21 72:3 77:11
91:6 94:19 123:7
126:8 134:16 152:25

158:13 166:19
171:19
Sort 43:21
sought 68:16 81:8,
19 120:15 122:8
126:14 153:14
Soughter 165:5
sounds 63:23
source 87:17 95:6
98:6
speak 30:13 48:10
53:5 65:20 96:8
speakers 65:4 72:2
84:1 90:14 99:9
106:10 111:1 132:20
148:3 177:5
speaking 30:16
speaks 63:24 173:13
specific 13:19 15:8
17:7 37:20 60:1
65:1, 7 75:22 87:25
88:21 89:4, 22 115:4
128:5
specifically 34:24
35:11 36:17 53:19
89:3 101:9 112:25
119:12 136:24 179:5
188:8 189:12
specificity 131:21
specifics 11:16 101:5
121:2 139:1, 10, 13
167:18 188:2
specs 10:13
speculate 16:16, 18
17:1 22:9 27:4
160:23 186:5
speculation 16:23
speech 91:10
spoken 30:21 102:5
Springs 52:20 158:15
ss 196:4
STANCIL 3:19
standard 99:15
stands 72:5
STANG 3:4
start 67:15 163:17
started 82:8 107:6
117:4 139:24
starts 93:3, 12

State 2:9 20:8 130:9 194:7 196:3, 8
stated 70:24
statement 83:21 182:18
STATES 1:1
static 25:2
status 161:9
stay 48:23 49:6 60:11 61:4, 12, 15, 20 62:19 149:8
step 115:6 117:13 190:23
steps 92:10 167:13
steward 97:22
Stinson 16:7 26:22
STIPULATED 6:1, 5, 9
stock 11:3 19:15, 21 20:5, 12 22:2
stocks 19:11
Stockton 141:7 142:9 145:23
stole 172:25
stolen 173:2
Stone 179:12 184:12, 24
stop 50:22 53:25 54:16 56:1 110:23 111:15, 17 158:14 167:7
stopped 118:13 191:12
Street 3:16 4:5
strict 191:11 192:15
strike 60:17 64:21, 24 80:20, 24
stringent 190:19
strong 102:22 194:22
structure 32:22 52:5 94:5 161:2 162:3, 5
struggle 10:12 26:7
struggling 149:4
stuff 66:21 88:2 89:12 90:12 95:23 117:4 131:10 132:5 146:10 165:6 172:13 193:19
style 164:8 165:24

subject 33:16 66:8 93:22 94:3 96:21 107:25 150:21, 22
submitted 37:7 39:7
subordinate 77:2
subordinated 76:22
Subscribed 195:14 199:21
subsequently 145:19
subsidiary 74:9, 12
substance 29:20
substantive 82:15
suggest 170:25
suit 188:23
Suite 4:6 52:20 156:11
summons 44:2
Sunday 134:25
supplemented 190:10
support 87:24 91:8 150:5 163:13
supported 91:5 93:7
supporting 37:3, 24 39:2 49:19 57:20, 23 58:11, 12, 22 59:10 90:5, 8, 19 94:23 100:25 103:5, 16 106:14, 17, 21 144:14, 18 145:21 146:4, 5, 6 147:3 148:1, 10, 17 150:2 163:13 164:15 180:20, 25 185:6 186:8, 22 188:9, 19 194:2
supposed 179:4
sure 33:8 41:3 47:23 48:18 64:18 73:1 76:6 82:3 84:20 92:10 95:10 133:9 139:20 142:16 146:7 155:15 163:20 164:6 165:6 169:18 173:5 180:5, 8 184:23
surprise 51:10 60:5
surprised 60:5
suspected 90:4, 17
suspicion 84:15
suspicions 84:13

Sutton 101:25 102:6, 8 113:18, 20
Sutton's 102:14
sworn 6:10, 13 7:2 132:10 195:14 196:12 199:21

< T >
Tab 50:14 67:4 74:18 156:7 163:6
table 99:18
tactics 71:12 81:12, 15
take 19:1 23:18 24:1 27:20 29:14 33:6 57:14 75:5 92:10 100:2 111:12 115:19 117:8 137:4 139:18 140:8 156:16 179:24 180:2 181:23 190:23
taken 29:21 82:10 109:5 110:7 132:19 140:11 158:1, 25 180:3
talk 144:3 152:17
talking 44:20 84:8 96:25 111:15, 17 134:25 135:2, 5 144:4, 6 187:3
Tarasov 113:1
taste 83:15
tax 14:3 51:4 53:17, 20 151:20 161:9
team 64:20
Tech 5:5
tell 30:20 48:21 62:5 63:12 98:18 100:17 102:17 115:21 116:17 131:20 152:4 160:1, 6 161:13 179:13, 14 181:17, 25 192:3
telling 43:18 66:16 96:18, 24 101:12
ten 123:10
ten-minute 179:24
tens 43:15 182:10
term 137:23 138:5, 11, 15 153:15

terms 86:21 88:16 117:3 134:7 177:13 187:15 188:4 193:25
testified 7:3 118:3 129:22
testify 30:1
testimony 12:8 19:24 30:10, 17, 21, 23 42:22 46:16 60:9 78:19 116:14 129:20 130:3 148:13 184:19 196:13
TEXAS 1:2 39:3, 11, 15, 20 52:21 81:24 102:10 103:22 104:7, 15 105:6, 9, 25 106:22 107:23 108:9, 10, 15, 21 109:3, 5, 15 185:7 186:24 188:12, 22 194:1, 14
Thank 24:11 43:10 54:21 92:3 106:3 140:10 189:3 195:2, 5
then-effective 77:6
thing 43:11 85:12 146:21
things 33:15 40:22 41:6, 15, 18 78:11, 13 89:12 108:6 110:19 117:2 176:15 178:23
think 12:20 26:21 34:9 42:25 44:14, 24 45:8 48:12 58:8 63:16 78:17, 25 79:5, 7 83:19 85:12, 21 87:19 88:9 93:3, 4, 12 95:18 96:5, 18, 23 97:3, 21, 25 98:18, 19 99:15 102:14, 21 103:12 104:4, 17 105:17 111:13 115:8 116:15 117:5, 17, 18, 21 134:13 140:2 145:14 147:1, 5, 12 154:16 159:22 161:6 163:19 165:11 170:5 171:13 172:7 176:14, 16 183:8, 18 184:1, 8,

*14, 16, 24, 25* 186:*4*
**thinking** 98:*11* 187:*8*
**THIS____DAY**
199:*22*
**Thornton** 145:*24*
189:*25*
**thought** 71:*6* 107:*20*
114:*2* 142:*13* 170:*24*
182:*23*
**thousand** 53:*20*
**three** 45:*9* 57:*16*
106:*16, 17* 110:*1*
148:*1*
**three-person** 151:*19*
**tickets** 108:*5*
**tight** 187:*13*
**Time** 5:*6* 6:*8* 12:*20*
14:*7* 20:*17* 25:*3, 11*
27:*10* 32:*21* 35:*22*
39:*15* 41:*19* 47:*3*
53:*12* 56:*9* 57:*1, 12*
59:*11* 62:*4, 5* 63:*15*
71:*18* 75:*3, 5, 11, 18*
78:*5* 88:*13* 96:*8, 17*
98:*8* 99:*7* 109:*12*
112:*13* 117:*22*
130:*10* 131:*5, 15*
145:*19* 165:*12* 167:*9*
172:*5* 176:*13* 178:*18*
180:*2* 181:*24* 190:*23*
194:*7* 195:*5, 8*
**timeframe** 88:*16*
**timely** 176:*13*
**times** 7:*13* 66:*14*
104:*18* 107:*14, 19*
145:*9* 146:*1*
**timing** 99:*22*
**tip** 174:*14*
**tired** 115:*8*
**title** 151:*22*
**today** 7:*12, 24* 11:*17,*
*22* 12:*19* 14:*17*
15:*16* 16:*25* 18:*3*
19:*8* 21:*11* 23:*9*
30:*1* 42:*18* 55:*10, 14*
56:*9* 57:*1, 12* 78:*21*
79:*10, 20* 80:*6* 81:*6*
93:*6, 21* 98:*23*
116:*21* 121:*3, 5, 13*
122:*7* 123:*13, 25*

127:*21* 128:*6, 21*
129:*2, 5* 135:*25*
138:*2* 154:*16* 156:*15*
179:*20* 180:*9* 185:*23*
192:*19* 195:*6*
**today's** 31:*17*
**told** 32:*16* 51:*8*
62:*17, 22* 83:*3*
101:*10* 152:*16*
157:*11* 162:*25*
166:*22, 25*
**top** 41:*16* 163:*24*
**topic** 15:*20* 29:*24*
30:*14*
**trades** 108:*4*
**trading** 107:*25*
179:*12*
**train** 108:*5*
**transaction** 162:*3*
175:*19* 177:*25*
**transactions** 79:*4*
**TRANSCRIPT** 199:*2*
**transfer** 47:*6*
**transparency** 183:*10*
**transparent** 98:*3, 10,*
*19*
**trap** 98:*1*
**trial** 6:*8* 91:*2* 114:*4*
191:*2, 8, 21*
**trickled** 90:*6, 9, 20*
92:*5, 11* 143:*10*
148:*25*
**tricky** 97:*20*
**tried** 79:*24* 138:*12*
**triggered** 132:*7*
**true** 19:*25* 83:*7, 12*
183:*8* 193:*21* 196:*13*
**Trust** 3:*6* 7:*20, 21*
18:*22* 19:*3* 23:*5, 12*
30:*5* 62:*16* 63:*3*
75:*25* 80:*12* 134:*8,*
*10* 168:*11*
**trustee** 8:*15, 16, 18*
9:*1, 11, 14, 18, 20, 25*
10:*3, 6* 17:*16, 23*
19:*2* 23:*20* 24:*2*
26:*13* 31:*23* 62:*14*
63:*1* 79:*1* 113:*12*
117:*1*
**trustees** 30:*25*

**Trustee's** 5:*8, 9, 10,*
*11* 110:*3* 112:*19*
113:*11, 16*
**trusts** 63:*24*
**try** 7:*12* 72:*7* 89:*19*
91:*2* 133:*23* 153:*4,*
*23* 167:*6* 173:*24*
174:*2* 188:*3*
**trying** 20:*3* 88:*16*
90:*24* 131:*18* 135:*4,*
*15* 146:*6*
**two** 45:*8* 48:*24* 61:*5*
83:*18* 109:*1* 111:*8*
144:*9* 155:*17* 156:*19*
181:*21* 182:*6* 190:*6*
193:*17*
**two-day** 191:*3* 192:*9,*
*22*
**type** 79:*1*
**typically** 16:*3*

**< U >**
**U.S** 110:*2* 112:*19*
113:*11, 12, 16*
**ultimately** 183:*11*
**umbrella** 73:*23*
**unaware** 31:*16*
40:*23* 41:*1* 42:*18*
**unbelievable** 49:*16*
**unconscionable**
184:*16*
**uncover** 97:*19*
**uncovered** 140:*17*
143:*18*
**underlying** 79:*14*
131:*7* 148:*1* 149:*11*
**understand** 8:*14*
55:*10* 69:*11* 80:*15*
91:*2* 99:*2, 3* 103:*24*
119:*22* 120:*17, 20*
135:*4* 136:*1* 147:*14*
151:*24* 157:*14* 158:*6*
185:*16* 187:*14*
191:*23* 193:*15, 20*
**understanding** 13:*5,*
*8* 17:*16, 22* 18:*15*
19:*22* 28:*22* 65:*19*
75:*9* 101:*18* 103:*15*
104:*6* 106:*25* 130:*22*
134:*6* 141:*11* 144:*13,*

*22* 147:*2, 19* 149:*23*
154:*20, 25* 159:*3*
160:*19* 161:*14* 176:*2*
185:*21* 190:*24* 191:*1,*
*6, 25* 193:*7, 24*
**understood** 150:*25*
**undo** 29:*2, 8*
**unfortunate** 182:*7*
**unhelpful** 177:*13*
**unidentified** 169:*8*
**uninvolved** 63:*1*
**UNITED** 1:*1*
**unknown** 90:*17*
**unnecessary** 177:*12*
**unsecured** 182:*21*
**unwind** 28:*24*
**update** 173:*1*
**upper** 75:*18* 78:*5*
164:*7*
**urgency** 60:*14* 61:*7*
**use** 17:*25* 165:*3, 23*
185:*19*

**< V >**
**vacate** 28:*16* 42:*7*
64:*5* 65:*9* 180:*13*
181:*14, 18* 182:*1*
184:*2, 3*
**valuation** 86:*4* 183:*5*
**valuations** 183:*23*
**value** 21:*10* 41:*3*
45:*17* 46:*3, 8, 19, 21,*
*24* 47:*4, 9, 10, 15, 24,*
*25* 48:*2, 13* 83:*13*
177:*13*
**various** 13:*13* 63:*21*
81:*21* 104:*17, 18*
**verify** 116:*1*
**versions** 150:*11*
**view** 108:*15, 16*
133:*16* 147:*12*
**voice** 24:*8*
**void** 78:*12*
**voided** 78:*14*
**voids** 78:*18*
**voluntarily** 187:*15*
**voting** 157:*21* 159:*20*

**< W >**

**wait** 71:*13* 99:*5*
**waiting** 185:*15*
**waived** 6:*4*
**want** 16:*14, 16, 18*
17:*1* 22:*9* 27:*4, 22*
46:*20* 67:*13* 72:*17*
75:*5* 78:*10* 81:*17*
83:*18* 84:*18, 19* 87:*7*
88:*21* 90:*24* 91:*2*
95:*19* 96:*1, 10* 97:*2*
98:*10* 99:*4, 20* 105:*2*
111:*12* 115:*6, 25*
118:*9* 120:*12* 131:*10*
140:*8* 145:*10* 160:*23*
176:*5* 186:*5* 191:*20*
**wanted** 71:*1, 20*
141:*22* 164:*15*
**Washington** 3:*17*
4:*15* 110:*3*
**way** 24:*6* 69:*2* 72:*4*
75:*23* 79:*6* 133:*16,*
*23* 150:*22* 192:*22*
196:*18*
**Well** 25:*5* 26:*15*
31:*2* 66:*22* 70:*8*
78:*14* 82:*5* 88:*3, 10*
90:*2* 103:*10* 109:*10*
110:*11* 118:*11*
119:*13* 132:*9* 136:*25*
146:*14* 176:*19, 21*
183:*12*
**went** 79:*1* 171:*24*
191:*11*
**we're** 7:*23* 44:*19*
53:*3* 54:*18* 67:*7*
73:*11* 84:*13* 91:*1*
96:*11, 14* 97:*25* 98:*2*
99:*20* 132:*25* 139:*23*
146:*11* 192:*2*
**We've** 7:*13* 86:*20*
100:*23* 117:*2* 131:*8*
152:*5, 6* 160:*16*
181:*4*
**whatsoever** 64:*3*
**WHEREOF** 196:*20*
**wife** 132:*12*
**willing** 29:*10*
**WILLKIE** 3:*14*
**win** 192:*25*

**winding** 163:*14*
164:*16*
**wiped** 86:*3*
**wiping** 88:*1*
**wire** 168:*10*
**withdrawal** 138:*6, 20*
154:*1*
**withdrawing** 137:*20*
**withdrawn** 8:*21, 22*
9:*9* 16:*22* 17:*23*
20:*23* 24:*17* 28:*14*
34:*8* 37:*1* 42:*2*
47:*25* 49:*2* 60:*25*
91:*6* 94:*18* 101:*23*
116:*16, 18* 119:*6*
121:*4* 124:*10* 136:*5*
138:*18* 160:*3* 161:*16*
189:*18* 190:*25*
**withdrew** 134:*20*
135:*18* 136:*1* 137:*9,*
*16*
**Witness** 4:*13* 7:*2*
51:*23* 54:*21* 55:*1*
95:*2* 104:*20* 105:*21*
125:*14* 139:*18, 22*
140:*5* 186:*16* 195:*2*
196:*10, 14, 20* 197:*4*
**woman** 145:*25*
**won** 93:*17* 190:*20*
193:*1*
**word** 10:*12* 26:*7*
**work** 63:*8, 10* 97:*9*
**workflow** 38:*15, 18*
**working** 84:*14*
131:*10*
**works** 82:*5* 148:*2*
**workstream** 150:*10*
**world** 14:*7*
**worth** 21:*23* 22:*2, 4,*
*6*
**would've** 63:*7*
144:*19* 159:*6* 176:*10,*
*12, 21* 183:*13*
**wrap** 111:*16*
**writ** 44:*1, 18* 45:*7,*
*12* 47:*12, 16* 48:*4, 14,*
*16, 21* 49:*3, 5, 12*
59:*16, 22* 60:*4* 61:*2*
83:*5, 9, 14, 16* 84:*3,*
*25* 85:*5* 86:*14, 16*

87:*21* 88:*11* 90:*3, 6,*
*8, 15, 20* 91:*5, 8* 92:*5,*
*12* 93:*8* 98:*8* 142:*12*
143:*10* 145:*17*
146:*23* 148:*24, 25*
149:*9, 10, 12, 14, 22*
150:*5* 190:*8, 10*
192:*8*
**written** 32:*23*
**wrongdoing** 40:*18*
112:*8*
**wrongful** 119:*9*
136:*12, 19*

**< Y >**
**Yeah** 15:*10, 12*
19:*25* 32:*20* 35:*14*
40:*3* 44:*12* 52:*10*
68:*21* 69:*3, 24* 71:*4*
77:*3* 83:*15* 84:*18*
90:*2* 93:*11* 98:*12*
105:*17* 107:*19* 115:*8*
131:*13* 139:*12*
145:*11* 149:*10*
154:*23* 155:*4* 169:*11*
175:*10* 177:*3, 12*
184:*8* 188:*15*
**year** 53:*21* 146:*13*
**years** 9:*12* 19:*18*
110:*13* 116:*1*
**York** 2:*9* 3:*8* 196:*3,*
*5, 8*
**Young** 5:*11*
**Yup** 108:*19* 123:*9*
154:*9* 164:*10*

**< Z >**
**zero** 59:*14*
**ZIEHL** 3:*4*
**ZOOM** 2:*7*

## WORD LIST

**< $ >**
**$10,000**  (*1*)
**$100**  (*1*)
**$200**  (*1*)
**$300**  (*1*)
**$850**  (*2*)
**$950**  (*1*)

**< 1 >**
**1**  (*7*)
**1:27**  (*1*)
**100**  (*2*)
**10019**  (*1*)
**11**  (*5*)
**11:03**  (*1*)
**11:15**  (*1*)
**11:30**  (*1*)
**1111**  (*1*)
**12**  (*1*)
**1200**  (*1*)
**13**  (*1*)
**135**  (*2*)
**14**  (*1*)
**15**  (*6*)
**150**  (*1*)
**156**  (*1*)
**15th**  (*7*)
**16**  (*2*)
**160**  (*1*)
**163**  (*1*)
**16th**  (*1*)
**1700**  (*1*)
**173**  (*1*)
**17th**  (*3*)
**18**  (*1*)
**1812**  (*1*)
**1875**  (*1*)
**19-34054-sgj11**  (*1*)

**< 2 >**
**2**  (*5*)
**2:30**  (*1*)
**20**  (*1*)
**200**  (*1*)
**20004**  (*1*)
**20006**  (*1*)
**2004**  (*1*)

**2015**  (*1*)
**2019**  (*2*)
**2020**  (*1*)
**2021**  (*1*)
**2022**  (*6*)
**2023**  (*5*)
**2024**  (*6*)
**2025**  (*23*)
**2026**  (*7*)
**2101**  (*2*)
**22**  (*1*)
**23**  (*3*)
**24**  (*4*)
**25**  (*4*)
**25-03055-bwo**  (*1*)
**25th**  (*1*)
**28**  (*5*)
**28th**  (*1*)
**29**  (*1*)

**< 3 >**
**3**  (*6*)
**3:27**  (*1*)
**3:40**  (*1*)
**30**  (*5*)
**300**  (*4*)
**31**  (*1*)
**31A**  (*1*)
**36th**  (*1*)
**38**  (*1*)
**39**  (*1*)

**< 4 >**
**4**  (*4*)
**4,000**  (*1*)
**40,000**  (*1*)
**400**  (*1*)
**41**  (*2*)
**45**  (*1*)
**48**  (*1*)

**< 5 >**
**5**  (*3*)
**5:06**  (*1*)
**50**  (*1*)
**500**  (*1*)
**53803**  (*1*)

**< 6 >**

**6**  (*1*)
**60**  (*1*)
**60(b**  (*1*)
**600,000**  (*1*)
**67**  (*1*)

**< 7 >**
**7**  (*3*)
**70**  (*1*)
**700**  (*1*)
**70130**  (*1*)
**74**  (*1*)
**75201**  (*1*)

**< 8 >**
**8**  (*5*)
**8th**  (*1*)

**< 9 >**
**9:03**  (*1*)
**9:15**  (*1*)
**9019**  (*67*)
**99**  (*1*)
**99.5**  (*1*)
**990**  (*9*)
**990s**  (*1*)

**< A >**
**a.m**  (*1*)
**abated**  (*3*)
**abatement**  (*3*)
**ability**  (*2*)
**able**  (*3*)
**abused**  (*1*)
**abusive**  (*1*)
**accelerated**  (*1*)
**access**  (*2*)
**accounting**  (*4*)
**accounts**  (*1*)
**accuracy**  (*1*)
**accurate**  (*3*)
**accurately**  (*2*)
**accuse**  (*1*)
**accused**  (*1*)
**act**  (*17*)
**acted**  (*1*)
**acting**  (*10*)
**action**  (*9*)
**actions**  (*2*)

**activities**  (*1*)
**activity**  (*4*)
**actors**  (*1*)
**acts**  (*7*)
**actual**  (*3*)
**added**  (*1*)
**addition**  (*2*)
**additional**  (*1*)
**address**  (*6*)
**addressed**  (*3*)
**adequately**  (*2*)
**administer**  (*1*)
**administered**  (*2*)
**administering**  (*1*)
**administrative**  (*1*)
**administrator**  (*2*)
**admit**  (*1*)
**adopt**  (*1*)
**Adv**  (*1*)
**adverse**  (*2*)
**advice**  (*11*)
**advised**  (*4*)
**advising**  (*1*)
**advisor**  (*2*)
**advisors**  (*1*)
**advisory**  (*1*)
**Affidavit**  (*11*)
**affidavits**  (*1*)
**affiliate**  (*2*)
**affiliated**  (*6*)
**affiliates**  (*1*)
**affirmatively**  (*1*)
**afforded**  (*1*)
**Africa**  (*1*)
**afternoon**  (*1*)
**AG**  (*2*)
**agencies**  (*3*)
**agency**  (*6*)
**agent**  (*20*)
**agents**  (*1*)
**ago**  (*5*)
**agree**  (*5*)
**AGREED**  (*5*)
**agreement**  (*31*)
**agreements**  (*3*)
**ahead**  (*8*)
**ain't**  (*1*)
**allegations**  (*14*)
**alleged**  (*1*)

Deposition of James Dondero                                      In re Highland Capital Management, L.P.

| | | | |
|---|---|---|---|
| **AMELIA** (*1*) | **Assistant** (*1*) | **behalf** (*59*) | **case** (*19*) |
| **amount** (*1*) | **assorted** (*1*) | **behave** (*1*) | **cash** (*1*) |
| **Amy** (*1*) | **assume** (*4*) | **behest** (*1*) | **caused** (*3*) |
| **and/or** (*1*) | **Assumes** (*1*) | **belief** (*2*) | **Cayman** (*39*) |
| **ANDREA** (*1*) | **assurance** (*1*) | **believe** (*108*) | **Caymans** (*4*) |
| **Andrews** (*1*) | **assured** (*2*) | **believed** (*3*) | **CCR-NJ** (*2*) |
| **animal** (*1*) | **Atlas** (*11*) | **believing** (*1*) | **ceased** (*2*) |
| **answer** (*44*) | **attached** (*3*) | **bell** (*1*) | **Cedar** (*2*) |
| **answered** (*8*) | **attention** (*1*) | **benefactor** (*1*) | **certain** (*2*) |
| **anybody** (*40*) | **attorney** (*22*) | **beneficiaries** (*3*) | **certified** (*1*) |
| **anybody's** (*1*) | **attorney-client** (*3*) | **beneficiary** (*4*) | **certify** (*2*) |
| **anyone's** (*1*) | **Attorneys** (*11*) | **benefit** (*3*) | **cetera** (*1*) |
| **anyway** (*2*) | **attorney's** (*1*) | **Bermuda** (*1*) | **CFO** (*1*) |
| **apologize** (*5*) | **August** (*7*) | **best** (*38*) | **chain** (*1*) |
| **apparent** (*2*) | **Austin** (*1*) | **better** (*1*) | **chairman** (*1*) |
| **appeal** (*2*) | **authorities** (*2*) | **beyond** (*2*) | **changing** (*2*) |
| **appear** (*2*) | **authority** (*32*) | **big** (*2*) | **channels** (*4*) |
| **appearance** (*2*) | **authorize** (*1*) | **biggest** (*1*) | **Chapter** (*2*) |
| **appeared** (*3*) | **authorized** (*22*) | **binding** (*3*) | **charitable** (*4*) |
| **appears** (*2*) | **authorizing** (*4*) | **bit** (*4*) | **charities** (*17*) |
| **appellate** (*11*) | **automatic** (*6*) | **bleed** (*1*) | **charity** (*9*) |
| **applied** (*1*) | **automatically** (*8*) | **blew** (*1*) | **Chart** (*9*) |
| **appoint** (*1*) | **available** (*2*) | **blood** (*1*) | **charts** (*6*) |
| **appointed** (*3*) | **Avenue** (*1*) | **board** (*7*) | **check** (*2*) |
| **appointing** (*1*) | **aware** (*98*) | **bodies** (*3*) | **choose** (*2*) |
| **appraisal** (*14*) | **awareness** (*16*) | **bona** (*2*) | **chunk** (*6*) |
| **appraised** (*2*) | **awfully** (*1*) | **books** (*2*) | **circles** (*1*) |
| **appreciate** (*5*) | | **bottom** (*2*) | **circumstances** (*2*) |
| **apprised** (*2*) | **< B >** | **bought** (*2*) | **City** (*9*) |
| **approval** (*3*) | **back** (*26*) | **box** (*2*) | **claim** (*1*) |
| **approve** (*1*) | **back-and-forth** (*1*) | **boxes** (*4*) | **Claimant** (*1*) |
| **approved** (*2*) | **background** (*1*) | **Boy** (*1*) | **claimants** (*1*) |
| **approving** (*2*) | **bad** (*9*) | **break** (*12*) | **clarity** (*1*) |
| **April** (*4*) | **badgering** (*1*) | **brief** (*2*) | **class** (*7*) |
| **argument** (*3*) | **balance** (*2*) | **Broadway** (*1*) | **classes** (*3*) |
| **arising** (*1*) | **ball** (*1*) | **brought** (*4*) | **Claus** (*1*) |
| **Ashcroft** (*1*) | **BANKRUPTCY** (*12*) | **burn** (*1*) | **clean** (*1*) |
| **Ashcroft's** (*1*) | **Barbara** (*7*) | **business** (*16*) | **clear** (*2*) |
| **aside** (*10*) | **barely** (*2*) | **buyer** (*4*) | **client** (*4*) |
| **asked** (*20*) | **barrier** (*1*) | | **clients** (*1*) |
| **asking** (*22*) | **base** (*2*) | **< C >** | **client's** (*1*) |
| **asks** (*1*) | **based** (*9*) | **call** (*3*) | **close** (*2*) |
| **aspect** (*3*) | **bases** (*1*) | **called** (*10*) | **closed** (*1*) |
| **aspects** (*1*) | **basis** (*12*) | **calls** (*5*) | **closer** (*1*) |
| **assert** (*2*) | **BATES** (*1*) | **camouflage** (*1*) | **collateral** (*1*) |
| **asserted** (*1*) | **Beacon** (*6*) | **capacity** (*7*) | **collectively** (*2*) |
| **asserting** (*1*) | **began** (*3*) | **CAPITAL** (*7*) | **combination** (*1*) |
| **asset** (*9*) | **beginning** (*2*) | **care** (*3*) | **come** (*8*) |
| **assets** (*24*) | **begins** (*3*) | **carefully** (*2*) | **coming** (*5*) |

**commandeer** (*1*)
**commandeered** (*1*)
**commenced** (*2*)
**comment** (*2*)
**comments** (*3*)
**Commission** (*4*)
**committed** (*1*)
**committee** (*8*)
**communication** (*5*)
**communications** (*8*)
**Company** (*3*)
**compel** (*7*)
**compensation** (*12*)
**competent** (*2*)
**competently** (*1*)
**compilation** (*1*)
**compile** (*1*)
**compiled** (*1*)
**compiling** (*1*)
**complaint** (*3*)
**complaints** (*2*)
**complete** (*1*)
**complex** (*1*)
**compliance** (*3*)
**compliant** (*2*)
**compliantly** (*2*)
**complicated** (*1*)
**comply** (*5*)
**concept** (*1*)
**concern** (*1*)
**concerned** (*2*)
**concerning** (*10*)
**concerns** (*1*)
**conclusion** (*2*)
**conclusions** (*1*)
**concurrent** (*1*)
**conduct** (*6*)
**confidence** (*1*)
**confident** (*1*)
**confidential** (*3*)
**confirm** (*1*)
**connected** (*2*)
**connection** (*18*)
**consent** (*15*)
**consented** (*1*)
**consequence** (*1*)
**consequences** (*1*)
**consider** (*1*)
**consideration** (*4*)

**considered** (*1*)
**consistent** (*3*)
**contact** (*7*)
**contacted** (*4*)
**contained** (*1*)
**contains** (*1*)
**contemporaneously** (*1*)
**contend** (*1*)
**contended** (*5*)
**contends** (*4*)
**contested** (*2*)
**context** (*2*)
**continuation** (*1*)
**continuing** (*2*)
**continuous** (*1*)
**contract** (*1*)
**contribution** (*1*)
**contrivance** (*2*)
**contrived** (*2*)
**control** (*29*)
**controlled** (*4*)
**controlling** (*2*)
**controls** (*4*)
**conversation** (*3*)
**conversations** (*6*)
**convey** (*1*)
**copy** (*6*)
**corner** (*3*)
**correct** (*85*)
**CORRECTIONS** (*1*)
**correctly** (*3*)
**Counsel** (*46*)
**COUNTY** (*1*)
**couple** (*5*)
**Cournoyer** (*1*)
**course** (*1*)
**COURT** (*45*)
**cover** (*1*)
**covered** (*1*)
**COVID** (*1*)
**creating** (*2*)
**creditors** (*1*)
**Crescent** (*1*)
**criminal** (*5*)
**criteria** (*1*)
**Crown** (*34*)
**current** (*2*)
**cut** (*2*)

**< D >**
**D.C** (*1*)
**DAF** (*4*)
**DALLAS** (*118*)
**damming** (*1*)
**Danielle** (*1*)
**date** (*6*)
**dated** (*1*)
**dates** (*2*)
**DAUGHERTY** (*1*)
**daughter** (*1*)
**David** (*2*)
**Davor** (*1*)
**day** (*9*)
**days** (*5*)
**DC** (*2*)
**deal** (*1*)
**death** (*1*)
**Debtor** (*2*)
**decade** (*1*)
**deceased** (*1*)
**December** (*11*)
**decided** (*3*)
**deciding** (*1*)
**decision** (*6*)
**decisionmaking** (*1*)
**decisions** (*5*)
**declaration** (*6*)
**declarations** (*1*)
**declined** (*1*)
**defame** (*1*)
**Defendant/Counter-Plaintiff** (*1*)
**defendants** (*7*)
**defer** (*2*)
**definitely** (*3*)
**definition** (*1*)
**defrauded** (*2*)
**delegated** (*1*)
**delegating** (*3*)
**denied** (*1*)
**Dep** (*1*)
**departure** (*1*)
**depends** (*1*)
**depicted** (*2*)
**depo** (*2*)
**Deponent** (*2*)
**deposed** (*4*)

**DEPOSITION** (*21*)
**depositions** (*8*)
**derivative** (*1*)
**describe** (*8*)
**described** (*7*)
**describing** (*1*)
**DESCRIPTION** (*1*)
**deserve** (*1*)
**designate** (*1*)
**designated** (*14*)
**designation** (*1*)
**desire** (*1*)
**detail** (*2*)
**details** (*11*)
**DFW** (*3*)
**Diaz** (*8*)
**difference** (*2*)
**different** (*21*)
**difficult** (*1*)
**diluted** (*1*)
**direct** (*6*)
**direction** (*1*)
**directly** (*11*)
**director** (*3*)
**directors** (*2*)
**director's** (*2*)
**disagreeing** (*1*)
**disappeared** (*1*)
**disappointed** (*3*)
**disarray** (*1*)
**disclose** (*2*)
**disclosed** (*3*)
**disclosure** (*1*)
**discovered** (*18*)
**discovery** (*24*)
**discretion** (*1*)
**discuss** (*10*)
**discussed** (*4*)
**discussion** (*2*)
**discussions** (*3*)
**dispute** (*2*)
**dissolve** (*3*)
**distinction** (*2*)
**distinguish** (*1*)
**distributed** (*1*)
**distribution** (*1*)
**DISTRICT** (*1*)
**DIVISION** (*3*)
**docket** (*1*)

Deposition of James Dondero                                                In re Highland Capital Management, L.P.

document  (*32*)
documentation  (*1*)
documentations  (*1*)
documented  (*1*)
documents  (*12*)
doing  (*3*)
doings  (*1*)
dollars  (*5*)
Dolomiti  (*13*)
Dolomiti's  (*2*)
DONDERO  (*41*)
donor  (*2*)
door  (*1*)
Doug  (*1*)
Douglas  (*1*)
dozen  (*2*)
drafted  (*1*)
Draper  (*1*)
drawn  (*1*)
drops  (*1*)
due  (*1*)
Dugaboy  (*127*)
Dugaboy's  (*61*)
duly  (*3*)
duty  (*1*)

< E >
earlier  (*11*)
early  (*9*)
earned  (*1*)
ease  (*1*)
economic  (*5*)
EDNEY  (*293*)
educate  (*1*)
educated  (*1*)
effect  (*2*)
efficient  (*1*)
effort  (*1*)
egregious  (*1*)
eight  (*1*)
either  (*10*)
eliminated  (*1*)
Ellington  (*1*)
else's  (*1*)
e-mail  (*3*)
e-mails  (*12*)
embezzled  (*1*)
embezzlement  (*4*)
employed  (*1*)

employees  (*1*)
Empower  (*25*)
ends  (*2*)
engaged  (*5*)
enjoined  (*1*)
enjoining  (*1*)
enormously  (*2*)
enter  (*7*)
entered  (*6*)
entering  (*1*)
entire  (*2*)
entirely  (*2*)
entirety  (*1*)
entities  (*65*)
entitled  (*2*)
entity  (*25*)
entity's  (*1*)
equity  (*1*)
ERRATA  (*1*)
ESQ  (*6*)
essentially  (*1*)
establish  (*1*)
established  (*1*)
estate  (*6*)
et  (*1*)
European  (*2*)
evasive  (*1*)
evasively  (*1*)
events  (*1*)
Eventually  (*2*)
Everest  (*1*)
everybody  (*1*)
everybody's  (*1*)
evidence  (*52*)
evidences  (*1*)
evidentiary  (*5*)
exact  (*4*)
Exactly  (*3*)
EXAMINATION  (*1*)
examined  (*1*)
Excellent  (*1*)
excessive  (*1*)
excessiveness  (*1*)
Exchange  (*1*)
executive  (*1*)
exempt  (*1*)
exercise  (*7*)
exercised  (*4*)
Exhibit  (*19*)

exhibits  (*1*)
expected  (*1*)
expense  (*2*)
expenses  (*4*)
experience  (*3*)
expire  (*1*)
EXPIRES  (*1*)
express  (*1*)
extended  (*1*)
extensive  (*2*)
extent  (*10*)
external  (*4*)

< F >
fact  (*8*)
facts  (*7*)
factual  (*1*)
faded  (*1*)
failed  (*15*)
fair  (*35*)
Fairlawn  (*1*)
Fairlawn's  (*1*)
fall  (*1*)
falls  (*1*)
familiar  (*5*)
family  (*22*)
Fantastic  (*1*)
far  (*7*)
FARR  (*1*)
fast  (*3*)
February  (*10*)
feel  (*4*)
fees  (*3*)
feet  (*1*)
felt  (*1*)
fide  (*2*)
Fiduciary  (*1*)
figure  (*1*)
file  (*12*)
filed  (*60*)
files  (*1*)
filing  (*13*)
filings  (*1*)
financial  (*3*)
find  (*4*)
fine  (*4*)
finish  (*4*)
finished  (*1*)
firm  (*12*)

firms  (*12*)
first  (*19*)
fits  (*2*)
five  (*2*)
fleecing  (*1*)
flipped  (*1*)
Floor  (*1*)
Florida  (*1*)
flow  (*3*)
fly  (*1*)
followed  (*2*)
following  (*6*)
follows  (*1*)
force  (*1*)
form  (*247*)
formal  (*1*)
formed  (*3*)
forth  (*3*)
forward  (*1*)
found  (*3*)
Foundation  (*127*)
Foundation's  (*5*)
four  (*2*)
fourth  (*1*)
frankly  (*1*)
fraud  (*12*)
fraudulent  (*1*)
Friday  (*3*)
friend  (*1*)
front  (*2*)
froze  (*1*)
full  (*4*)
fully  (*2*)
functioning  (*1*)
Fund  (*2*)
funds  (*2*)
FURTHER  (*6*)

< G >
GALLAGHER  (*1*)
General  (*31*)
generally  (*11*)
generals  (*1*)
General's  (*2*)
getting  (*9*)
give  (*7*)
given  (*4*)
giving  (*1*)
glad  (*2*)

Global  (33)
go  (26)
going  (63)
Good  (6)
gotten  (2)
government  (1)
GP  (2)
Grand  (2)
Grant  (2)
granted  (2)
granting  (1)
grantor  (3)
Great  (10)
grew  (1)
Grosvenor  (1)
ground  (2)
grounds  (5)
guarantee  (1)
guess  (8)
guys  (4)

< H >
HAGAMAN  (1)
Hakusan  (9)
half  (7)
Hance  (4)
hand  (1)
handle  (2)
handled  (2)
handles  (1)
handling  (1)
hands  (2)
Hang  (1)
happen  (2)
happened  (3)
happening  (1)
HART  (1)
head  (2)
hear  (5)
heard  (4)
hearing  (35)
hearings  (2)
held  (10)
he'll  (1)
helpful  (1)
hereinbefore  (1)
hereunto  (1)
hiding  (1)
HIGHLAND  (79)

Highland's  (6)
highlight  (2)
highlighted  (2)
highly  (5)
Hill  (3)
hired  (1)
hiring  (1)
HMIT  (56)
HMIT's  (1)
hold  (1)
HoldCo  (2)
holding  (1)
holds  (2)
Holland  (12)
Honis  (13)
hope  (3)
hospitality  (6)
host  (1)
hour  (2)
hours  (3)
HR  (2)
hundred  (1)
hundreds  (1)
Hunter  (18)
Hunton  (1)
hurdles  (1)
HURT  (1)

< I >
iceberg  (1)
idea  (2)
identification  (5)
identified  (3)
identify  (22)
identity  (3)
IDF  (5)
ignored  (1)
imagine  (2)
immediately  (2)
implementation  (1)
implying  (1)
important  (1)
improper  (3)
inaccurate  (4)
inappropriately  (1)
Inaudible  (5)
inbound  (1)
incident  (1)
include  (2)

included  (4)
including  (1)
income  (1)
incurred  (2)
Independent  (2)
independents  (1)
indicating  (1)
indications  (1)
indirectly  (1)
individual  (1)
individually  (1)
induction  (1)
influence  (1)
inform  (1)
informant  (1)
information  (50)
informed  (2)
in-house  (5)
initiated  (4)
injunction  (18)
injunctive  (1)
inquire  (1)
inquiries  (1)
inquiring  (1)
inside  (4)
insider  (3)
insofar  (1)
institution  (3)
institutions  (1)
instruct  (10)
INSTRUCTED  (1)
instructing  (1)
instruction  (6)
instructions  (2)
Insurance  (4)
intended  (2)
intention  (2)
interaction  (1)
interest  (26)
interested  (1)
interests  (3)
internal  (5)
interpret  (1)
invest  (4)
invested  (1)
investigated  (1)
investigating  (6)
investigation  (4)
investigations  (2)

Investment  (11)
investments  (1)
investor  (2)
involve  (1)
involved  (11)
involvement  (2)
involving  (1)
IR  (1)
Isaac  (1)
Island  (1)
Islands  (17)
issue  (5)
issued  (6)
issues  (4)
items  (3)
it'll  (1)
its  (27)

< J >
JAMES  (10)
JEFF  (1)
Jernigan  (1)
Jernigan's  (1)
Jersey  (1)
Jim  (7)
JOB  (1)
JOHN  (7)
Johnny  (4)
Johnny's  (1)
join  (5)
joined  (5)
joining  (1)
joint  (10)
jointly  (1)
JOLs  (21)
JONES  (1)
Jordan  (1)
JOSH  (1)
judge  (3)
Julie  (2)
July  (24)
June  (18)
justice  (1)
justification  (1)

< K >
Kansas  (9)
Keep  (12)
keeper  (1)

**keeping**  *(4)*
**KELLY**  *(1)*
**kind**  *(5)*
**kiss-off**  *(1)*
**Kitrick**  *(1)*
**knew**  *(10)*
**Knight**  *(12)*
**know**  *(305)*
**knowledge**  *(51)*
**known**  *(7)*
**Kurth**  *(1)*

**< L >**
**L.P**  *(3)*
**LA**  *(1)*
**lack**  *(10)*
**lacked**  *(3)*
**laid**  *(3)*
**Lambert**  *(1)*
**laptop**  *(3)*
**large**  *(6)*
**largely**  *(3)*
**late**  *(3)*
**latitude**  *(1)*
**law**  *(18)*
**lawsuit**  *(3)*
**lawyer**  *(10)*
**lawyers**  *(7)*
**lay**  *(1)*
**laying**  *(1)*
**lean**  *(1)*
**learn**  *(8)*
**learned**  *(23)*
**learning**  *(4)*
**learns**  *(1)*
**leave**  *(1)*
**left**  *(9)*
**left-hand**  *(2)*
**Legal**  *(13)*
**legitimate**  *(1)*
**letter**  *(11)*
**letters**  *(4)*
**Leventon**  *(1)*
**LEVY**  *(1)*
**LEWIS**  *(1)*
**Life**  *(3)*
**lifetime**  *(1)*
**lightly**  *(1)*
**limit**  *(2)*

**limitations**  *(1)*
**Limited**  *(19)*
**line**  *(2)*
**liquidate**  *(1)*
**liquidation**  *(10)*
**liquidation's**  *(1)*
**liquidator**  *(1)*
**liquidators**  *(15)*
**liquidator's**  *(1)*
**liquidity**  *(1)*
**LISA**  *(5)*
**listen**  *(6)*
**litany**  *(1)*
**litigant**  *(1)*
**litigated**  *(1)*
**litigation**  *(15)*
**little**  *(5)*
**Littleton**  *(3)*
**Liz**  *(1)*
**LLC**  *(7)*
**Ln**  *(1)*
**logical**  *(1)*
**Logically**  *(1)*
**long**  *(9)*
**longer**  *(2)*
**long-term**  *(1)*
**Longtime**  *(1)*
**look**  *(5)*
**looking**  *(4)*
**looks**  *(1)*
**lose**  *(1)*
**lost**  *(10)*
**lot**  *(4)*
**lots**  *(3)*
**low**  *(1)*
**LP**  *(7)*
**LPA**  *(1)*
**lunch**  *(1)*

**< M >**
**machinations**  *(1)*
**mail**  *(1)*
**maintain**  *(1)*
**maintains**  *(1)*
**man**  *(1)*
**manage**  *(10)*
**managed**  *(1)*
**MANAGEMENT**
  *(12)*

**managements**  *(1)*
**manager**  *(1)*
**Mancino**  *(1)*
**manipulate**  *(1)*
**Maples**  *(7)*
**MARK**  *(53)*
**marked**  *(5)*
**Mark's**  *(1)*
**marriage**  *(1)*
**Massachusetts**  *(1)*
**material**  *(4)*
**matter**  *(10)*
**matters**  *(7)*
**McGinnis**  *(3)*
**mean**  *(14)*
**meaning**  *(1)*
**meaningful**  *(2)*
**means**  *(1)*
**meat**  *(1)*
**Mechanism**  *(2)*
**mechanisms**  *(2)*
**member**  *(2)*
**members**  *(3)*
**memory**  *(6)*
**mentioned**  *(10)*
**MICHAEL**  *(1)*
**mid**  *(2)*
**middle**  *(3)*
**Mike**  *(6)*
**million**  *(23)*
**millions**  *(2)*
**mind**  *(2)*
**mine**  *(2)*
**minutes**  *(2)*
**minutiae**  *(1)*
**mirrors**  *(1)*
**misleading**  *(2)*
**mismarked**  *(1)*
**missed**  *(2)*
**missing**  *(1)*
**Missouri**  *(12)*
**Misstates**  *(3)*
**misunderstood**  *(1)*
**misusing**  *(1)*
**MO**  *(1)*
**modifications**  *(1)*
**mole**  *(4)*
**moment**  *(7)*
**Monday**  *(4)*

**money**  *(6)*
**monies**  *(2)*
**month**  *(1)*
**months**  *(4)*
**MORGAN**  *(1)*
**morning**  *(2)*
**MORRIS**  *(134)*
**motion**  *(74)*
**motions**  *(1)*
**Mountain**  *(24)*
**move**  *(11)*
**moved**  *(3)*
**moving**  *(1)*
**multiple**  *(12)*
**MURACO**  *(4)*
**mutual**  *(2)*

**< N >**
**N.W**  *(1)*
**name**  *(10)*
**named**  *(1)*
**names**  *(1)*
**Nancy**  *(50)*
**Nancy's**  *(4)*
**nature**  *(2)*
**necessarily**  *(2)*
**necessary**  *(3)*
**need**  *(9)*
**needed**  *(6)*
**needing**  *(1)*
**needs**  *(4)*
**negatively**  *(1)*
**neither**  *(6)*
**never**  *(10)*
**New**  *(14)*
**newly**  *(17)*
**news**  *(1)*
**NexBank**  *(10)*
**NexPoint**  *(4)*
**NexPoint's**  *(1)*
**non**  *(1)*
**nonprivileged**  *(1)*
**nonpublic**  *(4)*
**nonresponsive**  *(1)*
**Nope**  *(1)*
**normal**  *(2)*
**north**  *(1)*
**NORTHERN**  *(1)*
**Notary**  *(4)*

noted *(3)*
notes *(4)*
notice *(3)*
noticed *(1)*
November *(2)*
number *(3)*
numbers *(1)*
numerous *(6)*
nutshell *(1)*
NW *(1)*

**< O >**
oath *(1)*
object *(47)*
objected *(4)*
objecting *(4)*
Objection *(237)*
objections *(10)*
obligation *(4)*
obligations *(1)*
obligor *(1)*
obtain *(8)*
obtained *(6)*
obtaining *(3)*
obviously *(1)*
occur *(2)*
occurred *(2)*
occurring *(1)*
October *(1)*
odd *(1)*
offended *(2)*
offer *(1)*
Office *(11)*
officer *(11)*
officers *(1)*
official *(8)*
Oh *(4)*
Okada *(24)*
Okada's *(1)*
okay *(153)*
once *(2)*
one-half *(2)*
ones *(1)*
ongoing *(2)*
onion *(2)*
oOo *(1)*
operating *(2)*
opinion *(1)*
opportunity *(2)*

opposed *(1)*
optimistic *(1)*
option *(13)*
orchestrate *(1)*
order *(11)*
org *(4)*
organization *(8)*
Organizational *(6)*
organizations *(29)*
orgs *(1)*
original *(3)*
Orleans *(1)*
outcome *(1)*
outlined *(1)*
outreach *(5)*
outside *(3)*
outstanding *(1)*
overall *(1)*
oversee *(1)*
oversized *(1)*
overturned *(1)*
owned *(7)*
owner *(1)*
owners *(1)*
ownership *(2)*
owns *(3)*

**< P >**
p.m *(1)*
PACHULSKI *(1)*
page *(10)*
pages *(1)*
paid *(3)*
papers *(5)*
paperwork *(2)*
paragraph *(6)*
paragraphs *(1)*
parcel *(1)*
part *(12)*
participation *(3)*
particular *(5)*
particularly *(1)*
parties *(4)*
partner *(3)*
partners *(1)*
partnership *(17)*
party *(2)*
path *(1)*
patience *(1)*

PATRICK *(86)*
Patrick's *(10)*
payment *(1)*
PE *(2)*
peel *(1)*
peeling *(2)*
pending *(1)*
Pennsylvania *(1)*
people *(7)*
perceived *(1)*
percent *(9)*
perfectly *(1)*
performances *(1)*
performing *(1)*
period *(6)*
permeating *(1)*
permitted *(1)*
person *(27)*
personal *(2)*
personally *(2)*
perspective *(1)*
pertained *(1)*
pertaining *(1)*
pertains *(1)*
petition *(4)*
Pg *(1)*
Pham *(1)*
phone *(1)*
phonetic *(6)*
phrase *(1)*
piece *(1)*
place *(8)*
placed *(2)*
Plaintiff/Counter-
Defendant *(1)*
plan *(2)*
plans *(1)*
play *(3)*
pleadings *(4)*
Please *(14)*
point *(9)*
POMERANTZ *(1)*
portfolio *(1)*
posed *(4)*
position *(13)*
possible *(5)*
post *(1)*
pounded *(1)*
power *(5)*

powerful *(1)*
Poydras *(1)*
prefer *(2)*
prejudice *(6)*
premeditation *(1)*
preparation *(2)*
prepare *(3)*
prepared *(2)*
preparing *(2)*
PRESENT *(3)*
presented *(4)*
presenter *(1)*
president *(8)*
press *(1)*
prevented *(1)*
primary *(2)*
principal *(10)*
prior *(7)*
private *(5)*
privilege *(4)*
privileged *(8)*
privy *(1)*
probably *(3)*
problem *(1)*
Proc *(1)*
procedures *(1)*
proceed *(2)*
proceeding *(14)*
proceedings *(3)*
process *(31)*
process-wise *(1)*
produce *(2)*
produced *(1)*
product *(1)*
Professional *(4)*
professionals *(1)*
projected *(1)*
prompted *(1)*
proper *(8)*
properly *(14)*
proposed *(3)*
proprietary *(1)*
prosecute *(1)*
prosecuting *(1)*
protect *(1)*
protocol *(1)*
protocols *(2)*
provenance *(1)*
provide *(4)*

**provided**  *(14)*
**provides**  *(5)*
**providing**  *(4)*
**Public**  *(6)*
**publication**  *(1)*
**publicly**  *(1)*
**punitive**  *(2)*
**purchase**  *(1)*
**purpose**  *(5)*
**purposes**  *(3)*
**Pursuant**  *(4)*
**pursue**  *(1)*
**pursuing**  *(1)*
**put**  *(31)*
**putting**  *(2)*

**< Q >**
**quarter**  *(1)*
**queried**  *(1)*
**question**  *(228)*
**questioning**  *(2)*
**questions**  *(13)*
**quickly**  *(2)*
**quite**  *(5)*
**quote**  *(1)*
**quotes**  *(1)*

**< R >**
**railroad**  *(1)*
**ran**  *(1)*
**Rand**  *(15)*
**ratified**  *(1)*
**Raver**  *(8)*
**Raymond**  *(3)*
**reach**  *(3)*
**reached**  *(1)*
**read**  *(10)*
**reading**  *(1)*
**Reads**  *(1)*
**ready**  *(2)*
**real**  *(1)*
**really**  *(9)*
**realtime**  *(1)*
**reason**  *(25)*
**reasons**  *(3)*
**recall**  *(29)*
**receipt**  *(1)*
**receive**  *(2)*
**received**  *(3)*

**receiver**  *(2)*
**receiver-type**  *(1)*
**receives**  *(1)*
**Recess**  *(4)*
**recollection**  *(15)*
**recommend**  *(2)*
**record**  *(7)*
**records**  *(2)*
**recover**  *(1)*
**recusal**  *(1)*
**recused**  *(3)*
**red**  *(4)*
**redeem**  *(1)*
**redeemed**  *(3)*
**redeeming**  *(1)*
**redemption**  *(2)*
**redirect**  *(1)*
**redirecting**  *(1)*
**refer**  *(9)*
**reference**  *(3)*
**referred**  *(3)*
**referring**  *(8)*
**reflected**  *(3)*
**reflects**  *(2)*
**refresh**  *(2)*
**refreshed**  *(1)*
**regarding**  *(10)*
**Registered**  *(3)*
**regular**  *(1)*
**regulatory**  *(8)*
**reinstated**  *(1)*
**REIT**  *(7)*
**REITs**  *(2)*
**relate**  *(1)*
**related**  *(1)*
**relating**  *(3)*
**relationship**  *(5)*
**relationships**  *(1)*
**release**  *(2)*
**released**  *(3)*
**releases**  *(4)*
**relevant**  *(6)*
**reliance**  *(1)*
**relief**  *(2)*
**rely**  *(3)*
**relying**  *(1)*
**remaining**  *(1)*
**remains**  *(3)*
**remember**  *(35)*

**REMOTE**  *(2)*
**remove**  *(4)*
**removed**  *(5)*
**removing**  *(1)*
**rendered**  *(1)*
**reorganization**  *(1)*
**Reorganized**  *(1)*
**repeat**  *(6)*
**replace**  *(2)*
**replaced**  *(6)*
**replacing**  *(1)*
**reply**  *(2)*
**report**  *(1)*
**Reported**  *(1)*
**Reporter**  *(6)*
**reporting**  *(1)*
**reports**  *(1)*
**represent**  *(6)*
**representative**  *(4)*
**represented**  *(9)*
**representing**  *(1)*
**represents**  *(10)*
**request**  *(9)*
**requested**  *(2)*
**requests**  *(7)*
**require**  *(1)*
**requiring**  *(1)*
**reread**  *(1)*
**rescind**  *(1)*
**reservation**  *(1)*
**reserve**  *(2)*
**reserved**  *(1)*
**resolve**  *(1)*
**respect**  *(20)*
**respective**  *(1)*
**respond**  *(3)*
**response**  *(3)*
**responsibilities**  *(2)*
**responsibility**  *(5)*
**responsible**  *(1)*
**responsive**  *(4)*
**restricted**  *(1)*
**restructuring**  *(1)*
**restructurings**  *(1)*
**result**  *(1)*
**retail**  *(2)*
**retained**  *(1)*
**retention**  *(1)*
**return**  *(2)*

**returns**  *(2)*
**reveal**  *(1)*
**revealing**  *(1)*
**reversed**  *(1)*
**review**  *(14)*
**reviewed**  *(1)*
**right**  *(125)*
**right-hand**  *(1)*
**rights**  *(8)*
**ringing**  *(1)*
**Road**  *(1)*
**role**  *(13)*
**roles**  *(2)*
**rolled**  *(1)*
**rolls**  *(1)*
**RPR**  *(1)*
**Ruhland**  *(1)*
**Rukavina**  *(1)*
**Rule**  *(5)*
**rules**  *(2)*
**run**  *(3)*
**running**  *(2)*
**rushing**  *(4)*

**< S >**
**sale**  *(2)*
**Santa**  *(7)*
**sat**  *(1)*
**sausage**  *(1)*
**saw**  *(5)*
**saying**  *(7)*
**says**  *(10)*
**Scarborough**  *(4)*
**scenes**  *(1)*
**schedule**  *(3)*
**scheme**  *(1)*
**scope**  *(16)*
**Scott**  *(1)*
**screen**  *(3)*
**screwed**  *(1)*
**scroll**  *(6)*
**scrolling**  *(2)*
**sealing**  *(1)*
**seat**  *(1)*
**SEC**  *(2)*
**second**  *(2)*
**secondhand**  *(1)*
**seconds**  *(1)*
**secret**  *(4)*

| | | | |
|---|---|---|---|
| **Securities** (3) | **situation** (1) | **status** (1) | **suspicions** (1) |
| **see** (32) | **six** (5) | **stay** (9) | **Sutton** (5) |
| **seeing** (1) | **skip** (1) | **step** (3) | **Sutton's** (1) |
| **seek** (5) | **Skyview** (7) | **steps** (2) | **sworn** (7) |
| **seeking** (2) | **Skyview's** (1) | **steward** (1) | |
| **seen** (2) | **small** (5) | **Stinson** (2) | **< T >** |
| **self-dealing** (1) | **snippets** (1) | **STIPULATED** (3) | **Tab** (5) |
| **self-interest** (2) | **so-called** (2) | **stock** (6) | **table** (1) |
| **seller** (1) | **sold** (7) | **stocks** (1) | **tactics** (3) |
| **send** (2) | **sole** (3) | **Stockton** (3) | **take** (21) |
| **sensational** (1) | **solely** (1) | **stole** (1) | **taken** (9) |
| **sense** (1) | **solicit** (1) | **stolen** (1) | **talk** (2) |
| **sent** (3) | **solvency** (1) | **Stone** (3) | **talking** (11) |
| **sentence** (1) | **solvent** (2) | **stop** (9) | **Tarasov** (1) |
| **separate** (3) | **somebody** (8) | **stopped** (2) | **taste** (1) |
| **September** (7) | **soon** (4) | **Street** (2) | **tax** (6) |
| **served** (5) | **Sorry** (14) | **strict** (2) | **team** (1) |
| **services** (11) | **Sort** (1) | **strike** (5) | **Tech** (1) |
| **set** (15) | **sought** (7) | **stringent** (1) | **tell** (19) |
| **sets** (1) | **Soughter** (1) | **strong** (2) | **telling** (5) |
| **setting** (1) | **sounds** (1) | **structure** (6) | **ten** (1) |
| **settle** (1) | **source** (3) | **struggle** (2) | **ten-minute** (1) |
| **settlement** (39) | **speak** (5) | **struggling** (1) | **tens** (2) |
| **seven** (3) | **speakers** (10) | **stuff** (12) | **term** (5) |
| **share** (6) | **speaking** (1) | **style** (2) | **terms** (8) |
| **shared** (2) | **speaks** (2) | **subject** (8) | **testified** (3) |
| **shares** (8) | **specific** (14) | **submitted** (2) | **testify** (1) |
| **Shawn** (2) | **specifically** (12) | **subordinate** (1) | **testimony** (16) |
| **Sheahan** (1) | **specificity** (1) | **subordinated** (1) | **TEXAS** (30) |
| **sheet** (7) | **specifics** (8) | **Subscribed** (2) | **Thank** (9) |
| **sheets** (1) | **specs** (1) | **subsequently** (1) | **then-effective** (1) |
| **shifted** (2) | **speculate** (7) | **subsidiary** (2) | **thing** (3) |
| **show** (3) | **speculation** (1) | **substance** (1) | **things** (13) |
| **showing** (1) | **speech** (1) | **substantive** (1) | **think** (71) |
| **side** (5) | **spoken** (2) | **suggest** (1) | **thinking** (2) |
| **sides** (1) | **Springs** (2) | **suit** (1) | **THIS___DAY** (1) |
| **signatory** (1) | **ss** (1) | **Suite** (3) | **Thornton** (2) |
| **signature** (3) | **STANCIL** (1) | **summons** (1) | **thought** (6) |
| **signed** (14) | **standard** (1) | **Sunday** (1) | **thousand** (1) |
| **Significant** (4) | **stands** (1) | **supplemented** (1) | **three** (6) |
| **signing** (1) | **STANG** (1) | **support** (4) | **three-person** (1) |
| **similar** (1) | **start** (2) | **supported** (2) | **tickets** (1) |
| **simple** (3) | **started** (4) | **supporting** (41) | **tight** (1) |
| **single** (1) | **starts** (2) | **supposed** (1) | **Time** (51) |
| **sir** (23) | **State** (6) | **sure** (24) | **timeframe** (1) |
| **Siri** (2) | **stated** (1) | **surprise** (2) | **timely** (1) |
| **sister** (3) | **statement** (2) | **surprised** (1) | **times** (7) |
| **sit** (32) | **STATES** (1) | **suspected** (2) | **timing** (1) |
| **sitting** (2) | **static** (1) | **suspicion** (1) | **tip** (1) |

215-341-3616   transcripts@everestdepo.com
Everest Court Reporting LLC

**tired**  (*1*)
**title**  (*1*)
**today**  (*48*)
**today's**  (*1*)
**told**  (*11*)
**top**  (*2*)
**topic**  (*3*)
**trades**  (*1*)
**trading**  (*2*)
**train**  (*1*)
**transaction**  (*3*)
**transactions**  (*1*)
**TRANSCRIPT**  (*1*)
**transfer**  (*1*)
**transparency**  (*1*)
**transparent**  (*3*)
**trap**  (*1*)
**trial**  (*6*)
**trickled**  (*7*)
**tricky**  (*1*)
**tried**  (*2*)
**triggered**  (*1*)
**true**  (*6*)
**Trust**  (*15*)
**trustee**  (*23*)
**trustees**  (*1*)
**Trustee's**  (*8*)
**trusts**  (*1*)
**try**  (*11*)
**trying**  (*7*)
**two**  (*13*)
**two-day**  (*3*)
**type**  (*1*)
**typically**  (*1*)

**< U >**
**U.S**  (*5*)
**ultimately**  (*1*)
**umbrella**  (*1*)
**unaware**  (*4*)
**unbelievable**  (*1*)
**unconscionable**  (*1*)
**uncover**  (*1*)
**uncovered**  (*2*)
**underlying**  (*4*)
**understand**  (*22*)
**understanding**  (*34*)
**understood**  (*1*)
**undo**  (*2*)

**unfortunate**  (*1*)
**unhelpful**  (*1*)
**unidentified**  (*1*)
**uninvolved**  (*1*)
**UNITED**  (*1*)
**unknown**  (*1*)
**unnecessary**  (*1*)
**unsecured**  (*1*)
**unwind**  (*1*)
**update**  (*1*)
**upper**  (*3*)
**urgency**  (*2*)
**use**  (*4*)

**< V >**
**vacate**  (*10*)
**valuation**  (*2*)
**valuations**  (*1*)
**value**  (*18*)
**various**  (*6*)
**verify**  (*1*)
**versions**  (*1*)
**view**  (*4*)
**voice**  (*1*)
**void**  (*1*)
**voided**  (*1*)
**voids**  (*1*)
**voluntarily**  (*1*)
**voting**  (*2*)

**< W >**
**wait**  (*2*)
**waiting**  (*1*)
**waived**  (*1*)
**want**  (*41*)
**wanted**  (*4*)
**Washington**  (*3*)
**way**  (*10*)
**Well**  (*21*)
**went**  (*3*)
**we're**  (*17*)
**We've**  (*9*)
**whatsoever**  (*1*)
**WHEREOF**  (*1*)
**wife**  (*1*)
**willing**  (*1*)
**WILLKIE**  (*1*)
**win**  (*1*)
**winding**  (*2*)

**wiped**  (*1*)
**wiping**  (*1*)
**wire**  (*1*)
**withdrawal**  (*3*)
**withdrawing**  (*1*)
**withdrawn**  (*28*)
**withdrew**  (*5*)
**Witness**  (*18*)
**woman**  (*1*)
**won**  (*3*)
**word**  (*2*)
**work**  (*3*)
**workflow**  (*2*)
**working**  (*2*)
**works**  (*2*)
**workstream**  (*1*)
**world**  (*1*)
**worth**  (*4*)
**would've**  (*7*)
**wrap**  (*1*)
**writ**  (*56*)
**written**  (*1*)
**wrongdoing**  (*2*)
**wrongful**  (*3*)

**< Y >**
**Yeah**  (*33*)
**year**  (*2*)
**years**  (*4*)
**York**  (*6*)
**Young**  (*1*)
**Yup**  (*4*)

**< Z >**
**zero**  (*1*)
**ZIEHL**  (*1*)
**ZOOM**  (*1*)