Digitally signed by Advance Performance Exponents Inc.
Date: 2025.05.04:11 -05:00
Reason: Apex Certified
Location: Apex

**FSD2025-0201**                                                      **2025-07-15**



Plaintiff
M MacInnis
First Affidavit
15 July 2025
Exhibit MM-1

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 (      )**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

<u>Plaintiff</u>

**AND**

|       |       |
|-------|-------|
| **(1)** | **MARK ERIC PATRICK** |
| **(2)** | **PAUL MURPHY** |
| **(3)** | **CDMCFAD, LLC** |
| **(4)** | **DFW CHARITABLE FOUNDATION** |
| **(5)** | **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** |
| **(6)** | **CLO HOLDCO, LTD.** |

<u>Defendants</u>

---

**FIRST AFFIDAVIT OF MARGOT MACINNIS**

---

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)

**FSD2025-0201**                                                      **2025-07-15**

I, **MARGOT MACINNIS** of Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands MAKE OATH AND SAY as follows:

**INTRODUCTION**

1      I am Managing Director of Grant Thornton Specialist Services (Cayman) Limited ("**Grant Thornton**").  I am one of the joint official liquidators ("**JOLs**") of Charitable DAF HoldCo, Ltd (In Official Liquidation) (the "**Company**"), alongside Sandipan Bhowmik also of Grant Thornton.  Mr Bhowmik and I were appointed as JOLs of the Company by an order of this Honourable Court dated 6 May 2025 in Cause No. 116 of 2025 (JAJ) (the "**Appointment Order**").

2      I am duly authorised by my fellow JOL, Sandipan Bhowmik, to make this affidavit on the JOLs' behalf in support of the JOLs' summons dated 15 July 2025 (the "**Application**").  The Application seeks orders for injunctive relief and ancillary disclosure orders against various of the Defendants to the Statement of Claim filed by the JOLs for and on behalf of the Company in these proceedings on 15 July 2025 (the "**SOC**").  The Application also seeks orders for leave to serve the foreign Defendants with the Writ and SOC (together with this Application) out of the jurisdiction pursuant to Grand Court Rules, O.11.

3      These proceedings arise out of a series of transactions whereby it appears that Mr Mark Patrick (a director and the sole Management Shareholder of the Company), caused the Company to transfer away its valuable limited partnership interest in Charitable DAF Fund, LP (the "**Fund**") to entities controlled by him. The end result of these transactions was that the Company exchanged an asset worth approximately US$270 million for a membership interest in a Delaware limited liability company which interest was then redeemed for the sum of c. US$1.6 million. These transactions have severely prejudiced the Company and its ultimate beneficial owners which are four large charitable organisations registered in the US.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)      2

On 14 July 2025, in Cause No. 116 of 2025 (JAJ) (the **"Liquidation Proceedings"**), this Honourable Court made an order granting sanction, pursuant to s.110(2) of the Companies Act (2025 Revision) and Companies Winding Up Rules (2023 Consolidation) (the **"CWR"**) O.11, r.1(1)(a), for the JOLs to, until further order, commence and pursue these legal proceedings in the name and on behalf of the Company advancing claims in substantially the form set out in the SOC.

4    The Writ and SOC is being filed at the same time as this Application.

5    There is now produced and shown to me a paginated exhibit marked **"MM-1"**. This contains true copies of certain documents to which I refer in this affidavit. Where I refer to a page in this affidavit, I am referring to a page in **"MM-1"**.

6    In providing or commenting on any legal advice the JOLs have received at any time since their appointment, the JOLs do not intend to waive privilege in any general sense and are providing this information solely to assist the Court in understanding the context for the JOLs' claims in the SOC.

**THE COMPANY'S STAKEHOLDERS AND NATURE OF THE COMPANY**

The Company's Shareholders

7    The Company was incorporated in the Cayman Islands on 7 November 2011 (a copy of its certificate of incorporation is at page 1432 of MM-1).  The Company's share capital is divided into Participating Shares and Management Shares.

8    The Company's Memorandum and Articles provided that Management Shareholders had the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company, but no right to participate in the profits or assets of the Company (Art 11), whereas the Participating Shareholders had no right to vote at Company meetings, but did have rights

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)      3

**CONFIDENTIAL**    **TDIT004715**

in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles (Art 12). (pages 11 to 12 of MM-1)

9        At the date of this affidavit, the Company has one Management Shareholder and five registered Participating Shareholders.

10       The Management Shares in the Company (being 100 in total) are held entirely by Mr Mark Patrick who is also a director of the Company while the second director is Mr Paul Murphy (the "**Directors**").   Messrs Patrick and Murphy are two of the defendants in the Proposed Proceedings.

11       The Participating Shareholders are:

11.1    Highland Kansas City Foundation, Inc. (the "**Highland Kansas Foundation**"), which was issued 100 shares in the Company on 30 November 2011;

11.2    Highland Dallas Foundation, Inc. (the "**Highland Dallas Foundation**"), which was issued 100 shares on 30 November 2011.  For completeness, I note that since June 2004, Highland Dallas Foundation has been renamed as NexPoint Philanthropies Dallas Inc;

11.3    Highland Santa Barbara Foundation, Inc. (the "**Highland Santa Barbara Foundation**"), which was issued 100 shares in the Company on 30 November 2011;

11.4    The Community Foundation of North Texas ("**CFNT**") for the Highland Capital Management, L.P. Charitable Fund at CFNT (the "**HCMLP**"), which was issued 5 Participating Shares on 13 August 2015; and

11.5    DFW Charitable Foundation ("**DFW**"), an entity controlled by Mr Patrick, which was issued 318 shares in the Company on 7 February 2025 (the "**DFW Share Issuance**"). The validity of this allotment is, however, challenged by the JOLs in these proceedings (see paragraphs 118 to 119 of the SOC).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)      4

12      The Company has brought this Application on an *inter partes* basis affording what the JOLs consider to be a reasonable period of time for the relevant Defendants to file and serve evidence in response and make submissions at the hearing of the Application (which the JOLs are presently seeking to be listed on a date in the week commencing Monday, 4 August 2025). The JOLs intend to serve this Application and my affidavit on all Defendants on the same day that it is filed.  In the case of the foreign Defendants, should they refuse to voluntarily accept service, this will be subject to the JOLs obtaining an order granting leave to serve them out of the jurisdiction (see paragraphs 98 to 102 below).

<u>The Charitable Structure</u>

*Structure and Control*

13      Four charities held the ultimate economic interest in the Company prior to the DFW Share Issuance and held Participating Shares either directly or indirectly.

14      Since their appointment, the JOLs have sought, as best they can, to obtain a fulsome understanding of the way the Company operated historically and to that end have held discussions with three of the four charities that (indirectly) held the majority of the Participating Shares in the Company prior to the DFW Share Issuance (32.787% each) namely:

14.1    *The Dallas Foundation* (which controls Highland Dallas Foundation): a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets.

14.2    *Greater Kansas City Community Foundation* (which controls Highland Kansas Foundation): a charitable entity established in Kansas in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)      5

14.3   *Santa Barbara Foundation* (which controls Highland Santa Barbara Foundation): a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

15   I will refer to the Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation collectively as the "**Charities**".

16   The fourth charity, CFNT is a charity established in 1981 which manages assets totaling $513 million and donated $38.9 million to local non-profits in 2023.  CFNT holds its Participating Shares in the Company directly (i.e., without interposing a supporting organisation).  The JOLs have not yet seen any organisational documents with respect to CFNT, such that they have been unable to take advice on its structure and how it fulfils its charitable purposes.  CFNT held only 1.639% of the Participating Shares prior to the DFW Share Issuance.

17   Each of the Charities held their interests in the Company indirectly through Highland Kansas Foundation, the Highland Dallas Foundation and the Highland Santa Barbara Foundation respectively (i.e. the Dallas Foundation held their interest through the Participating Shares held by Highland Dallas Foundation etc) (together, the "**Supporting Organisations**").

18   From communications with the Charities[1] and the JOLs' advisors, the JOLs understand that the relationship between the Charities and each Supporting Organisation operated in a substantively similar manner. Specifically:

18.1   The Supporting Organisations were incorporated in Delaware by Mr James Dondero on or about 22 November 2011. Copies of the constitutional documents of the Supporting Organisations, namely: (i) the certificates of incorporation; (ii) by-laws (the "**Bylaws**") are exhibited at pages 38 to 95 of MM-1.

---

[1]   Discussions with the Dallas Foundation through Julie Diaz (President and CEO) and Torrey Littleton (Vice President of Finance). Discussions with the Greater Kansas City Community Foundation through Debbie Wilkerson (President and CEO) and Julie Barry (Vice President of Finance).  Discussions with the Santa Barbara Foundation through Jackie Carrera (President and CEO) and Janet Mocker (Senior Director of Finance)

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)      6

**CONFIDENTIAL**                                                                                                      **TDIT004718**

18.2 The manner in which an individual can establish a Supporting Organisation in order to assist the Charities is explained in a document titled "*Procedures for Establishment and Operation of Funds and Supporting Organizations*" provided to the JOLs by the Greater Kansas City Community Foundation.  A copy of this document is exhibited at pages 96 to 122 of MM-1.

18.3 Each of the Supporting Organisations is classified as a so-called Type I supporting organisation of its respective Charity, which means that it is operated, supervised and controlled by that Charity.[2] Copies of the Internal Revenue Service (the "**IRS**") correspondence dated 19 January 2013, 12 February 2013 and 21 March 2013 confirming that the Supporting Organisations are exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "**Code**") and determining that their classification as Type I Supporting Organisations are exhibited at pages 123 to 129 of MM-1.

18.4 The Supporting Organisations are "*organised and operated exclusively to support and benefit*" the relevant Charity.

18.5 The relationship between each Supporting Organisations and its respective Charity is further governed by either, in the case of the Highland Kansas City Foundation, an agreement recording the legal relationship between the parties, dated 30 November 2011 (the "**Legal Relationship Agreement**"), or, in the case of the Highland Dallas Foundation and the Highland Santa Barbara Foundation, a Supporting Organization Operating Agreement each dated 30 November 2011 (each an "**Operating Agreement**") which provide, among other things:

---

[2] Supporting organisations are either Type I, Type II or Type III.  Type I supporting organisations must be controlled by their supported organisations, typically by giving the supported organisation(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)      7

(a) the Charity will provide services to the Supporting Organisation, including grant administration and other services necessary to operate the Supporting Organizations; and

(b) in consideration for the services provided by the Charity to the Supporting Organisation, the Supporting Organisation shall pay an administrative fee to the Charity (most of which are based on a percentage of the market value of the assets held by the relevant Supporting Organisation).

Copies of the Legal Relationship Agreement and Operating Agreements are exhibited at pages 130 to 147 of MM-1.

18.6 The Bylaws provide that (amongst other things):

(a) There are two classes of members of the Supporting Organisations with one member in each such class (section 2.1):

(i) the institutional member (the **"Institutional Member"**) which shall be the Charity; and

(ii) the individual member (the **"Individual Member"**) which shall be Mr Dondero or an individual designated as the Individual Member in the Bylaws.

(b) In terms of voting on a matter submitted to a vote of the members (section 2.2):

(i) the Institutional Member is entitled to two votes; and

(ii) the Individual Member is entitled to one vote.

(c) Institutional membership is not transferable or assignable (section 2.3).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948) 8

(d)     Individual membership is transferable or assignable only upon approval of the Institutional Member (section 2.3).

(e)     Both the Institutional Member and the Individual Member must be present in person or represented proxy to constitute a quorum at all meetings of members (section 2.9).

(f)     There shall be three directors of the board of the Supporting Organisation. Two directors shall be elected annually by the Institutional Member and one director shall be elected annually by the Individual Member (section 3.2).

19   Given that two of the three members of the board of the Supporting Organisations are appointed by the Charity (as the Institutional Member), each respective Charity controls each corresponding Supporting Organisations.

20   Specifically, as it relates to each of the Supporting Organisations, the boards of directors are as follows:

20.1   Highland Kansas Foundation:

(a)     Mr Dondero;

(b)     Brenda Chumley of the Greater Kansas City Community Foundation;

(c)     Debbie Wilkerson of the Greater Kansas City Community Foundation.

20.2   Highland Dallas Foundation:

(a)     Mr Dondero;

(b)     Matthew Randazzo of the Dallas Foundation; and

(c)     Julie Diaz of the Dallas Foundation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     9

20.3   Highland Santa Barbara Foundation:

(a)   Mr Dondero;

(b)   Jacqueline M. Carrera of the Santa Barbara Foundation; and

(c)   Arnold Brier of the Santa Barbara Foundation.

21   Informed by the above considerations, the JOLs now understand that the relevant Charity (and not Mr Dondero in the present context) controls the respective Supporting Organisation through its ability to control the Supporting Organisations' board of directors, in a similar manner to a parent-subsidiary relationship in an ordinary corporate group structure.

22   The JOLs understand from their advisors that:

22.1   The Supporting Organisations support the Charities by way of making grants to them from time to time from any dividends received from the Company;

22.2   However, the Supporting Organisations have no ability to pay dividends to their members or payments to their directors (save reasonable fees for services) and can only make grants to the relevant Charity in furtherance of their charitable purposes;

22.3   The charity/supporting organisation structure is a very typical structure in the US to enable charitable donations to be made in a tax efficient manner; and

22.4   When a charity/its supporting organisation wishes to invest in a hedge fund or private equity fund, it will typically do so through an offshore corporate blocker to avoid becoming liable for "unrelated business taxable income" ("**UBTI**").

*The Company's Interest in the Fund*

23   As outlined in further detail at paragraphs 67.5 to 67.6 below, the Company was incorporated as a blocker for US tax purposes between the Supporting Organisations (underpinned by the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   10

**CONFIDENTIAL**                                                                                                  **TDIT004722**

Case 19-34054-sgj11   Doc 4627-1   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 207   Page 11 of 66
**Page 11 of 66**

**FSD2025-0201**                                                                                                    **2025-07-15**

Charities) and their interests in the Charitable DAF Fund, LP (the "**Fund**"), a Cayman Islands exempted limited partnership, where substantial investment assets were held. In this role the Company was the Limited Partner in the Fund, and held 99% of the economic interest in the Fund ("**the Partnership Interest**").

24   The Fund is governed by its second amended and restated limited partnership agreement dated 11 March 2024 (the "**LPA**").  Prior to the Relevant Transactions (defined below), the Company was the sole limited partner in the Fund and CDH GP, Ltd., a Cayman Islands entity owned by Mark Patrick, was the general partner of the fund (the "**General Partner**").

25   The Company as the limited partner, and CFNT and the Charities as the indirect beneficial owners (via the Supporting Organisations in respect of the Charities and via the Company in respect of CFNT), had the sole economic or relevant ownership interest in the Fund:

25.1   the recitals to the LPA state (amongst other things) that "…*the parties hereto desire for the Fund to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein*";

25.2   clause 1.3 provided that "…*the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.*" (Emphasis added);

25.3   clause 1.6(a) of the LPA provides that "*the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*"; and

25.4   "Indirect Charitable Owners" is defined in the LPA as "*the indirect equity owners of the Limited Partners*" i.e., the Company's shareholders or the Charities.

A copy of the LPA is exhibited at pages 148 to 165 of MM-1.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     11

26      In that sense, prior to the Relevant Transactions (as defined below) the Supporting Organisations were the ultimate beneficial owners of the Fund and its substantial investment assets.

*The Fund Entities and their business / investment activities*

27      The Fund held its assets through CLO HoldCo, Ltd., a Cayman Islands exempted limited company, which is the Sixth Defendant to these proceedings ("**CLO HoldCo**"). The JOLs have undertaken research into the Fund and its business and investment activities.  Whilst the JOLs have thus far only undertaken preliminary research, and do not yet have a full picture, from that initial research we understand that the Fund's known subsidiaries that it holds through CLO HoldCo, the Fund Entities[3], are mostly passive investment vehicles holding a mix of assets, including cash, promissory notes, shares in Nexpoint entities[4], publicly traded stock, real estate, receivables/proceeds from litigation proceedings, receivable amounts from brokers, dividends due, and amounts due from affiliates.

28      To summarise the key findings of the JOLs' initial research into the Fund Entities' assets, in collecting the books and records of the Company, the JOLs have obtained an expense report of CLO HoldCo as of 30 June 2024, which shows that CLO HoldCo held on its balance sheet the following assets (without specifying whether such assets were held directly or through subsidiaries):

28.1    US$89 million in cash held at various banks and financial institutions;

28.2    Shares in a number of publicly listed companies;

---

[3] As listed in Schedule A of the draft Order that accompanies this affidavit.  Note that CLO HoldCo is itself listed as one of the Fund Entities for the purposes of the draft Order and the same applies to the use of that term in this affidavit.

[4] Mr Dondero founded and is currently the President of NexPoint, an investment management firm registered with the U.S. Securities and Exchange Commission.  The JOLs are aware that Mr Dondero set up the Company and the Fund for philanthropic and charitable causes, and therefore donations to the Fund likely arose from the proceeds from NexPoint's (formerly Highland Capital Management) business activities.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     12

28.3 A non-convertible promissory note issued by TerreStar Corporation with a value of US$83 million;

28.4 Membership Units in a company referred to in the expense report as "NHT Holdco, LLC", for US$2.1 million; and

28.5 A loan due of US$1.3 million from an entity referred to in the expense report as "HCMSI";

28.6 A receivable of US$637,000 due from a broker; and

28.7 A dividend receivable of US$185k.

(pages 166 to 169 of MM-1)

29 In respect of the other corporate entities owned by CLO HoldCo, the JOLs have ascertained as follows:

29.1 Liberty CLO HoldCo, Ltd ("**Liberty HoldCo**") and Atlas IDF, LP ("**Atlas**") hold certain choses of action by way of litigation claims. In this regard, on 8 May 2025, the JOLs received a letter from Stinson LLP, who confirmed that they are a Texas law firm acting for certain defendants to three separate litigation proceedings commenced by Liberty HoldCo and Atlas respectively (pages 170 to 173 of MM-1). Liberty HoldCo is a wholly owned subsidiary of CLO HoldCo and one of the Fund Entities (i.e. a "**Fund Entity**"). The JOLs understand that Atlas is a subsidiary of Rand Advisors, LLC, which is also a Fund Entity. The letter from Stinson LLP explained that:

(a) Liberty HoldCo is seeking proceeds of approximately US$500,000 from the defendants to litigation pending in the United States District Court for the District of Delaware captioned: "*Liberty CLO HoldCo, Ltd. v. Nancy Dondero, as Trustee of The Dugaboy Investment Trust, Grant James Scott, as Trustee of The SLHC Trust, NexPoint Advisors, L.P., NexPoint Real Estate Advisors IV,*

*L.P., NexPoint Advisors GP, LLC, and NexPoint Real Estate Advisors GP, LLC, Case 1:25-cv-00236-UNA.*"

(b)     Liberty HoldCo is seeking payment of US$1,334,980.74 allegedly owed to it by Highland Capital Management Services, Inc. in litigation pending in the United States District Court for the Northern District of Texas, Dallas Division captioned: "*Liberty CLO HoldCo, LTD., v. Highland Capital Management Services, Inc., Civil Action No. 3:25-CV-477-L*"

(c)     Atlas is seeking payment of US$13,905,223.93 in allegedly unpaid principal and interest on two demand promissory notes against defendant NexPoint Real Estate Partners LLC, as well on an alleged guarantee given by defendant Dugaboy Investment Trust, a trust for which Mr Patrick was previously counsel, in litigation pending in the Business Court of Texas, First Division, captioned: "*IDF, LP, v. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC and Nancy Dondero, as Trustee of the Dugaboy Investment Trust*".

29.2    The JOLs have discovered from various public filings that:

(a)     Liberty HoldCo owns –

(i)     As of 30 April 2025, 2,549,002 shares in NexPoint Capital Inc, representing 29.5% of the issued stock, which according to SEC disclosures is valued at USD12.9 million (page 185 of MM-1);

(ii)    As of 31 March 2025, 500,120 class Z shares in NexPoint Real Estate Strategies Fund, representing 33.63% of the issued stock class (pages 301 of MM-1). The JOLs have not identified a value for this stock.

(iii)   100% of the Class I membership interest in Nexpoint Polo Glen Holdings LLC. A put option over this interest is valued at approximately

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     14

**CONFIDENTIAL**                                                      **TDIT004726**

US$693,000 according to filings in litigation in the United States District Court for the State of Delaware dated 28 February 2025 (page 335 of MM-1).

(b)  CDHC Royse City Land, LLC, a Fund Entity, owns eight properties in Texas.  The eight properties comprise of vacant agricultural and development plots with a total area of approximately 31 million square feet. The plots have an appraised value of US$11.4 million according to the county tax assessors of Rockwall, Collin and Hunt counties. The Royse City properties are subject to a deed of trust registered on 18 September 2018 which includes an assignment of rent, security agreement, and fixture filing in favour of Nexbank SSB. (pages 346 to 356 of MM-1)

(c)  CDHC Assets, LLC, a Fund Entity, owns three properties in Texas.  Two of the properties are in Kaufman County. The two properties consist of vacant agricultural land plots with a combined area of 1.2 million square feet and a combined market value of US$657,773 according to tax assessor records. The properties are subject to a deed of trust registered on 18 September 2018 which includes an assignment of rent, security agreement, and fixture filing in favour of Nexbank SSB. (pages 357 to 368 of MM-1)

(d)  CDHC Fort Worth Land, LLC, a Fund Entity, owns five properties in Texas.  The five properties comprise vacant residential plots with an area of 4,996 square feet, each worth US$125,000 (US$625,000 total) according to appraised values from the Tarrant County tax assessor. They are subject to a deed of trust registered on 18 September 2018 which includes an assignment of rent, security agreement, and fixture filing in favour of Nexbank SSB. (pages 369 to 378 of MM-1)

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     15

(e)    CDHC Stewart Creek, LLC, a Fund Entity, owns one property in Texas.  The property is a vacant land plot with an area of approximately 2 million square feet. It has a market value of US$796,834 according to tax assessor records. The JOLs' searches of county records showed no mortgage or security registered against this plot of land (page 379 of MM-1).

(f)    Rand Advisors, LLC ("**Rand Advisors**"), a Fund Entity, is an investment management firm that was registered in Delaware on 27 August 2013. The company is registered with the SEC as an advisor and is required to file disclosures annually through a Form ADV. The disclosures show that it was founded by an individual named John Honis. Mr Honis was the chief commercial officer of the company, though he was replaced by Mr Patrick according to a March 2023 public filing (pages 406, 412 and 433 of MM-1). Rand Advisors operates a shared services agreement with Skyview Group, Mr Patrick's employer.

(g)    Rand Advisors is 100% owned by Charitable DAF Holdings Corp. (which is a Fund Entity that the JOLs understand is an indirect wholly owned subsidiary of the Fund) according to its Form ADV filed in March 2025 (page 412 of MM-1). The public filings also show that it manages assets worth US$153.6 million (pages 386, 387, 402 and 412 of MM-1). The assets are managed on behalf of three clients, namely Atlas (which the JOLs understand to be a subsidiary of Rand Advisors), Rand PE Fund 1 LP, and Rand Series 1 Fund LP.

(h)    The JOLs have been unable to obtain any details of the specific assets managed by Rand Advisors on behalf of the three entities listed above. However, Rand Advisors' investment strategies were described in its public disclosures as follows:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     16

(i)     Investing in senior secured bank loans, collateralised loan obligations and collateralised debt obligations. This strategy is utilised for Rand Series 1 Fund LP;

(ii)    Investing in small to medium sized companies which are either involved in or are the target of acquisition attempts, and in companies which are facing bankruptcy or are attempting spin offs, liquidations, workouts or reorganizations. This strategy is utilised for Rand PE Fund 1 LP; and

(iii)   Investing in bank loans, currency and securities including long and short positions on public equities, fixed income, derivatives and collateralised loan obligations. This strategy is utilised for Atlas.  (pages 417 to 418 of MM-1).

## BACKGROUND TO THE COMPANY'S CLAIMS IN THESE PROCEEDINGS

30    The JOLs' investigations to date (including a review of the Company's documents that have been provided by third parties) have identified very significant areas of concern. In very short summary, and as an overarching comment, it appears that the Directors entered into several transactions that were designed to, and did:

30.1    remove the Company's sole asset (being the Partnership Interest) to entities within the control of one of the Company's directors, Mr Patrick, for no meaningful consideration, or at least at a vast undervalue; and

30.2    enrich Mr Patrick through the charging of excessive director's fees and discretionary bonuses.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     17

**CONFIDENTIAL**

**TDIT004729**

31 Outlined below is a brief *dramatis personae* with respect to the various Defendants to these proceedings:

31.1 **D1 – Mr Mark Eric Patrick**. Mr Patrick is a U.S. attorney and was employed as tax counsel by Highland Capital Management, L.P. ("**Highland**"), an investment company founded by Mr Dondero, from 2008 to 2021 and as tax counsel by Highland Consulting Group, Inc. d/b/a Skyview Group from March 2021 to October 2024. He was instrumental in the creation of the Fund in 2011; in particular, he advised on the tax structure of using an offshore 'blocker' company.

31.2 Mr Patrick is one of two directors of the Company, having been appointed as a director on 25 March 2021. In that capacity, he was responsible for the supervision of the day-to-day operations of the Company. As director, Mr Patrick also owed, and continues to owe, fiduciary duties to the Company. Mr Patrick was also:

(a) the holder of all of the Management Shares in the Company;

(b) the manager of CDMCFAD, LLC ("**CDM**") (see paragraph 31.4 below), to which entity the Directors assigned the Partnership Interest;

(c) the sole member of DFW, which is now the sole member of CDM;

(d) the director of CDH GP, Ltd., the General Partner; and

(e) a director of CLO HoldCo, the Cayman Islands entity through which the Fund holds its assets.

31.3 **D2 – Mr Paul Murphy**. Mr Murphy was the other director of the Company, having been appointed so on 22 April 2021. Mr Murphy is also a director of CLO HoldCo.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948) 18

**CONFIDENTIAL** **TDIT004730**

31.4 **D3 – CDM**. A limited liability company incorporated in Delaware on 12 December 2024. Mr Patrick is the Manager of CDM and DFW is has been the sole member of CDM since 27 March 2025.

31.5 **D4 – DFW**. A non-profit non-stock corporation incorporated in Delaware on 9 December 2024 by Mr Douglas Mancino, a partner a Seyfarth Shaw LLP ("**Seyfarth**"), a U.S. law firm apparently engaged by the Fund.  It is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes. Its certificate of incorporation is at pages 435 to 437 of MM-1.  The JOLs understand that DFW is:

(a) now the holder of the majority of the Participating Shares (51.04%) in the Company pursuant to the DFW Share Issuance on 7 February 2025 (see further below); and

(b) controlled by Mr Patrick as its sole member.

31.6 **D5 – the General Partner**. A Cayman Islands exempted limited company incorporated on 27 February 2024.  It replaced Charitable DAF GP, LLC (the "**Original GP**") as the Fund's current general partner on 7 March 2024, after Mr Patrick sought advice from Walkers on forming a new entity to replace the Original GP. On 5 February 2024, Shields Legal asked Mr Patrick whether that entity should be a Cayman LLC or exempted company, to which he responded (page 438 of MM-1): *"Doesn't matter to me. Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection."*

31.7 **D6 – CLO HoldCo**. A Cayman Islands exempted limited company.  CLO HoldCo is the Fund's only direct subsidiary; the Fund held all of CLO HoldCo's issued shares.  Copies of structure charts showing the Fund structure both before and after the Relevant Transactions (defined below) are at pages 439 to 440 of MM-1.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   19

**CONFIDENTIAL** **TDIT004731**

## THE RELEVANT TRANSACTIONS

32    The series of transactions which form the basis of the Company's claims in these proceedings (the "**Relevant Transactions**"), involve three apparent sets of transactions:

32.1    the transactions pursuant to which the Partnership Interest was transferred to CDM on 18 December 2024, in exchange for the sole membership of CDM (the "**LP/LLC Exchange**");

32.2    the purported DFW Share Issuance to DFW on 7 February 2025; and

32.3    the redemption of the Company's membership in CDM on 27 March 2025 (the "**Redemption**").

33    Each of the Relevant Transactions was undertaken without the knowledge or consent of the Supporting Organisations. Each of the Relevant Transactions was at or on the instigation, instruction and involvement of Mr Patrick and Mr Murphy.

34    The substantive effect of the Relevant Transactions was that:

34.1    the Company:

(a)    was divested of its Partnership Interest in the Fund, which had a NAV of US$269.1m[5], for around US$1.6m.

(b)    made a distribution to its participating shareholders (excluding its new shareholder, DFW) in the amount of c.US$1.6m;

34.2    the Supporting Organisations and CFNT:

(a)    were entirely divested of their indirect interest in the Fund; and

---

[5] According to a valuation report dated 30 September 2024

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    20

(b)    had their shareholding, which comprised 100% of the Participating Shares in the Company, and which represented the entire economic interest in it, to less than 50%.

35    The Relevant Transactions are described in more detail below.

36    In addition to the Relevant Transactions, Mr Patrick also procured that very significant increases to his remuneration were approved by the Company (the "**Remuneration Transactions**"), which increases the JOLs consider to have been made in breach of fiduciary duty.

The No Confidence Letter and advice sought in consequence

37    On 11 November 2024, as a result of concerns about excessive remuneration and lack of information about the manner in which the Fund was being managed, Holland and Knight, U.S. attorneys for the Supporting Organisations, wrote  a letter to Mr Murphy on 11 November 2024 advising that the Supporting Organisations no longer had confidence in the governance of the Company and/or the Fund and considered that a reorganisation of the governance structures was required to protect the charitable efforts of the Supporting Organisations (the "**No Confidence Letter**") (pages 441 to 442 of MM-1).

38    Mr Patrick subsequently sought advice from Walkers, then Cayman attorneys to the Company, as to whether the Company could issue further Participating Shares to a new non-profit organisation to dilute the Supporting Organisations and insert a new member able to oppose a potential winding-up petition brought by the Supporting Organisations on just and equitable grounds.  On 26 November 2024, Mr Murphy wrote that:

"*Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    21

*by diluting them therefore the company should be wound up or an order made for change of management /revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground…"* (page 443 of MM-1)

39 On 27 November 2024, Walkers responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition will be taken into consideration and would likely help any efforts Mr Patrick might make to resist such winding up (page 448 of MM-1).

The LP/LLC Exchange

40 On 18 December 2024:

40.1 The Directors resolved to approve the transfer of the entirety of the Partnership Interest to CDM, in exchange for the contribution by the sole member of CDM (i.e., Mr Patrick) of 100% of the membership interest in CDM (the "**18 December Resolution**").  With respect to the LP/LLC Exchange, the 18 December Resolution states that the Directors justified the transactions, purportedly relying on US tax advice (amongst other things) (the "**US Tax Advice**"), as follows:

"… *would help insulate the DAF from exposure to [Dondero] and his entities who may be at risk of causing the [IRS] to revoke the tax-exempt status of one or more of the Participating Shareholders/supporting organizations which could imperil the assets of the Company*" (see section 2.1(f)(i) of the 18 December Resolution);

 "*The IRS would look favorably upon any and all attempts for DAF to maintain its influence from what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement"* (see section 2.1(f)(iii) of the 18 December Resolution); and

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     22

**CONFIDENTIAL**

"…*as permitted under the LLC Act, the terms of the LLC Agreement [with respect to CDM] eliminate the fiduciary duties of the manager of the Transferee*" (see section 2.1((g)(v)) of the 18 December Resolution).

40.2   By way of a Deed of Assignment and Assumption dated 18 December 2024 (the "**Deed**") entered into between the Company, CDM and the General Partner, the Company then assigned the Partnership Interest (comprising 99% of the economic interest in the Fund) to CDM in exchange for the transfer to the Company of 100% of the membership interest in CDM (the "**CDM Assignment**") and the "**CDM Membership**").  The Deed was executed by Mr Patrick on behalf of each of (i) the Company in his capacity as a director; (ii) CDM, in his capacity as manager; and (iii) the General Partner, in his capacity as a director.

40.3   A copy of the December Resolution, the CDM Assignment, and the LLC Agreement are exhibited at pages 454 to 494 of MM-1.

41   The effect of the above transactions was that:

41.1   CDM was inserted into the corporate structure below and as a subsidiary of the Company and would hold the entirety of the Partnership Interest in the Fund previously held by the Company; and

41.2   The Company would hold the entirety of the CDM Membership Interest in CDM, such that its sole asset, formerly its limited partner interest in the Fund, was exchanged for that membership interest in CDM, a Delaware LLC. As is set out in the SOC, this set of transactions was not, on its own, an economically neutral one.

<u>The DFW Share Issuance</u>

42   In November 2024, without telling the Supporting Organisations or the Charities, the Directors began seeking advice from Walkers on whether the Company could issue new Participating

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   23

**CONFIDENTIAL**                                                                                        **TDIT004735**

Shares that would have the effect of diluting the existing Participating Shareholders, "*in light of a possible just and equitable winding up petition*" being filed by one of the Supporting Organisations, as is recorded at paragraph 1 of Walkers' draft advice dated "*[xx] February 2025*" (page 495 of MM-1). A copy of the email chain showing the Directors started to seek this advice in November 2024 is at page 448 of MM-1.

43     On 7 February 2025:

43.1     The Directors resolved to issue 318 Participating Shares to DFW (the "**Share Issuance Resolution**"), which resulted in DFW owning 51.04% of the Participating Shares in the Company. In the Share Issuance Resolution, the Directors purported to justify the DFW Share Issuance on the basis that (amongst other things):

(a)     The Supporting Organisations and HCMLP had requested information and made false and misleading claims about the Company and its finances which the Directors believe were directed by Mr Dondero.

(b)     Purportedly relying on the US Tax Advice:

(i)     there was a risk the IRS could revoke the tax-exempt status of the Supporting Organisations and HCMLP which could imperil the charitable status and assets of the Company;

(ii)     increasing the number of participating shareholders would mitigate the undue influence and private inurement of Mr Dondero; and

(iii)     the IRS would look favourably upon attempts by the Fund to maintain its independence from his (i.e., Mr Dondero's) attempts to use the Fund for his private benefit.

(c)     The DFW Share Issuance would protect the Company and the Participating Shareholders.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     24

**CONFIDENTIAL**     **TDIT004736**

**FSD2025-0201**                                                                                              **2025-07-15**

43.2    The Company issued 318 Participating Shares and allotted them to DFW.

43.3    A copy of the Share Issuance Resolution is exhibited at pages 500 to 524 of MM-1.

44    The effect of the above transactions was that DFW now holds 51.04% of the Participating Shares in the Company and the Supporting Organisations and CFNT have been diluted from an aggregate shareholding of 100% to 49%.

45    The JOLs understand that the US Tax Advice referred to by the Directors is an email from Carington, Coleman, Sloman & Blumenthal, L.L.P. ("**Carrington Coleman**") dated 18 December 2024 (the "**Carrington Coleman Email**").  A copy of this email is exhibited at pages 525 to 526 of MM-1.

The Admission and Redemption

46    On 27 March 2025:

46.1    The Directors caused the Company to enter into a letter agreement with CDM (the "**Letter Agreement**"), pursuant to which:

(a)    CDM redeemed the membership interest that the Company held in it.

(b)    CDM issued a new membership interest to DFW, such that DFW became CDM's sole member.

(c)    The Company assigned to CDM various contracts and agreements to which the Company was a party, listed in Schedule A to the Letter Agreement.

46.2    Mr Patrick caused the following documents to be executed (the "**Admission and Redemption Documents**"):

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    25

**FSD2025-0201**                                                                                              **2025-07-15**

**CONFIDENTIAL**                                                                                              **TDIT004737**

(a)   Admission and Amendment No.1 Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192;

(b)   Redemption and Amendment No.2 Agreement under which CDM redeemed the Company's CDM Membership for the same sum of US$1,637,192 (the "**Redemption Amount**"); and

(c)   A written consent of the manager of CDM in connection with the matters referred to at paragraphs 46.1(a) and 46.1(b) above (the "**Manager Consent**").

46.3   Copies of the Letter Agreement, the Manager Consent and the Admissions and Redemption Documents (which are Exhibits A and B of the Manager Consent) are exhibited at pages 527 to 688 of MM-1.

47   On 2 April 2025, the Directors of the Company resolved to approve the:

47.1   redemption of the Company's CDM Membership for the Redemption Amount; and

47.2   shareholder distribution of US$1,612,192.01 to the Community Foundation of North Texas and the Supporting Organisations.

Copies of the resolutions are exhibited at pages 689 to 691 of MM-1.

48   The effect of the Redemption was that the Company's CDM Membership were in effect purchased by or transferred to DFW for the Redemption Amount.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   26

**CONFIDENTIAL**                                    **TDIT004738**

Case 19-34054-sgj11 Doc 4627-1 Filed 05/11/26 Entered 05/11/26 17:05:52 Desc
Exhibit 207 Page 27 of 66

The Remuneration Transactions

49 The Company's expenses have increased materially following Mr Patrick's appointment as a director on 25 March 2021. Specifically (and amongst other things):

49.1 The Directors' fees increased from around US$40,000 in 2022 to approximately US$600,000 in 2023 (page 694 of MM-1).

49.2 On 13 September 2024, the Directors resolved to increase Mr Patrick's salary to US$850,000 per annum and approve a long-term incentive ("**LTI**") of 7.5% of annualised net fund returns in excess of 10% (capped at 25% annualised return). A copy of this resolution is exhibited at pages 695 to 696 of MM-1.

49.3 On 1 October 2024:

(a) the Directors resolved that Mr Patrick was to receive an LTI payment of US$975,000 and an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary. A copy of this resolution is exhibited at pages 697 to 704 of MM-1.

(b) Mr Patrick signed an employment agreement for his own position at the Company for the period from 24 March 2021 which provided, among other things, for a base salary of US$850,000 and an LTI payment of US$4,759,000. A copy of this agreement is exhibited at pages 705 to 722 of MM-1.

50 By way of contrast to the remuneration that Mr Patrick resolved that he should be awarded, his predecessor's salary (Grant Scott) during his tenure in the same position was approximately US$60,000 per annum.

51 As regards expenses, expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948) 27

## THE JOLS' CONCERNS

52 The JOLs' overarching concern is that the Relevant Transactions and the Remuneration Transactions were pursued by the Directors for the sole or primary reason of removing assets from the Company to benefit entities controlled by Mr Patrick or for his benefit personally, to the detriment of the Charities.

<u>Impacts on Charities</u>

53 The JOLs continue to investigate the impact that the Relevant Transactions have on the Charities. The Relevant Transactions have reduced the ability the Supporting Organisations and the Charities to meet their charitable objectives by: (i) stripping them of some of their assets and creating a hole in their balance sheets; (ii) reducing the Charities' ability to pay their overheads because, historically, these have been (in part) financed by the Supporting Organisations, where the fees charged by the Charities are typically based on a percentage of the market value of assets controlled by the Supporting Organisations; and (iii) the Remuneration Transactions have reduced the Fund's ability to provide financial support to the Supporting Organisations and, by extension, the Charities.

*A Hole in the Charities' Balance Sheets*

54 Although the JOLs' investigations continue, they understand that, historically, the Supporting Organisations have held the Participating Shares on their own balance sheets and the Charities have held them on their consolidated balance sheets.

55 For example, the Santa Barbara Foundation:

55.1 Its publicly available, independently audited financial statements for the year ended 31 December 2023 (a copy of which are exhibited at pages 726 to 750 of MM-1) disclose the following:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     28

**CONFIDENTIAL** **TDIT004740**

**FSD2025-0201**                                                                                                    **2025-07-15**

(a)     page 7 explains that the Highland Santa Barbara Foundation was consolidated within the Santa Barbara Foundation's financial statements because it is "*effectively under SBF's control*".

(b)     page 3 shows that the Santa Barbara Foundation held assets of US$802 million as at 31 December 2023, of which US$611 million were investments;

(c)     page 15 shows that US$78,284,712 million of these investments were held in the form of "Fixed income (illiquid) investments;

(d)     page 16 explains that this includes "*100 participation shares in a non-controlling partnership interest composed primarily of collateralized loan obligations.  100% of this investment is held by a supporting organization, HSBF, at fair value.*"; and

(e)     page 19 explains that the fair value of this investment is "*based upon annual independent third-party valuations using the same techniques and variables as in prior years.*"

55.2    A ValueScope report obtained from the Highland Santa Barbara Foundation (which valued its 100 Participating Shares as at 31 December 2023) shows that ValueScope valued the Highland Santa Barbara Foundation's (and by extension, the interest of the Santa Barbara Foundation) interest in those shares at US$78,284,712, being exactly the same value recorded in the Santa Barbara Foundation's financial statements referred to above. A copy of the relevant ValueScope report is exhibited at pages 751 to 809 of MM-1.

56      The JOLs understand that neither the Highland Santa Barbara Foundation nor the Santa Barbara Foundation have been able to compile financial statements for the year ended 31 December 2024 because of the lack of a valuation report at that date.  However, the JOLs are concerned that, because of the Relevant Transactions (particularly the LP/LLC Exchange) the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     29

**FSD2025-0201**                                                                                                    **2025-07-15**

**CONFIDENTIAL**                                                                                                    **TDIT004741**

FSD2025-0201 2025-07-15

Santa Barbara Foundation now has a hole in its balance sheet of approximately $78 million, which will threaten or limit its ability to meet its charitable purposes, including because, as noted at paragraph 18.5(b) above and 58 below, the JOLs understand that the fees it is able to charge to the Highland Santa Barbara Foundation are calculated as a percentage of the market value of assets held by the Highland Santa Barbara Foundation.

57     The JOLs are also concerned that the other Supporting Organisations and Charities will also have similar holes in their balance sheet as a result of the Relevant Transactions.

*Ability of the Charities to Pay Their Overheads*

58     The JOLs understand that:

58.1     the Charities provide a range of services to the Supporting Organisations;

58.2     the obligations to provide those services will continue, despite the Relevant Transactions;

58.3     the Supporting Organisations pay a fee to the Charities to pay for these services; and

58.4     the Supporting Organisations' ability to pay those fees has, historically, been made possible in whole or in part because of money provided by the Fund;

58.5     The fees are typically based on a percentage of the market value of assets held by the Supporting Organisations (see for example the Administrative Fee Schedule at Exhibit B of the Greater Kansas City Community Fund and Highland Kansas City Foundation Legal Relationship Agreement at page 132 of MM-1); and

58.6     As a result of the Relevant Transactions, the market value of the assets held by the Supporting Organisations has been reduced significantly, which has a direct impact on the fees charged by the Charities to the Supporting Organisations.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     30

FSD2025-0201 2025-07-15

CONFIDENTIAL TDIT004742

59   The JOLs are, therefore, concerned that the Relevant Transactions (particularly the LP/LLC Exchange) will reduce the funds available to the Charities to meet their obligations to the Supporting Organisations.

**THE DEFENDANTS' POSITION**

60   The Relevant Transactions formed the basis for the petition dated 28 April 2025 filed by the Supporting Organisations to bring the voluntary liquidation of the Company under the supervision of the Court (and thereby commence the Liquidation Proceedings).

61   On 24 June 2025, the JOLs' sanction application to engage attorneys was heard by this Honourable Court in the Liquidation Proceedings.  DFW, Mr Patrick and Mr Murphy filed evidence ostensibly in opposition to the JOLs' sanction application.[6] However, that evidence (in substance) outlined these parties' positions with respect to the propriety of the Relevant Transactions. As far as the JOLs understand, it is their purported justification for what occurred.

62   Whilst the JOLs' position is that the Application has been brought on an *inter partes* basis with sufficient time for the Defendants to submit evidence and legal submissions setting out their defences to the Company's claims, the JOLs nevertheless consider it would assist the Court to set out the JOLs' understanding of those defences as gleaned from the evidence filed by the Defendants in the Liquidation Proceedings.  That provides the context for the next section of this affidavit, where I explain the investigations that the JOLs have undertaken to assess the merits of the Defendants' likely defences.

---

[6] The first affidavit of Paul Murphy dated 4 June 2025 ("**Murphy 1**"); first affidavit of Mark Eric Patrick on behalf of DFW dated 4 June 2025 ("**Patrick 1**"); and first affidavit of Mark Eric Patrick (in his capacity as the management shareholder of the Company) dated 4 June 2025 ("**Patrick 2**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   31

**CONFIDENTIAL**

63 At a high level, the JOLs understand that the position advanced by DFW and the Directors for the Relevant Transactions includes the following:

63.1 The Supporting Organisations did not have an economic interest in the Company but, rather, the Company's purpose was to act as a throughput for discretionary, charitable donations to qualifying recipients (which were not necessarily the Supporting Organisations or the Charities) (the "**No Economic Interest Justification**"). Owing to the No Economic Interest Justification, the Supporting Organisations did not lose anything because of the Relevant Transactions.

63.2 The Relevant Transactions were necessary, proper and valid (the "**Dondero Control Justification**"), citing tax advice from Carrington Coleman in its memorandum of advice dated 25 March 2025 (the "**Carrington Coleman Memo**") (see pages 940 to 956 of MM-1), for the following reasons:

(a) To protect the Company and the Directors from attempts by Mr Dondero and the Supporting Organisations to exert improper or damaging dominion and control over the Company's assets, as this would expose the Company and the Directors to breaches of US tax laws and regulations.

(b) To protect the Company and the Fund's asset-holding subsidiaries from actions by Mr Dondero and the Supporting Organisations that would expose them to claims by third parties that the Company and the Fund's asset-holding companies were "alter egos" of Mr Dondero such that the Fund's assets could be utilised to satisfy the claims of those third parties against Mr Dondero.

(c) To prevent Mr Dondero from being able to access the Fund's assets for his own benefit.

63.3 Relatedly, the JOLs understand that in a letter on 20 March 2025 (at a time when the LP/LLC Exchange and DFW Share Issuance had already been effected), Douglas M.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948) 32

**CONFIDENTIAL** **TDIT004744**

Mancino of Seyfarth wrote to the IRS regarding Highland Dallas Foundation, Inc, as part of a Form 13909, Tax-Exempt Organization Complaint (Referral) submission, and that an updated letter dated 1 May 2025 was sent to the IRS pursuant to the same complaint (collectively, the "**IRS Complaint**") (pages 957 to 973 of MM-1).

63.4    The Directors obtained independent valuation reports which they relied on to justify the redemption of the Company's CDM Interest for c.US$1.6million (the "**Valuation Justification**").  Specifically:

(a)    Valuation advice from FTI, being its report dated 27 March 2025 (the "**FTI Report**") (see pages 974 to 987 of MM-1). The FTI Report is relied on in, and exhibited to, (amongst other things) the Manager Consent to the Redemption.

(b)    Valuation advice from ValueScope, being its reports dated 7 January 2025 and 26 March 2025 (the "**ValueScope Reports**"). These were similarly relied on in, and exhibited to, (amongst other things) the Manager Consent to the Redemption.

(c)     Copies of these reports are exhibited at pages 810 to 939 of MM-1.

64    With respect to the Remuneration Transactions, the JOLs understand that Mr Patrick seeks to rely on a report dated 26 August 2024 prepared by Mercer (the "**Remuneration Increase Justification**") to support the justification for the increase in his remuneration (which appears to have then been backdated to the date of his commencement as a director of the Company). A copy of the report prepared by Mercer (the "**Mercer Report**") is exhibited at pages 988 to 1007 of MM-1.

**THE JOLS' INVESTIGATIONS**

65    Since the date of our appointment, the JOLs have been investigating the affairs of the Company, which includes the investigation of each of the purported justifications offered by

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    33

**CONFIDENTIAL**                                                              **TDIT004745**

DFW and the Directors in relation to the Relevant Transactions and the Remuneration Transactions. These are addressed in the paragraphs below.

<u>The No Economic Interest Justification</u>

66      With respect to the No Economic Interest Justification, the suggestion appears to be that the Company is different from every other Cayman Islands exempted limited company because its registered shareholders do not have an economic interest or a true or relevant economic interest.

67      The JOLs have recently discovered (amongst other things) a memorandum of advice prepared by Haynes and Boone, LLP (the Company's then US counsel) dated 9 July 2021 (the "**H&B Memorandum**") which explains the reasons for the corporate structure of the Company and the Fund.  In particular, the H&B Memorandum states that (amongst other things):

67.1      A donor advised fund ("**DAF**") is a separately managed charitable investment account established by a donor within a public charity (a section 501(c)(3) entity). The charity is generally referred to as a 'sponsor'.

67.2      The donor typically maintains certain advisory privileges over the DAF funds or account but the DAF account is fully and completely owned and controlled by the sponsor. Because a contribution to a DAF account is, for tax purposes, the equivalent of a contribution to a public charity and the donor gets a tax benefit for it, the contribution must be permanent and irrevocable.

67.3      A sponsor may create a subsidiary as a "supporting organisation" which is also a section 501(c)(3) charity which is treated financially as part of a consolidated unit with the sponsor.  The JOLs understand from their advisors that a supporting organisation structure could be used as an alternative to a DAF.

**FSD2025-0201**                        **2025-07-15**
**CONFIDENTIAL**                        **TDIT004746**

67.4    For example, The Dallas Foundation which is one of the Charities formed, owns and controls the Highland Dallas Foundation which is one of the Supporting Organisations in this structure.  Donations were made to the Highland Dallas Foundation as both the sponsor and supporting organisation.  The Highland Dallas Foundation, from time to time then makes distributions to The Dallas Foundation which in turn makes distributions to other charities.

67.5    Sponsors and supporting organisations are tax-exempt organisations.  A tax-exempt organisation is generally exempt from all federal and state income taxes except if it receives income classified as "unrelated business taxable income".  Income received by a sponsor or supporting organisation directly from an investment fund or private equity vehicle would attract UBTI.  To prevent UBTI from flowing through to a tax-exempt organisation, a sponsor or supporting organisation can utilise a "corporate blocker" which is accomplished by having a corporation interposed between the tax-exempt organisation and the investment fund. Using a structure in this manner is often described as using a "blocker" because the UBTI is blocked out and does not flow through to the tax-exempt investor. Instead, the UBTI is included in the income of, and subject to tax in, the blocker corporation. That is, the reason for interposing the Company between the Supporting Organisations and the Fund was simply for tax reasons.

67.6    In this case, the Company is a corporate blocker for the Fund for the purposes set forth above.

A copy of the H&B Memorandum is exhibited at pages 1008 to 1012 of MM-1.

68    With respect to matters raised in the H&B Memorandum and the Carrington Coleman Memo including (amongst other things) the meaning of supporting organisations and DAFs under the

**CONFIDENTIAL**                              **TDIT004747**

Code and, specifically, how that applies to the Company, the JOLs understand from their advisors that the position is as follows:

68.1   Under the Code, a DAF must meet each of the three following conditions:

    (a)   It is separately identified by reference to contributions of a donor or donors;

    (b)   A "sponsoring organisation" owns and controls it; and

    (c)   A donor has or reasonably expects to have advisory privileges with respect to the distribution or investment of amounts held in such fund or account by reason of the donor's status as a donor.

68.2   The Company is not itself a tax-exempt entity or a DAF as a matter of US law, despite the use of the term "DAF" in the Company's name.  The Company does not meet the statutory requirements of a DAF, in particular:

    (a)   Mr Patrick holds the Management Shares of the Company rather than a sponsoring organisation;

    (b)   There is nothing in the Company's minute book that indicates that the Company is separately identified by reference to its donor; and

    (c)   There is no evidence that Mr Dondero, as the alleged donor, possessed the requisite advisory privileges with respect to distributions from the Company, because the Company may only pay dividends to its Participating Shareholders, leaving no option for anyone, even Mr Dondero, to direct those dividend payments to another charitable organisation.

68.3   Highland Dallas Foundation is a Type I supporting organisation with respect to The Dallas Foundation which means that, among other things, Highland Dallas Foundation must operate exclusively for the benefit of The Dallas Foundation.  In other words,

**FSD2025-0201**                                                                                    **2025-07-15**

Highland Dallas Foundation (and the other Supporting Organisations) may only benefit their supported Charities.

68.4    Unlike Highland Dallas Foundation, the Company is neither a US income tax-exempt entity nor a "supporting organisation" within the meaning of the Code.

68.5    The Participating Shares in the Company are therefore best characterised as an asset of Highland Dallas Foundation Inc in the form of an investment in an offshore private equity structure. This same characterisation applies to the participating shares in the Company owned by the supporting organisations to the Santa Barbara Foundation and the Kansas City Foundation and by CFNT respectively (i.e., these parties have an economic interest in the Company).

69    Having regard to the matters outlined above, the JOLs are currently of the view that:

69.1    It is clear that the Company is a Cayman Islands exempted limited company and there are no special or unique features applicable to it in the current structure;

69.2    As a corollary, it appears that (as is the case in all Cayman Islands exempted limited companies) the registered participating shareholders have the economic interest in the Company;

69.3    The documents available to the JOLs do not support the No Economic Interest Justification and, to the contrary, it appears that the No Economic Interest Justification is flawed;

69.4    The No Economic Interest Justification does not in any event adequately address the question of who holds the economic interest in the Company; and

69.5    Even if it was true that the economic interest were in fact held by someone other than the registered participating shareholders, it is clear that such interest is not held by Mr

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    37

**FSD2025-0201**                                                                                    **2025-07-15**

**CONFIDENTIAL**                                                                                    **TDIT004749**

**FSD2025-0201**                                                                        **2025-07-15**

Patrick, and nothing justifies him in effect using his powers and functions to divest the Company of all its assets.

69.6   Ultimately, and in any event, it does not much matter where the economic interest in the Company lies, because it is not the shareholders who are bringing the present proceedings; rather, it is the Company, acting through the JOLs, that is suing the Directors because the Directors have divested the Company of its only asset for a significant undervalue.

The Dondero Control Justification

70   As to the Dondero Control Justification, the JOLs understand from their advisors that the position is as follows:

70.1   The purported concerns raised in the Carrington Coleman Memo (even taken at their highest and assuming they are true) would not have any immediate implications for the Company; and

70.2   Any allegation that Highland Dallas Foundation's loss of exempt status was imminent and could somehow imperil the Company's charitable mission is unfounded as a matter of US tax law.

71   Further, in completing the LP/LLC Exchange and the DFW Share Issuance, the Directors relied on a short email advice in the form of the Carrington Coleman Email, with the substantive advice (in the form of the Carrington Coleman Memo) not received until 25 March 2025 (i.e., a mere two days before the date of the Redemption).

72   As to the factual allegations relied on by the Directors as part of the Dondero Control Justification:

72.1   The Highland Dallas Foundation has recently confirmed to the JOLs that it has never been investigated by the IRS or any other governmental agency; and

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   38

72.2    As outlined above at paragraphs 18 to 21, the JOLs understand that Mr Dondero did not have control over the Supporting Organisations (rather, that control was required to be with the Charities).

73      As with the No Economic Interest Justification, having considered (amongst other things) the issues outlined above, it is the JOLs' view that the Dondero Control Justification is flawed, and would be flawed even if the factual allegations made in paragraph 72 above were true.

74      The defects in the Carrington Coleman Memo will be addressed more fully in counsel's skeleton argument, but, most fundamentally, the Carrington Coleman Memo fails to explain why it is that any investigation by the US tax authorities into the Highland Dallas Foundation (even if that were to lead to the revocation of the Highland Dallas Foundations' tax-exempt status, which is far from certain and could only occur after a lengthy process, including appeals[7]) could have implications for the status or assets of the Company.  The Company has no status as a matter of US law, being a Cayman entity, and nor is there any plausible basis on which an investigation into the status of the Highland Foundation could threaten the Company's assets; rather, the problem is one that arises purely at the 'shareholder' level, and as a matter of US law.  As Mr Patrick is a tax attorney, the JOLs believe that he should have been aware of the shortcomings of the Carrington Coleman Memo.

75      In any event, as far as the JOLs are aware, after some investigation through their US lawyers, no IRS Audit (being the first stage of any investigation) has even been initiated against Highland Dallas.

---

[7] The JOLs understand from their US advisers (without waiving privilege) that the process of investigation into the status of a tax-exempt entity involves an initial audit, and that, if an adverse determination is made, the taxpayer may file a "protest letter", which triggers an appeals process within a separate department of the IRS.  If the initial appeal is unsuccessful, the taxpayer has a further right of appeal to the US Tax Court; and that, in any event, the loss of tax-exempt status is a remedy of last resort, that will not usually be applied if a monetary penalty would suffice.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    39

76      Further:

76.1    On 5 March 2025, in connection with the DFW Share Issuance, Mr Tony Beswetherick KC issued retrospective advice in draft to the Company that undermined the stated justification for the DFW Share Issuance. In that advice, Mr Beswetherick opined that (amongst other things):

(a)     Where Articles confer a power on directors to issues shares, that power is a fiduciary one and must only be exercised for proper purposes; an issue of shares '*deliberately aimed at altering the balance of power between shareholders*' is problematic; the power should not be exercised with a view to altering an existing balance of power, irrespective of whether the directors consider that doing so is in the interests of the company;

(b)     The effect of the DFW Share Issuance was that, if there were to be a company meeting or proposal to approve a modification that affects the Participating Shareholders' rights, the ability of the prior Participating Shareholders to vote down such a change was negatively affected (DFW now having over 50% of the total Participating Shares);

(c)     It is not immediately clear from the Share Issue Resolutions whether the justifications stated were relevant to the Directors' decision. If they were relevant, it is not explained why the issue of shares to DFW would prevent false claims being made by Mr Dondero; it may be that those matters are part of the context, rather than part of the reason for the decision; and

(d)     The Participating Shareholders might suggest the Share Issue Resolutions are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board.

A copy of this advice is exhibited at pages 1013 to 1038 of MM-1.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     40

76.2    In instructing Seyfarth to send the IRS Complaint, which was first sent on 20 March 2025 with an updated version sent on 1 May 2025 and was stated to be sent on behalf of the Company, Mr Patrick and Mr Murphy effectively did their best to "tip off" the IRS as to a host of matters said to call into question the charitable status of at least one of the Supporting Organisations (and original Participating Shareholder).  When viewed against the wording from the Company's board resolution dated 18 December 2024, the JOLs' hold serious concerns that the IRS Complaint seems to have been calculated to increase the "*risk of causing the [IRS] to revoke the tax-exempt status of one or more of the Participating Shareholders/supporting organizations*" and so increase the risk that such a decision would "*imperil the assets of the Company*". In other words, the JOLs believe that the IRS Complaint was essentially an attempt by Mr Patrick and Mr Murphy to manufacture grounds on which the Relevant Transactions could be justified after the fact.

76.3    The JOLs' believe that the evidence demonstrates that Mr Patrick and Mr Murphy had already contemplated the objective of redeeming the Company's interest in the Fund well before any legal advice as to the need to effect distancing measures from Mr Dondero had yet been received. For example, on 9 November 2023, Shields Legal Group, US attorneys then acting for the Company, sent a work plan to Campbells LLP, then Cayman Islands attorneys for the Company (the "**Work Plan**"), which stated, as to the advice that was sought:

(a)    That it related to "*potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc*"; and

(b)    "*we may need to rely on opinions and memoranda in potential future disputes.*" (pages 1433 to 1434 of MM-1)

The Work Plan was subsequently updated on 28 November 2023.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    41

**CONFIDENTIAL**    **TDIT004753**

76.4   The JOLs believe that this demonstrates that the Directors were interested in obtaining advice for defensive purposes so as to justify actions they were already contemplating taking, which actions were referred to in the following questions set out in the Work Plan:

(a)   "*Can the controlling person dilute shares, e.g., the Participation Shares?*"

(b)   "*Can the controlling person redeem shares, e.g., the Participation Shares?*"

(c)   "*Is there any Cayman law requirement that Holdco [i.e. the Company] distribute money upwards to the next level of entities (Highland Dallas Foundation, Inc. and others)?*"

(d)   "*Could HoldCo liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless?*"

(e)   "*What can be done at this point to make [the share transfers in Holdco from Mr Scott to Mr Patrick] bullet proof?*" (pages 1437 to 1438 of MM-1)

<u>The Valuation Justification</u>

77   As outlined above, the Directors and DFW have sought to rely on the FTI Report and the ValueScope Reports in support of the price calculated for the Redemption (which was at approximately a 99.2% implied discount to the stated NAV of the Fund). However, having considered the contents of these documents and consulted with their advisors, the JOLs are of the view that there are glaring issues with these reports purported to be relied on by DFW and the Directors:

77.1   With respect to each of these reports, they are expressed to be solely reliant on the information provided to the service providers by the Company and/or the Directors (i.e., the stated facts have not been independently verified by the service providers);

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   42

**CONFIDENTIAL**

**TDIT004754**

77.2 The FTI Report is expressly stated to be inappropriate to be relied on in support of a transaction and does not constitute FTI's views on the value of any Participating Shares (see paragraph 1.8 at page 976 of MM-1). Notwithstanding the explicit 'non-reliance' language:

(a) the Manager Consent expressly referred to and relied on in the FTI Report as justification for the Admission and Redemption (see page 598 of MM-1); and

(b) Carrington Coleman relied on the FTI Report in the Carrington Coleman Memo dated 25 March 2025 (see page 955 of MM-1).

77.3 With respect to the ValueScope Reports (and amongst other things):

(a) ValueScope was instructed to determine the "fair market value" of the Participating Shares and the membership interest in CDM on the basis of the price at which the Participating Shares would change hands between a willing buyer and a willing seller (see pages 792, 811 and 866 of MM-1).

(b) ValueScope does not appear to have:

(i) considered whether valuation on the basis of a sale was appropriate or whether for example, winding up was a possibility, such that value could have been realised by reference to the stated NAV of the Fund (in the amount of US$269.1 million) as opposed to the c. US$1.6m received by the Company for that interest; and

(ii) addressed themselves as to whom benefitted from the residual value of c. US$267.4m.

(c) ValueScope had prepared a report dated 7 January 2025 (valuation as of 30 September 2024) (pages 810 to 864 of MM-1) in which the fair market value of 100 Participating Shares in the Company was stated as being US$75,961,370

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948) 43

(page 813 of MM-1).  Accordingly, between 30 September 2024 to 25 March 2025, ValueScope considered that there had been a reduction in value of 99.29% in less than a six-month period, even though both valuations relied on the same balance sheet dated 30 September 2024.  The 25 March 2025 valuation did not refer to an updated balance sheet.

77.4    In addition, the JOLs' investigations have uncovered several pieces of advice given to the Company that appear to further undermine the Valuation Justification. Merely by way of examples:

(a)    Following a call on 11 February 2025 between PwC and Walkers (together with Mr Patrick's "onshore and Delaware counsel", in the context of a potential engagement with respect to the valuation of the shares of the Company (prior to the Company's engagement of FTI), PwC declined to accept the instructions in the following terms:

> "...*our view is that the new Delaware entity (CDMCFAD, LLC) effectively has full economic interest and control over the Fund, so we don't really see a basis for applying any discounts to the underlying Fund NAV for that entity.*
>
> *As it relates to the participating shareholders' interest in Holdco, we don't think we can reliably estimate the value/discount given the current fact pattern. While we could make hypothetical assumptions about how the articles may be interpreted, and/or how future cash flows may or may not be distributed, the impact on value is so substantial that we don't think it would be a meaningful exercise (i.e. we'd end up with the discount being 100% in one scenario, but 0% in another). On that basis, I don't think there is a fee / scope that can work for us currently.*"

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    44

A copy of this email is exhibited at page 1039 of MM-1.

(b)     With respect to the FTI Report:

(i)     On 17 March 2025, Mr Patrick wrote to Walkers making it clear that it was his intention to liquidate the Company without notice to the Supporting Organisations and to otherwise obstruct the Supporting Organisations' ability to exercise any right to petition to wind up the Company on just and equitable grounds. A copy of this email is exhibited at page 1058 of MM-1.

(ii)    In an email chain ending in an email dated 26 March 2025 (i.e., one day before the FTI Report was issued), FTI and Walkers had an exchange in the following terms:

> "*Walkers: We have discussed with our client and onshore counsel and set out some amendments in the attached. In addition, we note (1) we have not received any material addressing reliance on the memo by CDM; and (2) the "Limitations and restrictions" section still provides that the memo "should not be used to support a transaction". For the memo to be useful in the circumstances, CDM [and HoldCo] need to be able to rely on it or a separate memo would need to be addressed to CDM on which it may rely.  Further, both entities need to be able to rely on the memo(s) to support the proposed transaction.*
>
> *FTI: What is the intention of adding that directors should act in the interests of future members? I am struggling to understand*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     45

**CONFIDENTIAL** **TDIT004757**

*how a director could act in a manner which is beneficial for future shareholders which is not also helpful for existing shareholders.*

*The limitations in our note will remain. To do a valuation to support a transaction, we will need to do significantly more detailed work. This is an unusual/complicated situation. We are open to doing a fairness opinion on the transaction. But this will require approval from our risk committee and more information on the transaction and situation. We are happy for CDM to have our memo on a non-reliance basis. But this memo should not be used to support a transaction.*" (Emphasis added)

A copy of this email chain is exhibited at pages 1075 to 1076 of MM-1.

<u>The Remuneration Increase Justification</u>

78   As to the Remuneration Transactions, viewed in the context of the broader deficiencies in the justifications offered by the Directors and DFW, the JOLs consider that there is, at least, a live question as to the propriety of the Remuneration Increase Justification.  This is informed by the following considerations:

78.1   The Mercer Report is dated some three years after Mr Patrick commenced his role as a director of the Company and purports to justify three years of back-pay (plus bonuses) at many multiples to his immediate predecessor.

78.2   No justification is offered in Patrick 1 or Patrick 2 with respect to the reason for this report being commissioned when it was, noting that:

(a)   the Relevant Transactions were completed in close proximity to the date of the Mercer Report; and

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   46

(b)      the effect of the transactions pursued in reliance on the Mercer Report resulted in a significant cash outflow from the Company.

## THE STATEMENT OF CLAIM

79      The JOLs are of the view that justifications offered by DFW and the Directors do not justify the septs described above. In light of this, the JOLs decided to prepare and file the SOC.

80      The Company's claims pleaded in the SOC arise as a result of the breaches by the Directors of their fiduciary duties owed to the Company, having caused the Company to have dissipated its assets through a combination of: (a) the Relevant Transactions; and (b) the Remuneration Transactions, all of which were for the benefit of entities controlled by Mr Patrick or for his benefit personally.

81      The factual background to the Company's claims is set out in paragraphs 9 to 154 of the SOC. This includes details of the following:

81.1    the background to the Company and its creation, including the other entities within the structure (e.g., the Fund);

81.2    the control of the Company and the Fund; and

81.3    the events giving rise to the dissipation of the Company's assets and the dilution of the Supporting Organisations' economic interest in the Company.

82      Details of the specific breaches of fiduciary duties committed by the Directors, which underpin each of the Company's claims, are set out and fully particularised at paragraphs 160 to 172 of the SOC.

83      In summary, these centre on the Directors' wilful and dishonest breaches of their fiduciary duties:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    47

**FSD2025-0201**                                                                                           **2025-07-15**

83.1    to act *bona fide* in the best interests of the Company;

83.2    to exercise the powers vested in them for a proper purpose;

83.3    not to place themselves in a position in which there was a conflict between their duty to the Company and their personal interests or the interests of other companies in which they were interested;

83.4    to not make an unauthorised profit from or by reason of their fiduciary office;

83.5    to not purchase, directly or indirectly, the property of the Company without the full and informed consent of the Company; and

83.6    duty to exercise reasonable skill, care, and diligence in the performance of his role and function as director.

Unlawful Means Conspiracy

84    The Company has a claim against all of the Defendants for unlawful means conspiracy as set out in paragraph 173 of the SOC.  This is based on the Defendants having conspired and combined together to injure the Company by unlawful means and the Company having suffered loss and damage as a result.

Proprietary Claim / Knowing Receipt

85    The Company's claims against CDM for knowing receipt are set out in paragraph 174 of the SOC.  These claims are based on the premise that:

85.1    CDM had imputed, or attributed knowledge of the breaches of fiduciary duties committed by Mr Patrick, who was at all material times the guiding mind of each entity, including CDM, for which he either acted as a director or otherwise controlled;

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    48

**FSD2025-0201**                                                                                           **2025-07-15**

**CONFIDENTIAL**                                                                                          **TDIT004760**

85.2 The Company has a beneficial proprietary interest in the sole limited partner interest in the Fund and a proprietary claim to it; the interest having been misappropriated from the Company by virtue of the Directors' breaches of fiduciary duty described above; and

85.3 CDM therefore holds the Partnership Interest on trust or constructive trust for the Company and is liable to account to the Company in equity, by restoring the interest in the Fund to the Company and/or accounting for any profits or otherwise accounting to the Company in equity.

Unjust Enrichment / Restitution

86 The Company has a claim against CDM for unjust enrichment as set out at paragraph 175 of the SOC. This is on the basis that it received the Company's interest in the Fund without there being a valid assignment or other justification for that receipt, such that it is liable to the Company in restitution.

Relief

87 The substantive relief sought by the Company against each of the Proposed Defendants is set out in the prayer for relief of the SOC and includes (amongst other things): (a) damages and / or equitable compensation; (b) orders for restitution; (c) orders for restoration of the Company's property; (d) rectification of the register of members of the Company; and (e) plus interest on such amounts.

**THE INJUNCTIONS SOUGHT BY THE JOLS**

88 The JOLs in this Application seek orders that:

88.1 The Defendants will:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   49

**CONFIDENTIAL** **TDIT004761**

(a)   Preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature), whether held directly or indirectly, in the Fund, the Fund Entities and/or any assets of the Fund; and

(b)   Procure that the Fund Entities and their wholly owned subsidiaries will not in any way dispose of, deal with, encumber, transfer or diminish the value of any of their assets.

88.2   The Defendants will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish any assets in their possession or control, whether they are in or outside the Cayman Islands, which were, are or may be received (whether directly or indirectly):

(a)   By way of distribution, disposition, dividend, benefit, payment or other transfer from (as the case may be) the Company, the Fund, DFW, CDM, the General Partner, the Fund Entities and/or their wholly owned subsidiaries; or

(b)   From any assets of the Fund, the Fund Entities and/or their wholly owned subsidiaries.

88.3   The Defendants shall not do anything to cause, procure, incite, promote or assist a breach by any other Defendant of the above sections 88.1 and 88.2; and

88.4   Ancillary asset disclosure orders against all Defendants.

89   The basis for the injunctive relief sought is that the Defendants each own and/or control assets that the Company has an equitable proprietary interest in (or at least a seriously arguable case that it does):

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   50

89.1   Prior to the Relevant Transactions taking place, the Company held the Partnership Interest, and thereby indirectly owned (99% of) all assets held by the Fund through its wholly owned subsidiary CLO HoldCo (and its subsidiaries). [8]

89.2   After the Relevant Transactions took place, and by reason of the Directors' breaches of fiduciary duty –

(a)   CDM now holds the Partnership Interest in the Fund, which continues to hold its assets through CLO HoldCo (and its subsidiaries);

(b)   DFW is the sole member of CDM;

(c)   Mark Patrick is the sole member of DFW;

(d)   Mark Patrick has full control over DFW, CDM, the General Partner (and thus the Fund), and (together with Mr Murphy) CLO HoldCo.  Mr Patrick therefore has the ability to control and/or deal with the Partnership Interest and the Fund's assets, including any distributions of the Fund's assets received by CDM as its sole limited partner.  He now exercises this control free from the oversight previously exercised by the Supporting Organisations and CFNT through their holding of Participating Shares in the Company. [9]

90   However, the Company has at least a seriously arguable case that CDM and DFW hold these assets through steps taken by the Directors that amounted to breaches of fiduciary duty, and therefore that these assets are subject to a constructive trust in favour of the Company, which I understand to be the necessary pre-requisite for the Court to grant a proprietary injunction restraining the disposition of that property.

---

[8] A structure chart showing the JOLs' understanding of the Fund holding structure prior to the Relevant Transactions is at page 439 of MM-1

[9] A structure chart showing the JOLs' understanding of the Fund holding structure after the Relevant Transactions is at page 440 of MM-1.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)      51

91    The legal elements that must be satisfied to obtain the above relief will be addressed in the JOLs' skeleton argument.  However, I wish to note the following points of fact that the JOLs believe to be relevant to those elements:

Serious issue to be tried

91.1    On 14 July 2025, this Honourable Court granted sanction for the JOLs to file the SOC and in doing so accepted that the merits of the JOLs' claims satisfied the relevant threshold for the sanction of commencement of claims by official liquidators.

91.2    The Directors and DFW have put forward explanations as to why the transfer of the Partnership Interest to CDM was legally justifiable, which the JOLs do not believe stand up to scrutiny as explained above.

Damages would not be an adequate remedy

91.3    As far as the JOLs' are aware, CDM has no other assets beyond the Partnership Interest and therefore would likely be unable to meet any order for damages made against it.  Only an order for CDM (and the other Defendants, to the extent they hold assets that derive from the Partnership Interest) to restore the Company's property could return the Company to the position it would have been in had the improper transactions carried out by the Defendants not taken place.  The JOLs' believe that the only way to ensure that such an order will be effective at the conclusion of these proceedings is for a proprietary injunction to be granted against the Defendants in respect of that property in the interim.

91.4    Further, as explained above, the Company, its Supporting Organisations, the Charities and the Fund are part of a carefully constructed investment structure for (i) the tax efficient treatment of charitable donations; and (ii) investments to be made for the ultimate benefit of the Charities.  Without the re-transfer of the Partnership Interest to the Company, those parties may be unable to achieve their charitable objectives as

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    52

Case 19-34054-sgj11 Doc 4627-1 Filed 05/11/26 Entered 05/11/26 17:05:52 Desc Exhibit 207 Page 53 of 66

effectively or at all. An award of damages in lieu of proprietary relief would mean that the Company would hold only cash and no other assets or investments, and the Charities and Supporting Organisations would effectively be back to square one in terms of setting up a proper investment structure to carry out their investments and protect their tax-exempt status.

<u>Balance of convenience</u>

91.5 The JOLs do not believe that the proprietary injunctions they seek would hinder the operation of the Fund or the Fund Entities in any material way. As set out at paragraph 27 above, the Fund and the Fund Entities are mostly passive investment vehicles that hold shares or interests in other Fund Entities, cash, debt instruments, receivables, vacant land and/or stock in publicly traded companies. They are not, as far as the JOLs understand, engaged in active trading of assets or making of new investments on a frequent basis.

91.6 Accordingly, the JOLs believe that there is no justification for any new investments or other transactions to be made by any of those entities, beyond payments needed to stay in good standing and comply with their statutory obligations.

91.7 Against that backdrop, the JOLs' position is that no dispositions of the assets of the Fund, the Fund Entities or any other subsidiaries above US$10,000 need or should be made pending the determination of the Company's proprietary claim which, if successful, would see the Partnership Interest returned to the Company and the Company would therefore wholly own (indirectly) all assets of the Fund, the Fund Entities and their wholly owned subsidiaries. Should any payments or investments be made by the Fund, the Fund Entities or any of their wholly owned subsidiaries which have the effect of harming the value of the Partnership Interest, that would render the proprietary relief the JOLs are seeking much less effective.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    53

91.8 Notwithstanding the above, the JOLs recognise that there may become a need for certain payments or other dispositions of assets to be made to preserve, maintain or improve the value of existing assets held by the Defendants, the Fund Entities and/or their wholly owned subsidiaries. Accordingly, the JOLs' draft Order provides for:

(a) The entity concerned to make a written request to the JOLs to make any such payments, together with full supporting information and documentation as well as an explanation of the rationale for the transaction; and

(b) The JOLs to decide within 7 days whether to approve or disapprove the proposed transaction.

91.9 The JOLs' also recognise that there will likely be a need for certain payments to be made by the Defendants, the Fund Entities or their wholly owned subsidiaries that are reasonably necessary in the ordinary course of business to keep the corporate Defendants, the Fund Entities or their wholly owned subsidiaries in good standing. The JOLs' draft Order allows for any such payments of US$10,000 or less to be made.

91.10 The JOLs are also unaware of any harm that would be caused to CDM by preserving the status quo in respect of the Partnership Interest. By comparison, if a proprietary injunction is not granted and CDM were to transfer the Partnership Interest to another party or otherwise deal with that interest in some way, the Company could be significantly prejudiced. Specifically, the Company's proprietary claim to the Partnership Interest could be undermined or become more difficult to enforce.

<u>Disclosure of assets</u>

91.11 The JOLs have only limited information as to what assets each of the Defendants, Fund Entities and their wholly owned subsidiaries hold (beyond the assets set out in paragraphs 28 to 29 above). Even so, the JOLs have no way of verifying this information or knowing if it is completely up to date.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948) 54

**CONFIDENTIAL** **TDIT004766**

91.12   In circumstances where, on the JOLs' case, a misappropriation of the Company's sole and valuable asset has already occurred, the JOLs believe protection is needed to prevent any further dissipation of assets from occurring in breach of any injunction that is granted.  The JOLs' believe that this protection can be afforded by way of disclosure orders in support of the injunction requiring the Defendants to disclose on affidavit what assets they each hold and their approximate value[10].  Having that information to hand will allow the JOLs (and the Court) to effectively police the injunction (in terms of preventing dissipation of Fund assets and thereby preserving the value of the limited partner interest in the Fund).

91.13   In addition, the disclosure orders seek confirmation as to:

(a)   All of the entities owned directly or indirectly by the Fund, including full details as to their owners, directors, officers or other controllers, and places and details of incorporation.  This will allow the JOLs to have a complete picture of the Fund structure.

(b)   All payments by way of salary, bonus, dividend, distribution or other compensation made to Mr Patrick or Mr Murphy by the Company, the Fund, DFW, CDM, the General Partner, CLO HoldCo, or any of the Fund Entities or other entities revealed by (a) above since 27 February 2024[11].  The JOLs believe this disclosure is warranted in light of the concerns the JOLs have as to the Remuneration Transactions explained at paragraphs 49 to 51 above.

(c)   All payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor, whether a firm, partnership, company or individual, made by the Company, the Fund, DFW, CDM, the General Partner,

---

[10] with the Sixth Defendant to procure the Fund Entities and their wholly owned subsidiaries to provide this information for inclusion in the Sixth Defendant's affidavit

[11] Being the date that the General Partner was incorporated.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     55

CLO HoldCo, or any of the Fund Entities or other entities revealed by (a) above since 27 February 2024.  The JOLs believe this disclosure is warranted due to the concerns the JOLs have as to: (i) the Remuneration Transactions; and (ii) the significant and unexplained increase in expenditure by the Company under Mr Patrick's stewardship as explained in paragraph 51 above.

<u>Cross undertaking in damages</u>

91.14  If required by the Court, the JOLs' are content to provide the usual cross-undertaking in damages should the freezing injunctions be granted, and it is subsequently held by the Court that the injunctions should not have been granted.  However, the JOLs' starting position is that this is not a case where a cross-undertaking in damages should be required, for reasons that will be explained in more detail in counsel's skeleton argument.

**PROTOCOL CORRESPONDENCE**

92  Prior to the JOLs filing this Application, the JOLs had been engaging with CDM, the General Partner for and on behalf of the Fund, and CLO HoldCo (the "**CDM Entities**"), in relation to a potential protocol that would mitigate the need for the JOLs to pursue an application for an interim injunction.  However, the JOLs are of the view that the protocol proposed by the CDM Entities would not adequately protect the Company's position pending the completion of these proceedings.

93  The relevant correspondence pertaining to the potential protocol is as follows:

93.1  On 16 May 2025, Campbells LLP ("**Campbells**") sent a letter to the JOLs on behalf of their clients, the CDM Entities[12].  In the letter, Campbells stated that: "*…in an effort to assuage any concerns the JOLs may have regarding the commercial activities of the*

---

[12] Whilst the letter is dated "16 March 2025" this is incorrect – the letter was sent and received on 16 May 2025

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     56

*Fund and the risk of dissipation of assets outside of the ordinary course of business, the CDM Entities would be prepared to enter into a form of Protocol which provided for, amongst other necessary and appropriate terms, the reporting of material transactions on the basis that such information was held confidentially by the JOLs.*" (pages 1093 to 1095 of MM-1).

93.2   On 30 May 2025, Johnstone Law ("**JL**"), who at that stage were acting for the JOLs, sent a letter to Campbells in response.  In that letter, the JOLs took issue with Mr Ronan Doherty of Campbells attending a directions hearing in the Liquidation Proceedings without having standing to do so, and yet making "*submissions from the back of the Court in which he represented that [the CDM Entities] had sought to cooperate and comply with the JOLs' requests for information… by proposing a 'protocol' with which the JOLs had not engaged, which is a plain mischaracterisation of events.*" (page 1096 of MM-1).

93.3   Later on 30 May 2025, Campbells sent a letter to JL responding to JL's letter of the same date.  Campbells enclosed a draft reporting protocol to this letter, whereby, in their words: "*[the CDM Entities] offer to provide, inter alia, the following information to the JOLs:*

   *(a) a report listing all transactions undertaken by the Fund, or any of the CDM Entities, since 27 March 2025 which exceed US$5,000,000;*

   *(b) a 'business plan' explaining the ordinary day to day business of the Fund;*

   *(c) a monthly transactions report; and*

   *(d) advance notice of any single transaction exceeding US$5,000,000, or any series of transactions in an aggregate amount exceeding US$5,000,000 (save for transactions in the ordinary course of business involving or related to the*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   57

**CONFIDENTIAL**                                                         **TDIT004769**

*renumeration of employees, officers and directors, agents, advisors and / or service providers)."*

The letter sought the JOLs' agreement to the proposed protocol by 4 June 2025. A copy of the letter and the draft protocol enclosed with it is at pages 1098 to 1112 of MM-1.

93.4 On 5 June 2025, JL sent a letter to Campbells which conveyed the JOLs' position on the draft protocol as follows:

"*Protocol*

*7. The JOLs' preliminary view is that the Company may have inter alia clear prima facie proprietary and other claims to the asset transferred pursuant to the transfer of the Company's interest in the Charitable DAF Fund, LP to your client, CDMCFAD, LLC, pursuant to a deed of assignment and assumption on 18 December 2024 (the Deed). Nothing in your letter changes that analysis.*

*8. The protocol you propose is entirely inappropriate both to responding to proprietary claims and to the current circumstances. No dealing of any nature is appropriate in assets over which proprietary claims are asserted, whether in the ordinary course of business or subject to any threshold. Further, no expenditure from these assets on legal or any other professional fees is appropriate at any time.*

*9. It is in any event impossible for the JOLs to engage with the protocol in circumstances where they have no serious knowledge or understanding of what is happening at any underlying level. Your clients have had since 12 May 2025 to provide that knowledge and understanding and continue to decline to provide it to the JOLs. We again urge all your clients to set aside their distractive tactics*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948) 58

**CONFIDENTIAL**

*and cooperate, and provide all information and documents, in an open and frank manner.*

*10. In the circumstances, the JOLs require your clients to provide undertakings by 3pm on 6 June 2025 that there will be no dealing in the assets formerly owned by the Company, and the provision of full and complete information on the whereabouts, ownership and control of all assets owned by the Company (directly or indirectly, legally or beneficially) prior to execution of the Deed. Nothing short of those assurances and undertakings is acceptable at this stage to the JOLs.*" (page 1114 of MM-1)

93.5    On 9 June 2025, Campbells sent a letter to JL enclosing a revised reporting protocol for the JOLs' consideration.  As stated in the letter, the changes that Campbells made to the draft protocol previously provided with their letter of 30 May 2025 were to: "*(i) remove the value threshold from the historical reporting obligation at paragraph 2.1, and (ii) reduce the value threshold for the provision of advance notice at paragraph 2.5 [from US$5 million to US$1 million].*" (page 1117 of MM-1).

93.6    On 19 June 2025, Maples and Calder (Cayman) LLP ("**Maples**"), who were at that stage engaged to act for the JOLs, sent a letter to Campbells responding to their letter of 9 June 2025 to JL.  Maples' letter set out a non-exhaustive list of the issues that the JOLs had identified with the draft protocol proposed by the CDM Entities (see paragraphs 4.1 to 4.11 of the letter at pages 1126 to 1127 of MM-1).  Maples' letter also enclosed a fresh protocol in a form acceptable to the JOLs (the "**Maples Draft Protocol**"), which sought to address the deficiencies of the CDM Entities' proposed protocol (pages 1129 to 1136 of MM-1).  This letter also noted that any terms agreed would also need to be given effect to by way of undertaking to the Court, as opposed to agreement between the parties.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     59

**CONFIDENTIAL**

**TDIT004771**

93.7  On 29 June 2025, Campbells sent a letter to Maples responding to Maples' letter of 19 June 2025 and the JOLs' draft protocol enclosed therewith.  In that letter, the CDM Entities took the position that they "*fundamentally object to the approach adopted in the JOLs' Protocol*".  The overarching reason why they rejected the JOLs' proposed protocol was stated to be: "*[t]he proposed restrictions, controls and undertakings sought by the JOLs would impose severe limitations on [the CDM Entities'] ability to operate, and would have the practical effect of placing their ongoing charitable activities under the de facto control of the JOLs, notwithstanding that no such legal authority exists*".  However, no detail has been provided to date as to precisely how the protections sought by the JOLs would materially impact the CDM Entities' operations.

93.8  The 29 June 2025 Campbells' letter proposed some slight revisions to the CDM Entities' proposed protocol and enclosed a revised draft (the **"Revised Campbells Draft Protocol**").  However, having reviewed that draft, the JOLs are of the view that the revisions made do not sufficiently address the issues identified by the JOLs with the previous draft of the CDM Entities' protocol.  I note that in several places in Campbells' letter, it was suggested that the protections the JOLs' were seeking in our draft protocol "could only properly be obtained through injunctive relief".  Hence, the JOLs' being unsatisfied that the CDM Entities' protocol (as revised) sufficiently protects the Company's position in these proceedings, the JOLs now seek injunctive relief by way of this Application.  Copies of the Campbells' letter and the Revised Campbells Draft Protocol are at pages 1137 to 1170 of MM-1.

93.9  Further, Kobre & Kim on behalf of the Directors, and Baker & Partners on behalf of DFW, wrote to the JOLs in separate emails on 30 June 2025 (pages 1171 to 1176 of MM-1) , in which both asserted (surprisingly, given the content of the Maples Draft Protocol, which expressly provided for undertakings by the Directors and DFW) that their clients had not been asked to give any form of undertaking, and that their clients would not be willing to give any.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     60

## TEXAS PROCEEDINGS BY THE SUPPORTING ORGANISATIONS

94      The JOLs have recently become aware that the Supporting Organisations issued a Petition against Mr Patrick, DFW, CDM, the General Partner, and the Original GP (the "**Texas Petition**") and an application for a temporary restraining order ("**TRO**" and "**TRO Motion**") before the Texas Business Court.  Pursuant to the TRO Motion, those organisations sought the immediate appointment of a receiver over DFW and CDM, the imposition of a constructive trust over all assets, interests, and property, and immediate injunctive relief to freeze all assets that were held in the Fund. A copy of the court papers are exhibited at pages 1177 to 1426 of MM-1.

95      In filing the Texas Petition and TRO Motion, the Supporting Organisations are acting independently of the JOLs with advice from their own independent US counsel.  The JOLs were informed of the Texas Petition and TRO Motion after they were filed by the Supporting Organisations.

96      As the JOLs understand the position as at the date of this affidavit:

96.1    The Supporting Organisations have alleged in the Texas Petition that Mr Patrick owed them fiduciary duties, on the basis of the LPA, and that those fiduciary duties were breached by the Relevant Transactions.

96.2    On 2 July 2025, there was a hearing in respect of the TRO Motion and at that hearing, at the direction of the Texas Business Court, the parties entered into a Rule 11 Agreement under the Texas Rules of Civil Procedure pending an inter partes hearing of the TRO Motion (the "**Rule 11 Agreement**"). The JOLs have been informed that the Rule 11 Agreement is a binding contract between the parties and that the key points of the Rule 11 Agreement are:

(a)     That the defendants to the Texas Petition shall not make any payments or disbursements other than those in the ordinary course of business.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     61

(b)      Investments and monies must be kept in the existing entities that currently hold those investments and monies.  In respect of investments, if any investment is monetised on its own terms, then the entity may prudently reinvest the resulting cash proceeds into liquid securities.

(c)      There shall be no changes to the corporate structure of ownership of the defendants to the Texas Petition.

(together, the "**Rule 11 Restrictions**")

96.3     On 11 July 2025, the parties entered into an amended Rule 11 Agreement (the "**Amended Rule 11 Agreement**"), which, amongst other things, provided for the following:

(a)      The defendants to the Texas Petition have until 14 July 2025 to file a challenge to the Texas Business Court's jurisdiction;

(b)      The Rule 11 Restrictions will continue until the defendants' jurisdiction challenge is granted, or if refused, until the TRO Motion is heard; and

(c)      If the Texas Business Court denies the defendants' jurisdiction challenge, the TRO Motion shall be heard as soon as reasonably practicable after the ruling, unless the ruling is stayed by an appellate court (pages 1427 to 1429 of MM-1)

96.4     The JOLs' understand that the likely date of the hearing of the defendants' jurisdiction challenge is some time shortly after 24 July 2025, being the deadline for the defendants' to file their reply (with the Supporting Organisations having until 21 July 2025 to file their response to the jurisdiction challenge), and the last procedural step prescribed in the Amended Rule 11 Agreement as to the jurisdiction challenge.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     62

**CONFIDENTIAL** **TDIT004774**

97      The JOLs are of the view that the Rule 11 Restrictions do not adequately protect the Company's position in these proceedings.  The JOLs hold that belief for these reasons:

97.1    Firstly, the Rule 11 Restrictions permit the defendants to make ordinary course of business transactions[13], which does not adequately protect the Company's proprietary interest in the Partnership Interest as it would seemingly allow Mr Patrick to continue to pay himself large salaries and bonuses, in his capacity as a director of the General Partner, CDM and/or DFW, from assets derived entirely from the Fund (as he has done before through the Remuneration Transactions).

97.2    Secondly, the Rule 11 Restrictions are, of course, only temporary; they are due to expire in the near future should the defendants' jurisdiction challenge succeed or, if it is denied, should the TRO Motion be denied in a hearing to follow very shortly thereafter.  The JOLs are therefore keen to ensure that the injunctions it seeks from this Honourable Court in this Application will, if granted, come into effect shortly before the Rule 11 Restrictions expire.

97.3    Thirdly, the relief in the Texas Petition and the TRO Motion is sought by separate entities from the Company, with a completely different claim and over which the JOLs have no control.  Given sanction of this Court has been granted to commence these proceedings, the JOLs believe that we would be at serious risk of not discharging our duties to the Company properly if we did not to seek injunctive relief on behalf of the Company in this Court to adequately protect its proprietary claims (which the Texas Petition is not squarely directed at).

**LEAVE TO SERVE OUT**

98      The JOLs' also seek orders, pursuant to Grand Court Rules, O.11, for leave to serve the foreign Defendants with the Writ and SOC (together with this Application) out of the jurisdiction.  Whilst

---

[13] See (7)a. of the Amended Rule 11 Agreement at page 1428 of MM-1

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     63

the JOLs intend to write to the various Cayman Islands attorneys acting for the foreign Defendants to ask if they have instructions to accept service, particularly in light of the fact they are challenging jurisdiction in Texas, the JOLs believe it is prudent to seek leave to serve out orders now in case those Defendants do not voluntarily accept service.

99 Mr Patrick, DFW and CDM are all incorporated or reside outside the jurisdiction of this Court (the "**Foreign Defendants**"). The reasons as to why the JOLs contend that this is an appropriate case for leave to serve the Foreign Defendants outside the jurisdiction will be set out in detail in the JOLs' skeleton argument.

100 However, in brief, the Company will rely on the following gateways for service out of the jurisdiction:

100.1 GCR O.11, r.1(1)(ff), which covers claims "*brought against a person who is or was a director, officer or member of a company registered within the jurisdiction or who is or was a partner of a partnership, whether general or limited, which is governed by the laws of the Islands and the subject matter of the claim relates in any way to such company or partnership or to the status, rights or duties of such director, officer, member or partner in relation thereto*". The claim against Mr Patrick falls squarely within this gateway.

100.2 GCR O.11, r.1(1)(c), which covers cases where a foreign defendant is a necessary or proper party to a claim otherwise to be tried in the Cayman Islands. I understand that the central question for this gateway is whether the defendant in question would properly be joined to the litigation if they were present within the jurisdiction. I believe that all three of the Foreign Defendants fall within this test; all three are clearly central to the claim that will in any case be brought against the Cayman Islands-based defendants.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    64

100.3   GCR O.11, r.1(1)(f), which covers claims for a breach of duty where the damage was sustained or resulted from an act committed within the jurisdiction.  I believe that the claims fall within this gateway also, in that Mr Patrick's breach of fiduciary duty as regards the CDM Assignment took place in this jurisdiction, and further the damage suffered was by the Company, which is Caymanian, and therefore was suffered within the jurisdiction.

100.4   GCR O.11, r.1(1)(j), which applies where a claim is brought in respect of a trust, whether express, implied or constructive, that is governed by or ought to be executed according to the laws of the Cayman Islands.  In the present case, the Company claims that CDM and DFW hold property for it on a constructive trust arising from breach of fiduciary duties owed as a matter of Cayman law, and so I understand that those constructive trusts are themselves Cayman law-governed.

101   Further, I believe that it is clear that the Cayman Islands is the jurisdiction where this claim ought to be litigated.  Fundamentally, this is a Cayman-law governed dispute between a Cayman company and its directors, who have breached their fiduciary duties.  That is a dispute that can only properly be resolved in the Cayman Islands.  Further, CDM and DFW, whilst based in Delaware, do not have an independent role to play; they are simply the creature companies of Mr Patrick and are under his control.  Finally, there are no practical problems with the Cayman courts trying the dispute; there is a commonality of language among all relevant parties (i.e. English) and Mr Patrick, based in Texas, can easily attend Court as required.

102   I understand from counsel that if leave is granted, it will be necessary for the JOLs to serve the Foreign Defendants in the United States in accordance with United States law, which the JOLs intend to do.  For this purpose, I understand that:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     65

**CONFIDENTIAL**                                    **TDIT004777**

102.1   As an individual, Mr Patrick can be served by way of engaging a process server in the United States to personally deliver to Mr Patrick, in person, a copy of the documents, showing the delivery date; and

102.2   As corporations, DFW and CDM can be served by way of engaging a process server in the United States to personally deliver a copy of the documents to their registered agent in the State of Delaware, which as of the date of this affidavit is The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware, 19801 (see search results of the Delaware Division of Corporations at pages 1430 to 1431 of MM-1).

**Conclusion**

103   For the reasons outlined above, I humbly request that this Honourable Court accede to the Application and grant the injunctive and other relief sought by the JOLs on behalf of the Company.

SWORN to at *UGLAND HOUSE,* )
*GEORGE TOWN* )
Grand Cayman, Cayman Islands, )
this *15TH* day of July 2025 )
before me )

_____
Notary Public

Rachel Baxendale
Notary Public - Cayman Islands

_____
Commission expires on 31 January *2026*

_____
Margot MacInnis

Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   66

**CONFIDENTIAL**                                                                    **TDIT004778**