not approve the proposed transaction, the Defendant or CDM Entity making the request shall not consummate the proposed transaction.

4. From the date of this undertaking to the date of the determination of the JOLs' Summons, the Defendants and the CDM Entities will disclose to the JOLs, at the end of each calendar month: (i) a full listing of payments or other transactions undertaken by them below US$10,000 in the calendar month just passed; and (ii) copies of all existing and up to date balance sheets and financial statements or records prepared in relation to the Defendants or the CDM Entities.

5. The Defendants and the CDM Entities consent to the entry of one or more orders in the chapter 15 case, *In re Charitable DAF Holdco, Ltd (In Official Liquidation)*, United States Bankruptcy Court for the District of Delaware, Case No. 25-11376 (BLS), recognising and enforcing the above undertakings in the United States.

CONFIDENTIAL                                                                        TDIT006527

E-filed in the Office of the Clerk
for the Business Court of Texas
7/20/2025 10:25 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

**CAUSE NO. 25-BC01B-0027**

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § | IN THE TEXAS BUSINESS COURT |
| | § | |
| *Plaintiffs*, | § § | |
| v. | § § | FIRST DIVISION |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | § § § § § | |
| | § | |
| *Defendants*. | § | DALLAS, TEXAS |

<u>**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**</u>

Plaintiffs (together, the "Charitable Owners") file this First Amended Petition, Application for Temporary Injunction, and Emergency Application for Appointment of Receiver, and respectfully show the Court as follows:

## I.    PRELIMINARY STATEMENT

1.1    Defendant Mark Patrick took over $270 million in funding support from some of the best community-based charities in the country. He testified on June 25, 2025 that, by the time his plan was complete, Plaintiffs were left with "nothing."[1]

1.2    Patrick flagrantly violated his fiduciary duties to Plaintiffs, and he redirected the fund's beneficial ownership to a new sham organization he controlled. This follows his pattern of using Plaintiffs' resources to enrich himself at the expense of charities and the communities and

---

[1] *See* June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11 (App. Pg. 200).

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                    **PAGE 1**

**CONFIDENTIAL** TDIT006528

people they benefit. So far, he has paid himself at least $3.9 million in a single year from funds meant to support the charities he betrayed.

1.3     If the Court does not bar Patrick's and the other Defendants' further adverse actions through a receivership, Plaintiffs will lose millions in charitable funds earmarked for the communities they serve.  And, their loss will be at the hands of the very person who was supposed to protect them.  Accordingly, Plaintiffs seek a Temporary Injunction freezing the funds and the appointment of a Receiver over the funds and the organization holding them.

## II.     DISCOVERY CONTROL PLAN AND MONETARY RELIEF

2.1     Plaintiffs intend that discovery be conducted under Level 2 as set forth in Rule 190.3 of the Texas Rules of Civil Procedure.  Plaintiffs reserve the right to request to conduct discovery pursuant to "Level 3" as set forth in Rule 190 of the Texas Rules of Civil Procedure.

2.2     Plaintiffs seek damages in excess of $5,000,000 exclusive of interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs.

## III.     PARTIES

3.1     **The Highland Dallas Foundation, Inc.** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The Highland Dallas Foundation, Inc. provides funding to The Dallas Foundation, a Texas charitable entity established in 1929, which has awarded over $1 billion in charitable grants that support a broad range of needs.

3.2     **The Highland Kansas City Foundation, Inc.** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The Highland Kansas City Foundation, Inc. provides funding to the Greater Kansas City Community Foundation, established in 1978, which has awarded over $8 billion in in charitable grants that support a broad range of needs.

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                    **PAGE 2**

CONFIDENTIAL                                                        TDIT006529

**1567**

3.3    **The Highland Santa Barbara Foundation, Inc.** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The Highland Santa Barbara Foundation, Inc. provides funding to charitable organizations including the Santa Barbara Foundation, established in 1928, which has awarded over $750 Million in charitable grants and supports a broad range of needs.

3.4    **DFW Charitable Foundation** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. It was organized on December 9, 2024, with Defendant Mark Patrick as the DFW Charitable Foundation's sole member and sole director. It purports to be a nonprofit nonstock corporation serving exclusively charitable purposes. The DFW Charitable Foundation is headquartered at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

3.5    **Mark Patrick ("Patrick")** is an individual who resides in Texas and holds management control over the Charitable DAF Fund ("Charitable DAF Fund" or the "Fund") structure, as explained more thoroughly below. Patrick resides and at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

3.6    **CDMCFAD, LLC** is a Delaware limited liability company with headquarters at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

3.7    **CDH GP, Ltd**. is a Cayman Island limited company with headquarters at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER        **PAGE 3**

**38**

<u>**1587**</u>

**CONFIDENTIAL**                                                                 **TDIT006530**

3.8 **CHARITABLE DAF GP, LLC** is a Delaware limited liability company with headquarters at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

### IV. JURISDICTION AND VENUE

4.1 Pursuant to Government Code § 25A.004, this Court has jurisdiction over this matter because the amount in controversy exceeds $5 million excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

- and is an action regarding the governance, governing documents, or internal affairs of organizations, namely Charitable DAF Fund, L.P., and Charitable DAF HoldCo, Ltd;

- and is an action by an owner of an organization, namely the Charitable Owners as participating and beneficial owners of Charitable DAF Holdco, Ltd ("Charitable DAF Holdco") and thereby the Fund in which the Charitable Owners held the sole economic interest, and through a sham transaction, briefly owners of CDMCFAD, LLC, and is brought against a controlling person and managerial entities of the organization, namely Patrick, Charitable DAF, GP, LLC, CDH GP, Ltd and Patrick's controlled entities, DFW Charitable Foundation, and CDMCFAD, LLC; and alleges numerous fiduciary and other breaches of Patrick's, Charitable DAF GP, LLC's, and CDH GP, Ltd.'s obligations in the capacity of a controlling person and managerial official of Charitable DAF Holdco, Ltd and the Fund. and is an action alleging that Patrick, as a controlling person, and managerial official, with the entities he dominated and used, breached a duty owed to the Charitable Owners as a controlling owner of Charitable DAF Holdco, and thus an equitable owner of CDMCFAD, LLC and Charitable DAF Fund, L.P. by reason of the Patrick's status as an owner of management interests, controlling person, and managerial official, including the breach of a duty of loyalty and good faith;

- and is an action seeking equitable and injunctive relief.

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 4**

**39**

**1588**

**CONFIDENTIAL** **TDIT006531**

4.2    The Court also has related supplemental jurisdiction per Government Code § 25A.004.

4.3    The Court also maintains plenary power to appoint a receiver under Texas Government Code § 24.003, Texas Civil Practice and Remedies Code § 64.001(a)(3), Texas Business and Organizations Code §§ 11.401 and 11.410, and through the Court's inherent powers at equity.

4.4    Personal jurisdiction is proper by Texas courts pursuant to Texas Civil Practice & Remedies Code § 17.042 because Defendants committed tortious actions, including Texas resident Mark Patrick, who improperly took approximately $270 million in value, and other conduct within Texas, incorporated herein, which are the subject of this Petition.  Defendants are therefore subject to specific personal jurisdiction because of the complained-of acts that they committed in Texas. Defendants all have substantial business operations, assets, and other connections to Texas. Defendants are subject to general personal jurisdiction in Texas because they both reside in, and have continuous and systematic contacts with, Texas.  Defendants have also consented to the jurisdiction of Texas courts.

4.5    Venue is proper in this county under Texas Civil Practice & Remedies Code § 15.002 because Defendant Patrick is a resident of Dallas County, Texas and Patrick undertook and directed a substantial portion of the complained-of acts in Dallas County, Texas.  On information and belief, the DFW Charitable Foundation, CDH GP, Ltd., Charitable DAF GP, LLC, and CDMCFAD are headquartered in Dallas County.  Dallas County is within the 1st Division of the Texas Business Court.

---

PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                                    PAGE 5

**40**

<u>**1589**</u>

CONFIDENTIAL                                                                TDIT006532

## V.    FACTUAL BACKGROUND

### A. *The Charitable DAF Fund Structure*

5.1    Highland Capital Management, L.P. ("**Highland**") was an SEC registered investment advisor. In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated by Highland's founder, James Dondero, through his charitable trust to a charitable foundation. The goal was to create a permanent, self-sustaining, self-governing charitable infrastructure to facilitate sustained philanthropic efforts in specific communities in the United States through several Charitable Owners.  Together, three of those Charitable Owners are the Plaintiffs here.[2]  As with all "supporting organizations," disinterested parties must hold a majority of the voting rights in the Charitable Owners.  So, Mr. Dondero as the original donor held one vote as a director; and the Foundations supported by the Charitable Owners held the remaining two votes and thus control over them.

5.2    To that end, in 2011, the Fund was formed to hold the donated assets.

5.3    The Charitable DAF Fund primarily holds assets through a wholly-owned subsidiary entity called CLO HoldCo, Ltd. ("**CLO HoldCo**").

5.4    At the same time the Charitable DAF Fund was created, DAF HoldCo, a Cayman Islands entity, was also organized. Charitable DAF HoldCo held all of the economic interest in the Charitable DAF Fund. In other words, Charitable DAF HoldCo was the beneficial owner of all monies flowing from the assets held in the Charitable DAF Fund.

5.5    The ultimate purpose of forming Charitable DAF Fund and Charitable DAF HoldCo was to benefit certain, substantial regional nonprofit charities in California, Missouri, and Texas. The governing documents of the Charitable DAF Fund specifically refer to these Charitable

---

[2] A fourth charitable owner that held less than a 2% interest is not party to this action.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                          **PAGE 6**

**41**

<u>**1590**</u>

Owners.  Participating shares in Charitable DAF HoldCo were therefore issued to Charitable Owners, which were the ultimate beneficial owners of the assets held in the Charitable DAF Fund. Together, the Charitable Owners owned 100% of the Participating Shares of Charitable DAF HoldCo. The Charitable Owners held their beneficial ownership in the assets of the Charitable DAF Fund by virtue of those Participating Shares in Charitable DAF HoldCo. Put simply: the Charitable Owners owned 100% of Charitable DAF HoldCo, which was the beneficial owner of all the assets in the Charitable DAF Fund. Three of the four Charitable Owners are the Plaintiffs in this Lawsuit and held 98.34% of the economic interests in the Fund.

5.6     In turn and as intended, the funds generated by the Charitable DAF Fund enabled the Charitable Owners to provide funding directly to charitable causes foundations in three regions of the United States, primarily through nonprofit organizations. Specifically, The Dallas Foundation, The Greater Kansas City Community Foundation, and The Santa Barbara Foundation (together, the "**Charities**") are each affiliated with one of the Charitable Owners and receive regular grants for charitable work ultimately funded by Charitable DAF Fund. For example, funds have supported schools for the needy, children's advocacy, educational and recreational institutions accessible to the public, and important medical facilities and programs.  From funding education programs and healthcare services to supporting economic development and community welfare projects, these funds help strengthen the Charitable Owners' ability to serve individuals and families in need.

5.7     Since the Charitable DAF Fund's inception, the Charitable Owners have granted over $42 million to charitable organizations, including donations to 275 organizations, with average annual grant payments of $3.7 million. The Charitable Owners perform irreplaceable

PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                                      PAGE 7

**42**

**1591**

FSD2025-0116                                                                2025-08-19

CONFIDENTIAL                                                               TDIT006534

philanthropic work in their communities and/or throughout the nation, and do so in a steady, reliable manner that permits them to build progress on initiatives year after year.

### B.  *Control of the Charitable DAF Fund*

5.8    The Charitable Owners, via Charitable DAF HoldCo, were the sole economic beneficiaries of the Charitable DAF Fund and together held all of the economic interest in it. Management control of the Charitable DAF Fund and Charitable DAF HoldCo, however, was vested not with those organizations but rather in "Management Shares." The "Management Shares" provided the only voting rights for any and all shareholders in Charitable DAF HoldCo. But these shares explicitly did not convey a right to any economic benefit of the assets in the Charitable DAF Fund, which belonged and was expressly reserved solely to the Charitable Owners (the Plaintiffs).

5.9    Ownership of the general partner in the Charitable DAF Fund and the Management Shares in Charitable DAF HoldCo were concentrated in one person, vested with enormous trust (the "**Control Position**"). The Control Position was expressly obligated to manage the Charitable DAF Fund and Charitable DAF HoldCo for the economic benefit of the Charitable Owners. The Control Position therefore owed the Charitable Owners fiduciary duties of candor, care, and loyalty, including a prohibition against any self-dealing.

5.10    The Amended and Restated Limited Partnership Agreement of the Charitable DAF Fund dated November 7, 2011 (the "**ARLPA**"), and the Amended and Restated Memorandum and Articles of Association of the LP dated January 19, 2015 ("**Articles**"), govern the Charitable DAF Fund and its partners. These were the effective governing documents over the Charitable DAF Fund and Charitable DAF Holdco at the time the conduct alleged herein commenced.  The ARLPA and the Articles, from which the Control Position derives its authority, also impose a clear duty

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                                **PAGE 8**

**43**

**1592**

CONFIDENTIAL                                                                                TDIT006535

upon the Control Position to exercise his powers for the sole benefit of the Charitable Owners (the Plaintiffs).

5.11    For example, the Preamble to the ARLPA states: "WHEREAS, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended and the parties hereto desire for the Partnership to be *for the economic benefit of the Limited Partner and its Charitable Owners* (as defined below) as set forth herein[.]"[3]

5.12    Likewise, Section 1.3 (Purpose and Powers) states that the Control Position must manage the fund assets "*for the purpose of benefitting, directly or indirectly, the Charitable Owners.*"[4]

5.13    Section 1.6 (Powers) likewise emphasizes: "[T]he General Partner [Control Position] . . . is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; *provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*"[5]

5.14    The ARLPA thus provides that Charitable DAF Fund was formed to make investments, directly or indirectly, "for the economic benefit of the Limited Partner [DAF HoldCo] and its Charitable Owners." In this context, the Control Position is responsible for the governance and management functions of the Charitable DAF Fund as required for it to carry out its sole purpose of benefiting the Charitable Owners and the Charities they support.

---

[3] Emphasis added
[4] Emphasis added.
[5] Emphasis added.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                **PAGE 9**

**44**

**1593**

5.15    The ARLPA is infused throughout with the singular command: The Control Position has great authority but is required to act with fidelity in exercising it for the benefit of the Charitable Owners. The governing documents of the Charitable DAF Fund thus form the foundation of a special factual relationship based on direct and close contact between the Control Position and the Charitable Owners.  The governing documents establish that by virtue of the role and express obligations, the Control Position holds himself out as an agent acting for the benefit of the Charitable Owners and supplies them the information upon which they must rely.  Patrick and the Defendants thus undertook, and were treated as having assumed, responsibility to act on behalf and for the benefit of the Plaintiffs; and the Plaintiffs were treated as having entrusted their interests, transactions, affairs, and property to them.  As set forth herein, the Parties built upon that foundation through their conduct over years, and it is  this conduct directly pertinent to the instant case.

5.16    Grant Scott was initially selected for the Control Position. Mr. Scott effectively served the Charitable Owners' charitable purposes in his role in the Control Position. For this, Mr. Scott received $60,000 in annual compensation—a compensation rate that remained unchanged for the better part of a decade. During this time, the Charitable Owners and their respective charitable foundations made great strides in creating philanthropic, charitable work that was efficient, steady, and reliable, and that grew and built on their progress year after year.

C. *Mark Patrick's Assumption of Control*

5.17    Highland filed for bankruptcy in October 2019 ("**Highland Bankruptcy**") and, as a result, the Charitable DAF Fund became engaged in certain disputes arising from the bankruptcy, increasing the time and responsibilities associated with the Control Position. Mr. Scott did not feel qualified to manage those disputes and decided to resign from the Control Position.

PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                                   PAGE 10

**45**

**1594**

5.18    Mark Patrick, a tax attorney who had played a significant role in developing the overall Charitable DAF Fund structure while at Highland, suggested that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected Charitable DAF Fund.

5.19    On March 25, 2021, Mr. Scott resigned transferring all his management shares and membership interest to Patrick for nominal consideration, and Patrick was appointed as director of Charitable DAF HoldCo. Patrick therefore assumed the Control Position from that date. Patrick then hired Paul Murphy, a Cayman Islands' director, to join him in his efforts to abscond with the $270 million in assets.

### D. *Patrick's Breaches of Fiduciary Duty*

5.20    In 2023, while acting as the sole fiduciary for the Charitable Owners at Charitable DAF Fund and DAF HoldCo, Patrick embarked upon a brazen and calculated conspiracy to defraud the Charitable Owners of their beneficial interest in the $270 Million held by the Charitable DAF Fund, in direct violation of the fiduciary duties imposed by the Charitable DAF Fund's governing documents and by common law.  Patrick further conspired to transfer that entire $270 Million interest to a new entity controlled by Patrick and operated out of his living room in Dallas, Texas.

### E. *Undisclosed Self-Dealing*

5.21    Patrick engaged in a series of ethically and legally dubious conduct prior to embarking upon his grand scheme to defraud the Charitable Owners.  For example, in June 2023, Patrick requested that The Highland Dallas Foundation, Inc. direct $10,000 to Creative HEARTS TX, a non-profit entity formed on June 13, 2023. Patrick expected this to be an annually recurring donation. Patrick failed to disclose that he, his wife, and daughter were the directors of this entity,

PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                                                 PAGE 11

which had been created approximately two weeks earlier. The Highland Dallas Foundation, Inc. funded an initial $10,000 contribution but declined to commit to doing so annually.

### F. *Attempted Fraudulent Kickback Scheme*

5.22    In September 2023, Patrick approached Kevin Cronin, CEO of Fortaris Capital Advisors, proposing a fraudulent kickback scheme to personally benefit Patrick. Fortaris previously provided legitimate services to the Charitable DAF Fund. Now, Patrick proposed that the Charitable DAF Fund engage a new vendor controlled by Mr. Cronin. Patrick proposed that the Charitable DAF Fund pay this sham vendor a monthly fee of $25,000-$50,000. The sham vendor, however, would not provide any services to the Charitable DAF Fund. Instead, Patrick expected to collect half of the fee as undisclosed supplemental compensation. That is, he expected to collect something for nothing in a classic fraud.

5.23    Mr. Cronin declined and relayed what occurred to Mr. Dondero. Mr Dondero then confronted Patrick, who admitted that what Mr. Cronin reported was true.

5.24    Mr. Dondero ensured that Charitable Owners were also informed about Patrick's kickback scheme. Despite significant concern, the Charitable Owners had doubts about whether, based on the governing documents and Patrick's positions, they could remove Patrick from the Control Position.

### G. *Insider Trading*

5.25    In August 2024, Patrick tried to capitalize on material non-public information obtained through his employment at Skyview through his self-described "outside compliance counsel" Douglas Mancino to advise the Highland Dallas Foundation, Inc. to exercise a put option in a NexPoint affiliated asset, constituting attempted violations of U.S. securities laws. The Dallas Foundation declined to trade on Patrick's improper tip.

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    PAGE 12

47

1596

CONFIDENTIAL                                                          TDIT006539

5.26 Skyview's compliance department conducted an internal investigation that concluded Patrick's actions constituted serious breaches of compliance obligations and attempted serious breaches of U.S. securities laws.

5.27 Patrick resigned from Skyview immediately before the investigation was finalized and simultaneously terminated the Charitable DAF Fund's services agreement with Skyview without justification and against the Charitable DAF Fund's interests.

### H. *Patrick Raids the Charitable DAF Fund*

5.28 After resigning from Skyview, Patrick began shrouding the Charitable DAF Fund structure's overall financial reporting and communications to the point that the Plaintiffs were essentially cut off from any view into the finances of the fund. As of September 2024—the last reliable data accessible to the Plaintiffs prior to filing this Action—the Charitable DAF Fund held approximately $270 million strictly for the financial benefit of the Plaintiffs and ultimately their supported Charities.

5.29 Prior to Patrick's tenure in the Control Position and for a period thereafter, the Control Position received a reasonable but measured stipend of $60,000 per year, consistent with the nature of the position as a fiduciary for charitable organizations serving those in need. Patrick's predecessor never awarded himself compensation more than $60,000 per annum. During that time, the Charitable DAF Fund was a tremendous success, growing in value and contributing to the good works of the Charitable Owners.

5.30 No later than 2024, however, Patrick raided the fund for personal gain. A review of the Charitable DAF Fund's last accessible financial records—provided in August 2024— showed dramatic and unexplained increases in expenditures:

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** PAGE 13

**48**

**1597**

- Directors' fees increased from $40,000 in 2022 to almost $600,000 in 2023, and to approximately $2.25 million in the first half of 2024 alone (a 12,400% increase from 2022 if annualized).

- Legal expenses increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022 (a 300% increase if annualized).

- Overall expenses for the first half of 2024 were around $18.3 million, compared to $18.6 million for all of 2023.

5.31    This was only a warmup. In September 2024, without advising the Charitable Owners or their supported charities, and without approval from anyone other than himself and his hand-picked second Director-for-hire in the Cayman Islands, Mr. Murphy, Patrick used his authority over Charitable DAF Holdco to award himself an annual salary of $850,000 per year. Patrick also awarded himself a "long-term incentive" payment tied to the fund's returns, amounting to 7.5% of annualized net fund returns in excess of 10% (capped at an annualized 25% return). Then, the next month, on the basis of this "LTI" calculation Patrick awarded himself an "LTI" payment of $975,000 and an "annual discretionary bonus" for 2023 in the amount of 2.5 times his base salary.  The result:  In two months in Fall 2024, Partick awarded himself $3,925,000 in compensation directly from the Charitable DAF Fund that was held for the benefit of the Charitable Owners.  Patrick did this even though the governing documents of the Charitable DAF Fund, by which both his powers and his duties to the Charitable Owners arose, were explicit that the Charitable DAF Fund was to be managed "for the economic benefit of the Limited Partner [DAF HoldCo] and its Charitable Owners [the Plaintiffs]" and "not for the economic benefit of the General Partner [Patrick]."

5.32    Patrick did all this in secret. Because of the structure of the Charitable DAF Fund and its management, no one supervised his compensation decisions aside, presumably, from his self-appointed fellow Director Murphy.  The beneficiaries of the Charitable DAF Fund were never

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                          **PAGE 14**

**49**

**1598**

advised, and had no opportunity to learn, that in a few short years, Patrick had unilaterally increased his personal compensation from the Charitable DAF Fund by 6,441%. Patrick and the other Defendants provided the Plaintiffs with partial information about the Charitable DAF Fund's finances, doing so through half-truths and partial disclosures that obscured the whole truth from them. Patrick did so despite repeated requests from the Plaintiffs and their counsel and counsel for the Charitable DAF Fund for complete information.

### I. *Patrick Ignores the Charitable Owners' Concerns*

5.33    On November 11, 2024, given what the Charitable Owners already knew, the three major Charitable Owners drafted a letter to Murphy, the Cayman Islands director, stating that "we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "**DAF-related entities**"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable."[6]

5.34    The letter continued, "because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."

5.35    On January 23, 2025, the Charitable Owners again demanded Patrick and Murphy provide clarity into the Charitable DAF Fund's financial position, expressing dismay that Patrick and Murphy continued to ignore their repeated requests for information. The Plaintiffs requested:

---

[6] Ltr. of Nov. 11, 2024 (Appx. Pg. 162-163)

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**       **PAGE 15**

50

<u>**1599**</u>

- Income Statements for the last for years: A complete set of income statements (or profit and loss statements) for the last four fiscal years (2021-2024), including any supplemental notes or breakdowns that provide insight into revenue streams and expenses.

- Listing of Underlying Assets: A detailed listing of the underlying assets held by DAF HoldCo, including both tangible and intangible assets. This should include any real estate, investments, intellectual property, or other significant assets that contribute to the company's operations or value.

- Audited Financial Statements: The most recent audited financial statements for DAFHoldCo, including the balance sheet, statement of cash flows, and any related auditor's reports. Please include any supplementary schedules or disclosures that are typically associated with these statements.

- Current Structure of DAFHoldCo Operations: An up-to-date organizational chart or structural overview detailing the key divisions, subsidiaries, and any relevant operational or financial entities that comprise the DAFHoldCo structure, including any significant changes that may have occurred over the last few years.

5.36    The Defendants never acknowledged receipt of this January 23, 2025 email. On January 28, 2025, therefore, the Charitable Owners requested a winding up of the Charitable DAF Fund's assets:

> These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Charitable Owners so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the assets further.

Importantly, at the time of this communication, Charitable DAF Fund still held the beneficial interest in the Charitable DAF Fund, though (as set forth below, and unknown to the Plaintiffs), that interest was now layered through Patrick's new entity, CDMCFAD.  In other words, at the time the Plaintiffs requested a winding up, there is no question that they remained the 100%

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                **PAGE 16**

beneficial owners of the assets in the Charitable DAF Fund and were entitled to the distribution of those assets under the Charitable DAF Fund's governing documents. By contrast, Patrick (whether individually or through one or more of his secretly-created entities) held nothing more than the miniscule par value of the Management Shares.

5.37    As set forth below in more detail, Patrick and the Defendants eventually responded to the Charitable Owners' inquiries by making a series of false statements, promising information and meetings that never arrived, and presenting carefully selected, incomplete information to mislead the Plaintiffs into a false sense of security and delay any decisive action on their part to effect a distribution. Meanwhile, Defendants used that veil of secrecy and misrepresentation to embark upon a conspiracy intended to defraud the Plaintiffs from their entire beneficial interests in the Charitable DAF Fund, before they could act to effect a distribution of its assets.

### J.    *Patrick Conspires to Defraud Three Charities of $270 Million*

5.38    Between November 2024 and the present, internal documents obtained through proceedings in the Cayman Islands reveal that Patrick entered into a conspiracy to defraud the Charitable Owners of their beneficial interest in the $270 Million in assets held by the Charitable DAF Fund. At the outset of the scheme, the Defendants' agents summarized the essence of the task they had been assigned: "Could Holdco liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares [belonging to the Plaintiffs here] worthless?"[7] The entire premise of Patrick's project was to sever the Charitable Owners and their related Charities from the assets of the Charitable DAF Fund that Patrick was supposed to invest and maintain for their economic benefit, leaving them with worthless shares.

---

[7] Writ of Summons and Statement of Claim, ¶ 80.4, filed on July 15, 2025 at Cause No. FSD2025-0201 in the Grand Court of the Cayman Islands between Charitable DAF HoldCo, Ltd. v. Mark Eric Patrick, et al. (the "CI Statement of Claim")

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                **PAGE 17**

**52**

**1601**

5.39    Patrick and the other Defendants first diluted the Charitable Owners' interests in the Charitable DAF Fund to impede them from being able to exercise their right to wind up the Charitable DAF Fund's operations and thereby obtain their equitable share of the $270 Million fund.  Patrick then engaged in a calculated series of moves to defraud the charities of their $270 Million interest in the Charitable DAF Fund.  He did this while a demand to "wind up" the Charitable DAF Fund was pending from the Charitable Owners, and with the express intent of lifting the Charitable DAF Fund's assets away from the Charitable Owners before that wind-up could occur.  In November 2024, Partick and Murphy began to contemplate how they could defraud the charities of their interests in the Charitable DAF Fund. One challenge they identified was the prospect that the Charitable Owners might file a petition in the Cayman Islands to "wind up" Charitable DAF Holdco and its asset (the Charitable DAF Fund), which would then entitle the charities to its proceeds and Patrick to nothing.  But Patrick and Murphy found a solution: By issuing new participation shares in Charitable DAF Holdco to a new "charity" that Patrick himself controlled, they could dilute down the Charitable Owners so they represent a smaller percentage of Holdco's shares.  As expressly contemplated by Patrick and Murphy, this would undermine any future petition to "wind up" because the shares in Charitable DAF Holdco controlled by Partick's new entity could oppose the petition.  Patrick believed that the opposition of his new "charity" to any "winding up" petition could insulate him against any effort by the Charitable Owners to thwart his scheme.[8]

5.40    Accordingly, on December 9, 2024, Patrick formed Defendant DFW Charitable Foundation (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Patrick named himself the Sham Charity's sole member and sole director and its registered address

---

[8] CI Statement of Claim, ¶ 91.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 18**

**53**

**1602**

was Patrick's home in Dallas. This entity was formed for the express purpose of later diluting down the Charitable Owners and blocking them from opposing the remainder of Patrick's scheme.

5.41    In February 2025, Patrick, Murphy, and the Defendants issued new Participating Shares in Charitable DAF Holdco to the Sham Charity created by Patrick, with the intent and for the express and stated purpose of blocking a possible equitable winding up petition by the Charitable Owners.  Notably, this was after the Charitable Owners had requested in writing that the Charitable DAF Fund be wound up.  In other words, Patrick and the other Defendants issued the shares expressly in order to alter the balance of power between the holders of Participating Shares.  Defendants did this in direct contravention of their express obligations to the Charitable Owners; and his specific knowledge that, under Cayman law, the power to issue shares is a fiduciary power that may only be exercised for proper purposes and may never be deliberately intended to alter the balance of power between shareholders. On February 7, 2025, Patrick issued his newly-formed and personally-created-and-controlled Sham Charity a fifty-one percent (51%) interest in the charitable assets—318 participating shares in Charitable DAF Holdco, more than were held by all the Charitable Owners put together. This sham dilution reduced the Charitable Owners' cumulative holding in Charitable DAF HoldCo from 100% of the participation shares to 48.9%. Following the new issuance: (i) The Highland Dallas Foundation, Inc.'s interest was diluted from 32.787% to 16.05%; (ii) The Highland Kansas City Foundation, Inc.'s interest was diluted from 32.787% to 16.05%; (iii) The Highland Santa Barbara Foundation, Inc.'s interest was diluted from 32.787% to 16.05% and (iv) the HCMLP Charitable Fund's[9] interest was diluted from 1.639% to 0.80%.

---

[9] The HCMLP Charitable Fund is a separate charity which provides funding for the North Texas Community Foundation. While it is not a named plaintiff, the damages it incurred because of the acts of Patrick are notable and relevant to show Patrick's impact across the State of Texas.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                PAGE 19

5.42 Patrick and the other Defendants never advised the Charitable Owners of any of these steps, and as set forth below, made affirmative misrepresentations and material omissions to hide them, and to dissuade and delay the Plaintiffs from taking certain specific actions to discover, oppose, or reverse them. The formation of the new "charity" controlled by Patrick, and the award of 318 new participating shares to that Sham Charity, were all done in secret, with the cooperation of all the Defendants. Moreover, throughout this very same secret process, as set forth in more detail below, Patrick and the Defendants (directly and through their agents) were falsely presenting a partial picture to the Plaintiffs about these facts, and were falsely representing to the Charitable Owners that (A) the reported increases in expenditures on Director's fees were inaccurate; and (B) the "restructuring" of the fund was proper and for the benefit of the Charitable Owners. Accordingly, Plaintiffs had no opportunity to learn the facts that the Defendants were keeping secret, and in fact the Defendants affirmatively misled the Plaintiffs about them.

5.43 Around the same time, Patrick formed the sham charity, on December 12, 2024, Patrick incorporated CDMCFAD, LLC, a Delaware limited liability company.

5.44 In secret, and without notice to the Charitable Owners, on December 18, 2024, Patrick caused Charitable DAF HoldCo to transfer to CDMCFAD, LLC 100% of its interest in Charitable DAF Fund. In turn, Charitable DAF HoldCo acquired 100% of the interest in CDMCFAD, LLC. As a result, CDMCFAD effectively was inserted as a blocking company in between Charitable DAF HoldCo, owned by the Charitable Owners, and the Charitable DAF Fund itself (where the $270M assets resided). Suddenly, the Charitable Owners no longer held a 100% beneficial interest in the entity that held the assets of Charitable DAF Fund. Instead, Patrick

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** PAGE 20

**55**

<u>**1604**</u>

CONFIDENTIAL TDIT006547

ensured a different and new entity (CDMCFAD) held Charitable DAF Fund. This was a critical step in the plan to "make the Participation Shares [held the Charities] worthless[.]"[10]

5.45    In February 2024, without telling the Charitable Owners, Patrick formed a new entity in the Cayman Islands to replace the General Partner entity managing the Charitable DAF Fund.  The prior General Partner had been a Delaware entity.  Patrick's express directive was that the new General Partner be "hard to find or track or trace.  Or find owners etc.  Strong litigation protection."[11]  By early March 2025, Patrick had formed this new secret entity, and it had replaced the General Partner of the Charitable DAF Fund.  Again, the Charitable Owners were never informed.

5.46    On March 27, 2025, Patrick caused CDMCFAD (the new holder of $270 million in assets) to issue new shares to the Sham Charity, *and only to the Sham Charity*. He issued no additional shares in CDMCFAD to the Charitable Owners. His fraudulent scam was nearly complete.

5.47    Now, only two entities held direct economic interests in CDMCFAD (the entity that now held the $270M Charitable DAF Fund).  Those two entities were Charitable DAF Holdco (still owned 48.5% by the Plaintiffs) and DFW Charitable Foundation.

5.48    Now that Holdco's interest in the Charitable DAF Fund existed only through CDMCFAD, Patrick and Murphy knew that causing Holdco to exchange or redeem its interest in CDMCFAD would sever the Charitable Owners entirely from the Charitable DAF Fund.

5.49    The remaining problem for Patrick and the Defendants was the obvious value of the interests the Charitable Owners held in the Charitable DAF Fund. Valuations of those interests had been performed continuously for years and had consistently, unerringly, and correctly reflected

---

[10] CI Statement of Claim, ¶ 80.4.
[11] CI Statement of Claim, ¶ 82.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 21**

**56**

**1605**

that they were roughly equivalent to the value of the Charitable DAF Fund itself. In other words, as recently as September 2024, they were valued at roughly $270 Million.

5.50    Patrick and the Defendants thus faced a problem.  They had no interest in exchanging the interests of the Charitable Owners in Holdco (and therefore in the Charitable DAF Fund) for equivalent value.  Instead, their goal from the beginning had been to "liquidate" Holdco, "distribute all its assets elsewhere," and "make the Participation Shares [belonging to the Charitable Owners here] worthless[.]"[12] So, to achieve this and to give themselves "cover" for doing so, Patrick and the Defendant embarked on a self-interested, results-oriented, fraudulent exercise in valuation-shopping.

5.51    Thus began a shopping expedition for a valuation firm willing to provide a deflated valuation of Holdco's interest in the Charitable DAF Fund, now held via CDMCFAD.  In January 2025, Patrick's legal counsel in the Cayman Islands, Walkers, approached PricewaterhouseCoopers ("**PwC**"), seeking a valuation of shares in Charitable DAF HoldCo, noting that the Charitable Owners were "potential adverse parties."  In February 2025, Walkers informed PwC that CDMCFAD was inserted into the structure and also requested a valuation of membership interests in CDMCFAD, on the one hand, and of the Participation Shares held by the Charitable Owners in Holdco, on the other.  But PwC gave an unwelcome answer, responding that "*there is no meaningful difference*" between the two valuations requested - "*i.e. the economic interest in the underlying NAV still fully accrues to the participating shareholders[.]*"  In other words, PwC's professional guidance was precisely what the Defendants did not want to hear—any fair "redemption" of the Plaintiffs' interest in the Fund would require a payment at or very near the face value of the Fund itself.  A phone call followed wherein PwC asked for clarity about what

---

[12] *See Id.*

Mr Patrick was trying to achieve by the Restructuring.   After that call, PwC declined the assignment.   The Defendants, however, brazenly ignored the guidance they had just obtained and rushed forward to find a more compliant valuator.

5.52    The next stop on Patrick's shopping trip was FTI Consulting in London ("**FTI**"). Walkers again presented the scenario.   FTI suggested that depending on the alignment with the Charitable DAF Fund's mission, a discount of approximately 14% on the low end or 95% on the high end.   But FTI was also clear that a real valuation in support of a transaction would require a much closer inspection of the specific terms of the transaction, the restructuring of the organizations, and the underlying assets themselves.   FTI thus advised that their preliminary analysis could not be used in support of any transaction.

5.53    Patrick was anxious to finish his scheme to steal all the Charitable Owners' interests. On March 17, 2025, Patrick informed and instructed Walkers that they needed to have FTI remove its restriction against using any valuation for the purposes of a transaction.   Patrick also disclosed his attempt at a post-hoc justification for his fraudulent, tortious, and unethical conduct:   Patrick was seeking "new advice of two separate U.S. Tax counsel" that the "best interests of the Company [was] to have non Dondero holders of its interests."   Once again, all of this brazen conduct was hidden from the Plaintiffs.

5.54    Over the next several days, Walkers sought to have FTI issue a valuation opinion that was unrestricted for use to support Patrick's transaction against the Charitable Owners.   For its part, Walkers opined to FTI that the directors owed no "overriding duty to act in the shareholders' interest," but only in the "best interest of the company."   FTI responded with a pertinent question, "Can you explain how it was in the interests of the company to materially dilute the existing shareholders?" There was never a satisfactory answer.

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 23**

**58**

**1607**

5.55     Slightly later, Walkers asked FTI, "please could you delete references to our advice so as to avoid any arguments about waiver of privilege."  Walkers further advised FTI that what it really wanted was a "valuation report which may, in connection with a proposed redemption of the membership interests in CDM[CFAD], be disclosed to third parties and relied on to establish fair market value[.]"

5.56     Now realizing that Walkers was hiding the ball, FTI responded: "This is material change in the purpose and access rights of the report.  Please provide more detail of the transaction. Is it the case that Mark will make CDM[CFAD] redeem the shares owned in by DAF? . . . We also note our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares.  To do a valuation we would need to do a more detailed exercise, including valuing the underlying assets."  Shortly thereafter, FTI further elaborated: "If the firm was wound down, would it result in distributions to the existing participating shareholders?  Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing?"[13]  Then FTI touched the point with a needle, in language making it clear that the rigged estimate Defendants were seeking could not survive scrutiny: "[W]hy haven't the participating shareholders triggered a wind-down?  If they can trigger a wind down and then in short order receive $300m of distributions, *it does change things re discount*."[14]

5.57     Walkers continued on behalf of Defendants to push FTI to give a valuation opinion that could be used to justify their intended fraud.  But, now understanding some of what Defendants intended, FTI refused. FTI closed the book as follows on March 26: "What is the intention of adding that directors should act in the interests of future members*?  I am struggling to understand how a director could act in a manner that is beneficial for future shareholders which is not also*

---

[13] CI Statement of Claim, ¶ 134
[14] CI Statement of Claim, ¶ 134 (emphasis added).

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 24**

**59**

**1608**

Case 19-34054-sgj11   Doc 4627-2   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 208   Page 26 of 54
**FSD2025-0116**                    **Page 67 of 1306**                    **2025-08-19**

1589

*helpful for existing shareholders.* The limitations in our note will remain. To do a valuation to support a transaction, we will need to do significantly more detailed work . . . [T]his memo should not be used to support a transaction."[15]   So in the end, FTI—like PwC—explained to the Defendants that the Charitable Owners' interests had substantial value given all the facts and circumstances, and it could not issue an opinion for use in a transaction that said otherwise. Again, the Defendants got news they did not want to hear; again, they ignored the guidance received and moved on to find a more malleable partner.

5.58    Patrick's next stop seeking a deflated valuation was ValueScope. Since year-end 2020, ValueScope had provided valuations for Charitable DAF Fund net assets, ranging between $177 million and $277 million, with the most recent being September 2024, at $270 million. Over the same time period, ValueScope had provided fair market value for the Charitable Owners' shares on a per share basis ranging from $481,468 to $782,847, with the September 2024 valuation at $759,614. In other words, ValueScope had valued the Charitable Owners' interests at around $270 Million just six months earlier. Unlike FTI and PwC, however, ValueScope saw its way to applying a 99.2% discount against the Charitable Owners' interests for "Lack of Control" (a situation that had *always* been inherent in the structure of the Fund) and entirely changed its methodology from prior periods. The end result: ValueScope determined that each participating share had a fair market value of $5368 in March 2025, down from $759,614, just several months earlier. According to ValueScope's "work," the Charitable Owners total value was approximately $1.6 million. ValueScope failed in their "valuation" even to address a key point that PwC and FTI had emphasized: The Charitable Owners would acquire the lion's share of $270 Million if they

---

[15] *Id.* ¶ 135 (emphasis added).

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 25**

**60**

**1609**

triggered an equitable wind-up, which they likely had the right to do. But the Defendants were happy to take "yes" for an answer.

5.59 Patrick wasted no time before weaponizing his sham valuation. The April 2 "redemption" outlined below relied extensively on the sham ValueScope report—without ever mentioning ValueScope's sharp change in methodology from years of its earlier reports; without recognizing that ValueScope failed to account for the possibility or right of the Plaintiffs to wind up; without any serious effort to justify the 99.2% reduction in value estimation from the report issued just six months earlier; and without giving the Plaintiffs any chance even to see the report, much less rebut it.

5.60 But, the Defendants also relied upon and cited in the "redemption" the FTI "memo," despite FTI's express assertion and disclaimer that its preliminary work *could not be used to support a transaction*, and despite FTI's clear advice that the reality of the Charitable Owners' rights to effect a wind up and acquire the value of the Charitable DAF Fund required a substantial necessary adjustment upwards to the estimated value of their shares.

5.61 On April 2, 2025, Patrick and the Defendants caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million. That is, he exchanged $270 million for $1.6 million, a ridiculous transaction bereft of reasonably equivalent value.[16] Their goal—to "make the Participation Shares [belonging to the Plaintiffs here] worthless"—was achieved.[17] CDMCFAD participated directly by "buying" Charitable DAF Holdco's shares; the General Partner entities participated directly by causing the redemption.

5.62 After the transaction, Charitable DAF HoldCo purportedly had no assets and no remaining interest in Charitable DAF Fund. As a result, Patrick's Sham Charity, Defendant DFW

---

[16] Written Resolutions of the Directors of the Company dated 2 April 2025 (Appx. Pg. 102-103)
[17] CI Statement of Claim, ¶ 80.4.

Charitable Foundation, was the sole limited partner and beneficial owner of Charitable DAF Fund, through its now-100% ownership of CDMCFAD, and CDMCFAD's 100% ownership of the fund. This final step completely severed the Charitable Owners and their nonprofit charities from the assets of the Charitable DAF Fund. In Patrick's own words under oath, "the entity in liquidation [Charitable DAF Holdco, Ltd.] owns nothing."[18]

5.63    Before the start of these self-dealing transactions, in October 2024, the Charitable Owners owned 100% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Charitable Owners owned Participation Shares worth zero. Again, all of his self-dealing activity took place with no clarity or transparency. Patrick converted the Charitable Owners' assets to Patrick's personal benefit and ownership, and violated his fiduciary duties of care, candor, and loyalty that he owed to the Charitable Owners.

### K.  *The Defendants' Material Misstatements and Omissions*

5.64    Through this entire conspiracy, from Fall 2024 through May 2025, the Defendants and their agents engaged in an orchestrated effort to mislead the Plaintiffs about their actions and intentions.  The Defendants did so in order to convince the Plaintiffs that the assets in the Charitable DAF Fund were secure; to hide their efforts to "make the Participation Shares worthless" from the Plaintiffs; to falsely convince the Charitable Owners that Defendants' strange corporate "restructuring" acts were in legitimate service to the Charitable DAF Fund's charitable objectives and the needs of the Plaintiffs; and to dissuade or delay any action by the Charitable Owners to protect or secure the value of their beneficial interests in the Charitable DAF Fund, and/or to reverse the dilution of their Participation Shares in Charitable DAF Holdco or the sham

---

[18] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11; (Appx. Pg. 200).

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**    **PAGE 27**

**62**

**1611**

CONFIDENTIAL    TDIT006554

"redemption" of Charitable DAF Holdco by CDMCFAD—by, for instance, the filing of an equitable "winding up" petition.

5.65    Due to the position of trust the governing documents assigned to the Control Position; and due to Patrick's practice of sharing information about the Charitable DAF Fund only through close and direct interactions or transmissions, the Plaintiffs were factually dependent upon the special relationship between them and Patrick—both for any information about the Fund, its assets, and its transactions, and for the protection of the Plaintiffs' interests.  The Plaintiffs were required to rely on information and advice that Patrick provided directly to them and depended on him to make material disclosures to them of pertinent information regarding transactions, acquisitions, and the like.   This rendered the Plaintiffs unusually vulnerable to material misrepresentations and omissions the Defendants made while they were executing their scheme. By virtue of the governing documents and the Parties' relations over time, Patrick and the Defendants had undertaken, and were treated as having assumed, responsibility to act on behalf and for the benefit of the Plaintiffs; and the Plaintiffs entrusted their interests, transactions, affairs, and property to them. The Defendants, for their own benefit, used the position and special inside knowledge they held to take improper and unfair advantage of the Charitable Owners, especially through their material misrepresentations and omissions.

5.66    On or about November 5, 2024, "compliance counsel" for Defendants, Doug Mancino, held a call with outside counsel for the Charitable Owners.  In that call, Defendants' counsel represented that the increased legal spend by the Defendants in 2024 was due to the need to settle legal disputes, and that the 2025 legal spend was thus expected to decrease.  Defendants' counsel mentioned nothing about increased legal expenditures associated with a massive, contemplated restructuring.

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                    **PAGE 28**

**63**

<u>**1612**</u>

5.67    On or about December 11, 2024, even while the Defendants were executing their scheme to render the Participation Shares "worthless," Defendants' counsel arranged for a video call with outside counsel for the Charitable Owners.  In an email the prior day, on December 10, 2024 "compliance counsel" for the Defendants referenced the Charitable Owners' "concerns about depletion of assets" and asserted that, "in fact . . . just the opposite has been happening under the leadership of Paul Murphy and Mark Patrick."  In response, outside counsel for the Charitable Owners emphasized their vulnerability and their inability to independently assess the Defendants' representations, given their reliance on the Defendants:  ""[W]ithout detailed financials, or any financials at all, the Supporting Organizations are left in the unenviable position of having [to] rely on presentations about what parties say the numbers show rather than being able to see precisely the story the numbers tell."

5.68    In the December 11, 2024 video call, the Defendants worked to allay the concerns expressed in the November 2024 no-confidence letter and thereby delay or dissuade any action on the part of the Plaintiffs to petition for an equitable wind-up until Patrick's self-dealing "restructuring" was complete.  Patrick, Murphy, and their agents attended.  The meeting literally happened the same week the Defendants formed CDMCFAD (the entity "inserted" below Holdco to hold the Charitable DAF Fund) and the DFW Foundation (the Sham Charity controlled by Patrick); and just one week before the Defendants executed the fatal transfer of Holdco's interests in the Charitable DAF Fund to CDMCFAD.  At this meeting, the Defendants purported to provide to the Charitable Owners a global survey on their plans for the Charitable DAF Fund. The Defendants presented their purported vision of running the Charitable DAF Fund as a more professional and institutional investment vehicle, for the benefit of its charitable purposes and the Charitable Owners.  They promised to provide more financial information in the future.  Through

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 29**

**64**

**1613**

**FSD2025-0116**                    **2025-08-19**

**CONFIDENTIAL**                    **TDIT006556**

this presentation, the Defendants expressed two fundamental messages: First, the Control Position remained dedicated to the duty imposed by the Charitable DAF Fund's governing documents—managing Charitable DAF Fund assets for the benefit of the Charitable Owners; Second, Defendants' "restructuring" was for the purpose of executing that duty in a more professional and institutional manner. These messages were explicitly false, as the Defendants well knew that they were in the very midst of executing their scheme to "make the Participation Shares worthless." And they were false by omission, as the Defendants shared some information but failed to disclose the critical lodestar by which that information could be accurately read: Defendants' pending, concrete acts to subvert the Plaintiffs' interests in Holdco and the Charitable DAF Fund, and the intentions and overall scheme behind those acts.

5.69  The very next day, on December 12, 2024, the Defendants secretly formed CDMCFAD, the entity the Defendants intended to use to replace Charitable DAF Holdco, and ultimately to sever the connection between the Charitable Owners and the Fund.

5.70  Just one day later, on December 13, 2024, "compliance counsel" for the Defendants sent a follow-up email to outside counsel for the Charitable Owners. That correspondence did not disclose the formation or intended use of CDMCFAD. Instead, it encouraged and demanded the Charitable Owners rely on the representations made in the meeting and unilaterally abandon their well-founded concerns on that express basis. The email asserted: "[T]hese two meetings have provided the [Supporting Organizations] with a great deal of transparency regarding governance, financial matters, and independence of Charitable DAF Holdco, Ltd. and its affiliates. (collectively, the DAF). Therefore, we believe it is imperative that each [Supporting Organization] not only retract the November 11 [no confidence] letter in writing but also affirmatively disavow the concerns[.]" The Defendants' counsel further asserted: "The DAF is actively working on one

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    PAGE 30

**65**

**1614**

or more development projects from which your [Supporting Organization] clients (and independently their supported organizations) will benefit from financially from Participating Shareholder dividend distributions for many years to come." Again, the Defendants' representatives made these assertions and encouraged and demanded that the Plaintiffs rely upon them, while literally in the midst of executing their plan to permanently sever the Plaintiffs from the very "dividend distributions" referenced in the correspondence.

5.71    On January 30, 2025, Paul Murphy (copying Mark Patrick), acting for the Defendants, sent an email to the Charitable Owners offering additional meetings, and asserting that "we are more than happy to continue to engage with the foundations/supporting organizations in an effort to provide clarity on investments and the DAF Holdco structure." In the same correspondence, Murphy added: "DAF Holdco holds itself to the highest standards in achieving its goal of maximizing returns in risk adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF Holdco's independence and are advised by best-in-class, independent experts." Defendants sent this promise of "clarity on investments and the DAF Holdco structure" little more than a month after secretly inserting CDMCFAD into that structure as a "blocker" between the Charitable Owners and their interests in the Charitable DAF Fund; and less than a week before executing on their scheme to replace the Charitable DAF Fund's General Partner to better insulate Patrick. Again, Defendants' statement was an express untruth and a failure to perform on an express promise—they had no intent to provide "clarity" to the Plaintiffs, but in fact were in the midst of forming a replacement General Partner entity that was "hard to find or track or trace. Or find owners."[19] And again, these statements omitted the critical facts that would have informed the Plaintiffs of the true landscape.

---

[19] CI Statement of Claim, ¶ 82.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**        **PAGE 31**

66

1615

Again, Patrick and the Defendants intended by these misrepresentations and omissions to forestall and defeat an effort by the Charitable Owners to secure the value of their Participating Shares. Indeed, they had no regard for any inferences the Charitable Owners would draw from their misstatements and omissions—indeed, they were counting on misdirection.

5.72    On February 4, 2025, Paul Murphy (copying Mark Patrick) sent an additional email note to the Charitable Owners on behalf of the Defendants, promising a further meeting at which the Defendants could "resolve [their] concerns."  The Defendants again failed to provide key details that would render the statements they did make not misleading, misrepresented facts, and expressed a false promise of "working with" the Charitable Owners, hoping to delay or undermine any decisive action on their part to protect their valuable interests in the Charitable DAF Fund. The Defendants represented: "We remain committed to trying to work with your clients and would be grateful if you could confirm your clients' willingness to do so."  This happened at the same time the Defendants were deeply entrenched in executing their plot.  Again, the Defendants made expressly false statements—their "commit[ment]" to "work with" the Charitable Owners; made a false promise to work with the Charitable Owners when the Defendants had no intent to do so, and at the same time, omitted critical facts essential to accurately understand the true nature of the Defendants' actions and commitments.

5.73    On February 14, 2025—one day after the Defendants engaged FTI in an effort to secure a sham valuation reducing the value of the Plaintiffs' interests by more than 99%-- "compliance counsel" for the Defendants continued to gaslight the Charitable Owners, asserting that "Charitable [D]AF is not paying Paul or Mark 'millions in director fees."

5.74    On March 17, 2025—while the scheme to defraud the Plaintiff was nearing its end—"compliance counsel" for the Defendants reached out to the Charitable Owners' outside

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                          PAGE 32

**67**

**1616**

CONFIDENTIAL                                                    TDIT006559

counsel, purportedly seeking "a couple of dates for Paul Murphy to make a presentation to your three clients." Plaintiffs' counsel responded with three options for dates the following day. Defendants never set the meeting. At this point, the Defendants were irrevocably committed to the path of severing the Charitable Owners from the Fund, and the only possible purpose for such an overture was to keep the charade begun with earlier promises of cooperation, transparency, and future benefits from the Participation Shares going for just a bit longer—just long enough to consummate the conspiracy.

5.75 The Plaintiffs relied on the misrepresentations of the Defendants throughout the relevant period. That reliance was justified under all the circumstances, including Defendants' course of conduct, Defendants' specific representations, and Defendants' obligations to Plaintiffs arising under the governing documents and common law. Those representations were effective in dissuading and delaying the Plaintiffs from taking action that would have secured to them their interests in the $270 Million Fund, including by discovering and opposing the dilution of their interest in the Charitable DAF Fund and by seeking an equitable winding up to secure their interest.

## L. *The Cayman Island Proceedings*

5.76 On April 2, 2025, again unbeknownst to the Charitable Owners, the Defendants voted to place placed DAF HoldCo into *voluntary* liquidation in the Cayman Islands through written resolutions of directors executed by Patrick, with joint voluntary liquidators appointed.

5.77 But the Charitable Owners already did know: that Patrick had (1) actively thwarted all financial transparency; (2) refused to address the Charitable Owners well-founded concerns including their expression of no-confidence; and (3) engaged in a pattern of fraudulent self-dealing.

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                   **PAGE 33**

**68**

<u>**1617**</u>

5.78    As a result, the Charitable Owners filed an *involuntary* Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.* Absent doing so, the Charitable Owners would not have learned about Patrick's voluntary liquidation.

5.79    Cayman Islands counsel for the Charitable Owners alleged essentially the same facts as recounted in this Petition before the Grand Court. However, Defendants DFW Charitable Foundation and CDMCFAD are Delaware-organized entities and were not expressly named in the Grand Court proceedings.

5.80    The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things[20]:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.
>
> 6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:
>
> a) the power to present a petition for the winding up of Charitable DAF Fund, LP if so advised;
>
> b) the power to file a summons and to apply for an order appointing provisional liquidators of the Charitable DAF Fund if so advised; and

---

[20] Supervision Order (Appx. Pg. 244-246)

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**    **PAGE 34**

**69**

**1618**

CONFIDENTIAL TDIT006561

c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

5.81   Once appointed to fill the shoes of Charitable DAF Holdco, the Joint Official Liquidators performed an internal investigation, reviewing the documents and correspondence belonging to that entity.  Based on that investigation and in the interests of Charitable DAF Holdco (not a party here), they determined to waive privilege over substantial records now in their control. On July 15, 2025, the Joint Official Liquidators filed a Statement of Claim in the Grand Court of the Cayman Islands on behalf of Charitable DAF Holdco.  The Statement of Claim quotes extensively from the records belonging to Charitable DAF Holdco, which document in detail the conduct of the Defendants in this Action.[21]

## VI.    CAUSES OF ACTION

### Count 1 – Common Law Fraud Against All Defendants

6.1    Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.2    The Defendants made material misrepresentations to the Plaintiffs, as set forth above and herein.

6.3    The Defendants made the representations with knowledge of their falsity; or recklessly as a positive assertion, without knowledge of their truth, as set forth above and herein.

6.4    The Defendants intended for the Plaintiffs to rely upon the representations, or to induce reliance upon the representations.  Specifically, amongst other purposes, the Defendants intended that their representations would dissuade or delay the Plaintiffs from discovering or contesting the dilution of their interest in Charitable DAF Holdco; and dissuade or delay the Plaintiffs from filing an equitable winding up petition or taking other decisive action to protect

---

[21] CI Statement of Claim.

their interest in the Charitable DAF Fund, reverse the dilution, and/or reverse the sham "redemption," all of which would have saved and preserved the value of their interest in the Charitable DAF Fund and defeated the Defendants' scheme to "make the Participation Shares [belonging to the Plaintiffs] worthless[.]"

6.5     Patrick has testified that through their hidden manipulations, at great expense of the funds meant for charitable purposes via the Plaintiffs, the Plaintiffs now own "nothing."

6.6     The Plaintiffs justifiably relied upon the representations, as set forth herein and otherwise, as they knew Defendants were charged by the governing documents of the Charitable DAF Fund to always manage its assets for the economic benefit of the Charitable Owners (the Plaintiffs), and the Defendants repeatedly asserted that the purpose of their actions and the changes in Charitable DAF Fund management were not to harm the Plaintiffs, but to better serve the Plaintiffs through more professional and institutional structures and procedures.

6.7     The Plaintiffs suffered injury and damages as a result of the reliance, and seek actual and exemplary damages in an amount to be determined at trial.

### Count 2 – Fraud by Nondisclosure Against All Defendants

6.8     Paragraphs 1.1 - 5.81 are incorporated as though fully set forth herein.

6.9     The Defendants deliberately failed to disclose certain material facts.

6.10    The Defendants had a duty to disclose those facts to the Plaintiffs, arising from their obligations pursuant to the Charitable DAF Fund's governing documents to always manage the Charitable DAF Fund for the economic benefit of the Plaintiffs.

6.11    The Defendants had a further duty to disclose those facts to the Plaintiffs arising from their fiduciary obligations arising under common law.

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** PAGE 36

**71**

**1620**

CONFIDENTIAL TDIT006563

6.12    The Defendants had a further duty to disclose those facts to the Plaintiffs because the Defendants made a partial disclosure that created a false impression, as set forth above and herein, as set forth above and herein.

6.13    The Defendants had a further duty to disclose those facts to the Plaintiffs because they voluntarily disclosed certain information, creating a duty to disclose the whole truth, as set forth above and herein.

6.14    The Plaintiffs were ignorant of the true facts and did not have an equal opportunity to discover them, as set forth above and herein.

6.15    The Defendants knew the Plaintiffs were ignorant of the true facts and did not have an equal opportunity to discover them, as set forth above and herein.

6.16    The Defendants intended that the Plaintiffs act or refrain from acting based on the nondisclosure, as set forth above and herein.

6.17    The Plaintiffs relied on the nondisclosure, which resulted in their injury in the amount to be proven at trial, but which exceeds $250 Million.

### Count 3 – Breach of Fiduciary Duty against Patrick, CDH GP, Ltd., and Charitable DAF GP, LLC

6.18    Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.19    By virtue of Defendants' Control Positions related to the overall Charitable DAF Fund structure and specifically DAF HoldCo and the Charitable DAF Fund, and his special relationship with Plaintiffs, Patrick owed fiduciary duties to the Plaintiffs.

6.20    The Defendants held a special factual relationship of direct and close reliance with the Plaintiffs, as set forth above, expressed by the governing documents and then by the reality that the Plaintiffs were dependent upon the Defendants to protect their interests in the transactions, finances, and acquisitions of the Fund, and were required to rely (and did rely) on information and

---

PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                    PAGE 37

**72**

**1621**

advice the Defendants provided about the Fund. Patrick and the Defendants undertook, and were treated as having assumed, responsibility to act on behalf and for the benefit of the Plaintiffs; and the Plaintiffs were treated as having entrusted their interests, transactions, affairs, and property to them. On this basis, the Defendants owed further and greater fiduciary duties to the Plaintiffs in their management of the Fund and its assets.

6.21 By virtue of their assertions and by virtue of the governing documents empowering them to act, the Defendants expressly and implicitly asserted that they acted on behalf of the Plaintiffs as agents for them in the transactions of the Fund. On this basis, the Defendants owed further and greater fiduciary duties to the Plaintiffs in their management of the Fund and its assets.

6.22 Patrick's position of trust was underscored by the governing documents of the Charitable DAF Fund, which expressed his required fidelity to the Plaintiffs in making all decisions in the Control Position for their economic benefit.

6.23 The Defendants breached their fiduciary duties to the Plaintiffs by diluting and then stripping them of their legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit. In so doing, Defendants for their own benefit used their position and special inside knowledge acquired by them to take improper or unfair advantage of the Plaintiffs.

6.24 The Defendants breached these duties through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity. Again, in so doing, they for their own benefit used their position and special inside knowledge to take improper or unfair advantage of the Charitable Owners.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 38**

**73**

**1622**

**CONFIDENTIAL** **TDIT006565**

6.25    Patrick breached his fiduciary duties by mismanaging the Charitable DAF Fund's finances, and dramatically increasing director compensation to his own benefit.  Again, in so doing, they for their own benefit used their position and special inside knowledge to take improper or unfair advantage of the Plaintiffs.

6.26    Patrick breached his fiduciary duty by successfully causing a transfer of assets ultimately from the Plaintiffs to a charity controlled by Patrick and his immediate family without disclosing the relationship.

6.27    The actions incorporated herein have wrongfully deprived the Plaintiffs of substantial economic support and assets, harming, and threatening irreparable harm to, the Plaintiffs and the Charities that they support, including by causing them to lose the value of their Participation Shares at an undervalue. Plaintiffs have suffered damages as a result of Defendants' breach of their fiduciary duties.

### Count 4 – Civil Conspiracy against all Defendants.

6.28    Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.29    The Defendants conspired and combined their efforts to effect a common scheme.

6.30    The Defendants sought through that combination to achieve a common object and course of action—to wit, to "make the Participation Shares worthless" and thereby transfer away from the Plaintiffs, and to the Defendants, the entire beneficial ownership of the $270 Million in assets in the Charitable DAF Fund.

6.31    The Defendants took one or more unlawful, overt acts in pursuit of the object and course of action of the combination and conspiracy—to wit, at minimum, fraud, breach of fiduciary duty, conversion, and constructive fraud, as set forth herein.

PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                          PAGE 39

**74**

**1623**

**FSD2025-0116** **2025-08-19**

**CONFIDENTIAL** **TDIT006566**

6.32    The Plaintiffs suffered damages as a proximate result of the combination and conspiracy.

### Count 5 - Constructive Fraud Against All Defendants

6.33    Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.34    "Constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Tex. Integrated Conveyor Systems, Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366 (Tex. App.—Dallas 2009). "In constructive fraud the actor's intent is irrelevant." *Id.* "Constructive fraud is the breach of a legal or equitable duty which the law declares fraudulent because it violates a fiduciary duty." *Id.*

6.35    As a fiduciary, Patrick's and the other Defendants' conduct in diluting the Plaintiffs' interests, selling interests at below-market values, and liquidating DAF HoldCo and transferring its interests to the Sham Charity without notice constitutes constructive fraud.

6.36    Plaintiffs have suffered damages as a result of Patrick's fraud.

### Count 6 - Unjust Enrichment Against Patrick, CDMCFAD, LLC and DFW Charitable Foundation

6.37    Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.38    A claim of unjust enrichment applies when a party obtains "a benefit from another by fraud, duress, or the taking of an undue advantage." *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010)).

6.39    Patrick, CDMCFAD, and the DFW Charitable Foundation stripped the Plaintiffs of their rightful legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                    PAGE 40

**75**

**1624**

6.40    Patrick, CDMCFAD, and the DFW Charitable Foundation took these interests and assets for their own benefit via fraud and taking undue advantage of the access available through the Control Positions and overlapping control with the DFW Charitable Foundation.

6.41    Patrick also took undue advantage through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.42    Patrick, CDMCFAD, and DFW Charitable Foundation have been unjustly enriched at the expense of the Plaintiffs. Plaintiffs have been damaged by Patrick's unjust enrichment.

**Count 7 – Conversion Against Patrick, CDMCFAD, LLC, CDH GP, Ltd., and DFW Charitable Foundation**

6.43    Paragraphs 1.1 – 5.81 are incorporated as if fully restated herein.

6.44    Conversion requires a showing that (1) the plaintiff owned, had legal possession, or was entitled to possession of the property, (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights, and (3) the plaintiff demanded the property, and (4) defendant refused the return of the property. *Wells Fargo Bank Northwest, N.A. v. RPK Capital XVI, L.L.C.*, 360 S.W.3d 691, 699 (Tex. App.—Dallas 2012 no pet.).

6.45    The Plaintiffs held legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.46    Patrick with the other named Defendants have unlawfully and without authorization, assumed and exercised dominion over the Plaintiffs' legal, equitable, and beneficial interests in the Charitable DAF Fund structure including their participation in DAF HoldCo, the Charitable DAF Fund, and Charitable DAF Fund assets through the dilution scheme that diverted

---

PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                    PAGE 41

**76**

**1625**

all the legal and beneficial economic interests to Patrick's controlled entity, DFW Charitable Foundation.

6.47   The Plaintiffs requested distribution in kind of the Charitable DAF Fund structure assets, which all have ignored and refused. Plaintiffs have been damaged as a result of these conversions.

### Count 8 – Imposition of Constructive Trust Against Patrick, CDMCFAD, LLC and DFW Charitable Foundation

6.48   Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.49   "A constructive trust is an equitable remedy created by the courts to prevent unjust enrichment." *Troxel v. Bishop*, 201 S.W.3d 290, 297 (Tex. App.—Dallas, no pet.). "To obtain a constructive trust, the proponent must prove: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer, and (3) tracing to an identifiable res." *Id*.

6.50   Patrick through the DFW Charitable Foundation has breached his fiduciary relationship with the Plaintiffs by converting legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit, resulting in the unjust enrichment of the DFW Charitable Foundation and Patrick.

6.51   All the legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit in the overall Charitable DAF Fund structure should be imposed with a constructive trust running to the benefit of the Plaintiffs.

### VII.   APPLICATION FOR RECEIVERSHIP

7.1   Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**   PAGE 42

**77**

**1626**

7.2 The Plaintiffs seek the immediate appointment of a receiver over Defendants the DFW Charitable Foundation and CDMCFAD, LLC (the "**Receivership Entities**") under three independent bases: Texas Civil Practice & Remedies Code sections 64.001(a), Texas Business Organizations Code section 11.410, and the Court's inherent equitable powers.

### A. *Texas Civil Practice & Remedies Code*

7.3 Under section 64.001 of the Texas Civil Practice and Remedies Code, a court may appoint a receiver in an action between "partners or others jointly owning or interested in any property or fund," or "in any case in which a receiver may be appointed under the rules of equity." TEX. CIV. PRAC. & REM. CODE § 64.001(a)(3), (7).

7.4 A party with a probable interest or a right to the property or fund has standing to seek the appointment of a receiver. *Id*. § 64.001(b). "[T]he property or fund must be in danger of being lost, removed, or materially injured." *Id.*

7.5 A probable interest exists by statute in actions between partners and in actions between joint owners of property. *Id*. § 64.001(a)(3).

7.6 One purpose of a receivership is to preserve assets and resolve issues relating to an entity's affairs where there are allegations of fraud or improper activities. *See Floyd v. MMWKM Advisors, LLC*, No. 05-23-00638-CV, 2024 WL 549036 at *2 (Tex. App.–Dallas 2024, pet. denied, reh'g denied).

### B. *Texas Business and Organizations Code*

7.7 A court that has subject matter jurisdiction over specific property of a domestic or foreign entity in Texas may appoint a receiver for that property in several scenarios, including an action between "partners or others jointly owning or interested in the property or fund." TEX. BUS. ORG. CODE § 11.403(a)(3).

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** PAGE 43

78

<u>1627</u>

7.8     Additionally, under Section 11.410 of the Texas Business Organizations Code, a court may appoint a receiver for all of the property, in and outside Texas, of a foreign entity doing business in Texas and its business if the court determines, in accordance with the ordinary usages of equity, that circumstances exist that necessitate the appointment of a receiver even if a receiver has not been appointed by another court. *Id*. § 11.410(a).

### C.  *Rules of Equity*

7.9     In addition to specific statutory authority to appoint receivers, Texas courts retain inherent equitable power to do so. Texas law makes clear that the rules of equity control the appointment and power of a receiver unless inconsistent with a statutory provision. TEX. CIV. PRAC. & REM. CODE § 64.004

### D.  *Receivership Standards Under Texas Law and Equity*

7.10     The appointment of a receiver lies within the discretion of the trial court. *See Spiritas v. Davidoff*, 459 S.W.3d 224, 231 (Tex. App.—Dallas 2015, no pet.).

7.11     The facts alleged in the receivership application will be construed as favorably as possible for the applicant. *Couch Mortgage Co. v. Roberts*, 544 S.W.2d 944, 946-47 (Tex. Civ. App. – Houston [1st Dist.] 1976, writ dismissed).

7.12     Conduct that supports a cause of action for fraud or breach of fiduciary duties is often the same type of conduct that supports an application for a receivership. *Ritchie v. Rupe*, 443 S.W.3d 856, 873 (Tex. 2014).

### E.  *The Charitable Owners are entitled to the Emergency Appointment of a Receiver to Oversee the Receivership Entities*

7.13     The Plaintiffs have an ownership interest in their participating shares in DAF HoldCo and thereby its economic ownership of the Charitable DAF Fund and the assets that were rightfully held by the Charitable DAF Fund and entrusted to the control of Patrick.

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 44**

**79**

**1628**

**FSD2025-0116** **2025-08-19**

**CONFIDENTIAL** **TDIT006571**

7.14 Patrick wrongfully caused the Plaintiffs' participation shares to be diluted and then caused the Plaintiffs' beneficial economic interests in the Charitable DAF Fund structure to be wrongfully transferred to a collection of sham entities wholly dominated by Patrick.

7.15 Charitable DAF Fund was valued at $270 million as recently as September 2024. Now no assets remain in the Charitable DAF Fund structure. The Plaintiffs have not received any just compensation, participation, or other consideration for the conversion of their substantial interests in the Charitable DAF Fund structure.

7.16 Receivership Entities now maintain complete management control and beneficial rights over the Charitable DAF Fund structure's substantial assets or otherwise possess those assets to the exclusion of Charitable DAF Fund.

7.17 Patrick dominates and controls the Receivership Entities. As shown, Patrick has demonstrated a pattern of selling assets at below-market values, attempting to engage in self-dealing transactions, transacting assets at non-market terms in potential self-dealing transactions, dramatically increasing internal and professional administrative expenses that burdens and dissipates charitable assets, and secreting his activities while controlling assets dedicated to charitable causes. To preserve assets from further dissipation, a receiver should replace Patrick's oversight of the Receivership Entities and their assets, which were wrongfully acquired and held.

7.18 The Plaintiffs have been stripped of access to the benefit of assets meant to support charitable causes, resulting in financial distress and immediately threatening planned and ongoing support of countless charities including education, medical research, and community initiatives.

7.19 The Plaintiffs have demonstrated a strong likelihood of success on their claims given the documented pattern of breaches, financial irregularities and successful litigation in the Cayman Islands.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 45**

**80**

**1629**

7.20 The Plaintiffs have demonstrated a clear and compelling need for immediate court oversight to prevent further injury and preserve the charitable assets at risk due to Patrick's actions via the Receivership Entities.

7.21 The participating shares in DAF HoldCo as well as assets valued at $270 Million are in danger of being lost, removed, or materially injured and circumstances exist to necessitate the appointment of a receiver to conserve the property, fund, and avoid further, irreparable harm to Plaintiffs.

7.22 Given Patrick's demonstrated and recent malfeasance using the Receivership Entities as tools of fraud, no other adequate remedy exists under law.

## VIII – APPLICATION FOR TEMPORARY INJUNCTION PENDING APPROVAL OF RECEIVERSHIP

8.1. Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

8.2. Plaintiffs seek injunctive relief preventing the Defendants from further use, transfer, dispersal, and/or alienation of the assets that were held in the Charitable DAF Fund following a hearing on Plaintiffs' Application for Temporary Injunction , regardless of where they are presently held. If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment. This application is supported by the sworn declarations of Julie Diaz and James David Dondero.

8.3. A writ of injunction is proper where "the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant," or where "a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act

**81**

**1630**

would tend to render the judgment in that litigation ineffectual," or where "irreparable injury to real or personal property is threatened, irrespective of any remedy at law." TEX. CIV. PRAC. & REM. CODE § 65.011. "A temporary injunction pending trial on the merits 'may be and usually is issued in connection with any species of litigation where it is necessary to preserve the status quo pending a final adjudication of the rights of the parties." *Turcotte v. Alice Nat'l Bank*, 402 S.W.2d 894, 896 (Tex.1966). An applicant for the writ must show (1) a probable right to recover on the merits after final hearing and (2) a probable and irreparable injury unless the writ is issued. *See* TEX. CIV. PRAC. & REM. CODE § 65.011; *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002)

8.4.    Texas courts universally recognize that in cases where dispersal or liquidation of assets required to pay a judgment is likely, temporary injunctive relief is proper to preserve the status quo and ensure that the efficacy of ultimate relief for the Plaintiffs is not defeated by financial machinations while the case is pending.  In other words, the adequacy of an available legal remedy must be judged in the circumstances of the particular case, and in such circumstances, any legal remedy by way of a judgment for money damages is properly viewed as inadequate on the ground that the funds may be reduced pending final hearing and thus be unavailable in their entirety.  *See Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ).

8.5.    The above authorities support the award of the temporary injunctive relief requested herein, because the assets formerly held in the Charitable DAF Fund for the benefit of the Plaintiffs are already being alienated from their beneficial owners and the conduct of Defendants demonstrates the likelihood of their continued transfer, alienation, expenditure, and dispersal while this case is pending and before the rights of the Plaintiffs to those funds can be vindicated.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                              **PAGE 47**

**82**

**1631**

CONFIDENTIAL                                                                    TDIT006574

8.6.     Unless enjoined, Patrick and the other Defendants will cause and continue to cause irreparable harm to Plaintiffs for which there is no adequate remedy at law; including, without limitation, the dispersal, expenditure, transfer, and further alienation of more than $270 Million that can never be replaced because the Defendants will lack the means to do so.

8.7.     Plaintiffs will therefore suffer immediate and irreparable injury without adequate remedy at law if a Temporary Injunction is not ordered against the Defendants.  Accordingly, Plaintiffs request the Court freeze:

(a) all assets that were held in the Charitable DAF Fund as of the instant date of this filing, and

(b) prohibiting Patrick and the other Defendants, or anyone acting in concert with them or at their direction, from any use, expenditure, transfer, dispersal, dilution, encumbrance, or alienation of any of those funds pending resolution of Plaintiff's Motion for Temporary Injunction.

8.8.     The harm to Plaintiffs is imminent, and if the Court does not enjoin the Defendants, they will be irreparably injured, as set forth herein. If the Defendants prevail on the merits, the funds will still be available to them for their use in future.  The balance of burdens thus strongly favors Plaintiffs, who stand to lose everything absent injunctive relief—over Defendants, who will at most suffer a minor inconvenience if they ultimately prevail.

8.9.     The issuance of injunctive relief will not disserve the public interest. Balancing the equities and other factors, including the significant potential for irreparable harm to the Plaintiffs and the lack of harm to Defendants, demonstrates that the relief will not disserve the public interest. Indeed, freezing the funds at issue in place to ensure that this fraudulent scheme is not permitted consummation absent judicial scrutiny serves the public interest by protecting vital charitable interests.

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                              **PAGE 48**

**83**

**1632**

CONFIDENTIAL                                                    TDIT006575

**A.** ***Plaintiffs have a Probable Right to the Relief Sought in their Claims Against Defendants.***

8.10.    Plaintiffs easily satisfy this test. Establishing a probable right to relief does not require the applicant for a TRO to establish that it will prevail at trial. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Instead, this element requires only that the applicant allege a cause of action and present evidence that tends to sustain that cause of action. *See id*; *Transport Co. of Tex. v. Robertson Transports, Inc.*, 261 S.W.2d 549, 552 (Tex. 1953). The cause of action itself need not involve permanent injunctive relief—the trial court "[has] discretion to preserve the status quo so long as [a movant] demonstrate[s] his probable right to recover damages." *Metcalfe*, 863 S.W.2d at 58.

8.11.    Plaintiffs have a probable right to the relief sought on its claims for breach of fiduciary duty, constructive fraud, unjust enrichment, and conversion. As alleged in more detail above, Defendants have committed and continue to commit acts that have raided four vital charitable organizations of $270 Million that funds vital philanthropic efforts relied upon by key communities across the nation.  The evidence summarized herein thus establishes that these injuries arise as a direct result of Defendants' conduct.

**B.** ***Plaintiffs Will Suffer Immediate, Irreparable Injury in the Absence of a Temporary Restraining Order and Temporary Injunction.***

8.12.    Plaintiffs will suffer immediate, irreparable injury in the absence of a temporary restraining order and temporary injunction, as summarized above.  Plaintiffs will suffer precisely the sort of irreparable injuries Texas courts have sought to prevent by granting temporary injunctive relief. *See Staubach*, 667 S.W.2d at 567–68.

8.13.    Plaintiffs have no adequate remedy at law.  Without injunctive relief, the assets intended to benefit the Plaintiffs will be spent, dispersed, transferred, and alienated while this litigation unfolds.  These losses, as well as others which will inevitably occur if Defendants are

---

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**     **PAGE 49**

**84**

**1633**

**FSD2025-0116** **2025-08-19**

**CONFIDENTIAL** **TDIT006576**

not enjoined, cannot be compensated in monetary terms once the funds are dispersed, and are the types of harm for which injunctive relief is particularly necessary and appropriate.

8.14. Accordingly, and in order to preserve the status quo during the pendency of this action, Defendants should be cited to appear and show cause why the funds at issue should not be frozen for the pendency of this Action, and why Defendants should not be temporarily restrained during the pendency of this action from directly or indirectly using, spending, transferring, encumbering, dispersing, or further alienating the funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing.

8.15. Plaintiffs seek a temporary restraining order and temporary injunction against Defendants freezing all funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing, and enjoining Defendants and any others acting by, for, or in concert with them, including but not limited to their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of the order by personal service or otherwise, from either directly or indirectly: spending, dispersing, using, encumbering, transferring, or alienating those funds and assets.

8.16. Plaintiffs further seek a receivership over the funds and assets and the entities holding the funds and assets, whereupon the temporary injunctive relief sought here may properly expire because the assets will then be under the control of a receiver answering to this Court.

8.17. Plaintiffs is willing to post a bond in an amount directed by the Court.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** PAGE 50

**85**

**1634**

## VIII. PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A. Appoint a receiver to take possession and control of all assets, properties, and operations of DFW Charitable Foundation and CDMCFAD, LLC;

B. Enjoin Defendants from further disposing of, transferring, encumbering, or dissipating any Charitable DAF Fund and DAF HoldCo assets;

C. Impose a Constructive Trust against Patrick, CDMCFAD, LLC and DFW Charitable Fund;

D. Require the reversal of the dilution scheme and unauthorized asset transfers;

E. Require recission of improper redemption of shares and share transfers;

F. Award actual damages in an amount to be proven at trial;

G. Award exemplary damages as permitted by law;

H. Award attorneys' fees and costs;

I. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**MCCARTY LAW PLLC**

*/s/ Darren McCarty*
Darren L. McCarty
State Bar No. 24007631
darren@mccartylawpllc.com
316 West 12th Street, Suite 400
Austin, Texas 78701
512-827-2902

- and -

**DUANE MORRIS LLP**

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
100 Crescent Court, Suite 1200

**CONFIDENTIAL** **TDIT006578**

Dallas, Texas 75201
(214) 257-7213 – Telephone
(214) 292-8442 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served by

electronic means on this day, July 20, 2025, on all counsel or parties of record.

*/s/ Craig M. Warner*
Craig M. Warner

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 52**

**87**

**1636**

**CONFIDENTIAL** **TDIT006579**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Benjamin Warden on behalf of Benjamin Warden
Bar No. 24115926
BWarden@duanemorris.com
Envelope ID: 103353344
Filing Code Description: Amended Filing
Filing Description: 2025.07.20 Plts First Amended Petition
Status as of 7/21/2025 9:19 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 7/20/2025 10:25:19 PM | SENT |
| Brent M.Rubin | | brubin@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 7/20/2025 10:25:19 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 7/20/2025 10:25:19 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 7/20/2025 10:25:19 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 7/20/2025 10:25:19 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 7/20/2025 10:25:19 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 7/20/2025 10:25:19 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 7/20/2025 10:25:19 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 7/20/2025 10:25:19 PM | SENT |
| Lizzette Velazquez | | lvelazquez@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 7/20/2025 10:25:19 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 7/20/2025 10:25:19 PM | SENT |