Plaintiff
M MacInnis
First Affidavit
15 July 2025
Exhibit MM-1

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 (     )**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

<u>Plaintiff</u>

**AND**

| | |
|---|---|
| **(1)** | **MARK ERIC PATRICK** |
| **(2)** | **PAUL MURPHY** |
| **(3)** | **CDMCFAD, LLC** |
| **(4)** | **DFW CHARITABLE FOUNDATION** |
| **(5)** | **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** |
| **(6)** | **CLO HOLDCO, LTD.** |

<u>Defendants</u>

---

**FIRST AFFIDAVIT OF MARGOT MACINNIS**

---

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)

CONFIDENTIAL
TDIT004967

**FSD2025-0116** **Page 9 of 1530** **2025-08-19**

I, **MARGOT MACINNIS** of Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands MAKE OATH AND SAY as follows:

## INTRODUCTION

1    I am Managing Director of Grant Thornton Specialist Services (Cayman) Limited ("**Grant Thornton**"). I am one of the joint official liquidators ("**JOLs**") of Charitable DAF HoldCo, Ltd (In Official Liquidation) (the "**Company**"), alongside Sandipan Bhowmik also of Grant Thornton. Mr Bhowmik and I were appointed as JOLs of the Company by an order of this Honourable Court dated 6 May 2025 in Cause No. 116 of 2025 (JAJ) (the "**Appointment Order**").

2    I am duly authorised by my fellow JOL, Sandipan Bhowmik, to make this affidavit on the JOLs' behalf in support of the JOLs' summons dated 15 July 2025 (the "**Application**"). The Application seeks orders for injunctive relief and ancillary disclosure orders against various of the Defendants to the Statement of Claim filed by the JOLs for and on behalf of the Company in these proceedings on 15 July 2025 (the "**SOC**"). The Application also seeks orders for leave to serve the foreign Defendants with the Writ and SOC (together with this Application) out of the jurisdiction pursuant to Grand Court Rules, O.11.

3    These proceedings arise out of a series of transactions whereby it appears that Mr Mark Patrick (a director and the sole Management Shareholder of the Company), caused the Company to transfer away its valuable limited partnership interest in Charitable DAF Fund, LP (the "**Fund**") to entities controlled by him. The end result of these transactions was that the Company exchanged an asset worth approximately US$270 million for a membership interest in a Delaware limited liability company which interest was then redeemed for the sum of c. US$1.6 million. These transactions have severely prejudiced the Company and its ultimate beneficial owners which are four large charitable organisations registered in the US.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    2

**FSD2025-0116** **2025-08-19**

**CONFIDENTIAL** **TDIT004968**

On 14 July 2025, in Cause No. 116 of 2025 (JAJ) (the "**Liquidation Proceedings**"), this Honourable Court made an order granting sanction, pursuant to s.110(2) of the Companies Act (2025 Revision) and Companies Winding Up Rules (2023 Consolidation) (the "**CWR**") O.11, r.1(1)(a), for the JOLs to, until further order, commence and pursue these legal proceedings in the name and on behalf of the Company advancing claims in substantially the form set out in the SOC.

4       The Writ and SOC is being filed at the same time as this Application.

5       There is now produced and shown to me a paginated exhibit marked "**MM-1**". This contains true copies of certain documents to which I refer in this affidavit. Where I refer to a page in this affidavit, I am referring to a page in "**MM-1**".

6       In providing or commenting on any legal advice the JOLs have received at any time since their appointment, the JOLs do not intend to waive privilege in any general sense and are providing this information solely to assist the Court in understanding the context for the JOLs' claims in the SOC.

**THE COMPANY'S STAKEHOLDERS AND NATURE OF THE COMPANY**

The Company's Shareholders

7       The Company was incorporated in the Cayman Islands on 7 November 2011 (a copy of its certificate of incorporation is at page 1432 of MM-1).  The Company's share capital is divided into Participating Shares and Management Shares.

8       The Company's Memorandum and Articles provided that Management Shareholders had the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company, but no right to participate in the profits or assets of the Company (Art 11), whereas the Participating Shareholders had no right to vote at Company meetings, but did have rights

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)       3

**CONFIDENTIAL** **TDIT004969**

in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles (Art 12). (pages 11 to 12 of MM-1)

9        At the date of this affidavit, the Company has one Management Shareholder and five registered Participating Shareholders.

10       The Management Shares in the Company (being 100 in total) are held entirely by Mr Mark Patrick who is also a director of the Company while the second director is Mr Paul Murphy (the "**Directors**").   Messrs Patrick and Murphy are two of the defendants in the Proposed Proceedings.

11       The Participating Shareholders are:

11.1    Highland Kansas City Foundation, Inc. (the "**Highland Kansas Foundation**"), which was issued 100 shares in the Company on 30 November 2011;

11.2    Highland Dallas Foundation, Inc. (the "**Highland Dallas Foundation**"), which was issued 100 shares on 30 November 2011.  For completeness, I note that since June 2004, Highland Dallas Foundation has been renamed as NexPoint Philanthropies Dallas Inc;

11.3    Highland Santa Barbara Foundation, Inc. (the "**Highland Santa Barbara Foundation**"), which was issued 100 shares in the Company on 30 November 2011;

11.4    The Community Foundation of North Texas ("**CFNT**") for the Highland Capital Management, L.P. Charitable Fund at CFNT (the "**HCMLP**"), which was issued 5 Participating Shares on 13 August 2015; and

11.5    DFW Charitable Foundation ("**DFW**"), an entity controlled by Mr Patrick, which was issued 318 shares in the Company on 7 February 2025 (the "**DFW Share Issuance**"). The validity of this allotment is, however, challenged by the JOLs in these proceedings (see paragraphs 118 to 119 of the SOC).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     4

CONFIDENTIAL                                                      TDIT004970

12      The Company has brought this Application on an *inter partes* basis affording what the JOLs consider to be a reasonable period of time for the relevant Defendants to file and serve evidence in response and make submissions at the hearing of the Application (which the JOLs are presently seeking to be listed on a date in the week commencing Monday, 4 August 2025). The JOLs intend to serve this Application and my affidavit on all Defendants on the same day that it is filed.  In the case of the foreign Defendants, should they refuse to voluntarily accept service, this will be subject to the JOLs obtaining an order granting leave to serve them out of the jurisdiction (see paragraphs 98 to 102 below).

The Charitable Structure

*Structure and Control*

13      Four charities held the ultimate economic interest in the Company prior to the DFW Share Issuance and held Participating Shares either directly or indirectly.

14      Since their appointment, the JOLs have sought, as best they can, to obtain a fulsome understanding of the way the Company operated historically and to that end have held discussions with three of the four charities that (indirectly) held the majority of the Participating Shares in the Company prior to the DFW Share Issuance (32.787% each) namely:

14.1    *The Dallas Foundation* (which controls Highland Dallas Foundation): a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets.

14.2    *Greater Kansas City Community Foundation* (which controls Highland Kansas Foundation): a charitable entity established in Kansas in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds.

14.3 *Santa Barbara Foundation* (which controls Highland Santa Barbara Foundation): a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

15 I will refer to the Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation collectively as the "**Charities**".

16 The fourth charity, CFNT is a charity established in 1981 which manages assets totaling $513 million and donated $38.9 million to local non-profits in 2023. CFNT holds its Participating Shares in the Company directly (i.e., without interposing a supporting organisation). The JOLs have not yet seen any organisational documents with respect to CFNT, such that they have been unable to take advice on its structure and how it fulfils its charitable purposes. CFNT held only 1.639% of the Participating Shares prior to the DFW Share Issuance.

17 Each of the Charities held their interests in the Company indirectly through Highland Kansas Foundation, the Highland Dallas Foundation and the Highland Santa Barbara Foundation respectively (i.e. the Dallas Foundation held their interest through the Participating Shares held by Highland Dallas Foundation etc) (together, the "**Supporting Organisations**").

18 From communications with the Charities[1] and the JOLs' advisors, the JOLs understand that the relationship between the Charities and each Supporting Organisation operated in a substantively similar manner. Specifically:

18.1 The Supporting Organisations were incorporated in Delaware by Mr James Dondero on or about 22 November 2011. Copies of the constitutional documents of the Supporting Organisations, namely: (i) the certificates of incorporation; (ii) by-laws (the "**Bylaws**") are exhibited at pages 38 to 95 of MM-1.

---

[1] Discussions with the Dallas Foundation through Julie Diaz (President and CEO) and Torrey Littleton (Vice President of Finance). Discussions with the Greater Kansas City Community Foundation through Debbie Wilkerson (President and CEO) and Julie Barry (Vice President of Finance). Discussions with the Santa Barbara Foundation through Jackie Carrera (President and CEO) and Janet Mocker (Senior Director of Finance)

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948) 6

**CONFIDENTIAL** **TDIT004972**

18.2    The manner in which an individual can establish a Supporting Organisation in order to assist the Charities is explained in a document titled "*Procedures for Establishment and Operation of Funds and Supporting Organizations*" provided to the JOLs by the Greater Kansas City Community Foundation.  A copy of this document is exhibited at pages 96 to 122 of MM-1.

18.3    Each of the Supporting Organisations is classified as a so-called Type I supporting organisation of its respective Charity, which means that it is operated, supervised and controlled by that Charity.[2] Copies of the Internal Revenue Service (the "**IRS**") correspondence dated 19 January 2013, 12 February 2013 and 21 March 2013 confirming that the Supporting Organisations are exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "**Code**") and determining that their classification as Type I Supporting Organisations are exhibited at pages 123 to 129 of MM-1.

18.4    The Supporting Organisations are "*organised and operated exclusively to support and benefit*" the relevant Charity.

18.5    The relationship between each Supporting Organisations and its respective Charity is further governed by either, in the case of the Highland Kansas City Foundation, an agreement recording the legal relationship between the parties, dated 30 November 2011 (the "**Legal Relationship Agreement**"), or, in the case of the Highland Dallas Foundation and the Highland Santa Barbara Foundation, a Supporting Organization Operating Agreement each dated 30 November 2011 (each an "**Operating Agreement**") which provide, among other things:

---

[2] Supporting organisations are either Type I, Type II or Type III.  Type I supporting organisations must be controlled by their supported organisations, typically by giving the supported organisation(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    7

**CONFIDENTIAL**                                                                                    **TDIT004973**

(a)   the Charity will provide services to the Supporting Organisation, including grant administration and other services necessary to operate the Supporting Organizations; and

(b)   in consideration for the services provided by the Charity to the Supporting Organisation, the Supporting Organisation shall pay an administrative fee to the Charity (most of which are based on a percentage of the market value of the assets held by the relevant Supporting Organisation).

Copies of the Legal Relationship Agreement and Operating Agreements are exhibited at pages 130 to 147 of MM-1.

18.6   The Bylaws provide that (amongst other things):

(a)   There are two classes of members of the Supporting Organisations with one member in each such class (section 2.1):

(i)   the institutional member (the "**Institutional Member**") which shall be the Charity; and

(ii)   the individual member (the "**Individual Member**") which shall be Mr Dondero or an individual designated as the Individual Member in the Bylaws.

(b)   In terms of voting on a matter submitted to a vote of the members (section 2.2):

(i)   the Institutional Member is entitled to two votes; and

(ii)   the Individual Member is entitled to one vote.

(c)   Institutional membership is not transferable or assignable (section 2.3).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   8

**FSD2025-0116**                              **Page 16 of 1530**                              **2025-08-19**

(d)     Individual membership is transferable or assignable only upon approval of the Institutional Member (section 2.3).

(e)     Both the Institutional Member and the Individual Member must be present in person or represented proxy to constitute a quorum at all meetings of members (section 2.9).

(f)     There shall be three directors of the board of the Supporting Organisation. Two directors shall be elected annually by the Institutional Member and one director shall be elected annually by the Individual Member (section 3.2).

19      Given that two of the three members of the board of the Supporting Organisations are appointed by the Charity (as the Institutional Member), each respective Charity controls each corresponding Supporting Organisations.

20      Specifically, as it relates to each of the Supporting Organisations, the boards of directors are as follows:

20.1    Highland Kansas Foundation:

(a)     Mr Dondero;

(b)     Brenda Chumley of the Greater Kansas City Community Foundation;

(c)     Debbie Wilkerson of the Greater Kansas City Community Foundation.

20.2    Highland Dallas Foundation:

(a)     Mr Dondero;

(b)     Matthew Randazzo of the Dallas Foundation; and

(c)     Julie Diaz of the Dallas Foundation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     9

**FSD2025-0116**                                                                              **2025-08-19**

**CONFIDENTIAL**                                                                              **TDIT004975**

13

20.3    Highland Santa Barbara Foundation:

(a)     Mr Dondero;

(b)     Jacqueline M. Carrera of the Santa Barbara Foundation; and

(c)     Arnold Brier of the Santa Barbara Foundation.

21     Informed by the above considerations, the JOLs now understand that the relevant Charity (and not Mr Dondero in the present context) controls the respective Supporting Organisation through its ability to control the Supporting Organisations' board of directors, in a similar manner to a parent-subsidiary relationship in an ordinary corporate group structure.

22     The JOLs understand from their advisors that:

22.1    The Supporting Organisations support the Charities by way of making grants to them from time to time from any dividends received from the Company;

22.2    However, the Supporting Organisations have no ability to pay dividends to their members or payments to their directors (save reasonable fees for services) and can only make grants to the relevant Charity in furtherance of their charitable purposes;

22.3    The charity/supporting organisation structure is a very typical structure in the US to enable charitable donations to be made in a tax efficient manner; and

22.4    When a charity/its supporting organisation wishes to invest in a hedge fund or private equity fund, it will typically do so through an offshore corporate blocker to avoid becoming liable for "unrelated business taxable income" ("**UBTI**").

*The Company's Interest in the Fund*

23     As outlined in further detail at paragraphs 67.5 to 67.6 below, the Company was incorporated as a blocker for US tax purposes between the Supporting Organisations (underpinned by the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    10

**CONFIDENTIAL**        **TDIT004976**

14

Charities) and their interests in the Charitable DAF Fund, LP (the "**Fund**"), a Cayman Islands exempted limited partnership, where substantial investment assets were held. In this role the Company was the Limited Partner in the Fund, and held 99% of the economic interest in the Fund ("**the Partnership Interest**").

24   The Fund is governed by its second amended and restated limited partnership agreement dated 11 March 2024 (the "**LPA**").  Prior to the Relevant Transactions (defined below), the Company was the sole limited partner in the Fund and CDH GP, Ltd., a Cayman Islands entity owned by Mark Patrick, was the general partner of the fund (the "**General Partner**").

25   The Company as the limited partner, and CFNT and the Charities as the indirect beneficial owners (via the Supporting Organisations in respect of the Charities and via the Company in respect of CFNT), had the sole economic or relevant ownership interest in the Fund:

25.1   the recitals to the LPA state (amongst other things) that "…*the parties hereto desire for the Fund to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein*";

25.2   clause 1.3 provided that "…*the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.*" (Emphasis added);

25.3   clause 1.6(a) of the LPA provides that "*the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*"; and

25.4   "Indirect Charitable Owners" is defined in the LPA as "*the indirect equity owners of the Limited Partners*" i.e., the Company's shareholders or the Charities.

A copy of the LPA is exhibited at pages 148 to 165 of MM-1.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     11

CONFIDENTIAL                                                                                            TDIT004977

26      In that sense, prior to the Relevant Transactions (as defined below) the Supporting Organisations were the ultimate beneficial owners of the Fund and its substantial investment assets.

*The Fund Entities and their business / investment activities*

27      The Fund held its assets through CLO HoldCo, Ltd., a Cayman Islands exempted limited company, which is the Sixth Defendant to these proceedings ("**CLO HoldCo**"). The JOLs have undertaken research into the Fund and its business and investment activities. Whilst the JOLs have thus far only undertaken preliminary research, and do not yet have a full picture, from that initial research we understand that the Fund's known subsidiaries that it holds through CLO HoldCo, the Fund Entities[3], are mostly passive investment vehicles holding a mix of assets, including cash, promissory notes, shares in Nexpoint entities[4], publicly traded stock, real estate, receivables/proceeds from litigation proceedings, receivable amounts from brokers, dividends due, and amounts due from affiliates.

28      To summarise the key findings of the JOLs' initial research into the Fund Entities' assets, in collecting the books and records of the Company, the JOLs have obtained an expense report of CLO HoldCo as of 30 June 2024, which shows that CLO HoldCo held on its balance sheet the following assets (without specifying whether such assets were held directly or through subsidiaries):

28.1    US$89 million in cash held at various banks and financial institutions;

28.2    Shares in a number of publicly listed companies;

---

[3] As listed in Schedule A of the draft Order that accompanies this affidavit. Note that CLO HoldCo is itself listed as one of the Fund Entities for the purposes of the draft Order and the same applies to the use of that term in this affidavit.

[4] Mr Dondero founded and is currently the President of NexPoint, an investment management firm registered with the U.S. Securities and Exchange Commission. The JOLs are aware that Mr Dondero set up the Company and the Fund for philanthropic and charitable causes, and therefore donations to the Fund likely arose from the proceeds from NexPoint's (formerly Highland Capital Management) business activities.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)      12

CONFIDENTIAL TDIT004978

28.3   A non-convertible promissory note issued by TerreStar Corporation with a value of US$83 million;

28.4   Membership Units in a company referred to in the expense report as "NHT Holdco, LLC", for US$2.1 million; and

28.5   A loan due of US$1.3 million from an entity referred to in the expense report as "HCMSI";

28.6   A receivable of US$637,000 due from a broker; and

28.7   A dividend receivable of US$185k.

(pages 166 to 169 of MM-1)

29   In respect of the other corporate entities owned by CLO HoldCo, the JOLs have ascertained as follows:

29.1   Liberty CLO HoldCo, Ltd ("**Liberty HoldCo**") and Atlas IDF, LP ("**Atlas**") hold certain choses of action by way of litigation claims. In this regard, on 8 May 2025, the JOLs received a letter from Stinson LLP, who confirmed that they are a Texas law firm acting for certain defendants to three separate litigation proceedings commenced by Liberty HoldCo and Atlas respectively (pages 170 to 173 of MM-1). Liberty HoldCo is a wholly owned subsidiary of CLO HoldCo and one of the Fund Entities (i.e. a "**Fund Entity**"). The JOLs understand that Atlas is a subsidiary of Rand Advisors, LLC, which is also a Fund Entity. The letter from Stinson LLP explained that:

(a)   Liberty HoldCo is seeking proceeds of approximately US$500,000 from the defendants to litigation pending in the United States District Court for the District of Delaware captioned: "*Liberty CLO HoldCo, Ltd. v. Nancy Dondero, as Trustee of The Dugaboy Investment Trust, Grant James Scott, as Trustee of The SLHC Trust, NexPoint Advisors, L.P., NexPoint Real Estate Advisors IV,*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   13

CONFIDENTIAL                                                                                         TDIT004979

Case 19-34054-sgj11 Doc 4627-5 Filed 05/11/26 Entered 05/11/26 17:05:52 Desc
Exhibit 211 - Part 01 Page 14 of 759

*L.P., NexPoint Advisors GP, LLC, and NexPoint Real Estate Advisors GP, LLC, Case 1:25-cv-00236-UNA.*"

(b) Liberty HoldCo is seeking payment of US$1,334,980.74 allegedly owed to it by Highland Capital Management Services, Inc. in litigation pending in the United States District Court for the Northern District of Texas, Dallas Division captioned: "*Liberty CLO HoldCo, LTD., v. Highland Capital Management Services, Inc., Civil Action No. 3:25-CV-477-L*"

(c) Atlas is seeking payment of US$13,905,223.93 in allegedly unpaid principal and interest on two demand promissory notes against defendant NexPoint Real Estate Partners LLC, as well on an alleged guarantee given by defendant Dugaboy Investment Trust, a trust for which Mr Patrick was previously counsel, in litigation pending in the Business Court of Texas, First Division, captioned: "*IDF, LP, v. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC and Nancy Dondero, as Trustee of the Dugaboy Investment Trust*".

29.2 The JOLs have discovered from various public filings that:

(a) Liberty HoldCo owns –

(i) As of 30 April 2025, 2,549,002 shares in NexPoint Capital Inc, representing 29.5% of the issued stock, which according to SEC disclosures is valued at USD12.9 million (page 185 of MM-1);

(ii) As of 31 March 2025, 500,120 class Z shares in NexPoint Real Estate Strategies Fund, representing 33.63% of the issued stock class (pages 301 of MM-1). The JOLs have not identified a value for this stock.

(iii) 100% of the Class I membership interest in Nexpoint Polo Glen Holdings LLC. A put option over this interest is valued at approximately

**CONFIDENTIAL** **TDIT004980**

FSD2025-0116                         **Page 22 of 1530**                         2025-08-19

US$693,000 according to filings in litigation in the United States District Court for the State of Delaware dated 28 February 2025 (page 335 of MM-1).

(b)     CDHC Royse City Land, LLC, a Fund Entity, owns eight properties in Texas.  The eight properties comprise of vacant agricultural and development plots with a total area of approximately 31 million square feet. The plots have an appraised value of US$11.4 million according to the county tax assessors of Rockwall, Collin and Hunt counties. The Royse City properties are subject to a deed of trust registered on 18 September 2018 which includes an assignment of rent, security agreement, and fixture filing in favour of Nexbank SSB. (pages 346 to 356 of MM-1)

(c)     CDHC Assets, LLC, a Fund Entity, owns three properties in Texas.  Two of the properties are in Kaufman County. The two properties consist of vacant agricultural land plots with a combined area of 1.2 million square feet and a combined market value of US$657,773 according to tax assessor records. The properties are subject to a deed of trust registered on 18 September 2018 which includes an assignment of rent, security agreement, and fixture filing in favour of Nexbank SSB. (pages 357 to 368 of MM-1)

(d)     CDHC Fort Worth Land, LLC, a Fund Entity, owns five properties in Texas.  The five properties comprise vacant residential plots with an area of 4,996 square feet, each worth US$125,000 (US$625,000 total) according to appraised values from the Tarrant County tax assessor. They are subject to a deed of trust registered on 18 September 2018 which includes an assignment of rent, security agreement, and fixture filing in favour of Nexbank SSB. (pages 369 to 378 of MM-1)

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     15

FSD2025-0116                                                                 2025-08-19

**CONFIDENTIAL**                                                             TDIT004981

19

(e)     CDHC Stewart Creek, LLC, a Fund Entity, owns one property in Texas.  The property is a vacant land plot with an area of approximately 2 million square feet. It has a market value of US$796,834 according to tax assessor records. The JOLs' searches of county records showed no mortgage or security registered against this plot of land (page 379 of MM-1).

(f)     Rand Advisors, LLC ("**Rand Advisors**"), a Fund Entity, is an investment management firm that was registered in Delaware on 27 August 2013. The company is registered with the SEC as an advisor and is required to file disclosures annually through a Form ADV. The disclosures show that it was founded by an individual named John Honis. Mr Honis was the chief commercial officer of the company, though he was replaced by Mr Patrick according to a March 2023 public filing (pages 406, 412 and 433 of MM-1). Rand Advisors operates a shared services agreement with Skyview Group, Mr Patrick's employer.

(g)     Rand Advisors is 100% owned by Charitable DAF Holdings Corp. (which is a Fund Entity that the JOLs understand is an indirect wholly owned subsidiary of the Fund) according to its Form ADV filed in March 2025 (page 412 of MM-1). The public filings also show that it manages assets worth US$153.6 million (pages 386, 387, 402 and 412 of MM-1). The assets are managed on behalf of three clients, namely Atlas (which the JOLs understand to be a subsidiary of Rand Advisors), Rand PE Fund 1 LP, and Rand Series 1 Fund LP.

(h)     The JOLs have been unable to obtain any details of the specific assets managed by Rand Advisors on behalf of the three entities listed above. However, Rand Advisors' investment strategies were described in its public disclosures as follows:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     16

CONFIDENTIAL                                                                    TDIT004982

20

(i)     Investing in senior secured bank loans, collateralised loan obligations and collateralised debt obligations. This strategy is utilised for Rand Series 1 Fund LP;

(ii)     Investing in small to medium sized companies which are either involved in or are the target of acquisition attempts, and in companies which are facing bankruptcy or are attempting spin offs, liquidations, workouts or reorganizations. This strategy is utilised for Rand PE Fund 1 LP; and

(iii)     Investing in bank loans, currency and securities including long and short positions on public equities, fixed income, derivatives and collateralised loan obligations. This strategy is utilised for Atlas.  (pages 417 to 418 of MM-1).

## BACKGROUND TO THE COMPANY'S CLAIMS IN THESE PROCEEDINGS

30     The JOLs' investigations to date (including a review of the Company's documents that have been provided by third parties) have identified very significant areas of concern. In very short summary, and as an overarching comment, it appears that the Directors entered into several transactions that were designed to, and did:

30.1     remove the Company's sole asset (being the Partnership Interest) to entities within the control of one of the Company's directors, Mr Patrick, for no meaningful consideration, or at least at a vast undervalue; and

30.2     enrich Mr Patrick through the charging of excessive director's fees and discretionary bonuses.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   17

**CONFIDENTIAL**                                        **TDIT004983**

31      Outlined below is a brief *dramatis personae* with respect to the various Defendants to these proceedings:

31.1      **D1 – Mr Mark Eric Patrick**. Mr Patrick is a U.S. attorney and was employed as tax counsel by Highland Capital Management, L.P. ("**Highland**"), an investment company founded by Mr Dondero, from 2008 to 2021 and as tax counsel by Highland Consulting Group, Inc. d/b/a Skyview Group from March 2021 to October 2024. He was instrumental in the creation of the Fund in 2011; in particular, he advised on the tax structure of using an offshore 'blocker' company.

31.2      Mr Patrick is one of two directors of the Company, having been appointed as a director on 25 March 2021. In that capacity, he was responsible for the supervision of the day-to-day operations of the Company. As director, Mr Patrick also owed, and continues to owe, fiduciary duties to the Company. Mr Patrick was also:

     (a)      the holder of all of the Management Shares in the Company;

     (b)      the manager of CDMCFAD, LLC ("**CDM**") (see paragraph 31.4 below), to which entity the Directors assigned the Partnership Interest;

     (c)      the sole member of DFW, which is now the sole member of CDM;

     (d)      the director of CDH GP, Ltd., the General Partner; and

     (e)      a director of CLO HoldCo, the Cayman Islands entity through which the Fund holds its assets.

31.3      **D2 – Mr Paul Murphy**. Mr Murphy was the other director of the Company, having been appointed so on 22 April 2021. Mr Murphy is also a director of CLO HoldCo.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     18

**CONFIDENTIAL**          **TDIT004984**

22

**FSD2025-0116**                    **Page 26 of 1530**                    **2025-08-19**

31.4   **D3 – CDM**. A limited liability company incorporated in Delaware on 12 December 2024. Mr Patrick is the Manager of CDM and DFW is has been the sole member of CDM since 27 March 2025.

31.5   **D4 – DFW**. A non-profit non-stock corporation incorporated in Delaware on 9 December 2024 by Mr Douglas Mancino, a partner a Seyfarth Shaw LLP ("**Seyfarth**"), a U.S. law firm apparently engaged by the Fund.  It is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes. Its certificate of incorporation is at pages 435 to 437 of MM-1.  The JOLs understand that DFW is:

(a)   now the holder of the majority of the Participating Shares (51.04%) in the Company pursuant to the DFW Share Issuance on 7 February 2025 (see further below); and

(b)   controlled by Mr Patrick as its sole member.

31.6   **D5 – the General Partner**. A Cayman Islands exempted limited company incorporated on 27 February 2024.  It replaced Charitable DAF GP, LLC (the "**Original GP**") as the Fund's current general partner on 7 March 2024, after Mr Patrick sought advice from Walkers on forming a new entity to replace the Original GP. On 5 February 2024, Shields Legal asked Mr Patrick whether that entity should be a Cayman LLC or exempted company, to which he responded (page 438 of MM-1): *"Doesn't matter to me. Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection."*

31.7   **D6 – CLO HoldCo**. A Cayman Islands exempted limited company.  CLO HoldCo is the Fund's only direct subsidiary; the Fund held all of CLO HoldCo's issued shares.  Copies of structure charts showing the Fund structure both before and after the Relevant Transactions (defined below) are at pages 439 to 440 of MM-1.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   19

**FSD2025-0116**                                                        **2025-08-19**

**CONFIDENTIAL**                                                    **TDIT004985**

## THE RELEVANT TRANSACTIONS

32      The series of transactions which form the basis of the Company's claims in these proceedings (the "**Relevant Transactions**"), involve three apparent sets of transactions:

32.1    the transactions pursuant to which the Partnership Interest was transferred to CDM on 18 December 2024, in exchange for the sole membership of CDM (the "**LP/LLC Exchange**");

32.2    the purported DFW Share Issuance to DFW on 7 February 2025; and

32.3    the redemption of the Company's membership in CDM on 27 March 2025 (the "**Redemption**").

33      Each of the Relevant Transactions was undertaken without the knowledge or consent of the Supporting Organisations.  Each of the Relevant Transactions was at or on the instigation, instruction and involvement of Mr Patrick and Mr Murphy.

34      The substantive effect of the Relevant Transactions was that:

34.1    the Company:

(a)      was divested of its Partnership Interest in the Fund, which had a NAV of US$269.1m[5], for around US$1.6m.

(b)      made a distribution to its participating shareholders (excluding its new shareholder, DFW) in the amount of c.US$1.6m;

34.2    the Supporting Organisations and CFNT:

(a)      were entirely divested of their indirect interest in the Fund; and

---

[5] According to a valuation report dated 30 September 2024

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     20

24

**FSD2025-0116**                    **Page 28 of 1530**                    **2025-08-19**

(b)   had their shareholding, which comprised 100% of the Participating Shares in the Company, and which represented the entire economic interest in it, to less than 50%.

35   The Relevant Transactions are described in more detail below.

36   In addition to the Relevant Transactions, Mr Patrick also procured that very significant increases to his remuneration were approved by the Company (the "**Remuneration Transactions**"), which increases the JOLs consider to have been made in breach of fiduciary duty.

The No Confidence Letter and advice sought in consequence

37   On 11 November 2024, as a result of concerns about excessive remuneration and lack of information about the manner in which the Fund was being managed, Holland and Knight, U.S. attorneys for the Supporting Organisations, wrote  a letter to Mr Murphy on 11 November 2024 advising that the Supporting Organisations no longer had confidence in the governance of the Company and/or the Fund and considered that a reorganisation of the governance structures was required to protect the charitable efforts of the Supporting Organisations (the "**No Confidence Letter**") (pages 441 to 442 of MM-1).

38   Mr Patrick subsequently sought advice from Walkers, then Cayman attorneys to the Company, as to whether the Company could issue further Participating Shares to a new non-profit organisation to dilute the Supporting Organisations and insert a new member able to oppose a potential winding-up petition brought by the Supporting Organisations on just and equitable grounds.  On 26 November 2024, Mr Murphy wrote that:

"*Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     21

**FSD2025-0116**                    **2025-08-19**

**CONFIDENTIAL**                    **TDIT004987**

FSD2025-0116                                                                                           2025-08-19

*by diluting them therefore the company should be wound up or an order made for change of management /revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground…"* (page 443 of MM-1)

39   On 27 November 2024, Walkers responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition will be taken into consideration and would likely help any efforts Mr Patrick might make to resist such winding up (page 448 of MM-1).

<u>The LP/LLC Exchange</u>

40   On 18 December 2024:

40.1   The Directors resolved to approve the transfer of the entirety of the Partnership Interest to CDM, in exchange for the contribution by the sole member of CDM (i.e., Mr Patrick) of 100% of the membership interest in CDM (the "**18 December Resolution**").  With respect to the LP/LLC Exchange, the 18 December Resolution states that the Directors justified the transactions, purportedly relying on US tax advice (amongst other things) (the "**US Tax Advice**"), as follows:

"… *would help insulate the DAF from exposure to [Dondero] and his entities who may be at risk of causing the [IRS] to revoke the tax-exempt status of one or more of the Participating Shareholders/supporting organizations which could imperil the assets of the Company*" (see section 2.1(f)(i) of the 18 December Resolution);

 *"The IRS would look favorably upon any and all attempts for DAF to maintain its influence from what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement"* (see section 2.1(f)(iii) of the 18 December Resolution); and

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    22

FSD2025-0116                                                                                           2025-08-19

**CONFIDENTIAL**                                                                                TDIT004988

26

**FSD2025-0116**                    **Page 30 of 1530**                    **2025-08-19**

> "…*as permitted under the LLC Act, the terms of the LLC Agreement [with respect to CDM] eliminate the fiduciary duties of the manager of the Transferee*" (see section 2.1((g)(v)) of the 18 December Resolution).

40.2   By way of a Deed of Assignment and Assumption dated 18 December 2024 (the "**Deed**") entered into between the Company, CDM and the General Partner, the Company then assigned the Partnership Interest (comprising 99% of the economic interest in the Fund) to CDM in exchange for the transfer to the Company of 100% of the membership interest in CDM (the "**CDM Assignment**") and the "**CDM Membership**").  The Deed was executed by Mr Patrick on behalf of each of (i) the Company in his capacity as a director; (ii) CDM, in his capacity as manager; and (iii) the General Partner, in his capacity as a director.

40.3   A copy of the December Resolution, the CDM Assignment, and the LLC Agreement are exhibited at pages 454 to 494 of MM-1.

41   The effect of the above transactions was that:

41.1   CDM was inserted into the corporate structure below and as a subsidiary of the Company and would hold the entirety of the Partnership Interest in the Fund previously held by the Company; and

41.2   The Company would hold the entirety of the CDM Membership Interest in CDM, such that its sole asset, formerly its limited partner interest in the Fund, was exchanged for that membership interest in CDM, a Delaware LLC. As is set out in the SOC, this set of transactions was not, on its own, an economically neutral one.

The DFW Share Issuance

42   In November 2024, without telling the Supporting Organisations or the Charities, the Directors began seeking advice from Walkers on whether the Company could issue new Participating

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    23

**FSD2025-0116**                                                                 **2025-08-19**

**CONFIDENTIAL**
                                                        **TDIT004989**

27

Shares that would have the effect of diluting the existing Participating Shareholders, "*in light of a possible just and equitable winding up petition*" being filed by one of the Supporting Organisations, as is recorded at paragraph 1 of Walkers' draft advice dated "*[xx] February 2025*" (page 495 of MM-1). A copy of the email chain showing the Directors started to seek this advice in November 2024 is at page 448 of MM-1.

43      On 7 February 2025:

43.1    The Directors resolved to issue 318 Participating Shares to DFW (the "**Share Issuance Resolution**"), which resulted in DFW owning 51.04% of the Participating Shares in the Company. In the Share Issuance Resolution, the Directors purported to justify the DFW Share Issuance on the basis that (amongst other things):

(a)     The Supporting Organisations and HCMLP had requested information and made false and misleading claims about the Company and its finances which the Directors believe were directed by Mr Dondero.

(b)     Purportedly relying on the US Tax Advice:

(i)      there was a risk the IRS could revoke the tax-exempt status of the Supporting Organisations and HCMLP which could imperil the charitable status and assets of the Company;

(ii)     increasing the number of participating shareholders would mitigate the undue influence and private inurement of Mr Dondero; and

(iii)    the IRS would look favourably upon attempts by the Fund to maintain its independence from his (i.e., Mr Dondero's) attempts to use the Fund for his private benefit.

(c)     The DFW Share Issuance would protect the Company and the Participating Shareholders.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)      24

**CONFIDENTIAL** **TDIT004990**

**FSD2025-0116** **2025-08-19**

43.2    The Company issued 318 Participating Shares and allotted them to DFW.

43.3    A copy of the Share Issuance Resolution is exhibited at pages 500 to 524 of MM-1.

44    The effect of the above transactions was that DFW now holds 51.04% of the Participating Shares in the Company and the Supporting Organisations and CFNT have been diluted from an aggregate shareholding of 100% to 49%.

45    The JOLs understand that the US Tax Advice referred to by the Directors is an email from Carington, Coleman, Sloman & Blumenthal, L.L.P. ("**Carrington Coleman**") dated 18 December 2024 (the "**Carrington Coleman Email**").  A copy of this email is exhibited at pages 525 to 526 of MM-1.

The Admission and Redemption

46    On 27 March 2025:

46.1    The Directors caused the Company to enter into a letter agreement with CDM (the "**Letter Agreement**"), pursuant to which:

(a)    CDM redeemed the membership interest that the Company held in it.

(b)    CDM issued a new membership interest to DFW, such that DFW became CDM's sole member.

(c)    The Company assigned to CDM various contracts and agreements to which the Company was a party, listed in Schedule A to the Letter Agreement.

46.2    Mr Patrick caused the following documents to be executed (the "**Admission and Redemption Documents**"):

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    25

**FSD2025-0116** **2025-08-19**

**CONFIDENTIAL** **TDIT004991**

(a) Admission and Amendment No.1 Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192;

(b) Redemption and Amendment No.2 Agreement under which CDM redeemed the Company's CDM Membership for the same sum of US$1,637,192 (the "**Redemption Amount**"); and

(c) A written consent of the manager of CDM in connection with the matters referred to at paragraphs 46.1(a) and 46.1(b) above (the "**Manager Consent**").

46.3 Copies of the Letter Agreement, the Manager Consent and the Admissions and Redemption Documents (which are Exhibits A and B of the Manager Consent) are exhibited at pages 527 to 688 of MM-1.

47 On 2 April 2025, the Directors of the Company resolved to approve the:

47.1 redemption of the Company's CDM Membership for the Redemption Amount; and

47.2 shareholder distribution of US$1,612,192.01 to the Community Foundation of North Texas and the Supporting Organisations.

Copies of the resolutions are exhibited at pages 689 to 691 of MM-1.

48 The effect of the Redemption was that the Company's CDM Membership were in effect purchased by or transferred to DFW for the Redemption Amount.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     26

30

The Remuneration Transactions

49 The Company's expenses have increased materially following Mr Patrick's appointment as a director on 25 March 2021. Specifically (and amongst other things):

49.1 The Directors' fees increased from around US$40,000 in 2022 to approximately US$600,000 in 2023 (page 694 of MM-1).

49.2 On 13 September 2024, the Directors resolved to increase Mr Patrick's salary to US$850,000 per annum and approve a long-term incentive ("**LTI**") of 7.5% of annualised net fund returns in excess of 10% (capped at 25% annualised return). A copy of this resolution is exhibited at pages 695 to 696 of MM-1.

49.3 On 1 October 2024:

(a) the Directors resolved that Mr Patrick was to receive an LTI payment of US$975,000 and an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary. A copy of this resolution is exhibited at pages 697 to 704 of MM-1.

(b) Mr Patrick signed an employment agreement for his own position at the Company for the period from 24 March 2021 which provided, among other things, for a base salary of US$850,000 and an LTI payment of US$4,759,000. A copy of this agreement is exhibited at pages 705 to 722 of MM-1.

50 By way of contrast to the remuneration that Mr Patrick resolved that he should be awarded, his predecessor's salary (Grant Scott) during his tenure in the same position was approximately US$60,000 per annum.

51 As regards expenses, expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   27

**THE JOLS' CONCERNS**

52    The JOLs' overarching concern is that the Relevant Transactions and the Remuneration Transactions were pursued by the Directors for the sole or primary reason of removing assets from the Company to benefit entities controlled by Mr Patrick or for his benefit personally, to the detriment of the Charities.

Impacts on Charities

53    The JOLs continue to investigate the impact that the Relevant Transactions have on the Charities. The Relevant Transactions have reduced the ability the Supporting Organisations and the Charities to meet their charitable objectives by: (i) stripping them of some of their assets and creating a hole in their balance sheets; (ii) reducing the Charities' ability to pay their overheads because, historically, these have been (in part) financed by the Supporting Organisations, where the fees charged by the Charities are typically based on a percentage of the market value of assets controlled by the Supporting Organisations; and (iii) the Remuneration Transactions have reduced the Fund's ability to provide financial support to the Supporting Organisations and, by extension, the Charities.

*A Hole in the Charities' Balance Sheets*

54    Although the JOLs' investigations continue, they understand that, historically, the Supporting Organisations have held the Participating Shares on their own balance sheets and the Charities have held them on their consolidated balance sheets.

55    For example, the Santa Barbara Foundation:

55.1    Its publicly available, independently audited financial statements for the year ended 31 December 2023 (a copy of which are exhibited at pages 726 to 750 of MM-1) disclose the following:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    28

**CONFIDENTIAL**                                                      **TDIT004994**

**FSD2025-0116** | **Page 36 of 1530** | **2025-08-19**

(a) page 7 explains that the Highland Santa Barbara Foundation was consolidated within the Santa Barbara Foundation's financial statements because it is "*effectively under SBF's control*".

(b) page 3 shows that the Santa Barbara Foundation held assets of US$802 million as at 31 December 2023, of which US$611 million were investments;

(c) page 15 shows that US$78,284,712 million of these investments were held in the form of "Fixed income (illiquid) investments;

(d) page 16 explains that this includes "*100 participation shares in a non-controlling partnership interest composed primarily of collateralized loan obligations. 100% of this investment is held by a supporting organization, HSBF, at fair value.*"; and

(e) page 19 explains that the fair value of this investment is "*based upon annual independent third-party valuations using the same techniques and variables as in prior years.*"

55.2 A ValueScope report obtained from the Highland Santa Barbara Foundation (which valued its 100 Participating Shares as at 31 December 2023) shows that ValueScope valued the Highland Santa Barbara Foundation's (and by extension, the interest of the Santa Barbara Foundation) interest in those shares at US$78,284,712, being exactly the same value recorded in the Santa Barbara Foundation's financial statements referred to above. A copy of the relevant ValueScope report is exhibited at pages 751 to 809 of MM-1.

56 The JOLs understand that neither the Highland Santa Barbara Foundation nor the Santa Barbara Foundation have been able to compile financial statements for the year ended 31 December 2024 because of the lack of a valuation report at that date. However, the JOLs are concerned that, because of the Relevant Transactions (particularly the LP/LLC Exchange) the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948) 29

**CONFIDENTIAL** | **TDIT004995**

33

Santa Barbara Foundation now has a hole in its balance sheet of approximately $78 million, which will threaten or limit its ability to meet its charitable purposes, including because, as noted at paragraph 18.5(b) above and 58 below, the JOLs understand that the fees it is able to charge to the Highland Santa Barbara Foundation are calculated as a percentage of the market value of assets held by the Highland Santa Barbara Foundation.

57    The JOLs are also concerned that the other Supporting Organisations and Charities will also have similar holes in their balance sheet as a result of the Relevant Transactions.

*Ability of the Charities to Pay Their Overheads*

58    The JOLs understand that:

58.1    the Charities provide a range of services to the Supporting Organisations;

58.2    the obligations to provide those services will continue, despite the Relevant Transactions;

58.3    the Supporting Organisations pay a fee to the Charities to pay for these services; and

58.4    the Supporting Organisations' ability to pay those fees has, historically, been made possible in whole or in part because of money provided by the Fund;

58.5    The fees are typically based on a percentage of the market value of assets held by the Supporting Organisations (see for example the Administrative Fee Schedule at Exhibit B of the Greater Kansas City Community Fund and Highland Kansas City Foundation Legal Relationship Agreement at page 132 of MM-1); and

58.6    As a result of the Relevant Transactions, the market value of the assets held by the Supporting Organisations has been reduced significantly, which has a direct impact on the fees charged by the Charities to the Supporting Organisations.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    30

CONFIDENTIAL                                                                           TDIT004996

34

**FSD2025-0116**          **Page 38 of 1530**          **2025-08-19**

59     The JOLs are, therefore, concerned that the Relevant Transactions (particularly the LP/LLC Exchange) will reduce the funds available to the Charities to meet their obligations to the Supporting Organisations.

**THE DEFENDANTS' POSITION**

60     The Relevant Transactions formed the basis for the petition dated 28 April 2025 filed by the Supporting Organisations to bring the voluntary liquidation of the Company under the supervision of the Court (and thereby commence the Liquidation Proceedings).

61     On 24 June 2025, the JOLs' sanction application to engage attorneys was heard by this Honourable Court in the Liquidation Proceedings. DFW, Mr Patrick and Mr Murphy filed evidence ostensibly in opposition to the JOLs' sanction application.[6] However, that evidence (in substance) outlined these parties' positions with respect to the propriety of the Relevant Transactions. As far as the JOLs understand, it is their purported justification for what occurred.

62     Whilst the JOLs' position is that the Application has been brought on an *inter partes* basis with sufficient time for the Defendants to submit evidence and legal submissions setting out their defences to the Company's claims, the JOLs nevertheless consider it would assist the Court to set out the JOLs' understanding of those defences as gleaned from the evidence filed by the Defendants in the Liquidation Proceedings. That provides the context for the next section of this affidavit, where I explain the investigations that the JOLs have undertaken to assess the merits of the Defendants' likely defences.

---

[6] The first affidavit of Paul Murphy dated 4 June 2025 ("**Murphy 1**"); first affidavit of Mark Eric Patrick on behalf of DFW dated 4 June 2025 ("**Patrick 1**"); and first affidavit of Mark Eric Patrick (in his capacity as the management shareholder of the Company) dated 4 June 2025 ("**Patrick 2**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   31

**FSD2025-0116**          **2025-08-19**

**CONFIDENTIAL**          **TDIT004997**

63      At a high level, the JOLs understand that the position advanced by DFW and the Directors for the Relevant Transactions includes the following:

63.1    The Supporting Organisations did not have an economic interest in the Company but, rather, the Company's purpose was to act as a throughput for discretionary, charitable donations to qualifying recipients (which were not necessarily the Supporting Organisations or the Charities) (the "**No Economic Interest Justification**"). Owing to the No Economic Interest Justification, the Supporting Organisations did not lose anything because of the Relevant Transactions.

63.2    The Relevant Transactions were necessary, proper and valid (the "**Dondero Control Justification**"), citing tax advice from Carrington Coleman in its memorandum of advice dated 25 March 2025 (the "**Carrington Coleman Memo**") (see pages 940 to 956 of MM-1), for the following reasons:

(a)    To protect the Company and the Directors from attempts by Mr Dondero and the Supporting Organisations to exert improper or damaging dominion and control over the Company's assets, as this would expose the Company and the Directors to breaches of US tax laws and regulations.

(b)    To protect the Company and the Fund's asset-holding subsidiaries from actions by Mr Dondero and the Supporting Organisations that would expose them to claims by third parties that the Company and the Fund's asset-holding companies were "alter egos" of Mr Dondero such that the Fund's assets could be utilised to satisfy the claims of those third parties against Mr Dondero.

(c)    To prevent Mr Dondero from being able to access the Fund's assets for his own benefit.

63.3    Relatedly, the JOLs understand that in a letter on 20 March 2025 (at a time when the LP/LLC Exchange and DFW Share Issuance had already been effected), Douglas M.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)      32

**CONFIDENTIAL**                                                                                          **TDIT004998**

Mancino of Seyfarth wrote to the IRS regarding Highland Dallas Foundation, Inc, as part of a Form 13909, Tax-Exempt Organization Complaint (Referral) submission, and that an updated letter dated 1 May 2025 was sent to the IRS pursuant to the same complaint (collectively, the "**IRS Complaint**") (pages 957 to 973 of MM-1).

63.4    The Directors obtained independent valuation reports which they relied on to justify the redemption of the Company's CDM Interest for c.US$1.6million (the "**Valuation Justification**").  Specifically:

(a)    Valuation advice from FTI, being its report dated 27 March 2025 (the "**FTI Report**") (see pages 974 to 987 of MM-1). The FTI Report is relied on in, and exhibited to, (amongst other things) the Manager Consent to the Redemption.

(b)    Valuation advice from ValueScope, being its reports dated 7 January 2025 and 26 March 2025 (the "**ValueScope Reports**"). These were similarly relied on in, and exhibited to, (amongst other things) the Manager Consent to the Redemption.

(c)    Copies of these reports are exhibited at pages 810 to 939 of MM-1.

64    With respect to the Remuneration Transactions, the JOLs understand that Mr Patrick seeks to rely on a report dated 26 August 2024 prepared by Mercer (the "**Remuneration Increase Justification**") to support the justification for the increase in his remuneration (which appears to have then been backdated to the date of his commencement as a director of the Company). A copy of the report prepared by Mercer (the "**Mercer Report**") is exhibited at pages 988 to 1007 of MM-1.

## THE JOLS' INVESTIGATIONS

65    Since the date of our appointment, the JOLs have been investigating the affairs of the Company, which includes the investigation of each of the purported justifications offered by

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    33

**FSD2025-0116**                                       **2025-08-19**

DFW and the Directors in relation to the Relevant Transactions and the Remuneration Transactions. These are addressed in the paragraphs below.

The No Economic Interest Justification

66      With respect to the No Economic Interest Justification, the suggestion appears to be that the Company is different from every other Cayman Islands exempted limited company because its registered shareholders do not have an economic interest or a true or relevant economic interest.

67      The JOLs have recently discovered (amongst other things) a memorandum of advice prepared by Haynes and Boone, LLP (the Company's then US counsel) dated 9 July 2021 (the "**H&B Memorandum**") which explains the reasons for the corporate structure of the Company and the Fund.  In particular, the H&B Memorandum states that (amongst other things):

67.1    A donor advised fund ("**DAF**") is a separately managed charitable investment account established by a donor within a public charity (a section 501(c)(3) entity). The charity is generally referred to as a 'sponsor'.

67.2    The donor typically maintains certain advisory privileges over the DAF funds or account but the DAF account is fully and completely owned and controlled by the sponsor. Because a contribution to a DAF account is, for tax purposes, the equivalent of a contribution to a public charity and the donor gets a tax benefit for it, the contribution must be permanent and irrevocable.

67.3    A sponsor may create a subsidiary as a "supporting organisation" which is also a section 501(c)(3) charity which is treated financially as part of a consolidated unit with the sponsor.  The JOLs understand from their advisors that a supporting organisation structure could be used as an alternative to a DAF.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)      34

**FSD2025-0116**                                                        **2025-08-19**

**CONFIDENTIAL**                                            **TDIT005000**

67.4 For example, The Dallas Foundation which is one of the Charities formed, owns and controls the Highland Dallas Foundation which is one of the Supporting Organisations in this structure. Donations were made to the Highland Dallas Foundation as both the sponsor and supporting organisation. The Highland Dallas Foundation, from time to time then makes distributions to The Dallas Foundation which in turn makes distributions to other charities.

67.5 Sponsors and supporting organisations are tax-exempt organisations. A tax-exempt organisation is generally exempt from all federal and state income taxes except if it receives income classified as "unrelated business taxable income". Income received by a sponsor or supporting organisation directly from an investment fund or private equity vehicle would attract UBTI. To prevent UBTI from flowing through to a tax-exempt organisation, a sponsor or supporting organisation can utilise a "corporate blocker" which is accomplished by having a corporation interposed between the tax-exempt organisation and the investment fund. Using a structure in this manner is often described as using a "blocker" because the UBTI is blocked out and does not flow through to the tax-exempt investor. Instead, the UBTI is included in the income of, and subject to tax in, the blocker corporation. That is, the reason for interposing the Company between the Supporting Organisations and the Fund was simply for tax reasons.

67.6 In this case, the Company is a corporate blocker for the Fund for the purposes set forth above.

A copy of the H&B Memorandum is exhibited at pages 1008 to 1012 of MM-1.

68 With respect to matters raised in the H&B Memorandum and the Carrington Coleman Memo including (amongst other things) the meaning of supporting organisations and DAFs under the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    35

Code and, specifically, how that applies to the Company, the JOLs understand from their advisors that the position is as follows:

68.1     Under the Code, a DAF must meet each of the three following conditions:

      (a)     It is separately identified by reference to contributions of a donor or donors;

      (b)     A "sponsoring organisation" owns and controls it; and

      (c)     A donor has or reasonably expects to have advisory privileges with respect to the distribution or investment of amounts held in such fund or account by reason of the donor's status as a donor.

68.2     The Company is not itself a tax-exempt entity or a DAF as a matter of US law, despite the use of the term "DAF" in the Company's name. The Company does not meet the statutory requirements of a DAF, in particular:

      (a)     Mr Patrick holds the Management Shares of the Company rather than a sponsoring organisation;

      (b)     There is nothing in the Company's minute book that indicates that the Company is separately identified by reference to its donor; and

      (c)     There is no evidence that Mr Dondero, as the alleged donor, possessed the requisite advisory privileges with respect to distributions from the Company, because the Company may only pay dividends to its Participating Shareholders, leaving no option for anyone, even Mr Dondero, to direct those dividend payments to another charitable organisation.

68.3     Highland Dallas Foundation is a Type I supporting organisation with respect to The Dallas Foundation which means that, among other things, Highland Dallas Foundation must operate exclusively for the benefit of The Dallas Foundation. In other words,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    36

40

Highland Dallas Foundation (and the other Supporting Organisations) may only benefit their supported Charities.

68.4   Unlike Highland Dallas Foundation, the Company is neither a US income tax-exempt entity nor a "supporting organisation" within the meaning of the Code.

68.5   The Participating Shares in the Company are therefore best characterised as an asset of Highland Dallas Foundation Inc in the form of an investment in an offshore private equity structure. This same characterisation applies to the participating shares in the Company owned by the supporting organisations to the Santa Barbara Foundation and the Kansas City Foundation and by CFNT respectively (i.e., these parties have an economic interest in the Company).

69   Having regard to the matters outlined above, the JOLs are currently of the view that:

69.1   It is clear that the Company is a Cayman Islands exempted limited company and there are no special or unique features applicable to it in the current structure;

69.2   As a corollary, it appears that (as is the case in all Cayman Islands exempted limited companies) the registered participating shareholders have the economic interest in the Company;

69.3   The documents available to the JOLs do not support the No Economic Interest Justification and, to the contrary, it appears that the No Economic Interest Justification is flawed;

69.4   The No Economic Interest Justification does not in any event adequately address the question of who holds the economic interest in the Company; and

69.5   Even if it was true that the economic interest were in fact held by someone other than the registered participating shareholders, it is clear that such interest is not held by Mr

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     37

CONFIDENTIAL                                                                 TDIT005003

41

Patrick, and nothing justifies him in effect using his powers and functions to divest the Company of all its assets.

69.6 Ultimately, and in any event, it does not much matter where the economic interest in the Company lies, because it is not the shareholders who are bringing the present proceedings; rather, it is the Company, acting through the JOLs, that is suing the Directors because the Directors have divested the Company of its only asset for a significant undervalue.

The Dondero Control Justification

70 As to the Dondero Control Justification, the JOLs understand from their advisors that the position is as follows:

70.1 The purported concerns raised in the Carrington Coleman Memo (even taken at their highest and assuming they are true) would not have any immediate implications for the Company; and

70.2 Any allegation that Highland Dallas Foundation's loss of exempt status was imminent and could somehow imperil the Company's charitable mission is unfounded as a matter of US tax law.

71 Further, in completing the LP/LLC Exchange and the DFW Share Issuance, the Directors relied on a short email advice in the form of the Carrington Coleman Email, with the substantive advice (in the form of the Carrington Coleman Memo) not received until 25 March 2025 (i.e., a mere two days before the date of the Redemption).

72 As to the factual allegations relied on by the Directors as part of the Dondero Control Justification:

72.1 The Highland Dallas Foundation has recently confirmed to the JOLs that it has never been investigated by the IRS or any other governmental agency; and

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948) 38

CONFIDENTIAL TDIT005004

72.2   As outlined above at paragraphs 18 to 21, the JOLs understand that Mr Dondero did not have control over the Supporting Organisations (rather, that control was required to be with the Charities).

73   As with the No Economic Interest Justification, having considered (amongst other things) the issues outlined above, it is the JOLs' view that the Dondero Control Justification is flawed, and would be flawed even if the factual allegations made in paragraph 72 above were true.

74   The defects in the Carrington Coleman Memo will be addressed more fully in counsel's skeleton argument, but, most fundamentally, the Carrington Coleman Memo fails to explain why it is that any investigation by the US tax authorities into the Highland Dallas Foundation (even if that were to lead to the revocation of the Highland Dallas Foundations' tax-exempt status, which is far from certain and could only occur after a lengthy process, including appeals[7]) could have implications for the status or assets of the Company. The Company has no status as a matter of US law, being a Cayman entity, and nor is there any plausible basis on which an investigation into the status of the Highland Foundation could threaten the Company's assets; rather, the problem is one that arises purely at the 'shareholder' level, and as a matter of US law. As Mr Patrick is a tax attorney, the JOLs believe that he should have been aware of the shortcomings of the Carrington Coleman Memo.

75   In any event, as far as the JOLs are aware, after some investigation through their US lawyers, no IRS Audit (being the first stage of any investigation) has even been initiated against Highland Dallas.

---

[7] The JOLs understand from their US advisers (without waiving privilege) that the process of investigation into the status of a tax-exempt entity involves an initial audit, and that, if an adverse determination is made, the taxpayer may file a "protest letter", which triggers an appeals process within a separate department of the IRS. If the initial appeal is unsuccessful, the taxpayer has a further right of appeal to the US Tax Court; and that, in any event, the loss of tax-exempt status is a remedy of last resort, that will not usually be applied if a monetary penalty would suffice.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   39

**CONFIDENTIAL** **TDIT005005**

43

76     Further:

76.1     On 5 March 2025, in connection with the DFW Share Issuance, Mr Tony Beswetherick KC issued retrospective advice in draft to the Company that undermined the stated justification for the DFW Share Issuance. In that advice, Mr Beswetherick opined that (amongst other things):

       (a)     Where Articles confer a power on directors to issues shares, that power is a fiduciary one and must only be exercised for proper purposes; an issue of shares '*deliberately aimed at altering the balance of power between shareholders*' is problematic; the power should not be exercised with a view to altering an existing balance of power, irrespective of whether the directors consider that doing so is in the interests of the company;

       (b)     The effect of the DFW Share Issuance was that, if there were to be a company meeting or proposal to approve a modification that affects the Participating Shareholders' rights, the ability of the prior Participating Shareholders to vote down such a change was negatively affected (DFW now having over 50% of the total Participating Shares);

       (c)     It is not immediately clear from the Share Issue Resolutions whether the justifications stated were relevant to the Directors' decision. If they were relevant, it is not explained why the issue of shares to DFW would prevent false claims being made by Mr Dondero; it may be that those matters are part of the context, rather than part of the reason for the decision; and

       (d)     The Participating Shareholders might suggest the Share Issue Resolutions are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board.

       A copy of this advice is exhibited at pages 1013 to 1038 of MM-1.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     40

**CONFIDENTIAL**                                                             **TDIT005006**

44

**FSD2025-0116**                    **Page 48 of 1530**                    **2025-08-19**

76.2   In instructing Seyfarth to send the IRS Complaint, which was first sent on 20 March 2025 with an updated version sent on 1 May 2025 and was stated to be sent on behalf of the Company, Mr Patrick and Mr Murphy effectively did their best to "tip off" the IRS as to a host of matters said to call into question the charitable status of at least one of the Supporting Organisations (and original Participating Shareholder).  When viewed against the wording from the Company's board resolution dated 18 December 2024, the JOLs' hold serious concerns that the IRS Complaint seems to have been calculated to increase the "*risk of causing the [IRS] to revoke the tax-exempt status of one or more of the Participating Shareholders/supporting organizations*" and so increase the risk that such a decision would "*imperil the assets of the Company*". In other words, the JOLs believe that the IRS Complaint was essentially an attempt by Mr Patrick and Mr Murphy to manufacture grounds on which the Relevant Transactions could be justified after the fact.

76.3   The JOLs' believe that the evidence demonstrates that Mr Patrick and Mr Murphy had already contemplated the objective of redeeming the Company's interest in the Fund well before any legal advice as to the need to effect distancing measures from Mr Dondero had yet been received. For example, on 9 November 2023, Shields Legal Group, US attorneys then acting for the Company, sent a work plan to Campbells LLP, then Cayman Islands attorneys for the Company (the "**Work Plan**"), which stated, as to the advice that was sought:

(a)   That it related to "*potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc*"; and

(b)   "*we may need to rely on opinions and memoranda in potential future disputes.*" (pages 1433 to 1434 of MM-1)

The Work Plan was subsequently updated on 28 November 2023.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     41

**FSD2025-0116**                                        **2025-08-19**

**CONFIDENTIAL**                                        **TDIT005007**

45

76.4 The JOLs believe that this demonstrates that the Directors were interested in obtaining advice for defensive purposes so as to justify actions they were already contemplating taking, which actions were referred to in the following questions set out in the Work Plan:

(a) "*Can the controlling person dilute shares, e.g., the Participation Shares?*"

(b) "*Can the controlling person redeem shares, e.g., the Participation Shares?*"

(c) "*Is there any Cayman law requirement that Holdco [i.e. the Company] distribute money upwards to the next level of entities (Highland Dallas Foundation, Inc. and others)?*"

(d) "*Could HoldCo liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless?*"

(e) "*What can be done at this point to make [the share transfers in Holdco from Mr Scott to Mr Patrick] bullet proof?*" (pages 1437 to 1438 of MM-1)

The Valuation Justification

77 As outlined above, the Directors and DFW have sought to rely on the FTI Report and the ValueScope Reports in support of the price calculated for the Redemption (which was at approximately a 99.2% implied discount to the stated NAV of the Fund). However, having considered the contents of these documents and consulted with their advisors, the JOLs are of the view that there are glaring issues with these reports purported to be relied on by DFW and the Directors:

77.1 With respect to each of these reports, they are expressed to be solely reliant on the information provided to the service providers by the Company and/or the Directors (i.e., the stated facts have not been independently verified by the service providers);

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    42

46

77.2    The FTI Report is expressly stated to be inappropriate to be relied on in support of a transaction and does not constitute FTI's views on the value of any Participating Shares (see paragraph 1.8 at page 976 of MM-1). Notwithstanding the explicit 'non-reliance' language:

(a)    the Manager Consent expressly referred to and relied on in the FTI Report as justification for the Admission and Redemption (see page 598 of MM-1); and

(b)    Carrington Coleman relied on the FTI Report in the Carrington Coleman Memo dated 25 March 2025 (see page 955 of MM-1).

77.3    With respect to the ValueScope Reports (and amongst other things):

(a)    ValueScope was instructed to determine the "fair market value" of the Participating Shares and the membership interest in CDM on the basis of the price at which the Participating Shares would change hands between a willing buyer and a willing seller (see pages 792, 811 and 866 of MM-1).

(b)    ValueScope does not appear to have:

(i)    considered whether valuation on the basis of a sale was appropriate or whether for example, winding up was a possibility, such that value could have been realised by reference to the stated NAV of the Fund (in the amount of US$269.1 million) as opposed to the c. US$1.6m received by the Company for that interest; and

(ii)    addressed themselves as to whom benefitted from the residual value of c. US$267.4m.

(c)    ValueScope had prepared a report dated 7 January 2025 (valuation as of 30 September 2024) (pages 810 to 864 of MM-1) in which the fair market value of 100 Participating Shares in the Company was stated as being US$75,961,370

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    43

**CONFIDENTIAL**                                                                                    **TDIT005009**

47

(page 813 of MM-1).  Accordingly, between 30 September 2024 to 25 March 2025, ValueScope considered that there had been a reduction in value of 99.29% in less than a six-month period, even though both valuations relied on the same balance sheet dated 30 September 2024.  The 25 March 2025 valuation did not refer to an updated balance sheet.

77.4   In addition, the JOLs' investigations have uncovered several pieces of advice given to the Company that appear to further undermine the Valuation Justification. Merely by way of examples:

(a)    Following a call on 11 February 2025 between PwC and Walkers (together with Mr Patrick's "onshore and Delaware counsel", in the context of a potential engagement with respect to the valuation of the shares of the Company (prior to the Company's engagement of FTI), PwC declined to accept the instructions in the following terms:

> "...*our view is that the new Delaware entity (CDMCFAD, LLC) effectively has full economic interest and control over the Fund, so we don't really see a basis for applying any discounts to the underlying Fund NAV for that entity.*
>
> *As it relates to the participating shareholders' interest in Holdco, we don't think we can reliably estimate the value/discount given the current fact pattern. While we could make hypothetical assumptions about how the articles may be interpreted, and/or how future cash flows may or may not be distributed, the impact on value is so substantial that we don't think it would be a meaningful exercise (i.e. we'd end up with the discount being 100% in one scenario, but 0% in another). On that basis, I don't think there is a fee / scope that can work for us currently.*"

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     44

48

**FSD2025-0116**                                                                                **2025-08-19**

A copy of this email is exhibited at page 1039 of MM-1.

(b)      With respect to the FTI Report:

(i)      On 17 March 2025, Mr Patrick wrote to Walkers making it clear that it was his intention to liquidate the Company without notice to the Supporting Organisations and to otherwise obstruct the Supporting Organisations' ability to exercise any right to petition to wind up the Company on just and equitable grounds. A copy of this email is exhibited at page 1058 of MM-1.

(ii)     In an email chain ending in an email dated 26 March 2025 (i.e., one day before the FTI Report was issued), FTI and Walkers had an exchange in the following terms:

> "*Walkers: We have discussed with our client and onshore counsel and set out some amendments in the attached. In addition, we note (1) we have not received any material addressing reliance on the memo by CDM; and (2) the "Limitations and restrictions" section still provides that the memo "should not be used to support a transaction". For the memo to be useful in the circumstances, CDM [and HoldCo] need to be able to rely on it or a separate memo would need to be addressed to CDM on which it may rely. Further, both entities need to be able to rely on the memo(s) to support the proposed transaction.*
>
> *FTI: What is the intention of adding that directors should act in the interests of future members? I am struggling to understand*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     45

**FSD2025-0116**                                                                                **2025-08-19**

**CONFIDENTIAL**                                                                                **TDIT005011**

49

> *how a director could act in a manner which is beneficial for future*
> *shareholders which is not also helpful for existing shareholders.*
>
> *The limitations in our note will remain. To do a valuation to*
> *support a transaction, we will need to do significantly more*
> *detailed work. This is an unusual/complicated situation.* We are
> open to doing a fairness opinion on the transaction. But this will
> require approval from our risk committee and more information
> on the transaction and situation. *We are happy for CDM to have*
> *our memo on a non-reliance basis. But this memo should not be*
> *used to support a transaction.*" (Emphasis added)

A copy of this email chain is exhibited at pages 1075 to 1076 of MM-1.

The Remuneration Increase Justification

78      As to the Remuneration Transactions, viewed in the context of the broader deficiencies in the justifications offered by the Directors and DFW, the JOLs consider that there is, at least, a live question as to the propriety of the Remuneration Increase Justification.  This is informed by the following considerations:

78.1    The Mercer Report is dated some three years after Mr Patrick commenced his role as a director of the Company and purports to justify three years of back-pay (plus bonuses) at many multiples to his immediate predecessor.

78.2    No justification is offered in Patrick 1 or Patrick 2 with respect to the reason for this report being commissioned when it was, noting that:

(a)      the Relevant Transactions were completed in close proximity to the date of the Mercer Report; and

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)      46

**CONFIDENTIAL**                                                                    **TDIT005012**

(b)    the effect of the transactions pursued in reliance on the Mercer Report resulted in a significant cash outflow from the Company.

## THE STATEMENT OF CLAIM

79    The JOLs are of the view that justifications offered by DFW and the Directors do not justify the septs described above. In light of this, the JOLs decided to prepare and file the SOC.

80    The Company's claims pleaded in the SOC arise as a result of the breaches by the Directors of their fiduciary duties owed to the Company, having caused the Company to have dissipated its assets through a combination of: (a) the Relevant Transactions; and (b) the Remuneration Transactions, all of which were for the benefit of entities controlled by Mr Patrick or for his benefit personally.

81    The factual background to the Company's claims is set out in paragraphs 9 to 154 of the SOC. This includes details of the following:

81.1    the background to the Company and its creation, including the other entities within the structure (e.g., the Fund);

81.2    the control of the Company and the Fund; and

81.3    the events giving rise to the dissipation of the Company's assets and the dilution of the Supporting Organisations' economic interest in the Company.

82    Details of the specific breaches of fiduciary duties committed by the Directors, which underpin each of the Company's claims, are set out and fully particularised at paragraphs 160 to 172 of the SOC.

83    In summary, these centre on the Directors' wilful and dishonest breaches of their fiduciary duties:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     47

**CONFIDENTIAL**                                                            **TDIT005013**

83.1    to act *bona fide* in the best interests of the Company;

83.2    to exercise the powers vested in them for a proper purpose;

83.3    not to place themselves in a position in which there was a conflict between their duty to the Company and their personal interests or the interests of other companies in which they were interested;

83.4    to not make an unauthorised profit from or by reason of their fiduciary office;

83.5    to not purchase, directly or indirectly, the property of the Company without the full and informed consent of the Company; and

83.6    duty to exercise reasonable skill, care, and diligence in the performance of his role and function as director.

Unlawful Means Conspiracy

84    The Company has a claim against all of the Defendants for unlawful means conspiracy as set out in paragraph 173 of the SOC.  This is based on the Defendants having conspired and combined together to injure the Company by unlawful means and the Company having suffered loss and damage as a result.

Proprietary Claim / Knowing Receipt

85    The Company's claims against CDM for knowing receipt are set out in paragraph 174 of the SOC.  These claims are based on the premise that:

85.1    CDM had imputed, or attributed knowledge of the breaches of fiduciary duties committed by Mr Patrick, who was at all material times the guiding mind of each entity, including CDM, for which he either acted as a director or otherwise controlled;

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    48

52

85.2 The Company has a beneficial proprietary interest in the sole limited partner interest in the Fund and a proprietary claim to it; the interest having been misappropriated from the Company by virtue of the Directors' breaches of fiduciary duty described above; and

85.3 CDM therefore holds the Partnership Interest on trust or constructive trust for the Company and is liable to account to the Company in equity, by restoring the interest in the Fund to the Company and/or accounting for any profits or otherwise accounting to the Company in equity.

Unjust Enrichment / Restitution

86 The Company has a claim against CDM for unjust enrichment as set out at paragraph 175 of the SOC.  This is on the basis that it received the Company's interest in the Fund without there being a valid assignment or other justification for that receipt, such that it is liable to the Company in restitution.

Relief

87 The substantive relief sought by the Company against each of the Proposed Defendants is set out in the prayer for relief of the SOC and includes (amongst other things): (a) damages and / or equitable compensation; (b) orders for restitution; (c) orders for restoration of the Company's property; (d) rectification of the register of members of the Company; and (e) plus interest on such amounts.

**THE INJUNCTIONS SOUGHT BY THE JOLS**

88 The JOLs in this Application seek orders that:

88.1 The Defendants will:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   49

**CONFIDENTIAL**                    **TDIT005015**

53

(a)    Preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature), whether held directly or indirectly, in the Fund, the Fund Entities and/or any assets of the Fund; and

(b)    Procure that the Fund Entities and their wholly owned subsidiaries will not in any way dispose of, deal with, encumber, transfer or diminish the value of any of their assets.

88.2    The Defendants will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish any assets in their possession or control, whether they are in or outside the Cayman Islands, which were, are or may be received (whether directly or indirectly):

(a)    By way of distribution, disposition, dividend, benefit, payment or other transfer from (as the case may be) the Company, the Fund, DFW, CDM, the General Partner, the Fund Entities and/or their wholly owned subsidiaries; or

(b)    From any assets of the Fund, the Fund Entities and/or their wholly owned subsidiaries.

88.3    The Defendants shall not do anything to cause, procure, incite, promote or assist a breach by any other Defendant of the above sections 88.1 and 88.2; and

88.4    Ancillary asset disclosure orders against all Defendants.

89    The basis for the injunctive relief sought is that the Defendants each own and/or control assets that the Company has an equitable proprietary interest in (or at least a seriously arguable case that it does):

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    50

**CONFIDENTIAL**        **TDIT005016**

89.1    Prior to the Relevant Transactions taking place, the Company held the Partnership Interest, and thereby indirectly owned (99% of) all assets held by the Fund through its wholly owned subsidiary CLO HoldCo (and its subsidiaries).[8]

89.2    After the Relevant Transactions took place, and by reason of the Directors' breaches of fiduciary duty –

(a)    CDM now holds the Partnership Interest in the Fund, which continues to hold its assets through CLO HoldCo (and its subsidiaries);

(b)    DFW is the sole member of CDM;

(c)    Mark Patrick is the sole member of DFW;

(d)    Mark Patrick has full control over DFW, CDM, the General Partner (and thus the Fund), and (together with Mr Murphy) CLO HoldCo.  Mr Patrick therefore has the ability to control and/or deal with the Partnership Interest and the Fund's assets, including any distributions of the Fund's assets received by CDM as its sole limited partner.  He now exercises this control free from the oversight previously exercised by the Supporting Organisations and CFNT through their holding of Participating Shares in the Company.[9]

90    However, the Company has at least a seriously arguable case that CDM and DFW hold these assets through steps taken by the Directors that amounted to breaches of fiduciary duty, and therefore that these assets are subject to a constructive trust in favour of the Company, which I understand to be the necessary pre-requisite for the Court to grant a proprietary injunction restraining the disposition of that property.

---

[8] A structure chart showing the JOLs' understanding of the Fund holding structure prior to the Relevant Transactions is at page 439 of MM-1

[9] A structure chart showing the JOLs' understanding of the Fund holding structure after the Relevant Transactions is at page 440 of MM-1.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    51

91      The legal elements that must be satisfied to obtain the above relief will be addressed in the JOLs' skeleton argument.  However, I wish to note the following points of fact that the JOLs believe to be relevant to those elements:

Serious issue to be tried

91.1    On 14 July 2025, this Honourable Court granted sanction for the JOLs to file the SOC and in doing so accepted that the merits of the JOLs' claims satisfied the relevant threshold for the sanction of commencement of claims by official liquidators.

91.2    The Directors and DFW have put forward explanations as to why the transfer of the Partnership Interest to CDM was legally justifiable, which the JOLs do not believe stand up to scrutiny as explained above.

Damages would not be an adequate remedy

91.3    As far as the JOLs' are aware, CDM has no other assets beyond the Partnership Interest and therefore would likely be unable to meet any order for damages made against it.  Only an order for CDM (and the other Defendants, to the extent they hold assets that derive from the Partnership Interest) to restore the Company's property could return the Company to the position it would have been in had the improper transactions carried out by the Defendants not taken place.  The JOLs' believe that the only way to ensure that such an order will be effective at the conclusion of these proceedings is for a proprietary injunction to be granted against the Defendants in respect of that property in the interim.

91.4    Further, as explained above, the Company, its Supporting Organisations, the Charities and the Fund are part of a carefully constructed investment structure for (i) the tax efficient treatment of charitable donations; and (ii) investments to be made for the ultimate benefit of the Charities.  Without the re-transfer of the Partnership Interest to the Company, those parties may be unable to achieve their charitable objectives as

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     52

56

effectively or at all.  An award of damages in lieu of proprietary relief would mean that the Company would hold only cash and no other assets or investments, and the Charities and Supporting Organisations would effectively be back to square one in terms of setting up a proper investment structure to carry out their investments and protect their tax-exempt status.

<u>Balance of convenience</u>

91.5   The JOLs do not believe that the proprietary injunctions they seek would hinder the operation of the Fund or the Fund Entities in any material way.  As set out at paragraph 27 above, the Fund and the Fund Entities are mostly passive investment vehicles that hold shares or interests in other Fund Entities, cash, debt instruments, receivables, vacant land and/or stock in publicly traded companies.  They are not, as far as the JOLs understand, engaged in active trading of assets or making of new investments on a frequent basis.

91.6   Accordingly, the JOLs believe that there is no justification for any new investments or other transactions to be made by any of those entities, beyond payments needed to stay in good standing and comply with their statutory obligations.

91.7   Against that backdrop, the JOLs' position is that no dispositions of the assets of the Fund, the Fund Entities or any other subsidiaries above US$10,000 need or should be made pending the determination of the Company's proprietary claim which, if successful, would see the Partnership Interest returned to the Company and the Company would therefore wholly own (indirectly) all assets of the Fund, the Fund Entities and their wholly owned subsidiaries.  Should any payments or investments be made by the Fund, the Fund Entities or any of their wholly owned subsidiaries which have the effect of harming the value of the Partnership Interest, that would render the proprietary relief the JOLs are seeking much less effective.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     53

**CONFIDENTIAL**                    **TDIT005019**

91.8    Notwithstanding the above, the JOLs recognise that there may become a need for certain payments or other dispositions of assets to be made to preserve, maintain or improve the value of existing assets held by the Defendants, the Fund Entities and/or their wholly owned subsidiaries.  Accordingly, the JOLs' draft Order provides for:

(a)    The entity concerned to make a written request to the JOLs to make any such payments, together with full supporting information and documentation as well as an explanation of the rationale for the transaction; and

(b)    The JOLs to decide within 7 days whether to approve or disapprove the proposed transaction.

91.9    The JOLs' also recognise that there will likely be a need for certain payments to be made by the Defendants, the Fund Entities or their wholly owned subsidiaries that are reasonably necessary in the ordinary course of business to keep the corporate Defendants, the Fund Entities or their wholly owned subsidiaries in good standing.  The JOLs' draft Order allows for any such payments of US$10,000 or less to be made.

91.10    The JOLs are also unaware of any harm that would be caused to CDM by preserving the status quo in respect of the Partnership Interest.  By comparison, if a proprietary injunction is not granted and CDM were to transfer the Partnership Interest to another party or otherwise deal with that interest in some way, the Company could be significantly prejudiced. Specifically, the Company's proprietary claim to the Partnership Interest could be undermined or become more difficult to enforce.

Disclosure of assets

91.11    The JOLs have only limited information as to what assets each of the Defendants, Fund Entities and their wholly owned subsidiaries hold (beyond the assets set out in paragraphs 28 to 29 above).  Even so, the JOLs have no way of verifying this information or knowing if it is completely up to date.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    54

58

91.12    In circumstances where, on the JOLs' case, a misappropriation of the Company's sole and valuable asset has already occurred, the JOLs believe protection is needed to prevent any further dissipation of assets from occurring in breach of any injunction that is granted.  The JOLs' believe that this protection can be afforded by way of disclosure orders in support of the injunction requiring the Defendants to disclose on affidavit what assets they each hold and their approximate value[10].  Having that information to hand will allow the JOLs (and the Court) to effectively police the injunction (in terms of preventing dissipation of Fund assets and thereby preserving the value of the limited partner interest in the Fund).

91.13    In addition, the disclosure orders seek confirmation as to:

(a)    All of the entities owned directly or indirectly by the Fund, including full details as to their owners, directors, officers or other controllers, and places and details of incorporation.  This will allow the JOLs to have a complete picture of the Fund structure.

(b)    All payments by way of salary, bonus, dividend, distribution or other compensation made to Mr Patrick or Mr Murphy by the Company, the Fund, DFW, CDM, the General Partner, CLO HoldCo, or any of the Fund Entities or other entities revealed by (a) above since 27 February 2024[11].  The JOLs believe this disclosure is warranted in light of the concerns the JOLs have as to the Remuneration Transactions explained at paragraphs 49 to 51 above.

(c)    All payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor, whether a firm, partnership, company or individual, made by the Company, the Fund, DFW, CDM, the General Partner,

---

[10] with the Sixth Defendant to procure the Fund Entities and their wholly owned subsidiaries to provide this information for inclusion in the Sixth Defendant's affidavit

[11] Being the date that the General Partner was incorporated.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    55

CLO HoldCo, or any of the Fund Entities or other entities revealed by (a) above since 27 February 2024.  The JOLs believe this disclosure is warranted due to the concerns the JOLs have as to: (i) the Remuneration Transactions; and (ii) the significant and unexplained increase in expenditure by the Company under Mr Patrick's stewardship as explained in paragraph 51 above.

<u>Cross undertaking in damages</u>

91.14   If required by the Court, the JOLs' are content to provide the usual cross-undertaking in damages should the freezing injunctions be granted, and it is subsequently held by the Court that the injunctions should not have been granted.  However, the JOLs' starting position is that this is not a case where a cross-undertaking in damages should be required, for reasons that will be explained in more detail in counsel's skeleton argument.

**PROTOCOL CORRESPONDENCE**

92   Prior to the JOLs filing this Application, the JOLs had been engaging with CDM, the General Partner for and on behalf of the Fund, and CLO HoldCo (the "**CDM Entities**"), in relation to a potential protocol that would mitigate the need for the JOLs to pursue an application for an interim injunction.  However, the JOLs are of the view that the protocol proposed by the CDM Entities would not adequately protect the Company's position pending the completion of these proceedings.

93   The relevant correspondence pertaining to the potential protocol is as follows:

93.1   On 16 May 2025, Campbells LLP ("**Campbells**") sent a letter to the JOLs on behalf of their clients, the CDM Entities[12].  In the letter, Campbells stated that: "*…in an effort to assuage any concerns the JOLs may have regarding the commercial activities of the*

---

[12] Whilst the letter is dated "16 March 2025" this is incorrect – the letter was sent and received on 16 May 2025

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    56

CONFIDENTIAL                                                          TDIT005022

*Fund and the risk of dissipation of assets outside of the ordinary course of business, the CDM Entities would be prepared to enter into a form of Protocol which provided for, amongst other necessary and appropriate terms, the reporting of material transactions on the basis that such information was held confidentially by the JOLs.*" (pages 1093 to 1095 of MM-1).

93.2    On 30 May 2025, Johnstone Law ("**JL**"), who at that stage were acting for the JOLs, sent a letter to Campbells in response.  In that letter, the JOLs took issue with Mr Ronan Doherty of Campbells attending a directions hearing in the Liquidation Proceedings without having standing to do so, and yet making "*submissions from the back of the Court in which he represented that [the CDM Entities] had sought to cooperate and comply with the JOLs' requests for information… by proposing a 'protocol' with which the JOLs had not engaged, which is a plain mischaracterisation of events.*" (page 1096 of MM-1).

93.3    Later on 30 May 2025, Campbells sent a letter to JL responding to JL's letter of the same date.  Campbells enclosed a draft reporting protocol to this letter, whereby, in their words: "*[the CDM Entities] offer to provide, inter alia, the following information to the JOLs:*

*(a) a report listing all transactions undertaken by the Fund, or any of the CDM Entities, since 27 March 2025 which exceed US$5,000,000;*

*(b) a 'business plan' explaining the ordinary day to day business of the Fund;*

*(c) a monthly transactions report; and*

*(d) advance notice of any single transaction exceeding US$5,000,000, or any series of transactions in an aggregate amount exceeding US$5,000,000 (save for transactions in the ordinary course of business involving or related to the*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    57

CONFIDENTIAL                                                                  TDIT005023

FSD2025-0116 **Page 65 of 1530** 2025-08-19

*renumeration of employees, officers and directors, agents, advisors and / or service providers).*"

The letter sought the JOLs' agreement to the proposed protocol by 4 June 2025.  A copy of the letter and the draft protocol enclosed with it is at pages 1098 to 1112 of MM-1.

93.4 On 5 June 2025, JL sent a letter to Campbells which conveyed the JOLs' position on the draft protocol as follows:

"***Protocol***

*7. The JOLs' preliminary view is that the Company may have inter alia clear prima facie proprietary and other claims to the asset transferred pursuant to the transfer of the Company's interest in the Charitable DAF Fund, LP to your client, CDMCFAD, LLC, pursuant to a deed of assignment and assumption on 18 December 2024 (the Deed). Nothing in your letter changes that analysis.*

*8. The protocol you propose is entirely inappropriate both to responding to proprietary claims and to the current circumstances. No dealing of any nature is appropriate in assets over which proprietary claims are asserted, whether in the ordinary course of business or subject to any threshold. Further, no expenditure from these assets on legal or any other professional fees is appropriate at any time.*

*9. It is in any event impossible for the JOLs to engage with the protocol in circumstances where they have no serious knowledge or understanding of what is happening at any underlying level. Your clients have had since 12 May 2025 to provide that knowledge and understanding and continue to decline to provide it to the JOLs. We again urge all your clients to set aside their distractive tactics*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    58

FSD2025-0116 2025-08-19

*and cooperate, and provide all information and documents, in an open and frank manner.*

*10. In the circumstances, the JOLs require your clients to provide undertakings by 3pm on 6 June 2025 that there will be no dealing in the assets formerly owned by the Company, and the provision of full and complete information on the whereabouts, ownership and control of all assets owned by the Company (directly or indirectly, legally or beneficially) prior to execution of the Deed. Nothing short of those assurances and undertakings is acceptable at this stage to the JOLs.*" (page 1114 of MM-1)

93.5   On 9 June 2025, Campbells sent a letter to JL enclosing a revised reporting protocol for the JOLs' consideration.  As stated in the letter, the changes that Campbells made to the draft protocol previously provided with their letter of 30 May 2025 were to: "*(i) remove the value threshold from the historical reporting obligation at paragraph 2.1, and (ii) reduce the value threshold for the provision of advance notice at paragraph 2.5 [from US$5 million to US$1 million].*" (page 1117 of MM-1).

93.6   On 19 June 2025, Maples and Calder (Cayman) LLP ("**Maples**"), who were at that stage engaged to act for the JOLs, sent a letter to Campbells responding to their letter of 9 June 2025 to JL.  Maples' letter set out a non-exhaustive list of the issues that the JOLs had identified with the draft protocol proposed by the CDM Entities (see paragraphs 4.1 to 4.11 of the letter at pages 1126 to 1127 of MM-1).  Maples' letter also enclosed a fresh protocol in a form acceptable to the JOLs (the **"Maples Draft Protocol**"), which sought to address the deficiencies of the CDM Entities' proposed protocol (pages 1129 to 1136 of MM-1).  This letter also noted that any terms agreed would also need to be given effect to by way of undertaking to the Court, as opposed to agreement between the parties.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     59

63

93.7   On 29 June 2025, Campbells sent a letter to Maples responding to Maples' letter of 19 June 2025 and the JOLs' draft protocol enclosed therewith.  In that letter, the CDM Entities took the position that they "*fundamentally object to the approach adopted in the JOLs' Protocol*".  The overarching reason why they rejected the JOLs' proposed protocol was stated to be: "*[t]he proposed restrictions, controls and undertakings sought by the JOLs would impose severe limitations on [the CDM Entities'] ability to operate, and would have the practical effect of placing their ongoing charitable activities under the de facto control of the JOLs, notwithstanding that no such legal authority exists*".  However, no detail has been provided to date as to precisely how the protections sought by the JOLs would materially impact the CDM Entities' operations.

93.8   The 29 June 2025 Campbells' letter proposed some slight revisions to the CDM Entities' proposed protocol and enclosed a revised draft (the **"Revised Campbells Draft Protocol**").  However, having reviewed that draft, the JOLs are of the view that the revisions made do not sufficiently address the issues identified by the JOLs with the previous draft of the CDM Entities' protocol.  I note that in several places in Campbells' letter, it was suggested that the protections the JOLs' were seeking in our draft protocol "could only properly be obtained through injunctive relief".  Hence, the JOLs' being unsatisfied that the CDM Entities' protocol (as revised) sufficiently protects the Company's position in these proceedings, the JOLs now seek injunctive relief by way of this Application.  Copies of the Campbells' letter and the Revised Campbells Draft Protocol are at pages 1137 to 1170 of MM-1.

93.9   Further, Kobre & Kim on behalf of the Directors, and Baker & Partners on behalf of DFW, wrote to the JOLs in separate emails on 30 June 2025 (pages 1171 to 1176 of MM-1) , in which both asserted (surprisingly, given the content of the Maples Draft Protocol, which expressly provided for undertakings by the Directors and DFW) that their clients had not been asked to give any form of undertaking, and that their clients would not be willing to give any.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)   60

64

## TEXAS PROCEEDINGS BY THE SUPPORTING ORGANISATIONS

94    The JOLs have recently become aware that the Supporting Organisations issued a Petition against Mr Patrick, DFW, CDM, the General Partner, and the Original GP (the "**Texas Petition**") and an application for a temporary restraining order ("**TRO**" and "**TRO Motion**") before the Texas Business Court. Pursuant to the TRO Motion, those organisations sought the immediate appointment of a receiver over DFW and CDM, the imposition of a constructive trust over all assets, interests, and property, and immediate injunctive relief to freeze all assets that were held in the Fund. A copy of the court papers are exhibited at pages 1177 to 1426 of MM-1.

95    In filing the Texas Petition and TRO Motion, the Supporting Organisations are acting independently of the JOLs with advice from their own independent US counsel. The JOLs were informed of the Texas Petition and TRO Motion after they were filed by the Supporting Organisations.

96    As the JOLs understand the position as at the date of this affidavit:

96.1    The Supporting Organisations have alleged in the Texas Petition that Mr Patrick owed them fiduciary duties, on the basis of the LPA, and that those fiduciary duties were breached by the Relevant Transactions.

96.2    On 2 July 2025, there was a hearing in respect of the TRO Motion and at that hearing, at the direction of the Texas Business Court, the parties entered into a Rule 11 Agreement under the Texas Rules of Civil Procedure pending an inter partes hearing of the TRO Motion (the "**Rule 11 Agreement**"). The JOLs have been informed that the Rule 11 Agreement is a binding contract between the parties and that the key points of the Rule 11 Agreement are:

(a)    That the defendants to the Texas Petition shall not make any payments or disbursements other than those in the ordinary course of business.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    61

(b) Investments and monies must be kept in the existing entities that currently hold those investments and monies. In respect of investments, if any investment is monetised on its own terms, then the entity may prudently reinvest the resulting cash proceeds into liquid securities.

(c) There shall be no changes to the corporate structure of ownership of the defendants to the Texas Petition.

(together, the "**Rule 11 Restrictions**")

96.3 On 11 July 2025, the parties entered into an amended Rule 11 Agreement (the "**Amended Rule 11 Agreement**"), which, amongst other things, provided for the following:

(a) The defendants to the Texas Petition have until 14 July 2025 to file a challenge to the Texas Business Court's jurisdiction;

(b) The Rule 11 Restrictions will continue until the defendants' jurisdiction challenge is granted, or if refused, until the TRO Motion is heard; and

(c) If the Texas Business Court denies the defendants' jurisdiction challenge, the TRO Motion shall be heard as soon as reasonably practicable after the ruling, unless the ruling is stayed by an appellate court (pages 1427 to 1429 of MM-1)

96.4 The JOLs' understand that the likely date of the hearing of the defendants' jurisdiction challenge is some time shortly after 24 July 2025, being the deadline for the defendants' to file their reply (with the Supporting Organisations having until 21 July 2025 to file their response to the jurisdiction challenge), and the last procedural step prescribed in the Amended Rule 11 Agreement as to the jurisdiction challenge.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)    62

CONFIDENTIAL      TDIT005028

97      The JOLs are of the view that the Rule 11 Restrictions do not adequately protect the Company's position in these proceedings.  The JOLs hold that belief for these reasons:

97.1    Firstly, the Rule 11 Restrictions permit the defendants to make ordinary course of business transactions[13], which does not adequately protect the Company's proprietary interest in the Partnership Interest as it would seemingly allow Mr Patrick to continue to pay himself large salaries and bonuses, in his capacity as a director of the General Partner, CDM and/or DFW, from assets derived entirely from the Fund (as he has done before through the Remuneration Transactions).

97.2    Secondly, the Rule 11 Restrictions are, of course, only temporary; they are due to expire in the near future should the defendants' jurisdiction challenge succeed or, if it is denied, should the TRO Motion be denied in a hearing to follow very shortly thereafter.  The JOLs are therefore keen to ensure that the injunctions it seeks from this Honourable Court in this Application will, if granted, come into effect shortly before the Rule 11 Restrictions expire.

97.3    Thirdly, the relief in the Texas Petition and the TRO Motion is sought by separate entities from the Company, with a completely different claim and over which the JOLs have no control.  Given sanction of this Court has been granted to commence these proceedings, the JOLs believe that we would be at serious risk of not discharging our duties to the Company properly if we did not to seek injunctive relief on behalf of the Company in this Court to adequately protect its proprietary claims (which the Texas Petition is not squarely directed at).

**LEAVE TO SERVE OUT**

98      The JOLs' also seek orders, pursuant to Grand Court Rules, O.11, for leave to serve the foreign Defendants with the Writ and SOC (together with this Application) out of the jurisdiction.  Whilst

---

[13] See (7)a. of the Amended Rule 11 Agreement at page 1428 of MM-1

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     63

**CONFIDENTIAL**                                                                                    **TDIT005029**

the JOLs intend to write to the various Cayman Islands attorneys acting for the foreign Defendants to ask if they have instructions to accept service, particularly in light of the fact they are challenging jurisdiction in Texas, the JOLs believe it is prudent to seek leave to serve out orders now in case those Defendants do not voluntarily accept service.

99     Mr Patrick, DFW and CDM are all incorporated or reside outside the jurisdiction of this Court (the "**Foreign Defendants**"). The reasons as to why the JOLs contend that this is an appropriate case for leave to serve the Foreign Defendants outside the jurisdiction will be set out in detail in the JOLs' skeleton argument.

100     However, in brief, the Company will rely on the following gateways for service out of the jurisdiction:

100.1     GCR O.11, r.1(1)(ff), which covers claims "*brought against a person who is or was a director, officer or member of a company registered within the jurisdiction or who is or was a partner of a partnership, whether general or limited, which is governed by the laws of the Islands and the subject matter of the claim relates in any way to such company or partnership or to the status, rights or duties of such director, officer, member or partner in relation thereto*". The claim against Mr Patrick falls squarely within this gateway.

100.2     GCR O.11, r.1(1)(c), which covers cases where a foreign defendant is a necessary or proper party to a claim otherwise to be tried in the Cayman Islands. I understand that the central question for this gateway is whether the defendant in question would properly be joined to the litigation if they were present within the jurisdiction. I believe that all three of the Foreign Defendants fall within this test; all three are clearly central to the claim that will in any case be brought against the Cayman Islands-based defendants.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948)     64

**CONFIDENTIAL**     **TDIT005030**

100.3 GCR O.11, r.1(1)(f), which covers claims for a breach of duty where the damage was sustained or resulted from an act committed within the jurisdiction. I believe that the claims fall within this gateway also, in that Mr Patrick's breach of fiduciary duty as regards the CDM Assignment took place in this jurisdiction, and further the damage suffered was by the Company, which is Caymanian, and therefore was suffered within the jurisdiction.

100.4 GCR O.11, r.1(1)(j), which applies where a claim is brought in respect of a trust, whether express, implied or constructive, that is governed by or ought to be executed according to the laws of the Cayman Islands. In the present case, the Company claims that CDM and DFW hold property for it on a constructive trust arising from breach of fiduciary duties owed as a matter of Cayman law, and so I understand that those constructive trusts are themselves Cayman law-governed.

101 Further, I believe that it is clear that the Cayman Islands is the jurisdiction where this claim ought to be litigated. Fundamentally, this is a Cayman-law governed dispute between a Cayman company and its directors, who have breached their fiduciary duties. That is a dispute that can only properly be resolved in the Cayman Islands. Further, CDM and DFW, whilst based in Delaware, do not have an independent role to play; they are simply the creature companies of Mr Patrick and are under his control. Finally, there are no practical problems with the Cayman courts trying the dispute; there is a commonality of language among all relevant parties (i.e. English) and Mr Patrick, based in Texas, can easily attend Court as required.

102 I understand from counsel that if leave is granted, it will be necessary for the JOLs to serve the Foreign Defendants in the United States in accordance with United States law, which the JOLs intend to do. For this purpose, I understand that:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948) 65

**CONFIDENTIAL** **TDIT005031**

102.1 As an individual, Mr Patrick can be served by way of engaging a process server in the United States to personally deliver to Mr Patrick, in person, a copy of the documents, showing the delivery date; and

102.2 As corporations, DFW and CDM can be served by way of engaging a process server in the United States to personally deliver a copy of the documents to their registered agent in the State of Delaware, which as of the date of this affidavit is The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware, 19801 (see search results of the Delaware Division of Corporations at pages 1430 to 1431 of MM-1).

## Conclusion

103 For the reasons outlined above, I humbly request that this Honourable Court accede to the Application and grant the injunctive and other relief sought by the JOLs on behalf of the Company.

SWORN to at UGLAND HOUSE, )
GEORGE TOWN )
Grand Cayman, Cayman Islands, )
this 15TH day of July 2025 )
before me )

Margot MacInnis

Notary Public

Rachel Baxendale
Notary Public - Cayman Islands

Commission expires on 31 January 2026

Filed by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/83692948) 66

CONFIDENTIAL

TDIT005032

75

Plaintiff
M MacInnis
First Affidavit
15 July 2025
Exhibit MM-1

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 201 OF 2025 (     )

IN THE MATTER OF THE GRAND COURT ACT

BETWEEN:

CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

Plaintiff

AND

(1)    MARK ERIC PATRICK

(2)    PAUL MURPHY

(3)    CDMCFAD, LLC

(4)    DFW CHARITABLE FOUNDATION

(5)    CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER

(6)    CLO HOLDCO, LTD.

Defendants

---

**EXHIBIT MM-1**

---

This is the Exhibit shown to me and marked "**MM-1**" to the First Affidavit of **MARGOT MACINNIS**.

Sworn before me this *15TH* day of July 2025

Rachel Baxendale
Notary Public - Cayman Islands

Commission expires on 31 January *2026*

Notary Public

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/

CONFIDENTIAL    TDIT005033

FSD2025-0116                                                              2025-08-19

---

**INDEX TO EXHIBIT MM-1**
**TO FIRST AFFIDAVIT OF MARGOT MACINNIS**

---

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 1. | Company's Memorandum and Articles | 20 February 2025 | 1-37 |
| 2. | Highland Kansas Foundation – Certificate of Incorporation | 23 November 2021 | 38-40 |
| 3. | Highland Kansas Foundation – By-laws | Undated | 41-59 |
| 4. | Highland Dallas Foundation – Certificate of Incorporation | 23 November 2021 | 60-62 |
| 5. | Highland Dallas Foundation – By-laws | Undated | 63-77 |
| 6. | Highland Santa Barbara Foundation – Certificate of Incorporation | 23 November 2021 | 78-80 |
| 7. | Highland Santa Barbara Foundation – By-laws | Undated | 81-95 |
| 8. | Procedures for Establishment and Operation of Funds and Supporting Organizations | Undated | 96-122 |
| 9. | Highland Dallas Foundation – IRS Determination Letter | 19 January 2013 | 123-124 |
| 10. | Highland Santa Barbara Foundation - IRS Determination Letter | 12 February 2013 | 125-127 |
| 11. | Highland Kansas Foundation - IRS Determination Letter | 21 March 2013 | 128-129 |
| 12. | Highland Kansas City Foundation - Legal Relationship Agreement | 30 November 2011 | 130-132 |

FSD2025-0116                                                              2025-08-19

CONFIDENTIAL

TDIT005034

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 13. | Highland Dallas Foundation - Supporting Organization Operating Agreement | 30 November 2011 | 133-140 |
| 14. | Highland Santa Barbara Foundation - Supporting Organization Operating Agreement | 30 November 2011 | 141-147 |
| 15. | Charitable DAF Fund, LP - LPA | 11 March 2024 | 148-165 |
| 16. | CLO HoldCo - Expense report of as of 30 June 2024 | 30 June 2024 | 166-169 |
| 17. | Letter from Stinson LLP to the JOLs | 8 May 2025 | 170-173 |
| 18. | NexPoint Capital, Inc. – Proxy Statement | 7 May 2025 | 174-196 |
| 19. | NexPoint Real Estate Strategies Fund – Prospectus | 30 April 2025 | 197-333 |
| 20. | Complaint - Liberty CLO HoldCo, Ltd v Nancy Dondero and others (United States District Court for the State of Delaware) | 28 February 2025 | 334-345 |
| 21. | CDHC Royse City Land, LLC – Property Tax Assessments | Various | 346-356 |
| 22. | CDHC Assets, LLC - Property Tax Assessments | May 2025 | 357-368 |
| 23. | CDHC Fort Worth Land, LLC - Property Tax Assessments | Various | 369-378 |
| 24. | CDHC Stewart Creek, LLC – Property Tax Assessment | 29 May 2025 | 379 |
| 25. | Rand Advisors LLC – Form ADV | March 2025 | 380-408 |
| 26. | Rand Advisors LLC – Brochure | March 2025 | 409-434 |
| 27. | DFW Charitable Foundation – Certificate of Incorporation | 9 December 2024 | 435-437 |

**CONFIDENTIAL** TDIT005035

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 28. | Email from Shields Legal to Mr Patrick | 5 February 2024 | 438 |
| 29. | Structure chart showing the JOLs' understanding of the Fund holding structure prior to the Relevant Transactions | Undated | 439 |
| 30. | Structure chart showing the JOLs' understanding of the Fund holding structure after the Relevant Transactions | Undated | 440 |
| 31. | No Confidence Letter | 11 November 2024 | 441-442 |
| 32. | Email from Mr Murphy to Mr Patrick | 26 November 2024 | 443-447 |
| 33. | Email from Walkers to the Directors | 27 November 2024 | 448-453 |
| 34. | 18 December Resolution | 18 December 2024 | 454-460 |
| 35. | CDM Assignment | 18 December 2024 | 461-466 |
| 36. | CDMCFAD, LLC LLC Agreement | 18 December 2024 | 467-494 |
| 37. | Walkers' Draft Advice | February 2025 | 495-499 |
| 38. | Share Issuance Resolution | 7 February 2025 | 500-524 |
| 39. | Carrington Coleman Email | 18 December 2024 | 525-526 |
| 40. | Letter Agreement | 27 March 2025 | 527-531 |
| 41. | Manager Consent (Admission and Redemption Documents exhibited) | 27 March 2025 | 532-688 |
| 42. | Resolution of the Directors (Redemption) | 2 April 2025 | 689-691 |
| 43. | Resolution of the Directors (Assignment) | 2 April 2025 | 692-693 |
| 44. | Expenses Table | Undated | 694 |

**CONFIDENTIAL**                                         TDIT005036

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 45. | Resolution of the Directors (Mr Patrick's Salary) | 13 September 2024 | 695-696 |
| 46. | Resolution of the Directors (Mr Patrick's LTI Payment and Annual Discretionary Bonus) | 1 October 2024 | 697-704 |
| 47. | Employment Agreement | 24 March 2021 | 705-722 |
| 48. | Santa Barbara Foundation - Audited Financial Statements (year ended 31 December 2023) | 5 September 2024 | 723-750 |
| 49. | Valuescope Report | 11 April 2024 | 751-809 |
| 50. | Valuescope Report | 7 January 2025 | 810-864 |
| 51. | Valuescope Report | 26 March 2025 | 865-939 |
| 52. | Carrington Coleman Memo | 25 March 2025 | 940-956 |
| 53. | IRS Complaint | 20 March 2025 | 957-973 |
| 54. | FTI Report | 27 March 2025 | 974-987 |
| 55. | Mercer Report | 26 August 2024 | 988-1007 |
| 56. | H&B Memorandum | 9 July 2021 | 1008-1012 |
| 57. | Opinion (Mr Tony Beswetherick KC) | 5 March 2025 | 1013-1038 |
| 58. | Email from PwC to Walkers | 11 February 2025 | 1039-1057 |
| 59. | Email from Mr Patrick to Walkers | 17 March 2025 | 1058-1074 |
| 60. | Email chain between FTI and Walkers | 26 March 2025 | 1075-1092 |
| 61. | Letter from Campbells to the JOLs | 16 May 2025 | 1093-1095 |
| 62. | Letter from Johnstone Law to Campbells | 30 May 2025 | 1096-1097 |

**CONFIDENTIAL**                                                                 TDIT005037

FSD2025-0116                    **Page 84 of 1530**                    2025-08-19

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 63. | Letter from Campbells to Johnstone Law (enclosing draft protocol) | 30 May 2025 | 1098-1112 |
| 64. | Letter from Johnstone Law to Campbells | 5 June 2025 | 1113-1116 |
| 65. | Letter from Campbells to Johnstone Law (enclosing draft protocol) | 9 June 2025 | 1117-1124 |
| 66. | Letter from Maples to Campbells (enclosing draft protocol) | 19 June 2025 | 1125-1136 |
| 67. | Letter from Campbells to Maples (enclosing Revised Campbells Draft Protocol) | 29 June 2025 | 1137-1170 |
| 68. | Email from Kobre & Kim to Maples | 30 June 2025 | 1171-1173 |
| 69. | Email from Baker & Partners to Maples | 30 June 2025 | 1174-1176 |
| 70. | Texas Petition | 1 July 2025 | 1177-1422 |
| 71. | Texas Petition – Proposed Order | Undated | 1423-1426 |
| 72. | Second Rule 11 Agreement | 11 July 2025 | 1427-1429 |
| 73. | DFW Charitable Foundation – Delaware Division of Corporations Search Results | Undated | 1430 |
| 74. | CDMCFAD, LLC – Delaware Division of Corporations Search Results | Undated | 1431 |
| 75. | Company's Certificate of Incorporation | 27 October 2011 | 1432 |
| 76. | Shields Legal – Memorandum – Work Plan | 9 November 2023 | 1433-1440 |
| 77. | Letter from Seyfarth Shaw LLP to the IRS | 1 May 2025 | 1441-1446 |

FSD2025-0116                                                  2025-08-19

CONFIDENTIAL
TDIT005038

**FSD2025-0116**

**2025-08-19**

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

## Campbells

Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

campbellslegal.com

(14133-42760)



*www.verify.gov.ky File#: 263805*

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**CONFIDENTIAL**

**TDIT005039**

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

1. The name of the Company is Charitable DAF HoldCo, Ltd.

2. The registered office of the Company will be situated at the offices of Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are:

    (a) to benefit community-focused non-profit foundations established or located anywhere in the world or for the purposes recognised as charitable, as the Directors may from time to time determine, in furtherance of the following mission statement: "Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference"; and

    (b) to do all such things in the opinion of the Directors are or may be incidental or conducive to the above objects or any part of them.

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Companies Act (as amended) of the Cayman Islands (the "**Act**").

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power

35631852.5.C8689.187150

1

*www.verify.gov.ky File#: 263805*

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**CONFIDENTIAL** **TDIT005040**

to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Act to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.

35631852.5.C8689.187150

2



*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116** **2025-08-19**

3

**CONFIDENTIAL** **TDIT005041**

**FSD2025-0116**

**2025-08-19**

## TABLE OF CONTENTS

CLAUSE                                                                                      PAGE

TABLE A ................................................................................................................ 1

INTERPRETATION ................................................................................................... 1

PRELIMINARY ........................................................................................................ 5

SHARES ................................................................................................................. 6

MANAGEMENT SHARES ......................................................................................... 6

PARTICIPATING SHARES ........................................................................................ 7

MODIFICATION OF RIGHTS ..................................................................................... 7

CERTIFICATES ....................................................................................................... 7

FRACTIONAL SHARES ............................................................................................ 7

TRANSFER OF SHARES .......................................................................................... 8

TRANSMISSION OF SHARES .................................................................................... 8

ALTERATION OF SHARE CAPITAL ........................................................................... 9

REDEMPTION, PURCHASE AND SURRENDER OF SHARES ......................................... 9

TREASURY SHARES .............................................................................................. 10

GENERAL MEETINGS ............................................................................................ 11

NOTICE OF GENERAL MEETINGS ........................................................................... 11

PROCEEDINGS AT GENERAL MEETINGS ................................................................ 11

VOTES OF SHAREHOLDERS .................................................................................. 13

CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS .............................. 14

DIRECTORS .......................................................................................................... 14

POWERS AND DUTIES OF DIRECTORS .................................................................... 15

35631852.5.C8689.187150                                    i

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**                                                            **2025-08-19**

**CONFIDENTIAL**                                                            **TDIT005042**

**BORROWING POWERS OF DIRECTORS** ................................................................................ 17

**THE SEAL** .......................................................................................................................... 17

**DISQUALIFICATION OF DIRECTORS** .................................................................................. 17

**PROCEEDINGS OF DIRECTORS** ........................................................................................ 18

**DIVIDENDS** ...................................................................................................................... 21

**ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION** ........................................ 21

**CAPITALISATION OF RESERVES** ...................................................................................... 22

**SHARE PREMIUM ACCOUNT** ........................................................................................... 23

**NOTICES** ......................................................................................................................... 23

**NON-RECOGNITION OF TRUSTS** ...................................................................................... 24

**WINDING UP** .................................................................................................................... 25

**AMENDMENT OF ARTICLES OF ASSOCIATION** .................................................................. 25

**CLOSING OF REGISTER OR FIXING RECORD DATE** ........................................................... 25

**REGISTRATION BYWAY OF CONTINUATION** ...................................................................... 26

**MERGERS AND CONSOLIDATION** ..................................................................................... 26

**DISCLOSURE** ................................................................................................................... 26

**INDEMNITY** ..................................................................................................................... 27

**DISPUTE RESOLUTION** ..................................................................................................... 28

**AEOI** ............................................................................................................................... 30

35631852.5.C8689.187150 ii

www.verify.gov.ky File#: 263805

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

CONFIDENTIAL TDIT005043

FSD2025-0116

2025-08-19

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

**TABLE A**

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Act shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

**INTERPRETATION**

1.  In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Act**" means the Companies Act (as amended) of the Cayman Islands.

"**AEOI**" means:

(i)  sections 1471 to 1474 of the Code and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

(ii)  the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters - the Common Reporting Standard and any associated guidance;

(iii)  any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in

35631852.5.C8689.187150

1

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

*www.verify.gov.ky File#: 263805*

FSD2025-0116

2025-08-19

6

**CONFIDENTIAL**

**TDIT005044**

FSD2025-0116                                                          2025-08-19

order to comply with, facilitate, supplement or implement the legislation, regulations or guidance described in sub-paragraphs (i) and (ii); and

(iv)     any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs.

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Code**" means the US Internal Revenue Code of 1986, as amended.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Electronic Record**" has the same meaning as in the Electronic Transactions Act.

"**Electronic Transactions Act**" means the Electronic Transactions Act (as amended) of the Cayman Islands.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Management Director**" means a director of the Company holding a Management Share (as defined below).

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Act and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Material Transaction**" means any transaction (or series of connected transactions), including an acquisition, distribution, investment or divestiture by the Company, for the aggregate amount in excess of $250,000;

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Act.

"**Ordinary Resolution**" means a resolution:

(a)     passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a

35631852.5.C8689.187150                                2

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

FSD2025-0116                                                          2025-08-19  7

**CONFIDENTIAL**                                                 TDIT005045

**FSD2025-0116**                                                                                **2025-08-19**

poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)      approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "Participating Shares" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Act and these Articles, means the Register maintained by the Company pursuant to the Act and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Act and includes any Branch Register(s) established by the Company in accordance with the Act.

"**Restricted Person**" means any Person holding Participating Shares:

(a)      in breach of the law or requirements of any country or governmental authority;

(b)      that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c)      in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.



35631852.5.C8689.187150                                       3

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**                                                                                **2025-08-19**

*www.verify.gov.ky File#: 263805*

8

**CONFIDENTIAL**                                                                                **TDIT005046**

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber.

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Act.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Act, being a resolution:

(a)     passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)      approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" and "**US**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a)     words importing the singular number shall include the plural number and vice versa;

(b)     words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**CONFIDENTIAL**                                                            **TDIT005047**

(c)     the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)     reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)     reference to a statutory enactment shall include reference to any amendment or re- enactment thereof for the time being in force;

(f)     reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case;

(g)     reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another;

(h)      any requirements as to execution or signature under the Articles including the execution  of the Articles themselves can be satisfied in the form of an electronic signature as  defined in the Electronic Transactions Act; and

(i)     sections 8 and 19(3) of the Electronic Transactions Act shall not apply.

2.     Subject to the preceding Articles, any words defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

3.     The business of the Company may be commenced at any time after incorporation.

4.     The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5.     The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company.  Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6.     The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Act and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office.  The Directors may

35631852.5.C8689.187150                              5

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**

**2025-08-19**

keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Act, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Act.

**SHARES**

7.	Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a)	issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

(b)	and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8.	The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9.	The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares.  Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other.  The Company may also pay such brokerage as may be lawful on any issue of Shares.

10.	The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

**MANAGEMENT SHARES**

11.	The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company.  In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles.  Management Shares confer no other right to participate in the profits or assets of the Company.

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

*www.verify.gov.ky File#: 263805*

**FSD2025-0116**

**2025-08-19**

**11**

**CONFIDENTIAL**

**TDIT005049**

## PARTICIPATING SHARES

12.     Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## MODIFICATION OF RIGHTS

13.     Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting.  To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him.  For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

14.     The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.

## CERTIFICATES

15.     No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

16.     The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share.  If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

35631852.5.C8689.187150                          7

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

*www.verify.gov.ky File#: 263805*

**CONFIDENTIAL**                                                 TDIT005050

### TRANSFER OF SHARES

17.    The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer.  The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

18.    The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

19.    The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

20.    All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

21.    If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

### TRANSMISSION OF SHARES

22.    The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share.  In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

23.    Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the



*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**CONFIDENTIAL**                                                **TDIT005051**

FSD2025-0116 2025-08-19

Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

24.    A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

25.    The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

26.    The Company may by Ordinary Resolution:

(a)    consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b)    convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c)    subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d)    cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

27.    The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION, PURCHASE AND SURRENDER OF SHARES

28.    Subject to the Act, the Company may:

(a)    issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

35631852.5.C8689.187150      9

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

FSD2025-0116      2025-08-19
14

**CONFIDENTIAL**      TDIT005052

     (b)     purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

     (c)     make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Act; and

     (d)     accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

29.     Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

30.     The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

31.     The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

### TREASURY SHARES

32.     Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Act. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

33.     No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

34.     The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

     (a)     the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

     (b)     a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Act, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.



*Filed: 21-Feb-2025 09:26 EST*

*www.verify.gov.ky File#: 263805*        *Auth Code: E90228166495*

**FSD2025-0116**                             **2025-08-19**
                                                      15

**CONFIDENTIAL**                                           **TDIT005053**

35.    Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

### GENERAL MEETINGS

36.    The Directors may, whenever they think fit, convene a general meeting of the Company.

37.    The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.  The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

38.    If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

### NOTICE OF GENERAL MEETINGS

39.    At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

40.    The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

### PROCEEDINGS AT GENERAL MEETINGS

41.    All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

42.    No business shall be transacted at any general meeting unless a quorum of Shareholders Is present at the time when the meeting proceeds to business.  Save as otherwise provided by these Articles,

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

FSD2025-0116                                                              2025-08-19
                                                                            16

**CONFIDENTIAL**                                                          TDIT005054

one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

43.    If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved.  In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

44.    If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

45.    The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

46.    If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

47.    The chairman may adjourn a meeting from time to time and from place to place either:

(a)    with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting): or

(b)    without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

   (i)     secure the orderly conduct or proceedings of the meeting; or

   (ii)    give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.  When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting.  Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

48.    At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**CONFIDENTIAL**                                                           **TDIT005055**

by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

49. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

50. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

51. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

### VOTES OF SHAREHOLDERS

52. On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

53. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

54. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

55. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

56. On a poll votes may be given either personally or by proxy.

57. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

CONFIDENTIAL TDIT005056

58. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

59. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

60. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

61. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at genera! meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

### CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

62. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

### DIRECTORS

63. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

64. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

65. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

66. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

67. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

68. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

*Filed: 21-Feb-2025 09:26 EST*
*www.verify.gov.ky File#: 263805*　　　　　*Auth Code: E90228166495*

**CONFIDENTIAL**　　　　　**TDIT005057**

**FSD2025-0116**                                                                      **2025-08-19**

69.     The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

70.     The Management Director shall be entitled to cast ten (10) votes on all matters and each other Director shall be entitled to cast one (1) vote. Such voting powers shall apply to voting in any committee or subcommittee of the Board. Every reference in these Articles to a majority or other proportion of the Directors, including for purposes of determining a quorum, shall refer to a majority or other proportion of the votes of the Directors then in office.

### POWERS AND DUTIES OF DIRECTORS

71.     Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company.  No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

72.     The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit.  Any natural person or corporation so appointed by the Directors may be removed by the Directors or



35631852.5.C8689.187150                                    15

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**                         *www.verify.gov.ky File#: 263805*                         **2025-08-19**
                                                                                                    **20**

**CONFIDENTIAL**                                                                      **TDIT005058**

**FSD2025-0116**                                                                                            **2025-08-19**

by the Company by Ordinary Resolution.  The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

73.     The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit.  Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

74.     The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

75.     The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

76.     The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

77.     The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

78.     The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and

*Filed: 21-Feb-2025 09:26 EST*
*www.verify.gov.ky File#: 263805*                                    *Auth Code: E90228166495*

**FSD2025-0116**                                                                                            **2025-08-19**

**CONFIDENTIAL**                                                                                           **TDIT005059**

may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

79. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

## BORROWING POWERS OF DIRECTORS

80. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

## THE SEAL

81. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

82. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

83. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

84. The office of Director shall be vacated, if the Director:

(a) becomes bankrupt or makes any arrangement or composition with his creditors;

*www.verify.gov.ky File#: 263805*

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**CONFIDENTIAL**                                          **TDIT005060**

**FSD2025-0116**                                                                                                       **2025-08-19**

(b)      dies or is found to be or becomes of unsound mind;

(c)      resigns his office by notice in writing to the Company;

(d)      is removed from office by Ordinary Resolution;

(e)      is removed from office by notice addressed to him at his last known address and signed by ail of his co-Directors (not being less than two in number); or

(f)      is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

### PROCEEDINGS OF DIRECTORS

85.      The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their  meetings and proceedings as they  think fit. Questions arising at any meeting shall be decided by a majority of votes.  In case of an equality of votes the chairman shall have a second or casting vote.  A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

86.      A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

87.      The  quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two which must include the Management Director, and if there be one Director the quorum shall be one.

88.      A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made.  A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

89.      A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director

35631852.5.C8689.187150                                              18



*Filed: 21-Feb-2025 09:26 EST*
*www.verify.gov.ky File#: 263805*                                    *Auth Code: E90228166495*

**FSD2025-0116**                                                                                                       **2025-08-19**
                                                                                                                                    **23**

**CONFIDENTIAL**                                                                                                       **TDIT005061**

104

**FSD2025-0116**                    **Page 108 of 1530**                    **2025-08-19**

shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established.  A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

90.   Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

91.   The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a)      all appointments of officers made by the Directors;

(b)      the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c)      all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

92.   When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

93.   A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be, shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be.  When signed a resolution may consist of several documents each signed by one or more of the Directors. Notwithstanding anything to the contrary herein, a resolution in writing signed by all the Directors in respect of a Material Transaction must be duly notarized by a notary public.

94.   The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.



35631852.5.C8689.187150                                    19

www.verify.gov.ky File#: 263805

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**                                              **2025-08-19**
                                                                    **24**

**CONFIDENTIAL**                                              **TDIT005062**

**FSD2025-0116**                    **Page 109 of 1530**                    **2025-08-19**

95.    The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

96.    Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings.  If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

97.    A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

98.    All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

35631852.5.C8689.187150                                                  20

*Filed: 21-Feb-2025 09:26 EST*
*www.verify.gov.ky File#: 263805*                          *Auth Code: E90228166495*

**FSD2025-0116**                                                    **2025-08-19** **25**

**CONFIDENTIAL**                                                    **TDIT005063**

**FSD2025-0116**

**2025-08-19**

## DIVIDENDS

99. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

100. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

101. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

102. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

103. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

104. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

105. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

106. No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

107. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

35631852.5.C8689.187150

21

www.verify.gov.ky File#: 263805

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**

**2025-08-19**

26

**CONFIDENTIAL**

**TDIT005064**

108. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

109. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

110. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

111. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Act and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

## CAPITALISATION OF RESERVES

112. Subject to the Act and these Articles, the Directors may:

    (a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

    (b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

        (i) paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

        (ii) paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

        and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

    (c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or

35631852.5.C8689.187150     22

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

FSD2025-0116     2025-08-19    27

**CONFIDENTIAL**       TDIT005065

FSD2025-0116                                                                              2025-08-19

debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d)    authorise a Person to enter (on behalf of ail the Shareholders concerned) into an agreement with the Company providing for either:

  (i)    the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

  (ii)   the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares, and any such agreement made under this authority being effective and binding on all those Shareholders; and

  (iii)  generally do all acts and things required to give effect to any of the actions contemplated by this Article.

### SHARE PREMIUM ACCOUNT

113.   The Directors shall in accordance with the Act establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

114.   There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Act, out of capital.

### NOTICES

115.   Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

116.   Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.



35631852.5.C8689.187150                                        23

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

FSD2025-0116                                                                              2025-08-19

28

CONFIDENTIAL                                                                          TDIT005066

FSD2025-0116                                                                     2025-08-19

117.    Any notice or other document, if served by:

(a)    post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b)    facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c)    recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d)    electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

118.    Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

119.    Notice of every general meeting of the Company shall be given to:

(a)    all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b)    every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

### NON-RECOGNITION OF TRUSTS

120.    Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

FSD2025-0116                                            2025-08-19

**CONFIDENTIAL**                                        TDIT005067

interest in any Share or (except only as otherwise provided by these Articles or as the Act requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

### WINDING UP

121.    If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

122.    Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(a)    first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(b)    second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

123.    If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes.  The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

### AMENDMENT OF ARTICLES OF ASSOCIATION

124.    Subject to the Act and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

### CLOSING OF REGISTER OR FIXING RECORD DATE

125.    For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days.  If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of,

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

*www.verify.gov.ky File#: 263805*

**CONFIDENTIAL**                                                          **TDIT005068**

attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

126.    In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

127.    If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

### REGISTRATION BYWAY OF CONTINUATION

128.    The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing.  In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

### MERGERS AND CONSOLIDATION

129.    The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Act.

### DISCLOSURE

130.    The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

*Filed: 21-Feb-2025 09:26 EST*

*www.verify.gov.ky File#: 263805*                    *Auth Code: E90228166495*

**INDEMNITY**

131.    To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "Covered Person" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes wilful misconduct or Gross Negligence by such Covered Person (as determined by a non-appeaiable judgment of a court of competent jurisdiction).

132.    Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

133.    To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction).  The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

134.    Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.



*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

135. The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

## DISPUTE RESOLUTION

136. Subject to the prior written consent of all parties involved in the Dispute (as defined below) to such dispute resolution procedures, the following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, a trustee appointed to represent the Company on claims derivative of the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

    (a)    Mediation:

        (i)    subject to the prior written consent of all parties involved in the Dispute, any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

        (ii)    the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

        (iii)    the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

        (iv)    each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

    (b)    Arbitration:

    Subject to the prior written consent of all parties involved in the Dispute to such dispute resolution procedure, if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be administered by JAMS/Endispute pursuant to JAMS' Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

        (i)    the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue

35631852.5.C8689.187150          28

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*
*www.verify.gov.ky File#: 263805*

TDIT005071

concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act

("**FAA**"), and resolved by the arbitrators, provided, however, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii)    the arbitrators may not award non-monetary or equitable relief of any sort.  They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum.  In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrators) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii)   the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees.  All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees.  This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv)    no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it.  In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty- five requests for admission; (v) ten requests for production.  In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non- parties, shall not be permitted;

(v)     all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement.  Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements.  Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

opportunity to protect their interests.  In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered.  The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi)   the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

(c)   Notwithstanding anything to the contrary herein, for greater certainty, in accordance with the terms herein, if all parties involved in the Dispute do not provide written consent to following the mediation and/or arbitration provisions herein, a party shall maintain its right to pursue his/her/its Dispute in court.

**AEOI**

137.   Notwithstanding any other Article, in order to comply with AEOI, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by AEOI, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member. Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.

138.   In order to comply with AEOI and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to AEOI or incur any costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) (together, "**costs**") associated with AEOI, the Directors may cause the Company to undertake any of the following actions:

(a)   compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to AEOI; or (ii) where there has otherwise been non-compliance by the Company with AEOI whether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b)   deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

(i)   comply with any applicable requirement to apply and collect withholding tax pursuant to AEOI;

(ii)   allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with AEOI;

*Filed: 21-Feb-2025 09:26 EST*
*www.verify.gov.ky File#: 263805*                                    *Auth Code: E90228166495*

**CONFIDENTIAL**                                                      **TDIT005073**

116

      (iii)    ensure that any AEOI related costs are recovered from the Member(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs.

139.    In order to give effect to the requirements imposed upon the Company by AEOI, as well as any of the actions contemplated by Articles 138(a) and 139(b), the Directors may undertake any of the following actions:

    (a)    create separate classes and/or series of Shares ("**AEOI Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of AEOI Shares as the Directors determine;

    (b)    may re-name any number of Shares (whether issued or unissued) as AEOI Shares, create a Separate Account with respect to such AEOI Shares and apply any AEOI related costs or withholding taxes to such Separate Account;

    (c)    allocate any AEOI costs or withholding tax among Separate Accounts on a basis determined solely by the Directors; and

    (d)    adjust the Net Asset Value per Share of any relevant Shares (including any AEOI Share).

35631852.5.C8689.187150        31

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*
*www.verify.gov.ky File#: 263805*

### Annexure

**Fiscal Year**

The fiscal year of the Company ends on the 31st day of December in each year, unless the Directors prescribe some other period therefor.

35631852.5.C8689.187150                                                32

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**CONFIDENTIAL**                                                                                    **TDIT005075**



PAGE  1

*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND KANSAS
CITY FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-THIRD
DAY OF NOVEMBER, A.D. 2011, AT 4:23 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE
NEW CASTLE COUNTY RECORDER OF DEEDS.

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9179752

DATE: 11-28-11

5070449  8100

111227849

You may verify this certificate online
at corp.delaware.gov/authver.shtml

FSD2025-0116                    **Page 123 of 1530**                    2025-08-19

State of Delaware
Secretary of State
Division of Corporations
Delivered 05:03 PM 11/23/2011
FILED 04:23 PM 11/23/2011
SRV 111227849 - 5070449 FILE

## CERTIFICATE OF INCORPORATION

## OF

## HIGHLAND KANSAS CITY FOUNDATION, INC.

FIRST: The name of the corporation is Highland Kansas City Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit the Greater Kansas City Community Foundation, a Missouri nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by the Greater Kansas City Community Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation

FSD2025-0116                                                      2025-08-19

39

CONFIDENTIAL                                                      TDIT005077

exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to the Greater Kansas City Community Foundation. If the Greater Kansas City Community Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 22 day of November, 2011.

James Dondero

- 2 -

78673.000002 EMF_US 37829386v4

CONFIDENTIAL                                                      TDIT005078

## HIGHLAND KANSAS CITY FOUNDATION, INC.

### Unanimous Written Consent of Directors
### In Lieu of Organizational Meeting

THE UNDERSIGNED, being all of the directors of Highland Kansas City Foundation, Inc. (the "Foundation"), a Delaware nonprofit nonstock corporation, do hereby consent to the adoption of, and do hereby adopt, the following resolutions pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, and hereby direct that this Written Consent be filed with the minutes of the proceedings of the Board of Directors of the Foundation:

### Approval of Certificate of Incorporation

The Certificate of Incorporation, filed with the Secretary of State of Delaware on November 23, 2011, is ratified and approved; and the Secretary is hereby ordered to file the Certificate of Incorporation in the minute book.

### Adoption of Bylaws

The bylaws attached to this consent is hereby adopted and approved as the Bylaws of the Foundation; and the Secretary is ordered to file a copy of the Bylaws in the minute book.

### Election of Officers

The following persons are elected as officers of the Foundation in the capacities set forth opposite their respective names below to serve until the next annual meeting of the Board of Directors and until their respective successors are elected and qualified or until their earlier death, resignation or removal:

President                       James Dondero
Secretary and Treasurer         Grant Scott

### Confirmation of Tax-Exempt Status

The officers are authorized (i) to proceed with preparation of an exemption application (IRS Form 1023) seeking to have the Foundation classified as a charitable organization under Section 501(c)(3) of the Internal Revenue Code, (ii) to sign the application and related documents on behalf of the Foundation, (iii) to file the completed application package with the Internal Revenue Service, and (iv) to deal with the Service in all matters relating to the exemption application both in person and

CONFIDENTIAL                                                      TDIT005079

through attorneys and other agents, all without any requirement to seek further authorization from the Board. When the Service issues a determination letter recognizing the Foundation's tax-exempt status, the Secretary is ordered to make copies of the exemption application and the IRS determination letter available for public inspection at the Foundation's principal office during regular business hours, as required by Section 6104(d) of the Internal Revenue Code.

### Ratification of Preorganization Activities

The Foundation hereby adopts, approves, ratifies and confirms all contracts and agreements entered into and all other actions taken or performed by the incorporator of the Foundation in connection with the incorporation, organization and commencement of business of this Foundation.

### Establishment of Corporate Bank Accounts

The officers of the Foundation are hereby authorized to open one or more commercial banking accounts for and in the name of the Foundation anywhere within the United States, at any time and from time to time, and to deposit to the credit of the Foundation in such banking accounts any monies, checks, drafts, orders or other commercial paper payable to the Foundation or its order, and at any time and from time to time to withdraw all or any part of the funds on deposit in the name of the Foundation in any such banking accounts and to designate or change the designation of the officer or officers or their designees who are authorized to make such deposits or withdrawals;

the forms of banking resolutions used by any banks in which accounts of the Foundation are established pursuant to the immediately preceding resolution, are hereby approved and adopted as if set forth herein in full;

the proper officers of the Foundation are hereby authorized to execute on behalf of the Foundation and to file with such banks (and the President or any Vice President or the Secretary of the Foundation is hereby authorized to certify) such forms of banking resolutions, together with proper signature cards designating the officers and agents of the Foundation who are authorized to sign checks and drafts to be paid from the Foundation's accounts in order to be filed in the minute book of the Foundation; and

with respect to any such banking accounts, any banking institution may act in reliance on such banking resolutions and signature cards until receipt of actual notice of the modification or revocation of the same.

CONFIDENTIAL TDIT005080

123

### Enabling Resolution

The officers of this Foundation be, and each of them hereby is, authorized, empowered and directed, for and on behalf of the Foundation, to take any and all further actions, to negotiate for and enter into agreements and amendments to agreements, to perform all such acts and things, to make, execute, file, deliver or record in the name and on behalf of the Foundation all such certificates, instruments, agreements, applications, papers or other documents, and to make all such payments as they, in their judgment, or in the judgment of any one or more of them, may deem necessary, advisable or appropriate in order to carry out the purposes and intent of, or consummate the transactions contemplated by, the foregoing resolutions and/or all of the transactions contemplated therein or thereby, and to carry on the business of this Foundation, the authorization therefor to be conclusively evidenced by the taking of such action or the execution and delivery of such certificates, instruments, agreements or documents.

*[Remainder of page intentionally left blank; signatures appear on following page.]*

CONFIDENTIAL                                                                    TDIT005081

IN WITNESS WHEREOF, the undersigned, being all of the directors of the Foundation, have caused this Unanimous Written Consent to be executed as of the 30th day of November, 2011.

James Dondero

Grant Scott

Deborah L. Wilkerson

78673.000002 EMF_US 38037496v2

CONFIDENTIAL TDIT005082

BYLAWS

OF

HIGHLAND KANSAS CITY FOUNDATION, INC.

CONFIDENTIAL                                              TDIT005083

## TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| | | | 1 |
| ARTICLE I | OFFICES | | 1 |
| | Section 1.1 | Registered Office | 1 |
| | Section 1.2 | Other Offices | 1 |
| ARTICLE II | MEMBERSHIP | | 1 |
| | Section 2.1 | Classes and Number | 1 |
| | Section 2.2 | Voting | 1 |
| | Section 2.3 | Transfer of Membership | 2 |
| | Section 2.4 | Resignation of Member | 2 |
| | Section 2.5 | Place of Meetings | 2 |
| | Section 2.6 | Annual Meetings | 2 |
| | Section 2.7 | Special Meetings | 2 |
| | Section 2.8 | Notice of Meetings of Members | 3 |
| | Section 2.9 | Quorum | 3 |
| | Section 2.10 | Voting | 3 |
| | Section 2.11 | Proxies | 3 |
| | Section 2.12 | Action by Written Consent | 4 |
| ARTICLE III | DIRECTORS | | 4 |
| | Section 3.1 | General Powers | 4 |
| | Section 3.2 | Number of Directors | 4 |
| | Section 3.3 | Vacancies | 4 |
| | Section 3.4 | Place of Meetings | 4 |
| | Section 3.5 | Committees of Directors | 4 |
| | Section 3.6 | Compensation of Directors | 4 |
| | Section 3.7 | Annual Meeting | 5 |
| | Section 3.8 | Additional Regular Meetings | 5 |
| | Section 3.9 | Special Meetings | 5 |
| | Section 3.10 | Method and Timing of Notice | 5 |
| | Section 3.11 | Purpose not Required in Notice | 5 |
| | Section 3.12 | Waiver of Notice | 6 |
| | Section 3.13 | Action by Written Consent | 6 |
| | Section 3.14 | Validation of Action by Consent | 6 |
| | Section 3.15 | Quorum and Manner of Acting | 6 |
| | Section 3.16 | Resignation and Removal of Directors | 6 |
| ARTICLE IV | OFFICERS | | 6 |
| | Section 4.1 | Officers | 7 |
| | Section 4.2 | Election, Term of Office and Eligibility | 7 |
| | Section 4.3 | Subordinate Officers | |

-i-

Section 4.4     Removal ...................................................................................... 7
Section 4.5     The President ............................................................................ 7
Section 4.6     The Secretary ........................................................................... 7
Section 4.7     The Assistant Secretaries ........................................................ 7
Section 4.8     Chairman................................................................................... 8
Section 4.9     The Chief Financial Officer ..................................................... 8
Section 4.10    The Assistant Chief Financial Officers.................................... 8
Section 4.11    Delegation of Duties ................................................................ 8

ARTICLE V      BOOKS AND RECORDS............................................................ 8

Section 5.1     Location .................................................................................... 8
Section 5.2     Inspection.................................................................................. 9

ARTICLE VI     MISCELLANEOUS PROVISIONS.............................................. 9

Section 6.1     Fiscal Year ................................................................................ 9
Section 6.2     Depositories .............................................................................. 9
Section 6.3     Checks, Drafts and Notes.......................................................... 9
Section 6.4     Contracts and Other Instruments .............................................. 9
Section 6.5     Conflicts of Interest................................................................... 9
Section 6.6     Waivers of Notice ..................................................................... 10
Section 6.7     Ownership Interests in Other Entities....................................... 10
Section 6.8     Indemnification. ........................................................................ 10
Section 6.9     Amendment of Bylaws. ............................................................. 12

-ii-

CONFIDENTIAL                                                               TDIT005085

FSD2025-0116
2025-08-19

# BYLAWS

## OF

## HIGHLAND KANSAS CITY FOUNDATION, INC.

### ARTICLE I

### OFFICES

Section 1.1   Registered Office. The registered office of Highland Kansas City Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2   Other Offices. The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

### ARTICLE II

### MEMBERSHIP

Section 2.1   Classes and Number. The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be the Greater Kansas City Community Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2   Voting. Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members. In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3   Transfer of Membership. Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member

-1-

FSD2025-0116

CONFIDENTIAL

TDIT005086

interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4    Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5    Place of Meetings. All meetings of the members shall be held by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6    Annual Meetings. Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7    Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting.   The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8    Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the

-2-

CONFIDENTIAL TDIT005087

facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9    Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10    Voting. When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11    Proxies. At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12    Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.13. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

-3-

CONFIDENTIAL TDIT005088

## ARTICLE III

## DIRECTORS

Section 3.1    General Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2    Number of Directors. The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3    Vacancies. If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4    Place of Meetings. The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5    Committees of Directors. The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6    Compensation of Directors. Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7    Annual Meeting. The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of

-4-

CONFIDENTIAL                                                                    TDIT005089

Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8    Additional Regular Meetings. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9    Special Meetings. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10    Method and Timing of Notice. Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

Section 3.11    Purpose not Required in Notice. Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12    Waiver of Notice. Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

-5-

CONFIDENTIAL                                                                    TDIT005090

Section 3.13    Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14    Validation of Action by Consent. All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15    Quorum and Manner of Acting. A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16    Resignation and Removal of Directors. Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

## ARTICLE IV

## OFFICERS

Section 4.1    Officers. The officers of the Corporation shall include a President and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

-6-

CONFIDENTIAL                                                              TDIT005091

134

FSD2025-0116                    **Page 138 of 1530**                    2025-08-19

Section 4.2     Election, Term of Office and Eligibility. The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof. Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3     Subordinate Officers. The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4     Removal. The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5     The President. The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6     The Secretary. The Secretary shall:

(a)     keep the minutes of the meetings of the members and of the Board of Directors;

(b)     see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)     be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d)     in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7     The Assistant Secretaries. If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant

-7-

FSD2025-0116                                                                    2025-08-19

54

CONFIDENTIAL

TDIT005092

Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8 Chairman. The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9 The Chief Financial Officer. The Chief Financial Officer, if any, shall:

(a) receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b) render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c) in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10 The Assistant Chief Financial Officers. If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11 Delegation of Duties. In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V

### BOOKS AND RECORDS

Section 5.1 Location. The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

-8-

Section 5.2    Inspection. The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1    Fiscal Year. The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2    Depositories. The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3    Checks, Drafts and Notes. All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4    Contracts and Other Instruments. The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances.

Section 6.5    Conflicts of Interest. No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

-9-

CONFIDENTIAL                                                                                      TDIT005094

Section 6.6   Waivers of Notice. Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members, Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7   Ownership Interests in Other Entities. Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8   Indemnification.

(a)   Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)   If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the

-10-

CONFIDENTIAL                                                              TDIT005095

unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c) The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d) The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e) To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f) Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g) The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

-11-

CONFIDENTIAL TDIT005096

Section 6.9    <u>Amendment of Bylaws</u>. Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors.

-12-

99900.13475 EMF_US 37828905v7

CONFIDENTIAL                                                                TDIT005097



### Delaware

PAGE  1

#### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND DALLAS FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2011, AT 7:34 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9177054

DATE: 11-23-11

5069985  8100

111224468

You may verify this certificate online
at corp.delaware.gov/authver.shtml

**CONFIDENTIAL**                                        **TDIT005098**

141

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:17 PM 11/22/2011
FILED 07:34 PM 11/22/2011
SRV 111224468 - 5069985 FILE

## CERTIFICATE OF INCORPORATION

### OF

## HIGHLAND DALLAS FOUNDATION, INC.

FIRST: The name of the corporation is Highland Dallas Foundation. Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit The Dallas Foundation, a Texas nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by The Dallas Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws: provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions

CONFIDENTIAL

TDIT005099

FSD2025-0116

2025-08-19

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to The Dallas Foundation. If The Dallas Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 2\_ day of November, 2011.

_____
James Dondero

- 2 -

FSD2025-0116

2025-08-19
62

CONFIDENTIAL

TDIT005100

FSD2025-0116                                                                 2025-08-19

**BYLAWS**
**OF**

**HIGHLAND DALLAS FOUNDATION, INC.**

CONFIDENTIAL                                                              TDIT005101

144

FSD2025-0116                    Page 148 of 1530                    2025-08-19

## TABLE OF CONTENTS

**Page**

ARTICLE I OFFICES ..................................................................................................1

    Section 1.1    Registered Office ....................................................................1
    Section 1.2    Other Offices ...........................................................................1

ARTICLE II MEMBERSHIP ......................................................................................1

    Section 2.1    Classes and Number................................................................1
    Section 2.2    Voting .....................................................................................1
    Section 2.3    Transfer of Membership .........................................................1
    Section 2.4    Resignation of Member...........................................................2
    Section 2.5    Place of Meetings....................................................................2
    Section 2.6    Annual Meetings .....................................................................2
    Section 2.7    Special Meetings .....................................................................2
    Section 2.8    Notice of Meetings of Members .............................................2
    Section 2.9    Quorum ...................................................................................3
    Section 2.10    Voting .....................................................................................3
    Section 2.11    Proxies....................................................................................3
    Section 2.12    Action by Written Consent .....................................................3

ARTICLE III DIRECTORS .........................................................................................4

    Section 3.1    General Powers .......................................................................4
    Section 3.2    Number of Directors ...............................................................4
    Section 3.3    Vacancies ...............................................................................4
    Section 3.4    Place of Meetings....................................................................4
    Section 3.5    Committees of Directors .........................................................4
    Section 3.6    Compensation of Directors .....................................................4
    Section 3.7    Annual Meeting ......................................................................4
    Section 3.8    Additional Regular Meetings..................................................5
    Section 3.9    Special Meetings .....................................................................5
    Section 3.10    Method and Timing of Notice.................................................5
    Section 3.11    Purpose not Required in Notice ..............................................5
    Section 3.12    Waiver of Notice ....................................................................5
    Section 3.13    Action by Written Consent. ....................................................6
    Section 3.14    Validation of Action by Consent ...........................................6
    Section 3.15    Quorum and Manner of Acting...............................................6
    Section 3.16    Resignation and Removal of Directors ...................................6

ARTICLE IV OFFICERS..............................................................................................6

    Section 4.1    Officers ...................................................................................6
    Section 4.2    Election, Term of Office and Eligibility.................................7

-i-

FSD2025-0116                                                        2025-08-19

64

CONFIDENTIAL                                                        TDIT005102

**FSD2025-0116**                                                              2025-08-19

Section 4.3          Subordinate Officers ...................................................................7
Section 4.4          Removal ...................................................................................7
Section 4.5          The President ...........................................................................7
Section 4.6          The Secretary ...........................................................................7
Section 4.7          The Assistant Secretaries ..........................................................7
Section 4.8          Chairman .................................................................................8
Section 4.9          The Chief Financial Officer .........................................................8
Section 4.10         The Assistant Chief Financial Officers ..........................................8
Section 4.11         Delegation of Duties ..................................................................8

ARTICLE V BOOKS AND RECORDS ..................................................................8

Section 5.1          Location ...................................................................................8
Section 5.2          Inspection .................................................................................9

ARTICLE VI MISCELLANEOUS PROVISIONS .....................................................9

Section 6.1          Fiscal Year ...............................................................................9
Section 6.2          Depositories .............................................................................9
Section 6.3          Checks, Drafts and Notes...........................................................9
Section 6.4          Contracts and Other Instruments ..............................................9
Section 6.5          Conflicts of Interest...................................................................9
Section 6.6          Waivers of Notice ....................................................................10
Section 6.7          Ownership Interests in Other Entities.........................................10
Section 6.8          Indemnification .......................................................................10
Section 6.9          Amendment of Bylaws .............................................................11

-ii-

FSD2025-0116                                                                    2025-08-19

BYLAWS

OF

HIGHLAND DALLAS FOUNDATION, INC.

## ARTICLE I

## OFFICES

Section 1.1    Registered Office.  The registered office of Highland Dallas Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2    Other Offices.  The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II

## MEMBERSHIP

Section 2.1    Classes and Number.  The Corporation shall have two classes of members and one member in each such class:  the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2    Voting.  Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members.  In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3    Transfer of Membership.  Institutional Membership in the Corporation is not transferable or assignable.  The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member.  Subject to the approval of the Institutional Member, Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member.  Each successor Individual Member shall succeed to the rights of the initial Individual Member.  Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member

-1-

FSD2025-0116                                                                    2025-08-19

CONFIDENTIAL

TDIT005104

interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member.  In the event of a conflict between such transfer documents, the one bearing the latest date shall control.  Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member.  If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder.  In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4     Resignation of Member.  A member may resign at any time upon written notice to the Secretary.

Section 2.5     Place of Meetings.  All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6     Annual Meetings.  Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting.  The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7     Special Meetings.  Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting.  Such request shall state the purpose or purposes of the proposed meeting.   The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8     Notice of Meetings of Members.  When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting).  Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone.  If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid.  If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address.  If delivered by facsimile, such notice shall be deemed to be delivered when the

-2-

FSD2025-0116                                       2025-08-19

facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number.  If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9    Quorum.  Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws.  If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy.  At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10    Voting.  When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11    Proxies.  At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law.  Any member represented by proxy shall be counted as present at such meeting for all purposes.  Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12    Action by Written Consent.  Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted.  A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12.  Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action.  Each such consent must state the date of each member's signature.  Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

FSD2025-0116                                                                                2025-08-19

CONFIDENTIAL                                                       TDIT005106

## ARTICLE III

## DIRECTORS

Section 3.1    General Powers.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2    Number of Directors.  The number of Directors that shall constitute the Board of Directors shall be three (3).  Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member.  Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3    Vacancies.  If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy.  If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director.  Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4    Place of Meetings.  The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5    Committees of Directors.  The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6    Compensation of Directors.  Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7    Annual Meeting.  The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors.  If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of

**CONFIDENTIAL**                                                    **TDIT005107**

Directors, no further notice of such annual meeting shall be required.  If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8     <u>Additional Regular Meetings</u>.  The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors.  If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required.  If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9     <u>Special Meetings</u>.  Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3)  days notice to each director.  The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10     <u>Method and Timing of Notice</u>.  Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting.  Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone.  If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid.  If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address.  If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number.  If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

Section 3.11     <u>Purpose not Required in Notice</u>.  Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12     <u>Waiver of Notice</u>.  Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice.  A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

**CONFIDENTIAL**                                        **TDIT005108**

Section 3.13 <u>Action by Written Consent</u>. Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14 <u>Validation of Action by Consent</u>. All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15 <u>Quorum and Manner of Acting</u>. A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16 <u>Resignation and Removal of Directors</u>. Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

**ARTICLE IV**

**OFFICERS**

Section 4.1 <u>Officers</u>. The officers of the Corporation shall include a President and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

-6-

Section 4.2    Election, Term of Office and Eligibility.  The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof.  Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal.  None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3    Subordinate Officers.  The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine.  The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4    Removal.  The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause.  Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5    The President.  The President shall be the chief executive officer of the Corporation.  He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation.  In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6    The Secretary.  The Secretary shall:

(a)    keep the minutes of the meetings of the members and of the Board of Directors;

(b)    see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)    be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d)    in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7    The Assistant Secretaries.  If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant

-7-

**CONFIDENTIAL**                                                                                    TDIT005110

Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8     Chairman.  The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9     The Chief Financial Officer.  The Chief Financial Officer, if any, shall:

(a)     receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things:  keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b)     render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c)     in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10     The Assistant Chief Financial Officers.  If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11     Delegation of Duties.  In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V

## BOOKS AND RECORDS

Section 5.1     Location.  The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

-8-

**FSD2025-0116**                    **2025-08-19**

73

**CONFIDENTIAL**                    **TDIT005111**

Section 5.2    Inspection.  The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1    Fiscal Year.  The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2    Depositories.  The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3    Checks, Drafts and Notes.  All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4    Contracts and Other Instruments.  The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances.

Section 6.5    Conflicts of Interest.  No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment.  All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

**CONFIDENTIAL**                                                                     **TDIT005112**

Section 6.6    <u>Waivers of Notice</u>.  Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members, Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7    <u>Ownership Interests in Other Entities</u>.  Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8    <u>Indemnification</u>.

(a)    Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators.  The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise.  The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)    If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the

-10-

156

unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c) The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d) The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e) To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f) Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g) The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9 <u>Amendment of Bylaws</u>. Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the

-11-

CONFIDENTIAL TDIT005114

157

Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

-12-

77

**CONFIDENTIAL**                                                            **TDIT005115**



# Delaware

PAGE 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND SANTA BARBARA FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2011, AT 7:36 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9177064

DATE: 11-23-11

5069989 8100

111224480

You may verify this certificate online
at corp.delaware.gov/authver.shtml

**CONFIDENTIAL** TDIT005116

159

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:17 PM 11/22/2011
FILED 07:36 PM 11/22/2011
SRV 111224480 - 5069989 FILE

## CERTIFICATE OF INCORPORATION

### OF

## HIGHLAND SANTA BARBARA FOUNDATION, INC.

FIRST: The name of the corporation is Highland Santa Barbara Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated, exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit Santa Barbara Foundation, a California nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code of 1986 as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by Santa Barbara Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions

CONFIDENTIAL                                          TDIT005117

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to Santa Barbara Foundation. If Santa Barbara Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 2L day of November, 2011.

James Dondero

- 2 -

CONFIDENTIAL                                                              TDIT005118

FSD2025-0116                     **Page 165 of 1530**                     2025-08-19

**BYLAWS**
**OF**

**HIGHLAND SANTA BARBARA FOUNDATION, INC.**

CONFIDENTIAL                                                    TDIT005119

FSD2025-0116　　　　　　　　　**Page 166 of 1530**　　　　　　　　　2025-08-19

## TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| ARTICLE I | OFFICES | | 1 |
| | Section 1.1 | Registered Office | 1 |
| | Section 1.2 | Other Offices | 1 |
| ARTICLE II | MEMBERSHIP | | 1 |
| | Section 2.1 | Classes and Number | 1 |
| | Section 2.2 | Voting | 1 |
| | Section 2.3 | Transfer of Membership | 1 |
| | Section 2.4 | Resignation of Member | 2 |
| | Section 2.5 | Place of Meetings | 2 |
| | Section 2.6 | Annual Meetings | 2 |
| | Section 2.7 | Special Meetings | 2 |
| | Section 2.8 | Notice of Meetings of Members | 2 |
| | Section 2.9 | Quorum | 3 |
| | Section 2.10 | Voting | 3 |
| | Section 2.11 | Proxies | 3 |
| | Section 2.12 | Action by Written Consent | 3 |
| ARTICLE III | DIRECTORS | | 4 |
| | Section 3.1 | General Powers | 4 |
| | Section 3.2 | Number of Directors | 4 |
| | Section 3.3 | Vacancies | 4 |
| | Section 3.4 | Place of Meetings | 4 |
| | Section 3.5 | Committees of Directors | 4 |
| | Section 3.6 | Compensation of Directors | 4 |
| | Section 3.7 | Annual Meeting | 4 |
| | Section 3.8 | Additional Regular Meetings | 5 |
| | Section 3.9 | Special Meetings | 5 |
| | Section 3.10 | Method and Timing of Notice | 5 |
| | Section 3.11 | Purpose not Required in Notice | 5 |
| | Section 3.12 | Waiver of Notice | 5 |
| | Section 3.13 | Action by Written Consent | 6 |
| | Section 3.14 | Validation of Action by Consent | 6 |
| | Section 3.15 | Quorum and Manner of Acting | 6 |
| | Section 3.16 | Resignation and Removal of Directors | 6 |
| ARTICLE IV | OFFICERS | | 6 |
| | Section 4.1 | Officers | 6 |
| | Section 4.2 | Election, Term of Office and Eligibility | 7 |

-i-

Section 4.3     Subordinate Officers .................................................................... 7
Section 4.4     Removal .................................................................................... 7
Section 4.5     The President ............................................................................ 7
Section 4.6     The Secretary ........................................................................... 7
Section 4.7     The Assistant Secretaries ........................................................... 7
Section 4.8     Chairman.................................................................................. 8
Section 4.9     The Chief Financial Officer ........................................................ 8
Section 4.10    The Assistant Chief Financial Officers ......................................... 8
Section 4.11    Delegation of Duties .................................................................. 8

ARTICLE V     BOOKS AND RECORDS .................................................................. 8

Section 5.1     Location ................................................................................... 8
Section 5.2     Inspection................................................................................. 9

ARTICLE VI    MISCELLANEOUS PROVISIONS ...................................................... 9

Section 6.1     Fiscal Year ............................................................................... 9
Section 6.2     Depositories. ............................................................................. 9
Section 6.3     Checks, Drafts and Notes............................................................ 9
Section 6.4     Contracts and Other Instruments. ................................................. 9
Section 6.5     Conflicts of Interest................................................................... 9
Section 6.6     Waivers of Notice ..................................................................... 10
Section 6.7     Ownership Interests in Other Entities ........................................... 10
Section 6.8     Indemnification. ......................................................................... 10
Section 6.9     Amendment of Bylaws. ............................................................... 11

-ii-

**CONFIDENTIAL**                                                TDIT005121

FSD2025-0116                    **Page 168 of 1530**                    2025-08-19

# BYLAWS

OF

## HIGHLAND SANTA BARBARA FOUNDATION, INC.

### ARTICLE I

### OFFICES

Section 1.1    Registered Office. The registered office of Highland Santa Barbara Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2    Other Offices. The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

### ARTICLE II

### MEMBERSHIP

Section 2.1    Classes and Number. The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be Santa Barbara Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2    Voting. Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members. In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3    Transfer of Membership. Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member

-1-

FSD2025-0116                                                        2025-08-19
84

CONFIDENTIAL                                                        TDIT005122

interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4    Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5    Place of Meetings. All meetings of the members shall be held by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6    Annual Meetings. Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7    Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8    Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the

-2-

CONFIDENTIAL TDIT005123

facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9    Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10    Voting. When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11    Proxies. At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12    Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.13. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

-3-

## ARTICLE III

## DIRECTORS

Section 3.1    General Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2    Number of Directors. The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3    Vacancies. If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4    Place of Meetings. The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5    Committees of Directors. The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6    Compensation of Directors. Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7    Annual Meeting. The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of

-4-

CONFIDENTIAL TDIT005125

Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8    Additional Regular Meetings. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9    Special Meetings. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10    Method and Timing of Notice. Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

Section 3.11    Purpose not Required in Notice. Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12    Waiver of Notice. Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

CONFIDENTIAL                                                                    TDIT005126

FSD2025-0116                                                                2025-08-19

Section 3.13   Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14   Validation of Action by Consent. All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15   Quorum and Manner of Acting. A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16   Resignation and Removal of Directors. Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

**ARTICLE IV**

**OFFICERS**

Section 4.1   Officers. The officers of the Corporation shall include a President and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

-6-

CONFIDENTIAL                                                              TDIT005127

Section 4.2    Election, Term of Office and Eligibility. The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof. Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3    Subordinate Officers. The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4    Removal. The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5    The President. The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6    The Secretary. The Secretary shall:

(a)    keep the minutes of the meetings of the members and of the Board of Directors;

(b)    see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)    be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d)    in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7    The Assistant Secretaries. If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant

-7-

Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8 <u>Chairman</u>. The Chairman, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9 <u>The Chief Financial Officer</u>. The Chief Financial Officer, if any, shall:

(a)    receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things:  keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b)    render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c)    in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10 <u>The Assistant Chief Financial Officers</u>. If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11 <u>Delegation of Duties</u>. In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V

## BOOKS AND RECORDS

Section 5.1 <u>Location</u>. The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

-8-

Section 5.2 Inspection. The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1 Fiscal Year. The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2 Depositories. The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3 Checks, Drafts and Notes. All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4 Contracts and Other Instruments. The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances.

Section 6.5 Conflicts of Interest. No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

-9-

CONFIDENTIAL TDIT005130

Section 6.6   <u>Waivers of Notice</u>. Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members, Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7   <u>Ownership Interests in Other Entities</u>. Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8   <u>Indemnification</u>.

(a)   Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)   If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the

-10-

unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c)    The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d)    The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e)    To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f)    Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g)    The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9    Amendment of Bylaws. Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations

-11-

or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors.

-12-

**FSD2025-0116**

**2025-08-19**



GREATER KANSAS CITY
COMMUNITY FOUNDATION

# PROCEDURES FOR ESTABLISHMENT AND OPERATION OF FUNDS AND SUPPORTING ORGANIZATIONS

---

<u>INDEX</u>

**PART A.    RULES GOVERNING ALL FUNDS AND SUPPORTING ORGANIZATIONS**  1

Section 1.    TYPES OF DONORS, FUNDS, SUPPORTING ORGANIZATIONS AND
SPLIT-INTEREST ARRANGEMENTS    1
    a.   Eligible Donors
    b.   Funds
    c.   Supporting Organizations
    d.   Split-Interest Arrangements

Section 2.    ACCEPTANCE OF CONTRIBUTIONS    2
    a.   General Policies and Approval
    b.   Review and Approval of Contributions
    c.   Written Acknowledgment of Acceptance of Contributions
    d.   Donor's Counsel
    e.   Minimum Initial Contributions
    f.   Additional Contributions
    g.   Contributions are Irrevocable
    h.   Donor Restrictions on Use of Property
    i.   Policy to Sell Contributed Property
    j.   Tax Deduction vs. Net Proceeds from Sale of Contributed Property
    k.   Confidentiality and Privacy Policy

Section 3.    INVESTMENT POLICIES    4

Section 4.    ADMINISTRATIVE EXPENSES    5

Section 5.    CHARITABLE PURPOSE    5

Section 6.    EDUCATIONAL PROGRAM    5

Section 7.    AMENDMENTS    5

**PART B.    FUNDS**    5

Section 1.    TYPES OF FUNDS    5
    a.   Donor-Advised Funds
    b.   Designated Funds
    c.   Organization Funds
    d.   Field of Interest Funds
    e.   Scholarship Funds
    f.   Unrestricted Funds

i

Last updated: 9/13/2023

Section 2.    GENERAL POLICIES                                                                    6

Section 3.    DONOR MAY SELECT NAME OF FUND                                                      6

Section 4.    DISTRIBUTIONS                                                                      6
    a.   Grants Shall Follow Donor's Intent
    b.   Grants Will Normally Identify the Name of the Fund
    c.   Grants Must Not Provide More Than an Incidental Benefit to Donor
    d.   Other Limits on Distributions
    e.   Donor Generally Cannot Control Timing of Grants
    f.   Board May Identify Specific Charitable Needs of the Community

Section 5.    VARIANCE POWER AND MONITORING FUNCTION                                             8
    a.   Community Foundation to Follow General Donor Intent if Variance Power is Exercised
    b.   Fund to Keep Donor's Name if Variance Power Exercised
    c.   Community Foundation to Monitor Beneficiary's Performance of Terms of Grant

Section 6.    ADVISORY COMMITTEES OF FUNDS                                                       8
    a.   General Rules
    b.   Usually Majority Vote is Required
    c.   Authority to Act as Agent of Community Foundation Restricted
    d.   Fundraising
    e.   Divorce/Separation of Current Donor Advisors

Section 7.    SPECIAL RULES FOR DONOR-ADVISED FUNDS                                             10
    a.   Establishment and Purpose
    b.   Distributions from Donor-Advised Funds
    c.   Minimum Grant Amount from Donor-Advised Funds
    d.   Grant Activity Policy
    e.   Eligible Advisors During the Donor(s)' Lifetime
    f.   Successor Advisors After the Death of Donor(s)
    g.   Option to Split Funds for Successor Advisors
    h.   Conversion of Donor-Advised Fund After Advisory Privilege Ends

Section 8.    SPECIAL RULES FOR DESIGNATED FUNDS                                                13
    a.   Establishment and Purpose
    b.   Monitoring Function and Variance Power

Section 9.    SPECIAL RULES FOR ORGANIZATION FUNDS                                              13
    a.   Establishment and Purpose
    b.   Monitoring Function and Variance Power

Section 10.    SPECIAL RULES FOR FIELD OF INTEREST FUNDS                                        13
    a.   Establishment and Purpose
    b.   Geographic Affiliates
    c.   Monitoring Function and Variance Power

Section 11.    SPECIAL RULES FOR SCHOLARSHIP FUNDS                                              14
    a.   Establishment and Purpose
    b.   Employer-Sponsored Scholarship Funds
    c.   Other Permitted Grants to Individuals
    d.   Monitoring Function and Variance Power
    e.   Conflict of Interest

ii

Last updated: 9/13/2023

**CONFIDENTIAL**                                                          **TDIT005135**

178

**FSD2025-0116**                 **Page 182 of 1530**                 **2025-08-19**

Section 12.    SPECIAL RULES FOR TRUSTS CREATED AS COMPONENT FUNDS                16

**PART C.      SUPPORTING ORGANIZATIONS**                16

Section 1.    ESTABLISHMENT AND PURPOSE                16
  a.    Definition and Tax Status
  b.    Technical Requirements Under the Tax Laws
  c.    Tax Advantages of Supporting Organization

Section 2.    POLICIES APPLICABLE TO A SUPPORTING ORGANIZATION                17

Section 3.    TERMINATION OF RELATIONSHIP                18

**PART D.      SPLIT-INTEREST ARRANGEMENTS**                18

Section 1.    DEFINITIONS                18
  a.    Charitable Gift Annuity
  b.    Charitable Remainder Annuity Trust
  c.    Charitable Remainder Unitrust
  d.    Charitable Lead Trust
  e.    Retained Life Estate

Section 2.    COMMUNITY FOUNDATION AS TRUSTEE; MINIMUM CONTRIBUTIONS;
   OTHER CONDITIONS                19
  a.    Community Foundation as Trustee of Split-Interest Gifts
  b.    Minimum Contributions
  c.    Other Conditions

**APPENDIX**                21

**TAX LAWS THAT GOVERN INCOME TAX CHARITABLE CONTRIBUTIONS**                21

Section 1.    TIMING OF INCOME TAX DEDUCTIONS                21

Section 2.    EVIDENCE OF DEDUCTION REQUIRED                21
  a.    Any Contribution of $250 or More
  b.    Appraisals Required for Gifts of Property Over $5,000; Exceptions for Cash
   and Publicly Traded Securities

Section 3.    AMOUNT OF INCOME TAX DEDUCTION                22

Section 4.    ANNUAL DEDUCTION LIMITATIONS                22
  a.    Individuals
  b.    Business Entities
  c.    Trusts and Estates

Section 5.    TREATMENT OF EXCESS BUSINESS HOLDINGS                23

Approved: 5/31/00;
Updated 5/24/01, 9/13/06, 12/6/06, 12/13/07,
12/10/08, 12/09/09, 12/08/10, 3/9/11, 11/14/12,
9/29/16, 9/11/19, 9/16/20, 11/16/22 and 9/13/2023

iii

179

**FSD2025-0116**                     **Page 183 of 1530**                     **2025-08-19**

# PROCEDURES FOR ESTABLISHMENT AND OPERATION OF FUNDS AND SUPPORTING ORGANIZATIONS

THE GREATER KANSAS CITY COMMUNITY FOUNDATION has established the following procedures in order to carry out its mission:

Improve the quality of life in Greater Kansas City by increasing charitable giving, educating and connecting donors to community needs they care about, and leading on critical community issues.

## PART A.  RULES GOVERNING ALL FUNDS AND SUPPORTING ORGANIZATIONS

**Section 1.**  *Types of Donors, Funds, Supporting Organizations and Split-Interest Arrangements*

A Donor may establish with the Community Foundation one or more Funds, Supporting Organizations and Split-Interest Arrangements.  A Fund is a component part of the Community Foundation; grants are made from each Fund to carry out the charitable purposes specified by the Donor.  Supporting Organizations and Split-Interest Trusts are not Funds and generally constitute separate legal entities.  Split-Interest Arrangements are ways to make a deferred gift to establish a Fund.  Included within these categories are:

a.  Eligible Donors
The Community Foundation will accept contributions from the following types of Donors:
1. Individuals and family members
2. Corporations/Partnerships/Limited Liability Companies
3. Nonprofit Organizations
4. Private Foundations
5. Various Branches of Government
6. Collective private groups of concerned citizens and associations
7. Bequests and Trusts

b.  Funds
1. Donor-Advised Funds
2. Designated Funds
3. Nonprofit Organization Funds
4. Field of Interest Funds
5. Scholarship Funds
6. Unrestricted Funds

c.  Supporting Organizations

d.  Split-Interest Arrangements
1. Charitable Gift Annuities
2. Charitable Remainder Annuity Trusts
3. Charitable Remainder Unitrusts
4. Charitable Lead Trusts
5. Retained Life Estate

1

**FSD2025-0116**                     **2025-08-19**
99
**CONFIDENTIAL**                     **TDIT005137**

FSD2025-0116                          **Page 184 of 1530**                          2025-08-19

**Section 2.** *Acceptance of Contributions*

a.   General Policies and Approval

Requests to establish Funds, Supporting Organizations or Split-Interest Arrangements with the Community Foundation will be reviewed by the staff (and by the Board of Directors (or a designated committee) if the staff determines such a review is necessary) for consistency with the Community Foundation's charitable purposes and specific charitable needs.  The senior management officers of the Community Foundation have the authority to approve the establishment of individual Funds and affiliated relationships/agreements/contracts.  With respect to supporting organizations, the senior management officers have the authority to recommend approval of a particular supporting organization relationship to the Board of Directors, but the Board of Directors (or a designated committee) shall have the final authority to formally approve the relationship by appointing the requisite number of directors to the supporting organization's board.

b.   Review and Approval of Contributions

All contributions are subject to the review and approval by the Community Foundation prior to acceptance. The Community Foundation's staff generally has the authority to accept contributions of cash and marketable securities (those that are actively traded and sellable on the open market).  A senior management officer of the Community Foundation before acceptance will review contributions of all other assets that are not readily marketable and shall consider the value of the asset, the likelihood that the asset can be quickly liquidated, the charitable nature of the gift, potential risks to the Foundation, carrying costs, and unrelated business income tax consequences.  Contributions of illiquid assets include but are not limited to closely held securities, limited liability companies (LLC's), limited partnerships and tangible personal property and require prior approval per gift acceptance policies as established and approved by the Board of Directors (or a designated committee).  Contributions of real estate shall be handled by the Real Estate Charitable Foundation, a supporting organization of the Community Foundation, and are subject to the review and approval by the board of directors of the Real Estate Charitable Foundation.

Contributions that would violate the excess business holdings rule for donor-advised funds under the Pension Protection Act of 2006 are generally prohibited, but may be accepted in special circumstances if reviewed and approved by a senior management officer of the Community Foundation. Any interest in an entity in which any interest is owned by a donor or advisor to a donor-advised fund, by a family member of any such person, or by an entity in which any of the foregoing persons has an interest shall be referred to the Foundation's senior management and legal team for an opinion on the possible application of Section 4943 of the Internal Revenue Code of 1986, as amended (hereinafter "Code").  *See* Appendix: Section 5 for treatment of excess business holdings.

For any publicly traded non-cash assets held in a Fund, should sufficient liquidity not be available in the Fund to cover any expenses, taxes or liabilities due as a result of the Fund's ownership of such assets, the Donor will be expected to contribute additional liquid assets to the Fund as necessary to fully and timely fund such obligations.

For illiquid non-cash assets, the Donor will be required to sign a gift agreement whereby the Donor agrees to indemnify and reimburse the Community Foundation for, from and against all taxes owed or expenses and liabilities incurred because of the Community Foundation's ownership of the asset. The Donor must also agree to contribute additional liquid assets to their Fund as necessary to cover such obligations should sufficient liquidity not be available in their Fund.

c.   Written Acknowledgment of Acceptance of Contributions

The Community Foundation will provide written confirmation at the time of acceptance of any contribution that is required by the IRS to be documented by an acknowledgment for the Donor's tax return.  The

2

**CONFIDENTIAL**                                              **TDIT005138**

**FSD2025-0116**                                                                                      **2025-08-19**

Community Foundation, in its discretion, may also provide written confirmation of contributions that are not otherwise required by the IRS to be acknowledged.  Contributions not accepted will be returned as soon as practical.  The confirmation will include the dollar amount of the contribution of any cash gifts and may include the average of the high and low selling prices on the date of the gift for marketable securities such as publicly traded stocks, bonds and mutual fund shares.  Acknowledgement of illiquid non-cash assets will only include a description of the gift but will not include a dollar value of the donated asset.  Donors should obtain a qualified appraisal prior to making such a contribution.  (The IRS generally requires a donor to obtain a qualified appraisal for illiquid assets no earlier than 60 days before the date of the gift and no later than the due date (including extensions) for the income tax return where the donor first claims a deduction for the gift.)

d.   Donor's Counsel

The Community Foundation encourages each prospective Donor to have the terms of all proposed agreements reviewed by the Donor's legal, tax and/or financial advisors.  The Community Foundation does not provide legal, tax or financial advice.  The Donor is advised that it is the Donor's responsibility to obtain any necessary appraisals, file appropriate tax returns, and defend against any challenges to claims of tax benefits.

e.   Minimum Initial Contributions

Generally, there is no minimum amount to establish a named Fund with the exception of Scholarship Funds, which require a minimum contribution of $25,000 to establish.

The minimum amounts to establish a Split-Interest Arrangement are:

1.  Charitable Gift Annuity                        $100,000
2.  Charitable Remainder Annuity Trust             $250,000
3.  Charitable Remainder Unitrust                  $250,000

The minimum amounts necessary to establish a Supporting Organization will be mutually agreed upon by the Board of Directors (or its designated committee) and the Donor or the governing body of the Supporting Organization.

f.   Additional Contributions

Additional contributions of cash and actively traded marketable securities to an established Fund may be made in any amount at any time.  Gifts of other assets (illiquid assets) require advanced approval per gift acceptance policies approved by the Board of Directors (or a designated committee) (see Section 2.b. above).  However, federal tax laws prohibit additional contributions to a charitable remainder annuity trust or a charitable gift annuity.  In these cases, a new trust or annuity agreement will be necessary.

g.   Contributions are Irrevocable

Any contribution made to the Community Foundation, once accepted, represents an irrevocable charitable contribution to the Greater Kansas City Community Foundation.  Contributions to the Community Foundation are not refundable.

h.   Donor Restrictions on Use of Property

Federal tax laws provide that a Donor to the Community Foundation may not impose any "material restriction" (a term defined in the Treasury Regulations), which prevents the Community Foundation from freely and effectively employing the contributed assets, or the income derived therefrom, in furtherance of

3

**CONFIDENTIAL**                                                                          **TDIT005139**

its charitable purposes.  Any restriction (beyond the specified charitable purposes stated in the instrument of transfer) sought to be imposed by a Donor is subject to review and approval by the Community Foundation.

i.    Policy to Sell Contributed Property

The general policy of the Community Foundation is to sell all contributed property as soon as practical after receipt so as to minimize market risk.  For non-publicly traded securities or other assets for which no readily liquid market exists, the Community Foundation will exercise discretion as to the timing and price of sales.  Closely held stock or other assets for which no readily liquid market exists that are retained for any reason and that are valued in excess of $3,000,000 (or, in the aggregate, are of material value compared to the other assets of the Community Foundation), shall be revalued every three (3) years from the date of the gift to the Community Foundation.  The cost of the valuation shall be an expense of the Fund, Supporting Organization or Split-Interest Arrangement holding such asset.

Any costs incurred by the Community Foundation necessary for the disposition of securities and other assets (i.e., legal and appraisal fees) and for the management of such assets prior to disposition will be an expense of the Fund.  Should sufficient liquidity not be available in the Fund to cover any expenses, taxes or liabilities due as a result of the Fund's ownership of such assets, the Donor will be expected to contribute additional funds to the Fund as necessary to fully and timely fund such obligations. Exceptions to this general policy will be made only in unusual circumstances and only with the prior approval of a senior management officer of the Community Foundation and in accordance with policies as established and approved by the Investment Committee.

j.    Tax Deduction vs. Net Proceeds from Sale of Contributed Property

An individual for income tax purposes can deduct a charitable contribution only in the year in which the contribution is actually paid or ownership has transferred (excess contributions above adjusted gross income percentage limitations may be carried forward for up to five additional years).  Tax laws generally provide rules on how the value of the contribution deduction is to be determined.  Gifts to the Greater Kansas City Community Foundation are deductible at the highest "public charity" level allowed by law.  Please see the Appendix for a further explanation of tax laws governing charitable contributions.

The value of the contribution for tax deduction purposes may vary from the net proceeds realized by the Community Foundation upon the sale of the contributed property.  Donors are encouraged to consult with their professional tax advisors to determine the appropriate value for tax deduction purposes.

k.   Confidentiality and Privacy Policy

All agreements with Donors and all information concerning Donors and prospective Donors shall be held in strict confidence by the Community Foundation, subject to legally authorized and enforceable requests for information by government agencies and courts.  All other requests for or releases of information concerning a Donor will be honored or allowed only if permission is obtained from the Donor prior to release of such information. All personal data collected through our websites, email or any Community Foundation form is subject to the Community Foundation's privacy policy, which can be found at www.growyourgiving.org/privacy-policy.

**Section 3.  *Investment Policies***

The Community Foundation's investment program shall seek to provide competitive market returns with reasonable levels of risk.  The officers of the Community Foundation so empowered or the Investment Committee shall direct the investments of these Funds consistent with the objective.  Copies of the Community Foundation's investment program and policies are available to any interested party upon request.

4

**CONFIDENTIAL**                    **TDIT005140**

Generally, if a particular investment portfolio is not recommended by the Donor, Donor Advisor(s) or Advisory Committee as provided below, Funds shall be invested in the Community Foundation's money market pool. If a Donor, Donor Advisor(s) or an Advisory Committee is interested in having all or a portion of a Fund invested in a particular investment portfolio provided by the Community Foundation, then the current Donor, Donor Advisor(s) or Advisory Committee may make an appropriate recommendation to the Community Foundation in accordance with the policies and procedures approved by the Investment Committee. Such recommendations are advisory, and the Community Foundation will exercise independent authority over the investments of the principal and income of each Fund. Segregated asset accounts may be permitted, with advanced approval. The Fund holding such accounts shall pay the direct costs of such arrangements, including additional administrative costs.

**Section 4.** *Administrative Expenses*

Each Fund, Supporting Organization and Split-Interest Arrangement will be charged in accordance with the current administrative fee schedule. If an expense is directly associated with a specific Fund, Supporting Organization or Split-Interest Arrangement, then the expense will generally be directly charged to the applicable fund. The current Community Foundation fee schedule is available to any interested party upon request.

**Section 5.** *Charitable Purpose*

For purposes of these Procedures, a "charitable purpose" is an educational, religious, scientific, literary, public or other purpose permitted to be carried on by organizations described in Code Sections 170(c)(1) and 170(c)(2)(B).

**Section 6.** *Educational Program*

The Community Foundation's mission and activities and the needs of the community will be well served by active promotion and community education concerning such activities and needs. The Community Foundation shall conduct educational programs that help connect donors to the priorities they care about and the needs of the community.

**Section 7.** *Amendments*

The Procedures for Establishment and Operation of Funds and Supporting Organizations may be amended by a majority vote of the Board of Directors (or a designated committee) at any regular or special meeting.

**PART B.  FUNDS**

**Section 1.** *Types of Funds*

Funds are categorized by their charitable purpose.

    a. *Donor-Advised Funds*: the Donor, Donor Advisor(s) or Advisory Committee may recommend charitable grant recipients from time to time.

    b. *Designated Funds*: this type of fund is created to ensure that support will be provided to one specific charitable organization named by the Donor(s).

    c. *Organization Funds*: this type of fund (also referred to as an agency fund) is established by an organization that is recognized as a public charity described in Code Section 509(a)(1), (a)(2) or (a)(3) for the benefit of that organization.

**CONFIDENTIAL**        **TDIT005141**

**FSD2025-0116**                                       **2025-08-19**

d. *Field of Interest Funds*: this type of fund allows the Donor to support multiple named organizations or an area of charitable interest, defined broadly (such as education) or narrowly (such as cancer research). A Donor can also select a defined geographic area or specific community to benefit from grant distributions.

e. *Scholarship Funds*: Donors can support worthy students at an institution (high school, college, technical), students in a particular field of study, students from a particular geographic area, or students who have attended a specific high school or school district, provided that the students are selected through an objective and non-discriminatory competitive selection process.

f. *Unrestricted Funds*: Donors may choose an unrestricted fund that allows the Community Foundation to determine where annual grant distributions will do the most good.

**Section 2.** *General Policies*

Each Fund, whether administered directly by the Community Foundation or through a separate trust, custodial account or agency agreement, shall be considered part of (and legally owned by) the Community Foundation and shall be governed by its Articles of Incorporation, Bylaws and by these Procedures. The Community Foundation is vested with ultimate authority and control over the principal and income of each Fund.

**Section 3.** *Donor May Select Name of Fund*

Each Fund will be named as the Donor wishes.  However, the Community Foundation reserves the right to reject names that it finds objectionable.

**Section 4.** *Distributions*

a. <u>Grants Shall Follow Donor's Intent</u>

Grants will be made from each Fund consistent with the instructions given by the Donor at the time that the Fund was established.  If, however, (1) the Donor's instructions are contrary to the Articles of Incorporation, Bylaws or Procedures, or (2) the "variance power" (described below in Sections B.5; B.8(b); B.9(b); B.10(c); and B.11(d)) is exercised, then the Donor's instructions shall be modified to a degree that is necessary for compliance with these Procedures.  To the extent practicable or feasible, the Board of Directors shall distribute amounts for purposes that are consistent with the Donor's charitable interests.  The Community Foundation is vested with ultimate authority and control over the principal and income of each Fund.

b. <u>Grants Will Normally Identify the Name of the Fund</u>

Unless otherwise requested by the Donor Advisor, any distribution shall identify the name of the Fund from which it is made.

c. <u>Grants Must Not Provide More Than an Incidental Benefit to Donor</u>

The Community Foundation will not make a grant that provides a financial benefit to a Donor, Donor Advisor, Advisory Committee member, any person in whose honor a Fund is created or named, or any related party to such a person (for purposes of this Manual, a "related party" shall include (i) any family member of such person (i.e., such person's spouse, ancestors, children, grandchildren, great-grandchildren, brothers, sisters, nieces, nephews and any of their spouses) and (ii) any entity in which such a person or a combination of such persons owns more than 35% of the combined voting power, profits interest or beneficial interest).  (The preceding sentence does not apply to grants made out of an Organization Fund to the Organization for which the Fund was established.)

6

**FSD2025-0116**                    **2025-08-19**

**CONFIDENTIAL**                    **TDIT005142**

Distributions from the Community Foundation may not be used in whole or in part for any private benefit such as tickets or tables at charitable events, goods and services bought at charitable auctions, or priority seating at athletic events, ticket rights or points.

The Community Foundation may make grants that provide a Donor, Donor Advisor(s), Advisory Committee member or related party with name recognition and such other benefits that the Internal Revenue Service has recognized as not providing the Donor with more than an incidental benefit.

d.   Other Limits on Distributions

Additional rules apply to funds classified as "donor-advised funds" under the Pension Protection Act of 2006. The legal definition of a donor-advised fund under this law is a fund or account that (i) is separately identified by reference to contributions of a donor or donors; (ii) is owned and controlled by a "sponsoring organization" (i.e., the Community Foundation); and (iii) the donor (or any person appointed or designated by the donor – a "donor advisor") has, or reasonably expects to have, advisory privileges with respect to the distribution or investment of amounts held in the fund or account by reason of the donor's status as a donor. This definition could include funds that the Community Foundation has classified as Donor-Advised Funds, Designated Funds or Field of Interest Funds.

The Community Foundation will not make any grant, loan, compensation or similar payment (including expense reimbursement) to a Donor, Donor Advisor, Advisory Committee member, any person in whose honor a Fund is created or named or any related party from any fund.

The Community Foundation will also not make any grant directly to an individual or to an organization for the benefit of a specified individual from any fund other than a Scholarship Fund, a disaster relief fund or personal hardship fund.

If a distribution is proposed from any fund that is classified as a donor-advised fund under the law to a non-charitable entity or to a Type III supporting organization that is not "functionally integrated" with its supported organization as defined by law, then such distribution will not be allowed until it has been reviewed by a senior management officer of the Community Foundation - and, if required by law, procedures are in place so that the Community Foundation can exercise "expenditure responsibility" over such distribution. Expenditure responsibility generally requires the Community Foundation to exert all reasonable efforts and establish adequate procedures to (i) see that the distribution is spent solely for the charitable purpose for which it is made, (ii) obtain full and complete reports from the distributee regarding the use of such distribution and (iii) make full and detailed reports regarding such distribution to the Secretary of the Treasury, if applicable.

e.   Donor Generally Cannot Control Timing of Grants

The ultimate right to direct the timing and amount of all distributions of income or principal from any Fund is vested in the Board of Directors. As is required by federal tax regulations, a Donor may not reserve the right to direct the timing of distributions from the Fund. However, a Donor can specify in the establishing document or instrument of transfer:

1.  That some or all of the principal (as opposed to income or specific assets) may not be distributed for a specified period of time.
2.  That distributions are limited to income only.
3.  That distributions should be made annually (or more frequently).

If distributions are limited to income, and unless otherwise specified in the instrument of transfer, income shall be annually computed based on the current spending policy of the Community Foundation. The current spending policy of the Community Foundation is 5% of the average past three year-end Fund asset balances.

7

**CONFIDENTIAL** TDIT005143

f.    Board May Identify Specific Charitable Needs of the Community

In fulfilling that part of the Community Foundation's mission of providing leadership on critical community issues, the Board may enumerate specific charitable needs and specific organizations that it deems are most deserving of support.

**Section 5.** *Variance Power And Monitoring Function*

a.    Community Foundation to Follow General Donor Intent if Variance Power is Exercised

If the Board of Directors exercises the variance power described in Section B.8(b), B.9(b), B.10(c), or B.11(d) to modify a Designated Fund, Organization Fund, Field of Interest Fund, or Scholarship Fund, or if the privilege of the Donor, Donor Advisor(s) or Advisory Committee and other persons designated to make recommendations from a Donor-Advised Fund has been terminated in accordance with Section B.7, then the Board of Directors shall convert the Fund into its choice of either an Unrestricted Fund or a Field of Interest Fund.  To the extent practicable or feasible, the Board of Directors shall distribute charitable grants from the converted Fund for purposes that are consistent with the original Donor's charitable interests.

b.    Fund To Keep Donor's Name If Variance Power Exercised

Generally the Fund shall retain the name given by the Donor unless the Board of Directors, in its discretion, has chosen to deposit all of the Fund's assets into an Unrestricted Fund.

c.    Community Foundation to Monitor Beneficiary's Performance of Terms of Grant

In addition to the Monitoring Functions hereinafter stated, the Board of Directors through the Board Committees and the Staff may periodically review the effectiveness with which agencies that receive grants from Funds and Supporting Organizations are performing their responsibilities in the utilization of these grants toward attainment of the Community Foundation's and the Donor's objectives.  Where necessary, the Board shall initiate corrective action.

**Section 6.** *Advisory Committees of Funds*

a.    General Rules

A Donor or the Board of Directors may appoint an Advisory Committee for a Donor-Advised, Designated, Nonprofit Organization or Unrestricted Fund.

With respect to a Field of Interest Fund, the Donor may recommend an Advisory Committee (which may include the Donor) to be appointed by the Community Foundation in which case the senior management officers of the Community Foundation shall have the authority to appoint the Advisory Committee on behalf of the Board of Directors of the Community Foundation.

The rules governing an Advisory Committee for a Scholarship Fund are set forth in Section B.11(a)(3) below.

The Advisory Committee may make recommendations to the Board of Directors concerning grants from the Fund and any other matters that it deems of importance.  Generally, each Advisory Committee should select one person who will have the authority to transmit the Advisory Committee's recommendations to the Community Foundation.

**CONFIDENTIAL**                    **TDIT005144**

187

**b.   Usually Majority Vote Is Required**

Unless contrary instructions have been made by the Donor or by the Community Foundation, whenever two persons are designated to make recommendations they shall act by unanimous consent; whenever more than two persons are so designated, then a recommendation by a majority of such persons shall constitute an effective recommendation for consideration by the Community Foundation.  Otherwise, each committee may operate under such procedures as it finds appropriate.

**c.   Authority to Act as Agent of Community Foundation Restricted**

The Community Foundation generally encourages Donors to contribute to the Community Foundation and its Funds.  However, no person has the authority to act as the agent of the Community Foundation unless he or she has received express written authority from the Community Foundation.  In particular, the Community Foundation does not authorize any volunteer or advisor to accept contributions on its behalf, to commit Community Foundation resources to any activity, or to engage in fundraising activities in the name of the Community Foundation or on behalf of any of its Funds without written permission from the Board of Directors or an authorized employee.

The Community Foundation is generally supportive of charitable activities that benefit the residents of this region.  The restrictions in this section are necessitated, in part, because of compliance with tax and other laws that require disclosure of benefits associated with charitable contributions as well as contemporaneous written acknowledgements to certain Donors of contributions (the failure for which could subject the Community Foundation and its Funds to fines and penalties).  We need to be informed about activities being done in the name of the Community Foundation (and its Funds) and to monitor any obligations associated with those activities.

**d.   Fundraising**

The Community Foundation will not sponsor or assist with any fundraising or other events for any Fund, and will not process event registrations or tickets or be responsible for any funds collected by a third-party or crowdfunding source. The Community Foundation will only be responsible for purely charitable donations.  Any advertising, promotional or other materials must be consistent with this policy and any additional fundraising guidelines published by the Community Foundation.

**e.   Divorce/Separation of Current Donor Advisors**

This policy generally will only affect current Donor Advisors whereby either spouse may request grant distributions from a Fund.

In the event spouses serve as the only Advisors to a Fund, and a legal action for divorce, separation or annulment is pending between the spouses, the Community Foundation may, upon receiving notice of such action:

1. suspend processing any grant distribution recommendation for such Fund(s) unless and until the spouses both agree in writing to approve the grant distribution recommendation, or

2. suspend processing any grant distribution recommendations for such Fund(s) unless and until the spouses have jointly agreed in writing to an alternative procedure, acceptable to the Community Foundation, to provide for the future administration of such Fund(s).  Subject to the approval of the Community Foundation, the spouses may jointly authorize the Community Foundation to bifurcate any Fund(s), designating one spouse or other successor Advisor to serve as the Advisor to one of the successor Fund(s) and designating the other spouse or other successor Advisor to serve as the Advisor to the other successor Fund(s) created as a result of bifurcation.

9

CONFIDENTIAL                                                           TDIT005145

188

In the event that the spouses cannot jointly agree as provided above and no divorce decree, order of legal separation, order of annulment, property settlement agreement, agreement of the parties or other legal order has been entered or approved which would otherwise resolve the issue to the satisfaction of the Community Foundation, the Community Foundation may, in its sole discretion, bifurcate any Fund(s) so affected into equal shares and designate one spouse to serve as the Advisor to one of the successor Fund(s) and designate the other spouse to serve as the Advisor to the other successor Fund(s) created as a result of bifurcation. However, the Community Foundation shall not take such action until at least six months have transpired since the date upon which the action for divorce, separation or annulment was filed with the court of record.

**Section 7.**   *Special Rules for Donor-Advised Funds*

   a.   Establishment and Purpose

A Donor may establish a Donor-Advised Fund whereby the individual Donor(s) and/or designated Advisors, retain a lifetime privilege to recommend charitable grant recipients to the Community Foundation. Corporate Donor-Advised Funds may continue to advise on charitable distributions as long as the Corporation continues to operate.

   b.   Distributions from Donor-Advised Funds

Donors and/or Donor Advisors may make written recommendations of grants to tax exempt charitable organizations described in Code Section 501(c)(3), other than private non-operating foundations. Charitable organizations must be public charities as described in Code Sections 509(a)(1) or 509(a)(2), supporting organizations described in Code Sections 509(a)(3) that are Type I, Type II or Type III functionally-integrated or private operating foundations. Distributions shall not reference the existence of a charitable pledge. As provided in the Internal Revenue Code and Regulations, the Board of Directors has the absolute right to direct all distributions of income and/or principal from Donor-Advised Funds.

   c.   Minimum Grant Amount from Donor-Advised Funds

The Board of Directors may designate a minimum grant amount for Donor-Advised Funds.

   d.   Grant Activity Policy

As the legal owner of assets contributed to the Community Foundation and held in its funds, the Community Foundation is responsible for ensuring the funds are used for grantmaking, exclusively for charitable purposes, and do not confer any private benefit on the Donor or any other person. With donor-advised funds, the Community Foundation works with the Donor and/or Donor Advisor(s) to determine when grants will be made from those funds. To that end, the Community Foundation monitors the use of donor-advised funds to ensure their activity leads to charitable distributions.

   1.   Examples of Fund Activity. The following are examples of Fund activity that lead to distributions. If this policy ever conflicts with federal law or state law (including the Uniform Prudent Management of Institutional Funds Act, commonly known as UPMIFA), the relevant law controls. A Fund is considered active when there is regular communication between a Donor, Donor Advisor(s) (or named successors) and the Community Foundation regarding the existence and purpose of that Fund. Examples of some of the activities that would deem a Fund active include, but are not limited to:

       a.   Regular Grant Recommendations. Donor advisor generally recommends grants at least annually to qualified charitable organizations. The amount of grantmaking can vary from year to year.

108

**CONFIDENTIAL**

TDIT005146

FSD2025-0116                                                                                    2025-08-19

b. <u>Developing a Philanthropic Program</u>. Donor makes a substantial contribution to a Fund, for example upon the sale of his or her business, and refrains from recommending grants for a given initial period while the Donor consults with the Community Foundation and/or does his or her own research to determine what types of grants will best meet community needs and/or the Donor's philanthropic goals.

c. <u>Long-term Giving Plan</u>. Donor Advisor deliberately reduces the frequency or size of grant recommendations from the Fund, for example:

   i. During his or her working years, with the intention of increasing the Fund balance to support grantmaking during retirement when the Donor Advisor expects his or her income to change.

   ii. To build a Fund over time so the Donor's children can make grants later (the idea being the Donor is leaving a charitable legacy for the next generation to administer).

   iii. When the Fund is invested in an illiquid or undervalued investment and the Donor Advisor intends to begin making grant recommendations when the investment can be sold at a reasonable price.

d. <u>Project Grants</u>. Donor makes a substantial contribution to a Fund and determines to recommend grants to a specific qualified charitable organization over a period of years so that the Donor can monitor how the charitable organization performs, and to consider whether another organization would better achieve the Donor's charitable objectives.

e. <u>Starter Fund</u>.  Donor wants to build the Fund balance to make substantial grants to the community. Therefore, there may be no distributions made until the Fund balance reaches an amount stated in the Fund file based on the Community Foundation's conversations with the Donor and/or Donor Advisor(s).

f. <u>Specific Occasion Grant</u>. Donor Advisor refrains from recommending grants for a number of years with the specific charitable goal of recommending a grant upon a specific occasion. Examples may include, but are not limited to:

   i. Donor is incapacitated with no successor Advisor(s) named so the Community Foundation waits until the Donor's death to distribute the Fund according to the Donor's original intent on file with the Community Foundation;

   ii. The Fund has transitioned to named successor Advisors, but they are minors and no adult representative is named to represent them (so grants resume when successor Advisors are adults);

   iii. Founders of Fund who are also the Donor Advisors are getting divorced so that grants are suspended until both the spouses agree on grants, which may include splitting the Fund into two separate funds, one for each spouse to advise, or eventually dissolving the Fund by the making of charitable grants;

   iv. Grants are suspended during litigation involving a Fund (e.g., the Donor left his/her estate to a Fund, but the Donor's heirs are disputing the bequest so the Community Foundation does not allow grants until the litigation is resolved); or

   v. Donor leaves a bequest to a Fund and distributions are made periodically to the Fund during the estate settlement process, but grants are not made until the estate is fully settled and the Fund receives a final distribution from the estate.

11

FSD2025-0116                                                                                    2025-08-19

CONFIDENTIAL                                                                              TDIT005147

190

**FSD2025-0116**  **Page 194 of 1530**  **2025-08-19**

2. <u>Re-Activating Grantmaking</u>. Should there be no grant activity in a donor-advised fund for at least three years, steps will be taken by the staff of the Community Foundation to activate the Fund. These steps may include, but are not limited to:

    a. Notifying the Fund Advisor regularly and periodically (at least annually over a period of three years) to encourage the Advisor to activate the fund.

    b. Distributing grants from the Fund to qualified grant recipients that align with the Donor's intent, but if the Community Foundation determines such intent is obsolete, incapable of being fulfilled, impractical, or inconsistent with the community's charitable needs, then the Community Foundation shall exercise its variance power to enable the Community Foundation to continue to use its resources to meet the needs of the community and to address the charitable purposes for which the funds were committed.

e. <u>Eligible Advisors During the Donor(s)' Lifetime</u>

Recommendations for distributions shall be subject to the following rules:

1. Generally, the Donor(s) may designate any adult (i.e., at least age 18) person(s) to have the privilege of making recommendations throughout the lifetime of the Donor or his or her spouse, unless earlier terminated by resignation or incapacity. Donor(s) may designate additional and/or alternative Advisors at any time during the Donor(s)' lifetime.

2. A Donor other than an individual, such as a corporation, partnership or trust, will not be subject to a time limit for its privilege to make recommendations.

f. <u>Successor Advisors After the Death of Donor(s)</u>

1. The Donor(s) may designate one or more adult (i.e., at least age 18) person(s) to have the privilege of making recommendations throughout their lifetimes, unless earlier terminated by resignation or incapacity. If more than one person is named, then the successor Advisors shall operate under the rules governing Advisory Committees described in Section B.6.

2. Subject to the terms of the instrument of transfer, each successor Advisor to the Fund that was designated by the Donor may likewise designate a successor Advisor to act in his or her place (who in turn may designate a successor Advisor to act in his or her place, and so on).

3. After the Donor's death (or Donors' deaths), the Community Foundation will contact the successor Advisors in writing to inform them that they have been named as successor Advisors for the Fund. If after three years from the date of the Community Foundation's initial written correspondence to the successor Advisor(s) there has been no response or action from the successor Advisor(s), and the Community Foundation has tried to contact the successor Advisors at least annually during that three-year period, then the Community Foundation will become the successor Advisor for the Fund. In that case, the Community Foundation will endeavor to use the Fund in a way that is consistent with the original Donor's/Donors' charitable interests that may be known to the Community Foundation.

g. <u>Option to Split Funds for Successor Advisors</u>

If a Donor has designated successor Advisors and if the charitable interests of the successor Advisors are sufficiently diverse, then the Community Foundation may, with the consent of the successor Advisors and subject to the terms of the Donor's instrument of transfer, divide the Donor-Advised Fund into multiple Donor-Advised Funds and limit each successor Advisor's advisory privilege to a separate Fund.

12

**FSD2025-0116**  **2025-08-19**

110

**CONFIDENTIAL**  **TDIT005148**

h.   Conversion of Donor-Advised Fund After Advisory Privilege Ends

Upon termination of the advisory privilege, a Donor-Advised Fund will be converted at the discretion of the Community Foundation to an Unrestricted Fund or a Field of Interest Fund as provided for in Part B, Section 5.

**Section 8.**   *Special Rules for Designated Funds*

a.   Establishment and Purpose

A Donor may establish a Designated Fund for one public charity described in Code Sections 509(a)(1), (a)(2) or (a)(3).

b.   Monitoring Function and Variance Power

The Community Foundation shall monitor the performance of the designated charitable organization to determine that it is using payments for charitable purposes consistent with the Community Foundation's purposes and the Donor's intention at the time the contribution was made.  If the Board of Directors determines that continued payments for the designated organization have become unnecessary, obsolete, incapable of fulfillment, impractical or inconsistent with the community's charitable needs the Board may, in its discretion, select an alternative public charity with a similar mission and charitable purpose of the original Designated Charity as specified in the instrument of transfer or convert the Designated Fund to an Unrestricted Fund or Field of Interest Fund.  The Fund shall then continue in accordance with the provisions of Section B.5.

**Section 9.**   *Special Rules for Organization Funds*

a.   Establishment and Purpose

An Organization described in Code Section 509(a)(1), (a)(2) or (a)(3) may establish an Organization Fund (also referred to as an agency fund) for its benefit.

b.   Monitoring Function and Variance Power

The Community Foundation shall monitor the performance of the designated charitable organization to determine that it is using payments for charitable purposes consistent with the Community Foundation's purposes and the Donor's intention at the time the contribution was made.  If the Board of Directors determines that continued payments for the designated organization have become unnecessary, obsolete, incapable of fulfillment, impractical or inconsistent with the community's charitable needs the Board may, in its discretion, select an alternative public charity with a similar mission and charitable purpose of the original Designated Nonprofit Charitable Organization as specified in the instrument of transfer or convert the Organization Fund to an Unrestricted Fund or Field of Interest Fund.  The Fund shall then continue in accordance with the provisions of Section B.5.

**Section 10.**  *Special Rules for Field of Interest Funds*

a.   Establishment and Purpose

A Donor or the Community Foundation may establish a Field of Interest Fund from which payments are made to multiple named organizations or for a specific charitable purpose (field of interest). The specified purpose may be broad, such as support of education, health care or arts and humanities; or narrow, such as the prevention of child abuse.  Field of Interest Funds may also be established for specific geographic areas such as a neighborhood, section of city, county or metropolitan area.  Any proposed Field of Interest Fund that is intended to provide aid to individuals who have suffered loss as a result of a personal hardship or

13

CONFIDENTIAL

catastrophic disaster shall be reviewed and approved in advance by the Community Foundation's legal team to ensure compliance with additional Internal Revenue Service rules.  In short, personal hardship and disaster relief funds must have a sufficiently large or indefinite pool of grantees and recipients must be selected based on a written and objective determination of need that is reviewed by an independent selection committee that is controlled by the Community Foundation.

b.  Geographic Affiliates

The Community Foundation's governing body maintains oversight and control over geographic affiliates.  A geographic affiliate is a component fund (or collection of component funds), established within or by the Community Foundation, serving a defined geographic region under a common advisory board.  Grants recommended by the advisory board of a geographic affiliate shall be subject to the same due diligence process exercised by the Community Foundation for all other Field of Interest funds.

c.   Monitoring Function and Variance Power

The Community Foundation shall periodically evaluate all Field of Interest Funds.  If the Board of Directors determines that continued payments for the specified charitable purpose have become unnecessary, obsolete, incapable of fulfillment, impractical, or inconsistent with the community's charitable needs, the Board in its discretion, may change the field of interest of the Fund or convert it to an Unrestricted Fund.  The Fund shall then continue in accordance with the provisions of Section B.5.

**Section 11.  *Special Rules for Scholarship Funds***

a.   Establishment and Purpose

A Donor or the Community Foundation may establish a Scholarship Fund from which grants are made for study or other similar purposes to support one or more worthy recipients, provided that the recipients are selected through an objective and non-discriminatory competitive selection process.

Scholarships must be awarded in accordance with a selection process that is consistent with the Community Foundation's tax-exempt status and consistent with the allowance of tax deductions for individuals making contributions to the Community Foundation.  In addition, the selection process must include the following:

1. A sufficiently broad pool of potential grantees.  The pool of scholarship applicants must be sufficiently broad so that the making of grants to the members of the group will be considered as furthering a charitable purpose and not merely benefiting private interests.  However, if the scholarship program requires the selection of an exceptionally qualified individual to carry out its purposes and the pool of such individuals is small, the Fund shall include documentation of the efforts made to determine qualified members of the class of potential recipients.  Any proposed limitation on the pool of grantees that is based on race or any other characteristic that might be counter to law or public policy or inconsistent with the Community Foundation's tax-exempt status shall be reviewed by the Community Foundation's legal team.

2. Objective and non-discriminatory selection criteria.  The criteria used in selecting scholarship recipients shall be objectively related to the purpose of the scholarship and applied equally to all applicants.  Criteria might include, but need not be limited to: prior academic performance, recommendations from professors, financial need, or evidence of an applicant's motivation, character, ability and potential.  The specified criteria may be broad, such as attending any institution of higher learning at the discretion of the student, or narrow, such as a specific major at a specified named institution.  Scholarship Funds may also be established for specific geographic areas such as a section of city, county or metropolitan area. Scholarships may be awarded for students to attend a specific institution (elementary through high school, college, technical);

14

**CONFIDENTIAL**                    **TDIT005150**

FSD2025-0116                                                                                                    2025-08-19

students in a particular field of study or major; students from a particular geographic area; or students who have attended a specific high school or school district.

3. <u>A sufficiently independent selection committee</u>. The Donor may designate the Community Foundation to serve as the selection committee to review scholarship applications and select recipients. Alternatively, the Donor may recommend an Advisory Committee (which may include the Donor) to be appointed by the Community Foundation in which case the senior management officers of the Community Foundation shall have the authority to appoint the Advisory Committee on behalf of the Board of Directors of the Community Foundation. The Advisory Committee will review scholarship applications and select scholarship recipients, and, if needed, the manager of scholarship funds for the Community Foundation shall control the Advisory Committee by having the equivalent of a supermajority vote on the Advisory Committee. The manager of scholarship funds for the Community Foundation shall have the ultimate authority to select the scholarship recipients and the Donor, Donor Advisor(s) and any persons related to the Donor or Donor Advisor(s) shall not directly or indirectly control the Advisory Committee. Donors who recommend Advisory Committees for Scholarship Funds shall strive to recommend individuals who are familiar with the community and who have expertise related to the scholarship being awarded.

b. Employer-Sponsored Scholarship Funds

Any proposed Scholarship Fund that will be sponsored by an employer and awarding scholarships to employees or family members of employees shall be reviewed and approved in advance by the Community Foundation's legal team to ensure compliance with additional Internal Revenue Service rules governing such scholarship programs.

c. Other Permitted Grants to Individuals

In addition to scholarship grants for study at an educational institution described in Code Section 170(b)(1)(A)(ii) (i.e., an educational institution which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of students at the institution), Scholarship Funds may also provide for (1) grants to individuals that constitute a prize or award if the recipient is chosen from the general public and without any action on the recipient's part, the recipient is not required to render substantial services as a condition of receiving the prize or award and the prize or award otherwise complies with Code Section 4945(g)(2); or (2) grants to individuals that are made for the purpose of achieving a specific objective, producing a report or other similar product, or improving or enhancing a literary, artistic, musical, scientific, teaching or other similar capacity, skill or talent of the recipient as provided in Code Section 4945(g)(3).

d. Monitoring Function and Variance Power

The Community Foundation shall periodically evaluate all Scholarship Funds. If the Board of Directors determines that continued payments for the specified charitable purpose have become unnecessary, obsolete, incapable of fulfillment, impractical, or inconsistent with the community's charitable needs, the Board in its discretion, may change the scholarship criteria of eligibility or convert it to an Unrestricted Fund. The Fund shall then continue in accordance with the provisions of Section B.5.

e. Conflict of Interest

No scholarship award shall be made to a Donor's family member including direct ancestors and direct lineal descendants, spouse, and other relatives including brothers, sisters, nieces, nephews, aunts, uncles, cousins, and their respective spouses and children. Non-donor Advisory Committee members shall also adhere to the same policy regarding scholarship recipients awarded to Advisory Committee family members.

15

194

**Section 12.** *Special Rules for Trusts Created as Component Funds*

The tax regulations provide that in order for a trust to be treated as a component part of a community foundation (rather than a separate trust), the following requirements must be met:

a. The terms of the trust instrument and the Donor's instrument of transfer must subject the trust to the operation of the Articles of Incorporation and Bylaws of the Community Foundation;

b. The Community Foundation must have the power to modify any restriction or condition on the distribution of assets for any specified charitable purpose or to any specified organization if, in the sole judgment of the Board of Directors, such restriction or condition becomes, in effect, unnecessary, incapable of fulfillment, or inconsistent with the charitable needs of the community served;

c. The Community Foundation must have the power to replace the trustee for breach of fiduciary duty under state law;

d. The Community Foundation must have the power to replace any participating trustee for failure to produce a reasonable return of net income over a reasonable period of time;

e. The Donor may not impose any "material restriction" (as that term is defined in the Treasury regulations) with respect to the transferred assets; and

f. The Community Foundation must accept the contribution.

## PART C. SUPPORTING ORGANIZATIONS

**Section 1.** *Establishment and Purpose*

a. Definition and Tax Status

A supporting organization is:

1. A charitable corporation or trust

2. Classified by the IRS as:

(a) a Section 501(c)(3) charity, and

(b) as a public charity (rather than a private foundation) because it supports a publicly supported charity, such as a community foundation.

The tax laws provide that a supporting organization will be a public charity, even if all contributions have come from related parties or even if it has not received any contributions over a period of years (either situation would normally cause a charity to be a private foundation).

b. Technical Requirements Under The Tax Laws

In order to be a supporting organization of the Community Foundation under Code Section 509(a)(3), the establishing Donor seeking supporting organization status must prove to the IRS that it:

1. Is organized to support the Community Foundation,

2. Is not controlled by "disqualified persons",

16

114

**CONFIDENTIAL** TDIT005152

FSD2025-0116                                                                                          2025-08-19

Disqualified persons include substantial contributors to the supporting organization (donors who gave more than $5,000 to the supporting organization if this amount is also more than 2% of the organization's total contributions by the end of the taxable year), members of that person's family and businesses controlled by the person.  By law, they cannot have 50% or more of the voting power of the governing body or a veto power over the actions of the organization since that would constitute "control."

3.  Is operated, supervised, or controlled "by" or "in connection with" the Community Foundation.

(a)  "by" means that the Community Foundation appoints a majority of the governing body of the supporting organization,

-or-

(b)  "in connection with" is a much more complicated procedure by which the supporting organization must show that:

i.  The Community Foundation appoints at least one member of the governing body of the supporting organization, and

ii.  Through its operations, the supporting organization does either one of the following:

1.  Engages in activities that the Community Foundation would otherwise do itself but for the supporting organization, or

2.  Distributes 85% or more of its income to or for the use of the Community Foundation in such a way that the Community Foundation is "attentive" to the supporting organization.

c.  <u>Tax Advantages of Supporting Organization</u>

1.  Avoid Private Foundation Taxes and Administrative Requirements
A supporting organization is treated as a public charity and is free from private foundation excise taxes and administrative requirements of a private non-operating foundation.

2.   Greater Tax Benefits for Donors
A donor to a supporting organization can frequently claim greater tax benefits than if the same property was given to a private non-operating foundation:

a.  A larger tax deduction for gifts of real estate or closely held stock (fair market value vs. cost basis).
b.  A larger deduction can be claimed each year, if the donor is subject to the annual charitable deduction limitation.

**Section 2.  *Policies Applicable to a Supporting Organization***

The terms of the relationship to become a supporting organization of the Community Foundation and the benefits and services that one organization may provide to the other shall be mutually agreed upon by the governing bodies of both organizations.  In general, this relationship requires the active oversight and involvement of the Community Foundation.  Consequently, the following information must be obtained from the supporting organization:

1.  Copies of the organization's articles of incorporation and bylaws, if in corporate form, or trust instrument, if in trust form, and tax exemption letter from the Internal Revenue Service.

17

FSD2025-0116                                                                                          2025-08-19

115

**CONFIDENTIAL**                                                                                     TDIT005153

2. Copies of all board meeting notices and minutes of the board meetings;
3. Notification when any board member appointed by the Community Foundation finishes his or her term, resigns or otherwise ceases to serve;
4. Financial reports at least quarterly (unless all of the supporting organization's assets are already held at the Community Foundation);
5. Copies of all account statements upon request of the Community Foundation (if the supporting organization's assets are not all held at the Community Foundation);
6. Copies of the annual 990 reports to the Internal Revenue Service; and
7. Information concerning all grants so that the grants can be processed through the Community Foundation.

In return, the Community Foundation's role is to provide the supporting organization with the following primary services (additional services may be separately negotiated):

1. Appointment of the requisite number of members to the supporting organization's board as required by the organization's governing document(s);
2. Periodic financial statements;
3. Access to on-line tools provided to donors by the Community Foundation;
4. Information upon request regarding grant-making opportunities; and
5. The processing of all grants.

The tax laws require that organizational documents (articles of incorporation or trust instrument) of the supporting organization must (1) specify that the Community Foundation will be the supported organization and (2) specify charitable purposes that are supportive of, and not broader than, those of the Community Foundation. In addition, the supporting organization's activities must support the Community Foundation.

**Section 3.**  *Termination of Relationship*

Either the Board of Directors or the Governing Body of the supporting organization may terminate the relationship upon such notice as is prescribed in the agreement between the Community Foundation and the supporting organization.  Termination may cause the supporting organization to lose its public charity tax status and be reclassified as a private non-operating foundation.

**PART D.  SPLIT-INTEREST ARRANGEMENTS**

**Section 1.**  *Definitions*

Split-interest arrangements are sometimes referred to as "deferred gifts".  They generally pay income to a Donor (or someone else who is named by the Donor) over the person's life and then distribute the assets to a charity upon death.

a. Charitable Gift Annuity (Immediate or Deferred) - A contract with the Community Foundation to receive a fixed dollar amount each year over a person's life; the annuity contract must meet the tax requirements of Code Section 514(c)(5).  Payments are generally based upon the American Council on Gift Annuities approved tables in effect at the time that the gift is made.

The rate of return the Donor(s) receives depends upon the age (and, if applicable, the age of the spouse) at the time of the gift.  The older the Donor, the higher the rate of return will be.  Payments may be made annually or in more frequent intervals. The remaining proceeds are distributed to a named charitable Fund established by the Donor at the Community Foundation, excluding an Organization Fund. (See Part B, Section 1)

b. Charitable Remainder Annuity Trust - A trust that pays a fixed dollar amount (at least 5% of the value of the property contributed to the trust).  Payments are made annually (or more frequently) to

18

one or more income beneficiaries for life (or for a fixed term of years -- maximum 20).  The remaining proceeds are distributed to a named charitable Fund established by the Donor at the Community Foundation, excluding an Organization Fund.  (See Part B, Section 1)

c.  Charitable Remainder Unitrust - A trust that pays a fixed percentage (at least 5%) of the value of the trust's assets each year (as valued at the beginning of each year) to one or more income beneficiaries for life (or for a fixed term of years -- maximum 20). The remaining proceeds are distributed to a named charitable Fund established by the Donor at the Community Foundation, excluding an Organization Fund. (See Part B, Section 1)

d.  Charitable Lead Trust - This is the inverse of a charitable remainder annuity trust or unitrust. Income is distributed to the Community Foundation, into a named charitable Fund established by the Donor, (over a period of years or the lifetime of the Donor) and the remainder is usually distributed to members of the Donor's family.  Such a trust can be a useful part of an estate plan to keep a rapidly appreciating asset (such as real estate or stock) within a family.

Currently, the Community Foundation does not trustee charitable lead trusts.  However, the Community Foundation will be pleased to work with the Donor to help find an appropriate trustee.

e.  Retained Life Estate - Donors may leave their principal residence, vacation home or farm to a named charitable Fund established by the Donor or to an existing Fund at the Community Foundation and retain the right to live in the house or farm for the Donor's lifetime (the life of a surviving spouse can also be added).  The Donor receives a sizable charitable income tax deduction the year the property is donated through the Retained Life Estate.  The amount of the tax deduction is dependent on the age(s) of the Donor and the value of the home or farm.  A gift of a personal residence now, with retained life residency for the Donor and/or spouse, gives the Donor the same estate tax benefits as a gift by will plus an immediate income tax deduction.

**Section 2.**  *Community Foundation as Trustee; Minimum Contributions; Other Conditions*

a.  Community Foundation as Trustee of Split-Interest Gifts

The Community Foundation offers Charitable Gift Annuities to Donors.  The Community Foundation can also serve as trustee for charitable remainder annuity trusts and charitable remainder unitrusts.  The Community Foundation will not trustee Charitable Lead Trusts.  However, Donors may designate a named charitable Fund at the Community Foundation as the income beneficiary of the lead interest.

b.  Minimum Contributions

1.  Charitable Gift Annuity                    $100,000
2.  Charitable Remainder Annuity Trust    $250,000
3.  Charitable Remainder Unitrust            $250,000

c.  Other Conditions

1.  Charitable Gift Annuities

Under the tax laws, the entire remainder interest of a charitable gift annuity must be distributed to the Community Foundation. A Donor may recommend that the proceeds be used to establish a Donor-Advised, Designated, Field-of-Interest, Scholarship or Unrestricted Fund or be added to any existing Fund.  In the absence of such a recommendation, the proceeds will generally be used to establish (or be added to) a named Unrestricted Fund.

CONFIDENTIAL                                                                      TDIT005155

198

2.  Charitable Remainder Trusts

In order for it to serve as the trustee, the Community Foundation must be named as the beneficiary of the remainder interest of a charitable remainder annuity trust or a charitable remainder unitrust.  A Donor may establish or add to an Unrestricted, Designated, Field-of-Interest, Scholarship or Donor-Advised Fund with the remainder proceeds of the charitable remainder trust.  In the absence of such a designation, the proceeds will generally be used to establish (or be added to) a named Unrestricted Fund.

3.  Policies Concerning Contributions

The general rules described in Part A (concerning contributions to the Community Foundation) generally apply to contributions to split-interest arrangements (particularly Section A.2 which gives the Community Foundation the authority to reject assets that are hard to sell or carry potential liabilities).

4.  Independent Review by Legal Counsel

A Donor is advised to consult independent legal counsel concerning contributions to Split-Interest Arrangements including the drafting and review of all documents establishing the split-interest gift.

**CONFIDENTIAL**                                                                       **TDIT005156**

## APPENDIX

**TAX LAWS THAT GOVERN INCOME TAX CHARITABLE CONTRIBUTIONS**

**Section 1.**  *Timing of Income Tax Deductions*

The tax laws generally provide that a contribution is deductible in the year that the property is delivered to the Community Foundation.  Delivery is considered made under the following circumstances:

(1) Unconditional delivery or mailing of a check to the Community Foundation which subsequently clears in due course will constitute an effective contribution on the date of delivery or, if the check is received in the ordinary course of the mails, on the date of mailing.

(2) Unconditional delivery or mailing of a properly endorsed stock or bond certificate will constitute an effective contribution on the date of delivery or, if such certificate is received in the ordinary course of the mails, on the date of mailing.

(3) If a contribution is made subject to compliance with certain conditions, then the contribution is not effective until the Community Foundation agrees to comply with such conditions.

(4) Except as provided in paragraph (5), if a Donor delivers a stock certificate to his or her bank, broker, other agent or the issuing corporation for transfer to the Community Foundation, or instructs his or her bank, broker, other agent or the issuing corporation to transfer stock to the Community Foundation, then the gift is effective on the date the stock is transferred on the books of the issuing corporation.

(5) If stock is registered in a nominee name by a bank, broker or other agent and such bank, broker or other agent agrees to hold the stock in such nominee name on behalf of the Community Foundation, so that the stock will not be transferred on the books of the issuing corporation, then the gift of such stock is effective on the earlier of the date on which such bank, broker or other agent (i) acknowledges in writing that it holds the stock on behalf of the Community Foundation, or (ii) makes the appropriate entry in its books and records to reflect that it holds the stock on behalf of the Community Foundation.

(6) Delivery to the Community Foundation will be effective upon receipt by a senior management officer of the Community Foundation, or the employee or agent authorized by any such officer to accept the contributions.

**Section 2.**  *Evidence of Deduction Required*

a.  Any Contribution of $250 or More

Donors will not be able to claim a charitable deduction for any gift of cash or property of $250 or more to any charity unless a "contemporaneous written acknowledgement" from the charity can be produced; cancelled checks will not suffice.  To meet the requirements, the receipt (1) must contain certain information and (2) must be received within certain time limits.

1.  Contents of Acknowledgment

The acknowledgment must state (a) the amount of cash and a description (but not value) of any property contributed and (b) whether the charity had provided any goods or services in exchange for the property described in clause (if so, then it must state the value of the goods and services).

21

**CONFIDENTIAL**                    TDIT005157

FSD2025-0116                                                                                       2025-08-19

2.   Time Limits

An acknowledgment will generally be considered to be "contemporaneous" if you obtain it before you file your tax return for that year.

b.   Appraisals Required for Gifts of Property Over $5,000; Exceptions for Cash and Publicly Traded Securities

Donors who contribute property (other than publicly traded securities) valued at more than $5,000 in any year must substantiate the value with "qualified appraisals" from "qualified appraisers".  The $5,000 threshold is increased to $10,000 in the case of non-publicly traded stock.  The requirement does NOT apply to contributions of cash or publicly traded stock.  By law, the cost of the appraisal must be borne by the Donor.

The Donor must attach a copy of IRS Form 8283 ("Non-cash Charitable Contributions") to the tax return in the year of the contribution. A charitable organization (including a community foundation) that receives such property must sign a copy of the appraisal report (IRS Form 8283), which should then be attached to the Donor's income tax return.

If the Community Foundation sells the property listed on IRS Form 8283 within three years of receipt, it is required by law to disclose the sale price to the IRS and to the Donor on IRS Form 8282.

**Section 3.   *Amount of Income Tax Deduction***

Generally the Donor can deduct the amount of cash or the fair market value of the long-term capital gain property contributed to the Community Foundation.  Usually the best results are for gifts of appreciated long-term capital gain stock and real estate because a Donor can generally deduct the entire fair market value for gifts of such property to the Community Foundation.

**Section 4.   *Annual Deduction Limitations***

a.   Individuals

The maximum amount of the deduction depends on (1) the type of property contributed (cash, ordinary income property, short-term capital gain property or long-term capital gain property), (2) the nature of the charitable organization (public charity or private foundation), and (3) the amount of adjusted gross income ("AGI") shown on the IRS Form 1040.  Deductions for amounts in excess of these annual limitations can usually be carried forward for five additional years.

The annual deduction limitations for INDIVIDUALS for cash and long-term capital gain property, the most common types of gifts to the Community Foundation, are:

| Type of Charity | *Cash* | *Long-term Capital Gain Property (Stock & Real Estate)* |
|---|---|---|
| **Public Charity** (including a Fund in the Community Foundation) | 60% of AGI | 30% of AGI |
| **Private Foundation** | 30% of AGI | 20% of AGI |

Amounts that exceed the deduction percentage limitation may be carried forward for five additional years.

22

CONFIDENTIAL                                                                                       TDIT005158

FSD2025-0116                                                                                          2025-08-19

b.  Business Entities

C Corporations may generally deduct up to 10% of their taxable income. However, the charitable deduction for entities such as S Corporations, Limited Liability Companies and Partnerships generally passes through to its shareholders, members or partners.

c.  Trusts and Estates

Estates and trusts are eligible for an unlimited income tax charitable deduction, provided that the contribution came from income rather than corpus and was made pursuant to the governing instrument.

**Section 5.  *Treatment of Excess Business Holdings***

Under the Pension Protection Act of 2006 (PPA), the private foundation excess business holdings rules now apply to donor-advised funds as if they were private foundations[1]. That is, the holdings of a donor-advised fund in a business enterprise, **together with the holdings of persons who are disqualified persons with respect to that fund**, may not exceed any of the following:

• Twenty percent[2] of the voting stock[3] of an incorporated business

• Twenty percent of the profits interest of a partnership or joint venture or the beneficial interest of a trust or similar entity.

Ownership of unincorporated businesses that are not substantially related to the fund's purposes is also prohibited.

Donor-Advised funds receiving gifts of interests in a business enterprise after the date of the PPA's enactment (August 17, 2006) will have five years to divest holdings that are above the permitted amount, with the possibility of an additional five years if approved by the Secretary of the Treasury. Funds that held such assets on August 17, 2006 will have a much longer period to divest under the same complicated transition relief given to private foundations in 1969[4].

**What is a business enterprise?**

A "business enterprise" is the active conduct of a trade or business, including any activity which is regularly carried on for the production of income from the sale of goods or the performance of services. Specifically excluded from the definition are:

- Holdings that take the form of bonds or other debt instruments unless they are a disguised form of equity
- Income from dividends, interest, royalties and from the sale of capital assets
- Income from leases unless the income would be taxed as unrelated business income
- "Functionally-related" businesses and program-related investments
- Businesses that derive at least 95 percent of their income from passive sources (dividends, interest, rent, royalties, capital gains). This will have the effect of excluding gifts of interests in most family limited partnerships, and other types of holding company arrangements.

**What is a disqualified person?**

Donors and persons appointed or designated by donors are disqualified persons if they have—or reasonably expect to have—advisory privileges with respect to the donor-advised fund by virtue of their status as

23

donors. Members of donors' and advisors' families are also disqualified, but the section does not define "family" and does not cross-reference either section 4958 or 4946 for the definition. Finally, the term includes 35-percent-controlled entities as defined in section 4958(f)(3).

**Community Foundation Policy with regard to assets categorized under the PPA as "excess business holdings"**

The Community Foundation will identify and monitor any new gift to a donor-advised fund of any interest qualifying as an "excess business holding" under the PPA. The Community Foundation will exercise its best effort to dispose of the contributed interest at the best possible price within five years of the date of the gift, as required under the PPA. In any event, the Community Foundation will dispose of any excess business holding prior to the five-year time limit, except in the event that the Treasury Department grants an additional five-year holding period. The Community Foundation will notify potential donors of such interests of this requirement prior to the contribution of such interest.

[1] The language is clear that it is only the donor-advised fund—not the sponsoring charity—that is to be treated as a private foundation. Accordingly, it appears that this section does not apply to assets held by the sponsoring charity's investment pools, or assets held by funds that are not donor-advised.

[2] Thirty-five percent if it can be shown that persons who are not disqualified persons have effective control of the business.

[3] Additionally, the donor-advised fund will be barred from holding non-voting stock of an incorporated business unless the disqualified persons collectively own less than 20 percent of the voting stock. Under the *de minimis* rule, the donor-advised fund could continue to hold an interest that did not exceed two percent of the voting stock and two percent of the value. Additional rules apply to cover situations such as mergers, redemptions, and acquisitions.

[4] Excess holdings acquired by purchase must be disposed of immediately. If purchases by disqualified persons cause the donor-advised fund to have excess holdings, the donor-advised fund will have 90 days to dispose of the excess.

*The above Appendix is intended to provide a general overview of charitable tax law.  The above does not constitute tax or legal advice.  Donors should consult their professional tax advisor and/or legal counsel before making a charitable gift to the Greater Kansas City Community Foundation.*

24

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH 45201

DEPARTMENT OF THE TREASURY

Date: JAN 19 2013

HIGHLAND DALLAS FOUNDATION INC
C/O HUNTON & WILLIAMS LLP
DOUGLAS M MANCINO
550 S HOPE ST STE 2000
LOS ANGELES, CA 90071

Employer Identification Number:
  45-3961755
DLN:
  17053058308022
Contact Person:
  SHEILA M ROBINSON          ID# 31220
Contact Telephone Number:
  (877) 829-5500
Accounting Period Ending:
  December 31
Public Charity Status:
  509(a)(3)
Form 990 Required:
  Yes
Effective Date of Exemption:
  November 22, 2011
Contribution Deductibility:
  Yes
Addendum Applies:
  No

Dear Applicant:

We are pleased to inform you that upon review of your application for tax
exempt status we have determined that you are exempt from Federal income tax
under section 501(c)(3) of the Internal Revenue Code. Contributions to you are
deductible under section 170 of the Code. You are also qualified to receive
tax deductible bequests, devises, transfers or gifts under section 2055, 2106
or 2522 of the Code. Because this letter could help resolve any questions
regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified
as either public charities or private foundations. We determined that you are
a public charity under the Code section(s) listed in the heading of this
letter.

Specifically, we have determined that you are a Type I supporting organization
under section 509(a)(3). A Type I supporting organization is operated,
supervised, or controlled by one or more publicly supported organizations.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public
Charities, for some helpful information about your responsibilities as an
exempt organization.

Letter 947 (DO/CG)

CONFIDENTIAL

TDIT005161

-2-

HIGHLAND DALLAS FOUNDATION INC

Sincerely,

Holly O. Paz
Director, Exempt Organizations
Rulings and Agreements

Enclosure: Publication 4221-PC

Letter 947 (DO/CG)

CONFIDENTIAL

TDIT005162

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH 45201

DEPARTMENT OF THE TREASURY

Date: **FEB 12 2013**

HIGHLAND SANTA BARBARA FOUNDATION
 INC
C/O MARK PATRICK
300 CRESCENT CT STE 700
DALLAS, TX 75201

Employer Identification Number:
 45-3962008
DLN:
 17053060398012
Contact Person:
 GINGER L JONES           ID# 31646
Contact Telephone Number:
 (877) 829-5500

Accounting Period Ending:
 December 31
Public Charity Status:
 509(a)(3)
Form 990 Required:
 Yes
Effective Date of Exemption:
 November 22, 2011
Contribution Deductibility:
 Yes
Addendum Applies:
 No

Dear Applicant:

We are pleased to inform you that upon review of your application for tax
exempt status we have determined that you are exempt from Federal income tax
under section 501(c)(3) of the Internal Revenue Code. Contributions to you are
deductible under section 170 cf the Code. You are also qualified to receive
tax deductible bequests, devises, transfers or gifts under section 2055, 2106
or 2522 of the Code. Because this letter could help resolve any questions
regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified
as either public charities or private foundations. We determined that you are
a public charity under the Code section(s) listed in the heading of this
letter.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public
Charities, for some helpful information about your responsibilities as an
exempt organization.

Letter 947 (DO/CG)

CONFIDENTIAL                                                TDIT005163

CONFIDENTIAL

TDIT005164

-2-

HIGHLAND SANTA BARBARA FOUNDATION

We have sent a copy of this letter to your representative as indicated in your power of attorney.

Sincerely,

*Holly O. Paz*

Holly O. Paz
Director, Exempt Organizations
Rulings and Agreements

Enclosure:   Publication 4221-PC

Letter 947 (DO/CG)

CONFIDENTIAL                                                                    TDIT005165

```
INTERNAL REVENUE SERVICE                    DEPARTMENT OF THE TREASURY
P. O. BOX 2508
CINCINNATI, OH  45201


                 MAR 2 1 2013         Employer Identification Number:
                                       45-3961865
Date:                                 DLN:
                                       17053066302032
HIGHLAND KANSAS CITY FOUNDATION INC   Contact Person:
C/O HUNTON & WILLIAMS LLP               GREGORY WOO            ID# 95340
MARGARET S ALFORD                     Contact Telephone Number:
1445 ROSS AVE STE 3700                 (877) 829-5500
DALLAS, TX  75202                     Accounting Period Ending:
                                       December 31
                                      Public Charity Status:
                                       509(a)(3)
                                      Form 990 Required:
                                       Yes
                                      Effective Date of Exemption:
                                       November 23, 2011
                                      Contribution Deductibility:
                                       Yes
                                      Addendum Applies:
                                       Yes
```

Dear Applicant:

We are pleased to inform you that upon review of your application for tax exempt status we have determined that you are exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code. Contributions to you are deductible under section 170 of the Code. You are also qualified to receive tax deductible bequests, devises, transfers or gifts under section 2055, 2106 or 2522 of the Code. Because this letter could help resolve any questions regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified as either public charities or private foundations. We determined that you are a public charity under the Code section(s) listed in the heading of this letter.

Specifically, we have determined that you are a Type I supporting organization under section 509(a)(3). A Type I supporting organization is operated, supervised, or controlled by one or more publicly supported organizations.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities, for some helpful information about your responsibilities as an exempt organization.

                                               Letter  947 (DO/CG)

CONFIDENTIAL                                                    TDIT005166

-2-

HIGHLAND KANSAS CITY FOUNDATION INC

Sincerely

Holly O. Paz
Director, Exempt Organizations
Rulings and Agreements

Enclosure:   Publication 4221-PC

Letter  947 (DO/CG)

CONFIDENTIAL   TDIT005167

## Agreement and
## Acknowledgment of Legal Relationship

The Highland Kansas City Foundation, Inc. (the "Foundation") will request the IRS to grant to it public charity status, effective as of the date of its incorporation, by reason of its supporting organization relationship with the Greater Kansas City Community Foundation, a Missouri nonprofit corporation ("Community Foundation"). This relationship requires the active oversight and involvement of the Community Foundation. In furtherance of this relationship, the Community Foundation and the Foundation agree as follows:

The Community Foundation shall provide the following Base Services to the Foundation: (1) quarterly statements evidencing all account transactions including receipts, disbursements and investment earnings, (2) access to on-line tools provided to donors by the Community Foundation, (3) information upon request regarding grant making opportunities, (4) processing of all grants, (5) all other services generally provided for donor advised funds by the Community Foundation under the standard administrative fee schedule, and (6) appointment of two of the three directors of the Foundation as required by the Foundation's Articles of Incorporation and Bylaws. Additional services may be provided for an additional fee. Both parties shall agree in writing as to any additional services to be provided and the fee for such additional services.

The Community Foundation shall perform no management, accounting, tax or other services with respect to any subsidiaries of the Foundation, or any entities in which the Foundation owns or holds any interest.

In consideration of the Base Services to be provided, the Foundation shall pay the greater of (i) $62,500 or (ii) the administrative fee as set forth in the Community Foundation's then current public Administrative Fee Schedule (the "Administrative Fee Schedule"). The Foundation hereby acknowledges receipt of the current Administrative Fee Schedule attached as Exhibit B and accepts the terms of said schedule. This fee will be applied against the market value of assets held in the Foundation. Such fees will be assessed monthly, however the Foundation shall at all times maintain a cash reserve sufficient to cover the estimated fees for one year. Any and all direct operating expenses incurred by the Community Foundation, such as transaction fees, courier services, tax return preparation fees for Forms 990, legal fees and special audit fees, will be billed at actual cost. The Administrative Fee Schedule is subject to modification and may be increased or decreased at the sole discretion of the Community Foundation's Board of Directors. The Community Foundation shall promptly notify the Foundation of any such modification and send to the Foundation the new, modified Administrative Fee Schedule.

The Foundation agrees to provide the Community Foundation with any other records and data necessary for the Community Foundation to provide the Foundation with the Base Services and any additional services, and further, the Foundation warrants that any such records and data provided shall be accurate and true and that the Community Foundation may rely on such records and data in fulfilling its obligations hereunder. Further the Foundation shall cooperate in any audit of the Community Foundation for which information related to the Foundation is requested. The Foundation agrees to provide the Community Foundation with any and all information needed to fulfill the Community Foundation's obligations hereunder on such forms and in such format as may be reasonably requested by the Community Foundation.

21481479;V-3

CONFIDENTIAL

TDIT005168

Specifically, the Foundation agrees to provide the Community Foundation with the following on a timely basis (1) copies of the Foundation's Articles of Incorporation and Bylaws and tax exemption letter from the Internal Revenue Service, (2) copies of all Board meeting notices and minutes of the Board meetings, (3) financial reports at least quarterly, (4) copies of all account statements of the Foundation upon request of the Community Foundation, and (5) a copy of the Foundation's annual Form 990 report to the Internal Revenue Service. Further, the Foundation will notify the Community Foundation when any director appointed by the Community Foundation that is not otherwise affiliated with the Community Foundation finishes his or her term, resigns or otherwise ceases to serve.

This Agreement shall commence on November 30, 2011 and shall continue in effect until terminated by either party. Either party may terminate this Agreement upon 60 days advance written notice to the other party.

The Community Foundation is a public charity and any and all terms and conditions of this agreement which would otherwise adversely affect its status as a public charity shall be considered null and void.

This Agreement shall be interpreted and enforced according to the laws of the State of Missouri.

This Agreement contains the entire understanding of the parties and shall not be supplemented with any other term or condition unless such term or condition is reduced to writing and specifically incorporated herein by written agreement of the parties.

The undersigned have read and understand the contents of this agreement and are authorized to enter into this agreement on behalf of the parties hereto.

_____, President
James Dondero
Highland Kansas City Foundation, Inc.
Date: November 30, 2011

Laura W. McKnight, President
Greater Kansas City Community Foundation
Date: 11 30 11

2

21481479.V-3

CONFIDENTIAL                                            TDIT005169

## EXHIBIT B

# ADMINISTRATIVE FEES
## TO SUPPORT THE
## GREATER KANSAS CITY COMMUNITY FOUNDATION'S
## MISSION-BASED OPERATIONS

This administrative fee schedule applies to all funds at the Greater Kansas City Community Foundation and its regional affiliates. Through economies of scale, the Foundation is able to charge minimal fees compared to the cost of establishing and maintaining your own private foundation. The fees are used exclusively to support the Community Foundation's operating expenses—your investment in a public charity dedicated to improving the quality of life in our region and ensuring that each philanthropic investment returns the greatest personal and civic benefit possible.

### ANNUAL ADMINISTRATIVE FEES ON THE
### MARKET VALUE OF FUND ASSETS
**1.00% on the first $500,000**
0.60% on the next $500,000
0.30% on the next $2 million
0.10% on the next $4 million

Funds with assets in excess of $7 million will be charged a flat fee of 0.25% on the total assets. The minimum fee is $250 per year. The minimum amount to establish a fund is $10,000. The fees stated above are the annual fees; fees are charged to the fund monthly based on the average fair market value of assets. For newly established funds, the minimum annual fee is prorated over the remainder of the year.

Funds will be charged for any extraordinary direct expenses incurred on behalf of a specific fund, such as commissions for the sale of contributed stock. Additional fees may be assessed for extraordinary services such as special grant processing and review or other non-standard services.

21481479V-3

CONFIDENTIAL TDIT005170

## THE DALLAS FOUNDATION

### SUPPORTING ORGANIZATION OPERATING AGREEMENT

THIS SUPPORTING ORGANIZATION OPERATING AGREEMENT (this "Agreement") is made and entered into on November 30, 2011, by and between THE DALLAS FOUNDATION ("Foundation") and the HIGHLAND DALLAS FOUNDATION, INC. ("Supporting Organization"),

**RECITALS:**

A.  Foundation is a Texas nonprofit corporation exempt from taxation under Internal Revenue Code ("Code") Section 501(c)(3), and a public charity described in Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Code. The principal objective of Foundation is to solicit, receive and accept property to be administered, used and applied for charitable purposes, primarily but not exclusively in or for the benefit of Dallas County, Texas.

B.  Supporting Organization, a Delaware nonprofit non-stock charitable corporation, is established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of Foundation.

C.  Supporting Organization expects to obtain a determination letter from the Internal Revenue Service (the "IRS") that Supporting Organization is a tax-exempt organization described in Section 501(c)(3) of the Code and a Type 1 supporting organization described in Section 509(a)(3) of the Code.

D.  Foundation and Supporting Organization have entered into this Agreement for the purpose of documenting their agreements relating to the operation of Supporting Organization as a Type 1 supporting organization of Foundation. It is the intent of the parties that the assets held by Supporting Organization will generate funds for grantmaking primarily but not exclusively in Dallas County and for the payment of fees to Foundation under this Agreement.

NOW THEREFORE, the parties agree as follows:

1.  **GOVERNANCE OF SUPPORTING ORGANIZATION**

    1.1  OPERATIONS. Supporting Organization is a separately-incorporated corporation, solely responsible for its own operations and for its compliance with tax and other laws. At all times during the term of this Agreement, Supporting Organization shall operate as a Type 1 supporting organization of Foundation, as contemplated in Section 509(a)(3)(B)(i) of the Code. Foundation recognizes that assets contributed to Supporting Organization will be held in the name of Supporting Organization and will be subject to spending and investment policies as shall be determined by the Board of Directors of Supporting Organization from time to time.

    1.2  BOARD OF DIRECTORS. Supporting Organization's Board of Directors will be the governing body for Supporting Organization. Unless otherwise agreed by the parties, Supporting Organization's initial Board of Directors shall consist of three (3) members.

    (a)  FOUNDATION APPOINTMENTS. Foundation's Board of Trustees, as required by the Code, will at all times appoint a majority of Supporting Organization's directors. Foundation will cooperate with Supporting Organization to ensure that all persons appointed by Foundation are committed to the purposes of Supporting Organization. Foundation's appointees to Supporting Organization's Board of Directors may include Foundation's trustees or staff, as well as third parties selected by Foundation. Foundation's appointees shall not, apart from their service as Supporting

010036 000007 DALLAS 2811351.2                    1

Organization directors or officers, be "disqualified persons" with respect to Supporting Organization as defined in Sections 509(a)(3)(C) and 4946 of the Code. Supporting Organization shall notify Foundation if any appointee is a disqualified person other than by virtue of his or her service as a Supporting Organization director or officer. Foundation's appointees to Supporting Organization's Board of Directors shall serve in accordance with Supporting Organization's Bylaws.

(b)    SUPPORTING ORGANIZATION APPOINTMENTS. Mr. James Dondero or his successor shall elect or appoint a minority of the members of the Board of Directors of Supporting Organization (i.e., one, as long as the Board of Directors numbers three), who may be a disqualified person(s).

(c)    DISQUALIFIED PERSONS. Under no circumstances shall individuals who are disqualified persons (other than by virtue of their service as directors or officers of Supporting Organization) have majority control of Supporting Organization's Board of Directors or have veto powers over actions by the Supporting Organization's Board of Directors, nor shall disqualified persons described in Section 4946 of the Code and persons described in Section 4958(c)(3)(B) of the Code be compensated by Supporting Organization or receive grants, loans or similar payments from Supporting Organization.

1.3    No COMPENSATION. The parties agree that in order to avoid even the perception of personal benefit, no directors of Supporting Organization shall receive compensation for their service as such. Notwithstanding the foregoing, Supporting Organization's directors may be reimbursed for reasonable and necessary out of pocket expenses actually incurred for their board service.

1.4    MEETINGS. Supporting Organization's Board of Directors shall meet at least once annually in a manner permitted under Delaware law. The directors shall meet at least once annually in person, unless unforeseen circumstances make attendance in person impossible.

2.    FINANCE AND OPERATIONS

2.1    FISCAL YEAR. Supporting Organization's fiscal year shall be the calendar year.

2.2    SERVICES. Foundation will provide the services to Supporting Organization described in SCHEDULE A, attached, and as such schedule may be amended by Foundation and Supporting Organization in writing from time to time.

2.3    FEES:

(a)    In consideration for Foundation's services under this Agreement, Supporting Organization shall pay to Foundation the annual fees described more particularly in SCHEDULE B, attached.

(b)    The parties may agree to additional fees in respect to the performance of any additional services not described in SCHEDULE A to this agreement. Foundation shall notify the Supporting Organization in advance of any changes in annual fees set forth in SCHEDULE A.

2.4    INVESTMENTS

(a)    From time to time, some or all of Supporting Organization's funds may be invested with the pooled endowment funds of Foundation to achieve economies of scale and strive for the highest expected level of returns for a given level of risk with the goal of enabling Supporting Organization to achieve its philanthropic and financial objectives. Decisions with respect to the retention, investment, or reinvestment of assets or commingling of assets shall be made by Foundation's Board of Trustees or by a committee or agent authorized by the Board of Trustees, in accordance with Foundation's investment policies. Supporting Organization's funds will be accounted for and reported on separately.

010036 000007 DALLAS 2811351.2                                      2

(b)      Supporting Organization may at any time remove any or all of its funds invested with Foundation's pooled investment fund and invest its own funds separately from those of Foundation, subject to limitations on investment withdrawals with regard to any particular investment class (e.g., limitations on early withdrawals from "fund of funds"). Supporting Organization may select its own custodian and investment consultant and pay the relevant fees directly, subject to Section 1.2(c) of this Agreement.

3.      **TERM**

3.1      COMMENCEMENT. The term of this Agreement commenced upon the contribution of funds to Supporting Organization on November 30, 2011.

3.2      TERM. Supporting Organization and Foundation intend to engage in a long-term relationship. The initial term of this agreement shall be one year, and the term shall be renewed automatically for successive one-year periods. Notwithstanding the foregoing, this agreement may be terminated at any time by either party providing the other party with 30 days advance written notice of its intent to terminate the Agreement. Should either party wish to terminate this relationship, the following process will be followed:

(a)      The parties will agree on amendments to the certificate of incorporation and bylaws of Supporting Organization. The amendments will change the status of Supporting Organization from a supporting organization of Foundation and provide for the transfer of Supporting Organization's assets to one or more of the following entities as determined by Supporting Organization:

(i)      A stand-alone publicly-supported organization described in Section 501(c)(3) of the Code.

(ii)      A supporting organization of another publicly-supported 501(c)(3) organization.

(iii)      A donor-advised fund of a publicly-supported organization described in Section 501(c)(3) of the Code.

(b)      Neither party will unreasonably withhold its approval of these amendments.

(c)      In the event of the termination of this Agreement, each party shall be responsible for its own fees and costs related to the termination.

3.3      LOSS OF TAX-EXEMPT STATUS. This agreement shall be automatically terminated in the event that Supporting Organization is determined to not qualify as a tax-exempt organization described in Section 501(c)(3) of the Code.

4.      **INDEMNIFICATION AND INSURANCE**

4.1      Foundation will indemnify, defend, and hold harmless Supporting Organization, its officers, directors, employees, members, agents, and affiliated organizations against and from any claims, liability, suits, damages, losses, or expenses whatsoever, including reasonable attorneys fees incurred, arising or alleged to arise out of the acts or omissions of Foundation, its officers, employees, members, agents, and affiliated organizations, under this Agreement. Foundation will maintain at all times during the term of this Agreement general liability and director and officer liability insurance in such amounts and against such risks as are standard in the industry, naming Supporting Organization and its directors and officers as additional insureds. The coverage will protect against the acts or omissions of Supporting Organization, its officers, directors, agents, and employees.

010036 000007 DALLAS 2811351.2                                3

4.2     Supporting Organization will indemnify, defend, and hold harmless Foundation, its officers, trustees, employees, members, agents, and affiliated organizations against and from any claims, liability, suits, damages, losses, or expenses whatsoever, including reasonable attorneys fees incurred, arising or alleged to arise out of the acts or omissions of Supporting Organization, its officers, directors, employees, members, agents, and affiliated organizations, under this Agreement.

5.     **MISCELLANEOUS**

5.1     GOVERNING LAW. This Agreement and the legal relations between the parties shall be governed by and construed under the laws of the State of Texas.

5.2     RECORDS. Supporting Organization will supply to Foundation on a timely basis copies of the following materials as they are created, updated, or amended: incorporation documents; annual filings with the State of Texas; meeting minutes and actions of the Board of Directors and of any committee with Board authority; board contact information; investment statements; and board policies.

5.3     PUBLICITY. Foundation may disclose the existence, funding and grants of the Supporting Organization in its Annual Report and other documentation published by Foundation. Any information presented for publication by the media shall be approved in advance by Supporting Organization. Foundation reserves the right to approve in advance any publicity from Supporting Organization mentioning Foundation.

5.4     FURTHER ASSURANCES. Each of the parties hereto does hereby covenant and agree, without any further consideration, to execute, acknowledge, and deliver all such other documents and to take all such other actions as may be necessary or convenient in order to carry out more effectively any of the purposes of this Agreement.

5.5     AMENDMENTS. This Agreement may be amended from time to time only by written instrument signed by both parties; and this Agreement shall be amended by the parties whenever necessary or advisable in order to comply with requirements of the Code relating to tax-exempt organizations and supporting organizations.

5.6     ENTIRE AGREEMENT. This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior agreements between the parties with regard to such subject matter.

010036 000007 DALLAS 2811351.2                    4

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

HIGHLAND DALLAS FOUNDATION, INC.

DALLAS FOUNDATION

_____
James Dondero, President

_____
Mary M. Jalonick, President

010036 000007 DALLAS 2811351.2

5

CONFIDENTIAL TDIT005175

## SCHEDULE A

### SCHEDULE OF SERVICES

Foundation will provide to Supporting Organization the services indicated below:

1.1 Administrative Services.

   a. Maintenance of Supporting Organization's records, reports and files.

   b. Performance of related accounting services for Supporting Organization.

   c. Payment of accounts payable and other liabilities of Supporting Organization.

   d. Preparation and distribution of all financial statements required to be generated by Supporting Organization.

   e. Oversight of the preparation and filing of all federal and state returns required of Supporting Organization.

   f. As needed, preparation and distribution to the governing body of Supporting Organization of periodic reports on the financial condition of the Supporting Organization.

1.2 Corporate Formalities Services.

   a. Calendaring of required member and board meetings.

   b. Notice of all meetings.

   c. Facilities and administrative support for member and board meetings.

   d. Preparation of minutes.

   e. Maintenance of minute book.

   f. Assistance with selection of candidates for the board.

1.3 Grant Administration.

   a. Assistance with development of program goals, guidelines and a form of Request for Proposal.

   b. Disseminate RFP to target groups.

   c. Receive and screen all proposals.

   d. Preparation of a summary grid of proposals for review and decision by the Supporting Organization.

   e. Prepare and send responses to applicants.

   f. Disbursement of grants with grant letters.

   g. Monitor performance of grantees.

010036 000007 DALLAS 2811351.2                          A-1

FSD2025-0116                     **Page 223 of 1530**                     2025-08-19

h.   Receive and review interim and annual reports from grantees.

Supporting Organization acknowledges that Foundation is providing only the services listed above. Any services not selected, and any services not listed above, shall not be within the scope of Foundation's responsibilities under this Agreement. Without limiting the foregoing, Supporting Organization acknowledges that Foundation is not providing any investment advice or services to Supporting Organization, and that Supporting Organization is responsible for the management and investment of its assets.

010036 000007 DALLAS 2811351.2                     A-2

CONFIDENTIAL                                                         TDIT005177

## SCHEDULE B

### SCHEDULE OF FEES

In consideration of the services provided to Supporting Organization by Foundation, Supporting Organization shall pay Foundation an annual administrative fee (Fee) in the amount of .25% of the assets owned directly or indirectly by Supporting Organization, plus out-of-pocket costs. The Fee is payable in quarterly installments in arrears in the amount of .0625% of the prior quarter-end net asset value, plus out-of-pocket expenses for said quarter.

010036 000007 DALLAS 2811351.2

B-1

**CONFIDENTIAL**                    **TDIT005178**

## SANTA BARBARA FOUNDATION

### SUPPORTING ORGANIZATION OPERATING AGREEMENT

THIS AGREEMENT is made and entered into on November 30, 2011, by and between the SANTA BARBARA FOUNDATION ("Foundation") and the **Highland Santa Barbara Foundation, Inc.** ("Supporting Organization"),

**RECITALS:**

A.    Foundation is a California nonprofit public benefit corporation exempt from taxation under Internal Revenue Code ("Code") Section 501(c)(3), and a public charity described in Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Code. The principal objective of Foundation is to solicit, receive and accept property to be administered, used and applied for charitable purposes, primarily but not exclusively in, or for the benefit of Santa Barbara County.

B.    Supporting Organization, a Delaware nonprofit non-stock charitable corporation, is a "Type 1 Supporting Organization" under Section 509(a)(3) of the Code established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of Foundation.

C.    Supporting Organization expects to obtain a determination letter from the Internal Revenue Service that it is a tax-exempt organization under Section 501(c)(3) and a Type 1 supporting organization.

D.    Foundation and Supporting Organization have entered into this Agreement for the purpose of documenting their agreements relating to the operation of Supporting Organization as a Type 1 Supporting Organization of Foundation. It is the intent of the parties that each year the assets held by Supporting Organization will generate funds for grantmaking primarily but not exclusively in Santa Barbara County and for the payment of fees to Foundation under this Agreement.

NOW THEREFORE, the parties agree as follows:

1.    **GOVERNANCE OF SUPPORTING ORGANIZATION**

     1.1    **OPERATIONS.** Supporting Organization is a separately-incorporated corporation, solely responsible for its own operations and for its compliance with tax and other laws. At all times during the term of this Agreement, Supporting Organization shall operate as a Type 1 Supporting Organization of Foundation, as contemplated in Section 509(a)(3)(B)(i) of the Code. Foundation recognizes that assets contributed to Supporting Organization will be held in the name of Supporting Organization and will be subject to spending and investment policies as shall be determined by the Board of Directors of Supporting Organization from time to time.

     1.2    **BOARD OF DIRECTORS.** Supporting Organization's Board of Directors will be the governing body for Supporting Organization. Unless otherwise agreed by the parties, Supporting Organization's initial Board of Directors shall consist of 3 members.

        (a)    **FOUNDATION APPOINTMENTS.** Foundation's Board of Trustees, as required by the Code, will at all times appoint a majority of Supporting Organization's directors. Foundation will cooperate with Supporting Organization to ensure that all persons appointed by Foundation are committed to the purposes of Supporting Organization. Foundation's appointees to Supporting Organization's Board of Directors may include Foundation's trustees or staff, as well as third parties selected by Foundation.

1

CONFIDENTIAL       TDIT005179

222

Foundation's appointees shall not, apart from their service as Supporting Organization directors or officers, be "disqualified persons" as defined in Sections 509(a)(3)(C) and 4946 of the Code. Supporting Organization shall notify Foundation if any appointee is a disqualified person other than by virtue of his or her service as a Supporting Organization director or officer. Foundation's appointees to Supporting Organization's Board of Directors shall serve at the will of Foundation or for terms outlined in Supporting Organization's Bylaws.

(b)   SUPPORTING ORGANIZATION APPOINTMENTS. Mr. James Dondero or his successor shall elect or appoint a minority of the board members (i.e., one, as long as the Board of Directors numbers three), who may be a disqualified person(s).

(c)   DISQUALIFIED PERSONS. Under no circumstances shall individuals who are disqualified persons (other than by virtue of their service as directors or officers of Supporting Organization) have majority control of Supporting Organization's board or have veto powers over Supporting Organization's board. Disqualified persons described in Section 4946 of the Code and persons described in Section 4958(c)(3)(B) of the Code cannot be compensated by Supporting Organization or receive grants, loans or similar payments from Supporting Organization.

1.3   COMPENSATION. Foundation does not pay trustees or hire trustees to provide specific services. The parties agree that in order to avoid even the perception of personal benefit, no directors of Supporting Organization shall receive compensation for their service as such. Notwithstanding the foregoing, Supporting Organization's directors may be reimbursed for reasonable and necessary out of pocket expenses actually incurred for their board service.

1.4   MEETINGS. Supporting Organization's Board of Directors shall meet at least once annually in a manner permitted under Delaware law.

1.5   POLICIES. Within the first year of Supporting Organization's existence, Supporting Organization's Board of Directors shall establish the following policies, and provide copies of such policies to Foundation when they are created and amended: Charitable Mission Statement, Gift Acceptance Policy, Investment Policy, and Grantmaking Policy.

2.   FINANCE AND OPERATIONS

2.1   FISCAL YEAR. Supporting Organization's fiscal year will be the calendar year.

2.2   SERVICES. Foundation will provide the services to Supporting Organization described in SCHEDULE A, attached, and as such schedule may be amended by Foundation and Supporting Organization in writing from time to time.

2.3   FEES:

(a)   Supporting Organization shall pay to Foundation the fees described more particularly in SCHEDULE B, attached.

(b)   The parties may agree to additional fees in respect to the performance of any additional services not described in SCHEDULE A to this agreement. Foundation shall notify the Supporting Organization in advance of any changes in administrative fees enacted by Foundation's Board of Trustees.

2

CONFIDENTIAL                                                                     TDIT005180

223

2.4    INVESTMENTS

(a)    From time to time, some or all of Supporting Organization's funds may be invested with the pooled endowment funds of Foundation to achieve economies of scale and strive for the highest expected level of returns for a given level of risk with the goal of enabling Supporting Organization to achieve its philanthropic and financial objectives. Decisions with respect to the retention, investment, or reinvestment of assets or commingling of assets shall be made by Foundation's Board of Trustees or by a committee or agent authorized by the Board of Trustees, in accordance with Foundation's investment policies. Supporting Organization's funds will be accounted for and reported on separately.

(b)    Supporting Organization may at any time remove any or all of its funds invested with Foundation's pooled investment fund and invest its own funds separately from those of Foundation, subject to limitations on investment withdrawals with regard to any particular investment class (e.g., limitations on early withdrawals from "fund of funds"). Supporting Organization may select its own custodian and investment consultant and pay the relevant fees directly.

3.    TERM

3.1    COMMENCEMENT. The term of this Agreement shall commence upon the contribution of funds to Supporting Organization.

3.2    TERM. Supporting Organization and Foundation intend to engage in a long-term relationship. The initial term of this agreement shall be one year, and the term shall be renewed automatically for successive one-year periods. Notwithstanding the foregoing, this agreement may be terminated at any time by either party providing the other party with 30 days advance written notice of its intent to terminate the Agreement. Should either party wish to dissolve this relationship, the following process will be followed:

(a)    The parties will agree on amendments to the certificate of incorporation and bylaws of Supporting Organization. The amendments will change the status of Supporting Organization from a supporting organization of Foundation and provide for the transfer of Supporting Organization's assets to one or more of the following entities as determined by Supporting Organization:

(i)    A stand-alone publicly-supported 501(c)(3) organization, or

(ii)    A supporting organization of another publicly-supported 501(c)(3) organization.

(iii)    A donor-advised fund of a publicly-supported 501(c)(3) organization.

(b)    Neither party will unreasonably withhold its approval of these amendments.

(c)    In the event of the dissolution of this relationship, each party shall be responsible for its own fees and costs related to the dissolution.

3.3    LOSS OF TAX-EXEMPT STATUS. This agreement shall be automatically terminated upon the date the IRS determines that Supporting Organization is not a tax-exempt organization under Section 501(c)(3) of the Code.

3

CONFIDENTIAL                                                                TDIT005181

FSD2025-0116

4.    **INDEMNIFICATION AND INSURANCE**

4.1    Foundation will indemnify, defend, and hold harmless Supporting Organization, its officers, directors, employees, members, agents, and affiliated organizations against and from any claims, liability, suits, damages, losses, or expenses whatsoever, including reasonable attorneys fees incurred, arising or alleged to arise out of the acts or omissions of Foundation, its officials, employees, members, agents, and affiliated organizations, under this Agreement. Foundation will maintain at all times during the term of this Agreement general liability and director and officer liability insurance in such amounts and against such risks as are standard in the industry, naming Supporting Organization and its directors and officers as additional insureds. The coverage will protect against the acts or omissions of Supporting Organization, its officers, directors, agents, and employees.

4.2    Supporting Organization will indemnify, defend, and hold harmless Foundation, its officers, trustees, employees, members, agents, and affiliated organizations against and from any claims, liability, suits, damages, losses, or expenses whatsoever, including reasonable attorneys fees incurred, arising or alleged to arise out of the acts or omissions of Supporting Organization, its officers, directors, employees, members, agents, and affiliated organizations, under this Agreement.

5.    **MISCELLANEOUS**

5.1    **GOVERNING LAW.** This Agreement and the legal relations between the parties shall be governed under the laws of the State of California.

5.2    **RECORDS.** Supporting Organization will supply to Foundation on a timely basis copies of the following materials as they are created, updated, or amended: incorporation documents; annual filings with the State of California and IRS; meeting minutes and actions of the Board and of any committee with Board authority; board contact information; investment statements; and board policies.

5.3    **PUBLICITY.** Foundation may disclose the existence, funding and grants of the Supporting Organization in its Annual Report and other documentation published byFoundation. Any information presented for publication by the media shall be approved in advance by Supporting Organization. Foundation reserves the right to approve any publicity from Supporting Organization mentioning Foundation.

5.4    **FURTHER ASSURANCES.** Each of the parties hereto does hereby covenant and agree, without any further consideration, to execute, acknowledge, and deliver all such other documents and to take all such other actions as may be necessary or convenient in order to carry out more effectively any of the purposes of this Agreement.

5.5    **AMENDMENTS.** This Agreement may be amended from time to time by written instrument signed by the parties; and this Agreement shall be amended by the parties whenever necessary or advisable in order to comply with requirements of the Code relating to tax-exempt organizations and supporting organizations.

5.6    **ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements between the parties with regard to such subject matter.

4

CONFIDENTIAL

TDIT005182

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**HIGHLAND SANTA BARBARA**
**FOUNDATION, INC.**

James Dondero, President
November 30, 2011

**SANTA BARBARA FOUNDATION**

Ronald V. Gallo, President & CEO
November 30, 2011

5

**CONFIDENTIAL**    TDIT005183

## SCHEDULE A

### SCHEDULE OF SERVICES

Foundation will provide to Supporting Organization the services indicated below:

1.1 Administrative Services.
   a. Maintenance of Supporting Organization's records, reports and files.
   b. Performance of related accounting services for Supporting Organization.
   c. Payment of accounts payable and other liabilities of Supporting Organization.
   d. Preparation and distribution of all financial statements required to be generated by Supporting Organization.
   e. Oversight of the preparation and filing of all federal and state returns required of Supporting Organization.
   f. As needed, preparation and distribution to the governing body of Supporting Organization of periodic reports on the financial condition of the Supporting Organization.

1.2 Corporate Formalities Services.
   a. Calendaring of required member and board meetings.
   b. Notice of all meetings.
   c. Facilities and secretarial support for member and board meetings.
   d. Preparation of minutes.
   e. Maintenance of minute book.
   f. Assistance with selection of candidates for the board.

1.3 Grant Administration.
   a. Assistance with development of program goals, guidelines and a form of Request for Proposal.
   b. Disseminate RFP to target groups.
   c. Receive and screen all proposals.
   d. Preparation of a summary grid of proposals for review and decision by the Corporation's governing board or officers.
   e. Prepare and send responses to applicants.
   f. Disbursement of grants with grant letters.
   g. Monitor performance of grantees.
   h. Receive and review interim and annual reports from grantees.

Supporting Organization acknowledges that Foundation is providing only the services listed above. Any services not selected, and any services not listed above, shall not be within the scope of Foundation's responsibilities under this Agreement. Without limiting the foregoing, Supporting Organization acknowledges that Foundation is not providing any investment advice or services to Supporting Organization, and that Supporting Organization is responsible for the management and investment of its assets.

1

CONFIDENTIAL                                                                    TDIT005184

## SCHEDULE B

### SCHEDULE OF FEES

In consideration of the services provided to Supporting Organization by Foundation, Supporting Organization shall pay Foundation an annual support fee (Fee) as outlined below. Fees are payable quarterly in arrears and are based on the prior quarter-end net asset value.

1% (100 basis points) per annum (i.e., 25 basis points per quarter) on the first $3 million
0.75% (75 basis points) per annum (i.e., 18.75 basis points per quarter) on the next $2 million
0.50% (50 basis points) per annum (i.e., 12.5 basis points per quarter) on the next $5 million up to $10 million
0.25% (25 basis points) per annum (i.e., 6.25 basis points per quarter) on all amounts over $10 million

CONFIDENTIAL                    TDIT005185

228

FSD2025-0116 *Execution Version*        **Page 232 of 1530**        2025-08-19

**DATED 11 March 2024**

**SECOND AMENDED AND RESTATED**
**EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP**

---

WARNING
THE TAKING OR SENDING BY ANY PERSON OF AN ORIGINAL OF THIS DOCUMENT INTO THE
CAYMAN ISLANDS MAY GIVE RISE TO THE IMPOSITION OF CAYMAN ISLANDS STAMP DUTY

29858621.5.C8689.187150

CONFIDENTIAL        TDIT005186

FSD2025-0116 *Execution Version*                                                           2025-08-19

## TABLE OF CONTENTS

**PAGE**

ARTICLE I    GENERAL PROVISIONS; COMPENSATION AND EXPENSES ................................ 1
1.1    Continuation. ................................................................................................ 1
1.2    Name. ........................................................................................................... 1
1.3    Purpose and Powers. ................................................................................... 1
1.4    Registered Office. ........................................................................................ 1
1.5    Partners. ....................................................................................................... 1
1.6    Powers. ......................................................................................................... 1
1.7    Term. ............................................................................................................. 2
1.8    Admission of New Partners. ......................................................................... 2
1.9    Taxable Year. ............................................................................................... 2
1.10    Liability of Partners ...................................................................................... 2
1.11    Limitation on Assignability of Partners' Interests. ........................................ 2
1.12    Definitions. .................................................................................................... 2
1.13    Service Providers. ........................................................................................ 3
1.14    Partnership Expenses. ................................................................................. 3
1.15    Partnership Records. .................................................................................... 3
1.16    Limited Partner Information. ......................................................................... 3

ARTICLE II    POWERS. ...................................................................................................... 4
2.1    Partnership Powers. ..................................................................................... 4
2.2    Rights, Powers, Limitations on Liability and Indemnification of General Partner. .......... 5

ARTICLE III    CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES ......................... 7
3.1    Capital Contributions. .................................................................................. 7
3.2    Capital Account; Allocation of Profits and Losses. ...................................... 7

ARTICLE IV    LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWLS FROM CAPITAL ACCOUNT ........................................................................................ 8
4.1    Legal Interest. ............................................................................................. 8
4.2    Distributions. ............................................................................................... 8
4.3    Withdrawal. .................................................................................................. 8

ARTICLE V    DURATION OF PARTNERSHIP ..................................................................... 9
5.1    Commencement of Winding Up. .................................................................. 9
5.2    Winding Up. ................................................................................................. 9
5.3    Termination. ................................................................................................. 9

ARTICLE VI    MISCELLANEOUS ........................................................................................ 9
6.1    Tax Matters Partner. .................................................................................... 9
6.2    Right to Hire. ................................................................................................ 9
6.3    Applicable Law, etc. ..................................................................................... 10
6.4    Power of Attorney. ....................................................................................... 10
6.5    Tax Elections Under the Internal Revenue Code. ........................................ 10
6.6    Amendments to Partnership Agreement. ..................................................... 10
6.7    Investment Representation. ......................................................................... 11
6.8    Notices. ........................................................................................................ 11
6.9    General Partner Determinations. ................................................................. 11
6.10    Dispute Resolution. ..................................................................................... 11
6.11    Successors and Assigns. ............................................................................. 13
6.12    Severability. ................................................................................................. 13
6.13    No Third Party Rights. .................................................................................. 13
6.14    No Right to Partition. .................................................................................... 14

29858621.5.C8689.187150

CONFIDENTIAL
TDIT005187

FSD2025-0116 *Execution Version*                                        2025-08-19

## SECOND AMENDED AND RESTATED

## EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP

**THIS SECOND AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT** (the "Agreement") is made on 11 March 2024

BETWEEN

(1) CDH GP, Ltd., a Cayman Islands exempted company having its registered office at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands as general partner (the "**General Partner**");

(2) Charitable DAF HoldCo, Ltd, a Cayman Islands exempted company having its registered office at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands as limited partner (the "**Limited Partner**"); and

(3) Each individual, partnership, corporation, limited liability company, trust or other entity (each, a "**Person**") admitted as a limited partner or general partner (collectively, the "**Partners**") of the Partnership (as defined below) in accordance with this Agreement, including any Persons hereafter admitted as Partners in accordance with this Agreement and excluding any Persons who cease to be Partners in accordance with this Agreement.

**WHEREAS**, Charitable DAF Fund, LP (the "**Partnership**") was formed on October 25, 2011 and registered as an exempted limited partnership pursuant to and in accordance with the Exempted Limited Partnership Act (as amended) of the Cayman Islands (the "**Act**"), and an Initial Limited Partnership Agreement of the Partnership was entered into as of the same date (the "**Initial Agreement**");

**WHEREAS**, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein;

**WHEREAS**, the Limited Partner and Charitable DAF GP, LLC, as general partner of the Partnership, amended and restated the Initial Agreement in its entirety on November 7, 2011 ("**A&R LPA**");

**WHEREAS**, Charitable DAF GP, LLC assigned to the General Partner its general partnership interest and the General Partner assumed the obligations of Charitable DAF GP, LLC, as general partner of the Partnership pursuant to an assignment and assumption agreement dated 7 March 2024; and

**WHEREAS**, the Limited Partner and the General Partner, desire to amend and restate the A&R LPA in its entirety as set forth below.

**FSD2025-0116**

2025-08-19

**NOW THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby adopt this Agreement to be their Limited Partnership Agreement, as follows:

**IT IS AGREED:**

## ARTICLE I

### GENERAL PROVISIONS; COMPENSATION AND EXPENSES

1.1    Continuation. The parties hereto continue the Partnership as an exempted limited partnership formed on October 25, 2011 pursuant to the Act.

1.2    Name. The name of the Partnership is Charitable DAF Fund, LP or such other name as the General Partner may from time to time determine provided that the words "Limited Partnership" or the abbreviations "LP" or "L.P." shall be included in the name as required by the Act.

1.3    Purpose and Powers. The purpose of the Partnership shall be to invest and trade, directly or indirectly, in securities of all types and other investment vehicles and instruments, and to engage in any lawful activity for which exempted limited partnerships may be formed under the Act. At least initially, a majority of the Partnership's assets shall be invested in shares of CLO HoldCo, Ltd., a Cayman Islands exempted company ("**CLO HoldCo**"), but the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.

1.4    Registered Office. The registered office of the Partnership is c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands or such other place in the Cayman Islands as the General Partner may in its absolute discretion from time to time determine. The General Partner shall make the required filings with the Registrar of Exempted Limited Partnerships of any change to the Partnership's registered office in accordance with the Act.

1.5    Partners. The name and addresses of the Partners are as follows:

| Name | Address |
|------|---------|
| CDH GP, LTD. (General Partner) | c/o Campbells Corporate Services Limited<br>Floor 4, Willow House<br>Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands |
| Charitable DAF HoldCo, Ltd (Limited Partner) | c/o Campbells Corporate Services Limited<br>Floor 4, Willow House<br>Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands |

1.6    Powers.

(a) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and conduct of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of an exempted limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in

1

**FSD2025-0116**

2025-08-19

151

**CONFIDENTIAL**

**TDIT005189**

29858621.5.C8689.187150

this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.

(b)  Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management or conduct of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

1.7  <u>Term.</u> The Partnership was established on October 25, 2011 and shall continue until wound up and subsequently dissolved in accordance with this Agreement or any amendment or modification thereof.

1.8  <u>Admission of New Partners.</u>  The General Partner may at any time admit one or more new Partners on such terms as it may determine in its sole discretion; provided that any such new Limited Partner shall have as its equity owners solely Indirect Charitable Owners.

1.9  <u>Taxable Year.</u> The Taxable Year of the Partnership shall be a calendar fiscal year, or such other fiscal year as the General Partner shall determine in their sole discretion from time to time.

1.10  <u>Liability of Partners</u>

(a)  The General Partner shall be liable for all of the debts, liabilities and obligations of the Partnership.

(b)  Except to the extent otherwise required by law or this Agreement, a Limited Partner shall not be personally liable for any obligations of the Partnership to third parties nor for the return of any distributions from the Partnership to the Limited Partner. Limited Partners should not take part in the conduct of the business of the Partnership and should not deal with third parties, nor for the return of any distributions from the Partnership to the Limited Partner, or otherwise hold itself out, as a general partner of the Partnership.  A Limited Partner may be liable for the tax audit and related expenses referred to in Section 6.1

1.11  <u>Limitation on Assignability of Partners' Interests.</u>

(a)  A Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner. Any attempted assignment or substitution not made in accordance with this section shall be void *ab initio*.

(b)  The General Partner may not assign their interests in the Partnership to any entity that is not under common control with the General Partner without the consent of a majority-in-interest of the Limited Partners. Notwithstanding the foregoing, the General Partner may freely assign their economic interest in the Partnership in whole or in part.  The General Partner shall file, or cause to be filed, any amended Section 10 Statement with the Cayman Islands Registrar of Exempted Limited Partnerships required to be filed pursuant to Section 10 of the Act to give effect to the provisions of this Section 1.11.

1.12  <u>Definitions.</u> For the purpose of this Agreement, unless the context otherwise requires:

2

(a)      General Partner. The term "**General Partner**" shall refer to CDH GP, Ltd., and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

Indirect Charitable Owners. The term "Indirect Charitable Owner" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 50l(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

(b)      Limited Partner. The term "**Limited Partner**" shall refer to Charitable DAF HoldCo Ltd (and each person subsequently admitted as a limited partner by the General Partner pursuant to the terms of this Agreement).

(c)      Partner. The term "**Partner**" shall refer to the General Partner or the Limited Partner.

1.13     Service Providers. The General Partner may engage one or more Persons to act, or remove any one or more Persons from so acting, as service providers to the Company (including, without limitation, as manager, administrator, custodian, registrar and transfer agent, investment manager, investment adviser, sponsor and/or prime broker, auditors and legal counsel to the Partnership) in its sole discretion; provided, that any compensation paid to any such service provider that is affiliated with the General Partner shall be in an amount customary for services of a similar nature.

1.14     Partnership Expenses. The Partnership will bear its own operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees (if any), taxes, research costs, legal and accounting expenses and other operating expenses. In addition, the Partnership will bear its pro rata share of CLO HoldCo's operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees, taxes, research costs, legal and accounting expenses and other operating expenses. The Partnership will also bear (or reimburse the General Partner for) its organizational fees and expenses. To the extent the Partnership shares trading expenses with other accounts that may be managed by the General Partner or any affiliates, it will bear a proportionate share of the associated costs. In no event shall the General Partner receive any compensation from the Partnership.

1.15     Partnership Records. The General Partner shall cause to be maintained at the principal office of the Partnership, or at such other place as the Act may permit, a register of limited partnership interests which shall include such information as may be required by the Act (the "**Register**"). The Register shall not be part of this Agreement. The General Partner shall, from time to time, update the Register as required by the Act to accurately reflect the information therein and no action of any Limited Partner shall be required to amend or update the Register. [Upon the prior consent of the General Partner, the Limited Partners shall have the right to inspect the Register.] Any reference in this Agreement to the Register shall be deemed a reference to the Register as in effect from time to time. Subject to the terms of this Agreement, the General Partner may take any action authorised hereunder in respect of the Register, including making the Register available at the registered office to satisfy any order or notice pursuant to the Tax Information Authority Act (as amended) without any need to obtain the consent of any other Partner.

1.16     Limited Partner Information. Other than what has been expressly agreed to be provided to the Limited Partners herein, the Limited Partners are not entitled to any other additional information regarding the Partnership (including for the purposes of section 22 of the Act (which is disapplied with respect to the Partnership)) unless agreed by the General Partner in its sole discretion.

**ARTICLE II**

3

29858621.5.C8689.187150

**CONFIDENTIAL**                                                      TDIT005191

## POWERS

2.1     <u>Partnership Powers.</u>

The Partnership shall have the following powers:

(a)     To purchase, sell, invest and trade, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non- U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, syndicated debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; statutory claims; royalty claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (all such items being called herein a "**Financial Instruments**"), and to sell Financial Instruments short and cover such sales;

(b)     To possess, transfer, mortgage, pledge, charge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Financial Interests held or owned by the Partnership with the ultimate objective of the preservation, protection, improvement and enhancement in value thereof and to hold such Financial Interests in the name of the Partnership, in the name of any securities broker or firm, in the name of any nominee of such firm, or in the name of any other nominee or any other street name, or any combination thereof;

(c)     To lend, either with or without security, any Financial Instruments, funds or other properties of the Partnership, including by entering into reverse repurchase agreements, and, from time to time, undertake leverage on behalf of the Partnership;

(d)     To borrow or raise moneys and, from time to time, without limit as to amount, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any of the foregoing instruments and of the interest thereon by mortgage upon or pledge, charge,

conveyance or assignment in trust of the whole or any part of the property of the Partnership, whether at the time owned or thereafter acquired, and to sell, pledge, charge or otherwise dispose of such bonds or other obligations of the Partnership for its purposes;

(e) To have and maintain one or more offices within or without the Cayman Islands and in connection therewith to rent or acquire office space, engage personnel and do such other acts and things as may be necessary or advisable in connection with the maintenance of such office or offices;

(f) To open, maintain and close bank accounts and brokerage accounts, including the power to draw checks or other orders for the payment of monies; and

(g) To enter into, make and perform all contracts, agreements and other undertakings as may be necessary or advisable or incidental to the carrying out of the foregoing objects and purposes.

2.2 <u>Rights, Powers, Limitations on Liability and Indemnification of General Partner.</u>

(a) Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the General Partner, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including members of any committee and parties acting as agents for the execution of transactions) (each, a **"Covered Person"** and collectively, **"Covered Persons")** shall be subject to the provisions of this Section.

(b) To the fullest extent permitted by law, no Covered Person shall be liable to the Partnership or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Partnership, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Partnership, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Partnership whom such Covered Person believes is authorized to make such suggestions on behalf of the Partnership, (iii) any act or omission by the Partnership, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Partnership selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c) Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Partnership or in furtherance of the business of the Partnership in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d) To the fullest extent permitted by law, the Partnership shall indemnify and save harmless Covered Persons (the **"Indemnitees"),** from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection

5

with the business of the Partnership, any investment made under or in connection with this Agreement, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Partnership, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or gross negligence.

(e)     Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

(f)     The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

(g)     The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h)     **Notwithstanding anything in this Agreement to the contrary, the aggregate maximum amount that a Covered Person may be liable to the Partnership and/or any of the Partners pursuant to this Agreement shall, to the extent not prohibited by law, never exceed the amount of management and incentive fees received by such Covered Person from the Partnership under this Agreement prior to the date that the acts or omissions giving rise to a claim for indemnification or liability shall have occurred. In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits. No Covered Person shall incur any liability for interest on any monies at any time received by such Covered Person or any investment loss or other charge resulting therefrom with respect to amounts invested hereunder.**

(i)     <u>**WAIVER OF CONSUMER RIGHTS:**</u>  **The Partnership and each of the Limited Partners waive all of their respective rights, if any, under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Texas Business & Commerce Code ("DTPA"), a law that gives consumers special rights and protections. After consultation with an attorney of Partnership's own selection, Partnership voluntarily consents to this waiver. This waiver includes any right to recover attorneys' fees under the DTPA Further, Partnership waives all of its rights to any and all protections afforded by any other state or federal Consumer Protection Acts, including the recovery of attorneys' fees.**

(j)     No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

6

29858621.5.C8689.187150

CONFIDENTIAL

**FSD2025-0116**                                                      **2025-08-19**

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Covered Person, the Partnership (and not the applicable Covered Person) shall be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence or reckless or intentional misconduct of any Covered Person.  Given the volume of transactions executed on behalf of the Partnership, Limited Partners acknowledge that trading errors (and similar errors) will occur and that the Partnership shall be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Covered Person.

(k)      This Section 2.2 shall survive a Limited Partner's withdrawal as a limited partner of the Partnership and any termination of this Agreement.

## ARTICLE III

## CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES

3.1      Capital Contributions.

(a)      Each Partner has made the capital contributions to the Partnership in the amount set forth in the records of the Partnership.  The Limited Partner has contributed to the Partnership all of the outstanding equity interests of CLO HoldCo.

3.2      Capital Account; Allocation of Profits and Losses.

(b)      There shall be established for each Partner on the books of the Partnership as of the first day of the fiscal period during which such Partner was admitted to the Partnership a capital account for such Partner in an amount equal to his capital contribution to the Partnership.

(c)      Since the General Partner's capital account and contributions shall be the minimum required by Act, all income, deductions, gains, losses and credits of the Partnership shall be allocated shall be for the benefit of the Limited Partner, except as may otherwise be required by law.  In the event any valuation of assets is necessary or appropriate, the General Partner shall determine such value in any reasonable manner determined by the General Partner in its sole discretion consistent with relevant accounting principles and applicable law.

(d)      For purposes of determining the share of any items allocated to any period during the relevant Taxable Year of the Partnership, such shares shall be determined by the General Partner using any method permitted by the Code and the regulations thereunder.  All allocations to be made by the General Partner may be overridden if necessary to comply with the Code, the regulations thereunder or other applicable law.

(e)      To the extent that the Partnership pays withholding taxes as to a Partner, such amounts shall be charged to the applicable Partner's capital account; provided, however, that any such amounts may be treated as an advance to the Partner with interest to be charged to that Partner's capital account at a rate determined by the General Partner.

(f)      Each Partner agrees not to treat, on any tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with treatment of such item by the Partnership.

29858621.5.C8689.187150

**FSD2025-0116**                                                      **2025-08-19**
                                                                          **157**

**CONFIDENTIAL**
                                                                 **TDIT005195**

FSD2025-0116                                                                                           2025-08-19

# ARTICLE IV

## LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWLS FROM CAPITAL ACCOUNT

4.1    Legal Interest. Each Partner shall have and own during any Taxable Year an undivided interest in the Partnership equal to his opening capital account for such period.

4.2    Distributions.

(a)    Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses. In determining the amount of cash or securities available for distribution, the General Partner may retain reasonable reserves in such amounts as it determines may be necessary to cover expenses, contingencies and losses. Notwithstanding the foregoing, distributions made in connection with a sale of all or substantially all of the Partnership's assets or a liquidation of the Partnership shall be made in accordance with the capital account balances of the Partners within the time period set forth in Treasury Regulations Section 1.704- 1(b)(2)(ii)(b)(3).

(b)    The General Partner may withhold and pay over to the U.S. Internal Revenue Service (or any other relevant taxing authority) such amounts as the Partnership is required to withhold or pay over, pursuant to the Code or any other applicable law, on account of a Partner's distributive share of the Partnership's items of gross income, income or gain.

(c)    For purposes of this Agreement, any taxes so withheld or paid over by the Partnership with respect to a Partner's distributive share of the Partnership's gross income, income or gain shall be deemed to be a distribution or payment to such Partner, reducing the amount otherwise distributable to such Partner pursuant to this Agreement and reducing the capital account of such Partner. If the amount of such taxes is greater than any such distributable amounts, then such Partner and any successor to such Partner's interest shall pay the amount of such excess to the Partnership, as a contribution to the capital of the Partnership. Notwithstanding anything to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, will not be required to make a distribution to any Partner on account of its interest in the Partnership if such distribution would violate any provision of the Act or any other applicable law.

4.3    Withdrawal. Without the consent of the General Partner, no Partner may withdraw as a Partner or make withdrawals from such Partner's capital account. In the event the General Partner permits any such withdrawal, the withdrawal shall be on such terms and conditions as the General Partner shall determine in its sole discretion. The General Partner may require the withdrawal of all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.

# ARTICLE V

8

29858621.5.C8689.187150

FSD2025-0116                                                                                           2025-08-19
                                                                                                       158

CONFIDENTIAL                                        TDIT005196

## DURATION OF PARTNERSHIP

5.1 <u>Commencement of Winding Up.</u> The Partnership shall be required to be wound up and subsequently dissolved pursuant to the provisions of Section 36(1)(a) of the Act after the earliest of:

(a) the service of a notice by the General Partner on the other Partners requiring that the Partnership be wound up and dissolved; or

(b) the withdrawal by or resignation of the General Partner as general partner of the Partnership; or

(c) the withdrawal of all Limited Partners.

Upon the occurrence of any such event, the Partnership's affairs shall be wound up by the General Partner or such other Person as the General Partner shall appoint to act as liquidator of the Partnership.

5.2 <u>Winding Up.</u> Upon the commencement of the winding up of the Partnership, the General Partner (or a duly appointed liquidator, as applicable) shall proceed with the liquidation and distribution of the assets of the Partnership in an orderly manner in accordance with this Agreement and the Act.

5.3 <u>Termination.</u> Upon completion of the winding up of affairs of the Partnership in accordance with the Act and this Agreement, the General Partner (or liquidator, as applicable) shall execute a notice of dissolution ("**Notice of Dissolution**") in respect of the Partnership and cause such Notice of Dissolution to be filed with the Registrar of Exempted Limited Partnerships of the Cayman Islands, and this Agreement shall terminate.

## ARTICLE VI

### MISCELLANEOUS

6.1 <u>Tax Matters Partner.</u> The General Partner shall at all times constitute, and have full powers and responsibilities, as the Tax Matters Partner of the Partnership. In the event the Partnership shall be the subject of an income tax audit by any Federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof, and the Tax Matters Partner shall be indemnified and held harmless by the Partnership and each Partner for any action so taken by him in good faith. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership to the extent of available Partnership funds, and any excess shall be paid by the Partners individually in proportion to their percentage interests in the Partnership.

6.2 <u>Right to Hire.</u>

(a) Nothing herein shall preclude the General Partner from engaging on behalf of the Partnership the services of any person or firm, whether or not affiliated with the General Partner, including the General Partner, to render for compensation such services to the Partnership as may be necessary to implement the business purposes of the Partnership. For the avoidance of doubt, the General Partner and the Limited Partners confirm that any such compensation is received by the General Partner in its capacity as general partner of the Partnership and in

9

furtherance of the General Partner's authority to conduct the Partnership's business and affairs on behalf of the Partnership.

(b) Each of the Partners consents that the General Partner or any Limited Partner or any affiliate (as defined in the Securities Act of 1933, as amended, and the regulations thereunder) of any of them, including without limitation the investment manager of the CLO HoldCo, may engage in or possess an interest in directly or indirectly, any other present or future business venture of any nature or description for his own account, independently or with others, including but not limited to, any aspect of the securities business or any other business engaged in by the Partnership, and may become the general partner in other partnerships; and neither the Partnership nor any Partner shall have any rights in or to such independent venture or the income or profits derived therefrom.

(c) The General Partner and any affiliate or employee of such General Partner, may hereafter render investment advisory services to other investors with respect to, and/or may own, purchase or sell, securities or other interests in property the same as or similar to those which the General Partner may purchase, hold or sell on behalf of the Partnership.

6.3   Applicable Law, etc. This Agreement: (i) shall be binding on the executors, administrators, estates, heirs and legal successors of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the Cayman Islands; and iii) may be executed in more than one counterpart, all of which taken together shall constitute one and the same instrument.

6.4   Power of Attorney. Each of the undersigned does hereby constitute and appoint the General Partner, with full power of substitution, his true and lawful representative and attorney in-fact, in his name, place and stead to make, execute, sign and file this Agreement and any amendment to this Agreement authorized by the terms of this Agreement, and all such other instruments, documents and certificates (and any amendments thereto) which may from time to time be required by the laws of the Cayman Islands, the United States of America, or any state in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Partnership and to take any further action that the General Partner considers advisable in its sole discretion in connection with the exercise of its authority pursuant to this Agreement.

This power of attorney is intended to secure a proprietary interest of the General Partner and, in addition, the obligations of each relevant Limited Partner under this Agreement and shall be irrevocable.

6.5   Tax Elections Under the Internal Revenue Code. The General Partner shall have the authority to make all tax elections and determinations on behalf of the Partnership under the Internal Revenue Code, the regulations promulgated thereunder or other applicable law to effect any elections, determinations or capital allocations.

6.6   Amendments to Partnership Agreement. The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the consent of the General Partner together with the consent of a majority in interest of the Limited Partners, insofar as is consistent with the laws governing this Agreement. Notwithstanding the foregoing, the General Partner shall have the right to effect amendments to this Agreement without the consent of any Limited Partner, including without limitation, to reflect: a change in the location of the Partnership's principal place of business; a change in the registered office or registered agent; a change in the name of the Partnership; admission of Partners in accordance with this Agreement; a change that is necessary to qualify the Partnership as a limited partnership under the laws of any state or that is necessary or advisable in the opinion of the Tax Matters Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for Federal income tax purposes; a change of the provisions relating to the management fee or other compensation to the General Partner so that such provisions conform to any applicable requirements of the U.S. Securities and Exchange

10

Commission and other regulatory authorities; a change (i) that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state agency or contained in any Federal or state statute, compliance with any of which the General Partner deems to be in the best interests of the Partnership and the Limited Partners, (ii) that is required or contemplated by this Agreement, or (iii) that is necessary or desirable to implement new regulations published by the Internal Revenue Service with respect to partnership allocations of income, gain, loss, deduction and credit; a change to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provision with respect to the matters or questions arising under this Agreement which will not be inconsistent with the provisions hereof; or a change that does not adversely affect the Limited Partners in any material respect; provided, that in no event shall the General Partner effect any amendment to this Agreement that has the effect of giving the General Partner any economic benefits in the assets of the Partnership; provided further, that the General Partner shall give notice to the Limited Partners of any such amendment.

6.7     Investment Representation. Each Partner hereby acknowledges and represents that it acquired its interest in the Partnership for investment purposes only and not with a view to its resale or distribution.

6.8     Notices. All notices, requests or approvals that any party hereto is required or desires to give to any Partner or to the Partnership shall be in writing signed by or on behalf of the party giving the same and delivered personally or sent overnight express mail by a reputable private carrier or by prepaid registered or certified mail, return receipt requested, addressed (i) to the Limited Partner at the address set forth in this Agreement; (ii) to the Partnership at the principal place of business of the Partnership with a copy of such notice sent simultaneously to the General Partner at 6716 Glenhurst Dr., Dallas, TX 75254; or (iii) to the respective party at such other address or addresses as the party may specify from time to time in a writing given to the Partnership in the manner provided in this Section 6.8 of ARTICLE VI. Notice shall be deemed to have been duly given and received (i) on the date of delivery, if personally delivered, (ii) on the next business day subsequent to sending by overnight express mail as aforesaid, or iii) on the third day subsequent to mailing if mailed as aforesaid; provided that any withdrawal notices shall not be deemed to have been given until actually received by the Partnership.

6.9     General Partner Determinations. Any determinations or calculations made by the General Partner shall, if made in good faith and in the absence of manifest error, be binding upon the Partnership and its Limited Partners.

6.10    Dispute Resolution. The following procedures shall be used to resolve any controversy or claim **("Dispute")** arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

    (a)     Mediation.

        (1)     Any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

11

**CONFIDENTIAL**

242

FSD2025-0116                                                                2025-08-19

(2)      The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(3)      The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

(4)      Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

(b)      <u>Arbitration.</u> If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect **("Arbitration Rules").** In the event of a conflict, the provisions of this document will control.

(1)      The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act ("FAA"), and resolved by the arbitrators, provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(2)      The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

12

(3)    The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code§ 38.001(8), which rights the parties expressly waive.

(4)    No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty- five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents.  The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(5)    All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(6)    The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

6.11    Successors and Assigns. Subject to the limitations set forth in Section 1.11, this Agreement shall inure to the benefit of and be binding upon the parties and to their respective heirs, executors, administrators, successors and permitted assigns. For the avoidance of doubt, any Limited Partner who becomes a former Limited Partner shall remain bound to all terms and conditions of this Agreement.

6.12    Severability. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

6.13    No Third Party Rights. Any Covered Person not being a party to this Agreement, may enforce any rights granted to it pursuant to this Agreement in its own right as if it were a party to this Agreement. Except as expressly provided in the foregoing sentence, a person who is not a party to this Agreement shall not have any rights under the Contracts (Rights of Third Parties) Act (as amended)

13

of the Cayman Islands to enforce any term of this Agreement.  Notwithstanding any term of this Agreement, the consent of or notice to any person who is not a party to this Agreement shall not be required for any termination, rescission or agreement to any variation, waiver, assignment, novation, release or settlement under this Agreement at any time."

6.14    <u>No Right to Partition.</u> Each of the Partners, on behalf of themselves and their shareholders, partners, principals, members, successors and assigns, if any and as permitted hereunder, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.

**[Signature Page follows.]**

14

29858621.5.C8689.187150

**CONFIDENTIAL**                                                                **TDIT005202**

IN WITNESS WHEREOF, the undersigned have executed and delivered this Amended and Restated Exempted Limited Partnership Agreement as a Deed on the day and year first above written.

EXECUTED AS A DEED by Charitable DAF Holdco, )
Ltd, as Limited Partner: )
)
)
Duly Authorised Signatory
)
) Name: Mark Patrick
)
) Title: Director

in the presence of:

_Kasey J. Rose_
Signature of Witness

Name: Kasey J. Rose

Address: 16400 Dallas Pkwy, Ste 300
Dallas, TX 75248

EXECUTED AS A DEED by CDH GP, Ltd. as )
General Partner: )
)
)
Duly Authorised Signatory
)
) Name: Mark Patrick
)
) Title: Director

in the presence of:

_Kasey J. Rose_
Signature of Witness

Name: Kasey J. Rose

Address: 16400 Dallas Pkwy, Ste 300
Dallas, TX 75248

15

29858621.2.C8689.187150

CONFIDENTIAL TDIT005203

FSD2025-0116           2025-08-19

**CLO HoldCo, Ltd.**
Balance Sheet
6/30/2024

| Position Name | Par Amount | 5/31 Mark | 6/30 Mark | MV | Repo Financing | Secured Loan To Frontier Bank |
|---|---|---|---|---|---|---|
| TerreStar Corporation Term Loan A - Non Convertible | 82,981,754.50 | 99.78 | 99.80 | 82,815,790.99 | - | - |
| NexPoint Skorpios | 65,000.00 | 525.90 | 452.95 | 29,441,954.82 | - | - |
| NREA SB II Holdings, LLC | 25,000.00 | - | 1,005.92 | 25,147,991.14 | - | - |
| Highland CLO Funding, Ltd. | 75,061,661.00 | 0.19 | 0.19 | 14,029,024.44 | - | - |
| NexPoint Capital, INC. | 2,549,002.29 | 5.32 | 5.22 | 13,305,791.96 | - | - |
| NRSZX | 500,119.62 | 16.95 | 16.88 | 8,442,019.20 | - | - |
| NCI Royse City Land, LLC | 1.00 | 5,649,400.00 | 5,649,400.00 | 5,649,400.00 | - | - |
| NREF | 395,033.00 | 14.22 | 13.72 | 5,419,852.76 | - | - |
| NexPoint Adare - Tranche 1 | 19,500.00 | 294.48 | 273.45 | 5,332,269.21 | - | - |
| WMG BELLE AVENUE MEZZANINE, LLC | 424,000.00 | 9.59 | 9.67 | 4,098,074.48 | - | - |
| SRTY | 119,086.00 | 27.22 | 27.79 | 3,309,399.94 | - | - |
| Conservation Equity Fund I | 1.00 | 3,031,280.00 | 3,001,654.00 | 3,001,654.00 | - | - |
| .SERENG | 1.00 | 2,652,593.75 | 2,741,693.11 | 2,741,693.11 | - | - |
| FFWM | 407,241.00 | 5.92 | 6.55 | 2,667,428.55 | - | - |
| SPXU | 89,724.00 | 32.21 | 28.82 | 2,585,845.68 | - | - |
| WMG Belle Avenue Orlando Partners, LLC | 145,200.00 | 15.23 | 15.23 | 2,211,531.04 | - | - |
| NXRT | 53,129.00 | 36.67 | 39.51 | 2,099,126.79 | - | - |
| SQQQ | 246,117.00 | 10.02 | 8.28 | 2,037,848.76 | - | - |
| NHF | 353,094.00 | 5.51 | 5.53 | 1,952,609.82 | - | - |
| TerreStar Corporation New Common | 5,082.00 | 325.41 | 322.82 | 1,640,571.24 | - | - |
| NLA Assets, LLC | 1.00 | 1,301,900.00 | 1,301,900.00 | 1,301,900.00 | - | - |
| NCI Stewart Creek, LLC | 100.00 | 12,500.00 | 12,500.00 | 1,250,000.00 | - | - |
| NCI Apache Trail, LLC | 1.00 | 940,000.00 | 940,000.00 | 940,000.00 | - | - |
| NCI Fort Worth Land, LLC | 1.00 | 874,200.00 | 874,200.00 | 874,200.00 | - | - |
| NexPoint Polo Glen DST | 101.06 | 6,591.94 | 6,621.74 | 669,192.92 | - | - |
| UDFI | 946,492.00 | 0.62 | 0.58 | 545,936.59 | - | - |
| MPMQ Appraisal Rights Claims | 105,492.00 | 5.00 | 5.00 | 527,460.00 | - | - |
| TGTX | 14,250.00 | 16.30 | 17.79 | 253,507.50 | - | - |
| TMO | 457.00 | 567.98 | 553.00 | 252,721.00 | - | - |
| Multi Strat | 1.00 | 218,841.51 | 213,864.25 | 213,864.25 | - | - |
| ACHC US | 2,500.00 | 68.89 | 67.54 | 168,850.00 | - | - |
| SRG | 30,000.00 | 5.26 | 4.67 | 140,100.00 | - | - |
| NHT Holdco, LLC - Membership Units | 2,108,589.00 | 0.07 | 0.05 | 109,056.22 | - | - |
| Highland CLO Funding, Ltd. - Participation Rights | 520,517.33 | 0.19 | 0.19 | 97,284.69 | - | - |
| COLL | 2,997.00 | 33.14 | 32.20 | 96,503.40 | - | - |
| Big Valley Power Property, LLC | 1.00 | 94,000.00 | 94,000.00 | 94,000.00 | - | - |
| BIO | 332.00 | 286.86 | 273.11 | 90,672.52 | - | - |
| MT Statutory Trust 2002 7.740% - 06/2023 @ Float 7.7400 6/19/2023 | 77,380.04 | 100.03 | 100.03 | 77,405.13 | - | - |
| Crusader Fund II, Ltd., Prior | 147,959.88 | 0.28 | 0.28 | 41,294.60 | - | - |
| TerreStar Corporation Term Loan C - Non Convertible | 38,968.65 | 99.78 | 99.80 | 38,890.71 | - | - |
| Total Wire - Convertible Promissory Note | 20,560.00 | 100.00 | 100.00 | 20,560.00 | - | - |
| HRTX | 5,500.00 | 3.70 | 3.50 | 19,250.00 | - | - |
| ACRG/A/U CN | 17,526.00 | 0.37 | 0.29 | 4,994.91 | - | - |
| ACRG/B/U CN | 7,511.00 | 0.43 | 0.22 | 1,652.42 | - | - |
| PRTK | 18,600.00 | 0.08 | 0.08 | 1,488.00 | - | - |
| iHeartCommunications, Inc. (fka Clear Channel Communications, Inc.) 6.375% - 05/2026 - 45174HBC0 FIX 6.375% 5/1/2026 | 411.00 | 76.64 | 77.86 | 320.00 | - | - |
| ABERD NOT LISTED | 1,000.00 | 0.01 | 0.01 | 11.04 | - | - |
| AMERICAN ENERGY/AEPB FIX @ 7.38% 11/01/2021 02563LAC2 | 464.00 | 0.50 | 0.50 | 2.30 | - | - |
| Total | | | | 225,760,996.14 | $ - | $ - |

| | |
|---|---|
| Cash - Jefferies | 34,790,228 |
| Cash - Cantor | 414,812 |
| Cash - Charles Schwab | 13,421,413 |
| Cash - Vista Bank | 19,145,999 |
| Cash - NexBank 639 | 12,438,971 |
| Cash - NexBank 057 | - |
| Cash - JPM | 1,582,718 |
| Cash - Wells Fargo | 717,926 |
| Cash - Hancock Whitney | 6,040,851 |
| | |
| HCT Holdco | - |
| Collateral Receivable | 81,419 |
| Prepaid Admin Fees | - |
| Accrued Income | 777,205 |
| Dividend Receivable | 184,427 |
| Due from affiliate | - |
| Distributions Receivable | - |
| Due from broker | 637,419 |
| HCMSI Loan - Interest | - |
| HCMSI Loan | 1,371,222 |
| Deferred loan fees | - |

| Total Assets | 317,365,603.10 |
|---|---|

**Payables:**

| | |
|---|---|
| Accrued Expenses | (191,847) |
| Repo Financing Payable | - |
| Secured Notes Payable | - |
| Unsecured Notes Payable | (32,801,593) |
| Nexvest Notes Payable | (1,650,000) |
| HCRE Note | (1,911,125) |
| Due to Broker | (824,037) |
| Loan Interest Payable | (9,649,816) |
| Repo Interest Payable | - |
| Total Amounts Payable | $ (47,028,418) |

| Total Net Assets | $ 270,337,185 |
|---|---|

CONFIDENTIAL           TDIT005204

**CONFIDENTIAL**

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 239 of 759

CLO HoldCo, Ltd.
Performance Summary

| Month | Beginning NAV | Subs/Reds | P&L | Management Fee | Incentive Fee | Ending NAV | Gross Return | YTD Gross Return | Net Return | YTD Net |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/31/2023 | 276,241,856 | (363,206.75) | 1,829,396 | - | - | 277,708,046 | 0.66% | 0.66% | 0.66% | 0.66% |
| 2/28/2023 | 277,708,046 | - | 2,004,483 | - | - | 279,712,529 | 0.72% | 1.39% | 0.72% | 1.39% |
| 3/31/2023 | 279,712,529 | - | (4,484,591) | - | - | 275,227,938 | -1.60% | -0.24% | -1.60% | -0.24% |
| 4/30/2023 | 275,227,938 | (635,950.00) | 987,731 | - | - | 275,579,718 | 0.36% | 0.12% | 0.36% | 0.12% |
| 5/31/2023 | 275,579,718 | - | (1,357,105) | - | - | 274,222,613 | -0.49% | -0.37% | -0.49% | -0.37% |
| 6/30/2023 | 274,222,613 | (252,646.00) | (3,555,966) | - | - | 270,414,002 | -1.30% | -1.66% | -1.30% | -1.66% |
| 7/31/2023 | 270,414,002 | - | 2,746,212 | - | - | 273,160,213 | 1.02% | -0.67% | 1.02% | -0.67% |
| 8/31/2023 | 273,160,213 | 11,870,127.43 | 1,975,180 | - | - | 287,005,521 | 0.72% | 0.05% | 0.72% | 0.05% |
| 9/30/2023 | 287,005,521 | (554,287.00) | 2,432,777 | - | - | 288,884,011 | 0.85% | 0.90% | 0.85% | 0.90% |
| 10/31/2023 | 288,884,011 | - | (6,284,402) | - | - | 282,599,608 | -2.18% | -1.29% | -2.18% | -1.29% |
| 11/30/2023 | 282,599,608 | - | (10,686,904) | - | - | 271,912,704 | -3.78% | -5.03% | -3.78% | -5.03% |
| 12/31/2023 | 271,912,704 | (500,000.00) | 6,458,980 | - | - | 277,871,684 | 2.38% | -2.77% | 2.38% | -2.77% |
| 1/31/2024 | 277,871,684 | (90,122.50) | (3,976,081) | - | - | 273,805,480 | -1.43% | -1.43% | -1.43% | -1.43% |
| 2/29/2024 | 273,805,480 | - | (48,855) | - | - | 273,756,625 | -0.02% | -1.45% | -0.02% | -1.45% |
| 3/31/2024 | 273,756,625 | - | (1,307,067) | - | - | 272,449,558 | -0.48% | -1.92% | -0.48% | -1.92% |
| 4/30/2024 | 272,449,558 | (355,890.00) | (261,066) | - | - | 271,832,602 | -0.10% | -2.01% | -0.10% | -2.01% |
| 5/31/2024 | 271,832,602 | - | (2,381,482) | - | - | 269,451,120 | -0.88% | -2.87% | -0.88% | -2.87% |
| 6/30/2024 | 269,451,120 | - | 886,065 | - | - | 270,337,185 | 0.33% | -2.55% | 0.33% | -2.55% |

TDIT005205

CLO HoldCo, Ltd.
Top 10 Holdings

| Position | Quantity | FMV |
|---|---:|---:|
| TerreStar Corporation Term Loan A - Non Convertible | 82,981,754.50 | 82,815,790.99 |
| NexPoint Skorpios | 65,000.00 | 29,441,954.82 |
| NREA SB II Holdings, LLC | 25,000.00 | 25,147,991.14 |
| Highland CLO Funding, Ltd. | 75,061,661.00 | 14,029,024.44 |
| NexPoint Capital, INC. | 2,549,002.29 | 13,305,791.96 |
| NRSZX | 500,119.62 | 8,442,019.20 |
| NCI Royse City Land, LLC | 1.00 | 5,649,400.00 |
| NREF | 395,033.00 | 5,419,852.76 |
| NexPoint Adare - Tranche 1 | 19,500.00 | 5,332,269.21 |
| WMG BELLE AVENUE MEZZANINE, LLC | 424,000.00 | 4,098,074.48 |
| **Grand Total** | **162,021,071.41** | **193,682,169.01** |

**CONFIDENTIAL**                                    TDIT005206

FSD2025-0116                                                                      2025-08-19

CLO HoldCo, Ltd.
YTD Expense

| Expense | 1/31/2024 | 2/29/2024 | 3/31/2024 | 4/30/2024 | 5/31/2024 | 6/30/2024 | YTD ($) | YTD (%) |
|---|---|---|---|---|---|---|---|---|
| Legal Fee Expense | 1,082,141 | 1,333,388 | 871,969 | 1,012,494 | 1,232,228 | 652,525 | 6,184,745 | 32.71% |
| Rent Expense | 1,014,693 | - | 2,029,385 | 1,045,133 | 1,045,133 | 1,045,133 | 6,179,477 | 32.68% |
| Directors Fees | - | 2,189,500 | - | - | - | - | 2,189,500 | 11.58% |
| Tax Fee Expense | 95,177 | 56,462 | 288 | 1,038,780 | 69,445 | - | 1,260,152 | 6.66% |
| Interest Expense | 138,361 | 128,977 | 138,168 | 133,776 | 138,375 | 134,209 | 811,866 | 4.29% |
| Fund Administration Expense | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 499,998 | 2.64% |
| Valuation Expense | 48,452 | 40,143 | 34,973 | 93,219 | 87,396 | 109,480 | 413,663 | 2.19% |
| Valuation Expense | 22,178 | 40,143 | 31,058 | 50,421 | 79,680 | 64,412 | 287,892 | 1.52% |
| Misc Fee Expense | 1,849 | 54,951 | 17,451 | 77,710 | 65,125 | 32,968 | 250,054 | 1.32% |
| Acquisition Fee Expense | 70,000 | - | 70,000 | - | - | 70,000 | 210,000 | 1.11% |
| Withholding Expense | 40,753 | 19,460 | 53,802 | 25,972 | 19,502 | 41,506 | 200,995 | 1.06% |
| Clearing Fees | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 120,000 | 0.63% |
| Consulting Fees | 30,000 | - | 30,000 | - | - | 30,000 | 90,000 | 0.48% |
| Administrator Expense | 15,169 | 14,965 | 14,963 | 14,897 | 14,867 | 14,748 | 89,609 | 0.47% |
| Directors and Officers Fee Expense | - | 6,236 | 61,925 | - | - | - | 68,161 | 0.36% |
| Dividend Expense | 1,667 | - | - | 50,868 | - | - | 52,535 | 0.28% |
| Government Fees - Liberty | 1,468 | - | - | - | - | - | 1,468 | 0.01% |
| **Totals** | 2,665,241 | 3,987,558 | 3,457,315 | 3,646,603 | 2,855,084 | 2,298,314 | 18,910,115 | 100.00% |

FSD2025-0116                                                                      2025-08-19

169

CONFIDENTIAL

TDIT005207

250

FSD2025-0116 **Page 254 of 1530** 2025-08-19

**Deborah Deitsch-Perez**
**PARTNER**

DIRECT: 214.560.2218
OFFICE: 214.560.2201

deborah.deitschperez@stinson.com

May 8, 2025

Via Electronic Mail

Margot MacInnis
Grant Thornton Specialist Services
(Cayman) Limited
2nd floor Century Yard,
Cricket Square,
PO Box 1044
Grand Cayman KY1-1102
margot.macinnis@uk.gt.com

Sandipan Bhowmik
Grant Thornton Specialist Services
(Cayman) Limited
2nd floor Century Yard,
Cricket Square,
PO Box 1044,
Grand Cayman KY1-1102
sandipan.bhowmik@uk.gt.com

Re:      Litigation Related to Charitable DAF HoldCo LTD.

Dear Ms. MacInnis and Mr. Blowmik:

My firm represents The Dugaboy Investment Trust, NexPoint Advisors, L.P., NexPoint Advisors GP, LLC, NexPoint Real Estate Advisors IV, L.P, NexPoint Real Estate Advisors GP, LLC, NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC, The SLHC Trust, and Highland Capital Management Services, Inc. (the "Clients") in various pieces of litigation that appear to be connected with your role as the Official Liquidators of Charitable DAF HoldCo LTD. (the "DAF").

The purpose of this letter is to provide you with a summary and update of the litigation so that you can determine whether you, on behalf of the DAF, need to take any steps with respect to your role as Official Liquidators and with respect to assets that may have been inappropriately diverted from the DAF. Specifically, as you are most likely aware, it is our understanding that Mark Patrick  surreptitiously formed a new corporate structure to which he transferred the DAF's assets (the "Fraudulent Transferee") in an effort to place the DAF's assets beyond the reach of the DAF's rightful beneficial owners, namely the Dallas Foundation, Santa Barbara Foundation, Kansas City Foundation, and the Community Foundation of North Texas (collectively the "Charities").

The litigation matters and related transactions that we're currently handling may give rise to monies that should be due to entities formerly indirectly owned by the DAF, but are now owned by the Fraudulent Transferee or others. We want to make sure that you are

2200 Ross Avenue, Suite 2900, Dallas, TX 75201

CORE/3533061.0002/199069702.6

FSD2025-0116                                                    2025-08-19
**CONFIDENTIAL**                                                 170   **TDIT005208**

Margot MacInnis
Sandipan Bhowmik
May 8, 2025
Page 2

aware of these matters so that you may intervene or take other actions you deem appropriate and that we are not subject to a claim by the DAF if the subsidiaries of the Fraudulent Transferee are successful in recovering on these claims. A primary concern is that the pending litigation may convert certain securities positions held by the former DAF subsidiaries into cash, which would be easier for Mr. Patrick to place beyond the reach of both the Official Liquidators and the Charities.

The litigation is as follows:

1.      **Liberty CLO HoldCo, Ltd. v. Nancy Dondero, as Trustee of The Dugaboy Investment Trust, Grant James Scott, as Trustee of The SLHC Trust, NexPoint Advisors, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Advisors GP, LLC, and NexPoint Real Estate Advisors GP, LLC, Case 1:25-cv-00236-UNA, pending in the United States District Court for the District of Delaware.**

In this litigation, Liberty CLO HoldCo, Ltd. ("Liberty"), an entity that was formerly indirectly owned 100% by the DAF, alleges that Defendants breached their contractual obligation to purchase Liberty's membership interests in NexPoint Polo Glen Holdings, LLC within 30 days of Liberty exercising its put option under the Option Agreement, dated Jane 13, 2024. Defendants allege that Liberty breached the Option Agreement by failing to "execute, acknowledge and deliver such further instruments and to do such other acts as may be reasonably necessary or appropriate to" effectuate the transaction as expressly required by the Option Agreement. Rather than perform its contractual obligations, Liberty filed suit. Defendants further allege that Liberty breached the Option Agreement by demanding that The Dugaboy Investment Trust ("Dugaboy") pay any taxes on the option purchase price, rather than withholding the amount of any tax obligation. Defendants also contend that they are not liable to Plaintiff because Plaintiff refused to act in a commercially reasonable manner to execute the necessary sales documents it was required to execute under the Option Agreement.

Plaintiff has conceded that it is required to enter into a transfer agreement and now agrees that it is responsible for taxes upon the transfer and that Respondent is required to withhold those taxes to ensure they are paid. The current purchase price is $594,907.35; the amount to be withheld for taxes is $ $92,119.46, with Seller to receive $502,787.00.

Please let us know if you object to our proceeding to effectuate this transaction. If you have any objection to our remitting the proceeds to Liberty CLO HoldCo, Ltd please give us specific instructions by May 15, 2025. Be aware that we need some official communication, preferably from a court, if you want us to not remit the proceeds to Liberty.

2.      **Atlas IDF, LP, v. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC and Nancy Dondero, as Trustee of the Dugaboy Investment**

CORE/3533061.0002/199069702.6

**CONFIDENTIAL**                                                      TDIT005209

Margot MacInnis
Sandipan Bhowmik
May 8, 2025
Page 3

### Trust, Cause No. 25-BC01B-0004, pending in the Business Court of Texas, First Division.

In this litigation, Plaintiff is attempting to collect on $13,905,223.93 in allegedly unpaid principal and interest on two demand promissory notes against Defendant NexPoint, as well on an alleged guaranty against Defendant Dugaboy, a trust for which Mr. Patrick and Shawn Raver previously both were counsel. The Defendants have denied liability and asserted third-party claims against Mr. Patrick and Mr. Raver for using their position as Dugaboy's trusted counsel to fraudulently induce Dugaboy to execute the alleged guaranty.

Assuming no other secret changes to the DAF structure by Mr. Patrick, the Dallas Foundation, through an insurance annuity policy issued by Crown Global Insurance, is the primary economic owner and beneficiary of Plaintiff. The DAF entities have a general partnership control position, but no economic interest.

On February 20, 2025, Mr. Patrick sought to have the two promissory notes transferred for $500,000 to Liberty, which we now understand is owned indirectly by a new entity created by Mr. Patrick. Atlas' fund documents require limited partner consent to related party transactions. Crown Global, at the instructions of the Dallas Foundation, did not consent to the transaction. Mr. Patrick asked for consent again on February 27, 2025, with proposed revised economics of the transaction. Crown Global, again instructed by Dallas Foundation, withheld consent. At no point in time did Mr. Patrick disclose that Liberty, the proposed transferee, was under the new ownership of an entity created and controlled by Mr. Patrick.

This litigation is proceeding quickly and my clients are writing to confirm that you are aware of this litigation and understand that Plaintiff, which was previously indirectly owned by the DAF, is seeking to collect this money. Therefore, we are writing to allow you to take any actions you feel might be necessary to protect the assets at issue in the litigation.

### 3.   Liberty CLO HoldCo, LTD., v. Highland Capital Management Services, Inc., Civil Action No. 3:25-CV-477-L, pending in the United States District Court for the Northern District of Texas, Dallas Division.

In this litigation, Plaintiff seeks to collect on a $3,006,776.00 promissory note against Defendant. Plaintiff alleges that Defendant failed to make a payment when due, and Plaintiff accelerated the debt, alleging that Defendant owes $1,334,980.74 on the promissory note as of February 3, 2025.

Defendant alleges that is not liable on the promissory note because any payment obligations on the promissory note were timely satisfied when Defendant paid a third

CORE/3533061.0002/199069702.6

253

**FSD2025-0116**                    **Page 257 of 1530**                    **2025-08-19**

Margot MacInnis
Sandipan Bhowmik
May 8, 2025
Page 4

party to satisfy a debt that Plaintiff owed to that same third party, and accounted for that payment as a payment on the note.

As with the Atlas litigation described above, my clients are writing to confirm that you are aware of this litigation and understand that Plaintiff, which was also previously owned by the DAF, is seeking to collect this money. Therefore, we are writing to allow you to take any actions you feel might be necessary to protect the assets at issue in the litigation.

***********************

In connection with each of these matters, we would need compelling documentation to persuade any of the courts to either stay the action or hold proceeds in the registry of the court. We are happy to provide you any of the publicly available court filings in order to aid in your decision.

Please feel free to call me with any questions.

Sincerely,

**Stinson LLP**

Deborah Deitsch-Perez

DRD:clt

CORE/3533061.0002/199069702.6

DEF 14A 1 d889398ddef14a.htm NEXPOINT CAPITAL, INC.

**SCHEDULE 14A**
**(RULE 14a-101)**

**INFORMATION REQUIRED IN PROXY STATEMENT**

**SCHEDULE 14A INFORMATION**

**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934**

Filed by the Registrant ☑

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2)

☑   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material Pursuant to § 240.14a-12

# NexPoint Capital, Inc.

(Name of Registrant as Specified in its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☑   No fee required.

☐   Fee paid previously with preliminary materials.

☐   Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11.

CONFIDENTIAL                                                    TDIT005212

**NEXPOINT CAPITAL, INC.**
**300 Crescent Court**
**Suite 700**
**Dallas, Texas 75201**
**(844) 485-9167**

**May 7, 2025**

Dear Stockholder:

Enclosed you will find the proxy materials for the 2025 Annual Meeting of Stockholders of NexPoint Capital, Inc. (the "Corporation") to be held at 300 Crescent Court, Suite 700, Dallas, Texas 75201, on Monday, June 16, 2025, at 8:15 a.m. Central Time (the "Annual Meeting").

At the Annual Meeting, you will be asked to elect two (2) Class I Directors to each serve a three-year term. In addition to voting on the Election of Directors, which is described in more detail in the accompanying Notice of Annual Meeting of Stockholders and Proxy Statement, you will have an opportunity to hear a report on the Corporation and to discuss other matters of interest to you as a stockholder.

**It is very important that your shares be represented at the Annual Meeting.** Whether or not you plan to attend, I urge you to please complete, date, sign and mail the enclosed proxy card to us to assure that your shares are represented at the Annual Meeting.

Sincerely,

/s/ James Dondero
James Dondero
President and Principal Executive Officer

1

**NEXPOINT CAPITAL, INC.**
**300 Crescent Court**
**Suite 700**
**Dallas, Texas 75201**
**(844) 485-9167**

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**
**TO BE HELD ON JUNE 16, 2025**

Notice is hereby given to holders of shares of common stock of NexPoint Capital, Inc., a Delaware corporation (the "Corporation"), that the 2025 Annual Meeting of Stockholders will be held at 300 Crescent Court, Suite 700, Dallas, Texas 75201, on Monday, June 16, 2025, at 8:15 a.m. Central Time (the "Annual Meeting").

Please vote your shares in accordance with the instructions on the enclosed proxy card whether or not you attend the Annual Meeting. The Annual Meeting will be held for the following purposes:

1.      To elect each of Ethan Powell and Bryan A. Ward as a Class I Director of the Corporation to serve for a three-year term expiring at the 2028 Annual Meeting of Stockholders or until his successor is duly elected and qualifies (the "Proposal"); and

2.      To transact such other business as may properly come before the Annual Meeting and any adjournment or postponement thereof.

**THE BOARD OF DIRECTORS, INCLUDING EACH OF THE INDEPENDENT DIRECTORS, UNANIMOUSLY RECOMMENDS A VOTE FOR THE PROPOSAL.**

The close of business on April 30, 2025 has been fixed as the record date for the determination of stockholders entitled to notice of, and to vote at, the Annual Meeting and any adjournment or postponement thereof. Please call (844) 485-9167 for directions on how to attend the Annual Meeting and vote in person.

**Important Notice Regarding Availability of Proxy Materials for the Stockholder Meeting to be held on June 16, 2025: Copies of these proxy materials, including the Corporation's Annual Report, the Notice for the Annual Meeting, the Proxy Statement and the form of proxy, are available to you on the Internet at https://vote.proxyonline.com/nexpoint/docs/bdc.pdf. Copies of the proxy materials are also available upon request, without charge, by writing to EQ Fund Solutions, LLC at EQ Fund Solutions, LLC, ATTN: NexPoint 20589 Fulfillment, 55 Challenger Road, Ridgefield Park, New Jersey 07660, by calling (866) 796-1292, or by sending an e-mail to corporateservices@equiniti.com using subject line: NexPoint 20589 Fulfillment. Stockholders are encouraged to read all of the proxy materials before voting as the proxy materials contain important information necessary to make an informed decision.**

**The Board of Directors is requesting your vote. Your vote is important regardless of the number of shares that you own. Please complete and sign the enclosed proxy card and return it promptly in the enclosed envelope, which needs no postage if mailed in the United States. If you desire to vote in person at the Annual Meeting, you may revoke your proxy at any time before it is exercised.**

                                    By Order of the Board of Directors,

                                    /s/ Stephanie Vitiello
                                    Stephanie Vitiello
                                    Secretary

May 7, 2025
Dallas, Texas

1

FSD2025-0116
**Page 261 of 1530**
2025-08-19

**NEXPOINT CAPITAL, INC.**
**300 Crescent Court**
**Suite 700**
**Dallas, Texas 75201**
**(844) 485-9167**

**PROXY STATEMENT**
**ANNUAL MEETING OF STOCKHOLDERS**
**JUNE 16, 2025**

This Proxy Statement is furnished in connection with the solicitation of proxies on behalf of the Board of Directors (the "Board") of NexPoint Capital, Inc., a Delaware corporation (the "Corporation"), for use at the Corporation's 2025 Annual Meeting of Stockholders (the "Annual Meeting") to be held at 300 Crescent Court, Suite 700, Dallas, Texas 75201, on Monday, June 16, 2025, at 8:15 a.m. Central Time, and at any and all adjournments or postponements thereof, for the purposes set forth in the accompanying Notice of Annual Meeting of Stockholders dated May 7, 2025. The Corporation is a closed-end management investment company that has elected to be treated as a business development company under the Investment Company Act of 1940, as amended (the "1940 Act"). NexPoint Advisors, L.P., a Delaware limited partnership (the "Adviser") serves as the investment adviser and the administrator ("Administrator") to the Corporation. The principal executive offices of each of the Corporation and the Adviser are located at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

This Proxy Statement and the accompanying Notice of Annual Meeting of Stockholders and form of proxy are being provided to stockholders on or about May 7, 2025. The Board has fixed the close of business on April 30, 2025 as the record date (the "Record Date") for the determination of stockholders entitled to receive notice of, and to vote at, the Annual Meeting. As of the Record Date, 9,146,110.355 shares of the Corporation's Common Stock were issued and outstanding, and the Corporation had not issued any shares of preferred stock. Stockholders of the Corporation are entitled to one vote for each share held and fractional votes for each fractional share held.

If the form of proxy is properly executed and returned in time to be voted at the Annual Meeting, the shares covered thereby will be voted at the Annual Meeting in accordance with the instructions marked thereon. All properly executed proxies received by the Board that do not specify how shares should be voted will be voted (i) **"FOR"** the election as a Director of each of the nominees listed in the Proposal below, and (ii) in the discretion of the persons named as proxies in connection with any other matter which may properly come before the Annual Meeting or any adjournment or postponement thereof.

The Board does not know of any matters to be considered at the Annual Meeting other than the Election of Directors referred to in this Proxy Statement and the Notice of Annual Meeting. A stockholder may revoke his or her proxy any time before it is exercised by (i) voting in person at the Annual Meeting, (ii) giving written notice of such revocation to the Secretary of the Corporation or (iii) returning a properly executed, later-dated proxy before the Annual Meeting.

In addition to soliciting proxies by mail, officers of the Corporation or officers or employees of the Adviser may solicit proxies by the Internet or by telephone. Copies of the Notice for the Annual Meeting, the Proxy Statement, the form of proxy and the Corporation's annual report are available at https://vote.proxyonline.com/nexpoint/docs/bdc.pdf. The Corporation has engaged EQ Fund Solutions, LLC, at EQ Fund Solutions, LLC, ATTN: NexPoint 20589 Fulfillment, 55 Challenger Road, Ridgefield Park, New Jersey 07660 to provide stockholder meeting services, including the distribution of this Proxy Statement and related materials to stockholders, as well as assisting the Corporation in soliciting proxies for the Annual Meeting, at an approximate cost of $23,968. The costs of proxy solicitation and expenses incurred in connection with the preparation of this Proxy Statement and its enclosures will be paid by the Corporation.

1

**Quorum**

A quorum must be present at the Annual Meeting for any business to be conducted. The presence in person or by proxy of the holders of a majority of the shares of Common Stock entitled to vote shall constitute a quorum for the Annual Meeting. Shares represented by properly executed proxies with respect to which (i) a vote is withheld or (ii) the stockholder abstains will be treated as shares that are present and entitled to vote for purposes of determining a quorum.

Shares of Common Stock held by a broker or other nominee for which the nominee has not received voting instructions from the record holder and does not have discretionary authority to vote the shares on non-routine proposals are considered "broker non-votes" with respect to such proposals. Because the election of a Director is a non-routine matter, broker non-votes are not entitled to vote at the Annual Meeting. Therefore, broker non-votes will be treated as shares that are not present for quorum purposes at the Annual Meeting.

If a quorum is not present at the Annual Meeting, or if a quorum is present but sufficient votes to approve the Proposal are not received, the persons named as proxies may propose one or more adjournments or postponements of the Annual Meeting to permit further solicitation of proxies. Any adjournment or postponement will require the affirmative vote of a majority of those shares that are represented at the Annual Meeting in person or by proxy, whether or not a quorum is present.

**Vote Required**

The election of a Director requires the affirmative vote of a majority of the shares of Common Stock cast at the Annual Meeting in person or by proxy. Abstentions are counted as present at the Annual Meeting for purposes of determining a quorum, but, assuming the presence of a quorum, will have the effect of a vote against a nominee.

Broker non-votes are described as votes cast by a broker or other nominee on behalf of a beneficial holder who does not provide explicit voting instructions to such broker or nominee and who does not attend the Annual Meeting. The election of a Director is a non-routine matter. As a result, if you hold shares in "street name" through a broker, bank or other nominee, your broker, bank or nominee will **not** be permitted to exercise voting discretion with respect to the Proposal at the Annual Meeting to elect each of Ethan Powell and Bryan A. Ward as a Class I Director of the Corporation. Thus, if you do not give your broker or nominee specific instructions on how to vote for you or do not vote for yourself by returning a proxy card or by other arrangement with your broker or nominee, your shares will have no effect on the election of the Class I Directors at the Annual Meeting.

**THE PROPOSAL**

**ELECTION OF DIRECTORS**

The Board is currently composed of five Directors, who are divided into three classes with staggered terms of three years each, with the term of office of one of the three classes expiring at each annual meeting of the stockholders.

At the Annual Meeting, the holders of the Corporation's shares of Common Stock are being asked to re-elect Ethan Powell and Bryan A. Ward as Class I Directors of the Corporation, each to serve for a three-year term expiring at the 2028 annual meeting of stockholders or until his successor is duly elected and qualifies. Ethan Powell and Bryan A. Ward are currently serving as Class I Directors of the Corporation and have agreed to continue to serve as Class I Directors, if re-elected. If Ethan Powell and Bryan A. Ward are not available for re-election at the time of the Annual Meeting, the persons named as proxies will vote for such substitute nominee(s) as the Corporation's Governance and Compliance Committee may select.

John Honis is currently serving as a Class III Director and was last elected to serve until the 2027 annual meeting of stockholders at the Corporation's annual meeting of stockholders held on June 26, 2024. Dr. Bob Froehlich

2

and Ms. Dorri McWhorter are currently serving as Class II Directors and each was last elected to serve until the 2026 annual meeting of stockholders at the Corporation's annual meeting of stockholders held on June 16, 2023. Ethan Powell and Bryan A. Ward are currently serving as Class I Directors and each was last elected to serve until the 2025 annual meeting of stockholders at the Corporation's annual meeting of stockholders held on June 10, 2022. Messrs. Powell and Ward will continue to serve as Class I Directors if re-elected at the Annual Meeting until the 2028 annual meeting of shareholders or until their respective successors are duly elected and qualify. The Corporation's Directors are not required to attend the Corporation's annual stockholder meetings.

**THE BOARD, INCLUDING EACH OF THE INDEPENDENT DIRECTORS, UNANIMOUSLY RECOMMENDS THAT STOCKHOLDERS VOTE "FOR" THE RE-ELECTION OF EACH OF THE NOMINEES AS A DIRECTOR.**

**Qualifications and Additional Information about the Director Nominees and the Continuing Directors**

The following provides an overview of the considerations that led the Board to conclude that the individual nominees for Director or the individuals serving as continuing Directors of the Corporation should be nominated or so serve, as well as each nominee's and each Director's name and certain biographical information as reported by them to the Corporation. Among the factors the Board considered when concluding that an individual should be a nominee for Director or serve on the Board were the following: the individual's experience, skills, expertise, education, knowledge, diversity, personal and professional integrity, character, business judgment, time availability in light of other commitments, dedication, the candidate's ability to qualify as an Independent Director and the existence of any other relationships that might give rise to a conflict of interest and other relevant factors that the Corporation's Governance and Compliance Committee considers appropriate in the context of the needs of the Board (e.g., whether a candidate is an "audit committee financial expert" under the federal securities laws).

In respect of the Director nominees and each continuing Director, the individual's professional accomplishments and prior experience, including, in some cases, in fields related to the operations of the Corporation, were a significant factor in the determination that each of the individuals should be a nominee for Director or serve as a Director of the Corporation. Each Director nominee's and each continuing Director's professional experience and additional considerations that contributed to the Board's conclusion that an individual should serve on the Board are summarized in the table below.

The "Fund Complex," as referred to herein consists of: the Corporation, each series of NexPoint Funds I ("NFI"), each series of NexPoint Funds II ("NFII"), Highland Opportunities and Income Fund ("HFRO"), Highland Global Allocation Fund ("GAF"), and NexPoint Real Estate Strategies Fund ("NRESF").

3

*Class III Director (continuing Director not up for re-election at the Annual Meeting)*

| Name, Year of Birth and Address[1] | Position(s) held with the Corporation | Term of Office and Length of Time Served[2] | Principal Occupation(s) During the Past Five Years | Other Directorships Held During the Past Five Years[3] | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|---|---|---|
| *Interested Director* | | | | | |
| John Honis[4] (1958) | Director | Term expires 2027; Class III Director since 2014 | President of Rand Advisors, LLC (August 2013 to August 2022); President of Valience Group, LLC (since July 2021); and Consultant of Rand Advisors, LLC (since August 2022). | None | Significant experience in the financial industry; significant managerial and executive experience, including experience as president, chief executive officer or chief restructuring officer of five telecommunication firms; experience on other boards of directors/trustees. |

4

CONFIDENTIAL                                                                    180
                                                                                TDIT005218

*Class II Directors (continuing Directors not up for re-election at the Annual Meeting)*

| Name, Year of Birth and Address[1] | Position(s) held with the Corporation | Term of Office and Length of Time Served[2] | Principal Occupation(s) During the Past Five Years | Other Directorships Held During the Past Five Years[3] | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|---|---|---|
| *Independent Directors* | | | | | |
| Dr. Bob Froehlich (1953) | Director | Term expires 2026; Class II Director since 2014 | Retired. | Director of KC Concessions, Inc. (from January 2013 to March 2025); Director of American Sports Enterprise, Inc. (since January 2013); Chairman and owner, Kane County Cougars Baseball Club (from January 2013 to March 2025); Director of The Midwest League of Professional Baseball Clubs, Inc. (from January 2013 to December 2021); Director of Kane County Cougars Foundation, Inc. (from January 2013 to March 2025); Director of Galen Robotics, Inc. (from August 2016 to September 2023); Director and Special Advisor to Vault Data, LLC (since February 2018); Director of American Association of Professional Baseball, Inc. (since February 2021); Director of National Amateur Fall Baseball Federation (since December 2023); and Executive Director of Kane County Cougars Baseball Foundation Inc. (from July 2023 to March 2025) (remaining as Director). | Significant experience in the financial industry; significant managerial and executive experience; significant experience on other boards of directors, including as a member of several audit committees. |
| Dorri McWhorter (1973) | Director | Term expires 2026; Class II Director since 2022 | President and CEO, YMCA of Metropolitan Chicago (from 2021 to 2025); and Chief Executive Officer, YWCA Metropolitan Chicago (from 2013 to 2021). | Board Director of William Blair Funds (since 2019); Board Director of Skyway Concession Company, LLC (since 2018); Board Director of Illinois CPA Society (from 2017 to 2022); Board Director of Lifeway Foods, Inc. (since 2020); Board Director of Green Thumb Industries, Inc. (from February 2022 to October 2022); Member of Financial Accounting Standards Advisory Council (since 2021); and Board Director of LanzaTech Global, Inc. (since 2023). | Significant managerial and executive experience, including experience as president and chief executive officer; significant background and experience in financial accounting; significant experience on other boards of directors, including for other registered investment companies. |

5

FSD2025-0116 **Page 266 of 1530** 2025-08-19

*Nominees for Class I Directors*

| Name, Year of Birth and Address[1] | Position(s) held with the Corporation | Term of Office and Length of Time Served[2] | Principal Occupation(s) During the Past Five Years | Other Directorships Held During the Past Five Years[3] | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|---|---|---|
| *Independent Directors* | | | | | |
| Ethan Powell (1975) | Director and Chairman of the Board | Term expires 2025; Class I Director since 2014 | Principal and CIO of Brookmont Capital Management, LLC (since May 2020); CEO, Chairman and Founder of Impact Shares LLC (since December 2015); Trustee/Director of the Fund Complex (from June 2012 to July 2013 and since December 2013); and Trustee of Strategic Trust (since August 2021). | Trustee of Tidal Trust III (formerly Impact Shares Funds I Trust) (since 2016). | Significant experience in the financial industry; significant executive experience including past service as an officer of funds in the Fund Complex; significant administrative and managerial experience. |

6

| Name, Year of Birth and Address[1] | Position(s) held with the Corporation | Term of Office and Length of Time Served[2] | Principal Occupation(s) During the Past Five Years | Other Directorships Held During the Past Five Years[3] | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|---|---|---|
| Bryan A. Ward (1955) | Director | Term expires 2025; Class I Director since 2014 | President – Private Banking, Lakeside Bank (since September 2023); Business Development Banker, CrossFirst Bank (from January 2023 to April 2023) (President-Dallas from October 2020 to January 2023 and Senior Advisor from April 2019 to October 2022); and Private Investor, BW Consulting, LLC (since 2014) and Anderson Consulting/Accenture (from 1991 to 2013). | Director of Equity Metrix, LLC. | Significant experience on this and/or other boards of directors/trustees; Audit and Qualified Legal Compliance Committee Chairperson; significant managerial and executive experience; significant experience as a management consultant. |

(1)    The address for the nominees and each Director is c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201.
(2)    On an annual basis, as a matter of Board policy, the Governance and Compliance Committee reviews each Director's performance and determines whether to extend each such Director's service for another year. Effective June 2013, the Board adopted a retirement policy wherein the Governance and Compliance Committee shall not recommend the continued service as a Director of a Board member who is older than 80 years of age at the time the Governance and Compliance Committee reports its findings to the Board.
(3)    Each of the Directors and the nominees oversee 7 portfolios in the Fund Complex.
(4)    In light of certain relationships between Mr. Honis and historically affiliated entities of the Adviser, including Highland Capital Management, L.P. ("HCMLP"), arising out of HCMLP's pending Chapter 11 proceedings, Mr. Honis is treated as an Interested Director of the Corporation effective January 28, 2020.

7

264

**Information about the Executive Officers**

Set forth below are the names and certain information regarding the Corporation's executive officers. Each executive officer serves until his or her successor has been duly elected and qualifies, or until his or her earlier resignation or removal.

| Name, Year of Birth and Address[1] | Position(s) held with the Corporation | Principal Occupation(s) During Past Five Years |
|---|---|---|
| James Dondero (1962) | President and Principal Executive Officer since 2014 | Founder of the Adviser; Co-founder of HCMLP and NexPoint Asset Management, L.P. ("NexPoint"); Chairman of the Board of NexPoint Residential Trust, Inc. (NYSE: NXRT) since May 2015; President and a member of the investment committee of NRESF since February 2020; Chief Executive Officer and director of NexPoint Diversified Real Estate Trust ("NXDT") since December 2018; Portfolio Manager of NexPoint Event Driven Fund, Highland Global Allocation Fund, Highland Opportunities and Income Fund and NexPoint Merger Arbitrage Fund (each a series of NFI), NexPoint Climate Tech Fund (a series of NFII), the Corporation and NRESF. |
| Dustin Norris (1984) | Executive Vice President since April 2019 | Head of Distribution and Chief Product Strategist at the Adviser since March 2019; President of NexPoint Securities, Inc. since April 2018; and Officer of the Fund Complex since November 2012. |
| Frank Waterhouse (1971) | Treasurer and Principal Accounting Officer since May 2015 and Principal Financial Officer since April 2021 | Chief Financial Officer of Skyview Group since February 2021; Chief Financial Officer and Partner of HCMLP from December 2011 and March 2015, respectively, to February 2021; Treasurer of the Fund Complex since May 2015; Principal Financial Officer of NFI, NFII, GAF, HFRO, and NXDT since April 2021 and from October 2017 to February 2021; and Principal Executive Officer of NFI, NFII, GAF and HFRO from February 2018 to February 2021 and since April 2021. |
| Stephanie Vitiello (1983) | Secretary since April 2021 and Chief Compliance Officer and Anti-Money Laundering Officer since November 2021 | Chief Compliance Officer and Counsel of Skyview Group since February 2021. Prior to her current role at Skyview Group, Ms. Vitiello served as Managing Director – Distressed, Assistant General Counsel, Associate General Counsel, and In-House Counsel for HCMLP. |
| Will Mabry (1986) | Assistant Treasurer since April 2021 | Director, Fund Analysis of Skyview Group since February 2021. Prior to his current role at Skyview Group, Mr. Mabry served as Senior Manager – Fund Analysis, Manager – Fund Analysis, and Senior Fund Analyst for HCMLP. |

(1)  The address for each officer is c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201.

8

CONFIDENTIAL

184

TDIT005222

**Security Ownership of Certain Beneficial Owners and Management**

The following table sets forth certain ownership information with respect to our Common Stock, as of April 30, 2025, for those persons who directly or indirectly own, control or hold with the power to vote, five percent or more of our outstanding Common Stock and all officers and Directors, individually and as a group.

| Name and Address | Type of Ownership | Shares Owned | Value of Securities | Percentage of Outstanding Shares as of April 30, 2025 |
|---|---|---|---|---|
| Liberty CLO Holdco Ltd.(1) | Beneficial | 2,549,002.292 | $12,923,441.62 | 29.5% |
| All officers and Directors as a group (10 persons)(2) | N/A | None | $ 0 | 0% |

(1)    The address for Liberty CLO Holdco Ltd. is One Nexus Way, Camana Bay, George Town, Grand Cayman KY 19005.
(2)    The address for each Director or officer is c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201.

**Dollar Range of Equity Securities Beneficially Owned by Directors**

Set forth in the table below is the dollar range of shares beneficially owned by each Director in (i) the Corporation and (ii) all registered investment companies in the Fund Complex overseen by such Director.

| Name of Director | Dollar Range of Shares of the Corporation(1) | Aggregate Dollar Range of Equity Securities(1) Owned in All Registered Investment Companies Overseen by Director in the Fund Complex |
|---|---|---|
| *Independent Directors* | | |
| Dr. Bob Froehlich | None | Over $100,000 |
| Bryan A. Ward | None | $50,001-$100,000 |
| Ethan Powell | None | $50,001-$100,000 |
| Dorri McWhorter | None | None |
| *Interested Director* | | |
| John Honis(2) | None | $1-$10,000 |

(1)    Based on market value as of December 31, 2024.
(2)    In light of certain relationships between Mr. Honis and historically affiliated entities of the Adviser, including HCMLP, arising out of HCMLP's pending Chapter 11 proceedings, Mr. Honis is treated as an Interested Director of the Corporation effective January 28, 2020.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and the rules thereunder require that the Corporation's Directors and officers and persons who own beneficially, directly or indirectly, more than 10 percent of any class of the Corporation's securities file initial reports of beneficial ownership and reports of changes in beneficial ownership with the U.S. Securities and Exchange Commission ("SEC") and furnish the Corporation with copies of all such reports. Specific due dates for those reports have been established, and the Corporation is required to report in this Proxy Statement any known failure to file such reports by those due dates during the past fiscal year. Based solely upon a review of the copies of such reports furnished, the Corporation does not know of any Director, officer or person who beneficially owns more than 10 percent of any class of the Corporation's securities who failed to file on a timely basis the required reports during the past fiscal year.

9

**Role of the Board of Directors, Leadership Structure and Risk Oversight**

*The Role of the Board*

The Board oversees the management and operations of the Corporation. Like most business development companies and registered investment companies, the day-to-day management and operation of the Corporation is performed by various service providers to the Corporation, such as the Adviser, custodian and transfer agent. The Board has appointed senior employees of certain of these service providers as officers of the Corporation, with responsibility to monitor and report to the Board on the Corporation's operations. The Board receives regular reports from these officers and service providers regarding the Corporation's operations. For example, the Chief Financial Officer provides reports as to financial reporting matters and investment personnel report on the performance of the Corporation. The Board has appointed a Chief Compliance Officer who administers the Corporation's compliance program and regularly reports to the Board as to compliance matters. Some of these reports are provided as part of formal Board meetings, which are typically held quarterly and involve the Board's review of, among other items, recent Corporation operations. The Board also periodically holds telephonic meetings as part of its review of the Corporation's activities. From time to time, one or more members of the Board may also meet with management in less formal settings, between scheduled Board meetings, to discuss various topics. In all cases, however, the role of the Board and of any individual Director is one of oversight and not of management of the day-to-day affairs of the Corporation and its oversight role does not make the Board a guarantor of the Corporation's investments, operations or activities.

*Board Structure and Leadership*

The Board has structured itself in a manner that it believes allows it to perform its oversight function effectively. The Board consists of five Directors, four of whom are not "interested persons," as defined in the 1940 Act, of the Corporation. These individuals are referred to as the Corporation's independent Directors (the "Independent Directors"). During the fiscal year ended December 31, 2024, the Board convened eight times. Each Director then serving in such capacity attended at least 75% of the meetings. The Corporation encourages, but does not require, Directors to attend the Annual Meeting.

The Board periodically reviews its leadership structure, including the role of the Chairman. The Board also completes an annual self-assessment during which it reviews its leadership and Committee structure and considers whether its structure remains appropriate in light of the Corporation's current operations. The Board believes that its leadership structure, including the current percentage of the Board who are Independent Directors is appropriate given its specific characteristics. These characteristics include: (i) the extent to which the work of the Board is conducted through the standing committees, and that the Audit and Qualified Legal Compliance Committee (the "Audit Committee") and the Governance and Compliance Committee meetings are each chaired by an Independent Director; (ii) the extent to which the Independent Directors meet as needed, together with their independent legal counsel, in the absence of members of management and any member of the Board who is considered an "interested person" of the Corporation; and (iii) Mr. Powell's and Mr. Honis' previous positions with NexPoint and/or historical affiliates of the Adviser, which enhances the Board's understanding of the operations of the Adviser.

*Board Oversight of Risk Management.* The Board's role is one of oversight, rather than active management. This oversight extends to the Corporation's risk management processes. These processes are embedded in the responsibilities of officers of, and service providers to, the Corporation. For example, the Adviser and other service providers to the Corporation are primarily responsible for the management of the Corporation's investment risks. The Board has not established a formal risk oversight committee. However, much of the regular work of the Board and its standing Committees addresses aspects of risk oversight. For example, the Directors seek to understand the key risks facing the Corporation, including those involving conflicts of interest; how management identifies and monitors these risks on an ongoing basis; how management develops and implements controls to mitigate these risks; and how management tests the effectiveness of those controls.

10

CONFIDENTIAL                                                                    TDIT005224

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 259 of 759

267

FSD2025-0116                    **Page 271 of 1530**                    2025-08-19

In the course of providing that oversight, the Board receives a wide range of reports on the Corporation's activities from the Adviser and other service providers, including reports regarding the Corporation's investment portfolio, the compliance of the Corporation with applicable laws, and the Corporation's financial accounting and reporting. The Board also meets periodically with the Corporation's Chief Compliance Officer to receive reports regarding the compliance of the Corporation with the federal securities laws and the Corporation's internal compliance policies and procedures and meets with the Corporation's Chief Compliance Officer periodically, including at least annually, to review the Chief Compliance Officer's annual report, including the Chief Compliance Officer's risk-based analysis for the Corporation. The Board's Audit Committee also meets regularly with the Chief Financial Officer and the Corporation's independent registered public accounting firm to discuss, among other things, the internal control structure of the Corporation's financial reporting function. The Board also meets periodically with the portfolio managers of the Corporation to receive reports regarding the management of the Corporation, including its investment risks.

The Board recognizes that not all risks that may affect the Corporation can be identified, that it may not be practical or cost-effective to eliminate or mitigate certain risks, that it may be necessary to bear certain risks (such as investment-related risks) to achieve the Corporation's goals, that reports received by the Directors with respect to risk management matters are typically summaries of the relevant information, and that the processes, procedures and controls employed to address risks may be limited in their effectiveness. As a result of the foregoing and other factors, risk management oversight by the Board and by the Committees is subject to substantial limitations.

**Committees of the Board**

The Board conducts much of its work through certain standing Committees. The Board has three Committees, the Audit Committee, the Governance and Compliance Committee, and the Administration and Operations Committee, each of which are discussed in greater detail below. The Board has adopted charters for each of these Committees.

For the fiscal year ended December 31, 2024, the Audit Committee held five meetings, the Governance and Compliance Committee held five meetings, and the Administration and Operations Committee held five meetings. Each Director then serving in such capacity attended at least 75% of the meetings of the Committees of which he or she is a member.

***Audit and Qualified Legal Compliance Committee***

The members of the Audit Committee are Dr. Froehlich, Messrs. Ward and Powell, and Ms. McWhorter, each of whom is an Independent Director. Mr. Ward serves as Chairperson of the Audit Committee. The Audit Committee is responsible for (i) approving the Corporation's independent registered public accounting firm, (ii) reviewing with the Corporation's independent accountants the plans and results of the audit engagement and the adequacy of the Corporation's internal accounting controls, and (iii) approving professional services provided by the independent registered public accounting firm. The Audit Committee is charged with compliance with Rules 205.2(k) and 205.3(c) of Title 17 of the Code of Federal Regulations regarding alternative reporting procedures for attorneys representing the Corporation who appear and practice before the SEC on behalf of the Corporation. The Audit Committee also oversees valuations determined by the Adviser, who pursuant to Rule 2a-5 under the 1940 Act, has been designated by the Board as the Corporation's valuation designee to perform the fair valuation determination for securities and other assets held by the Corporation in accordance with valuation policies and procedures established by the Adviser and approved by the Board. The Board has determined that Mr. Ward is an "audit committee financial expert," as defined under Item 407(d)(5) of Regulation S-K under the Exchange Act. In addition, each member of the Audit Committee meets the current independence and experience requirements of Rule 10A-3 under the Exchange Act.

A current copy of the Corporation's Audit Committee Charter is available on the Corporation's website at https://www.nexpoint.com/nexpoint-capital-bdc/.

11

*Governance and Compliance Committee*

The members of the Governance and Compliance Committee are Dr. Froehlich, Messrs. Powell and Ward, and Ms. McWhorter, each of whom is independent for purposes of the 1940 Act. Dr. Froehlich serves as the Chairperson of the Governance and Compliance Committee. The Governance and Compliance Committee's function is to oversee and make recommendations to the full Board or the Independent Directors, as applicable, with respect to the Corporation's governance, selection and nomination of Directors, compensation of Directors, and related matters, as well as to oversee and assist Board oversight of the Corporation's compliance with legal and regulatory requirements and to seek to address any potential conflicts of interest between the Corporation and the Adviser in connection with any potential or existing litigation or other legal proceeding related to securities held by the Corporation and the Adviser or another client of the Adviser. The Governance and Compliance Committee is also responsible for evaluating each Director and determining whether to recommend each Director's continued service in that capacity.

The Governance and Compliance Committee considers nominees properly recommended by the Corporation's stockholders. The Corporation's bylaws provide that for any nomination to be properly brought by a stockholder for a meeting, such stockholder will have to comply with advance notice requirements and provide the Corporation with certain information. Generally, to be timely, a stockholder's notice must be received at the Corporation's principal executive offices not less than 90 days nor more than 120 days prior to the first anniversary of the date the proxy statement for the immediately preceding annual meeting of stockholders was released to the Corporation's stockholders.

The Corporation's bylaws further provide that nominations of persons for election to the Board at a special meeting may be made only by or at the direction of the Board and, provided that the Board has determined that Directors will be elected at the meeting, by a stockholder who is entitled to vote at the meeting and who has complied with the advance notice provisions of the bylaws.

This notice must contain, as to each nominee, all of the information relating to such person as would be required to be disclosed in a proxy statement meeting the requirements of Regulation 14A under the Exchange Act, and certain other information set forth in the bylaws, including the following information for each Director nominee: full name, age and address; principal occupation during the past five years; directorships on publicly held companies and investment companies during the past five years; number of shares of Common Stock owned, if any; and a written consent of the individual to stand for election if nominated by the Board and to serve if elected by the stockholders. In order to be eligible to be a nominee for election as a Director, such potential nominee may be required to provide additional information to determine his or her qualifications or eligibility to serve on the Board.

The Governance and Compliance Committee has not established any specific, minimum qualifications that must be met for an individual to be considered for nomination as a Director. Criteria and attributes considered by the Governance and Compliance Committee in evaluating the qualifications of individuals for election as a Director, including individuals nominated by stockholders, include the following: experience, skills, expertise, education, knowledge, diversity, personal and professional integrity, character, business judgment, time availability in light of other commitments, dedication, the individual's ability to qualify as an Independent Director and the existence of any other relationships that might give rise to a conflict of interest and other relevant factors that the Governance and Compliance Committee considers appropriate in the context of the needs of the Board (e.g., whether a candidate is an "audit committee financial expert" under the federal securities laws).

A current copy of the Corporation's Governance and Compliance Committee Charter is available on the Corporation's website at https://www.nexpoint.com/nexpoint-capital-bdc/.

*Administration and Operations Committee*

The members of the Administration and Operations Committee are Dr. Froehlich, Messrs. Honis, Powell and Ward, and Ms. McWhorter. The Administration and Operations Committee is responsible for reviewing the

12

administrative operations of the Corporation, reviewing arrangements with financial intermediaries who provide service to the Corporation, including Corporation payments to financial intermediaries and for overseeing any funds that, in the Board's determination, employ alternative investment strategies. Mr. Honis serves as Chairperson of the Administration and Operations Committee.

### *Compensation Committee*

As none of the Corporation's executive officers are compensated by the Corporation, the Corporation does not have a compensation committee and neither the Board nor a Committee thereof produces and/or reviews a report on executive officers compensation practices. The Governance and Compliance Committee reviews and evaluates compensation payable to the Directors at least annually to ensure that such compensation continues to be appropriate in light of the responsibilities of the Directors. The Governance and Compliance Committee makes any recommendations regarding changes to the Directors' compensation to the Board, and the full Board approves the Directors' compensation.

### Compensation of Directors and Executive Officers

The executive officers of the Corporation receive no direct remuneration from the Corporation. Each Director of the Corporation who oversees all of the funds in the Fund Complex receives an annual retainer of $150,000 payable in quarterly installments and allocated among each portfolio in the Fund Complex based upon relative net assets. The Directors are reimbursed for actual out-of-pocket expenses relating to attendance at meetings. The Directors do not receive any separate compensation in connection with service on Committees or for attending Board or Committee meetings; however, the Chairman of the Board receives an additional annual payment of $20,000 and the Chairperson of each Committee receives an additional annual payment of $10,000, payable in quarterly installments and allocated among each portfolio in the Fund Complex based on relative net assets. The Directors do not receive equity awards or incentive-based compensation and do not have any pension or retirement plan.

The following table summarizes the compensation paid by the Corporation to its Directors and the aggregate compensation paid by the Fund Complex to the Directors for services rendered in the fiscal year ended December 31, 2024.

| Name of Director | Aggregate Compensation from the Corporation | Aggregate Compensation from the Fund Complex |
|---|---|---|
| **Independent Directors** | | |
| Bryan A. Ward | $ 3,947 | $ 160,000 |
| Dr. Bob Froehlich | $ 3,947 | $ 160,000 |
| Ethan Powell | $ 4,192 | $ 170,000 |
| Dorri McWhorter | $ 3,700 | $ 150,000 |
| **Interested Director** | | |
| John Honis | $ 3,947 | $ 160,000 |

### Code of Conduct and Code of Ethics

The Corporation expects each of its officers and Directors, as well as any person affiliated with its operations, to act in accordance with the highest standards of personal and professional integrity at all times and to comply with the Corporation's policies and procedures and all laws, rules and regulations of any applicable international, federal, provincial, state or local government. To this effect, the Corporation has adopted a Sarbanes-Oxley ("SOX") Code of Ethics, which is posted on the Corporation's website at https://www.nexpoint.com/nexpoint-capital-bdc/. The SOX Code of Ethics applies to the Corporation's principal executive officer and principal financial officer.

13

As required by the 1940 Act, the Corporation and the Adviser have each adopted a Code of Ethics (the "Rule 17j-1 Code of Ethics") that establishes procedures that apply to the Corporation's Directors, executive officers, officers, their respective staffs and the employees of the Adviser with respect to their personal investments and investment transactions. Each Rule 17j-1 Code of Ethics generally does not permit investments by the Corporation's Directors, officers or any other covered person in securities that may be purchased or held by the Corporation. You may access the Corporation's Rule 17j-1 Code of Ethics on the Corporation's website at https://www.nexpoint.com/nexpoint-capital-bdc/.

**Certain Relationships and Related Party Transactions**

The Corporation has entered into agreements with the Adviser and Administrator. Certain members of the Corporation's senior management have ownership and financial interests in the Adviser and the Administrator. Members of senior management also serve as officers of other investment managers affiliated with the Adviser that do and may in the future manage investment funds, accounts or other investment vehicles with investment objectives similar to those of the Corporation. In addition, the Corporation's executive officers and Directors and the partners of the Adviser serve or may serve as officers, directors or principals of entities that operate in the same, or related, lines of business as the Corporation does or of investment funds, accounts or other investment vehicles managed by the Corporation's affiliates. These investment funds, accounts or other investment vehicles may have investment objectives similar to the Corporation's investment objective.

As a result, the Corporation may not be given the opportunity to participate in certain investments made by investment funds, accounts or other investment vehicles managed by the Adviser or its affiliates. However, in order to fulfill its fiduciary duties to each of its clients, the Adviser intends to allocate investment opportunities in a manner that is fair and equitable over time and is consistent with the Adviser's allocation policy, investment objective and strategies so that the Corporation is not disadvantaged in relation to any other client. Where the Corporation is able to co-invest consistent with the requirements of the 1940 Act, if sufficient securities or loan amounts are available to satisfy the Corporation's and each such account's proposed demand, the opportunity will be allocated in accordance with the Adviser's pre-transaction determination. If there is an insufficient amount of an investment opportunity to satisfy the Corporation's demand and that of other accounts sponsored or managed by the Adviser or its affiliates, the allocation policy provides that allocations among the Corporation and such other accounts will generally be made pro rata based on the amount that each such party would have invested if sufficient securities or loan amounts were available. Where the Corporation is unable to co-invest consistent with the requirements of the 1940 Act, the Adviser's allocation policy further provides for investments to be allocated on a random or rotational basis to assure that all clients have fair and equitable access to such investment opportunities.

The Board, in consultation with the Corporation's Chief Executive Officer, Chief Compliance Officer and legal counsel, may review potential related party transactions and, during these reviews, it may also consider any conflicts of interest brought to its attention pursuant to the Corporation's Code of Conduct or the Corporation's or the Adviser's Rule 17j-1 Code of Ethics.

The Corporation has entered into an investment advisory agreement with the Adviser pursuant to which the Adviser has agreed to provide investment advisory services to the Corporation. In exchange for these services, the Corporation will pay the Adviser a fee for investment management services consisting of a base management fee and a performance-based incentive fee. For the fiscal year ended December 31, 2024, the Adviser earned a base management fee of $945,241. For the fiscal year ended December 31, 2024, the Adviser did not earn an incentive fee. Effective December 20, 2017, the Adviser ended its voluntary waiver of advisory fees. Fees waived before June 10, 2016 are not subject to recoupment. The Adviser may elect to recoup any fees voluntarily waived from and after June 10, 2016 within three years from the date that such fees were otherwise payable, provided that the recoupment of the Adviser will be limited to the amount of such voluntarily waived fees (excluding any fees the Adviser has indicated are not subject to recoupment) and will not cause the sum of the Corporation's advisory fees, administration fees, and "Other Expenses" (as defined in the Expense Limitation Agreement), nor will any recoupment exceed the annual rate of 3.40% of average gross assets.

14

The Corporation has also entered into an administration agreement pursuant to which the Adviser furnishes the Corporation with office facilities, equipment and clerical, bookkeeping, recordkeeping and other administrative services to enable the Corporation to operate. The Corporation has agreed to reimburse the Adviser for its allocable portion of overhead and other expenses incurred by the Adviser in performing its obligations under the administration agreement. To the extent that the Adviser outsources any of its functions, the Corporation will pay the fees associated with such functions on a direct basis without profit to the Adviser. In no event, however, will the Corporation reimburse the Adviser under the administration agreement in an amount that exceeds an annual rate of 0.4% of the Corporation's gross assets, including cash and cash equivalents and assets purchased with borrowed funds.

The Adviser has entered into a Services Agreement with Skyview Group ("Skyview") pursuant to which the Adviser will receive administrative and operational support services to enable it to provide the required advisory services to the Corporation.

Certain Skyview personnel became dual-employees of NexPoint Services, Inc., a wholly-owned subsidiary of the Adviser. The same services are being performed by the dual-employees. The Adviser, and not the Corporation, will compensate all Adviser, Skyview, and dual-employee personnel who provide services to the Corporation.

In the future, the Corporation may engage the Adviser or certain of its affiliates to provide services other than those discussed above. Any arrangements would be subject to approval by the Board prior to the Adviser or its affiliates being engaged to provide services to the Corporation.

### Information About the Independent Registered Public Accounting Firm

Cohen & Company, Ltd. ("Cohen"), an independent registered public accounting firm located at 1350 Euclid Avenue, Suite 800, Cleveland, OH 44115, currently serves as the independent registered public accounting firm for the Corporation. Representative(s) of Cohen will not attend the Annual Meeting, but Cohen has been given the opportunity to make a statement if they desire to do so and will be available should any matter arise requiring their presence. After reviewing the Corporation's audited financial statements for the fiscal year ended December 31, 2024, the Corporation's Audit Committee recommended to the Corporation's Board that such statements be included in the Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2024. A copy of the Audit Committee's report appears below.

**Independent Registered Public Accounting Firm Fees and Services**

The following table presents fees for professional services rendered by Cohen for the Corporation's fiscal years ended December 31, 2024 and 2023. One hundred percent (100%) of all services provided by Cohen were pre-approved and no fees were subject to pre-approval by the Audit Committee pursuant to Rule 2-01(c)(7)(i)(C) of Regulation S-X. The audit services are approved by the Audit Committee pursuant to an audit engagement letter, and, in accordance with the Corporation's pre-approval policies and procedures, the Audit Committee of the Corporation must pre-approve all non-audit services provided by Cohen, and all non-audit services provided by Cohen to the Adviser, or any entity controlling, controlled by, or under common control with the Adviser that provides ongoing services to the Corporation that are related to the operations and financial reporting of the Corporation. In some circumstances, when certain services were not recognized at the time of the engagement to be non-audit services, the pre-approval requirement may be waived if the aggregate amount of the fees for such non-audit services constitutes less than five percent of the total amount of revenues paid to Cohen by the Corporation during the fiscal year in which the non-audit services are provided. Cohen provides permitted non-audit services to certain entities controlling, controlled by or under common control with the Adviser that provide ongoing services to the Corporation.

15

272

**FSD2025-0116**          **Page 276 of 1530**          **2025-08-19**

| | Fiscal Year Ended December 31, 2024 | | Fiscal Year Ended December 31, 2023 | |
|---|---|---|---|---|
| Audit Fees paid by the Corporation | $ | 135,000 | $ | 135,000 |
| Audit-Related Fees paid by the Corporation | $ | 31,500 | $ | 31,500 |
| Tax Fees paid by the Corporation | $ | 15,500 | $ | 15,500 |
| All Other Fees paid by the Corporation | $ | 0 | $ | 0 |
| Total Fees | $ | 182,000 | $ | 182,000 |

***Audit Fees.*** Audit fees consist of fees billed for professional services rendered for the audit of the Corporation's year-end financial statements and reviews of the interim financial statements included in quarterly reports and services that are normally provided by the independent registered public accounting firm in connection with statutory and regulatory filings. These services also include the required audits of the Corporation's internal controls over financial reporting.

***Audit-Related Fees.*** Audit-related fees consist of fees billed for assurance and related services that are reasonably related to the performance of the audit or review of the Corporation's financial statements and are not reported under "Audit Fees." These services include attestation services that are not required by statute or regulation, consultations concerning financial accounting and reporting standards, and fees related to requests for documentation and information from regulatory and other government agencies.

***Tax Fees.*** Tax fees consist of fees billed for professional services for tax compliance. These services include assistance regarding federal, state, and local tax compliance.

***All Other Fees***. All other fees include fees for products and services other than the services reported above.

### Report of the Audit Committee[1]

The following is the report of the Audit Committee (the "Committee") of NexPoint Capital, Inc. (the "Corporation") with respect to the Corporation's audited financial statements for the fiscal year ended December 31, 2024.

The Committee oversees the Corporation's accounting and financial reporting processes and the audits of the Corporation's financial statements. Management is responsible for the preparation, presentation and integrity of the Corporation's financial statements, the Corporation's accounting and financial and reporting principles, and internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations. The Committee reviewed the audited financial statements in the Corporation's annual report on Form 10-K for the fiscal year ended December 31, 2024 with management and discussed the quality of the accounting principles, the reasonableness of significant judgments and the clarity of disclosures in the financial statements.

The Committee has considered and discussed the above-described December 31, 2024 audited financial statements with management and with Cohen. The Committee has also discussed with Cohen the matters required to be discussed by the statement on Auditing Standards No. 1301, as amended (AICPA, Professional Standards, Vol. 1. AU section 380), as adopted by the Public Company Accounting Oversight Board ("PCAOB") in Rule 3200T, *The Auditor's Communication With Those Charged With Governance*. The Committee reviewed with Cohen, who is responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgment as to the quality, not just the acceptability, of the Corporation's accounting principles and such other matters as are required to be discussed with the Committee

---

[1]   The material in this report is not "soliciting material," is not deemed "filed" with the SEC, and is not to be incorporated by reference into any filing of the Corporation under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made before or after the date hereof and irrespective of any general incorporation language in any such filing.

16

under generally accepted auditing standards. Finally, the Committee reviewed the written disclosures and the letters from Cohen required by PCAOB Rule 3526, *Communication with Audit Committees Concerning Independence*, as currently in effect, has considered whether the provision of other non-audit services by Cohen to the Corporation are compatible with maintaining Cohen's independence, and has discussed with Cohen its independence of the Corporation.

The Committee discussed with Cohen the overall scope and plans for the audit. The Committee met with Cohen to discuss the results of their audit, their evaluations of the Corporation's internal controls and the overall quality of the Corporation's financial reporting.

Based upon the reports and discussions described in this report, and subject to the limitations on the role and responsibilities of the Committee referred to in this proxy statement and in the Committee's Charter, the Committee recommended to the Board (and the Board has approved) that the Corporation's audited financial statements be included in the Corporation's annual report on Form 10-K for the fiscal year ended December 31, 2024 and filed with the SEC.

Stockholders are reminded, however, that the members of the Committee are not professionally engaged in the practice of auditing or accounting. Members of the Committee rely, without independent verification, on the information provided to them and on the representations made by management and Cohen. Accordingly, the Committee's oversight does not provide an independent basis to determine that management has maintained appropriate accounting and financial reporting principles or appropriate internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations. Furthermore, the Committee's considerations and discussions, referred to above, do not assure that the audit of the Corporation's financial statements has been carried out in accordance with the standards of the PCAOB, that the financial statements are presented in conformity with accounting principles generally accepted in the United States of America or that the Corporation's independent registered public accounting firm is, in fact, "independent."

Bryan A. Ward, Committee Chair
Dr. Bob Froehlich, Committee Member
Ethan Powell, Committee Member
Dorri McWhorter, Committee Member

### OTHER MATTERS TO COME BEFORE THE ANNUAL MEETING

The Directors do not intend to present any other business at the Annual Meeting nor are they aware that any stockholder intends to do so. If, however, any other matters are properly brought before the Annual Meeting, the persons named in the proxy will vote thereon in accordance with their judgment.

### ADDITIONAL INFORMATION

**Stockholder Proposals**

The Corporation expects that the 2026 Annual Meeting of Stockholders will be held in June 2026, but the exact date, time and location of such meeting have yet to be determined. Proposals to be included in the proxy statement for the 2026 Annual Meeting must be submitted by eligible stockholders who have complied with the relevant regulations of the SEC and received no later than January 7, 2026. In addition, the Corporation's bylaws contain an advance notice provision requiring that, if a stockholder's proposal, including nomination of a Director, is brought before the next annual meeting of the Corporation's stockholders, such stockholder must provide timely notice thereof in writing addressed to Stephanie Vitiello, Secretary, c/o NexPoint Capital, Inc., 300 Crescent Court, Suite 700, Dallas, Texas 75201. Notices of intention to present proposals, including nomination of a Director, at the 2026 Annual Meeting must be received by the Corporation between January 7,

17

2026 and 5:00 p.m. Central Time on February 6, 2026. The submission of a proposal does not guarantee its inclusion in the Corporation's proxy statement or presentation at the 2026 Annual Meeting of the Stockholders unless certain securities law requirements are met. The Corporation reserves the right to reject, rule out of order, or to take other appropriate action with respect to any proposal that does not comply with these and other applicable requirements. Proxies solicited by the Corporation will confer discretionary voting authority with respect to these proposals if the proposals are not received by the Corporation, in good order and complying with all applicable legal requirements, by February 6, 2026, and may confer discretionary voting authority with respect to proposals received before such date, in each case subject to SEC rules governing the exercise of this authority.

**Delivery Requirements**

The SEC has adopted rules that permit companies and intermediaries such as brokers to satisfy delivery requirements for proxy statements with respect to two or more stockholders sharing the same address by delivering a single proxy statement or Notice of Internet Availability of Proxy Materials ("Notice") addressed to those stockholders or by sending separate Notices for each household account in a single envelope. This process, which is commonly referred to as "householding," potentially provides extra convenience for stockholders and cost savings for companies. The Corporation and some brokers household proxy materials or Notices, delivering a single proxy statement or Notice to multiple stockholders sharing an address unless contrary instructions have been received from the affected stockholders. Once a stockholder has received notice from a broker or the Corporation that they will be householding materials to the stockholder's address, householding will continue until the stockholder is notified otherwise or until the stockholder revokes consent. If a stockholder does not want Corporation mailings consolidated and would prefer to receive separate mailings at any time in the future, the stockholder should call the Corporation at (844) 485-9167 or write the Corporation c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201 and the Corporation will furnish separate mailings, in accordance with instructions.

**COPIES OF THE CORPORATION'S ANNUAL REPORT DATED DECEMBER 31, 2024 TO STOCKHOLDERS ARE AVAILABLE UPON REQUEST, WITHOUT CHARGE, BY WRITING TO EQ FUND SOLUTIONS, LLC AT EQ FUND SOLUTIONS, LLC, ATTN: NEXPOINT 20589 FULFILLMENT, 55 CHALLENGER ROAD, RIDGEFIELD PARK, NEW JERSEY 07660, BY CALLING (866) 796-1292, OR BY SENDING AN E-MAIL TO CORPORATESERVICES@EQUINITI.COM, USING SUBJECT LINE: NEXPOINT 20589 FULFILLMENT.**

**Communications with Directors**

Stockholders of the Corporation who wish to communicate with the Directors (or with an individual Director) should send communications to the attention of Stephanie Vitiello, Secretary and Chief Compliance Officer, c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201, and all communications will be directed to the Director or Directors indicated in the communication or, if no Director or Directors are indicated, to all Directors.

**It is important that proxies be returned promptly. You are urged to complete and sign the enclosed proxy card and return it promptly in the enclosed envelope, which needs no postage if mailed in the United States.**

Dallas, Texas
May 7, 2025

18



**PROXY CARD**



YOUR VOTE IS IMPORTANT NO MATTER HOW MANY SHARES YOU OWN. **PLEASE CAST YOUR PROXY VOTE** *TODAY!*

# NEXPOINT CAPITAL, INC.

PROXY FOR AN ANNUAL MEETING OF STOCKHOLDERS TO BE HELD ON JUNE 16, 2025

The undersigned holder of shares of NexPoint Capital, Inc., a Delaware corporation (the "Corporation"), revoking prior proxies, hereby appoints Stephanie Vitiello and Will Mabry, as attorneys-in-fact and proxies of the undersigned, granted in connection with the voting of the shares subject hereto. Each of them, with full power of substitution, are entitled to vote shares held in the name of the undersigned as of the record date at the Annual Meeting of Stockholders of NexPoint Capital, Inc. at 300 Crescent Court, Suite 700, Dallas, Texas 75201 on June 16, 2025, at 8:15 a.m. Central Time (the "Annual Meeting"), or at any adjournment or postponement thereof, upon the Proposal described in the Notice of Meeting and accompanying Proxy Statement. The undersigned acknowledges receiving the Notice of Meeting and accompanying Proxy Statement.

**Do you have questions?**

If you have any questions about how to vote your proxy or about the meeting in general, please call toll-free (866) 796-1292. Representatives are available to assist you Monday through Friday 9 a.m. to 10 p.m. Eastern Time.

---

**IMPORTANT NOTICE REGARDING AVAILABILITY OF PROXY MATERIALS FOR THE ANNUAL MEETING OF STOCKHOLDERS TO BE HELD JUNE 16, 2025:**

**The proxy statement is available online at:** https://vote.proxyonline.com/nexpoint/docs/bdc.pdf

CONFIDENTIAL TDIT005233

## NEXPOINT CAPITAL, INC.                                  PROXY CARD

<u>**YOUR SIGNATURE IS REQUIRED**</u> FOR YOUR VOTE TO BE
**COUNTED.** The signer(s) acknowledge(s) receipt of this Proxy Statement of the Board
of Directors. Your signature(s) on this should be exactly as your name(s) appear on this
Proxy (reverse side). If the shares are held jointly, each holder should sign this Proxy.
Attorneys-in-fact, executors, administrators, trustees or guardians should indicate the full
title and capacity in which they are signing.

| | |
|---|---|
| SIGNATURE (AND TITLE IF APPLICABLE) | DATE |
| SIGNATURE (IF HELD JOINTLY) | DATE |

**This proxy is solicited on behalf of the Corporation's Board of Directors.** The Proposal has been unanimously approved by
the Board of Directors and recommended for approval by stockholders. When properly executed, this proxy will be voted as
indicated or "FOR" the proposal if no choice is indicated. The proxy will be voted in accordance with the proxy holders' best
judgment as to any other matters that may arise at the Annual Meeting.

**THE BOARD OF DIRECTORS, INCLUDING EACH OF THE INDEPENDENT DIRECTORS, UNANIMOUSLY RECOMMENDS THAT
STOCKHOLDERS VOTE "FOR" THE ELECTION OF THE NOMINEES AS A DIRECTOR.**

TO VOTE, MARK CIRCLES BELOW IN BLUE OR BLACK INK AS FOLLOWS. Example: ●

**PROPOSAL(S):**

1. To elect each of Ethan Powell and Bryan A. Ward as a Class I Director of the
Corporation to serve for a three-year term expiring at the 2028 Annual Meeting of
Stockholders or until his successor is duly elected and qualifies (the "Proposal");
and

| | FOR | WITHHOLD |
|---|---|---|
| 1.1 Ethan Powell | O | O |
| 1.2 Bryan A. Ward | O | O |

2. To transact such other business as may properly come before the Annual
Meeting and any adjournment or postponement thereof.

## THANK YOU FOR VOTING

277

FSD2025-0116

Page 281 of 1530

2025-08-19

As filed with the Securities and Exchange Commission on April 30, 2025

1933 Act File No. 333-209022
1940 Act File No. 811-23129

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM N-2
**(Check appropriate box or boxes)**

## REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933* ☒
**Pre-Effective Amendment No.** ☐
**Post-Effective Amendment No. 14** ☒

## REGISTRATION STATEMENT
*UNDER*
*THE INVESTMENT COMPANY ACT OF 1940* ☒
**Amendment No. 16** ☒

# NexPoint Real Estate Strategies Fund
**(Registrant Exact Name as Specified in Charter)**

**300 Crescent Court, Suite 700**
**Dallas, Texas 75201**
**(Address of Principal Executive Offices, Number, Street, City, State, Zip Code)**

**(833) 697-6246**
**(Registrant's Telephone Number, including area code)**

| | |
|---|---|
| **Ms. Stephanie Vitiello** | **Copies of Communications to:** |
| **NexPoint Real Estate Strategies Fund** | **Jon-Luc Dupuy, Esquire** |
| **300 Crescent Court, Suite 700** | **K&L Gates LLP** |
| **Dallas, Texas 75201** | **1 Congress Street, Suite 2900** |
| **(Name and Address (Number, Street, City, State, Zip Code)** | **Boston, Massachusetts 02114** |
| **of Agent for Service)** | |

**Approximate Date of Proposed Public Offering:**
**As soon as practicable after the effective date of this Registration Statement.**

☐ Check box if the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans.

☒ Check box if any securities being registered on this Form will be offered on a delayed or continuous basis in reliance on Rule 415 under the Securities Act of 1933 ("Securities Act"), other than securities offered in connection with a dividend reinvestment plan.

☐ Check box if this Form is a registration statement pursuant to General Instruction A.2 or a post-effective amendment thereto.

☐ Check box if this Form is a registration statement pursuant to General Instruction B or a post-effective amendment thereto that will become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act.

☐ Check box if this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction B to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act.

It is proposed that this filing will become effective (check appropriate box)

☐ when declared effective pursuant to Section 8(c) of the Securities Act

☐ immediately upon filing pursuant to paragraph (b)

☒ on April 30, 2025, pursuant to paragraph (b)

☐ 60 days after filing pursuant to paragraph (a)

☐ on (date) pursuant to paragraph (a)

If appropriate, check the following box:

☐ This [post-effective] amendment designates a new effective date for a previously filed [post-effective amendment] [registration statement].

☐ This Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, and the Securities Act registration statement number of the earlier effective registration statement for the same offering is:_____.

☐ This Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, and the Securities Act registration statement number of the earlier effective registration statement for the same offering is:_____.

☐ This Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, and the Securities Act registration statement number of the earlier effective registration statement for the same offering is:_____.

Check each box that appropriately characterizes the Registrant:

☒ Registered Closed-End Fund (closed-end company that is registered under the Investment Company Act of 1940 ("Investment Company Act")).

☐ Business Development Company (closed-end company that intends or has elected to be regulated as a business development company under the Investment Company Act).

☒ Interval Fund (Registered Closed-End Fund or a Business Development Company that makes periodic repurchase offers under Rule 23c-3 under the Investment Company Act).

☐ A.2 Qualified (qualified to register securities pursuant to General Instruction A.2 of this Form).

☐ Well-Known Seasoned Issuer (as defined by Rule 405 under the Securities Act).

☐ Emerging Growth Company (as defined by Rule 12b-2 under the Securities Exchange Act of 1934 ("Exchange Act").

☐ If an Emerging Growth Company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of Securities Act.

☐ New Registrant (registered or regulated under the Investment Company Act for less than 12 calendar months preceding this filing).

FSD2025-0116

2025-08-19

197

CONFIDENTIAL

TDIT005235

FSD2025-0116                    **Page 282 of 1530**                    2025-08-19

**PROSPECTUS**

# NexPoint Real Estate Strategies Fund

### Class A (NRSAX), Class C (NRSCX)
### and Class Z (NRSZX) Shares

---

The Fund. NexPoint Real Estate Strategies Fund (the "Fund") is a continuously offered, non-diversified, closed-end management investment company that operates as an interval fund.

This Prospectus provides the information that a prospective investor should know about the Fund before investing. You are advised to read this Prospectus carefully and to retain it for future reference. Additional information about the Fund, including a Statement of Additional Information ("SAI") dated April 30, 2025, has been filed with the U.S. Securities and Exchange Commission ("SEC"). The SAI is available upon request and without charge by writing the Fund at NexPoint Real Estate Strategies Fund, c/o SS&C Technologies, Inc., P.O. Box 219630, Kansas City, MO, 64121-9730, or by calling toll-free (844) 485-9167. You may request the Fund's SAI, annual and semi-annual reports, and other information about the Fund or make shareholder inquiries by calling (844) 485-9167 or by visiting https://www.nexpoint.com/funds/nexpoint-real-estate-strategies-fund/. The SAI, which is incorporated by reference into (legally made a part of) this Prospectus, is also available on the SEC's website at http://www.sec.gov. The address of the SEC's website is provided solely for the information of prospective shareholders and is not intended to be an active link.

Investment Objective. The Fund's investment objective is to seek long-term total return with an emphasis on current income. The Fund seeks to achieve this objective by primarily investing in a broad range of private and public real estate-related debt, equity and preferred equity investments across multiple real estate sectors. There can be no assurance that the Fund will achieve this objective.

Investment Strategy. The Fund pursues its investment objective by investing, under normal circumstances, at least 80% of its assets (defined as net assets plus the amount of any borrowing for investment purposes) in real estate and real estate-related securities, as further described in this Prospectus.

Securities Offered. The Fund engages in a continuous offering of three classes of shares of beneficial interest of the Fund: Class A shares, Class C shares and Class Z shares. The Fund is authorized as a Delaware statutory trust to issue an unlimited number of shares. The Fund is offering to sell, through its principal underwriter, NexPoint Securities, Inc. (the "Distributor"), under the terms of this Prospectus, an unlimited number of shares of beneficial interest of each class. The shares of each class are offered on a continuous basis at the Fund's net asset value ("NAV") per share plus the applicable sales load. See "Fees and Fund Expenses" and "Plan of Distribution". The Distributor is not required to sell any specific number or dollar amount of the Fund's shares, but will use reasonable efforts to sell the shares. Funds received will be invested promptly and no arrangements have been made to place such funds in an escrow, trust or similar account. Assets that cannot be invested promptly in real estate or real estate-related securities will be invested in cash or cash equivalents. The shares of beneficial interest of the Fund are continuously offered under Rule 415 of the Securities Act of 1933, as amended (the "Securities Act").

Use of Leverage. The Fund incurs leverage as a part of its investment strategy. The Fund may also invest in private and public real estate investment funds or trusts, including real estate investment funds or trusts managed by affiliated or unaffiliated managers or entities wholly-owned by the Fund, that may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to higher levels of leverage than the Fund is permitted to, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities. The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho Securities USA LLC ("Mizuho") that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement. The Fund's asset coverage ratio was 1,172% as of March 31, 2025. See "Risk Factors — Leverage Risk".

Non-Traded REITs. The Fund may invest in publicly registered non-traded real estate investment trusts ("REITs"), which are illiquid and are not subject to the protections of the Investment Company Act of 1940, as amended (the "1940 Act"). Some or all of these funds may be managed by NexPoint Advisors, L.P., the Fund's investment adviser (the "Adviser" or "NexPoint"), or an affiliate.

**Investors should understand that:**

- the Fund does not currently intend to list its shares on any securities exchange;

- there is no secondary market for the Fund's shares, and the Fund does not expect that such a market will develop at this time; and

- your investment in the Fund will be illiquid.

**Before investing, you should therefore consider the following factors:**

- You may not have access to the money you invest for an extended period of time.

- You may not be able to sell your shares at the time of your choosing regardless of how the Fund performs.

- Because you may not be able to sell your shares at the time of your choosing, you may not be able to reduce your exposure in a market downturn.

- An investment in the Fund may not be suitable for investors who may need the money they invested in a specified timeframe.

- The amount of distributions that the Fund may pay, if any, is uncertain.

- The Fund may pay distributions in significant part from sources that may not be available in the future and that are unrelated to the Fund's performance, such as from offering proceeds, borrowings, and amounts from the Fund's affiliates that are subject to repayment by investors. All or a portion of a distribution may consist of a return of capital. Because a return of capital may reduce a shareholder's tax basis, it will increase the amount of gain or decrease the amount of loss on a subsequent disposition of the shareholder's shares.

---

**The Fund has implemented a share repurchase program, but it is only required to repurchase up to 5% of its outstanding shares per quarter. In the event a repurchase offer is oversubscribed, the Fund may not repurchase all of the shares tendered but will repurchase shares tendered on a *pro rata* basis, and no assurance can be given that the Fund will repurchase all of a shareholder's tendered shares over any period. In addition, the Fund may in the future determine to list its shares on a public securities exchange, but even if an active secondary market in the Fund's shares were to develop as a result, closed-end fund shares frequently trade at a discount from their NAV. Investing in the Fund involves a considerable degree of risk. See "Risk Factors" on page 40 of this Prospectus.**

**Neither the SEC nor any state securities commission has approved or disapproved these securities or determined if this Prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

The Fund is offering the shares in a continuous offering through the Distributor at NAV plus the applicable sales load. The Distributor also may enter into selected dealer agreements with other broker-dealers for the sale and distribution of the Fund's shares. The Fund currently offers the following three share classes to investors, Class A, Class C and Class Z Shares. See "Plan of Distribution" of page 73 of this Prospectus.

| | Class A Shares | Class C Shares | Class Z Shares |
|---|---|---|---|
| Public Offering Price Per Share | $ 15.83 | $ 16.06 | $ 16.06 |
| Maximum Sales Load as a Percentage of Purchase Amount[1,2] | 6.08% | None | None |
| Amount of Securities | Unlimited | Unlimited | Unlimited |

(1) For Class A shares, "maximum sales load" includes: (i) broker commissions of 5.00% of the Fund's public offering price per Class A share; and (ii) distributor fees of 0.75% of the Fund's public offering price per Class A share. See "Fees and Fund Expenses."

(2) The Adviser and/or its affiliates, in their discretion and from their own resources (which may include the Adviser's legitimate profits from the management fee it receives from the Fund), may pay additional compensation to brokers or dealers in connection with the sale and distribution of Fund shares. There is no limit on the amount of additional compensation paid by the Adviser or its affiliates, subject to the limitations imposed by FINRA. In addition, the Fund, the Adviser and/or their respective affiliates may pay a servicing fee to the Distributor and to other selected broker-dealers and other financial industry professionals for providing ongoing services in respect of holders of Class A and Class C shares with whom they have distributed shares of the Fund. The Fund's (and, indirectly, Class A and Class C holders') share of such servicing fees will not exceed an annual rate of 0.25% of the Fund's average daily net asset value attributable to Class A and Class C shares, respectively. See "Plan of Distribution."

---

**Distributor**

**NexPoint Securities, Inc.**

**Member FINRA/ SIPC**

**The date of this Prospectus is April 30, 2025.**

CONFIDENTIAL TDIT005238

**TABLE OF CONTENTS**

PROSPECTUS SUMMARY                                                1
FEES AND FUND EXPENSES                                          15
FINANCIAL HIGHLIGHTS                                            18
THE FUND                                                       27
USE OF PROCEEDS                                                27
INVESTMENT OBJECTIVE, POLICIES AND STRATEGIES                  28
RISK FACTORS                                                  40
MANAGEMENT OF THE FUND                                        59
DETERMINATION OF NET ASSET VALUE                              63
CONFLICTS OF INTEREST                                         65
QUARTERLY REPURCHASES OF SHARES                               68
DISTRIBUTION POLICY                                           71
DISTRIBUTION REINVESTMENT POLICY                              72
U.S. FEDERAL INCOME TAX MATTERS                               73
DESCRIPTION OF CAPITAL STRUCTURE AND SHARES                   75
ANTI-TAKEOVER PROVISIONS IN THE DECLARATION OF TRUST          76
PLAN OF DISTRIBUTION                                          77
LEGAL MATTERS                                                84
REPORTS TO SHAREHOLDERS                                       84
INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM                 85
ADDITIONAL INFORMATION                                       85
TABLE OF CONTENTS OF THE STATEMENT OF ADDITIONAL INFORMATION

## PROSPECTUS SUMMARY

*The following summary highlights information contained elsewhere in this Prospectus. This summary may not contain all of the information that you should consider before investing in the Fund. You should review the more detailed information contained in this Prospectus and in the Statement of Additional Information ("SAI"), especially the information set forth under the heading "Risk Factors."*

**The Fund**

NexPoint Real Estate Strategies Fund (the "Fund") is a continuously offered, non-diversified, closed-end management investment company that operates as an interval fund. See "The Fund." As an interval fund, the Fund will offer to make repurchases of no less than 5% of its outstanding shares at net asset value ("NAV"), on a quarterly basis, unless such offer is suspended or postponed in accordance with regulatory requirements. See "Quarterly Repurchases of Shares."

**Investment Objective and Policies**

*Investment Objective.* The Fund's investment objective is to seek long-term total return with an emphasis on current income. The Fund seeks to achieve this objective by primarily investing in a broad range of private and public real estate-related debt, equity and preferred equity investments across multiple real estate sectors. There can be no assurance that the Fund will achieve this objective.

*Investment Strategy.* The Fund pursues its investment objective by investing, under normal circumstances, at least 80% of its assets in "real estate and real estate-related securities" (as defined below). In particular, the Fund will pursue its investment objective by investing the Fund's assets primarily in: (1) commercial mortgage-backed securities ("CMBS") and residential mortgage-backed securities ("RMBS"); (2) direct preferred equity and mezzanine investments in real properties; (3) equity securities of public (both traded and non-traded) and private debt and equity real estate investment trusts ("REITs") and/or real estate operating companies ("REOCs"); and (4) opportunistic and value added direct real estate strategies. The Fund will effect its direct real estate strategy through investments in one or more REIT subsidiaries, including through NRESF REIT Sub, LLC and NRESF REIT Sub II, LLC (each, a "REIT Subsidiary" and collectively, the "REIT Subsidiaries"), which were formed on July 8, 2016 and June 6, 2022, respectively. The REIT Subsidiaries entered into separate investment advisory agreements with the Fund's investment advisor, NexPoint Advisors, L.P. (the "Adviser" or "NexPoint"), concurrent with their formation.

Preferred equity and mezzanine investments in real estate transactions come in various forms which may or may not be documented in the borrower's organizational documents. Generally, real estate preferred equity and/or mezzanine investments are typically junior to first mortgage financing but senior to the borrower's or sponsor's equity contribution. The investments are typically structured as an investment by a third-party investor in the real estate owner or various affiliates in the chain of ownership in exchange for a direct or indirect ownership interest in the real estate owner entitling it to a preferred/priority return on its investment. Sometimes, the investment is structured much like a loan where (i) "interest" on the investment is required to be paid monthly by the "borrower" regardless of available property cash flow; (ii) the entire investment is required to be paid by a certain maturity date; (iii) default rate "interest" and penalties are assessed against the "borrower" in the event payments are not made timely; and (iv) a default in the repayment of investment potentially results in the loss of management and/or ownership control by the "borrower" in the company in favor of the investor or other third-party.

In addition, subject to the 15% Limitation (as defined below), the Fund may invest up to 20% of its total assets in equity or debt securities other than real estate and real estate-related securities. The Adviser will evaluate each opportunity within the context of whether the Adviser believes the various real estate subsectors are within the

1

broader real estate cycle and tactically allocate among these opportunities. Also, the Adviser will select investments it believes offer the best potential outcomes and relative risk to assemble the most appropriate portfolio to meet the risk-adjusted return goals of the Fund. The Adviser has broad discretion to allocate the Fund's assets among equity or debt securities other than real estate and real estate-related securities and to change allocations as conditions warrant.

This portfolio construction strategy seeks to: (i) recognize and allocate capital based upon where the Adviser believes we are in the current real estate cycle; and (ii) minimize drawdowns during market downturns and maximize risk adjusted returns during all market cycles, though there can be no assurance that this strategy will achieve this objective. The Fund will rely on the expertise of the Adviser and its affiliates to determine the appropriate structure for structured credit investments, which may include bridge loans, common and preferred equity or other debt-like positions, as well as the acquisition of such instruments from banks, servicers or other third parties.

The Fund defines "real estate and real estate-related securities" to consist of common stock, convertible or non-convertible preferred stock, warrants, convertible or non-convertible secured or unsecured debt, and partnership or membership interests issued by:

- CMBS, RMBS and other real estate credit investments, which include existing first and second mortgages on real estate, either originated or acquired in the secondary market, and secured, unsecured and/or convertible notes offered by REOCs and REITs;

- publicly traded REITs managed by affiliated or unaffiliated asset managers and their foreign equivalents ("Public REITs");

- REOCs;

- private real estate investment funds managed by affiliated or unaffiliated institutional asset managers ("Private Real Estate Investment Funds");

- registered closed-end funds that invest principally in real estate (collectively, "Public Investment Funds");

- real estate exchange traded funds ("ETFs"); and

- publicly-registered non-traded REITs ("Non-Traded REITs") and private REITs, generally wholly-owned by the Fund or wholly-owned or managed by an affiliate.

REITs are pooled investment vehicles that invest primarily in income-producing real estate or real estate-related loans or interests, and REOCs are companies that invest in real estate and whose shares trade on public exchanges. Foreign REIT equivalents are entities located in jurisdictions that have adopted legislation substantially similar to the REIT tax provisions in that they provide for favorable tax treatment for the foreign REIT equivalent and require distributions of income to shareholders.

The Fund has not imposed limitations on the portion of its assets that may be invested in any of the categories outlined above other than certain Private Real Estate Investment Funds. The Fund, however, will limit its investments in Private Real Estate Investment Funds and any other investments that are excluded from the definition of "investment company" under the 1940 Act by Section 3(c)(1) or Section 3(c)(7) of the 1940 Act to no more than 15% of its net assets (the "15% Limitation"). Such entities are typically private equity funds and hedge funds. The 15% Limitation does not apply to any collateralized loan obligations ("CLOs"), certain of which may rely on Section 3(c)(1) or 3(c)(7) of the 1940 Act. For purposes of compliance with the 15% Limitation, the Fund will not count its direct investments in wholly-owned subsidiaries but will look through such subsidiaries and count their underlying holdings. The Fund may engage in short sales and securities lending.

2

*Leverage.* The Fund incurs leverage as part of its investment strategy. The Fund may also invest in private and public real estate investment funds or trusts, including real estate investment funds or trusts managed by affiliated or unaffiliated managers or entities wholly-owned by the Fund, that may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to higher levels of leverage than the Fund is permitted to, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities. The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement. The Fund's asset coverage ratio was 1,172% as of March 31, 2025. See "Risk Factors — Leverage Risk".

In addition to any indebtedness incurred by the Fund, any subsidiary of the Fund, including the REIT Subsidiaries, may also utilize leverage, including by mortgaging properties held by special purpose vehicles, or by acquiring property with existing debt. Any such borrowings will generally be the sole obligation of each respective special purpose vehicle, without any recourse to any other special purpose vehicle, the REIT Subsidiaries, the Fund or its assets, and the Fund will not treat such non-recourse borrowings as senior securities (as defined in the 1940 Act) for purposes of complying with the 1940 Act's limitations on leverage unless the financial statements of the special purpose vehicle, or the subsidiary of the Fund that owns such special purpose vehicle, will be consolidated in accordance with Regulation S-X and other accounting rules. If cash flow is insufficient to pay principal and interest on a special purpose vehicle's borrowings, a default could occur, ultimately resulting in foreclosure of any security instrument securing the debt and a complete loss of the investment, which could result in losses to the REIT Subsidiaries and, therefore, to the Fund. To the extent that any subsidiaries of the Fund, including the REIT Subsidiaries, directly incur leverage in the form of debt (as opposed to non-recourse borrowings made through special purpose vehicles), the amount of such recourse leverage used by the Fund and such subsidiaries, including the REIT Subsidiaries, will be consolidated and treated as senior securities for purposes of complying with the 1940 Act's limitations on leverage by the Fund. See "Investment Objective, Policies and Strategies."

*Policies.* The Fund's 80% policy with respect to investment in real estate and real estate-related securities is not fundamental and may be changed by the Fund's board of trustees (the "Board") without shareholder approval. However, shareholders will be given at least 60 days' notice prior to any change in the 80% Policy. The Fund's SAI contains a list of all of the fundamental and non-fundamental investment policies of the Fund under the heading, "Investment Objective and Policies." For purposes of the Fund's 80% policy, the Fund will invest only in Public Investment Funds and Private Real Estate Investment Funds that either: (1) have adopted a policy to invest, under normal circumstances, at least 80% of their net assets, plus borrowings for investment purposes, in real estate and real estate-related securities; or (2) do not have a stated 80% policy, but do invest, under normal circumstances, at least 80% of their net assets, plus borrowings for investment purposes, in real estate and real estate-related securities, as determined by the Adviser's review of their portfolio holdings, investment objectives and strategies. Prior to investing in an underlying fund that does not have a stated 80% policy, the Adviser will review the underlying fund's prospectus or offering memorandum, financial statements, and any available third party research, and may also meet with the underlying fund's management team in order to determine whether the underlying fund follows an 80% policy under normal circumstances. Following the Fund's investment in the underlying fund, the Adviser will continue to monitor the underlying fund on an ongoing basis, reviewing all relevant information as it becomes available. If at any point the Adviser has reason to believe that the underlying fund's investment strategy has changed, or that the underlying asset mix has changed in a way that no longer satisfies the 80% policy, the Adviser will immediately reclassify the investment for purposes of testing the Fund's compliance with its 80% policy. If the Fund were to temporarily fall out of compliance with its 80% Policy as a result of the reclassification of an underlying fund, the Fund would take one or more of the following actions in order to come back into compliance with its 80% Policy: (i) restricting additional investments that do not fall within the 80% Policy; (ii) selling one or more investments that are outside of the 80% Policy;

3

(iii) deploying new capital raised in the Offering in investments that fall within the 80% Policy; or (iv) if available, utilizing borrowings from a credit facility to make investments that fall within the 80% Policy.

The Fund concentrates investments in the real estate and real estate-related industry, meaning that, under normal circumstances, it invests 25% or more of its total assets in real estate and real estate-related industry securities. This policy is fundamental and may not be changed by the Board without shareholder approval. The Fund's SAI contains a list of all of the fundamental and non-fundamental investment policies of the Fund, under the heading "Investment Objective and Policies."

**Investment Adviser and Fees**

NexPoint Advisors, L.P., which serves as the investment adviser of the Fund, is registered with the SEC as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act") and is an affiliate of NexPoint Asset Management, L.P. ("NAM"). The Adviser also externally manages NexPoint Capital, Inc., a non-traded business development company (a "BDC"), NexPoint Event Driven Fund, NexPoint Merger Arbitrage Fund, and NexPoint Climate Tech Fund. NAM manages Highland Opportunities and Income Fund ("HFRO") and Highland Global Allocation Fund ("GAF"), registered closed-end funds whose shares trade on the NYSE.

The Adviser has entered into a Services Agreement with Skyview Group ("Skyview"), pursuant to which the Adviser will receive administrative and operational support services to enable it to provide the required advisory services to the Fund.

Certain Skyview personnel became dual-employees of NexPoint Services, Inc., a wholly-owned subsidiary of the Adviser. The same services are being performed by the dual-employees. The Adviser, and not the Fund, will compensate all Adviser, Skyview, and dual-employee personnel who provide services to the Fund.

The Adviser's senior management team has experience across private lending, private equity, real estate investing and other investment strategies. Collectively, the Adviser and its affiliates managed approximately $16.9 billion in assets as of December 31, 2024, including approximately $12.5 billion in gross real estate assets.

Pursuant to an investment advisory agreement with the Fund (the "Investment Advisory Agreement"), the Adviser receives a monthly fee at the annual rate of 1.25% of the Fund's Daily Gross Assets. Daily Gross Assets is defined in the Investment Advisory Agreement as total assets, including assets resulting from leverage, less any liabilities. For purposes of calculating the Fund's Daily Gross Assets, derivatives will be valued at their market value, not their notional value.

The Adviser and the Fund have entered into an expense limitation and reimbursement agreement (the "Expense Limitation Agreement") under which the Adviser has agreed contractually to waive its fees and to pay or absorb the ordinary operating expenses of the Fund (including organizational and offering expenses, but excluding distribution fees, interest, dividend expenses on short sales, brokerage commissions and other transaction costs, acquired fund fees and expenses, taxes, expenses payable by the Fund for third party administration services, litigation expenses and extraordinary expenses), to the extent that they exceed 1.75% per annum of the Fund's average Daily Gross Assets (the "Expense Limitation"). "Daily Gross Assets" is defined in the Expense Limitation Agreement as an amount equal to total assets, less any liabilities, but excluding liabilities evidencing leverage. If the Fund incurs expenses excluded from the Expense Limitation Agreement, the Fund's expense ratio would be higher and could exceed the Expense Limitation. In consideration of the Adviser's agreement to limit the Fund's expenses, the Adviser is entitled to recoup from the Fund the amount of any fees waived and Fund expenses paid or absorbed (other than organizational and initial offering expenses, which are those expenses incurred by the Fund in order to permit the Fund to be declared effective by the SEC and to commence

4

operations) to the extent that: (1) the reimbursement for fees and expenses will be made only if payable not more than three years from the date on which such fees are foregone or expenses are incurred by the Adviser; and (2) such recoupment does not cause the Fund's ordinary operating expenses plus recoupment to exceed the Expense Limitation in effect at the time the expenses were paid or waived or any Expense Limitation in effect at the time of recoupment. The Expense Limitation Agreement may not be amended or terminated for one year from the date of this Prospectus, unless approved by the Board. See "Management of the Fund."

The REIT Subsidiaries entered into separate investment advisory agreements with the Adviser in July 2016 and June 2022. To the extent fees are paid to the Adviser by the REIT Subsidiaries, such fees will be offset against fees otherwise payable by the Fund to the Adviser, such that shareholders of the Fund will only be subject to one layer of fees to the Adviser. Notwithstanding this arrangement, the Fund and its shareholders will indirectly bear the expenses associated with forming the REIT Subsidiaries, non-advisory fees paid by the REIT Subsidiaries (if any) and operating expenses, including maintaining their REIT qualification. To the extent the Fund forms one or more other REIT subsidiaries, it is expected that they will enter into separate investment advisory agreements that have substantially similar terms. The Fund may invest in funds not managed by an affiliate of the Adviser (including closed-end funds, ETFs, private funds, externally managed traded and non-traded REITs, etc.), in which case two layers of fees will be paid by the Fund.

**Transfer Agent and Fund Administrator/Sub-Administrator**

SS&C Technologies, Inc. ("SS&C") serves as the transfer agent of the Fund. The Adviser serves as the Fund's Administrator. SEI Global Funds Services ("SEI") serves as the Fund's Sub-Administrator. See "Management of the Fund."

**Distribution Fees**

Class C shares will pay to the Distributor a distribution fee (the "Distribution Fee") that will accrue at an annual rate equal to 0.75% of the Fund's average daily net assets attributable to Class C shares, and is payable on a quarterly basis. Class A and Class Z shares are not subject to a Distribution Fee. See "Plan of Distribution."

**Shareholder Servicing Fee**

The Fund (and, indirectly, the Class A and Class C shareholders) will pay a monthly shareholder servicing fee at an annual rate of up to 0.25% of the average daily net assets of Class A and Class C shares. The Fund will not pay a monthly shareholder servicing fee in connection with Class Z shares.

**Closed-End Fund Structure**

Closed-end funds differ from open-end management investment companies (commonly referred to as mutual funds) in that closed-end funds do not typically redeem their shares at the option of the shareholder. Rather, closed-end fund shares typically trade in the secondary market via a stock exchange. Unlike many closed-end funds, however, the Fund's shares will not be listed on a stock exchange. Instead, the Fund will operate as an interval fund, meaning that the Fund will provide limited liquidity to shareholders by offering to repurchase a limited amount of shares (at least 5%) on a quarterly basis, which is discussed in more detail below. An investment in the Fund is suitable only for investors who can bear the risks associated with the limited liquidity of the shares and should be viewed as a long-term investment. The Fund is subject to continuous asset in-flows, although not subject to continuous out-flows. The Board may, in the future, seek shareholder approval to list the Fund's shares on a national securities exchange depending on market conditions and other factors.

5

**Share Classes**

The Fund currently offers three different classes of shares: Class A, Class C, and Class Z shares. The Fund has received exemptive relief from the SEC to issue multiple classes of shares and to impose asset-based distribution fees and early-withdrawal charges (also described as contingent deferred sales charges, or "CDSCs," in this Prospectus). An investment in any share class of the Fund represents an investment in the same assets of the Fund. However, the purchase restrictions and ongoing fees and expenses for each share class are different. The fees and expenses for the Fund are set forth in "Fees and Fund Expenses." If an investor has hired an intermediary and is eligible to invest in more than one class of shares, the intermediary may help determine which share class is appropriate for that investor. When selecting a share class, you should consider which share classes are available to you, how much you intend to invest, how long you expect to own shares, and the total costs and expenses associated with a particular share class.

Each investor's financial considerations are different. You should speak with your financial advisor to help you decide which share class is best for you. Not all Financial Intermediaries (as defined below) offer all classes of shares. If your Financial Intermediary offers more than one class of shares, you should carefully consider which class of shares to purchase.

**Investor Suitability**

An investment in the Fund involves a considerable amount of risk. It is possible that you may lose money. An investment in the Fund is suitable only for investors who can bear the risks associated with the limited liquidity of the shares and should be viewed as a long-term investment. Before making your investment decision, you should: (i) consider the suitability of this investment with respect to your investment objectives and personal financial situation; and (ii) consider factors such as your personal net worth, income, age, risk tolerance and liquidity needs.

**Repurchases of Shares**

The Fund is an interval fund and, as such, has adopted a fundamental policy to make quarterly repurchase offers, at NAV, of no less than 5% of the shares outstanding. There is no guarantee that shareholders will be able to sell all of the shares they desire in a quarterly repurchase offer because shareholders, in total, may wish to sell more than 5% of the Fund's shares. If the amount of repurchase requests exceeds the number of shares the Fund offers to repurchase, the Fund will repurchase shares on a pro rata basis. Limited liquidity will be provided to shareholders only through the Fund's quarterly repurchases. The Fund will maintain liquid securities or cash or, if available, will borrow in amounts sufficient to meet quarterly redemption requirements. See "Quarterly Repurchases of Shares."

**Summary of Risks**

Investing in the Fund involves risks, including the risk that you may receive little or no return on your investment or that you may lose part or all of your investment. Consequently, you can lose money by investing in the Fund. No assurance can be given that the Fund will achieve its investment objective, and investment results may vary substantially over time and from period to period. An investment in the Fund is not appropriate for all investors. Each risk summarized below is a principal risk of investing in the Fund, and different risks may be more significant at different times depending upon market conditions or other factors.

An investment in the Fund is not a deposit of any bank and is not insured or guaranteed by the Federal Deposit Insurance Corporation ("FDIC") or any other government agency.

***Substantial Conflicts of Interest.*** As a result of the Fund's arrangements with NexPoint, there may be times when NexPoint or its affiliates have interests that differ from those of the Fund's shareholders, giving rise to a

6

conflict of interest. The Fund's officers serve or may serve as officers, directors or principals of entities that operate in the same or a related line of business as the Fund does, or of investment funds managed by the Adviser or its affiliates. Similarly, the Adviser or its affiliates may have other clients with similar, different or competing investment objectives. In serving in these multiple capacities, they may have obligations to other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund or its shareholders. For example, the Fund's officers have, and will continue to have, management responsibilities for other investment funds, accounts or other investment vehicles managed or sponsored by the Adviser and its affiliates.

The Fund's investment objective may overlap, in part or in whole, with the investment objective of such affiliated investment funds, accounts or other investment vehicles.

As a result, those individuals may face conflicts in the allocation of investment opportunities among the Fund and other investment funds or accounts advised by or affiliated with the Adviser. The Adviser will seek to allocate investment opportunities among eligible accounts in a manner that is fair and equitable over time and consistent with its allocation policy. However, the Fund can offer no assurance that such opportunities will be allocated to it fairly or equitably in the short-term or over time. In addition, it is anticipated that a significant portion of the Fund's assets will be represented by securities sponsored, organized and/or managed by the Adviser and its affiliates, which may include REITs, asset-backed securities and/or structured finance securities. The Adviser will monitor for conflicts of interest in accordance with its fiduciary duties and will provide the independent trustees of the Fund with an opportunity to periodically review the Fund's investments in such REITs, asset-backed securities and/or structured finance securities and assure themselves that continued investment in such securities remains in the best interests of the Fund and its shareholders. Please see "Risk Factors — Conflicts of Interest" for a description of risks associated with conflicts of interest.

***Closed-End Fund ("CEF") Risk.*** The Fund is a CEF. CEFs differ from open-end management investment companies (commonly referred to as mutual funds) in that CEFs may list their shares for trading on a securities exchange and do not redeem their shares at the option of the shareholder. By comparison, mutual funds issue securities redeemable at net asset value at the option of the shareholder and typically engage in a continuous offering of their shares. Mutual funds are subject to continuous asset in-flows and out-flows that can complicate portfolio management, whereas CEFs generally can stay more fully invested in securities consistent with the CEF's investment objective and policies. In addition, in comparison to open-end funds, CEFs have greater flexibility in their ability to make certain types of investments, including investments in illiquid securities.

***Concentration in Real Estate Securities Risk.*** The Fund will not invest in real estate directly, but, because the Fund will concentrate its investments in investment vehicles that invest principally in real estate and real estate-related securities, its portfolio will be significantly impacted by the performance of the real estate market and may experience more volatility and be exposed to greater risk than a more diversified portfolio. The values of companies engaged in the real estate industry are affected by: (i) changes in general economic and market conditions; (ii) changes in the value of real estate properties; (iii) risks related to local economic conditions, overbuilding and increased competition; (iv) increases in property taxes and operating expenses; (v) changes in zoning laws; (vi) casualty and condemnation losses; (vii) variations in rental income, neighborhood values or the appeal of property to tenants; (viii) the availability of financing; and (ix) changes in interest rates and leverage.

***Mortgage-Backed Securities Risk.*** Mortgage-backed securities are bonds which evidence interests in, or are secured by, commercial or residential mortgage loans, as the case may be. Accordingly, mortgage-backed securities are subject to all of the risks of the underlying mortgage loans. In a rising interest rate environment, the value of mortgage-backed securities may be adversely affected when payments on underlying mortgages do not occur as anticipated. The value of mortgage-backed securities may also change due to shifts in the market's perception of issuers and regulatory or tax changes adversely affecting the mortgage securities markets as a

7

CONFIDENTIAL                                              TDIT005246

whole. In addition, mortgage-backed securities are subject to the credit risk associated with the performance of the underlying commercial or residential mortgage properties. Mortgage-backed securities are also subject to several risks created through the securitization process.

The Fund may invest in the residual or equity tranches of CMBS, which are referred to as subordinate CMBS and interest-only CMBS. Subordinate CMBSs are paid interest only to the extent there are funds available to make payments. There are multiple tranches of CMBS, offering investors various maturity and credit risk characteristics. Tranches are categorized as senior, mezzanine, and subordinated/equity, according to their degree of risk. The most senior tranche of a CMBS has the greatest collateralization and pays the lowest interest rate. If there are defaults or the collateral otherwise underperforms, scheduled payments to senior tranches take precedence over those of mezzanine tranches, and scheduled payments to mezzanine tranches take precedence over those to subordinated/equity tranches. Lower tranches represent lower degrees of credit quality and pay higher interest rates intended to compensate for the attendant risks. The return on the lower tranches is especially sensitive to the rate of defaults in the collateral pool. The lowest tranche (i.e. the "equity" or "residual" tranche) specifically receives the residual interest payments (i.e., money that is left over after the higher tranches have been paid and expenses of the issuing entities have been paid) rather than a fixed interest rate. As a result, interest only CMBS possess the risk of total loss of investment in the event of prepayment of the underlying mortgages. There is no limit on the portion of the Fund's total assets that may be invested in interest-only multifamily CMBS.

The Fund also may invest in interest-only multifamily CMBS issued by multifamily mortgage loan securitizations. However, these interest-only multifamily CMBS typically only receive payments of interest to the extent that there are funds available in the securitization to make the payment and may introduce increased risks since these securities have no underlying principal cash flows.

*Debt Securities Risk.* When the Fund invests in debt securities, the value of your investment in the Fund will fluctuate with changes in interest rates. Typically, a rise in interest rates causes a decline in the value of debt securities. In general, the market price of debt securities with longer maturities will increase or decrease more in response to changes in interest rates than shorter-term securities. Other risk factors include credit risk (the debtor may default) and prepayment risk (the debtor may pay its obligation early, reducing the amount of interest payments). These risks could affect the value of a particular investment, possibly causing the Fund's share price and total return to be reduced or fluctuate more than other types of investments. This kind of market risk is generally greater for funds investing in debt securities with longer maturities.

*Non-Payment Risk.* Debt securities are subject to the risk of non-payment of scheduled interest and/or principal. Nonpayment would result in a reduction of income to the Fund, a reduction in the value of the security experiencing nonpayment and a potential decrease in the NAV of the Fund. There can be no assurance that the liquidation of any collateral would satisfy the borrower's obligation in the event of non-payment of scheduled interest or principal payments, or that such collateral could be readily liquidated.

*Securities Market Risk.* An investment in the Fund's shares is subject to investment risk, including the possible loss of the entire principal amount invested. An investment in the Fund's shares represents an indirect investment in the securities owned by the Fund. The value of these securities, like other market investments, may move up or down, sometimes rapidly and unpredictably, due to factors affecting particular companies or the securities markets generally. Economic, political and financial conditions, industry or economic trends and developments or public health risks, such as epidemics or pandemics, may, from time to time, and for varying periods of time, cause volatility, illiquidity or other potentially adverse effects in the financial markets. The value of your shares at any point in time may be worth less than the value of your original investment, even after taking into account any reinvestment of dividends and distributions.

8

*Illiquid and Restricted Securities***.** The Fund may not be able to readily dispose of illiquid securities at prices that approximate those at which the Fund could sell such securities if they were more widely traded and, as a result of such illiquidity, the Fund may have to sell other investments or engage in borrowing transactions if necessary to raise cash to meet its obligations.

*Distribution Policy Risk.* The Fund's distribution policy may, under certain circumstances, have certain adverse consequences to the Fund and its shareholders because it may result in a return of capital resulting in less of a shareholder's assets being invested in the Fund and, over time, increase the Fund's expense ratio. The distribution policy also may cause the Fund to sell a security at a time it would not otherwise do so in order to manage the distribution of income and gain. Pending the investment of the net proceeds in accordance with the investment objective and policies, all or a portion of the Fund's distributions may consist of a return of capital (i.e. from your original investment).

*Public and Private Investment Funds Risk.* For investments in Public Investment Funds and Private Real Estate Investment Funds not managed by the Adviser or its affiliates, Fund shareholders will bear two layers of fees and expenses: asset-based fees and expenses at the Fund level, and asset-based fees, incentive allocations or fees and expenses at the Public Investment Fund or Private Real Estate Investment Fund level. The Fund's performance depends, in part, upon the performance of the Public Investment Fund and Private Real Estate Investment Fund managers and their selected strategies, the adherence by such managers to such selected strategies, the instruments used by such managers, and the Adviser's ability to select managers and strategies and effectively allocate Fund assets among them.

Private Real Estate Investment Funds are not publicly traded and therefore are not liquid investments. To determine the value of the Fund's investments in Private Real Estate Investment Funds, the Adviser considers, among other things, information provided by the Private Real Estate Investment Funds, including quarterly unaudited financial statements, which if inaccurate could adversely affect the Adviser's ability to accurately value the Fund's shares. In addition to valuation risk, shareholders of Private Real Estate Investment Funds are not entitled to the protections of the 1940 Act.

To the extent the Fund invests in Private Real Estate Investment Funds managed by the Adviser or its affiliates, fees paid at the Private Real Estate Investment Fund level will be reimbursed to the Fund so that shareholders will only pay fees at the Fund level.

*REIT Risk***.** REITs may be affected by changes in the real estate markets generally as well as changes in the values of the properties owned by the REIT or securing the mortgages owned by the REIT. REITs are dependent upon management skill and are not diversified. REITs are also subject to heavy cash flow dependency, defaults by borrowers, self-liquidation, and the possibility of failing to qualify for favorable tax treatment under the Internal Revenue Code of 1986, as amended (the "Code"), and to maintain an exemption under the 1940 Act. Finally, certain REITs may be self-liquidating at the end of a specified term, and run the risk of liquidating at an economically inopportune time.

*Non-Traded REIT Risk***.** Non-traded REITs are subject to the following risks in addition to those described in "REIT Risk." Non-Traded REITs are subject to significant commissions, expenses, and organizational and offering costs that reduce the value of an investor's (including the Fund's) investment. Non-Traded REITs are not liquid, and investments in Non-Traded REITs may not be accessible for an extended period of time. There is no guarantee of any specific return on the principal amount or the repayment of all or a portion of the principal amount invested in Non-Traded REITs. In addition, there is no guarantee that investors (including the Fund) will receive distributions. Distributions from Non-Traded REITs may be derived from sources other than cash flow from operations, including the proceeds of the offering, from borrowings, or from the sale of assets. Payments of distributions from sources other than cash flow from operations will decrease or diminish an investor's interest.

9

***Private REIT Risk.*** Private REITs are subject to the following risks in addition to those described in "Public and Private Real Estate Investment Funds Risk" and "REIT Risk." Private REITS are unlisted, making them more difficult to value and trade. Moreover, private REITs generally are exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), and, as such, are not subject to the same disclosure requirements as Public REITs and Non-Traded REITs, which makes private REITs more difficult to evaluate from an investment perspective. In addition, Private REITs may not have audited financial statements.

***ETF Risk.*** The value of ETFs can be expected to increase and decrease in value in proportion to increases and decreases in the indices that they are designed to track. The volatility of different index tracking stocks can be expected to vary in proportion to the volatility of the particular index they track. ETFs are traded similarly to stocks of individual companies. Although an ETF is designed to provide investment performance corresponding to its index, it may not be able to exactly replicate the performance of its index because of its operating expenses and other factors. The underlying indices that an ETF is designed to track may also experience volatility due to disruptive events, such as natural disasters, pandemic or epidemics or other widespread health crises. Any such impact could adversely affect the Fund's performance and may lead to losses on your investment in the Fund. Because ETFs trade on a securities exchange, extreme market volatility or potential lack of an active trading market for an ETF's shares may trade at a premium or discount to their net asset value. The Fund's investment in shares of ETFs subject it to the risks of owning the securities underlying the ETF, as well as certain structural risks, including authorized participant concentration risk, market maker risk, premium/discount risk and trading issues risk. As a shareholder in an ETF, the Fund bears its proportionate share of the ETF's expenses.

***Issuer Risk.*** The value of a specific security can perform differently from the market as a whole for reasons related to the issuer, such as management performance, financial leverage and reduced demand for the issuer's goods and services.

***Leverage Risk.*** Leverage creates a greater risk of loss, as well as a potential for more gain, for the Fund's shares than if leverage were not used. The use of leverage, such as borrowing money to purchase securities, will cause the Fund or a Public Investment Fund or Private Real Estate Investment Fund in which the Fund has invested, to incur additional expenses and significantly magnify the Fund's losses in the event of underperformance of the Fund's (or Public Investment Fund's or Private Real Estate Investment Fund's) underlying investments. Interest on borrowings (or dividends on preferred shares) may be at a fixed or floating rate and generally will be based on short-term rates. Interest payments and fees incurred in connection with such borrowings will reduce the amount of distributions available to the Fund's shareholders. As long as the rate of return, net of applicable Fund expenses, on the Fund's portfolio investments purchased with leverage exceeds the costs associated with such leverage, the Fund will generate more return or income than will be needed to pay such costs. In this event, the excess will be available to pay higher dividends to the Fund's shareholders. Conversely, if the Fund's return on such assets is less than the cost of leverage and other Fund expenses, the return to the Fund's shareholders shares will diminish or may be eliminated altogether. To the extent that the Fund uses leverage, the net asset value of the Fund's shares and the yield to the Fund's shareholders will be more volatile. The Fund's leveraging strategy may not be successful. The Fund's investments in Public Investment Funds and REITs managed by affiliated or unaffiliated institutional asset managers may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to the higher levels of leverage than the Fund is permitted to incur itself, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities. The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement. The Fund's asset coverage ratio was 1,172% as of March 31, 2025.

In addition, a lender to the Fund or a Private Real Estate Investment Fund or a Public Investment Fund may terminate or refuse to renew any credit facility. If the Fund or Private Real Estate Investment Fund or a Public Investment Fund is unable to access additional credit, it may be forced to sell investments at inopportune times,

10

**CONFIDENTIAL**                                                          **211**

TDIT005249

which may further reduce the amount of distributions available to Fund shareholders. The Fund's investments in Public Investment Funds and REITs managed by affiliated or unaffiliated institutional asset managers may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to higher levels of leverage than the Fund is permitted to incur itself, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities. See "Risk Factors — Leverage Risk".

*Reverse Repurchase Agreement Risk.* The Fund may enter into reverse repurchase transactions with Mizuho or other banks and securities dealers. A reverse repurchase transaction is a repurchase transaction in which the Fund is the seller of, rather than the investor in, securities or other assets and agrees to repurchase them at a date certain or on demand. Use of a reverse repurchase transaction may be preferable to a regular sale and later repurchase of securities or other assets because it avoids certain market risks and transaction costs. Reverse repurchase transactions involve the risk that the market value of securities and/or other assets purchased by the Fund with the proceeds received by the Fund in connection with such reverse repurchase transactions may decline below the market value of the securities the Fund is obligated to repurchase under such transactions. They also involve the risk that the counterparty may liquidate the securities delivered to it by the Fund under the reverse repurchase agreement following the occurrence of an event of default by the Fund under the reverse repurchase agreement. At the time when the Fund enters into a reverse repurchase transaction, liquid securities (e.g., cash, U.S. Government securities or other "high grade" debt obligations) of the Fund having a value at least as great as the Purchase Price of the securities to be purchased will be segregated on the books of the Fund throughout the period of the obligation. The use of these investment strategies may increase net asset value fluctuation.

*Liquidity Risk.* There is currently no secondary market for the shares and the Fund expects that no secondary market will develop. Limited liquidity is provided to shareholders only through the Fund's quarterly repurchase offers for no less than 5% of the shares outstanding at NAV. There is no guarantee that shareholders will be able to sell all of the shares they desire in a quarterly repurchase offer. The Fund's investments are also subject to liquidity risk. Liquidity risk exists when particular investments of the Fund would be difficult to purchase or sell, possibly preventing the Fund from selling such illiquid securities at an advantageous time or price, or possibly requiring the Fund to dispose of other investments at unfavorable times or prices in order to satisfy its obligations. Funds with principal investment strategies that involve securities of companies with smaller market capitalizations, derivatives or securities with substantial market and/or credit risk tend to have the greatest exposure to liquidity risk.

*Management Risk.* Management Risk is the risk associated with the fact that the Fund relies on the Adviser's ability to achieve its investment objective. The Adviser may be incorrect in its assessment of the intrinsic value of the companies whose securities the Fund holds, which may result in a decline in the value of Fund shares and failure to achieve its investment objective.

*Medium and Small Capitalization Company Risk.* Compared to investment companies that focus only on large capitalization companies, the Fund's NAV may be more volatile because it also invests in medium and small capitalization companies. Compared to larger companies, medium and small capitalization companies are more likely to have: (i) more limited product lines or markets and less mature businesses; (ii) fewer capital resources; (iii) more limited management depth; and (iv) shorter operating histories. Further, compared to larger companies, the securities of small and medium capitalization companies are more likely to experience more significant changes in market values, be harder to sell at times and at prices that the Adviser believes appropriate, and offer greater potential for gains and losses.

*Non-Diversification Risk.* While the Adviser intends to invest in a number of real estate and real estate-related securities issued by different issuers and employ multiple investment strategies with respect to the Fund's investment portfolio, it is possible that a significant amount of the Fund's investments could be invested in the

11

instruments of only a few companies or other issuers or that at any particular point in time one investment strategy could be more heavily weighted than the others. The focus of the Fund's investment portfolio in any one issuer would subject the Fund to a greater degree of risk with respect to defaults by such issuer or other adverse events affecting that issuer, and the focus of the portfolio in any one industry or group of industries would subject the Fund to a greater degree of risk with respect to economic downturns relating to such industry or industries.

*Valuation Risk.* Portfolio securities may be valued using techniques other than market quotations, under the circumstances described under "Determination of Net Asset Value." The value established for a portfolio security may be different than what would be produced through the use of another methodology or if it had been priced using market quotations. Portfolio securities that are valued using techniques other than market quotations, including "fair valued" securities, may be subject to greater fluctuation in their value from one day to the next than would be the case if market quotations were used. In addition, there is no assurance that the Fund could sell a portfolio security for the value established for it at any time and it is possible that the Fund would incur a loss because a portfolio security is sold at a discount to its established value.

Fair value is defined as the amount for which assets could be sold in an orderly disposition over a reasonable period of time, taking into account the nature of the asset. Fair value pricing, however, involves judgments that are inherently subjective and inexact, since fair valuation procedures are used only when it is not possible to be sure what value should be attributed to a particular asset or when an event will affect the market price of an asset and to what extent. As a result, fair value pricing may not reflect actual market value, and it is possible that the fair value determined for a security will be materially different from the value that actually could be or is realized upon the sale of that asset.

*Equity Securities Risk.* The market prices of equity securities owned by the Fund may fall over short or long periods of time. In addition, equity securities represent a share of ownership in a company, and rank after bonds and preferred stock in their claim on the company's assets in the event of bankruptcy.

*Preferred Securities Risk.* Preferred securities are subject to credit risk and interest rate risk. Interest rate risk is, in general, that the price of a debt security falls when interest rates rise. Securities with longer maturities tend to be more sensitive to interest rate changes. Credit risk is the risk that an issuer of a security may not be able to make principal and interest or dividend payments on the security as they become due. The credit quality of preferred stock and convertible securities held by the Fund may be lowered if an issuer's financial condition changes, leading to greater volatility in the price of the security. Holders of preferred securities may not receive dividends, or the payment can be deferred for some period of time. In bankruptcy, creditors are generally paid before the holders of preferred securities. Preferred stock, which may include preferred stock in real estate transactions, represents an equity or ownership interest in an issuer that pays dividends at a specified rate and that has precedence over common stock in the payment of dividends.

*Repurchase Policy Risks.* Quarterly repurchases by the Fund of its shares typically will be funded from available cash or sales of portfolio securities. However, payment for repurchased shares may require the Fund to liquidate portfolio holdings earlier than the Adviser otherwise would liquidate such holdings, potentially resulting in losses, and may increase the Fund's portfolio turnover. The Adviser may take measures to attempt to avoid or minimize such potential losses and turnover, and instead of liquidating portfolio holdings, may borrow money to finance repurchases of shares. If the Fund borrows to finance repurchases, interest on any such borrowings will negatively affect shareholders who do not tender their shares in a repurchase offer by increasing the Fund's expenses and reducing net investment income. The Fund's quarterly repurchase offers are a shareholder's only means of liquidity with respect to his or her shares.

*Short Sales Risk.* Short sales risk is the risk of loss associated with any appreciation on the price of a security borrowed in connection with a short sale. The Fund may engage in short sales that are not made

12

"against-the-box," which means that the Fund may sell short securities even when they are not actually owned or otherwise covered at all times during the period the short position is open. Short sales that are not made "against-the-box" involve unlimited loss potential since the market price of securities sold short may continuously increase.

***Securities Lending Risk.*** Securities lending risk is the risk that the Fund may make secured loans of its portfolio securities. Any decline in the value of a portfolio security that occurs while the security is out on loan is borne by the Fund, and will adversely affect performance. Also, there may be delays in recovery of securities loaned, losses in the investment of collateral, and loss of rights in the collateral should the borrower of the securities fail financially while holding the security.

***Risks Relating to Fund's Tax Status.*** To remain eligible for the favorable tax treatment accorded to regulated investment companies ("RICs") and their shareholders under the Code, the Fund must meet certain source of income, asset diversification and annual distribution requirements. If the Fund were to fail to comply with the income, diversification or distribution requirements, all of its taxable income regardless of whether timely distributed to shareholders would be subject to fund-level tax at the applicable corporate income tax rate and all of its distributions from earnings and profits (including from net long-term capital gains) would be taxable to shareholders as ordinary income. In any such event, the resulting corporate taxes could substantially reduce the Fund's net assets, the amount of income available for distribution and the amount of its distributions. Any such failure would have a material adverse effect on the Fund and its shareholders.

***RIC-Related Risks of Investments Generating Non-Cash Taxable Income.*** Certain of the Fund's investments will require the Fund to recognize taxable income in a taxable year in excess of the cash received from those investments during that year. In particular, the Fund expects that a portion of its investments in loans and bonds will be treated as having "market discount" and/or "original issue discount" for U.S. federal income tax purposes, which, in some cases, could be significant. Because the Fund may be required to recognize income in respect of these investments before or without receiving cash representing such income, the Fund may have difficulty satisfying the annual distribution requirements applicable to RICs and avoiding Fund-level U.S. federal income or excise taxes. Accordingly, the Fund may be required to sell portfolio securities, including at potentially disadvantageous times or prices, raise additional debt or equity capital, or reduce new investments, to obtain the cash needed to make the necessary income distributions. If the Fund liquidates portfolio securities to raise cash, the Fund may realize gain or loss on such liquidations; in the event the Fund realizes net long-term or short-term capital gains from such liquidation transactions, its shareholders may receive larger capital gain or ordinary dividends, respectively, than they would in the absence of such transactions.

***REIT Tax Risk for REIT Subsidiaries.*** The REIT Subsidiaries and any REIT subsidiary the Fund may form in the future will elect to be taxed as REITs beginning with the first year in which they commence material operations. In order for each REIT Subsidiary and any future REIT subsidiary to qualify and maintain its qualification as a REIT, it must satisfy certain requirements set forth in the Code and Treasury Regulations that depend on various factual matters and circumstances. The Fund and the Adviser intend to cause the REIT Subsidiaries and any future REIT subsidiaries to structure their activities in a manner designed to satisfy all of these requirements. However, the application of such requirements is not entirely clear, and it is possible that the Internal Revenue Service ("IRS") may interpret or apply those requirements in a manner that jeopardizes the ability of such REIT subsidiary to satisfy all of the requirements for qualification as a REIT.

If any REIT Subsidiary or future REIT subsidiary fails to qualify as a REIT for any taxable year that it is operational and does not qualify for certain statutory relief provisions, it will be subject to U.S. federal income tax on its taxable income at the applicable corporate income tax rate. In addition, it will generally be disqualified from treatment as a REIT for the four taxable years following any taxable year in which it fails to qualify as a REIT.

13

CONFIDENTIAL                                              TDIT005252

**U.S. Federal Income Tax Matters**

The Fund has elected to be taxed for U.S. federal income tax purposes, and intends to continue to qualify annually, as a RIC under Subchapter M of the Code. As a RIC, the Fund generally will not be subject to fund-level U.S. federal income taxes on any ordinary income or capital gain that it timely distributes to its shareholders from its taxable earnings and profits. Even if the Fund qualifies as a RIC, it generally will be subject to U.S. federal corporate income tax on its undistributed taxable income and could be subject to U.S. federal excise, state, local and foreign taxes. To maintain RIC tax treatment, the Fund must meet specified source-of-income and asset diversification requirements and distribute annually at least the sum of 90% of its ordinary income and net short-term capital gain in excess of net long-term capital loss, if any, and 90% of net exempt interest income. See "U.S. Federal Income Tax Matters."

**Distribution Policy**

The Fund's distribution policy is to make monthly distributions to shareholders. The Board has the ultimate discretion as to whether such distributions will be in stock or in cash. However, this distribution policy is subject to change and there is no guarantee the target rate will be achieved. Unless a shareholder elects otherwise, the shareholder's distributions will be reinvested in additional shares under the Fund's distribution reinvestment policy. Shareholders who elect not to participate in the Fund's distribution reinvestment policy will receive all distributions in cash paid to the shareholder of record (or, if the shares are held in street or other nominee name, then to such nominee). The Fund's historical distributions approved by the Board may be found on the Fund's website, located at https://www.nexpoint.com/funds/nexpoint-real-estate-strategies-fund/. See "Distribution Policy" and "Distribution Reinvestment Policy."

**Custodian**

The Bank of New York Mellon ("BNY Mellon") serves as the Fund's custodian. See "Management of the Fund."

14

**FEES AND FUND EXPENSES**

The following table is intended to assist you in understanding the costs and expenses that an investor in this offering will bear directly or indirectly.

| | Class A Shares | Class C Shares | Class Z Shares |
|---|---|---|---|
| **Shareholder Transaction Expenses** | | | |
| Maximum Sales Load (as a percent of offering price)[1] | 5.75% | None | None |
| Contingent Deferred Sales Charge[2] | 1.00% | 1.00% | None |
| Exchange Fee | None | None | None |
| **Annual Expenses (as a percentage of net assets attributable to shares)** | | | |
| Management Fees | 1.25% | 1.25% | 1.25% |
| Interest Payments on Borrowed Funds[3] | 0.80% | 0.80% | 0.80% |
| Dividends and Fees on Securities Sold Short | 0.46% | 0.46% | 0.46% |
| Other Expenses[3] | 1.24% | 1.24% | 1.24% |
| Distribution Fee[4] | None | 0.75% | None |
| Shareholder Servicing Fee[5] | 0.25% | 0.25% | None |
| Total Annual Expenses | 4.00% | 4.75% | 3.75% |
| Fee Waiver and Reimbursement[6] | 0.74% | 0.74% | 0.74% |
| Total Annual Expenses (after fee waiver and reimbursement)[7] | 3.26% | 4.01% | 3.01% |

1.  A portion of the sales load payable on Class A shares will be a reallowance to participating broker-dealers (see page 77 of this Prospectus). In addition, up to 0.75% of this sales load will be paid to the Fund's Distributor. There are no sales loads on reinvested distributions. The Fund reserves the right to waive broker commissions.
2.  Class A shares purchased without an initial sales charge in accounts aggregating $500,000 or more may be subject to a 1.00% CDSC on shares redeemed during the first 18 months after their purchase. Class C shares are subject to a 1.00% CDSC for redemptions of shares within 18 months after their purchase.
3.  As of December 31, 2024, the Fund employed leverage in an amount equal to 8% of net assets. The Fund may employ leverage going forward. This variable rate is based on current interest rates under the Fund's committed facility and is subject to change. The interest rate will increase in rising interest rate environments and, therefore, the actual interest rate expense borne by Fund shareholders will increase over time in a rising interest rate environment. While the Fund has no present intention to issue preferred shares within the next twelve months, if an attractive preferred shares financing opportunity were to come to the Fund's attention during that period, the Fund may consider that opportunity. See "Principal Risks of the Fund — Leverage Risk" in the Prospectus for a brief description of the Fund's Repurchase Agreement with Mizuho.
4.  Class C shares will pay to the Distributor a Distribution Fee that will accrue at an annual rate equal to 0.75% of the average daily net assets attributable to Class C shares, and is payable on a quarterly basis. These Distribution fees may be paid to broker or Financial Intermediaries as compensation to sell Fund shares. Class A and Class Z shares are not subject to a Distribution Fee. See "Plan of Distribution."
5.  Shareholder Servicing Fees may be used to compensate financial industry professionals for providing ongoing services in respect of clients with whom they have distributed shares of the Fund. Please refer to page 79 of this Prospectus for information.
6.  The Adviser and the Fund have entered into an Expense Limitation Agreement under which the Adviser has agreed contractually to waive its fees and to pay or absorb the ordinary annual operating expenses of the Fund (including organizational and offering expenses, but excluding distribution fees, interest, dividend expenses on short sales, brokerage commissions and other transaction costs, acquired fund fees and expenses, taxes, expenses payable by the Fund for third party administration services, litigation expenses and extraordinary expenses), to the extent that they exceed 1.75% per annum of the Fund's average Daily

15

Gross Assets (the "Expense Limitation"). If the Fund incurs expenses excluded from the Expense Limitation Agreement, the Fund's expense ratio would be higher and could exceed the Expense Limitation. In consideration of the Adviser's agreement to limit the Fund's expenses, the Adviser is entitled to recoup from the Fund the amount of any fees waived and Fund expenses paid or absorbed (other than organizational and initial offering expenses, which are those expenses incurred by the Fund in order to permit the Fund to be declared effective by the SEC and to commence operations) to the extent that: (1) the reimbursement for fees and expenses will be made only if payable not more than three years from the date on which such fees are foregone or expenses are incurred by the Adviser; and (2) such recoupment does not cause the Fund's ordinary operating expenses plus recoupment to exceed the Expense Limitation in effect at the time the expenses were paid or waived or any Expense Limitation in effect at the time of recoupment. The Expense Limitation Agreement will remain in effect until at least May 1, 2026 unless and until the Board approves its modification or termination. The Expense Limitation Agreement may not be amended or terminated unless approved by the Board. See "Management of the Fund." "Fee Waiver and Reimbursement" have been restated from fiscal year amounts to reflect current fees and expenses.

7. The value included in the "Total Annual Expenses" line item corresponds to the Expense Limitation pursuant to the Expense Limitation Agreement. The value in the "Fees and Fund Expenses" table is presented as a percentage of net assets, while the Expense Limitation, pursuant to the Expense Limitation Agreement, is calculated based on average Daily Gross Assets, but converted and expressed as a percentage of net assets for purposes of the fees and fund expenses table presentation. "Total Annual Expenses (after fee waiver and reimbursement)" have been restated from fiscal year amounts to reflect current fees and expenses.

The Fees and Fund Expenses Table describes the fees and expenses that you may pay if you buy and hold shares of the Fund. You may qualify for sales charge discounts on purchases of shares if you and your family invest, or agree to invest in the future, at least $50,000 in the Fund. More information about these and other discounts is available from your financial professional and in the "Plan of Distribution — Purchasing Shares" section of this Prospectus. More information about management fees, fee waivers and other expenses is available in the "Management of the Fund" section of this Prospectus.

16

## EXAMPLE

The following example illustrates the hypothetical expenses that you would pay on a $1,000 investment assuming annual expenses attributable to shares remain unchanged and shares earn a 5% annual return. The example reflects total annual expenses after fee waivers and expense reimbursements for the one-year period and the first year of the three-, five-, and ten-year periods:

| Example | 1 Year | 3 Years | 5 Years | 10 Years |
|---|---|---|---|---|
| Class A Shares | $ 88 | $ 166 | $ 245 | $ 450 |
| Class C Shares | | | | |
| If you do not sell your shares | $ 40 | $ 136 | $ 233 | $ 477 |
| If you sold all of your shares at the end of the period | $ 50 | $ 136 | $ 233 | $ 477 |
| Class Z Shares | $ 30 | $ 108 | $ 187 | $ 395 |

**The example should not be considered a representation of actual future expenses. Actual expenses may be higher or lower than those shown.**

If shareholders request repurchase proceeds be paid by wire transfer, such shareholders will be assessed an outgoing wire transfer fee at prevailing rates charged by SS&C, currently $10.00. The purpose of the above table is to help a holder of shares understand the fees and expenses that such holder would bear directly or indirectly. There can be no assurance that the Expense Limitation Agreement will be renewed. In the event the Expense Limitation Agreement is terminated by either party, investors will likely bear higher expenses.

17

**CONFIDENTIAL** **TDIT005256**

FSD2025-0116                    **Page 303 of 1530**                    2025-08-19

**FINANCIAL HIGHLIGHTS**

The following Financial Highlights table is intended to help you understand the Fund's financial performance since inception. Certain information reflects the financial results for a single Fund share. The total returns in the tables represent the rate that an investor would have earned or lost on an investment in the Fund (assuming reinvestment of all dividends and distributions). This information for the years ended December 31, 2024, 2023, 2022, 2021 and 2020 has been audited by Cohen & Company, Ltd., an independent registered public accounting firm. Financial statements for the fiscal year ended December 31, 2024 and the Report of the Independent Registered Public Accounting Firm thereon appear in the Fund's Annual Report for the Fiscal Year Ended December 31, 2024, which is incorporated by reference into the Statement of Additional Information and available from the Fund upon request. The Fund's performance has been enhanced by the existence of contractual waivers of fees and expenses, which may not continue into the future.

18

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class A**

Selected data for a share outstanding throughout each year is as follows:

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2024 | 2023 | 2022 | 2021 | 2020 |
| Net Asset Value, Beginning of Year | $17.51 | $ 19.73 | $21.31 | $ 16.19 | $ 20.36 |
| **Income from Investment Operations:** | | | | | |
| Net investment income[a] | 0.48 | 0.51 | 0.31 | 0.09 | 0.48 |
| Net realized and unrealized gain (loss) | (0.59) | (1.31) | (0.47) | 6.46 | (3.23) |
| Total from Investment Operations | (0.11) | (0.80) | (0.16) | 6.55 | (2.75) |
| **Less Distributions Declared to shareholders:** | | | | | |
| From net investment income | (0.57) | (0.52) | (0.30) | (0.34) | (0.39) |
| From return of capital | (0.85) | (0.90) | (1.12) | (1.09) | (1.03) |
| Total distributions declared to shareholders | (1.42) | (1.42) | (1.42) | (1.43) | (1.42) |
| **Net Asset Value, End of year[b]** | $15.98 | $ 17.51 | $19.73 | $ 21.31 | $ 16.19 |
| Total Return[b][c] | (0.60)% | (4.30)% | (1.15)% | 42.42% | (12.98)% |
| **Ratios to Average Net Assets / Supplemental Data:[d]** | | | | | |
| Net Assets, End of Year (000's) | $7,555 | $ 9,265 | $9,288 | $ 5,903 | $ 2,273 |
| Gross operating expenses[e] | 4.00% | 4.25% | 2.87% | 3.08% | 3.41% |
| Net investment income (loss) | 2.88% | 2.66% | 1.42% | 0.51% | 2.97% |
| Portfolio turnover rate | 13% | 10% | 41% | 41% | 42% |
| Average commission rate paid[f] | $ — | $0.0289 | $ — | $0.0225 | $0.0348 |

[a]   Per share data was calculated using average shares outstanding during the year.
[b]   The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.
[c]   Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's Investment Adviser not waived or reimbursed a portion of expenses, total return would have been lower.
[d]   All ratios for the period have been annualized, unless otherwise indicated.
[e]   Supplemental expense ratios are shown below:
[f]   Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2024 | 2023 | 2022 | 2021 | 2020 |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses)[g] | 3.32% | 3.18% | 2.28% | 1.99% | 2.44% |
| Interest expense and commitment fees | 0.80% | 0.77% | 0.25% | — % | 0.34% |
| Dividends and fees on securities sold short | 0.46% | 0.47% | 0.06% | 0.02% | — % |

[g]   This includes the additional voluntarily elected waiver by the Investment Adviser during the year which resulted in a 0.06% impact to the net expenses ratio.

Amounts designated as " —" are zero or have been rounded to zero.

19

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class A**

Selected data for a share outstanding throughout each period is as follows:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016[a] |
| **Net Asset Value, Beginning of Period** | $ 18.99 | $ 20.65 | $ 20.62 | $ 20.00 |
| **Income from Investment Operations:** | | | | |
| Net investment income[b] | 0.94 | 0.95 | 1.44 | 0.14 |
| Net realized and unrealized gain/(loss) | 1.83 | (1.33) | 0.19 | 0.68 |
| Total from investment operations | 2.77 | (0.38) | 1.63 | 0.82 |
| **Less Distributions Declared to Shareholders:** | | | | |
| From net investment income | (0.91) | (1.28) | (1.39) | (0.20) |
| From net realized gains | (0.49) | — | (0.21) | — |
| Total distributions declared to shareholders | (1.40) | (1.28) | (1.60) | (0.20) |
| **Net Asset Value, End of Period[c]** | $ 20.36 | $ 18.99 | $ 20.65 | $ 20.62 |
| Total Return[c][d] | 14.59% | (2.42)% | 8.18% | 4.12%[e] |
| **Ratios to Average Net Assets[f] / Supplemental Data:** | | | | |
| Net assets, end of period (in 000's) | $ 1,546 | $ 414 | $ 126 | $ 1 |
| Gross operating expenses[g] | 4.33% | 4.20% | 4.75% | 10.78% |
| Net investment income (loss) | 4.56% | 4.82% | 6.99% | 1.56% |
| Portfolio turnover rate | 39% | 49% | 99% | 14%[e] |
| Average commission rate paid[h] | $0.0222 | $0.0111 | $0.0155 | $0.0295 |

(a) Class commenced operations on July 21, 2016.

(b) Net investment income (loss) per share was calculated using average shares outstanding during the period.

(c) The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.

(d) Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's investment adviser not waived or reimbursed a portion of expenses, total return would have been lower.

(e) Not annualized.

(f) All ratios for the period have been annualized, unless otherwise indicated.

(g) Supplemental expense ratios are shown below:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016[a] |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses) | 2.50% | 2.38% | 2.01% | 2.08% |
| Interest expense and commitment fees | 0.76% | 0.22% | — % | — % |
| Dividends and fees on securities sold short | — % | 0.08% | 0.01% | — % |

(h) Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

Amounts designated as " —" are zero or have been rounded to zero.

20

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class C**

**Selected data for a share outstanding throughout each year is as follows:**

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2024 | 2023 | 2022 | 2021 | 2020 |
| **Net Asset Value, Beginning of Year** | $17.73 | $ 19.96 | $21.56 | $ 16.37 | $ 20.53 |
| **Income from Investment Operations:** | | | | | |
| Net investment income (loss)[a] | 0.36 | 0.36 | 0.15 | (0.04) | 0.36 |
| Net realized and unrealized gain (loss) | (0.60) | (1.31) | (0.49) | 6.52 | (3.22) |
| Total from Investment Operations | (0.24) | (0.95) | (0.34) | 6.48 | (2.86) |
| **Less Distributions Declared to shareholders:** | | | | | |
| From net investment income | (0.52) | (0.47) | (0.26) | (0.32) | (0.34) |
| From return of capital | (0.77) | (0.81) | (1.00) | (0.97) | (0.96) |
| Total distributions declared to shareholders | (1.29) | (1.28) | (1.26) | (1.29) | (1.30) |
| **Net Asset Value, End of year[b]** | $16.20 | $ 17.73 | $19.96 | $ 21.56 | $ 16.37 |
| Total Return[b][c] | (1.36)% | (5.02)% | (1.93)% | 41.32% | (13.45)% |
| **Ratios to Average Net Assets / Supplemental Data:[d]** | | | | | |
| Net Assets, End of Year (000's) | $2,885 | $ 3,964 | $4,558 | $ 2,706 | $ 1,791 |
| Gross operating expenses[e] | 4.74% | 4.98% | 3.64% | 3.85% | 4.13% |
| Net investment income (loss) | 2.11% | 1.90% | 0.69% | (0.21)% | 2.14% |
| Portfolio turnover rate | 13% | 10% | 41% | 41% | 42% |
| Average commission rate paid[f] | $ — | $0.0289 | $ — | $0.0225 | $0.0348 |

(a)   Per share data was calculated using average shares outstanding during the year.
(b)   The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.
(c)   Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's Investment Adviser not waived or reimbursed a portion of expenses, total return would have been lower.
(d)   All ratios for the period have been annualized, unless otherwise indicated.
(e)   Supplemental expense ratios are shown below:
(f)   Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2024 | 2023 | 2022 | 2021 | 2020 |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses)[g] | 4.07% | 3.93% | 3.05% | 2.74% | 3.18% |
| Interest expense and commitment fees | 0.80% | 0.77% | 0.25% | — % | 0.34% |
| Dividends and fees on securities sold short | 0.46% | 0.47% | 0.06% | 0.02% | — % |

(g)   This includes the additional voluntarily elected waiver by the Investment Adviser during the year which resulted in a 0.06% impact to the net expenses ratio.

Amounts designated as " –" are zero or have been rounded to zero.

21

FSD2025-0116                    Page 307 of 1530                    2025-08-19

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class C**

Selected data for a share outstanding throughout each period is as follows:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016[a] |
| Net Asset Value, Beginning of Period | $ 19.10 | $ 20.72 | $ 20.58 | $ 20.00 |
| **Income from Investment Operations:** | | | | |
| Net investment income[b] | 0.79 | 0.83 | 1.12 | 0.04 |
| Net realized and unrealized gain | 1.89 | (1.30) | 0.46 | 0.71 |
| Total from investment operations | 2.68 | (0.47) | 1.58 | 0.75 |
| **Less Distributions Declared to Shareholders:** | | | | |
| From net investment income | (0.83) | (1.15) | (1.23) | (0.17) |
| From net realized gains | (0.42) | — | (0.21) | — |
| Total distributions declared to shareholders | (1.25) | (1.15) | (1.44) | (0.17) |
| Net Asset Value, End of Period[e] | $ 20.53 | $ 19.10 | $ 20.72 | $ 20.58 |
| Total Return[c][d] | 13.97% | (2.90)% | 7.94% | 3.78%[e] |
| **Ratios to Average Net Assets[f] / Supplemental Data:** | | | | |
| Net assets, end of period (in 000's) | $ 880 | $ 511 | $ 1 | $ 1 |
| Gross operating expenses[g] | 5.08% | 4.93% | 5.05% | 11.53% |
| Net investment income (loss) | 3.81% | 4.08% | 5.39% | 0.45% |
| Portfolio turnover rate | 39% | 49% | 99% | 14%[e] |
| Average commission rate paid[h] | $0.0222 | $0.0111 | $0.0155 | $0.0295 |

(a)   Class commenced operations on July 21, 2016.
(b)   Net investment income (loss) per share was calculated using average shares outstanding during the period.
(c)   The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.
(d)   Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's investment adviser not waived or reimbursed a portion of expenses, total return would have been lower.
(e)   Not annualized.
(f)   All ratios for the period have been annualized, unless otherwise indicated.
(g)   Supplemental expense ratios are shown below:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016[a] |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses) | 3.28% | 3.12% | 2.87% | 2.83% |
| Interest expense and commitment fees | 0.76% | 0.22% | — % | — % |
| Dividends and fees on securities sold short | — % | 0.08% | 0.13% | — % |

(h)   Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

Amounts designated as "—" are zero or have been rounded to zero.

22

FSD2025-0116                                        2025-08-19

CONFIDENTIAL                                        223

TDIT005261

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class Z**

Selected data for a share outstanding throughout each year is as follows:

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2024** | **2023** | **2022** | **2021** | **2020** |
| **Net Asset Value, Beginning of Year** | $ 17.74 | $ 19.97 | $ 21.54 | $ 16.36 | $ 20.55 |
| **Income from Investment Operations:** | | | | | |
| Net investment income[a] | 0.53 | 0.57 | 0.36 | 0.14 | 0.53 |
| Net realized and unrealized gain (loss) | (0.60) | (1.33) | (0.46) | 6.51 | (3.26) |
| Total from Investment Operations | (0.07) | (0.76) | (0.10) | 6.65 | (2.73) |
| **Less Distributions Declared to shareholders:** | | | | | |
| From net investment income | (0.58) | (0.54) | (0.31) | (0.38) | (0.44) |
| From return of capital | (0.88) | (0.93) | (1.16) | (1.09) | (1.02) |
| Total distributions declared to shareholders | (1.46) | (1.47) | (1.47) | (1.47) | (1.46) |
| **Net Asset Value, End of year[b]** | $ 16.21 | $ 17.74 | $ 19.97 | $ 21.54 | $ 16.36 |
| Total Return[b][c] | (0.34)% | (4.06)% | (0.85)% | 42.68% | (12.75)% |
| **Ratios to Average Net Assets / Supplemental Data:[d]** | | | | | |
| Net Assets, End of Year (000's) | $24,109 | $27,165 | $25,711 | $15,493 | $12,709 |
| **Gross operating expenses[e]** | 3.75% | 4.02% | 2.61% | 2.85% | 3.24% |
| Net investment income (loss) | 3.12% | 2.95% | 1.66% | 0.78% | 3.24% |
| Portfolio turnover rate | 13% | 10% | 41% | 41% | 42% |
| Average commission rate paid[f] | $ — | $0.0289 | $ — | $0.0225 | $0.0348 |

(a) Per share data was calculated using average shares outstanding during the year.

(b) The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.

(c) Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's Investment Adviser not waived or reimbursed a portion of expenses, total return would have been lower.

(d) All ratios for the period have been annualized, unless otherwise indicated.

(e) Supplemental expense ratios are shown below:

(f) Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2024** | **2023** | **2022** | **2021** | **2020** |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses)[g] | 3.07% | 2.94% | 2.03% | 1.73% | 2.19% |
| Interest expense and commitment fees | 0.80% | 0.77% | 0.25% | — % | 0.34% |
| Dividends and fees on securities sold short | 0.46% | 0.47% | 0.06% | 0.02% | — % |

23

**CONFIDENTIAL**

TDIT005262

(g) This includes the additional voluntarily elected waiver by the Investment Adviser during the year which resulted in a 0.06% impact to the net expenses ratio.

Amounts designated as " —" are zero or have been rounded to zero.

24

CONFIDENTIAL TDIT005263

**Financial Highlights**

**NexPoint Real Estate Strategies Fund, Class Z**

Selected data for a share outstanding throughout each period is as follows:

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2017 | 2016[a] |
| Net Asset Value, Beginning of Period | $ 19.08 | $ 20.73 | $ 20.57 | $ 19.95 |
| **Income from Investment Operations:** | | | | |
| Net investment income[b] | 0.99 | 1.04 | 1.33 | 0.24 |
| Net realized and unrealized gain | 1.93 | (1.36) | 0.48 | 0.59 |
| Total from investment operations | 2.92 | (0.32) | 1.81 | 0.83 |
| **Less Distributions Declared to Shareholders:** | | | | |
| From net investment income | (0.97) | (1.33) | (1.44) | (0.21) |
| From net realized gains | (0.48) | — | (0.21) | — |
| Total distributions declared to shareholders | (1.45) | (1.33) | (1.65) | (0.21) |
| Net Asset Value, End of Period[c] | $ 20.55 | $ 19.08 | $ 20.73 | $ 20.57 |
| Total Return[c][d] | 15.40% | (2.17)% | 9.12% | 4.17%[e] |
| **Ratios to Average Net Assets[f] / Supplemental Data:** | | | | |
| Net assets, end of period (in 000's) | $17,837 | $13,132 | $ 8,011 | $ 7,279 |
| Gross operating expenses[g] | 4.09% | 3.94% | 4.60% | 11.26% |
| Net investment income (loss) | 4.80% | 5.08% | 6.44% | 2.45% |
| Portfolio turnover rate | 39% | 49% | 99% | 14%[e] |
| Average commission rate paid[h] | $0.0222 | $0.0111 | $0.0155 | $0.0295 |

(a) Class commenced operations on July 1, 2016.
(b) Net investment income per share was calculated using average shares outstanding during the period.
(c) The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end.
(d) Total return is at net asset value assuming all distributions are reinvested and no initial sales charge or CDSC. For periods with waivers/reimbursements, had the Fund's investment adviser not waived or reimbursed a portion of expenses, total return would have been lower.
(e) Not annualized.
(f) All ratios for the period have been annualized, unless otherwise indicated.
(g) Supplemental expense ratios are shown below:

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2017 | 2016[a] |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses) | 2.30% | 2.13% | 1.87% | 1.83% |
| Interest expense and commitment fees | 0.76% | 0.22% | — % | — % |
| Dividends and fees on securities sold short | — % | 0.08% | — % | — % |

25

(h)    Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

| | For the Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2024 | 2023 | 2022 | 2021 | 2020 |
| Borrowings at end of year | | | | | |
| Aggregate Amount Outstanding | 2,988,000 | 6,036,000 | 3,966,000 | 29,000 | 31,000 |
| Asset Coverage Per $1,000 | 12,551.77 | 771.07 | 1,036.22 | 832,099.72 | 542,072.06 |

| | 2019 | 2018 | 2017 | 2016 |
| --- | --- | --- | --- | --- |
| Borrowings at end of period | | | | |
| Aggregate Amount Outstanding including Preferred Shares | 6,459,135 | 3,354,013 | — | — |
| Asset Coverage Per $1,000 | 4,137.16 | 5,191.05 | N/A | N/A |

Amounts designated as "—" are zero or have been rounded to zero.

26

**CONFIDENTIAL**                                              **227**

TDIT005265

**THE FUND**

The Fund is a continuously offered, non-diversified, closed-end management investment company that operates as an interval fund. The Fund was organized as a Delaware statutory trust on January 11, 2016. The Fund's principal office is located at 300 Crescent Court, Suite 700, Dallas, Texas 75201, and its telephone number is (833) 697-6246.

**USE OF PROCEEDS**

The net proceeds of the continuous offering of shares will be invested in accordance with the Fund's investment objective and policies (as stated below) as soon as practicable after receipt. The Fund will pay its organizational and offering expenses incurred with respect to its initial and continuous offering, less amounts advanced pursuant to the Expense Limitation Agreement. Since February 9, 2018, NexPoint Advisors, L.P., the Fund's investment adviser (the "Adviser" or "NexPoint") has paid or reimbursed the Fund's organizational and offering expenses incurred with respect to its initial and continuous offering and will not seek recoupment of such fees. Pending investment of net proceeds in accordance with the Fund's investment objective and policies, the Fund will invest in money market or short-term, high quality fixed-income mutual funds. Investors should expect, therefore, that before the Fund has fully invested the proceeds of the offering in accordance with its investment objective and policies, the Fund's assets would earn interest income at a modest rate which may be less than the Fund's distribution rate. The Fund's distributions may exceed its earnings and profits. As a result, a portion of the distributions the Fund makes may represent a return of capital for tax purposes. A return of capital is a return of your investment rather than a return of earnings or gains derived from our investment activities. Any invested capital that is returned to shareholders will be reduced by the Fund's fees and expenses, as well as the applicable sales load, which is non-refundable to its shareholders.

27

**CONFIDENTIAL**                    **228**

TDIT005266

## Investment Objective and Policies

*Investment Objective.* The Fund's investment objective is to seek long-term total return with an emphasis on current income. The Fund seeks to achieve this objective by primarily investing in a broad range of private and public real estate-related debt, equity and preferred equity investments across multiple real estate sectors. There can be no assurance that the Fund will achieve this objective. The Fund's investment objective is non-fundamental and may be changed by the Board of Trustees (the "Board") without shareholder approval. Shareholders will, however, receive at least 60 days' prior notice of any change in this investment objective.

*Investment Strategy.* The Fund pursues its investment objective by investing, under normal circumstances, at least 80% of its assets in "real estate and real estate-related securities" (as defined below). In particular, the Fund will pursue its investment objective by investing the Fund's assets primarily in: (1) commercial mortgage-backed securities ("CMBS") and residential mortgage-backed securities ("RMBS"); (2) direct preferred equity and mezzanine investments in real properties; (3) equity securities of public (both traded and non-traded) and private debt and equity real estate investment trusts ("REITs") and/or real estate operating companies ("REOCs"); and (4) opportunistic and value added direct real estate strategies. The Fund will effect its direct real estate strategy through investments in one or more REIT subsidiaries, including through the REIT Subsidiaries, which were formed on July 8, 2016 and June 6, 2022, respectively. The REIT Subsidiaries entered into separate investment advisory agreements with the Adviser concurrent with their formation. Preferred equity and mezzanine investments in real estate transactions come in various forms which may or may not be documented in the borrower's organizational documents. Generally, real estate preferred equity and/or mezzanine investments are typically junior to first mortgage financing but senior to the borrower's or sponsor's equity contribution. The investments are typically structured as an investment by a third-party investor in the real estate owner or various

affiliates in the chain of ownership in exchange for a direct or indirect ownership interest in the real estate owner entitling it to a preferred/priority return on its investment. Sometimes, the investment is structured much like a loan where: (i) "interest" on the investment is required to be paid monthly by the "borrower" regardless of available property cash flow; (ii) the entire investment is required to be paid by a certain maturity date; (iii) default rate "interest" and penalties are assessed against the "borrower" in the event payments are not made timely; and (iv) a default in the repayment of investment potentially results in the loss of management.

In addition, subject to the 15% Limitation, the Fund may invest up to 20% of its total assets in equity or debt securities other than real estate and real estate-related securities. The Adviser will evaluate each opportunity within the context of where the Adviser believes the various real estate subsectors are within the broader real estate cycle and tactically allocate among these opportunities. The Adviser has broad discretion to allocate the Fund's assets among these investment categories and to change allocations as conditions warrant. Also, the Adviser will select investments it believes offer the best potential outcomes and relative risk to assemble the most appropriate portfolio to meet the risk-adjusted return goals of the Fund.

This portfolio construction strategy seeks to: (i) recognize and allocate capital based upon where the Adviser believes we are in the current real estate cycle; and (ii) minimize drawdowns during market downturns and maximize risk adjusted returns during all market cycles, though there can be no assurance that this strategy will achieve this objective. The Fund will rely on the expertise of the Adviser and its affiliates to determine the appropriate structure for structured credit investments, which may include bridge loans, common and preferred equity or other debt-like positions, as well as the acquisition of such instruments from banks, servicers or other third parties.

28

The Fund defines "real estate and real estate-related securities" to consist of common stock, convertible or non-convertible preferred stock, warrants, convertible or non-convertible secured or unsecured debt, and partnership or membership interests issued by:

- CMBS, RMBS and other real estate credit investments, which include existing first and second mortgages on real estate, either originated or acquired in the secondary market, and secured, unsecured and/or convertible notes offered by REOCs and REITs;

- Public REITs;

- REOCs;

- Private Real Estate Investment Funds;

- Public Investment Funds;

- Real estate ETFs; and

- Non-Traded REITs and private REITs, generally wholly-owned by the Fund or wholly-owned or managed by an affiliate.

REITs are pooled investment vehicles that invest primarily in income-producing real estate or real estate-related loans or interests, and REOCs are companies that invest in real estate and whose shares trade on public exchanges. Foreign REIT equivalents are entities located in jurisdictions that have adopted legislation substantially similar to the REIT tax provisions in that they provide for favorable tax treatment for the foreign REIT equivalent and require distributions of income to shareholders.

The Fund has not imposed limitations on the portion of its assets that may be invested in any of the categories outlined above other than Private Real Estate Investment Funds. The Fund, however, will limit its investments in Private Real Estate Investment Funds and any other investments that are excluded from the definition of "investment company" under the 1940 Act by Section 3(c)(1) or Section 3(c)(7) of the 1940 Act to no more than 15% of its net assets (the "15% Limitation"). Such entities are typically private equity funds and hedge funds.

This limitation does not apply to any collateralized loan obligations ("CLOs"), certain of which may rely on Section 3(c)(1) or 3(c)(7) of the 1940 Act. For purposes of compliance with the 15% Limitation, the Fund will not count its direct investments in wholly-owned subsidiaries but will look through such subsidiaries and count their underlying holdings. The Fund may engage in short sales and securities lending.

*Leverage.* The Fund incurs leverage as part of its investment strategy. There can be no assurance that any leveraging strategy the Fund employs will be successful during any period in which it is employed. The Fund may also invest in Private Real Estate Investment Funds, Public REITs, REOCs and Non-Traded REITs, which may incur higher levels of leverage. Accordingly, the Fund through these investments may be exposed to higher levels of leverage than the Fund is permitted to incur itself, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities. The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement.

In addition to any indebtedness incurred by the Fund, any subsidiary of the Fund, including the REIT Subsidiaries, may also utilize leverage, including by mortgaging properties held by special purpose vehicles, or by acquiring property with existing debt. Any such borrowings will generally be the sole obligation of each respective special purpose vehicle, without any recourse to any other special purpose vehicle, the REIT Subsidiaries, the Fund or its assets, and the Fund will not treat such non-recourse borrowings as senior securities (as defined in the 1940 Act) for purposes of complying with the 1940 Act's limitations on leverage unless the financial statements of the special purpose vehicle, or the subsidiary of the Fund that owns such special purpose vehicle, will be consolidated in accordance with Regulation S-X and other accounting rules. If cash flow is

29

insufficient to pay principal and interest on a special purpose vehicle's borrowings, a default could occur, ultimately resulting in foreclosure of any security instrument securing the debt and a complete loss of the investment, which could result in losses to the REIT Subsidiaries and, therefore, to the Fund. To the extent that any subsidiaries of the Fund, including the REIT Subsidiaries, directly incur leverage in the form of debt (as opposed to non-recourse borrowings made through special purpose vehicles), the amount of such recourse leverage used by the Fund and such subsidiaries, including the REIT Subsidiaries, will be consolidated and treated as senior securities for purposes of complying with the 1940 Act's limitations on leverage by the Fund.

*Policies.* The Fund's Statement of Additional Information ("SAI") contains a list of all of the fundamental and non-fundamental investment policies of the Fund, under the heading "Investment Objective and Policies."

*Actively-Managed Liquid Real Estate Securities*

Fears of broader equity market volatility, and uncertain interest rates has created opportunities in publicly traded REITs. Deceleration in net operating income growth expectations in certain sectors, rising financing costs and tighter lending conditions have made it more difficult for public REITs to grow net asset value or make accretive acquisitions. These changes in investors expectations and the way in which public REITs capitalize their investments

has lead to discounts of public REIT shares compared to the private market values of the real estate in which they own for a number of property sectors. Amidst this backdrop of underlying discount to net asset, the Adviser believes that: (i) opportunities to purchase traded REITs and source public and private debt will remain more attractive than purchasing property directly; and (ii) in the near term, investors seeking exposure to real estate should allocate to defensive, risk-adjusted strategies. Over the near term, the Adviser will seek to actively source and manage these opportunities on behalf of the Fund in such a way as to attempt to maximize risk adjusted yields and total return across a full real estate market cycle.

Because of the large discounts between what properties could be sold for in the private markets versus where they trade in the public markets, the Adviser believes a near term opportunity exists to purchase equity interests in certain property types at inherent discounts to the Adviser's large and sophisticated equity team has decades of expertise in identifying and executing deep value and value type investments. These resources may be utilized by the Fund to identify and profit from dislocations in the public equity REIT markets.

### Actively-Managed Private Real Estate Securities

Although commercial property prices in select markets have roughly doubled since their 2009 trough, the dislocation (or, mispricing of assets) in the real estate debt markets, which emerged as a by-product of the larger global credit crisis and the ensuing recession, provided opportunities for sophisticated investors as borrowers were being held to stricter lending criteria. The ensuing gap between what lenders are willing to lend and what sponsors are willing to put up in equity capital, is also a byproduct of cyclical patterns and investors' evolving return expectations — leveraged private investors can no longer easily expect to generate mid-to-high teen leveraged internal rates of return to hit or exceed return hurdles that allow sponsors to maximize their promote fees. Thus, the Adviser believes demand for real estate debt and preferred equity financing significantly outweighs the supply of such product, and that this imbalance creates inefficiency and provides the Fund an opportunity for attractive lending opportunities secured or supported by real estate asset values. Please see "Investment Strategy" for a description of the types of preferred equity and mezzanine investments the Fund may make.

The Adviser expects these opportunistic investment opportunities to continue in both the private and public real estate markets, at least for the medium-term, and that the volume of potential deal flow is likely to be very material (based on the experience of the Adviser). In sum, the Fund will seek to allocate capital to each area of the market where dislocation is persisting and in the Adviser's opinion, unwarranted. Additionally, the Adviser believes that as the real estate cycle nears the top of the Expansion phase and begins to enter the Early Downturn

30

phase, there will be a convergence emerging between capitalization rates of core (high quality properties located in historically strong markets that generally do not require upgrades or renovations) and value add (properties that are high quality but whose value can increase through some event, such as upgrades or renovations) real estate assets that will allow the Fund to selectively and strategically find opportunities to purchase high quality core properties at capitalization rates similar to value add properties.

### Investment Highlights

*Fully Integrated Platform — One Sponsor.* The Fund has access to NexPoint and its affiliates' fully integrated commercial finance, investment, management, and servicing platform. The resources available to the investment team provide the capability to pursue complex transactions in an efficient and expeditious manner and should enhance the Fund's ability to engage in "one-off" opportunities due to NexPoint's strong presence in the real estate sector. The investment approach is developed, executed and managed by a seasoned team of professionals that have generated superior returns in real estate investing, all under one platform. As a result, the Adviser is more accountable directly to the Fund and its shareholders by directly managing Fund investments in most cases while charging the Fund a single layer of fees (fees paid to entities managed by an affiliate will be rebated back to the Fund. See "Management of the Fund — Investment Adviser").

*Experienced Investment Team.* The management team available to the Fund has an extensive history of underwriting, originating, purchasing, and servicing debt secured by commercial real estate and purchasing direct real estate investments. NexPoint and its affiliates invest in various credit and equity strategies through, REITs, DST 1301 exchange, non-traded funds, publicly traded funds, closed-end funds, mutual funds and an ETF, and manages strategies such as direct real estate, real estate credit and originated or structured real estate credit investments. Together with its affiliates, NexPoint had approximately $16.9 billion in assets under management as of December 31, 2024.

*Reduced Exposure to Downturns.* If the real estate markets deteriorate, the Adviser believes that its strategies should generally reduce the Fund's exposure to market downturns. Through its preferred equity investments and direct real estate strategies (i.e., ownership through wholly-owned REITs), the Adviser believes that it should be able to eliminate the common equity investments in the underlying properties by taking control of the properties and owning the underlying assets at 60-80% of the improved cost, thereby creating a hedge against market downturns. The public debt and equity positions will be subject to market movements.

*Strategy for All Market Cycles.* The Fund's strategy, as devised by the Adviser, is designed to produce potentially superior total returns, high yields and capital preservation over all market cycles; however, there is no guarantee that the Adviser will produce these results during all market conditions. The Adviser continuously analyzes the real estate markets, both geographically and across each sector, and determines where in the cycle each sector is. Based on this determination, the Adviser allocates capital to sectors and within the capital structure of real estate investments it deems will produce the best investment results. In this way, the Adviser attempts to limit drawdowns by creating a "hedge" when the real estate cycle is in a downturn.

*Unique Market Opportunity for Liquid Real Estate Securities.* The Adviser believes that the current discounts to underlying net asset values of public REITs presents a unique opportunity for astute real estate investors. Additionally, the low capitalization rate environment and volume of refinancing transactions set to take place in the next few years will potentially allow the Fund to originate credit and preferred equity investments to high quality operators backed by high quality properties. The Fund's investment approach will include fundamental company analysis, with detailed property-level underwriting with particular attention to the management team's capital allocation.

*History as a Fiduciary.* In addition to making capital decisions to maximize returns for investors, NexPoint fosters a culture of fiduciary responsibility throughout the company. NexPoint has invested substantial sums directly in real estate and real estate credit investments. It has extensive experience in converting debt

31

investments into equity and working out distressed real estate situations. These capabilities will be utilized for the benefit of the Fund. Members of the Fund's management team also operate: externally managed publicly traded REITs, NexPoint Residential Trust, Inc. ("NXRT"), that manages a portfolio of Class B, value add multifamily properties, and NexPoint Diversified Real Estate Trust ("NXDT"); VineBrook Homes Trust, Inc., an externally managed private REIT that manages a portfolio of single-family housing properties in the Midwest U.S. ("VineBrook"); NexPoint Hospitality Trust, an externally managed publicly traded REIT ("NHT") listed on

the TSX Venture Exchange, that manages a portfolio of hospitality assets located in the U.S; NexPoint Real Estate Finance, Inc., an externally managed publicly traded mortgage REIT ("NREF"); NexPoint Storage Partners, Inc. ("NSP"), an externally managed private REIT that manages a portfolio of self-storage facilities nationwide; and multiple a private REITs which are wholly-owned by closed-end registered investment companies affiliated with the Fund.

*Access to a Large Investment Platform.* Through NexPoint and its affiliates, the Fund has access to a fully integrated investment platform that, as of December 31, 2024, had acquired more than $16.9 billion across multiple strategies and product types up and down the capital stack, and owned approximately $12.5 billion in gross real estate assets. NexPoint's position in the markets gives it access to unique sourcing opportunities for investments not typically available to retail investors in a registered fund product.

NexPoint is a select sponsor with Freddie Mac and has experience structuring financing solutions behind first mortgage lenders, including banks, life insurance companies, Freddie Mac and the Federal National Mortgage Association, or Fannie Mae, including mezzanine loans and preferred equity investments. NexPoint and its affiliates have successfully tailored financing solutions for property owners in creative and highly symbiotic ways with respect to a typical Freddie Mac or Fannie Mae first mortgage. NexPoint's multifamily loan and investment platform complies with current Freddie Mac and Fannie Mae standards, giving the Fund a unique opportunity to invest alongside quality sponsors and the largest multifamily lenders in the U.S.

**Investment Selection, Diversification and Criteria Used in Selecting Investments**

*Investment Selection.* The Fund's assets will be primarily public and private debt, equity and preferred equity investments, originated by the Adviser. The Adviser sources investments through its public and private market research and exposure, third party brokerages, current partners and financing intermediaries. The Fund expects that a majority of its private investments will be held in special purpose entities, which may be joint ventures with a third party (whether wholly owned or a joint venture, a "Subpartnership") and managed by the Adviser or an affiliate of the Adviser. Performing debt and preferred equity investments will generally provide current income from periodic interest payments. There can be no assurance that any or all of the Fund's investment strategies will be successful.

The Adviser will utilize its in-house experience and third party experts to continuously analyze the real estate markets to determine the point at which the real estate cycle is at any given moment. The Adviser cannot provide any assurance that its assessments of when real estate sectors are at the top or bottom will be correct or that it will accurately assess when the real estate cycle is moving between different phases. However, the Adviser believes that NexPoint's position in various investment markets, its high quality investment staff, its access to third party research and other experts gives it an educated view on the real estate market.

*Financing Strategy.* The Adviser may elect in the future for the Fund to obtain one or more credit facilities with financial institutions, which may be secured by the Fund's investments. The intent of these borrowings will be to generate positive returns in excess of the costs associated with such borrowings. In addition, or alternatively, the Adviser may seek to leverage investments on a case-by-case basis. The Fund is authorized to borrow money in connection with its investment activities, subject to the limits of the asset coverage requirement of the 1940 Act. The Fund also may borrow money to satisfy repurchase requests from Fund shareholders and to otherwise provide the Fund with temporary liquidity. The 1940 Act requires a registered investment company to satisfy an

32

asset coverage requirement of 300% of its indebtedness, including amounts borrowed, and measured at the time indebtedness occurs. This means that the value of the Fund's total indebtedness may not exceed one-third of the value of its total assets, including the value of the assets purchased with the proceeds of its indebtedness. Private and Public Real Estate Investment Funds, REITs and REOCs may utilize leverage in their investment activities. However, such entities' borrowings are not subject to the asset coverage requirement of the Fund. Accordingly, the Fund, through its investments in such entities, may be exposed to the risk of leveraged investment programs.

There can be no assurance that any or all of the Fund's investment strategies will be successful. See "Principal Risks of the Fund — Leverage Risk" in the Prospectus for a brief description of the Fund's Repurchase Agreement with Mizuho.

***Diversification of Asset Managers.*** On occasion, and when investing in private debt and/or equity, the Fund may identify and invest side-by-side with one or more unaffiliated asset managers in investment opportunities sourced by such manager with expertise in managing portfolios of real estate. Using information generally available to investors, the Adviser will evaluate asset managers based on their experience, track record, current portfolios, and ability to weather real estate cycles by employing effective risk management and mitigation strategies.

***Other Information Regarding Investment Strategy.*** The Fund may, from time to time, take defensive positions that are inconsistent with the Fund's principal investment strategy in attempting to respond to adverse market, economic, political or other conditions. During such times, the Adviser may determine that the Fund should invest up to 100% of its assets in cash or cash equivalents, consisting of money market instruments, prime commercial paper, repurchase agreements, Treasury bills and other short-term obligations of the U.S. Government, its agencies or instrumentalities. In these and in other cases, the Fund may not achieve its investment objective. The Adviser may invest the Fund's cash balances in any investments it deems appropriate. The Adviser expects that such investments will be made, without limitation and as permitted under the 1940 Act, in money market funds, repurchase agreements, U.S. Treasury and U.S. agency securities, municipal bonds and bank accounts. Any income earned from such investments is ordinarily reinvested by the Fund in accordance with its investment program. Many of the considerations entering into recommendations and decisions of the Adviser and the Fund's portfolio managers are subjective.

The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement. The Fund's asset coverage ratio was 1,172% as of March 31, 2025.

The Fund has no intent to use leverage through the issuance of preferred shares during the next twelve months. However, the Board may decide to issue preferred shares in the future, subject to the asset coverage requirements of the 1940 Act, which generally require that a fund have asset coverage of at least 300% of the issue size. The Fund may borrow for investment purposes, for temporary liquidity, or to finance repurchases of its shares, as permitted under the 1940 Act. In addition, the Fund may be deemed to incur economic leverage embedded in instruments in which it may invest.

The frequency and amount of portfolio purchases and sales (known as the "portfolio turnover rate") will vary from year to year. It is anticipated that the Fund's portfolio turnover rate will ordinarily be between 25% and 75%. The portfolio turnover rate is not expected to exceed 100%, but may vary greatly from year to year and will not be a limiting factor when the Adviser deems portfolio changes appropriate. Although the Fund generally does not intend to trade for short-term profits, the Fund may engage in short-term trading strategies, and securities may be sold without regard to the length of time held when, in the opinion of the Adviser, investment considerations warrant such action. These policies may have the effect of increasing the annual rate of portfolio turnover of the Fund. Higher rates of portfolio turnover would likely result in higher brokerage commissions and may generate short-term capital gains taxable as ordinary income. If securities are not held for certain applicable holding periods, dividends paid on them will not qualify for the advantageous federal tax rates applicable to

33

"qualified dividend income" under the Internal Revenue Code of 1986, as amended (the "Code"). For the fiscal year ended December 31, 2024, the Fund's portfolio turnover rate was 13%. There is no assurance what portion, if any, of the Fund's distributions will qualify to be treated as "qualified dividend income" under the Code and thus taxable to individual shareholders at the rate applicable to long-term capital gain. See "U.S. Federal Income Tax Matters."

**Portfolio Investments**

The Fund may invest in the following types of securities, subject to certain limitations as set forth below. The Fund is under no obligation to invest in any of these securities:

*Mortgage-Backed Securities.* The Fund may invest in mortgage-backed securities. Common examples of mortgage-backed securities include CMBS and RMBS. Mortgage-backed securities differ from conventional debt securities because principal is paid back over the life of the security rather than at maturity. The Fund may receive unscheduled prepayments of principal before the security's maturity date due to voluntary prepayments, refinancings, or foreclosures on the underlying mortgage loans. To the Fund this means a loss of anticipated interest and a portion of its principal investment represented by any premium the Fund may have paid. Mortgage prepayments generally increase when interest rates fall. Collateralized Mortgage Obligations ("CMOs") are obligations fully collateralized by a portfolio of mortgages or mortgage-related securities. Payments of principal and interest on the mortgages are passed through to the holders of the CMOs on the same schedule as they are received, although certain classes of CMOs have priority over others with respect to the receipt of prepayments on the mortgages. Therefore, depending on the type of CMOs in which the Fund invests, the investment may be subject to a greater or lesser risk of prepayment than other types of mortgage-related securities.

Mortgage-backed securities also are subject to extension risk, which is when rising interest rates can cause mortgage-backed security's average maturity to lengthen unexpectedly due to a drop in mortgage prepayments. This will increase a mortgage-backed security's sensitivity to rising interest rates and its potential for price declines.

CMBS are a type of mortgage-backed security that is secured by a single commercial mortgage loan or a pool of commercial real estate loans. Like all mortgage-backed securities, CMBS are subject to all of the risks of the underlying mortgage loans. Because they are not standardized, CMBS can be difficult to value. Commercial real estate loans are secured by multifamily or commercial property and are subject to risks of delinquency and foreclosure. The ability of a borrower to repay a loan secured by an income-producing property typically is dependent primarily upon the successful operation of such property rather than upon the existence of independent income or assets of the borrower. If the net operating income of the property is reduced, the borrower's ability to repay the loan may be impaired. Net operating income of an income-producing property can be affected by, among other things: tenant mix, success of tenant businesses, property management decisions, property location and condition, competition from comparable types of properties, changes in laws that increase operating expenses or limit rents that may be charged, any need to address environmental contamination at the property, the occurrence of any uninsured casualty at the property, changes in national, regional or local economic conditions and/or specific industry segments, declines in regional or local real estate values, declines in regional or local rental or occupancy rates, increases in interest rates, real estate tax rates and other operating expenses, and changes in governmental rules, regulations and fiscal policies, including environmental legislation, natural disasters, terrorism, social unrest and civil disturbances.

RMBS are a type of mortgage-backed security that is backed by mortgages on residential real estate. Credit-related risk on RMBS arises from losses due to delinquencies and defaults by the borrowers in payments on the underlying mortgage loans and breaches by originators and servicers of their obligations under the underlying documentation pursuant to which the RMBS are issued. The rate of delinquencies and defaults on residential mortgage loans and the aggregate amount of the resulting losses will be affected by a number of factors, including general economic conditions, particularly those in the area where the related mortgaged property is located, the level of the borrower's equity in the mortgaged property and the individual financial circumstances of the borrower. If a residential

34

mortgage loan is in default, foreclosure on the related residential property may be a lengthy and difficult process involving significant legal and other expenses. The net proceeds obtained by the holder on a residential mortgage loan following the foreclosure on the related property may be less than the total amount that remains due on the loan. The prospect of incurring a loss upon the foreclosure of the related property may lead the holder of the residential mortgage loan to restructure the residential mortgage loan or otherwise delay the foreclosure process.

The Fund may also invest in the residual or equity tranches of CMBS, which are referred to as subordinate CMBS and interest-only CMBS. Subordinate CMBSs are paid interest only to the extent that there are funds available to make payments. To the extent the collateral pool includes a large percentage of delinquent loans, there is a risk that interest payment on subordinate CMBSs will not be fully paid. There are multiple tranches of CMBS, offering investors various maturity and credit risk characteristics. Tranches are categorized as senior, mezzanine, and subordinated/equity, according to their degree of risk. The most senior tranche of a CMBS has the greatest collateralization and pays the lowest interest rate. If there are defaults or the collateral otherwise underperforms, scheduled payments to senior tranches take precedence over those of mezzanine tranches, and scheduled payments to mezzanine tranches take precedence over those to subordinated/equity tranches. Lower tranches represent lower degrees of credit quality and pay higher interest rates intended to compensate for the attendant risks. The return on the lower tranches is especially sensitive to the rate of defaults in the collateral pool. The lowest tranche (i.e. the "equity" or "residual" tranche) specifically receives the residual interest payments (i.e., money that is left over after the higher tranches have been paid and expenses of the issuing entities have been paid) rather than a fixed interest rate. The Fund expects its investments in subordinate CMBSs will be subject to risks arising from delinquencies and foreclosures, thereby exposing the Fund's investment portfolio to potential losses. Subordinate securities of CMBSs are also subject to greater credit risk than those CMBSs that are more highly rated. The Fund also may invest in interest-only multifamily CMBS issued by multifamily mortgage loan securitizations. However, these interest-only multifamily CMBS typically only receive payments of interest to the extent that there are funds available in the securitization to make the payment and may introduce increased risks since these securities have no underlying principal cash flows.

In the event of any default under a mortgage loan held by the Fund, the Fund will bear a risk of loss of principal to the extent of any deficiency between the value of the collateral and the principal and accrued interest of the mortgage loan. Foreclosure of a mortgage loan can be an expensive and lengthy process that could have a substantial negative effect on anticipated returns on the foreclosed mortgage loan.

If the Fund makes or invests in mortgage loans and there are defaults under those mortgage loans, the Fund may not be able to repossess and sell the underlying properties in a timely manner. The resulting time delay could reduce the value of the investment in the defaulted mortgage loans.

Investments in commercial real estate loans are subject to changes in credit spreads. When credit spreads widen, the economic value of such investments decrease. Even though a loan may be performing in accordance with its loan agreement and the underlying collateral has not changed, the economic value of the loan may be negatively impacted by the incremental interest foregone from the widened credit spread.

The value of mortgage-backed securities may change due to shifts in the market's perception of issuers and regulatory or tax changes adversely affecting the mortgage securities market as a whole. Mortgage-backed securities are also subject to several risks created through the securitization process. Subordinate mortgage-backed securities are paid interest only to the extent that there are funds available to make payments. To the extent the collateral pool includes delinquent loans, there is a risk that the interest payment on subordinate mortgage-backed securities will not be fully paid. Subordinate mortgage-backed securities are also subject to greater credit risk than those mortgage-backed securities that are more highly rated.

35

CONFIDENTIAL

234

TDIT005272

***Real Estate Investment Trusts (REITs).***

The Fund intends to invest in public (including non-traded REITs) and private REITs. When investing in private or non-traded REITs, the investments will be primarily in REITs wholly-owned by the Fund and managed by an affiliate or in REITs not wholly-owned by the Fund but managed by an affiliate. REITs are pooled investment vehicles that invest primarily in income-producing real estate or real estate-related loans or interests. REITs are subject to risks similar to those associated with direct ownership of real estate (including loss to casualty or condemnation, increases in property taxes and operating expenses, zoning law amendments, changes in interest rates, overbuilding and increased competition, variations in market value, adverse changes in the real estate

markets generally or in specific sectors of the real estate industry and possible environmental liabilities), as well as additional risks discussed below.

REITs are generally classified as equity REITs, mortgage REITs or a combination of equity and mortgage REITs. Equity REITs invest the majority of their assets directly in real property and derive income primarily from the collection of rents. Equity REITs can also realize capital gains by selling properties that have appreciated in value. Mortgage REITs invest the majority of their assets in real estate mortgages and derive income from the collection of interest payments. REITs are not taxed on income distributed to shareholders provided they comply with the applicable requirements of the Code. The Fund will indirectly bear its proportionate share of any management and other expenses paid by REITs in which it invests in addition to the expenses paid by the Fund. Debt securities issued by REITs are, for the most part, general and unsecured obligations and are subject to risks associated with REITs.

Investing in REITs involves certain unique risks in addition to those risks associated with investing in the real estate industry in general. An equity REIT may be affected by changes in the value of the underlying properties owned by the REIT. A mortgage REIT may be affected by changes in interest rates and the ability of the issuers of its portfolio mortgages to repay their obligations. REITs are dependent upon the skills of their managers and are not diversified. REITs are generally dependent upon maintaining cash flows to repay borrowings and to make distributions to shareholders and are subject to the risk of default by lessees or borrowers. REITs whose underlying assets are concentrated in properties used by a particular industry, such as health care, are also subject to risks associated with such industry. REITs are often leveraged or invest in properties that are themselves leveraged, exposing them to the risks of leverage generally. Among other things, leverage will generally increase losses during periods of real estate market declines.

REITs (especially mortgage REITs) are also subject to interest rate risks. When interest rates decline, the value of a REIT's investment in fixed rate obligations can be expected to rise. Conversely, when interest rates rise, the value of a REIT's investment in fixed rate obligations can be expected to decline. If the REIT invests in adjustable rate mortgage loans the interest rates on which are reset periodically, yields on a REIT's investments in such loans will gradually align themselves to reflect changes in market interest rates. This causes the value of such investments to fluctuate less dramatically in response to interest rate fluctuations than would investments in fixed rate obligations.

REITs may have limited financial resources, may trade less frequently and in a more limited volume and may be subject to more abrupt or erratic price movements than larger company securities.

The Fund's strategy for investing in publicly traded REITs is to take advantage of situations where the REIT is trading at a discount to the fair value of the REITs underlying properties as determined by the Adviser as well as gaining exposure to certain real estate sectors with an element of liquidity. The Fund may also invest in publicly traded REITs that are commonly referred to as "mortgage REITs" that invest in various debt investments collateralized or secured by real estate. The Fund will invest in publicly traded mortgage REITs to gain exposure to real estate credit investments that are trading at a discount to inherent value of the underlying debt, as determined by the Adviser.

36

Effective for taxable years beginning after December 31, 2017 and before January 1, 2026, the Code generally allows individuals and certain other non-corporate entities a deduction for 20% of qualified REIT dividends. Regulations allow a RIC to pass the character of its qualified REIT dividends through to its shareholders provided certain holding period requirements are met. As a result, a shareholder in the Fund will be eligible to receive the benefit of the same 20% deduction with respect to qualified REIT dividends included in Fund distributions that is available to direct investors in REITs.

Dividends paid by REITs will generally not qualify for the reduced federal income tax rates applicable to qualified dividends under the Code. See "U.S. Federal Income Tax Matters."

*Closed-End Funds.*

The Fund may invest its assets in "closed-end" investment companies (or "closed-end funds") that invest, directly or indirectly, in real estate, especially where discounts to net asset values are present. A core strategy of the Fund is to take advantage of dislocations in various markets, as determined by the Adviser, where the Adviser believes a near-term catalyst exists for the discount to narrow.

The Fund generally will purchase shares of closed-end funds in the secondary market. The Fund will incur normal brokerage costs on such purchases similar to the expenses the Fund would incur for the purchase of securities of any other type of issuer in the secondary market. The Fund may, however, also purchase securities of a closed-end fund in an initial public offering when, in the opinion of the Adviser, based on a consideration of the nature of the closed-end fund's proposed investments, the prevailing market conditions and the level of demand for such securities, they represent an attractive opportunity for growth of capital. The initial offering price typically will include a dealer spread paid to the underwriter, which may be higher than the applicable brokerage cost if the Fund purchased such securities in the secondary market.

*Private Real Estate Investment Funds and Public Investment Funds.*

Although the Fund does not anticipate investing a large percentage of the Fund's capital in unaffiliated Private Real Estate Investment Funds, the Adviser may allocate capital to these investments on an opportunistic basis. The Fund will limit its investments in Private Real Estate Investment Funds and any other investments that are excluded from the definition of "investment company" under the 1940 Act by Section 3(c)(1) or Section 3(c)(7) of the 1940 Act to no more than 15% of its net assets (the "15% Limitation"). Such entities are typically private equity funds and hedge funds. For purposes of compliance with the 15% Limitation, the Fund will not count its direct investments in wholly-owned subsidiaries but will look through such subsidiaries and count their underlying holdings. The Fund may also invest in Public Investment Funds that are trading at discounts to net asset values. Private Real Estate Investment Funds and Public Investment Funds may employ a wide variety of investment strategies, including:

- *Diversified Equities.* A long/short investment strategy of investing in equity, equity-related and other securities.

- *Debt and Equity Opportunities.* A long/short investment strategy in corporate debt and equity securities of leveraged companies and financially distressed firms and other investments.

- *Credit Opportunities.* A long/short investment strategy in corporate debt and equity securities to capture credit opportunities in all market environments.

- *Structured Credit.* A long/short investment strategy in structured mortgage-backed securities.

- *Managed Futures.* A strategy that generates returns from convergent and divergent trends in the financial and currency futures markets.

37

CONFIDENTIAL TDIT005274

### Real Estate Operating Companies.

The Fund intends to invest in REOCs. REOCs are companies that invest in real estate and whose shares trade on public exchanges. The market value of REOC shares and the ability of REOCs to distribute income may be adversely affected by the same factors as those described above for REITs. However, REOCs differ from REITs in that dividends received by REOC shareholders are taxed similar to dividends of a standard corporation, REOCs have less investment limitations and investments can be funded with internally generated funds without penalty (i.e., forfeiting tax advantages), and REOCs do not need to hire outside management for certain assets such as hotels.

### Repurchase Agreements.

The Fund may invest up to 33 1/3% of its assets in repurchase agreements. It may enter into repurchase agreements with broker-dealers, member banks of the Federal Reserve System and other financial institutions.

Repurchase agreements are loans or arrangements under which the Fund purchases securities and the seller agrees to repurchase the securities within a specific time and at a specific price. The repurchase price is generally higher than the Fund's purchase price, with the difference being income to the Fund. Under the direction of the Board, the Adviser reviews and monitors the creditworthiness of any institution which enters into a repurchase agreement with the Fund. The counterparty's obligations under the repurchase agreement are collateralized with U.S. Treasury and/or agency obligations with a market value of not less than 100% of the obligations, valued daily. Collateral is held by the Fund's custodian in a segregated, safekeeping account for the benefit of the Fund. Repurchase agreements afford the Fund an opportunity to earn income on temporarily available cash at relatively low risk. In the event of commencement of bankruptcy or insolvency proceedings with respect to the seller of the security before repurchase of the security under a repurchase agreement, the Fund may encounter delay and incur costs before being able to sell the security. Such a delay may involve loss of interest or a decline in price of the security. If the court characterizes the transaction as a loan and the Fund has not perfected a security interest in the security, the Fund may be required to return the security to the seller's estate and be treated as an unsecured creditor of the seller. As an unsecured creditor, the Fund would be at risk of losing some or all of the principal and interest involved in the transaction.

### Reverse Repurchase Agreements.

A reverse repurchase agreement is an investment technique under which the Fund sells an underlying debt security and simultaneously obtains the commitment of the purchaser (generally, a commercial bank or a broker or dealer) to sell the security back to the Fund at an agreed upon price on an agreed upon date. The repurchase price is generally higher than the Fund's sale price. Reverse repurchase agreements could involve certain risks in the event of default or insolvency of the other party, including possible delays or restrictions upon the Fund's ability to dispose of the underlying securities. An additional risk is that the market value of securities sold by the Fund under a reverse repurchase agreement could decline below the price at which the Fund is obligated to repurchase them. Reverse repurchase agreements will be considered borrowings by the Fund and as such would be subject to any restrictions on borrowing.

Reverse repurchase agreements are also generally subject to earmarking and coverage requirements, with the result that the Fund will designate on its books and records on an ongoing basis cash, U.S. government securities, or other liquid securities in an amount at least equal to the Fund's obligations under the reverse repurchase agreement.

### Exchange Traded Funds ("ETFs").

Subject to the limitations on investment in other investment companies, the Fund may invest its assets in ETFs that invest primarily in real estate markets where investing directly would be cost prohibitive to the Fund or

38

inefficient. ETFs, such as SPDRs, NASDAQ 100 Index Trading Stock (QQQs), iShares and various country index funds, are funds whose shares are traded on a national securities exchange or the National Association of Securities Dealers' Automatic Quotation System (NASDAQ). Certain ETFs focus on the real estate sector and provide investors an opportunity to gain exposure to these sectors of the market. ETFs may be based on underlying equity or fixed income securities. SPDRs, for example, seek to provide investment results that generally correspond to the performance of the component common stocks of the S&P 500. ETFs do not sell individual shares directly to investors and only issue their shares in large blocks known as "creation baskets." The investor purchasing a creation basket may sell the individual shares on a secondary market. Therefore, the liquidity of ETFs depends on the adequacy of the secondary market. An ETF's investment objective may not be achieved. ETFs based on an index may not replicate and maintain exactly the composition and relative weightings of securities in the index, and for these and other reasons the returns of an ETF may diverge significantly from the index which it is designed to track. ETFs are subject to the risks of investing in the underlying securities. The Fund, as a holder of the securities of an ETF, will bear its pro rata portion of the ETF's expenses, including advisory fees. These expenses are in addition to the direct expenses of the Fund's own operations. The underlying indices that an ETF is designed to track may also experience volatility due to disruptive events, such as natural disasters, pandemic or epidemics or other widespread health crises. Any such impact could adversely affect the Fund's performance and may lead to losses on your investment in the Fund.

39

FSD2025-0116          RISK FACTORS     **Page 323 of 1530**                    2025-08-19

An investment in the Fund's shares is subject to risks. The value of the Fund's investments will increase or decrease based on changes in the prices of the investments it holds. This will cause the value of the Fund's shares to increase or decrease. You could lose money by investing in the Fund. By itself, the Fund does not constitute a complete investment program. Before investing in the Fund you should consider carefully the following risks the Fund faces through its direct investments in real estate-related securities. The risks set out below are not the only risks the Fund faces, but they are the principal risks associated with an investment in the Fund as well as generally associated with investment in a fund with investment objectives, investment policies, capital structure or trading markets similar to the Fund's. Additional risks and uncertainties not currently known to the Fund or that are currently immaterial also may materially adversely affect the Fund's business, financial condition and/or operating results. If any of the following events occur, the Fund's business, financial condition and results of operations could be materially adversely affected.

*Substantial Conflicts of Interest.* The Adviser and/or its general partner, limited partners, officers, affiliates and employees provide investment advice to other parties and manage other accounts and private investment vehicles similar to the Fund. For the purposes of this section, the term "NexPoint" shall include the Adviser and its affiliated investment advisors, and all affiliates listed on its Form ADV, as filed with the SEC March 28, 2025 (CRD No. 163564). In connection with such other investment management activities, the Adviser and/or its general partner, limited partners, officers, affiliates and employees may decide to invest the funds of one or more other accounts or recommend the investment of funds by other parties, rather than the Fund's monies, in a particular security or strategy. In addition, the Adviser and such other persons will determine the allocation of funds from the Fund and such other accounts to investment strategies and techniques on whatever basis they consider appropriate or desirable in their sole and absolute discretion.

NexPoint has built a professional working environment, a firm-wide compliance culture and compliance procedures and systems designed to protect against potential incentives that may favor one account over another. NexPoint has adopted policies and procedures that address the allocation of investment opportunities, execution of portfolio transactions, personal trading by employees and other potential conflicts of interest that are designed to ensure that all client accounts are treated equitably over time. Nevertheless, NexPoint furnishes advisory services to numerous clients in addition to the Fund, and NexPoint may, consistent with applicable law, make investment recommendations to other clients or accounts (including accounts that have performance or higher fees paid to NexPoint or in which portfolio managers have a personal interest in the receipt of such fees) that may be the same as or different from those made to the Fund. In addition, NexPoint, its affiliates and any of their partners, directors, officers, stockholders or employees may or may not have an interest in the securities whose purchase and sale the Adviser recommends to the Fund. Actions with respect to securities of the same kind may be the same as or different from the action that the Adviser, or any of its affiliates, or any of their partners, directors, officers, stockholders or employees or any member of their families may take with respect to the same securities. Moreover, the Adviser may refrain from rendering any advice or services concerning securities of companies of which any of the Adviser's (or its affiliates') partners, directors, officers or employees are directors or officers, or companies as to which the Adviser or any of its affiliates or partners, directors, officers and employees of any of them has any substantial economic interest or possesses material non-public information.

The Adviser, its affiliates or their partners, directors, officers or employees similarly serve or may serve other entities that operate in the same or related lines of business, including accounts managed by an investment adviser affiliated with the Adviser. Accordingly, these individuals may have obligations to investors in those entities or funds or to other clients, the fulfillment of which might not be in the best interests of the Fund. As a result, the Adviser will face conflicts in the allocation of investment opportunities to the Fund and other funds and clients. In order to enable such affiliates to fulfill their fiduciary duties to each of the clients for which they have responsibility, the Adviser will endeavor to allocate investment opportunities in a fair and equitable manner, pursuant to policies and procedures adopted by the Adviser and its advisory affiliates that are designed to manage potential conflicts of interest, which may, subject to applicable regulatory constraints, involve pro rata

40

co-investment by the Fund and such other clients or may involve a rotation of opportunities among the Fund and such other clients. The Fund will only make investments in which the Adviser or an affiliate hold an interest to the extent permitted under the 1940 Act and SEC staff interpretations or pursuant to the terms and conditions of the exemptive order received by the Adviser and certain funds affiliated with the Fund, dated April 19, 2016. For example, exemptive relief is not required for the Fund to invest in syndicated deals and secondary loan market transactions in which the Adviser or an affiliate has an interest where price is the only negotiated point. The order applies to all "Investment Companies," including future closed-end investment companies registered under the 1940 Act that are managed by the Adviser, which includes the Fund. The Fund, therefore, may in the future invest in accordance with the terms and conditions of the exemptive order. To mitigate any actual or perceived conflicts of interest, allocation of limited offering securities (such as IPOs and registered secondary offerings) to principal accounts that do not include third party investors may only be made after all other client account orders for the security have been filled. However, there can be no assurance that such policies and procedures will in every case ensure fair and equitable allocations of investment opportunities, particularly when considered in hindsight.

Conflicts may arise in cases when clients and/or the Adviser and other affiliated entities invest in different parts of an issuer's capital structure, including circumstances in which one or more clients own private securities or obligations of an issuer and other clients may own public securities of the same issuer. In addition, one or more clients may invest in securities, or other financial instruments, of an issuer that are senior or junior to securities, or financial instruments, of the same issuer that are held by or acquired for, one or more other clients. For example, if such issuer encounters financial problems, decisions related to such securities (such as over the terms of any workout or proposed waivers and amendments to debt covenants) may raise conflicts of interests. In such a distressed situation, a client holding debt securities of the issuer may be better served by a liquidation of the issuer in which it may be paid in full, whereas a client holding equity securities of the issuer might prefer a reorganization that holds the potential to create value for the equity holders. In the event of conflicting interests within an issuer's capital structure, NexPoint will generally pursue the strategy that NexPoint believes best reflects what would be expected to be negotiated in an arm's length transaction, but in all instances with due consideration being given to NexPoint's fiduciary duties to each of its accounts (without regard to the nature of the accounts involved or fees received from such accounts). This strategy may be recommended by one or more NexPoint investment professionals. A single person may make decisions with respect to more than one part of an issuer's capital structure. NexPoint personnel board members may still make recommendations to the applicable investment professional(s). A portfolio manager with respect to any applicable NexPoint registered investment company clients ("Retail Accounts") will make an independent determination as to which course of action he or she determines is in the best interest of the applicable Retail Accounts. NexPoint may use external counsel for guidance and assistance. The Adviser and its affiliates have both subjective and objective procedures and policies in place designed to manage potential conflicts of interest involving clients so that, for example, investment opportunities are allocated in a fair and equitable manner among the Fund and such other clients. An investment opportunity that is suitable for multiple clients of the Adviser and its affiliates may not be capable of being shared among some or all of such clients due to the limited scale of the opportunity or other factors, including regulatory restrictions imposed by the 1940 Act. There can be no assurance that the Adviser's or its affiliates' efforts to allocate any particular investment opportunity fairly among all clients for whom such opportunity is appropriate will result in an allocation of all or part of such opportunity to the Fund. Not all conflicts of interest can be expected to be resolved in favor of the Fund.

Another type of conflict may arise if one client account buys a security and another client sells or shorts the same security. Currently, such opposing positions are generally not permitted within the same account without prior trade approval by the Adviser's Chief Compliance Officer. However, a portfolio manager may enter into opposing positions for different clients to the extent each such client has a different investment objective and each such position is consistent with the investment objective of the applicable client. In addition, transactions in investments by one or more affiliated client accounts may have the effect of diluting or otherwise disadvantaging the values, prices or investment strategies of other client accounts.

41

Because certain client accounts may have investment objectives, strategies or legal, contractual, tax or other requirements that differ (such as the need to take tax losses, realize profits, raise cash, diversification, etc.), an affiliated adviser may purchase, sell or continue to hold securities for certain client accounts contrary to other recommendations. In addition, an affiliated adviser may be permitted to sell securities or instruments short for certain client accounts and may not be permitted to do so for other affiliated client accounts.

As a result of the Fund's arrangements with NexPoint, there may be times when NexPoint, the Adviser or their affiliates have interests that differ from those of the Fund's shareholders, giving rise to a conflict of interest. NexPoint and the Adviser are under common ownership, and the Fund's officers serve or may serve as officers, directors or principals of entities that operate in the same or a related line of business as the Fund does, or of investment funds managed by the Adviser or its affiliates. Similarly, the Adviser or its affiliates may have other clients with similar, different or competing investment objectives. In serving in these multiple capacities, they may have obligations to other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund or its shareholders. For example, the Fund's officers have, and will continue to have, management responsibilities for other investment funds, accounts or other investment vehicles managed or sponsored by the Adviser and its affiliates. The Fund's investment objective may overlap, in part or in whole, with the investment objective of such affiliated investment funds, accounts or other investment vehicles. As a result, those individuals may face conflicts in the allocation of investment opportunities among the Fund and other investment funds or accounts advised by or affiliated with the Adviser. The Adviser will seek to allocate investment opportunities among eligible accounts in a manner that is

FSD2025-0116                                                                    2025-08-19

239

CONFIDENTIAL                                                              TDIT005277

fair and equitable over time and consistent with its allocation policy. However, the Fund can offer no assurance that such opportunities will be allocated to it fairly or equitably in the short-term or over time.

In addition, it is anticipated that a significant portion of the Fund's assets will be represented by securities sponsored, organized and/or managed by NexPoint and its affiliates, which may include REITs, asset-backed securities and/or structured finance securities. The Adviser will monitor for conflicts of interest in accordance with its fiduciary duties and will provide the independent trustees of the Fund with an opportunity to periodically review the Fund's investments in such REITs, asset-backed securities and/or structured finance securities and assure themselves that continued investment in such securities remains in the best interests of the Fund and its shareholders. The Adviser may effect client cross-transactions where it causes a transaction to be effected between the Fund and another client advised by the Adviser or any of its affiliates. The Adviser may engage in a client cross-transaction involving the Fund any time that the Adviser believes such transaction to be fair to the Fund and the other client of the Adviser or its affiliates.

The Adviser may direct the Fund to acquire or dispose of investments in cross trades between the Fund and other clients of the Adviser or its affiliates in accordance with applicable legal and regulatory requirements. In addition, to the extent permitted by the 1940 Act and SEC staff interpretations, the Fund may make and/or hold an investment, including an investment in securities, in which the Adviser and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Adviser's own investments in such companies.

***Closed-End Fund ("CEF") Risk.*** The Fund is a CEF. CEFs differ from open-end management investment companies (commonly referred to as mutual funds) in that CEFs may list their shares for trading on a securities exchange and do not redeem their shares at the option of the shareholder. By comparison, mutual funds issue securities redeemable at net asset value at the option of the shareholder and typically engage in a continuous offering of their shares. Mutual funds are subject to continuous asset in-flows and out-flows that can complicate portfolio management, whereas CEFs generally can stay more fully invested in securities consistent with the CEF's investment objective and policies. In addition, in comparison to open-end funds, CEFs have greater flexibility in their ability to make certain types of investments, including investments in illiquid securities.

***Debt Securities Risk.*** When the Fund invests in debt securities, the value of your investment in the Fund will fluctuate with changes in interest rates. Typically, a rise in interest rates causes a decline in the value of debt

42

securities. In general, the market price of debt securities with longer maturities will increase or decrease more in response to changes in interest rates than shorter-term securities. Other risk factors include credit risk (the debtor may default) and prepayment risk (the debtor may pay its obligation early, reducing the amount of interest payments). These risks could affect the value of a particular investment, possibly causing the Fund's share price and total return to be reduced or fluctuate more than other types of investments. The kind of market risk is generally greater for funds investing in debt securities with longer maturities. In the course of investing in such investments, we may come into possession of material nonpublic information and, because of prohibitions on trading in securities of issuers while in possession of such information, we may be unable to enter into a transaction in a publicly-traded security for that issuer when it would otherwise be advantageous for us to do so. Alternatively, we may choose not to receive material nonpublic information about an issuer of such loans, with the result that we may have less information about such issuers than other investors who transact in such assets.

***Structured Finance Securities Risk.*** A portion of the Fund's investments may consist of collateralized mortgage obligations, collateralized bond obligations, collateralized loan obligations or similar instruments. Such structured finance securities are generally backed by an asset or a pool of assets, which serve as collateral. Depending on the type of security, the collateral may take the form of a portfolio of mortgage loans or bonds or other assets. The Fund and other investors in structured finance securities ultimately bear the credit risk of the underlying collateral. In some instances, the structured finance securities are issued in multiple tranches, offering investors various maturity and credit risk characteristics, often categorized as senior, mezzanine and subordinated/equity according to their degree of risk. The riskiest securities are the equity tranche, which bears the bulk of defaults from the bonds or loans serving as collateral, and thus may protect the other, more senior tranches from default. If there are defaults or the relevant collateral otherwise underperforms, scheduled payments to senior tranches of such securities take precedence over those of mezzanine tranches, and scheduled payments to mezzanine tranches take precedence over those to subordinated/equity tranches. A senior tranche typically has higher ratings and lower yields than the underlying securities, and may be rated investment grade. Despite the protection from the equity tranche, other tranches can experience substantial losses due to actual defaults, increased sensitivity to defaults due to previous defaults and the disappearance of protecting tranches, market anticipation of defaults and aversion to certain structured finance securities as a class.

***Non-Payment Risk.*** Debt securities are subject to the risk of non-payment of scheduled interest and/or principal. Nonpayment would result in a reduction of income to the Fund, a reduction in the value of the security experiencing nonpayment and a potential decrease in the net asset value ("NAV") of the Fund. There can be no assurance that the liquidation of any collateral would satisfy the borrower's obligation in the event of non-payment of scheduled interest or principal payments, or that such collateral could be readily liquidated. Moreover, as a practical matter, most borrowers cannot satisfy their debts by selling their assets. Borrowers pay their debts from the cash flow they generate. This is particularly the case for borrowers that are highly leveraged. If the borrower's cash flow is insufficient to pay its debts as they come due, the borrower is far more likely to seek to restructure its debts than it is to sell off assets to pay its debts. Borrowers may try to restructure their debts either by seeking protection from creditors under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") or negotiating a work out. In the event of bankruptcy of a borrower, the Fund could experience delays or limitations with respect to its ability to realize the benefits of the collateral securing a debt security. The agent generally is responsible for determining that the lenders have obtained a perfected security interest in the collateral securing the debt security. If a borrower files for protection from creditors under Chapter 11 of the Bankruptcy Code, the Bankruptcy Code will impose an automatic stay that prohibits the agent from liquidating collateral. The agent may ask the bankruptcy court to lift the stay. As a practical matter, the court is unlikely to lift the stay if it concludes that the borrower has a chance to emerge from the reorganization proceedings and the collateral is likely to hold most of its value. If the lenders have a perfected security interest, the debt security will be treated as a separate class in the reorganization proceedings and will retain a priority interest in the collateral. Chapter 11 reorganization plans typically are the product of negotiation among the borrower and the various creditor classes. Successful negotiations may require the lenders to extend the time for repayment, change the interest rate or accept some consideration in the form of junior debt or equity securities. A work out outside of bankruptcy may produce similar concessions by senior lenders.

43

**Page 325 of 1530**

*Distribution Policy Risk.* The Fund's distribution policy may, under certain circumstances, have certain adverse consequences to the Fund and its shareholders because it may result in a return of capital resulting in less of a shareholder's assets being invested in the Fund and, over time, increase the Fund's expense ratio. A return of capital may also reduce a shareholder's tax basis, resulting in higher taxes when the shareholder sells his or her shares, and may cause a shareholder to pay taxes even if he or she sells such shares for less than the original purchase price. The distribution policy also may cause the Fund to sell a security at a time it would not otherwise do so in order to manage the distribution of income and gain. The initial distribution will be declared on a date determined by the Board. If the Fund's investments are delayed, the initial distribution may consist principally of a return of capital. Pending the investment of the net proceeds in accordance with the Fund's investment objective and policies, all or a portion of the Fund's distributions may consist of a return of capital (i.e. from your original investment). Shareholders should not assume that the source of a distribution from the Fund is net profit. Shareholders should note that return of capital will reduce the tax basis of their shares (but not below zero) and potentially increase the taxable gain, if any, or decrease any loss recognized for tax purposes upon disposition of their shares.

*Illiquid and Restricted Securities.* The Fund may not be able to readily dispose of illiquid securities at prices that approximate those at which the Fund could sell such securities if they were more widely traded and, as a result of such illiquidity, the Fund may have to sell other investments or engage in borrowing transactions if necessary to raise cash to meet its obligations.

The Fund may purchase certain securities ("Rule 144A Securities") eligible for resale to qualified institutional buyers as contemplated by Rule 144A under the Securities Act. Rule 144A provides an exemption from the registration requirements of the Securities Act for the resale of certain restricted securities to certain qualified institutional buyers. One effect of Rule 144A is that certain restricted securities may be considered liquid, though no assurance can be given that a liquid market for Rule 144A Securities will develop or be maintained. However, where a substantial market of qualified institutional buyers has developed for certain unregistered securities purchased by the Fund pursuant to Rule 144A under the Securities Act, the Fund intends to treat such securities as liquid securities in accordance with procedures approved by the Board. Because it is not possible to predict with assurance how the market for Rule 144A Securities will develop, the Board has directed the Adviser to monitor carefully the Fund's investments in such securities with particular regard to trading activity, availability of reliable price information and other relevant information. To the extent that, for a period of time, qualified institutional buyers cease purchasing restricted securities pursuant to Rule 144A, the Fund's investments in such securities may have the effect of increasing the level of illiquidity in its investment portfolio during such period.

*Management Fee Risk.* The management fee paid to the Adviser is based on the Fund's Daily Gross Assets, as defined in the Investment Advisory Agreement. As a result, investors in the Fund's shares will invest on a "gross" basis and receive distributions on a "net" basis after expenses, resulting in a lower rate of return than one might achieve through direct investments. Because the management fee is based on the Fund's gross assets, the Adviser will benefit if and when the Fund issues additional equity, incurs debt or uses leverage. The use of leverage will increase the likelihood of default under any credit facility or other debt instruments the Fund enters into, which would disfavor the holders of Fund shares, including investors in this offering.

*Public and Private Investment Funds Risk.* The Fund's performance depends in part upon the performance of the Public and Private Investment Fund managers and their selected strategies, the adherence by such Public and Private Investment Fund managers to such selected strategies, the instruments used by such Public and Private Investment Fund managers and the Adviser's ability to select Public and Private Investment Fund managers and strategies and effectively allocate Fund assets among them. Fund shareholders will bear two layers of fees and expenses: asset-based fees and expenses at the Fund level, and asset-based fees, which may include incentive allocations or fees and expenses at the Public or Private Investment Fund level.

The Fund is subject to, and indirectly invests in Public Investment Funds and Private Real Estate Investment Funds that are subject to risks associated with legal and regulatory changes applicable to financial institutions

44

generally or to Public Investment Funds or Private Real Estate Investment Funds in particular. The Fund may not be able to invest in certain Public Investment Funds or Private Real Estate Investment Funds that are oversubscribed or closed, or the Fund may be able to allocate only a limited amount of assets to a Public Investment Fund or a Private Real Estate Investment Fund that has been identified as an attractive opportunity. The Fund's investments in certain Public Investment Funds and Private Real Estate Investment Funds may be subject to lock-up periods, during which the Fund may not withdraw its investment. The Fund may invest indirectly a substantial portion of its assets in Public Investment Funds and Private Real Estate Investment Funds that follow a particular type of investment strategy, which may expose the Fund to the risks of that strategy. Many of the Fund's assets will be priced in the absence of a readily available market and may be priced based on determinations of fair value, which may prove to be inaccurate. The Fund, upon its redemption of all or a portion of its interest in a Public Investment Fund or a Private Real Estate Investment Fund, may receive an in-kind distribution of securities that are illiquid or difficult to value and difficult to dispose of.

Public Investment Fund and Private Real Estate Investment Fund returns may exhibit greater correlations among each other or with fixed-income or equity indices than anticipated by the Adviser, particularly during times of general market turmoil. Public and Private Investment Fund managers may invest the Public Investment Funds' or the Private Real Estate Investment Funds' assets in securities of non-U.S. issuers, including those in emerging markets, and the Fund's assets may be invested in Public Investment Funds or Private Real Estate Investment Funds that may be denominated in non-U.S. currencies, thereby exposing the Fund to various risks that may not be applicable to U.S. securities. Public and Private Investment Fund Managers focus primarily on the real estate industry, which subjects Public Investment Funds and Private Real Estate Investment Funds, and thus the Fund, to greater risk and volatility than if investments had been made in issuers in a broader range of industries. Public and Private Investment Fund Managers may focus on a particular country or geographic region, which may subject Public Investment Funds and Private Real Estate Investment Funds, and thus the Fund, to greater risk and volatility than if investments had been made in issuers in a broader range of geographic regions.

Public Investment Fund managers may use derivatives for speculative or hedging purposes. Public Investment Fund managers may have limited operating histories upon which to evaluate their performance. Public Investment Funds may incur leverage for investment or other purposes, which may increase the volatility of the Public Investment Funds. Public Investment Fund managers may sell short securities held by Public Investment Funds, which presents the theoretical risk of unlimited loss because of increases in the market price of the security sold short, and the risk that Public Investment Funds' short selling activities may be adversely affected by regulatory restrictions that may be imposed at any time. Public Investment Fund managers may invest the Public Investment Funds' assets without limitation in restricted and illiquid securities. Public Investment Fund managers may invest the Public Investment Funds' assets in equity securities without limitation as to market capitalization. Public Investment Funds may invest in equity securities issued by smaller capitalization companies, including micro-cap companies, the prices of which may be subject to erratic market movements.

Private Real Estate Investment Funds are not publicly traded and therefore are not liquid investments. Please see "Liquidity Risk" for a description of risks associated with illiquid securities. As a result, the Fund may consider information provided by the asset manager to determine the value of the Fund's investment in the Private Real Estate Investment Fund. The valuation provided by an asset manager as of a specific date may vary from the actual sale price that may be obtained if such investment were sold to a third party. The Adviser will conduct reasonable due diligence to value securities and may also consider information provided by the Private Real Estate Investment Funds, including quarterly unaudited financial statements, which if inaccurate could adversely affect the Adviser's ability to value accurately the Fund's shares. Private Real Estate Investment Funds that invest primarily in publicly traded securities are more easily valued.

In addition to valuation risk, shareholders of Private Real Estate Investment Funds are not entitled to the protections of the 1940 Act. For example, Private Real Estate Investment Funds need not have independent boards, may not require shareholder approval of advisory contracts, may leverage to an unlimited extent, and may engage in joint transactions with affiliates. As a result, Private Real Estate Investment Funds may make significant use of leverage,

45

which has the potential to magnify losses versus funds that do not employ leverage. Please see "Leveraging Risk" below for a description of risks associated with the use of leverage. Additionally, Private Real Estate Investment Fund managers may have limited operating histories upon which to evaluate their performance, and some Private Real Estate Investment Fund managers may not be registered under the Advisers Act. Further, Private Real Estate Investment Fund managers may charge investors (such as the Fund) asset-based fees of up to 2.0% of total assets and incentive allocations or fees of as much as 20% of a Private Real Estate Investment Fund's net profits (or more in certain limited circumstances), which may create incentives for Private Real Estate Investment Fund managers to make investments that are riskier or more speculative than in the absence of these fees. These characteristics present additional risks, including the possibility of total risk of loss, for shareholders.

*REIT Risk.* REITs may be affected by changes in the real estate markets generally as well as changes in the values of the properties owned by the REIT or securing the mortgages owned by the REIT. REITs are dependent upon management skill and are not diversified. REITs are also subject to heavy cash flow dependency, defaults by borrowers, self-liquidation, and the possibility of failing to qualify for favorable tax treatment under the Code and to maintain an exemption under the 1940 Act. For example, because a REIT may acquire debt securities of issuers primarily engaged in or related to the real estate industry, it also could conceivably own real estate directly as a result of a default on such securities. Any rental income or income from the

CONFIDENTIAL TDIT005279

directors, which could adversely affect its ability to retain its tax status. A REIT's failure to qualify may also have tax consequences on its shareholders. Finally, certain REITs may be self-liquidating at the end of a specified term, and run the risk of liquidating at an economically inopportune time.

**Non-Traded REIT Risk.** Non-traded REITs are subject to the following risks in addition to those described in "REIT Risk." Non-Traded REITs are subject to significant commissions, expenses, and organizational and offering costs that reduce the value of an investor's (including the Fund's) investment. Non-Traded REITs are not liquid, and investments in Non-Traded REITs may not be accessible for an extended period of time.

Redemption programs offered by Non-Traded REITs may have significant restrictions, such as caps on the amount of shares that can be redeemed annually, limits on the amounts and sources of funds that may be used to fund redemptions and the ability of the REIT to suspend or terminate the program at its discretion. There is no guarantee of any specific return on the principal amount or the repayment of all or a portion of the principal amount invested in Non-Traded REITs. In addition, there is no guarantee that investors (including the Fund) will receive distributions. Distributions from Non-Traded REITs may be derived from sources other than cash flow from operations, including proceeds of the offering, from borrowings, or from the sale of assets. Payments of distributions from sources other than cash flow from operations will decrease or diminish an investor's interest. Dividends paid by Non-Traded REITs may vary based on economic risks, geopolitical risks, changes in the real estate market, performance of the REIT, regulatory changes, and key personnel changes. Distributions from Non-Traded REITs can be suspended for a period of time or halted altogether.

**Private REIT Risk.** Private REITs are subject to the following risks in addition to those described in "Public and Private Real Estate Investment Fund Risk" and "REIT Risk." Private REITs are typically smaller and financially less stable than Public REITs. Private REITS are unlisted, making them more difficult to value and trade. Moreover, private REITs generally are exempt from Securities Act registration and, as such, are not subject to the same disclosure requirements as Public REITs and Non-Traded REITs, which makes private REITs more difficult to evaluate from an investment perspective. In addition, Private REITs may not have audited financial statements.

**Asset-Backed Securities.** Because asset-backed securities often are secured by the loans underlying the securities, the Fund may lose money if there are defaults on the loans underlying the securities. Such defaults have increased the risk for asset-backed securities that are secured by home-equity loans related to sub-prime mortgage loans, especially in a declining residential real estate market. Asset-backed securities also may be subject to more rapid repayment than their stated maturity dates indicate, due to changing economic conditions. To maintain its position in such securities, the Fund may reinvest the reductions in principal amounts resulting

46

from the prepayments. Yields on those reinvested amounts are subject to prevailing market rates. Because prepayments of principal generally increase when rates are falling, the Fund generally has to reinvest proceeds from prepayments at lower rates. Investments in asset-backed securities may also be subject to valuation risk.

**Mortgage-Backed Securities Risk.** Mortgage-backed securities are bonds which evidence interests in, or are secured by, a single commercial or residential mortgage loan or a pool of commercial or residential mortgage loans. Accordingly, mortgage-backed securities in which the Fund intends to invest are subject to all of the risks of the underlying mortgage loans. In a rising interest rate environment, the value of mortgage-backed securities may be adversely affected when payments on underlying mortgages do not occur as anticipated, resulting in the extension of the security's effective maturity and the related increase in interest rate sensitivity of a longer-term investment. The value of mortgage-backed securities may also change due to shifts in the market's perception of issuers and regulatory or tax changes adversely affecting the mortgage securities markets as a whole. In addition, mortgage-backed securities are subject to the credit risk associated with the performance of the underlying mortgage properties. In certain instances, third party guarantees or other forms of credit support can reduce the credit risk. Mortgage-backed securities are also subject to several risks created through the securitization process. Subordinate CMBSs are paid interest only to the extent that there are funds available to make payments. To the extent the collateral pool includes a large percentage of delinquent loans, there is a risk that interest payment on subordinate CMBSs will not be fully paid. Subordinate classes of CMBSs are also subject to greater credit risk than those CMBSs that are more highly rated. We also may invest in interest-only multifamily CMBS issued by multifamily mortgage loan securitizations. However, these interest-only multifamily CMBS typically only receive payments of interest to the extent that there are funds available in the securitization to make the payment and may introduce increased risks since these securities have no underlying principal cash flows. As a result, interest only CMBS possess the risk of total loss of investment in the event of prepayment of the underlying mortgages. We have not imposed a limit in the portion of our total assets that may be invested in interest-only multifamily CMBS.

**Issuer Risk.** The value of a specific security can be more volatile than the market as a whole and can perform differently from the value of the market as a whole, for reasons related to the issuer, such as management performance, financial leverage and reduced demand for the issuer's goods and services.

**Leverage Risk.** The use of leverage, such as borrowing money to purchase securities, by the Fund or a Private Real Estate Investment Fund or a Public Investment Fund will magnify the Fund's gains or losses. The use of leverage via short selling by a Private Real Estate Investment Fund or a Public Investment Fund will also magnify the Fund's gains or losses. Generally, the use of leverage also will cause the Fund and a Private Real Estate Investment Fund or a Public Investment Fund to have higher expenses (especially interest and/or short selling-related dividend expenses) than those of funds that do not use such techniques. Interest on borrowings (or dividends on preferred shares) may be at a fixed or floating rate and generally will be based on short-term rates. Interest payments and fees incurred in connection with such borrowings will reduce the amount of distributions available to the Fund's shareholders. As long as the rate of return, net of applicable Fund expenses, on the Fund's portfolio investments purchased with leverage exceeds the costs associated with such leverage, the Fund will generate more return or income than will be needed to pay such costs. In this event, the excess will be available to pay higher dividends to the Fund's shareholders. Conversely, if the Fund's return on such assets is less than the cost of leverage and other Fund expenses, the return to the Fund's shareholders will diminish or may be eliminated entirely. To the extent that the Fund uses leverage, the net asset value of the Fund's shares and the yield to the Fund's shareholders will be more volatile. The Fund's leveraging strategy may not be successful.

In addition, a lender to the Fund or a Private Real Estate Investment Fund or a Public Investment Fund may terminate or refuse to renew any credit facility. If the Fund or Private Real Estate Investment Fund or a Public Investment Fund is unable to access additional credit, it may be forced to sell investments at inopportune times, which may further reduce the amount of distributions available to Fund shareholders. The Fund's investments in Public Investment Funds and REITs managed by affiliated or unaffiliated institutional asset managers may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to higher levels of leverage than the Fund is permitted to incur itself, including a greater risk of loss with respect to such investments as a result of higher leverage employed by such entities.

47

The Fund intends to leverage its portfolio through a master repurchase agreement entered into with Mizuho that allows the Fund to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement. The Fund's asset coverage ratio was 1,172% as of March 31, 2025.

**Liquidity Risk.** The Fund is a closed-end investment company structured as an "interval fund" and designed for long-term investors. Unlike many closed-end investment companies, the Fund's shares are not listed on any securities exchange and are not publicly traded. There is currently no secondary market for the shares and the Fund expects that no secondary market will develop. Limited liquidity is provided to shareholders only through the Fund's quarterly repurchase offers for no less than 5% of the shares outstanding at NAV. There is no guarantee that shareholders will be able to sell all of the shares they desire in a quarterly repurchase offer. The Fund's investments are also subject to liquidity risk. Liquidity risk exists when particular investments of the Fund would be difficult to purchase or sell, possibly preventing the Fund from selling such illiquid securities at an advantageous time or price, or possibly requiring the Fund to dispose of other investments at unfavorable times or prices in order to satisfy its obligations. Funds with principal investment strategies that involve securities of companies with smaller market capitalizations, derivatives or securities with substantial market and/or credit risk tend to have the greatest exposure to liquidity risk.

**Management Risk.** The Fund is subject to management risk because it relies on the Adviser's ability to achieve its investment objective. The Fund runs the risk that the Adviser's investment techniques will fail to produce desired results and cause the Fund to incur significant losses. The Adviser also may fail to use derivatives effectively, choosing to hedge or not to hedge positions at disadvantageous times. In addition, if one or more key individuals leave, the Adviser may not be able to hire qualified replacements or may require an extended time to do so. This situation could prevent the Fund from achieving its investment objectives.

**Securities Market Risk.** An investment in shares is subject to investment risk, including the possible loss of the entire principal amount invested. An investment in shares represents an indirect investment in the securities owned by the Fund. The value of these securities, like other market investments, may move up or down, sometimes rapidly and unpredictably. Economic, political and financial conditions, industry or economic trends and developments or public health risks, such as epidemics or pandemics, may, from time to time, and for varying periods of time, cause volatility, illiquidity or other potentially adverse effects in the financial markets. The value of your shares at any point in time may be worth less than the value of your original investment, even after taking into account any reinvestment of dividends and distributions.

CONFIDENTIAL TDIT005280

***Medium and Small Capitalization Company Risk.*** The Fund will concentrate its investments in real estate-related securities. Many issuers of real estate securities are medium or small capitalization companies which may be newly-formed or have limited product lines, distribution channels and financial and managerial resources. The risks associated with these investments are generally greater than those associated with investments in the securities of larger, more-established companies. This may cause the Fund's NAV to be more volatile when compared to investment companies that focus only on large capitalization companies.

Generally, securities of medium and small capitalization companies are more likely to experience sharper swings in market values and are generally more volatile than those of larger companies. In addition, such securities generally trade in less liquid markets, in which it may be more difficult for the Adviser to sell and at prices that the Adviser believes appropriate. Compared to large companies, smaller companies are more likely to have: (i) less information publicly available; (ii) more limited product lines or markets and less mature businesses; (iii) fewer capital resources; (iv) more limited management depth; and (v) shorter operating histories. Further, the equity securities of smaller companies are often traded over-the-counter and generally experience a lower trading volume than is typical for securities that are traded on a national securities exchange. Consequently, the Fund may be required to dispose of these securities over a longer period of time (and potentially at less favorable prices) than would be the case for securities of larger companies, offering greater potential for gains and losses and associated tax consequences.

48

***Concentration in Real Estate Securities Risk.*** The Fund will not invest in real estate directly, but because the Fund will concentrate its investments in investment vehicles that invest principally in real estate and real estate-related securities, its portfolio will be significantly impacted by the performance of the real estate market and may experience more volatility and be exposed to greater risk than a more diversified portfolio. Although the Fund will not invest in real estate directly, the Fund may be subject to risks similar to those associated with direct ownership in real property. The value of the Fund's shares will be affected by factors affecting the value of real estate and the earnings of companies engaged in the real estate industry. These factors include, among others: (i) changes in general economic and market conditions; (ii) changes in the value of real estate properties; (iii) risks related to local economic conditions, overbuilding and increased competition; (iv) increases in property taxes and operating expenses; (v) changes in zoning laws; (vi) casualty and condemnation losses; (vii) variations in rental income, neighborhood values or the appeal of property to tenants; (viii) the availability of financing; and (ix) changes in interest rates. Many real estate companies utilize leverage, which increases investment risk and could adversely affect a company's operations and market value in periods of rising interest rates. The value of securities of companies in the real estate industry may go through cycles of relative under-performance and over-performance in comparison to equity securities markets in general. There are also special risks associated with real estate operations generally, as described below:

- *Land.* Land may be affected by development risks including insufficient tenant demand to build or construction delays as well as adverse changes in local and national economic and market conditions.

- *Development Issues.* Certain real estate companies may engage in the development or construction of real estate properties. These companies in which the Fund invests ("portfolio companies") are exposed to a variety of risks inherent in real estate development and construction, such as the risk that there will be insufficient tenant demand to occupy newly-developed properties, and the risk that prices of construction materials or construction labor may rise materially during the development.

- *Lack of Insurance.* Certain of the portfolio companies may fail to carry comprehensive liability, fire, flood, earthquake extended coverage and rental loss insurance, or insurance in place may be subject to various policy specifications, limits and deductibles. Should any type of uninsured loss occur, the portfolio company could lose its investment in, and anticipated profits and cash flows from, a number of properties and, as a result, adversely affect the Fund's investment performance.

- *Dependence on Tenants.* The value of the Fund's portfolio companies' properties and the ability to make distributions to their shareholders depend upon the ability of the tenants at their properties to generate enough income in excess of their operating expenses to make their lease payments. Changes beyond the control of our portfolio companies may adversely affect their tenants' ability to make their lease payments and, in such event, would substantially reduce both their income from operations and ability to make distributions to our portfolio companies and, consequently, the Fund.

- *Financial Leverage.* Real estate companies may be highly leveraged and financial covenants may affect the ability of real estate companies to operate effectively.

- *Environmental Issues.* In connection with the ownership (direct or indirect), operation, management and development of real properties that may contain hazardous or toxic substances, a portfolio company may be considered an owner, operator or responsible party of such properties and, therefore, may be potentially liable for removal or remediation costs, as well as certain other costs, including governmental fines and liabilities for injuries to persons and property. The existence of any such material environmental liability could have a material adverse effect on the results of operations and cash flow of any such portfolio company and, as a result, the amount available to make distributions on shares of the Fund could be reduced.

- *Financing Issues.* Financial institutions in which the Fund may invest are subject to extensive government regulation. This regulation may limit both the amount and types of loans and other financial commitments a financial institution can make, and the interest rates and fees it can charge. In addition, interest and investment rates are highly sensitive and are determined by many factors beyond a financial institution's control, including general and local economic conditions (such as inflation,

49

recession, money supply and unemployment) and the monetary and fiscal policies of various governmental agencies such as the Federal Reserve Board. These limitations may have a significant impact on the profitability of a financial institution since profitability is attributable, at least in part, to the institution's ability to make financial commitments such as loans. Profitability of a financial institution is largely dependent upon the availability and cost of the institution's funds, and can fluctuate significantly when interest rates change.

***Multifamily Real Estate Sector in General.*** While we intend to seek to diversify our investment portfolio among real estate sectors, we expect to invest a portion of our assets in investments in the multifamily real estate sector. Our business may be adversely affected by various operating risks common to the multifamily industry. We plan to invest in target assets, which are typically debt and preferred equity investments where the underlying real estate is comprised of multifamily properties. Multifamily properties have different economic characteristics than many other real estate assets. A typical office property, for example, has long-term leases with third-party tenants, which provides a relatively stable long-term stream of revenue. Multifamily properties, on the other hand, generate revenue from tenants that typically have short-term leases (generally one year or less in duration), which causes the rental rate and occupancy levels at multifamily properties to change frequently, and results in earnings that can be volatile.

In addition, our borrowers operating such multifamily properties will be subject to various operating risks common to the multifamily industry, including, among others, the following:

- competition from other multifamily properties in the markets in which a borrower operates;

- over-building of multifamily properties in the markets in which a borrower operates, which results in increased supply and will adversely affect occupancy and revenues at such borrower's multifamily properties;

- requirements for periodic capital reinvestment to repair and upgrade multifamily properties;

- increases in operating costs due to inflation and other factors that may not be offset by increased rental rates;

- changes in interest rates;

- changes in the availability, cost, and terms of financing;

- changes in governmental laws and regulations, fiscal policies, and zoning ordinances and the related costs of compliance with laws and regulations, fiscal policies, and ordinances;

- adverse effects of international, national, regional and local economic and market conditions; and

- risks generally associated with the ownership of multifamily properties and real estate, as discuss in some greater detail below.

The occurrence of any of the foregoing could adversely impact a borrower's ability to successfully own and operate a multifamily that will be the primary source of repayment of our Investment. In addition, should we foreclose on an investment and acquire the underlying asset, we, as the multifamily operator, would be faced with these same risks.

***Non-Diversification Risk.*** While the Adviser intends to invest in a number of real estate and real estate-related securities issued by different issuers and employ multiple investment strategies with respect to the Fund's investment portfolio, it is possible that a significant amount of the Fund's investments could be invested in the instruments of only a few companies or other issuers or that at any particular point in time one investment strategy could be more heavily weighted than the others. The focus of the Fund's investment portfolio in any one issuer would subject the Fund to a greater degree of risk

CONFIDENTIAL

with respect to an individual issuer or other adverse events affecting that issuer, a particular industry or group of industries would subject

the Fund to a greater degree of risk with respect to economic downturns relating to such industry or industries. The focus of the Fund's investment portfolio in any one investment strategy would subject the Fund to a greater degree of risk than if the Fund's investment portfolio were varied in its investments with respect to several investment strategies.

*Valuation Risk.* Portfolio securities may be valued using techniques other than market quotations, under the circumstances described under "Determination of Net Asset Value." The value established for a portfolio security may be different than what would be produced through the use of another methodology or if it had been priced using market quotations. Portfolio securities that are valued using techniques other than market quotations, including "fair valued" securities, may be subject to greater fluctuation in their value from one day to the next than would be the case if market quotations were used. In addition, there is no assurance that the Fund could sell a portfolio security for the value established for it at any time and it is possible that the Fund would incur a loss because a portfolio security is sold at a discount to its established value.

Fair value is defined as the amount for which assets could be sold in an orderly disposition over a reasonable period of time, taking into account the nature of the asset. Fair value pricing, however, involves judgments that are inherently subjective and inexact, since fair valuation procedures are used only when it is not possible to be sure what value should be attributed to a particular asset or when an event will affect the market price of an asset and to what extent. As a result, fair value pricing may not reflect actual market value, and it is possible that the fair value determined for a security will be materially different from the value that actually could be or is realized upon the sale of that asset.

*Equity Securities Risk.* The market prices of equity securities owned by the Fund may go up or down, sometimes rapidly or unpredictably. The value of a security may decline for a number of reasons that may directly relate to the issuer, such as management performance, fundamental changes to the business, financial leverage, non-compliance with regulatory requirements and reduced demand for the issuer's goods or services. The values of equity securities also may decline due to general market conditions that are not specifically related to a particular company, such as real or perceived adverse economic conditions, changes in the general outlook for corporate earnings, changes in interest or currency rates, unexpected trading activity among retail investors or adverse investor sentiment generally. Certain equity securities may decline in value even during periods when the prices of equity securities in general are rising, or may not perform as well as the market in general. In addition to these risks, preferred stock and convertible securities are also subject to the risk that issuers will not make payments on securities held by the Fund, which could result in losses to the Fund. The credit quality of preferred stock and convertible securities held by the Fund may be lowered if an issuer's financial condition changes, leading to greater volatility in the price of the security. In addition, a company's preferred stock generally pays dividends only after the company makes required payments to holders of its bonds and other debt. For this reason, the value of preferred stock will usually react more strongly than bonds and other debt to actual or perceived changes in the company's financial condition or prospects. The market value of convertible securities also tends to fall when prevailing interest rates rise.

*Preferred Securities Risk.* Preferred securities are subject to credit risk and interest rate risk. Interest rate risk is, in general, that the price of a debt security falls when interest rates rise. Securities with longer maturities tend to be more sensitive to interest rate changes. Credit risk is the risk that an issuer of a security may not be able to make principal and interest or dividend payments on the security as they become due. Holders of preferred securities may not receive dividends, or the payment can be deferred for some period of time. In bankruptcy, creditors are generally paid before the holders of preferred securities.

*Convertible Securities Risk.* Convertible securities are hybrid securities that have characteristics of both bonds and common stocks and are subject to risks associated with both debt securities and equity securities. Convertible securities are similar to fixed-income securities because they usually pay a fixed interest rate (or dividend) and are obligated to repay principal on a given date in the future. The market value of fixed-income and preferred securities tends to decline as interest rates increase and tends to increase as interest rates decline. Convertible

securities have characteristics of a fixed-income security and are particularly sensitive to changes in interest rates when their conversion value is lower than the value of the bond or preferred share. Fixed-income and preferred securities also are subject to credit risk, which is the risk that an issuer of a security may not be able to make principal and interest or dividend payments on the security as they become due. Fixed-income and preferred securities also may be subject to prepayment or redemption risk. If a convertible security held by the Fund is called for redemption, the Fund will be required to surrender the security for redemption, convert it into the issuing company's common stock or cash or sell it to a third party at a time that may be unfavorable to the Fund.

In addition, the Fund may invest in fixed-income and preferred securities rated less than investment grade that are sometimes referred to as high yield or "junk bonds." These securities are speculative investments that carry greater risks and are more susceptible to real or perceived adverse economic and competitive industry conditions than higher quality securities. Such securities also may be subject to resale restrictions. The lack of a liquid market for these securities could decrease the Fund's share price. Convertible securities have characteristics similar to common stocks especially when their conversion value is the same as the value of the bond or preferred share. The price of equity securities may rise or fall because of economic or political changes. Stock prices in general may decline over short or even extended periods of time. Market prices of equity securities in broad market segments may be adversely affected by a prominent issuer having experienced losses or by the lack of earnings or such an issuer's failure to meet the market's expectations with respect to new products or services, or even by factors wholly unrelated to the value or condition of the issuer, such as changes in interest rates.

*ETF Risk.* The value of ETFs can be expected to increase and decrease in value in proportion to increases and decreases in the indices that they are designed to track. The volatility of different index tracking stocks can be expected to vary in proportion to the volatility of the particular index they track. ETFs are traded similarly to stocks of individual companies. Although an ETF is designed to provide investment performance corresponding to its index, it may not be able to exactly replicate the performance of its index because of its operating expenses and other factors. The underlying indices that an ETF is designed to track may also experience volatility due to disruptive events, such as natural disasters, pandemic or epidemics or other widespread health crises. Any such impact could adversely affect the Fund's performance and may lead to losses on your investment in the Fund. Because ETFs trade on a securities exchange, extreme market volatility or potential lack of an active trading market for an ETF's shares may trade at a premium or discount to their net asset value. The Fund's investment in shares of ETFs subject it to the risks of owning the securities underlying the ETF, as well as certain structural risks, including authorized participant concentration risk, market maker risk, premium/discount risk and trading issues risk. As a shareholder in an ETF, the Fund bears its proportionate share of the ETF's expenses.

*Counterparty Risk.* Counterparty risk is the risk that a counterparty (the other party to a transaction or an agreement or the party with whom the Fund executes transactions) to a transaction with the Fund may be unable or unwilling to make timely principal, interest or settlement payments, or otherwise honor its obligations. In an attempt to limit the counterparty risk associated with such transactions, the Fund conducts business only with financial institutions judged by the Adviser to present acceptable credit risk. For example, repurchase agreements are loans of money or arrangements under which the Fund purchases securities and the seller agrees to repurchase the securities within a specific time and at a specific price. The repurchase price is generally higher than the Fund's purchase price, with the difference being income to the Fund. The counterparty's obligations under the repurchase agreement are collateralized with U.S. Treasury and/or agency obligations with a market value of not less than 100% of the obligations, valued daily. Collateral is held by the Fund's custodian in a segregated, safekeeping account for the benefit of the Fund. Repurchase agreements afford the Fund an opportunity to earn income at low risk on temporarily available cash. If bankruptcy or insolvency proceedings commence with respect to the seller of the securities before repurchase of the securities under a repurchase agreement, the Fund may encounter delays and incur costs before being able to sell the securities. Such a delay may involve loss of interest or a decline in price of the securities. If a court characterizes the transaction as a loan and the Fund has not perfected a security interest in the securities, the Fund may be required to return the securities to the seller's estate and be treated as an unsecured creditor of the seller. As an unsecured creditor, the Fund would be at risk of losing some or all of the principal and interest involved in the transaction.

*Derivatives Risk.* While the Fund does not intend to invest in derivatives or utilize hedging strategies as a principal investment strategy, the Private Real Estate Investment Funds and Public Investment Funds in which the Fund invests will use derivatives (consisting of forwards, options, repurchase agreements, futures, warrants, and swaps) to enhance returns or hedge against market declines. A Private Real Estate Investment Fund's or Public Investment Fund's use of derivative instruments involves risks different from, or possibly greater than, the risks associated with investing directly in securities and other traditional investments. These risks include: (i) the risk that the counterparty to a derivative transaction may not fulfill its contractual obligations; (ii) risk of mispricing or improper valuation; and (iii) the risk that changes in the value of the derivative may not correlate perfectly with the underlying asset, rate or index. Derivative prices are highly volatile and may fluctuate substantially during a short period of time. Such prices are influenced by numerous factors that affect the markets, including, but not limited to: (i) changing supply and demand relationships; government programs and policies; (ii) national and international political and economic events; (iii) changes in interest rates; (iv) inflation and deflation; and

CONFIDENTIAL

(i) illiquidity and other related relationships. Certain derivatives have the potential for unlimited loss, regardless of the size of the initial investment. When a fund uses derivatives for leverage, investments in that fund will tend to be more volatile, resulting in larger gains or losses in response to market changes. To limit risks associated with leverage, a fund is required to comply with Rule 18f-4 under the 1940 Act (the "Derivatives Rule") as outlined below.

The Derivatives Rule mandates that a fund adopt and/or implement: (i) value-at-risk limitations (VaR); (ii) a written derivatives risk management program; (iii) new board oversight responsibilities; and (iv) new reporting and recordkeeping requirements. In the event that a fund's derivative exposure is 10% or less of its net assets, excluding certain currency and interest rate hedging transactions, it can elect to be classified as a limited derivatives user (Limited Derivatives User) under the Derivatives Rule, in which case the fund is not subject to the full requirements of the Derivatives Rule. Limited Derivatives Users are excepted from VaR testing, implementing a derivatives risk management program, and certain board oversight and reporting requirements mandated by the Derivatives Rule. However, a Limited Derivatives User is still required to implement written compliance policies and procedures reasonably designed to manage its derivatives risks.

The Derivatives Rule also provides special treatment for reverse repurchase agreements, similar financing transactions and unfunded commitment agreements. Specifically, a fund may elect whether to treat reverse repurchase agreements and similar financing transactions as "derivatives transactions" subject to the requirements of the Derivatives Rule or as senior securities equivalent to bank borrowings for purposes of Section 18 of the 1940 Act. In addition, when-issued or forward settling securities transactions that physically settle within 35-days are deemed not to involve a senior security.

**Short Sales Risk.** Short selling involves selling securities that may or may not be owned and borrowing the same securities for delivery to the purchaser, with an obligation to replace the borrowed securities at a later date. Short selling allows the Fund to profit from declines in market prices to the extent such decline exceeds the transaction costs and the costs of borrowing the securities. However, because the borrowed securities must be replaced by purchases at market prices in order to close out the short position, any appreciation in the price of the borrowed securities would result in a loss. The securities necessary to cover a short position may not be available for purchase. Purchasing securities to close out the short position can itself cause the price of the securities to rise further, thereby exacerbating the loss. The Fund may mitigate such losses by replacing the securities sold short before the market price has increased significantly. Under adverse market conditions, the Fund might have

difficulty purchasing securities to meet margin calls on its short sale delivery obligations, and might have to sell portfolio securities to raise the capital necessary to meet its short sale obligations at a time when fundamental investment considerations would not favor such sales. Short sales by the Fund that are not made "against the box" theoretically involve unlimited loss potential, since the market price of securities sold short may continuously increase. If other short positions of the same security are closed out at the same time, a "short squeeze" can occur where demand exceeds the supply for the security sold short. A short squeeze makes it more likely that the Fund will need to replace the borrowed security at an unfavorable price.

53

---

**Foreign Investment Risk.** Investing in foreign securities typically involves more risks than investing in U.S. securities, and includes risks associated with: political and economic developments — the political, economic and social structures of some foreign countries may be less stable and more volatile than those in the United States; trading practices — government supervision and regulation of foreign securities and currency markets, trading systems and brokers may be less than in the United States; availability of information — foreign issuers may not be subject to the same disclosure, accounting and financial reporting standards and practices as U.S. issuers; and limited markets — the securities of certain foreign issuers may be less liquid (harder to sell) and more volatile.

To the extent the Fund invests in investment vehicles that hold securities that are denominated in foreign currencies, the value of securities denominated in foreign currencies can change significantly when foreign currencies strengthen or weaken relative to the U.S. dollar. Currency rates in foreign countries may fluctuate significantly over short periods of time for a number of reasons, including changes in interest rates and the imposition of currency controls or other political developments in the United States or abroad. These currency movements may negatively impact the value of the Fund even when there is no change in the value of the security in the issuer's home country.

The risks of foreign investments may be greater in developing or emerging market countries.

**Other Investment Companies.** The Fund may invest in other investment companies. Investment companies combine shareholders' funds for investment in a variety of instruments, including equity securities, debt securities, and money market instruments and may invest primarily in a particular type of security, a particular industry or a mix of securities and industries. An investment company is not taxed on income distributed to shareholders if, among other things, it distributes to its shareholders substantially all of its taxable income for each taxable year. As a shareholder of another investment company, the Fund may bear a proportionate share of the expenses of such other investment company, including management fees, administration fees and custodial fees, in addition to the expenses of the Fund. To the extent permitted by and subject to applicable law or SEC exemptive relief, the Fund may invest in shares of investment companies (including money market mutual funds) advised or sub-advised by NexPoint or its affiliates.

**Securities Lending Risk.** Securities lending is subject to the risk that loaned securities may not be available to the Fund on a timely basis and the Fund may, therefore, lose the opportunity to sell the securities at a desirable price. Any loss in the market price of securities loaned by the Fund that occurs during the term of the loan would be borne by the Fund and would adversely affect the Fund's performance. Also, there may be delays in recovery, or no recovery, of securities loaned should the borrower of the securities fail financially while the loan is outstanding. In addition, voting rights with respect to loaned securities generally pass to the borrower. The Fund, as the lender, retains the right to recall the loans and obtain the return of the securities loaned in order to vote the loaned securities. However, in many circumstances the Fund may be unable to recall the securities in time to vote or may determine that the benefits to the Fund of voting are outweighed by the indirect or direct costs of such a recall. In these circumstances, loaned securities may be voted or not voted in a manner adverse to the best interests of the Fund. All of the aforementioned risks may be greater for non-U.S. securities.

These lending transactions must be fully collateralized at all times, but involve some credit risk to the Fund if the borrower or the party (if any) guaranteeing the loan should default on its obligation and the Fund is delayed in or prevented from recovering the collateral. In addition, any income or gains and losses from investing and reinvesting any cash collateral delivered by a borrower pursuant to a loan are generally at the Fund's risk, and to the extent any such losses reduce the amount of cash below the amount required to be returned to the borrower upon the termination of any loan, the Fund may be required to pay or cause to be paid to such borrower or another entity an amount equal to such shortfall in cash. The Fund generally accepts cash (U.S. and foreign currency), securities issued or guaranteed by the U.S. government or its agencies or instrumentalities, or sovereign debt as collateral for these lending transactions, although in the future may accept other types of collateral. There is also a risk of loss should the borrower default before the securities are returned, and due to market movements the value of the collateral held has fallen and/or the value of the securities on loan has risen.

54

---

**Repurchase Policy Risks.** Quarterly repurchases by the Fund of its shares typically will be funded from available cash or sales of portfolio securities. However, payment for repurchased shares may require the Fund to liquidate portfolio holdings earlier than the Adviser otherwise would liquidate such holdings, potentially resulting in losses, and may increase the Fund's portfolio turnover.

The Adviser may take measures to attempt to avoid or minimize such potential losses and turnover, and instead of liquidating portfolio holdings, may borrow money to finance repurchases of shares. If the Fund borrows to finance repurchases, interest on any such borrowings will negatively affect shareholders who do not tender their shares in a repurchase offer by increasing the Fund's expenses and reducing net investment income. To the extent the Fund finances repurchase proceeds by selling investments, the Fund may hold a larger proportion of its gross assets in less liquid securities. Also, the sale of securities to fund repurchases could reduce the market price of those securities, which in turn would reduce the Fund's NAV.

Repurchase of shares will tend to reduce the amount of outstanding shares and, depending upon the Fund's investment performance, its net assets. A reduction in the Fund's net assets may increase the Fund's expense ratio, to the extent that additional shares are not sold. In addition, the repurchase of shares by the Fund may be a taxable event to shareholders.

The Fund's quarterly repurchase offers are a shareholder's only means of liquidity with respect to his or her shares. The shares are not traded on a national securities exchange and no secondary market exists for the shares, nor does the Fund expect a secondary market for its shares to exist in the future.

**Reverse Repurchase Agreement Risk.** The Fund may enter into reverse repurchase agreements with respect to securities held by the Fund that could otherwise be sold by the Fund. In a reverse repurchase agreement the Fund sells a security held by the Fund and simultaneously obtains the commitment of the purchaser (typically, a commercial bank or a broker or dealer) to sell the security back to the Fund at an agreed-upon price on an agreed-upon date. The Fund will maintain cash or liquid securities in an amount sufficient to cover its obligations with respect to reverse repurchase agreements. The Fund receives payment for such securities only upon physical delivery or evidence of book entry transfer by its custodian. Regulations of the SEC require that, if securities are sold by a fund under a reverse repurchase agreement, the fund designate or segregate liquid assets in an amount equal to the fund's daily marked-to-market value of such agreement. Reverse repurchase agreements are considered borrowings of money by the Fund and as such would be subject to the restrictions on issuing senior securities.

CONFIDENTIAL

FSD2025-0116                                                                                                         2025-08-19

Repurchase agreements could involve certain risks in the event of default or insolvency of the other party, including possible delays or restrictions upon the Fund's ability to dispose of the proceeds of the sale received from the counterparty. An additional risk is that the market value of securities sold by the Fund under a reverse repurchase agreement could decline below the price at which the Fund is obligated to repurchase them.

***Risks Relating to Fund's Tax Status.*** To remain eligible for the favorable tax treatment accorded to regulated investment companies ("RICs") and their shareholders under the Code, the Fund must meet certain source of income, asset diversification and annual distribution requirements. Very generally, in order to qualify as a RIC, the Fund must derive at least 90% of its gross income for each taxable year from dividends, interest, payments with respect to certain securities loans, gains from the sale or other disposition of stock, securities or foreign currencies, other income derived with respect to its business of investing in stock or other securities, or income from qualified publicly traded partnerships. In some cases, if the Fund fails to meet these income requirements at the end of a taxable year, it will be able to cure such failure by paying a Fund-level tax to avoid the loss of its RIC status; such tax could be substantial. The Fund must also meet certain asset diversification requirements at the end of each quarter of each of its taxable years. Failure to meet these diversification requirements on the last day of a quarter will result in the Fund's loss of RIC status, unless it is able to cure such failure, for instance, by disposing of certain investments, including at potentially disadvantageous times and prices, and, in some cases, by paying a Fund-level tax.

55

In addition, in order to be eligible for the favorable tax treatment accorded RICs, the Fund must meet the annual distribution requirement, requiring it to distribute with respect to each taxable year at least the sum of 90% of its "investment company taxable income" (generally-its taxable ordinary income and realized net short-term capital gains in excess of realized net long-term capital losses, if any) and 90% of its net tax-exempt income (if any), to its shareholders. Because the Fund may leverage its portfolio through a master repurchase agreement, may enter into reverse repurchase transactions from time to time, and may use additional debt financing in the future, the Fund is subject to certain asset coverage ratio requirements under the 1940 Act that could, under certain circumstances, restrict the Fund from making the distributions necessary to satisfy this annual distribution requirement and to avoid fund-level U.S. federal income or excise taxes. Any taxable income (including net long-term capital gains) that the Fund is unable to distribute will be subject to fund-level tax at the applicable corporate income tax rate. Further, if the Fund fails to meet the annual distribution requirement or either of the RIC qualification requirements in respect of a taxable year and is ineligible to or otherwise does not cure such failure for any such year, all of its taxable income regardless of whether timely distributed to shareholders will be subject to fund-level tax at the applicable corporate income tax rate and all of its distributions from earnings and profits (including from net long-term capital gains) will be taxable to shareholders as ordinary income. Some portions of such distributions may be eligible for the dividends-received deduction in the case of corporate shareholders and may be eligible to be treated as "qualified dividend income" in the case of shareholders taxed as individuals, provided, in both cases, the shareholder meets certain holding period and other requirements in respect of the Fund's shares. See "U.S. Federal Income Tax Matters."

If the Fund were to fail to qualify or were ineligible for treatment as a RIC, the resulting fund-level taxes could substantially reduce the Fund's net assets, the amount of income available for distribution and the amount of its distributions. Such a failure would have a material adverse effect on the Fund and its shareholders. In addition, in some cases, the Fund could be required to recognize unrealized gains, pay substantial taxes and interest and make substantial distributions in order to re-qualify as a RIC.

***RIC-Related Risks of Investments Generating Non-Cash Taxable Income.*** Certain of the Fund's investments will require the Fund to recognize taxable income in a taxable year in excess of the cash actually received by the Fund with respect to those investments during that year. In particular, the Fund expects that a substantial portion of its investments in loans and other debt obligations will be treated as having "market discount" and/or "original issue discount" for U.S. federal income tax purposes, which, in some cases, could be significant. Because the Fund may be required to recognize income in respect of these investments before or without receiving cash representing such income, the Fund may have difficulty satisfying the annual distribution requirements applicable to RICs and avoiding Fund-level U.S. federal income or excise taxes. Accordingly, the Fund may be required to sell portfolio securities, including at potentially disadvantageous times or prices, raise additional debt or equity capital, or reduce new investments, to obtain the cash needed to make these income distributions. If the Fund liquidates portfolio securities to raise cash, the Fund may realize gain or loss on such liquidations; in the event the Fund realizes net long-term or short-term capital gains from such liquidation transactions, its shareholders may receive larger capital gain or ordinary dividends, respectively, than they would in the absence of such transactions.

***REIT Tax Risk for REIT Subsidiaries.*** The REIT Subsidiaries and any REIT subsidiary the Fund may form in the future will elect to be taxed as REITs beginning with the first year in which they commence material operations. In order for each REIT Subsidiary and any future REIT subsidiary to qualify and maintain its qualification as a REIT, it must satisfy certain requirements set forth in the Code and Treasury Regulations that depend on various factual matters and circumstances. The Fund and the Adviser intend to cause the REIT Subsidiaries and any future REIT subsidiaries to structure their activities in a manner designed to satisfy all of these requirements. However, the application of such requirements is not entirely clear, and it is possible that the Internal Revenue Service ("IRS") may interpret or apply those requirements in a manner that jeopardizes the ability of such REIT subsidiary to satisfy all of the requirements for qualification as a REIT.

If any REIT Subsidiary or future REIT subsidiary fails to qualify as a REIT for any taxable year that it is operational and it does not qualify for certain statutory relief provisions, it will be subject to U.S. federal income

56

tax on its taxable income at the applicable corporate income tax rate. In addition, it would generally be disqualified from treatment as a REIT for the four taxable years following any taxable year in which it fails to qualify as a REIT. Loss of REIT status would reduce a REIT subsidiary's net earnings available for investment or distribution to the Fund as a result of the imposition of entity-level tax on the REIT subsidiary. In addition, distributions to the Fund would no longer qualify for the dividends paid deduction, and the REIT subsidiary would no longer be required to make distributions. If this occurs, the REIT subsidiary might be required to borrow funds or liquidate some investments in order to pay the applicable tax.

To obtain the favorable tax treatment afforded to REITs under the Code, among other things each REIT subsidiary generally will be required each year to distribute to its shareholders at least 90% of its REIT taxable income determined without regard to the dividends-paid deduction and excluding net capital gain. To the extent that it does not distribute all of its net capital gains, or distributes at least 90%, but less than 100%, of its REIT taxable income, as adjusted, it will have to pay an entity-level tax on amounts retained. Furthermore, if it fails to distribute during each calendar year at least the sum of (a) 85% of its ordinary income for that year, (b) 95% of its capital gain net income for that year, and (c) any undistributed taxable income from prior periods, it would have to pay a 4% nondeductible excise tax on the excess of the amounts required to be distributed over the sum of (x) the amounts that it actually distributed and (y) the amounts it retained and upon which it paid income tax at the entity level. These requirements could cause it to distribute amounts that otherwise would be spent on investments in real estate assets, and it is possible that the REIT subsidiary might be required to borrow funds, possibly at unfavorable rates, or sell assets to fund the required distributions.

In order to qualify as a REIT, not more than 50% of the value of a REIT subsidiary's shares may be owned, directly or indirectly, through the application of certain attribution rules under the Code, by any five or fewer individuals, as defined in the Code to include specified entities, during the last half of any taxable year other than the REIT subsidiary's first taxable year (the "50% Test"). For purposes of the 50% Test, the REIT subsidiary will "look through" to the beneficial owners of the Fund's shares. Accordingly, if five or fewer individuals or certain specified entities during the last half of any calendar year own, directly or indirectly, more than 50% of the REIT subsidiary's shares through the Fund, then the REIT subsidiary's qualification as a REIT could be jeopardized. The Adviser intends to monitor all purchases and transfers of a REIT subsidiary's shares and the Fund's shares by regularly reviewing, among other things, ownership filings required by the federal securities laws to monitor the beneficial ownership of a REIT subsidiary's shares to ensure that the REIT subsidiary will meet and will continue to meet the 50% Test. However, the Adviser may not have the information necessary for it to ascertain with certainty whether or not a REIT subsidiary satisfies the 50% test and may not be able to prevent the REIT subsidiary from failing the 50% Test. If a REIT subsidiary fails to satisfy the requirements related to the direct or indirect ownership of its outstanding capital stock, the REIT subsidiary would fail to qualify a REIT and the REIT subsidiary would be required to pay U.S. federal income tax on its taxable income, and distributions to its shareholders would not be deductible by it in determining its taxable income.

***Operational and Technology Risk.*** The Fund, its service providers, and other market participants increasingly depend on complex information technology and communications systems to conduct business functions. These

systems are subject to a number of different threats or risks that could adversely affect the Fund and its shareholders, despite the efforts of the Fund and its service providers to adopt technologies, processes, and practices intended to mitigate these risks. For example, unauthorized third parties may attempt to improperly access, modify, disrupt the operations of, or prevent access to these systems of the Fund, the Fund's service providers, counterparties, or other market participants or data within them (a "cyber-attack").

Power or communications outages, acts of god, information technology equipment malfunctions, operational errors, and inaccuracies within software or data processing systems may also disrupt business operations or impact critical data. Market events also may trigger a volume of transactions that overloads current information technology and communication systems and processes, impacting the ability to conduct the Fund's operations.

57

Cyber-attacks, disruptions, or failures that affect the Fund's service providers or counterparties may adversely affect the Fund and its shareholders, including by causing losses for the Fund or impairing Fund operations. For example, the Fund's or its service providers' assets or sensitive or confidential information may be misappropriated, data may be corrupted, and operations may be disrupted (e.g., cyber-attacks or operational failures may cause the release of private shareholder information or confidential Fund information, interfere with the processing of shareholder transactions, impact the ability to calculate the Fund's NAV, and impede trading). In addition, cyber-attacks, disruptions, or failures may cause reputational damage and subject the Fund or its service providers to regulatory fines, litigation costs, penalties or financial losses, reimbursement or other compensation costs, and/or additional compliance costs.

While the Fund and its service providers may establish business continuity and other plans and processes to address the possibility of cyber-attacks, disruptions, or failures, there are inherent limitations in such plans and systems, including that they do not apply to third parties, such as other market participants, as well as the possibility that certain risks have not been identified or that unknown threats may emerge in the future.

Similar types of operational and technology risks are also present for issuers of the Fund's investments, which could have material adverse consequences for such issuers, and may cause the Fund's investments to lose value. In addition, cyber-attacks involving a Fund counterparty could affect such counterparty's ability to meet its obligations to the Fund, which may result in losses to the Fund and its shareholders. Furthermore, as a result of cyber-attacks, disruptions, or failures, an exchange or market may close or issue trading halts on specific securities or the entire market, which may result in the Fund being, among other things, unable to buy or sell certain securities or financial instruments or unable to accurately price its investments. The Fund cannot directly control any cybersecurity plans and systems put in place by its service providers, Fund counterparties, issuers in which the Fund invests, or securities markets and exchanges.

In addition, other disruptive events, including (but not limited to) natural disasters and public health crises may adversely affect the Fund's ability to conduct business, in particular if the Fund's employees or the employees of its service providers are unable or unwilling to perform their responsibilities as a result of any such event. Even if the Fund's employees and the employees of its service providers are able to work remotely, those remote work arrangements could result in the Fund's business operations being less efficient than under normal circumstances, could lead to delays in its processing of transactions, and could increase the risk of cyber-attacks.

58

**CONFIDENTIAL**                                                                    **247**

TDIT005285

**MANAGEMENT OF THE FUND**

The Fund is a party to contractual arrangements with various parties, including, among others, the Adviser, the Distributor, the fund administrator, and the transfer agent, who provide services to the Fund. Shareholders are not parties to, or intended ("third-party") beneficiaries of, any such contractual arrangements, and such contractual arrangements are not intended to create in any individual shareholder or group of shareholders any right to enforce them against the service providers or to seek any remedy under them against the service providers, either directly or on behalf of the Fund. Neither this Prospectus, nor the related SAI, is intended, or should be read, to be or to give rise to an agreement or contract between the Fund and any investor, or to give rise to any rights in any shareholder or other person other than any rights under federal or state law that may not be waived.

**Trustees and Officers**

The Board is responsible for the overall management of the Fund, including supervision of the duties performed by the Adviser. The Board is comprised of four trustees (each, a "Trustee"). The Trustees are responsible for the Fund's overall management, including adopting the investment and other policies of the Fund, electing and replacing officers and selecting and supervising the Fund's investment adviser. The name and business address of the Trustees and officers of the Fund and their principal occupations and other affiliations during the past five years, as well as a description of committees of the Board, are set forth under "Management" in the SAI.

**Investment Adviser**

NexPoint Advisors, L.P., which serves as the Adviser to the Fund, is registered with the SEC as an investment adviser under the Advisers Act and is an affiliate of NAM. NexPoint has its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. James Dondero, along with Mark Okada, founded the parent of the Adviser in April 1993. The Adviser also externally manages NexPoint Capital, Inc., a non-traded BDC. NAM manages Highland Opportunities and Income Fund ("HFRO") and Highland Global Allocation Fund ("GAF"), registered closed-end funds whose shares trade on the NYSE. The Adviser's senior management team has experience across private lending, private equity, real estate investing and other investment strategies. Collectively, the Adviser and its affiliates managed approximately $16.9 billion in assets as of December, 31, 2024 including approximately $12.5 billion in gross real estate assets. The Adviser is controlled by James Dondero by virtue of his control of its general partner, NexPoint Advisors GP, LLC.

Under the general supervision of the Board, the Adviser will carry out the investment and reinvestment of the net assets of the Fund, will furnish continuously an investment program with respect to the Fund, and determine which securities should be purchased, sold or exchanged. In addition, the Adviser will supervise and provide oversight of the Fund's service providers. The Adviser has entered into a Services Agreement (the "Services Agreement") with Skyview Group ("Skyview"), pursuant to which the Adviser will receive administrative and operational support services to enable it to provide the required advisory services to the Fund. The Adviser will compensate all Adviser and Skyview personnel who provide services to the Fund. In return for these services, facilities and payments, the Fund has agreed to pay the Adviser as compensation under the Investment Advisory Agreement a monthly management fee computed at the annual rate of 1.25% of the Daily Gross Assets of the Fund. The Adviser may employ research services and service providers to assist in the Adviser's market analysis and investment selection.

A discussion regarding the basis for the Board's approval of the Fund's Investment Advisory Agreement is available in the Fund's annual report to shareholders for the year ended December 31, 2024.

The Adviser and the Fund have entered into the Expense Limitation Agreement under which the Adviser has agreed contractually to waive its fees and to pay or absorb the ordinary operating expenses of the Fund (including organizational and offering expenses, but excluding distribution fees, interest, dividend expenses on short sales, brokerage commissions and other transaction costs, acquired fund fees and expenses, taxes, expenses payable by

59

the Fund for third party administration services, litigation expenses and extraordinary expenses), to the extent that they exceed 1.75% per annum of the Fund's average Daily Gross Assets (the "Expense Limitation"). If the Fund incurs expenses excluded from the Expense Limitation Agreement, the Fund's expense ratio would be higher and could exceed the Expense Limitation. In consideration of the Adviser's agreement to limit the Fund's expenses, the Adviser is entitled to recoup from the Fund the amount of any fees waived and Fund expenses paid or absorbed (other than organizational and initial offering expenses, which are those expenses incurred by the Fund in order to permit the Fund to be declared effective by the SEC and to commence operations) to the extent that: (1) the reimbursement for fees and expenses will be made only if payable not more than three years from the date on which such fees are foregone or expenses are incurred by the Adviser; and (2) such recoupment does not cause the Fund's ordinary operating expenses plus recoupment to exceed the Expense Limitation in effect at the time the expenses were paid or waived or any Expense Limitation in effect at the time of recoupment. The Expense Limitation Agreement will remain in effect until at least May 1, 2026, unless and until the Board approves its modification or termination. The Expense Limitation Agreement may not be amended or terminated unless approved by the Board.

The REIT Subsidiaries entered into a separate investment advisory agreement with the Adviser in July 2016 and June 2022. To the extent fees are paid to the Adviser by the REIT Subsidiaries, such fees will be offset against fees otherwise payable by the Fund to the Advisor, such that shareholders of the Fund will only be subject to one layer of fees to the Adviser. Notwithstanding this arrangement, the Fund and its shareholders will indirectly bear the expenses associated with forming the REIT Subsidiaries, non-advisory fees paid by the REIT Subsidiaries (if any) and operating expenses, including maintaining their REIT qualification. To the extent the Fund forms one or more other REIT subsidiaries, it is expected that they will enter into separate investment advisory agreements that have substantially similar terms. The Fund may invest in funds not managed by an affiliate of the Adviser (including closed-end funds, ETFs, private funds, externally managed traded and non-traded REITs, etc.), in which case two layers of fees will be paid by the Fund.

Pursuant to the Investment Advisory Agreement, the Adviser provides administration services to the Fund, provides executive and other personnel necessary to administer the Fund and furnishes office space. Under a separate sub-administration agreement, dated July 23, 2018, the Adviser has delegated certain administrative functions to SEI Global Funds Services ("SEI") and pays SEI a portion of the fee it receives from the Fund. Under the Sub-Administration Agreement, SEI has agreed to provide fund accounting services; asset data services; fund administration and reporting services; and regulatory administration services, including preparation and filing of various reports with the appropriate regulatory agencies and the SEC for the Fund.

**Portfolio Managers**

James Dondero and Matthew McGraner serve as the portfolio managers and are primarily responsible for the day-to-day management of the Fund.

**James Dondero** is the founder and President of NexPoint Advisors, L.P. ("NexPoint") and co-founder of NexPoint Asset Management, L.P. ("NAM"). Mr. Dondero has over 30 years of experience investing across the alternative landscape. In that time, he established a number of integrated businesses to manage investments in real estate, private equity, and high-yield and structured credit, among other areas. Mr. Dondero holds various leadership roles at NexPoint Advisors, L.P., NexPoint Asset Management, L.P., and other NexPoint affiliates. Mr. Dondero holds various leadership roles across the NexPoint businesses; he serves as a portfolio manager for several funds and is an officer and director at NexPoint's publicly traded REITs. Additionally, Mr. Dondero holds director positions at several companies within financial services, real estate, and other industries. He is the chairman of NexBank Capital, Inc. and a director of SeaOne Holdings, LLC. A dedicated philanthropist, Mr. Dondero actively contributes to initiatives in education, veterans' affairs, and community and economic development, and has been instrumental in supporting a number of civic and cultural institutions in the Dallas-Fort Worth area. He is a member of the Southern Methodist University Cox School of Business Executive Board

60

CONFIDENTIAL                     249

TDIT005287

and the George W. Bush Presidential Center Executive Advisory Council. Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He received certification as a Certified Public Accountant (CPA) and a Certified Managerial Accountant (CMA) and is a holder of the right to use the Chartered Financial Analyst (CFA) designation.

**Mr. McGraner** has extensive experience in real estate and private equity transactions and currently leads the operations of the real estate platform of NexPoint Advisors, L.P. and its affiliates, a suite of leading alternative investment managers he co-founded. In that role, he sources and executes investments, manages risk and develops potential business opportunities, including fundraising, private investments and joint ventures. In his role at NexPoint, Mr. McGraner has served as the Executive VP and Chief Investment Officer of NXRT, a multifamily real estate investment trust, since 2016; NREF, a mortgage REIT, since 2020; VineBrook Homes Trust, a single family rental REIT, since 2019; NexPoint Diversified Real Estate Trust, a diversified REIT, since 2022; and as a member of the board of directors and President of NexPoint Storage Partners, a self-storage REIT, since 2020. Mr. McGraner is also a licensed attorney and was formerly an attorney at an AmLaw 20 multinational law firm, where his practice primarily focused on private equity, real estate and mergers and acquisitions. Since 2013, Mr. McGraner has led the acquisition and financing of over $20.0 billion of real estate investments. Mr. McGraner holds a B.S. from Vanderbilt University and a J.D. from the Washington University School of Law.

The SAI provides additional information about the Fund's portfolio managers' compensation, other accounts managed and ownership of Fund shares.

**Transfer Agent**

SS&C serves as the transfer agent of the Fund.

**Custodian**

Bank of New York Mellon ("BNY"), with principal offices at 240 Greenwich Street, New York, New York 10286, serves as custodian for the securities and cash of the Fund's portfolio. Under a Custodian Agreement, BNY holds the Fund's assets in safekeeping and keeps all necessary records and documents relating to its duties.

**Fund Expenses**

The Adviser is obligated to pay expenses associated with providing the services stated in the Investment Advisory Agreement, including compensation of and office space for its officers and employees connected with investment and economic research, trading and investment management and administration of the Fund. The Adviser is obligated to pay the fees of any Trustee of the Fund who is affiliated with it. The Adviser will provide such services either directly or through the Services Agreement with Skyview.

The Fund pays all other expenses incurred in the operation of the Fund, which consist of: (i) expenses for legal and independent accountants' services; (ii) costs of printing proxies, share certificates, if any, and reports to shareholders; (iii) charges of the custodian and transfer agent in connection with the Fund's distribution reinvestment policy; (iv) fees and expenses of independent Trustees; (v) printing costs; (vi) membership fees in trade associations; (vii) fidelity bond coverage for the Fund's officers and Trustees; (viii) errors and omissions insurance for the Fund's officers and Trustees; (ix) brokerage costs; (x) taxes; (xi) costs associated with the Fund's quarterly repurchase offers; (xii) servicing fees; and (xiii) other extraordinary or non-recurring expenses and other expenses properly payable by the Fund. The expenses incident to the offering and issuance of shares to be issued by the Fund will be capitalized and amortized on a straight-line basis over 12 months.

61

Class C shares will pay to the Distributor a Distribution Fee that will accrue at an annual rate equal to 0.75% of the Fund's average daily net assets attributable to Class C shares, and is payable on a quarterly basis. Class A and Class Z shares are not subject to Distribution Fees. The Fund will also pay a monthly shareholder servicing fee at an annual rate of up to 0.25% of the average daily net assets of the Class A and Class C shares. See "Plan of Distribution."

The Fund will pay organizational costs and offering expenses incurred with respect to the offering of its shares from the proceeds of the offering, less amounts advanced under the Expense Limitation. Since February 9, 2018, the Adviser paid or reimbursed the Fund's organizational and offering expenses incurred with respect to its initial and continuous offering and will not seek recoupment of such fees. For tax purposes, offering costs cannot be deducted by the Fund or the Fund's shareholders. Therefore, for tax purposes, the expenses incident to the offering and issuance of shares to be issued by the Fund will be capitalized and amortized on a straight-line basis over 12 months.

The Investment Advisory Agreement authorizes the Adviser to select brokers or dealers (including affiliates) to arrange for the purchase and sale of Fund securities, including principal transactions. Any commission, fee or other remuneration paid to an affiliated broker or dealer will be paid in compliance with the Fund's procedures adopted in accordance with Rule 17e-1 under the 1940 Act.

62

**DETERMINATION OF NET ASSET VALUE**

The net asset value (or NAV) per share of each class of shares of the Fund is calculated as of 4:00 p.m., Eastern Time, on each day that the NYSE is open for business, except on days on which regular trading on the NYSE is scheduled to close before 4:00 p.m., when the Fund calculates NAV as of the scheduled close of regular trading. The NYSE is open Monday through Friday, but currently is scheduled to be closed on New Year's Day, Dr. Martin Luther King, Jr. Day, Presidents' Day, Good Friday, Memorial Day, Juneteenth Independence Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day or on the preceding Friday or subsequent Monday when a holiday falls on a Saturday or Sunday, respectively. The NAV per share of each class of shares of the Fund is computed by dividing the value of the Fund's net assets (i.e., the value of its securities and other assets less its liabilities, including expenses payable or accrued but excluding capital stock and surplus) attributable to the class of shares by the total number of shares of the class outstanding at the time the determination is made. The value of the Fund's portfolio assets may change on days the Fund is closed. Class A shares will be offered at net asset value plus their respective sales load, while Class C and Class Z shares will be offered at net asset value. During the continuous offering, the price of the shares will increase or decrease on a daily basis according to the net asset value of the shares.

Pursuant to Rule 2a-5 under the 1940 Act, the Board has designated NexPoint as the Fund's valuation designee (the "Valuation Designee") to perform the fair valuation determination for securities and other assets held by the Fund. NexPoint acting through its "Valuation Committee," is responsible for determining the fair value of investments for which market quotations are not readily available. The Valuation Committee is comprised of officers of NexPoint and certain of NexPoint's affiliated companies and determines fair value and oversees the calculation of the NAV. The Valuation Designee is subject to Board oversight and certain reporting and other requirements intended to provide the Board the information it needs to oversee the Valuation Designee.

The Fund's portfolio securities are valued in accordance with valuation policies and procedures established by the Adviser and approved by the Board.

NexPoint uses the following valuation methods to determine either current market value for investments for which market quotations are available or, if not available, the fair value, as determined in good faith pursuant to NexPoint's policies and procedures:

- The market value of each security listed or traded on any recognized securities exchange or automated quotation system will be the last reported sale price at the relevant valuation date on the composite tape or on the principal exchange on which such security is traded. If no sale is reported on that date, or for over-the-counter securities, the Adviser utilizes, when available, pricing quotations from principal market makers. Such quotations may be obtained from third-party pricing services or directly from investment brokers and dealers in the secondary market. Generally, the Fund's loan and bond positions are not traded on exchanges and consequently are valued based on market prices received from third-party pricing services or broker-dealer sources.

- Dividends declared but not yet received, and rights in respect of securities which are quoted ex-dividend or ex-rights, will be recorded at the fair value thereof, as determined by the Adviser, which may (but need not) be the value so determined on the day such securities are first quoted ex-dividend or ex-rights.

- Listed options, or over-the-counter options for which representative brokers' quotations are available, will be valued in the same manner as listed or over-the-counter securities as hereinabove provided. Premiums for the sale of such options written by the Fund will be included in the assets of the Fund, and the market value of such options shall be included as a liability.

- The Fund's non-marketable investments for which market quotations are not readily available will generally be valued in such manner as the Adviser determines in good faith to reflect their fair values under procedures approved by the Board. The Valuation Committee has been established to provide

63

oversight of the valuation policies, processes and procedures, and is comprised of personnel from the Adviser and its affiliates. The Valuation Committee meets monthly to review the proposed valuations for investments and financial instruments and is responsible for evaluating the overall fairness and consistent application of established policies.

- The pricing of all assets that are fair valued in this manner will be subsequently reported to the Board. Pursuant to the Fund's pricing procedures, securities for which market quotations are not readily available may include securities that are subject to legal or contractual restrictions on resale, securities for which no or limited trading activity has occurred for a period of time, or securities that are otherwise deemed to be illiquid (i.e., securities that cannot be disposed of within seven days at approximately the price at which the security is currently priced by the Fund). Swaps and other derivatives would generally fall under this category.

- Investments by the Fund in any other mutual fund are valued at their respective NAVs as determined by those mutual funds each business day. The prospectuses for those mutual funds explain the circumstances under which those funds will use fair value pricing and the effects of using fair value pricing.

Rule 2a-5 states that a market quotation is readily available only when that quotation is a quoted price (unadjusted) in active markets for identical investments that the Fund can access at the measurement date, provided that a quotation will not be readily available if it is not reliable. Market quotations may also be not "readily available" if a significant event occurs that causes the Adviser to believe that the market price of a security no longer represents the security's current value at the time of the Fund's NAV calculation. In determining the fair value price of a security, the Adviser may use a number of other methodologies, including those based on discounted cash flows, multiples, recovery rates, yield to maturity or discounts to public comparables.

When determining the fair value of an asset, the Adviser will seek to determine the price that the Fund might reasonably expect to receive from the current sale of that asset in an arm's-length transaction. Fair value is defined as the amount for which assets could be sold in an orderly disposition over a reasonable period of time, taking into account the nature of the asset. Fair value determinations are based upon all available factors that the Adviser deems relevant. Fair value pricing, however, involves judgments that are inherently subjective and inexact, since fair valuation procedures are used only when it is not possible to be sure what value should be attributed to a particular asset or when an event will affect the market price of an asset and to what extent. As a result, there can be no assurance that fair value pricing will reflect actual market value, and it is possible that the fair value determined for a security will be materially different from the value that actually could be or is realized upon the sale of that asset.

Private Real Estate Investment Funds and Non-Traded REITs will be difficult to value, particularly to the extent that their underlying investments are not publicly traded. In the event a Non-Traded REIT does not report a value to the Fund on a timely basis, the Adviser, acting pursuant to policies approved by the Board, will determine the fair value of the Fund's investment based on the most recent value reported by the Non-Traded REIT, as well as any other relevant information available at the time the Fund values its investments. Following procedures approved by the Board, in the absence of specific transaction activity in a particular investment fund, the Adviser will consider whether it is appropriate, in light of all relevant circumstances, to value the Fund's investment at the net asset value reported by the Non-Traded REIT at the time of valuation or to adjust the value to reflect a premium or discount.

The Adviser will provide the Board with periodic reports, no less frequently than quarterly, that discuss the functioning of the valuation process, if applicable to that period, and that identify issues and valuation problems that have arisen, if any.

64

## CONFLICTS OF INTEREST

As a general matter, certain conflicts of interest may arise in connection with a portfolio manager's management of a fund's investments, on the one hand, and the investments of other accounts for which the portfolio manager is responsible, on the other. For example, it is possible that the various accounts managed could have different investment strategies that, at times, might conflict with one another to the possible detriment of the Fund. Alternatively, to the extent that the same investment opportunities might be desirable for more than one account, possible conflicts could arise in determining how to allocate them. Other potential conflicts might include conflicts created by specific portfolio manager compensation arrangements, and conflicts relating to selection of brokers or dealers to execute Fund portfolio trades and/or specific uses of commissions from Fund portfolio trades (for example, research, or "soft dollars", if any). The Adviser has adopted policies and procedures and has structured its portfolio managers' compensation in a manner reasonably designed to safeguard the Fund from being negatively affected as a result of any such potential conflicts. These policies and procedures generally require that the Adviser distribute investment opportunities among client accounts in a fair and equitable manner (*i.e.,* on a pro rata basis, relative to the size of the order) and seek best execution for securities transactions executed on the Fund's behalf.

If a potential investment is appropriate for either the Fund or another entity managed by the Adviser or its affiliates, such as NXDT, NXRT, VineBrook, NHT, NREF, NexPoint Real Estate Capital, LLC, NexPoint Real Estate Opportunities, LLC, NFRO REIT Sub, LLC or NexPoint Capital REIT, LLC, the Adviser and its affiliates have an allocation policy that provides that opportunities will be allocated among those accounts for which participation in the respective opportunity is considered most appropriate, taking into account, among other considerations with respect to any real estate investments:

First, the allocation policy looks to the investment objectives of the funds managed by the Adviser and its affiliates. To the extent the opportunity is consistent with the investment objectives of more than one fund managed by the Adviser and its affiliates, the allocation policy then looks to other factors, such as:

- which fund has available cash (including availability under lines of credit) to acquire the investment;

- whether there are any positive or negative income tax effects on any of the funds relating to the purchase;

- whether the investment opportunity creates geographic, asset class or tenant concentration / diversification concerns for any of the funds;

- how the investment size, potential leverage, transaction structure and anticipated cash flows affect each fund, including earnings and distribution coverage; and

- whether one or more of the funds has an existing relationship with the tenant(s), operator, facility or system associated with the investment, or a significant geographic presence that would make the investment strategically more important.

The Adviser will allocate investment opportunities across the entities for which such opportunities are appropriate, consistent with its internal conflict of interest and allocation policies. The Adviser will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy. However, there is no assurance that such investment opportunities will be allocated to the Fund fairly or equitably in the short-term or over time and there can be no assurance that the Fund will be able to participate in all such investment opportunities that are suitable for it. Please see "Risk Factors — Conflicts of Interest" for a description of risks associated with conflicts of interest.

Below are policies and procedures developed by the Adviser to address various conflicts of interest that may involve the Fund.

65

*Affiliated Services*

In situations where NexPoint and/or its affiliates, including, without limitation, any of their respective employees, provide services (including serving as an officer or director) to various companies in which the Fund has an interest, the relevant employee(s) must promptly notify NexPoint's Chief Compliance Officer of the activity prior to commencement of the service. All compensation in whatever form, including any non-cash compensation such as restricted shares, attributable to NexPoint and/or its affiliates serving as an officer or director to such companies must be immediately paid to the Fund in proportion to the Fund's relative ownership of such companies as of the date paid.

*Portfolio Management*

The Adviser's policies also require the Adviser and its personnel to: (i) ensure that the investment advice provided to the Fund is suitable to the Fund's investment objectives, needs and circumstances; (ii) ensuring fair and equitable allocations of investment opportunities among the Fund and the Adviser's other advisory clients and in the aggregation of orders; and (iii) trading for the Fund only on an agency basis.

The portfolio managers and their teams are responsible for the monitoring and positioning of the investments of the Fund. This includes the evaluation of a variety of factors affecting each investment such as industry and currency risks, concentration and liquidity and the suitability of the investment for the Fund.

The Adviser will not consider: (i) performance fees or differences in management fees between accounts in determining allocations; (ii) direct and indirect ownership of the Adviser or its affiliates or employees in an account in determining allocations; and (iii) relative performance of accounts in determining allocations.

The Adviser and/or any of its affiliates may serve as officers, directors or principals of entities that operate in the same or a related line of business as the Fund, or of other investment funds managed by the Adviser or its affiliates. In serving in these multiple capacities, they may have obligations to other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund or its shareholders. The Fund may compete with other entities managed by the Adviser and its affiliates for capital and investment opportunities.

There is no limitation or restriction on the Adviser or any of its affiliates with regard to acting as investment manager (or in a similar role) to other parties or persons. This and other future activities of the Adviser and/or its affiliates may give rise to additional conflicts of interest. Such conflicts may be related to obligations that the Adviser or its affiliates have to other clients.

Subject to prior approval of the Board, certain affiliates of the Adviser, including NexBank and Governance Re Ltd. among others, may provide banking, agency, insurance and other services to the Fund and its subsidiaries for customary fees, and neither the Fund, nor its subsidiaries will have a right to any such fees.

*Capital Structure Conflicts*

Conflicts may arise in cases when the Fund invests in different parts of an issuer's capital structure, including circumstances in which one or more advisory clients of NexPoint or its affiliates own private securities or obligations of an issuer and other clients may own public securities of the same issuer. As discussed above, in the event of conflicting interests within an issuer's capital structure, NexPoint will generally pursue the strategy that NexPoint believes best reflects what would be expected to be negotiated in an arm's length transaction with due consideration being given to NexPoint's fiduciary duties to each of its accounts (without regard to the nature of the accounts involved or the fees received from such accounts).

*Affiliated Transactions and Cross Trading*

As further described below, the Adviser may effect client cross-transactions where the Adviser causes a transaction to be effected between the Fund and another client advised by the Adviser or any of its affiliates. The

66

Adviser may engage in a client cross-transaction involving the Fund any time that the Adviser believes such transaction to be fair to the Fund and the other client of the Adviser or its affiliates in accordance with the Adviser's internal written cross-transaction policies and procedures.

The Adviser may direct the Fund to acquire or dispose of investments in cross trades between the Fund and other clients of the Adviser or its affiliates in accordance with applicable legal and regulatory requirements. In addition, to the extent permitted by the 1940 Act and SEC staff interpretation, the Fund may make and/or hold an investment, including an investment in securities, in which the Adviser and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Adviser's own investments in such companies.

*Participation in Creditor Committees, Underwriting and Other Activities*

The Adviser and/or any of its affiliates may participate in creditors or other committees with respect to the bankruptcy, restructuring or workout or foreclosure of the Fund's investments. In such circumstances, the Adviser may take positions on behalf of itself or its affiliates that are adverse to the Fund's interests.

The Adviser and/or any of its affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of investments purchased by the Fund. Such transactions are on an arm's-length basis and may be subject to arm's-length fees. There is no expectation for preferential access to transactions involving investments that are underwritten, originated, arranged or placed by the Adviser and/or any of its affiliates and neither the Fund nor its shareholders shall have the right to any such fees.

*Material Non-Public Information*

There are generally no ethical screens or information barriers among the Adviser and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions. If the Adviser, any of its personnel or its affiliates were to receive material non-public information about an investment or issuer, or have an interest in causing us to acquire a particular investment, the Adviser may be prevented from causing the Fund to purchase or sell such asset due to internal restrictions imposed on the Adviser. Notwithstanding the maintenance of certain internal controls relating to the management of material non-public information, it is possible that such controls could fail and result in the Adviser, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information. Inadvertent trading on material non-public information could have adverse effects on the Adviser's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Adviser's ability to perform its investment management services to the Fund. In addition, while the Adviser and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers. In such event, the Adviser's ability to operate as an integrated platform could also be impaired, which would limit the Adviser's access to personnel of its affiliates and potentially impair its ability to manage the Fund's investments.

NexPoint and its affiliates believe these policies and procedures are reasonably designed to prevent violations of the federal securities laws with respect to the conflicts identified above.

67

**QUARTERLY REPURCHASES OF SHARES**

Once each quarter, the Fund will offer to repurchase at NAV no less than 5% of the outstanding shares of the Fund, unless such offer is suspended or postponed in accordance with regulatory requirements (as discussed below). The offer to purchase shares is a fundamental policy that may not be changed without the vote of the holders of a majority of the Fund's outstanding voting securities (as defined in the 1940 Act). Shareholders will be notified in writing of each quarterly repurchase offer and the date the repurchase offer ends (the "Repurchase Request Deadline"). Shares received by the Fund or a Financial Intermediary (as defined below) prior to the Repurchase Request Deadline will be repurchased at the NAV per share determined as of the close of regular trading on the NYSE no later than the 14th day after the Repurchase Request Deadline, or the next business day if the 14th day is not a business day (each a "Repurchase Pricing Date").

Shareholders will be notified in writing about each quarterly repurchase offer, how they may request that the Fund repurchase their shares and the "Repurchase Request Deadline," which is the date the repurchase offer ends. The Fund will be deemed to have received a repurchase request order prior to the Repurchase Request Deadline when a financial intermediary or its agent or authorized designee (which may include other intermediaries designated by the financial intermediary to receive orders on the Fund's behalf) (collectively, "Financial Intermediaries") receives the order from the shareholder prior to the Repurchase Request Deadline, provided the Fund receives the repurchase request order from the Financial Intermediary prior to 11:59 p.m. Eastern Time on the date the repurchase offer ends. Financial Intermediaries are responsible for placing orders correctly and promptly with the Fund. Shares tendered for repurchase by shareholders prior to any Repurchase Request Deadline will be repurchased subject to the aggregate repurchase amounts established for that Repurchase Request Deadline. The time between the notification to shareholders and the Repurchase Request Deadline is generally 30 days, but may vary from no more than 42 days to no less than 21 days. Payment pursuant to the repurchase will be made by checks to the shareholder's address of record, or credited directly to a predetermined bank account on the Purchase Payment Date, which will be no more than seven days after the Repurchase Pricing Date. The Board may establish other policies for repurchases of shares that are consistent with the 1940 Act, regulations thereunder and other pertinent laws.

**Determination of Repurchase Offer Amount**

The Board, or a committee thereof, in its sole discretion, will determine the number of shares that the Fund will offer to repurchase (the "Repurchase Offer Amount") for a given Repurchase Request Deadline. The Repurchase Offer Amount will be no less than 5% and no more than 25% of the total number of shares outstanding on the Repurchase Request Deadline. In determining the Repurchase Offer Amount, the Board, or a committee thereof, may consider any information it deems necessary or appropriate, including the percentage of the Fund's outstanding shares tendered in previous repurchase offers; the Adviser's assessment of the liquidity of the Fund's investment portfolio; the potential impact of the Repurchase Offer Amount on Fund shareholders who do not tender their shares; and the potential impact of the Repurchase Offer Amount on the Fund's ability to achieve its investment objective. Investors should not rely on repurchase offers being made in amounts in excess of 5% of Fund assets, even in the event that shareholders tender more than the Repurchase Offer Amount with respect a repurchase offer.

If shareholders tender for repurchase more than the Repurchase Offer Amount for a given repurchase offer, the Fund will repurchase the shares on a pro rata basis. However, the Fund may accept all shares tendered for repurchase by shareholders who own less than one hundred shares and who tender all of their shares, before prorating other amounts tendered. In addition, the Fund will accept the total number of shares tendered in connection with required minimum distributions from an IRA or other qualified retirement plan. It is the shareholder's obligation to both notify and provide the Fund supporting documentation of a required minimum distribution from an individual retirement account ("IRA") or other qualified retirement plan.

68

CONFIDENTIAL

257

TDIT005295

**Notice to Shareholders**

Approximately 30 days (but no less than 21 days and more than 42 days) before each Repurchase Request Deadline, the Fund shall send to each shareholder of record and to each beneficial owner of the shares that are the subject of the repurchase offer a notification ("Shareholder Notification"). The Shareholder Notification will contain information shareholders should consider in deciding whether or not to tender their shares for repurchase. The notice also will include detailed instructions on how to tender shares for repurchase, state the Repurchase Offer Amount and identify the dates of the Repurchase Request Deadline, the scheduled Repurchase Pricing Date, and the date the repurchase proceeds are scheduled for payment (the "Repurchase Payment Deadline"), which will be no more than seven days after the Repurchase Pricing Date. The notice also will set forth the NAV that has been computed no more than seven days before the date of notification, and how shareholders may ascertain the NAV after the notification date.

**Repurchase Price**

The repurchase price of the shares will be the NAV as of the close of regular trading on the NYSE on the Repurchase Pricing Date. You may call (844) 485-9167 to learn the NAV. The notice of the repurchase offer also will provide information concerning the NAV, such as the NAV as of a recent date or a sampling of recent NAVs, and a toll-free number for information regarding the repurchase offer.

**Repurchase Amounts and Payment of Proceeds**

Shares tendered for repurchase by shareholders prior to any Repurchase Request Deadline will be repurchased subject to the aggregate Repurchase Offer Amount established for that Repurchase Request Deadline. Payment pursuant to the repurchase offer will be made by check to the shareholder's address of record, or credited directly to a predetermined bank account on the Repurchase Payment Deadline. The Board may establish other policies for repurchases of shares that are consistent with the 1940 Act, regulations thereunder and other pertinent laws.

If shareholders tender for repurchase more than the Repurchase Offer Amount for a given repurchase offer, the Board may, but is not required to, authorize the Fund to repurchase an additional amount of shares not to exceed 2% of the outstanding shares of the Fund on the Repurchase Request Deadline. If the Fund determines not to repurchase more than the Repurchase Offer Amount, or if shareholders tender shares in an amount exceeding the Repurchase Offer Amount plus 2% of the outstanding shares on the Repurchase Request Deadline, the Fund will repurchase the shares on a pro rata basis. However, the Fund may accept all shares tendered for repurchase by shareholders who own less than one hundred shares and who tender all of their shares, before prorating other amounts tendered.

**Contingent Deferred Sales Charge ("CDSC")**

Selling brokers, or other Financial Intermediaries that have entered into distribution agreements with the Distributor with respect to the sale of Class A and Class C shares, may receive a commission of up to 1.00% of the purchase price of Class A or Class C shares of $5,000,000 or more. Shareholders who tender for repurchase of such shareholder's Class A or Class C shares within 18 months of purchase will be subject to a CDSC of 1.00% of the original purchase price, which will be deducted from repurchase proceeds, if: (i) the original purchase was for amounts of $500,000 or more; and (ii) the shares were purchased without an initial sales charge. The Distributor may waive the imposition of the CDSC in the following situations: (1) shareholder death; or (2) shareholder disability. Any such waiver does not imply that the CDSC will be waived at any time in the future or that such CDSC will be waived for any other shareholder. Class Z shares will not be subject to an early-withdrawal charge.

**Suspension or Postponement of Repurchase Offer**

The Fund may suspend or postpone a repurchase offer only: (a) if making or effecting the repurchase offer would cause the Fund to lose its status as a RIC under the Code; (b) for any period during which the NYSE or any

69

market on which the securities owned by the Fund are principally traded is closed, other than customary weekend and holiday closings, or during which trading in such market is restricted; (c) for any period during which an emergency exists as a result of which disposal by the Fund of securities owned by it is not reasonably practicable, or during which it is not reasonably practicable for the Fund fairly to determine the value of its net assets; or (d) for such other periods as the Commission may by order permit for the protection of shareholders of the Fund.

**Liquidity Requirements**

The Fund must maintain liquid assets equal to the Repurchase Offer Amount from the time that the notice is sent to shareholders until the Repurchase Pricing Date. The Fund will ensure that a percentage of its net assets equal to at least 100% of the Repurchase Offer Amount consists of assets that can be sold or disposed of in the ordinary course of business at approximately the price at which the Fund has valued the investment within the time period between the Repurchase Request Deadline and the Repurchase Payment Deadline. The Board has adopted procedures that are reasonably designed to ensure that the Fund's assets are sufficiently liquid so that the Fund can comply with the repurchase offer and the liquidity requirements described in the previous paragraph. If, at any time, the Fund falls out of compliance with these liquidity requirements, the Board will take whatever action it deems appropriate to ensure compliance.

**Consequences of Repurchase Offers**

Repurchase offers will typically be funded from available cash or sales of portfolio securities. Payment for repurchased shares, however, may require the Fund to liquidate portfolio holdings earlier than the Adviser otherwise would, thus increasing the Fund's portfolio turnover and potentially causing the Fund to realize losses.

The Adviser intends to take measures to attempt to avoid or minimize such potential losses and turnover, and instead of liquidating portfolio holdings, may borrow money to finance repurchases of shares. If the Fund borrows to finance repurchases, interest on that borrowing will negatively affect shareholders who do not tender their shares in a repurchase offer by increasing the Fund's expenses and reducing any net investment income. To the extent the Fund finances repurchase amounts by selling Fund investments, the Fund may hold a larger proportion of its assets in less liquid securities. The sale of portfolio securities to fund repurchases also could reduce the market price of those underlying securities, which in turn would reduce the Fund's NAV.

Repurchase of the Fund's shares will tend to reduce the amount of outstanding shares and, depending upon the Fund's investment performance, its net assets. A reduction in the Fund's net assets would increase the Fund's expense ratio, to the extent that additional shares are not sold and expenses otherwise remain the same (or increase). In addition, the repurchase of shares by the Fund will be a taxable event to shareholders.

The Fund is intended as a long-term investment. The Fund's quarterly repurchase offers are a shareholder's only means of liquidity with respect to his or her shares. Shareholders have no rights to redeem or transfer their shares, other than limited rights of a shareholder's descendants to redeem shares in the event of such shareholder's death pursuant to certain conditions and restrictions. The shares are not traded on a national securities exchange and no secondary market exists for the shares, nor does the Fund expect a secondary market for its shares to exist in the future.

70

**DISTRIBUTION POLICY**

The Fund's distribution policy is to make monthly distributions to shareholders. The Fund's Board has the ultimate discretion as to whether such distributions will be in kind or in cash. If, for any distribution, investment company taxable income (which term includes net short-term capital gain), if any, and net tax-exempt income, if any, is less than the amount of the distribution, such difference will generally constitute a tax-free return of capital distributed from the Fund's assets. The Fund's final distribution for each taxable year will include any remaining investment company taxable income and net tax-exempt income undistributed during the year, as well as all net capital gain realized during the year. If the total distributions made in any taxable year exceed investment company taxable income, net tax-exempt income and net capital gain, such excess distributed amount would be treated as ordinary dividend income to the extent of the Fund's current and accumulated earnings and profits. Distributions in excess of the earnings and profits would first be a tax-free return of capital to the extent of a shareholder's adjusted tax basis in the shares. After such adjusted tax basis is reduced to zero, the distribution would constitute capital gain (assuming the shares are held as capital assets).

This distribution policy may, under certain circumstances, have certain adverse consequences to the Fund and its shareholders because it may result in a return of capital, which in turn may result in fewer of a shareholder's assets being invested in the Fund and which, over time, would increase the Fund's expense ratio and decrease returns of shareholders. The distribution policy also may cause the Fund to sell securities at a time it would not otherwise do so in order to manage the distribution of income and gain. The initial distribution will be declared on a date determined by the Board. If the Fund's investments are delayed, the initial distribution may consist principally of a return of capital.

Unless the registered owner of shares elects to receive cash, all dividends declared on shares will be automatically reinvested in additional shares of the Fund. See "Distribution Reinvestment Policy."

The dividend distribution described above may result in the payment of approximately the same amount or percentage to the Fund's shareholders each period.

Shareholders receiving periodic payments from the Fund may be under the impression that they are receiving net profits. However, all or a portion of a distribution may consist of a return of capital. Shareholders should not assume that the source of a distribution from the Fund is net profit. A return of capital distribution is not taxable to a shareholder unless it exceeds a shareholder's tax cost (or "tax basis") in the Fund's shares. Returns of capital distributions reduce a shareholder's tax basis, thereby potentially increasing the taxable gain, if any, or decreasing the loss recognized by a shareholder upon a subsequent disposition of Fund shares. Once a shareholder's tax basis is reduced to zero, any further return of capital distribution would be taxable as capital gains, provided shares are held as capital assets. As required under Section 19(a) of the 1940 Act, the Fund will provide a notice to shareholders at the time of distribution when such distribution does not consist solely of net income. Additionally, each distribution payment will be accompanied by a written statement which discloses the source or sources of each distribution. The IRS requires you to report the amounts so received in any calendar year, excluding returns of capital, in each case as determined and reported on Forms 1099 (which amounts may differ from the sum of the amounts reported in prior notices under Section 19(a) as a result of the Fund's performance subsequent to such notices), on your income tax return, generally for the calendar year in which such amounts were received. The Fund will provide disclosures, with each distribution, that estimate the percentages of the current and year-to-date distributions that represent: (1) net investment income; (2) capital gains; and (3) return of capital. At the end of the year, the Fund may be required under applicable law to re-characterize distributions made previously during that year among: (1) ordinary income; (2) capital gains; and (3) return of capital for tax purposes. An additional distribution may be made in December, and other additional distributions may be made with respect to a particular fiscal year in order to comply with applicable law. Shareholders should read any written disclosure provided pursuant to Section 19(a) and Rule 19a-1 carefully and should not assume that the source of any distribution from the Fund is net profit.

The Board reserves the right to change the monthly distribution policy from time to time.

71

341

FSD2025-0116                    **Page 345 of 1530**                    2025-08-19

**DISTRIBUTION REINVESTMENT POLICY**

The Fund will operate under a distribution reinvestment policy administered by SS&C (the "Agent"). Pursuant to the policy, the Fund's ordinary income dividends, capital gain distributions or other distributions (each, a "Distribution" and collectively, "Distributions"), net of any applicable U.S. withholding tax, are reinvested in shares of the Fund.

Shareholders automatically participate in the distribution reinvestment policy, unless and until an election is made to withdraw from the policy on behalf of such participating shareholder. Shareholders who do not wish to have Distributions automatically reinvested should so notify the Agent in writing at NexPoint Real Estate Strategies Fund, c/o SS&C Technologies, Inc., P.O. Box 219630, Kansas City, MO 64121-9730. Such written notice must be received by the Agent 30 days prior to the record date of the Distribution or the shareholder will receive such Distribution in shares through the distribution reinvestment policy. Under the distribution reinvestment policy, the Fund's Distributions to shareholders are reinvested in full and fractional shares as described below.

When the Fund declares a Distribution, the Agent, on the shareholder's behalf, will receive additional authorized shares from the Fund either newly-issued or repurchased from shareholders by the Fund and held as treasury shares. The number of shares to be received when Distributions are reinvested will be determined by dividing the amount of the Distribution by the Fund's NAV per share.

The Agent will maintain all shareholder accounts and furnish written confirmations of all transactions in the accounts, including information needed by shareholders for personal and tax records. The Agent will hold shares in the account of the shareholders in non-certificated form in the name of the participant, and each shareholder's proxy, if any, will include those shares purchased pursuant to the distribution reinvestment policy. Each participant, nevertheless, has the right to request certificates for whole and fractional shares owned. The Fund will issue certificates in its sole discretion. The Agent will distribute all proxy solicitation materials, if any, to participating shareholders.

In the case of shareholders, such as banks, brokers or nominees, that hold shares for others who are beneficial owners participating under the distribution reinvestment policy, the Agent will administer the distribution reinvestment policy on the basis of the number of shares certified from time to time by the record shareholder as representing the total amount of shares registered in the shareholder's name and held for the account of beneficial owners participating under the distribution reinvestment policy.

Neither the Agent nor the Fund shall have any responsibility or liability beyond the exercise of ordinary care for any action taken or omitted pursuant to the distribution reinvestment policy, nor shall they have any duties, responsibilities or liabilities except as expressly set forth herein. Neither shall they be liable hereunder for any act done in good faith or for any good faith omissions to act, including, without limitation, failure to terminate a participant's account prior to receipt of written notice of his or her death or with respect to prices at which shares are purchased or sold for the participants account and the terms on which such purchases and sales are made, subject to applicable provisions of the federal securities laws.

The automatic reinvestment of Distributions will not relieve participants of any federal, state or local income tax that may be payable (or required to be withheld) on such Distributions. See "U.S. Federal Income Tax Matters."

The Fund reserves the right to amend or terminate the distribution reinvestment policy. There is no direct service charge to participants with regard to purchases under the distribution reinvestment policy; however, the Fund reserves the right to amend the distribution reinvestment policy to include a service charge payable by the participants.

All correspondence concerning the distribution reinvestment policy should be directed to the Agent at NexPoint Real Estate Strategies Fund, c/o SS&C Technologies, Inc., P.O. Box 219630, Kansas City, MO 64121-9730. Certain transactions can be performed by calling the toll free number (844) 485-9167.

72

**U.S. FEDERAL INCOME TAX MATTERS**

The following briefly summarizes some of the important federal income tax consequences to shareholders of investing in the Fund's shares, reflects the federal tax law as of the date of this Prospectus, and does not address special tax rules applicable to certain types of investors, such as corporate, tax-exempt and foreign investors. The summary discusses certain U.S. federal income tax consequences that may be relevant to a shareholder of the Fund that acquires, holds and/or disposes of shares of the Fund, and reflects provisions of the Code, existing Treasury regulations, rulings published by the IRS, and other applicable authority, as of the date of this Prospectus. These authorities are subject to change by legislative or administrative action, possibly with retroactive effect. The following discussion is only a summary of some of the important tax considerations generally applicable to investments in the Fund and the discussion set forth herein does not constitute tax advice. For more detailed information regarding tax considerations, see the SAI. There may be other tax considerations applicable to particular investors such as those holding shares in a tax-advantaged account such as an IRA or 401(k) plan. In addition, income earned through an investment in the Fund may be subject to state, local and foreign taxes. Investors should consult their tax advisers regarding other federal, state or local tax considerations that may be applicable in their particular circumstances, as well as any proposed tax law changes.

The Fund has elected to be treated and intends to qualify each year for taxation as a RIC under Subchapter M of the Code. In order for the Fund to qualify as a RIC, it must meet certain requirements regarding the sources of its income, the diversification of its assets, and the amount and timing of its distributions each year. If the Fund meets such requirements and so qualifies for the favorable tax treatment accorded to RICs, the Fund (but not the shareholder) will not be subject to federal income tax on income or gains distributed in a timely manner to its shareholders in the form of dividends or capital gain distributions. The Code imposes a 4% nondeductible excise tax on RICs, such as the Fund, to the extent they do not meet certain distribution requirements by the end of each calendar year. The Fund anticipates meeting these distribution requirements so as to avoid being subject to the 4% excise tax.

The Fund intends to make distributions of investment company taxable income after payment of the Fund's operating expenses no less frequently than annually. Unless a shareholder is ineligible to participate or elects otherwise, all distributions will be automatically reinvested in additional shares of the Fund pursuant to the distribution reinvestment policy. For U.S. federal income tax purposes, all dividends are generally taxable whether a shareholder receives them in cash or reinvests them in additional shares of the Fund. Distributions of the Fund's investment company taxable income (including short-term capital gains) will generally be taxable to shareholders as ordinary income to the extent of the Fund's current and accumulated earnings and profits. Distributions of the Fund's net capital gains (that is, the excess of net long-term capital gain over net short-term capital loss, in each case determined with reference to any loss carryforwards) properly reported by the Fund as capital gain dividends ("Capital Gain Dividends"), if any, are taxable to shareholders as long-term capital gains, regardless of the length of time shares have been held by shareholders. Distributions, if any, in excess of the Fund's earnings and profits will first reduce the adjusted tax basis of a holder's shares (thereby increasing any taxable gain or decreasing any taxable loss in connection with a subsequent taxable disposition of such shares) and, after that basis has been reduced to zero, will constitute capital gains to the shareholder of the Fund (assuming the shares are held as a capital asset). Some portions of the Fund's distributions may be eligible for the dividends-received deduction in the case of corporate shareholders and may be eligible to be treated as qualified dividend income in the case of shareholders taxed as individuals, provided, in both cases, the shareholder meets certain holding period and other requirements in respect of the Fund's shares. Dividends received by the Fund from a REIT will not qualify for the corporate dividends-received deduction and generally will not constitute qualified dividend income. There can be no assurance as to what portion of Fund distributions, if any, may be eligible for the dividends received deduction or for treatment as qualified dividend income.

If you sell, exchange or otherwise dispose of any of your shares of the Fund (including (i) exchanging them for shares of another eligible Fund as described in "Exchange of Shares" below or (ii) through a redemption) you will generally recognize a gain or loss in an amount equal to the difference between your tax basis in such shares

73

CONFIDENTIAL TDIT005300

of the Fund and the amount you receive upon disposition of such shares. If you hold your shares as capital assets, any such gain or loss will be long-term capital gain or loss if you have held (or are treated as having held) such shares for more than one year at the time of sale. All or a portion of any loss you realize on a taxable sale or exchange of your shares of the Fund will be disallowed if you acquire other shares of the Fund (whether through the automatic reinvestment of dividends or otherwise) within a 61-day period beginning 30 days before and ending 30 days after your sale or exchange of the shares. In such case, the basis of the shares acquired will be adjusted to reflect the disallowed loss.

In addition, any loss realized upon a taxable sale or exchange of Fund shares held (or deemed held) by you for six months or less will be treated as long-term, rather than short-term, to the extent of any capital gain dividends received (or deemed received) by you with respect to those shares.

The Fund will inform its shareholders of the source and tax status of all distributions promptly after the close of each calendar year.

74

### DESCRIPTION OF CAPITAL STRUCTURE AND SHARES

The Fund is an unincorporated statutory trust established under the laws of the State of Delaware upon the filing of a Certificate of Trust with the Secretary of State of Delaware on January 11, 2016. The Fund's Agreement and Declaration of Trust (the "Declaration of Trust") provides that the Trustees of the Fund may authorize separate classes of shares of beneficial interest. The Trustees have authorized an unlimited number of shares. The Fund does not intend to hold annual meetings of its shareholders.

The Declaration of Trust, which has been filed with the SEC, permits the Fund to issue an unlimited number of full and fractional shares of beneficial interest, no par value. The Fund offers three different classes of shares: Class A, Class C, and Class Z shares. The Fund has received exemptive relief from the SEC to issue multiple classes of shares and to impose asset-based distribution fees and early-withdrawal charges (See IC Release No. 28908, September 22, 2009). An investment in any share class of the Fund represents an investment in the same assets of the Fund. However, the minimum investment amounts, sales loads, and ongoing fees and expenses for each share class are different. The fees and expenses for the Fund are set forth in "Fees and Fund Expenses." The details of each share class are set forth in "Plan of Distribution."

Holders of shares will be entitled to the payment of dividends when, as and if declared by the Board. The Fund currently intends to make dividend distributions to its shareholders after payment of Fund operating expenses including interest on outstanding borrowings, if any, no less frequently than quarterly. Unless the registered owner of shares elects to receive cash, all dividends declared on shares will be automatically reinvested for shareholders in additional shares of the same class of the Fund. See "Distribution Policy." The 1940 Act may limit the payment of dividends to the holders of shares.

Each whole share shall be entitled to one vote as to matters on which it is entitled to vote pursuant to the terms of the Declaration of Trust on file with the SEC. Upon liquidation of the Fund, after paying or adequately providing for the payment of all liabilities of the Fund, and upon receipt of such releases, indemnities and refunding agreements as they deem necessary for their protection, the Trustees may distribute the remaining assets of the Fund among its shareholders. The shares are not liable to further calls or to assessment by the Fund. There are no pre-emptive rights associated with the shares. The Declaration of Trust provides that the Fund's shareholders are not liable for any liabilities of the Fund. Although shareholders of an unincorporated statutory trust established under Delaware law, in certain limited circumstances, may be held personally liable for the obligations of the Fund as though they were general partners, the provisions of the Declaration of Trust described in the foregoing sentence make the likelihood of such personal liability remote.

The Fund generally will not issue share certificates. However, upon written request to the Fund's transfer agent, a share certificate may be issued at the Fund's discretion for any or all of the full shares credited to an investor's account. Share certificates that have been issued to an investor may be returned at any time. The Fund's transfer agent will maintain an account for each shareholder upon which the registration of shares are recorded, and transfers, permitted only in rare circumstances, such as death or bona fide gift, will be reflected by bookkeeping entry, without physical delivery. The transfer agent will require that a shareholder provide requests in writing, accompanied by a valid signature guarantee form, when changing certain information in an account such as wiring instructions or telephone privileges.

The following table shows the amounts of Fund shares that have been authorized and are outstanding as of March 31, 2025:

| Title of Class | Amount Authorized | Amount Held by Fund or for its Account | Amount Outstanding Excluding Amount Shown Under |
|---|---|---|---|
| Class A | Unlimited | None | 464,693 |
| Class C | Unlimited | None | 162,541 |
| Class Z | Unlimited | None | 1,432,029 |

75

**ANTI-TAKEOVER PROVISIONS IN THE DECLARATION OF TRUST**

The Declaration of Trust includes provisions that could have the effect of limiting the ability of other entities or persons to acquire control of the Fund or to change the composition of the Board, and could have the effect of depriving the Fund's shareholders of an opportunity to sell their shares at a premium over prevailing market prices, if any, by discouraging a third party from seeking to obtain control of the Fund. These provisions may have the effect of discouraging attempts to acquire control of the Fund, which attempts could have the effect of increasing the expenses of the Fund and interfering with the normal operation of the Fund. The Trustees are elected for indefinite terms and do not stand for reelection. A Trustee may be removed from office without cause only by a written instrument signed or adopted by a majority of the remaining Trustees or by a vote of the holders of at least two-thirds of the class of shares of the Fund that are entitled to elect a Trustee and that are entitled to vote on the matter. The Declaration of Trust does not contain any other specific inhibiting provisions that would operate only with respect to an extraordinary transaction such as a merger, reorganization, tender offer, sale or transfer of substantially all of the Fund's asset, or liquidation.

76

CONFIDENTIAL TDIT005303

**PLAN OF DISTRIBUTION**

NexPoint Securities, Inc., located at 200 Crescent Court, Suite 700, Dallas, Texas 75201, serves as the Fund's principal underwriter, within the meaning of the 1940 Act, and acts as the distributor of the Fund's shares on a reasonable efforts basis, subject to various conditions. The Distributor is an affiliate of the Adviser. The Fund's shares are offered for sale through the Distributor at NAV plus the applicable sales load. The Distributor also may enter into selected dealer agreements with other broker-dealers for the sale and distribution of the Fund's shares. No arrangement has been made to place funds received in an escrow, trust or similar account. The Distributor is not required to sell any specific number or dollar amount of the Fund's shares, but will use its reasonable efforts to sell the shares. Shares of the Fund will not be listed on any national securities exchange and the Distributor will not act as a market marker in Fund shares.

On a quarterly basis, Class C shares will pay a Distribution Fee that will accrue at an annual rate equal to 0.75% of the Fund's average daily net assets attributable to Class C shares. Class A and Class Z shares are not subject to Distribution Fees. Class A and Class C shares are subject to a monthly shareholder servicing fee at an annual rate of up to 0.25% of the average daily net assets of the Fund attributable to each respective share class.

**Additional Broker Dealer Compensation**

The Adviser or its affiliates, in the Adviser's discretion and from their own resources (which may include the Adviser's legitimate profits from the advisory fee it receives from the Fund), may pay additional compensation to brokers or dealers in connection with the sale and distribution of Fund shares (the "Additional Compensation"). In return for the Additional Compensation, the Fund may receive certain marketing advantages including access to a broker's or dealer's registered representatives, placement on a list of investment options offered by a broker or dealer, or the ability to assist in training and educating the broker's or dealer's registered representatives. The Additional Compensation may differ among brokers or dealers in amount or in the manner of calculation: payments of Additional Compensation may be fixed dollar amounts, or based on the aggregate value of outstanding shares held by shareholders introduced by the broker or dealer, or determined in some other manner. The receipt of Additional Compensation by a selling broker or dealer may create potential conflicts of interest between an investor and its broker or dealer who is recommending the Fund over other potential investments. The payment of Additional Compensation may also have the effect of increasing the Fund's assets under management, which would increase management fees payable to the Adviser. There is no limit on the amount of additional compensation paid by the Adviser or its affiliates, subject to the limitations imposed by FINRA.

Additionally, the Fund, the Adviser and/or their respective affiliates, may pay a servicing fee to the Distributor and to other selected securities dealers and other financial industry professionals for providing ongoing services in respect of clients with whom they have distributed shares of the Fund. Such services may include electronic processing of client orders, electronic fund transfers between clients and the Fund, account reconciliations with the Fund's transfer agent, facilitation of electronic delivery to clients of Fund documentation, monitoring client accounts for back-up withholding and any other special tax reporting obligations, maintenance of books and records with respect to the foregoing, and such other information and liaison services as the Fund or the Adviser may reasonably request. Pursuant to a Shareholder Servicing Plan and Agreement, the Fund's (and, indirectly, the Class A and Class C holders') share of such servicing fees will not exceed an annual rate of 0.25% of the Fund's average daily net asset value.

Prior to the initial public offering of shares, the Adviser purchased $101,750 in shares of the Fund, which amount meets the net worth requirements of Section 14(a) of the 1940 Act.

**Purchasing Shares**

Investors may purchase shares directly from the Fund in accordance with the instructions below. Investors may buy and sell shares of the Fund through Financial Intermediaries that have made arrangements with the Fund and

77

CONFIDENTIAL

266

TDIT005304

are authorized to buy and sell shares of the Fund. Orders will be priced at the appropriate price next computed after it is received by the Fund or a Financial Intermediary. A Financial Intermediary may hold shares in an omnibus account in the Financial Intermediary's name or the Financial Intermediary may maintain individual ownership records. The Fund may pay the Financial Intermediary for maintaining individual ownership records as well as providing other shareholder services. Financial Intermediaries may charge fees for the services they provide in connection with processing your transaction order or maintaining an investor's account with them. Investors should check with their Financial Intermediary to determine if their account is subject to these arrangements. The Fund will be deemed to have received a purchase order prior when a Financial Intermediary receives the order from the shareholder. Financial Intermediaries are responsible for placing orders correctly and promptly with the Fund, forwarding payment promptly. Orders transmitted with a Financial Intermediary before the close of regular trading (generally 4:00 p.m., Eastern Time) on a day that the NYSE is open for business will be priced based on the Fund's NAV next computed after it is received by the Financial Intermediary.

**By Mail**

To make an initial purchase by mail, complete an account application and mail the application, together with a check made payable to NexPoint Real Estate Strategies Fund to:

**Regular Mail**

NexPoint Real Estate Strategies Fund
c/o SS&C Technologies, Inc.
P.O. Box 219630
Kansas City, MO 64121-9730

**Express Mail**

NexPoint Real Estate Strategies Fund
c/o SS&C Technologies, Inc.
801 Pennsylvania Ave
Kansas City, MO 64105

All checks must be in U.S. Dollars drawn on a domestic bank. The Fund will not accept payment in cash or money orders. The Fund also does not accept cashier's checks in amounts of less than $500. To prevent check fraud, the Fund will neither accept third party checks, Treasury checks, credit card checks, traveler's checks or starter checks for the purchase of shares, nor post-dated checks, post-dated on-line bill pay checks, or any conditional purchase order or payment.

It is the policy of the Fund not to accept applications under certain circumstances or in amounts considered disadvantageous to shareholders. The Fund reserves the right to reject any application.

**By Wire — Initial Investment**

To make an initial investment in the Fund, the transfer agent must receive a completed account application before an investor wires funds. Investors may mail or overnight deliver an account application to the transfer agent. Upon receipt of the completed account application, the transfer agent will establish an account. The account number assigned will be required as part of the instruction that should be provided to an investor's bank to send the wire. An investor's bank must include both the name of the Fund, the account number, and the investor's name so that monies can be correctly applied. If you wish to wire money to make an investment in the Fund, please call the Fund at (844) 485-9167 for wiring instructions and to notify the Fund that a wire transfer is coming. Any commercial bank can transfer same-day funds via wire. The Fund will normally accept wired funds for investment on the day received if they are received by the Fund's designated bank before the close of regular

78

trading on the NYSE. Your bank may charge you a fee for wiring same-day funds. The bank should transmit funds by wire to:

ABA #: (number provided by calling toll-free number above)
Credit: SS&C Technologies, Inc.
Account #: (number provided by calling toll-free number above)
Further Credit:
NexPoint Real Estate Strategies Fund
(shareholder registration)
(shareholder account number)

**By Wire — Subsequent Investments**

Before sending a wire, investors must contact the transfer agent to advise them of the intent to wire funds. This will ensure prompt and accurate credit upon receipt of the wire. Wired funds must be received prior to 4:00 p.m. Eastern time to be eligible for same day pricing. The Fund, and its agents, including the transfer agent and custodian, are not responsible for the consequences of delays resulting from the banking or Federal Reserve wire system, or from incomplete wiring instructions.

**Automatic Investment Plan — Subsequent Investments**

You may participate in the Fund's Automatic Investment Plan, an investment plan that automatically moves money from your bank account and invests it in the Fund through the use of electronic funds transfers or automatic bank drafts. You may elect to make subsequent investments by transfers of a minimum of $50 on specified days of each month into your established Fund account. Please contact the Fund at (844) 485-9167 for more information about the Fund's Automatic Investment Plan.

**By Telephone**

Investors may purchase additional shares of the Fund by calling (844) 485-9167. If an investor elected this option on the account application, and the account has been open for at least 15 days, telephone orders will be accepted via electronic funds transfer from your bank account through the Automated Clearing House (ACH) network. Banking information must be established on the account prior to making a purchase. Orders for shares received prior to 4 p.m. Eastern time will be purchased at the appropriate price calculated on that day.

Telephone trades must be received by or prior to market close. During periods of high market activity, shareholders may encounter higher than usual call waits. Please allow sufficient time to place your telephone transaction.

In compliance with the USA Patriot Act of 2001, SS&C will verify certain information on each account application as part of the Fund's Anti-Money Laundering Program. As requested on the application, investors must supply full name, date of birth, social security number and permanent street address. Mailing addresses containing only a P.O. Box will not be accepted. Investors may call SS&C at (844) 485-9167 for additional assistance when completing an application.

If SS&C does not have a reasonable belief of the identity of a customer, the account will be rejected or the customer will not be allowed to perform a transaction on the account until such information is received. The Fund also may reserve the right to close the account within 5 business days if clarifying information/documentation is not received.

**Exchange of Shares**

Shareholders of the Fund whose shares are repurchased during a Repurchase Offer may exchange those shares for shares of the same share class of any series within NexPoint Funds I or NexPoint Funds II. Such exchanges

79

will be effected at the daily NAV per share, such exchanges will be available during all Repurchase offer periods, subject to the limitations set forth below. **Call (844) 485-9167 for the prospectus of the fund being purchased, including applicable investment minimums, and read it carefully before investing.**

Your exchange privilege will be revoked if the exchange activity is considered excessive. In addition, the Fund may reject any exchange request for any reason, including if it does not think that the exchange is in the best interests of the Fund and/or its shareholders. The Fund may also terminate your exchange privilege if the Adviser determines that your exchange activity is likely to adversely impact its ability to manage the Fund or if the Fund otherwise determines that your exchange activity is contrary to its short-term trading policies and procedures.

Unless you are a tax-exempt investor or investing through a tax-advantaged retirement account or other tax-advantaged arrangement, an exchange is generally a taxable event, and you may realize a gain or a loss for federal income tax purposes. See "U.S. Federal Income Tax Matters." To exchange by telephone, call (844) 485-9167. Please have your account and taxpayer identification number available when calling.

**Financial Consultants — Subsequent Investments**

Investors may purchase additional shares of the Fund by contacting their financial consultants, such as a broker or investment adviser, and such intermediaries can arrange additional purchases for them.

**Share Class Considerations**

When selecting a share class, you should consider the following:

- which share classes are available to you;

- how much you intend to invest;

- how long you expect to own the shares; and

- total costs and expenses associated with a particular share class.

Each investor's financial considerations are different. You should speak with your financial advisor to help you decide which share class is best for you. Not all Financial Intermediaries offer all classes of shares. If your Financial Intermediary offers more than one class of shares, you should carefully consider which class of shares to purchase.

**Purchase Terms**

**Class A Shares**

Class A shares are sold at the prevailing net asset value per Class A share plus the applicable sales load (which may be reduced as described below); however, the following are additional features that should be taken into account when purchasing Class A shares:

- a minimum initial investment of $500 for regular accounts and $50 for retirement plan accounts, and a minimum subsequent investment of: (i) $50 under the Fund's automatic investment program; and (ii) $50 if not made pursuant to the automatic investment program;

- a monthly shareholder servicing fee at an annual rate of up to 0.25% of the average daily net assets of the Fund attributable to Class A shares; and

- shareholders tendering Class A shares fewer than 18 months after the original purchase date may be subject to a CDSC of 1.00%, which will be deducted from repurchase proceeds, if: (i) the original purchase was for amounts of $500,000 or more; and (ii) the shares were purchased without an initial sales charge.

80

The price of the Class A shares during the Fund's continuous offering will fluctuate over time with the net asset value of the Class A shares. Investors in Class A shares will pay a sales load based on the amount of their investment in the Fund. The sales load payable by each investor depends upon the amount invested by such investor in the Fund, but may range from 0.00% to 5.75%, as set forth in the table below. A reallowance to participating broker-dealers will be made by the Distributor from the sales load paid by each investor. There are no sales loads on reinvested distributions. The Fund reserves the right to waive broker commissions. The following sales loads apply to your purchases of Class A shares of the Fund:

| Amount Invested | Dealer Reallowance | Distributor Fee | Total Sales Load as a % of Offering Price | Total Sales Load as a % of Amount Invested |
|---|---|---|---|---|
| Under $50,000 | 5.00% | 0.75% | 5.75% | 6.10% |
| $50,000 to $99,999 | 4.50% | 0.50% | 5.00% | 5.26% |
| $100,000 to $249,999 | 3.50% | 0.50% | 4.00% | 4.17% |
| $250,000 to $499,999 | 2.50% | 0.50% | 3.00% | 3.09% |
| $500,000 and above* | ** | None | ** | see below |

\*   Class A Shares bought without an initial sales charge in accounts aggregating $500,000 or more at the time of purchase are subject to a 1.00% CDSC if the shares are sold within 18 months of purchase. Subsequent Class A Share purchases that bring a shareholder's account value above $500,000 are not subject to a front-end sales charge, but are subject to a CDSC if redeemed within 18 months of purchase. The 18-month period begins on the day the purchase is made. The CDSC does not apply to load waived shares purchased for certain retirement plans or other eligible fee-based programs.

\*\*   A selling broker may receive a commission on purchases of Class A shares of $500,000 or above as detailed below:

| Amount Invested | Dealer Reallowance |
|---|---|
| Less than $5,000,000 | 1.00% |
| $5,000,000 to less than $25,000,000 | 0.50% |
| $25,000,000 or more | 0.25% |

You may be able to buy Class A shares without a sales charge (i.e., "load-waived") when you are:

- reinvesting dividends or distributions;

- participating in an investment advisory or agency commission program under which you pay a fee to an investment advisor or other firm for portfolio management or brokerage service;

- exchanging an investment in Class A (or equivalent type) shares of another fund for an investment in the Fund;

- a current or former director or Trustee of the Fund;

- an employee (including the employee's spouse, domestic partner, children, grandchildren, parents, grandparents, siblings or any dependent of the employee, as defined in section 152 of the Code) of the Fund's Adviser or its affiliates or of a broker-dealer authorized to sell shares of the Fund;

- purchasing shares through the Fund's Adviser; or

- purchasing shares through a financial services firm (such as a broker-dealer, investment adviser or financial institution) that has a special arrangement with the Fund.

In addition, concurrent purchases of Class A shares by related accounts may be combined to determine the application of the sales load. The Fund will combine purchases made by an investor, the investor's spouse or domestic partner, and dependent children when it calculates the sales load.

81

It is the investor's responsibility to determine whether a reduced sales load would apply. The Fund is not responsible for making such determination. To receive a reduced sales load, notification must be provided at the time of the purchase order. If you purchase Class A shares directly from the Fund, you must notify the Fund in writing. Otherwise, notice should be provided to the Financial Intermediary through whom the purchase is made so they can notify the Fund.

*Right of Accumulation*

For the purposes of determining the applicable reduced sales charge, the right of accumulation allows you to include prior purchases of Class A shares of the Fund as part of your current investment as well as reinvested dividends. To qualify for this option, you must be either:

- an individual;

- an individual and spouse purchasing shares for your own account or trust or custodial accounts for your minor children; or

- a fiduciary purchasing for any one trust, estate or fiduciary account, including employee benefit plans created under Sections 401, 403 or 457 of the Code, including related plans of the same employer.

If you plan to rely on this right of accumulation, you must notify the Fund's Distributor at the time of your purchase. You will need to give the Distributor your account numbers. Existing holdings of family members or other related accounts of a shareholder may be combined for purposes of determining eligibility. If applicable, you will need to provide the account numbers of your spouse and your minor children as well as the ages of your minor children.

**Class C Shares**

Class C shares are sold at the prevailing NAV per Class C share; however, the following are additional features that should be taken into account when purchasing Class C shares:

- a minimum initial investment of $500 for regular accounts and $50 for retirement plan accounts, and a minimum subsequent investment of: (i) $50 under the Fund's automatic investment program; and (ii) $50 if not made pursuant to the automatic investment program;

- a monthly shareholder servicing fee at an annual rate of up to 0.25% of the average daily net assets of the Fund attributable to Class C shares;

- a Distribution Fee which will accrue at an annual rate equal to 0.75% of the average daily net assets of the Fund attributable to Class C shares; and

- a CDSC equal to 1.00% of the original purchase price of Class C shares repurchased by the Fund for repurchases of Class C shares within 18 months following such shareholder's initial purchase.

- The Distributor will pay your financial advisor an up-front commission of 1.00% on sales of Class C shares.

The price of the Class C shares during the Fund's continuous offering will fluctuate over time with the net asset value of the Class C shares. Investors in Class C shares will not pay any upfront sales charges. A selling broker may receive commissions on purchases of Class C shares over $1,000,000.

**Class Z Shares**

Class Z shares will be sold at the prevailing NAV per Class Z share and are not subject to any upfront sales charge. The Class Z shares are not subject to a Distribution Fee, a CDSC or a monthly shareholder servicing fee. Class Z shares may only be available through certain Financial Intermediaries. Because the Class Z shares of the

82

Fund are sold at the prevailing NAV per Class Z share without an upfront sales charge, the entire amount of your purchase is invested immediately. However, Class Z shares require a minimum investment of $100,000 and a minimum subsequent investment in any amount. The Fund reserves the right to waive minimum investment amounts.

**Shareholder Service Expenses**

The Fund has adopted a "Shareholder Servicing Plan and Agreement" (the "Plan") under which the Fund may compensate financial industry professionals for providing ongoing services in respect of clients with whom they have distributed shares of the Fund. The Plan operates in a manner consistent with Rule 12b-1 under the 1940 Act, which regulates the manner in which an open-end investment company may directly or indirectly bear the expenses of distributing its shares. Although the Fund is not an open-end investment company, it has undertaken to comply with the terms of Rule 12b-1 as a condition of an exemptive order under the 1940 Act which permits it to have a multi-class structure, CDSCs and distribution and shareholder servicing fees. Such services may include electronic processing of client orders, electronic fund transfers between clients and the Fund, account reconciliations with the Fund's transfer agent, facilitation of electronic delivery to clients of Fund documentation, monitoring client accounts for back-up withholding and any other special tax reporting obligations, maintenance of books and records with respect to the foregoing, and such other information and liaison services as the Fund or the Adviser may reasonably request. Under the Shareholder Servicing Plan and Agreement, the Fund may incur expenses on an annual basis equal to 0.25% of its average net assets attributable to Class A and Class C shares.

In addition to payments under the Plan, from time to time the Fund may pay broker-dealers and other intermediaries' account-based fees for networking and account maintenance. In addition, the Adviser and/or the Distributor may, from time to time, at their own expense out of the revenues they receive from the Fund and/or its own financial resources, make cash payments to broker-dealers and other Financial Intermediaries (directly and not as an expense of the Fund) as an incentive to sell shares of the Fund and/or to promote retention of customer assets in the Fund. Such cash payments may be calculated on sales of shares of the Fund ("Sales-Based Payments") or on the average daily net assets of the Fund attributable to that particular broker-dealer or other Financial Intermediary ("Asset-Based Payments"). Each of the Adviser and/or the Distributor may agree to make such cash payments to a broker-dealer or other Financial Intermediary in the form of either or both Sales-Based Payments and Asset-Based Payments.

The Adviser and/or the Distributor may also make other cash payments to broker-dealers or other Financial Intermediaries in addition to or in lieu of Sales-Based Payments and Asset-Based Payments, in the form of payment for travel expenses, including lodging, incurred in connection with trips taken by qualifying registered representatives of those broker-dealers or other Financial Intermediaries and their families to places within or outside the United States; meeting fees; entertainment; transaction processing and transmission charges; advertising or other promotional expenses; allocable portions, based on shares of the Fund sold, of salaries and bonuses of registered representatives of an affiliated broker-dealer or other Financial Intermediary that is a financial advisor; or other expenses as determined in the Adviser or the Distributor's discretion, as applicable. In certain cases these other payments could be significant to the broker-dealers or other Financial Intermediaries. Any payments described above will not change the price paid by investors for the purchase of the shares of the Fund, the amount that the Fund will receive as proceeds from such sales, or the amounts payable under the Plan.

83

**LEGAL MATTERS**

K&L Gates, LLP, located at 1 Congress Street, Suite 2900, Boston, Massachusetts 02114, acts as the Fund's legal counsel.

**REPORTS TO SHAREHOLDERS**

The Fund will send to its shareholders unaudited semi-annual and audited annual reports (or, if applicable, a notice of electronic accessibility thereof), including a list of investments held.

**Householding**

In an effort to decrease costs, the Fund intends to reduce the number of duplicate annual and semi-annual reports (or, if applicable, notices of electronic accessibility thereof) by sending only one copy of each to those addresses shared by two or more accounts and to shareholders reasonably believed to be from the same family or household. Once implemented, a shareholder must call (844) 485-9167 to discontinue householding and request individual copies of these documents. Once the Fund receives notice to stop householding, individual copies will be sent beginning thirty days after receiving your request. This policy does not apply to account statements.

84

**CONFIDENTIAL**                              **273**                              **TDIT005311**

**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Cohen & Company, Ltd. has been appointed as the independent registered public accounting firm for the Fund. Cohen & Company, Ltd. is located at 1350 Euclid Ave, Suite 800, Cleveland, Ohio 44115.

**ADDITIONAL INFORMATION**

The Prospectus and the SAI do not contain all of the information set forth in the Registration Statement that the Fund has filed with the SEC (File No. 333-209022). The complete Registration Statement may be obtained from the SEC at www.sec.gov. See the cover page of this Prospectus for information about how to obtain a paper copy of the Registration Statement or SAI without charge.

85

**PRIVACY NOTICE**

The Fund recognizes and respects your privacy expectations, whether you are a visitor to the Fund's web site, a potential shareholder, a current shareholder or even a former shareholder.

**I. Collection of Information.**

The Fund may collect nonpublic personal information about you from the following sources:

1. *Account applications and other forms,* which may include your name, address and social security number, written and electronic correspondence and telephone contacts;

2. *Web site information,* including any information captured through our use of "cookies"; and

3. *Account history,* including information about the transactions and balances in your accounts with us or our affiliates.

**II. Disclosure of Information.**

The Fund may share the information it collects with its affiliates, the Fund may also disclose this information as otherwise as permitted by law. The Fund does not sell your personal information to third parties for their independent use.

**III. Confidentiality and Security of Information.**

The Fund restricts access to nonpublic personal information about you to its employees and agents who need to know such information to provide products or services to you. The Fund maintains physical, electronic and procedural safeguards that comply with federal standards to guard your nonpublic personal information, although you should be aware that data protection cannot be guaranteed.

86

**CONFIDENTIAL**                                                    275

TDIT005313

# NexPoint Real Estate Strategies Fund

**Class A (NRSAX), Class C (NRSCX)
and Class Z (NRSZX) Shares**

---

**PROSPECTUS**

---

**Distributor**

**NexPoint Securities, Inc.**

**Member FINRA/ SIPC**

---

**April 30, 2025**

All dealers that buy, sell or trade the Fund's shares, whether or not participating in this offering, may be required to deliver a prospectus when acting on behalf of the Fund's Distributor.

You should rely only on the information contained in this Prospectus. The Fund has not authorized any other person to provide you with different information. If anyone provides you with different or inconsistent information, you should not rely on it. The Fund is not making an offer to sell these securities in any jurisdiction where the offer or sale is not permitted.

NRES-PROS-0425

## STATEMENT OF ADDITIONAL INFORMATION

## NEXPOINT REAL ESTATE STRATEGIES FUND

**Principal Executive Offices**
**300 Crescent Court**
**Suite 700**
**Dallas, Texas 75201**
**(833) 697-6246**

This Statement of Additional Information ("SAI") is not a prospectus. This SAI should be read in conjunction with the prospectus of NexPoint Real Estate Strategies Fund (the "Fund"), dated April 30, 2025 (the "Prospectus"), as it may be supplemented from time to time. The Prospectus is hereby incorporated by reference into this SAI (legally made a part of this SAI). Capitalized terms used but not defined in this SAI have the meanings given to them in the Prospectus. This SAI does not include all information that a prospective investor should consider before purchasing the Fund's securities.

You should obtain and read the Prospectus and any related Prospectus supplement prior to purchasing any of the Fund's securities. A copy of the Prospectus may be obtained without charge by calling the Fund toll-free at (844) 485-9167 or by visiting the Fund's website at https://www.nexpoint.com/funds/nexpoint-real-estate-strategies-fund/. Information on the website is not incorporated herein by reference. The registration statement of which the Prospectus is a part can be reviewed and copied at the Public Reference Room of the U.S. Securities and Exchange Commission ("SEC") at 100 F Street NE, Washington, D.C. You may obtain information on the operation of the Public Reference Room by calling the SEC at 202-551-8090. The Fund's filings with the SEC are also available to the public on the SEC's Internet web site at *www.sec.gov*. Copies of these filings may be obtained, after paying a duplicating fee, by electronic request at the following E-mail address: publicinfo@sec.gov, or by writing the SEC's Public Reference Section, 100 F Street NE, Washington, D.C. 20549-0102.

**April 30, 2025**

CONFIDENTIAL

277

TDIT005315

**TABLE OF CONTENTS**

| | |
|---|---|
| GENERAL INFORMATION AND HISTORY | S-1 |
| INVESTMENT OBJECTIVE AND POLICIES | S-1 |
| MANAGEMENT OF THE FUND | S-15 |
| CODES OF ETHICS | S-22 |
| PROXY VOTING POLICIES AND PROCEDURES | S-22 |
| CONTROL PERSONS AND PRINCIPAL HOLDERS | S-22 |
| INVESTMENT ADVISORY AND OTHER SERVICES | S-24 |
| PORTFOLIO MANAGERS | S-29 |
| ALLOCATION OF BROKERAGE | S-31 |
| TAX STATUS | S-33 |
| OTHER INFORMATION | S-46 |
| INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | S-46 |
| FINANCIAL STATEMENTS | S-47 |
| APPENDIX A | A-1 |

## GENERAL INFORMATION AND HISTORY

The Fund is a continuously offered, non-diversified, closed-end management investment company that operates as an interval fund. The Fund is a non-diversified investment company, which means that the Fund is not limited by the Investment Company Act of 1940, as amended (the "1940 Act") with respect to the proportion of its assets that may be invested in the securities of a single issuer. As a registered investment company (a "RIC"), however, the Fund will be required to comply with certain asset diversification tests at the end of each quarter of its taxable year. The Fund was organized as a Delaware statutory trust on January 11, 2016. The Fund's principal office is located at 300 Crescent Court, Suite 700, Dallas, Texas 75201, and its telephone number is (833) 697-6246. The Fund is advised by NexPoint Advisors, L.P. ("NexPoint" or the "Adviser"). The investment objective and principal investment strategies of the Fund, as well as the principal risks associated with the Fund's investment strategies, are set forth in the Prospectus. Certain additional investment information is set forth below.

## INVESTMENT OBJECTIVE AND POLICIES

**Investment Objective**

The Fund's investment objective is to seek long-term total return with an emphasis on current income. The Fund seeks to achieve this objective by primarily investing in a broad range of private and public real estate-related debt, equity and preferred equity investments across multiple real estate sectors. There can be no assurance that the Fund will achieve this objective. The Fund's investment objective is non-fundamental and may be changed by the Board of Trustees (the "Board") without shareholder approval. Shareholders will, however, receive at least 60 days' prior notice of any change in this investment objective.

**Fundamental Policies**

The Fund's stated fundamental policies, which may only be changed by the affirmative vote of a majority of the outstanding voting securities of the Fund (the shares), are listed below. For the purposes of this SAI, "majority of the outstanding voting securities of the Fund" means the vote, at an annual or special meeting of shareholders, duly called: (a) of 67% or more of the shares present at such meeting, if the holders of more than 50% of the outstanding shares are present or represented by proxy; or (b) of more than 50% of the outstanding shares, whichever is less.

The Fund may not:

(1) Borrow money, except to the extent permitted by the 1940 Act (which currently limits borrowing to no more than 33-1/3% of the value of the Fund's total assets, including the value of the assets purchased with the proceeds of its indebtedness, if any). The Fund may borrow for investment purposes, for temporary liquidity, or to finance repurchases of its shares.

(2) Issue senior securities, except to the extent permitted by Section 18 of the 1940 Act (which currently limits the issuance of a class of senior securities that is indebtedness to no more than 33-1/3% of the value of the Fund's total assets or, if the class of senior security is stock, to no more than 50% of the value of the Fund's total assets).

(3) Purchase securities on margin.

(4) Underwrite securities of other issuers, except insofar as the Fund may be deemed an underwriter under the Securities Act of 1933, as amended (the "Securities Act"), in connection with the disposition of its portfolio securities. The Fund may invest in restricted securities (those that must be registered under the Securities Act before they may be offered or sold to the public).

(5) Invest 25% or more of the value of its total assets in the securities of companies or entities engaged in any one industry or group of industries, except that, under normal circumstances, the Fund will invest

S-1

over 25% of its total assets in the securities of companies in the real estate industry. This limitation does not apply to investment in the securities of the U.S. Government, its agencies or instrumentalities. For purposes of this limitation, the Fund will define an industry or group of industries by reference to Standard & Poor's Global Industry Classification Standard codes for industry classifications.

(6) Purchase or sell commodities, unless acquired as a result of ownership of securities or other investments, except that the Fund may purchase and sell forward and futures contracts and options to the full extent permitted under the 1940 Act, sell foreign currency contracts in accordance with any rules of the Commodity Futures Trading Commission, invest in securities or other instruments backed by or linked to commodities, and invest in companies that are engaged in a commodities business or have a significant portion of their assets in commodities, and may invest in commodity pools and other entities that purchase and sell commodities and commodity contracts.

(7) Make loans to others, except (a) where each loan is represented by a note executed by the borrower, (b) through the purchase of debt securities in accordance with its investment objective and policies, (c) to the extent the entry into a repurchase agreement, in a manner consistent with the Fund's investment policies or as otherwise permitted under the 1940 Act, is deemed to be a loan, and (d) by loaning portfolio securities.

(8) Purchase or sell real estate, except that the Fund may invest in securities of companies that deal in real estate or are engaged in the real estate business, including real estate investment Funds and real estate operating companies, and instruments secured by real estate or interests therein and the Fund may acquire, hold and sell real estate acquired through default, liquidation, or other distributions of an interest in real estate as a result of the Fund's ownership of such other assets.

In addition, the Fund has adopted a fundamental policy that it will make quarterly repurchase offers for no less than for 5% of the Fund's shares outstanding at net asset value ("NAV") less any repurchase fee, unless suspended or postponed in accordance with regulatory requirements, and each repurchase pricing shall occur no later than the 14th day after the Repurchase Request Deadline, or the next business day if the 14th is not a business day.

If a restriction on the Fund's investments is adhered to at the time an investment is made, a subsequent change in the percentage of Fund assets invested in certain securities or other instruments, or change in average duration of the Fund's investment portfolio, resulting from changes in the value of the Fund's total assets, will not be considered a violation of the restriction; provided, however, that the asset coverage requirement applicable to borrowings shall be maintained in the manner contemplated by applicable law.

There can be no assurance that any leveraging strategy the Fund employs will be successful during any period in which it is employed. The Fund may also invest in private real estate investment funds ("Private Real Estate Investment Funds"), public real estate investment trusts ("REITs"), real estate operating companies ("REOCs"), and non-traded REITs, which may incur higher levels of leverage. Accordingly, the Fund, through these investments, may be exposed to higher levels of leverage than the Fund is permitted to. The Fund's asset coverage was 1,172% as of March 31, 2025. See "Risk Factors – Leverage Risk".

In addition to any indebtedness incurred by the Fund, any subsidiary of the Fund, including NRESF REIT Sub, LLC and NRESF REIT Sub II, LLC (the "REIT Subsidiaries"), may also utilize leverage, including by mortgaging properties held by special purpose vehicles, or by acquiring property with existing debt. Any such borrowings will generally be the sole obligation of each respective special purpose vehicle, without any recourse to any other special purpose vehicle, the REIT Subsidiaries, the Fund or its assets, and the Fund will not treat such non-recourse borrowings as senior securities (as defined in the 1940 Act) for purposes of complying with the 1940 Act's limitations on leverage unless the financial statements of the special purpose vehicle, or the subsidiary of the Fund that owns such special purpose vehicle, will be consolidated in accordance with Regulation S-X and other accounting rules. If cash flow is insufficient to pay principal and interest on a special purpose vehicle's borrowings, a default could occur, ultimately resulting in foreclosure of any security instrument securing the debt and a complete

S-2

CONFIDENTIAL  TDIT005318

loss of the investment, which could result in losses to the REIT Subsidiaries and, therefore, to the Fund. To the extent that any subsidiaries of the Fund, including the REIT Subsidiaries, directly incur leverage in the form of debt (as opposed to non-recourse borrowings made through special purpose vehicles), the amount of such recourse leverage used by the Fund and such subsidiaries, including the REIT Subsidiaries, will be consolidated and treated as senior securities for purposes of complying with the 1940 Act's limitations on leverage by the Fund.

**Non-Fundamental Policies**

The following are additional investment limitations of the Fund and may be changed by the Board without shareholder approval.

*80% Investment Policy.* The Fund has adopted a policy to invest at least 80% of its assets (defined as net assets plus the amount of any borrowing for investment purposes) in "real estate and real estate-related securities," as defined in the Prospectus. Shareholders of the Fund will be provided with at least 60 days prior notice of any change in the Fund's 80% policy.

If a restriction on the Fund's investments is adhered to at the time an investment is made, a subsequent change in the percentage of Fund assets invested in certain securities or other instruments, or change in average duration of the Fund's investment portfolio, resulting from changes in the value of the Fund's total assets, will not be considered a violation of the restriction; provided, however, that the asset coverage requirement applicable to borrowings shall be maintained in the manner contemplated by applicable law.

*Covered Obligations.* Consistent with U.S. Securities and Exchange Commission ("SEC") staff guidance, financial instruments that involve obligations to make future payments to third parties will not be viewed as creating any senior security provided that the Fund covers its obligations as described below.

Those financial instruments can include, among others: (i) securities purchased on a when-issued, delayed delivery, and to be announced basis; (ii) futures contracts; (iii) forward currency contracts; (iv) written options; and (vi) securities sold short. Consistent with SEC staff guidance, the Fund will consider its obligations involving such a financial instrument as "covered" when the Fund: (1) maintains an offsetting financial position; or (2) segregates liquid assets (constituting cash, cash equivalents or other liquid portfolio securities) equal to the Fund's exposures relating to the financial instrument, as determined on a daily basis. Dedicated Fund compliance policies and procedures, which the Board has approved, govern the kinds of transactions that can be deemed to be offsetting transactions for purposes of (1) above, and the amounts of assets that need to be segregated for purposes of (2) above. The Fund will seek to value financial instruments on a mark-to-market basis but may also rely on the instrument's notional value or upon valuations provided by third party pricing services, subject to the approval of the Board.

*Short Selling.* Although the Fund does not currently intend to engage in short sales as a principal investment strategy, the Fund may engage in short sales for hedging purposes.

**Non-Principal Investment Strategies**

*Convertible Securities.* The Fund may invest in convertible securities, which are typically issued as bonds or preferred shares with the option to convert to equities. As a result, convertible securities are a hybrid that have characteristics of both bonds and common stocks and are subject to risks associated with both debt securities and equity securities. The market value of bonds and preferred shares tend to decline as interest rates increase. Fixed-income and preferred securities also are subject to credit risk, which is the risk that an issuer of a security may not be able to make principal and interest or dividend payments as due. Convertible securities may have characteristics similar to common stocks especially when their conversion value is higher than their value as a bond. The price of equity securities into which a convertible security may convert may fall because of economic

S-3

or political changes. Stock prices in general may decline over short or even extended periods of time. Additionally, the value of the embedded conversion option may be difficult to value and evaluate because the option does not trade separately from the convertible security.

*Foreign Securities.* The Fund may invest in non-U.S. real estate companies and other foreign securities. Purchases of foreign securities entail certain risks. For example, there may be less information publicly available about a foreign company than about a U.S. company, and foreign companies generally are not subject to accounting, auditing and financial reporting standards and practices comparable to those in the U.S. Other risks associated with investments in foreign securities include changes in restrictions on foreign currency transactions and rates of exchanges, changes in the administrations or economic and monetary policies of foreign governments, the imposition of exchange control regulations, the possibility of expropriation decrees and other adverse foreign governmental action, the imposition of foreign taxes, less liquid markets, less government supervision of exchanges, brokers and issuers, difficulty in enforcing contractual obligations, delays in settlement of securities transactions and greater price volatility. In addition, investing in foreign securities will generally result in higher commissions than investing in similar domestic securities.

*Money Market Instruments.* The Fund may invest, for defensive purposes or otherwise, some or all of its assets in high quality fixed-income securities, money market instruments and money market mutual funds, or hold cash or cash equivalents in such amounts as the Adviser deems appropriate under the circumstances. In addition, the Fund or a Private Real Estate Investment Fund or registered closed-end funds that invest principally in real estate may invest in these instruments pending allocation of its respective offering proceeds. Money market instruments are high quality, short-term fixed-income obligations, which generally have remaining maturities of one year or less and may include U.S. Government securities, commercial paper, certificates of deposit and bankers acceptances issued by domestic branches of U.S. banks that are members of the Federal Deposit Insurance Corporation, and repurchase agreements.

*Investment Companies.* The Fund may invest in investment companies such as open-end funds (mutual funds), closed-end funds and exchange traded funds (also referred to as "Underlying Funds"). Such investments are subject to limitations prescribed by the 1940 Act unless a U.S. Securities and Exchange Commission (the "SEC") exemption is applicable or as may be permitted by rules under the 1940 Act, including Section 12 of the 1940 Act, or SEC staff interpretations thereof. The Fund may invest in other investment companies beyond the statutory limits set forth in Section 12 of the 1940 Act to the extent permitted by an exemptive rule adopted by the SEC. The 1940 Act limitations currently provide, in part, that the Fund may not purchase shares of an investment company if: (a) such a purchase would cause the Fund to own in the aggregate more than 3% of the total outstanding voting stock of the investment company; (b) such a purchase would cause the Fund to have more than 5% of its total assets invested in the investment company; or (c) more than 10% of the Fund's total assets would be invested in the aggregate in all investment companies. The Fund may invest in excess of the foregoing limitations in an exchange-traded fund ("ETF") that is not part of the same group of investment companies (e.g., an unaffiliated ETF) if the ETF has obtained exemptive relief from the SEC and both the ETF and the Fund adhere to the conditions in the exemptive relief. Accordingly, when affiliated persons hold shares of any of the Underlying Funds, the Fund's ability to invest fully in shares of those funds may be restricted, and the Adviser must then, in some instances, select alternative investments that would not have been its first preference.

The Fund may invest in investment companies that are advised by the Adviser or its affiliates, including ETFs, to the extent permitted by applicable law and/or pursuant to exemptive relief from the SEC. These investment companies typically incur fees that are separate from those fees incurred directly by the Fund. The Fund's purchase of such investment company securities results in the layering of expenses, such that shareholders would indirectly bear a proportionate share of the operating expenses of such investment companies, including advisory fees, in addition to paying Fund expenses.

The 1940 Act also provides that an Underlying Fund whose shares are purchased by the Fund will be obligated to redeem shares held by the Fund only in an amount up to 1% of the Underlying Fund's outstanding securities

S-4

during any period of less than 30 days. Shares held by the Fund in excess of 1% of an Underlying Fund's outstanding securities therefore, will be considered not readily marketable securities, which, together with other such securities, may not exceed 15% of the Fund's total assets.

Under certain circumstances an Underlying Fund may determine to make payment of a redemption by the Fund wholly or partly by a distribution in kind of securities from its portfolio, in lieu of cash, in conformity with the rules of the SEC. In such cases, the Fund may hold securities distributed by an Underlying Fund until the Adviser determines that it is appropriate to dispose of such securities.

Investment decisions by the investment advisers of the Underlying Funds are made independently of the Fund and its Adviser. Therefore, the investment advisor of one Underlying Fund may be purchasing shares of the same issuer whose shares are being sold by the investment advisor of another such fund. The result would be an indirect expense to the Fund without accomplishing any investment purpose. Because other investment companies employ an investment adviser, such investments by the Fund may cause shareholders to bear duplicate fees.

*Hedge Funds.* The Fund may invest up to 15% of its gross assets in "hedge funds," which are private investment funds that would be required to register as investment companies but for an exemption under section 3(c)(1) or 3(c)(7) of the 1940 Act. Hedge funds are not subject to the requirements and protections of the 1940 Act and carry all of the risks associated with Private Real Estate Investment Funds, as disclosed in the Fund's prospectus. In addition, investors should be aware that hedge funds often engage in leverage, short-selling, arbitrage, hedging, derivatives, and other speculative investment practices that may significantly increase investment loss. Hedge funds are highly illiquid, are not required to provide periodic pricing or valuation information to investors, and often charge high fees that can erode investment performance. Certain hedge funds charge performance fees that may create an incentive for its manager to make investments that are riskier or more speculative than those it might have made in the absence of a performance fee. Additionally, hedge funds need not have independent boards of trustees and do not require investor approval of advisory contracts.

*Debtor-in-Possession ("DIP") Loans.* The Fund may invest in or extend loans to companies that have filed for protection under Chapter 11 of the United States Bankruptcy Code ("Chapter 11"). DIP financings allow the entity to continue its business operations while reorganizing under Chapter 11 and such financings must be approved by the bankruptcy court. These DIP loans are most often working-capital facilities put into place at the outset of a Chapter 11 case to provide the debtor with both immediate cash and the ongoing working capital that will be required during the reorganization process. DIP financings are typically fully secured by a lien on the debtor's otherwise unencumbered assets or secured by a junior lien on the debtor's encumbered assets (so long as the loan is fully secured based on the most recent current valuation or appraisal report of the debtor). DIP financings are often required to close with certainty and in a rapid manner in order to satisfy existing creditors and to enable the issuer to emerge from bankruptcy or to avoid a bankruptcy proceeding. There is a risk that the borrower will not emerge from Chapter 11 bankruptcy proceedings and be forced to liquidate its assets under Chapter 7 of the United States Bankruptcy Code. In the event of liquidation, the Fund's only recourse will be against the property securing the DIP financing.

*Rights Offerings and Warrants to Purchase.* The Fund may participate in rights offerings and may purchase warrants, which are privileges issued by corporations enabling the owners to subscribe to and purchase a specified number of shares of the corporation at a specified price during a specified period of time. Subscription rights normally have a short life span to expiration. The purchase of rights or warrants involves the risk that the Fund could lose the purchase value of a right or warrant if the right to subscribe to additional shares is not exercised prior to the rights' and warrants' expiration. Also, the purchase of rights and/or warrants involves the risk that the effective price paid for the right and/or warrant added to the subscription price of the related security may exceed the value of the subscribed security's market price such as when there is no movement in the level of the underlying security.

S-5

***Special Situations.*** The Fund may invest in companies undergoing work-outs, liquidations, reorganizations, bankruptcies, insolvencies or other fundamental changes or similar transactions. In any investment opportunity involving any such type of special situation, there exists the risk that the contemplated transaction either will be unsuccessful, will take considerable time or will result in a distribution of cash or new securities the value of which will be less than the purchase price to the Fund of the securities or other financial instruments in respect of which such distribution is received. Similarly, if an anticipated transaction does not in fact occur, the Fund may be required to sell its investment at a loss. The consummation of such transactions can be prevented or delayed by a variety of factors, including but not limited to: (i) intervention of a regulatory agency; (ii) market conditions resulting in material changes in securities prices; (iii) compliance with any applicable bankruptcy, insolvency or securities laws; and (iv) the inability to obtain adequate financing. Because there is substantial uncertainty concerning the outcome of transactions involving financially troubled companies in which the Fund intends to invest, there is a potential risk of loss by the Fund of its entire investment in such companies.

***Certain Bankruptcy and Insolvency Issues.*** Some of the companies in which the Fund invests may be involved in a complex bankruptcy or insolvency proceeding in the United States or elsewhere. There are a number of significant risks inherent in the bankruptcy or insolvency process. The Fund cannot guarantee the outcome of any bankruptcy or insolvency proceeding.

Under U.S. bankruptcy proceedings or other insolvency proceedings, the Fund may risk taking a loss on its investment and having its claim released or discharged against the debtor and third parties. For example, under a plan of reorganization, the Fund could receive a cash distribution for less than its initial investment or receive securities or other financial instruments in exchange for its claims, which then could be discharged and released against the debtor or other third parties. In addition, under U.S. bankruptcy proceedings, a debtor can effectuate a sale of assets with a purchaser acquiring such assets free and clear of any claims or liens underlying the Fund's investment with the Fund having only potential recourse to the proceeds of the sale.

Under certain circumstances, payments to the Fund may be reclaimed, recharacterized or avoided if any such payment or distribution is later determined by the applicable court to have been a fraudulent conveyance, fraudulent transfer, a preferential payment or otherwise subject to avoidance under applicable law. In addition, especially in the case of investments made prior to the commencement of bankruptcy proceedings, creditors can lose their ranking and priority if they exercise "domination and control" of a debtor and other creditors can demonstrate that they have been harmed by such actions.

Many events in a bankruptcy are often beyond the control of the creditors. While creditors may be given an opportunity to object to or otherwise participate in significant actions, there can be no assurance that a court in the exercise of its broad powers or discretion would not approve actions that would be contrary to the interests of the Fund as a creditor.

The duration of a bankruptcy or insolvency proceeding is difficult to predict. A creditor's return on investment can be adversely impacted by delays while a plan of reorganization is being negotiated, approved by the creditors, confirmed by the bankruptcy court and until the plan ultimately becomes effective. Similar delays can occur while a court may be considering a sale or other restructuring transaction. In addition, the administrative costs in connection with a bankruptcy or insolvency proceeding are frequently high and will be paid out of the debtor's estate prior to any return to unsecured creditors or equity holders. If a proceeding involves protracted or difficult litigation, or turns into a liquidation, substantial assets may be devoted to administrative costs. Also, in the early stages of the bankruptcy process, it is often difficult to estimate the extent of, or even to identify, any contingent claims that might be made. Further, certain claims that have priority by law (for example, claims for taxes) may be quite substantial.

The effect of a bankruptcy filing on or by a portfolio company may adversely and permanently affect the portfolio company. The portfolio company may lose its market position, going concern value and key employees and otherwise become incapable of restoring itself as a viable entity. If for this or any other reason the proceeding is converted to a liquidation, the liquidation value of the portfolio company may not equal the liquidation value that was believed to exist at the time of the investment.

S-6

CONFIDENTIAL TDIT005322

***Co-Investments.*** Opportunities for co-investments may arise when the Adviser or its affiliates become aware of investment opportunities that may be appropriate for the Fund and its affiliates' other clients. The Fund will only make investments in which the Adviser or an affiliate hold an interest to the extent permitted under the 1940 Act and SEC staff interpretations or pursuant to the terms and conditions of the exemptive order received by the Adviser and certain funds affiliated with the Fund, dated April 19, 2016. For example, exemptive relief is not required for the Fund to invest in syndicated deals and secondary loan market transactions in which the Adviser or an affiliate has an interest where price is the only negotiated point. The order applies to all "Investment Companies," which includes future closed-end investment companies registered under the 1940 Act that are managed by the Adviser, which includes the Fund. The Fund, therefore, may in the future invest in accordance with the terms and conditions of the exemptive order.

Investment opportunities that are presented to an affiliate's other clients may be referred to the Fund and vice versa. For each such referral, the Adviser intends to independently analyze and evaluate whether the co-investment transaction is appropriate for the Fund. In addition, co-investment transactions that are recommended and approved by the Adviser will generally be subject to the review and approval by a committee consisting of independent trustees on the Fund's Board. For each type of co-investment transaction, the Fund intends to apply a specific protocol, which will be approved by the Fund's independent trustees and be designed to ensure the fairness to the Fund of the specific type of co-investment transaction. However, neither the Fund nor any affiliates' other clients will be obligated to invest or co-invest when investment opportunities are referred to by the Fund or them.

***Short-Term Trading.*** The portfolio managers of the Fund may also give trading desk personnel of the Adviser general authorization to enter into a limited amount of short-term trades (purchases expected to be sold within 15 business days) in debt instruments on behalf of the Fund. Over time, it is expected that these trades will not exceed 2% of the Fund's assets.

**Derivatives**

***Generally.*** The Fund may invest up to 10% of its gross assets in transactions involving options, futures and other derivative financial instruments for speculative purposes or to hedge against risks or other factors and variables that may affect the values of the Fund's portfolio securities. A hedging transaction may not perform as anticipated, and the Fund may suffer losses as a result of its hedging activities. Derivatives can be volatile and involve various types and degrees of risk. By using derivatives, the Fund may be permitted to increase or decrease the level of risk, or change the character of the risk, to which the portfolio is exposed.

A small investment in derivatives could have a substantial impact on the Fund's performance. The market for many derivatives is, or suddenly can become, illiquid. Changes in liquidity may result in significant and rapid changes in the prices for derivatives. If the Fund were to invest in derivatives at an inopportune time, or the Adviser evaluates market conditions incorrectly, the Fund's derivative investment could negatively impact the Fund's return, or result in a loss. In addition, the Fund could experience a loss if its derivatives were poorly correlated with its other investments, or if the Fund were unable to liquidate its position because of an illiquid secondary market.

***Options and Futures.*** The Fund may engage in the use of options and futures contracts, so-called "synthetic" options, including options on baskets of specific securities, or other derivative instruments written by broker-dealers or other financial intermediaries. These transactions may be effected on securities exchanges or in the over-the-counter market, or they may be negotiated directly with counterparties. In cases where instruments are purchased over-the-counter or negotiated directly with counterparties, the Fund is subject to the risk that the counterparty will be unable or unwilling to perform its obligations under the contract. These transactions may also be illiquid and, if so, it might be difficult to close out the Fund's position.

S-7

**CONFIDENTIAL**                    **TDIT005323**

The Fund may purchase call and put options on specific securities. The Fund may also write and sell covered or uncovered call and put options for both hedging and speculative purposes. A put option gives the purchaser of the option the right to sell, and obligates the writer to buy, the underlying security at a stated price at any time before the option expires. Similarly, a call option gives the purchaser of the option the right to buy, and obligates the writer to sell, the underlying security at a stated price at any time before the option expires.

In a covered call option, the Fund owns the underlying security. The sale of such an option exposes the Fund to a potential loss of opportunity to realize appreciation in the market price of the underlying security during the term of the option. Using covered call options might expose the Fund to other risks, as well. For example, the Fund might be required to continue holding a security that the Fund might otherwise have sold to protect against depreciation in the market price of the security.

In a covered put option, cash or liquid securities are placed in a segregated account on the Fund's books. The sale of such an option exposes the seller, during the term of the option, to a decline in price of the underlying security while also depriving the seller of the opportunity to invest the segregated assets.

When writing options, the Fund may close its position by purchasing an option on the same security with the same exercise price and expiration date as the option that it has previously written on the security. If the amount paid to purchase an option is less or more than the amount received from the sale, the Fund will, accordingly, realize a profit or loss. To close out a position as a purchaser of an option, the Fund would liquidate the position by selling the option previously purchased.

The use of derivatives that are subject to regulation by the Commodity Futures Trading Commission (the "CFTC") under the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), by the Fund could cause the Fund to be a commodity pool, which, absent an available exemption would require the Fund to comply with certain rules of the CFTC. In connection with its management of the Fund, the Adviser has claimed an exclusion from the definition of commodity pool operator under the Commodity Exchange Act ("CEA") and is therefore not currently subject to registration or regulation as a pool operator.

The Fund may enter into futures contracts in U.S. domestic markets or on exchanges located outside the United States. Foreign markets may offer advantages, such as trading opportunities or arbitrage possibilities not available in the United States, but they also may subject the Fund to greater risk than domestic markets. For example, common clearing facilities may not exist in markets where foreign exchanges are the principal markets, and investors may look only to the broker to perform the contract. Adverse changes in the exchange rate could eliminate any profits that might be realized in trading, or a loss could be incurred as a result of those changes. Transactions on foreign exchanges may include both commodities traded on domestic exchanges and those that are not. Unlike trading on domestic commodity exchanges, trading on foreign commodity exchanges is not regulated by the CFTC.

Engaging in these transactions involves risk of loss, which could adversely affect the value of the Fund's gross assets. No assurance can be made that a liquid market will exist for any particular futures contract at any particular time. Many futures exchanges and boards of trade limit the amount of fluctuation permitted in futures contract prices during a single trading day. Once the daily limit has been reached in a particular contract, no trades may be made that day at a price beyond that limit, or trading may be suspended for specified periods during the trading day. Futures contract prices could move to the limit for several consecutive trading days with little or no trading, thereby preventing prompt liquidation of positions, and potentially subjecting the Fund to substantial losses.

Successful use of futures also is subject to the Adviser's ability to correctly predict movements in the relevant market and to evaluate the appropriate correlation between the transaction being hedged and the price movements of the futures contract.

S-8

The Fund may also purchase and sell stock index futures contracts. A stock index futures contract obligates the Fund to pay or receive an amount of cash equal to a fixed dollar amount specified in the futures contract, multiplied by the difference between the settlement price of the contract on the contract's last trading day, and the value of the index based on the stock prices of the securities that comprise it at the opening of trading in those securities on the next business day. The Fund may purchase and sell interest rate futures contracts, which represent obligations to purchase or sell an amount of a specific debt security at a future date at a specific price. In addition, the Fund may purchase and sell currency futures or commodity futures. A currency future creates an obligation to purchase or sell an amount of a specific currency at a future date at a specific price. A commodity future creates an obligation to purchase or sell an amount of a specific commodity at a future date at a specific price.

*Options on Securities Indexes.* The Fund may purchase and sell call and put options on stock indexes listed on national securities exchanges or traded in the over-the-counter market for hedging and speculative purposes. A stock index fluctuates with changes in the market values of the stocks included in the index. Accordingly, successful use of options on stock indexes will be subject to the Adviser's ability to correctly evaluate movements in the stock market generally, or of a particular industry or market segment.

*Swap Agreements.* The Fund may enter into a swap agreements, which generally include equity, interest rate, and index and currency rate swap agreements. The Fund is not limited to any particular form of swap agreement if the Adviser determines that other forms are consistent with the Fund's investment objective and policies. Swap agreements are contracts entered into by two parties (primarily institutional investors) for periods ranging from a few weeks to more than a year. In a standard swap transaction, the parties agree to exchange the returns (or differentials in rates of return) earned or realized on particular predetermined investments or instruments, which may be adjusted for an interest factor. The gross returns to be exchanged or "swapped" between the parties are generally calculated with respect to a "notional amount," *i.e.*, the return on or increase in value of a particular dollar amount invested at a particular interest rate, in a particular foreign currency, or in a "basket" of securities representing a particular index. Additional forms of swap agreements include: (i) interest rate caps, under which, in return for a premium, one party agrees to make payments to the other to the extent interest rates exceed a specified rate or "cap"; (ii) interest rate floors, under which, in return for a premium, one party agrees to make payments to the other to the extent interest rates fall below a specified level or "floor"; and (iii) interest rate collars, under which a party sells a cap and purchases a floor (or vice versa) in an attempt to protect itself against interest rate movements exceeding certain minimum or maximum levels.

Generally, the Fund's obligations (or rights) under a swap agreement will be equal only to the net amount to be paid or received under the agreement, based on the relative values of the positions held by the parties. The risk of loss is limited to the net amount of interest payments that a party is contractually required to make. As such, if the counterparty to a swap defaults, the Fund's risk of loss consists of the net amount of payments that it is entitled to receive.

*Derivatives Rule.* The regulation of the U.S. and non-U.S. derivatives markets has undergone substantial change in recent years and such change may continue. In particular, on October 28, 2020, the SEC adopted new regulations governing the use of derivatives by registered investment companies ("Rule 18f-4" or the "Derivatives Rule"). Funds were required to implement and comply with Rule18f-4 by August 19, 2022. Rule 18f-4 eliminates the asset segregation framework formerly used by funds to comply with Section 18 of the 1940 Act, as amended.

The Derivatives Rule mandates that a fund adopt and/or implement: (i) value-at-risk limitations ("VaR"); (ii) a written derivatives risk management program; (iii) new board oversight responsibilities; and (iv) new reporting and recordkeeping requirements. In the event that a fund's derivative exposure is 10% or less of its net assets, excluding certain currency and interest rate hedging transactions, it can elect to be classified as a limited derivatives user ("Limited Derivatives User") under the Derivatives Rule, in which case the fund is not subject to the full requirements of the Derivatives Rule. Limited Derivatives Users are excepted from VaR testing,

S-9

implementing a derivatives risk management program, and certain board oversight and reporting requirements mandated by the Derivatives Rule. However, a Limited Derivatives User is still required to implement written compliance policies and procedures reasonably designed to manage its derivatives risks.

The Derivatives Rule also provides special treatment for reverse repurchase agreements, similar financing transactions and unfunded commitment agreements. Specifically, a fund may elect whether to treat reverse repurchase agreements and similar financing transactions as "derivatives transactions" subject to the requirements of the Derivatives Rule or as senior securities equivalent to bank borrowings for purposes of Section 18 of the 1940 Act. Repurchase agreements are not subject to the Derivatives Rule, but are still subject to other provisions of the 1940 Act. In addition, when-issued or forward settling securities transactions that physically settle within 35-days are deemed not to involve a senior security.

Additional legislation may be enacted subsequent to the date of this SAI that could negatively affect the assets of the Fund. Legislation or regulation may change the way in which the Fund itself is regulated. The Adviser cannot predict the effects of any new governmental regulation that may be implemented, and there can be no assurance that any new governmental regulation will not adversely affect the Fund's performance or ability to achieve its investment objectives.

In addition, regulations adopted by the prudential regulators that took effect with regards to most funds in 2019 require certain banks to include in a range of financial contracts, including derivative and short-term funding transactions, terms delaying or restricting a counterparty's default, termination and other rights in the event that the bank and/or its affiliates become subject to certain types of resolution or insolvency proceedings. The regulations could limit the Fund's ability to exercise a range of cross-default rights if its counterparty, or an affiliate of the counterparty, is subject to bankruptcy or similar proceedings. Such regulations could further negatively impact the Fund's use of derivatives.

*Valuation of Derivative Instruments.* The Fund will seek to value financial instruments on a mark-to-market basis, but may also rely on valuations provided by third party pricing services.

**Portfolio Turnover**

The Fund's portfolio turnover rate is not expected to exceed 100%, but may vary greatly from year to year and will not be a limiting factor when the Adviser deems portfolio changes appropriate. Although the Fund generally does not intend to trade for short-term profits, the Fund may engage in short-term trading strategies, and securities may be sold without regard to the length of time held when, in the opinion of the Adviser, investment considerations warrant such action. These policies may have the effect of increasing the annual rate of portfolio turnover of the Fund. Higher rates of portfolio turnover would likely result in higher brokerage commissions and may generate short-term capital gains taxable as ordinary income. If securities are not held for certain applicable holding periods, dividends paid on them will not qualify for the advantageous federal tax rates applicable to "qualified dividend income." See "Tax Status."

For the fiscal year ended December 31, 2023, the Fund's portfolio turnover rate was 10%. For the fiscal year ended December 31, 2024, the Fund's portfolio turnover rate was 13%.

**Repurchases and Transfers of Shares**

*Repurchase Offers.* The Board has adopted a resolution setting forth the Fund's fundamental policy that it will conduct quarterly repurchase offers (the "Repurchase Offer Policy"). The Repurchase Offer Policy sets the interval between each repurchase offer at one quarter and provides that the Fund shall conduct a repurchase offer each quarter (unless suspended or postponed in accordance with regulatory requirements). The Repurchase Offer Policy also provides that the repurchase pricing shall occur not later than the 14th day after the Repurchase Request Deadline or the next business day if the 14th day is not a business day. Under normal circumstances, it is

S-10

expected that the repurchase pricing date will be the Repurchase Request Deadline and that the repurchase price will be the Fund's NAV determined after the close of business on the Repurchase Request Deadline. The Fund's Repurchase Offer Policy is fundamental and cannot be changed without shareholder approval. The Fund may, for the purpose of paying for repurchased shares, be required to liquidate portfolio holdings earlier than the Adviser would otherwise have liquidated these holdings. Such liquidations may result in losses, and may increase the Fund's portfolio turnover.

*Repurchase Offer Policy Summary of Terms.*

1.  The Fund will make repurchase offers at periodic intervals pursuant to Rule 23c-3 under the 1940 Act, as that rule may be amended from time to time. Rule 23c-3 establishes requirements that closed-end funds must follow when making repurchase offers to their shareholders.

2.  The repurchase offers will be made in March, June, September and December of each year.

3.  The Fund must receive repurchase requests submitted by shareholders in response to the Fund's repurchase offer within 21 to 42 days of the date the repurchase offer is made (or the preceding business day if the New York Stock Exchange is closed on that day), as specified by the Fund (the "Repurchase Request Deadline").

4.  The maximum time between the Repurchase Request Deadline and the next date on which the Fund determines the NAV applicable to the purchase of shares (the "Repurchase Pricing Date") is 14 calendar days (or the next business day if the fourteenth day is not a business day).

The Fund may not condition a repurchase offer upon the tender of any minimum amount of shares. The Fund may deduct from the repurchase proceeds only a repurchase fee that is paid to the Fund and is reasonably intended to compensate the Fund for expenses directly related to the repurchase. The repurchase fee may not exceed 2% of the proceeds. However, the Fund does not currently charge a repurchase fee. The Fund may rely on Rule 23c-3 only so long as the Board satisfies the fund governance standards defined in Rule 0-1(a)(7) under the 1940 Act.

*Procedures.* All periodic repurchase offers must comply with the following procedures:

*Repurchase Offer Amount.* Each quarter, the Fund may offer to repurchase at least 5% and no more than 25% of the Fund's outstanding shares on the Repurchase Request Deadline (the "Repurchase Offer Amount"). The Board shall determine the quarterly Repurchase Offer Amount.

*Shareholder Notification.* Thirty days before each Repurchase Request Deadline, the Fund shall send to each shareholder of record and to each beneficial owner of the shares that are the subject of the repurchase offer a notification ("Shareholder Notification") providing the following information:

1.  A statement that the Fund is offering to repurchase its shares from shareholders at NAV;

2.  Any fees applicable to such repurchase, if any;

3.  The Repurchase Offer Amount;

4.  The dates of the Repurchase Request Deadline, Repurchase Pricing Date, and the date by which the Fund must pay shareholders for any shares repurchased (which shall not be more than seven days after the Repurchase Pricing Date) (the "Repurchase Payment Deadline");

5.  The risk of fluctuation in NAV between the Repurchase Request Deadline and the Repurchase Pricing Date, and the possibility that the Fund may use an earlier Repurchase Pricing Date;

6.  The procedures for shareholders to request repurchase of their shares and the right of shareholders to withdraw or modify their repurchase requests until the Repurchase Request Deadline;

S-11

CONFIDENTIAL TDIT005327

7. The procedures under which the Fund may repurchase such shares on a pro rata basis if shareholders tender more than the Repurchase Offer Amount;

8. The circumstances in which the Fund may suspend or postpone a repurchase offer;

9. The NAV of the shares computed no more than seven days before the date of the notification and the means by which shareholders may ascertain the NAV thereafter; and

10. The market price, if any, of the shares on the date on which such NAV was computed, and the means by which shareholders may ascertain the market price thereafter.

The Fund must file a Form N-23c-3 ("Notification of Repurchase Offer'') and three copies of the Shareholder Notification with the SEC within three business days after sending the notification to shareholders.

*Notification of Beneficial Owners*. Where the Fund knows that shares subject to a repurchase offer are held of record by a broker, dealer, voting trustee, bank, association or other entity that exercises fiduciary powers in nominee name or otherwise, the Fund must follow the procedures for transmitting materials to beneficial owners of securities that are set forth in Rule 14a-13 under the Securities Exchange Act of 1934.

*Repurchase Requests*. Repurchase requests must be submitted by shareholders by the Repurchase Request Deadline. The Fund shall permit repurchase requests to be withdrawn or modified at any time until the Repurchase Request Deadline, but shall not permit repurchase requests to be withdrawn or modified after the Repurchase Request Deadline.

*Repurchase Requests in Excess of the Repurchase Offer Amount*. If shareholders tender more than the Repurchase Offer Amount, the Fund may, but is not required to, repurchase an additional amount of shares not to exceed 2% of the outstanding shares of the Fund on the Repurchase Request Deadline. If the Fund determines not to repurchase more than the Repurchase Offer Amount, or if shareholders tender shares in an amount exceeding the Repurchase Offer Amount plus 2% of the outstanding shares on the Repurchase Request Deadline, the Fund shall repurchase the shares tendered on a pro rata basis. This policy, however, does not prohibit the Fund from:

1. Accepting all repurchase requests by persons who own, beneficially or of record, an aggregate of not more than 100 shares and who tender all of their stock for repurchase, before prorating shares tendered by others, or

2. Accepting by lot shares tendered by shareholders who request repurchase of all shares held by them and who, when tendering their shares, elect to have either: (i) all or none; or (ii) at least a minimum amount or none accepted, if the Fund first accepts all shares tendered by shareholders who do not make this election.

*Suspension or Postponement of Repurchase Offers*. The Fund shall not suspend or postpone a repurchase offer except pursuant to a vote of a majority of the Board, including a majority of the Trustees who are not interested persons of the Fund, and only:

1. If the repurchase would cause the Fund to lose its status as a RIC under Subchapter M of the Internal Revenue Code of 1986, as amended (the "Code");

2. If the repurchase would cause the shares that are the subject of the offer that are either listed on a national securities exchange or quoted in an inter-dealer quotation system of a national securities association to be neither listed on any national securities exchange nor quoted on any inter-dealer quotation system of a national securities association;

3. For any period during which the New York Stock Exchange or any other market in which the securities owned by the Fund are principally traded is closed, other than customary weekend and holiday closings, or during which trading in such market is restricted;

S-12

CONFIDENTIAL

TDIT005328

371

4.     For any period during which an emergency exists as a result of which disposal by the Fund of securities owned by it is not reasonably practicable, or during which it is not reasonably practicable for the Fund fairly to determine the value of its net assets; or

5.     For such other periods as the SEC may by order permit for the protection of shareholders of the Fund.

If a repurchase offer is suspended or postponed, the Fund shall provide notice to shareholders of such suspension or postponement. If the Fund renews the repurchase offer, the Fund shall send a new Shareholder Notification to shareholders.

*Computing Net Asset Value*. The Fund's current NAV shall be computed no less frequently than weekly, and daily on the five business days preceding a Repurchase Request Deadline, on such days and at such specific time or times during the day as set by the Board. Currently, the Board has determined that the Fund's NAV shall be determined daily following the close of the New York Stock Exchange. The Fund's NAV need not be calculated on:

1.     Days on which changes in the value of the Fund's portfolio securities will not materially affect the current NAV of the shares;

2.     Days during which no order to purchase shares is received, other than days when the NAV would otherwise be computed; or

3.     Customary national, local, and regional business holidays described or listed in the Prospectus.

*Liquidity Requirements*. From the time the Fund sends a Shareholder Notification to shareholders until the Repurchase Pricing Date, a percentage of the Fund's assets equal to at least 100% of the Repurchase Offer Amount (the "Liquidity Amount") shall consist of assets that individually can be sold or disposed of in the ordinary course of business, at approximately the price at which the Fund has valued the investment, within a period equal to the period between a Repurchase Request Deadline and the Repurchase Payment Deadline, or of assets that mature by the next Repurchase Payment Deadline. This requirement means that individual assets must be salable under these circumstances. It does not require that the entire Liquidity Amount must be salable. In the event that the Fund's assets fail to comply with this requirement, the Board shall cause the Fund to take such action as it deems appropriate to ensure compliance.

*Liquidity Policy*. The Board may delegate day-to-day responsibility for evaluating liquidity of specific assets to the Adviser, but shall continue to be responsible for monitoring the Adviser's performance of its duties and the overall composition of the portfolio. Accordingly, the Board has approved this policy that is reasonably designed to ensure that the Fund's portfolio assets are sufficiently liquid so that the Fund can comply with its fundamental policy on repurchases and comply with the liquidity requirements in the preceding paragraph.

1.     In evaluating liquidity, the following factors are relevant, but not necessarily determinative:

    (a)    The frequency of trades and quotes for the security.

    (b)    The number of dealers willing to purchase or sell the security and the number of potential purchasers.

    (c)    Dealer undertakings to make a market in the security.

    (d)    The nature of the marketplace trades (e.g., the time needed to dispose of the security, the method of soliciting offer and the mechanics of transfer).

    (e)    The size of the fund's holdings of a given security in relation to the total amount of outstanding of such security or to the average trading volume for the security.

2.     If market developments impair the liquidity of a security, the Adviser should review the advisability of retaining the security in the portfolio. The Adviser should report to the basis for its determination to retain a security at the next Board meeting.

S-13

**CONFIDENTIAL**                             **291**     **TDIT005329**

3.      The Board shall review the overall composition and liquidity of the Fund's portfolio on a quarterly basis.

4.      These procedures may be modified as the Board deems necessary.

_Registration Statement Disclosure_. The Fund's registration statement must disclose its intention to make or consider making such repurchase offers.

_Annual Report Disclosure_. The Fund shall include in its annual report to shareholders the following:

1.      Disclosure of its fundamental policy regarding periodic repurchase offers.

2.      Disclosure regarding repurchase offers by the Fund during the period covered by the annual report, which disclosure shall include:

(a)     the number of repurchase offers,

(b)     the repurchase offer amount and the amount tendered in each repurchase offer,

(c)     and the extent to which in any repurchase offer the Fund repurchased stock pursuant to the procedures in Rule 23c-3(b)(5) under the 1940 Act.

_Advertising_. The Fund, or any underwriter for the Fund, must comply, as if the Fund were an open-end company, with the provisions of Section 24(b) of the 1940 Act and the rules thereunder and file, if necessary, with FINRA or the SEC any advertisement, pamphlet, circular, form letter, or other sales literature addressed to or intended for distribution to prospective investors.

**Transfers of Shares.** No person may become a substituted shareholder without the written consent of the Board, which consent may be withheld for any reason in the sole and absolute discretion of the Board. Shares may be transferred only: (i) by operation of law pursuant to the death, bankruptcy, insolvency or dissolution of a shareholder; or (ii) with the written consent of the Board, which may be withheld in its sole and absolute discretion. The Board may, in its discretion, delegate to the Adviser its authority to consent to transfers of shares. Each shareholder and transferee is required to pay all expenses, including attorneys and accountants fees, incurred by the Fund in connection with such transfer.

S-14

**MANAGEMENT OF THE FUND**

The Board has overall responsibility to manage and control the business affairs of the Fund, including the complete and exclusive authority to oversee and to establish policies regarding the management, conduct and operation of the Fund's business. The Board exercises the same powers, authority and responsibilities on behalf of the Fund as are customarily exercised by the board of directors of a registered investment company organized as a corporation. The business of the Fund is managed under the direction of the Board in accordance with the Agreement and Declaration of Trust and the Fund's Bylaws (the "Governing Documents"), each as amended from time to time, which have been filed with the SEC and are available upon request.

The Board consists of five individuals, four of whom are not "interested persons" (as defined under the 1940 Act) of the Fund, the Adviser, or the Fund's distributor ("Independent Trustees"). Interested Persons generally include affiliates, immediate family members of affiliates, any partner or employee of the Fund's legal counsel, and any person who has engaged in portfolio transactions for the Fund or who has loaned the Fund money or property within the previous six months. Pursuant to the Governing Documents of the Fund, the Trustees shall elect officers including a President, a Secretary, a Treasurer, a Principal Executive Officer and a Principal Accounting Officer. The Board retains the power to conduct, operate and carry on the business of the Fund and has the power to incur and pay any expenses, which, in the opinion of the Board, are necessary or incidental to carry out any of the Fund's purposes. The Trustees, officers, employees and agents of the Fund, when acting in such capacities, shall not be subject to any personal liability except for his or her own bad faith, willful misfeasance, gross negligence or reckless disregard of his or her duties.

**Trustee Qualifications**

Generally, the Fund believes that each Trustee is competent to serve because of their individual overall merits including: (i) experience; (ii) qualifications; (iii) attributes; and (iv) skills.

The Fund does not believe any one factor is determinative in assessing a Trustee's qualifications, but that the collective experience of each Trustee makes them each highly qualified.

Following is a list of the Trustees and executive officers of the Fund and their principal occupation over the last five years.

The "Fund Complex," as referred to herein consists of: the Fund, each series of NexPoint Funds I ("NFI"), each series of NexPoint Funds II ("NFII"), Highland Global Allocation Fund ("GAF"), Highland Opportunities and Income Fund ("HFRO"), and NexPoint Capital, Inc. (the "BDC"), a closed-end management investment company that has elected to be treated as a business development company under the 1940 Act.

**Trustees**

| Name, Date of Birth, Position(s) with the Fund and Length of Time Served, Term of Office¹ and Number of Portfolios in the Fund Complex Overseen by the Trustee | Principal Occupations(s) During the Past Five Years and Other Directorships/ Trusteeships Held During the Past Five Years | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|
| **Independent Trustees** | | |
| **Dr. Bob Froehlich** (4/28/1953) Trustee since March 2016; Indefinite term 7 funds | Retired. Director of KC Concessions, Inc. (from January 2013 to March 2025); Director of American Sports Enterprise, Inc. (since January 2013); Chairman and owner, Kane | Significant experience in the financial industry; significant managerial and executive experience; significant experience on other boards of directors, including as a member of several audit committees. |

S-15

| Name, Date of Birth, Position(s) with the Fund and Length of Time Served, Term of Office[1] and Number of Portfolios in the Fund Complex Overseen by the Trustee | Principal Occupations(s) During the Past Five Years and Other Directorships/ Trusteeships Held During the Past Five Years | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|
| | County Cougars Baseball Club (from January 2013 to March 2025); Director of The Midwest League of Professional Baseball Clubs, Inc. (from January 2013 to December 2021); Director of Kane County Cougars Foundation, Inc. (from January 2013 to March 2025); Director of Galen Robotics, Inc. (from August 2016 to September 2023); Director and Special Advisor to Vault Data, LLC (since February 2018); Director of American Association of Professional Baseball, Inc. (since February 2021); Director of National Amateur Fall Baseball Federation (since December 2023) and Executive Director of Kane County Cougars Baseball Foundation Inc. (from July 2023 to March 2025) (remaining as Director). | |
| **Ethan Powell** (6/20/1975) Trustee since March 2016; Chairman of the Board since March 2016; Indefinite term 7 funds | Principal and CIO of Brookmont Capital Management, LLC (since May 2020); CEO, Chairman and Founder of Impact Shares LLC (since December 2015); Trustee /Director of the Fund Complex (from June 2012 until July 2013 and since December 2013); and Trustee of Strategic Trust (since August 2021). Trustee of Tidal Trust III (formerly Impact Shares Trust I) (since May 2016) | Significant experience in the financial industry; significant executive experience including past service as an officer of funds in the Fund Complex; significant administrative and managerial experience. |
| **Bryan A. Ward** (2/4/1955) Trustee since March 2016; Indefinite term 7 funds | President – Private Banking, Lakeside Bank (since September 2023); Business Development Banker, CrossFirst Bank (from January 2023 to April 2023) (President-Dallas from October 2020 until January 2023 and Senior Advisor from April 2019 until October 2022); and Private Investor, BW Consulting, LLC (since 2014); and Anderson Consulting/Accenture (from 1991 to 2013). Director of Equity Metrix, LLC | Significant experience on this and/or other boards of directors/trustees, Audit Committee Chair; significant managerial and executive experience; significant experience as a management consultant. |

S-16

FSD2025-0116                    **Page 379 of 1530**                    2025-08-19

| Name, Date of Birth, Position(s) with the Fund and Length of Time Served, Term of Office[1] and Number of Portfolios in the Fund Complex Overseen by the Trustee | Principal Occupations(s) During the Past Five Years and Other Directorships/ Trusteeships Held During the Past Five Years | Experience, Qualifications, Attributes, Skills for Board Membership |
|---|---|---|
| **Dorri McWhorter** <br> (6/30/1973) <br><br> Trustee since May 2022; <br> Indefinite term <br> 7 funds | President & CEO, YMCA of Metropolitan Chicago (from 2021 to 2025); Chief Executive Officer, YWCA Metropolitan Chicago (from 2013 to 2021). <br><br> Board Director of William Blair Funds (since 2019); Board Director of Skyway Concession Company, LLC (since 2018); Board Director of Illinois CPA Society (from 2017 to 2022); Board Director of Lifeway Foods, Inc. (since 2020); Board Director of Green Thumb Industries, Inc. (from February 2022 to October 2022); Member of Financial Accounting Standards Advisory Council (since 2021); Board Director of LanzaTech Global, Inc. (since 2023). | Significant managerial and executive experience, including experience as president and chief executive officer; significant background and experience in financial accounting; significant experience on other boards of directors, including for other registered investment companies. |
| **Interested Trustees** | | |
| **John Honis[2]** <br> (6/16/1958) <br><br> Trustee since March 2016; <br> Indefinite term <br> 7 funds | President of Rand Advisors, LLC (August 2013 – August 2022); CEO of Valience Group, LLC (since July 2021) and Consultant of Rand Advisors, LLC (since August 2022). | Significant experience in the financial industry; significant managerial and executive experience, including experience as president, chief executive officer or chief restructuring officer of five telecommunication firms; experience on other boards of directors. |

[1]   On an annual basis, as a matter of Board policy, the Governance and Compliance Committee reviews each Trustee's performance and determines whether to extend each such Trustee's service for another year. The Board has adopted a retirement policy wherein the Governance and Compliance Committee shall not recommend the continued service as a Trustee of a Board member who is older than 80 years of age at the time the Governance and Compliance Committee reports its findings to the Board.

[2]   In light of certain relationships between Mr. Honis and historically affiliated entities of the Adviser, including Highland Capital Management, L.P. ("HCMLP"), arising out of HCMLP's pending Chapter 11 proceedings, Mr. Honis is treated as an Interested Trustee of the Trust effective January 28, 2020.

S-17

FSD2025-0116                                                              2025-08-19

CONFIDENTIAL                                                              295

TDIT005333

**Officers***

| Name, Date of Birth, Position(s) held with the Trust and Length of Time Served, Term of Office | Principal Occupations(s) During the Past Five Years |
|---|---|
| **James Dondero** (6/29/1962) President and Principal Executive Officer since March 2016; Indefinite Term | Founder of NexPoint; Co-founder of HCMLP and NexPoint Asset Management, L.P. ("NAM"); Chairman of the Board of NexPoint Residential Trust, Inc. since 2015; NexPoint Hospitality Trust, NexPoint Real Estate Finance, Inc., Texmark Timber Treasury, L.P., and SeaOne Holdings, LLC; Portfolio Manager of GAF, HFRO, NexPoint Event Driven Fund and NexPoint Merger Arbitrage Fund (each a series of NFI); NexPoint Climate Tech Fund (series of NFII); the BDC; and NRESF. |
| **Frank Waterhouse** (4/14/1971) Treasurer since March 2016; Principal Financial and Accounting Officer since April 2021; Indefinite Term | Chief Financial Officer of Skyview Group since February 2021; Chief Financial Officer and Partner of HCMLP from December 2011 and March 2015, respectively, to February 2021; Treasurer of the Fund Complex since May 2015. |
| **Dustin Norris** (1/6/1984) Executive Vice President since April 2019; Indefinite Term | Head of Distribution and Chief Product Strategist at NexPoint since March 2019; President of NexPoint Securities, Inc. since April 2018; Officer of the Fund Complex since November 2012. |
| **Stephanie Vitiello** (6/21/1983) Secretary since April 2021; Chief Compliance Officer and Anti-Money Laundering Officer since November 2021; Indefinite Term | Chief Compliance Officer and Counsel of Skyview Group since February 2021. Prior to her current role at Skyview Group, Ms. Vitiello served as Managing Director – Distressed, Assistant General Counsel, Associate General Counsel and In-House Counsel for HCMLP. |
| **Will Mabry** (7/2/1986) Assistant Treasurer since April 2021; Indefinite Term | Director, Fund Analysis of Skyview Group, since February 2021. Prior to his current role at Skyview Group, Mr. Mabry served as Senior Manager – Fund Analysis, Manager – Fund Analysis, and Senior Fund Analyst for HCMLP. |

\* The address for each Trustee and Officer is c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201.

**Board Committees**

*Audit and Qualified Legal Compliance Committee.* The members of the Audit and Qualified Legal Compliance Committee are Dr. Froehlich and Messrs. Powell and Ward and Ms. McWhorter, each of whom is independent for purposes of the 1940 Act. Mr. Ward serves as Chairperson of the Audit and Qualified Legal Compliance Committee. The Audit and Qualified Legal Compliance Committee is responsible for: (i) approving the Fund's independent accountants; (ii) reviewing with the Fund's independent accountants the plans and results of the audit engagement and reviewing the adequacy of the Fund's internal accounting controls; and (iii) approving professional services provided by the Fund's independent accountants. The Audit and Qualified Legal Compliance Committee is charged with compliance with Rules 205.2(k) and 205.3(c) of Title 17 of the Code of Federal Regulations regarding alternative reporting procedures for attorneys representing the Fund who appear

S-18

CONFIDENTIAL

TDIT005334

and practice before the SEC on behalf of the Fund. The Audit Committee also oversees valuations determined by the Adviser, who pursuant to Rule 2a-5 under the 1940 Act, has been designated by the Board as the Fund's valuation designee to perform the fair valuation determination for securities and other assets held by the Fund in accordance with valuation policies and procedures established by the Adviser and approved by the Board. In addition, each member of the Audit and Qualified Legal Compliance Committee meets the current independence and experience requirements of Rule 10A-3 under the Exchange Act.

During the fiscal year ended December 31, 2024, the Audit and Qualified Legal Compliance Committee held five meetings.

***The Governance and Compliance Committee.*** The Fund's Governance and Compliance Committee's function is to oversee and make recommendations to the full Board or the Independent Trustees, as applicable, with respect to the governance of the Fund, selection and nomination of Trustees, compensation of Trustees, and related matters, as well as to oversee and assist Board oversight of the Fund's compliance with legal and regulatory requirements and to seek to address any potential conflicts of interest between the Fund and the Adviser in connection with any potential or existing litigation or other legal proceeding related to securities held by the Fund and the Adviser or another client of the Adviser. The Governance and Compliance Committee is also responsible for evaluating each Trustee and determining whether to recommend each Trustee's continued service in that capacity. The Governance and Compliance Committee will consider recommendations for Trustee nominees from shareholders sent to the Secretary of the Fund, 300 Crescent Court, Suite 700, Dallas, Texas 75201. A nomination submission must include all information relating to the recommended nominee that is required to be disclosed in solicitations or proxy statements for the election of Trustees, as well as information sufficient to evaluate the recommended nominee's ability to meet the responsibilities of a Trustee of the Fund. Nomination submissions must be accompanied by a written consent of the individual to stand for election if nominated by the Board and to serve if elected by the shareholders, and such additional information must be provided regarding the recommended nominee as reasonably requested by the Governance and Compliance Committee. The Governance and Compliance Committee is currently comprised of Dr. Froehlich and Messrs. Ward and Powell and Ms. McWhorter, each of whom is independent for purposes of the 1940 Act. Dr. Froehlich serves as the Chairperson of the Governance and Compliance Committee. The Governance and Compliance Committee met five times during the fiscal year ended December 31, 2024.

***The Administration and Operations Committee.*** The members of the Administration and Operations Committee are Dr. Froehlich and Messrs. Honis, Ward, and Powell and Ms. McWhorter. Mr. Honis serves as Chairperson of the Administration and Operations Committee. The Administration and Operations Committee is responsible for reviewing arrangements with financial intermediaries who provide service to the Fund, including Fund payments to financial intermediaries, and for overseeing any funds that, in the Board's determination, employ alternative investment strategies. The Administration and Operations Committee met five times during the fiscal year ended December 31, 2024.

**Board Leadership Structure**

The Board is led by Ethan Powell, an Independent Trustee, who has served as the Chairman of the Board since March 2016. Under certain 1940 Act governance guidelines that apply to the Fund, the Independent Trustees will meet in executive session, at least quarterly. Under the Fund's governing documents, the Chairman of the Board is responsible for: (a) presiding at board meetings; (b) calling special meetings on an as-needed basis; and (c) execution and administration of Fund policies, including: (i) setting the agendas for board meetings; and (ii) providing information to board members in advance of each board meeting and between board meetings. The Fund believes that the Chairman, and, as an entity, the full Board, provide effective leadership that is in the best interests of the Fund and each shareholder.

The Board periodically reviews its leadership structure, including the role of the Chairman. The Board also completes an annual self-assessment during which it reviews its leadership and Committee structure and

S-19

CONFIDENTIAL TDIT005335

considers whether its structure remains appropriate in light of the Fund's current operations. The Board believes that its leadership structure, including the current percentage of the Board who are Independent Trustees is appropriate given its specific characteristics. These characteristics include: (i) the extent to which the work of the Board is conducted through the standing committees, and that the Audit and Qualified Legal Compliance Committee and the Governance and Compliance Committee meetings are each chaired by an Independent Trustee; (ii) the extent to which the Independent Trustees meet as needed, together with their independent legal counsel, in the absence of members of management and any member of the Board who is considered an "interested person" of the Fund; and (iii) Mr. Powell's and Mr. Honis' previous positions with NAM and/or historical affiliates of the Adviser which enhances the Board's understanding of the operations of the Adviser.

**Board Oversight of Risk Management**

The Board's role is one of oversight, rather than active management. This oversight extends to the Fund's risk management processes. These processes are embedded in the responsibilities of officers of, and service providers to, the Fund. For example, the Adviser and other service providers to the Fund are primarily responsible for the management of the Fund's investment risks. The Board has not established a formal risk oversight committee. However, much of the regular work of the Board and its standing Committees addresses aspects of risk oversight. For example, the Trustees seek to understand the key risks facing the Fund, including those involving conflicts of interest; how management identifies and monitors these risks on an ongoing basis; how management develops and implements controls to mitigate these risks; and how management tests the effectiveness of those controls.

In the course of providing that oversight, the Board will receive a wide range of reports on the Fund's activities from the Adviser and other service providers, including reports regarding the Fund's investment portfolio, the compliance of the Fund with applicable laws, and the Fund's financial accounting and reporting. The Board will also meet periodically with the Fund's Chief Compliance Officer to receive reports regarding the compliance of the Fund with the federal securities laws and the Fund's internal compliance policies and procedures and meets with the Fund's Chief Compliance Officer periodically, including at least annually, to review the Chief Compliance Officer's annual report. The Board's Audit and Qualified Legal Compliance Committee will also meet regularly with the Chief Financial Officer and Treasurer and the Fund's independent public accounting firm to discuss, among other things, the internal control structure of the Fund's financial reporting function. The Board will also meet periodically with the portfolio managers of the Fund to receive reports regarding the management of the Fund, including its investment risks.

The Board recognizes that not all risks that may affect the Fund can be identified, that it may not be practical or cost-effective to eliminate or mitigate certain risks, that it may be necessary to bear certain risks (such as investment-related risks) to achieve the Fund's goals, that reports received by the Trustees with respect to risk management matters are typically summaries of the relevant information, and that the processes, procedures and controls employed to address risks may be limited in their effectiveness. As a result of the foregoing and other factors, risk management oversight by the Board and by the Committees is subject to substantial limitations.

**Trustee Ownership**

The following table indicates the dollar range of equity securities that each Trustee beneficially owned in the Fund and the aggregate dollar range of equity securities owned by the Trustees in all funds overseen by the Trustees in the Fund Complex as of December 31, 2024.

S-20

| Name of Trustee | Dollar Range of Equity Securities in the Fund | Aggregate Dollar Range of Equity Securities[1] Owned in All Funds of the Funds Complex Overseen by Trustee[2] |
|---|---|---|
| **Independent Trustees** | | |
| Ethan Powell | None | $50,001 - $100,000 |
| Dr. Bob Froehlich | None | Over $100,000 |
| Bryan A. Ward | None | $10,001 - $50,000 |
| Dorri McWhorter | None | None |
| **Interested Trustee** | | |
| John W. Honis | None | $1 - $10,000 |

[1] Based on market value as of December 31, 2024.
[2] Dollar ranges are as follows: None, $1-$10,000, $10,001-$50,000, $50,001-$100,000 and over $100,000.

**Compensation**

The executive officers of the Fund receive no direct remuneration from the Fund. Each Trustee who oversees all of the funds in the Fund Complex receives an annual retainer of $150,000 payable in quarterly installments and allocated among each portfolio in the Fund Complex based on relative net assets. Trustees are reimbursed for actual out-of-pocket expenses relating to attendance at meetings The Trustees do not receive any separate compensation in connection with service on Committees or for attending Board or Committee Meetings; however, the Chairman of the Board receives an additional annual payment of $20,000 and the Chairperson of the each Committee each receive an additional annual payment of $10,000 payable in quarterly installments and allocated among each portfolio in the Fund Complex based on relative net assets. The Trustees do not have any pension or retirement plan.

The table below details the amount of compensation the Trustees received from the Fund during the fiscal year ended December 31, 2024. The Fund does not have a bonus, profit sharing, pension or retirement plan.

| Name of Trustee | Aggregate Compensation From the Fund | | Pension or Retirement Benefits Accrued as Part of the Fund's Expenses | | Estimated Annual Benefits Upon Retirement | | Aggregate Compensation From the Funds Complex | |
|---|---|---|---|---|---|---|---|---|
| **Independent Trustees** | | | | | | | | |
| Dr. Bob Froehlich | $ | 3,181 | $ | 0 | $ | 0 | $ | 160,000 |
| Bryan A. Ward | $ | 3,181 | $ | 0 | $ | 0 | $ | 160,000 |
| Ethan Powell | $ | 3,379 | $ | 0 | $ | 0 | $ | 170,000 |
| Dorri McWhorter | $ | 2,982 | $ | 0 | $ | 0 | $ | 150,000 |
| **Interested Trustees** | | | | | | | | |
| John W. Honis | $ | 3,181 | $ | 0 | $ | 0 | $ | 160,000 |

S-21

**CODES OF ETHICS**

The Fund and the Adviser have adopted codes of ethics under Rule 17j-1 of the 1940 Act. These codes permit personnel subject to the codes to invest in securities, including securities that may be purchased or held by the Fund. The codes of ethics are available on the EDGAR Database on the SEC's web site (http://www.sec.gov), and copies of these codes may be obtained, after paying a duplicating fee, by electronic request at the following e-mail address: publicinfo@sec.gov, or by writing the SEC's Public Reference Section, Washington, D.C. 20549-0102.

**PROXY VOTING POLICIES AND PROCEDURES**

The Board has delegated the voting of proxies for Fund securities to the Adviser pursuant to the Adviser's proxy voting policies and procedures. Under these policies and procedures, the Adviser will vote proxies related to Fund securities in the best interests of the Fund and its shareholders. A copy of the Adviser's proxy voting policies and procedures is attached as Appendix A to this SAI. The Fund's proxy voting record for the most recent 12-month period ended June 30 is available: (i) without charge, upon request, by calling 844-485-9167; and (ii) on the SEC's web site (http://www.sec.gov).

**CONTROL PERSONS AND PRINCIPAL HOLDERS**

A principal shareholder is any person who owns (either of record or beneficially) 5% or more of the outstanding shares of a fund. A control person is one who owns, either directly or indirectly more than 25% of the voting securities of a company or acknowledges the existence of control. A control person may be able to determine the outcome of a matter put to a shareholder vote.

As of March 31, 2025, as a result of Mr. Dondero's controlling interest in the Adviser, the Trustees and officers beneficially owned approximately 8.57% of the Fund's outstanding shares.

S-22

CONFIDENTIAL

300

TDIT005338

As of March 31, 2025, the only persons known by the Fund to own of record or beneficially 5% or more of any class of the outstanding shares of the Fund were as follows:

| Name and Address | Outstanding Shares Held | Percentage of Class (%) |
|---|---|---|
| **NEXPOINT REAL ESTATE STRATEGIES FUND – CLASS A** | | |
| Pershing LLC | 43,054 | 9.11% |
| PO Box 2052 | | |
| Jersey City, NJ 07303-2052 | | |
| Calton & Associates, Inc. | 29,815 | 6.31% |
| 2701 N Rocky Point Dr. | | |
| Suite 1000 | | |
| Tampa, FL 33607 | | |
| **NEXPOINT REAL ESTATE STRATEGIES FUND – CLASS C** | | |
| Hilltop Securities Inc. | 18,648 | 10.61% |
| 717 N Harwood Street Suite 3400 | | |
| Dallas, TX 75201-6534 | | |
| Pershing LLC | 13,310 | 7.58% |
| PO Box 2052 | | |
| Jersey City, NJ 07303-2052 | | |
| **NEXPOINT REAL ESTATE STRATEGIES FUND – CLASS Z** | | |
| Liberty CLO Holdco Ltd. | 500,120 | 33.63% |
| 300 Crescent Court | | |
| Dallas, TX 75206 | | |
| Charles Schwab & Co. Inc. | 407,285 | 27.38% |
| Special Custody Account FBO Customers | | |
| Attn. Mutual Funds | | |
| 211 Main Street | | |
| San Francisco, CA 94105 | | |
| Axos Clearing LLC | 107,431 | 7.22% |
| FBO #861 PB BOX 6503 | | |
| Englewood, CO 80155-6503 | | |

S-23

## INVESTMENT ADVISORY AND OTHER SERVICES

**The Adviser**

NexPoint Advisors, L.P., which serves as the investment adviser of the Fund, is registered with the SEC as an investment adviser under the Advisers Act. NexPoint is owned by The Dugaboy Investment Trust, of which James Dondero is the beneficiary, and NexPoint Advisors GP, LLC, NexPoint's general partner. Mr. Dondero is the President and sole member of NexPoint Advisors GP, LLC.

The Adviser also externally manages NexPoint Capital, Inc., a non-traded business development company. Affiliates of the Adviser manage NXDT, a diversified REIT whose share trades on the NYSE; NXRT, a publicly-traded REIT whose shares trade on the NYSE; VineBrook Homes Trust, Inc., a Private Real Estate Investment Fund that manages a portfolio of single-family housing properties in the Midwest U.S.; NexPoint Hospitality Trust ("NHT"), a REIT listed on the TSX Venture Exchange that manages a portfolio of hospitality assets located in the U.S.; NexPoint Real Estate Finance, Inc., an externally managed publicly traded mortgage REIT ("NREF"); and certain wholly-owned REIT subsidiaries of other closed-end funds in the Fund Complex. NexPoint Asset Management, L.P., an affiliate of the Adviser, manages Highland Opportunities and Income Fund ("HFRO") and Highland Global Allocation Fund ("GAF"), registered closed-end funds whose shares trade on the NYSE. The Adviser's senior management team has experience across private lending, private equity, real estate investing and other investment strategies. Collectively, the Adviser and its affiliates managed approximately $16.8 billion in assets as of January 31, 2025, including approximately $11.7 billion in gross real estate assets.

Under the general supervision of the Board, the Adviser will carry out the investment and reinvestment of the net assets of the Fund, will furnish continuously an investment program with respect to the Fund, and determine which securities should be purchased, sold or exchanged. In addition, the Adviser will supervise and provide oversight of the Fund's service providers. The Adviser has entered into a Services Agreement (the "Services Agreement") with Skyview Group ("Skyview"), pursuant to which NexPoint will receive administrative and operational support services to enable it to provide the required advisory services to the Fund.

Certain Skyview personnel became dual-employees of NexPoint Services, Inc., a wholly-owned subsidiary of the Adviser. The same services are being performed by the dual-employees. The Adviser, and not the Fund, will compensate all Adviser, Skyview, and dual-employee personnel who provide services to the Fund.

Pursuant to the Investment Advisory Agreement with the Fund, the Adviser receives a monthly fee at the annual rate of 1.25% of the Fund's Daily Gross Assets. Daily Gross Assets is defined in the Investment Advisory Agreement as total assets, less any liabilities, but excluding liabilities evidencing leverage. A discussion regarding the basis for the Board's approval of the Fund's Investment Advisory Agreement is available in the Fund's annual report for the period ended December 31, 2024.

The Adviser and the Fund have entered into the Expense Limitation Agreement under which the Adviser has agreed contractually to waive its fees and to pay or absorb the ordinary operating expenses of the Fund (including organizational and offering expenses, but excluding distribution fees, interest, dividend expenses on short sales, brokerage commissions and other transaction costs, acquired fund fees and expenses, taxes, expenses payable by the Fund for third party administration services, litigation expenses and extraordinary expenses), to the extent that they exceed 1.75% per annum of the Fund's average Daily Gross Assets (the "Expense Limitation"). "Daily Gross Assets" is defined in the Expense Limitation Agreement as an amount equal to total assets, less any liabilities, but excluding liabilities evidencing leverage. If the Fund incurs expenses excluded from the Expense Limitation Agreement, the Fund's expense ratio would be higher and could exceed the Expense Limitation. In consideration of the Adviser's agreement to limit the Fund's expenses, the Adviser is entitled to recoup from the Fund the amount of any fees waived and Fund expenses paid or absorbed (other than organizational and initial offering expenses, which are those expenses incurred by the Fund in order to permit the Fund to be declared

effective by the SEC and to commence operations) to the extent that: (1) the reimbursement for fees and expenses will be made only if payable not more than three years from the date on which such fees are foregone or expenses are incurred by the Adviser; and (2) such recoupment does not cause the Fund's ordinary operating expenses plus recoupment to exceed the Expense Limitation in effect at the time the expenses were paid or waived or any Expense Limitation in effect at the time of recoupment. The Expense Limitation Agreement may not be amended or terminated for one year from the date of the Prospectus, unless approved by the Board. See "Management of the Fund." During the fiscal year ended December 31, 2022, the Fund paid $419,640 in advisory fees. The Adviser waived $195,464 in advisory fees during that same period. During the fiscal year ended December 31, 2023, the Fund paid $535,940 in advisory fees. The Adviser waived $461,692 in advisory fees during that same period. During the fiscal year ended December 31, 2024, the Fund paid $479,153 in advisory fees. The Adviser waived $331,916 in advisory fees during that same period.

**Other Services.** Pursuant to the Investment Advisory Agreement, the Adviser provides administration services to the Fund, provides executive and other personnel necessary to administer the Fund and furnishes office space. The Adviser waived its fees for administration services for the fiscal year ended December 31, 2017. Under a separate sub-administration agreement entered into as of October 1, 2018, the Adviser has delegated certain administrative functions to SEI Global Funds Services ("SEI") and pays SEI a fee for administration services. Under the administration agreement, SEI has agreed to provide fund accounting services; asset data services; fund administration and reporting services; and regulatory administration services, including preparation and filing of various reports with the appropriate regulatory agencies and the SEC for the Fund. The Adviser generally assists in all aspects of the Fund's administration and operations and furnishes offices, necessary facilities, equipment and personnel. SS&C Technologies, Inc. ("SS&C") serves as the transfer agent of the Fund.

**Conflicts of Interest**

Because each portfolio manager manages other accounts, including accounts that may pay higher fees, potential conflicts of interest exist, including potential conflicts between the investment strategy of the Fund and the investment strategy of the other accounts managed by the portfolio manager and potential conflicts in the allocation of investment opportunities between the Fund and the other accounts. The Adviser has policies and procedures in place that are reasonably designed to mitigate these conflicts of interest, which are also described below.

The Adviser and/or its general partner, limited partners, officers, affiliates and employees provide investment advice to other parties and manage other accounts and investment vehicles similar to the Fund. For the purposes of this section, the term "NexPoint" shall include the Adviser and its affiliated investment advisors and all affiliates listed on its Form ADV, as filed with the SEC March 28, 2025 (CRD No. 163564).

In connection with such other investment management activities, the Adviser and/or its general partner, limited partners, officers, affiliates and employees may decide to invest the funds of one or more other accounts or recommend the investment of funds by other parties, rather than the Fund's monies, in a particular security or strategy. In addition, the Adviser and such other persons will determine the allocation of funds from the Fund and such other accounts to investment strategies and techniques on whatever basis they consider appropriate or desirable in their sole and absolute discretion.

NexPoint has built a professional working environment, a firm-wide compliance culture and compliance procedures and systems designed to protect against potential incentives that may favor one account over another. The Adviser has adopted policies and procedures that address the allocation of investment opportunities, execution of portfolio transactions, personal trading by employees and other potential conflicts of interest that are designed to ensure that all client accounts are treated equitably over time. Nevertheless, the Adviser furnishes advisory services to numerous clients in addition to the Fund, and the Adviser may, consistent with applicable law, make investment recommendations to other clients or accounts (including accounts that have performance or higher fees paid to the Adviser or in which portfolio managers have a personal interest in the receipt of such

S-25

fees) that may be the same as or different from those made to the Fund. In addition, the Adviser, its affiliates and any of their partners, directors, officers, stockholders or employees may or may not have an interest in the securities whose purchase and sale the Adviser recommends to the Fund. Actions with respect to securities of the same kind may be the same as or different from the action that the Adviser, or any of its affiliates, or any of their partners, directors, officers, stockholders or employees or any member of their families may take with respect to the same securities. Moreover, the Adviser may refrain from rendering any advice or services concerning securities of companies of which any of the Adviser's (or its affiliates') partners, directors, officers or employees are directors or officers, or companies as to which the Adviser or any of its affiliates or partners, directors, officers and employees of any of them has any substantial economic interest or possesses material non-public information.

The Adviser, its affiliates or their partners, directors, officers or employees similarly serve or may serve other entities that operate in the same or related lines of business, including accounts managed by an investment adviser affiliated with the Adviser. Accordingly, these individuals may have obligations to investors in those entities or funds or to other clients, the fulfillment of which might not be in the best interests of the Fund. As a result, the Adviser will face conflicts in the allocation of investment opportunities to the Fund and other funds and clients. In order to enable such affiliates to fulfill their fiduciary duties to each of the clients for which they have responsibility, the Adviser will endeavor to allocate investment opportunities in a fair and equitable manner, pursuant to policies and procedures adopted by the Adviser and its advisory affiliates that are designed to manage potential conflicts of interest, which may, subject to applicable regulatory constraints, involve pro rata co-investment by the Fund and such other clients or may involve a rotation of opportunities among the Fund and such other clients. The Fund will only make investments in which the Adviser or an affiliate hold an interest to the extent permitted under the 1940 Act and SEC staff interpretations or pursuant to the terms and conditions of the exemptive order received by the Adviser and certain funds affiliated with the Fund, dated April 19, 2016. For example, exemptive relief is not required for the Fund to invest in syndicated deals and secondary loan market transactions in which the Adviser or an affiliate has an interest where price is the only negotiated point. The order applies to all "Investment Companies," including future closed-end investment companies registered under the 1940 Act that are managed by the Adviser, which includes the Fund. The Fund, therefore, may in the future invest in accordance with the terms and conditions of the exemptive order. To mitigate any actual or perceived conflicts of interest, allocation of limited offering securities (such as IPOs and registered secondary offerings) to principal accounts that do not include third party investors may only be made after all other client account orders for the security have been filled. However, there can be no assurance that such policies and procedures will in every case ensure fair and equitable allocations of investment opportunities, particularly when considered in hindsight.

Conflicts may arise in cases when clients and/or the Adviser and other affiliated entities invest in different parts of an issuer's capital structure, including circumstances in which one or more clients own private securities or obligations of an issuer and other clients may own public securities of the same issuer. In addition, one or more clients may invest in securities, or other financial instruments, of an issuer that are senior or junior to securities, or financial instruments, of the same issuer that are held by or acquired for, one or more other clients. For example, if such issuer encounters financial problems, decisions related to such securities (such as over the terms of any workout or proposed waivers and amendments to debt covenants) may raise conflicts of interests. In such a distressed situation, a client holding debt securities of the issuer may be better served by a liquidation of the issuer in which it may be paid in full, whereas a client holding equity securities of the issuer might prefer a reorganization that holds the potential to create value for the equity holders. In the event of conflicting interests within an issuer's capital structure, the Adviser will generally pursue the strategy that the Adviser believes best reflects what would be expected to be negotiated in an arm's length transaction, but in all instances with due consideration being given to NexPoint's fiduciary duties to each of its accounts (without regard to the nature of the accounts involved or fees received from such accounts). This strategy may be recommended by one or more NexPoint investment professionals. A single person may make decisions with respect to more than one part of an issuer's capital structure. Adviser personnel board members may still make recommendations to the applicable investment professional(s). A portfolio manager with respect to any applicable NexPoint registered investment

S-26

company clients ("Retail Accounts") will make an independent determination as to which course of action he or she determines is in the best interest of the applicable Retail Accounts. NexPoint may use external counsel for guidance and assistance.

The Adviser and its affiliates have both subjective and objective procedures and policies in place designed to manage potential conflicts of interest involving clients so that, for example, investment opportunities are allocated in a fair and equitable manner among the Fund and such other clients. An investment opportunity that is suitable for multiple clients of the Adviser and its affiliates may not be capable of being shared among some or all of such clients due to the limited scale of the opportunity or other factors, including regulatory restrictions imposed by the 1940 Act. There can be no assurance that the Adviser's or its affiliates' efforts to allocate any particular investment opportunity fairly among all clients for whom such opportunity is appropriate will result in an allocation of all or part of such opportunity to the Fund. Not all conflicts of interest can be expected to be resolved in favor of the Fund.

Another type of conflict may arise if one client account buys a security and another client account sells or shorts the same security. Currently, such opposing positions are generally not permitted within the same account without prior trade approval by the Chief Compliance Officer. However, a portfolio manager may enter into opposing positions for different clients to the extent each such client has a different investment objective and each such position is consistent with the investment objective of the applicable client. In addition, transactions in investments by one or more affiliated client accounts may have the effect of diluting or otherwise disadvantaging the values, prices or investment strategies of other client accounts.

Because certain client accounts may have investment objectives, strategies or legal, contractual, tax or other requirements that differ (such as the need to take tax losses, realize profits, raise cash, diversification, etc.), an affiliated adviser may purchase, sell or continue to hold securities for certain client accounts contrary to other recommendations. In addition, an affiliated adviser may be permitted to sell securities or instruments short for certain client accounts and may not be permitted to do so for other affiliated client accounts.

As a result of the Fund's arrangements with NexPoint, there may be times when NexPoint, the Adviser or their affiliates have interests that differ from those of the Fund's shareholders, giving rise to a conflict of interest. NexPoint and the Adviser are under common ownership, and the Fund's officers serve or may serve as officers, directors or principals of entities that operate in the same or a related line of business as the Fund does, or of investment funds managed by the Adviser or its affiliates. Similarly, the Adviser or its affiliates may have other clients with similar, different or competing investment objectives. In serving in these multiple capacities, they may have obligations to other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund or its shareholders. For example, the Fund's officers have, and will continue to have, management responsibilities for other investment funds, accounts or other investment vehicles managed or sponsored by the Adviser and its affiliates. The Fund's investment objective may overlap, in part or in whole, with the investment objective of such affiliated investment funds, accounts or other investment vehicles. As a result, those individuals may face conflicts in the allocation of investment opportunities among the Fund and other investment funds or accounts advised by or affiliated with the Adviser. The Adviser will seek to allocate investment opportunities among eligible accounts in a manner that is fair and equitable over time and consistent with its allocation policy. However, the Fund can offer no assurance that such opportunities will be allocated to it fairly or equitably in the short-term or over time.

In addition, it is anticipated that a significant portion of the Fund's assets will be represented by securities sponsored, organized and/or managed by NexPoint and its affiliates, which may include REITs, asset-backed securities and/or structured finance securities. The Adviser will monitor for conflicts of interest in accordance with its fiduciary duties and will provide the independent trustees of the Fund with an opportunity to periodically review the Fund's investments in such REITs, asset-backed securities and/or structured finance securities and assure themselves that continued investment in such securities remains in the best interests of the Fund and its shareholders.

S-27

The Adviser may direct the Fund to acquire or dispose of investments in cross trades between the Fund and other clients of the Adviser or its affiliates in accordance with applicable legal and regulatory requirements. In addition, to the extent permitted by the 1940 Act and SEC staff interpretations, the Fund may make and/or hold an investment, including an investment in securities, in which the Adviser and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Adviser's own investments in such companies.

**Shareholder Service Expenses**

The Fund has adopted a "Shareholder Servicing Plan and Agreement" (the "Plan") under which the Fund may compensate financial industry professionals for providing ongoing services in respect of clients with whom they have distributed shares of the Fund. The Plan operates in a manner consistent with Rule 12b-1 under the 1940 Act, which regulates the manner in which an open-end investment company may directly or indirectly bear the expenses of distributing its shares. Although the Fund is not an open-end investment company, it has undertaken to comply with the terms of Rule 12b-1 as a condition of an exemptive order under the 1940 Act which permits it to have a multi-class structure, CDSCs and distribution and shareholder servicing fees. Such services may include electronic processing of client orders, electronic fund transfers between clients and the Fund, account reconciliations with the Fund's transfer agent, facilitation of electronic delivery to clients of Fund documentation, monitoring client accounts for back-up withholding and any other special tax reporting obligations, maintenance of books and records with respect to the foregoing, and such other information and liaison services as the Fund or the Adviser may reasonably request. Under the Shareholder Servicing Plan and Agreement, the Fund may incur expenses on an annual basis equal to 0.25% of the average daily net assets of the Class A and Class C shares.

In addition to payments under the Plan, from time to time the Fund may pay broker-dealers and other intermediaries' account-based fees for networking and account maintenance. In addition, the Adviser and/or the Distributor may, from time to time, at their own expense out of the revenues they receive from the Fund and/or its own financial resources, make cash payments to broker-dealers and other financial intermediaries (directly and not as an expense of the Fund) as an incentive to sell shares of the Fund and/or to promote retention of customer assets in the Fund. Such cash payments may be calculated on sales of shares of the Fund ("Sales-Based Payments") or on the average daily net assets of the Fund attributable to that particular broker-dealer or other financial intermediary ("Asset-Based Payments"). Each of the Adviser and/or the Distributor may agree to make such cash payments to a broker-dealer or other financial intermediary in the form of either or both Sales-Based Payments and Asset-Based Payments.

The Adviser and/or the Distributor may also make other cash payments to broker-dealers or other financial intermediaries in addition to or in lieu of Sales-Based Payments and Asset-Based Payments, in the form of payment for travel expenses, including lodging, incurred in connection with trips taken by qualifying registered representatives of those broker-dealers or other financial intermediaries and their families to places within or outside the United States; meeting fees; entertainment; transaction processing and transmission charges; advertising or other promotional expenses; allocable portions, based on shares of the Fund sold, of salaries and bonuses of registered representatives of an affiliated broker-dealer or other financial intermediary that is a financial advisor; or other expenses as determined in the Adviser or the Distributor's discretion, as applicable. In certain cases these other payments could be significant to the broker-dealers or other financial intermediaries. Any payments described above will not change the price paid by investors for the purchase of the shares of the Fund, the amount that the Fund will receive as proceeds from such sales, or the amounts payable under the Plan.

S-28

**PORTFOLIO MANAGERS**

As described in the prospectus, James Dondero and Matthew McGraner serve as portfolio managers and are primarily responsible for the day-to-day management of the Fund.

**Mr. Dondero** is the founder and President of NexPoint Advisors, L.P. ("NexPoint") and co-founder of NAM. Mr. Dondero has over 30 years of experience investing across the alternative landscape. In that time, he established a number of integrated businesses to manage investments in real estate, private equity, and high-yield and structured credit, among other areas. Mr. Dondero holds various leadership roles at NexPoint Advisors, L.P., NexPoint Asset Management, L.P., and other NexPoint affiliates. Mr. Dondero holds various leadership roles across the NexPoint businesses; he serves as a portfolio manager for several funds and is an officer and director at NexPoint's publicly traded REITs. Additionally, Mr. Dondero holds director positions at several companies within financial services, real estate, and other industries. He is the chairman of NexBank Capital, Inc. and a director of SeaOne Holdings, LLC. A dedicated philanthropist, Mr. Dondero actively contributes to initiatives in education, veterans' affairs, and community and economic development, and has been instrumental in supporting a number of civic and cultural institutions in the Dallas-Fort Worth area. He is a member of the Southern Methodist University Cox School of Business Executive Board and the George W. Bush Presidential Center Executive Advisory Council. Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He received certification as a Certified Public Accountant (CPA) and a Certified Managerial Accountant (CMA) and is a holder of the right to use the Chartered Financial Analyst (CFA) designation.

**Mr. McGraner** has extensive experience in real estate and private equity transactions and currently leads the operations of the real estate platform of NexPoint Advisors, L.P. and its affiliates, a suite of leading alternative investment managers he co-founded. In that role, he sources and executes investments, manages risk and develops potential business opportunities, including fundraising, private investments and joint ventures. In his role at NexPoint, Mr. McGraner has served as the Executive VP and Chief Investment Officer of NXRT, a multifamily real estate investment trust, since 2016; NREF, a mortgage REIT, since 2020; VineBrook Homes Trust, a single family rental REIT, since 2019; NexPoint Diversified Real Estate Trust, a diversified REIT, since 2022; and as a member of the board of directors and President of NexPoint Storage Partners, a self-storage REIT, since 2020. Mr. McGraner is also a licensed attorney and was formerly an attorney at an AmLaw 20 multinational law firm, where his practice primarily focused on private equity, real estate and mergers and acquisitions. Since 2013, Mr. McGraner has led the acquisition and financing of over $20.0 billion of real estate investments. Mr. McGraner holds a B.S. from Vanderbilt University and a J.D. from the Washington University School of Law.

As of March 31, 2025, Mr. Dondero beneficially owned approximately 4.4% of the Fund's outstanding shares, Mr. McGraner beneficially owned approximately 2.59% of the Fund's outstanding shares. Of shares beneficially owned by Mr. Dondero, approximately 0.7% of such shares are held by the Dugaboy Investment Trust, of which Mr. Dondero is the beneficiary. Approximately 0.9% of such shares are held by NexPoint. Mr. Dondero is the President and sole member of NexPoint Advisors GP, LLC, NexPoint's general partner, and may be deemed to be an indirect beneficial owner of shares held by NexPoint. Mr. Dondero disclaims beneficial ownership of all such shares except to the extent of his pecuniary interest therein.

**Compensation of Portfolio Managers**

The Fund's financial arrangements with its portfolio managers, its competitive compensation and its career path emphasis at all levels reflect the value senior management places on key resources. Compensation may include a variety of components and may vary from year to year based on a number of factors, including the pre-tax relative performance of the portfolio manager's underlying account, the pre-tax combined performance of the

S-29

portfolio manager's underlying accounts, and the pre-tax relative performance of the portfolio manager's underlying accounts measured against other employees.

The principal components of compensation include a base salary, a discretionary bonus, and various retirement benefits.

*Base compensation*. Generally, the portfolio managers will receive base compensation based on his seniority and/or position with the Fund, which may include the amount of assets supervised and other management roles within the Fund. Base compensation is determined by taking into account current industry norms and market data to ensure that the Fund pays a competitive base compensation.

*Discretionary compensation*. In addition to base compensation, the portfolio managers may receive discretionary compensation, which can be a substantial portion of total compensation. Discretionary compensation can include a discretionary cash bonus paid to recognize specific business contributions and to ensure that the total level of compensation is competitive with the market.

Because the portfolio manager's compensation is based on his individual performance, the Fund does not have a typical percentage split among base salary, bonus and other compensation. Senior portfolio managers who perform additional management functions may receive additional compensation in these other capacities. Compensation is structured such that key professionals benefit from remaining with the Fund.

As of December 31, 2024, the portfolio managers were responsible for the management of the following types of accounts other than the Fund*:*

**James Dondero**

| Type of Account | Number of Accounts Managed | Total Assets (millions) | Number of Accounts Managed Subject to Performance-Based Advisory Fee | Total Assets Subject to Performance-Based Advisory Fee (millions) |
|---|---|---|---|---|
| Registered Investment Companies | 6 | $ 2,050 | 1 | $ 58 |
| Other Pooled Investment Vehicles | 3 | $ 4,941 | 3 | $ 4,941 |
| Other Accounts | — | $ — | — | $ — |

**Matthew McGraner**

| Type of Account | Number of Accounts | Total Assets (millions) | Number of Accounts Managed Subject to Performance-Based Advisory Fee | Total Assets Subject to Performance-Based Advisory Fee (millions) |
|---|---|---|---|---|
| Registered Investment Companies | — | $ — | | $ — |
| Other Pooled Investment Vehicles | 3 | $ 4,941 | 3 | $ 4,941 |
| Other Accounts | — | $ — | — | $ — |

**Distributor**

NexPoint Securities, Inc. (the "Distributor"), located at 200 Crescent Court, Suite 700, Dallas, Texas 75201, serves as the Fund's principal underwriter and acts as the distributor of the Fund's shares on a reasonable efforts basis, subject to various conditions.

S-30

**ALLOCATION OF BROKERAGE**

Specific decisions to purchase or sell securities for the Fund are made by the portfolio managers who are employees of the Adviser. The Adviser is authorized by the Trustees to allocate the orders placed on behalf of the Fund to brokers or dealers who may, but need not, provide research or statistical material or other services to the Fund or the Adviser for the Fund's use. Such allocation is to be in such amounts and proportions as the Adviser may determine. Some of the services received as the result of Fund transactions may primarily benefit accounts other than the Fund, while services received as the result of portfolio transactions effected on behalf of those other accounts may primarily benefit the Fund. While such services are useful and important in supplementing its own research and facilities, the Adviser believes the value of such services is not determinable and does not significantly reduce its expenses. Any research or other benefits received by the Adviser from a broker-dealer, for transactions where the Fund will be "paying-up", will qualify for the safe harbor provisions under Section 28(e) of the Securities Exchange Act of 1934.

In selecting a broker or dealer to execute each particular transaction, the Adviser will take the following into consideration:

- the best net price available;

- the reliability, integrity and financial condition of the broker or dealer;

- the size of and difficulty in executing the order; and

- the value of the expected contribution of the broker or dealer to the investment performance of the Fund on a continuing basis.

Brokers or dealers executing a portfolio transaction on behalf of the Fund may receive a commission in excess of the amount of commission another broker or dealer would have charged for executing the transaction if the Adviser determines in good faith that such commission is reasonable in relation to the value of brokerage and research services provided to the Fund. In allocating portfolio brokerage, the Adviser may select brokers or dealers who also provide brokerage, research and other services to other accounts over which the Adviser exercises investment discretion. Some of the services received as the result of Fund transactions may primarily benefit accounts other than the Fund, while services received as the result of portfolio transactions effected on behalf of those other accounts may primarily benefit the Fund.

During the fiscal year ended December 31, 2022, the Fund paid brokerage commissions of $0, of which $0 was paid to NexBank.

During the fiscal year ended December 31, 2023, the Fund paid brokerage commissions of $0, of which $0 was paid to NexBank.

During the fiscal year ended December 31, 2024, the Fund paid brokerage commissions of $0, of which $0 was paid to NexBank.

During the fiscal year ended December 31, 2024, the Fund did not acquire any securities of its regular brokers or dealers. At that date, the Fund did not hold any securities of its regular brokers or dealers. For these purposes, regular brokers or dealers are: (a) the brokers or dealers that received the greatest dollar amount of brokerage commissions by virtue of direct or indirect participation in the Fund's portfolio transactions during the Fund's most recent fiscal year; (b) the brokers or dealers that engaged as principal in the largest dollar amount of portfolio transactions of the Fund during the Fund's most recent fiscal year; or (c) the brokers or dealers that sold the largest dollar amount of securities of the Fund during the Fund's most recent fiscal year.

**Affiliated Party Transactions**

The Adviser and its affiliates will not purchase securities or other property from, or sell securities or other property to, the Fund, except that the Fund may in accordance with rules under the 1940 Act engage in

S-31

transactions with accounts that are affiliated with the Fund as a result of common officers, directors, advisers, members, managing general partners or common control. These transactions would be effected in circumstances pursuant to policies adopted by the Trustees pursuant to Rule 17a-7 under the 1940 Act, in which the Adviser determined that it would be appropriate for the Fund to purchase and another client to sell, or the Fund to sell and another client to purchase, the same security or instrument on the same day.

If the Adviser places Fund trades through an affiliated broker, the trades will be executed under a policy adopted by the Trustees pursuant to Section 17(e) and Rule 17(e)(1) under the 1940 Act which places limitations on the securities transactions effected through affiliates. The policy of the Fund with respect to brokerage is reviewed by the Trustees from time to time. Because of the possibility of further regulatory developments affecting the securities exchanges and brokerage practices generally, the foregoing practices may be modified.

S-32

**TAX STATUS**

The following discussion is general in nature and should not be regarded as an exhaustive presentation of all possible tax ramifications.

The discussion summarizes certain U.S. federal income tax consequences that may be relevant to a shareholder of the Fund that acquires, holds and/or disposes of shares of the Fund, and reflects provisions of the Code, existing Treasury regulations, rulings published by the IRS, and other applicable authority as of the date of this SAI. These authorities are subject to change by legislative or administrative action, possibly with retroactive effect. The following discussion is only a summary of some of the important tax considerations generally applicable to investments in the Fund and the discussion set forth herein does not constitute tax advice. There may be other tax considerations applicable to particular investors such as those holding shares in a tax-advantaged account such as an IRA or 401(k) plan. In addition, income earned through an investment in the Fund may be subject to state, local and foreign taxes. All shareholders should consult a qualified tax adviser regarding their investment in the Fund.

The Fund has elected to be treated and intends to qualify each year for taxation as a RIC under Subchapter M of the Code, which requires compliance with certain requirements concerning the sources of its income, diversification of its assets, and the amount and timing of its distributions to shareholders (as described below). If the Fund so qualifies, the Fund will not be subject to federal income or excise tax on net investment income or net capital gain that are distributed to shareholders in accordance with the applicable timing requirements. Net investment income and net capital gain of the Fund will be computed in accordance with Section 852 of the Code. Very generally, net investment income consists of dividends and interest less expenses. Net capital gain for a fiscal year is computed by taking into account any capital loss carryforward of the Fund.

The Fund intends to distribute all of its net investment income, any excess of net short-term capital gains over net long-term capital losses, and any excess of net long-term capital gains over net short-term capital losses in accordance with the timing requirements imposed by the Code so as to avoid imposition of federal income or excise taxes. Distributions of net investment income will be made quarterly and net capital gain will be made no later than December 31 of each year. Both types of distributions will be in shares of the Fund unless a shareholder elects to receive cash.

In order to qualify for the favorable tax treatment accorded to RICs under Subchapter M of the Code, the Fund must: (a) derive at least 90% of its gross income for each taxable year from dividends, interest, payments with respect to certain securities loans, net income from interests in "qualified publicly traded partnerships" and gains from the sale or other disposition of stock, securities or foreign currencies, or other income (including, but not limited to, gains from options, futures or forward contracts) derived with respect to the business of investing in such stock, securities or currencies, and net income derived from interests in "qualified publicly traded partnerships"; (b) diversify its holdings so that, at the end of each quarter of its taxable year: (i) at least 50% of the market value of the Fund's assets is represented by cash, U.S. government securities and securities of other RICs, and other securities (for purposes of this calculation, generally limited in respect of any one issuer, to an amount not greater than 5% of the market value of the Fund's assets and 10% of the outstanding voting securities of such issuer); and (ii) not more than 25% of the value of its assets is invested, including through corporations in which it owns a 20% or more voting stock interest, in the securities of (other than U.S. government securities or the securities of other RICs) any one issuer, two or more issuers which the Fund controls and which are determined to be engaged in the same or similar trades or businesses, or the securities of one or more "qualified publicly traded partnerships"; and (c) distribute to its shareholders with respect to each taxable year at least the sum of 90% of the Fund's "investment company taxable income" (as that term is defined in the Code, without regard to the deduction for dividends paid — generally taxable ordinary income and the excess, if any, of net short-term capital gains over net long-term capital losses) and 90% of any net tax-exempt interest income (the excess of the Fund's gross tax-exempt interest over certain disallowed deductions), for such year, in a manner qualifying for the dividends paid deduction.

S-33

CONFIDENTIAL 311 TDIT005349

If the Fund qualifies and is eligible for treatment as a RIC (i.e., satisfies the source of income and diversification requirements described in (i) and (ii) above and satisfies the annual distribution requirement described in (iii) above), it will not be subject to U.S. federal income tax on income distributed in a timely manner to its shareholders in the form of dividends (including Capital Gain Dividends, as defined below). If the Fund were not a "publicly offered" RIC within the meaning of Code Section 67(c)(2)(B) for any year, certain of the Fund's direct and indirect expenses, including management fees and certain other advisory expenses, would be subject to special "pass-through" rules. Such rules would treat these expenses as additional dividends to certain of the Fund's direct or indirect shareholders (generally including individuals and entities that compute their taxable income in the same manner as an individual).

If, for any taxable year, the Fund were to fail to meet the income, diversification or distribution test described above, the Fund could in some cases cure such failure, including by paying a fund-level tax, paying interest, making additional distributions, or disposing of certain assets. If the Fund were ineligible to or otherwise did not cure such failure for any year, or if the Fund were otherwise to fail to qualify as a RIC accorded favorable tax treatment for such year, the Fund would be subject to tax on its taxable income at the applicable corporate income tax rate, and all distributions from earnings and profits, including any distributions of net tax-exempt income and net long-term capital gains, would be taxable to shareholders as ordinary income. Some portions of such distributions may be eligible for the dividends-received deduction in the case of corporate shareholders and may be eligible to be treated as "qualified dividend income" and thus taxable at the lower long-term capital gain rate in the case of shareholders taxed at individual rates, provided, in both cases, the shareholder meets certain holding period and other requirements in respect of the Fund's shares (as described below). In addition, the Fund could be required to recognize unrealized gains, pay substantial taxes and interest and make substantial distributions before re-qualifying as a RIC that is accorded favorable tax treatment.

If in a calendar year the Fund fails to distribute at least an amount equal to the sum of 98% of its ordinary income for such year and 98.2% of its capital gain net income (adjusted for certain ordinary losses) for the one-year period ending on October 31 of such year (unless an election is made to use the Fund's taxable year), plus any such undistributed amounts from the prior year, the Fund will be subject to a nondeductible 4% excise tax on the undistributed amounts. For purposes of the required excise tax distribution, a RIC's ordinary gains and losses from the sale, exchange or other taxable disposition of property that would otherwise be taken into account after October 31 of a calendar year generally (unless an election is made to use the Fund's taxable year) are treated as arising on January 1 of the following calendar year. Also, for these purposes, the Fund will be treated as having distributed any amount on which the Fund has been subject to corporate income tax in the taxable year ending with the calendar year. The Fund reserves the right to pay the excise tax when circumstances warrant. Under ordinary circumstances, the Fund expects to make sufficient distributions so as to avoid liability for this tax.

The Fund is not permitted to deduct capital losses in excess of capital gains ("net capital losses") against its net investment income. Instead, potentially subject to certain limitations, it may carry net capital losses from any taxable year forward to subsequent taxable years to offset capital gains, if any, realized during such subsequent taxable year. Capital loss carryforwards are reduced to the extent they offset current-year net realized capital gains, whether the Fund retains or distributes such gains. Net capital losses will be carried forward to one or more subsequent taxable years without expiration to offset capital gains realized during such subsequent taxable years; any such carryforward losses will retain their character as short-term or long-term.

Distributions of taxable net investment income and the excess of net short-term capital gain over net long-term capital loss are taxable to shareholders as ordinary income.

Distributions of net capital gain (that is, the excess of net long-term capital gain over net short-term capital loss, in each case determined with reference to any loss carryforwards) properly reported by the Fund as capital gain dividends ("Capital Gain Dividends") generally are taxable to shareholders as long-term capital gain, regardless of the length of time the shares of the Fund have been held by such shareholders.

S-34

In order for some portion of the dividends received by one of the Fund's shareholders to be qualified dividend income, the Fund must meet holding period and other requirements with respect to some portion of the dividend-paying stocks in its portfolio and the shareholder must meet holding period and other requirements with respect to Fund shares. In general, a dividend will not be treated as qualified dividend income (at either the corporate or stockholder level): (1) if the dividend is received with respect to any share of stock held for fewer than 61 days during the 121-day period beginning on the date which is 60 days before the date on which such share becomes ex-dividend with respect to such dividend (or, in the case of certain preferred stock, 91 days during the 181-day period beginning 90 days before such date); (2) to the extent that the recipient is under an obligation (whether pursuant to a short sale or otherwise) to make related payments with respect to positions in substantially similar or related property; (3) if the recipient elects to have the dividend income treated as investment income for purposes of the limitation on deductibility of investment interest; or (4) if the dividend is received from a foreign corporation that is: (a) not eligible for the benefits of a comprehensive income tax treaty with the United States (with the exception of dividends paid on stock of such a foreign corporation readily tradable on an established securities market in the United States); or (b) treated as a passive foreign investment company.

In general, distributions of investment income the Fund designates as derived from qualified dividend income will be treated as qualified dividend income by a shareholder taxed at individual rates, provided the shareholder meets the holding period and other requirements described in the paragraph immediately above with respect to Fund shares. The Fund does not expect a significant portion of its distributions to constitute qualified dividend income.

"Qualified REIT dividends" (i.e., ordinary REIT dividends other than capital gain dividends and portions of REIT dividends designated as qualified dividend income) are treated as eligible for a 20% deduction by non-corporate taxpayers. This deduction, if allowed in full, equates to a maximum effective tax rate of 29.6% (37% top rate applied to income after 20% deduction). Regulations allow a RIC to pass the character of its qualified REIT dividends through to its shareholders provided certain holding period requirements are met.

In general, dividends of net investment income received by the Fund's corporate shareholders will qualify for the 50% dividends-received deduction generally available to corporations to the extent of the amount of eligible dividends the Fund receives from domestic corporations for the taxable year. A dividend the Fund receives will not be treated as a qualifying dividend: (i) if it has been received with respect to any share of stock that the Fund has held for less than 46 days (91 days in the case of certain preferred stock) during the 91-day period beginning on the date which is 45 days before the date on which such share becomes ex-dividend with respect to such dividend (during the 181-day period beginning 90 days before such date in the case of certain preferred stock); or (ii) to the extent that the Fund is under an obligation (pursuant to a short sale or otherwise) to make related payments with respect to positions in substantially similar or related property. Moreover, the dividends-received deduction may be disallowed or reduced: (i) if the corporate stockholder fails to satisfy the foregoing requirements with respect to Fund shares; or (ii) by application of various provisions of the Code (for instance, the dividends-received deduction is reduced in the case of a dividend received on debt-financed portfolio stock (generally, stock acquired with borrowed funds)). The Fund does not expect a significant portion of its distributions to be eligible for this corporate dividends-received deduction.

When the Fund makes a repurchase offer for its shares (as described in "Quarterly Repurchase of Shares") and a shareholder tenders all shares he or she holds, or is considered to be holding, and such shareholder does not hold (directly or by attribution) any other of the Fund's shares, such shareholder will be treated as having sold his or her shares and generally will realize a capital gain or loss (as described further below). If a shareholder tenders fewer than all of his or her shares or continues to hold (directly or by attribution) other units of the Fund's shares, there is some risk that such shareholder may be treated as having received a dividend distribution under Section 301 of the Code (a "Section 301 distribution") unless the redemption is treated as being either: (i) "substantially disproportionate"; or (ii) otherwise "not essentially equivalent to a dividend" under the relevant rules of the Code. A Section 301 distribution is not treated as a sale or exchange giving rise to a capital gain or loss, but rather is treated as a dividend to the extent supported by the Fund's current and accumulated earnings

S-35

and profits, with the excess treated as a return of capital reducing a shareholder's tax basis in Fund shares, but not below zero, and thereafter as capital gain. Where a redeeming shareholder is treated as receiving a dividend, there is a risk that non-tendering shareholders whose interests in the Fund increase as a result of such tender will be treated as having received a taxable distribution from the Fund. Dividend treatment of a tender would also affect the amount and character of income that the Fund is required to distribute for the year in which the redemption occurred. It is possible that such a dividend would qualify as "qualified dividend income"; otherwise, it would be taxable as ordinary income. To the extent the Fund recognizes net gains on the liquidation of portfolio securities to meet such tenders, the Fund will be required to make additional distributions to its common shareholders.

A disposition of Fund shares by a shareholder treated as a sale or exchange will generally result in the recognition of taxable gain or loss in an amount equal to the difference between the amount realized and the shareholder's tax basis in his or her Fund shares. Such gain or loss is treated as a capital gain or loss if the shares are held as capital assets. However, any loss realized upon the sale or exchange of shares within six months from the date of their purchase will be treated as a long-term capital loss to the extent of any amounts treated as Capital Gain Dividends during such six-month period. All or a portion of any loss realized upon the sale or exchange of shares may be disallowed under the "wash sale" rules of the Code to the extent shares are purchased (including shares acquired by means of reinvested dividends) within 30 days before or after such sale or exchange. In such case, the basis of the shares acquired will be adjusted to reflect the disallowed loss. Sales or exchanges of Fund shares are also subject to reporting requirements.

Distributions of taxable net investment income and net capital gain will be taxable as described above, whether received in additional cash or reinvested in additional shares. Shareholders electing to receive distributions in the form of additional shares will have a cost basis for federal income tax purposes in each share so received equal to the net asset value of a share on the reinvestment date.

All distributions of taxable net investment income and net capital gain, whether received in shares or in cash, must be reported by each taxable shareholder on his or her federal income tax return. Dividends or distributions declared in October, November or December as of a record date in such a month, if any, will be deemed to have been received by shareholders on December 31, if paid during January of the following year.

Under the Code, the Fund will be required to report to the Internal Revenue Service all distributions of taxable income and capital gains as well as gross proceeds from the sale or exchange of Fund shares, except in the case of certain exempt shareholders. Under the backup withholding provisions of Section 3406 of the Code, distributions of taxable net investment income and net capital gain and proceeds from the sale or exchange of the shares of a RIC may be subject to withholding of federal income tax: (i) in the case of non-exempt shareholders who fail to furnish the Fund with their taxpayer identification numbers ("TIN") and with required certifications regarding their status under the federal income tax law; or (ii) if the Fund is notified by the IRS or a broker that withholding is required due to an incorrect TIN or a shareholder's previous failure to report taxable interest or dividends. If the backup withholding provisions are applicable, any such distributions and proceeds, whether received in cash or reinvested in additional shares, will be reduced by the amounts required to be withheld. Backup withholding is not an additional tax. Any amounts withheld may be credited against the shareholder's federal income tax liability, provided the appropriate information is furnished to the IRS.

The Code imposes a 3.8% Medicare contribution tax on the "net investment income" of certain individuals, estates and trusts to the extent their income exceeds certain amounts. Net investment income generally includes for this purpose dividends the Fund pays, including any Capital Gain Dividends, and net capital gains recognized on the sale or exchange of Fund shares. Shareholders are advised to consult their tax advisors regarding the possible implications of this additional tax on their investment with the Fund.

S-36

**Return of Capital Distributions**

If, for any taxable year, the Fund's total distributions exceed both current and accumulated earnings and profits, the excess will generally be treated as a tax-free return of capital up to the amount of your tax basis in Fund shares. The amount treated as a tax-free return of capital will reduce your tax basis in Fund shares, thereby increasing your potential gain or reducing your potential loss on the subsequent sale of Fund shares. Any such amounts distributed to you in excess of your tax basis in Fund shares will be taxable to you as capital gain.

Distributions the Fund pays with respect to its shares are generally subject to U.S. federal income tax as described herein to the extent they do not exceed the Fund's realized income and gains, even though such dividends and distributions may economically represent a return of a particular shareholder's investment. Such distributions are likely to occur in respect of shares purchased at a time when the Fund's net asset value reflects either unrealized gains, or realized but undistributed income or gains, that were therefore included in the price the shareholder paid. Such distributions may reduce the value of Fund shares below the shareholder's cost basis in those shares. As described above, the Fund is required to distribute realized income and gains regardless of whether its net asset value also reflects unrealized losses.

**Tax Implications of Certain Investments**

Some debt obligations with a fixed maturity date of more than one year from the date of issuance that the Fund acquires in the secondary market may be treated as having "market discount." Very generally, market discount is the excess of the stated redemption price of a debt obligation (or in the case of an obligation issued with OID (as defined below), its "revised issue price") over the purchase price of such obligation. Generally, any gain recognized on the disposition of, and any partial payment of principal on, a debt obligation having market discount is treated as ordinary income to the extent the gain, or principal payment, does not exceed the "accrued market discount" on such debt obligation. Alternatively, a holder may elect to accrue market discount currently. If the Fund makes this election, it would be required to include currently any accrued market discount on such debt obligations in its taxable income (as ordinary income) and thus distribute it over the terms of the obligations, even though payment of those amounts is not received until a later time, upon partial or full repayment or disposition of the applicable debt obligations. The rate at which market discount accrues, and thus is included in the Fund's income, will depend upon which of the permitted accrual methods it elects.

In addition, some debt obligations with a fixed maturity date of more than one year from the date of issuance (and zero-coupon debt obligations with a fixed maturity date of more than one year from the date of issuance) that the Fund originates or acquires will be treated as debt obligations that are issued originally at a discount. Generally, the amount of the original issue discount ("OID") is treated as interest income and is included in taxable income (and the Fund is required to distribute it) over the term of the debt obligation, even though payment of that amount is not received until a later time, upon partial or full repayment or disposition of the debt obligation. In addition, payment-in-kind ("PIK") securities the Fund originates or acquires will give rise to income which is required to be distributed and is taxable even though the Fund receives no interest payment in cash on the security during the year in which the income was accrued.

Some debt obligations with a fixed maturity date of one year or less from the date of issuance that the Fund originates or acquires may be treated as having OID or, in certain cases, "acquisition discount" (very generally, the excess of the stated redemption price over the purchase price). Generally, the Fund will be required to include the OID or acquisition discount in income (as ordinary income) over the term of the debt obligation and thus distribute it over the term of the debt obligation, even though payment of that amount is not received until a later time, upon partial or full repayment or disposition of the debt obligation. The rate at which OID or acquisition discount accrues, and thus is included in the Fund's income, will depend upon which of the permitted accrual methods the Fund elects.

Some preferred securities may include provisions that permit the issuer, at its discretion, to defer the payment of distributions for a stated period without any adverse consequences to the issuer. If the Fund owns a preferred

S-37

CONFIDENTIAL TDIT005353

security that is deferring the payment of its distributions, the Fund may be required to report income for U.S. federal income tax purposes to the extent of any such deferred distribution even though it has not yet actually received the cash distribution.

As a result of holding the foregoing kinds of obligations, the Fund may be required to pay out as an income distribution each year an amount which is greater than the total amount of cash interest (or dividends in the case of preferred securities) the Fund actually received. Such distributions may be made from, among other things, the Fund's cash assets or cash generated from its liquidation of portfolio securities. The Fund may realize gains or losses from such liquidations. In the event the Fund realizes net long-term or short- term capital gains from such transactions, its shareholders may receive a larger capital gain or ordinary dividend, respectively, than they would in the absence of such transactions.

Investments in distressed debt obligations that are at risk of or in default present special tax issues. Tax rules are not entirely clear about issues such as whether and to what extent the Fund should recognize market discount on these debt obligations; when the Fund may cease to accrue interest, OID or market discount; when and to what extent the Fund may take deductions for bad debts or worthless securities and how the Fund should allocate payments received on obligations in default between principal and income. The Fund will address these and other related issues when, as and if it invests in such obligations, in order to seek to ensure that it distributes sufficient income to preserve its eligibility for treatment as a RIC and does not become subject to U.S. federal income or excise tax.

A portion of the OID accrued on certain high-yield discount obligations the Fund owns may not be deductible to the issuer and will instead be treated as a dividend paid by the issuer for purposes of the dividends-received deduction. In such cases, if the issuer of the obligation is a domestic corporation, dividend payments the Fund makes may be eligible for the dividends-received deduction to the extent of the deemed dividend portion of such OID.

The Fund's transactions, if any, in options, futures contracts, hedging transactions, forward contracts, straddles and foreign currencies will be subject to special tax rules (including mark-to-market, constructive sale, straddle, wash sale and short sale rules), the effect of which may be to accelerate income to the Fund, defer losses to the Fund, cause adjustments in the holding periods of the Fund's securities, convert long-term capital gains into short-term capital gains and convert short-term capital losses into long-term capital losses. These rules could therefore affect the amount, timing and character of distributions to shareholders.

Certain of the Fund's hedging activities (including its transactions, if any, in foreign currencies or foreign currency-denominated instruments) are likely to produce a difference between its book income and its taxable income. If the Fund's book income exceeds its taxable income, the distribution (if any) of such excess book income will be treated as: (i) a dividend to the extent of the Fund's remaining earnings and profits (including earnings and profits arising from tax-exempt income); (ii) thereafter, as a return of capital to the extent of the recipient's basis in the shares; and (iii) thereafter, as gain from the sale or exchange of a capital asset. If the Fund's book income is less than its taxable income, the Fund could be required to make distributions exceeding book income to qualify as a RIC that is accorded favorable tax treatment and to avoid an entity-level tax.

Because the tax rules applicable to derivative financial instruments are in some cases uncertain under current law, an adverse determination or future guidance by the IRS with respect to these rules (which determination or guidance could be retroactive) may affect whether the Fund has made sufficient distributions, and otherwise satisfied the relevant requirements, to maintain its qualification as a RIC and avoid a fund-level tax.

Pursuant to a notice issued by the IRS and Treasury Regulations that have yet to be issued but may apply retroactively, a portion of the Fund's income (including income allocated from certain pass-through entities) that is attributable to a residual interest in a real estate mortgage investment conduit or taxable mortgage pool (referred to in the Code as an "excess inclusion") will be subject to U.S. federal income tax in all events. This

S-38

notice also provides, and the regulations are expected to provide, that excess inclusion income of a RIC will be allocated to shareholders of the RIC in proportion to the dividends received by such shareholders, with the same consequences as if the shareholders held the related interest directly. As a result, to the extent the Fund invests in any such interests, it may not be a suitable investment for certain tax-exempt shareholders. Although the Fund does not expect to make investments that generate or pass through excess inclusion income in the manner described above, the Fund may make such investments, and may need to make certain elections set forth in the IRS notice governing such matters.

In general, excess inclusion income allocated to shareholders: (i) cannot be offset by net operating losses (subject to a limited exception for certain thrift institutions); (ii) will constitute unrelated business taxable income ("UBTI") to entities (including a qualified pension plan, an individual retirement account, a 401(k) plan, a Keogh plan or other tax-exempt entity) subject to tax on UBTI, thereby potentially requiring such an entity that is allocated excess inclusion income, and otherwise might not be required to file a U.S. federal income tax return, to file such a tax return and pay tax on such income; and (iii) in the case of a non-U.S. shareholder, will not qualify for any reduction in U.S. federal withholding tax. A shareholder will be subject to U.S. federal income tax on such inclusions notwithstanding any exemption from such income tax otherwise available under the Code.

**Passive Foreign Investment Companies**

Equity investments by the Fund in certain "passive foreign investment companies" ("PFICs") could subject the Fund to a U.S. federal income tax (including interest charges) on distributions received from the company or on proceeds received from the disposition of shares in the company, which tax cannot be eliminated by making distributions to Fund shareholders. However, the Fund may elect to treat a PFIC as a "qualified electing fund" ("QEF election"), in which case the Fund will be required to include its share of the company's income and net capital gains annually, regardless of whether they receives any distribution from the company.

The Fund also may make an election to mark the gains (and to a limited extent losses) in such holdings "to the market" as though it had sold and repurchased its holdings in those PFICs on the last day of the Fund's taxable year. Such gains and losses are treated as ordinary income and loss. The QEF and mark-to-market elections may accelerate the recognition of income (without the receipt of cash) and increase the amount required to be distributed for the Fund to avoid taxation. Making either of these elections therefore may require the Fund to liquidate other investments (including when it is not advantageous to do so) to meet its distribution requirement, which also may accelerate the recognition of gain and affect the Fund's total return. Because it is not always possible to identify a foreign corporation as a PFIC, the Fund may incur the tax and interest charges described above in some instances.

**Foreign Currency Transactions**

The Fund's transactions in foreign currencies, foreign currency-denominated debt securities and certain foreign currency options, futures contracts and forward contracts (and similar instruments) may give rise to ordinary income or loss to the extent such income or loss results from fluctuations in the value of the foreign currency concerned. Such ordinary income treatment may accelerate the Fund's distributions to shareholders and increase the distributions taxed to shareholders as ordinary income. The Fund cannot carry forward any net ordinary losses so created to offset income or gains earned in subsequent years.

**Foreign Taxation**

Income received by the Fund from sources within foreign countries may be subject to withholding and other taxes imposed by such countries. Tax treaties and conventions between certain countries and the U.S. may reduce or eliminate such taxes. If more than 50% of the value of the Fund's total assets at the close of its taxable year consists of securities of foreign corporations, the Fund may be able to elect to "pass through" to the Fund's shareholders the amount of eligible foreign income and similar taxes paid by the Fund. If this election is made, a

S-39

shareholder generally will be required to include in gross income (in addition to taxable dividends actually received) his or her pro rata share of the foreign taxes paid by the Fund, and may be entitled either to deduct (as an itemized deduction), or claim a credit for, his or her pro rata share of such foreign taxes in computing his or her taxable income, subject to certain limitations. In particular, a shareholder must hold his or her shares (without protection from risk of loss) on the ex-dividend date and for at least 15 more days during the 30-day period surrounding the ex-dividend date to be eligible to claim a foreign tax credit with respect to a dividend. No deduction for foreign taxes may be claimed by a shareholder who does not itemize deductions. Each shareholder will be notified within 60 days after the close of the Fund's taxable year whether the foreign taxes paid by the Fund will "pass through" for that year. If the Fund does not qualify for or does not make such election, shareholders generally will not be entitled to claim a credit or deduction with respect to foreign taxes paid by the Fund; in that case the foreign tax will nonetheless reduce the Fund's taxable income.

**Non-U.S. Shareholders**

Distributions the Fund pays to shareholders that are not "U.S. persons" within the meaning of the Code ("foreign shareholders") and that the Fund properly reports as: (1) Capital Gain Dividends; (2) interest-related dividends; and (3) short-term capital gain dividends, each as defined below and subject to certain conditions described below, generally are not subject to withholding of U.S. federal income tax."

In general, the Code defines: (1) "short-term capital gain dividends" as distributions of net short-term capital gains in excess of net long-term capital losses; and (2) "interest-related dividends" as distributions from U.S. source interest income of types similar to those not subject to U.S. federal income tax if earned directly by an individual foreign shareholder, in each case to the extent such distributions are properly reported as such by the Fund in a written notice to shareholders. The exceptions to withholding for Capital Gain Dividends and short-term capital gain dividends do not apply to: (A) distributions to an individual foreign shareholder who is present in the United States for a period or periods aggregating 183 days or more during the year of the distribution and (B) distributions attributable to gain that is treated as effectively connected with the conduct by the foreign shareholder of a trade or business within the United States under special rules regarding the disposition of U.S. real property interests. The exception to withholding for "interest-related dividends" does not apply to distributions to a foreign shareholder: (A) that has not provided a satisfactory statement that the beneficial owner is not a U.S. person; (B) to the extent that the dividend is attributable to certain interest on an obligation if the foreign shareholder is the issuer or is a 10% shareholder of the issuer; (C) that is within certain foreign countries that have inadequate information exchange with the United States; or (D) to the extent the dividend is attributable to interest paid by a person that is a related person of the foreign shareholder and the foreign shareholder is a controlled foreign corporation. The Fund is permitted to report such part of the Fund's dividends as interest-related and/or short-term capital gain dividends as are eligible, but is not required to do so. In the case of shares held through an intermediary, the intermediary may withhold even if the Fund reports all or a portion of a payment as an interest-related or short-term capital gain dividend to shareholders.

Foreign shareholders should contact their intermediaries regarding the application of these rules to their accounts.

Distributions to foreign shareholders other than Capital Gain Dividends, interest-related dividends, and short-term capital gain dividends (e.g., dividends attributable to dividend and foreign-source interest income or to short-term capital gains or U.S. source interest income to which the exception from withholding described above does not apply) are generally subject to withholding of U.S. federal income tax at a rate of 30% (or lower applicable treaty rate).

A foreign shareholder is not, in general, subject to U.S. federal income tax on gains (and is not allowed a deduction for losses) realized on the sale of the Fund's shares unless: (i) such gain is effectively connected with the conduct of a trade or business carried on by such holder within the United States; (ii) in the case of an individual holder, the holder is present in the United States for a period or periods aggregating 183 days or more during the year of the sale and certain other conditions are met; or (iii) certain special rules relating to gain attributable to the sale or exchange of U.S. real property interests apply to the foreign shareholder's sale of the Fund's shares.

S-40

CONFIDENTIAL

318

TDIT005356

Foreign shareholders with respect to whom income from the Fund is effectively connected with a trade or business conducted by the foreign shareholder within the United States will in general be subject to U.S. federal income tax on the income derived from the Fund at the graduated rates applicable to U.S. citizens, residents or domestic corporations, whether such income is received in cash or reinvested in additional units of the Fund's shares and, in the case of a foreign corporation, may also be subject to a branch profits tax. If a foreign shareholder is eligible for the benefits of a tax treaty, any effectively connected income or gain will generally be subject to U.S. federal income tax on a net basis only if it is also attributable to a permanent establishment maintained by the shareholder in the United States. More generally, foreign shareholders who are residents of a country with an income tax treaty with the United States may obtain different tax results than those described herein, and are urged to consult their tax advisors.

Special rules would apply if the Fund were a qualified investment entity ("QIE") because it is either a "U.S. real property holding corporation" ("USRPHC") or would be a USRPHC but for the operation of certain exceptions to the definition of U.S. real property interests ("USRPIs") described below. Very generally, a USRPHC is a domestic corporation that holds USRPIs the fair market value of which equals or exceeds 50% of the sum of the fair market values of the corporation's USRPIs, interests in real property located outside the United States, and other trade or business assets. USRPIs generally are defined as any interest in U.S. real property and any interest (other than solely as a creditor) in a USRPHC or, very generally, an entity that has been a USRPHC in the last five years. A fund that holds, directly or indirectly, significant interests in REITs may be a USRPHC. Interests in domestically controlled QIEs, including REITs and RICs that are QIEs, not-greater-than-10% interests in publicly traded classes of stock in REITs and not-greater-than-5% interests in publicly traded classes of stock in RICs generally are not USRPIs, but these exceptions do not apply for purposes of determining whether the Fund is a QIE.

If an interest in the Fund were a USRPI, a greater-than-5% foreign shareholder, or any foreign shareholder if shares in the Fund are not considered regularly traded on an established securities market, generally would be required to file a U.S. tax return in connection with the sale of its Fund shares, and pay related taxes due on any gain realized on the sale.

Moreover, if the Fund were a USRPHC or, very generally, had been one in the last five years, it would be required to withhold on amounts distributed to a greater-than-5% foreign shareholder to the extent such amounts would not be treated as a dividend, i.e., are in excess of the Fund's current and accumulated "earnings and profits" for the applicable taxable year. Such withholding generally is not required if the Fund is a domestically controlled QIE.

If the Fund were a QIE, under a special "look-through" rule, any distributions to a foreign shareholder attributable directly or indirectly to: (i) distributions received by the Fund from a lower-tier RIC or REIT that the Fund is required to treat as USRPI gain in its hands; and (ii) gains realized on the disposition of USRPIs by the Fund would retain their character as gains realized from USRPIs in the hands of the Fund's foreign shareholders and would be subject to U.S. tax withholding. In addition, such distributions could result in the foreign shareholder being required to file a U.S. tax return and pay tax on the distributions at regular U.S. federal income tax rates. The consequences to a foreign shareholder, including the rate of such withholding and character of such distributions (e.g., as ordinary income or USRPI gain), would vary depending upon the extent of the foreign shareholder's current and past ownership of the Fund.

Foreign shareholders of the Fund also may be subject to "wash sale" rules to prevent the avoidance of the tax-filing and -payment obligations discussed above through the sale and repurchase of Fund shares.

In order to have qualified for any exemption from withholding described above (to the extent applicable) or for lower withholding tax rates under income tax treaties, or to establish an exemption from backup withholding, a foreign shareholder must have complied with applicable certification and filing requirements relating to its non-U.S. status (including, in general, furnishing an IRS Form W-8BEN, Form W-8BEN-E or substitute form). Foreign shareholders should contact their tax advisors in this regard.

S-41

Special rules (including withholding and reporting requirements) apply to foreign partnerships and those holding Fund shares through foreign partnerships. Additional considerations may apply to foreign trusts and estates. Investors holding Fund shares through foreign entities should consult their tax advisors.

A foreign shareholder may be subject to state and local tax and to the U.S. federal estate tax in addition to the U.S. federal tax on income referred to above.

**Other Reporting and Withholding Requirements**

Sections 1471-1474 of the Code, and the U.S. Treasury Regulations and IRS guidance issued thereunder (collectively, "FATCA"), generally require the Fund to obtain information sufficient to identify the status of each of the Fund's shareholders under FATCA or under an applicable intergovernmental agreement (an "IGA"). If a shareholder fails to provide the required information or otherwise fails to comply with FATCA or an IGA, the Fund or its agent may be required to withhold under FATCA 30% of the ordinary dividends that it pays to that shareholder. Proposed regulations (having current effect) eliminate the application of the withholding tax that was scheduled to take effect in 2019 with respect to the gross proceeds of the sale, redemption or exchange of Fund shares and certain Capital Gain Dividends it pays to that shareholder. If the Fund makes a payment that is subject to FATCA withholding, the Fund, or its agent, are required to withhold even if the payment would otherwise be exempt from withholding under rules applicable to non-U.S. shareholders (e.g., Capital Gain Dividends, short-term capital gain dividends and interest-related dividends). You are urged to consult your tax advisor regarding the applicability of FATCA and any other reporting requirements. In addition, foreign countries are considering, and may implement, laws similar in purpose and scope to FATCA.

**REIT Subsidiary**

*Taxation of a REIT Subsidiary*

As discussed above, the Fund may hold certain of its assets, including qualifying real estate investments in the form of debt securities, structured credit, preferred equity and mezzanine investments in real estate properties, through a REIT subsidiary, including the REIT Subsidiaries. The Fund intends to monitor the value of the shares of any REIT subsidiary such that not more than 25% of the value of the Fund's total assets is invested in REIT subsidiaries.

The Fund intends that any REIT subsidiary would elect to be treated, and qualify annually, as a REIT under the Code beginning with the first year in which it commenced material operations. The Fund believes that if a REIT subsidiary were to satisfy the 50% Test (as defined below), that subsidiary would be able to qualify as a REIT. A REIT subsidiary's ability to satisfy the 50% Test, is not certain. Given the highly complex nature of the rules governing REITs, the ongoing importance of factual determinations and the possibility of future changes in circumstances or applicable law, no assurance can be given that a REIT subsidiary would qualify as a REIT for any particular year.

Qualification and taxation as a REIT depends on a REIT subsidiary's ability to meet, on a continuing basis, through actual results of operations, distribution levels, share ownership and various other qualification requirements imposed upon REITs by the Code. In addition, a REIT subsidiary's ability to qualify as a REIT may depend in part upon the operating results, organizational structure and entity classification for U.S. federal income tax purposes of certain entities in which the REIT subsidiary invests. A REIT subsidiary's ability to qualify as a REIT also requires that it satisfy certain asset and income tests, some of which depend upon the fair market value of assets directly or indirectly owned by it or which serve as security for loans made by it. Such values may not be susceptible to a precise determination. Accordingly, no assurance can be given that the actual results of a REIT subsidiary's operations for any taxable year will satisfy the requirements for qualification and taxation as a REIT.

S-42

CONFIDENTIAL

320

TDIT005358

401

FSD2025-0116                     **Page 405 of 1530**                     2025-08-19

**Requirements for Qualification as a REIT**

To qualify for the beneficial tax regime applicable to REITs, a REIT subsidiary must meet and continue to meet the requirements described below relating to organization, sources of income, nature of assets and distributions of income to its shareholders.

*Organizational Requirements*

The Code defines a REIT as a domestic corporation, trust or association:

(1)    which is managed by one or more trustees or directors;

(2)    the beneficial ownership of which is evidenced by transferable shares or by transferable certificates of beneficial interest;

(3)    which would be taxable as a domestic corporation but for Sections 856 through 859 of the Code;

(4)    which is neither a financial institution nor an insurance company subject to certain provisions of the Code;

(5)    the beneficial ownership of which is held by 100 or more persons;

(6)    not more than 50.0% in value of the outstanding stock of which is owned, directly or indirectly applying various attribution rules, by or for five or fewer individuals (as defined in the Code to include for these purposes certain entities) (the "50% Test");

(7)    which makes an election to be a REIT (or has made such election for a previous taxable year which has not been revoked or terminated) and satisfies all relevant filing and other administrative requirements established by the IRS that must be met to elect and maintain REIT status;

(8)    which uses the calendar year as its taxable year; and

(9)    which meets certain other tests, described below, regarding the nature of its income and assets and the amount of its distributions.

The Code provides that conditions (1) through (4), inclusive, must be met during the entire taxable year, that condition (5) must be met during at least 335 days of a taxable year of 12 months, or during a proportionate part of a taxable year of less than 12 months, and that condition (6) must be met during the last half of each taxable year. For purposes of condition (6), the beneficiaries of a pension or profit-sharing trust described in Section 401(a) of the Code, and not the pension or profit-sharing trust itself, are treated as REIT shareholders. Conditions (5) and (6) do not apply to a REIT until the second taxable year in which the REIT has made an election to be treated as such. A REIT subsidiary would be treated as having met condition (6) above for a taxable year if it complied with certain Treasury Regulations for ascertaining the ownership of its stock for such year and if it did not know (or after the exercise of reasonable diligence would not have known) that its stock was sufficiently closely held during such year to cause it to fail condition (6).

The Fund intends to structure and operate any REIT subsidiary and conduct its activities in a manner designed to satisfy all of these requirements. However, the application of such requirements is complex, and it is possible that the IRS may interpret or apply those requirements in a manner that jeopardizes the ability of a REIT subsidiary to satisfy all of the requirements for qualification as a REIT or that the REIT subsidiary may be unable to satisfy all of the applicable requirements.

To obtain the favorable tax treatment afforded to REITs under the Code, among other things, a REIT subsidiary generally will be required each year to distribute to its shareholders at least 90% of its REIT taxable income determined without regard to the dividends-paid deduction and excluding net capital gain. To the extent that it does not distribute all of its net capital gains, or distributes at least 90%, but less than 100%, of its REIT taxable income, as adjusted, it will have to pay an entity-level tax on amounts retained. Furthermore, if it fails to distribute during

S-43

each calendar year at least the sum of: (a) 85% of its ordinary income for that year; (b) 95% of its capital gain net income for that year; and (c) any undistributed taxable income from prior periods, it would have to pay a 4% nondeductible excise tax on the excess of the amounts required to be distributed over the sum of (x) the amounts that it actually distributed and (y) the amounts it retained and upon which it paid income tax at the entity level.

These requirements could cause a REIT subsidiary to distribute amounts that otherwise would be spent on investments in real estate assets, and it is possible that the REIT subsidiary might be required to borrow funds, possibly at unfavorable rates, or sell assets to fund the required distributions.

*Investment in a REIT Subsidiary*

Provided that a REIT subsidiary qualifies as a REIT, distributions made to the Fund out of the REIT subsidiary's current or accumulated earnings and profits, and not designated as capital gain dividends, would generally be taken into account by the Fund as ordinary dividend income and would not be eligible for the dividends received deduction for corporations. In determining the extent to which a distribution with respect to a REIT subsidiary's common shares constituted a dividend for U.S. federal income tax purposes, a REIT subsidiary's earnings and profits would be allocated first to distributions with respect to the REIT subsidiary's preferred stock, if any, and then to the REIT subsidiary's common shares. Dividends received from REITs are generally not eligible to be taxed at the preferential qualified dividend income rates applicable to individual U.S. shareholders who receive dividends from taxable subchapter C corporations.

Effective for taxable years beginning after December 31, 2017 and before January 1, 2026, the Code generally allows individuals and certain other non-corporate entities a deduction for 20% of qualified REIT dividends. Regulations allow a RIC to pass the character of its qualified REIT dividends through to its shareholders provided certain holding period requirements are met. As a result, a shareholder in the Fund will be eligible to receive the benefit of the same 20% deduction with respect to qualified REIT dividends included in Fund distributions that is available to direct investors in REITs.

In addition, distributions from a REIT subsidiary that are designated as capital gain dividends will be treated by the Fund as long-term capital gain income, to the extent that they do not exceed the actual net capital gain of the REIT subsidiary for the taxable year, without regard to the period for which the Fund has held the REIT subsidiary's shares. To the extent that a REIT subsidiary elects under the applicable provisions of the Code to retain the REIT subsidiary's net capital gains, the Fund would be treated as having received, for U.S. federal income tax purposes, the REIT subsidiary's undistributed capital gains as well as a corresponding credit or refund, as the case may be, for taxes paid by the REIT subsidiary on such retained capital gains. The Fund would increase its adjusted tax basis in the REIT subsidiary's common shares by the difference between its allocable share of such retained capital gain and its share of the tax paid by the REIT subsidiary.

Distributions from a REIT subsidiary in excess of the REIT subsidiary's current or accumulated earnings and profits would not be taxable to the Fund to the extent that they do not exceed the Fund's adjusted tax basis in the REIT subsidiary's common shares in respect of which the distributions were made, but rather would reduce the adjusted tax basis of these shares, thus reducing any loss or increasing any gain on a subsequent taxable disposition by the Fund of these shares. To the extent that such distributions exceed the adjusted tax basis of the Fund's shares of the REIT subsidiary's common shares, they would be included in income as long-term capital gain, or short-term capital gain if the shares have been held for one year or less. In addition, any dividend declared by a REIT subsidiary in October, November or December of any year and payable to the Fund if it is the holder of record on a specified date in any such month would be treated as both paid by the REIT subsidiary and received by the Fund on December 31 of such year if the dividend is actually paid by the REIT subsidiary in January of the following calendar year.

To the extent that a REIT subsidiary has available net operating losses and capital losses carried forward from prior tax years, such losses may reduce the amount of distributions that must be made in order to comply with the

S-44

REIT distribution requirements. Such losses, however, would not be passed through to the Fund and do not offset income of the Fund from other sources, nor do they affect the character of any distributions that are actually made by a REIT subsidiary, which are generally treated as taxable income in the hands of the Fund to the extent that the REIT subsidiary has current or accumulated earnings and profits.

S-45

**OTHER INFORMATION**

Each share represents a proportional interest in the assets of the Fund. Each share has one vote at shareholder meetings, with fractional shares voting proportionally, on matters submitted to the vote of shareholders. There are no cumulative voting rights. Shares do not have pre-emptive or conversion or redemption provisions. In the event of a liquidation of the Fund, shareholders are entitled to share pro rata in the net assets of the Fund available for distribution to shareholders after all expenses and debts have been paid.

**Legal Counsel**

K&L Gates, LLP, located at 1 Congress Street, Suite 2900, Boston, Massachusetts 02114, acts as the Fund's legal counsel.

**Custodian**

BNY Mellon ("BNY"), with principal offices at 240 Greenwich Street, New York, New York, 10286, serves as custodian for the securities and cash of the Fund's portfolio. Under a Custodian Agreement, BNY holds the Fund's assets in safekeeping and keeps all necessary records and documents relating to its duties.

**INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Cohen & Company, Ltd. has been appointed the independent registered public accounting firm for the Fund. Cohen & Company, Ltd. is located at 1350 Euclid Avenue, Suite 800, Cleveland, Ohio 44115.

S-46

**FINANCIAL STATEMENTS**

The Fund's audited financial statements appearing in the Fund's annual shareholder report for the year ended December 31, 2024 are incorporated by reference in this Statement of Additional Information and have been so incorporated in reliance upon the report of Cohen & Company, Ltd., the independent registered public accounting firm for the Fund. The Fund's annual and semiannual shareholder reports are available upon request and without charge by writing to the Fund at 300 Crescent Court, Suite 700, Dallas, Texas 75201 or by calling (844) 485-9167 and viewed on the Fund's website at https://www.nexpoint.com/funds/nexpoint-real-estate-strategies-fund/.

S-47

**Page 410 of 1530**

---

**Part C**

**Other Information**

**Item 25.** *Financial Statements and Exhibits*

**1. Financial Statements**

Part A — Financial Highlights.

Part B — Audited financial statements for the fiscal year ended December 31, 2024 are incorporated by reference herein to the Registrant's annual report for the fiscal year ended December 31, 2024.

**2. Exhibits**

| | |
|---|---|
| (a) | Amended and Restated Agreement and Declaration of Trust of Registrant (2) |
| (b) | By-Laws (1) |
| (c) | Not applicable |
| (d) | Provisions of instruments defining the rights of holders of securities are contained in the Registrant's Amended and Restated Agreement and Declaration of Trust and By-Laws |
| (e) | Dividend Reinvestment Plan (8) |
| (f) | Not applicable |
| (g) (1) | Investment Advisory and Administrative Services Agreement, dated May 18, 2016, between the Registrant and NexPoint Advisors, L.P. (2) |
| (g) (2) | Advisory Agreement for NRESF REIT Sub, LLC (3) |
| (g) (3) | Advisory Agreement for NRESF REIT Sub II, LLC (12) |
| (h) (1) | Distribution Agreement, dated May 18, 2016, between the Registrant and NexPoint Securities, Inc. (formerly, Highland Capital Funds Distributor, Inc.) (2) |
| (h) (2) | Form of Selling Agreement (1) |
| (h) (3) | Form of Shareholder Servicing Plan and Agreement (4) |
| (h) (4) | Distribution Plan for Class C Shares (2) |
| (i) | Not applicable |
| (j) (1) | Master Custodian Agreement with Bank of New York Mellon, dated October 3, 2018 (7) |
| (j) (2) | Amendment 1 to Master Custodian Agreement, dated April 8, 2019 (7) |
| (j) (3) | Amendment 2 to Master Custodian Agreement, dated April 8, 2019 (7) |
| (j) (4) | Amendment 3 to Master Custodian Agreement, dated June 14, 2019 (8) |
| (j) (5) | Amendment 4 to Master Custodian Agreement, dated December 21, 2020 (9) |
| (j) (6) | Amendment 5 to Master Custodian Agreement, dated February 18, 2021 (9) |
| (j) (7) | Amendment 6 to Master Custodian Agreement, dated March 18, 2021 (9) |
| (k) (1) | Amended and Restated Expense Limitation and Reimbursement Agreement, dated May 1, 2025, between the Registrant and NexPoint Advisors, L.P. (13) |
| (k) (2) | Master Sub-Administration Agreement, dated July 23, 2018, between NexPoint Advisors, L.P., on behalf of the Registrant, and SEI Investments Global Funds Services (6) |
| (k) (3) | Agency Agreement, dated August 5, 2014, between the Registrant and SS&C Technologies, Inc. (formerly DST Systems, Inc.) (4) |

| | | |
|---|---|---|
| (k) | (4) | Amendment No. 1 to Agency Agreement, dated June 10, 2016, between the Registrant and SS&C Technologies, Inc. (formerly DST Systems, Inc.) (4) |
| (k) | (5) | Form of Joinder Agreement to Agency Agreement, dated September 6, 2016, between the Registrant and SS&C Technologies, Inc. (formerly DST Systems, Inc.) (5) |
| (k) | (6) | U.S. Prime Brokerage Agreement, dated September 25, 2018, between the Registrant and BNP Paribas Securities Corp. (6) |
| (k) | (7) | Annex to the Master Repurchase Agreement dated October 3, 2019, between the Registrant and Mizuho Securities USA LLC. (8). |
| (k) | (8) | Bridge Credit Agreement dated February 7, 2020, between NexPoint Real Estate Finance Operating Partnership, L.P., the Registrant, Highland Opportunities and Income Fund (formerly Highland Income Fund), Highland Global Allocation Fund, NexPoint Strategic Opportunities Fund and KeyBank, National Association. (8) |
| (l) | (1) | Opinion and Consent of Counsel (2) |
| (l) | (2) | Consent of Counsel (13) |
| (m) | | Not applicable |
| (n) | | Consent of Independent Registered Public Accounting Firm (13) |
| (o) | | Not applicable |
| (p) | (1) | Subscription Agreement dated April 19, 2016, between the Registrant and NexPoint Advisors, L.P. (4) |
| (p) | (2) | Subscription Agreement dated June 9, 2016, between the Registrant and NexPoint Advisors, L.P. (4) |
| (q) | | Not applicable |
| (r) | (1) | Code of Ethics of the Registrant (9) |
| (r) | (2) | Code of Ethics of NexPoint Advisors, L.P. (12) |
| (r) | (3) | Code of Ethics of the NexPoint Securities, Inc. (formerly, Highland Capital Funds Distributor, Inc.) (4) |
| (s) | | Not applicable |
| (t) | | Powers of Attorney dated June 8, 2021 and January 11, 2022 (10) |
| (t) | (1) | Powers of Attorney dated May 1, 2022 (11) |

(1) Incorporated by reference to Pre-Effective Amendment No. 2 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 22, 2016.

(2) Incorporated by reference to Pre-Effective Amendment No. 3 to the Registrant's Registration Statement on Form N-2 filed with the SEC on June 17, 2016.

(3) Incorporated by reference to Post-Effective Amendment No. 2 to the Registrant's Registration Statement on Form N-2 filed with the SEC on August 22, 2016.

(4) Incorporated by reference to Post-Effective Amendment No. 4 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 28, 2017.

(5) Incorporated by reference to Post-Effective Amendment No. 6 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 26, 2018.

(6) Incorporated by reference to Post-Effective Amendment No. 7 to the Registrant's Registration Statement on Form N-2 filed with the SEC on October 9, 2018.

(7) Incorporated by reference to Post-Effective Amendment No. 8 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 29, 2019.

(8) Incorporated by reference to Post-Effective Amendment No. 9 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 29, 2020.

(9) Incorporated by reference to Post-Effective Amendment No. 10 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 30, 2021.

(10)   Incorporated by reference to Post-Effective Amendment No. 11 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 29, 2022.

(11)   Incorporated by reference to Post-Effective Amendment No. 12 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 28, 2023.

(12)   Incorporated by reference to Post-Effective Amendment No. 13 to the Registrant's Registration Statement on Form N-2 filed with the SEC on April 29, 2024.

(13)   Filed herewith.

**Item 26. *Marketing Arrangements***

Reference is made to the Distribution Agreement and Form of Selling Agreement included as Exhibits (h)(1) and (h)(2) hereto.

**Item 27. *Other Expenses of Issuance and Distribution***

The following table sets forth the estimated expenses to be incurred in connection with all offerings described in this Registration Statement:

| | | |
|---|---|---:|
| SEC Registration Fee | $ | 0 |
| FINRA Fee | $ | 0 |
| Legal fees | $ | 1,500,000 |
| Blue Sky fees | $ | 100,000 |
| Accounting fees | $ | 1,000,000 |
| Printing and Mailing | $ | 2,500,000 |
| Total | $ | 5,100,000 |

**Item 28. *Persons Controlled by or Under Common Control with the Registrant***

NRESF REIT Sub, LLC and NRESF REIT Sub II, LLC are wholly-owned subsidiaries of the Registrant. NRESF REIT Sub, LLC and NRESF REIT Sub II, LLC are organized under the laws of Delaware and have elected to be treated as real estate investment trusts.

**Item 29. *Number of Holders of Shares***

The following table sets forth the approximate numbers of record holders of the Registrant's outstanding shares as of March 31, 2025:

| Title of Class | Number of Record Holders |
|---|---:|
| Common Shares of Beneficial Interest | |
| Class A | 230 |
| Class C | 142 |
| Class Z | 284 |

**Item 30. *Indemnification***

Reference is made to Article VIII, Section 2 of the Registrant's Amended and Restated Agreement and Declaration of Trust (the "Declaration of Trust"), incorporated by reference hereto, and to Section 8 of the Registrant's Distribution Agreement, incorporated by reference hereto. The Registrant hereby undertakes that it will apply the indemnification provisions of the Declaration of Trust and Distribution Agreement in a manner consistent with Release 40-11330 of the Securities and Exchange Commission (the "SEC") under the Investment Company Act of 1940, as amended (the "1940 Act"), so long as the interpretation therein of Sections 17(h) and 17(i) of the 1940 Act remains in effect. The Registrant maintains insurance on behalf of any person who is or was an independent trustee, officer, employee, or agent of the Registrant against certain liability asserted against and

incurred by, or arising out of, his or her position. However, in no event will the Registrant pay that portion of the premium, if any, for insurance to indemnify any such person for any act for which the Registrant itself is not permitted to indemnify.

Insofar as indemnification for liability arising under the Securities Act of 1933, as amended (the "Securities Act"), may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

**Item 31. *Business and Other Connections of Investment Advisor***

A description of any other business, profession, vocation, or employment of a substantial nature in which the investment adviser of the Registrant, and each member, director, executive officer, or partner of any such investment adviser, is or has been, at any time during the past two fiscal years, engaged in for his or her own account or in the capacity of member, trustee, officer, employee, partner or director, is set forth in the Registrant's prospectus and statement of additional information in the sections entitled "Management of the Fund." Information as to the members and officers of the Adviser is included in its Form ADV as filed with the SEC (CRD No. 163564), and is incorporated herein by reference.

**Item 32. *Location of Accounts and Records***

(1) SS&C Technologies, Inc. (formerly DST Asset Manager Solutions, Inc.), 30 Braintree Hill Office Park, Suite 400, Braintree, MA 02184 (records relating to its function as transfer agent).

(2) Bank of New York Mellon, 240 Greenwich Street, New York, NY 10286 (records relating to its function as custodian).

(3) NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201 (records relating to its function as adviser and administrator).

(4) SEI Investments Global Fund Services, One Freedom Valley Drive, Oaks, Pennsylvania 19456 (records relating to its function as sub-administrator).

(5) NexPoint Securities, Inc., 200 Crescent Court, Suite 700, Dallas, Texas 75201 (records relating to its function as distributor).

(6) Skyview Group, 2101 Cedar Springs Road, Suite 1200, Dallas, Texas 75201 (records relating to its function as administrator).

**Item 33. *Management Services***

Not Applicable.

**Item 34. *Undertakings***

1. The Registrant undertakes to suspend the offering of Shares until the prospectus is amended if (1) subsequent to the effective date of its registration statement, the net asset value of the Fund declines more than ten percent from its net asset value as of the effective date of the registration statement or (2) the net asset value of the Fund increases to an amount greater than its net proceeds as stated in the prospectus.

CONFIDENTIAL                                                          TDIT005367

FSD2025-0116 **Page 414 of 1530** 2025-08-19

2. Not Applicable.

3. The Registrant undertakes:

(a) to file, during any period in which offers or sales are being made, a post-effective amendment to the registration statement:

(1) to include any prospectus required by Section 10(a)(3) of the Securities Act;

(2) to reflect in the prospectus any facts or events after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20% change in the maximum aggregate offering price set forth in the "Calculation of Filing Fee Tables" in the effective registration statement; and

(3) to include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

(b) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(c) The Registrant undertakes to remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(d) The Registrant undertakes that, for the purpose of determining liability under the Securities Act:

(1) Not Applicable;

(2) if the Registrant is subject to Rule 430C, each prospectus filed pursuant to Rule 424(b) under the Securities Act as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A, shall be deemed to be a part of and included in the registration statement as of the date it is first used after effectiveness; *provided, however*, that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract or sale prior to such first use, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

(e) The Registrant undertakes that, for the purpose of determining liability of the Registrant under the Securities Act to any purchaser in the initial distribution of securities, in a primary offering of securities of the undersigned Registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned Registrant will be a seller to the purchaser and will be considered to offer or sell such securities to the purchaser:

(1) any preliminary prospectus or prospectus of the undersigned Registrant relating to the offering required to be filed pursuant to Rule 424 under the Securities Act;

(2) free writing prospectus relating to the offering prepared by or on behalf of the undersigned Registrant or used or referred to by the undersigned Registrant;

(3) the portion of any advertisement pursuant to Rule 482 under the Securities Act relating to the offering containing material information about the undersigned Registrant or its securities provided by or on behalf of the undersigned Registrant; and

(4) any other communication that is an offer in the offering made by the undersigned Registrant to the purchaser.

4. Not Applicable.

5. Not Applicable.

6. Not Applicable.

7. The Registrant undertakes to send by first class mail or other means designed to ensure equally prompt delivery within two business days of receipt of a written or oral request, the Registrant's statement of additional information.

**CONFIDENTIAL**

**331**

TDIT005369

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, as amended (the "1933 Act) and the Investment Company Act of 1940, as amended (the "1940 Act"), the Registrant certifies that it meets all of the requirements for effectiveness of this Registration Statement pursuant to Rule 486(b) under the 1933 Act and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Dallas and the State of Texas, on the 30th day of April, 2025.

NEXPOINT REAL ESTATE STRATEGIES FUND

/s/ James Dondero
James Dondero
President
(Principal Executive Officer)

Pursuant to the requirements of the 1933 Act and the 1940 Act, this Registration Statement has been signed by the following persons in the capacities set forth below on the 30th day of April, 2025.

| Signature | Title |
|---|---|
| /s/ James Dondero<br>James Dondero | President<br>(Principal Executive Officer) |
| /s/ Frank Waterhouse<br>Frank Waterhouse | Treasurer (Principal Financial and Principal Accounting Officer) |
| /s/ Ethan Powell*<br>Ethan Powell | Chairman of the Board of Trustees |
| /s/ Dr. Bob Froehlich*<br>Dr. Bob Froehlich | Trustee |
| /s/ John Honis*<br>John Honis | Trustee |
| /s/ Bryan A. Ward*<br>Bryan A. Ward | Trustee |
| /s/ Dorri McWhorter*<br>Dorri McWhorter | Trustee |

* By:  /s/ Frank Waterhouse
       Frank Waterhouse
       Attorney in Fact*

* Pursuant to powers of attorney dated May 1, 2022, incorporated herein by reference to Post-Effective Amendment No. 12 to the Registration Statement previously filed with the Commission on April 28, 2023 (Accession Number 0001193125-23-126043), and June 8, 2021 incorporated herein by reference to Post-Effective Amendment No. 11 to the Registration Statement previously filed with the Commission on April 29, 2022 (Accession Number 0001193125-22-131260).

**EXHIBIT INDEX**

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| (k)(1) | Amended and Restated Expense Limitation and Reimbursement Agreement, dated May 1, 2025, between the Registrant and NexPoint Advisors, L.P. |
| (l)(2) | Consent of Counsel |
| (n) | Consent of Independent Registered Public Accounting Firm |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LIBERTY CLO HOLDCO, LTD. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| NANCY DONDERO, as Trustee of The | § | |
| Dugaboy Investment Trust, GRANT | § | CIVIL ACTION NO. _____ |
| JAMES SCOTT as Trustee of The SLHC | § | |
| Trust, NEXPOINT ADVISORS, L.P., | § | |
| NEXPOINT ADVISORS GP, LLC, | § | |
| NEXPOINT REAL ESTATE ADVISORS | § | |
| IV, L.P. and NEXPOINT REAL ESTATE | § | |
| ADVISORS GP, LLC | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT

Plaintiff Liberty CLO Holdco, Ltd. ("Liberty") files this Original Complaint against

Defendants Nancy Dondero, as Trustee of The Dugaboy Investment Trust, Grant James Scott, as

Trustee of The SLHC Trust, NexPoint Advisors, L.P. ("NexPoint Advisors"), NexPoint Real

Estate Advisors IV, L.P. (collectively the "NexPoint Affiliates"), NexPoint Advisors GP, LLC,

and NexPoint Real Estate Advisors GP, LLC (together with NexPoint Advisors GP, LLC, the

"NexPoint GPs") and states as follows:

### SUMMARY OF COMPLAINT

1.     The NexPoint Affiliates breached their contractual put-option obligation to buy

membership interests of NexPoint Polo Glen Holdings, LLC ("Polo Glen") owned by Liberty.

Indeed, while the NexPoint Affiliates purported to accept the put, they failed to consummate the

sale within 30 days of Liberty's exercise of the put, and instead offered only vague assurances that

they would draft transactional documents and close at some unknown time in the future. And when

**CONFIDENTIAL** **TDIT005372**

draft transactional documents were presented after the 30-day deadline to exercise the put, they contained numerous terms that Liberty is not required to agree to under the Option Agreement, including broad releases, indemnification obligations, and representations.

2.      The NexPoint Affiliates therefore breached the Option Agreement. Moreover, though NexPoint Advisors guaranteed the NexPoint Affiliates' payment and performance obligations under the Option Agreement, it failed to pay Liberty for its Polo Glen membership interests after demand, and has therefore breached its Guaranty with Liberty. For these reasons, Liberty seeks (1) an order of specific performance compelling the NexPoint Affiliates and NexPoint GPs to consummate the purchase of Liberty's membership interests in Polo Glen; (2) a judgment against NexPoint Advisors for $692,660.51, plus its reasonable attorney's fees, costs, and pre- and post-judgment interest for breach of the Guaranty; and/or (3) a declaratory judgment that either (a) the NexPoint Affiliates have forfeited their right to purchase the Polo Glen membership interests and that Liberty may sell those interests free and clear of any rights of the NexPoint Affiliates, or (b) that Liberty is not required to execute documents containing broad releases, indemnification obligations, and representations and warranties to effectuate its put under the Option Agreement.

**PARTIES, JURISDICTION, AND VENUE**

3.      Liberty is an exempted company organized under the laws of the Cayman Islands with its principal place of business located at Floor 4, Willow House, Cricket Square, Grand Cayman KY-9010 KY, and it is a foreign citizen for purposes of diversity jurisdiction.

4.      Defendant Nancy Dondero is the sole Trustee for The Dugaboy Investment Trust, who, on information and belief, is a Florida citizen for diversity purposes. She may be served with process at 1510 Coral Oak Ln. # 1305, Vero Beach, FL 32963, or wherever she may be found.

5.      Defendant Grant James Scott is the sole Trustee for The SLHC Trust, who, on information and belief, is a North Carolina citizen for diversity purposes. He may be served with process at 5311 Tannat Ct, #204, Raleigh, NC 27612, or 1712 Scales St, Raleigh, NC 27608, or wherever he may be found.

6.      Defendant NexPoint Advisors, L.P. is a Delaware limited partnership, whose general partner is NexPoint Advisors GP, LLC. NexPoint Advisors GP, LLC is a Delaware limited liability company, whose sole member is James D. Dondero, who is a Texas citizen for diversity purposes. NexPoint Advisors, L.P. has one limited partner, The Dugaboy Investment Trust, a Delaware perpetual nonrevocable trust with its principal place of business in Dallas County, Texas. Nancy Marie Dondero is The Dugaboy Investment Trust's sole trustee, who on information and belief is an individual and a Florida citizen for diversity purposes. NexPoint Advisors, L.P. may be served with process through its registered agent, The Corporation Trust Company, at Corporation Trust Center 1209 Orange St, Wilmington, DE 19801.

7.      Defendant NexPoint Advisors GP, LLC is a Delaware limited liability company, whose sole member is James D. Dondero, who is a Texas citizen for diversity purposes. NexPoint Advisors GP, LLC may be served with process through its registered agent, The Corporation Trust Company, at Corporation Trust Center 1209 Orange St, Wilmington, DE 19801.

8.      Defendant NexPoint Real Estate Advisors IV, L.P. is a Delaware limited partnership, whose general partner is NexPoint Real Estate Advisors GP, LLC. NexPoint Real Estate Advisors GP, LLC is a Delaware limited liability company, whose sole member is NexPoint Advisors, LP. NexPoint Advisors, L.P. is a Delaware limited partnership, whose general partner is NexPoint Advisors GP, LLC. NexPoint Advisors GP, LLC is a Delaware limited liability company, whose sole member is James D. Dondero, who is an individual and Texas citizen for

diversity purposes. NexPoint Advisors, L.P., has one limited partner, The Dugaboy Investment Trust, a Delaware perpetual nonrevocable trust with its principal place of business in Dallas County, Texas. Nancy Marie Dondero is The Dugaboy Investment Trust's sole trustee, who on information and belief is an individual and a Florida citizen for diversity purposes. NexPoint Real Estate Advisors IV, L.P. may be served with process through its registered agent, The Corporation Trust Company, at Corporation Trust Center 1209 Orange St, Wilmington, DE 19801.

9. Defendant NexPoint Real Estate Advisors GP, LLC is a Delaware limited liability company, whose sole member is NexPoint Advisors, LP. NexPoint Advisors, L.P. is a Delaware limited partnership, whose general partner is NexPoint Advisors GP, LLC. NexPoint Advisors GP, LLC is a Delaware limited liability company, whose sole member is James D. Dondero, who is an individual and Texas citizen for diversity purposes. NexPoint Advisors, L.P. has one limited partner, The Dugaboy Investment Trust, a Delaware perpetual nonrevocable trust with its principal place of business in Dallas County, Texas. Nancy Marie Dondero is The Dugaboy Investment Trust's sole trustee, who on information and belief is an individual and a Florida citizen for diversity purposes. NexPoint Real Estate Advisors GP, LLC may be served with process through its registered agent, The Corporation Trust Company, at Corporation Trust Center 1209 Orange St, Wilmington, DE 19801.

10. This Court has subject-matter jurisdiction over this civil action under 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between the parties and the matter in controversy, exclusive of interest and costs, exceeds $75,000.00. In addition to diversity jurisdiction, the Court has supplemental jurisdiction under 28 U.S.C. § 1367.

11. This Court has personal jurisdiction over the NexPoint Affiliates and the NexPoint GPs. In the Option Agreement at issue, the NexPoint Affiliates submitted to the jurisdiction of the

courts of the State of Delaware and of the United States District Court for the District of Delaware. Option Agreement § 4.

12.    Venue is proper in the United States District Court for the District of Delaware because the NexPoint Affiliates and NexPoint GPs waived any objection to this District being the venue for any dispute arising out of or relating to the agreement in the Option Agreement at issue. Option Agreement § 4.

**FACTUAL BACKGROUND**

5.    On or about June 13, 2024, the NexPoint Affiliates executed a letter agreement which provided Liberty with a put option for its interests in NexPoint Polo Glen Holdings, LLC (the "Option Agreement"). A true and correct copy of the Option Agreement is attached as **Exhibit 1**. Liberty holds 100% of the Class I Membership Interests in Polo Glen, as outlined in the Polo Glen Limited Liability Company Agreement. A true and correct copy of the Polo Glen Limited Liability Company Agreement is attached as **Exhibit 2**.

6.    Under the Option Agreement, Liberty has the right to require the NexPoint Affiliates to purchase all of Liberty's Class I Membership Interests in Polo Glen 30 days after Liberty serves a written notice of its election to exercise the put option (the "Class I Put Option"). Option Agreement § 1. Specifically, the Option Agreement provides that "each constituent of the collectively designated NexPoint Affiliates, agrees that it is jointly and severally liable to purchase the Class I Put Option, within thirty (30) days after exercise by [Liberty]." Option Agreement § 1(c).[1] NexPoint Advisors guaranteed the payment and performance of this Option Agreement under a Guaranty Agreement executed between NexPoint Advisors and Liberty, among others,

---

[1] The Option Agreement uses the same definition for "NexPoint Affiliates" and "Class I Put Option" as used herein.

CONFIDENTIAL                                                                TDIT005376

dated June 13, 2024 (the "Guaranty"). A true and correct copy of the Guaranty is attached as **Exhibit 3**.

7.      On January 15, 2025, Liberty sent the required written notice that it elected to exercise its Class I Put Option to the NexPoint Affiliates (the "Notice"). A true and correct copy of the Notice is attached as **Exhibit 4**. Thus, the NexPoint Affiliates had until February 14, 2025—30 days after the Notice—to "purchase the Class I Put Option." Option Agreement § 1(c).

8.      On February 14, 2025, instead of complying with the terms of the Option Agreement and purchasing Liberty's membership interests (that is, *paying* for them), the NexPoint Affiliates merely notified Liberty that they had received the Notice and advised that Dugaboy *intended* to purchase the interests, but it needed an unspecified, additional amount of time to prepare the necessary documents to close the transaction. A true and correct copy of the response is attached as **Exhibit 5**.

9.      On February 26, 2025, the NexPoint Affiliates circulated draft "put option purchase" documents to Liberty. Not only were those documents late, but they contained numerous improper provisions that were not required by the Option Agreement and that Liberty is not obligated to accept—namely, broad releases of the NexPoint Affiliates, a broad indemnification in favor of the NexPoint Affiliates, and several representations and warranties to be made by Liberty. As a result, none of the NexPoint Affiliates have complied with the Option Agreement and purchased the interests from Liberty.

10.     Before filing this suit, Liberty served notice on NexPoint Advisors under the Guaranty, demanding that it pay $692,660.51 for Liberty's Polo Glen membership interests (the "Guaranty Notice"). A true and correct copy of the Guaranty Notice is attached as **Exhibit 6**. But

to date, NexPoint Advisors has failed to comply with its guaranty obligations and has not paid Liberty for its Polo Glen membership interests.

### CAUSE OF ACTION

11. Each cause of action and theory of recovery below incorporates all of the allegations outlined above as if fully set forth therein.

12. All conditions precedent have been performed, waived, or have occurred.

### COUNT ONE

#### BREACH OF OPTION AGREEMENT AGAINST NEXPOINT AFFILIATES AND NEXPOINT GPS

13. The Option Agreement is a valid and enforceable contract.

14. The Option Agreement's plain terms state that the NexPoint Affiliates must purchase Liberty's Polo Glen membership interests, and are jointly and severally liable to do so, within 30 days of receipt of written notice from Liberty that it is exercising its put option. *See* Option Agreement § 1(c). The NexPoint GPs are jointly and severally liable for the acts of their respective limited partnerships.

15. Liberty sent the required Notice to the NexPoint Affiliates on January 15, 2025. *See* Liberty Notice. Thus, the NexPoint Affiliates had to purchase Liberty's membership interests by no later than February 14, 2025. *See* Option Agreement § 1(c). The NexPoint Affiliates failed to purchase the subject interests by February 14, 2025, and still have not purchased the subject interests to date.

16. As a result of the NexPoint Affiliates' (and the NexPoint GPs') failure to purchase Liberty's membership interest, Liberty has suffered injury, and will continue to suffer injury.

17. Liberty seeks an order of specific performance compelling the NexPoint Affiliates and the NexPoint GPs to consummate the purchase of Liberty's Polo Glen membership interests.

**CONFIDENTIAL**                    **TDIT005378**

Specific performance is a remedy for breach of contract which takes the form of a mandatory injunction requiring a party to fulfill its contractual obligations. *26 Capital Acquisition Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 464 (Del. Ch. 2023). Specific performance is available when ordinary damages would not provide adequate relief. *Id.*

18. Ordinary damages would not provide Liberty adequate relief because Liberty no longer wishes to own its interests in Polo Glen and seeks to exercise its right to sell those interests to the NexPoint Affiliates. Accordingly, Liberty seeks the equitable relief of specific performance of the Option Agreement, including but not limited to a mandatory injunction requiring the NexPoint Affiliates (and, by extension, the NexPoint GPs) to purchase Liberty's interests as required by the Option Agreement.

## COUNT TWO

### BREACH OF GUARANTY AGAINST NEXPOINT ADVISORS

19. The Guaranty is a valid and enforceable contract.

20. The Guaranty's plain terms state that NexPoint Advisors must purchase Liberty's Polo Glen membership interests to the extent the NexPoint Affiliates failed to perform under the Option Agreement, after NexPoint Advisors receives notice of that failure. *See* Guaranty §§ 2, 4.

21. Liberty sent the required Guaranty Notice to NexPoint Advisors on February 27, 2025, which triggered NexPoint Advisors' obligation to purchase Liberty's Polo Glen membership interests. *See* Guaranty Notice. But to date, NexPoint Advisors has failed to purchase the subject interests.

22. As a result, Liberty has suffered injury, and will continue to suffer injury, in the amount of at least $692,660.51, plus costs and pre- and post-judgment interest. Moreover, Liberty

had to engage counsel to enforce its rights under the Guaranty, and it is entitled to recover its reasonable attorney's fees incurred in connection with that enforcement effort. *See* Guaranty § 12.

### COUNT THREE

#### DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201

23.     In the alternative to Counts One and Two, Liberty seeks a declaration of the parties' rights and duties under the Option Agreement pursuant to 28 U.S.C. §§ 2201 and 2202. An actual and justiciable controversy exists between Liberty and the NexPoint Affiliates concerning (1) whether the NexPoint Affiliates have forfeited their right to purchase Liberty's Polo Glen membership interests under the Option Agreement because they did not comply with the Option Agreement's terms; or (2) whether Liberty is required to execute documentation to effectuate the purchase of its Polo Glen membership interests that include excess terms, such as releases, indemnification provisions, and representations and warranties.

24.     This controversy is ripe and of sufficient immediacy to justify the issuance of a declaratory judgment. The Option Agreement specifically provides that the NexPoint Affiliates are entitled to purchase Liberty's Polo Glen membership interests "within 30 days after exercise by [Liberty]." *See* Option Agreement § 1(c). The Option Agreement does not create any right for the NexPoint Affiliates to purchase the Polo Glen membership interests outside of that 30-day period. But the NexPoint Affiliates did not consummate the purchase of Liberty's Polo Glen membership interests within 30 days of Liberty's exercise of their put rights. And the Option Agreement does not require Liberty to execute documentation including unreasonably broad releases, indemnification provisions, and representations and warranties.

25.     Accordingly, Liberty seeks a declaration from the Court that:

    a. The NexPoint Affiliates have forfeited their right to purchase Liberty's Polo Glen membership interests under the Option Agreement and Liberty may sell

Case 19-34054-sgj11    Doc 4627-5    Filed 05/11/26    Entered 05/11/26 17:05:52    Desc
Exhibit 211 - Part 01    Page 415 of 759

423

**FSD2025-0116**                    **Page 427 of 1530**                    **2025-08-19**
Case 1:25-cv-00236-JLH    Document 1    Filed 02/28/25    Page 10 of 12 PageID #: 10

its Polo Glen membership interests free and clear of any rights of the NexPoint Affiliates; or

b. Liberty is not required to execute documents containing broad releases, indemnification obligations, or representations and warranties to effectuate its put under the Option Agreement.

26.    Liberty also seeks any other declaratory relief that would be useful to the resolution of the dispute between the parties.

### PRAYER FOR RELIEF

Plaintiff Liberty CLO Holdco, Ltd. respectfully requests that Defendants Nancy Dondero, as Trustee of The Dugaboy Investment Trust, Grant James Scott, as Trustee of The SLHC Trust, NexPoint Advisors, L.P., NexPoint Advisors GP, LLC, NexPoint Real Estates Advisors IV, L.P., and NexPoint Real Estate Advisors GP, LLC, be cited to appear and answer herein, and requests that the Court enter a final judgment:

a. Ordering specific performance of the NexPoint Affiliates' and the NexPoint GPs' obligation to purchase Liberty's Polo Glen membership interests under the Option Agreement;

b. Awarding Liberty a judgment against NexPoint Advisors for $692,660.51, plus its reasonably attorney's fees, costs, and pre- and post-judgment interest; or

c. A declaration pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202 that:

  i. The NexPoint Affiliates have forfeited their right to purchase Liberty's Polo Glen membership interests under the Option Agreement and that Liberty may sell its Polo Glen membership interests free and clear of any rights of the NexPoint Affiliates; or

  ii. Liberty is not required to execute documents containing broad releases,

**CONFIDENTIAL**                                                        **TDIT005381**

indemnification obligations, or representations and warranties to effectuate

its put under the Option Agreement; and

d.    all other relief to which Liberty is justly entitled.

CONFIDENTIAL    TDIT005382

Case 1:25-cv-00236-JLH   Document 1   Filed 02/28/25   Page 12 of 12 PageID #: 12

Dated: February 28, 2025

DORSEY & WHITNEY (DELAWARE) LLP

*/s/* Eric Lopez Schnabel
Eric Lopez Schnabel (DE Bar No. 3672)
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801
Telephone:  (302) 425-7171
Facsimile:  (302) 425-7177
E-mail:  *schnabel.eric@dorsey.com*

-and-

Brian Shaw (*pro hac vice pending*)
Texas Bar No. 24053473
Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St., Suite 5500
Dallas, TX 75202
Telephone: (214) 855-3003
E-mail: *bshaw@ccsb.com*

Monica Gaudioso (*pro hac vice pending*)
Texas Bar No. 24084570
Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St., Suite 5500
Dallas, TX 75202
Telephone: (214) 855-3088
E-mail: *mgaudioso@ccsb.com*

Abbie Blaker (*pro hac vice pending*)
Texas Bar No. 24131268
Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St., Suite 5500
Dallas, TX 75202
Telephone: (214) 855-3058
E-mail: *ablaker@ccsb.com*

**ATTORNEYS FOR PLAINTIFF LIBERTY
CLO HOLDCO, LTD.**

FSD2025-0116
## PID 11041 | AUTUMN

2025-08-19
Property Summary Report | 2025
Online Services | Rockwall Central Appraisal District

## GENERAL INFO

### ACCOUNT

| | |
|---|---|
| Property ID: | 11041 |
| Geographic ID: | 0104-0000-0004-00-0R |
| Type: | R |
| Zoning: | |
| Agent: | SOUTHLAND PROPERTY TAX |
| Legal Description: | A0104 W J HART, TRACT 4, ACRES 28.198 (PT OF 49.258 AC TR PLUS 655 AC IN COLLIN CO) |
| Property Use: | D1 |

### OWNER

| | |
|---|---|
| Name: | NCI ROYSE CITY LAND LLC |
| Secondary Name: | |
| Mailing Address: | 6716 GLENHURST DR   DALLAS TX US 75254 |
| Owner ID: | 1068183 |
| % Ownership: | 100.000000 |
| Exemptions: | |

### LOCATION

| | |
|---|---|
| Address: | AUTUMN |
| Market Area: | |
| Market Area CD: | NC099-2022 |
| Map ID: | 5-3 |

### PROTEST

Protest Status:
Informal Date:
Formal Date:

## VALUES

### CURRENT VALUES

| | |
|---|---|
| Land Homesite: | $0 |
| Land Non-Homesite: | $578,059 |
| Special Use Land Market: | $0 |
| Total Land: | $578,059 |
| | |
| Improvement Homesite: | $0 |
| Improvement Non-Homesite: | $0 |
| Total Improvement: | $0 |
| | |
| Market: | $578,059 |
| Special Use Exclusion (-): | $0 |
| Appraised: | $578,059 |
| Value Limitation Adjustment (-): | $9,588 |
| Net Appraised: | $568,471 |

### VALUE HISTORY



2025   2024   2023   2022   2021

Values for the current year are preliminary and are subject to change.

### VALUE HISTORY

| Year | Land Market | Improvement | Special Use Exclusion | Appraised | Value Limitation Adj (-) | Net Appraised |
|---|---|---|---|---|---|---|
| 2025 | $578,059 | $0 | $0 | $578,059 | $9,588 | $568,471 |
| 2024 | $578,059 | $0 | $0 | $578,059 | $104,333 | $473,726 |
| 2023 | $394,772 | $0 | $0 | $394,772 | $0 | $394,772 |
| 2022 | $394,770 | $0 | $0 | $394,770 | $0 | $394,770 |
| 2021 | $225,580 | $0 | $0 | $225,580 | $0 | $225,580 |

Page 1 of 2    Effective Date of Appraisal:  January 1    Date Printed:   May 29, 2025    Powered By: <True Prodigy>

FSD2025-0116
2025-08-19
346

CONFIDENTIAL
TDIT005384

FSD2025-0116                                                                                              2025-08-19

## TAXING UNITS

| Unit | Description | Tax Rate | Net Appraised | Taxable Value |
|------|-------------|----------|---------------|---------------|
| CRC | CITY OF ROYSE CITY | 0.578000 | $568,471 | $568,471 |
| GRW | ROCKWALL COUNTY | 0.254700 | $568,471 | $568,471 |
| SRC | ROYSE CITY ISD | 1.255200 | $568,471 | $568,471 |

DO NOT PAY FROM THIS ESTIMATE. This is only an estimate provided for informational purposes and may not include any special assessments that may also be collected. Please contact the tax office for actual amounts.

## IMPROVEMENT

## LAND

| Land | Description | Acres | SQFT | Cost per SQFT | Market Value | Special Use Value |
|------|-------------|-------|------|---------------|--------------|-------------------|
| C1 | VACANT LT/TR NON WF | 28.1980 | 1,228,304 | $0.47 | $578,059 | $0 |

## DEED HISTORY

| Deed Date | Type | Description | Grantor/Seller | Grantee/Buyer | Book ID | Volume | Page | Instrument |
|-----------|------|-------------|----------------|---------------|---------|--------|------|------------|
| 7/3/14 | WD | WARRANTY DEED | NEXBANK CAPITAL INC | NCI ROYSE CITY LAND LLC | | 2014 | 0000009 498 | |
| 10/4/11 | WD | WARRANTY DEED | NEXBANK SSB | NEXBANK CAPITAL INC | | 6576 | 223 | 456682 |
| 9/7/10 | STD | SUBSTITUTE TRUSTEE | OAKMONT LAND TEN LP | NEXBANK SSB | | 6220 | 141 | 438881 |
| 8/31/07 | WD | WARRANTY DEED | OAKMONT CAPITAL GROUP INC | OAKMONT LAND TEN LP | | | | |
| 3/16/07 | WD | WARRANTY DEED | DFW PRECAST CONTRACTORS | OAKMONT CAPITAL GROUP INC | | 5011 | 95 | |
| 5/17/01 | WD | WARRANTY DEED | JDI PROPERTIES LLC TRUSTEE | LIN JAMES C & | | 2146 | 299/303 | 0 |
| 5/17/01 | WD | WARRANTY DEED | LIN JAMES C & | DFW PRECAST CONTRACTORS | | 2146 | 264 | 0 |
| 10/27/00 | WD | WARRANTY DEED | BALEY TEDDY | JDI PROPERTIES LLC TRUSTEE | | 1995 | 28 | 0 |
| 7/12/96 | WD | WARRANTY DEED | 1994 LAND FUND II-DALLAS I, LP | BALEY TEDDY | | 1135 | 146 | 0 |
| 10/5/93 | STD | SUBSTITUTE TRUSTEE | SOUTHWEST DALLAS 10 INC | RESOLUTION TRUST CORP/RCVR | | 830 | 305 | 0 |
| 12/23/92 | WD | WARRANTY DEED | TELECOM CORPORATION | SOUTHWEST DALLAS 10 INC | | 750 | 100 | 0 |
| 7/26/88 | STD | SUBSTITUTE TRUSTEE | TELECOM CORPORATION | TELECOM CORPORATION | | 417 | 36 | 0 |
| | OT | | MORTON REALTY CO | TELECOM CORPORATION | | | | 0 |
| | OT | | GODWIN M L TRUSTEE | MORTON REALTY CO | | | | 0 |
| | OT | | GENTRY C R & R M | GODWIN M L TRUSTEE | | | | 0 |

Page 2 of 2    Effective Date of Appraisal:  January 1    Date Printed:  May 29, 2025    Powered By: <True Prodigy>

FSD2025-0116                                                                                              2025-08-19

347

**CONFIDENTIAL**                                                                                          TDIT005385

FSD2025-0116
**PID 11045 |**

2025-08-19
Property Summary Report | 2025
Online Services | Rockwall Central Appraisal District

## GENERAL INFO

### ACCOUNT

| | |
|---|---|
| Property ID: | 11045 |
| Geographic ID: | 0104-0000-0009-00-0R |
| Type: | R |
| Zoning: | |
| Agent: | SOUTHLAND PROPERTY TAX |
| Legal Description: | A0104 W J HART, TRACT 9, ACRES 14.6, (PT OF 49.258 AC TR PLUS 655 AC IN COLLIN CO) |
| Property Use: | D1 |

### OWNER

| | |
|---|---|
| Name: | NCI ROYSE CITY LAND LLC |
| Secondary Name: | |
| Mailing Address: | 6716 GLENHURST DR   DALLAS TX US 75254 |
| Owner ID: | 1068183 |
| % Ownership: | 100.000000 |
| Exemptions: | |

### LOCATION

| | |
|---|---|
| Address: | |
| Market Area: | |
| Market Area CD: | NC099-2022 |
| Map ID: | 5-3 |

### PROTEST

Protest Status:
Informal Date:
Formal Date:

## VALUES

### CURRENT VALUES

| | |
|---|---|
| Land Homesite: | $0 |
| Land Non-Homesite: | $299,300 |
| Special Use Land Market: | $0 |
| Total Land: | $299,300 |
| Improvement Homesite: | $0 |
| Improvement Non-Homesite: | $0 |
| Total Improvement: | $0 |
| Market: | $299,300 |
| Special Use Exclusion (-): | $0 |
| Appraised: | $299,300 |
| Value Limitation Adjustment (-): | $4,964 |
| Net Appraised: | $294,336 |

### VALUE HISTORY



2025   2024   2023   2022   2021

Values for the current year are preliminary and are subject to change.

### VALUE HISTORY

| Year | Land Market | Improvement | Special Use Exclusion | Appraised | Value Limitation Adj (-) | Net Appraised |
|---|---|---|---|---|---|---|
| 2025 | $299,300 | $0 | $0 | $299,300 | $4,964 | $294,336 |
| 2024 | $299,300 | $0 | $0 | $299,300 | $54,020 | $245,280 |
| 2023 | $204,400 | $0 | $0 | $204,400 | $0 | $204,400 |
| 2022 | $204,400 | $0 | $0 | $204,400 | $0 | $204,400 |
| 2021 | $116,800 | $0 | $0 | $116,800 | $0 | $116,800 |

FSD2025-0116
2025-08-19
348

CONFIDENTIAL
TDIT005386

FSD2025-0116                                                                                    2025-08-19

## TAXING UNITS

| Unit | Description | Tax Rate | Net Appraised | Taxable Value |
|------|-------------|---------:|--------------:|--------------:|
| CRC | CITY OF ROYSE CITY | 0.578000 | $294,336 | $294,336 |
| GRW | ROCKWALL COUNTY | 0.254700 | $294,336 | $294,336 |
| SRC | ROYSE CITY ISD | 1.255200 | $294,336 | $294,336 |

DO NOT PAY FROM THIS ESTIMATE. This is only an estimate provided for informational purposes and may not include any special assessments that may also be collected. Please contact the tax office for actual amounts.

## IMPROVEMENT

## LAND

| Land | Description | Acres | SQFT | Cost per SQFT | Market Value | Special Use Value |
|------|-------------|------:|-----:|--------------:|-------------:|------------------:|
| C1 | VACANT LT/TR NON WF | 14.6000 | 635,976 | $0.47 | $299,300 | $0 |

## DEED HISTORY

| Deed Date | Type | Description | Grantor/Seller | Grantee/Buyer | Book ID | Volume | Page | Instrument |
|-----------|------|-------------|----------------|---------------|---------|-------:|-----:|-----------:|
| 7/3/14 | WD | WARRANTY DEED | NEXBANK CAPITAL INC | NCI ROYSE CITY LAND LLC | | 2014 | 0000009 498 | |
| 10/4/11 | WD | WARRANTY DEED | NEXBANK SSB | NEXBANK CAPITAL INC | | 6576 | 223 | 456682 |
| 9/7/10 | STD | SUBSTITUTE TRUSTEE | OAKMONT LAND TEN LP | NEXBANK SSB | | 6220 | 141 | 438881 |
| 8/31/07 | WD | WARRANTY DEED | OAKMONT CAPITAL GROUP INC | OAKMONT LAND TEN LP | | | | |
| 3/16/07 | WD | WARRANTY DEED | DFW PRECAST CONTRACTORS | OAKMONT CAPITAL GROUP INC | | 5011 | 95 | |
| 9/10/01 | WD | WARRANTY DEED | BALEY TEDDY | DFW PRECAST CONTRACTORS | | 2261 | 163 | 0 |
| 7/12/96 | WD | WARRANTY DEED | 1994 LAND FUND II-DALLAS I, LP | BALEY TEDDY | | 1135 | 146 | 0 |
| 10/5/93 | STD | SUBSTITUTE TRUSTEE | SOUTHWEST DALLAS 10 INC | RESOLUTION TRUST CORP/RCVR | | 830 | 305 | 0 |
| 12/23/92 | WD | WARRANTY DEED | TELECOM CORPORATION | SOUTHWEST DALLAS 10 INC | | 750 | 100 | 0 |
| 7/26/88 | STD | SUBSTITUTE TRUSTEE | TELECOM CORPORATION | TELECOM CORPORATION | | 417 | 36 | 0 |
| | OT | | MORTON REALTY CO | TELECOM CORPORATION | | | | 0 |
| | OT | | GODWIN M L TR | MORTON REALTY CO | | | | 0 |
| | OT | | WOODWARD MADALENE | GODWIN M L TR | | | | 0 |

Page 2 of 2    Effective Date of Appraisal: January 1    Date Printed:    May 29, 2025    Powered By: <True Prodigy>

FSD2025-0116                                                                                    2025-08-19

349

CONFIDENTIAL

TDIT005387

FSD2025-0116
**PID 54550 |**
2025-08-19
Property Summary Report | 2025
Online Services | Rockwall Central Appraisal District

## GENERAL INFO

### ACCOUNT

| | |
|---|---|
| Property ID: | 54550 |
| Geographic ID: | 0104-0000-0004-01-0R |
| Type: | R |
| Zoning: | |
| Agent: | SOUTHLAND PROPERTY TAX |
| Legal Description: | A0104, W J HART, TRACT 4-1, 6.46 ACRES (PT OF 49.258 AC TR PLUS 655 AC IN COLLIN CO) |
| Property Use: | D1 |

### OWNER

| | |
|---|---|
| Name: | NCI ROYSE CITY LAND LLC |
| Secondary Name: | |
| Mailing Address: | 6716 GLENHURST DR   DALLAS TX US 75254 |
| Owner ID: | 1068183 |
| % Ownership: | 100.000000 |
| Exemptions: | |

### LOCATION

Address:

Market Area:
Market Area CD:    NC099-2022
Map ID:    5-3

### PROTEST

Protest Status:
Informal Date:
Formal Date:

## VALUES

### CURRENT VALUES

| | |
|---|---|
| Land Homesite: | $0 |
| Land Non-Homesite: | $25,840 |
| Special Use Land Market: | $0 |
| Total Land: | $25,840 |
| Improvement Homesite: | $0 |
| Improvement Non-Homesite: | $0 |
| Total Improvement: | $0 |
| Market: | $25,840 |
| Special Use Exclusion (-): | $0 |
| Appraised: | $25,840 |
| Value Limitation Adjustment (-): | $0 |
| Net Appraised: | $25,840 |

### VALUE HISTORY



Values for the current year are preliminary and are subject to change.

### VALUE HISTORY

| Year | Land Market | Improvement | Special Use Exclusion | Appraised | Value Limitation Adj (-) | Net Appraised |
|---|---|---|---|---|---|---|
| 2025 | $25,840 | $0 | $0 | $25,840 | $0 | $25,840 |
| 2024 | $25,840 | $0 | $0 | $25,840 | $0 | $25,840 |
| 2023 | $25,840 | $0 | $0 | $25,840 | $0 | $25,840 |
| 2022 | $25,840 | $0 | $0 | $25,840 | $0 | $25,840 |
| 2021 | $25,840 | $0 | $0 | $25,840 | $0 | $25,840 |

Page 1 of 2    Effective Date of Appraisal:  January 1    Date Printed:   May 29, 2025    Powered By: <True Prodigy>

FSD2025-0116
2025-08-19
350

431

FSD2025-0116                                                      2025-08-19

## TAXING UNITS

| Unit | Description | Tax Rate | Net Appraised | Taxable Value |
|------|-------------|----------|---------------|---------------|
| CRC | CITY OF ROYSE CITY | 0.578000 | $25,840 | $25,840 |
| GRW | ROCKWALL COUNTY | 0.254700 | $25,840 | $25,840 |
| SRC | ROYSE CITY ISD | 1.255200 | $25,840 | $25,840 |

DO NOT PAY FROM THIS ESTIMATE. This is only an estimate provided for informational purposes and may not include any special assessments that may also be collected. Please contact the tax office for actual amounts.

## IMPROVEMENT

## LAND

| Land | Description | Acres | SQFT | Cost per SQFT | Market Value | Special Use Value |
|------|-------------|-------|------|---------------|--------------|-------------------|
| C1 | VACANT LT/TR NON WF | 6.4600 | 281,397.6 | $0.09 | $25,840 | $0 |

## DEED HISTORY

| Deed Date | Type | Description | Grantor/Seller | Grantee/Buyer | Book ID | Volume | Page | Instrument |
|-----------|------|-------------|----------------|---------------|---------|--------|------|------------|
| 7/3/14 | WD | WARRANTY DEED | NEXBANK CAPITAL INC | NCI ROYSE CITY LAND LLC | | 2014 | 0000009498 | |
| 10/4/11 | WD | WARRANTY DEED | NEXBANK SSB | NEXBANK CAPITAL INC | | 6576 | 223 | 456682 |
| 9/7/10 | STD | SUBSTITUTE TRUSTEE | OAKMONT LAND TEN LP | NEXBANK SSB | | 6220 | 141 | 438881 |
| 8/31/07 | WD | WARRANTY DEED | OAKMONT CAPITAL GROUP INC | OAKMONT LAND TEN LP | | | | |
| 3/16/07 | WD | WARRANTY DEED | DFW PRECAST CONTRACTORS | OAKMONT CAPITAL GROUP INC | | 5011 | 95 | |
| 5/17/01 | WD | WARRANTY DEED | LIN JAMES C & | M R DEVELOPMENT | | 2146 | 307 | 0 |

**FSD2025-0116**
**Scott Grigg**
**Tax Assessor\Collector**
**Collin County**
P.O. Box 8046
McKinney, TX 75070



Physical Location:
2300 Bloomdale Road Ste. 2324
McKinney, TX 75071
Ph: 972-547-5020

2025-08-19

### TAX STATEMENT 2024+

1
V1.1

STATEMENT DATE: **05/29/2025**
ACCOUNT: **R671000000201**

LEGAL: ABS A0710 JOHN PENNINGTON SURVEY
TRACT 2
153.28 ACRES

OWNER: NCI ROYSE CITY LAND LLC
PARCEL ADDRESS: 0000233 COUNTY ROAD 588
EXEMPTION CODES: AG002

PIDN: 1286012
ACRES: 153.28

| AG DEFERRED VAL | AG LAND | APPRAISED VALUE | | | |
|---|---|---|---|---|---|
| 2,273,909 | 25,291 | 2,299,200 | | | |

| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE VALUE | TAX RATE PER $100 | BASE TAX | PENALTY & INTEREST |
|---|---|---|---|---|---|
| COLLIN COUNTY | 2,273,909 | 25,291 | 0.149343 | 0.00 | 0.00 |
| COLLIN  COLLEGE | 2,273,909 | 25,291 | 0.081220 | 0.00 | 0.00 |
| | | | SUBTOTAL | 0.00 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |
| | | | **TOTAL AMOUNT DUE** | **0.00** | |

*This top portion and your canceled check will serve as your receipt.*

**^** *Detach on perforation and return this portion with your check payable to:*

**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**
**972-547-5020**

| TOTAL AMOUNT DUE $0.00 |
|---|

^^AMOUNT DUE ON RECEIPT^^

OWNER: NCI ROYSE CITY LAND LLC
1286012

ACCOUNT:   R671000000201   2024+

NCI ROYSE CITY LAND LLC
6716 GLENHURST DR
DALLAS TX 75254-8621

| IF PAID IN | AMOUNT DUE |
|---|---|
| JUN | 0.00 |
| JUL | 0.00 |
| AUG | 0.00 |
| SEP | 0.00 |
| OCT | 0.00 |
| NOV | 0.00 |

20240R671000000201000000000000000000000000000000000000000000C01

CONFIDENTIAL
TDIT005390

433

**FSD2025-0116**

**Scott Grigg**

**Tax Assessor\Collector**

**Collin County**

**P.O. Box 8046**
**McKinney, TX 75070**

**Page 437 of 1530**



**2025-08-19**

Physical Location:
**2300 Bloomdale Road Ste. 2324**
**McKinney, TX 75071**
**Ph: 972-547-5020**

**TAX STATEMENT 2024+**

1
V1.1

STATEMENT DATE: **05/29/2025**
ACCOUNT: **R668300001101**

LEGAL: ABS A0683 TURNER ODELL SURVEY
TRACT 11
2.5 ACRES; (SPLIT BY COUNTY LINE)

OWNER: NCI ROYSE CITY LAND LLC
PARCEL ADDRESS:
EXEMPTION CODES: AG002

PIDN: 1288760
ACRES: 2.5

| AG DEFERRED VAL | AG LAND | APPRAISED VALUE | | | |
|---|---|---|---|---|---|
| 67,087 | 413 | 67,500 | | | |

| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE VALUE | TAX RATE PER $100 | BASE TAX | PENALTY & INTEREST |
|---|---|---|---|---|---|
| COLLIN COUNTY | 67,087 | 413 | 0.149343 | 0.00 | 0.00 |
| COLLIN COLLEGE | 67,087 | 413 | 0.081220 | 0.00 | 0.00 |
| | | | SUBTOTAL | 0.00 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |
| | | | **TOTAL AMOUNT DUE** | **0.00** | |

*This top portion and your canceled check will serve as your receipt.*

**^** *Detach on perforation and return this portion with your check payable to:*

**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**
**972-547-5020**

| TOTAL AMOUNT DUE |
|---|
| **$0.00** |

**^^AMOUNT DUE ON RECEIPT^^**

OWNER: NCI ROYSE CITY LAND LLC
1288760

**ACCOUNT: R668300001101 2024+**

**NCI ROYSE CITY LAND LLC**
**6716 GLENHURST DR**
**DALLAS TX 75254-8621**

| IF PAID IN | AMOUNT DUE |
|---|---|
| JUN | 0.00 |
| JUL | 0.00 |
| AUG | 0.00 |
| SEP | 0.00 |
| OCT | 0.00 |
| NOV | 0.00 |

20240R668300001101000000000000000000000000000000000000000C01

**FSD2025-0116**

**2025-08-19**

353

**CONFIDENTIAL**

TDIT005391

**434**

**FSD2025-0116**                         **Page 438 of 1530**                    **2025-08-19**

**Scott Grigg**
**Tax Assessor\Collector**                                                  Physical Location:
**Collin County**                                                           **2300 Bloomdale Road Ste. 2324**
P.O. Box 8046                                                               **McKinney, TX 75071**
McKinney, TX 75070                                                         **Ph: 972-547-5020**



**TAX STATEMENT 2024+**                                                     1
                                                                            V1.1

STATEMENT DATE: **05/29/2025**                     LEGAL:   ABS A0966 WILLIAM WILSON SURVEY
ACCOUNT: **R696600000601**                                  TRACT 6 SPLIT BY COUNTY LINE
                                                           41.492 ACRES

OWNER:  NCI ROYSE CITY LAND LLC                    PIDN:  2520624
PARCEL ADDRESS:  COUNTY ROAD 979                   ACRES:  41.492
EXEMPTION CODES:  AG002

| AG DEFERRED VAL | AG LAND | APPRAISED VALUE | | | |
|---|---|---|---|---|---|
| 1,030,454 | 6,846 | 1,037,300 | | | |

| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE VALUE | TAX RATE PER $100 | BASE TAX | PENALTY & INTEREST |
|---|---|---|---|---|---|
| COLLIN COUNTY | 1,030,454 | 6,846 | 0.149343 | 0.00 | 0.00 |
| COLLIN  COLLEGE | 1,030,454 | 6,846 | 0.081220 | 0.00 | 0.00 |
| | | | SUBTOTAL | 0.00 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |
| | | | **TOTAL AMOUNT DUE** | **0.00** | |

*This top portion and your canceled check will serve as your receipt.*

**^** *Detach on perforation and return this portion with your check payable to:*

**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**
**972-547-5020**

| **TOTAL AMOUNT DUE** |
|---|
| **$0.00** |

**^^AMOUNT DUE ON RECEIPT^^**

OWNER: NCI ROYSE CITY LAND LLC
2520624

**ACCOUNT:   R696600000601   2024+**

| IF PAID IN | AMOUNT DUE |
|---|---|
| JUN | 0.00 |
| JUL | 0.00 |
| AUG | 0.00 |
| SEP | 0.00 |
| OCT | 0.00 |
| NOV | 0.00 |

**NCI ROYSE CITY LAND LLC**
**6716 GLENHURST DR**
**DALLAS TX 75254-8621**

20240R696600000601000000000000000000000000000000000000000000000000C01

**FSD2025-0116**                                                            **2025-08-19**
                                                                            **354**
**CONFIDENTIAL**                                                            **TDIT005392**

FSD2025-0116

**Scott Grigg**
**Tax Assessor\Collector**
**Collin County**
P.O. Box 8046
McKinney, TX 75070



2025-08-19

Physical Location:
2300 Bloomdale Road Ste. 2324
McKinney, TX 75071
Ph: 972-547-5020

### TAX STATEMENT 2024+

1
V1.1

| | |
|---|---|
| STATEMENT DATE: **05/29/2025** | LEGAL: ABS A0246 JOHN DAVIS SURVEY |
| ACCOUNT: **R624600000101** | TRACT 1 |
| | 136.053 ACRES |

OWNER: NCI ROYSE CITY LAND LLC
PARCEL ADDRESS: COUNTY ROAD 588
EXEMPTION CODES: AG002

PIDN: 2673936
ACRES: 136.053

| AG DEFERRED VAL | AG LAND | APPRAISED VALUE | | | |
|---|---|---|---|---|---|
| 2,698,612 | 22,448 | 2,721,060 | | | |

| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE VALUE | TAX RATE PER $100 | BASE TAX | PENALTY & INTEREST |
|---|---|---|---|---|---|
| COLLIN COUNTY | 2,698,612 | 22,448 | 0.149343 | 0.00 | 0.00 |
| COLLIN  COLLEGE | 2,698,612 | 22,448 | 0.081220 | 0.00 | 0.00 |
| | | | SUBTOTAL | 0.00 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |
| | | | **TOTAL AMOUNT DUE** | **0.00** | |

*This top portion and your canceled check will serve as your receipt.*

**^** *Detach on perforation and return this portion with your check payable to:*

**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**
**972-547-5020**

| TOTAL AMOUNT DUE |
|---|
| $0.00 |

**^^AMOUNT DUE ON RECEIPT^^**

OWNER: NCI ROYSE CITY LAND LLC
2673936

**ACCOUNT:    R624600000101   2024+**

| IF PAID IN | AMOUNT DUE |
|---|---|
| JUN | 0.00 |
| JUL | 0.00 |
| AUG | 0.00 |
| SEP | 0.00 |
| OCT | 0.00 |
| NOV | 0.00 |

**NCI ROYSE CITY LAND LLC**
**6716 GLENHURST DR**
**DALLAS TX 75254-8621**

20240R624600000101000000000000000000000000000000000000000000C01

FSD2025-0116

2025-08-19
355

**CONFIDENTIAL**

TDIT005393

**FSD2025-0116**
### Scott Grigg
### Tax Assessor\Collector
### Collin County
**P.O. Box 8046**
**McKinney, TX 75070**



**2025-08-19**
Physical Location:
**2300 Bloomdale Road Ste. 2324**
**McKinney, TX 75071**
**Ph: 972-547-5020**

F
1 F$F

### TAX STATEMENT 2024+

**STATEMENT DATE: 05/29/2025**
**ACCOUNT:  R667000000201**

LEGAL:   ABS A06V0 4OS NAILE SUR1EY
TRACT 2
. 25$6FV ACRES

| | | |
|---|---|---|
| OWNER:   NCI ROYSE CITY LAND LLC | PIDN:   26V. 7. V | |
| PARCEL ADDRESS:   COUNTY ROAD 970 | ACRES:   . 25$6FV | |
| EXEMPTION CODES:   AG002 | | |

| AG DE3ERRED 1AL | AG LAND | APPRAISED 1ALUE | | | |
|---|---|---|---|---|---|
| 58 668956 | 9. 8962 | 585208F0J | | | |

| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE 1ALUE | TAX RATE PER , F00 | BASE TAX | PENALTY & INTEREST |
|---|---|---|---|---|---|
| COLLIN COUNTY | 58 668956 | 9. 8962 | 0$F57. 5. | 0$00 | 0$00 |
| COLLIN  COLLEGE | 58 668956 | 9. 8962 | 0$0JF220 | 0$00 | 0$00 |
| | | | SUBTOTAL | 0$00 | 0$00 |
| | | | PRIOR YEARS | 0$00 | |
| | | | **TOTAL AMOUNT DUE** | **0.00** | |

*This top portion and your canceled check will serve as your receipt.*

**^** *Detach on perforation and return this portion with your check payable to:*

**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**
**972-547-5020**

| TOTAL AMOUNT DUE |
|---|
| **$0.00** |

**^^AMOUNT DUE ON RECEIPT^^**

OWNER: NCI ROYSE CITY LAND LLC
26V. 7. V

**ACCOUNT:**   **R667000000201   2024+**

**NCI ROYSE CITY LAND LLC**
**6716 GLENHURST DR**
**DALLAS TX 75254-8621**

| IF PAID IN | AMOUNT DUE |
|---|---|
| 4UN | 0$00 |
| 4UL | 0$00 |
| AUG | 0$00 |
| SEP | 0$00 |
| OCT | 0$00 |
| NO1 | 0$00 |

20240R6670000002010000000000000000000000000000000000000000000000C01

**FSD2025-0116**

**2025-08-19**
356

**CONFIDENTIAL**

TDIT005394

# Kaufman CAD Property Search

## 🔖 Property Details

| Account | | | |
|---|---|---|---|
| Property ID: | 6578 | Geographic ID: | 99.0171.0000.0775.00.02.02 |
| Type: | R | Zoning: | |
| Property Use: | | Condo: | |
| Location | | | |
| Situs Address: | 0 HWY 80 FORNEY, TX | | |
| Map ID: | C1-D-2 | Mapsco: | |
| Legal Description: | JNO GREGG, TRACT 775.00; 9.32 ACRES | | |
| Abstract/Subdivision: | A0171 | | |
| Neighborhood: | (21-002) Forney in City Limits (Misc.) | | |
| Owner | | | |
| Owner ID: | 197251 | | |
| Name: | NLA ASSETS LLC | | |
| Agent: | 9252 | | |
| Mailing Address: | 6716 GLENHURST DR DALLAS, TX 75254 | | |
| % Ownership: | 100.0% | | |
| Exemptions: | For privacy reasons not all exemptions are shown online. | | |

## 🔖 Property Values

| | |
|---|---|
| Improvement Homesite Value: | $0 (+) |
| Improvement Non-Homesite Value: | $0 (+) |
| Land Homesite Value: | $0 (+) |
| Land Non-Homesite Value: | $265,691 (+) |
| Agricultural Market Valuation: | $0 (+) |
| Market Value: | $265,691 (=) |
| Agricultural Value Loss:❓ | $0 (-) |
| Appraised Value:❓ | $265,691 (=) |
| HS Cap Loss: ❓ | $0 (-) |
| Circuit Breaker: ❓ | $13,979 (-) |
| Assessed Value: | $251,712 |

CONFIDENTIAL                                                                    TDIT005395

| Ag Use Value: | $0 |
|---|---|

Information provided for research purposes only. Legal descriptions and acreage amounts are for Appraisal District use only and should be verified prior to using for legal purpose and or documents. Please contact the Appraisal District to verify all information for accuracy.

## 🔖 Property Taxing Jurisdiction

**Owner:** NLA ASSETS LLC **%Ownership:** 100.0%

| Entity | Description | Market Value | Taxable Value | Freeze Ceiling |
|---|---|---|---|---|
| CF | CITY OF FORNEY | $265,691 | N/A | |
| KC | KAUFMAN COUNTY | $265,691 | N/A | |
| SF | FORNEY ISD | $265,691 | N/A | |
| P2 | PRECINCT 2 | $265,691 | N/A | |
| RB | ROAD & BRIDGE | $265,691 | N/A | |
| CAD | KAUFMAN CAD | $265,691 | N/A | |

CONFIDENTIAL    TDIT005396

🔖 Property Land

| Type | Description | Acreage | Sqft | Eff Front | Eff Depth | Market Value | Prod. Value |
|------|-------------|---------|------|-----------|-----------|--------------|-------------|
| ZC | NATIVE PASTURE | 3.32 | 144,619.20 | 0.00 | 0.00 | $139,572 | $0 |
| ZC | NATIVE PASTURE | 6.00 | 261,360.00 | 0.00 | 0.00 | $126,119 | $0 |

## 🔖 Property Roll Value History

| Year | Improvements | Land Market | Ag Valuation | Appraised | HS Cap Loss | Assessed |
|---|---|---|---|---|---|---|
| 2025 | $0 | $265,691 | $0 | $265,691 | $0 | $251,712 |
| 2024 | $0 | $215,990 | $0 | $215,990 | $0 | $209,760 |
| 2023 | $0 | $174,800 | $0 | $174,800 | $0 | $174,800 |
| 2022 | $0 | $153,290 | $0 | $153,290 | $0 | $153,290 |
| 2021 | $0 | $162,030 | $0 | $162,030 | $0 | $162,030 |
| 2020 | $0 | $162,030 | $0 | $162,030 | $0 | $162,030 |
| 2019 | $0 | $162,030 | $0 | $162,030 | $0 | $162,030 |
| 2018 | $0 | $174,750 | $0 | $174,750 | $0 | $174,750 |
| 2017 | $0 | $174,750 | $0 | $174,750 | $0 | $174,750 |
| 2016 | $0 | $174,750 | $0 | $174,750 | $0 | $174,750 |

## 🔖 Property Deed History

| Deed Date | Type | Description | Grantor | Grantee | Volume | Page | Number |
|---|---|---|---|---|---|---|---|
| 12/15/2014 | WD | WARRANTY DEED | NCI ASSETS HOLDING COMPANY LLC | NLA ASSETS LLC | 4794 | 260 | 9661 |
| 12/15/2014 | WD | WARRANTY DEED | NEXBANK SSB | NEXBANK CAPITAL INC | 4794 | 242 | 9659 |
| 12/15/2014 | WD | WARRANTY DEED | NEXBANK CAPITAL INC | NCI ASSETS HOLDING COMPANY LLC | 4794 | 251 | 9660 |

CONFIDENTIAL    TDIT005398

## Kaufman CAD Property Search

### 🔖 Property Details

| Account | | | |
|---|---|---|---|
| **Property ID:** | 14114 | **Geographic ID:** | 99.0517.0000.0015.00.06.06 |
| **Type:** | R | **Zoning:** | |
| **Property Use:** | | **Condo:** | |
| **Location** | | | |
| **Situs Address:** | COLQUITT RD TERRELL, TX | | |
| **Map ID:** | C3-B-4 | **Mapsco:** | |
| **Legal Description:** | SWING & LAWS, TRACT 15; 17.39 ACRES | | |
| **Abstract/Subdivision:** | A0517 | | |
| **Neighborhood:** | (28-002N) CITY OF TERRELL NORTH OF 80 | | |
| **Owner** | | | |
| **Owner ID:** | 197251 | | |
| **Name:** | NLA ASSETS LLC | | |
| **Agent:** | 9252 | | |
| **Mailing Address:** | 6716 GLENHURST DR DALLAS, TX 75254 | | |
| **% Ownership:** | 100.0% | | |
| **Exemptions:** | For privacy reasons not all exemptions are shown online. | | |

### 🔖 Property Values

| | |
|---|---|
| **Improvement Homesite Value:** | $0 (+) |
| **Improvement Non-Homesite Value:** | $0 (+) |
| **Land Homesite Value:** | $0 (+) |
| **Land Non-Homesite Value:** | $0 (+) |
| **Agricultural Market Valuation:** | $0 (+) |
| **Market Value:** | $0 (=) |
| **Agricultural Value Loss:**❓ | $0 (-) |
| **Appraised Value:**❓ | $0 (=) |
| **HS Cap Loss:** ❓ | $0 (-) |
| **Circuit Breaker:** ❓ | $0 (-) |
| **Assessed Value:** | $0 |

CONFIDENTIAL

TDIT005399

| Ag Use Value: | $0 |
|---|---|

Information provided for research purposes only. Legal descriptions and acreage amounts are for Appraisal District use only and should be verified prior to using for legal purpose and or documents. Please contact the Appraisal District to verify all information for accuracy.

## 🔖 Property Taxing Jurisdiction

**Owner:** NLA ASSETS LLC **%Ownership:** 100.0%

| Entity | Description | Market Value | Taxable Value | Freeze Ceiling |
|---|---|---|---|---|
| CT | CITY OF TERRELL | $409,812 | N/A | |
| KC | KAUFMAN COUNTY | $409,812 | N/A | |
| ST | TERRELL ISD | $409,812 | N/A | |
| TV | TRINITY VALLEY CC | $409,812 | N/A | |
| P3 | PRECINCT 3 | $409,812 | N/A | |
| RB | ROAD & BRIDGE | $409,812 | N/A | |
| CAD | KAUFMAN CAD | $409,812 | N/A | |

CONFIDENTIAL TDIT005400

🔖 Property Land

| Type | Description | Acreage | Sqft | Eff Front | Eff Depth | Market Value | Prod. Value |
|------|-------------|---------|------|-----------|-----------|--------------|-------------|
| ZC | NATIVE PASTURE | 17.39 | 757,508.40 | 0.00 | 0.00 | $409,812 | $0 |

CONFIDENTIAL                                                                TDIT005401

444

Kaufman Property Search

## 🔖 Property Roll Value History

| Year | Improvements | Land Market | Ag Valuation | Appraised | HS Cap Loss | Assessed |
|------|-------------:|------------:|-------------:|----------:|------------:|---------:|
| 2025 | $0 | $0 | $0 | $0 | $0 | $0 |
| 2024 | $0 | $409,812 | $0 | $409,812 | $0 | $409,812 |
| 2023 | $0 | $363,700 | $0 | $363,700 | $0 | $363,700 |
| 2022 | $0 | $274,000 | $0 | $274,000 | $0 | $274,000 |
| 2021 | $0 | $208,680 | $0 | $208,680 | $0 | $208,680 |
| 2020 | $0 | $208,680 | $0 | $208,680 | $0 | $208,680 |
| 2019 | $0 | $148,200 | $0 | $148,200 | $0 | $148,200 |
| 2018 | $0 | $109,900 | $0 | $109,900 | $0 | $109,900 |
| 2017 | $0 | $109,900 | $0 | $109,900 | $0 | $109,900 |
| 2016 | $0 | $109,900 | $0 | $109,900 | $0 | $109,900 |

## 🔖 Property Deed History

| Deed Date | Type | Description | Grantor | Grantee | Volume | Page | Number |
|-----------|------|-------------|---------|---------|-------:|-----:|-------:|
| 12/15/2014 | WD | WARRANTY DEED | NEXBANK SSB | NEXBANK CAPITAL INC | 4794 | 242 | 9659 |
| 12/15/2014 | WD | WARRANTY DEED | NCI ASSETS HOLDING COMPANY LLC | NLA ASSETS LLC | 4794 | 260 | 9661 |
| 12/15/2014 | WD | WARRANTY DEED | NEXBANK CAPITAL INC | NCI ASSETS HOLDING COMPANY LLC | 4794 | 251 | 9660 |

364

CONFIDENTIAL

TDIT005402

445

# Kaufman CAD Property Search

## 🔖 Property Details

### Account

| | | | |
|---|---|---|---|
| **Property ID:** | 75256 | **Geographic ID:** 00.3699.0000.0002.00.06.06 | |
| **Type:** | R | **Zoning:** | |
| **Property Use:** | | **Condo:** | |

### Location

| | | | |
|---|---|---|---|
| **Situs Address:** | I 20 TX | | |
| **Map ID:** | D4-D-4 | **Mapsco:** | |
| **Legal Description:** | TERRELL CHRISTIAN ACADEMY, LOT 2 | | |
| **Abstract/Subdivision:** | S3699 | | |
| **Neighborhood:** | (28-001) Terrell ISD | | |

### Owner

| | |
|---|---|
| **Owner ID:** | 197251 |
| **Name:** | NLA ASSETS LLC |
| **Agent:** | 9252 |
| **Mailing Address:** | 6716 GLENHURST DR DALLAS, TX 75254 |
| **% Ownership:** | 100.0% |
| **Exemptions:** | For privacy reasons not all exemptions are shown online. |

## 🔖 Property Values

| | |
|---|---|
| **Improvement Homesite Value:** | $0 (+) |
| **Improvement Non-Homesite Value:** | $0 (+) |
| **Land Homesite Value:** | $0 (+) |
| **Land Non-Homesite Value:** | $0 (+) |
| **Agricultural Market Valuation:** | $0 (+) |
| **Market Value:** | $0 (=) |
| **Agricultural Value Loss:**❓ | $0 (-) |
| **Appraised Value:**❓ | $0 (=) |
| **HS Cap Loss:** ❓ | $0 (-) |
| **Circuit Breaker:** ❓ | $0 (-) |
| **Assessed Value:** | $0 |

CONFIDENTIAL                                      TDIT005403

| Ag Use Value: | $0 |
| --- | --- |

Information provided for research purposes only. Legal descriptions and acreage amounts are for Appraisal District use only and should be verified prior to using for legal purpose and or documents. Please contact the Appraisal District to verify all information for accuracy.

## 🔖 Property Taxing Jurisdiction

**Owner:** NLA ASSETS LLC **%Ownership:** 100.0%

| Entity | Description | Market Value | Taxable Value | Freeze Ceiling |
| --- | --- | --- | --- | --- |
| CT | CITY OF TERRELL | $807,439 | N/A | |
| KC | KAUFMAN COUNTY | $807,439 | N/A | |
| ST | TERRELL ISD | $807,439 | N/A | |
| TV | TRINITY VALLEY CC | $807,439 | N/A | |
| P1 | PRECINCT 1 | $807,439 | N/A | |
| RB | ROAD & BRIDGE | $807,439 | N/A | |
| CAD | KAUFMAN CAD | $807,439 | N/A | |

**CONFIDENTIAL**   **TDIT005404**

## 🔖 Property Land

| Type | Description | Acreage | Sqft | Eff Front | Eff Depth | Market Value | Prod. Value |
|------|-------------|---------|------|-----------|-----------|--------------|-------------|
| UNDEVLND | UNDEVELOPED LAND | 14.83 | 645,951.24 | 0.00 | 5.00 | $807,439 | $0 |

CONFIDENTIAL                                                                    TDIT005405

## 🔖 Property Roll Value History

| Year | Improvements | Land Market | Ag Valuation | Appraised | HS Cap Loss | Assessed |
|---|---|---|---|---|---|---|
| 2025 | $0 | $0 | $0 | $0 | $0 | $0 |
| 2024 | $0 | $807,439 | $0 | $807,439 | $0 | $807,439 |
| 2023 | $0 | $783,200 | $0 | $783,200 | $0 | $783,200 |
| 2022 | $0 | $807,439 | $0 | $807,439 | $0 | $807,439 |
| 2021 | $0 | $645,950 | $0 | $645,950 | $0 | $645,950 |
| 2020 | $0 | $645,950 | $0 | $645,950 | $0 | $645,950 |
| 2019 | $0 | $575,000 | $0 | $575,000 | $0 | $575,000 |
| 2018 | $0 | $575,000 | $0 | $575,000 | $0 | $575,000 |
| 2017 | $0 | $575,000 | $0 | $575,000 | $0 | $575,000 |
| 2016 | $0 | $575,000 | $0 | $575,000 | $0 | $575,000 |

## 🔖 Property Deed History

| Deed Date | Type | Description | Grantor | Grantee | Volume | Page | Number |
|---|---|---|---|---|---|---|---|
| 12/15/2014 | WD | WARRANTY DEED | NEXBANK SSB | NEXBANK CAPITAL INC | 4794 | 242 | 9659 |
| 12/15/2014 | WD | WARRANTY DEED | NCI ASSETS HOLDING COMPANY LLC | NLA ASSETS LLC | 4794 | 260 | 9661 |
| 12/15/2014 | WD | WARRANTY DEED | NEXBANK CAPITAL INC | NCI ASSETS HOLDING COMPANY LLC | 4794 | 251 | 9660 |

CONFIDENTIAL    TDIT005406

449

**FSD2025-0116**

**2025-08-19**

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

**IN GOD WE TRUST**

Facebook.com/TarrantCountyTAC

@TarrantCoTax                V5.5

Visit our website for online credit card and eCheck payments.
Pay by phone at 817-884-1110

**STATEMENT DATE:** 05/29/2025        **TAX STATEMENT 2024+**
**ACCOUNT:** 00000933422
LEGAL:  FIELDS HILLSIDE ADDITION BLOCK V
LOT 2

OWNER:  NCI FORT WORTH LAND LLC          PIDN:  13780   V   2
PARCEL ADDRESS:  0001019 W PEACH ST       ACRES:  0.1148
EXEMPTION CODES:  TF001

| LAND VALUE | APPRAISED VALUE | | | | | |
|---|---|---|---|---|---|---|
| 125,000 | 125,000 | | | | | |
| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE VALUE | TAX RATE PER $100 | BASE TAX | PENALTY & INTEREST | |
| FT WORTH CITY | 0 | 125,000 | 0.672500 | 840.63 | 0.00 | |
| TARRANT COUNTY | 0 | 125,000 | 0.187500 | 234.38 | 0.00 | |
| REG WATER DIST | 0 | 125,000 | 0.026700 | 33.38 | 0.00 | |
| T C HOSPITAL | 0 | 125,000 | 0.182500 | 228.13 | 0.00 | |
| T C COLLEGE | 0 | 125,000 | 0.112280 | 140.35 | 0.00 | |
| CFW PID #1 | 0 | 125,000 | 0.130000 | 162.50 | 0.00 | |
| FT WORTH ISD | 0 | 125,000 | 1.062400 | 1328.00 | 0.00 | |
| | | | SUBTOTAL | 2,967.37 | 0.00 | |
| | | | PRIOR YEARS | 0.00 | | |

**\*\*YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER\*\***

NCI FORT WORTH LAND LLC



RETURN WITH PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933422   2024+

13780----V----2          TC

| IF PAID IN | AMOUNT DUE |
|---|---|
| JUN | 0.00 |
| JUL | 0.00 |

NCI FORT WORTH LAND LLC
6716 GLENHURST DR
DALLAS TX 75254

Make checks payable to:
RICK D. BARNES, TAX ASSESSOR-COLLECTOR



SCAN BARCODE
TO PAY NOW

00000933422   0000000000   0000000000   0000000000   0529202500000

**FSD2025-0116**

**2025-08-19**

369

**CONFIDENTIAL**

**TDIT005407**

450

**FSD2025-0116**



**2025-08-19**

**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

 Facebook.com/TarrantCountyTAC

@TarrantCoTax                    V5.5

IF YOU ARE 65 YEARS OF AGE OR OLDER OR ARE DISABLED, AND YOU
OCCUPY THE PROPERTY DESCRIBED IN THIS DOCUMENT AS YOUR
RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE APPRAISAL DISTRICT
REGARDING ANY ENTITLEMENT YOU MAY HAVE TO A POSTPONEMENT IN THE
PAYMENT OF THESE TAXES.

**TOTAL AMOUNT DUE**    | 0.00 |

**\*\*YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER\*\***



RETURN WITH PAYMENT

NCI FORT WORTH LAND LLC

**PAY THIS AMOUNT**

**$0.00**

00000933422   2024+

13780----V----2        TC

NCI FORT WORTH LAND LLC
6716 GLENHURST DR
DALLAS TX 75254

| IF PAID IN | AMOUNT DUE |
|---|---|
| JUN | 0.00 |
| JUL | 0.00 |

Make checks payable to:
RICK D. BARNES, TAX ASSESSOR-COLLECTOR





SCAN BARCODE
TO PAY NOW

**FSD2025-0116**

00000933422    0000000000    0000000000    0000000000    0529202500000

**2025-08-19**

370

**CONFIDENTIAL**

**TDIT005408**

**FSD2025-0116**



**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

**2025-08-19**

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

f  Facebook.com/TarrantCountyTAC

X  @TarrantCoTax                    V5.5

DISCOVER   VISA   mastercard.   AMERICAN EXPRESS

Visit our website for online credit card and eCheck payments.
Pay by phone at 817-884-1110

**STATEMENT DATE:** 025 95 0/ 2          **TAX STATEMENT / 0/ 4+**
**ACCOUNT:** 00000933430
LEGAL:  FIELDS HILLSIDE ADDITION BLOCK V
LOT 2

OWNER:  NCI FORT WORTH LAND LLC          PIDN:  12780   V   2
PARCEL ADDRESS:  0001015 W PEACH ST          ACRES:  0.1148
EXEMPTION CODES:  TF001

| LAND VAL3 E | APPRAISED VAL3 E | | | | |
|---|---|---|---|---|---|
| 1$5,000 | 1$5,000 | | | | |

| TAXING ENTITIES | EXEMPTION AMO3 NT | TAXABLE VAL3 E | TAX RATE PER U100 | BASE TAX | PENALTY & INTEREST |
|---|---|---|---|---|---|
| FT WORTH CITY | 0 | 1$5,000 | 0.67$500 | 840.62 | 0.00 |
| TARRANT CO3 NTY | 0 | 1$5,000 | 0.187500 | $24.28 | 0.00 |
| REG WATER DIST | 0 | 1$5,000 | 0.0$6700 | 22.28 | 0.00 |
| T C HOSPITAL | 0 | 1$5,000 | 0.18$500 | $$8.12 | 0.00 |
| T C COLLEGE | 0 | 1$5,000 | 0.11$$80 | 140.25 | 0.00 |
| CFW PID #1 | 0 | 1$5,000 | 0.120000 | 16$.50 | 0.00 |
| FT WORTH ISD | 0 | 1$5,000 | 1.06$400 | 12$8.00 | 0.00 |
| | | | S3 BTOTAL | $,967.27 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |

**\*\*YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER\*\***

NCI FORT WORTH LAND LLC



RET3 RN WITH PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933430   2024+

12780----V----2          TC

NCI FORT WORTH LAND LLC
6716 GLENH3 RST DR
DALLAS TX 75$54

| IF PAID IN | AMOUNT DUE |
|---|---|
| J3 N | 0.00 |
| J3 L | 0.00 |

Make checks payable to:
RICK D. BARNES, TAX ASSESSOR-COLLECTOR

  

SCAN BARCODE
TO PAY NOW

00000933430   0000000000   0000000000   0000000000   0529202500000

452

**FSD2025-0116**

**2025-08-19**



**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

 Facebook.com/TarrantCountyTAC

@TarrantCoTax   V5.5

IF YOU ARE 62 YEARS OF AGE OR OLDER OR ARE DISABLED, AND YOU
OCCUPY THE PROPERTY DESCRIBED IN THIS DOCUMENT AS YOUR
RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE APPRAISAL DISTRICT
REGARDING ANY ENTITLEMENT YOU MAY HAVE TO A POSTPONEMENT IN THE
PAYMENT OF THESE TAXES.

| TOTAL AMOUNT DUE | 0.00 |
|---|---|

**\*\*YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER\*\***

NCI FORT WORTH LAND LLC



RET3RN WITH PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933430  2024+

12780----V----2    TC

NCI FORT WORTH LAND LLC
6716 GLENH3RST DR
DALLAS TX 75$54

| IF PAID IN | AMOUNT DUE |
|---|---|
| J3 N | 0.00 |
| J3 L | 0.00 |

Make checks payable to:
RICK D. BARNES, TAX ASSESSOR-COLLECTOR





SCAN BARCODE
TO PAY NOW

00000933430    0000000000    0000000000    0000000000    0529202500000

**FSD2025-0116**



**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**2025-08-19**

**IN GOD WE TRUST**

f  Facebook.com/TarrantCountyTAC

X  @TarrantCoTax                    V5.5

DISCOVER   VISA   mastercard.   AMERICAN EXPRESS

Visit our website for online credit card and eCheck payments.
Pay by phone at 817-884-1110

**STATEMENT DATE:** 025 95 0/ 2         **TAX STATEMENT / 0/ 4+**
**ACCOUNT:** 00000933449
LEGAL:  FIELDS BILLSIDE ADDITION KLOC2 V
LOT 4

OWNER:  NCI FORT WORTB LAND LLC            PIDN:  1H780   V   4
PARCEL ADDRESS:  000101H W PEACB ST         ACRES:  0.1148
EXEMPTION CODES:  TF001

| LAND VAL3 E | APPRAISED VAL3 E | | | | | |
|---|---|---|---|---|---|---|
| 1$5,000 | 1$5,000 | | | | | |

| TAXING ENTITIES | EXEMPTION AMO3 NT | TAXAKLE VAL3 E | TAX RATE PER U100 | BASE TAX | PENALTY & INTEREST |
|---|---|---|---|---|---|
| FT WORTB CITY | 0 | 1$5,000 | 0.67$500 | 840.6H | 0.00 |
| TARRANT CO3 NTY | 0 | 1$5,000 | 0.187500 | $H4.H8 | 0.00 |
| REG WATER DIST | 0 | 1$5,000 | 0.0$6700 | HH.H8 | 0.00 |
| T C BOSPITAL | 0 | 1$5,000 | 0.18$500 | $$8.1H | 0.00 |
| T C COLLEGE | 0 | 1$5,000 | 0.11$$80 | 140.H5 | 0.00 |
| CFW PID #1 | 0 | 1$5,000 | 0.1H0000 | 16$.50 | 0.00 |
| FT WORTB ISD | 0 | 1$5,000 | 1.06$400 | 1H$8.00 | 0.00 |
| | | | S3 KTOTAL | $,967.H7 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |

**\*\*YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER\*\***



NCI FORT WORTB LAND LLC

RET3 RN WITB PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933449  2024+

1H780----V----4          TC

NCI FORT WORTB LAND LLC
6716 GLENB3 RST DR
DALLAS TX 75$54

| IF PAID IN | AMOUNT DUE |
|---|---|
| J3 N | 0.00 |
| J3 L | 0.00 |

Make checks payable to:
**RIC2 D. KARNES, TAX ASSESSOR-COLLECTOR**



SCAN BARCODE
TO PAY NOW

00000933449     0000000000     0000000000     0000000000     0529202500000

454

**FSD2025-0116**　　　　　　　**Page 458 of 1530**　　　　　　　**2025-08-19**

**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

 Facebook.com/TarrantCountyTAC

@TarrantCoTax　　　　V5.5

IF YOU ARE 62 YEARS OF AGE OR OLDER OR ARE DISABLED, AND YOU
OCCUPY THE PROPERTY DESCRIBED IN THIS DOCUMENT AS YOUR
RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE APPRAISAL DISTRICT
REGARDING ANY ENTITLEMENT YOU MAY HAVE TO A POSTPONEMENT IN THE
PAYMENT OF THESE TAXES.

| TOTAL AMOUNT DUE | 0.00 |
|---|---|

**\*\*YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER\*\***



RET3RN WITB PAYMENT

NCI FORT WORTB LAND LLC

**PAY THIS AMOUNT**

**$0.00**

00000933449　2024+

1H780----V----4　　　TC

NCI FORT WORTB LAND LLC
6716 GLENB3RST DR
DALLAS TX 75$54

| IF PAID IN | AMOUNT DUE |
|---|---|
| J3N | 0.00 |
| J3L | 0.00 |

Make checks payable to:
RIC2 D. KARNES, TAX ASSESSOR-COLLECTOR

 

SCAN BARCODE
TO PAY NOW

00000933449　0000000000　0000000000　0000000000　0529202500000

**FSD2025-0116**　　　　　　　　　　　　　　　　**2025-08-19**

374

**CONFIDENTIAL**　　　　　　　　　　　　　　　　**TDIT005412**

FSD2025-0116



**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

2025-08-19

**IN GOD WE TRUST**

f  Facebook.com/TarrantCountyTAC

X  @TarrantCoTax                    V5.5

Visit our website for online credit card and eCheck payments.
Pay by phone at 817-884-1110

**STATEMENT DATE:** 07/14/2025    **TAX STATEMENT 2024+**
**ACCOUNT:** 00000933457
LEGAL: FIELDS HILLSIDE ADDITION BLOCK V
LOT 5

OWNER: NCI FORT WORTH LAND LLC          PIDN: 13780  V  5
PARCEL ADDRESS: 0001009 W PEACH ST       ACRES: 0.1148
EXEMPTION CODES: TF001

| LAND VALUE | APPRAISED VALUE | | | | |
|---|---|---|---|---|---|
| 125,000 | 125,000 | | | | |

| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE VALUE | TAX RATE PER $100 | BASE TAX | PENALTY & INTEREST |
|---|---|---|---|---|---|
| FT WORTH CITY | 0 | 125,000 | 0.672500 | 840.63 | 0.00 |
| TARRANT COUNTY | 0 | 125,000 | 0.187500 | 234.38 | 0.00 |
| REG WATER DIST | 0 | 125,000 | 0.026700 | 33.38 | 0.00 |
| T C HOSPITAL | 0 | 125,000 | 0.182500 | 228.13 | 0.00 |
| T C COLLEGE | 0 | 125,000 | 0.112280 | 140.35 | 0.00 |
| CFW PID #1 | 0 | 125,000 | 0.130000 | 162.50 | 0.00 |
| FT WORTH ISD | 0 | 125,000 | 1.062400 | 1328.00 | 0.00 |
| | | | SUBTOTAL | 2,967.37 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |

**\*\*YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER\*\***



NCI FORT WORTH LAND LLC

RETURN WITH PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933457  2024+

13780----V----5        TC

NCI FORT WORTH LAND LLC
6716 GLENHURST DR
DALLAS TX 75254

| IF PAID IN | AMOUNT DUE |
|---|---|
| AUG | 0.00 |
| SEP | 0.00 |

Make checks payable to:
**RICK D. BARNES, TAX ASSESSOR-COLLECTOR**



SCAN BARCODE
TO PAY NOW

**CONFIDENTIAL**                                         TDIT005413

456

**FSD2025-0116**                    **Page 460 of 1530**                                    **2025-08-19**



**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

f  Facebook.com/TarrantCountyTAC

X  @TarrantCoTax                                    V5.5

**IF YOU ARE 65 YEARS OF AGE OR OLDER OR ARE DISABLED, AND YOU
OCCUPY THE PROPERTY DESCRIBED IN THIS DOCUMENT AS YOUR
RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE APPRAISAL DISTRICT
REGARDING ANY ENTITLEMENT YOU MAY HAVE TO A POSTPONEMENT IN THE
PAYMENT OF THESE TAXES.**

**TOTAL AMOUNT DUE**      0.00

**\*\*YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER\*\***

NCI FORT WORTH LAND LLC



RETURN WITH PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933457   2024+

13780----V----5          TC

NCI FORT WORTH LAND LLC
6716 GLENHURST DR
DALLAS TX 75254

| IF PAID IN | AMOUNT DUE |
|---|---|
| AUG | 0.00 |
| SEP | 0.00 |

Make checks payable to:
RICK D. BARNES, TAX ASSESSOR-COLLECTOR

 

SCAN BARCODE
TO PAY NOW

00000933457      0000000000      0000000000      0000000000      0714202500000

**FSD2025-0116**                                                                        **2025-08-19**

**376**

**CONFIDENTIAL**                                                                        **TDIT005414**

**FSD2025-0116**                                                                    **2025-08-19**



**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

Facebook.com/TarrantCountyTAC

@TarrantCoTax                    V5.5

DISCOVER   VISA   mastercard.   AMERICAN EXPRESS

Visit our website for online credit card and eCheck payments.
Pay by phone at 817-884-1110

| | |
|---|---|
| **STATEMENT DATE:** 05/29/2025 | **TAX STATEMENT 2024+** |
| **ACCOUNT:** 00000933538 | |
| LEGAL: FIELDS KILLSIDE ADDITION HLOC2 V | |
| LOT 13 | |

OWNER: NCI FORT WORTK LAND LLC                    PIDN: 1U780    V   13   A
PARCEL ADDRESS: 0001014 W HLBFF ST               ACRES: 0.1148
EXEMPTION CODES: TF001

| LAND VALBE | APPRAISED VALBE | | | | |
|---|---|---|---|---|---|
| 135,000 | 135,000 | | | | |

| TAXING ENTITIES | EXEMPTION AMOBNT | TAXAHLE VALBE | TAX RATE PER $100 | BASE TAX | PENALTY & INTEREST |
|---|---|---|---|---|---|
| FT WORTK CITY | 0 | 135,000 | 0.673500 | 840.6U | 0.00 |
| TARRANT COBNTY | 0 | 135,000 | 0.187500 | 3U4.U8 | 0.00 |
| REG WATER DIST | 0 | 135,000 | 0.036700 | UU.U8 | 0.00 |
| T C KOSPITAL | 0 | 135,000 | 0.183500 | 338.1U | 0.00 |
| T C COLLEGE | 0 | 135,000 | 0.113380 | 140.U5 | 0.00 |
| CFW PID #1 | 0 | 135,000 | 0.1U0000 | 163.50 | 0.00 |
| FT WORTK ISD | 0 | 135,000 | 1.063400 | 1U38.00 | 0.00 |
| | | | SBHTOTAL | 3,967.U7 | 0.00 |
| | | | PRIOR YEARS | 0.00 | |

**\*\*YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER\*\***



RETBRN WITK PAYMENT

NCI FORT WORTK LAND LLC

**PAY THIS AMOUNT**

**$0.00**

00000933538   2024+

1U780----V---13---A        TC

| IF PAID IN | AMOUNT DUE |
|---|---|
| JBN | 0.00 |
| JBL | 0.00 |

NCI FORT WORTK LAND LLC
6716 GLENKBRST DR
DALLAS TX 75354

Make checks payable to:
RIC2 D. HARNES, TAX ASSESSOR-COLLECTOR



SCAN BARCODE
TO PAY NOW

00000933538   0000000000   0000000000   0000000000   0529202500000

**FSD2025-0116**                                                              **2025-08-19**
                                                                               377

**CONFIDENTIAL**                                                              **TDIT005415**

458

**FSD2025-0116**                                                    **2025-08-19**

**RICK D. BARNES**
TARRANT COUNTY
TAX ASSESSOR-COLLECTOR

100 E. Weatherford, Fort Worth, TX 76196
(817) 884-1100
e-mail: taxoffice@tarrantcountytx.gov
web: www.tarrantcountytx.gov

**IN GOD WE TRUST**

 Facebook.com/TarrantCountyTAC

@TarrantCoTax                    V5.5

IF YOU ARE 65 YEARS OF AGE OR OLDER OR ARE DISABLED, AND YOU
OCCUPY THE PROPERTY DESCRIBED IN THIS DOCUMENT AS YOUR
RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE APPRAISAL DISTRICT
REGARDING ANY ENTITLEMENT YOU MAY HAVE TO A POSTPONEMENT IN THE
PAYMENT OF THESE TAXES.

| TOTAL AMOUNT DUE | 0.00 |
|---|---|

**\*\*YOUR CHECK WILL BE CONVERTED INTO AN ELECTRONIC FUND TRANSFER\*\***

NCI FORT WORTK LAND LLC



RETBRN WITK PAYMENT

**PAY THIS AMOUNT**

**$0.00**

00000933538   2024+

1U780----V---13---A        TC

NCI FORT WORTK LAND LLC
6716 GLENKBRST DR
DALLAS TX 75354

| IF PAID IN | AMOUNT DUE |
|---|---|
| JBN | 0.00 |
| JBL | 0.00 |

Make checks payable to:
RIC2 D. HARNES, TAX ASSESSOR-COLLECTOR

 

SCAN BARCODE
TO PAY NOW

00000933538    0000000000    0000000000    0000000000    0529202500000

**FSD2025-0116**                                                    **2025-08-19**
                                                                        **378**

**CONFIDENTIAL**                                                    **TDIT005416**

**459**

**Page 463 of 1530**

**FSD2025-0116**
**Scott Grigg**
**Tax Assessor\Collector**
**Collin County**
P.O. Box 8046
McKinney, TX 75070



**2025-08-19**

Physical Location:
2300 Bloomdale Road Ste. 2324
McKinney, TX 75071
Ph: 972-547-5020

### TAX STATEMENT 2024+

1
V1.1

STATEMENT DATE: **05/29/2025**
ACCOUNT: **R94480A000002**

LEGAL:   TWIN CREEKS BLK A LOT 1

OWNER:   NCI STEWART CREEK LLC
PARCEL ADDRESS:   ROCK CREEK LN
EXEMPTION CODES:

PIDN:   2-630601
ACRES:   45.732

| NON-HOMESITE VAL | APPRAISED VALUE | | | | | |
|---|---|---|---|---|---|---|
| 796,834 | 796,834 | | | | | |
| TAXING ENTITIES | EXEMPTION AMOUNT | TAXABLE VALUE | TAX RATE PER $100 | BASE TAX | PENALTY & INTEREST |
| FRISCO CITY | 0 | 796,834 | 0.425517 | 3390.66 | 440.79 |
| | | | SUBTOTAL | 3,390.66 | 440.79 |
| | | | PRIOR YEARS | 11.93 | |
| | | | PENALTY & INTEREST | 440.79 | |
| | | | **TOTAL AMOUNT DUE** | **3,843.38** | |

**IF THE PROPERTY DESCRIBED IN THIS DOCUMENT IS YOUR RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE COLLIN COUNTY TAX OFFICE REGARDING A RIGHT YOU MAY HAVE TO ENTER INTO AN INSTALLMENT AGREEMENT DIRECTLY WITH THE COLLIN COUNTY TAX OFFICE FOR THE PAYMENT OF THESE TAXES.**

*This top portion and your canceled check will serve as your receipt.*

**^** *Detach on perforation and return this portion with your check payable to:*

**Collin County**
**P.O. Box 8046**
**McKinney, TX 75070**
**972-547-5020**

| TOTAL AMOUNT DUE |
|---|
| **$3,843.38** |

**^^AMOUNT DUE ON RECEIPT^^**

OWNER: NCI STEWART CREEK LLC
2-630601

**NOTE: TOTAL SHOWS CURRENT AND PRIOR YEAR TAXES DUE.**
ACCOUNT:   R94480A000002   2024+

NCI STEWART CREEK LLC
6716 GLENHURST DR
DALLAS TX 75254-8621

| IF PAID IN | AMOUNT DUE |
|---|---|
| JUN | 3,911.28 |
| JUL | 4,613.24 |
| AUG | 4,652.32 |
| SEP | 4,691.40 |
| OCT | 4,730.50 |
| NOV | 4,769.58 |

20240R94480A000002000038433800003911280000461324000000000000C01

**FSD2025-0116**

**2025-08-19**
**379**

**CONFIDENTIAL**

**TDIT005417**

# FORM ADV

### UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND REPORT BY EXEMPT REPORTING ADVISERS

| | |
|---|---|
| Primary Business Name: RAND ADVISORS, LLC | CRD Number: 172839 |
| Annual Amendment - All Sections | Rev. 10/2021 |
| 3/17/2025 8:51:05 AM | |

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 4.

### Item 1 Identifying Information

Responses to this Item tell us who you are, where you are doing business, and how we can contact you. If you are filing an *umbrella registration*, the information in Item 1 should be provided for the *filing adviser* only. General Instruction 5 provides information to assist you with filing an *umbrella registration*.

A.   Your full legal name (if you are a sole proprietor, your last, first, and middle names):
   **RAND ADVISORS, LLC**

B.   (1) Name under which you primarily conduct your advisory business, if different from Item 1.A.
   **RAND ADVISORS, LLC**

   List on *Section 1.B. of Schedule D* any additional names under which you conduct your advisory business.

   (2) If you are using this Form ADV to register more than one investment adviser under an *umbrella registration*, check this box ☐

   *If you check this box, complete a Schedule R for each relying adviser.*

C.   If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.(1)), enter the new name and specify whether the name change is of
   ☐ your legal name or ☐ your primary business name:

D.   (1) If you are registered with the SEC as an investment adviser, your SEC file number: **801-80265**

   (2) If you report to the SEC as an *exempt reporting adviser*, your SEC file number:

   (3) If you have one or more Central Index Key numbers assigned by the SEC ("CIK Numbers"), all of your CIK numbers:

| CIK Number |
|---|
| 1660386 |
| 1660401 |

E.   (1) If you have a number ("*CRD* Number") assigned by the *FINRA's CRD* system or by the IARD system, your *CRD* number: **172839**

   *If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

   (2) If you have additional *CRD* Numbers, your additional *CRD* numbers:

                                    No Information Filed

F.   *Principal Office and Place of Business*

   (1) Address (do not use a P.O. Box):

   | Number and Street 1: | | Number and Street 2: | |
   |---|---|---|---|
   | 2101 CEDAR SPRINGS ROAD | | SUITE 1200 | |
   | City: | State: | Country: | ZIP+4/Postal Code: |
   | DALLAS | Texas | United States | 75201 |

   If this address is a private residence, check this box: ☐

   List on *Section 1.F. of Schedule D* any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for SEC registration, if you are registered only with the SEC, or if you are reporting to the SEC as an exempt reporting adviser, list the largest twenty-five offices in terms of numbers of employees as of the end of your most recently completed fiscal year.

   (2) Days of week that you normally conduct business at your *principal office and place of business*:
   ⦿ Monday - Friday ○ Other:

   Normal business hours at this location:
   9AM-5PM

   (3) Telephone number at this location:
   214-908-8130

   (4) Facsimile number at this location, if any:

**CONFIDENTIAL**                                      380                    **TDП005418**

461

(5) What is the total number of offices, other than your *principal office and place of business*, at which you conduct investment advisory business as of the end of your most recently completed fiscal year?

0

G.  Mailing address, if different from your *principal office and place of business* address:

Number and Street 1:                                    Number and Street 2:

City:                    State:                    Country:                    ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

H.  If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

Number and Street 1:                                    Number and Street 2:

City:                    State:                    Country:                    ZIP+4/Postal Code:

| | | Yes | No |
|---|---|---|---|

I.  Do you have one or more websites or accounts on publicly available social media platforms (including, but not limited to, Twitter, Facebook and LinkedIn)?    ◉  ○

*If "yes," list all firm website addresses and the address for each of the firm's accounts on publicly available social media platforms on Section 1.I. of Schedule D. If a website address serves as a portal through which to access other information you have published on the web, you may list the portal without listing addresses for all of the other information. You may need to list more than one portal address. Do not provide the addresses of websites or accounts on publicly available social media platforms where you do not control the content. Do not provide the individual electronic mail (e-mail) addresses of employees or the addresses of employee accounts on publicly available social media platforms.*

J.  Chief Compliance Officer

(1) Provide the name and contact information of your Chief Compliance Officer. If you are an *exempt reporting adviser*, you must provide the contact information for your Chief Compliance Officer, if you have one. If not, you must complete Item 1.K. below.

Name:                                    Other titles, if any:

Telephone number:                                    Facsimile number, if any:

Number and Street 1:                                    Number and Street 2:

City:                    State:                    Country:                    ZIP+4/Postal Code:

Electronic mail (e-mail) address, if Chief Compliance Officer has one:

(2) If your Chief Compliance Officer is compensated or employed by any *person* other than you, a *related person* or an investment company registered under the Investment Company Act of 1940 that you advise for providing chief compliance officer services to you, provide the *person's* name and IRS Employer Identification Number (if any):

Name:

IRS Employer Identification Number:

K.  Additional Regulatory Contact Person: If a person other than the Chief Compliance Officer is authorized to receive information and respond to questions about this Form ADV, you may provide that information here.

Name:                                    Titles:

Telephone number:                                    Facsimile number, if any:

Number and Street 1:                                    Number and Street 2:

City:                    State:                    Country:                    ZIP+4/Postal Code:

Electronic mail (e-mail) address, if contact person has one:

| | | Yes | No |
|---|---|---|---|

L.  Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*?    ◉  ○

*If "yes," complete Section 1.L. of Schedule D.*

| | | Yes | No |
|---|---|---|---|

M.  Are you registered with a *foreign financial regulatory authority*?    ○  ◉

*Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes," complete Section 1.M. of Schedule D.*

| | | Yes | No |
|---|---|---|---|

N.  Are you a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934?    ○  ◉

| | | Yes | No |
|---|---|---|---|

O.  Did you have $1 billion or more in assets on the last day of your most recent fiscal year?    ○  ◉

If yes, what is the approximate amount of your assets:

**CONFIDENTIAL**                                                        381

○ $10 billion to less than $50 billion

○ $50 billion or more

*For purposes of Item 1.O. only, "assets" refers to your total assets, rather than the assets you manage on behalf of clients. Determine your total assets using the total assets shown on the balance sheet for your most recent fiscal year end.*

P.    Provide your *Legal Entity Identifier* if you have one:

A *legal entity identifier* is a unique number that companies use to identify each other in the financial marketplace. You may not have a *legal entity identifier*.

---

**SECTION 1.B. Other Business Names**

No Information Filed

---

**SECTION 1.F. Other Offices**

No Information Filed

---

**SECTION 1.I. Website Addresses**

List your website addresses, including addresses for accounts on publicly available social media platforms where you control the content (including, but not limited to, Twitter, Facebook and/or LinkedIn). You must complete a separate Schedule D Section 1.I. for each website or account on a publicly available social media platform.

Address of Website/Account on Publicly Available Social Media Platform:    HTTP://WWW.RANDADVISORS.COM/

---

**SECTION 1.L. Location of Books and Records**

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business*. You must complete a separate Schedule D, Section 1.L. for each location.

Name of entity where books and records are kept:
HIGHGATE CONSULTING GROUP INC

Number and Street 1:
2101 CEDAR SPRINGS RD

Number and Street 2:
SUITE 1200

| City: | State: | Country: | ZIP+4/Postal Code: |
|---|---|---|---|
| DALLAS | Texas | United States | 75201 |

If this address is a private residence, check this box: ☐

Telephone Number:
214-550-4459

Facsimile number, if any:

This is (check one):
○ one of your branch offices or affiliates.
◉ a third-party unaffiliated recordkeeper.
○ other.

Briefly describe the books and records kept at this location.
ALL BOOKS AND RECORDS OF THE ADVISER

---

**SECTION 1.M. Registration with Foreign Financial Regulatory Authorities**

463

*Uncheck for attributed*

## Item 2 SEC Registration/Reporting

Responses to this Item help us (and you) determine whether you are eligible to register with the SEC. Complete this Item 2.A. only if you are applying for SEC registration or submitting an *annual updating amendment* to your SEC registration. If you are filing an *umbrella registration*, the information in Item 2 should be provided for the *filing adviser* only.

A.  To register (or remain registered) with the SEC, you must check **at least one** of the Items 2.A.(1) through 2.A.(12), below. If you are submitting an *annual updating amendment* to your SEC registration and you are no longer eligible to register with the SEC, check Item 2.A.(13). Part 1A Instruction 2 provides information to help you determine whether you may affirmatively respond to each of these items.

You (the adviser):

☑  (1)  are a **large advisory firm** that either:

(a)  has regulatory assets under management of $100 million (in U.S. dollars) or more;  or

(b)  has regulatory assets under management of $90 million (in U.S. dollars) or more at the time of filing its most recent *annual updating amendment* and is registered with the SEC;

☐  (2)  are a **mid-sized advisory firm** that has regulatory assets under management of $25 million (in U.S. dollars) or more but less than $100 million (in U.S. dollars) and you are either:

(a)  not required to be registered as an adviser with the *state securities authority* of the state where you maintain your *principal office and place of business*; or

(b)  not subject to examination by the *state securities authority* of the state where you maintain your *principal office and place of business*;

Click HERE for a list of states in which an investment adviser, if registered, would not be subject to examination by the state securities authority.

(3)  Reserved

☐  (4)  have your *principal office and place of business* **outside the United States**;

☐  (5)  are **an investment adviser (or subadviser) to an investment company** registered under the Investment Company Act of 1940;

☐  (6)  are **an investment adviser to a company which has elected to be a business development company** pursuant to section 54 of the Investment Company Act of 1940 and has not withdrawn the election, and you have at least $25 million of regulatory assets under management;

☐  (7)  are a **pension consultant** with respect to assets of plans having an aggregate value of at least $200,000,000 that qualifies for the exemption in rule 203A-2(a);

☐  (8)  are a **related adviser** under rule 203A-2(b) that *controls*, is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

If you check this box, complete *Section 2.A.(8) of Schedule D.*

☐  (9)  are an **adviser** relying on rule 203A-2(c) because you **expect to be eligible for SEC registration within 120 days;**

If you check this box, complete *Section 2.A.(9) of Schedule D.*

☐  (10)  are a **multi-state adviser** that is required to register in 15 or more states and is relying on rule 203A-2(d);

If you check this box, complete *Section 2.A.(10) of Schedule D.*

☐  (11)  are an **Internet adviser** relying on rule 203A-2(e);

If you check this box, complete *Section 2.A.(11) of Schedule D.*

☐  (12)  have **received an SEC order** exempting you from the prohibition against registration with the SEC;

If you check this box, complete *Section 2.A.(12) of Schedule D.*

☐  (13)  are **no longer eligible** to remain registered with the SEC.

### *State Securities Authority Notice Filings* and State Reporting by *Exempt Reporting Advisers*

C.  Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings*. In addition, *exempt reporting advisers* may be required to provide *state securities authorities* with a copy of reports and any amendments they file with the SEC. If this is an initial application or report, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to direct your *notice filings* or reports to additional state(s), check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* or reports from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

Jurisdictions

| | | | |
|---|---|---|---|
| ☐ AL | ☐ IL | ☐ NE | ☐ SC |
| ☐ AK | ☐ IN | ☐ NV | ☐ SD |
| ☐ AZ | ☐ IA | ☐ NH | ☐ TN |
| ☐ AR | ☐ KS | ☐ NJ | ☑ TX |

| | | | |
|---|---|---|---|
| ☐ CO | ☐ KY | ☑ NY | ☐ UT |
| ☐ CT | ☐ LA | ☐ NC | ☐ VT |
| ☐ DE | ☐ ME | ☐ ND | ☐ VI |
| ☐ DC | ☐ MD | ☐ OH | ☐ VA |
| ☐ FL | ☐ MA | ☐ OK | ☐ WA |
| ☐ GA | ☐ MI | ☐ OR | ☐ WV |
| ☐ GU | ☐ MN | ☐ PA | ☐ WI |
| ☐ HI | ☐ MS | ☐ PR | ☐ WY |
| ☐ ID | ☐ MO | ☐ RI | |
| | ☐ MT | | |

*If you are amending your registration to stop your notice filings or reports from going to a state that currently receives them and you do not want to pay that state's notice filing or report filing fee for the coming year, your amendment must be filed before the end of the year (December 31).*

**SECTION 2.A.(8) Related Adviser**

If you are relying on the exemption in rule 203A-2(b) from the prohibition on registration because you *control*, are *controlled* by, or are under common *control* with an investment adviser that is registered with the SEC and your *principal office and place of business* is the same as that of the registered adviser, provide the following information:

Name of Registered Investment Adviser

*CRD* Number of Registered Investment Adviser

SEC Number of Registered Investment Adviser
-

**SECTION 2.A.(9) Investment Adviser Expecting to be Eligible for Commission Registration within 120 Days**

If you are relying on rule 203A-2(c), the exemption from the prohibition on registration available to an adviser that expects to be eligible for SEC registration within 120 days, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

☐ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☐ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

**SECTION 2.A.(10) Multi-State Adviser**

If you are relying on rule 203A-2(d), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 15 or more states to register as an investment adviser with the *state securities authorities* in those states.

☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 15 states to register as an investment adviser with the *state securities authorities* of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 15 states to register as an investment adviser with the *state securities authorities* in those states.

**SECTION 2.A.(11) Internet Adviser**

If you are relying on rule 203A-2(e), the Internet adviser exemption from the prohibition on registration, you are required to make a representation about your eligibility for SEC registration. By checking the appropriate box, you will be deemed to have made the required representation.

If you are applying for registration as an investment adviser with the SEC or changing your existing Item 2 response regarding your eligibility for SEC registration, you must make this representation:

☐ I will provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

If you are filing an annual updating amendment to your existing registration and are continuing to rely on the Internet adviser exemption for SEC registration, you must make this representation:

☐ I have provided and will continue to provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

CONFIDENTIAL    TDM005422

**SECTION 2.A.(12) SEC Exemptive *Order***

If you are relying upon an SEC *order* exempting you from the prohibition on registration, provide the following information:

Application Number:

803-

Date of *order*:

---

**Item 3 Form of Organization**

If you are filing an *umbrella registration*, the information in Item 3 should be provided for the *filing adviser* only.

A.  How are you organized?
   - ○ Corporation
   - ○ Sole Proprietorship
   - ○ Limited Liability Partnership (LLP)
   - ○ Partnership
   - ◉ Limited Liability Company (LLC)
   - ○ Limited Partnership (LP)
   - ○ Other (specify):

   *If you are changing your response to this Item, see Part 1A Instruction 4.*

B.  In what month does your fiscal year end each year?
   DECEMBER

C.  Under the laws of what state or country are you organized?
   State      Country
   Delaware  United States

   *If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.*

   *If you are changing your response to this Item, see Part 1A Instruction 4.*

---

**Item 4 Successions**

|   |   | Yes | No |
|---|---|---|---|
| A. | Are you, at the time of this filing, succeeding to the business of a registered investment adviser, including, for example, a change of your structure or legal status (e.g., form of organization or state of incorporation)? | ○ | ◉ |

   *If "yes", complete Item 4.B. and Section 4 of Schedule D.*

B.  Date of Succession: (MM/DD/YYYY)

   *If you have already reported this succession on a previous Form ADV filing, do not report the succession again. Instead, check "No." See Part 1A Instruction 4.*

---

**SECTION 4 Successions**

No Information Filed

---

**Item 5 Information About Your Advisory Business - Employees, Clients, and Compensation**

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. Part 1A Instruction 5.a. provides additional guidance to newly formed advisers for completing this Item 5.

**Employees**

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Item 5.A. and Items 5.B.(1), (2), (3), (4), and (5). If an employee performs more than one function, you should count that employee in each of your responses to Items 5.B.(1), (2), (3), (4), and (5).*

CONFIDENTIAL TDI1005423

466

FSD2025-0116                                                                                                                    2025-08-19

A.    Approximately how many *employees* do you have? Include full and part-time *employees* but do not include any clerical workers.

1

B.    (1)    Approximately how many of the *employees* reported in 5.A. perform investment advisory functions (including research)?

1

(2)    Approximately how many of the *employees* reported in 5.A. are registered representatives of a broker-dealer?

0

(3)    Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives*?

0

(4)    Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives* for an investment adviser other than you?

0

(5)    Approximately how many of the *employees* reported in 5.A. are licensed agents of an insurance company or agency?

0

(6)    Approximately how many firms or other *persons* solicit advisory *clients* on your behalf?

0

*In your response to Item 5.B.(6), do not count any of your employees and count a firm only once – do not count each of the firm's employees that solicit on your behalf.*

### Clients

*In your responses to Items 5.C. and 5.D. do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

C.    (1)    To approximately how many *clients* for whom you do not have regulatory assets under management did you provide investment advisory services during your most recently completed fiscal year?

0

(2)    Approximately what percentage of your *clients* are non-*United States persons*?

0%

D.    *For purposes of this Item 5.D., the category "individuals" includes trusts, estates, and 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships.*
*The category "business development companies" consists of companies that have made an election pursuant to section 54 of the Investment Company Act of 1940. Unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, do not answer (1)(d) or (3)(d) below.*

Indicate the approximate number of your *clients* and amount of your total regulatory assets under management (reported in Item 5.F. below) attributable to each of the following type of *client*. If you have fewer than 5 *clients* in a particular category (other than (d), (e), and (f)) you may check Item 5.D.(2) rather than respond to Item 5.D.(1).

The aggregate amount of regulatory assets under management reported in Item 5.D.(3) should equal the total amount of regulatory assets under management reported in Item 5.F.(2)(c) below.

If a *client* fits into more than one category, select one category that most accurately represents the *client* to avoid double counting *clients* and assets. If you advise a registered investment company, business development company, or pooled investment vehicle, report those assets in categories (d), (e), and (f) as applicable.

| Type of *Client* | (1) Number of Client(s) | (2) Fewer than 5 *Clients* | (3) Amount of Regulatory Assets under Management |
|---|---|---|---|
| (a) Individuals (other than *high net worth individuals*) | 0 | ☐ | $ 0 |
| (b) *High net worth individuals* | 0 | ☐ | $ 0 |
| (c) Banking or thrift institutions | 0 | ☐ | $ 0 |
| (d) Investment companies | 0 | | $ 0 |
| (e) Business development companies | 0 | | $ 0 |
| (f) Pooled investment vehicles (other than investment companies and business development companies) | 3 | | $ 153,660,847 |
| (g) Pension and profit sharing plans (but not the plan participants or government pension plans) | 0 | ☐ | $ 0 |
| (h) Charitable organizations | 0 | ☐ | $ 0 |
| (i) State or municipal *government entities* (including government pension plans) | 0 | ☐ | $ 0 |
| (j) Other investment advisers | 0 | ☐ | $ 0 |

CONFIDENTIAL

386

TDM005424

| (k) Insurance companies | 0 | ☐ | $ 0 |
| (l) Sovereign wealth funds and foreign official institutions | 0 | ☐ | $ 0 |
| (m) Corporations or other businesses not listed above | 0 | ☐ | $ 0 |
| (n) Other: | 0 | ☐ | $ 0 |

**Compensation Arrangements**

E.   You are compensated for your investment advisory services by (check all that apply):
   ☑ (1)   A percentage of assets under your management
   ☐ (2)   Hourly charges
   ☐ (3)   Subscription fees (for a newsletter or periodical)
   ☐ (4)   Fixed fees (other than subscription fees)
   ☐ (5)   Commissions
   ☐ (6)   *Performance-based fees*
   ☐ (7)   Other (specify):

---

**Item 5 Information About Your Advisory Business - Regulatory Assets Under Management**

**Regulatory Assets Under Management**

                                                                                             Yes   No

F.   (1)   Do you provide continuous and regular supervisory or management services to securities portfolios?   ◉   ○

   (2)   If yes, what is the amount of your regulatory assets under management and total number of accounts?

                                          U.S. Dollar Amount                    Total Number of Accounts
   Discretionary:                  (a)  $ 153,660,847                   (d)  80
   Non-Discretionary:            (b)  $ 0                                    (e)  0
   Total:                             (c)  $ 153,660,847                   (f)  80

   *Part 1A Instruction 5.b.* explains how to calculate your regulatory assets under management. You must follow these instructions carefully when completing this Item.

   (3)   What is the approximate amount of your total regulatory assets under management (reported in Item 5.F.(2)(c) above) attributable to *clients* who are non-*United States persons*?

      $ 0

---

**Item 5 Information About Your Advisory Business - Advisory Activities**

**Advisory Activities**

G.   What type(s) of advisory services do you provide? Check all that apply.
   ☐ (1)   Financial planning services
   ☐ (2)   Portfolio management for individuals and/or small businesses
   ☐ (3)   Portfolio management for investment companies (as well as "business development companies" that have made an election pursuant to section 54 of the Investment Company Act of 1940)
   ☑ (4)   Portfolio management for pooled investment vehicles (other than investment companies)
   ☐ (5)   Portfolio management for businesses (other than small businesses) or institutional *clients* (other than registered investment companies and other pooled investment vehicles)
   ☐ (6)   Pension consulting services
   ☐ (7)   Selection of other advisers (including *private fund* managers)
   ☐ (8)   Publication of periodicals or newsletters
   ☐ (9)   Security ratings or pricing services
   ☐ (10)  Market timing services
   ☐ (11)  Educational seminars/workshops
   ☐ (12)  Other(specify):

   *Do not check Item 5.G.(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, including as a subadviser. If you check Item 5.G.(3), report the 811 or 814 number of the investment company or investment companies to which you provide advice in* Section 5.G.(3) of Schedule D.

H.   If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?

   ○  0
   ○  1 - 10
   ○  11 - 25
   ○  26 - 50
   ○  51 - 100
   ○  101 - 250
   ○  251 - 500
   ○  More than 500
      If more than 500, how many?
      (round to the nearest 500)

CONFIDENTIAL                                                           TDM005425

*In your responses to this Item 5.H., do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

|  |  | Yes | No |
|---|---|---|---|
| I. | (1) Do you participate in a *wrap fee program*? | ○ | ◉ |

(2) If you participate in a *wrap fee program*, what is the amount of your regulatory assets under management attributable to acting as:

    (a) *sponsor* to a *wrap fee program*
        $

    (b) portfolio manager for a *wrap fee program*?
        $

    (c) *sponsor* to and portfolio manager for the same *wrap fee program*?
        $

*If you report an amount in Item 5.I.(2)(c), do not report that amount in Item 5.I.(2)(a) or Item 5.I.(2)(b).*

*If you are a portfolio manager for a wrap fee program, list the names of the programs, their sponsors and related information in Section 5.I.(2) of Schedule D.*

*If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients, or you advise a mutual fund that is offered through a wrap fee program, do not check Item 5.I.(1) or enter any amounts in response to Item 5.I.(2).*

|  |  | Yes | No |
|---|---|---|---|
| J. | (1) In response to Item 4.B. of Part 2A of Form ADV, do you indicate that you provide investment advice only with respect to limited types of investments? | ○ | ◉ |
|  | (2) Do you report *client* assets in Item 4.E. of Part 2A that are computed using a different method than the method used to compute your regulatory assets under management? | ○ | ◉ |

K.      Separately Managed Account *Clients*

|  | Yes | No |
|---|---|---|
| (1) Do you have regulatory assets under management attributable to *clients* other than those listed in Item 5.D.(3)(d)-(f) (separately managed account *clients*)? | ○ | ◉ |

*If yes, complete Section 5.K.(1) of Schedule D.*

|  | Yes | No |
|---|---|---|
| (2) Do you engage in borrowing transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ◉ |

*If yes, complete Section 5.K.(2) of Schedule D.*

|  | Yes | No |
|---|---|---|
| (3) Do you engage in derivative transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ◉ |

*If yes, complete Section 5.K.(2) of Schedule D.*

|  | Yes | No |
|---|---|---|
| (4) After subtracting the amounts in Item 5.D.(3)(d)-(f) above from your total regulatory assets under management, does any custodian hold ten percent or more of this remaining amount of regulatory assets under management? | ○ | ◉ |

*If yes, complete Section 5.K.(3) of Schedule D for each custodian.*

L.      Marketing Activities

(1) Do any of your *advertisements* include:

|  | Yes | No |
|---|---|---|
| (a) Performance results? | ○ | ◉ |
| (b) A reference to specific investment advice provided by you (as that phrase is used in rule 206(4)-1(a)(5))? | ○ | ◉ |
| (c) *Testimonials* (other than those that satisfy rule 206(4)-1(b)(4)(ii))? | ○ | ◉ |
| (d) *Endorsements* (other than those that satisfy rule 206(4)-1(b)(4)(ii))? | ○ | ◉ |
| (e) *Third-party ratings*? | ○ | ◉ |
| (2) If you answer "yes" to L(1)(c), (d), or (e) above, do you pay or otherwise provide cash or non-cash compensation, directly or indirectly, in connection with the use of *testimonials*, *endorsements*, or *third-party ratings*? | ○ | ○ |
| (3) Do any of your *advertisements* include *hypothetical performance*? | ○ | ◉ |

**CONFIDENTIAL**

---

### SECTION 5.G.(3) Advisers to Registered Investment Companies and Business Development Companies

No Information Filed

---

### SECTION 5.I.(2) *Wrap Fee Programs*

No Information Filed

---

### SECTION 5.K.(1) Separately Managed Accounts

After subtracting the amounts reported in Item 5.D.(3)(d)-(f) from your total regulatory assets under management, indicate the approximate percentage of this remaining amount attributable to each of the following categories of assets. If the remaining amount is at least $10 billion in regulatory assets under management, complete Question (a). If the remaining amount is less than $10 billion in regulatory assets under management, complete Question (b).

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment* . Mid-year is the date six months before the end of year date. Each column should add up to 100% and numbers should be rounded to the nearest percent.

Investments in derivatives, registered investment companies, business development companies, and pooled investment vehicles should be reported in those categories. Do not report those investments based on related or underlying portfolio assets. Cash equivalents include bank deposits, certificates of deposit, bankers' acceptances and similar bank instruments.

Some assets could be classified into more than one category or require discretion about which category applies. You may use your own internal methodologies and the conventions of your service providers in determining how to categorize assets, so long as the methodologies or conventions are consistently applied and consistent with information you report internally and to current and prospective clients. However, you should not double count assets, and your responses must be consistent with any instructions or other guidance relating to this Section.

(a)

| Asset Type | | Mid-year | End of year |
|---|---|---|---|
| (i) | Exchange-Traded Equity Securities | % | % |
| (ii) | Non Exchange-Traded Equity Securities | % | % |
| (iii) | U.S. Government/Agency Bonds | % | % |
| (iv) | U.S. State and Local Bonds | % | % |
| (v) | *Sovereign Bonds* | % | % |
| (vi) | Investment Grade Corporate Bonds | % | % |
| (vii) | Non-Investment Grade Corporate Bonds | % | % |
| (viii) | Derivatives | % | % |
| (ix) | Securities Issued by Registered Investment Companies or Business Development Companies | % | % |
| (x) | Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development Companies) | % | % |
| (xi) | Cash and Cash Equivalents | % | % |
| (xii) | Other | % | % |

Generally describe any assets included in "Other"

(b)

| Asset Type | | End of year |
|---|---|---|
| (i) | Exchange-Traded Equity Securities | % |
| (ii) | Non Exchange-Traded Equity Securities | % |
| (iii) | U.S. Government/Agency Bonds | % |
| (iv) | U.S. State and Local Bonds | % |
| (v) | *Sovereign Bonds* | % |
| (vi) | Investment Grade Corporate Bonds | % |
| (vii) | Non-Investment Grade Corporate Bonds | % |
| (viii) | Derivatives | % |
| (ix) | Securities Issued by Registered Investment Companies or Business Development Companies | % |
| (x) | Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development | % |

CONFIDENTIAL                                                                              TDM005427

470

| | |
|---|---|
| (xi)   Cash and Cash Equivalents | % |
| (xii)  Other | % |

Generally describe any assets included in "Other"

---

**SECTION 5.K.(2) Separately Managed Accounts - Use of *Borrowings* and Derivatives**

☑ **No information is required to be reported in this Section 5.K.(2) per the instructions of this Section 5.K.(2)**

If your regulatory assets under management attributable to separately managed accounts are at least $10 billion, you should complete Question (a). If your regulatory assets under management attributable to separately managed accounts are at least $500 million but less than $10 billion, you should complete Question (b).

(a)   In the table below, provide the following information regarding the separately managed accounts you advise. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise. End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. Mid-year is the date six months before the end of year date.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

In column 3, provide aggregate *gross notional value* of derivatives divided by the aggregate regulatory assets under management of the accounts included in column 1 with respect to each category of derivatives specified in 3(a) through (f).

You may, but are not required to, complete the table with respect to any separately managed account with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

(i) Mid-Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equity Derivative* | (e) *Commodity Derivative* | (f) *Other Derivative* |
| Less than 10% | $ | $ | % | % | % | % | % | % |
| 10-149% | $ | $ | % | % | % | % | % | % |
| 150% or more | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(ii) End of Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equity Derivative* | (e) *Commodity Derivative* | (f) *Other Derivative* |
| Less than 10% | $ | $ | % | % | % | % | % | % |
| 10-149% | $ | $ | % | % | % | % | % | % |
| 150% or more | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(b)   In the table below, provide the following information regarding the separately managed accounts you advise as of the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

You may, but are not required to, complete the table with respect to any separately managed accounts with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* |
|---|---|---|
| Less than 10% | $ | $ |
| 10-149% | $ | $ |
| 150% or more | $ | $ |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

---

**SECTION 5.K.(3) Custodians for Separately Managed Accounts**

No Information Filed

---

**Item 6 Other Business Activities**

In this Item, we request information about your firm's other business activities.

A.  You are actively engaged in business as a (check all that apply):
☐  (1)   broker-dealer (registered or unregistered)
☐  (2)   registered representative of a broker-dealer
☐  (3)   commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
☐  (4)   futures commission merchant
☐  (5)   real estate broker, dealer, or agent
☐  (6)   insurance broker or agent
☐  (7)   bank (including a separately identifiable department or division of a bank)
☐  (8)   trust company
☐  (9)   registered municipal advisor
☐  (10)  registered security-based swap dealer
☐  (11)  major security-based swap participant
☐  (12)  accountant or accounting firm
☐  (13)  lawyer or law firm
☐  (14)  other financial product salesperson (specify):

*If you engage in other business using a name that is different from the names reported in Items 1.A. or 1.B.(1), complete Section 6.A. of Schedule D.*

|  |  |  | Yes | No |
|---|---|---|---|---|
| B. | (1) | Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)? | ○ | ◉ |
|  | (2) | If yes, is this other business your primary business? | ○ | ○ |

*If "yes," describe this other business on Section 6.B.(2) of Schedule D, and if you engage in this business under a different name, provide that name.*

|  |  | Yes | No |
|---|---|---|---|
| (3) | Do you sell products or provide services other than investment advice to your advisory *clients*? | ○ | ◉ |

*If "yes," describe this other business on Section 6.B.(3) of Schedule D, and if you engage in this business under a different name, provide that name.*

---

**SECTION 6.A. Names of Your Other Businesses**

No Information Filed

---

**SECTION 6.B.(2) Description of Primary Business**

Describe your primary business (not your investment advisory business):

If you engage in that business under a different name, provide that name:

CONFIDENTIAL
TDIT005429

**SECTION 6.B.(3) Description of Other Products and Services**

Describe other products or services you sell to your *client*. You may omit products and services that you listed in Section 6.B.(2) above.

If you engage in that business under a different name, provide that name:

---

**Item 7 Financial Industry Affiliations**

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

A. This part of Item 7 requires you to provide information about you and your *related persons*, including foreign affiliates. Your *related persons* are all of your *advisory affiliates* and any *person* that is under common *control* with you.

You have a *related person* that is a (check all that apply):

- ☐ (1) broker-dealer, municipal securities dealer, or government securities broker or dealer (registered or unregistered)
- ☐ (2) other investment adviser (including financial planners)
- ☐ (3) registered municipal advisor
- ☐ (4) registered security-based swap dealer
- ☐ (5) major security-based swap participant
- ☐ (6) commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- ☐ (7) futures commission merchant
- ☐ (8) banking or thrift institution
- ☐ (9) trust company
- ☐ (10) accountant or accounting firm
- ☐ (11) lawyer or law firm
- ☐ (12) insurance company or agency
- ☐ (13) pension consultant
- ☐ (14) real estate broker or dealer
- ☐ (15) sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
- ☐ (16) sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

*Note that Item 7.A. should not be used to disclose that some of your employees perform investment advisory functions or are registered representatives of a broker-dealer. The number of your firm's employees who perform investment advisory functions should be disclosed under Item 5.B.(1). The number of your firm's employees who are registered representatives of a broker-dealer should be disclosed under Item 5.B.(2).*

*Note that if you are filing an umbrella registration, you should not check Item 7.A.(2) with respect to your relying advisers, and you do not have to complete Section 7.A. in Schedule D for your relying advisers. You should complete a Schedule R for each relying adviser.*

*For each related person, including foreign affiliates that may not be registered or required to be registered in the United States, complete Section 7.A. of Schedule D.*

*You do not need to complete Section 7.A. of Schedule D for any related person if: (1) you have no business dealings with the related person in connection with advisory services you provide to your clients; (2) you do not conduct shared operations with the related person; (3) you do not refer clients or business to the related person, and the related person does not refer prospective clients or business to you; (4) you do not share supervised persons or premises with the related person; and (5) you have no reason to believe that your relationship with the related person otherwise creates a conflict of interest with your clients.*

*You must complete Section 7.A. of Schedule D for each related person acting as qualified custodian in connection with advisory services you provide to your clients (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)), regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

---

**SECTION 7.A. Financial Industry Affiliations**

No Information Filed

---

**Item 7 *Private Fund* Reporting**

                                              Yes   No

B. Are you an adviser to any *private fund*?                               ◉   ○

*If "yes," then for each private fund that you advise, you must complete a Section 7.B.(1) of Schedule D, except in certain circumstances described in the next sentence and in Instruction 6 of the Instructions to Part 1A. If you are registered or applying for registration with the SEC or reporting as an SEC exempt reporting adviser, and another SEC-registered adviser or SEC exempt reporting adviser reports this information with respect to any such private fund in Section 7.B.(1) of Schedule D of its Form ADV (e.g., if you are a subadviser), do not complete Section 7.B.(1) of Schedule D with respect to that private fund. You must, instead, complete Section 7.B.(2) of Schedule D.*

*In either case, if you seek to preserve the anonymity of a private fund client by maintaining its identity in your books and records in numerical or alphabetical code, or similar designation, pursuant to rule 204-2(d), you may identify the private fund in Section 7.B.(1) or 7.B.(2) of Schedule D using the same code or designation in place of the fund's name.*

**CONFIDENTIAL**              392         **TDII005430**

**SECTION 7.B.(1)** *Private Fund* Reporting

**Funds per Page:** 15 ▾ Total Funds: 2

A. PRIVATE FUND

**Information About the *Private Fund***

1.  (a) Name of the *private fund*:

ATLAS IDF, LP

(b) *Private fund* identification number:
(include the "805-" prefix also)

805-9274628204

2.  Under the laws of what state or country is the *private fund* organized:

State:                          Country:

Delaware                        United States

3.  (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
| --- |
| ATLAS IDF GP, LLC |

(b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
| --- |

4.  The *private fund* (check all that apply; you must check at least one):

☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
| --- |

                                                                 **Yes  No**

6.  (a) Is this a "master fund" in a master-feeder arrangement?                                              ○   ◉

(b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
| --- |

                                                                  **Yes  No**

(c) Is this a "feeder fund" in a master-feeder arrangement?                                              ○   ◉

(d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
| --- |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

**CONFIDENTIAL**                                                                    393

8. (a) Is this *private fund* a "fund of funds"? ○ ◉

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

(b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? ○ ○

**Yes No**

9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? ○ ◉

10. What type of fund is the *private fund*?

○ hedge fund ○ liquidity fund ◉ private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:
$ 29,902,788

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:
$ 500,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:
2

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:
0%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:
0%

**Yes No**

(b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? ○ ○

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:
100%

**Your Advisory Services**

**Yes No**

17. (a) Are you a subadviser to this *private fund*? ○ ◉

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
| --- |

**Yes No**

18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? ○ ◉

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
| --- |

**Yes No**

19. Are your *clients* solicited to invest in the *private fund*? ○ ◉

NOTE: For purposes of this question, do not consider feeder funds of the private fund.

20. Approximately what percentage of your *clients* has invested in the *private fund*?
0%

**Private Offering**

**Yes No**

**CONFIDENTIAL** 394 TDﬁ005432

FSD2025-0116 *private fund* ever relied on an exemption from r~~egistration its offerings~~ under Regulation D of the Securities Act of 1933? **2025-08-19**

**Page 479 of 1530**

22. If yes, provide the *private fund's* Form D file number (if any):

| No Information Filed |
|---|

### B. SERVICE PROVIDERS

#### Auditors

|  | Yes | No |
|---|---|---|

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?   ◉ ○

    (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?   ◉ ○

    If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

    **Additional Auditor Information : 1 Record(s) Filed.**

    If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

    (b) Name of the auditing firm:

        COHEN & CO.

    (c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

        City:           State:          Country:
        AKRON           Ohio            United States

                                                                                        Yes   No

    (d) Is the auditing firm an *independent public accountant*?                          ◉    ○

    (e) Is the auditing firm registered with the Public Company Accounting Oversight Board?   ◉    ○

        If yes, Public Company Accounting Oversight Board-Assigned Number:
        925

    (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?   ◉    ○

                                                                                        Yes   No

    (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?   ◉    ○

    (h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

        ◉ Yes  ○ No  ○ Report Not Yet Received

        *If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

#### Prime Broker

                                                                                        Yes   No

24. (a) Does the *private fund* use one or more prime brokers?                            ○    ◉

    If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

    | No Information Filed |
    |---|

#### Custodian

                                                                                        Yes   No

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?   ◉    ○

    If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

    **Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)  Legal name of custodian:
US BANK

(c)  Primary business name of custodian:
US BANK

(d)  The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

**Yes No**

(e)  Is the custodian a *related person* of your firm?                                     ○ ⦿

(f)  If the custodian is a broker-dealer, provide its SEC registration number (if any):

-

CRD Number (if any):

(g)  If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

## Administrator

**Yes No**

26.  (a)  Does the *private fund* use an administrator other than your firm?                ⦿ ○

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b)  Name of administrator:

HIGHGATE CONSULTING GROUP INC

(c)  Location of administrator (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

**Yes No**

(d)  Is the administrator a *related person* of your firm?                                 ○ ⦿

(e)  Does the administrator prepare and send investor account statements to the *private fund's* investors?

⦿ Yes (provided to all investors)  ○ Some (provided to some but not all investors)  ○ No (provided to no investors)

(f)  If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

27.  During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

## Marketers

**Yes No**

28.  (a)  Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?       ○ ⦿

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

| |
|---|
| No Information Filed |

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:

   RAND PE FUND I, L.P.

   (b) *Private fund* identification number:
   (include the "805-" prefix also)

   805-7357834832

2. Under the laws of what state or country is the *private fund* organized:

   State:                                    Country:

   Delaware                                  United States

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| RAND PE FUND MANAGEMENT, LLC |

   (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| |
|---|
| No Information Filed |

4. The *private fund* (check all that apply; you must check at least one):

   ☑ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

   ☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| |
|---|
| No Information Filed |

                                                                                    Yes  No

6. (a) Is this a "master fund" in a master-feeder arrangement?                        ○   ◉

   (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| |
|---|
| No Information Filed |

                                                                                    Yes  No

   (c) Is this a "feeder fund" in a master-feeder arrangement?                        ○   ◉

   (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

   Name of *private fund*:

   *Private fund* identification number:
   (include the "805-" prefix also)

   NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| |
|---|
| No Information Filed |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their

CONFIDENTIAL                                                                          TDM005435

478

FSD2025-0116 ... in a single fund ("master fund"). A fund would also be a feeder fund investing in a "master fund" for purposes of this question where ... 2025-08-19
multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  | | Yes | No |
|---|---|---|---|

8.  (a)  Is this *private fund* a "fund of funds"?  ○ ◉

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

(b)  If yes, does the *private fund* invest in funds managed by you or by a *related person*?  ○ ○

**Yes  No**

9.  During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?  ○ ◉

10.  What type of fund is the *private fund*?

○ hedge fund  ○ liquidity fund  ◉ private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11.  Current gross asset value of the *private fund*:

$ 0

**Ownership**

12.  Minimum investment commitment required of an investor in the *private fund*:

$ 500,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13.  Approximate number of the *private fund's* beneficial owners:

3

14.  What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

0%

15.  (a)  What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

**Yes  No**

(b)  If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*?  ◉ ○

16.  What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

100%

**Your Advisory Services**

**Yes  No**

17.  (a)  Are you a subadviser to this *private fund*?  ○ ◉

(b)  If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

**Yes  No**

18.  (a)  Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*?  ○ ◉

(b)  If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

**Yes  No**

19.  Are your *clients* solicited to invest in the *private fund*?  ○ ◉

NOTE: For purposes of this question, do not consider feeder funds of the private fund.

20.  Approximately what percentage of your *clients* has invested in the *private fund*?

0%

|  | Yes | No |
|---|---|---|

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? ⦿ ○

22. If yes, provide the *private fund's* Form D file number (if any):

| No Information Filed |
|---|

B. SERVICE PROVIDERS

**Auditors**

|  | Yes | No |
|---|---|---|

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? ⦿ ○

(2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? ⦿ ○

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

---

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:

COHEN & CO

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| AKRON | Ohio | United States |

|  | Yes | No |
|---|---|---|

(d) Is the auditing firm an *independent public accountant*? ⦿ ○

(e) Is the auditing firm registered with the Public Company Accounting Oversight Board? ⦿ ○

If yes, Public Company Accounting Oversight Board-Assigned Number:

925

(f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? ⦿ ○

---

|  | Yes | No |
|---|---|---|

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? ⦿ ○

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

⦿ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

|  | Yes | No |
|---|---|---|

24. (a) Does the *private fund* use one or more prime brokers? ○ ⦿

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

| No Information Filed |
|---|

**Custodian**

|  | Yes | No |
|---|---|---|

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? ⦿ ○

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

CONFIDENTIAL

Additional Custodian Information : 1 Record(s) Filed.

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)  Legal name of custodian:
STATE STREET GLOBAL MARKETS, LLC

(c)  Primary business name of custodian:
STATE STREET GLOBAL MARKETS, LLC

(d)  The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| BOSTON | Massachusetts | United States |

**Yes  No**

(e)  Is the custodian a *related person* of your firm?                                   ○  ⊙

(f)  If the custodian is a broker-dealer, provide its SEC registration number (if any):
8 - 69862

CRD Number (if any):
285852

(g)  If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

**Administrator**

**Yes  No**

26.  (a)  Does the *private fund* use an administrator other than your firm?                ⊙  ○

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b)  Name of administrator:
HIGHGATE CONSULTING GROUP INC

(c)  Location of administrator (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

**Yes  No**

(d)  Is the administrator a *related person* of your firm?                                ○  ⊙

(e)  Does the administrator prepare and send investor account statements to the *private fund's* investors?
⊙ Yes (provided to all investors)  ○ Some (provided to some but not all investors)  ○ No (provided to no investors)

(f)  If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

---

27.  During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

Marketers

| | Yes | No |
|---|---|---|

28. (a)  Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?  ○ ◉

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

No Information Filed

**Funds per Page:** 15 ▼  Total Funds: 2

---

**SECTION 7.B.(2)** *Private Fund* **Reporting**

1.  Name of the *private fund*:

RAND ADVISORS SERIES I INSURANCE FUND SERIES INTERESTS OF THE SALI MULTISERIES

2.  *Private fund* identification number:
(include the "805-" prefix also)
805-9425927696

3.  Name and SEC File number of adviser that provides information about this *private fund* in Section 7.B.(1) of Schedule D of its Form ADV filing
Name:
SALI FUND SERVICES
SEC File Number:
801 - 61702

| | Yes | No |
|---|---|---|

4.  Are your *clients* solicited to invest in this *private fund*?  ○ ◉

In answering this question, disregard feeder funds' investment in a master fund. For purposes of this question, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

---

**Item 8 Participation or Interest in *Client* Transactions**

In this Item, we request information about your participation and interest in your *clients*' transactions. This information identifies additional areas in which conflicts of interest may occur between you and your *clients*. Newly-formed advisers should base responses to these questions on the types of participation and interest that you expect to engage in during the next year.

Like Item 7, Item 8 requires you to provide information about you and your *related persons*, including foreign affiliates.

**Proprietary Interest in *Client* Transactions**

| | | Yes | No |
|---|---|---|---|
| A. | Do you or any *related person*: | | |
| | (1) buy securities for yourself from advisory *clients*, or sell securities you own to advisory *clients* (principal transactions)? | ○ | ◉ |
| | (2) buy or sell for yourself securities (other than shares of mutual funds) that you also recommend to advisory *clients*? | ◉ | ○ |
| | (3) recommend securities (or other investment products) to advisory *clients* in which you or any *related person* has some other proprietary (ownership) interest (other than those mentioned in Items 8.A.(1) or (2))? | ◉ | ○ |

**Sales Interest in *Client* Transactions**

| | | Yes | No |
|---|---|---|---|
| B. | Do you or any *related person*: | | |
| | (1) as a broker-dealer or registered representative of a broker-dealer, execute securities trades for brokerage customers in which advisory *client* securities are sold to or bought from the brokerage customer (agency cross transactions)? | ○ | ◉ |
| | (2) recommend to advisory *clients*, or act as a purchaser representative for advisory *clients* with respect to, the purchase of securities for which you or any *related person* serves as underwriter or general or managing partner? | ◉ | ○ |
| | (3) recommend purchase or sale of securities to advisory *clients* for which you or any *related person* has any other sales interest (other than the receipt of sales commissions as a broker or registered representative of a broker-dealer)? | ○ | ◉ |

**Investment or Brokerage Discretion**

| | | Yes | No |
|---|---|---|---|
| C. | Do you or any *related person* have *discretionary authority* to determine the: | | |
| | (1) securities to be bought or sold for a *client's* account? | ◉ | ○ |

**FSD2025-0116** amount of securities to be bought or sold for a *client's* account?                                         **2025-08-19** ○

    (3)  broker or dealer to be used for a purchase or sale of securities for a *client's* account?     ◉ ○

    (4)  commission rates to be paid to a broker or dealer for a *client's* securities transactions?    ◉ ○

D.  If you answer "yes" to C.(3) above, are any of the brokers or dealers *related persons*?    ○ ◉

E.  Do you or any *related person* recommend brokers or dealers to *clients*?    ◉ ○

F.  If you answer "yes" to E. above, are any of the brokers or dealers *related persons*?    ○ ◉

G.  (1)  Do you or any *related person* receive research or other products or services other than execution from a broker-dealer or a third party    ◉ ○
("soft dollar benefits") in connection with *client* securities transactions?

    (2)  If "yes" to G.(1) above, are all the "soft dollar benefits" you or any *related persons* receive eligible "research or brokerage services" under    ◉ ○
section 28(e) of the Securities Exchange Act of 1934?

H.  (1)  Do you or any *related person*, directly or indirectly, compensate any *person* that is not an *employee* for *client* referrals?    ○ ◉

    (2)  Do you or any *related person*, directly or indirectly, provide any *employee* compensation that is specifically related to obtaining *clients* for    ○ ◉
the firm (cash or non-cash compensation in addition to the *employee's* regular salary)?

I.  Do you or any *related person*, including any *employee*, directly or indirectly, receive compensation from any *person* (other than you or any *related*    ○ ◉
*person*) for *client* referrals?

*In your response to Item 8.I., do not include the regular salary you pay to an employee.*

*In responding to Items 8.H. and 8.I., consider all cash and non-cash compensation that you or a related person gave to (in answering Item 8.H.) or received from (in answering Item 8.I.) any person in exchange for client referrals, including any bonus that is based, at least in part, on the number or amount of client referrals.*

---

**Item 9 Custody**

In this Item, we ask you whether you or a *related person* has *custody* of *client* (other than *clients* that are investment companies registered under the Investment Company Act of 1940) assets and about your custodial practices.

                                                         **Yes No**

A.  (1)  Do you have *custody* of any advisory *clients'*:

    (a)  cash or bank accounts?    ◉ ○

    (b)  securities?    ◉ ○

*If you are registering or registered with the SEC, answer "No" to Item 9.A.(1)(a) and (b) if you have custody solely because (i) you deduct your advisory fees directly from your clients' accounts, or (ii) a related person has custody of client assets in connection with advisory services you provide to clients, but you have overcome the presumption that you are not operationally independent (pursuant to Advisers Act rule 206(4)-2(d)(5)) from the related person.*

    (2)  If you checked "yes" to Item 9.A.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which you have *custody*:

    U.S. Dollar Amount                Total Number of *Clients*

    (a) $ 153,649,022              (b) 3

*If you are registering or registered with the SEC and you have custody solely because you deduct your advisory fees directly from your clients' accounts, do not include the amount of those assets and the number of those clients in your response to Item 9.A.(2). If your related person has custody of client assets in connection with advisory services you provide to clients, do not include the amount of those assets and number of those clients in your response to 9.A.(2). Instead, include that information in your response to Item 9.B.(2).*

                                                          **Yes No**

B.  (1)  In connection with advisory services you provide to *clients*, do any of your *related persons* have *custody* of any of your advisory *clients'*:

    (a)  cash or bank accounts?    ○ ◉

    (b)  securities?    ○ ◉

*You are required to answer this item regardless of how you answered Item 9.A.(1)(a) or (b).*

    (2)  If you checked "yes" to Item 9.B.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which your *related persons* have *custody*:

    U.S. Dollar Amount                Total Number of *Clients*

    (a) $                      (b)

C.  If you or your *related persons* have *custody* of *client* funds or securities in connection with advisory services you provide to *clients*, check all the following that apply:

    (1)  A qualified custodian(s) sends account statements at least quarterly to the investors in the pooled investment vehicle(s) you manage.  ☐

    (2)  An *independent public accountant* audits annually the pooled investment vehicle(s) that you manage and the audited financial statements  ☑

**CONFIDENTIAL**                                                     **TDI1005440**

FSD2025-0116 are distributed to the investors in the pools.          **Page 487 of 1530**                                    **2025-08-19**

(3)  An *independent public accountant* conducts an annual surprise examination of *client* funds and securities.   ☐

(4)  An *independent public accountant* prepares an internal control report with respect to custodial services when you or your *related persons* are qualified custodians for *client* funds and securities.   ☐

*If you checked Item 9.C.(2), C.(3) or C.(4), list in Section 9.C. of Schedule D the accountants that are engaged to perform the audit or examination or prepare an internal control report. (If you checked Item 9.C.(2), you do not have to list auditor information in Section 9.C. of Schedule D if you already provided this information with respect to the private funds you advise in Section 7.B.(1) of Schedule D).*

|   |   |   | Yes | No |
|---|---|---|---|---|
| D. | Do you or your *related person(s)* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*? | | | |
| | (1) you act as a qualified custodian | | ○ | ◉ |
| | (2) your *related person(s)* act as qualified custodian(s) | | ○ | ◉ |

*If you checked "yes" to Item 9.D.(2), all related persons that act as qualified custodians (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)) must be identified in Section 7.A. of Schedule D, regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

E.  If you are filing your *annual updating amendment* and you were subject to a surprise examination by an *independent public accountant* during your last fiscal year, provide the date (MM/YYYY) the examination commenced:

F.  If you or your *related persons* have *custody* of *client* funds or securities, how many *persons*, including, but not limited to, you and your *related persons*, act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*?
2

---

**SECTION 9.C.** *Independent Public Accountant*

No Information Filed

---

**Item 10 Control Persons**

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you. If you are filing an *umbrella registration*, the information in Item 10 should be provided for the *filing adviser* only.

If you are submitting an initial application or report, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application or report, you must complete Schedule C.

|   |   | Yes | No |
|---|---|---|---|
| A. | Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies? | ○ | ◉ |

*If yes, complete Section 10.A. of Schedule D.*

B.  If any *person* named in Schedules A, B, or C or in Section 10.A. of Schedule D is a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934, please complete Section 10.B. of Schedule D.

---

**SECTION 10.A.** *Control Persons*

No Information Filed

---

**SECTION 10.B.** *Control Person* **Public Reporting Companies**

No Information Filed

---

**Item 11 Disclosure Information**

In this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below. In accordance with General Instruction 5 to Form ADV, "you" and "your" include the *filing adviser* and all *relying advisers* under an *umbrella registration*.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you.

CONFIDENTIAL                                                                                  TDI1005441

separately identifiable department or division" (See the Glossary of Terms to determine who your *advisory affiliates* are.)

*If you are registered or registering with the SEC or if you are an exempt reporting adviser, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the questions as posed; you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A.(1), 11.A.(2), 11.B.(1), 11.B.(2), 11.D.(4), and 11.H.(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.*

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

| | Yes | No |
|---|---|---|
| Do any of the events below involve you or any of your *supervised persons*? | ○ | ◉ |

For "yes" answers to the following questions, complete a Criminal Action DRP:

A. In the past ten years, have you or any *advisory affiliate*: **Yes No**

(1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? ○ ◉

(2) been *charged* with any *felony*? ○ ◉

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.A.(2) to charges that are currently pending.*

B. In the past ten years, have you or any *advisory affiliate*:

(1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? ○ ◉

(2) been *charged* with a *misdemeanor* listed in Item 11.B.(1)? ○ ◉

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.B.(2) to charges that are currently pending.*

For "yes" answers to the following questions, complete a Regulatory Action DRP:

C. Has the SEC or the Commodity Futures Trading Commission (CFTC) ever: **Yes No**

(1) *found* you or any *advisory affiliate* to have made a false statement or omission? ○ ◉

(2) *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes? ○ ◉

(3) *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? ○ ◉

(4) entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity? ○ ◉

(5) imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity? ○ ◉

D. Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*:

(1) ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical? ○ ◉

(2) ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes? ○ ◉

(3) ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? ○ ◉

(4) in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity? ○ ◉

(5) ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity? ○ ◉

E. Has any *self-regulatory organization* or commodities exchange ever:

(1) *found* you or any *advisory affiliate* to have made a false statement or omission? ○ ◉

(2) *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a "*minor rule violation*" under a plan approved by the SEC)? ○ ◉

(3) *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? ○ ◉

(4) disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities? ○ ◉

F. Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended? ○ ◉

G. Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.? ○ ◉

For "yes" answers to the following questions, complete a Civil Judicial Action DRP:

H. (1) Has any domestic or foreign court: **Yes No**

FSD2025-0116 (1) in the past ten years, *enjoined* you or any *advisory affiliate* in connection with any *investment-related* activity?                                    2025-08-19 ⊙

(b) ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations?   ○ ⊙

(c) ever dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you or any *advisory affiliate* by a state or *foreign financial regulatory authority*?   ○ ⊙

(2) Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H.(1)?   ○ ⊙

---

**Item 12 Small Businesses**

The SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to determine whether you meet the definition of "small business" or "small organization" under rule 0-7.

Answer this Item 12 only if you are registered or registering with the SEC **and** you indicated in response to Item 5.F.(2)(c) that you have regulatory assets under management of less than $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state registration, or switching from SEC to state registration.

For purposes of this Item 12 only:

- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *person's* total assets, you may use the total assets shown on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if that amount is larger).
- *Control* means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise. Any *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the profits, of another *person* is presumed to *control* the other *person*.

|  | Yes | No |
|---|---|---|
| A.  Did you have total assets of $5 million or more on the last day of your most recent fiscal year? | ○ | ○ |

*If "yes," you do not need to answer Items 12.B. and 12.C.*

B.  Do you:

(1) *control* another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year?   ○ ○

(2) *control* another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year?   ○ ○

C.  Are you:

(1) *controlled* by or under common *control* with another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year?   ○ ○

(2) *controlled* by or under common *control* with another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year?   ○ ○

---

**Schedule A**

**Direct Owners and Executive Officers**

1. Complete Schedule A only if you are submitting an initial application or report. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.
2. Direct Owners and Executive Officers. List below the names of:
   (a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required if you are registered or applying for registration and cannot be more than one individual), director, and any other individuals with similar status or functions;
   (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act);
   Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.
   (c) if you are organized as a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;
   (d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and
   (e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.
3. Do you have any indirect owners to be reported on Schedule B?   ⊙ Yes   ○ No
4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.
5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).
6. Ownership codes are:     NA - less than 5%        B - 10% but less than 25%     D - 50% but less than 75%
                                                   A - 5% but less than 10%     C - 25% but less than 50%     E - 75% or more
7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does

FSD2025-0116    not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are    2025-08-19
*control persons*.

(b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

(c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| CHARITABLE DAF HOLDINGS CORP. | DE | OWNER | 08/2022 | E | Y | N | |
| Patrick, Mark | I | CCO | 08/2022 | NA | Y | N | 7626259 |

---

### Schedule B

**Indirect Owners**

1. Complete Schedule B only if you are submitting an initial application or report. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.

2. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:

   (a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation;

   For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (b) in the case of an owner that is a partnership, <u>all</u> general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;

   (c) in the case of an owner that is a trust, the trust and each trustee; and

   (d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.

3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.

5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:    C - 25% but less than 50%    E - 75% or more
                        D - 50% but less than 75%    F - Other (general partner, trustee, or elected manager)

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

   (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Entity in Which Interest is Owned | Status | Date Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|---|
| LIBERTY CLO HOLDCO, LTD. | FE | CHARITABLE DAF HOLDINGS CORP. | OWNER OF CHARITABLE DAF HOLDINGS CORP. | 04/2023 | E | Y | N | |
| CHARITABLE DAF HOLDCO LTD. | FE | LIBERTY CLO HOLDCO, LTD. | OWNER OF CHARITABLE DAF FUND, L.P. | 11/2011 | E | Y | N | |
| CDH GP, LTD | DE | LIBERTY CLO HOLDCO, LTD. | GNEREAL PARTNER OF CHARITABLE DAF FUND, L.P | 03/2024 | F | Y | N | |
| Patrick, Mark | I | CDH GP, LTD | SOLE OWNER AND SOLE DIRECTOR OF CDH GP, LTD. | 03/2024 | E | Y | N | 7626259 |

---

### Schedule D - Miscellaneous

You may use the space below to explain a response to an Item or to provide any other information.

---

### Schedule R

No Information Filed

---

DRP Pages



**CRIMINAL DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

---

**Part 2**

**Exemption from brochure delivery requirements for SEC-registered advisers**

SEC rules exempt SEC-registered advisers from delivering a firm brochure to some kinds of clients.  If these exemptions excuse you from delivering a brochure to *all* of your advisory clients, you do not have to prepare a brochure.

|  | Yes | No |
|---|---|---|
| Are you exempt from delivering a brochure to all of your clients under these rules? | ○ | ◉ |

*If no, complete the ADV Part 2 filing below.*

Amend, retire or file new brochures:

| Brochure ID | Brochure Name | Brochure Type(s) |
|---|---|---|
| 400181 | ADV PART 2A | Private funds or pools |
| 409351 | ADV PART 2 | Private funds or pools |

---

**Part 3**

| CRS | Type(s) | Affiliate Info | Retire |
|---|---|---|---|

There are no CRS filings to display.

---

**Execution Pages**

**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature:      Date: MM/DD/YYYY
SHAWN RAVER      03/17/2025
Printed Name:      Title:
SHAWN RAVER      OPERATIONS

CONFIDENTIAL      TDI1005445

Adviser *CRD* Number:
172839

| **NON-RESIDENT INVESTMENT ADVISER EXECUTION PAGE** |
|---|

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing*.

2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

3. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any *person* subject to your written irrevocable consents or powers of attorney or any of your general partners and *managing agents*.

Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the *non-resident* investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature:                                          Date: MM/DD/YYYY
Printed Name:                                       Title:
Adviser *CRD* Number:
172839

489

# FORM ADV PART 2A

# RAND ADVISORS, LLC

March 2025

2101 Cedar Springs Road, Suite 1200
Dallas, TX  75201
www.RANDADVISORS.com
(214) 288-9555

This brochure provides information about the qualifications and business practices of Rand Advisors, LLC.  If you have any questions about the contents of this brochure, please contact us at mpatrick@randadvisors.com.  The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission or by any state securities authority. Additional information about Rand Advisors, LLC is also available at the Securities and Exchange Commission's website www.adviserinfo.sec.gov.  Our registration as an investment adviser does not imply any level of skill or training.

409

CONFIDENTIAL

TDIT005447

490

## ITEM 2.   MATERIAL CHANGES

As of our last annual amendment filing on March 4, 2024, we have no material changes to disclose.

We will ensure that you receive a summary of any material changes to this and subsequent brochures within 120 days of the close of our fiscal year, which is December 31st.  We will provide other ongoing disclosure information about material changes as they occur.  We will also provide you with information on how to obtain the complete brochure.  Currently, our brochure may be requested at any time, without charge, by contacting Mark Patrick at (214) 908-8130.

ii

410

CONFIDENTIAL

TDIT005448

# ITEM 3.   TABLE OF CONTENTS

ITEM 1.      COVER PAGE ......................................................................................... i

ITEM 2.      MATERIAL CHANGES ......................................................................... ii

ITEM 3.      TABLE OF CONTENTS ....................................................................... iii

ITEM 4.      ADVISORY BUSINESS ......................................................................... 1

ITEM 5.      FEES AND COMPENSATION ............................................................. 2

ITEM 6.      PERFORMANCE-BASED FEES ......................................................... 4

ITEM 7.      TYPES OF CLIENTS ............................................................................ 5

ITEM 8.      METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND
             RISK OF LOSS ...................................................................................... 6

ITEM 9.      DISCIPLINARY INFORMATION ...................................................... 9

ITEM 10.     OTHER FINANCIAL INDUSTRY  ACTIVITIES AND
             AFFILIATIONS ..................................................................................... 10

ITEM 11.     CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT
             TRANSACTIONS AND PERSONAL TRADING ............................. 11

ITEM 12.     BROKERAGE PRACTICES ................................................................ 16

ITEM 13.     REVIEW OF ACCOUNTS .................................................................... 18

ITEM 14.     CLIENT REFERRALS  AND OTHER COMPENSATION ............. 19

ITEM 15.     CUSTODY ............................................................................................... 20

ITEM 16.     INVESTMENT DISCRETION ........................................................... 21

ITEM 17.     VOTING CLIENT SECURITIES ....................................................... 22

ITEM 18.     FINANCIAL INFORMATION ............................................................ 23

# ITEM 4.   ADVISORY BUSINESS

We are the sub-adviser to Rand Advisors Series I Insurance Fund (the "Rand Fund"), and adviser to the Rand PE Fund I, L.P. (the "Rand PE Fund") and Atlas IDF, LP (the "Atlas Fund") (all such entities shall collectively be referred to as the "Funds" or "Clients"), all of which are unregistered investment funds. The Rand Fund held its initial offering in October 2013. The Rand PE Fund and the Atlas Fund were funded in 2015.

OWNERSHIP

Rand Advisors, LLC ("Rand," "Adviser", "we" or "us") is owned 100% by Charitable DAF Holdings Corp. and was founded in 2013 by John Honis.

TYPES OF ADVISORY SERVICES

The Funds are our sole advisory clients at this time.  The Funds seek to achieve their respective investment objectives primarily through the strategies described in "ITEM 8. METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF LOSS" and in the Private Placement Memoranda (each, a "PPM") for each Fund.

REGULATORY ASSETS UNDER MANAGEMENT

As of December 31, 2024, the amount of our total discretionary regulatory assets under management was $153,660,847.

All assets are managed on a discretionary basis.

CONFIDENTIAL                                               TDIT005450

## ITEM 5.   FEES AND COMPENSATION

For providing investment advisory services, Rand typically charges the Client a management fee and other fees as necessary and agreed to (including, but not limited to, expenses related to servicing accounts, such as administration and legal services).   Fees may be deducted directly from the Funds.

We have entered into a shared services agreement with Highgate Consulting Group Inc., d.b.a Skyview ("HCG or "Highgate"). Please refer to the PPM for each Fund for a list of services to be provided by HCG.

The Funds incur brokerage and other transaction costs associated with Rand's management of Client Accounts.   Please see the section titled ITEM 12 <u>Brokerage Practices</u> of this ADV Part 2 for a discussion of Rand's brokerage practices.

FEE SCHEDULE

Please refer to the PPM or other applicable offering documents for each of the Funds for a detailed description of fees, expenses and use of proceeds.

UNREGISTERED INVESTMENT FUNDS

As compensation for our advisory services, each of the Funds typically pays Rand management fees based on each Fund's agreements.   Management fees are based upon outstanding capital accounts or amounts of committed capital.   In some cases, certain investors in one Fund may pay a different fee than others based on the terms of their agreement with Rand.

In addition to management fees, brokerage and transaction costs, investors in the Funds will indirectly bear the fees and expenses paid by the Funds, including custody fees, administration, legal, audit and tax preparation fees, overhead allocation, and certain other fees and expenses.   Each of the Fund's PPM's or offering documents include more detailed information about the fees and expenses paid by each of the Funds.

OTHER COMPENSATION

Fund Accounts may hold significant positions, individually or collectively, in the securities issued by a company.   Accordingly, Rand may have the right to appoint a board member or officer for such company.   Rand may appoint an employee or a third party to such position as it sees fit in the best interest of Rand and the Funds.   Employees are permitted to retain all compensation received for such positions except to the extent contrary to the governing documents for one or more Fund Accounts, in which case the proportion of such compensation related to such Fund Account(s) will be paid to those Account(s) (generally in proportion to relative assets of the Fund Account as of the date paid).

2

CONFIDENTIAL                                                      TDIT005451

In addition, to the extent permitted by the offering and/or governing documents of the applicable advised accounts, Rand and/or its affiliates receive other fees for services provided to portfolio companies, provided such fees are on arms-length terms. See also ITEM 10 <u>Other Financial Industry Activities and Affiliations</u>.

We have established procedures designed to address possible conflicts of interest that such board or officer positions might present, including requiring authorization from the Chief Compliance Officer prior to an officer or employee serving as a board member. As a result of such activities, Rand may acquire confidential information, which may restrict Fund Accounts from transacting in certain securities. As a result, we may not initiate a transaction on behalf of Clients which we otherwise might have.

CONFIDENTIAL TDIT005452

## ITEM 6.   PERFORMANCE-BASED FEES

At this time, we do not charge any performance-based or incentive-based fees or allocations. These are fees or allocations based on a share of capital gains on, or capital appreciation of, the assets of the client.

4

CONFIDENTIAL                                                      TDIT005453

## ITEM 7. TYPES OF CLIENTS

Our sole advisory clients are the Atlas IDF, Rand PE Fund 1 and the Rand Series 1 Fund, all being limited partnerships.

CONFIDENTIAL      TDIT005454

# ITEM 8.   METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF LOSS

INVESTMENT STRATEGY

The items below are general descriptions of the types of investment strategies we currently utilize, although we may add or subtract from this list based on various factors including macro-economic conditions.

INVESTMENT STRATEGIES

### The Rand Series 1 Fund

*Bank Loan Strategy*

Rand's bank loan strategy seeks to generate attractive absolute returns by opportunistically making investments across the capital structure, with a core focus in senior secured bank loans.  The bank loan strategy is long-biased and U.S. focused.

*Structured Finance Investments*

Rand invests in various structured finance instruments, including collateralized loan obligations and collateralized debt obligations.  The rate of return on the structured finance instrument may be determined by applying a multiplier to the rate of total return on the reference loan or loans.  Application of a multiplier is comparable to the use of financial leverage, a speculative technique.  Leverage magnifies the potential for gain and the risk of loss, because of a relatively small decline in the value of a reference loan could result in a relatively large loss for the value of a structured finance instrument.

Please see the PPM for the Rand Series 1 Fund for a complete description of the investment objectives and strategies of the fund.

### The Rand PE Fund 1

The Rand PE Fund's strategy is to invest in small- to medium-sized companies that are involved in (or are the target of) acquisition attempts or tender offers, and/or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies or similar transactions.

Please see the PPM for the Rand Series 1 Fund for a complete description of the investment objectives and strategies of the fund.

6

CONFIDENTIAL                                                      TDIT005455

*The Atlas IDF Fund*

The Atlas Fund's strategy may include investing in long and short equity positions, arbitrage, bank loans, cash, fixed income securities, high yield bonds, derivative transactions, foreign investments, companies, money market instruments, collateralized loan obligations and currency hedging. Please see the PPM for the Rand PE Fund 1 for a complete description of the investment objectives and strategies of the fund.

Please see the PPM for the Atlas IDF Fund for a complete description of the investment objectives and strategies of the fund.

METHOD OF ANALYSIS

The investment process used by Rand to evaluate potential investments employs a combination of rigorous qualitative (issuer, portfolio and legal considerations) and quantitative (structural, cash flow, collateral valuation and pricing/relative value) analysis. Rand uses a proprietary quantitative analytical tool and 3rd party software in connection with gathering information on investments. The sell discipline is largely enforced by ongoing monitoring of individual names.

Other sources of information include obtaining and reviewing due diligence packages prepared by debt issuers and underwriters of institutional private placements and meetings with management of issuers.

MATERIAL RISKS OF SIGNIFICANT STRATEGIES

Some, but not necessarily all, of the risks involved in the strategies used by Rand in order to meet the stated investment objectives in the Funds include:

- Credit
- Illiquid Securities
- Inflation
- Investment in Distressed Assets
- Investments in Structured Finance Instruments
- Investments in Senior Secured Loans
- Maturity
- Market or Interest Rates
- Valuation of Portfolio Holdings
- Competition
- Volatility
- Market Liquidity

7

CONFIDENTIAL                                                          TDIT005456

- Over-the-Counter-Trading

- Leverage

MATERIAL RISKS OF METHODS OF ANALYSIS

Qualitative Analysis – The major risk involved with qualitative analysis is that it is subjective in nature; assigning probability and impacts to risks is a subjective exercise.

Quantitative Analysis – The major risk involved with the use of quantitative risk analysis is the limited availability of data. Therefore, any lack of data concerning the structure, cash flow, collateral valuation and pricing/relative value of the underlying investment can restrict the Adviser's ability to perform thorough research into the suitability of the investment for the Funds.

Please refer to the PPM or other offering documents for each Fund for a complete description of the risks involved with the investment strategies of the Funds.

8

CONFIDENTIAL                                       TDIT005457

500

## ITEM 9.   DISCIPLINARY INFORMATION

We do not have any information to disclose concerning the Adviser or John Honis, Mark Patrick or Shawn Raver.  We adhere to high ethical standards.

9

CONFIDENTIAL                                                TDIT005458

FSD2025-0116                    Page 505 of 1530                    2025-08-19

# ITEM 10.  OTHER FINANCIAL INDUSTRY
## ACTIVITIES AND AFFILIATIONS

We have no industry activities or affiliations to disclose. Additional information regarding potential conflicts of interest is provided in Item 11 Code of Ethics, Participation or Interest in Client Transactions and Personal Trading and the Conflicts of Interest description in the PPM or offering documents for each of the Funds.

FSD2025-0116                                                    2025-08-19
421

CONFIDENTIAL                                                    TDIT005459

502

## ITEM 11.  CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING

We maintain a policy of strict compliance with the highest standards of ethical business conduct and the provisions of applicable federal securities laws, including rules and regulations promulgated by the SEC, and have adopted policies and procedures described in our Code of Ethics. The Code of Ethics applies to each of our "access persons" as defined in the U.S. Investment Advisers Act of 1940.  It is designed to ensure compliance with legal requirements of our standard of business conduct.

A complete copy of our Code of Ethics is available to any client or prospective client upon request.

STANDARDS OF CONDUCT

We and our access persons are expected to comply with all applicable federal and state laws and regulations.  Access persons are expected to adhere to the highest standards of ethical conduct and maintain confidentiality of all information obtained with respect to client matters and bring any risk issues, violations, or potential violations to the attention of our Chief Compliance Officer.  Access persons are expected to deal with clients fairly and disclose any activity that may create an actual or potential conflict of interest between them and us or any client.

ETHICAL BUSINESS PRACTICES

Falsification or alteration of records or reports, also known as a prohibited financial practice, or knowingly approving such conduct is prohibited.  Payments to government officials or employees are prohibited except for political contributions approved by our Chief Compliance Officer. We seek to outperform our competition fairly and honestly and seek competitive advantages through superior performance not illegal or unethical dealings.  Access persons are strictly prohibited from (i) participating in online blogging and communication with the media, and (ii) spreading of false rumors pertaining to any publicly traded company.

CONFIDENTIALITY

Access persons must maintain the confidentiality of our proprietary and confidential information and that of our clients, and must not disclose that information unless the necessary approval is obtained.  We have a particular duty and responsibility, as investment adviser, to safeguard client information.   Information concerning the identity and transactions of investors is confidential, and such information will only be disclosed to those access persons and outside parties who need to know it in order to fulfill their responsibilities.

11

CONFIDENTIAL                                                              TDIT005460

503

GIFT AND ENTERTAINMENT POLICY

Access persons are permitted, on occasion, to accept gifts and invitations to attend entertainment events. When doing so, however, employees should always act in our best interests and that of our clients and should avoid any activity that might create an actual or perceived conflict of interest or impropriety in the course of our business relationships. Under no circumstances may (i) gifts of cash or cash equivalents be accepted or (ii) any gifts be received in consideration or recognition of any services provided to, or transactions entered into by, Client Accounts.

PERSONAL TRADING

*Personal Trading Policy*

Access persons are allowed to trade reportable securities. Access persons are not permitted to trade any security of which we or a Client own any portion of the capital structure or that is on our restricted list without permission. Access persons who violate the personal trading policy are reprimanded in accordance with the sanctions provisions outlined in the Code of Ethics. Personal securities transactions are reviewed by the Chief Compliance Officer or his/her designee for compliance with the personal trading policy and applicable SEC rules and regulations.

*Prohibition against Insider Trading*

We forbid any access person from trading, either personally or on behalf of others, including the Funds, on material non-public information or communicating material non-public information to others in violation of the law or duty owed to another party. This conduct is frequently referred to as "insider trading". The concepts of material non-public information, penalties for insider trading, and processes for identifying insider trading are addressed in detail in the Compliance Manual and Code of Ethics.

*Reporting Requirements*

In compliance with SEC rules, access persons are required to disclose all of their reportable securities holdings within 10 days of becoming an access person, within 10 days of opening a new account, and annually thereafter. Additionally, at the end of each month after quarter-end, all access persons must report all transactions in reportable securities over which the access person had any direct or indirect beneficial ownership. Access persons are also required annually to affirm all reportable transactions from the prior year.

12

CONFIDENTIAL                                                          TDIT005461

POTENTIAL CONFLICTS

Rand and its affiliates may engage in a broad range of activities, including activities for their own account and for the accounts of the Clients. This section describes various potential conflicts that may arise in respect of its business, as well as how Rand addresses such conflicts of interest. The discussion below does not describe all conflicts that may arise.

Any of the potential conflicts of interest will be discussed and resolved on a case by case basis. Rand's determination as to which factors are relevant, and the resolution of such conflicts, will be made using Rand's best judgment, but in its sole discretion. In resolving conflicts, Rand will take into consideration the interests of the relevant clients, the circumstances giving rise to the conflict and applicable laws.

Certain procedures for resolving specific conflicts of interest are set forth below. The following list is not all inclusive and for a complete description of the conflicts of interest for a particular Fund, please read the applicable PPM or offering documents.

### Allocation of Investment Opportunities

Rand may act as investment adviser to clients that have similar investment objectives and pursue similar strategies. Certain investments identified by Rand may be appropriate for multiple clients. Investment decisions for such clients are made by Rand in its best judgment, but in its discretion, taking into account such factors as Rand believes relevant. Such factors may include investment objectives, regulatory restrictions, current holdings, availability of cash for investment, the size of investments generally, and limitations and restrictions on a Client's Account that are imposed by such client.

### Conflicts Related to Investment Activities

Rand has an incentive to allocate assets into vehicles that produce the greatest fees for Rand. Each of these situations give rise to a potential conflict of interest in the allocation of investment opportunities. As previously described, Rand has adopted trade allocation policies and procedures that seek to ensure fair and equitable access to investment opportunities for all accounts.

### Trade Aggregation

In some circumstances, Rand may seek to buy or sell the same securities contemporaneously for multiple client accounts. Rand may, in appropriate circumstances aggregate securities trades for a client with similar trades for other clients, but is not required to do so. In particular, Rand may determine not to aggregate transactions that relate to portfolio management decisions that are made independently for different accounts or if Rand and/or its affiliates determine that aggregation is not practicable, not required or inconsistent with client direction.

13

*Errors*

Rand's responsibility for its trade errors is set forth in the governing documents for the relevant Fund. No soft-dollars may be used to satisfy any trade errors. In addition, Rand may not use the securities in one client's account to settle the trade error in another client's account.

*Conflicts Related to Valuation*

Rand may have a role in determining asset values with respect to client accounts and may be required to price an asset when a market price is unavailable or unreliable. This may give rise to a conflict of interest because Rand may be paid an asset-based fee on certain client accounts. In order to mitigate these conflicts, Rand and its affiliates determine asset values in accordance with valuation procedures, which generally are set forth in Rand's Compliance Manual.

*Other Potential Conflicts*

Rand or its affiliates may invest (or recommend that one of the Funds invest) in securities issued by one of the Funds and may hedge derivative positions by buying or selling securities issued by one of the Funds. A potential conflict may arise in such circumstances because Rand may be incentivized to favor one Fund that issues securities over the Fund on whose behalf Rand is making the investment. In addition to the Funds, some of Rand's service providers are issuers of securities. Rand may determine that it is in the best interests of one of the Funds to purchase securities issued by one of these entities. Rand has adopted policies and procedures designed to address conflicts of interest arising from the foregoing activities. Furthermore, it is Rand's general policy not to take into account the fact that an issuer is a client, service provider or vendor when making investment decisions.

Certain qualified employees and affiliates may invest in the Funds either through general partner entities or as limited partners, shareholders or otherwise. Rand generally reduces or waives all or a portion of the management fee related to the investments by such persons.

*Conflicts Related to Information Possessed by or Provided by Rand*

Certain persons within Rand or its affiliates may receive or create information (*e.g.*, proprietary technical models) that is not generally available to the public. Rand has no obligation to provide such information to any of the Funds or effect transactions for any of the Funds on the basis of such information and in many cases Rand or its affiliates will be prohibited from trading for the Funds based on the information. Similarly, one Fund may have access to information regarding Rand's transactions or views that is not available to one of the other Funds, and may act on that information through accounts managed by persons other than Rand or its affiliates. Such

14

transactions may negatively impact other clients (*e.g.*, through market movements or decreasing availability or liquidity of securities).

CONFIDENTIAL TDIT005464

## ITEM 12.  BROKERAGE PRACTICES

BROKER-DEALER SELECTION

Rand has an obligation to obtain "best execution" for Client transactions considering the execution price and overall commission costs paid and certain other factors.  Our trading desk route orders to various broker-dealers for execution at their discretion.  Where possible, we deal directly with the dealers who make a market in the securities involved, except in those circumstances where it believes better prices and execution are available elsewhere.

Factors involved in selecting brokerage firms include such factors as:

*Broker Specific*

- ❖ Size of broker
- ❖ Reputation
- ❖ Quality of service
- ❖ Experience
- ❖ Financial stability and creditworthiness
- ❖ Financial statements
- ❖ Regulatory filings
- ❖ Standing in financial community
- ❖ Ability to handle block trades
- ❖ Acceptable record of delivery and payment on past transactions
- ❖ Quality of research and investment information provided

*Transaction Specific*

- ❖ Best available execution
- ❖ Market knowledge regarding specific industries and securities
- ❖ Access to sources of supply or markets
- ❖ Nature of the market for the security

THE APPROVAL PROCESS

Rand's trading desk is only allowed to trade with approved broker-dealers.

If a Fund Account is under the custody of one brokerage firm and another brokerage firm is a selling group member for an underwriting syndicate, such a Client Account may not be able to participate in the purchase of securities in the underwriting because the custodial

16

CONFIDENTIAL                                                              TDIT005465

brokerage firm was not a selling group member.  In addition, to the extent that a Client directs brokerage trades to be placed with a particular broker, the allocation of securities transactions may be impacted.

DIRECTED BROKERAGE

Due to the nature of the Adviser's business, Rand does not currently allow directed brokerage.

TRADE AGGREGATION

Rand does not have any separately managed accounts.  Please see Item 11 Code of Ethics, Participation or Interest in Client Transactions, and Personal Trading and the PPM and offering documents for each Fund for additional information regarding Rand's trade aggregation procedures.

17

CONFIDENTIAL                                                        TDIT005466

509

## ITEM 13.  REVIEW OF ACCOUNTS

We provide reporting as agreed with each of our Clients. Please refer to the PPM or offering documents for each Fund for a description of the reporting practices for each Fund.

18

429

CONFIDENTIAL                                                    TDIT005467

## ITEM 14.  CLIENT REFERRALS
## AND OTHER COMPENSATION

Rand may pay compensation to a third-party/broker-dealer who refer prospective investors to us. Prior to paying such referral fees, we will verify that the third party is appropriately registered to receive such compensation. Please refer to the PPM or offering documents for each of the Funds for information regarding client referrals.

CONFIDENTIAL                                                    TDIT005468

511

## ITEM 15.  CUSTODY

Because the Advisor is under common control with the general partner of the Atlas IDF, Rand PE 1 and Rand Series 1 funds, we may be deemed to have custody of those Funds' assets.  Assets for which we have custody are held only at qualified custodians and in accordance with applicable regulations.  These regulations require us to maintain Fund assets with a qualified custodian in a separate account for each Fund under each Fund's name.  The Funds' securities and other assets are held in the custody or US Bank and State Street.

431

CONFIDENTIAL                                                         TDIT005469

## ITEM 16.  INVESTMENT DISCRETION

We intend to manage the Funds on a discretionary basis.  For a description of limitations imposed on our discretionary authority to manage securities, please see Item 4 Advisory Business and the PPM or offering documents for each Fund.

All investors of the Funds must complete the subscription documentation we required in order to accept an investment, which may include a joinder to the applicable governing documents of the vehicle.  This documentation includes an authorization granting us investment discretion for the Funds.

21

CONFIDENTIAL                                          TDIT005470

# ITEM 17.  VOTING CLIENT SECURITIES

SECURITIES HELD IN CLIENT ACCOUNTS

Rand's proxy voting policy ensures proxies are voted on behalf of each Fund Account's securities and in the best economic interests of such Fund Account, without regard to the interests of Rand or any other Fund under Rand's management.  Rand evaluates the subject matter of each proxy and votes on behalf of the Fund Account in accordance to the guidelines set forth in our proxy voting policy.

If Rand determines that there is a potential material conflict of interest in voting a proxy, it will abstain from voting.  Rand also may determine not to vote proxies with respect to securities of any issuer if it determines it would be in its Client's overall best interests not to vote.

OBTAINING A COPY OF THE POLICY

Clients and prospective clients can obtain a copy of the proxy voting policy or information on how we voted proxies by contacting our Chief Compliance Officer at mpatrick@randadvisors.com.

22

CONFIDENTIAL                                                    TDIT005471

## ITEM 18.  FINANCIAL INFORMATION

We are required to provide you with certain financial information or disclosures about our financial condition.  We have no financial commitment that would impair our ability to meet any contractual and fiduciary commitments to you, our client.  We have not been the subject of any bankruptcy proceedings.

In no event shall we charge advisory fees that are both in excess of twelve hundred dollars and more than six months in advance of advisory services rendered.

23

CONFIDENTIAL                                                    TDIT005472

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:06 PM 12/09/2024
FILED 04:06 PM 12/09/2024
SR 20244432762 - File Number 10030937

CERTIFICATE OF INCORPORATION
OF
DFW CHARITABLE FOUNDATION
a nonprofit nonstock corporation

### I.

The name of the Corporation is DFW Charitable Foundation.

### II.

The name of the incorporator is Douglas Mancino. The address of the incorporator is 2029 Century Park East, Suite 3500, Los Angeles, CA 90067.

### III.

The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

### IV.

A. The Corporation is a nonprofit nonstock corporation and is not organized for the private gain of any person. It is organized under the General Corporation Law of the State of Delaware ("DGCL") exclusively for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States internal revenue law (the "Code").

B. In furtherance of its purposes, the Corporation shall have all the general powers and privileges of a corporation granted by the DGCL, as now in effect or as may hereafter be amended, including the power to solicit grants and contributions to further its charitable purposes.

### V.

The Corporation shall not have any capital stock and the Corporation is not authorized . The member of the corporation is Mark Patrick. The rights and privileges of the member shall be set forth in the Corporation's bylaws, provided that the member shall not have a "membership interest" in the Corporation within the meaning of section 114(d)(2) of the DGCL.

### VI.

A. No part of the activities of the Corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation. The Corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of, or in opposition to, any candidate for public office.

315132803v.2

73

B. Notwithstanding any other provision of this Certificate of Incorporation, the Corporation shall not directly or indirectly carry on any activity which would prevent it from obtaining exemption from Federal income taxation as a corporation described in section 501(c)(3) of the Code, or cause it to lose such exempt status, or carry on any activity not permitted to be carried on by a corporation, contributions to which are deductible under section 170(c)(2) of the Code.

## VII.

The property of the Corporation is irrevocably dedicated to charitable purposes, and no part of the net income or assets of the Corporation shall ever inure to the benefit of any director, officer, or member thereof or to the benefit of any private person. Upon the dissolution or winding up of the Corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of the Corporation shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for charitable purposes and which has established its tax-exempt status under section 501(c)(3) of the Code.

## VIII.

A director or officer of the Corporation shall not be liable to the Corporation for monetary damages for breach of fiduciary duty as a director or officer, except for liability: (a) for any breach of the director's or officer's duty of loyalty to the Corporation or its members, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, or (c) for any transaction from which the director or officer derived any improper personal benefit. If the DGCL is amended after adoption of this Article VIII to authorize Corporation action further eliminating or limiting the personal liability of directors or officers, then the liability of a director or officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any repeal or modification of the foregoing provisions of this Article VIII shall not adversely affect any right or protection of a director or officer of the Corporation existing at the time, or increase the liability of any director or officer of the Corporation with respect to any acts or omissions of such director or officer occurring prior to such repeal or modification.

## IX.

The Corporation shall, to the maximum extent permitted from time to time under the law of the State of Delaware, indemnify and upon request shall advance expenses to any person who is or was a party or is threatened to be made a party to any threatened, pending or completed action, suit, proceeding or claim, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was or has agreed to be a member or director or officer of the Corporation, or while the person is or was serving at the request of the Corporation as a director, officer, partner, trustee, employee or agent of any corporation, limited liability company, partnership, joint venture, trust or other entity, against expenses (including reasonable attorneys' fees and expenses), judgments, fines, penalties and amounts paid in settlement incurred in connection with the investigation, preparation to defend, or defense of such action, suit, proceeding or claim; provided however that: (a) the foregoing shall not require the Corporation to indemnify, or advance expenses to, any member or director or officer in connection with any

2

315132803v.2

74

action, suit, proceeding or claim initiated by or on behalf of such member or director or officer, or any against the Corporation initiated by or on behalf of such member or director or officer; and (b) a member or director or officer seeking indemnification under this Article IX shall execute a written undertaking (reasonably acceptable to the Corporation) to repay the Corporation any expense or other amounts advanced and/or paid to such member or director or officer under this Article IX in the event that it is ultimately determined that such member or director or officer is not entitled to be indemnified by the Corporation. Such indemnification shall not be exclusive of other indemnification rights arising under any bylaw, agreement, vote of directors or member or otherwise and shall inure to the benefit of the heirs and legal representatives of such person. Any person seeking such indemnification under this Article IX shall be deemed to have met the standard of conduct required for such indemnification unless the contrary shall be established. Any repeal or modification of the foregoing provisions of this Article IX shall not adversely affect any right or protection of a member or director or officer of the Corporation with respect to any acts or omissions of such member or director or officer occurring prior to such repeal or modification.

**IN WITNESS WHEREOF**, this Certificate of Incorporation has been executed by its incorporator this 9th day of December, 2024.

/s/ Douglas Mancino
Douglas Mancino, Incorporator

3

315132803v.2

75

FSD2025-0116                                                                                           2025-08-19
Rachel Baxendale

| | |
|---|---|
| **From:** | Brandon R. Schaller <bschaller@shieldslegal.com> |
| **Sent:** | 05 February 2024 1:20 PM |
| **To:** | Philip Aubry |
| **Cc:** | Geoffrey Sykes; Bart Higgins |
| **Subject:** | FW: Cayman GP |
| **Attachments:** | image001.png |

**[this message is from an external sender]**

FYI



**BRANDON R. SCHALLER**
**Attorney**
16400 Dallas Parkway, Suite 300
Dallas, Texas 75248
Direct: (469) 726-3055
Email: bschaller@shieldslegal.com

**Legal Solutions. Business Insight. Your Trusted Advisor.**

**From:** Mark Tax <mpatricktax1040@gmail.com>
**Sent:** Monday, February 5, 2024 12:18 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** Shawn Raver <sraver@hotmail.com>; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** Re: Cayman GP

CAUTION: This email originated from outside of the organization.

Doesn't matter to me. Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection.

On Mon, Feb 5, 2024, 11:43 AM Brandon R. Schaller <bschaller@shieldslegal.com> wrote:

Mark,

Question from Walkers. Do you want the new Cayman GP to be a Cayman LLC or an exempted company?

1

CONFIDENTIAL                                                                     TDIT005476

519

CONFIDENTIAL

FSD2025-0116

2025-08-19

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 511 of 759

Before



58

TDIT005477

FSD2025-0116

2025-08-19

439

CONFIDENTIAL

# Current – DAF Holdco



Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 512 of 759

TDIT005478

**FSD2025-0116**      **Page 525 of 1530**      **2025-08-19**

Docusign Envelope ID: 11CD8132-6630-49A0-A1FE-D8548E9451F8

November 11, 2024

**From**: Highland Dallas Foundation, Inc.
Highland Kansas City Foundation, Inc.
Highland Santa Barbara Foundation, Inc.

**To**: Mr. Paul Murphy
Director of Charitable DAF HoldCo, Ltd.
and Charitable DAF Holdings Corp.
paul@gkmanagement.com.ky

Dear Mr. Murphy:

We write to you collectively on behalf of the following organizations:

1. Highland Dallas Foundation, Inc., a participation shareholder in Charitable DAF HoldCo, Ltd., of which you are a director along with Mark Patrick. As you know, Mr. Patrick also is the managing member of the Charitable DAF GP, LLC, which governs the related Charitable DAF Fund, LP.

2. Highland Kansas City Foundation, Inc., also a participation shareholder in Charitable DAF HoldCo, Ltd.

3. Highland Santa Barbara Foundation, Inc., also a participation shareholder in Charitable DAF Holdco, Ltd.

Highland Dallas Foundation, Inc is a supporting organization of The Dallas Foundation. Highland Kansas City Foundation, Inc. is a supporting organization of Greater Kansas City Community Foundation. Highland Santa Barbara Foundation, Inc. is a supporting organization of Santa Barbara Foundation. The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (collectively the "Foundations") have worked closely with their respective supporting organizations named above to award grants and funding to a wide range of charitable causes that have made tangible, lasting impacts on the communities they serve. Our primary commitment has been, and always will be, our concern for the community, respect for donors, thoughtful giving, and careful investing—core values that have guided each of us throughout our existence.

With these core values and with the well-being of these Foundations in mind, we write you to voice that we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "DAF-related entities"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable. Recently, various competing constituencies provided the Foundations with conflicting information related to the operations and financial inner

**CONFIDENTIAL**      TDIT005479

Docusign Envelope ID: 11CD8132-6630-49A0-A1FE-D8548E9451F8

Mr. Paul Murphy
November 11, 2024
Page 2

workings of the DAF-related entities. This conflicting information raises significant concerns about how the corpus of these funds is administered and spent. The Foundations have no real pathway to verify the information as the current governance structures prevent them from receiving such information, and indeed, efforts to secure additional information have been rebuffed. As a result, these recent submissions demonstrate that the current governance structure is ill-equipped to address such allegations and provide sufficient protection to the economic funds that support so many charitable efforts.

Further, because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities.

Thank you for your attention to this matter. Our counsel with the law firm of Holland & Knight LLP is copied on this letter should you have any questions.

Sincerely yours,

HIGHLAND DALLAS FOUNDATION, INC.

By: _____
Julie Diaz
Vice President

HIGHLAND KANSAS CITY FOUNDATION, INC.

By: _____
Debbie Wilkerson
Vice President

HIGHLAND SANTA BARBARA FOUNDATION, INC.

By: _____
Jacqueline M. Carrera
Secretary and Treasurer

cc:   David M. Rosenberg
      (via email at david.rosenberg@hklaw.com)

      Michael Stockham
      (via email at michael.stockham@hklaw.com)

**FSD2025-0116**                   2025-08-19

**Rachel Baxendale**

---

| | |
|---|---|
| **From:** | Paul Murphy <paul@gkmanagement.com.ky> |
| **Sent:** | 26 November 2024 6:32 PM |
| **To:** | Mark Patrick; Geoffrey Sykes |
| **Cc:** | Brandon R. Schaller; dmancino@seyfarth.com; Shawn Raver; Bart Higgins; Lauren Vernon; Philip Aubry; Barnaby Gowrie |
| **Subject:** | RE: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181] |

---

**[this message is from an external sender]**

---

Thanks for this Geoffry,

Mark, I'll let Walkers come back but here are my thoughts:

1. Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful that they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluting them therefore the company should be wound up or an order made for change of management/revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground to claim just and equitable grounds.

2. Management shareholders have a right to object to the winding up but they have no special status by virtue of being management shares. I'll have to double check the docs but this would be different if there were something in the articles of association/share issuance agreement where there was an explicit provision where they had agreed not to present a winding up petition. The just and equitable ground is specifically designed to prevent unfair prejudice to a shareholder.

3. I think our main point is to stress that if they take any action they significantly undermine Donderro's position in the bankruptcy and UBS action because he will be seen as the alter ego of DAF as they've always claimed. Additionally, taking steps to preserve independence improves the DAFs standing in those proceedings. This isn't related to the advice but something for the call next week.

Paul.

---

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** Tuesday, November 26, 2024 5:43 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; dmancino@seyfarth.com; Paul Murphy <paul@gkmanagement.com.ky>; Shawn Raver <sraver@dafholdco.com>; Bart Higgins <bhiggins@shieldslegal.com>; Lauren Vernon <Lauren.Vernon@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Subject:** Re: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181]

Another consideration, is that Holdco has management shares. Does the equitable theory take into account the rights of the owner of the management shares when the non-control shares want equitable relief. If the management shareholders, disagrees, are those powers and right abdicated in a equitable wind down proceedong? Seems the Management Shareholder has a right to express its rights as to whether the company should be wound down or not.

1

**FSD2025-0116**                                          2025-08-19

**443**

On Tue, Nov 26, 2024, 4:26 PM Mark Patrick <mpatrick@dafholdco.com> wrote:

Charitable DAF Holdco holds only one asset - LP interest in charitable daf fund LP.  As a limited partner, Holdco cannot force the partnership to wind its affairs?

On Tue, Nov 26, 2024, 4:11 PM Mark Patrick <mpatrick@dafholdco.com> wrote:

If new participating shares are issued to a new non-profit,  and say per Paul's point they try to implement an "equitable" winding down of the company, but the new shareholders objects, would that help? Also, what could possibly be the basis for any "equitable" liquidation if the Articles don't give such rights.

On Tue, Nov 26, 2024, 3:34 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

Hi Brandon

Thanks for your time on the phone last week and the below.

As discussed, please see attached in draft the high priority memo as updated with a new Section E in respect of winding up petitions on the just and equitable ground.

We look forward to speaking with you tomorrow morning.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** Friday, November 22, 2024 1:36 PM
**To:** dmancino@seyfarth.com; Philip Aubry <Philip.Aubry@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Paul Murphy <paul@gkmanagement.com.ky>; mpatrick@dafholdco.com; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** DAF - Participating Shares Summary

CONFIDENTIAL                                                        TDIT005482

FSD2025-0116                                                                                                      2025-08-19
**[this message is from an external sender]**

Doug and Walkers team,

As discussed, here are our notes from a review of the provisions applicable to Participating Shares in the Articles for Charitable DAF HoldCo, Ltd. As you know, we are not licensed in the Cayman Islands, so we would appreciate Walkers' help to confirm/expand our views.

**Rights of Participating Shares\*:**

Rights

1. Participate (receive) discretionary dividends. See "Participating Share" and Articles generally.
2. If new shares/classes are issued, and the change would materially adversely vary the Participating Shares, then 2/3rds Participating Shareholder consent is required. See #13.
   a. Issuance of authorized but unissued Participating Shares (i.e., dilution of existing shareholders) makes this consent right contingent on outstanding shares. See #14 and #7.
3. Rights to assets in a winding up in accordance with the waterfall. See #122-124.
4. Certain foundations own 100 Participating Shares out of a total of authorized 4,999,900 Participating Shares. See #7.

No rights

1. Cannot vote shares. See #12.
2. Cannot redeem shares. See "Participating Shares."
3. No rights to information. See #12.
4. No rights to attend meetings. See #12.
5. No rights to notice of meetings. See #12.
6. No rights to pro rata distributions based on % of Participating Shares. See #105.
7. No rights to appoint or remove directors or officers. See Articles generally and #65.
8. No rights to receive notice of issuance of additional shares. See Articles generally.
9. No rights to receive notice of distributions to other Participating Shareholders. See Articles generally.
10. No pre-emptive rights. See Articles generally.

FSD2025-0116                                                                                                      2025-08-19

**CONFIDENTIAL**                                                                                       TDIT005483

FSD2025-0116                                                                                    2025-08-19

Restrictions

1. If a Participating Shareholder is (i) in breach of any law, (ii) is not a non-profit, or (iii) the directors are of the opinion such Shareholder might result in the Company incurring additional liability, including for legal reasons, the directors may require such Shareholder to transfer its shares. See #21. *Walkers to review.*
2. May be diluted by the directors issuing additional Participating Shares. See #8.
   a. Including additional pari passu shares. See #14.
   b. Dilution may, ultimately, affect the ability of the existing Participating Shareholders to consent to changes to the rights attached to the Participating Shares. See #14, #7, and Articles generally.

*Suggest the foundations confirm that they have the latest version of the Articles (attached). We suspect they do not.

Best regards,

Brandon

**Brandon R. Schaller**

**ATTORNEY**

16400 Dallas Parkway, Suite 300

Dallas, TX 75248

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

**SHIELDSLEGAL.COM**

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message.  You should not copy it or disclose its contents to any other person.  Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses.  This e-mail message does not contain or constitute legal advice and/or federal tax advice.  The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

FSD2025-0116                                                                                    2025-08-19
                                                                                                     446

**CONFIDENTIAL**                                                                          TDIT005484

527

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

**CONFIDENTIAL**                                                                                    TDIT005485

**FSD2025-0116**                                                                              2025-08-19

**Rachel Baxendale**

---

| | |
|---|---|
| **From:** | Barnaby Gowrie |
| **Sent:** | 27 November 2024 9:09 AM |
| **To:** | Mark Patrick; Paul Murphy |
| **Cc:** | Geoffrey Sykes; Brandon R. Schaller; dmancino@seyfarth.com; Shawn Raver; Bart Higgins; Lauren Vernon; Philip Aubry |
| **Subject:** | RE: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181] |
| **Attachments:** | Aquapoint L.P. v Xiaohu Fan (CICA (Civil) Appeal No. 14 of 2022).pdf; In the matter of Sigma Finance Corporation (Cause No. FSD 171 of 2024 (DDJ) 19 July 2024).pdf |

Hi Mark, Paul

Thanks for your emails.  Our answers to Mark's questions are as follows, and we generally agree with Paul's comments in respect of them:

1. *If new participating shares are issued to a new non-profit,  and say per Paul's point they try to implement an "equitable" winding down of the company, but the new shareholders objects, would that help?*
   a. Yes, if other shareholders are opposed to an equitable winding up that will be taken into consideration and would likely help.  However, it may not be determinative – the question will still be whether, in all of the circumstances, it is just and equitable for the company to be wound up.

2. *Also, what could possibly be the basis for any "equitable" liquidation if the Articles don't give such rights.*
   a. The right to seek a winding up order on the just and equitable ground is provided by legislation (see the Companies Act (2023 Revision) sections 92(e)) and 95(3)).

3. *Charitable DAF Holdco holds only one asset - LP interest in charitable daf fund LP.  As a limited partner, Holdco cannot force the partnership to wind its affairs?*
   a. As a limited partner of Charitable DAF Fund LP, Charitable DAF HoldCo Ltd does have standing to present a petition seeking the winding up of Charitable DAF Fund LP, including on the just and equitable basis.

4. *Another consideration,  is that Holdco has management shares. Does the equitable theory take into account the rights of the owner of the management shares when the non-control shares want equitable relief. If the management shareholders, disagrees, are those powers and right abdicated in a equitable wind down proceeding? Seems the Management Shareholder has a right to express its rights as to whether the company should be wound down or not.*
   a. As above, on the hearing of a winding up petition on the just and equitable ground, the question will be whether, in all of the circumstances, it is just and equitable for the company to be wound up.  The rights and views of the holder of the management shares will be relevant to that consideration, but may not be determinative.  If a winding up order is made and a liquidator appointed, the rights of the holder of the management shares will be varied in line with relevant legislation and the articles.  Noting the meeting tomorrow morning we have not explored this in detail but please let us know if you would like further advice in that regard.

5. *Please provide a couple Cayman Cases where Equitable wind up occurred for my review based on mismanagement, etc.  I'd like some context if this procedure is extra ordinary / rare or an action that does occur leading to Cayman Case Law.*
   a. Winding up orders on the just and equitable ground are not extraordinary or rare in the Cayman Islands.  Please see attached two Cayman decisions involving winding up orders on the just and equitable ground (noting that partnerships may be wound up on the just and equitable ground under the same provisions as companies, and that the *Aquapoint* decision is currently on appeal to the Judicial Committee of the Privy Council).

Please let us know if you would like anything further before the meeting tomorrow morning.

Best regards,

**FSD2025-0116**                                                                              2025-08-19
                                                                                                      **448**
CONFIDENTIAL                                      TDIT005486

529

Barney

**Barnaby Gowrie**
Partner
**Walkers (Cayman) LLP**

**T** +1 345 914 6365  |  **M** +1 345 525 3385
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** Tuesday, November 26, 2024 6:44 PM
**To:** Paul Murphy <paul@gkmanagement.com.ky>
**Cc:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Brandon R. Schaller <bschaller@shieldslegal.com>;
dmancino@seyfarth.com; Shawn Raver <sraver@dafholdco.com>; Bart Higgins <bhiggins@shieldslegal.com>; Lauren
Vernon <Lauren.Vernon@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Barnaby Gowrie
<Barnaby.Gowrie@walkersglobal.com>
**Subject:** Re: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

1. Agreed about the perception.

However,  I have been exploring funding a large campus in DFW  with a major church building, housing, and conference
center, and exhibitions. In addition we been having exploring other large donations in the future on the scale of tens of
millions leading to hundreds millions for educational buildings for an existing University in Dallas.

People I have spoken to have suggested I form a non profit now to work these endeavors.

On Tue, Nov 26, 2024, 5:31 PM Paul Murphy <paul@gkmanagement.com.ky> wrote:

Thanks for this Geoffry,

Mark, I'll let Walkers come back but here are my thoughts:

1. Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and
   outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful
   that they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to
   weaken their position by diluting them therefore the company should be wound up or an order made for
   change of management/revocation of the share issuances. It's a very difficult situation to get right without
   gifting them a potential ground to claim just and equitable grounds.

2. Management shareholders have a right to object to the winding up but they have no special status by virtue of
   being management shares. I'll have to double check the docs but this would be different if there were
   something in the articles of association/share issuance agreement where there was an explicit provision where

**CONFIDENTIAL**                                                                              **TDIT005487**

FSD2025-0116                                                                                                          2025-08-19

they had agreed not to present a winding up petition. The just and equitable ground is specifically designed to prevent unfair prejudice to a shareholder.

3. I think our main point is to stress that if they take any action they significantly undermine Donderro's position in the bankruptcy and UBS action because he will be seen as the alter ego of DAF as they've always claimed. Additionally, taking steps to preserve independence improves the DAFs standing in those proceedings. This isn't related to the advice but something for the call next week.

Paul.

---

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** Tuesday, November 26, 2024 5:43 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; dmancino@seyfarth.com; Paul Murphy <paul@gkmanagement.com.ky>; Shawn Raver <sraver@dafholdco.com>; Bart Higgins <bhiggins@shieldslegal.com>; Lauren Vernon <Lauren.Vernon@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Subject:** Re: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181]

Another consideration,  is that Holdco has management shares. Does the equitable theory take into account the rights of the owner of the management shares when the non-control shares want equitable relief. If the management shareholders, disagrees, are those powers and right abdicated in a equitable wind down proceedong? Seems the Management Shareholder has a right to express its rights as to whether the company should be wound down or not.

On Tue, Nov 26, 2024, 4:26 PM Mark Patrick <mpatrick@dafholdco.com> wrote:

Charitable DAF Holdco holds only one asset - LP interest in charitable daf fund LP.  As a limited partner, Holdco cannot force the partnership to wind its affairs?

On Tue, Nov 26, 2024, 4:11 PM Mark Patrick <mpatrick@dafholdco.com> wrote:

If new participating shares are issued to a new non-profit,  and say per Paul's point they try to implement an "equitable" winding down of the company, but the new shareholders objects, would that help? Also, what could possibly be the basis for any "equitable" liquidation if the Articles don't give such rights.

On Tue, Nov 26, 2024, 3:34 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

FSD2025-0116                                                                                                          2025-08-19

450

CONFIDENTIAL                                                                                                   TDIT005488

531

Hi Brandon

Thanks for your time on the phone last week and the below.

As discussed, please see attached in draft the high priority memo as updated with a new Section E in respect of winding up petitions on the just and equitable ground.

We look forward to speaking with you tomorrow morning.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** Friday, November 22, 2024 1:36 PM
**To:** dmancino@seyfarth.com; Philip Aubry <Philip.Aubry@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Paul Murphy <paul@gkmanagement.com.ky>; mpatrick@dafholdco.com; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** DAF - Participating Shares Summary

**[this message is from an external sender]**

---

Doug and Walkers team,

As discussed, here are our notes from a review of the provisions applicable to Participating Shares in the Articles for Charitable DAF HoldCo, Ltd. As you know, we are not licensed in the Cayman Islands, so we would appreciate Walkers' help to confirm/expand our views.

**Rights of Participating Shares*:**

CONFIDENTIAL      TDIT005489

532

Rights

1. Participate (receive) discretionary dividends. See "Participating Share" and Articles generally.
2. If new shares/classes are issued, and the change would materially adversely vary the Participating Shares, then 2/3rds Participating Shareholder consent is required. See #13.

    a. Issuance of authorized but unissued Participating Shares (i.e., dilution of existing shareholders) makes this consent right contingent on outstanding shares. See #14 and #7.

3. Rights to assets in a winding up in accordance with the waterfall. See #122-124.
4. Certain foundations own 100 Participating Shares out of a total of authorized 4,999,900 Participating Shares. See #7.

No rights

1. Cannot vote shares. See #12.
2. Cannot redeem shares. See "Participating Shares."
3. No rights to information. See #12.
4. No rights to attend meetings. See #12.
5. No rights to notice of meetings. See #12.
6. No rights to pro rata distributions based on % of Participating Shares. See #105.
7. No rights to appoint or remove directors or officers. See Articles generally and #65.
8. No rights to receive notice of issuance of additional shares. See Articles generally.
9. No rights to receive notice of distributions to other Participating Shareholders. See Articles generally.
10. No pre-emptive rights. See Articles generally.

Restrictions

1. If a Participating Shareholder is (i) in breach of any law, (ii) is not a non-profit, or (iii) the directors are of the opinion such Shareholder might result in the Company incurring additional liability, including for legal reasons, the directors may require such Shareholder to transfer its shares. See #21. *Walkers to review*.
2. May be diluted by the directors issuing additional Participating Shares. See #8.

    a. Including additional pari passu shares. See #14.
    b. Dilution may, ultimately, affect the ability of the existing Participating Shareholders to consent to changes to the rights attached to the Participating Shares. See #14, #7, and Articles generally.

*Suggest the foundations confirm that they have the latest version of the Articles (attached). We suspect they do not.

5

533

FSD2025-0116                                                                    2025-08-19

Best regards,

Brandon

**Brandon R. Schaller**

**ATTORNEY**

16400 Dallas Parkway, Suite 300

Dallas, TX 75248

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

**SHIELDSLEGAL.COM**

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message. You should not copy it or disclose its contents to any other person. Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses. This e-mail message does not contain or constitute legal advice and/or federal tax advice. The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

FSD2025-0116                                                                    2025-08-19

453

CONFIDENTIAL                                          TDIT005491

**CHARITABLE DAF HOLDCO, LTD**
the ("**Company**")

**Unanimous Written Resolutions of all of the Directors of the Company passed on
18 December 2024
in accordance with the Articles of Association of the Company**

1     **Declaration of Interests**

**IT IS NOTED THAT** the directors of the Company (each, a "**Director**" and together, the "**Directors**") have declared their respective interests (if any) in the matters contemplated by these resolutions, and any such interest be and is hereby noted, ratified and acknowledged.

2     **Transfer of interest in the Partnership**

2.1     **IT IS NOTED THAT:**

(a)     In connection with a corporate restructure of the Company's group, the Company proposes to transfer, convey, assign or otherwise contribute to CDMCFAD, LLC, a Delaware limited liability company (the "**Transferee**"), 100% of the Company's interests in CHARITABLE DAF FUND, LP, an exempted limited partnership established in the Cayman Islands (the "**Partnership**") in consideration for the contribution by the sole member of the Transferee of 100% of the issued and outstanding limited liablity company interests in the Transferee (the "**Transfer**").

(b)     In connection with the Transfer, the Company proposes to enter into a deed of assignment and assumption (the "**Deed**"), substantially in the form that was circulated to and carefully considered by the Directors, to be entered into by and among the Company, the Transferee and CDH GP, LTD, solely in its capacity as general partner (the "**GP**") of the Partnership, under the terms of which the Company will transfer, convey, assign or otherwise contribute all of its Transferred Interest (as defined in the Deed) to the Transferee on the terms and conditions set out therein.

(c)     Section 1.11(a) of the amended and restated limited partnership agreement of the Partnership dated as of 7 November 2011 as amended on 26 July 2022 and as further amended and restated as of 11 March 2024 (as further amended, restated and/or supplemented from time to time) (the "**Partnership Agreement**") provides that a Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner (each term as defined in the Partnership Agreement).

(d)     Under the terms of the Deed, it is expected that:

CONFIDENTIAL                                                    TDIT005492

(i)    the Transferee will make in favour of the GP and the Company, each representation, as was made by the Company in connection with its admission as a Limited Partner;

(ii)    the Transferee will undertake to perform all of the obligations of a Limited Partner and be bound by and receive the benefit of all terms of the Partnership Agreement and replace the Company as a Limited Partner and will assume all the duties, liabilities and obligations, whether past (to the extent permitted by law), present or future, under the Partnership Agreement with respect to the Transferred Interest;

(iii)    the GP will: (x) consent to the assignment and assumption contemplated thereby; (y) acknowledge that all requirements and conditions for the Transfer and the admission of the Transferee as a Limited Partner of the Partnership have been satisfied or waived; and (z) certify that the Transferee will, in accordance with Section 1.15 of the Partnership Agreement, be listed in the books and records of the Partnership as a Limited Partner and as sole legal owner of the Transferred Interest;

(iv)    the GP will agree to admit the Transferee as a Limited Partner in respect of the Transferred Interest and remove, in accordance with Section 1.15 of the Partnership Agreement, the name of the Company from the register of Limited Partners maintained in respect of the Partnership; and

(v)    the Company and Transferee will undertake to jointly and severally indemnify the GP and the Partnership from any expense arising from the transactions contemplated by the Deed or any losses arising from the breach of the Deed or the Partnership Agreement.

(e)    All the requirements of the transfer provisions contained in the Partnership Agreement have been or will be either satisfied by the Company and Transferee or waived by the GP.

(f)    U.S. tax counsel has advised the Company and its Directors that reorganization of the Company and its subsidiaries pursuant to the Transfer generally would provide the following benefits and protections to the Company, the Partnership, and the Company's subsidiaries (collectively, the "**DAF**"):

(i)    The Transfer would help insulate the DAF from exposure to James Dondero and his entities (collectively, "**Dondero**"), who may be at risk of causing the Internal Revenue Service (the "**IRS**") to revoke the tax-exempt status of one or more of the participating shareholders/supporting organizations, which could imperil the assets of the DAF;

(A)    Each Internal Revenue Code (the "**IRC**") Section 501(c)(3) organization must be organized and operating primarily for charitable purposes;

(B)    Treasury Regulation Section 1.501(c)(3)-1(c)(1) provides that an organization will not be compliant with the operational test "if more than

2

an insubstantial part of its activities is not in furtherance of an exempt purpose"; and

(C)   An IRC Section 501(c)(3) organization cannot be operated for the benefit of an individual or entity due to the private benefit/private inurement prohibition.

(ii)   The Transfer would help reduce the influence of Dondero and, as such, would broaden the charitable scope of DAF for its benefit and the benefit of the public;

(iii)   The IRS would look favorably upon any and all attempts for DAF to maintain its influence from "what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement"; and

(iv)   Further, due to Dondero's attempts to control the DAF and its assets, DAF runs an increased risk of being embroiled in litigation directed against Dondero and his entities.

(g)   Delaware counsel has advised the Company and its Directors that, as a result of the Transfer, the Transferred Interest shall be held by the Transferee, and that certain Limited Liabiltiy Company Agreement of the Transferee (the "**LLC Agreement**"), along with the Transfer generally, shall provide the following benefits and protections to the Company and the Partnership:

(i)   Under Delaware law and the Delaware Limited Liability Compay Act (the "**LLC Act**"), there are very few required adminstrative or other requirements for a limited liablity company that cannot be modified or elimintated in a limited liablity company agreement and therefore, the Company and the Partnership will benefit from the contractual freedom and flexbility to provide for its desired terms under the LLC Agreement;

(ii)   As a Delaware limited liability company, the Transferee will be governed by the LLC Act, which unlike the statutes in almost every other jurisidction, is updated annually to stay current based on the needs of companies forming in Delaware and the changing markets, as well as any needed changes due to the results of case law;

(iii)   Under the LLC Act, the only required filing in Delaware is a certificate of formation that contains only the name of the company and its registered agent and registered office, therefore maintaining the privacy of the members and managers of the company by allowing them to put their business terms into a limited liablity company agreement that is a private document not avialable to the public;

(iv)   Under the LLC Act, and the LLC Agreement, the neither the Company nor the Partnership shall be personally liable for the debts, obligations and liabilities of the Transferee, whether such debts, obligations or liabilities arise in contract, tort or otherwise;

3

(v) As permitted under the LLC Act, the terms of the LLC Agreement eliminate the fiduciary duties of the manager of the Transferee;

(vi) It will be very difficult to dissolve and terminate the Transferee, with any such voluntary decision requiring the consent of the manager of the Transferee;

(vii) The cost to maintain a limited liabliity company in Delaware is relatively low, with only a $300 annual state franchise tax and minimal expenses to maintain a Delaware registered agent and registered office;

(viii) Any enforcement action with respect to the LLC Agreement will likely occur in the Delaware Chancery Court, which is known as being one of the most respected and sophisticated business courts in the United States.

2.2 **IT IS HEREBY RESOLVED THAT:**

(a) It is in the best interests of the Company to enter into the Transfer and execute and enter into the Deed and consummate the transactions contemplated thereunder.

(b) A draft of the Deed having been provided to the Directors, the form thereof be approved on behalf of the Company, subject to such amendments and additions thereto as any director, officer or attorney of the Company in his absolute discretion and opinion deems appropriate, the signature of any director, officer or attorney of the Company on the Deed being due evidence for all purposes of his approval of any such amendment or addition and the final terms thereof on behalf of the Company.

(c) The Company do give, make, sign, execute and deliver all such notes, deeds, agreements, letters, notices, certificates, acknowledgments, instructions, fee letters and other documents (whether of a like nature or not) (the "Ancillary Documents") as may in the sole opinion and absolute discretion of any director, officer or attorney of the Company be considered necessary or desirable for the purpose of compliance with any condition precedent or the coming into effect of or otherwise giving effect to, consummating or completing or procuring the performance and completion of all or any of the transactions contemplated by or referred to in the Deed and the Company do all other such acts and things as might in the sole opinion and absolute discretion of any director, officer or attorney of the Company be necessary or desirable for the purposes aforesaid.

(d) The Ancillary Documents be in such form as any director, officer or attorney of the Company should in his absolute discretion and sole opinion approve, the signature of any director, officer or attorney of the Company on any of the Ancillary Documents being due evidence for all purposes of his approval of the terms thereof on behalf of the Company.

(e) The Deed and the Ancillary Documents (where required to be executed by the Company) be executed by the signature thereon of any director, officer or attorney of the Company and the Company deliver and perform the Deed and Ancillary Documents.

(f) Any director, officer or attorney of the Company be and they are hereby authorised to take such further actions as they may consider necessary or convenient to effect the foregoing resolutions.

4

CONFIDENTIAL                                                      TDIT005495

538

FSD2025-0116                 **Page 542 of 1530**                 2025-08-19

(g)    All prior acts of any of the directors, officers or attorneys of the Company in connection with the foregoing resolutions be and they hereby are confirmed, ratified and approved.

[*Signature Page follows*]

5

CONFIDENTIAL                                                 TDIT005496

IN WITNESS WHEREOF the undersigned, being all of the Directors of the Company for the time being, hereby adopt and pass the foregoing resolutions as unanimous written resolutions on the date set out above.

Name:  **Mark E. Patrick**

Title:    Director


Name:  **Paul Murphy**

Title:    Director

CONFIDENTIAL                                                                    TDIT005497

IN WITNESS WHEREOF the undersigned, being all of the Directors of the Company for the time being, hereby adopt and pass the foregoing resolutions as unanimous written resolutions on the date set out above.

_____

Name: **Mark E. Patrick**

Title:    Director

_____

Name: **Paul Murphy**

Title:    Director

CONFIDENTIAL                                                                TDIT005498

## Deed of Assignment and Assumption

This Deed of Assignment and Assumption (this "**Deed**") is made on the 18th day of December 2024

BY AND AMONG:

(1) **CDH GP, LTD**, a company incorporated under the laws of the Cayman Islands, with registered number 407515, whose registered office is at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands (the "**General Partner**"), in its capacity as general partner of **CHARITABLE DAF FUND, LP**, an exempted limited partnership formed under the laws of the Cayman Islands, with registered number 53083, whose registered office is at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands (the "**Partnership**");

(2) **CHARITABLE DAF HOLDCO, LTD**, a company incorporated under the laws of the Cayman Islands, with registered number 263805, whose registered office is at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands (the "**Transferor**"); and

(3) **CDMCFAD, LLC**, a Delaware limited liability company (the "**Transferee**").

WHEREAS:

(A) The General Partner is the general partner of the Partnership which is governed by an amended and restated limited partnership agreement of the Partnership dated as of 7 November 2011 as amended on 26 July 2022 and as further amended and restated as of 11 March 2024 (as further amended, restated and/or supplemented from time to time) (the "**Partnership Agreement**").

(B) Unless otherwise defined, capitalised terms used in this Deed have the meanings given to them in the Partnership Agreement.

(C) In connection with a corporate restructuring of the Transferor's corporate group, the Transferor now wishes to assign to the Transferee the entirety of its interest in the Partnership, together with the rights and obligations attaching thereto (together, the "**Transferred Interest**") for the Consideration (as defined below) to the Transferor, and the Transferee wishes to assume all of the rights and obligations with respect to the Transferred Interest and be admitted to the Partnership, subject to the terms and conditions of this Deed (the "**Assignment**").

(D) The General Partner, whose consent is required for the purpose of the assignment of any interest in the Partnership, hereby provides its consent, subject to the terms and conditions of this Deed.

4900-9980-4933\1

CONFIDENTIAL TDIT005499

542

**NOW IT IS HEREBY AGREED AS FOLLOWS:**

**1      Assignment of Transferred Interest**

1.1    Subject to the terms and conditions of this Deed, the Transferor hereby assigns the Transferred Interest to the Transferee with effect on and from the date of this Deed (the "**Transfer Date**") in consideration for the contribution by the sole member of the Transferee of 100% of the issued and outstanding limited liablity company interests in the Transferee (the "**Consideration**") to the Transferor, and without prejudice to its obligations under clause 7 hereof and subject to the remaining terms and conditions of this Deed, the Transferee shall exercise its reasonable best endeavours to facilitate the implementation of the transfer, assignment, conveyance and contribution of the Consideration to the Transferor, with effect as of the date of this Deed.

1.2    Except as expressly provided herein, no further action by any party hereto and no additional document or instrument of transfer shall be required to evidence such assignment, transfer and assumption.

**2      Undertaking to be Bound and Power of Attorney**

2.1    In accordance with the terms of the Partnership Agreement and upon the General Partner giving its consent to the Assignment, and making appropriate entries for the name and details of the Transferee, including as required by sections 1.11(a) and 1.15 of the Partnership Agreement, into the register of Limited Partners, the Transferee undertakes to the General Partner and the Partnership that it will be bound by and have full benefit of all the terms of the Partnership Agreement and this Deed in the place of and instead of the Transferor in respect of the Transferred Interest and will assume all the duties, liabilities and obligations, whether past (to the extent permitted by law), present or future, of the Transferor under the Partnership Agreement with respect to the Transferred Interest as if the Transferee had been a Limited Partner in the Partnership with respect to the Transferred Interest with effect from the date upon which the Transferor became a Limited Partner pursuant to the terms of the Partnership Agreement and for all other purposes under the Partnership Agreement and any other relevant agreements. Furthermore, the General Partner hereby confirms the satisfaction or due waiver by the General Partner of any and all applicable conditions and restrictions set forth in the Partnership Agreement (or any other relevant agreements) to the proposed Assignment.

2.2    Without limitation to clause 2.1 above, the Transferee hereby constitutes, appoints and grants to the General Partner the power of attorney set out in section 6.4 of the Partnership Agreement with effect on and from the Transfer Date.

2.3    The Transferee hereby makes in favour of the General Partner and the Transferee, each representation, as was made by the Transferor in connection with its admission as a Limited Partner.

2

4900-9980-4933\1

3    Distributions and other accrued sums in respect of the Transferred Interest

3.1    The Transferor agrees that:

(a)    on and from the Transfer Date, it shall cease to have any further entitlement to allocations of income or distributions whatsoever or any other rights or benefits in respect of the Transferor's interest in the Partnership (including, for the avoidance of doubt, any dividends which may be payable in connection with the Transferred Shares relating to the period up to the Transfer Date but which may be paid after the Transfer Date) (collectively, the "**Distributions**");

(b)    all Distributions payable to the Transferor under the terms of the Partnership Agreement in respect of the Transferred Interest transferred and assigned hereunder and which accrue during, or are payable by reference to, any period prior to the Transfer Date shall be payable to the Transferee; and

(c)    any sums paid to the Partnership in connection with its admission as a Limited Partner or other costs or expenses paid in connection with the establishment or ongoing administration of the Partnership shall not be reimbursed.

4    Accession

In consideration of the mutual covenants contained herein, the General Partner, Transferor and Transferee hereby agree that, with effect from the Transfer Date, the Transferee shall have the rights and benefits under, and be bound by the provisions of, the Partnership Agreement in respect of the Transferred Interest and all parties, other than the Transferor, shall be bound by the terms of the Partnership Agreement in every way as if the Transferee was named therein in substitution of and for the Transferor.

5    Approval of General Partner and Updates to Register of Limited Partners

5.1    In reliance upon the undertakings, representations and warranties given by the Transferor and Transferee (as applicable) under this Deed, the General Partner:

(a)    consents, for the purposes of section 1.11 of the Partnership Agreement and for all other purposes, to the transactions contemplated by this Deed;

(b)    acknowledges that all requirements and conditions relating to such transactions have been satisfied or waived; and

(c)    certifies that the Transferee will be listed in the books and records of the Partnership as a Limited Partner and as sole legal owner of the Transferred Interest in substitution of and for the Transferor; and

shall, on the Transfer Date, promptly:

(d)    record the assignment of the Transferred Interest in accordance with applicable law;

3

4900-9980-4933\1

(e)    admit the Transferee as a Limited Partner in respect of the Transferred Interest; and

(f)    remove the name of the Transferor from the register of Limited Partners.

## 6    Indemnification

6.1    The Transferor and the Transferee hereby agree to indemnify and hold the General Partner and the Partnership harmless from any damage, loss, claim or expense resulting from:

(a)    the transactions contemplated by this Deed; or

(b)    any breach of this Deed or the Partnership Agreement by the Transferor or the Transferree, whether such breach occurred prior to, on or after the Transfer Date.

6.2    The liability of the Transferor and the Transferee under clause 6.1 shall be joint and several.

## 7    Further Assurances

Each of the parties hereto shall, at any time and from time to time, at the request of the other, promptly and duly execute and deliver any and all such further documents and instruments as may be reasonably required for the Transferor and Transferee to obtain the full benefit of the transactions contemplated by this Deed or as may be required pursuant to the Partnership Agreement to complete the substitution of the Transferor by the Transferee as a Limited Partner of the Partnership.

## 8    Miscellaneous

8.1    All words and terms which are defined in the Partnership Agreement and which are used in this Deed shall (where so used, and save only: (a) where otherwise expressly provided; or (b) where the context otherwise requires) have the same meanings as are given to such words and terms in the Partnership Agreement.

8.2    In this Deed, the clause headings are for convenience only and shall not affect the construction of this Deed, words and terms (including defined terms) denoting the singular shall include the plural and vice versa and words importing any gender shall include all genders.

8.3    The Transferor and the Transferee shall jointly and severally be obligated to reimburse the General Partner and the Partnership for all reasonable expenses (including attorneys' fees and expenses) in connection with the transfer and assignment of the Transferred Interest from the Transferor to the Transferee in accordance with this Deed.

8.4    Neither the Transferor nor the Transferee shall assign all or any part of their rights or obligations under this Deed.

8.5    If any provision of this Deed shall be held to be illegal or unenforceable, the enforceability of the remainder of this Deed shall not be affected.

4

4900-9980-4933\1

CONFIDENTIAL                                                    TDIT005502

545

8.6   This Deed may be signed in any number of counterparts. Any single counterpart or a set of counterparts signed, in either case, by all the parties hereto shall constitute a full and original Deed for all purposes.

8.7   This Deed and the rights of the parties hereto shall be governed by, and interpreted in accordance with, the laws of the Cayman Islands. The parties hereto hereby submit to the non-exclusive jurisdiction of the Cayman Islands courts.

*[signature page to follow]*

5

4900-9980-4933\1

546

IN WITNESS WHEREOF the parties have executed and delivered this document as a deed on the date first written above.

**GENERAL PARTNER**

EXECUTED AND DELIVERED AS A DEED BY

Name: Mark E Patrick
Title: Director
for and on behalf of
**CDH GP, LTD.**
as general partner of
**CHARITABLE DAF FUND, LP,**
in the presence of:

Name: MaryNell Cash
Title: Witness

**TRANSFEROR**

EXECUTED AND DELIVERED AS A DEED by

Name:
Title: Director
for and on behalf of
**CHARITABLE DAF HOLDCO, LTD**

**TRANSFEREE**

EXECUTED AND DELIVERED AS A DEED by

Name: Mark E Patrick
Manager
for and on behalf of
**CDMCFAD, LLC**

in the presence of:

Name: MaryNell Cash
Title: Witness

6

4900-9980-4933\1

CONFIDENTIAL TDIT005504

FSD2025-0116                                                      2025-08-19

---

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**CDMCFAD, LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

**December 18, 2024**

---

CONFIDENTIAL                                                      TDIT005505

**FSD2025-0116**                   **Page 552 of 1530**                                    **2025-08-19**

## TABLE OF CONTENTS

<u>Page</u>

Section 1 Definitions.................................................................................................................1

    1.1    Specific Definitions .....................................................................................1

    1.2    General Usage ...............................................................................................5

Section 2 Formation ..............................................................................................................6

    2.1    Formation and Name....................................................................................6
    2.2    Term.............................................................................................................6
    2.3    Purpose and Scope ......................................................................................6
    2.4    Principal Office............................................................................................7
    2.5    Delaware Office and Agent .........................................................................7
    2.6    Admission of Members................................................................................7
    2.7    Contact Information of the Members............................................................7
    2.8    Additional Documents .................................................................................7
    2.9    Title to Property ..........................................................................................7

Section 3 Capitalization ........................................................................................................7

    3.1    Capital Contributions ..................................................................................7
    3.2    Limitation on Capital Contributions ...........................................................8
    3.3    Withdrawal and Return of Capital ..............................................................8
    3.4    Loans to the Company .................................................................................8
    3.5    Interest on Capital .......................................................................................8
    3.6    Limitation of Liability; Return/Withholding of Certain Distributions ...................8

Section 4 Profits and Losses .................................................................................................9

    4.1    Allocations of Company Profits and Losses................................................9
    4.2    Allocation Adjustments Required to Comply With Section 704(b) of the
            Code ............................................................................................................9
    4.3    General Allocation and Capital Account Maintenance Provisions.......................11
    4.4    Nonallocation of Distributions to Increases in Minimum Gain.............................12
    4.5    Allocation of Liabilities ............................................................................12
    4.6    Modifications to Preserve Underlying Economic Objectives.............................12
    4.7    Withholding Taxes.....................................................................................12
    4.8    Intent of Allocations/Cash Savings Clause ...............................................13

Section 5 Distributions........................................................................................................14

    5.1    Distributions..............................................................................................14
    5.2    Limitation on Distributions .......................................................................15

Section 6 Administration; Management ...............................................................................15

-i-

6.1     Management Powers and Authority of the Manager ...........................................15
6.2     Designation of Manager ...........................................................................16
6.3     Manager's Power to Bind the Company ......................................................16
6.4     Action by Members .................................................................................16
6.5     No Duties to the Company .......................................................................16
6.6     Manager and Member Expenses ...............................................................16
6.7     Tax Matters; Partnership Representative ....................................................17
6.8     Records and Financial Statements .............................................................18
6.9     Valuation of Company Assets ..................................................................18
6.10    Officers. ...............................................................................................19

Section 7 Transfers and Resignations .......................................................................19

7.1     Transfers of Interests ..............................................................................19
7.2     Resignation/Removal of a Member ...........................................................19
7.3     Redemption ..........................................................................................19

Section 8 Dissolution and Liquidation ......................................................................19

8.1     Dissolving Events ..................................................................................19
8.2     Winding Up and Liquidation ...................................................................20
8.3     Deficit Restoration/Liability ....................................................................21

Section 9 Exculpation; Indemnification .....................................................................21

9.1     Exculpation ..........................................................................................21
9.2     Indemnification .....................................................................................21

Section 10 General Provisions .................................................................................22

10.1    Meetings ..............................................................................................22
10.2    Action Without a Meeting .......................................................................22
10.3    Entire Agreement ..................................................................................22
10.4    Amendments .........................................................................................22
10.5    Counterparts; Binding upon Members ........................................................22
10.6    No Third Party Beneficiaries ...................................................................22
10.7    Notices, Consents, Elections, Etc .............................................................23
10.8    Severability ..........................................................................................23
10.9    Governing Law ......................................................................................23
10.10   Status Under the Act ..............................................................................23
10.11   Partnership for Tax Purposes Only ............................................................23
10.12   Miscellaneous .......................................................................................23

SCHEDULE A – Member Information

-ii-

CONFIDENTIAL                                                            TDIT005507

550

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## CDMCFAD, LLC

## A DELAWARE LIMITED LIABILITY COMPANY

This Limited Liability Company Agreement of CDMCFAD, LLC, a Delaware limited liability company, is entered into as of December 18, 2024 and is hereby made effective as of the Effective Date (as defined below).

## SECTION 1

## DEFINITIONS

**1.1**   *Specific Definitions*.  As used in this Agreement:

*Act* shall mean the Delaware Limited Liability Company Act, Title 6, Delaware Code, Section 18-101 *et seq*.

*Adjusted Capital Account Deficit* shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)    The Capital Account shall be increased by any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) or the penultimate sentences of each of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)    The Capital Account shall be decreased by the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

*Affiliate* shall mean, with respect to any Person, any other Person with regard to which the Person is controlling, controlled or commonly controlled.  For purposes of the preceding sentence, "control" shall mean the power to direct the principal business management and activities of a Person, whether through ownership of voting Securities, by agreement, or otherwise.

*Agreement* shall mean this Limited Liability Company Agreement of CDMCFAD, LLC, a Delaware limited liability company, including all schedules, appendices, and exhibits hereto, as amended in accordance with the terms hereof.

CONFIDENTIAL                                                                    TDIT005508

*Allocation Percentage* shall mean, for each Member, the percentage set forth on Schedule A, which shall be adjusted as necessary to reflect the Members' varying interests in the Company.  For the avoidance of doubt, the aggregate Allocation Percentages of all Members shall at all times equal one hundred percent (100%).

*Capital Account* shall mean, for each Member, a separate account that is:

    (a)    Increased by:  (i) the amount of such Member's Capital Contribution and (ii) allocations of Profits to such Member pursuant to Section 4;

    (b)    Decreased by:  (i) the amount of cash distributed to such Member by the Company; (ii) the Fair Market Value of any other property distributed to such Member by the Company (determined as of the time of distribution and net of liabilities secured by such property that the Member assumes or to which the Member's ownership of the property is subject); and (iii) allocations of Losses to such Member pursuant to Section 4;

    (c)    Otherwise adjusted in accordance with the provisions of this Agreement; and

    (d)    Revalued in connection with any event described in paragraph (a) of the definition of "Gross Asset Value" to the extent the Manager determines that a revaluation is necessary to preserve the economic arrangement of the Members.  In determining the amount of any liability for purposes of subparagraphs (a) and (b) above, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Treasury Regulations.

Capital Accounts shall be maintained in accordance with Treasury Regulations Section 1.704-1(b) and specifically in a manner consistent with the Member's interest in the Company and the provisions of this Agreement shall be interpreted and applied in a manner consistent with such regulations and intent.

*Capital Contribution* shall mean, for any Member, the sum of the net amount of cash and the Fair Market Value of any other property (determined as of the time of contribution and net of liabilities secured by such property that the Company assumes or to which the Company's ownership of the property is subject) contributed by such Member to the capital of the Company. For purposes of this Agreement, each Capital Contribution shall be deemed to have been made at the later of:  (i) the Close of Business on the due date of such Capital Contribution as determined in accordance with this Agreement; or (ii) the Close of Business on the date on which such Capital Contribution is actually received by the Company.

*Certificate* shall mean the Certificate of Formation of the Company, as amended and/or restated from time to time.

*Close of Business* shall mean 5:00 p.m., local time, in New York, New York.

*Code* shall mean the United States Internal Revenue Code of 1986, as amended.

*Company* shall mean CDMCFAD, LLC, a Delaware limited liability company.

-2-

*Depreciation* shall mean, for each Fiscal Year or other period, an amount equal to the federal income tax depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period; provided, however, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year or other period bears to such beginning adjusted tax basis; and provided further, that if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

*Fair Market Value* shall have the meaning set forth in Section 6.9(b).

*Fiscal Period* shall mean the Fiscal Year or such shorter period as necessary to take into account the Members' varying interests in the Company.

*Fiscal Year* shall mean the period from January 1 through December 31 of each year (unless otherwise required by law).

*Gross Asset Value* shall mean, with respect to any asset, such asset's adjusted basis for federal income tax purposes (except that the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross Fair Market Value of the asset on the date of contribution), except as follows:

(a) The Gross Asset Value of all Company assets shall be adjusted to equal their respective fair market values upon the occurrence of any of the events listed in Treasury Regulations Section 1.704-1(b)(2)(iv)(f)(5); provided, however, that adjustments pursuant to this clause (a) (other than in a liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g)) shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

(b) The Gross Asset Value of any Company asset distributed to any Member shall be the Fair Market Value of such asset on the date of distribution.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (a) or paragraph (b) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

*Interest* shall mean, for each Member, the entirety of such Member's rights, duties and limited liability company interest in respect of the Company in such Member's capacity as such (as distinguished from any other capacity such as employee, debtor or creditor) and shall include such Member's right, if any, to vote on Company matters, bind the Company vis-à-vis third parties, or receive distributions as well as such Member's obligation under this Agreement, if any, to provide services, make Capital Contributions or take any other action.

-3-

**CONFIDENTIAL** **TDIT005510**

*Manager* shall mean the Person designated as the Manager in Section 6.2.

*Member* shall mean those Persons admitted as members under this Agreement as shown on Schedule A as such schedule may be updated from time to time, each in such Person's capacity as a member of the Company. Except where the context requires otherwise, a reference in this Agreement to "the Members" shall mean all of the Members.

*Member Minimum Gain* has the same meaning as the term "partner nonrecourse debt minimum gain" in Treasury Regulations Section 1.704-2(i)(2).

*Member Nonrecourse Deduction* shall mean an item of loss, expense or deduction attributable to a nonrecourse liability of the Company for which a Member bears the economic risk of loss within the meaning of Treasury Regulations Section 1.704-2(i).

*Minimum Gain* of the Company or *Company Minimum Gain* shall, as provided in Treasury Regulations Section 1.704-2, mean the total amount of gain the Company would realize for federal income tax purposes if it disposed of all assets subject to nonrecourse liability for no consideration other than full satisfaction thereof.

*Person* shall mean an individual, partnership, corporation, limited liability company, unincorporated organization, trust, joint venture, governmental agency, or other entity, whether domestic or foreign.

*Principal Office* shall have the meaning set forth in Section 2.4.

*Profits* and *Losses* shall mean, for each Fiscal Year or other Fiscal Period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other Fiscal Period, as applicable, determined in accordance with Section 703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code), with the following adjustments:

(a) Any income of the Company exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to (or subtracted from, as the case may be) such taxable income or loss;

(b) Any expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from (or added to, as the case may be) such taxable income or loss;

(c) In the event that the Gross Asset Value of any Company asset is adjusted in accordance with paragraphs (a) or (b) of the definition of "Gross Asset Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d) Gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed

-4-

by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(e)      In lieu of the depreciation, amortization and other cost recovery deductions that would otherwise be taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other Fiscal Period, computed in accordance with the definition of "Depreciation" above; and

(f)      Notwithstanding any other provision of this definition, any items that are specially allocated pursuant to Sections 4.2 or 4.3 shall not be taken into account in computing Profits or Losses.

*Securities* shall mean debt, equity and synthetic securities of any type.

*Term* shall have the meaning set forth in Section 2.2.  Where not capitalized, "term" shall mean the entire period of the Company's existence, including any period of winding-up and liquidation following the dissolution of the Company pursuant to Section 8.1.

*Title XI 2015 RBA* shall have the meaning set forth in Section 6.7(d).

*Transfer* shall mean any sale, exchange, transfer, gift, encumbrance, assignment, pledge, mortgage, hypothecation or other disposition, whether voluntary or involuntary.

*Treasury Regulations* shall mean the regulations issued by the United States Treasury Department and relating to a matter arising under the Code.

*Updated Capital Account* shall mean, with respect to a Member, such Member's Capital Account determined as if, immediately prior to the time of determination, all of the Company's assets had been sold for Fair Market Value and any previously unallocated Profits and Losses had been allocated pursuant to Section 4.

**1.2**      *General Usage*.  The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.  Except where the context clearly requires to the contrary:  (i) each reference in this Agreement to a designated "Section," "Schedule," "Exhibit," or "Appendix" is to the corresponding Section, Schedule, Exhibit, or Appendix of or to this Agreement; (ii) instances of gender or entity-specific usage (*e.g.*, "his," "her," "its," "person" or "individual") shall not be interpreted to preclude the application of any provision of this Agreement to any individual or entity; (iii) the word "or" shall not be applied in its exclusive sense; (iv) "including" shall mean "including, without limitation"; (v) references to laws, regulations and other governmental rules, as well as to contracts, agreements and other instruments, shall mean such rules and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the effective date of this Agreement) and shall include all successor rules and instruments thereto; (vi) references to any specific statute or similar codification of law shall mean such statute or other codification as construed, modified, extended or enabled by any applicable binding governmental rules or regulations; (vii) references to "law" shall mean any applicable law, whether embodied in statute, governmental rule or regulation, case law or other legally binding format; (viii) references to "$" or "dollars" shall mean the lawful

-5-

currency of the United States; (ix) references to "federal" shall be to laws, agencies or other attributes of the United States (and not to any State or locality thereof); (x) the meaning of the terms "domestic" and "foreign" shall be determined by reference to the United States; (xi) references to "days" shall mean calendar days and references to "business days" shall mean all days other than Saturdays, Sundays and days that are legal holidays in the State of New York; (xii) references to months or years shall be to the actual calendar months or years at issue (taking into account the actual number of days in any such month or year); (xiii) days, business days and times of day shall be determined by reference to local time in New York, New York; and (xiv) the English language version of this Agreement shall govern all questions of interpretation relating to this Agreement, notwithstanding that this Agreement may have been translated into, and executed in, other languages.

## SECTION 2

## FORMATION

**2.1** *Formation and Name*.

(a) The Members hereby enter into this Agreement and form the Company as a limited liability company in accordance with the Act. Mark Patrick is hereby designated as an "authorized person" of the Company within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware (such filing being hereby approved and ratified in all respects and the time at which the initial Certificate of Formation is filed with the Secretary of State of the State of Delaware, the "**Effective Date**"). Upon the filing of the Certificate of Formation of the Company with the Secretary of State of the State of Delaware, his powers as an "authorized person" of the Company ceased, and the Manager thereupon became the designated "authorized person" of the Company and shall continue as the designated "authorized person" of the Company within the meaning of the Act. The Manager, as an "authorized person" of the Company within the meaning of the Act, shall execute, deliver and file, or cause the execution, delivery and filing of, all certificates (and any amendments and/or restatements thereof) required or permitted by the Act to be filed with the Secretary of State of the State of Delaware. The Member shall execute, deliver and file, or cause the execution, delivery and filing of any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any other jurisdiction in which the Company may wish to conduct business.

(b) The name of the Company shall be "CDMCFAD, LLC."

**2.2** *Term*. The "Term" of the Company commenced as of the filing of the Certificate with the Secretary of State of the State of Delaware and shall continue until the Company is dissolved and then wound up pursuant to Section 8.1. Except as provided in Section 8.1, the Company shall not be dissolved.

**2.3** *Purpose and Scope*. Within the meaning and for purposes of the Act, the purpose and scope of the Company shall include any lawful action or activity permitted to a limited liability company under the Act, as determined by the Manager.

-6-

**CONFIDENTIAL** **TDIT005513**

    **2.4**    *Principal Office*.  The Company shall have a single "Principal Office" which shall at all times be located within the United States.  The Principal Office shall be located at such location as may hereafter be determined by the Manager.

    **2.5**    *Delaware Office and Agent*.  The Company shall maintain a Delaware registered office and agent for service of process as required by the Act.  In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Manager shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be, each in accordance with the Act.

    **2.6**    *Admission of Members*.  Each Person as of the date hereof that has executed this Agreement and whose name is listed under Name and Contact Information on Schedule A, as such Schedule A may be updated from time to time by the Manager, is hereby admitted as a member of the Company.  With the consent of the Manager, additional Members may be admitted to the Company from time to time upon each such Person's execution of a counterpart signature page to this Agreement or other joinder agreeing to be bound by the terms of this Agreement.

    **2.7**    *Contact Information of the Members*.  Set forth below the name of each Member on Schedule A shall be appropriate contact information for such Member.  Each Member shall promptly provide the Company with the information required to be set forth for such Member on Schedule A and shall thereafter promptly notify the Company of any change to such information.

    **2.8**    *Additional Documents*.  The Manager shall cause to be executed, filed, recorded, published, or amended any documents, as the Manager in its reasonable discretion determines to be necessary or advisable:  (x) in connection with the formation, operation, dissolution, winding-up, or termination of the Company pursuant to applicable law; or (y) to otherwise give effect to the terms of this Agreement.  The terms and provisions of each document described in the preceding sentence shall be initially established and shall be amended as necessary to cause such terms and provisions to be consistent with the terms and provisions of this Agreement.

    **2.9**    *Title to Property*.  Title to all Company property shall be held in the name of the Company; provided, however, that publicly traded Securities may be held in "street name" or through a similar arrangement with a reputable financial institution.

---

### SECTION 3

### CAPITALIZATION

---

    **3.1**    *Capital Contributions*.

    (a)    *Initial Capital Contributions*.  Each Member has contributed (or is deemed to have contributed) such capital to the Company as set forth on the books and records of the Company.  Except to the extent set forth on the books and records of the Company or agreed to by the Manager, all Capital Contributions shall be in cash and/or cash equivalents.

-7-

(b)      *Increased Capital Contributions*.   The Members may make additional Capital Contributions to the Company at such times and in such amounts as shall be determined by the Manager and the Member making such additional Capital Contribution.

(c)      *Adjustment of Member Allocation Percentages*.   Upon (i) the admission of a Member following the date hereof or (ii) the acceptance of Capital Contributions by the Company from a Member following contribution of such Member's initial Capital Contribution, the Manager shall adjust the Allocation Percentage of each Member, and shall accordingly update Schedule A hereto, so that the Allocation Percentages of the Members represent their Interest in the Company taking into account a revaluation of the Company's assets, if any, and in accordance with the economic arrangement of the Members.

3.2      *Limitation on Capital Contributions*.   Except as specifically provided in this Section 3, no Person shall be permitted or required to make a contribution to the capital of the Company.

3.3      *Withdrawal and Return of Capital*.   Except as provided in Section 5 and Section 8 or as otherwise agreed to by the Manager, no Member shall be entitled to the return of such Member's Capital Contribution, a distribution in respect of such Member's Capital Account balance, or any other distribution in respect of such Member's Interest.

3.4      *Loans to the Company*.   No Member shall be required to lend any money to the Company or to guaranty any Company indebtedness.

3.5      *Interest on Capital*.   No Member shall be entitled to interest on such Member's Capital Contribution, Capital Account balance, or share of unallocated Profits.

3.6      *Limitation of Liability; Return/Withholding of Certain Distributions*.

(a)      Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member or manager of the Company.

(b)      A Member that receives a distribution (i) in violation of this Agreement or (ii) that is required to be returned to the Company under applicable law shall return such distribution within thirty (30) days after demand therefor by the Manager.   The Company may elect to withhold from any distributions otherwise payable to a Member amounts due to the Company from such Member.

(c)      Nothing in this Section 3.6 shall be applied to release any Member from (i) its obligation to make Capital Contributions or other payments specifically required under this Agreement or (ii) its obligations pursuant to any relationship between the Company and such Member acting in a capacity other than as a Member (including, for example, as a borrower, employee or independent contractor).

-8-

FSD2025-0116                                                                2025-08-19

## SECTION 4

## PROFITS AND LOSSES

**4.1** *Allocations of Company Profits and Losses*. Except as otherwise provided in this Agreement, Profits and Losses for each Fiscal Period shall be allocated as follows:

(a) Profits shall be allocated among the Members in the following order of priority:

(i) First, among the Members on a pro rata basis so as to reverse prior allocations of Losses for prior Fiscal Periods under Section 4.1(b)(ii) until cumulative Profit allocated under this Section 4.1(a)(i) equals the cumulative Losses allocated under Section 4.1(b)(ii); and

(ii) Second, among the Members in proportion to their Allocation Percentages.

(b) Losses shall be allocated among the Members in the following order of priority:

(i) First, among the Members on a pro rata basis so as to reverse allocations of Profits for prior Fiscal Periods under Sections 4.1(a)(i) and 4.1(a)(ii), in reverse order, until Losses allocated under this Section 4.1(b)(i) equal the cumulative Profit previously allocated under Sections 4.1(a)(i) and 4.1(a)(ii); and

(ii) Second, among the Members in proportion to their Allocation Percentages.

**4.2** *Allocation Adjustments Required to Comply With Section 704(b) of the Code*.

(a) *Limitation on Allocation of Losses*. If an item of Losses otherwise allocable to a Member under Section 4.1(b) would cause such Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year (or increase the amount of such Member Adjusted Capital Account Deficit), the item shall not be allocated to such Member, but shall instead be specially allocated as follows:

(i) To the Members in proportion to their respective positive Capital Account balances, until the Capital Account balance of each Member has been reduced to (but not less than) zero; and

(ii) Next, to the Members as a group in proportion to their respective Allocation Percentages as determined in the reasonable discretion of the Manager.

To the extent that there have been special allocations of Losses away from a Member under this Section 4.2(a) that have not subsequently been reversed pursuant to this sentence or Sections 4.2(f)

-9-

or 4.3(e), the next available items of Profits otherwise allocable to such Member pursuant to Section 4.1(a) shall be specially allocated to the Members to whom such items of Losses had been specially allocated under this Section 4.2(a) so as to first offset in reverse order such special allocations of Losses.

(b)     *Qualified Income Offset*.  In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.2(b) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 4 have been tentatively made as if this Section 4.2(b) were not in this Agreement.

(c)     *Gross Income Allocation*.  In the event any Member has an Adjusted Capital Account Deficit at the end of any Fiscal Year, that Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.2(c) shall be made only if and to the extent that the Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 4 have been made, as if Section 4.2(b) and this Section 4.2(c) were not in this Agreement.

(d)     *Member Nonrecourse Deductions*.  In accordance with the provisions of Treasury Regulations Section 1.704-2(i), each item of Member Nonrecourse Deduction shall be allocated among the Members in proportion to the economic risk of loss that the Members bear with respect to the nonrecourse liability of the Company to which such item of Member Nonrecourse Deduction is attributable.

(e)     *Minimum Gain Chargeback*.  This Section 4.2(e) hereby incorporates by reference the "minimum gain chargeback" provisions of Treasury Regulations Section 1.704-2.  In general, upon a reduction of Company Minimum Gain or Member Minimum Gain, the preceding sentence shall require that items of income and gain be allocated among the Members in a manner that reverses prior allocations of deductions attributable to liabilities giving rise to Company Minimum Gain or Member Nonrecourse Deductions as well as reductions in the Members' Capital Account balances resulting from distributions that, notwithstanding Section 4.4, are allocable to increases in the Company Minimum Gain.  Subject to the provisions of Section 704 of the Code and the Treasury Regulations thereunder, if the Manager determines in its reasonable discretion at any time that operation of such "minimum gain chargeback" provisions likely will not achieve such a reversal by the conclusion of the liquidation of the Company, the Manager shall adjust the allocation provisions of this Section 4 as necessary to accomplish that result.

(f)     *Intent of Regulatory Allocations*.    The allocations set forth in Sections 4.2(a) through 4.2(e) are intended to comply with certain regulatory requirements under the Code.  The Members intend that, to the extent possible, all allocations made pursuant to such Sections will, over the term of the Company, be offset either with other allocations pursuant to Sections 4.2(a) through 4.2(e) or with special allocations of other items of Company income, gain,

-10-

loss or deduction pursuant to this Section 4.2(f).  Accordingly, the Manager is hereby authorized and directed to make offsetting allocations of Company income, gain, loss or deduction under this Section 4.2(f) in whatever manner the Manager determines is appropriate so that, after such offsetting special allocations are made, the Capital Accounts of the Members are, to the extent possible, equal to the Capital Accounts each would have if the provisions of Sections 4.2(a) through 4.2(e) were not contained in this Agreement and all Company income, gain, loss, and deduction were instead allocated in accordance with the provisions of Section 4.1.

**4.3**     *General Allocation and Capital Account Maintenance Provisions*.

(a)     *Book - Tax Accounting Disparities*.  If Company property is reflected in the Capital Accounts of the Members at a value that differs from the adjusted tax basis of such property (whether because such property was contributed to the Company by a Member or because of a revaluation of the Members' Capital Accounts under Treasury Regulations Section 1.704-1(b)), allocations of depreciation, amortization, income, gain or loss with respect to such property shall be made among the Members in a manner which takes such difference into account in accordance with Code Section 704(c) and the Treasury Regulations issued thereunder using a method determined in the reasonable discretion of the Manager.

(b)     *Allocations in Event of Transfer*.  If an Interest in the Company is Transferred in accordance with this Agreement, allocations of Profits and Losses as between the transferor and transferee shall be made using any method selected by the Manager and permitted under Section 706 of the Code.

(c)     *Adjustment to Capital Accounts for Distributions of Property*.  If property distributed in kind is reflected in the Capital Accounts of the Members at a value that differs from the Fair Market Value of such property at the time of distribution, the difference shall be treated as Profit or Loss on the sale of the property and shall be allocated among the Members in accordance with the provisions of Section 4.

(d)     *Tax Credits and Similar Items*.  Any tax credits or similar items not allocable pursuant to Sections 4.1, 4.2 and 4.3(a) through 4.3(c) shall be allocated to the Members in proportion to their respective Allocation Percentages.  Notwithstanding the preceding sentence, if Company expenditures that give rise to tax credits also give rise to Member Nonrecourse Deductions, the tax credits attributable to such expenditures shall be allocated in accordance with Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)     *Reallocation of Certain Losses*.  To the extent that:  (i) Losses which otherwise would have been allocated to a Member under this Section 4.3 were allocated to one or more other Members pursuant to Section 4.2(a) or any other provision of this Agreement that prohibits the allocation to a Member of Losses which would reduce such Member's Capital Account (or Updated Capital Account) balance below a specified amount; (ii) such allocation has not been reversed pursuant to the subsequent operation of Section 4.2(a) or this Section 4.3(e); and (iii) the Member thereafter returns a distributed amount as required under Section 3.6(b) or otherwise makes a contribution to the capital of the Company, the Capital Accounts of the Members shall be adjusted in connection with such return or contribution (to the extent of the value thereof) to effect a reallocation, in reverse order, of such Losses to the Member.

-11-

4937-0258-2788\4

FSD2025-0116                                                                    2025-08-19

(f)     *Tax Allocations*.  It is intended that items of Company income, gain, loss, deduction or credit recognized for federal income tax purposes shall be allocated among the Members for federal income tax purposes in the same manner as its correlative item of "book" income, gain, loss or deduction is allocated pursuant to Sections 4.1 and 4.2 hereof, to the extent consistent with the requirements of the Code and the Treasury Regulations.

**4.4**     *Nonallocation of Distributions to Increases in Minimum Gain*.  To the extent permitted under Treasury Regulations Section 1.704-2(h), distributions to Members shall not be allocable to increases in the Company Minimum Gain.  In general, and except as provided in such Treasury Regulations, the preceding sentence is intended to ensure that reductions in a Member's Capital Account balance resulting from distributions of money or other property to that Member are not reversed by the minimum gain chargeback provisions of Section 4.2(e).

**4.5**     *Allocation of Liabilities*.  Solely for purposes of determining the Members' respective shares of the nonrecourse liabilities of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), each Member's interest in Company Profits shall be equal to the ratio that such Member's Allocation Percentage bears to the aggregate Allocation Percentages of the Members.

**4.6**     *Modifications to Preserve Underlying Economic Objectives*.  In the event that (i) there is a change in the federal income tax law, (ii) the Company borrows money or property, or (iii) the Company makes an election to adjust the basis of the Company's assets under Section 754 of the Code, the Manager, acting in his reasonable discretion after consultation with tax counsel to the Company, shall make the minimum modifications to the allocation provisions of this Agreement necessary to preserve the underlying economic objectives of the Members as reflected in this Agreement and, in the case of such a borrowing or election, to properly allocate the tax items relating to such borrowing or election in accordance with the Code and the Treasury Regulations.

**4.7**     *Withholding Taxes*.

(a)     The Company shall be permitted to withhold taxes from distributions to, and allocations among, the Members to the extent required by law (as determined by the Manager in the Manager's sole discretion).  Except as otherwise provided in this Section 4.7, any amount so withheld by the Company with regard to a Member shall be treated for purposes of this Agreement as an amount actually distributed to such Member pursuant to Section 5.1.  An amount shall be considered withheld by the Company if, and at the time, remitted to a governmental agency without regard to whether such remittance occurs at the same time as the distribution or allocation to which it relates; provided, however, that an amount actually withheld from a specific distribution or designated by the Manager as withheld from a specific allocation shall be treated as if distributed at the time such distribution or allocation occurs.  Nothing in this Section 4.7(a) shall have any bearing on amounts withheld from a Member in respect of compensation paid or payable to such Member in such Member's capacity as an employee of the Company or pursuant to a bona fide written employment agreement between such Member and the Company.

(b)     If, pursuant to Section 4.7(a), an amount withheld with regard to a Member is treated for purposes of this Agreement as an amount distributed to such Member pursuant to

-12-

4937-0258-2788\4
481

CONFIDENTIAL                                                   TDIT005519

**FSD2025-0116**                                                                          **2025-08-19**

Section 5.1, subsequent actual distributions to such Member pursuant to Section 5.1 shall be reduced as necessary to, as quickly as possible, cause the aggregate distributions to such Member over the term of the Company (including actual distributions and distributions deemed to have occurred pursuant to Section 4.7(a)) to equal the actual distributions that would have been made to such Member if Section 4.7(a) were not part of this Agreement.

(c)     To the extent that operation of Section 4.7(a) would create a negative balance in a Member's Updated Capital Account or increase the amount by which such Updated Capital Account balance is negative, the amount of the deemed distribution shall instead be treated as a loan by the Company to such Member, which loan shall be payable upon demand by the Company and shall bear interest at a floating rate equal to the prime rate as announced from time to time by the Wall Street Journal, compounded daily.

(d)     In the event that the Manager determines in its discretion that the Company lacks sufficient cash available to pay withholding taxes in respect of a Member, the Manager may, in its sole and absolute discretion, make a loan to the Company to enable the Company to pay such taxes.  Any such loan shall be full-recourse to the Company and shall bear interest at a floating rate equal to the prime rate as published from time to time by The Wall Street Journal, compounded daily.  Notwithstanding any provision of this Agreement to the contrary, any loan (including interest accrued thereon) made to the Company by a Member or the Manager pursuant to this Section 4.7(d) shall be repaid or returned as promptly as is reasonably possible.

(e)     Each Member hereby agrees to indemnify the Company and the other Members for (i) any liability they may incur for failure to properly withhold taxes in respect of such Member, and (ii) any tax liabilities imposed on the Company with respect to such Member; moreover, each Member hereby agrees that neither the Company nor any other Member shall be liable for any excess taxes withheld in respect of such Member's Interest and that, in the event of overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate governmental authority.  The obligations of a Member set forth in this Section 4.7 shall survive the resignation of any Member from the Company or any Transfer of a Member's Interest.

**4.8**     *Intent of Allocations/Cash Savings Clause*.  The parties intend that the foregoing allocation provisions of this Section 4 shall produce final Capital Account balances of the Members that will permit liquidating distributions that are made in accordance with final Capital Account balances under Section 8.2(d) hereof to be made in a manner identical to the order of priorities set forth in Section 5.1(b).  To the extent that the allocation provisions of this Section 4 would fail to produce such final Capital Account balances, (i) such provisions shall be amended by the Manager without the consent of any Member or other Person, if and to the extent necessary to produce such result and (ii) income and loss of the Company for prior open years (including items of gross income and deduction of the Company for such years) shall be reallocated by the Manager among the Members to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years, as approved by the Manager.  This Section 4.8 shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service ("**IRS**") or any other taxing authority.  The Manager shall have the power to amend this Agreement without the consent of the Members, as it reasonably considers advisable, to make the allocations and adjustments described in this Section 4.8.  To the extent that after making the allocations and

-13-

4937-0258-2788\4

**482**

**CONFIDENTIAL**                                                                 **TDIT005520**

adjustments described in this Section 4.8, the distributions that any Member will receive under this Agreement are less than the amount of the distributions such Member would receive if all such distributions were made pursuant to the order of priority set forth in Section 5.1(b), the Company may make a guaranteed payment (within the meaning of Section 707(c) of the Code) to such Member (to be made at the time such Member would otherwise receive the distributions that have been reduced) to the extent such payment does not violate the requirements of Sections 704(b) and 514(c)(9)(E) of the Code or may take such other action as reasonably determined by the Manager to offset such reduction.

## SECTION 5

## DISTRIBUTIONS

**5.1**     *Distributions*.

(a)     *General*.  Except as otherwise provided in this Agreement, distributions prior to the dissolution of the Company shall be made in accordance with this Section 5.1 and each Member actually receiving amounts pursuant to a specific distribution by the Company shall receive a pro rata share of each item of cash or property of which such distribution is constituted (based upon such Member's share under this Agreement of the total amount to be included in such distribution).

(b)     *Discretionary Distributions*.  The Manager may at any time in its sole discretion to the extent the Company has cash and any property available for distribution taking into account current and anticipated needs (including without limitation operating expenses, debt service, guaranteed payments and a reserve for future operating costs), distribute such excess cash and any property available for distributions to the Members in accordance with their respective Allocation Percentages.

(c)     *Tax Distributions.*

(i)     Notwithstanding the foregoing, the Company shall distribute to each Member, not later than ninety (90) days after the close of each Fiscal Year, or as soon as reasonably practicable thereafter, an amount of cash equal to the product of the Tax Percentage for such Fiscal Year and such Member's allocated share of the Company's net taxable income and gain for such Fiscal Year as shown on the Company's federal income tax return. The Manager may, in its sole discretion and determination, make distributions pursuant to this Section 5.1(c) on a quarterly basis so as to permit the Members to make quarterly estimated tax payments.

(ii)     For purposes of this Section 5.1(c), the "Tax Percentage" shall equal the highest combined federal, state and local marginal tax rate for an individual resident of the State of Texas with respect to net taxable income or net short term capital gains or with respect to net long term capital gains, as applicable.  The Manager may adjust the determination of the Tax Percentage to reflect a change in law or rates.

-14-

**CONFIDENTIAL**                    **TDIT005521**

(iii)    For purposes of determining whether the Company has satisfied its distribution obligation under Section 5.1(c)(i), all cash distributions made during a Fiscal Year shall be treated as distributions made to satisfy Section 5.1(c)(i) in respect of such Fiscal Year (except to the extent that such distributions were made to satisfy the obligations of the Company under Section 5.1(c)(i) in respect of one or more prior Fiscal Years, in which case such distributions shall be treated as having been made pursuant to Section 5.1(c)(i) in respect of such prior Fiscal Year(s)). Further, distributions made in respect of this Section 5.1(c) during any Fiscal Year shall be treated as satisfying the distribution requirement of Section 5.1(b) hereof with respect to such Fiscal Year (except to the extent that such distributions were made in respect of a prior Fiscal Year, in which case such distribution shall be treated as having been made in respect of such prior Fiscal Year(s)).

(iv)    At the election of the Manager, no distribution shall be required pursuant to Section 5.1(c)(i) in respect of any Fiscal Year if the total net taxable income and gain of the Company for such Fiscal Year is less than or equal to One Hundred Thousand Dollars ($100,000).

(v)    No distribution shall be required to be made pursuant to this Section 5.1(c) to a Member to the extent such Member has a cumulative net loss with respect to such Member's allocable share of the taxable income or gain, as the case may be, after taking into account allocations for the current and all prior taxable periods.

(vi)    The Company shall not make a distribution under this Section 5.1(c) to a Member to the extent such Member is allocated net taxable income and gain solely in connection with (A) redemption of such Member's Interest or (B) a liquidation of the Company.

(d)    *Source of Items Available for Distribution*.  In the event that, at the time of a distribution, items available for distribution include items from more than one source, the source of those items actually distributed shall be determined by the Manager in its sole discretion.

**5.2**    *Limitation on Distributions*.  No distribution shall be made to a Member pursuant to Section 5.1 if and to the extent that such distribution would:  (i) create a negative balance in the Updated Capital Account of such Member or increase the amount by which such Updated Capital Account balance is negative; (ii) cause the Company to be insolvent; or (iii) render the Member liable for a return of such distribution under applicable law.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to a Member on account of its interest in the Company if such distribution would violate the Act or other applicable law.

## SECTION 6

## ADMINISTRATION; MANAGEMENT

**6.1**    *Management Powers and Authority of the Manager*.  Except as otherwise specifically provided in this Agreement, the Company and its business shall be managed, controlled and operated exclusively by the Manager, which shall be the "manager" of the Company

-15-

**CONFIDENTIAL** **TDIT005522**

FSD2025-0116                   **Page 569 of 1530**                        2025-08-19

within the meaning of Section 18-101 of the Act and shall have all of the powers and authority in respect of the Company permitted to managers under the Act.

6.2 ***Designation of Manager***. The initial Manager shall be Mark Patrick. In the event that Mark Patrick dies or is unable to serve as such, the will or other testamentary documentation for Mark Patrick shall designate a successor Manager. To the extent that the will or other related documentation for Mark Patrick fails to provide for a successor Manager or if any such designated individual shall be unable or is unwilling to fill such position, the managing shareholder of Charitable DAF HoldCo, Ltd., shall appoint a successor Manager. To the extent that Mark Patrick desires to resign as Manager, he shall appoint his successor.

6.3 ***Manager's Power to Bind the Company***.

(a) Notwithstanding any provision of this Agreement to the contrary, any contract agreement, deed, lease, note or other document or instrument executed on behalf of the Company by a Manager shall be deemed to have been duly executed by the Company; no Member's signature shall be required in connection with the foregoing and third parties shall be entitled to rely upon the Manager's power to bind the Company without otherwise ascertaining that the requirements of this Agreement have been satisfied.

(b) The Manager is hereby authorized to file with any governmental entity, on behalf of the Company and the Members, a certificate or similar instrument that evidences the Manager's power to bind the Company as set forth in the preceding paragraph (a).

(c) To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement the Manager is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the Manager shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in its "good faith" or under another express standard, the Manager shall act under such express standard and shall not be subject to any other or different standard.

6.4 ***Action by Members***. Except as set forth in Section 6.2, no Member shall have any right to vote with respect to any Company action.

6.5 ***No Duties to the Company***. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.

6.6 ***Manager and Member Expenses***.

(a) ***General***. Except as otherwise provided in this Section 6.6, no Manager or Member shall be reimbursed for expenses incurred on behalf of, or otherwise in connection with,

-16-

FSD2025-0116                                                              2025-08-19
                                                                              **485**

CONFIDENTIAL
                                                        TDIT005523

the Company.  Any reimbursement paid by a third party for expenses actually reimbursed by the Company shall be retained by (or paid over by the recipient thereof to) the Company.

(b)     *Manager*.   The Manager shall be reimbursed by the Company for reasonable out-of-pocket expenses incurred by the Manager on behalf of the Company.

(c)     *Member*.  A Member shall be reimbursed for expenses incurred on behalf of the Company only with the approval of the Manager, which approval may be withheld by the Manager in its sole and absolute discretion.

**6.7**     *Tax Matters; Partnership Representative*.

(a)     ***Partnership Classification for Tax Purposes***.   Except to the extent otherwise required by applicable law (disregarding for this purpose any requirement that can be avoided through the filing of an election or similar administrative procedure), the Manager shall cause the Company to take the position that the Company is a "partnership" or disregarded entity, as applicable, for federal, state and local income tax purposes and shall cause to be filed with the appropriate tax authorities any elections or other documents necessary to give due legal effect to such position.  A Member shall not file (and each Member hereby represents that it has not filed) any income tax election or other document that is inconsistent with the Company's position regarding its classification as a "partnership" for applicable federal, state and local income tax purposes.

(b)     ***Notice of Inconsistent Treatment of Company Item***.  No Member shall file a notice with the IRS under Section 6222(b) of the Code in connection with such Member's intention to treat an item on such Member's federal income tax return in a manner which is inconsistent with the treatment of such item on the Company's federal income tax return.

(c)     ***Notice of Settlement Agreement***.  Any Member entering into a settlement agreement with the United States Department of the Treasury which concerns a Company item shall notify the Manager of such settlement agreement and its terms within sixty (60) days after the date thereof.

(d)     ***Partnership Representative and Audits***.

(i)     The Manager shall be the "partnership representative" of the Company (the "**Partnership Representative**") pursuant to and to the extent permitted by Section 6223 of Title XI of the Bipartisan Budget Act of 2015 ("**Title XI 2015 BBA**").  In the event of any pending tax action, investigation, claim or controversy at the Company level that may result in a "partnership adjustment," within the meaning of Section 6241(2) of Title XI 2015 BBA (a "**Partnership Adjustment**"), to any item reported on a federal tax return of any Member(s), the Partnership Representative, shall keep such Member(s) fully and timely informed by written notice of any audit, administrative or judicial proceedings, meetings or conferences with the IRS or other similar material matters that come to its attention in its capacity as Partnership Representative.  The Partnership Representative will give the Members not less than fifteen (15) days' prior written notice as to any action to be taken or of any decision not to take action with respect to any such material matter.  The Partnership Representative shall act in any similar capacity under applicable state, local or foreign law, subject to similar restrictions and obligations.

-17-

The Company shall reimburse the Partnership Representative for its reasonable expenses in connection with the performance of his duties hereunder.

(ii)     For any Partnership Adjustment or proposed Partnership Adjustment to the federal income tax returns of the Company for which an "imputed underpayment," within the meaning of Section 6225(b) of Title XI 2015 BBA would arise, then either, (1) the Partnership Representative may require that the Member(s) affected by such Partnership Adjustment file amended returns that take into account such Partnership Adjustments and pay any additional tax due pursuant to Section 6225(c) of Title XI 2015 BBA or (2) if the Partnership Representative does not require the affected Member(s) to file such amended returns as provided in clause (1), and the affected Member(s) do not otherwise file such amended returns, the Partnership Representative may elect application of Section 6226 of Title XI 2015 BBA.  In any case, the affected Member(s) shall keep the Partnership Representative fully and timely informed by written notice of any administrative or judicial proceedings, meetings or conferences with the IRS or other similar matters with respect to the Partnership Adjustment, and the Partnership Representative shall have the right to review and comment on any submissions to the IRS, and attend and jointly participate in any meetings or conferences with the IRS.

(iii)     This Section 6.7(d) is intended to comply with certain provisions under Title XI 2015 BBA that may be subject to change or further interpretation by the U.S. Treasury or IRS.  In the event of such change or further interpretation, the Manager is hereby authorized to amend this Agreement consistent with the provisions of Sections 6.7(d)(i) and 6.7(d)(ii) above.

**6.8**     *Records and Financial Statements*.

(a)     The Company shall maintain true and proper books, records, reports, and accounts in which shall be entered all transactions of the Company.  The Company shall also maintain all schedules to this Agreement and shall update such schedules promptly upon receipt of new information relating thereto. Notwithstanding anything in Section 18-305 of the Act, except as provided in Section 6.8(b), no Member shall have any right to review or inspect any of the books or records of the Company or receive any other Company information.

(b)     Within ninety (90) days after the end of each Fiscal Year, or as soon as reasonably practicable thereafter, the Company shall supply to each Member such Member's IRS Schedule K-1 for such Fiscal Year.

**6.9**     *Valuation of Company Assets*.

(a)     *General*.  The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.

(b)     *Binding Effect*.  The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.

4937-0258-2788\4

FSD2025-0116                                                                2025-08-19

487

CONFIDENTIAL                                                                TDIT005525

**2025-08-19**

**6.10** *Officers*.  The Manager may, from time to time as it deems advisable, select natural persons who are employees or agents of the Company and designate them as officers of the Company (the "**Officers**") and assign titles (including, without limitation, President, Vice President, Secretary, and Treasurer) to any such person.  Unless the Manager decides otherwise, if the title given to an Officer is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office.  Any delegation pursuant to this Section 6.10 may be revoked at any time by the Manager.  An Officer may be removed with or without cause by the Manager.

## SECTION 7

### TRANSFERS AND RESIGNATIONS

**7.1** *Transfers of Interests*.  To the fullest extent permitted by law, a Member shall not Transfer all or any portion of its Interest without the prior written consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion.

**7.2** *Resignation/Removal of a Member*.  No Member shall resign from the Company or otherwise cease to be a Member without the consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion.

**7.3** *Redemption*.  The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason.  Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion.  Such payment to the Member shall either be made in cash or pursuant to a promissory note.  Such promissory note shall:  (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal amount of the Fair Market Value of such Member's Interest being redeemed, as determined by the Manager in its sole discretion.

## SECTION 8

### DISSOLUTION AND LIQUIDATION

**8.1** *Dissolving Events*.  The Company shall be Dissolved upon the occurrence of any of the following events:

(a) An election in writing by the Manager to dissolve the Company;

(b) Any time there are no members of the Company, unless the Company is continued in accordance with the Act; or

-19-

**2025-08-19**
**488**

**CONFIDENTIAL** **TDIT005526**

(c)     The entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

To the maximum extent permitted by the Act, the Members hereby waive their rights to seek a judicial dissolution of the Company.

**8.2     *Winding Up and Liquidation*.**

(a)     Upon dissolution of the Company, the Manager shall promptly wind up the affairs of, and liquidate the Company. In furtherance thereof, the Manager, as the "liquidating trustee" of the Company within the meaning of the Act shall: (i) continue to have all of the administrative and management rights and powers of the Manager (including the power to bind the Company); and (ii) be reimbursed for Company expenses it incurs. Following dissolution, the Company shall sell or otherwise dispose of assets determined by the Manager to be unsuitable for distribution to the Members, but shall engage in no other business activities except as may be necessary to preserve the value of the Company's assets during the period of winding-up and liquidation. At the conclusion of the winding-up and liquidation of the Company, the Manager shall: (i) hold the books and records of the Company for not less than six years following the termination of the Company under the Act; and (ii) execute, file and record, as necessary, a certificate of cancellation or similar document to effect the termination of the Company under the Act and other applicable laws.

(b)     Distributions to the Members in liquidation may be made in cash or in kind, or partly in cash and partly in kind, as determined by the Manager. Distributions in kind shall be valued at Fair Market Value as determined in accordance with the provisions of Section 6.9 and shall be subject to such conditions and restrictions as may be necessary or advisable to preserve the value of the property so distributed or to comply with applicable law. Each Member actually receiving amounts pursuant to a specific distribution shall receive a pro rata share of each item of cash or property of which such distribution is constituted (based upon such Member's share of the total amount to be included in such distribution).

(c)     The Profits and Losses of the Company during the period of winding-up and liquidation shall be allocated among the Members in accordance with the provisions of Section 4. If any property is to be distributed in kind, the Capital Accounts of the Members shall be adjusted with regard to such property in accordance with the provisions of Section 4.3(c).

(d)     The assets of the Company (including proceeds from the sale or other disposition of any assets during the period of winding-up and liquidation) shall be applied as follows:

(i)     First, to repay any claims and obligations of the Company, whether to third parties or the Members, in the order of priority required by law and to the creation of any reserves which the Manager, or the liquidating trustee, as applicable, reasonably deems necessary for all contingent, conditional or unmatured claims or obligations of the Company (which reserves when they become unnecessary in accordance with the Act, shall be distributed in accordance with the provisions of clause (i), below); and

-20-

(ii) Next, to the Members in proportion to their respective positive Capital Account balances (after taking into account all adjustments to the Members' Capital Accounts required under Section 8.2(c)).

**8.3** *Deficit Restoration/Liability*. Except as otherwise specifically provided in this Agreement, a Member shall have no obligation to restore a negative balance in such Member's Capital Account at the time of dissolution of the Company and no liability to the Company or to any other Member in respect of a negative balance in such Member's Capital Account during the term of the Company or at the conclusion of the Company's termination.

## SECTION 9

## EXCULPATION; INDEMNIFICATION

**9.1** *Exculpation*. To the fullest extent permitted by applicable law, neither the Manager, Partnership Representative nor any Officer or Member nor any officer, director, employee, agent or Affiliate of the foregoing (collectively, the "**Covered Persons**"), shall be liable to the Company, or any other Person who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Person's gross negligence or willful misconduct.

**9.2** *Indemnification*.

(a) To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 9.2 by the Company shall be provided out of and to the extent of Company assets only, and no Member nor the Manager shall have personal liability on account thereof.

(b) To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon the receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section 9.2.

(c) A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to

-21-

the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

(d) The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Covered Person to the Company or its members otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

(e) The foregoing provisions of this Section 9.2 shall survive any termination of this Agreement.

---

### SECTION 10

### GENERAL PROVISIONS

---

**10.1** *Meetings*. There shall be no requirement of annual or periodic meetings of the Company's members or managers within the meaning of the Act.

**10.2** *Action Without a Meeting*. Any action of the Manager may be taken by written consent of the Manager. Any consent or approval required by this Agreement to be "written" may also be made by the use of electronic transmission.

**10.3** *Entire Agreement*. This Agreement and the other agreements referred to herein, including any employment, services, granting or other similar agreements, contain the entire understanding among the Members, and supersede any prior written or oral agreement between them, with respect to the Company. There are no representations, agreements, arrangements, or understandings, oral or written, among the Members relating to the Company which are not fully expressed in this Agreement (or any employment, services, granting or other similar agreements).

**10.4** *Amendments*. This Agreement may be amended, in whole or in part, only through a written amendment executed by the Manager.

**10.5** *Counterparts; Binding upon Members*. This Agreement may be executed in any number of counterparts and, when so executed, all of such counterparts shall constitute a single instrument binding upon all parties notwithstanding the fact that all parties are not signatory to the original or to the same counterpart.

**10.6** *No Third Party Beneficiaries*. The provisions of this Agreement are not intended to be for the benefit of or enforceable by any third party and shall not give rise to a right on the part of any third party to require a Member to make a Capital Contribution, return distributions, or make other payments to the Company as set forth in this Agreement.

-22-

572

**10.7**  *Notices, Consents, Elections, Etc*.  All notices, consents, agreements, elections, amendments, demands and approvals provided for or permitted by this Agreement or otherwise relating to the Company shall be in writing and signed copies thereof shall be retained with the books of the Company.  For purposes of the following provisions of this Section 10.7, the term "notice" shall be deemed to include any notice, statement, report, consent or similar item required or permitted to be provided to one or more Persons under this Agreement or applicable law.

**10.8**  *Severability*.  In the event that any provision of this Agreement is determined to be invalid or unenforceable, such provision shall be deemed severed from the remainder of this Agreement and replaced with a valid and enforceable provision as similar in intent as reasonably possible to the provision so severed, and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

**10.9**  *Governing Law*.  The interpretation and enforceability of this Agreement and the rights and liabilities of the Members and the Manager as such shall be governed by the laws of the State of Delaware.  To the extent permitted by the Act and other applicable law, the provisions of this Agreement shall supersede any contrary provisions of the Act or other applicable law.

**10.10** *Status Under the Act*.   This Agreement is the "limited liability company agreement" of the Company within the meaning of Section 18-101 of the Act.

**10.11** *Partnership for Tax Purposes Only*.  As set forth in Section 2.1, the Members hereby form the Company as a limited liability company under the Act.  The Members expressly do not intend hereby to form a partnership except insofar as the Company may be treated as a partnership solely for tax purposes.

**10.12** *Miscellaneous*.  This Agreement shall not be construed for or against any party by reason of the authorship or alleged authorship of any provisions hereof or by reason of the status of the respective parties.  Each Member hereby specifically consents to the selection of all other Members admitted to the Company pursuant to the terms of this Agreement.

*[remainder of page intentionally left blank]*

-23-

4937-0258-2788\4

**CONFIDENTIAL**                                                                                    **TDIT005530**

IN WITNESS WHEREOF, the parties have executed this Limited Liability Company Agreement of CDMCFAD, LLC, a Delaware limited liability company, as of the date first above written.

MEMBERS:

CHARITABLE DAF HOLDCO, LTD.

By: _____
Name: Mark Patrick
Title: Director

MANAGER:

_____
Name: Mark Patrick

4937-0258-2788\4

CONFIDENTIAL                                                            TDIT005531

**CDMCFAD, LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

**SCHEDULE A**

**MEMBER INFORMATION**

**Revised:  December 18, 2024**

| Name and Contact Information | Allocation Percentage |
|---|---|
| Charitable DAF Holdco, Ltd.<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 100% |

Confidential Evidence

Walkers Draft: [XX]/2025



# Memorandum

**To:**      Shields Legal Group, P.C and Charitable DAF Holdco, Ltd.

**From:**    Walkers (Cayman) LLP

**Date:**    [XX] February 2025

**Subject:** Issuing new shares and seeking declaratory relief, and amending the articles in respect of mediation and arbitration

This memorandum is limited to the matters referred to herein and shall not be construed as extending to any other matter or document not referred to herein. This memorandum is given solely for the benefit of Shields Legal Group, P.C and Charitable DAF Holdco, Ltd. and may not be relied upon by any other person without our prior written consent. For greater certainty, this memorandum shall be construed in accordance with the laws of the Cayman Islands. We are Cayman Islands Attorneys at Law and provide no advice or express no views as to any laws other than the laws of the Cayman Islands in force and as interpreted at the date of this memorandum. We have not, for the purposes of this memorandum, made any investigation of the laws, rules or regulations of any other jurisdiction.

The memorandum being provided is a reasoned memorandum based on the laws of the Cayman Islands and court decisions, and we have accordingly applied certain principles established in court decisions to the factors which we think are relevant in connection with the Charitable DAF HoldCo Ltd (and other relevant entities) at the date hereof. Further, where there is an absence of case law or authority in respect of Cayman Islands companies, we have (to the extent possible) applied and consider it reasonable to apply Cayman Islands/English law corporate legal principles. The Grand Court of the Cayman Islands (the "**Cayman Court**") might, however, take into account different factors (or view the factors considered herein differently). Moreover, although the views we have reached are based on reasoning and analysis which is in our view consistent with the authorities reviewed, the Cayman Court could apply different reasoning and, hence, reach a conclusion different to that set out in this opinion.

## A.    Introduction

1.      You have asked us to consider the following questions:

(a)     In light of a possible just and equitable winding up petition filed by one of the Participating Shareholders, could and should the current articles be amended as they relate to mediation and arbitration; and

(b)     Whether Charitable DAF HoldCo Ltd ("**HoldCo**") could:

(i)     issue new participating shares which would have the effect of diluting the current Participating Shareholders (the "**Share Issue**"); and

FSD2025-0116

2025-08-19 Privileged and Confidential

Walkers Draft: [XX]/2025

(ii)     seek declaratory relief in respect of the issue of those shares.

2.      The issues which have been outlined to us with respect to the Company and the articles are highly unusual, and the below actions are not without risk.  Whilst the articles do confer upon the directors and the Management Shareholder rights including as set out below, the manner in which it appears the company is intended to operate is highly unusual, and at least on one view, appears to cut across certain fundamental principles of Cayman law.  As such, the actions being considered are novel to a significant degree, and it is difficult to be certain how a Cayman Court may approach these questions.

3.      In summary, in our view:

(a)     We recommend amending the articles so as to provide that the Company and the Participating Shareholders must agree that a dispute should be submitted to mediation and/or arbitration.   Simultaneously, we recommend amending the memorandum of association to bring the objects of the Company into line with its mission statement; and

(b)     In respect of the Share Issue:

(i)     The articles of HoldCo grant the directors the power to issue new participating shares which would have the effect of diluting the current Participating Shareholders; and

(ii)     We do not recommend that HoldCo issues the shares then immediately seeks declaratory relief – the prospects of success of that application would be low, as the Court will not entertain hypothetical applications, there must be a real and present dispute between the parties.

**B.      Amendment of memorandum and articles re object, mediation and arbitration**

*Articles in respect of mediation and arbitration*

4.      The mediation and arbitration procedures as set out in Article 137 "*shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company … [and/or] its Shareholders*".

5.      The Management Shareholder has the power to amend the articles by written resolution:

"*Subject to the Companies Act (as amended) and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part*" (Article 125).

6.      Further, the directors may authorise the variation in rights attaching to the Participating Shares:

"*The Directors, or the Shareholders by Ordinary Resolution, may authorise … the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution*" (Article 8); and

7.      Article 8 also provides that such variation may be authorised by the Shareholders by Ordinary Resolution, which in this instance means by the Management Shareholders as Participating Shareholders are not entitled to vote at general meetings of the company:

(a)     ""*Ordinary Resolution" means a resolution:*

35628222.1.C8689.187150

FSD2025-0116

**CONFIDENTIAL**

TDIT005534

Confidential Evidence

Walkers Draft: [XX]/2025

(i)   *passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or*

(ii)  *approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed*";

(b)   ""*Participating Share" means a non-voting, participating, non-redeemable share in the capital of the Company*…" (Article 1); and

(c)   "*Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article*" (Article 12).

8.    However, any material adverse variation or abrogation of the rights attaching to the participating shares requires the written consent of at least two-thirds of the participating shareholders:

*"…the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting*" (Article 13).

9.    If the Articles were to be amended such that the Company was able to unilaterally elect whether or not a dispute was to be submitted to mediation and/or arbitration, in our view that would likely be considered a material adverse variation of the rights attaching to the Participating Shares. In that case, a two-thirds majority of the Participating Shareholders would be required to consent to such change. We understand that there is no appetite to put changes to the Articles to the Participating Shareholders.

10.   However, if the Articles were amended such that any dispute would only be subject to mediation and/or arbitration if the holders of the Participating Shares and the Company were to agree on that course of action, in our view that is unlikely to constitute a material adverse variation of the rights attaching to the Participating Shares, as their rights relative to the rights of the Company (at least arguably) would not have changed.

11.   Participating Shareholders are entitled to vote at separate meetings in respect of any material adverse variation or abrogation of their rights (Article 12). However, the Articles do not provide Participating Shareholders with the right to vote on, or to receive notice of, any variation in their rights which does not constitute a material adverse variation or abrogation. Accordingly, in our view, the directors could amend the articles to provide that disputes are to be subject to mediation and arbitration if the holders of the shares and the Company were to agree, without being required to provide notice of that change to the Participating Shareholders.

*Memorandum in respect of object*

12.   The memorandum of the company states at paragraph 3 that "*the objects for which the company is established are unrestricted*". We are instructed that the mission statement of the company is: "*Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*" (email from B Schaller dated 7 February 2025).

35628222.1.C8689.187150

CONFIDENTIAL                                                                    TDIT005535

578

Walkers Draft: [XX]/2025

13.   In order to clarify the proper objects and purpose for which the company was established, the objects of the company should be specifically tied to the mission statement. We consider that amending paragraph 3 of the memorandum so as to specify that the object of the company is as per the mission statement above (rather than generating profit for its shareholders) would provide further support for the argument that the Share Issue is in the interests of the company as a whole (as discussed further below).   For clarity, "*a company may, by special resolution, alter its memorandum of association with respect to any objects, powers or other matters specified therein*" (Companies Act (as amended), section 10).

**C.     Share Issue**

14.   The directors of HoldCo have the power to issue new shares by written resolution:

> "*…all Shares for the time being unissued shall be under the control of the Directors who may: (a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine*" (Article 7).

15.   The rights attached to any class of shares, including the participating shares, may:

> "*only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting*" (Article 13).

16.   However, the issue of further participating shares is not deemed to be a material adverse variation or abrogation of the rights of the Participating Shareholders:

> "*The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not … be deemed to be materially adversely varied or abrogated by, inter alia, the creation, allotment or issue of further Participating Shares ranking pari passu with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company*" (Article 14).

17.   On the basis of the above, in our view, the Articles confer upon the directors of HoldCo the power to issue shares which dilute the Participating Shareholders.  The Participating Shareholders do not have any pre-emption rights, or the right to vote on, or receive notice of, the issuance of further participating shares.

18.   Directors of Cayman Islands companies are subject to a duty to act in the best interests of the company, which duty is owed to the company as a whole.  Accordingly, while the Articles grant the directors the power to issue new shares as outlined above, there must be a corporate benefit to the exercise of that power.  In this instance, given that the threat to the Company is coming from one or more of the Participating Shareholders, and that it is a threat to the purpose and existence of the Company, there may be a reasonable basis for the directors to form the view that issuing shares with the intention of mitigating that threat is in the best interests of the Company as a whole (notwithstanding that it would not be in the best interests of the individual Participating Shareholders).

19.   In addition, if the incoming Participating Shareholder purchases its new shares, that would distinguish it from the existing Participating Shareholders (who we are instructed paid nothing for their shares) and provide further corporate benefit.

20.   Further, we recommend issuing the new shares after the amendment of the memorandum and articles as above, such that the Share Issue is in line with the (new) objects of the Company. Otherwise, we recommend issuing the new shares sooner rather than later, so that the issue is

35628222.1.C8689.187150

FSD2025-0116                        **Page 583 of 1530**                        2025-08-19

Walkers Draft: [XX]/2025

complete before any winding up petition is presented.  If a winding up petition in respect of HoldCo is presented to the Court, and a winding up order is ultimately made, any alteration in the status of the company's members made after the presentation of the petition will be void (unless the Court orders otherwise) (Companies Winding Up Rules (as amended), ss 99 and 100(2)).

**D.   Application for declaratory relief**

21.   It has been suggested that HoldCo could seek declaratory relief from the Cayman Courts in respect of the Share Issue, seeking to bolster the legitimacy of the Share Issue and protect it from challenge.

22.   Applications for declaratory relief may be made in the Cayman Islands pursuant to the Grand Court Rules O.15, r.16:

> "*No action or other proceeding shall be open to objection on the ground that a merely declaratory judgment or order is sought thereby, and the Court may make binding declarations of right whether or not any consequential relief is or could be claimed.*"

23.   The principles which apply to applications for declaratory relief include the following:

(a)   "*There must, in general, be a real and present dispute between the parties before the court as to the existence or extent of a legal right between them*…"; and

(b)   "*the court must be satisfied that all sides of the argument will be fully and properly put. It must therefore ensure that all those affected are either before it or will have their arguments put before the court*".[1]

24.   We understand that the attraction of seeking declaratory relief immediately following the Share Issue to have been avoiding litigation against the Participating Shareholders.

25.   However, on the basis of the principles outlined above, if an application for declaratory relief was made immediately following the Share Issue, i.e. before any dispute had arisen with the Participating Shareholders and/or without the Participating Shareholders being before the Court, that application would have low prospects of success.

26.   Accordingly, we do not recommend pursing the declaratory relief application in that context. However, if and when a dispute does arise with the participating shareholders in respect of the Share Issue, a declaratory application may still be a useful card to play.

---

[1] *In the matter of Principal Investing Fund et al*, FSD 268 of 2021 (IKJ), 15 July 2024, at [9], citations omitted.

35628222.1.C8689.187150

FSD2025-0116                                                           2025-08-19

CONFIDENTIAL                                                           TDIT005537

580

**FSD2025-0116**                    **Page 584 of 1530**                    **2025-08-19**

**Charitable DAF HoldCo, Ltd**
(the "**Company**")

_____

**Unanimous Written Resolutions of the Board of Directors of the Company**

_____

**1        Directors' Interests**

1.1      It is noted that none of the directors of the Company (together the "**Directors**", and each a "**Director**") have any monetary or financial interest in the matters referred to herein.

**2        Recent Developments**

2.1      It is noted that the Directors have received communications from certain current Participating Shareholders requesting information and making false and misleading claims regarding the Company's and its subsidiaries' finances.

2.2      It is noted that the Directors believe the aforementioned communications were motivated and/or directed by James Dondero as retaliation for Mark Patrick's resignation from Skyview Group and the Company's various efforts to create independence between the Company and its subsidiaries on the one hand and James Dondero and his affiliates on the other hand.

2.3      It is noted that the Directors have knowledge that the false and misleading information forming the basis of these claims was provided by SEI, a back-office service provider to the Company and certain of its subsidiaries, to employees of certain Dondero-controlled entities such as Skyview Group or NexPoint.

2.4      It is noted that none of the concerns raised by the current Participating Shareholders were raised prior to Mark Patrick's resignations from Skyview Group, despite there being no change in the information provided or the frequency of information provided.

**3        U.S. Counsel Tax Advice**

3.1      It is noted that the Directors have received United States Tax Counsel advice that, among other things:

(a)      "there is a significantly heightened risk that the Internal Revenue Service of the United States could severely penalize and/or revoke the tax-exempt status of one or more of the current Participating Shareholders, which could imperil the status and assets of the Company"; and

(b)      "Increasing the number of Participating Shareholders would mitigate considerations of undue influence/private inurement/private beneift and broaden the scope of DAF's charitable reach to the public; and

(c)      "The IRS will look favorably upon any and all attempts for DAF to maintain its

#6777948v3

**FSD2025-0116**                                                                                    **2025-08-19**
**500**

**CONFIDENTIAL**                                                                                    **TDIT005538**

**FSD2025-0116**                    **Page 585 of 1530**                    **2025-08-19**

independence from what seems to be persistent attempts by James Dondero and the entities controled by him to use DAF for his private benefit and private inurement."

3.2    It is noted that the Directors believe the Share Issuance (as defined below) to DFW (as defined below) is based on this U.S. tax advice and will protect the Company and the current Participating Shareholders and will also further the Company's charitable mission.

**4        Cayman Counsel Legal Advice**

4.1    It is noted that the Directors have sought and obtained legal advice from separate Cayman Islands counsel ("**Walkers**"), who have confirmed that (i) the Directors have the ability to issue new Participating Shares as contemplated by the Share Issuance, (ii) if the Directors believe the Participating Shares are held by a Restricted Person (as defined in Article 21 of the Company's M&A), the Directors may require such shareholder to transfer its shares, and (iii) the Participating Shareholders have no or limited rights to information.

4.2    It is noted that attached as Exhibit A hereto is the Walkers presentation outlining the rights accompanying the Participating Shares (the "**Walkers Presentation**").

**5        Issue of Shares**

5.1    It is noted that the Company proposes to issue 318 Participating Shares of a nominal or par value of US$0.01 each as fully paid up (the "**Participating Shares**") to DFW Charitable Foundation ("**DFW**"), a Delaware non-profit non-stock corporation (the "**Share Issuance**").

5.2    Following the Share Issuance, DFW shall own 51.04% of the issued Participating Shares of the Company.

5.3    It is resolved that:

(a)    the Share Issuance be approved with effect from the date of these resolutions;

(b)    Campbells Corporate Services Limited be and is hereby instructed to make the appropriate entry in the register of members of the Company in respect of the Share Issuance;

(c)    any and all actions of the Company, the Directors or any officer of the Company taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such actions had been presented for approval and approved by the Directors prior to such action(s) being taken; and

(d)    the Directors shall meet on not less than a quarterly basis to discuss recent developments and how to best protect the Company and its shareholders.

582

**6** **Ancillary Documents**

6.1 It is further resolved that:

(a) the Company do give, make, sign, execute and deliver all such agreements, letters, notices, certificates, acknowledgements, instructions and other documents (whether of a like nature or not) (the "**Ancillary Documents**") as may in the sole opinion and absolute discretion of any Director be considered necessary or desirable for the purpose of compliance with any condition precedent or the coming into effect of or otherwise giving effect to, consummating or completing or procuring the performance and completion of all or any of the transactions contemplated by or referred to in all or any of the documents referred to above and the Company do all other such acts and things as might in the sole opinion and absolute discretion of any Director be necessary or desirable for the purpose aforesaid;

(b) the Ancillary Documents be in such form as any Director should in his absolute discretion and sole opinion approve, the signature of any such person on any of the Ancillary Documents being due evidence for all purposes of his approval of the terms thereof on behalf of the Company;

(c) the Ancillary Documents (where required to be executed by the Company) be executed by the signature thereof of any one Director together with such changes as such Director shall in his absolute discretion consider necessary or appropriate (the signature of such Director on any Ancillary Document being conclusive evidence of his approval of the same for and on behalf of the Company);

(d) the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner aforesaid;

(e) any and all actions of the Company, or of any Director or officer, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and hereby are ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval, and approved by, the Directors prior to such action being taken; and

(f) the prior execution of any Ancillary Documents by any Director are approved, ratifed and confirmed in all respects.

[*signature page(s) follow(s)*]

#6777948v3

CONFIDENTIAL TDIT005540

**FSD2025-0116**    **Page 587 of 1530**    2025-08-19

_____

Name: **Mark Patrick**
Title: Director

Date: 2-7-2025

Name: **Paul Murphy**
Title: Director

Date: 7th February 2025

Signature Page
Unanimous Written Resolutions of the Board of Directors

#6777948v3

**FSD2025-0116**    **2025-08-19**

**503**

**CONFIDENTIAL**    **TDIT005541**

**Exhibit A**

**Walkers Presentation**

CONFIDENTIAL

![Walkers logo]

# Participating Shareholder Rights
# Charitable DAF Holdco Ltd.

Making financial services work

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 577 of 759

CONFIDENTIAL

# Binding Effect of Articles of Association

2   Walkers | Making financial services work

# Binding Effect of Articles of Association

"… the binding effect of the Articles as they stand … is given statutory force by section 25(3) of the Companies Law which reads:

> '(3) Where registered the said articles of association shall bind the company and the members thereof to the same extent as if each member had subscribed his name and affixed his seal thereto, and there were in such articles contained a covenant on the part of himself, his heirs, executors and administrators to conform to all the regulations contained in such articles subject to this law; ….'"

(*In the Matter of Strategic Turnaround Master Partnership Ltd* [2008] CIGC J1128-1, per Chief Justice Smellie at paragraph 135)

3     Walkers | Making financial services work

CONFIDENTIAL

TDIT005545

Case 19-34054-sgj11 Doc 4627-5 Filed 05/11/26 Entered 05/11/26 17:05:52 Desc Exhibit 211 - Part 01 Page 579 of 759

# Participation in Discretionary Dividends

4    Walkers | Making financial services work

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 581 of 759

# Participate in Discretionary Dividends

"The Participating Shares shall confer upon the Shareholders … the right to participate in the profits or assets of the Company in accordance with these Articles." **(Art 12)**

Walkers | Making financial services work

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 582 of 759

# Participation in Discretionary Dividends

"The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit." **(Art 102)**

"Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares." **(Art 105)**

**Participating Shareholders do not have:**

• **the right to cause or vote on distributions;**

• **the right to pro rata distributions based on their shareholding;**

• **the right to annual or timed distributions; or**

• **the right to receive notice of distributions to other Participating Shareholders.**

6       Walkers | Making financial services work

TDIT005548

CONFIDENTIAL

# Removal of Directors

7    Walkers | Making financial services work

Case 19-34054-sgj11    Doc 4627-5    Filed 05/11/26    Entered 05/11/26 17:05:52    Desc
Exhibit 211 - Part 01    Page 583 of 759

CONFIDENTIAL

# Removal of Directors

"Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution."
**(Art 65)**

**Participating Shareholders do not have:**

- the right to remove Directors; or

- the right to appoint Directors.

<u>**Note: the right to appoint Directors is held by the Management Shareholder and the Directors, and the right to remove Directors is held solely by the Management Shareholder (Articles 64, 65, and 69, and Definition of "Ordinary Resolution").**</u>

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 584 of 759

TDIT005550

# Modification of Rights

9    Walkers | Making financial services work

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 586 of 759

# Modification of Rights

"… the rights attached to [any] Class may … only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting." **(Art 13)**

**Participating Shareholders do not have:**

- **the right to cause a distribution; or**

- **the right to amend the Articles.**

10     Walkers | Making financial services work

TDIT005552

# Modification of Rights – Issuance of Shares

"<u>The rights conferred upon the holders of the Participating Shares</u> of any Class issued with preferred or other rights <u>shall not</u> … <u>be deemed to be materially adversely varied or abrogated by</u>, *inter alia*, the creation, allotment or <u>issue of further Participating Shares</u> ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company." **(Art 14)**

"… all Shares for the time being unissued shall be under the control of the Directors who may:

(a)    <u>issue</u>, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

(b)    and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued." **(Art 7)**

**Participating Shareholders do not have:**

- **the right to vote on the issuance of further Participating Shares;**

- **pre-emption rights; or**

- **the right to receive notice of such issuance.**

11     Walkers | Making financial services work

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 587 of 759

TDIT005553

# Modification of Rights – Issuance of Shares

"The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each…" **(Art 7)**

**Note:** Of the authorised share capital of the Company, 305 Participating Shares have been issued. In accordance with the Articles, the Directors may unilaterally issue additional Participating Shares and thereby dilute the power of existing shareholders for the purposes of voting on matters that may materially adversely vary or abrogate the rights of the Participating Shareholders.

**Additional Note: many of the rights that shareholders of a company typically hold (e.g. the right to receive notices, and the right to vote at general meetings, including in respect of the appointment and removal of directors) are held by the Management Shareholder (Mark Patrick) rather than the Participating Shareholders. In addition, the Directors (Mark Patrick and Paul Murphy) have the ability to unilaterally declare dividends and issue new Participating Shares without the approval of the Participating Shareholders (or the Management Shareholder).**

12      Walkers | Making financial services work

CONFIDENTIAL

TDIT005554

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 588 of 759

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Exhibit 211 - Part 01   Page 589 of 759

# Share Redemption

13      Walkers  |  Making financial services work

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 590 of 759

# Share Redemption

"**"Participating Share"** means a non-voting, participating, <u>non-redeemable share</u> in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles…"

"… the Company shall have <u>power to redeem</u> or purchase any of its shares and to sub-divide or consolidate the said shares or any of them…" **(Paragraph 7, Memorandum)**

"The rights conferred upon the holders of the Participating Shares … shall not … be deemed to be materially adversely varied or abrogated by … <u>the redemption</u> or purchase of any Participating Shares of any Class by the Company." **(Art 14)**

**Participating Shareholders do not have:**

- the right to redeem their shares; or

- the right to vote on the Company's redemption of their shares.

14    Walkers | Making financial services work

TDIT005556



# Transfer of Shares

15    Walkers | Making financial services work

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Exhibit 211 - Part 01   Page 591 of 759

Desc

CONFIDENTIAL

Case 19-34054-sgj11 Doc 4627-5 Filed 05/11/26 Entered 05/11/26 17:05:52 Desc
Exhibit 211 - Part 01 Page 592 of 759

# Share Transfer by Notice of the Directors – Restricted Person

"If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles." **(Art 21)**

"**Restricted Person**" means any Person holding Participating Shares:

a) in breach of the law or requirements of any country or governmental authority;

b) that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501 (c)(3) of the Code; or

c) in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered."

Note: the Directors have duties to act, and to exercise their powers, in the best interests of the Company. The scope of those duties includes continually evaluating whether any Participating Shareholder may pose a threat to the Company which could cause them to fall within the definition of Restricted Person, and how best to protect the Company against any such threat.

16      Walkers | Making financial services work

TDIT005558

CONFIDENTIAL

# General Meetings

17      Walkers  |  Making financial services work

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 594 of 759

# General Meetings

"Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company…" **(Art 12)**

**Participating Shareholders do not have:**

- **the right to receive notice of general meetings;**

- **the right to attend general meetings;**

- **the right to speak at general meetings;**

- **the right to vote at general meetings; or**

- **the right to information regarding proceedings of general meetings.**

18     Walkers | Making financial services work

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52
Exhibit 211 - Part 01   Page 595 of 759

# Limited Information Rights

19    Walkers  |  Making financial services work

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc Exhibit 211 - Part 01   Page 596 of 759

# Limited Information Rights

"The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors." **(Art 108)**

"The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and <u>no</u> <u>Shareholder</u> (not being a Director) <u>shall have any right of inspecting any account or book or document of the Company</u> except as conferred by law or authorised by the Directors or by Ordinary Resolution." **(Art 110)**

**Participating shareholders have <u>very limited </u> information rights. Specifically, the articles do not provide the Participating Shareholders with the following:**

- **the right to inspect any account;**

- **the right to inspect any book; or**

- **the right to inspect any document of the Company.**

Further to the above, we note that :

- This only applies to the limited company which issued the participation shares, i.e. DAF HoldCo;

- It does not apply to subsidiary entities;

- It does not apply to entities in which DAF HoldCo holds a passive interest; and

- There is no "look- through" down through all the entities in the structure.

TDIT005562

**Rachel Baxendale**

| | |
|---|---|
| **From:** | David N. Corkern <DCorkern@CCSB.com> |
| **Sent:** | 18 December 2024 11:24 PM |
| **To:** | Brandon R. Schaller |
| **Cc:** | Bart Higgins; Brian P. Shaw |
| **Subject:** | DAF--proposed reorganization |

CAUTION: This email originated from outside of the organization.

Brian,

In accordance with our conversation this morning with Mark Patrick, here are my initial thoughts regarding the U.S. tax issues that merit a reorganization of Charitable DAF Holco, Ltd. ("DAF"). It is my understanding that DAF currently has four (4) non-voting participating shareholders/supporting organizations, each of which is an IRC Section 501(c)(3) organization (per filings with the IRS) and controlled, directly or indirectly, by James Dondero ("Dondero"). You have detailed instances in which you believe Dondero has acted in ways that create a per se conflict of interest between him and each of the participating shareholders that he controls, as well as DAF. For example, it is my understanding that as recently as November, 2023, Dondero requested the current manager of DAF to transfer approximately $1,000,000 to Sentinel Reinsurance, Ltd. (a Dondero-controlled entity) in payment of legal fees unrelated to DAF or its charitable purposes. It is my further understanding that Grant Scott, the prior manager of DAF and a college friend of Dondero, had a history of using DAF funds to benefit Dondero personally. While the current manager has been acting independently of Dondero and those under Dondero's influence and/or control, this pattern of Dondero's using DAF as his personal "piggy bank" has caused the perception among many of Dondero's creditors that DAF has been or is as his financial alter ego. As such, DAF runs an increased risk of being embroiled in litigation directed against Dondero and his entities.

To the extent that the participating shareholders/supporting organizations have either encouraged or acquiesced in Dondero's accessing DAF funds for his personal benefit, either directly or through the entities that he controls or in which he has considerable financial interest, those organizations run the risk of losing their tax-exempt status with the IRS. Each IRC Section 501(c)(3) organization must be organized <u>and</u> operating primarily for charitable purposes. Treas. Reg. Section 1.501(c)(3)-1(c)(1) provides that an organization will not be compliant with the operational test "if more than an insubstantial part of its activities is not in furtherance of an exempt purpose." Additionally, an IRC Section 501(c)(3) organization cannot be operated for the benefit of an individual or entity—private benefit/private inurement prohibition.

Given what has been detailed about Dondero's past and continued actions with the participating shareholders/supporting organizations and DAF, there is a heightened risk that the IRS could revoke the tax-exempt status of one or more of said participating shareholders/supporting organizations, which could imperil the status and assets of DAF. To help insulate DAF from any such exposure and to facilitate and expand its charitable purposes, DAF is considering a two-prong restructure/reorganization that will bring in additional participating shareholders and create a Delaware blocking LLC. Clearly, expanding the number of shareholders of DAF will dilute the influence of Dondero and the entities controlled by him and, as such, will broaden the charitable scope of DAF for the benefit of the public. The IRS will look favorably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement.

David

**David N. Corkern**
*Senior Counsel*



O 214.855.3099
DCorkern@CCSB.com / ccsb.com

Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St / Suite 5500 / Dallas, TX 75202

Admitted in Texas, Louisana, and D.C.

LLM in Taxation

**Board Certified Tax Law Specialist —
Louisiana Board of Legal Specialization**

**David N. Corkern**
*Senior Counsel*



O 214.855.3099
DCorkern@CCSB.com / ccsb.com

Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St / Suite 5500 / Dallas, TX 75202

Admitted in Texas, Louisana, and D.C.

LLM in Taxation

**Board Certified Tax Law Specialist —
Louisiana Board of Legal Specialization**

This electronic message is confidential and is intended only for the use of the individual to whom it is addressed. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, you are hereby notified that any use, dissemination, distribution or reproduction of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify me by electronic message or telephone at 214-855-3000, and delete the message from your system. Carrington, Coleman, Sloman & Blumenthal, L.L.P. www.carringtoncoleman.com

CONFIDENTIAL

March 27, 2025

**Re: Letter Agreement re: Assignment of Undertakings**

To whom it may concern:

This letter agreement (this "Agreement") is to confirm in writing an agreement made by Charitable DAF HoldCo, Ltd., a Cayman Islands limited company ("Holdco") and CDMCFAD, LLC, a Delaware limited liability company ("DAF"). Each party hereto may be referred to generically as a "Party" or collectively as the "Parties" in this Agreement.

WHEREAS, DAF completed a restructuring on March 27, 2025, that (i) issued new membership interests in DAF to DFW Charitable Foundation, a Delaware 501(c)(3) non-profit organization and (ii) redeemed the membership interests in DAF owned by Holdco (collectively, the "Issuance and Redemption Transaction");

WHEREAS, Mark Patrick and Paul Murphy, the Directors of Holdco intend to wind up the affairs of Holdco and engage liquidators to complete that process; and

WHEREAS, in connection with the Issuance and Redemption Transaction, Holdco and DAF have mutually agreed to assign all of the contracts and agreements listed on Schedule A hereto (collectively, the "Assigned Contracts") from Holdco to DAF.

NOW, THEREFORE, as material inducement to each Party entering this Agreement, and in consideration of the mutual representations and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.        Assignment of Undertakings. Subject to the terms hereof, Holdco hereby assigns the Assigned Contracts to DAF with effect on and from the date first written above in consideration for the assumption of liabilities set forth herein (the "Assignment of Undertakings").

2.        Assumption of Liabilities. In connection with the Assignment of Undertakings, DAF has agreed to assume all responsibilities and risks in any manner connected with the Assigned Contracts, whether now existing or hereafter arising.

3.        Further Assurances. Until such time as Holdco completes its liquidation, Holdco agrees to cooperate (at DAF's sole expense) with DAF to take any further actions requested by DAF in connection with this Assignment of Undertakings, including executing assignment or similar agreements necessary to cause DAF to enter into the Assigned Contracts and obtain consent from counterparties. Notwithstanding anything to the contrary set forth herein, DAF shall not be responsible for funding any litigation of adverse actions relating to Holdco arising after the date hereof.

4.        Representations and Warranties. By its execution and delivery hereof, each of the Parties represents and warrants to the other Party that, as of the date hereof and after giving effect to this Agreement:

(a) (i) such Party has all requisite power and authority to execute and deliver this Agreement, (ii) this Agreement has been duly executed and delivered by each Party to the other, and (iii) this Agreement constitutes the legal, valid, and binding obligations of such Party, enforceable in accordance with its respective terms;

Letter Agreement re: Assignment of Undertakings                    Page 1

CONFIDENTIAL                                                        TDIT005565

(b) neither the execution, delivery, and performance of this Agreement, nor the consummation of any transactions contemplated herein or therein, will (i) contravene the terms of the trust agreement, limited liability company agreement, or other governing documents as applicable to such Party hereto; (ii) conflict with or result in any breach or contravention of, or the creation of (or the requirement to create) any lien under, or require any payment to be made under (a) any contractual obligation to which such Party is bound or affecting such Party or its respective properties or (b) any order, injunction, writ or decree of any governmental authority or any arbitral award to which such Party or such Party's property is subject; or (iii) violate any applicable law; and

(c) no approval, consent, exemption, authorization, or other action by, notice to, or filing with, any governmental authority or other person not previously obtained is necessary or required in connection with the execution, delivery, or performance by, or enforcement against, such Party to this Agreement.

5.    Assignment. Neither Party may assign this Agreement without the other Party's prior written consent.

6.    Governing Law; Venue. The Parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Texas and to the jurisdiction of the federal courts with jurisdiction covering Dallas, Texas, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of Texas or the federal courts with jurisdiction covering Dallas, Texas, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

7.    Further Assurances. Each Party agrees to execute, acknowledge, and deliver such further instruments and to do all such other acts as may be reasonably necessary or appropriate in order to carry out the purposes and intent of this Letter.

8.    Notices. All notices or requests required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given when hand delivered or sent by certified mail, return receipt requested, or by reputable overnight courier, in each case with receipt verified in writing, addressed in accordance with the respective Parties' signature on the signature pages hereto.

9.    Signature; Counterparts. This Agreement may be executed electronically, or in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

10.    Enforceability. If one or more provisions of this Agreement is found by a court of competent jurisdiction to be illegal, invalid, or unenforceable in whole or in part, the remaining terms and provisions of this Agreement shall remain in full force and effect disregarding such illegal, invalid, or unenforceable portion and such court shall be empowered to modify, if possible, such illegal, invalid, or unenforceable provision to the extent necessary to make it enforceable in accordance with the intent and purposes of the Parties expressed herein to the fullest extent permitted by applicable law.

11.    WAIVER OF JURY TRIAL. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF

Letter Agreement re: Assignment of Undertakings                 Page 2

THIS AGREEMENT OR THE SUBJECT MATTER HEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

12. _Merger: Amendment_. This Agreement (i) is the only agreement between the Parties concerning the subject matter hereof and supersedes, terminates and cancels any prior statements, representations or agreements between the Parties concerning the subject matter hereof, (ii) is being executed by the Parties without reliance upon any representation, warranty, or other statement of any kind whatsoever, whether oral or written, which is not expressly set forth herein, and (iii) may not be changed orally, but only in a writing signed by duly authorized representatives of each of the Parties.

[_Remainder of Page Intentionally Blank_]

Letter Agreement re: Assignment of Undertakings Page 3

The undersigned have executed this Agreement as of the date first written above.

**Agreed and Accepted:**

**Charitable DAF HoldCo, Ltd.,**
a Cayman Islands limited company

By: _____
Name: Mark Patrick
Title: Director

By: _____
Name: Paul Murphy
Title: Director

Address for Notices:
Email: mpatrick@dafholdco.com
Email: pmurphy@dafholdco.com

**CDMCFAD, LLC,**
a Delaware limited liability company

By: _____
Name: Mark Patrick
Title: Manager

Address for Notices:
Email: mpatrick@dafholdco.com

Signature Page | Letter Agreement re: Assignment of Undertakings

CONFIDENTIAL TDIT005568

## Schedule A

### Assigned Contracts and Agreements

1. Engagement Letter between Stone Hilton PLLC and Charitable DAF HoldCo, Ltd. dated February 27, 2025
2. Engagement Letter between Shields Legal Group, P.C. and Charitable DAF HoldCo, Ltd. (among others) dated September 27, 2023
3. Terms of Engagement by Walkers (Cayman) LLP to Charitable DAF HoldCo, Ltd.
4. Firestarter Proposal between Firestarter and Charitable DAF HoldCo, Ltd. dated January 15, 2025
5. Various ValueScope agreements, which we do not have
6. Engagement Letter between Seyfarth Shaw LLP and Charitable DAF HoldCo, Ltd. dated October 23, 2023
7. Engagement Letter between Deloitte Tax LLP and Charitable DAF HoldCo, Ltd. dated January 17, 2023
    a. Engagement Letter between Deloitte Tax LLP and Charitable DAF HoldCo, Ltd. dated February 7, 2022
8. Acknowledgment and Ratification Agreement among Grant James Scott, Charitable DAF HoldCo, Ltd., Charitable DAF GP, LLC, and Charitable DAF Fund, LP dated July 1, 2024
9. Engagement Letter among Charitable DAF HoldCo, Ltd. (and other DAF entities) and Carrington Coleman dated March 22, 2024
10. Engagement Letter among Charitable DAF HoldCo, Ltd., Charitable DAF GP, LLC, and Hueston Hennigan LLP dated January 26, 2024
11. In DAF's sole discretion, any other contract which they deem necessary to achieve a voluntary and solvent liquidation of Holdco

Schedule A | Letter Agreement re: Assignment of Undertakings

CONFIDENTIAL                                                                    TDIT005569

FSD2025-0116                                                                     2025-08-19

**WRITTEN CONSENT
OF THE MANAGER
OF
CDMCFAD, LLC**

**March 27, 2025**

The undersigned, being the manager (the "Manager") of CDMCFAD, LLC, a Delaware limited liability company (the "Company"), does hereby consent to, adopt and approve, ratify and confirm by written consent the following resolutions and directs that this written consent be filed with the minutes of the proceedings of the Company:

**WHEREAS**, the current sole member of the Company is Charitable DAF Holdco, Ltd. (the "Current Member");

**WHEREAS**, the Company is currently governed by that certain Limited Liability Company Agreement of the Company, dated December 18, 2024 (the "LLC Agreement");

**WHEREAS**, the Company is part of a larger group of entities that include the Current Member (collectively the "DAF"), and the mission statement of the Current Member (which is representative of DAF as a whole) is as follows: "*Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*" (the "Mission Statement");

**WHEREAS**, the Highland Dallas Foundation, Inc., the Highland Kansas City Foundation, Inc., and the Highland Santa Barbara Foundation, Inc. (collectively, the "Highland Foundations") are Participating Shareholders in the Current Member and may be entitled to discretionary dividends if declared by the current Directors of the Current Member;

**WHEREAS**, the Manager has formed the view that the Current Member, by virtue of being a member of the Company and having as Participating Shareholders the Highland Foundations, poses a material risk to the Company, its assets, and the Mission Statement of DAF due to, among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii);

**WHEREAS**, and in connection therewith, the Manager desires to cause the Company to (i) admit DFW Charitable Foundation as an additional member of the Company and to amend the LLC Agreement to reflect the same, each pursuant to the terms of that certain Admission and Amendment No. 1 Agreement, a form of which is attached hereto as Exhibit A (the "Admission Agreement") and (ii) redeem the entire limited liability company interests in the Company held by the Current Member and to amend the LLC Agreement to reflect the same, each pursuant to the terms of that certain Redemption and Amendment No. 2 Agreement, a form of which is attached hereto as Exhibit B (the "Redemption Agreement" and together with the Admission Agreement, jointly, the "Restructure Agreements");

**WHEREAS**, in connection with the Restructure Agreements and the transactions contemplated thereby, the Manager (on behalf of the Company) obtained a valuation report of the membership interests

FSD2025-0116                                                                     2025-08-19

**532**

CONFIDENTIAL

TDIT005570

613

of the Company from ValueScope and (ii) FTI Consulting, copies of which are attached hereto as Exhibit E, which valuation reports have informed the Manager the fair market value of the membership interests;

**WHEREAS**, for the foregoing reasons, and others, the Manager has determined it to be in the best interests of the Company and its members for the Company to take all steps necessary to complete the transactions contemplated by the Restructure Agreements (such transactions collectively, the "Member Reorganization") so that the Company and DAF can again fulfill its Mission Statement and charitable purpose.

**NOW, THEREFORE, BE IT RESOLVED**, that the Member Reorganization is hereby approved in all respects in accordance with the terms set forth in the Restructure Agreements; and be it

**RESOLVED FURTHER**, that the terms, conditions and provisions of each of the Restructure Agreements are hereby approved in all respects; and be it

**RESOLVED FURTHER**, that the Manager, acting alone, be, and hereby is, authorized and empowered to execute and deliver in the name and on behalf of the Company and to cause the Company to perform its obligations under, such other and further agreements, instruments or documents (with such changes as the Manager deems necessary or advisable, such determination to be conclusively evidenced by the Manager's execution thereof) and to take all other actions that the Manager deems necessary or advisable to evidence and finalize the Member Reorganization and to carry out the intent and accomplish the purposes of these resolutions; and be it

**RESOLVED FURTHER**, that all acts of the Manager taken prior to the adoption of the foregoing resolutions, which acts are consistent with the purposes of the foregoing resolutions are hereby severally ratified, confirmed, approved and adopted as acts of the Company.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

2

**CONFIDENTIAL**                                                                              **TDIT005571**

IN WITNESS WHEREOF, the undersigned has executed this written consent as of the date first set forth above.

MANAGER:

Name: Mark E. Patrick

[SIGNATURE PAGE TO WRITTEN CONSENT OF THE MANAGER OF CDMCFAD, LLC]

FSD2025-0116         2025-08-19

EXHIBIT A

Admission Agreement

## ADMISSION AND AMENDMENT NO. 1 AGREEMENT

This Admission and Amendment No. 1 Agreement (this "**Agreement**"), is entered into by the undersigned on March 27, 2025 (the "**Effective Date**").  Capitalized terms used herein and not otherwise defined shall have the meanings for such terms set forth in the LLC Agreement (as defined below).

### RECITALS

WHEREAS, CDMCFAD, LLC, a Delaware limited liability company (the "**Company**") is currently governed by that certain Limited Liability Company Agreement of the Company, dated as of December 18, 2024 (the "**LLC Agreement**");

WHEREAS, in accordance with the terms of the LLC Agreement, the parties hereto desire to: (i) admit the undersigned new Member (the "**New Member**") as an additional Member of the Company with the capital contribution of $1,637,192 (the "**Capital Contribution**") and Allocation Percentage set forth in Exhibit A hereto and (ii) amend Schedule A to the LLC Agreement as set forth in Exhibit A hereto to reflect the foregoing, as of the Effective Date; and

WHEREAS, the Manager hereby consents to and approves of the admission of the New Member and the amendments to Schedule A to the LLC Agreement as contemplated herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### AGREEMENTS

**I.    Admission.**  Each of the parties hereto hereby consents to the admission of the undersigned New Member as an additional Member of the Company.  In exchange for the payment to the Company of the Capital Contribution, the New Member is hereby issued a limited liability company interest in the Company with an Allocation Percentage as set forth on Exhibit A attached hereto as of the Effective Date.  Upon the execution of this Agreement, the undersigned New Member is hereby admitted as an additional Member of the Company as of the Effective Date and in such capacity, hereby agrees to and shall be bound by the terms of the LLC Agreement commencing as of the Effective Date.  For the avoidance of doubt, the execution and delivery of this Agreement by the undersigned New Member shall constitute the execution and delivery of a counterpart signature page to the LLC Agreement as required under Section 2.6 of the LLC Agreement.

**II.    Amendments.**

A.    Schedule A of the LLC Agreement is hereby amended and restated in its entirety and replaced with Exhibit A attached hereto.

521677\00001\4928-6266-5259\1

### III.   <u>Miscellaneous</u>.

A.   <u>Agreement in Effect</u>.  Except as otherwise hereby amended, the LLC Agreement shall remain in full force and effect.

B.   <u>Governing Law</u>.  This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Delaware, all rights and remedies being governed by such laws.

C.   <u>Counterparts</u>.  This Agreement may be executed in counterparts (including by facsimile or other electronic transmission), each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

D.   <u>Successors and Assigns</u>.  This Agreement is binding upon and will inure to the benefit of the parties to this Agreement and their successors and assigns.

[*Signature Page Follows*]

**CONFIDENTIAL**                                    **TDIT005575**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and date first above written.

MANAGER:

_____

Name: Mark Patrick

NEW MEMBER:

DFW CHARITABLE FOUNDATION

By: _____

Name: Mark Patrick

Title: President

*[Signature Page to Admission and Amendment No. 1 Agreement – CDMCFAD, LLC]*

CONFIDENTIAL

# EXHIBIT A

## LIMITED LIABILITY COMPANY AGREEMENT

## SCHEDULE A

## MEMBER INFORMATION

### Revised:  March 27, 2025

| Name and Contact Information | Allocation Percentage |
|---|---|
| Charitable DAF Holdco, Ltd.<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 50% |
| DFW Charitable Foundation<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 50% |

FSD2025-0116

2025-08-19

EXHIBIT B

Redemption Agreement

FSD2025-0116

2025-08-19

540

CONFIDENTIAL

TDIT005578

621

**FSD2025-0116**                    **Page 625 of 1530**                    **2025-08-19**

### REDEMPTION AND AMENDMENT NO. 2 AGREEMENT

This Redemption and Amendment No. 2 Agreement (this "**Agreement**"), is entered into by the undersigned on March 27, 2025 (the "**Effective Date**").  Capitalized terms used herein and not otherwise defined shall have the meanings for such terms set forth in the LLC Agreement (as defined below).

### RECITALS

WHEREAS, CDMCFAD, LLC, a Delaware limited liability company (the "**Company**") is currently governed by that certain Limited Liability Company Agreement of the Company, dated as of December 18, 2024 (as heretofore amended, the "**LLC Agreement**"); and

WHEREAS, in accordance with the terms of the LLC Agreement, Manager desires to: (i) redeem the entire limited liability company interest in the Company currently held by Charitable DAF HoldCo, Ltd. (the "**Redeemed Member**") effective as of the Effective Date for $1,637,192 (the "**Redemption Price**"), such amount being the Fair Market Value for the Redeemed Member's Interest as determined by the Manager, and (ii) amend Schedule A to the LLC Agreement as set forth in Exhibit A hereto to reflect the foregoing, as of the Effective Date.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### AGREEMENTS

**I.     Redemption.**   The Manager hereby approves and as of the Effective Date, the Redeemed Member's entire Interest in the Company is hereby redeemed by the Company for the payment of the Redemption Price.  As of the redemption contemplated by this Section I, the Redeemed Member shall cease to be a member of the Company and shall thereupon cease to have any rights or obligations as a member of the Company under the LLC Agreement, the Act or otherwise.

**II.    Amendments.**

A.     Schedule A of the LLC Agreement is hereby amended and restated in its entirety and replaced with Exhibit A attached hereto.

**III.   Miscellaneous.**

A.     Agreement in Effect.  Except as otherwise hereby amended, the LLC Agreement shall remain in full force and effect.

B.     Governing Law.  This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Delaware, all rights and remedies being governed by such laws.

521677\00001\4910-9195-6523\1

**CONFIDENTIAL**                    **TDIT005579**

622

FSD2025-0116 **Page 626 of 1530** 2025-08-19



Seyfarth Shaw LLP
2029 Century Park East
Suite 3500
Los Angeles, California  90067-3021
T (310) 277-7200
F (310) 201-5219

dmancino@seyfarth.com
T (310) 201 5241

www.seyfarth.com

March 20, 2025

**FEDEX**

TEGE Referrals Group
Internal Revenue Service
1100 Commerce Street
MC 4910 DAL
Dallas, TX 75242-1027

Re:   Highland Dallas Foundation, Inc. (EIN: 45 3961755)

Dear Sir or Madam

I am writing on behalf of my client, Charitable DAF Holdco, Ltd., a Cayman Islands exempt[1] company ('DAF Holdco"), concerning the deterioration of its relationship with one of its Participating Shareholders, Highland Dallas Foundation, Inc. ("Highland Dallas").[2] Highland Dallas is a supporting organization of the Dallas Foundation.

The deterioration of this relationship is due directly to the undue influence and control exercised over Highland Dallas by James D. Dondero and his affiliates, as described in this Form 13909, *Tax-Exempt Organization Complaint (Referral).* This disclosure letter supplements in detail and in exhibits the more general information described in the accompanying Form 13909 and is an integral part of that form (collectively, the Form 13909 and this letter are referred to as the 'Referral').

We believe the information described in this Referral will demonstrate clearly that Mr. Dondero's influence and control is an inappropriate donor relationship with representatives of the Dallas Foundation who serve on the Board of Directors of and as officers of Highland Dallas. We believe this undue influence and control potentially jeopardizes the tax-exempt status of Highland Dallas as an organization described in section 501(c)(3) and, at a minimum, causes it to fail to remain a supporting organization described in section 509(a)(3) because of the

---

[1] To be clear, DAF Holdco is not a tax-exempt organization under U.S. tax law, notwithstanding the use of the term "DAF" in its corporate name.. However, under its Cayman Islands Articles of Association  a "Restricted Person," i.e., an entity that *cannot* own Participating Shares, is an organization that is *not* described in section 501(c)(3) of the Code. As a consequence, all Participating Shareholders of DAF Holdco must be and remain organizations described in section 501(c)(3).
[2] The Dallas Foundation is a tax exempt community foundation described in sections 501(c)(3), 509(a)(1) and 170(b)(1)(A)(vi) of the Internal Revenue Code of 1986 (the "Code").

542

CONFIDENTIAL

TDIT005580

FSD2025-0116 2025-08-19

March 20, 2025
Page 2

excessive influence of a disqualified person and substantial contributor, i.e., Mr. Dondero, under section 509(a)(3)(C).

This Referral is divided into three major parts, with multiple subparts.

Part I provides the Internal Revenue Service (the "IRS" or the "Service") with extensive factual information concerning Highland Dallas, its governance and control. As will be seen, Mr. Dondero exerts undue influence and control over Highland Dallas directly, as a director, President and substantial contributor, and indirectly through his and his associates' influence over Highland Dallas's supported organization representatives on the Highland Dallas Board of Directors, and the Dallas Foundation itself.

Part II provides the IRS with background information on DAF Holdco and Mr. Dondero's efforts to exert dominion and control over DAF Holdco and its assets. Because Highland Dallas is a Participating Shareholder of DAF Holdco, Mr. Dondero's efforts (both successful and unsuccessful) to control DAF Holdco for his personal gain directly affect Highland Dallas financially and provide him an additional amount of private benefit and private inurement from a donation where he once benefitted from a charitable contribution deduction to a charitable remainder trust ("CRT").

As will be discussed in Part III, the tax discussion section, Mr. Dondero's influence and control is pervasive and is exercised primarily for Mr. Dondero's financial benefit directly and for the financial benefit he derives indirectly through several entities owned or controlled by him. We believe he therefore derives more than insubstantial benefit form Highland Dallas and causes its net earnings to inure to his benefit, all in violation of section 501(c)(3)'s most basic operational requirements. Also, at a minimum, we believe his influence and control over Highland Dallas has caused it to become a private foundation, thereby subjecting Mr. Dondero to Chapter 42 excise tax exposure.

I.      Background Concerning the Formation and Legal Structure of Highland Dallas, Highland Capital Management, L.P., and NexPoint Advisors, L.P.

A. Highland Dallas

Highland Dallas was incorporated as a Delaware nonprofit nonstock corporation by Mr. Dondero in 2011 in connection with his desire to form three tax-exempt public charities to become the three remaindermen of a CRT of which he was the income beneficiary. Highland Dallas applied for and was recognized by the IRS as a charitable organization described in section 501(c)(3) of the Code and as a supporting organization of the Dallas Foundation described in section 509(a)(3) of the Code. Highland Dallas did not register as a foreign corporation to do business in Texas until 2020.

At the time of its formation, Mr. Dondero became the sole "individual" member of Highland Dallas, with the legal power to select one director. The Dallas Foundation became the sole "institutional" member of Highland Dallas, with the power to select two directors. Thus, in 2011, Highland Dallas satisfied the requirements for being classified as a Type I supporting organization of the Dallas Foundation.

CONFIDENTIAL                                                                                              TDIT005581

March 20, 2025
Page 3

In addition, Mr. Dondero, in 2011, became and remains today the President of Highland Dallas and a member of its Board of Directors.

The other two supporting organizations are the Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara") (EIN: 45-3962008) and the Highland Kansas City Foundation, Inc. ("Highland Kansas City") (EIN: 45-3961865). These two supporting organizations of the Santa Barbara Foundation and Greater Kansas City Community Foundation, respectively, also have the same legal structure as Highland Dallas and, like Highland Dallas, each owns 100 Participating Shares of DAF Holdco.

We do not believe either Highland Santa Barbara or Highland Kansas City is as easily manipulated by Mr. Dondero and his affiliates as Highland Dallas because, according to their Forms 990 for 2023 (which is the last year those forms are available on Guidestar.com), Participating Shares of DAF Holdco are their only assets. By contrast, Mr. Dondero has made substantial additional contributions to Highland Dallas after 2011, either directly or through trusts or other entities owned or controlled by Mr. Dondero, some of which will be addressed later in this Referral. Thus, we believe Mr. Dondero is in a position to exert greater influence as a substantial contributor to Highland Dallas on the Directors of Highland Dallas appointed by the Dallas Foundation (including the Dallas Foundation's President & CEO, Julie Diaz).[*]

### B. Mr. Dondero and Highland Capital Management, L.P.

Highland Capital Management, L.P. ("HCM") is an investment management firm located in Dallas, Texas that was co-founded in 1993 and controlled by Mr. Dondero and individuals close to him. As described on page 7 of the *Special Turnover Petition* filed by UBS Securities LLC and UBS AG London Branch in the New York Supreme Court in 2023, a complete copy of which is enclosed with this Referral as Exhibit 1 (the "2023 UBS Petition"), before HCM filed for bankruptcy, "HCM was an investment management firm that managed billions of dollars in assets 'through its organizational structure of approximately 2,000 separate business entities'" (citation omitted). It is estimated by a plaintiff in another action that, at its height, HCM managed as much as $40 billion in assets.

Mr. Dondero was not only HCM's co-founder with Mark Okada,[1] he served as HCM's President and Chief Executive Officer until he was removed by the bankruptcy trustee in 2020.

---

[*] By way of example, the consolidated financial statements of the Dallas Foundation for 2020 available on its website include the assets of seven supporting organization, including Highland Dallas. Page 22 of the statements disclose that approximately $163.4 million of its assets were held by supporting organizations. On page 19, it appears that approximately $92.3 million (almost 57%) represent Highland Dallas assets. Also, in 2023, Highland Dallas received almost $34 million in charitable contributions, presumably all from Mr. Dondero and entities affiliated with or controlled by him. Thus, it is understandable why the Dallas Foundation representatives who serve on the Highland Dallas Board would acquiesce to almost any request or demand made by Mr. Dondero or one of his associates such as Lucy Bannon.
[1] In the Dallas Foundation's 2022 Form 990, the most recent available on Guidestar.com, Mr. Okada was listed as a member of the Board of Governors of the Dallas Foundation. On its website, the Dallas Foundation identifies another confidant and employee of Mr. Dondero, Lucy Bannon, as an "Advisory Member" of the Board of Governors (last visited March 5, 2025). Thus, Mr. Dondero continues to exert substantial indirect influence over Highland Dallas's supported organization, the Dallas Foundation.

CONFIDENTIAL                                                        TDIT005582

March 20, 2025
Page 4

C. Mr. Dondero, NexPoint Advisors, L.P., and NexPoint Hospitality Trust

In 2012, prior to his removal as President of HCM in 2020, Mr. Dondero formed NexPoint Advisors, L.P. ("NexPoint Advisors"), a Dallas-based portfolio real estate and investment firm. NexPoint Advisors is one of a vast array of entities operating under the "NexPoint" umbrella. After the HCM bankruptcy, Mr. Dondero and his affiliates seemlessly shifted their operations from HCM to NexPoint Advisors and its affiliates.

As alleged in another lawsuit filed in 2021 in the United States Bankruptcy Court of the Northern District of Texas by Marc S. Kirshner as a litigation trustee in the HCM bankruptcy case, "NexPoint [Advisors] was effectively a shell entity that Dondero created in March 2012 to siphon profits from [HCM] in order to evade [HCM's] creditors." See Complaint and Objection to Claim in Kirschner v. Dondero, at Al. Case No. 19-34054-sgj11, at pages 18-21, a copy of which is attached as Exhibit 2.

Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), a grantor trust, allegedly owns 99.9% of NexPoint Advisors. Mr. Dondero is the income beneficiary of Dugaboy and his sister, Nancy Dondero, is the family trustee of Dugaboy.

One of the entities affiliated with and advised by NexPoint Advisors is NexPoint Hospitality Trust, an open-ended real estate investment trust (the "REIT") based in Ontario, Canada. The REIT was formed in 2018 for the purpose of acquiring and operating income-producing hotel properties in the United States. The REIT's investment interests (called "Units") were listed for public trading on the TSX Venture Exchange of the Toronto Stock Exchange ("TSXV").

Dugaboy contributed 1,500,000 Class B non-voting Units of the REIT to Highland Dallas on December 24, 2019 and also granted Highland Dallas an "embedded" put option to sell them back to Dugaboy for $6.19 per share (the "Put Option"). The net asset value of the REIT as of December 24, 2019 was $6.19 per share. The Put Option is exercisable at any time prior to December 24, 2026. See the Dugaboy/REIT documents included as Exhibit 2.

The significance of the Put Option at that time is that the Class B non-voting Units could be treated for valuation purposes as equivalent to the Class A voting Units, which were owned or controlled by Mr. Dondero. Therefore, for purposes of determining their fair market value on the date of the charitable contribution, the valuation firm could value them as if they were voting Units unreduced by a 2.9% discount for lack of control. That allowed Dugaboy to claim a charitable deduction in 2019 of $11,606,000, which we assume passed through to Mr. Dondero as the income beneficiary of Dugaboy. We also assume that Highland Dallas signed a Form 8283, Noncash Charitable Contributions, form acknowledging it received the Units that would have been included with Mr. Dondero's 2019 Form 1040 along with a qualified appraisal of the Units (we have no actual knowledge of this, however).

On information and belief, we believe Mr. Dondero has used his influence and control over Highland Dallas to cause it defer exercising the Put Option at least through the effective time of the merger for at least three reasons.

- First, the forbearance to exercise the Put Option allows Mr. Dondero and Dugaboy to enjoy the benefits of an interest-free loan of $9,285,000 (the put exercise price ($6.19 x 1,500,000 units) while the Put Option remains outstanding and unexercised.

CONFIDENTIAL

TDIT005583

March 20, 2025
Page 5

- Second, the forbearance to exercise the Put Option effectively has protected Mr. Dondero from the declining value of the REIT between December 2019 and November 2024. As of November 22, 2024, the reported fair value of the Units was $0.015 per Unit, so the fair value on that date of 1,500,000 Units was only $22,500, less than one percent of the Put Option value of $9,285,000.

- Third, most charitable organizations have a policy of immediately selling contributed shares that are listed for trading on a stock exchange in order both to diversify and to reinvest the sale proceeds in a manner that aligns more closely with the charity's investment policy. Had Highland Dallas sold the Units on the TSXV at any time within three years after their receipt, Highland Dallas would have been required to file a Form 8282, *Donee Information Return*, with the Service that would likely have reflected a much lower value of the original contribution amount claimed in 2019. Thus, in effect, Highland Dallas was acting to protect Mr. Dondero from having to address the precipitous fall in fair market value as the REIT Units plummeted in value beginning shortly after the gift was made.

Highland Dallas's failure to exercise the Put Option up until now becomes all the more significant because on November 25, 2024, the REIT announced the execution of a definitive agreement (the "Merger Agreement") pursuant to which the REIT will be dissolved and its subsidiary entities will be merged with and into entities owned or controlled, directly or indirectly, by NexPoint Diversified Real Estate Trust. Under the Merger Agreement, The proposed price per Unit is $0.36 per Unit. According to the press release issued by the REIT announcing the merger, "[t]he proposed price of US$0.36 per Unit represents a premium of approximately 2300% to the 30-day volume weighted average price per Unit on the TSXV ended November 22, 2024 of US$0.015."

Last month, in a press release issued on February 21, 2025, it was announced that a majority of minority votes approved of the merger. Under Canadian law, when a person such as Mr. Dondero owns or controls a majority of a Canadian public company's voting shares, a transaction such as this merger must be approved by two-thirds of the minority shares, or in this instance the 5,131,020 Class B non-voting Units.

Based on public filings with the U.S. Securities and Exchange Commission, we believe the REIT had approximately 29,353,660 Units, of which 82.52% were owned by entities owned or controlled by Mr. Dondero.

We have to assume that Highland Dallas voted its 1,500,000 Units in favor of the merger at Mr. Dondero's request.[5] That suggests that the merger needed Highland Dallas's 29.2% (almost one-third of the two-thirds vote required) of minority Unit's approval. That also suggests that

---

[5] We understand that the Board of Directors of Highland Dallas usually acts by Unanimous Written Consent Without a Meeting, which means the Mr. Dondero along with the two Dallas Foundation Board appointees would have approved voting in favor of the merger. Presumably the same would be true if a decision were taken by the Board to refrain from exercising the Put Option.

CONFIDENTIAL                                                              TDIT005584

March 20, 2025
Page 8

Highland Dallas chose not to exercise its Put Option to permit Mr. Dondero to retain control over the REIT even as its finances deteriorated.

We have no way of knowing whether Highland Dallas will exercise the Put Option before the REIT is dissolved (projected for the end of the first quarter of 2025, i.e., by the end of this month), but clearly if it fails to do so this will result in a $9 million inappropriate windfall to both Dugaboy and Mr. Dondero. Obtaining the answer to this question would only require the IRS to open an examination of Highland Dallas and issue an Information Document Request and/or issue a third-party subpoena to Dugaboy.[6]

### D. Highland Dallas's Assumed Name

In March 2024, Highland Dallas filed an Assumed Name certificate with the Texas Secretary of State to permit it to operate under the name "NexPoint Philanthropies Dallas, Inc." This is consistent with Mr. Dondero's current ownership and control of NexPoint Advisers and his loss of control of HCM in the bankruptcy and consistent with the goal of allowing a private company (NexPoint) and Mr. Dondero to take credit for and enjoy the halo effect from NexPoint Philanthropies Dallas's (really Highland Dallas's) charitable giving.

### E. Mr. Dondero's Firearms Contributions to Highland Dallas

Several years ago, Mr. Dondero (either directly or through entities owned and controlled by him) made contributions of a collection of firearms to Highland Dallas. Presumably, a Highland Dallas officer signed the donee acknowledgment on Form 8283, *Noncash Charitable Contributions*, and checked the box "No" asking whether the organization intended to use the property for an unrelated use, because checking "Yes" would limit Mr. Dondero's charitable contribution deduction to his adjusted basis and not its appraised fair market value. This in itself demonstrates Mr. Dondero's improper influence over the Dallas Foundation representatives serving as Board members and officers of Highland Dallas, especially as it is hard to believe a supporting organization of a community foundation could possibly use firearms in a related trade or business.

But to further demonstrate his abuses and diversions of assets for his own benefit, earlier this year in 2025 he diverted a substantial debt service payment of $1.3 million on a loan owed to one of DAF Holdco's subsidiaries to pay for a specially-designed and built vault for those firearms (shotguns). That diversion of assets has caused a default of that loan that has now landed in Texas State court, thereby depleting DAF Holdco's assets further because of legal fees. It is unknown whether the vault was requested by anyone associated with the Dallas Foundation serving as a director or officer of Highland Dallas, such as Julie Diaz, but we believe it likely was.

### F. Mr. Dondero's Character

Mr. Dondero has a demonstrated pattern of behavior of stealing assets from those he perceives as adversaries. What is also demonstrated by even a cursory reading of the 2023 UBS Petition

---

[6] We will be happy to provide the IRS with a copy of the S-4 filed with the SEC available on EDGAR and the REIT's press releases that were used to develop this data.

CONFIDENTIAL                                                                    TDIT005585

March 20, 2025
Page 7

and the *First Amended Original Complaint* filed by Highland Employee Retention Assets LLC against Mr. Dondero and his affiliates on July 15, 2024 in the U.S. District Court for the Northern District of Texas, Dallas Division, a complete copy of which is enclosed as Exhibit 4 with this Referral (the "2024 Complaint"), Mr. Dondero, to put it mildly, has no respect for corporate formalities and is willing to engage in self-dealing to strip entities of their assets without regard to any fiduciary duty of care or loyalty to serve his personal needs and to benefit himself financially to the detriment of others, including his own former HCM employees.[7]

The 2023 UBS Petition outlines how Mr. Dondero, facing a $1 billion judgment, directed various entities he owned and controlled to shift substantially all of their assets offshore to a Cayman Islands insurance company for a fraudulent insurance policy. The 2023 UBS Petition is an attempt to collect on a 2020 $1 billion judgment in favor of the UBS entities. Mr. Dondero has been so successful at hiding assets that the UBS entities have not been paid.

The 2024 Complaint seeks recovery of hundreds of millions from Mr. Dondero. It describes how a former Mr. Dondero employee at HCM, Patrick Daugherty, had a falling out with Mr. Dondero. After the falling out, Mr. Dondero took extraordinary steps to ruin Mr. Daugherty's life—depriving him of assets, removing his long-term incentive plan, embroiling him in lawsuits, and the list goes on.

These are not isolated incidents. In the ACIS Capital Management, L.P. matter,[8] Mr. Dondero had a falling out with Josh Terry, a former employee of HCM, and took extraordinary steps to ruin Mr. Terry's life—the same playbook as above with Mr. Daugherty.

In fact, Mr. Dondero and his litigiousness is widely known in the Dallas/Fort Worth area. Mr. Dondero is variously described as "Highland Capital's Giraffe-Eating Hedge Fund Manager" (Dallas Observer June 1, 2012), and "the distressed debt investor who was once a scourge to private equity. . . " (Financial Times March 10, 2023).

As it relates to this Referral more specifically, in a May 3, 2023 post entitled "James Dondero: Dallas's Surprising Philanthropy Hero," the post states: "Most gifts are made through the Highland Dallas Foundation, Inc., the philanthropic arm of Highland Capital Management." Note that this post appears to have been prepared by Mr. Dondero himself and appeared three years after he was ousted as HCM's President. What's more to the point is that it outlines in Mr. Dondero's own words the likely failures of Highland Dallas to comply with the section 509(a)(3) operational test discussed below. A copy of that post is included as Exhibit 6.

### G. Skyview Group

Skyview Group is a back-office and administrative service provider whose clients consist 99% of entities affiliated with or controlled by Mr. Dondero. Mr. Mark Patrick was engaged as a tax

---

[7] *See also In Re: Highland Capital Management L.P. v. Dondero*, Case No. 19-34054-sgj11 (June 6, 2021), a decision by the U.S. Bankruptcy Court for the Northern District of Dallas. In that opinion, the Bankruptcy Judge found Mr. Dondero to be in contempt for violating a temporary restraining order. A copy of that opinion is enclosed as Exhibit 5.

[8] We can provide the IRS with a copy of this complaint if that would be of interest.

March 20, 2025
Page 8

consultant by Skyview Group until Mr. Patrick resigned in October 2024 on the advice of the undersigned counsel. Skyview Group charged DAF Holdco management fees for its services.

Skyview Group is nominally owned and controlled by Scott Ellington, who was HCM's Chief Legal Officer and General Counsel until his removal by the bankruptcy trustee in 2021. Despite this nominal ownership and control by Mr. Ellington, Mr. Dondero controls all compensation decisions, including decisions relating to Mr. Ellington's compensation, and thus dominates Skyview Group as if he owned it himself.

Since Mr. Patrick's resignation from Skyview Group, Mr. Patrick has been directly employed and compensated by DAF Holdco rather than Skyview Group. In addition, Mr. Patrick, again acting on advice of counsel, caused DAF Holdco to give six-months' notice in October 2024 to Skyview Group that it was terminating its contract with Skyview Group.

Mr. Dondero became furious when he learned of these actions, and that is when (for the first time in over a decade) Highland Dallas and Dallas Foundation executives and attorneys started raising questions about DAF Holdco's investments and management. In addition, this is when Highland Dallas, and Julie Diaz (who serves as both the President of the Dallas Foundation and as a Director and Vice President of Highland Dallas), began voicing concerns over DAF Holdco's investment performance, concerns that were never raised when Mr. Dondero's lackey, Grant Scott was rubber-stamping NexPoint and other Dondero-related investments and that were never raised prior to Mr. Patrick's resignation from Skyview Group.

## II.    DAF Holdco

### A.  The Grant Scott Control Era

Back in 2011, when Highland Dallas and the two other supporting organizations were being formed, one of the highly successful types of investments designed and marketed by HCM through investment partnerships were collateralized loan obligations, or CLOs.

A CLO is a single security backed by a pool of corporate debt issued by corporate borrowers with low credit ratings or loans taken out by private equity firms to conduct leveraged buyouts. With a CLO, the investor receives scheduled debt payments from the underlying loans, assuming most of the risk in the event of a default. In exchange for taking on that default risk, the investor is offered greater diversity and the potential for higher-than-average investment returns. DAF Holdco was formed initially in 2011 to hold partnership interests in partnerships that held CLOs.

Mr. Dondero caused DAF Holdco to be formed to have a structure through which he could have his CRT make remainder interest distributions of the Participating Shares of DAF Holdco to Highland Dallas and to the other two supporting organizations.[9] How CLOs work is not relevant

---

[9] This is documented in Part III, Line 4a of each of the three supporting organizations' Form 990, *Return of Organization Exempt From Income Tax*, for 2023 (the last year for which a Form 990 for the organizations was posted on Guidestar.com).

CONFIDENTIAL                                                      TDIT005587

March 20, 2025
Page 8

to this Referral except to the extent that Management Shares of DAF Holdco were initially issued to Mr. Dondero's college roommate and long-time close friend, Grant Scott.[13]

Grant Scott's ownership of the Management Shares from 2011 to 2021 effectively allowed Mr. Dondero to retain control of DAF Holdco and, thereby, use DAF Holdco's assets as a piggybank for other investments described below. Management Shares have no economic right to distributions; the value for Mr. Dondero is in their control over DAF Holdco and the ability to utilize its assets either to make dividend distributions to the Participating Shareholders (i.e., the supporting organizations) or to fund Dondero-managed investments on non-market terms and with below-market returns on investment.

NexPoint Advisors repeatedly reached out to DAF Holdco for investment-backing with below market terms and rates of returns while under the control of Grant Scott. Grant Scott consummated these transactions without hiring outside counsel or valuation experts for DAF Holdco. The lack of arms-length dealing under Grant Scott's control is made patently obvious in the ValueScope November 18, 2024 presentation materials included as Exhibit 7. The economics of these transactions clearly show that Mr. Dondero was directing Grant Scott to cause DAF Holdco to enter into below-market deals for DAF Holdco that redirected the profits to Mr. Dondero and entities he owns. In other words, Mr. Dondero was stealing from DAF Holdco and, in turn, the supporting organizations.

Mr. Dondero's theft was not limited to below-market transactions. In March 2020, Mr. Dondero and his affiliates directed Grant Scott to make a $1 million payment to an entity called Tall Pine Group, LLC. The payment was allegedly for professional services rendered, but no such services were rendered to DAF Holdco. In subsequent court filings, it became clear that the $1 million went to pay Mr. Dondero's affiliates' employment compensation bonuses, which could not be paid in the normal course because HCM was subject to various bankruptcy restrictions at the time. Further detail is available in the *Kirschner Complaint*, at page 61, a copy of which is attached hereto as Exhibit 2.

### B. The Mark Patrick Control Era (including present day)

Grant Scott assigned the Management Shares to Mark Patrick in March 2021. Mr. Patrick now controls DAF Holdco and the timing of distributions to the supporting organizations, including Highland Dallas. Mr. Patrick also controls the negotiations and approvals of the terms and conditions of all investments since he assumed control. Since then, under Mark Patrick's leadership DAF Holdco has begun to diversify away from Dondero-managed investments.

Total DAF Holdco (including its subsidiaries) exposure to Dondero-managed investments was over $100 million in June 2023. Because of the formation history of DAF Holdco and the various transactions between DAF Holdco and Dondero-managed investments, DAF Holdco has been named as a defendant in numerous lawsuits claiming it is an alter ego of Mr. Dondero and his

---

[13] On pages 7 and 8 of the litigation trustee's Complaint and Objection to Claims in *Kirschner v. Dondero* included as Exhibit 2, the trustee described Grant Scott as follows: "Dondero personally selected Scott as his successor to run the Charitable DAF Fund. . . . Scott has no training in finance or compliance and no investment experience. Scott routinely rubber-stamped Dondero's and [HCM's] directives without asking questions or requesting additional information."

CONFIDENTIAL                                                            TDIT005588

March 20, 2025
Page 10

entities and that the initial funds transferred to DAF Holdco from the CRT were fraudulent transfers. These lawsuits have been very expensive and time-consuming for DAF Holdco, which disadvantages Highland Dallas and the other Participating Shareholders because the payment of legal fees depletes available cash.

Because Mr. Patrick viewed the $100 million exposure to Dondero-related and the lawsuits as a risk to DAF Holdco (and therefore the Participating Shareholders), he has taken steps to create layers of independence between DAF Holdco and Mr. Dondero. As documented by an independent valuation consultant, Value4Scope, LLC (a copy of the ValueScope report is enclosed as Exhibit 7), upon assuming control of DAF Holdco, Mr. Patrick engaged independent counsel to assist him in negotiating "market" terms and returns on investment for investments with all outside parties, especially those controlled by or affiliated with Mr. Dondero, such as NexPoint Advisors. Neither Mr. Dondero nor his associates expected this because no market discipline was exercised by DAF Holdco when it was controlled by Mr. Dondero's college roommate and close friend Grant Scott.

Outside counsel and valuation experts frequently either negotiated more market-standard (and more favorable to DAF Holdco) terms for Dondero-managed investments or advised against the transactions on the terms proposed by Mr. Dondero (via his various entities, including NexPoint Advisors). And, because Mr. Patrick refused to simply rubber-stamp Dondero-related investment asks, Mr. Dondero became upset with Mr. Patrick and demanded that Mr. Patrick provide him with increased levels of control over DAF Holdco, including meetings between Mr. Patrick and Mr. Dondero three times per week when he was still a consultant with Skyview Group, and permitting one of Mr. Dondero's affiliates increased access to DAF Holdco information and finances. Mr. Patrick refused these requests.

Mr. Patrick also hired an independent director for DAF Holdco, Paul Murphy. During Mr. Scott's control, Mr. Scott served as sole director and sole person in control. There was no requirement under Cayman law to hire an independent director; Mr. Patrick did so for the benefit of DAF Holdco (and, indirectly, Highland Dallas and the other Participating Shareholders).

Mark Patrick also resigned from Skyview Group in October 2024. As noted above, Mr. Dondero effectively controls Skyview Group, and it is nominally owned by one of his affiliates. Scott Ellington. Mr. Dondero viewed this as the last straw—he viewed this as his final loss of control over DAF Holdco and its assets. On the same day, in order to complete the separation. Mr. Patrick directed DAF Holdco to terminate a services agreement with Skyview Group.

Mr. Patrick's resignation from Skyview Group was recommended by outside counsel, including this firm. Mr. Patrick recognizes he has fiduciary duties to DAF Holdco and its subsidiaries. Mr. Dondero created tension with these duties by demanding that Mr. Patrick rubber-stamp Dondero-managed investments, as did Grant Scott. For example, in September 2024, Mr. Dondero recommended that DAF Holdco consummate a real property acquisition of The Campus at Legacy (described in Exhibit 7) for $45 million and provide one of Mr. Dondero's entities a repurchase option if the price were to appreciate. In no uncertain terms, DAF Holdco would take all the downside financial and real estate risk and transfer the upside financial benefit to Mr. Dondero if this proposal had been accepted. This was typical for Dondero-managed investments.

CONFIDENTIAL                                                       TDIT005589

March 20 2025
Page 11

Mr. Dondero also demanded that Mr. Patrick cause DAF Holdco to wire one of Mr. Dondero's offshore entities, Sentinel, $1.5 million in November 2023. Mr. Patrick sought the advice of outside counsel, who told Mr. Patrick the payment would be "impermissible and illegal for a number of reasons". Mr. Patrick accordingly refused the payment (i.e., embezzlement) request.

Mr. Dondero's behavior and attitude toward DAF Holdco is nothing if not consistent. Whether Mr. Scott or Mr. Patrick was in control, Mr. Dondero never abandoned the belief that the assets he caused his CRT to distribute to DAF Holdco remained his own. Mr. Patrick's steps toward independence and then resigning from Skyview Group in October 2024 led to Mr. Dondero exerting his influence over Highland Dallas in a manner we believe results in improper private benefit accruing to him as discussed in the tax aspects portion of this disclosure letter.

Following Mr. Patrick's resignation from Skyview Group, Mr. Dondero directed his entities to cease all principal and interest payments owed on Dondero-managed investments to DAF Holdco and its subsidiaries, which has led to several ongoing lawsuits discussed below and outlined in Exhibit 7. It is inevitable that Mr. Patrick will receive the same treatment as Mr. Daugherty and Mr. Terry (described above)—he will be subject to frivolous, vexatious lawsuits and harassment because he is Mr. Dondero's newest villain.

### C. October 2024 to Present

The events that have unfolded show Mr. Dondero's anger at his loss of control of DAF Holdco's assets. Mr. Patrick met with Highland Dallas shortly after his resignation from Skyview Group and assured Julie Diaz of Highland Dallas and the Dallas Foundation that his resignation would not modify management of distributions to the Dallas Foundation. Mr. Patrick believed the meeting went well. Ms. Diaz voiced no concerns and actually requested additional distributions.

Shortly thereafter, Highland Dallas and the two other Participating Shareholders hired the law firm Holland & Knight (which had already represented the Dallas Foundation for years) to represent them and to send a "no confidence" letter to DAF Holdco. This purported lack of confidence was a new sentiment by Highland Dallas, which had never previously expressed any concern when it received ValueScope reports from Grant Scott. The "no confidence" letter came out of the blue—there were no calls, emails, or other communications that expressed a lack of confidence or requested any information whatsoever.

DAF Holdco subsequently learned that Mr. Dondero directed his subordinates at Skyview Group and NexPoint Advisors to provide false and misleading financial information to Highland Dallas and to the other Participating Shareholders. Rather than contact DAF Holdco or Mr. Patrick to question this information (especially given the questionable source), Highland Dallas sent the "no confidence" letter without any attempt to verify it. (As a post-script, DAF Holdco has refuted the false and misleading information, but the dispute continues because it was never really about that.)

Despite the November 11, 2024 date on the "no confidence" letter, DAF Holdco did not receive it until December 8, 2024, after the November 18, 2024 presentation to the supporting organizations' attorneys, Holland & Knight. In addition, DAF Holdco received the "no confidence" letter from Mr. Dondero's personal attorneys, who do not represent Highland Dallas or the other Participating Shareholders.

CONFIDENTIAL          TDIT005590

March 30, 2025
Page 12

DAF Holdco responded and voiced its concerns that Mr. Dondero was directing Highland Dallas to take these actions. Recall that Mr. Dondero is a Director and President of Highland Dallas. Holland & Knight ignored the accusations that Mr. Dondero was calling the shots and began sending acrimonious (but toothless) emails to DAF Holdco. Finally, Julie Diaz, a Director and Vice President of Highland Dallas (and President of the Dallas Foundation), sent an email requesting a winding up of DAF Holdco and distribution of all of its assets to Highland Dallas and the other Participating Shareholders.

Paul Murphy, an independent Director of DAF Holdco, made a presentation to the supporting organizations' attorneys from Holland & Knight in which he reviewed all of the governance and management improvements that have already been made, but they persist behind the scenes to facilitate Mr. Dondero's attempts to undermine Mr. Patrick and regain control over DAF Holdco's assets for use by NexPoint for investments.

DAF Holdco was contacted in February 2025 by Cayman Islands counsel stating they represent "DAF 2." DAF Holdco believes this "DAF 2" is an attempt by Mr. Dondero and his affiliates to fraudulently obtain DAF's assets.

In February 2025, DAF Holdco subsidiaries filed two lawsuits against Mr. Dondero's entities for non-payment on Dondero-managed investments. Mr. Patrick also directed a non-DAF entity he controls to file a third lawsuit against Mr. Dondero's entities for non-payment. These lawsuits are fundamentally the same as other lawsuits where creditors have sued Mr. Dondero and his entities for nonpayment. Mr. Dondero has not changed—he refuses to pay his debts and he believes he is the rightful owner of DAF Holdco's assets. Mr. Dondero's instrument is Highland Dallas. He controls Highland Dallas and will cause it to continue its crusade against DAF Holdco. As noted by James Seery, the HCM bankruptcy trustee who removed Mr. Dondero from HCM, Mr. Dondero will "burn the place down" if he does not get his way.

### III.   Discussion of Tax Exemption-Related Lack of Compliance and Outright Avoidance

In order for an organization to qualify for tax-exempt status under section 501(a) of the Code as a charitable organization described in section 501(c)(3) of the Code, it must be organized and operated exclusively for one or more charitable purposes described in section 501(c)(3) and the Treasury Regulations promulgated thereunder. We do not question whether Highland Dallas is organized for charitable purposes, nor do we question whether Highland Dallas's grantmaking to the Dallas Foundation and other bona-fide charitable organizations is consistent with its charitable purposes.

We do question whether Mr. Dondero's influence and control over at least Highland Dallas has allowed some portion of their net earnings to indirectly inure to Mr. Dondero's benefit as a result of his historic access to DAF Holdco's assets at below market rates and terms that appear to have been acquiesced to by each supporting organization. As we discuss below, Mr. Dondero's influence and control over DAF Holdco when Grant Scott was its Management Shareholder was never of concern, especially to Highland Dallas, even as each supporting organization's received periodic valuation reports prepared by ValueScope detailing DAF Holdco's NexPoint investments. See report prepared for Grant Scott by ValueScope, attached hereto as Exhibit 8. In fact, we believe those valuation reports were used by each of them to prepare their Forms 990 and to prepare consolidated financial statements.

CONFIDENTIAL                                                        TDIT005591

March 20, 2025
Page 13

We also believe that each of the supporting organizations operates for Mr. Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets now that Mr. Patrick declined NexPoint investment requests that are both on non-market proposed terms and provide below market returns on investment.

If Highland Dallas elects not to exercise the Put Option before the REIT dissolves, we believe that would be an excess benefit transaction under section 4958 of the Code in which the organization managers had to have knowingly participated.

We also believe Mr. Dondero exercises such control as a substantial contributor of Highland Dallas, resulting from gifts he has made since the initial gift of Participating Shares were made by the ORT in 2011, that Highland Dallas should no longer satisfy the requirement in section 509(a)(3)(C) that there be no control by disqualified persons.

Finally, as discussed briefly below, we believe the donor advised fund rules in section 4966 and 4967 may be implicated, but have insufficient knowledge of the facts to assert conclusively that they do apply.

### A. Private Benefit.

We respectfully submit that Highland Dallas in particular no longer satisfies the operational test of section 501(c)(3) because its actions taken at Mr. Dondero's direction serve his private interests more than incidentally as prohibited by Treasury Regulation § 1.501(c)(3)-1(d)(1)(ii).

As we have outlined above, Mr. Dondero and affiliates such as NexPoint Advisors used DAF Holdco, when it was controlled by Grant Scott, as his personal piggybank. And, when Grant Scott controlled DAF Holdco, neither Julie Diaz (in her capacity as Director and Vice President of Highland Dallas) nor the Dallas Foundation questioned whether DAF Holdco's investment were prudent or generated market returns. Rather, even as they received and used for tax and financial reporting purposes the ValueScope valuation opinions which disclosed DAF Holdco's NexPoint and other Dondero-related investments, they never questioned whether the terms were market terms or whether the asset allocations were prudent. It was only after Mr. Patrick took over as Management Shareholder of DAF Holdco and (a) started declining NexPoint investment asks—really demands, (b) started diversifying DAF Holdco's investments away from NexPoint investments, (c) began demanding repayment of amounts owed with respect to NexPoint investments, and (d) Mr. Patrick resigned from Skyview Group and terminated its contract for back office and other services, that the supporting organizations collectively hired outside counsel and, under the lead of Julie Diaz, a Director and Vice President of Highland Dallas began sending no-confidence emails to DAF Holdco Directors (including Mr. Patrick and Mr. Murphy) demanding information to which they were not even legally entitled (a fact that their attorneys openly acknowledged in a Zoom call) and a complete restructuring of DAF Holdco to bring it back under Mr. Dondero's control.

In the seminal decision, *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), the Tax Court concluded that the absence of private inurement to the benefit of a private shareholder or individual does not end the analysis of whether an organization satisfies the operational test of exemption under section 501(c)(3). It went on to state "when the Court concludes that no prohibited inurement of net earnings exists, it cannot stop there but must

CONFIDENTIAL

TDIT005592

FSD2025-0116                    **Page 639 of 1530**                    2025-08-19

March 20, 2025
Page 14

inquire further and determine whether a prohibited private benefit is conferred." (citations omitted) Id. at 1070. It concluded that "an organization's conferral of benefits on disinterested persons may cause it to serve 'a private interest' within the meaning of section 1.501(c)(3)-1(d)(1)(ii)." Id. at 1070.

Finally, after looking at the organization's exclusive source of funding (much the same as Mr. Dondero's exclusive funding of Highland Dallas), control of a majority of the Board by members of the Republican Party (analogous to Mr. Dondero's role as President and Director of Highland Dallas and his substantial influence over the two Dallas Foundation directors evidenced by their epiphany that something has to be done since Mr. Dondero no longer controls DAF Holdco), and several other factors, "we conclude that petitioner is operated for the benefit of private interests, a nonexempt purpose." Id. at 1080.

In another case, Airlie Foundation, Inc. v. United States, 55 F.3d 684 (D.C. Cir. 1995), the relationship between the founder and executive director of the foundation bears a strong resemblance to the relationship between Mr. Dondero and Highland Dallas and served as a basis for sustain the Service's revocation of its section 501(c)(3) exemption on the ground that it provided more than incidental private benefit to the founder. Although the actual basis for revocation of exemption was a finding of inurement of net earnings, the pervasive control of the founder clearly influenced the D.C. Circuit to affirm the District Court and, equally important, the court cited American Campaign Academy for the proposition that an organization does not operate exclusively for tax-exempt purpose if it serves a private interest rather than a public interest, and "[t]his requirement applies to the organization's actual, not purported purposes." Id. at 75 AFTR 2d 95-2068, 95-2071.

### B.  Potential Inurement

Section 501(c)( also requires that "no part of the net earnings " of the organization may "inure to the benefit of any private shareholder or individual." As observed in the Airlie Foundation case, "the extent of the inurement is immaterial." Id. As noted in that case, and as is the case with Mr. Dondero, the founder of Airlie Foundation, Inc. "established and controlled a network of taxable and tax-exempt entities. The transactions that took place within the network organizations formed the basis for the IRS's revocation of AFI's tax-exempt status, as discussed at length by the district court."

We respectfully submit that if the Service audits Highland Dallas it will identify many more instances of inurement, beyond the single instance of forgiving $33,672 by Airlie Foundation Inc. owed by one of the founder's affiliated entities. The Dugaboy effective interest-free loan and potential windfall if Highland Dallas fails to exercise its Put Option should be enough, but we believe there will be many other transactions such as management and administrative fees that generate income for Dondero-related entities.

As discussed above in Section II.A., during the Grant Scott controllership of DAF Holdco, Mr. Dondero's effective control of DAF Holdco led DAF Holdco to make investments that benefitted him personally. These investment deprived DAF Holdco of assets that could be distributed to Participating Shareholders, including Highland Dallas.

CONFIDENTIAL                                                              TDIT005593

March 28, 2025
Page 15

C.  The Failure to Exercise the Put Option as an Excess Benefit Transaction

As you know, section 4958 treats as excess benefit transactions between a public charity such as Highland Dallas and a disqualified person such as Mr. Dondero economic arrangements that are above or below market between them. Section 4958(c)(3)(A) also treats as "automatic" excess benefit transactions "any grant, loan, compensation or other similar payment to" a disqualified person such as a substantial contributor.

We believe, upon examination, the Service will find that Highland Dallas has engaged in multiple automatic excess benefit transactions with Mr. Dondero or entities owned and controlled by him such as NexPoint Advisors.

First, the forbearance to exercise the Put Option effectively created an interest free loan to Dugaboy, a disqualified person. Thus, the mere fact it has remained outstanding for years means it is an automatic excess benefit transaction that requires not only the payment of the 25% excise tax by Dugaboy but also the correction of it through the payment of the full $8,260,000 plus interest.

Second, if NexPoint Advisors performs investment management services for a fee that would be an automatic excess benefit transaction requiring not only correction but also payment of the 25% excise tax. In fact, we know from public SEC filings that NexPoint Advisors or one of its affiliates does perform investment management services for the REIT, which may itself be an excess benefit transaction requiring correction.

Finally, while other excess benefit transactions may be identified during an examination of Highland Dallas, any forbearance to exercise the Put Option to benefit Dugaboy should be regarded, at a minimum, as a "similar payment" given the fact that Mr. Dondero benefits economically in a substantial way from that forbearance.

Given that the other two directors must act to approve these actions, it is likely they have done so knowingly and willfully.

D.  Potential Non-Compliance with Section 509(a)(3) Operational Test Sufficient to Cause Highland Dallas to be Reclassified as a Private Foundation and Thus Subject to Chapter 42 Rules

In Mr. Dondero's article entitled "James Dondero: Dallas's Surprising Philanthropy Hero" (May 3, 2023, copy enclosed as Exhibit 6), Mr. Dondero said as follows:

> "Mr. Dondero and his firm have supported The Family Place, The Dallas Zoo, SMU's Tower Scholars program, The Perot Museum of Nature and Science, Education is Freedom, and many more local charity organizations. Most gift are made through the philanthropic arm of Highland Capital Management."

Thus, in his own words, Mr. Dondero has acknowledged Highland Dallas has violated the section 509(a)(3) operational test in Treasury Regulation § 1.509(a)-4(e)(1) concerning permissible beneficiaries of a supporting organization and should be reclassified as a private foundation. That would mean that all dealings between Highland Dallas and entities owned or controlled by Mr. Dondero should be scrutinized to determine whether they constitute acts of

CONFIDENTIAL                                                    TDIT005594

March 20, 2025
Page 15

self-dealing described in section 4941 of the Code or violate other provisions of Chapter 42 of the Code, such as the taxable expenditure rules in section 4945.

Under Treasury Regulation § 1.509(a)(-4(e)(1), "[a] supporting organization will be regarded as 'operated exclusively' to support one or more specified publicly supported organizations only if it engages solely in activities which support or benefit the specified publicly supported organizations." (emphasis supplied)

The only exception to the requirement that a supporting organization benefit the supported organization "solely" is when the supporting organization provides benefits to individual members of the charitable class benefited by the supported organization, such as by granting scholarships to graduates of a particular high school for college. See, e.g. *Nellie Callahan Scholarship Fund v. Commissioner*, 73 T.C. 626 (1980). The word "solely" is unambiguous, therefore, Mr. Dondero's own acknowledgement that Highland Dallas is the source of his funding of other admittedly charitable organizations provides conclusive evidence that Highland Dallas fails the operational test of section 509(a)(3).

Furthermore, section 509(a)(3)(C) provides that a supporting organization may not be controlled directly or indirectly by a disqualified person. A substantial contributor to a supporting organization is a disqualified person under section 4946(a)(1)(A). Thus, Mr. Dondero's Dugaboy gift of the REIT Units to Highland Dallas made him a disqualified person and his effective veto power places him in control of Highland Dallas.

Therefore, we respectfully submit that that the Service should examine Highland Dallas to determine if it should be reclassified as a private foundation for the foregoing reasons and, if it is so-reclassified, all transactions between Mr. Dondero and his related or controlled entities should be evaluated to determine whether any constitute acts of self-dealing under section 4941. This should include the failure on the part of Highland Dallas to exercise its Put Option.

E.  Potential Non-Compliance with Section 4966/4967 Rules Applicable to Donor Advised Funds

Finally, we respectfully submit that the Service should examine Highland Dallas to determine whether it, in effect, functions as a donor advised fund of Mr. Dondero given the fact he provided substantially all of its funding, effectively controls it and may personally benefit financially more than incidentally through entities he owns or controls from management fees, charity special events such as banquets and other means.

CONFIDENTIAL                                                       TDIT005595

March 20, 2025
Page 17

Representatives of DAF Holdco will be available to be interviewed by the Service in a manner that will not result in compromising confidentiality under section 6103 and without the need for an administrative summons.

Very truly yours,

SEYFARTH SHAW LLP

Douglas M. Mancino

cc. Mark Patrick, Paul Murphy and Texas, California and Missouri Offices of the Attorney General (Charitable Trusts Sections)

DMM

CONFIDENTIAL       TDIT005596

FSD2025-0116
Page 643 of 1530
2025-08-19

March 20, 2025
Page 18

## LIST OF EXHIBITS

1. Special Turnover Petition filed in March 2023 in *UBS Securities LLC and UBS AG London Branch v. James Dondero et. al.*, in the Supreme Court of the State of New York
2. Complaint and Objection to Claims filed in October 2021 in *Kirschner v. Dondero et.al.*, Case No. 19-34054-sgj11 in U S. Bankruptcy Court Northern District of Texas
3. Documents pertaining to The Dugaboy Investment Trust charitable contribution of 1,500,000 Class Units of NexPoint Hospitality Trust to Highland Dallas
4. Plaintiff's First Amended Complaint filed in July 2024 in *Highland Employee Retention LLC v James Dondero et.al.*, Case No. 3:24 cv-00498 K, in the U.S. District Court for the Northern District of Texas
5. Bankruptcy Court Memorandum Opinion issued in June 2021 in *In Re. Highland Capital Management, L P. v James Dondero*, Case No. 19 34054-sgj11
6. Post dated May 3, 2023 by James Dondero entitled: "James Dondero : Dallas' Surprising Philanthropy Hero"
7. ValueScope, LLC Slide Deck presented to Supporting Organizations legal counsel in a Zoom call on November 18, 2024
8. Example of ValueScope, Inc Valuation Analysis prepared for Grant Scott when he was in control of DAF Holdco

316700053v 11

CONFIDENTIAL
TDIT005597

C.      <u>Successors and Assigns</u>.  This Agreement is binding upon and will inure to the benefit of the parties to this Agreement and their successors and assigns.

[*Signature Page Follows*]

2

**CONFIDENTIAL**                                                                    **TDIT005598**

IN WITNESS WHEREOF, the Manager executed this Agreement as of the day and date first above written.

MANAGER:

_____
Name: Mark Patrick

*[Signature Page to Redemption and
Amendment No. 2 Agreement – CDMCFAD, LLC]*

# EXHIBIT A

## LIMITED LIABILITY COMPANY AGREEMENT

## <u>SCHEDULE A</u>

## MEMBER INFORMATION

### Revised: March 27, 2025

| Name and Contact Information | Allocation Percentage |
|---|---|
| DFW Charitable Foundation<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 100% |

CONFIDENTIAL TDIT005600

Exhibit C

Seyfarth Shaw LLP Letter to IRS (with copies to California, Missouri, and Texas Attorney
Generals)

 **Seyfarth**

Seyfarth Shaw LLP
2029 Century Park East
Suite 3500
Los Angeles, California 90067-3021
T (310) 277-7200
F (310) 201-5219

dmancino@seyfarth.com
T (310) 201 5241

www.seyfarth.com

March 20, 2025

**FEDEX**

TEGE Referrals Group
Internal Revenue Service
1100 Commerce Street
MC 4910 DAL
Dallas, TX 75242-1027

Re:  Highland Dallas Foundation, Inc. (EIN: 45 3961755)

Dear Sir or Madam

I am writing on behalf of my client, Charitable DAF Holdco, Ltd., a Cayman Islands exempt[1] company ('DAF Holdco'), concerning the deterioration of its relationship with one of its Participating Shareholders, Highland Dallas Foundation, Inc. ("Highland Dallas").[2] Highland Dallas is a supporting organization of the Dallas Foundation.

The deterioration of this relationship is due directly to the undue influence and control exercised over Highland Dallas by James D. Dondero and his affiliates, as described in this Form 13909, *Tax-Exempt Organization Complaint (Referral).* This disclosure letter supplements in detail and in exhibits the more general information described in the accompanying Form 13909 and is an integral part of that form (collectively, the Form 13909 and this letter are referred to as the 'Referral').

We believe the information described in this Referral will demonstrate clearly that Mr. Dondero's influence and control is an inappropriate donor relationship with representatives of the Dallas Foundation who serve on the Board of Directors of and as officers of Highland Dallas. We believe this undue influence and control potentially jeopardizes the tax-exempt status of Highland Dallas as an organization described in section 501(c)(3) and, at a minimum, causes it to fail to remain a supporting organization described in section 509(a)(3) because of the

---

[1] To be clear, DAF Holdco is not a tax-exempt organization under U.S. tax law, notwithstanding the use of the term "DAF" in its corporate name.. However, under its Cayman Islands Articles of Association a "Restricted Person," i.e., an entity that *cannot* own Participating Shares, is an organization that is *not* described in section 501(c)(3) of the Code. As a consequence, all Participating Shareholders of DAF Holdco must be and remain organizations described in section 501(c)(3).
[2] The Dallas Foundation is a tax exempt community foundation described in sections 501(c)(3), 509(a)(1) and 170(b)(1)(A)(vi) of the Internal Revenue Code of 1986 (the "Code").

CONFIDENTIAL TDIT005602

March 20, 2025
Page 2

excessive influence of a disqualified person and substantial contributor, i.e., Mr. Dondero, under section 509(a)(3)(C).

This Referral is divided into three major parts, with multiple subparts.

Part I provides the Internal Revenue Service (the "IRS" or the "Service") with extensive factual information concerning Highland Dallas, its governance and control. As will be seen, Mr. Dondero exerts undue influence and control over Highland Dallas directly, as a director, President and substantial contributor, and indirectly through his and his associates' influence over Highland Dallas's supported organization representatives on the Highland Dallas Board of Directors, and the Dallas Foundation itself.

Part II provides the IRS with background information on DAF Holdco and Mr. Dondero's efforts to exert dominion and control over DAF Holdco and its assets. Because Highland Dallas is a Participating Shareholder of DAF Holdco, Mr. Dondero's efforts (both successful and unsuccessful) to control DAF Holdco for his personal gain directly affect Highland Dallas financially and provide him an additional amount of private benefit and private inurement from a donation where he once benefitted from a charitable contribution deduction to a charitable remainder trust ("CRT").

As will be discussed in Part III, the tax discussion section, Mr. Dondero's influence and control is pervasive and is exercised primarily for Mr. Dondero's financial benefit directly and for the financial benefit he derives indirectly through several entities owned or controlled by him. We believe he therefore derives more than insubstantial benefit form Highland Dallas and causes its net earnings to inure to his benefit, all in violation of section 501(c)(3)'s most basic operational requirements. Also, at a minimum, we believe his influence and control over Highland Dallas has caused it to become a private foundation, thereby subjecting Mr. Dondero to Chapter 42 excise tax exposure.

    I.    **Background Concerning the Formation and Legal Structure of Highland Dallas, Highland Capital Management, L.P., and NexPoint Advisors, L.P.**

**A. Highland Dallas**

Highland Dallas was incorporated as a Delaware nonprofit nonstock corporation by Mr. Dondero in 2011 in connection with his desire to form three tax-exempt public charities to become the three remaindermen of a CRT of which he was the income beneficiary. Highland Dallas applied for and was recognized by the IRS as a charitable organization described in section 501(c)(3) of the Code and as a supporting organization of the Dallas Foundation described in section 509(a)(3) of the Code. Highland Dallas did not register as a foreign corporation to do business in Texas until 2020.

At the time of its formation, Mr. Dondero became the sole "individual" member of Highland Dallas, with the legal power to select one director. The Dallas Foundation became the sole "institutional" member of Highland Dallas, with the power to select two directors. Thus, in 2011, Highland Dallas satisfied the requirements for being classified as a Type I supporting organization of the Dallas Foundation.

CONFIDENTIAL                                                        TDIT005603

March 20, 2025
Page 3

In addition, Mr. Dondero, in 2011, became and remains today the President of Highland Dallas and a member of its Board of Directors.

The other two supporting organizations are the Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara") (EIN 45-3962008) and the Highland Kansas City Foundation, Inc. ("Highland Kansas City") (EIN 45-3961865). These two supporting organizations of the Santa Barbara Foundation and Greater Kansas City Community Foundation, respectively, also have the same legal structure as Highland Dallas and, like Highland Dallas, each owns 100 Participating Shares of DAF Holdco.

We do not believe either Highland Santa Barbara or Highland Kansas City is as easily manipulated by Mr. Dondero and his affiliates as Highland Dallas because, according to their Forms 990 for 2023 (which is the last year those forms are available on Guidestar.com), Participating Shares of DAF Holdco are their only assets. By contrast, Mr. Dondero has made substantial additional contributions to Highland Dallas after 2011, either directly or through trusts or other entities owned or controlled by Mr. Dondero, some of which will be addressed later in this Referral. Thus, we believe Mr. Dondero is in a position to exert greater influence as a substantial contributor to Highland Dallas on the Directors of Highland Dallas appointed by the Dallas Foundation (including the Dallas Foundation's President & CEO, Julie Diaz).[a]

### B. Mr. Dondero and Highland Capital Management, L.P.

Highland Capital Management, L.P. ("HCM") is an investment management firm located in Dallas, Texas that was co-founded in 1993 and controlled by Mr. Dondero and individuals close to him. As described on page 7 of the *Special Turnover Petition* filed by UBS Securities LLC and UBS AG London Branch in the New York Supreme Court in 2023, a complete copy of which is enclosed with this Referral as Exhibit 1 (the "2023 UBS Petition"), before HCM filed for bankruptcy, "HCM was an investment management firm that managed billions of dollars in assets 'through its organizational structure of approximately 2,000 separate business entities'" (citation omitted). It is estimated by a plaintiff in another action that, at its height, HCM managed as much as $40 billion in assets.

Mr. Dondero was not only HCM's co-founder with Mark Okada,[a] he served as HCM's President and Chief Executive Officer until he was removed by the bankruptcy trustee in 2020.

---

[a] By way of example, the consolidated financial statements of the Dallas Foundation for 2020 available on its website include the assets of seven supporting organizations, including Highland Dallas. Page 22 of the statements disclose that approximately $163.4 million of its assets were held by supporting organizations. On page 19, it appears that approximately $92.3 million (almost 57%) represent Highland Dallas assets. Also, in 2023, Highland Dallas received almost $34 million in charitable contributions, presumably all from Mr. Dondero and entities affiliated with or controlled by him. Thus, it is understandable why the Dallas Foundation representatives who serve on the Highland Dallas Board would acquiesce to almost any request or demand made by Mr. Dondero or one of his associates such as Lucy Bannon.

[a] In the Dallas Foundation's 2022 Form 990, the most recent available on Guidestar.com, Mr. Okada was listed as a member of the Board of Governors of the Dallas Foundation. On its website, the Dallas Foundation identifies another confidant and employee of Mr. Dondero, Lucy Bannon, as an "Advisory Member" of the Board of Governors (last visited March 5, 2025). Thus, Mr. Dondero continues to exert substantial indirect influence over Highland Dallas's supported organization, the Dallas Foundation.

CONFIDENTIAL TDIT005604

March 20, 2025
Page 4

C. Mr. Dondero, NexPoint Advisors, L.P., and NexPoint Hospitality Trust

In 2012, prior to his removal as President of HCM in 2020, Mr. Dondero formed NexPoint Advisors, L.P. ("NexPoint Advisors"), a Dallas-based portfolio real estate and investment firm. NexPoint Advisors is one of a vast array of entities operating under the "NexPoint" umbrella. After the HCM bankruptcy, Mr. Dondero and his affiliates seemlessly shifted their operations from HCM to NexPoint Advisors and its affiliates.

As alleged in another lawsuit filed in 2021 in the United States Bankruptcy Court of the Northern District of Texas by Marc S. Kirshner as a litigation trustee in the HCM bankruptcy case, "NexPoint [Advisors] was effectively a shell entity that Dondero created in March 2012 to siphon profits from [HCM] in order to evade [HCM's] creditors." See Complaint and Objection to Claim in Kirschner v. Dondero, et. Al. Case No. 19-34054-sgj11, at pages 18-21, a copy of which is attached as Exhibit 2.

Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), a grantor trust, allegedly owns 99.9% of NexPoint Advisors. Mr. Dondero is the income beneficiary of Dugaboy and his sister, Nancy Dondero, is the family trustee of Dugaboy.

One of the entities affiliated with and advised by NexPoint Advisors is NexPoint Hospitality Trust, an open-ended real estate investment trust (the "REIT") based in Ontario, Canada. The REIT was formed in 2018 for the purpose of acquiring and operating income-producing hotel properties in the United States. The REIT's investment interests (called "Units") were listed for public trading on the TSX Venture Exchange of the Toronto Stock Exchange ("TSXV").

Dugaboy contributed 1,500,000 Class B non-voting Units of the REIT to Highland Dallas on December 24, 2019 and also granted Highland Dallas an "embedded" put option to sell them back to Dugaboy for $6.19 per share (the "Put Option"). The net asset value of the REIT as of December 24, 2019 was $6.19 per share. The Put Option is exercisable at any time prior to December 24, 2026. See the Dugaboy/REIT documents included as Exhibit 2.

The significance of the Put Option at that time is that the Class B non-voting Units could be treated for valuation purposes as equivalent to the Class A voting Units, which were owned or controlled by Mr. Dondero. Therefore, for purposes of determining their fair market value on the date of the charitable contribution, the valuation firm could value them as if they were voting Units unreduced by a 2.9% discount for lack of control. That allowed Dugaboy to claim a charitable deduction in 2019 of $11,606,000, which we assume passed through to Mr. Dondero as the income beneficiary of Dugaboy. We also assume that Highland Dallas signed a Form 8283, Noncash Charitable Contributions, form acknowledging it received the Units that would have been included with Mr. Dondero's 2019 Form 1040 along with a qualified appraisal of the Units (we have no actual knowledge of this, however).

On information and belief, we believe Mr. Dondero has used his influence and control over Highland Dallas to cause it defer exercising the Put Option at least through the effective time of the merger for at least three reasons.

- First, the forbearance to exercise the Put Option allows Mr. Dondero and Dugaboy to enjoy the benefits of an interest-free loan of $9,285,000 (the put exercise price ($6.19 × 1,500,000 units) while the Put Option remains outstanding and unexercised.

CONFIDENTIAL                                                      TDIT005605

March 20, 2025
Page 5

- Second, the forbearance to exercise the Put Option effectively has protected Mr. Dondero from the declining value of the REIT between December 2019 and November 2024. As of November 22, 2024, the reported fair value of the Units was $0.015 per Unit, so the fair value on that date of 1,500,000 Units was only $22,500, less than one percent of the Put Option value of $9,285,000.

- Third, most charitable organizations have a policy of immediately selling contributed shares that are listed for trading on a stock exchange in order both to diversify and to reinvest the sale proceeds in a manner that aligns more closely with the charity's investment policy. Had Highland Dallas sold the Units on the TSXV at any time within three years after their receipt, Highland Dallas would have been required to file a Form 8282, *Donee Information Return*, with the Service that would likely have reflected a much lower value of the original contribution amount claimed in 2019. Thus, in effect, Highland Dallas was acting to protect Mr. Dondero from having to address the precipitous fall in fair market value as the REIT Units plummeted in value beginning shortly after the gift was made.

Highland Dallas's failure to exercise the Put Option up until now becomes all the more significant because on November 25, 2024, the REIT announced the execution of a definitive agreement (the "Merger Agreement") pursuant to which the REIT will be dissolved and its subsidiary entities will be merged with and into entities owned or controlled, directly or indirectly, by NexPoint Diversified Real Estate Trust. Under the Merger Agreement, The proposed price per Unit is $0.36 per Unit. According to the press release issued by the REIT announcing the merger, "[t]he proposed price of US$0.36 per Unit represents a premium of approximately 2300% to the 30-day volume weighted average price per Unit on the TSXV ended November 22, 2024 of US$0.015."

Last month, in a press release issued on February 21, 2025, it was announced that a majority of minority votes approved of the merger. Under Canadian law, when a person such as Mr. Dondero owns or controls a majority of a Canadian public company's voting shares, a transaction such as this merger must be approved by two-thirds of the minority shares, or in this instance the 5,131,020 Class B non-voting Units.

Based on public filings with the U.S. Securities and Exchange Commission, we believe the REIT had approximately 29,353,660 Units, of which 82.52% were owned by entities owned or controlled by Mr. Dondero.

We have to assume that Highland Dallas voted its 1,500,000 Units in favor of the merger at Mr. Dondero's request.[5] That suggests that the merger needed Highland Dallas's 29.2% (almost one-third of the two-thirds vote required) of minority Unit's approval. That also suggests that

---

[5] We understand that the Board of Directors of Highland Dallas usually acts by Unanimous Written Consent Without a Meeting, which means the Mr. Dondero along with the two Dallas Foundation Board appointees would have approved voting in favor of the merger. Presumably the same would be true if a decision were taken by the Board to refrain from exercising the Put Option.

CONFIDENTIAL                                                                     TDIT005606

March 20, 2025
Page 8

Highland Dallas chose not to exercise its Put Option to permit Mr. Dondero to retain control over the REIT even as its finances deteriorated.

We have no way of knowing whether Highland Dallas will exercise the Put Option before the REIT is dissolved (projected for the end of the first quarter of 2025, i.e., by the end of this month), but clearly if it fails to do so this will result in a $9 million inappropriate windfall to both Dugaboy and Mr. Dondero. Obtaining the answer to this question would only require the IRS to open an examination of Highland Dallas and issue an Information Document Request and/or issue a third-party subpoena to Dugaboy.[6]

### D. Highland Dallas's Assumed Name

In March 2024, Highland Dallas filed an Assumed Name certificate with the Texas Secretary of State to permit it to operate under the name "NexPoint Philanthropies Dallas, Inc." This is consistent with Mr. Dondero's current ownership and control of NexPoint Advisers and his loss of control of HCM in the bankruptcy and consistent with the goal of allowing a private company (NexPoint) and Mr. Dondero to take credit for and enjoy the halo effect from NexPoint Philanthropies Dallas's (really Highland Dallas's) charitable giving.

### E. Mr. Dondero's Firearms Contributions to Highland Dallas

Several years ago, Mr. Dondero (either directly or through entities owned and controlled by him) made contributions of a collection of firearms to Highland Dallas. Presumably, a Highland Dallas officer signed the donee acknowledgement on Form 8283, *Noncash Charitable Contributions*, and checked the box "No" asking whether the organization intended to use the property for an unrelated use, because checking "Yes" would limit Mr. Dondero's charitable contribution deduction to his adjusted basis and not its appraised fair market value. This in itself demonstrates Mr. Dondero's improper influence over the Dallas Foundation representatives serving as Board members and officers of Highland Dallas, especially as it is hard to believe a supporting organization of a community foundation could possibly use firearms in a related trade or business.

But to further demonstrate his abuse and diversions of assets for his own benefit, earlier this year in 2025 he diverted a substantial debt service payment of $1.3 million on a loan owed to one of DAF Holdco's subsidiaries to pay for a specially-designed and built vault for those firearms (shotguns). That diversion of assets has caused a default of that loan that has now landed in Texas State court, thereby depleting DAF Holdco's assets further because of legal fees. It is unknown whether the vault was requested by anyone associated with the Dallas Foundation serving as a director or officer of Highland Dallas, such as Julie Diaz, but we believe it likely was.

### F. Mr. Dondero's Character

Mr. Dondero has a demonstrated pattern of behavior of stealing assets from those he perceives as adversaries. What is also demonstrated by even a cursory reading of the 2023 UBS Petition

---

[6] We will be happy to provide the IRS with a copy of the S-4 filed with the SEC available on EDGAR and the REIT's press releases that were used to develop this data.

650

March 20, 2025
Page 7

and the *First Amended Original Complaint* filed by Highland Employee Retention Assets LLC against Mr. Dondero and his affiliates on July 15, 2024 in the U.S. District Court for the Northern District of Texas, Dallas Division, a complete copy of which is enclosed as Exhibit 4 with this Referral (the "2024 Complaint"), Mr. Dondero, to put it mildly, has no respect for corporate formalities and is willing to engage in self-dealing to strip entities of their assets without regard to any fiduciary duty of care or loyalty to serve his personal needs and to benefit himself financially to the detriment of others, including his own former HCM employees.[7]

The 2023 UBS Petition outlines how Mr. Dondero, facing a $1 billion judgment, directed various entities he owned and controlled to shift substantially all of their assets offshore to a Cayman Islands insurance company for a fraudulent insurance policy. The 2023 UBS Petition is an attempt to collect on a 2020 $1 billion judgment in favor of the UBS entities. Mr. Dondero has been so successful at hiding assets that the UBS entities have not been paid.

The 2024 Complaint seeks recovery of hundreds of millions from Mr. Dondero. It describes how a former Mr. Dondero employee at HCM, Patrick Daugherty, had a falling out with Mr. Dondero. After the falling out, Mr. Dondero took extraordinary steps to ruin Mr. Daugherty's life—depriving him of assets, removing his long-term incentive plan, embroiling him in lawsuits, and the list goes on.

These are not isolated incidents. In the ACIS Capital Management, L.P. matter,[8] Mr. Dondero had a falling out with Josh Terry, a former employee of HCM, and took extraordinary steps to ruin Mr. Terry's life—the same playbook as above with Mr. Daugherty.

In fact, Mr. Dondero and his litigiousness is widely known in the Dallas/Fort Worth area. Mr. Dondero is variously described as "Highland Capital's Giraffe-Eating Hedge Fund Manager" (Dallas Observer June 1, 2012), and "the distressed debt investor who was once a scourge to private equity. . . " (Financial Times March 10, 2023).

As it relates to this Referral more specifically, in a May 3, 2023 post entitled "James Dondero: Dallas's Surprising Philanthropy Hero," the post states: "Most gifts are made through the Highland Dallas Foundation, Inc., the philanthropic arm of Highland Capital Management." Note that this post appears to have been prepared by Mr. Dondero himself and appeared three years after he was ousted as HCM's President. What's more to the point is that it outlines in Mr. Dondero's own words the likely failures of Highland Dallas to comply with the section 509(a)(3) operational test discussed below. A copy of that post is included as Exhibit 6.

### G. Skyview Group

Skyview Group is a back-office and administrative service provider whose clients consist 99% of entities affiliated with or controlled by Mr. Dondero. Mr. Mark Patrick was engaged as a tax

---

[7] *See also In Re: Highland Capital Management L.P. v. Dondero*, Case No. 19-34054-sgj11 (June 6, 2021), a decision by the U.S. Bankruptcy Court for the Northern District of Dallas. In that opinion, the Bankruptcy Judge found Mr. Dondero to be in contempt for violating a temporary restraining order. A copy of that opinion is enclosed as Exhibit 5.

[8] We can provide the IRS with a copy of this complaint if that would be of interest.

570

CONFIDENTIAL

TDIT005608

March 20, 2025
Page 8

consultant by Skyview Group until Mr. Patrick resigned in October 2024 on the advice of the undersigned counsel. Skyview Group charged DAF Holdco management fees for its services.

Skyview Group is nominally owned and controlled by Scott Ellington, who was HCM's Chief Legal Officer and General Counsel until his removal by the bankruptcy trustee in 2021. Despite this nominal ownership and control by Mr. Ellington, Mr. Dondero controls all compensation decisions, including decisions relating to Mr. Ellington's compensation, and thus dominates Skyview Group as if he owned it himself.

Since Mr. Patrick's resignation from Skyview Group, Mr. Patrick has been directly employed and compensated by DAF Holdco rather than Skyview Group. In addition, Mr. Patrick, again acting on advice of counsel, caused DAF Holdco to give six-months' notice in October 2024 to Skyview Group that it was terminating its contract with Skyview Group.

Mr. Dondero became furious when he learned of these actions, and that is when (for the first time in over a decade) Highland Dallas and Dallas Foundation executives and attorneys started raising questions about DAF Holdco's investments and management. In addition, this is when Highland Dallas, and Julie Diaz (who serves as both the President of the Dallas Foundation and as a Director and Vice President of Highland Dallas), began voicing concerns over DAF Holdco's investment performance, concerns that were never raised when Mr. Dondero's lackey, Grant Scott was rubber-stamping NexPoint and other Dondero-related investments and that were never raised prior to Mr. Patrick's resignation from Skyview Group.

II.     **DAF Holdco**

A. **The Grant Scott Control Era**

Back in 2011, when Highland Dallas and the two other supporting organizations were being formed, one of the highly successful types of investments designed and marketed by HCM through investment partnerships were collateralized loan obligations, or CLOs.

A CLO is a single security backed by a pool of corporate debt issued by corporate borrowers with low credit ratings or loans taken out by private equity firms to conduct leveraged buyouts. With a CLO, the investor receives scheduled debt payments from the underlying loans, assuming most of the risk in the event of a default. In exchange for taking on that default risk, the investor is offered greater diversity and the potential for higher-than-average investment returns. DAF Holdco was formed initially in 2011 to hold partnership interests in partnerships that held CLOs.

Mr. Dondero caused DAF Holdco to be formed to have a structure through which he could have his CRT make remainder interest distributions of the Participating Shares of DAF Holdco to Highland Dallas and to the other two supporting organizations.[9] How CLOs work is not relevant

---

[9] This is documented in Part III, Line 4a of each of the three supporting organizations' Form 990, *Return of Organization Exempt From Income Tax*, for 2023 (the last year for which a Form 990 for the organizations was posted on Guidestar.com).

March 20, 2025
Page 8

to this Referral except to the extent that Management Shares of DAF Holdco were initially issued to Mr. Dondero's college roommate and long-time close friend, Grant Scott.[15]

Grant Scott's ownership of the Management Shares from 2011 to 2021 effectively allowed Mr. Dondero to retain control of DAF Holdco and, thereby, use DAF Holdco's assets as a piggybank for other investments described below. Management Shares have no economic right to distributions; the value for Mr. Dondero is in their control over DAF Holdco and the ability to utilize its assets either to make dividend distributions to the Participating Shareholders (i.e., the supporting organizations) or to fund Dondero-managed investments on non-market terms and with below-market returns on investment.

NexPoint Advisors repeatedly reached out to DAF Holdco for investment-backing with below market terms and rates of returns while under the control of Grant Scott. Grant Scott consummated these transactions without hiring outside counsel or valuation experts for DAF Holdco. The lack of arms'-length dealing under Grant Scott's control is made patently obvious in the ValueScope November 18, 2024 presentation materials included as Exhibit 7. The economics of these transactions clearly show that Mr. Dondero was directing Grant Scott to cause DAF Holdco to enter into below-market deals for DAF Holdco that redirected the profits to Mr. Dondero and entities he owns. In other words, Mr. Dondero was stealing from DAF Holdco and, in turn, the supporting organizations.

Mr. Dondero's theft was not limited to below-market transactions. In March 2020, Mr. Dondero and his affiliates directed Grant Scott to make a $1 million payment to an entity called Tall Pine Group, LLC. The payment was allegedly for professional services rendered, but no such services were rendered to DAF Holdco. In subsequent court filings, it became clear that the $1 million went to pay Mr. Dondero's affiliates' employment compensation bonuses, which could not be paid in the normal course because HCM was subject to various bankruptcy restrictions at the time. Further detail is available in the *Kirschner Complaint*, at page 61, a copy of which is attached hereto as Exhibit 2.

### B. The Mark Patrick Control Era (including present day)

Grant Scott assigned the Management Shares to Mark Patrick in March 2021. Mr. Patrick now controls DAF Holdco and the timing of distributions to the supporting organizations, including Highland Dallas. Mr. Patrick also controls the negotiations and approvals of the terms and conditions of all investments since he assumed control. Since then, under Mark Patrick's leadership DAF Holdco has begun to diversify away from Dondero-managed investments.

Total DAF Holdco (including its subsidiaries) exposure to Dondero-managed investments was over $100 million in June 2023. Because of the formation history of DAF Holdco and the various transactions between DAF Holdco and Dondero-managed investments, DAF Holdco has been named as a defendant in numerous lawsuits claiming it is an alter ego of Mr. Dondero and his

---

[15] On pages 7 and 8 of the litigation trustee's Complaint and Objection to Claims in *Kirschner v. Dondero* included as Exhibit 2, the trustee described Grant Scott as follows: "Dondero personally selected Scott as his successor to run the Charitable DAF Fund . . . Scott has no training in finance or compliance and no investment experience. Scott routinely rubber-stamped Dondero's and [HCM's] directives without asking questions or requesting additional information."

March 20, 2025
Page 10

entities and that the initial funds transferred to DAF Holdco from the CRT were fraudulent transfers. These lawsuits have been very expensive and time-consuming for DAF Holdco, which disadvantages Highland Dallas and the other Participating Shareholders because the payment of legal fees depletes available cash.

Because Mr. Patrick viewed the $100 million exposure to Dondero-related and the lawsuits as a risk to DAF Holdco (and therefore the Participating Shareholders), he has taken steps to create layers of independence between DAF Holdco and Mr. Dondero. As documented by an independent valuation consultant, ValueScope, LLC (a copy of the ValueScope report is enclosed as Exhibit 7), upon assuming control of DAF Holdco, Mr. Patrick engaged independent counsel to assist him in negotiating "market" terms and returns on investment for investments with all outside parties, especially those controlled by or affiliated with Mr. Dondero, such as NexPoint Advisors. Neither Mr. Dondero nor his associates expected this because no market discipline was exercised by DAF Holdco when it was controlled by Mr. Dondero's college roommate and close friend Grant Scott.

Outside counsel and valuation experts frequently either negotiated more market-standard (and more favorable to DAF Holdco) terms for Dondero-managed investments or advised against the transactions on the terms proposed by Mr. Dondero (via his various entities, including NexPoint Advisors). And, because Mr. Patrick refused to simply rubber-stamp Dondero-related investment asks, Mr. Dondero became upset with Mr. Patrick and demanded that Mr. Patrick provide him with increased levels of control over DAF Holdco, including meetings between Mr. Patrick and Mr. Dondero three times per week when he was still a consultant with Skyview Group and permitting one of Mr. Dondero's affiliates increased access to DAF Holdco information and finances. Mr. Patrick refused these requests.

Mr. Patrick also hired an independent director for DAF Holdco, Paul Murphy. During Mr. Scott's control, Mr. Scott served as sole director and sole person in control. There was no requirement under Cayman law to hire an independent director; Mr. Patrick did so for the benefit of DAF Holdco (and, indirectly, Highland Dallas and the other Participating Shareholders).

Mark Patrick also resigned from Skyview Group in October 2024. As noted above, Mr. Dondero effectively controls Skyview Group, and it is nominally owned by one of his affiliates. Scott Ellington. Mr. Dondero viewed this as the last straw—he viewed this as his final loss of control over DAF Holdco and its assets. On the same day, in order to complete the separation, Mr. Patrick directed DAF Holdco to terminate a services agreement with Skyview Group.

Mr. Patrick's resignation from Skyview Group was recommended by outside counsel, including this firm. Mr. Patrick recognizes he has fiduciary duties to DAF Holdco and its subsidiaries. Mr. Dondero created tension with these duties by demanding that Mr. Patrick rubber-stamp Dondero-managed investments, as did Grant Scott. For example, in September 2024, Mr. Dondero recommended that DAF Holdco consummate a real property acquisition of The Campus at Legacy (described in Exhibit 7) for $45 million and provide one of Mr. Dondero's entities a repurchase option if the price were to appreciate. In no uncertain terms, DAF Holdco would take all the downside financial and real estate risk and transfer the upside financial benefit to Mr. Dondero if this proposal had been accepted. This was typical for Dondero-managed investments.

CONFIDENTIAL                                                                    TDIT005611

March 70 2025
Page 11

Mr. Dondero also demanded that Mr. Patrick cause DAF Holdco to wire one of Mr. Dondero's offshore entities, Sentinel, $1.5 million in November 2023. Mr. Patrick sought the advice of outside counsel, who told Mr. Patrick the payment would be "impermissible and illegal for a number of reasons". Mr. Patrick accordingly refused the payment (i.e., embezzlement) request.

Mr. Dondero's behavior and attitude toward DAF Holdco is nothing if not consistent. Whether Mr. Scott or Mr. Patrick was in control, Mr. Dondero never abandoned the belief that the assets he caused his CRT to distribute to DAF Holdco remained his own. Mr. Patrick's steps toward independence and then resigning from Skyview Group in October 2024 led to Mr. Dondero exerting his influence over Highland Dallas in a manner we believe results in improper private benefit accruing to him as discussed in the tax aspects portion of this disclosure letter.

Following Mr. Patrick's resignation from Skyview Group, Mr. Dondero directed his entities to cease all principal and interest payments owed on Dondero-managed investments to DAF Holdco and its subsidiaries, which has led to several ongoing lawsuits discussed below and outlined in Exhibit 7. It is inevitable that Mr. Patrick will receive the same treatment as Mr. Daugherty and Mr. Terry (described above)—he will be subject to frivolous, vexatious lawsuits and harassment because he is Mr. Dondero's newest villain.

### C. October 2024 to Present

The events that have unfolded show Mr. Dondero's anger at his loss of control of DAF Holdco's assets. Mr. Patrick met with Highland Dallas shortly after his resignation from Skyview Group and assured Julie Diaz of Highland Dallas and the Dallas Foundation that his resignation would not modify management of distributions to the Dallas Foundation. Mr. Patrick believed the meeting went well. Ms. Diaz voiced no concerns and actually requested additional distributions.

Shortly thereafter, Highland Dallas and the two other Participating Shareholders hired the law firm Holland & Knight (which had already represented the Dallas Foundation for years) to represent them and to send a "no confidence" letter to DAF Holdco. This purported lack of confidence was a new sentiment by Highland Dallas, which had never previously expressed any concern when it received ValueScope reports from Grant Scott. The "no confidence" letter came out of the blue—there were no calls, emails, or other communications that expressed a lack of confidence or requested any information whatsoever.

DAF Holdco subsequently learned that Mr. Dondero directed his subordinates at Skyview Group and NexPoint Advisors to provide false and misleading financial information to Highland Dallas and to the other Participating Shareholders. Rather than contact DAF Holdco or Mr. Patrick to question this information (especially given the questionable source), Highland Dallas sent the "no confidence" letter without any attempt to verify it. (As a post-script, DAF Holdco has refuted the false and misleading information, but the dispute continues because it was never really about that.)

Despite the November 11, 2024 date on the "no confidence" letter, DAF Holdco did not receive it until December 8, 2024, after the November 18, 2024 presentation to the supporting organizations' attorneys, Holland & Knight. In addition, DAF Holdco received the "no confidence" letter from Mr. Dondero's personal attorneys, who do not represent Highland Dallas or the other Participating Shareholders.

March 30, 2025
Page 12

DAF Holdco responded and voiced its concerns that Mr. Dondero was directing Highland Dallas to take these actions. Recall that Mr. Dondero is a Director and President of Highland Dallas. Holland & Knight ignored the accusations that Mr. Dondero was calling the shots and began sending acrimonious (but toothless) emails to DAF Holdco. Finally, Julie Diaz, a Director and Vice President of Highland Dallas (and President of the Dallas Foundation), sent an email requesting a winding up of DAF Holdco and distribution of all of its assets to Highland Dallas and the other Participating Shareholders.

Paul Murphy, an independent Director of DAF Holdco, made a presentation to the supporting organizations' attorneys from Holland & Knight in which he reviewed all of the governance and management improvements that have already been made, but they persist behind the scenes to facilitate Mr. Dondero's attempts to undermine Mr. Patrick and regain control over DAF Holdco's assets for use by NexPoint for investments.

DAF Holdco was contacted in February 2025 by Cayman Islands counsel stating they represent "DAF 2." DAF Holdco believes this "DAF 2" is an attempt by Mr. Dondero and his affiliates to fraudulently obtain DAF's assets.

In February 2025, DAF Holdco subsidiaries filed two lawsuits against Mr. Dondero's entities for non-payment on Dondero-managed investments. Mr. Patrick also directed a non-DAF entity he controls to file a third lawsuit against Mr. Dondero's entities for non-payment. These lawsuits are fundamentally the same as other lawsuits where creditors have sued Mr. Dondero and his entities for nonpayment. Mr. Dondero has not changed—he refuses to pay his debts and he believes he is the rightful owner of DAF Holdco's assets. Mr. Dondero's instrument is Highland Dallas. He controls Highland Dallas and will cause it to continue its crusade against DAF Holdco. As noted by James Seery, the HCM bankruptcy trustee who removed Mr. Dondero from HCM, Mr. Dondero will "burn the place down" if he does not get his way.

III.    Discussion of Tax Exemption-Related Lack of Compliance and Outright Avoidance

In order for an organization to qualify for tax-exempt status under section 501(a) of the Code as a charitable organization described in section 501(c)(3) of the Code, it must be organized and operated exclusively for one or more charitable purposes described in section 501(c)(3) and the Treasury Regulations promulgated thereunder. We do not question whether Highland Dallas is organized for charitable purposes, nor do we question whether Highland Dallas's grantmaking to the Dallas Foundation and other bona-fide charitable organizations is consistent with its charitable purposes.

We do question whether Mr. Dondero's influence and control over at least Highland Dallas has allowed some portion of their net earnings to indirectly inure to Mr. Dondero's benefit as a result of his historic access to DAF Holdco's assets at below market rates and terms that appear to have been acquiesced to by each supporting organization. As we discuss below, Mr. Dondero's influence and control over DAF Holdco when Grant Scott was its Management Shareholder was never of concern, especially to Highland Dallas, even as each supporting organization received periodic valuation reports prepared by ValueScope detailing DAF Holdco's NexPoint investments. See report prepared for Grant Scott by ValueScope, attached hereto as Exhibit 8. In fact, we believe those valuation reports were used by each of them to prepare their Forms 990 and to prepare consolidated financial statements.

CONFIDENTIAL                                                                      TDIT005613

March 20, 2025
Page 13

We also believe that each of the supporting organizations operates for Mr. Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets now that Mr. Patrick declined NexPoint investment requests that are both on non-market proposed terms and provide below market returns on investment.

If Highland Dallas elects not to exercise the Put Option before the REIT dissolves, we believe that would be an excess benefit transaction under section 4958 of the Code in which the organization managers had to have knowingly participated.

We also believe Mr. Dondero exercises such control as a substantial contributor of Highland Dallas, resulting from gifts he has made since the initial gift of Participating Shares were made by the ORT in 2011, that Highland Dallas should no longer satisfy the requirement in section 509(a)(3)(C) that there be no control by disqualified persons.

Finally, as discussed briefly below, we believe the donor advised fund rules in section 4966 and 4967 may be implicated, but have insufficient knowledge of the facts to assert conclusively that they do apply.

### A. Private Benefit

We respectfully submit that Highland Dallas in particular no longer satisfies the operational test of section 501(c)(3) because its actions taken at Mr. Dondero's direction serve his private interests more than incidentally as prohibited by Treasury Regulation § 1.501(c)(3)-1(d)(1)(ii).

As we have outlined above, Mr. Dondero and affiliates such as NexPoint Advisors used DAF Holdco, when it was controlled by Grant Scott, as his personal piggybank. And, when Grant Scott controlled DAF Holdco, neither Julie Diaz (in her capacity as Director and Vice President of Highland Dallas) nor the Dallas Foundation questioned whether DAF Holdco's investment were prudent or generated market returns. Rather, even as they received and used for tax and financial reporting purposes the ValueScope valuation opinions which disclosed DAF Holdco's NexPoint and other Dondero-related investments, they never questioned whether the terms were market terms or whether the asset allocations were prudent. It was only after Mr. Patrick took over as Management Shareholder of DAF Holdco and (a) started declining NexPoint investment asks—really demands, (b) started diversifying DAF Holdco's investments away from NexPoint investments, (c) began demanding repayment of amounts owed with respect to NexPoint investments and (d) Mr. Patrick resigned from Skyview Group and terminated its contract for back office and other services, that the supporting organizations collectively hired outside counsel and, under the lead of Julie Diaz, a Director and Vice President of Highland Dallas began sending no-confidence emails to DAF Holdco Directors (including Mr. Patrick and Mr. Murphy) demanding information to which they were not even legally entitled (a fact that their attorneys openly acknowledged in a Zoom call) and a complete restructuring of DAF Holdco to bring it back under Mr. Dondero's control.

In the seminal decision, *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), the Tax Court concluded that the absence of private inurement to the benefit of a private shareholder or individual does not end the analysis of whether an organization satisfies the operational test of exemption under section 501(c)(3), it went on to state "when the Court concludes that no prohibited inurement of net earnings exists, it cannot stop there but must

CONFIDENTIAL                                                         TDIT005614

March 20, 2025
Page 14

inquire further and determine whether a prohibited private benefit is conferred."(citations omitted) Id. at 1070. It concluded that "an organization's conferral of benefits on disinterested persons may cause it to serve 'a private interest' within the meaning of section 1.501(c)(3)-1(d)(1)(ii)." Id. at 1070.

Finally, after looking at the organization's exclusive source of funding (much the same as Mr. Dondero's exclusive funding of Highland Dallas), control of a majority of the Board by members of the Republican Party (analogous to Mr. Dondero's role as President and Director of Highland Dallas and his substantial influence over the two Dallas Foundation directors evidenced by their epiphany that something has to be done since Mr. Dondero no longer controls DAF Holdco), and several other factors, "we conclude that petitioner is operated for the benefit of private interests, a nonexempt purpose." Id. at 1080.

In another case, Airlie Foundation, Inc. v. United States, 55 F.3d 684 (D.C. Cir. 1995), the relationship between the founder and executive director of the foundation bears a strong resemblance to the relationship between Mr. Dondero and Highland Dallas and served as a basis for sustain the Service's revocation of its section 501(c)(3) exemption on the ground that it provided more than incidental private benefit to the founder. Although the actual basis for revocation of exemption was a finding of inurement of net earnings, the pervasive control of the founder clearly influenced the D.C. Circuit to affirm the District Court and, equally important, the court cited American Campaign Academy for the proposition that an organization does not operate exclusively for tax-exempt purpose if it serves a private interest rather than a public interest and "[t]his requirement applies to the organization's actual, not purported purposes." Id. at 75 AFTR 2d 95-2068, 95-2071.

### B. Potential Inurement

Section 501(c)( also requires that "no part of the net earnings" of the organization may "inure to the benefit of any private shareholder or individual." As observed in the Airlie Foundation case, "the extent of the inurement is immaterial." Id. As noted in that case, and as is the case with Mr. Dondero, the founder of Airlie Foundation, Inc. "established and controlled a network of taxable and tax-exempt entities. The transactions that took place within the network organizations formed the basis for the IRS's revocation of AFI's tax-exempt status, as discussed at length by the district court."

We respectfully submit that if the Service audits Highland Dallas it will identify many more instances of inurement, beyond the single instance of forgiving $33,672 by Airlie Foundation Inc. owed by one of the founder's affiliated entities. The Dugaboy effective interest-free loan and potential windfall if Highland Dallas fails to exercise its Put Option should be enough, but we believe there will be many other transactions such as management and administrative fees that generate income for Dondero-related entities.

As discussed above in Section II.A., during the Grant Scott controllership of DAF Holdco, Mr. Dondero's effective control of DAF Holdco led DAF Holdco to make investments that benefitted him personally. These investment deprived DAF Holdco of assets that could be distributed to Participating Shareholders, including Highland Dallas.

577

CONFIDENTIAL                                    TDIT005615

March 20, 2025
Page 15

### C. The Failure to Exercise the Put Option as an Excess Benefit Transaction

As you know, section 4958 treats as excess benefit transactions between a public charity such as Highland Dallas and a disqualified person such as Mr. Dondero economic arrangements that are above or below market between them. Section 4958(c)(3)(A) also treats as "automatic" excess benefit transactions "any grant, loan, compensation or other similar payment to" a disqualified person such as a substantial contributor.

We believe, upon examination, the Service will find that Highland Dallas has engaged in multiple automatic excess benefit transactions with Mr. Dondero or entities owned and controlled by him such as NexPoint Advisors.

First, the forbearance to exercise the Put Option effectively created an interest free loan to Dugaboy, a disqualified person. Thus, the mere fact it has remained outstanding for years means it is an automatic excess benefit transaction that requires not only the payment of the 25% excise tax by Dugaboy but also the correction of it through the payment of the full $8,250,000 plus interest.

Second, if NexPoint Advisors performs investment management services for a fee that would be an automatic excess benefit transaction requiring not only correction but also payment of the 25% excise tax. In fact, we know from public SEC filings that NexPoint Advisors or one of its affiliates does perform investment management services for the REIT, which may itself be an excess benefit transaction requiring correction.

Finally, while other excess benefit transactions may be identified during an examination of Highland Dallas, any forbearance to exercise the Put Option to benefit Dugaboy should be regarded, at a minimum, as a "similar payment" given the fact that Mr. Dondero benefits economically in a substantial way from that forbearance.

Given that the other two directors must act to approve these actions, it is likely they have done so knowingly and willfully.

### D. Potential Non-Compliance with Section 509(a)(3) Operational Test Sufficient to Cause Highland Dallas to be Reclassified as a Private Foundation and Thus Subject to Chapter 42 Rules

In Mr. Dondero's article entitled "James Dondero: Dallas's Surprising Philanthropy Hero" (May 3, 2023, copy enclosed as Exhibit 6), Mr. Dondero said as follows:

> "Mr. Dondero and his firm have supported The Family Place, The Dallas Zoo, SMU's Tower Scholars program, The Perot Museum of Nature and Science, Education is Freedom, and many more local charity organizations. Most gifts are made through the philanthropic arm of Highland Capital Management."

Thus, in his own words, Mr. Dondero has acknowledged Highland Dallas has violated the section 509(a)(3) operational test in Treasury Regulation § 1.509(a)-4(e)(1) concerning permissible beneficiaries of a supporting organization and should be re-classified as a private foundation. That would mean that all dealings between Highland Dallas and entities owned or controlled by Mr. Dondero should be scrutinized to determine whether they constitute acts of

CONFIDENTIAL                                                                   TDIT005616

March 20, 2025
Page 15

self-dealing described in section 4941 of the Code or violate other provisions of Chapter 42 of the Code, such as the taxable expenditure rules in section 4945.

Under Treasury Regulation § 1.509(a)-4(e)(1), "[a] supporting organization will be regarded as 'operated exclusively' to support one or more specified publicly supported organizations only if it engages solely in activities which support or benefit the specified publicly supported organizations." (emphasis supplied)

The only exception to the requirement that a supporting organization benefit the supported organization "solely" is when the supporting organization provides benefits to individual members of the charitable class benefited by the supported organization, such as by granting scholarships to graduates of a particular high school for college. See, e.g. *Nellie Callahan Scholarship Fund v. Commissioner*, 73 T.C. 626 (1980). The word "solely" is unambiguous, therefore, Mr. Dondero's own acknowledgement that Highland Dallas is the source of his funding of other admittedly charitable organizations provides conclusive evidence that Highland Dallas fails the operational test of section 509(a)(3).

Furthermore, section 509(a)(3)(C) provides that a supporting organization may not be controlled directly or indirectly by a disqualified person. A substantial contributor to a supporting organization is a disqualified person under section 4946(a)(1)(A). Thus, Mr. Donero's Dugaboy gift of the REIT Units to Highland Dallas made him a disqualified person and his effective veto power places him in control of Highland Dallas.

Therefore, we respectfully submit that that the Service should examine Highland Dallas to determine if it should be reclassified as a private foundation for the foregoing reasons and, if it is so-reclassified, all transactions between Mr. Dondero and his related or controlled entities should be evaluated to determine whether any constitute acts of self-dealing under section 4941. This should include the failure on the part of Highland Dallas to exercise its Put Option.

### E. Potential Non-Compliance with Section 4966/4967 Rules Applicable to Donor Advised Funds

Finally, we respectfully submit that the Service should examine Highland Dallas to determine whether it, in effect, functions as a donor advised fund of Mr. Dondero given the fact he provided substantially all of its funding, effectively controls it and may personally benefit financially more than incidentally through entities he owns or controls from management fees, charity special events such as banquets and other means.

CONFIDENTIAL                                                        TDIT005617

March 20, 2025
Page 17

Representatives of DAF Holdco will be available to be interviewed by the Service in a manner that will not result in compromising confidentiality under section 6103 and without the need for an administrative summons.

Very truly yours,

SEYFARTH SHAW LLP

Douglas M. Mancino

cc. Mark Patrick, Paul Murphy and Texas, California and Missouri Offices of the Attorney General (Charitable Trusts Sections)

DMM

CONFIDENTIAL

TDIT005618

March 20, 2025
Page 18

## LIST OF EXHIBITS

1. Special Turnover Petition filed in March 2023 in *UBS Securities LLC and UBS AG London Branch v. James Dondero et. al.*, in the Supreme Court of the State of New York

2. Complaint and Objection to Claims filed in October 2021 in *Kirschner v. Dondero et.al.*, Case No. 19-34054-sgj11 in U S. Bankruptcy Court Northern District of Texas

3. Documents pertaining to The Dugaboy Investment Trust charitable contribution of 1,500,000 Class Units of NexPoint Hospitality Trust to Highland Dallas

4. Plaintiff's First Amended Complaint filed in July 2024 in *Highland Employee Retention LLC v James Dondero et.al.*, Case No. 3:24-cv-00498-K, in the U.S. District Court for the Northern District of Texas

5. Bankruptcy Court Memorandum Opinion issued in June 2021 in *In Re. Highland Capital Management, L.P. v James Dondero*, Case No. 19-34054-sgj11

6. Post dated May 3, 2023 by James Dondero entitled "James Dondero: Dallas's Surprising Philanthropy Hero"

7. ValueScope, LLC Slide Deck presented to Supporting Organizations legal counsel in a Zoom call on November 18, 2024

8. Example of ValueScope, Inc Valuation Analysis prepared for Grant Scott when he was in control of DAF Holdco

316700053v 11

CONFIDENTIAL                                                  TDIT005619

Exhibit D

Carrington Coleman Tax Advice to DAF

**CONFIDENTIAL**

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

From: David N. Corkern
To: Charitable DAF HoldCo, Ltd.
Date: March 25, 2025

<u>Executive Summary</u>

This memorandum will serve to amplify the initial thoughts I provided regarding the U.S. tax issues as they related to the issuance of new participation shares in and reorganization of Charitable DAF HoldCo, Ltd. and its related companies (collectively "DAF"). My analysis is based upon a review of relevant sections of the Internal Revenue Code of 1986, as amended ("Code"), United States Treasury regulations ("Treasury Regulations" or "Treas. Reg."), relevant case law, and the facts that you have provided to me (outlined below) concerning DAF, James Dondero ("Dondero"), DAF's shareholders/supporting organizations, i.e., Highland Dallas Foundation, Inc. ("Highland Dallas"), Highland Kansas City Foundation, Inc. ("Highland Kansas City"), Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara"), and HMLP Charitable Fund (collectively "SOs"), and the historical interactions by and among DAF, Dondero, Dondero affiliates/entities, and SOs. I have not been asked to nor have I independently verified the facts that you have provided to me as they relate to DAF, Dondero, SOs (individually or collectively, including tax-exempt status by the IRS), and other individuals or entities associated therewith or who may have contracted or interacted therewith.

<u>Facts</u>[1]

DAF currently has four (4) non-voting SOs, each of which has been recognized as an organization exempt from U.S. income taxes under Code Section 501(c)(3).

Dondero appointed his college roommate, Grant Scott ("Scott"), to be the control person of DAF, who, at no time during his tenure at DAF, hired outside counsel, an independent director, or outside valuation experts to evaluate the transactions that Dondero undertook with DAF, either directly or through various entities that he controlled or exercised significant influence, including, but not limited to, SOs. In addition, Highland Capital Management, LP, an entity controlled by Dondero, charged investment manager fees to DAF. (It is my understanding that Scott never evaluated the reasonableness of those fees.) As outlined in the ValueScope Presentation (defined below), Scott approved deals with various Dondero-controlled entities for below-mark investment returns, effectively enriching Dondero to the detriment of both DAF and SOs, and the charitable organizations that they serve.

Dondero has operated his businesses (including Highland and now NexPoint) with very little excess cash and has looked to DAF as a source of $300 million that he can control, typically

---

[1] See Exhibit C for a timeline of relevant events.

1

FSD2025-0116

2025-08-19

CARRINGTON COLEMAN

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

approaching DAF to serve as short-term or emergency bridge financing to enable his businesses to close speculative investments, each of which require DAF to take outsize risk for below-market investment returns.

In November 2023, Dondero attempted to exert influence over DAF's current director/manager, Mark Patrick, asking him to transfer from DAF approximately $1,500,000 to Sentinel Reinsurance, Ltd. (a Dondero-owned entity)[2] in payment of legal fees unrelated to DAF or its charitable purposes. This request would have taken money from DAF and its charitable beneficiaries and put it into Dondero's pockets. Outside counsel advised DAF leadership that the cash transfer proposed by Dondero would be "impermissible and illegal for a number of reasons."

Dondero is enmeshed in Highland Dallas, Highland Kansas City, and Highland Santa Barbara (the "Highland SOs"). Dondero is the Individual Member under the Bylaws of each. Dondero is also one of three members of the Board of Directors of each Highland SO, as well as the President of each. In addition to the authority granted by the Bylaws of the Highland SOs to Dondero, Dondero wields broad influence over the Highland SOs and their officers and directors, who view him as the "donor"[3] with respect to DAF. Dondero has appointed his public relations specialist, Lucy Bannon, as his primary contact with the Highland SOs.[4]

On October 2, 2024, Mark Patrick resigned from his position at Skyview Group, which is a back-office and administrative service provider whose clients consist 99% of entities affiliated with or owned by Dondero. Skyview Group itself is owned by Scott Ellington, a long-time associate of Dondero.[5] On the same date, Mark Patrick also directed the DAF to terminate its services agreement with Skyview Group. Douglas Mancino of Seyfarth Shaw LLP, long-time compliance counsel to DAF, advised Mark Patrick to resign from Skyview Group to create more independence from Dondero. While Mark Patrick was at Skyview Group, Dondero had made demands that Mark Patrick meet with him three times a week in person regarding various Dondero-proposed investment opportunities to benefit Dondero and/or his affiliated entities, which demands Mark Patrick declined on behalf of DAF. While Mark Patrick was at Skyview Group, the Highland SOs had never raised a concern with Mark Patrick's leadership or his investment decisions or the financial information provided to the SOs. When Mark Patrick resigned from Skyview Group, he

---

[2] Dondero used Sentinel as part of a fraudulent insurance scheme to hide assets from a creditor of a fund and other investors.

[3] Dondero has donated an antique gun collection and hedge fund interest to the Highland Dallas Foundation. A confidential source has indicated to DAF that Dondero is promising the Dallas Foundation he will donate NexBank stock (the predominant source of his wealth) into a similar structure as DAF.

[4] DAF believes Ms. Bannon is assisting in writing the correspondence (detailed below) from Holland & Knight. A confidential source has indicated to DAF that Ms. Bannon has been appointed to an official position with the Highland SOs to act on their behalf.

[5] Although Ellington owns Skyview Group, all Skyview employees know, including its human resources department, that Dondero determines Skyview's employee's compensation, including Scott Ellington's. This is another example of Dondero creating a façade of an independent entity that is not independent.

2

FSD2025-0116                                                                                          2025-08-19

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

made clear to Dondero associates that he did not intend to have further conversations directly with Dondero and that Mark Patrick viewed his resignation and the termination of the Skyview Group services agreement as in the best interest of DAF.

Immediately after Mark Patrick's resignation from Skyview Group, Dondero was furious and directed his associates at Skyview Group and NexPoint to begin a campaign to turn the Highland SOs against DAF. Dondero's associates, including Chris Rice (who works for both Skyview Group and NexPoint), reached out to DAF's back-office services provider, SEI, and requested financial information on the DAF. Chris Rice did not reveal to SEI that he was working at Dondero's behest. Chris Rice promptly took this information, after modifying it and trying to frame it as a parade of horrible, to the Highland SOs. The inaccurate information Chris Rice presented to the Highland SOs included: (i) 2024 director fees were on track to exceed $5 million (which is false and several multiples higher than the true amount) and (ii) 2024 legal expenses were on track to equal $12 million (which is again false and represents an annualized number only through June 30, 2024). Skyview Group had access to DAF financials throughout Mark Patrick's tenure, but Skyview Group did not go running to the Highland SOs until after Mark Patrick resigned from Skyview Group. Other than via the Skyview Group and the ValueScope quarterly reports, the Highland SOs do not have access to any of DAF's financial information.

Following Mark Patrick's resignation from Skyview Group and to assure the Highland SOs that DAF's charitable giving to the Highland SOs would continue as usual and that the Highland SOs would continue to receive the quarterly ValueScope reports as usual, Mark Patrick arranged meetings with the heads of the Highland SOs[6]. These meetings went well, and the discussions raised no concerns about DAF, its finances, or its governance. Despite these meetings and open lines of communication, Mark Patrick was never asked whether the information Chris Rice presented to the Highland SOs was true or false, which demonstrates the Highland SOs had marching orders by Dondero to attempt to wind up DAF and reject any other solution.

In early November 2024, DAF made clear it would not proceed with a Dondero-recommended investment, TCAL, which is outlined in the ValueScope presentation. NexPoint proposed TCAL to DAF in September 2024. TCAL represented an illiquid asset with no income, and the Dondero-proposed structure would have required DAF to pay all the costs while providing a right of repurchase to a Dondero-controlled entity to capture the upside, if any. This is another example of Dondero's hubris and his view of DAF's money as his money.

While the meetings by and among Mark Patrick, Doug Mancino, and the SOs were occurring, during October and November 2024, Dondero directed his personal attorney, Johnny Sutton at Ashcroft Sutton Reyes LLC, to reach out to DAF's counsel and ask if Mark Patrick would accept money to resign from the DAF. Sutton made various offers, including offering Mark Patrick

---

[6] These meetings are listed on Exhibit C.

3



**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

large sums of money, his own island in the Caribbean, and other accommodations (including releases) to resign. Each of these offers were rejected. Mark Patrick believed that Dondero made these offers because Dondero sensed he had lost any semblance of control over DAF and its assets. Mark Patrick believed that, if he were to resign, Dondero would appoint another individual loyal to Dondero's personal interests, which would enable Dondero to use DAF's assets to enrich himself once again at DAF's expenses. Johnny Sutton also suggested that he spoke on behalf of the Highland SOs.

On November 20, 2024, DAF arranged a presentation by ValueScope, a financial services provider to DAF, to counsel to the Highland SOs (the "ValueScope Presentation"). Attached as Exhibit A is the ValueScope Presentation. Among other things, this detailed DAF's historical investments and Dondero's influence on DAF's investments, and it also explained the voluminous and expensive lawsuits for which Dondero was responsible. It detailed that DAF had been named as a defendant in at least eight lawsuits due to its affiliation with Dondero and had also brought at least four lawsuits at Dondero's recommendation and insistence. The ValueScope presentation also outlines certain transactions proposed by Dondero to DAF that would have had outsized benefits for Dondero's own pockets[7] while creating significant risk and capped upside for DAF.

Courts have ruled that Dondero is a "vexatious litigant" due to his long, documented, and colorful history of bringing frivolous lawsuits motivated by personal animus, which are, almost without exception, losing cases.[8] Dondero's lawsuits follow a consistent theme: Dondero is sued for taking other peoples' money.[9] This is precisely what Dondero has tried to do with DAF.

Unbeknownst to DAF, prior to the ValueScope Presentation, the Highland SOs had written a letter dated November 11, 2024, asserting that the Highland SOs had no confidence in the governance structures of DAF and directing (without authority) DAF to avoid any depletion of assets (the "No Confidence Letter"). The No Confidence Letter was not mentioned during the

---

[7] There are numerous examples of Dondero financially benefitting from the DAF. A few include: (i) the Tall Pine scheme where Dondero employees appropriated $1MM from the DAF in a fraudulent transaction, (ii) directing money due by a Dondero entity to a DAF entity to instead pay one of Dondero's personal friends, Patrick McCabe, for a payment McCabe was owed by a Highland SO, and (iii) the aforementioned embezzlement request for Sentinel.

[8] Attached as Exhibit D is Dondero's Vexatious Reply Brief, in which he acknowledges he has no indirect or direct control over DAF and transferred control of Charitable DAF GP, LLC, the general partner of Charitable DAF Fund, LP to Grant Scott.

[9] A examples include: (i) Dondero diverted $160MM from a Highland-advised fund to a private insurance company under the guise of a fraudulent insurance policy to frustrate UBS on collection of a judgment and now is being sued in New York State Court by UBS for over $1 billion, (ii) Dondero withdrew tens of millions in cash from a fund called Crusader and justified it as "management fees owed"; the eventual arbitration award against him was so large his investment company had to file bankruptcy, (iii) Dondero funneled assets from a joint venture he had with Highland partner Josh Terry; this resulted in an involuntary bankruptcy to prevent the assets being funneled out of a joint venture to a Dondero entity, and (iv) after a falling out with Patrick Daughtery, Dondero funneled assets out of an employee retention vehicle and effectively away from Daughtery, resulting in extensive litigation.

4

**FSD2025-0116**                                                            **2025-08-19**

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

ValueScope Presentation. Further, the No Confidence Letter was not received from the Highland SOs or their counsel—the No Confidence Letter was provided by Johnny Sutton of Ashcroft, Dondero's personal attorneys, nearly a month after it was written, on December 6, 2024. Given the timing (barely a month after Mark Patrick had resigned from Skyview Group) and the source (Dondero's personal attorneys), it seems highly probable that the No Confidence Letter was written at Dondero's behest.

The No Confidence Letter also came as a surprise to DAF and its counsel because the ValueScope Presentation and the Murphy Presentation were well received. The Highland SOs made no effort to verify the information provided to them by Chris Rice and were undeterred and even communicating in bad faith given the No Confidence Letter's timing and the ValueScope and Murphy Presentations.

Following the ValueScope Presentation, on December 11, 2024, DAF held a presentation by its independent director, Paul Murphy, that provided extensive corporate governance and investment information (the "Murphy Presentation"), which is attached as Exhibit B. During the Murphy Presentation, Michael Stockham of H&K said the contents of the presentation were exactly what he wanted to hear and asked Paul Murphy to present it directly to the Highland SOs. Walkers (Cayman counsel to DAF) was also scheduled to present on the rights of participation shareholders during the Walkers presentation, but Stockham indicated that if Walkers were there to detail the limited rights of participation shareholders, he was already aware, and the presentation was unnecessary.

Based on the reception to the presentations (including Michael Stockham indicating he wanted to end on a "positive" note), and with a promise to continue addressing the Highland SOs' concerns, DAF's counsel requested the No Confidence Letter be withdrawn. This request was rejected. Notwithstanding the rejection of this request, DAF and the Highland SOs' counsel agreed that the best next step was to schedule a presentation by Paul Murphy directly to the Highland SOs.

On January 7, 2025, the ValueScope quarterly financial update was provided to the Highland SOs, which has been provided on a quarterly basis for years.

On January 10, 2025, Mark Patrick successfully negotiated that Dondero direct about $8 million to pay amounts that were due to DAF on the Small Bay II transaction. Since Mark Patrick's resignation from Skyview Group in October, Dondero had directed NexPoint to cease required payments to DAF on Small Bay II and other NexPoint-led investments.

On January 21, 2025, the Highland SOs' counsel emailed a request to set up a Zoom call for the Murphy presentation to the Highland SOs. Only two days later, on January 23, 2025, despite the pending Zoom call, Julie Diaz, CEO of the Highland Dallas Foundation, emailed Mark

5

**FSD2025-0116**                                                            **2025-08-19**

**CONFIDENTIAL**                                                        **TDIT005625**

**FSD2025-0116**  **2025-08-19**

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

Patrick's out-of-use email address (which was communicated to her previously) to request additional financial information by February 10, 2025. On January 28, 2025, despite the pending Zoom call and the timeline in January 23, 2025, email, Julie Diaz sends a second email, this time requesting a winding up of DAF. These emails, of course, were inconsistent with the Zoom call with Paul Murphy.

On January 30, 2025, DAF responded to the Highland SOs and expressed concern (not for the first time) that Dondero was directing the Highland SOs to express these concerns and send this inconsistent communication.

On January 31, 2025, the Highland SOs' counsel responded and ignored DAF's concern that Dondero was controlling the Highland SOs. Instead, the Highland SOs' counsel adopted a confrontational, accusatory, and threatening tone, in stark contrast to the "positive" note that concluded the Murphy Presentation.

DAF emailed on February 4, 2025; to express it was willing to cooperate with the Highland SOs and provide them information but also requested the Highland SOs confirm they would like to continue to work with DAF to resolve their concerns.

H&K responded with an adversarial email on February 7, 2025, that contained misleading claims such as "over the last three months, you have not provided any information about the assets and financial health of the fund." This email ignored the fact that DAF provided the quarterly financial report for 9/30/24 on January 7, 2025, the ValueScope Presentation, and the Murphy Presentation. It is clear to DAF's leadership that the Highland SOs will not be satisfied by additional information and are being directed and controlled by their Individual Member, Director, and President—Dondero. Holland & Knight, as counsel to the Highland SOs, has opted for an adversarial, ostrich-head-in-the-sand approach to Dondero's misdeeds.

H&K's February 7, 2025, response also discussed Charitable DAF GP, LLC, the former general partner of Charitable DAF Fund, LP. Historically, Dondero once owned Charitable DAF GP, LLC, but transferred it to Grant Scott in 2012. DAF and its counsel identified that Dondero would be likely to contest the transfer to Scott and thereby seek to gain control of DAF and its assets, so for compliance purposes, DAF dissolved Charitable DAF GP, LLC and transitioned to a Cayman general partner for Charitable DAF Fund, LP.[10]

---

[10] Prior to receiving the February 7, 2025, email, DAF also heard from a confidential source that Dondero's associates were planning to assert control of Charitable DAF GP, LLC and thereby regain control of DAF. DAF interpreted this as a strategy that Dondero would attempt to assert his transfer to Grant Scott was invalid and then Dondero would control the general partner and direct the DAF to distribute its assets to Dondero or Dondero's affiliates.

6

FSD2025-0116                                                           2025-08-19

## CARRINGTON COLEMAN

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

On February 12, 2025, Andrew Johnstone of Johnstone Law emailed Paul Murphy to say he represents Charitable DAF Fund 2 LP (DAF 2) and requested a meeting with Paul to discuss "DAF 1 and DAF 2." DAF has information that Dondero has been working to form another "DAF" with the intention to combine the two DAFs and assert control over the assets. DAF believes this is another attempt, directly or indirectly, by Dondero to assert control over DAF and its assets.

On February 13, 2025, Atlas IDF, LP, an entity controlled by Mark Patrick, filed a lawsuit against NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC ("NREP") and Nancy Dondero, as Trustee of The Dugaboy Investment Trust, due to NREP's and Dugaboy's (as a guarantor) failure to repay ~$13 million in demand notes. While Atlas IDF, LP is not owned by DAF, this filing shows more independence between Mark Patrick and Dondero.

On February 14, 2025, Doug Mancino emailed Michael Stockham of H&K correcting the various financial misstatements in H&K's email, addressing the control that Dondero is seeking to exert over DAF and the Participating Shareholders, and offering to have a call with Paul Murphy as previously discussed.

On February 25, 2025, Liberty CLO HoldCo, Ltd. ("Liberty"), a subsidiary of Charitable DAF HoldCo, Ltd., filed a lawsuit against Highland Capital Management Services, Inc. ("HCMSI"), an entity believed to be controlled by NexPoint and/or Dondero, because HCMSI defaulted on a ~$1.3 million promissory note payable to Liberty. Instead of making a required payment to Liberty, HCMSI directed the payment to a personal friend of Dondero named Patrick McCabe. This is more evidence that NexPoint and Dondero fail to repay their debts and more evidence of independence between DAF and Dondero.

On February 27, 2025: Michael Stockham of H&K sent letter requesting presentation from Paul Murphy in the next two weeks, as initially discussed in December. This request is a change of course from the January 21 and January 28 letters from Julie Diaz, which said that a presentation would not occur before DAF turned over to them substantial financial information.

On February 28, 2025, Liberty filed a lawsuit against Nancy Dondero, as Trustee for Dugaboy, Grant Scott, as Trustee of The SLHC Trust, NexPoint Advisors, and other NexPoint entities due to the NexPoint Affiliates' failure to satisfy their obligations under a put option contract. This is more evidence that Dondero and his entities fail to repay their debts and more evidence of independence between DAF and Dondero.

---

DAF believes the frustration in H&K's email is due, in large part, to the realization that the Dondero-GP strategy would not work. H&K attempted to twist the GP reorganization as evidence Mark Patrick was going rogue, but the GP reorganization also had benefits from a Cayman legal standpoint. This Dondero-GP strategy is also inconsistent with Dondero's Vexatious Reply Brief attached as Exhibit D, in which he acknowledges (i) he has no direct or indirect control over DAF and (ii) he transferred Charitable DAF GP, LLC to Grant Scott.

7

**FSD2025-0116**                                                                                          **2025-08-19**

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

Historically, DAF was funded with assets from Highland Capital Management Partners Charitable Trust #2, which Dondero funded and obtained a charitable deduction for his contribution.

Application

    1.   Donative intent; Self-dealing penalties

Under U.S. tax law, when someone donates to charity, they have to give up "dominion and control" of the donated assets, meaning the donor has to completely and irrevocably transfer ownership and control of the property to the charity. This includes relinquishing any power to change the use or disposition of the donated assets. For the donation to be tax-deductible, the donor must (i) intend to permanently give up control of the property, (ii) transfer legal title and control of the property, (iii) deliver the property, and (iv) ensure the charity accepts the donation. To qualify for a charitable deduction, the donor cannot reclaim the property or dictate how it is used. See Code Section 170; Code Section 2511; Treas. Reg. Section 25.2511-2(b). The aforementioned facts suggest that Dondero is attempting, through his control of the Highland SOs, to exert dominion and control over the cash and property that he previously donated to DAF and for which he claimed charitable deductions, all for his personal benefit). If the Internal Revenue Service ("IRS") were to make a finding that Dondero never intended to part with dominion and control over the "gifts" he made to DAF, then they would likely disallow the income and gift tax deductions that he took, and impose civil penalties, including, but not limited to, the accuracy-related penalty on underpayments under Code Section 6662 and potentially the civil fraud penalty authorized by Code Section 6663.

In addition, Code Section 4941 imposes significant penalties on self-dealings between a private foundation (such as each Highland SO) and a "disqualified person." The term "disqualified person" is defined by Code Section 4946(a)(1) to include a "substantial contributor," as well as a "foundation manager" (i.e., officer, director, or trustee of a foundation) Based upon the facts provided, it seems clear that Dondero would be considered a "disqualified person" with respect to each and every Highland SOs. Dondero's past transactions (e.g., NexPoint) and other attempts to garner personal benefit at the expense of DAF and the Highland SOs. Along with the potential for self-dealing penalties under Code Section 4941, Dondero's persistent pattern of self-dealing with the Highland SOs exposes each of those entities to revocation by the IRS of its tax-exempt status. If the IRS were to determine that Dondero's pattern of self-dealing constituted a willful attempt to evade or avoid federal income taxes, then the IRS could refer to the matter for criminal prosecution. See Code Section 7201, et seq.

    2.  Private inurement/benefit

8

**FSD2025-0116**                                                                                          **2025-08-19**

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

Organizations enjoying tax-exempt status under Code Section 501(c)(3) must comply with requirements set forth in relevant Code sections, as well as relevant Treasury Regulations. Code Section 501(c)(3) provides:

> Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, _no part of the net earnings of which inures to the benefit of any private shareholder or individual_, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to ) any candidate for public office. (_Emphasis added_.)

The prohibition against private inurement is a statutory in nature and is also set forth in Treas. Reg. Section 1.501(c)(3)-1(c)(2). Private inurement is a subset of private benefit (discussed below) and has often been restricted to unjust payments of money to those individuals in positions of control within tax-exempt organizations. See IRS EO CPE (2001).

The concept of private benefit is derived from that part of Code Section 501(c)(3) that requires organizations (such as SOs) to be operated exclusively for tax-exempt purposes. Organizations will not be deemed exempt under Code Section 501(c)(3) unless they serve public rather than a private function. According to Treas. Reg. Section 1.501(c)(3)-1(d)(ii), an organization will not be deemed exempt unless it serves a public rather than a private interest. This concept was endorsed by the United States Supreme Court when it addressed the predecessor to Code Section 501(c)(3). See Better Business Bureau of Washington, D.C. v. United States, 326 U.S. 279 (1945). If an activity would benefit an individual or for-profit entity (regardless of whether such individual or for-profit entity is affiliated with or controls the tax-exempt entity) substantially, then the transaction would run afoul of the private benefit proscription, regardless of whether payments were unreasonable or excessive. See Church by Mail v. Commissioner, 765 F. 2d 1387 (9th Cir. 1985), aff'g TCM 1984-349 (1984). Other examples of private benefit/inurement have involved an inadequately secured loan (Lowry Hospital Association v. Commissioner, 66 T.C. 850 (1976) and payment of excessive rent (Texas Trade School v. Commissioner, 30 T.C. 642, aff'd 272 F. 2d 168 (5th Cir. 1959). The United States Tax Court has opined that, while some benefits can be conferred without jeopardizing an organizations tax-exempt status, "private benefits" should be defined as "nonincidental benefits conferred on disinterested persons that serve private interests."

9

FSD2025-0116        2025-08-19

## CARRINGTON COLEMAN

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

IRS and Treasury Regulations require that organizations enjoying tax-exempt status under Code Section 501(c)(3) be both organized and operated exclusively for tax-exempt purposes. Treas. Reg. Section 1.501(c)(3)-1(c)(1) provides that an organization will not be compliant with the operational test "if more than an insubstantial part of its activities is not in furtherance of an exempt purpose." While it is my understanding that each of the SOs has met the organizational test of Code Section 501(c)(3) and relevant Treasury Regulations, each SO must also pass the operational test throughout its existence. Whether a tax-exempt organization has engaged in activities that violate the proscriptions against private inurement and/or private benefit is highly fact specific. Treas. Reg. Section 1.501(c)(3)-1(d)(ii) places the burden of proof squarely upon a tax-exempt organization to demonstrate its continued compliance with the operational test described above.

While the current manager has been acting independently of Dondero and those under Dondero's influence and/or control, this pattern of Dondero's using DAF as his personal "piggy bank" may be perceived by the IRS and Dondero's creditors that DAF has been or is as his financial alter ego. Any suggestion or perception of alter ego status between Dondero and DAF increases the risk that DAF could find itself embroiled in litigation directed against Dondero, one or more SOs, and any of the other entities that he does or may control, whether directly or indirectly.

To the extent that any of the SOs have either encouraged or acquiesced in Dondero's accessing DAF funds for his personal benefit, either directly or through the entities that he controls or in which he has considerable financial interest, those organizations run an increased risk of losing their tax-exempt status by operating for private and not public benefit. As discussed above, each organization that has received tax-exempt status under Code Section 501(c)(3) must be organized <u>and</u> operating primarily for charitable purposes.

Given what has been detailed about Dondero's past and continued actions with SOs and DAF, there is a significantly heightened risk that the IRS could severely penalized and/or revoke the tax-exempt status of one or more SOs, which could imperil the status and assets of DAF. To help insulate DAF from any such exposure and to facilitate and expand its charitable purposes, DAF adopted a corporate restructuring on December 18, 2024, which resulted in the use of a Delaware blocking corporation to lessen the negative effect to DAF of Dondero's influence over the existing SOs.

Increasing the number of supporting organizations to current SOs would mitigate considerations of undue influence/private inurement/private benefit and broaden the scope of DAF's charitable reach to the public. The IRS will look favorably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero, and the entities controlled by him to use DAF for his private benefit and private inurement.

10

FSD2025-0116      2025-08-19
592
**CONFIDENTIAL**      TDIT005630

673

**FSD2025-0116**          **Page 677 of 1530**          **2025-08-19**

# CARRINGTON COLEMAN

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

### Exhibit A

**November 20, 2024, ValueScope Presentation to Foundations**

[See attached.]

11

Case 19-34054-sgj11  Doc 4627-5  Filed 05/11/26  Entered 05/11/26 17:05:52  Desc
Exhibit 211 - Part 01  Page 666 of 759

**FSD2025-0116**                                                                                     **2025-08-19**

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

<u>**Exhibit B**</u>

**December 11, 2024, Paul Murphy Presentation to Foundations**

[See attached.]

12

**FSD2025-0116**  675  **Page 679 of 1530**  **2025-08-19**

### Exhibit C

### Timeline

- June 2023: DAF exposure to NexPoint DST transactions is over $100MM.[11]
- October 2023: DAF turns down NexPoint-proposed Storage Partners DST IV due to unfavorable economics for DAF.
- November 2023: DAF turns down NexPoint-proposed Storage Partners DST V due to unfavorable economics for DAF.
- November 2023: Dondero requests Mark Patrick direct DAF to wire money to Dondero's entity, Sentinel Reinsurance Ltd., so that Sentinel can pay some legal bills. The legal bills bear no relation to the DAF. Mark seeks the advice of counsel who suggests doing this may be illegal, so Mark refuses to do so.
- March 7, 2024: David Rosenberg emails Mark Patrick and NexPoint to inform them that Highland Dallas Foundation, Inc. will do business in Texas under the assumed name NexPoint Philanthropies, Inc.
- June 13, 2024: DAF closes NexPoint-proposed Small Bay II transaction, which diverts $10MM to Dondero's trust, Dugaboy.
- August 22, 2024: Doug Mancino speaks with David Rosenberg about various developments regarding the Highland Dallas Foundation and Jim Dondero
- September 2024: DAF turns down two NexPoint-proposed transactions that would benefit NexPoint and Dondero: (i) the preferred dividend financing and (ii) a new Storage Partners DST VI.
  - Rob Harris, NexPoint' s general counsel, tells Shields that if DAF does not do the deal, "People will lose their jobs, and it isn't going to be me."
- September 2024: NexPoint proposed DAF invest $45 million in TCAL, receive a capped upside on its investment, and assume all the financial risk.
- September 26, 2024: Scott Ellington and Dylan Wiltermuth at Carey Olsen reach out to Paul Murphy and ask whether Paul would consider becoming a director of the DAF (which he obviously already was).
- September 30, 2024: Doug Mancino provides advice to Mark Patrick that there is a conflict of interest between DAF and Skyview Group and recommends Mark Patrick resign from Skyview Group and terminate the services agreement with Skyview Group

---

[11] From June 2023 until the present day, DAF and its counsel have successfully reduced this exposure level to about $700k in February 2025. In October 2023, DAF received advice from counsel "…you should substantially reduce any such [Dondero-led investments] so that they compromise only an insubstantial amount of the assets held in the DAF structure" due to concerns that, as of June 2023, DAF entities' investments in Dondero-led investments was 44% of its total investments. DAF was concerned that Dondero would direct his entities (including NexPoint) to stop payment on Dondero-led investments if DAF rejected Dondero's proposals. This concern was validated in October, November, and December of 2024 because, when Mark Patrick left Skyview Group, Dondero directed NexPoint to stop paying DAF about $8 million that it was due on Small Bay II.

676

- October 2, 2024: Mark Patrick resigns from Skyview Group
- October 2, 2024: DAF terminates services agreement with Skyview Group
- October 3-October 24, 2024: Chris Rice (a Skyview Group employee and a NexPoint employee) reaches out to SEI and convinces SEI to provide financial information relating to the DAF
- October 10, 2024
  - Mark Patrick meets with Julie Diaz of the Highland Dallas Foundation, Inc.
  - Mark Patrick has a telephone call with Debbie Wilkerson, the CEO of Highland Kansas City Foundation, Inc.
- October 10, 2024: NexPoint ceases payments to DAF that NexPoint is contractually obligated to make regarding Small Bay II
- October 14, 2024: Doug Mancino talks to Tammy Sims Johnson of the Highland Santa Barbara Foundation, Inc.
- October 3-November 11, 2024: Supporting organizations hire H&K (including a litigator) to represent them
- November 8, 2024: DAF effectively declines TCAL transaction proposed to Mark Patrick by Dondero because the economics were unfavorable for DAF
- November 11, 2024: Supporting organizations sign letter addressed to Paul Murphy, conspicuously not signed by Dondero
  - This letter is the first indication to DAF, Mark Patrick, Paul Murphy, and Doug Mancino that the supporting organizations have any issues, despite
- November 20, 2024: ValueScope and Doug Mancino make presentation to H&K, counsel to the supporting organizations
- December 6, 2024: Supporting organizations' letter received by Brian Shaw, counsel to DAF/Mark Patrick, who forwards it to Paul Murphy, who confirms he had not previously received it.
- December 11, 2024: DAF holds presentation with Paul Murphy re: corporate governance and investments. Walkers (Cayman counsel) also joins. H&K declines to hear from Walkers re: participation share rights.
- December 13, 2024: Doug Mancino emails H&K requesting withdrawal of the November 11 letter and proposing a path forward.
- December 18, 2024: Doug Mancino follows up on his December 13, 2024, email.
- December 19, 2024: David Rosenberg of H&K refuses to withdraw letter and discusses a presentation by Paul Murphy to the foundations.
- January 7, 2025: the ValueScope 9/30/24 quarterly report is provided to the Highland SOs.
- January 8, 2025: David Rosenberg of H&K proposes times for presentation by Paul Murphy to the foundations.

14

CONFIDENTIAL TDIT005634

677

- January 10, 2025: In a matter related to the HCMLP bankruptcy, Mark Patrick successfully negotiated that Dondero direct about $8 million to pay amounts that were due to DAF on the Small Bay II transaction.

- January 21, 2025: David Rosenberg confirms a Zoom call is fine.

- January 23, 2025: Julie Diaz, CEO of the Highland Dallas Foundation, emailed Mark Patrick's out-of-use email address (which was communicated to her previously) to request additional financial information by February 10, 2025

- January 28, 2025: Julie Diaz sends a second email, this time requesting a winding up of the DAF.

- January 30, 2025: DAF (Paul Murphy) responded to the Highland SOs and expressed concern (not for the first time) that Dondero was directing the Highland SOs to express these concerns and send this inconsistent communication.

- January 31, 2025: Michael Stockham of H&K sends an adversarial email ignoring DAF's concerns.

- February 4, 2025: DAF (Paul Murphy) emails and says it is willing to cooperate with the Highland SOs and provide them with information but also requested the Highland SOs confirm they would like to continue to work with DAF to resolve their concerns.

- February 7, 2025: DAF HoldCo approves issuance of participation shares to DFW Charitable Foundation, which result in DFW Charitable Foundation holding 51.04% of the participation shares.

- February 7, 2025: Michael Stockham of H&K sends another adversarial email that contains misleading claims.

- February 12, 2025: Andrew Johnstone of Johnstone Law emails Paul Murphy saying Johnstone acts for "Charitable DAF Fund 2 LP (DAF 2)".

- February 13, 2025: Atlas IDF, LP, an entity controlled by Mark Patrick, filed lawsuit against NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, and Nancy Dondero, as Trustee of The Dugaboy Investment Trust, alleging that NexPoint (as payor) and Dugaboy (as guarantor) failed to repay ~$13 million in demand notes following demand.

- February 14, 2025: Doug Mancino emails Michael Stockham of H&K correcting the various financial misstatements in H&K's email, addressing the control that Dondero is seeking to exert over DAF and the Participating Shareholders, and offering to have a call with Paul Murphy as previously discussed.

- February 25, 2025: Liberty CLO HoldCo, Ltd. ("Liberty"), a subsidiary of Charitable DAF HoldCo, Ltd., filed lawsuit against Highland Capital Management Services, Inc. ("HCMSI"), an entity believed to be controlled by NexPoint and/or Dondero, alleging that HCMSI defaulted on a ~$1.3 million promissory note payable to Liberty. Instead of making a payment to Liberty, HCMSI directed the payment to a personal friend of Dondero, Patrick McCabe.

15

CONFIDENTIAL                                                        TDIT005635

- February 27, 2025: Michael Stockham of H&K sent letter requesting presentation from Paul Murphy in the next two weeks.
  - This is the presentation that was planned for January prior to the letters on January 21, 2025 and January 28, 2025, which effectively retracted the request for a presentation.
- February 28, 2025: Liberty filed lawsuit against Nancy Dondero, as Trustee for Dugaboy, Grant Scott, as Trustee of The SLHC Trust, NexPoint Advisors, and other NexPoint entities due to the NexPoint Affiliates' failure to satisfy their obligations under a put option contract.
- February 28, 2025: Charitable DAF HoldCo, Ltd. received FTI Consulting valuation analysis that suggests a discount of 95% of net value should be applied to the Participation Shares.
- March 3, 2025: Charitable DAF HoldCo, Ltd. received ValueScope valuation analysis of 100 Participation Shares at $529,183.
- March 20, 2025: Charitable DAF HoldCo, Ltd. sends letter to Internal Revenue Service raising issues with Highland Dallas Foundation, Inc.
- March 21, 2025: Charitable DAF HoldCo, Ltd. sent copy of IRS letter to Texas AG, Missouri AG, and California AG

**CONFIDENTIAL**                    **TDIT005636**

## Exhibit D

### Vexatious Reply Brief



Dondero Vexatiuos
Reply Brief and DAF

Exhibit E

ValueScope and FTI Consulting Valuations

FSD2025-0116                                              2025-08-19

**VALUATION ANALYSIS OF
100% MEMBERSHIP INTEREST IN
CDMCFAD, LLC**

**AS OF
MARCH 25, 2025**

Prepared for:

Mr. Bart F. Higgins
Attorney
Shields Legal Group

CONFIDENTIAL                                              TDIT005639

March 26, 2025

Mr. Bart F. Higgins
Attorney
Shields Legal Group
16400 Dallas Parkway
Dallas, Texas 75248

### RE: Valuation Analysis of Membership Interest in CDMCFAD, LLC

Dear Mr. Higgins:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of the 100% non-controlling membership interest (the "Subject Interest" or the "Membership Interest") in CDMCFAD, LLC (the "Company") as of March 25, 2025 (the "Valuation Date").[1]  This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of membership interests), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value.  Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60.  These factors include:

1. The nature of the business and its history from inception.
2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.

---

[1]   Our analysis assumes that the Company and CLO HoldCo's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

Mr. Bart F. Higgins
March 26, 2025
Page 2

7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The valuation is conducted under the assumption that the Company will continue as a going concern.[2]  The liquidation premise of value was considered but deemed inapplicable, as the going-concern premise reflects the "highest and best use" of the Membership Interest.  The Membership Interest does not confer control and has an extremely limited claim to the underlying net asset value of CLO HoldCo, Ltd ("CLO HoldCo"). Economic benefits are contingent on discretionary distributions made by the Company's manager ("Management").  Given these characteristics, the going concern approach appropriately reflects their value.

## SCOPE OF WORK

To gain an understanding of Company's operations, we reviewed the Company's financial and operational data and spoke with Management.  To understand the environment in which Company operates, we researched relevant information concerning the US private equity, hedge funds & investment vehicles industry.  We also studied economic conditions as of the Valuation Date and their impact on the Company and its industry.

We valued the Subject Interest in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances.  Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Balance sheet for CLO HoldCo as of September 30, 2024

- The Limited Liability Company Agreement of CDMCFAD, LLC, as of December 18, 2024

- Information regarding the Company's history and current operations

---

[2] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

**VALUE**SCOPE, LLC
FSD2025-0116

2025-08-19
603

CONFIDENTIAL

TDIT005641

FSD2025-0116                                                                                                    2025-08-19

Mr. Bart F. Higgins
March 26, 2025
Page 3

- Historical distributions from CLO HoldCo

- The organizational structure chart for CDMCFAD, LLC

- Discussions with Management

- Pepperdine 2024 Private Capital Markets Report, dated June 10, 2024

- IBISWorld Industry Report 52599, *Private Equity, Hedge Funds & Investment Vehicles in the US*, October 2024

The procedures employed in valuing the Subject Interest included such steps that we considered necessary, including (but not limited to):

- An analysis of the general economic environment and industry as of the Valuation Date

- An interview with Management regarding expectations for future distributions

- An application of appropriate valuation techniques and procedures, including the income approach

- An analysis of other pertinent facts and data influencing our conclusion of value

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation.  Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data.  Our analysis was based in part on this information, as well as on other data we developed.

**FSD2025-0116**                                                                                                        **2025-08-19**

Mr. Bart F. Higgins
March 26, 2025
Page 4

## CONCLUSION OF VALUE

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**
**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | 20.0% | ($408,339) | *Schedule C.4* |
| **Value of Subject Interest, Minority, Non-Marketable** | | **$1,637,192** | |

We are independent of the Company and its affiliates and have no current or prospective economic interest in the assets that are the subject of this analysis.  Our fee for these valuation services was in no way influenced by the results of our analysis.  The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report.  If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

ValueScope, LLC

## TABLE OF CONTENTS

**ENGAGEMENT OVERVIEW** ..................................................................................**1**

   DESCRIPTION OF THE ASSIGNMENT ............................................................... 1
   SCOPE........................................................................................................... 1
   PROCEDURES................................................................................................ 1

**COMPANY OVERVIEW**...................................................................................**2**

   CDMCFAD, LLC OVERVIEW........................................................................... 2
   CAPITALIZATION TABLE ............................................................................... 2
   COMPANY STRUCTURE CHART ..................................................................... 3
   FINANCIAL POSITION .................................................................................. 3
   SUBJECT INTEREST OVERVIEW...................................................................... 6

**ECONOMIC AND INDUSTRY OVERVIEW**........................................................**8**

   OVERVIEW OF THE U.S. ECONOMY ............................................................... 8
   OVERVIEW OF THE PRIVATE EQUITY... & INVESTMENT VEHICLES INDUSTRY................. 16

**VALUATION METHODOLOGY** ......................................................................**17**

   VALUATION APPROACHES.......................................................................... 17
   VALUATION METHODS ............................................................................... 18
   SUMMARY OF THE VALUATION APPROACHES AND METHODS ...................... 18

**VALUATION ANALYSIS** ...............................................................................**20**

   INCOME APPROACH ANALYSIS ................................................................... 20

**CONCLUSION OF VALUE - SUBJECT INTEREST**.............................................**22**

   DISCOUNT FOR LACK OF MARKETABILITY ................................................... 22
   PRE-IPO STUDIES....................................................................................... 34
   APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST.................. 35
   DISCOUNT ADJUSTMENT DISCUSSION......................................................... 36
   SUBJECT INTEREST DISCOUNT CALCULATION.............................................. 37
   FAIR MARKET VALUE CONCLUSION ............................................................ 38

**ASSUMPTIONS AND LIMITING CONDITIONS** ...............................................**39**

**APPRAISAL CERTIFICATION** .......................................................................**44**

## TABLE OF SCHEDULES

**VALUATION SUMMARY** ................................................................. SUMMARY SCHEDULE

**HISTORICAL FINANCIAL ANALYSIS** ..................................................................... **A**

HISTORICAL DISTRIBUTIONS TABLE ................................................................. A.1

HISTORICAL DISTRIBUTIONS CHARTS ............................................................. A.2

CLO HOLDCO, LTD - SUMMARY BALANCE SHEET ........................................... A.3

**INCOME APPROACH** .......................................................................................... **B**

DISCOUNTED CASH FLOW (DCF) ANALYSIS ..................................................... B.1

SENSITIVITY ANALYSIS – HYPOTHETICAL RISK-FREE BOND ........................... B.2

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS** ....................................... **C**

RESTRICTED STOCK STUDIES................................................................................ C.1

RESTRICTED STOCK STUDIES SUMMARY STATISTICS ........................................ C.2

DLOM QUALITATIVE SCORING ........................................................................... C.3

CALCULATION OF MARKETABILITY DISCOUNT................................................... C.4

DLOM FOOTNOTES AND COMMENTS................................................................ C.5

**FSD2025-0116**                                                                                    **2025-08-19**

## ENGAGEMENT OVERVIEW

**DESCRIPTION OF THE ASSIGNMENT**

We were retained to perform an independent valuation analysis to determine the fair market value of the 100% non-controlling membership interest (the "Subject Interest" or the "Membership Interest") in CDMCFAD, LLC (the "Company") as of March 25, 2025 (the "Valuation Date").[3]   This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of membership interests), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

**SCOPE**

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections.  The first section outlines the description, scope, and procedures of our analysis.  The second section provides a brief description of the Company and the Subject Interest.  The third section includes a discussion of the national economy and the industry in which the Company operates.  The fourth section details a discussion of valuation theory and methodology.  The fifth section presents our valuation analysis, and the sixth section presents our conclusion of the fair market value of the Subject Interest.

**PROCEDURES**

This valuation analysis was conducted in accordance with generally accepted valuation procedures.  These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances.  We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information.  Our analysis was based in part on this information, as well as on other data obtained through additional research.  A full discussion of the methodologies employed appears in the following sections of this report.

---

[3]    Our analysis assumes that the Company and CLO HoldCo's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

## COMPANY OVERVIEW

### CDMCFAD, LLC OVERVIEW[4]

CDMCFAD, LLC is a Delaware limited liability company formed in December 2024. Upon the members' acceptance of the interest, the members agreed to the provisions of the Limited Liability Company Agreement of CDMCFAD, LLC (the "Company Agreement") and the Companies Law of the state of Delaware (as amended from time to time, the "Law"). As a holding company, the Company's underlying assets have been allocated across a broad range of asset classes, including but not limited to cash and cash equivalents, public equity, private equity, private credit, real estate, and other alternative investments.

### CAPITALIZATION TABLE

The Company's membership interest is held by Charitable DAF HoldCo, Ltd. Mark Patrick is the Manager of the Company.

---

[4]   Based on the Company Agreement and a discussion with Management.

**FSD2025-0116**                                                                    COMPANY OVERVIEW   2025-08-19

## COMPANY STRUCTURE CHART



## FINANCIAL POSITION

The Company's only asset stems from its indirect interest in CLO HoldCo, Ltd ("CLO HoldCo"). The Company provided an unaudited balance sheet (the "Balance Sheet") for CLO HoldCo as of September 30, 2024. Based on a review of the Balance Sheet, CLO HoldCo reported total assets of $316.3 million, including $138.4 million of cash & cash equivalents, $175.3 million of other investments, and $2.5 million of other assets. CLO HoldCo reported total liabilities of $47.2 million.  CLO HoldCo has net assets of $269.1

**CONFIDENTIAL**                                                                                      TDIT005648

million on its books as of September 30, 2024.  The Balance Sheet is presented below and in Schedule A.3.

### CLO HoldCo, Ltd - Summary Balance Sheet

| | Balance Sheet as of: | |
| --- | --- | --- |
| | 9/30/2024 | |
| | Actual | % |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

CLO HoldCo historically paid distributions of $819,050 in 2019, $619,050 in 2020, $834,450 in 2021, $968,950 in 2022, $950,881 in 2023, and $317,796 in the first three quarters of 2024.  Fourth quarter distributions were historically larger than in the first three quarters.[5]   Historical Distributions are presented in the following charts and in Schedules A.1 and A.2.

---

[5]   Distributions are typically paid a few months following the end of a quarter.  As a result, fourth quarter distributions may be paid in the first or second quarter of the following calendar year.

692

**FSD2025-0116**                    COMPANY OVERVIEW                    **2025-08-19**



Note: Q4 2024 distributions have not yet been paid

**FSD2025-0116**                                        **2025-08-19**

612

**CONFIDENTIAL**                                        **TDIT005650**

## SUBJECT INTEREST OVERVIEW

The Subject Interest consists of a 100% non-controlling membership interest in the Company.  The Subject Interest may receive discretionary cash distributions from time to time.  The rights and limitations of the Membership Interest are defined by the Company Agreement and are directly influenced by the discretion and actions of Management.

The Company Agreement grants Management substantial discretion over distributions, interest allocation, governance, and financial transparency, leaving members with little influence over corporate decisions.  The Membership Interest is subject to transfer restrictions and limited access to information, with limited voting rights and no ability to amend governing documents.  Given these extensive limitations, the Membership Interest represents a highly restricted and passive financial interest with little control or enforceable rights.

### *Limited Rights Over Distributions*

Members do not have:

- The right to cause, vote on, or receive distributions.
- The right to annual, timed, or guaranteed distributions.
- The ability to amend the Company Agreement to modify distribution rights.

### *Governance and Voting Limitations*

Members do not have:

- The right to remove or appoint Management.
- The right to vote on the issuance of additional membership interest, receive notice of such issuance, or exercise pre-emption rights.
- The right to vote on or receive notice of membership redemptions.

The appointed Management has full control over the management, operations, and affairs of the Company, including the reallocation of the membership interests on terms they determine.  Since members do not have voting or approval rights over reallocation, the membership interest may be reallocated at any time, potentially impacting the economic interests associated with existing interest.  Additionally, the transfer of membership interest requires Management consent, and Management may reject transfers at their discretion.  Furthermore, Management may cause any membership interest to be redeemed by the Company for any reason.

**FSD2025-0116**                                                    COMPANY OVERVIEW    **2025-08-19**

### Restrictions on Meetings and Information Access

Members do not have:

- The right to receive notice of, attend, speak at, or vote at general meetings.
- The right to inspect company records, accounts, or documents, except at Management's sole discretion.
- The ability to modify or amend the Company Agreement in any capacity.

For further details, refer to Appendix A for key provisions of the Company Agreement.

**CONFIDENTIAL**                                                                       **TDIT005652**

**FSD2025-0116**                                                                  **2025-08-19**

## ECONOMIC AND INDUSTRY OVERVIEW

### OVERVIEW OF THE U.S. ECONOMY

In the third quarter of 2024, the US economy expanded at a faster pace than in the second quarter.  Inflation, which peaked at 8.99% in June 2022, declined to 2.73% by November 2024, reflecting progress toward the Federal Reserve's target.  After a prolonged period of elevated interest rates to curb inflation, signs of a cooling labor market and stable prices led the Fed to cut rates by 25 basis points in December.  The rate hikes that began in 2023 initially resulted in an inverted yield curve, signaling investor concerns about an economic slowdown, but the curve has since normalized following the presidential election.  Meanwhile, US equity markets gained momentum, with major indices ending the year higher, supported by easing inflation and expectations of further monetary policy accommodation.

### Gross Domestic Product[6]

Real gross domestic product (GDP) increased at an annual rate of 3.1 percent in the third quarter of 2024, following an increase of 3.0 percent in the second quarter. The acceleration in real GDP in the third quarter primarily reflected accelerations in exports, consumer spending, and federal government spending.  These movements were partly offset by a downturn in private inventory investment and a larger decrease in residential fixed investment.

---

[6]   U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Third Quarter 2024. (Release Date: 12/19/2024).

### Population

Population growth is an important driver of long-term growth in an economy.  The total population increased from 335.9 million in November 2023 to 337.7 million in November 2024.[7]  The working-age population (15-64) increased from 208.9 million in November 2023 to 209.0 million in November 2024.[8]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic.  It partially recovered in just several months and has been trending upward/flat.  In November 2023, the civilian labor force participation rate was 62.8% and stands at 62.5% as of November 2024.[9]

---

[7]  U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[8]  Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[9]  U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

697

**FSD2025-0116**  ECONOMIC AND INDUSTRY OVERVIEW  **2025-08-19**

### Employment

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 227,000 in November 2024 and the unemployment rate changed little at 4.2 percent. Employment trended up in health care, leisure and hospitality, government, and social assistance. Retail trade lost jobs.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased from 7.0% in November 2023 to 7.7% in November 2024.[10]

Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will increase from 4.0 percent in 2024 to 4.3 percent in 2025 and then decrease to 4.1 percent in 2027.

---

[10]   U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

**FSD2025-0116**  **2025-08-19**

617

**CONFIDENTIAL**  **TDIT005655**

**FSD2025-0116**                                           ECONOMIC AND INDUSTRY OVERVIEW                **2025-08-19**

### Inflation

According to the BLS, The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.3 percent in November on a seasonally adjusted basis, after rising 0.2 percent in each of the following 4 months. Over the last 12 months, the all-items index increased 2.7 percent before seasonal adjustment.[11]

The index for shelter rose 0.3 percent in November and was the main factor in the all items increase. The food index increased 0.4 percent in November. The index for food away from home rose 0.5 percent over the month, while the index for food at home rose 0.3 percent. The energy index fell 0.2 percent over the month, after being unchanged in the preceding month.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has declined significantly since a year ago, November 2023, declining from 53.20% to 5.10% in November 2024[12].The forecasters predict current-quarter headline CPI inflation will average 2.2 percent at an annual rate, down from the prediction of 2.5 percent in the previous survey[13].

---

[11]   Federal Reserve Bank of St. Louis, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[12]   Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[13]   Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters,* November 15, 2024.

ECONOMIC AND INDUSTRY OVERVIEW

### Interest Rates

The interest rate on the three-month Treasury bill declined from 5.20% as of December 29, 2023, to 4.23% as of December 31, 2024.[14] The interest rate on the ten-year Treasury note increased from 3.88% as of December 29, 2023, to 4.58% as of December 31, 2024.[15]

The interest rate on Moody's Aaa-rated corporate bonds increased from 4.65% as of December 29, 2023, to 5.40% as of December 31, 2024.[16] The interest rate on the Moody's Baa-rated corporate bonds increased from 5.49% to 6.00% over the same time.[17]

---

[14] Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[15] Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[16] Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last January 10, 2025.

[17] Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

**FSD2025-0116**                    **Page 704 of 1530** ECONOMIC AND INDUSTRY OVERVIEW **2025-08-19**

In the last twelve months, the yield curve transitioned from being inverted to normal, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill increasing between December 29, 2023, to December 31,2024 from -0.59% to a positive 0.70%.[18]

*Corporate Profits*

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) decreased slightly by 15 billion in the third quarter of 2024 from the second quarter of 2024.

---

[18]   U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed January 10, 2025.

**FSD2025-0116**                    ECONOMIC AND INDUSTRY OVERVIEW                    2025-08-19

### Stock Markets[19]

The stock markets gained momentum from December 29, 2023, to December 31, 2024. The S&P 500 Index (SPY) closed at 475.31 on December 29, 2023, and closed higher at 586.08 on December 31, 2024. The Dow Jones Industrial Average Index (DIA) closed at 376.87 on December 29, 2023, and closed higher at 425.50 on December 31, 2024. The NASDAQ Composite Index (QQQ) closed at 409.52 on December 29, 2023, and closed higher at 511.23 on December 31, 2024. In the graph below, the December 30, 2022, values were set to 100.

### Construction & Housing Starts

Construction spending and housing starts are two other important indicators for the economy. Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment. Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy. Housing starts decreased from 1.510 million units in November 2023 to 1.289 million units in November 2024.[20] Construction spending, a seasonally adjusted annual figure, increased from $2.09 trillion in November 2023 to $2.15 trillion in November 2024.[21]

---

[19]   CapIQ Database, last accessed January 10, 2025.
[20]   U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.
[21]   U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

### Consumer Sentiment

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has increased from 61.30 a year ago in November 2023 to 71.80 in November 2024. Although it has increased significantly from a year ago, the index is still well below the pre-COVID high of 101.0 in February 2020.[22] The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions.  The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S.  This is considered a leading indicator of future consumer expenditures and economic activity.

---

[22]   University of Michigan, *Surveys of Consumers*, November 2024

## OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY[23]

This industry is composed of private equity funds, hedge funds, closed-end funds, unit investment trusts and other financial vehicles. Entities in this industry manage securities or other assets on behalf of shareholders, unit holders or other beneficiaries to achieve high returns on targeted investments. This industry excludes insurance and employee-benefit funds, open-end investment funds and trusts, estates and agency accounts.

### Executive Summary

In recent years, industry assets have become increasingly integral to institutional investors' portfolios and the larger asset management market. Institutional investors are individuals or organizations that trade securities in such substantial volumes that they qualify for lower commissions and fewer protective regulations since it's assumed that they're knowledgeable enough to protect themselves. Increasing demand from institutional investors has contributed to the surge in the industry's assets under management (AUM) and revenue during the current period.

In recent years, the industry has continued to enmesh itself more deeply within the broader financial ecosystem despite the challenges posed at the onset of the period. The pandemic, mainly in the first quarter of 2020, contributed to revenue declines for many operators. Many portfolios, previously thought to be sound investments, were reevaluated and businesses pivoted their strategies due to the unprecedented nature of the crisis. However, as inflation was rampant in the latter part of the period, the FED increased interest rates to control high inflation, although as inflationary pressures eased in 2024, the FED cut interest rates, which will increase liquidity in financial markets. The Fed is anticipated to cut rates further in 2025, increasing liquidity and driving the shift of investments into equities from fixed-income securities. Overall, over the past five years, industry revenue grew at a CAGR of 4.2% to $310.1 billion, including an increase of 2.5% in 2025 alone. Industry profit has climbed significantly and will comprise 49.6% of revenue in the current year.

Industry revenue will grow at a CAGR of 2.7% to $353.7 billion over the five years to 2030. The Federal Reserve is anticipated to cut interest rates as inflationary pressures continue to ease. These declining interest rates will increase liquidity in the markets. Private equity firms and hedge funds will have less difficulty raising capital for investments. As characteristics of the financial system change in light of post-financial crisis banking regulations and regulators' recognition of the importance of hedge funds within the financial system, hedge funds will likely experience heightened oversight.

---

[23]    IBISWorld Industry Report 52599, March 2025, *Private Equity, Hedge Funds & Investment Vehicles in the U.S.*

FSD2025-0116 2025-08-19

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

## VALUATION APPROACHES

### Income Approach

The income approach quantifies the present value of anticipated future income generated by a business or an asset.  Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes.  One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow.  The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate.  The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

### Market Approach

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets.  Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset.  Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions.  The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

### Asset-Based (Cost) Approach

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities.  Replacement cost is often a primary indicator of the value of a business' assets.  The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it.  Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors.  The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

VALUESCOPE, LLC

Page 17

FSD2025-0116

2025-08-19

624

CONFIDENTIAL

TDIT005662

## VALUATION METHODS

The following are common valuation methods used under the three approaches:

A. Income Approach
1.  Discounted Cash Flow Method (multi-period model)
2.  Direct Capitalization Method (single period model)
3.  Excess Earnings Method

B. Market Approach
1.  Guideline Public Company Method
2.  Merger and Acquisition Method

C. Asset-Based Approach
1.  Reproduction Cost Method
2.  Replacement Cost Method
3.  Net Asset Value Method

## SUMMARY OF THE VALUATION APPROACHES AND METHODS

For the valuation of non-controlling interests in holding companies such as the Company, the asset-based approach is most commonly used.  When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities).  The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

However, in the case of the Membership Interest under consideration, the asset-based approach is not applicable.  The Subject Interest does not confer control and only have a claim in respect of the underlying assets of CLO HoldCo in a winding up.  Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of this interest are contingent upon discretionary distributions by Management.  As such, the value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality.

Given the nature of the Membership Interest, the income approach, specifically the discounted cash flow (DCF) method, is the most appropriate valuation methodology.[24] This approach estimates the present value of expected future distributions, if any, based

---

[24]  The market approach was considered but deemed inapplicable due to the absence of comparable transactions involving securities with characteristics similar to the Membership Interest.

**FSD2025-0116**    VALUATION METHODOLOGY    **2025-08-19**

on reasonable assumptions regarding Management's discretion in making such distributions.  If no future distributions are expected, the value of the Subject Interest would be nominal.  The DCF method captures the time value of money and the risk associated with the uncertainty of future distributions, providing a more accurate measure of the fair market value of the Membership Interest.

707

## VALUATION ANALYSIS

### INCOME APPROACH ANALYSIS

The income approach estimates the fair market value of an interest based on the present value of expected future economic benefits.  In the case of the Membership Interest, these economic benefits are exclusively tied to discretionary distributions made by Management, rather than earnings or cash flows of the underlying NAV of the Company or CLO HoldCo.  The approach involves forecasting expected future distributions and discounting them to present value using a rate of return that reflects the risk associated with the uncertainty and discretionary nature of these distributions.  The resulting present value represents the fair market value of the Subject Interest.

### *Discounted Cash Flow Method*

We developed a DCF model to determine the fair market value of the Subject Interest as of the Valuation Date.  The DCF method projects the distributions that the member is expected to receive.  Each projected distribution is discounted to present value using a rate that reflects the risk associated with the uncertainty and discretionary nature of these payments.

### *Projected Distributions*

Distributions to the holders of the Subject Interest were projected based on discussions with Management and a review of historical distributions.  Management indicated that the timing and size of future distributions will be discretionary, and that the Company does not intend to establish reserves for distributions.

Despite this discretion, Management currently intends to maintain distributions to the holders of the Subject Interest at levels consistent with those paid by CLO HoldCo over the past 12 to 24 months.  We projected distributions to occur quarterly, with the next four quarters reflecting the average distribution of the corresponding quarters from the prior two years, totaling approximately $950,000.  Beyond this period, distributions were assumed to grow at an annual rate of 2.5%, consistent with expected inflation, in perpetuity.

### *Cost of Equity*

A cost of equity of 68.3% was applied to discount the expected discretionary distributions to the holders of the Subject Interest, reflecting their high-risk profile, lack of claim on underlying NAV, and absence of control over distributions.  This rate was selected based on the third quartile of required returns for pre-seed venture capital investments from the Pepperdine 2024 private capital markets report, aligning with the speculative nature

**FSD2025-0116**                                                                                                VALUATION ANALYSIS   **2025-08-19**

of potential cash flows, significant legal and governance risks, and the inability to force a sale or liquidity event.  The Subject Interest exhibits characteristics similar to early-stage equity investments, where cash flows are highly uncertain, illiquidity risks are substantial, and investor returns are largely dependent on discretionary managerial decisions.  Given these factors, a higher-end venture capital return benchmark was deemed appropriate.

### Conclusion – Income Approach Analysis

Based on the forecasts and methodologies presented in this analysis, the income approach indicated a minority and marketable value of the Subject Interest of $2,045,531 as of the Valuation Date.

This conclusion of value implies a discount for lack of control (DLOC) of 99.2%, calculated as the concluded marketable value of the Subject Interest divided by the NAV of CLO HoldCo.[25]

To assess the impact of the discount rate, a sensitivity analysis was performed under the hypothetical assumption that projected distributions followed the risk profile of a risk-free perpetual bond with identical expected cash flows.  In this scenario, a 4.65% discount rate, equivalent to the 30-year US Treasury yield as of the Valuation Date, was applied. Under this assumption, the minority, marketable value of the Subject Interest would be $44.7 million, resulting in an implied DLOC of 83.4%.  However, this analysis does not reflect the substantial risks associated with the Subject Interest.

---

[25]   Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls.  Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

## CONCLUSION OF VALUE - SUBJECT INTEREST

Based on the methodologies presented in this analysis, it is our opinion that the value of the Subject Interest on a minority and marketable basis, as of the Valuation Date, can reasonably be stated as $2,045,531.

### DISCOUNT FOR LACK OF MARKETABILITY

A discount for lack of marketability (DLOM) is necessary to determine the fair market value of the Subject Interest, as it cannot be readily sold or liquidated in an active market. The absence of a public exchange and transfer restrictions further constrain liquidity.  A review of restricted stock studies was conducted to support the DLOM, examining the price differences between freely traded shares and comparable shares with resale restrictions.  These studies provide empirical evidence of the impact of illiquidity on value, reinforcing the rationale for applying a marketability discount.

### *Restricted Stock Studies*

The restricted stock studies reviewed included data from 1966 through 2010.  The studies analyzed the difference in prices between publicly traded stock and restricted stocks of the same entity.  The restricted stocks were identical to the traded stock except for marketability.  A summary of the mean and median discounts of the restricted stock studies is presented in the following figure.

**CONFIDENTIAL**                                                                    **TDIT005667**

710

**FSD2025-0116**                    CONCLUSION OF VALUE - SUBJECT INTEREST                    **2025-08-19**

**Summary of Restricted Stock Studies**

**SEC Institutional Investor Study[26]**

The SEC Institutional Investor Study is a comprehensive restricted stock study with 398 transactions from January 1, 1966, through October 22, 1969.  The study analyzed differences in discounts based on the following categories: trading market, type of institution purchasing the security, transaction size, sales of the issuer, and earnings of the issuer.  The study found significant differences in discounts for type of exchange, sales, and earnings of the issuer.  Stocks listed on the major exchanges had lower

---

[26]   U.S. Securities and Exchange Commission, "Institutional Investor Report," 92nd Congress, 1st Session, House Documents No. 92-4, Part 5, 1971.

**FSD2025-0116**                                                          **2025-08-19**

630

**CONFIDENTIAL**

**TDIT005668**

discounts than smaller exchanges and over-the-counter stocks.  The study found higher discounts for companies with smaller sales and lower earnings.

### Johnson & Racette Study[27]

Richard Johnson and George Racette performed a study on restricted securities purchased by registered investment companies between 1967 and 1973.  The study included 86 observations sent from 75 investment companies that met the selection criteria.  Johnson and Racette's analysis indicated an average marketability discount of 34%, in line with the range with the most common observations of 30-40%.

### Gelman Study[28]

Milton Gelman of National Economic Research Associates, Inc. conducted a study of 89 restricted stock transactions executed by four investment companies from 1968 to 1970. The investment companies were formed in 1968 to specialize in restricted securities.  A significant portion of the funds of the investment companies were invested in restricted stock transactions consisting of shares of large and small companies listed on large and small exchanges, over the counter, purchased directly from the companies, or from selling stockholders.   Gelman's analysis found mean and median discounts of approximately 33%.  In addition, 59% of the transactions had discounts of 30% or more and 36% of the transactions had discounts of 40% or more.

### Trout Study[29]

Robert R. Trout, a principal of Trout, Shulman & Associates, analyzed 60 transactions involving the purchase of restricted stock by mutual funds from 1968 to 1972.  Trout performed a regression analysis to determine the relationship between discounts and certain variables such as exchange listing, number of shares outstanding, and transaction size relative to total outstanding shares.  Trout's findings suggested an intercept or implied mean and median discount of 43.5%.

---

[27]   Richard D. Johnson and George A. Racette, "Discounts on Letter Stock Do Not Appear to Be a Good Base on Which to Estimate Discounts for Lack of Marketability on Closely Held Stocks," *Taxes—The Tax Magazine*, August 1981, 574-581.

[28]   Milton Gelman, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely-Held Company, "*The Journal of Taxation*, June 1972, 353-354.

[29]   Robert R. Trout, "Estimation of the Discount Associated With the Transfer of Restricted Securities," *Taxes—The Tax Magazine*, June 1977, 381-385.

### Moroney Study[30]

Robert E. Moroney of Moroney, Beissner & Co. in Houston presented his restricted stock study to the Texas CPA Tax Institute in November 1972.  The study was subsequently published in 1973.  The analysis focused on 146 transactions in restricted securities by 10 registered investment companies.  The discounts ranged from a 30% premium to a 90% discount with a mean and median discount of 35.8% and 32.8%, respectively.

### Maher Study[31]

Michael Maher, a former estate and gift tax agent with the Internal Revenue Service, published his study results in 1976.  The study observed discounts for 34 restricted stock transactions from 1966 to 1973.  The results of his study suggested a mean discount for his total and adjusted analyses of 35.4% and 34.7%, respectively.

### Standard Research Consultants Study[32]

A 1983 study by two Standard Research consultants, William F. Pittock and Charles H. Stryker, CPA, observed discounts relating to 28 private placements of common stock from October 1978 to June 1982.  The discounts varied from 7% to 91% with a median of 45%.  The results of the study tend to suggest higher discounts for companies with smaller revenues.

### Wruck Study[33]

Karen Wruck's Harvard University study on firm value analyzed 83 sales of unregistered securities from 1979 to 1984, 37 of which were observable and included in the study's sample.  On average, the offering price of the unregistered securities was set at 86.5% of the market price of the stock on the day before the announcement, indicating a discount of 13.5%.  The median discount indicated was similar at 12.2%.

---

[30]   Robert E. Moroney, "Most Courts Overvalue Closely Held Stocks," *Taxes—The Tax Magazine*, March 1973, 144-155.

[31]   J. Michael Maher, "Discounts for Lack of Marketability for Closely Held Business Interests," *Taxes—The Tax Magazine*, September 1976, 562-570.

[32]   William F. Pittock and Charles H. Stryker, "Revenue Ruling 77-287 Revisited," *SRC Quarterly Reports*, Spring 1983, 1-3, cited in Quantifying Marketability Discounts by Z. Christopher Mercer, 63.

[33]   Karen H. Wruck, "Equity Ownership Concentration and Firm Value, Evidence From Private Equity Financings," *Journal of Financial Economics*, Vol. 23. 1989, 3-1.

### FMV Opinions Study[34]

The FMV Study included over 230 transactions from 1980 through April 1997, the date of the most recent amendment of Rule 144.  The mean and median discounts were 22.3% and 20.1%, respectively.  The authors of the study made the following generalization regarding their analysis:

- Companies with higher revenues resulted in lower discounts and vice versa
- Companies with unrestricted stock traded on exchanges exhibited lower discounts
- Discounts were higher for blocks exceeding 10% of ownership
- Discounts for companies with capitalization under $50 million ranged from 30% to 40%

### Barclay, Holderness, Sheehan Study[35]

Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan's study observed private placements of large-percentage blocks of stock from 1980 to 1996.  Specifically, the study analyzed private placements to a variety of different types of investors, namely active investors, passive investors, and management.  Active investors were found to be willing to pay higher prices in their placements, indicating lower discounts, while management placements had the highest discounts, although they were found to not have a statistically significant difference from private placements.  In total, the average discount across all private placements was 18.7% while the median discount was 17.4%.

### Hertzel & Smith Study[36]

A 1993 study by Michael Hertzel and Richard L. Smith analyzed private placements between 1980 between 1987.  The study's sample included private placements of 106 companies listed on the NYSE and AMEX exchanges as well as OTC firms.  While the mean and median indicated discounts were 20% and 13%, respectively, more than 35% of the private placements observed had discounts greater than 25%.

---

[34]  Hall, Lance S., and Timothy C. Polacek, "Strategies for Obtaining the Largest Valuation Discounts," *Estate Planning*, January/February 1994. pp. 38-44.

[35]  Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan, "Private Placements and Managerial Entrenchment," *The Journal of Corporate Finance*, 2007, Vol. 13, Issue 4, 461-484.

[36]  Michael Hertzel and Richard L. Smith, "Market Discounts and Shareholder Gains for Placing Equity Privately," *The Journal of Finance*, Vol. 48, No. 2. June 1993, 459-485.

## Management Planning Study[37]

Management Planning, Inc.  published the results of a study performed from 1980-1996 by Robert P. Oliver, ASA and Roy H.  Meyers, ASA, CFA.  They started with a base on 231 transactions and looked at discounts from the total sample, discounts from 53 transactions without registration rights, and discounts from 27 transactions with registration rights.  A summary of the mean and median discounts from their study is presented in the following table.

**Results of Management Planning Study**

| Discount | Entire Sample of 231 Transactions | 53 Transactions without Registration Rights | 27 Transactions with Registration Rights |
|---|---|---|---|
| Low | N/A | 3.0% | N/A |
| Mean | 29.0% | 27.0% | 12.8% |
| Median | 28.0% | 25.0% | 9.1% |
| High | N/A | 58.0% | N/A |

The authors cite the difference between discounts with and without registration rights as evidence of the lack of marketability on an investment.  Certain factors were also cited by the authors as the most influential in determining discounts.  The factors include:

- Companies with higher revenues tend to have lower discounts
- Companies with higher earnings tend to have lower discounts
- Higher per share prices tend to have lower discounts
- Lower price volatility tends to result in lower discounts
- Block sizes representing a higher percentage of average trading volume tend to have higher discounts
- Large dollar blocks tend to have lower discounts

## Hertzel, Lemmon, Linck, Rees Study[38]

A 2001 study by Michael Hertzel, Michael Lemmon, James Linck, and Lynn Rees analyzed private placements from 1980 to 1996.  A total of 619 private placements were ultimately selected for the sample, which primarily consisted of small-cap, technology companies as 79% of the sample companies were traded on the NASDAQ exchange and the mean market value of equity for the companies was $188 million.  Of the 619 private

---

[37] A Study by Management Planning Inc. published in Z. Christopher Mercer, "Analysis of Restricted Stocks of Public Companies 1980-1995," *Quantifying Marketability Discounts*, Peabody Publishing, 1997, Chapter 12, 345-370.  Retrieved from John J. Stockdale Sr., *BVR's Guide to Discounts for Lack of Marketability*. 5th ed. Vol. 1. Portland, OR: Business Valuation Resources, LLC, 2013.

[38] Michael Hertzel, Michael Lemmon, James S. Linck, and Lynn L. Rees, "Long-Run Performance Following Private Placements of Equity," workpaper, Dec. 21, 2001.

CONFIDENTIAL                                                                                                            TDIT005672

**Page 719 of 1530** CONCLUSION OF VALUE - SUBJECT INTEREST

placements in the sample, 404 had sufficient information and disclosures to determine relevant discounts. The study indicated a mean discount of 16.5% and a median discount of 13.4%.

### Wruck & Wu Study[39]

A study by Karen Wruck and YiLin Wu in 2008 supplemented Ms. Wruck's 1989 study and analyzed private placements of companies between 1980 and 1999. 1,976 private placements were selected in the sample. Of these, 1,854 had data for observed discounts. The study found a mean discount of 11.33% and a median discount of 10.96%.

### Angrist, Curtis, Kerrigan (MPI) Study[40]

A study by Ezra Angrist, Harry Curtis, III, CFA, ASA, and Daniel Kerrigan, CFA in 2011 grouped a total of 402 transactions of unregistered stock into four groups based on the timing of the issuances in respect to the changes in holding period restrictions per Rule 144 as follows:

**Results of Angrist, Curtis, Kerrigan (MPI) Study**

| Period | Observations | Mean Discount | Median Discount |
|---|---|---|---|
| Pre-1990 | 79 | 30.5% | 32.3% |
| 1990 - Apr 1997 | 110 | 25.1% | 22.5% |
| May '97 - Feb '08 | 164 | 20.8% | 16.6% |
| Feb '08 - Dec '08 | 49 | 5.9% | 5.0% |
| Total | 402 | 22.1% | 19.6% |

Results of the study show that as restriction periods have declined, so have discounts.

### Willamette Management Associates Study[41]

Willamette performed an analysis of 33 private placements of restricted stock from January 1, 1981 through May 27, 1984. There was a brief overlap in the latter part of the period included in the Standard Research Consultants Study. The Willamette study resulted in a mean discount of 31.2%.

---

[39] Karen H. Wruck and Yi Lin Wu, "Business Relationships, Corporate Governance, and Performance: Evidence From Private Placements of Common Stock," *Journal of Corporate Finance*, 15, 2009, 30-47.

[40] Ezra Angrist, Harry Curtis III, and Daniel Kerrigan, "Regression Analysis and Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 30, No. 1 Spring 2011, 36-48.

[41] Shannon Pratt, Robert F. Reilly, and Robert P. Schweihs, *Valuing a Business*, 2nd edition, 247.

**Silber Study[42]**

William L.  Silber, a professor of finance and economics at the Stern School of Business at New York University analyzed 69 private placements from 1981 through 1989.  Silber's study results ranged from a 12.7% premium to an 84% discount with a mean discount of 33.8%.  Silber also cited in his findings that discounts are larger when the block of restricted stock is large relative to the total shares outstanding and the dollar size is inversely related to the discount.

**Krishnamurthy, et al. Study[43]**

Srinivasan Krishnamurthy, Pual Spindt, Venkat Subramaniam, and Tracie Woidtke's 2001 study analyzed private placements from 1983 to 1992.  The study performed different discount calculations for the following classifications: 1) restricted shares, 2) shares with registration pending, 3) shares not known to be restricted, and 4) shares with pending registration or not known to be restricted (groups 2 and 3 combined).  The mean discounts for Groups 1-4 were 34.0%, 23.3%, 15.4%, and 16.0%, respectively.  The overall mean discount was 19.4%.

**Wu Study[44]**

YiLin Wu's study on private placements was published in the Journal of Financial Economics in 2004.  The study analyzed 301 private placements taking place from 1986 to 1997.  Mean and median discounts of 8.7% and 19.8%, respectively, were observed.

**Bajaj Study[45]**

The Bajaj study expands on previous restricted stock studies, namely by Wruck and by Hertzel and Smith.  This study analyzed 88 private placements occurring between 1990 and 1995.   The 88 observations revealed results ranging from a premium of approximately 14% to a discount of 68%, with mean and discounts of 22% and 21%, respectively.  The authors note four characteristics to consider regarding the target firm and private placement itself when analyzing discounts: the percentage of total shares offered, business risk, financial distress, and total proceeds.

---

[42]   William L. Silber, "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," *Financial Analysts Journal*, July-August 1991, 60-64.

[43]   Srinivasan Krishnamurthy, Paul Spindt, Venkat Subramaniam, and Tracie Woidtke, "Does Investor Identity Matter in Equity Issues? Evidence From Private Placements," *Journal of Financial Intermediation*, 14, 2005, 210–238.

[44]   Yi Lin Wu, "The Choice of Equity Selling Mechanisms," *Journal of Financial Economics*, 74, 2004, 93-119.

[45]   Mukesh Bajaj, David J. Denis, Stephen P. Ferris, and Atulya Sarin, "Firm Value and Marketability Discounts," *Journal of Corporation Law*, Vol. 27, Fall 2001, 89-115.

### Johnson Study (Business Valuation Review)[46]

Bruce A. Johnson, ASA of Munroe, Park & Johnson conducted a restricted stock study from 1991 to 1995. The study included 72 private placements with results varying from a 10% premium to a 60% discount with a mean discount of 20%. Johnson also cited four important factors to consider when evaluating potential discounts: positive net income, sales volume, transaction value, and net income strength.

### Finnerty Study[47]

John D. Finnerty, professor of finance at Fordham University, performed two studies to compare the impact of the changes in law regarding restriction periods for private placements that occurred in 1997 and 2008. The first study focused on private placements from 1991 to 1997 and resulted in mean and median discounts of 26% and 20%, respectively. The second study focused on private placements from 1997 to 2008 and resulted in mean and median discounts of 22% and 16%, respectively.

### Chaplinsky Purchase Discount and Warrant Study[48]

Susan Chaplinsky's and David Haushalter's 2010 study analyzed private placements with a concentration on contract terms. The study asserts that companies that are riskier and have poorer performance more commonly have private placement contracts with contingency terms rather than just offering a pure discount. The indicated mean discount considering only the purchase discount was 19%, and the median was 15%. The indicated mean discount considering purchase discounts as well as warrants was 17%, and the median was 14%.

### Brophy PIPE Study[49]

David J. Brophy, Paige P. Ouimet, and Clemens Sialm of the University of Michigan performed a 2006 study that compared the effects of issuing private placements to hedge fund investors versus other investors. The study indicated a mean discount of 14% when private placements were issued to hedge funds, but the mean discount when the issuance involved other investors was just 9%.

---

[46] Bruce A. Johnson, "Quantitative Support for Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 18, No. 4, December 1999, 152-155.

[47] John D. Finnerty, "An Average-Strike Put Option Model of the Marketability Discount," *The Journal of Derivatives*, April 19, 2012, 53-69.

[48] Susan Chaplinsky and David Haushalter, "Financing Under Extreme Risk: Contract Terms and Returns to Private Investments in Public Equity," *Review of Financial Studies*, 2010, 23 (7), 2,789-2,820.

[49] David Brophy, Paige Ouimet, and Clemens Sialm, "Hedge Funds as Investors of Last Resort?" workpaper, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=782791.

### Columbia Financial Advisors Study[50]

This study focused on the effect of the Rule 144 holding period reduction to one year. The study considered two periods: January 1, 1996, to April 30, 1997, and May 1, 1997, to December 31, 1998.  The one-year holding period became effective April 29, 1997.  A summary of the study results is presented in the following table.

**Summary of Columbia Financial Advisors Study**

|  | January 1, 1996 to April 30, 1997 | May 1, 1997 to December 31, 1998 |
|---|---|---|
| Number of Transactions | 23 | 15 |
| Low | 0.8% | 0.0% |
| Mean | 21.0% | 13.0% |
| Median | N/A | 9.0% |
| High | 67.5% | 30.0% |

### Meidan Study[51]

Danny Meidan's 2006 study observed PIPE transactions between 1996 and 2003.  The study categorized a total of 1,726 total private placement transactions into three groups: placements issued at discounts greater than 30%, placements issued between a 30% discount and 5% premium, and placements issued at a premium greater than 5%.  The majority of these transactions fell into the 30% discount to 5% premium category at 1,278 placements, or roughly 74% of the total sample.  The weighted average of the mean discounts was calculated as 9.8%.

### Verdasca Study[52]

Andrew Verdasca of the Leonard N. Stern School of Business of New York University performed a 2007 study on a sample of 771 private placement transactions.  The study found a discount range from a 78% discount to a 93% premium, but both the mean and median results indicated discounts of approximately 10%.

---

[50] Kathryn F. Aschwald, "Restricted Stock Discounts Decline as Result of 1-Year Holding Period," *Shannon Pratt's Business Valuation Update*, Vol. 6, No. 5, May 2000, 1-5.

[51] Danny Meidan , "The Informativeness of Offer Characteristics Versus Investor Identity in PIPE Transactions," April 2, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=894689.

[52] Andrew Verdasca , "Common Stock PIPE Discounts and Long-Term Performance," April 2, 2007, www.stern.nyu.edu/cons/groups/content/documents/webasset/uat_024319.pdf.

**FSD2025-0116**  CONCLUSION OF VALUE - SUBJECT INTEREST  **2025-08-19**

### Billett & Floros Study[53]

Matthew T. Billett and Ioannis V. Floros' 2012 study focuses on two key features of financial relationships, contract terms and investor identity, in regard to private placements between 2001 and 2008.  These factors were found to both complement and substitute for the other depending on individual circumstances.  By analyzing 12,004 transactions in the PlacementTracker and PrivateRaise databases, the study concluded a median discount of 26.7%.

### Stout Risius Ross Study[54]

Aaron M. Stumpf, CPA/ABV, Robert L. Martinez, and Christopher T. Stallman of the valuation firm Stout Risius Ross performed a study of restricted stock transactions from September 2005 through May 2010, focusing on discounts associated with shorter holding periods.  The chosen time period includes transactions both before and after Rule 144 implementation.  The study found that for all transactions considered, the average and median discounts were 10.9% and 9.3%, respectively.  Stout Risius Ross also found that the most significant and reliable factors influencing discounts were subject company volatility, block size, dividends, profitability, growth, and size.

### Harris-Trugman Study[55]

William Harris, AM of Trugman Valuation Associates, Inc.'s study was performed to analyze the impact of the economic recession on implied restricted stock discounts and the statistical relationships between implied restricted stock discounts and various company-specific variables.  The study originally included 80 transactions of restricted stock sales that took place in 2007-2008.  Due to the volatility of the Rule 144 holding period implementation, an additional 56 transactions were included in 2011.  For the 47 transactions that took place prior to Rule 144 implementation, the average and median discounts were 17.9% and 14.8%, respectively.  The 89 transactions analyzed after the rule implantation had average and median discounts of 15.9% and 14.3%, respectively.  The overall group indicated mean and median discounts of 16.6% and 14.3%, respectively.  The Harris-Trugman study noted that the only company-specific variable that had a notable statistical relationship with the implied discounts was volatility.

---

[53]  Matthew Billett and Ioannis Floros, "Do Investor Identity and Contract Terms Interact? Evidence From the Wealth Effects of Private Placements," workpaper, April 2012, papers.ssrn.com/sol3/papers.cfm?abstract_id=1784498.

[54]  Aaron Stumpf, Robert Martinez, and Christopher Stallman, "The Stout Risius Ross Restricted Stock Study: A Recent Examination of Private Placement Transactions From September 2005 Through May 2010," *Business Valuation Review*, Vol. 30, No. 1, Spring 2011, 36-48.

[55]  William Harris, "Trugman Associates, Inc. (TVA) Restricted Stock Study—An Update," *Business Valuation Review*, Vol. 30, No. 4, Winter 2011, 132-139.

**VALUE**SCOPE, LLC

**FSD2025-0116**

CONFIDENTIAL

Page 32

**2025-08-19**

TDIT005677

### Summary of Restricted Stock Studies

The restricted stock studies previously mentioned were performed based on data from 1966 to 2010.  Reported mean discounts range from 8.7% to 35.6%.  The average of reported mean discounts was 20.8%, while the median was 19.4%.   Reported median discounts range from 9.0% to 45.0%.  The average of reported median discounts was 19.9%, while the median was 15.3%.

Some of the variation in the studies has to do with the specific periods analyzed.  Prior to April 1997, the SEC-required holding period for restricted stocks was two years.  That was decreased to one year on April 29, 1997.  Similarly, the holding period was reduced from one year to six months effective February 15, 2008.

The following table shows the summary statistics for studies based upon the period studied.

**Analysis of Restricted Stock Studies for Different Periods**

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | Mean | Median |
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |
| | | |

721

The studies also cited several company and security specific factors in determining the estimated discount.

## PRE-IPO STUDIES

In recent years, a number of pre-IPO studies were performed to support marketability discounts. The methodology applied in these studies is based on the initial offering price (the price prior to public trading). This price is reduced by the price per share at the time of the last private transaction (which must be less than five months prior to the initial offering to qualify for the study) and adjusted by an appropriate index to account for related market or sector movements over the five-month period. The resulting amount is divided by the initial offering price to arrive at the appropriate discount. The pre-IPO methodology of determining marketability discounts is a relevant method as private stockholders experience an inability to freely sell their stock in the open market, similar to restricted stockholders. Furthermore, private stockholders differ from unrestricted public stockholders, much like restricted stockholders, because there is not a public forum in which investments can be easily liquidated (which is only one of the differences between private and public stockholders).

### *Emory Studies*

John Emory, Sr., ASA began his pre-IPO studies with Baird & Co. and continued his studies with his own firm, Emory Business Valuation, LLC. Emory has completed nine studies with the original published in June 1986. The first eight studies eliminated development-stage companies, companies with historical operating losses and companies with IPO prices less than $5 per share. The ninth study deviated from the previous studies as follows:

- Included only companies with "com" in their names

- Review period was increased from 18 months in the previous studies to 35 months

- All transactions were actual sales as opposed to the previous studies that included options

- Most of the companies did not have earnings

The study consisted of 53 transactions. The mean and median discounts by study are presented in the following chart.

**FSD2025-0116**  CONCLUSION OF VALUE - SUBJECT INTEREST  **2025-08-19**



### *Willamette Management Associates Pre-IPO Study*

This study observed 556 companies and 1,007 transactions from 1975 through 1997. The adjusted mean discount[56] for each time period varied from 28.9% to 56.8%. The mean for the entire review period was 44.2%. The median discount range was from 31.8% to 73.1% with the overall median at 50.4%. The Willamette study found the standard mean discount was greater than 35% for all but three of the 14 periods in the study and that median discounts exceeded 40% in all but one year.

### *Valuation Advisors Pre-IPO Study*

Two studies were conducted by Valuation Advisors for the calendar years of 1999 and 2000. The mean discount of these studies was 48.9%. The key feature of this study was the inclusion of holding period based upon the length of time between the private transaction and the IPO. The study confirmed the author's initial hypothesis that higher discounts accompany longer holding periods.

### APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST

While there are potential application problems associated with various studies, especially the pre-IPO studies, a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest. The mean and median discounts from the restricted stock studies ranged from 9% to 45%. The findings of the restricted stock studies as well as additional private placement studies by Hertzel and Smith suggest discounts can vary greatly depending on size, profitability and other company or security specific factors.

---

[56]   Excluded highest and lowest deciles of indicated discounts

**VALUE**SCOPE, LLC

**FSD2025-0116**

**CONFIDENTIAL**

Page 35

**2025-08-19**

TDIT005680

The latest restricted stock studies indicate mean and median marketability discounts in 14% range.  We view the latest restricted stock studies as shorter term and therefore have taken the full sample of restricted stock studies into account in our analysis.  Our analysis compares these interests to the comparable transactions and makes adjustments from the baseline discounts noted in the comparable transactions.  Since the latest one-year study does not measure restricted securities with similar hold periods relative to the vast majority of other discount studies and since it has a relatively small sample size, we relied upon all the restricted stock studies' findings as the basis for our comparison.

The pre-IPO studies may be less indicative of appropriate marketability discounts, as much of the differences in the transaction prices between pre-IPO and IPO may include event premiums, such as the securing of additional capital which promotes the viability of the company.  We did not use these studies for our analysis.

### Factors Affecting Marketability

Based on the SEC Study, we noticed that as company size and profitability decreases, the marketability discount associated with restricted stock in these companies increase.  We also note that various other factors affected discounts observed in the other studies.  Most notably, the following affect marketability discounts:

- Increase in dividend payment decreases marketability discounts
- Increase in the size of interest and amount of control decreases discounts
- Increase in financial strength of the company decreases discounts
- Increase in restrictions increases marketability discounts

Given the characteristics of size, lack of distribution history, etc., we concluded a 20.8% marketability discount, with a standard deviation of 8.2%, as the baseline observed from all the restricted stock studies we reviewed.

### DISCOUNT ADJUSTMENT DISCUSSION

In the following sections, we adjust the marketability discount to reflect the attributes of the Subject Interest.

The analysis originates with the baseline discount concluded in the previous section.  Then, our analysis reviews several factors that affect marketability for both the interests being valued and the comparable interest which provides the base of comparison.  Each interest is assigned a ranking from 1 to 5 (from Poor to Strong) based upon the respective feature.  Then, the feature ranking for the Subject Interest is subtracted from the feature ranking from the comparable interest.  This results in a range of outputs from -4 to +4

(from significantly worse to significantly better).  The output is then multiplied by the standard deviation of the restricted stock studies (lack of marketability) to give an indication as to the adjustment necessary to the baseline discount based upon this feature.  An importance factor (from low to high) is also attributed to each feature to provide a final scaling factor for the specific feature.

Once the individual feature scaling factors are computed, the baseline discounts are adjusted upward and downward by multiplying the baseline discount by the product of all relevant feature scaling factors.

## SUBJECT INTEREST DISCOUNT CALCULATION

### Adjustment Analysis – Marketability

The Subject Interest is characterized by a lack of rights and, is therefore, somewhat riskier and more volatile.  The Membership Interest has restrictions on the transfer of the interest and only have a claim in respect of the underlying assets in a winding up.

The 20.8% baseline lack of marketability discount of the comparable investments reflects the discount that would apply to the Subject Interest if it had illiquidity features similar to restricted stock.  Since the Subject Interest did not exhibit these exact characteristics, further adjustments were necessary to conclude fair market value.

Schedule C.3 summarizes the differences between the Subject Interest and the comparable investments used in our analysis.  Overall, these factors resulted in a modest decrease in the discount from the baseline.

Based on the analyses and procedures outlined herein, we concluded that a lack of marketability discount of 20.0% is appropriate for the Subject Interest.

725

**FAIR MARKET VALUE CONCLUSION**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**
**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | 20.0% | ($408,339) | *Schedule C.4* |
| **Value of Subject Interest, Minority, Non-Marketable** | | **$1,637,192** | |

Our conclusion of value implies an expected payback period of 1.27 years for the Subject Interest. Our conclusion of value is presented in the Summary Schedule as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report. We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information as well as on other data we developed. We have no obligation to update this report or our conclusion of value for information that comes to our attention after the date of this report.

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, LLC is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated.  They should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever.  Notwithstanding the foregoing, the valuation report and its contents may be disclosed to third parties, including potential investors, acquirers, and advisors, to establish the fair market value of the Company or in connection with transactions involving the Company, without requiring prior written consent from ValueScope, LLC.  Additionally, the Company may distribute this report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, LLC, and we shall have no responsibility for any such unauthorized change.

The valuation report has been prepared based on specific assumptions, methodologies, and data outlined herein.  This report may be used alongside other appraisals or studies for comparative or analytical purposes.  The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts.  The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, other than as expressly permitted herein, without the express written consent of ValueScope, LLC.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

**VALUE**SCOPE, LLC

FSD2025-0116

Page 39

2025-08-19

646

CONFIDENTIAL

TDIT005684

## OPERATIONAL ASSUMPTIONS

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

## COMPETENT MANAGEMENT ASSUMED

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership. This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

## NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement. If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, LLC must be made in advance. ValueScope, LLC reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s). We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

**VALUE**SCOPE, LLC

**FSD2025-0116**

Page 40

**2025-08-19**

647

**CONFIDENTIAL**

**TDIT005685**

**NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE**

No opinion is rendered as to legal fee or property title.  No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

**LIENS AND ENCUMBRANCES**

ValueScope will give no consideration to liens or encumbrances except as specifically stated.  We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks.  We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

**INFORMATION PROVIDED BY OTHERS**

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain.  All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

**PROSPECTIVE FINANCIAL INFORMATION**

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted.  Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA).  We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation guidelines.

CONFIDENTIAL    TDIT005686

### REGULATORY AND ENVIRONMENTAL CONSIDERATIONS

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

### POTENTIAL FUTURE SALES

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

**VALUE**SCOPE, LLC

**FSD2025-0116**

**CONFIDENTIAL**

Page 42

**2025-08-19**
649

TDIT005687

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided. An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time. Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

**INDEMNIFICATION BY THE COMPANY**

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement. Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement. In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

731

## APPRAISAL CERTIFICATION

I certify that, to the best of my knowledge and belief:

1.  We have not inspected certain assets, properties, or business interests encompassed by this appraisal.

2.  We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.

3.  We have no personal interest or bias with respect to the subject matter of this report or the parties involved.

4.  Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.

5.  To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.

6.  No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.

7.  The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.

8.  This report and analysis were prepared under the direction of Steven C. Hastings.

9.  I am in compliance with all professional appraisal certifications and licensing.

10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.

By:    ValueScope, LLC

Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, LLC

FSD2025-0116                                                                          2025-08-19

## APPENDIX A
### KEY COMPANY AGREEMENT PROVISIONS

1. With the meaning and for purposes of the Act, the purpose and scope of the Company shall include any lawful action or activity permitted to a limited liability company under the Act, as determined by the Manager. [Section 2.3]

2. Except as otherwise provided in this Agreement, Profits and Losses for each Fiscal Period shall be allocated as follow: (a) Profits shall be allocated among the Members in the following order and priority: (i) First, among the Members on a pro rata basis so as to reverse prior allocations of Losses for prior Fiscal Periods under Sections 4.1(b)(ii) until cumulative Profit allocated under this Section 4.1(a)(i) equals the cumulative Losses allocated under Section 4.1(b)(ii); and (ii) Second, among the Members in proportion to their Allocation Percentages. [Section 4.1(a)]

3. The Manager may at any time in its sole discretion to the extent the Company has cash and any property available for distribution taking into account current and anticipated needs (including without limitation operating expenses, debt service, guaranteed payments and a reserve for future operating costs), distribute such excess cash and any property available for distributions to the Members in accordance with their respective Allocation Percentages. [Section 5.1(b)]

4. Except as otherwise specifically provided in this Agreement, the Company and its business shall be managed, controlled and operated exclusively by the Manager, which shall be the "manager" of the Company within the meaning of Section 18-101 of the Act and shall have all of the powers and authority in respect of the Company permitted to managers under the Act. [Section 6.1]

5. The initial Manager shall be Mark Patrick. In the event that Mark Patrick dies or is unable to serve as such, the will or other testamentary documentation for Mark Patrick shall designate a successor Manager. To the extent that the will or other related documentation for Mark Patrick fails to provide for a successor Manager or if any such designated individual shall be unable or is unwilling to fill such position, the managing shareholder of Charitable DAF HoldCo, Ltd., shall appoint a successor Manager. To the extent that Mark Patrick desires to resign as Manager, he shall appoint his successor. [Section 6.2]

6. Notwithstanding any provision of this Agreement to the contrary, any contract agreement, deed, lease, note or other document or instrument executed on

VALUESCOPE, LLC                                                               Page A-1

behalf of the Company by a Manager shall be deemed to have been duly executed by the Company; no Member's signature shall be required in connection with the foregoing and third parties shall be entitled to rely upon the Manager's power to bind the Company without otherwise ascertaining that the requirements of this Agreement have been satisfied. [Section 6.3(a)]

7.  To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement the Manager is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the Manager shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in its "good faith" or under another express standard, the Manager shall act under such express standard and shall not be subject to any other or different standard. [Section 6.3(c)]

8.  Except as set forth in Section 6.2, no Member shall have any right to vote with respect to any Company action. [Section 6.4]

9.  To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing. [Section 6.5]

10. The Company shall maintain true and proper books, records, reports, and accounts in which shall be entered all transactions of the Company. The Company shall also maintain all schedules to this Agreement and shall update such schedules promptly upon receipt of new information relating thereto. Notwithstanding anything in Section 18-305 of the Act, except as provided in Section 6.8(b), no Member shall have any right to review or inspect any of the books or records of the Company or receive any other Company information. [Section 6.8(a)]

11. To the fullest extent permitted by law, a Member shall not Transfer all or any portion of its Interest without the prior written consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion. [Section 7.1]

12. No Member shall resign from the Company or otherwise cease to be a Member without the consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion. [Section 7.2]

13. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal amount of the Fair Market Value of such Member's Interest being redeemed, as determined by the Manager in its sole discretion. [Section 7.3]

14. There shall be no requirement of annual or periodic meetings of the Company's members or managers within the meaning of the Act. [Section 10.1]

15. Any action of the Manager may be taken by written consent of the Manager. Any consent or approval required by this Agreement to be "written" may also be made by the use of electronic transmission. [Section 10.2]

16. This Agreement may be amended, in whole or in part, only through a written amendment executed by the Manager. [Section 10.4]

## APPENDIX B
## QUALIFICATIONS OF THE APPRAISER

### *Steven C. Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA*
**Principal**
**shastings@valuescopeinc.com, 817-481-4901**

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

### EMPLOYMENT HISTORY

*2006 – Present*                                                              *ValueScope, LLC*

*Principal*

Mr. Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis. As a CPA with significant valuation and financial reporting experience, Mr. Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

*2001 – 2006*                                                                *Value Capital, LLC*

*Principal*

Mr. Hastings served as a principal with Value Capital, LLC. During his tenure at Value Capital Mr. Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries. He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions. His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000*                             *Finance Commission of Texas*

*Director*

The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner. As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets. Mr. Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations. He was

**VALUE**SCOPE, LLC                                                          Page B-1

CONFIDENTIAL                                                          TDIT005693

instrumental in assisting the Savings and Loan Department in writing new Mortgage Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001*                                                          *MedCare Financial Solutions, Inc.*

*President*

Mr.  Hastings served as an officer of MedCare Financial Solutions, Inc.  and MedCapital Funding Corporation.   MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers.   MedCare Financial Solutions provided other financial and operational services to health care providers.   These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending.   Mr.  Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

*1986 – 1994*                                                          *H.D.  Vest Financial Services*

*Executive Vice President and CFO*

As executive vice president and CFO of H.D.  Vest Financial Services, Mr.  Hastings assisted in placing over $1.5 billion annually in investment.  Responsible for day-to-day financial operations and capital structuring, Mr.  Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers.  Mr.  Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr.  Hastings supervised stockbrokers' and investment advisors' day-to-day activities.  As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies.  Being licensed in life, disability, health, property and casualty insurance, Mr.  Hasting was instrumental in implementing this line of business at HD Vest.

*1979 – 1986*                                                          *Arthur Andersen & Co.*

*Senior Manager*

Mr.  Hastings served as a senior manager with significant responsibilities in the several industries.  He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona

Bachelor of Science - Indiana University, Bloomington, Indiana

**CERTIFICATIONS AND LICENSES**

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

**ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS**

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

**RECENT IRS CASES - OFFICE OF CHIEF COUNSEL**

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.
- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C.  Docket No.  30515-09, Nancy Sue Hawk, Transferee, Petitioner v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.
- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C.  Docket No.  3030-14, Red River Ventures, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C.  Docket No.  1045-13, Estate of Jinana M.  Bowey, et al, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.
- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C.  Docket No.  8401-13, Estate of Edward S.  Redstone, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.
- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C.  Docket No.  223630-12, Michael Tricarichi, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C.  Docket No.  6936-10, et al, John M.  Alterman, et al, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No.  8097-13, *Sumner Redstone, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.*
- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No.  20177-11, *Richard H.  Cullifer, Petitioner, v.  Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.*
- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

**FSD2025-0116** **Page 743 of 1530** APPENDIX B: QUALIFICATIONS OF THE APPRAISER **2025-08-19**

**RECENT IRS CASES – LMSB AUDIT DIVISION**

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.
- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.
- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.
- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.
- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

**RECENT DEPARTMENT OF JUSTICE CASE**

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America. Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No. 4:16-cv-03302, ALPC Services of Texas, Inc. v. United States of America and Internal Revenue Service. Valuation issues report, 2017.
- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No. 12-844, *The Estate of David W. Longaberger v. The United States.* Valuation issues report, 2014.

**RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS**

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al. Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.
- Expert Report June 2018
- Deposition Testimony May 2019

VALUESCOPE, LLC

**FSD2025-0116**

Page B-5

**2025-08-19**

**659**

**CONFIDENTIAL**

**TDIT005697**

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al. Fraudulent transfer, solvency and economic damages.
- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.
- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No. CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al. Economic damages related to lost wages.
- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No. 2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.
- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No. 14-671C. Always at Market, Inc. v. United States of America (DOD/DOJ). Army & Air Force Exchange Service economic damages.
- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No. CV-05-1483, General Medicine, PC v. Healthsouth Corporation v. General Medicine, PC. Economic damages related to contract dispute.
- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

**CONFIDENTIAL** TDIT005698

**FSD2025-0116**    **Page 745 of 1530** APPENDIX B: QUALIFICATIONS OF THE APPRAISER    **2025-08-19**

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

 "Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International

## WHITE PAPERS

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v. Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

742

# SCHEDULES

CONFIDENTIAL

Case 19-34054-sgj11    Doc 4627-5    Filed 05/11/26    Entered 05/11/26 17:05:52    Desc
Exhibit 211 - Part 01    Page 735 of 759

**CDMCFAD, LLC**
**Table of Contents**                                    **Valuation Date: March 25, 2025**

| Table of Contents | |
|---|---|
| **Schedule Name** | **Schedule** |
| **Valuation Summary and Conclusion** | Summary Schedule |
| | |
| **Historical Financial Analysis** | |
| Historical Distributions Table | Schedule A.1 |
| Historical Distributions Charts | Schedule A.2 |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.3 |
| | |
| **Income Approach Analysis** | |
| Synthesis of Net Cash Flow | Schedule B.1 |
| Sensitivity Analysis - Hypothetical Risk-Free Bond | Schedule B.2 |
| | |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Restricted Stock Studies | Schedule C.1 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.2 |
| DLOM Qualitative Scoring | Schedule C.3 |
| Calculation of Marketability Discounts | Schedule C.4 |
| DLOM Footnotes and Comments | Schedule C.5 |

TDIT005701

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 736 of 759

| CDMCFAD, LLC | Summary Schedule |
|---|---|
| **Valuation Summary and Conclusion** | **Valuation Date: March 25, 2025** |

*Synthesis of Fair Market Value*

| Fair Market Value Summary | | Value | Reference |
|---|---|---|---|
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| **Value of Subject Interest, Minority, Non-Marketable** | | **$1,637,192** | |

TDIT005702

CONFIDENTIAL

Case 19-34054-sgj11    Doc 4627-5    Filed 05/11/26    Entered 05/11/26 17:05:52    Desc
Exhibit 211 - Part 01    Page 737 of 759

| CDMCFAD, LLC | Schedule A.1 |
|---|---|
| **Historical Financial Analysis** | **Valuation Date: March 25, 2025** |

*Historical Distributions Table*

| Quarterly Distributions - Previous 5 Years | |
|---|---|
| **Quarter** | **Total** |
| **31-Mar-19** | $90,750 |
| **30-Jun-19** | 90,125 |
| **30-Sep-19** | 84,875 |
| **31-Dec-19** | 553,300 |
| **2019 Subtotal** | **$819,050** |
| **31-Mar-20** | 62,750 |
| **30-Jun-20** | 66,500 |
| **30-Sep-20** | 65,500 |
| **31-Dec-20** | 424,300 |
| **2020 Subtotal** | **$619,050** |
| **31-Mar-21** | 77,625 |
| **30-Jun-21** | 91,375 |
| **30-Sep-21** | 97,375 |
| **31-Dec-21** | 568,075 |
| **2021 Subtotal** | **$834,450** |
| **31-Mar-22** | 104,125 |
| **30-Jun-22** | 116,125 |
| **30-Sep-22** | 112,750 |
| **31-Dec-22** | 635,950 |
| **2022 Subtotal** | **$968,950** |
| **31-Mar-23** | 107,875 |
| **30-Jun-23** | 102,750 |
| **30-Sep-23** | 106,625 |
| **31-Dec-23** | 633,631 |
| **2023 Subtotal** | **$950,881** |
| **31-Mar-24** | 106,467 |
| **30-Jun-24** | 105,127 |
| **30-Sep-24** | 106,202 |
| **31-Dec-24** | **TBD** |
| **2024 Subtotal** | **$317,796** |
| **Grand Total (2019 - 2024)** | **$4,510,177** |

Note: Payments are typically made two to three months following the end of each period.

TDIT005703

CONFIDENTIAL

2025-08-19

Page **750 of 1530**

FSD2025-0116

TDIT005704

FSD2025-0116

2025-08-19

**CDMCFAD, LLC**
**Historical Financial Analysis**

*Historical Distributions Charts*

**Schedule A.2**
**Valuation Date: March 25, 2025**



## Quarterly Distributions by Year



## Historical Annual Distributions

Note: Q4 2024 distributions have not yet been paid

CONFIDENTIAL

FSD2025-0116

2025-08-19

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 739 of 759

| CDMCFAD, LLC | Schedule A.3 |
|---|---|
| **Historical Financial Analysis** | **Valuation Date: March 25, 2025** |

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: | |
|---|---|---|
| | **9/30/2024** | |
| | **Actual** | **%** |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| | | |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| | | |
| **Total Assets** | 316,257,723 | 100.0% |
| | | |
| **Total Liabilities** | 47,204,916 | 14.9% |
| | | |
| **Total Equity** | 269,052,808 | 85.1% |
| | | |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

TDIT005705

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 740 of 759

**CDMCFAD, LLC**
**Income Approach Analysis**

**Schedule B.1**
**Valuation Date: March 25, 2025**

*Synthesis of Net Cash Flow*

| | | For the Projected Period Ending: | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
| Projected Distributions | | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ WACC = | 68.3% | *0.9663* | *0.8484* | *0.7449* | *0.6540* | *0.5742* | *0.5041* | *0.4426* | *0.3886* | *0.3412* | *0.2995* | *0.2630* | *0.2309* | |
| **Present Value (PV) Net Cash Flow** | | **$613,430** | **$90,926** | **$77,423** | **$69,593** | **$373,598** | **$55,377** | **$47,153** | **$42,384** | **$227,533** | **$33,726** | **$28,718** | **$25,813** | |

| | |
|---|---|
| PV net cash flow | $1,685,675 |
| PV residual value | $359,856 |
| **Value of Subject Interest, Minority, Marketable** | **$2,045,531** |
| Less: Discount for Lack of Marketability | |
| *(see schedule C.4)* | 20.0% |
| **Value of Subject Interest, Minority, Non-Marketable** | **$1,637,192** |

| Key Valuation Statistics | |
|---|---|
| CLO HoldCo Net Asset Value | $269,052,808 |
| Implied Discount for Lack of Control | 99.2% |
| Valuation as a % of NAV | 0.6% |
| Estimated Payback Period (Years) | 1.27 |

**Residual Value - Gordon Growth Model**

| | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 68.3% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 1.5x |
| Residual value : | $1,558,568 |
| x PV factor : | *0.2309* |
| PV residual value : | $359,856 |

CONFIDENTIAL

Case 19-34054-sgj11  Doc 4627-5  Filed 05/11/26  Entered 05/11/26 17:05:52  Desc
Exhibit 211 - Part 01  Page 741 of 759

| CDMCFAD, LLC | Schedule B.2 |
|---|---|
| Income Approach Analysis | Valuation Date: March 25, 2025 |

*Sensitivity Analysis - Hypothetical Risk-Free Bond*

|  |  | For the Projected Period Ending: | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
| Projected Distributions |  | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period |  | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 |  |
| PV Factor @ Risk Free Rate = | 4.7% | *0.9970* | *0.9858* | *0.9746* | *0.9636* | *0.9527* | *0.9420* | *0.9313* | *0.9208* | *0.9104* | *0.9001* | *0.8899* | *0.8799* |  |
| **Present Value (PV) Net Cash Flow** |  | **$632,896** | **$105,644** | **$101,300** | **$102,540** | **$619,894** | **$103,473** | **$99,219** | **$100,433** | **$607,158** | **$101,348** | **$97,180** | **$98,370** |  |

| | |
|---|---|
| PV net cash flow | $2,769,456 |
| PV residual value | $41,969,350 |
| **Value of Subject Interest, Minority, Marketable** | **$44,738,806** |
| Less: Discount for Lack of Marketability | 20.0% |
| *(see schedule C.4)* | |
| **Value of Subject Interest, Minority, Non-Marketable** | **$35,807,821** |

| Key Valuation Statistics | |
|---|---|
| CLO HoldCo Net Asset Value | $269,052,808 |
| Implied Discount for Lack of Control | 83.4% |
| Valuation as a % of NAV | 13.3% |
| Estimated Payback Period (Years) | 26.53 |

### Residual Value - Gordon Growth Model

| | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 4.7% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 46.5x |
| Residual value : | $47,699,415 |
| x PV factor : | *0.8799* |
| PV residual value : | $41,969,350 |

TDIT005707

669

CONFIDENTIAL

FSD2025-0116

TDIT005708

FSD2025-0116

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 742 of 759

2025-08-19

2025-08-19
670

**CDMCFAD, LLC**
**Discount for Lack of Marketability (DLOM) Analysis**

Schedule C.1
**Valuation Date: March 25, 2025**

*DLOM Determination - Restricted Stock Studies*

| | Name of Study | Study Date | From | To | Sub-Sample | Observations | Reported Mean | Reported Median |
|---|---|---|---|---|---|---|---|---|
| | **Restricted Stock Studies** | | | | | | | |
| | | | **Period Covered** | | | | | |
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

CONFIDENTIAL

FSD2025-0116

2025-08-19

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 743 of 759

| CDMCFAD, LLC | Schedule C.2 |
|---|---|
| **Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: March 25, 2025** |

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | **Mean** | **Median** |
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |

TDIT005709

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 744 of 759

| CDMCFAD, LLC | | | | | Schedule C.3 |
|---|---|---|---|---|---|
| **Discount for Lack of Marketability (DLOM) Analysis** | | | | | **Valuation Date: March 25, 2025** |

*DLOM Qualitative Scoring*

| Feature | Restricted Stock | Rating | Discount for Lack of Marketability (DLOM) Analysis | Rating | Advantage |
|---|---|---|---|---|---|
| Asset liquidity | Securities examined in marketability studies often are of smaller industrial operating companies, often with poor cash flows. | Fair | A majority of investments are in illiquid securities with poor cash flows. However, CLO HoldCo has approximately $91 million in net cash, representing approximately 34% of net asset value. | Strong | Better |
| Cash flow expectations | Restricted securities typically have a lower likelihood of paying dividends since they are associated with emerging companies. | Fair | Distributions are entirely dependent on manager discretion as to the timing and amount. Distributions are not required. However, regular distributions have been made over the last five years. | Good | Slightly better |
| Contingent liabilities | Moderate probability of contingent liabilities depending on type of company and size.  Smaller companies can fall prey to securities litigation. | Fair | Higher probability of contingent liabilities. CLO HoldCo has been engaged in numerous litigation matters. | Weak | Slightly worse |
| Debt capacity | Company leverage is usually on the higher side, as they are typically in the emerging stage. | Weak | CLO HoldCo has a small amount of debt representing 15% of net asset value. | Good | Better |
| Redemption/ withdrawal | No redemption rights. | Poor | No redemption rights. | Poor | Equal |
| Transfer restrictions | Transfer restrictions are limited to securities laws, with holding periods of two years.  Holding period was shortened to one year in 1997, but studies generally relate to two year holds. Once the restriction time period is complete, no restrictions on transfer exist. Markets are liquid for non-restricted shares. | Fair | Transfers must be approved by the managers. | Poor | Worse |
| Value of entity | Companies range in size, however, restricted securities are more commonly utilized by smaller companies in the development stage. Approximately 50 percent of the companies issuing restricted stock included in the Silber study had sales less than $40 million. | Fair | Members have extremely limited rights to the underlying net asset value. CLO HoldCo is expected to generate revenue well in excess of the expected distributions. | Good | Slightly better |
| Value of interest | Purchasers of restricted securities tend to be institutional or private investors that are active in the public markets.  The analysis associated with these types of securities precludes small holders from purchasing. Size of interests tend to be moderate. | Fair | At the manager's discretion, members may be diluted through the issuance of additional membership interests to non-existing members. | Poor | Worse |

TDIT005710

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-5   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 - Part 01   Page 745 of 759

| **CDMCFAD, LLC** | | | | | | **Schedule C.4** |
|---|---|---|---|---|---|---|
| **Discount for Lack of Marketability (DLOM) Analysis** | | | | | | **Valuation Date: March 25, 2025** |

*Calculation of Marketability Discounts*

| Feature | Net Advantage | Gross Adjustment | Importance | Weight | Adjustment | Scaling Adjustment | Final Adjustment |
|---|---|---|---|---|---|---|---|
| | | | | | | F = 1+E or | |
| | A (Schedules B) | B = F(A) | C | D = F(C) | E = B x D | 1/(1-E) | |
| **Marketability Factors** | | | | | | | |
| Asset liquidity | Better | -16% | High | 100% | -16% | 86% | -2.9% |
| Cash flow expectations | Slightly better | -8% | High | 100% | -8% | 92% | -1.4% |
| Contingent liabilities | Slightly worse | 8% | High | 100% | 8% | 108% | 1.4% |
| Debt capacity | Better | -16% | Low | 25% | -4% | 96% | -0.7% |
| Redemption/ withdrawal | Equal | 0% | High | 100% | 0% | 100% | 0.0% |
| Transfer restrictions | Worse | 16% | High | 100% | 16% | 116% | 2.8% |
| Value of entity | Slightly better | -8% | Medium | 50% | -4% | 96% | -0.8% |
| Value of interest | Worse | 16% | Low | 25% | 4% | 104% | 0.8% |
| **Net Scaling Adjustment** | **G = Product (F$_i$), i = 1 to n** | | | | | **96%** | **-0.8%** |
| | | | | | | | |
| **Marketability Discount** | | | | | | | |
| Unadjusted discount | H (See Report) | | | | 20.8% | | |
| Scaling adjustment | G (See above) | | | | 96% | | |
| **Concluded Marketability Discount** | **I = G x H** | | | | **20.0%** | | |

TDIT005711

CONFIDENTIAL

| CDMCFAD, LLC | Schedule C.5 |
|---|---|
| **Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: March 25, 2025** |

*DLOM Footnotes and Comments*

**A)** Our comparison matrix ranks the features of the Subject Interest and the comparable interests on a scale from 1 to 5.

1 = Poor  2 = Weak  3 = Fair  4 = Good  5 = Excellent

We then subtract the Subject Interest feature score from the comparable feature score to determine the advantage.

0 = Equal  1 = Slightly Better  2 = Better  3 = Much Better  4 = Significantly Better
-1 = Slightly Worse  -2 = Worse  -3 = Much Worse  -4 = Significantly Worse

**B)** B is calculated as the weighted average standard deviation of the comparable investments in closed end funds multiplied by the Advantage Score.

**C)** The importance of the feature is assessed.

1 = Low  2 = Medium  3 = High

**D)** Weights are allocated as follows:

Low = 25%  Medium = 50%  High = 100%

**E)** To compute the adjustment, B is multiplied by D.

**F)** The scaling adjustment is computed as 1+E if E > 0 or 1/(1-E) if E < 0 for the particular feature.

**G)** The net scaling adjustment for marketability factors is the product of all marketability features' scaling adjustments.

**H)** This is the concluded baseline marketability discount determined for comparable investments.

**I)** This is the baseline marketability discount multiplied by the scaling factor.

Case 19-34054-sgj11  Doc 4627-5  Filed 05/11/26  Entered 05/11/26 17:05:52  Desc
Exhibit 211 - Part 01  Page 746 of 759

**FTI CONSULTING**

# Memorandum

---

TO: **Charitable DAF Holdco, Ltd**

FROM: **FTI Consulting**

DATE: **27 March 2025**

RE: **Discounts relating to participation shares**

---

PRIVILEGED AND CONFIDENTIAL

## 1. Introduction

1.1 Charitable DAF Holdco, Ltd ("**DAF**") is a Cayman Islands registered company formed in 2011. We understand DAF invests in real estate, hedge funds, and money market funds.

1.2 DAF's share classes comprise: (i) Management Shares; and (ii) Participating Shares. The 100 Management Shares are solely held by Mark Patrick ("**Mr Patrick**"), a director of DAF at all relevant times.[1] In respect of the Participating Shares:

(1) 305 Participating Shares had been issued as of 30 September 2024 (the "**Valuation Date**").[2] These were held by: (i) Highland Dallas Foundation, Inc; (ii) Highland Kansas City Foundation, Inc., (iii) Highland Santa Barbara Foundation, Inc., and (iv) The Community Foundation of North Texas. We understand that these companies are all "Support Organizations" for nonprofit charities, except for The Community Foundation of North Texas which is a nonprofit charity itself;

(2) 623 Participating Shares had been issued as of 11 February 2025 following the Board's resolution on 7 February 2025 ("**Feb 2025 Resolution**"). Under the Feb 2025 Resolution, 318 new Participating Shares were issued to DFW Charitable Foundation (a nonprofit charity). We understand that the number of Participating Shares held by each of the other parties in point (1) above has not changed.

1.3 Holders of Participating Shares may, from time to time and subject to the Directors' sole discretion, receive cash distributions from DAF to fulfil their charitable goals. As we explain further in this memo, the rights conferred to the Management Shares and Participating Shares are significantly different.

---

[1] Paul Murphy is the other director of DAF. Based on our discussion, we understand that Mr Patrick is the main decision maker.

[2] Valuescope Report, page 7.

200 Aldersgate | Aldersgate Street | London EC1A 4HD
T: +44 (0)20 3727 1000 | F: +44 (0)20 3727 1007 | fticonsulting.com

FTI Consulting LLP. Registered in England and Wales at the above address. Registered number OC372614, VAT number GB 815 0575 42.
A full list of Members is available for inspection at the registered address.



1.4 Valuescope, Inc prepared a report dated 7 January 2025 (the "**Valuescope Report**") for Mr Patrick.[3] Valuescope's scope was to perform a valuation of the fair market value of 100 Participation Shares of DAF as of the Valuation Date, and they conclude on a value of US$ 76m as summarised in the table below.

**Table 1-1: Summary of Valuescope's conclusions**

| | | |
|---|---|---|
| DAF's net asset value ("**NAV**") | [a] | US$ 269.05m |
| Participation Shares outstanding | [b] | 305 |
| **NAV per share** | **[c] = [a]/[b]** | **US$0.88m** |
| Discount for lack of control | [d] | 8.1% |
| Discount for lack of marketability | [e] | 6.3% |
| Subject shares | [f] | 100 |
| **FMV of subject shares** | **[g] = [c] x (1-[d]-[e]) x [f]** | **$75.96m** |

*Source: Valuescope Report, page 4.*

### FTI's scope

1.5 We have been asked to prepare a memorandum setting out our indicative view of the discount applicable (if any) in assessing the fair market value of Participating Shares by considering: (i) how the rights associated with the Participating Shares differ from the rights typically associated with ordinary shares in a company; and (ii) the impact of the existence of an additional share class (being the management shares owned by Mr Patrick).

1.6 We understand the above issues have not been considered by Valuescope in their report. That is, we assume that Valuescope's conclusions are based on a valuation of 100 Participating Shares as if they confer rights that are typically attached to a minority holding of ordinary shares in a private company.

1.7 As we explain in this memorandum, we consider that the rights conferred to Participating Shares are extremely limited, and the potential distribution of cash flows is highly dependent on whether the shareholder's specific circumstance is aligned with the mission of DAF. As a result, we expect:

(1) a limited discount due to lack of control and marketability (i.e., close to the range concluded by Valuescope) if the shareholder is fully aligned with the mission of DAF; and

(2) a high discount due to lack of control and marketability for a shareholder who is not aligned with the mission of DAF of over **95%** to be applicable. The reason for not fully discounting the value is that there may be some option value to the shareholder if, with the passage of time, the interests of the Managing Shareholder become aligned with the shareholder's interests.

---

[3] We understand that Valuescope provides quarterly updates of such report.

Privileged and Confidential

### Limitations and restrictions

1.8 We understand that this memo will be used by the DAF in order to assist it in the context of understanding how a valuation expert may assess the discount referenced in 1.5. It is understood that this analysis is indicative in nature and should not be used to support a transaction. This memo does not constitute: (i) our views on the value of any Participating Shares; and/or (ii) financial or tax advice on the fair value (or any other basis of value) of such shares. It should not be relied upon for any other purpose other than that as stated.

1.9 It is not within our scope to verify or assess the accuracy of any financial information of DAF, including its NAV (as provided in the Valuescope Report or otherwise). We do not opine on matters of law. If any of our assumptions regarding legal matters change, then our opinion may change.

1.10 This memorandum is confidential. It should not be used, reproduced or circulated for any other purpose, in whole or in part, without our prior written consent.

### Structure of memorandum

1.11 In the remainder of this memorandum, we:

(1) summarise our understanding of the history and structure of DAF relevant to our assessment. This is set out in Section 2;

(2) explain whether the rights of holders in Participating Shares materially affects the value of the shares compared to ordinary shares. This is set out in Section 3 below; and

(3) conclude on the discount applicable in valuing the Participating Shares. This is summarised in Section 4 below.

3/14

**CONFIDENTIAL** **677**

TDIT005715

## 2. Our understanding of DAF's history and structure

2.1 We have the following understanding from Mr Patrick in relation to DAF's history and current position, in respect of: (i) intent of the shareholding structure; (ii) dividend distribution policy; and (iii) the assets that are held by DAF and its reported NAV. We summarise our understanding of these topics in turn below.

### Intent of the shareholding structure

2.2 DAF is set up in a structure such that the Participating Shareholders (i.e., nonprofit organisations) hold a passive economic, non-voting interest. The Participating Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed – we understand that any attempts to do so may be regarded as a criminal offense by the IRS or result in significant tax liabilities.

2.3 The foregoing tax issues and structure is the primary reason for the separation of control between Participating Shares (holders of which have very limited rights as described further in Section 3) and the Management Shares (holders of which have effective control over DAF). That is, the holder of the Management Shares needs to exercise independence and act on an arms' length basis to the holders of the Participating Shares and their affiliates.

### CDMCFAD LLC

2.4 As at February 2025, DAF holds a 100% of CDMCFAD LLC (the "**Delaware LLC**"), a Delaware limited liability company, which in turn owns a 100% LP interest in Charitable DAF Fund, LP. Mr Patrick is the Manager of the Delaware LLC.[4]

2.5 We understand that Mr Patrick, as the Manager of the Delaware LLC, has similar rights to the Delaware LLC as he does to DAF. Therefore, we consider the discount applicable to the shares in Delaware LLC to be the same as the discount we estimate for the Participation Shares.

2.6 We understand that no specific arrangements in the LLC agreement are considered to be extraordinary. In this context, we note that the discount applicable when determining the value of the DAF shares (which is based on the value of CLO Holdco, Ltd) should only consider the discount we estimate as applicable to the Participation Shares (as opposed to discount applicable to the Participation Shares multiplied by the discount applicable to the Delaware LLC shares).

### Dividend distribution policy

2.7 When DAF was created in 2011, it was roughly targeting US$ 3m to 4m of annual distributions. It has done so until around 2019. From 2019, DAF became involved in a legal dispute, and the quantum of distributions has declined.[5]

---

[4] 2025.02.12 DAF Structure Chart.

[5] We have not received details supporting the figure of historical distributions by DAF.

759

**FTI CONSULTING**

2.8 Going forwards, we understand that DAF has recently wrote its charitable mission into its corporate documents. The Directors of DAF aim to use and distribute DAF's funds to organisations that are aligned DAF's charitable mission, which may include educational and communal projects.

### Assets held by DAF

2.9 We understand that, in addition to cash and liquid assets (such as money market type funds), DAF holds CLOs and real estate assets. We provide a snapshot of the assets as at 30 September 2024, as shown in the Valuescope Report.

5/14

### Figure 2-1: NAV reported by DAF as of 30 September 2024

| | 9/30/2024 Actual | % |
|---|---|---|
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| Total Current Assets | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Highland CLO Funding, Ltd. | 10,002,234 | 3.2% |
| Highland CLO Funding, Ltd. (Participation Rights) | 69,385 | 0.0% |
| MidWave Common | 1,640,571 | 0.5% |
| MidWave - Term Loan A | 85,552,571 | 27.1% |
| MidWave - Term Loan C | 40,174 | 0.0% |
| NexPoint Capital, Inc. (BDC) | 14,223,433 | 4.5% |
| NexPoint Real Estate Strategies Fund Z | 8,487,030 | 2.7% |
| NexPoint Real Estate Finance (NREF) | 6,174,381 | 2.0% |
| NexPoint Residential (NXRT) | 2,338,207 | 0.7% |
| NexPoint Diversified Real Estate (NXDT) | 2,331,025 | 0.7% |
| Small Bay II (Class I) | 3,770,609 | 1.2% |
| Small Bay II (Class II) | 4,047,276 | 1.3% |
| Small Bay II (Class III) | 2,357,682 | 0.7% |
| Polo Glen | 678,545 | 0.2% |
| NHT Holdco | 109,056 | 0.0% |
| ACHC | 158,525 | 0.1% |
| COLL | 115,804 | 0.0% |
| HRTX | 10,945 | 0.0% |
| ACRG/AU | 3,267 | 0.0% |
| ACRG/BU | 1,409 | 0.0% |
| TGTX | 333,308 | 0.1% |
| TMO | 282,686 | 0.1% |
| BIO | 111,081 | 0.0% |
| iHeart Communications | 365 | 0.0% |
| Multi Strat | 107,324 | 0.0% |
| Crusader Fund II, Ltd. | 38,131 | 0.0% |
| BVP Property | 94,000 | 0.0% |
| NCI Apache Trail | 1,104,000 | 0.3% |
| NCI Fort Worth Land | 874,200 | 0.3% |
| NCI Royse City Land | 11,448,367 | 3.6% |
| NCI Stewart Creek | 1,250,000 | 0.4% |
| NLA Assets | 1,766,000 | 0.6% |
| FPWM | 2,541,184 | 0.8% |
| SRG | 139,500 | 0.0% |
| SRTY | 2,380,529 | 0.8% |
| SQQQ | 1,818,805 | 0.6% |
| SPXU | 2,174,013 | 0.7% |
| Serengeti | 2,951,678 | 0.9% |
| Conservation Equity Fund | 3,253,139 | 1.0% |
| MMPQ | 527,460 | 0.2% |
| Total Wire Convertible Promissory Note | 20,560 | 0.0% |
| Sable Permian Resources | 2 | 0.0% |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

*Source: Valuescope report, page 46.*



2.10    We understand that the NAV in the snapshot above is unlikely to reflect updated market value of the assets. For example, some real estate assets are reported at historical cost, which are dated and would not reflect their market values as at the reporting date.

2.11    Valuescope applies two discounts to the reported NAV of $269m in their valuation:

(1)    a 8.1% discount for lack of control. This is calculated by reference to the average discount in traded close-end funds against their reported NAV; and

(2)    a 6.3% discount for lack of marketability. This is calculated as the average of: (i) 2.8%, calculated using a put option approach; and (ii) 9.7%, based on findings of studies on restricted stocks.

2.12    We understand from you that Valuescope has not considered the rights of the Participating Shares in their assessment of the above discounts. That is, Valuescope valued the Participating Shares as if they confer rights that are typically attached to a hypothetical minority holding of ordinary shares in a private company.

2.13    The studies and approaches considered by Valuescope are commonly referred to in valuations in the context of tax reporting in US. We consider that other approaches may be used and further adjustments may be required to reflect the circumstance of DAF's history (even in respect of valuing a hypothetical ordinary share).[6] However, it is not within our scope to review and/or adjust Valuescope's assessment.

---

[6]    Further, the discount to NAV observed in traded close-end funds may not necessarily reflect a 'lack of control'. Such discounts may be due to the assumptions regarding the yield curve and other assumptions used by the fund in determining its NAV.

762

Privileged and Confidential

## 3. Participating Shareholder Rights

3.1   In this section, we discuss the rights of the holders in Participating Shares, specifically in respect of:

(1)   the issuance of new shares;

(2)   dividends;

(3)   voting and the appointment and removal of directors;

(4)   share transfers;

(5)   share redemption; and

(6)   the access to information.

3.2   The analysis of these rights is based on information you have provided to us.

3.3   At the outset, we note an overarching point relating to the Participating Shares. That is, we understand from you that Directors will act according to the best interest of the company, that is, to achieve the charitable causes that are aligned with DAF's mission. We understand that the Directors acting in the best interests of the company is generally regarded as the interests of the members as a whole and in certain circumstances the object of the company may be taken into account when determining what is in the best interests of the company. In preparing this note, we have assumed, as agreed with you, that Directors acting in the best interests of the company relates to the interests of the members, and ensuring charitable causes are served, in alignment with, as we understand it, DAF's mission.

### (1) Issuance of new shares

3.4   We understand that Participating Shareholders do not have: (i) the right to vote on the issuance of further Participating Shares; (ii) pre-emption rights; or (iii) the right to receive notice of such issuance.

3.5   In accordance with the Articles, DAF's Directors may unilaterally issue additional Participating Shares and thereby dilute the power of existing shareholders. On 7 February 2025, through the Board's resolution, DAF issued 318 new Participating Shares (reflecting 51% of all outstanding Participating Shares) to DFW Charitable Foundation, thereby diluting the power of other shareholders.

3.6   Based on the above, we understand that the Participation Shares can be diluted (without corresponding price or compensation paid to existing shareholders) without approval from any shareholders. This introduces a high uncertainty to the value of such shares. Such risks of dilution (without compensation) in the Participating Shares would therefore be materially higher than ordinary shares in typical companies, which confer rights to block such dilution.

8/14


### (2) Dividends

3.7    In respect of the timing and amounts of dividends in Participation Shares, DAF's Directors have "*sole and absolute discretion*" to declare dividends "*without a requirement to pay such dividends on a pro-rata basis*".

3.8    We understand from you that Participating Shareholder do not have

- the right to cause or vote on distributions;

- the right to pro rata distributions based on their shareholding;

- the right to annual or timed distributions; or

- the right to receive notice of distributions to other Participating Shareholders.

3.9    With respect to these four points, we have regard to the UK 'Model Articles for private companies limited by shares' as a guide to what would be considered typical rights to ordinary shareholders in respect of dividends.[7][8]

(1)    **Cause or vote on distributions**. Dividends may be declared 'by ordinary resolution'. A dividend must not be declared unless the directors have made a recommendation for such amount. Therefore, whilst ordinary shareholders typically have a final vote on distributions, it is expected that such dividends need to be recommended by the director in the first place. In the context of DAF, the lack of rights to cause or vote on distributions may not merit a significant discount because of the common reliance placed on the directors' recommendation.

(2)    **Pro rata distributions**. Under the UK's model articles: "*Unless the shareholders' resolution to declare or directors' decision to pay a dividend, or the terms on which shares are issued, specify otherwise, it must be paid by reference to each shareholder's holding of shares*".[9] The default position of ordinary shareholder is that they would receive dividends on a pro rata basis (by reference to each shareholder's holding of shares). Alternatively, if the terms of shares allow, or that there would be a shareholders' resolution, there may be non pro rata distributions. However, in our experience we expect the extent of the disproportionate distribution to be clearly defined in the company's articles or shareholder's agreement (e.g., Shareholder A gets 10% voting rights but 50 % access to dividends).

---

7    We understand that in Cayman Islands, the companies act is designed to be flexible so that the memorandum and articles can be tailored to meet the requirements of the company. Therefore we have chosen the UK's guide as that would be more informative of the expectations of a 'typical ordinary shareholder'.

8    https://www.gov.uk/government/publications/model-articles-for-private-companies-limited-by-shares/model-articles-for-private-companies-limited-by-shares#declaringdividends

9    See also UK government's guide on directors' duties, stating that "*You must usually pay dividends to all shareholders.*" https://www.gov.uk/running-a-limited-company/print

9/14



Privileged and Confidential

In the context of DAF, we consider that the discount relating to the uncertainty of dividends is high, given that: (i) the directors have the sole discretion to issue dividends without the Participating Shareholders' approval; and (ii) the terms do not specify to the extent of the potential non pro rata distribution, such that the uncertainty arises for each dividend payment.

(3) **Annual or timed distributions**. This is not a typical right attached to ordinary shareholders (such characteristic may be more prevalent in preference shares). We therefore do not consider this to merit additional discount.

(4) **Right to receive notice of distributions to other shareholders.** In itself, this right is not valuable if the shareholders are expected to receive a pro rata dividend (or are clear about the extent of disproportion of their dividends), as they can calculate the dividends received by each shareholder. It is only the uncertainty of non pro rata distributions (i.e., point 2 above) which means this right may be useful. We therefore do not consider any additional discounts applied based on point 2 above.

3.10 As above, since 2019, DAF has continued to make distributions, albeit of a reduced quantum. Therefore, in respect of the Participating Shareholder, there is a high uncertainty regarding: (i) whether its charity goals are aligned with DAF's mission such that it would receive distributions (this may change over time but also appears binary at any given date); (ii) the timing of any future cash flows; and (iii) the relevant amount of such cash flows.

3.11 We understand that the Participating Shareholders' only right to DAF's assets is in the situation where DAF gets wound up.[10] We understand that the Participating Shareholders have the right to seek a winding up of the company, as conferred upon them by the Companies Act. However, it is not clear whether the court would approve the winding up of the company. We understand that if the company is acting in a manner consistent with its articles then the winding up petition is unlikely to be successful.

3.12 Given the differences to rights that are typically attached to ordinary shareholders as explained above, we consider that a very material discount to be applicable.

### (3) Voting and the appointment and removal of directors

3.13 Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the company. Further, the right to appoint or remove directors is held by the Management Shareholder.

3.14 The above rights are typically granted to ordinary shareholders. In this regard, the Participating Shares are similar to typical 'preferred shares' or non-voting shares. This can be considered as a lack of control over the company's operations or investments.

---

[10] Article 121 to 123, Memorandum and articles of association.

**FSD2025-0116**  **Page 769 of 1530** 2025-08-19

Privileged and Confidential

3.15    Normally, the discount applied to non-voting rights is relatively low (valuers typically consider a range of 3-5%[11]). This is because this risk, generally labelled as corporate governance risk, is somewhat contained by the directors' duties to act in the best interest of the shareholders. For example, the UK companies act requires a director of a company to act in the way he or she considers, in good faith, would "*most likely promote the success of the company for the benefit of its members as a whole*" and having regard to "*the need to act fairly as between members of the company*."[12]

3.16    We understand that the above is not fully applicable to DAF, given the Articles of the company and that its Directors only need to act to promote its charitable mission without any influence exerted by the holders of the Participating Shares.[13]

3.17    In our view, the lack of rights to appoint or remove directors would merit a discount that would be more material than the usual discounts considered for a lack of voting rights.

### (4) Share transfer

3.18    DAF's Directors may require the transfer of Participating Shares if it comes into notice that such shares are held by a Restricted Person, i.e., a person in breach of laws and regulations or in the Directors' opinion might result in DAF incurring liabilities or suffering penalties.

3.19    Given that such transfer happens only in cases relating to potential threats to the company (including legal threats), we understand that this clause offers protection to DAF's operations. Therefore, additional discounts to the Participating Shareholders may not be applicable, unless there is doubt as to the Directors' judgement, which is discussed in the topic of appointment and removal of directors above.

### (5) Redemption of shares

3.20    Participating Shares are defined as non-redeemable shares. We therefore do not consider discounts relating to this feature in respect of the Participating Shares.

3.21    To the extent that CDMCFAD LLC shares are redeemable, given the potential dilution and no guarantee to a pro rata cash distribution rights (as explained above), we have not considered any additional discount to be applied on this factor. That is, we consider that the discount applied to the factors above would also cover the risk of redemption.

---

[11]   See, e.g., BVR's guide to discounts for lack of marketability, page 281; and Stanford Law Review (2019), Nonvoting Shares and Efficient Corporate Governance, page 44.

[12]   https://www.legislation.gov.uk/ukpga/2006/46/section/172

[13]   As explained above, the attempt to exert influence may be a criminal tax offense.

11/14


### (6) Access to information

3.22   Participating shareholders have limited information rights (except those as conferred by law or authorised by the Directors). Specifically, the articles do not provide the Participating Shareholders with the following: (i) the right to inspect any account; (ii) the right to inspect any book; or (iii) the right to inspect any document of the Company.

3.23   The lack of information creates uncertainty to the shareholder. However, we understand that the shareholders have quarterly financial reports that provide basic access to the company's financial information but are not entitled to further information except as provided at the discretion of management. For the purpose of a valuation of the Participating Shares' fair market value based on its NAV - which we understand to be accurate for the purpose of our exercise - a discount may not be applicable (or in any case would be covered under the lack of control).


## 4.    Discounts applicable in valuing the Participating Shares

4.1    The table below summarises our view of the materiality of each factors in considering the value of Participating Shares as discussed in Section 3.

**Table 4-1 Materiality of rights in Participating Shareholders in valuation**

|  | **Materiality (in principle)** |
|---|---|
| Issuance of new shares | Very material due to potential dilution effect |
| Dividends | Very material due to no rights for pro-rata distribution, and uncertainty as to alignment with mission of DAF |
| Voting and change in Directors | Material due to uncertainty as to alignment with mission of DAF |
| Share transfer | Limited |
| Share redemption | None for Participating Shares. Potentially material for CDMCFAD LLC; however discount would be covered in the discount due to lack of control over issuance of new shares and rights to dividends |
| Access to information | Very limited – has certain access conferred by law |

4.2    Judge Laro's comments in *Mandelbaum v Commissioner* on discount for lack of marketability is often referred to by valuation practitioners determining discounts for lack of marketability:

> *"Ascertaining the appropriate discount for lack of marketability is a factual determination.  Critical to this determination is an appreciation of the fundamental elements of value that are used by an investor making his or her investment decision."*

4.3    The list of issues that Judge Laro went on to cite as important in a determination of the discount are now commonly referred to as the "Mandelbaum factors", which are broadly summarised as:

(1)    Financial statement analysis

(2)    Dividend policy

(3)    Nature of the company (history, position in industry, economic outlook)

(4)    Company's management

(5)    Amount of control in the transferred shares

(6)    Restrictions on transferability of stock

(7)    Holding period for stock

(8)    Company's redemption policy